Daniel D. Maynard, No. 009211
dmaynard@mmcec.com
Mary K. Plomin, 032368
msplomin@gmail.com
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | No. CR 15-00707-PHX-SRB |
| Plaintiff, | **DEFENDANT'S MOTION TO PRECLUDE OR LIMIT EXPERT TESTIMONY AND MEMORANDUM OF LAW IN SUPPORT** |
| v. | |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

Defendant, Abdul Malik Abdul Kareem ("Abdul Kareem"), by and through undersigned counsel, files this Motion to Preclude or Limit Expert Testimony and Memorandum of Law in Support (the "Motion").

## Introduction

This motion is submitted on behalf of Abdul Kareem ("Abdul Kareem") pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 526 U.S. 579 (1993), and Rules 702, 703, 401, 402, and 403, Fed.R.Evid., and the Fifth and Sixth Amendments to the U.S. Constitution, to preclude or limit the projected testimony of Evan L Kohlmann ("Kohlmann"), for whom the government has provided notice to the defense as a proposed government expert witness at trial.

As detailed below, Kohlmann's testimony does not qualify for admission under the panoply of applicable federal rules and/or constitutional provisions and should be precluded because he and/or his testimony:

(1) are not a proper means or form of expert testimony because his proposed testimony, as reflected in his expert report, is designed for litigation purposes rather than the organic product of expert research, experience, and/or scholarship, and consists entirely of unsubstantiated hearsay gleaned from the Internet, and not from the experience, study, research, and field work characteristic of authentic expertise. In addition, the sources of the hearsay are not fully described, and could very well include information that violates Abdul Kareem's Sixth Amendment right to confrontation as established in *Crawford v. Washington*, 541 U.S. 36 (2004), as well as his right to Due Process as guaranteed by the Fifth Amendment;

(2) will not assist the trier of fact to "understand the evidence" because the information is *not* beyond the understanding of the average juror, and because, even if it were, Kohlmann lacks the requisite specialized knowledge and training;

(3) lacks a viable methodology within the academic/scientific community in which he claims to operate; and

As detailed below, Kohlmann's 28 page single-spaced report is a compendium of information from the Internet. Embedded inextricably within those materials is multi-level, unverified hearsay, in many instances from unidentified sources, that is neither competent evidence generally, or a proper form of expert testimony. It is the assimilation of inadmissible evidence for the purposes of testimony funneled through a purported expert.

As a result, contrary to the requirements for expert witnesses set forth in *Daubert*, neither Kohlmann nor his testimony rest on a "reliable foundation" or would be "relevant to the task at hand." 526 U.S. at 597. Nor is that requisite "reliable foundation" satisfied by prior testimony or prior admission by judges. Rather, it requires, and is designed to be based upon, peer review, acceptability in the scientific community, testing, error rates, and a proposed expert's substantive experiences and credentials. *Id.*, at 593-94.

Examined in that context, Kohlmann's testimony is neither "relevant to the task" at hand nor reliable. In addition, neither *Daubert* nor any other case prescribes a rule that would validate an expert, and decide a *Daubert* motion, based on qualification as an expert in the past. Accordingly, it is respectfully submitted that regardless of any past record of qualification by

1  courts as an expert, Kohlmann's qualifications and his testimony in this case, at this time, merit

2  fresh scrutiny in the Court's independent exercise of its discretion under Rule 702.  Subjected

3  to such review, it is respectfully submitted that. Kohlmann and his testimony should be

4  precluded or in the alternative limited.

5  **STATEMENT OF THE FACTS**

6  Pursuant to Rule 16(a)(1)(G), Fed.R.Crim.P., and by disclosure dated November 12,

7  2015 (DKt. No. 125) attached as Exhibit 1 to the accompanying Declaration of Daniel D.

8  Maynard (hereinafter "Maynard Declaration"), the government provided notice that it intended

9  to call Kohlmann as an expert witness at trial with a brief summary of Kohlmann's projected

10 testimony at trial that was basically the same as that to be provided by Lorenzo Vidino.

11 Kohlmann's Expert Report, attached as Exhibit 2 to Maynard Declaration, was provided to

12 defense counsel on February 8, 2016 at approximately 10:00 p.m.  The Government has stated

13 orally in open court on February 8, 2016 that this is only a draft.

14 The Government advised in its November 12, 2015 filing that it intended to introduce

15 expert testimony from Kohlmann to (1)  provide background information on organizations

16 within the global jihadist movement, to include the relationship between ISIL, ISIS, the

17 ai-Qai'ida organization and ai-Qa-ida in the Arabian Peninsula (AQAP); (2) to explain some

18 of the processes by which individuals in foreign countries with seemingly little connection to

19 jihadist fronts in place like Syria or Afghanistan became mobilized; (3) to discuss the role of

20 Anwar ai-Awlaki, an American citizen who became the leading English language ideologue

21 for the global jihadist movement; (4) to discuss the role of other ideologues for the global

22 jihadist movements; (5) to testify about the specific vocabulary used by Kareem and his alleged

23 co-conspirators to describe themselves and the world and the community of people around

24 them; (6) to testify that jihad refers primarily to violent jihad, which is traditionally understood

25 to be the lesser jihad (lesser in importance); (7) about tracking ISIS and other contemporary

26 terrorist movements, particularly over online media such as Twitter and other communication

platforms; (8) about the nature of online recruitment, communication platforms used, and communication techniques and strategies; and (9) to testify about compartmentalization and the indirect means of communication between U.S. foot soldiers and ISIS members abroad.

Additionally, the Government said Kohlmann may be called to testify about a forensic examination of computer equipment and cell phones he was to do (1) regarding the downloading of cell phone information from cell phones seized from the defendant and his co-conspirators, computers, and digital media, including but not limited to hard drives, CDs, DVDs, and GPS devices; (2) a forensic analysis on the computer/media storage devices and cell phone evidence obtained in this case and explain how he was able to obtain information, files and other stored data from the cell phones and/or ASIM@ cards associated with cell phones, as well as all digital media. Kohlmann would then testify consistent with any reports he issues, as well as his interpretations of the relevant computer evidence, including but not limited to the following:

> (a) The location, type, descriptions of relevant data found on the digital media and cell phones;
>
> (b) The process by which he forensically previews electronic devices, media storage devices, computer hard drives, and cell phones;
>
> (c) The process by which he makes a duplicate copy of the media storage devices to insure that there are no changes made to the originals;
>
> (d) The process by which he completes his forensic analysis; and
>
> (e) The process whereby users can delete or remove items from electronic media.

I.   **Kohlmann And/or His Testimony Should Be Precluded Because They Do Not Satisfy the Standards of the Applicable Rules of Evidence, and Violate the Fifth and Sixth Amendments**

Kohlmann and his testimony fail to qualify for admission under Rule 702, Fed.R.Evid. As the Court in *United States v. Abu Ali*, 05 Cr. 53 (GBL) (E.D.Va.) commented in precluding Kohlmann's testimony, the fact that the Government has hired him to testify as an expert

witness in cases "does not with this judge sit as a basis to qualify him as an expert in al-Qaeda, particularly where he has had no contact with someone from al-Qaeda."  *Id*., at Motions Hearing, October 28, 2005, T. 28-29 (a copy of which is attached as Exhibit 3 to the Maynard Declaration).

### A.   *The Pertinent Law Regarding Expert Qualifications*

In determining whether or not a proposed expert should be permitted to testify and even if so, to what extent such testimony should be limited the standards set by Rules 702 and 703, Fed.R.Evid., as well as by the Supreme Court in both *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), control.

### 1.   *The Standards Set Forth In Rule 702, Fed.R.Evid.*

Rule 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The party seeking to introduce expert testimony bears the burden of establishing those factors by a preponderance of the evidence. *See United States v. Williams*, 506 F.3d 151, 160-61 (2d Cir. 2007); Rule 702 assigns to the district court the role of gatekeeper and charges the Court with ensuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The Court's gatekeeping function requires a two-part inquiry.

First, the Court must determine whether the party presenting the testimony has met its burden of establishing whether the proffered expert testimony is reliable. The aim of that

inquiry regarding reliability is to exclude expert testimony based merely on subjective belief or unsupported speculation, and requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 589, 590. Reliability is the hallmark of the *Daubert* standard.

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact in understanding the evidence; essentially, whether the expert's testimony is relevant. *See Daubert*, 509 U.S. at 591; Fed.R.Evid. 702.

As the Ninth Circuit explained in its decision in *Daubert* after remand from the Supreme Court, "[u]nder *Daubert*, . . . we must determine nothing less than whether the experts' testimony reflects 'scientific knowledge,' whether their findings are 'derived by the scientific method,' and whether their work product amounts to good science." *Daubert*, 43 F.3d 1311, 1315 (9th Cir. 1995), *on remand*.

In that context, while a court's inquiry regarding reliability is a "flexible one[,]" in *Daubert* the Court enumerated certain non-exhaustive factors that can contribute to reliability, or lack thereof:

> (1) whether the method has been tested to determine its validity. 526 U.S. at 593;
>
> (2) whether there are standards of performance and whether the error rate is known. *Id*., at 594;
>
> (3) whether the method has been subjected to peer review and publication. *Id*., at 593-94; and
>
> (4) whether the method has garnered general acceptance. *Id*., at 594.

Yet those specific factors "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire,* 526 U.S. at 141. Here, while consideration of social science experts may not involve the same level of precision and standardization as exists in evaluating the physical sciences, there nevertheless, are standards that assist in assessing the reliability of such experts,

including some of those listed in *Daubert*. *See Kumho Tire*, 526 U.S. at 147-49; *White v. Ford Motor Co.*, 312 F.3d 990, 1007 (9th Cir. 2002) (trial court required to "apply his gatekeeping role . . . to all forms of expert testimony, not just scientific testimony").

### 2.    The Standards Set Forth In Rule 703, Fed.R.Evid.

Rule 703, Fed.R.Evid., requires that such underlying facts or data be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703.  In addition, if the underlying facts or data are otherwise inadmissible, the expert may not disclose them to the jury "unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed.R.Evid. 703. *See United States v. al-Moayad*, 545 F.3d 139, 161 (2nd Cir. 2008); *United States v. Long*, 917 F.2d 691 (2nd Cir. 1990)(in allowing an FBI agent's detailed descriptions of organized crime families, trial court erred because the evidence was only marginally relevant and not directly related to the case, and thus its prejudicial effect substantially outweighed its probative value).

Expert testimony must assist the trier of fact to "understand the evidence" through the use of specialized knowledge.  Rule 702(a), Fed.R.Evid.  In that context, an expert may not be "created" for the purposes of testifying in litigation.  Thus, intensive study or research of a particular subject matter merely for the purpose of repeating that research to a jury is not "expertise" of the type recognized or permissible under Rules 702 or 703. *See, e.g., United States v. Dukagjini*, 326 F.3d 45, 55 (2d Cir. 2002).

### 3.    The Limiting Principles Applied Through Rule 403, Fed.R.Evid.

Expert testimony, like all testimony, is subject to the requirements of Rule 403, Fed.R.Evid, that provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The Advisory Committee's notes to Rule 403 define

1  "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly

2  though not necessarily, an emotional one."

3      **B.**    **Under the Standards Prescribed By Rules 702, 703, 403, Fed.R.Evid., and Daubert, _Kohlmann Does Not Qualify As An Expert, and His Testimony Is Inadmissible_**

4

5          There are numerous reasons why Kohlmann's testimony should be precluded.  While

6  Kohlmann has been permitted to testify many times in U.S. federal court, that is not dispositive

7  because (a) the particular subject matter and nature of his report in this case does not satisfy

8  Rules 702 or 703; (b) _de novo_ evaluation of Kohlmann is appropriate give the accumulation of

9  information and investigation of his background and claims that were either not available in the

10  early stages of his career, or were not raised in _Daubert_ motions; and (c) even if Kohlmann's

11  projected testimony clears the hurdles established by Rules 702 and 703, important portions are

12  substantially more prejudicial than probative, and should be precluded pursuant to Rule 403.

13      **1.**    **Kohlmann's Report and/or Proposed Testimony Are Not Proper Forms or Means of Expert Testimony**

14

15          Kohlmann's projected testimony, to the extent it mirrors the content of his Expert Report

16  (attached to the Maynard Declaration as Exhibit 2) strays far beyond the permissible boundaries

17  of expert testimony, and would inject irrelevant and substantially prejudicial testimony at trial.

18  In fact, in other cases, even courts that have permitted Kohlmann to testify have been careful

19  to circumscribe his testimony to constrain it within the limits of proper expert testimony.

20          Kohlmann's report is not an expert report contemplated by Rule 16(a)(1)(G),

21  Fed.R.Crim.P., but rather the equivalent of a term paper commissioned by the government, and

22  which any person with rudimentary research skills and an internet connection (and a translator)

23  could compose, and thereby be proclaimed an "expert" on a particular subject.  It does not

24  require any expertise, but merely a computer, and does not demonstrate "specialized

25  knowledge," but merely downloading and typing capability.

26

Nor does Kohlmann's report offer any substantive expert analysis that would assist the trier of fact here. It does not offer conclusions based upon reliable methodology but instead summarizes certain selected materials found on the Internet.  Notably, of the 121 footnotes in Kohlmann's report there is not a single citation to an academically peer-reviewed article, journal or book.

In *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp.2d 414 (E.D.N.Y. 2013), the Court precluded certain aspects of Kohlmann's proposed expert testimony because his report "is nothing more than a recitation of secondary evidence" and "he makes no attempt to bring his expertise to bear and comes to no conclusion as to the import or accuracy of his summaries other than concluding that Hamas has claimed responsibility for the attacks." *Id*., at 446.  As the Court in *Strauss* pointed out, "[t]his tactic of simply 'repeating hearsay evidence without applying any expertise whatsoever' has been rejected by the Second Circuit, and therefore must be rejected here."  *Id*., *quoting United States v. Mejia,* 545 F.3d 179, 197 (2nd Cir. 2008).

The Court in *Abu Ali* recognized the problem with relying wholesale on information obtained from the internet:

> [t]he Court does not think that the Internet, particularly the postings that he has described here, in and of themselves have any – there's no way to test the reliability of them. There's no way to know who posts them. There's no way to know who maintains them. There is no way to know whether the information there is accurate or not.

*Abu-Ali*, T. 27:17-23 (Exhibit 3 to the Maynard Declaration).

In examining the factors which the Supreme Court in *Daubert* stated a court must look to determine whether expert testimony is sufficiently reliable under Rule 702, Fed.R.Evid., the Ninth Circuit, upon remand in *Daubert*, pointed out that

> [o]ne very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. . . .

43 F.3d at 1317.

That "independence from litigation" is critical, because, as the Ninth Circuit explained in deciding *Daubert* after remand from the Supreme Court, "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office," and testimony based on prior, independent research "provides important, objective proof that the research comports with the dictates of good science." *See Daubert v. Merrell Dow Pharmaceuticals, Inc*. 43 F.3d 1311, 1317 (9th Cir. 1995), *on remand*.   Kohlmann's report and projected testimony have not grown naturally and directly out of research but rather have been developed expressly for purposes of testifying in this case.   The Ninth Circuit has stated that "independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support." *Id*. As a result, "[t]hat the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were derived by the scientific method." *Id*. (internal quotations omitted). The Ninth Circuit found that "[i]f the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles.  *Id*., at 1317-1318 (internal quotations omitted).

Thus, since Kohlmann's conclusions are based on the research and conclusions of others, rather than his own independent research (beyond collecting materials from the internet), the burden is on the government to provide "other objective, verifiable evidence that the testimony is based on scientifically valid principles" and constitutes sufficiently reliable and proper expert testimony.

**2.      Testimony by Kohlmann Based on Hearsay In the Form of Testimonial Statements That Would Violate Abdul Kareem's Sixth Amendment Rights Under *Crawford v. Washington* Must Also Be Excluded By The Court**

Kohlmann's testimony should be narrowed to prevent him from introducing custodial or testimonial statements at trial. Such testimony, if permitted, would constitute inadmissible hearsay and would violate Abdul Kareem's constitutional rights under the Confrontation Clause as established in the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. at 61, because Abdul Kareem would not have the opportunity to confront or to cross-examine the declarants on their statements.

Kohlmann's report is replete with assertions without any source, and even the contentions that note sources are the rankest hearsay, entirely unsubstantiated and without any indicia of reliability.  Most are in the form of propaganda and rhetoric issued in communiques by "media wings" designed for political and/or public relations purposes (as well as to promote personal and organizational rivalries) rather than accuracy and thus are unreliable.

In *United States v. Amawi*, 06 Cr. 719 (JGC)(N.D. Ohio, Western Div. March 27, 2008) (Docket #701), Judge James G. Carr expressed concerns regarding Kohlmann's proposed testimony about propaganda, and concluded that "testimony about the nature of these materials was not necessary for the understanding of what they are" because "propaganda . . . can have many purposes, most, if not all of which are self-evident" and "[t]o the extent that these materials seek to entice, excite, or incite their viewers, jurors can, on seeing the materials, well understand those various objectives."  *See Amawi* Order, at 6-7 (a copy of which is attached to the Maynard Declaration as Exhibit 4).

An expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony.  *See Dukagjini*, 326 F.3d at 58.  Most importantly, an expert may not "simply transmit that hearsay to the jury." *Id*. at 54.  Otherwise, the expert would be simply "repeating hearsay evidence without applying any expertise whatsoever" and the government would, as a result, be allowed

- 11 -

"to circumvent the rules prohibiting hearsay." *Mejia*, 545 F.3d at 197, *quoting Dukagjini*, 326 F.3d at 58-59.

In light of the Supreme Court's plurality opinion in *Williams v. Illinois*, 132 S.Ct. 2221 (2012), which follows *Crawford*, it appears that Rule 703 is itself limited by the Sixth Amendment's right to confrontation. As a result, notwithstanding Rule 703, an expert's "basis testimony" is inadmissible if it is admitted for its truth. *See Williams*, 132 S.Ct. at 2256, 2258 (Thomas, J., concurring in the judgment); *see also id.*, at 2268 (Kagan, J., dissenting, noting that "five Justices agree, in two opinions reciting the same reasons, that … [the expert's] statement about [the basis of his testimony] went to its truth, and the State could not rely on her status as an expert to circumvent the Confrontation Clause requirements").

Here, Kohlmann's report and projected testimony do not constitute expertise; rather, they represent merely a surrogate witness parroting hearsay statements in a manner immune from confrontation and cross-examination. The introduction of any of this evidence would improperly enhance the government's case simply by repetition of rank hearsay rather than authentic expertise, and would unduly prejudice Abdul Kareem, in addition to violating his rights under the Sixth Amendment's Confrontation Clause and the Due Process clause of the Fifth Amendment.

**4.      Even If Admissible Under Rules 702 and 703, Portions of Kohlmann's Projected Testimony Should Be Precluded Pursuant to Rule 403, Fed.R.Evid.**

If the Court concludes that the testimony described is relevant to the charges in this case, Kohlmann's testimony regarding certain subject matters must nonetheless be excluded at trial under Rule 403, Fed.R.Evid., which permits the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

Kohlmann's report has substantial capacity to induce the jury to equate Abdul Kareem with known terrorists in the *al Qaeda* leadership, and to associate him with terrorist attacks and threats for which he is not on trial, with which he has never been alleged to have had any involvement, and which are not necessarily even within the time frame alleged in the Second Superseding Indictment.

Testimony about *al Qaeda* leaders, past and potential violent acts against the U.S., would not illuminate the charges in this case, but rather shroud them under the cloak of *al Qaeda* and its looming shadow, including 9/11, neither of which are properly invoked in this case.  That would encourage the jury to equate Abdul Kareem with *al Qaeda* and its various nefarious actions and members, and would serve only to prejudice the jury against Abdul Kareem, and to confuse it regarding the issues in this case.  *See*, *e.g.*, *United States v. al-Moayad,* 545 F.3d 139, 161 (2nd Cir. 2008) (district court erred in admitting expert testimony regarding a Tel Aviv bus bombing that "[t]he defendants were not charged with planning or carrying out" because the "bus bombing was almost entirely unrelated to the elements of the charges" and "involve[d] conduct more inflammatory than the charged crime[s]").

The Advisory Committee's notes to Rule 403 define "unfair prejudice" as "an undue tendency to suggest decision on an improper basis, commonly though not necessarily, an emotional one."  By conjuring up the names of *al Qaeda*'s leaders, and describing threats and violence against the U.S. and its citizens (including in concert with *al Qaeda*), and thus playing to the jurors fears (and emotions, including anger and vengeance), Kohlmann's testimony threatens to defeat any prospect of a fair trial for Abdul Kareem.  Judge Carr shared these same concerns in *Amawi*, concluding that "permitting the proposed testimony would suggest that, contrary to the evidence, these defendants somehow had connection with those groups, persons or activities" and that "[e]ven if that weren't so, allowing such elaboration would unavoidably create a penumbra of prejudice that could unfairly and improperly affect the outcome." *Amawi* Order, at 9 (Exhibit 4 to the Maynard Declaration).

As a result, in *Amawi*, Judge Carr held that "as with other aspects of Kohlmann's anticipated testimony, the modest, even minimal probative value of testimony about groups, persons, and events with which the jurors may not be familiar and with which the defendants have no connections whatsoever is outweighed by the potential for unfair prejudice." *Id*.

Accordingly, given the limited probative value of the matters in Kohlmann's report described above when compared to the danger of unfair prejudice which they present, it is respectfully submitted that Rule 403 compels narrowing the parameters of Kohlmann's proposed testimony to exclude the irrelevant and inflammatory evidence at Abdul Kareem's trial.

Thus, even if Kohlmann is permitted to testify at all, circumscribing his testimony is necessary.  Courts have in the past narrowed Kohlmann's testimony on the grounds of relevance in many of the cases in which he has otherwise been qualified as an expert witness. *See e.g.*, Exhibit 4 to the Maynard Declaration; *United States v. Amawi*, (Exhibit 5 to the Maynard Declaration), *United States v. Kabir*, 12 Cr. 92 (VAP) (C.D. Cal.)(July 14, 2014).

In *Amawi*, a case charging the defendants with conspiring to kill and maim members of the U.S. military in Iraq and with material support for terrorism, as well as with unlawfully distributing a video showing how to make a suicide bomb vest, Judge Carr limited Kohlmann's testimony regarding "general information regarding international terrorism" because such evidence was "not relevant to the issues in th[at] case" and because "the limited probative value of his testimony [wa]s outweighed very substantially by its very considerable potential for unfair prejudice to the defendants."  *See Amawi* Order, at 4 (Exhibit 4 to the Maynard Declaration).

For all these reasons, it is respectfully submitted that Kohlmann's projected testimony should be precluded, or at the very least limited to only those items that are relevant to the jury's understanding of the issues in this case.

5.    **Kohlmann's Report and Projected Testimony Are Not Reliable Because He Lacks Any Discernible and/or Acceptable Methodology**

Kohlmann does not explain his "methodology" in his report. He does not have training in social science methodology, including in statistics, probability, and sampling. Kohlmann's lack of acceptable methodology was the basis for the limiting of his testimony in *United States v. Kabir*, 12 Cr. 92 (VAP) (C.D. Cal.)(July 14, 2014), in which Judge Phillips concluded that "[t]he Court is not persuaded that Kohlmann's methodology of constructing and maintaining the 'homegrown terrorist' profile is reliable, and that the application of the profile to this case is relevant, helpful, and not confusing or prejudicial." *Id.*, at 4 (Exhibit 5 to the Maynard Declaration).

Articulating her reservations and Kohlmann's utter lack of facility with fundamental social science terminology, Judge Phillips added that:

> while Kohlmann has amassed an impressive collection of materials relating to international terrorism, he is unfamiliar with basic terms and theories of social science research (such as "variable," "attribute," "operational definition," and "grounded theory"), he has not submitted the profile and its application for rigorous peer review (despite his claim that it presents a reliable theory of identifying "homegrown terrorists"), and he does not employ recognized social scientific tools (such as random sampling and blind tests) to control for bias or error.

*Id.*

As a result, Judge Phillips ruled that the government had "not sufficiently shown Kohlmann's methodology of constructing and refining the 'homegrown terrorist' profile to be reliable." *Id.* In addition, Judge Phillips concluded that "under FRE 403, the Court finds any probative value of the profile and its application to this case will be substantially outweighed by the unfair prejudice, confusion, and misleading of the jury that likely will result from the presentation of Kohlmann's testimony on this subject." *Id.*, at 4-5. Judge Phillips did permit Kohlmann to testify regarding "(1) the history and context of the Al-Qa'ida, the Taliban in Afghanistan, and Islamic extremism (or the "global jihadi movement"), (2) the use of various social and internet media by Islamic terrorist organizations, and (3) the terms, concepts, and

phrases used in this context." *Id.*, at 5.

Kohlmann's *Curriculum Vitae*, dated January 2016, a copy of which is the first three pages of his report is attached to the Maynard Declaration as Exhibit 2, reveals that his purported expertise is not the product of substantive training, experience, field work, recognized scholarship, academic position, or language skills but arises from his routine downloading of materials from the internet and his prior testimony.  For example, Kohlmann's resume does not provide any evidence that he has          •          taught on the subject;

          •          taken any training or academic courses on the subject;

          •          visited the subject region at all, much less for a sufficient time period; or

          •          learned, spoken, or read the various languages and/or dialects that are spoken and read in the region.

As a result, Kohlmann lacks "a reliable basis in the knowledge and experience" of a relevant discipline.

### Conclusion

It is respectfully submitted that, in light of the above, a court should be leery with respect to qualifying Kohlmann as an expert.  Kohlmann is a self-styled expert whose "expertise" gained almost exclusively to testify for the government in terrorist cases.  His work has not been subjected to the rigors of academic peer review. He has achieved, though, the status of expert witness in dozens of cases, enabling him to testify repeatedly as a government expert witness. Being an expert at being an expert, however, is precisely what Justice Scalia seemed to have in mind in emphasizing the obligation of district courts to exercise discretion to exclude "expertise that is *fausse* and science that is junky." *Kumho Tire Co.*, 526 U.S. at 159 (Scalia, J., *concurring*).

Accordingly, it is respectfully submitted that Abdul Kareem's motion to preclude Kohlmann's testimony, or in the alternative narrow it considerably, be granted.

1    RESPECTFULLY SUBMITTED this 12th day of February, 2016.

2                                  **MAYNARD CRONIN ERICKSON**
                                   **CURRAN & REITER, P.L.C.**
3
                                   By /s/Daniel D. Maynard
4                                      Daniel D. Maynard
                                       3200 North Central Avenue, Suite 1800
5                                      Phoenix, Arizona 85012
                                       Attorney for Defendant
6
**ORIGINAL** of the foregoing e-filed this 12th day of February, 2016 via ECF with:
7    Clerk of the Court
     United States District Court
8    401 W. Washington
     Phoenix, AZ 85003
9
**COPY** of the foregoing e-delivered this 12th day of February, 2016 via ECF to:
10
     Kristen Brook
11   Joseph E. Koehler
     US Attorneys Office
12   2 Renaissance Square
     40 N. Central Ave., Ste. 1200
13   Phoenix, AZ 85004-4408
     Attorneys for Plaintiff
14
      /s/Stacey Tanner
15

16

17

18

19

20

21

22

23

24

25

26

                                   - 17 -