CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 18, 2016 |
| Abdul Malik Abdul Kareem, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #3
TESTIMONY: S.A. ROBERT J. MESHINSKY - PART 1


APPEARANCES:
For the Government:
        U.S. ATTORNEY'S OFFICE
        By:  **Kristen Brook, Esq.**
             **Joseph Edward Koehler, Esq**.
        40 North Central Avenue, Suite 1200
        Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
        MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
        By: **Daniel D. Maynard, Esq.**
             **Mary Kathleen Plomin, Esq.**
        3200 North Central Avenue, Suite 1800
        Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

1          **E X C E R P T   O F   P R O C E E D I N G S**

2          THE CLERK:  Please state your name for the record and

3     spell your last name.

4          THE WITNESS:  Sure.  Robert.  Middle initial J.

5     Meshinsky.  M-E-S-H-I-N-S-K-Y.

6          THE COURT:  You may proceed Mr. Koehler.

7        **SPECIAL AGENT ROBERT J. MESHINSKY, WITNESS, SWORN**

8                    **DIRECT EXAMINATION**

9     BY MR. KOEHLER:

10    Q    Could you please introduce yourself to the jury.

11    A    Good afternoon.  My name is Robert Joseph Meshinsky.  I'm

12    a Special Agent with the FBI here in Phoenix.

13    Q    Do you have a particular duty set as an FBI agent here in

14    Phoenix?

15    A    Yes.  I'm the computer forensic examiner.

16    Q    And are you a member of what's called the CART team?

17    A    Yes.

18    Q    What does "CART" stand for?

19    A    Computer Analysis Response Team.

20    Q    How long have you been a Special Agent with the FBI?

21    A    Over 20 years.

22    Q    And how long have you been on the CART team?

23    A    Nineteen years.

24    Q    And that whole time have you been a computer forensic

25    specialist?

1    A    Yes and I also worked cases.

2    Q    What kind of training did you have regarding computers

3    before joining the CART team?

4    A    Before I joined the Bureau, I worked for a software

5    development company in Silicon Valley for five years.

6    Training is -- most of my training has been provided by the

7    Bureau or self-taught.

8    Q    And as part of your duties with the CART team, do you

9    participate in the execution of search warrants?

10   A    Yes.

11   Q    And do you perform a particular role in connection with

12   the execution of search warrants?

13   A    During a search warrant we will seize any of the digital

14   media that we come across.

15   Q    When you're at the scene of a search warrant, do you

16   follow a procedure for determining what electronic devices to

17   seize and how to preserve the data in those devices and

18   maintain their integrity?

19   A    We do.  If a computer is off, it will remain off and we

20   will seize it that way.

21   Q    Is there a step before that, deciding whether you actually

22   need a device?

23   A    Yes.  We will read the warrant and we will also speak with

24   the case agent as well and to see if it's something that we

25   need to take.

1    Q    Okay.  And you mentioned you checked to see if the device

2    is on.

3         If the device is on, what do you do first?

4    A    If the device is on, the first thing we check to see is if

5    encryption is running.

6         If encryption is running, we'll need to do what we

7    call a logical extraction where we'll pull the files off right

8    then and there.

9         And we will power the machine off because we may not

10   get into it once we power it off.

11        And if it's not encrypted, we will take screenshots

12   so we know what the screen looked like, the monitor looked

13   like at the time we made entry.  And we'll take pictures of

14   that so we know what it was like at that time.  And then we'll

15   power it down and we'll turn it over to the seizing agent.

16   Q    Okay.  You mentioned the words "logical extraction."

17        Can you explain to the jury what a logical extraction

18   is.

19   A    Logical extraction would be the active files that are on

20   your computer at the time your computer is on.  If you go into

21   a user directory, you'll see My Pictures, My Documents.  Those

22   are logical files that fall into that and you can see them

23   when your computer is on.

24   Q    Does the logical file include any file that has been

25   deleted?

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

 1   A    No.

 2   Q    Does it include anything that is stored in the RAM memory

 3   of the computer?

 4   A    No.

 5   Q    Can you explain to the jury what RAM memory is?

 6   A    Random Access Memory.  When you turn a computer on and the

 7   application needs to fire up -- start up, excuse me -- it uses

 8   the Random Access Memory.

 9         It kind of goes in and stores some information there

10   and then opens up the applications.

11   Q    Do you ever take security precautions to make sure that

12   the device isn't disguising any boobie trap or some other

13   thing during the execution of the search warrant?

14   A    We look for any -- we'll do a physical inventory on the

15   items to make sure there's no wires --

16         COURT REPORTER:  Could you repeat that, please?

17         THE COURT:  He said we'll do a physical inventory on

18   the items and look for --

19         THE WITNESS:  -- any wires, things that can be

20   hanging off the computer.

21         MR. KOEHLER:  All right.  Let's slow down a little

22   bit.

23         THE WITNESS:  I'm from New York.

24   BY MR. KOEHLER:

25   Q    You talk a little faster and I have to be very mindful

UNITED STATES DISTRICT COURT

1   myself.

2          All right.  So you have checked to see if the device

3   is on.  You have done a logical extraction if there's

4   encryption running, and otherwise take photographs of the

5   screen and make sure it's not boobie trapped, right?

6   A    Right.

7   Q    Once you have done that, you said you power it off?

8   A    That is correct.

9   Q    And then does part of that involve disconnecting it?

10  A    Yes.  We will disconnect the power supply.  Most of the

11  time we only need to take the box with us because we have

12  monitors, keyboards, mice.  There's no need for us to take

13  those items.

14  Q    So you're talking about the physical box of the computer?

15  A    That is correct.

16  Q    And what about other electronic devices, cellular

17  telephones and that kind of thing?  What is your process for

18  making sure that you preserve whatever data is on those

19  devices before seizing them?

20  A    If a cellular telephone is on, we will see if it's PIN

21  locked, pattern locked, see if we're able to obtain the

22  password from the individual who owns the phone.

23          If they provide it to us, we will put it in and then

24  we will undo the security.

25          We will then power the phone down once we have the

1    pass code.

2           If we are not given the pass code, we will put the

3    phone into airplane mode that it cannot dial out or receive

4    any phone calls.

5    Q   Can you explain very quickly what "airplane mode" means

6    for a phone in case folks on the jury don't know that

7    particular term.

8           THE COURT:  I thought all it meant was that's what

9    you had to do when you were on an airplane.

10          MR. KOEHLER:  Correct.

11          THE WITNESS:  That's right.  So it doesn't receive or

12   pass the signal out from the cell.

13   BY MR. KOEHLER:

14   Q   Do you turn the radios off on the phone?

15   A   You do.

16   Q   Okay.  And then what do you do after that?

17   A   We -- if we seize the phone, then we, in turn, turn it

18   over to the seizing agent.

19   Q   And does that get put into evidence at that point?

20   A   Yes.  Well, it will be transported back to the evidence

21   room and then placed into evidence.

22   Q   If a phone is locked and you don't get the password, do

23   you have remedies for that?

24   A   We do.  There's software that we can use.  If that

25   software doesn't work, then we would have to send it back to

1    the lab at Quantico and they either have a tool sweep that

2    they use that we are not able to use in the field or they can

3    open up the phone and take the memory off of the chips.

4    Q    What is the name of the lab in DC or Quantico to which you

5    send it?

6    A    We send it to the cryptology -- CEAU is the abbreviation.

7    It is in the Bureau or lab abbreviations and I can't remember

8    the whole name of it.

9    Q    Is it a Cryptographic Unit?

10   A    Yes, it is.

11   Q    Okay.  Once you've gotten to this point and you're going

12   to examine the phone or the computer, what is your next step?

13   You go get it from evidence?

14   A    That is correct.

15   Q    Okay.  And what do you do once you have retrieved it from

16   evidence in order to get the data that's on the device?

17   A    If we are using a computer as an example, we'll pull the

18   computer out of evidence.  We will then remove the hard drive

19   from the computer.  And then we will attach the hard drive to

20   a write blocker, a forensic write blocker, so that we cannot

21   write any data to the original evidence.

22         We'll attach the forensic write blocker to our exam

23   machine and then, in turn, we'll open up an application that

24   we use to image which is going to make a bit-for-bit copy of

25   the hard drive.  It will be like a photocopy of all the data

1   that's on the hard drive.

2        It's a copy that we use on -- excuse me -- a tool

3   called FTK, Forensic Tool Kit Imager.  And we make a

4   bit-for-bit copy of the hard drive.

5   Q   And when you say "bit-for-bit copy," are you talking about

6   a binary copy?

7   A   Yes.  The zeros and the ones.

8   Q   And so it records each zero and one in the exact same

9   order that it is on the drive?

10  A   On the original drive, correct.

11  Q   Is there a program or an algorithm that you can use to

12  verify that the bit-for-bit copy that you take from the hard

13  drive is identical to what is on the hard drive itself?

14  A   FTK Imager will do a verification of the drive at the

15  beginning; create what we call an MD5 hash, which is like an

16  electronic fingerprint, and then once that's done, it will

17  also perform another MD5 hash.

18        And if those match, then you know you have an exact

19  duplicate of the hard drive.

20  Q   And is it able to do the same thing to verify the

21  duplicated data after that data has been analyzed to make sure

22  that it has not been tampered with later?

23  A   Yes.

24  Q   So you have walked us through the creation of the binary

25  image of the computer.

1        Let's talk about what you do to create an image of a

2   cellular telephone or another electronic device.

3   A   A cellular telephone, we use a product called UFED -- or

4   Cellebrite, excuse me -- UFED 4, the number 4, PC.  It's an

5   application that runs on a laptop.  And then we attach the

6   phone to the laptop.  Yes.

7   Q   I want to pause you for a moment for the court reporter.

8        Could you please spell "Cellebrite"?

9   A   Cellebrite is C-E-L-L-E-B-R-I-T-E.

10  Q   And then UFED, is that an acronym?  U-F-E-D?

11  A   Correct.

12  Q   And then you said 4 PC.  Is it the number 4?

13  A   The number 4 PC.

14  Q   Okay.  Continue please.

15  A   So we'll attach it to the laptop running the software and

16  we'll then download the information off it.

17       We can do three types of extractions.  You can do a

18  logical extraction which would just be the logical files on

19  the phone.  You can do a file system extraction which would go

20  through and get all the file information that's going to be

21  off of the RAM of the memory chips that are on the phone.  Or

22  we can do a physical which would go bit-for-bit on the phone,

23  so it's getting all of the information off the phone, whether

24  it's a deleted file, an active file.  It's getting all of that

25  information.

1    Q    So to be clear, you mentioned "logical extraction" before.

2    Is this the same thing where it only recovers active files

3    that have not been deleted; is that correct?

4    A    That is correct.

5    Q    Okay.  And you used the term "specialized devices" to

6    refer to various types of cellular phones; Smartphone and so

7    forth?

8    A    Correct.

9    Q    And you use that program that you just talked about,

10   Cellebrite or other similar programs, to process all of those

11   types of items?

12   A    Yes.

13   Q    All right.  So now you have made this image from the

14   computer, right?

15   A    Correct.

16   Q    What happens next with -- let's talk specifically about

17   computers first.

18   A    Once the image is made of the computer, we will open up an

19   application we call AD Lab which is Access Data Lab.

20          We process it in AD Lab.  What AD Lab does is it goes

21   through and characterized -- it pulls out all of the

22   information that's stored on the hard drive and puts it into

23   tabs.  So if you wanted to focus on the pictures, there's a

24   graphics tab.  And you click on the graphics tab and there's

25   all the pictures that are stored on that computer; documents,

```
 1   e-mails, spreadsheets.  E-mails are broken down into dates,

 2   times, things of that nature.

 3   Q    Does AD Lab do anything to change the data in any way?

 4   A    It does not write to the data.

 5   Q    What does it do with the data in order to generate this

 6   list of categorized files that you talked about?

 7   A    It interprets the zeros and ones based on the footers or

 8   the extensions of the files.

 9   Q    When you say "extensions," are you talking about the file

10   name extensions like ".wav" and so on?

11   A    Correct.  .pdf.  That's an extension.

12   Q    And .jpg for .jpg photos?

13   A    Correct.

14   Q    Does AD Lab also interpret the data for unused space on

15   the computer for deleted files and other types of data on the

16   computer?

17   A    If it's able to recover a deleted file, it will.

18   Sometimes it's only able to recover a fragment of the file and

19   it will attempt to recover that as well.

20   Q    Can it recover the names of files that have been deleted

21   even if it can't recover the data from the files themselves?

22   A    Yes.

23   Q    What about things like search histories, cookies, and

24   other things like that on the computer?

25   A    It will recover that if it's able to.  It's all being
```

1    tracked on your computer through your web browser.  So AD Lab

2    will go through and provide a nice, clean representation of

3    all your cookies, your history file.

4    Q   Does it organize that data in some way?

5    A   It does.  It puts it into a nice database.

6    Q   Does that include things like the autofill when you're

7    doing a form?  Let's say you have applied for something and

8    you're filling out a form on the computer.  If it's an

9    autofill-type form, will that information also be stored in a

10   browser?

11   A   It could be stored in the browser, yes.

12   Q   And if it is, can AD Lab recover that?

13   A   Yes.

14   Q   What about things like search strings?

15   A   If you conduct a search string, it will -- a search string

16   will be if you put in certain words that you are looking for.

17         AD Lab, once we index the hard drive -- indexing is

18   where we take and it goes through and identifies every file by

19   name that's on the computer.  So everything that starts with

20   the letter "A," everything that starts with the letter "B,"

21   and then goes from there.

22         So when you do a string search, you type in the word

23   "dog," it's going to pull up every reference to the word "dog"

24   on the computer.

25   Q   So once you have processed this data using AD Lab and

1    generated this list of files, deleted information, search

2    histories, and so on that you have described, what do you do

3    with that data?

4    A    The data is then put into what we call "CAIR," which is

5    Case Agent Investigative Review -- Case Agent Investigative

6    Review, yes, sorry.

7             And that's a virtual machine that the case agents can

8    then sit at their desk or anybody on their squad can then go

9    and start looking at the data to help forward their

10   investigation.

11   Q    You mentioned you called it a "virtual machine."  Can you

12   explain what you mean by that.

13   A    All of our data is stored on a server that resides in the

14   lab that I work in.  Where the case agents, they sit on other

15   floors, so they are able to log into our server via a virtual

16   machine.

17            A virtual machine will not allow them to write -- the

18   way we have it set up, they cannot write to any of the data.

19   They can only review the data.

20   Q    So in other words, can an agent in any way from their

21   workstation alter the data that has been derived from the

22   computer?

23   A    All the files, they only have read-access to.

24   Q    And does that mean they cannot change the data?

25   A    That is correct.

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

```
 1   Q    When an agent goes through this data, if they want to flag
 2   something, how do they do that?
 3   A    They can label it or they can bookmark it.
 4   Q    Once they have gone through and bookmarked things of
 5   interest, what happens next?
 6   A    Once we're told that they're done bookmarking the files of
 7   interest, we will create the final report based on the
 8   bookmarks.
 9        It will go -- we will go through and clean up the
10   bookmarks and make sure they look presentable.
11   Q    Okay.  And do you eliminate duplicates, for instance, and
12   so on?
13   A    We eliminate duplicates.  Sometimes words are misspelled
14   in the titles.  Capitalization is -- something is lower case
15   where a capital should be, so I will change that.
16   Q    Does your cleaning up of the bookmarks in any way affect
17   what they have selected?
18   A    No.
19   Q    Does it in any way affect the data?
20   A    No.
21   Q    Once you create a final report, what happens next?
22   A    The final report is passed on -- we put it onto a piece of
23   media; CD, DVD, or blue ray disk, depending on the size.  And
24   then we archive all the remaining data which would be the
25   image sets, the AD Lab working files.
```

UNITED STATES DISTRICT COURT

1    The actual case, we'll put onto a hard drive and then

2    that hard drive is stored in evidence.

3    Q   When you store the hard drive in evidence, does there come

4    a time when you would get rid of that or destroy it?

5    A   If the case is closed and the case agent deems that the

6    evidence is no longer necessary, then it will be destroyed.

7    Q   Is it otherwise maintained?

8    A   Yes.  It's in evidence.

9    Q   And what's the purpose for that?

10   A   In case it needs to be used again.

11   Q   Prior to the destruction of the data, do you run that hash

12   test to, again, check the integrity of the data?

13   A   Prior to closing out the lead and copying all the imaged

14   sets over to the hard drive, we will run an MD 5 hash against

15   the original image.  That's to make sure nothing has changed.

16   Q   When an agent wants -- or an intelligence analyst wants an

17   item from the data set exported in order to create an exhibit

18   or otherwise examine that item, who does the exporting,

19   generally speaking?

20   A   We will do that for them.

21   Q   All right.  Let's go now back to the specialized devices.

22   When you have run Cellebrite UFED 4 PC and gotten the

23   image of that device, what do you do with that image?

24   A   That image is then put into another product from

25   Cellebrite called Cellebrite Physical Analyzer which processes

1   the file that's created by the 4 PC device -- image, or sorry,

2   software.

3           And then that, in turn, puts it into categories as

4   well.  So all of your pictures, all of your text messages, all

5   of your video files, it will break down the text messages

6   between individuals, put it into, you know, historical

7   perspective for you.

8   Q    So when you say "break it down by individuals," are you

9   talking about organizing it by the phone number with which the

10  text communication was occurring?

11  A    That is correct.

12  Q    And does it also organize call logs?

13  A    It does.

14  Q    What about applications on the phone?

15  A    If it's able to get the applications, it will download the

16  applications as well.

17  Q    And the application data?

18  A    And the application data as well.

19  Q    Can you explain to the jury some of the types of things

20  that might be found in application data in a cell phone or

21  Smartphone?

22  A    Some of the things that could be found are, you know, text

23  documents.

24          On your Smartphone most of us have now, we have our

25  web browsers.  We do our e-mail on it.  We do our banking on

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

1    it.  So all of that information is being stored on your phone

2    and we are able to retrieve that information.

3    Q   If you are not able to retrieve that information but you

4    can otherwise see it in the phone by manipulating the phone,

5    do you use a program or some other device to make a record of

6    what else you find on the phones?

7    A   We use a program called ZRT.

8    Q   And do you know what that's an acronym for?

9    A   Zippy Reporting Tool.

10   Q   And can you explain to the jury what that tool is.

11   A   It takes a digital photograph of the screen and assigns an

12   MD 5 hash to that picture.  So you just scroll through, take a

13   picture, and move on, and it creates a report of all the

14   pictures you have taken and puts it into a nice report for

15   you.

16   Q   All right.  So we're going to skip past the Zippy

17   Recording Tool at this point and go back to the end product

18   from the Cellebrite Physical Analyzer.

19          How does it output that data so that one of the

20   agents or the intelligence analysts can go through the data

21   that you have recovered from the phone?

22   A   We will save it in two formats.  We'll save it as an HTML,

23   so when you open it up, it's like surfing the Internet; click

24   on the links, go to the pictures and move forward, or we'll

25   also save it as an Excel spreadsheet.

1              And we do that for several reasons.  One, if they're

2    going to take the phone numbers, they can sort on the columns;

3    or they can import the information that's in the Excel

4    spreadsheet into a different database if they had to.

5    Q   May I have just one moment, Your Honor?

6              You mentioned earlier recovering deleted files from

7    the computer.  If files have been deleted before you come

8    across the computer, are you in a position to recover files if

9    the data is still somehow present on the drive?

10   A   Sometimes we are able to recover data.  It depends on the

11   size of the hard drive and how much activity has taken place

12   on that hard drive.

13   Q   And can you explain how data from deleted files would

14   remain on a hard drive?

15   A   When a file is deleted, when you hit "delete," all you're

16   doing is telling the operating system that this space is

17   available if you need it.

18             The file actually still exists.  It's just at the

19   beginning of the name.  It just removes the first letter and

20   puts a character there and lets the system know that, okay,

21   this is a deleted file.  If I need to come back to this area

22   for some reason, I can put data at that location.

23             Smaller drives and a lot of activity, it would be

24   harder to recover versus drives now adays where we are up in

25   the terabytes in size.  Odds are, you are not going to come

1   back around to where your deleted file is and overwrite that

2   unless you're doing a lot of activity and moving files and

3   things of that nature.

4            THE COURT:  So if you have a lot of memory on your

5   computer and not a lot of data on your computer, all your

6   deleted files are all still there?

7            THE WITNESS:  That is correct.

8            MR. KOEHLER:  All right.  We are done with the

9   subject of recovering data for the moment.

10           THE COURT:  For the moment?  Not forever?

11  BY MR. KOEHLER:

12  Q   All right.  Were you part of a search warrant execution

13  team in July of 2012 on July 20th of 2012?

14  A   Yes, I was.

15  Q   Was that at the home of a person by the name of Abu Bakr

16  Ahmed?

17  A   As far as I can recall, yes.

18  Q   During the course of the execution of that search warrant,

19  did you recover electronic devices?

20  A   Yes.

21           MR. KOEHLER:  If I may approach the witness with

22  Exhibit 161?

23           THE COURT:  You may.

24  BY MR. KOEHLER:

25  Q   Agent Meshinsky, do you recognize that device?

1   A    That's a laptop that we -- that was seized at that

2   location.

3   Q    Were you the person who seized that device?

4   A    I am.

5   Q    Can you read off the serial number of that device and tell

6   us the make and model number?

7   A    Maybe.  No, on the serial number.  I can't read that

8   small.  If I can borrow your glasses?

9          What's a Lenovo is the laptop.  The model name is --

10   or it's actually a number.  0768.

11          And the serial number I cannot read.

12   Q    Okay.  We'll save that for later.  Maybe we'll put it on

13   the document camera at some point.

14          All right.  When you seized that Lenovo, do you

15   recall the act of seizing it?

16   A    I do.

17   Q    Okay.  I'm going to place before you what's been marked as

18   Exhibit No. 392 on the document camera.

19          Do you recognize that image?

20   A    Yes.

21   Q    Can you tell us what that is?

22   A    That is the computer that was on when we made entry on the

23   day of the search warrant.

24   Q    Does that photograph fairly and accurately depict the

25   Lenovo at that time?

1    A    Yes.

2              MR. KOEHLER:  Move to admit Exhibit 392.

3              THE COURT:  Is there any objection?

4              MS. PLOMIN:  No objection, Your Honor.

5              THE COURT:  392 is admitted.

6         (Exhibit No. 392 admitted in evidence.)

7    BY MR. KOEHLER:

8    Q    Looking at the photograph of the computer there, do you

9    recognize devices that are inserted into the side ports on the

10   computer?

11   A    There are three devices.  There's a Magic Jack on the left

12   side of the computer.  It's used for phone calls.

13   Q    Could you put -- you've got a touch screen in front of

14   you.  Can you touch it right where the Magic Jack is?

15   A    Right there (indicating.)  Do you want me to circle it?

16   Q    Sure.

17   A    Magic Jack.

18              Then on this side, this white cable here leads to the

19   printer.  That was attached -- it's sitting on top of.  And

20   then a flash drive or thumb drive in the other USB port.

21   Q    That flash drive, do you recall the brand of that?

22   A    I do not.

23   Q    Did you seize that along with the computer?

24   A    Yes.

25   Q    Did you later on have the occasion to image both of these

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

1    devices?

2    A    Yes.

3    Q    And how did you go about that process?  The same as what

4    we described before?

5    A    Yes.

6    Q    Were you able to recognize them from evidence from having

7    seized them at the time that you took them in and extracted

8    the images from them?

9    A    Yes.

10   Q    Now, directing your attention to that flash drive, the

11   thumb drive, when you extracted the image from that, did you

12   store that image as we described earlier?

13   A    Yes, we did.

14   Q    And did agents later come back to you to review that

15   particular image of the thumb drive?

16   A    Yes.

17   Q    Were you asked to export files from that thumb drive?

18   A    Yes.

19   Q    Was one of the files that you exported from the thumb

20   drive called "S&I.pdf"?

21   A    Yes.

22   Q    I'm going to place for you on the document camera what's

23   been marked, for identification, as Exhibit 173.

24            I'm just going to show the cover page for now.  Do

25   you recognize that?

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

1   A   I do.

2   Q   What is that?

3   A   That's the cover page of the document that you just

4   described and was located on the thumb drive.

5   Q   So is this document -- have you reviewed this before

6   coming to court today?

7   A   I reviewed it this morning.

8   Q   And is this document a true and accurate copy of the .pdf.

9   "S&I.pdf" that you recovered from that thumb drive?

10  A   Yes.

11          MS. BROOK:  Move to admit 173.

12          THE COURT:  Any objection?

13          MS. PLOMIN:  No objection.

14          THE COURT:  173 is admitted.

15      (Exhibit No. 173 admitted in evidence.)

16  BY MR. KOEHLER:

17  Q   174 and 175 are media files.

18          Did you recover information about media files on the

19  thumb drive?

20  A   There was several video files that were on the thumb drive

21  but they had been deleted so we could not play them.

22  Q   Were you able to recover those in any way?

23  A   No.

24  Q   Do you recall the name of the first media drive that

25  begins with the word "training"?

UNITED STATES DISTRICT COURT

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

```
 1    A    I don't recall the names, no.
 2    Q    Was one of the files you recovered named "Training That
 3    Makes Killing Civilians Acceptable 1 of 2"?
 4    A    I believe so.
 5    Q    Was another one "Training That Makes Killing Civilians
 6    Acceptable 2 of 2"?
 7    A    I believe so.
 8              THE COURT:  So you couldn't recover the video?
 9              THE WITNESS:  Correct.
10              THE COURT:  But you recovered a title?
11              THE WITNESS:  Right.  We were able to recover the
12    title but not the video.  The actual video we couldn't
13    recover.
14    BY MR. KOEHLER:
15    Q    Now, I'm going to direct your attention to Exhibit 176.
16    Was one of the files that you recovered called "A Treatise on
17    the Legal Status of Using Weapons of Mass Destruction Against
18    Infidels"?
19    A    Yes.
20    Q    And have you reviewed that before coming to court this
21    morning?
22    A    This morning I saw the cover.
23    Q    And do you recognize Exhibit 176?
24    A    Yes.
25    Q    Is that document a true and correct copy of the document
```

1    that you recovered from the flash drive bearing the same name?

2    A    Yes.

3            MR. KOEHLER:  Move to admit 176.

4            MS. PLOMIN:  No objection.

5            THE COURT:  176 is admitted.

6        (Exhibit No. 176 admitted in evidence.)

7    BY MR. KOEHLER:

8    Q    Now, directing your attention to Exhibit 177, do you

9    recognize that item?

10   A    Yes.

11   Q    Did you extract a file by the name of "To Make It Known To

12   The People and Not To Hide It" from the thumb drive?

13   A    Yes.

14   Q    Do you recognize that in comparison?

15   A    Yes.

16   Q    Is it a true and correct copy of that .pdf?

17   A    Yes.

18           MR. KOEHLER:  Move to admit 177.

19           MS. PLOMIN:   no objection.

20           THE COURT:  177 is admitted.

21       (Exhibit No. 177 admitted in evidence.)

22   BY MR. KOEHLER:

23   Q    Was there another media file on the computer that went by

24   the title "The Hatred of the Kuffar.mp4"?

25   A    Yes.

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

1    Q    Were you able to recover that media file?

2    A    No, we were not.

3    Q    I'm sorry?

4    A    We were not.

5    Q    Now, going on to No. 180 -- or excuse me -- 179.

6          Was there a file .pdf called Targeting Dar al-Harb

7    Populations"?

8    A    Yes.

9    Q    And was that Inspire Magazine Issue No. 8?

10   A    Yes.

11   Q    The file that's on the document camera before you, do you

12   recognize that?

13   A    Yes.

14   Q    Is that a true and correct copy of Inspire Magazine Issue

15   No. 8 that you recovered off of the flash drive?

16   A    Yes.

17          MR. KOEHLER:  Move to admit 179.

18          MS. PLOMIN:  No objection.

19          THE COURT:  179 is admitted.

20        (Exhibit No. 179 admitted in evidence.)

21   BY MR. KOEHLER:

22   Q    Did you also recover a .pdf copy of Inspire Magazine Issue

23   No. 9 off of the computer?

24   A    Off the thumb drive, yes.

25   Q    Yes.  Off the thumb drive.  Thank you.

1           And directing your attention to the screen with the

2   document camera, do you recognize that?

3   A    Yes.

4   Q    Is that a true and correct copy of the Inspire Magazine

5   Issue 9 that you recovered from the thumb drive?

6   A    Yes.

7           MR. KOEHLER:  Move to admit 180.

8           MS. PLOMIN:  No objection.

9           THE COURT:  180 is admitted.

10      (Exhibit No. 180 admitted in evidence.)

11   BY MR. KOEHLER:

12   Q    Directing your attention to Exhibit 181.  Did you recover

13   a file, a .pdf file, from the thumb drive titled "The Ruling

14   on Dispossessing The Disbelievers Wealth In Dar al-Harb"?

15   A    Yes.

16   Q    And in looking at that document, is that a true and

17   correct copy of the same document that you recovered from the

18   thumb drive?

19   A    Yes.

20           MR. KOEHLER:  Move to admit 181.

21           MS. PLOMIN:  No objection.

22           THE COURT:  181 is admitted.

23      (Exhibit No. 181 admitted in evidence.)

24   BY MR. KOEHLER:

25   Q    Moving on to 182, did you recover a document, a .pdf, from

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

```
1    the thumb drive titled "The Slicing Sword"?
2    A   Yes.
3    Q   And looking at the document camera in front of you, do you
4    recognize that?
5    A   Yes.
6    Q   Is that a true and correct copy of the .pdf "Slicing
7    Sword" that you recovered from the thumb drive?
8    A   Yes.
9            MR. KOEHLER:  Move to admit 182.
10           MS. PLOMIN:  No objection.
11           THE COURT:  182 is admitted.
12       (Exhibit No. 182 admitted in evidence.)
13   BY MR. KOEHLER:
14   Q   Did you also recover a file titled "The Ruling on Leaving
15   the Battle -- Leaving for Battle and the Precondition of
16   Takfir"?
17   A   Yes.
18   Q   And directing your attention to Exhibit 183, do you
19   recognize that?
20   A   I do.
21   Q   Is that a true and correct copy of that file?
22   A   Yes.
23           MR. KOEHLER:  Move to admit 183.
24           MS. PLOMIN:  No objection.
25           THE COURT:  183 is admitted.
```

1      (Exhibit No. 183 admitted in evidence.)

2            THE COURT:  Mr. Koehler, we're going to take our

3      afternoon break at this time.

4            MR. KOEHLER:  Perfect timing.

5            THE COURT:  Ladies and gentlemen --

6            I was watching the stack, as soon as I saw you were

7      at the last one.

8            Ladies and gentlemen, we will recess for 15 minutes

9      until approximately five after 3:00.

10            You are reminded again of the admonition not to

11      discuss the case among yourselves or with anyone else.

12            Please do not form any conclusions about the case

13      until you have heard all the evidence and begun your

14      deliberations.

15            Court is in recess for 15 minutes.

16      (Recess taken at 2:46 p.m.)

17      (Open court, no jury present at 2:55 p.m.)

18            THE COURT:  Thank you.  Please sit down.  The record

19      will show the presence of counsel and the defendant.

20            Mr. Koehler?

21            MR. KOEHLER:  Thank you, Your Honor.

22            Last evening, probably about six o'clock or so, we

23      were made aware through the case agent that he had received a

24      call from a person by the name of Ruth Ortiz.

25            Ms. Ortiz is the mother of two of our juvenile

1    witnesses in the case.  She called and was extraordinarily

2    upset because ABC 15 reporters came to her house to ask her

3    how she felt about the defendant's alleged radicalization of

4    her two sons.

5              Needless to say, that was not a pleasant thing to

6    find out.  It creates the potential for witnesses to be

7    intimidated and scared from testifying having reporters show

8    up at their doorsteps, especially when we're dealing with

9    juveniles.  And we're obviously very concerned with the

10   conduct of the press in the case.

11             And I know we can't tell them what to do --

12             THE COURT:  Well, please don't say "the press."  Say

13   "ABC 15 reporters."

14             MR. KOEHLER:  Yes.  I understand.

15             THE COURT:  Were they there with a camera crew?

16             MR. KOEHLER:  I do not know that specific detail.

17             THE COURT:  Did she get the names of the reporters

18   who showed up?

19             MR. KOEHLER:  She did not, apparently, so I don't

20   know the full details, but we did learn that it was ABC 15

21   News.

22             THE COURT:  And what would you like me to do?

23             MR. KOEHLER:  I think it wouldn't hurt to remind the

24   press that this is a very sensitive case and that talking to

25   juvenile witnesses or attempting to talk to juvenile

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

 1   witnesses, especially, is a very intimidating thing.

 2          THE COURT:  Well, here's the thing.  You said "the

 3   press" again and I don't know that, you know, at the moment

 4   there's nobody to talk to.

 5          MR. KOEHLER:  Yes.  I'm aware.

 6          THE COURT:  And the individuals who have created the

 7   problem for Ms. Ortiz are not here.

 8          I don't know that admonishing people who haven't done

 9   anything improper is appropriate.  But if there were some

10   other action that you wanted me to take that was specific to

11   Channel 15 News, I would certainly entertain that.

12          But I don't really see that it would be effective to

13   tell other people who haven't done anything inappropriate --

14          MR. KOEHLER:  Agreed.  Agreed.  It's more in the

15   notion of alerting folks that this is an issue and hoping that

16   no one else crosses that line, and certainly that ABC 15

17   doesn't repeat that.

18          THE COURT:  Or, I mean, you might also want to

19   consider whether you would like to have someone from your

20   office who deals with the press -- because I'm sure you have a

21   public information officer -- they probably have contacts with

22   individuals at all of the media outlets.

23          And perhaps the appropriate thing would be for that

24   person to raise the concern with the individuals who made the

25   contact and emphasize that we're not talking about regular

1    ordinary witnesses.  We're talking about juveniles and, you

2    know, problems that could ensue if they were somehow

3    intimidated from testifying.

4            MR. KOEHLER:  That process is underway as well, Your

5    Honor, but I did want to advise the Court.

6            My office asked us to make sure that you were alerted

7    to this fact and aware of it.

8            THE COURT:  Okay.

9            MR. KOEHLER:  So that if it were to come up

10   somehow --

11           THE COURT:  Okay.  So at the present time you're not

12   asking that I do anything?

13           MR. KOEHLER:  Right.  We're not asking to have the

14   courtroom closed or anything along those lines, but should

15   this issue arise again, we wanted to alert the Court to it in

16   the first instance.

17           THE COURT:  I appreciate it.  Thank you.  Ms. Brook?

18           MS. BROOK:  Oh, I'm sorry.

19           Just before you got off the bench we had one

20   additional issue unrelated, which is that Matthew Reinsmoen is

21   an FBI agent who is going to be testifying this afternoon, a

22   very brief witness, for about ten minutes.

23           It appears that his name was left off the witness

24   list.  We had anticipated June Drake, another individual who

25   was with him, an FBI agent, to be testifying.  She is out of

 1   the country and unavailable.

 2           So I know that the jury hasn't been asked:

 3           Do you know Matthew Reinsmoen?

 4           It's not an ideal circumstance and we apologize for

 5   it, but he is a very brief witness today.

 6           THE COURT:  They haven't known anybody else from the

 7   FBI, so the likelihood is remote, so we can just verify that

 8   when he testifies.

 9           I take it, though, that he is someone who has been

10   disclosed to the defense?

11           MR. MAYNARD:  Yes.

12           MS. BROOK:  Yes.  He has.

13           THE COURT:  All right.  I think we have about five

14   more minutes before the jury comes in.

15           Okay.  I will just stay here.  Maureen will go check

16   and see if they are ready.

17      (Open court, jury present at 3:06 p.m.)

18           THE COURT:  Thank you, ladies and gentlemen.  Please

19   sit down.  The record will show the presence of the jury,

20   counsel, and the defendant.

21           Mr. Koehler, you may continue your questions.

22           MR. KOEHLER:  Your Honor, subject to our earlier

23   discussion about recalling Agent Meshinsky for other purposes,

24   I have no further questions of him regarding these devices.

25           THE COURT:  Thank you.

1              Ms. Plomin?

2              MS. PLOMIN:   Thank you.

3                        **CROSS EXAMINATION**

4    BY MS. PLOMIN:

5    Q    Good afternoon, Agent.

6    A    Good afternoon.

7    Q    Now, Agent, you recovered the Lenovo laptop, Government's

8    Exhibits 61 from 2419 Vista Avenue; is that correct?

9    A    That is correct.

10   Q    And you recovered several other electronic devices from

11   that house, correct?

12   A    Correct.

13   Q    How many computers did you recover from the house?

14   A    I don't recall how many at the time.

15   Q    Would "five" sound accurate to you?

16   A    It could.

17   Q    Did you prepare a 302 regarding the collection of these

18   devices?

19   A    I should have prepared a 302, yes.

20   Q    Would it refresh your recollection to look at that 302?

21   A    Yes.

22              THE COURT:   You were right the first time.

23              MS. PLOMIN:   Thank you.

24   BY MS. PLOMIN:

25   Q    Can you please review it to refresh your recollection.

                    UNITED STATES DISTRICT COURT

1     A    Okay.

2     Q    And was "five" correct?

3     A    Yes.

4     Q    And you recovered two devices from room H; is that

5     correct?

6     A    That is correct.

7     Q    And room H is the room where the Lenovo was recovered,

8     correct?

9     A    Correct.

10    Q    And this second computer, what kind of computer was found

11    in room H aside from the Lenovo?

12    A    Actually, the -- it was a thumb drive, 2 gig thumb drive.

13    Q    I want to direct your attention to paragraph 5.

14    A    Okay.

15    Q    Was there a second laptop found in the -- in room H?

16    A    Yes.  There's two -- two room H -- or excuse me.  Two

17    laptops were found in room H, yes.

18    Q    All right.  And the second laptop, can you describe that.

19    A    Based on this, it's an HP dv5 laptop.

20    Q    And I just want to be clear.

21         When you were discussing the Government's Exhibit 174

22    through 183, you located all of those on the flash drive, not

23    on the Lenovo computer?

24    A    That is correct.

25    Q    And were you able to determine when you were reviewing the

1   flash drive the user who created the documents that were on

2   the flash drive?

3   A    No.

4   Q    Were you able to determine where those documents came from

5   in terms of what electronic device that they came from?

6   A    No.

7   Q    And if the documents on the flash drive did come from the

8   Lenovo laptop, would you expect to see those same documents

9   somewhere on the Lenovo laptop?

10  A    There would be a reference to it.  The document may reside

11  on the laptop, but there could also be a pointer or a

12  reference.

13  Q    And are you aware of any references or pointers to the

14  documents that were found on the flash drive that were found

15  on the Lenovo?

16  A    I'm not aware of any right now.

17  Q    All right.  Did you have an occasion to analyze the actual

18  Lenovo laptop?

19  A    EMH did, put it into CAIR, and it was reviewed by somebody

20  else, a case agent.

21  Q    And who was it reviewed by?

22  A    I don't recall when it was reviewed in 2012.

23  Q    Did anybody look to see if there were any pointers or

24  indicators of the documents that were found on the flash

25  drive, if there were any of those found on the Lenovo laptop?

1    A    I can't answer that question.

2    Q    I would like to direct your attention to Government

3    Exhibit No. 392.  It's been admitted into evidence.

4         Do you have 392?

5         THE COURT:  Do we not have all of the exhibits, Mr.

6    Koehler?

7         MR. KOEHLER:  This was given to the defense, Your

8    Honor, yes.

9         THE COURT:  I'm not talking about the defense.

10        I'm talking about me.  Not -- and I'm not talking

11   about my copy.  I'm talking about the official exhibits.

12        From my understanding, you have been showing exhibits

13   and offering them in evidence and I have been admitting them,

14   and yet we have not been provided with the original exhibit.

15        MR. KOEHLER:  We have the original marked and

16   intended to come up during the break to put those in and give

17   those to the clerk and we will do that at the break.

18        THE COURT:  So before you leave today, all of the

19   exhibits have to be in the custody of the courtroom deputy.

20        MR. KOEHLER:  We will do that.

21        THE COURT:  Thank you.

22        So we would love to hand it to the witness, but we

23   don't have it, Ms. Plomin.

24        So since it's admitted, you can put it on the

25   document camera and we'll look at it from there.

1          MS. PLOMIN:  Thank you.

2          I'm not sure that you can see that.

3   BY MS. PLOMIN:

4   Q   So on Exhibit 392, is this the way the Lenovo looked to

5   you when you first recovered it?

6   A   Yes.

7   Q   And it was powered on?

8   A   Correct.

9   Q   And this was the screen that was on the Lenovo when you

10  entered the room to take the computer?

11  A   Correct.

12  Q   All right.  And it's difficult to see, but looking in the

13  top left-hand corner where there's an address and a name, can

14  you see what that name says?

15  A   I cannot make that name out.  Park?

16  Q   The second line down.

17          The target of the search warrant, are you aware, was

18  Abu Bakr Ahmed?

19  A   Yes.

20  Q   And do you see Abu Bakr Ahmed's name on the second line on

21  the top left-hand corner of the document?

22  A   Yes.

23  Q   And you didn't analyze the Lenovo laptop for additional

24  users other than Mr. Abdul Kareem, did you?

25  A   I didn't analyze the computer.  We put it into CAIR and

1   then it was analyzed by a case agent.

2   Q   All right.  And just going back to the flash drive, there

3   is absolutely no way to tell who loaded those documents onto

4   the flash drive?

5   A   That's correct.

6           MS. PLOMIN:  I don't have any further questions, Your

7   Honor.

8           THE COURT:  Thank you.

9           Any redirect at this time, Mr. Koehler?

10          MR. KOEHLER:  No redirect, Your Honor.  Thank you.

11       (End of Excerpt of Proceedings.)

12                          * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#1   2-18-16

```
 1
 2                    C E R T I F I C A T E
 3
 4         I, ELIZABETH A. LEMKE, do hereby certify that I am
 5    duly appointed and qualified to act as Official Court Reporter
 6    for the United States District Court for the District of
 7    Arizona.
 8         I FURTHER CERTIFY that the foregoing pages constitute
 9    a full, true, and accurate transcript of all of that portion
10    of the proceedings contained herein, had in the above-entitled
11    cause on the date specified therein, and that said transcript
12    was prepared under my direction and control.
13         DATED at Phoenix, Arizona, this 3rd day of March,
14    2016.
15
16
17
18
19                    s/Elizabeth A. Lemke
                      ELIZABETH A. LEMKE, RDR, CRR, CPE
20
21
22
23
24
25
```