UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,      )
                               )
            Plaintiff,         )
                               )    **CR15-00707-PHX-SRB**
        vs.                    )    Phoenix, Arizona
                               )    February 19, 2016
**Abdul Malik Abdul Kareem**,      )
                               )
            Defendant.         )
                               )
_____)

        BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
        EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
              JURY TRIAL - DAY #4
          TESTIMONY:  AMY VAUGHAN-PART #1
              (Pages 1-26, Inclusive)


APPEARANCES:
For the Government:
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
               **Joseph Edward Koehler, Esq**.
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004


For the Defendant Abdul Malik Abdul Kareem:
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
              **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012


Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1    <u>E X C E R P T   O F   P R O C E E D I N G S</u>

2         THE CLERK:  Please state your name for the record and

3    spell your last name.

4         THE WITNESS:  Amy Kathleen Vaughan.  A-M-Y.

5    V-A-U-G-H-A-N.  Kathleen.  K-A-T-H-L-E-E-N.

6         THE COURT:  You may proceed, Mr. Koehler.

7              **AMY KATHLEEN VAUGHAN, WITNESS, SWORN**

8                        **DIRECT EXAMINATION**

9    BY MR. KOEHLER:

10   Q   Good afternoon.  Could you please introduce yourself to

11   the jury.

12   A   Hi.  My name is Amy Vaughan and I'm an Intelligence

13   Analyst for the FBI.

14   Q   How long have you worked for the FBI?

15   A   Just over five years now.

16   Q   What are your duties as an Intelligence Analyst?

17   A   I perform a variety of research tasks, mostly providing

18   context for the investigations, exploiting data, and analyzing

19   it, and then disseminating it to the intelligence community,

20   as well as attempting to create assessments based on the data

21   we currently have to predict likely outcomes.

22   Q   Are you assigned to a particular unit in the FBI?

23   A   Yes.  I'm assigned to a squad on the Joint Terrorism Task

24   Force.

25   Q   And is that here in Phoenix?

1    A    Yes.

2    Q    How long have you been in that assignment?

3    A    Just over five years.

4    Q    So since day one in the FBI, you have been in an

5    Intelligence Analyst in the national security squad here in

6    Phoenix?

7    A    Yes.

8    Q    As part of your duties, do you review electronic images

9    that have been extracted from computers and cell phones and so

10   forth?

11   A    Yes, on occasion.

12   Q    Can you explain a little bit about how that material comes

13   to you, first off.

14   A    Yes.  It's acquired through some legal process or consent

15   that's given to search the device.  The CART team acquires the

16   device and processes it.  And that information is loaded as a

17   digital image to a review system that we have access to back

18   at the FBI.

19   Q    Is that the point at which you get it?

20   A    Yes.

21   Q    Why don't you tell us a little bit about how the review

22   system operates from your end?

23   A    So the first thing we do is establish what it is that we

24   are looking for.  We usually, if we're not familiar with the

25   facts of the case, which might well happen, I review them and

1    then we do two things.

2    Q    Let me pause you for a second.  You mentioned that you

3    review the facts of the case.  How do you do that?

4    A    Usually, just by speaking with the case agents and

5    reviewing the case file.

6    Q    So you want to get an understanding of what it is that

7    you're looking for?

8    A    Yes.

9    Q    In the context of your work at the FBI in your unit, is

10   there a particular area of focus of what you would always be

11   looking for?

12   A    Material relating to terrorism.

13   Q    As part of your review of a device when looking for

14   material related to terrorism, what types of data are you

15   looking through?

16   A    Documents such as .pdfs, Word documents, correspondence,

17   mainly e-mail or Instant Messages, things like that, videos,

18   audio, graphics.  That's the main base of what we look at.

19   Q    And what kinds of things are you looking for in that data?

20   A    Terrorist propaganda is a big one.  So things like

21   magazines, videos that we know have been released by terrorist

22   groups, news releases that they put out.

23        We also look for any sign of contact with known

24   terrorist groups or individuals of concern, things like

25   bomb-making instructions or instructional manuals that might

1    tell you how to commit an attack.

2         Let's see, I think that is about it.

3    Q   Do those kinds of things serve as hallmarks of items that

4    might relate to terrorism?

5    A   Yes.  Some of them can be indicators of radicalization or

6    interest in a group or even intent to commit a future attack.

7    Q   Does seeing those things alone cause you to draw a

8    conclusion or do you have to do further investigation?

9    A   Typically, we have to do further investigation.

10   Q   As you go through and you find items that perhaps have

11   some of these hallmarks, what do you do as you move through

12   the data?

13   A   First we have a labeling system in our forensic tool that

14   allows us to label whether something is pertinent or

15   nonpertinent or if it needs further processing by a CART

16   examiner or a translator or something like that.

17        Then myself or someone -- you know, someone working

18   in a similar position, would go and research the actual item

19   if such research is required.

20        So if it's a lecture or something that I haven't

21   heard of before, I will go and look that up and get a better

22   idea of what exactly it is.

23   Q   What kind of research would you do to look that up?

24   A   I might search the Internet or search FBI databases.

25   There are repositories of terrorist propaganda or lectures and

1    so forth that I can check.

2    Q    When you check, are you looking for particular information

3    about, for instance, you mentioned audio.  What would you be

4    looking to find out about the audio?

5    A    Who produced it and published it.  Who it features.

6    Q    When you say "who it features," what do you mean by that?

7    A    Who is delivering the lecture.  What it's about.

8    Q    Will you review transcripts of them as well, if they are

9    available?

10   A    If they are available, but they usually are not.

11   Q    When you're dealing with documents, e-mails, Word

12   documents, .pdfs, and so on, do you have tools available to

13   help speed your processing of those kinds of items?

14   A    Our forensic tool is set up in a way that makes an

15   immediate review of some of these items a little more easier,

16   just that it will show you all of them at once so that you can

17   scan through a little faster.

18   Q    Are you able to use things like search strings?

19   A    Yes.  We also have the ability to do targeted searches,

20   which is usually the second part of any review of media that

21   we do.

22   Q    Are you able to do those kinds of searches when you're

23   dealing with image files or video or audio files?

24   A    It depends on whether or not metadata is embedded in those

25   files with audio or video.  Things like the title and the

 1    author are often embedded in the file.  And, therefore, when

 2    we do a targeted search, those things will turn up, but with

 3    pictures that's usually not the case.

 4    Q    What do you have to do when you're looking through

 5    pictures and audio and video to make certain that you don't

 6    miss anything?

 7    A    We need to actually look at them, listen to them, watch

 8    them.

 9    Q    One by one?

10    A    Yes.

11    Q    In today's world with ever-increasing hard drive sizes,

12    can you walk the jury through what it's like to be doing that?

13          THE COURT:  Well, my question would be why?  Can't we

14    get to what she was doing in this case?

15          MR. KOEHLER:  Certainly.  I just wanted to lay the

16    foundation for how we get there.

17    BY MR. KOEHLER:

18    Q    So in this case, have you -- obviously, we have met before

19    today; is that correct?

20    A    Yes.

21    Q    Have you reviewed a number of devices in connection with

22    the investigation of the attack in Garland, Texas?

23    A    Yes.

24    Q    Was one of those devices an image of a Lenovo computer

25    that was created in 2015?

1    A    Yes.

2    Q    And during the review of that computer, the image of that

3    computer, did you find items that were relevant to the

4    investigation?

5    A    Yes.

6    Q    I'm going to show you what's been marked for

7    identification as Exhibit No. 166.

8          If I can have a moment, Your Honor.

9          Showing you what's marked for identification as

10   Exhibit No. 162, Ms. Vaughan, do you recognize that?

11   A    Yes.

12   Q    Can you tell the Court and the jury what that is?

13   A    This is a screenshot of our forensic tool which shows a

14   file that has been put into the Recycle Bin and recycled which

15   was previously a .pdf file entitled S&I.pdf.

16   Q    Is that a fair and accurate depiction of the screenshot of

17   the Recycle Bin of the Lenovo from 2015?

18   A    I believe so.

19          MR. KOEHLER:  Move to admit Exhibit 162.

20          MS. PLOMIN:  No objection.

21          THE COURT:  162 is admitted.

22      (Exhibit No. 162 admitted in evidence.)

23   BY MR. KOEHLER:

24   Q    Ms. Vaughan, the file film S&I.pdf, had you seen that

25   filename elsewhere before?

1   A   Yes.

2   Q   And can you tell the jury what that filename meant to you?

3   A   Yes.  I recognized it as a .pdf of a file called the

4   Global Islamic Media Front Security and Intelligence Course.

5   Q   And now I'm now going to place Exhibit 163.  Do you

6   recognize that?

7   A   Yes.

8   Q   Where did that come from?

9   A   I believe that came from the Lenovo.

10  Q   And is that a fair and accurate depiction of the image

11  that you found on the Lenovo?

12  A   Yes.

13          MR. KOEHLER:  Move to admit 163.

14          MS. PLOMIN:  No objection.

15          THE COURT:  163 is admitted.

16      (Exhibit No. 163 admitted in evidence.)

17  BY MR. KOEHLER:

18  Q   What are the words on that image?

19  A   It says Apocalypse Rising.

20  Q   Did you recognize that image when you saw it?

21  A   No.

22  Q   There's one other question about that.

23          Do you recall the date of access for that particular

24  image?

25  A   I don't recall, no.

1    Q   All right.  Did you also review the image of the desktop

2    computer, No. 263 is the exhibit number?  Have you seen that

3    desktop before today?

4    A   Which -- can you be more specific about which desktop it

5    is?

6           THE COURT:  Would you know if Mr. Koehler told you

7    what location it was seized from, what computer he's referring

8    to?

9           THE WITNESS:  Yes.

10           THE COURT:  Okay.  Why don't you tell her what

11    desktop image she reviewed.

12    BY MR. KOEHLER:

13    Q   Let me ask this.  Is there more than one desktop computer

14    that was reviewed in the case?

15    A   No, but I just wanted to make sure it was the right one.

16    Q   And having seen me lift it up, is that the right one?

17    A   Yes, sir.

18    Q   During the course of reviewing the desktop computer, did

19    you find evidence of a series of files in a lecture series

20    called Bearers of Glad Tidings?

21    A   Yes.

22    Q   And what format were those files in?

23    A   I believe they were MP3 files.

24    Q   And were those files exported from the computer on your

25    behalf?

1   A    I believe so, yes.

2   Q    Did you also review on the computer and find a file, a

3   sermon by a person named Anwar al-Awlaki, about the

4   persecution of Muslims?

5   A    Yes.

6   Q    And do you recall the precise name of that file?

7   A    It's Brutality Towards Muslims.

8   Q    Was there also a file on that computer, a series thereof,

9   called Constants On The Path of Jihad?

10          MS. PLOMIN:  Your Honor, objection as to which

11   computer.

12          MR. KOEHLER:  We're still talking about the desktop

13   computer.

14          THE COURT:  So this series of questions is related

15   exclusively to the desktop computer?

16          MR. KOEHLER:  That is correct.

17          THE COURT:  Please continue.

18          THE WITNESS:  Yes.

19   BY MR. KOEHLER:

20   Q    And was that a six-part audio series?

21   A    Yes.

22   Q    And was that also in MP3 format?

23   A    Yes.

24   Q    Was there also another audio called 17 Rules of Dream

25   Interpretations?

```
 1    A    Yes.

 2    Q    And another one called Dreams in Qur'an and Hadith?

 3    A    Yes.

 4    Q    Was there another audio called Dreams Of The Companions?

 5    A    Something like that, yes.

 6    Q    How about an audio called The Dust Will Never Settle Down?

 7    A    Yes.

 8    Q    And did you recognize that particular filename?

 9    A    Yes.

10    Q    Do you know who the person is who delivered that lecture?

11    A    Anwar al-Awlaki.

12    Q    Was there another lecture concerning America's War on

13    Islam?

14    A    Yes.

15    Q    And a lecture about a classical book on jihad?

16    A    Yes.

17    Q    Another audio advocating Muslims to restore the honor of

18    Islam in calling for the revival of the Khalifah and jihad?

19    A    Yes.

20    Q    Were there two audios,  Allah Is Preparing Us For Victory

21    Parts 1 and 2?

22    A    Yes.

23    Q    And It's A War Against Islam?

24    A    Yes.

25    Q    Was there also a print version of Constants On The Path To
```

```
 1    Jihad or On The Path Of Jihad on the computer?
 2    A   Yes.
 3    Q   I'm placing Exhibit 279 on the camera.
 4            Ms. Vaughan, do you recognize that?
 5    A   Yes.
 6    Q   Is that a true and accurate copy of the document that you
 7    found on the desktop computer Constants On The Path Of Jihad?
 8    A   Yes.
 9            MR. KOEHLER:  Move to admit 279.
10            MS. PLOMIN:  No objection.
11            THE COURT:  279 is admitted.
12        (Exhibit No. 279 admitted in evidence.)
13    BY MR. KOEHLER:
14    Q   Now, moving on to Exhibit 281.  And I believe our
15    witness -- or our exhibit list has this incorrectly described.
16            Did you find a page from Dabiq Magazine Issue No. 4?
17    A   Yes.
18    Q   Was that page 13 of the magazine?
19    A   Yes.
20    Q   I'm putting Exhibit 281 on the monitor for you.
21            Is that a fair and accurate depiction of the page
22    that you found on the desktop computer?
23    A   Yes.
24            MR. KOEHLER:  Move to admit 281.
25            MS. PLOMIN:  No objection.
```

```
 1              THE COURT:  281 is admitted.

 2        (Exhibit No. 281 admitted in evidence.)

 3   BY MR. KOEHLER:

 4   Q   Ms. Vaughan, looking at the objects depicted in the photo

 5   there, do you recognize those from your work?

 6   A   I believe they're some sort of missile.

 7   Q   Now moving on, did you also find Dabiq Issue 5 on the

 8   computer?

 9   A   Yes.

10   Q   I'm placing what's been marked, for identification, as

11   Exhibit 282 on the document camera.

12              Do you recognize that, Ms. Vaughan?

13   A   Yes.

14   Q   Is that a true and correct copy of the Dabiq Issue 5

15   Magazine that you found on the computer?

16   A   Yes.

17              MR. KOEHLER:  Move to admit 282.

18              MS. PLOMIN:  No objection.

19              THE COURT:  282 is admitted.

20        (Exhibit No. 282 admitted in evidence.)

21   BY MR. KOEHLER:

22   Q   Ms. Vaughan, did you also find screen captures of videos

23   on the computer in places?

24   A   Yes.

25   Q   Was one of them a screencap from an official ISIL video of
```

1    fighters loading artillery?

2    A    Yes.

3    Q    And had you seen the actual video that this came from?

4    A    No.

5    Q    How could you tell it was from an official ISIL video?

6    A    I recognized on the bottom there's an official logo.  And

7    that logo is one of the provincial media outlets for the

8    Islamic State.

9    Q    Is Exhibit 283 one such screen capture?

10   A    Yes.

11   Q    Is that a true and accurate copy of the screencap you

12   found on the computer?

13   A    Yes.

14           MR. KOEHLER:  Move to admit 283.

15           MS. PLOMIN:  No objection.

16           THE COURT:  283 is admitted.

17       (Exhibit No. 283 admitted in evidence.)

18   BY MR. KOEHLER:

19   Q    Now, directing your attention to Exhibit 284, was there a

20   screen capture from a video of a person about to be beheaded

21   on the computer?

22   A    Yes.

23   Q    And can you tell where that screen capture came from?

24   A    It's a video from Wilayah Halab.

25   Q    And what is that?

1    A    That is one of the provincial media outlets of the Islamic

2    State.

3    Q    Is that a true and accurate copy of the screen capture?

4    A    Yes.

5              MR. KOEHLER:  Move to admit 284.

6              MS. PLOMIN:  Your Honor, we object to this in

7    relevance and overly inflammatory.

8              THE COURT:  The objection is overruled.  284 is

9    admitted.

10             But you can take it off the screen now, Mr. Koehler.

11        (Exhibit No. 284 admitted in evidence.)

12   BY MR. KOEHLER:

13   Q    Did the computer also contain an advertisement for an

14   article titled The Obligation Of Appointing a Khalifah & The

15   Forbiddance Of Delaying Such from Ansar al Khilafah, an ISIL

16   supporter organization?

17   A    Yes.

18   Q    I placed 285 on the document camera.  Is that a true and

19   accurate copy of that advertisement?

20   A    Yes.

21             MR. KOEHLER:  Move to admit 285.

22             MS. PLOMIN:  No objection.

23             THE COURT:  285 is admitted.

24        (Exhibit No. 285 admitted in evidence.)

25   BY MR. KOEHLER:

1  Q   Ms. Vaughan, there's a person's picture in the upper,

2  little bit left of center, of the picture.

3           Do you recognize that picture?

4  A   Yes.  That is Abu Bakr al-Baghdadi.

5  Q   And who is he?

6  A   He is the Khalifah of the Islamic State.

7  Q   Going now to 286, is there a screen capture from an ISIL

8  branch in Libya on the computer depicting prisoners marched

9  along a beach?

10 A   Yes.

11 Q   Now, in your work, have you learned about ISIL's expansion

12 in the Middle East?

13 A   Yes.

14 Q   Do they have a branch in Libya?

15 A   Yes, they do.

16 Q   And had you -- have you seen this particular video during

17 your work?

18 A   I have seen parts of it, yes.

19 Q   And does this photograph fairly and accurately depict the

20 screen capture you found on the computer?

21 A   Yes.

22           MR. KOEHLER:  Move to admit 286.

23           MS. PLOMIN:  No objection.

24           THE COURT:  286 is admitted.

25      (Exhibit No. 286 admitted in evidence.)

```
 1    BY MR. KOEHLER:

 2    Q   Have you seen the later part of this video when these

 3    people are executed?

 4    A   I have not watched that part, but I am aware of it.

 5    Q   I'm going to lay foundation for some of these and then

 6    move on and we'll talk about admitting them later, if that's

 7    okay.

 8              Is there a picture on the computer of a man being --

 9    having been publicly executed?

10    A   Yes.

11    Q   Is Exhibit 287 a fair and accurate depiction of that

12    picture?

13    A   Yes.

14    Q   Exhibit No. 288.  Do you see a picture on the computer of

15    a group of people looking like they were executing a person in

16    that courtyard?

17    A   Yes.

18    Q   Does the building have a flag on it?

19    A   There's a flag on a pole on the courtyard floor.

20    Q   And what kind of flag is it?

21    A   I believe it's an Islamic State flag.

22    Q   Is this a true and accurate copy of the depiction on the

23    computer?

24    A   Yes.

25    Q   Did the computer also contain a screen capture from an
```

1  official video of a beheading that's about to occur?

2  A    Yes.

3  Q    Is 289 an accurate depiction of that image?

4  A    Yes.

5        THE COURT:   I'm going to interrupt you here for a

6  moment, because so far there have not been any objections to

7  the foundation for these photos.

8        And so to try to move things along a bit, does the

9  defendant have objections to whether or not these are true and

10  accurate screenshots from images from the desktop computer?

11        MS. PLOMIN:   No.   Our only objection would be

12  relevance and overly inflammatory on a number of these

13  exhibits.

14        THE COURT:   Thank you.

15  BY MR. KOEHLER:

16  Q    Looking at 290, did you find a screen capture of a --

17        THE COURT:   Well, we're not going to go through them

18  unless they're admitted.   We're not going to have a

19  description of what's in an exhibit that isn't admitted when

20  we know that you don't have to lay the foundation because we

21  have just been told that the defense has no objection to the

22  foundation for these exhibits.

23        MR. KOEHLER:   If they're not going to object to

24  foundation on the exhibits, then we can go through later

25  and --

1           The concern I have is making sure that I associate

2     the right exhibit numbers with the right computer in a way

3     that makes it clear for the record.

4           THE COURT:  I understand that.

5           So you're asking about exhibits through what number?

6           MR. KOEHLER:  Right now I'm on 290.  And not all of

7     these display the things that are of concern.  Some of them

8     are not.

9     BY MR. KOEHLER:

10    Q   So on page 9 of our exhibit list, Exhibits 289 through

11    299, and 301 through 306, and 308 through 310 are ones that if

12    the defendant is willing to stipulate to foundation, I will

13    skip through those and we can circle back to them later.

14          THE COURT:  Because you can avow that based on your

15    prior discussions with Ms. Vaughan that she would say these

16    were all true and accurate things that she found during her

17    review of the laptop computer?

18          MR. KOEHLER:  That is correct.  But it's the desktop

19    computer.

20          THE COURT:  I'm sorry.  I did misspeak.

21          The desktop computer, the one that you held up.

22          MR. KOEHLER:  Yes.

23          THE COURT:  And is that accurate that there is no

24    foundation objections to the exhibit numbers that Mr. Koehler

25    just read out?

CR15-00707-PHX-SRB      AMY VAUGHAN-PART#1      2-19-16

1          MS. PLOMIN:  That is accurate, Your Honor.

2          THE COURT:  Thank you.

3          MR. KOEHLER:  So with that said, I will move to

4    Exhibit 300.  And if there are foundational objections, I will

5    ask the witness what it is.

6    BY MR. KOEHLER:

7    Q   Is that the right direction?

8    A   Yes.

9    Q   Ms. Vaughan, can you tell us what that image is?

10   A   This is one of the logos used by the official media

11   outlets of the Islamic State.

12          MR. KOEHLER:  Move to admit 300.

13          MS. PLOMIN:  No objection.

14          THE COURT:  300 is admitted.

15      (Exhibit No. 300 admitted in evidence.)

16          THE COURT:  Is it fuzzy in this picture or is it

17   always fuzzy?

18          THE WITNESS:  No.  This picture has been increased in

19   size so it's a little bit pixilated.

20   BY MR. KOEHLER:

21   Q   Now, moving on to Exhibit 307, again, assuming no

22   foundational objections, Ms. Vaughan, can you tell us what

23   this picture is?

24   A   This is a picture of James Foley as he was depicted in the

25   video that showed his execution.

1    Q    And are you aware of who released that video?

2    A    Yes.  The Islamic State.

3              MR. KOEHLER:  Move to admit 307.

4              MS. PLOMIN:  No objection, Your Honor.

5              THE COURT:  307 is admitted.

6         (Exhibit No. 307 admitted in evidence.)

7    BY MR. KOEHLER:

8    Q    And who was James Foley?

9    A    I'm not totally clear on his exact profession, but he

10   worked in Syria and was kidnapped by the Islamic State.

11   Q    Now, moving to 311, what does this photograph depict?

12   A    I believe that it depicts a truckload full of prisoners.

13             MR. KOEHLER:  Move to admit 311.

14             MS. PLOMIN:  No objection.

15             THE COURT:  311 is admitted.

16        (Exhibit No. 311 admitted in evidence.)

17   BY MR. KOEHLER:

18   Q    Ms. Vaughan, do you recognize the writing in the lower

19   right-hand corner of that picture?

20   A    Yes.  I think some of it is cut off in this particular --

21   Q    Based on what you can see, can you tell what it is?

22   A    Yes.  I'm fairly sure it's a screencap from one of the

23   official Islamic State videos.

24   Q    And what does it show?

25   A    It shows an explosion in a field of some kind.

```
 1              MR. KOEHLER:  That's Exhibit 312.  Move to admit it.

 2              MS. PLOMIN:  No objection.

 3              THE COURT:  312 is admitted.

 4         (Exhibit No. 312 admitted in evidence.)

 5    BY MR. KOEHLER:

 6    Q   Moving now to 313, what is that?

 7    A   These are children in front of an Islamic State flag

 8    posing in a very common religious gesture.

 9    Q   And what is that religious gesture?

10              THE COURT:  Why don't we admit it first so that the

11    jury knows what the gesture is at the same time that she's

12    telling us what it is.

13              MR. KOEHLER:  Move to admit 313.

14              MS. PLOMIN:  No objection.

15              THE COURT:  313 is admitted.

16         (Exhibit No. 313 admitted in evidence.)

17    BY MR. KOEHLER:

18    Q   And are you familiar with that gesture?

19    A   Yes.

20    Q   What is it?

21    A   It's a single finger extended upright.  And to the best of

22    my knowledge, it signifies one of the core theological

23    concepts of Islam.

24    Q   Which is?

25    A   Oneness of God, I guess.
```

1   Q    Now, moving to 314, can you tell us what that is?

2   A    This is a picture of Steven Sotloff being held sort of by

3   the back of his shirt by Jihadi John in a video released by

4   the Islamic State.

5   Q    Did you know through your work who Jihadi John was?

6   A    Yes.

7   Q    Who was he?

8   A    He was a member of the Islamic State and he became famous

9   because he appeared in these videos as the executioner of

10   these captives and because he spoke English.

11          MR. KOEHLER:  Move to admit 314.

12          MS. PLOMIN:  No objection.

13          THE COURT:  314 is admitted.

14      (Exhibit No. 314 admitted in evidence.)

15          THE COURT:  Are we finished with photographs?

16          MR. KOEHLER:  For the moment.

17          THE COURT:  Would this be a good time to end for the

18   day?

19          MR. KOEHLER:  It certainly would, Your Honor.

20          THE COURT:  I assume the jury is not complaining if

21   we don't go all the way to 4:30.

22          Okay.  There being no objection from the jury to

23   ending a little early on this Friday afternoon, ladies and

24   gentlemen, we will recess until Tuesday.  Please remember

25   Tuesday.  Well, if you come on Monday, I will be here but

1    there won't be any trial.  So please come on Tuesday at 9:00

2    a.m.

3            Please remember the admonition that you are not to

4    discuss this case among yourselves or with anyone else,

5    including family, friends, people that you work with.  You

6    remember what you can tell them.  You're on a jury.  The case

7    is going to last up to five weeks and you can't tell them

8    anything else about the case until the trial is over.

9            Also, again, you heard about a lot of different

10   things.  Things you may not be familiar with.  Please do not

11   do any research.  Don't even look up how to spell something.

12   I just found out I have been spelling something wrong all day

13   now that I have seen it in writing.

14           Don't go back and try to figure out how to spell

15   anything.  If you are worried about your spelling, ask me.  I

16   won't know the answer but I will find out the answer for you.

17           And, finally, please do not form any conclusions

18   about the case until you have heard all the evidence and begun

19   your deliberations.

20           Court is in recess until Tuesday morning at 9:00 a.m.

21           MR. KOEHLER:  Your Honor, when can we take up the

22   issue that's raised in the Trial Memoranda?

23           THE COURT:  Not today.

24       (End of Excerpt of Proceedings.)

25                           * * *

1

2                        C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 4th day of March,

14   2016.

15

16

17

18

19                        s/Elizabeth A. Lemke
                          ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25