# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 23, 2016 |
| **Abdul Malik Abdul Kareem,** | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**
**EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL - DAY #5**
**(Pages 27-140, Inclusive.)**


APPEARANCES:
For the Government:
         U.S. ATTORNEY'S OFFICE
         By:  **Kristen Brook, Esq.**
              **Joseph Edward Koehler, Esq**.
         40 North Central Avenue, Suite 1200
         Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
         MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
         By: **Daniel D. Maynard, Esq.**
             **Mary Kathleen Plomin, Esq.**
         3200 North Central Avenue, Suite 1800
         Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1              E X C E R P T   O F   P R O C E E D I N G S

2              MR. KOEHLER:  The United States recalls Amy Vaughan.

3              MS. BROOK:  She's in transit up the elevator.

4              THE COURT:  Maybe your witnesses should be in the

5      witness room rather than on the third floor.

6              MS. BROOK:  We thought that she was.

7              My apologies, Your Honor.  We thought she was right

8      outside.

9              THE COURT:  Ms. Vaughan, you may take the stand and

10     you may continue, Mr. Koehler.

11             **AMY KATHLEEN VAUGHAN, WITNESS, SWORN**

12                  **DIRECT EXAMINATION (cont'd)**

13     BY MR. KOEHLER:

14     Q   Good morning, Ms. Vaughan.

15     A   Good morning.

16     Q   On Friday afternoon when we left off, we were reviewing

17     files from the tower computer and I believe we were at Exhibit

18     315.

19             During the course of the review of the tower

20     computer, did you reveal a Google search for the website

21     called "authentictauhid"?

22     A   Yes.

23     Q   Is that a known website to FBI?

24     A   Yes.

25     Q   And what is that website?

1    A    That is the website of Jamaican Sheikh Abdullah al-Faisal.

2    Q    And I'm going to go to Exhibit 315.

3           Agent Vaughan, is Exhibit 315 a true and accurate

4    reproduction of the Google search history from the tower

5    computer?

6    A    Yes.

7    Q    And are there several exhibits that are marked the same

8    way that are all part of that same Google search history?

9    A    Yes.

10   Q    This is page 2 of 315.  Is that also part of that

11   reproduction of the Google search history?

12   A    Yes.  This is the other half of it.

13   Q    Okay.

14          THE COURT:  Oh.  So this would have been like we

15   would tape it together into one page and it would be about

16   this wide?

17          THE WITNESS:  Yes.

18          THE COURT:  Thank you.

19          MR. KOEHLER:  Move to admit 315.

20          MS. PLOMIN:  No objection.

21          THE COURT:  315 is admitted.

22       (Exhibit No. 315 admitted in evidence.)

23          MR. KOEHLER:  And we'll have a cleaner copy that

24   that's a little bit easier for the jury to read later on.

25   BY MR. KOEHLER:

1    Q    And I move now to Exhibit 319.  Was there a profile on the

2    computer that was viewed for a user known as "tru_Qur'an"?

3    A    Yes.

4    Q    I place Exhibit 319 on the computer.

5         Can you explain to the members of the jury how you're

6    able to locate the profile and what this profile is?

7    A    Well, on the other side of this Internet history there is

8    the title and it says in the title the name of the member.

9    His profile is being looked at.

10        And I recognized that as a username that was used

11   many times by Elton Simpson.

12   Q    So seeing that on the computer, what did that tell you in

13   terms of seeing that on the computer?

14   A    I thought it could mean that Mr. Simpson had logged in and

15   was looking at his own profile or that someone was interested

16   in what he had written.

17   Q    During your review of this computer, did you determine who

18   the principal user of the computer was?

19   A    I believe it was Nadir Soofi.

20   Q    And is this a true and correct copy of the Google history

21   showing the history of the tru_Qur'an profile?

22   A    Yes.

23        MR. KOEHLER:  Move to admit 319.

24        MS. PLOMIN:  Objection as to foundation as to which

25   device this was located on.

1                THE COURT:  Was this also from the tower computer

2     that we see on the table there?

3                THE WITNESS:  Yes.

4                THE COURT:  Is there any objection?

5                MS. PLOMIN:  No, Your Honor.

6                THE COURT:  319 is admitted.

7          (Exhibit No. 319 admitted in evidence.)

8                MR. KOEHLER:  Just for the record, we will be talking

9     about the tower computer on everything I talk about until we

10    shift to another one and I will announce that when we get

11    there.

12               THE COURT:  Thank you.

13    BY MR. KOEHLER:

14    Q   Now, directing your attention to Exhibit 320, was there a

15    viewing of a video called Battalions of Faith on YouTube in

16    the Internet history on 263?

17    A   Yes.

18    Q   And is 320 an accurate depiction of the user history

19    showing that?

20    A   Yes.

21               MR. KOEHLER:  Move to admit 320.

22               MS. PLOMIN:  No objection.

23               THE COURT:  320 is admitted.

24          (Exhibit No. 320 admitted in evidence.)

25    BY MR. KOEHLER:

1   Q   Now, directing you to Exhibit 321, was there a viewing of

2   something called "Nasyid senandung jihad A nasru Tawala"?

3   A   Yes.

4   Q   Was that also on YouTube?

5   A   Yes.

6   Q   Is 321 a fair and accurate depiction of the Internet

7   history for that?

8   A   Yes.

9           MR. KOEHLER:  Move to admit 321.

10          MS. PLOMIN:  No objection.

11          THE COURT:  321 is admitted.

12      (Exhibit No. 321 admitted in evidence.)

13  BY MR. KOEHLER:

14  Q   Now, moving to 326.  Did the history of the computer show

15  the viewing of a video called "Quran Fighting Is Prescribed

16  For You"?

17  A   I believe this is just a Google search for that phrase,

18  but, yes.

19  Q   And is that a true and correct copy of the Google history

20  reflecting that search?

21  A   Yes.

22          MR. KOEHLER:  Move to admit 326.

23          MS. PLOMIN:  No objection.

24          THE COURT:  326 is admitted.

25      (Exhibit No. 326 admitted in evidence.)

```
1    BY MR. KOEHLER:

2    Q    I'm now directing you to 327.  Can you tell the Court and

3    jury what that shows.

4    A    This is the same Google search and it also shows the

5    results.

6    Q    And does it --

7    A    Oh, there we go.

8    Q    Does it show a click-through to the result of the search?

9    A    Yes.  I think the other pages show the referred link.  So

10   we can tell that that -- the other page was accessed as a

11   result of that Google search.

12   Q    Okay.  And can you explain for a minute how that works

13   with Google, how the Google search feature works, and how you

14   can see the click-through when you're reviewing the computer's

15   history?

16   A    Yes.  One way is if the referred link is recorded.  So any

17   time you are looking at a website and you click on something,

18   when you go to the next page and that's recorded in your

19   Internet history, there is a record, the refer, of how you got

20   there, what you clicked on to get to that page.  So that's one

21   way.

22          Another way is that on occasion, Google will generate

23   another refer link that includes the results and the query

24   together in one big long link.

25          So in this case, it was the first of the first sort.
```

1    Q    You saw the refer in the visit to the site?

2    A    Yes.  In the Internet history that was recorded.

3              THE COURT:  So I think we've all used Google.

4              So if I say -- if I Google "backpacks," then you can

5    see my Google history that I Googled that word.

6              And then is what you're saying that this shows which

7    of the search results I clicked on?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  Thank you.

10   BY MR. KOEHLER:

11   Q    Have you encountered -- have you encountered in the course

12   of your career cases in which you have seen users clear their

13   Internet search history?

14   A    Yes.

15   Q    And are you able to see all of this when that happens?

16   A    No.

17   Q    And what about when you execute a search warrant on

18   Google -- somebody's Google account?  Can you sometimes see

19   their Google search history as part of the execution of the

20   search warrant?

21   A    Yes.  So there's the Internet history on your computer

22   which you can clear by, you know, going to your history and

23   clicking "clear."

24              But Google records separately what you are searching

25   when you are logged into your Google account.  So you have to

1    also take the additional step of clearing it from inside of

2    your Google account settings.

3    Q    Is there also a way for someone to avoid having the

4    browser itself track their searching history?

5    A    Yes.   Many browsers have such a feature.

6    Q    What is that feature called?

7    A    It's known variously as "incognito mode" or "privacy mode"

8    or "in private browsing."

9    Q    And does Internet Explorer have that feature?

10   A    Yes.

11   Q    Google Chrome?

12   A    Yes.

13   Q    Firefox?

14   A    Yes.

15   Q    The Apple browser Safari, does it also have such a

16   feature?

17   A    I can't recall.

18   Q    So is 326 a true and correct printout of that

19   click-through to that result?

20           THE COURT:  327?

21           MR. KOEHLER:  Yes.  327.  Thank you, Your Honor.

22           THE WITNESS:  Yes.

23           MR. KOEHLER:  Move to admit 327.

24           MS. PLOMIN:  No objection.

25           THE COURT:  327 is admitted.

1          (Exhibit No. 327 admitted in evidence.)

2    BY MR. KOEHLER:

3    Q   And is this the page that shows the click-through,

4    Ms. Vaughan?

5    A   Yes.  It's right below it there.

6    Q   And then switching to the other page of it.

7          THE COURT:  You're leaving it up there as if all of

8    us understand what all of those letters and numbers mean.

9          So I think you can take it down and move on, Mr.

10   Koehler.

11         MR. KOEHLER:  I was watching their faces to make sure

12   that everybody was done looking at it on the screen.  Thank

13   you.  I know I hate when people pull things off when I'm

14   trying to read them.

15   BY MR. KOEHLER:

16   Q   All right.  Now, moving on to 328.  Did you find evidence

17   of the user of the tower computer here searching for a website

18   that conducts academic research on jihadist propaganda?

19   A   Yes.

20   Q   I put 328 on the screen.  Is that an example of that?

21   A   Yes.

22   Q   And what is the name of the website they visited?

23   A   Jihadology.net.

24   Q   And is 328 a fair and accurate depiction of that history?

25   A   Yes.

 1              MR. KOEHLER:  Move to admit 328.

 2              MS. PLOMIN:  No objection.

 3              THE COURT:  328 is admitted.

 4         (Exhibit No9. 328 admitted in evidence.)

 5    BY MR. KOEHLER:

 6    Q   Can you tell what the user was searching for specifically

 7    there?

 8    A   They were viewing like a category page that was

 9    specifically marked Dabiq Magazine.

10              So we would expect this page they were looking at to

11    contain all of the blogs, articles about Dabiq Magazine.

12    Q   And can you read what the next entry is on that list.

13    A   Jihadology.net/2014/07/05, al-Hayat-media-center presents

14    a new issue of the Islam State's magazine Dabiq; and the

15    number one.

16    Q   Now, moving on to 329, did the visitor -- or the user of

17    the tower computer make more visits to that jihadology

18    website?

19    A   Yes.  There is a storage section of it which is labeled

20    with the name of the author.  That's the "azalin" portion.

21    That's the name of the author.

22              So this shows visits to a number of other .pdf files

23    on the website.

24    Q   And did it show visits for issues 1 through 8 of Dabiq

25    Magazine?

1    A    This page only shows, I think, 1 through 5, yes.  Only 1

2    through 5.

3    Q    Okay.  And then moving on to page 3 of the exhibit.

4    A    Yes.  This shows 6 through 8.

5    Q    So does that mean the user had accessed 8 issues of Dabiq

6    Magazine at that point in time?

7    A    Yes.  I believe at this point in time there were only 8

8    issues available.

9    Q    Is 329 a fair and accurate depiction of that history?

10   A    Yes.

11           MR. KOEHLER:  Move to admit 329.

12           MS. PLOMIN:  No objection.

13           THE COURT:  329 is admitted.

14      (Exhibit No. 329 admitted in evidence.)

15   BY MR. KOEHLER:

16   Q    Moving on to 330, did the computer show history of the

17   user's tracking what law enforcement was doing here in Arizona

18   regarding terrorism?

19   A    I remember seeing a few articles about police activities

20   and counterterrorism training.

21   Q    And directing your attention here to Exhibit 330, is this

22   one such example?

23   A    Yes.

24   Q    Is that a fair and accurate depiction of that search or

25   that viewing of an article?

1    A    Yes.

2              MR. KOEHLER:  Move to admit 330.

3              MS. PLOMIN:  No objection.

4              THE COURT:  Exhibit 330 is admitted.

5         (Exhibit No. 330 admitted in evidence.)

6    BY MR. KOEHLER:

7    Q    And what was the name of the story.

8    A    Soldiers Hold Terrorism Training Drill In Arizona.

9    Q    Did that same Internet history also show Twitter searches

10   for Islamic State or "#IS"?

11   A    Yes.  It shows a search for "#IS."

12   Q    And is 331 a depiction of that?

13   A    Yes.

14             MR. KOEHLER:  Move to admit 331.

15             MS. PLOMIN:  No objection.

16             THE COURT:  331 is admitted.

17        (Exhibit No. 331 admitted in evidence.)

18   BY MR. KOEHLER:

19   Q    Did it also show searches for "ISIS"?

20   A    Yes.  It shows searches for hashtag I-S-I-S or "#ISIS."

21   Q    And is 332 a fair and accurate depiction of that in the

22   search history?

23   A    Yes.

24             MR. KOEHLER:  Move to admit 332.

25             MS. PLOMIN:  No objection.

```
 1              THE COURT:  332 is admitted.

 2         (Exhibit No. 332 admitted in evidence.)

 3    BY MR. KOEHLER:

 4    Q   Did it, again, show more searches for "Authentic Tauheed"?

 5    A   Yes.

 6    Q   And is 333 an example of that?

 7    A   Yes.

 8              MR. KOEHLER:  Move to admit 333.

 9              MS. PLOMIN:  No objection.

10              THE COURT:  333 is admitted.

11         (Exhibit No. 333 admitted in evidence.)

12    BY MR. KOEHLER:

13    Q   Directing your attention to 334, is that a specific entry

14    from the web browser history on the tower computer?

15    A   Yes.

16    Q   And does that show a date of visiting the Authentic

17    Tauheed website?

18    A   Yes.

19    Q   Is that a fair and accurate depiction of that particular

20    line from the history?

21    A   Yes.

22              MR. KOEHLER:  Move to admit 334.

23              MS. PLOMIN:  No objection.

24              THE COURT:  334 is admitted.

25         (Exhibit No. 334 admitted in evidence.)
```

UNITED STATES DISTRICT COURT

1    BY MR. KOEHLER:

2    Q    Now, directing your attention to Exhibit 338, is that an

3    object that you found on the computer?

4    A    Yes.

5    Q    And can you tell us in brief what that is?

6    A    It's a picture of a masked man holding a rifle and it has

7    the caption:

8            "We have come for the sake of Allah and we have

9    declared jihad."

10   Q    And that's a true and accurate copy of what came off the

11   computer?

12   A    Yes.

13           MR. KOEHLER:  Move to admit 338.

14           MS. PLOMIN:  Your Honor, I would just like to clarify

15   which computer this was found on.

16           THE COURT:  It's still from the tower computer,

17   correct, Mr. Koehler?

18           MR. KOEHLER:  That is correct, Your Honor.

19           MS. PLOMIN:  No objection.

20           THE COURT:  338 is admitted.

21       (Exhibit No. 338 admitted in evidence.)

22   BY MR. KOEHLER:

23   Q    And I want to direct your attention to 340.  Do you

24   recognize that?

25   A    Yes.

```
 1   Q    Is that also a true and accurate copy of a picture coming
 2   off of the computer?
 3   A    Yes.
 4              MR. KOEHLER:  Move to admit 340.
 5              MS. PLOMIN:  No objection.
 6              THE COURT:  340 is admitted.
 7        (Exhibit No. 340 admitted in evidence.)
 8   BY MR. KOEHLER:
 9   Q    That's a little hard to read.  Can you tell us what the
10   text below "we are coming" says?
11   A    Yes.  It says:
12              "Now has come the time of the men.  And this is a
13   place not for words but for action.  Sheikh Abdullah Azzam."
14   Q    Thank you.
15              I'm going to direct your attention to Exhibit 341.
16   Is that also from the desktop computer?
17   A    Yes.
18   Q    And can you tell us what that is in brief?
19   A    This is a screenshot taken by an android phone and it
20   shows a direct message conversation on Twitter with a person
21   named Jazrawi, username Jihad28aa.
22   Q    And was this tied to other evidence in this case?
23   A    Yes.  This is -- the other correspondent is the account
24   "atawaakul" which belonged to Mr. Simpson.
25   Q    And did it tie to other evidence that you found regarding
```

1   this particular conversation in other locations?

2   A   Yes.  When we searched that particular Twitter account, we

3   found this conversation.

4   Q   Okay.  Is that a true and accurate depiction of what you

5   found on the desktop?

6   A   Yes.

7           MR. KOEHLER:  Move to admit 341.

8           MS. PLOMIN:  No objection.

9           THE COURT:  341 is admitted.

10      (Exhibit No. 341 admitted in evidence.)

11  BY MR. KOEHLER:

12  Q   Can you tell from the colors and messages on the screen

13  which person is which in the conversation?

14  A   Yes.

15  Q   Can you explain that, please.

16  A   The ones in blue are the receiver, in this case

17  Mr. Simpson; and the ones in white on the left side is the

18  person he's talking to, Jazrawi.

19  Q   Directing your attention to Exhibit 342, is that an image

20  that came off of the computer, the desktop computer here?

21  A   Yes.

22  Q   The bottom text on the black there, have you seen that

23  before?

24  A   Yes.  This is the text that appears on the Islamic State

25  flag.

1    Q   Is that a true and accurate copy of what came off the

2    desktop computer?

3    A   Yes.

4              MR. KOEHLER:  Move to admit 342.

5              MS. PLOMIN:  Your Honor, objection based on relevance

6    and I believe inflammatory.

7              THE COURT:  The objection overruled.  342 is

8    admitted.

9        (Exhibit No. 342 admitted in evidence.)

10   BY MR. KOEHLER:

11   Q   I'm now going to move on to Exhibit 346.

12             Ms. Vaughan, is this another image from the desktop

13   computer?

14   A   Yes.

15   Q   And is this a fair and accurate depiction of what you

16   found on the computer?

17   A   Yes.

18             MR. KOEHLER:  Move to admit 346.

19             MS. PLOMIN:  No objection.

20             THE COURT:  346 is admitted.

21       (Exhibit No. 346 admitted in evidence.)

22   BY MR. KOEHLER:

23   Q   I'm now going to move on to 348 -- or excuse me -- 347.

24             Ms. Vaughan, do you recognize that image?

25   A   Yes.

CR15-00707-PHX-SRB    AMY VAUGHAN-PART#2    2-23-16

1    Q    It's a little pixilated; is that correct.

2    A    Yes.

3    Q    Did that come off the computer as well?

4    A    Yes.

5    Q    Is that a thumbnail image?

6    A    Yes.

7    Q    Do you recognize where that image is from?

8    A    Yes.  This is part of the controversial Charlie Hebdo

9    cover that depicted the Prophet Muhammad.

10   Q    Is that a true and accurate copy of what came off the

11   computer?

12   A    Yes.

13          MR. KOEHLER:  Move to admit 346 -- or 347.  Excuse

14   me.

15          MS. PLOMIN:  No objection.

16          THE COURT:  347 is admitted.

17      (Exhibit No. 347 admitted in evidence.)

18          MR. KOEHLER:  If I can have just one moment, Your

19   Honor.  I want to make sure I'm in the right place.

20   BY MR. KOEHLER:

21   Q    Ms. Vaughan, as part of your review of devices, did you

22   also come to review a laptop that had belonged to Nadir Soofi?

23   A    Yes.

24   Q    And was that pursuant to a consent to search?

25   A    That is my understanding, yes.

1    Q    I'm moving on to that.

2               Was that a Dell Inspiron laptop?

3    A    Yes.

4    Q    Are you aware of how that came into FBI's hands?

5    A    I believe that the laptop was given by Mr. Soofi to his

6    son.  And his -- the mother of his son, her family gave it to

7    the FBI.

8    Q    During the course of reviewing that, did you find

9    materials of relevance to this case?

10   A    Yes.

11   Q    I'll start off with what's been marked for identification

12   as Exhibit 242.  Do you recognize that?

13   A    Yes.

14   Q    Does that depict an individual whose identity you know?

15   A    Yes.  This is Nathaniel Soofi.

16   Q    Is that a fair and accurate depiction of the picture you

17   found on the computer?

18   A    Yes.

19               MR. KOEHLER:  Move to admit 242.

20               MS. PLOMIN:  To clarify, the Dell Inspiron computer?

21               MR. KOEHLER:  That's correct.

22               MS. PLOMIN:  No objection.

23               THE COURT:  242 is admitted.

24        (Exhibit No. 242 admitted in evidence.)

25   BY MR. KOEHLER:

1    Q    Now, moving on to 243, do you recognize that?

2    A    Yes.  This is a clearer version of the previous picture.

3              MR. KOEHLER:  Move to admit 243.

4              THE COURT:  I don't know why we need two of them.

5    She said it's the same picture and this is clearer.

6              MR. KOEHLER:  I move to substitute 243 for 242 then.

7              THE COURT:  Then 242 is withdrawn.  243 is admitted.

8         (Exhibit No. 243 admitted in evidence.)

9    BY MR. KOEHLER:

10   Q    Ms. Vaughan, did you also find a video of Nathaniel Soofi

11   on the computer?

12   A    Yes.

13   Q    And what did the video depict?

14   A    It showed him firing at a target with his father coaching

15   him on how to do so properly.

16   Q    And who is the father?

17   A    Nadir Soofi.

18   Q    Ms. Vaughan, is that another picture off the computer?

19   A    Yes.

20   Q    Do you recognize the individual in that photograph?

21   A    Yes.  This is Anwar al-Awlaki.

22   Q    Is that a true copy of what came off the computer?

23   A    Yes.

24             MR. KOEHLER:  This is Exhibit No. 209.  Government

25   moves to admit 209.

1           MS. PLOMIN:  No objection.

2           THE COURT:  209 is admitted.

3       (Exhibit No. 209 admitted in evidence.)

4   BY MR. KOEHLER:

5   Q   During your search of the computer, did you also find a

6   series of audio recordings known as the "Hereafter"?

7   A   Yes.

8   Q   Did you find parts 1 to 22 of that series?

9   A   Yes.

10  Q   Did you also find parts 1 to 16 of what's called The

11  Seerah Mecca?

12  A   Yes.

13  Q   And 1 to 19 of the Seerah Medina?

14  A   Yes.

15  Q   And did you find parts 2, 4 to 7, 9 to 10, and 12 to 17 of

16  the Seerah Medina Part 1?

17  A   Yes.

18  Q   And parts 2 to 21 of The Lives Of The Prophets?

19  A   Yes.

20  Q   Are these all audio tape lectures?

21  A   Yes.

22  Q   And do you know who the speaker is in these lectures?

23  A   Anwar al-Awlaki.

24  Q   Directing your attention to 216.  Do you recognize that

25  image?

1    A    Yes.

2    Q    Was this similar to an image that we admitted earlier into

3    evidence of people being walked along the beach?

4    A    Yes.

5    Q    Is that a true and accurate copy of the picture off of the

6    Dell Inspiron laptop?

7    A    Yes.

8              MR. KOEHLER:  Move to admit 216.

9              MS. PLOMIN:  No objection.

10             THE COURT:  216 is admitted.

11        (Exhibit No. 216 admitted in evidence.)

12    BY MR. KOEHLER:

13    Q    Moving on now to 218.  Can you tell us what that is.

14    A    Yes.  This is a picture of a man wearing camouflage,

15    holding an Islamic State flag, and lifting his other hand in

16    the Tauheed finger gesture.

17    Q    Have you seen this image in another location aside from

18    the computer?

19    A    Yes.  This image appears in an issue of Dabiq as well.

20    Q    Dabiq Magazine?

21    A    Uh-huh.

22    Q    And is this a true and accurate copy of the picture on the

23    computer?

24    A    Yes.

25             MR. KOEHLER:  Move to admit 218.

1              MS. PLOMIN:  No objection.

2              THE COURT:  218 is admitted.

3         (Exhibit No. 218 admitted in evidence.)

4    BY MR. KOEHLER:

5    Q   You mentioned the Tauheed finger.  Can you spell the

6    "Tauheed."  I'm not sure we've done that for the court

7    reporter.

8    A   It's spelled many ways.  The way that I usually spell it

9    is T-A-W-H-I-D.

10   Q   And have you seen it also spelled T-A-U-H-E-E-D?

11   A   Yes.

12   Q   I now have 219 on the monitor.  Do you recognize that?

13   A   Yes, but it's upsidedown.

14   Q   That's what we have you here for.

15             Can you tell us what that is?

16   A   This is a picture of the Islamic State flag.

17             MR. KOEHLER:  Move to admit 219.

18             MS. PLOMIN:  No objection.

19             THE COURT:  219 is admitted.

20        (Exhibit No. 219 admitted in evidence.)

21   BY MR. KOEHLER:

22   Q   Now, moving on to 223.  Can you tell us what that is?

23   A   This is a picture of armed men in front of an Islamic

24   State flag.

25   Q   That's another pixilated photo.  Did that come from a

```
 1   thumbnail as well?

 2   A   Yes.

 3   Q   Is it otherwise fair and accurate?

 4   A   Yes.

 5            MR. KOEHLER:  Move to admit 223.

 6            MS. PLOMIN:  Your Honor, I'm assuming this was also

 7   found in the Dell Inspiron laptop?

 8            MR. KOEHLER:  That's correct.

 9            MS. PLOMIN:  No objection.

10            THE COURT:  223 is admitted.

11       (Exhibit No. 223 admitted in evidence.)

12   BY MR. KOEHLER:

13   Q   Moving on to 225.  What is that?

14   A   This is a picture of a man walking on a ridge holding an

15   Islamic State flag.

16   Q   And is that a true and accurate copy of what came off the

17   Dell Inspiron laptop?

18   A   Yes.

19            MR. KOEHLER:  Move to admit 225.

20            MS. PLOMIN:  No objection.

21            THE COURT:  225 is admitted.

22       (Exhibit No. 225 admitted in evidence.)

23   BY MR. KOEHLER:

24   Q   Now, moving forward to 229.  Do you recognize that?

25   A   Yes.
```

```
1    Q   What is it?

2    A   This is a picture of an Islamic State flag that has been

3    spray painted onto a wall.

4    Q   Is that a true and accurate copy of that?

5    A   Yes.

6              MR. KOEHLER:  Move to admit 229.

7              MS. PLOMIN:  No objection.

8              THE COURT:  229 is admitted.

9         (Exhibit No. 229 admitted in evidence.)

10   BY MR. KOEHLER:

11   Q   Now, moving on to Exhibit 232.

12             Ms. Vaughan, in the history on the computer did you

13   run into a web search for the Islamic State flag?

14   A   I believe this was recovered from an unallocated space.

15   Q   Okay.  And can you explain what an unallocated space is?

16   A   Yes.  So when something is deleted from a computer,

17   it's -- it doesn't really go away.  It's just sort of marked

18   for reuse.  So it is possible sometimes when we use our

19   forensic tools to recover those deleted items from that space.

20   Q   And is this an example of that?

21   A   Yes.

22   Q   And does this section of the unallocated space reflect

23   that the person actually clicked through to the item?

24   A   Yes.  So it shows that a Google search was performed for

25   the phrase "Islamic State flag" and this was probably in
```

```
 1   Google Images.
 2          The user clicked through to an image which is called
 3   ShababFlag.svg that is hosted on wikimedia.org.
 4   Q   Is that a true and copy of that unallocated space?
 5   A   Yes.
 6          MR. KOEHLER:  Move to admit 232.
 7          MS. PLOMIN:  No objection.
 8          THE COURT:  232 is admitted.
 9      (Exhibit No. 232 admitted in evidence.)
10   BY MR. KOEHLER:
11   Q   Ms. Vaughan, did you follow that link to the ShababFlag
12   file on the Wikimedia commons site?
13   A   Yes.
14   Q   And what was that flag that you found?
15   A   It was the same flag that is used by al Shabab and the
16   Islamic State and several other terrorist groups that are
17   affiliated with al-Qa'ida.
18   Q   We admitted into evidence earlier in the trial Exhibit 65
19   which was a series of pages that had been damaged by water and
20   so forth.
21          Do you recall seeing pages with that same image on
22   it?
23   A   Yes.
24   Q   And did you examine the text along the edge of those
25   pages?
```

1    A    Yes, I did.

2    Q    What did you find in that text?

3    A    I found a URL for a flag called ShababFlag.svg.

4    Q    And did it match this URL here for the

5    commons.wikimedia.org?

6    A    Not quite.  But you see there above there is a version of

7    it that includes the phrase "1280px."  It included that

8    portion.

9    Q    You have a touch screen there in front of you.  Can you

10   underline that little part that you're talking about, the

11   1280px.

12   A    (Indicating)

13   Q    So a little to the left of center of your underline?

14   A    Yes, the part that says "1280px."

15   Q    Okay.  When you examined the text along the edge of the

16   thing, could you see anything that told you what date those

17   items were printed?

18   A    I believe there was, but I can't recall what the date was.

19   Q    Is it on the text of the document itself?

20   A    Of this one?

21   Q    Of the flag -- of the charred or the damaged paper?

22   A    Yes.

23          MR. KOEHLER:  Your Honor, may I approach the witness?

24          THE COURT:  Yes.

25          MR. KOEHLER:  I'm approaching with Exhibit 65 which

1    is in evidence.

2    BY MR. KOEHLER:

3    Q   Are you able to tell the date that was printed?

4    A   Yes.  There's a page here that has the date.  January 16,

5    2015.  And then it's 1:51 p.m.

6    Q   So approximately three-and-a-half months before the attack

7    in Garland, Texas?

8    A   Yes.

9    Q   Are you familiar with the date of the Charlie Hebdo attack

10   in Paris, France?

11   A   That was in January of 2015.

12           THE COURT:  Excuse me, Mr. Koehler.  We're going to

13   take our morning break.

14           Ladies and gentlemen, we're going to take a 15-minute

15   break.  We'll reconvene at approximately 10:25.  You are

16   reminded again of the admonition not to discuss the case among

17   yourselves or with anyone else.

18           Please do not form any conclusions about the case

19   until you have heard all the evidence and begun your

20   deliberations.

21           I will excuse the jury at this time and stay here and

22   discuss some matters with counsel.

23       (Open court, no jury present at 10:09 a.m.)

24           THE COURT:  You may step down, Ms. Vaughan.  Thank

25   you.  Please sit down.

1          We have a sleeping juror.  And our sleeping juror has

2     not just been sleeping today, but she appeared to also be

3     having great difficulty staying awake last week as well.

4          And one of the jurors seated next to her had alerted

5     Maureen to the fact that the juror had also been sleeping.

6     It's juror No. 3.  I was observing it last week and also this

7     morning.  Perhaps counsel have observed it as well.

8          At this point in time, do you want me to speak to

9     her?  Do you want me to do anything?  Do you want to just

10    leave it alone and hope that Mr. Koehler's presentation

11    becomes more scintillating and keeps her awake?

12         While what we have been doing this morning has been

13    somewhat tedious, I wouldn't suggest that she was only

14    sleeping through this tedious part.  She was sleeping quite a

15    bit last week too.

16         So I wanted to bring it to your attention and ask if

17    you wanted me to do anything.

18         MR. KOEHLER:  Perhaps we can have a moment to think

19    about that and confer with defense counsel.

20         THE COURT:  I take it, have you observed it as well?

21         MR. MAYNARD:  Yes, I have.

22         THE COURT:  Mr. Maynard has.  Okay.  Good.

23         MR. KOEHLER:  I don't see out of my left eye, Your

24    Honor, so I very frequently don't see the jury when I'm on

25    this side of the courtroom.

1          THE COURT:  It's not just me that's observed it.

2     Several other people have observed it as well.

3          And as I said, as well as the -- one of the jurors

4     seated next to her, so.

5          MR. MAYNARD:  My suggestion would be that you have a

6     short conversation with her and say that you noted it.  Ask

7     her if she has a problem.  I mean, there are people that have

8     sleeping issues.

9          THE COURT:  I would be happy to do that.

10         I would suggest that if that's what you want me to

11    do, that I would do it at the lunch break so that Maureen

12    could approach her discreetly and ask her if she could come

13    talk to me.  And I would want to do it in my office and not on

14    the record and see what I can find out.

15         MR. KOEHLER:  Government has no objection to that.

16         We also would suggest that if she remains on the

17    jury, perhaps she should silently be designated as an

18    alternate.

19         THE COURT:  I would suggest that it would be

20    premature to make that decision, but I will talk to her and

21    report back to you.

22         If it turns out that she does really have this as a

23    problem that she's experienced outside of the courtroom, that

24    we might want to consider something that doesn't allow her to

25    stay and sleep through the rest of the trial.

1           The problem is that when a juror brings it to my

2    attention, it also tells me that it's of concern to the jury

3    too.  And so -- but anyway, I'll speak to her at noon.  I will

4    report back to you about our conversation.

5           MS. BROOK:  Your Honor, if we may -- I'm sorry.

6    Mr. Maynard has something that could go first.  But if we may,

7    before you step off the bench, just address something briefly

8    at sidebar with Your Honor?

9           THE COURT:  Sure.

10          MR. MAYNARD:  Your Honor, I have got an issue.

11          THE COURT:  Could you explain it to me at a

12   microphone?

13          MR. MAYNARD:  Yes.

14          We subpoenaed a number of witnesses to come in for

15   when our case is going to be put on and asked them to call us

16   so that we could do scheduling and most of them have done

17   that.

18          I have a couple of witnesses who -- because I set the

19   subpoenas for today because I wasn't sure how long the

20   government's case would last and so I did it early, but I have

21   a couple of witnesses that are outside that are fairly upset

22   with having been subpoenaed and either wanted to talk to you.

23   What I want is --

24          THE COURT:  Oh.  You mean it isn't that they didn't

25   understand they didn't have to be here today?  It's that

1    they're upset that they are subject to a subpoena?

2          MR. MAYNARD:  Yes.  And that they came and they don't

3    want to ever come back again.

4          And I mean I have tried to explain to them that we

5    will accommodate their schedule and I will give them, you

6    know, 24, 48 hours' notice when we would be putting them on.

7          They just don't want to be subject to a subpoena.

8    They don't want to be here.

9          THE COURT:  What do you want me to do?

10          MR. MAYNARD:  They're subject to a subpoena.  I want

11    them to be ordered that they have to comply with it and that I

12    will give them either 48 hours or 72 hours' notice, whatever

13    the Court thinks is reasonable for them to come back.

14          THE COURT:  So you want to bring them in and have me

15    tell them that?

16          MR. MAYNARD:  Yes.

17          THE COURT:  Okay.  Let's do that right now.

18          MR. MAYNARD:  Okay.

19          THE COURT:  Could you two gentlemen come forward?  I

20    want to talk to you for a moment.  You can just stay right

21    there.

22          Sir, could I have your name -- the gentleman to my

23    left.

24          ANTHONY SAMPSON:  Anthony Sampson.

25          THE COURT:  Mr. Sampson.  And --

1          STUART SAMPSON:  Stuart Sampson.

2          THE COURT:  Two Mr. Sampsons.

3          Gentlemen, I understand that you have been served

4    with a subpoena to appear and testify in this case and that

5    you're not very happy about that.

6          ANTHONY SAMPSON:  Yeah, because I'm testifying to

7    something that I don't know about.  Just moved out here so I

8    don't know anything about this.

9          THE COURT:  I just want to explain to you that

10   because you have been served with a subpoena, you are required

11   to appear in court and testify.

12         STUART SAMPSON:  Okay --

13         THE COURT:  Hold on.  I don't know when you will be

14   required to testify.  I understand that with the subpoena came

15   a letter saying:  Please call defense counsel and he will let

16   you know when you need to be here.

17         You have to do that.  Let me explain and then I will

18   let you speak.

19         You are free to set a time to talk to Mr. Maynard or

20   to Ms. Plomin, the lawyers that subpoenaed you, to try to find

21   out what they want to talk to you about.  And I'm sure they

22   will sit down and tell you.

23         And then if there is nothing that you have to say

24   that's helpful to them, they can certainly let you know that.

25         So, Mr. Sampson, was there something you wanted to

UNITED STATES DISTRICT COURT

1    say?

2           STUART SAMPSON:  I do.  Actually, since this case or

3    whatever, I have been constantly harassed by the FBI.  I have

4    been constantly harassed by the defense.  My family has been

5    harassed; my wife, my kids.  They even come into the masjid to

6    talk to us when we have nothing to do.

7           I don't know anything.  I'm missing days at work and

8    everything for something I have no clue about.  So.

9           THE COURT:  Have you actually -- this is not the FBI.

10   This is the defense lawyers.

11          STUART SAMPSON:  Defense as well.

12          THE COURT:  Have you talked to them?

13          STUART SAMPSON:  Yeah.  I told them several times I

14   don't know.  I don't want to speak to them about something I

15   don't know and then they're forcing me to come to court.

16          I'm not willing to come up here and lie about

17   anything because I don't know.

18          THE COURT:  And we would hope that you do not do

19   that.  You will -- when, if called to testify, be under oath

20   and promise to tell the truth.

21          And the other Mr. Sampson, was there something you

22   wanted to say?

23          ANTHONY SAMPSON:  My wife and daughter, we got -- I'm

24   about to get a divorce because of this.  And my daughter is

25   back home because of this now.  And I just got married --

1    because of harassment -- and I just came out here so I don't

2    know nothing.

3            THE COURT:  Now, at this point in time the defense is

4    not going to contact you again except to tell you when to come

5    back to testify.

6            And despite the fact that you don't think you have

7    anything to say that's important or relevant to this case, if

8    the defense feels otherwise, this subpoena does require you to

9    appear.

10           And because Mr. Maynard will give you a specific day

11   and time and if you -- when you show up on that day and time,

12   even if he's not ready for your testimony, I will allow that

13   you come and testify so that you are here for as short a

14   period of time as possible.

15           But because you have been served with a subpoena,

16   despite your telling me that you don't know anything, I can't

17   release you from your subpoena.  Only the person who

18   subpoenaed you can.

19           So I would suggest that you talk to Mr. Maynard and

20   Ms. Plomin.  They can tell you when to be here.  And I'm sorry

21   but you will have to be here to testify on that day.

22           STUART SAMPSON:  I can testify but I'm going to say

23   the same thing.  I don't know anything.

24           THE COURT:  That's fine.  This has nothing to do with

25   what you're going to say.  It has to do with the fact that you

 1    will have to be here and answer the questions that are asked

 2    of you.

 3              So I apologize if this may have caused you problems

 4    and with your job and with your family, but this is a very

 5    important matter and so you will have to come back and testify

 6    when Mr. Maynard schedules you to be here.

 7              Okay.  Thank you.

 8              MR. KOEHLER:  Your Honor, there was the issue defense

 9    raised in their Trial Memorandum under Rule 403.

10              THE COURT:  We were going to talk at sidebar about

11    something?

12         (At sidebar on the record.)

13              MS. BROOK:  Your Honor, they wanted to flag an issue

14    for tomorrow morning.  I wanted to do it at sidebar because of

15    the nature of the issue.

16              THE COURT:  Tomorrow morning?

17              MS. BROOK:  Yes.  So we can take it up at any point

18    today at sidebar.

19              THE COURT:  We can take it up later.

20              MS. BROOK:  Okay.

21              Did you have something else you wanted to say?

22              MR. KOEHLER:  Yes, but it doesn't need to be at

23    sidebar.

24              THE COURT:  Okay.  Can we take it up later?

25              MR. KOEHLER:  It involves Ms. Vaughan's testimony and

1    foundation for exhibits the defense is objecting to under Rule

2    403.

3            THE COURT:  Okay.  That has nothing to do with the

4    foundation and we can address the admissibility at the time

5    that it is offered.

6            MR. KOEHLER:  Okay.  Well, I was ready to offer some.

7            MS. PLOMIN:  Your Honor, I also have an issue with

8    respect to Ms. Vaughan's testimony we just received.

9            THE COURT:  I don't want to talk at sidebar about

10   things that should be publically heard, but we are all going

11   to take a four-minute break now.

12       (End of discussion at sidebar.)

13           THE COURT:  Court is in recess.

14       (Recess taken at 10:21 a.m.; resumed at 10:31 a.m.)

15       (Open court, jury present.)

16           THE COURT:  Thank you, ladies and gentlemen.  Please

17   sit down.  The record will show the presence of the jury,

18   counsel, and the defendant.

19            I just passed the question that one of the jurors

20   gave me to the lawyers and so that's why they are reading a

21   single sheet of paper.

22           MR. KOEHLER:  I have read the question, Your Honor.

23            As long as there is no objection from the defense on

24   the basis of cumulativeness, because we do plan on explaining

25   this through a later witness, I would be happy to have

1    Ms. Vaughan explain those two words.

2              THE COURT:  Okay.  Why don't you go ahead and ask

3    her.

4    BY MR. KOEHLER:

5    Q   Ms. Vaughan, we have made reference to the title of the

6    magazine Dabiq?

7    A   Yes.

8    Q   Is there a place called Dabiq?

9    A   Yes.  I believe it's in Syria.

10   Q   And what is that place?

11   A   It's a small town.

12   Q   And you've also talked about the Tauheed finger.

13   A   Yes.

14   Q   What does the word "Tauheed" mean?

15   A   It's usually translated as monotheism, I believe, or

16   oneness.  It is one of the core theological concepts of Islam

17   is the singularness of Allah and of their faith.

18              MR. KOEHLER:  Thank you.

19   BY MR. KOEHLER:

20   Q   So when we left off we were on Exhibit 232, the link back

21   and you mentioned the date that those flags were printed.

22   A   Uh-huh.

23   Q   And remind us of that date and then we can move on.

24   A   That was January 16, 2015.

25   Q   Thank you.

1              Now, directing your attention to Exhibit 233.  During

2    your review of the computer, did you find sections of a book

3    called 40th Hadith On Jihad?

4    A   Yes.

5    Q   And is Exhibit 233 a true and accurate copy of the

6    different pages of 40 Hadith On Jihad that you found on the

7    Dell Inspiron laptop?

8    A   Yes.  One of two pages.

9              MR. KOEHLER:  The government moves to admit 233.

10             MS. PLOMIN:  No objection.

11             THE COURT:  233 is admitted.

12        (Exhibit No. 233 admitted in evidence.)

13   BY MR. KOEHLER:

14   Q   Ms. Vaughan, does the book state the three conditions of a

15   true Muslim?

16   A   Yes.

17   Q   Can you read the what those three conditions are?

18   A   Yes.

19             Number one:  He himself should be a mujahid.

20             Number two:  He should provide a mujahid with a means

21   of warfare and other necessities of life.

22             Three:  He should see to the well-being of a

23   mujahid's family in the latter's absence and ensure their

24   protection.

25             THE COURT:  And continuing with trying to explain

1    what a word means that we might not be familiar with, what --

2    BY MR. KOEHLER:

3    Q    What is the word "mujahid."

4    A    It is one who engages in jihad or a holy warrior is often

5    translated.

6    Q    Can you please read the text in the plain font at the

7    bottom of page 59?

8    A    "Just see how close a martyr is to paradise.  There is no

9    barrier between him and paradise apart from becoming a martyr.

10   We can also gauge from this Hadith the extent of the

11   conviction of the Sahaba on the words of Rasulullah and how

12   desirous they were in acting upon his words."

13   Q    Okay.  So we have a few more words in there.

14           First of all, what is a "Hadith"?

15   A    A Hadith is a saying of Muhammad.

16   Q    And "Sahaba."

17   A    These -- it's a name for the companions of Muhammad.  The

18   first converts to Islam, the people that he traveled with.

19   Q    And "Rasulullah."

20   A    That is a name for Muhammad.

21   Q    Now, moving on to Exhibit 234.  Do you recognize that

22   image?

23   A    Yes.  A portion of it's been cut off in this printing.

24   Q    Okay.  With the exception of a portion of it being cut

25   off, do you recognize that from the Dell Inspiron laptop?

CR15-00707-PHX-SRB   AMY VAUGHAN-PART#2   2-23-16

1    A    Yes.

2              THE COURT:  Move to admit 234.

3              MS. PLOMIN:  No objection.

4              THE COURT:  234 is admitted.

5         (Exhibit No. 234 admitted in evidence.)

6    BY MR. KOEHLER:

7    Q    Now, the part of it that's cut off is the text; is that

8    right?

9    A    Yes.

10   Q    And without being cut off, do you recall what the text

11   read?

12   A    Yes.  It said:  "Islam will dominate the world."

13   Q    Now, moving on to 235.  Is this something else you

14   recognize from the Dell laptop?

15   A    Yes.

16   Q    And what is this?

17   A    This is a series of screen captures from a video.

18   Q    What's the name of the video?

19   A    And Incite The Believers.

20   Q    Is this a true and accurate copy of what was on the Dell

21   laptop?

22   A    Yes.

23             THE COURT:  Could I clarify?

24             Are we looking at something that was on the Dell

25   laptop or was there a video on the Dell laptop from which you

1    took screenshots.

2              THE WITNESS:  No, Your Honor.  This is exactly what

3    was on the laptop.

4              THE COURT:  Thank you.

5              Did you move the admission, Mr. Koehler?

6              MR. KOEHLER:  I will do so at this time if I haven't.

7              THE COURT:  Is this 235?  Is there any objection?

8              MS. PLOMIN:  No, Your Honor.

9              THE COURT:  235 is admitted.

10         (Exhibit No. 235 admitted in evidence.)

11   BY MR. KOEHLER:

12   Q    Who is the speaker in this video?

13   A    His name is Muhammad Arrashud.

14   Q    And do you know who that person is?

15   A    I don't know a whole lot about him but he was a cleric who

16   supported jihad and called for violence.

17   Q    Was this speech something that predated ISIS?

18   A    Yes.

19   Q    I guess that's where I was going.  Thank you.

20              Now, moving on to 236, do you recognize that?

21   A    Yes.

22   Q    Is this a picture that came off of the Dell Inspiron

23   laptop?

24   A    Yes.

25   Q    Do you recognize the individual in the photo?

1    A    That is Abubakar Shekau the leader of Boko Haram.

2              MR. KOEHLER:  Move to admit 236.

3              MS. PLOMIN:  No objection.

4              THE COURT:  236 is admitted.

5         (Exhibit No. 236 admitted in evidence.)

6    BY MR. KOEHLER:

7    Q    Now, going to 237.  Do you recognize that?

8    A    Yes.

9    Q    Did that also come off the Dell laptop?

10   A    Yes.

11             MR. KOEHLER:  Move to admit 237.

12             MS. PLOMIN:  No objection.

13             THE COURT:  237 is admitted.

14        (Exhibit No. 237 admitted in evidence.)

15   BY MR. KOEHLER:

16   Q    Can you tell us who is depicted in that picture?

17   A    That is Dzokhar Tsarnaev, one of the Boston Marathon

18   bombers.

19   Q    Now, going to 239.  Is that also off the Dell laptop?

20   A    Yes.

21   Q    And is that a true and accurate copy?

22   A    Yes.

23             MR. KOEHLER:  Move to admit 239.

24             MS. PLOMIN:  No objection.

25             THE COURT:  239 is admitted.

```
 1          (Exhibit No. 239 admitted in evidence.)

 2     BY MR. KOEHLER:

 3     Q    Now, this one is another one of those pixilated images; is

 4     that correct, Ms. Vaughan?

 5     A    Yes.

 6     Q    In the left can you tell us what those words say?

 7     A    It said:  "Message to America.  The Boston attacks."

 8     Q    And is the "Boston attacks" part that part that's in the

 9     lower right-hand part of the screen that's pixilated?

10     A    I think it's on the bottom there somewhere.

11     Q    And did you look at this --

12     A    Oh, yes.  You're right.  It's the part on the right there.

13     Q    Did you look at this a little bit better resolution than

14     the pixilated version than we have printed here?

15     A    Yes.  And I also watched the video on YouTube.

16     Q    Do you recall who released the video on YouTube?

17     A    It's a group called Salafi Media.

18     Q    Is that a group known to the FBI?

19     A    Yes.

20     Q    Now, moving on to 240.  Do you recognize that picture?

21     A    Yes.

22     Q    Is that also from the Dell laptop?

23     A    Yes.

24          MR. KOEHLER:  Move to admit 240.

25          MS. PLOMIN:  No objection.
```

```
 1              THE COURT:  240 is admitted.

 2         (Exhibit No. 240 admitted in evidence.)

 3    BY MR. KOEHLER:

 4    Q    Do you recognize the person in that picture?

 5    A    Yes.  This is Anjem Choudary.

 6    Q    And do you know where he is based?

 7    A    The UK.

 8    Q    Now, Exhibit 250.  Do you recognize that?

 9    A    Yes.

10    Q    What is that?

11    A    This is a picture of what I believe is Mr. Soofi's

12    apartment and there are several other individuals in the

13    picture, including Mr. Simpson and who I believe is the

14    defendant.

15    Q    And is that a fair and accurate copy of what came off of

16    the Dell laptop?

17    A    Yes.

18              MR. KOEHLER:  Move to admit 250.

19              MS. PLOMIN:  No objection.

20              THE COURT:  250 is admitted.

21         (Exhibit No. 250 admitted in evidence.)

22    BY MR. KOEHLER:

23    Q    Can you use your monitor there and circle Mr. Simpson in

24    the picture.

25    A    (Indicating)
```

1    Q    And the person you believe to be the defendant.

2    A    (Indicating)

3    Q    Do you know who the person is on the far left in the

4    picture at all?

5    A    I'm not sure.  I can only guess.

6    Q    Okay.  We wouldn't want you to do that.

7             Exhibit 251.  Do you recognize that?

8    A    Yes.  This is a picture of the same room from a different

9    angle.

10   Q    And is that also from the Dell laptop?

11   A    Yes.

12             MR. KOEHLER:  Move to admit 251.

13             MS. PLOMIN:  No objection.

14             THE COURT:  251 is admitted.

15        (Exhibit No. 251 admitted in evidence.)

16   BY MR. KOEHLER:

17   Q    Can you tell us who is on the left in the picture?

18   A    That is Mr. Simpson.

19   Q    And do you recognize the child on the right in the

20   picture?

21   A    I think that's Nathaniel Soofi.

22   Q    Moving now to 254.  Did you find a publication of a book

23   on the computer called the Maidens of Jannat?

24   A    Yes.

25   Q    And is this a true and copy of the book that you found on

```
 1   the Dell laptop?

 2   A   Yes.

 3           MR. KOEHLER:  Move to admit 254.

 4           MS. PLOMIN:  No objection.

 5           THE COURT:  254 is admitted.

 6       (Exhibit No. 254 admitted in evidence.)

 7   BY MR. KOEHLER:

 8   Q   I think we have the translation of "Jannat" right there on

 9   the paper.

10   A   Yes.

11   Q   What is that, for the record.

12   A   "Paradise."

13   Q   Thank you.

14           Now, moving on to 260.  Do you recognize that?

15   A   Yes.

16   Q   What is it?

17   A   This is a picture of a DVD set which is called The End Of

18   Time.  A New Beginning.

19   Q   Was that also on the Dell laptop?

20   A   Yes.

21           MR. KOEHLER:  Move to admit 260.

22           MS. PLOMIN:  No objection.

23           THE COURT:  260 is admitted.

24       (Exhibit No. 260 admitted in evidence.)

25   BY MR. KOEHLER:
```

75

```
1    Q    Now, showing Exhibit 262.  Ms. Vaughan, do you recognize

2    that.

3    A    Yes.

4    Q    It's a little pixilated.  Were you able to see that in a

5    little better resolution before coming to court today?

6    A    Sort of.  Close enough.

7    Q    Is that also from the Dell laptop?

8    A    Yes.

9    Q    Can you tell us what that is?

10   A    It is a picture of Cardinal Stadium.

11   Q    Is that the University of Phoenix Stadium?

12   A    Yes.

13            MR. KOEHLER:  Move to admit 262.

14            MS. PLOMIN:  No objection.

15            THE COURT:  262 is admitted.

16       (Exhibit No. 262 admitted in evidence.)

17   BY MR. KOEHLER:

18   Q    Next I want to go through a series of audios.  We'll lay

19   the foundation for them to be played later.

20            On the laptop did you find -- or I guess this is

21   going -- we're going to circle back to the desktop at this

22   point.

23            On the desktop -- so this computer here from the

24   Simpson and Soofi residence -- I asked you before about the

25   lecture series Bearers of Glad Tidings.
```

1      Have you had an opportunity to listen to Exhibit 264

2   and compare it to the audio that was found on the computer?

3   A   I have not.

4   Q   What about the audio Brutality Toward Muslims.  Did you

5   listen to Exhibit 265?

6   A   Yes.

7   Q   And is that a true and accurate copy of the audio from

8   that same lecture that was found on the computer?

9   A   Yes.

10          MR. KOEHLER:  Move to admit 265.

11          MS. PLOMIN:  No objection.

12          THE COURT:  265 is admitted.

13      (Exhibit No. 265 admitted in evidence.)

14   BY MR. KOEHLER:

15   Q   Now, 266.  Did you also listen to the audio Exhibit 266

16   and compare it to the audio that was found on the computer

17   Constants On The Path Of Jihad?

18   A   I have not had an opportunity to listen to that one.

19   Q   Okay.  271.  The Dust Will Never Settle Down.

20          Have you compared that to the audio from the

21   computer?

22   A   Yes.

23   Q   And is that a fair and accurate copy of the audio from the

24   computer?

25   A   Yes.

```
1              MR. KOEHLER:  Move to admit 271.

2              MS. PLOMIN:  No objection.

3              THE COURT:  271 is admitted.

4         (Exhibit No. 271 admitted in evidence.)

5    BY MR. KOEHLER:

6    Q   And 273.  Lecture concerning America's War On Islam.

7              Have you listened to that and compared it to the

8    audio from the computer?

9    A   Yes.

10   Q   And is that a true and accurate copy of the audio from the

11   computer?

12   A   Yes.

13             MR. KOEHLER:  Move to admit 273.

14             MS. PLOMIN:  No objection.

15             THE COURT:  273 is admitted.

16        (Exhibit No. 273 admitted in evidence.)

17             MR. KOEHLER:  If I can have just a moment, Your

18   Honor?

19             THE COURT:  You may.

20             MR. KOEHLER:  Thank you.

21             THE COURT:  Mr. Koehler, do you have any more

22   questions for Ms. Vaughan?

23             MR. KOEHLER:  I do.  I do.

24   BY MR. KOEHLER:

25   Q   Did you have an opportunity to review the content derived
```

1    from a Maxwest cellular telephone belonging to Mr. Kareem?

2    A    Yes.

3    Q    I'm going to direct your attention to Exhibit 127.

4         THE COURT:   I think it's 126, because according to my

5    list, 127 is a photograph.

6         MR. KOEHLER:   That's correct, Your Honor.

7         126 is the phone itself.   127 is the content.

8    BY MR. KOEHLER:

9    Q    So directing your attention to Exhibit 127.   Do you

10   recognize that?

11   A    Yes.

12   Q    Can you tell us what that is?

13   A    This is a picture of Mr. Simpson.

14   Q    And is that a true and accurate copy of the picture that

15   came from the Maxwest cell phone?

16   A    Yes.

17        MR. KOEHLER:   Move to admit 127.

18        MS. PLOMIN:   No objection.

19        THE COURT:   127 is admitted.

20        (Exhibit No. 127 admitted in evidence.)

21   BY MR. KOEHLER:

22   Q    On the upper part of the image here -- and we'll get to

23   that in a second and give the jurors a chance to look -- this

24   part of the image, can you tell us what that is.

25   A    Yes.   This is the EXIF data.

1   Q    And what is EXIF data?

2   A    It is metadata that is usually generated by the

3   picture-taking device.  And it can include such things as the

4   model of the camera that took the picture.  How big it is.

5   The date it was taken.  Technical details about the

6   composition like the aperture size and things like that.

7   Q    And does the metadata show the date that this particular

8   picture was taken, including the time?

9   A    Yes.

10  Q    And what is that date and time?

11  A    March 12, 2015 at I think it says 8:38.  It's a little

12  hard to read.  P.M.

13          THE COURT:  What's "metadata"?

14          THE WITNESS:  Metadata in this case is data attached

15  to the file that describes the file, certain aspects or

16  attributes of the file.

17          THE COURT:  And you have to look for it some place

18  else in your phone to find it?

19          THE WITNESS:  In this case what the picture actually

20  depicts is opening the Properties of this picture on a

21  computer and that's what is -- that's how we accessed it in

22  this particular case.

23          THE COURT:  Thank you.

24  BY MR. KOEHLER:

25  Q    If you are looking at a picture on the phone, can you also

1   pull up that picture's properties in the menu on your image

2   program on the phone?

3   A    Sometimes.  I think it often requires a special program.

4   Q    Looking at the background in this photograph, are you able

5   to tell in a general sense where this photograph was taken?

6   A    Yes.  It's at a Baskin Robbins.

7   Q    Now, moving on to 129, do you recognize that?

8   A    Yes.

9   Q    Did that also come from the Maxwest cell phone?

10  A    Yes.

11  Q    Is that a fair and accurate depiction of the image from

12  the Maxwest cell phone?

13  A    Yes.

14          MR. KOEHLER:  Move to admit 129.

15          MS. PLOMIN:  No objection.

16          THE COURT:  129 is admitted.

17     (Exhibit No. 129 admitted in evidence.)

18  BY MR. KOEHLER:

19  Q    Can you identify who is in that picture?

20  A    Yes.  This is Mr. Simpson.

21  Q    And there's a coffee cup on the table in front of him.  Do

22  you recognize that?

23  A    I didn't, but one of my colleagues did and they told me

24  it's from Hava Java.

25  Q    Well, can you read the words on the cup?

1    A    They are a little too small.

2    Q    Okay.  I'll try to zoom in for you.

3         Can you make that out now?

4    A    Not really.

5    Q    Okay.  We'll move on.

6         Is this a different means of showing the metadata

7    that is associated with a particular photograph?

8    A    Yes.

9    Q    And can you tell from the image name as well as the

10   metadata the date and time that photo was taken?

11   A    Yes.

12   Q    Can you tell us that?

13   A    It is November 22, 2014.

14   Q    And is the timestamp following that?

15   A    Yes.  It says 9:49 P.M.

16   Q    Now, moving on to 129 --

17        THE COURT:  Okay.  129 is what you just offered and I

18   admitted but I think you meant 128.

19        MR. KOEHLER:  Yes.

20        THE COURT:  Because Maureen just showed me 129 and

21   it's a different picture.

22        MR. KOEHLER:  Yes.  That is correct.  So I will move

23   to admit 128 and I will put 129 before the witness.

24        And may the record reflect the previous discussion

25   was regarding 128.

```
 1              THE COURT:  Yes.  So 128 is admitted and now we're

 2    looking at 129.

 3         (Exhibit No. 128 admitted in evidence.)

 4              MR. KOEHLER:  Correct.

 5              THE COURT:  Well, some of us are looking at it.

 6    Pretty soon all of us will be looking at it.

 7    BY MR. KOEHLER:

 8    Q    Ms. Vaughan, do you recognize 129?

 9    A    Yes.

10    Q    And what is that?

11    A    This is a picture of Mr. Simpson.

12    Q    Did that also come from the Maxwest cell phone?

13    A    Yes.

14    Q    Is that a fair and accurate copy of the picture that came

15    off the phone?

16    A    Yes.

17              MR. KOEHLER:  Move to admit 129.

18              MS. PLOMIN:  No objection.

19              THE COURT:  129 is admitted.

20         (Exhibit No. 129 admitted in evidence.)

21    BY MR. KOEHLER:

22    Q    Is that likewise the metadata from that phone?

23    A    Yes.

24    Q    Or from that picture.  Sorry.

25    A    Yes.
```

1   Q   Can you tell the date and time that picture was taken?

2   A   Yes, it is May 15, 2014.  1:16 P.M.

3   Q   Now, we're on 130.  Do you recognize that?

4   A   Yes.

5   Q   Is that also from the Maxwest cell phone?

6   A   Yes.

7   Q   Is that a fair and accurate copy of that?

8   A   Yes.

9           MR. KOEHLER:  Move to admit 130.

10          MS. PLOMIN:  No objection.

11          THE COURT:  130 is admitted.

12      (Exhibit No. 130 admitted in evidence.)

13  BY MR. KOEHLER:

14  Q   There's a lot of reflection off of that.  Have you

15  reviewed that image before coming to court today?

16  A   Yes.

17  Q   And looking at the screen of that computer, could you tell

18  what brand of computer that is?

19  A   Yes.  There's an Acer logo on the program that's running

20  on the computer.

21  Q   And what is the date and time of this image?

22  A   May 22, 2014, at a minute before midnight.

23  Q   Did you also review the content of an RCA android tablet?

24  A   Yes.

25  Q   Did that device also belong to Mr. Abdul Kareem?

1    A    Yes.

2    Q    I have placed what's been marked for identification as

3    Exhibit 133 on the screen in front of you.  Do you recognize

4    that?

5    A    Yes.

6    Q    I apologize that's a little bit dark.  Can you tell us

7    what that is.

8    A    Yes.  It's a picture of Mr. Simpson using a phone.

9    Q    And what is the date and time of that image?

10   A    February 23, 2015, at 7:35 A.M.

11   Q    And was that stored on the android tablet?

12   A    Yes.

13              MR. KOEHLER:  Move to admit 133.

14              MS. PLOMIN:  No objection.

15              THE COURT:  133 is admitted.

16       (Exhibit No. 133 admitted in evidence.)

17   BY MR. KOEHLER:

18   Q    Going to Exhibit 134.  Do you recognize that?

19   A    Yes.

20   Q    And what is that?

21   A    This is another picture of Mr. Simpson.

22   Q    And is that also from that RCA android tablet?

23   A    Yes.

24              MR. KOEHLER:  Move to admit 134.

25              MS. PLOMIN:  No objection.

 1            THE COURT:  134 is admitted.

 2       (Exhibit No. 134 admitted in evidence.)

 3  BY MR. KOEHLER:

 4  Q   What is the date and time of that photo?

 5  A   Could you zoom in?

 6            THE COURT:  Make it a little bigger for her.

 7            THE WITNESS:  Thank you.  It was February 18, 2015,

 8  2:17 A.M.

 9  BY MR. KOEHLER:

10  Q   Now, directing your attention to Exhibit 135.  Can you

11  tell us what that is.

12  A   Yes.  This is a picture of the defendant.

13  Q   Also from that RCA android tablet?

14  A   Yes.

15  Q   And can you tell us the date and time of that?

16  A   February 18, 2015.  2:18 A.M.

17  Q   So one minute after the last picture?

18  A   Yes.

19  Q   Does this picture appear to be what's commonly known as a

20  "selfie"?

21  A   Yes.

22            MR. KOEHLER:  Move to admit 135.

23            MS. PLOMIN:  No objection.

24            THE COURT:  135 is admitted.

25       (Exhibit No. 135 admitted in evidence.)

```
 1    BY MR. KOEHLER:

 2    Q   Now, directing your attention to 136.  Do you recognize

 3    that?

 4    A   Yes.

 5    Q   And what is that?

 6    A   This is a picture of Mr. Simpson.

 7    Q   Is that likewise from the android tablet?

 8    A   Yes.

 9            MR. KOEHLER:  Move to admit 136.

10            MS. PLOMIN:  No objection.

11            THE COURT:  136 is admitted.

12        (Exhibit No. 136 admitted in evidence.)

13    BY MR. KOEHLER:

14    Q   And can you tell us the date and time of that photo.

15    A   February 18, 2015, 2:15 A.M.

16    Q   So about three minutes before the last picture?

17    A   Yes.

18            MR. KOEHLER:  If I can have one moment, please?

19            THE COURT:  Yes.

20            Yes, ma'am?

21            A JUROR:  Can we take a break?

22            THE COURT:  Yes.  We will take a brief recess.  The

23    jurors are reminded of the usual admonition.

24            Court is in recess for ten minutes.

25        (Recess taken at 11:10; resumed at 11:23 a.m.)
```

1              THE COURT:  Thank you, ladies and gentlemen.  Please

2    sit down.  I understand we are going to interrupt

3    Ms. Vaughan's testimony to take the testimony of another

4    witness.

5              MS. BROOK:  Yes, Your Honor, with your permission we

6    have a brief witness by the name of Waseem Hyman and his

7    stomach is a little upset, so we were hoping to put him on now

8    and take a brief interlude.

9         **(Excerpt of Proceedings recessed at 11:24 a.m.; resumed at**

10   **11:47 a.m.)**

11             THE COURT:  Please continue with your examination of

12   Ms. Vaughan, Mr. Koehler.

13             MR. KOEHLER:  Thank you, Your Honor.

14             **AMY KATHLEEN VAUGHAN, WITNESS, SWORN**

15                  **DIRECT EXAMINATION (cont'd)**

16   BY MR. KOEHLER:

17   Q   I believe when we left off, we had just gone through the

18   last image from the Max-- from the RCA tablet computer; is

19   that correct, Ms. Vaughan?

20             THE COURT:  Well, whether it was the last one or not

21   isn't really up to her to say.

22             MR. KOEHLER:  Exhibit 136 is where we were.

23   BY MR. KOEHLER:

24   Q   Did you also go through the Acer Aspire computer that's

25   sitting on the table here in front of the jury.

1    A   Yes.

2    Q   Through the image of that.

3         Before we get there, I want to ask you, were there

4    designators given to these different devices by the CART team

5    so that you could tell one device from another as you went

6    through?

7    A   Yes.

8    Q   And as you reviewed the material, did you review the

9    computer materials in what's called CAIR.

10   A   Yes.

11   Q   And can you refresh the jury's memory on what "CAIR"

12   stands for?

13   A   I don't actually know what CAIR stands for, but I can

14   describe what it is.

15   Q   Okay.  Go ahead.

16   A   It is a virtual machine.  So like a virtual environment

17   that we can log into and use our forensics tools to review the

18   data without changing anything or injuring our own computer

19   systems if there is something bad on there.

20   Q   And in the course of doing that, was the Maxwest cell

21   phone known by a particular designator?

22   A   I believe that was QPX4.

23   Q   And the Acer Aspire computer we're about to talk about,

24   what was its designator, if you recall?

25   A   QPX1, if I recall correctly.

1   Q   And the RCA tablet that we just finished talking about?

2   A   QPX3.  Yes.  QPX3.

3   Q   All right.  Now, talking about the Acer Aspire computer

4   here, were you able to assess who the user of that computer

5   was?

6   A   Yes.

7   Q   And how did you assess who the user of that computer was?

8   A   By observing logins to accounts.  Sending e-mails.  There

9   were Google voice accounts, I believe.  Pictures.  That's --

10  Q   Okay.

11  A   Various different items.

12  Q   And just for the record, we're referring to the Acer

13  Aspire that's marked and admitted as Exhibit 112.

14          And who did you assess the user of that Acer Aspire

15  to be?

16  A   The defendant.

17  Q   Abdul Malik Abdul Kareem?

18  A   Yes.

19  Q   Was one of the user accounts that you viewed on there

20  gitrdonemoving@gmail.com?

21  A   Yes.

22  Q   Placing on the document camera what's been marked for

23  identification as Exhibit No. 185.  Do you recognize that?

24  A   Yes.

25  Q   Is that a true and accurate copy of an image that came off

1    of the Acer Aspire computer?

2    A    Yes.

3              MR. KOEHLER:  Move to admit 185.

4              MS. PLOMIN:  No objection.

5              THE COURT:  185 is admitted.

6        (Exhibit No. 185 admitted in evidence.)

7    BY MR. KOEHLER:

8    Q    Is that the same picture that we looked at before on a

9    different device?

10   A    Yes.

11   Q    Now, moving on to 186.  Was that also on the Acer Aspire

12   computer?

13   A    Yes.

14   Q    And what is that?

15   A    It is a picture of the defendant.

16   Q    And is that a fair and accurate picture of what came off

17   of the Acer Aspire.

18   A    Yes.

19             MR. KOEHLER:  Move to admit 186.

20             MS. PLOMIN:  No objection.

21             THE COURT:  186 is admitted.

22       (Exhibit No. 186 admitted in evidence.)

23             THE COURT:  Let's move on, Mr. Koehler.

24   BY MR. KOEHLER:

25   Q    Now, showing you what's been marked for identification as

1    Exhibit No. 187.  Ms. Vaughan, do you recognize that?

2    A   Yes.

3    Q   Can you tell us where that came from?

4    A   This was recovered from a System Restore Point.

5    Q   Okay.  What is a System Restore Point?

6    A   My understanding is that it is basically a backup of the

7    computer.

8          So that if something goes wrong, maybe you get a

9    virus or something breaks, you can just roll back to that

10   System Restore Point.  It's a feature of Windows.

11   Q   And would a System Restore Point restore portions of files

12   that had been deleted and so forth?

13   A   It could, I suppose.

14   Q   Okay.  And would it recover things that might otherwise go

15   missing during the course of a computer being operated by a

16   user?

17   A   It could, yes.

18   Q   Okay.  And what did the restore point's date reflect?

19   A   I believe it was April 21st, 2015.

20   Q   And is this a true and correct print of the recovery of

21   that particular item from the System Restore Point?

22   A   Yes.

23          MR. KOEHLER:  Move to admit 187.

24          MS. PLOMIN:  No objection.

25          THE COURT:  Exhibit 187 is admitted.

1        (Exhibit No. 187 admitted in evidence.)

2   BY MR. KOEHLER:

3   Q   Can you tell us what this particular string relates to

4   from the restore point?

5   A   Taken all together, this shows that the user attempted to

6   access a YouTube video.  And we can see that the URL of the

7   YouTube video and its full title are in the last string.  The

8   title of that video being ISIS video:  Flames of War.  Full

9   Film.

10        So the other strings show that in order to get to

11  that page, that user had to first click on a dialog box that

12  appears on YouTube when an item like a video has been deemed

13  controversial or graphic.  So --

14  Q   Let's slow down.  And I want you to circle the portion of

15  the string that shows that the person had to go through that

16  dialog box.

17  A   Yes.  (Indicating)

18  Q   And is that where it says:  Verify_controversy.

19  A   Yes.

20  Q   Okay.  And did the person have to do that more than once?

21  A   They also had to go through a dialog that -- in which they

22  had to attest that they were of an appropriate age to watch a

23  graphic or mature video.

24  Q   Okay.  And coming from the right side of the screen, can

25  you draw an arrow to that?

```
 1    A    (Indicating)

 2    Q    And does that string reflect that the person, in fact, did

 3    click through to that full video?

 4    A    Yes.  So here I will underline where it says

 5    "has_verified=1"

 6    Q    And when you see the "one" there, is that binary code?

 7    A    I believe so, yes.

 8    Q    Ms. Vaughan, during your work for the FBI, have you become

 9    familiar with a video known as Flames of War?

10    A    Yes.

11    Q    And have you seen that video?

12    A    I have not seen it, no.

13    Q    Okay.

14    A    But I am aware of it.

15    Q    And do you know who released the video?

16    A    The Islamic State.

17    Q    During your view of the Acer Aspire computer, did you look

18    at access logs on the computer to see when the computer was

19    last used?

20    A    I did a review of all of the files to see what the very

21    most recent access date was, yes.

22    Q    And what was the most recent access date that you observed

23    on the Acer Aspire laptop?

24    A    May 30, 2015.

25    Q    So the end of May of 2015.
```

1              And did you also analyze a Nextbook tablet computer?

2    A    Yes.

3    Q    And did you assess who the user was of the Nextbook tablet

4    computer?

5    A    Yes.

6    Q    And how did you assess the identity of the user of that

7    particular item?

8    A    For that item it was processed with a -- what's called a

9    Cellebrite device that creates a report.

10             And one of the categories in the report is what

11   accounts are configured -- like the device is configured to

12   use, such as e-mail accounts, Google accounts, and so forth.

13   Q    And did that advice -- device -- excuse me -- show access

14   to the gitrdonemoving@gmail.com account?

15   A    Yes, I believe so.

16             MR. KOEHLER:  Your Honor, may I approach the clerk?

17   I want to verify that I brought exhibits up there.

18             THE COURT:  Go right ahead.

19             MR. KOEHLER:  Thank you.

20             Your Honor, may I approach the clerk again, Your

21   Honor?

22             THE COURT:  Yes.

23   BY MR. KOEHLER:

24   Q    I'm going to show you what's been marked for

25   identification as Exhibit No. 450.  Do you recognize that?

1    A    Yes.

2    Q    What is that?

3    A    It is an image that says Git-r-Done.  Exclamation point.

4    Q    Did that come from the Nextbook tablet?

5    A    Yes.

6         MR. KOEHLER:  Move to admit 450.

7         MS. PLOMIN:  No objection.

8         THE COURT:  450 is admitted.

9       (Exhibit No. 450 admitted in evidence.)

10        THE COURT:  We have all read it, Mr. Koehler.

11   BY MR. KOEHLER:

12   Q    I'm now placing Exhibit 451.  Do you recognize that?

13   A    Yes.

14   Q    Is that also an image that came off of the Nextbook

15   tablet?

16   A    Yes.

17        MR. KOEHLER:  Move to admit 451.

18        THE COURT:  Is there any objection?

19        MS. PLOMIN:  No, Your Honor.

20        THE COURT:  You said -- okay.  451 is admitted.

21      (Exhibit No. 451 admitted in evidence.)

22   BY MR. KOEHLER:

23   Q    Now, going to Exhibit 452.  Is that also an image from the

24   Nextbook tablet?

25   A    Yes.

1           MR. KOEHLER:  Move to admit 452.

2           MS. PLOMIN:  No objection.

3           THE COURT:  452 is admitted.

4       (Exhibit No. 452 admitted in evidence.)

5   BY MR. KOEHLER:

6   Q   Now, moving on to 453.  Ms. Vaughan, is that also from the

7   Nextbook tablet?

8   A   Yes.

9           MR. KOEHLER:  Move to admit 453.

10           MS. PLOMIN:  No objection.

11           THE COURT:  453 is admitted.

12       (Exhibit No. 453 admitted in evidence.)

13   BY MR. KOEHLER:

14   Q   Now, moving to 454.  Is that also from the Nextbook

15   tablet?

16   A   Yes.

17           MR. KOEHLER:  Move to admit 454.

18           MS. PLOMIN:  No objection.

19           THE COURT:  454 is admitted.

20       (Exhibit No. 454 admitted in evidence.)

21   BY MR. KOEHLER:

22   Q   Now, moving on to 455.  Is this likewise an image from the

23   Nextbook tablet?

24   A   Yes.

25           MR. KOEHLER:  Move to admit 455.

1          MS. PLOMIN:  No objection.

2          THE COURT:  455 is admitted.

3      (Exhibit No. 455 admitted in evidence.)

4   BY MR. KOEHLER:

5   Q   I would like to now direct your attention to Exhibit 456.

6   Is that likewise an image from the Nextbook tablet?

7   A   Yes.

8          MR. KOEHLER:  Move to admit 456.

9          MS. PLOMIN:  Your Honor, we object on the grounds of

10  relevance and overly inflammatory.

11         THE COURT:  I'll reserve ruling on 456.

12  BY MR. KOEHLER:

13  Q   457.  Is that also from the Nextbook tablet?

14  A   Yes.

15         MR. KOEHLER:  Move to admit 457.

16         MS. PLOMIN:  No objection.

17         THE COURT:  457 is admitted.

18     (Exhibit No. 457 admitted in evidence.)

19  BY MR. KOEHLER:

20  Q   Now, moving on to 458.  Do you recognize that?

21  A   Yes.

22  Q   Is that also from the nextbook tablet?

23  A   Yes.

24         MR. KOEHLER:  Move to admit 458.

25         MS. PLOMIN:  No objection.

```
 1              THE COURT:  458 is admitted.

 2        (Exhibit No. 458 admitted in evidence.)

 3   BY MR. KOEHLER:

 4   Q   Have you seen the individual depicted in that photo

 5   before, Ms. Vaughan?

 6   A   Yes.

 7   Q   What is that person's name?

 8   A   His name is Hakimullah Mesud.

 9   Q   Do you know who that person was?

10   A   He was a former leader of the Pakistani Taliban.

11   Q   Now, moving on to 459.  Do you recognize that?

12   A   Yes.

13   Q   Is that also from the Nextbook tablet?

14   A   Yes.

15              MR. KOEHLER:  Move to admit 459.

16              MS. PLOMIN:  No objection.

17              THE COURT:  459 is admitted.

18        (Exhibit No. 459 admitted in evidence.)

19   BY MR. KOEHLER:

20   Q   There appears to be an object on the right side of the

21   photo, black and white.  At a higher resolution, were you able

22   to see what that object is?

23   A   There was no higher resolution available but it looks very

24   much like an Islamic State flag.

25   Q   Now, jumping up to 467.  Do you recognize that?
```

1    A    Yes.

2    Q    Is that also from the Nextbook tablet?

3    A    Yes.

4             MR. KOEHLER:  Move to admit 467.

5             MS. PLOMIN:  No objection.

6             THE COURT:  467 is admitted.

7        (Exhibit No. 467 admitted in evidence.)

8    BY MR. KOEHLER:

9    Q    And can you tell us what this comes from, Ms. Vaughan?

10   A    This is an eBook that -- if I remember correctly, is

11   associated with the Google account gitrdonemoving@gmail.com.

12   Q    And so when you say "eBook," what is an eBook?

13   A    It's a .pdf version, a digital version of a book.

14   Q    Now, looking at 468.  Is that also from the Nextbook

15   tablet?

16   A    Yes.

17            MR. KOEHLER:  Move to admit 468.

18            MS. PLOMIN:  No objection.

19            THE COURT:  468 is admitted.

20       (Exhibit No. 468 admitted in evidence.)

21   BY MR. KOEHLER:

22   Q    Is this likewise an eBook from the Nextbook tablet?

23   A    Yes.

24   Q    What is the title of the eBook?

25   A    It's entitled the Origins Of The Islamic State.

```
1    Q    And now Exhibit 469, is that also an image from the
2    Nextbook tablet?
3    A    Yes.
4              MR. KOEHLER:  Move to admit 469.
5              MS. PLOMIN:  No objection.
6              THE COURT:  469 is admitted.
7         (Exhibit No. 469 admitted in evidence.)
8    BY MR. KOEHLER:
9    Q    In the lower right-hand corner there's the word "Quetta."
10   Do you see that, Ms. Vaughan?
11   A    Yes.
12   Q    Are you familiar with a place called Quetta?
13   A    Yes.  That's a city in Pakistan.
14             MR. KOEHLER:  Your Honor, I'm through going through
15   the exhibits that I can with the witness at this point.
16             I think there are a couple of foundational items we
17   may need to clean up.  And with the exception of those items,
18   I have no further questions for the witness at this point.
19             THE COURT:  Thank you.
20             Ladies and gentlemen, we'll take our lunch break.  We
21   will reconvene at 1:30.
22             You are reminded of the admonition not to discuss the
23   case among yourselves or with anyone else.
24             Please do not form any conclusions about the case
25   until you've heard all the evidence and begun your
```

1    deliberations.

2              Court is in recess until 1:30.

3         (Recess taken at 12:08 p.m.; resumed at 1:32 p.m.)

4              THE COURT:  I wanted to be sure you were all getting

5    your exercise.  That's why you had to get up twice.

6              Please sit down.  The record will show the presence

7    of the jury, counsel, and the defendant.

8              Ladies and gentlemen, over the lunch hour one of the

9    jurors indicated that she was a little bit uncomfortable

10   sitting for as long as we have to sit here.  And I suggested

11   to her and I'm going to suggest to the rest of you that if any

12   of you need to just stand up during the trial for a few

13   minutes just to stretch your back, it will not disturb anyone

14   or distract anyone.

15             So feel free to do that because I know that for some

16   people it can be uncomfortable to sit for an hour-and-a-half

17   at a time and not have the ability like you do in your

18   workplace to stand up and move around a little bit.

19             Let's continue with Ms. Vaughan's testimony.  Cross.

20             Now, let me just clarify for a moment.

21             Have you completed all of your direct examination of

22   Ms. Vaughan or are you intending to recall her later?

23             We had that discussion and I wasn't sure how it

24   resolved.

25             MR. KOEHLER:  I'm intending to recall her later, Your

1    Honor, because I found out right before she resumed the stand

2    this morning that there were some computer problems that

3    prevented her from comparing specific audio exhibits with

4    audio that came off of --

5              THE COURT:  Just the ones that you just -- the few

6    that you spoke about on direct?

7              MR. KOEHLER:  That's correct.

8              THE COURT:  And so it would just be for that purpose?

9              MR. KOEHLER:  That's correct.

10             THE COURT:  Okay.

11             Cross then, Ms. Plomin.

12             MS. PLOMIN:  Thank you.

13                           **CROSS EXAMINATION**

14    BY MS. PLOMIN:

15    Q   Good afternoon, Ms. Vaughan.

16    A   Good afternoon.

17    Q   Ms. Vaughan, I just want to make it very clear for the

18    jury which devices you analyzed and what you found on them.

19             Now, is it fair to say that you analyzed 15

20    electronic devices that were found either in Mr. Abdul

21    Kareem's truck or his house?

22    A   I don't remember the exact count, but there was certainly

23    a large number of devices, yes.

24    Q   And did you prepare a report for this case?

25    A   Yes, for most, but not all of these devices.

1    Q    And did you prepare a report including the Acer laptop?

2    A    Yes, I did.

3    Q    All right.  And that was found in Mr. Kareem's apartment,

4    correct?

5    A    Yes.

6    Q    All right.  And did you prepare a report analyzing the RCA

7    laptop?

8    A    A tablet.

9    Q    Yes.

10   A    Yes.

11   Q    And that was found in Mr. Kareem's truck, correct?

12   A    Yes.

13   Q    And there was also an iMac desktop that was found in

14   Mr. Kareem's apartment, correct?

15   A    Yes.

16   Q    And finally, a Nextbook tablet; is that correct?

17   A    Yes.  I did not write a report on that device.

18   Q    Did you prepare a report on January 22, 2016?

19   A    Could you be more specific?

20         THE COURT:  Why don't you show it to her on the

21   screen and maybe that will allow her to recognize it.

22   BY MS. PLOMIN:

23   Q    I'll show you the first page of it.

24         Is that your report?  Do you recognize it?

25   A    Yes.  I assisted in the preparation of this report.

1    Q    And who did you assist in the preparation of this report?

2    A    Special Agent Whitson.

3    Q    Were you the -- is it safe to say you were the computer

4    analyst that participated in creating this report and the only

5    computer analyst?

6    A    Yes.

7    Q    I would like to show you Bates 2067.  It's a Bates-stamped

8    copy.  Is that a portion of your report prepared on January

9    22, 2016?

10   A    Yes.

11   Q    And does that relate to the Nextbook tablet that was found

12   in Mr. Abdul Kareem's moving truck?

13   A    Yes.

14   Q    All right.  So, in fact, you did include in one of your

15   reports an analysis of the Nextbook tablet, correct?

16   A    Yes.  There was another analysis that was done by another

17   analyst that wasn't me, but I helped to prepare that report

18   and the other analyst did not.

19   Q    Okay.  So you didn't analyze the Nextbook tablet?

20   A    I examined it.  I just did not write the final report.

21   Q    All right.  So you examined it and you did include

22   portions of that in your report?

23   A    Yes.

24   Q    And who was that other analyst?

25   A    Her name is Jessica Maxwell.

1   Q   Maxwell?

2   A   Yes.

3   Q   And are you aware whether she prepared a report?

4   A   Yes, she did.

5   Q   Okay.  Now, you testified at some length yesterday about

6   the hard drive on what's been called the tower computer,

7   correct?

8   A   Yes.

9   Q   And that was found in Mr. Simpson and Mr. Soofi's

10   apartment, correct?

11   A   Yes.

12   Q   And when you analyzed that, you analyzed to look for any

13   other users of the device, correct?

14   A   Yes.  That would be part of my analysis.

15   Q   Look for people who logged in on their e-mail, correct?

16   A   Sure.

17   Q   And who logged into Google accounts?

18   A   Sure.

19   Q   Any other kind of indicators that you look for?

20   A   Well, there's many different types of accounts like forum

21   accounts or accounts on social media, things like that would

22   have been included in my analysis.

23   Q   All right.  Social media like Twitter?

24   A   Yes.

25   Q   And it wouldn't be social media but YouTube?

1   A   Yes.

2   Q   And when you analyzed the tower laptop -- or desktop, I'm

3   sorry -- hard drive that was found in Mr. Simpson and

4   Mr. Soofi's apartment, you found nothing relating to Mr. Abdul

5   Kareem, correct?

6   A   I don't believe so.

7           May I refer to my report?

8   Q   Please.

9           Can you tell us which report you're referring to to

10  refresh your recollection?

11  A   I'm going to look at a report I have on Internet Activity

12  Analysis and then another report that is entitled

13  Comprehensive Analysis of QPX2, 3 and 4.

14          And the question was whether or not there was

15  anything indicating that Mr. Kareem had accessed that

16  computer?

17  Q   Yes.  Whether he was a user on the computer.

18  A   No.  I don't think so.

19  Q   So there is no indication that Mr. Kareem had used that

20  computer according to your forensic analysis?

21  A   No.

22  Q   Now, you testified yesterday about the items found in the

23  tower computer and for a short time this morning.

24          And I just want to ask you:  In comparison between

25  the tower computer that was found in Mr. Simpson and Soofi's

1    apartment and the multiple devices that you analyzed relating

2    to Mr. Abdul Kareem, okay?

3         Now, you testified that you found photographs of --

4    various photographs of ISIS flags in the tower computer and

5    also Mr. Soofi's laptop, correct?

6    A   Yes.

7    Q   And you found nothing like that, you found no ISIS flags

8    in any of Mr. Kareem's four devices that you analyzed?

9    A   On the Nextbook tablet there was a picture that appeared

10   to contain an ISIS flag.

11   Q   Let me actually pull that up.

12        I'm showing you Government's Exhibit 459 and I'm

13   going to point to it.  Are you speaking about that image in

14   the background that I'm pointing to?

15   A   Yes.

16   Q   In the right-hand corner of the photograph?

17   A   Yes, I am.

18   Q   Okay.  And I want to ask you:  This image was found in the

19   Nextel computer that you wrote a short amount in your report,

20   correct?

21   A   Yes.

22   Q   And the image is extremely pixilated.

23        How did you view that image -- how did you view that

24   image when you viewed it in the image of the computer?

25   A   It was extracted in the Cellebrite report.  So we saw

1    an -- actually a smaller version of it in that report.

2    Q    And what do you mean by "a smaller version" of it?

3    A    It was -- that exhibit has been enlarged, I believe.

4    Q    So if you were to be looking into the computer, what would

5    the image actually look like?  Would it be a thumbnail image?

6    A    Something like that, yes.

7    Q    And what is a thumbnail image?

8    A    It's a smaller version of another picture, usually for

9    quick displaying, say, in a -- like file explorer-type

10   situation.

11   Q    All right.  And aside from that one image in the four

12   computers and the one cell phone that you analyzed of Mr.

13   Abdul Kareem, you found no pictures of an ISIS flag, correct?

14   A    No.

15   Q    And you found no pictures of an ISIS leader?

16   A    I would have to refer to my report for that.

17   Q    Please do.

18   A    According to my report, on the Lenovo that was acquired in

19   2015, there was a report of an ISIS leader.

20   Q    From September 11, 2014; is that right?

21        Or, I'm sorry, November of 2014, correct?

22   A    Yes.

23   Q    Okay.  And are you aware that computer was no longer in

24   Mr. Abdul's Kareem's possession at that time?

25   A    Yes.

1   Q    So in terms of any time you're aware that a device was in

2   Mr. Abdul Kareem's possession, you never found a picture of an

3   ISIS leader, correct?

4   A    No.

5   Q    And there were no photographs in any of Mr. Abdul Kareem's

6   devices depicting any beheadings or preparations for a

7   beheading, correct?

8   A    Other than the one that we just looked at, I don't believe

9   so, no.

10  Q    And there were no -- I want to point out Government's

11  Exhibit 286.  You located that image on two devices.  Which

12  devices were those?

13  A    It was the laptop recovered from Mr. Soofi's apartment

14  and -- let me make sure I have the right one.  I'm fairly

15  certain it was the tower computer from Mr. Soofi's apartment

16  as well.

17  Q    Okay.  And you did not locate that image on any of Mr.

18  Abdul Kareem's devices, correct?

19  A    No.

20  Q    You did not locate any images of people who had been

21  kidnapped by ISIS on any of Mr. Abdul Kareem's devices,

22  correct?

23  A    Correct.

24  Q    You did not locate Dabiq Magazine or any other ISIS

25  magazines on any of Mr. Abdul Kareem's -- or magazines issued

1   by ISIS on any of Mr. Abdul Kareem's devices, correct?

2   A   Correct.

3   Q   I just want to go through some of the devices you

4   analyzed.

5        You mentioned a Lenovo laptop.  The Lenovo laptop,

6   you said you examined an image from 2015; is that correct?

7   A   Yes.

8   Q   Okay.  And are you aware that that Lenovo laptop was

9   seized in a raid of an apartment or a house on Vista Street

10  where Mr. Abdul Kareem, Mr. Simpson, and Mr. Abubaker Ahmed

11  lived on July 20th of 2011?

12  A   Yes.  I'm aware of that.

13  Q   And it was seized by the FBI, correct?

14  A   Yes.

15  Q   And the FBI did not contact Mr. Abdul Kareem until January

16  of 2014 to potentially return that laptop, that Lenovo laptop

17  to him, correct?

18  A   I can't attest to that.

19  Q   And is it your understanding he then gave that laptop to a

20  man by the name of Sergio Martinez?

21  A   That's what I have been told, yes.

22  Q   And in your analysis of the Lenovo laptop, you said you

23  looked at an image from 2015.  But aside from the images you

24  found as late as November of 2014, all of your analysis of the

25  Lenovo laptop was from back in 2012 prior to the FBI seizing

1  the Lenovo laptop, correct?

2  A   I'm sorry.  That was a little bit confusing.

3  Q   Okay.  Well, in your report at pages -- Bates-stamped

4  pages 2056 through 2066 -- and this is your January 22, 2016

5  report?

6  A   I'm sorry.  Can you remind me of which one that is?

7          As you can see, I've got a pretty big stack of

8  reports here.

9  Q   Yes, you do.

10         THE COURT:  It's that one from last month that you

11  said you helped in the preparation of.

12         THE WITNESS:  Oh, yes.  The 302, yes.

13         THE COURT:  So what is your question?

14  BY MS. PLOMIN:

15  Q   So in that report, the items that you noted were all from

16  January -- were all from 2012, aside from one item or two

17  items in November of 2014, correct?

18  A   In this 302 concerning specifically the Lenovo?

19  Q   Yes.

20  A   Let me make sure.

21         No.  These items were discovered in the 2015 review

22  of this Lenovo.

23  Q   My question is:  The items that you noted were either

24  accessed or viewed in 2012?

25  A   Oh.  Yes.  I believe that's correct.

1    Q    Now, concerning the Lenovo, you mentioned that you looked

2    to see other users on the computer in order to determine who's

3    using the computer, correct?

4    A    Correct.

5    Q    You found evidence logging in of an e-mail address

6    ibrahimibrahim602@gmail.com on that Lenovo laptop, correct?

7    A    I think I discovered that in my 2012 review of the device.

8    Q    Did you look for other users of the computer in 2015?

9    A    For the 2015 review it was done in a somewhat different

10   fashion, so that it was Agent Whitson who reviewed the

11   Internet history which would have shown that and not me.

12   Q    I'm sorry.  Agent Whitson and not you?

13   A    Yes.  So that information, if it was there, would have

14   been in the Internet history and I did not review the Internet

15   history at that time in 2015.

16   Q    Okay.  So in 2015 did you look to see who else might have

17   been using the laptop back in 2012 when you noted items that

18   you thought were of interest to you?

19   A    Yes.  But I was not as involved as extensively in this

20   one, so it was mostly reviewing files and not Internet data.

21   Q    Okay.  So did you personally look for other users on the

22   Lenovo back in 2012?

23         THE COURT:  She means:  Did you look in 2015 for

24   other users using it in 2012?

25         THE WITNESS:  Well, I wasn't -- since I wasn't

1    reviewing the Internet items where that would have been, I

2    wasn't specifically looking for it.

3              I mean, I would have been aware of that and if I had

4    found it, it would be noted.

5    BY MS. PLOMIN:

6    Q    Okay.  Now, when you testified on direct, you discussed

7    two items that were located in the Lenovo back when you

8    reviewed an image of it back in 2015 and there were two items.

9              The first one was an image and you couldn't recall

10   what that was.  It was an image where -- with the words

11   "apocalypse" on it.  Do you recall that?

12   A    Yes.  I recall that.

13   Q    Okay.  And are you aware that's a video game?

14   A    I have since looked that up and found that, yes.

15   Q    So that is no indication of extremist kind of propaganda,

16   correct?

17   A    No.  Although it is interesting, because there is no other

18   record of accessing that video game on the device.

19   Q    Okay.  And are you aware that Sergio Martinez allowed his

20   children to use his laptop -- or the Lenovo laptop once it was

21   given to him?

22   A    I was not aware of that.

23   Q    Could you tell when that video game was played on the

24   Lenovo?

25   A    I could not find any sign that the video game was played

1    on the Lenovo.

2    Q    And the only other item that you testified to that you

3    found in the image of the Lenovo was a GIMF Security Course,

4    correct?

5    A    Correct.

6    Q    And what does GIMF stand for?

7    A    Global Islam Media Front.

8    Q    And that was found in the Recycle Bin of the Lenovo?

9    A    Yes.

10   Q    Are you aware that there was also a flash drive that was

11   inserted into the Lenovo when the FBI seized it back in 2012?

12   A    Yes.  I'm aware of that.

13   Q    Can you briefly tell the jury how a flash drive works so

14   we can be clear?

15   A    I will do my best.

16        A flash drive or some other kind of mobile storage,

17   it's a small device that you plug into a computer and you can

18   put files on it and then remove it and transfer them to

19   another computer.

20   Q    So it's essentially a storage device?

21   A    Yes.  That's correct.

22   Q    And all of the files on a flash drive have to come from a

23   computer, correct?

24   A    Correct.

25   Q    All right.  And are you aware that the items were loaded

```
 1    onto the flash drive -- I'm sorry -- the GIMF document was
 2    also on the flash drive?
 3    A   Yes.
 4    Q   And are you aware that it was loaded onto the flash drive
 5    on April 19, 2012?
 6    A   I can't recall specifically, but that sounds correct.
 7    Q   All right.  And then it was sent to the Recycle Bin on the
 8    Lenovo laptop on April 20, 2012?
 9    A   Yes.  That's correct.
10    Q   Okay.  And do you know how that document --
11            Tell me.  The GIMF Security Course, was that a
12    document?  Was that a book?  Was that an online magazine?
13    A   It's a .pdf file.  I suppose you could say it's a book.
14    Q   Okay.  Do you know how long it was?
15    A   It's -- I don't recall, no.
16    Q   Okay.  And do you know how it got onto the Lenovo laptop?
17    A   I can't say.
18    Q   All right.  So you don't know if it was sent in an e-mail
19    to somebody and then downloaded onto that computer, correct?
20    A   I couldn't tell that, no.
21    Q   And you don't know if it was loaded on from the flash
22    drive onto that computer, correct?
23    A   I couldn't tell that, no.
24    Q   And would it be a plausible scenario that it was sent to
25    somebody on an e-mail or downloaded from the Internet onto the
```

1   desktop of the Lenovo, put onto the flash drive, and then sent

2   into the Recycle Bin?

3   A    Certainly.

4   Q    Okay.  And did you yourself conduct a search or an

5   analysis of the flash drive that was inserted into the Lenovo?

6   Did you yourself conduct that analysis back in 2012?

7   A    I did.

8   Q    And did you note that in this same report in the January

9   22nd report of 2016?  It's a 302 report.

10          Did you discuss that in that report?

11  A    I don't believe so.  Let me check.  I may be

12  misremembering.

13          Yes.  It is there.  It's the last item.

14  Q    Now, I just want to clarify.  Are you aware that another

15  laptop computer was seized in the same room that

16  Mr. Simpson -- Mr. Abdul Kareem shared with Mr. Simpson back

17  in 2012?

18  A    Yes.  I believe there were four or five computers seized

19  from that residence.

20  Q    And there was an HP laptop that was seized from the same

21  room that Mr. Abdul Kareem shared with Mr. Simpson.  Are you

22  aware of that?

23  A    I don't remember specifically what the device models were,

24  where they were in the room when they were seized.

25  Q    Did you prepare a report on September 7, 2012, regarding

1    the various devices that were seized in the Vista residence in

2    2012?

3    A   Yes, I did.

4    Q   Do you have that report here with you today?

5    A   I believe so.  Let me pull it out.

6    Q   You noted five computers that were seized that you

7    analyzed, correct?

8    A   Correct.

9    Q   And I want to turn your attention to computer No. 3 as you

10   have listed in your report?

11   A   All right.

12   Q   And does that refer to the HP laptop that was found in the

13   Vista residence?

14   A   Yes, it does.

15   Q   And when you analyzed that computer, did you reach a

16   conclusion as to who you determined the likely user of that

17   laptop was?

18   A   Yes, I did.

19   Q   And who was that?

20   A   Elton Simpson.

21   Q   Okay.  And we'll go back to that, but that's the HP

22   laptop?

23   A   Correct.

24   Q   Okay.  Now, I want to go back to the flash drive that was

25   inserted into the Lenovo computer back in 2012.  All right?

1          Now, on that flash drive the GIMF Security Course
2    that you found in the Recycle Bin of the Lenovo was also on
3    the flash drive, correct?
4    A   Yes.
5    Q   Okay.  And that same document was also on the HP laptop?
6    A   Yes, it was.
7    Q   Okay.  And I want to talk about some other documents
8    located on the flash drive.  Okay?
9          And these are documents that you noted in your
10   report?
11   A   Yes.
12   Q   Okay.  There's a document called SlicingTheSword.pdf,
13   correct?
14   A   Yes.  That's correct.
15   Q   And that was on just the Lenovo -- I'm sorry -- on the
16   thumb drive, correct?
17   A   Yes.
18   Q   And that was also on Elton Simpson's HP computer, correct?
19   A   Yes, it was.
20   Q   And that was not on the Lenovo laptop?
21   A   No.  It was not.
22   Q   There is another .pdf you found important:  To Make it
23   Known to People and Not to Hide It.  And that was on the flash
24   drive, correct?
25   A   Yes.

1    Q    And that was also on Mr. Simpson's HP laptop, correct?

2    A    One moment.  Yes, it was.

3    Q    And that was not on the Lenovo laptop attributed to Mr.

4    Abdul Kareem, correct?

5    A    No.

6    Q    And there was another .pdf -- can you explain what a .pdf

7    is?

8    A    Yes.  It's an Adobe proprietary format for displaying

9    documents.

10   Q    So that would be a document format, correct, if ".pdf" was

11   at the end of it?

12   A    Yes.

13   Q    And there is document entitled a treatise by Sheikh Nasser

14   Al-Fayed, A Treatise on the Legal Status of Using Weapons of

15   Mass Destruction Against the Infidels, correct?

16   A    Yes.

17   Q    And that was on the thumb drive?

18   A    Yes.

19   Q    And that was also on Mr. Simpson's computer that was

20   seized in 2012, the HP computer, correct?

21   A    Yes, it was.

22   Q    And that was not anywhere on the Lenovo laptop when you

23   analyzed it, the image of it in 2015?

24   A    No.

25   Q    Now, turning to 2015 again.  I want to talk about the

1    tower computer that you attributed to Mr. Simpson and

2    Mr. Soofi that was found in Mr. Simpson's and Soofi's

3    apartment.

4         Now on that computer there was also the same GIMF

5    document found on that computer, correct?

6         I'm sorry.  Let me withdraw and ask you an easier

7    question.

8         In terms of all the photos and screenshots that you

9    testified to yesterday that came from the Simpson and Soofi's

10   desktop computer, were you able to determine a date of any of

11   those photographs.

12   A    Some of them, yes.

13   Q    Okay.  And if you were able to determine it, did you

14   testify to it already?

15   A    I don't believe I did.

16   Q    Okay.  Do you recall which photographs that you were able

17   to determine a date on?

18   A    We're still speaking about the tower computer, yes?

19   Q    Yes, ma'am.

20   A    I have a very large spreadsheet here which contains a

21   number of dates for a significant number of files.

22        Is there any specific file that you would like to

23   know about?

24   Q    We can get back to that.

25        Is there a way to determine how a photograph gets

1   onto the computer?  Did they download it from the Internet?

2   Can you determine from looking at the image how it got onto

3   the computer?

4   A   From the image itself?  Not usually, no.

5   Q   What are the possible ways it could get onto a computer?

6   A   You could download it from the Internet.

7           You could view it on a website and have that be

8   temporarily saved in your browser cache.

9           You could receive it in an e-mail.

10          You could take it off of a flash drive.

11          You could create one.

12          I think those are the most common ways of acquiring

13  an image.

14  Q   And is there a difference between a thumb image that's

15  found and an image that isn't pixilated the way that a thumb

16  image is found?

17  A   You mean the thumbnail images?

18  Q   Yes.

19  A   Typically, thumbnail images are created automatically from

20  the larger image, so they should have the same content.

21  Q   Now, when you analyzed the tower computer found at Simpson

22  and Soofi's apartment, did you prepare a report on that?

23  A   Yes, I did.

24  Q   Okay.  And I'm referring to a report prepared on February

25  6, 2016.  Do you have that in front of you?

1    A    Is this the one entitled Comprehensive Analysis of QPX2,

2    3, and 4?

3    Q    Yes.

4    A    Yes.  I have it.

5    Q    Now, there's a section in your report where you refer to

6    weapons purchases on that tower computer, correct?

7    A    Yes, there is.

8    Q    Okay.  You document seven different items that you found

9    of interest in terms of weapons purchases on the tower

10   computer, correct?

11   A    Yes.

12   Q    And can you describe for us each of those items that you

13   found?

14   A    Certainly.  There is an e-mail dated February 8, 2015,

15   from Midway USA for -- it's like a receipt, I believe, for a

16   ProMag magazine.

17        There is an e-mail dated February 8, 2015, from

18   Atlantic Firearms which confirms their registration of a

19   profile for Nad Soofi.

20        There is an e-mail dated February 18, 2015, from eBay

21   confirming shipment of a Jiminez Arms 9 millimeter magazine.

22        There is an e-mail on February 18, 2015, from eBay

23   confirming shipment of a 10-round Mag clip.

24        There is an e-mail dated November 21, 2013, from a

25   merchant called Grab A Gun confirming a purchase of a ProMag

 1   Glock magazine.

 2          There is an e-mail dated February 8, 2015, from

 3   Midway USA for -- containing a receipt for a ProMag Luger

 4   magazine.

 5          And lastly, there is an e-mail dated February 8,

 6   2015, to Atlantic Firearms from Mr. Soofi asking them to add

 7   his apartment number to the shipping info for -- presumably

 8   for an order that he has just made.

 9   Q   Okay, thank you.

10          And I just want to be clear.  Moving to the laptop,

11   the Inspiron laptop attributed to Mr. Soofi.

12          Did you look on that Inspiron laptop for any other

13   users of that laptop?

14   A   I don't recall specifically going out of my way to do so,

15   but certainly I was on the lookout for it.  And I don't recall

16   finding any such traces.

17   Q   Okay.  You didn't find any such traces of Mr. Abdul Malik

18   Abdul Kareem on that laptop at all, correct?

19   A   No.

20   Q   Now, I want to go to Mr. Abdul Kareem's devices that were

21   recovered in 2015; the Acer, the RCA, the Nextbook, the iMaC,

22   and his Maxwest phone.

23          You did not locate any of these weapons-related

24   purchases on any of those devices, correct?

25   A   Not those, no.

 1   Q   Okay.  Now, let's turn specifically to the Acer Aspire

 2   laptop located in Mr. Abdul Kareem's apartment.  Okay?

 3         Are you aware that it was located in his apartment

 4   face down on a desk with no power charger?

 5   A   I was not aware of that, no.

 6   Q   All right.  Are you aware that no modem was located in

 7   that apartment to access the Internet?

 8   A   Do you mean such as one would use to connect to the

 9   Internet service provider?

10   Q   Yes.

11   A   I was not aware of that.

12   Q   All right.  Now, when you examined the Acer Aspire laptop,

13   you located several other users of that laptop; is that

14   correct?

15   A   I found traces of one other user that no longer existed.

16   Q   Okay.  Well, let's go back.

17         Did you find a login for Hyman Abdul Khabir for a

18   gmail.com?

19   A   I don't recall that.

20   Q   Did you find a user Laura?

21   A   I don't recall that.

22   Q   Can you turn to page 5 of 39 of your report on January 22,

23   2016.

24   A   Yes, I have that.

25   Q   Okay.  And the second line from the bottom.  Users.

1    Laura.  Downloads.  Does that refresh your recollection?

2    A    Oh, I'm sorry.  I totally misheard you.  I thought you

3    said "Abora" or "Agora" or something.

4    Q    Laura.

5    A    Laura.  Yes.  I did find traces of a user named Laura.

6    Q    Did you find a login for Ortiz Carlos on a gmail account?

7    A    I don't recall that.

8    Q    What about any Facebook logins?

9    A    I did see Facebook logins, but I could not identify who

10    they were for.

11    Q    You didn't find any Twitter accounts accessed, did you?

12    A    No.  However, I think the way that Twitter works now, you

13    wouldn't see it.

14    Q    But you did find evidence of Twitter activity on

15    Mr. Simpson and Mr. Soofi's computer?

16    A    Yes.

17    Q    And what was -- can you explain that?

18    A    There were visits to Twitter and there were -- there was a

19    screenshot of a phone that was accessing a Twitter account.

20    Q    And you didn't find that on the Acer laptop or any other

21    of Mr. Abdul Kareem's devices, correct?

22    A    No.

23    Q    Now, when you spoke about the video Flames of War on

24    direct, that is something that you located traces of in the

25    Acer laptop, correct?

1   A   Yes.

2   Q   Okay.  And that's the laptop we're talking about that was

3   found face down with no computer cord in Mr. Abdul Kareem's

4   apartment?

5   A   Yes.

6   Q   All right.  And you indicated that it was -- there was a

7   System Restore Point on April 21 of 2015, correct?

8   A   Yes.  That's when it was created.

9   Q   Okay.  And that could be if --

10         Does the system automatically restore?  Is that what

11   happens?

12   A   I think it automatically creates restore points, but it

13   would not automatically restore itself without some action

14   from the user.

15   Q   Okay.  And you can't with specificity say if or when that

16   video was viewed, correct?

17   A   I can only say that it was not viewed after 4/21.

18   Q   Okay.  So it could have been in 2014?

19   A   Obviously, it couldn't have been before the video was

20   published, so sometime in between those two dates.

21   Q   And the video was published when?

22   A   September 19, 2014.

23   Q   Okay.  And did you take a look at the Acer laptop to

24   determine whether Mr. Abdul Kareem had -- whether there were

25   any gaps in usage of the Acer laptop, let's say, from November

1    of 2014 through May of 2015?

2    A    Well, I wasn't specifically looking to graph his usage of

3    the machine but I did look at some evidence of usage.

4    Q    Okay.  You indicated there was a last date that the

5    computer was accessed, correct?

6    A    That would have been the absolute last time it was used or

7    turned on.

8    Q    But you did not look for a gap in usage?

9    A    No.

10   Q    Now, the RCA tablet that you looked at that was found in

11   Mr. Abdul Kareem's moving truck, you testified on direct that

12   there were essentially four pictures of note that you found in

13   that tablet, correct?

14   A    Yes.

15   Q    All right.  You didn't find any extremist material at all

16   of note to you in that RCA tablet?

17   A    I did find some YouTube searches that were of concern, but

18   they would not rise to the level of being directly connected

19   to terrorist activity.

20   Q    You didn't find any activity searching for ISIS, correct?

21   A    No.

22   Q    You didn't find any ISIS flags?

23   A    No.

24   Q    You didn't find any ISIS leaders?

25   A    No.

1   Q   You didn't find any evidence of beheadings?

2   A   No.

3   Q   You didn't find -- and this is an important question.

4          In all of Mr. Abdul Kareem's devices that you

5   analyzed, you didn't find any evidence prior to May 3rd of

6   2015 of the Draw Muhammad Contest in Garland, Texas?

7   A   No.

8   Q   And you didn't find any evidence of any interest in the

9   Charlie Hebdo attack in Paris, France, correct?

10  A   No, not that I can recall.

11  Q   And you didn't find any evidence in any of his devices of

12  searching for weapons purchases, correct?

13  A   I do recall searches about weapons but they did not seem

14  to be about purchasing weapons.

15  Q   Did you note that in your report?

16  A   I did not because it was not specific enough to really

17  merit any consideration on our part.

18  Q   Okay.  So nothing important to you?

19  A   No.  It was searches for merely like the word "gun" or

20  "firearm" which is not very specific at all.

21  Q   And in all of your analysis of Mr. Abdul Kareem's

22  computers, did you find any evidence that Mr. Abdul Kareem had

23  or accessed a Twitter account?

24  A   No.

25  Q   What about any social media that Mr. Abdul Kareem accessed

1    any social media?

2    A    I believe he had a GooglePlus account.

3    Q    And --

4              THE COURT:   What's GooglePlus?

5              THE WITNESS:   GooglePlus is a social network that was

6    launched by Google to work with Google accounts.

7              You may actually have a GooglePlus account if you

8    have Gmail already made for you.

9              It's very like Facebook where you have posts and you

10   can share things to your friends.   You have circles of friends

11   that you build and you can tailor your posts to different

12   circles.

13             THE COURT:   Thank you.

14   BY MS. PLOMIN:

15   Q    I just briefly want to ask you about the Nextbook computer

16   found in Mr. Abdul Kareem's moving truck.

17             Were you able to determine how long that computer had

18   been used or when it was initially used?

19   A    No.   I don't believe so.

20   Q    All right.   Would it be consistent with your findings that

21   that computer had only been used since the beginning of May?

22   A    I don't recall.

23   Q    Okay.   In any of the images that you testified to that

24   were found in the Nextbook computer, were you able to

25   determine a date that they were downloaded or actually somehow

1  put onto that computer?

2  A   That metadata was available, but I can't remember it off

3  the top of my head.

4  Q   Did you note it in any report?

5  A   I did not, no.

6  Q   In fact, you didn't note any of those images in your

7  January 22nd, 2016, report which is the report that you

8  prepared including the Nextbook -- or discussing the Nextbook

9  computer?

10 A   Yes.  That's correct.

11 Q   So what you're saying is that you can determine the date

12 that those were put on the Nextbook computer, those images,

13 but you don't know what they are sitting here today without

14 looking at something to refresh your recollection?

15 A   Yes.  That's true.

16 Q   All right.  Were you able to determine how any of those

17 images got onto the computer, if they were sent in an e-mail

18 or if they were viewed in a news article?  Do you have any

19 idea?

20 A   It is -- it is possible that some of that information

21 would be available on the Cellebrite report but I can't

22 specifically recall right now.

23 Q   So you didn't look for your testimony today how these

24 images that were put in by the government today found on the

25 Nextbook computer, you didn't look to see how they got onto

1    the computer?

2    A   Yes.  This is because I did not prepare the final report

3    on that.

4    Q   Who prepared the final report?

5    A   That was Jessica Maxwell as I mentioned earlier.

6    Q   But you're the one here testifying about it today,

7    correct?

8    A   Yes.  That's true.

9    Q   When did Jessica Maxwell prepare a report regarding the

10   Nextel computer?

11   A   It would have been around the same time that I prepared my

12   report about the Maxwest as we were conducting our views

13   simultaneously.

14   Q   About the Maxwest?

15   A   Yes.  I believe I wrote the report about the RCA tablet a

16   little bit later, but we were all reviewing those devices at

17   the same time, so sometime around that.

18   Q   Sometime around January 22nd of 2016?

19   A   I think so.  I'm not sure.

20   Q   Can you look at your report to determine the date of when

21   you prepared the report you're referring to?

22   A   On my reports I have had to remove the administrative

23   header because it's classified, so I don't have that

24   information on me.

25   Q   Okay.  I'm showing you the report that we have been

1    discussing, the January 22nd, 2016, report.

2         Does that refresh your recollection as to when you

3    prepared it?

4    A    No.  I'm sorry.  I was actually thinking of my other

5    report.

6    Q    What report are you referring to?

7    A    This is my personal review of the Maxwest.

8    Q    The Maxwest.  What is the Maxwest?

9    A    That is the SmartPhone that one -- one of the SmartPhones

10   that was recovered.

11        I apologize because I only know it as QPX4.

12   Q    Are you talking about the report encompassing the Maxwest

13   Gravity 5.5 SmartPhone?

14   A    Yes.  On my report it's titled Media Review of QPX4.

15   Q    Is that the report you're referring to?

16   A    Yes.

17   Q    Okay.  And so does that refresh your recollection as to

18   when that report was created?

19   A    Yes.

20   Q    January 19, 2016?

21   A    Yes.

22   Q    Okay.  And you believe that Jessica Maxwell prepared a

23   report on the Nextel computer around that time?

24   A    Nextbook tablet, yes.

25        I believe she finished her report a little before me,

1    but I don't recall specifically what date she serialized that

2    report.

3    Q   Now, in her report -- do you have her report there on the

4    stand with you?

5    A   I don't.  No.

6    Q   Okay.  Do you know if she examined or tried to ascertain

7    when these images on -- that are being attributed to Mr. Abdul

8    Kareem's Nextbook tablet -- when they were put onto the

9    computer?

10   A   She may have.  That information certainly would have been

11   available to her.

12   Q   And that may be in her report?

13   A   I know that she included screenshots of the images but I'm

14   not sure if she included the metadata.

15   Q   She included screenshots of the images in her report?

16   A   Yes.

17   Q   Of the images that were presented in court before this

18   jury today?

19   A   Yes.

20   Q   And do you know if she looked for the method by which

21   these images got onto the Nextbook tablet?

22   A   Since she reviewed the Internet history, she may well have

23   uncovered some of that information.

24   Q   And are you aware if she put that into her report?

25   A   I can't recall at this exact moment.

1    Q    So what you can say today only is that you --

2          Did you actually see these images in the image of Mr.

3    Abdul Kareem's Nextbook tablet?

4    A    Yes.  I did review the Cellebrite report.

5    Q    And the Cellebrite report.  And can you just explain how

6    you do that review and what it looks like?

7    A    So when the device is processed using the Cellebrite, it's

8    like a thing that you plug the phone into.

9          It creates a bigger part -- it's available in HTML

10   and Excel spreadsheet formats.  And there's different

11   categories that you can review that separates out specific

12   data types; so e-mails, SMS, internet history, things of that

13   nature.

14   Q    And you said you plugged the phone into -- but you're

15   talking about in this case the tablet?

16   A    Yes.  I'm sorry.  Mobile device.

17         And to clarify, I did not participate in the

18   extraction of any of these devices.  That is -- I'm not on the

19   CART team and that's a CART team function.

20   Q    Okay.  So you reviewed this report to look at the images,

21   correct?

22   A    Yes.

23   Q    And that's to the extent basically all that you did in

24   terms of the Nextbook tablet, correct?

25   A    Yes.

1          MS. PLOMIN:  Your Honor, I would like at this time to

2     reserve any future cross until we have received the Maxwell

3     report.

4          THE COURT:  Any redirect, Mr. Koehler?

5          MR. KOEHLER:  Yes, Your Honor.

6                    **REDIRECT EXAMINATION**

7     BY MR. KOEHLER:

8     Q   Ms. Vaughan, the reports that you refer to of your own and

9     of Ms. Maxwell, are those 302 reports?

10    A   No.  They are 1057s.

11    Q   They are what?

12    A   They are FD1057s.

13    Q   And what is that?

14    A   It's colloquially known as an "EC."

15    Q   And what does "EC" stand for?

16    A   Electronic communication.

17    Q   Okay.  And are those internal communications within the

18    FBI?

19    A   Yes.

20    Q   When you prepare your electronic communication of an

21    analysis of a device like you have done here, where does that

22    go?

23    A   It goes into our case file system which is called

24    Sentinel.

25    Q   And do the case agents use those ECs to aid them in

1   preparing the actual 302 report reporting the analysis of the

2   device?

3   A   Yes.  They do.

4   Q   Is that how your ECs were used?

5   A   Yes.

6   Q   And so would the content of your EC have been something

7   that would have been incorporated into the 302?

8   A   Yes, in whole or in part.

9   Q   And the January 22nd, 2016, report that was being used to

10  refresh your recollection, what kind of report is that?

11  A   That's a 302.

12  Q   And who prepared that?

13  A   Agent Whitson.

14  Q   You mentioned that on the RCA tablet there were some

15  YouTube searches of concern.

16          What were those searches?

17  A   They were searches for other religious figures,

18  specifically, Khalid Yasin and Zakir Naik.

19          And these are individuals who are not considered

20  connected to a terrorist group or even necessarily promoting a

21  terrorist group but have made statements in the past that are

22  of concern.

23          For example, I have a quote in my EC of Zakir Naik

24  was banned from entering the UK by the Home Secretary for

25  stating that every Muslim should be a terrorist.

1    Q    Can you spell that individual's name?

2    A    Z-A-K-I-R.  N-A-I-K.  Zakir Naik.

3    Q    And Khalid Yasin?

4    A    K-H-A-L-I-D.  Y-A-S-I-N.

5    Q    On cross-examination Ms. Plomin asked you about the dates

6    of items being loaded onto the flash drive, specifically the

7    S&I.pdf as well as having been removed from the Lenovo Recycle

8    Bin.  Do you recall that?

9    A    Yes.

10   Q    And I believe you testified that it was loaded onto the

11   flash drive on the 19th?

12   A    Yes.

13   Q    Of what month?

14   A    April.

15   Q    Of 2014?

16   A    Of 2012.

17   Q    I'm sorry.  2012.

18           And deleted from the Lenovo's Recycle Bin the

19   following day?

20   A    Yes.  That's correct.

21   Q    Did you look at the HP laptop that belonged to

22   Mr. Simpson?

23   A    Yes, I did.

24   Q    And did it show a date of that file being loaded onto that

25   laptop?

1    A    Let me consult my report.

2         Unfortunately, I have not noted any of the dates but

3    I suspect that information is still available.

4    Q    Can a computer user with their flash drive plugged into a

5    computer download an item straight from an e-mail or straight

6    off the Internet onto that flash drive?

7    A    Yes.  They have to do so intentionally, but it's certainly

8    possible.

9    Q    In other words, would that person be able to bypass the

10   computer's desktop or hard drive and so on and go straight to

11   the flash drive?

12   A    Yes.

13   Q    You mentioned that thumbnails are created for quick

14   display of an image.

15        Do computers running Windows automatically create

16   thumbnail images of larger photos that are stored on the

17   computer?

18   A    Yes.

19   Q    And does that mean the larger image would have been stored

20   on that computer at some point in the past?

21   A    That would be a reasonable assumption, yes.

22   Q    And can a thumbnail remain behind even if the larger image

23   has been deleted?

24   A    It's possible.

25   Q    If an image was downloaded off of the Internet, can that

1  sometimes be revealed through the Internet search history or

2  the Internet viewing history of that computer?

3  A    Yes.

4          MR. KOEHLER:  May I have a moment, Your Honor?

5          THE COURT:  Yes.

6          MR. KOEHLER:  Nothing further at this time, Your

7  Honor.

8          THE COURT:  We are not excusing Ms. Vaughan?

9          MR. KOEHLER:  That is correct.  Thank you.

10          THE COURT:  All right.  Ms. Vaughan, you may step

11  down.  You are not excused as a witness.  So you are not to

12  discuss your testimony with any other witness.  You are only

13  to discuss your testimony with the lawyers.  But I think you

14  are safe for today.  You can probably leave and Mr. Koehler

15  will let you know when you need to come back.

16          THE WITNESS:  Thank you, Your Honor.

17          THE COURT:  You are welcome.

18          The government may call its next witness.

19      (End of Excerpt of Proceedings.)

20                          * * *

21

22

23

24

25

C E R T I F I C A T E

I, ELIZABETH A. LEMKE, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 4th day of March, 2016.

s/Elizabeth A. Lemke
ELIZABETH A. LEMKE, RDR, CRR, CPE