# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 26, 2016 |
| Abdul Malik Abdul Kareem, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #8
TESTIMONY:  SPECIAL AGENT STEWART WHITSON - PART #1
(Pages 1-64, Inclusive.)

APPEARANCES:
For the Government:
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
               **Joseph Edward Koehler, Esq.**
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
               **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1              E X C E R P T   O F   P R O C E E D I N G S
 2         THE CLERK:  Please state your name for the record
 3    spelling your first and last name.
 4         THE WITNESS:  Stewart Whitson.  S-T-E-W-A-R-T.
 5    W-H-I-T-S-O-N.
 6         MS. BROOK:  Just one moment.
 7         SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN
 8                      DIRECT EXAMINATION
 9    BY MS. BROOK:
10    Q    Good afternoon.
11    A    Good afternoon.
12    Q    Would you please introduce yourself one more time to
13    ladies and gentlemen of the jury.
14    A    Hi.  I'm Special Agent Stewart Whitson with the Federal
15    Bureau of Investigation.
16    Q    And, sir, what is your current assignment?
17    A    I'm a Special Agent assigned to a National Security Squad
18    and I investigate counterterrorism matters.
19    Q    How long have you been with the FBI?
20    A    Just under five years.
21    Q    And what is your educational background before you joined
22    the FBI?
23    A    I obtained a Bachelor of Arts in Political Science with a
24    minor in History, along with a Juris Doctorate from the
25    University of Minnesota.  And I'm currently pursuing a
```

1    master's degree from George Washington University in Safety

2    and Security Leadership with an emphasis on strategic security

3    studies.

4    Q    Prior to joining the FBI, where were you employed?

5    A    I was a U.S. Army Infantry Platoon Leader and then later a

6    Company Commander.

7    Q    And the later what?

8    A    A Company Commander in the infantry.

9    Q    At some point did you become an officer within the

10   military?

11   A    Yes, I was an officer.

12   Q    In that capacity, were you ever deployed?

13   A    Yes.

14   Q    Where were you deployed to?

15   A    I was deployed to Iraq for 16 months in 2005 to 2007.

16   Q    And as an officer deployed in Iraq, just briefly, what

17   were some of your duties there?

18   A    Well, essentially, I had an area of -- well, I spent some

19   time between Ramadi and Fallujah, but most of my time near

20   Baghdad.  And I had an area of the city that I was there to

21   help take care of, to provide safety and security, built an

22   elementary school, pharmacy, that kind of thing.  So just kind

23   of met with Imams and sheikhs and things like that in the

24   area.

25   Q    So fast-forwarding, then at some point, obviously, five

1    years ago you became a Special Agent within the FBI.

2              At some point did you become the lead case agent in

3    the investigation against Abdul Malik Abdul Kareem?

4    A    Yes.

5    Q    And as it relates to him, prior to May 5th of 2015, did

6    you know him?

7    A    No.

8    Q    Historically, are you aware of an investigation the FBI

9    had into Elton Simpson?

10   A    Yes.

11   Q    And were you ever involved in that particular case?

12   A    No.

13   Q    I want to start off and talk about an interview that you

14   conducted on May 5th of 2015.  On that day did you happen to

15   interview Abdul Malik Abdul Kareem?

16   A    Yes.

17   Q    And here --

18             THE COURT:  How about, Agent Whitson, could you speak

19   more closely to the microphone?

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  Thank you.

22   BY MS. BROOK:

23   Q    Here with us in the courtroom today, do you see him?

24   A    Yes.

25   Q    Can you point to him and identify something that he's

1   wearing.

2   A   He's the gentleman in the long-sleeved collared shirt,

3   blue.

4        MS. BROOK:  Your Honor, may the record reflect the

5   witness has identified the defendant?

6        THE COURT:  Yes.

7   BY MS. BROOK:

8   Q   So how was it on that day on May 5th that you became

9   involved in conducting that particular interview?

10  A   On May 5th, the morning of May 5th, I was asked by my

11  supervisor to assist in the interview of Mr. Kareem.

12  Q   And on that day on May 5th, was the defendant a suspect in

13  the investigation?

14  A   No.

15  Q   We've heard, and obviously, you have been here as the lead

16  case agent, so you have heard Detective Nash testify about him

17  being there during that interview and taking notes.

18        Other than you and Detective Nash, were there any

19  other agents that were involved in that interview that day?

20  A   No.

21  Q   So let's talk about the setup of that interview.

22        How was it that the defendant came to the FBI to

23  partake in that particular interview?

24  A   Sometime prior -- early in the morning, I guess, that day

25  Detective Nash had reached out to Mr. Kareem via telephone and

1    asked him whether he would be willing to voluntarily come into

2    the office to speak with investigators.

3    Q    Did you do anything to set up an interview room?

4    A    Yes.

5    Q    What did you do?

6    A    So while he coordinated with Mr. Kareem to see if

7    Mr. Kareem would be willing to come in, I set up the interview

8    room we would use and then I sought to acquire a recording

9    device to use during that interview.

10   Q    So you sought out a recording device to use in that

11   particular interview.  Is it a priority of yours to record

12   interviews that you conduct as part of an ongoing

13   investigation?

14   A    It depends on the situation.

15   Q    And explain that a little bit.

16   A    Well, so a lot of the interviews we do may be in an

17   environment that isn't necessarily safe or conducive for

18   conducting recordings.  So if we're going into a place of

19   known crime or we're interviewing someone that we know to be

20   dangerous, I may not want to worry about messing with the

21   recording device while I'm conducting the interview.

22          But, typically, when it's going to be something in

23   the office or something such as this interview was, I would

24   try to record it.  That would be my practice.

25   Q    And what was your first step that day in an attempt to

UNITED STATES DISTRICT COURT

1    record the interview?  Did you select a particular room?

2    A   Yes.  So my first effort was to obtain a room that we

3    already had wired for video and audio but that room was taken.

4    Because of the investigation, lots of people were being

5    interviewed.  So then I needed to find an alternate location.

6    Q   Okay.  And just to be clear, on that day was the defendant

7    under arrest?

8    A   No.

9    Q   And was he in any way ordered to come down to the FBI to

10   partake in an interview?

11   A   No.

12   Q   Did you reach out to Special Agent Brian Taylor within the

13   FBI?

14   A   Yes.

15   Q   And who is Brian Taylor?  What's his position within the

16   FBI?

17   A   He's a Special Agent that deals with technical matters,

18   recording devices, and things like that.

19   Q   And so did -- is he a technically-train Special Agent that

20   assists with setting up recording devices?

21   A   Yes.

22   Q   Did you enlist his help to set up the recording device in

23   the particular room that you had the defendant in for an

24   interview?

25   A   Well, initially, I just requested a device to use.  But

 1    Special Agent Taylor let me know that he already had a room

 2    wired for audio and video and asked if I wanted to use that,

 3    which, of course, I said, yes, if you already have that wired

 4    for audio and video, that would work out perfectly.

 5    Q    So how was it the defendant appeared at the FBI that day?

 6    Did he -- how did he get there, do you know?

 7    A    I believe he drove himself.  He -- we didn't go get him.

 8    He somehow showed up at our office at the time when he was

 9    supposed to and then Detective Nash went out to greet him.

10    Q    At some point did you greet him within the FBI?

11    A    Yes.

12    Q    And where was it that you greeted him?

13    A    I greeted him -- so we have a door that leads into a lobby

14    area at our office.  And then there's another door that leads

15    into the area with the interview rooms.  And so I greeted him

16    at that other door that leads into where the interview rooms

17    are.

18    Q    And did he come with you into the interview room?

19    A    Yes.

20    Q    And the interview room, just explain the setup of it.  How

21    many total -- once you got in there with him, how many people

22    were inside the interview room?

23    A    There were three of us.

24    Q    Okay.  So it was you, Detective Nash, and the defendant?

25    A    Yes.

1   Q   And the room that you're in, is the door locked?

2   A   No.

3   Q   And do you express to an individual when you're

4   interviewing them in these circumstances that they are free to

5   leave and it's a voluntary interview?

6   A   Yes.

7   Q   What do you say?

8   A   So my --

9          THE COURT:   Could I ask that instead of asking it

10  theoretically, if you could ask about what he did that day?

11  BY MS. BROOK:

12  Q   So let's focus in right on this particular interview.

13  What did you say to the defendant in terms of it being a

14  voluntary interview?

15  A   Well, as soon as he came into the room with us, I thanked

16  him, told him how much we appreciated that he had voluntarily

17  come into the office, that obviously, he understood with what

18  had happened in Texas that we were interviewing lots of people

19  and so that it made our job a lot easier for people to be

20  willing to come in and do it like that and sincerely thanked

21  him for doing that.

22  Q   Okay.  Approximately, how long was the interview?

23  A   Just under two hours.

24  Q   And at any point during the interview, did you leave the

25  room?

```
 1    A    No.

 2    Q    At any point during the interview did Detective Nash leave

 3    the room?

 4    A    No.

 5    Q    And at any point did the defendant leave the room?

 6    A    No.

 7    Q    At any point did he express that he wanted to leave the

 8    room?

 9    A    No.

10    Q    At any point did he express that he didn't want to talk to

11    you?

12    A    No.

13    Q    How did he appear during the interview?  Did he look sick

14    at all?

15    A    No.

16    Q    Did he appear to be sweating at all?

17    A    No.

18    Q    Did he appear to be struggling to communicate with you at

19    all?

20    A    No.  Not at all.

21    Q    Did he seem uncomfortable at all?

22    A    No.  I think, you know, once we got into the conversations

23    about Simpson, I think you could see him kind of well up with

24    tears as we were talking about that.  But other than that, he

25    seemed perfectly comfortable.
```

1    Q    Did you ask him if he knew Elton Simpson and Nadir Soofi?

2    A    Yes.

3    Q    And what did he say?

4    A    He said he did know them.

5    Q    Did he know that they were both killed on May 3rd of 2015,

6    so two days before?

7    A    Yes.

8    Q    And, initially, did he tell you that to his knowledge,

9    Simpson didn't have an AK?

10   A    Yes, initially.

11   Q    And by "AK," what does that mean?

12   A    He said an AK-47, which I understood, based on the context

13   of the conversation, to be an AK-47 assault rifle.

14   Q    Then what happened next?

15   A    Then -- so after he said that, we asked him further

16   questions.  And then he corrected himself and said that he had

17   seen an AK-47.

18   Q    Did you ask him if he had ever gone shooting with Simpson

19   or Soofi?

20            MR. MAYNARD:  Objection, Your Honor.  It's leading.

21            THE COURT:  I don't think that was.  Overruled.

22            THE WITNESS:  So, yes.  I did ask him if he had gone

23   shooting with Simpson and Soofi.

24   BY MS. BROOK:

25   Q    And what did he say?

1   A   He said no.

2   Q   Did he say anything about Simpson ever asking him to go

3   shoot with him?

4   A   Yes.

5   Q   What did he say?

6   A   He said that they had asked him to go shooting and had

7   specified that they didn't want to do it at a range.  They

8   wanted to do it somewhere out in the desert in order to avoid

9   law enforcement detection.  And he said that his response was

10  he declined to do that.

11  Q   Did he make any statements about whether or not Simpson

12  and Soofi had gone shooting with the weapons that they used in

13  connection with the attack?

14  A   He stated that to the best of his knowledge, they had not

15  ever fired the weapons that they ultimately used in Garland.

16  Q   Did he make any statements about whether he had seen

17  Simpson or Soofi with body armor, military gear, or vests?

18  A   Yes.

19  Q   What did he say?

20  A   He specifically said that he had not seen body armor,

21  other kind of tactical gear, backpacks, things of that nature.

22  Q   At some point during the conversation did the defendant

23  say who he thought Simpson and Soofi may be influenced by?

24  A   Yes.

25  Q   And who was that?

1    A    He described him as a radical salafi Jamaica-based

2    scholar named Faisal.

3    Q    And based upon your training and experience, your work

4    within the JTTF, the Joint Terrorism Task Force, do you know

5    what Sheikh Faisal is?

6    A    Yes.

7    Q    Who is he?

8    A    Sheikh Faisal is a Jamaica-based radical cleric.  He was

9    someone that supported the al-Qa'ida and the Arabian Peninsula

10   and al-Qa'ida in general before the emergence of the Islamic

11   State.

12           And then when the Islamic State announced its

13   khalifate on June 29th of 2014, he was one of the first

14   English-speaking clerics to come out in support of them.  And

15   so he delivered lectures and things like that in support of

16   the Islamic State.

17   Q    Did the defendant say whether or not he too followed or

18   watched Sheikh Faisal?

19   A    The defendant said he did not.

20   Q    And let me take a step back.

21           So in this case during the course of its

22   investigation, did you find evidence of Sheikh Faisal lectures

23   on the defendant's Acer computer?

24   A    Yes.

25   Q    Where else did you find evidence of Sheikh Faisal

1  lectures?

2  A    We also found two to three -- I believe it was three

3  separate Sheikh Faisal CDs in Simpson and Soofi's apartment

4  located on 19th Avenue.

5  Q    In the beginning of the interview -- I want to go back to

6  is the interview itself -- did you warn the defendant that

7  lying to the FBI is a crime?

8  A    Yes.

9  Q    Did you ask him if he had heard or whether or not he knew

10  of the Draw The Prophet Muhammad Contest in Garland, Texas,

11  before the attack happened?

12  A    Yes.

13  Q    And what did he say?

14  A    He said he had not heard of the attack -- or heard of the

15  event at all until after the attack took place.

16  Q    Did you ask him whether or not he knew in advance that

17  Simpson or Soofi planned to conduct an attack on the contest?

18  A    I did.

19  Q    And what did he say?

20  A    He said he did not know that they planned to do that.

21  Q    At some point during the course of your conversation with

22  the defendant, did he tell you that he only talked to Simpson

23  on one particular phone, that he only had one phone?

24  A    Yes.

25           MR. MAYNARD:  Objection.  Leading.

1          THE COURT:  That one was.  Sustained.

2    BY MS. BROOK:

3    Q    What did he say about the way in which he contacted

4    Simpson by using a phone?

5    A    During the interview he mentioned that Simpson had two

6    phones but that there was only one phone that he communicated

7    with and that the other phone Simpson had, Simpson didn't

8    share that number with anyone else and that Simpson

9    communicated with a woman based in Canada using that phone.

10   But that Mr. Kareem only called him on the other phone.

11   Q    In the week before the attack, what did the defendant

12   describe as his contact with Simpson?

13   A    During this interview the defendant said he had -- that

14   they had essentially cut off communications with him the week

15   prior to the attack, that Simpson was not returning his phone

16   calls.

17   Q    Did he state anything about a Friday night dinner that

18   Simpson didn't show up to?

19   A    Yes.

20   Q    What did he say?

21   A    May I check my notes?

22   Q    Please.

23          MR. MAYNARD:  Your Honor, can I inquire as to what

24   the agent is looking at?

25          THE COURT:  Yes.

CR15-00707-PHX-SRB   STEWART WHITSON-PART#1   2-26-16

1        THE WITNESS:  I'm looking at my report dated May 5th,

2   2015.  It's an FD-302 that I drafted following that interview.

3   BY MS. BROOK:

4   Q   And what did he say?

5   A   He said that he had seen Simpson on May 1st at the mosque.

6   That he had confronted him about canceling the reservations

7   and that he had invited him and others to have a dinner at his

8   house.

9   Q   Did he also say that before that point that week he hadn't

10  seen him?

11  A   May I review my notes?

12  Q   Please.

13  A   Yes.  He said one week prior that he had -- Simpson had

14  cut off communications with him and then he had suddenly

15  received a text message from Simpson on April 30th.

16  Q   I want to go back for a second.

17       Defense counsel mentioned the report that you have.

18  So after you completed this interview, did you draft a report?

19  A   Yes.

20       MR. MAYNARD:  Objection, Your Honor, to the form of

21  the question.  I never mentioned a report.

22       THE COURT:  He just asked what report it was after

23  Whitson asked, but nevertheless, the answer will stand.

24  BY MS. BROOK:

25  Q   So after the interview that you conducted with the

1    defendant, did you create a report?

2    A   Yes.

3    Q   And how many pages is it?

4    A   It's four pages.

5    Q   How soon after the interview itself was completed did you

6    sit down and write out the report?

7    A   Within 24 hours.

8    Q   And what did you use to assist you in creating that

9    report?

10   A   I used interview notes created primarily by my partner

11   Detective Nash.  I also had some interview notes myself.  And

12   I also relied upon my memory and the memory of Detective Nash.

13   Q   Is it important as you're trained to generate your reports

14   close in time to the interview itself?

15   A   Yes.

16   Q   And why is that?

17   A   The memory is fresh in your mind so it will tend to be

18   more accurate the sooner you can do it.

19   Q   I want to ask about one more question related to the

20   interview.

21          Did you ask the defendant if Simpson or Soofi had

22   asked him to participate in the attack?

23   A   Yes.

24   Q   And what did he say about that?

25   A   He said that they had not asked him to participate in the

1    attack.

2    Q   Did he say "that attack" or "any attack"?

3    A   He said -- they had not asked him to participate in that

4    attack or any attack.

5    Q   After the interview was over, did the defendant leave the

6    interview room?

7    A   Yes.

8    Q   And how did that happen?

9    A   Once the interview came to a conclusion, we told -- we

10   again thanked him for coming in voluntarily and for his time

11   and we escorted him out.

12          And so we kind of got to that same door where I had

13   met him before.  The interview equipment was in an adjacent

14   room that's located right next to that opening, so I stopped

15   in that doorway where that opening is and said my good-byes

16   there and then Detective Nash continued into the lobby with

17   Mr. Kareem.

18   Q   Did you at some point go in to stop the recording

19   equipment?

20   A   Yes.

21   Q   Who as it that initially started the recording equipment

22   before the interview began?

23   A   Special Agent Taylor.

24   Q   And had you worked out --

25          Well, how do you know that he was going to start the

1    equipment?

2    A   So prior to conducting the interview, I had come down and

3    Special Agent Taylor had kind of given me a quick orientation

4    to the equipment, how it would work, that kind of thing.  And

5    we developed a plan of how it would work.  And essentially he

6    would --

7         Well, first we did tests to make sure the camera

8    where it was positioned would be able to see Mr. Kareem and

9    see us, that our heads wouldn't block it, that kind of thing,

10   because it was located behind us.

11        So after we had done those tests, then we developed a

12   plan whereby I would give him a thumbs up when I was ready for

13   him to start the recording.  He would give me a thumbs up to

14   let me know the recording was actually going.  And then I

15   would open those two doors that led to the lobby and allow

16   Mr. Kareem to come in.

17        That way the recording would be rolling before he

18   came into the room and not start, you know, after he was in

19   there, that kind of thing.

20   Q   And before the interview started, did you give Special

21   Agent Taylor the thumbs up as you had planned on doing?

22   A   Yes.

23   Q   And at the end of the interview, what was the plan for how

24   the recording equipment would be stopped?

25   A   And so the plan was he would start the equipment.  And

1   then once it was over, all I had to do was come in and there

2   was a single button to push on this equipment.  And so he had

3   explained that to me.  And he said:  When you push that, that

4   will stop it and it will also eject an SD card which was the

5   digital media that the recording would go onto.

6           We would then, obviously, take that card and we would

7   bring it to our electronic surveillance folks who then, you

8   know, keep that as evidence and make copies of it, that sort

9   of thing.

10  Q   So did you and Detective Nash, after the conclusion of the

11  interview, go back into the interview recording equipment room

12  and press Stop like you were told to do by Special Agent

13  Taylor?

14  A   Yes.

15  Q   And did the SD card eject out of the system?

16  A   Yes.

17  Q   And was the SD card placed into property and evidence?

18  A   Yes.

19  Q   At some point after the interview did you become aware

20  that the interview itself did not download and record onto the

21  SD card?

22  A   Yes.

23  Q   Are you aware of whether or not the SD card had been taken

24  to be further analyzed to see if they can extract the

25  interview off of it?

1    A    Yes.

2    Q    Was there any success?

3    A    No.

4         And so they were able to see the practice videos I

5    described.  Those were able to be found on there where he had

6    had me come in and he had tested to see if it would work.  But

7    the actual interview was not on the disk.

8    Q    On June 10th of 2015, so approximately 35 days later, was

9    the defendant arrested after he was indicted in connection

10   with this case?

11   A    Yes.

12   Q    And Mr. Koehler is going to start the equipment.

13        On that particular day was the defendant interviewed

14   again?

15   A    Yes.

16   Q    Before you interviewed him -- and let's back up a little

17   bit.

18        So he was arrested.  Where was he arrested?

19   A    He was arrested at a gas station located in the southwest

20   area of Phoenix.  I can't recall the exact city.  It's a

21   Valero gas station.  But he was driving his moving truck and

22   he was pulled over and arrested.

23   Q    And where did you conduct the interview?

24   A    The interview was conducted at FBI headquarters which is

25   located in Phoenix.

1   Q   And who was it that was part of this particular interview?

2   A   Again, it was myself and Detective Nash conducted the

3   interview.

4   Q   Do you recall approximately what time of day it was?

5   A   I don't recall off the top of my head because it was

6   indoors.  And so I was managing the operation from indoors, so

7   I didn't --

8   Q   Before you started the interview, obviously, at this point

9   the defendant is under arrest?

10   A   Uh-huh.

11   Q   Did you advise him of his rights?

12   A   Yes.

13   Q   And, Your Honor --

14   A   Sorry.  I do.  It was in the morning, obviously, because

15   that's when -- the earlier morning hours to early afternoon

16   was when he was finally arrested I recall.

17   Q   So the interview was in the morning or in the afternoon?

18   A   The interview didn't take place until afternoon but he was

19   arrested sometime in late morning to early afternoon, so it

20   would have been just after that.

21   Q   And have you had a chance to review clips 407 through 430.

22   Do they fairly and accurately represent the interview?

23   A   Yes.

24   Q   I spoke a moment ago.  I asked you about the advisal of

25   rights.  You said that you had given it to him.

1          Your Honor, at this point the government is going to

2    move to admit and publish Exhibit No. 407.

3          MR. MAYNARD:  Your Honor, due to completeness, I ask

4    that the entire interview be shown to the jury.

5          THE COURT:  Well, you can certainly do that if you

6    wish.  But I don't -- I don't know how long it is.  I don't

7    know how many pauses there are in it.  But I'm sure you have

8    the whole thing.

9          MR. MAYNARD:  I have the disk and I don't know

10   exactly what clips the government is planning to show, for

11   certain reasons, and so --

12         THE COURT:  I'm going to allow the government to

13   proceed.  And if at a later point in time you want to show the

14   rest or the entire interview, you may do so.  So you may

15   proceed.  It's --

16         MS. BROOK:  407.

17         THE COURT:  Well, are you going to offer all of them?

18         MS. BROOK:  I am.

19         THE COURT:  Isn't it 407 then through 430?

20         MS. BROOK:  The government is going to be offering

21   407 through 422 and then 424 through 428 and 430.

22         MR. MAYNARD:  Your Honor, again, having not seen the

23   clips, under 106 I would ask that they show it all.  I just

24   haven't seen them.

25         THE COURT:  Well, what you have seen is the entire

```
 1   interview.
 2             MR. MAYNARD:  Yes.  Numerous times.
 3             THE COURT:  And I take it you do not doubt when
 4   Ms. Book says that these are all excerpted from the
 5   interview -- that same interview.
 6             MR. MAYNARD:  I don't have any reason to doubt
 7   Ms. Brook.
 8             THE COURT:  Well, the objection is overruled.
 9             407 through 422, 424 through 428 and 430 are
10   admitted.
11        (Exhibit Nos. 407, 408, 409, 410, 411, 412, 413, 414, 415,
12   416, 417, 418, 419, 420, 421, 422, 424, 425, 426, 427, 428,
13   and 430 admitted in evidence.)
14             MS. BROOK:  Thank you, Your Honor.
15             And we're going to go ahead and play now the clip.
16        (Displaying video clip to the jury.)
17   BY MS. BROOK:
18   Q   Did you ask him during the interview if he knew Elton
19   Simpson and Nadir Soofi?
20   A   Yes.
21             MS. BROOK:  Government is going to play Exhibit 408.
22        (Displaying video clip to the jury.)
23   BY MS. BROOK:
24   Q   Did you ask him if he had heard of the Charlie Hebdo
25   attack?
```

1    A    Yes.

2         (Displaying video clip to the jury.)

3    BY MS. BROOK:

4    Q    Did you ask him about Cochise?

5    A    Yes.

6    Q    And let's just take a step for a second.  During the

7    course of this investigation, did you determine the date and

8    time when the defendant moved out of the house on Cochise?

9    A    Yes.

10   Q    When was that?

11   A    It was sometime towards the middle of March 2015, possibly

12   toward the end.

13   Q    And we've seen evidence in this case of the search warrant

14   that was conducted at the defendant's house on 21st Place.

15        About when after he moved out of the house on Cochise

16   did he move into that particular house?

17   A    His lease began on April 1st of 2015 in the new house --

18   or in the new apartment, I should say, the one located on 21st

19   Place.

20   Q    And then the search warrant was conducted on June 10th of

21   2015?

22   A    Yes.

23   Q    Did you ask him if he had heard Simpson and Soofi talk

24   about the Garland attack?

25   A    Yes.

```
 1          (Displaying video clip to the jury.)

 2     BY MS. BROOK:

 3     Q    What's the Dola?

 4     A    Well, I think al Dola is what he meant is the first "D" in

 5     the acronym "DASH" which is the Arabic acronym for ISIS.

 6     Islamic State.  That it basically means the word "state" in

 7     that acronym.

 8     Q    Did you ask him during the interview if looking back, he

 9     thought that there were clues that they would attack?

10     A    Yes.

11     Q    And did he respond?

12     A    Yes.  He responded.

13          (Displaying video clip to the jury.)

14     BY MS. BROOK:

15     Q    Did you ask him about the guns that Simpson and Soofi had

16     with them?

17     A    Yes.

18     Q    The guns during the attack?

19     A    Yes.

20          (Displaying video clip to the jury.)

21     BY MS. BROOK:

22     Q    So he stated initially that he went shooting with Simpson

23     and Soofi this one time about a year-and-a-half ago and then

24     towards the end of the interview said about a year ago?

25     A    Yes.
```

1   Q   Did you follow up on that particular shooting event and

2   ask him about the guns that Simpson and Soofi brought that one

3   day he said where they all went shooting together?

4   A   Yes.

5        (Displaying video clip to the jury.)

6   BY MS. BROOK:

7   Q   Did you ask further questions to pinpoint exactly who

8   Sergio was that the defendant was talking about?

9   A   Yes.  Yes, I did.

10       (Displaying video clip to the jury.)

11  BY MS. BROOK:

12  Q   Did you ask him if on that one day when they -- he is

13  saying that Simpson and Soofi and he went shooting, if Simpson

14  shot or fired a weapon when he was out there?

15  A   Yes.

16       (Displaying video clip to the jury.)

17  BY MS. BROOK:

18  Q   Did you ask him when this one time shooting event

19  occurred?

20  A   Yes.

21       (Displaying video clip to the jury.)

22  BY MS. BROOK:

23  Q   Did you also ask him where he had gotten the ammunition

24  that he shot that day?

25  A   Yes.

```
 1        (Displaying video clip to the jury.)

 2             THE COURT:  Excuse me, Ms. Brook.

 3             We're going to take our afternoon break.

 4             Ladies and gentlemen, we will reconvene at a quarter

 5   to 3:00.  You are reminded of the admonition not to discuss

 6   the case or form any conclusions about it until you have heard

 7   all the evidence and begun your deliberations.

 8             Court is in recess until quarter to 3:00.  I'll

 9   excuse the jury at this time.

10        (Open court, no jury present at 2:27 p.m.)

11             THE COURT:  You may step down, Agent Whitson.

12             THE WITNESS:  Thank you, Your Honor.

13             THE COURT:  Mr. Koehler?

14             MR. KOEHLER:  Your Honor, Mr. Maynard addressed the

15   issue of the rule of completeness.

16             The government will object to the defendant offering

17   up self-serving hearsay from the other portions of the

18   interview unless he can show that they are somehow directly

19   tied to something being taken out of context.

20             THE COURT:  I note that you have a transcript that

21   you have running with these various film clips.

22             Do you have a transcript of the entire interview?

23             MR. KOEHLER:  Yes.  And it was disclosed to the

24   defense.

25             THE COURT:  That's fine.  But I was going to ask that
```

1   you give it to me so that I am prepared when Mr. Maynard asks

2   to play other parts of the interview.

3          MR. KOEHLER:  We will get that for you, Your Honor.

4          One thing I wanted to bring up specifically about

5   that, during the course of the interview, the subject of the

6   molestation accusations comes up.

7          And the defendant goes into some fairly lengthy

8   detail explaining why, you know, this accusation was false and

9   so on.

10          I'm assuming he doesn't want to play that part of the

11   interview, but perhaps I'm wrong.

12          THE COURT:  Well, why don't you provide me with the

13   transcript.

14          MR. MAYNARD:  Well, Judge, I believe -- I don't think

15   we have a transcript that's like this that's a video --

16          THE COURT:  No.  I'm asking for a transcript -- I

17   don't want to watch the interview because I can read it

18   faster.  I'm asking just for the transcript.

19          MR. KOEHLER:  We will get that to you, Your Honor.

20          MS. BROOK:  Your Honor, just one other unrelated

21   issue, but since we have everyone gathered without the jury, I

22   noted again this morning, and additionally, yesterday

23   afternoon again, that Juror No. 3 is sleeping.

24          She was not catching her head this morning, but she

25   was absolutely, in my opinion, her eyes were closed for

1   prolonged periods, not making any eye contact or having any

2   direct contact with the witness and was staring down at the

3   screen during periods in which there was nothing on the

4   screen.

5          I just wanted to make that observation.

6          THE COURT:  That is consistent with my observations

7   as well.

8          MS. BROOK:  I wanted to reurge what we brought up two

9   days ago regarding removing that particular juror.

10          MR. MAYNARD:  I reluctantly agree.

11          THE COURT:  Well, what I would propose --

12          So let me be clear.

13          MR. MAYNARD:  Because we have noticed she is sleeping

14   the last two days.

15          THE COURT:  So both the government and defense

16   counsel agree that I should excuse Juror No. 3; is that

17   correct, Ms. Brook?

18          MS. BROOK:  Yes.

19          THE COURT:  Mr. Maynard?

20          MR. MAYNARD:  Yes.

21          THE COURT:  What I will do to avoid any embarrassment

22   to Juror No. 3 is that I'm going to ask Maureen to discreetly

23   ask her to stay behind when we recess at the end of the day.

24          And I will have her in my -- ask her into my office

25   and just she and I -- and I will excuse her not on the record

CR15-00707-PHX-SRB   STEWART WHITSON-PART#1   2-26-16

```
1    and not with all of the rest of you present.
2             MS. BROOK:  Thank you, Your Honor.
3             MR. MAYNARD:  That's fine.
4             MR. KOEHLER:  Your Honor, there was one very minor
5    detail.  I neglected to walk through a few exhibits with
6    Mr. Meshinsky before we finished.
7             THE COURT:  He will be back.
8             MR. KOEHLER:  Correct.  And I spoke to Ms. Plomin.
9    She has graciously agreed that I may go back into that with
10   him before she begins her cross on Tuesday.
11            THE COURT:  Okay.  And then are we still -- I had on
12   the list for today Ms. Ahmadi.
13            Is she going to be testifying?
14            MR. KOEHLER:  We needed to line up a Dari interpreter
15   for her.  And because of that, we decided to push her to
16   Tuesday.  And I apologize for not notifying the Court first
17   thing about that.
18            We may decide not to call her at all, but we're going
19   to dwell on that.  But if we do, it will be Tuesday.
20            THE COURT:  I heard her name finally and she's just
21   someone else that worked in this same restaurant?
22            MR. KOEHLER:  That is correct.
23            THE COURT:  Okay.  All right.  Anything else?
24            MR. KOEHLER:  No, Your Honor.
25            THE COURT:  Okay.  We will reconvene at a quarter to
```

1    3:00.

2         (Recess taken at 2:32 p.m.; resumed at 2:48 p.m.)

3         (Open court, jury present.)

4              THE COURT:  Thank you, ladies and gentlemen.  Please

5    sit down.  The record will show the presence of the jury,

6    counsel, and the defendant.

7              Ms. Brook, you may continue.

8              MS. BROOK:  Thank you, Your Honor.

9    BY MS. BROOK:

10   Q   So we left off -- and, I think, the last thing I asked you

11   before we were about to play a clip -- was did you ask the

12   defendant if he ever went shooting with Simpson and Soofi

13   together on any other occasion other than this one time that

14   he had talked to you about?

15   A   Yes.

16        (Displaying video clip to the jury.)

17   BY MS. BROOK:

18   Q   Also -- and I skipped over it by accident right before we

19   got to this clip -- did you ask him how well Simpson and Soofi

20   shot that day when he was talking about them shooting with

21   Sergio?

22   A   Yes.

23        (Displaying video clip to the jury.)

24   BY MS. BROOK:

25   Q   During the interview did the defendant talk more about

```
 1    Sergio?

 2    A   Yes.

 3         (Displaying video clip to the jury.)

 4    BY MS. BROOK:

 5    Q   Did you ask the defendant if he knew of or believed in the

 6    Khalifah or the khalif?

 7    A   Yes.

 8    Q   And just to refresh our memory a little bit, who exactly

 9    is the Khalifah or the khalif?

10    A   Well, the idea of the khalif is to be the leader of the

11    Ummah or the community of Muslims throughout the world.

12         And currently, Abu Bakr al Bagdadi has claimed

13    himself to be the Khalifah of the Ummah and he is the current

14    leader of the Islamic State.

15    Q   And, again, who are the only people that believe that the

16    khalif or the Khalifah presently exist?

17         MR. MAYNARD:   Objection.   Foundation.

18         THE COURT:   Sustained.

19         MS. BROOK:   We can handle that through another

20    witness but we're going to move on and play 422.

21         (Displaying video clip to the jury.)

22    BY MS. BROOK:

23    Q   Did you ask the defendant more about moving out of

24    Cochise?

25    A   Yes.
```

```
 1   Q   And also about how often or how much he would see Simpson?

 2   A   Yes.

 3       (Displaying video clip to the jury.)

 4   BY MS. BROOK:

 5   Q   Did you ask the defendant if he knew about the Draw the

 6   Prophet Muhammad contest in Garland, Texas, before the attack?

 7   A   Yes.

 8       (Displaying video clip to the jury.)

 9   BY MS. BROOK:

10   Q   Did you show him a picture of Stephan Verdugo and ask him

11   if he knew him?

12   A   Yes.

13       (Displaying video clip to the jury.)

14   BY MS. BROOK:

15   Q   Did the defendant admit to you that he possessed and he

16   owned guns?

17   A   Yes.

18       (Displaying video clip to the jury.)

19   BY MS. BROOK:

20   Q   Did you ask him about his relationship with Simpson in the

21   days before the attack?

22   A   Yes.

23       (Displaying video clip to the jury.)

24   BY MS. BROOK:

25   Q   Did you ask the defendant if he had ever bought ammunition
```

1  with Simpson before?

2  A   Yes.

3       (Displaying video clip to the jury.)

4  BY MS. BROOK:

5  Q   Did you ask the defendant if he previously had been

6  convicted of a felony?

7  A   Yes.

8       (Displaying video clip to the jury.)

9  BY MS. BROOK:

10  Q   And if we can switch it back to the Elmo.  Thank you so

11  much.

12       In the course of the investigation in this case, did

13  you execute search warrants on Google search history of the

14  defendant?

15  A   Yes.  I served two search warrants on his Gmail account

16  gitrdonemoving@gmail.com?

17  Q   And did that also produce Google search history as well?

18  A   Yes.

19  Q   In your analysis of the search warrant returns and the

20  defendant's computer as well, did you find evidence of erased

21  computer history?

22  A   Yes.  I found evidence that -- that someone had gone into

23  that "gitrdonemoving" Gmail account and erased the search

24  history inside that account.

25  Q   And explain that.  How did you find that?

1    A    Well, so to back up, I had served two separate search

2    warrants.

3          The first one arrived back in early June of 2015.

4    And when I reviewed that search warrant return, I saw there

5    was only a list of one group of searches done on a single day

6    and I believe it was May 21st of 2015.

7          When I served a second search warrant upon that same

8    company and I looked at the search history inside the Google

9    account, I noticed that that day 5/21 was no longer visible.

10   And instead, there was only days through, I believe, June 6th

11   through on or about June 9th of 2015.

12         And so by -- and one other thing to state.

13         In both of those search warrants returns, there's a

14   line in there where it says about the search history.  And

15   then it will say "true" or "false."  If it says "true" on that

16   line, that mean that it's saving your history in Google.  If

17   it says "false," which you can go into your Google account and

18   turn that off, then it will not save that history.

19         And so because I saw that listed as "true," I knew

20   that the user of that e-mail account did not turn that

21   function off.

22         So in other words, the Google account would be saving

23   their search history.  And so by looking at all that data

24   together, I was able to conclude that he had gone in and

25   erased his Google search history sometime after that 5/21 date

1    because it was no longer there when I saw it the next time.

2    Q    So let me just be clear.  So there were two separate

3    captures of the Google search history?

4    A    Uh-huh.

5    Q    And what we're referring to specifically, is it the

6    Internet browsing history?

7    A    No.  And so basically when you go into Google when you're

8    signed in, whether you know it or not, if you're still logged

9    onto your Google account -- say you have checked your Gmail

10   and you haven't logged out -- Google continues to track your

11   search history.

12        And so what also happens on your computer is your

13   Internet browser tracks your search history.  And so most

14   people know in that Internet browser, that's that box when

15   you're looking at the Internet and you see the line across.

16        And sometimes if you'll hit that arrow, drop an

17   arrow, you'll see places you visited.  Or you can delete --

18   there will be a button there to delete your browsing history.

19        Well, a lot of people know to delete that.  But what

20   they might not know is in order to delete the records on their

21   Google account, they actually have to go into Google and do a

22   extra step, and that's actually log into their Google Gmail

23   account and erase it there as well.

24        So analysis of these search warrants showed me that

25   that person had taken that extra step.  So not only had they

1    erased the browsing history, but they had actually known or at

2    least cared enough to go into their Google account and

3    actually do it, and again, on more than one occasion based on

4    my analysis.

5    Q   And you could tell that because the second capture of

6    Google Internet history did not provide search history that

7    the first capture did?

8    A   Yes.

9    Q   I want to talk to you about the gitrdonemoving@gmail.com

10   e-mail address.  Did you too execute a search warrant on that

11   particular e-mail address?

12   A   Yes.  Those were the two search warrants that I described

13   moments ago.

14   Q   And I want to speak specifically about a particular

15   e-mail.

16          Did you find an e-mail that was sent to

17   gitrdonemoving@gmail.com on November 9th of 2014?

18   A   Yes.

19   Q   And in the course of your investigation, was that e-mail

20   relevant?

21   A   Yes.

22   Q   Can you explain that?

23   A   Yes.  It was an e-mail that was forwarded from Elton

24   Simpson.

25          It was a letter from Elton Simpson's probation

1    officer detailing travel restrictions related to Elton

2    Simpson.

3            And so what the records show is that Elton Simpson,

4    without putting the message, had just forwarded that e-mail he

5    had received from his probation officer, directly to the

6    e-mail address gitrdonemoving@gmail.com.

7    Q   So let's take a step back and rewind for a minute.

8            So back in November of 2014, have you become aware

9    through the course of this investigation, that Elton Simpson

10   was on federal probation and had a probation officer?

11   A   Yes.

12   Q   And was that officer an individual by the name of Angela?

13   A   I don't recall her name.

14   Q   Okay.  I'm going to place on the overhead what has not yet

15   been admitted but is marked as Government's Exhibit No. 190.

16           And in looking at this particular exhibit, what do

17   you see?

18   A   This is the letter I just spoke about and it's --

19   Q   I'm going to go ahead and scroll to the top so you can see

20   that as well.

21           Does it fairly and accurately represent the e-mail

22   that you saw subject to the execution of this search warrant?

23   A   It does.

24           MS. BROOK:  The government moves to admit and publish

25   190.

CR15-00707-PHX-SRB   STEWART WHITSON-PART#1   2-26-16

```
1              MR. MAYNARD:  No objection.
2              THE COURT:  190 is admitted.
3         (Exhibit No. 190 admitted in evidence.)
4    BY MS. BROOK:
5    Q    Starting from the top, let's go ahead and scroll.  I know
6    the type is really small.  Who was this e-mail from?
7    A    The sender is Ibrahim at e-mail address
8    ibrahimibrahim602@gmail.com.
9    Q    And who is it sent to?
10   A    It was sent to gitrdonemoving@gmail.com.
11   Q    And just so we're all on the same page, who have you
12   determined through the execution of these search warrants is
13   the owner of that e-mail account?
14   A    I have been able to determine the user of both accounts
15   through search warrants.  But the gitrdonemoving@gmail.com is
16   owned by Mr. Kareem.  It's his account.
17   Q    And the owner of the first e-mail account Ibrahim?
18   A    Was Elton Simpson's e-mail account.
19   Q    You spoke about the date already.  Do you see the date
20   there listed at the top?
21   A    Yes.
22   Q    What is that?
23   A    It's 9 November, 2014.
24   Q    And as we look at the text, so pulling it down, do you see
25   attached to it an e-mail sent to Ibrahim forwarded to the
```

UNITED STATES DISTRICT COURT

1    defendant from his probation officer Angela?

2    A    Yes.

3    Q    Can you read it to us, please?

4    A    Yes.  It says:

5              I just reviewed your judgment and there is nothing as

6    far as travel restriction.  I am not sure why you were stopped

7    from getting on the plane.  Did they give you a reason at the

8    time?  What they did say was -- what did they say was the

9    reason you were stopped?  As far as I am concerned, as long as

10   you comply with the ten business days' notice and you get

11   approval from me for domestic travel, I do not see why you

12   cannot go.  Out of the country is a different procedure and

13   takes longer.  Hope that helps.  Thanks.

14   Q    So bottom line, communication through this e-mail, does it

15   express that Ibrahim needs to have approval from his probation

16   officer in order to travel domestic or foreign?

17   A    Yes.  It's approval to travel foreign and has to provide

18   at least ten-day notice to travel domestically.

19   Q    I want to turn back to the Maxwest cell phone of the

20   defendant that was seized inside the cab of his truck on June

21   10th.  That particular cell phone, what was it identified by

22   in the lab?  What QPX number did they give it?

23   A    It was known as QPX4.

24   Q    I'm going to place on the overhead what has not yet been

25   admitted yet, Government's Exhibit 486.

1              Do you recognize what's in this photo?

2    A    I do.

3    Q    And what is it?

4    A    It's a picture of Elton Simpson with his cell phone in his

5    hand taken in an unknown restaurant.

6    Q    Where was this photo extracted from?  What device?

7    A    This photo was extracted from QPX4, the Maxwest cell

8    phone.

9              MS. BROOK:  Your Honor, the government moves to admit

10   and publish 486.

11             MR. MAYNARD:  No objection.

12             THE COURT:  486 is admitted.

13        (Exhibit No. 486 admitted in evidence.)

14   BY MS. BROOK:

15   Q    Moving on to 487, not yet admitted government's 487.

16             Do you recognize that?

17   A    Yes.

18   Q    And what do you recognize it as?

19   A    This is another picture of Elton Simpson with his cell

20   phone and, again, in a restaurant that I do not know which

21   restaurant that is.  It was taken on the QPX4 Maxwest cell

22   phone.

23             MS. BROOK:  Government moves to admit and publish

24   486 -- I'm sorry -- 487.

25             MR. MAYNARD:  No objection.

1          THE COURT:  487 is admitted.

2      (Exhibit No. 487 admitted in evidence.)

3   BY MS. BROOK:

4   Q   We've spoken in this case extensively about the Acer

5   computer laptop that was found in the defendant's house on

6   June 10th.  We've heard testimony about the Flames of War

7   video that was captured and accessed on the Acer computer as

8   well as downloaded onto the Acer computer.

9          MR. MAYNARD:  Objection to the form of the question,

10  Your Honor.

11         THE COURT:  Sustained.

12  BY MS. BROOK:

13  Q   Have you had a chance to review Government's Exhibit No.

14  471?

15  A   Yes.

16  Q   And does 471 fairly and accurately reflect the video

17  Flames of War?

18  A   Yes.

19  Q   Obviously, as part of that, have you had an opportunity to

20  review the full video in its entirety?

21  A   Yes.

22  Q   Can you provide us just a general description of that

23  video?

24  A   Yes, I can.

25          Flames of War is a propaganda video that was

1    published by the Islamic State in September of 2014.  It's a

2    55-minute long film.  It's almost two films put together.  The

3    first part of it is what I would describe as the Islamic

4    State's version of history starting with the US-led invasion

5    of Iraq, the way they see how that history has played out to

6    their current position.

7         And then the end of the video includes a scene from

8    an Islamic State member performing -- he actually delivers a

9    speech too the West and then executes a number of Syrian

10   soldiers after they had dug their own grave and then executes

11   them upon the completion of his speech.

12        MS. BROOK:  We'll save for a later time discussion of

13   the significance and role of that particular video, but at

14   this point the government moves to conditionally admit 471

15   subject to discussions later about 403.

16        MR. MAYNARD:  No objection.

17        THE COURT:  471 is admitted.

18     (Exhibit No. 471 admitted in evidence.)

19   BY MS. BROOK:

20   Q   In reviewing the defendant's Acer computer, did you also

21   find evidence of Anwar al-Awlaki lectures that were downloaded

22   onto that computer?

23   A   Yes.

24   Q   How many?

25   A   At least five al-Awlaki lectures were downloaded on the

1    Acer Aspire laptop.

2    Q   And can you talk to us about the time frame.

3         What are the earliest downloads of the al-Awlaki

4    lecture onto the Aspire laptop of the defendant's?

5    A   Well, of the five, the data that still remains on the Acer

6    only provides dates for two of the five and both of those were

7    in August of 2015.

8    Q   Is it August of 2013?

9    A   Yes.  It was actually August of 2013.  Sorry.  I misspoke.

10   Q   And you stated that the computer only retains the download

11   dates for those two?

12   A   Yes.  That's all that remains on the computer at the time

13   when we searched it.

14   Q   So can you explain what that means?

15   A   Yes.  So any time someone obviously -- it's kind of been

16   explained a couple times.  But anytime someone downloads

17   something on their computer, an image of that is saved on the

18   computer.

19        And then once they delete that image, it goes into

20   another area of the computer.  It doesn't leave the computer,

21   but it just goes to that area.  And the computer can then

22   write over that when it needs to save other files.

23        And the computer, when it decides to write over that

24   other area, it doesn't do it in an organized fashion.  It

25   doesn't just write over this document first and then move on

1   to the next one.  It just kind of randomly picks space and we

2   call it that "unallocated space."

3         And so that's why when things have been deleted,

4   you'll find fragments of it.  So fragments of the metadata

5   that might not include the address when it was created or

6   other things like that.

7         And so that was the case with these.  There were only

8   two where we could see that date and we can confidently say

9   those were downloaded on or about August of 2013.

10        The remaining three we simply do not know the date

11  that those were viewed or downloaded.

12  Q   Have you had an opportunity to review Exhibit No. 184?

13  A   Yes.

14  Q   Now, we're going to come back to that.

15        So moving along, I want to talk about the defendant's

16  Nextbook tablet that was found inside of his truck on June

17  10th of 2015.

18        Placing on the overhead Exhibit No. 459 already

19  admitted, looking at the thumbnail that was the remaining

20  remnant of the image on this particular tablet, based upon

21  your training and experience, do you recognize this image?

22  A   Yes.

23  Q   And what do you recognize it as?

24  A   This is a screencap of an ISIS propaganda video that was

25  released on or about 28 August of 2014 entitled A Message In

1   Blood To The Leaders Of The Kurdish American Alliance.

2            Would you like me to continue?

3   Q   Please.

4   A   You can see in the background there's a mosque in the

5   background.  That's actually the Great Mosque in Mosul in

6   Iraq.  And you can see there's an Islamic State flag to the

7   right of the third -- I guess you would call them Islamic

8   State mujahideen fighter in the back that you can kind of see

9   it.

10            What you can't see on this imagine, if it was the

11   actual video were you to watch it, there's another black

12   Islamic State flag that's digitally enhanced that's put on the

13   screen in the top-left corner but you can't see that on this

14   version.  You would see that if you were actually watching

15   this video.

16   Q   So the image itself is a still frame from the video

17   itself?

18   A   Yes.

19   Q   You also mentioned the release date of the video.  What

20   was that?

21   A   It was on or about August 28th of 2014.

22   Q   We have talked about another tablet, the RCA tablet.

23   A   Yes.

24   Q   On that particular tablet was Origins of the Islamic State

25   found?

1    A    Yes.

2    Q    And can you explain for us what Origins of the Islamic

3    State is?

4    A    I guess you could describe it as a treatise on the

5    conquests of the Prophet Muhammad be upon him and it's an

6    older work that was published in or about 1916 is when it was

7    actually translated it from Arabic to English.  That's about

8    it.

9    Q    So it's a treatise?

10   A    Yes.

11   Q    And was it found in its entirety?

12   A    Yes.

13   Q    Can we please hand the witness Exhibit No. 196.

14            In the execution -- well, in the course of the

15   investigation of this particular case, did FBI execute a

16   search warrant on BMO Harris Bank, and specifically, the

17   defendant's account held with them?

18   A    Yes.

19   Q    I have handed you Exhibit No. 196.  Do you recognize that?

20   A    Yes.

21   Q    And what do you recognize it as?

22   A    This is a grand jury subpoena that was issued to BMO

23   Harris Bank and it's listed Abdul Malik Abdul Kareem, so any

24   accounts belonging to or utilized by Abdul Malik Abdul Kareem.

25   Q    And when the bank executes a search warrant and then

1    returns the compliance to you, does that compliance include

2    the data transactions creation of the account itself?

3    A   Yes.

4    Q   And did you find any transaction or event relevant to the

5    investigation as it relates to those documents?

6    A   Yes.  There was two pieces of information that I think are

7    relevant.

8    Q   What was the first?

9    A   The first one was on or about November 10th of 2014, Abdul

10   Malik Abdul Kareem opened this account depositing $10,000

11   cash.

12   Q   And what was the second?

13   A   The second was on or about November 13th of 2014, so just

14   three days later, Mr. Kareem withdrew $5,000 cash.

15   Q   You made mention when you started speaking about the first

16   relevant fact that the opening of this account in and of

17   itself was relevant.  Explain that.

18   A   Mr. Kareem already possessed more than one bank account.

19   Some had been -- kind of languished.  But there was another

20   account he was using.  So that we found that interesting,

21   whereas, you know, most people would just deposit money into

22   their existing account.

23        The fact that he created a new account at a new bank

24   he had not banked with prior to this date and that he then

25   withdrew $5,000 of the cash right away following that deposit.

1    Q   If we could please hand to the witness Exhibit No. -- and

2    there's four of them but we can do them one at a time.

3              The first is 472.  May I approach the clerk?

4              THE COURT:  Yes.

5    BY MS. BROOK:

6    Q   So you have been handed Exhibit No. 472 which has already

7    been admitted and we have spoken about it.  What is 472?

8    A   472 is two copies of fingerprints taken for Mr. Kareem.

9    And looks like one copy with the dates printed were October 20

10   of 2015 and the other copy, the date printed -- well, this is

11   the date printed here, so it was June 15, 2015.

12             One second if I can further analyze.  I want to

13   confirm that this may be the same.  Yes.  This is a copy of

14   the one below it, it looks like.

15   Q   And I'm going to place on the overhead what has not yet

16   been admitted as -- I'm sorry.  It has been admitted.  472.

17             So as we look at this particular exhibit, were you

18   present when the defendant Abdul Malik Abdul Kareem's prints

19   were rolled and placed onto this particular card?

20   A   Yes.

21   Q   And do you recall when that happened?

22   A   I don't recall the exact date, but I can see that there

23   may be a date on it.  But I don't recall off the top of my

24   head the date when we took this.

25   Q   Okay.  And was there one time, one occurrence, where you

1    were present with the defendant when his prints were rolled?

2    A    Yes.

3    Q    Just for completeness, I'm going to put it back on the

4    overhead for a moment.  And as we scroll in -- and, Your

5    Honor, this particular exhibit was conditionally admitted, so

6    we would just move to fully admit it at this point.

7            MR. MAYNARD:  No objection.

8            THE COURT:  To the extent that it was conditionally,

9    it is now admitted.

10       (Exhibit No. 472 admitted in evidence.)

11   BY MS. BROOK:

12   Q    And looking at this particular exhibit we see notes

13   related to an FBI Laboratory Print Identification Comparison,

14   correct?

15   A    Yes.

16   Q    And that's the verified 10/21/15?

17   A    Yes.

18   Q    Turning next to Exhibit No. 139 which you have before you.

19           Do you recognize 139?

20   A    Yes.  This is the certified copy of the Judgment and

21   Conviction for Mr. Kareem's 2004 DUI arrest.  It's a Class 4

22   felony.

23           MS. BROOK:  And, again, so government moves --

24           I believe this too was conditionally admitted.  139.

25           THE COURT:  Correct.

1              MS. BROOK:  So the government would move to

2      unconditionally admit it.

3              MR. MAYNARD:  No objection.

4              THE COURT:  So ordered.

5         (Exhibit No. 139 admitted in evidence.)

6      BY MS. BROOK:

7      Q    The copy that you have there before you, is that a

8      certified copy with a raised seal on the back page as well as

9      it being stapled together?

10     A    Yes.

11             MS. BROOK:  Your Honor, may I publish?

12             THE COURT:  Yes.

13     BY MS. BROOK:

14     Q    So in looking at the first page, can you see that it is

15     the Judgment of the Court?

16             Defendant is guilty of the following:

17             Offense Count 1.  Aggravated Driving or Actual

18     Physical Control While Under the Influence of Intoxicating

19     Liquor or Drugs, a class 4 felony?

20     A    Yes.

21     Q    And are you aware that a Class 4 felony in the State of

22     Arizona is punishable by more than one year in prison?

23     A    Yes.

24     Q    Additionally, I'm going to turn to the last page.

25             Looking at the last page of that document, can you

1   see that there's a fingerprint?

2   A   Yes.

3   Q   And that fingerprint too has an identified stamp,

4   laboratory signature by the FBI, stating that it has been

5   compared.

6   A   Yes.

7   Q   And are you aware in this case, as there's already been

8   testimony, that that fingerprint on that last page was

9   compared and identified to the defendant Abdul Malik Abdul

10  Kareem?

11              MR. MAYNARD:  Objection, Your Honor.  It's leading.

12              THE COURT:  Sustained.

13  BY MS. BROOK:

14  Q   Are you aware of who that fingerprint on the last page of

15  the Judgment and Commitment Order was identified to belong to?

16              THE WITNESS:  Yes.

17              MR. MAYNARD:  Objection.  Lack of foundation.

18              THE COURT:  Sustained.

19  BY MS. BROOK:

20  Q   It's already been testified to, so we will move on.

21              I would just like for you for a moment to read to us

22  the social security number in evidence there.

23  A   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.

24  Q   Moving along to Exhibit 140 which you have before you, do

25  you recognize that?  I'll give you a chance to look at it.

1    A    Yes.

2    Q    And what do you recognize it as?

3    A    This is a certification -- certified copy of Mr. Kareem's

4    birth certificate and it actually has two copies.

5         It has one under the name of Decarus Lowell Thomas

6    and it has another certification for birth of Abdul Malik

7    Abdul Kareem signifying that they are one in the same person.

8         MS. BROOK:  The government moves to admit and publish

9    140.

10        MR. MAYNARD:  No objection.

11        THE COURT:  140 is admitted.

12      (Exhibit No. 140 admitted in evidence.)

13   BY MS. BROOK:

14   Q    Where does it state where he was born?

15   A    It says Philadelphia.

16   Q    Moving along to Exhibit 141, do you recognize that once

17   you get a chance to look at that?

18   A    Yes.

19   Q    And what is it?

20   A    This is a certified copy of an Order changing the name of

21   an adult.  The applicant's name is Decarus Lowell Thomas and

22   the name being changed to is Abdul Malik Abdul Kareem.

23   Q    And certified is a raised seal and is it stapled?

24   A    There's a raised seal, and, yes, it's stapled.

25        MS. BROOK:  Government moves to admit 141.

1        MR. MAYNARD:  No objection.

2        THE COURT:  141 is admitted.

3     (Exhibit No. 141 admitted in evidence.)

4   BY MS. BROOK:

5   Q   I want to change subjects a little bit and discuss part of

6   your investigation.

7        So in this case we've heard testimony and talked

8   about going out to the Wittmann area to look at the desert and

9   take pictures and examine the scene.

10       Were you able to go out to the Table Mesa desert area

11  also testified to to go out and examine that particular desert

12  area?

13  A   I did not personally do that, but members of our team

14  attempted to locate that area but were unable to locate an

15  area that we could say they actually shot at.

16  Q   And based upon your training and experience, are you

17  familiar with the topography and the range area that's out

18  there in Table Mesa?

19       MR. MAYNARD:  Objection, Your Honor.  He just said he

20  didn't go out there.

21       THE COURT:  She's asking if he is familiar with that

22  area of Arizona.

23       MR. MAYNARD:  Okay.

24       THE WITNESS:  I am familiar with that area.

25  BY MS. BROOK:

```
1    Q    Can you explain what that range area looks like?
2    A    Yes.  It's just arid desert, mountains, and there's a
3    winding road that goes through that area and there's a number
4    of spots off the side of the road where anyone can go off to
5    the side of the road and shoot.
6              And so, again, there was a number of locations where
7    that could have taken place, but not that we could
8    definitively say the group had been into.
9    Q    And based upon your training and experience, is that a
10   very --
11             Well, is it a place that has a more populated shell
12   area?
13             MR. MAYNARD:  Objection.  Lack of foundation.
14             THE COURT:  Sustained.
15   BY MS. BROOK:
16   Q    I want to talk for a minute about your training and
17   experience as it relates to firearms and operating firearms
18   within the capacity of the FBI as well as within the United
19   States military.
20             Is that something that you were trained to do back
21   when you were working for the military as well as when you
22   worked for the FBI?
23   A    Yes.
24   Q    And is it something that --
25             Well, explain to us a little bit about that.
```

1   A   Well, from my military experience, I started as a basic

2   enlisted person, a private.  So that's our entire life centers

3   around weapons and things like that.

4         And then later when I became an officer, I was taught

5   more about weapons, about properly maintaining them,

6   disassembling, reassembling them, that kind of things.  But

7   then also being able to teach that to my soldiers and/or have

8   my -- we call them NCOs, but they would teach the classes too

9   and I would help oversee that.

10         On the FBI side of things, I was a member of the SWAT

11  Team for three years.  And so, obviously, I trained quite

12  extensively with weapons and things like that, again, knowing

13  how to properly disassemble them, to clean them and maintain

14  them properly so they will work, to then properly lubricate

15  them so that they will continue to function, and then to

16  properly reassemble them so that they can function when

17  needed.

18  Q   Explain to us the purpose of properly lubricating a

19  weapon.

20  A   Well, depending -- well, all weapons which have moving

21  parts, they're metal parts that rub against one another.  And

22  so lubrication is often needed, obviously, to help limit the

23  friction that happens between those moving parts.  So that's

24  generally the reason why you lubricate.

25         The other reason, obviously, is rust.  So because the

1    weapon is made primarily of metal, if moisture gets inside the

2    components, especially the internal components that you can't

3    see, then that can create rust which could obviously cause the

4    weapon to either malfunction or not operate properly later on.

5    Q   So what happens to a weapons's firing capability if it's

6    not properly lubricated and maintained?

7    A   It diminishes.  Its capability diminishes if it's not

8    properly maintained.

9         Specific things that could happen, it could lock up.

10   The weapon could actually go as far as to break, obviously, if

11   some part became corroded or broke because it wasn't

12   maintained.

13        But the other kind of more common thing is the weapon

14   could just jam.  And that's when as a -- you know, as a weapon

15   is firing, when one round is fired, you know, especially with

16   semiautomatic rifles and things like that -- when one round is

17   fired, that causes the next round to then come up into the

18   chamber and so those parts are moving.  And if the components

19   of the weapon aren't properly lubricated and aren't moving

20   properly, then that can mess up that function as far as the

21   round being able to come up.

22        And what will happen is it will just jam.  You'll

23   fire one shot and then you'll kind of get a lock.  You'll have

24   to clear that weapon.  Actually, take the magazine out, clear

25   it, and then reload it and start over.

1  Q   When you were in the military conducting trainings on

2  properly maintaining and working with weapons, did you teach

3  other people how to lubricate weapons?

4  A   Yes, I did.

5  Q   Did you teach other people how to break weapons down?

6  A   Yes, I did.

7  Q   Did you teach other people how to reassemble weapons?

8  A   Yes, I did.

9  Q   Is it a skill?

10 A   Yes.  It is a skill.

11         MS. BROOK:  May I have one moment?

12         THE COURT:  Yes.

13         MS. BROOK:  We have one last thing but it might take

14 just a moment for me to find.  Exhibit No. 98.

15         Your Honor, may I ask the agent to come down?  He is

16 much more familiar --

17         THE COURT:  Did you say 98?

18         MS. BROOK:  Yes.  98, 100, and 101.

19         THE COURT:  Yes.  Go ahead.  They are CDs if you need

20 a hint.

21         MS. BROOK:  Thank you.

22         Sorry about the delay.  May I approach?

23         THE COURT:  Yes.

24 BY MS. BROOK:

25 Q   Showing -- I'm showing the witness what's been previously

1   marked and admitted as Exhibit No. 98, 100, and 101.

2           Do you recognize those?

3   A    I do.

4   Q    And what do you recognize them as?

5   A    These are three separate CDs with lectures of Sheikh

6   Faisal who we had spoken about earlier, the Jamaican-based

7   salafi scholar whom the defendant had said Elton Simpson may

8   have been inspired by during the first interview.

9           And so there's three separate disks that were

10  discovered inside the Simpson/Soofi apartment on 19th Avenue.

11          MS. BROOK:  Your Honor, we have one last exhibit for

12  the defendant -- or I'm sorry -- for the witness to look at

13  and it's a spreadsheet related to the data on the Acer and

14  we're just trying to identify it.

15  BY MS. BROOK:

16  Q    And, Special Agent Whitson, as part of your notes up

17  there, do you have the spreadsheet on the Acer?

18  A    Are you looking for the Internet search history for the

19  Acer?

20  Q    Correct.

21  A    Yes.  I do have a copy here of that.

22  Q    Okay.  And what I just wanted to marry up and discuss for

23  a moment was to come back to those Sheikh Faisal lectures.

24          We've now looked at the three exhibits, the Sheikh

25  Faisal lectures identified in Simpson and Soofi's house.  And

1    I wanted to discuss for a moment the download of those

2    lectures or the data that was left behind on the Acer computer

3    related to Sheikh Faisal.

4    A    Okay.

5    Q    Do you have information about that download or the

6    information that was left behind about Sheikh Faisal on the

7    Acer?

8            MR. MAYNARD:  Judge, I'm going to object at this

9    time.  He's going to be relying upon a document we really have

10   never had.

11           THE COURT:  Has this spreadsheet been given to

12   Mr. Maynard?

13           MS. BROOK:  Yes.  And he has before him his reports

14   which have all been disclosed.

15           THE COURT:  So your question, again, Ms. Brook?

16   BY MS. BROOK:

17   Q    The data that was found or identified on the Acer computer

18   as it relates to Sheikh Faisal, can you explain what the data

19   was?

20           MR. MAYNARD:  Judge, again, objection.

21           Whatever we have been given, we just got and we sent

22   it to our expert to look at.  I can't read it.

23           MS. BROOK:  And, Your Honor, this is all discussed in

24   Evan Kohlmann's report extensively.

25           THE COURT:  Okay.  Since Agent Whitson isn't going

```
 1    anywhere, he's going to be with us through the rest of the
 2    trial, we're going to defer until Mr. Maynard has had a chance
 3    to have somebody interpret this for him.
 4            MS. BROOK:  Sounds good.
 5            Your Honor, I'm just confirming.
 6            I don't have any other questions.
 7            THE COURT:  Mr. Maynard.
 8            MR. MAYNARD:  Judge, is it possible -- I mean, I have
 9    to get reorganized to start cross-examining.  There's been a
10    lot of information.
11            THE COURT:  Is what possible?
12            MR. MAYNARD:  Take an early break today?
13            THE COURT:  You mean recess until Tuesday at 9:00?
14            MR. MAYNARD:  Yes.
15            THE COURT:  Are there any objections?
16            I see no objections from the jury.
17            So, ladies and gentlemen, we will recess until nine
18    o'clock on Tuesday morning.
19            You are reminded again of the admonition not to
20    discuss the case among yourselves or with anyone else.
21            Please remember that you are not to communicate any
22    information about this case to anyone.  The only thing you can
23    say is that you're selected to sit on a jury, the case could
24    last up to three more weeks, and you can't tell them anything
25    else about the case until the trial is over.
```

1          Once, again, no research, no investigation about the

2     case on your own, and finally, please do not form any

3     conclusions about the case until you have heard all the

4     evidence and begun your deliberations.

5          Court is in recess until nine o'clock Tuesday

6     morning, March 1st.

7          (End of Excerpt of Proceedings.)

8                         *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                       C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 8th day of March,

14   2016.

15

16

17

18

19                          s/Elizabeth A. Lemke
                            ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25