# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) March 2, 2016 |
| **Abdul Malik Abdul Kareem,** | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE: THE HONORABLE SUSAN R. BOLTON, JUDGE**
**EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL - DAY #10**
**TESTIMONY: SPECIAL AGENT STEWART WHITSON - PART #2**
**(Pages 65-120, Inclusive.)**


**APPEARANCES:**
**For the Government:**
           U.S. ATTORNEY'S OFFICE
           By:  **Kristen Brook, Esq.**
                **Joseph Edward Koehler, Esq.**
           40 North Central Avenue, Suite 1200
           Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
           MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
           By: **Daniel D. Maynard, Esq.**
                **Mary Kathleen Plomin, Esq.**
           3200 North Central Avenue, Suite 1800
           Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1      **E X C E R P T   O F   P R O C E E D I N G S**

2            THE COURT:  Agent Whitson, come take the witness

3      stand.

4            And please go ahead and sit down as you come in.  The

5      record will reflect the jury has now joined us.  Everyone else

6      may also be seated.

7            Mr. Maynard, you may cross-examine Agent Whitson.

8            MR. MAYNARD:  Thank you, Your Honor.

9            **SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN**

10                        **CROSS EXAMINATION**

11     BY MR. MAYNARD:

12     Q   Good afternoon, Agent Whitson.

13     A   Good afternoon, sir.

14     Q   I want to ask you a couple of questions about just

15     investigation in general.

16            You are the case agent on this case, correct?

17     A   Yes.

18     Q   And as the case agent, you are basically in charge of the

19     entire investigation for the FBI?

20     A   Yes.

21     Q   Okay.  So you are the one who decides what people need to

22     be interviewed; is that correct?

23     A   To a certain extent.

24     Q   Okay.  And you will decide to some degree what needs to be

25     fingerprinted, what doesn't need to be fingerprinted?

 1    A    To a certain extent.

 2    Q    All right.  I mean, there's certain standards that the FBI

 3    follows on a case.  I mean, for instance, because this event

 4    actually starts in Garland, Texas, the agents there actually

 5    started to process that scene before you ever got involved in

 6    this case?

 7    A    Yes.

 8    Q    Okay.  And we've heard a number of the people that were

 9    testifying.  I think we would ask them at times, Are you an

10    agent?

11         And there are people working in the FBI who are not

12    agents, they are just employees of the FBI; is that correct?

13    A    Yes.

14    Q    And the FBI has the capacity to do fingerprint analysis,

15    correct?

16    A    Yes.

17    Q    DNA analysis?

18    A    Yes.

19    Q    Hair analysis?

20    A    Yes.

21    Q    Fibers?

22    A    Yes.

23    Q    And there are certain protocols that are followed by the

24    FBI when it is processing a scene, correct?

25    A    Yes.

1   Q   And there are also certain protocols that are followed

2   when the FBI is interviewing witnesses?

3   A   Yes.

4   Q   Let's briefly talk about that for a minute.

5            In this case, for instance, the last witness that was

6   on the stand, when he was interviewed six hours after he had

7   learned of his brother's death, the FBI recorded that

8   interview.

9            Are you aware of that?

10  A   Yes.

11  Q   And it was surreptitiously done.  In other words, the FBI

12  agents did not tell him we are recording this interview, at

13  least according to him?

14  A   Yes.

15  Q   Why is that?

16           MS. BROOK:  Objection.  Speculation.

17           THE COURT:  I think he's asking it generally why it's

18  done, not why it was done in connection with that specific

19  interview.

20           Would that be correct, Mr. Maynard?

21           MR. MAYNARD:  Yes.

22           THE COURT:  Why does the FBI interview people on tape

23  and not tell them about it?

24           THE WITNESS:  Well, so there's an option to do both.

25  Obviously, you can record and tell the person that they are

1    being recorded.  And then it is also permissible to not tell

2    the person they're being recorded.

3            And, generally, that decision is based on a judgment

4    call of the person conducting the recording in consultation

5    with their supervisor and with other people involved in the

6    case.

7            Sometimes if you tell someone they're being recorded,

8    that can make the statement -- they could be less forthcoming.

9    So people will tend to -- especially that we are describing

10   that scenario where the recording device was on the table, in

11   my experience people will be staring at that recording device

12   and it will make them nervous and not necessarily that they

13   are going to lie, but it just makes them uncomfortable.

14           And so that's one reason that we might not say that a

15   recording is going to take place.  But there are certainly

16   others as well.

17   Q   Are there -- is there a protocol in the FBI that if

18   somebody is a prospective target that you will surreptitiously

19   tape them?

20   A   No.

21   Q   Is that a call that is left up to the agent who is doing

22   the interview to decide?

23   A   So, generally, it would be up to that agent in

24   consultation with their supervisor and the rest of the team

25   would make a decision on that, what made the most sense.

1    Q    Well, and using the last witness Ali Soofi that we just

2    had, his first interview was taped.

3            Do you know whether or not the interview that was

4    done of him at the airport was taped?

5    A    I don't know.

6    Q    You would be the person, though, who all --

7            What is a 302?

8    A    A FD-302 is a report we generate whenever something occurs

9    that is potentially testimonial.

10           So if we talk to someone that could be potentially

11   testimonial, then we would write down that interview into our

12   form which we call an FD-302.

13   Q    And I'm just going to knock the "FD" off and call it a

14   "302" from now on in your cross.

15           Were you responsible for reviewing all of the 302s

16   that were generated in this investigation?

17   A    For the investigation of Mr. Kareem, yes.

18   Q    All right.  We'll get to that in a second.

19           But if an agent did something that generated a 302,

20   was that 302 then sent to you?

21   A    Not always.

22   Q    Okay.  Would it eventually come to you?

23   A    It depends.  So may I explain?

24   Q    Yes.  Give me a --

25   A    So, obviously, the initial investigation was the Simpson

 1   and Soofi investigation.  Those two investigations each had

 2   their own case agent that would be running that case.

 3           Any reports that had to do with Simpson and Soofi

 4   would have gone to those case files for those agents to

 5   review.

 6           I became involved with Mr. Kareem a few days later, I

 7   think as I'd explained before, but it was around May 8th.  And

 8   so until May 8th there wasn't -- I wasn't part of the

 9   investigation.

10   Q   Well, in fact, prior to May 8th, the investigation wasn't

11   really the investigation of Mr. Abdul Kareem.  It was the

12   investigation of Mr. Simpson?

13   A   Exactly.  And Mr. Soofi.

14   Q   Well, didn't the investigation number actually go back to

15   about 2006 when we look at those very first 302s?

16   A   I'm not sure that they go back --

17           That would sound right but -- for Mr. Simpson.

18   Q   I mean, you are aware that Mr. Simpson had been

19   investigated by the FBI?

20   A   Yes.

21   Q   You are aware that Mr. Simpson had been prosecuted by the

22   FBI?

23   A   Yes.

24   Q   You are aware that he was convicted of a crime?

25   A   Yes.

```
 1    Q    Lying to the FBI?

 2    A    Yes.

 3    Q    And he was a convicted felon?

 4    A    Yes.

 5    Q    Okay.  And you understood that Mr. Simpson, after his

 6    conviction, was on probation?

 7    A    Yes.

 8    Q    Okay.  As part of your investigation, have you determined

 9    whether any probation officers went and interviewed

10    Mr. Simpson at his home?

11    A    No.

12    Q    You have not done that?

13    A    No.

14    Q    Okay.  Now, in -- to stay with the taping for a few

15    minutes, Mr. Soofi just testified and you heard his testimony

16    that he was aware that he was being taped in some interviews

17    that he had with the FBI in Kansas.

18          Do you recall that testimony?

19    A    Yes.

20    Q    Okay.  Do you know whether or not he was taped when he did

21    his September interview?

22    A    Is that the video teleconference interview?

23    Q    Yes.

24    A    He was not taped.

25    Q    Why, if you have him on a video teleconference in Kansas
```

1    and you're here in Phoenix, are you not taping that?

2    A    Well, that particular interview was with Mr. Soofi and his

3    defense attorney.  And it was -- and the end that we were on

4    was in a U.S. Attorney's Office with the two prosecutors.

5           And so I assumed the call was -- and this is my

6    assumption -- but the call was probably something that was

7    made by his defense attorney that he didn't want that

8    recorded.

9           But I don't know.  It wasn't the FBI or anything.

10   Q    Mr. Soofi seemed to think it was recorded, but it was not,

11   correct?

12   A    That's what he -- he seemed to think that, yes.

13   Q    But it clearly was not recorded?

14   A    It was not recorded.

15   Q    And then there was an interview where you and Ms. Brook

16   flew to Texas to meet with him at his mother's house, correct?

17   A    Yes.

18   Q    And that was to get him ready to come here and testify?

19   A    Yes.  To talk with him, yes.

20   Q    And, again, you didn't record that conversation either,

21   did you?

22   A    No.

23   Q    Does the FBI have a protocol that when they're getting a

24   witness ready to testify that you don't record it so that it

25   doesn't have to be turned over to defense counsel?

```
1   A   No.
2   Q   You just -- was that your decision to make not to
3   interview him -- or not to tape that last interview as you
4   prepared him to come testify?
5   A   No.  My understanding is --
6   Q   Wait.  Was that --
7   A   I'm sorry?
8   Q   Was that your decision to make that particular call not to
9   tape him?
10  A   No.
11  Q   Who made that decision?
12  A   That would be the decision of the prosecutors.
13  Q   Now, as this investigation began after the Garland event,
14  were you involved in it on May 4th?
15  A   Yes.  I was involved, I guess you could say.
16  Q   Is it fair to say that here in Phoenix, the FBI began to
17  go out and take statements from people they thought might have
18  knowledge about what had happened in Garland, Texas?
19  A   Yes.
20  Q   Okay.  And the FBI also, I think, even on the evening of
21  May 3rd started the process of going in to gather witnesses --
22  gather evidence from Soofi and Simpson's apartment here in
23  Phoenix?
24  A   Yes.
25  Q   Okay.  And that evidence, as we've heard and seen, would
```

1    be bagged, sealed, and then there would be a chain of custody

2    so that you could process that for possible evidence that

3    could be used in a trial?

4    A   Yes.

5    Q   Okay.  And the FBI then also started calling particular

6    people and asking them to come in for interviews, correct?

7    A   Yes.

8    Q   One of the people that you called to interview was my

9    client Mr. Abdul Kareem?

10   A   Yes.  Detective Nash called him, yes.

11   Q   Detective Nash is not an FBI agent, but he was working on

12   the Joint Task Force with the FBI at the time?

13   A   Yes.

14   Q   Okay.  And so Mr. Abdul Kareem came in to the FBI's office

15   without having a subpoena, correct?

16   A   Yes.

17   Q   And he came in and he gave a statement to you and Mr. Nash

18   without a lawyer present?

19   A   Yes.

20   Q   And during that same time period, you were also

21   interviewing -- or the FBI or people of the Joint Task Force

22   were interviewing people like Saleem Sampson?

23   A   I'm not sure exactly when he was interviewed, but, yes, I

24   know he was interviewed.

25   Q   Okay.

1    A    Whether it was at the same time or not.

2    Q    Ali Soofi was interviewed rather early?

3    A    Yes.

4    Q    Okay.  Did you interview Duncan Simpson, Mr. Simpson's

5    father?

6    A    Yes.  He was interviewed.

7    Q    And did you interview Duncan Simpson, Jr., Mr. Simpson's

8    brother?

9    A    Yes.  I believe so.

10   Q    And there was an interview done of Nathaniel Soofi?

11   A    Yes.

12   Q    The son?

13   A    Yes.

14   Q    And his mother?

15   A    Yes.

16   Q    And Abdul Mubarak who came in here and testified earlier?

17   A    Yes.

18   Q    And Mr. Abdul Hyman, he was interviewed?

19   A    Yes.

20   Q    Now, all of these people are being interviewed and the FBI

21   is beginning to gather evidence, correct?

22   A    Yes.

23   Q    You're getting evidence from Garland, Texas, and you're

24   also gathering evidence from Soofi and Simpson's apartment?

25   A    Yes.

```
1    Q   And when the FBI is going to seek to look for fingerprints

2    or DNA, do you send that material to Quantico or do you

3    process it here in Phoenix?

4    A   That's all sent to Quantico; so DNA, fingerprints.

5    Q   Now, let's talk just for a second about the interview with

6    Abdul Malik that occurred on May 5th of 2015.

7            You intended to record that interview, correct?

8    A   Yes.

9    Q   And that interview was taken at the FBI office here in

10   Phoenix?

11   A   Yes.  Yes.

12   Q   And I believe your testimony on direct examination was

13   Agent Brian Taylor had a room already equipped to do an

14   interview in?

15   A   Yes.

16   Q   And you were going to video and audiotape that interview?

17   A   Yes.

18   Q   And you had a signal with Mr. Taylor where you would give

19   him the thumbs up and he was to make sure that the camera was

20   turned on?

21   A   Yes.

22   Q   And then for some reason or other, either the camera

23   didn't turn on, or something happened to the machine?

24   A   Yes.

25   Q   Or something happened to the chip that was in the machine?
```

1    A    Yes.

2    Q    Okay.  And it would be your understanding when

3    Mr. Kareem -- Abdul Kareem came in, you led him into that

4    conference room and you turned around and gave the thumbs up?

5    A    No.

6    Q    No?  When did you give the thumbs up?

7    A    So, Detective Nash left the area where the interview rooms

8    are and he went out into the lobby area which is -- to get

9    Mr. Kareem.

10          And so I stayed behind.  And once he left, I looked

11   into the room where Special Agent Taylor was and I gave him

12   the thumbs up signal.  And they then kind of manipulated the

13   machine or whatever and then looked back up to me and gave me

14   a thumbs-up symbol.

15          Once he give me that thumbs-up symbol, that was a cue

16   to me to know that the recording had started.  So we were

17   using thumb up because we didn't want to be talking, hey, is

18   the recording going, because it would be capturing our voice

19   saying that.  So that's why we were using the thumb ups.

20          So when he gives me that thumbs-up and says the

21   recording is going, then I turn and open the door that leads

22   to the lobby area.  And right as I open that door, that's when

23   Detective Nash comes in with Mr. Kareem.

24          And so I escort him right in.

25          And to kind of back up a second, if I may, the room

1   where Special Agent Taylor had this recording equipment set up

2   is a room that's right nextdoor to the room where we were

3   conducting the interview.

4          And so the doors are literally right next to each

5   other, so, you know, once we did the thumbs-up signal, I was

6   to shut that door.  That's why he was starting it.  And then

7   we walked past that closed door into the room to do the

8   interview.

9   Q   So you would have expected that this audio/video machine

10  was going to be working because Agent Taylor is an expert?

11  A   Yes.

12  Q   And it wasn't you or Nash that had to push the button to

13  start it?

14  A   Yes.

15  Q   Agent Taylor should have been sitting there looking at it,

16  seeing whether or not it was looking into the room and working

17  properly, correct?

18  A   Yes.

19  Q   And you expected that that happened because he gave you

20  the thumbs up?

21  A   Yes.

22  Q   And then you went in and you took an interview, believing

23  that this audio and video recording was working?

24  A   Yes.

25  Q   And then afterwards you walked out and one of you went to

1    turn it off, correct?

2    A    Yes.

3    Q    Either you or Mr. Nash?

4    A    Yes.

5    Q    Okay.  And then one of you collected the card, the SIM

6    card or whatever was used?

7    A    Yes.  Detective Nash collected the card.

8    Q    Did you turn it off or did Detective Nash turn it off?

9    A    Yes.  I think I was the one that turned it off.

10   Q    So you turn it off, but then he ejects the card?

11   A    Yeah.  Because it wasn't an instantaneous -- so I pushed

12   the button and I think it just kind of had a -- where it shuts

13   down or whatever and then it ejects and then he took the card.

14   Q    Okay.  And then he supposedly took the card down and put

15   it into Security so that it can -- you have a chain of custody

16   on the card, correct?

17   A    Yes.  It's Electronic Surveillance is that group that he

18   brought it to.

19   Q    That CART group we've talked about?

20   A    It's not the same as CART, but it's in a -- they're a

21   completely separate group, but essentially just any electronic

22   surveillance, they keep track of that evidence as opposed to

23   the other evidence room that has the other type of evidence.

24   Q    And then at some point you learned that there was nothing

25   on the card?

1   A   Yes.

2   Q   And did you take any steps at that point to determine if

3   the card had malfunctioned?

4   A   Yes.  So -- well, so I learned the day before --

5   Q   Did you take steps --

6   A   I mean, I personally did not.

7   Q   Okay.  Did you -- who took those steps to determine if the

8   card had malfunctioned?

9   A   So Special Agent Taylor went directly to Electronic

10  Surveillance the next morning and he personally inspected the

11  card to make sure it wasn't a mistake on their part, that the

12  data wasn't buried on there somewhere.

13          And what he was able to find was the recordings of

14  the test runs we had done before we started the recording, but

15  that was all that was on there.  There wasn't anything else.

16  Q   Did anybody then go and check the equipment to see if it

17  had malfunctioned?

18  A   I don't know that -- I mean, I don't know if the equipment

19  was still set up.  It was something that was temporarily set

20  up in the room.

21  Q   To this day do you know what caused this malfunction that

22  you have?

23  A   I do not know.

24  Q   And also in the interview room there is a camera, a

25  security camera in the corner, that is looking down on the

1    room, correct?

2    A    Yes.

3    Q    And it is -- although it's not taking audio, it's taking

4    video?

5    A    Yes.

6    Q    And were you advised that you should keep a copy of that

7    video of the interview since you now had lost the audio and

8    the video?

9    A    No.

10   Q    Nobody told you that?

11   A    I was not advised that I should do that.

12   Q    Anybody suggest to you that that would be the right thing

13   to do?

14   A    No.  Special Agent Taylor sent me --

15   Q    You answered the question.  Thank you.

16          Can I approach the clerk, Your Honor?

17          THE COURT:  Yes.

18          MR. MAYNARD:  Can the witness be shown Exhibit 547,

19   please.  Oh, I'm sorry.

20   BY MR. MAYNARD:

21   Q    Do you recognize Exhibit 547?

22   A    Yes.

23   Q    Is this an e-mail starting at the bottom from Brian Taylor

24   to you on May 6th of 2015?

25   A    Yes.

1    Q   And then on the top are you responding to Mr. Taylor's

2    e-mail to you on May 6th of 2015?

3    A   Yes.

4            MR. MAYNARD:  Okay.  Move for the admission of

5    Exhibit 547.

6            MS. BROOK:  Your Honor, this e-mail contains hearsay,

7    so we would object.

8            THE COURT:  The objection is overruled.

9            547 is admitted.

10       (Exhibit No. 547 admitted in evidence.)

11   BY MR. MAYNARD:

12   Q   Would you look at the first e-mail which is on the bottom

13   of the page.  It says:

14           "No luck on recovering the audio or video of the

15   interview.  I was able to recover the 'test' videos prior to

16   the actual interview" --

17           And I'm going to skip down to the next paragraph.

18           "I spoke with Jeff Mendez this morning and told him

19   that you would require video exported from the security system

20   DVR."

21           Do you see that?

22   A   Yes.

23   Q   "He said no problem but requested that you send an e-mail

24   to Shari McAllister" -- and on.

25           And you responded:

UNITED STATES DISTRICT COURT

1            "Thanks for running this all down.  I'll touch base
2    with the case agents first, and if they want me to proceed,
3    I'll send the e-mail and get with Rich."
4            Do you recall sending this e-mail?
5    A   Yes.
6    Q   And I take then you did not follow through and save the
7    security system DVR; is that correct?
8    A   What do you mean by that?
9    Q   It says you would require video exported from security
10   system DVR.
11           So doesn't that refer to the security camera that's
12   in the corner?
13   A   So, yeah.  I did not send a request to Rich Stoddard and
14   Shari McAllister as he said.
15   Q   You did not.  Even though Mr. Taylor had suggested that
16   you would need this, you didn't follow through and get that?
17   A   No.
18   Q   Now, the interview that you did on May 5th of 2015 of Mr.
19   Abdul Kareem, you've testified you prepared a 302 the next
20   day; is that correct?
21   A   Yes.
22   Q   And you testified you used Agent Nash's notes and some
23   notes that you had?
24   A   Yes.
25   Q   How long were your notes?

```
 1   A   My notes were maybe less than half of a page.

 2   Q   Okay.  And this was an hour, hour-and-a-half interview?

 3   A   Yes.  About that, yes.

 4   Q   Did you show Mr. Abdul Kareem any pictures during that

 5   interview?

 6   A   I don't believe so.

 7   Q   Now, after that interview he was free to leave, correct?

 8   A   Yes.

 9   Q   And do you recall whether or not his nephew who was with

10   him was also interviewed on May 5th?

11   A   Yes.  I believe he was.

12   Q   Okay.  And there's a 302 of that interview also?

13   A   Yes.  It would -- yes.

14   Q   Now, at some point the FBI got a call concerning an

15   individual by the name of Stefan Verdugo, correct?

16   A   Yes.

17   Q   And Stefan Verdugo then met with FBI agents and he was

18   interviewed at length?

19   A   Yes.

20   Q   Is it fair to say that after Stefan Verdugo came in and

21   met with the FBI on or about May 7th, that the investigation

22   in this case changed?

23   A   Yes.  That's fair.

24   Q   At that point did Mr. Abdul Kareem, based on Mr. Verdugo's

25   statements to the FBI, did he become the target of the
```

1    investigation?

2    A    He became a subject.  He became an investigative subject.

3    Q    What is the difference between a "subject" and a "target"?

4    A    Well, there can be a couple different types of

5    investigations.

6         One type of investigation can be of an incident.  So,

7    for instance, the investigation that was going on in Dallas

8    was an investigation of the Garland attack.

9         My investigation that I was involved in was an

10   investigation of a subject and in this case it was Mr. Kareem.

11   Q    What's the difference between a "subject" and a "target"?

12   A    Well, I guess that would be semantics.

13   Q    Okay.

14   A    I wouldn't really call him a "target."  I would call him a

15   "subject."

16   Q    Beginning on May 8th, did the FBI begin to do surveillance

17   on Mr. Kareem?

18   A    I don't recall the exact day, but it would have been very

19   close to May 8th which was the day we opened the full

20   investigation.

21        MR. MAYNARD:  Your Honor, can I put a 302 showing the

22   beginning of the -- to refresh his recollection?

23        THE COURT:  Yes.

24   BY MR. MAYNARD:

25   Q    Agent Whitson, I'm going to put on a 302.  Could you take

1    a look at that for a moment?

2    A    Yes.

3    Q    Does that help refresh your recollection?

4    A    That does.  Thank you.

5    Q    Do you recall that the physical surveillance of Mr. Abdul

6    Kareem began the day after the FBI met with Mr. Verdugo?

7    A    Well, so all I can tell from that is it looked like

8    surveillance was going on on the 8th.  I can't tell

9    necessarily when it started.

10            But it was certainly going -- that would make sense

11   that it would have started on the 8th after we had opened the

12   full investigation.

13   Q    All right.  Were you -- is that the date that you became

14   the case agent?

15   A    Yes.

16   Q    Okay.  And starting on May 8th, the FBI began to do

17   physical surveillance on Mr. Abdul Kareem on a daily basis?

18   A    Yes.

19   Q    And what I mean by "physical" -- or "physical

20   surveillance" is you had agents that were literally watching

21   him from 7:30 or 8:00 in the morning until sometime into the

22   evening?

23   A    Twenty-four hours a day.

24   Q    You had him 24 hours a day?

25   A    Twenty-four hours a day.

1   Q   And there were times when he would be driving his moving

2   truck and there would be helicopters that would be following

3   him?

4   A   There's an aircraft, so an airplane.  I don't know of any

5   helicopters, but there was an aircraft.

6   Q   Okay.  And, additionally, you engaged Mr. Verdugo to

7   assist in this investigation at that point?

8   A   Well, he had already come forward on his own before that,

9   but.

10  Q   He had come forward and you asked Mr. Verdugo to make some

11  telephone calls to Mr. Abdul Kareem?

12  A   Yes.

13  Q   And those telephone calls were then monitored and taped?

14  A   Yes.

15  Q   And you then asked Mr. Verdugo to try to go back to work

16  with Mr. Abdul Kareem?

17  A   Yes.

18  Q   And you asked Mr. Verdugo to carry a body wire so that his

19  conversations with Mr. Abdul Kareem and others would be taped?

20  A   Yes.

21  Q   And this went on for several weeks?

22  A   Yes.

23  Q   And you gathered all of that information as part of this

24  investigation?

25  A   Yes.

1   Q   Okay.  And I believe we've heard Mr. Verdugo was paid

2   $500?

3   A   Yes.

4   Q   Was he ever paid any more than that?

5   A   No.

6   Q   In fact, at some point while he was assisting the FBI in

7   this, did he get charged with a crime?

8   A   Yes.

9   Q   And then he fled the state and went to California?

10  A   Yes.

11  Q   Okay.  Now, the FBI then decided to arrest Abdul Kareem on

12  June 10th of 2015?

13  A   Yes.

14  Q   Correct?

15  A   Yes, sir.

16  Q   And you arrested him at a gas station.  He was in his

17  moving truck?

18  A   Yes.

19  Q   Okay.  And he didn't resist?

20  A   No.

21  Q   He didn't run away?

22  A   No.

23  Q   And during the entire time that the FBI was following him

24  24 hours a day from May 8th, was that until June 10th?

25  A   Yes.

1    Q    Okay.  You never saw him try to leave the state?

2    A    No.

3    Q    Never saw him try to leave the country?

4    A    No.

5    Q    Okay.  And he is arrested and he is taken into custody and

6    he is then taken to the FBI headquarters to be interviewed

7    again?

8    A    Yes.

9    Q    And this time we do have a tape of that interview?

10   A    Yes.

11   Q    And you read him his rights because he is now under arrest

12   and he's in custody?

13   A    Yes.

14   Q    And he decided not to have a lawyer?

15   A    Yes.

16   Q    When the FBI is talking to witnesses or potential

17   witnesses, is it okay for the FBI to lie to them?

18   A    Yes.

19   Q    Isn't that something you routinely do is you'll lie to

20   somebody and say, "Geez, Mr. A has told us this terrible thing

21   about you"?

22   A    Not routinely.

23   Q    You do it on occasion?

24   A    On occasion.

25   Q    It's a technique that's used by the FBI?

1    A    Yes.

2    Q    I mean, you told -- you told Mr. Abdul Kareem that --

3         Strike that.

4         You told Mr. Hyman that Mr. Abdul Kareem had said

5    that he had been out in the desert shooting with him when you

6    interviewed Mr. Hyman?

7         MS. BROOK:  Objection.  Hearsay.

8         THE COURT:  Sustained.

9    BY MR. MAYNARD:

10   Q    Okay.  Once Mr. Abdul Kareem was arrested, you took his

11   pickup truck or his moving truck and you started processing

12   it, correct?

13   A    Yes.

14   Q    And in that truck you found a lot of documents that dealt

15   with the running of his business?

16   A    Yes.

17   Q    I mean, he clearly was running a business, was he not?

18   A    Yes.

19   Q    And you found a gun?

20   A    Yes.

21   Q    And when you interviewed him that day, did you ask him if

22   he had any weapons?

23   A    Yes.

24   Q    And he told you that there would be a gun in the truck?

25   A    Yes.

1    Q    And he told you there would be a gun in his house?

2    A    Yes.

3    Q    And at that point, you had not told him that there was a

4    search warrant and that there was a search going on in his

5    home, had you?

6    A    I think I had, because I think my question to him was:

7            Are we going to find any guns?

8            So it's kind of in a sense that we're doing a search

9    there.  Can you just tell us where they're at so we can move

10   along.

11   Q    And he told you there was one there?

12   A    He said there was.

13   Q    And he told you it was a 9 millimeter?

14   A    Yes.

15   Q    And you asked him did he have any other weapons and he

16   said no?

17   A    Yes.

18   Q    Okay.  And during that time period where you're

19   interviewing him, FBI agents are processing his house and also

20   processing his truck?

21   A    Yes.

22   Q    And later that evening you go out and you meet with

23   Mr. Abu -- Mr. Mubarak?

24   A    Yes.

25   Q    And you tell him that Mr. Abdul Kareem has been arrested?

CR15-00707-PHX-SRB     STEWART WHITSON-PART#2    3-2-16

```
 1              MS. BROOK:  Objection.  Hearsay.
 2              THE COURT:  Overruled.  You may answer if you told
 3      him that when you interviewed him that night.
 4              THE WITNESS:  Yes.
 5      BY MR. MAYNARD:
 6      Q   Okay.  Did you tell him that he was going to spend the
 7      rest of his life in jail?
 8              MS. BROOK:  Objection.  Hearsay.
 9              THE COURT:  Sustained.
10      BY MR. MAYNARD:
11      Q   Agent Whitson, also during this same time period prior to
12      the arrest of Mr. Abdul Kareem had a grand jury been empaneled
13      or was there a grand jury empaneled that was actually looking
14      at him?
15      A   At Mr. Kareem?
16      Q   Yes.
17      A   Yes.
18      Q   Okay.  And were you the one that was asking for certain --
19      to get this grand jury to give certain subpoenas to get
20      certain information?
21      A   Yes.  I had submitted grand jury subpoenas.
22      Q   Right.  I mean, you asked for all of his banking records?
23      A   Yes.
24      Q   Is that correct?
25              You asked for all of his records dealing with
```

1    telephone companies that he had had any relationship with?

2    A    Yes.

3    Q    I mean, in fact, I think you -- I think I saw them for

4    four different telephone companies, correct?

5    A    Yes.

6    Q    And all of these companies complied and you got all of

7    that information?

8    A    Yes.

9    Q    And you got Google searches that he had done, correct?

10   A    Yes.  Those are search warrant returns not --

11   Q    I'm sorry?

12   A    I had search warrant returns from Google, not from the

13   grand jury, but.

14   Q    And during your surveillance, you had followed him to a

15   storage facility and you got a warrant to go look at that

16   storage facility?

17   A    Yes.

18   Q    And you didn't find any -- anything that was incriminating

19   at that storage facility, correct?

20   A    Yes.

21   Q    Yes, that's correct?

22   A    Well, we never searched the storage facility, but we did

23   obtain that, I believe, and reviewed the records and never

24   conducted a search.

25   Q    Do you recall that there were four phone companies that

95

1  subpoenas were issued to?

2          THE COURT:  I think he already said that.

3          MR. MAYNARD:  Okay.

4  BY MR. MAYNARD:

5  Q   And do you recall that there were three banks that

6  subpoenas were issued to?

7  A   That sounds right.

8  Q   You mentioned the other day on your direct examination, I

9  believe, that you had looked at his banking records and there

10  was one particular transaction out of all these banking

11  records that you thought was a little peculiar or suspicious?

12  A   There was actually a couple, but I was asked about one.

13  Q   Okay.  Did you actually have a forensic accountant go

14  through and look at his banking records?

15  A   Yes.

16  Q   And did the forensic accountant prepare a report on the

17  banking records?

18  A   Yes.

19  Q   Okay.  And the one particular matter that you talked about

20  that you said looked a little suspicious was a $10,000 deposit

21  and the next day was a $5,000 withdrawal?

22  A   Well, it was three days later there was a $5,000 --

23  Q   Yeah.

24  A   And it was -- yeah.  $10,000 cash, yes.

25  Q   Did you, in the process of your investigation, go through

1    and determine if he had made any major purchases within a day

2    or two of that withdrawal?

3    A    We analyzed bank records to see if there was evidence of

4    that, including, obviously, credit cards and things like that.

5    Q    Did you look to see whether or not he had bought one of

6    his two moving trucks within a week of when he made that

7    withdrawal?

8    A    Yea.  We did not see evidence of that.

9    Q    And did you look to see -- even in the documents that you

10   found in his truck you didn't see any evidence that?

11   A    Not -- yeah -- no evidence that I can recall.

12   Q    You don't know whether he did or he didn't?

13   A    Yeah, I don't.  No.  There was not.

14   Q    You also sent subpoenas to Microsoft, correct?

15   A    Yes.

16   Q    And sent subpoenas to at least three credit agencies?

17   A    Yes.

18   Q    And subpoenas to yelp.com?

19   A    Yes.

20   Q    You were pretty invested in this investigation, were you

21   not?

22   A    Yes.

23   Q    Spending a lot of time on it?

24   A    Yes.

25   Q    Okay.  And we had a woman who came in here earlier

1    testifying about an incident that occurred in a parking lot at

2    a -- I believe it was a T-Mobile or Verizon store.

3              Do you recall that testify?

4    A   Yes.

5    Q   Okay.  And did you ever subpoena Mr. Abdul Kareem's

6    medical records to see whether or not he went to the hospital

7    the day after he was hit in that parking lot?

8    A   No.

9    Q   So you don't know as we sit here whether or not he went to

10   the hospital at John C. Lincoln the next day?

11   A   No.

12   Q   You don't know whether he went to visit a doctor?

13   A   No.

14   Q   A week later?

15   A   No.  I don't know that.

16   Q   Okay.  You could have done that had you chosen to?

17   A   Yes.  I suppose, yes.

18   Q   Now, let me back up just a little bit.

19             On the Garland, Texas, matter, you, as part -- as

20   being the case agent in this case would have looked at that

21   incident pretty thoroughly, would you not?

22   A   Yes.

23   Q   You were aware that the FBI had paid a confidential

24   informant in Mr. Simpson's case over $130,000 in the course of

25   five years?

```
 1   A   No.  I'm not aware of that.
 2   Q   You've never heard that before?
 3            MS. BROOK:  Objection, Your Honor.  Relevance.
 4            THE COURT:  Sustained.
 5   BY MR. MAYNARD:
 6   Q   Okay.  Was the FBI -- did the FBI alert the Police
 7   Department in Garland, Texas, that Mr. Simpson may be a
 8   problem?
 9   A   Yes.  My understanding is yes.
10   Q   Okay.  And did they send a copy of his picture to the
11   Garland Police Department or to the FBI office in Texas?
12   A   That's my understanding is yes.
13   Q   Okay.  And how long before the incident occurred did the
14   FBI do that?
15   A   I don't know.
16            MR. MAYNARD:  May I approach the witness -- the
17   clerk?
18            THE COURT:  Yes.
19            MR. MAYNARD:  Your Honor, may I approach the clerk
20   with Exhibit 548?
21            THE COURT:  Yes.
22            MR. MAYNARD:  549 and 550.
23   BY MR. MAYNARD:
24   Q   Agent, looking at Exhibit 548, do you recognize that
25   photograph?
```

1   A   I recognize the photograph, yes.

2   Q   Okay.  And what is that a picture of?

3   A   That's a picture of Mr. Kareem's living room.

4   Q   And looking at 549, do you recognize that photograph?

5   A   I actually don't recognize this one, but I can tell from

6   the content of the picture that it's clearly Mr. Kareem's --

7   Q   Are these paragraphs taken by the FBI when it did its

8   search?

9   A   These look like the ones -- yes.  These look like the ones

10  taken by the FBI.

11  Q   And Exhibit 550, do you recognize it?

12  A   I don't recognize this particular picture, but I -- so I

13  don't.

14  Q   Okay.  And do you recognize this as the room -- photograph

15  of the room in Mr. Abdul Kareem's apartment?

16  A   I don't.

17          MR. MAYNARD:  Move for the admission of 549 and 548.

18          MS. BROOK:  No objection.

19          THE COURT:  548 and 549 are admitted.

20      (Exhibit Nos. 548 and 549 admitted in evidence.)

21          MR. MAYNARD:  May I publish, Your Honor?

22          THE COURT:  Yes.

23  BY MR. MAYNARD:

24  Q   Now, when the FBI goes into an apartment or to a house, do

25  they normally take pictures as they first go in and then do

1   they take pictures after they leave?

2   A   Well, so I guess not technically as they first -- so first

3   entry is gained.  And so depending on the circumstances, if

4   that's done by a SWAT team or something like that, that entry

5   would take place first, so you wouldn't get photos before they

6   had entered.

7         If it's a compliant one, then the Evidence Response

8   Team will begin their search by doing entry photos before

9   conducting the search.

10  Q   In this particular case was there a SWAT team involved?

11  A   Yes, there was.

12  Q   Was there a concern that the condo or the apartment might

13  be boobie trapped?

14  A   Yes, there was.

15  Q   And was that because Mr. Verdugo had advised the FBI that

16  Mr. Abdul Kareem boobie trapped his apartment?

17  A   Yes.  That was a concern, yes.

18  Q   And did you find any -- or did the FBI find any boobie

19  traps in the apartment?

20  A   No.  No.

21  Q   Did you find any surveillance equipment in the apartment?

22  A   I believe not.

23  Q   Were there any alarm systems in the apartment?

24  A   I don't believe so.

25  Q   Had Mr. Verdugo told the FBI that there might be alarm

1    systems in the apartment?

2    A    Not in this apartment, but in the previous apartment that

3    he lived in, he said that one was boobie trapped or had

4    alarms -- I don't know if he said "alarms" but.

5    Q    Because of that, there was some concerns.  So when you

6    west into this one, you were careful?

7    A    Yes.  I made the assumption that if he had it in the other

8    apartment, he might have it in this one as well.

9    Q    And is this the way you understand the apartment looked?

10   A    This is -- I have never actually seen the apartment.  I

11   have only seen the photos.  But there is -- this is what I

12   understand to be his apartment.

13   Q    Exhibit 549.  Again, that's the way the apartment looked

14   when the FBI got there?

15   A    That I can't say.

16          MS. BROOK:  I object to foundation based upon what he

17   testified to.

18          THE COURT:  He said:  "That I can't say."

19   BY MR. MAYNARD:

20   Q    You did not then participate in going into the apartment;

21   is that correct?

22   A    No.

23   Q    Now, did the FBI, simultaneously to going into Mr. Abdul

24   Kareem's apartment, did they also conduct a search on

25   Mr. Hyman's apartment?

```
 1   A    Yes.  The FBI did.

 2   Q    Did you participate in that particular search?

 3   A    No.

 4   Q    And was it in that search where the lists that we have

 5   seen with the seven individuals on it that the expert

 6   testified about were found?

 7   A    Yes.

 8   Q    Now, the FBI, as we have seen, collected these guns from

 9   Garland, Texas, correct?

10   A    Yes.

11   Q    And they have done a fingerprint analysis on them?

12   A    Yes.

13   Q    And they have determined that my client's fingerprints are

14   not on those guns?

15   A    Yes.

16   Q    Correct.

17        They've also done a DNA analysis?

18   A    In one -- are you referring to the guns on the table or

19   the just the ones from Garland, right.

20   Q    The guns from Garland.

21   A    That's what I wanted to be sure.

22        Sorry, could you say the last question, sir?

23   Q    Yeah.  Did the FBI do a DNA analysis to determine whether

24   or not my clients' DNA was found on these guns from Garland,

25   Texas?
```

1   A   Yes.

2   Q   And they did not find my client's DNA, did they?

3   A   No.

4   Q   Did the FBI take apart the guns to determine how well they

5   had been maintained?

6   A   Not that I know of.

7   Q   We have heard testimony today that these guns were

8   maintained in a certain manner with grease on them and some

9   left on.

10          Has anybody checked to see how they were maintained?

11  A   No.

12  Q   So as we sit here, you don't know whether they were

13  properly maintained or not properly maintained?

14  A   Yeah.  I cannot say whether they were properly maintained.

15  Q   Did the FBI do a -- work with the ATF --

16          What is the ATF?

17  A   Alcohol Tobacco & Firearms is an agency of the federal

18  government that deals primarily in those type of violations.

19  Q   Does the FBI work in conjunction with the ATF to determine

20  where guns are purchased?

21  A   Yes.

22  Q   And did the FBI work with the ATF in this case to

23  determine where the guns that were found in Garland, Texas,

24  had been purchased?

25  A   Yes.

1   Q   And was there anything in that investigation of the guns

2   found in Garland, Texas, that indicated that my client had

3   purchased those guns?

4          MS. BROOK:  Objection, Your Honor.  Speculation.

5          THE COURT:  Overruled.  You may answer if you know.

6          THE WITNESS:  Nothing in the ATF reports that would

7   indicate that Mr. Kareem purchased those guns.

8   BY MR. MAYNARD:

9   Q   Okay.  Are you familiar with an individual by the name of

10  Ali Biaz?

11  A   Yes.

12  Q   Okay.  Was he actually investigated in this case?

13  A   Yes.

14  Q   And had Mr. Biaz had an AK-47 for sale on Craigslist in

15  January of 2015?

16  A   I think that is correct, yes.

17  Q   And did he indicate that he had posted on Backpage on

18  January 6th of 2015, an AK-47 for sale on that particular day?

19  A   I don't recall the exact dates off the top of my head of

20  when he posted it, but.

21  Q   But there would be a 302 that would indicate that,

22  correct?

23  A   Yes.  I think there would be a 302 that would indicate

24  that.

25  Q   Let me see if I can show you the 302 dated May 22nd of

```
 1    2015 and see if that helps to refresh your recollection.

 2              Do you see that last paragraph?

 3    A    Yes.

 4    Q    Does that help refresh your recollection?

 5    A    Well, I didn't draft this report, but I can --

 6    Q    I understand.  But this report would have been sent to you

 7    for review, correct?

 8    A    Yes.  I would have reviewed this.

 9    Q    This would have been done by an agent who was reporting to

10    you as the case agent on the case?

11    A    Well, so this technically would have gone to the

12    Simpson/Soofi because it was tracking those weapons.

13              But, yes, this did not come to me but I definitely

14    reviewed this at one point.

15              Sir, could it be put back on, please?  I want to read

16    the last part.

17              Okay.  Thank you.

18    Q    Mr. Biaz had an AK-47 for sale on January 6th of 2015 here

19    in Phoenix, Arizona for $700, correct?

20    A    Yes.  According -- yes.

21    Q    Did the FBI investigate Mr. Biaz to get his text messages

22    to see if he had texted anybody about this?

23    A    Yeah.  We already had copies of the text messages from one

24    of the phones seized in Dallas.

25    Q    And that's how you came to go to him, correct?
```

UNITED STATES DISTRICT COURT

1   A   Yes.

2   Q   Okay.  Were there other individuals that sold AK47s that

3   you also investigated?

4   A   There were other individuals that were selling AK47s.

5         I think even Mr. Biaz couldn't say with certainty

6   that he did actually sell it other than what his statement

7   was.

8         But one that comes to mind is -- I think his last

9   name was Leon.  L-E-O-N.  I don't know if I'm pronouncing that

10   correctly.  But he was another individual that was also

11   selling AK47s around that same time.

12   Q   Now, in the searches of Soofi and Simpson's apartment, you

13   also found a number of notebooks, correct?

14   A   Yes.

15   Q   And some of those notebooks actually had writing in it and

16   you would analyze that writing?

17   A   Yes.

18   Q   Okay.  Now, by analyzing it, you may have looked at it to

19   determine who wrote it, correct?

20   A   Yes.

21   Q   And there were also times when the FBI looked at that

22   notebook and found that there had been writing on a sheet of

23   paper.  That paper had been ripped out.  But you could tell

24   from the indentation underneath that there had been writing on

25   the sheet that was on top?

1    A    Yes.

2    Q    Does that make sense?

3    A    Yes.  Indented writing?

4    Q    Right.

5    A    Yes.

6    Q    And the FBI has a technique to uncover what is in that

7    indented writing; isn't that right?

8    A    Yes.

9    Q    And in this particular case, you sent some of those

10   notebooks off to Quantico to have them be tested

11   electrostatically; is that right?

12   A    Yes.

13   Q    In fact, there's a -- it's an electrostatic detection

14   apparatus that is used by the FBI, correct?

15   A    Yes.

16           MR. MAYNARD:  And the -- may I approach?

17           THE COURT:  Yes.

18           MR. MAYNARD:  Can the witness be shown Exhibit 553.

19   BY MR. MAYNARD:

20   Q    Do you recall seeing this document before?

21   A    Yes.

22   Q    And was this document tested by the FBI's lab in Quantico,

23   Virginia?

24   A    Yes.

25   Q    And did you prepare a 302 on this document?

1   A   I believe I did.

2   Q   Do you recall that you prepared a 302 where you wrote out

3   in more legible English what you understood was on this

4   document?

5   A   Yes.  I do recall that.

6   Q   And this would have been done in the normal investigative

7   process of the FBI, correct?

8   A   Drafting the 302?

9   Q   Yeah.  Drafting the 302.

10   A   Yes.

11   Q   Looking at the document that was attached and then

12   drafting a 302 as to what it says?

13   A   Yes.

14        MR. MAYNARD:  Okay.  I move for the admission of 553.

15        MS. BROOK:  Your Honor, I object to foundation based

16   upon the document itself and the writing.

17        THE COURT:  I think --

18        MS. BROOK:  And hearsay.

19        THE COURT:  All we know about this is that he's seen

20   it before.  I don't think you -- I mean, we can infer that you

21   tied it back in to this is some indented writing that was

22   electrostatically tested but he didn't say that.

23        MR. MAYNARD:  Okay.  Let me --

24   BY MR. MAYNARD:

25   Q   Was this -- or the original --

1          This is a photocopy.  Was the original -- is this a

2    photocopy of a page from a notebook that was uncovered at

3    Simpson and Soofi's apartment?

4    A    It looks like it is, yes.

5    Q    And did you take it and send it to Quantico, Virginia?

6    A    Yes.  I sent it, yes.

7    Q    And did it get an electrostatic detection.

8    A    I don't know the exact -- someone at the Quantico lab

9    performed a test on it to be able to look at the indented

10   writing.

11   Q    And who was the individual that did that?

12   A    His name was Antoine Frazier and he's a -- I can't recall

13   his title, but he's a lab -- an employee at the FBI lab at

14   Quantico.

15   Q    And did Antoine Frazier prepare a report to be sent back

16   to you?

17   A    Yes.

18   Q    And did you then take that report and prepare a 302?

19   A    Yes.  Yes.  It was based on his report, so, yeah.

20   Q    Did you base it on the document or did you base it on the

21   report?

22   A    I based it just solely on the document, I believe.  So

23   using his indented version, I then drafted a 302.

24          MR. MAYNARD:  Your Honor, I move for the admission of

25   553?

1          MS. BROOK:  Same objection as it relates to hearsay.

2          THE COURT:  Well, considering the fact that I can't

3   read one single thing on here except a stray letter, I can't

4   figure out what the value of this is other than to show this

5   is what it looks like when it comes back from being tested.

6          I mean, nobody can read this.  I don't know how Agent

7   Whitson did an interpretation of it but maybe he can explain

8   it.

9   BY MR. MAYNARD:

10  Q   I don't have the original, but Agent Whitson, using the

11  report -- and I have Mr. French (sic) subpoenaed so I hate to

12  have him come back but I can but he prepared a 302?

13         THE COURT:  I can't assess whether it's admissible

14  because I can't read a single thing on here.

15         But obviously, the next thing you want to do is have

16  Agent Whitson's interpretation of this.

17         MR. MAYNARD:  I do.

18         THE COURT:  Because nobody can read it.  So I need to

19  see that.

20         MR. MAYNARD:  All right.  May I approach?

21         THE COURT:  Yes.

22         So how did you read it?  Does the original -- is it

23  more legible or did you use a magnifying glass or?

24         THE WITNESS:  Your Honor, it comes back in kind of

25  two versions.  So it has that one version where the writing is

1  in white and the background is in black.

2           And then another version, the opposite.  And so using

3  both of those versions to look back and forth, the parts that

4  you can see in black you can write; and then you've got to go

5  to the other version to see the rest of the document, back and

6  forth.

7           And, again, it is my interpretation of what this

8  says.

9  BY MR. MAYNARD:

10  Q   All right.  Agent Whitson, Exhibit 554, this is a 302 that

11  you prepared, correct?

12  A   Yes.

13  Q   You prepared it on or about October 21st of 2015?

14  A   Yes.

15  Q   And you did this after having sent a small blue notebook,

16  along with other documents, back to Quantico to be analyzed,

17  correct?

18  A   Yes.

19  Q   And this particular notebook had been found in Soofi and

20  Simpson's apartment; is that right?

21  A   Yes.

22  Q   And you received a report back from Quantico that you

23  utilized to prepare this document?

24  A   Yes.

25  Q   And this is the type of document that you would have

1   prepared in the normal course of your investigation?

2   A   Yes.

3   Q   And based upon the testing that was done back in Quantico,

4   it appears that somebody had written a note and then ripped

5   that note out of the notebook, correct?

6   A   Yes.

7   Q   And what we then have is your interpretation, based upon

8   the testing that has been done by the FBI, as to what that

9   original note said?

10  A   Yes.  So based on the indent that was left on the page

11  beneath the page that was ripped out.

12  Q   Because it was important for you to try to determine all

13  the relevant evidence that you could find in this case?

14  A   Yes.

15          MR. MAYNARD:  Your Honor, I move for the admission of

16  553 and 554.

17          MS. BROOK:  Same objection, Your Honor.

18          THE COURT:  The objection is overruled.

19          553 -- and let me just say with respect to 554, I

20  don't know if there is any additional objection.  I have only

21  been focusing on Agent Whitson's quoting of what he believes

22  was written in the indented writing.  So there may be other

23  portions, but I haven't read them.

24          MS. BROOK:  And so, Your Honor, the same objection

25  would be hearsay as it relates to the underlying information

1    upon which the text was derived.

2         THE COURT:  The objection is overruled and I'm going

3    to admit 553 and at least that portion of 554 that contains

4    the interpretation of 553.

5      (Exhibit Nos. 553 and 554 admitted in evidence.)

6    BY MR. MAYNARD:

7    Q   All right.  Agent Whitson, would you, beginning on the

8    bottom, would you read to the jury what that says.

9    A   Yes.  It says:

10        "Bismillah.

11        Dear akhi Fil Lah Subhan Allah.  There was a change

12   in plans.  Indeed something dreadful came up.  The money that

13   I had from you was being used for what was needed for the

14   initial plan but that changed.  This money is what was left

15   over..." --

16        And I think it's the word "but" --

17        "...I will leave you with the title of my car to do

18   as you please with it.  I believe Abdul Malik knows how to get

19   it notarized.  I was also going to give you my tax return but

20   it won't be here in time.  Please forgive me if you do not get

21   all the money back.

22        Always fear Allah and keep me in your dua inshaAllah.

23   You have benefitted me greatly.  Allah grant you Jannah.

24   Forgive me for my short..." --

25        I can't tell the word --

1          "...and may Allah unite us in Jannah."

2          Signed.  "Ibrahim."

3    Q   And this was found in Ibrahim's apartment?

4    A   Yes.

5    Q   And do you know as part of your investigation who Ibrahim

6    gave the title to his car to?

7    A   I can -- no.  I don't know with certainty.

8    Q   Okay.  Do you understand that the title was given to some

9    individual?

10   A   Yes.

11   Q   But you as the case agent don't know who that is?

12   A   I don't know with certainty, but I have an idea.

13   Q   Okay.  It wasn't given to my client, was it?

14   A   No.

15          THE COURT:  I take it since we're reading this

16   indented writing that you never found the original note?

17          THE WITNESS:  That's correct, Your Honor.

18          MR. MAYNARD:  Sorry, Judge.  I've got a mess.

19          May I approach?

20          THE COURT:  Yes.

21   BY MR. MAYNARD:

22   Q   Agent Whitson, before we get to 555 and 556 and 557, after

23   obtaining that notebook we just looked at, what steps did you

24   do to further investigate who had received the car from

25   Mr. Simpson?

1    A    I -- it was -- as soon as I saw that information I called

2    a meeting with various other agents in the office who were

3    handling different aspects of the branching investigations

4    that came off of this main one and then asked if this meant

5    anything to them and then collected information in that sense.

6    Q    Okay.  And did you go out and interview anybody?

7    A    I did not go out and interview.

8    Q    And although you said you've speculated who got it, you

9    don't know?

10   A    I don't know.

11   Q    All right.  Could you please look at 556 please -- or 555.

12        Have you seen this envelope before as part of the

13   investigation?

14   A    Yes.

15   Q    Was this an envelope that was found in Elton Simpson's

16   apartment?

17   A    Yes.

18   Q    And was this preserved by the FBI in the normal course of

19   its investigation?

20   A    Yes.

21        MR. MAYNARD:  Move for the admission of 555.

22        MS. BROOK:  No objection.

23        THE COURT:  555 is admitted.

24        (Exhibit No. 555 admitted in evidence.)

25   BY MR. MAYNARD:

```
 1   Q   Who appears to be the sender of this letter?

 2   A   Abu Jihaad.

 3   Q   And do you know who Abu Jihaad is?

 4   A   Yes.

 5   Q   Who is he?

 6   A   He was an individual arrested a while back for

 7   terrorism-related charges.  He was convicted of providing

 8   information to a terrorist group while employed as a member of

 9   the Navy.

10   Q   And would you take a look at 556, please.

11           Have you seen this document before?

12   A   Yes.

13   Q   And was this found in Mr. Simpson's apartment also?

14   A   Yes.

15   Q   And was it preserved by the FBI in the normal course of

16   its investigation?

17   A   Yes.

18           MR. MAYNARD:  I'd move for the admission of 556.

19           MS. BROOK:  No objection.

20           THE COURT:  556 is admitted.

21       (Exhibit No. 556 admitted in evidence.)

22   BY MR. MAYNARD:

23   Q   The letter was written to an individual by the name of

24   Saabir Nurse.  Do you see that?

25   A   Yes.
```

1  Q   Who is Mr. Nurse?

2  A   Saabir Nurse is an associate of Ibrahim's.

3  Q   Okay.  Is this the individual that he worked with?

4  A   At the dentist office, yes.

5  Q   Okay.  And it appears to have come from the same

6  individual that's in prison for terrorism?

7  A   Yes.

8  Q   And, could you take a look at --

9        And, again, that was found at Soofi and Simpson's

10  apartment, correct?

11 A   Yes.

12 Q   Could you take a look at Exhibit 557, please.

13       Have you seen this document before?

14 A   Yes.

15 Q   And was this found at Soofi and Simpson's apartment?

16 A   Yes.

17 Q   And was it found in the normal course of your

18  investigation?

19 A   Yes.

20 Q   And was it preserved by the FBI?

21 A   Yes.

22       MR. MAYNARD:  I move for the admission of 557.

23       MS. BROOK:  No objection.

24       THE COURT:  557 is admitted.

25     (Exhibit No. 557 admitted in evidence.)

```
 1   BY MR. MAYNARD:

 2   Q    This appears to be another letter from the same Saabir

 3   Nurse?

 4   A    Yes.

 5   Q    From Mr. Jihaad?

 6   A    Yes.

 7   Q    Did you ever interview Mr. Jihaad in connection with this

 8   investigation?

 9   A    No.

10   Q    Did you interview Saabir Nurse in connection with this

11   investigation?

12   A    The FBI did conduct interviews with Mr. Nurse.

13   Q    And there was a 302 done?

14   A    Yes.  That's my understanding.

15   Q    Did anyone ever interview Mr. Nurse after you prepared the

16   handwritings or the 302 on that electrostatic page?

17   A    I don't know if it was after I had prepared the 302, but

18   it was after we had had that talk.  So I had that talk before

19   the 302 was even done.

20   Q    Do you know whether or not the FBI asked Mr. Nurse if he

21   had received that document from Mr. Simpson?

22   A    I believe, yes.  I believe they did.

23   Q    And did the FBI ask him for a copy of it?

24   A    I don't.  I don't know.

25   Q    In other words, you didn't get a copy of the document?
```

| | |
|---|---|
| 1 | A    Yeah.  I never received it -- a copy of that document. |
| 2 | MR. MAYNARD:  Okay.  Judge, is there any way we can |
| 3 | quit early today and I can get organized and be done in about |
| 4 | ten minutes in the morning? |
| 5 | THE COURT:  Well, the morning? |
| 6 | MR. MAYNARD:  Oh, the afternoon. |
| 7 | THE COURT:  Not the morning. |
| 8 | But, yes, we can, only if you promise that tomorrow |
| 9 | morning when the rest of us aren't here that you make an |
| 10 | appointment to have Maureen mark any additional exhibits that |
| 11 | you intend to use in the cross-examination of Agent Whitson. |
| 12 | MR. MAYNARD:  I promise. |
| 13 | THE COURT:  Okay. |
| 14 | Ladies and gentlemen, we will recess until one |
| 15 | o'clock tomorrow afternoon. |
| 16 | You are reminded again of the admonition not to |
| 17 | discuss the case among yourselves or with anyone else. |
| 18 | Please do not form any conclusions about the case |
| 19 | until you have heard all the evidence and begun your |
| 20 | deliberations. |
| 21 | Court is in recess until one o'clock tomorrow |
| 22 | afternoon. |
| 23 | (End of Excerpt of Proceedings.) |
| 24 | * * * |
| 25 | |

1

2                    C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 8th day of March,

14   2016.

15

16

17

18

19

20                   s/Elizabeth A. Lemke
                     ELIZABETH A. LEMKE, RDR, CRR, CPE
21

22

23

24

25