UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) March 3, 2016 |
| Abdul Malik Abdul Kareem, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #11
TESTIMONY:  SPECIAL AGENT STEWART WHITSON - PART #3
(Pages 121-193, Inclusive.)


APPEARANCES:
For the Government:
            U.S. ATTORNEY'S OFFICE
            By:  **Kristen Brook, Esq.**
                 **Joseph Edward Koehler, Esq**.
            40 North Central Avenue, Suite 1200
            Phoenix, AZ  85004


For the Defendant Abdul Malik Abdul Kareem:
            MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
            By: **Daniel D. Maynard, Esq.**
                **Mary Kathleen Plomin, Esq.**
            3200 North Central Avenue, Suite 1800
            Phoenix, AZ  85012


Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1              E X C E R P T   O F   P R O C E E D I N G S

 2          THE COURT:  Good afternoon, ladies and gentlemen.

 3   Please sit down.  The record will show the presence of the

 4   jury, counsel, and the defendant.

 5          Mr. Maynard, you may continue your cross-examination

 6   of Agent Whitson.

 7          MR. MAYNARD:  Thank you, Your Honor.

 8      SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN

 9              CROSS EXAMINATION (cont'd)

10   Q   Good afternoon, Agent Whitson.

11   A   Good afternoon, sir.

12   Q   A couple of -- a few followup questions that I have from

13   yesterday.

14          In the course of your investigation, you determined

15   that Mr. Abdul Kareem did not ever have a Twitter account; is

16   that correct?

17   A   Yes.

18   Q   Okay.  And did the FBI do a canvass of the apartment

19   complex that Simpson and Soofi lived in after this incident?

20   In other words, did they go door-to-door and talk to the

21   residents in the area?

22   A   Yes.

23   Q   And in the process of doing that, none of them --

24          Or strike that.

25          You also, when that canvass was being done, you had
```

1    pictures of Simpson and Soofi; Nadir Soofi, Ali Soofi, Abdul

2    Kareem, and others, correct?

3    A   Well, I didn't conduct the canvass, but a number of agents

4    did and I would assume they would have had pictures of all

5    those people.  That's right.

6    Q   The purpose of that canvass was to go there and say, "Can

7    you identified these people as either being here or living

8    here"?

9    A   Yes.  That would be, yes.

10   Q   And is it fair to say that nobody identified Abdul Kareem

11   as ever coming over there?

12   A   I don't recall there being anyone that did that.

13   Q   Okay.  You don't recall anybody who said, "I saw him

14   here"?

15        THE COURT:  Well, he wouldn't recall what anybody

16   said because he didn't do it.  So you can only ask him if

17   there were any positive results of people saying they had seen

18   him.

19   BY MR. MAYNARD:

20   Q   I understand.  From the 302 that you reviewed as part of

21   your investigation, is it fair to say that nobody identified

22   Mr. Abdul Kareem as having been there?

23   A   I do not recall anyone from the apartment complex

24   remembering him.

25   Q   Okay.  Now, we heard Ali Soofi's testimony yesterday and

1    there were a number of times that he had been interviewed by
2    the FBI prior to his coming in to testify, correct?
3    A    Yes.
4    Q    And you had participated in a number of those interviews?
5    A    Yes.
6    Q    I believe the last two?
7    A    Two, yes.
8    Q    One was in September where it was done telephonically --
9    or with a video camera?
10   A    Yes.
11   Q    He was in Kansas with a lawyer.  You were here with
12   somebody from the U.S. Attorney's Office?
13   A    Yes.
14   Q    Okay.  And you prepared a 302 from that interview?
15   A    Yes.
16   Q    But you did not videotape or audiotape that interview?
17   A    Yes.  I did not.
18   Q    And you would have put down everything that you thought
19   was important that he said in that interview in your 302?
20   A    Yes.
21   Q    Okay.  He never mentioned in that interview that he had
22   seen Abdul Kareem assisting or directing his brother and
23   Mr. Simpson in cleaning the weapons, did he?
24   A    I would have to review my report to --
25   Q    You had a notebook.  Do you want to look at September --

1   September 29th?

2   A    I have just reviewed my report from September 25, 2015,

3   and I don't see that he was asked that question or that he

4   provided any information related to cleaning or disassembling

5   or reassembling a weapon.

6   Q    All right.  And I said "September 29."  That was the date

7   that the 302 was finalized and entered up in the top

8   right-hand corner, correct?

9   A    Yes, sir.

10  Q    But the interview actually occurred on September 25th?

11  A    Yes.

12  Q    Okay.  You then flew to Dallas, Texas, and met with him at

13  his mother's house with Ms. Brook?

14  A    In Texas.

15  Q    In Texas.  Somewhere near Dallas?

16  A    Not near Dallas, but, yes, in Texas.

17  Q    And you did not audio or videotape that interview?

18  A    No, I did not.

19  Q    That was the first time that he ever mentioned that he had

20  seen my client directing Mr. Soofi, his brother, and

21  Mr. Simpson in how to clean and disassemble any of these

22  weapons, correct?

23  A    I think that's correct.

24  Q    Okay.  And that interview took place on January 29th of

25  2016?

1  A   I'm not sure if I have a copy of that report with me.  If

2  you have it --

3          THE COURT:  Well, does that date sound about right?

4          THE WITNESS:  That sounds about right, Your Honor.

5          MR. MAYNARD:  Thank you.

6  BY MR. MAYNARD:

7  Q   Now, additionally, as you were preparing for this trial,

8  you went into the jail, Maricopa County Jail, to interview

9  Mr. Verdugo, correct?

10  A   Yes.

11  Q   And that was to get him ready to come over here and

12  testify?

13  A   What do you mean by that?

14  Q   Well, I mean, didn't you want to go, as you had done with

15  Mr. Soofi, and follow up and see what his testimony would be?

16  A   Not to see what his testimony would be, but I did conduct

17  an interview with him, a trial prep interview.

18  Q   I mean, Mr. Soofi had been interviewed by the FBI on five

19  or six occasions.  Yet you and Ms. Brook determined that it

20  was necessary to fly to Texas the end of January prior to this

21  trial.  That was to see what his testimony was going to be,

22  correct?

23  A   Not to see what his testimony was going to be.  To

24  interview him and conduct a pretrial interview.

25  Q   Okay.  You did the same thing with Mr. Verdugo, but you

1    did it in the county jail?

2    A    Yes.  I think -- I believe it was the county jail.

3    Q    And you did not tape that interview either, did you?

4    A    No.  We do not tape interviews in the jail.

5    Q    You can take a computer into the county jail, correct?

6    A    I don't know what the -- what you're allowed to take into

7    the jail.

8    Q    Did you ask anybody if you could bring in a recording

9    device?

10   A    On the first time that I went to interview him, I did ask

11   if I could bring a recording device.

12   Q    And in December of 2015 when you went to the county jail

13   to interview Mr. Verdugo, did you ask them if you could bring

14   in a recording device?

15   A    If that was the first one -- so the first time we

16   interviewed him in the jail, I asked them if I could bring in

17   a recording device, yes.

18   Q    And are you telling me that somebody told you that you

19   could not?

20   A    Yes.  The people in the entry area said they wouldn't

21   allow the recording device to be brought in.

22   Q    Okay.  And it was in that interview when you told

23   Mr. Verdugo that you would make a statement to -- or provide a

24   statement to the County Attorneys to assist him in the

25   prosecution that the County was bringing against him?

1   A   No.  I didn't make that statement.

2   Q   Did you tell him you would provide him with a statement?

3   A   No.  I did not tell him I would provide him with a

4   statement.

5   Q   Did you --

6   A   But --

7   Q   Did you prepare a statement?

8   A   Ultimately, I prepared a statement.

9   Q   What was the purpose of the statement?

10  A   Based on my understanding that observations we had made

11  would contain potentially exculpatory material towards his

12  state charges.  So in other words, we had witnessed things

13  that could tend to show his innocence, we had a constitutional

14  mandate to provide that information to the prosecutor to let

15  them know, you know, what we had observed.

16  Q   And did you provide the prosecutors with this

17  constitutionally-mandated information?

18  A   Yes.  I provided it to the prosecutors.

19  Q   And did you prepare it on the day before you went to

20  interview Mr. Verdugo?

21  A   I believe it was prepared after.

22  Q   Your Honor, can --

23          Well, Mr. Verdugo testified that he was -- I believe

24  he said he was shown a copy.

25  A   No.  That's impossible.  He wouldn't have been shown a

 1   copy of the statement I prepared.  He was never shown a copy

 2   of the statement I prepared by me.

 3   Q   Can Mr. Whitson be shown Exhibit 564.

 4       Agent Whitson, is this one of the statements that was

 5   prepared by you?

 6   A   Yes.

 7   Q   Okay.  And were you aware that Agent Nash also prepared a

 8   statement concerning his observations?

 9   A   Yes.

10   Q   And was Mr. Verdugo told that the statements would be

11   prepared?

12   A   Yes.  He was told that.

13   Q   Okay.  And if you -- you knew that Mr. Vergudo had been in

14   custody with the County since June or July, correct?

15   A   I don't recall the exact date of when he was --

16   Q   Sometime in the summer?

17   A   Yes.

18   Q   I mean, you knew that your witness who had prompted you to

19   begin tailing my client 24 hours a day had been taken into

20   custody by the County Attorney's Office here?

21       MS. BROOK:  Objection.  Form of question.

22       THE COURT:  Sustained.

23   BY MR. MAYNARD:

24   Q   You knew that Mr. Verdugo had been taken into custody

25   sometime in the summer of 2015?

```
 1    A    Yes.  I knew, yes.

 2    Q    Okay.  And it just so happens that it's either the day of

 3    or the day before you meet with him in December is the first

 4    time you prepare this 302 concerning your observations that

 5    would be exculpatory for him?

 6    A    Yes.  I didn't know the details of why he was arrested.

 7    Q    Did the FBI --

 8         Strike that.

 9         Can the witness be shown Exhibit 196?  May I

10    approach, Your Honor?

11         THE COURT:  Yes.

12    BY MR. MAYNARD:

13    Q    Agent Whitson, can you tell the jury what 196 is?

14    A    Yes.  196 is a grand jury return from BMO Harris Bank for

15    bank accounts belonging to Abdul Malik Abdul Kareem.

16    Q    And these are the -- these bank accounts have been

17    reviewed or forensically reviewed by an accountant for the

18    FBI?

19    A    Yes.

20    Q    And these are the bank records that you looked at when you

21    said that there was some unusual activity?

22    A    Yes.

23    Q    And these were the records where he had placed in a

24    $10,000 deposit and then within days after that took on

25    November 13 --
```

UNITED STATES DISTRICT COURT

 1              THE COURT:  Excuse me.  I don't think this is in

 2  evidence.

 3              MR. MAYNARD:  Sorry.  I move for the admission of

 4  Exhibit 196.

 5              THE COURT:  Is there any objection?

 6              MS. BROOK:  No objection.

 7              THE COURT:  196 is admitted.

 8      (Exhibit No. 196 admitted in evidence.)

 9  BY MR. MAYNARD:

10  Q   Okay.  On what would be about the sixth or seventh page of

11  the document, these are the records that show a $10,000

12  deposit.  And then on November 13th there was a $5,000

13  withdrawal?

14  A   Yes.

15  Q   Correct?

16  A   Yes.

17  Q   And you thought that was unusual?

18  A   Not just because of those two facts, but, yes.

19  Q   Okay.  Can the witness be shown Exhibit 559.

20              Agent Whitson, have you ever seen Exhibit 559 before?

21  A   I don't recognize it, but.

22  Q   Does the yellow marker with the number 22 on it look

23  familiar to you?

24  A   I mean, that looks like a marker that would be used at a

25  scene, but.

1   Q    Do you know whether or not this is a copy of a notebook

2   that was taken from Mr. Abdul Kareem's vehicle when he was

3   arrested by the FBI on June 10th of 2015?

4   A    I don't.

5   Q    Okay.  And I take it then, even though the notebook is

6   turned to a particular page and photographed, you don't recall

7   ever seeing this?

8   A    I don't.

9   Q    And so, therefore, you would have not done any

10  investigation concerning the information that is found on

11  Exhibit 559?

12  A    Well, there is -- I did some investigation related to some

13  things that are written there.

14  Q    But how would you have done that without looking at that?

15        Did you do a background on the truck that he had

16  purchased?

17  A    Well, no.  There's information there that looks like

18  information that came from other things and so I did

19  investigative efforts on those other things.

20  Q    Did you do any investigation to determine when Mr. Abdul

21  Kareem had purchased the box truck, the 1998 box truck?

22  A    Yes.

23  Q    And what did you do?

24  A    I checked with records with the Motor Vehicle Department.

25  Q    When did you do that?

CR15-00707-PHX-SRB   STEWART WHITSON-PART#3      3-3-16

1    A    I did that yesterday.

2    Q    That was the first time?

3    A    Yeah.  That I did -- that I did it, yes.

4    Q    Are you aware of anybody else having done it?

5    A    No.

6    Q    Did you look -- did you look at Exhibit 559 over the

7    evening?

8    A    No.

9    Q    Okay.  What did you find from the Motor Vehicle

10   Department?

11   A    The records indicated that a GMC truck was purchased by

12   the defendant -- or I should say not purchased, but registered

13   with the State in or about January 20th, I believe, so January

14   20th of 2015.

15   Q    Okay.  Did you go back to look at any of the documents

16   that the FBI had recovered to determine if there was any sort

17   of receipt for the purchase of that truck?

18   A    Yes.  I looked.

19   Q    And you didn't find 559?

20   A    No, I did not.  I did not see anything that looks like

21   this.

22   Q    Okay.  Can I have the witness have Exhibits 242 and 243

23   and may I approach?

24            THE COURT:  The clerk?

25            MR. MAYNARD:  No.  I don't need to.  I'm sorry.

```
 1              Is 242 in evidence?

 2              THE COURT:  It is not.  Only 243 is this evidence.

 3     BY MR. MAYNARD:

 4     Q   Do you have 243 in front of you?

 5     A   Yes, I do.

 6     Q   Have you seen this photograph before?

 7     A   It looks familiar.

 8              MR. MAYNARD:  If it's in evidence, can I publish it?

 9              THE COURT:  Yes.

10     BY MR. MAYNARD:

11     Q   Do you know where the FBI found this photograph?

12     A   I don't recall for this one.

13     Q   Do you know who this is?

14     A   I think so.  The picture is kind of hard to see.

15     Q   Who do you believe it is?

16     A   But it looks like Nathaniel Soofi, which is Nadir Soofi's

17     son.

18     Q   Okay.  And did the FBI interview Nathaniel Soofi?

19     A   Yes.

20     Q   In this case we've heard from three witnesses so far that

21     said they knew about the Muhammad Drawing Contest before it

22     occurred.  Would you agree with that?

23     A   Could you say that again?

24     Q   Yeah.  We heard -- Mr. Verdugo said he had heard about the

25     Muhammad Drawing Contest before it occurred.
```

1    A    Yes.

2    Q    And the two juveniles, Carlos and Juan, both said they had

3    heard about that drawing contest before it occurred?

4    A    Yes.

5    Q    Okay.  Did anyone else in your investigation, anyone tell

6    you that they had heard of that contest before it occurred

7    other than those two individuals -- those three individuals?

8    A    No, not that I recall.

9    Q    Do you recall whether or not Mr.-- the young boy in the

10   photograph indicated that he knew about the contest before --

11           MS. BROOK:  Objection.  Hearsay as to any content of

12   conversations.

13           THE COURT:  Sustained.

14   BY MR. MAYNARD:

15   Q    Okay.  Did you participate in the preparation of the

16   indictments in this case?

17   A    What do you mean?

18   Q    Did you review them?  Approve them?

19   A    No.  I wouldn't, no.  I would provide information that

20   they may have used in crafting that.

21   Q    Are you aware how many indictments there are in this case?

22   A    Yes.  I believe so.

23   Q    Okay.  The first indictment was when?

24   A    It would have been on June 10th of 2015.

25   Q    So can you explain to the jury what an indictment is?

1    A   Well, an indictment is where the case is presented

2    before -- and in this case it was a grand jury -- and so the

3    case is presented before the grand jury.  And then the grand

4    jury votes on whether they believe there is sufficient cause

5    to justify indicting that individual or charging them with

6    those offenses.

7    Q   And at a later date there was a superseding indictment

8    that was filed; is that correct?

9    A   Yes.

10   Q   And a superseding indictment is one that adds new charges?

11   A   Yes.

12   Q   And then at a later date there was a second superseding

13   indictment that was charged -- filed?

14   A   Yes.

15   Q   And that last one is the one that is here in front of this

16   jury, correct?

17   A   Yes.

18   Q   And that one charged my client for the first time with

19   Conspiracy to Provide Material Support to a Foreign Terrorist

20   Organization; is that correct?

21   A   Yes.

22   Q   And that was done on or about September 22nd of 2015?

23   A   That sounds right.

24   Q   Were you happy when it was -- the government brought that

25   second superseding indictment?

1    A    No.

2    Q    No?

3    A    I don't think "happy" is a right way to describe that.

4    Q    Didn't you think this was a fantastic thing for the

5    government to do?

6    A    To do what?

7    Q    Charge him with Conspiracy to Provide Material Support to

8    a Foreign Terrorist Organization?

9    A    No.  I didn't think that was a happy thing to do.

10   Q    Could you show the witness Exhibit 558.

11        Agent Whitson, have you seen Exhibit 558 before?

12   A    I have not seen this exhibit.

13   Q    You have seen it before, correct?

14   A    I recognize it that it's an e-mail.

15   Q    There was an e-mail that was written to you by somebody at

16   the U.S. Department of Justice, correct?

17   A    Yes.

18   Q    And then you wrote an e-mail back to that person and

19   others, correct?

20   A    Yes.

21        MR. MAYNARD:  Okay.  I would move for the admission

22   of Exhibit 558.

23        MS. BROOK:  No objection.

24        THE COURT:  558 is admitted.

25        (Exhibit No. 558 admitted in evidence.)

```
 1   BY MR. MAYNARD:
 2   Q   Agent Whitson, when you were told that the FBI -- or the
 3   U.S. Attorney's Office here in Phoenix, Arizona, had been
 4   approved for conspiracy to file -- conspiracy to provide
 5   material support as outlined in your e-mail, your response
 6   was:
 7            "Fantastic news.  Thank you or three -- thank you all
 8   three of you for all the hard work.  I know there is going to
 9   be a lot of people in our organization who will be very
10   pleased."
11            You thought in was fantastic, didn't you?
12   A   I was thanking them for their hard work, yes.
13   Q   And the people in your organization that you're talking
14   about is the FBI, correct?
15   A   Yes.
16            MR. MAYNARD:  Your Honor, I don't have any more
17   cross-examination, but I believe that Ms. Plomin has some.
18            THE COURT:  Yes.  This will be --
19            That was your last question?
20            MR. MAYNARD:  Yes, ma'am.
21            THE COURT:  Ladies and gentlemen, I made an exception
22   to my rule that only one lawyer could participate for each
23   side in the examination or cross-examination of a single
24   witness because Ms. Plomin has handled all of the
25   computer-related evidence in this case and Mr. Maynard has
```

```
 1    handled other evidence in the case.

 2            So there's not going to be any repetition of anything

 3    that Agent Whitson has already been asked, but now we're going

 4    to focus this part of the cross-examination on the --

 5            I said "computer," but more broadly, the electronic

 6    communication.

 7            MS. PLOMIN:  Thank you, Your Honor.

 8                        CROSS EXAMINATION

 9    BY MS. PLOMIN:

10    Q   Good afternoon, agent.

11    A   Good afternoon, ma'am.

12    Q   Madame Clerk, can we please give Agent Whitson Exhibits

13    544 through 546 and 565.

14            And, Agent, did you also bring Exhibit 48 with you,

15    the physical exhibit?  It has been admitted.

16    A   I don't know if that's here.  What is it, do you know?

17            THE COURT:  It's described as a black LG flip phone.

18            THE WITNESS:  I don't believe that's here in the

19    courtroom right now.

20    BY MS. PLOMIN:

21    Q   Okay.  Okay.

22            Now, Agent Whitson, I want to first direct your

23    attention to Exhibit 565.  Do you have that in front of you?

24    A   Yes.

25    Q   And do you recognize Exhibit 565 or what's depicted in
```

```
 1    Exhibit 565?
 2    A    It looks like text messages going back and forth from
 3    users.
 4    Q    And do you recognize those as text messages from Abdul
 5    Malik Abdul Kareem's cell phone, Maxwest cell phone?
 6              MS. BROOK:  Objection.  Hearsay.
 7              THE COURT:  Overruled.  He's being asked if he can
 8    identify that that is what is in this document.
 9              THE WITNESS:  I'm trying to see its number.
10              MS. PLOMIN:  And I would also offer it under the rule
11    of completeness, Your Honor.
12              THE WITNESS:  I don't see his number on here, but it
13    looks like these may be text messages from Mr. Kareem.
14    BY MS. PLOMIN:
15    Q    Okay.  You reviewed the text messages from Mr. Kareem's
16    Maxwest cell phone, correct?
17    A    Yes.
18    Q    And those would have been very important to you in your
19    investigation here, correct?
20    A    Yes.
21    Q    And we're looking at the dates of May 1st, 2015, through
22    May 3rd, 2015.  Were those significant dates in this
23    investigation?
24    A    Yes.
25    Q    And just -- what date was the Garland attack on?
```

1  A   The attack occurred on May 3rd.

2  Q   And so May 1st would have been the Friday before the

3  attack, correct?

4  A   Correct.

5  Q   Now, if you could turn to the message on May 1st, 2015, at

6  5:21:07 p.m.

7        MS. BROOK:  Your Honor, if I may, I think our

8  exhibits may be on the witness stand with Special Agent

9  Whitson.

10        Can I just approach to get our copy of these exhibits

11  so we can follow along?

12        THE COURT:  You mean your copy of 565?

13        MS. BROOK:  Right.  Not the ones that the clerk has

14  given him, but some additional copies.

15        THE COURT:  Okay.

16        MS. BROOK:  Thank you.

17        Apparently, they're not up there.

18  BY MS. PLOMIN:

19  Q   It's three lines up from the bottom of the first page.

20  A   Yes.

21  Q   Now, starting with that text message on May 1, 2015, at

22  5:21 p.m. and reading down from that, take a look at those and

23  see if you recognize those.

24  A   Yes.

25  Q   And where do you recognize those came from?

1    A   I believe these are text messages that came from

2    Mr. Kareem's phone to various people.

3    Q   Okay.  And is this a fair and accurate depiction of the

4    text messages that you reviewed from Mr. Kareem's phone from

5    May 1st, 2015, through May 3rd, 2015?

6    A   Yes.  It looks like a portion of those records.

7            MS. PLOMIN:  Your Honor, I move to admit Exhibit 565

8    and publish.

9            THE COURT:  Is there any objection?

10           MS. BROOK:  Your Honor, we object to hearsay as well.

11           THE COURT:  Overruled.  565 is admitted.

12       (Exhibit No. 565 admitted in evidence.)

13   BY MS. PLOMIN:

14   Q   I want to direct your attention to the first text message

15   on May 1st at 5:21 p.m.

16   A   Yes.

17   Q   And could you read for us the text messages from May 1st,

18   2015, at 5:21 p.m. through May 2nd, 2015, 8:44:07 a.m. which

19   is on the second page.

20           THE COURT:  Well, first, to the extent that you know

21   who the phone numbers are that they are going out to, can you

22   tell us that too?

23           THE WITNESS:  I don't know that.

24           THE COURT:  Okay.

25           THE WITNESS:  So there's other individuals who would

1   be more qualified to do this, the analyst that was in charge

2   of this project.

3           MS. PLOMIN:  Okay.  I'm just interested in what the

4   content of the messages are for the jury.

5           THE WITNESS:  Okay.

6           Should I begin?

7   Q   Yes.

8   A   "Salaam walekum."

9           "Salam walaikum brother I'm inviting you to lunch

10  tomorrow I'm marinating the goat the night inshallah lunch

11  start at one."

12  Q   Can I just stop you.

13          If you could read if they are outgoing or ingoing

14  text messages?

15  A   Those two were out.

16  Q   Okay.

17  A   And then in:

18          "Walaikum salaam shukran for the invite but I finish

19  work at 3 and I think I'll have to watch my daughter, if I can

20  I'll try to make it."

21          And then out at 9:37 p.m.:

22          "Salam walaikum brother I'm cooking curry goat

23  tomorrow Jamaican style I invite you tomorrow at 1 o'clock."

24          At 9:41 out:

25          "Salaam walaikum I'm marinating the meat for the

```
 1    curry it start at 1."
 2            At 9:41:56:
 3            "Just let the brothers know."
 4            And then keep going?
 5    Q   Yes.  Please.
 6    A   9:42 p.m. an in-message:
 7            "Will be working."
 8            9:42 p.m. in says:
 9            "In sha allah."
10            9:45 p.m.
11            "Alright excited inshaAllah Ill try and make it.  I
12    work but I'll see if I could leave for like 30 mints.  How
13    early can i come."
14            And then 10:02 P.m. an in:
15            "What happened."
16            And then 5/2 at 8:43 a.m.
17            "You can come early as you want."
18            As an out message.
19    Q   And what's the last message there, the next message?
20    A   At 8:44 a.m. an in-message says:
21            "Koo."
22    Q   Is that slang for "cool"?
23    A   That would be my guess, yes.
24    Q   All right.  So over the course of your investigation
25    through these text messages, was it your understanding that
```

1    Mr. Abdul Kareem was inviting some people over for lunch the

2    following day after May 1st?

3    A    Based on these text messages alone, yes.

4    Q    Okay.  Now can you please look at Exhibit 544, 545, and

5    546.

6    A    Yes.  I'm set.

7    Q    So you have reviewed Exhibit 544 through 546?

8    A    Yes.

9    Q    Do you recognize what's depicted in those three exhibits?

10   A    Yes.

11   Q    And what is depicted in those exhibits?

12   A    This is the LG 44G cell phone that was recovered from

13   Dallas.  It was a phone that was believed to be utilized by

14   Elton Simpson.  And these are screen captures where the CART

15   folks have gone in and taken pictures of the phone and what

16   they can see on the screen.

17   Q    And you reviewed those screen captures, correct?

18   A    Yes.

19   Q    And let's start with Exhibit 544 --

20          Well, first I want to ask you.  You said that this

21   phone was attributed to Mr. Elton Simpson; is that right?

22   A    Yes.

23   Q    I want to show you a document, Mobile Device Analysis

24   Report.

25          Do you recognize what that is?

1    A   I recognize what that report is.

2    Q   And what is that report?

3    A   That would be a cover sheet for a report that would come

4    from a CART examiner when they're examining a device.

5    Q   And does this indicate what the cover sheet -- what device

6    this cover sheet is for?

7    A   Yes, it does.

8    Q   And which device is that?

9    A   It shows it for the device with the telephone number

10   ending 8104.

11           And could I check my notes for something real quick?

12   Would that be all right?

13   Q   Sure.

14   A   Okay.

15   Q   So isn't it true that this phone was actually attributed

16   to Mr. Nadir Soofi?

17   A   Yes.  I misspoke.  This is actually a phone attributed to

18   Nadir Soofi according to this sheet.

19   Q   Okay.  And it was found in Mr. Soofi's car in Dallas -- or

20   in Garland, Texas?

21   A   I don't recall its exact location, but I understand that

22   this is a phone that was recovered in Garland.

23   Q   I'm going to turn your attention to Exhibit 545.

24           Your Honor, I ask for permission to admit Exhibit

25   545.

1              THE COURT:  Is there any objection?

2              MS. BROOK:  No objection.

3              THE COURT:  545 is admitted.

4         (Exhibit No. 545 admitted in evidence.)

5    BY MS. PLOMIN:

6    Q   Have you seen this text message before?

7    A   Yes.

8    Q   When did you first see this text message?

9    A   I don't recall the first date I saw it, but at some point

10   during the investigation I looked through these.

11   Q   All right.  The report date is May 5th, 2015, so did you

12   review this pretty early on in your investigation?

13   A   I don't recall exactly when I reviewed it, but I know I

14   reviewed it at some point in the investigation.

15   Q   Okay.  The phone number on the screen from 6025131626, do

16   you know whose phone number that is?

17   A   I believe and I'm not a hundred percent certain.

18   Q   Okay.  Did you or any other agent interview a man by the

19   name of Christian Leon after viewing this text message?

20   A   Yes.

21   Q   Do you know if that phone number belongs to Mr. Leon?

22   A   I believe that is the case, but I don't know with a

23   hundred percent certainty that that's his phone number, but I

24   believe that.

25   Q   All right.  And can you read the content of the text

1    message, the date and time?

2    A    Yes.   It says -- there was a message sent from phone

3    number ending in 1626.   It says:

4              "Do you still want to get the AK-74?"

5              It was sent on January 6th of 2015 at 7:01 a.m.

6    Q    And that was an incoming message to the phone attributed

7    to Mr. Soofi, correct?

8    A    Yes.

9    Q    And after that text message at 7:01 a.m., these were --

10              Well, let me actually back up.

11              This report that you are viewing, a portion of the

12   report, is it essentially screenshots of the various text

13   messages and phone calls that occur from a phone?

14   A    Yes.

15   Q    And so after this message came in to Mr. Soofi's phone,

16   "Do you still want to get the AK-74?" there were several calls

17   back and forth between this number ending in 1626, correct?

18   A    I don't know that there were several calls back and forth

19   between the numbers.

20   Q    Why don't you look at the rest of the exhibit to see if it

21   refreshes your recollection.

22   A    Okay.   I have reviewed it.

23   Q    All right.   And were there several calls following this

24   text message that came in to Mr. Soofi's phone?

25   A    Yes.   It looks like there were four.

1    Q    Were there actually five?

2    A    I count four.

3    Q    Including page 2?

4    A    No.  I actually do.  See a fifth because there's two lines

5    on the same one, so, yes, there were five.

6    Q    Okay.  I'm putting page 2 of the exhibit on the screen for

7    the jury.

8         What does that indicate to you?

9    A    This is -- this phone received a call from 1626, so from

10   6025131626, on January 6th at 7:41 a.m. and that the call

11   lasted approximately 4 minutes and 10 seconds.

12        It's hard to read a little bit, but I can't see if

13   that's a 4 or a 1 on this screen.  Looks like one minute.  It

14   looks like one minute and 47 seconds.

15   Q    Well, let's go back.

16        The first received call from 1626 about the text

17   message about the AK74 lasted for 4 minutes and 10 seconds; is

18   that right?

19   A    Yes.

20   Q    Okay.  And the second page indicates another dialed call

21   at 8:18 a.m. the same morning, correct?

22   A    Yes.

23   Q    And then there were two more received calls at 8:53 a.m.

24   and 9:08 a.m. the same morning of that text message, correct?

25   A    Yes.

1    Q    And finally, there was a dialed call at 9:14 a.m. on

2    January 6, 2015, to the phone number that texted about the

3    AK74 at 9:14 a.m., correct?

4    A    Yes.

5    Q    And you said after viewing these text messages, you or

6    other agents from the FBI went and interviewed Christian Leon,

7    true?

8    A    Yes.

9    Q    And have you reviewed the 302s relating to that interview?

10   A    I did.

11   Q    All right.  Were those 302s important to you that this

12   person was communicating with Mr. Soofi about buying an AK74?

13   A    Yes.

14   Q    Okay.  So the interviewers were Robert Tobias and Joseph

15   Mulligan.  Do you know who that is?

16   A    Yes.  I know who they are.

17   Q    Who do they work for?

18   A    They are special agents with the FBI.

19   Q    Did you direct them to go and conduct that interview?

20   A    I did not direct them to conduct that interview but

21   someone did.

22   Q    As the case agent investigating Mr. Abdul Kareem at the

23   time, you were not the person who directed them to go

24   interview somebody else who's communicating with them about

25   AK-74s?

1  A   No.  At that time, remember, the Simpson/Soofi

2  investigation had their investigators.

3           And so all the devices that came from the

4  Simpson/Soofi investigation, that would have been a lead

5  generated by those agents.  So it would have been those agents

6  that asked them to go conduct that interview and not me.

7  Q   So you weren't following a lead that pointed in a

8  direction other than to Mr. Abdul Kareem in purchasing or

9  selling the AK-74?

10  A   What do you mean by that?

11  Q   You were the case agent for Mr. Abdul Kareem in May of

12  2015, true?

13  A   Beginning May 8th, yes.

14  Q   Beginning May 8th.

15           And the interview of Mr. Leon was on May 20th of

16  2015.  Does that sound right?

17  A   That sound right.

18  Q   And you had already interviewed Mr. Abdul Kareem on

19  May 5th, correct?

20  A   Yes.

21  Q   And on May 12th you spoke to him?

22  A   Yes.

23  Q   And you had already spoken to Mr. Verdugo several times?

24  A   Yes.

25  Q   And the FBI was following Mr. Kareem 24 hours a day?

1    A   Yes.

2    Q   All right.  And you were suspicious of Mr. Kareem for

3    providing the guns that Mr. Soofi and Mr. Simpson took to

4    Garland, Texas, correct?

5    A   I don't know if I knew that yet at that time.

6    Q   Okay.

7    A   I don't know -- I don't think I knew that fact yet.

8    Q   You knew that fact?

9    A   No.  I don't think I knew that fact yet.  When the

10   interviews of Mr. Leon took place, I don't think I knew that

11   yet.

12   Q   Well, you didn't think you believed that yet; is that

13   right?

14   A   No.  I said I didn't know that fact that he provided those

15   weapons until after that date, I believe.  So the first

16   indication came from the interview of Sergio Martinez-Chavez

17   and that occurred on May 20th.

18   Q   Okay.  So you didn't know for sure.  You weren't there.

19        You're saying it's the first time your investigation

20   led you in that direction was at that time?

21        THE COURT:  You're arguing -- that's argumentative.

22        He says it the way he says it.  You say it a

23   different way.

24   BY MS. PLOMIN:

25   Q   Okay.  The interview with Mr. Leon, did you learn in the

1    course of your investigation that Mr. Leon was, in fact,

2    selling an AK-74 in January of 2015?

3    A    I did not learn that.  He claimed he had sold it in

4    October of 2014.

5    Q    Okay.  And then he was interviewed again on May 28th of

6    2015.  Did you review that 302?

7    A    I don't recall a second one.

8    Q    I'm putting a document on the screen to refresh your

9    recollection as to whether or not you reviewed the interview,

10   the May 28th interview of Mr. Leon.

11   A    I don't recall if I have seen this one or not, but it

12   contains some of the same information from the other one.

13   Q    All right.  So you were not aware that Mr. Leon told the

14   FBI that he was selling an AK-74 in January of 2015?

15   A    I don't remember seeing this.

16   Q    I'm just asking.

17           So you're not aware testifying today --

18           THE COURT:  He just answered the question,

19   Ms. Plomin.

20   BY MS. PLOMIN:

21   Q    And during the course of your investigation, did it become

22   clear -- did you learn that Mr. Leon was selling an AK-74 of

23   the same caliber and same make that was found in Garland,

24   Texas?

25   A    I learned that he -- yes, that he had sold -- he claimed

1    he had sold one that matched those same things, yes.

2    Q   All right.  And what was the make and the caliber of the

3    AK-74 that was found in Garland, Texas?

4    A   It was an AK-74, 5.45x39 millimeter caliber weapon.

5    Q   And who was it made by?

6    A   Elk River Tool and Die.

7    Q   And that was the same weapon Mr. Leon said he was selling

8    in January?

9    A   That same kind.

10   Q   Now, after learning this information about Mr. Leon, did

11   you investigate his Backpage account to determine who or with

12   whom he communicated about this AK-74?

13   A   There were other, so I did not personally, no.

14   Q   And did the FBI?

15   A   It's my understanding that they did, yes.

16   Q   They reviewed his Backpage account?

17   A   I don't know that they reviewed his Backpage account.

18   Q   Did you do a -- ask for a consent or do a search warrant

19   for his e-mails?

20   A   I did not.

21   Q   Did the FBI do that?

22   A   Not that I know of.

23   Q   Did you obtain a copy of his cell phone records?  Did you

24   ask for consent or write a search warrant for that?

25   A   I did not.

1    Q    Did the FBI do that?

2    A    I don't believe -- what's that?

3    Q    Did the FBI do that?

4    A    I don't know if we did.

5    Q    Did you interview anybody that Mr. Leon knew to determine

6    whether he had a connection to Mr. Soofi and Mr. Simpson?

7    A    I personally?

8    Q    Yes.

9    A    I did not personally that I know.

10   Q    Did the FBI do that?

11         MS. BROOK:  Objection.  Speculation.

12         THE COURT:  Overruled.  You may answer if you know.

13         THE WITNESS:  I don't know if the FBI did that.

14   BY MS. PLOMIN:

15   Q    What did you do to follow up with Mr. Leon and the text

16   message you found in Mr. Soofi's phone?

17   A    Me personally?

18   Q    The FBI that you know of?

19   A    Well, from -- so from the two -- it sounds like they did

20   an initial interview and then interviewed him again to see if

21   there was any more to it or any information we could use and

22   determined there was not.

23   Q    All right.  And did you -- did the FBI do anything to

24   follow up on that interview or those interviews?

25   A    Not that I know of.

1    Q   All right.  Could you look at Exhibit 546, please.

2    A   Yes.

3    Q   Have you seen Exhibit 546 before?

4    A   Yes.  I recognize it.

5    Q   And that came from Mr. Soofi's phone as well?

6    A   Yes.  I believe so.

7    Q   Your Honor --

8            And is this an accurate depiction of what you saw in

9    the report from Mr. Soofi's phone?

10   A   Yes.

11           MS. PLOMIN:  Permission to admit and publish, Your

12   Honor.

13           THE COURT:  Is there any objection to 546?

14           MS. BROOK:  No objection.

15           THE COURT:  546 is admitted.

16       (Exhibit No. 546 admitted in evidence.)

17   BY MS. PLOMIN:

18   Q   What date was this text message on?

19   A   It's January 5th of 2015.

20   Q   And 10:46 p.m.?

21   A   Yes.

22   Q   And the content says "$700," correct?

23   A   Yes.

24   Q   And the phone number who the message is from ending in

25   7302, did the FBI determine whose phone number that was?

```
 1    A    Yes.

 2    Q    And whose phone number was that?

 3    A    It was an individual named Baiz, I believe.  B-A-I-Z.

 4    Q    Ali Biaz?

 5    A    Yes.  That's right.

 6    Q    And did the same agents who interviewed Mr. Leon interview

 7    Mr. Biaz?

 8    A    I'm not sure who conducted the interview.

 9    Q    Did you review a 302 from a May 20th interview from

10    Mr. Ali Biaz?

11    A    I don't recall the date, but I did review an interview of

12    him.

13    Q    Would it refresh your recollection to look at the 302 for

14    the date?

15    A    Yes.

16    Q    Does that refresh your recollection?

17    A    Yes.

18    Q    And what date was that interview on?

19    A    It was on or about May 20th of 2015.

20    Q    And in your review of this 302, did you learn in the

21    course of your investigation that Mr. Biaz was selling an

22    AK-47 in January 2015?

23    A    Yes.

24    Q    And can you tell us a little bit about Mr. Biaz?

25         Have you ever interviewed him?
```

1    A    No.

2    Q    And did you learn how much Mr. Biaz was asking -- how much

3    money Mr. Biaz was asking for the sale of that AK-47 in

4    January of 2015?

5    A    I did.

6    Q    How much was that?

7    A    He was asking $700 for his AK-47.

8    Q    All right.  And Mr. Biaz -- did you learn that he actually

9    had seen Mr. Simpson shopping in his parents' market?

10   A    That he had -- when?

11   Q    He had seen Mr. Simpson before.

12   A    At some point in the past or something?

13   Q    Yes.

14   A    I'm not aware of that, but.

15   Q    Do you know if he was shown pictures of Mr. Simpson and

16   Mr. Soofi to see if he knew them?

17         MS. BROOK:  Your Honor, I object to hearsay and

18   speculation.

19         THE COURT:  Sustained.

20   BY MS. PLOMIN:

21   Q    So with respect to Mr. Biaz, when did you learn about this

22   information in Mr. Biaz's interview on May 20th, 2015?

23   A    This was another one of those that as it was -- the

24   investigation was going on, I believe it came to my attention

25   and I saw it.

```
1    Q   All right.  Any idea when you learned of it?

2    A   I don't recall the exact date.

3    Q   Do you think it was in 2015?

4    A   Yes.

5    Q   All right.  And once you learned that Mr. Biaz had been

6    communicating with Mr. Soofi about an AK -- well, about $700

7    and he was selling an AK-47, what did you do to investigate

8    him?

9    A   Well, when I reviewed the 302 of his interview, I

10   determined there was no need based on the information in that

11   302.

12   Q   Okay.  So you didn't review any of his accounts or his

13   financial records, anything aside from his word?

14   A   No.  Yeah.  Based on the description of the weapon he was

15   selling, I determined that there was no need.

16   Q   All right.  And that description came from him, correct?

17   A   From the investigators there who were filling out the --

18   who were drafting the report.

19   Q   Right.  But you didn't have any definitive evidence?  You

20   just had what he told them, correct?

21   A   That's what I -- yes.

22   Q   And Mr. Leon and Mr. Biaz both denied selling those

23   weapons to Mr. Soofi, right?

24   A   Yes.  Both denied that.

25   Q   And you decided to take their word for it and not
```

```
 1   investigate any further; is that right?
 2          MS. BROOK:  Objection, Your Honor.  Asked and
 3   answered.
 4          THE COURT:  Sustained.
 5          MS. PLOMIN:  I don't have anything further.
 6          THE COURT:  Ms. Brook.
 7          MS. BROOK:  Thank you.
 8                    REDIRECT EXAMINATION
 9   BY MS. BROOK:
10   Q    Good afternoon.
11   A    Good afternoon, ma'am.
12   Q    So let's start off right where defense counsel left off in
13   talking about Mr. Leon and Mr. Biaz.
14          Defense counsel has asked you about tracking down
15   prior owners of weapons in order to determine the source or
16   derivative purchase of the weapons found in this particular
17   case.
18   A    Yes.
19   Q    What's a trace report?
20   A    A trace report is an official report produced by the ATF.
21   And, essentially, it's an official report that lists the
22   current registered owner of a firearm.
23   Q    So does it show exactly who the current owner of a firearm
24   may be?
25   A    Not necessarily.
```

1    Q    So can you explain that?

2    A    Yes.  So in some states, Arizona included, if a private

3    owner sells a handgun to another private owner, there's no

4    record that's required to be kept.

5         And so the records that ATF has are records that are

6    given, you know, when this firearm is originally purchased.

7    So typically, for people in Arizona, that would be the person

8    who purchased it from a gun store or from a commercial

9    enterprise of some sort.

10        They would produce that report that ATF would have,

11   but then there would be no record of who they sold it to or

12   who that person had sold it to and on and on.

13   Q    So in those cases where there are not official trace

14   reports because the keep weapon itself wasn't purchased

15   through a federal firearms licensee or something where those

16   reports are generated, how might you determine where a weapon

17   came from?

18   A    Well, there's two ways, I guess.

19        One, is if the person who had the weapon told you who

20   they got it from, obviously, you could determine.

21        But the only other way is to basically just start

22   from the original purchaser or the one you have to go

23   interview them to see if they were the ones that provided it

24   or sold it directly to the person who last it now.

25        If not, maybe they'll give you a description of the

1    person they did sell it to.  Then you need to go find that

2    person and interview them and on and on and on.

3         And so depending how long that chain is, it can

4    obviously get a little convoluted.

5    Q   So how many weapons did ATF do trace reports on in this

6    particular case?

7    A   Eight.

8    Q   And did you review those reports?

9    A   Yes, I did.

10   Q   Did you attempt to trace the path of these weapons to

11   Simpson and Soofi and also the two weapons to the defendant?

12   A   Yes, I did.

13   Q   Did you have any success?

14   A   On two accounts.

15   Q   What were those?

16   A   So, one of the ATF reports listed Nadir Soofi as the

17   original owner, so obviously, we were able to determine that

18   that 9 millimeter high point that was discovered in Garland,

19   that was originally purchased by Nadir Soofi.

20        The other one we had success on was the 38 Special

21   that was found in Mr. Kareem's moving truck that he, you know,

22   admitted that was his.

23        That gun, the original owner, was a man named Sean

24   Raper.  He was an individual that testified here.  And so when

25   we went out and interviewed Mr. Raper, he provided a detailed

 1    description of who the person was he had sold it to.  Without

 2    us talking to him, he mentioned details about Mr. Kareem that

 3    we know he wouldn't have known.

 4              MR. MAYNARD:  That's beyond the scope -- it's

 5    hearsay.

 6              THE COURT:  I think he stopped answering when you

 7    started objecting and Ms. Brook is going to ask a new

 8    question.

 9    BY MS. BROOK:

10    Q   So let's go back to that 9 millimeter high point that you

11    talked about and you said that there was a trace history

12    tracing it back to Nadir Soofi.

13              That was purchased from a gun store, an FFL?

14    A   Yes.

15    Q   In what year?

16    A   It was in or about 2010.

17    Q   And then the other trace report was the 38 Special that

18    Sean Raper had testified about selling it to the defendant.

19    A   Yes.

20    Q   So with the other six weapons, what did you do to take

21    steps to identify if you could find the person that sold those

22    weapons?

23    A   Yes.  So as soon as we received those trace reports, leads

24    were sent out to investigators in the areas where those

25    original owners resided and interviews were conducted to see

1    if they could determine, first of all, whether that original

2    owner had directly supplied the weapon.

3           Or, like I had explained before, whether that

4    original owner had given it to someone else.  And then if that

5    "someone else" was able to be identified, additional leads

6    were sent to go interview that someone else and so on.

7    Q   Were you also able to look at text messages in this

8    particular case and attempt to track down if a sale of a

9    weapon happened based upon some text messages that you saw?

10   A   Yes.

11   Q   Ms. Plomin showed you a couple of different text strings.

12   One was Exhibit No. 545.  Was this the conversation with

13   Mr. Leon?

14   A   Yes.

15   Q   And based upon the 302 that was shown to you in your

16   investigation in this particular case, did the followup with

17   Mr. Leon lead to any useful evidence in this case?

18   A   It did not lead to any useful evidence.

19   Q   Can you explain that?

20   A   Yes.  So Mr. Leon's description of the person he'd sold

21   the weapon to changed.  The type of vehicle that was

22   described, I think -- I believe it was a red Jetta was the

23   person had driven in.  And so based on all that information,

24   there was no conclusive way for us to get any investigative

25   value from the information he was providing us.

1    Q    And in this case are you aware of Elton Simpson, Nadir

2    Soofi, or the defendant driving a red Jetta?

3    A    I am not.

4    Q    Additionally, the visual description of the individual he

5    sold that AK to, did it in any way match any of the suspects

6    in this case?

7    A    It didn't.  And the other thing from the text messages, we

8    couldn't tell that a sell had ever actually taken place.  So

9    if we had, you know, evidence in there where, "hey, thanks for

10   the sale, it was a pleasure doing business," you know, a

11   message of that sort, we could have drawn more conclusions.

12        But based on the text messages we have, we couldn't

13   confirm that a sale had taken place from them either way.

14   Q    These particular text messages that we have seen and that

15   are admitted, were they consistent with evidence that you have

16   seen in this case regarding Nadir Soofi's interest in

17   purchasing an AK-style weapon in January of 2015?

18        MR. MAYNARD:  Objection to the form of the question.

19        THE COURT:  Overruled.  You may answer.

20        THE WITNESS:  They are consistent.

21   BY MS. BROOK:

22   Q    Defense counsel also showed you Exhibit No. 546.

23        Based upon your investigation, were these the

24   communications, the text messages recovered with Mr. Biaz?

25   A    Yes.

1    Q    Additionally, based upon the timing of these particular

2    text messages, what probative value did they have in your

3    investigation based upon the requests or what the individual

4    Mr. Soofi was looking for?

5    A    I'm sorry.  Could you repeat the question?

6    Q    Did they have any value, the text messages, in terms of

7    what Nadir Soofi was looking for in January of 2015?

8    A    Yes.

9    Q    How so?

10   A    Well, as -- I know Ali had testified there's a weapon that

11   was purchased for $700.  So, obviously -- and we had

12   information to believe that weapons were purchased around that

13   date.

14         So clearly, we were interested in anything that would

15   come up that would indicate who that potential seller was.

16   Q    I want to talk about Mr. Biaz and the report that he gave.

17   Based upon the 302 and the information you had about the

18   communications back and forth with Mr. Biaz, was there any

19   indication that a sale was made?

20   A    There was no indication that a sale was made.

21   Q    And, additionally, the AK-style weapon that Mr. Biaz was

22   attempting to sell, what make was that?

23   A    I can't recall the full name but it was Century.

24   Q    I'm going to place on the overhead a report which is not

25   admitted into evidence.  Does that refresh your recollection?

1    A    That does.

2    Q    And, specifically, what was the weapon that Mr. Biaz was

3    attempting to sell back in January of 2015?

4    A    So the AK that he was selling was called a Century Arms,

5    so Century Arms brand AK-47.

6    Q    And is that in any way consistent with any of the weapons

7    involved in this case?

8    A    It is not.  They are not that brand.

9    Q    I want to turn next to Exhibit No. 565 which defense

10   counsel was asking you about.  I'm going to place them on the

11   overhead.

12         Are these the text messages from the defendant's

13   phone, that Maxwest phone, on May 1st and May 2nd?

14   A    Yes.

15   Q    And can you tell us what is -- what was Elton Simpson's

16   phone number during this time period?

17   A    I believe the last four were 8392, I believe.

18   Q    And in cross-referencing those last four digits, do you

19   see any contact with Elton Simpson on May 1st or May 2nd?

20   A    I don't.  Could you please slide it up?

21         MS. BROOK:  May I, Your Honor, just bring him the

22   physical exhibit?

23         THE COURT:  He actually has it.

24         MS. BROOK:  Oh, great.  All right.

25         THE WITNESS:  I do not see any contacts with that

1    number.

2    BY MS. BROOK:

3    Q   Defense counsel asked you about a lunch invitation.

4            Again, I'm just turning to page 2.  So page 2 takes

5    us down to the middle of May 2nd.  Again, do you see that

6    number?

7    A   I do not.

8    Q   And next, I'm going to focus in on that first text message

9    that defense counsel asked you about, the invitation that went

10   out, and you don't see any text messages to Elton Simpson?

11   A   I don't see any to Elton Simpson.

12   Q   Was the invitation for dinner or lunch?

13   A   It's for one o'clock.

14   Q   A meal at one o'clock?

15   A   A meal at one o'clock.

16   Q   And just for clarification, that was one o'clock on

17   Saturday, the 2nd?

18   A   Yes.

19   Q   Based upon review of text messages in this case, have you

20   seen text message exchanges in the previous day, earlier, and

21   I guess on April 30th back and forth with Elton Simpson and

22   the defendant?

23   A   Yes.

24   Q   And what was the nature of those communications?

25   A   I recall there being approximately, you know, six calls

1    back and forth, two of which were seven-minute duration calls

2    between the two on the evening of the 30th.

3    Q    And do you recall what the purpose of those messages were,

4    the text messages?

5    A    I don't recall off the top of my head.

6    Q    I'm going to place on the overhead what has already been

7    admitted and published as Government's Exhibit No. 478.

8           In looking at these messages, what have you inferred

9    was the time where dinner with Elton Simpson was set up?

10   A    It would have occurred between 7:12 and 9:12 p.m.

11   Q    On what day?

12   A    On April 30th, which was a Thursday.

13   Q    Okay.  And, additionally, can you read for us the message,

14   the 9:12 message on May 1st of 2015?

15   A    "Wa Alaykim salam wrwb.  Sorry about yesterday for the

16   punches and for today akhi.  I won't be able to make it.  I

17   know you hooked it up though.  LOL."

18   Q    Defense counsel has asked you a number of questions about

19   interviewing individuals and witnesses in this particular

20   case.  And is it routine for the FBI to record interviews for

21   people who are not considered to be suspects?

22   A    No.

23   Q    Describe for us what is a noncustodial interview?

24   A    A noncustodial interview is a voluntary interview.  It's

25   one where someone comes in or meets us voluntarily.  They can

1    leave at any time.  They can -- and end the interview at any

2    time.  So just completely voluntary.

3    Q    And what's a consensual interview?

4    A    A consensual is essentially the same thing.  So it

5    would -- we've asked them, "May we interview you."  And the

6    person has said, "Yes you may."  And then an interview takes

7    place.

8    Q    Is there a policy within the FBI about when an interview

9    should be recorded?

10   A    Yes.

11   Q    What's that policy?

12   A    Whenever we're doing what's called a custodial interview,

13   the policy is there is a presumption that it will be recorded.

14          So a custodial interview, obviously, is if someone is

15   under arrest or they're essentially not free to leave, that

16   they're being, you know, brought in in that sense.  That's a

17   custodial interview.  So in that case there is a presumption

18   we will record.

19          However, with the policy, obviously, there are still

20   exceptions to that presumption, various circumstances where it

21   wouldn't.  But the general presumption is that it will be

22   recorded.

23   Q    Is it a mandatory rule that it must be recorded?

24   A    It's a presumption.  Because there's exceptions to it, I

25   don't know if I would say it's a mandatory rule.

```
 1              It is the general -- I can't think of any situations
 2     where one of the exceptions has been used, so.
 3     Q   So what is the rule as it relates to consensual
 4     interviews?
 5     A   For consensual or those voluntary interviews, our policy
 6     says you may record.
 7     Q   Okay.  Again, is it a rule that you must record?
 8     A   No.  And it's generally not -- in a noncustodial
 9     interview, it would generally not be the practice to record an
10     interview.
11     Q   Can you explain that?
12     A   Yes.  So FBI agents and other employees too at the FBI
13     conduct interviews all the time.  And so most of those
14     interviews, they can range from people just coming into the
15     office to tell us about things they're concerned with.  They
16     may be us going out into the community and meeting with
17     community leaders and having interviews and discussions to a
18     wide range of things.
19              And so most of those interviews are just simply not
20     going to be recorded.
21              Instead, agents are trained at the FBI -- you know,
22     FBI Academy at Quantico on how to conduct interviews, to
23     remember them and take notes and that sort of thing.  And then
24     to memorialize those interviews when needed to on what I
25     described earlier as an FD 302 which is our form.
```

 1   Q   So your interview with the defendant on May 5th of 2015,

 2   was -- what type of interview was that?

 3   A   That was a noncustodial interview, so voluntary interview.

 4   Q   We have heard testimony from you about how you, Special

 5   Agent Taylor, and Detective Nash worked together to attempt to

 6   record that interview.

 7        Before the interview happened, did you tell the

 8   defendant that it was going to be recorded?

 9   A   I did not.

10   Q   The recording equipment itself, was it -- was it set up in

11   a place where it couldn't easily be seen?

12   A   Yes.  It was concealed.

13   Q   Defense counsel has asked you about --

14        THE COURT:  I just wanted to follow up because I

15   think one of the juror's questions was:  Why would you

16   surreptitiously record a noncustodial interview?

17        THE WITNESS:  Okay.  Well, that -- so again, it's

18   abnormal to do that.

19        But in a case like this, I think, where, you know, an

20   attack had taken place and people were coming in who may be

21   associates and to kind of take an extra step because of the

22   magnitude that there was a lot of people involved, obviously,

23   I wasn't a case agent for that case.  I was just someone

24   assisting them at that point.

25        And so there was that added benefit of capturing a

1    recording so then that agent on those cases could actually go

2    in and listen to that recording again as well and then also

3    they could read my report.

4          But for all of those reasons, and again, in this

5    case, there were case agents on the Simpson/Soofi matters and

6    that was kind of their call to make that they wanted to have

7    all their interviews recorded.

8          And so that's why initially you'll see a lot of the

9    interviews conducted towards the beginning of the

10   investigation are all recorded because that was kind of a

11   general mandate that came down from those case agents.

12         Obviously, then later as the investigation moves,

13   then that judgment call of whether or not a recording is

14   needed would have fallen to me then once it got to the part

15   for my investigation, if that makes sense.

16         THE COURT:  But why surreptitious?

17         THE WITNESS:  Oh, sorry, Your Honor.  That was your

18   question.

19         So the reason to do it surreptitiously, obviously,

20   there's times when a recording will be put on the table and

21   you can record and interview that way.

22         But my experience, just like taking notes in front of

23   someone while you're talking to them, it's extremely

24   distracting.  And I think, again, you know, our job is to get

25   at the truth, whatever that truth is, we want the truth.

1        And so if there's something we can do that can put

2   people at ease and we can just get the truth, whatever that is

3   from them, then I think that's the best policy.

4        And so in these kind of circumstances, obviously, if

5   I told them, you know, in an interview like that that it was

6   being recorded, I think it would be less likely that I would

7   get completely honest answers versus if I told them that it --

8   if I didn't tell them either way whether it was being

9   recorded.

10  BY MS. BROOK:

11  Q   So the interview on May 5th of 2015, Detective Nash took

12  copious notes?

13  A   Yes.

14  Q   And I just want to talk about your practice.  So you

15  mentioned before that oftentimes it's the case that you do

16  interviews and there isn't recording equipment set up

17  simultaneously.

18       Is it routine for you to write and draft reports

19  based upon notes --

20       MR. MAYNARD:  Objection, Your Honor.  This has been

21  asked and answered a number of times.

22       THE COURT:  Sustained.

23  BY MS. BROOK:

24  Q   I want to talk about the security camera.

25       Defense counsel asked you questions about a

1    particular e-mail and communications with an individual within

2    the FBI who said they couldn't recover the information on the

3    SD card.

4    A   Yes.

5    Q   Are you aware of any agent ever requesting security camera

6    footage from your office's security camera in any

7    investigation?

8    A   I have never heard of that ever being done in any

9    investigation.

10   Q   Security camera footage, does it contain audio?

11   A   No.  It's video only.

12   Q   Can you explain for us where exactly was the video camera

13   positioned in the interview room -- the interview room where

14   you conducted the interview with the defendant on May 5th?

15   A   So our interview rooms have a small camera that's located

16   in the ceiling that kind of pans down on the room.  It's a

17   wide-angle shot that's -- its intention is to capture all the

18   movement in the room.

19         Obviously, it's security, so it's primarily for

20   safety consideration.  So to make sure you can see the entire

21   room and know if anyone is in that room and then also to be

22   able to see their behavior.

23         And then obviously, that feed is monitored in what we

24   call an Op Center so they can see what's going on.  So should

25   we be in an interview room and something bad were to happen,

1    there would be people watching that who could then send aid to

2    us.  That's its purpose.

3    Q   The angle itself, is it focused in on anybody's faces?

4    A   No.  No.  So like I said, it's a wide-angle camera that's

5    kind of aiming down from the ceiling.  It's mostly the top of

6    your head.

7           So kind of the way we're sitting, it would have been

8    coming down the back of our heads and kind of the top of

9    Mr. Kareem's head.  And, again, it's not really designed to

10   capture what's going on.  There's no audio, obviously, but

11   it's to see where everyone is moving, where your hands are,

12   that kind of thing, for safety purposes.

13   Q   Defense counsel also asked you about recording pretrial

14   witness interviews with prosecutors.

15   A   Yes.

16   Q   In this case did you record those interviews?

17   A   Pretrial interviews?

18   Q   Correct.

19   A   Never.  No.

20   Q   And in any case have you ever recorded pretrial

21   interviews?

22   A   Never.

23   Q   In your experience what's the general purpose of a

24   pretrial witness interview?

25   A   So a pretrial interview is an opportunity for the

 1    prosecutors to speak with a person who is a potential witness

 2    to kind of explain what the process is going to be, what they

 3    can expect, that kind of thing, just to give them a general

 4    overview of the process.

 5          And then also to go through the things that -- the

 6    information they have provided and then to make sure the

 7    prosecutors have a complete understanding of all that

 8    information.

 9    Q   And during the course of interviewing any witness, have

10    you ever told any of them what any other witness has said?

11    A   Never.

12    Q   In pretrial witness interviews, is there an admonition

13    that's given to every witness?

14    A   Yes.

15    Q   What is it?

16    A   It's just to tell the truth.  So over -- any time you go

17    to pretrial interview, that's going to be something that's

18    repeated over and over to kind of help set them at ease.

19          It's just at the end of the day when you're on the

20    stand, just tell the truth and then you don't have to think.

21    You just tell the truth.

22          So that's the only admonition that's given.

23    Q   And in this case in any interview or every interview that

24    you conducted pretrial or during the investigation itself,

25    when new information came forward, did you generate a report?

1   A   Yes.

2   Q   Defense counsel has asked you about 302s.  Are those the

3   reports that you generate?

4   A   Yes.  Those are the reports.

5   Q   And every time there is new or additional information, do

6   you note it and put it into a report?

7   A   Yes.  Any time new information comes out, obviously, I

8   will put that in a report.

9   Q   From the beginning in this case, approximately how many

10  302 reports have been drafted?

11  A   This is a guess, but I would say probably 300 to 400 or

12  more, maybe even more than 400.

13  Q   And did you author every single report?

14  A   No.

15  Q   Approximately, how many FBI agents were involved in the

16  investigation of this case?

17  A   Between the various field officers throughout the United

18  States, I would say more than 200 special agents for sure.

19  Q   And how many intelligence analysts?

20  A   My estimate, probably minimum of 20 analysts, again, from

21  offices throughout the United States that would have been

22  involved.

23  Q   Defense counsel asked you specifically about Ali Soofi's

24  interviews.  He spoke about the two pretrial interviews; one

25  in September and another one in January.

1              He asked you about the September interview and asked

2     whether or not Ali Soofi talked about disassembling,

3     lubricating, and reassembling weapons, how he had watched the

4     defendant teach Simpson and Soofi how to disassemble,

5     lubricate, and reassemble the weapons.

6              MR. MAYNARD:  Objection to the form of the question.

7              THE COURT:  Sustained.

8     BY MS. BROOK:

9     Q    He asked you about how Ali Soofi reported in January that

10    process.

11    A    Yes.

12    Q    In September during that interview, you were there for it?

13    A    Yes.

14    Q    At any point was Ali Soofi asked whether or not he had

15    seen anybody disassemble, lubricate, or reassemble weapons?

16    A    He was not asked that.

17    Q    In the January interview, was he specifically asked that

18    question?

19    A    I think as he was reliving the moment and talking about --

20             MR. MAYNARD:  Objection.

21             THE COURT:  Yes.  Could you answer Ms. Brook's

22    question.  It was:

23             "In the January interview was he specifically asked

24    that question?"

25             THE WITNESS:  I think, yes, eventually, yes.

```
 1              THE COURT:  Excuse me, Ms. Brook.  We're going to
 2   take our afternoon break.
 3              Ladies and gentlemen, we will reconvene in 15
 4   minutes.  You're reminded of the usual admonitions.
 5              Court is in recess for 15 minutes.
 6         (Recess taken at 2:32 p.m.; resumed at 2:47 p.m.)
 7              THE COURT:  Thank you.  Please sit down.  The record
 8   will show the presence of the jury, counsel, and the
 9   defendant.
10              Ms. Brook, you may continue.
11              MS. BROOK:  Thank you, Your Honor.
12   BY MS. BROOK:
13   Q   Defense counsel asked you questions about Stefan Verdugo
14   and the process of interviewing him and how everything came
15   forward.
16              When this investigation began, did the FBI seek out
17   Stefan Verdugo?
18   A   No.
19   Q   Can you explain that?
20   A   Yes.  Stefan Verdugo came forward of his own free will, I
21   guess.  After seeing the news reported, he reached out and
22   contacted the FBI.
23   Q   And the information that Stefan Verdugo provided, was that
24   before or after he was arrested and charged in that other
25   case?
```

1    A    It was before.

2    Q    After it came to the FBI's attention that Stefan Verdugo

3    had been charged in another case, did the FBI assist in

4    arresting Stefan Verdugo?

5    A    Yeah.  It was actually the FBI that arrested Stefan

6    Verdugo.

7    Q    Defense counsel asked about the $500 payment that Stefan

8    Verdugo received.  Was that before or after he had provided

9    information?

10   A    That was after he had already provided information.

11   Q    Did Stefan Verdugo ever request any money?

12   A    No.  He never asked for a cent.

13   Q    Why did the FBI pay him $500?

14   A    Well, there were a couple reasons.

15        First, meeting with him, we were requiring him to

16   meet us at very late hours and in locations throughout the

17   Phoenix Metro area and we were asking him to provide his own

18   transportation to those areas.  So part of it was just to give

19   him money to pay for the fuel and gas, you know, that kind of

20   thing, so that he would continue to agree to meet with us as

21   the investigation moved forward.

22        The other reason was we learned in our talks with him

23   that he had a fine for a suspended license.  And so there was

24   a worry that in the course of our investigation, he could get

25   pulled over for that suspended license and not be able to

```
 1    continue to assist.

 2            And so when we found out that amount was around $500,

 3    we told him we would give him $500, expecting him to pay that,

 4    so that he would not have a suspended license anymore and so

 5    then he could continue to go forward.

 6    Q   Defense counsel asked you if during suspect interviews you

 7    lie to somebody that you're interviewing?

 8    A   Yes.

 9    Q   Why do you do that?

10    A   Well, it's -- sometimes people are less than forthcoming

11    and so there is a need, occasionally.  But essentially, I mean

12    I'm trying -- I don't think I have ever -- the only lie I have

13    ever given is pretended I know more than I really know.

14            MR. MAYNARD:  Objection.  It's beyond the scope of

15    the question.  He's now going beyond that.

16            THE COURT:  The objection is overruled.  The answer

17    will stand.

18    BY MS. BROOK:

19    Q   Are you trained tactically at the FBI to use that?

20    A   Yes.

21    Q   How so?

22    A   Well, so by -- so basically, how we describe it as

23    whenever you're going to make an accusation, you need to be

24    able to back up that accusation with facts.

25            And so there comes a point when you may need to kind
```

1    of create those, so to create the appearance that we know more

2    than we really do, and then that encourages the person we're

3    interviewing to tell us the information we don't know.

4          And then as we receive that information we don't

5    know, we use that and piece it together as the interview is

6    going on to then draw other conclusions, again, as a way to

7    motivate them to tell us the truth.

8    Q   Defense counsel yesterday asked you if you are invested in

9    this case.  What did you mean?

10   A   By "invested"?  Well, I mean, like any of my cases,

11   obviously, it's my duty to do the best I can to successfully

12   see the investigations to a conclusion.  So I'm invested in

13   all my cases in that sense.

14   Q   And "cases," do you have more cases than just this case?

15   A   Yes.  Yes.  Actually, I have twelve.

16   Q   Defense counsel also asked you about an e-mail from

17   December.  And I'm going to put it on the overhead.  It's 558,

18   an e-mail where you stated:

19          Fantastic news.  Thank you all three -- or thank you

20   all three of you for all the hard work.

21          Can you explain that?

22   A   Yes.  This was -- so in the process of pursuing the

23   different charges, there was a lot of work being done by

24   individuals.  And so, essentially, I was just trying to send

25   an e-mail to thank people for their hard work and to motivate

1    them to continue to want to work hard.

2          These are the same kind of, you know, e-mails I would

3    send for other members of the team when they, you know, work

4    long hours.

5          I think as we described, the 24/7 surveillance, so

6    obviously, we weren't doing surveillance for 24/7 but we were

7    working 24/7 until we knew this investigation had been done,

8    you know, same like we do all our investigations.

9          And so when I saw this e-mail, again, that was just a

10   way to try to make everyone -- you know, to tell the people I

11   appreciated their hard work.

12   Q    Did you believe that the charged were merited based upon

13   the evidence in this case?

14         MR. MAYNARD:  Objection to the form of the question

15   and also calls for -- well, speculation.

16         THE COURT:  Overruled.  You may answer.

17         THE WITNESS:  Yes.  I mean, obviously that --

18         THE COURT:  "Yes" is sufficient.

19         THE WITNESS:  Yes.  Yes.

20   BY MS. BROOK:

21   Q    And do you have any personal stake in the outcome of this

22   case?

23   A    No.  I mean, other than it's my job to find the truth and

24   to do the best job I can on every case I have.  So as long as

25   that's being accomplished, then that's good.

1  Q   Defense counsel asked you about the timing of drafting a

2  report for -- in conjunction with Stefan Verdugo.

3        And, specifically, he asked about a report that was

4  drafted on December 16th of 2015.  And defense counsel stated

5  that that report was drafted prior to visiting Verdugo in

6  custody.

7  A   Yes.

8  Q   I want to place on the overhead what has not been

9  admitted.  In looking at that report, does that refresh your

10 recollection on the date that the interview was conducted with

11 Stefan Verdugo at the Lower Buckeye Jail?

12 A   Yes.

13 Q   And what date was it?

14 A   It was on December 15, 2015.

15 Q   So a day before the report was drafted?

16 A   Yes.

17 Q   During the break did you have a chance to refresh your

18 recollection on Elton Simpson's phone number?

19 A   Yes.

20 Q   And what is it?

21 A   Well, it's the last four ending in 6382.

22 Q   So going back and placing on the overhead what's already

23 been admitted as 565 and cross-referencing that number with

24 these text messages, do you see any contact between the

25 defendant and Elton Simpson in terms of inviting him over to

1    dinner or lunch on May 2nd?

2    A   I do not.

3    Q   Defense counsel asked you about whether you subpoenaed

4    medical records for the defendant related to his claim that

5    Karen -- or Karem Gonzalez-Fabian hit him.

6    A   Yes.

7    Q   Don't tell us what was said, but did somebody from the

8    National Insurance Crime Bureau call you?

9    A   Yes.

10   Q   And do you know what the National Insurance Crime Bureau

11   is?

12           MR. MAYNARD:  Objection, Your Honor.  It's beyond the

13   scope.

14           THE COURT:  Overruled.

15           THE WITNESS:  The National Insurance Crime Bureau is

16   a nonprofit organization that teams up with law enforcement

17   and insurance companies, and basically, assists them in

18   identifying and prosecuting those who engage in insurance

19   fraud.

20   BY MS. BROOK:

21   Q   Did you speak to somebody from the National Insurance

22   Crime Bureau?

23   A   Yes, I did.

24   Q   With whom did you speak?

25   A   I spoke with a Special Agent.  His name was Guy Walters.

1   Q   What did you do after talking to Mr. Walters?

2   A   After talking to Mr. Walters, I contacted the victim of

3   the information he had sent, which was Karem Fabian, and asked

4   her for details surrounding the April 6th, 2015, incident

5   where she claimed, you know, someone had banged on her trunk

6   of her car.

7   Q   Defense counsel asked you if the defendant's fingerprints

8   were found on any of the guns found at the crime scene in

9   Garland.

10        To your knowledge, were any of Elton Simpson's prints

11  found on any of the weapons at the scene in Garland?

12  A   Not -- his fingerprints were not found, nor his DNA on any

13  of the evidence in Garland, so weapons or the notebooks or the

14  ISIS flags or anything, no Elton Simpson.

15  Q   Yesterday defense counsel asked you about an indented

16  writing.

17  A   Yes.

18  Q   Was the letter itself ever recovered?

19  A   No.

20  Q   And when you received information back from the lab about

21  the contents of that indented writing, that page, was there a

22  date written on that page?

23  A   There was not.

24  Q   Was there a name written about who it was to?

25  A   No.  It was addressed to Ismala which is a greeting.

```
 1            MS. BROOK:  Can I collect Exhibit 555, 556, and 557
 2   for Maureen to use on the overhead?
 3            THE COURT:  Yes.
 4   BY MS. BROOK:
 5   Q   Defense counsel yesterday asked you about some envelopes
 6   that were found at Elton Simpson's and Nadir Soofi's house.
 7   A   Yes.
 8   Q   Specifically, he asked you about three of them.  And I
 9   want to walk through them one at a time.
10            The first is Exhibit No. 557, already admitted.  I'll
11   span out and then focus in.
12            In looking at this and having seen the original,
13   what's the postmark date on this?
14   A   It's postmarked August 4th of 2010.
15   Q   I want to turn to the second which is already admitted,
16   Exhibit No. 556, and then I'm going to zoom in.
17            What's the postmark date on this letter?
18   A   This is March 12th, of 2012.
19   Q   I want to turn last to the third letter which is Exhibit
20   557 and then zooming in.
21            I think I transposed that.  Hang on one moment.  We
22   looked at that one.
23            Let's do this one 555.  Zooming out and now all the
24   way into the date.  What was the postmark date on this
25   particular letter?
```

1    A   This letter was postmarked September 15th, 2014.

2    Q   Have you had occasion to review the letter that was

3    contained within this envelope?

4    A   Yes, I have.

5    Q   And the government is going to move to admit Government's

6    Exhibit No. 498.  Let me put it on the overhead so the witness

7    can identify it.

8            Do you recognize this?

9    A   I do.

10   Q   And what is it?

11   A   This is the letter that was inside that envelope that was

12   dated 2014 and addressed to Elton Simpson.

13           MS. BROOK:  The government moves to admit

14   Government's Exhibit No. 498.

15           MR. MAYNARD:  Objection.  Lack of foundation.  Plus

16   it's beyond the scope.

17           THE COURT:  The objection is overruled.  498 is

18   admitted.

19       (Exhibit No. 498 admitted in evidence.)

20           MR. MAYNARD:  Can I have a copy?

21   BY MS. BROOK:

22   Q   I want to take a step back.

23           So Hassan Abu Jihaad who is that?

24   A   Hassan Abu Jihaad was an individual originally from

25   Phoenix who was indicted on terrorism and espionage charges in

UNITED STATES DISTRICT COURT

1    or about 2008 for information he provided to al-Qa'ida while

2    employed as a member of the U.S. Navy.

3    Q    The letter we looked at just a moment ago which is now

4    admitted, have you had an opportunity to read and review this

5    letter?

6    A    Yes.  I have read this letter before.

7    Q    And does this letter discuss a khalif?

8    A    Yes, it does.

9    Q    What does it say?

10   A    Well, it includes a series of printouts, essentially,

11   arguing against the legitimacy of the Islamic State's

12   declaration of the khalifate.

13   Q    Can you explain that?

14   A    Yes.  So in or about June 29, 2014, the Islamic State

15   declared a khalifate.

16        So they declared that they were going to have this

17   single khalif or leader of you Ummah, which is the community

18   of Muslims throughout the world.

19        They declared that on June 29th.  And obviously, with

20   that declaration, there came those that were in favor of it

21   and those that were adamantly opposed to it.

22        And these particular letters are from someone who is

23   adamantly opposed to the declaration of the khalifate.  This

24   comes from, again, Abu Jihaad who is an al-Qa'ida supporter

25   and al-Qa'ida and the Islamic State as Mr. Kohlmann --

1          MR. MAYNARD:  Your Honor, this is beyond the scope.

2     Lack of foundation.

3          THE COURT:  Sustained.  I think it goes beyond your

4     question.

5          MS. BROOK:  And we can move on to the next line of

6     questioning.

7     BY MS. BROOK:

8     Q   Defense counsel asked you about the tracking and

9     monitoring of the defendant starting on May 8th of 2015 and

10    carrying through to June 10th of 2015 when he was arrested in

11    connection with this case.

12    A   Yes.

13    Q   Are you familiar with whether or not there was a tracking

14    device that was placed on his car?

15    A   There was.

16    Q   How did the FBI learn about Sergio Martinez-Chavez?

17    A   From that tracking device.

18         MR. MAYNARD:  Your Honor, that's beyond the scope.

19         THE COURT:  Overruled.  You may answer.

20         THE WITNESS:  So information obtained from that

21    tracking device, as well as surveillance, revealed that

22    Mr. Kareem drove to Sergio Martinez-Chavez's house on the

23    night of May 14th of 2015 and that he arrived there just

24    before midnight still on the 14th on or about.

25         MS. BROOK:  May I have a moment?

1            THE COURT:  Yes.

2            MS. BROOK:  I don't have any further questions.

3            THE COURT:  Thank you, Agent Whitson.  You may step

4    down.

5        (End of Excerpt of Proceedings.)

6                            * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                   C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 8th day of March,

14   2016.

15

16

17

18

19                        s/Elizabeth A. Lemke
                          ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25