Daniel D. Maynard, No. 009211
dmaynard@mmcec.com
Mary K. Plomin, 032368
msplomin@gmail.com
**MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500

Attorneys for Defendant

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 15-00707-PHX-SRB |
| Plaintiff, | **DEFENDANT'S MOTION FOR NEW TRIAL BASED ON PROSECUTORIAL MISCONDUCT** |
| v. | |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

Defendant, Abdul Malik Abdul Kareem ("Mr. Abdul Kareem"), by and through undersigned counsel, respectfully requests this Court grant a new trial based on the United States of America's (the "Government") violation of *Brady* and its failure to provide timely discovery that constitutes outrageous misconduct prior to trial and during the trial and violates Mr. Abdul Kareem's right to due process and a fair trial guaranteed by the Sixth Amendment. This motion is supported by the accompanying memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND ON DISCOVERY ABUSES BY THE GOVERNMENT

Mr. Abdul Kareem was arrested and indicted on June 10, 2015. The Court Scheduling Order required that the Government produce its Final Witness List and Exhibit List by February 8, 2016, originally this disclosure deadline was January 8, 2016. (Dkt No. 46, Ex. 23) On February 8, 2016, the Government filed what was supposed to be its Final Exhibit List which included 350 exhibits. (Ex. 1) However, during the trial, the Government subsequently

disclosed 166 additional exhibits that included material that had never been provided to the defense before trial. (Trial Exhibits 351-499 and 600-616)(Ex. 2) Only 19 of the additional 166 exhibits were rebuttal exhibits. Many of the exhibits were multiple page reports and documents. Not only did the Government disclose 166 new exhibits during trial, but it disclosed 96 of these exhibits either the night before or the day they were introduced. Thus, the jury had been selected, the trial started and the Government, with over two hundred (200) special agents from the FBI and at least twenty (20) FBI analysts working on this case (Trial Transcript, 3-8-16, p. 178) for over eight months failed to list approximately a third of its exhibits before the trial began and failed to turn over significant amounts of discovery. This abuse handicapped Mr. Abdul Kareem's defense to such an extent as to cause him to not receive due process and a fair trial in violation of his Sixth Amendment Rights.

1. **Discovery Abuses**

The Court Scheduling Order required that the Government produce all notices required by Rule 16.1 by September 28, 2015 and all *Brady* disclosures by October 12, 2015. (Dkt. No. 46) As of October 13, 2015, the Government had produced discovery items through bate stamp number 436. (Ex. 3) After that date, the Government produced over 2,800 additional items of discovery. (Bate Stamp # 437-3236)(Ex. 4) Due to the Government's haphazard manner of producing discovery, a bate stamp item number sometimes marked a page of discovery and sometimes marked an entire external hard drive containing tens of thousands of pages of documents produced from up to 15 computers and cell phones. In November 2015 alone, the Government produced 1,065 items of discovery. (Bates Stamp # 437-1502)(Ex. 5) Between December 29, 2015 and February 15, 2016, the Government produced 1,087 additional items of discovery. (Bates Stamp # 1502-2589)(Ex. 6) During trial, the Government produced 647 bate stamped items of discovery in addition to seven computer forensic reports that it e-mailed to defense counsel during the trial. (Ex. 7)

## 2. Daily Summary of Discovery and Disclosures Abuses During Trial

### a) February 18, 2016 Government Disclosures During First Week of Trial

The trial started on February 16, 2016; however, on February 18, 2016, the Government hand delivered two envelopes containing new discovery to the defense at the court. Since trial was on going, the defense team could not review this material until after 5:00 p.m. One envelope contained thirteen CD's containing new discovery (Bates Stamp #2590-2636) and the second envelope contained a 23 page lab report. (Bates Stamp # 2637-2650)(Ex. 8) It was impossible for the defense team that consisted of two attorneys and a part-time paralegal to adequately review all this new material while it was conducting a trial that had already started.

In the evening of February 18, 2016, after having made the late disclosure listed above, the Government produced 302 reports documenting interviews of James Bell and Abdullah Mubarak for the first time via e-mail. (Ex. 9) The Government called Mr. Mubarak as a witness the next day. (*See* Tr. T. 2-9-16) At 11:09 p.m. on February 18, 2016, the Government gave notice via e-mail that they would be calling Amy Vaughn, a forensic computer analyst to testify the next day. (Ex. 10) The Government disclosed that Ms. Vaughn would be testifying about the "review of the CAIR image of the Lenovo Computer, Acer Aspire, Dell Inspiron laptop for Soofi and Simpson and Soofi's desktop computer." (Ex. 10) Amy Vaughan began her testimony on February 19, 2016 and continued testifying on February 23, 2016. On February 19, 2016, after the defense informed the court of the late notification, the Court ordered that the prosecution disclose their witnesses for the following day 24 hours in advance. However, it was impossible for the defense to review, analyze and synthesize all of the newly produced material from the Government.

### b) February 23, 2016 Government Disclosures in Second Week of Trial

On February 23, 2016, the Government hand delivered an envelope containing 23 CD's to the defense in court. (Bates Stamp # 2651-3236)(Ex. 11) Why this was not done over the

weekend is inexcusable, thus, the defense team was not able to review this information until after the close of the trial day, *i.e.*, after 5:00 p.m. One of these CD's alone contained 564 pages of FBI reports including documentation of forensic computer analyses, witness interviews of Amber Pluff, Nathaniel Soofi, and Efran Ochoa. Another CD contained a recorded interview of Efran Ochoa, a former roommate of Mr. Abdul Kareem's which had never been disclosed. The remaining 21 CD's contained volumes of documents relating to the FBI's forensic analysis in this case.

Also on February 23, 2016, the Government hand delivered 22 new exhibits (Trial Exhibits 448-470) to the defense. The Government introduced 13 of those exhibits through computer forensic analyst, Amy Vaughan that day. (Trial Exhibits 450-459 and 467-469) These 13 exhibits consisted of items that the Government's computer forensic analysts extracted from Mr. Abdul Kareem's RCA Nextbook tablet. Prior to disclosing the exhibits, the Government never disclosed a report authored by Amy Vaughan or any other forensic analyst discussing 10 of these exhibits. On January 29, 2016, the Government had disclosed a report written by Amy Vaughan in which she stated that there was "no explicitly radical material found" on the RCA tablet computer, but even this report was disclosed late since Ms. Vaughan had prepared the report on August 26, 2015. (Ex. 12) There is no reasonable explanation why this report was not produced around the time it was prepared. The defense received no notice of any context for these items and had no opportunity to consult its own forensic expert prior to cross examination. It was only on cross examination, that Ms. Vaughan stated that an analyst named Jessica Maxwell, prepared the "final report" regarding the RCA tablet computer on which Ms. Vaughan had been basing her testimony. (Tr. T., 2/23/16 p. 130:23-131:19) The Government had never disclosed that report and the defense was not aware of the existence of that report. Ms. Maxwell had prepared this report on or about January 22, 2016 and the Government had never disclosed this report.

Also, on February 23, 2016 at 6:44 p.m., the Government sent notice by e-mail that it intended on introducing 24 excerpts of Mr. Abdul Kareem's post arrest interview. (Trial Exhibits 407-430)(Ex. 13). The Government has never provided the defense with these excerpts to this day; however, the defense did have the entire interview. But, it was impossible to determine what portions of the entire interview should have been added under the doctrine of completeness without the Government's exhibit.

On February 24, 2016, Carlos and Juan testified for the Government. Despite numerous requests for un-redacted copies of their 302 reports, the Government never provided un-redacted copies of those reports. (Ex. 14)

### c) February 24, 2016 Government Disclosures

On February 24, 2016 at 9:16 p.m., the Government sent three documents via e-mail relating to Jeffrey Evans, who was testifying the next day. (Ex. 15) These documents included 1) a 3 page report prepared by Jeffrey Evans documenting his examination of 14 electronic items received by Evans on August 32, 205 including cell phones and computers 2) items extracted from a "Hirens" CD located in Mr. Abdul Kareem's apartment and 3) a table of contents of that CD. At 9:39 p.m., the Government e-mailed an exhibit that had not been disclosed or listed, on which its fingerprint expert would rely upon the next day. At 10:13 pm the Government sent notification to the Court of 6 new exhibits to be added the next day on February 25, 2016. (Trial Exhibits 472-477) (Trial Exhibit 477 was not on the e-mail to the court but was admitted the next day)(Ex. 16)

### d. February 25, 2016 Government Disclosures

On February 25, 2016, at 4:26 pm, the Government provided, via e-mail, two files containing the internet browsing history from Mr. Abdul Kareem's Lenovo laptop and a report regarding Mr. Abdul Kareem's RCA computer. (Ex. 17) The internet browsing history included a 437 page chart. The report regarding the RCA computer was an analysis of 19 images, most of which Ms. Vaughan already testified about. At 5:50 p.m., the Government sent

via e-mail a version of the internet history log that it had extracted from Mr. Abdul Kareem's Acer computer. (Ex. 18) At 9:09 p.m., the Government sent via e-mail two exhibits containing results of a subpoena for from Mr. Abdul Kareem's gmail account. (Ex. 19) At 11:02 p.m., the government sent 3 attachments including an internet access log of Mr. Abdul Kareem's Acer computer, an exhibit of Mr. Abdul Kareem's cell phone communications after the Garland attack, and an exhibit containing Mr. Abdul Kareem's cell phone communications with Simpson and Soofi. (Ex. 20) At 11:55 p.m., the Government notified the Court of 10 new exhibits it would introduce the following day. (Trial Exhibit 478-487)(Ex. 21) The communications after 9:00 p.m. were not seen by lead counsel for the defense until the morning of February 26, 2016 when he was preparing for that days witnesses.

### e) February 29, 2016 Government Discourses in Third Week of Trial

On February 29, 2016 at 9:15 pm, the Government disclosed 9 new exhibits via e-mail. (Trial Exhibits 48-497)(Ex. 22) Six of the exhibits had been extracted from Mr. Abdul Kareem's Acer computer by a Government forensic analyst. Two exhibits had been extracted from Simpson's cell phone. One of the exhibits contained photographs of pages of a notebook found in Simpson and Soofi's apartment. It was impossible for the defense to properly review these late disclosures and adequately prepare for trial. It is fair to say that the Government produced tens of thousands of pages of documents, videos and other materials after trial started that would take the defense team hundreds of hours to analyze thus depriving Mr. Abdul Kareem of a fair trial and due process pursuant to the Sixth Amendment. Counsel of Mr. Abdul Kareem was not able to review even a fraction of these later disclosed materials since the Government closed its case on March 3, 2016 and the defense had to prepare a dozen witnesses to testify.

The cumulative effect of these late disclosure caused the defense team to constantly be reviewing new material to figure out where it fit and to take it away from the planned preparation and presentation of the defense; *i.e.*, actual innocence.

### 3. *Brady* Violations

The Government's "Brady" deadline was October 13, 2015. (Ex. 23) The Government failed to provide material exculpatory evidence by the deadline and has continued to withhold material exculpatory evidence. The most glaring failure on the part of the Government was the failure to disclose evidence of third party guilt that could have been used to exonerate Mr. Abdul Kareem and for this reason the defense requests an evidentiary hearing to determine the full extent of what the Government has failed to disclose as explained below.

#### a) Ali Baiz and Christian Leon

The Government obtained a cell phone from the Garland scene that belonged to Nadir Soofi. The Government analyzed that cell phone and located text messages exchanged with two cell phone numbers regarding the purchase of an AK-47 rifle and an AK-74 rifle. The Government located the owners of those cell phone numbers with whom Soofi was communicating and determined their identities to be Christian Leon ("Leon") and Ali Baiz ("Baiz"). While the Government interviewed Leon and Baiz between May 20, 2015 and May 28, 2015, it failed to disclose the identity of these individuals or their statements to the defense until February 9, 2016, one week before the commencement of trial. (Ex. 24) The disclosure was made at a time when the Government was making voluminous other disclosures for the first time. Because of the inexcusably late disclosure, it was impossible for the defense to investigate these individuals or prepare a thorough defense. It is unknown whether, at this juncture, the defense has received all information relating to these individuals. Also, it should be noted that the Government disclosed these interviews buried within 154 pages of new discovery and an external hard drive filled with new discovery. (Ex. 24)

To compound this violation, when the Government finally did disclose the names of the individuals with whom Soofi was communicating about purchasing of the weapons, it redacted their phone numbers so the defense could not connect with certainty, which person was connected to which text messages found in Soofi's phone. The Government did not provide

1 the phone numbers for these individuals until March 2, 2016, the night before the cross
2 examination of Agent Whitson and it was too late to perform an adequate investigation. (Ex.
3 25) The defense was not able to locate and interview Leon and Baiz, plus it is believed the
4 Government had additional information it failed to disclose.

### b) Saabir Nurse, James Bradley Bell and John Sabari (AKA Yahya)

6 On January 8, 2016, the Government filed a Preliminary Witness List. The Government
7 listed Saabir Nurse ("Mr. Nurse"), John Sabari ("Sabari"), and James Bradley Bell ("Mr. Bell")
8 as witnesses despite having never disclosed a single statement, document or copy of an
9 interview from any of these individuals to the defense. (Ex. 26)

### 1) Saabir Nurse

11 On November 11, 2015, the Government disclosed a 302 report documenting a letter that
12 had been written in and torn out of a notebook discovered in Simpson and Soofi's apartment
13 to an unknown individual. To the best of the defense's knowledge, the actual letter was never
14 recovered, however the FBI was able to determine the contents of the letter based on
15 indentations made on the page below it after it was sent to the FBI Lab in Quantico, Virginia
16 for electrostatic testing. The letter was signed "Ibrahim" and stated, "the money that I had from
17 you was being used for what was needed for the initial plan but that changed. . ." and stated
18 "I will leave you with the title of my car to do as you please with it." (*See* Trial Exs. 553 and
19 554) The Government provided no information as to whom the letter was written or any
20 investigation it conducted in order to determine the recipient of the letter or its meaning.

21 The Government waited until January 29, 2016 to disclose a 302 report documenting an
22 interview with Dunston Simpson Sr., Elton Simpson's father, on November 3, 2015 that
23 disclosed that Mr. Nurse provided the title of Elton Simpson's car to Dunston Simpson Sr. after
24 the attack. (Exs. 27 and 28) This was well past the *Brady* deadline to disclose this vital piece
25 of information. Also, the Government waited until January 29, 2016, to disclose, for the first
26 time, any documentation of FBI interviews of Mr. Nurse. (Exs. 27 and 29) This included 302s

- 8 -

1 documenting interviews conducted on May 4, 2016 and May 26, 2016. Aside from this
2 disclosure, which occurred three months after the Government's *Brady* deadline and on the eve
3 of trial, the Government did not disclose any other materials regarding the investigation or
4 interviews with Mr. Nurse which it had done as disclosed by Agent Whitson on cross-
5 examination at trial for the first time. (Ex. 30)(Tr. T., 3/2/16, pp. 114-119)

6 During the trial, in response to questions on cross examination, Agent Whitson testified
7 that after receiving the information about the letter, he prepared a 302 report on October 21,
8 2015. He stated that he called a meeting with various other agents "handling different aspects
9 of the branching investigations . . . and asked if it meant anything to them and then collected
10 information in that sense." He was not sure if he called the meeting before or after he prepared
11 the 302. Agent Whitson testified that after this meeting FBI agents again interviewed Mr.
12 Nurse. (Tr. T., 3/2/16 pp. 114-119)

13 The Government has not disclosed any documentation of any interviews of Mr. Nurse
14 or further investigation that occurred near or after October 21, 2015 as was testified to by Agent
15 Whitson. According to Agent Whitson, further investigation was done. The note clearly
16 indicates that Mr. Nurse provided funds to Simpson, that he appears to have used for terrorist
17 activity and that Simpson is paying Mr. Nurse back by giving him his car. Certainly any further
18 investigation done by the Government is *Brady* material. Did the Government subpoena Mr.
19 Nurse's bank records or his phone records? All of this would be covered under *Brady*.

20 If the Government is not going to do a thorough investigation of individuals who appear
21 to be involved in criminal activity and whose activity might exonerate the Defendant, it must
22 provide timely disclosure to give the defense sufficient time to conduct such a necessary
23 investigation.

24 Additionally, the 302 that was disclosed, documenting the May 6, 2015 interview with
25 Mr. Nurse, states that Mr. Nurse showed agents his text messages and call log relating to his
26 communications with Simpson, Soofi and Stuart Sampson on the weekend of the attack.

According to the 302 report, Mr. Nurse gave consent to the FBI to obtain his text messages and call records. (Ex. 29) The Government has never provided any records of Mr. Nurse's cellular communications to the defense as set forth in the May 6, 2015, 302. It has failed to provide any financial records from Mr. Nurse, surveillance records or any other fruits of its investigation that could point to Mr. Nurse's guilt in lieu of Mr. Abdul Kareem's.

### 2) John Sabari [aka Yahya]

While John Sabari ("Mr. Sabari") was initially listed as a witness for the Government the Government has failed to provide a single disclosure regarding Mr. Sabari, his statements, his connection or lack thereof to Mr. Abdul Kareem, or any results of an investigation into Mr. Sabari and his connection with Simpson. It is believed that Mr. Sabari was the individual that Simpson met with to Skype with the Jamaican Salafi Cleric, Sheikh Faisal.

Upon information and belief, the FBI has been investigating Mr. Sabari since 2010 in connection to Simpson. According to the Government's trial memorandum in Simpson's 2010 trial, FBI agents showed Simpson pictures of Mr. Sabari and Mr. Nurse asking if the group spent time together. (Ex. 30) Simpson admitted that the group met together but denied that the FBI should have any concern about the group. A confidential informant recorded Simpson stating, "me and Yahya was talking about uh, me going to South Africa and then, uh, I make my way up to Somalia . . ." Mr. Sabari goes by the name "Yahya." Given the fact that the FBI has been investigating Mr. Sabari in connection to Simpson's potential terrorist activities since 2010, evidence of the fruits of any investigation of Mr. Sabari would be material to Mr. Abdul Kareem's case and should have been disclosed.

### 3) James Bell

Unbeknownst to the defense, prior to a disclosure made by the Government on February 11, 2016, one business day before trial, the Government had conducted two interviews with James Bradley Bell ("Mr. Bell") on May 4, 2015 and May 5, 2015. The Government waited until February 11, 2016, to disclose the existence of any interview of Mr. Bell. (Ex. 31) On

1  February 11, 2016, the Government provided only a recording of the May 5, 2015 interview
2  that was over two hours long and provided a 302 report on February 28, 2016.

3  The May 5, 2015 interview revealed that Mr. Bell had allowed Simpson to live with him
4  after Simpson's arrest in 2010 for terrorism related charges. Mr. Bell discussed his friendship
5  with Simpson and significant details that he was aware of prior to the Texas attack. Mr. Bell
6  revealed that six months prior to the attack, Simpson had gone to Mr. Bell's home, showed him
7  a hand gun, told him about dreams he was having about meeting the "hooris" in paradise
8  (which Mr. Bell understood to mean dying in a martyrdom), and told Mr. Bell that he planned
9  to rob people to get money. Mr. Bell informed FBI agents that he read Simpson's Twitter
10 pages including Simpson's tweets about ISIS and his tweet about the cartoon contest and
11 commented something to the effect of "these people will never learn." Garland, Texas contest
12 in which Simpson posted a link to the contest and commented "When will they ever learn?"
13 Thus, apparently Mr. Bell knew about the Mohammad Drawing contest before Simpson went
14 to Garland, Texas. During the trial, Agent Whitson testified that the only witnesses that he was
15 aware of that knew of the Mohammad drawing contest prior to the attack in Garland were, Mr.
16 Verdugo and Juan and Carlos; however, he knew or should have known that Nathaniel Soofi
17 and Mr. Bell knew of the contest. (Tr. T., 2/26/16, pp. 34-135)

18 In this May 5, 2015, interview Mr. Bell discussed his contact with Mr. Nurse the
19 weekend of the Garland attack, including stating that Mr. Nurse notified him that Simpson and
20 Soofi were dead between 9 and 9:30 on the night of the attack. Clearly, this is prior to what
21 other people learned and testified to at trial; thus indicating that Mr. Nurse and/or Mr. Bell were
22 aware that Simpson had gone to Texas. When asked specifically about his association with Mr.
23 Abdul Kareem, Mr. Bell stated "I don't know anyone who supports ISIS. The only one that
24 was obvious is Simpson because of his Twitter page."

25 During the May 5, 2015, interview there were several references to an interview that
26 occurred the day before with "Stu." The defense believed that this was a reference to Agent

Stewart Whitson. The Government did not provide any documentation of an interview of James Bell on May 4, 2015. It was only after an additional defense request that the Government provided documentation of this May 4, 2015 interview. The Government did not provide the 302 report of James Bell's May 4, 2015 interview which had been conducted by Agent Stewart Whitson and Agent Clint Hemberg until February 18, 2016 at 7:51 p.m. (Ex. 9)

Thus, it is abundantly clear that the Government intentionally withheld *Brady* material from the defense and it is believed that it continues to withhold *Brady* material. Clearly, Mr. Nurse, Mr. Sabari and Mr. Bell each had a close relationship with Simpson and may process exculpatory evidence that the Government has withheld. The Court should hold a hearing to determine what additional materials the Government has or is aware of.

**II.    Legal Analysis**

      **A.    Brady Violations**

The Supreme Court has held that a *Brady* violation may occur when the government fails to turn over impeachment evidence. *See United States v. Bagley*, 472 U.S. 667, 676 (1985). The prosecutor's obligation to turn over any Brady evidence in its possession exists regardless of whether the defendant requested the evidence. *United States v. Agurs*, 427 U.S. 97, 108 (1976). The prosecutor in charge of trying the case "has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

In *Strickler v. Greene*, 527 U.S. 263 (1999), the Supreme Court set forth the three essential components of a *Brady* prosecutorial misconduct claim: "The evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id*. at 281-82. For prejudice to exist, the suppressed, favorable evidence must be "material." *Brady*, 373 U.S. at 87. Under the materiality standard set forth

in *Brady*, the accused is entitled to a new trial "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34.

In *Kyles*, the Supreme Court emphasized four aspects of the materiality test. *Id*. at 434. First, the Court explained that "a reasonable probability of a different result" does not require a defendant to prove "that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id*. at 434. The burden on the defendant is less onerous: to obtain relief, he must show that because of the absence of the favorable evidence, the verdict at trial is not "worthy of confidence." *Id*.

Second, the defendant is not required to show that, "in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 434-35. The Court explained that: "One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435.

Third, a defendant who proves a *Brady* violation need not show prejudice because Brady's materiality test folds in a prejudice analysis. *Id*. at 435-46 ("Assuming, *arguendo*, that a harmless-error enquiry were to apply, a *Bagley* error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding might have been different, necessarily entails the conclusions that the suppression must have had [a] substantial and injurious effect or influence in determining the jury's verdict.") In short, if the favorable evidence suppressed by the government was ``material," then it is by definition prejudicial.

Fourth, the prejudicial effect of the suppressed evidence is "considered collectively, not item by item." *Id*. at 436. The Court indicated that this "collective" standard should encourage prosecutors to resolve close questions about the materiality of evidence in its possession in

favor of disclosure. *Id.* at 439. A government policy favoring disclosure underscores the prosecutor's role as a seeker of truth and justice rather than a competitor intent on winning at all costs. *Id.* at 439-40.

This was a close case. Even in the current climate where the threat of terrorism causes people to have a great deal of fear. Jurors have been quoted as saying they were evenly split at the start of deliberations. Clearly, the failure to make the necessary and required disclosures concerning Mr. Nurse, Mr. Sabari and Mr. Bell constitute *Brady* violations. It is clear the Government has not made full disclosures and if there is any question, the defense requests that the Court hold a hearing on this issues.

### B. <u>Agent Whitson's Failure to Disclose Information</u>

At trial, Agent Whitson said he was only aware of Carlos, Juan and Mr. Verdugo who in his investigation had heard of the Mohammad drawing contest before the incident in Garland, Texas (Tr. T., pgs. 134-135); however, he had interviewed Nathaniel Soofi who knew as did Mr. Bell who was interviewed by the FBI and was a significant person in this investigation.

The Supreme Court has held that no conviction should be obtained through the use of false evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The presentation of false evidence in a courtroom is intolerable because it perpetrates a fraud on the judge and the jury and undermines the rudimentary demands of justice. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935). The Government's obligation is to govern impartially, fairly and justly. With this unique power comes a unique responsibility: "to ensure that defendants receive fair trials." *United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000); *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). Generally speaking, the courts respond to the knowing presentation of false evidence by reversing a defendant's conviction and remanding for a new trial. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97 (1973)(the court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set

aside if there is any reasonably likelihood that the false testimony could have affected the judgment of the jury; *see also United States v. Wallach*, 935 F.2d 445, 456 (2nd Cir. 1991). In this case, the Government had information concerning Mr. Bell that was material and Agent Whitson either failed to disclose it intentionally or through neglect. Agent Whitson, although the case agent in charge, did not seem to know many things that might help the defense such as who received the registration to Simpson's car.

### III. CONCLUSION

The Sixth Amendment guarantees everyone a fair trial and due process; Mr. Abdul Kareem was denied both. Mr. Abdul Kareem was arrested and indicted on June 10, 201 and requested a speedy trial which this court provided. However, the Government violated his constitutional right to a fair trial and due process by violating this Court's orders concerning disclosures. Disclosures continued to come in during the trial and the Government disclosed tens of thousands of documents after the trial started. The defense did not have adequate time to analyze the new disclosures and work them into the defense's trial strategy. The strategy was based upon actual innocence of the primary charges; however, the Government continued to build its case and make late disclosures as the trial proceeded. Many of these late disclosures involved interviews that were conducted six to eight months before the trial started. The trial deteriorated into a game of Whack a Mole where the defense was constantly having to respond and regroup to parry new exhibits and allegations due to late disclosures of electronic information, inadequate and late disclosures concerning who sold Simpson and Soofi guns and ammunition, late disclosure concerning alleged actions taken by Mr. Abdul Kareem, *i.e.*, cleaning and caring for weapons and inadequate, late disclosures that violate *Brady* and its progeny; *i.e.*, concerning Mr. Nurse, Mr. Bell and Mr. Sabari. All in all, the Government's conduct deprived Mr. Abdul Kareem a fair trial and due process and this Court should grant him a new trial. At a minimum, this Court should hold an evidentiary hearing to determine what evidence the Government still has that it has not produced. According to Agent Whitson,

there should be additional evidence involving Mr. Nurse and it is hard to believe there was never any disclosures made concerning Mr. Sabari since the Government listed him as a witness.

RESPECTFULLY SUBMITTED this 31st day of March, 2016.

**MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.**

By /s/Daniel D. Maynard
Daniel D. Maynard
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
Attorney for Defendant

**ORIGINAL** of the foregoing e-filed this 31st day of March, 2016 via ECF with:
Clerk of the Court
United States District Court
401 W. Washington
Phoenix, AZ 85003

**COPY** of the foregoing e-delivered this 31st day of March, 2016 via ECF to:

Kristen Brook
Joseph E. Koehler
US Attorneys Office
2 Renaissance Square
40 N. Central Ave., Ste. 1200
Phoenix, AZ 85004-4408
Attorneys for Plaintiff

  /s/Stacey Tanner