UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB(MHB)** |
| vs. | ) Phoenix, Arizona |
| | ) December 29, 2015 |
| **Abdul Malik Abdul Kareem**, | ) 9:31 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING/INTERIM PRETRIAL CONFERENCE-DAY 3

(Pages 319 through 372, Inclusive)

APPEARANCES:
For the Government:
        U.S. ATTORNEY'S OFFICE
        By:  **Kristen Brook, Esq.**
             **Joseph Edward Koehler, Esq**.
        40 North Central Avenue, Suite 1200
        Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
        MAYNARD CRONIN BRICKSON CURRAN & REITER PLC
        By: **Daniel D. Maynard, Esq.**
            **Mary Kathleen Plomin, Esq**.
        3200 North Central Avenue, Suite 1800
        Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                        **INDEX OF WITNESSES**

3       **SPECIAL AGENT JOHN M. CHIAPPONE:**

4       Direct examination by Mr. Koehler              Page 322
        Cross examination by Mr. Maynard               Page 329
5       Redirect examination by Mr. Koehler            Page 343

6

7

8                        **INDEX OF EXHIBITS**

9
        **EXHIBIT NO.:**           **DESCRIPTION:**              **RECEIVED:**
10

11      Exhibit No. 17    FBI Electronic                Page 325
                          Communication dated 8/23/12
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        **P R O C E E D I N G S**

2        (Called to the order of court at 9:31 a.m.)

3        THE COURT:  Good morning, ladies and gentlemen.

4    Please sit down.

5        THE CLERK:  Criminal case 15-707.  *United States of*

6    evidentiary hearing.

7        MR. KOEHLER:  Good morning.  Joe Koehler and Kristen

8    Brook for the United States.

9        MR. MAYNARD:  Good morning, Your Honor.  Daniel

10   Maynard on behalf of Abdul Malik Abdul Kareem who is in

11   custody and present in the courtroom.

12       THE COURT:  We may have a few items to discuss today,

13   but since we have our witness here and ready to proceed, I

14   thought we'd take his testimony here, whether you wanted to

15   make any argument, closing argument on the motion, and then we

16   could discuss whatever other items we need to talk about

17   concerning this case.

18       So we'll begin by swearing in the witness, Maureen.

19       **(Witness duly sworn.)**

20       THE CLERK:  Please state your name for the record and

21   spell your last name.

22       THE WITNESS:  Special Agent John M. Chiappone.

23   C-H-I-A-P-P-O-N-E.

24       THE COURT:  Before you begin, Mr. Koehler,

25   Mr. Maynard, can you and your client see the witness?

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

1           MR. MAYNARD:  I'm sorry, Your Honor?

2           THE COURT:  Can you and your client see the screen?

3           MR. MAYNARD:  Yes.

4           THE COURT:  Okay.  Thank you.

5           You may proceed, Mr. Koehler.

6           MR. KOEHLER:  Thank you, Your Honor.

7      **(Witness Chiappone appearing via video conference.)**

8        **SPECIAL AGENT JOHN M. CHIAPPONE, WITNESS, SWORN**

9                    **DIRECT EXAMINATION**

10  Q   Agent Chiappone, could you please introduce yourself to

11  the Court, tell us where you work, and how long you've worked

12  there.

13  A   Yes.  My name is Special Agent John Chiappone.  I'm an FBI

14  Special Agent assigned to the New York Drug Terrorist and Task

15  Force.  I have worked in the New York Joint Terrorist Task

16  Force for approximately 15 months.  Previous to that I was

17  assigned to the Phoenix Joint Terrorism Task Force.

18  Q   How long were you with the Phoenix JTTF?

19  A   Just under four years.  I have been with the FBI for about

20  five-and-a-half years.

21  Q   What was your experience before joining the FBI?

22  A   Prior to the FBI, I was a Captain in the United States

23  Army, Military Police Corps, as well as a Deputy Sheriff for

24  Bristol County, Massachusetts Sheriff's Office.

25  Q   Very good.  Were you stationed in Phoenix, Arizona, in

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

1    2012?

2    A   Yes, I was.

3    Q   And were you co-case agent on a case involving an

4    investigation of a person by the name of Abubakar.  That's

5    A-B-U-B-A-K-A-R.  Last name Ahmed.  A-H-M-E-D?

6    A   Yes, I was.

7    Q   And can you give us a brief overview of what the

8    investigation involved in the June to July to August time

9    frame of 2012?

10   A   Yes.  We were investigating Mr. Ahmed due to his ties to

11   possible terrorist activities, as well as his use of a

12   possible forged document to enhance or further those terrorist

13   activities and also a violation of Title 18, 1001.

14   Q   What was the forged document?

15   A   The forged document was an Arizona State University

16   diploma that Mr. Ahmed had attempted to get produced for him

17   and forged.

18   Q   And what was the statute that was involved in that

19   particular offense?

20   A   That was Arizona Revised Statute 13-2002, Section 82.

21   Q   Were you involved in the execution of the search warrant

22   in relation to the attempted obtaining of the forged ASU

23   diploma?

24   A   Yes, I was.

25   Q   Prior to the execution of the search warrant, had you and

1    another person interviewed Abubakar Ahmed?

2    A    Yes.  Myself and Task Force Officer Daniel Herrmann had

3    interviewed Mr. Ahmed.

4    Q    Where did that interview take place?

5    A    The interview took place at Arizona State University

6    Police Department on 7/11/2012.

7    Q    Based on that interview and the other evidence that you

8    had gathered up until that point, did you make a determination

9    on whether to open a full investigation into Mr. Ahmed's

10   activities?

11   A    Yes.  Mr. Ahmed was previously a preliminary investigation

12   being overseen by a separate agent.  And based on that

13   interview and other information we had, we opened the -- we

14   decided to open a full investigation on Mr. Ahmed.

15   Q    I'm going to direct your attention to Exhibit No. 17.

16        Do you have that with you there today; is that

17   correct?

18   A    Yes.  I have it Exhibit 17.

19   Q    Looking at the last page of that, does that last page of

20   that exhibit tell you what date that you formally reopened the

21   investigation?

22   A    The first page shows the date that the report was

23   serialized and the last page date shows the date that I began

24   to draft the report.

25   Q    And what was the date you began to draft the report?

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

1    A    That was on 7/19/2012.

2    Q    And does this report fairly and accurately depict your

3    reasons for reopening the investigation at that point in time?

4    A    Yes, it does.

5              MR. KOEHLER:  Move to admit Exhibit 17.

6              MR. MAYNARD:  No objection.

7              THE COURT:  17 is admitted.

8         (Exhibit 17 admitted in evidence.)

9    BY MR. KOEHLER:

10   Q    As part of your investigation, was there a particular area

11   of focus that you were looking at in terms of the forged

12   document?

13   A    Yes.  We believed it was possible that Mr. Ahmed was going

14   to utilize the forged document in furtherance of terrorist

15   activities.  Part of that was in order to prove one of the

16   requirements of Arizona Revised Statute 13-2002, which is the

17   intent to defraud.

18   Q    And so were you looking for evidence of that intent to

19   defraud?

20   A    Yes.  We believed the intent to defraud could be directly

21   related to Mr. Ahmed wanting to further his terrorist

22   activities.

23   Q    During the execution of the search warrant, were computer

24   devices recovered?

25   A    Yes, there was.

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

1    Q    Was one of those computer devices a Lenovo laptop?

2    A    Yes, it was.

3    Q    Did you have occasion to speak to an individual then known

4    to you as Decarus Thomas regarding that laptop?

5    A    I did.  I interviewed Decarus Thomas on 7/20/2012 at the

6    residence.

7    Q    And specifically, did you ask him about who else besides

8    him used that computer?

9    A    Yes.  I specifically asked that question and Decarus

10   Thomas had told me that Mr. Ahmed had utilized this computer;

11   that Mr. Thomas had to yell at Mr. Ahmed to get off his

12   computer on numerous occasions because he was using it.

13   Q    After that, did agents seize that particular computer?

14   A    Yes.  That was the deciding factor in seizing that

15   computer.  We had previous discussions on whether to seize

16   that specific computer or not based upon the interview and

17   Mr. Thomas telling us that Mr. Ahmed had used that computer.

18   We felt we needed to seize that in furtherance of our

19   investigation.

20   Q    To your knowledge, did your CART Team perform an

21   extraction of the content of the computer?

22   A    Yes, they did.

23   Q    And do you use the CART software to examine computers on

24   occasion?

25   A    I have used it on occasion, but to be frank, I'm bad at

1    using the software.  That's why we usually get experts that we

2    have in the FBI to assist on that.

3    Q   When using CART software as a user, does it require you to

4    give it search parameters in order to conduct a search of the

5    computer?

6    A   Yes.  That is a requirement in order for that to happen.

7    Q   And what kinds of things do you have to provide in order

8    to use the software?

9    A   Keywords and search terms of information that you would be

10   interested in finding on the computer devices.

11   Q   Did you solicit assistance from anybody in searching the

12   electronic devices in this case in the 2012 search warrant?

13   A   Yes.  My co-case Task Force Officer Dan Herrmann as well

14   as Intelligence Analyst Amy Vaughan because her computer

15   expertise is far superior than mine.

16       (Court reporter requested witness to repeat his answer.)

17           MR. KOEHLER:  Can you repeat your answer please?

18           THE WITNESS:  Absolutely.  I asked for assistance

19   from Task Force Officer Daniel Herrmann and Intelligence

20   Analyst Amy Vaughan.  Ms. Vaughan, specifically, because of

21   her computer knowledge being far superior to mine.

22   BY MR. KOEHLER:

23   Q   And did you give Ms. Vaughan search parameters to use in

24   conducting the search?

25   A   I did.  We had discussions about what to search for.

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

```
 1   Q    Okay.  And what did you tell her to search for?
 2   A    Briefly, the terms that we -- I gave Amy -- or Ms. Vaughan
 3   to search for were terms related directly to the forgery of
 4   the ASU document, as well as terms related to terrorism due to
 5   my belief that the intent to defraud was directly related to
 6   furtherance of terrorist activities.
 7   Q    After Ms. Vaughan went through the computer, did she
 8   produce a report to you?
 9   A    Yes, she did.  She produced -- she prepared a report on
10   all of the devices, the numerous devices that were found.
11   Q    Did her analysis of the electronic devices appear to
12   connect activity involving travel to the Middle East and so
13   forth to the document?
14   A    Very much so.  There were a couple different documents
15   found in the computer.  One was an application for the Islamic
16   University in Saudia Arabia and another one was titled
17   Authentication of Documents.
18            And both of those had a requirement to have at least
19   a bachelor's degree in order to apply to that Islamic
20   University.
21   Q    And did Mr. Ahmed have a bachelor's degree, a real one, to
22   your knowledge?
23   A    No, he did not.  And we had done extensive searches of the
24   Arizona State University database and records to ensure that
25   Mr. Ahmed did not, in fact, have that degree that he had
```

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

```
1    produced and attempted to produce through the publishing
2    company.
3              MR. KOEHLER:  Can I have a moment, Your Honor?
4              THE COURT:  You may.
5              MR. KOEHLER:  I have nothing further at this time,
6    Your Honor.
7              THE COURT:  Mr. Maynard.
8                        CROSS EXAMINATION
9    BY MR. MAYNARD:
10   Q    Good morning, Agent Chiappone.
11   A    Good morning, sir.  How are you?
12   Q    Fine, thanks.
13             Now, prior to this search warrant being issued in
14   2012 for Mr. Ahmed's residence, how long had you been on the
15   Terrorist Task Force in Phoenix, Arizona?
16   A    I arrived on the Terrorist Task Force, I believe it was
17   May 1st, 2011, so a little over a year, about 15 months, give
18   or take, at that point.
19   Q    As part of your work, were you aware that Mr. Simpson had
20   been prosecuted for lying to the FBI in 2010?
21   A    Yes, I was aware of it, but I obviously did not have a
22   problem in that case.
23   Q    You have indicated to us that you participated in an
24   interview with Mr. Ahmed on July 11th of 2012.  Had you ever
25   interviewed him prior to that?
```

```
 1    A    Yes, I had.  I interviewed Mr. Ahmed at his residence, the

 2    same residence where the search warrant was conducted sometime

 3    in 2011.  I don't remember the exact date offhand, but --

 4    Q    If I were to suggest to you that it was on November 30th

 5    of 2011, would that refresh your recollection?

 6    A    Yeah.  November 30th sounds correct.

 7    Q    Okay.  And were you interviewing Mr. Ahmed at that time

 8    because you thought that he might be involved in some sort of

 9    terrorist activities?

10    A    Mr. Ahmed was under a preliminary investigation at that

11    time by another agent.  However, my primary reason for

12    interviewing Mr. Ahmed was due to investigation I had on

13    another subject who he was also affiliated with at that time.

14    Q    And who was that?

15    A    At this point I don't know if that subject is still under

16    investigation, if that's been disclose.  Before I answer that,

17    I don't know if I can or not.  Is there someone I could advise

18    that?

19              THE COURT:  Was it Mr. Thomas?

20              THE WITNESS:  Mr. Thomas was under investigation but

21    he's not the one I'm referring to at this time, ma'am.

22              THE COURT:  Okay.  At the moment I'm going to allow

23    him not to answer the question because it doesn't appear

24    necessarily relevant and could possibly jeopardize another

25    investigation.
```

```
1              MR. MAYNARD:  Okay.

2      BY MR. MAYNARD:

3      Q    Who participated in the interview of Mr. Ahmed with you?

4      A    On November 30th it was myself and Special Agent Kevin

5      O'Brien.

6      Q    Was there a 302 prepared for that interview?

7      A    Yes.  I believe there was.

8      Q    Do you know where that 302 is?

9      A    It should be in Mr. Ahmed's case file.

10     Q    Okay.  So is there a case file on Mr. Ahmed that you have

11     seen that would contain that 302?

12     A    Yes.

13     Q    Okay.  Do you recall how long that interview lasted?

14     A    Not precisely.  I would say it was approximately an hour

15     or less.

16     Q    Okay.  And it was at his home?

17     A    It was in his residence.  He invited us in to speak to

18     him.

19     Q    And did you see his computer in his home at that time?

20     A    Yes, I did.

21     Q    And did he identify that computer as being his computer?

22     A    Yeah.  He identified a laptop that was laying there that

23     was his.

24     Q    And did you find that same laptop when you executed the

25     search warrant in 2012?
```

1  A   I believe so.  However, at that time on November 30th,

2  2011, I didn't go and look at the computer and take a serial

3  number from that computer, so I cannot say that for certain.

4  Q   Okay.  Did you interview anyone else at Mr. Ahmed's

5  residence on 2011 other than Mr. Ahmed?

6  A   Mr. Thomas was interviewed.  He was not interviewed by me

7  personally, but he was interviewed by other agents.

8  Q   Was he called by Mr. Ahmed and asked to come to meet with

9  the FBI?

10  A   I believe so.  I don't think Mr. Thomas was there at that

11  point, though I can't say that for certain.

12  Q   But you did not participate in that interview; is that

13  correct?

14  A   No.  I was not the interviewing agent on Mr. Thomas at

15  that point.

16  Q   Were you interviewing Mr. Ahmed while Mr. Thomas was being

17  interviewed?  I'm trying to figure out how this is going on.

18  A   Yes.  Myself and Kevin were in the kitchen with Mr. Ahmed

19  and Mr. Thomas was being interviewed either in a separate room

20  or outside the apartment.

21  Q   And who interviewed him, Mr. Thomas?

22  A   I believe -- I would have to check the case log, but I

23  believe it was Special Agent Michael Vanostein(ph) and might

24  have been Special Agent Craig Schellenger(ph) but I would have

25  to check the file to be certain if Mr. Schellenger was there.

1    Q    And do you have an understanding that a 302 was prepared

2    of that November 30th, 2011 interview?

3    A    Yes.  And I should clarify, a 302 or a possible EC would

4    have been written at that point.

5          When I say "possible EC," possible Electronic

6    Communication, because if interviews are classified, they

7    could be put in an EC and not a 302.

8    Q    Can you recall whether or not those interviews were audio

9    taped?

10   A    No, those interviews were not audio taped to my knowledge.

11   Q    Was there a file that the FBI had on Mr. Thomas in 2011 at

12   the time that you did the interview?

13   A    Yes, there was.

14   Q    And as far as you know, that 302 or that EC should be in

15   that file; is that correct?

16   A    That would be my understanding, yes, that's correct.

17   Q    Now, the government has shown you what was marked as

18   Exhibit No. 11.  Do you have that in front of you -- I'm

19   sorry.  Exhibit 17.

20   A    Yes.  Exhibit 17 is right here.

21   Q    Is this a report that you prepared?

22   A    Yes, this is.

23   Q    And according to this report, was Mr. Ahmed -- had he been

24   the target of an investigation since July 25th of 2011?

25   A    That's correct.  That's when his preliminary investigation

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

1   was initiated.

2   Q   So from July 25th of 2011 until at least the time of the

3   execution of the search warrant, Mr. Ahmed was under

4   investigation by the FBI concerning possible terrorist

5   activity; is that correct?

6   A   That's correct.  That's correct.

7   Q   Okay.  Did you know an ASU police officer by the name of

8   Herrmann?

9   A   Yes, I did.

10  Q   And did you office with him as part of the Joint Terrorist

11  Task Force?

12  A   Yes, I did.

13  Q   Is he the one who advised you that ASU had been notified

14  of the possibility that Mr. Ahmed was seeking to forge a

15  diploma from ASU?

16  A   Yes, he was.

17  Q   Did you participate with Mr. -- Detective Herrmann in

18  preparing a search warrant for Mr. Ahmed's residence?

19  A   Yes, I did.

20  Q   And what role did you play in preparing that search

21  warrant?

22  A   I read over Detective Herrmann's search warrant affidavit.

23  And then myself and other people in our squad, as is quite

24  common when writing a search warrant, would give him advice on

25  how to, you know, any mistakes he might have found or

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

1    something such as that, kind of proofreading.

2    Q    Did you attempt to provide in the search warrant to cover

3    all computers and electronic devices that would be in

4    Mr. Ahmed's residence?

5    A    Yes.  In the search warrant we were looking to search for

6    anything that Mr. Ahmed would have access to that would

7    allow -- that would have evidence of the crime that he was

8    being investigated for.

9    Q    Weren't you also investigating him for possible terrorist

10   activity at the time?

11   A    Yes, we were.

12   Q    Did you go with Detective Herrmann when he met with the

13   Superior Court judge from Arizona to get the search warrant?

14   A    No, I did not.

15   Q    Did you participate in -- strike that.

16             Did you specifically talk to Detective Herrmann about

17   not putting information in the search warrant concerning

18   terrorist activity?

19   A    Not that I recall.  Again, that search warrant was focused

20   for forgery and his attempt to defraud, so that was what

21   Detective Herrmann had focused his affidavit on.

22   Q    Well, what you were really looking at for almost a year

23   prior to this was whether or not Mr. Ahmed was involved in

24   terrorist activity, correct?

25   A    For the year prior, yes, absolutely.

1    Q    And that's why you had interviewed him in November of

2    2011, correct?

3    A    Part of the reason and his association with another

4    individual.

5    Q    And did you ask Mr. Ahmed to be an informant for the FBI?

6    A    I did not.  Another agent might have spoke to him about

7    that at that time, but I personally did not ask him to be an

8    informant for the FBI.

9    Q    Did you overhear another agent ask him to be an informant?

10   A    Yes, I did.

11   Q    Okay.  Was that the primary purpose for the interview in

12   2011?

13   A    Absolutely not.

14   Q    Did Mr. Ahmed refuse to be an informant for the FBI?

15   A    Yes, he did.

16   Q    Okay.  Was Mr. Thomas asked to be an informant for the

17   FBI?

18   A    That I don't know.  I was not on that interview, so we

19   would have to look at the 302 or EC on that interview or talk

20   to those agents to determine that.

21   Q    And I take it you have not reviewed that EC or that 302 in

22   preparation for your testimony today?

23   A    No, I have not.

24   Q    What have you reviewed to prepare for your testimony

25   today?

1    A    I reviewed the Exhibit 17.  I reviewed the documents

2    regarding the search warrant and regarding the CART searches

3    on the computer and I reviewed the 302s that I wrote on

4    Mr. Thomas, Mr. Ahmed, and Mr. Simpson's interviews the day of

5    the search warrant.

6    Q    But you did not review any of the 302s for Mr. Ahmed from

7    November of 2011; is that correct?

8    A    No, I did not.  I did not, that's correct.

9    Q    Okay.  When the search warrant was executed, it was

10   approximately 10:30 in the morning?

11   A    Approximately.

12   Q    And there were over 20 officers that were involved in

13   this, correct?

14   A    Yes.

15   Q    You were off-site at the time?  You were not actually on

16   the site when the search warrant was being executed?

17   A    No.  At the time of the Phoenix Police Department's

18   serving of the search warrant, I was in the driveway, the

19   joint driveway by the garages of that residence.

20   Q    And did -- who was it that actually picked up all of the

21   electronic devices to inventory them as part of the search

22   warrant?

23   A    That would have been various agents of the FBI and Phoenix

24   Police Department that were on scene.

25   Q    And then were those items then taken out and put into a

1    van and inventoried?

2    A   Yes.

3    Q   Okay.  And did you -- after that was done, did you come in

4    and interview the three individuals who were living there?

5    A   We interviewed them on the outside.  The Phoenix Police

6    Department pulled those individuals out and had passed them

7    off to us to continue to secure the residence and at that time

8    we began to interview them.

9    Q   And did you interview Mr. Ahmed first?

10   A   I believe so, but I don't remember the exact procession of

11   who was interviewed first or who was interviewed second, but

12   we did interview all of them and Mr. Simpson was actually

13   interviewed twice within a short period of time and there is

14   two separate 302s documenting that.

15   Q   Okay.  And did the interviews last until approximately

16   12:30?

17   A   No.  I mean, maybe in total, but none of the interviews

18   were extremely long.  I would say the November 30th interview

19   was much longer in length than the interview on 7/20.

20   Q   Did -- just a moment, Your Honor, please.

21            On Exhibit 17 on the first page on the details --

22   A   Uh-huh.

23   Q   -- you have indicated that Phoenix is reopening and

24   converting caption matter to a full investigation based on

25   evidence that Abubakar Hussein Ahmed committed a violation of

1    Title 18, Section 1001.  What is 1001?

2    A    Section 1001 is lying to a federal officer.

3    Q    Okay.  And you then on the second page put:

4         "In addition to this violation, there is probable

5    cause to believe Ahmed has also committed violations of

6    ARS 13-2002.  That was the forgery charge, correct?

7    A    That's correct.

8    Q    After the computers were seized and analyzed, how long did

9    that take to analyze the material that was on the computers?

10   A    I don't know.  I would have to look at the reports and the

11   dates of the reports.  But it was a priority for our squad, so

12   I imagine that we did it quite quickly.

13   Q    I mean, is that the kind of thing you could do in a couple

14   of days or did it take weeks to do?

15   A    No.  It usually take weeks.  I mean, the information needs

16   to be uploaded into the system.  The search parameters have to

17   be inputted into the system.  And then the agents involved

18   have to go through it.

19        Depending upon the amount of data that was on the

20   computers, which I don't know how many gigabytes offhand was

21   the computer, will determine how long that will take, but it's

22   usually a matter of weeks.

23   Q    Were you the one who was basically leading this

24   investigation?

25   A    I was the primary case agent on this document.

1   Q   Did you give instructions to any of the FBI agents to

2   focus on the forgery aspect or information involving forgery

3   that could be found in the computers?

4   A   I asked the agents and analysts that were looking through

5   it to look for both information involving forgery and

6   terrorism due to the direct link between the forged document

7   and the terrorist activity that we were investigating.

8        So we had the ASU investigation into forgery.  There

9   was the FBI investigation into terrorism which was separate.

10  But the important thing was the search warrant was for the

11  forgery, so we were looking to see, one, evidence of forgery;

12  and two, the intent to defraud.  And we were assisting in

13  that.

14  Q   But you were also then looking to see if there was any

15  potential terrorist activity?

16  A   No.  We were looking for the intent to defraud which was

17  related to the terrorist activity.  We believed that the

18  purpose of getting that forged document was to further

19  Mr. Ahmed's terrorist activity and that would be his attempt

20  to defraud.

21  Q   Well, did you instruct the agents that after they had

22  looked into certain sections, if they didn't see anything that

23  had to do with forgery, that they should stop looking into

24  certain areas of the computer information?

25  A   I instructed the agents, as I stated, to look for evidence

1  of forgery and evidence of terrorism that would prove the

2  intent to defraud in the use of that forged document to

3  further terrorist activities.

4  Q   Do you have an understanding that the agents downloaded

5  everything on the computers and looked at everything in all of

6  the computers?

7  A   My understanding is they looked through everything through

8  the CART program that would be populated into based on the

9  search parameters.

10  Q   Okay.  And did you then take a look at the reports that

11  were generated to differentiate between what was found on the

12  different computers and electronic devices?

13  A   Yes.  The reports that were written, which I believe are

14  other exhibits, listed out each device by device and what was

15  found on each device.

16       MR. MAYNARD:  I don't have any further questions,

17  Your Honor.

18       THE COURT:  Thank you.

19       Agent Chiappone, I have one question for you.

20       With respect to the search that you did of the Lenovo

21  laptop with the assistance of Ms. Vaughan --

22       THE WITNESS:  Yes, ma'am.

23       THE COURT:  -- the documents that you spoke about

24  that were found pursuant to the search parameters, was there

25  any way for you or Ms. Vaughan to determine the identity of

1    the individual who made those searches?

2            THE WITNESS:  Ma'am, I'm not really good with

3    computers.  I'm going to try to explain it the best I can.

4            Basically, in the CART program, it's going to show

5    you as much as you can see based upon the search.  So I know

6    for some of the searches it will actually show you if someone

7    was, like, logged into their e-mail or something.

8            So, for instance, a YouTube search for videos would

9    show you this person searched for the videos.  And the same

10   thing, I believe, would go if they were logged into a Yahoo

11   account and searched Yahoo for, you know, FakePerformance.com

12   or something like that.

13           In this particular case I would have to look at the

14   report or perhaps Ms. Vaughan to know if that was linked

15   directly in the computer who was searching for it.  But to my

16   general knowledge, that's how it works.  If they were logged

17   into something, you could see who was searching it.

18           THE COURT:  Well, one of the specific things that you

19   mentioned was that there was searching related to an

20   application for the Islamic University.

21           And was that specific information, to your knowledge,

22   linked to any particular individual that had access to the

23   Lenovo computer?

24           THE WITNESS:  Yes, ma'am.  That information was

25   linked to Mr. Ahmed.  I would have to consult the report to

1    detail out how it was linked to Mr. Ahmed, but I do recall

2    that the search for Islamic University was directly linked to

3    Mr. Ahmed.

4              THE COURT:  Thank you.

5              Mr. Koehler, redirect?

6                        **REDIRECT EXAMINATION**

7    BY MR. KOEHLER:

8    Q    Agent Chiappone, do you have the full report of

9    Ms. Vaughan there with you?

10   A    I do.

11   Q    You mentioned that you would need to consult that.  Would

12   that refresh your memory on how the -- what was linked to

13   Mr. Ahmed in terms of the search of the computer?

14             THE COURT:  The Lenovo computer -- the Lenovo

15   computer, specifically.

16   BY MR. KOEHLER:

17   Q    Specifically, if you can look at that, directing your

18   attention to computer 4, which is on the second page running

19   to the third page of that report --

20             MR. MAYNARD:  What exhibit are we looking at?

21             MR. KOEHLER:  We're on Exhibit No. 14.

22             THE WITNESS:  Okay.  Yes.  I see computer 4.

23             And computer 4 references Abubakar Ahmed having

24   destroyed some court documents in the download folders, which

25   suggested that Ahmed either used this computer or it was used

1    on his behalf.  And that computer 4 had Internet history of

2    logging into abubakar5500@Yahoo.com.

3           And abubakar5500@yahoo.com, I know, from my

4    investigation, is the e-mail address that was used to contact

5    JFD Publishing asking for the forged document.

6    BY MR. KOEHLER:

7    Q   Was any of the information about searching for entrance

8    requirements for the University in Saudia Arabia contained --

9    did that appear to be contained in computer No. 4?

10   A   No.  It did not.  That information did not appear to be

11   contained in computer No. 4.

12   Q   So that information would have come from another computer?

13   A   That's correct.

14   Q   Let's talk for a minute about the relevance of terrorist

15   information to the fraud investigation.

16          You mentioned that you needed to show an intent to

17   defraud; is that correct?

18   A   That's correct.

19   Q   In your experience, have fraudulent documents been used in

20   connection with terrorism-type offenses?

21   A   Yes, they have.  I have even come across it in my recent

22   investigations.

23   Q   Can you, without getting into the specifics of a

24   particular investigation, give some examples of the types of

25   things that you have seen?

1   A   Specifically, referring to a recent investigation, my

2   current case is on the Paris attacks, deployed to Paris,

3   France, the day following the attacks.

4           And in that attack, forged passports were utilized by

5   two of the suicide bombers.  So that's the most recent example

6   I can think of.

7   Q   And have you seen other examples where people obtain

8   forged documents and use them to obtain legitimate documents

9   in order to further offenses that are related to terrorism?

10  A   Yes.  Forgery and fraud in general, whether it is to make

11  money from a fraud perspective in furtherance of terrorist

12  activities or a forged document to make money or give yourself

13  access to something is commonly used.

14  Q   Now, the case that you reopened in 2012, you mentioned

15  that that originally was opened in 2011; is that correct?

16  A   That's correct.

17  Q   Has that case ever been fully closed?

18  A   Not to my knowledge it's not.

19  Q   So is the case on Mr. --

20  A   Sorry.  Let me correct that.

21          The case was closed following the preliminary

22  investigation.  There was an agent that was working that case.

23  And in order to make it a smooth transition from the

24  preliminary investigation, switch the case to myself and the

25  new squad, it was actually closed and then immediately

1    reopened around the July/August 2012 time period.  And I

2    believe it has been active ever since then.

3    Q   And that's the investigation of Mr. Ahmed; is that

4    correct?

5    A   That's correct.

6    Q   Can you explain why, specifically, you asked Decarus

7    Thomas on July 11 of 2012 about the Lenovo computer?

8    A   On July 20th, the day of the search warrant?

9    Q   Yes.  Yes.  July 20th of 2012.  My apologies.

10   A   Yes.  There was -- we had discussions amongst ourselves at

11   the search warrant scene whether the computers of Mr. -- that

12   were identified as Mr. Simpson's computer and Mr. Thomas's

13   computer could be seized in good faith of a warrant.

14        And so those interviews were conducted of Mr. Thomas

15   and Mr. Simpson with the specific question asked, "Did

16   Mr. Ahmed utilize your computer," to determine that if we

17   should seize those computers to find the evidence we were

18   looking for or not.

19        Both Mr. Thomas and Mr. Simpson, as documented in the

20   interview 302s, said, yes, Mr. Ahmed had used their computers.

21        Therefore, the determination was made to seize it.

22        There are other items, for instance, there was about

23   54 -- I believe the exact count was $5,490 that Mr. Ahmed had

24   in a safe and $1200 that Mr.-- approximately $1200.  We did

25   not count it in his pocket -- that Mr. Simpson had.

```
 1            We believed there's a possibility that those were --
 2    that money was obtained from fraudulent activity.  However, it
 3    did not seem to be something that we could seize from our
 4    warrant, so we did not seize that money.  So we were taking a
 5    very serious determination of what we could seize in
 6    accordance with that warrant and what we could not.
 7            MR. KOEHLER:  I have no further questions.
 8            THE COURT:  Thank you.
 9            MR. MAYNARD:  Your Honor, at the last hearing the
10    government produced Exhibit 14.
11            And 14 was extensively redacted and I had asked the
12    government to see if we could get one that was unredacted.
13    Yesterday about 3:30 I got a copy of the unredacted version or
14    less-redacted version.  I would like to put that into evidence
15    with this witness.
16            It's the document that he was looking at and he was
17    only looking at one page and it clarifies --
18            THE COURT:  So do you want to substitute the version
19    that was given to you yesterday for Exhibit 14 that was marked
20    for identification?
21            MR. MAYNARD:  Or I can put it in as a new exhibit.
22            THE COURT:  Well, I don't like to have duplicates,
23    so, I mean, is there any reason why --
24            Well, Mr. Koehler might have a reason and I will ask
25    him after, but is there any reason why we can't simply
```

1   substitute old 14 with new 14?

2           MR. MAYNARD:  No.

3           MR. KOEHLER:  I don't have an objection to that, Your

4   Honor, but I do not think that the witness has the unredacted

5   version of that in front of him.  I think the witness --

6           THE COURT:  Well, this isn't an invitation for

7   Mr. Maynard to engage in recross.

8           MR. KOEHLER:  Okay.

9           THE COURT:  He had his opportunity to cross-examine

10  the witness.  This is simply his wanting to substitute one

11  unadmitted exhibit for another.

12          You have no objection?

13          MR. KOEHLER:  I have no objection to doing that just

14  so long as we are clear on what's in front of the agent who is

15  on the stand right now.

16          THE COURT:  Okay.  So we will -- if you provide us

17  with the less-redacted copy of Exhibit 14, we will substitute

18  that for the one that was marked at the beginning of this

19  hearing last month.

20          MR. MAYNARD:  And if it hasn't been admitted, I would

21  move for the admission of Exhibit 14.

22          THE COURT:  Apparently, it has been admitted.

23          MR. MAYNARD:  May I approach?

24          THE COURT:  Yes.

25          I think that we can allow Agent Chiappone to -- I

1    guess "hang up" isn't the right word for -- "disconnect" and

2    we will continue with any other matters we have to discuss.

3              Thank you very much, Agent Chiappone, for making

4    yourself available by video conference.

5              THE WITNESS:  Thank you, Your Honor, and a happy new

6    year.

7              THE COURT:  Thank you.

8        **(Video conference with Agent Chiappone ended.)**

9              THE COURT:  Mr. Koehler, did you wish to make a

10   closing argument on this motion to suppress?

11             MR. KOEHLER:  Your Honor, I believe I have stated the

12   government's position rather thoroughly in the response to the

13   defense motion.

14             The only thing that I have to add and it's what I

15   said in my opening statement, Your Honor, which is, in the

16   response to the motion, I noted that the intent looked more

17   like 404(b) type evidence.  However, the intent is actually an

18   element under section 2002.A.2 and it is one of the things

19   that the agents were focused on when they were interviewing

20   Mr. Ahmed on July 11th of 2012 and in conducting the search of

21   the warrant.

22             They were focused on what he was going to do with

23   that diploma, because they had to prove that he had a

24   fraudulent intent not merely to gain it, but to actually use

25   it in some other manner.

1           And so the evidence of terrorist activity, as Agent

2      Chiappone explained, that's a fairly common theme in terrorism

3      offenses for someone to use fraudulent documents.  And so that

4      was something that they were specifically looking for.  It was

5      within the scope of the warrant.

6           As this Court very well knows, search warrant

7      affidavits frequently don't make reference to other sensitive

8      aspects of an investigation as long as those aspects otherwise

9      fall within the scope of the warrant.

10          And in this case, terrorist-type activity did fall

11     within the scope of the warrant because it was specifically

12     the intent to use that document in that fashion.

13          And so in light of that, the search of the computers

14     did fall within the scope of the warrant.  And as we have

15     already pointed out in our response, the agents came across

16     that by an independent means, and that is, Sergio Martinez,

17     having gotten that computer from Mr. Kareem.  And because

18     Mr. Martinez got that computer from Mr. Kareem and then

19     voluntarily turned it over to the FBI, there is an independent

20     source of the same evidence.

21          Thank you.

22          THE COURT:  Thank you.

23          MR. MAYNARD:  Your Honor, there may or may not --

24          THE COURT:  Well, Mr. Maynard, I want you to start

25     with Sergio Martinez' consent to search the Lenovo laptop

1    which was undoubtedly in his possession and control and he had

2    authority over -- he had the right to consent to its search

3    based on all --

4          The only evidence I have is that it was given to him.

5    He had it with everything that was on it.  If the person who

6    gave it to him didn't delete the things that were on it,

7    either intentionally or thought he had and didn't, clearly,

8    Mr. Martinez had everything that was on that computer when he

9    received it and could consent to its search.

10          So even if I were to think that the search warrant in

11   2012 seized things that wasn't authorized to seize or that the

12   search of the computer -- the Lenovo laptop then went beyond

13   what should have been able to be searched even if it could

14   have been seized, isn't it all a moot point if in 2014 or 2015

15   Mr. Martinez shows up with the Lenovo laptop, gives it to the

16   FBI, and says you have my consent to search everything that's

17   on there.

18          MR. MAYNARD:  It certainly might be.  We don't know

19   what -- I can't tell you right now what was on the laptop that

20   Mr. Martinez turned over to the government.

21          If it's exactly the same, then you're right.  If it's

22   not exactly the same, if things had been deleted, the

23   government cannot use the search that was done back in 2012.

24   That was a pretext.  So I don't know.

25          THE COURT:  So you're saying that we don't have

CR15-00707-SRB EVIDENTIARY HEARING(cont'd)   12-29-15

1   evidence of what was actually on the Lenovo when it was turned

2   over to the FBI recently by Mr. Martinez?

3           MR. MAYNARD:  That's right.  I don't know what's on

4   it.  I don't know.  My understanding is Mr. Martinez -- the

5   password was changed to the newest child.  He used it to give

6   it to his son to play video games on.

7           THE COURT:  But you would agree that whatever was on

8   there when Mr. Martinez turned it over, the FBI can use for

9   any purpose?

10          MR. MAYNARD:  Reluctantly, but, yes.

11          THE COURT:  Okay.  Then continue with whatever

12  argument you wish to make.

13          MR. MAYNARD:  Okay.  Judge, this was clearly

14  something that was brought by the Joint Terrorist Task Force.

15  I understand that they had to do an investigation to determine

16  whether or not somebody had forged a document or not and a

17  diploma and maybe it was going to be used for something else.

18          But when you go in and you ask a judge or you ask a

19  magistrate to give us a search warrant to search somebody's

20  house, to go through their private papers and their private

21  documents, those judges and magistrates are supposed to be

22  independent.  They're the ones who are supposed to be the

23  backstop to make sure that the police and the government are

24  not going beyond what they're entitled to do.

25          THE COURT:  I agree.  But did they -- they drafted a

1    search warrant because of evidence that they had of forgery.

2    And the Court issued a search warrant to search for evidence

3    of forgery, including all of the elements of forgery under

4    Arizona State law which requires an intent to defraud.

5             The fact that the discovery of intent to defraud

6    might also have disclosed evidence that would be helpful in

7    the FBI's investigation of terrorism by Mr. Ahmed, does that

8    require that if the search warrant was legitimate for its

9    scope on forgery, that they have to say, oh, and by the way,

10   Judge, not within your jurisdiction, but we've got another

11   federal investigation into terrorism in addition to the Task

12   Force's investigation of forgery.

13            I don't think they have to.  You might think it would

14   be nice if the judge who issued the search warrant knew

15   everything that the agents knew but if the search warrant was

16   legitimate for the scope of the search to determine the

17   elements of fraud -- the evidence that would support the

18   elements of forgery, isn't that enough?

19            MR. MAYNARD:  No.  And the problem is this, Judge.

20            In this day and age with computers, if this were a

21   time 25 or 30 years ago when we just had paper documents and

22   the Court had given them a warrant to go in and look for

23   forgery, you would go through and you would look to see what

24   you could find that would support allegations that somebody

25   had forged something.

1          THE COURT:  Well, but in this case, if we were in the

2    paper world, they would have seized the paper that was the

3    application for Islamic University or was information

4    concerning the requirements to be admitted to Islamic

5    University that would show that one of the things you had to

6    have was a college degree which Mr. Ahmed didn't have, and

7    therefore, needed a forged one to get into Islamic University.

8          That clearly would have been seized in a paper search

9    to support the element of intent to defraud.

10          And if the scope of the search was to try to find

11   documents, electronic documents like that, to show what he

12   wanted to use the forged diploma for, if they didn't search

13   with search terms that went way beyond evidence that Mr. Ahmed

14   used the computer and evidence that would support the element

15   of intent to defraud, isn't this the same as the paper search

16   where they would have looked through a lot of paper but not

17   been able to take the ones that weren't relevant and only take

18   the ones that related to what they were searching for which

19   was evidence to support the charge of forgery?

20          MR. MAYNARD:  Not necessarily, and here is why.

21          When I go to the testimony of the ASU police officer.

22          THE COURT:  Herrmann.

23          MR. MAYNARD:  Detective Herrmann.

24          I asked him questions.

25          And did he advise you that they wanted to look --

1    that the FBI wanted to look at things beyond evidence of

2    attempted forgery?

3              They offered this assistance to the search warrant.

4    To what ends I can't recall.

5              But what he does go on to say, I asked him the

6    question:

7              Was the FBI look beyond the forgery to see if there

8    was any terrorist activity?

9              And he says:

10             Not to my knowledge.

11             Well, that's not accurate.

12             But where it actually becomes important is on page

13   191 of his testimony on November 24th of 2015.

14             And I said:

15             This is a report that you prepared after you had

16   completed your search of the computers, correct?

17             Yes.

18             This report doesn't indicate that you looked at any

19   computers other than those owned by Mr. Ahmed, correct?

20             He says:

21             Yes.

22             Was your focus on Mr. Ahmed's computer?

23             Yes, it was.

24             So to prepare the report pursuant to the warrant that

25   had been issued, it was only necessary for you to look at

 1    Mr. Ahmed's computer?

 2              His answer was:

 3              Yes.

 4              Judge, when I then look to Exhibit 17 which we just

 5    replaced and I gave you the new copy --

 6              THE COURT:  Fourteen.

 7              MR. MAYNARD:  -- or 14, rather -- and this was the

 8    one that I didn't have and I didn't get until four o'clock

 9    last night, so I couldn't have read this before.

10              It states in here the Computer 1, which is

11    Mr. Ahmed's computer, that the first thing they're going to do

12    is an analysis of this computer was conducted through the CART

13    review system to determine if they contained any extremist

14    material or other indications of criminal activity.

15              And I'm looking at the second page of the document.

16              And what they go on to say is on Computer 1 they log

17    in.  They find that there are Internet records found in

18    Computer 1 that suggests that the user of the computer was

19    attempting to obtain a fraudulent college diploma.  EBay

20    messages archived and exchanged correspondence with eBay

21    vendor selling diplomas.  Additionally, the user searched the

22    Internet for colleges that had closed and visited the

23    websites.

24              And all throughout the analysis of Computer 1, they

25    find that the user of Computer 1 was applying for federal

1    student aid.  And it talks about looking at different

2    universities in the Middle East that he may be attending or

3    wanting to attend in Qatar, Somalia, Jordan, Pakistan.

4         They then go into Computer 3, which was the computer

5    that Simpson had.

6         Now, the person who is in charge of the

7    investigation, ASU Detective Herrmann, has just told us that

8    all he needed to look at was Computer 1.  That was done

9    already.  That's all he ever used.

10        But what then goes on is that Computer 3, which is

11   Simpson's computer, there's over two pages here of

12   extremist -- or information that would indicate that one was a

13   terrorist or that one was involved with terrorist activity or

14   looking at terrorist activity.

15        When we got to Computer 4, which was my client's

16   computer, there is basically nothing there.  I mean, this was

17   YouTube -- he's got an e-mail address --

18        THE COURT:  Well, what's in the report essentially is

19   that there was evidence that Ahmed had used it.  That's all.

20        MR. MAYNARD:  Well, but to say that somebody has used

21   it doesn't give you carte blanche authority to go through and

22   look at everything that is in there.

23        The detective in charge of the investigation said

24   once I looked as the first computer, that's all I needed.

25   That's all he ever used.  He didn't need anything else.

1          This was a pretext, Judge.  This whole warrant -- I

2     mean, I understand that they went in there looking for

3     activity to deal with a fraudulent diploma.  But these

4     individuals were also being targeted for possible terrorist

5     activity, although it appears that they were asking two of the

6     individuals -- or at least one of them -- that's Mr. Ahmed to

7     be an informant for the FBI which he refused to do.

8          Judge, once you get a warrant, the case law as we

9     spelled out in the brief, indicates that it just isn't -- you

10    can't open it up to a general search.  You really do have to

11    be specific.  And once you go into something -- and

12    particularly, in the electronic age that we have now.  I mean,

13    this is becoming more and more important.

14         The government cannot just say I need to look for

15    this potential criminal activity, crack the door open, and

16    then go into and look at everything that is in there.

17         I'm not going to go through the cases I cited, but

18    the case that dealt with the Barry Bonds case in San Francisco

19    gives a very good analysis of why the FBI or any government

20    authority that is looking into somebody's computer

21    information, should not just go in there and look carte

22    blanche.

23         And that's what the FBI was doing in this case.  I

24    mean, they weren't looking just to determine whether or not

25    there was a forgery, which I think they should have been.  I

1    mean, if somebody is trying to forge with a computer and if he

2    was trying to use it for terrorist activity, they should have

3    been looking at it.

4         But that doesn't give them the right to just go in

5    carte blanche and look at everybody's computer in there and

6    that's what they really wanted to do in this case.

7         THE COURT:  Okay.  Thank you, Mr. Maynard.

8         My first question for you, Mr. Koehler, is do we have

9    evidence of what was on the computer from when Mr. Martinez

10   gave it to the FBI and consented to search?

11        MR. KOEHLER:  Your Honor, a separate image was

12   extracted from the Lenovo after Mr. Martinez turned it over to

13   the FBI.  The government turned a blue ray of that image over

14   to Mr. Maynard.  I can't remember the exact --

15        THE COURT:  I guess maybe I could ask the question

16   this way --

17        MR. KOEHLER:  Yes.

18        THE COURT:  Is there any evidence the government

19   intends to offer in this case that isn't -- from the Lenovo

20   that isn't on the blue ray made when Mr. Martinez allowed it

21   to be imaged in 2014 or '15?

22        MR. KOEHLER:  We intend to use the 2015 image of the

23   Lenovo.  That will -- assuming we prevail at trial, that would

24   avoid an appellate issue for us and so that's our intent is to

25   go that route or would narrow the scope of the appellate

1    issues, I should say.

2         THE COURT:  So is this motion to suppress a moot

3    issue because you don't intend to use any evidence from the

4    2012 search?

5         MR. KOEHLER:  Other than the Lenovo, that's correct.

6         THE COURT:  Of the Lenovo?

7         MR. KOEHLER:  There is the thumb drive that was in

8    the Lenovo that we do intend to use that we assert in our

9    motion papers that he lacks standing to object to that search.

10        THE COURT:  Because of the evidence that I have seen

11   that the defendant disavowed ownership of the thumb drive?

12        MR. KOEHLER:  Correct.

13        THE COURT:  So what you're telling me today is that

14   with respect to whatever was looked at in 2012, you don't

15   intend to offer that search, but the new search from -- I

16   don't remember what year.

17        MR. KOEHLER:  2015.

18        THE COURT:  From 2015?

19        MR. KOEHLER:  That is correct, Your Honor.

20        I do think it's important and we went to lengths to

21   establish that the agents, in fact, operated within the scope

22   of the warrant in 2012.  And it was not --

23        THE COURT:  Well, I agree to a point.

24        Based on the evidence that I have heard, they had the

25   right to seize the Lenovo.  And the search -- at least as

1    evidenced in Exhibit 14, reflects that what -- what the

2    defendant Mr. Kareem said then turned out to be true, that

3    Mr. Ahmed used his computer and we know that that's true based

4    on the search.

5         The question though is once they seized the computer

6    that belonged to somebody else that Mr. Ahmed used for -- I

7    don't know if it was occasionally, regularly, or all the

8    time -- are they limited in their search of the computer to

9    evidence that would support the elements of forgery?  Even

10   though, as a practical matter, they obtained an image are they

11   prohibited from looking at anything that isn't within the

12   scope of the warrant?

13        Similarly too, if we were in a paper world and they

14   went into a file cabinet and they might have paged through the

15   files but they weren't -- they wouldn't be allowed to seize

16   files that weren't supportive of what they were searching for.

17        MR. KOEHLER:  Your Honor, the one thing I would add

18   to that analysis is that the agents in 2015 got a new search

19   warrant to search the image that they still possessed from the

20   2012 execution of the warrant.

21        THE COURT:  I forgot about that.

22        MR. KOEHLER:  And so we followed the necessary steps

23   to go back and look through that.

24        THE COURT:  So you agree that they had to limit their

25   search in 2012.  But since they still had the image and got a

UNITED STATES DISTRICT COURT

1    new warrant in 2015, they could search the whole thing is your

2    position.

3          MR. KOEHLER:  That's correct.  One of the things that

4    Mr. Maynard raised in his papers was the notion that the

5    agents held onto that image too long.

6          Well, as has been pointed out, the investigation of

7    Mr. Ahmed is ongoing.  Imagine the prosecution for Mr. Ahmed

8    for that forgery offense in which we use computer evidence but

9    then tell his attorney that we have destroyed the image so

10   that he cannot have his own expert search through that image

11   and make determinations of whose computer, who was the user,

12   and so forth.

13         THE COURT:  But the government is telling me today

14   that the evidence that they are going to use at trial is not

15   from the 2015 search of the image they had had since 2012 but

16   from the consent search from Mr. Martinez.

17         MR. KOEHLER:  That is correct.

18         THE COURT:  Okay.  And the thumb drive is the subject

19   also of the 2015 search warrant?

20         MR. KOEHLER:  That is correct.

21         THE COURT:  Okay.  Thank you.

22         MR. KOEHLER:  Thank you.

23         THE COURT:  It's ordered taking this matter under

24   advisement.

25         I wanted to discuss a couple of other things with

1    you.  I know that there has been a superseding indictment.

2          MR. KOEHLER:  Your Honor, my co-counsel reminded me

3    that there is one possible use of the 2012 computer and that

4    would be for impeachment purposes.

5          In other words, if Mr. Kareem were to take the

6    witness stand and testify in some manner that contradicted

7    what we found in the 2012 warrant, we would reserve the right

8    to be able to use it for impeachment.

9          I apologize for the interruption.

10         THE COURT:  Okay.  Thank you.

11         There is a second superseding indictment that was

12   returned last week.  And I'm sure that Mr. Maynard is aware of

13   it, even though Mr. Kareem has not yet been arraigned on that.

14   I understand he is going to be arraigned on that superceding

15   indictment tomorrow morning before a magistrate judge.

16         And what I wanted to get some preliminary information

17   about from you in particular, Mr. Maynard, is whether the

18   addition of Count 5 is something that you anticipated and

19   already have the discovery on, or whether the addition of

20   Count 5 will likely affect your trial preparation and the time

21   that's needed.

22         We presently have a trial date of February 16th.

23         It may be premature to discuss that.  We will have

24   another opportunity to meet, which is the second subject as to

25   when that was, because it seems like next Monday as 1:30

1   doesn't make any sense at this point.

2        So do you know yet, Mr. Maynard?

3        MR. MAYNARD:  Do I know what?

4        THE COURT:  Whether or not the addition of Count 5 in

5   the second -- I didn't compare them side-by-side, but I assume

6   Counts 1 through 4 have not changed and only Count 5 has been

7   added.

8        MR. KOEHLER:  There are changes to Counts 1 and 4 --

9   or not 1 and 4; to Counts 1 and 3.

10        Count 1 had an additional "overt agent" added at the

11   end and Count 3 --

12        THE COURT:  So that would be the fourth "overt act"

13   would be new?

14        MR. KOEHLER:  Correct.  And then Count 3 added the

15   terrorism enhancement allegation for the false statements in

16   violation of the 1001.

17        THE COURT:  Okay.  And then Count 5 is entirely new?

18        MR. KOEHLER:  That is correct.

19        MR. MAYNARD:  If I understand the Court's question,

20   did I anticipate that the government would file a separate

21   superseding indictment?

22        No.  Because the evidence didn't change.  I mean --

23        THE COURT:  But I guess it's more importantly, will

24   this change our trial date?

25        MR. MAYNARD:  No.

1          THE COURT:  Okay.  Good.

2          The second thing that I wanted to just note for the

3   record is that when we last met, we spoke about the

4   possibility of a written questionnaire.  And I believe the

5   deadline to submit any proposed questionnaire was yesterday

6   and none was submit.

7          MR. KOEHLER:  That's for mailing, Your Honor.

8          We anticipated we have been working on a

9   questionnaire for -- to give to them the morning of or the day

10  before.

11         As I recall when we met last, you advised us that any

12  questionnaire that we wanted sent out via mail in advance of

13  the trial would need to be submitted by yesterday.  However,

14  the deadline was later, noon on February 1 of 2016, if they

15  were going to be filled out at the courthouse.

16         THE COURT:  Okay.  So that's the distinction?

17  Because we did have that discussion about the pros and cons of

18  each method.

19         And so the parties have rejected the idea of sending

20  a questionnaire by mail to an enormous number of prospective

21  jurors to complete without supervision.

22         MR. MAYNARD:  Judge, we have been working on a

23  questionnaire also.  But I think it's possible with it,

24  although I do not want to put the trial date off at all and I

25  don't think it's necessary, with the additional counts and the

 1   allegations of additional "overt acts," it may extend the

 2   trial a little longer, I think.

 3          I don't know if we want to send out a questionnaire

 4   to the jury strictly just on the time.

 5          THE COURT:  Oh.  We already agreed to that.  But we

 6   can discuss -- it may be premature -- they send that out --

 7   it's like four weeks in advance --

 8          THE CLERK:  45 days.

 9          THE COURT:  45 days, so six weeks and three days in

10   advance.

11          We had previously agreed that prospective jurors

12   would be prescreened for length of trial and that the dates

13   were February 16th through March 11th which is a period of

14   four weeks of four-day-a-week trial.

15          We obviously have a little bit of time.  Not a lot.

16   Six weeks before February 16th is probably next -- it's

17   probably Monday.

18          So if there's going to be any change or anticipated

19   change that would extend the trial beyond March 11th, we need

20   to know that before we send out the prescreening questionnaire

21   which tells the jurors nothing but what the length of the

22   trial is.

23          So do you anticipate any additional trial time as a

24   result of the additions in the second superseding indictment?

25          MR. KOEHLER:  We do not.

1          MR. MAYNARD:  I don't know if the government is

2    anticipating providing me with some new evidence to support

3    these claims or not.  If they are --

4          THE COURT:  Is there any new disclosure, Mr. Koehler?

5          MR. KOEHLER:  We are still finalizing the product on

6    the cellular analysis that we have discussed with Mr. Maynard.

7          We turned over the Cellebrite data to them in

8    spreadsheet form so that they could have their own analysis

9    performed of it.

10          There are a few reports that are left to produce, one

11    of which is the report of the 2015 search.  They have the

12    image but they don't have the report of the search of that.

13          And there may be a few other stray things out there.

14    Mr. Maynard requested a couple of interviews of related

15    subjects of the investigation.

16          And we are -- we have those in hand as of this

17    morning.  Those will be turned over in disclosure this

18    afternoon.  We are working on getting the records of those

19    interviews turned over as soon as possible as well.

20          We're in the final stages.  There's a few things here

21    and there that need to be cleaned up and make sure that we

22    have all our T's crossed and I's dotted, but we're about

23    there.

24          MR. MAYNARD:  Well, assuming there isn't anything

25    extraordinarily new.  I mean, I'm still hearing now that there

1    is an investigative report and there's 302s on my client that

2    occurred back in 2011 that I haven't seen.  But I will deal

3    with those issues with the government probably this afternoon.

4         But it's been a little slow in getting the materials

5    that we need.  But I don't anticipate that we're going to come

6    to this court and ask for any extensions.

7         I'm not sure that I wouldn't add an extra week onto

8    the length of the trial because of this allegation, the new

9    allegation in Count 5.

10        THE COURT:  That's kind of what I was thinking.

11        Maybe to be on the safe side, we should take it to

12   March 18th and that would be five weeks.  And I think

13   everybody would agree that we shouldn't have any difficulty

14   with a five-week  -- as long as we're prescreening a jury,

15   there's no reason to be stingy about the length.

16        MR. MAYNARD:  I think that's a good suggestion,

17   Judge.

18        THE COURT:  Okay.  So we will have the clerk's office

19   prescreen from February 16th to March 18th.

20        I mentioned a moment ago that we had a Final Pretrial

21   Conference set for January 4th at 1:30.  We set that, of

22   course, when we had the January trial date, but we did not

23   vacate it with the idea that we might still need to have some

24   further discussion.  But I don't know if there is anything

25   more to discuss on Monday than there would be today.

1          Mr. Koehler?

2          MR. KOEHLER:  I don't either, Your Honor.

3          MR. MAYNARD:  I don't anticipate there would be,

4    Judge.

5          THE COURT:  So we'll vacate January 4th.

6          MS. BROOK:  January 4th.

7          THE COURT:  How about if we set a Final Pretrial

8    Conference on Monday, February 8th at 10:00 and that will

9    be -- I will have had your proposed questionnaires.  Do we

10   need to reset deadlines for -- oh, no.  Oh, no.  We have them.

11   We already did.

12        I'm going to make a revision though.  I had set joint

13   statement of the case, joint proposed voir dire and

14   supplementary voir dire to which there is no objections by

15   noon, February 1.  We will keep that in place.

16        Trial briefs, joint proposed jury instructions,

17   supplemental are due February 9th.

18        And just thinking out loud, I don't really know that

19   we need to have those by the Final Pretrial Conference.  So I

20   think we will just keep that date, unless you think there

21   would be some reason that that would be a discussion at the

22   Final Pretrial Conference.

23        MR. KOEHLER:  I think we're fine with that, Your

24   Honor.

25        MR. MAYNARD:  I think we are fine.

```
 1            THE COURT:  So the written questionnaire that is

 2    being considered is due noon, February 1, and we're going to

 3    keep the number of prescreened jurors at 150.

 4            MR. KOEHLER:  Could you repeat that, Your Honor?

 5            THE COURT:  150 prescreened.  So jurors who -- not

 6    all of them, but haven't given us a good excuse for why they

 7    can't serve for five weeks.

 8            MR. KOEHLER:  We are in agreement with that, Your

 9    Honor.

10            MR. MAYNARD:  That's fine.

11            MR. KOEHLER:  Your Honor, there is one matter we

12    wanted to raise; and that is, the January 4 date for

13    preliminary witness and exhibit lists.

14            I would like to request that we push that back to

15    Friday, January 8th.

16            THE COURT:  Any objection?

17            MR. MAYNARD:  No.

18            THE COURT:  Okay.  Friday the 8th.

19            Everything else that we have set out in the order

20    from November 24th then is the same other than that -- that's

21    the only date we changed and the prescreened date for length

22    of trial.

23            Okay.  Unless something new happens, I will see you

24    on February 8th.

25            Oh, and, Mr. Maynard, I wanted to let you know that I
```

1    took care of your pending CJA matters with the exception of

2    one yesterday and the one that remains should be taken care of

3    today.

4              MR. MAYNARD:  Thank you, Your Honor.

5              THE COURT:  Court is in recess.

6         (Proceedings adjourned at 10:48 a.m.)

7                            *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                    C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5   duly appointed and qualified to act as Official Court Reporter

6   for the United States District Court for the District of

7   Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion

10  of the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 17th day of April,

14  2016.

15

16

17

18

19                        s/Elizabeth A. Lemke
                          _____
20                        ELIZABETH A. LEMKE, RDR, CRR, CPE

21

22

23

24

25