# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB(MHB)** |
| vs. | ) Phoenix, Arizona |
| | ) February 8, 2016 |
| Abdul Malik Abdul Kareem, | ) 10:05 A.M. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

### BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

### FINAL PRETRIAL CONFERENCE

**APPEARANCES:**
**For the Government:**
        U.S. ATTORNEY'S OFFICE
        By:  **Kristen Brook, Esq.**
            **Joseph Edward Koehler, Esq.**
        40 North Central Avenue, Suite 1200
        Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
        MAYNARD CRONIN BRICKSON CURRAN & REITER PLC
        By: **Daniel D. Maynard, Esq.**
            **Mary Kathleen Plomin, Esq**.
        3200 North Central Avenue, Suite 1800
        Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-SRB      **FINAL PRETRIAL CONFERENCE**      2-8-16

```
 1                   P R O C E E D I N G S

 2        (Called to the order of court at 10:05 a.m.)

 3             THE CLERK:  Criminal case  15-707.  United States of

 4   America v. Abdul Malik Abdul Kareem.   Time set for final

 5   pretrial conference.

 6             MS. BROOK:  Good morning, Your Honor.  Kristen Brook

 7   and Joe Koehler on behalf of the United States.

 8             MR. MAYNARD:  Good morning, Your Honor.  Daniel

 9   Maynard and Mary Plomin on behalf of Abdul Malik Abdul Kareem

10   who is in custody and in the courtroom.

11             THE COURT:  Good morning.

12             This is our Final Pretrial Conference.  Have all of

13   the deadlines that I previously set for everyone to disclose

14   things to each other that have passed as of this moment been

15   done?

16             MR. MAYNARD:  No.

17             THE COURT:  What hasn't been done, Mr. Maynard?  What

18   are you waiting for?

19             MR. MAYNARD:  I think we are -- today we're going to

20   exchange our last witness lists and exhibit lists -- or

21   exhibits.  We have not gotten expert reports from the

22   government on several experts that were listed at one time.

23             Now, they may have withdrawn them.  I don't know.

24             MS. BROOK:  And, Your Honor -- well, the two experts,

25   I believe defense is referring to is Evan Kohlmann and Lorenzo
```

CR15-00707-SRB     **FINAL PRETRIAL CONFERENCE**     2-8-16

```
 1    Vidino; is that correct.
 2              MR. MAYNARD:  Those are at least two.  There are
 3    actually four.
 4              The government had listed two other experts on their
 5    original expert list but then didn't include them on their
 6    witness list.  Mr. Berger -- and I can't remember the other
 7    one -- so I didn't know whether they were withdrawn or not.
 8              MS. BROOK:  And they were withdrawn.
 9              So the expert report that will be submitted once we
10    receive it -- and we are still awaiting receipt of it -- is
11    Mr. Kohlmann's.
12              At this stage there won't be an expert report as it
13    relates to Mr. Vidino.
14              THE COURT:  But he is going to testify?  Vidino?
15              MS. BROOK:  Vidino?  Yes.
16              THE COURT:  So he's going to testify consistent with
17    what you disclosed?
18              MS. BROOK:  Correct, in our notice.
19              THE COURT:  But he doesn't have a written report?
20              MS. BROOK:  Correct.
21              THE COURT:  To the extent that any of your experts
22    other than Mr. Kohlmann have a written report, they have been
23    disclosed?
24              MS. BROOK:  Yes.
25              THE COURT:  So forensic testing, those have all been
```

1    disclosed?

2          MS. BROOK:  That's correct.

3          MR. MAYNARD:  Yes.  Mr. Vidino and Mr. Kohlmann are

4    listed together.  And on the disclosure we got, they will

5    testify about exactly the same thing.  There is no difference

6    in them.

7          So, I mean, there's a part of me that's going to move

8    to exclude one of them because they can't -- I mean, I don't

9    see why we have expert testimony exactly the same thing.

10   They're -- they were both listed in the same paragraph on

11   disclosure.

12         THE COURT:  You mean there was no separate

13   description of what Mr. Vidino was going to say versus what

14   Mr. Kohlmann's going to say?

15         MR. MAYNARD:  That's correct.  It was Mr. Vidino,

16   Mr. Kohlmann will testify as follows.  We believe he will

17   testify about these things but we're not sure what it is.

18         THE COURT:  I don't think that's adequate, Ms. Brook.

19         If they are not -- it might have been adequate if

20   they were going to prepare a report so that the defendant had

21   some notice as to what the differences were.

22         But if Mr. Vidino is not preparing a report and you

23   have given no specific -- no disclosure specific to him as

24   opposed to jumbled together with Mr. Kohlmann, you -- either

25   you need to immediately give a disclosure specific to

1    Mr. Vidino, or perhaps even better, reconsider whether you

2    need two experts whose opinions can be summarized together.

3              MS. BROOK:  And two points on that.

4              One is that there was disclosure as it relates to

5    Mr. Vidino in the form of other transcripts he's given,

6    testimony he's given, so there were transcripts related to

7    testimony in this particular area.

8              With that said, both Kohlmann and Vidino were

9    disclosed with a notice stating that they were either for our

10   case-in-chief or for rebuttal.  So we know -- because the only

11   disclosure we have received from defense is a list of experts.

12   We don't have any witness lists or any other disclosure from

13   them.

14             We do have a list of experts from them as it relates

15   to Mr. Sageman and Mr. Gartenstein Ross.

16             However, you know, Mr. Vidino would likely be

17   reserved for a rebuttal situation.

18             THE COURT:  But you have disclosed his prior

19   testimony?

20             MS. BROOK:  That's correct.

21             THE COURT:  And you expect that he would be

22   testifying consistently in this case with what he said in past

23   cases.

24             I take it he's an expert not as to anything specific

25   to this defendant, but generally, with respect to the issue of

CR15-00707-SRB     **FINAL PRETRIAL CONFERENCE**     2-8-16

1    his expertise?

2         MS. BROOK:  Exactly, Your Honor.

3         THE COURT:  I say that generally, because I don't

4    have a copy of his disclosure, so I don't know what it says.

5    I mean, I'm sure it's in the file, but I don't have a copy of

6    it in front of me.

7         The only one I have is from 12/11 and that -- oh,

8    that's defendant's.  I do have one for plaintiff, but it

9    didn't have -- I don't remember that it had those two

10   gentlemen on it.

11        MR. MAYNARD:  I think it's in their supplement.

12        THE COURT:  Anything else you're missing?

13        MR. MAYNARD:  Well, yeah.  We haven't gotten what

14   they said we received.

15        We did get copies -- Mr. Kohlmann has testified, I

16   think, seven or eight times for the government and we got

17   copies of those but we did not get copies of anything on

18   Mr. Vidino.

19        My understanding is he has never testified for the

20   government before.  And so we didn't get anything on him.

21        MS. BROOK:  So what he has done previously, he has

22   testified before Congress.  He also has published articles and

23   those have been disclosed in the forms of links to those which

24   is what we were given.

25        THE COURT:  Oh, so you have provided some type of a

1  link so that Mr. Maynard could click on what you gave him and

2  see what Mr. Vidino has said in his testimony before Congress

3  and in the articles he has written?

4      MS. BROOK:  That's correct.  And his CV, which is

5  also extensive, and lists all of his publications.

6      MR. MAYNARD:  We did get that.  But I was under the

7  impression she said he had given testimony before and we had

8  not gotten any prior testimony of Mr. Vidino.

9      THE COURT:  Well, she said testimony, but now it's

10  clarified that it's not testimony in court but testimony

11  before Congress.

12      MR. MAYNARD:  The issue that we're still stuck with,

13  Judge, is they are listed as testifying about the same thing.

14      THE COURT:  Well, I think Ms. Brook just said that he

15  will only testify, if necessary, for rebuttal and not in their

16  case-in-chief, correct?

17      MS. BROOK:  Correct.

18      THE COURT:  And I can count on that?

19      MS. BROOK:  Yes.

20      THE COURT:  Okay.

21      MR. MAYNARD:  Okay.

22      THE COURT:  When do you expect to deliver the report

23  from Mr. Kohlmann?

24      MS. BROOK:  That should be delivered, we hope, today.

25  We hope we will be in receipt of that today.  It is a draft

1    and it may be amended.  And as soon as we get an amendment to

2    it, we will give defense that amendment or a more finalized

3    version as soon as we receive it.

4            I just wanted to give a quick footnote.  There may be

5    outstanding a handwriting comparison forensic report, as well

6    as, perhaps, one other forensic report that is in the queue,

7    because there have been some handwriting samples and some

8    things that have been sent to Quantico that we are still

9    awaiting receipt of.

10           Once we get those, immediately, we will disclose

11   those to defense.

12           THE COURT:  Okay.  Handwriting.  What's the other

13   one?

14           MS. BROOK:  Indented analysis.  So fingerprint

15   analysis, as well as DNA on some additional pieces of evidence

16   that we don't have yet because they haven't been drafted yet.

17           THE COURT:  Do you know what the results are?

18           MS. BROOK:  We don't.  But we can notify defense of

19   those as soon as we find out.

20           MR. MAYNARD:  We have gotten a number of fingerprint

21   reports already and hair analysis and DNA analysis and

22   handwriting analysis, so I wasn't aware that there were any

23   missing but --

24           THE COURT:  I want to talk to you about the

25   questionnaire that was submitted.  And I have a couple of

1    general comments about the questionnaire and then I have some

2    very specific comments about the proposed questionnaire.

3          My general comment about it is that it's too long and

4    it includes too many questions that are more properly asked in

5    open court.

6          I think that when I told you about my view of

7    questionnaires, I told you that I believe that questionnaires

8    are generally most useful to ask the questions that you fear

9    you will not get an honest answer or any answer in open court

10   because of the nature of the question.

11         And so asking somebody their name and where they work

12   in a questionnaire is not likely to yield any information they

13   wouldn't tell you -- I'm sorry -- we don't ask their names

14   anymore.

15         But asking someone whether they are married, what

16   they do for a living, and the like, is not, in my view,

17   appropriate in a questionnaire when that information is

18   readily disclosed in open court.

19         And we also don't want to eliminate the ability of

20   those lawyers and the defendant who are going to assist in

21   jury selection in not having an opportunity to see and hear

22   from the perspective jurors.

23         And if you include in a questionnaire more or less

24   every single question that they are likely to have an answer

25   to, then we might as well pick the jury based on the

1   questionnaire answers and never really look them in the eye

2   and hear them speak or see what they have to say, if anything.

3        So I have one final general comment about the

4   questionnaire; and that is, that I gave you one specific thing

5   that I said had to be included in the questionnaire if we used

6   a written questionnaire and it's not here, which is the list

7   of witnesses.

8        Because if we're going to give them a list -- if

9   we're going to give them a written questionnaire, they might

10  as well have a chance to look at and circle the names of

11  people whose names are familiar rather than have me read

12  dozens -- in this case dozens of names which, as an aside, I

13  saw that there's a preliminary list of witnesses where some

14  people's names are still not there.  And there was an

15  explanation that was given as to why their names weren't

16  there.

17       But that's not going to help us in jury selection

18  because we can't pick a jury and then have a surprise during

19  the trial that somebody takes the stand and we hadn't given

20  them their name and it's their nextdoor neighbor or worse, the

21  person that, you know, rear-ended them on the freeway a

22  year-and-a-half ago.

23       I mean, we just can't have that.  So if you think

24  about jury selection, they have to know who everybody is.

25       MS. BROOK:  On that particular issue, Your Honor,

CR15-00707-SRB     **FINAL PRETRIAL CONFERENCE**     2-8-16

1    that will not be a problem.  There were particular

2    sensitivities related to disclosure of individual names which

3    we have worked through.  So we anticipate today obviously we

4    will be filing our witness list.  We can easily input that

5    into a revised questionnaire for Your Honor and we will have

6    the names, the witnesses names.

7            THE COURT:  But I don't want you to include witnesses

8    who don't have a name.  Your witness list says we're going to

9    call a person from here and a person from there.

10           Well, that, you know, doesn't work for the jury

11   either.

12           MS. BROOK:  They will all have names.  The only

13   caveat to that would be we do have likely four juvenile

14   witnesses in this case.  Those individuals we will just refer

15   to by initial.  And perhaps in the witness list itself as we

16   submit to the jury in the questionnaire -- I don't know.  I

17   defer to Your Honor as to what you would like in that

18   circumstance.

19           THE COURT:  We have to have their names.

20           MS. BROOK:  Okay.

21           THE COURT:  I mean, their initials aren't going to

22   get the answer to the question.  I mean, what if that is --

23   what if one of the juveniles is somebody that one of the

24   prospective juror's kid had a problem with at school?  Then we

25   can't find that out, you know, three weeks into trial.

1        So their names have to be there.

2        MS. BROOK:  Absolutely.  Perhaps what we could do is

3    e-mail those names to Your Honor and defense counsel and then

4    we can put them into the questionnaire.

5        We just don't want to submit it and file it onto the

6    public record and have their names in it.

7        THE COURT:  Well, sure.  No.  The witness list for

8    the questionnaire is not necessarily the public witness list.

9        The questionnaires themselves will never be in the

10    public record.  They will be in a sealed record, just like --

11    well, not just like the voir dire.  The voir dire will be in a

12    public record.

13        Okay.  So the other thing -- and I don't recall that

14    I specifically said if you're going to have a questionnaire we

15    have to include this -- but if we're going to have a

16    questionnaire, we have to include, which is, the trial

17    schedule, the dates and the times, so that hopefully, upon

18    review of the answers, we can excuse people who give us an

19    obvious reason why they can't serve for five weeks.

20        We have a prescreened jury.  But as I have told you,

21    the standard -- they're very strict downstairs in

22    prescreening; not as strict as I will be in assessing

23    hardship.  And so we need -- there's no reason to ask 150

24    people about hardship if we find 40 people who have a clear

25    hardship and should be excused and then they never have to

1    come into the courtroom to answer any other questions.  So we

2    need to include that.

3         The process of completing the questionnaire.  It

4    should be obvious to you.  It's obvious to me that we can't

5    have the jurors fill out the questionnaire here in this

6    courtroom because there's simply no place for them to write.

7    So it has to be done downstairs at the tables in the jury

8    room.

9         But some of the questions in the questionnaire assume

10   that they know something about the case.  So the question -- I

11   mean, my preference, the cleanest way to do this, is to simply

12   have the Clerk, Maureen, go down and swear in the jurors.

13   Hand them the questionnaire.  Have them fill it out.  And then

14   whatever number are not excused, based on answers that show

15   hardship or clear bias, those people come up to the courtroom

16   for voir dire, which then proceeds in the normal fashion with

17   the joint statement of the case.

18        That would be, in my opinion, the best way to

19   proceed.  And so we have to be sure that the questions don't

20   assume knowledge about the case.  And I can't -- we will go to

21   some specific questions that may be pertinent there.

22        The other thing I think it said in the

23   questionnaire -- oh, I know.

24        When you finished answering the questionnaire, you

25   must sign with your name and that signature page you are

1    affirming the accuracy of your answers.

2            That page will be removed by the court staff and

3    will -- there's a typo there -- it says "wilt" not -- will not

4    be shown to any party.

5            Now, it's true that the signature will be removed

6    from the questionnaire before the questionnaire becomes part

7    of the record.  So that the only way to associate the person

8    with the questionnaire answers will be by juror number.

9            But I don't know why we would take that off and not

10   show it to any party.  You will have the names of the jurors,

11   at least temporarily, while we're selecting the jury.

12           And I think I said a minute ago the questionnaire

13   answers would be in a sealed record but I don't think that's

14   so.  I think the questionnaire answers, except for the

15   identification of the juror, will be in the public record.

16   That's when we take off their name and have their names in the

17   same sealed record with the juror names.

18           MR. MAYNARD:  Yes.  I believe the questionnaire is in

19   the public record.

20           THE COURT:  Right.  I misspoke about that.  I was

21   thinking about the last page where they sign their name.

22           There was also some instruction here -- well, there's

23   a lot of instruction here, perhaps too much instruction.

24           One of the instructions was to put your juror number

25   on every page.  My suggestion is that you have an extra prompt

UNITED STATES DISTRICT COURT

1    for them which is at the top of each page that says "juror

2    number" so that they can fill it in and hopefully will.

3           So I want to go through more specifically the things

4    in this questionnaire that I think shouldn't be in there

5    because they should be reserved for open court voir dire.  And

6    then I want to go through some questions that I don't think

7    should be in the questionnaire at all or in voir dire in open

8    court.  So --

9           MR. MAYNARD:  Judge, before you get to that, can you

10   tell us how you do voir dire with a jury?  How do you let us

11   do it?  Is it to the panel?

12          THE COURT:  I voir dire everyone.  I don't do a

13   strike-and-replace.  I do a struck method of jury selection

14   because strike-and-replace, in my view, is the replaced

15   jurors, particularly towards the end of voir dire, you're

16   never really sure that they have answered any of your

17   questions because you just asked them the question, "Did you

18   have a 'yes' answer to any of those 75 questions I asked

19   earlier?"

20          So I use the struck method.  So whatever number are

21   here are the number that we are going to voir dire, which is

22   the other reason we need the hardship people and -- I mean,

23   obvious bias.  Obviously, we're going to review for that.

24          But the hardship people, we need to have them out of

25   here so that we don't have to go through legitimate excuses

1    for being unable to serve for five weeks.

2           So I'm hoping that what we have for the actual voir

3    dire is some number, you know, maybe in the 60s, 70 at the

4    most.

5           MR. MAYNARD:  And do you allow counsel to ask

6    followup questions?

7           THE COURT:  Yes.

8           MR. MAYNARD:  Okay.

9           THE COURT:  So I would not include in the

10   questionnaire Questions 1 through 6.

11          Question 7, I have no particular feeling about.

12          I would not ask question 8 or 9.

13          I have a question mark about 10.  Aren't we getting a

14   little bit deep into that kind of information?  And if you

15   have a specific voir dire question you want me to ask as to

16   specific occupations, that seems to me to be reasonable.  But

17   why in the world would we ask someone to tell us the

18   occupations of all of their adult children and grandchildren?

19   I mean, people could -- that could be 20 people.  And what are

20   you going to do with the information?

21          That's kind of my idea of what are you going to do

22   with the information that you get?  And if the answer is,

23   well, gosh, I have no idea what I would do with the

24   occupations of a combination of adult and children and

25   grandchildren that could be a huge number, then don't ask the

1    question.

2             In you want to know specifically, "Do any of your

3    relatives work for this company or this agency?" then we

4    should ask them that.

5             I wouldn't ask 11 in a questionnaire.

6             I have no feelings, strong feelings about 12.

7             13 falls into -- you know, we ask on the standard

8    chart whether that specific juror has been in the military.

9    We don't ask about anybody else.  I would question why you

10   care about anybody else.

11            14 and 15 are a good example of why ask 14 if what

12   you want to ask is just 15?  What difference does it make if

13   somebody lived in, you know, Iceland for a few years?

14            If you want to know if they have ever lived in

15   particular parts of the world, why not ask them about that

16   part of the world and skip the other question?

17            In my standard voir dire, I ask whether anyone has

18   been a crime victim, so I wouldn't ask 16 here.  But if you

19   want -- 16 is one of those that you may think, yeah, that one

20   will likely get better answers.  So if you want to leave 16

21   in, I have no problem with that.

22            But I wouldn't repeat -- keep in mind, nobody is

23   going to be asked anything general that they have already

24   answered in writing.  There might be a followup to a written

25   answer.  So if you don't -- if you want to hear them say the

1    answer, don't ask it in writing.

2         I don't know how they can answer No. 17 and we will

3    see 17 going on and on.  But I always ask about whether people

4    practice -- anybody in the family practices law.  But if you

5    want to have it in writing, I don't care.

6         Nineteen, similarly.

7         Twenty, I have no strong feelings about.

8         I do not believe that 21 can be asked without the

9    type of question that I -- without the information that I

10   provide to the jury on this subject first, which is, that the

11   jury needs to know that they will be evaluating the testimony

12   of all witnesses for accuracy and truthfulness.  We want to

13   know if they can treat every witness the same without bias or

14   prejudice for or against some category.

15        And I think that 21, without being able to talk to

16   the jurors, won't give you any information that's particularly

17   useful.

18        Twenty-one -- the second No. 21, I don't like this

19   question.  I don't think that we need to ask jurors to tell us

20   this type of information.  And if there's something specific

21   you want to know, ask them specifically.  But I don't

22   subscribe to asking the question that's in the second No. 21.

23        Twenty-two, I think is clearly appropriate for this

24   questionnaire, but I don't know how they answer the final

25   question because this is one of those questions that

1    presupposes the jury knows something about the case.

2            And this, "If so, would those opinions prevent you

3    from fairly and impartially considering the evidence" and yet

4    there's nothing that comes before that that says that this

5    case has anything whatsoever to do with the incident in

6    Garland, Texas.  So how can they say that that opinion would

7    affect this case?

8            I mean, they might figure out that maybe this case

9    has something to do with it, but they don't even know that yet

10   because they haven't heard the joint statement of the case.

11           I would suggest that No. 23 is better reserved for

12   when everybody is introduced in court and I ask, "Have any --

13   do any of you know the defendant?"  And they see him.  And

14   then we could ask if they have ever heard of him or read

15   anything about him.

16           But to simply give this name -- I suppose you could

17   ask.  And if somebody said "yes," that you would have a pretty

18   good idea they know him fairly well.  But I don't know why you

19   would want to ask 24 in writing when we could ask it in open

20   court.

21           I think 25 is a perfectly nice question to ask in a

22   questionnaire, but I'm not sure we have a right to ask No. 26.

23           I don't like question 27.  I don't know what

24   information you -- what use you would put to the answer.  And

25   if you say, well, if they said, you know, my favorite leisure

1    activity is going out to the shooting range and shooting some

2    kind of a gun, then ask them if that's one of their leisure

3    activities.

4              I mean, why do we have to find out if they like to

5    bowl or knit or needlepoint.  Ask them what you want to know,

6    not a question that really is not productive, generally, of

7    any useful information.

8              I think 32 is not appropriate in the questionnaire.

9    Once again, if you -- if you try to put yourself in the

10   position of a juror who knows nothing about the case, all of a

11   sudden you drop 32 without any information as to what in the

12   world this case is about.  And I don't know how -- I could

13   assume that a "no" answer would truly show some bias, show

14   some inability to be impartial, when there's absolutely no

15   background about what this case is about at this point in

16   time.

17             I think 35 may be an appropriate question for this

18   case, but I think 36 is a completely inappropriate question.

19             I don't think we have any right to inquire into the

20   religious beliefs or the churches that prospective jurors and

21   their families attend except as might be relevant to this

22   case.

23             This question would be no different than asking them

24   if they were a registered Democrat or Republican or who they

25   were going to vote for in the next election.

1          We don't ask people what their religious practices

2     are if those practices aren't tied to something relevant to

3     voir dire.  So if you had something specific to ask like 35,

4     that's fine; but not 36.

5          Thirty-seven, I think, is an appropriate question,

6     but I don't like the followup.  How will they know if their

7     association with that person would affect their ability to be

8     fair and impartial in this case if they don't know anything

9     about what this case is?

10         The answer "yes" or "no" -- the answer "no,"

11    obviously, there's no more followup.  The answer "yes" might

12    mean we should follow up with that prospective juror and ask

13    some additional questions about whether that association has

14    been, you know, positive or negative or neutral.

15         I do not believe 39 is appropriately asked in writing

16    but is something that should be included -- is included and

17    should be asked and explained during voir dire.

18         With respect to 40, 41, 42, 43, my comment on those

19    is why not in open court?

20         I don't understand 44.  Maybe you could enlighten me.

21         MR. MAYNARD:  Are you asking me, Your Honor?

22         THE COURT:  I don't know whose idea 44 was, so I

23    asked it generally.

24         MR. MAYNARD:  Okay.  I'm not sure which one of us

25    because we went back and forth a number of times.

CR15-00707-SRB     **FINAL PRETRIAL CONFERENCE**     2-8-16

1    I believe there will be several people who testify or

2    there will be individuals who are witnesses in the case who

3    that's an issue.

4         THE COURT:  How will it become -- how will their

5    sexual orientation be a piece of admissible evidence?

6         MR. MAYNARD:  I'm not sure yet.  I don't know what

7    else to tell you.

8         THE COURT:  Okay.  I mean, I don't know that it's

9    particularly productive.

10        Okay.  Forty-six, again, I don't know that 46 -- I

11   mean, I assume that the vast majority of people would answer

12   46 "yes," but I don't know how they would answer the followup

13   when they have no information about this case at the moment

14   that they're filling out this questionnaire.

15        Forty-seven, no, no, no.  If you want to know

16   something specific, ask it.  But, no, I don't want to know --

17   I don't think that we have a right to know if they have a

18   "Bernie" or a "Trump" bumper sticker on their car.  I don't

19   think that we need to know if they have a religious symbol on

20   their car that shows what church they go to.

21        But if there's something specific that you want to

22   know, then ask it, but do not ask -- we will not ask 47.

23        Forty-eight, that's an open-court voir dire question

24   not a questionnaire question.

25        The subject matter of the case, they don't even know

1    what it is, so we can't ask it in the questionnaire.

2          Fifty does not -- is not appropriate without all of

3    the information that goes before 50 in open court.

4          Fifty-one is the same as 28.

5          So I'm going to send you back to the drawing board.

6          The other thing that you need to think about is this.

7          One of you needs to take the responsibility when we

8    get a questionnaire that is acceptable, much shorter, witness

9    list, and schedule, to provide 150 copies.

10          I would suggest for efficiency that while the copies

11   need to be collated, they shouldn't be stapled, because then

12   they have to be unstapled before they can be copied.

13          And the unstapling takes a lot of time.  And also,

14   depending on what happens when it's unstapled, it could also

15   affect the ability of the answered questionnaire from being

16   fed into a machine and not getting jambed.

17          So I would suggest clipped in some way.

18          What I have done in the past and what I believe we

19   would do in this case is the jury would be administered the

20   questionnaire at the earliest possible moment on Tuesday,

21   which would be around 8:30ish.

22          And that as soon as we had answers, obviously, some

23   people answer them quicker than others.  We would start

24   copying them.  Provide a copy to each of you.  And then we

25   would privately, but simultaneously, start reviewing the

CR15-00707-SRB     FINAL PRETRIAL CONFERENCE      2-8-16

1    answers.

2          When I review the answers, I, of course, go to like

3    three key things; the schedule and questions that might show

4    obvious bias.

5          And then we would meet and say, yes, this person

6    should be excused; or we don't agree and then decide who has

7    to come upstairs.

8          And I -- my goal would be to have everybody come

9    upstairs by no later than 1:30 on Tuesday so that we -- which

10   is the other reason this questionnaire has to be short and

11   targeted to the kinds of questions that you really believe

12   need to be answered in writing in order to get an honest

13   answer.

14          Because all of this other information we can obtain

15   from the jurors in open court.

16          You're not going to have to -- have time to digest

17   all of these relatively benign questions like what their

18   grandchildren do for a living in the time that I'm going to

19   permit.  We're not going to have them take this questionnaire,

20   answer it, and 150 people come back on Wednesday.

21          I don't know where the 150 people come from, but I

22   know that some number of them will come from quite a distance

23   and I don't think they should have to come back a second day

24   when we should be able to efficiently go through the obvious

25   bias and excuse those people, or the obvious hardship, and

1    excuse those people and let them go and only talk to the

2    people who have the potential to be a qualified juror.

3            So my last question on the questionnaire is:  When

4    are you going to be able to get it back to me?

5            MR. MAYNARD:  Judge, I would think -- we worked on

6    this together going back and forth.  My thought would be that

7    we could probably get it to you no later than tomorrow.

8            MS. BROOK:  Yeah.  That's what I was thinking.  End

9    of the day tomorrow.

10           MR. MAYNARD:  End of the day.

11           THE COURT:  Well, it better be in really, really good

12   shape, because I will not be available starting about one

13   o'clock tomorrow until Friday morning.

14           So if you don't get it to me until -- I was going to

15   suggest ten o'clock tomorrow morning so I would have a chance

16   to look at it and at least see whether I thought it met the

17   guidance that I provided to you today.

18           But if you can't, you're going to be scrambling over

19   our upcoming three-day weekend.

20           MR. MAYNARD:  Why don't we give a shot at getting it

21   to you by ten o'clock tomorrow morning and see where we are.

22           THE COURT:  Forewarned is all I can say.

23           MR. MAYNARD:  I hear you.

24           Judge, one other question.  My understanding is that

25   our court week will be Tuesday through Friday.  You are dark

1   on Mondays?

2            THE COURT:  That is correct.

3            So with respect to the dates, the five weeks, it's

4   always Tuesday through Friday.

5            MR. MAYNARD:  And what should we put in there because

6   some people are traveling?

7            THE COURT:  9:00 a.m. to 4:30.  I don't think we need

8   to do the lunch and 15-minute breaks.

9            MR. MAYNARD:  No.

10           THE COURT:  We just need to know if they can't be

11   there for certain days.

12           MR. MAYNARD:  But it's 9:00 a.m. to 4:30.

13           THE COURT:  9:00 a.m. to 4:30 p.m., Tuesday through

14   Friday, for the five weeks Friday.

15           Anything else on questionnaires?

16           So what you need to do as eliminate all of these -- I

17   don't know that anybody gave me proposed voir dire other than

18   in the questionnaire.

19           MR. MAYNARD:  I believe the government did.

20           THE COURT:  I think the government gave me -- well,

21   maybe they did.  They gave me two questions they wanted to

22   include in the questionnaire that apparently you couldn't

23   agree on.  But did I get any general voir dire?

24           MS. BROOK:  No, Your Honor.  And those would actually

25   be fine just as general voir dire but they were submitted

1    separately because we didn't agree upon them.

2          THE COURT:  Okay.  Well, when you take the questions

3    out, you might want to submit those questions that you took

4    out to me for proposed oral voir dire so that I don't miss

5    anything.  I mean, I have my standard, but I don't want to

6    miss things that you include.

7          Because when it comes to the opportunity for the

8    lawyers to do voir dire, it will be followup voir dire, not

9    panelwide general questions.  All panelwide general questions

10   are to be asked by me.

11         And so it's only those people that raised their hand

12   or answered a question in some way that you're actually

13   following up on an answer as opposed to getting the yes-or-no

14   answers initially.

15         Anything else on jury selection?

16         MS. BROOK:  Just as it relates to filing those with

17   Your Honor.  Would you like them filed on ECF or just

18   submitted to you via e-mail?  So refiled and submitted to the

19   Court?

20         THE COURT:  Yes.  But keep in mind that the actual

21   questionnaire won't -- the first page won't look like this.  I

22   mean, it may have a caption, but it will be just

23   questionnaire -- does it need a caption?  Can it have a

24   caption?  I don't have any feeling about that.  And it won't

25   be signed by you.  So I think it does have to be filed at some

1    point.

2           But I don't care at this time whether what you submit

3    to me is the voir dire in the form it's going to go to the

4    jury or it's filed.  I'm not concerned about keeping the

5    record.  I'm concerned about the questionnaire.

6           So however it's easiest -- whatever form is easiest

7    to work in, knowing what the ultimate 150 copies have to look

8    like.

9           MR. MAYNARD:  Can we just e-mail you the form of the

10   questionnaire by ten o'clock tomorrow and then if it's

11   approved or acceptable, then we can put it in a final form

12   after that?

13          THE COURT:  Yes.

14          MR. MAYNARD:  Okay.

15          THE COURT:  I want to speak rather circumspectly

16   about a couple of items.

17          Mr. Maynard, have you received by mail the notice

18   that the government filed last Friday or are you presently

19   aware of it?

20          MR. MAYNARD:  Yes.

21          THE COURT:  Okay.  What I want to speak about is the

22   motion to seal it and the motion to seal the motion to seal

23   it.  Or -- yes.

24          I don't know why those items should be sealed.  And I

25   have here a signed order that I signed last February but did

1    not give to Maureen yet to file in because it says it's under

2    seal.  And I don't know why the notice of filing and my order

3    that will be filed should be sealed.

4              MS. BROOK:  Your Honor, we filed the notice under

5    seal because of the section that was referenced in the notice.

6              So with that, if the Court's --

7              THE COURT:  But the fact that you've filed the notice

8    and cited the statute, there's nothing secret about that.

9              MS. BROOK:  We don't object at this stage to it

10   being -- the order or the notice being filed publicly and it

11   not being sealed.

12             THE COURT:  Okay.  So the motion to seal is denied.

13   And my order signed on February 5th will be filed in the

14   public record.

15             And this folder, Maureen, contains that signed order.

16             What else do you have on your agenda today for

17   discussion, Ms. Brook?

18             MS. BROOK:  Your Honor, just a couple of brief

19   housekeeping issues as it relates to the trial coming up.

20             In our opening we intend to show the jury a couple of

21   images, images of things that will come into evidence during

22   the case.  And so we just wanted to --

23             THE COURT:  By "imagines," do you mean "photographs?"

24             MS. BROOK:  Photographs.  As well as --

25             THE COURT:  And these are photographs -- have you yet

1   showed which photographs you're going to show in your opening

2   to Mr. Maynard?

3          MS. BROOK:  No, we haven't.  They are -- they haven't

4   all been selected or determined at this stage.  But they

5   are -- you know, evidence defense counsel has, you know,

6   pictures that are at issue in the case, images of --

7          THE COURT:  Let me just give you some guidance on

8   this.

9          I think you should be able to show photos in your

10  opening but not if they're photos to which Mr. Maynard is

11  going to have some legitimate objection.  If you want to show

12  evidence in your opening, we have to be sure it's admissible

13  evidence.

14         So at some point before your opening, which

15  hopefully, will be on Wednesday, Mr. Maynard has to see the

16  photos and I have to be convinced that they will be

17  admissible.

18         So I'm not talking about whether you can get somebody

19  to say "this photo was made at or near the time."  I'm talking

20  about the type of objection that might -- you might not be

21  able to cure with more foundation.

22         So he has to see what they are.  And if there is no

23  objection, fine.  I don't have to be involved.

24         But you can't just promise Mr. Maynard, "Don't worry,

25  these are ones that you have and they will surely be

1    admitted."

2          MS. BROOK:  We will discuss it thoroughly and he will

3    know which pictures.

4          THE COURT:  Okay.

5          MS. BROOK:  Additionally, I just wanted to alert the

6    Court that there is one witness who we will take somewhat out

7    of order, and that is, Evan Kohlmann who we will probably put

8    on the stand in the first couple of days due to his schedule.

9          So with that, he will be testifying to things that

10   will be coming into evidence later on in the case.  But I just

11   wanted to alert the Court to that issue so that we're all on

12   the same page.

13         THE COURT:  I always believe that we should attempt,

14   whenever possible, to accommodate witnesses out of order.  And

15   it's relatively impossible in most cases to actually have the

16   evidence come in completely chronologically.  Because one

17   witness may be testifying about more than one moment in time

18   and then someone comes in and fills in other moments.

19          And similarly, if there are defense witnesses -- I

20   realize in a criminal case there may be good reason why a

21   defense counsel may not want to put someone in out of order.

22   But if you did, Mr. Maynard, because of someone's schedule, I

23   would accommodate that as well.

24         MR. MAYNARD:  Your Honor, the problem I'm having with

25   Evan Kohlmann is he's the one that I don't have the report on.

1          THE COURT:  Apparently, you're going to get it later

2    today.

3          MR. MAYNARD:  Well, I would -- that would be nice.

4          THE COURT:  And obviously, the government's request

5    to put Mr. Kohlmann on early in their case and clearly out of

6    order is not going to be permitted if you have not had time to

7    review his report before he testifies.

8          And so it's even more important if the government

9    wishes to accommodate Mr. Kohlmann that they get his report to

10   you early this week.

11         MR. MAYNARD:  Judge, do you require that we give

12   notice to the other side of the witnesses that we anticipate

13   calling --

14         THE COURT:  Yes.

15         MR. MAYNARD:  -- each day or how do we do that?

16         THE COURT:  Well, I think first, that you should come

17   to a mutual agreement.  And I don't want to be involved in

18   setting the number of hours if you can agree.

19         But usually counsel can really agree to some

20   reasonable lineup for the next couple of days so that the

21   other side can be prepared for cross.  And it's mutually

22   advantageous for you to do that since there will be witnesses

23   on both sides.

24         I hate to be the one to say what the number of hours

25   are if you can agree to it.

1          Is there anything else, Ms. Brook or Mr. Koehler?

2          MS. BROOK:  Lastly, just as a followup, I had

3   mentioned earlier that the only notice of witness lists or

4   witnesses and disclosure that we received from the defense is

5   related to that expert notice disclosure that happened back in

6   December from defense.

7          We don't have any other witnesses disclosed from them

8   or any other reports.  So I assume, perhaps today, they're

9   planning on filing a witness list which may therein include

10  those individuals.

11         MR. MAYNARD:  We are.

12         THE COURT:  Good.  While we were talking, Maureen got

13  some information from the Jury Office that says that typically

14  filled-out questionnaires are given back to the jury office

15  and are kept for four years and six months after the last

16  serving juror on the wheel is finished serving.

17         The current wheel we expect to have until June of

18  2020; perhaps longer if there are jurors who serve past the

19  expiration of the wheel.

20         So apparently, the questionnaire -- the filled-out

21  questionnaires -- and you're sure she's talking about this

22  specific as opposed to their juror qualification

23  questionnaire -- don't end up being filed.

24         But if that's the case, and for some reason -- what I

25  have done in the past is one time we did like a thousand

1    questionnaires, and it might have been 1200.

2           But anyway, what we decided was that the only

3    questionnaires that would become part of the record were

4    questionnaires with the answers of jurors where there had not

5    been an agreement that they be excused.

6           So as you can guess on this 1200, most of the people

7    that were excused had to do with the length of the trial.  The

8    trial never happened, but we had the questionnaire answers and

9    it was going to be six months.

10          And so we eliminated hundreds and hundreds of people

11   based upon hardship.  And there was an agreement that all of

12   those questionnaires never had to be put in the court file

13   because there was never potentially an appeal issue with

14   respect to them because everybody agreed they would be excused

15   for hardship.

16          And it was only the questionnaires that ended up --

17   or that would have ended up being people that were actually

18   submitted to voir dire and were not excused by agreement.

19          So when you're thinking about your record in the

20   future, we might want to think about that as well.  That there

21   may -- when we get together and excuse people for hardship on

22   Tuesday, how could that be an issue on appeal if both sides

23   agreed they should be excused for hardship?  And then those

24   questionnaires would never become part of the record.

25          But we never had to refine it further.  And we may

1    refine it further if there's, you know, some actual, potential

2    appealable issue that arises out of a questionnaire answer.

3           And we did clarify that it is both their prescreening

4    for time questionnaire and this questionnaire that the Jury

5    Administration will keep no matter what for that four years

6    and six months after the wheel expires.

7           MR. KOEHLER:  Your Honor, on a housekeeping issue

8    regarding the questionnaire, would it be okay for the Court

9    for us to have the witness list as an essentially separate

10   pages that's attached to the questionnaire so that it can be

11   removed when it goes into the public record; the version that

12   has the juvenile names and so forth on it?

13          THE COURT:  Absolutely.  Yes.

14          I just thought of something else and I should have

15   had written notes for all of the things that I was thinking

16   about talking to you today but the witness list just reminded

17   me.

18          This trial is going to last five weeks.  And if you

19   call even half the witnesses that are on the government's

20   witness list, that is a whole lot of people for the jury to

21   associate back to who was it that said what.

22          And what I would like -- and the government's done

23   this before and it's really easy -- is to take a picture.  I

24   think you have done it before.  You take a picture, right back

25   in the witness room with a nice white background wearing

1   whatever they're wearing when they testify.  And it just has

2   their name underneath.

3          And that way the jury -- and we three-hole punch it

4   and the jurors can put it in their notebook with notes on it

5   if they're still testifying, with -- right in front of where

6   their notes are on that witness.  And then it's just a nice

7   recall method, "Oh, the guy that said this.  Oh, it's him."

8          Or there may be witnesses -- and this has happened in

9   the past and it's not a problem -- who, for whatever reason

10  don't wish to have their picture taken.  It's a consent thing.

11         I had an undercover somebody and they said no -- I

12  mean he was testifying but he didn't want to have his picture

13  taken.  And that's perfectly acceptable as well.

14         But for most witnesses, these are photos that go into

15  the jurors' notebook and at the end of the trial their notes

16  are shredded by us, including the photographs.

17         But in a case like this over the length of time and

18  the number of witnesses, if you really want the jury to be

19  able to recall what witnesses said, I think that that's an

20  important memory trigger to have the photograph if the

21  witnesses are -- consent to having that submitted knowing that

22  they won't be -- the jurors don't get to take them home and

23  put them in an album for future reference.

24         MR. KOEHLER:  Your Honor, would we be doing that at

25  the end of each day or the beginning of next morning or how,

1    mechanically, does that happen?

2            THE COURT:  Mechanically, what's happened in the past

3    is that you took the photo sometime while the witness was

4    here, and then your office made a color copy of it.  I don't

5    know if you do that here in the building or if you have to go

6    back to your office to make a color copy.

7            And then at the soonest time after the photos were

8    provided, so sometimes it was later the same day, other times,

9    sometime the next morning we would be giving them maybe three

10   photographs or, you know, three copies of photographs.

11           So it's really just as soon as possible thereafter.

12   And it's just, as I said, just a picture from shoulders up,

13   white background, and their name.  That's it.

14           Can you make those arrangements, Mr. Koehler?

15           MR. KOEHLER:  Absolutely.  We had already planned to

16   be doing that.  The part that you brought up about them going

17   into the jurors' notebooks was something that was new to me,

18   so I wanted to inquire about that specific part.

19           THE COURT:  Okay.  And then the thing is that unless

20   Mr. Maynard has the ability to do it with his witnesses, I

21   will probably ask the government to do it for Mr. Maynard's

22   witnesses also so that we're sure that -- I mean, obviously,

23   if Mr. Maynard wants to do it himself he can, but we want to

24   be sure that every witness who consents has their photo.

25           MR. KOEHLER:  We're happy to assist.

CR15-00707-SRB     FINAL PRETRIAL CONFERENCE     2-8-16

```
1              THE COURT:  Great.
2              MR. MAYNARD:  Another housekeeping matter, Your
3    Honor.  We did get a list of witnesses from the government and
4    I believe it was approximately a hundred or so.
5              THE COURT:  It's a lot.
6              MR. MAYNARD:  Quite a few folks.  And we got -- we
7    got the list --
8              THE COURT:  Is that the final one or still the
9    preliminary?
10             MR. KOEHLER:  That was the preliminary.
11             THE COURT:  The final one will be shorter, right?
12             MR. KOEHLER:  We think so.  There may be a few
13   additions, but overall, we think it will be shorter.
14             THE COURT:  Overall more deletions than additions?
15             MR. KOEHLER:  I believe so.
16             THE COURT:  Let's hope so.
17             MR. MAYNARD:  Additionally, Your Honor, the
18   government's witness list is very generic such as "photographs
19   from Garland, Texas."
20             We've gotten in the last two weeks, two-and-a-half
21   weeks, I got probably 50 e-mails from the government that were
22   in some sort of a DropBox that have videos, photographs, we've
23   gotten thousands of pages of new documents in the last two
24   weeks.
25             I'm hoping that the government today when they give
```

1    us their final list of exhibits, it's going to be their list

2    of exhibits and they're not going to be generic.

3          I have no idea.  I've gotten thousands of pictures

4    and video tapes and things.  So when they say they're going to

5    use a picture in an opening, I don't have a clue what they're

6    talking about.

7          MR. KOEHLER:  Your Honor, there have been two sets of

8    pictures that we uploaded for the defense and we provided them

9    with a drive because one of them just wasn't uploading

10   correctly.

11         Part of what we provided them was a drive that we

12   received about a week-and-a-half ago or so from the Garland,

13   Texas Police Department.

14         We finally got the Bomb Unit footage and the

15   photographs that were taken.  There's like an aerial

16   photograph from a helicopter that shows the scene on the

17   ground and that kind of information.

18         And we provided that drive to the defense, a copy of

19   that to the defense via the DropBox that Mr. Maynard is

20   talking about and there were photos that were part of that.

21         The other sets of photos that we have been providing

22   to the defense --

23         THE COURT:  Okay.  I want to short circuit this,

24   Mr. Koehler.

25         I know you have to give Mr. Maynard all that.  But

```
 1    here we are, eight days before trial.  What my interest is and

 2    Mr. Maynard's is what are you marking as exhibits?

 3         MR. KOEHLER:  We are going to be marking individual

 4    photos and they will have -- they won't be a generic

 5    description.  There may be to some degree generic in the sense

 6    that it might say "shell casings on the ground" or something

 7    along those lines; but it will, in fact, be descriptive.

 8         THE COURT:  Okay.  And that's -- is that -- I don't

 9    remember what -- is that today that's due.

10         MR. KOEHLER:  It's due today.  That's correct.

11         MR. MAYNARD:  My hope is --

12         THE COURT:  There's a lot of stuff you have to do

13    today by ten o'clock tomorrow morning.

14         MR. KOEHLER:  We are working very diligently to get

15    that done.  I will say that a lot of the other disclosure of

16    photographs that he's talking about are reports of extractions

17    of the computers.  They were given the data quite a while ago

18    so that they could review it and their expert could review it.

19         The Delrex reports are what they're called show the

20    extraction of the evidence and have links that you can click

21    on each individual photo inside of it.  It's the same material

22    that they have been given, just in a different form.

23         THE COURT:  I have a couple of other housekeeping

24    questions.  How many alternates do we want?  The number is

25    between one and four.
```

1              MR. MAYNARD:  Four.

2              MR. KOEHLER:  For a trial this long, four, yes,

3     please.

4              THE COURT:  And you don't have to answer this today,

5     but you will have to answer it before you exercise your

6     strikes.

7              Will the alternates be chosen by lot?

8              We need a stipulation for that.  With that and the

9     absence of a stipulation, they will be chosen in accordance

10    with the procedures set out in the Federal Rules of Criminal

11    Procedure including their being a separate strike pool for the

12    alternates.

13             But I don't need to know the answer to that today.

14    If you have the answer, you can give it to me; but Mr. Maynard

15    may need to discuss that with Mr. Kareem.

16             And one of the very first things that happens after

17    the jury is empaneled and I give preliminary instructions is

18    the reading of the Indictment.  And do you want the Indictment

19    read or do you want some other alternative?

20             The Indictment, as you know, contains a lot of

21    background information and lots of overt acts.  And we need to

22    know what Maureen will read to the jury, if anything, or

23    whether there will simply be some description of the charges.

24             I know you haven't focused on that yet and you don't

25    need to tell me that today, but it will be something that we

1    will have to know by the end of the week, let's say.

2              MR. MAYNARD:  Okay.

3              THE COURT:  And the preliminary instructions get

4    modified in a very minor way depending on how the jurors --

5    the alternates are chosen.

6              It either says, "You'll be chosen by lot at the end

7    of the case, so consider yourself a juror until such time as

8    that selection by lot is done;" or alternatively, it will say

9    "The last four-seated jurors are the alternates."

10             So whatever you decide will modify our preliminary

11   instructions.  But I will tell the alternates what their

12   status is, either unknown or known.

13             Anything else, Mr. Maynard?

14             MR. MAYNARD:  No, Your Honor.

15             THE COURT:  Mr. Koehler or Ms. Brook?

16             MR. KOEHLER:  Nothing further, Your Honor.  Thank

17   you.

18             THE COURT:  Great.  Okay.  So by ten o'clock tomorrow

19   I will have an e-mail from you with a new draft of a

20   questionnaire and I will try to have Maureen at least get back

21   to you with -- I might end up just writing some comments and

22   have her scan it and e-mail it back to you.

23             And then whatever has to be done to it, if anything,

24   can be done by the end of Thursday.

25             When does -- does Betsy need it before -- see because

1   Monday is a holiday, so the building -- you can't deliver the

2   150 copies to the Jury Administrator on Monday, which is what

3   we would ordinarily do.

4        So can they be there -- the jurors are summoned for

5   8:30.  Could they bring them as late as 8:00 a.m. on Tuesday?

6        Okay.  We're going to make a quick call to find out

7   if we can, because I know it would be much easier for you if

8   the 150 got delivered Tuesday morning.

9      (Discussion had off the record.)

10       THE COURT:  Okay.  Maureen is going to work it out

11   with you as to where she wants them delivered and what time on

12   Tuesday morning since we're not handing out the questionnaires

13   until she swears them in.  We don't want them having them and

14   then flipping through it until they are sworn.

15       Anything else, Mr. Koehler?

16       MR. KOEHLER:  Not at this point, Your Honor.  Thank

17   you.

18       THE COURT:  Mr. Maynard?

19       MR. MAYNARD:  Not at this time.

20       THE COURT:  The last thing that occurred to me is

21   that technically speaking, I really don't need you to be here

22   at 9:00 a.m. on Tuesday.

23       Because I don't know what time we will start getting

24   questionnaires, but it will be after 9:00 a.m.  But maybe we

25   should plan on convening at 9:00 a.m.  There may be

44

CR15-00707-SRB    FINAL PRETRIAL CONFERENCE    2-8-16

1   last-minute things to talk about while we're waiting for the

2   questionnaires to be completed.

3           So we could do it a little later.  It's up to you.

4   But I think it might be a good idea to have that time before

5   we start reviewing the questionnaires to see if there are any

6   issues we need to talk about.

7           MR. MAYNARD:  That would be fine.

8           THE COURT:  Betsy, that's the Jury Administrator,

9   wants to know if they are to fill it out in pen or pencil.

10          Oh, I have a preference for pen, so I don't really

11  care if counsel has a preference for pencil.

12          MS. BROOK:  We don't have a preference.

13          THE COURT:  Okay.  So let's meet on Tuesday morning

14  at 9:00.  See if there are any final issues that we need to

15  hash out at that time.  And then, hopefully, by starting

16  around 10ish, we'll be able to start giving you questionnaires

17  to look at.

18          Okay.  Court is in recess.

19          MS. BROOK:  Thank you.

20          MR. MAYNARD:  Have a good trip.

21      (Proceedings adjourned at 11:18 a.m.)

22                          * * *

23

24

25

UNITED STATES DISTRICT COURT

1
2                    C E R T I F I C A T E
3
4          I, ELIZABETH A. LEMKE, do hereby certify that I am
5    duly appointed and qualified to act as Official Court Reporter
6    for the United States District Court for the District of
7    Arizona.
8          I FURTHER CERTIFY that the foregoing pages constitute
9    a full, true, and accurate transcript of all of that portion
10   of the proceedings contained herein, had in the above-entitled
11   cause on the date specified therein, and that said transcript
12   was prepared under my direction and control.
13          DATED at Phoenix, Arizona, this 17th day of April,
14   2016.
15
16
17
18
19                        s/Elizabeth A. Lemke
                          ELIZABETH A. LEMKE, RDR, CRR, CPE
20
21
22
23
24
25