JOHN S. LEONARDO
United States Attorney
District of Arizona

KRISTEN BROOK
Arizona State Bar No. 023121
JOSEPH E. KOEHLER
Arizona State Bar No. 013288
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
Email: kristen.brook@usdoj.gov
Email: joe.koehler@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-15-00707-01-PHX-SRB |
|---|---|
| Plaintiff, | |
| v. | **GOVERNMENT'S CONSOLIDATED RESPONSE DEFENDANT'S MOTION FOR NEW TRIAL AND MOTION FOR JUDGMENT OF ACQUITTAL** |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

The United States of America, through undersigned counsel, respectfully submits this opposition to defendant Kareem's motion for a new trial and motion for judgment of acquittal and asks the Court to deny both motions.

As a threshold matter, although the defendant's motion purports to identify nearly two dozen separate "discovery abuses," the defendant repeatedly omits or misstates key facts.  For example, the defendant complains that the government didn't disclose his internet "browsing history" until midway through trial.  In fact, complete images of the defendant's Lenovo and Acer laptop computers—which included each computer's browsing history—were disclosed to the defense in September 2015.  The charts that the prosecution emailed to the defense during trial simply isolated this already-disclosed evidence.  This is hardly a "discovery abuse."  Separately, the defendant also raises

several complaints about the mid-trial production of interview reports. The defendant fails to acknowledge, however, that the great majority of these reports concerned interviews that had occurred just a few days earlier. In other words, the government wasn't sand-bagging the defense with evidence that should have been disclosed months earlier—to the contrary, the government was acting quickly to meet both the letter and spirit of its discovery obligations by rapidly processing and producing new evidence soon after it came into the government's possession.

Nor is there any merit to Kareem's assertion that the government disclosed "tens of thousands of pages of documents, videos and other materials after trial started." (CR 303 at 6.) Many of the items delivered to the defense were simply reformatted versions of items that had been previously disclosed. Some of the reformatting and re-disclosure was done at the request of defense counsel. The few items that were truly new disclosure, such as the FBI laboratory reports and interview reports, for the most part had recently been created.

The defendant also seeks to characterize many of the alleged "discovery abuses" as *Brady* violations. This tactic fails because the materials discussed in the defendant's motion were not remotely exculpatory. The defendant was charged with being a member of a conspiracy to launch an attack in Garland, Texas, and with being a member of a separate conspiracy to provide material support to ISIL. The indictment alleged, and the prosecution argued at trial, that the conspiracy was not limited to Simpson, Soofi, and Kareem—the conspiracy involved others. Accordingly, the materials Kareem claims pointed to involvement by others were not exculpatory. At most, these materials shed light on the roles others may have played in the conspiracy, separate and in addition to Kareem's role. They did not negate Kareem's guilt. The existence of other conspirators does not negate a conspiracy charge.

Moreover, even assuming certain items disclosed after the Court-ordered *Brady* deadline of October 12, 2015, might theoretically qualify as exculpatory, the delay in disclosing those items did not prevent Kareem from receiving a fair trial. Defense

counsel used the items discussed in Kareem's motion effectively at trial by admitting them as trial exhibits and using them in cross-examining witnesses.

Finally, and in any event, the defense could have requested additional time to prepare but strategically chose not to do so. The appropriate remedy for a party who feels aggrieved by the late disclosure of evidence is to seek a continuance. The trial in this case began February 16, 2016, approximately nine and one-half months after the failed terror attack in Garland on May 3, 2015. During that time, the FBI interviewed hundreds of people in Garland, in Arizona, and elsewhere in the United States. Agents executed numerous search warrants and recovered a large number of electronic devices and physical evidence that had to be processed and analyzed in connection with the investigation. Despite knowing the scope of the investigation, the amount of evidence that was gathered, and the number of devices and other objects that were still undergoing analysis, Kareem declined to seek a continuance (which would have provided additional time to review evidence that was still arriving in significant quantities as the trial approached) and instead demanded the speedy trial date set in this case. This was a tactical choice, and now that this strategy has failed the Court should not afford the defendant the remedy he forfeited – a continuance in the form of a new trial.

Background

In the parties' Joint Notice of Scheduling Order filed on July 31, 2015, the parties agreed to an October 12, 2015 *Brady* disclosure deadline. It is important to emphasize that "*Brady* disclosure" does not encompass *all* disclosure. Instead, it encompasses only evidence that is material and exculpatory. In addition, footnote one of the scheduling order made clear that the deadline applied only to evidence that was in the government's possession as of October 12, 2015:

> This deadline pertains to discovery within the government's possession and control as of the date set for compliance. If additional records are discovered by, or disclosed to, the government during pretrial preparation or otherwise, pursuant to Rule 16(c), Fed. R. Crim. P., the government shall promptly disclose any additional documentary evidence or materials to the defense as soon as practicable after such disclosure or discovery occurs.

(CR 46 at 1 n.1.)

**A. Applicable Law**

The government's disclosures after October 12, 2015, including the disclosures during trial, did not violate *Brady v. Maryland*, 373 U.S. 83 (1963). "The three elements of a *Brady* violation are: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the [government], either willfully or inadvertently; *and* (3) prejudice must have ensued." *United States v. Kohring*, 637 F.3d 895, 902-903 (9th Cir. 2011) (citation and internal quotation marks and alterations omitted).

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the  defense, the result of the proceeding would have been different." *Kohring*, 637 F.3d. at 903. "There is a 'reasonable probability' of prejudice when suppression of the evidence 'undermines confidence in the outcome of the trial.'" *Id*. A "reasonable probability" may be found even if the remainder of the evidence would have been sufficient to convict the defendant. *Id*. The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish "materiality" in the constitutional sense. *United States v. Agurs*, 427 U.S. 97, 109-110 (1976). Further, the rule of *Brady* applies only to information "unknown to the defense." *Id*. at 103.

To be material under *Brady*, the undisclosed evidence also must have been admissible. *United States v. Sarno*, 73 F.3d 1470, 1505 (9th Cir. 1995); *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir. 1989) ("Inadmissible evidence is by definition not material [for *Brady* purposes], because it never would have reached the jury and therefore could not have affected the trial outcome") (citation omitted).

A defendant alleging a *Brady* violation based on the late disclosure of evidence also must show he was prejudiced by the delay. Thus, if a defendant is able to make effective use of exculpatory or impeachment information that is disclosed mid-trial, no *Brady* claim will lie. *United States v. Browne*, 829 F.2d 760, 765-66 (9th Cir. 1987)

(affirming denial of new-trial motion premised on untimely, mid-trial disclosure of *Brady* material, and finding the evidence was still "of value" at the time it was disclosed; evidence was not material because defense made effective use of it during cross-examination and jury returned guilty verdict despite the impeachment.); *United States v. Gordon*, 844 F.2d 1397 (9th Cir. 1988) ("*Brady* does not necessarily require that the prosecution turn over exculpatory material before trial. To escape the *Brady* sanction, disclosure 'must be made at a time when disclosure would be of value to the accused.'").

Finally, courts have recognized that a continuance—as opposed to a dismissal or other severe sanction—is the best way to remedy any prejudice flowing from the late disclosure of evidence. *See, e.g., United States v. Gamez*, 235 F.3d 453, 461-462 (9th Cir. 2000) (affirming denial of motion to dismiss indictment for alleged *Brady* violation; continuance provided ample time for the defense to prepare, so disclosure ultimately "occurred at a time when it [was] of value to the accused"). In *United States v. Mathur*, 624 F.3d 498, 500, 506 (1st Cir. 2010), the court explained in detail why courts follow "the general rule requiring parties [aggrieved by a late disclosure] to ask for continuances."

> The customary remedy for a *Brady* violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses. The court offered precisely this remediation when the [late-disclosed evidence] came to light, but the defendant repeatedly rejected the proffered anodynes. 'Generally, we have viewed the failure to ask for a continuance as an indication that defense counsel was himself satisfied he had sufficient opportunity to use the evidence advantageously.' A fortiori, we can draw a comparable inference from a defendant's outright rejection of a proffered continuance. Such a decision often will reveal, with conspicuous clarity, defense counsel's perception that the belatedly disclosed information was not critical to his client's defense. So it is here."

*Id. See also United States v. Tarantino*, 846 F.2d 1384, 1417 (D.C. Cir. 1988) (*Brady* production during trial reasonable because the defense had the opportunity to use the materials); *United States v. Celis*, 608 F.3d 818, 836 (D.C. Cir. 2010) (*Giglio* disclosure on first day of trial, which had to be processed during trial in light of extensive pretrial disclosures, did not create *Brady* violation when record showed that counsel had been able to conduct effective cross-examination). Thus, even if Kareem felt he did not have

an opportunity to use the materials, the remedy would not be a new trial. On discovering helpful materials, Kareem could have – but did not – move for a continuance.

B.     **Alleged Pre-Trial Discovery Abuses**

Kareem's characterization of the government's pretrial disclosures in this case as "abuses" is unwarranted.  As noted above, the Garland attack occurred the evening of May 3, 2015.  Officers from the Garland Police Department and FBI agents across the United States immediately sprang into action in response to the attack, both to investigate the people behind the attack and to ensure that no further attacks were imminent.  In addition to large quantities of physical evidence gathered at four different scenes (the Garland crime scene; the Simpson/Soofi apartment; the Wittman, Arizona, shooting practice scene; and the Kareem apartment) and at least five vehicles (the Soofi car in Garland, Simpson's car and Soofi's van at their apartment, Kareem's moving truck, and Kareem's Isuzu Ascender), agents recovered and analyzed approximately 27 electronic devices in connection with the case.  Of those 27 devices, the government listed 21 as potential exhibits on its exhibit list and ultimately admitted 9 into evidence at trial.  (Exh. 2.)  The government also introduced particular pieces of evidence derived from four other devices as exhibits at trial.  Separately, FBI agents obtained records for numerous Twitter and email accounts associated with Elton Simpson, Nadir Soofi, Kareem, and other individuals who were investigated in connection with the case.  The vast majority of the electronic evidence gleaned from the various devices and electronic search warrants was disclosed on two 1-terabyte hard drives on September 2, 2015, and a 1-terabyte thumb drive on October 13, 2015—that is, in conformance with the *Brady* deadline specified in the parties' agreed-to scheduling order (although the order listed October 12 as the deadline, the parties agreed that, because this date fell on a weekend, it could be extended to October 13).  Agents also discovered a large number of CDs and DVDs in the various search locations.

The analysis of the electronic evidence was a labor- and time-intensive task that continued into the trial of the case.  Intelligence analysts reviewed various electronic

images of devices and flagged materials for additional review. They wrote Electronic Communications (ECs) describing the things they located in the electronic evidence. The analysts assisted special agents in drafting detailed reports describing the contents of various electronic devices and the relevance of the contents to other evidence in the case. For analysts who were called as witnesses in the case, their ECs covering the matters about which they were to testify qualified as Jencks material and were disclosed to the defense along with the special agent reports containing the more comprehensive analysis of the devices.

Notwithstanding all of this, Kareem complains about pre-trial material disclosed after the October 12, 2015 *Brady* disclosure deadline. His complaints lack merit. The attached Discovery Matrix, Exhibit 1, tracks each of the defendant's allegations and the government's disclosure in this case to illustrate the content of the disclosure and the time the government provided it to Kareem. (Exh. 1). As the Matrix shows, the government produced all reports and evidence to the defense in an orderly fashion that involved sorting, numbering, and tracking each item of disclosure soon after it came into the government's possession. The evidence was not *Brady* material and was, in any event, provided in enough time for Kareem to make use of the it at trial.

### C.  Alleged Trial Discovery Abuses

Kareem raises a number of issues concerning the disclosure of reports and witnesses during the trial. The witnesses about whom Kareem complains were on the government's witness list, and their statements were all provided to the defense in advance of their testimony. For many of the witnesses, the reports of their statements that were provided during trial repeated previous disclosures or related to recent interviews of those witnesses. The non-interview reports consisted primarily of forensic laboratory reports that were finalized shortly before the trial, along with procedural manuals, definitions and standards for analysis in the various FBI laboratories. Only two of the laboratory experts, fingerprint analyst Kelli Edmiston and firearms tool mark analyst Rodney Jiggetts, gave testimony in the case. Their testimony was largely

unremarkable. The rest of the forensic evidence in the case, to the extent it was relevant, was the subject of stipulations at the end of the case.

Kareem also contends the government engaged in abusive discovery practices by disclosing new exhibits during the trial. This claim is again unavailing. The exhibits that the government marked during the trial (1) consisted of documents and other items that had been disclosed to the defense well before the trial, (2) were derived from analysis completed during or shortly before trial, or (3) became relevant during the trial based on issues that arose for the first time during cross-examination of witnesses. The chart attached as Exhibit 1 summarizes the content, dates of creation, dates of disclosure, and in what form the items raised in Kareem's motion were disclosed. The discussion below will focus on the reasons for the various additions of exhibits and disclosure of new reports during the trial.

### 1. Disclosure of James Bell Reports on February 18, 2016

The government disclosed audio recordings of James Bell's May 5, 2015, interviews on February 11, 2016. (Exh. 1 at 8.) Although Mr. Bell's name was on the preliminary witness list filed by the government on January 8, 2016, Mr. Bell's interview recordings inadvertently were not provided before February 11, 2016. On February 11, 2016, the defense alerted government counsel that reports relating to Bell's interviews had not been disclosed. (Exh. 3, 2/11/16 5:33 p.m. Email from Mary Plomin). Government counsel emailed the reports to defense counsel on February 18, 2016. Each of the reports consisted of two pages, and none of Mr. Bell's statements was material. The reports revealed Bell had very limited knowledge about events leading up to the Garland attack and had little interaction with Kareem. (CR 303-1 p at 76-79, Def. Exh. 9.) Bell was not included on the Government's final witness list and did not testify during the trial.

### 2. Disclosure of Abdullah Mubarak Report on February 18, 2016

The report of Abdullah Mubarak disclosed on February 18, 2016, was the second disclosure of the same report which came from a pretrial interview of Mubarak conducted

on February 3, 2016. (Exh. 1 at 11.) The report for this interview was finalized on February 8, 2016. On February 15, 2016, the Government disclosed a hard copy of the report (Bates # 2469-71, CR 303-1 at 65.). The government disclosed the report again via email on February 18, 2016 as described in the Defendant's motion.

The government provided earlier discovery regarding Mubarak, including audio of his May 20, 2015 interview, disclosed on August 7, 2015 (Bates # 36). The transcript of Mubarak's May 20, 2015 interview was disclosed on November 18, 2015 (Bates # 1112-1174.) The Government disclosed Mubarak's June 10, 2015, interview on October 13, 2015, and again on November 18, 2015 (Bates # 389 & 1110-1111). On January 29, 2016, the Government disclosed Mubarak's November 30, 2015 interview (Bates # 1709-1710.) Mubarak testified on February 19, 2016.

### 3. Disclosure of Amy Vaughan's Upcoming Testimony on February 18, 2016

Kareem correctly notes the government provided notice on February 18, 2016, of its intent to call FBI Intelligence Analyst Amy Vaughan to testify the next day, February 19, 2016. IA Vaughan is not a computer forensic analyst; she is an intelligence analyst. IA Vaughan previously testified during the hearing on the defense motion to suppress evidence in the case, and the matters she covered in her testimony were disclosed on January 29, 2016, as part of her ECs and SA Whitson's January 22, 2016, comprehensive analytical report covering Kareem's electronic devices. IA Vaughan was listed on Government's preliminary and final witness list in this case. The defense conducted an extensive cross-examination of Ms. Vaughan on February 23, 2016 (RT 2/23/16 102-134.)

### 4. Disclosure of Amber Pluff Report on February 23, 2016

On January 15, 2016, an FBI agent interviewed Amber Pluff. On February 3, 2016 the government disclosed the recording of the interview with Ms. Pluff. (Bates # 2291). (Exhibit 1 at 6) The 5-page report of the interview was finalized on February 8, 2016, and first disclosed on February 15, 2016 (Bates # 2484-88). Government counsel

disclosed the report of the interview again via email on February 22, 2016, and again in hard copy form on February 23, 2016 (Bates # 2651-55). Ms. Pluff testified on February 23, 2016.

### 5. Disclosure of N.S. Report on February 23, 2016

The N.S. report disclosed on February 23, 2016 (Bates # 2901-2904), was a repeat of the same disclosure on February 17, 2016 (Bates # 2590-2593), and related to a pretrial interview of N.S. conducted on February 8, 2016. (Exhibit 1 at 9.) The report was finalized February 14, 2016. The government previously disclosed the recording of N.S.'s forensic interview on October 13, 2015 (Bates # 140) and the report of that interview on January 29, 2016 (Bates # 2115-16).

### 6. Disclosure of Efran Ochoa Report on February 23, 2016

FBI agents interviewed Efran Ochoa on February 8, 2016, and finalized a report of the interview on February 16, 2016. (Exhibit 1 at 14.) On February 21, 2016, defense counsel requested the report via email. On February 23, 2016, the government disclosed the interview report (Bates #2905-07) and the audio recording (Bates # 3221). Efran Ochoa did not appear on either party's witness list (CR 294, 295) and did not testify during the trial.

### 7. Addition of Exhibits from Nextbook Tablet

Kareem claims the government never produced a report discussing 10 of the 13 exhibits relating to the Nextbook tablet (mistakenly referred to as an RCA Nextbook tablet). (CR 303 at 4.) Those items all were part of the extraction of the Nextbook tablet that was disclosed on a hard drive on September 2, 2015, and again on a CD in the final UFED Report on January 21, 2016 (Bates # 1636). At no point in her testimony did IA Vaughan describe the exhibits as explicitly radical. The government offered the Nextbook exhibits, Nos. 450-459 and 467-469, and they were admitted into evidence without objection. (RT 2/23/16 94-99.)

The defense likewise complains about the lack of disclosure of a report of another intelligence analyst who reviewed the Nextbook tablet, Jessica Maxwell. The Court

ordered disclosure of the report during the trial and the government complied; however, IA Maxwell did not testify during the trial, and her report contained no exculpatory or impeachment material. Further, IA Vaughan did not write her own EC but instead assisted in drafting SA Whitson's final report on Kareem's devices that included the Nextbook tablet. (RT 2/23/16 104.) IA Maxwell did not assist in the preparation of the final report. (RT 2/23/16 104.) Therefore, IA Maxwell's EC was not subject to disclosure as Jencks, *Brady* or *Giglio* material, and failure to disclose it prior to that time did not violate any rule or case law.

### 8. Disclosure of Intent to Play Certain Excerpts of Kareem's Interview

Kareem contends the government "has never provided the defense with these excerpts [of Kareem's June 10, 2015, post-arrest interview] to this day; however, the defense did have the entire interview." (CR 303 at 5.) (See Exhibit 1 at 18.) This assertion is false. The government provided a list of the start and stop times for each of the individual exhibits that were excerpts of Kareem's post-arrest interview. (Exh. 4, Email to Defense Counsel Dated February 29, 2016 12:27 p.m. and Attachment.) The chart included the exhibit number, the clip name, and the start and stop times for each exhibit. The recording of the interview (Bates # 011, disclosed August 7, 2015) and a transcript of the interview (Bates # 934-1038, disclosed November 18, 2015) both were disclosed well before trial.

### 9. Disclosure of Unredacted Reports of Interviews of Juan and Carlos

Kareem contends the government failed to disclose unredacted copies of reports relating to interviews of Juan and Carlos in this case. (CR 303 at 5.) This assertion is false. On August 7, 2015, the government disclosed the full, unredacted, audio and video recordings of Juan and Carlos in the first discovery wave in the case (Bates # 1-2; Exh. 1 at 18-19.). In the same initial wave of discovery on the same date, the government disclosed redacted reports of the interviews (Bates # 186-189). With few exceptions, the redactions in the reports consisted of the child's name. In both reports, two additional names were redacted: the name of the children's older brother, and "Stephan Verdugo,"

who at the time was a confidential source. In both cases, the redacted language was merely the name of the person and did not include the content of the statement. In any event, the unredacted audio and video recordings of each child's interview contained all the information that had been redacted from the reports of the interviews.

On January 29, 2016, the government disclosed two additional reports relating to Juan and Carlos: Juan's four-page report (Bates #1836-1839) and Carlos' six-page report (Bates # 1840-1845). In Juan's report, the redactions consist of the child's name, four references to his juvenile brother and three references to his older brother. In Carlos's report, the redactions consist of the child's name and the names of his juvenile brother, his nephew, and his other brother. Again, only the person's name itself was redacted, not the content of the statement.

Finally, unredacted versions of the reports were hand-delivered to defense counsel in court before the children took the stand on February 24, 2016.

### 10. Jeffrey Evans Report and Exhibits

Kareem lists the disclosure of reports and exhibits from FBI Computer Forensic Analyst Jeffrey Evans among the "discovery abuses" the government allegedly committed in the case. (CR 303 at 5.) Mr. Evans drafted the three page report documenting his examination of 14 electronic items (Defendant's Exhibit 15) on February 24, 2016, and the government disclosed it the same day. (Exh. 1 at 20-21.)

The extraction and analysis of the Hirens 15.1 CD (Trial Exhibit 200) was conducted February 22-23, 2016. Mr. Evans produced a forensic report that included the files on the CD and which was disclosed to the defense on a CD that could be read on an ordinary computer with no additional software tools on February 23, 2016. (See defense Exh. 15, 303-2 at2, Koehler email dated 2/24/16 referencing CD delivered "yesterday")

Following the extraction, Mr. Evans conducted a test run of the CD demonstrating what a user would see if they "booted" a computer using the CD and then ran the "shredder" program. The Hirens Boot CD Walk Through (Trial Exhibit 477) was a series of seven pages of images containing screen shots from the test run. Only one of the

images had any extensive text on it.  This exhibit was identical to the file titled "QPX107_sample_run.pdf" that was attached to the email to defense counsel dated February 24, 2015 9:16 p.m. (Defense Exh. 15, CR 303-2 p. 6-12)

The Hirens 15.1 CD Table of Contents (Trial Exhibit 473) originally was produced as part of the forensic report on CD as well as via email.  The report of extraction of the CD was completed February 23, 2016, and hand-delivered to the defense on February 23, 2016.  The February 24, 2016, email merely included the same table of contents in the format in which it was to appear as an exhibit in JERS.

Mr. Evans testified on February 25, 2015, and Exhibits 473 and 477 were admitted into evidence that day.  The defense requested and received an extension for the cross-examination of Mr. Evans, and conducted the cross-examination on February 26, 2016. (CR 292, 294)

## 11. Kelli Edmiston Demonstrative Exhibit

Kareem correctly notes the government sent an email on February 24, 2016, containing an exhibit relating to Ms. Edmiston's testimony the next day.  (CR 303 at 5.) The email was sent at 6:38 p.m., not 9:39 p.m. as Kareem alleges in his motion.  (See Exhibit 5, Email dated February 24, 2016 6:38 p.m.)  The attachment was a single powerpoint slide with two fingerprints side by side and arrows on each fingerprint showing the points of comparison about which Ms. Edmiston was going to testify.  The slide was a demonstrative exhibit and was not admitted into evidence.  (Exh. 1 at 21.)

The government disclosed reports from Ms. Edmiston shortly after they were released.  The report that was Ms. Edmiston's final report relating to the case was finalized February 12, 2016, was uploaded into the FBI's Sentinel system on February 17, 2016, and disclosed in hard copy and on CD on February 18, 2016.  Another report, finalized January 30, 2016, was uploaded to Sentinel on February 9, 2016, and was disclosed February 23, 2016.  As Ms. Edmiston testified during the trial, she stopped conducting fingerprint analysis in February 2016 in order to ship the items under comparison back to Phoenix for use in the trial in this case.

### 12. Re-disclosure of Internet Browsing History

The internet browsing history was part of the disclosure of the Lenovo 2015 laptop image on November 18, 2015. (Exhibit 1 at 22-23.) Government and defense counsel had a discussion during a break in the courtroom. During the discussion it became clear that it would assist defense counsel to have the internet browsing history in a separate file in spreadsheet format in order to understand the snippets from that history that were contained in SA Whitson's January 22, 2016, report (disclosed January 29, 2016) analyzing Kareem's devices. Government counsel provided the spreadsheet file as a courtesy to the defense; it was not new disclosure.

### 13. Nextbook Images Analysis by Ms. Vaughan

During Ms. Vaughan's testimony, the defense asked questions about the dates certain images were created or downloaded on the Nextbook tablet. (RT 2/23/16 129-130.) (Exhibit 1 at 22-23) Ms. Vaughan went back through the image of the Nextbook and found metadata for some of those images that she could not recall during her cross-examination. (RT 2/23/16 130-131, 133-134.) As with the internet browsing history discussed above, the government disclosed the information she retrieved as a courtesy to the defense.

### 14. Acer Internet History Email

Kareem correctly notes the government sent an email with a shortened version of Acer Aspire laptop's internet history on February 25, 2016. (Exh. 1 at 29.) The government previously had disclosed the full version of the Acer's internet history on September 2, 2015, as part of its disclosure of the image of the Acer laptop. Relevant items from the internet history were included in SA Whitson's January 22, 2016, comprehensive analysis report regarding Kareem's electronic devices, which was disclosed January 29, 2016. Agent Whitson testified regarding items from the Acer's internet history on February 26, 2016. (RT 2/26/16 13, 44-46, 60-61.) The government did not mark an exhibit setting forth the Acer's internet browsing history because the browsing history was replete with irrelevant and highly-prejudicial material.

Government counsel had shown hard copies of the browsing history to defense counsel during breaks in the trial in order to forewarn defense counsel about potential pitfalls in cross-examining witnesses about the Acer's internet browsing history. (Defense Exh. 18, CR 303-2 at 36) Government counsel sent the spreadsheet as a courtesy to enable counsel more easily to search through it for specific items about which SA Whitson would testify. The spreadsheet also was useful to assist counsel to find items that might be useful in cross-examination without disclosing prejudicial material to the jury.

### 15. Google Account History Email

Kareem correctly notes the government sent an email on February 25, 2016, with two exhibits containing excerpts from the Google account history for Kareem's account, gitrdonemoving@gmail.com. (Exhibit 1 at 24-27.) The exhibits were excerpts of Exhibit 158, the full account history for the same email account. The excerpts were created in response to questions to Ms. Vaughan that implied Kareem was not using the Acer laptop or accessing the internet in May 2015. The government did not offer the excerpts (Exhibits 482-485) or the full account history into evidence. This is discussed in more detail below.

### 16. Acer Network Access Log and Cell Phone Communications Email

Kareem correctly notes the government sent an email on with an attachment consisting of the Acer's network access log from January through May 2015. (Exhibit 1 at 25.) The email also had Kareem's cell phone communications with Simpson and Soofi as well as his text history after the Garland attack.

Like the Gmail records above, the cell phone communications exhibit (Trial Exhibit 478) contained summaries and portions of the cellular phone records for Kareem's phone that were already contained in Exhibit 143. The post-attack text messages were derived from disclosure of the full search warrant results for Kareem's cell phone, which were disclosed to the defense on October 13, 2015 (Bates # 405). The messages became relevant after the opening statement revealed the defense planned to

rely on post-attack communications and events to establish Kareem's state of mind in the wake of the attack. (RT 2/17/16 27-28.)

The Acer network access log originally was disclosed as part of the Acer Aspire image on September 2, 2015. Like the Google account history excerpts and the post-attack text history from Kareem's phone, the access log became relevant during the cross-examination of Ms. Vaughan, when defense counsel sought to create an inference that Kareem's Acer Aspire laptop was not in use and did not have internet access in May-June 2015. Specifically, defense counsel asked whether Ms. Vaughan was aware agents did not recover a modem during the search of Kareem's apartment, and did not recover a power cord for the laptop. (RT 2/23/16 124.) This could have led to an inference that Kareem was not using the Acer computer in the time leading to the attack as well as after the attack. However, the access log revealed not only that the Acer was actively used through the end of May 2015, but also that it was accessing the internet via Kareem's Maxwest cell phone. Both of these facts also contradicted Kareem's trial testimony about not having used the Acer since November 2014 (RT 3/9/16 144-145), so the Acer network access log would have become a rebuttal exhibit even in the absence of the issue arising during cross-examination of Ms. Vaughan.

### 17. Addition of Exhibits 488-496

Kareem correctly notes the government gave notice of its intent to offer exhibits 488-496 on Monday, February 29, 2016 (a non-trial day); however, the time was 4:37 p.m., not 9:15 p.m. (Exh. 6, Email dated 2/29/16 4:37 p.m.)

Exhibits 488-492 all came from the internet history from Kareem's Acer Aspire laptop computer. (Exhibit 1 at 29.) Exhibit 493 was a transcript of the Battle of the Hearts and Minds lecture. The lecture itself had been admitted into evidence on February 18, 2016. (CR 292, Exh. 390.) The image of Kareem's Acer laptop was disclosed September 2, 2015, and IA Vaughan's EC and S/A Whitson's report summarizing the findings of the search and analysis of the internet history from the Acer laptop was disclosed January 29, 2016. The EC and report specifically identified visits to Hoor-al-

ayn.com (Bates 1654-56, 2049-51) and Kalamullah.com (Bates 1656, 1666, 2049, 2051, 2063-64). References to Anwar al-Awlaki on the Acer Aspire laptop, including the Battle of the Hearts and Minds lecture and the YouTube web addresses for it, likewise were described in IA Vauhan's EC and S/A Whitson's report (Bates # 1653-59, 1666-67, 1669, 2049-52, 2057-59, 2062-64, 2070, 2082-83). (Exh. 7, 8, 9.)

Exhibits 494 and 495 related to Simpson's Galaxy S5 phone having been used to access a document, "ISHD leak.pdf," which was a release by the Islamic State Hacking Division of personal information of U.S. military personnel that encouraged supporters to harm the personnel identified on the list. The report of extraction of Simpson's Samsung cell phone, which included the web history revealing searches for and access to the ISHD leak document, was disclosed September 2, 2015. (Exh. 1 at 29.)

Exhibit 496 consisted of photocopies of the pages from the blue steno notebook from the Simpson/Soofi apartment. Those copies of pages were disclosed on November 6, 2015 (Bates # 479). (Exh. 1 at 29.)

Exhibit 497 consisted of a photograph of Mohamed Abdullahi Hassan, aka Mujahid Miski, a person with whom Elton Simpson communicated on Twitter. Search warrant results from Twitter were disclosed October 13, 2015, and included all the relevant communications offered into evidence during the trial. Reports analyzing the Twitter and other communications between Simpson and Miski were disclosed January 29, 2016 (Bates 1672-74, 1887-1901). Exhibit 497 was a larger version of the same image of Miski that appeared in exhibit 480. A Google search of Miski's name immediately retrieves his Twitter user image that matches Exhibit 497.

### D.   Alleged *Brady* Violations

#### 1. Information About Ali Baiz & Christian Leon

Kareem contends the government failed to disclose information about Baiz and Leon until February 9, 2016, and that "it was impossible for the defense to investigate

these individuals or prepare a thorough defense." (CR 303 at 7.)  This allegation is without merit for several reasons.

First, the reports concerning interviews of Baiz and Leon did not contain exculpatory evidence.  Contrary to the defense suggestion, nothing in the reports supports the notion that Baiz or Leon sold any of the Garland weapons to Nadir Soofi.  Specifically, the firearm Baiz was selling was a Century Arms AK-47.  This firearm did not match either the Romarm/Cugir AK-47 that Elton Simpson used or the Elk River Tool & Die AK-74 that Nadir Soofi used in the Garland attack.  Meanwhile, Leon informed the interviewing agents that he did not sell the AK-74 rifle about which he had exchanged messages with Nadir Soofi.  Thus, the information in the reports was not exculpatory.  In fact, the information contained in the 302s was inculpatory because it showed efforts by Soofi to obtain firearms in January 2015.  Those efforts were consistent with the testimony of Ali Soofi about Nadir Soofi having acquired the AK-74 rifle with the defendant's assistance in January 2015.  (RT 3/2/16 29.)

Second, the defense possessed the information relating to Baiz and Leon in time to make effective use of it at trial.  Notably, the defense possessed this information earlier than Kareem claims in his motion.  The government disclosed the messages and associated phone numbers that were the subject of the Baiz and Leon 302s in September 2015. (Exh. 10, Defense Trial Exhibit 543.)  Moreover, the defense labeled and identified Trial Exhibits 543-546, which identified the phone numbers and the relevant communications set forth in the reports of Baiz and Leon. This was the precise information the defense claims it needed in order to locate Baiz and Leon.  In any event, the defense received the reports and connected them to the text messages in time to make use of them at trial.  The defense marked the Baiz and Leon text messages as exhibits and admitted some of them at trial during cross-examination of SA Whitson. (RT 3/3/16 SW 145-160; Trial Exhibits 544-546.)

Thus, the information was not *Brady* material, it already was in possession of the defense, and the defense received the information in the reports in time to make effective use of it at trial.

### 2. Saabir Nurse

Kareem relies on an indented letter (Trial Exhibit 553), the content of which was admitted into evidence as Trial Exhibit 554, to argue that Saabir Aaqil Nurse was a participant in the conspiracy to the exclusion of Kareem. (CR 303 at 8). Kareem claims the note clearly indicates that Mr. Nurse provided funds to Simpson that Simpson appeared to have used for terrorist activity, and that Simpson was paying Mr. Nurse back by giving him Simpson's car. Kareem further claims any further investigation done by the Government qualifies as *Brady* material. This is an inferential leap not supported by the evidence. Notably, the defense listed Nurse as a trial witness but did not call him to the stand.

On January 29, 2016, the Government disclosed Saabir Aaqil Nurse's two interviews with the FBI. Mr. Nurse was interviewed by the FBI on May 4, 2015 and again on May 21, 2015. Defendant listed a May 26, 2015 interview in his motion. That interview took place May 21, 2015, and the report of the interview was drafted May 26, 2015. Defendant also refers to a May 6, 2015, interview; this is the date the report of the May 4, 2015, interview was written. No additional interviews of Saabir Nurse took place, and no additional report was drafted. In his testimony, SA Stewart Whitson speculated that another interview may have been conducted after November 2015, but no such interview occurred. (RT 3/3/16 118.)

The interview reports reveal Nurse permitted agents to look through his phone. Nothing further came of that review, and the Government did not obtain a search warrant for the phone. Similarly, the government did not obtain historical cell phone records for Mr. Nurse's phone pursuant to 18 U.S.C. § 2703. However, cellular records of Elton Simpson, Nadir Soofi and Abdul Malik Abdul Kareem were provided in September of 2015. Any record of Nurse's involvement or contact with Elton Simpson, Nadir Soofi

and Abdul Malik Abdul Kareem would have been encapsulated in the phone records of the known co-conspirators in this case.

The fact that Nurse allowed agents to look through his phone and agents did not obtain additional information relating to Nurse's use of the phone not only fails to support Kareem's *Brady* claim, it gives rise to the inference that agents did not find information that incriminated Nurse. Even if agents had found such information, it would not necessarily have been exculpatory with respect to Kareem. The second superseding indictment in this case made reference to known and unknown conspirators, and the existence of other potential participants in the charged conspiracies does nothing to negate the testimony of the witnesses who established Kareem's participation in the conspiracies.

### 3. James Bradley Bell

Kareem alleges Mr. Bell apparently knew about the Mohammad Drawing contest before Simpson went to Garland, Texas, and that by not disclosing recordings of Bell's May 5, 2015, interviews until February 11, 2016, the government violated the Court's *Brady* deadline.

Referring to Bell's statements as *Brady* material is a significant overstatement. Whether Bell knew of the Garland attack in advance by virtue of having read one of Simpson's tweets is not in any way exculpatory toward Kareem. The statement did not become quasi-impeachment material until SA Whitson failed to recall that N.S. told him he knew about the contest before it happened. Importantly, Bell's statement about having seen Simpson's tweet about the contest was made to SAs Hemberg and Nolen, not Whitson, so Whitson's misstatement was limited to his failure to recall NS's statement and had nothing to do with Bell.

Moreover, the defense received Bell's statements in time to make use of them during the trial. As previously noted, the government turned over the recordings on February 11, 2016. The government turned over the reports, neither of which was

lengthy, on February 18, 2016.  The defense began its case-in-chief on March 3, 2016, and rested on March 9, 2016, and therefore had ample time to subpoena Bell to testify.

### 4.  John Sabari

Defendant did not request reports on John Sabari in this case.  The government is disclosing three reports of interviews of John Sabari.  The government has reviewed those reports, and none of them contains exculpatory material.

Based on the statements in the defendant's motion, Kareem's attorneys appear to have conducted extensive research into the 2010 case against Simpson and to have been well aware of events in that case and whatever connections Sabari had to it. Defense counsel referenced the earlier case against Simpson numerous times in the context of this case to argue the government was hounding Simpson after he received a sentence of probation and was seeking someone to blame after having failed to prevent Simpson and Soofi from going to Garland to conduct the attack.  In light of this and the fact that Kareem himself provided information to investigators about Sabari during his May 5, 2015, interview, the defense knew of Sabari's ties to Simpson and Soofi.  Specifically, the defense knew Simpson would speak to Jamaican cleric Sheikh Faisal via Skype at Sabari's home.  Despite this, the defense chose to focus on the letter ostensibly written to Nurse and on attacking the credibility of government witnesses who testified under oath about having seen Kareem watch/play jihadist videos in their presence, having heard Kareem speak of plans to attack the Garland contest, and having heard Kareem speak of killing Kaffirs and/or strapping a bomb to himself to kill Kaffirs

### E.    The Government Did Not Knowingly Present Material False Testimony.

On March 3, 2016, Special Agent Whitson's third day of testimony, the defendant elicited the following testimony on cross examination:

> Q:    In this case we've heard from three witnesses so far that
> said they knew about the Muhammad Drawing Contest before it
> occurred. Would you agree with that?
>
> A:    Could you say that again?

Q:      Yeah. We heard -- Mr. Verdugo said he had heard about the Muhammad Drawing Contest before it occurred.

A:      Yes.

Q:      And the two juveniles, Carlos and Juan, both said they had heard about that drawing contest before it occurred?

A:      Yes.

Q:      Okay. Did anyone else in your investigation, anyone tell you that they had heard of that contest before it occurred other than those two individuals -- those three individuals?

A:      No, not that I recall.

Q:      Do you recall whether or not Mr.-- the young boy in the photograph indicated that he knew about the contest before

MS. BROOK: Objection. Hearsay as to any content of conversations.

THE COURT: Sustained.

BY MR. MAYNARD:
Q :     Okay. Did you participate in the preparation of the indictments in this case?

(RT 3/3/16 Whitson at 134-135.)

Kareem claims the government violated *Napue* v. *Illinois*, 360 U.S. 264 (1959), through a "presentation of false evidence" in that SA Whitson recalled that only "Stephen Verdugo" and two juveniles "Juan and Carlos" had stated during the investigation to him that they knew the drawing contest was to occur before it happened. To establish a *Napue* violation, Kareem "must show" (1) Whitson's testimony was "actually false," (2) the government "knew or should have known" it was false, and (3) it was "material," meaning there is a "reasonable likelihood" it "could have affected" the verdict. *United States* v. *Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (quotations omitted). Kareem cannot make the required showing, for two reasons: the testimony was mistaken, not perjured, and the inaccuracy was immaterial.

- 22 -

**1. The testimony was mistaken, not perjured.**

Absent prosecutorial machinations aimed at misleading the jury while averting outright perjury—*i.e.*, abuses like the ones at the heart of the cases Kareem invokes — honestly mistaken witness recollections do not ordinarily satisfy *Napue*'s falsehood requirement. *Henry* v. *Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013).

SA Whitson agreed with Defense Counsel that Juan, Carlos and Mr. Verdugo knew about the contest before it occurred. SA Whitson then answered "No, not that I recall" to the question of did anyone else "tell him" about hearing of the contest before it occurred. First, the question called for hearsay, which was objected to when Defense counsel further questioned SA Whitson on the matter. Second, given the broad nature of the questions, it is clear that in the moment, Whitson was mistaken and did not include N.S. on his list of individuals. When asked about N.S's specific statements in the form of a reference to a photo of the child, the Government objected to hearsay as to the content of any conversations elicited. Defendant did not ask any more questions related to this line of questioning and Defendant proved up the fact through N.S.

On March 4, 2016, N.S. testified in the defendant's case. N.S. testified on direct and on cross examination that his dad, Nadir Soofi, told him about the contest (the Draw the Prophet Muhammad contest) before he died and that he learned about it as early as February 2015. (Tr. T., pgs 7 & 12.) Further, defense asked N.S. if he had told SA Whitson and the prosecutors (seated at the prosecution table) before trial "the same thing that he had told us here today." The witness testified "yes." (RT 3/3/16 N.S. at 11.)

> Q Did you go to their office two or three weeks ago and talk
> to them?
>
> A Yeah.
>
> Q Did you tell them the same thing that you've told us
> today?
>
> A Yes.

(RT 3/3/16 N.S. at 11.)

SA Whitson testified and agreed that three individuals mentioned knowing of the contest before it occurred. And that he did not "recall" others mentioning it. At best, this misstatement was impeachment of SA Whitson's memory. The defense has made no showing of anything more than mistaken memory related to N.S..

Defendant in his motion also states "Mr. Bell informed FBI agents that he read Simpson's Twitter pages including Simpson's tweets about ISIS and his tweet about the cartoon contest and commented something to the effect of 'these people will never learn'… thus apparently Mr. Bell knew of the Mohammad drawing contest prior to the attack in Garland." (CR 303 at 11.) Kareem incorrectly assumes SA Whitson therefore knew that Bell knew of the contest before it occurred. First, Bell's statement did not make clear whether he saw Simpson's "will they ever learn" tweet before or after the attack. Second, and more importantly, Bell's statement about that particular tweet was in his May 5, 2015, recorded interview with FBI SAs Theron Nolen and Clint Hemberg, but was not included in their report of that interview. SA Whitson had not listened to the recording of the Bell interview prior to the trial in this case, so he was not aware of Bell's knowledge of the tweet. (Exh. 11, Declaration of SA Whitson.)

SA Whitson's statement came at the end of lengthy cross-examination. He answered, "no, not that I can recall" in response to a question about whether anyone else told him they knew of the contest before the attack. First, the question itself was improperly seeking hearsay – an out of court statement offered for the truth of the matter asserted. Second, the statement of Bell on this topic would have been double hearsay because it would have come to SA Whitson from another agent's report rather than an interview Whitson conducted. Third, the response "not that I can recall" was truthful in the moment—the jury rightly could conclude in response to the defense argument that SA Whitson did not recall N.S. knew of the contest and plans to attack it or that Bell knew of the contest via Simpson's Twitter posts, and his failure to remember those facts was not an attempt to deceive. This impeachment was insignificant in light of the evidence from multiple sources showing Kareem discussed the contest with Simpson, Soofi and Abdul

Khabir Wahid, that he at some point planned to be part of the attack on the contest, that he watched and played for others violent jihadist and/or Islamic State videos, that he provided firearms to or assisted Simpson and Soofi in acquiring firearms and ammunition they used in attempting to attack the Garland contest, and that he trained Simpson and Soofi in the operation and maintenance of those firearms.

### 2. The inaccuracy was immaterial.

SA Whitson's failure to remember N.S. knew of the contest before it occurred could not have affected the verdict, because the defense successfully impeached Whitson on the subject through N.S.'s testimony that N.S. had told SA Whitson he knew of the plan to attack the contest. In addition, defense used this misstatement to challenge SA Whitson's credibility during closing arguments and the government did not argue during rebuttal that Whitson was correct in his misstatement.

An inaccuracy must be material, and materiality depends on whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Houston*, 648 F.3d at 814 (quotation omitted). Other circuits echo the same principle. *See, e.g.*, *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990) ("Under [*Napue*] a conviction must be set aside if the prosecution's case includes perjured testimony, the prosecution knew or should have known of the perjury, and there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. … However, not every testimonial inconsistency that goes uncorrected by the Government establishes a constitutional violation."); *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987) ("[a] defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured. Mere inconsistencies in testimony by Government witnesses do not establish the Government's knowing use of false testimony."). Taken together, *Verser and Griley* confirm at a minimum that in order for a *Napue* violation involving testimony to exist, (1) the witness must know that his or her testimony is false; (2) the burden for establishing that fact lies with the defendant; and (3) it does not suffice if the witness is merely mistaken or incorrect.

Kareem's reliance on *United States v. LaPage*, 231 F.3d 488, 490 (9th Cir. 2000) is mistaken. In *LaPage*, the prosecutor elicited testimony that was plainly incorrect. The witness testified under oath during an earlier trial that he did *not* recognize a particular person, and then in a later trial testified that he *did* recognize her in the earlier trial, and had identified her at the earlier hearing. The court found the prosecutor plainly knew the testimony was false because the matter was important and the same prosecutor tried the case both times. *Id.* at 490. Kareem's reliance on *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993), likewise is misplaced. In *Kojayan,* the AUSA was found by the Ninth Circuit to have made untruthful arguments and statements in rebuttal that were not based on the facts in evidence in the case and further in contrast to information that should have been disclosed to defense.

Because SA Whitson's testimony on this subject was merely mistaken and defense counsel effectively impeached it with the testimony of N.S., no *Napue* violation occurred.

**F.     Conclusion**

Case law makes clear that a continuance is the appropriate remedy in this circumstance. The law is equally clear that a Defendant cannot sit back on the receipt of new discovery, make a tactical choice not to object and hope for an acquittal, and then demand a new trial once that choice fails to yield the desired outcome.

For all of these reasons, Kareem's motion should be denied.

Respectfully submitted this 3rd day of May, 2016.

JOHN S. LEONARDO
United States Attorney
District of Arizona

*s/Kristen Brook*
 *s/Joseph E. Koehler*
KRISTEN BROOK
JOSEPH E. KOEHLER
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of May, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Maynard, Attorney for Defendant

By: /s Kristen Brook