CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) March 1, 2016 |
| Abdul Malik Abdul Kareem, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**
**EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL - DAY #9**
**TESTIMONY:  S.A. ROBERT J. MESHINSKY - PART 3**

**APPEARANCES:**
**For the Government:**
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
               **Joseph Edward Koehler, Esq.**
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
              **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1              **P R O C E E D I N G S**

2        (Called to the order of court at 9:07 a.m.)

3            THE COURT:  Good morning, ladies and gentlemen.

4    Please sit down.  The record will show the presence of the

5    jury, counsel, and the defendant.

6            Ladies and gentlemen, when we sat the jury, I

7    mentioned that during any trial that lasts several weeks we

8    seat alternate jurors so that if something comes up

9    unexpectedly during the trial and a juror has to be excused,

10   that we have enough jurors to continue.

11           Juror No. 3 has been excused as one of the alternate

12   jurors, so now you are 15, as opposed to 16, with three

13   alternates remaining.

14           The other thing I wanted to address with you is that

15   someone inquired as to why Special Agent Whitson was able to

16   sit through the whole trial and listen to all of the witnesses

17   who testify when I had told you before that the lawyers had

18   invoked the rule to exclude witnesses.

19           Well, there is an exception in the rule that allows

20   each side to have someone sitting with them who's

21   knowledgeable about the case that can assist the lawyers

22   either with the prosecution or the defense.  And because Agent

23   Whitson is the case agent, he was designated as the individual

24   to assist the prosecutors with the case -- with the evidence

25   and to consult with them during the trial.  And so he is

 1    subject to the exception to the rule.

 2          There were two other questions and I'm not prepared

 3    to address them now because I haven't had a chance to discuss

 4    them with counsel.

 5          Ms. Brook, the government -- my understanding is that

 6    you wish to interrupt Agent Whitson's testimony to put on the

 7    testimony of another witness.

 8          MS. BROOK:  That's correct, Your Honor, we do.

 9          And before we call Evan Kohlmann who is here on video

10    feed, we wanted to briefly put back on Robert Meshinsky.

11          MR. KOEHLER:  Yes, Your Honor.  The government wishes

12    to recall Agent Meshinsky to finish up some items that we left

13    off when we were presenting his testimony last week.

14          And then, obviously, the defense would have the

15    opportunity to cross-examine Agent Meshinsky.

16          MS. PLOMIN:  Your Honor, I just want to make clear

17    that the prosecution has limited recalling Mr. Meshinsky for a

18    very limited purpose of the Lenovo laptop and nothing else.

19          MR. KOEHLER:  And, Your Honor, that's something I

20    wanted to address with the Court and something that perhaps we

21    should discuss at sidebar.

22          THE COURT:  No.

23          MR. KOEHLER:  Okay.  There were items from the Acer

24    Aspire laptop computer that were originally uploaded and given

25    exhibit numbers but somehow didn't make it onto the

1    government's exhibit list and those numbers got passed over.

2          And so those items were kind of in the netherworld,

3    so to speak.  They're in the Court's JERS disk, but they were

4    not put into evidence or ever on our exhibit list prior to the

5    trial and we discovered that over the weekend.  And so I have

6    those items marked.

7          THE COURT:  And when did you notify the defense about

8    those additional items?

9          MR. KOEHLER:  I notified the defense about those

10   items yesterday afternoon and evening.

11         THE COURT:  Then that complies with my prior order

12   that if there were any additional exhibits, that you had to

13   provide notice the day before; and so, yes, you can go ahead

14   and -- what number they're marked, I don't know, but.

15         MR. KOEHLER:  They're marked 489 to 494, I believe.

16         THE COURT:  Okay.

17         MR. KOEHLER:  Or 488 to 492.  And then the other

18   items were items from the same --

19         THE COURT:  Where is -- by the way, where is our

20   witness.

21         MR. KOEHLER:  He is in the witness room.

22         THE COURT:  Let's get him in here.

23         MR. KOEHLER:  And then the last one was the Samsung

24   Galaxy S5 that are on the government's exhibit list as

25   Exhibits 40 through 48.

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

1          THE COURT:  What about them?  That you want to

2    inquire of Agent Meshinsky about those?

3          MR. KOEHLER:  That is correct.

4          THE COURT:  And is there some objection?

5          MS. PLOMIN:  Your Honor, I just want to reiterate, we

6    didn't get these exhibits until late yesterday.  We got one

7    e-mail at 4:30 and one after 9:00 p.m.

8          THE COURT:  Oh, well, that's not yesterday afternoon.

9          MR. KOEHLER:  The 4:30 e-mail, I believe, was the 488

10   numbers.  I need to go back and doublecheck my e-mail.

11         THE COURT:  Agent Meshinsky, you may take the stand.

12         MR. KOEHLER:  And the e-mail after 9:00 was one

13   photograph of an individual whose photograph already appears

14   in some of the Twitter records.  It's just a blownup version

15   of it.

16         THE COURT:  If it was sent after  9:00 p.m., we're

17   not going to have it admitted this morning.

18         MR. KOEHLER:  That's fine.  And it won't be this

19   morning, Your Honor.

20         THE COURT:  The next question is we obviously have

21   Mr. Kohlmann present by video conference.  And I just

22   explained the exception to the rule to exclude witnesses, so

23   let's be sure there's no objection to Mr. Kohlmann hearing

24   whatever testimony Agent Meshinsky is giving.

25         MR. MAYNARD:  There is an objection.  My suggestion

 1   would be let's get Mr. Kohlmann on first, get him over with,

 2   and then they can bring back Meshinsky.

 3          MR. KOEHLER:  Some of the exhibits --

 4          MR. MAYNARD:  They're going to attempt to have him

 5   testify about things that they want Mr. Kohlmann now to

 6   testify about.

 7          THE COURT:  Well, if we have the rule to exclude

 8   witnesses, so Mr. Kohlmann cannot be present during the

 9   testimony of any other witness.

10          MS. BROOK:  Your Honor, can we just press "mute" on

11   Mr. Kohlmann's end so that he doesn't hear anything?

12          MR. KOEHLER:  Or on our end.

13          THE COURT:  We can try that.

14          First of all, good morning, Mr. Kohlmann.  Can you

15   hear me?

16          EVAN KOHLMANN:  Sorry, Your Honor.  Yes, I can.

17          THE COURT:  Okay.  We're going to try to moot --

18   mute, rather, the audio for the witness who's going to

19   testify.  So if you don't hear anything, that's why.  So I'm

20   going to try to mute it now and then I'll ask you if you can

21   hear me.  And if you don't answer, I will assume it's because

22   it worked.

23          EVAN KOHLMANN:  Okay.  Thank you very much.

24          THE COURT:  Can you hear me, Mr. Kohlmann?

25          Okay.  I assume that means he can't hear me.

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

 1          MR. KOEHLER:  Are you able to hear us?

 2          THE COURT:  I think that's a "no."  Okay.  Please

 3   proceed.

 4          MR. KOEHLER:  Thank you.

 5      **SPECIAL AGENT ROBERT J. MESHINSKY, WITNESS, SWORN**

 6              **DIRECT EXAMINATION (cont'd)**

 7   BY MR. KOEHLER:

 8   Q   Agent Meshinsky, when we left off, we were last talking

 9   about the Acer Aspire computer.

10   A   Yes.

11   Q   And what was the QPX number assigned to that Aspire?

12   A   QPX-100.

13          MR. KOEHLER:  Bless you.

14   BY MR. KOEHLER:

15   Q   And as part of your review of that computer, did you

16   export portions of the slack space showing Internet search

17   history and so forth?

18   A   Yes.

19          THE COURT:  What is "slack space"?

20          THE WITNESS:  On a computer hard drive, you have

21   unallocated space, slack space, free space.  It's where

22   there's nothing -- the operating system is not there.  There

23   are no files there and you'll find remnants of files that have

24   been deleted.

25          THE COURT:  So is "slack space" free space?  I mean,

1   is it just another term for "free space or" "unallocated

2   space"?

3               THE WITNESS:  Yes, it is.  Yes.

4               THE COURT:  Okay.  Thank you.

5               MR. KOEHLER:  My apologies.

6   BY MR. KOEHLER:

7   Q    The items that you find in free, unallocated space, or

8   slack space, are those items that have been deleted in the

9   past but portions of them remain?

10  A    That's correct.

11  Q    And as part of that I'm going to show you Government's

12  Exhibit 488 on the document camera.

13              And, Agent Meshinsky, do you recognize Exhibit 488?

14  A    Yes.

15  Q    And can you tell us in general terms what this is?

16  A    This is from, like we said earlier, it's from the

17  unallocated space.  These are Internet searches, logs that

18  were recovered.  I created -- we did a sweep of the data and

19  then, in turn, converted it into a .pdf file, temporary

20  Internet files.

21  Q    Does this reflect searches for "Anwar al-Awlaki"?

22  A    Yes.

23              MR. KOEHLER:  Move to admit 488.

24              MS. PLOMIN:  I have noted my objection for the Court,

25  Your Honor.

1          THE COURT:  The objection is just late disclosure,

2    correct?

3          MS. PLOMIN:  That I know of, yes.

4          THE COURT:  The objection is overruled.  And is it

5    488 or 489?

6          MR. KOEHLER:  488.

7          THE COURT:  488 is admitted.

8      (Exhibit No. 488 admitted in evidence.)

9    BY MR. KOEHLER:

10   Q   Looking at the first line, Agent Meshinsky, can you

11   identify who the user account is on the computer at that

12   point?

13   A   At that point the user was Laura.

14   Q   During your review of the computer, did you find any

15   evidence of the identity of who Laura was?

16   A   I did not.

17   Q   And looking at the second line, does that show what we

18   were talking about and can you explain that?

19   A   Can you repeat your question?

20   Q   Looking at the second line, is that an example of what we

21   were talking about in terms of a search for "Anwar al-Awlaki"?

22   A   Yes.

23   Q   And how is it that you're able to see that and explain

24   that in terms of what that means on the computer.

25   A   If you start at the beginning, you have your "Hard Disk,"

1    the "Volume3," the "User," the User's "Laura."  The

2    information is stored in the "AppData," which within the

3    AppData there's a folder called "Local."  Within that folder

4    there's a folder called "Microsoft" with a "Windows" folder

5    within that directory.  You have the "Temporary Internet

6    Files."  And that was where that was.  It was stored in

7    there.

8    Q    And at the time you reviewed that computer, did a user

9    named "Laura" exist as an active user account on the computer?

10   A    Yes.

11   Q    Now, moving on to Exhibit 489, did your review of the

12   slack space also reveal visits to a hoor-al-ayn.com or

13   hoor-al-ayn.com?

14   A    Yes.

15   Q    And is 489 a true and accurate copy of that portion of the

16   space reflecting those?

17   A    Yes.

18           MR. KOEHLER:  Move to admit 489.

19           MS. PLOMIN:  Same objection, Your Honor.

20           THE COURT:  The objection to late disclosure is

21   overruled.  489 is admitted.

22       (Exhibit No. 489 admitted in evidence.)

23   BY MR. KOEHLER:

24   Q    And was this user again the "Laura" account on the

25   computer?

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

1    A    Correct.

2    Q    Now, moving on to 490, did your review of the computer

3    also reveal visits to kalamullah.com?

4    A    Yes.

5    Q    And is 490 an accurate depiction of those items from the

6    free space on the computer?

7    A    Yes.

8              MR. KOEHLER:  Move to admit 490.

9              MS. PLOMIN:  Objection.  Late disclosure.

10             THE COURT:  490 is admitted.  The objection is

11   overruled.

12       (Exhibit No0. 490 admitted in evidence.)

13             THE COURT:  How come this one doesn't look the same?

14             THE WITNESS:  When we sweep and convert it into a

15   document, the .pdf cleaned it up a little.

16             THE COURT:  But it looks totally different from the

17   last two.

18             THE WITNESS:  Right.  It's from a different part of

19   the slack space where we were looking at the searches that

20   they did for pictures and such.

21   BY MR. KOEHLER:

22   Q    And so the extensions "jpg" at the end of the filenames on

23   the second line and on the fourth line on the next one down, I

24   guess also on the end of the first line of each entry, does

25   that reflect that you're looking for pictures when you're

1    going through that part of the computer?

2    A    There were pictures that were looked for, right, at that

3    website.

4    Q    Now, moving on to 491, do you recognize this?

5    A    Yes.

6    Q    And can you tell us what that is?

7    A    These are websites that were visited by the user of the

8    computer.

9    Q    And does it reflect visits to islamicline.com, Sheikh

10   Anwar al-Awlaki?

11   A    Yes.

12   Q    Is this a true and correct copy of that portion of the

13   free space?

14   A    Yes.

15           MR. KOEHLER:  Move to admit 490.

16           MS. PLOMIN:  Same objection.

17           THE COURT:  The objection is overruled.  I think it's

18   491.

19           MR. KOEHLER:  It's 490 -- oh, that's right.  It is.

20   I'm sorry.  It's 491.

21           THE COURT:  491 is admitted.

22       (Exhibit No. 491 admitted in evidence.)

23   BY MR. KOEHLER:

24   Q    I'm going to move down.  Can you tell us who the user is

25   on this particular account?

1    A    This user is "git."  G-I-T.

2    Q    Now, moving on to 492, do you recognize this, Agent

3    Meshinsky?

4    A    Yes.

5    Q    Can you tell us in general terms what this is?

6    A    It's more information that was in the unallocated space.

7    Q    And what type of information is this?

8    A    It shows an individual going to -- actually, I'm sorry.

9    Playing a song, the name the artist, the album.  So it could

10   be -- it could be a music file that was downloaded and played.

11   Q    Okay.  Can it also just be an audio file that was

12   downloaded and played?

13   A    Yes.

14   Q    And so does that mean that this file actually existed on

15   the computer and had been stored to the computer?

16   A    Yes.

17   Q    Is this a fair and accurate depiction of that?

18   A    Yes.

19   Q    And can you tell us who the user is on that?

20   A    "Public."

21   Q    Can you explain what "Public" is on a computer?

22   A    Public on the computer could be a user that's open to

23   anybody that could use it.

24          MR. KOEHLER:  Okay.  Move to admit 492.

25          MS. PLOMIN:  Your Honor, I just ask for a standing

1  objection for Exhibits 492 through 497 that were late

2  disclosure.

3         THE COURT:  Well, I will assume that you have that

4  objection.  If there are any different objections, then I will

5  ask you to make them when they're offered.

6         492 is admitted.

7     (Exhibit No. 492 admitted in evidence.)

8  BY MR. KOEHLER:

9  Q   I'm now going to turn back to the Lenovo laptop computer,

10  the 2015 image of the Lenovo laptop computer, and can you tell

11  us, again, what the designator was for that computer?

12  A   That computer is QPX_300_1 would be the hard drive that

13  was in QPX_300.

14  Q   I'm going to start with Exhibit 164.

15         Do you recognize that?

16  A   Yes.

17  Q   And can you tell us what that is in general terms?

18  A   This is part of the file that was recovered from the

19  Lenovo.  What you have is screen capture of -- from the

20  application that we do the exam in.  What you have is some

21  searching.

22  Q   Okay.  Is this a true and correct copy of that portion of

23  the search history from the Lenovo laptop?

24  A   Yes.

25         MR. KOEHLER:  Move to admit 164.

1          MS. PLOMIN:  No objection.

2          THE COURT:  164 is admitted.

3      (Exhibit No. 164 admitted in evidence.)

4   BY MR. KOEHLER:

5   Q   And can you tell us what the user was searching for on the

6   Lenovo laptop?

7   A   Searching for video files on YouTube regards to "Battle of

8   the Hearts and Minds," several versions of it.

9   Q   And the dates of these searches?

10  A   April 1st, 2012.

11  Q   All right.  And now going to move on to 165, can you tell

12  us, again, in general terms what this is?

13  A   It's a browser history.  It's a snapshot for that

14  particular day from Mozilla Firefox.

15  Q   Is this, likewise, a true and correct copy of the search

16  history from the Mozilla Firefox for the Lenovo laptop, a 2015

17  image?

18  A   Yes.

19          MR. KOEHLER:  Move to admit 165.

20          MS. PLOMIN:  No objection.

21          THE COURT:  165 is admitted.

22      (Exhibit No. 165 admitted in evidence.)

23  BY MR. KOEHLER:

24  Q   And what was the user searching for here on YouTube?

25  A   Another video file entitled "Anwar al-Awlaki:  Brutality

UNITED STATES DISTRICT COURT

1    Towards the Muslims Part 2."

2    Q   Now, moving on to 166, is that another snip from the

3    Mozilla Firefox browser history?

4    A   It is for May 3rd, 2012.

5    Q   Is that a true and correct copy?

6    A   Yes.

7             MR. KOEHLER:  Move to admit 166.

8             MS. PLOMIN:  No objection.

9             THE COURT:  166 is admitted.

10        (Exhibit No. 166 admitted in evidence.)

11   BY MR. KOEHLER:

12   Q   And what was the user searching for there?

13   A   Another YouTube, "And Incite The Believers" by Sheikh

14   Abdullah Ibn Muhammad -- I do not want to say the last name

15   because I'm afraid I'll mess it up.

16   Q   Arrashud?

17   A   Arrashud.  Thank you.

18   Q   Now, on to 167, do you recognize that?

19   A   Yes.

20   Q   And is that another snip from the Mozilla Firefox browse

21   history?

22   A   Correct.

23   Q   Dated May 3, 2012?

24   A   Correct.

25   Q   Is that a true and correct copy?

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

1    A   Yes.

2            MR. KOEHLER:  Move to admit 167.

3            MS. PLOMIN:  No objection.

4            THE COURT:  167 is admitted.

5        (Exhibit No. 167 admitted in evidence.)

6    BY MR. KOEHLER:

7    Q   And can you tell us what video was searched for there?

8    A   "Mujahideen Bagram escape YouTube."

9    Q   Now, moving on to 168.

10           THE COURT:  Mr. Koehler, how many more of these do

11   you have from the Lenovo?

12           So far there have been no objections to any of them.

13           MR. KOEHLER:  Five.

14           THE COURT:  What numbers are they?

15           MR. KOEHLER:  Is 168 through 172.

16           THE COURT:  Are there any objections?

17           MS. PLOMIN:  No, Your Honor.

18           THE COURT:  Are you offering them?

19           MR. KOEHLER:  I am.

20           THE COURT:  168 through 172 are admitted.

21       (Exhibit Nos. 168, 169, 170, 171 and 172 admitted in

22   evidence.)

23   BY MR. KOEHLER:

24   Q   Let's start with 168.  What was the search here?

25   A   May 3, 2012, again, on YouTube for "mujahid escape Bagram.

1    YouTube."

2    Q    All right.  And these are all, again, from the Lenovo 2015

3    image?

4    A    Correct.

5    Q    Here's 169.

6    A    May 3, 2012.  Again, "Escape From Bagram Prison.  One.

7    Part 2 of 5.  Documentary."

8    Q    Now 170.

9    A    Browser history again.  May 8, 2012.  Google Search on

10   "mujahideen."  And then the other, again, is another search on

11   Google, same subject.  The date I can't read.  Time of the --

12   you have the hole punch right there.

13   Q    All right.

14   A    10:54.

15   Q    Very good.  We can cycle back to that later.

16        Now, 171.

17   A    Again, browser history.  Internet search history.  Again,

18   for "Lectures."  Dates 5/13/2012.  A lecture 5/14/2012.

19   5/15/2012.  And, again, 5/15/2012.

20   Q    Is the website there "kalamullah.com"?

21   A    Yes.

22   Q    And then the last one is this, a full print of the Firefox

23   Browser History?

24   A    Correct.

25   Q    I'll direct you now your attention to Exhibits 40 to 48

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

```
 1   and place them on the document camera for you one at a time.
 2            Do you recognize Exhibit No. 40?
 3   A   Yes.
 4   Q   And can you tell us in general terms what it is?
 5   A   It's a .pdf document that was recovered from the cell
 6   phone.
 7   Q   And which cell phone was that?
 8   A   The cell phone that we identified as one of the phones
 9   from Dallas that was recovered and processed in Dallas.
10   Q   Was it the Samsung?
11   A   Samsung S5.
12   Q   Do you remember the color of the phone?
13   A   It was white.
14   Q   And is this a true and correct copy of a .pdf file that
15   you exported from -- I'm sorry.
16            What was the QPX number you gave the phone?
17   A   Well, it's going to be a "DL" number.  I can't recall the
18   number.
19   Q   Okay.  But the white Galaxy S5?
20   A   Correct.
21            MR. KOEHLER:  Move to admit 40.
22            MS. PLOMIN:  No objection.
23            THE COURT:  40 is admitted.
24       (Exhibit No. 40 admitted in evidence.)
25            THE COURT:  Before you do them one at a time, Mr.
```

1    Koehler, are you planning to go through multiple exhibits of

2    things that all came from this white Galaxy Samsung phone?

3            MR. KOEHLER:  Yes, Your Honor.

4            THE COURT:  What are they?

5            MR. KOEHLER:  40 through 47.

6            THE COURT:  And it will be the same foundation from

7    this witness as to -- up to 47?

8            MR. KOEHLER:  That's correct, Your Honor.  And there

9    is one additional from the phone that is --

10           THE COURT:  Well, let's just take care of 40 through

11   47 right now and find out if the defense has any objection to

12   those.

13           MS. PLOMIN:  One moment, Your Honor.

14           I do not have any objection to foundation, Your

15   Honor.

16           THE COURT:  Are you offering 41 through 47, Mr.

17   Koehler?

18           MR. KOEHLER:  Yes, Your Honor.

19           THE COURT:  41 through 47 are admitted.

20       (Exhibit Nos. 41, 42, 43, 44, 45, 46 and 47 admitted in

21   evidence.)

22   BY MR. KOEHLER:

23   Q   So this is 41 on the document camera.

24           Can you just read the name of the publication,

25   please.

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

```
1   A    "RUM Which Nation Does The Agadutg Of The Last Day Refer
2   To?"
3   Q    And now 42.
4   A    "The ISIS Twitter Census.  Defining and describing the
5   population of ISIS supporters on Twitter."
6   Q    I'm going to skip to the third page of 42 because the
7   first two pages are just cover sheets.
8             THE COURT:  Okay.  So now you're on 42?
9             MR. KOEHLER:  That's correct.
10            THE COURT:  Okay.  The ISIS Twitter Census was 41.
11            MR. KOEHLER:  Correct.
12  BY MR. KOEHLER:
13  Q    So what is the name of 42, please?
14  A    From the Rand Corporation.  "Promoting Online Voices For
15  Countering Violent Extremism."
16  Q    Exhibit 43.
17  A    Court documents for the United States District Court,
18  Southern District of Ohio, Eastern Division.
19            United States of America, plaintiff, versus
20  Abdirahman Sheik Momamud, a/k/a -- I can't say it -- the
21  defendant.
22  Q    Is that an indictment?
23  A    Excuse me.
24  Q    Is that an indictment?
25  A    Yes.
```

 1   Q    Now 44.

 2   A    .pdf document.  "The Absent Obligation from the pen of

 3   Muhammad Abdus Salam Faraj."

 4   Q    And this part here?

 5   A    Can you move it a little.  It has kind of a glare on it.

 6          "And expel the Jews and Christians from the Arabian

 7   Peninsula."

 8   Q    And this is 45.

 9   A    Correct.  Dabiq -- can you say that one?

10   Q    Is that Dabiq?

11   A    Dabiq -- excuse me -- Issue No. 5.

12          Dabiq.  Issue No. 8.

13   Q    And 47.

14   A    How do you say that first word?

15   Q    Is that "hijra"?

16   A    "Hijra" -- thank you -- "to the Islamic State.  What to

17   pack up.  Who to contact.  Where to go.  Stories and more.

18   Prequel eBook.  The Islamic State 2015."

19   Q    All right.  And last but not least, directing your

20   attention to Exhibit 494, do you recognize that?

21   A    Yes.

22   Q    And what is that?

23   A    It's an Internet history from the Samsung browser.

24   Q    Okay.  The same cell phone that we have been talking

25   about, the white Galaxy S5?

1    A    Correct.

2    Q    Is that a true and correct copy of the extraction history

3    of the browser?

4    A    It's a portion of it, yes.

5    Q    Of that portion?

6    A    Yes.

7              MR. KOEHLER:  Move to admit 494.

8              THE COURT:  Okay.  What happened to -- it's not --

9    it's not a complete extraction.  It's just a little part of

10   it.

11             THE WITNESS:  No.  It's just page 89 of 178 pages.

12             THE COURT:  Oh.  Well, maybe we should be glad it's

13   only one page then.

14             Is there any objection other than late disclosure?

15             MS. PLOMIN:  No.  That's the only objection.

16             THE COURT:  494 is admitted.

17        (Exhibit No. 494 admitted in evidence.)

18             THE COURT:  So how many pages can you have on a

19   Samsung Galaxy phone?

20             Mr. Koehler just showed you exhibits that if he held

21   them all up was about this high (indicating) and you just said

22   there's 179 total pages of just this.

23             THE WITNESS:  Well, this is a report.  This

24   particular document is a report that we've created.

25             The documents that he showed us earlier, a cell phone

1   can hold up to -- the newer iPhones, 128 gigs worth of data.

2   So the Samsung phones are probably up there as well.  64 gigs.

3          THE COURT:  Thank you.

4   BY MR. KOEHLER:

5   Q   Do you know how many gigs of data the Galaxy S5 had

6   available to it?

7   A   That particular phone had 16 gigs.

8   Q   Okay.  And if you were to just take 16 gigs-worth of

9   paper, do you have any idea of how much space that would fill?

10  A   Well, they say that -- one gig is the equivalent of about

11  20 file cabinets of data.

12  Q   So 16 times 23,200 file cabinets?

13  A   If you say so.

14  Q   If my math is right.  Maybe I'm off.  Maybe it's only 320.

15  Yeah, it's 320.

16         320 filing cabinets full of paper?

17  A   That's what I use a calculator for.

18  Q   Can you read the third line here where my finger is?  Just

19  the part, the first part of the line where my finger is.

20  A   Sure.  Https//just paste.it./ISHDLEAK.

21  Q   And does reflect that the user visited a site called

22  "justpaste.it"?

23  A   Correct.

24  Q   And downloaded a document called I-S-H-D-L-E-A-K?

25  A   Correct.

1    Q   And, again, Agent Meshinsky, do you recall the identity of

2    the person who was using the Samsung Galaxy S5 or that you

3    assessed to be the user of that phone?

4    A   I believe it was one of the individuals in Dallas.

5           MR. KOEHLER:  May I have one moment?

6           THE COURT:  Yes.

7           MR. KOEHLER:  I just want to confirm with the clerk.

8           Is 166 in?   I thought I moved to admit and I wanted

9    to be sure.

10          THE CLERK:  Yes.

11          MR. KOEHLER:  It's in?  All right.

12          I have no further questions at this time.

13          THE COURT:  Ms. Plomin, do you have any questions on

14   cross?

15          MS. PLOMIN:  I do, Your Honor.

16          THE COURT:  You may proceed.

17                        **CROSS EXAMINATION**

18   BY MS. PLOMIN:

19   Q   Good morning, Mr. Meshinsky.

20   A   Good morning.

21   Q   I'm going to try and go chronologically here.  You have a

22   lot to testify about.

23   A   That's fine.

24   Q   In terms of the Lenovo, you testified to the search

25   history of several exhibits.  I believe it was Exhibits 164 --

1  I'm sorry -- 165 through 172.  Do you remember that?

2  A   Yes.

3  Q   Okay.  And in terms of the search history that you

4  reviewed and you testified to in those exhibits, let me just

5  clarify.  Those were all from 2012, correct?

6  A   Correct.

7  Q   All right.  And in terms of those exhibits that you

8  testified to, there were search histories on April 1st, 2012?

9  A   Correct.

10  Q   And May 3rd, 2012?

11  A   Correct.

12  Q   And all of the search history occurred between March and

13  May of 2012 that you testified to, correct?

14  A   That's correct.

15  Q   All right.  And when you viewed those items of search

16  history, are you able to determine which user was conducting

17  those searches?

18  A   Based on the documents that were printed out, I could not

19  tell.

20  Q   Now, moving on to the flash drive that was inserted into

21  the Lenovo, you testified to that maybe a week or a

22  week-and-a-half ago.

23       Now, did you review a report or did you conduct your

24  own analysis in order to determine when the files on the flash

25  drive were uploaded or were put onto the flash drive?

1   A    It was put into CAIR and I was -- once the files were

2   identified by the case agent and other members of his squad,

3   the report was printed.  We weren't asked to do any further

4   analysis on the thumb drive.

5   Q   All right.  And did you review Agent Neville -- I'm

6   sorry -- Mr. Neville's report on certain -- 27 items that were

7   found on the flash drive and when they were put onto the flash

8   drive?

9   A   I did not review his report.

10  Q   Now, moving on to the Acer laptop, you testified to

11  unallocated or slack space.

12        Are you able to determine any of the items that are

13  found in the unallocated space are you able to determine which

14  user left the remnants that you located in the slack space?

15  A   Only if it's able to be recovered.

16        When it goes in the slack space, the unallocated

17  space, are just fragments of files.  So if it was able to

18  recover that information who put it there, it would have.

19  Q   And you located a user named "Laura"?

20  A   Correct.

21  Q   Did it appear to you that -- well, Let me actually back

22  up.

23        Were you able to determine from those remnants that

24  were left in the slack space or the unallocated space when

25  they were viewed -- well, when they were viewed on the laptop?

1   A   No.

2   Q   Were you able to determine if they were viewed on the

3   laptop; the YouTube searches, for instance?

4   A   When I exported the documents out, that was one -- when I

5   saw them and reviewed them, prior to that all the information

6   was in CAIR and the case agents and the analysts were the ones

7   that reviewed it.

8   Q   And so who would that be a question for?

9   A   Probably the case agent.

10   Q   Agent Whitson?

11   A   Yes.

12        THE COURT:  So I think -- I'm not sure you answered

13   the question which was:

14        Were you able to determine if they were viewed on the

15   laptop; the YouTube searches, for instance.

16        THE WITNESS:  You would be able to, yes.  I'm sorry.

17   You would be able to.

18        THE COURT:  Were you able to determine?

19        THE WITNESS:  Based on the information I saw in the

20   slack space, yes, I could determine that they were viewed on

21   the laptop.

22   BY MS. PLOMIN:

23   Q   But you didn't -- you weren't instructed or you didn't do

24   that in this case?

25   A   That's correct.

1   Q    Now, moving on to the Galaxy S5 phone, the white phone

2   that was found in Texas, I believe you testified on direct

3   that you believed that that phone belonged to one of the

4   individuals in Texas.  I'm assuming you meant Elton Simpson or

5   Nadir Soofi?

6   A    Correct.

7   Q    Do you know which one had the subscriber information that

8   linked to that phone?

9   A    When I reviewed the report yesterday -- and I'm just

10  recalling now -- it was Simpson.

11  Q    Elton Simpson?

12  A    Yes.  Sorry.

13  Q    And those documents that you testified to at the end of

14  the direct examination today, those were found in the white

15  Samsung phone, correct?

16  A    That is correct.

17  Q    Belonging to Elton Simpson?

18  A    Correct.

19  Q    And were you able to determine --

20         Well, first, are you able to determine from a

21  forensic level when those documents are uploaded or downloaded

22  onto a phone?

23  A    You would be able to, yes.

24  Q    And did you do that in this case?

25  A    I did not.

1    Q    Do you know if anybody did that in this case?

2    A    I do not.

3    Q    Now, I believe it was on Friday you testified to an LG

4    phone, 440 phone, that was found in Simpson and Soofi's

5    apartment.  Do you remember that?

6    A    I believe I do.

7    Q    And you testified to two specific text messages that were

8    found in that phone?

9    A    Correct.

10   Q    And did you review the full -- is it ZRT Report?

11   A    Correct.

12   Q    And the ZRT Report is, essentially, a kind of snapshots of

13   pictures of all the activity in the phone?

14   A    That is correct.

15   Q    And did you review the full ZRT Report for that LG phone

16   that was found in Simpson and Soofi's apartment?

17        I want to distinguish because there are two LG

18   phones.

19   A    I did.

20   Q    And I have marked as Exhibit 342 -- I'm not going to ask

21   to admit it now -- but I would like to show it to you.

22        Does this appear to be the volume that -- of text

23   messages that you viewed in the LG phone that was found in

24   Simpson and Soofi's residence?

25   A    When I took pictures, so, I would have to look and see

1     your document there.

2              MS. PLOMIN:  Okay.  Your Honor, may I show it -- or

3     approach the clerk and show it to the witness?

4              THE COURT:  Yes.

5              MS. PLOMIN:  Thank you.

6              THE WITNESS:  Thank you.

7              What you have is the ZRT Report which I created.  And

8     the way the report is set up is you have the thumbnail view.

9              And if you click on the thumbnail view, then you will

10    get the expanded view.  So at the beginning of the report, as

11    you see here, your thumbnail views.  And when you click on it,

12    you would then get the full view here.

13             And that's why there's so many pages to this

14    document.

15    BY MS. PLOMIN:

16    Q    There's essentially a page for each text message?

17    A    Well, there's more than just the text messages.  I believe

18    there was also dialed numbers, contacts, missed calls,

19    received calls, pictures, then the message inbox, drafts, an

20    outbox, and that was it.

21    Q    Okay.  And in your review of that ZRT Report, are you able

22    to determine the contacts that are in the phone, the contacts

23    that the person who has the phone records the name and phone

24    number of?

25    A    If I was able to find it, I would have taken a picture

1   with it.  And the reason I had to take pictures is because the

2   other forensics software that we use does not recognize the

3   phone.  So this is the next step that we take.

4   Q   When you reviewed the ZRT Report, did you see text

5   messages with a person by the name of Bunker Bob?

6   A   I don't recall.

7   Q   Do you recall if you saw text messages asking --

8   requesting to buy various form of ammunition?

9   A   I do remember that, yes.

10  Q   And, specifically, ammunition for an AK-47?

11  A   I remember an AK-47 being mentioned in one of the text

12  messages, yes.

13  Q   And do you recall communication with a person by the name

14  of Bunker Bob?

15  A   I don't remember the name of the person they were

16  communicating with.

17  Q   I just want to clarify that that is a true and correct

18  copy of the ZRT Report that you created and that you viewed?

19  A   Correct.

20        MS. PLOMIN:  Your Honor, I'm not going to move to

21  admit the exhibit at this time.

22        THE COURT:  Mr. Koehler, do you have any questions on

23  redirect?

24                    **REDIRECT EXAMINATION**

25  BY MR. KOEHLER:

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

```
 1    Q    Ms. Plomin asked you about dates on some of the different
 2    files.
 3    A    Yes.
 4    Q    This is 488 in evidence.
 5         Did this file from the slack space give you any dates
 6    on when these things occurred?
 7    A    No, not that I can see.
 8    Q    Same question regarding 489 in evidence.
 9    A    No.
10    Q    One more question about that.
11         Are you able to tell whether from these particular
12    things whether the user actually clicked through and watched
13    the item?
14    A    On this particular page you can see if they clicked
15    through on a couple of them, yes.
16    Q    Okay.  Can you use the screen there and just point at the
17    line using the screen -- you can draw a line on it -- to show
18    which line you're talking about.
19    A    It could be this one right here (indicating) search is
20    this here.
21    Q    Okay.
22    A    And then the viewing is here.
23    Q    All right.  Thank you.
24         Now, moving on to 490, does 490 give you dates?
25    A    No.
```

1  Q   When someone navigates to a photo on a page, does the

2  photo display automatically?

3  A   On a page on some you would have to click on.  Some will

4  show on a webpage.

5  Q   Okay.  And can you see whether there was a click-through

6  on any of these or are you able to tell whether it would be

7  automatic?

8  A   I'm not able to tell.

9  Q   Okay.  491, same question about dates.

10 A   No dates.

11 Q   And are you able to see whether click-throughs occurred to

12 the content?

13 A   There would be a few here.  The search.

14        Do you want me to touch the screen?

15 Q   Yes, please.

16 A   Here -- oh, you moved it.

17 Q   All right.

18 A   There.  With a click -- there was a search here and a

19 click-through here.

20 Q   And this is 491.

21        And same questions with 492.

22 A   Here you do have some dates.  Where it was modified.  The

23 file.

24 Q   Okay.  Can you show us that?

25 A   Right there.  (indicating) August 19th, 2013, and this is

CR15-707-PHX-SRB   S.A.ROBERT MESHINSKY-PT#3 3-1-16

 1   an audio file.

 2          MR. KOEHLER:  That's all I have, Your Honor.  Thank

 3   you.

 4          THE COURT:  May Agent Meshinsky be excused or is he

 5   still subject to recall, Mr. Koehler?

 6          MR. KOEHLER:  He may be excused, Your Honor.

 7          THE COURT:  Is there any objection?

 8          MS. PLOMIN:  No, Your Honor.

 9          THE COURT:  Thank you, Agent Meshinsky.  You may step

10   down, sir, and you are excused as a witness.

11          THE WITNESS:  Thank you.  Should I leave this here?

12          THE COURT:  Maureen, would you get the exhibit back

13   and give it to Ms. Plomin?

14          Are we ready for Mr. Kohlmann now?

15          MS. BROOK:  We are, Your Honor.

16      (End of excerpt of proceedings.)

17                              *  *  *

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

CR15-707-PHX-SRB  S.A.ROBERT MESHINSKY-PT#3 3-1-16

C E R T I F I C A T E

I, ELIZABETH A. LEMKE, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 29th day of April, 2016.

s/Elizabeth A. Lemke
ELIZABETH A. LEMKE, RDR, CRR, CPE