Daniel D. Maynard, No. 009211
dmaynard@mmcec.com
Mary K. Plomin, 032368
msplomin@gmail.com
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | No.  CR 15-00707-PHX-SRB |
| Plaintiff, | **DEFENDANT'S CONSOLIDATED REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR NEW TRIAL AND MOTION FOR JUDGMENT OF ACQUITTAL** |
| v. | |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

The United States of America (the "Government"), through its undersigned counsel, opposed Defendant, Abdul Malik Abdul Kareem's ("Abdul Kareem") Motion for New Trial and Motion for Judgment on Acquittal on the bases that there is no merit to Kareem's argument that the Government abused discovery.  As Abdul Kareem's Motion and this Reply demonstrate, the Government has violated this Court's numerous orders, it violated its Constitutional obligations under *Brady*, and it continues to violate those obligations.

The Government filed its Consolidated Response [to] Defendant's Motion for New Trial and Motion for Judgment of Acquittal ("Response") on May 3, 2016; however, on May 6, 2016, it made a supplemental discovery of bates stamp number 003237-003243, 302 reports of three interviews of John Sabari ("Sabari"), conducted in May of 2015.  (Ex. 1)  These disclosures were made over a year after the first interview took place and confirm that the Government has still not fulfilled its disclosure obligations.  The interview taken on May 4, 2015 makes reference to previous interviews of Sabari that have not been disclosed (Ex. 1, p.

**MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.**
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE • SUITE 1800 • PHOENIX, ARIZONA 85012
TELEPHONE 602.279.8500 • FACSIMILE 602.263.8185

003238)  Sabari said he was only on a motorcycle social media website and forum.  (Ex. 1, p. 3237-38)  Sabari stated that Simpson was close with Saabir ["Nurse"], Salim and James Bell and there was no mention of Abdul Malik.

The second interview occurred on May 8, 2015 (Ex. 1 at 003239-240) from 3:10 p.m. until 5:20 p.m. and was electronically recorded.  That electronic recording still has not been produced and apparently it contains information about people who were close to Simpson including Soofi, James Bell, Saabir Nurse, Saleem, and Abdul Malik.

Sabari admitted he was active on a forum operated by Sheikh Faisal ("Faisal"); the individual that the Government went to great lengths to argue was followed by Abdul Kareem, who denied that he was a follower.  Sabari admitted he was an administrator of Faisal's Paltalk room called Authentic Tawheed and that he communicated with Faisal via Skype and in the past he had facilitated calls between Faisal, Soofi and Simpson.  (Ex. 1, 003239)  There is no mention of Abdul Kareem contacting Faisal.  There is probably more information on the audiotape; however, the document never mentions Abdul Kareem accompanying Soofi and Simpson to Sabari's residence and participating in these calls.  This information would have gone a long way to backing up Abdul Kareem's statements that he did not follow Faisal and showing a significant activity that Soofi and Simpson participated in with a known terrorist or terrorist sympathizer that did not include Abdul Kareem.  These 302s and the audiotape should have been turned over to the defense under *Brady* since they are exculpatory and are favorable to the defense.

Sabari admitted his knowledge of Simpson's "birdofgreen" Twitter account and its support of ISIS.  (Ex. 1, p. 003240) It appears that Sabari probably knew about the tweets made by Simpson before the Garland incident.  Also, Sabari said that Saabir [Nurse] was Simpson's employer and friend and was generous with his money.  (Ex. 1, p. 003240) This information would have corroborated the defenses theory that it was Saabir Nurse who gave Simpson the money that he used to finance the Garland incident rather than Abdul Kareem.

1  Lastly, Sabari confirms Abdul Kareem's testimony about his falling out with Simpson

2  over finding a listening device in his car.  (Ex. 1, p. 003240)

3  Clearly, Sabari was an important witness, known to the Government, whose testimony

4  was helpful to the defense.  The Government's contention is that it did not commit any

5  discovery violations nor any *Brady* violations and if it did, that the Defendant's sole remedy

6  was to seek a continuance.  The Government fails to understand that the trial in this case began

7  on February 16, 2016 and that the complained of discovery violations occurred before, during,

8  and after the trial and that the Defendant had a right to a speedy trial that included that his

9  Constitutional rights be protected and that the Court's orders not be violated.

10  **I.    Background**

11  As the Government notes, pursuant to the Joint Notice of Scheduling Order filed on July

12  31, 2015, the parties agree to an October 12, 2015 *Brady* disclosure deadline.  The Government

13  states that *Brady* disclosures encompass only "evidence that is material and exculpatory"

14  (Response, p. 3, lines 21-22) and footnote 1 of the Scheduling Order deadline applied only to

15  evidence that was in the Government's possession as of October 12, 2015.  Clearly the

16  documents that have been turned over to Defendant on May 6, 2016 were in the Government's

17  control and possession as of October 12, 2015, as is the two hour and ten minute tape recording.

18  Additionally, a great many of the documents turned over by the Government after October 12,

19  2015 were in the Government's possession and control prior to October 12, 2015.

20  In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the due

21  process clause requires the prosecution to disclose, upon request, evidence favorable to an

22  accused person when such evidence is material to guilt or punishment.   On June 23, 2015,

23  Abdul Kareem filed a general request for all discovery that Defendant would be entitled to,

24  including *Brady* material. *See* Ex. 2. Evidence "favorable to an accused" includes exculpatory

25  evidence and evidence that impeaches a Government witness.  *U.S. v. Bagley*, 473 U.S. 667,

26  673 (1985); *Milke v. Ryan*, 711 F.3d 998, 1012-13 (9th Cir. 2013).  Thus, a *Brady* violation

1  occurs when: 1) evidence is favorable to the accused because it is exculpatory or impeaching;

2  2) evidence was suppressed by the prosecution, either willfully or inadvertently; and 3)

3  prejudice ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

4  Favorable evidence is material if there is a reasonable probability that the disclosure

5  evidence would have changed the outcome of the proceeding. *See U.S. v. Kohring*, 637 F.3d

6  895, 903-06 (9th Cir. 2011). A reasonable probability under *Bagley* is a probability sufficient

7  to undermine confidence in the outcome. 473 U.S. at 678, 682 (plurality opinion)(*see also*

8  *Cone*, 556 U.S. at 452)(evidence is material when there is "reasonable probability that the

9  withheld evidence would have altered at least one juror's assessment [of the case]"). Aside

10 from exculpatory evidence, the Government is obligated to disclose information that could be

11 used to impeach Government witnesses, especially where the witness' testimony is an important

12 part of the Government's case. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972).

13 **II.     Speedy Trial**

14 The Sixth Amendment speedy trial guaranty, the Speed Trial Act of 1974 (18 U.S.C. §§

15 3161-74), and the Federal Rules of Criminal Procedure protect defendants from undue post-

16 accusation delay. The right to a speedy trial attaches at the time of arrest or formal charges,

17 whichever comes first. The remedy for violation of this right is to dismiss the indictment and

18 vacate any sentence that has been imposed. *See Strunk v. United States*, 412 U.S. 434, 440

19 (1973).

20 **III.    Prosecutorial Misconduct**

21 The prosecutor's duty in a criminal prosecution is to seek justice. *See Berger v. U.S.*,

22 295 U.S. 78, 88 (1935). Prosecutorial misconduct justifies reversing a conviction when it so

23 infects the trial with unfairness as to the make the resulting conviction a denial of due process.

24 *Darden v. Waynewright*, 477 U.S. 168, 181 (1986). The failure to make timely and complete

25 disclosures resulted in Abdul Kareem receiving an unfair trial.

26

1    Prosecutors may not knowingly present false testimony and have a duty to correct

2    testimony that know to be false. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). Plus, the

3    prosecutor must disclose evidence favorable to the defendant if the defendant so requests. *See*

4    *Banks v. Dretke*, 540 U.S. 668, 692 (2004); *see also Strickler v. Greene*, 527 U.S. 263, 281-82

5    (1999). It appears that Agent Whitson did not disclose others, that he knew knew about the

6    Mohammed Drawing Contest before it occurred besides NS; *i.e.*, Bell and Sabari. It appears

7    that Sabari probably knew about the contest since the 302s that were produced on May 6, 2016

8    state that he was aware of Simpson's Twitter account. (Ex. 1, p. 003240). When this is added

9    to Bell's statements set forth in the opening brief, it leads to the inescapable conclusion that the

10   Government was withholding evidence that it knew or should have known was favorable to the

11   defense. Whether he listened to Bell's interview; it seems doubtful that the interviewing agents

12   did not inform him. Bell, Sabari and Nurse were all close friends and confidants of Simpson.

13   The evidence at trial suggests that Nurse gave money to Simpson that he used to carry out the

14   incident at Garland. There is no connection between Nurse and Abdul Kareem and now the

15   May 2015 interviews of Sabari that were partially turned over on May 6, 2016 confirm the

16   closeness of the relationship between Simpson and Nurse and that Nurse was generous with his

17   money. Nurse's May 4, 2015 and May 21, 2105 interviews were not disclosed by the

18   Government until January 29, 2016. It appears based on Agent Whitson's testimony that there

19   were other interviews of Nurse that were conducted but never disclosed (RT 3/3/16 118). The

20   Government contends Agent Whitson was speculating; however, he is clear that others

21   conducted interviews after he prepared the handwriting on the electrostatic page on or about

22   October 21, 2015. (R.T., 3/3/16 111)

23        Bell was interviewed on May 5, 2016 but the recorded interview was not disclosed until

24   February 11, 2016 and the 302 not until February 18, 2016. The Government agrees that Bell

25   knew of the Garland attack in advance by virtue of reading one of Simpson's tweets (Response,

26   p. 20, lines 18-19) which is consistent with Sabari's statements. Why did the Government wait

to turn over this material until during the trial, at the same time it was inundating the defense with new reports and massive amounts of new material?

Lastly, the Government misstates when it said Abdul Kareem provided information to the Government about Sabari during his May 2015 interview (Response, p. 21, lines 14-15). Kareem knew an individual named Yahya but did not know his actual name. (*See* Ex. 3). The defense did not know the identify of Yahya and the Government kept it from the defense.

1. <u>Specific misstatements and misleading comments made in the Response</u>. Page 2, lines 1-3, the Government argues that the defendant fails to acknowledge when complaining about mistrial production of interview reports that the great majority of these reports concerned interviews that occurred just a few days earlier. This is not accurate. Four reports produced on February 9, 2016 (2435-2446, 2447-2448, 2449-2450, and 2451), and three CDs produced on February 11, 2016 (2454-2456), were all dated in May of 2015. It is true that the Government did produce interview CDs and 302 reports from May 2015 as of August 3, 2015 but the defense question why these other reports were not produced at that time but were produced on the eve of trial.

Additionally, there were several 302s that were not produced until after the trial began. NS was interviewed on February 8, 2016 and the reports were not produced until February 17, 2016 and February 23, 2016. Amber Pluff was interviewed on January 15, 2016 and that interview was not produced until February 23, 2016. Mr. Ochoa was interviewed on February 8, 2016 and it was not produced until February 23, 2016. Knowing that the trial was beginning on February 16, 2016, all of these pretrial interviews should have been produced prior to the start of trial, especially Ms. Pluff's which was done a month before the trial started.

On December 23, 2015, the defense had to request interview reports for Anthony Sampson and Stuart Sampson that were taken on May 3, 2015 and the Government contends on page 21 of its Response that the defense did not request the reports on John Sabari. The defense did not know the name of Sabari. It is difficult to request what you do not know but

1  it is clear that Sabari who was interviewed three times by the Government in May 2015

2  including a two hour ten minute interview that was recorded that has yet to be turned over, was

3  of great interest to the Government.

4      Between February 17, 2016 and February 23, 2016, after the trial had started, the

5  Government produced bates numbers 2590-3236 and claimed that many of these were "simply

6  reformatted versions of items that had previously disclosed . . . some of the reformatting and

7  redisclosure was done at the request for defense counsel. (Response, p. 2, lines. 10-11) Of the

8  585 pages of documents produced on February 23, 2016 (2561-3236):

9      1) 3199-3202 are dated May 20, 2015;

10     2) 3203-3206 is dated May 28, 2015;

11     3) 3207-3210 is dated August 19, 2015;

12     4) 3211-3214 is dated May 28, 2015; and

13     5) 3225-3236 - some appear to have been submitted to the FBI in May and June 2015;

14  however, there were a few that were not even submitted to the FBI for processing until January

15  26, 2016 and February 2, 2016.

16      Beginning on page 6 of their Response, the Government continually states that it

17  disclosed on September 2, 2015 or October 13, 2015 two hard drives that contained a great

18  many of the files. However, the Government is well aware that the defense was unable to open

19  the files. (*See* Ex. 4, Declaration of Gayle Sipe) Defense contacted the Government on

20  September 11, 2015 and again on September 15, 2015 advising them that we could not access

21  the hard drive. (Ex. 4, ¶¶ 4 and 5) Eventually, in a telephone call between AUSA Brook, FBI

22  Agent Whitson and Gayle Sipe, the paralegal for the defense, on September 17, 2015, Whitson

23  advised that the defense would not be able to open the files without an expert. (Ex. 4, ¶ 6) This

24  put the defense at a disadvantageous from the start because the defense had to go through the

25  approval process through the CJA to get an expert up to speed just to access documents that the

26  Government was providing. (Ex. 4, ¶ 7) This process of producing documents that the defense

was unable to open was continually a problem in that the Government provided the wrong passwords, there were the wrong CDs that were provided, as in #405. (Ex. 4, ¶ 13) The Government then uploaded documents to USAFZ, beginning in late January 2016, and on January 29, 2016, the defense advised the Government that it was not able to utilize USAFZ except for Mary Plomin, but that our paralegal who was in charge of document production could not, the Government then sent a hard drive replacement on February 4, 2016 that did not work nor could be accessed. (Ex. 4, ¶ 12)

The chart that the Government has attached as Exhibit 1 to its Response is incomplete and misleading for the following reasons:

Creation dates are conveniently left off of documents, *i.e.*:

Pg. 6(d) produced on 1/21/16 included firearm reports dated June-August 2015 and search warrant photos from defendant's apartment 6/10/15;

Pg. 7(e) produced on 1/21/16 included approximately 400 pages dated from May 2015 - November 30, 2015;

Pg. 8(f) Bates #2286 produced on 2/2/16 is dated 5/5/15; Bates #2288 (CD) produced on 2/3/16 is dated 5/22/15;

Pg. 8(g) Interviews (2447-2451) produced 2/9/16 are dated 5/20/15; and (2434-2446) is dated May 4, 2015;

Pg. 11 (2634 and 2636) CDs are dated 10/20/15;

Pg. 13 - Mubarak interview was taken on 2/3/16, the report finalized on 2/8/16, and not produced until 2/15/16;

Pg. 14 - Reports 2524-2531 were produced on 2/11/16 and 3199-3214 were produced on 2/23/16, however the lab request analyses were dated May 2015-August 2015;

Pg. 16 - Ochoa interview was taken on 2/8/16, the report finalized on 2/16/16, and not produced until 2/23/16;

Pg. 16 Reports 2908-3087 were produced 2/23/16; however the lab requests are from May 2015;

Pg. 17 Saabir Nurse letters produced (3220) on 2/23/16 were from 2010, 2012 and 2014 and included letters from/to Saabir Nurse, a person listed on defendant's list of witnesses;

Pg. 20 (#10) - Interview reports were redacted and defense only received unredacted reports on 2/24/16, after several prior requests;

Pg. 21 - Carlos was interviewed on 12/14/15, however, his report was not produced until 1/29/16.

It is a little unclear on several of the documents when they were given to the FBI analysts, because the date of receipt is not disclosed.

## IV. Other Trial Discovery Abuses

### A. James Bell

The Government disclosed audio recordings of James Bell's May 5, 2015 interviews on February 11, 2016, five days before trial. The Government claims inadvertence. On February 11, 2016, the defense requested copies of the 302 reports which then were not provided until February 18, 2016. The audio recording provided on the eve of trial while the defense is in the process of doing jury instructions, marking exhibits and preparing for trial was several hours long. The Government contends that "none of Mr. Bell's statements were material;" however, if they were not material, why did the Government include him on a preliminary witness list? Although they claim he was not a final witness list, he was on the February 8, 2016 witness list.

### B. Amber Pluff Report on February 23, 2016

Ms. Pluff was interviewed on January 15, 2016; however, her report was not disclosed for a month, until February 15, 2016.

### C. Jeffery Evans Reports

Mr. Evans did not draft his report until February 24, 2016. Extraction and analysis of the Hirens 15.1 CD were conducted on February 22 and 23, 2016, and the forensic report produced on February 23, 2016. Bates numbers 1419-1420 demonstrate that Mr. Evans had the Lenovo in September 2015. Evans report clearly should have been produced earlier.

### D. Kelli Edmiston Demonstrative Exhibits

Ms. Edmiston's exhibit was finalized on February 12, 2016 but produced at 6:38 p.m. on February 18, 2016 to be used in testimony the next day.

## E. Addition of Exhibits 488-496

The Government notes at pages 16 and 17 that IA Vaughn's and SA Whitson's report summarizing the findings of the search and analysis of the Internet history of the Acer computer was disclosed on January 29, 2016. However, some of these were dated July 7, 2015, and others January 15, 2016.

On page 17, the Government notes that Exhibit 496 consisting of photocopies of pages from a blue steno notebook from the Simpson-Soofi apartment were disclosed on November 6, 2015 but the author was not identified. On November 12, 2015, defense counsel sent a letter stating that we were unable to read the notebook and requesting the identity of the author. This was never provided.

## F. Information About Ali Biaz and Christian Leon

The interviews of Biaz and Leon were both on May 20, 2015, but they were not disclosed until February 9, 2016. The Government contends that they did not contain exculpatory evidence; however, the defense contends that they were favorable to the defense. The defense should have been given these timely so that it could have explored these two individuals. They may be the ones who sold the guns to Soofi and/or Simpson contrary to the Government's contention. Because of the late disclosure, and the cumulative effect of these late disclosures, these individuals were not able to be interviewed by the Defendant.

It appears that Biaz was selling an AK-47 at the time it appears Simpson purchased such a weapon. The Government takes Biaz's word that he was selling a Century Arms AK-47 with little or no investigation. Meanwhile, Leon told the Government that even though he had exchanged texts with Soofi about an AK-74 he did not sell his to Soofi. This information was helpful to the defense.

## V. Conclusion

It is clear that the Government intentionally withheld large amounts of evidence that it had in its possession for months, some as long as eight months before turning it over to the

defense. The Government had over two hundred (200) FBI agents that worked on the investigation, and at least twenty (20) FBI analysts. (T.T. 3/8/16, p. 178) Also, the U.S. Attorneys' office had two attorneys that handled the trial but there were numerous other U.S. Attorneys that appear to have been drafting motions and assisting behind the scene.

The defense consisted of two attorneys, a part-time paralegal and a part-time private investigator. The deck was stacked against the defense especially when the disclosures began to come in fast and furious on the eve of trial. There are numerous things that must be done before trial such as prepare a jury questionnaire, voir dire questions, exhibits, jury instructions, opening statements, plus prepare for cross-examination and direct examination of witnesses. This case was made even more difficult because the Muslim Community was and is afraid and in many cases refused to talk with defense counsel. The defense needed all leads timely to prepare the defense. Due to the volume of material produced by the Government right before the trial began, plus during trial coupled with the defenses limited resources, it was impossible for the defense to analyze all the new material, meet with potential witnesses, and weave it into the defense's case.

It is a fair conclusion that the Government acted in bad faith in withholding some of the most important witness interviews until the eve of and during trial and producing them along with volumes of other material thus ensuring that the defense could not uncover and utilize all the information beneficial to the defense.

Clearly, Simpson was very close to Bell and Sabari both who followed his tweets and it appears they knew about the Garland attack before it happened. Bell and Sabari along with Nurse knew of Simpson's radical activities along with his contacts with Faisal; however, their interviews were turned over just before trial, during trial and in the case of Sabari after trial. All contain *Brady* material and this information would have been beneficial to the Defendant.

Ali Biaz and Christian Leon were both interviewed by the Government in May 2015; however, their statements were not turned over until February 9, 2016. It was not possible for

1 the defense to investigate these leads on such short notice. If the Government had 200 agents

2 at its disposal, it should have at least turned over the fruits of its investigation in a timely

3 fashion rather than holding on to it until trial and after to give the defense an opportunity to

4 investigate all sources of favorable or probably favorable evidence.

5     The Government did not comply with its obligations. As demonstrated by this case,

6 prosecutors take the position that they are to decide what could be helpful to the defense and

7 whether it is material which runs contrary to the philosophy of the *Brady*/*Giglio* line of cases

8 and increases the risk that exculpatory evidence will be suppressed.

9     Although ours is an adversary system, the Government's job is not to win but to see that

10 justice is done. The  Government's agents have vast discretion about what leads to follow,

11 which witnesses to interview, what tests to conduct and countless other aspects of an

12 investigation which can include the manipulation of evidence to conceal it.  It is the

13 responsibility of the Government to make timely disclosure to the defense of information that

14 could be favorable to the defense and to do it timely so that the defense can investigate its

15 benefit and make arrangements to use it.

16     Clearly, many of the disclosures that were late by the Government are favorable to the

17 defense. Abdul Kareem did not get a fair trial due to the Government's failure to make its

18 required disclosures timely. For this reason, the Court should enter a judgment of acquittal or

19 alternatively grant a new trial.

20     RESPECTFULLY SUBMITTED this 24th day of May, 2016.

21     **MAYNARD CRONIN ERICKSON**
       **CURRAN & REITER, P.L.C.**

22

       By /s/Daniel D. Maynard
23         Daniel D. Maynard
           3200 North Central Avenue, Suite 1800
24         Phoenix, Arizona 85012
           Attorney for Defendant

25

26

1    **ORIGINAL** of the foregoing e-filed this 24th day of May, 2016 via ECF with:

2    Clerk of the Court
United States District Court
3    401 W. Washington
Phoenix, AZ 85003
4

     **COPY** of the foregoing e-delivered this 24th day of May, 2016 via ECF to:
5

     Kristen Brook
6    Joseph E. Koehler
US Attorneys Office
7    2 Renaissance Square
40 N. Central Ave., Ste. 1200
8    Phoenix, AZ 85004-4408
Attorneys for Plaintiff
9

     /s/Stacey Tanner
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26