**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) March 11, 2016 |
| **Abdul Malik Abdul Kareem**, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
GOVERNMENT REBUTTAL CLOSING ARGUMENT
JURY TRIAL - DAY #16

APPEARANCES:
For the Government:
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
               **Joseph Edward Koehler, Esq**.
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
               **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1          **E X C E R P T   O F   P R O C E E D I N G S**

2          MS. BROOK:  Good afternoon, ladies and gentlemen.

3          For the last hour-and-a-half the defense counsel has

4   stood before you and time and time again alleged that the

5   government is not here to find the truth and alleged that the

6   government is withholding evidence.

7          And as he said it over and over again -- bless you --

8   he made mention to a couple of things.

9          One, witnesses that you heard from and who called

10  them;

11          Two, agents' testimony and calling into question

12  their credibility or their motives;

13          Three, whether or not pretrial interviews were

14  recorded.

15          Ladies and gentlemen, in this case which lasted four

16  weeks, the government called witnesses and those witnesses

17  were subpoenaed and came here and testified.  In the criminal

18  justice system it is the government's burden exclusively to

19  prove to you all beyond a reasonable doubt that the defendant

20  is guilty of a crime.

21          It is our burden and our burden exclusively.

22          The defendant doesn't have to say a thing.  Doesn't

23  have to do a thing during the course of that trial.  But,

24  ladies and gentlemen, make no mistake about it, the defendant

25  has subpoena power too.

1    So when defense counsel stands before you and says

2    that the government was withholding evidence or the government

3    didn't call absolutely every witness, the defense can call

4    those witnesses too.

5    They made reference to Lupe.  If the government -- if

6    the defendant wanted you to hear from Lupe, they have subpoena

7    power too.

8    Defense counsel talked about pretrial interviews and

9    whether or not pretrial interviews in this case were recorded

10   and insinuated that things must have been covered up or the

11   truth did not come out from those interviews.

12   Ladies and gentlemen, Special Agent Whitson testified

13   and was asked specifically about that.  The first question he

14   was asked:

15   And in this case have you -- oh --

16   And in any case have you ever recorded pretrial

17   interviews?

18   Never.

19   In your experience what's the general purpose of a

20   pretrial witness interview?

21   So a pretrial interview is an opportunity for the

22   prosecutors to speak with a person who is a potential witness

23   to kind of explain what the process is going to be, what they

24   can expect, and the kind of thing, just to give them a general

25   overview of the process.

1          And then also to go through the things, the

2    information that they have provided, and make sure the

3    prosecutors have a complete understanding of all of that

4    information.

5          Further, Special Agent Whitson was asked:

6          In every interview conducted in this case, was there

7    an admonition given?

8          In pretrial witness interviews, is there an

9    admonition that was given to every witness?

10         Yes.

11         What is it?

12         It's just to tell the truth.  So over any time you go

13   to a pretrial witness interview, that's going to be something

14   that's repeated over and over again to kind of help set them

15   at ease.

16         It's just that at the end of the day when you're on

17   the stand, just tell the truth and then you don't have to

18   think.  You just tell the truth.

19         Ladies and gentlemen, defense counsel also talked

20   about the interview on May 5th that wasn't recorded and

21   insinuated that because the security camera footage was not

22   retrieved, that somehow evidence was covered up.

23         Special Agent Whitson testified that never in any

24   case has he ever heard of any agents subpoenaing security

25   camera footage or obtaining it.

1              And why?  Because there's no audio.

2              And also, when you look at the defendant's interview

3    on June 10th of 2015, the video, you can see up high in the

4    corner the security camera footage.  And you can see what that

5    angle would reflect; a wide span of the entire room without

6    any facial features or ability to see or decode people's

7    expresses.

8              But at the end of the day, ladies and gentlemen, all

9    of these questions that defense counsel has stood before you

10   and raised are distractions.  Distractions to keep you from

11   looking at the evidence that has come from this witness stand.

12             So let's start at the top.

13             Defense counsel started off by having you guys look

14   at the conspiracy instructions and talking about the defendant

15   just being merely present, and therefore, not being culpable.

16   Defense counsel talked about friends, the defendants' friends,

17   that he was around these people but he didn't do anything.

18             Ladies and gentlemen, first, the defendant chose

19   Elton Simpson as his friend.  And time and time again, he

20   chose him.  For a period of time he wasn't friends with him

21   because he thought that Ibrahim had put some sort of a tracker

22   or a device on his car and he was reporting on him to the FBI.

23             Just think about that for a second.  The defendant

24   was afraid that Ibrahim was reporting on him to the FBI.

25             What was the defendant afraid of?

1          So let's pause for a second and think about the

2    snapshot that that provides into the defendant's mindset.

3          If the defendant knows that Simpson is interested in

4    violent Jihadi material, if the defendant knows that Simpson

5    spends time watching execution videos conducted by ISIS, if

6    the defendant knows that Simpson has been convicted before,

7    but yet over the months before Garland, the defendant is

8    texting Simpson hundreds of times.  They're in frequent

9    contact.  Even with all of that stuff, they remain close

10   friends.

11         What does that tell you?

12         Well, let's put aside -- let's put into a box the

13   question of what their friendship indicates.  Because at the

14   end of the day, the question is:  What did the defendant

15   himself do?  This case isn't about who he was friends with.

16   It's about what he did.

17         He provided guns to Ibrahim and to Nadir Soofi.  He

18   provided ammunition to them.  He took them out shooting and he

19   also trained them on how to use their weapons.

20         Ladies and gentlemen, engaging in illegal Backpage

21   purchases of weapons or of ammunition with somebody who had a

22   minimum you know supports ISIS, that in and of it itself tells

23   you about the defendant's choices.

24         The evidence in this case shows that the defendant

25   not only helped and aided his friends who he knew supported

1    the Islamic State and were intending to act out to attack in

2    the name of the Islamic State, but it also shows that he

3    wanted to attack too.

4         You've heard about the testimony.  Him wanting to go

5    into a mall with a bomb and blow himself up.  You've also

6    heard the testimony from the days and weeks after the contest

7    was announced and the defendant was talking about wanting to

8    go and shoot up the contest too.

9         Ladies and gentlemen, "mere presence" isn't you

10   buying the bullets that end up on the ground in the scene at

11   Garland, Texas.

12        Aiding and abetting.  Let's talk about that as a

13   concept.  The defendant is charged with two conspiracies.  In

14   Count 1 and Count 5 he's charged with conspiracies.

15        Aiding and abetting applies to Count 1, Count 2, and

16   Count 3.  So in Count 1 and 2, the interstate transportation

17   of firearms with the intent to commit a felony, Count 1 is the

18   conspiracy; Count 2 is the actual crime.

19        Obviously, the defendant himself did not drive and

20   transport those weapons to Texas, but he helped.  And it is

21   the aid that he provided that makes him guilty of those

22   crimes.

23        But aid how?  Defense counsel suggests that when the

24   defendant purchased those weapons for Simpson and Soofi, at

25   that point the contest had not yet been announced.  What did

1   the defendant do after the contest was announced?

2          Well, he went out into the desert and he shot with

3   Simpson and Soofi.  He hosted them in his house to talk about

4   the plan to attack the contest.  He sat in Soofi and Simpson's

5   living room and he taught them how to disassemble, lubricate,

6   and reassemble those weapons, just as Ali Soofi testified to

7   when he came in here.

8          And defense counsel asked, they said, well, you must

9   be very -- you know, adept with weapons because you certainly

10  described that well.  And he responded:  I don't own a weapon.

11  I've shot before but I learned from watching.

12         Count 5, additionally, aiding and abetting applies to

13  that count too.  You don't have to find that the defendant was

14  part of the conspiracy, that he was part of the plan itself

15  between Simpson and Soofi, although the evidence that has come

16  from this witness stand does show that.

17         All you have to find is that he helped the plan.  If

18  he helped the plan while knowing of the plan, what it was, and

19  that was an evolving plan, as we know, it was an evolving plan

20  over 2015 and in the late months of 2014, a plan that first

21  came about talking about wanting to commit hijra, going to the

22  Islamic State, evolved into attacks, attacks that included the

23  United States military bases, recruitment centers, going in to

24  bomb a mall, and in the end it crystallized into Garland.

25         And how did he help?  The ways that we've talked

1    about already.

2          So defense counsel talked about other people, other

3    individuals who may also be responsible or involved.  At the

4    beginning of this case, the judge read to you the Indictment.

5    And when she did, it was clear that the "conspiracy" referred

6    to the "defendant and others," others not named, but others.

7          Defense counsel asks you to consider other people;

8    AK, Nurse, and distract you from the evidence that implicates

9    the defendant.  He brought before you all the indented letter

10   and he said that the indented letter somehow implicates

11   somebody else.

12         Well, let's talk about that letter for a moment.  The

13   indented letter itself was never found.  What was found was a

14   piece of paper that was etched over, sent to the lab, and they

15   raised a letter.  Let's assume -- or they raised the words

16   from the page.

17         So let's assume, hypothetically, that that letter was

18   found.  And let's assume, hypothetically, that Simpson on the

19   eve of the attack gave that letter to somebody else.

20         You have heard hours of testimony in this case from

21   experts; experts who have talked to you about how ISIS is a

22   well-oiled machine and they are trying to mobilize masses of

23   people to attack the United States to support the Islamic

24   State.

25         Implicated in that is the obvious point that a lot of

1   people are involved.  Just because an additional person may

2   also be involved, does not mean that the defendant isn't too

3   involved.  There are a lot of people.  And the question for

4   you to decide in this case is:  Is the defendant guilty?

5          A defense to a bank robbery case isn't:  I'm not

6   guilty because when I robbed the bank, I did it with a friend

7   and he's guilty, not me.

8          Just because more people may be responsible or

9   involved or assisting doesn't take away from the defendant's

10  involvement and his capability -- or his culpability for the

11  manner in which he assisted, aided, helped to plan, and put

12  together this attack.

13         Defense counsel also talked, similarly, about the

14  letters from Hassan Jihaad.  And we looked at just the letter

15  backings, the outside.  There was a letter in 2010, there was

16  a letter in 2012, and a letter in 2014.

17         Two were addressed to Saabir Nurse, the 2010 and the

18  2012 one.  The 2014 one was addressed to Elton Simpson.  And

19  remember, we opened that letter up.  It was written with a

20  typewriter.  And what did it say?  It was Hassan Jihaad trying

21  to convince Ibrahim to not believe in the Khalifah, to believe

22  in his mindset to support his terrorist group which is

23  al-Qa'ida.

24         Defense is trying to insinuate that there is a

25  conspiracy between somebody who is not ISIS and Elton Simpson.

1   You can see the letter.  The letter is in evidence.  Again,

2   these are distraction techniques.

3          Defense counsel talked about Nathaniel and focused on

4   just one part of what Nathaniel said, while excluding and

5   ignoring all of the other pieces of Nathaniel's testimony.

6          What Nathaniel testified to is that this plan came

7   together in February.  This plan came together months before

8   the attack.

9          Now, when asked on the stand if he knew Malik, he

10  said he had seen him.  Nathaniel had testified that when he

11  was at his dad's house, it was weekends and he spent a lot of

12  time with his dad.  Make no mistake, it came out clearly from

13  Nathaniel when he testified that him and his father keep some

14  really big secrets.

15         His dad had told him as a secret that he was going to

16  go attack Garland.  He talked to him about the bullets and not

17  leaving fingerprints.  He showed him the gun.  And he imparted

18  upon him the information that he might not come back and he

19  was going to kill Americans.

20         That was a secret between him and his dad.  A secret

21  he was not even allowed to tell his mom.

22         Defense counsel insinuates that if Nathaniel knew

23  this information, that obviously, he would have to equally

24  know information about the defendant.  Let's just think about

25  that for a moment in terms of common sense.

 1            First, Nadir Soofi is obviously a very complicated

 2      individual, an individual who was mentally okay with

 3      committing jihad, martyring himself in order to kill masses of

 4      Americans.  So getting in his head to understand exactly why

 5      he did what he did is a challenge.

 6            But let's think about common sense.  What Nadir does

 7      know is that Nathaniel is not going with him.  Nathaniel is

 8      staying here.  Which means, when and if Nadir does die while

 9      committing this jihad, the FBI and the police are going to

10      come and find Nathaniel and talk to him.

11            Does it make sense that he would impart upon this

12      8-year-old information about co-conspirators and their

13      identity, individuals who were not going with him to commit

14      the attack?

15            Similarly to Ali, Nathaniel and Soofi in that house,

16      along with the defendant, only extended certain information to

17      certain people.  Ali knew that the defendant, Simpson, and

18      Soofi all supported ISIS.  He knew that they watched those

19      videos.  He knew that the defendant wanted to kill kafirs.

20            But what didn't he know?  He didn't know about any

21      attack plans.  And strategically, he didn't know that.  Nadir

22      was not going to impart that information on him, nor the

23      defendant, nor Simpson, because all he has to do as an adult

24      is just pick up the phone and call 911.  And additionally, if

25      he didn't do that, he would call his parents.

1    Common sense tells us that Nathaniel only knew what

2    his dad wanted him to know.

3    Defense counsel talked to you about Sergio and

4    questioned Sergio's role in this.  Why was Sergio necessary to

5    go out to the desert to shoot?  And it brings up a corollary

6    point.

7    Defense counsel at the end thought it was odd, the

8    question that was asked to the defendant about shooting in the

9    desert by the agents on May 5th.  Obviously, the defendant is

10   a convicted felon.  Simpson is a convicted felon.  So they're

11   not going to head off to the local range in order to shoot.

12   The desert is the obvious place where they would

13   shoot if they're going to shoot.

14   But "Where in the desert?" is the question.  Sergio

15   testified that the summer before -- so the summer of 2014,

16   that he was at a birthday party at his mother's house and that

17   the defendant and Ibrahim were there too.  And it became clear

18   at that birthday party that behind mom's house you couldn't

19   fire rifles, that they were too loud.  The defendant knew

20   that.  And in January, the defendant sought out Sergio to help

21   him find a remote spot in the desert to shoot.  And he did.

22   You can see from the evidence from the Wittmann scene

23   that he shot and he shot there with the weapons that were used

24   to conduct the attack.

25   But, ladies and gentlemen, obviously, at that point

1   Sergio wasn't needed again.  Sergio had taken the defendant

2   and Simpson and Soofi -- and by "taken," I mean shown, because

3   the defendant himself drove Simpson and Soofi in his car to

4   the shooting area.

5        It was a remote location.  It was in Wittmann, an

6   area where there are lots of remote locations as the witnesses

7   testified to about the desert area out there.

8        So at that point he had given the defendant all he

9   needed, those remote locations in the desert.  We have heard

10  that the defendant, Simpson, and Soofi proceeded over the

11  following months to continue to go shooting out in the desert

12  together.  We have heard that from Ali.  We have heard that

13  from Mubarak.  We have heard that from AK.  And Verdugo talked

14  about all the times that they went shooting together.

15       Obviously, ladies and gentlemen, not all criminals

16  are masterminds.  And in this case, Simpson, Soofi, and the

17  defendant have left behind a lot of clues.  And in this case

18  they utilized Sergio for what they needed, which was to find

19  that desert location.  And he gave it to them and then the

20  defendant could continue to go shooting with Simpson and Soofi

21  and practice their shot in anticipation of the attacks that

22  they were planning to make over those months in 2015.

23       Defense counsel suggests that you can't trust

24  Verdugo.  You know, ladies and gentlemen, it would be great as

25  a prosecutor to come in here and to put on witnesses in any

1   case who were maybe two nuns and a school teacher.  The

2   defendant was friends with Verdugo.  It was the defendant's

3   friendship with Verdugo that made Verdugo a witness in this

4   case.

5          Defense counsel has insinuated benefits and we've

6   talked about those.  And at the end of the day, it is up to

7   you all to determine the credibility of any witness based upon

8   a lot of factors.

9          And one of them is corroboration; to look for

10  corroboration of witnesses' testimony to determine whether or

11  not what they are saying bears truthfulness.

12         With Ali, the corroboration -- I'm sorry -- with

13  Verdugo, the corroboration is Ali.  Two men.  They don't know

14  each other.  They have never met.  They live in different

15  places, but yet they report the exact same thing about the

16  defendant.

17         They report that the defendant was watching the ISIS

18  execution videos.  They report that the defendant kept saying

19  he wanted to kill kafirs.  They both report that during 2015,

20  the defendant and Simpson and Soofi went shooting together in

21  the desert and they both talk about the defendant's reaction

22  to the Charlie Hebdo attack.

23         Defense counsel suggests that you can't trust Verdugo

24  because of the absence of a recorded call which somehow talked

25  about the attack or had the defendant make an admission about

1    the attack.

2         Ladies and gentlemen, from the evidence that's come

3    from this witness stand, it's clear that the defendant is

4    paranoid of law enforcement.

5         What did he say to James Sampson in his first or so

6    call after he found out from Stuart that Ibrahim was likely

7    dead in the attack that he knew was going to take place -- and

8    we're going to get to that in a second.  He said:  I can't

9    talk to you about this on the phone.

10        Is it logical then to infer that he's going to make

11   admissions on the phone with anybody or Verdugo?

12   Corroboration with Verdugo.

13        You also look to Juan.  And a small detail, but an

14   important one, Verdugo testified about the mirrors inside the

15   Cochise house of the defendant's, that house that he lived in

16   up until the middle of March of 2015, the one where Juan and

17   Carlos lived across the street.

18        He talked about how the defendant had hung mirrors so

19   that he could see from one room into the other rooms.

20        When the defendant testified, he testified that the

21   room in the Cochise house that he spent the most time in was

22   the prayer room.

23        And then Juan.  Juan testified that it was through

24   those angled mirrors that he stood in the hallway on that very

25   first time that he heard the defendant talk about the Garland

1    contest and his desire to shoot it up.  He stood there in the

2    hall and he saw the words come out of the defendant's mouth by

3    looking in that angled mirror where he could see him into the

4    prayer room.

5          One last point about Verdugo.  James Sampson, the

6    defendant's own brother.  What did he say about Verdugo back

7    in June?  We heard the recording two days ago.  And he said:

8    He's a good kid.  He tries to help to fix things that he

9    doesn't know how to, like refrigerators, but he's a good kid.

10          Defense counsel talked at length and called Ali a

11   liar.  And, again, ladies and gentlemen, you are the judges of

12   credibility in this case and you exclusively.  Defense counsel

13   talked about how Ali disclosed information about the

14   defendant.  And he said that the manner in which he disclosed

15   the information means that you can't trust the information and

16   he is not telling the truth.

17          Well, what did Ali say?

18          Initially, did you tell the FBI about Malik?

19          No.  No, I didn't.  No.

20          Did you deliberately not tell them about Malik?

21          Yes.

22          Why?

23          I mean just from my --  you know, generally meeting

24   somebody, you know, the vibe you get off of people and the

25   general actions of somebody, you can tell, you know, how

1   violent a person is over what they're capable of.

2          I mean just from stories that I have heard, instances

3   that he was involved in, just the general, you know, the

4   feeling of the person.  You know, that you just feel what

5   they're capable of.

6          Eventually, did you tell them?

7          Yes, after I had gone to my brother's funeral and I

8   was interviewed in Kansas.

9          Additionally, he was asked:

10          Did you hold back information because of your fear of

11   people that Malik was associated with?

12          His response:  Yes.

13          So let's talk about that.  Ali testified about his

14   fear of the defendant and other people, about his fear that

15   they would come after him for retaliation or come after him --

16   them -- him to make them join him.

17          He talked about that fear.

18          And what brought home that fear for Ali?  What we

19   learned during AK's testimony.

20          We learned during AK's testimony that in the hours

21   after the attack in Garland, AK called Ali.

22          And he told Ali:  Do not talk to the police.

23          He made that call because Malik told him to make that

24   call.

25          Not only was he afraid of Malik because of him being

CR15-00707-SRB       GOVT REBUTTAL CLOSING       3-11-16

1   physically afraid of him or afraid he might get hurt, but

2   Malik had made sure that Ali wouldn't talk by reaching out to

3   him in the hours after his brother was killed to send the

4   message.

5           And, ladies and gentlemen, if the defendant wasn't a

6   co-conspirator with Simpson and Soofi, if the defendant wasn't

7   in the house with Simpson and Soofi and Ali, how would he ever

8   know Ali?  How would he ever know Ali's phone number?  And

9   most importantly, why in the world would he care what Ali told

10  to the police unless he knew that he had to cover his tracks,

11  because he knew what Ali had seen of him.

12          Ali had known about his support for the Islamic

13  State, about how he had talked about wanting to kill kafirs.

14  Ali knew the defendant and the defendant reached out through

15  AK to make sure he didn't talk.

16          Defense counsel -- we're going to get into this

17  briefly -- defense counsel talked a lot about the timing of

18  individuals, how the individuals who testified talked about

19  time and equated how they were able to report a time that an

20  event happened, or whether or not that individual was telling

21  the truth.

22          And he put on the overhead a page from Ali's

23  transcript.  And he said see, Ali here in this transcript says

24  that it was between March -- or February and March that Nadir

25  Soofi came back with that weapon and talked about the

1     defendant giving him the money to buy it.

2             Page 29 on direct examination, what did Ali say?

3             The defendant said, oh, well, you know --

4             Or defense counsel said Ali was wrong about the

5     timing.  It was, you know, February or March.  That's the

6     reason why it's inconsistent and you can't understand or test

7     his credibility.

8             In the beginning he said this:

9             I want to talk about other weapons.  At some point

10    did your brother come home with an AK style weapon?

11            His response:  Yes.  He had come home with a full

12    body AK.

13            Do you remember when that was?

14            It was roughly four months before the incident.

15            So roughly around January?

16            Around January time.

17            It was on cross-examination when asked was it

18    February or March, he said:  I think so.

19            Let's talk about timing.  Defense counsel has argued

20    to you that you can't trust Juan's testimony.  You can't trust

21    Carlos's testimony or any other adult who may not have the

22    timing of an event correct.  You can't trust them about the

23    substance of what they heard.

24            Ladies and gentlemen, common sense tells us that with

25    children and with some adults, they're not great with dates

1  and they're not great with times.  And that inability to

2  pinpoint actual dates or times doesn't have any bearing upon

3  their clear memories of significant events that have happened

4  in their lives.

5          So, children may not remember exactly when they went

6  to Disneyland or when they went to Legoland or when they went

7  to their friend's birthday party, but they do remember being

8  at their friend's birthday party.  They remember the

9  significant events like the first time they road on the

10 Matterhorn or taking that picture with Mickey Mouse.

11         Kids are kids.  And they may not remember exactly

12 when something happened.  For instance, a child may clearly

13 remember a clown that was at her best friend's birthday party

14 when she was a kid.  She remembers the red pants that they

15 were wearing, that crazy yellow hat, the big scary eyes, and

16 at 19 can still talk about that clown.

17         But if you ask her:  Was that in the fall or in the

18 spring or did that birthday party happen in the morning or the

19 afternoon?  And all bets are off.

20         Mr. Maynard is a very skilled cross-examiner and he

21 did a very good job confusing children and even some of the

22 adults on time.

23         At the end of the day the question is:  Did the

24 substance of the events that they reported, the significant

25 events that they heard in their life, did the substance of

1    those events stay the same and stay consistent?

2            And, again, ladies and gentlemen, you look to the

3    corroboration.  I'm not going to belabor the point at this

4    stage, but there are a couple of key details.

5            One is this:

6            Juan and Carlos.  Brothers.  Did they testify to the

7    exact same memories?  Or did each of them testify to

8    individual and distinct memories that they had?  Did each of

9    them testify that they hadn't spoken to the other about the

10   memories that they had?

11           The corroboration is in those details, the way in

12   which they can report what happened based on what else was

13   going on and the memories they have, the totality of the

14   events.

15           And one quick one with Carlos was Fox News.  When he

16   talked about the Jordanian pilot being burned alive, when he

17   talked about waking up because of the obnoxious laughter of

18   the defendant who then came in and got him and brought him

19   into the other room to watch that man burn alive.  He said he

20   saw it on Fox News.

21           And what did Evan Kohlmann testify to?  That the only

22   network that actually released that footage was Fox News.  It

23   was scandalous.  And it was, you know, something maybe there

24   was some backlash for Fox for doing, but nonetheless, those

25   are the details, the corroborating details to look for.

1          I have a couple more quick points and I know it's

2    been a long day, so we'll move quickly through it.

3          Defense has made a big deal out of the defendant's

4    reaction, his reaction to learning that Ibrahim had been

5    killed, that reaction at Red Lobster and in the hours

6    afterwards.

7          On one hand he said he was too upset.  Right?  The

8    defendant was too upset to have been part of the plan because

9    he wouldn't have been a jihadist if he was upset.  Or he

10   wasn't happy enough, something similar, along those lines.

11   Made a big deal out of his reaction.  Highlighting, as the

12   defense is arguing, that he was unaware.

13         Well, let's take a closer look at what happened in

14   those hours after the defendant learned that after the plan he

15   had put into play, Ibrahim had predictably died.

16         What happened?  He's sitting at Red Lobster.  He gets

17   the call.  The call comes from Stuart.  Stuart lets them know

18   that the news is calling because Ibrahim has been involved in

19   a shoot-out and it's everywhere.  It's all over the news.

20         Was the defendant's reaction the same as the

21   emotional display you all saw a few days ago?  Was he welled

22   up?  Was he sad?  No.  He called the waiter over.  He told you

23   from his own testimony:  I called the waiter over and asked

24   him to box up my food to go.

25         Additionally, look at the text messages.  How did the

1    defendant respond in those hours after?

2            You will see when you look at these records that the

3    defendant was in these hours -- so 8:30, 8:21 on May 3rd,

4    receiving texts from an individual who was doing some postings

5    for him as you can read from the text messages that continue:

6            Are you there?

7            And then he texted him back at 8:46.

8            Brother, call me.

9            Again, sending to the same number, a phone number,

10   and then:

11           Brother, why don't you call me back?

12           Again, continuing this discussion with him in the

13   early morning hours:

14           Hello brother.

15           He gets a message.

16           Now I'll post your ads.

17           He responds, doing these business-as-usual text

18   messages:

19           Okay brother.  Please post.  Okay brother.  Please

20   post.

21           And you can see that ads were posted.

22           And then as those hours continued, him negotiating

23   other pick-ups, business pick-ups, with somebody who he was

24   doing a job with.

25           The other reason that you know through these text

1   messages is his effort to silence Ali.  And you see that

2   through the exchange that he has here with AK:

3           Text me the dang number already.

4           And he does.

5           And we know what AK then did on his behalf.

6           Dr. Vidino testified about how individuals

7   predictably respond to circumstances and act in these

8   situations in order to act in accordance with how people would

9   anticipate them to act.

10           As we wrap up, look to the defendant's statements

11   that he made on the stand.  Did the defendant lie?

12           Mr. Koehler talked at length about it before and I'm

13   just going to highlight a couple quick points.

14           Defense counsel stood before you and said:  Look at

15   the chiropractic documents.  They support the defendant.  And

16   as you look at those documents, the question is:  Who wrote

17   them and for what purpose?

18           But at the end of the day, let's look at some other

19   lies that the defendant made on the stand and why.

20           One of them he testified that in the month of April,

21   he only saw Ibrahim twice.  He said once was on the 6th and

22   once was on the 22nd and those were the only two times.

23           So are there pieces of evidence that you have that,

24   even from just these evidence, you can see that that is a lie?

25           Text messages between the defendant and Ibrahim on

1    April 12:

2            Question -- or message sent:

3            I want to know if you want me to pick you up on the

4    way.  Dinner is ready.

5            To which he responds -- Simpson responds:

6            Okay.  You can.  Insha Allah.  Okay.

7            Did the defendant talk about them seeing each other

8    that day?  Or the next day?

9            I'll come and get you.

10           Okay.

11           Text from Kareem.

12           Simpson:  Insha Allah.

13           Kareem:  Okay.  I'll be right there.

14           Brother I'm outside.

15           Okay.

16           Ladies and gentlemen, you also heard from Mustafa

17   Hassan who said on April 30th he saw the defendant with

18   Ibrahim at that restaurant.

19           And these are just the pieces of evidence left behind

20   about their connection which the defendant lied about when he

21   sat there.

22           At the end of the day, the question is this:

23           Why would a man engage in illicit Backpage ammunition

24   purchases with Ibrahim?  Why would he provide Simpson and

25   Soofi guns?  Why would he take them shooting over and over

1    again?  Why would he teach them how to maintain and to keep

2    their weapons?

3         Why?  Because he knew that Simpson and Soofi were

4    ISIS supporters.  He too supported the Islamic State.  And he

5    wanted to help them act and attack and kill kafirs in the name

6    of ISIS to support the Islamic State.

7         The evidence in this case has come from the witness

8    stand and it has come from numerous different places, numerous

9    different witnesses, people who have been eyewitnesses and

10   have seen and heard and testified.

11        And the instructions tell you that at the end of the

12   day, there's not any one number of witnesses that you need to

13   look for.

14        You have heard from multiple witnesses who explain

15   and recount the defendant's attachments, his affiliation, and

16   his ideology.  And the fact that he wanted to attack America

17   in order to support the Islamic State.

18        Ladies and gentlemen, we ask you to hold the

19   defendant accountable and to find him guilty of all five

20   counts.

21        Thank you.

22     (End of Excerpt of Proceedings.)

23                          *  *  *

24

25

1

2                      C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 26th day of May,

14   2016.

15

16

17

18                    s/Elizabeth A. Lemke
                      ELIZABETH A. LEMKE, RDR, CRR, CPE
19

20

21

22

23

24

25