**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) March 2, 2016 |
| Abdul Malik Abdul Kareem, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**
**EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**TESTIMONY:  IVAN KOHLMANN - PART 2**
**JURY TRIAL - DAY #10**
**(Pages 172 through 197, Inclusive.)**


**APPEARANCES:**
**For the Government:**
            U.S. ATTORNEY'S OFFICE
            By:  **Kristen Brook, Esq.**
                **Joseph Edward Koehler, Esq.**
            40 North Central Avenue, Suite 1200
            Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
            MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
            By: **Daniel D. Maynard, Esq.**
                **Mary Kathleen Plomin, Esq.**
            3200 North Central Avenue, Suite 1800
            Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                        **INDEX OF WITNESSES**

2    **IVAN KOHLMANN:**

3    Cross examination (cont'd) by Mr. Maynard        Page 174
     Redirect examination by Ms. Brook               Page 188

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     <u>E X C E R P T   O F   P R O C E E D I N G S</u>

2          THE COURT:  Good morning, ladies and gentlemen.

3     Please sit down.  The record will show the presence of the

4     jury, counsel, and the defendant.

5          Mr. Maynard, you may continue your cross-examination

6     of Mr. Kohlmann.

7          MR. MAYNARD:  Thank you, Your Honor.

8                    **EVAN F. KOHLMANN, WITNESS, SWORN**

9                    **CROSS EXAMINATION (cont'd)**

10    BY MR. MAYNARD:

11    Q    Mr. Kohlmann, did you speak with anybody from the FBI or

12    the U.S. Attorney's Office after your testimony yesterday?

13    A    I did.

14    Q    Who did you speak with?

15    A    I spoke with Kristin Brook.

16    Q    And what was the discussion about?

17    A    The nature was the arrangements regarding my testimony

18    today and the VTC.

19    Q    Anything else?

20    A    I believe Ms. Brooks also asked me if I had returned a

21    disc to the U.S. Attorney's Office.

22    Q    Okay.  Now, yesterday at lunch after you were mistaken on

23    when the Prophet Drawing Contest in Garland was first

24    announced, you told us that through the lunch hour you had

25    determined it was a -- you determined the correct date.  Do

1    you recall that?

2    A    That's correct, yes.

3    Q    Okay.  Did you speak with anybody from the U.S. Attorney's

4    Office or the FBI during the lunch hour yesterday?

5    A    I didn't -- well, I did, actually.  I spoke with Kristen

6    Brook briefly and I reviewed evidence that they had sent to

7    me.

8    Q    And did she ask you to go back and review the evidence so

9    that you could get the correct date on the Muhammad Drawing

10   Contest?

11   A    That's correct, yes.

12   Q    Now, I believe when we ended yesterday we were talking --

13   I was asking you a few questions about how you ended up

14   preparing for your testimony.

15            You actually did prepare a report in this case,

16   correct?

17   A    That's correct, I did.

18   Q    Okay.  And you prepared a draft, correct?

19   A    Yes, that's correct.  Yeah.  An initial draft, that's

20   correct, yeah.

21   Q    And then how long after that draft did you finalize your

22   report?

23   A    I don't know.  It would have been maybe a week or two

24   weeks afterwards.  I was receiving evidence in pieces, so I

25   was -- basically, as I was going along, I was creating a new

 1   draft to incorporate new evidence that I had received.

 2   Q   Okay.  You did not -- and I believe you testified to this

 3   yesterday.  You did not actually download digital information

 4   from either cell phones or from other electronic -- other

 5   electronic media that had been gathered by the FBI; is that

 6   correct?

 7   A   Correct.  That's correct, yes.

 8   Q   And therefore, you did not forensically review any of that

 9   electronic -- those electronic devices?

10   A   That's correct, yes.

11   Q   Okay.  So your testimony is not based upon a forensic

12   analysis.  It's really based upon getting information from the

13   FBI and then telling the jury some historical background on

14   the individuals that you were asked about and certain writings

15   or videotapes?

16   A   Yeah.  I would say that's more or less correct, yes.

17   Q   Okay.  Now, yesterday --

18        Your Honor, I would like to put 497 on the overhead.

19        THE COURT:  Right.  And this is not admitted, but

20   used -- that's fine because it's just a larger version of a

21   picture of Miski that has already been admitted in evidence

22   and we're just using it because it's bigger.

23   BY MR. MAYNARD:

24   Q   Do you recall yesterday there was -- you testified that --

25   to the best of your knowledge that the photograph that is on

1    the screen is the photograph of Miski?

2    A   I believe I said it's the photograph associated with

3    Miski.  I have never met Miski, so I don't know if this is his

4    real photograph.  But this is certainly the photograph

5    associated with his avatar.

6    Q   Right.  And that's part of the problem in doing Internet

7    research, correct?

8    A   It depends.  It can be, depending on the type of

9    information and the type of analysis.

10   Q   You don't know whether Miski is actually a man or a woman,

11   correct?

12   A   No.  I know he's a man.

13   Q   But you've not met him?

14   A   That's correct.

15   Q   And the only picture you've seen is the one that's on his

16   avatar?

17   A   I believe so.  I did work on an investigation involving

18   Mr. Miski back in 2008, but I don't recall ever seeing any

19   other images of him other than the one that's on his Twitter

20   avatar or Twitter account.

21   Q   And a lot of what you do is you read what is put out by

22   people who profess to be terrorists on the Internet, correct?

23   A   That's a piece of it, yeah, a large piece of it.  Correct,

24   yes.

25   Q   Now a couple of things real briefly.

1           You've talked about yesterday you had published a

2    book in 2004, correct?

3    A    That's correct, yes.

4    Q    And that is the only book that you have published?

5    A    That's correct, yes.

6    Q    That book was published the same year that you graduated

7    from law school?

8    A    That's correct, yes.

9    Q    And is the book basically an extension of your senior

10   thesis at Georgetown?

11   A    I wouldn't call it exactly an "extension," but it's

12   certainly built upon the foundations that were established in

13   my honors thesis, yes.

14   Q    And it was first published by a press company in England

15   called Berg Press, correct?

16   A    It's Oxford International Press, but it's Berg as an

17   imprint of Oxford International Press.

18   Q    And Oxford International Press has nothing to do with

19   Oxford University?

20   A    That's exactly correct, yes.

21   Q    So when you tell us Oxford International Press, it is not

22   Oxford University Press, correct?

23   A    No, not at all.  They're two separate entities.  They have

24   nothing to do with each other.

25   Q    And you submitted your book to a number of university

1    presses hoping to have them publish the book, correct?

2    A    I think it's fair to say I submitted my book to a wide

3    range of presses in the U.S. and the UK.

4    Q    Including presses associated with major American

5    universities?

6    A    I think I only submitted it to one American university

7    which was the University of Pennsylvania.

8    Q    And that was the university that you were graduating from

9    at that time?

10   A    That's correct, yes.

11   Q    They turned your book down?

12   A    They didn't publish it but they never exactly responded,

13   so I don't know.

14   Q    Now, you went through yesterday and talked about the

15   various individuals, the seven individuals that were on this

16   list which was Exhibit 351.

17             May I put it on the screen, Your Honor?

18             THE COURT:  You may.

19   BY MR. MAYNARD:

20   Q    And is it your understanding that this list of individuals

21   is somehow related to my client?

22   A    It's my understanding it's related to this case, so I

23   suppose that's related to your client, but that's the extent.

24   Q    Well, in your report you mentioned at least three separate

25   times that:

UNITED STATES DISTRICT COURT

1              I have been provided with a handwritten list of seven

2    individuals that I understand were relevant to the defendant.

3              Do you recall that?

4    A    Yeah.   That's correct.

5    Q    Okay.   Do you know who prepared this list?

6    A    No, I do not.

7    Q    Do you know if my -- if that's my client's handwriting or

8    not?

9    A    No, I do not.

10   Q    Do you even know if my client knows who these seven people

11   are?

12   A    No, I do not.

13   Q    Now, yesterday you told us that you were called by the

14   U.S. Attorney's Office, contacted by them, and you started

15   work on this, I believe, in either late October or early

16   November; is that correct?

17   A    Approximately then, yes.

18   Q    And is that when they started sending you information so

19   that you could start working on this report?

20   A    I believe so, yes.

21   Q    Okay.   And then you completed your first draft sometime in

22   January or was it December?

23   A    I don't recall to be honest.   I think it was January, if I

24   remember correctly.

25   Q    Do you have a copy of your report with you?

1    A    Unfortunately, no.  I do not have it in front of me.

2    Q    Okay.  On the third page of your report --

3              May I read from his report or can I --

4              He can't see what I put on the monitor, can he?

5              THE COURT:  No.  He can't.

6    BY MR. MAYNARD:

7    Q    Okay.  On the third page of your report you indicate that

8    in January of 2016, the U.S. Attorney's Office for the

9    District of Arizona requested that I review various

10   evidentiary materials, including, but not limited to, FBI 302

11   documents and an FBI report outlining the contents of digital

12   media seized from the defendant.

13             Does that help to refresh your recollection when you

14   were actually contacted by the U.S. Attorney's Office here?

15   A    No.  That was a typo.  I was contacted earlier than that.

16   Q    Okay.  So --

17   A    I was asked to produce an expert report, I believe, in

18   January but I was contacted and provided evidence, I believe,

19   as early as December.

20   Q    You go on to say:

21             I was further asked to opine on topics and issues

22   found in these evidentiary materials that would be relevant to

23   my particular area of expertise.

24             You just did a typo when you typed this up; is that

25   correct?

```
1   A   Well, no.  It may just be a matter of interpretation.  I
2   mean, I was asked to write the report in January but I was --
3   I was in communication with the U.S. Attorney's Office earlier
4   than that and I began receiving evidence, I believe, earlier
5   than that.
6   Q   I thought you just told me that you had a draft done in
7   early January.
8   A   No.  I believe my draft was done in mid-January.
9   Q   Okay.  Now, you've talked about a number of individuals
10  from this list of seven that we've looked at.  And I believe
11  you talked about Azzam being sort of the father of jihad; is
12  that correct?
13  A   Shaykh Abdullah Azzam, correct, yes.
14  Q   And he wrote a book called The Defense of Muslim Lands?
15  A   That is one of his books, yes.
16  Q   And, in fact, we sort of looked at it.  I think you looked
17  at the cover and you talked about it being written in the
18  1980s, correct?
19  A   That's correct, yes.
20  Q   And when he wrote that, didn't he write it when the United
21  States was on the same side that he was against the Russians
22  in Afghanistan?
23  A   Saying that he was on the same side of the United States
24  is not accurate.  Abdullah Azzam rejected the United States
25  and insisted that he was not on the same side of the United
```

1    States.  Although it's true that they were both fighting

2    against the Soviets and against the Communist government in

3    Afghanistan.

4    Q   Now, you went over numerous sermons and speeches with us

5    yesterday and I'm not going to go back over them all, I

6    promise.

7            Can you -- were you provided with information as to

8    where those sermons and speeches came from?

9    A   I was provided with some information, although that's not

10   the focus of what I was looking at and I don't know how

11   detailed that information was.

12           There were names of computers and there were

13   evidentiary numbers and I'm aware in some cases where those

14   computers or where that evidence was taken or seized.  But in

15   other cases, I'm not sure I'm entirely familiar with the

16   source or what the significance is to the case.

17   Q   So you don't know whether my client actually viewed those

18   things or not?

19           MS. BROOK:  Objection.  Speculation.

20           THE COURT:  Overruled.  You may answer.

21           THE WITNESS:  I don't know.  No.

22   BY MR. MAYNARD:

23   Q   And we spent time yesterday talking about Inspire Magazine

24   and is it -- I'm probably pronouncing this wrong.  Is it

25   Dabiq?

1   A    Dabiq.  Dabiq.

2   Q    Both of those are jihadist magazines, correct?

3   A    Correct, yes.

4   Q    Inspire was actually put out by al-Qa'ida, yes?

5   A    Correct.

6   Q    And Dabiq was put out by ISIS, right?

7   A    Accurate, yes, correct.

8   Q    And there are many people who would read these magazines

9   that are not terrorists, including you.

10  A    Well, I don't want to say the word "many," but there are

11  definitely people that read this that are not terrorists,

12  that's correct, yes.

13  Q    You have no idea -- do you have any idea how many copies

14  of Inspire or Dabiq are read online?

15  A    I don't think there's a way of getting an absolutely

16  accurate --

17  Q    The answer is no, you don't have any idea?

18  A    I have an idea, but I don't have -- I wouldn't say it's

19  fully accurate.  It's more of a straw pole kind of idea.

20  Q    Communists could be reading these magazines?

21  A    Well, they do.

22  Q    And academics could read these magazines?

23  A    They certainly do.

24  Q    People like you who look into the Deep Dark Web could read

25  the magazines?

1  A   That's also true.

2  Q   Or people who were just sort of interested in what is

3  going on with al-Qa'ida could read Inspire?

4  A   They could, but I don't know how wise that would be but

5  they could, that's true.

6  Q   It may not be wise because people like you might think

7  that they're terrorists if they're reading those things,

8  correct?

9  A   I don't think they have to worry about me.  I think I'm

10  not the source of the problem.

11  Q   Now, you told us at length yesterday about the cases that

12  you've testified in for the United States Government.

13          Do you recall that testimony?  Is that a "yes"?

14  A   Yes.

15  Q   And --

16  A   Yes.

17  Q   And we went through not only how much you've made from

18  testifying, but in addition to that $1.3 million that you've

19  received, you've also received approximately $140,000 from the

20  Department of Defense?

21  A   I believe so, yes.

22  Q   And you have received an additional $154,000 paid for

23  different things that you have done for the FBI?

24  A   That's correct, yes.

25  Q   So prior to testifying today, you've made actually more

1    like $1.5 million from the Government?

2    A   Actually, you know, I'm not sure.  I think the 1.3

3    includes the FBI fees, although I'm not a hundred percent

4    certain about that.  It's possible.

5    Q   I have a letter from the U.S. Attorney that indicates that

6    it does not.  So --

7    A   I would defer to the letter.

8    Q   Okay.  Now, were you retained as an expert in a case

9    called the *United States v. Babar Ahmad* filed in Federal

10   District Court in Connecticut?

11   A   Yes, I was.

12   Q   And you don't have that listed on your resume anywhere,

13   correct?

14   A   Actually, I do.  I have it listed under *Hassan Abu Jihaad*,

15   et al. as the two of them were co-conspirators in the same

16   investigation.

17   Q   And how do you have it listed?

18   A   Under *Hassan Abu Jihaad*, et al.

19          Mr. Abu Jihaad was the co-conspirator in that case

20   and was tried separately but it was the same investigation.

21   Q   And this case was filed in the Federal District Court in

22   Connecticut in 2013 or 2014?

23   A   The initial case I don't remember.

24          Mr. Ahmad's case I was also supposed to testify in,

25   but I don't recall when it was filed.  I don't believe --

CR15-00707-SRB      IVAN KOHLMANN-Part 2      3-2-16

 1   yeah.  I don't recall.

 2   Q   I'm looking at your resume.

 3          Do you have your resume with you?

 4   A   Unfortunately, I do not have it in front of me right now.

 5   Q   Okay.  I don't see it on there, but you think it is

 6   somewhere?

 7   A   I testified in the *Abu Jihaad* case.

 8   Q   I see no cases filed --

 9   A   I believe it's in 2008 -- I would look in 2008 or '9 which

10   is when I believe Mr. Abu Jihaad's case went to trial.

11   Q   Did you prepare a report in 2014 in the *Ahmad* case?

12   A   Yes, I did.  Yes, I did.  Excuse me.

13   Q   And was that report withdrawn?

14   A   I have no idea.

15   Q   Do you know an individual by the name of Dr. Marc Sageman?

16   Sageman?

17   A   I do, yes.

18   Q   And did Dr. Sageman write a report in opposition to the

19   report that you had written?

20          MS. BROOK:  Objection.  Hearsay.

21          THE COURT:  The answer "yes" or "no" may be allowed.

22          THE WITNESS:  I have no idea, Your Honor.

23   BY MR. MAYNARD:

24   Q   So you have no idea whether he wrote such a report?

25   A   No.  I have no idea.  I don't believe I ever saw any

1    report issued by Dr. Sageman in that case.

2    Q   And as we sit here, you don't know whether or not your

3    report was actually withdrawn or not?

4    A   No, I do not.

5           MR. MAYNARD:  I don't have any further questions.

6           THE COURT:  Thank you.  Ms. Brook?

7           MS. BROOK:  Thank you, Your Honor.

8           MR. MAYNARD:  May I approach the clerk?

9           THE COURT:  Yes.

10                    **REDIRECT EXAMINATION**

11   BY MS. BROOK:

12   Q   Good morning.

13   A   Good morning.

14   Q   Defense counsel yesterday asked you about Anwar al-Awlaki

15   and how he is viewed by people in the United States after his

16   death.

17           Can you explain that a little.

18   A   Yes.  Anwar al-Awlaki's death in a drone strike was

19   obviously a major international news event and it was covered

20   very, very heavily in American media, as was the debate about

21   drone strikes killing American nationals.

22           As a result Anwar al-Awlaki became an extremely

23   controversial figure within the Muslim Community.  He was

24   directly associated not just with al-Qa'ida and Yemen, but the

25   last sermons that he had issued before his death in which he

1   had very aggressively in English called upon American Muslims

2   to go out and kill other people.

3           As a result there was a strong push from within the

4   Muslim Community to try to put aside Anwar al-Awlaki and to

5   avoid Anwar al-Awlaki because of the connotation of what his

6   name meant.

7           His name became synonymous with that of al-Qa'ida and

8   certainly most Muslims in the United States wanted to have

9   nothing to do with Anwar al-Awlaki or his ideas and certainly

10  did not want anyone to associate those ideas with them.

11  Q   Defense counsel yesterday asked you about the expert

12  examination that you provided in this particular case.

13          In some cases that you have been involved in have you

14  examined forensically digital evidence?

15          MR. MAYNARD:  Objection.  It's beyond the scope.

16          THE COURT:  Overruled.  You may answer.

17          THE WITNESS:  Yes, I have.

18  BY MS. BROOK:

19  Q   And in some cases do you make examinations based upon FBI

20  reports of their forensic examinations?

21  A   Yes.  That's also correct.

22  Q   In this case what did you do?

23  A   In this case I did the latter.

24  Q   At some point did you receive a piece of evidence from the

25  U.S. Attorney's Office here in Phoenix?

1    A    Several pieces, yes.

2    Q    I'm talking about digital, digital evidence.

3    A    Yes, I did.

4    Q    What form was that in?

5    A    I believe it was on a DVD or Blu-ray disc.

6    Q    And was that a single disc?

7    A    Yes.  It was a single disc.

8    Q    Did you conduct any examinations based on that disc?

9    A    I was preparing to and I had copied the material onto a

10   local cache but then I was advised by the U.S. Attorney's

11   Office to cease my analysis and to return the disc to the U.S.

12   Attorney's Office.

13   Q    So did you do forensic analysis that you rendered any

14   opinions on in this particular case?

15   A    No, I did not.  I followed the instructions given to me.

16   Q    And what did you do with the disc?

17   A    I returned the disc to the U.S. Attorney's Office via Fed

18   Ex.

19   Q    Yesterday you mentioned destroying something.  What was it

20   that was destroyed?

21   A    It was -- initially, when I copied the material on to

22   begin the analysis, I copied it into a cache, a local cache.

23   I then removed that material from the cache so I no longer

24   have any copy of it.

25   Q    It wasn't anything that you actually received in hard copy

1    that was all sent back?

2    A    No.   Everything -- everything that I received on that disc

3    was sent back and any copies that were made to do the analysis

4    were destroyed.   And like I said, I never actually got to

5    start doing the analysis.

6    Q    And along those lines, in cases where you do receive

7    forensic evidence, to your knowledge, are those pieces of

8    evidence all copies, not originals?

9    A    I don't think they are ever originals.

10   Q    You mentioned talking about an avatar in discussions with

11   defense counsel in regards to Miski.

12   A    Yes.

13   Q    What's an avatar?

14   A    An avatar online is when you create an identity for

15   yourself on a forum, on Twitter, on any other social

16   networking platform.   As part of that avatar, you have to

17   create a name for yourself and often you have to provide an

18   image.   And the idea is is that's your online identity.   That

19   name and that image forms your online identity.

20        Those avatars become very important because it's like

21   your calling sign.   It's like your name or your signature.

22   It's how people know who you are.

23   Q    How do you verify the authenticity of people's claims to

24   be terrorists on the Internet?

25   A    Well, in some cases there's ways of providing objective

1   evidence.  Some people simply are able to provide

2   authenticating information.  They're able to provide video of

3   themselves holding weapons in a conflict zone with other known

4   wanted individuals.

5        Other individuals receive authentication or

6   accreditation from sources that are unimpeachable, i.e., ISIS

7   saying, yes, this is officially this person or officially that

8   person.

9        Or conversely, people that are al-Qa'ida or ISIS

10  members online who, again, have been authenticated, who

11  themselves can authenticate others.

12       But there are innumerable ways to figure out whether

13  or not someone is really what they say or coming close to it

14  anyway.  Some pieces of that information can be difficult to

15  discern, particularly when it comes to photographs or avatar

16  information.

17  Q   In regards to Miski in particular, that avatar, is that an

18  individual you have been able to verify the authenticity of?

19  A   I believe it is, indeed, him.

20  Q   And with the other individuals that we've spoken about in

21  this case, have you too been able to verify the authenticity

22  of them?

23  A   Yes.  There's almost zero doubt whatsoever that Junaid

24  Hussain is Abu Hussain al-Britani and that those were his

25  Twitter accounts.  This information has been verified by

1   International governments as well as the United States

2   Government.

3           Mujahid Miski, a/k/a Mohamed Abdullahi Hassan, his

4   account and his presence, again, has been verified by the U.S.

5   Government.  In fact, he has surrendered in Somalia as of

6   recently, so we know he exists and we know that he was doing

7   this stuff.

8           So, again, there are ways of piecing together whether

9   or not someone is real and whether or not they're really

10  connected to an organization.

11          It can be challenging and it can take time, but with

12  the people that are involved in this particular case, I don't

13  think there's much of a question.

14  Q   In the realm of keeping current and maintaining knowledge

15  of terrorist organizations, what is the best means or forum

16  with which to understand research and keep current with those

17  organizations and individuals?

18          MR. MAYNARD:  Objection.  Beyond the scope.

19          THE COURT:  Overruled.

20          THE WITNESS:  You have to go -- excuse me.

21          THE COURT:  Hold on.

22          Overruled.  You may answer.

23          THE WITNESS:  Sorry, Your Honor.

24          The importance is is this.  Is that if you want to

25  understand what these folks are talking about, if you want to

1   understand their literature, if you want to understand their

2   videos, if you want to understand their ideology or their

3   theology, you have to go where those materials are present.

4        And these days the only place to find those materials

5   in the case of ISIS outside of a place like Syria or Iraq is

6   on the Internet.  If you are not studying the activities of

7   these organizations and their communications on the Internet,

8   you really have no picture of what these organizations or

9   individuals are doing.

10        The best forum of determining what they're up to is,

11   of course, going physically to Syria and Iraq and interviewing

12   Abu Bakr al-Baghdadi, the leader of ISIS, or interviewing Abu

13   Mohammed al-Ashami, the official spokesman of ISIS.  But

14   that's not an option.  That's not an option for anyone.

15        Short of that, the best next option is to go to their

16   objective statements that are in the form of video, audio

17   testimonials, their magazines, and their official communiques.

18        This is what these people believe.  There is

19   absolutely no doubt these things are authentic and legitimate.

20   Everyone acknowledges as much.  And it's a widely, widely

21   known and established science within the study of these

22   organizations.

23        I'm hardly the only person that relies on this.  In

24   fact, if you don't rely on this information, at least in part,

25   to understand what these groups are up to, you really don't

1    have any eye into what they're doing.

2    Q    Defense counsel asked you about Inspire Magazine, those

3    publications that we talked about yesterday, Issue 8, Issue 9.

4              To be clear, which branch of al-Qa'ida published

5    Inspire?

6    A    It's known as al-Qa'ida in the Arabian Peninsula, AQAP,

7    otherwise known as al-Qa'ida in Yemen.  It's al-Qa'ida's

8    faction in Yemen, which is the country south of Saudi Arabia

9    in the Arabian Peninsula.

10             MS. BROOK:  May I have a moment?

11             THE COURT:  Yes.

12   BY MS. BROOK:

13   Q    The CD that you returned to the U.S. Attorney's Office in

14   Phoenix, how soon after you received it did you return it?

15   A    I believe it was within days.

16   Q    Do you remember which month that happened in?

17   A    I believe it was late January, early February, but I'm not

18   exactly sure.  I'd have to check my records.

19             MS. BROOK:  I don't have any other questions.

20             THE COURT:  Thank you.

21             And at this time may Mr. Kohlmann be excused as a

22   witness?

23             MS. BROOK:  Yes.

24             MR. MAYNARD:  No objection.

25             THE COURT:  Thank you very much, Mr. Kohlmann.  We

1    are finished with you.  I hope you feel better soon.

2           THE WITNESS:  Thank you, Your Honor.  I really

3    appreciate your patience.

4        (End of excerpt of proceedings.)

5                          *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                      C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 27th day of June,

14   2016.

15

16

17

18

19                      s/Elizabeth A. Lemke
                        _____
20                      ELIZABETH A. LEMKE, RDR, CRR, CPE

21

22

23

24

25