JOHN S. LEONARDO
United States Attorney
District of Arizona

Kristen Brook
Arizona State Bar No. 023121
kristen.brook @usdoj.gov
Joseph E. Koehler
Arizona State Bar No. 013288
joe.koehler@usdoj.gov
Assistant United States Attorneys
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Telephone: 602-514-7500
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Abdul Malik Abdul Kareem,<br><br>　　　　　Defendant. | No. CR-15-0707-01-PHX-SRB (MHB)<br><br>**RESPONSE TO OBJECTIONS TO PRESENTENCE REPORT** |

　　　　The United States, through undersigned counsel, respectfully responds in opposition to the defendant's objections to the presentence report. The defendant, Abdul Malik Abdul Kareem, raises a number of factual objections that do not affect the guideline calculation. This response will address those objections in the factual background section below. In addition, Kareem objects to the PSR because it (1) does not provide a downward adjustment for acceptance of responsibility, (2) calculates a base offense level of 43 based on the death of co-conspirators Elton Simpson and Nadir Soofi, (3) includes an upward adjustment based on intentional selection of victims for their perceived religion, (4) includes an upward adjustment based on the commission of a federal crime of terrorism, (5) includes an upward adjustment for the use of body armor during the offense, (6) calculates an adjusted offense

level, greater of the offense levels, and total adjusted offense level of 60, and (7) establishes the criminal history category at Category VI. Kareem offers additional information regarding his offender characteristics, and asserts various arguments in support of a request for a downward departure or variance.

## I.     FACTUAL BACKGROUND

On March 17, 2016, the jury found Kareem guilty as charged, on 5 counts related his participation and involvement in an evolving plan to attack the United States in support of the Islamic State in the Levant (ISIL), a foreign terrorist organization. The evidence at trial showed that Kareem knowingly and intentionally conspired and aided and abetted Elton Simpson (Simpson) and Nadir Soofi (Soofi), to provide material support or resources to ISIL, by conducting attacks in the United States as encouraged by ISIL. The Garland attack was the culmination of the conspiracy, although Kareem, Simpson and Soofi considered other targets along the way, including U.S. military service members and U.S. military bases, recruitment centers, a public mall, and in the end the plan crystallized into the attack in Garland.

The evidence at trial showed that Kareem knowingly conspired to provide material support or resources to ISIL when he aided and abetted Simpson and Soofi in conducting possible attacks, and eventually the attack on the Garland contest, by providing expert advice and assistance in the form of firearms training, provided the money to purchase weapons they used in the attack, taught them to care for and maintain their weapons, took them shooting in the desert, supported the concept of the attack, hosted Simpson and Soofi in his home and provided a meeting location to discuss the attack, all while not acting to dissuade them or alert authorities. The evidence also showed Kareem wished to kill "Kaffirs" (non-Muslims), including by strapping a bomb to himself and blowing himself up in a shopping mall.

The evidence showed that at the time Kareem conspired to provide material support or aided and abetted Simpson and Soofi, he knew ISIL had engaged or was engaging in

terrorist activity or terrorism. Kareem knew Elton Simpson supported ISIL. Among other things, he admittedly watched, on his own and with Simpson, ISIL beheading videos and the video of the Jordanian pilot being burned alive, and talked to Simpson about ISIL.

On May 3, 2015, at approximately 6:51 p.m., Simpson and Soofi, armed in part with weapons and ammunition purchased by Kareem, arrived at the American Freedom Defense Initiative's Draw Muhammad Contest in Garland, Texas, with a plan to commit mass murder to support ISIL. Simpson and Soofi wore tactical gear and gloves, and Soofi wore a bulletproof vest, and they sprang from Soofi's black sedan armed with over 1,500 rounds of ammunition and six firearms. Simpson and Soofi opened fire on a security guard and police officer in the parking lot. Simpson and Soofi shot Bruce Joiner, a Garland Independent School District security guard, in the lower leg. Garland Police Department (GPD) officers returned fire and killed Simpson and Soofi in the parking lot before they reached the convention center where the event was underway with approximately 200 people in attendance.

Kareem in his objections makes a number of factual assertions that do not affect the guideline calculation. This response addresses some of those assertions in order to paint a more accurate picture of the trial evidence and provide factual background for evaluation of Kareem's departure and variance arguments.

Kareem "denies that his computer that was seized in 2012 contained documents and videos advocating ideological violence against civilians." (CR 381 at 2.) Although this assertion is technically accurate, Kareem fails to note investigators found the document "S&I.pdf" in the recycle bin of his computer. (Tr. Exh. 162.) S&I.pdf is the Security and Intelligence course, published by the Global Islamic Media Front and is a guide for evading intelligence and law enforcement agents. In addition, the Internet search history of Kareem's Lenovo laptop (the computer seized in 2012) contained searches for Anwar al-Awlaki's "Battle of the Hearts and Minds" lecture (Tr. Exh. 164.), al-Awlaki's lecture on "Brutality

Towards the Muslims" (Tr. Exh. 165.) and his lecture "AND INCITE THE BELIEVERS." (Tr. Exh. 166.)

Next, Kareem claims he never said he believed Simpson found religious justification for the Garland attack from a Jamaican-based cleric, "Faisal." (CR 381 at 3.) This claim ignores the testimony of Special Agent Stewart Whitson on February 26, 2016.  During his testimony about Kareem's May 5, 2015, interview, Whitson stated:

> Q: At some point during the conversation did the defendant say who he thought Simpson and Soofi may be influenced by?
> A:  Yes.
> Q:  And who was that?
> A:  He described him as a radical salafi Jamaica-based scholar named Faisal.
> Q: And based upon your training and experience, your work within the JTTF, the Joint Terrorism Task Force, do you know what Sheikh Faisal is?
> A: Yes.
> Q: Who is he?
> A: Sheikh Faisal is a Jamaica-based radical cleric. He was someone that supported the al-Qa'ida and the Arabian Peninsula and al-Qa'ida in general before the emergence of the Islamic State.  And then when the Islamic State announced its caliphate on June 29th of 2014, he was one of the first English-speaking clerics to come out in support of them. And so he delivered lectures and things like that in support of the Islamic State.

(RT 2/26/16 12-13).

Next, Kareem points out that he denied going shooting in the desert with Simpson and Soofi while accompanied by Stefan Verdugo, and notes "most of Verdugo's testimony was impeached." (CR 381 at 3.)  Verdugo testified that he went shooting with Kareem, Simpson and Soofi in the desert a few times at Table Mesa Road.  (RT 2/19/16 12-13, 16). Verdugo also testified that Kareem, Simpson and Soofi went shooting after jummah on Friday afternoons. (RT 2/19/16 25).  Although the defendant certainly asked impeaching questions of Verdugo, Verdugo's testimony on this point was corroborated by other witnesses, including defense witnesses.  Ali Soofi testified that on two occasions he heard and saw Kareem, Simpson and Soofi leave the apartment to go shooting.   (RT 3/19/16 32). On February 19, 2016, defense witness Abdullah Mubarak was asked: "did Mr. Kareem ever

talk to you about going shooting with Ibrahim and Nadir Soofi?" Mubarak testified that Kareem told him about going shooting, and "he mentioned those guys" Ibrahim and Nadir Soofi. (RT 2/19/16 6). On March 8, 2016 defense witness Abdul Khabir "AK" Wahid (AK) testified, "I do know that they (Kareem, Simpson and Soofi) went out shooting." (RT 3/8/16 61, 67-68). AK also testified that Kareem purchased a gun at night in a parking lot with Simpson. (RT 3-8-16 56-57). AK testified that he too was in the car when Kareem purchased this weapon. (RT 3-8-16 57).

  Next, Kareem notes the juvenile witnesses testified to having heard Kareem make statements about the Garland contest on dates before the contest was announced. (CR 381 at 3-4.) The fact that the juvenile witnesses got mixed-up with their dates is immaterial; they originally testified they didn't know the dates of the things they saw and heard. (RT 2/24/16 22, 33.) The jury ultimately found the defendant guilty and likely concluded, as common sense would dictate, that the juveniles simply were mistaken with respect to dates but accurately remembered the important details regarding things Kareem, Simpson and others said in their presence about the contest, about killing kaffirs, and about seeing the video of the Jordanian pilot being burned alive.

  Kareem claims "Mr. Martinez did not express concern about the shooting trip nor was there testimony that his children's mother feared for her children's safety." (CR 381 at 4.) This assertion is inaccurate. Martinez testified that he did express concern to his wife about the afternoon shooting trip with Kareem, Simpson and Soofi. (RT 2/24/16 16). Specifically, Mr. Martinez testified that he was concerned because "I thought to myself that he (Simpson) looked like a terrorist." (RT 2/24/16 16). During the testimony of Martinez's girlfriend, Nicole Medellin, Kareem objected to her testimony about anything Martinez stated when he returned from shooting with Simpson and Soofi. Medellin's statements on this subject are contained in the report of her interview and are consistent with Martinez's testimony.

Kareem makes the same types of assertions regarding Ali Soofi's testimony that he asserts regarding the testimony of the other witnesses, that it is unclear to him what portion of the testimony the jury believed. Ali Soofi may not have told investigators everything he knew in his initial interviews (because of his fear of Kareem), but his testimony matched the physical evidence and the testimony of other witnesses in the case with respect to the dates Simpson and Soofi acquired their firearms, the types of videos Kareem, Simpson, and Soofi watched in the apartment, and Kareem providing money to Simpson and Soofi.

Ultimately, after hearing from all the witnesses in the case and reviewing all the physical, documentary, and electronic evidence in the case, the jury returned a guilty verdict on all counts. This necessarily implies the jury found aspects of the various witnesses' testimony to be credible, including that of the juveniles, Verdugo, and Ali Soofi.

## II.   ARGUMENT

### A. The PSR Properly Does Not Include a Downward Adjustment for Acceptance of Responsibility

In his objection to PSR ¶¶ 33 and 54, Kareem without supporting argument asserts he admitted he was a prohibited possessor and cites U.S.S.G. § 3E1.1 comments 2 and 5, for the proposition that he is entitled to a downward adjustment for acceptance of responsibility. This assertion is incorrect. One must accept responsibility for the full range of relevant offense conduct in order to be in a position to assert entitlement to a downward adjustment for acceptance of responsibility. U.S.S.G. § 3E1.1 cmt. 1(A) (". . . a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."); *United States v. Rutledge*, 28 F.3d 998, 1002-03 (9th Cir. 1994). In addition, the downward adjustment for acceptance of responsibility generally is not appropriate if the defendant obstructs justice, including through false testimony at trial.[1]  *See* US.S.G. § 3E1.1 cmt. 4 ("Conduct resulting in an

---

[1] In light of the PSR's sentencing guidelines calculations resulting in a total adjusted offense level of 60, the government did not object to the PSR's failure to include a two-level upward adjustment for obstruction of justice. That said, the adjustment would be appropriate in light of Kareem's false testimony at trial. The jury necessarily found

enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply.").

In light of Kareem's failure to admit the full scope of his conduct for which he was convicted and his continuing protestations of innocence regarding Counts 1 through 3 and 5 of the indictment, this does not appear to be such an extraordinary case. *See United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994) ("Cases in which obstruction is not inconsistent with an acceptance of responsibility arise when a defendant, although initially attempting to conceal the crime, eventually accepts responsibility for the crime and abandons all attempts to obstruct justice."). Therefore, the PSR correctly declines to grant a downward adjustment for acceptance of responsibility.

B. The PSR Correctly Calculates the Base Offense Level

In his objection to PSR ¶ 36, Kareem asserts the cross-reference to the first-degree murder guideline is inappropriate. (CR 381 at 4-6.) Kareem claims the deaths of Simpson and Soofi do not trigger the felony murder rule because "[t]he guideline does not contemplate a sentence for murder when the persons who are killed are the perpetrators and not victims." (CR 381 at 5.) Kareem also claims the conduct triggering the murder cross-reference was neither charged in the indictment nor proven at trial. (CR 381 at 5.) The government respectfully disagrees.

First, the murder cross reference at U.S.S.G. § 2M5.3(c) is applicable because the conspirators intended to commit first-degree murder. They began planning shortly after the announcement of the contest to commit an unlawful killing, they amassed the weapons and ammunition with which to carry out the plan, and they acted deliberately, with malicious

---

Kareem's testimony to be false in its finding of guilt. Additionally, Kareem's testimony about not having accessed the Acer laptop computer since the fall of 2014 was demonstrably false in light of the Acer's network access logs revealing Kareem continued to use it and tether it to his Maxwest cellular phone through May 2015. (Tr. Exh. 481.)

and willful premeditation. Defendant Kareem was a participant in the planning process, shared his co-conspirators' desire to kill disbelievers, and sought to have the plan succeed by assisting Simpson and Soofi to acquire their firearms and ammunition, taking them to the desert to train in shooting their firearms, and instructing them on how to disassemble, clean, lubricate and reassemble their firearms. Further, the jury convicted Kareem of conspiring to transport firearms in interstate commerce with the intent to commit the felonies of murder and aggravated assault (as well as the substantive count charging the same), so although Kareem was not convicted of murder, the trial evidence established and the jury necessarily found he was a participant in the plan to commit murder and aggravated assault in Texas.

18 U.S.C. § 1111 states:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any . . . murder . . .; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

18 U.S.C. § 1111 (2016).

The federal felony murder rule embodied in § 1111 applies to the killing of someone other than the intended murder victim. *United States v. El-Zoubi,* 993 F.2d 442, 449 (5th Cir. 1993). In *El-Zoubi*, the court held the district court erred in failing to apply the arson guideline's cross-reference to the felony murder guideline set forth at U.S.S.G. 2A1.1. The court concluded "the 'most analogous guideline' from Chapter Two, Part A is the first degree murder guideline, § 2A1.1 . . . ." The court quoted the arson prong of § 1111's felony murder rule and noted "[p]roof of premeditation or deliberation is not required under the felony murder component of § 1111." (*Id.* (citing *United States v. Antelope*, 430 U.S. 641, 644 (1977)). The court explicitly declared: "The language of § 1111 is broad enough to include cases in which an arsonist's accomplice dies during the commission of the felony. Moreover, the death of an accomplice is a foreseeable result of procuring him to commit an arson." *Id.* at 449.

8

In this case, the conspirators planned to kill as many of the roughly 200 people present at the Garland contest as they could. They had a premeditated design that was intended unlawfully and maliciously to effect the deaths of people associated with the contest. The fact that Simpson and Soofi were the only people killed in the execution of the attack is of no moment for the purpose of applying § 1111 and U.S.S.G. § 2A1.1.

Simpson's and Soofi's deaths were not merely foreseeable; they were planned as part of the conspiracy and an inevitable result of the conspiracy. The evidence at trial showed they made final plans to resolve outstanding issues in their lives, such as Simpson leaving his car title to repay a debt and Soofi sending a farewell note to his ex-wife. The trial evidence likewise established Simpson and Soofi were seeking martyrdom as part of their support for ISIL. Therefore, their deaths were a foreseeable consequence of the conspiracy and Kareem rightly is accountable for their deaths.

The Ninth Circuit has held that in order to sustain a conviction for felony murder, the government need only prove that the defendant intended to commit the underlying felony; it does not need to show that the defendant intended to cause the death of the individual killed. *See United States v. Miguel*, 338 F.3d 995, 1006 (9th Cir. 2003) ("Felony murder does not require the first element [referring to intentional infliction of injury under voluntary manslaughter]: the Government need only prove the intent to commit the felony, not the intent to inflict the injury."); *United States v. Hicks*, 103 F.3d 837, 848 (9th Cir. 1996) (partially overruled on other grounds) ("The intent requirement for felony murder is the intent to commit the underlying dangerous felony, not intent to commit murder."). In this case, Kareem and his co-conspirators intended to commit the underlying dangerous felony of murder. Even if Kareem did not intend Simpson and Soofi to die during their planned mass murder of others during the attack, the evidence shows he wanted them to murder others and knew they were likely, if not certain, to die during the attack. Therefore, the PSR correctly applies the cross-reference to § 2A1.1.

### C. The PSR Correctly Imposes an Adjustment for Selecting a Victim Because of Actual or Perceived Religion

The evidence produced at trial overwhelmingly established that the attack on the Garland contest was based on religious motivation.  The evidence throughout showed the attack was in retaliation for a perceived insult to the Prophet Muhammad.  The co-conspirators, including Kareem, were seeking to kill attendees at the contest because they were not Muslims.  The evidence at trial also established specifically Kareem's antipathy toward "Kaffirs" (non-Muslims), including his repeated threats to kill "Kaffirs" by strapping a bomb to himself and blowing people up inside a shopping mall.

Specific examples of testimony on this subject include: Verdugo testified that Kareem was "like really intense about how he would speak about it (ISIS)." (RT 2/19/16 21.) Verdugo also witnessed Kareem and Simpson watch "gorish videos" of terrorist attacks. *Id*. Verdugo testified that Kareem called people who weren't Muslims kaffirs, and talked about "wanting to blow kaffirs up and he would yell "Allahu akbar" while he did it." (RT 2/19/16 10).

Juvenile witness Carlos testified that he converted to Islam at Kareem's insistence because "it was technically a mandatory thing … if I wasn't Muslim, I would be considered a kaffir, you know. (RT 2/24/16 8).    He doesn't really talk to kaffirs, you know what I mean."  (RT 2/24/16 8).   Kareem told Carlos that he would "shoot a kaffir" if he had to. (RT 2/24/16 18).   Kareem woke Carlos up from sleep and had him watch the video of the Jordanian pilot burned alive. (RT 2/24/16 13, 25).  Carlos and Kareem watched the pilot as he "was screaming and he was like – he was just in a cage being burned alive." (RT 2/24/16 13).  The whole time Kareem was "laughing because he was like obnoxious and loud . . . continuously laughing."  (RT 2/24/16 13).

On March 2, 2016, Ali Soofi (Ali), the brother of Nadir Soofi, testified that he resided in Phoenix, Arizona, and shared a one-bedroom apartment on 19th Avenue with Soofi and Simpson from February 2014 through March 2015. (RT 3/2/16 2-4). Kareem would discuss his support of ISIS with Simpson and Soofi, and "everything that was being watched and all

the literature that was being read and listened to was – it was more the militant, more ISIS-side of, you know, Islam." (RT 3/2/16 9-11).  Ali further testified that Kareem would talk about ISIS, "on occasion with Ibrahim, the conversations they had with the Twitter account that he had that he would tweet after watching videos of, you know, ISIS members driving around with their flags and guns, usually Ibrahim would tweet something. And then they would both be sitting on the couch and they would discuss, you know, the general idea of, you know, what was going on in the video and the text that was being sent." (RT 3/2/16 10).   On a couple of occasions, Kareem told Ali "these people (kuffars) should be killed." (RT 3/2/16 16).  Ali testified that Kareem "look(ed) pleased" as he watched an ISIL execution video.  (RT 3/2/16 16).  Ali also testified that Kareem, alongside Simpson and Soofi watched the news reports of the Charlie Hebdo attacks in January 2015 at the apartment.  (RT 3/2/16 21).  Kareem looked "excited" and "pleased" about the attack, that the attackers had "got their message across."   (RT 3/2/16 22).

The fact that no identifiable victims are listed in PSR ¶ 31 is immaterial because the issue is the perceived religion of the intended victims, or more to the point, the perceived absence of a specific religion, Islam, for the intended victims, and the co-conspirators' targeting them on that basis.

Jury findings are not required in the setting of advisory sentencing guidelines.  *See United States v. Ameline*, 409 F.3d 1073, 1077-78 (9th Cir. 2005).  Because the trial evidence overwhelmingly established a religious motivation for the attack, the PSR correctly includes a three-level upward adjustment pursuant to U.S.S.G. § 3A1.1(a).

   D.  <u>The PSR Correctly Imposes the Adjustment for a Federal Crime of Terrorism</u>

Kareem correctly notes he is being sentenced for conspiracy to provide material support to a foreign terrorist organization, and if his sentencing guideline calculation remained within the realm of U.S.S.G. § 2M5.3, he might have a colorable argument that applying the adjustment set forth in § 3A1.4(a) would amount to double counting. Whether such double counting would be impermissible, however, is a moot point.  Once the cross-

reference to § 2A1.1 is applied, the adjustment in § 3A1.4 no longer amounts to double-counting because it is an adjustment to the murder guideline, not the terrorism guideline. This is especially true because the firearms guideline that would apply to Counts 1 and 2 contains the same cross-reference to § 2A1.1, and the 12-level adjustment would apply independently to that cross reference if the firearms counts were calculated separately from the material support count. *See* U.S.S.G. § 2K2.1(c)(1)(B) (2016). In other words, the convictions for the firearms offenses in Counts 1 and 2 would result in the first-degree murder cross-reference to § 2A1.1, and then the federal terrorism offense adjustment in § 3A1.4(a) would apply to that count group, producing the same result calculated in the presentence report.

Kareem also argues this adjustment should not apply because the government did not show he had intent to influence governmental action. Whether Kareem had any intent to influence governmental action is irrelevant because the definition of "federal crime of terrorism" includes a violation of 18 U.S.C. § 2339B, providing material support to a foreign terrorist organization. 18 U.S.C. § 2332(g)(5)(B).

E. <u>The PSR Correctly Imposes an Adjustment for the Wearing of Body Armor</u>

Although Kareem is correct the jury did not specifically find he knew Soofi was wearing a bulletproof vest during the attack, no such finding was required. *See Ameline*, 409 F.3d at 1077-78. Kareem's remaining arguments on this issue appear to be an attempt to relitigate the issue of guilt. The only question is whether Soofi's wearing of a bulletproof vest was foreseeable. The evidence at trial showed Kareem had reason to know Soofi and/or Simpson would wear body armor during the attack, even though the conspirators knew Soofi and Simpson would die while committing the attack, because wearing body armor would permit the attackers to survive longer with the hope of enabling them to kill more people during the attack. Stefan Verdugo testified Kareem sought to acquire body armor even though he personally already owned a bulletproof vest. Verdugo's description of Kareem's

camouflage-pattern bulletproof vest exactly matched the vest FBI agents recovered during the search of Kareem's residence on June 10, 2015.

Kareem also requests a downward adjustment for his reduced role in the offense. Although Kareem did not physically go to Garland, Texas, to conduct the attack, the evidence at trial showed he did participate in planning the attack, he helped Simpson and Soofi acquire the weapons and ammunition they used in the attack, he helped them to train in the use of those firearms by taking them to the desert to practice shooting, and he taught them how to maintain those firearms. He was integral to their plan and is not entitled to a downward adjustment as a minor or minimal participant.

F. <u>The PSR Correctly Places Kareem in Criminal History Category VI</u>

Kareem objects to his placement in Criminal History Category VI. U.S.S.G. § 3A1.4(a) and (b) provide two separate adjustments in the context of terrorism cases. The first is the 12-level upward adjustment provided under U.S.S.G. § 3A1.4(a), discussed above. The second is U.S.S.G. § 3A1.4(b), which automatically places a defendant convicted of a federal terrorism offense in Category VI. Even if the 12-level upward adjustment provided in U.S.S.G. § 3A1.4(a) were somehow inapplicable to a person whose guideline calculation was confined within § 2M5.3, which the government does not concede, the criminal history adjustment in § 3A1.4(b) would still apply. The language in § 3A1.4(b) is clear: "In each such case [of an offense involving or intended to promote a federal crime of terrorism], the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI." U.S.S.G. § 3A1.4(b). This imposition of an increased offense level as well as increased criminal history score is permissible just as using prior convictions to increase offense levels and criminal history score in the firearms and immigration contexts is permissible. *See* U.S.S.G. §§ 2K2.1(a), 2L1.2(b) (imposing higher offense levels for certain types of convictions; those convictions also may trigger additional criminal history points); *United States v. Garcia-Cardenas*, 555 F.3d 1049, 1050 (9th Cir. 2009).

    G.  <u>Neither a Variance nor a Departure is Warranted Under the Facts of the Case</u>

Kareem asserts the facts of the case, including the fact that he did not accompany Simpson on their hate-driven mission of death, warrant a downward variance or departure. The government acknowledges this Court has the power to depart or vary from the advisory guideline range, even if the basis for varying is predicated on a policy disagreement with the sentencing guideline at issue. *See Kimbrough v. United States*, 128 S. Ct. 558 (2007).

Although the Court certainly has the power to depart or vary, the government respectfully suggests this is not a case in which the Court should exercise that power. The conspirators in this case sought to commit mass murder as a means of protesting a perceived insult to their religion, and further as a means of supporting the goal of ISIL to incite a religious war and trigger the fulfilment of apocalyptic prophecies. Kareem participated in this conspiracy and even went to the length of recruiting juveniles into his radical vision of Islam. As the government will explain more fully in its sentencing memorandum, this is not a case in which a downward departure or variance is warranted.

**III.   CONCLUSION**

Based on the foregoing, the United States respectfully requests the Court overrule Kareem's objections to the presentence report.

Respectfully submitted this 8th day of August, 2016.

        JOHN S. LEONARDO
        United States Attorney
        District of Arizona

        */s Joseph E. Koehler*
        _____
        JOSEPH E. KOEHLER
        KRISTEN BROOK
        Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of August, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate

copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Maynard, Attorney for Defendant

By: */s Joseph E. Koehler*
Joseph E. Koehler
Assistant U.S. Attorney