## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 16, 2016 |
| **Abdul Malik Abdul Kareem,** | ) 9:12 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #1
(Pages 1 through 151, Inclusive.)

**APPEARANCES:**
**For the Government:**
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
                **Joseph Edward Koehler, Esq.**
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
                **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB   JURY TRIAL-DAY #1  2-16-16

1                              **INDEX**

2

**SUMMARY OF COURT PROCEEDINGS**                    **PAGE:**

3
**COURT/COUNSEL DISCUSS JURY**                    Page  3
4   **QUESTIONNAIRES/STRIKES**

5   **JURY SELECTION**                              Page  44

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S

2        (Called to the order of court at 9:12 a.m.)

3   COURT/COUNSEL DISCUSS JURY QUESTIONNAIRES/STRIKES:

4            THE CLERK:  Criminal case 15-707.  United States of

5   America v. Abdul Malik Abdul Kareem.  Time set for jury trial.

6            MR. KOEHLER:  Good morning, Your Honor.  Joseph

7   Koehler and Kristen Brook for the United States.

8            MR. MAYNARD:  Good morning, Your Honor.  Dan Maynard

9   and Mary Plomin for Mr. Abdul Malik Abdul Kareem who is

10  present and in the courtroom.

11           THE COURT:  Please sit down.

12           I just wanted to touch base with you on where we are

13  in the process this morning.  The prospective jurors, I

14  believe there's 144 of them, have not yet begun to answer the

15  questionnaire.  They have not yet been sworn.  They are still

16  being given their orientation and being randomized and given

17  their juror numbers.  And as soon as they are ready, Maureen

18  will go down and administer the oath and hand out the

19  questionnaires.

20           What we anticipate doing then is that bringing the

21  answered questionnaires up in batches, not waiting until

22  everyone is complete, because certainly some people will fill

23  them out much quicker than others.  And so when we get 20 of

24  them, we will make copies for each of you and we will begin

25  separately going through them.
```

1      I, in particular, will be focusing on the first four

2  questions when I go through them.  I'm sure that the answers

3  to other questions are very significant to all of you, but

4  what my primary interest with this questionnaire is to be able

5  to excuse anyone who answers questions 1, 2, 3 or 4 in such a

6  way that it is obvious that they need to be excused.

7      There may be other questions beyond that that are

8  obvious, but my initial review will focus on that.  And so

9  that hopefully, we will be voir diring only jurors who will be

10  able to serve because they are available and physically

11  healthy and aren't friends with any of the witnesses.

12      The other thing that I wanted to go over with you is

13  some of the proposed oral voir dire that's been submitted.

14  And first, I'm going to start with the government's, because

15  the defendant's is predominantly duplicate of the government's

16  with some additional questions.

17      So the very first question, this voir dire

18  anticipates -- this proposed voir dire is written as if it

19  were going to have a written answer.  And the individual voir

20  dire that is done by me, typically, is followup questions to

21  people that have "yes" answers to any of the questions that

22  were asked of the prospective jury panel as a whole.

23      And then we ask them at some point in the proceedings

24  to answer the standard questions which basically is marital

25  status, what that individual does for a living, what their

1    spouse does for a living, if any, whether they have any

2    children under the age of 18, and whether they have ever

3    served in the military, and if so, what branch.

4         So marital status is covered, but age, place of

5    birth, and how long they have lived in Arizona is not covered.

6    And while it is true that we could have prospective jurors who

7    were born outside the United States, one of the things that we

8    do know is that all of the prospective jurors are citizens of

9    the United States.

10        So my question to the government is why do you want

11   this additional information?  What purpose does it serve?

12   You're going to see these people, so age is -- well, you can

13   tell if they're young or old or somewhere in between.

14        MR. KOEHLER:  To the extent that the Court's routine

15   voir dire covers that, we have no objection.

16        THE COURT:  It doesn't cover age.

17        MR. KOEHLER:  Right.  Well, we have no objection to

18   just sticking with the Court's routine.

19        THE COURT:  The routine.  Okay.

20        Do you agree, Mr. Maynard?

21        MR. MAYNARD:  I do.

22        THE COURT:  Okay.  So we'll delete that one.

23        The second one is:  What other jobs have you held in

24   the last ten years?  Why is that -- we're going to find out

25   their occupation, what they do for a living.

 1          Sometimes if somebody says something that's very

 2   generic, I might ask a followup as they're answering the

 3   question and I always follow up if they say they're retired

 4   and ask what they did before they were retired.

 5          MR. KOEHLER:  That works for us, Your Honor.

 6          THE COURT:  Okay.  Agreed?

 7          MR. MAYNARD:  That's fine.

 8          THE COURT:  Similarly, No. 4, I believe there's a

 9   specific question -- and I said I was going to go through the

10   government's first, but now I'm going to go into

11   Mr. Maynard's.

12          Mr. Maynard specifically wanted me to ask question

13   No. 12 which is asking about specific occupations.  And my

14   standard voir dire -- and I think also in some of this -- is

15   the law and law enforcement.

16          Is there some reason why we need to know highest

17   formal education and any degrees with the field involved?

18          MR. MAYNARD:  Your Honor, the categories that I

19   listed there, I think are relevant --

20          THE COURT:  No.  No.  I agree your question is

21   relevant.  Now I'm going back and asking the government why

22   they want a more generic.

23          MR. MAYNARD:  Okay.

24          THE COURT:  Why they want every juror to tell us

25   whether they finished high school or have a GED or have a

1   Ph.D.

2          MR. KOEHLER:  I think it just helps paint an overall

3   picture of the person, Your Honor, and that is, how far they

4   have gone with their education.  That's something that's of

5   interest, I think, to both sides to know how well educated our

6   jurors are.

7          THE COURT:  Okay.  As I said, there will be a

8   question about whether that individual has served in the

9   military, and if so, what branch.

10         You have as question No. 6 a broader question about

11  whether the person's spouse, children, or grandchildren ever

12  served in the military.

13         MR. KOEHLER:  That's a joint question that we

14  developed before we changed that around and we incorporated

15  some of the suggestions from the defense.  I think the person

16  or an immediate member of their family, given the nature of

17  this case, inquiring into that is something I think the

18  defense would definitely want to know.

19         MR. MAYNARD:  I agree.

20         THE COURT:  Okay.  No. 7 is similar to the question

21  in No. 7 in the questionnaire.

22         Your No. 7 says:  Have you ever lived outside the

23  United States, and if so, where and when?

24         Question 7 actually asks whether the individual has

25  ever visited or lived in the Middle East, Africa, or any

 1    predominant Muslim country or region.

 2            MR. KOEHLER:  I think it's covered, so that's fine.

 3            THE COURT:  Agreed?

 4            MR. MAYNARD:  Yes.

 5            THE COURT:  Thank you, Mr. Maynard.

 6            Okay.  Let me turn to Mr. Maynard's -- your questions

 7    1 through 9 are duplicative of what's in the government's, so

 8    I won't focus on those.

 9            And I think that you assured me the other day that

10    question No. 10 is relevant to some evidence that might come

11    in during the trial.

12            MR. MAYNARD:  I believe so, yes.

13            THE COURT:  No. 11.  I believe your No. 11 is

14    duplicative of No. 15 in the questionnaire that asks:  Do you

15    have any particular religious or moral opinions about the

16    consumption of alcohol?"

17            So can we eliminate No. 11?

18            MR. MAYNARD:  Yes.

19            MR. KOEHLER:  Your Honor, we flagged the issue of

20    sexual orientation in our trial memo.  And we will -- we just

21    want to draw the Court's attention to that that we will oppose

22    the admission of any evidence about that subject unless it is

23    directly relevant to the nature of the relationships in the

24    conspiracy itself that we have charged.

25            THE COURT:  But that doesn't -- since I haven't ruled

 1    on that objection yet, I still need to ask the question in

 2    voir dire.

 3            MR. KOEHLER:  And that's fine.  I just wanted to flag

 4    that as an ongoing issue.

 5            THE COURT:  And, Mr. Maynard, your question No. 13 is

 6    also covered in the questionnaire at 18.

 7            MR. MAYNARD:  I'll withdraw it.

 8            THE COURT:  Thank you.

 9            I think those are all the questions I had about the

10    proposed voir dire.

11            Let me turn just to some very brief -- very brief,

12    two words that I would suggest changing in the joint proposed

13    statement of the case.

14            On page 2, line 6, it says "to provide material

15    support in the form of property, currency, service" and then

16    it goes on.

17            Can we say "money"?

18            MR. MAYNARD:  That's fine.

19            MR. KOEHLER:  That sounds fine.  We actually had

20    consulted with our folks in DC and came up with a little bit

21    more narrow and generic form of that particular paragraph.

22            THE COURT:  Oh.  You have a new joint statement of

23    the case?

24            MR. KOEHLER:  We have a new paragraph that simplifies

25    that a little bit that we could get over to the Court later

1   this morning.

2           THE COURT:  Has Mr. Maynard seen it?

3           MR. KOEHLER:  No.  We need to show it to him as well.

4           THE COURT:  Yes, because it's a joint statement of

5   the case.

6           MR. KOEHLER:  It's just simpler.

7           THE COURT:  Good.  So is money -- does "currency"

8   turn into "money" in your new revised statement?

9           MR. KOEHLER:  I think "currency" disappears all

10  together.

11          THE COURT:  Even better.

12          And the only other one is really minor, which is on

13  page 3, line 2, it says "was prohibited in possessing" and I

14  wanted to say "was prohibited from possessing."

15          MR. KOEHLER:  No objection.

16          THE COURT:  I didn't think so.

17          Okay.  Anything else that we need to discuss before

18  we start reviewing -- oh.  I forgot.

19          One last thing and we may have already covered this.

20  So we're going to have the jurors return -- our target is to

21  have the jurors here at 1:00.  And so what I anticipate doing

22  is that we're going to go through these questionnaires.  I'm

23  going to focus on the first four questions.  And then I'm

24  going to meet with you and propose people to be excused based

25  on the questionnaire answers.

1          And then you can either agree on other answers and

2    propose other people that be excused based exclusively on

3    their questionnaires so that we, hopefully, limit the number

4    of jurors that are coming up to people that are realistically

5    part of the prospective jury panel.

6          So hopefully, we will be able to do that between

7    11:00 and 11:30.

8          MR. MAYNARD:  Judge, did you want to talk about

9    peremptories and alternates and how that was going to be

10   selected?

11         THE COURT:  Well, peremptories, I think, are pretty

12   simple.  I think that the government gets 8 and you get 12.

13         MR. MAYNARD:  Yes.

14         THE COURT:  And we've agreed to 16 jurors, which

15   means we need 36 qualified jurors for you to exercise those

16   strikes.

17         And I did ask whether or not both sides would be

18   willing to stipulate to the jurors selected by lot as

19   alternates.

20         Does the government wish to so stipulate?

21         MR. KOEHLER:  We would prefer by lot, yes, Your

22   Honor.

23         MR. MAYNARD:  That's fine.

24         THE COURT:  Okay.  So that is a stipulation of

25   counsel.  We will do that.  And the preliminary instructions,

1   which I'm going to give you --

2        Oh.  I'll ask you the question right now because I

3   put it on as a question mark on the preliminary instructions

4   which should be available momentarily.

5        On the Count 5, Conspiracy to Provide Material

6   Support, does it require an overt act?  Because the

7   instructions didn't have it in there.

8        MR. KOEHLER:  It does not, Your Honor.

9        THE COURT:  It does not.  Okay.  That answers the

10  question.

11       MR. KOEHLER:  That's correct.  The 2339(b) Conspiracy

12  does not include an overt act.  So similar to the drug

13  statutes under the Supreme Court case of *Shabani*, no overt act

14  is required.

15       THE COURT:  I just wanted to be sure we weren't --

16  because the other conspiracy does require an overt act and I

17  wanted to doublecheck with you on that.

18       The preliminary instructions that I'm proposing that

19  we give are simply the elements of the crimes charged.

20       As an example, we all know about the lengthy

21  follow-all definition of "conspiracy."  I don't propose to

22  give it at this time, but simply the elements of each crime

23  without those definitions so that the jurors at least have a

24  general idea of what the government needs to prove for each of

25  the five counts.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

1           So I will have them to you in a few minutes to take

2     a look at while you're waiting to take a look at the answered

3     questionnaires.

4           Is there anything else then, Mr. Koehler?

5           MR. KOEHLER:  There are three issues.

6           THE COURT:  Okay.

7           MR. KOEHLER:  The first one is the government has a

8     few witnesses that will testify about different search scenes

9     and different parts of the case.  And we would propose to

10    split their testimony.

11          One example is Robert Meshinsky is one of the CART

12    examiners and we intend to present, as you recall, the 2012

13    search at the home of Abubaker Ahmed that came up in the

14    motion to suppress.

15          We intend to present that part of the case, earlier,

16    about a week before we go into the devices that were recovered

17    from Simpson and Soofi's apartment as well as Mr. Kareem's

18    apartment.

19          So we would propose for him, and one or two other

20    witnesses, to have them testify about that specific issue.

21    And Mr. Maynard would be welcome to cross them at that time or

22    cross them later if he wanted to consolidate it all.

23          But in terms of direct testimony, we would prefer to

24    split that so that it makes more sense in terms of a time line

25    of the case.

 1           THE COURT:  So will he be offering substantive

 2   evidence or just process evidence, observations of -- I mean,

 3   because -- I'm not recalling specifically right now, but I

 4   know that at the time of the 2012 search, that one of the law

 5   enforcement officers spoke to the defendant and one of them --

 6   I mean, everybody that was present was spoken to and made some

 7   statements.

 8           Would those statements be coming in through Meshinsky

 9   at that time?

10           MR. KOEHLER:  No.

11           THE COURT:  He was not the one that got the

12   statements?

13           MR. KOEHLER:  That's correct.

14           THE COURT:  So you just want to talk about in 2012 we

15   searched and we recovered these things and then here is what I

16   did with them?

17           MR. KOEHLER:  Correct.

18           THE COURT:  Which is turned them over to somebody

19   else to extract whatever information was on them.

20           MR. KOEHLER:  Right.  He was the one who received

21   them for extraction.

22           I believe he might have been on the scene of the

23   search as well, and so he would testify about the recovery of

24   specifically the Lenovo laptop, as well as the thumb drive

25   that was attached to the Lenovo laptop.  And then we would

1    present the evidence that that laptop came back into the

2    government's custody later on after having been returned to

3    the defendant.

4          THE COURT:  Okay.

5          MR. KOEHLER:  And then he would explain what he did

6    to extract those two particular devices.

7          And then Ms. Vaughan would testify about her --

8          THE COURT:  But Ms. Vaughan is only going to testify

9    once, correct?

10          MR. KOEHLER:  That would be the other witness that we

11    would propose to have testify twice.  We could have some of

12    these witnesses on the stand for a very long period of time in

13    trying to differentiate between devices when the jury hasn't

14    even heard about the later searches.

15          I think it would make that very difficult.

16          THE COURT:  It isn't my preferred way of proceeding.

17    I'm -- I'm following how it might be easier for the jury,

18    particularly early in the case when they're still getting

19    familiar with it with Meshinsky.

20          I'm a little concerned about the cross -- well, maybe

21    before I'm concerned, I should find out if Mr. Maynard is fine

22    with it.  My thought was, you know, is this going to impact

23    his ability to effectively cross-examine?

24          And Meshinsky I kind of understand.  Ms. Vaughan -- I

25    mean, talking about the extraction process and then talking

1   about what was specifically extracted are two different --

2         I mean, if she's talking about what her process is,

3   it's very much like Meshinsky.  If she's talking about what

4   was actually recovered and substantively showing as exhibits

5   what it was, that coming through her testimony in different

6   points in time I'm a little concerned about.

7         But then are you concerned, Mr. Maynard; because if

8   you're not, then I shouldn't be?

9         MR. MAYNARD:  Oh, I'm always concerned, Your Honor.

10   And the problem I'm hearing and what I'm anticipating the

11   government is going to try to do is basically put the same

12   evidence on twice.

13         THE COURT:  Well, that's not going to be allowed

14   because I never --

15         MR. MAYNARD:  I hope not.

16         THE COURT:  -- because I never allow duplicative

17   evidence.

18         MR. MAYNARD:  I didn't figure you would.  But I don't

19   have -- with Meshinsky it sounds to me like it's not a

20   problem.  It's the process.  I took a computer.  I downloaded

21   these things.  Yada yada yada.

22         THE COURT:  Right.

23         MR. MAYNARD:  The problem I'm anticipating is

24   Ms. Vaughan is going to come in with her knowledge, I guess,

25   is going to say:

1          Back in 2012 I looked and here were these things that

2   I thought indicated that somebody might be radicalized or was

3   reading radical materials.

4          And then if she's going to come back and say I looked

5   at this same stuff or I looked at very similar things in 2015

6   and she's going to say the same thing, that's where I'm

7   getting the duplicate nature of this is from her testimony,

8   not from his.  That bothers me.  And I have just now heard

9   about it.

10          THE COURT:  Okay.  So it's "yes" on Meshinsky and

11   it's "we don't know yet" on Vaughan?

12          MR. KOEHLER:  If I can elaborate a little bit on

13   Ms. Vaughan, what we would propose to do with her, I would

14   propose to have her testify that after the computer came back

15   into the government's custody, a new image had been performed.

16   And, of course, Meshinsky would be the witness for that.  And

17   have her testify without elaborating on necessarily the

18   content of the documents, aside from establishing relevance,

19   that they were found on the computer, that they appeared

20   relevant to the investigation, and appeared connected to

21   radicalization.

22          And end it there and move to admit those documents

23   into evidence.  And then recall Ms. Vaughan later to talk

24   about her searches of other devices.

25          And the reason why I think it's important to do it

1    that way is to keep it straight in the jury's mind which sets

2    of devices we're talking about.

3            If we lay out everything that's in all the devices at

4    once through Ms. Vaughan and through other witnesses, what we

5    end up doing is just kind of jumbling all that together in a

6    way that might make it really hard to follow.

7            Whereas, if we space it out in time, they have time

8    to digest, okay, this is a computer that was found at this

9    point in time, this is a computer that was found at this

10   location, and so forth, and helps space it out in a way that

11   makes it easier for them to digest.

12           THE COURT:  We may have to have Ms. Vaughan testify

13   first so that Mr. Maynard and I can see that there is no

14   problem with her coming back and testifying again because she

15   will be prepared to testify either all together or separately

16   on two occasions.

17           MR. KOEHLER:  Okay.

18           THE COURT:  Okay?

19           MR. KOEHLER:  Thank you.

20           THE COURT:  Anything else then, Mr. Maynard?

21           MR. MAYNARD:  He said he had three things.

22           THE COURT:  Oh.  I'm sorry.

23           MR. KOEHLER:  The next item is Mr. Maynard has filed

24   a motion to preclude the government's expert Evan Kohlmann

25   from testifying and he has requested a Daubert Hearing on that

1   issue.

2          THE COURT:  I saw the motion and that's all I can

3   say.  I have seen it.  I have not read it.  Because I didn't

4   want to read it until I found out what the government's --

5   what the government's intentions were with respect to a

6   response.

7          Do you intend to respond in writing --

8          MR. KOEHLER:  Yes.

9          THE COURT:  -- orally or both?

10          MR. KOEHLER:  We intend to respond in writing.

11          THE COURT:  When?

12          MR. KOEHLER:  Tomorrow.

13          THE COURT:  Tomorrow?  Okay.

14          MR. KOEHLER:  This is certainly fairly late in the

15   game and we have Mr. --

16          THE COURT:  But so was his disclosure.

17          MR. KOEHLER:  Well, yes and no, Your Honor.  We

18   disclosed his preliminary report a couple of weeks ago.  And

19   the motion that Mr. Maynard filed in the case is remarkably

20   similar to motions that were filed seeking to preclude Mr.

21   Kohlmann in a case out of New York a few years ago.

22          THE COURT:  I'm guessing that's not a coincidence.

23          MR. KOEHLER:  Certainly not.  So my point is it's

24   something that Mr. Maynard was likely aware of in terms of Mr.

25   Kohlmann's background and expertise and perhaps could have

UNITED STATES DISTRICT COURT

1    been flagged a little sooner.

2         THE COURT:  And when do you intend -- I know you were

3    intending to have Mr. Kohlmann testify fairly early.

4         MR. KOEHLER:  Yes.  Thursday afternoon.  Mr. Kohlmann

5    is unavailable all week next week, so.

6         THE COURT:  What about the week after that?  We're

7    here for a long time.

8         MR. KOEHLER:  It puts us on the horns of a dilemma

9    because of travel not only for him but for other witnesses.

10   And it's making things a little bit difficult from a

11   logistical standpoint.

12        THE COURT:  Well, you know, we're just going to have

13   to deal with it as best we can because, as I said, I didn't

14   read it because I like to read it with the Response as well.

15        MR. KOEHLER:  Certainly.

16        THE COURT:  So that I have a sense of -- because

17   whenever you read one side, it always sounds eminently

18   reasonable until you read the other side's.

19        MR. KOEHLER:  What I think we would propose to do,

20   Your Honor, is to proffer through our response and verbally to

21   the extent we need to answer questions from the Court, what it

22   is that we intend to present through Mr. Kohlmann and the

23   information the Court needs to at least make a preliminary

24   ruling.

25        THE COURT:  Well, doesn't his disclosure tell me

 1    that?

 2            MR. KOEHLER:  We believe so, Your Honor.

 3            THE COURT:  Is that one of the many things that's in

 4    that thick --

 5            MR. KOEHLER:  It's attached as an exhibit to the

 6    motion, yes.

 7            THE COURT:  Okay.

 8            MR. KOEHLER:  And so moving past that, what we would

 9    propose to do is have at least a preliminary ruling on

10    admissibility under Daubert and then proceed with Mr.

11    Kohlmann's testimony, assuming the ruling is that he should be

12    allowed to testify.

13            And then at the conclusion of the foundational

14    section of his testimony, the Court would be in a position to

15    judge fully whether the government's proffer has been accurate

16    and decide, ultimately, whether to allow the substantive part

17    of his expert testimony to come in.

18            THE COURT:  So you're suggesting because of the

19    timing that I do read Mr. Maynard's motion before I have a

20    chance to hear any response from you?

21            MR. KOEHLER:  I don't know how quickly the Court will

22    move through both the motion and the response.  But if you

23    think it would be necessary to do that in order to arrive at a

24    preliminary ruling before Thursday morning, we would certainly

25    welcome that.

1            THE COURT:  Well, I will take a look at it while

2    we're waiting for the questionnaires.  At the present time I

3    really can't comment one way or the other on whether or not I

4    will be able to follow the process you're suggesting or not.

5            And it might put you on the horns of a dilemma, but

6    if that's what happens, then we'll just have to deal with it.

7            MR. KOEHLER:  We understand.

8            MR. MAYNARD:  The government is the one that brought

9    this bull in here that has horns.  The problem is --

10           THE COURT:  Well, Mr. Maynard, I can't -- I'm not

11   going to comment on his process.  And I don't -- I'm going to

12   read it and then we'll see where we are.

13           MR. MAYNARD:  Well, here's the problem.  I just want

14   to make sure the Court is clear.

15           He just said that we got the report several weeks

16   ago.  We didn't.  We got it Monday at 10:30 so --

17           THE COURT:   A.m. or p.m.?

18           MR. MAYNARD:  P.m.  P.m.  I was in bed.  I got it the

19   next morning.

20           I mean, so technically, it came into my office at

21   10:30.  I didn't see it till the next morning around 5:30 or

22   6:00.  Yes.

23           I'm parroting a motion that I got from another lawyer

24   and I filed it on Friday.  Well, the reason I had to wait till

25   Friday was, one, I had to read the motion and we had jury

1    instructions and everything else to do.

2           But secondly, the government had told me this was

3    only a draft motion, a preliminary.  I kept waiting thinking

4    the government was going to give me Mr. Kohlmann's final

5    report.

6           I still don't have his final report.  I was told by

7    the government as late as Thursday that they were going to

8    give me a final report in the next day or two.  I kept waiting

9    for it every day over the weekend.

10           THE COURT:  So is the report from Monday, February

11    8th, the final report, Mr. Koehler?

12           MR. KOEHLER:  The report from Monday -- I don't think

13    it was Monday, February 8th.

14           THE COURT:  Well, if it was last Monday, that would

15    be when it was.

16           MR. MAYNARD:  10:30 at night p.m.

17           MR. KOEHLER:  So there was the initial report that

18    was sent a week ago or a little over a week ago.  That was the

19    initial draft.

20           The updated draft had more specific information about

21    it based on the facts that came out --

22           THE COURT:  Okay.  My question is the one last

23    Monday.

24           MR. KOEHLER:  Yes.

25           THE COURT:  February 8th.  Is that the final report?

1           MR. KOEHLER:  No.  That was not the final report.

2           THE COURT:  Where is the -- when was the final report

3   delivered?

4           MR. KOEHLER:  That should have been delivered

5   already.  I'm not sure of the specific timing of it, Your

6   Honor.

7           THE COURT:  Well, this could create even more

8   problems for your anticipated testimony this Thursday.  If you

9   think it's been delivered and Mr. Maynard doesn't think it's

10  been delivered, you need to resolve that between the two of

11  you.

12          MR. KOEHLER:  We will.

13          THE COURT:  Okay.  All right.  Court is in recess.

14          MR. MAYNARD:  Judge, I thought he said he had three

15  issues.

16          MR. KOEHLER:  The third issue, that's the --

17          THE COURT:  I thought you said two.

18          MR. MAYNARD:  See how I'm helping out the government

19  here?

20          MR. KOEHLER:  The Defense 403 request on photographs

21  from the case.  The defense is -- has informed us that they

22  are going to object to photographs depicting beheadings and

23  depicting other gruesome acts of ISIS.

24          THE COURT:  Well, until such time as somebody

25  provides me with the 403(b) evidence, I really can't comment

 1    on it because all I have is a notice of 403(b).

 2            MR. KOEHLER:  And there's one other issue that

 3    relates to 403 that we have that we would ask for a sidebar to

 4    discuss.

 5            THE COURT:  Is it part of your notice of 403?

 6            MR. KOEHLER:  This involves juvenile witnesses in the

 7    case and witnesses that the defendant -- that the defense has

 8    noticed on their witness list.

 9            THE COURT:  Well, we don't have to discuss that now.

10            MR. KOEHLER:  Okay.

11            THE COURT:  Because nobody is testifying today.

12            MR. KOEHLER:  Okay.

13            THE COURT:  Okay?

14            MR. KOEHLER:  Thank you.

15            THE COURT:  All right.  Okay.  We're at recess.

16       (Recess taken at 9:44 a.m.; resumed at 12:28 p.m.)

17       (Open court, no jury present.)

18            THE COURT:  Thank you.  Please sit down.  The record

19    will show the presence of counsel and the defendant.

20            I want to go through the questionnaires that I have

21    identified as people who may be excused from downstairs and

22    not come up here.  I'm going to try to go in numerical order.

23            The first one is No. 14.  This person relates that he

24    or she cares for an elderly mother in the State of Maryland

25    which requires that the prospective juror fly home one to two

```
 1    times per month.
 2              MR. KOEHLER:  We have that juror flagged as well.
 3              MR. MAYNARD:  So do we.
 4              THE COURT:  Is there any objection to the Court
 5    excusing 14?
 6              MR. KOEHLER:  No.
 7              MR. MAYNARD:  None.
 8              THE COURT:  14 is excused.  And I'm going to let you
 9    keep track of them, Maureen.
10              The next one I have is No. 17 who said:  I would
11    prefer to spend my vacation on vacation, not here for this.
12              MR. KOEHLER:  They don't want to be part of our
13    trial?
14              THE COURT:  I can't hear you, Mr. Koehler.
15              MR. KOEHLER:  Somebody doesn't want to be part of our
16    trial?
17              THE COURT:  And this is somebody I would be happy to
18    inquire further.  But there was something about the tone of
19    this answer that I thought I would bring it to your attention
20    to see if you had any objection to excusing 17.
21              MR. MAYNARD:  I do not.
22              MR. KOEHLER:  Nor do we.
23              THE COURT:  17 is excused.
24              Juror No. 24 -- I'm sorry.  Not 24 -- 30.  I have a
25    bunch of other flags but they're not automatic excusals.
```

 1          This person writes:  My four-year-old is known to get

 2   sick a lot so I can miss some dates.  And also indicated a

 3   hearing problem and medication that makes it difficult to

 4   concentrate including Klonopin and Activia perhaps.

 5          Do you have any objection to the Court excusing No.

 6   30?

 7          MR. KOEHLER:  No, Your Honor.

 8          MR. MAYNARD:  No, Your Honor.

 9          THE COURT:  30 is excused.

10          No. 35.  35 writes that he or she is the primary

11   caregiver -- I think she is a "she."  She is the primary

12   caregiver for her mother.  They are in the process of joining

13   their households.  Her mother is moving in with her and her

14   husband.

15          Is there any objection to the Court -- oh, she also

16   indicated that she had a health problem called dystonia.

17          Is there any objection to my excusing 35?

18          MR. KOEHLER:  No, Your Honor.

19          MR. MAYNARD:  No, Your Honor.

20          THE COURT:  35 is excused.

21          Next one I have is No. 60.

22          MR. MAYNARD:  I'm sorry?

23          THE COURT:  Six zero.

24          It says:  My employer only pays two weeks of jury

25   duty and she couldn't pay her bills or he couldn't.  I don't

 1   know if it's a "he" or "she."

 2           Any objection to the Court excusing 60?

 3           MR. KOEHLER:  No, Your Honor.  Thank you.

 4           MR. MAYNARD:  No, Your Honor.

 5           THE COURT:  60 is excused.

 6           No. 65.  This individual wrote:  Income and not

 7   speaking good English.  And then in question No. 3 indicated:

 8   I don't speak good English.

 9           Is there any objection to the Court excusing 65?

10           MR. KOEHLER:  No, Your Honor.

11           MR. MAYNARD:  No, Your Honor.

12           THE COURT:  65 is excused.

13           No. 70.  This is the first one that's not a hardship

14   that I flagged.  This individual wrote on the Explanation

15   Sheet:  I do not fully understand the Muslim culture, but from

16   my very little experience around them and what I have seen on

17   the news, fear that I may be biased against them.

18           Is there any objection to excusing 70?

19           MR. MAYNARD:  No, Your Honor.

20           MR. KOEHLER:  May I have a moment?

21           Could you please read the response one more time on

22   the explanation?

23           THE COURT:  I do not fully understand the Muslim

24   culture, but from my very little experience around them and

25   what I have seen on the news, fear that I may be biased

1    against them.

2          Earlier the person wrote after the list of various

3    organizations it said:

4          What have you seen, read, or heard about them?

5          And it says:  That they are radical Islamists that

6    behead those who disagree with them.  Source:  Fox News.

7          Those were the two concerning items, but it was the

8    statement that --

9          MR. KOEHLER:  Yes.  Although we certainly think that

10   the statement to the earlier question is probably rather well

11   documented and that the answer to the latter one is --

12         THE COURT:  Well, I just want to know if you have any

13   objection to my excusing No. 70.

14         MR. KOEHLER:  We will not object.

15         THE COURT:  70 is excused.

16         72 wrote that he works in sales.  His paycheck

17   depends on a commission.  And he has no time off available.

18         Is there any objection to my excusing 72?

19         MR. KOEHLER:  No, Your Honor.

20         MR. MAYNARD:  No, Your Honor.

21         THE COURT:  72 is excused.

22         No. 75.  75 writes:  I have an appointment with VA

23   and take regular high blood pressure medication that makes me

24   sleepy and frequently using the bathroom.

25         Next wrote:  I have a heart problem and take meds

1    every day.

2          Is there any objection to excusing 75?

3          MR. KOEHLER:  No, Your Honor.

4          MR. MAYNARD:  No, Your Honor.

5          THE COURT:  75 is excused.

6          No. 77.  I have a subpoena to show/testify in a

7    criminal case on February 23rd.  I will be testifying as the

8    victim.  And later in No. 16, I assume this is related, wrote:

9    2014 victim of hit and run.

10         MR. KOEHLER:  No objection.

11         MR. MAYNARD:  No objection.

12         THE COURT:  77 is excused.

13         No. 81 writes:  I am the only source of income in my

14   household.

15         Let me just look at the juror list to see what --

16         No. 81 -- and also, I don't think you have this yet,

17   but I got it from the Jury Administrator.  81 reports her

18   occupation as insurance agent.  So I assume that means

19   commissions.

20         We could inquire further, but I thought putting two

21   and two together that this person probably would be excused

22   for financial hardship.

23         Is there any objection?

24         MR. KOEHLER:  No, Your Honor.

25         MR. MAYNARD:  No, Your Honor.

1          THE COURT:  81 is excused.

2          No. 84:  My husband has Alzheimer's and I need to be

3    with him during the day.  This individual does not list an

4    occupation, which may or may not be -- that doesn't

5    necessarily -- the difference between those who list and don't

6    list is whether they filled their questionnaire out online or

7    not.

8          So I don't know whether this person is employed or is

9    retired.  But I thought that was -- that was good enough to

10   excuse her for hardship.

11         Is there any objection?

12         MR. KOEHLER:  No, Your Honor.

13         MR. MAYNARD:  No, Your Honor.

14         THE COURT:  84 is excused.

15         No. 90.  This is an individual who does not believe

16   he or she has comprehension of the English language as

17   evidenced in No. 3.

18         Is there any objection to excusing 90?

19         MR. KOEHLER:  No, Your Honor.

20         MR. MAYNARD:  No, Your Honor.

21         THE COURT:  90 is excused.

22         No. 106.  106 answered questions 3 and 4 "no" but

23   then said "more information provided."

24         And in the explanation sheet wrote:  In the interests

25   of being candid, I am bipolar, have Type 2 diabetes, high

1    blood pressure, high cholesterol, and allergic allergies.  I

2    am medicated daily for all conditions.

3           Is there any objection to 106 being excused?

4           MR. KOEHLER:  No, Your Honor.

5           MR. MAYNARD:  No, Your Honor.

6           THE COURT:  106 is excused.

7           No. 112 has three children; one, in school; one,

8    three years old; and one, five months.  And said she would

9    need to hire a baby-sitter.

10          MR. KOEHLER:  No objection, Your Honor.

11          THE COURT:  Is there any objection to 112 being

12   excused, Mr. Maynard?

13          MR. MAYNARD:  No, Your Honor.

14          THE COURT:  112 is excused.

15          No. 113.  This is not a question relating to hardship

16   but says that list -- list several people, including himself,

17   in the field of national security or counterterrorism.

18          I'm not pushing for this, but I wanted to bring this

19   one to your attention.

20          MR. KOEHLER:  We think that is one that should be

21   inquired further rather than excusing for cause.

22          THE COURT:  No. 121.  Even over your objection, I

23   might excuse this person who is recovering from the flu and a

24   chest cold because we don't want to lose everybody else to the

25   flu.

1            So any objection to 121?

2            MR. KOEHLER:  No objection.

3            MR. MAYNARD:  No objection.

4            THE COURT:  121 is excused.

5            No. 123.  Single mother.  A five-week trial will be a

6    financial hardship for me.  And in No. 3 wrote:  I am diabetic

7    and also have rheumatoid arthritis in my hands, elbows, and

8    feet.  I have very bad days.

9            Any objection to 123?

10           MR. KOEHLER:  No, Your Honor.

11           MR. MAYNARD:  No, Your Honor.

12           THE COURT:  123 is excused.

13           No. 124 has company out-of-state training class in --

14   I think it's -- well, in California, I think, March 7 through

15   10.

16           We could inquire further or I could excuse for cause.

17   I'm not -- I leave it to the two of you.

18           MR. KOEHLER:  We have no objection, Your Honor.

19           MR. MAYNARD:  I don't have any objection, Your Honor.

20           THE COURT:  124 is excused.

21           No. 127 writes:  I have a business trip to Azerbaijan

22   scheduled for 12 March to 9 April.

23           Is there any objection to excusing this jury,

24   Mr. Koehler?

25           MR. KOEHLER:  No, Your Honor.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1  2-16-16

1          MR. MAYNARD:  No, Your Honor.

2          THE COURT:  127 is excused.

3          No. 130 is a graduate student currently enrolled in

4     course work and conducting research and will be defending his

5     or her dissertation in March and also has teaching assistant

6     duties for undergraduate courses.

7          Is there any objection to 130 being excused?

8          MR. KOEHLER:  No, Your Honor.

9          MR. MAYNARD:  No, Your Honor.

10         THE COURT:  130 is also excused.

11         No. 136.  This is not a hardship excuse but I wanted

12    to draw your specific attention to the answer to --

13         This person was a career military officer in the Air

14    Force and writes in answer to question 10:  Have you had a

15    close friend or family member that's been the victim of

16    terrorism?

17         "Many brothers in arms affected."

18         I would propose 136 be excused for cause.  Is there

19    any objection?

20         MR. KOEHLER:  We think we should voir dire that

21    witness on that separately from the rest of the panel.

22         THE COURT:  Well, I don't know about that, but if you

23    want me to inquire further, we can do that.

24         MR. KOEHLER:  Yes.  Please do that.

25         MR. MAYNARD:  Yes.

1          THE COURT:  This one I'm not going to ask you about.

2    I'm just going to tell you that 138 will be excused.

3          I had the Juror Administrator look to see what his

4    age is.  And his age is well over 70.  And according to -- I

5    think it's the statute -- that while people who are 70 and

6    older are -- may serve, they may be excused at their request

7    from service.  So I consider that a request to be excused.

8          So 138 is excused.

9          No. 142.  This is on the explanation sheet as an

10   explanation of question No. 4.  If the person is taking any

11   medication that affects concentration says that he or she is

12   taking hypertension and depression pills for an anxiety

13   disorder and high blood pressure.

14         Is there any objection to 142 being excused?

15         MR. KOEHLER:  No objection.

16         MR. MAYNARD:  No objection.

17         THE COURT:  142 is excused.

18         No. 143.  143 said the person has a health issue that

19   is incontinence.

20         I did inquire of the Jury Administrator about this

21   person's age, but this person is not over 70.  This person is

22   69 years old.  So, you know, this is one that we can inquire

23   more or excuse.

24         I would also point out once we're up in the 140's and

25   given the number that we have below 140 and only needing 36,

1    that this person is likely not in the jury strike pool.

2           MR. KOEHLER:  As I like to say:  Close enough for

3    government work.

4           THE COURT:  143.  No objection?

5           MR. MAYNARD:  No objection.

6           THE COURT:  144 has appointments.  Oh, mother has

7    Alzheimer's dementia.  I am her caretaker.

8           Any objection to 144 being excused?

9           MR. MAYNARD:  No objection.

10           MR. KOEHLER:  No objection.

11           THE COURT:  144 is excused.

12           No. 143, well, this one says:  Can't afford to pay my

13    bills if not at work.  Public school educator which would be

14    inconsistent with what I know about the schools.  But then

15    again, it's Juror No. 145.

16           Is there any objection to excusing 145?

17           MR. MAYNARD:  Are you on 145 or 143?

18           THE COURT:  145.

19           MR. MAYNARD:  Okay.

20           THE COURT:  What happened to -- you know what.  What

21    happened to 143?

22           MR. KOEHLER:  Incontinence.  Excused.

23           THE COURT:  I thought that was -- no.  No.  You're

24    correct.

25           So 143 is excused.  144 is excused.  This is 145.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

```
1              Any objection, Mr. Koehler?
2              MR. KOEHLER:  None.
3              MR. MAYNARD:  No, Your Honor.
4              THE COURT:  Okay.  145 is excused.
5              No. 146 just found out she was pregnant and is
6    worried that morning sickness may ensue.
7              I suggest we excuse her and not run that risk.
8              MR. KOEHLER:  No objection.
9              MR. MAYNARD:  No objection.
10             THE COURT:  146 is excused.
11             And lastly No. 147 writes:  I am a contingent
12   employee.
13             I don't know what that means.
14             And that person says:  I would be terminated -- my
15   contract would be terminated and employment.
16             So I think maybe they meant I'm a contract employee
17   and may not be protected by the statute.
18             I would suggest that 147 be excused.
19             MR. KOEHLER:  We have no objection, Your Honor.
20             MR. MAYNARD:  No objection.
21             THE COURT:  147 is excused.
22             There was one -- there was one other person who I
23   asked the Juror Administrator when this person returned to
24   have her call her employer.
25             MR. KOEHLER:  Is this juror No. 8?
```

1          THE COURT:  It's juror No. 5.

2          Juror No. 5 says:  I'm the main provider for my kids.

3   This would interfere with my work schedule.  Although it's an

4   excused absence, I don't know if I will be paid.

5          So I asked that she call while she's -- after she

6   gets back and find out.

7          Oh.  And apparently she gets paid, so we don't have

8   to worry about No. 5 in that regard.

9          MR. KOEHLER:  We had also flagged No. 8, Your Honor.

10  It was a similar one to another juror that mentioned they only

11  got paid for two weeks of juror duty.

12         THE COURT:  Oh.  Let me --

13         Oh.  You know what.  This one I was going to inquire

14  because the person says:  Remainder will be unpaid or PTO.

15  Paid time off.  However, I may have enough PTO to cover.

16         And so I thought that I would at least say you don't

17  have to do that, but if you are willing, wouldn't that be

18  generous.  But that was the only reason I didn't ask that he

19  or she automatically be excused.

20         MR. KOEHLER:  That sounds good to us, Your Honor.

21         THE COURT:  Now, was -- oh, I know.  There were a

22  couple who said they knew people.

23         The first one was No. 6.  No. 6 says:  I know

24  somebody named LeRoy Hoiland and I don't know if he is still

25  in the Coast Guard.

1          MR. KOEHLER:  We don't intend to call Mr. Hoiland and

2  we have offered a stipulation to the defense on foundation

3  that would obviate the need for his testimony.  He was a

4  search team leader.  We don't think he was actually the finder

5  at the particular residence.  So we don't think he will

6  necessarily appear as a witness in the case.

7          THE COURT:  Was he in the Coast Guard, do you know?

8          MR. KOEHLER:  I don't know.

9          THE COURT:  So you don't even know if this is the

10  same one?

11          MR. MAYNARD:  I have no idea.

12          I have advised them that I will stipulate to the

13  foundation of all of the things from Garland, Texas.

14          So for them, they don't have to fly out --

15          THE COURT:  Is that a Garland, Texas witness?

16          MR. KOEHLER:  No.  That's one of the houses.  And the

17  defense had listed them as a witness for potential items from

18  one of the residences.  And I had offered to stipulate to

19  foundation on the items from the residence that the defense

20  wants to put into evidence.

21          MR. MAYNARD:  Yes.

22          THE COURT:  So do we need this witness?

23          MR. MAYNARD:  It doesn't sound like it.

24          THE COURT:  Okay.  So we don't have to worry about

25  that.

 1          And there was one person and I didn't -- who said

 2   they knew -- worked with somebody that had been with DPS or

 3   Child Protective Services.

 4          MR. KOEHLER:  DCS.

 5          THE COURT:  Is that person -- I know -- oh.  There's

 6   an "I know Amy Vaughan."

 7          No. 54:  I know Amy Vaughan but I'm unsure if this is

 8   the same person on the list.

 9          But I thought we would inquire further and find out

10   if her Amy Vaughan works for the FBI.

11          No. 71 writes:  Melissa Bailey, former co-worker with

12   Department of Child Safety.

13          Is Melissa Bailey going to be called as a witness?

14          MR. MAYNARD:  There is a good possibility she could

15   be.

16          THE COURT:  Then we need to excuse 71.

17          MR. MAYNARD:  Yes.

18          THE COURT:  Is there any objection, Mr. Koehler?

19          MR. KOEHLER:  No, Your Honor.

20          THE COURT:  Mr. Maynard agrees.

21          MR. MAYNARD:  No, Your Honor.

22          THE COURT:  71 is excused.

23          This person needs to be inquired further.

24          This is No. 80:  I have an ex-co-worker named Mustafa

25   Hussan.  I don't know if it's the same person.

1          Is there anyone else that you wanted to suggest be

2    excused for cause based on written answers?

3          MR. MAYNARD:  Yes.  There were a couple, Your Honor.

4    No. 16.

5          THE COURT:  Let me get No. 16.  Well, at least I have

6    it in the pile that had Post-its on it.

7          MR. KOEHLER:  What number?

8          THE COURT:  Oh, yes.  This person has a subpoena to

9    testify on March 7th in a criminal case in state court and

10   doesn't know who would take priority.

11         I'm happy to excuse this person -- oh, this person

12   also says they have worked a terrorism case with Homeland

13   Security FBI.  They were a Senior Crime Scene specialist.

14         MR. KOEHLER:  We have no objection.

15         THE COURT:  Do you want to excuse 16?

16         MR. MAYNARD:  Yes.

17         THE COURT:  16 is excused.

18         Who is next, Mr. Maynard?

19         MR. MAYNARD:  Judge, I guess maybe just inquire about

20   No. 40.

21         THE COURT:  Yes.  I thought I should inquire.

22         MR. MAYNARD:  And No. 116.

23         THE COURT:  Oh, yes.

24         MR. MAYNARD:  Because of the explanation.

25         THE COURT:  I think 116 should be excused.

1              I had neglected to write her number down here, but I

2      agree with you, Mr. Maynard.  This is the woman who was the

3      flight attendant who was on a flight or had -- not at her home

4      base on 9/11 and lost people.

5              Is there any objection, Mr. Koehler, to excusing 116?

6              MR. KOEHLER:  No, Your Honor.

7              THE COURT:  116 is excused.

8              MR. MAYNARD:  And then 111.

9              THE COURT:  You know, I was going to inquire because

10     that's a -- it's basically a weekend.

11             MR. MAYNARD:  Oh, okay.

12             THE COURT:  The 27th and 28th are Saturday and

13     Sunday.  Next -- next week -- so the 25th is Thursday, 26th is

14     Friday.  So I was going to inquire.

15             I don't have any objection to excusing this person.

16     But I thought, you know, if it's just "I was planning to drive

17     up to Sunrise and go skiing but I could go some other

18     weekend."

19             MR. MAYNARD:  That's fine.

20             THE COURT:  Did you have anybody else that you

21     flagged base on the answers?

22             MR. MAYNARD:  No.

23             THE COURT:  How about the prosecution?  Mr. Koehler?

24     Did you have anyone else that you wanted to excuse just based

25     on their answers?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

1          MR. KOEHLER:  Not that we can think of at the moment,
2    Your Honor.
3          THE COURT:  Okay.  Then the last thing before we
4    bring up the jurors for voir dire is when we -- when I left
5    you this morning, you said there was going to be a new joint
6    statement of the case.
7          MR. KOEHLER:  Your Honor, we proposed a new paragraph
8    for the first paragraph of the joint statement of the case and
9    handed that to the defense to take a look if they have an
10   objection to it.  They would prefer to stick with the original
11   joint statement of the civil case.
12         THE COURT:  I can't hear you, Mr. Koehler.
13         MR. KOEHLER:  I'm sorry.
14         THE COURT:  You said you asked them to look at it
15   and?
16         MR. KOEHLER:  And they object.  They would prefer to
17   stick with the original joint statement.
18         THE COURT:  Then we will stick with the original one
19   to which there is no objection except I'm changing the word
20   "currency" to "money."
21         MR. KOEHLER:  No objection.
22         MR. MAYNARD:  We have no objection.
23         THE COURT:  Okay.  Good.  Anything else before we
24   bring up the remaining prospective jurors?
25         MR. MAYNARD:  Is there any possibility we're going to

```
 1    break for lunch or no?

 2              THE COURT:  I eat and work simultaneously.

 3              Well, what would you like to do?  It's one o'clock.

 4    You know, I can give you a little leeway.

 5              MR. MAYNARD:  Twenty minutes?

 6              THE COURT:  Done.  Does that work?

 7              MR. KOEHLER:  Sounds good.

 8              THE COURT:  We will bring the jurors up then about

 9    1:20.

10              Court is in recess.

11        (Recess taken at 12:59 p.m.)

12        (Open court, jury present at 2:01 p.m.)
```

**JURY SELECTION**

```
14              THE COURT:  Good afternoon, ladies and gentlemen.

15    Please sit down.  And I apologize for the close quarters.  But

16    hopefully it will stay cool in the courtroom.  It feels pretty

17    pleasant in here right now and we will try to be as efficient

18    as we can be.

19              Go ahead, Maureen.

20              THE CLERK:  Criminal case 15-707.  United States of

21    America v. Abdul Malik Abdul Kareem.  Time set for jury trial.

22              Counsel, please announce your presence for the

23    report.

24              MS. BROOK:  Good afternoon.  Kristen Brook and Joe

25    Koehler on behalf of the United States.
```

1          MR. MAYNARD:  Daniel Maynard and Mary Plomin on

2     behalf of Mr. Abdul Malik Abdul Kareem who is present in the

3     courtroom.

4          THE COURT:  Thank you.  Will all the prospective

5     jurors who are seated in the courtroom please stand and be

6     sworn -- I guess sworn again.

7          (Prospective jurors duly sworn.)

8          THE COURT:  Thank you.  Please sit down.

9          This is where I usually say we are now going to begin

10    the jury selection process in this case, but we have already

11    begun the jury selection process and I want to thank you so

12    much for your patience.

13          I know you filled out some questionnaires this

14    morning.  We have reviewed those questionnaires.  And we will

15    try not to repeat anything that was already asked of you in

16    writing in the questionnaires; and hopefully, that has also

17    made our process here this afternoon more efficient.

18          However, I will be asking you a number of questions

19    about yourselves.  And these questions are not designed to pry

20    unnecessarily into your personal lives.  And I hope that the

21    ones that were a little personal we've already asked in

22    writing and that there won't be any additional ones.

23          But please understand that both the written questions

24    and these oral questions this afternoon are necessary to be

25    asked in order to find out if any of you have any knowledge

1    about the case that's going to be tried, to find out if you

2    know any of the people who might be involved in the case, to

3    find out if you have any preconceived opinions about the case

4    that you might find difficult to set aside, and to find out if

5    you have had any personal experience or experience through a

6    family member or close friends that might affect your ability

7    to be fair and impartial.

8         Please do not withhold information in order to be

9    seated on the jury.  Please do not be concerned with whether

10   your answers to the questions are right or wrong.  This is not

11   supposed to be a test, ladies and gentlemen.  I ask that you

12   just be honest and straightforward in your answers and do not

13   be concerned with what you think the lawyers or I might want

14   to hear from you.

15        I am going to try to ask questions that will be

16   addressed to the whole jury panel that call for a "yes" or

17   "no" answer.  In your answer to one of these questions is

18   "no," you don't need to do anything.

19        If your answer is "yes," I will then call on you and

20   ask some additional questions.

21        When I call on you, we will also hand you a

22   microphone so that you can answer the question and everyone in

23   the courtroom will be able to hear your answer.

24        When I call on you, I will call on you by juror

25   number.  We are trying to keep the names of our jurors out of

1    the public record.  And that is the reason why you have been

2    given juror numbers and we will address you by juror number

3    rather than ask your name.

4         If at any time, ladies and gentlemen, I do ask a

5    question and for whatever reason you don't want to answer the

6    question out loud in the presence of all of the people in the

7    courtroom, we can hear your answer privately.  And I will

8    simply invite that prospective juror and the lawyers over here

9    to sidebar where we have a little microphone that doesn't

10   broadcast through the courtroom but only broadcasts into our

11   court reporter's headset and we can hear your answer

12   privately.

13        It is no difficult thing for us to do and we much,

14   much prefer having your answer than having you feel that it

15   would be embarrassing or difficult to answer the question in

16   the hearing of all of the rest of the people in the courtroom.

17        So I want to begin with some introductions, ladies

18   and gentlemen.  First, I want to introduce the people that are

19   here as court staff.  Liz Lemke is our court reporter.  Her

20   job is to take down everything that's said during court so

21   that if in the future anyone wants a word-for-word transcript

22   she would be able to produce one.

23        I think you have met Maureen Williams and you know

24   that one of her jobs is to administer the oaths to prospective

25   jurors.  She is our courtroom deputy.  She will be in charge

 1    of all of the exhibits in the trial.  And she is also someone

 2    who can be available to answer any questions that you might

 3    have related to your jury service.

 4           Another courtroom deputy Kathy Lara will be assisting

 5    us as well this afternoon.  She may not be here during the

 6    balance of the trial, but she is going to assist us in jury

 7    selection, as is one of my law clerks Sanessa Griffith.

 8           She has a microphone in the back of the courtroom.

 9    We're trying to get another microphone so that we can have one

10    for each side of the courtroom.  And I think we have one up

11    here.  Is there -- oh.  We're going to have a microphone up

12    here for the jurors that are in the front of the courtroom and

13    we'll pass that around as I call on you by number to answer

14    any questions that you may have indicated you have a "yes"

15    answer.

16           My name is Susan Bolton and I am one of the judges

17    here in the United States District Court in the District of

18    Arizona.

19           At this time I would like to ask Mr. Koehler and the

20    people that are seated with him to introduce themselves to the

21    prospective jury.  And after you have introduced yourselves,

22    speaking at a microphone, then I'm going to ask you to turn

23    around and let all the people behind you also see you so that

24    I can -- they can answer my next question.

25           MR. KOEHLER:  Good afternoon.  My name is Joe

```
 1    Koehler.  I'm an Assistant United States Attorney.  With me is

 2    Kristen Brook, also an Assistant United States Attorney, and

 3    Stewart Whitson a Special Agent with the Federal Bureau of

 4    Investigation.

 5              THE COURT:  Thank you, Mr. Koehler.

 6              And the next question, ladies and gentlemen, that you

 7    may have already anticipated is:  Do any of you know

 8    Mr. Koehler, Ms. Brook, or Special Agent Whitson?

 9              I see no hands.

10              Mr. Koehler and Ms. Brook work for the United States

11    Attorney's Office here in the District or State of Arizona.

12    To your knowledge, do any of you know anyone who works in the

13    United States Attorney's Office here in Arizona?

14              And, again, I see no hands.

15              Thank you very much.

16              Mr. Maynard, would you introduce yourself and

17    introduce the people that are seated with you.

18              MR. MAYNARD:  Yes.  I'm Dan Maynard and I'm here

19    representing Abdul Malik Abdul Kareem along with Mary Plomin

20    who is a lawyer with me and John Colvin who is a private

21    investigator working with me.

22              THE COURT:  I'm sorry.  Remember to speak at a

23    microphone so everybody can hear you and that includes me.

24              And I didn't get the last name of your investigator.

25              MR. MAYNARD:  John Colvin.
```

```
 1              THE COURT:  Colvin.

 2              MR. MAYNARD:  Yes.  C-O-L-V-I-N.

 3              THE COURT:  Thank you very much.

 4         Okay.  Turn and face the people here.  Some I think

 5    are blocked by the lectern.  Okay.  Thanks.  Please sit down.

 6         Do any of you know Mr. Maynard, his client

 7    Mr. Kareem, his associate Ms. Plomin, or his investigator

 8    Mr. Colvin?

 9              There is one hand.  We're going to bring you a

10    microphone and you're juror No. 45.

11              Who do you know, No. 45?

12              PANELIST NO. 48:  I'm Juror No. 48.

13              THE COURT:  I'm sorry.  No. 48.

14              PANELIST NO. 48:  I'm Mr. Maynard's neighbor.

15              THE COURT:  You're Mr. Maynard's neighbor.

16              Well, I'm going to excuse you -- I'm going to excuse

17    you from serving as a trial juror in this case.  And I'm not

18    going to ask you whether he's a good neighbor or a bad

19    neighbor but you may be excused at this time.  Thank you very

20    much.

21              PANELIST NO. 48:  All right.

22              THE COURT:  Are there any other hands?

23              I don't see any.  Thank you very much, ladies and

24    gentlemen.

25              At this time I'm going to read you a brief statement
```

1    about the nature of the charges in this case.

2         The United States alleges that the defendant Abdul

3    Malik Abdul Kareem, also known as Decarus Thomas, was involved

4    in a conspiracy to provide material support to the Islamic

5    State of Iraq and the Levant, also known as ISIL and ISIS, a

6    designated foreign terrorist organization.

7         The United States alleges Mr. Kareem conspired with

8    Elton Simpson and Nadir Soofi to provide material support in

9    the form of property, money, service, training, weapons,

10   personnel, and transportation to ISIL via Simpson and Soofi by

11   planning to conduct attacks within the United States, and

12   ultimately, aiding Simpson and Soofi in their attack at the

13   Muhammad Art Exhibit and Contest held at the Curtis Culwell

14   Center in Garland, Texas, on May 3, 2015.

15        The United States alleges Mr. Kareem's

16   co-conspirators Simpson and Soofi drove from Phoenix, Arizona,

17   to Garland, Texas, carrying with them six weapons and

18   approximately 1500 rounds of ammunition to conduct the attack.

19        The United States alleges that Simpson and Soofi

20   drove into the parking lot at the event, got out of their car,

21   and began shooting assault rifles at a security guard and a

22   police officer before both Simpson and Soofi were shot and

23   killed by police officers at the scene.

24        The United States alleges Mr. Kareem encouraged

25   Simpson and Soofi to conduct the attack and knowingly aided

1    Simpson and Soofi in planning the attack by, among or things,

2    providing firearms training and transportation to training,

3    helping them acquire firearms, and providing financial support

4    to them.

5          The United States also alleges Mr. Kareem made a

6    series of false statements during an FBI interview on May 5,

7    2015, including that he did not know in advance that Simpson

8    and Soofi planned to conduct an attack in Garland, Texas, and

9    that he did not know about an event, that is, the Muhammad Art

10   Exhibit and Contest that was to take place in Garland, Texas,

11   on or about May 3, 2015, until after Simpson and Soofi were

12   killed while attempting to conduct the attack on the contest.

13         The United States further alleges that Mr. Kareem was

14   prohibited from possessing firearms because of a prior felony

15   conviction.

16         The United States also alleges that Mr. Kareem was in

17   possession of two firearms on June 10, 2015.

18         Mr. Kareem denies all of the above allegations.

19         Mr. Kareem is charged in the Indictment with five

20   counts.

21         Count 1 charges him with conspiring with Simpson and

22   Soofi to transport firearms in interstate commerce with intent

23   to commit felonies, that is, Murder and Aggravated Assault, in

24   violation of the laws of the State of Texas.

25         Count 2 charges Mr. Kareem with aiding and abetting

1    Simpson and Soofi's act of transporting firearms in interstate

2    commerce with the intent to commit the felonies described

3    above, Murder and Aggravated Assault.

4         Count 3 charges Mr. Kareem with knowingly making

5    material false statements to the FBI during the investigation

6    following the events that occurred in Garland, Texas.

7         Specifically, it alleges Mr. Kareem knowingly made

8    the following false statements:

9         One, that he did not go shooting in the desert with

10   Simpson and Soofi before May 3, 2015;

11        Two, that before May 3, 2015, neither Simpson nor

12   Soofi fired the weapons they used in connection with the

13   attack in Garland, Texas;

14        Three, that Simpson and Soofi did not ask him to

15   participate in an attack of any kind on or before May 3, 2015;

16        Four, that he did not know in advance that Simpson

17   and Soofi planned to conduct an attack in Garland, Texas;

18        And five, that he did not know about an event, that

19   is, the Muhammad Art Exhibit and Contest that was to take

20   place in Garland, Texas, on or about May 3, 2015, until after

21   Simpson and Soofi were killed while attempting to conduct an

22   attack on the contest.

23        Count 4 charges Mr. Kareem with possessing two

24   firearms, a .38 caliber revolver and a 9 millimeter pistol

25   after having been convicted of a felony Aggravated Driving

1    While Under the Influence.

2          Count 5 charges Mr. Kareem with conspiring with

3    Simpson and Soofi to provide material support to ISIL, a

4    designated foreign terrorist organization.

5          Mr. Kareem has entered a plea of not guilty to the

6    charges and is presumed innocent.

7          The United States bears the burden of proving each

8    charge beyond a reasonable doubt.

9          Ladies and gentlemen, have any of you or any of your

10   close family members or close personal friends ever been

11   involved in any way in a case like this?

12         I see no hands.

13         Usually, my first question after reading the

14   statement of the case is to ask you what you have seen, read,

15   or heard about the case.  And I'm not asking you that question

16   because we asked you about the incident in Garland, Texas, in

17   your written questionnaire.

18         Is there anything about the case that I have just

19   described to you that with just that description alone you

20   believe would make it difficult for you to serve as a fair and

21   impartial juror?

22         I see a few hands.  We'll start in the back.  I think

23   I saw two hands in the last row and then there's a hand up

24   front.  So we'll start with the last row first.  There's

25   another hand over here.

1           And could I ask the people in the back, since I can't

2    see all of you, if you would stand when you're answering my

3    questions.  Who's got the microphone?  Juror No. 119.

4           PANELIST NO. 119:  I just do not feel that I could

5    fairly do the trial.

6           THE COURT:  Is there anything more that you can tell

7    me about why you feel that way?

8           PANELIST NO. 119:  Can I approach?

9           THE COURT:  Yes.  You can.  So just -- why don't you

10   hand the microphone to the next person.  We'll get to that

11   person later.  But if you would come up here to the front of

12   the courtroom and counsel can join her and we can get a little

13   bit more information from No. 119.

14      (At sidebar on the record.)

15          THE COURT:  Hold on a second.  Let the lawyers get up

16   where they can hear you.

17          PANELIST NO. 119:  I'm a retired elementary art

18   teacher and that involves children and stuff and I do not feel

19   I could fairly do the trial.

20          THE COURT:  Because that you were an art teacher?

21          PANELIST NO. 119:  Yes.

22          THE COURT:  And you are concerned that perhaps this

23   was a contest the children were involved in?

24          PANELIST NO. 119:  Yes.  And the children could have

25   been hurt and I cannot do that.

1          THE COURT:  Do you have any objection?

2          MR. MAYNARD:  No.

3          MR. KOEHLER:  No.

4          THE COURT:  Thank you very much for your candor and

5   you are excused.

6          PANELIST NO. 119:  Thank you so much.  It's a hard

7   choice to make but I want to be fair.

8          THE COURT:  I agree.  I agree.  Thank you very much.

9   You may be excused at this time.

10      (End of discussion at sidebar.)

11          THE COURT:  And for the record, No. 119 is excused.

12          And I believe there was another person with a hand up

13   in the back.  The gentleman in red, you're juror number --

14          PANELIST NO. 120:  120.

15          THE COURT:  Juror 120.  Yes, sir.

16          PANELIST NO. 120:  My son spent two years in Iraq as

17   a Marine and the stories he brought home --

18          THE COURT:  You're concerned that because of the

19   things that he's told you about his experiences there might

20   make it difficult for you to be fair and impartial?

21          PANELIST NO. 120:  Yes.

22          THE COURT:  Thank you very much, sir.

23          No. 114.

24          PANELIST NO. 114:  I would also like to approach.

25          THE COURT:  Okay.  Come on up.

1      (At sidebar on the record.)

2          THE COURT:  Speak into this microphone as soon as the

3   lawyers get here.  Go ahead.

4          PANELIST NO. 114:  I just feel like as of what I have

5   heard, I wouldn't be fair.

6          THE COURT:  Why do you think that?

7          PANELIST NO. 114:  I don't know.  I just feel like if

8   there is so many things against him that there is something

9   going on.

10          THE COURT:  Well, the government has to prove beyond

11   a reasonable doubt what they have alleged.

12          PANELIST NO. 114:  Uh-huh.

13          THE COURT:  And I will be explaining later to all of

14   the jurors exactly what that means.  These are just

15   allegations that they have made.  And jurors are required to

16   presume an individual is innocent.

17          Do you think that you can't do that?

18          PANELIST NO. 114:  Honestly?  No.

19          THE COURT:  Okay.  Thank you.

20          PANELIST NO. 114:  I'm being very honest.

21          THE COURT:  No.  I appreciate that.  It's very

22   important.

23          PANELIST NO. 114:  I just don't want my opinion to

24   affect somebody's life.

25          THE COURT:  Any objection to excusing 114?

 1          MR. MAYNARD:  No.

 2          MR. KOEHLER:  No.

 3          THE COURT:  Thank you very much.  You are excused at

 4  this time.

 5      (End of discussion at sidebar.)

 6          THE COURT:  For the record No. 114, is excused.

 7          No. 104?

 8          PANELIST NO. 104:  Yes.  Similar to the previous

 9  gentleman, I have two nephews who between them have served six

10  tours in Iraq and Afghanistan and have shared a lot of

11  information with me about those tours.

12          THE COURT:  Thank you very much, sir.

13          Can we hand the microphone up to this lady in the

14  front who had her hand up.  I think it's 129.

15          PANELIST NO. 129:  Can I speak to you up there?

16          THE COURT:  Sure.  No. 129 is going to approach.

17      (At sidebar on the record.)

18          THE COURT:  Speak into this, please.

19          PANELIST NO. 129:  Okay.  The case that -- in

20  Oklahoma I sit through a murder investigation.  My boyfriend

21  at the time was charged with murder.  And they put me -- they

22  had -- and they made me a material witness and they had put me

23  in protective custody.

24          THE COURT:  And you think that that experience --

25          PANELIST NO. 129:  Would make it hard for me to

1    believe what people are saying, yeah.

2         THE COURT:  Is there any objection to 129 being

3    excused?

4         MR. MAYNARD:  No.

5         MR. KOEHLER:  No.

6         THE COURT:  Thank you very much for telling us that

7    and you are excused at this time.

8         PANELIST NO. 129:  Okay.  Thank you.

9      (End of discussion at sidebar.)

10        THE COURT:  Juror 129 is excused.

11        Who was the microphone?  All right.  You are No. 44.

12        PANELIST NO. 44:  No. 44.  May I approach?

13        THE COURT:  Yes, you may.

14        PANELIST NO. 44:  I'm sorry.

15        THE COURT:  No.  No apology.

16      (At sidebar on the record.)

17        THE COURT:  Okay.  Go ahead.

18        PANELIST NO. 44:  I was in the Air Force in 2000 to

19    2004 and I was a part of serving when 9/11 happened and I

20    currently work for the VA.

21        THE COURT:  The DEA?

22        PANELIST NO. 44:  The VA.  And I see a lot of these

23    guys coming back with their wounds and stuff.  I think I can

24    be pretty impartial but I don't think it's fair to the guy if

25    there is somebody that has served and is currently working for

1    the Veterans Affairs and doing that stuff if I'm going to be

2    judging his life.  So I don't think it's fair to him, so I

3    think I might have a subtle bias.

4         THE COURT:  When you say a "subtle bias," what's

5    important here is that you're able to listen to all of the

6    evidence, presume innocence until the government presents all

7    of its evidence, and then hold them to proof beyond a

8    reasonable doubt.

9         PANELIST NO. 44:  Yes.

10        THE COURT:  Can you do that?

11        PANELIST NO. 44:  I could.  I just don't think it's

12   fair to him knowing that there's a former service member that

13   was affected by this and his family.

14        THE COURT:  I understand your concern and we'll find

15   out.

16        PANELIST NO. 44:  I agree.  I just wanted you to know

17   that.

18        THE COURT:  All right.  And Mr. Maynard will

19   communicate with you about that.  Thank you, No. 44.

20        (End of discussion at sidebar.)

21        THE COURT:  And who has the microphone now?

22        Yes, sir.  You're number?

23        PANELIST NO. 41:  Forty-one.

24        THE COURT:  Could you stand so I can see you?  Thank

25   you, sir.

1              PANELIST NO. 41:  My name is Steven --

2         THE COURT:  Don't tell us your name.

3         PANELIST NO. 41:  Ignore that.

4         THE COURT:  For today you're No. 41.

5         PANELIST NO. 41:  Yes.  So anyway, so for about five

6    years now I have been a staunch atheist and anti-religion

7    extremist.  I believe that would heavily affect my decision in

8    the case.

9         THE COURT:  Because of your personal anti-religion

10   feelings?

11        PANELIST NO. 41:  And specifically extremist views.

12        THE COURT:  Okay.  Thank you very much for letting us

13   know that.

14        Were there any other hands over here to my left --

15   yes -- my left.

16        Then to my right I saw at least there's a hand in the

17   front row.  You are juror No. 32.

18        PANELIST NO. 32:  May I approach, Your Honor?

19        THE COURT:  You may, of course.

20      (At sidebar on the record.)

21        THE COURT:  Go ahead, No. 32.

22        PANELIST NO. 32:  I was born in the southern

23   Philippines of a Christian family.  For decades my family has

24   been at war with the Muslims in the southern Philippines.  It

25   was a dirty war, so my brothers and my father was involved in

1    this war and the war continues.

2            So I grew up in that kind of --

3            THE COURT:  So you have -- you're concerned that your

4    feelings about the Muslims in the Philippines would cause you

5    to be biased against an individual who was a Muslim in this

6    country?

7            PANELIST NO. 32:  Yes.

8            THE COURT:  Is there any objection to excusing 32?

9            MR. MAYNARD:  No.

10           THE COURT:  Any objection?

11           MR. KOEHLER:  No.

12           THE COURT:  Thank you very much for your candor, sir,

13   and you are excused.

14       (End of discussion at sidebar.)

15           THE COURT:  Juror No. 32 is excused.

16           You must be No. 33.

17           PANELIST NO. 33:  Yes.  May I approach the bench

18   please?

19           THE COURT:  Yes.  Maybe the lawyers ought to just

20   stay up here.

21       (At sidebar on the record.)

22           THE COURT:  I'm going to ask you to speak into this

23   microphone.

24           PANELIST NO. 33:  I just feel for -- if he's

25   representing ISIS and I being a Christian, I don't feel I can

1    give fair decision.

2         THE COURT:  That is the question the jurors are going

3    to be asked to decide.  Right now all we have are allegations

4    and no evidence to prove any of it.

5         PANELIST NO. 33:  I understand that.  But I feel I

6    wouldn't be able to give an impartial judgment on that.

7         THE COURT:  So you feel that based on just what I

8    read you won't be able to presume the defendant innocent?

9         PANELIST NO. 33:  No.

10        THE COURT:  Any objection to excusing 33?

11        MR. MAYNARD:  No.

12        MR. KOEHLER:  No.

13        THE COURT:  Okay.  Thank you very much for your

14   candor, sir.  You are excused.

15      (End of discussion at sidebar.)

16        THE COURT:  Juror 33 is excused.

17        Is there anyone else who had a hand up on this side

18   of the courtroom?

19        Anyone else in the front?  Where is the microphone?

20        PANELIST NO. 6:  Can I approach?

21        THE COURT:  Oh, sure.  This is Juror No. 6.

22        If the coughing juror wants some water, we have some

23   up here we can give you.

24      (At sidebar on the record.)

25        PANELIST NO. 6:  I do have a brother in Homeland

 1    Security.  He's a special agent.

 2            THE COURT:  Is he here in Phoenix?

 3            PANELIST NO. 6:  No.  He's in Seattle.

 4            THE COURT:  Do you know what his job is.

 5            PANELIST NO. 6:  Just that he's a special agent in

 6    Homeland Security for the federal government.  And also have a

 7    brother-in-law who's an officer in the Navy and another

 8    brother who is an officer in the Air Force.

 9            I also had two cousins killed by drunk drivers and I

10    don't want to go through that again.

11            THE COURT:  So you are concerned that because you

12    know he had that conviction, you know that that causes you to

13    be biased?

14            PANELIST NO. 6:  Yeah.  I don't want to go through

15    that again.  I'm shaking.

16            THE COURT:  Any objection to excusing No. 6?

17            MR. MAYNARD:  No.

18            MR. KOEHLER:  No.

19            THE COURT:  Thank you very much for your candor.  You

20    are excused.

21            PANELIST NO. 6:  Is that the whole five weeks?

22            THE COURT:  Yes.

23        (End of discussion at sidebar.)

24            THE COURT:  No. 6 is excused.

25            Were there any other hands?

1              No. 31.  See the lawyers are up here waiting for you

2    already.

3        (At sidebar on the record.).

4              PANELIST NO. 31:  Currently, I work for the United

5    States Border Patrol and my mission, it's a little bit of a

6    conflict of interest with this case.  I mean, I feel like I

7    wouldn't -- I wouldn't be --

8              THE COURT:  So you think because of your training and

9    that type of interdiction that you do in the Border Patrol.

10             PANELIST NO. 31:  Yeah.  I'm trying to stop what's --

11   you know, weapons of mass destruction and terrorists from

12   coming into the country.  It's part of our mission.

13             THE COURT:  Is there any objection to excusing No.

14   31?

15             MR. MAYNARD:  No.

16             MR. KOEHLER:  No.

17             THE COURT:  Thank you very much, sir.  You may be

18   excused.

19        (End of discussion at sidebar.)

20             THE COURT:  Juror 31 is excused.

21        Any other hands?

22        Okay.  We'll move on to some more questions.

23        Hold on.  I'm just eliminating from my stack the

24   questionnaire answers of the people that have been excused so

25   we can -- it will be more manageable when we get to some

 1    individual questions.

 2            Ladies and gentlemen, you have already read the

 3    witness list, but there were two names that I wanted to bring

 4    to your attention right now and ask you if any of you know

 5    either of these two individuals, both of whom work for the

 6    FBI.

 7            Jennifer Fisher and Cathy Appleton.

 8            Do any of you know or think you might know either of

 9    those two employees of the FBI?

10            I see no hands.  Thank you.

11            Ladies and gentlemen, have any of you ever been a

12    member of a grand jury?

13            I see a couple of hands.  Let's start in the front

14    here with juror No. 51.  Sir, what grand jury were you a

15    member of?

16            PANELIST NO. 51:  Federal grand jury for the District

17    of Western Washington.

18            THE COURT:  And how long ago was that?

19            PANELIST NO. 51:  Two-and-a-half years ago is when I

20    left when I moved here.

21            THE COURT:  How long did you serve?

22            PANELIST NO. 51:  Eleven months.

23            THE COURT:  I always ask grand jurors that so that

24    our five-week trial all of a sudden sounds really short.

25            Sir, do you understand that your function as a member

1    of a grand jury is different from the function you would serve

2    here as a trial juror?

3              PANELIST NO. 51:  I do.

4              THE COURT:  And here you would have to find proof

5    beyond a reasonable doubt before the defendant could be found

6    guilty of any of the crimes that were charged.

7              PANELIST NO. 51:  I understand that.

8              THE COURT:  And would you be able to honor that

9    burden of proof that is different from the burden that the

10   government had before the grand jury?

11             PANELIST NO. 51:  I believe I would.

12             THE COURT:  Thank you very much, No. 51.

13             And was there someone else who has been a member of a

14   grand jury?

15             We're going to go to 85.  And then I see a hand over

16   on the extreme other side.  No. 85?

17             PANELIST NO. 85:  Yes.

18             THE COURT:  And what grand jury did you serve on?

19             PANELIST NO. 85:  I served at the DuPage County Grand

20   Jury in DuPage County, Illinois.

21             THE COURT:  How long ago?

22             PANELIST NO. 85:  It was about 20 years ago.

23             THE COURT:  And for how long did you serve?

24             PANELIST NO. 85:  I served for three months.

25             THE COURT:  And do you also understand the difference

1    between your function here if selected as a trial juror than

2    your function as a member of a grand jury?

3              PANELIST NO. 85:  Yes, Your Honor.

4              THE COURT:  And would you be able to hold the

5    government to the standard of proof beyond a reasonable doubt

6    that's required in a trial?

7              PANELIST NO. 85:  Yes, Your Honor.

8              THE COURT:  Thank you very much.

9              And you are No. 86.

10             PANELIST NO. 86:  Juror 86.  I served on the County

11   Grand Jury for Orange County, Florida, in the late '80s.

12             THE COURT:  For how long did you serve?

13             PANELIST NO. 86:  For three months.

14             THE COURT:  And do you understand the difference in

15   the requirements of proof here in the trial jury than what you

16   had when you served as a grand juror?

17             PANELIST NO. 86:  I do, Your Honor.

18             THE COURT:  And will you be able to apply that burden

19   of proof beyond a reasonable doubt here if selected?

20             PANELIST NO. 86:  Yes, I will.

21             THE COURT:  Thank you very much.

22             Anyone else who has ever served on a grand jury?

23             I see no further hands.

24             Do we have any lawyers who are members of the

25   prospective jury panel?

```
 1              We have one lawyer in the back.  You are juror No.
 2   115?
 3              PANELIST NO. 115:  Yes.
 4              THE COURT:  And do you practice law here in Phoenix?
 5              PANELIST NO. 115:  Yes.
 6              THE COURT:  Do you practice in the area of criminal
 7   law?
 8              PANELIST NO. 115:  A little bit, yes.
 9              THE COURT:  A little bit.
10         If you were selected as a trial juror in this case,
11   would you follow my instructions on the law rather than doing
12   any research on your own or trying to apply what you recall to
13   be the applicable law that governs this case.
14              PANELIST NO. 115:  Yes.  I think so.
15              THE COURT:  Thank you.  Is there anyone else who is a
16   lawyer?
17         How about you might not be a lawyer but you studied
18   law either in law school or perhaps in college?
19              I see a hand.  No. 18.
20              No. 9, could you pass the microphone down the row to
21   No. 18 and then we'll come back to No. 2.
22              PANELIST NO. 18:  Hello.  I did study criminal law in
23   college while studying forensics.
24              THE COURT:  And if selected as a trial juror in this
25   case, will you follow my instructions on the law and not dust
```

1  off your old textbooks to try to figure out what the law is?

2          PANELIST NO. 18:  Yes, I can.

3          THE COURT:  Okay, thank you very much.

4          PANELIST NO. 18:  You're welcome.

5          THE COURT:  And could we pass the microphone right

6  behind you, No. 9, to No. 2.

7          PANELIST NO. 2:  I'm currently in college right now.

8          THE COURT:  And what are you studying that's

9  law-related?

10          PANELIST NO. 2:  Organizational Security Management

11  Degree.  Emphasis on Homeland Security.

12          THE COURT:  Pardon me?

13          PANELIST NO. 2:  Emphasis on Homeland Security.

14          THE COURT:  On Homeland Security.

15          When you said "security," I was thinking "securities"

16  like "investments."

17          PANELIST NO. 2:  No, ma'am.

18          THE COURT:  And so are you studying criminal justice?

19          PANELIST NO. 2:  Yes, ma'am.

20          THE COURT:  Okay.  And if selected as a juror in this

21  case, will you follow my instructions on the law rather than

22  what you learned in class?

23          PANELIST NO. 2:  Yes, Your Honor.

24          THE COURT:  Thank you very much.

25          And was there another hand?  No. 93.

1          PANELIST NO. 93:  Yes.  I studied criminal justice

2     and got a degree for Evidence Technology.

3          THE COURT:  And same question.  Will you follow my

4     instructions rather than what you might recall of what you

5     learned when you studied criminal justice in college?

6          PANELIST NO. 93:  Yes.

7          THE COURT:  Thank you very much.

8          Have any of you, close friends or family members who

9     are lawyers -- there's more to the question than just are

10    lawyers -- and practice in the area of criminal law.  That is,

11    they work for a prosecutor's office, that could be the United

12    States Attorney's Office, an Attorney General's office, a

13    County Attorney or a District Attorney or they work as

14    criminal defense lawyers either in private practice or for a

15    public defenders organization.

16         Do any of you have any close friends or relatives who

17    are either criminal prosecutors or criminal defense attorneys?

18         There's a hand right there in that row and then we'll

19    go on down and get this side and then move over here.

20         You are No. 67?

21         PANELIST NO. 67:  Yes, ma'am.  My brother's

22    girlfriend's son is a lawyer, a criminal lawyer in Florida.

23         THE COURT:  In Florida.  And so do you have much

24    contact with him or hear anything about what he does?

25         PANELIST NO. 67:  No.

 1              THE COURT:  Okay.  Thank you very much.

 2              Let's see.  We have somebody in the second row.  Two

 3      people in the second row and then one person in the first row

 4      of the left side.

 5              PANELIST NO. 44:  I have a cousin in Washington.

 6              THE COURT:  I'm sorry.  No. 44.  I should have said

 7      that for the record.

 8              You have a cousin in Washington?

 9              PANELIST NO. 44:  Yes.  She's a lawyer.

10              THE COURT:  Do you have any particular contact with

11      what she does specifically?

12              PANELIST NO. 44:  No, ma'am.  I haven't spoken with

13      her in a few years.

14              THE COURT:  Okay.  Would you pass the microphone on

15      down to I think 41?

16              PANELIST NO. 41:  Yes, Your Honor.  Me and my

17      brother's friend, he's a practicing lawyer in Phoenix.

18              THE COURT:  Practicing in the area of criminal --

19              PANELIST NO. 41:  Criminal defense.

20              THE COURT:  And do you have any particular contact

21      with him in terms of the types of cases that he handles?

22              PANELIST NO. 41:  No.

23              THE COURT:  Thank you.  Could you hand the microphone

24      to the front row and we'll go to No. 25.

25              PANELIST NO. 25:  I have an uncle, my paternal uncle

1    was a criminal lawyer in Illinois for I don't know how many

2    years.  He's now in Arizona and he has changed his scope and

3    now he's doing -- I don't even know what.  I see him like once

4    a year.

5              THE COURT:  Okay.  Thank you, No. 25.

6              On this side there's a hand in the second and in the

7    third row.

8              PANELIST NO. 56:  My sister-in-law is Assistant

9    Attorney General in the State of Oregon.

10             THE COURT:  And do you and your sister-in-law have

11    conversations specifically about the cases that she

12    prosecutes?

13             PANELIST NO. 56:  No.  Years ago she mentioned -- I

14    don't know if she mentioned anything actually.  No.  I would

15    say no.

16             THE COURT:  Okay.  Thank you.  And I think there is

17    someone behind you.  No. 82.

18             PANELIST NO. 82:  Yes.  I have a cousin and she's

19    also a lawyer and she will be coming to visit me actually in

20    March.

21             THE COURT:  Okay.  Well, if you're on the jury, you

22    won't be able to talk to her about the case.  Okay?  Thank

23    you.

24             Anyone else?  How about in the front?

25             I don't see any other hands.  Thank you.

1          Let me ask you about a couple of other types of

2    occupations.  Do any of you or people close to you have

3    education, training, or employment as private investigators?

4          I see no hands.

5          How about in psychology or psychiatry?

6          I see a couple of hands -- a few hands in the back.

7    Let's go to the lady in green who is No. 69.

8          PANELIST NO. 69:  Yes.  One of our -- the scout moms

9    from our Boy Scout troop is a psychologist.

10         THE COURT:  Okay.  Thank you.  And I think there is

11   someone in the row ahead of you.  No. 46.

12         PANELIST NO. 46:  I have a minor in psychology.

13         THE COURT:  Okay.  Thank you.  Also 45.

14         PANELIST NO. 45:  My oldest sister is a psychology

15   professor.

16         THE COURT:  At where?

17         PANELIST NO. 45:  California.

18         THE COURT:  Thank you.  And I think right behind you

19   there is a lady with a hand.  No. 63.

20         PANELIST NO. 63:  I have a Ph.D. in clinical child

21   psychology.

22         THE COURT:  And is that your area of practice also?

23         PANELIST NO. 63:  Was, yes.

24         THE COURT:  Was?  Are you not practicing psychology

25   anymore?

1          PANELIST NO. 63:  Not having to do with criminal.

2          THE COURT:  Okay.  Thank you very much.

3          Anyone else on this side?  And on the other side,

4    Sanessa, and then we'll come to the front.  We'll go to the

5    lady here on the end who is -- oh, no.  In the first row.  No.

6    39.

7          PANELIST NO. 39:  I'm a special ed teacher so I

8    interact with the school psychologist daily.

9          THE COURT:  Okay.  Thank you very much.

10         And I think the lady at the end of the second row

11   there, No. 50.

12         PANELIST NO. 50:  I have a degree in counseling

13   psychology.

14         THE COURT:  And do you practice at this time?

15         PANELIST NO. 50:  No.

16         THE COURT:  Okay.  Thank you.

17         Anyone else on -- one more hand in the back and then

18   we'll come to the front -- or two more hands.

19         PANELIST NO. 74:  No. 74.  My wife has a bachelor's

20   degree in Psychology and a master's degree in Social Work.

21   She's not practicing right now.

22         THE COURT:  Thank you.  And I think there was one

23   last hand in the very back.

24         No. 99.

25         PANELIST NO. 99:  I have a master's degree in

1    counseling and psychology.  I'm working currently with the

2    reentry program with parolees as well as domestic violence and

3    substance abuse counseling.

4            THE COURT:  Thank you very much.

5            Now we're going to move up front, and No. 135, you

6    have the microphone.

7            PANELIST NO. 135:  Would you like me to stand?

8            THE COURT:  No, because see, I can see you.  It's the

9    people that are back there that I can't see.

10           PANELIST NO. 135:  I just recently took a class of

11   psychology.

12           THE COURT:  Okay.  Thank you.

13           And I think there was some other hands.  The

14   gentleman in front of you.  You are No. 126.

15           PANELIST NO. 126:  And when I went to college, I have

16   a minor in psychology.

17           THE COURT:  Okay.  Thank you.  And there's Juror No.

18   15 -- 18.  Thank you.

19           PANELIST NO. 18:  I'm currently in school for my

20   master's degree in forensic psychology.

21           THE COURT:  Thank you very much.  I missed two

22   people.  Right behind you, No. 8, and then one.

23           PANELIST NO. 8:  No. 8.  My son has a bachelor's in

24   psychology.  He's not practicing though.

25           THE COURT:  Thank you.  And then if you just pass the

1    microphone on down the row to No. 1.

2              PANELIST NO. 1:  My wife is a school psychologist.

3              THE COURT:  Thank you very much.

4              Have any of you had any training or employment in

5    corrections?  I think we just actually heard from someone

6    that's working in reentry programs and we don't have to repeat

7    that information.

8              But there was a hand up about corrections in the

9    back.  Yes, sir?  You're number --

10             PANELIST NO. 95:  No. 95.  I'm currently an officer

11   with the Arizona Department of Corrections.

12             THE COURT:  And what is your location where you work?

13             PANELIST NO. 95:  Hyman Complex SMU-1.

14             THE COURT:  Thank you very much.  And I think there

15   was someone behind you.

16             PANELIST NO. 115:  115 again.  Before I became an

17   attorney, I worked in corrections for five-and-a-half years

18   for the State of Maine.

19             THE COURT:  Thank you very much.

20             Anyone in the front, training or work in corrections?

21             We'll come to 140.  We'll get you the microphone.

22   It's on its way.

23             PANELIST NO. 149:  California State I was working as

24   a nurse for the prisoners.

25             THE COURT:  Okay.  Thank you very much.

1          Any other hands?

2          Do any of you have any education, training, or

3  employment in religion or philosophy?

4          I see a hand over on my right all the way against the

5  wall.  You're Juror No. --

6          PANELIST NO. 102:   102.

7          THE COURT:  Thank you.

8          PANELIST NO. 102:  I did two years in liberal arts

9  with an emphasis on ministry.

10          THE COURT:  And have you ever been employed in

11  ministry?

12          PANELIST NO. 102:  Not as a minister.  I worked for a

13  religious organization as a cook.

14          THE COURT:  But not any longer?

15          PANELIST NO. 102:  No.  Not currently.

16          THE COURT:  Thank you very much.

17          And also in that row there's a hand up.  If you'll

18  pass the microphone to No. 98.

19          PANELIST NO. 98:  I'm an ordained minister although I

20  don't practice.

21          THE COURT:  Thank you very much.

22          Any other hands?  Yes.  128.  We'll give you the

23  microphone.

24          PANELIST NO. 128:  I'm not personally trained, but I

25  am the daughter of a Southern Baptist Sunday school teacher.

```
 1            THE COURT:  Okay.  Thank you very much.

 2            Education, training, or employment in computer or

 3    information technology?

 4            We've got a lot of hands here.

 5            Did we have one more religion and philosophy?  Let's

 6    finish religion and philosophy and then we'll move to

 7    computers and information.  Technology.

 8            PANELIST NO. 76:  I'm called an ordained minister in

 9    the Episcopal church and I'm training to be virtual also, my

10    virtual minister.

11            THE COURT:  Okay.  Thank you very much.

12            Let's start in the front.  Computers and information

13    technology.  Where's the microphone?  Let's see.  We'll start

14    with 128 and then 12 and then we'll go to the back row.

15            PANELIST NO. 128:  I have my AAS in two different

16    networking technologies.  I'm not currently working but I am

17    fully trained.  I'm working on getting my A-plus

18    certification.

19            THE COURT:  What is AAS?

20            PANELIST NO. 128:  Associate's in Applied Sciences.

21            THE COURT:  Thank you very much.  No. 136.

22            PANELIST NO. 136:  No. 136.  I currently run the IT

23    network out at Luke Air Force Base and retired military

24    officer in IT.

25            THE COURT:  Thank you very much.  And 140.
```

 1          PANELIST NO. 140:  I currently do infomatics

 2   education for medical records data for nurses and doctors.

 3          Thank you.  And No. 12.

 4          PANELIST NO. 12:  Yes.  I have a bachelor's of

 5   science in Information Technology in programming.

 6          THE COURT:  And have you worked in that field also?

 7          PANELIST NO. 12:  As a JAVA developer, yes.

 8          THE COURT:  Okay.  Thank you.  No. 5.

 9          PANELIST NO. 5:  I've went to school for computer

10   networking and information technology but not in that field

11   right now.

12          THE COURT:  Okay.  Thank you.  No. 3.

13          PANELIST NO. 3:  I currently work in the IT

14   Department for Dignity Health.

15          THE COURT:  Thank you.  No. 2.

16          PANELIST NO. 2:  I'm currently enrolled in college in

17   cyber technology.

18          THE COURT:  Thank you very much.  No. 1.

19          PANELIST NO. 1:  I have a bachelor's degree in

20   computer science.

21          THE COURT:  Thank you.

22          Let's start right where you are there.  No. 34.

23          PANELIST NO. 34:  I'm a senior database administrator

24   for the Clerk of the Superior Court.  I teach -- I'm a

25   part-time teacher for the University of Phoenix where I teach

 1    JAVA programming.  I'm working right now as a subject matter

 2    expert for Grand Canyon University for their senior project.

 3    And I just got hired also part-time to teach some of their IT

 4    classes.

 5           THE COURT:  Thank you very much.  Who else on this

 6    side?  Okay.  Second row.  Is there somebody else in the first

 7    row?  I'm sorry.  I missed the hand over there.

 8           PANELIST NO. 40:  Juror No.  40.  My career was spent

 9    in the computer field, various positions.

10           THE COURT:  Okay.  Thank you.  Second row.  No. 51.

11           PANELIST NO. 51:  I spent 30 years in the United

12    States Naval Submarine Force as an Electronics Advanced

13    Instructor.

14           THE COURT:  Thank you.  Next row.  No. 74.

15           PANELIST NO. 74:  I'm the Senior Information Services

16    Manager for a large semiconductor company here.

17           THE COURT:  Thank you.  Who is next?  No. 97.

18           PANELIST NO,. 97:  My entire career has been with

19    business information systems.

20           THE COURT:  Thank you.

21           PANELIST NO. 98:  No. 98.  Can I approach please?

22           THE COURT:  Yes.

23       (At sidebar on the record.)

24           PANELIST NO. 98:  I work for American Express and I

25    am the team lead and manager for our vulnerability management

1   program.  I'm in charge of thousands and thousands of servers

2   and hundreds of people and making sure that they do their job

3   and doing patching and all kinds of things like that.

4          THE COURT:  Okay.  Thank you very much.

5       (End of discussion at sidebar.)

6          THE COURT:  No. 113.

7          PANELIST NO. 113:  I'm Juror No. 113.  I work in a

8   small production department working on softwares and servers

9   and configuring routers and gateways for commercial phone

10  systems.

11         THE COURT:  And one more hand on this side.

12         PANELIST NO. 101:  Juror 101.  I own 50 percent of a

13  construction company that builds industrial data transport

14  systems.

15         THE COURT:  Thank you.  And on this side in the first

16  row we'll start with No. 28.

17         PANELIST NO. 28:  I was a computer programmer analyst

18  for 40 years; recently retired.

19         THE COURT:  Thank you, sir.  Who is next?

20         PANELIST NO. 26:  No. 26.  I'm a retired teacher of

21  broadcast media and journalism.

22         THE COURT:  And that involved computers?

23         PANELIST NO. 26:  Much work with the computer.

24         THE COURT:  Okay.  Thank you.  No. 47.

25         PANELIST NO. 47:  (through ASL interpreter)  No. 47.

1    I work with --

2              THE COURT:  Okay.  Hold on.  Stop a minute.  Give the

3    microphone to the interpreter, please.

4              Let's start over.

5              PANELIST NO. 47:  (through ASL interpreter)  No. 47.

6    I work with development and user development tools at a

7    financial service company.

8              THE COURT:  Thank you.

9              PANELIST NO. 45:  No. 45.  I'm the RN Director of the

10   Q Care Infomatics which trains providers and other clinicians

11   on the electronic health record.

12             THE COURT:  Thank you.  No. 41.

13             PANELIST NO. 41:  I have an associate's of applied

14   science, emphasis design.

15             THE COURT:  Thank you.  Who else in the -- on my

16   left?  Any other hands over here?

17             Let me ask just another couple of questions and then

18   we'll take a short break and come back and, hopefully, finish

19   up with the questioning this afternoon.

20             May I see a show of hands.  How many of you or people

21   who live in your home with you own a firearm?

22             Let's try it the other way.  How many of you or

23   people that live with you do not own a firearm?

24             I'd say it's 60/40.

25             For those of you who do own a firearm, how many of

1   you go out and practice shooting it?

2           A whole lot of you.

3           How many of you shoot at a gun club?

4           How many of you when you go practicing go out and

5   shoot outside in some place where it's allowed?

6           Lots.  The answer is "lots."

7           I want to know if any of you have any strong

8   opinions -- obviously, about 60 percent of you own or someone

9   in your home owns a firearm and about 40 percent of you do

10  not.

11          But I want to know if any of you have any strong

12  opinions about the right to own firearms or strong opinions

13  that firearms -- people shouldn't -- in the United States

14  shouldn't be allowed to own firearms?

15          Do any of you feel like you might be an advocate for

16  one position or the other, rather than simply an owner of

17  firearms or someone who doesn't own?

18          So we have several -- I'm just going to call out the

19  numbers of the people -- let me have -- first ask --

20          Do any of you have any strong opinions that firearms

21  should not be able to be owned by people in the United States?

22          Okay.  And I'm not going to follow up.  If the

23  lawyers want to, they can.  And it's juror No. 20 and there

24  was one other hand.  You are No. 100 and also No. 141.  Did I

25  miss anybody?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

1              Okay.  And then the show of hands of those of you who

2    have strong feelings, perhaps to the point of advocacy, about

3    the ownership, the right to have ownership of firearms.

4              And I'm going to call out the numbers:  128, 133,

5    132, 10, 37, 52, 79 -- and the person next to 79?   No. 56?

6              PANELIST NO. 76:  76.

7              THE COURT:  And in the back in red, No. 120.  And

8    next to the gentleman in red, No. 101, 102, and 122.

9              And over here we have 24, 41, 43, 44, 28 -- and now

10   can't see the rest of the numbers.

11             The lady with the blonde hair?

12             PANELIST NO. 64:  64.

13             THE COURT:  And all the way in back?

14             PANELIST NO. 104:  104.

15             THE COURT:  And right in front of that gentleman?

16             PANELIST NO. 88:  88.

17             THE COURT:  And over here.  The gentleman that's

18   closest to me still with the hand up?

19             PANELIST NO. 66:  66.

20             THE COURT:  No. 66, 108, 110, and 94.

21             Thank you very much.

22             Last question and we'll bring this subject to a close

23   and we'll take a short break.

24             Have any of you or someone close to you ever been

25   injured by a firearm?

 1          Okay.  Several hands.  Let's -- do you have the

 2  microphone, No. 9?

 3          Who was the person that was injured?

 4          PANELIST NO. 9:  My father was killed by a firearm.

 5          THE COURT:  How long ago was that?

 6          PANELIST NO. 9:  Thirty years ago.

 7          THE COURT:  Okay.  Thank you very much.

 8          Also No. 12 -- oh.  No. 2 and then 12.

 9          PANELIST NO. 2:  I was deployed to Afghanistan and

10  lost soldier members.

11          THE COURT:  I'm sorry?

12          PANELIST NO. 2:  I was deployed to Afghanistan and

13  had soldiers members that were.

14          THE COURT:  Thank you very much.

15          No. 12 -- no.  I'm sorry.  No. 5 and then 15.

16          PANELIST NO. 5:  I know several people that were

17  killed by firearms.

18          THE COURT:  Thank you.  No. 15.

19          PANELIST NO. 15:  Yes.  I had a very close friend who

20  was killed by a firearm as well.

21          THE COURT:  Thank you.  No. 4 and then we'll go to

22  130.

23          PANELIST NO. 4:  I have a cousin whose husband was

24  killed by a firearm and a brother-in-law who was shot in a

25  hunting accident.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

```
 1            THE COURT:  Thank you very much.
 2            PANELIST NO. 18:  My brother was injured by a firearm
 3   and my brother-in-law was killed by a firearm.
 4            THE COURT:  And you are No. 18?
 5            PANELIST NO. 18:  Yes.
 6            THE COURT:  Thank you.  And in front, No. 141.
 7            PANELIST NO. 141:  I have a close friend that was
 8   killed by a firearm.
 9            THE COURT:  Thank you.  And No. 140.
10            PANELIST NO. 140:  A sister in 1984.
11            THE COURT:  And No. 139.
12            PANELIST NO. 139:  No. 139.  I had a nephew that died
13   by a self-inflicted gunshot wound.
14            THE COURT:  Thank you very much.  No. 135.
15            PANELIST NO. 135:  My cousin was shot.
16            THE COURT:  Thank you.  On this side, my right, let's
17   pass the microphone to No. 79.
18            PANELIST NO. 79:  My father was shot twice on two
19   separate occasions.
20            THE COURT:  Thank you.  Behind you.
21            PANELIST NO. 97:  No. 97.  My uncle, self-inflicted
22   wound.
23            THE COURT:  Thank you.  And I think next to you.
24            PANELIST NO. 98:  No. 98.  My father-in-law committed
25   suicide with a shotgun.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1  2-16-16

1          THE COURT:  Thank you.  Was there anyone else over

2   here?

3          PANELIST NO. 100:  No. 100.  My dad was shot a couple

4   of times and I was deployed to Vietnam and I lost a lot of

5   soldier friends.

6          THE COURT:  Thank you.  And behind you, No. 122.

7          PANELIST NO. 122:  No. 122.  My cousin's daughter

8   shot herself.

9          THE COURT:  Thank you.  And was there another hand

10  over here in the second row, Sanessa.

11         PANELIST NO. 56:  No. 56.   My aunt was killed by a

12  firearm in a hunting accident.

13         THE COURT:  Thank you.  And then we'll move over to

14  the other side in the front row, Sanessa.  No. 29.

15         PANELIST NO. 29:  Over the summer my cousin's firearm

16  went off and he was killed.

17         THE COURT:  Thank you.

18         PANELIST NO. 45:  No. 45.  My father was shot six

19  times over 50 years ago.

20         THE COURT:  Thank you very much.

21         PANELIST NO. 42:  No. 42.  My dad was shot and my

22  ex-husband was killed.

23         THE COURT:  Thank you.  Other hands on my left?

24  There's, I think, two more.

25         PANELIST NO. 89:  No. 89.  One of my good friends was

1     shot as was the rest of the party.

2              THE COURT:  Thank you.  And also behind you.

3              PANELIST NO. 104:  No. 104.  My step-brother was

4     killed by a firearm.

5              THE COURT:  Thank you very much.  Okay.  There's

6     actually two more hands.

7              Yes.  You are No. 103?

8              PANELIST NO. 103:  No. 103.  I was shot at in my 20s.

9              THE COURT:  You were shot at?

10             PANELIST NO. 103:  Yes.

11             THE COURT:  Thank you.  And, luckily, they missed.

12             PANELIST NO. 103:  Yes.

13             THE COURT:  There is one other gentleman in the third

14    row, Sanessa.

15             PANELIST NO. 67:  Juror No. 67, Your Honor.

16             THE COURT:  Could you take the microphone?  Thank

17    you, No. 67.

18             PANELIST NO. 67:  Yes, ma'am.  Juror No. 67.  My son

19    killed himself a couple years ago.

20             THE COURT:  Thank you very much.

21             So we're going to take a short break so you can

22    stretch your legs and use the restrooms.  I think there's

23    multiple restrooms on this floor.

24             When you come back, please take the same seats that

25    you're presently occupying.  On the recess do not discuss the

 1    case among yourselves or with anyone else or any of the

 2    questions.

 3            This is Courtroom 502 for when you come back in.

 4            Thank you.  And let's do this as quickly as possible.

 5    I know there's a lot of you but let's try to be back by 3:30.

 6       (Recess taken at 3:12 p.m.; resumed at 3:34 p.m.)

 7            THE COURT:  Thank you, ladies and gentlemen.  Please

 8    sit down.  The record will show the presence of the

 9    prospective jurors, counsel, and the defendant.

10            We have secured a third microphone, so we'll see if

11    that helps speed things up a little bit.

12            I have one more firearms question.  Do any of you

13    consider yourselves a firearms expert?

14            I see no hands.  Thank you.

15            Ladies and gentlemen, I want to know if any of you

16    are presently employed in law enforcement.

17            A couple of hands.  We'll come to the front and then

18    we'll go to the gentleman in the back.  No. 27.

19            PANELIST NO. 27:  No. 27, Your Honor.  May I

20    approach?

21            THE COURT:  You may.

22       (At sidebar on the record.)

23            THE COURT:  Thank you.  I'll ask you to speak into

24    this microphone, please.

25            PANELIST NO. 27:  Okay.  No. 27.  I'm current

1   employed at the Department of Homeland Security at the ICE

2   Detention Facility.  I'm not a law enforcement officer.  I

3   manage the contract for the facility for the transportation

4   and security officers.  I just basically make sure the

5   detainees are cared for, their health and welfare, the

6   detainees at the facility.

7           THE COURT:  Are you a certified law enforcement

8   officer?

9           PANELIST NO. 27:  Not exactly.  I'm covered under law

10  enforcement coverage, but I don't carry a badge.  I don't have

11  a weapon.

12          THE COURT:  Okay.

13          PANELIST NO. 27:  I'm unarmed.

14          THE COURT:  Thank you, sir.

15      (End of discussion at sidebar.)

16          THE COURT:  And the gentleman on my right, No. 95.

17          PANELIST NO. 95:  As previously stated, I'm an

18  officer with the Arizona Department of Corrections.

19          THE COURT:  And you did.  Thank you very much.

20          Any other current employment in law enforcement?

21          Okay.  Prior employment in law enforcement?

22          Okay.  Let's start with 133.  Where is our

23  microphone?

24          PANELIST NO. 133:  I was employed 30 -- well, I'm

25  sorry -- 20 years with the Aurora Colorado Police Department.

1              THE COURT:  How long have you been retired from the

2     police department?

3              PANELIST NO. 133:  Just about two years now.

4              THE COURT:  And what was your job when you worked for

5     the Aurora Police Department?

6              PANELIST NO. 133:  I was a commissioned officer.  The

7     last 17 years I was a felony filing detective.

8              THE COURT:  Thank you very much, sir.

9              Okay.  We'll go over to No. 62.

10             PANELIST NO. 62:  I worked for the Transportation

11    Security Administration from 2002 to 2007 at Sky Harbor

12    Airport.

13             THE COURT:  Thank you, sir.

14             Anyone else with prior law enforcement experience?

15             Ladies and gentlemen, witnesses of different sexual

16    orientations may testify in this case.  Would an individual's

17    sexual orientation affect your ability to fairly and

18    impartially consider that person's testimony?

19             I see no hands.  Thank you.

20             And that leads me to another important question.  In

21    deciding the facts of this case, the jury will be required to

22    evaluate the testimony of each witness for both accuracy and

23    truthfulness.  It is very important that every witness has the

24    same opportunity to convince you that their testimony is the

25    accurate and truthful testimony.

 1          And one of the things that we did in the

 2   questionnaires was to ask if you knew any of the people who

 3   were witnesses in this case, because people that you know, you

 4   likely have formed some opinion about whether they're people

 5   that are honest, whether they're people that have a good

 6   memory or a bad memory, whether they're the kind of people

 7   that can accurately relate things that happened in the past or

 8   are forgetful of details or perhaps exaggerate their details.

 9          And so we make sure in a trial that everyone who

10   comes to the witness stand is someone you will be meeting for

11   the first time when they testify.

12          And presumably, it is through their testimony, their

13   direct and cross-examination, that you decide whether that's

14   the witness that is giving the most accurate and truthful

15   version of events that different witnesses may testify about

16   differently.

17          And so the question I'm going to ask you is whether

18   you'll be able to judge each witness's testimony by applying

19   the same standards or same rules for accuracy and

20   truthfulness.  And that's a hard question to answer in the

21   abstract,  so I'm going to give you a couple of examples to

22   think about.

23          In this case there will be many witnesses who are

24   employed in law enforcement.  There will be many who are not.

25   Many who are civilians.

1        Would you give more weight or less weight to the

2    testimony of a law enforcement officer than you would give to

3    the weight of a non-law enforcement officer based solely on

4    the fact that one of them is employed in law enforcement and

5    the other is not?

6        Another possible example that you read about in your

7    questionnaire that there may be people in this trial who

8    testify that are of the Muslim faith and people who testify

9    that are of some other faith.

10        Would you give more weight or less weight to the

11    testimony of a witness because of their religious beliefs than

12    you would to someone who held different religious beliefs?

13        So is there anyone -- just using those two

14    examples -- who thinks that they will not be able to judge the

15    testimony of each witness who comes before you to testify at

16    this trial applying the same standards for accuracy and

17    truthfulness.

18        We'll start with No. 128.

19        PANELIST NO. 128:  May I approach?

20        THE COURT:  Yes, you may.

21    (At sidebar on the record.)

22        THE COURT:  I'm going to ask you to speak into this

23    microphone as soon as the lawyers get here.  Go ahead.

24        PANELIST NO. 128:  My issue is if it's a female

25    Muslim, since they cover their face, I'm --

1          THE COURT:  Oh, you're concerned if you can't see the

2    witness?

3          PANELIST NO. 128:  Yes.

4          THE COURT:  That's a fair question.  Are there any

5    witnesses who will not be able to be seen?

6          MR. KOEHLER:  No.

7          THE COURT:  Okay.  Does that satisfy you?

8          PANELIST NO. 128:  Yes.

9          THE COURT:  Okay.  That was easy.  Thank you very

10   much.

11      (End of discussion at sidebar.)

12          THE COURT:  Do you mind if I relate that to the rest

13   of the jurors?

14          PANELIST NO. 128:  No, I don't mind.

15          THE COURT:  Because it was something that I hadn't

16   thought of.  And what juror No. 28 raised at the sidebar was

17   that she was concerned that if there was a female who

18   testified that was a Muslim that may wished to have her face

19   covered, that that might affect the ability of the juror to

20   assess their credibility.

21          And I think that's a legitimate concern, but I have

22   been assured by both sides that there will be no witnesses who

23   testify during this trial that will be attempting to obscure

24   their faces in any way.

25          So is there anyone who thinks that they might have a

1    bias that would cause them to either believe or disbelieve a

2    witness based solely -- not even before you met them --

3    because of the nature of their employment, the nature of their

4    religion, the nature of their sexual orientation?

5              There's a hand in the back.  Juror No. 95.

6              PANELIST NO. 95:  May I approach?

7              THE COURT:  Yes.

8         (At sidebar on the record.)

9              THE COURT:  I'm going to ask you to speak into this

10   microphone as soon as one more lawyer gets here.  Go ahead.

11             PANELIST NO. 95:  Working in the field of

12   corrections, being surrounded by just officers and inmates,

13   I'm more inclined to accept the word -- sorry -- accept the

14   word of a state employee over that of anybody else around me

15   just because it has been engrained in me on everyday worklife.

16             THE COURT:  Well, I understand that and that inmates

17   kind of --

18             PANELIST NO. 95:  And I know inmates are different

19   than other people.

20             THE COURT:  But you are concerned because of your

21   training?

22             PANELIST NO. 95:  Right.

23             THE COURT:  That that might cause you to believe law

24   enforcement over anybody else?

25             PANELIST NO. 95:  Yes.

1          THE COURT:  Okay.  Is there any objection to excusing

2     No. 95?

3          MR. MAYNARD:  No.

4          MR. KOEHLER:  No.

5          THE COURT:  Thank you very much.  Juror 95, you are

6     excused.

7       (End of discussion at sidebar.)

8          THE COURT:  No. 95 is excused.

9          Were there any other hands?

10          Thank you very much.

11          Do any of the prospective jurors hold the belief that

12     Islam -- and that is Muslims, not Islamic State or some

13     organization -- but Islam, the religion, endorses violence to

14     a greater or lesser extent than other religions?

15          No. 10.

16          PANELIST NO. 10:  May I approach?

17          THE COURT:  Yes.

18       (At sidebar on the record.)

19          PANELIST NO. 10:  I guess I actually do because of

20     the fact that there are so many things that are going on.  I

21     do believe that there are quite a few of the Muslim people

22     that feel that it's -- that it's -- that it -- that they are

23     allowed to use harsher types of violence.

24          THE COURT:  This question, obviously, there are

25     individuals who feel that way.  This question really only goes

1    to whether you think that the religion.

2           PANELIST NO. 10:  Well, I think that there is part of

3    that religion that does.

4           THE COURT:  Okay.

5           PANELIST NO. 10:  Even though it's not maybe that the

6    whole religion, but I believe that maybe part of that religion

7    does.  So that makes it a little iffy and I don't know if I

8    can be fair in looking at it the more I think about it.

9           THE COURT:  Is there any objection to excusing No.

10   10?

11          MR. MAYNARD:  No.

12          MR. KOEHLER:  No.

13          THE COURT:  Thank you very much for your candor and

14   you are excused No. 10.

15      (End of discussion at sidebar.)

16          THE COURT:  No. 10 is excused.

17      Were there any other hands?

18      Do any of you have any negative feelings or negative

19   opinions about Muslims generally?

20      I see no hands.  Thank you.

21      Do any of the prospective jurors have any specific

22   problems with concentration or dealing with stress or

23   pressure?

24      I see no hands.  Thank you.

25      Ladies and gentlemen, in deciding the facts of this case,

1    you will be -- well, in reaching a verdict in this case, you

2    will be required to decide the facts and then you will be

3    required to apply the law.

4        I will give you what the law is as it applies to the

5    charges in this case in written instructions, written

6    instructions that will be provided to you, but which I will

7    also read out loud to you in open court.

8        I want to know whether any of you believe you would be

9    unable to follow the law that I will provide to you in these

10   instructions, disregarding your own notions or ideas about

11   what the law is or should be?

12       I see no hands.

13       If selected as a juror on this case, would any of you be

14   either unable or unwilling to render a verdict and base that

15   verdict solely on the evidence that will be presented at

16   trial?

17       I see no hands.

18       The law requires the government to prove the defendant

19   guilty beyond a reasonable doubt.  The defendant is presumed

20   by law to be innocent.  This means the defendant is not

21   required to prove his innocence or to produce any evidence.

22       A defendant in a criminal case has a constitutional right

23   not to testify.  The exercise of that right cannot be

24   considered by the jury in determining guilt or innocence.

25       Is there anyone who does not understand these principles

 1    of law that I have just stated?

 2        Do any of you disagree with them or think they should not

 3    be the law?

 4        And there were no hands in response to those two

 5    questions.

 6        The presumption of innocence and the government's

 7    requirement to prove guilt beyond a reasonable doubt are

 8    probably the two most important things that the jury needs to

 9    be mindful of during the course of the trial.

10        I have told you that the government has charged the

11    defendant with five different crimes and I described them to

12    you.

13        I told you that the defendant has pled not guilty.  No

14    evidence has been presented in this case yet.  That means the

15    defendant is presumed innocent and that presumption of

16    innocence must remain with the defendant until all the

17    evidence is presented in the case, the jury deliberates, and

18    only then could the jury decide that the presumption is lost

19    and that the defendant is guilty upon determining that the

20    government has proved guilt beyond a reasonable doubt.

21        Do any of you feel that you cannot honor the presumption

22    of innocence and require the government to prove guilt beyond

23    a reasonable doubt?

24        I see no hands.  Thank you.

25        Okay.  I'm going to stop talking for a little while and,

1    instead, I'm going to ask the prospective jurors to talk a

2    little bit about themselves.  I'm going to bring up this easel

3    that's blank, but it's not going to be for long.

4        These are just some general questions about yourselves.

5    And I'm going to add a couple of additional questions.  But

6    I'm not going to ask you to remember what they are.  I will

7    ask them of you as you answer these questions in turn.

8        So let's give the microphone to Juror No. 1.

9        And we're going to do the front and then we'll do one side

10   and then we'll do the other.  We're not going to try to go in

11   numerical order.  It will be too complicated because we have

12   all these people in the 130s in the front.

13       So, No. 1, could you please tell us a little bit about

14   yourself.

15           PANELIST NO. 1:  I'm married.  I have two children.

16   How do you want the question of employment answered?

17           THE COURT:  I'm sorry?

18           PANELIST NO. 1:  What type of response are you

19   looking for in the employment?

20           THE COURT:  Tell us what you do for a living.  You

21   don't have to tell us who you work for but what your

22   occupation or profession is; what you do for a living?

23           PANELIST NO. 1:  Currently, I find compliance to

24   aviation regulations.

25           My spouse is a school psychologist.  I have no prior

1   military service and I was on a civil jury case.

2           THE COURT:  Was that here in federal court or was it

3   in state court?

4           PANELIST NO. 1:  It was in county court.

5           THE COURT:  Thank you.  Two other questions.  What is

6   the highest formal education level you have completed?

7           PANELIST NO. 1:  I have a bachelor's degree.

8           THE COURT:  And in what field?

9           PANELIST NO. 1:  Computer science.

10          THE COURT:  And has your spouse, children, or

11  grandchildren served in any branch of the military?

12          PANELIST NO. 1:  No.

13          THE COURT:  Thank you.  I think those were the only

14  two supplemental questions.  Okay.  Thank you.

15          No. 2.

16          PANELIST NO. 2:  I'm divorced.  No children.  I don't

17  have a job right now.  I'm in college full time.  Prior

18  service, veteran, combat veteran.  And I have never done jury

19  service.  This is my first time.

20          THE COURT:  Did your former spouse serve in the

21  military?

22          PANELIST NO. 2:  No, ma'am.

23          THE COURT:  Okay.  Thank you.  Oh, and you're in

24  school right now studying for a bachelor's degree; is that

25  correct?

1           PANELIST NO. 2:  Correct.

2           THE COURT:  Remind us again.  In what field?

3           PANELIST NO. 2:  I'm a senior right now.  I lack nine

4    more months in Organizational Security Management Degree,

5    emphasis Homeland Security.

6           THE COURT:  Thank you.  No. 3.

7           PANELIST NO. 3:  No. 3.  I am divorced with two

8    children.  I work in information technology for healthcare --

9    in healthcare.  I was in the military.  I served in the Air

10   Force.  And I do not have any prior jury.

11          THE COURT:  When you served in the Air Force, for how

12   many years and what was your rank upon discharge?

13          PANELIST NO. 3:  Upon discharge I was an E-4 and five

14   years.

15          THE COURT:  Did you serve in any countries other than

16   the United States?

17          PANELIST NO. 3:  Yes.

18          THE COURT:  Where?

19          PANELIST NO. 3:  In Germany.

20          THE COURT:  And do either of your children -- are

21   either of your children in the military?

22          PANELIST NO. 3:  No.

23          THE COURT:  And what is your highest level of formal

24   education?

25          PANELIST NO. 3:  High school.  Went directly into the

1    military after that.

2         THE COURT:  Thank you.  No. 4.

3         PANELIST NO. 4:  I am married.  I have two children.

4    I am a private specialist for a semiconductor company.  My

5    spouse is retired.  My son was in the military.  He was a

6    Marine.  And I have had prior jury service, both civil and

7    criminal.

8         THE COURT:  And the criminal case?

9         PANELIST NO. 4:  It was a murder trial.

10        THE COURT:  And what was the jury's verdict?

11        PANELIST NO. 4:  Guilty.

12        THE COURT:  And what is your highest level of formal

13   education?

14        PANELIST NO. 4:  Little college but no degree.

15        THE COURT:  Thank you very much.

16        No. 5.

17        PANELIST NO. 5:  Single.  I have two kids under the

18   age of 18; my daughter is 16 and my son is 22-and-a-half

19   months.  I currently work as a subrogation specialist.  No

20   military experience and no prior jury service.

21        THE COURT:  And what is your highest level of formal

22   education?

23        PANELIST NO. 5:  Some technical school but no degree.

24        THE COURT:  Thank you very much.  No. 7.

25        PANELIST NO. 7:  I'm married.  Three children all

1   over the age of 18.  My wife and I are both retired.  I was in

2   the Army.  I attained the rank of E-5.  I was a Russian

3   linguist and I was stationed in Turkey.  And I have no prior

4   jury service.

5           THE COURT:  What did you do before you retired and

6   after you got out of the service?

7           PANELIST NO. 7:  I was involved in the family

8   furniture business.  I also was self-employed for a while as

9   an accounting consultant.  And I -- after I retired, I spent

10   some time driving a medical van.

11           THE COURT:  And are any of your children,

12   grandchildren, or was your spouse in the military also?

13           PANELIST NO. 7:  No.

14           THE COURT:  And what did your wife do before she

15   retired?

16           PANELIST NO. 7:  She was also in the furniture

17   business.

18           THE COURT:  And your highest level of formal

19   education?

20           PANELIST NO. 7:  Bachelor of science.

21           THE COURT:  In what field?

22           PANELIST NO. 7:  Management information systems.

23           THE COURT:  Thank you very much.  No. 8.

24           PANELIST NO. 8:  I'm divorced.  I have two adult

25   children.  I work as an examiner for a title company.  I have

1   no prior military service.  My son is currently a Second

2   Lieutenant in the Army.  I served on a jury.  It was through

3   the Superior Court.  It was a DUI case.

4          THE COURT:  What was the verdict?

5          PANELIST NO. 9:  Guilty.

6          THE COURT:  What is your highest level of formal

7   education?

8          PANELIST NO. 9:  I have a bachelor's in business

9   management.

10         THE COURT:  Thank you very much.

11         Let's give the microphone to No. 19.

12         PANELIST NO. 19:  I'm unmarried.  I have one child.

13         THE COURT:  Could you hold the microphone closer?

14         PANELIST NO. 19:  No. 19.  I'm unmarried.  One child.

15   I'm retired.  I have no military service.  And I have no prior

16   jury service.

17         THE COURT:  What did you do before you retired?

18         PANELIST NO. 19:  I was an executive assistant.

19         THE COURT:  What is your highest level of formal

20   education?

21         PANELIST NO. 19:  Some college.  No degree.

22         THE COURT:  And has your -- you said you had one

23   child.  Does that child have any military service?

24         PANELIST NO. 19:  No.

25         THE COURT:  Thank you very much.  No. 18.

 1          PANELIST NO. 18:  No. 18.  I'm married.  I have three

 2     biological children, four stepchildren; ages 16, 16, 14, 13,

 3     13, 11, and 8.  I'm currently a student.  My husband, he works

 4     with windows -- building windows.  No military service and I

 5     have never served on a jury.

 6          THE COURT:  And what are you studying?

 7          PANELIST NO. 18:  I'm studying my associate's in

 8     science for forensics and now I'm studying forensic

 9     psychologist.

10          THE COURT:  And does your husband have any military

11     service?

12          PANELIST NO. 18:  No, he does not.

13          THE COURT:  Thank you very much.  No. 15.

14          PANELIST NO. 15:  No. 15.  I'm married.  I have two

15     kids, 5 and 7.  I'm a stay-at-home mom.  My husband is an

16     engineering technician for a computer company.  Neither of us

17     have military service.  And I have no prior jury service.  And

18     I have an associate's degree in business.

19          THE COURT:  Thank you.  No. 13.

20          PANELIST NO. 13:  No. 13.  Single.  No children.  I'm

21     a claims analyst for a financial institution.  No military

22     service.  No prior jury service.  And I have an associate's in

23     accounting.

24          THE COURT:  Anybody in the military?

25          PANELIST NO. 13:  No.

```
 1              THE COURT:  Thank you.  No. 12.

 2              PANELIST NO. 12:  Juror 12.  I'm single.  No

 3   children.  Currently unemployed.  No military service.  No

 4   jury service.  I have a bachelor's in information

 5   technologist.

 6              THE COURT:  No. 11.

 7              PANELIST NO. 11:  I'm married.  Two adult children.

 8   I'm a retired librarian.  My spouse is an R.N.  Myself and --

 9   I have no family members that are in the military.  Two

10   different juries; one for DUI and one for a murder trial with

11   a hung jury for the one and the other one I was just an

12   alternate, so they were supposed to get us the verdict but I

13   don't know what it was.

14              THE COURT:  Which one was the hung jury?

15              PANELIST NO. 11:  The hung jury was for the DUI

16   trial.

17              THE COURT:  And for the other you were the alternate

18   and did not deliberate?

19              PANELIST NO. 11:  Correct.

20              THE COURT:  And military service?

21              PANELIST NO. 11:  None for me or my spouse.

22              THE COURT:  Okay.  Thank you.  No. 9.

23              PANELIST NO. 9:  I'm married and we have two adult

24   children.  I'm a registered nurse but retired.  My husband is

25   also retired.  He was a steelworker in Indiana.  Then we moved
```

1    to Arizona.  And then he worked for Gilbert school systems.

2    And he doesn't have any military service and neither do I.  I

3    did have -- let's see.  We were -- I was on a criminal trial

4    and it was guilty for Attempted Murder.  And neither of us

5    have any military service.

6         THE COURT:  And your highest level of formal

7    education?

8         PANELIST NO. 9:  It was a registered nurse.

9         THE COURT:  Okay.  Thank you very much.

10        I want to go back to No. 8 for just a moment based

11   on -- you had something in your questionnaire that I wanted to

12   cover with you while -- before we moved too far off.

13        You stated in your questionnaire that your employer

14   only pays for ten days of jury duty and that the remainder

15   would be unpaid or paid time off and that you might have

16   enough paid time off.

17        This is what I want to say to you that it would be

18   very generous of you to use your paid time off to serve as a

19   juror, but we certainly do not want you to use your vacation

20   time unless you have so much that you don't need it for

21   vacationing.

22        PANELIST NO. 8:  I always need vacation.

23        THE COURT:  To serve as a juror.

24        And obviously, we are going to have more than ten

25   trial days.  And we do not want to create a financial hardship

 1   on anyone.  So I didn't want to leave this subject without

 2   hearing what your feelings are about serving either in an

 3   unpaid capacity or using time that's paid that you do not have

 4   to use.

 5          PANELIST NO. 8:  I want to do my duty.

 6          THE COURT:  Okay.

 7          PANELIST NO. 8:  I don't mind serving.  I probably

 8   have enough PTO time to do it.

 9          THE COURT:  Okay.  Well, we really appreciate that.

10   Thank you very much.

11          Okay.  Now, let's -- since the microphone is all the

12   way down there, why don't we go to No. 141 and then we'll come

13   back this way.

14          PANELIST NO. 141:  I'm 141.  I'm single.  I have one

15   child, four months.  I am a new car inspector for Union

16   Pacific.  And I have no military service and I have never been

17   on a jury.

18          THE COURT:  And what is your highest level of formal

19   education?

20          PANELIST NO. 141:  I have my associate's degree.

21          THE COURT:  And in what field?

22          PANELIST NO. 141:  Recording engineering.

23          THE COURT:  Thank you very much.  No. 140.

24          PANELIST NO. 140:  No. 140.  I'm married.  I have

25   four children under the age of 18.  I currently work in the

1    Infomatics Department for nurses and doctors.  My spouse is an

2    R.N.  I had a two-year stint in the Philippines, Navy U.S.

3    Reserve, as a medic.  No prior jury service.

4            THE COURT:  What is your highest level of formal

5    education?

6            PANELIST NO. 140:  Six months away from my master's.

7            THE COURT:  In what field?

8            PANELIST NO. 140:  Nursing.

9            THE COURT:  Thank you very much.

10           PANELIST NO. 139:  Juror 139.  I'm married.  I have

11   three adult children.  High school, no college.  I'm not

12   working.  I'm a homemaker.  I used to time running events.  He

13   works for a large company in research and development.

14   Neither of us were in the military.  And I have not served on

15   a jury.

16           THE COURT:  And are any of your children in the

17   military?

18           PANELIST NO. 139:  No.

19           THE COURT:  Okay, thank you very much.

20           PANELIST NO. 137:  I'm juror 137.  I'm married.  I

21   have two adult children.  I'm a retired teacher.  My husband

22   is a retired nurse.  He has had prior military service in both

23   the Air Force and the Army.  And I have had no prior jury

24   service.  My highest degree of education is a master's degree

25   in education.  My husband has a master's in nursing.  I think

1   that did it.

2        THE COURT:  Thank you very much.  No. 136.

3        PANELIST NO. 136:  I'm juror 136.  I'm married.

4   Three children; one is 17.  I'm employed in IT.  My spouse is

5   a homemaker.  I'm a retired Air Force Major.  Do you want me

6   to do the laundry list of where I have been?

7        THE COURT:  Outside the United States.

8        PANELIST NO. 136:  Korea, Singapore, Philippines,

9   Germany, Italy, Afghanistan, Qatar, Bahrain, and Saudia

10  Arabia.

11       Do I get a star for that, knowing all of those?

12       I have no prior jury experience and I have my MBA.

13       THE COURT:  In what field?

14       PANELIST NO. 136:  Business.

15       THE COURT:  Thank you.

16       PANELIST NO. 135:  I'm Juror 135.  I'm single.  I

17  have a five-year-old.  I'm a fraud detection analyst.  No

18  military service and I was dismissed from my last attempted

19  prior jury service, I guess.  My highest level of education is

20  college and I'm still trying to obtain my degree.

21       THE COURT:  You are still working on it.  And what's

22  your major?

23       PANELIST NO. 135:  I want to be an ultrasound

24  technician.

25       THE COURT:  Thank you very much.

1            PANELIST NO. 134:  No. 134.  I'm divorced.  Two adult

2    children.  I'm a registered nurse.  I served in the Air Force

3    as a medic.  I was on one prior jury.  It was a DUI.  I think

4    it was about six or seven years ago.  My highest degree is a

5    bachelor's of science.  And none of my relatives have been in

6    the military.

7            THE COURT:  Okay.  Thank you very much.  No. 133.

8            PANELIST NO. 133:  Yes.  I have been married 40

9    years.  I have two grown children.  My son served six years in

10   Army Special Forces.  I currently work at the Home Depot.  I

11   have a master's in public administration.  My wife is a

12   retired lab tech.  I served in the Air Force as a Staff

13   Sergeant, worked on aircraft avionics and then became a

14   captain and worked in space operations.

15           The oversea service I did was mostly Europe but some

16   in Africa, Ethiopia, the Congo.  The only jury service I did,

17   oddly enough, was a court-martial panel in the Air Force.  I

18   found a guy guilty of child abuse.

19           THE COURT:  Thank you very much.  Juror No. 132.

20           PANELIST NO. 132:  Juror 132.  I'm divorced for over

21   20 years.  No children.  I'm a retired insurance claims

22   examiner.  As a matter of fact, I was in your courtroom about

23   20 years ago.  No military service.  And I have served on a

24   jury twice, both criminal cases; one was a conviction, one was

25   a hung jury.

1          THE COURT:  And the conviction was for what crime, do

2   you recall?

3          PANELIST NO. 132:  Aggravated driving.

4          THE COURT:  Aggravated DUI?

5          PANELIST NO. 132:  Yes.

6          THE COURT:  Thank you.  Highest level of formal

7   education?

8          PANELIST NO. 132:  Bachelor's degree in political

9   science.

10          THE COURT:  Thank you very much.  Juror No. 131.

11          PANELIST NO. 131:  I'm Juror 131.  I've been in a

12  domestic partnership for seven years.  I don't have any

13  children.  I work in the Department of Public Health with

14  Maricopa County.  My spouse is employed as an academic advisor

15  for an out-of-state University.  I don't have any military

16  service, no prior jury service, and I have completed practical

17  nursing through a technical school.

18          THE COURT:  Thank you very much.  And No. 126.

19          PANELIST NO. 126:  No. 126.  Yes.  I'm married.  My

20  wife and I hit our 50th year last month.

21          THE COURT:  Congratulations.

22          PANELIST NO. 126:  We have three adult children and

23  we have been employed for years.  I had two different jobs

24  most of my life; one was a Department of Defense for my last

25  18 years with the Defense Contract Administrative Services as

 1   a Quality Assurance Representative in Wisconsin.  And prior to

 2   that I was with the Department of Army for about five years as

 3   an Administrator in Reserve Centers.  And prior to that I was

 4   with the Post Office a couple years.  And I also spent almost

 5   29 years along the way in Army Reserves.

 6          And I had been in -- I forget 10 or 11 different

 7   units.  My highest rank was Sergeant Major in the Intel

 8   Department of Madison Group Headquarters and Command Sergeant

 9   Major Acting.  And I retired in one job in '97 and the other

10   in '98.  My spouse has worked part-time while having children

11   and locations and duties, it would take forever on the

12   military service.

13          THE COURT:  We do have forever.

14          PANELIST NO. 126:  Sometimes I do.  But anyway, prior

15   jury service, I was in two of them in Wisconsin; one was a car

16   accident, a lady had her neck hurt, and the other was a child

17   being molested.

18          THE COURT:  Were the verdicts guilty or not guilty or

19   a mix of the two?

20          PANELIST NO. 126:  Guilty in both -- no.  No.  No.

21   Wait.  No.  The child molester was guilty and the lady that

22   said she got hit in the neck by a car accident, the last thing

23   they saw was a -- that we saw was a movie showing that she had

24   been playing golf the day before and tennis and no one was

25   hurt and she, you know, just lied.

1        THE COURT:  What is your highest level of formal

2   education?

3        PANELIST NO. 126:  I have a bachelor's and a whole

4   lot of credits toward my master's.

5        THE COURT:  In what field?

6        PANELIST NO. 126:  Well, I could get equivalency in

7   management, but I didn't want to pay the 1500 bucks for it.

8   And I have hundreds and hundreds of credit hours in the

9   Department of Defense and Department of the Army and some

10   other ones.

11        THE COURT:  Thank you, sir.  No. 128.

12        PANELIST NO. 128:  I'm No. 128.  I'm single.  No

13   children.  I'm currently unemployed though I am trained to

14   repair so, I do some freelance repairs for my family

15   computers.  I personally have not served in the military, but

16   I am a Navy brat from 20 years.  And my brother was a

17   reservist.  Prior service, I was called four times, never was

18   chosen.  My highest education is a dual AAS in Cysco and

19   Microsoft.

20        THE COURT:  Okay.  Thank you very much.  And in the

21   back, let's start in the first row with No. 29.

22        PANELIST NO. 29:  I'm married.  I have four children;

23   21, 18, and twins that are 13.  I work part-time.  My husband

24   is a superintendent.  We have no military service and no prior

25   jury service.

1          THE COURT:  Any military service among your children?

2          PANELIST NO. 29:  No.

3          THE COURT:  And what is your highest level of formal

4  education?

5          PANELIST NO. 29:  High school diploma.

6          THE COURT:  Thank you very much.

7          PANELIST NO. 28:  I'm No. 28.  I'm married with two

8  grown children.  My wife and I are both retired.  Neither of

9  us has military service or jury service.

10          THE COURT:  Your highest level of formal education?

11          PANELIST NO. 28:  One year of college.

12          THE COURT:  Thank you very much.

13          PANELIST NO. 27:  Juror 27.  I'm divorced.  Three

14  children.  I work with contracts and customer service.  I was

15  in the Army for three years back in 1980.  My daughter also

16  served in the Army.  And I have no prior jury service.

17          THE COURT:  And your highest level of formal

18  education?

19          PANELIST NO. 27:  Technical schools.

20          THE COURT:  In what area?

21          PANELIST NO. 27:  In contracting.

22          THE COURT:  Thank you very much.

23          PANELIST NO. 26:  No. 26.  Married.  Two adult

24  children.  Retired public school teacher.  My husband is a

25  retired copper miner.  He was a Marine.  And I have had no

```
 1    prior jury service.

 2              THE COURT:  What is your highest level of formal

 3    education?

 4              PANELIST NO. 26:  Master's of education.

 5              THE COURT:  Thank you very much.

 6              PANELIST NO. 25:  My name is No. 25.

 7              THE COURT:  For today only.

 8              PANELIST NO. 25:  I am married.  My wife of eight

 9    years and I have a one-year-old.  And of the three of us,

10    there is no military service record.  I'm currently employed

11    as a medical interpreter at three Valley hospitals; full time

12    at one, parttime at one, and on-call at one.  My wife is an

13    R.N.  No prior jury service.  And I currently have my

14    bachelor's degree in Spanish and I'm halfway through my

15    pursuit to my master's degree in the same.

16              THE COURT:  Thank you very much.

17              PANELIST NO. 24:  Juror 24.  I'm happily married.

18    Three adult children.  I'm a commercial vehicle underwriter.

19    My wife was formerly in real estate.  I have a military

20    background.  No prior jury service.  Bachelor's in a French

21    and Business.  Prior hospitalization for pulmonary embolisms.

22              THE COURT:  I have your questionnaire and you did

23    indicate that you have a medical situation where you are not

24    able to sit for long periods of time.

25              PANELIST NO. 24:  I'm concerned about that, yes,
```

```
 1    absolutely.

 2              THE COURT:  If you are selected as a juror in this

 3    case and you are free to stand up and stretch your legs, would

 4    that be -- and you won't be sitting on a hard bench.  I don't

 5    know if that makes any difference.

 6              PANELIST NO. 24:  I would not like to experience the

 7    hospitalization again, so.

 8              THE COURT:  Well, this is a -- No. 24, I really have

 9    to leave this to you whether you think you could serve with

10    some accommodation or whether your concern is that you

11    would -- that this could provoke another hospitalization.

12              PANELIST NO. 24:  That's my concern.

13              THE COURT:  Then I will excuse you from serving as a

14    trial juror.  I don't want you to be sitting and worrying

15    about that when you need to be sitting and concentrating on

16    the evidence.

17              Thank you very much, sir, and you can be excused.

18              PANELIST NO. 23:  Juror 23.  Recently widowed.  Five

19    children.  Retired from the kosher food business.  No military

20    service.  Never served on a jury.

21              THE COURT:  Are any of your children or grandchildren

22    in the military or have served in the military?

23              PANELIST NO. 23:  No.

24              THE COURT:  And what is your highest level of formal

25    education?
```

1          PANELIST NO. 23:  Sorry?

2          THE COURT:  Your highest level of formal education?

3          PANELIST NO. 23:  One year of college.

4          THE COURT:  Thank you very much.

5          PANELIST NO. 22:  No. 22.  I'm married.  No children.

6   I'm a surgical tech.  And my spouse is in human resources.  No

7   military service.  And I was on a jury for a molestation case

8   that was a hung jury.  And I have an AA in science.

9          THE COURT:  Thank you very much.

10          PANELIST NO. 21:  Juror 21.  Married.  Three grown

11  children.  I'm an office specialist at an elementary

12  preschool.  My husband is the Director of Open Spaces for

13  Pinal County.  No military.  And no prior jury service.  High

14  school diploma.

15          THE COURT:  Thank you very much.

16          PANELIST NO. 20:  Married.  Two adult children --

17          THE COURT:  Tell me your juror number.

18          PANELIST NO. 20:  I'm sorry.  20.

19          THE COURT:  Thank you very much.

20          PANELIST NO. 20:  Married.  Two adult children.  One

21  grandchild.  Currently employed as a school counselor.  My

22  husband is retired.  His military service was in the Army.  He

23  was a Major.  He was an infantry officer.  We were in Germany

24  and he was in England.  Is that what you meant?  Okay.

25          It was all him.  Well, I was in Germany.  And I have

1   never been selected to serve on a jury.  And my highest degree

2   is -- it's called an education specialist.  It's a year beyond

3   a master's.

4           THE COURT:  Thank you very much.  No. 41.

5           PANELIST NO. 41:  No. 41.  I'm not married.  No

6   children.  Part-time cashier.  No prior military service.

7   Never been -- had to go to jury service -- jury duty.  My

8   highest education is an associate's in applied science.

9           THE COURT:  And no military?

10           PANELIST NO. 41:  Correct.

11           THE COURT:  Thank you very much.

12           PANELIST NO. 42:  Juror 42.  I'm married.  I have one

13   grown child.  I'm a retired meat cutter.  My husband works in

14   the golf industry.  There is no military experience.  I did

15   serve on a DUI jury in Colorado.  And high school, no college.

16           THE COURT:  The DUI, guilty or not guilty?

17           PANELIST NO. 42:  Not guilty.

18           THE COURT:  Thank you very much.  No. 43.

19           PANELIST NO. 43:  No. 43.  I currently work for an

20   assisted living community driving residents to their doctors'

21   appointments.  My husband is a delivery driver delivering

22   commercial copiers throughout the state.  We have no military

23   service.  I served on a criminal DUI case.  The verdict was

24   guilty.  And I have a bachelor of science in justice studies.

25           THE COURT:  Thank you very much.

1          PANELIST NO. 44:  I'm Juror No. 44.  I'm married.  I

2    have a two-and-a-half year old daughter.  I'm a physical

3    therapist.  My wife is in medical billing.  I was in the Air

4    Force for four years.  Overseas I was in Korea and Cypress.

5    I've never had jury service and I have a doctorate in physical

6    therapy.

7          THE COURT:  Thank you very much.

8          PANELIST NO. 45:  Juror No. 45.  I'm single.

9    Widowed.  I have an adult daughter.  I'm currently employed as

10   an R.N. Director of Acute Care Infomatics for a healthcare

11   organization.  I have no military service.  My daughter has

12   none as well.  I have no prior jury service.  My highest level

13   degree was a master's of science in nursing.

14         THE COURT:  Thank you.

15         PANELIST NO. 46:  Juror 46.  I'm married.  I have two

16   children, two and four.  I'm a social worker.  My husband is

17   an accountant and a real estate agent.  No military service

18   for either of us.  No prior jury service.  And my highest

19   level of education is a bachelor of arts in sociology and a

20   minor in psychology.

21         THE COURT:  Thank you.

22         PANELIST NO. 44:  I'm No. 44.  I'm not married.  I

23   have no children.  I work as a business analyst and we develop

24   tools at a financial office.  And I have no military service

25   experience and no jury service.

```
1              THE COURT:  Highest level of education?

2              PANELIST NO. 44:  A bachelor's in finance.

3              THE COURT:  Thank you very much.

4              PANELIST NO. 49:  Juror No. 49.  I'm single.  No

5    children.  Currently unemployed.  No military service.  No

6    jury duty -- prior jury duty service.  And I have my

7    bachelor's in communication.

8              THE COURT:  And when you're employed, what is it that

9    you do?

10             PANELIST NO. 49:  My last job was a stocker at

11   Target.

12             THE COURT:  Thank you very much.

13             PANELIST NO. 69:  Juror No. 69.  I'm married.  I have

14   two stepchildren; one is 15, the other is 21.  I'm an account

15   manager for a consulting company that specializes in employee

16   benefits and wellness.  And my husband is right now a

17   stay-at-home dad.  No military service with any of us.  And no

18   prior jury service.  And I have my associate's in business

19   administration.

20             THE COURT:  Thank you.

21             PANELIST NO. 68:  I'm No. 68.  I'm single.  No

22   children.  I'm a sales manager for Merchant Services Group for

23   a major bank.  I don't have military service.  My dad is

24   retired Navy Senior Chief.  No prior jury service.  And my

25   education is a couple years of college but no degree.
```

1          THE COURT:  Thank you.

2          Oh, wait a second.  Could you go back to No. 69 for a

3    moment?  And I wanted to inquire.

4          You had written in your questionnaire:  This is peak

5    season for my work and I have a heavy caseload.

6          PANELIST NO. 69:  I'm the only account manager.  It's

7    a small business, family-owned business, and I'm the only

8    account manager.  We deal with benefits for quite a few of the

9    school districts.  And it's time for their bid openings,

10   meeting packets, and a lot of that is on me.  So it's a really

11   hard time right now and I have got some people trying to

12   balance out what I do but I still would be working at night.

13         THE COURT:  Thank you very much for that additional

14   information.

15         PANELIST NO. 67:  I'm juror 67.  I'm divorced but I

16   have been with my better half for 26 years.  Between us we

17   have got four kids and 8 grandkids.  Retired, medically

18   retired, I used to be a miner.

19         THE COURT:  Highest level of formal education?

20         PANELIST NO. 67:  Okay.  I'm sorry.  Tenth grade.

21   And then my other half, she's a high school graduate.  I was

22   in the military scheduled for six years and I did two.  And I

23   have had prior jury duty.

24         THE COURT:  Criminal or civil cases?

25         PANELIST NO. 67:  Criminal.

1             THE COURT:  And what were the charges and the

2     verdicts, if you recall?

3             PANELIST NO. 67:  The charges was murder and they

4     both got convicted.

5             THE COURT:  Thank you very much.

6             PANELIST NO. 66:  I'm juror No. 66.

7             THE COURT:  I think you may have switched it off.

8             PANELIST NO. 66:  I'm juror 66.  I'm a widower.  I

9     have one grown son.  I'm a civil engineer.  I served in the

10    U.S. Army.  No prior jury service.  And my highest degree was

11    bachelor of science with majors in Physics and Mathematics.

12            THE COURT:  Thank you, sir.

13            PANELIST NO. 64:  I have been married 44 years.  I

14    have two grown children.  I'm self-employed.  I run a decor

15    website out of my home.  I am married to a 30-year Air Force

16    vet.  And our family is drowning in military service.  My

17    father and my father-in-law are both career military retired,

18    my brother-in-law, career military retired and my nephew is

19    Army Reserves.  I served three years ago on a jury for

20    domestic abuse and found not guilty.

21            THE COURT:  And your highest level of formal

22    education?

23            PANELIST NO. 64:  I'm three years of college

24    education.

25            THE COURT:  Thank you very much.

1           PANELIST NO. 63:  I'm juror No. 63.  I am married.

2    Two adult children.  And not me, not my children, not my

3    husband, nobody in military service.  Currently not employed.

4    My husband is in aviation and aerospace.  Never served in a

5    jury.  And I have a doctorate in child psychology.

6           THE COURT:  Thank you.

7           PANELIST NO. 62:  Juror 62.  I'm single.  I have two

8    children, 8 and 10.  They live with their mother.  I'm

9    currently employed in data entry.  I have no military service

10   but work in the TSA.  I did receive the Federal Anti-Terrorism

11   Training.  I have no prior jury service and I have a

12   bachelor's in telecommunications.

13          THE COURT:  Thank you.

14          PANELIST NO. 61:  I'm juror 61.  I'm widowed.  I have

15   two grown daughters.  I'm semiretired.  I do commissioned

16   artwork.  Military service, I have none.  My late husband was

17   a captain in the Air Force, a fighter pilot in Vietnam and in

18   South Korea.  I have never been on a jury before.  And I have

19   an associate's degree in commercial art.

20          THE COURT:  Thank you very much.

21          PANELIST NO. 59:  Juror No. 59.  I am married and I

22   have two grown children.  One married to a proudly serving

23   police officer in the Phoenix area.  I have -- formally, I'm

24   retired right now but I was a 25-year federal employee.  My

25   husband was a 20-year retiree of the Air Force.  The job that

1    he did there was in electronics.  And even though it was top

2    secret, it was written up in the USA World News Report so I

3    guess I can talk about it.

4         It was airborne surveillance evidently.  He -- after

5    he retired from that, he went to become a contractor.  And in

6    that area he did go over into the Mid East.  He was stationed

7    in Qatar and Saudia Arabia.  He is retired now also.  And I

8    have not had any prior jury selections.  And my highest level

9    was one year of college.

10        THE COURT:  And what type of work did you do for the

11   federal government?

12        PANELIST NO. 59:  I was Chief of Prosthetics in the

13   VA system for three hospitals in Nebraska.

14        THE COURT:  Thank you very much.

15        Would you give the microphone to the woman seated

16   behind you?

17        PANELIST NO. 86:  Juror 86.  I have been married 53

18   years.  We have two grown children.  I'm retired from

19   education.  I was a middle school gifted and talented teacher

20   for impoverished students.  My husband retired from labor

21   relations in Javea Highway.  My son proudly served in the Army

22   and is currently serving as National Guard for Arizona.  My

23   daughter served four years in the U.S. Air Force.  I was in a

24   previous -- besides the grand jury that I mentioned -- the

25   previous criminal case was found innocent.  It was a theft.

1          THE COURT:  Thank you.

2          PANELIST NO. 86:  And I have a master's degree in

3   education.

4          THE COURT:  Thank you very much.

5          I knew we were missing something but couldn't

6   remember what it was.

7          PANELIST NO. 87:  I'm juror 87.  I'm a widow.  I have

8   no children.  I'm retired from the State of Arizona but

9   currently work part-time as a clerk in a hospital giftshop.  I

10  have one prior jury service for a DUI case and they were found

11  guilty.  And my highest level education is high school.

12         THE COURT:  And you had mentioned a medical problem

13  in your juror questionnaire.  Do you believe that that would

14  interfere with your ability to serve?

15         PANELIST NO. 87:  I think it could, yes.

16         THE COURT:  Is this something where you just

17  occasionally have a problem that --

18         PANELIST NO. 87:  Yes.

19         THE COURT:  And you feel that this service for this

20  five-week period could be not good for your health?

21         PANELIST NO. 87:  Yes, I do.

22         THE COURT:  Okay.  Juror 87, I will excuse you from

23  serving.  Thank you very much.

24         PANELIST NO. 88:  No. 88.  I'm single.  No children.

25  I'm employed as a registered nurse.  My fiance was a retired

 1    Army colonel and I have prior jury service, two trials; one

 2    for rape and one for murder.  And they were both guilty.  And

 3    my highest education is a bachelor of science.

 4            THE COURT:  In what field?

 5            PANELIST NO. 88:  In health information management.

 6            THE COURT:  Thank you very much.

 7            PANELIST NO. 89:  I'm juror 89.  I'm married.  No

 8    children.  Both my husband and I work in manufacturing.

 9    Neither he or I have ever been in the service.  However, my

10    ex-husband was a Marine.  And my brother is -- has done Navy

11    and is now in the Air Force.  And I have never done jury duty.

12    And I'm a high school graduate.

13            THE COURT:  I wanted to ask you about something that

14    you wrote in your questionnaire about that you provide

15    transportation for your husband to and from work each day.

16            PANELIST NO. 89:  Yes.

17            THE COURT:  And what -- is that timing incompatible

18    with jury service or is it something that you could take him

19    to work and pick him up and still serve?

20            PANELIST NO. 89:  If it's like an 8:00 to 5:00 deal,

21    then yes, I could still serve.

22            THE COURT:  Okay.  It's like a 9:00 to 4:30 deal.

23            PANELIST NO. 89:  That's even better.

24            THE COURT:  Okay.  Thank you very much.

25            PANELIST NO. 91:  Juror No. 91.  I'm married.  Four

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

 1    kids.  Youngest is 13.  The rest are grown.  I work in

 2    maintenance for a school district and also in a metal

 3    fabrication shop.  My wife is in retail management.  No

 4    military service.  Never been on a jury.  And I have a

 5    bachelor of science in forestry.

 6              THE COURT:  Thank you, sir.

 7              PANELIST NO. 92:  Juror 92.  Married.  Two grown

 8    adults.  My son is in the military, Army Reservist.  And my

 9    husband works for the aerospace industry.  And I'm a freelance

10    consultant.  Right now I'm not working.  And three years of

11    college with no degree.

12              THE COURT:  Thank you very much.

13              PANELIST NO. 93:  I'm juror 93.  I'm single.  No

14    children.  I'm a financial aid technician.  No military

15    service.  No prior jury service.  And my highest level of

16    education is having an associate in fine arts and an associate

17    in evidence technology with two certificates for police

18    photography and fingerprint analysis.

19              THE COURT:  Thank you very much.

20              PANELIST NO. 94:  Juror 94.  Married with four

21    children; ages one, three, six and thirteen.  I work in

22    finance.  My wife is a stay-at-home mother.  No military

23    service for either.  No jury service.  Some college.  No

24    degree.

25              THE COURT:  Thank you very much.

1           And for those of you that are watching the clock,

2    particularly since I said it's 9:00 to 4:30, we're going to

3    finish up with the back row and we're going to recess for the

4    day and you'll have to come back tomorrow to continue and

5    complete jury selection.

6           So just a few more minutes.

7           PANELIST NO. 111:  Juror No. 111.  Single.  No

8    children.  Salesman for a technology company.  No military

9    service.  No previous jury duty.  And a bachelor's degree in

10   applied science.

11          THE COURT:  Okay.  Before you pass the microphone, in

12   your questionnaire you talked about a trip you had planned on

13   the 25th through the 28th of February.

14          PANELIST NO. 111:  Correct.  Yes.

15          THE COURT:  Tell me a little bit more about that.

16          PANELIST NO. 111:  My fiancee's brother is getting

17   married that weekend in Minnesota.

18          THE COURT:  Oh.  I think we need to excuse No. 111

19   because it's his fiancee's brother.  If he doesn't show up at

20   the wedding, the family may not like him very much.  Is there

21   any objection to excusing 111?

22          MR. KOEHLER:  No, Your Honor.

23          MR. MAYNARD:  No objection, Your Honor.

24          THE COURT:  111, you may be excused.

25          PANELIST NO. 110:  Juror 110.  Married 43 years.  Two

1    adult children, two daughters.  I'm retired.  I was in the

2    electrical trade for 45 years.  My wife helped teach autistic

3    kids.  Two years in the Marine Corps.  No prior jury duty.

4    None of my children was in the service.

5              THE COURT:  Your highest level of education?

6              PANELIST NO. 110:  High school.  And then I did a

7    four-year apprenticeship for the electrical trade.

8              THE COURT:  And in your questionnaire you were

9    concerned about some doctor appointments that you have that

10   conflict with our trial schedule; is that right?

11             PANELIST NO. 110:  I see a dermatologist.  I had a

12   melanoma several years ago, so I'm on a six-month rotation

13   going in for checkups but it's not crucial, I mean.

14             THE COURT:  We won't be in trial on Mondays.  So is

15   it something that you could perhaps reschedule to a Monday if

16   it's in conflict?

17             PANELIST NO. 110:  There's only certain days of the

18   week that my doctor is in there but I can reschedule if need

19   to.

20             THE COURT:  Thank you.  I appreciate it.

21             PANELIST NO. 109:  Juror 109.  I got no children.

22   I'm a manufacturing engineer.  I have no military service.  I

23   was on a jury service for a civil personal injury case.  And I

24   have a bachelor of science in mechanical engineering.

25             THE COURT:  Thank you very much.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

1          PANELIST NO. 108:  Married.  Retired facilities

2    maintenance.  My wife is still a housewife working away.  No

3    military service.  And no prior jury duty.

4          THE COURT:  Highest level of formal education?

5          PANELIST NO. 108:  College.

6          PANELIST NO. 107:  I'm juror No. 107.  I'm unmarried.

7    No children.  I'm a veterinary technician at a zoological

8    facility.  No military service.  No prior jury service.  I

9    have an associate's of science and I'm halfway through a

10   bachelor's degree.

11         THE COURT:  Thank you very much.

12         PANELIST NO. 105:  I'm 105.  I'm single.  No

13   children.  I work for a large financial firm as a conversion

14   consultant for financial advisors.  I have no military

15   service.  No prior jury service.  And a couple years of

16   college but no degree.

17         THE COURT:  Thank you very much.

18         PANELIST NO. 104:  I'm Juror 104.  I'm married.  Two

19   stepchildren, 16 and 22.  Currently retired.  I was a

20   corporate communications executive.  Previously, my wife is an

21   accounting manager.  No prior military service for any of us

22   and no prior jury service.  I have got a bachelor's in

23   business administration.

24         THE COURT:  Thank you very much.

25         PANELIST NO. 103:  I'm juror No. 103.  I'm married.

1    I have seven children, four step.  I'm disabled.  I was a

2    school bus driver.  My spouse restores cars for a living.  I

3    served on jury duty.  I think it was civil.  And I was the

4    13th juror to leave.  And no military.

5         THE COURT:  And your highest level of formal

6    education?

7         PANELIST NO. 103:  Eleventh grade.

8         THE COURT:  Thank you very much.

9         Could I see counsel briefly at sidebar.

10    (At sidebar on the record.)

11         THE COURT:  Since we are recessing until tomorrow, I

12    wondered if there were any people that both sides agree could

13    be excused.

14         The only two that I have on my list were 104 and 121

15    that talked about how they have nephews that have done six

16    tours in the Middle East; and then 120 who talked about his

17    son's stories in Iraq.

18         I didn't pursue it further with either of them but

19    both of them were heading towards "they couldn't be fair."

20         Do you want to excuse 104 and 120?

21         MR. MAYNARD:  I have no problem.  We're not going to

22    get that far anyway.

23         MS. BROOK:  We don't object to it either.

24         MR. KOEHLER:  No objection.

25         MS. BROOK:  No objection.

1           THE COURT:  I don't have anybody else.

2       (End of discussion at sidebar.)

3           THE COURT:  So, ladies and gentlemen, we are going to

4   recess until nine o'clock tomorrow morning to complete jury

5   selection.

6           Jurors No. 104 and 120, I am going to excuse you.

7   You do not have to return tomorrow.

8           Now, there are some rules between now and tomorrow

9   morning and they are this:

10          You are not allowed to talk to anybody about this

11  case.  If somebody says, "How come you're not coming to work

12  tomorrow?" or "Why do you have to go back downtown to court

13  tomorrow?" all you can tell them is:

14          I am being considered for jury selection in a trial

15  and I can't tell you anything else about the case.

16          So you can't tell them that it's a criminal case.

17  You can't tell them what the charges are.  You can't tell them

18  who any of the people are.

19          For those of you that are ultimately selected as

20  trial jurors, there will be 16 of you.  You won't be able to

21  talk about the case at all until the trial is over.  For those

22  of you that are not of the 16 that serve as trial jurors, you

23  will be released from this prohibition on discussing the case

24  when you are excused.

25          But it is very important that you not discuss with

1  anyone else, your family, your friends, the people you work

2  with, anything about this case, anything about the questions,

3  anything about the status of your selection as jurors, only

4  that you are still being considered as a trial juror in a

5  case.

6          Tomorrow -- I usually say take the same seats when

7  you come in tomorrow, but I think we're going to try to even

8  it up a little bit.  Some people have a little elbow room and

9  others are still kind of crushed together.  So I will just

10 have the -- the lawyers will just have to adapt and we will

11 fill out -- fill up these empty seats in the front.

12         Tomorrow I think what would be the easiest thing for

13 you to do, rather than coming up here one at a time, report

14 back in to the Jury Administration Office on the first floor

15 where you started out this morning where, you know, the chairs

16 are comfortable.

17         And we will come and get you and bring you back up

18 here at nine o'clock rather than have you try to filter in at

19 9:00.

20         And plus the lawyers or I might have a little

21 business to conduct before nine o'clock tomorrow morning.  I'm

22 not sure yet.  We'll find out after you all leave.

23         So any questions?  Any concerns?  A few questions?  .

24         Okay.  Juror No. 85?

25         PANELIST NO. 85:  Regarding transportation, if we are

 1   excused, will it be before noon or afternoon?  Do you have any

 2   idea?

 3            THE COURT:  Before noon.  I'm keeping my fingers

 4   crossed.  Keep your answers short and to the point and we'll

 5   be out of here -- well, all of you that aren't chosen.

 6            I'm going to try really hard to finish by noon or

 7   shortly thereafter.  Let's just say before the lunch break.

 8            Was there another?  Yes.  This gentleman in the back?

 9            A JUROR:  I'm assuming we're supposed to retain our

10   numbers and bring them back tomorrow.

11            PANELIST NO. 25:  Oh, yes.  That is one thing we

12   can't change.  We can't change your numbers.  Hopefully, it

13   will still be sticky tomorrow.  No. 25.

14            If you forget your number, if you forget to bring

15   your number, just remember what it was and we'll give you a

16   new one.

17            PANELIST NO. 27:  When you say "numbers," you mean

18   the nine digit number?

19            THE COURT:  No.  The one that you're wearing.  For

20   most of you it's two.  For some of you it's three.  But just

21   the one that you are wearing.

22            PANELIST NO. 100:  I'm Juror 100.  You said you

23   wanted us down in the room by eight o'clock tomorrow or by

24   nine o'clock?

25            THE COURT:  Well, I want you all here ready to go by

1   nine o'clock so you can be up here at 9:00.

2        So if I were you, I would get there no later than

3   8:45ish.  But yeah, I'm not as -- I don't make you come just

4   as early as the Jury Administrator.  But we're going to try to

5   start right at 9:00 so we can get hopefully through the rest

6   of the questioning earlier -- as early in the day as possible.

7        I can't promise noon, but we'll sure try to hit that

8   target.  Yes?

9        PANELIST NO. 63:  If one is selected to serve, would

10  the trial start tomorrow or would it be the next day or

11  something?

12       THE COURT:  Well, if we finish as I hope by around

13  noon, yes, we will start tomorrow afternoon.

14       Yes?

15       PANELIST NO. 3:  The documentation I provided my job

16  stated that I would know if I was selected today or not.  So

17  will we be provided something stating we have to come back?

18       THE COURT:  They will give you the documentation down

19  in the Jury Administrator's Office if you need another one of

20  those things for your job.

21       PANELIST NO. 135:  I have a doctor's appointment

22  tomorrow I cannot miss.

23       THE COURT:  That you cannot reschedule?

24       PANELIST NO. 135:  No.

25       THE COURT:  Is it important -- don't tell me about

1    your personal health issue, but is it an important doctor's

2    appointment that you feel that you have to meet and can't

3    reschedule?

4             PANELIST NO. 135:  Yes.

5             THE COURT:  Is there any objection to excusing 135?

6             MR. KOEHLER:  No, Your Honor.

7             MR. MAYNARD:  No, Your Honor.

8             THE COURT:  Then, No. 135, you don't have to come

9    back tomorrow.

10            MR. MAYNARD:  You should have told us a lot earlier.

11            THE COURT:  No. 25 again?

12            PANELIST NO. 25:  Is parking the same?

13            THE COURT:  Parking is the same tomorrow.

14            There was another hand over here?  No. 52.

15            PANELIST NO. 52:  How long do you particularly allow

16   for lunch?

17            THE COURT:  Oh, well, once the jury is selected, we

18   usually have about an hour and 15 minutes for lunch each day.

19   And we take a break -- we didn't even get to the very specific

20   schedule.

21            It's 9:00 to 4:30 with about an hour, hour and 15

22   minutes for lunch, and then breaks in the middle of the

23   morning and breaks in the middle of the afternoon.

24            One more.  No. 102?

25            PANELIST NO. 102:  Will you come and get us tomorrow

1   morning?

2           THE COURT:  We'll come and get you or we'll have the

3   Jury Administrator escort you back up here.

4           Okay.  I'm going to leave for a moment and then I'm

5   going to come back and talk -- unless it's something you need

6   to say in front of all the jurors, Mr. Maynard?

7           MR. MAYNARD:  Can I have a sidebar?  No.

8           Can the admonition include media and news?

9           THE COURT:  Thank you very much for reminding me.

10          There have -- there were some news reports.  I think

11  some of you even noted that you heard some things on the radio

12  maybe yesterday or today.

13          If you -- don't listen to any news reports or please

14  don't read -- if there's something in the paper tomorrow,

15  there have been some reporters here today.  They were the

16  people that were in the back because there were no seats for

17  them anymore.

18          So do not read any news reports, listen to any news

19  reports, watch any news reports.  So you might be watching the

20  nine o'clock or the ten o'clock news tonight and they may say

21  "Jury selection started."

22          Turn it off.  Leave the room.  Don't listen to any

23  news reports, read anything.  Because from here on out,

24  everything you learn about this case has to be from the

25  evidence that's presented in this courtroom and nothing from

1    the outside.

2         Have I answered all your questions?  I'm sorry it's

3    been such a long day.  We will try to get you out of here, as

4    I said, hopefully, by noon tomorrow, but there's not a

5    guarantee.  We will see all of you then tomorrow morning at

6    9:00 a.m.  I will recess and then we will come back and see if

7    there are any matters we need to finish up with.

8         Court is in recess.

9       (Recess taken at 4:51 p.m.; resumed at 4:58 p.m.)

10      (Open court, no jury present.)

11        THE COURT:  Thank you.  Please sit down.  The record

12   will show the presence of counsel and the defendant.

13        I wanted to go over where we are on voir dire and

14   make sure I haven't missed anything that you thought I was

15   going to ask and I haven't.

16        And I forgot to ask about 69.  I don't feel strongly

17   about juror 69.  She is the one I was asking about peak season

18   for her work and she has a heavy caseload.  But, you know, we

19   maybe can talk about her after we have all the jurors and

20   people that asked to be excused but don't have too big a

21   hardship so we can leave her, especially since she's coming

22   back tomorrow.

23      So in looking at the proposed voir dire, I think I have

24   covered all of the defendant's voir dire with the exception of

25   the last three questions.  And I think that I have covered all

1    of the government's voir dire as well with the exception of

2    the last three questions and the questions that are on, you

3    know, the two extra questions that are ongoing with respect to

4    the jurors that haven't answered the easel questions.

5            MS. BROOK:  Your Honor, the only one that we eyeball

6    on our list would be No. 21 which would be:

7            Would you have any difficulty finding a person guilty

8    because of your own religious, moral, philosophical, or

9    personal beliefs?

10           THE COURT:  Well, that one, I said with the exception

11   of the last three, but that one -- well, let's talk about that

12   for a moment.

13           Well, never mind.  I'll just ask it.

14           I think 19 and 20 are already covered, so we will

15   make sure we do 21.

16           And with respect to the 21, 22, and 23 --

17           Well, 21 and 22 -- 22, I think, is kind of covered by

18   what we've already asked and is also a little bit subsumed

19   within 21.

20           MR. MAYNARD:  It probably is.

21           THE COURT:  So we have 21 -- two 21's and a 23.

22           With respect to just my general voir dire, after they

23   finish this, I don't have anything else.  Then I will open it

24   up first to the government and then to the defense to ask any

25   followup questions.

1        MR. MAYNARD:  I guess I have two questions, Judge.  I
2   mean, you did ask the questions about following this Court's
3   instructions on the law on reasonable doubt.
4        14, it just seems to me that this case is a little
5   bit different; our No. 14.
6        THE COURT:  Well, the problem is is that it's without
7   context.  Too heavy a burden?  I mean, it's the burden.
8        Too heavy compared to what?
9        MR. MAYNARD:  Too heavy compared to what you find in
10  a normal case.
11       THE COURT:  Well, what normal case would that be?  I
12  mean, the jurors, as you have heard -- first of all, there are
13  very few of them that have jury experience.
14       Those that do, it's almost all criminal experience,
15  so that's the normal case for proof beyond a reasonable doubt.
16  I mean, the idea of asking a question like this without
17  context would suggest that they know there are other standards
18  of proof which they don't.
19       I mean, I know lawyers try to explain it to them all
20  the time, but in this case I don't know that they would know
21  that there is -- that this is too heavy or not heavy enough or
22  there is something lighter.
23       That's the problem I have with it.  That's why I
24  tried to explain what I explained in connection with
25  presumption of innocence and what that means.

1           MR. MAYNARD:  The other issue --

2           THE COURT:  And I will be instructing them in the

3  preliminary instructions as to what "proof beyond a reasonable

4  doubt" means.

5           MR. MAYNARD:  Okay.  There were a number of the

6  questionnaires that indicated that the individuals may have

7  problems with alcohol because of religious beliefs.  I'm not

8  sure I really want to get into that individually.  I would

9  rather the Court deal with it.

10          THE COURT:  Well, I don't want to deal with it at

11 all.  I mean, you asked -- these are your questions.

12          MR. MAYNARD:  Oh, sure.

13          THE COURT:  They have answered them.  And actually, I

14 thought to the extent that people wrote answers, if there's

15 any particular ones that you're concerned about, but a lot of

16 people wrote, you know, kind of thoughtful answers that wrote

17 anything at all.

18          I mean, most -- a lot of people just didn't say

19 anything.

20          MR. MAYNARD:  Yeah.  Most people didn't.  But there

21 were probably a half dozen that indicated that for --

22          THE COURT:  Well, maybe they're "for cause"

23 challenges or maybe they are people that you want to follow up

24 with.  But I don't really know what more I would ask about it.

25          MR. MAYNARD:  All right.  Well, I'll think about what

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

1    I'll follow up with.

2            THE COURT:  Yes.

3            MR. MAYNARD:  Okay.

4            THE COURT:  Because they've answered the general

5    question about how they feel about alcohol and I thought there

6    were just a handful that were staunchly opposed to it.

7            MR. MAYNARD:  There were.

8            THE COURT:  I mean, a lot of people wrote a lot --

9    several people wrote about getting drunk is a bad thing or

10   perhaps even sinful.

11           Anything else that we need to talk about?

12           The preliminary instructions.  I'm not going to

13   ask -- unless you know that they're fine right now and want to

14   tell me that.

15           Otherwise, please look at them over the break.  And

16   if you have any concerns or corrections, first, talk to the

17   other side about it and then we'll see where we are.  Because

18   that will be the first order of business after we swear in the

19   jury.

20           I will read the preliminary instructions.  Maureen

21   will read the Indictment.  And then we will have openings at

22   least tomorrow.

23           Mr. Koehler?

24           MR. KOEHLER:  We will discuss our issues with the

25   preliminary instructions with the defense counsel as you

1    requested.

2         THE COURT:  Okay.  Because if you agree on something

3    different, I'm happy to give whatever you agree on.  But this

4    was just my attempt to give the basics of the elements of the

5    crimes that are charged.

6         MR. MAYNARD:  Just some scheduling issues too; two

7    issues.  One is I'm assuming we're going to get the jury

8    picked in the morning --

9         THE COURT:  Me too.

10        MR. MAYNARD:  -- is what it looks like.

11        THE COURT:  I mean unless -- well, right now, I mean,

12   do either of you anticipate an extensive amount of voir dire?

13        MS. BROOK:  No.

14        MR. MAYNARD:  No, I don't.

15        So I guess the question I had was I have told the

16   government my opening would probably be about an hour.  Theirs

17   would be an hour-and-a-half.  I guess I'm just assuming that

18   we're both going to open tomorrow assuming that we have a jury

19   picked in the morning.

20        THE COURT:  I sure hope so.

21        MR. MAYNARD:  Okay.

22        The second thing is the government did give me -- I

23   guess this is the final report -- after we met this morning.

24        THE COURT:  Mr. Kohlmann?

25        MR. MAYNARD:  Mr. Kohlmann.

1          I have now sent this off to -- I e-mailed it to my

2     experts back in DC to look at.  But I'm told --

3          THE COURT:  Is it different than the other one?

4          MR. MAYNARD:  It's 31 pages.  I don't know.  I

5     haven't had a chance to read it.  I have been here all day.

6          THE COURT:  Well, I was looking at it when I had

7     little down time this morning and it looked like there was a

8     lot of stuff that's probably identical to what's been in a

9     bunch of his other reports.  And then at the very end of each

10    section or at the very end of most sections there was

11    something that tried to relate it to evidence in this case.

12         Is that what this one looks like too?

13         MR. MAYNARD:  I haven't read it.  Never looked at it.

14         THE COURT:  So is it any different?

15         MS. BROOK:  Your Honor, it adds some analysis at the

16    end related to Simpson and Soofi's computers and their

17    technology.  So it adds some additional information.

18         THE COURT:  But it doesn't delete anything?

19         MS. BROOK:  Correct.

20         THE COURT:  Okay.

21         MR. MAYNARD:  My issue is this:  Is that we're going

22    to --

23         THE COURT:  Well, my issue is:  Let's just settle

24    this right now.  There's no way Mr. Kohlmann is testifying on

25    Thursday.  Is that the plan?

1           MS. BROOK:  That was the plan.

2           THE COURT:  It's not going to happen.  It's just not

3    going to happen.  You can't provide this report a week ago

4    Monday for the very first time and the final report today and

5    expect that we can have him testify on Thursday.

6           And if that puts you on the horns of a dilemma,

7    you'll just have to figure your way off, because he cannot

8    testify on Thursday.  He's got to be scheduled for at least

9    next week at the soonest, maybe the week after.

10          In addition to which, just looking at Mr. Maynard's

11   motion and looking at the report -- and I'm using the word

12   "looking" because it was obviously a quick read -- I think

13   before I could say for sure even if I -- if Mr. Kohlmann was

14   to testify, before I could say what the scope of his testimony

15   was to be, I would have to have a little bit more sense of

16   what the evidence was going to be that was actually going to

17   be admitted in the case and I sure won't know that on

18   Thursday.

19          And his testimony presumes the admission of a whole

20   lot of information.  I'll just give you one example.

21          He's talking about -- at his ending paragraphs he's

22   talking about the search of the Acer computer.

23          Well, the only computer that I know of from our prior

24   evidence that is clearly relevant in this case is the Lenovo

25   computer.  And so before Mr. Kohlmann could ever talk about

1   anything on an Acer computer, we would have to have evidence

2   as to how in the world anything on an Acer computer was

3   something that Mr. Kareem can be charged with knowledge of.

4           And I don't have that information and I'm going to

5   get it not by some proffer but by the evidence in the case.

6           But that's just a simple example.  I mean, when he's

7   talking about the Lenovo and the flash drive, at least I know

8   what the issues are and I have ruled on the issues with

9   respect to the Lenovo and the flash drive.

10           But the Acer, I don't know how that comes back to

11   Mr. Kareem.  And only the witness is going to be able to try

12   to explain that to me.  And if it's not explained, how in the

13   world could I let Kohlmann testify about it?

14           So I think we have some breathing room now on

15   Kohlmann because my understanding is he's not available next

16   week.

17           MS. BROOK:  That's correct.

18           THE COURT:  And so we're looking at at least two

19   weeks away.

20           MR. MAYNARD:  That's fine.

21           THE COURT:  So we have plenty of time to worry about

22   him.  Is there anything else?

23           MR. MAYNARD:  One last.  Can we take the

24   questionnaires with us?  I mean, routinely we're not entitled

25   to, but it certainly would move things along a little bit if

```
 1    we could.  We don't have names on them.  We just have numbers.
 2              THE COURT:  Do you promise you will --
 3              Okay.  So all the people that we have excused, leave
 4    theirs.  I don't know if you have pulled them out but you have
 5    to solemnly promise that you will not make copies of them.
 6              MR. MAYNARD:  Okay.
 7              THE COURT:  And that you will bring back the one and
 8    only copy you have tomorrow because we will be keeping them.
 9              And I don't know if the government wants to do the
10    same thing.
11              MS. BROOK:  No.
12              THE COURT:  Okay.  So no solemn promises from you.
13    You're leaving your questionnaires here?
14              MR. KOEHLER:  Correct, Your Honor.
15              MR. MAYNARD:  Now I lay me down to sleep.
16              Yes, I solemnly promise.
17              THE COURT:  Okay.  Anything else, Mr. Koehler or Ms.
18    Brook?
19              MR. KOEHLER:  No, Your Honor.  Thank you.
20              THE COURT:  Okay.  See you tomorrow morning at 9:00.
21         (Proceedings adjourned at 5:12 p.m.)
22                              * * *
23
24
25
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #1   2-16-16

1

2                   C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 1st day of August,

14   2016.

15

16

17

18

19                   s/Elizabeth A. Lemke
                     ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25