**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | )   **APPEAL** |
| | )   **CR15-00707-PHX-SRB** |
| vs. | )   Phoenix, Arizona |
| | )   February 17, 2016 |
| Abdul Malik Abdul Kareem, | )   9:40 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL - DAY #2**
**(Pages 152 through 318, Inclusive.)**

**APPEARANCES:**
**For the Government:**
             U.S. ATTORNEY'S OFFICE
             By:  **Kristen Brook, Esq.**
                  **Joseph Edward Koehler, Esq.**
             40 North Central Avenue, Suite 1200
             Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
             MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
             By: **Daniel D. Maynard, Esq.**
                  **Mary Kathleen Plomin, Esq.**
             3200 North Central Avenue, Suite 1800
             Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

## INDEX

**SUMMARY OF COURT PROCEEDINGS**                          **PAGE:**

JURY SELECTION CONTINUED                          Page 154
JURY SWORN                                        Page 199
PRELIMINARY INSTRUCTIONS TO THE JURY  `           Page 200
INDICTMENT READ                                   Page 215
OPENING STATEMENT:  Government                    Page 225
OPENING STATEMENT:  Defense                       Page 248

### INDEX OF WITNESSES

**BRUCE JOINER:**

Direct examination by Mr. Koehler              Page 263
Cross examination by Mr. Maynard               Page 275
Redirect examination by Mr. Koehler            Page 277

**OFFICER GREGORY STEVENS:**

Direct examination by Mr. Koehler              Page 280
Cross examination by Mr. Maynard               Page 295
Redirect examination by Mr. Koehler            Page 297

**SPECIAL AGENT BRIAN MARLOW:**

Direct examination by Mr. Koehler              Page 300

### INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
| --- | --- | --- |
| Exhibit No. 1 | Overhead Photograph - Curtis Culwell Center | Page 266 |
| Exhibit No. 2 | Helicopter Night Photo 1 | Page 290 |
| Exhibit No. 3 | Helicopter Night Photo 2 | Page 292 |
| Exhibit No. 7 | Elk River Tool & Die AK-74 Rifle (5.45 x 39mm)(Item34) | Page 309 |
| Exhibit No. 8 | Drum magazine with 73 rounds of 5.45 x 39 mm ammunition (Items 34A, 34B) | Page 311 |
| Exhibit No. 75 | Garland crime scene photos | Page 305 |

```
 1              P R O C E E D I N G S

 2         (Called to the order of court at 9:40 a.m.)

 3         (Open court, jury present.)

 4    JURY SELECTION CONTINUED

 5              THE COURT:  Good morning, ladies and gentlemen.

 6    Welcome back.  Please sit down.  The record will show the

 7    presence of the prospective jurors, counsel, and the

 8    defendant.

 9              Ladies and gentlemen, I want to pick up where we left

10    off yesterday, which is completing the side of the courtroom

11    to my right, the information that you have that I have asked

12    that you provide to me and to counsel.

13              And we will start with Juror No. 34.  And then I will

14    remind you of our two additional questions if you don't

15    remember them from yesterday.

16              PANELIST NO. 34:  Hi.  I'm juror No. 34.  My marital

17    status is divorced.  I have one grown son.  I'm a Senior

18    Database Administrator.  Occasionally, I teach introduction to

19    JAVA programming for a university.  Do you care about the

20    volunteer work we do?

21              THE COURT:  I'm sorry?

22              PANELIST NO. 34:  Are you interested in the volunteer

23    employment that we would be doing or does that not matter?

24              THE COURT:  Is it computer-related?

25              PANELIST NO. 34:  No.
```

```
 1            THE COURT:  Then we don't need to know that
 2   information.
 3            PANELIST NO. 34:  Okay.  Military service, I have a
 4   son who was in the Army but he got hurt early in the basic
 5   training in the states so he got an honorable discharge so
 6   never really served.  And I have never been on a jury before.
 7            THE COURT:  And what is your highest level of formal
 8   education?
 9            PANELIST NO. 34:  I have a master's degree in
10   computer information systems.
11            THE COURT:  Thank you very much.  And No. 36.
12            PANELIST NO. 36:  I'm No. 36.  I have been married
13   for 55 years almost.  Two adult children.  Ten
14   great-grandchildren.  Keeps me busy.  Employment, my husband
15   and I both retired.  My husband is working part-time keeping
16   busy.  He had ten years of the National Guard in Washington
17   State.  And I was on a jury one time in traffic court and
18   dismissed.
19            THE COURT:  And before you retired, what did you do?
20            PANELIST NO. 36:  Oh, many things.  Daycare, raising
21   a lot of children, and I had my own cleaning business.
22            THE COURT:  And what about military service for you,
23   your spouse, any of your children, or grandchildren?
24            PANELIST NO. 36:  Just my spouse.  Ten years with the
25   National Guard.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

```
 1              THE COURT:  And your highest -- I'm sorry to
 2   interrupt.  Your highest level of formal education?
 3              PANELIST NO. 36:  I had one year of business school.
 4              THE COURT:  Thank you very much.  No. 37.
 5              PANELIST NO. 37:  Juror No. 37.  I'm married.  I have
 6   two children under the age of 18.  I have a son that's in the
 7   Air Force stationed in Japan.  I work in retail sales.  My
 8   husband is a stay-at-home dad and is a student in information
 9   technology, mobile development.  Neither of us have any
10   military service.  I did serve on a jury for Burglary.  We
11   found the defendant guilty.  And my highest level of education
12   is bachelor of science in sports medicine.
13              THE COURT:  Thank you very much.  No. 38.
14              PANELIST NO. 38:  No. 38.  I'm single.  No kids.  I
15   do sales and tech support at a major Internet company.  I have
16   never served in the military and no prior jury experience.
17   And my highest level of education is technical college, no
18   degree.
19              THE COURT:  Thank you very much.
20              PANELIST NO. 39:  Juror 39.  I'm married with no
21   children.  I'm a special ed teacher.  My husband is a BMW
22   technician.  Neither of us served in the military.  I have
23   never been on a jury.  And I have completed by first year of
24   my doctorate.
25              THE COURT:  In what field?
```

1              PANELIST NO. 39:  Education.

2              THE COURT:  Thank you so much.

3              PANELIST NO. 40:  No. 40.  Married with two adult

4    children.  Both my wife and I are retired.  I spent my career

5    in the computer industry.  My wife is an artist.  Both of us

6    have had no military service other than my serving two years

7    in Air Force ROTC.  I have been a prospective juror but never

8    hit the -- never been a juror.  And I have a bachelor of

9    science in business administration.  And none of my kids or

10   grandkids are in the service as well.

11             THE COURT:  And I wanted to ask you in particular,

12   No. 40.  You indicated that you're still convalescing from

13   some surgery last year.  Are you concerned at all that that --

14   that your jury service would be a problem with the continued

15   convalescing?

16             PANELIST NO. 40:  Not at this time.

17             THE COURT:  Thank you very much.

18             And if you could pass the microphone to the

19   individual behind you.  And you are No. 58.

20             PANELIST NO. 58:  Juror 58.  I am divorced.  I have

21   three grown children.  I have recently retired from teaching

22   art for 30 years and now it's my turn.  So I -- let's see.  I

23   have not been in the military.  My ex-husband was in the

24   reserves.  And I have been on two trials previously; one was

25   for counterfeit checks and one was a DUI.  And the verdict in

1  both was guilty.  My highest degree is a bachelor of fine

2  arts.

3          THE COURT:  Thank you very much.

4          PANELIST NO. 57:  I'm juror 57 and I am married.  I

5  have one adult son.  I worked for a printing trade association

6  for over 20 years in admin and HR.  My husband was in the

7  military for 31 years.  He served in Iraq and he is now a

8  firearms salesperson.  And my -- I have an associate's degree

9  in admin.

10          THE COURT:  Thank you very much.

11          PANELIST NO. 56:  No. 56.  I am single.  Widowed.  I

12  have four adult children.  I am a substitute teacher, ages K

13  through 12th grade.  I have an early childhood bachelor's

14  degree in teaching.  And I have not been in the military and

15  no jury duty.

16          THE COURT:  Thank you very much.

17          PANELIST NO. 55:  Juror 55.  I'm single.  Never

18  married.  My employment was unskilled labor.  No military

19  service.  No jury service.  And I completed the tenth grade of

20  high school.

21          THE COURT:  Thank you very much.

22          PANELIST NO. 54:  No. 54.  I'm married with three

23  grown children.  I'm a financial executive and my wife is a

24  registered nurse.  Nobody in my family has military service.

25  And I have not had prior jury experience.  And my highest

1    formal education is MBA.

2         THE COURT:  In your questionnaire you mentioned that

3    you knew someone named Amy Vaughan and we have a witness named

4    Amy Vaughan and let's try to find out if they're the same

5    person.

6         Does the Amy Vaughan you know work for the FBI?

7         PANELIST NO. 54:  No, ma'am.

8         THE COURT:  Okay.  It's a different Amy Vaughan.

9    Thank you very much.

10        PANELIST NO. 53:  I'm Juror 53.  I'm divorced.  I

11   have two grown children.  I have been in healthcare for over

12   20 years.  I'm a referral coordinator.  I have no -- there is

13   no military service with me, my ex-husband, or my children.

14   No jury service.  And my highest degree is bachelor's degree

15   in healthcare administration.

16        THE COURT:  Thank you very much.

17        PANELIST NO. 52:  I'm No. 52.  I'm single.  Have no

18   children.  And I work in customer service for an airline.  No

19   military service.  I have been called for jury duty but never

20   been on a jury.  And my highest level of education is a

21   bachelor's degree in American History.

22        THE COURT:  Thank you very much.

23        PANELIST NO. 51:  I'm juror 51.  I'm married.  I have

24   two adult children.  I'm retired.  My wife is retired.  I

25   spent 30 years in the Navy.  Highest rank was W-4.  My duties

```
 1   included advanced electronics information and personal
 2   security on submarines.  Traveled around the world many times.
 3   Prior jury service was federal grand jury.  I have an
 4   associate's degree in electrical engineering and over four
 5   years of schools in the military.
 6           THE COURT:  Did you have a career between -- between
 7   retirement from the Navy and retirement from work?
 8           PANELIST NO. 51:  Not that I paid taxes on.
 9           THE COURT:  Okay.  Say no more please.
10           PANELIST NO. 50:  That's a hard act to follow.
11           I'm No. 50.  I am married.  I have two adult
12   children.  I'm currently in retail sales.  Spouse is a
13   dentist.  No military service in any family member.  No prior
14   jury service.  And I have a master's in counseling education.
15           THE COURT:  Thank you very much.
16           PANELIST NO. 73:  I'm juror No. 73.  I'm married.  We
17   have three adult children.  I'm a homemaker and self-employed.
18   My husband is a foreman on a high voltage line crew for one of
19   the utility companies.  And no military service for myself.
20   My husband was in the Marine Corps.  Our oldest son is
21   currently stateside active service in the Army.  And I have no
22   prior jury service.  My highest level of education is my high
23   school diploma.
24           THE COURT:  Thank you very much.
25           PANELIST NO. 74:  Juror 74.  I have been married for
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

```
 1    17 years.  We have a 10-year-old daughter.  I currently am the
 2    senior information services manager for a semiconductor
 3    company where I have been for 12 years.  My wife is a
 4    stay-at-home mom for the last six years.  Previously, she was
 5    a clinical social worker for the VA hospitals.  Neither of us
 6    have any military service.  I don't have any previous jury
 7    service.  And my highest education is a master's degree in
 8    engineering management.
 9             THE COURT:  Thank you very much.
10             PANELIST NO. 76:  Juror 76.  I'm divorced.  No
11    children.  I work as a medical clerk for a health insurance
12    company that works on behalf of the VA.  Neither my ex-husband
13    or myself have served in the military.  No jury service.  But
14    I have been called a few times.  And I have a bachelor of arts
15    and I majored in history.
16             THE COURT:  Thank you very much.
17             PANELIST NO. 78:  Juror No. 78.  I'm divorced.  I
18    have three adult children.  I'm retired.  Before that I was a
19    manager for a night club and a bar.  No military service other
20    than my father.  No prior jury service.  And my highest
21    education is high school with some college but no degree.
22             THE COURT:  Thank you very much.
23             PANELIST NO. 79:  Juror No. 79.  Married with two
24    adult children.  I retired after 35 years of utility service
25    administrator for a natural gas company.  My wife retired
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

 1   after 30 years as a manager in special investigation for an

 2   insurance company.  I spent four years in the Navy.  I was an

 3   electronics mechanic and did a six-month tour in the Middle

 4   East.  I have not sat on a jury and my wife and children did

 5   not serve in the military and I have a master's in

 6   organizational management.

 7            THE COURT:  Thank you very much.

 8            PANELIST NO. 80:  I'm No. 80.  Single.  No children.

 9   I'm a quality analyst at a hospital.  No military service and

10   no prior jury service.  My highest education level is some

11   college, no degree.

12            THE COURT:  Now, in your questionnaire you also

13   identified knowing a person by the name of Mustafa Hussan who

14   is a former co-worker of yours.  And let's see if we can find

15   out if it's the same person or a different person.

16            Did this person work for you at the healthcare

17   location where you currently work?

18            PANELIST NO. 80:  Yes.

19            THE COURT:  Do you know what he did for a living

20   there?

21            PANELIST NO. 80:  I think he was some type of nurse.

22            THE COURT:  Some type of nurse.

23            Do we know if this individual is in some type of a

24   healthcare occupation, Ms. Brook?

25            MS. BROOK:  No.  Not in the healthcare profession.

1           THE COURT:  And how old -- just estimate.  How old

2      would you say the Mustafa Hussan --

3           PANELIST NO. 80:  Maybe like in his 40s.

4           MS. BROOK:  Not the same one.

5           THE COURT:  Not the same one.  Okay.  Thank you very

6      much.

7           PANELIST NO. 82:  Hello.  I'm 82.  I'm not married.

8      I have one child.  I currently work for a company that does

9      pumps and distribution with oils and gas and I do the accounts

10     receivables collections.  I have not served in the military.

11     I don't have anybody in my family that served in the military.

12     I have no prior jury service.  And my highest education is

13     high school.

14          THE COURT:  Thank you very much.

15          PANELIST NO. 83:  Juror No. 83.  I'm single.  No

16     children.  I work in retail as a guest experience manager.  I

17     have no military service, although both my grandfathers served

18     in the military and my brother is currently an officer in the

19     Air Force.  I have never been on a jury.  And I have a

20     bachelor of science in business marketing and a bachelor of

21     arts in business communication.

22          THE COURT:  Thank you.

23          PANELIST NO. 85:  No. 85.  I'm married.  No children.

24     My husband and I are both retired.  We have no military

25     service.  In addition to the grand jury I mentioned yesterday,

1    I did serve on a trial, a DUI trial, in which case we did find

2    the -- we found guilty.  My highest level of education is an

3    MBA.

4            THE COURT:  Thank you very much.

5            PANELIST NO. 102:  Juror 102.  I'm single.  No

6    children.  I'm a chef.  My father was in the Navy in World War

7    II.  Never been on a jury.  And I have an associate's in

8    culinary arts and three years towards a bachelor with a

9    ministry emphasis.

10           THE COURT:  Thank you very much.

11           PANELIST NO. 101:  Juror 101.  I'm divorced with two

12   adult children now married with children.  I have 50 percent

13   ownership in a construction company we started 30 years ago.

14   I have no military service.  I have zero education.  I have no

15   formal education.  I didn't finish seventh grade.  I have been

16   called for juror duty several times and never been selected.

17   I assume because I have no education.

18           THE COURT:  Thank you very much.

19           PANELIST NO. 101:  And is that all?

20           THE COURT:  Did you mention military?

21           PANELIST NO. 101:  My eldest daughter and her husband

22   are both Captains in the U.S. Army now.

23           THE COURT:  Okay.  Thank you very much.

24           PANELIST NO. 100:  Juror 100.  I'm in a 15-year

25   partnership, domestic partner.  I have no children unless I

1   can count my furs.  I'm a retired RN.  And I have military

2   service.  Former Vietnam vet.  Captain was my rank in the

3   United States Air Force.  I was in the medical corps during

4   that period of time as a nurse.  I have never served on a jury

5   before.  My highest education is a bachelor's in business

6   administration.

7          THE COURT:  Thank you very much.

8          PANELIST NO. 99:  No. 99.  I am married with two

9   adult children.  I have a master's degree in counseling

10  psychology.  And I work as a therapist with the Department of

11  Corrections.  My husband as a Ph.D. in psychology and religion

12  and is a prison chaplain.  No military background with my

13  family.  No previous jury service.

14         THE COURT:  Thank you.

15         PANELIST NO. 98:  Juror No. 98.  I'm married.  I have

16  three kids, ages 12, just turned 15 yesterday, and 16.  I am

17  employed in IT at a large financial institution.  My wife is a

18  homemaker and home schools our kids.  I have no prior military

19  experience, no prior jury service, and my highest education is

20  a bachelor of science in business administration.

21         THE COURT:  Thank you.

22         PANELIST NO. 97:  I'm juror No. 97.  I am divorced.

23  I have four adult children.  I have retired from a career in

24  information technology and business information systems.  I

25  have no military experience.  I have one child who served in

 1   the Air Force for four years with an honorable discharge.  I

 2   currently have a grandchild who is serving in the Air Force

 3   right now, his third year, doing aircraft maintenance.  I have

 4   had prior jury service.  I have been on two criminal cases.

 5   The first case was a fraud case where we returned a guilty

 6   verdict.  The second case was a murder case where the trial

 7   ended in a mistrial.  The jury never received the case to

 8   deliberate.  And my highest education is some college with no

 9   degree.

10        THE COURT:  Thank you very much.

11        PANELIST NO. 96:  Hi.  I'm No. 96.  I'm divorced.  I

12   have two adult children.  I am a certified pharmacy

13   technician.  My highest education was two years of college,

14   associate degree in nursing.

15        I have no military experience.  My ex-husband was

16   drafted for Vietnam before we met.  He served in Vietnam.  I

17   have two prior juries; one was a DUI and the other one was an

18   assault and stabbing.  And I just found out this morning that

19   my work will only pay for ten days of jury duty a year.

20        THE COURT:  Ten days a year?

21        PANELIST NO. 96:  Yes.

22        THE COURT:  And are you scheduled to work more or

23   less during the same times that we're scheduled to be here in

24   court?

25        PANELIST NO. 96:  Yes.

1           THE COURT:  And would the loss of that additional pay

2     for the days beyond ten that we will be here create a

3     financial hardship?

4           PANELIST NO. 96:  Yes.  I was just in a car accident

5     three weeks ago and I had to use my sick time and part of my

6     vacation, unfortunately, for that.  So I don't have much left.

7           THE COURT:  I will excuse you from serving as a trial

8     juror in this case.  You may be excused at this time.

9           PANELIST NO. 96:  Thank you very much.

10          THE COURT:  And your juror number is?

11          PANELIST NO. 96:  No. 96.

12          THE COURT:  96.  No. 96.  Thank you very much.

13          PANELIST NO. 113:  Juror 113.  Single.  No children.

14    I work in the production department of a company that does

15    business phone systems.  I served in the Navy.  I got out as

16    an E-5.  My father and my three brothers were all Air Force

17    and my youngest brother is still serving.  I've never served

18    on a jury.  And I have a bachelor's in political science.

19          THE COURT:  Thank you.

20          PANELIST NO. 115:  I'm No. 115.  I'm single.  I have

21    no children.  I'm an attorney right now.  I have no military

22    service.  No prior jury service.  And my highest degree is a

23    juris doctor.

24          THE COURT:  Thank you.

25          PANELIST NO. 118:   I'm juror 118.  I'm married 25

1   years.  I have four children.  Two are under 18.  One is 17.

2   And one is 15.  I'm an accountant.  My husband is a nuclear

3   engineer.  Neither my husband nor myself have military service

4   but on both sides we have several brothers that are in all the

5   branches; Air Force, Marines, and Army.  I have been on two

6   juries.  They're both criminal here in Maricopa County.  One

7   was a kidnapping.  We found the defendant guilty.  The other

8   was an aggravated robbery.  We found him not guilty.

9              THE COURT:  Thank you very much.

10              PANELIST NO. 118:  And education, he has an

11   accountancy.

12              THE COURT:  Thank you very much.

13              PANELIST NO. 122:  I'm juror No. 122.  I'm married.

14   Five children; three adult children, twins that are 17.  I

15   work in aerospace fiberoptic work.  My husband works for a

16   helicopter company, manufacturing work there, engineering.  No

17   service in the military for my children, myself or my husband,

18   and never served on a jury.

19              THE COURT:  And your highest level of education?

20              PANELIST NO. 122:  Some college, no degree.

21              THE COURT:  Thank you very much.

22              PANELIST NO. 125:  Juror 125.  I'm married for almost

23   42 years.  My husband and I have one son and I have two

24   stepchildren.  I have a bachelor's of arts in geography,

25   master's of science in library science, and additional

post-graduate work but not completed towards elementary

education certification.  I have spent most of my working

career working as a librarian.  My husband and I also at one

point owned for a number of years a video store.  And I have

also worked for a company that did document analyzation for

the documents for litigation.  My husband for many years was

involved in the service station business, including being a

service station dealer.  My husband was in the Air Force prior

to the Vietnam War.  My son is currently a Lieutenant in the

Navy serving as a liaison officer in the British Navy.  My

prior jury service, I have been three juries; one involved

road rage that turned into an assault with a knife and that

jury was a hung jury.  The next jury that I was on involved --

I'm not sure I can remember all the details, but it started, I

think, as perhaps gang-related on the south side of Tucson.

And by the time people got into cars and on the north side

there was an assault involved and that person was found

guilty.  The last case I was on was a spousal rape case.

There were three charges.  The jury found guilty on two of the

charges and innocent on one.

          THE COURT:  And your highest level of education?

          PANELIST NO. 125:  The highest degree would be the

master's of science and library science.

          THE COURT:  Thank you very much.

          Ladies and gentlemen, do any of you know any of the

```
 1    other prospective jurors?
 2              You have had a chance to look around the courtroom,
 3    look around the jury room, hear everybody talk.
 4              I see one hand.  I actually -- oh, there's two.  I
 5    was going to say I should see two.  You are juror number?
 6              PANELIST NO. 45:  Juror No. 45.  I know juror No.
 7    140.
 8              THE COURT:  Okay.  Good.  It's always good when the
 9    hands match.  Sometimes we get one and they say I know
10    somebody and the other one says, "I don't think I know you."
11              But No. 140, you also know juror No. 45; is that
12    correct?
13              PANELIST NO. 140:  Yes.
14              THE COURT:  The question I have for each of you.  If
15    both of you end up on the jury -- and -- is it 45?  Will you
16    be able to exercise your own independent judgment about the
17    facts and not be overly influenced by 140's determination of
18    the facts?
19              PANELIST NO. 45:  Yes, Your Honor.
20              THE COURT:  And same question for you, juror No. 140.
21              PANELIST NO. 140:  Yes, Your Honor.
22              THE COURT:  Thank you very much.
23              Anybody else think they know any of the other
24    prospective jurors?
25              Ladies and gentlemen, I will be instructing you both
```

 1   preliminarily and in your final instructions that the

 2   responsibility of the jury is to find the facts and then apply

 3   the law to the facts as you find them and reach a verdict.

 4   And that you are to reach a verdict without consideration of

 5   sympathy or prejudice.

 6         Would any of you find it difficult to render a

 7   verdict of guilty if the evidence supported such a verdict

 8   because of your own religious, moral, philosophical, or

 9   personal beliefs, or because of sympathy for a defendant's

10   personal circumstances or conditions, or merely because

11   rendering a guilty verdict might be an unpleasant task?

12         I see no hands.  Thank you.

13         Do any of the prospective jurors believe that as a

14   result of filling out the questionnaire, hearing the statement

15   of the case, and listening to the questions asked by the Court

16   and the answers given by various prospective jurors, that you

17   have formed an opinion about this case?

18         I see one hand.  We'll pass the microphone to juror

19   No. 41.

20         PANELIST NO. 41:  Yes.  May I approach, Your Honor?

21         THE COURT:  Yes, you may.

22      (At sidebar on the record.)

23         THE COURT:  Good morning.  Could you speak into this

24   small microphone please?

25         PANELIST NO. 41:  Sure.  Yes.  As I stated previously

1    yesterday, I swore an oath to tell the truth and not hold

2    anything back.  So, therefore, from my views for being an

3    anti-religious extremist, I feel I would be biased, you know,

4    because the case is related to religious extremism.  I believe

5    it would be very hard to not have a biased opinion because of

6    the things I believe are happening with ISIS and ISIL.

7         THE COURT:  I really appreciate your being so honest

8    with us.

9         PANELIST NO. 41:  I don't want to have a false

10   verdict because of my personal opinions possibly affecting

11   someone's life.

12        THE COURT:  Is there any objection to excusing this

13   juror?

14        MS. BROOK:  No objection.

15        MR. MAYNARD:  No objection.

16        THE COURT:  Thank you so much, juror 41.

17     (End of discussion at sidebar.)

18        THE COURT:  Juror 41 is excused.

19        Were there any other hands raised?

20        Ladies and gentlemen, I have asked all the questions

21   I plan to ask, but the lawyers get a chance to ask some

22   followup questions at this time.

23        And so we will first -- Ms. Brook, are you going to

24   be the one for the government?

25        MS. BROOK:  Yes, Your Honor.

 1              THE COURT:  We'll have Ms. Brook address the

 2    prospective jurors.

 3              And, again, when you answer the question, let's wait

 4    until we get one of our microphones to you.

 5              MS. BROOK:  Good morning again, everyone.

 6              I have two quick questions for you.  So yesterday the

 7    Judge inquired into everybody's background as it relates to

 8    IT, computers, computer science, and their experience.

 9              Are there any here amongst us who feel that they are

10    experts in the field of computers or computer science?  And if

11    you do, if you could just raise your hand.

12              So I'm seeing juror 34.  Is there anyone else?

13              Your number, sir?

14              PANELIST NO. 98:  98.

15              MS. BROOK:  Juror 98.  And anyone else?

16              So specifically then to 34 and 98, if in this case

17    you heard testimony from somebody who was deemed to be a

18    computer expert, would you have a hard time setting aside your

19    own experiences or your opinions and listening fairly to the

20    testimony of that individual?

21              PANELIST NO. 34:  Probably I need clarification on

22    what you consider "expert" and what I consider "expert."

23              MS. BROOK:  And that's a good question and it's kind

24    of a tangible thing in this sort of a setting to be able to

25    articulate.

1        I guess the question is simply this.  Do you feel so

2   strongly in your experience, your training as an expert in

3   computers, that it would be hard to listen to somebody else if

4   maybe they said something you disagreed with?

5        PANELIST NO. 34:  No.  I can listen to someone with

6   an open mind about what they're saying.  But "expert," I think

7   I'm really, really good at what I do.  I think I'm good as a

8   database administrator.  And I think, you know, I'm pretty

9   good with programming but I don't think I'm the best.  I think

10  there's always someone better, so I can keep an open mind.

11       MS. BROOK:  Okay.  Thank you.  And was it 96 in the

12  back.

13       THE COURT:  No. 98.

14       PANELIST NO. 98:  Juror 98.  I think I would probably

15  would be okay with that.  I can't say for sure because my

16  expertise area I know extremely well.  And if it's my

17  expertise area, I might have an issue with it, but if it's

18  not, I'm okay.

19       MS. BROOK:  So let me follow up on that a little bit.

20  What exactly is your expertise area specifically?

21       PANELIST NO. 98:  I make sure hackers don't get into

22  our computer systems.

23       MS. BROOK:  Okay.  And let me also follow up briefly

24  with 34, if we can come back.

25       What's your expertise, specifically?

1        PANELIST NO. 34:  I'm a programmer, so I know

2   programming very well.  I don't know -- I'm not an expertise

3   in networking or certain aspects of it.  I know database

4   administration very well, so maybe I'm not considered an

5   expert when you are talking about the overall.

6        MS. BROOK:  Okay.

7        PANELIST NO. 34:  IT.

8        MS. BROOK:  And I apologize.  To go back to 98

9   briefly to ask the same followup question, do you feel that

10  you would be able to listen to the evidence fairly and make a

11  judgment based upon the evidence or do you feel that your own

12  opinions and background may come into play?

13       PANELIST NO. 98:  Well, like I said, if it's my area

14  of expertise, that small little piece, then I might have an

15  issue if they say something wrong.

16       MS. BROOK:  Okay.  Great.

17       I have one other question unrelated to IT.  And

18  yesterday the Court asked everybody here if they have strong

19  opinions about the right to bear arms.  So a number of people,

20  obviously, raised their hand and said that they did.

21       Are any of you here that have those strong opinions,

22  do any of you feel that there should be no restrictions on the

23  right to possess weapons?

24       So what I mean by that, specifically, is does anybody

25  feel that the law should not prohibit certain people like

1      felons to possess weapons?

2              Does anybody disagree with that law?  And I'm not --

3              THE COURT:  I see no hands, Ms. Brook.

4              MS. BROOK:  With that I thank you all.

5              That's all I have.

6              THE COURT:  Thank you very much.  Mr. Maynard.

7              MR. MAYNARD:  I have a few questions.  I probably

8      won't be as short as the government was.

9              My client owned a couple of businesses and one of

10     them was a moving business and it also cleaned carpets.  So

11     what I want to know is if anybody ever had interactions with

12     those businesses.  It was called Git-r Done Moving and Git-r

13     Done Cleaning.

14             Anybody ever get moved by Git-r Done.

15             Never had your carpets cleaned by Git-r Done

16     Cleaning?  Okay.

17             There were people here that indicated that they had a

18     relationship with a financial institution.  Does anybody here

19     have a relationship other than a checking account or something

20     but they're actually employed by Alliance Bank?

21             Okay.  There were also a number of people in their

22     jury questionnaire who indicated having problems with

23     drinking.  Not that they had problems with drinking, they had

24     problems with other people drinking.

25             And I don't want to point individuals out, but the

1   question I really had was is there anybody here that is so

2   against drinking that they think it's either a sin or immoral

3   or that it would affect their decision making?  In other

4   words, if they thought that somebody was drinking, that they

5   would think that they were a bad person because of that?

6          Okay.  Thank you.

7          I have a couple of followup questions with a couple

8   of individuals and I don't believe there was an answer.

9          Juror No. 5 --

10         THE COURT:  Could we pass the microphone to No. 5?

11  Thank you, No. 9.

12         MR. MAYNARD:  Okay.  In your questionnaire you

13  indicated you didn't know whether or not you would be paid for

14  jury duty.

15         PANELIST NO. 5:  Right.

16         THE COURT:  And I don't remember if the Judge

17  followed up with you on that.  Is that a financial hardship

18  for you?

19         PANELIST NO. 5:  I did check with my employer and I

20  would be receiving my full pay.

21         MR. MAYNARD:  You would be?  Okay.

22         You also in your questionnaire mentioned something

23  about if somebody killed in the name of religion they were a

24  coward.  I would agree with you.

25         But because this case involves an alternative

1   religion to what most of us here practice, does that affect

2   you at all in this case?

3           PANELIST NO. 5:  It's kind of -- I would say it's

4   hard to say.  I would take the case based on its merits.  But

5   that is my personal belief, you know, whether it's mainstream

6   religion or any alternative religion.

7           MR. MAYNARD:  Okay.  There's no question my client,

8   Mr. Abdul Malik Abdul Kareem, is a Muslim.

9           PANELIST NO. 5:  Okay.

10          MR. MAYNARD:  Does that affect your ability to be --

11          PANELIST NO. 5:  No.

12          MR. MAYNARD:  -- to listen to this case?

13          PANELIST NO. 5:  No.  It doesn't.

14          MR. MAYNARD:  Okay.  Juror No. -- I lost the number.

15   Juror 11.

16          THE COURT:  Right in front of you, No. 5.  Thank you.

17          MR. MAYNARD:  And, again, I'm not trying to pick on

18   anybody.  Is it working?

19          PANELIST NO. 11:  Okay.

20          THE COURT:  Yes.

21          MR. MAYNARD:  Okay.  In your questionnaire, I believe

22   that you said you watched the news very, very closely on this

23   particular case.  Do you recall that?

24          PANELIST NO. 11:  Yes.

25          MR. MAYNARD:  Okay.  When you say that, I mean, did

 1    you do some independent research, did you look at online

 2    articles and things about the case?

 3              PANELIST NO. 11:  No.

 4              MR. MAYNARD:  Okay.  When you said you followed it

 5    very -- what did you mean by that?

 6              PANELIST NO. 11:  Just the clips I saw on the news.

 7              MR. MAYNARD:  Okay.  Did you -- because of following

 8    the case so closely, do you think you have formed any ideas or

 9    preconceived ideas or notions about the case from your having

10    followed it so closely?

11              PANELIST NO. 11:  I don't know.

12              MR. MAYNARD:  Okay.  When you say you followed it

13    closely, did you just watch the articles at the time or have

14    you been reading articles in the past several months about the

15    case?

16              PANELIST NO. 11:  No.  Just as it came up on the

17    news.

18              MR. MAYNARD:  Okay.  Because you were one of the few

19    that said you followed it so closely.  I was surprised half

20    hadn't followed it at all.

21              Do you think that your having followed it closely has

22    an effect on your ability in this case to just hear the

23    evidence here?  I mean, in other words, have you already got

24    some preconceived ideas about, jeez, this is what I think

25    because this is what I've read?

1          THE COURT:  As related to Mr. Kareem?

2          MR. MAYNARD:  As related to Mr. Abdul Kareem.

3          PANELIST NO. 11:  I don't think so.

4          MR. MAYNARD:  All right.  Thank you.

5          Juror 25.  Okay.  In your questionnaire you indicated

6  that you had visited the Middle East on a tour of the Holy

7  Land.  When was that?  What kind of tour was it?

8          PANELIST NO. 25:  It was approximately 20ish years

9  ago.  I was like 16 or 17.  And I went with a group from

10  church.  And it was -- basically, it was walking in Christ's

11  footsteps, walking the Via Dolorosa leading up to Mount

12  Golgotha just so we could actually see where he was condemned,

13  where the cross was laid on him, where he first fell, where he

14  met Mary Magdalene, where each event happened.

15          MR. MAYNARD:  Okay.  Do you believe that that

16  experience has affected you so that it would impact your

17  ability to decide this case since my client is a Muslim?

18          PANELIST NO. 25:  While it was a religious

19  experience, it didn't have any bearing on any religion for me.

20  I don't think it has any bearing in my personal opinion on

21  this case, no.

22          MR. MAYNARD:  Okay.  Thank you.

23          A number of people in the jury panel indicated that

24  they are on social media often, every day, many times a day.

25  And some people are on six and seven different types of social

1  media.

2       If the Judge were to ask you not to do any research

3  on the case, not to participate in social media during the

4  term of the trial, is that going to adversely affect anybody

5  so that they don't --

6       THE COURT:  Hold on.  I'm not going to tell them not

7  to engage in social media if they want to go on Facebook or

8  they want to send out a tweet to their friends about something

9  that has nothing to do with the case.

10      I will be advising them very specifically that they

11  cannot use social media to do any research about the case or

12  to find out any information about the case or any of the

13  people who might be involved in the case.

14      But as it relates to using social media on a personal

15  basis to stay in touch with friends, on a business basis, that

16  is not going to be prohibited.

17      MR. MAYNARD:  With the Judge's admonition, does that

18  affect anybody's ability to be a juror in this case?

19      Yes?

20      PANELIST NO. 98:  Can I approach please.

21      THE COURT:  Juror 98?  Yes, please.

22     (At sidebar on the record.)

23      THE COURT:  Good morning.

24      PANELIST NO. 98:  Good morning.  With my job I use

25  social media to determine if people are going to attack us.

 1   And things like this --

 2           THE COURT:  "Attack us" meaning attack your company?

 3           PANELIST NO. 98:  Yes.  Sorry.

 4           THE COURT:  What company is that?

 5           PANELIST NO. 98:  American Express.

 6           THE COURT:  Okay.

 7           PANELIST NO. 98:  And so my concern is if there is

 8   any kind of leaks or anything about this, if it comes up and

 9   it might come up in my job, I have to see tweets and things

10   like that.  So that's my concern.

11           THE COURT:  All right.  I appreciate the information.

12           PANELIST NO. 98:  Okay.

13           THE COURT:  Thank you very much.

14      (End of discussion at sidebar.)

15           THE COURT:  I know a few people may have asked for a

16   break.  I'm going to try to finish the questions and then

17   we'll take a break.  Do you have --

18           MR. MAYNARD:  Probably about five more minutes.

19           THE COURT:  Five more minutes and then I have one

20   final question and then we'll take a rather lengthy break.

21           MR. MAYNARD:  Juror 43, in your juror questionnaire

22   you indicated that you had been to Kenya, Malaysia.  Could you

23   just give me a little bit more background on that.

24           PANELIST NO. 43:  I traveled with a Christian music

25   group.  We did concerts there.  We were there for about a

 1    week, between Singapore and Malaysia, and then one week in

 2    Kenya and that was back in 1986 and '87.

 3              MR. MAYNARD:  If you could pass that to 44.

 4              You were in Tanzania, Cypress.  Was this all the

 5    military?

 6              PANELIST NO. 44:  No.  Just Cypress was the military.

 7              MR. MAYNARD:  Pardon me?

 8              PANELIST NO. 44:  Just Cypress was the military.

 9    Tanzania and Kenya weren't.

10              MR. MAYNARD:  When were you in Tanzania?

11              PANELIST NO. 44:  When I was 15 and 16 -- 16 years

12    old.  Excuse me.

13              MR. MAYNARD:  And juror No. 48?

14              THE COURT:  Juror 48 was excused.

15              MR. MAYNARD:  Okay.  Judge, that's all I have.

16              THE COURT:  Thank you.

17              MR. MAYNARD:  Thank you.

18              THE COURT:  Ladies and gentlemen, a whole lot of

19    questions were asked yesterday both in writing and orally.  It

20    may be that there's something that you forgot and you were

21    wondering if I would ever give you a chance to say, "Oh, I

22    forgot to tell you."

23              So if there's anything that would have been

24    responsive that you just didn't think of at the time that you

25    wish to tell us now, please raise your hand.

 1          One hand in the very back at the end of the last row

 2   and then a couple hands up here.  So we'll start over in the

 3   back corner.  You are No. --

 4          PANELIST NO. 103:  103.

 5          THE COURT:  What is the information that you would

 6   like to add at this time?

 7          PANELIST NO. 103:  I forgot about my father being in

 8   the military all my childhood.  And I also have a niece that

 9   is a nurse and she works in a prison on the weekends.

10          THE COURT:  Okay.  And what branch of the military

11   was your father in all your life?

12          PANELIST NO. 103:  He was in the Army, Navy, and

13   Marines, but he retired in the Army of 32 years as a First

14   Sergeant.

15          THE COURT:  Okay.  Thank you very much.

16          And then there was -- the microphone is with No. 57.

17          PANELIST NO. 57:  Can I approach, please?

18          THE COURT:  Yes, you may.  And then I saw two more

19   hands.  We will take No. 57 and then this individual and then

20   141.

21      (At sidebar on the record.)

22          THE COURT:  Good morning.  Let's wait for the lawyers

23   to get here and you can speak into this microphone.

24          PANELIST NO. 57:  Okay.  After my husband retired

25   from the military, he was a police officer in Pennsylvania.

```
 1    And I think I -- I don't think I mentioned that.

 2              THE COURT:  Okay.  All right.  Thank you very much.

 3              PANELIST NO. 57:  Okay.

 4         (End of discussion at sidebar.)

 5              THE COURT:  No. 141?

 6              PANELIST NO. 141:  My job only pays for 16 hours and

 7    I believe I used that all up today.

 8              THE COURT:  Okay.  Let me -- your job basically pays

 9    you for two days?

10              PANELIST NO. 141:   Right.

11              THE COURT:  And for the rest of that time if you were

12    selected you would not be paid; is that correct?

13              PANELIST NO. 141:  I will not be paid.

14              THE COURT:  And would the loss of those days' pay

15    create a financial hardship?

16              PANELIST NO. 141:  Yes, it is.

17              THE COURT:  No. 141, I will excuse you from serving

18    as a trial juror.

19              PANELIST NO. 141:  Thank you.

20              THE COURT:  Thank you very much.  Juror 64?

21              PANELIST NO. 64:  No. 64.  I don't think how relevant

22    this would be, but when my husband and I were stationed in

23    Washington, D.C. he witnessed the attack on the Pentagon on

24    9/11.

25              THE COURT:  He was there and he saw it?
```

1          PANELIST NO. 64:  He ran to the side of the building.

2     He was working for the Surgeon General of the United States

3     Air Force at the time.  Saw the smoke and all the commotion.

4          THE COURT:  Thank you very much.

5          Is there anyone else?  There's a hand on the end to

6     my far right. Your number?

7          PANELIST NO. 102:  Juror 102.  A guy I knew during my

8     first year of college died overseas in the Middle East from an

9     IED.  And I know it was on the questionnaire, but it had

10    totally slipped my mind because I didn't keep contact with him

11    after school.

12         THE COURT:  Okay.  Thank you very much.

13         No. 25?

14         PANELIST NO. 25:  May I approach, Your Honor?

15         THE COURT:  Pardon?

16         PANELIST NO. 25:  May I approach?

17         THE COURT:  Certainly.

18     (At sidebar on the record.)

19         PANELIST NO. 25:  It completely slipped my mind

20    yesterday.

21         THE COURT:  That's okay.  Speak to this microphone

22    please.

23         PANELIST NO. 25:  Oh, okay.  My brother is a lead

24    detective for the El Mirage Police Department and my

25    sister-in-law is in the FBI but I don't know what she does.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2  2-17-16

1          THE COURT:  And is she based here in Phoenix or

2    somewhere else?

3          PANELIST NO. 25:  She's in Washington but she was

4    recently transferred here because she got a hardship because

5    she and my brother got married.

6          THE COURT:  What is her name.

7          PANELIST NO. 25:  Macaela -- her maiden name is

8    Hicks.  H-I-C-K-S.  Married named is Hughes.   H-U-G-H-E-S.

9          THE COURT:  Okay.  Thank you very much.

10          PANELIST NO. 25:  Okay.  Thank you.

11      (End of discussion at sidebar.)

12          THE COURT:  Is there anyone I missed?

13          Last -- oh, one more.

14          PANELIST NO. 101:  May I?

15          THE COURT:  Yes, please.  It's No. 101.

16      (At sidebar on the record.)

17          THE COURT:  Good morning.

18          PANELIST NO. 101:  Hi.

19          THE COURT:  Come speak to this microphone, please.

20          PANELIST NO. 101:  You asked yesterday if anyone

21    considered themselves a firearms expert.

22          THE COURT:  Yes.

23          PANELIST NO. 101:  Well, that was subjective enough

24    to confuse me, so I wasn't sure how to answer.  I owned a 45

25    percent of a firearm -- of a firearms ammunition manufacturing

1    company for years and operated it solely.

2         So I do know ballistics and casings and powder and

3    primers and bullets and wadding and other manual arms for

4    almost all antique firearms and most modern and dozens of

5    specific model numbers.

6         So I guess if I'm not an expert, I'm -- I'll probably

7    be able to be able to find one.

8         THE COURT:  You are an expert in ammunition in

9    particular?

10         PANELIST NO. 101:  And firearms.

11         THE COURT:  Okay.  Thank you very much.

12         PANELIST NO. 101:  I thought you might want to excuse

13    me but I just did not answer that.

14         THE COURT:  Thank you very much, sir.

15      (End of discussion at sidebar.)

16         THE COURT:  No. 13?

17         PANELIST NO. 13:  My godson did four years in the

18    Marines.  And on the questionnaires with the violent attack,

19    my uncle was brutally attacked back in 1984 and later died

20    from complications.

21         THE COURT:  Okay.  Thank you very much.

22         Last question.

23         Ladies and gentlemen, is there anything we haven't

24    asked you that you think we should know about you that could

25    possibly affect your ability to be fair and impartial in this

1   case?

2          And the last thing I want to say, you have heard a

3   couple of people mention their employers paying them, not

4   paying them, paying them for only a certain number of days.

5          If any of you don't know what the status is of your

6   pay, vis-a-vis the number of days you serve, we need to know

7   before we pick the 16 jurors that will try this case.

8          As you have all heard, for those people who have said

9   "I'm not going to be paid" and "it will create a financial

10  hardship," I have excused them, whether it was two days with

11  the last gentleman or ten days with someone earlier this

12  morning.

13         If you turn out to be one of the 16 jurors chosen and

14  tell me tomorrow, "Gosh, I just found out I'm not going to get

15  paid," it will be too late.  I will not be able to excuse you

16  tomorrow.  I can only excuse you for hardship, for a financial

17  hardship before we choose the 16.

18         So is there anyone here who is concerned about that?

19         Okay.  No. -- so here is what I'm going to do.  For

20  those of you that are concerned about that, we're going to

21  take a break right now.  And this break is going to last until

22  about 11:15.

23         During that time period, I want all of you to call

24  your employer and find out precisely what their policy is.

25  And if you will not be paid, then I want you to report that

1    immediately to Maureen or Sanessa or Kathy.  They will make

2    sure that they will be out in the hallway or some place where

3    you can let them know.

4           If any of you don't have a phone -- I can't imagine

5    that -- but if it's -- I'm just used to saying that from back

6    in the old days when people didn't have phones in their

7    pocket.  If any of you need to use our phone, we can make that

8    available to you.

9           But if you have any of those concerns, we need to

10   know about them before we call the 16 up, because that won't

11   be an excuse tomorrow.  It's only an excuse before the jurors

12   are selected.

13          So please as you go out, let Sanessa know you are

14   going to call and report back to her so that I can let the

15   lawyers know if any of you have a financial hardship related

16   to your pay.

17          Thank you very much.

18          Ladies and gentlemen, we will reconvene, I hope, at

19   11:15.  It may take a few minutes beyond that.  It might --

20   but on the break, once again, you are not to discuss the case

21   among yourselves or with anyone else.  Not to let anybody know

22   the status of jury selection.  Don't talk to the lawyers.

23          There's been some other people in the back of the

24   courtroom that are interested in this case.  Don't talk to any

25   of them.  Don't let anybody talk to you about the case.

```
 1           And we will reconvene -- when we reconvene, it's

 2    really going to be tight, because I'm going to leave these

 3    seats open to seat the 16 jurors.  So we will bring you in,

 4    but some of you may have to just kind of stand in the back

 5    until we get 16 people in the front.

 6           So I'm going to excuse the prospective jurors at this

 7    time.  We will see -- please try to be out in the hallway by

 8    about 11:15, 11:20 at the latest, and we will then select the

 9    jurors who will try the case.

10       (Recess taken at 10:38 a.m.)

11       (Open court, no jury present at 10:41 a.m.)

12           LAW CLERK SANESSA GRIFFITH:  No. 100 was starting a

13    new job and they asked to be deleted from jury selection.  But

14    he is like five weeks and he is going to start training at

15    some point.

16           THE COURT:  Okay.  So No. 100 told you that he is

17    starting a new job.  I don't know why they don't tell us.  And

18    so he wants to be excused.

19           Anybody have a problem with that?

20           MS. BROOK:  No objection.

21           MR. MAYNARD:  No objection.

22           THE COURT:  Okay.  So we will excuse 100 but don't

23    tell him yet.  At this point everybody is coming back.

24           LAW CLERK SANESSA GRIFFITH:  Okay.

25           THE COURT:  So could you give me the numbers of the
```

 1    ones that are -- so we can see how many of them might make a

 2    difference.

 3              LAW CLERK SANESSA GRIFFITH:  13, 25, 69, 80, and then

 4    100.

 5              THE COURT:  And 100.

 6              Okay.  So we took care of No. 100.

 7              No. 69.  If you will recall is the woman that asked

 8    to be excused in any event because she said she was really

 9    busy at work.  She's the only one that does her job.  And I

10    was going to ask you if you -- and now she said it was a very

11    small company and now she's concerned that she won't get paid.

12              Can we excuse 69?  Is there any objection?

13              MS. BROOK:  No objection.

14              MR. MAYNARD:  No objection.

15              THE COURT:  Okay.  We'll excuse 69.

16              I don't have anyone else on my list who actually said

17    "I want to being excused."  There may be some people that you

18    want to challenge, but 69 is the only one that I recall that

19    specifically asked to be excused and we did not excuse her for

20    a hardship that wasn't an automatic, "Sure, I'll let you go."

21              So what I would like to do is ask the government if

22    they have any -- let's just take between 1 and 65.

23              We haven't actually counted, but then we'll count and

24    see where we are so we don't need to talk about people that

25    are in the higher numbers.

```
 1              MR. KOEHLER:  That's easy.  We have no for-cause
 2   challenges, Your Honor.
 3              THE COURT:  Well, that is easy, Mr. Koehler.  Thank
 4   you.
 5              MR. MAYNARD:  Same question?
 6              THE COURT:  Same question, Mr. Maynard.
 7              MR. MAYNARD:  Same answer.
 8              THE COURT:  No for-cause challenges?
 9              MR. MAYNARD:  No.
10              THE COURT:  Okay.  So let me have Maureen count,
11   because I think what we have now are two people that are
12   uncertain about whether they will get paid or not that are in
13   that group.  Okay.
14              We are only through juror No. 49 apparently.
15              Now, let me suggest that rather than waiting, unless
16   you have an objection, can we just excuse 13 and 25 that don't
17   know whether they are going to be paid or not, rather than
18   have them get the bad news later?
19              You know who 25 is.
20              13 is not immediately coming to mind, but we know who
21   25 is.
22              MR. KOEHLER:  We think we would rather check.
23              THE COURT:  You would rather check?
24              MR. KOEHLER:  We would rather check.
25              THE COURT:  Rather check?
```

1           MR. KOEHLER:  Yes.

2           THE COURT:  And the same with 13?

3           MR. KOEHLER:  Yes.

4           THE COURT:  So, Sanessa, what are you going to do?

5           LAW CLERK SANESSA GRIFFITH:  They're going to let me

6    know.  I know 25 is for sure, but I'll check with 13.

7           THE COURT:  Well, then, so here is what is going to

8    happen.

9           If 13 and 25, if one or the other reports back that

10   they are not going to be paid, I will excuse them for

11   hardship.  And then the line will just drop down one or two

12   which would be to either 50 or 51.

13          Have you reached an agreement on the preliminary

14   instructions?

15          MR. MAYNARD:  Yes.  I believe we did.

16          MS. BROOK:  We have, Your Honor.  Did you receive an

17   interlineated copy of them with the changes?

18          THE COURT:  If I did receive them, how would I have

19   received them?

20          MS. BROOK:  You wouldn't have received it yet.  We

21   will do that quickly and get that to Your Honor.

22          THE COURT:  I would like to give the preliminaries

23   before lunch if we could.

24          MR. KOEHLER:  I want to explain to the Court what it

25   is that we have.

1        THE COURT:  If you are in agreement, I don't care.

2        MR. KOEHLER:  It's going to be a matter of copying

3    and pasting and how much you want to look at.

4        THE COURT:  Could I -- I would really like to be

5    looking at it while I heard the explanation.  It's really hard

6    to explain editorial changes on jury instructions and have

7    them in my head.

8        MR. KOEHLER:  This is more just a concept thing.

9        Count 2, our theory from the start of the case has

10   been "aiding and abetting."

11       THE COURT:  I assumed that's what one of the changes

12   was going to be.

13       MR. KOEHLER:  And the Count 2 instruction does not

14   include anything with "aiding and abetting."

15       THE COURT:  Well, are you -- I understand that Count

16   5 is charged both ways and it's not clear to me which way or

17   whether it's going to be both ways.

18       But Count 2, you're telling me right now, is

19   exclusively "aiding and abetting."

20       MR. KOEHLER:  Correct.

21       THE COURT:  So we can change the instruction to be an

22   "aiding and abetting" as opposed to the elements without

23   "aiding and abetting."

24       MR. KOEHLER:  Correct.

25       THE COURT:  No problem.  Is that the only problem?

1    MR. KOEHLER:  And then just an editorial suggestion,

2  near the end where you talk about using mobile devices to

3  communicate about the case, there's references to Blackberries

4  and so on.

5    We would just recommend updating that to Smartphones

6  and that's it.

7    THE COURT:  That's a good idea.  Okay.

8    MR. KOEHLER:  Blackberries are out of date.

9    THE COURT:  I know people particularly that work for

10  the federal government that still use Blackberries.

11    Do you have the interlineated copy for me?

12    MR. KOEHLER:  Not yet.  We will do that shortly.

13    THE COURT:  Okay.  And then we will report back to

14  you as soon as we hear from 13 and 25.

15    In the meantime, perhaps you could exercise a few

16  other strikes.

17    Okay.  Ms. Brook?

18    MS. BROOK:  I don't know if you wanted to take up a

19  housekeeping matter.

20    THE COURT:  I do not want to do anything at all that

21  would interfere with your exercising your strikes.

22    MS. BROOK:  Okay then.

23    THE COURT:  Thank you.

24    MS. BROOK:  Thanks.

25    THE COURT:  Court is in recess.

1          (Recess taken at 10:48 a.m.)

2          (Open court, no jury present at 11:07 a.m.)

3          THE COURT:  Thank you.  Please sit down.  The record

4    will show the presence of counsel and the defendant.

5          Apparently, Nos. 13 and 25 reported back to Sanessa

6    that they did not have any problem with their employment.

7          But apparently after hands went up, several other

8    people got concerned and a lot were on the phone with their

9    employer.  And No. 43 has just reported back to Sanessa that

10   her employer told her that she would only be paid at the rate

11   of $12 an hour and that she makes a great deal more than that.

12         And so I would propose that we excuse 43.  Is there

13   any objection?

14         MS. BROOK:  No objection.

15         MR. MAYNARD:  No objection.

16         THE COURT:  43 is excused.

17         And the other reason I came is that I have excused

18   No. 50.  She reported to Sanessa that she just got a message

19   that her mother-in-law had been taken to the hospital and she

20   had to leave and go to the hospital.

21         So I think that will change us to the last qualified

22   juror being 51.

23         And so continue on with your strikes.

24         MS. BROOK:  Thank you.

25         THE COURT:  We will reconvene as soon as we can.

```
 1              MS. BROOK:  Thank you.

 2              THE COURT:  Okay.

 3         (Recess taken at 11:08 a.m.; resumed at 11:38 a.m.)

 4         (Open court, jury present.)

 5              THE COURT:  Thank you, ladies and gentlemen.

 6              For those of you who can, please be seated.  The

 7    record will show the presence of the prospective jurors,

 8    counsel, and the defendant.

 9              Ladies and gentlemen, at this time the courtroom

10    deputy will call the numbers of the 16 jurors selected to try

11    the case.

12              As your number is called, please take a seat in the

13    jury box as Sanessa will direct.

14              THE CLERK:  Juror No. 1.

15              THE COURT:  I think you get your same seat that you

16    have had since yesterday.

17              THE CLERK:  Juror No. 3.

18         Juror No. 5.

19         Juror No. 7.

20         Juror No. 9.

21         Juror No. 15.

22         Juror No. 19.

23         Juror No. 21.

24         Juror No. 22.

25         Juror No. 36.
```

1            Juror No. 37.

2            Juror No. 39.

3            Juror No. 40.

4            Juror No. 44.

5            Juror No. 45.

6            And juror No. 49.

7            THE COURT:  Those of you, ladies and gentlemen, that

8    were not selected as trial jurors in this case, I want to

9    thank you so much for your being present the last two days and

10   for answering all of our questions both orally and in writing.

11           At this time all of you are excused.  Thank you so

12   much for your service on this summons.

13           Will the jury please stand and be sworn.

14       **(The Jury Is Sworn)**

15           THE COURT:  Please sit down.

16           Ladies and gentlemen, you just found on your seats a

17   white binder.  And on top of the binder you should have found

18   a jury badge and some preliminary instructions.  Those numbers

19   can be removed whenever you're ready and you will now be asked

20   to wear that juror badge while you're in and around the

21   courthouse during the trial.

22           I am going to read to you the preliminary

23   instructions.  They are available for you to retain in your

24   notebooks during the trial.

25           After I complete reading these instructions, we'll

1   take about a one-hour break for lunch.

2        After lunch we will resume and the lawyers will make

3   their opening statements.  And if we have time, we will begin

4   with the testimony in the case.

5        As I read the preliminary instructions, you may

6   follow along or just listen, whatever is your preference.

7   **PRELIMINARY INSTRUCTIONS TO THE JURY**

8        Ladies and gentlemen, you now are the jury in this

9   case, and I want to take a few minutes to tell you something

10  about your duties as jurors and to give you some instructions.

11  These are preliminary instructions.  At the end of the trial I

12  will give you more detailed instructions.  Those instructions

13  will control your deliberations.

14       You should not take anything I may say or do during

15  the trial as indicating what I think of the evidence or what

16  your verdict should be.

17       This is a criminal case brought by the United States

18  government.  The government has charged the defendant with

19  Conspiracy to Transport Firearms and Ammunition in Interstate

20  Commerce with the Intent to Commit a Felony, Aiding and

21  Abetting the Transportation of Firearms and Ammunition in

22  Interstate Commerce with the Intent to Commit a Felony, False

23  Statements, Felon in Possession of Firearms, and Conspiracy to

24  Provide Material Support or Resources to a Foreign Terrorist

25  Organization.  The charges against the defendant are contained

1    in the Indictment.  The Indictment is simply the description

2    of the charges made by the government against the defendant;

3    it is not evidence of anything.

4           In order to help you follow the evidence, I will now

5    give you a brief summary of the elements of the crimes which

6    the government must prove beyond a reasonable doubt to make

7    its case.

8           The defendant is charged in Count 1 of the Indictment

9    with Conspiracy to Transport Firearms and Ammunition in

10   Interstate Commerce with the Intent to Commit a Felony.  In

11   order for the defendant to be found guilty of Conspiracy to

12   Transport Firearms in Interstate Commerce with Intent to

13   Commit a Felony, the government must prove each of the

14   following elements beyond a reasonable doubt:

15          First, beginning on or before January 7, 2015, and

16   continuing through May 3, 2015, there was an agreement between

17   two or more persons to transport firearms and ammunition from

18   one state to another with the intent to commit a felony or

19   with knowledge or reasonable cause to believe a felony would

20   be committed with the firearms and ammunition;

21          Second, the defendant became a member of the

22   conspiracy knowing of at least one of its objects and

23   intending to help accomplish it; and

24          Third, one of the members of the conspiracy performed

25   at least one overt act for the purpose of carrying out the

1    conspiracy.

2            The defendant is charged in Count 2 with Aiding and

3    Abetting the Transportation of Firearms and Ammunition in

4    Interstate Commerce with the Intent to Commit a Felony.  In

5    order for the defendant to be found guilty of Aiding and

6    Abetting the Transportation of Firearms and Ammunition in

7    Interstate Commerce with Intent to Commit a Felony, the

8    government must prove each of the following elements beyond a

9    reasonable doubt:

10            First, a person transported firearms and ammunition

11   from one state to another with the intent to commit a felony

12   or with knowledge or reasonable cause to believe a felony

13   would be committed with the firearms and ammunition.

14            Second, the defendant aided, counseled, commanded,

15   induced, or procured that person with respect to at least one

16   element of transporting firearms and ammunition in interstate

17   commerce with the intent to commit a felony;

18            Third, the defendant acted with the intent to

19   facilitate transporting firearms and ammunition in interstate

20   commerce with the intent to commit a felony; and

21            Fourth, the defendant acted before the crime was

22   completed.

23            The defendant is charged in Count 3 of the Indictment

24   with False Statements.  In order for the defendant to be found

25   guilty of False Statements, the government must prove each of

1    the following elements beyond a reasonable doubt:

2              First, on or about May 5, 2015, the defendant made a

3    false statement in a matter within the jurisdiction of the

4    Federal Bureau of Investigation, with all of you agreeing on

5    the false statement he made;

6              Second, the defendant acted wilfully; that is, the

7    defendant acted deliberately and with knowledge both that the

8    statement was untrue and that his conduct was unlawful; and

9              Third, the statement was material to the activities

10   or decisions of the Federal Bureau of Investigation; that is,

11   it had a natural tendency to influence, or was capable of

12   influencing, the agency's decisions or activities.

13             The defendant is charged in Count 4 of the Indictment

14   with Felon in Possession of Firearms.  In order for a

15   defendant to be found guilty of Felon in Possession of

16   Firearms, the government must prove each of the following

17   elements beyond a reasonable doubt:

18             First, on or about June 10, 2015, the defendant

19   knowingly possessed a firearm;

20             Second, the firearm had been shipped or transported

21   from one state to another state; and

22             Third, at the time the defendant possessed the

23   firearm, the defendant had been convicted of a crime

24   punishable by imprisonment for a term exceeding one year.

25             The defendant is charged in Count 5 of the Indictment

1    with Conspiracy to Provide Material Support or Resources to a

2    Foreign Terrorist Organization.  In order for a defendant to

3    be found guilty of Conspiracy to Provide Material Support or

4    Resources to a Foreign Terrorist Organization, the government

5    must prove each of the following elements beyond a reasonable

6    doubt:

7           First, beginning no later than June 2014, and

8    continuing through May 3, 2015, there was an agreement between

9    two or more persons to provide material support or resources

10   to a foreign terrorist organization, specifically, the Islamic

11   state of Iraq and the Levant, also known as ISIL;

12          Second, the defendant became a member of the

13   conspiracy knowing of its object and intending to help

14   accomplish it;

15          Third, ISIL was designated a foreign terrorist

16   organization at the time of the conspiracy;

17          Fourth, the defendant knew that at least one of the

18   following conditions existed:

19          That ISIL was a designated foreign terrorist

20   organization; or

21          That ISIL has engaged, or was engaging, in terrorist

22   activity; or

23          That ISIL has engaged, or was engaging, in terrorism;

24   and

25          Fifth, the offense occurred in whole, or in part,

 1   within the United States.

 2           The defendant has pled not guilty to the charges and

 3   is presumed innocent unless and until proved guilty beyond a

 4   reasonable doubt.  A defendant has the right to remain silent

 5   and never has to prove innocence or present any evidence.

 6           The evidence you are to consider in deciding what the

 7   facts are consists of:

 8           One, the sworn testimony of any witness;

 9           Two, the exhibits which are received into evidence;

10   and

11           Three, any facts to which all the lawyers stipulate.

12           Some evidence may be admitted for a limited purpose

13   only.  If I instruct you that an item of evidence has been

14   admitted for a limited purpose, you must consider it only for

15   that limited purpose and for no other.

16           The following things are not evidence, and you must

17   not consider them as evidence in deciding the facts of this

18   case:

19           One, statements and arguments of the attorneys;

20           Two, questions and objections of the attorneys;

21           Three, testimony that I instruct you to disregard;

22   and

23           Four, anything you may see or hear when the court is

24   not in session even if what you see or hear is done or said by

25   one of the parties or by one of the witnesses.

1          Evidence may be direct or circumstantial.  Direct

2     evidence is direct proof of a fact, such as testimony by a

3     witness about what that witness personally saw or heard or

4     did.  Circumstantial evidence is indirect evidence, that is,

5     it is proof of one or more facts from which one can find

6     another fact.  You are to consider both direct and

7     circumstantial evidence.  The law permits you to give equal

8     weight to both, but it is for you to decide how much weight to

9     give to any evidence.

10          There are rules of evidence which control what can be

11     received into evidence.  When a lawyer asks a question or

12     offers an exhibit into evidence and a lawyer on the other side

13     thinks that it is not permitted by the rules of evidence, that

14     lawyer may object.  If I overrule the objection, the question

15     may be answered or the exhibit received.  If I sustain the

16     objection, the question cannot be answered, and the exhibit

17     cannot be received.  Whenever I sustain an objection to a

18     question, you must ignore the question and must not guess what

19     the answer would have been.

20          Sometimes I may order that evidence be stricken from

21     the record and that you disregard or ignore the evidence.

22     That means that when you are deciding the case, you must not

23     consider the evidence which I told you to disregard.

24          In deciding the facts in this case, you may have to

25     decide which testimony to believe and which testimony not to

1   believe.  You may believe everything a witness says, or part

2   of it, or none of it.

3           In considering the testimony of any witness, you may

4   take into account:

5           The opportunity and ability of the witness to see or

6   hear or know the things testified to;

7           Two, the witness' memory;

8           Three, the witness' manner while testifying;

9           Four, the witness' interest in the outcome of the

10  case and any bias or prejudice;

11          Five, whether other evidence contradicted the

12  witness' testimony;

13          Six, the reasonableness of the witness' testimony in

14  light of all the evidence; and

15          Any other factors that bear on believability.

16          I will now say a few words about your conduct as

17  jurors.

18          Until the trial is over:

19          First, you are not to discuss this case with anyone,

20  including your fellow jurors, members of your family, people

21  involved in the trial, or anyone else, nor are you allowed to

22  permit others to discuss the case with you.  If anyone

23  approaches you and tries to talk to you about the case, please

24  let me know about it immediately;

25          Second, do not read any news stories or articles or

 1    listen to any radio or television reports about the case or

 2    about anyone who has anything to do with it;

 3            Third, you must not conduct any independent research

 4    about the case, the matters in the case, and the individuals

 5    involved in the case.  In other words, you should not consult

 6    dictionaries or reference materials, search the Internet,

 7    websites, blogs, or use any other electronic tools to obtain

 8    information about this case or to help you decide the case.

 9    Please do not try to find out information from any source

10    outside the courtroom.  Many of you use cell phones,

11    Smartphones, the Internet and other tools of technology.  You

12    must not use these tools to communicate electronically with

13    anyone about the case.  This includes your family and friends.

14    You may not communicate with anyone about the case on your

15    cell phone, through e-mail, a Smartphones, iPhone, text

16    messaging, or on Twitter, through any blog or website, through

17    any Internet chat room, or by way of any other social

18    networking websites, including Facebook, My Space, LinkedIn,

19    and YouTube.

20            Fourth, if you need to communicate with me or have

21    any questions during the trial of a witness or about the

22    evidence, simply give a note to the law clerk or the courtroom

23    deputy to give to me.  If any juror submits a written

24    question, I will consult with counsel before deciding whether

25    the question can be answered; and

1          Fifth, do not make up your mind about what the

2    verdict should be until after you have gone to the jury room

3    to decide the case and you and your fellow jurors have

4    discussed the evidence.  Keep an open mind until then.

5          At the end of the trial you will have to make your

6    decision based on what you recall of the evidence.  You will

7    not have a written transcript of the trial.  I urge you to pay

8    close attention to the testimony as it is given.

9          If you wish, you may take notes to help you remember

10   what witnesses said.  If you do take notes, please keep them

11   to yourself until you and your fellow jurors go to the jury

12   room to decide the case.  Do not let note taking distract you

13   so that you do not hear other answers by witnesses.  When you

14   leave for the day, your notes should be left in the courtroom.

15         Members of the jury, the law provides for a jury of

16   12 persons.  In any case lasting several weeks, we seat

17   alternate jurors so that if a juror becomes ill or has a

18   personal emergency, the trial can continue without that juror.

19         Just because you aren't one of the first 12 jurors

20   doesn't mean you are necessarily going to be the alternate.

21   The alternate jurors will be chosen by lot at the end of the

22   case.  Until then, each of you must consider yourself a juror

23   in this case.  Please do not be concerned with who may or may

24   not be the alternates.

25         The next phase of the trial will begin after lunch.

1   First, the courtroom deputy will read the Indictment.   Then

2   each side may make an opening statement.   An opening statement

3   is not evidence.   It is simply an outline to help you

4   understand what that party expects the evidence will show.   A

5   party is not required to make an opening statement.

6          The government will then present evidence and counsel

7   for the defendant may cross-examine.   Then the defendant may

8   present evidence and counsel for the government may

9   cross-examine.

10          After the evidence has been presented, I will

11   instruct you on the law that applies to the case and the

12   attorneys will make closing arguments.

13          After that, you will go to the jury room to

14   deliberate on your verdict.

15          We are now going to break for lunch until 1:15.

16          Sanessa is going to take all 16 of you out through

17   this door and you will find yourself in a corridor with two

18   jury rooms.   And she'll take you first to our jury room.

19          But there's 16 of you and it might be a little

20   crowded in there.   So I have arranged with the judge nextdoor

21   whose jury room is also in this corridor to let you use his

22   jury room as well.   This is important for two reasons.   Number

23   one, because it's crowded, and number two, because each jury

24   room has two bathrooms in it.

25          So you are free to use them at least this week and

1    next week and then we'll see what happens with his trial that

2    is scheduled the week after.  But that will allow you to have

3    a little bit more room.

4          Sanessa will also show you how to get back into that

5    corridor after you leave it because there's a keypad lock

6    there so that you're in a corridor that the public can't get

7    into.

8          So if, by chance, you forget the code or can't get

9    back for some reason, at the end of this hallway there are two

10   double doors, glass doors, and next to those doors are a bunch

11   of doorbells.  If you push the one that says "Bolton,"

12   somebody will answer the speaker there and will come and help

13   you get back into the jury corridor after lunch.

14         A couple of very important things.  Please wear your

15   juror badges in and around the courthouse so that everyone

16   knows that you're on a jury.

17         Second, you have seen that there are some people

18   today in the audience.  There may be more people in the

19   audience.  Don't talk to them at all.  The reason I say don't

20   talk to them at all -- and that's hard, because you want to

21   say hi, good morning, or something -- is because if you're

22   seen, even exchanging pleasantries with someone involved in

23   the case, it could be perceived by a third person looking at

24   this interaction as some improper conduct by that person with

25   the jurors.

1              Also, if you're wearing your juror badges, hopefully,

2     that will cause other people to not talk in your presence

3     about the case.

4              Probably some of you, if not all of you, are going to

5     be making a phone call or two over the lunch hour to say, "I

6     have been selected on a jury that's going to last for five

7     weeks."

8              And the other person is going to say, "Oh, gosh, is

9     it something interesting?"

10             And your natural reaction is going to be to say, "Oh,

11    yeah.  It's a really great case.  This is what we've been told

12    that it's about."

13             You can't do that.  All you can do is say, "I've been

14    selected to sit on a case that's going to last for five

15    weeks,"

16             You can tell them the precise schedule, if you want,

17    Tuesday through Friday from 9:00 to 4:30.  And the other thing

18    you can tell them is, "I can't tell you anything else until

19    the trial is over."

20             When the trial is over, you'll be free to discuss

21    this case with anyone you want.  But until then, you cannot,

22    including family members, friends, or anyone else.

23             So with that further admonition, we'll see you at

24    1:15.  You can leave through this exit.  Just leave your

25    notebooks in your seats and you'll find them there after

1    lunch.

2         (Open court, no jury present at 12:07 p.m.)

3              THE COURT:  Please sit down.

4              I've been handed what I understand to be the slides

5    that the government wants to use in its opening statement.

6    And it's open to a page called "The Aftermath."

7              First, let me ask, is this the only slide that the

8    defense has any concern with?

9              MR. MAYNARD:  Yes, Your Honor.

10             THE COURT:  Okay.  And what is the concern?

11             MR. MAYNARD:  I just think it shows dead bodies.  And

12   I'm not sure that that's relevant.  I understand it's from a

13   distance but --

14             THE COURT:  Well, I'm not sure I would have known

15   that's what it showed if they weren't labeled.  So I don't see

16   any real harm in this.  Obviously, it's relevant to the case

17   to some extent what happened in Garland, Texas.  And I really

18   don't see that this is a particularly graphic or inflammatory

19   picture.

20             As I said, I'm not sure I would have -- I would have

21   had to study it for a minute to know that it was actually

22   showing two deceased individuals.

23             So I will allow the government to use it.

24             Is there anything else we need to talk about before

25   1:15?

1          MS. BROOK:  No, Your Honor.

2          MR. MAYNARD:  No, Your Honor.

3          THE COURT:  Okay.  And your estimate for opening is?

4          MS. BROOK:  I think 45 minutes.

5          THE COURT:  Forty-five minutes.

6          THE COURT:  Your estimate for opening?

7          MR. MAYNARD:  Thirty to 45 minutes.

8          THE COURT:  Do you have a witness for this afternoon?

9          MS. BROOK:  We do.

10          THE COURT:  Excellent.

11          So what I think -- well, I'll see what the timing is.

12          My thought is let you go first.  Then we take a break

13    because it's a lot to sit through just -- even with color

14    slides, plus Maureen is going to be reading the Indictment

15    which will take a little bit of time as well.

16          We'll take a break.  Then we'll have the defense

17    opening and then we will have the first witness.

18          MS. BROOK:  All right.  Maureen just gave me a note

19    that you want to stay in the courtroom over the lunch hour,

20    Mr. Maynard?

21          MR. MAYNARD:  Yes.

22          THE COURT:  So here is -- that's fine except for

23    this.

24          We're going to be locking those doors.  So if you

25    leave, the doors will lock behind you.  So I understand that

1   you might want to do some work or whatever, but we can't leave

2   the doors unlocked because we want to be sure that the stuff

3   in here -- I mean, we trust you with everything in here, but

4   we don't necessarily trust anybody else that could come

5   walking in if the doors were left unlocked.

6           MR. MAYNARD:  That would be fine.

7           THE COURT:  Okay.  All right.

8           Court is in recess until 1:15.

9       (Recess taken at 12:10 p.m.; resumed at 1:17 p.m.)

10      (Open court, jury present.)

11          THE COURT:  Good afternoon, ladies and gentlemen.

12  Please sit down.

13          The record will show the presence of the jury,

14  counsel, and the defendant.

15          Ladies and gentlemen, at this time the courtroom

16  deputy will read the formal charges that are contained in the

17  Indictment.

18          After that, we will hear the opening statement of the

19  government.

20  **INDICTMENT READ**

21          THE CLERK:  Beginning prior to February 1, 2014, and

22  continuing through May 3, 2015, Abdul Malik Abdul Kareem,

23  Elton Francis Simpson, and Nadir Hamid Soofi resided in

24  Phoenix, Arizona, and frequently spent time together at the

25  respective residences and elsewhere in the Phoenix area.  In

1    or around this time period, the three men became interested in

2    violent jihad and the foreign terrorist organization of the

3    Islamic State of Iraq and the Levant.  The three men watched

4    and read ISIL-related videos and other materials relating to

5    ISIL and the violent jihad and expressed their support for the

6    terrorist organization.

7         Since at least 2014, using social media, ISIL has

8    called for attacks against citizens -- civilian and

9    military -- of the countries participating in the United

10   States-led coalition against ISIL.  For instance, on September

11   21, 2014, ISIL released a speech of Abu Muhammed Al-Adnani, a

12   senior leader and official spokesman of ISIL.  In this speech,

13   entitled, "Indeed Your Lord Is Ever Watchful," Al-Adnani calls

14   on Muslims who support ISIL from around the world to defend

15   the Islamic State" and to "rise and defend your state from

16   your place where you may be."  In addition, using social

17   media, ISIL has been encouraging individuals to kill specific

18   persons within the United States.

19        At an unknown time but no later than in or about

20   June, 2014, Kareem, Simpson, and Soofi began conspiring to

21   support ISIL.  The conspiracy focused on supporting ISIL by

22   providing, among other material support, themselves and their

23   services, to ISIL, including by attacking targets in the

24   United States.  Among the targets Kareem, Simpson, and Soofi

25   considered as part of their conspiracy to provide material

1    support to ISIL were military bases, individual military

2    service members, shopping malls, Super Bowl XLIX, which, as of

3    the time of their planning, was to be held in Glendale,

4    Arizona, on February 1, 2015, and a so-called Muhammad Art

5    Exhibit and Contest scheduled to occur in May 2015 at the

6    Curtis Culwell Center in Garland, Texas.

7            On or about May 3, 2015, on the day of the

8    aforementioned contest, Simpson and Soofi drove toward the

9    Curtis Culwell Center in Garland, Texas, stopped their car,

10   got out, and began shooting with assault rifles at security

11   personnel and law enforcement.  A security guard was struck by

12   a bullet and injured, and Simpson and Soofi were shot and

13   killed by police officers.

14           On October 15, 2004, in the United States Secretary

15   of State designated al-Qa'ida in Iraq, then known as Jam'at al

16   Tawhid wa'al-Jihad, as a Foreign Terrorist Organization, and

17   as a Specially Designated Global Terrorist.  On May 15, 2014,

18   the Secretary of State amended the designation of al-Qa'ida in

19   Iraq as a Foreign Terrorist Organization and as a Specially

20   Designated Global Terrorist entity to add the alias Islamic

21   State of Iraq and the Levant as its primary name.  The

22   Secretary also added the following aliases to the ISIL

23   listing:  The Islam State of Iraq al-Sham, the Islam State of

24   Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham,

25   Daesh, Dawla al Islamiya and Al-Furqan Establishment for Media

1    Production.  Although the group has never called itself

2    al-Qa'ida in Iraq, this name has frequently been used to

3    describe it through its history.  To date, ISIL remains a

4    Designated Federal Terrorist Organization.  In an audio

5    recording publicly released on or around June 29, 2014, ISIL

6    announced a formal change of its name to the Islamic State.

7             Count 1.  Beginning on or before January 7, 2015, and

8    continuing through May 3, 2015, at or near Phoenix, in the

9    District of Arizona, and elsewhere, Kareem, together with

10   other persons known and unknown, conspired to violate the law

11   in that they knowingly and intentionally conspired to

12   transport firearms and ammunition in interstate commerce with

13   the intent to commit crimes punishable by imprisonment

14   exceeding one year and with the knowledge and reasonable cause

15   to believe that an offense punishable by imprisonment

16   exceeding one year was to be committed therewith, including

17   murder, in violation of Texas law, and aggravated assault in

18   violation of Texas law.

19            In furtherance of the conspiracy and to effect the

20   objects of the conspiracy, the following overt acts, among

21   others, were committed in the District of Arizona:

22            One.  On dates beginning before January 7, 2015, and

23   ending on or before May 3, 2015, Kareem, Simpson, Soofi, and

24   other persons known and unknown, traveled to remote desert

25   areas near Phoenix, Arizona, to practice shooting firearms.

1        Two.  On dates between January 7, 2015, and May 3,

2   2015, Kareem provided firearms to Simpson and Soofi.

3        Three.  On dates between February 11, 2015, and May

4   3, 2015, Kareem hosted Simpson, Soofi, and other persons known

5   and unknown inside his home in Phoenix, Arizona, to discuss

6   attacking the Muhammad Art Exhibit and Contest in Garland,

7   Texas.

8        Four.  On dates between May 1, 2015, and May 3, 2015,

9   Simpson and Soofi traveled from Phoenix, Arizona, to Garland,

10  Texas, armed with firearms, all in violation of the law.

11       Count 2.  Beginning on or before May 1, 2015, and

12  continuing through May 3, 2015, at or near Phoenix, in the

13  District of Arizona, and elsewhere, Kareem did knowingly and

14  intentionally transport firearms and ammunition in interstate

15  commerce with the intent to commit crimes punishable by

16  imprisonment exceeding one year and with knowledge and

17  reasonable cause to believe that an offense punishable by

18  imprisonment exceeding one year was to be committed therewith,

19  that is, murder, in violation of Texas law, and aggravated

20  assault, in violation of -- all in violation of Texas law --

21  all in violation of the law.

22       Count 3.  On or about May 5, 2015, at or near

23  Phoenix, in the District of Arizona, in a matter within the

24  jurisdiction of the Federal Bureau of Investigation, an agency

25  of the United States, and in a matter involving terrorism,

1    Kareem did knowingly and willfully make false, fradulent, and

2    fictitious material statements, that is;

3         One.  That he did not go shooting in the desert with

4    Simpson and Soofi before May 3, 2015;

5         Two.  That before May 3, 2015, neither Simpson nor

6    Soofi fired the weapons they used in connection with the

7    attack in Garland, Texas;

8         Three.  That Simpson and Soofi did not ask him to

9    participate in an attack of any kind on or before May 3, 2015;

10        Four.  That he did not know in advance that Simpson

11   and Soofi planned to conduct an attack in Garland, Texas; and

12        Five.  That he did not know about an event, that is,

13   the Muhammad Art Exhibit and Contest that was to take place in

14   Garland, Texas, on or about May 3, 2015, until after Simpson

15   and Soofi were killed while attempting to conduct an attack on

16   the contest, all in violation of the law.

17        Count 4.  On or about June 10, 2015, in the District

18   of Arizona, Kareem, having been convicted of a crime

19   punishable by imprisonment for a term exceeding one year, that

20   is, Aggravated Driving Under the Influence in the State of

21   Arizona, did knowingly possess in and affecting interstate

22   commerce firearms, that is, a Taurus model 85 Ultralite .38

23   caliber revolver and a Tanfoglio model Witness 9 millimeter

24   pistol, all in violation of the law.

25        Count 5.  Beginning at an unknown time but no later

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

1    than in or about June, 2014, and continuing through May 3,

2    2015, at or near Phoenix, in the District of Arizona, and

3    elsewhere, Kareem, Simpson, and Soofi, together with other

4    persons known and unknown, knowingly and intentionally

5    conspired to provide "material, support or resources,"

6    including services and personnel, to a foreign terrorist

7    organization, that is, the Islamic State of Iraq and the

8    Levant, which at all relevant times was designated by the

9    Secretary of State as a foreign terrorist organization,

10   knowing that ISIL was a designated foreign terrorist

11   organization, that ISIL engages and has engaged in terrorist

12   activity, and that ISIL engages and has engaged in terrorism.

13        In furtherance of the conspiracy and to effect the

14   objects of the conspiracy, the following overt acts, among

15   others, were committed in the District of Arizona:

16        One.  From in or about 2014 up through May 1, 2015,

17   Kareem, Simpson, Soofi, and other persons known and unknown

18   watched videos depicting jihadist violence and apparent

19   wartime footage in Syria, Iraq, and elsewhere in the Middle

20   East.

21        Two.  On dates between February 2014 and May 1, 2015,

22   Kareem, Simpson, and Soofi, and other persons known and

23   unknown, watched videos depicting torture and executions

24   perpetrated by individuals and groups purportedly acting on

25   behalf of ISIL and other violent jihadist groups.

1          Three.   While watching the videos referenced in

2     paragraphs 1 and 2, Kareem exhorted and encouraged Simpson and

3     Soofi to engage in violent activity in the United States to

4     support ISIL and impose retribution for United States military

5     actions in the Middle East.

6          Four.   On dates between October 2014 and May 1, 2015,

7     Simpson "re-tweeted" videos depicting violence and apparent

8     wartime footage in Syria and Iraq as well as videos depicting

9     torture and executions perpetrated by individuals and groups

10    purportedly acting on behalf of ISIL and other violent

11    jihadist groups.

12         Five.   On dates between February 2014, and May 3,

13    2015, Kareem, Simpson, Soofi, and other persons known and

14    unknown, traveled to remote desert areas near Phoenix,

15    Arizona, to practice shooting firearms.   Kareem arranged the

16    shooting trips, provided transportation to shooting trips, and

17    provided guidance to Simpson and Soofi on how to operate and

18    fire assault rifles.

19         Six.   On dates between February 2014 and May 1, 2015,

20    Kareem, Simpson, Soofi, and other persons known and unknown,

21    listened to and watched videos of nasheeds, which are

22    inspirational Islamic songs.   The videos accompanying the

23    nasheeds depicted people wearing black masks and head scarves

24    riding in trucks with black flags mounted on them and shooting

25    rifles.

1        Seven.  On dates between October 2014 and May 1,

2   2015, Simpson "tweeted" and used social media to communicate

3   with ISIL and other violent jihadists, and to communicate with

4   ISIL representatives and other violent jihadists.

5        Eight.  On dates between June 2014 and continuing

6   through March 2015, Kareem, Simpson, and Soofi, and others

7   known and unknown, researched travel to the Middle East for

8   the purpose of traveling overseas to support ISIL and to fight

9   alongside ISIL.

10        Nine.  Beginning on or about December 31, 2014, and

11   continuing to on or about May 1, 2015, Kareem, Simpson, Soofi,

12   and others known and unknown, attempted to acquire pipe bombs.

13   Kareem inquired about the types of explosives that would be

14   required to damage or destroy public venues, including the

15   Westgate Mall and the University of Phoenix Stadium in

16   Glendale, Arizona, located adjacent the Westgate Entertainment

17   District and the location of Super Bowl XLIX, which was to be

18   held on February 1, 2015.

19        Ten.  On or about February 11, 2015, the organizers

20   of the Muhammad Art Exhibit and Contest announced that the

21   contest would be held at the Curtis Culwell Center in Garland,

22   Texas, on May 3, 2015.  After the announcement, Kareem,

23   Simpson, Soofi, and others, known and unknown, discussed ways

24   to disrupt the contest.

25        Eleven.  On date between February 1, 2015, and May 3,

1   2015, Kareem hosted Simpson, Soofi, and other persons known

2   and unknown, inside his home in Phoenix, Arizona, to discuss

3   attacking the Muhammad Art Exhibit and Contest in Garland,

4   Texas.

5          Twelve.  On or about March 20, 2015, Simpson accessed

6   materials published by ISIL on that same day that contained

7   residential address information for United States military

8   service members and a call by ISIL for supporters to attack

9   such military service members.  A handwritten note

10  subsequently found in the apartment shared by Simpson and

11  Soofi contained the name, personal information, and Phoenix,

12  Arizona address of one of the military service members

13  identified for targeting by ISIL.

14         Thirteen.  On unknown dates between December 2014 and

15  April 2015, Simpson, Soofi, and others, known and unknown,

16  traveled to Yuma and elsewhere in Arizona and drove on or near

17  military installations after having discussed plans to attack

18  a military base.

19         Fourteen.  On or about April 21, 2015, Kareem watched

20  "Flames of War," an ISIL propaganda video.

21         Fifteen.  On dates between May 2014 and May 3, 2015,

22  Kareem provided firearms to Simpson and Soofi.

23         Sixteen.  On or about April 6, 2015, Kareem feigned

24  having been struck by a car in a parking lot, and later

25  attempted to make an insurance claim based on the incident in

1   order to raise money to support the conspiracy.

2           Seventeen.  On dates between May 1, 2015, and May 3,

3   2015, Simpson and Soofi traveled from Phoenix, Arizona, to

4   Garland, Texas, armed with firearms.  Simpson and Soofi were

5   also carrying printed paper versions of the ISIL flag.

6           Eighteen.  On May 3, 2015, Simpson and Soofi exited

7   their vehicle and began shooting firearms at security and law

8   enforcement personnel near the Muhammad Art Exhibit and

9   Contest at the Curtis Culwell Center in Garland, Texas, all in

10  violation of the law.

11          To which the defendant has entered a plea of not

12  guilty.

13          THE COURT:  Thank you, Maureen.

14          The government may make its opening statement.

15  **OPENING STATEMENT:  Government**

16          MS. BROOK:  Thank you, Your Honor.

17          Three men right here in Arizona set out to commit

18  mass murder, an unimaginable Armageddon-like shootout in

19  Texas.

20          Of the three, only one is here in the courtroom

21  today.  Only one is here, because the other two died in Texas.

22  The defendant remains.  He is here because of the role he

23  played in the attack.

24          The defendant, along with his co-conspirators, shared

25  a mission, a desire to kill disbelieving Americans.  The

1   defendant's role in this three-man team was that he was the

2   bank roller.  He was the trainer.  He was the motivator.  And

3   in that, he was the man who stayed behind in the hopes that

4   his role in this team would not come to light.

5           But the path of evidence that the defendant left

6   behind betrayed his plan to hide his role.  So on a Sunday

7   evening in May, on May 3rd, as the defendant and his

8   co-conspirators had planned, his co-conspirators drove into

9   the parking lot of the Curtis Culwell Center in Garland,

10  Texas.

11          They were dressed in black, armed in body armor as

12  they had planned, and on that Sunday evening, nearly 200

13  people were in attendance inside that stadium.  It was an

14  indoor facility, and as had been advertised for months below,

15  during that point in time, between 5:00 and 7:00 in the

16  evening, they were hosting an event known as the Draw The

17  Prophet Muhammad Contest, an event that drew nearly 200 people

18  who had purchased tickets to be there.  People were there

19  looking at cartoons, caricatures that had been drawn of the

20  Prophet Muhammad.

21          And as the defendant and his co-conspirators had

22  planned, just as the event was coming to a close shortly

23  before 7:00, the co-conspirators drove into the parking lot

24  outside of the facility.  They wore body armor.  They stopped

25  their car and the co-conspirators each got out.  With them

1    they had six weapons, semi-assault weapons, as well as rifles

2    and pistols, and over 1500 rounds of ammunition.

3              The defendant's co-conspirators, the driver and the

4    passenger, got out of the car, guns blazing, firing.

5              What they didn't count on was the heroic action of

6    law enforcement who were able to stave off the event and stop

7    the attackers.

8              So why is it that these three men attempted to kill

9    hundreds of Americans?

10             Ladies and gentlemen, in this case you are going to

11   learn more than you ever thought you would about the Islamic

12   State, about ISIS, also known as ISIL, and you're going to

13   hear experts talk about it in a broad array of detail.

14             The defendant is charged not only with participating

15   in the attack there in Garland, but he is also charged with

16   separately providing material support to the Islamic State, to

17   ISIS.

18             I will talk in a little bit about how ISIS infuses

19   this case and about how that terrorist organization has a

20   broad, strategic agenda to inspire and recruit homegrown

21   terrorists.

22             This afternoon I want to talk to you about four

23   separate things.  We're going to talk about what happened.

24   We're going to talk about why it happened.  We're going to

25   talk about the evidence.  And we're going to talk about the

1    crimes.

2         But before we get into each of those four areas, I

3    want to take a moment and talk to you about the defendant and

4    his co-conspirators.

5         The defendant, Decarus Thomas, the name he was born

6    with and the name that he went by back in 2012, the defendant

7    and his two co-conspirators Nadir Soofi and Elton Simpson have

8    known each other for a few years.

9         You will hear evidence in this case that back in

10   2012, the defendant, who then still was known as Decarus

11   Thomas, lived in an apartment along with Elton Simpson.

12   You'll hear in this case that Elton Simpson also went by the

13   name Ibrahim.

14        The two of them lived in an apartment here in Phoenix

15   and they lived there alongside a third man.  In the summer of

16   2012, the police executed a search warrant at their apartment.

17   And when they did, they seized the defendant's laptop.  It's a

18   Lenovo laptop.  And in it stuck a 2 gigabyte thumb drive.

19   They seized it.  After the search warrant they returned it.

20        And after the attack in Garland, the police, through

21   another search warrant, searched the computer and the hard

22   drive.  You are going to hear that what they found on it was

23   violent jihadi material, propaganda, material about violence.

24        Shortly after the search warrant was executed back in

25   the summer of 2012, the defendant moved out.  He moved out and

1    he moved away from Simpson.  He was suspicious that the FBI

2    was watching him.  He was suspicious that the FBI was tracking

3    him.  And he was worried that he was being followed.  You will

4    hear that even for a time he cut off his contact with Elton

5    Simpson.  But as time moved on and the months carried forward,

6    the defendant and Simpson started to spend time together

7    again.

8            In the summer of 2012, two summers later, Elton

9    Simpson now lives in an apartment with Nadir Soofi.  The two

10   of them live in an one-bedroom apartment.  It's a one-bedroom

11   apartment that has adjacent to it a small living room with a

12   kitchen.  In the bedroom Nadir Soofi lives.  In the living

13   room on a L-shaped couch, that's where Elton Simpson lives and

14   sleeps.

15           You're going to hear that for 13 months the two men

16   lived there with Ali Soofi.  Ali is Nadir's younger brother.

17   He's going to testify in this case.  He lived there with the

18   defendant.  He lived there with Simpson and with his older

19   brother Nadir.

20           For 13 months, up until four weeks before the attack,

21   he slept on the other side of the L-shaped couch; Simpson

22   sleeping on one side, he sleeping on the other side.  And he

23   watched.  He watched as over that period of time Simpson, his

24   brother Nadir, and the defendant became increasingly violent

25   and jihadist.

1           He watched the defendant because the defendant was

2   there too.  Over time he was there often.  He spent a lot of

3   time with Simpson and Soofi.  Often he even slept over.

4           And when the defendant would sleep over at the

5   apartment, he would sleep on the side of the couch that

6   Simpson would sleep and Simpson would sleep on the floor.

7   During this time Ali will testify that the three men were

8   soaking in ISIS propaganda.  They were watching beheading

9   videos and they were watching those videos on a TV screen that

10  was right there feet away from the couch in the living room.

11          That TV screen was hooked up to a computer and

12  everyone sitting in the living room could see what was on it;

13  ISIS propaganda, beheading videos played loud.

14          You'll also hear that during this time Nadir and

15  Simpson tried to convert Ali to be Muslim.

16          They pushed and they tried, but Ali wasn't budging.

17  So they did become a little more guarded around him as he was

18  not buying into their belief system.  Ali was struggling at

19  the time because Ali and Nadir worked together.  The two

20  brothers owned together a carpet cleaning business and they

21  weren't making money.  They weren't making money to pay rent.

22  They weren't making money to buy food.

23          As the months progressed towards the fall of 2014,

24  the Islamic State through a video, a video that was done by

25  one of the key spokespeople for the Islamic State, they

1   released in September a proclamation which said that they were

2   calling for foreign actors to attack in support of ISIL.

3          The proclamation said:

4          "The best thing you can do is to strive to do your

5   best and kill any disbeliever, whether he be French, American

6   or from any of their allies.  Kill the disbeliever whether he

7   be civilian or military.  Attack their bases.  Do not let them

8   feel secure.  Hunt them wherever they may be."

9          This proclamation went out in September.

10         Folks, you're going to hear a lot about the attack in

11   Garland in May.  And I want to focus in first on the five to

12   six months before that attack happened.

13         You're going to hear evidence in this case that in

14   November, Simpson forwarded an e-mail to the defendant where

15   he conveyed the fact that in order for him to travel abroad,

16   he had to notify his probation officer.  In other words the

17   government had to know that he was seeking permission to

18   travel out of state.

19         A month later in late December you'll hear evidence

20   in this case that the defendant was standing in a parking lot

21   late at night purchasing a gun.  And that when he did so, he

22   peeled off $300, handed it to the man that was selling him the

23   gun, and with a wad of cash still in his hand, looked at him

24   and said, "I'm looking for more guns.  Let me know if you have

25   some."

1          Days later on New Year's Eve you're going to hear

2    evidence that the defendant was asking a friend, an employee

3    of his if he could get him pipe bombs.

4          And then days after that on January 7th of last year,

5    the Charlie Hebdo attack happened in Paris.  Charlie Hebdo is

6    a magazine that was -- that is in Paris.  And the magazine had

7    put forward on its cover a caricature, a drawing of the

8    Prophet Muhammad.

9          You will hear that on January 7th, armed jihadi,

10   violent perpetrators broke into the Charlie Hebdo Magazine and

11   they killed 11 of the employees.

12         Media news releases of what had happened and the

13   footage were all over the television.  You're going to hear

14   evidence in this case that witnesses saw the defendant

15   cheering, watching footage about those people being killed by

16   these violent jihadists in Paris.  You're going to hear

17   witnesses testify that he said, "Those are my people" as he

18   cheered.

19         Throughout this month you will also hear that the

20   defendant was attempting to buy silencers, bulletproof vests,

21   and then more guns.  You will hear testimony that the

22   defendant purchased an Elk River rifle that he gave to Nadir.

23         Ali -- they weren't making money.  They were inside

24   their house and Nadir and the defendant come in.  Nadir has

25   this Elk River rifle.  And Ali looks at him and says, "What

1    are you doing?" to which the defendant said, "I bought that

2    for him."  And Ali looked and Nadir said, "Maybe in time I

3    will be able to pay him back."

4          You're going to hear about another weapon, another

5    assault rifle that the defendant purchased for Simpson months

6    before, a snubnose AK.

7          You're also going to hear from another witness,

8    another friend of the defendant's.  The defendant towards the

9    middle of January reached out to a friend of his, a man by the

10   name of Sergio Martinez-Chavez, and said to him, "I need you

11   to take me shooting."  Him in particular because Sergio knew

12   of remote places in the desert where he could go and shoot

13   without being detected.

14         Sergio was busy.  He put him off for a little bit.

15   The defendant kept asking.  And Sergio said, okay, I'll take

16   you.  When they went, the defendant showed up, not just

17   himself, but with Simpson and Soofi.  He drove them out to the

18   desert where they fired semi-assault rifles.

19         You will hear that Simpson and Soofi weren't just

20   standing and firing but they were running and firing these

21   rifles at the same time and the defendant stood there

22   laughing.

23         At the defendant's house on Cochise Road you're going

24   to hear from witnesses, friends of the defendant who spent

25   time there, including two children, Juan and Carlos, 11 and 12

1   years old.  They lived across the street and they were friends

2   with the defendant.  They spent a considerable amount of time

3   with the defendant towards the middle to the end of 2014 and

4   through the first couple of months of 2015.

5          The defendant indoctrinated them into his form of

6   Islam.  He bought them presents; a Play Station, a watch, a

7   phone, toys, he took them out to dinner.  He told them that in

8   order to be his friend they had to be Muslim.  And he also

9   told him that people that don't believe what he believes about

10   Islam are called "kafirs" and that he wanted to kill kafirs.

11          As January turned to February, the Super Bowl was set

12   to -- and did occur here in Glendale, Arizona, on February

13   1st.  You're going to hear testimony that the group originally

14   contemplated attacking the Super Bowl and the Westgate Mall, a

15   mall that was adjacent to the Super Bowl facility, a place

16   nearby where thousands of spectators from the Super Bowl would

17   spend time and did spend time.

18          The defendant tried to obtain explosives and

19   ultimately was unable to and so the group shifted their focus

20   to a different attack.

21          Ladies and gentlemen, you're going to hear evidence

22   in this case that on February 3rd the Islamic State released a

23   video, a 26-year-old F-16 pilot, Jordanian pilot, crash landed

24   in Syria.  He was captured by the Islamic State and he was

25   killed.  Burned to death.

1          The video was released by the Islamic State's

2    propaganda machine and it was aired here in the United States.

3    You're going to hear evidence that the defendant, early in the

4    morning, as that footage of the man being burned was aired,

5    woke up Carlos.  Enthusiastically, he wanted to show him the

6    video of this man being burned alive.

7          On February 11th the Draw The Prophet Muhammad

8    Cartoon Contest was announced.  It was announced both on

9    Facebook as well as on different parts of the Internet.

10   You'll see evidence in this case that two days later, on

11   February 13th, Simpson tweeted, sent out a message on his

12   Twitter account, about the contest happening.

13         You're going to hear evidence in this case about the

14   defendant sitting in his house and being with his

15   co-conspirators discussing their plans to attack the Draw The

16   Prophet Muhammad Contest.

17         As February turned to March, the defendant, along

18   with his co-conspirators, continued to discuss attacking and

19   killing people at the Draw The Prophet Muhammad Contest.  The

20   defendant and his co-conspirators continued to watch these

21   ISIS propaganda videos, the beheading videos.

22         And during this month the defendant taught his

23   co-conspirators Simpson and Soofi how to work with their

24   weapons, the Elk River rifle, that AK snubnose.  The defendant

25   taught both of them how to disassemble the rifles.  How to

1   clean them.  How to lubricate them.  And then how to

2   reassemble them.

3          Ali will testify about how he watched the defendant

4   at their glass table, the little plexiglas table in their

5   living room, teach the two men how to take care of their

6   weapons.

7          You will also hear witnesses testify about the

8   defendant talking about wanting to sell his possessions and

9   move overseas to fight.

10          March turned to April.  Over these four months,

11   January, February, March, and April, the defendant and his

12   co-conspirator Simpson talked frequently.  Over those four

13   months they had 380 contacts over their phones, so in the form

14   of phone calls or text messages.

15          In this case you're not just going to see violent

16   ISIS propaganda videos on the co-conspirators' computers and

17   on their phones.  You're also going to see it on the

18   defendant's computer, his Acer computer.

19          On or before April 21st, downloaded onto that

20   computer, was a video called Flames of War.  It was played.

21   It's a 55-minute video that is an important recruitment video

22   for the organization.  It was set out in September.  And it

23   portrays the Islamic State's version of history.  It also

24   glorifies these jihadist videos or these jihadist fighters and

25   it glorifies their fight and killing disbelievers.  It's in

1   English.

2          And in this video it shows the murder of six

3   different victims who it films them digging their graves and

4   then at the end, shows their lifeless body in the grave that

5   they had dug.

6          A person -- an English voiceover, in essence, tells

7   America that they are next.

8          On April 23rd, two days later, Simpson tweeted out

9   about the Draw the Prophet Muhammad Contest.  In particular,

10  he tweeted because there were so many submissions, drawings

11  for the contest, that the contest had announced that they were

12  going to have more prizes.  And he tweeted out, "Will they

13  ever learn?"

14         You're going to hear that when the defendant spoke to

15  the FBI he lied and he said that he wasn't in contact with

16  Simpson before the attack.

17         You will hear testimony in this case the Thursday

18  night, just days before the attack, that the defendant was

19  seen in a restaurant picking up food to go with Simpson.

20  You'll also hear evidence of them at the mosque together the

21  next day.

22         Ladies and gentlemen, you're going to hear evidence

23  in this case from experts.  You're going to hear evidence in

24  this case from civilian witnesses; children, friends and

25  family of the defendant, and his co-conspirators.  Some of

1    these witnesses have checkered backgrounds and some do not.

2    Some of these witnesses are in custody right now on unrelated

3    charges.  And when they sit here before you, they will be in

4    stripes.  You will take all of that into account at the end of

5    this case.

6           You're also going to see hard evidence in this case.

7    You're going to see the defendant's own hard drive.  We have

8    talked about the computer, the Lenovo computer from 2012, and

9    also the thumb drive that was sticking into it.

10          You will see that there are violent jihadi videos and

11   propaganda material in three separate places; so the computer

12   from 2012, the thumb drive sticking into it, and the

13   defendant's Acer computer from 2015.

14          On that computer from 2012 and the thumb drive you

15   are going to hear evidence of a course that was on it.  A .pdf

16   document about a course that teaches individuals how to act

17   securely on the Internet in order to evade police detection.

18   You're also going to hear information about articles about

19   killing civilians and how to target mass groups of civilians

20   in order to inflict the greatest amount of damage.  You are

21   also going to see the Acer and you're going to see the Flames

22   of War video.

23          Ladies and gentlemen, in this case the defendant and

24   his co-conspirators obsessed over a now-dead Muslim cleric by

25   the name of Anwar al-Awlaki.  In this case you will probably

1    hear more than you probably thought you would about Anwar

2    al-Awlaki.  He is a man whose sermons preached and prayed that

3    Allah would destroy the United States.

4         The evidence in this case is going to show that the

5    defendant and his co-conspirators were obsessed with Anwar

6    al-Awlaki and they were focused by his political agenda; the

7    overthrow of the United States government and encouraging

8    martyrs to commit jihad and kill Americans.

9         That, there, is Anwar al-Awlaki.  And you are going

10   to see evidence of Anwar al-Awlaki on the defendant's laptop.

11   You're are going to see it on Soofi's phone, a phone that he

12   picked up on the drive from Phoenix to Texas to conduct the

13   attack, the 65-page sermon he downloaded.  You are also going

14   to see it on a list of scholars that Simpson left behind and

15   handed to a 17-year-old boy on the evening before he and Soofi

16   took off and drove to Garland.

17        I want to take a minute and talk about ISIS.  This

18   case is about a conspiracy to conduct an attack on U.S. soil

19   to promote ISIL.  And you are going to hear that these men

20   were planning an attack on U.S. soil.  I have talked about

21   Garland specifically.  In this case you are going to hear

22   about different plans of attack and the fact that the

23   defendant and his co-defendants finally settled on Garland.

24        The defendant and his co-conspirators were followers

25   of ISIL.  And you're going to hear a lot of information about

1   it, but I want to give you a quick snapshot.

2          ISIL is an organization that has been around for

3   years, a few years.  Back in 2010 they started to be led by a

4   man by the name of Abu Bakr al-Baghdadi.  He is pictured here.

5   Abu Bakr al-Baghdadi in the summer of 2014, on June 29th of

6   2014, stepped forward and announced himself to be the "Caliph"

7   or the "Khalifa."  And what that is is the commander of the

8   faithful, the commander of all Muslims.

9          It's a unique concept to ISIS, because other

10  terrorist organizations, al-Qa'ida included, do not believe

11  that presently there is a Khalifa.  And they certainly don't

12  believe that Abu Bakr al-Baghdadi is the Khalifa, presently

13  the commander or the leader of all Muslims.  It's a belief

14  specific to the Islamic State.

15         You are going to hear about their agenda.  Their

16  commitment to purifying the world by murdering nonbelievers.

17         Over the past couple of years ISIS has seized up

18  territory in Iraq and Syria, territory greater in size right

19  now than the United Kingdom and they are purging, destroying,

20  killing nonbelievers.

21         The Islamic State believes that they are awaiting the

22  end of times, a battle to end all battles that's going to

23  happen in a place called Dabiq, Syria, where they are going to

24  fight the West, the disbelievers, become victorious, and then

25  that's going to usher in a period of Apocalypse.

1           The Islamic State is not al-Qa'ida but they do come

2    from a splinter group of al-Qa'ida.  So, therefore, they have

3    some same, similar theories and roots.  You're going to hear

4    that there are some within ISIS that hold Osama bin Laden,

5    obviously the commander of al-Qa'ida, to be an honorable

6    person, somebody that they respect.

7           Social media.  The social media wing of ISIS is also

8    a unique facet of this particular terrorist organization.

9    They have created a propaganda machine that puts forward in an

10   unprecedented race, in a unique way, very high-quality videos

11   of death and killing.

12          They put out onto the Internet almost daily

13   assassinations, killings of individual people.  But unique to

14   the Islamic State, they also put forward videos of

15   assassinations of mass groups of people, men in black with the

16   flag of ISIL, killing, beheading, shooting, hurting prisoners,

17   people who are dressed in orange, which you will hear is a

18   play on the prisoners from Guantanimo Bay.

19          And another facet of this particular group, they

20   utilize Western recruiters or propagandists, English-speaking,

21   charismatic, articulate individuals who seek out homegrown

22   terrorists in the United States and other countries.

23          There has come to be an awareness since 2010 and 2011

24   amongst violent jihadi terrorist organizations that creating

25   another 9/11 is very challenging and it's easier to inspire

1    and recruit extremists who are already located within that

2    particular country.

3         Talking about Twitter for a moment.  In this case,

4    ladies and gentlemen, you are going to see more tweets than

5    you can shake a stick at, but I want to give you a brief

6    preview of some of the ones that you will see.

7         The first.  We talked about this a couple of minutes

8    ago.  This is a tweet, a message sent out as the evidence will

9    show from Simpson.  The image right there in that box is a

10   picture of Anwar al-Awlaki and the message:

11        "When will they ever learn?  They are planning on

12   selecting the best picture drawn of Rasulullah (saws) in

13   Texas."

14        That's the Muhammad.  The Prophet.

15        One more.  This tweet was sent out from Simpson just

16   minutes before; sixteen minutes before the attack in Garland.

17        Again, another picture of Anwar al-Awlaki.

18        "Shariah is Light."

19        "The bro with me and myself have given bay'ah to

20   Amirul Mu'mineen.  May Allah accept us as mujahideen.  Make

21   dua."

22        Meaning, the brother with me and myself have given

23   allegiance to the Admiral Mu'mineen.

24        That is Abu Bakr al-Baghdadi.

25        "May Allah accept us as mujahideen."

1        Or jihadists.

2        You are going to see other hard evidence in this

3   case.  We talked earlier about the weapons that the

4   defendants, co-conspirators brought.  You are going to hear

5   evidence about how that weapon, top row on the right with the

6   36 next to it, the AK-47 pistol grip, was the weapon the

7   defendant purchased for Simpson.

8        And then on the bottom in the middle with the 34, the

9   Elk River AK-47 was the weapon -- 74 -- was the weapon that

10   the defendant purchased for his other co-conspirator Nadir.

11        You will also hear evidence that some of the

12   ammunition that was used in the Garland attack was purchased

13   with the defendant and Simpson together.  It was found at the

14   scene.  And a month after the attack, some of the same

15   ammunition was also found in a safe in the defendant's closet

16   in his bedroom.

17        You will hear FBI experts testify in this case from

18   the lab in Quantico and they will testify about forensic

19   analysis that was conducted on the shell casings found at the

20   Wittmann scene, that desert scene, the place where Sergio took

21   the defendant and he brought his co-conspirators to shoot.

22   You will hear how the shell casings there match shell casings

23   found at the scene in Garland, Texas.

24        The defendant helped train his co-conspirators with

25   the same weapons that his co-conspirators used in the Garland

1    attack.  This case, ladies and gentlemen, ends in a shootout

2    in a parking lot.  And you are going to hear from the heroic

3    law enforcement officers who were able to stave off the

4    attack.

5         You are going to hear from Bruce Joiner.  Bruce

6    Joiner was the unarmed security guard who first encountered

7    the defendant's co-conspirators as they drove into that

8    parking lot in Garland, Texas.  You are going to hear how he

9    looked as Simpson and Soofi got out of their car, got out with

10   long rifles in their hands.

11        And then he looked at Simpson, the passenger, and he

12   was smiling.  And as he looked at his smile, he thought that

13   it must be a joke.  And then he heard the shots.  As he heard

14   the shots, he saw the passenger and the driver move to the

15   back of the car that they came in and Joiner instinctively

16   dove.  He dove behind a tree.  With the intensity of the

17   moment, he didn't even realize that he had been shot.

18        You will also hear from Officer Stevens.  Officer

19   Stevens who, in using his service pistol, was able to take

20   down Simpson and Soofi who were armed with semi-automatic

21   weapons and other weapons.  You see here in this picture the

22   car and you see Simpson and Soofi.  You also see the Elk River

23   drum magazine, the Elk River rifle that the defendant bought

24   for Soofi and you see that AK-74 that the defendant bought for

25   Simpson.

1          Shortly after the attack, the Islamic State claimed

2     responsibility.  "The two brothers attained shahdah in Texas.

3     O Kuffar know that death is better than living humiliated.

4     Allahu Akbar.  Hash tag.  Garland shooting."

5          The defendant is charged with five crimes and I want

6     to take a minute and walk through them.

7          Count 1 and Count 2 relate to the same type of

8     offense.  It's the interstate transportation of weapons with

9     the intent to commit a felony.

10          It's a crime to take weapons across state lines with

11     the intent to commit a felony.  The government will prove that

12     Simpson and Soofi carried their weapons from Phoenix to

13     Garland, Texas, in order to murder people in Garland and that

14     when they left, they had the plan to do just that.  And that

15     the defendant knew that Simpson and Soofi had that plan and he

16     agreed to help them carry it out.

17          Count 1 relates to the agreement.

18          Count 2 is the act of aiding his co-conspirators

19     before they left in their plan of transporting these firearms

20     with the intent to commit a felony.

21          Count 3.  The defendant is charged with material

22     false statements.  Lies to the FBI.

23          You will see in the count it lists five lies and

24     we'll go through them one by one.

25          The first:  That the defendant did not go shooting in

1    the desert with Simpson and Soofi before May 3rd of 2015.

2          A second lie:  Before May 3rd of 2015, neither

3    Simpson nor Soofi fired the weapons they used in connection

4    with the attack in Garland, Texas.

5          Third lie:  Simpson and Soofi did not ask him, the

6    defendant, to participate in an attack of any kind on or

7    before May 3rd of 2015.

8          Fourth:  That the defendant did not know in advance

9    that Simpson and Soofi planned to conduct an attack in

10   Garland, Texas.

11         And the fifth lie:  That the defendant did not know

12   that the Muhammad Art Exhibit and Contest that was to take

13   place in Garland, Texas, on or about May 3rd of 2015, that he

14   didn't know about it until after it occurred.

15         That's the fifth lie.

16         Ladies and gentlemen, in this case you only need to

17   all agree on one lie.  Certainly, the evidence will show, all

18   five, but in the jury deliberation room just need to find and

19   agree upon one.

20         Fourth charge.  The defendant is charged in Count 4

21   with being a prohibited possessor in possession of a firearm.

22         The government will prove to you that the defendant

23   was convicted of a felony.  That he -- after he was convicted

24   he was found in possession of a firearm and that weapon at

25   some point had traveled from one state to another.

1          Last, Count 5.  The defendant is charged with a

2     conspiracy to materially support the Islamic State.  The

3     defendant helped Simpson and Soofi.  The defendant knew that

4     Simpson and Soofi were followers, supporters of ISIS, and he

5     agreed to help them carry out an attack in support of ISIS.

6          The crime is the agreement, not the act of the

7     attack.  The defendant bought Simpson and Soofi weapons.  The

8     defendant trained them with their weapons.  The defendant

9     taught Simpson and Soofi how to break them down, clean them,

10    lubricate them, and reassemble them.  And the defendant

11    motivated Simpson and Soofi to make the attack.

12         Ladies and gentlemen, I'm going to end where I began.

13    The defendant was the third man of a team set on mass murder.

14    Each had their role.  Two were killed and one remains.

15         After the evidence has come from that witness stand,

16    we will stand before you again and ask you to find the

17    defendant guilty as charged.

18         Thank you.

19         THE COURT:  Thank you, Ms. Brook.

20         Ladies and gentlemen, we will take our afternoon

21    break.  We will reconvene in 20 minutes at 2:35.

22         You are reminded of the admonition not to discuss the

23    case among yourselves or with anyone else.

24         You are not to form any conclusions about the case

25    until you have heard all the evidence and begun your

 1   deliberations.

 2            Court is in recess for 20 minutes.

 3        (Recess taken at 2:13 p.m.; resumed at 2:38 p.m.)

 4            THE COURT:  Thank you, ladies and gentlemen.

 5            Please sit down.  The record will show the presence

 6   of the jury, counsel, and the defendant.

 7            Mr. Maynard, you may make your opening statement.

 8   **OPENING STATEMENT:  Defense**

 9            MR. MAYNARD:  Thank you, Your Honor.

10            Good afternoon, Ladies and Gentlemen of the Jury.

11            I want to introduce you to Mr. Abdul Malik Abdul

12   Kareem.  Born in Philadelphia he was Decarus Thomas.  His

13   father was a police officer.  This is the man that the

14   government has accused of all of these heinous crimes.

15            Go ahead and sit down.

16            On May 1st of 2015 he had a cousin that was -- or a

17   nephew that was flying back in here from Philadelphia.  His

18   nephew had worked with him before.  He owned a moving company.

19   His nephew was coming back to have a job with him.

20            His other nephew that actually lived out here in

21   Phoenix went to pick up his brother at the airport and about

22   one o'clock in the afternoon they went to the mosque, one of

23   the mosques here in Phoenix, and they prayed.  And on Fridays

24   for Muslims is like Sundays for Christians.  It's the day of

25   prayer for maybe an hour-and-a-half.

1          Afterwards, his nephew was going back to his house to

2     live with him because his nephew was coming out here to work

3     with him.  His nephew had been in Philadelphia since I believe

4     it was November of 2011.  His nephew used to work with him

5     before, but his problem was his nephew was a very devout

6     Muslim.  And at that time -- this was Decarus Thomas -- and he

7     would not let his nephew kneel during the middle of the day to

8     pray when they were working, so his nephew got mad and had

9     gone home.

10          In the meantime in 2013, Decarus converted to Islam.

11     He changed his name to Abdul Malik Abdul Kareem.  So the

12     nephew is coming back to live with him and work with him.

13          They see each other at the mosque.  They also see a

14     number of other people.  They see Simpson and they see Soofi

15     there.  And Malik invites a lot of people over that night for

16     dinner.  He's going to cook.  In fact, he's going to cook a

17     goat.

18          But as the day goes on, he has a medical appointment

19     that he has to go to and he realizes he can't buy the meat and

20     get everything prepared for that night, so he calls Simpson,

21     texts other people, and tells them I'm not going to have the

22     dinner until tomorrow night, which is going to be May 2nd.

23          This is the person that is the bank roller, trainer,

24     and motivator, according to the government.

25          You need to understand that Phoenix, Arizona, to

1    Garland, Texas, is over a thousand miles.

2            The next day he prepares the food -- actually

3    prepares it that night.  He has a number of people that come

4    over to have dinner and lunch with him.  Simpson sends him a

5    text and you are going to see the text and it says:  I'm sorry

6    I'm not going to be able to make it.  And you're going to have

7    to decide whether or not this was all a ruse; Simpson saying

8    "I can't make it."

9            On May 3rd in the evening, the government is exactly

10   right as to what happens with Simpson and Soofi.  They

11   initiate some sort of an attack in Garland, Texas, at this

12   Muhammad Drawing Contest.

13           What you're going to hear from not only my client, he

14   said this over and over to the FBI, but you're also going to

15   hear it from people in the Muslim Community here.  This was

16   not a well-known event.  There were not 200 people at this

17   Muslim drawing contest, this Muhammad drawing contest, there

18   were 160.  It got notoriety after this event occurred.  Okay.

19           Malik is sitting in a Red Lobster restaurant that

20   night with his nephew and he's having a good time.  He's

21   enjoying himself.  They have ordered food.  They're sitting

22   down and a phone call comes in from his other nephew saying

23   that Simpson' brother has called saying -- because he's being

24   contacted by somebody from the press and they want to know:

25           Do you know whether your brother Elton Simpson is

1    here in Phoenix?  Is he in Texas?  Is he involved in something

2    in Texas?  What's going on?

3            And that information is conveyed to Malik.

4            The reaction that changes on his face that you will

5    hear from his nephew is shock.  He has no idea what has gone

6    on.  They pack up -- they get the restaurant to pack up their

7    food.  They take it and they leave.

8            And his nephew has told him that he has gone by

9    Simpson' house and that there are FBI there and there are

10   agents and there's police officers.  So he drives over there

11   to see what's going on.  And then he drives to the house of

12   another friend that's good friends with Simpson to see if he

13   knows what's going on.

14           And that friend and Malik and his nephew drive back

15   to Simpson's house.  In fact, they see some tarps outside.

16   They think Simpson has been involved in something and that

17   maybe he's dead and he's lying on the ground out there.  They

18   don't know anything about Garland, Texas.

19           Later that evening he goes to Simpson's father's

20   house trying to find out what's happened.

21           Now, through the course of the next couple of weeks

22   and starting the next day, the FBI has a very large

23   investigation going on and they start interviewing lots of

24   people who knew Simpson and Soofi at the mosque that they

25   attended.

 1           They interview people that they worked with.  They

 2    interviewed anybody around there.  You're going to hear from

 3    the government.  They'll talk about how they went into

 4    Simpson's and Soofi's apartment and what they found there.

 5           And that's going to be really important to look at

 6    what was on Simpson and Soofi's computers, their cell phones,

 7    in their apartment, because then they call Malik, the FBI

 8    does, and they ask him to come into the FBI office for an

 9    interview and he comes involuntarily and he's interviewed with

10    them.

11           And that's the interview that they have now charged

12    him with lying to the FBI.  And I would love to show you the

13    videotape of the interview because the FBI had surreptitiously

14    put in a camera and a recorder so that they could record it so

15    you would know exactly what he said.

16           But somehow or another it either didn't get turned on

17    or got destroyed but we don't have that videotape.  All we

18    have is the word of the two FBI agents that were in there who

19    thought that they were videotaping this.

20           Well, and then there was a camera up in the corner, a

21    security camera.  And as the judge will tell you, one of the

22    things you do is when you listen to witnesses, you not only

23    listen to what they say, but you watch them.  And you tell --

24    are they telling the truth?  What's their body language like?

25           And I would love to show you that video of the

1    interview with the FBI with Malik but the FBI destroyed it.

2    Said:  I don't have it.

3           Now, I do have an interview that takes place on June

4    10th when they finally arrest him because he doesn't lawyer-up

5    at the time.  He sits down and tells them what he knows.  And

6    you'll see that and you'll hear that.

7           But let's go back a little bit and talk about why

8    this all came about.  My client who the government says is the

9    bank roller, the trainer, the motivator, apparently the leader

10   of this thing, adopts Islam in 2013.

11          Elton Simpson, he became a Muslim in 2004.  You're

12   going to hear evidence that starting in about 2005, 2006, the

13   FBI thought that Simpson was becoming radicalized.  And over

14   the course of the next four or five years they paid $140,000

15   to a Somali informant to tape Simpson's conversations.  Took

16   four or five years for them to do this.  And then they finally

17   bring charges against him in 2009 and he goes to trial in 2010

18   and the judge decides that he's lied to the FBI but not about

19   terrorism.

20          Okay.  So Simpson then is on probation.  Malik

21   doesn't meet Simpson until 2011 and doesn't know anything

22   about this trial that's gone on.  He's not a practicing Muslim

23   at the time.  He's dabbling in it.  He's looking at it.  He's

24   going to the mosque on occasion.  But he hasn't converted.  He

25   hasn't changed his name.

1          Now, he moves in -- and the government just told you

2    in their opening -- he moved in with Simpson and another guy.

3    Well, he moved in with Simpson, another fellow, Abubaker

4    Ahmed, and there was a fourth individual that was there.

5          And the government does a raid on this house in 2012

6    because they think that Abubaker Ahmed is making false

7    certificates for the ASU graduation certificates.

8          But I believe it was a pretext because I think the

9    evidence is going to show they went in and they got

10   everybody's computer about this and they got my client's

11   computer and when they interviewed him he said, yes, this is

12   my computer.  The evidence is there are other people in this

13   house that use my computer.  And there's a flash drive in that

14   computer.  He said it's not mine.  I don't know whose it is

15   but that flash drive is not mine.

16         And there is a great deal of radical material on that

17   flash drive and that's going to be one of the questions that

18   you're going to be asked in this case is who owned the flash

19   drive and was it his?  Or is this the kind of material that

20   was found all the time on Simpson's stuff?

21         Now, the government just told you in the opening that

22   the evidence would show that they had a falling out at that

23   point and that they moved apart in 2012.  It didn't happen.

24   They moved to another apartment in 2012.  He continued to live

25   with Simpson.  Simpson was his friend.  Was his buddy.

 1          And they lived together until the summer of 2013.

 2    Now, in the summer of 2013, he and Simpson did have a falling

 3    out and he believed that Simpson had put some sort of a

 4    tracking device on his car or something and so he told

 5    Simpson, look, I don't want to be around you.  I don't want to

 6    be involved in this kind of stuff.  You've got to leave.  And

 7    Simpson left and they never lived together after the summer of

 8    2013.

 9          Now, this person who is alleged to be this

10    mastermind, bank roller of this terrorist plot, who does he

11    now start living with?  Well, he brings in some young Hispanic

12    boys that worked with him on his moving company.  He brings in

13    a Vietnam war vet who's a Christian named Billy Elliott.

14    Billy Elliott is going to come in here and testify.

15          I'm going to tell you right now you're going to have

16    a hard time listening to Billy Elliott because he only has

17    half a lip.  He got it bitten off at some point.  And they're

18    going to testify about what he was like from 2013 to 2015.

19          They lived together -- he and Elliott lived together

20    through that whole period of time -- and they're going to tell

21    you there's no radicalization things going on.  He's not

22    watching the kinds of things the government argues that he's

23    watching.

24          There's no question that you're going to hear some

25    evidence from some people that are going to say that he was

1    doing radical things.  You're going to hear an individual say

2    that he asked him to build a pipe bomb.

3         What I tell you to do is just wait till you hear the

4    evidence and keep an open mind till you hear the

5    cross-examination.  You need to look at the motivation behind

6    what these people say.  You need to look at the timing of what

7    they say.  You need to look to see if they're really telling

8    the truth.

9         Now, the government showed you pictures of Anwar

10   al-Awlaki, a picture that Simpson had on his Twitter page.

11        There will be evidence that my client listened to

12   some CDs of Anwar al-Awlaki.  But there will also be evidence

13   that shows that Anwar al-Awlaki was an American-born cleric.

14   His father was an engineer.  He was born while his dad was in

15   school over here.  And he was an Imam in California for a

16   while and he was an Imam in Falls Church, Virginia, and he

17   made a lot of videos that were about the Prophet and the

18   Qur'an and those types of issues.

19        And you are going to hear evidence from a number of

20   Muslims that the large percentage of the American Muslim

21   population listened to those CDs.  There's no question that

22   later on al-Awlaki became radicalized and he did produce CDs

23   later on that are about terrorism and radicalization.  And

24   he's the first American that was ever killed and authorized to

25   be killed in a drone strike by the United States.

1          But the DVDs and the CDs that my client had are not

2      those.  It's the ones that were at the very beginning in his

3      non-radicalized period.

4          In 2014 my client again begins to get friendly again

5      with Simpson.  Let me make it clear.  Did he go out into the

6      desert shooting with Simpson?  Yes.  On two occasions.  All

7      right.  Two occasions.  Both times were with a man by the name

8      of Sergio Martinez.

9          He took Simpson with him to Sergio Martinez's house

10     for a birthday celebration.  There are numerous members of

11     Sergio Martinez's family there.  It's Sergio Martinez's

12     mother's house.  Everybody is out shooting guns in the

13     backyard.  There is nobody doing any training on how to shoot

14     a gun.  He's not training anybody.  He's not providing the

15     guns.  Simpson happens to be there at a birthday party.

16         And I hope the government brings in Sergio Martinez.

17     If not, I will, and you'll hear that testimony.

18         Now, in January of 2015, he calls Martinez again and

19     says, look, I've got a couple of friends that want to shoot

20     guns.  Can we come out and shoot?  And Martinez says, yes.

21         So they go out there to shoot at Martinez's house

22     again.  And Martinez gets his two boys who I think are 6 and

23     8, puts them in the car, and they all go out into the desert

24     shooting.

25         And you're going to have to decide whether or not

1    this is somebody training radicals to do an attack in January

2    of 2015, if they would call their Christian/Hispanic friend

3    with his two children and go out shooting.

4           And as the government just told you a few minutes

5    ago, he's laughing.  He's laughing with Martinez because Soofi

6    and Simpson each have AK-47s.  He's never shot one before.

7    Neither has Martinez.  And they're laughing because these guys

8    don't know what they're doing.  Martinez has got -- he's not

9    training them.  This is an over-active imagination by the

10   government.

11          What happens after this is that he has conversations

12   with Simpson and Soofi but they're not living together.  He

13   has a business to run.  He has homeless people that are living

14   at his apartment with children there.  This very alleged

15   devout Muslim who's going to do these terrible things has all

16   of these homeless Christian folks along with Billy Elliott and

17   others living with him.

18          Now, the government has told you just a few moments

19   ago that there are 380 contacts over the phone between the two

20   of them.  There may have been 380 calls but there weren't 380

21   connections.

22          Again, you're going to hear an awful lot of evidence

23   both from the government and from the defense on the number of

24   phone calls that were done, how many of them were actually

25   connected, and you're going to get a lot of information about

1    texts and text messages that were sent.

2         Those text messages are really important because

3    social media in this case is going to be very, very important.

4    The government has some witnesses that are going to come in

5    and testify that my client would go out every Friday with

6    Simpson and Soofi shooting in the desert.  It didn't happen.

7         You're going to look at these telephone records to

8    see where they were traveling to to see if Simpson and Soofi

9    were even with my client, with Malik.  Did they go into the

10   desert?  Did they ever go into the desert where these

11   individuals said they were going shooting on a Friday, the

12   holy day, the Sabbath day for the Islamic religion?

13        There are going to be some children that testify in

14   this case.  And let me tell you ahead of time, watching

15   children testify about things can be very difficult.

16        I believe that the really difficult one in this case

17   will be Nadir Soofi's son.  He was interviewed by the FBI.

18   He's been videotaped.  I'm assuming he is going to come in and

19   testify.  It's hard watching an 8 or 9-year-old son testify

20   about his dead father, especially when he knew exactly what

21   his father was going to do.  And his father was teaching him

22   at that age to shoot a gun.

23        You're not going to hear any evidence from Nadir

24   Soofi that my client was involved whatsoever or from Nadir

25   Soofi's son.  But that son is going to implicate his father.

1    He's going to talk about Simpson.  And he's going to talk

2    about Ali.

3          And you heard the government tell you about what Ali

4    is going to come in here and testify.  It will be interesting

5    to see what Mr. Ali says -- or Ali Soofi says -- because Ali

6    Soofi's testimony has changed dramatically over this.  He is

7    interviewed on May 4th, the day after his brother is killed.

8    As days go on his testimony just starts changing.

9          Why?  It's going to be for you to decide after you

10   hear cross-examination.  You look at time lines and you look

11   at the evidence in this case.

12         Did he know more than he knew and he's letting on?

13   He lived with them.  He lived with Soofi and Simpson.  And

14   there's no question they carried out a terrorist act.

15         You are not going to hear anything from the defense

16   that this was not an act of terrorism by Soofi and by Simpson.

17         But one of the other things the government didn't

18   mention to you is that hours -- hours before the attack

19   occurred in Garland, Texas, the FBI is sending e-mails to

20   Garland, Texas, with Simpson's picture on it.  Because somehow

21   or another, they believe that he may be involved in an attack

22   up there.  But it appears that somebody at the government

23   forgot to open the e-mail so they didn't distribute it to

24   everybody there.

25         Are some people embarrassed about what happened?  I

1    think so.  Are they trying to blame somebody else?  You'll

2    decide.

3          This is a case where it is really guilt by

4    association.  He's there.  He went shooting with them.  He did

5    go to the mosque that they went to.  He was a friend of

6    Simpson's.

7          But you need to look at the evidence in this case,

8    and particularly, the electronic evidence.  Not just what

9    people say, but when we look at electronic evidence, when we

10   go in and look at the computers, look at Simpson's computer,

11   what did he have on it?  Lots and lots and lots of radicalized

12   material, things that promoted terrorism.

13         When we look at Soofi's cell phones and his computer,

14   the one that he shared with Simpson, lots and lots of

15   radicalized information and terrorist information.

16         When you look at Malik's computer and his cell

17   phones, you're not going to find that.  You might find one or

18   two things, but nothing.  They look completely different.

19         Now, the government has just now told you that he's

20   basically the mastermind.  He's the money man.  He's the

21   trainer.  He's the motivator.

22         After you have listened to all of this evidence, I

23   believe that you'll come to the conclusion that my client was

24   friends.  He had no idea they were going to do this.  He had

25   no idea that they were going to Dallas, Texas.

1          Let me talk briefly, just briefly, about the

2   different charges because Count 1 and 2 and Counts 5 deal with

3   that trip to Garland, Texas, where that act of terrorism took

4   place.  Okay.

5          The count that deals with whether he lied to the FBI

6   or not, you're going to have to make that decision.  I wish I

7   had that video to show you.  I wish we knew exactly what he

8   said.  He certainly has always denied that he knew they were

9   going to Garland, Texas, or that they asked him to go to

10  Garland, Texas, or he knew they were going to do anything like

11  that.

12         When it comes to the issue of whether or not he is a

13  felon in possession, the evidence is going to be clear.  All

14  right.  He doesn't have one felony conviction.  He has two.

15         Back over ten years ago in about a four-year period

16  he got two felony DUIs.  All right.  Those are the felonies

17  that he had.  He should not have possessed a gun.  And the

18  evidence is going to show that he carried a gun all the time.

19  He had a .38 and he had a 9 millimeter.

20         It's going to be clear.  And he carried that .38

21  because he had a moving business and he would go and there

22  were times when he had been threatened.

23         Should he have carried it?  No.  Did he?  Yes.

24         At the close of this case all I'm asking you to do

25  now is keep an open mind.  Listen to the examinations.  Pay

```
 1    careful attention to the electronic information in here, the

 2    hard evidence that we can see.  Pay careful attention to the

 3    cross-examinations and look at people's credibility and

 4    whether they're telling the truth.

 5           And I suggest to you that a large number of the

 6    government's witnesses are not telling the truth.

 7           Thank you.

 8           THE COURT:  Thank you, Mr. Maynard.

 9           The government may call its first witness.

10           MR. KOEHLER:  Thank you, Your Honor.  The United

11    States calls Bruce Joiner.

12           If I could retrieve Exhibit 1 from the clerk, please?

13           THE COURT:  Sir, please come forward and be sworn.

14      (Witness duly sworn)

15           THE CLERK:  Please state your name for the record and

16    spell your last name.

17           THE WITNESS:  Bruce David Joiner.  J-O-I-N-E-R.

18              BRUCE DAVID JOINER, WITNESS, SWORN

19                     DIRECT EXAMINATION

20    BY MR. KOEHLER:

21    Q   Good afternoon, sir.

22    A   Good afternoon.

23    Q   Would you please introduce yourself to the jury and tell

24    them where you work.

25    A   I'm Bruce Joiner.  I work at Garland Independent School
```

```
 1    District.  It's a school district that has three cities there

 2    in the Dallas area of Texas.

 3    Q   What do you do for the Garland Independent School

 4    District?

 5    A   I work in their Security Department.  And you want me to

 6    elaborate a little or?

 7    Q   What do you do working in their Security Department?

 8    A   Thank you.  Basically, we're almost like a police

 9    department, except that because we're security, we are not

10    armed and we patrol the schools after hours.  And we're in the

11    schools during hours, checking doors, making sure they're

12    locked, looking for safety issues, and that kind of thing.

13    Q   You mentioned that because you're security, you're not

14    armed.  Is someone who is not a sworn law enforcement officer

15    permitted to carry a gun on any form of school property in the

16    State of Texas?

17    A   No.  They are not allowed.

18    Q   Were you in the past at times acting as a sworn police

19    officer?

20    A   Yes.

21    Q   During what time frames were that and what jurisdictions?

22    A   From 2001 to 2005 I was at Baylor Healthcare Systems which

23    is a private healthcare system that had their own police

24    department.  And then after that, I was with the City of

25    Rowlett for about six months.
```

1   Q   Can you please spell "Rowlett" for our court reporter?

2   A   Yes.  R-O-W-L-E-T-T.

3   Q   Thank you.

4         Now, you mentioned that you work as a security guard

5   for the Garland Independent School District; is that right?

6   A   Yes.

7   Q   Were you working on May 3 of 2015?

8   A   Yes, I was.

9   Q   Where were you assigned that day?

10  A   I was assigned to the parking lot duties, specifically,

11  the entrance for the VIP speakers and hosts of the event, as

12  well as any workers that would be coming in and out.

13  Q   I would like to switch the witness's monitor to the

14  document camera, please.

15        Sir, do you recognize what is here on Exhibit 1?

16  A   Yes.

17  Q   Can you tell the Court and jury what that is?

18  A   That is the west parking lot of the Curtis Culwell Center.

19  Q   Is that where this event was being held?

20  A   Yes, sir, in the conference area.

21  Q   And does this photograph fairly and accurately depict an

22  overhead view of the Curtis Culwell Center and the west

23  parking lot?

24  A   Yes.

25        MR. KOEHLER:  Move to admit Exhibit 1 and publish.

1          MR. MAYNARD:  No objection, Your Honor.

2          THE COURT:  One is admitted.

3      (Exhibit No. 1 admitted in evidence.)

4  BY MR. KOEHLER:

5  Q    The monitor that's in front of you has a touch screen.

6  A    Okay.

7  Q    Can you please use the touch screen there and draw a

8  circle in the area of the parking lot where you were

9  stationed?

10  A    The entry. (Indicating)

11  Q    And what time did you start your service there at the

12  entry to the parking lot?

13  A    I think we arrived around 12:00 and I began at that

14  station at one o'clock.

15  Q    What is the name of the road that is running along the

16  parking lot there?

17  A    Naaman School Road.

18  Q    And what was your assigned duty there at the parking lot?

19  A    Basically, it was to screen anybody coming in, making sure

20  that those that were regular attendees of the event didn't get

21  into the parking where we were only allowing the workers and

22  the security detail vehicles, as well as the speakers and

23  hosts of the event.

24  Q    Looking at the photograph, your circle is more or less in

25  the top upper half and center of the photograph going left to

1   right, correct?

2   A   Say that again?  I'm sorry.

3   Q   Your circle is a little bit above center?

4   A   Yes.

5   Q   And a little bit to the left of center?

6   A   Right.

7   Q   Looking left to right.

8        Looking at that photograph, which direction was the

9   main parking lot?

10   A   The main parking lot was to the right, so it was farther

11   down to the right of the monitor.

12   Q   And during the course of the day, did you have vehicles

13   approach you coming along Naaman School Road?

14   A   Yes, we did.  We had several vehicles that day.  I'm not

15   sure how many, at least 20 that would -- some of them actually

16   pulled into the driveway and stopped and asked us questions,

17   others slowed down and rolled down their windows and asked

18   questions.  And most of the time it was somebody going to the

19   other parking area.

20   Q   To the main parking area?

21   A   To the main parking area.

22   Q   Did you also have people come through there --

23        First off, was there someone with you at that

24   location?

25   A   Yes.

1    Q    And who was with you?

2    A    Officer Greg Stevens with the Garland Police Department.

3    Q    And looking at the photograph there, did he have a vehicle

4    with him?

5    A    He did.  His vehicle was actually parked inside of the

6    sidewalk.  If you can imagine the line of the sidewalk, he

7    parked his vehicle across the -- kind of the exit-side of that

8    entrance.

9         So right on this side right here (indicating) he has

10   blocked off half of the circle -- I mean the entrance -- with

11   his vehicle.  And so we're kind of standing.  We have cones

12   and we're standing, pretty much taking advantage of the shade

13   from those trees that are there.  So we were in around there.

14        And then we would approach a vehicle as it stopped

15   and answer any questions and direct them.  If they were

16   workers or something like that, then we removed the cones and

17   let them pass through.

18   Q    Do you recall how many people you had come into the VIP

19   section of the Culwell Center, roughly?

20   A    There were only two really big entourages.  One was the

21   host Emily Geller and her group.  The second was the speaker.

22   I don't really know him, but his entourage came through.

23        The rest were workers.  And they had actually had

24   early on in that afternoon an orientation for some new workers

25   that came and left before the event.  So probably in all that

1    day there was probably 30 or 40 people that we had let in

2    their -- vehicles, I should say -- but most of those were gone

3    before -- because they were there for the workers'

4    orientation.

5    Q   Do you recall how big the two groups were that were with

6    Ms. Geller and the speaker?

7    A   I would say at least three SUVs each.

8    Q   And each one of them fully loaded?

9    A   They were tinted.  I mean, I would assume that they were

10   pretty well fully loaded.

11   Q   All right.  Very good.

12           Do you remember what the event was that was being

13   held there at the Culwell Center that day?

14   A   Yes.  It was a Draw the Prophet Contest.

15           There was a prize.  They had a speaker from Holland

16   who spoke in opposition to Islam.

17   Q   All right.  Do you remember about what time that event was

18   letting out?

19   A   It was about 6:40 or so.  I think when we got a radio

20   transmission that they had awarded the prize money and that

21   they were dismissing the program, kind of a "get ready there's

22   going to be foot traffic and people going to their cars" and

23   stuff like that.

24   Q   And did you start to see a little bit of that foot

25   traffic?

1   A   I had just seen a few people.  Most of the parking is off

2   of this view.  They were not in this parking area that you see

3   here in this camera view and so we did not see very many

4   people, but we did see a few.

5   Q   When all this was going on, did something unusual happen

6   near the parking lot?

7   A   Yes.  We had another vehicle pull up.  What was different

8   was it pulled up rather abruptly and stop -- it did not --

9   Q   Can you describe the vehicle?

10  A   Pardon?

11  Q   Can you describe the vehicle, please.

12  A   It was a dark-colored sedan.  I believe it was a four-door

13  but I'm not sure.  It stopped.  It just -- just the right nose

14  of the vehicle was actually in the driveway.

15  Q   I'm going to change the color so that where you're

16  standing stays there.

17  A   Okay.

18  Q   If you can go ahead and make a line.  I changed it from

19  red to blue.  If you would go ahead and make a line in the

20  road where the car pulled up and stopped.

21        Oh, it stayed red.  Okay.  Well, we'll stick with red

22  then.

23  A   Okay.  It's actually just a little bit -- I'm not very

24  precise with this, but it's kind of in the -- it doesn't go

25  over the sidewalk, but it pulls in the entrance and kind of

1   that angle.  They came from the west and were headed eastbound

2   on Naaman School Road.

3   Q   So were they in -- you showed them in the lane that was

4   closest to you.

5       Were they traveling in the correct direction of that

6   lane going toward the right side of the photograph?

7   A   Yes, they were.

8   Q   And you mentioned they were traveling and they made an

9   abrupt stop.  Can you go ahead and describe what happened from

10  there?

11  A   Yeah.  It's not a high-speed area, but most of the people

12  had kind of eased in there when they pulled in because they

13  were kind of looking for where to go.

14      This car just pulled up and -- it didn't screech to a

15  stop, but it stopped pretty abruptly and both doors just

16  instantly popped open and both the driver and the passenger

17  got out.

18      They had their guns, rifles in their hands at the

19  time, and so it was very different than -- I had actually

20  taken a couple steps towards the vehicle expecting to answer a

21  question about whatever question they had, but then I noticed

22  the guns right away.

23  Q   Were you expecting to give them directions or something

24  along those lines?

25  A   Yeah.  That's why I was approaching the vehicle.  I would

1   have never approached it had I thought anything different.

2   Q   Did you focus on either the driver or the passenger at the

3   point where they started to come out of the vehicle?

4   A   I was on the passenger's side and I focused on the

5   passenger.  He had a very kind of surreal-looking smile on his

6   face and it just kind of caught me as one of those moments

7   that I remember.

8   Q   Did that smile make you think anything about what was

9   going on at that point?

10   A   Yeah.  It kind of threw me for a brief second.  I thought

11   it might be some kind of prank and that somebody was going to

12   get hurt because, if you know anything about Garland, Texas,

13   they don't play around.  And --

14        But as quickly as that thought went into my mind, I

15   realized that this was not a prank.

16   Q   What did you do after that?

17   A   My best memory is is I dove to the ground and I hid behind

18   the trees over here -- can I still mark this?

19   Q   Yes.

20   A   So I'm kind of behind this tree here laying on the ground

21   (Indicating).

22        The tree base is just about as big as my head, so I'm

23   just kind of at an angle from where their car is, trying to

24   get as much of me behind a small tree as I can.

25   Q   Could you hear anything happen while this was going on?

1   A    Yeah.   I'm not sure when I picked up on the gunfire.   I

2   know I did not hear the initial shots.   But once I got behind

3   the tree and peeked out from behind there, then I could hear

4   the shots.

5         I don't know how many shots I heard exactly, but I

6   heard about three kind of bursts of guns.   And by then I could

7   hear the police officers giving commands to stop moving.   Stop

8   moving.

9         They were also yelling for Officer Stevens, who had

10  kind of wandered out to the back of their car, for him to get

11  back with the other officers behind his vehicle just so there

12  would be no crossfire or anything like that.

13        They actually yelled "cease fire, cease fire" at one

14  point in order to draw him back into the protection of the

15  group and his vehicle.

16  Q    What do you remember happening after that?

17  A    After that the SWAT vehicle comes, the armored vehicle,

18  they call it "the Cat" came up from the rear.   Officers came

19  off of it from off the side of it.   They were standing in --

20  there were two more rifle rounds.   And from that point on

21  there was no more shooting.

22  Q    What happened after the shooting stopped?

23  A    After the shooting stopped, I heard a female officer

24  Brandy Johnson, Officer Brandy Johnson call to me and say,

25  "Are you hit?"

1          And I said, "I don't know."

2          And just about as quickly as she asked me that

3     question, I began to feel the burning in my leg.  And I looked

4     down at my boot and pulled my pant legs up and said, "Yes, I

5     am hit."

6     Q    Where were you struck?

7     A    I was struck in the left leg towards the outside between

8     my ankle and my knee, kind of halfway up there.  If you're

9     familiar with boots, it would be just above the bootline.

10    Q    Were you treated at the scene?

11    A    I was treated.  They pulled their vehicle around and kind

12    of blocked the area between me and the suspects.  Again, they

13    were still thinking that this might have an explosive device

14    with it and they pulled me to the rear of the vehicle.  They

15    initially put a triage on my lower leg and then they decided

16    to move it up to my upper leg to triage a tourniquet to triage

17    that.

18          And then from there they took me to the -- what would

19    be the back of the parking lot where an ambulance was waiting.

20    There was an ambulance at the event the whole time.

21    Q    And from that point forward you had no further

22    observation?

23    A    Once I was in the ambulance, I had no further observation

24    of what went on.

25    Q    And were you carried away immediately in the ambulance?

1  A   I probably had another five to ten minutes there as they

2  were triaging and getting my vitals.  And I had asked them to

3  let me call my wife and to call my boss who was there on the

4  property so that I could tell them that I was okay.

5         And so there was a little delay.  I don't know how

6  long exactly before we were headed some place.  They had to

7  make a decision about which hospital I would be going to as

8  well.

9  Q   After your hospital treatment, did you have any further

10  complications from the injury?

11  A   No.

12         MR. KOEHLER:  No further questions for the witness,

13  Your Honor.

14         THE COURT:  Any questions, Mr. Maynard?

15                    **CROSS EXAMINATION**

16  BY MR. MAYNARD:

17  Q   Very briefly.  Good afternoon, Mr. Joiner.

18  A   Good afternoon.

19  Q   When you said that the passenger got out and he had a

20  serene-looking smile, was it sort of a goofy look on his face?

21  A   No.  It was kind of "I gotcha" and I just never had

22  experienced anything like that before.

23  Q   And I hope you don't again.

24  A   Yeah.

25  Q   What about the driver?  Did you see any look on his face

1   or did you get to see his face?

2   A    Not really.  He was moving to the rear of the vehicle.  I

3   would describe it as not shielding themselves behind the

4   vehicle, but actually moving just to the rear where the

5   vehicle was.

6   Q    Okay.  There was a very fast reaction.  Was there a lot of

7   security at this particular event?

8   A    There was a lot of security at this event.  There weren't

9   a lot of security at that particular entrance.

10  Q    Where you were?

11  A    Right.

12  Q    Okay.  Can you tell the jury, give them some idea of how

13  much security was there?

14  A    I can tell you that -- and I don't know where they were.

15  While we work with the Garland Police Department, they don't

16  divulge all their secrets.  But they had snipers on a nearby

17  building that would have been blocked in this case by trees

18  and foliage like that.

19          They had several officers at the other entrance with

20  rifles.  They had the SWAT team at the dock waiting.  They

21  also had uniformed officers in their vehicles in the parking

22  area patrolling.  They had motorcycle officers that were,

23  basically, just making the loop around Naaman School Road and

24  going around and just kept making the loop.  And they were

25  checking license plates as they went along just for -- looking

1    for anything suspicious.

2    Q   And had you participated in prior days in some meetings

3    where there were discussions about safety and officers and how

4    many there would be there and that kind of thing?

5    A   I didn't attend the official meetings that were held with

6    the Garland P.D. and school officials, but I was briefed in

7    our security briefing before the event.

8         MR. MAYNARD:  No further questions.

9         THE COURT:  Any questions on redirect?

10                    **REDIRECT EXAMINATION**

11   BY MR. KOEHLER:

12   Q   You mentioned it was a kind of "gotcha" kind of a grin.

13   Can you describe how wide his smile was, if that makes any

14   sense?

15   A   I guess just kind of the Cheshire cat grin.  If you have

16   seen that, it's just a very wide smile.  It was not

17   necessarily -- I don't even remember teeth.  It was just a

18   huge grin.

19        And that's why I think initially I thought it might

20   be a prank.  But then I thought, no, that's a "gotcha" and he

21   really did have me because I was taking steps towards him.

22   Q   Did you see the rifle start to come up at all?

23   A   They were messing with the rifles, but honestly, I don't

24   remember other than them probably getting them to the ready

25   position.  But my focus was getting to cover.  I was unarmed.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

```
 1   I knew I was unarmed.  And I had already picked my spot to be.
 2           MR. KOEHLER:  No further questions.
 3           THE COURT:  May this witness be excused?
 4           MR. KOEHLER:  Yes, Your Honor.
 5           THE COURT:  Is there any objection?
 6           MR. MAYNARD:  No, Your Honor.
 7           THE COURT:  Thank you, Mr. Joiner.  You may step down
 8   and you are excused as a witness.
 9           Mr. Koehler, your next witness, please.
10           MR. KOEHLER:  Your Honor, before we go on with our
11   next witness, there is an exhibit we need to discuss with
12   defense counsel if we could take just a couple minute break to
13   do that.
14           THE COURT:  No.  Call your next witness please.
15           MR. KOEHLER:  The government calls Gregory Stevens.
16           MR. MAYNARD:  And, Your Honor, I forgot to invoke the
17   rule.
18           THE COURT:  Oh, well, we can take care of that.
19           Are there other witnesses that are present?
20           MR. KOEHLER:  Not in the courtroom, Your Honor.
21           THE COURT:  Outside?
22           We need to get everybody in, Mr. Maynard, and invoke
23   the rule.
24           MR. KOEHLER:  We have treated the rule as invoked and
25   all of our witnesses are either downstairs or one waiting in
```

UNITED STATES DISTRICT COURT

1    the anteroom.

2         THE COURT:  Okay.  Let's have any witnesses that are

3    present in the environs of the courtroom come in and we'll

4    swear them and advise them concerning the rule.

5         MR. KOEHLER:  Certainly.

6         THE COURT:  So while the witness is coming in, the

7    rule we're talking about is called the Rule to Exclude

8    Witnesses, which means that witnesses can't be in the

9    courtroom listening to other witnesses' testimony before they

10   testify.  And they're not allowed to talk to each other about

11   their testimony.

12        Nobody else?  Okay.  Sir, would you please come

13   forward and be sworn.

14        **(Witness duly sworn)**

15        THE CLERK:  Please state your name for the record and

16   spell your last name.

17        THE WITNESS:  I'm Officer G.B. Stevens.  That's

18   spelled S-T-E-V-E-N-S.  It's Gregory Brian Stevens.

19        THE COURT:  And since there are no other witnesses

20   present to be advised concerning the requirements of the rule,

21   I'm going to ask that the lawyers advise all of the witnesses

22   as they appear of the requirements of the rule.

23        And we will also post the door so that witnesses do

24   not come into the courtroom until they're called in to

25   testify.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

1          You may proceed, Mr. Koehler.

2          MR. KOEHLER:  Thank you, Your Honor.

3      **OFFICER GREGORY BRIAN STEVENS, WITNESS, SWORN**

4                **DIRECT EXAMINATION**

5   BY MR. KOEHLER:

6   Q   Sir, would you please introduce yourself to the jury.

7   A   I'm Officer Greg Stevens.  I'm a police officer in the

8   City of Garland, Texas.

9   Q   How long have you been so employed?

10  A   Just shy of 38 years.

11  Q   What are your day-to-day duties with the Garland Police

12  Department?

13  A   I'm assigned to the Traffic Division.  Basically, my

14  duties include selective traffic enforcement, accident

15  investigation.  In the Traffic Unit we have some specialized

16  training to do accident reconstruction, anything related to

17  traffic escorts, those kinds of things.

18  Q   And before joining the Garland Police Department, what did

19  you do?

20  A   I was a student and worked part-time for a university

21  police department as a dispatcher.  I was not a sworn officer.

22  Q   Were you on duty on May 3rd of 2015?

23  A   I was.

24  Q   What were you doing that day?

25  A   I had -- I was working a special assignment at the Curtis

1    Culwell Center for an event that was taking place there.  It

2    was an extra duty job.

3    Q   And do you recall the name of the event that was being

4    held?

5    A   I believe it was called the Draw the Prophet Contest.

6    Q   Where were you stationed that day?

7    A   I was at the west entrance to the Center, to the parking

8    area of the Center.

9    Q   Can you tell us what time you started your duty there at

10   the west entrance?

11   A   I arrived about -- and checked in with Lieutenant

12   Colasanto about 1:30 in the afternoon.

13   Q   Do you recall approximately how many officers were on duty

14   in the vicinity of the Curtis Culwell Center that day?

15   A   I would just have to guesstimate probably 30; 25 to 30.

16   Q   And was that a normal security profile there at the Curtis

17   Culwell Center for an event?

18   A   No.  It was a -- it was a little more -- there were more

19   officers than usual because we had some concerns about the

20   event.

21   Q   Explain what those concerns were.

22   A   Well, the nature of the event -- we had heard -- and this

23   was relayed to me by some supervisory personnel -- we had

24   heard that there were some possible threats to the event due

25   to the nature of it.

1              And so as a precaution, we put together a response

2      plan that was certainly not typical of most events that would

3      be held there.

4      Q    Was there also private security present at the event?

5      A    There were some security personnel for the promoter of the

6      event and also a guest speaker there.

7      Q    Do you remember the name of the promoter of the event?

8      A    Her name was Pamela Geller.

9      Q    And do you remember about how many people she had on her

10     security team?

11     A    I don't know the exact number, three or four probably.  I

12     only met one, which was kind of the supervisor of her group.

13     Q    And what about the speaker?

14     A    He had three or four people with him.  And I had -- I

15     didn't really visit with them, but I had seen them.

16     Q    Do you recall his name by chance?

17     A    Wilder, I believe, was his last name.  I can't recall what

18     his first name was.

19     Q    And where was he from, if you know.

20     A    I don't recall.  It was in Europe.  I don't recall which

21     country it was.

22     Q    Was he there to speak at the Draw Muhammad event that you

23     were talking about?

24     A    Yes.  He was.

25     Q    Did there come a point during the day that you took a

1    break?

2    A    Just briefly.  It was very late in the day.  I left my

3    post -- I called some other officers to take my place at my

4    post briefly while I went up to the building itself and I took

5    a rest room break.

6    Q    And did you come back to your post immediately after that?

7    A    I did.

8    Q    And was somebody at your post in your place while you were

9    gone?

10   A    They were, yes, sir.

11   Q    Was that right before the event came to a close?

12   A    Yes.

13   Q    And were you at your post when the event itself came to a

14   close?

15   A    While I was on my -- taking a quick bathroom break, I

16   heard on the radio somebody say, quote, it looks like it just

17   ended.  And that's when I immediately returned to my post and

18   relieved the officers that had relieved me and then I was back

19   on my post.

20   Q    Did you see people starting to leave the event after that?

21   A    I didn't see -- from my vantage point, I couldn't see the

22   entrance into the building itself until they would have had to

23   have gotten quite a ways away from the building before I could

24   really see them in my line of sight.  So I personally didn't

25   see a lot of people leaving the building.

1   Q   As this was all happening, did something unusual happen in

2   the street in front of you?

3   A   Yes, sir.

4   Q   Can you describe in your own words what happened?

5   A   Well sir, I was standing in the driveway area.  The

6   driveway is quite wide.  I had a number of tall cones, three

7   or four feet tall, that were blocking the entrance to the

8   driveway.  My assignment was to only allow a certain group of

9   people into that west entrance and it was very specific.  So

10  everybody else was to enter further down from where I was

11  posted.

12        I had most of the entrance blocked with these tall

13  cones.  My car was parked kind of parallel with these --

14  almost parallel with these cones inside the driveway in the

15  parking area pretty close to the cones.

16        And there was about -- I had moved about three of

17  them that left an opening on the left side of the driveway if

18  you were facing the street wide enough for about a lane of

19  traffic where a car could drive through there, if necessary,

20  to allow somebody in or to allow somebody out.  And I was

21  standing kind of in that open part of the driveway.

22        While I was standing there, a small black car pulls

23  up kind of rapidly and pulls partially into the driveway,

24  parallel to the cones.

25        And I'm not -- obviously, it got my attention because

1    that's not where somebody could park and so on.  And the fact

2    that it pulled up kind of rapidly kind of got my attention.  I

3    looked at the -- I happened to notice that the vehicle had

4    out-of-state license plates on it, which was not a huge

5    concern, but it was just something I happened to notice.

6         And as the vehicle came to a stop and I was watching,

7    both the passenger door and the driver's door immediately

8    opened.

9    Q   Let me stop you there for a moment.

10        Did you have someone else with you on the scene?

11   A   Yes, sir.  GISD, Garland Independent School District, has

12   a security force.  And one of their security officers, Bruce

13   Joiner, had been stationed at the same location with me all

14   day and he was standing to my left.

15        There was a tree kind of to the left of us that was

16   providing shade.  He was to my left and a little behind me.

17   And he was standing there when the car drove up.

18   Q   Could you see Joiner between you and the car at the point

19   when the car pulled up?

20   A   No.  He was -- I was -- he was behind me and to my left.

21   The car was to my right.

22   Q   Okay.  And then what happened?

23   A   Well, as soon as both doors opened, the passenger and the

24   driver both exited the vehicle and I had a clearer view of the

25   passenger.  And as the passenger exited the vehicle, I could

1    tell that he was -- he was holding something.  And I

2    immediately recognized that he was exiting the vehicle with

3    some type of rifle, an assault rifle.

4          When I recognized what that was, I immediately drew

5    my pistol, my service pistol --

6    Q    What caliber is your service pistol?

7    A    It's a .45 caliber Glock.

8    Q    And is it a semiautomatic weapon?

9    A    It is.

10   Q    How many rounds did you have in your magazine for that

11   pistol?

12   A    The magazine holds 13 rounds and I had one round in my

13   chamber.

14   Q    Okay.  Go on.

15   A    So, when I recognized he was exiting the vehicle with a

16   rifle, I immediately took my service revolver, my service

17   pistol out of my holster, and engaged the passenger.  I fired

18   several rounds at him; three or four, maybe as many as five.

19          And he fell to the ground.  Kind of -- he had moved

20   from the -- from where he had gotten out of the car toward the

21   back of the car, but he fell to the ground.  And his rifle

22   came out of his hand but was still in close proximity to him.

23   But he appeared to be at least temporarily incapacitated at

24   that time.

25          So once I saw that he went down and that, you know,

1    appeared to be incapacitated at least temporarily, I directed

2    my attention toward the driver.  And I was able to acquire the

3    driver coming around the back of the car.

4    Q    What was the driver doing at that point?

5    A    He had a -- he had a rifle in his hands, both hands.  He

6    had the rifle up.  And I can't -- I can't testify as to

7    whether he was firing the rifle at that moment or not, but I

8    heard a muffled -- what sounded like muffled automatic weapon

9    fire.  So I'm assuming he was firing the weapon at that time.

10            And I was able to acquire him.  I fired three or four

11   rounds in his direction and he fell to the ground as well in

12   similar fashion to as what happened to the passenger.  He

13   seemed to be at least temporarily incapacitated as well.

14            I redirected my attention to the passenger and he was

15   moving around.  I had concerns that he was able to retrieve

16   his rifle and I fired several more rounds in his direction.

17            He seemed to fall again, meaning he hadn't gotten up,

18   but he at least fell and became more still as though he had

19   become, once again, incapacitated, at least temporarily.

20            So once again, I redirected my attention back to the

21   driver, still concerns about him being armed with an automatic

22   or semi-automatic rifle.  I fired -- he was still moving

23   around.  I fired several more rounds at him.  And he kind of

24   fell and seemed to be incapacitated once again.

25            When I fired the last round that I fired at the

1    driver on the second time was -- was the last round in my gun.

2    My slide locked back, which is an indication the weapon is

3    empty.

4         I immediately dropped my magazine and did what we

5    would call a "tactical reload."  It's a very rapid reload.

6    Readied my gun to fire some more rounds.  And I started to

7    approach the passenger because he was still moving around.

8    His hands were -- he was clutching kind of up toward his chest

9    and throat area.

10   Q   Was there a concern about what he might be doing by

11   clutching around his chest and his throat area?

12   A   Yes, sir, there was a couple of concerns.

13        One was that he may have a weapon, another weapon or

14   that he may have some kind of an explosive device or a

15   triggering device.

16        Both of the occupants of the vehicle seemed to be

17   wearing some type of tactical vests and kind of backpacks.  I

18   didn't know if there may be some kind of an explosive device

19   in one of those -- in their garment or in their car or what.

20        So my greatest concern was that he was trying to pull

21   a pin on a grenade or touch a button or maybe retrieve another

22   weapon.

23        As I was starting to approach him, that's when the

24   other officers had arrived and got my attention.  And I

25   retreated from that position to a position of cover behind my

1   vehicle.

2   Q   What happened after you retreated to the position of cover

3   behind your vehicle?

4   A   We had SWAT team members that were there at the scene that

5   had been assigned.  They had arrived.  They have an armored

6   personnel vehicle that arrived.

7   Q   Is that vehicle called a Bear Cat?

8   A   Yes, sir.  We call it -- it's manufactured by Lenco.  It's

9   their Bear Cat model.

10   Q   Okay.

11   A   Those officers then kind of took it from there.  I was

12   still up front and then I was moved behind the -- to a safe

13   position behind the Bear Cat.

14   Q   All right.  I'm going to pause you for a moment there.

15       I would like to direct your attention to what has

16   been marked for identification as Exhibit No. 2.  Do you

17   recognize that, sir?

18   A   Yes, sir, I do.

19   Q   And can you tell us what that is?

20   A   Well, that is the west entrance to the Curtis Culwell

21   Center.  You can see the vehicle that is at the bottom of the

22   picture is my vehicle.  It is -- that was where it was

23   positioned kind of parallel to those cones.  Those are the

24   tall cones I was speaking about earlier.

25       And you can see there's one of them moved over to the

1   right side, the other one moved over to the left, that left

2   the -- kind of one lane entrance to the driveway open.

3   Q   Looking at the photo, can you tell from where that photo

4   was shot?

5   A   That was some type of an aerial photo.  I'm not sure where

6   that photo was taken from.

7   Q   Does it fairly and accurately depict the scene as it

8   appeared that night, including the positions of the two people

9   that got out of the vehicle and your vehicle and the cones

10  after the shooting took place?

11  A   Yes, sir, it does.

12          MR. KOEHLER:  Move to admit Exhibit 2 and publish.

13          MR. MAYNARD:  No objection.

14          THE COURT:  Two is admitted.

15      (Exhibit No. 2 admitted in evidence.)

16  BY MR. KOEHLER:

17  Q   Can you show us in the video where your car is --

18          And you have a touch screen next to you.  You can

19  just place a little dot on your car.  Touch where your car is

20  and it will light up.

21  A   This is my car here. (Indicating)

22  Q   Okay.  Where is the suspect vehicle?

23  A   That vehicle there.

24  Q   And can you circle first the passenger.

25  A   I believe this is the passenger.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

1    Q    Okay.  And I'm going to clear that and have you circle the

2    driver, please.

3    A    That would be the driver. (Indicating)

4    Q    Looking at your car, there's an object in front of your

5    car.  Can you tell the jury what that is?

6    A    That's a police motorcycle.

7    Q    And over to the right end of the picture, do you see an

8    object on the ground in front of the suspect vehicle?  Do you

9    know what that is from the picture?

10   A    Is it the extreme right?  Is that what you're talking

11   about?

12   Q    The far right.

13   A    Yeah.  I don't know what that is.

14   Q    Okay.  Thank you.  I'm going to go to Exhibit 3 now.

15            In general terms, can you tell us what Exhibit 3 is?

16   A    This is an aerial-type photograph of the suspect vehicle

17   and the two occupants of the suspect vehicle.

18   Q    In this photograph is this a closer or further-out view of

19   what we just saw a moment ago?

20   A    That would be a closer view of what we saw a moment ago.

21   Q    And does it likewise fairly and accurately depict the

22   scene?

23   A    It does.

24            MR. KOEHLER:  Move to admit and publish Exhibit 3.

25            MR. MAYNARD:  No objection.

1              THE COURT:  Three is admitted.

2         (Exhibit No. 3 admitted in evidence.)

3    BY MR. KOEHLER:

4    Q   Looking now at Exhibit No. 3, are you able to identify the

5    weapons that the two individuals had?

6    A   I can see --

7              THE COURT:  You mean tell us what they are as opposed

8    to identify what they are specifically?

9              MR. KOEHLER:  Tell us where they are in the

10   photograph and --

11             THE COURT:  Okay.

12             MR. KOEHLER:  -- and which weapon came from which

13   person.

14             THE WITNESS:  Should I circle them?

15             MR. KOEHLER:  Yes, please.  And start with -- let me

16   clear first.  It's always good.  There we go.

17   BY MR. KOEHLER:

18   Q   Let's start with the passenger and the passenger's weapon.

19   A   This would be the passenger (indicating) and this appears

20   to be his weapon.

21   Q   Okay.  And now the driver and the driver's weapon, please.

22   A   This would be the driver and this would be his weapon.

23   (Indicating)

24   Q   You mentioned before that there was a concern about

25   explosive devices.

1              Did the SWAT team -- you mentioned that the SWAT team

2     arrived on the scene; is that right?

3     A   That's right.

4     Q   Did they take action in light of the fact that there was

5     this concern?

6     A   Yes, they did.

7     Q   Can you please describe that for the jury.

8     A   Once the -- once the Bear Cat had arrived, we had a -- one

9     of the SWAT personnel, because of the concerns about the

10    potential of detonating some type of explosive device, the

11    decision was made that two lethal headshots would be taken to

12    be sure that both of those suspects would not be able to

13    continue to try and detonate any explosive device or any

14    remote device if one existed.

15    Q   I want to back you up a little bit.

16              When you first saw the passenger come out of the car

17    with the gun, did you see him begin to raise the gun before

18    you fired?

19    A   I did.

20    Q   Could you tell by the way he was holding his gun whether

21    he was attempting to shoot from the hip or from the shoulder?

22    A   It was on its way up.  He was probably ultimately going to

23    end up at the shoulder, but I don't think he ever got that far

24    up.

25    Q   Okay.  And then what about the driver?

1    A    The driver appeared to be shooting from the shoulder.

2    Q    And when they began shooting, were they standing fully

3    upright or were they still in any kind of a crouched position?

4    A    The passenger was more crouched as he was exiting the

5    vehicle.  He had to kind of swing the barrel of the rifle

6    around to get it out of the vehicle.  When I acquired the

7    driver, he was in a more upright position.

8    Q    And were they moving or standing still at that point?

9    A    They were moving.

10   Q    Were you alerted -- were you aware through your time there

11   at the event approximately how many people were at the event?

12   A    It's my understanding there was a couple hundred people.

13   Q    After the two suspects were neutralized, was there still a

14   concern about potential explosives?

15   A    Yes.

16   Q    And can you explain what that concern was?

17   A    Well, we were unaware or uncertain if they were wearing

18   some kind of explosive device, may have had an explosive

19   device in a backpack or some pouch.  They were wearing

20   military-type load-bearing vests that had extra magazines for

21   their weapons and so on.

22        We didn't know if any of those pouches may have

23   contained some kind of explosive device.  And on a grander

24   scale, we were concerned about the vehicle that was there,

25   whether there may be -- whether inside the vehicle or in the

1    trunk or somewhere else in the vehicle might be an even larger

2    explosive device that could be remotely detonated.

3    Q   Did a unit of the Garland Police Department respond to

4    address those concerns?

5    A   Yes.  Our Bond Unit did respond.

6    Q   And did you see them respond?

7    A   No.

8    Q   Were you already away from the scene by then?

9    A   Yes.

10             MR. KOEHLER:  If I could have a moment?

11             At this time I have no further questions for the

12   witness, Your Honor.

13             THE COURT:  Mr. Maynard, cross-examination.

14                        **CROSS EXAMINATION**

15   BY MR. MAYNARD:

16   Q   Officer Stevens, can you describe how the passenger looked

17   when he got out of the vehicle?  What did his facial features

18   look like?

19   A   I don't recall looking directly at his face.  I think my

20   attention kind of zeroed in on the fact that he had a weapon

21   in his hand.

22   Q   That was enough.  Okay.

23             Did you get a look at the driver of the vehicle, his

24   face, before you discharged your weapon at him?

25   A   Not that I -- not that I recall.  I may have.  But I don't

1  have a recollection of facial features or any of those kind of

2  things.

3          Once again, I think my attention was really directed

4  more toward the center of mass, which is a training thing.

5  That's what we're trained to do.  I think at that point under

6  the circumstances, my training kicked in and I did what I was

7  trained to do.

8  Q   And it looked like the driver is -- I don't know -- ten or

9  eleven feet away from the back of the car.  Can you tell me

10 what he was doing?

11 A   Once he exited the vehicle, he moved toward the back of

12 the car and continued moving in that direction.  And

13 ultimately, that's where he fell.  He may have moved on the

14 ground slightly, you know, a little bit after the fact, but I

15 know that he had gotten around behind the back of the vehicle

16 pretty rapidly.

17 Q   But from the pictures that we saw, it doesn't look like he

18 was crouching down behind the vehicle do get cover.  Did he

19 ever do that?

20 A   Not that I was aware of.

21 Q   Okay.  And give us an idea of how long this encounter

22 lasted.  Ten seconds?  Fifteen seconds?

23 A   Probably no more than fifteen seconds.

24 Q   Do you have any military training?

25 A   No, sir.

1   Q   Okay.  Did it look like either one of these guys had any

2   training in military or use of a weapon of this nature?

3   A   I didn't have a long enough time to review their skills.

4   Q   Okay.  You just took care of business?

5   A   I detected the threat, not only to myself and my fellow

6   officers, but everybody there and, you know, I did what -- you

7   know, luckily I was able to rely on my training and did what I

8   had to do.

9         MR. MAYNARD:  Okay.  No questions.

10        THE COURT:  Anything on redirect, Mr. Koehler?

11                        **REDIRECT EXAMINATION**

12   BY MR. KOEHLER:

13   Q   You mentioned your training and you responded using your

14   training.  Can you describe a little bit the amount of

15   training that you had?

16   A   Well, as beginning in the Police Academy, we have a

17   firearms training course that we have to complete and so on.

18   Of course, that was many long years ago for me.

19        But each year, each of us, each police officer in the

20   City of Garland, State of Texas, is required to qualify with

21   their weapon.  It's a -- you have to show a certain

22   proficiency to be able to use your weapon effectively and

23   safely.  Like I said, you have to qualify twice a year.

24        And as long as -- and if you don't pass this

25   qualification, then you'll be receiving more training, extra

1    training, and another opportunity to qualify.  If you can't

2    qualify with the weapon, then you will be disqualified as a

3    police officer.

4            During my career I have had a number of occasions to

5    be able to attend additional firearms training that's been

6    provided by the City.  And so, in addition to just the

7    qualifying course, which is, you know, still training but it's

8    more of a qualification than training, I have had an

9    opportunity to do some other firearms training throughout my

10   career.

11   Q   As part of your training, do they -- you mentioned that

12   you have to repeat this on a regular basis.  Is there a reason

13   they have you go back and requalify every year and so on?

14   A   Well, it's to -- to assure that you still maintain and can

15   exhibit competence with your weapon that you can use it safely

16   and effectively in your defense or defense of somebody else.

17   It's to identify maybe training needs and those kind of things

18   as well.

19   Q   Would your skill stay as sharp without that training?

20   A   No.  It's like most any other skill.  Usually the more you

21   practice, the better you are; the less you practice, then the

22   less proficient you are.

23   Q   Does your training include firearms maintenance?

24   A   Part of the -- once we -- when we go to the range and

25   fire, we do have a cleaning -- several cleaning stations

 1    there.  We are required to clean our weapons.

 2         On some occasions, our range master, who has got

 3    gunsmithing qualifications, will not only field strip our

 4    weapons -- and "field strip" meaning take it down to some more

 5    basic components, take the slide off and the barrel out, so

 6    that we can more adequately clean it.

 7         The range master will actually take it apart even

 8    further and inspect some of the more intricate parts of the

 9    weapon to being sure that it's working correctly and

10    serviceable.

11    Q   Is field stripping part of the day-to-day cleaning and

12    operation of the firearm?

13         MR. MAYNARD:  Objection, Your Honor.  Relevancy to

14    the evidence.

15         THE COURT:  Sustained.

16         MR. KOEHLER:  No further questions.

17         THE COURT:  May this witness be excused?

18         MR. KOEHLER:  Yes.

19         THE COURT:  Any objection?

20         MR. MAYNARD:  No, Your Honor.

21         THE COURT:  Thank you, Officer Stevens.  You may step

22    down, sir, and you are excused as a witness.

23         The government may call its next witness.

24         MR. KOEHLER:  This is going to take a moment because

25    we're going to be bringing in evidence that's being brought in

 1    securely.

 2              THE COURT:  Is the witness -- does the witness have

 3    the evidence?  Can we get the witness on the stand, sworn

 4    and --

 5              MR. KOEHLER:  The United States calls Brian Marlow.

 6    Start with that.  It's M-A-R-L-O-W.

 7        **(Witness duly sworn.)**

 8              THE CLERK:  Please state your name for the record,

 9    spelling your first and last name.

10              THE WITNESS:  Brian Marlow.  B-R-I-A-N   M-A-R-L-O-W.

11            **SPECIAL AGENT BRIAN MARLOW, WITNESS, SWORN**

12                      **DIRECT EXAMINATION**

13    BY MR. KOEHLER:

14    Q    Good afternoon.

15    A    Good afternoon.

16    Q    Could you please introduce yourself to the jury.

17    A    Special Agent Brian Marlow of the Dallas Division of the

18    FBI.

19    Q    How long have you worked for the FBI?

20    A    Since 2006.

21    Q    And what is your title there?

22    A    Special Agent.  My job function is Senior Team Leader of

23    the Evidence Response Team.

24    Q    Before we go into your duties with that, what did you do

25    before joining the FBI?

1    A    I was in the United States Army as a commissioned officer

2    and then I also was a project engineer for various

3    manufacturing and distribution companies.

4    Q    How long were you in the Army?

5    A    Active duty, a little over two years, and the National

6    Guard for a little over two years as well.

7    Q    As part of your duties with the FBI, have you also served

8    as a firearms instructor?

9    A    I have since 2008.

10   Q    And let's talk a little bit about your duties with the

11   Evidence Response Team.  You said you're the Senior Team

12   Leader.  What does that involve?

13   A    We have a team of 32 members that are on call or standby

14   to respond to various crime scenes or search -- execute search

15   warrants.  We may execute federal, as well as we may assist

16   state and local police as well on various searches or crime

17   scene.

18   Q    And can you tell us a little bit about the training you

19   received and the protocols you have to follow with the

20   Evidence Response Team?

21   A    Well, every one of our members, they go through a two-week

22   course on basic collection, techniques of evidence, and that

23   covers anything from collecting latent prints to impression

24   evidence to all our documentations required, photography as

25   well.

1              So that's some of the basic courses, basic functions

2     that we do.  There's also advance courses that you can take

3     that are made available to us as well.

4     Q   What is the purpose of all of this training for the

5     Evidence Response Team?  Is there a goal when responding to a

6     scene that this training is designed to serve?

7     A   Our goal or our mission is to basically document the

8     evidence -- or excuse me -- document the crime scene as it is

9     and collect and preserve the evidence that's there.

10    Q   And as part of that preserving the integrity of the

11    evidence?

12    A   Yes.

13    Q   And does preserving the integrity of the evidence involve

14    making sure that it remains in the same condition it was in

15    when you found it?

16    A   Yes.

17    Q   Were you on duty on May 3rd and 4th of 2015?

18    A   I was.

19    Q   And were you called out to the scene of the Curtis Culwell

20    Center in Garland, Texas, at some point that night on May 3rd?

21    A   Yes, I was.

22    Q   Approximately, what time did you arrive at the scene?

23    A   I arrived at the outskirts of the scene 10:30 p.m. on the

24    3rd of May.  I didn't come onto the scene until about 4:15

25    a.m. on the 4th.

1    Q    And why was that?

2    A    The bomb technicians were making sure the scene was safe.

3    Q    And through your time at the scene, were you aware of what

4    they did to make the scene safe?

5    A    Once I came onto the scene, I did a walk-through with the

6    special agent, the bomb technician, and he explained to me

7    that they used one of their tools to mitigate any explosive

8    devices that were in the car.  They also mitigated various

9    bags to make sure that there was no explosive devices there as

10   well.

11   Q    When you did the walk-through on the scene, was evidence

12   laying on the street?

13   A    Yes.  It was scattered throughout.

14   Q    And I'm going to show you Exhibits 2 and 3 which are in

15   evidence.  Let's start with Exhibit No. 3.

16          THE COURT:  It's upside down.

17          MR. KOEHLER:  I just noticed that myself.  Thank you.

18   There you go.

19   BY MR. KOEHLER:

20   Q    Looking at that, was that -- in that photo is there

21   evidence laying on the street that was there the next day when

22   you came through the crime scene?

23   A    Some of it, but there was a lot more --

24   Q    Okay.

25   A    -- once I came on the scene.

1    Q   And having looked at that and having looked at the scene

2    the next day, could you infer where that evidence would have

3    had to have come from?

4    A   From the bomb technicians mitigating the car and the bags

5    from explosive threat.

6    Q   If I could go only to the witness's monitor, please.

7              I'm about to show you two photographs marked as

8    Exhibit 75.  This is page 1.

9              Agent Marlow, do you recognize Exhibit 75?

10   A   Yes.  It's one of the photographs we took on the scene.

11   Q   I'm going to show you page 2.  Do you recognize that as

12   well?

13   A   Yes.  That's also part of the scene.  It's kind of the

14   north side of the road.

15   Q   And do these photographs depict daylight or nighttime

16   hours?

17   A   It was daylight.

18   Q   So do you know when these photos were taken approximately?

19   A   I would say sometime in the morning.

20   Q   On which day?

21   A   On May 4th.

22   Q   Do these photos fairly and accurately depict the scene as

23   it looked when you arrived?

24   A   Yes.

25             MR. KOEHLER:  Move to admit Exhibit 75 and going back

CR15-00707-PHX-SRB    JURY TRIAL-DAY #2   2-17-16

```
 1    to page 1.
 2              THE COURT:  Any objection?
 3              MR. MAYNARD:  No.
 4              THE COURT:  75 is admitted.
 5         (Exhibit No. 75 admitted in evidence.)
 6    BY MR. KOEHLER:
 7    Q   Looking at the trunk of that car --
 8              THE COURT:  And it's just two, correct?  No. 75?
 9              MR. KOEHLER:  Two pages, yes.
10    BY MR. KOEHLER:
11    Q   Looking at the trunk of the car, can you tell us about the
12    condition of the back end of that car at that point?
13    A   It's -- I mean it's not in its normal state.  I mean it's
14    blown -- split apart, I guess.
15    Q   Something -- would something require a great deal of force
16    to have done that?
17    A   Yes.
18              THE COURT:  So your understanding was the bomb
19    technicians did that?
20              THE WITNESS:  Yes, ma'am.
21    BY MR. KOEHLER:
22    Q   Can you tell us in page 2 of the exhibit where that is in
23    relation to the car in the first page of the exhibit?
24    A   The black Chevrolet is, I guess, off to the right of the
25    photo, just outside the edge of the right edge of the photo.
```

1    Q    So page 2 is left side and page one is the right side?

2    A    Yes.

3    Q    Can you give the jurors an idea, just generally speaking,

4    of the approximate size of the debris field that you were

5    dealing with with the evidence?

6    A    The center part of it was the intersection between the

7    entrance to the parking lot, to the west parking lot, and the

8    four lane road, Naaman Forest Boulevard.  That was the center

9    part of it.  But we had debris in the parking lot itself, you

10   know, some fragments.  It was a pretty large field and it was

11   pretty scattered.

12   Q    From looking at the items that you found in the street and

13   the items that you found near the car, could you tell which

14   items, other than the two bodies and the two firearms next to

15   the bodies, where the rest of those materials came from,

16   whether they came from the people themselves or from the

17   inside of the car?

18   A    You mean originally before the bomb technicians?

19   Q    Correct.

20   A    No.

21   Q    So did you treat this crime scene as being, for lack of a

22   better term, "pristine" at that point in time?

23   A    No.  But we -- I mean, we process the scene as we find it.

24   So whatever the scene looks like when we get on the scene,

25   that's how we -- that's how we document it.

1   Q    At the same time, did you know whether the scene was

2   identical to what it was before the bomb techs acted on the

3   car?

4   A    Based on the discussions with the bomb tech, no, it was

5   not.

6   Q    And so among the objects that you gathered on the scene

7   were there shell casings?

8   A    Yes.

9   Q    Was there ammunition?

10   A    Yes.

11   Q    And when you arrived at the scene, were you able to tell

12   which shell casings might have come from the firearms that

13   were there on the scene versus having come from inside the

14   car?

15   A    No.

16   Q    I want to direct your attention to the two people that

17   were there at the scene laying on the ground.

18          Did your team examine them?

19   A    We did.

20   Q    Were both individuals alive or deceased at that point?

21   A    They were deceased at that time.

22   Q    Did you find weapons and ammunition either on their bodies

23   or in the immediate proximity of their bodies?

24   A    We did.

25   Q    All right.  I'm going to start with Exhibit No. 3 --

1   excuse me -- not No. 3.  No. 5.  I'm actually going to change

2   that.  I'm going to go to No. 7 first.

3           May the agent approach the witness, Your Honor?

4           THE COURT:  Yes.  And request is always required, but

5   you may.

6           Is it sealed?

7           MR. KOEHLER:  It is sealed and -- well, the box is

8   not sealed.

9           THE COURT:  Okay.  That's what I wanted to know

10  because I was going to offer scissors.

11          MR. KOEHLER:  Oh, thank you.

12          THE COURT:  So tell us what's in the box.

13          THE WITNESS:  This is the weapon that was located

14  near Mr. Soofi.  It was an Elk River Tool and Die, AK74-type

15  weapon.

16  BY MR. KOEHLER:

17  Q   Do you know what the caliber of that weapon is, the size

18  of the ammunition it took?

19  A   5.45 by 39 millimeter.

20  Q   Was there a little confusion about that on the scene when

21  the agents first arrived at the scene?

22  A   Yes.

23  Q   Does that AK-74 weapon resemble another type of weapon

24  that's very similar?

25  A   It shoots a similar-type round as an AK-47.

1   Q   So the two types -- or things that can sometimes be

2   confused with each other?

3   A   Yes.

4   Q   Is Exhibit 7 in substantially the same condition it was

5   when it was found at the scene on May 3rd and 4th of 2015?

6   A   Yes.

7        MR. KOEHLER:  Move to admit Exhibit 7.

8        MR. MAYNARD:  No objection.

9        THE COURT:  Seven is admitted.

10      (Exhibit No. 7 admitted in evidence.)

11       THE COURT:  Could you please tell the jury what you

12  have done to make the weapon safe so that it cannot be fired?

13       THE WITNESS:  We put wire ties to keep the action

14  open so it doesn't close -- actually, we emptied it from any

15  ammunition and then we locked it open so it won't close on

16  them.

17       THE COURT:  Have you also removed the magazine?

18       THE WITNESS:  Yes, ma'am.

19       MR. KOEHLER:  That was my next question.

20       THE COURT:  Thank you.  Please continue, Mr. Koehler.

21  BY MR. KOEHLER:

22  Q   So you have made the weapon safe; is that correct?

23  A   Yes.

24       MR. KOEHLER:  At this time, if I may borrow the

25  Court's scissors to remove the weapon in the box?

1          THE COURT:  Sure.  It's already removed.  Okay.  It's

2    not tied down.  So what do you want the witness to do?

3    BY MR. KOEHLER:

4    Q    I would like to have the case agent hold the weapon

5    vertically to show it to the jury.

6          THE COURT:  That's fine.  They both have gloves on,

7    so either one of them can do it.

8        (Exhibit No. 7 being displayed to the jury.)

9          MR. KOEHLER:  If you would please return the box and

10   then we'll go to Exhibit No. 8.  And may I have the case agent

11   approach the witness with Exhibit 8, Your Honor?

12         THE COURT:  Yes.  And we'll recess after we get

13   Exhibit 8 described and possibly admitted.

14   BY MR. KOEHLER:

15   Q    Agent Marlow, do you recognize Exhibit No. 8?

16   A    I do.

17   Q    Can you tell the Court and the jury what that is?

18   A    This is the magazine and the ammunition that was found

19   within the magazine that was inserted into the Elk River

20   AK-type 74.

21   Q    How many rounds of ammunition were in the magazine in the

22   gun?

23   A    73 is what my memory serves me.

24   Q    And is the ammunition and the magazine, with the exception

25   of the ammunition having been removed and processed, in

 1    substantially the same condition it was when it was found on

 2    May 3rd and 4 of 2015?

 3    A   Yes.  That is correct.

 4         MR. KOEHLER:  Move to admit Exhibit 8.

 5         MR. MAYNARD:  No objection.

 6         THE COURT:  Eight is admitted.

 7      (Exhibit No. 8 admitted in evidence.)

 8    BY MR. KOEHLER:

 9    Q   Looking at the magazine itself please, does it have any

10    indication on it what its capacity is?

11    A   Yes, it does.

12    Q   What is its capacity?

13    A   95 rounds.

14         MR. KOEHLER:  If I could have the case agent display

15    the magazine and the ammunition for the jury?

16         THE COURT:  He may.

17         MR. KOEHLER:  Just one at a time is fine.

18      (Exhibit No. 8 being displayed to the jury.)

19         THE COURT:  Any more questions about 8?

20         MR. KOEHLER:  No, Your Honor, not at this time.

21         THE COURT:  Then we will recess for the day.

22         Sir, you may step down.

23         Ladies and gentlemen, we are going to recess until

24    nine o'clock tomorrow morning.  I want to remind you again of

25    the admonition that you are not to discuss the case among

1   yourselves or with anyone else or form any conclusions about

2   the case until you have heard all the evidence.

3          Remember that the only thing that you can tell people

4   is that you have been selected to sit on a jury, the case may

5   last up to five weeks, and you can't tell them anything else

6   about the trial until it is over.

7          Also, you may have heard things said today, seen

8   people's names on slides, heard different terminology.

9          If you want to know any more about it, you have to

10  find out about it here in this courtroom.  You cannot use the

11  Internet or any other reference material to try to learn

12  anything about any of the people that may be involved in the

13  case, talked about during the case, any of the terms that were

14  used, any of the organizations that were or may be mentioned

15  in the future.

16         If there is something you're curious about, ask me in

17  writing.  I will talk to the lawyers about it and we will see

18  if we can get you the answer or at least explain to you why we

19  cannot.

20         And so with that further admonition, let me excuse

21  the jury at this time and we will see you tomorrow morning at

22  9:00 a.m.  Just leave your notebooks in your seats.  We'll

23  collect them and then we'll redistribute them in the morning.

24      (Open court, no jury present at 4:25 p.m.)

25         THE COURT:  Please sit down.  I have two things.  I

1    didn't know if you have any.

2           The two things are, first, I didn't mention -- you

3    can go ahead and step down, sir.  I did not mention the

4    photographs yet because I wanted to doublecheck and make sure

5    we were going to do that and at least our -- at least the two

6    or three witnesses that we now had have consented to it.

7           MR. KOEHLER:  Thank you for bringing that up, because

8    at first I didn't know what you meant by "photographs" and we

9    had that flagged for you.

10          The FBI has declined to have their employees

11   photographed, but otherwise, we will be asking our witnesses

12   to consent to that.

13          THE COURT:  Okay.  And that's -- and so did the two

14   individuals from Garland agree to be photographed?

15          MS. BROOK:  I don't think they have yet been asked

16   but we will take care of that before they depart today.

17          THE COURT:  Okay.  Mr. Joiner and Officer Stevens.

18          MS. BROOK:  Okay.

19          THE COURT:  Okay.  And I wanted to make -- I'm going

20   to let the jury know that it's voluntary, but I didn't want to

21   talk to them about it until I was sure we were actually going

22   to have some.

23          MR. KOEHLER:  I have a feeling because of the nature

24   of their actions in the case, that they would probably like to

25   be sure that their photographs will be collected from everyone

 1    and destroyed afterward.

 2              THE COURT:  They will be.  In fact, if you could

 3    three-hole punch them, that would be nice.  If you can't, we

 4    can do it.

 5              MR. KOEHLER:  We will.

 6              THE COURT:  And we will have them put them in their

 7    notebooks and then I will tell them that we're going to

 8    collect them -- they can't take them home.  We'll collect them

 9    with their notebooks long with their notes at the end.

10              Go ahead.  Ms. Brook?

11              MS. BROOK:  Just briefly as a corollary.  Is it

12    possible, Your Honor, to admonish the jury not to take any

13    photographs of the photographs with their phones or anything

14    like that.  That might alleviate some anxiety.

15              THE COURT:  I will try to remember to tell them that

16    but please remind me.

17              The second thing that I wanted to mention.  I thought

18    I went over this with counsel.  Mr. Koehler, when you asked if

19    we could take a short break so that you could discuss

20    something about an exhibit with Mr. Maynard and I said no.

21              First of all, when you have 16 jurors, there are no

22    short breaks.  Once you let 16 jurors leave the courtroom and

23    they start using the rest room, there is no such thing as a

24    break less than 20 minutes and we're lucky if we can get them

25    all situated for that.

1          But secondly, when I tell the jury that we're going

2    to be taking evidence from nine o'clock in the morning to 4:30

3    in the afternoon with a break in the morning, a break in the

4    afternoon and a lunch break, I really mean it.  We're not

5    going to take any other breaks unless something unexpected

6    happens.

7          And so far nothing unexpected has happened, so I

8    expect that if there are things that we need to discuss, that

9    we do it at 4:30, we do it before 9:00 a.m., we shorten our 15

10   or 20-minute break in the morning or in the afternoon or we

11   shorten our lunch break so that the jury is hearing evidence

12   during the time that I promised them that they would be

13   hearing evidence rather than wondering why we're taking so

14   long to do whatever it is that we're doing.

15         That was my two things.  Anything else, Mr. Koehler?

16         MR. KOEHLER:  No, Your Honor.  And I apologize for

17   that.  There was an issue about videos that we wanted to be

18   certain that the defense had actually seen.  Because when we

19   gave them the video in discovery, there was an awful lot of it

20   and we wanted to make sure they had seen it.

21         THE COURT:  So the video from Garland?  Is that what

22   you want to show of the crime --

23         MR. KOEHLER:  Yes.

24         THE COURT:  -- of the scene.

25         MR. KOEHLER:  It's a motorcycle video that Officer

1   Orman -- and the defense graciously has offered to stipulate

2   foundationally for these, which is why we're going through the

3   ERT supervisor rather than parading 25 witnesses from the ERT

4   before you.

5           THE COURT:  Thank you, Mr. Maynard.

6           MR. MAYNARD:  You're more than welcome.

7           THE COURT:  Although foundational testimony is very,

8   very riveting.

9           MR. KOEHLER:  We have found the same.

10          Anyway, back to these two videos.  So one of them is

11  the video from the camera that is mounted on Officer Orman's

12  motorcycle.  Officer Orman is not going to come testify for

13  five minutes to lay foundation and fly six hours to do that

14  and we're grateful to the defense attorneys for that

15  agreement.

16          And the same thing is true for another officer,

17  Officer Mittendorf.

18          Officer Orman pulls up to the scene right as Officer

19  Stevens is standing over the two and getting ready to back

20  away.  And we see him back away off of the video.  And then

21  the second video is Officer Mittendorf's car.  And the scene

22  is a little bit darker, but you see him pull up and you hear

23  the last two shots that are fired in that video.

24          THE COURT:  The ones that the SWAT team did?

25          MR. KOEHLER:  Yes.

1          THE COURT:  Okay.

2          MR. KOEHLER:  And there is a call out on the radio

3    that you hear that there is an officer -- I believe they say

4    there's two officers down because they don't realize that

5    Joiner is not a police officer.

6          THE COURT:  Okay.  Anything else, Mr. Maynard, before

7    we see you tomorrow morning at 9:00?

8          MR. MAYNARD:  No, Your Honor.

9          THE COURT:  Okay.  Court is in recess until nine

10   o'clock tomorrow morning.

11       (Proceedings adjourned at 4:31 p.m.)

12                              * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                           C E R T I F I C A T E

3

4           I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 1st day of August,

14   2016.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25