# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 18, 2016 |
| Abdul Malik Abdul Kareem, | ) 9:05 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 3
(Pages 319 through 517, Inclusive.)

**APPEARANCES:**
**For the Government:**
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
               **Joseph Edward Koehler, Esq.**
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
               **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                          **INDEX OF WITNESSES**

3    **SPECIAL AGENT BRIAN MARLOW:**

4    Direct examination by Mr. Koehler **(cont'd)**        Page 326
     Cross examination by Mr. Maynard                  Page 381
5    Redirect examination by Mr. Koehler               Page 393

6    **DETECTIVE JEFFREY DAVIS NASH:**

7    Direct examination by Ms. Brook                   Page 395
     Cross examination by Mr. Maynard                  Page 409
8    Redirect examination by Ms. Brook                 Page 426

9    **SPECIAL AGENT MARIO CALBONE:**

10   Direct examination by Ms. Brook                   Page 433

11   **SPECIAL AGENT BRIAN MARLOW:**

12   Direct examination by Mr. Koehler                 Page 441
     Voir dire examination by Mr. Maynard             Page 442
13
     **SPECIAL AGENT ROBERT J. MESHINSKY:**
14
     Direct examination by Mr. Koehler                 Page 445
15   Cross examination by Mr. Plomin                    Page 478

16   **SPECIAL AGENT JASON SAITTA:**

17   Direct examination by Ms. Brook                   Page 484

18   **CHARLES STANLEY:**

19   Direct examination by Ms. Brook                   Page 498

20

21

22

23

24

25

1                    **INDEX OF EXHIBITS**

2   **EXHIBIT NO.:**        **DESCRIPTION:**              **RECEIVED:**

| Exhibit No. | Description | Received |
|---|---|---|
| Exhibit No. 5 | Keltec 9mm Rifle | Page 340 |
| Exhibit No. 6 | 32 rounds of 9mm Luger ammunition (Keltec) (Item 23A) | Page 342 |
| Exhibit No. 9 | Black magazine with 30 rounds of 5.45x39mm ammunition (Items 34C, 34D) | Page 347 |
| Exhibit No. 10 | Romarm Cugir Draco AK-47 Pistol (7.62 x 39mm) (Item 36) | Page 329 |
| Exhibit No. 11 | Tapco 7.62 magazine with 23 rounds of 7.62 x 39mm ammunition (Items 36A, 36B) | Page 330 |
| Exhibit No. 12 | Taurus Model 605 .357 Magnum Revolver (Item I) | Page 331 |
| Exhibit No. 13 | 5 rounds of .38 special ammunition (Item I-A) | Page 333 |
| Exhibit No. 15 | Hi Point C9 9mm Pistol (Item 1-A) | Page 335 |
| Exhibit No. 16 | 10 rounds of 9mm ammunition (Item 35A) | Page 336 |
| Exhibit No. 17 | Jimenez Arms JA9 9mm Pistol (Item L) | Page 338 |
| Exhibit No. 18 | 3 magazines & 31 rounds of 9mm ammunition (Item L-A) | Page 339 |
| Exhibit No. 19 | 50 rounds of 9mm ammunition in a plastic bag (Item 29) | Page 351 |
| Exhibit No. 20 | 83 rounds of ammunition (Item 30) | Page 352 |
| Exhibit No. 21 | 30 rounds of ammunition (Item 25) | Page 352 |
| Exhibit No. 22 | 30 rounds of ammunition (Item 26) | Page 352 |
| Exhibit No. 23 | 392 rounds of 7.62 x 39mm ammunition (Item 24) | Page 352 |
| Exhibit No. 24 | Black bag with 162 rounds of 7.62 x 39mm ammunition (Item 21) | Page 354 |
| Exhibit No. 25 | 30 rounds of 7.62 x 39mm ammunition (Item 37) | Page 354 |

| 1 | Exhibit No. 26 | 124 rounds of 7.62 x 39mm ammunition; 15 rounds of 9mm ammunition; 21 rounds of .38 special ammunition (Item 62) | Page 354 |
|---|---|---|---|
| 3 | Exhibit No. 27 | Box of 7.62 x 39mm ammunition (WPA) (Item D) | Page 360 |
| 4 | Exhibit No. 28 | Box of 7.62 x 39mm ammunition (Item F) | Page 360 |
| 5 | Exhibit No. 29 | Box of .38 Special ammunition (PMC Bronze) (Item F) | Page 361 |
| 6 | Exhibit No. 30 | Various rounds of ammunition (Item J) | Page 354 |
| 7 | Exhibit No. 31 | 1 (9mm) Magazine (Item Z) | Page 348 |
| | Exhibit No. 32 | 3 (7.62) x 39 mm) (Item Z) | Page 347 |
| 8 | Exhibit No. 33 | 89 rounds of 7.62 x 39mm ammunition and 8 rounds of 9mm ammunition (Item Z-1) | Page 347 |
| 9 | Exhibit No. 34 | 9 mm magazine with 13 rounds of ammunition (Item 51) | Page 358 |
| 10 | Exhibit No. 35 | Glock magazine with 11 rounds of 9mm ammunition (Item 64) | Page 358 |
| 11 | Exhibit No. 36 | Black Tapco double magazine, 58 rounds of ammunition (Item 65) | Page 358 |
| 13 | Exhibit No. 37 | Two unknown caliber magazines (Item 68) | Page 358 |
| 14 | Exhibit No. 38 | Tapco magazine with 30 rounds of 7.62 x 39 mm ammunition (Item 74) | Page 358 |
| | Exhibit No. 54 | Microsoft Surface tablet | Page 380 |
| 16 | Exhibit No. 55 | 9mm ammunition (loose rounds) | Page 362 |
| | Exhibit No. 57 | 7.62 x 39mm ammunition (loose rounds) | Page 362 |
| 17 | Exhibit No. 58 | 5.45 x 39mm ammunition (loose rounds) | Page 362 |
| 18 | Exhibit No. 59 | Remnants of Perfecta 9mm ammunition box | Page 363 |
| 19 | Exhibit No. 60 | Perfecta 9mm ammunition | Page 363 |
| 20 | Exhibit No. 61 | 9mm ammunition shell casings | Page 366 |
| | Exhibit No. 62 | .38 special ammunition shell casings | Page 366 |
| 21 | Exhibit No. 63 | 7.62 x 39mm ammunition shell casings | Page 366 |
| 22 | Exhibit No. 64 | 5.45 x 39mm ammunition shell casings | Page 366 |
| 23 | Exhibit No. 65 | Printed IS Flags | Page 371 |
| 24 | Exhibit No. 67 | Book:  Defense of the Muslim Lands (Garland) | Page 372 |

| | | |
|---|---|---|
| Exhibit No. 68 | White bullet proof vest and carrier (Item W) (Soofi) | Page 343 |
| Exhibit No. 69 | Black tactical vest and carrier (Soofi) | Page 343 |
| Exhibit No. 70 | Camouflage tactical vest (Simpson) (Item K) | Page 344 |
| Exhibit No. 71 | 4 (7.62) magazine clips and 100 rounds (Item K-A) | Page 345 |
| Exhibit No. 72 | Black bullet proof vests (not worn) (Item 32) | Page 349 |
| Exhibit No. 73 | New York Yankees hat | Page 377 |
| Exhibit No. 76 | Wallet with Bank of America card and driver's license (Soofi) (Item BB) | Page 378 |
| Exhibit No. 77 | Simpson's driver's license with wallet (Item H) | Page 378 |
| Exhibit No. 78 | Subway receipt (Item E) | Page 379 |
| Exhibit No. 79 | Picture with ammunition Evid 29 | Page 359 |
| Exhibit No. 80 | Picture with ammunition Evid 30 | Page 359 |
| Exhibit No. 81 | Picture with ammunition Evid 31 | Page 359 |
| Exhibit No. 84 | .38 Special ammunition (Simpson/Soofi apartment) | Page 503 |
| Exhibit No. 86 | Samsung cell phone | Page 496 |
| Exhibit No. 95 | CD: The Life of Muhammad, Makkan Period, Imam Anwar al-Awlaki (Ibrahim) | Page 507 |
| Exhibit No. 161 | Lenovo laptop | Page 437 |
| Exhibit No. 173 | S&I.pdf ("Class Notes From The Security And Intelligence Course, Global Islamic Media Front") (Memorex 2GB flash drive image) | Page 467 |
| Exhibit No. 176 | A Treatise on the Legal Status of Using Weapons of Mass Destruction Against the Infidels (Memorex 2GB flash drive image) | Page 469 |
| Exhibit No. 177 | To Make it Know to People... and NotTo hide it, By Anwar Al-Awlaki (Memorex 2GB flash drive image) | Page 470 |
| Exhibit No. 179 | Inspire Magazine Issue 8 (Memorex 2GB flash drive image) | Page 471 |

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| Exhibit No. 180 | Inspire Magazine Issue 9 (Memorex 2GB flash drive image) | Page 471 |
| Exhibit No. 181 | The Ruling on Dispossessing the Disbelievers Wealth in Dar al-Harb (Memorex 2GB flash drive image) | Page 472 |
| Exhibit No. 182 | The Slicing Sword (Memorex 2GB flash drive image) | Page 472 |
| Exhibit No. 183 | The Ruling on Leaving for Battle and the Precondition of Takfir (Memorex 2GB flash drive image) | Page 473 |
| Exhibit No. 203 | Search Warrant Diagram | Page 487 |
| Exhibit No. 263 | Desktop computer (Simpson/ Soofi Apt) | Page 493 |
| Exhibit No. 367 | Photo of 039 White Galaxy S5 | Page 374 |
| Exhibit No. 368 | Photo of 048 Black LG Flip Phone | Page 375 |
| Exhibit No. 369 | Photo of 049 UMX Cell Phone | Page 375 |
| Exhibit No. 370 | Photo of 050 Blue Samsung Galaxy S3 | Page 376 |
| Exhibit No. 371 | Photo of 066 Fortress of the Muslim | Page 373 |
| Exhibit No. 372 | Photo of 074 TomTom GPS | Page 376 |
| Exhibit No. 373 | Photo of drum magazine | Page 327 |
| Exhibit No. 376 | Photo of Elk River Tool and Die AK-74 rifle | Page 328 |
| Exhibit No. 377 | Photo of Roman AK-47 pistol grip | Page 331 |
| Exhibit No. 378 | Photo of Jimenez Arms 9mm pistol | Page 339 |
| Exhibit No. 379 | Photo of Taurus .357 revolver in pocket | Page 334 |
| Exhibit No. 381 | Photo of Keltec 9mm rifle | Page 342 |
| Exhibit No. 382 | Photo of HiPoint 9mm pistol | Page 337 |
| Exhibit No. 385 | Photo of Simpson/Soofi Apartment Room G | Page 502 |
| Exhibit No. 387 | Photo of Simpson Infiniti (front) | Page 506 |
| Exhibit No. 388 | Photo of Simpson Infiniti (rear) | Page 506 |
| Exhibit No. 390 | CD: Imam Anwar Awlaki - The Battle of Hearts and Minds | Page 515 |
| Exhibit No. 392 | Photo of Lenovo Laptop | Page 465 |
| Exhibit No. 393 | Photo of Simpson/Soofi apartment living room | Page 492 |

UNITED STATES DISTRICT COURT

325

```
 1    Exhibit No. 394     Photo of desk              Page 492
      Exhibit No. 395     Photo of trunk of Simpson  Page 513
 2                        Infiniti
      Exhibit No. 396     Blue CD case               Page 514
 3    Exhibit No. 504     Property Receipt - Kareem   Page 400
                          (001455)
 4    Exhibit No. 518     Consent to Search          Page 436
      Exhibit No. 519     Receipt (001417)           Page 438
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                    P R O C E E D I N G S

 2          (Called to the order of court at 9:05 a.m.)

 3              THE COURT:  Good morning, ladies and gentlemen.

 4     Please sit down.  The record will show the presence of the

 5     jury, counsel, and the defendant.

 6              Before we started this morning, a juror made a

 7     request that when maps were displayed, that there be a compass

 8     sign on the map indicating, I assume, north, south, east, or

 9     west; or at least one of those four.  And I passed that

10     request on to counsel.

11              You may continue with your questions, Mr. Koehler.

12              MR. KOEHLER:  Thank you, Your Honor.

13                   BRIAN MARLOW, WITNESS, SWORN

14                   DIRECT EXAMINATION (cont'd)

15     BY MR. KOEHLER:

16     Q   When we left off yesterday, Agent Marlow, we were

17     discussing the drum magazine found on the ground with the Elk

18     River Tool and Die firearm; is that correct?

19     A   Yes.

20     Q   I would like to place on the witness's monitor what's been

21     marked for identification as Exhibit No. 373.

22              Agent Marlow, do you recognize that exhibit?  Is it

23     shown on your monitor?

24     A   It's not showing up.

25              THE COURT:  We're showing "no signal."
```

1          MR. KOEHLER:  We're on the document camera.

2          THE COURT:  Now it's on.

3          THE WITNESS:  Yes.

4    BY MR. KOEHLER:

5    Q   And can you tell the Court and the jury what that is?

6          THE COURT:  Well, the jury can't see it because it

7    hasn't been admitted yet.

8          MR. KOEHLER:  Right.  So I'm laying the foundation

9    for it first.

10         THE COURT:  Why don't you find out, first, if there's

11   going to be any objection?

12         MR. KOEHLER:  Is there an objection to 373?

13         MR. MAYNARD:  No.

14         MR. KOEHLER:  Move to admit 373 and publish.

15         THE COURT:  373 is admitted.

16      (Exhibit No. 373 admitted in evidence.)

17   BY MR. KOEHLER:

18   Q   Agent Marlow, can you tell us all what that is?

19   A   That is the drum magazine that was attached to the Elk

20   River rifle.

21   Q   With the exception of being detached from the weapon, does

22   that fairly and accurately depict how the magazine looked that

23   day?

24   A   Yes.

25   Q   Is that with all the ammunition inside of the magazine?

1    A    Minus the one that was in the chamber, yes.

2    Q    And the one in the chamber, is that the one that's on the

3    ground next to it?

4    A    That is correct.

5    Q    Agent Marlow, I'm placing on the document camera Exhibit

6    No. 376.

7              MR. MAYNARD:  No objection.

8              MR. KOEHLER:  Move to admit and publish.

9              THE COURT:  376 is admitted.

10        (Exhibit No. 376 admitted in evidence.)

11   BY MR. KOEHLER:

12   Q    Can you tell us what that is?

13   A    That is the Elk River rifle with the drum attached.

14   Q    And, again, who was carrying that particular rifle?

15   A    That would be Mr. Soofi.

16             MR. KOEHLER:  May I have the case agent approach the

17   witness, again with Exhibit No. 10, please, and let's also

18   bring up Exhibit 11.

19             THE COURT:  Yes.

20             SPECIAL AGENT WHITSON:  May I approach, Your Honor?

21             THE COURT:  You may.

22             MR. MAYNARD:  Judge, if this will move the process

23   on, I don't have any objection to any of these guns, the

24   physical evidence that's sitting here.

25   BY MR. KOEHLER:

```
1    Q    Agent Marlow, can you tell us what's inside the box?

2    A    This is the weapon that was lying next to Mr. Simpson

3    which is a Draco AK47-type weapon with a pistol grip.

4    Q    For the record, we're talking about Exhibit 10.

5              Has that been made safe?

6    A    It has.

7    Q    How has that weapon been made safe?

8    A    With a zip tie to -- excuse me -- put a zip tie in through

9    the -- to keep the action open and also I removed the

10   ammunition first and the magazine.

11   Q    Is the magazine also gone from the gun?

12   A    The magazine is gone, yes.

13             MR. KOEHLER:  Move to admit Exhibit 10.

14             THE COURT:  Without objection, 10 is admitted.

15        (Exhibit No. 10 admitted in evidence.)

16             MR. KOEHLER:  Move to publish.

17             THE COURT:  Yes.

18             MR. KOEHLER:  Agent Whitson, could you please

19   demonstrate the weapon for the jury.

20             SPECIAL AGENT WHITSON:  Your Honor, may I borrow the

21   Court's scissors?

22             THE COURT:  Yes.

23             SPECIAL AGENT WHITSON:  Thank you.

24        (Exhibit No. 10 being displayed to the jury.)

25             MR. KOEHLER:  May I approach the witness, Your Honor?
```

```
 1              THE COURT:  Yes.

 2              MR. KOEHLER:  And now Exhibit No. 11.

 3              SPECIAL AGENT WHITSON:  May I approach, Your Honor?

 4              THE COURT:  You may.

 5    BY MR. KOEHLER:

 6    Q   Agent Marlow, can you tell us what Exhibit 11 is, please.

 7    A   This is the magazine and the ammunition that was in the

 8    magazine that was in the Draco AK47-type weapon.

 9    Q   And how many rounds of ammunition were in the magazine and

10    the weapon itself?

11    A   There was 22 in the magazine and one in the chamber, so a

12    total of 23.

13              MR. KOEHLER:  Twenty-three rounds.

14              Move to admit Exhibit 11.

15              THE COURT:  Without objection, 11 is admitted.

16         (Exhibit No. 11 admitted in evidence.)

17              MR. KOEHLER:  May the case agent publish to the jury?

18              THE COURT:  Yes.

19         (Exhibit No. 11 being displayed to the jury.)

20    BY MR. KOEHLER:

21    Q   I'm now going to show the witness on the document camera

22    Exhibit 377.  And I have been informed by the defense that

23    there is no objection to this exhibit.

24              THE COURT:  Do you wish to offer it?

25              MR. KOEHLER:  Yes, I do.
```

1    THE COURT:  377 is admitted.

2    (Exhibit No. 377 admitted in evidence.)

3    MR. KOEHLER:  Move to publish.

4    (Exhibit No. 377 being displayed to the jury.)

5  BY MR. KOEHLER:

6  Q    Does that photo depict that firearm?

7  A    It does, yes.

8  Q    Is it in the immediate vicinity of Mr. Simpson?

9  A    Yes.  It was located next to him.

10 Q    I would like to now have the case agent approach the

11 witness with Exhibits 12 and 13.

12    Can you tell us what Exhibit 12 is, please.

13 A    This is the Taurus five-shot revolver that was found in

14 Mr. Simpson's pocket.

15 Q    What is the caliber of that revolver?

16 A    It is a .357 -- excuse me -- .357 Magnum.

17    MR. KOEHLER:  Without objection from the defense, the

18 government will move to admit.

19    THE COURT:  12 is admitted.

20    (Exhibit No. 12 admitted in evidence.)

21 BY MR. KOEHLER:

22 Q    Has that weapon been made safe?

23 A    It has been, yes.

24 Q    How has the weapon been made safe?

25 A    There's a zip tie to prevent the action to be -- keep the

 1    action open.

 2    Q    And has the weapon also been unloaded?

 3    A    It has been, yes.

 4              MR. KOEHLER:  Move to publish.

 5              THE COURT:  Go right ahead.

 6         (Exhibit No. 12 being displayed to the jury.)

 7              MR. KOEHLER:  If you would please return that over

 8    here.

 9              THE COURT:  Well, I was going to say, could he hand

10    him 13 first?

11              MR. KOEHLER:  Yes, please.  I couldn't see from this

12    angle that it wasn't up there.

13              THE COURT:  Go ahead, Mr. Koehler.

14              MR. KOEHLER:  Thank you.

15    BY MR. KOEHLER:

16    Q    Tell us what Exhibit 13 is, please.

17    A    These are the five rounds, .38 Special rounds, that were

18    in the revolver, Taurus revolver.

19    Q    And you mentioned before that you are a firearms

20    instructor.  Does a .357 Magnum also fire .38 Special

21    ammunition?

22    A    Yes, it does.

23              MR. KOEHLER:  Move to admit Exhibit 11.

24              THE COURT:  Thirteen.

25              MR. KOEHLER:  Or 13.

1            THE COURT:  Thirteen.

2            Without objection, 13 is admitted.

3        (Exhibit No. 13 admitted in evidence.)

4            MR. KOEHLER:  Move to publish.

5            THE COURT:  Go right ahead.

6        (Exhibit No. 13 being displayed to the jury.)

7            MR. KOEHLER:  Your Honor, I'm informed the defense

8    objects to this, so I'm going to lay a foundation.

9            MR. MAYNARD:  Judge, it's not the foundation I object

10   to.  It's the condition of the weapon compared to the other

11   ones which have been set aside with rulers by them so that

12   this one is in a different condition than the others.

13           THE COURT:  Okay.  Well, so far I haven't heard what

14   the objection is, but why don't you proceed, Mr. Koehler.

15   BY MR. KOEHLER:

16   Q   Agent Marlow, on the screen next to you is a photograph.

17   Do you recognize that?

18   A   I do.

19   Q   Can you tell us what that is?

20   A   That is the Taurus revolver that was found in

21   Mr. Simpson's cargo pocket.

22   Q   Is that the same as Exhibit No. 12?

23   A   Yes.

24   Q   And does that picture fairly and accurately depict the gun

25   as it was found?

1  A   Yes, exactly.

2  Q   Did agents cut away the pocket on Mr. Simpson's clothing

3  in order to expose the weapon?

4  A   Yes.

5  Q   Otherwise, is it exactly how it was found when the agents

6  went through the scene?

7  A   That is correct.

8         MR. KOEHLER:  Move to admit Exhibit No. --

9         MR. MAYNARD:  Objection on the grounds of relevancy

10  and it's over-inflammatory because of the condition of the

11  gun.  The jury has already seen the actual gun itself.

12         THE COURT:  No speaking objections, Mr. Maynard.  So

13  the basis, the evidentiary basis is relevance?

14         MR. MAYNARD:  Relevance.

15         THE COURT:  Overruled.  And exhibit --

16         MR. KOEHLER:  379, Your Honor.

17         THE COURT:  379 is admitted.

18      (Exhibit NO. 379 admitted in evidence.)

19         MR. KOEHLER:  And this is a new exhibit that's not on

20  the list yet.

21  BY MR. KOEHLER:

22  Q   Moving on to Exhibit No. 15, may I have Exhibit No. 15 and

23  No. 16 placed before the witness.

24         SPECIAL AGENT WHITSON:  May I approach, Your Honor?

25         THE COURT:  You may.

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1   BY MR. KOEHLER:

2   Q   Could you please tell us what Exhibit 15 is?

3   A   This is a Hi-Point 9 millimeter semiautomatic pistol.

4   Q   And was that weapon found at the scene?

5   A   It was.  It was located on the ground next to Mr. Soofi.

6   Q   Has that weapon been made safe?

7   A   It has been.

8   Q   How so?

9   A   Removed the magazine and all the ammunition and locked

10  open the action with the zip tie.

11          MR. KOEHLER:  Move to admit Exhibit 15.

12          MR. MAYNARD:  No objection.

13          THE COURT:  15 is admitted.

14      (Exhibit No. 15 admitted in evidence.)

15          MR. KOEHLER:  Move to publish.

16          THE COURT:  Well, there is something else in the box.

17          THE WITNESS:  I'm sorry.  This is the magazine that

18  was -- it was in the weapon.

19          THE COURT:  Okay.  Thank you.

20  BY MR. KOEHLER:

21  Q   Is the magazine, likewise, unloaded?

22  A   It is.

23          MR. KOEHLER:  Move to publish.

24          THE COURT:  Go right ahead.

25      (Exhibit No. 15 being displayed to the jury.)

1      THE COURT:  So why don't we talk about 16 while 15 is

2  being showed to the jury?

3      MR. KOEHLER:  Shall do, Your Honor.

4  BY MR. KOEHLER:

5  Q   Agent Marlow, can you tell us what Exhibit 16 is?

6  A   These are the 9 millimeter rounds that were in the

7  magazine and the one in the chamber of that weapon, the

8  Hi-Point 9 millimeter.

9  Q   Is that in the same condition in which it was found?

10     THE COURT:  Well, no, not exactly because it was --

11 BY MR. KOEHLER:

12 Q   With the exception of being removed from the chamber?

13 A   Right.  These rounds were taken directly from the magazine

14 and the chamber and packaged.

15     MR. KOEHLER:  Move to admit 16.

16     MR. MAYNARD:  No objection.

17     THE COURT:  16 is admitted.

18    (Exhibit No. 16 admitted in evidence.)

19     MR. KOEHLER:  Move to publish.

20     THE COURT:  Go right ahead.

21    (Exhibit No. 16 being displayed to the jury.)

22 BY MR. KOEHLER:

23 Q   How many total rounds were in the weapon?

24 A   There were ten total.

25 Q   I'd like to show the witness what is marked for

```
 1    identification as Exhibit 382 on the document camera.

 2              Agent Marlow, do you recognize that?

 3    A    Yes.  That is the Hi-Point 9 millimeter.

 4    Q    Does it fairly and accurately depict the Hi-Point where it

 5    was found?

 6    A    Yes.  That's where it was located on the scene.

 7              MR. KOEHLER:  Move to admit Exhibit 382.

 8              MR. MAYNARD:  No objection.

 9              THE COURT:  382 is admitted.

10         (Exhibit No. 382 admitted in evidence.)

11    BY MR. KOEHLER:

12    Q    I would like to direct your attention to Exhibits 17 and

13    18.

14              May the case agent approach the witness?

15              While waiting for the case agent to approach, can you

16    tell us about how close that last exhibit, No. 15, was to

17    Mr. Soofi when it was found?

18    A    I would say it was in a couple feet.

19    Q    Thank you.

20              All right.  First, drawing your attention to Exhibit

21    No. 17, can you please examine that and tell us what that is?

22    A    This is a Jiminez Arms 9 millimeter semiautomatic pistol

23    that was on Mr. Simpson.

24    Q    And you said "found on Mr. Simpson."  Where was it found

25    on Mr. Simpson?
```

1   A   Mr. Simpson had an ammo vest that had magazines in it, as

2   well as this 9 millimeter.

3   Q   And is that gun made safe?

4   A   It is made safe, yes.

5   Q   Otherwise from being made safe, is it in substantially the

6   same condition in which it was found?

7   A   Yes.

8           MR. KOEHLER:  Move to admit 17.

9           MR. MAYNARD:  No objection.

10          THE COURT:  17 is admitted.

11      (Exhibit No. 17 admitted in evidence.)

12          MR. KOEHLER:  Move to publish.

13          THE COURT:  Go right ahead.

14      (Exhibit No. 17 being displayed to the jury.)

15  BY MR. KOEHLER:

16  Q   While No. 17 is being shown to the jury, can you please

17  take a look at 18.  Can you tell us what that is?

18  A   These are -- this is the magazine that was in the Jiminez

19  Arms 9 millimeter as well as the rounds.  In addition, there

20  was -- he had two additional magazines in his pocket, the 9

21  millimeter magazines, that is also as part of this exhibit.

22  Q   How many total rounds did he have for the 9 millimeter on

23  his person?

24  A   Thirty-one.

25          THE COURT:  Move to admit Exhibit 18.

```
 1              MR. MAYNARD:  No objection.

 2              THE COURT:  18 is admitted.

 3          (Exhibit No. 18 admitted in evidence.)

 4              MR. KOEHLER:  Move to publish.

 5              THE COURT:  Go right ahead.

 6          (Exhibit No. 18 being displayed to the jury.)

 7              MR. KOEHLER:  Your Honor, I have been informed

 8      there's no objection to Exhibit 378 which I placed on the

 9      document camera, so I'll move to admit at this time.

10              THE COURT:  No objection, Mr. Maynard?

11              MR. MAYNARD:  No objection.

12              THE COURT:  378 is admitted.

13          (Exhibit No. 378 admitted in evidence.)

14      BY MR. KOEHLER:

15      Q   Agent Marlow, do you recognize that?

16      A   Yes.  That's the Jiminez Arms 9 millimeter.

17      Q   Does that also show the vest that Mr. Simpson was wearing?

18      A   Yes.  That is correct.

19      Q   Now, let's circle back to Exhibit No. 5.

20              May I have the case agent approach with Exhibits 5

21      and 6, please?

22              THE COURT:  Yes.

23      BY MR. KOEHLER:

24      Q   Agent Marlow, can you identify Exhibit 5 for us, please?

25      A   This is the KelTec 9 millimeter rifle that was found next
```

```
 1   to -- and magazine that was -- empty magazine that was found

 2   next to the vehicle.

 3   Q   And is that firearm in essentially the same condition it

 4   was when it was found?

 5   A   Yes, other than made safe, yes.

 6   Q   And tell us how it's been made safe.

 7   A   I removed the magazine and any -- and the -- excuse me --

 8   and the ammo that was in the chamber and placed a zip tie in

 9   the action to keep it open.

10           MR. KOEHLER:  Move to admit Exhibit No. 5.

11           MR. MAYNARD:  No objection.

12           THE COURT:  5 is admitted.

13       (Exhibit No. 5 admitted in evidence.)

14           MR. KOEHLER:  Move to publish.

15           THE COURT:  Go right ahead.

16       (Exhibit No. 5 being displayed to the jury.)

17   BY MR. KOEHLER:

18   Q   While that is being published, Agent Marlow, can you tell

19   the jury if there is anything a little bit different about

20   Exhibit 5 from what you normally see in a rifle in terms of

21   the stock?

22   A   I have to examine it again.

23   Q   Okay.  I'll have him bring it back your way.

24   A   I guess I don't know what you're asking.

25   Q   Is that a telescoping stock?
```

1   A   Yes.  It can be adjustable.  Sorry.

2   Q   That's what I wanted to ask.  Thank you.

3          THE COURT:  So would you show the jury what part is

4   the stock?

5          THE WITNESS:  This portion right here. (Indicating)

6          THE COURT:  So it's the rear portion?  Thank you.

7          MR. KOEHLER:  Can I have Agent Whitson hold the

8   firearm with the stock face up so that the jury can see it?

9          THE COURT:  They may already know this, but just in

10  case, so, yes.

11         MR. KOEHLER:  I just want to make a record.

12         THE COURT:  Yes.  So now he's showing the stock as

13  the -- what's up?

14      (Exhibit No. 5 being displayed to the jury.)

15         MR. KOEHLER:  Yes.

16         THE COURT:  Thank you.

17         MR. KOEHLER:  And that's relevant to later testimony,

18  Your Honor.

19         THE COURT:  Okay.  So we're moving to 6?

20         MR. KOEHLER:  Yes.  Return the firearm over here and

21  I'll move on to Exhibit No. 6.

22  BY MR. KOEHLER:

23  Q   Could you tell us what Exhibit No. 6 is, please?

24  A   These are the rounds that came out of the KelTec rifle, as

25  well as one additional round that was located on the ground

1   next to it.

2   Q   What's the total round count for that firearm?

3   A   Thirty-two.

4   Q   I'm sorry?  Did you say 32?

5   A   Yes.

6          MR. KOEHLER:  Move to admit Exhibit 6.

7          MR. MAYNARD:  No objection.

8          THE COURT:  6 is admitted.

9      (Exhibit No. 6 admitted in evidence.)

10         MR. KOEHLER:  Move to publish.

11         THE COURT:  Go right ahead.

12     (Exhibit No. 6 being displayed to the jury.)

13         MR. KOEHLER:  While that is being published --

14         MR. MAYNARD:  That's fine.

15  BY MR. KOEHLER:

16  Q   Drawing your attention to Exhibit No. 381 on the document

17  camera and I'm informed there is no objection to that exhibit.

18         THE COURT:  Are you offering 381?

19         MR. KOEHLER:  Move to admit.

20         THE COURT:  381 is admitted.

21     (Exhibit No. 381 admitted in evidence.)

22  BY MR. KOEHLER:

23  Q   Agent Marlow, is that the gun as it was found on the --

24  next to the car?

25  A   Yes.  That's a photo of it in place.

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1   Q    How far from the car was this?

2   A    Just a few feet.

3   Q    And on what side of the car; driver or passenger?

4   A    It was on the passenger's side.

5            MR. KOEHLER:  I would like to now ask the case agent

6   to place Exhibits 68 and 69 before the witness.

7            SPECIAL AGENT WHITSON:  May I approach?

8            THE COURT:  Yes.

9   BY MR. KOEHLER:

10  Q    Agent Marlow, can you tell us what Exhibits 68 and 69 are?

11  A    Yes.  Exhibit 68 is the armored vest that Mr. Soofi was

12  wearing and then on -- on top of his clothing, his black

13  clothing.  And then on top of the vest itself was a black ammo

14  carrier.

15  Q    And who was wearing those?

16  A    Mr. Soofi.

17  Q    Are those in the same condition in which they were found?

18  A    Yes.

19           MR. KOEHLER:  Move to admit 68 and 69.

20           MR. MAYNARD:  No objection.

21           THE COURT:  68 and 69 are admitted.

22       (Exhibit Nos. 68 and 69 admitted in evidence.)

23  BY MR. KOEHLER:

24  Q    Now, moving on to Exhibits 70 and 71, can the case agent

25  place those in front of the witness --

1            Oh, yes.  Can I publish these first?

2            THE COURT:  Sure.

3        (Exhibit Nos. 68 and 69 being displayed to the jury.)

4            THE COURT:  What number do you want now?

5            MR. KOEHLER:  70 and 71.

6            SPECIAL AGENT WHITSON:  May I approach, Your Honor?

7            THE COURT:  You may.

8            Why don't we start with 70?

9    BY MR. KOEHLER:

10   Q   Can you identify what Exhibit 70 is?

11   A   Yes.  This is the ammo vest that Mr. Simpson was wearing

12   as well as the gloves.  It's kind of an olive camouflage-type

13   ammo vest.

14   Q   Is that in substantially the same condition it was in when

15   it was found?

16   A   Yes, minus removing of the ammunition, magazines, and the

17   9 millimeter.

18           MR. KOEHLER:  Move to admit Exhibit 70.

19           MR. MAYNARD:  No objection.

20           THE COURT:  70 is admitted.

21       (Exhibit No. 70 admitted in evidence.)

22   BY MR. KOEHLER:

23   Q   Now, directing your attention to 71, can you tell us what

24   that is?

25   A   These are the four magazines that he had -- that

1   Mr. Simpson had in this camouflage ammo carrier with the

2   ammunition, the 7.62 ammunition.

3   Q   And does the 7.62 ammunition match the pistol grip AK-47

4   that you described earlier and we admitted into evidence?

5   A   Yes.  It could be shot through it, yes.

6   Q   How many total rounds of that?

7   A   One hundred sixteen.

8         MR. KOEHLER:  Move to admit Exhibit 71.

9         MR. MAYNARD:  No objection.

10        THE COURT:  71 is admitted.

11     (Exhibit No. 71 admitted in evidence.)

12        MR. KOEHLER:  We can first publish 70 and then follow

13   that with 71?

14        THE COURT:  It looks like it would be hard to do them

15   both at the same time.

16     (Exhibit Nos. 70 and 71 being displayed to the jury.)

17   BY MR. KOEHLER:

18   Q   Just to keep everybody on track with which person we're

19   talking about, who did these come off of?

20   A   Mr. Simpson.

21   Q   All right.  I would now like to circle back to Mr. Soofi

22   again.  You mentioned earlier that he had the 5.45 Elk River

23   rifle; is that correct?

24   A   Correct.

25   Q   Were there additional magazines and ammunition with him as

```
1   well as the rifle and the drum magazine?

2   A   Yes.  He had four additional magazines in his ammo vest as

3   well.

4          MR. KOEHLER:  If I could please have the case agent

5   place Exhibits 9, 32, and 33?

6          SPECIAL AGENT WHITSON:  May I approach, Your Honor?

7          THE COURT:  Yes, you may.

8          So can we address all three simultaneously?  Based on

9   my description of them, they're all magazines and ammunition.

10  BY MR. KOEHLER:

11  Q   Starting with Exhibit 9 and then moving to Exhibit 32 and

12  33, can you describe what each of those is?

13  A   These are the magazines that had the 5.45 ammunition in it

14  that was located in Mr. Soofi's ammo carrier.

15  Q   Did those magazines all match the Elk River Tool and Die

16  firearm that's Exhibit No. 7?

17  A   I guess define "match."

18          THE COURT:  I think he means can they be shot through

19  that rifle.

20          THE WITNESS:  Yes.  They can be shot through that

21  rifle.

22  BY MR. KOEHLER:

23  Q   And could those magazines be inserted into that rifle?

24  A   Yes.

25          MR. KOEHLER:  Move to admit 9, 32, and 33.
```

```
 1            MR. MAYNARD:  No objection.

 2            THE COURT:  9, 32 and 33 are admitted.

 3        (Exhibit Nos. 9, 32 and 33 admitted in evidence.)

 4   BY MR. KOEHLER:

 5   Q   Can you tell us the total ammunition count between those

 6   four magazines?

 7   A   I would have to do some math.

 8   Q   Let's do No. 9 first.  How many rounds were in 9?

 9   A   Okay.  There's 30 rounds in No. 9.

10   Q   Okay.  And then how many rounds were in the three

11   magazines that are Exhibit 32?

12   A   If my memory serves me correct, 89.

13   Q   So a total of 119 between the four magazines; is that

14   correct?

15   A   Yes.

16            MR. KOEHLER:  Move to publish -- well, I've already

17   moved to admit.

18            Move to publish 9, 32, and 33.

19            THE COURT:  All at once.

20        (Exhibit Nos. 9, 32, and 33 being displayed to the jury.)

21            MR. KOEHLER:  If I can now have Exhibit 31 placed

22   before the witness.

23            SPECIAL AGENT WHITSON:  May I approach?

24            THE COURT:  Go right ahead.

25   BY MR. KOEHLER:
```

```
1    Q   Do you recognize Exhibit 31?

2    A   Yes.  This is the 9 millimeter magazine that Mr. Soofi had

3    on his person.

4    Q   Is that in the same condition in which it was found?

5    A   Other than being unloaded, yes.

6            MR. KOEHLER:  Move to admit 31.

7            MR. MAYNARD:  No objection.

8            THE COURT:  31 is admitted.

9        (Exhibit No. 31 admitted in evidence.)

10           MR. KOEHLER:  I think we already admitted the

11   ammunition that came with that magazine.

12           THE COURT:  Yes.

13           MR. KOEHLER:  If I can briefly publish that to the

14   jury.

15           THE COURT:  Let's just hold it up and move on fast.

16           MR. KOEHLER:  Go ahead and return it please.

17           THE COURT:  It's not very interesting.

18   BY MR. KOEHLER:

19   Q   In addition to the ammunition that was in the magazines,

20   did agents find other ammunition strewn about the scene?

21   A   Yes.

22   Q   Before we go to that, was there another bulletproof vest

23   found at the scene?

24   A   There was.  There was one laying on the ground.

25           MR. KOEHLER:  If I can have Exhibit 72 placed before
```

```
 1   the witness.
 2              THE COURT:  Go right ahead.
 3   BY MR. KOEHLER:
 4   Q   Do you recognize that?
 5   A   Yes.  This is the body armor that was laying on the
 6   ground.
 7   Q   And was anybody wearing that particular vest?
 8   A   No.
 9   Q   Where was it found?
10   A   It was laying on the street.
11   Q   Do you remember about how close it was to the car?
12   A   I don't recall exactly, but 10, 15 feet maybe.
13              MR. KOEHLER:  Okay.  Move to admit.
14              MR. MAYNARD:  No objection.
15              THE COURT:  I don't remember what number it is.
16              MR. KOEHLER:  72.
17              THE COURT:  Thank you.  72 is admitted.
18        (Exhibit No. 72 admitted in evidence.)
19              MR. KOEHLER:  If I can now have exhibits -- I'm going
20   to do these in small batches so I don't take up the whole
21   witness stand, if that's okay with the Court.
22              THE COURT:  Oh, it's okay to take up the whole
23   witness stand, Mr. Koehler, if you are going to get what I
24   expect, which is a whole bunch of different bags of
25   ammunition.
```

```
 1              MR. KOEHLER:  That's correct.  I'm going to try to do

 2    them about five at a time because they can be a little

 3    difficult to maneuver.

 4              THE COURT:  Okay.

 5              MR. KOEHLER:  So if I could have 19 through 23 placed

 6    before the witness.

 7              SPECIAL AGENT WHITSON:  May I approach?

 8              THE COURT:  Yes.

 9    BY MR. KOEHLER:

10    Q   Starting first with Exhibit No. 19?

11              THE COURT:  Let's start with 19 through 23.

12              Are they all evidence bags containing rounds of

13    ammunition?

14              THE WITNESS:  Yes, they are.

15              THE COURT:  And where did you find it?

16              THE WITNESS:  These were located on the ground south

17    of Mr. Soofi's location.

18              THE COURT:  And how did you decide which ammunition

19    to put into which evidence bag?

20              THE WITNESS:  Just based on their location.

21    Generally, if they are separate, then we kind of keep them

22    together.

23              THE COURT:  Okay.  Thank you.

24              MR. MAYNARD:  No objection.

25    BY MR. KOEHLER:
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1   Q    Starting with Exhibit 19, what is the caliber of the
 2   ammunition?
 3   A    It's 9 millimeter.
 4   Q    How many rounds?
 5   A    Fifty.
 6           MR. KOEHLER:  Move to admit 19.
 7           THE COURT:  19 is admitted.
 8       (Exhibit No. 19 admitted in evidence.)
 9   BY MR. KOEHLER:
10   Q    Now, directing your attention to No. 20, can you tell us
11   what that is?
12   A    It's 5 -- excuse me -- 5.54 by 39 millimeter.
13   Q    5.45?
14   A    Excuse me.  Yes.  5.45.
15   Q    And how many rounds are in that?
16   A    Eighty-three.
17   Q    Now, directing your attention to 21, what is the caliber
18   of that ammunition?
19   A    5.45.
20   Q    And how many rounds?
21   A    Thirty.
22   Q    And Exhibit No. 23?
23   A    Twenty-three or 22?
24   Q    Twenty-three.
25   A    I'm sorry?
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1    Q    Twenty-three?
 2    A    Oh.  23 is 5.45.
 3    Q    And how many rounds?
 4    A    392.
 5              MR. KOEHLER:  Move to admit 19 through 23.
 6              MR. MAYNARD:  No objection.
 7              THE COURT:  19 through 23 are admitted.
 8         (Exhibit Nos. 19, 20, 21, 22, and 23 admitted in
 9    evidence.)
10              MR. KOEHLER:  Move to publish.  And I think we can go
11    two at a time.
12              THE COURT:  I think we can have him take as many as
13    he can hold and move on.  We only need to see so much
14    ammunition.  It's been described.
15         (Exhibit No. 19, 20, 21, 22, and 23 being displayed to the
16    jury.)
17              THE COURT:  Which numbers would you like now, Mr.
18    Koehler?
19              MR. KOEHLER:  24 through 26 and 30.
20              SPECIAL AGENT WHITSON:  May I approach?
21              THE COURT:  Yes.
22              SPECIAL AGENT WHITSON:  May I borrow the Court's
23    stapler?
24              THE COURT:  Stapler?
25              SPECIAL AGENT WHITSON:  Yes.
```

```
 1              THE COURT:  Yes.

 2              SPECIAL AGENT WHITSON:  Thank you.

 3    BY MR. KOEHLER:

 4    Q   Agent Marlow, are those, likewise, ammunition that was

 5    gathered at the scene?

 6    A   Yes.

 7    Q   Starting with No. 24, can you tell us what that is?

 8    A   It's 5.45 ammunition and a black bag.

 9    Q   How many rounds?

10    A   162.

11    Q   And 25, what type of ammunition?

12    A   5.45.

13    Q   How many rounds?

14    A   Thirty and then it had a magazine as well.

15    Q   So did that come with the 30 rounds inside the magazine?

16    A   Yes.  That is correct.

17    Q   Now, going to 26.

18    A   Okay.  7.62 and .38 Special as well as 9 millimeter.

19    Q   How many rounds of 7.62?

20    A   I don't know off the top of my head.

21              THE COURT:  Maybe 124?

22              I have a list of exhibits, ladies and gentlemen, that

23    I'm just not that good at counting.  It's written down here.

24    BY MR. KOEHLER:

25    Q   Does 124 sound right?
```

CR15-00707-PHX-SRB  JURY TRIAL - DAY #3  2-18-16

1   A    That's sounds correct.

2   Q    And how many rounds of 9 mil.

3            THE COURT:  I'm going to guess 15.

4   BY MR. KOEHLER:

5   Q    Is that correct?

6   A    Sounds correct.

7   Q    And 21 rounds of .38 Special, is that also correct?

8   A    That sounds correct.

9   Q    Now, going to Exhibit No. 30.

10  A    Okay.

11  Q    And what is that?

12  A    It's two rounds of 9 millimeter and 7.62 ammunition.

13  It's the bullets and one complete round.

14           MR. KOEHLER:  Government moves to admit Exhibits 24,

15  25, 26, and 30.

16           MR. MAYNARD:  No objection.

17           THE COURT:  24, 25, 26, and 30 are admitted.

18       (Exhibit Nos. 24, 25, 26, and 30 admitted in evidence.)

19           MR. KOEHLER:  Request to publish.

20           THE COURT:  Go right ahead.

21       (Exhibit No. 24, 25, 26, and 30 being displayed to the

22  jury.)

23           THE COURT:  Was all of this also found on the ground?

24           THE WITNESS:  Yes, various locations on the ground.

25  BY MR. KOEHLER:

 1    Q    Specifically, looking at Exhibit No. 26, that's the only

 2    one that has different calibers mixed together.

 3         Do you recall where that was found on the ground?

 4    Was it just out in the open on the ground?

 5    A    Can you show it to me?  I'm sorry.

 6         MR. KOEHLER:  Exhibit 26.

 7         SPECIAL AGENT WHITSON:  May I approach, Your Honor?

 8         THE COURT:  Yes.

 9         THE WITNESS:  This was located near a gray backpack

10    on the north curb.

11    BY MR. KOEHLER:

12    Q    And from what you could tell, did it come out of that

13    backpack at some point?

14    A    Yeah.  I believe this is one of the ones that the bomb

15    techs opened to make sure there was no explosive devices.

16    Q    All right.  And then looking at 24, was that also

17    contained in some fashion?

18         THE COURT:  24 is the exhibit that had the black bag

19    with it.

20         THE WITNESS:  Yeah.  The ammunition was in the black

21    bag and that was actually located south of the -- or near the

22    car, south of the subjects, deceased subjects.

23         MR. KOEHLER:  All right.  If I could take those away

24    now and start with Exhibits 34, 35, 36, 37, and 38.

25         THE COURT:  You may.

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1    BY MR. KOEHLER:

 2    Q    Starting with No. 34, can you tell us what that is?

 3    A    This is a 9 millimeter magazine, as well as 9 millimeter

 4    rounds.

 5    Q    And all the other bags are ammunition as well?

 6    A    37 is just a magazine.  38 is just a magazine -- well

 7    actually, correction.  38, yes, is a magazine and ammunition.

 8    35 is a magazine and ammunition.  And 36 is magazine and

 9    ammunition.

10    Q    With 35, can you tell what brand of magazine that is?

11    A    It's a Glock.

12    Q    And you mentioned it had ammunition.  How many rounds and

13    what caliber?

14    A    Eleven rounds, 9 millimeter.

15    Q    Okay.  Now 36, what is the caliber and number of rounds?

16    A    7.62 caliber.

17              I'm sorry.  What was your other question?

18              THE COURT:  How many?

19    BY MR. KOEHLER:

20    Q    How many rounds?

21              THE COURT:  Let's say 58.

22    BY MR. KOEHLER:

23    Q    Does 58 sound right?

24    A    That sounds correct.  Sorry.  There was 50 plus some more.

25    Q    So the question I have for you, how many magazines are in
```

1    58?

2              THE COURT:  No.  In 36.

3    BY MR. KOEHLER:

4    Q    Oh, I'm sorry, in 36.

5              See what happens.  I get that 58 stuck in my head.

6    A    There's two magazines.

7    Q    And are those magazines attached to each other?

8    A    They aren't now as packaged, but I believe they were as

9    found on the scene.

10   Q    And how were they attached when they were found on the

11   scene?

12   A    I believe they were taped together.

13   Q    And were they taped so that they were in the same

14   direction or an opposite directions?

15   A    I believe they are in opposite directions, if my memory

16   serves me correctly.

17   Q    Now, you mentioned earlier that you work as a firearms

18   instructor.  Is there something special about magazines being

19   taped in opposite directions?

20   A    As far as a quick exchange.

21   Q    So you can pop one out and flip it and put it back in the

22   gun?

23   A    Yes.

24   Q    All right.  Now, moving on -- I just lost my place.  I

25   apologize.  So that was 36.

1          Now, on 37, were you able to determine the caliber of

2    those magazines, what ammunition they matched?

3    A   I did not examine them before but -- I didn't examine them

4    before.

5    Q   Do they appear to be large capacity magazines?

6    A   Yeah.  I would venture to say it's either, again, 7.62 or

7    the 5.45.

8    Q   And now Exhibit No. 38, what caliber and how many rounds

9    were with the magazine and ammunition in 38?

10   A   There is 7.62.  There's a total of 30 rounds and one

11   magazine.

12          MR. KOEHLER:  Government moves to admit 34 through

13   38.

14          MR. MAYNARD:  No objection.

15          THE COURT:  34 through 38 are admitted.

16       (Exhibit Nos. 34, 35, 36, 37 and 38 admitted in evidence.)

17          MR. KOEHLER:  Move to publish.

18          THE COURT:  Go right ahead.

19       (Exhibit No. 34, 35, 36, 37 and 38 being displayed to the

20   jury.)

21   BY MR. KOEHLER:

22   Q   Agent Marlow, I'm going to place on the document camera on

23   your screen what's been marked for identification as Exhibit

24   No. 79.

25          MR. MAYNARD:  No objection.

```
 1              MR. KOEHLER:  Move to admit 79.

 2              THE COURT:  79 is admitted.

 3         (Exhibit No. 79 admitted in evidence.)

 4    BY MR. KOEHLER:

 5    Q   Does that photograph depict the condition in which some of

 6    the ammunition was found?

 7    A   Yes.  This was taken in place.

 8    Q   Now moving to 80.

 9              MR. MAYNARD:  No objection.

10              MR. KOEHLER:  Move to admit 80.

11              THE COURT:  80 is admitted.

12         (Exhibit No. 80 admitted in evidence.)

13              MR. KOEHLER:  And now 81.  Move to admit 81.

14              MR. MAYNARD:  No objection.

15              THE COURT:  81 is admitted.

16         (Exhibit No. 81 admitted in evidence.)

17    BY MR. KOEHLER:

18    Q   Agent Marlow, did agents also find packaged ammunition on

19    the scene?

20    A   Yes.

21              MR. KOEHLER:  I would like to place Exhibits 27, 28,

22    and 29 before the witness.

23              THE COURT:  Go right ahead.

24    BY MR. KOEHLER:

25    Q   Starting with Exhibit No. 27, can you tell us what that
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1    is?

 2    A   This is a box of WPA 7.62 by 39 millimeter rounds

 3    ammunition.

 4    Q   Is that in substantially the same condition it was in when

 5    found?

 6    A   Yes.

 7              MR. KOEHLER:  Move to admit 27.

 8              MR. MAYNARD:  No objection.

 9              THE COURT:  27 is admitted.

10       (Exhibit No. 27 admitted in evidence.)

11    BY MR. KOEHLER:

12    Q   Now going to 28 --

13              THE COURT:  Is that another box of the same kind of

14    ammunition?

15              THE WITNESS:  Yes, Your Honor.

16              THE COURT:  Do you want to offer that?

17              MR. MAYNARD:  No objection.

18              MR. KOEHLER:  Move to admit 28.

19              THE COURT:  28 is admitted.

20       (Exhibit No. 28 admitted in evidence.)

21    BY MR. KOEHLER:

22    Q   Now 29?

23    A   This is a partial box of PMC 9 millimeter ammunition.

24    Q   Please check the caliber on that.

25    A   Oh, I'm sorry.  Correction.  .38 Special.
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1   Q    Is the lot number visible on that box on the inside flap?
 2   I don't want you to read it yet because it's not in evidence.
 3   A    Yes, it is visible.
 4              MR. KOEHLER:  Okay.  I move to admit 27 through 29.
 5              THE COURT:  Is there any objection to 29?
 6              MR. MAYNARD:  No.
 7              THE COURT:  29 is admitted.
 8         (Exhibit No. 29 admitted in evidence.)
 9              MR. KOEHLER:  And 28?
10              THE COURT:  It's already been admitted.
11              MR. KOEHLER:  I didn't recall.  Okay.  Thank you.
12   BY MR. KOEHLER:
13   Q    Can you please read the lot number from the inside flap of
14   that box?
15   A    Lot 38 G-1071.
16   Q    And what is the brand of that ammunition?
17   A    PMC.
18   Q    And you already stated that it's .38 Special?
19   A    Yes.  Thirty rounds.
20              MR. KOEHLER:  I thought I was done with ammo, but I'm
21   not.  If we can move on to Exhibits 55 through 58.
22              THE COURT:  Yes.  Let's move on to 55 through 58.
23   Let's just move on to 55 to 58.
24              MR. KOEHLER:  We're withdrawing 56, so it's 55, 57,
25   and 58.  Now, may the agent approach the witness?
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1            THE COURT:  Yes.  So are these three exhibits all
2    loose rounds of ammunition sorted by caliber?
3            THE WITNESS:  Yes, Your Honor.
4    BY MR. KOEHLER:
5    Q    What's the caliber of 55?
6    A    9 millimeter -- yes.  9 millimeter.
7    Q    And 57?
8    A    7.62.
9    Q    And 58?
10   A    5.45.
11   Q    Were those rounds found strewn about the scene?
12   A    Yes.
13            MR. KOEHLER:  Move to admit 55, 57 and 58.
14            MR. MAYNARD:  No objection.
15            THE COURT:  55, 57 and 58 are admitted.
16       (Exhibit Nos. 55, 57, and 58 admitted in evidence.)
17            MR. KOEHLER:  Can you take those away and move on to
18   59 and 60?
19            SPECIAL AGENT WHITSON:  May I approach, Your Honor?
20            THE COURT:  Yes.
21   BY MR. KOEHLER:
22   Q    Starting first with 60, is that more ammunition?
23   A    Yes.  These are 9 millimeter.
24   Q    And was that found together with 59 in the same area?
25   A    Same area, north curb.

1    Q    And what is 60 exactly?

2    A    Exhibit 60?

3    Q    Yes.  I'm sorry.

4            THE COURT:  Did you mean 59?

5            MR. KOEHLER:  59.  Thank you.

6            THE WITNESS:  59 is, I guess, a partial box of

7    ammunition.  Perfecta brand.

8    BY MR. KOEHLER:

9    Q    Is the lot number visible anywhere on that packaging?

10   A    I see a number but I'm not sure if it's the lot number.

11   Q    And you mentioned already it's Perfecta 9 millimeter; is

12   that correct?

13   A    Yes.

14   Q    Are those both in the same condition in which they were

15   found?

16   A    Yes.

17           MR. KOEHLER:  Move to admit 59 and 60.

18           MR. MAYNARD:  No objection.

19           THE COURT:  59 and 60 are admitted.

20       (Exhibit Nos. 59 and 60 admitted in evidence.)

21   BY MR. KOEHLER:

22   Q    Did agents also find shell casings when they were

23   canvassing the scene?

24   A    Yes, we did.

25           THE COURT:  Okay.  Before we get to shell casings,

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1    we're going to take our morning break.  We'll reconvene at

2    10:30.

3            Ladies and gentlemen, you are reminded of the

4    admonition not to discuss the case among yourselves or with

5    anyone else.

6            You are not to form any conclusions about the case

7    until you have heard all the evidence and begun your

8    deliberations.

9            Court is in recess.

10       (Recess taken at 10:12 a.m.; 10:33 a.m.)

11           THE COURT:  Thank you, ladies and gentlemen.  Please

12   sit down.  The record will show the presence of the jury,

13   counsel, and the defendant.

14           Mr. Koehler, you may continue with your questioning.

15           MR. KOEHLER:  Thank you, Your Honor.

16           The case agent is indisposed at the moment.  May I

17   approach the witness to place Exhibit 61 through 64 before the

18   witness?

19           THE COURT:  You may.

20           MS. BROOK:  May I approach?

21           THE COURT:  Yes.  Ms. Brook is going to help.

22   BY MR. KOEHLER:

23   Q   Starting with 61, can you tell the Court and the jury what

24   that is?

25   A   These are two 9 millimeter casings.

1          MR. KOEHLER:  All right.  And moving on to No. --

2          THE COURT:  What do you mean when you say "casing."

3          THE WITNESS:  The bullet is not with it.

4    Potentially, it could have been fired.

5    BY MR. KOEHLER:

6    Q    Does that indicate that the round has been expended?

7    A    It could be, yes.

8    Q    How you can tell for sure if that casing has been

9    expended?

10   A    You can look at the primer and see if the firing pin had a

11   dent in it.

12   Q    And are they dented on those two?

13          Don't worry, I'm not going to ask you on the larger

14   quantities.

15   A    These two are not, no.

16   Q    And then looking at 62.

17   A    It's a .38 Special casing.  One.

18   Q    And given that it's one, can you tell us whether that one

19   was expended?

20   A    It was not.

21   Q    Looking at 63 and 64, first with 63, what caliber is that?

22   A    These are 7.62.

23   Q    There's a lot of those; is that right?

24   A    Yes, there is.

25   Q    Now, looking at Exhibit No. 64.

1   A   These are 5.45.

2   Q   A lot of those as well?

3   A   I'm sorry?

4   Q   A lot of those as well?

5   A   Yes.  Some of these have been fired as well.

6   Q   Were these casings all found on the ground at the Garland

7   scene?

8   A   Yes, scattered throughout.

9         MR. KOEHLER:  Move to admit 61 through 64?

10         MR. MAYNARD:  No objection.

11         THE COURT:  61 through 64 are admitted.

12      (Exhibit Nos. 61, 62, 63, and 64 admitted in evidence.)

13   BY MR. KOEHLER:

14   Q   Earlier you testified about the fact that the trunk of

15   this vehicle had essentially been blown open by the

16   Garland P. D. Bomb Unit; is that correct?

17   A   That is correct.

18   Q   And this ammunition was found all over the scene of the

19   incident?

20   A   Yes.

21   Q   Based on those two facts, is there any way for you to

22   determine which casings were actually fired from the weapons

23   and which casings would have come from inside the car somehow?

24   A   You mean previously fired?

25   Q   Yes.

1   A   No.  There's not -- no.  I can't tell that.

2   Q   And based on that, could you tell how many rounds would

3   have been fired from either of the guns that Mr. Simpson or

4   Mr. Soofi had in their possession that night?

5   A   No.  I couldn't tell from looking at the scene.

6           MR. KOEHLER:  61 through 64 have been admitted; is

7   that correct?

8           THE COURT:  That is correct.

9   BY MR. KOEHLER:

10  Q   Before we move on, I want to go back to Exhibit No. 15.

11          May I approach the witness to retrieve and bring up

12  No. 15?

13          THE COURT:  Yes.

14          SPECIAL AGENT WHITSON:  May I approach, Your Honor?

15          MR. KOEHLER:  Agent Whitson is back.

16          Exhibit 15.  It's over here.

17          THE COURT:  Go right ahead.

18  BY MR. KOEHLER:

19  Q   For the record, this is Exhibit 15 already in evidence.

20          Can you describe the grips on this?  This is the

21  Hi-Point 9 millimeter firearm, correct?

22  A   Yes.  That is correct.

23          It's black in color.  I'm not sure of the technical

24  term, but grooves for your fingers, if those -- I'm not sure.

25  Q   Are the grips plastic or metal?

1   A    It's a plastic, rubberish.

2   Q    Thank you.  Can we retrieve Exhibit 15 from the witness?

3        Before we move on from all of the firearms-related

4   evidence, I want to talk a little bit about your work as a

5   firearms instructor.  You mentioned you have been doing that

6   since 2008; is that correct?

7   A    2008, yes.

8   Q    Can you tell us the basics of what you teach when you act

9   as a firearms instructor?

10  A    Well, we're going to teach them, you know, basic

11  marksmanship skills, the fundamentals of shooting correctly

12  and with accuracy, maintenance of the weapon, safe handling of

13  it, disassemble and assembly of the weapon, and function

14  check.  Those are the basics.

15  Q    And when you're training students to shoot, do you train

16  them to fire from a stationary position or while moving?

17  A    Both.

18  Q    And in terms of "while moving," do you have them running

19  with the firearm or merely moving in a slower manner?

20  A    Both.  I mean, it's a -- we practice, you know, safe --

21  you know, there's safety issues on the range.  You know,

22  there's certain training issues.  But we certainly, you know,

23  train them to run as well as to move at a deliberate pace.

24  Q    And when you're training people how to use firearms while

25  running, what are the types of things that you're teaching

1  them on how to use the firearm while running?

2  A   Well, obviously maintaining it in the direction you want

3  it to be pointed.  You know, there's accuracy.  There's

4  different considerations when you're moving versus, you know,

5  when you're stationary as far as accuracy.  So, you know,

6  maintaining that sight picture is important.

7  Q   Can you tell the jury what a "sight picture" means for

8  those that might not be familiar with that term?

9  A   Essentially, it's your target and what you're aiming at.

10 Q   Do you also teach firearms maintenance as part of your

11 training?

12 A   Yes.

13 Q   And can you describe what steps of firearms maintenance

14 you teach?

15 A   Essentially, disassemble and cleaning and lubrication of

16 the weapon.

17 Q   And when you say "disassemble," is that also known as

18 "field stripping"?

19 A   It could be.  I have heard that term before.

20 Q   And is that necessary to clean the gun?

21 A   To ensure -- yeah.  I believe so, to ensure that, you

22 know, it operates as it's supposed to.

23 Q   Why is it important to keep a gun clean?

24 A   So it doesn't jam up or have any other malfunction.  And

25 be a way of -- you know, when you disassemble it and

CR15-00707-PHX-SRB  JURY TRIAL - DAY #3  2-18-16

```
 1  reassemble it and do a function check, you ensure that it's

 2  operating properly.

 3  Q   So no bent springs or catches or anything like that in the

 4  slide?

 5  A   Correct.

 6  Q   You mentioned also that you teach them to lubricate the

 7  firearm.  Why is that important?

 8  A   Again, so it doesn't jam up or lock up.

 9  Q   Do you also teach your students how to reassemble a

10  firearm after they have done this?

11  A   Yes.

12  Q   And are they tested on those things?

13  A   Yes.

14  Q   Is that an important part of their qualification when

15  going through firearms instruction?

16  A   Their initial training is, you know -- in agent training,

17  yes.

18  Q   In your experience, do students maintain their skills if

19  they don't go through repeat training or otherwise use their

20  firearm on a regular basis?

21  A   It's a very perishable skill, yes.

22  Q   I'm sorry.  What did you say?

23  A   It's a very perishable skill.

24  Q   So it fades if they don't do that; is that right?

25  A   That is correct, yes.
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1            MR. KOEHLER:  I want to now place before the witness

2    Exhibit No. 65.

3            SPECIAL AGENT WHITSON:  May I approach, Your Honor?

4            THE COURT:  Yes.

5    BY MR. KOEHLER:

6    Q    Agent Marlow, do you recognize that?

7    A    I do.

8    Q    Can you tell us what that is?

9    A    These are two packages.  We found them in two different

10   locations.  Basically, I describe them as ISIL flags.

11   Q    Are those in substantially the same condition on which

12   they were found on the night of May 3rd and morning of May

13   4th?

14   A    Yes.

15           MR. KOEHLER:  Move to admit.

16           MR. MAYNARD:  No objection.

17           MR. KOEHLER:  65.

18           THE COURT:  65 is admitted.

19       (Exhibit No. 65 admitted in evidence.)

20           MR. KOEHLER:  Move to publish.

21           THE COURT:  Go right ahead.

22       (Exhibit No. 65 being displayed to the jury.)

23           MR. KOEHLER:  I would now like to direct the witness

24   to Exhibit No. 67.

25           SPECIAL AGENT WHITSON:  May I approach, Your Honor?

 1              THE COURT:  You may.

 2     BY MR. KOEHLER:

 3     Q   Can you tell the Court and jury what that is?

 4     A   It's a book titled *Defense of the Muslim Lands*.

 5     Q   Was that also found at the scene of the attack in Garland,

 6     Texas?

 7     A   Yes.  It was found near the -- I guess the west median.

 8     Q   Is that book in substantially the same condition it was in

 9     when found?

10     A   Yes.

11              MR. KOEHLER:  Move to admit 67.

12              MR. MAYNARD:  No objection.

13              THE COURT:  67 is admitted.

14         (Exhibit No. 67 admitted in evidence.)

15              MR. KOEHLER:  Move to publish.

16              THE COURT:  Are you going on to 66?

17              MR. KOEHLER:  I'm going to skip 66 for the moment,

18     Your Honor.

19              THE COURT:  Okay.

20              Go right ahead.

21         (Exhibit No. 67 being displayed to the jury.)

22              MR. KOEHLER:  Sorry for the delay, Your Honor.

23     BY MR. KOEHLER:

24     Q   Agent Marlow, I have placed on the document camera for you

25     what's been marked for identification as Exhibit No. 371.  Do

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1    you recognize that?

2    A   I do.

3    Q   What is it?

4    A   It's a photo of the front passenger's seat of the car with

5    various items in it.

6    Q   Is there a book there in the front passenger's seat of the

7    car?

8    A   Yes.  A black book.

9    Q   And does that photo accurately depict the book as it was

10   encountered by agents that day?

11   A   Yes.

12           MR. KOEHLER:  Move to admit 371.

13           MR. MAYNARD:  No objection.

14           THE COURT:  371 is admitted.

15      (Exhibit No. 371 admitted in evidence.)

16           MR. KOEHLER:  Move to publish.

17      (Exhibit No. 371 being displayed to the jury.)

18   BY MR. KOEHLER:

19   Q   Did agents also find cell phones and other electronic

20   devices on the scene?

21   A   Yes.

22   Q   I'm going to place on the document camera for you what's

23   been marked for identification as Exhibit 367.  Do you

24   recognize that?

25   A   I do.

UNITED STATES DISTRICT COURT

1    Q    What is that?

2    A    This is a Galaxy S5 that was found in the glove box.

3    Q    And does that photo fairly and accurately depict that

4    item?

5    A    Yes.

6    Q    And was that item seized as part of evidence in the case?

7    A    It was.

8              MR. KOEHLER:  Move to admit 367.

9              MR. MAYNARD:  No objection.

10             THE COURT:  367 is admitted.

11        (Exhibit No. 367 admitted in evidence.)

12   BY MR. KOEHLER:

13   Q    Do you know what became of the item that was -- the

14   Samsung Galaxy S5 phone?

15   A    I believe it was sent off for analysis.

16   Q    Now, directing your attention to what I will place on the

17   document camera and marked for identification as Exhibit 368,

18   this is two pages.  Can you tell us what that is?

19   A    An LG flip phone.

20   Q    And where was that found?

21   A    It was found in the vehicle.

22   Q    Is that -- does that fairly and accurately depict that

23   phone as it was found?

24   A    Yes.

25             MR. KOEHLER:  Move to admit 368.

```
 1              MR. MAYNARD:  No objection.

 2              THE COURT:  368 is admitted.

 3         (Exhibit No. 368 admitted in evidence.)

 4    BY MR. KOEHLER:

 5    Q   Do you know the model of that flip phone?

 6    A   Not off the top of my head, no.

 7    Q   Okay.  I'm now going to place on the document camera what

 8    has been marked as Exhibit 369.  Do you recognize that?

 9    A   I do.

10    Q   Can you tell us what that is?

11    A   That's another cell phone.  UMX brand.  The phone was

12    found in the front passenger's seat of the vehicle.

13    Q   Does that photo accurately depict that phone as it was

14    found?

15    A   Yes.

16              MR. KOEHLER:  Move to admit 369.

17              MR. MAYNARD:  No objection.

18              THE COURT:  369 is admitted.

19         (Exhibit No. 369 admitted in evidence.)

20    BY MR. KOEHLER:

21    Q   Now, I'm going to place before you what is marked for

22    identification as Exhibit No. 370.  Do you recognize that?

23    A   I do.

24    Q   What is it?

25    A   It's another cell phone.  I think it's an S3 Samsung cell
```

CR15-00707-PHX-SRB  JURY TRIAL - DAY #3  2-18-16

```
 1    phone that was found within the car as well.

 2    Q   Is it a Samsung Galaxy S3?

 3    A   Yes.

 4    Q   And does that photo fairly and accurately depict that

 5    item?

 6    A   Yes, it does.

 7            MR. KOEHLER:  Move to admit 370.

 8            MR. MAYNARD:  No objection.

 9            THE COURT:  370 is admitted.

10        (Exhibit No. 370 admitted in evidence.)

11    BY MR. KOEHLER:

12    Q   I'm now going to show you what's been marked for

13    identification as Exhibit 372.

14    A   Okay.

15    Q   Do you recognize that?

16    A   I do.  It's a TomTom GPS that was found in the vehicle,

17    the dashboard of the vehicle.

18    Q   And does that photograph fairly and accurately depict the

19    TomTom GPS?

20    A   Yes.

21            MR. KOEHLER:  Move to admit 372.

22            MR. MAYNARD:  No objection.

23            THE COURT:  372 is admitted.

24        (Exhibit No. 372 admitted in evidence.)

25    BY MR. KOEHLER:
```

1    Q    Were all these items submitted for analysis?

2    A    As far as I am aware, yes.

3          MR. MAYNARD:  I'm sorry.  I didn't hear the answer.

4          THE COURT:  He said:

5          As far as I am aware, yes.

6    BY MR. KOEHLER:

7    Q    May I please have Exhibits 73, 76, 77, and 78 placed

8    before the witness.  And 78, if you could bring that one to

9    me, please.

10          THE COURT:  You want the witness to have 73 and 76?

11          MR. KOEHLER:  73, 76, and 77 before the witness.

12    BY MR. KOEHLER:

13    Q    Starting with Exhibit No. 73, can you tell the Court and

14    jury what that is?

15    A    73 is a New York Yankees baseball cap.

16    Q    And where was that found?

17    A    It was located within a few feet of Mr. Soofi on the

18    ground.

19    Q    Is that in substantially the same condition it was in when

20    found?

21    A    Yes.

22          MR. KOEHLER:  Move to admit 73.

23          MR. MAYNARD:  No objection.

24          THE COURT:  73 is admitted.

25          (Exhibit No. 73 admitted in evidence.)

```
 1    BY MR. KOEHLER:

 2    Q   Now, moving on to No. 76.

 3    A   Okay.  You want me to describe it?

 4    Q   Yes, please.

 5    A   It's a brown wallet.  It also has, I guess, contained in

 6    the wallet was Mr. Soofi's Arizona driver's license and a Bank

 7    of America Visa card.

 8              MR. KOEHLER:  Move to admit 76.

 9              MR. MAYNARD:  No objection.

10              THE COURT:  76 is admitted.

11         (Exhibit No. 76 admitted in evidence.)

12    BY MR. KOEHLER:

13    Q   And now on to 77.

14    A   It's a dark-colored wallet and it also has Arizona

15    driver's license of Mr. Simpson.

16              MR. KOEHLER:  Move to admit 77.

17              MR. MAYNARD:  No objection.

18              THE COURT:  77 is admitted.

19         (Exhibit No. 77 admitted in evidence.)

20    BY MR. KOEHLER:

21    Q   I'm going to place on the document camera what's been

22    marked for identification as Exhibit No. 78.  Do you recognize

23    that?

24    A   I do.

25    Q   What is it?
```

1   A    It's a Subway receipt that was found in the car.

2   Q    And is that in substantially the same condition it was

3   when found?

4   A    Yes.

5             MR. KOEHLER:  Move to admit 78.

6             If I can ask the case agent to please bring 76 and 77

7   to me and I'll --

8             THE COURT:  Is there an objection?

9             MR. MAYNARD:  Oh, no.  I'm sorry, Judge.

10            THE COURT:  78 is admitted.

11        (Exhibit No. 78 admitted in evidence.)

12            MR. KOEHLER:  If I could have the case agent bring 76

13   and 77 to me to publish.

14            THE COURT:  Yes.

15            MR. KOEHLER:  I'm using the document camera for that.

16            That's Exhibit 77 and this is Exhibit 76.

17            Your Honor, can I have a moment?  I just want to go

18   through the list to make sure I have put everything in.

19            THE COURT:  Yes.

20            MR. KOEHLER:  One last thing.  If I could ask Exhibit

21   54 to be placed before the witness.

22            SPECIAL AGENT WHITSON:  May I approach, Your Honor?

23            THE COURT:  Yes, you may.

24   BY MR. KOEHLER:

25   Q    Agent Marlow, do you recognize that item?

```
1    A    I do.

2    Q    What is it?

3    A    It's a damaged tablet computer.

4    Q    Is it a Microsoft Surface or do you know?

5    A    I do not know.

6    Q    Okay.  And where was that object found?

7    A    It was found underneath the trunk of the car.

8    Q    To your knowledge, was that also sent off for analysis and

9    recovery?

10   A    Yes.

11   Q    With the exception of being opened for that purpose, does

12   that object -- is that object in substantially the same

13   condition in which it was found?

14   A    Yes, it is.

15             MR. KOEHLER:  Move to admit 54.

16             MR. MAYNARD:  No objection.

17             THE COURT:  54 is admitted.

18        (Exhibit No. 54 admitted in evidence.)

19             THE COURT:  Before I forget, should we change the

20   description on the exhibit list which describes it as a cell

21   phone?

22             MR. KOEHLER:  Yes.  I have actually printed an

23   updated list for that purpose, Your Honor.

24             THE COURT:  Thank you very much.

25             MR. KOEHLER:  May I confer with co-counsel?
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
1              THE COURT:  You may.
2              MR. KOEHLER:  Your Honor, there is one item from the
3    Garland scene that is still at the lab and it's on its way
4    back to Arizona.
5              So with the exception of recalling the witness for
6    the purpose of laying foundation for that item, the government
7    has no further questions.
8              THE COURT:  Thank you.  Mr. Maynard.
9                        CROSS EXAMINATION
10   BY MR. MAYNARD:
11   Q   Good morning, Mr. Marlow.
12   A   Good morning, sir.
13   Q   If I understand correctly, you were called out either in
14   the evening of May 3rd or the early morning of May 4th to come
15   to this particular scene in Garland, Texas?
16   A   That's correct.  It was the evening of May 3rd.
17   Q   Okay.  By the time you got there, had the Bomb Unit or
18   Explosive Unit, had they blown the car?
19   A   When I first -- when I arrived on the scene or the
20   perimeter of the scene, I guess is the question?
21   Q   When you arrived on the scene, we saw a picture of the car
22   and I can show it to you, but it looked like it had been blown
23   up and then it looked like there was some foam or something on
24   it.  Do you recall that picture?
25   A   When I arrived at the scene, you know, the morning -- in
```

UNITED STATES DISTRICT COURT

1    the morning four o'clock in the morning, the car had already

2    been made safe or disrupted.

3    Q   Okay.  Well, I want to try and make this clear for me and

4    for the jury.

5           Is it your understanding that after this shooting

6    incident occurred, the Bomb Squad came out there and they --

7    to make the car safe they detonated some sort of an explosive

8    in the car?

9    A   They used one of their tools.  I'm not a bomb technician,

10   so I don't know exactly what they used.

11   Q   So you don't know as you sit here whether or not things

12   that were found outside the car had originally been in it?

13   A   The only thing I know is they showed me the -- once I was

14   on the scene, they showed me the -- I guess the helicopter,

15   the plane photograph of it.  And it didn't appear that --

16   other than the deceased subjects and a couple of some weapons

17   that the other objects were not on the ground.

18   Q   Right.  I think what we saw earlier was a couple of

19   pictures that occurred right after the shooting and the two

20   perpetrators are down on the ground and they each have a gun

21   near them, either a rifle or a long pistol with a stock, the

22   one that we've seen here.

23          Did you see those photographs too?

24   A   I did.  I did see those photos.

25   Q   When you got on the scene, the scene didn't look like

UNITED STATES DISTRICT COURT

1    that, did it?

2    A    That's correct.

3    Q    So when you were talking about where all of this stuff was

4    found, is it your understanding that the materials that we

5    have here were in the car but they were blown up and they blew

6    out and flew all around?

7    A    Either from the car or from the bags that they had removed

8    and did the same thing.  They made those safe.

9    Q    Okay.  Is it your understanding that some law enforcement

10   officers removed some sort of backpacks or bags and then made

11   them safe by exploding them?

12   A    Yes.

13   Q    Okay.  And do you have an understanding as we sit here

14   today whether or not there were any explosives that Soofi and

15   Simpson had actually brought with them in the car?

16   A    I don't believe they found any, no.

17   Q    Okay.  So all the damage, the blowing up, was actually

18   done by law enforcement attempting to make the place safe

19   because they were concerned that there may have been

20   explosives, correct?

21   A    Could you restate the question or repeat the question?

22   I'm sorry.

23   Q    Probably not.

24        The condition of the scene with all the bullets and

25   shells all over the ground outside the car, that was caused by

1    law enforcement making the vehicle safe by blowing it up?

2    A    That is my understanding, yes.

3    Q    Okay.  Now, you're a firearms expert, but were you also in

4    charge of sort of securing the items that were found in the

5    car for examination at a later time by law enforcement?

6    A    I wouldn't call myself a firearms expert.  I'm a firearms

7    instructor.  But the car was part of the scene, yes.

8    Q    But was part of your job to make sure that the items that

9    were in the car or around the car were secured and not

10   tampered with so that they could be examined by some law

11   enforcement agency at a later date?

12   A    We recovered the evidence, right.

13   Q    And -- okay.  But were you in charge of that?  Was that

14   you?

15   A    I was the team leader on the scene, yes.

16   Q    All right.  We looked at these various cell phones that

17   we just saw pictures of.  And if I have to, I'll put them back

18   on, but I would rather not.

19        Was it your job to secure those so they could be sent

20   to somewhere to be analyzed and examined?

21   A    Correct.

22   Q    Okay.  And so you would have taken those cell phones --

23   presumably, people would be wearing gloves so that they don't

24   put their own fingerprints on it.  They put them into bags

25   like we have here.  And then they would secure them so they

1   could be tested at a later time?

2   A   Yes.

3   Q   And in the case of the cell phones, for instance, would

4   those have been sent to the FBI at -- where would they have

5   been sent?

6   A   I'm not sure where they were sent.  I mean, we collected

7   the evidence.  That was our responsibility, collecting the

8   evidence on the scene, and then the case agents, they handle

9   it from there.

10  Q   Okay.  So do you don't know whether or not it went

11  straight from Dallas to Quantico or came to Phoenix or where

12  it went?

13  A   I believe they went to -- they went to our computer lab in

14  Dallas, the cell phones themselves.

15  Q   Okay.  And then the tablet that we saw, you're the one

16  who -- or your team secured that, correct?

17  A   Correct.

18  Q   Do you remember where you sent it?

19  A   I believe, you know, hearing from a third person, I guess,

20  that they was sent to Quantico and then back to Dallas for

21  analysis.

22  Q   Okay.  And would you have taken those items, the cell

23  phones and the notebook and have turned them over to someone

24  else within a day or two?

25  A   Yes.

1   Q   Okay.  You would not have been the one who processed to

2   see if there were fingerprints on those items?

3   A   No.  That is correct.

4   Q   In all of these guns that we have down here, did your

5   office of the FBI in Dallas do any fingerprint analysis on

6   them?

7   A   No.

8   Q   Do you know whether they were sent somewhere else to have

9   a fingerprint analysis done on them?

10  A   I do not know.

11  Q   Okay.  Do you know whether or not all of these items that

12  we have sitting here on the floor were sent somewhere else,

13  whether it be Quantico or somewhere?

14          THE COURT:  You mean for analysis?

15          MR. MAYNARD:  For analysis.

16          THE WITNESS:  I believe some of the items have been.

17  I couldn't tell you which ones.

18  BY MR. MAYNARD:

19  Q   Okay.  Did you -- on the scene did you have somebody in

20  your team take fingerprints from Soofi and Simpson before the

21  bodies were released to go to the Coroner's Office in Dallas?

22  A   We did, yes.

23  Q   Okay.  And did you have somebody on your team take DNA

24  samples from Soofi and Simpson before the bodies went to the

25  Coroner's Office?

CR15-00707-PHX-SRB  JURY TRIAL - DAY #3  2-18-16

1   A    We did.

2   Q    And was the reason to do that in part because you wanted

3   to see what DNA or what fingerprints would be on the items

4   that you found on the scene?

5   A    The intent was to take them from the subjects, the

6   deceased subjects.

7   Q    I understand that's exactly what you did.

8        But the reason for doing that was so that you could

9   check to see if their fingerprints or their DNA were on the

10  items that you were finding; is that correct?

11  A    The reason is for possible analysis.

12  Q    Okay.  But you're not the one who would have done any of

13  that analysis?

14  A    No.

15  Q    Okay.  And do you know whether or not fingerprints and DNA

16  analysis were done on these guns to determine if anybody

17  else's fingerprints or DNA were on them other than Soofi's and

18  Simpson's?

19  A    I do not know that.

20  Q    Did you do any analysis to determine which one or if any

21  of the guns had been fired that day on May 3rd?

22  A    I did not do any analysis, no.

23  Q    There was some questioning about shell casings.

24       Generally, a shell casing is a -- the back part of a

25  shell and the bullet part has been shot off, correct?

1   A    That's a way to describe it, yes.

2   Q    In my very simplistic manner, okay.

3          You found a number of shell casings around there from

4   different types of ammunition, correct?

5   A    We did, yes.

6   Q    You could not determine that those casings or that the

7   bullets had been shot on that day at that site, could you?

8   A    Not by collecting -- not by just collecting the shell

9   casings, no.

10  Q    And, for instance, when we were looking at some of the

11  exhibits, I believe we looked at Exhibit 4 which was the

12  Taurus .357.  Do you remember that particular gun?

13  A    I do.

14  Q    Okay.  And my notes indicate that it had 5 rounds of.  .38

15  Special ammunition in it?

16  A    Yes.

17  Q    And that was the one that was actually found in Simpson's

18  pocket and the pocket had been cut away to show the gun?

19  A    Yes.  I remember that.

20  Q    Okay.

21          THE COURT:  I just want to correct the record.

22          You described it as Exhibit 4.  The Taurus is Exhibit

23  12.

24          MR. MAYNARD:  I appreciate that, Judge.

25  Unfortunately, I have it on my thing as the fourth weapon.

1   That's what I was looking at, so I apologize.  It was Exhibit

2   12.

3   BY MR. MAYNARD:

4   Q   Did you then determine from looking at that weapon that

5   was in Simpson' pocket, whether it had been fired by Simpson

6   that day?

7   A   I could not tell.  It was fully loaded.  All the rounds in

8   the revolver had not been fired.

9   Q   Okay.  So it doesn't look like any of the shell casings

10  from the .38s that were found outside would have come from him

11  shooting that gun on that particular day, correct?

12  A   I can't tell.  I mean, I don't -- I can't tell just by

13  looking at the gun itself and the shell casings whether or not

14  they had been fired that day or not.

15  Q   Right.  But you were out there and you talked to them and

16  you understood that by the time the car got there to the time

17  Simpson and Soofi had been immobilized was 10 or 15 seconds?

18  A   I didn't -- I didn't interview the witnesses.

19  Q   Okay.  So I take it then on the six weapons that were

20  there, you did not determine whether any of them had actually

21  been shot on that day; is that correct?

22  A   That's correct.  By collecting them, I couldn't tell if

23  they had been shot that day or not.

24  Q   Now, does the FBI do traces on weapons or do they turn it

25  over to another agency to do that?

1  A    What do you mean by "traces"?

2  Q    Do you look at the serial numbers on guns and trace where

3  they were manufactured and where they were sold?

4  A    I believe they do that through the ATF.

5  Q    Okay.  So did you take an inventory of the serial numbers

6  on the weapons to determine where they were manufactured or

7  was that for someone else to do?

8  A    We collected them.

9  Q    Yes.

10 A    We attempted to collect all the identifying information

11 off the weapon.

12 Q    And did you prepare a 302 that would have that information

13 on it?

14 A    I don't know if the 302 has all the details, identifying

15 information of the weapons, but some of our attachments, you

16 know, would have our logs which has our details, information

17 on it.

18         THE COURT:  Would you please tell the jury what a 302

19 is?

20         THE WITNESS:  A "302" is our internal report, our

21 report of interview, our report of some sort of law

22 enforcement activity, testimonial in nature.

23         MR. MAYNARD:  Thank you, Your Honor.

24 BY MR. MAYNARD:

25 Q    Now, we looked at a number of other items, including the

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1  book.  Did you also find a notebook in the vehicle or around

2  the vehicle?

3  A   We found a -- like a steno book that was near one of

4  the -- one of the bags that had been opened.

5  Q   Okay.  And what happened to that steno book, if you know?

6  A   We collected it as far as I know.

7  Q   And you would have sealed it in an envelope like this and

8  sent it off somewhere?

9  A   We would -- we collected it and turned it into our

10 evidence -- our evidence room.

11 Q   Okay.  Is that what happened to all of this?  It went into

12 an evidence room somewhere?

13 A   Yes.

14 Q   What I'm trying to figure out is did you ship any of

15 this -- you -- to someone else?  And then I'm going to ask you

16 who you shipped it to?

17 A   I did not ship any of those items.

18 Q   All right.  So you were collecting the evidence on the

19 scene and put it into an evidence room?

20 A   That's correct.

21 Q   And somebody else was responsible for them taking it from

22 that evidence room and sending it to wherever they sent it to

23 for testing?

24 A   Yeah.  The case agents would handle that.

25 Q   Do you remember who the case agent was at that time?

1  A   The Dallas -- our Dallas -- I mean, they had a multiple

2  one.  I guess it was -- I interacted with several on the

3  squad, so I'm not sure who was assigned case agent.

4  Q   Did you interact with any case agents from Phoenix or were

5  they all from Dallas?

6  A   They were all from Dallas.

7  Q   Okay.  Do you have an understanding of who --

8       And the case agent, is that the individual in the FBI

9  that's in charge of the investigation?

10  A   Yes.

11  Q   Okay.  Do you have an understanding of who the case agent

12  was at that time or within the first two days that was

13  responsible for this case in Dallas?

14  A   I believe it was Special Agent Mel Tilton.

15  Q   And if I understood correctly, Mr. Soofi was wearing body

16  armor and then he had some sort of a vest on that carried

17  ammunition?

18  A   That's correct.

19  Q   And Mr. Simpson had on a vest that had ammunition, but for

20  some reason, did not have the body armor on?

21  A   That is correct.

22  Q   And when you selected the DNA and fingerprints from

23  Mr. Simpson, you would have, again, put those in the evidence

24  locker and someone else was responsible for that from that

25  point forward?

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1    A    That is correct.

 2              MR. MAYNARD:  Okay.  I don't have any further

 3    questions, Judge.

 4              THE COURT:  Any questions on redirect, Mr. Koehler?

 5                        REDIRECT EXAMINATION

 6    BY MR. KOEHLER:

 7    Q    Can you explain in brief detail what happens with evidence

 8    after you have collected it?  Where does it go and how does it

 9    proceed from there?

10    A    Once we collect it, you know, we escort it back to our

11    field office and it's checked into our evidence room which is

12    locked and secured at that point.

13              And then it's -- we turn it over to them.  The chain

14    of custody goes to them.

15    Q    And you mentioned there was a Dallas case agent.  You said

16    Mel Tilton.  Is that Melanie Tilton?

17    A    Yes.

18    Q    Or Melinda Tilton?  I'm sorry.

19    A    No.  It's Melinda.

20    Q    And was there also another Dallas case agent by the name

21    of Boyd Geiger working on the investigation?

22    A    Yes.

23    Q    You mentioned the steno book that was recovered at the

24    scene.  Do you have any knowledge of where that steno book

25    went?
```

```
 1   A   We secured it -- you know, we secured it in the evidence
 2   room after the scene.
 3   Q   And were photographs taken of that book in place?
 4   A   Yes.
 5           MR. KOEHLER:  And, Your Honor, that's the item that
 6   I'm going to reserve recall on.  Thank you.
 7           THE COURT:  Agent Marlow, you may step down.  You are
 8   not excused as a witness.  Apparently, there's another item of
 9   evidence you will be asked about once it arrives in Phoenix.
10           The rule has been invoked in this case, so you are
11   not to discuss your testimony with any other witness.  You may
12   discuss it with the lawyers.
13           THE WITNESS:  Okay.
14           THE COURT:  Thank you.  You may step down.
15           MR. MAYNARD:  Your Honor, could we have a quick
16   sidebar?
17           THE COURT:  Yes.
18           In the meantime you can get your next witness ready
19   to go.
20       (At sidebar on the record.)
21           MR. MAYNARD:  What's the piece of evidence?
22           THE COURT:  I'm sorry. I can't hear a word you're
23   saying.  You are supposed to speak to me not him.
24           MR. MAYNARD:  I'm sorry.  What's the piece of
25   evidence you don't have here?
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1              THE COURT:  The steno book.

 2              MR. KOEHLER:  The steno book.

 3              MR. MAYNARD:  Okay.  If that's it --

 4              THE COURT:  You can talk to Mr. Koehler about it.  If

 5    he wants to release the witness, that's fine.  It's not up to

 6    me.

 7              MR. MAYNARD:  Okay.

 8        (End of discussion at sidebar.)

 9              MS. BROOK:  Your Honor, the government calls FBI Task

10    Force Officer Detective Jeffrey Nash.

11              THE COURT:  Please come forward and be sworn, sir.

12        (Witness duly sworn)

13              THE CLERK:  Please state your name for the record,

14    spelling your first and last name.

15              THE WITNESS:  Jeffrey Davis Nash.  J-E-F-F-R-E-Y.

16    Davis is D-A-V-I-S.  Nash is N-A-S-H.

17              THE COURT:  You may proceed, Ms. Brook.

18              MS. BROOK:  Thank you.

19              And, Maureen, he is going to need Exhibit 504.

20         DETECTIVE JEFFREY DAVIS NASH, WITNESS, SWORN

21                      DIRECT EXAMINATION

22    BY MS. BROOK:

23    Q   Good morning.  Would you please introduce yourself to the

24    ladies and gentlemen of the jury.

25    A   My name is Jeffery Davis Nash.  I'm a task force officer
```

1    with the FBI in a Joint Terrorism Task Force.

2    Q    What does it mean to be a task force officer?

3    A    I'm basically almost an agent.

4    Q    So almost an agent with the FBI?

5    A    Correct.

6    Q    You mentioned, are you a detective?

7    A    I am a detective.

8    Q    And detective with whom?

9    A    I am with the Department of Public Safety here in Arizona.

10   Q    And how long have you been a detective with the Department

11   of Public Safety?

12   A    It will be 30 years the end of April.

13          THE COURT:   Okay.  I'm going to ask if you could

14   speak more directly into the microphone.

15          You're turning to face the jury, which is just fine,

16   as long as the microphone is also focused in that direction.

17          THE WITNESS:   Yes.  I will be on the job 30 years at

18   the end of April of this year.

19   BY MS. BROOK:

20   Q    So in the last 29 years during your time with DPS, at some

21   point did you get assigned or sent out to the FBI to work in

22   conjunction with them?

23   A    I did.

24   Q    And when you got sent there, were you assigned to a

25   particular unit within the FBI?

1   A   I was.

2   Q   What unit is that?

3   A   That's the National Security Unit 1.  It's the Joint

4   Terrorism Task Force.

5   Q   How long have you been there?

6   A   Since October of 2010.

7   Q   And so almost -- well, a little over five years?

8   A   Yes.

9   Q   Back in January -- so January 23rd of 2014, I assume it's

10   part of the last six years, so were you on duty and working

11   with the FBI?

12   A   I was.

13   Q   And did you have contact to reach out to Abdul Malik Abdul

14   Kareem?

15   A   I did.

16   Q   And so I specifically want to talk about January 23rd of

17   2014 on that particular day.

18          How did you reach out to him?

19   A   Via telephone.  I called his cell phone.

20   Q   And when you called his cell phone, did anybody answer?

21   A   He did.

22   Q   Okay.  What was the purpose?  Why did you reach out to

23   him?

24   A   Basically, two reasons.  The first was to return a laptop

25   computer that was taken during the search warrant in 2012.

1    Q    So I want to take a moment -- and, Your Honor, may I

2    approach and bring to the witness Exhibit No. 161?

3            THE COURT:  Yes.

4            MS. BROOK:  Thank you.

5    BY MS. BROOK:

6    Q    We're going to get specifically to 161 in just a moment,

7    but before we do, I want to go back.

8            You mentioned a search warrant back in July of 2012.

9    A    Correct.

10   Q    And was that search warrant on July 22nd of 2012?

11   A    I believe that was the date, yes.

12   Q    Was it executed at 2419 West Vista Avenue?

13   A    Yes.

14   Q    Phoenix, Arizona 85021?

15   A    Yes.

16   Q    And on that day was a laptop seized?

17   A    I wasn't there during the search warrant, but, yes.

18   Q    Okay.  So on the 23rd of January, fast-forwarding now a

19   year-and-a-half, why did you reach out to Abdul Malik Abdul

20   Kareem in relation --

21   A    I'm sorry.  To try and return the laptop and to ask him

22   about some things that were found on there.

23   Q    Was it just the laptop?

24   A    It was a laptop, a thumb drive, and then there was another

25   shell of a computer with no guts.

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1   Q    Okay.  And when you talked to him on the phone, was there

2   an agreement made that he was going to pick that property up?

3   A    Yes.

4   Q    Okay.  Placing on the overhead what's been marked as

5   Exhibit No. 504, do you recognize this document?

6   A    Yes.  This is a copy of the receipt that I signed and he

7   signed.

8   Q    Okay.  And by "he," who do you mean?

9   A    I'm sorry?

10   Q    By "he," who do you mean?

11   A    Mr. Kareem.

12   Q    Do you see Mr. Kareem here with us in the courtroom today?

13   A    Yes.

14   Q    Can you please point to him and identify something that he

15   is wearing?

16   A    Seated at the defendant's table with the checked -- the

17   light white-and-gray checked shirt.

18        MS. BROOK:  Your Honor, may the record reflect that

19   the witness has identified the defendant.

20        THE COURT:  It may.

21   BY MS. BROOK:

22   Q    So this particular sheet, this was the sheet that was

23   filled out when you returned the property to him on January

24   24th?

25   A    Correct.

1    Q    And does it have his signature?

2    A    It does.

3    Q    Did you watch as he signed it?

4    A    Yes.

5              MS. BROOK:  Your Honor, may I publish?

6              THE COURT:  Do you want to offer it?

7              MS. BROOK:  Oh, yes, ma'am.  Move to admit.

8              MR. MAYNARD:  No objection.

9              THE COURT:  504 is admitted.

10        (Exhibit No. 504 admitted in evidence.)

11             MS. BROOK:  Thank you.  May we publish?

12             THE COURT:  Yes.  It's on the screen.

13             MS. BROOK:  Right.

14   BY MS. BROOK:

15   Q    So it shows here the date at the top; is that correct?

16   A    It does.

17   Q    And please just go ahead and read this for us.

18   A    January 24, 2014.  Time:  1440 hours.  Abdul Kareem.

19   Address:  3218 East Bell Road, No. 314, Phoenix, Arizona,

20   85032.

21             Describing the items 1B3:  One Lenovo 0768.  Serial

22   No. L -- as in Lincoln -- 3 hyphen H -- as in Henry -- K -- as

23   in king -- zero 7 one zero 7 slash zero 3.

24             No. 2 is a Memorex 2 gigabyte hard drive.

25             And then the next item would be the 1B5 was the Dell

1    Dimension 2350.  Serial No. 1Q -- as in queen -- 8 M -- as in

2    Mary -- 821.  And that was the computer shell that had no

3    internals.

4    Q   And we spoke about signatures on the bottom.  Is this

5    signed?

6    A   Yes.

7    Q   Just for clarification, I may have misspoke.

8           So we spoke about the Lenovo and you read off the

9    serial number.  And then, additionally, it was a 2 gigabyte

10   flash drive; is that correct?

11   A   Yes.  Hard drive -- I'm sorry.  Thumb drive.  Flash drive.

12   I call them "thumb drive" but it is a "flash drive" also.

13   Q   Describe what something like that looks like.

14   A   It's basically about maybe two inches by maybe half an

15   inch.  It's just a memory stick, various memory sizes.

16   Q   And a stick like that, is it made to stick into your

17   computer?

18   A   Yes.  It's a USB plug-in.

19   Q   Okay.  I want you to turn your attention to Exhibit No.

20   161 in front of you.  Do you recognize that?

21   A   Yes.

22   Q   And what do you recognize it as?

23   A   This is the computer that was given back to Mr. Kareem and

24   the power cord.

25   Q   Okay.  And does it match the serial number?  Can you flip

1    161 over and look at the back?

2    A   Yes, it does.

3    Q   All right.  Did you ask the defendant about Inspire

4    Magazine?

5    A   I did.

6    Q   And based upon your training and experience, your work in

7    the Joint Terrorism Task Force, what is Inspire Magazine?

8    A   Inspire Magazine is a magazine that's online.  It's

9    written in English, published by Anwar al-Awlaki and Samir

10   Kahn who are members of the al-Qa'ida and the Arabian

11   Peninsula.  They put out this magazine with inspirational

12   articles.  Also, it basically is a jihadi how-to manual from

13   stabbing somebody to planting a bomb on an airplane.

14   Q   And when you asked the defendant about the magazine, what

15   did he say?

16   A   He said he had looked at it.

17   Q   He said he had looked at the magazine?

18   A   Yes.

19   Q   Did he say anything else specifically about the magazine?

20   A   Other than he had said that he didn't follow that kind of

21   thing.  He just looked at it to see what it was all about.

22   Q   Did he say that he looked at it on his own?

23   A   Yes.

24   Q   I want to turn to May 5th of 2015.  So fast-forwarding now

25   a year and four months to May 5th of 2015.

1          Were you part of an interview of the defendant on

2   that day?

3   A    I was.

4   Q    And where did the interview take place?

5   A    At the FBI Headquarters Building.

6   Q    How was it planned?

7   A    I'm sorry?

8   Q    How was it planned?  How was it set up?

9   A    We were going to record the interview.  It would be audio

10  and video recording in an interview room.

11  Q    So did you know the interview was going to happen before

12  the interview actually started?

13  A    Yes.

14  Q    And were arrangements made to record that interview?

15  A    Yes, they were.

16  Q    What did you do in terms of arranging or ensuring that the

17  recording of the interview would happen?

18  A    I did nothing as far as arranging it.  Special Agent

19  Whitson did that.  I went and picked up Mr. Kareem at the --

20  what we call the "guard shack" and walked him up to the main

21  lobby.

22  Q    And was anybody else other than Mr. Whitson also involved

23  in assisting with the recording equipment that day?

24  A    Yes.

25  Q    Who?

1    A    Brian Taylor, Special Agent Brian Taylor.

2    Q    And what is Special Agent Brian Taylor's job?

3    A    He is basically an electronics technician.  He's in charge

4    of setting up this equipment, making sure everything is

5    working properly.

6    Q    And to your knowledge, were steps taken to start the

7    equipment before the interview started?

8    A    Yes.

9    Q    During the interview did you take notes?

10   A    I did.

11   Q    And afterwards, after the interview, was a 302 or one of

12   those FBI reports generated?

13   A    Yes, it was.

14   Q    And approximately how long after the interview was that

15   report generated?

16   A    It was written the next day.

17   Q    In the interview was it just you or was there another

18   agent?

19   A    Agent Whitson was there also.

20   Q    And did you have occasion, you know, the next day or so to

21   look at the report?

22   A    I did.

23   Q    And did the report itself accurately reflect the

24   information that was conveyed by the defendant during the

25   interview that you had had with him?

1    A   Yes, it did.

2    Q   After the interview was done, did you do anything to stop

3    the recording equipment?

4    A   No.  I did not.

5    Q   Were you involved at all or did you witness any part of

6    the stopping of the equipment?

7    A   Yes.

8    Q   And what did you see?

9    A   Special Agent Whitson put -- pushed the "stop" button.  I

10   took -- it was recorded on an SD card, which is a little

11   one-inch memory card.

12        I took the card out and then took it up to what we

13   call ELSUR, our electronic surveillance section.

14   Q   And based upon your experience with the FBI, the equipment

15   that was used that day, is that standard equipment that's used

16   in interviews conducted there at the FBI?

17   A   Yes.

18   Q   And so you took out the SD card.

19        And explain again what you did with it after you took

20   it out.

21   A   To maintain a chain of custody, I had it in my possession

22   and I walked it up to our ELSUR Section and then admitted that

23   as an evidentiary item.

24   Q   At some point did you come to learn that the recording

25   equipment didn't work?

1    A    I did.

2    Q    And did you learn that close in time?

3    A    It was within a couple of days, yes.

4    Q    Your notes from the interview, were they preserved?

5    A    Yes, they were.

6         MS. BROOK:  May I have just a moment?

7         THE COURT:  Yes.

8    BY MS. BROOK:

9    Q    During the interview itself was the defendant told that he

10   was free to leave?

11   A    I don't recall if he was told he was free to leave.

12   Q    Was it a voluntary interview?

13   A    Yes.

14   Q    And explain to me exactly where the room is that the

15   interview occurs in relation to the FBI building itself.

16   A    The way the FBI building is laid out, they have the main

17   entrance after you come through Security.  There's a main

18   lobby.  We took him inside a door that you have to have a card

19   key to get in.  It's only locked from going in.  And then went

20   into a room off of that hallway from that doorway.

21   Q    And were -- was water and any sort of -- was water

22   provided during the interview?

23   A    Yes.

24   Q    And was the door locked?

25   A    No.  The door was not locked.

1  Q   Okay.  After the interview was over, was he permitted to

2  leave?

3  A   He was.

4  Q   And at any point during the interview did he get up and

5  want to leave?

6  A   No.

7  Q   Did he -- I want to talk about his demeanor and how he

8  appeared.

9         At any point during the interview did he look as if

10  he wasn't feeling well?

11  A   He didn't look as though he was feeling well.  He was sad

12  just because his friends had died a couple of days before

13  that.  But other than that, he appeared to be normal.

14  Q   Okay.  At any point did he seem to be, you know,

15  expressing any sort of physical signs of not feeling well?

16  A   No.

17  Q   You expressed before that this was a voluntary interview.

18  Explain to us what is stated to somebody who is engaging in a

19  voluntary interview as it starts.

20  A   Basically, you talk to them and just ask them if they

21  might have a few minutes to come in or some time to come in

22  and talk to us about an issue.

23  Q   And, in fact, that day did the defendant show up on his

24  own?

25  A   Yes, he did.

```
 1   Q    And you mentioned going out to the front gate to getting

 2   him --

 3   A    Correct.

 4   Q    -- to get him.

 5             And then bringing him back?

 6   A    Yes.

 7   Q    Were any threats made to him during the interview?

 8   A    I'm sorry.  Threats made?

 9   Q    Any threats?

10   A    No threats were made.

11   Q    Any coercion?  Any promises?

12   A    No.

13             MS. BROOK:  I have no further questions.

14             THE COURT:  Thank you.

15             Ladies and gentlemen, we're going to break for lunch

16   at this time.  We will reconvene at 1:15.

17             You are reminded, again, of the admonition not to

18   discuss the case among yourselves or with anyone else.  You

19   are also not to form any conclusions about the case until you

20   have heard all the evidence and begun your deliberations.

21             Court is in recess until 1:15.

22       (Recess taken at 11:41 a.m.; 1:19 p.m.)

23             THE COURT:  Good afternoon, ladies and gentlemen.

24   Please sit down.  The record will show the presence of the

25   jury, counsel, and the defendant.
```

1              Mr. Maynard, you may cross-examine Detective Nash.

2                          **CROSS EXAMINATION**

3    BY MR. MAYNARD:

4    Q    Thank you.  Good afternoon, Detective Nash.

5    A    Good afternoon.

6    Q    Now, you began working with the FBI on this Joint

7    Terrorism Task Force sometime in the 2011/2012 time frame; is

8    that correct?

9    A    No.  2010.

10   Q    2010.  All right.

11             But you were not involved -- or were you involved in

12   the execution of the search warrant at the house that

13   Mr. Abdul Kareem was living in with Mr. Simpson and two other

14   men?

15   A    I was not.

16   Q    Okay.  But you were asked by somebody to return the

17   computers that had been taken when that search warrant had

18   been effected?

19   A    After -- not when the search warrant was --

20   Q    Right.

21   A    After the case was closed.

22   Q    So that it's clear for the jury, the search warrant that

23   was done where Mr. Simpson's and Mr. Abdul Kareem's computer

24   along with other computers and electronic devices was done in

25   the summer of 2012?

1    A    That's correct.

2    Q    All right.  And so that the FBI had those computers from

3    the summer of 2012 until January of 2014, correct?

4    A    Correct.

5    Q    And you were given the task of calling Mr. Simpson and

6    returning his computer to him?

7    A    Yes.

8    Q    Okay.  And, in fact, you did.  I mean, you called him and

9    you met with Mr. Simpson and he came in and saw you and you

10   gave him back his computer?

11   A    Yes.

12   Q    And you talked to him about the material that was on his

13   computer?

14   A    Correct.

15   Q    And some of that material included --

16          MS. BROOK:  Your Honor, objection.  Misstates the

17   testimony.  The computer we have discussed was the one that

18   belonged --

19          THE COURT:  Excuse me.  What's the objection?

20          MS. BROOK:  Misstates testimony.

21          THE COURT:  He's talking about Mr. Simpson now.

22          MS. BROOK:  Okay.

23          THE COURT:  The question was about Mr. Simpson, not

24   Mr. Kareem.

25          THE WITNESS:  Correct.

1          MS. BROOK:  Thank you.

2          THE COURT:  Go ahead.

3   BY MR. MAYNARD:

4   Q    Okay.  And so when you returned Mr. Simpson his computer,

5   you talked to him about the material that was on his computer?

6   A    Yes.

7   Q    Okay.  And on his computer was certain material, including

8   copies of Inspire Magazine which is the al-Qa'ida magazine

9   that you were talking about earlier?

10  A    Correct.

11  Q    Okay.  And you returned that computer to him and he took

12  the computer and left, correct?

13  A    Yes.

14  Q    And while you interviewed him that day, you asked him

15  about Abdul Malik Abdul Kareem.  Do you recall that?

16  A    Yes.

17  Q    And he didn't know who that was.  Do you remember that?

18  A    No.

19          MS. BROOK:  Objection.  Hearsay.

20          THE COURT:  Overruled.  You may answer "yes" or "no."

21          THE WITNESS:  I'm sorry.  He -- I don't recall if he

22  remembered Abdul Malik Abdul Kareem or not.

23  BY MR. MAYNARD:

24  Q    Do you remember that it was not until you mentioned the

25  name Decarus Thomas that he recalled who -- he said:

```
 1              Oh, I know him.

 2              MS. BROOK:  Same objection.

 3              THE COURT:  Overruled.  You may answer.

 4              THE WITNESS:  It's possible, yes.  I don't recall

 5    exactly.

 6    BY MR. MAYNARD:

 7    Q   Do you recall preparing a 302 of that particular meeting?

 8    A   Yes, I did.

 9              THE COURT:  Okay.  Well, we were already on the edge

10    of hearsay, so we're not going to go into any more detail

11    about that, Mr. Maynard, about what Mr. Simpson may have said.

12              MR. MAYNARD:  Okay, Your Honor.

13              THE COURT:  Because if you do, I will sustain

14    Ms. Brook's objection.

15              MR. MAYNARD:  I understand, but -- okay.

16    BY MR. MAYNARD:

17    Q   Then you called Mr. Abdul Kareem and asked him to come in

18    and get his computer, correct?

19    A   I did.

20    Q   And originally he said he didn't want it.  He didn't want

21    to come in and get it.  Do you recall that?

22    A   Yes.

23    Q   And you told him:

24              Jeez, you could take it and sell it and make some

25    money.  Come in and get your computer.
```

1   A   Well, I didn't tell him to come in and get it, but I said

2   if he wanted to, he could do that, yes.

3   Q   So he eventually came in and got the computer, correct?

4   A   Yes.

5   Q   And he said that the Lenovo was his?

6   A   Yes.

7   Q   And inserted in the Lenovo was a flash drive, or I think

8   you referred to it as a "thumb drive." Do you recall that?

9   A   I'm not sure what time frame you're talking. When I gave

10  him back the computer, there was no thumb drive in it. It was

11  separate, but it was all returned to him, yes.

12  Q   Did you have an understanding that when it had been taken

13  by the government in July of 2012, that the thumb drive was

14  in -- inserted into the Lenovo computer?

15  A   That's my understand, yes.

16  Q   Okay. And so when Mr. Abdul Kareem came back to get his

17  computer, he said to you the computer -- the Lenovo was his,

18  correct?

19  A   Yes.

20  Q   And he denied that the flash drive was his?

21          MS. BROOK: Objection. Hearsay.

22          THE COURT: Overruled. You may answer, if you can.

23          THE WITNESS: I don't recall him saying that. He

24  took possession of it when he signed the receipt, the property

25  receipt.

```
 1   BY MR. MAYNARD:

 2   Q   Do you recall doing a 302 on that particular meeting with

 3   Mr. Abdul Kareem?

 4   A   Yes.

 5   Q   Do you believe that looking at the 302 would help refresh

 6   your recollection as to what you and Mr. Abdul Kareem

 7   discussed at that meeting?

 8   A   As far as the thumb drive, yes -- or the flash drive.

 9         MR. MAYNARD:  Your Honor, can I have this marked as

10   an exhibit just for identification?

11         THE COURT:  Now, why don't you just put it on --

12         I mean, you can later, but just to speed things up,

13   the jury can't see -- this is not an item that would be

14   admitted in evidence.  But if you just want to point to what

15   you want him to read to himself, go right ahead, and just do

16   it on the document camera.

17   BY MR. MAYNARD:

18   Q   All right.  Would you read the third paragraph to

19   yourself, please.

20   A   Okay.

21   Q   Does that help refresh your recollection about that

22   conversation?

23   A   Yes, it does.

24   Q   Did he deny that the thumb drive was his?

25         MS. BROOK:  Same objection, Your Honor.  Hearsay.
```

1   801.  And covered by our trial memo.

2          THE COURT:  Please answer "yes" or "no."

3          THE WITNESS:  Yes, he did.

4   BY MR. MAYNARD:

5   Q   Now, when was the next time you saw Mr. Abdul Kareem?

6   A   From what date?  After --

7   Q   The next time you saw him after this meeting that took

8   place in January of 2014?

9   A   Which day?  There were two days that I had seen him.  From

10  the 23rd or the 24th?

11  Q   Okay.  You saw him on January 23rd and you saw him on

12  January 24th?

13  A   Yes.

14  Q   Do you recall -- strike that.

15          Were you the one who called him in May of 2015 and

16  asked him to come in for an interview?

17  A   I believe so.

18  Q   Okay.  And he agreed to voluntarily come to the FBI's

19  office for an interview, correct?

20  A   Yes.

21  Q   And when he arrived, do you recall if he came by himself

22  or was there somebody with him?

23  A   I don't know.  I met him at the guard shack.

24  Q   I'm sorry?

25  A   I don't know.  I met him at the guard shack.

1   Q    Okay.  What have you reviewed today to prepare for your

2   testimony?

3   A    My 302s.

4   Q    All the 302s that you have done concerning interviews with

5   Mr. Abdul Kareem?

6   A    Yes.

7   Q    Anything else?

8   A    No.

9   Q    Okay.  Did you know his nephew Anthony Sampson?

10  A    I know who he is.

11  Q    Okay.  Do you also know him as Hakeem?

12  A    Yes.

13  Q    Do you recall whether or not he was with Mr. Abdul Kareem

14  when he arrived on May 5th?

15  A    Again, I don't know.  I met Mr. Kareem at the guard shack.

16  Q    And so that the jury is clear, there is a guard shack

17  that's right outside of the FBI building that is secured near

18  the parking lot, correct?

19  A    Correct.

20  Q    And then one comes into the guard shack and you escort

21  them into the FBI building?

22  A    Correct.

23  Q    And you don't know whether or not Hakeem was interviewed

24  by the FBI on that particular day or not?

25  A    No, I don't.

1   Q   Did you know on that day whether Mr. Abdul Kareem was

2   diabetic or not?

3   A   On that day?

4   Q   Yes, sir.

5   A   I don't believe he was.

6   Q   And prior to him arriving, you have testified earlier that

7   there was a technical expert that set up surveillance

8   equipment in the interview room that you were going to take

9   Mr. Abdul Kareem into, correct?

10  A   Correct.

11  Q   Okay.  And did you participate in setting up that

12  equipment?

13  A   No, I did not.

14  Q   Was that done by this technical agent and Special Agent

15  Whitson?

16  A   I don't believe Special Agent Whitson helped set it up.

17  Brian Taylor set the machine up.

18  Q   Okay.  And when you brought Mr. Abdul Kareem in, was it

19  your understanding that the machine was set up in the room?

20  A   Not in the interview room, but next door.

21  Q   I'm sorry?

22  A   Not in the interview room, but next door.

23  Q   Okay.  But it was set up next door so that it could

24  videotape and audio tape in the interview room?

25  A   Right.  Correct.

1   Q   And the intent was to video and audio tape what Mr. Abdul

2   Kareem was going to tell you and Special Agent Whitson,

3   correct?

4   A   Yes.

5   Q   And did you look into the room where the audio and video

6   equipment was before going into the interview room?

7   A   Yes.

8   Q   Did it appear to be functioning at the time you looked at

9   it?

10   A   When I looked in the room, the TV screen was on and you

11   could see a reflection of the room.

12   Q   Okay.  And you went into the room and you conducted an

13   interview that lasted what?  An hour?  Hour-and-a-half?

14   A   About that, yes.

15   Q   Okay.  Now, did you bring any snacks or soft drinks

16   because Mr. Abdul Kareem was diabetic at that time?

17   A   I recall bringing some things in.  I don't remember

18   exactly what; small cookies or some water.

19   Q   And do you recall telling me at an earlier date that you

20   understood that he was diabetic?

21   A   Yes.

22   Q   Okay.  But today you tell me you didn't know he was

23   diabetic?

24   A   After going back and reviewing, yes, you're right,

25   correct.

1   Q   Okay.  Do you recall that he told you in that interview

2   that he was diabetic?

3   A   I don't recall him saying that.

4   Q   Who do you understand pushed the "start" button on the

5   recording device?

6   A   My understanding is Brian Taylor started it.

7   Q   And how do you come to that understanding?

8   A   From prior testimony.

9   Q   You have read Brian Taylor's prior testimony?

10   A   I was here in court when we had the hearing.

11   Q   With Brian Taylor?

12   A   Yes.

13   Q   Do you recall that the judge gave an admonition and I

14   invoked the rule and the witnesses weren't entitled to be in

15   the room while somebody else was testifying?

16   A   I was seated at the -- at the prosecution table.  I was

17   the lead.

18   Q   You were the lead person?

19   A   Yes.

20   Q   Okay.  But you do recall that admonition that was given?

21   A   Yes.

22   Q   Now, after the interview is completed, who is the one that

23   goes in and presses the button to stop the recording device?

24   A   That was Agent Whitson.

25   Q   Okay.  And how have you come by that information?

1    A    From recollection.

2    Q    Recollection from the event or recollection from the

3    testimony?

4    A    From the event.

5    Q    Let me see if I can refresh your recollection again.

6          I'm going to show you part of a transcript of a

7    former hearing.  I'm going to direct your attention to -- this

8    is going to be page 54 and I'm going to show you questions

9    that were starting on line 23.

10         I just want you to read them to yourself, please.

11   A    Yes.

12   Q    Okay.  And I'm going to the next page 55.  Go ahead and

13   read the first three lines to yourself.

14   A    "I don't know how to operate the equipment?"

15         THE COURT:  No, to yourself, not out loud.

16         THE WITNESS:  Okay.

17   BY MR. MAYNARD:

18   Q    Do you recall that back in November, you didn't know to

19   press the "stop" button?

20   A    Right.  Correct.

21   Q    But now you're telling us you do remember and it was Agent

22   Whitson?

23   A    Yes.

24   Q    Okay.  And then there is a memory card that's in that

25   machine; is that right?

1   A   Yes.

2   Q   And who was it that took out the memory card?

3   A   I took out the memory card.

4   Q   So Whitson goes in and presses the button to stop it, but

5   you come in later on and you take out the memory card?

6   A   No.  I was with him.

7   Q   You were with him?

8   A   Yes.

9   Q   So he presses a button to stop it, but you go over and get

10  the memory card?

11  A   Yes.

12  Q   And you are the one who takes the memory card to somebody

13  to check it in to make sure that it's secure and safe?

14  A   Yes.

15  Q   And when was it that you learned that there wasn't

16  anything on the memory card that showed the interview of you

17  and Agent Whitson and Mr. Abdul Kareem?

18  A   It was within a couple days.

19  Q   Okay.  What steps did you take to try to preserve that

20  interview, if any?

21  A   From my notes.

22  Q   So you had -- well, when you were taking notes, you

23  thought that this thing was be audiotaped and videotaped,

24  correct?

25  A   Yes.

1   Q    And audiotaping and videotaping, you do that on most

2   interviews when you can?

3   A    Yes.

4   Q    All right.  Because those are more accurate than your

5   notes are going to be?

6   A    Yes.

7   Q    And did you take any steps to have somebody at the FBI

8   office see there was some way to determine if there was any

9   other additional information on that chip that had been taken

10  out?

11  A    Yes, we did.

12  Q    Okay.  When did you do that?

13  A    I don't recall the exact date.

14  Q    Was it months later?

15  A    I don't remember the exact date.

16  Q    Were you in charge of doing that or was Agent Whitson in

17  charge of doing that?

18  A    I believe it was me.

19  Q    Okay.  What is it that you did?

20       Did you ever send it to Guantanimo to have them -- I

21  mean strike it?

22       Did you send it to Quantico to have them examine it?

23       THE WITNESS:  We made some phone calls to do that,

24  but in the interim we had had our CART people take a look at

25  that.

1          THE COURT:  Okay.  Hold on.  CART people.  What are

2     CART people?

3          THE WITNESS:  Computer -- I'm sorry.  Computer

4     Analyzation, Recovery, and Response Team.

5          THE COURT:  Okay.  You just used an acronym that the

6     jury maybe has never heard before.  So you have your own

7     computer people here in Phoenix that you asked to look at the

8     memory card.

9          THE WITNESS:  Yes, ma'am.

10    BY MR. MAYNARD:

11    Q    But that wasn't done as soon as you realized there wasn't

12    anything on the chip?

13    A    Not right away, no.

14    Q    Additionally, there's a camera in the corner of the

15    interview room, correct, a security camera?

16    A    I believe so, yes.

17    Q    And the security camera doesn't have audio capabilities.

18    It's just a video?

19    A    Yes.

20    Q    And, in fact, just so that it's clear, when you were going

21    to audio and videotape this interview, you were doing it

22    surreptitiously.

23          You didn't tell Mr. Abdul Kareem that it was being

24    interviewed -- that you were being audioed or videotaped, did

25    you?

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1   A   No, we did not.

2   Q   Did you even ask him?  I mean, he hadn't refused to be

3   audio or videotaped, had he?

4   A   No.

5   Q   So you don't know whether he would have agreed to it or

6   not, correct?

7   A   Correct.

8   Q   And, in fact, a month later when he's arrested on June

9   10th, he comes in for -- and he is arrested at this time.  And

10  you participate in an interrogation of him or a questioning of

11  him, correct?

12  A   Correct.

13  Q   And doesn't he -- he agrees to that questioning.  And he's

14  already under arrest, correct?

15  A   Correct.

16  Q   And that particular interview is audio and videotaped,

17  correct?

18  A   Correct.

19  Q   And we have a copy of that?

20  A   Yes.

21  Q   Okay.  But going back to May 5th when he is in there,

22  there's also a camera in the corner that would have shown his

23  body language, would have shown his movements, would have

24  shown your movements, Agent Whitson's movements, correct?

25  A   Correct.

1    Q    And what happened to that audio?

2    A    I can't answer that.

3    Q    Or that video?

4    A    I can't answer that question.  I don't know.

5    Q    Have you looked for it?

6    A    To my knowledge, no.

7    Q    Do you have any understanding of whether it exists or

8    whether it has been destroyed?

9    A    I don't know if it's even recorded.

10   Q    Now, after the May 5th interview with Mr. Abdul Kareem, he

11   was free to go?

12   A    Correct.

13   Q    And he left, correct?

14   A    Correct.

15   Q    But he came back to the FBI's headquarters on his own

16   without being asked to on May 12th, didn't he?

17   A    Yes.

18   Q    And he asked to meet with agents to talk to them, correct?

19   A    Yes.

20   Q    And he waited for some 30 or 40 minutes and then he left.

21        Do you recall that?

22   A    Yes.

23   Q    And then at some point Agent Whitson then got him on the

24   phone and he spoke to Agent Whitson and you were listening in

25   on that conversation, correct?

1    A    Yes.

2    Q    And that was all voluntarily on Mr. Abdul Malik's -- Abdul

3    Kareem's part, correct?

4    A    Yes.

5             MR. MAYNARD:  I don't have any further questions,

6    Judge.

7             THE COURT:  Ms. Brook, redirect?

8             MS. BROOK:  Thank you, Your Honor.

9                        **REDIRECT EXAMINATION**

10   BY MS. BROOK:

11   Q    I'm going to place on the overhead already-admitted and

12   published Exhibit No. 504.

13            Defense counsel asked you questions about the

14   defendant coming back and picking up the Lenovo laptop as well

15   as that thumb drive.  At any point did you tell him he had to

16   pick it up?

17   A    No.

18   Q    At any point did you tell him he was under some obligation

19   to have to pick it up?

20   A    No.

21   Q    If he didn't pick it up, what would have happened to it?

22   A    I'm not sure.  The FBI does not -- is not into the storage

23   of people that just don't want to pick up property, so I'm not

24   sure at that point.

25   Q    Did you order him to come down to the FBI to pick it up on

1    January 24th of 2014?

2    A    No.

3    Q    Did he come down willingly that day?

4    A    My understanding is yes.

5    Q    And, again, just to make clear, you returned to him the

6    Lenovo laptop that we've talked about, Exhibit No. 161, as

7    well as that 2 gigabyte thumb drive?

8    A    Correct.

9    Q    And he took both?

10   A    He did.

11   Q    Where in the interview on -- during the interview on May

12   5th of 2015, did the defendant express being in discomfort,

13   any physical discomfort?

14   A    No.

15   Q    Did he show signs of any physical discomfort?

16   A    No.

17   Q    Was he sweating or seeming ill?

18   A    The only thing that I noticed about him was he seemed sad,

19   but, no.

20   Q    And at any point did he indicate that he didn't want to be

21   there?

22   A    No.

23   Q    At any point did he indicate that he wanted to leave and

24   stop talking?

25   A    No.

1   Q   And if he had gotten up and stopped talking, was he free

2   to leave?

3   A   He was.

4   Q   Were there any doors locked in between him and the exit?

5   A   There were doors, but they were free to exit through.

6   Q   His position in that interview room, was he closest to the

7   door?

8   A   He was.

9   Q   Defense counsel asked you whether or not at some point you

10  learned the defendant was diabetic?

11  A   Yes.

12  Q   At some point in the investigation of this case did it

13  become relevant whether or not he was diabetic?

14  A   Yes.

15  Q   And was that based on finding a diabetic test strip at a

16  scene?

17  A   Yes.

18  Q   And was that after May 5th?

19  A   Yes.

20  Q   Defense counsel also asked you about being at a prior

21  hearing and whether or not you heard testimony of Brian

22  Taylor.

23       At that prior hearing, were you sitting in the

24  hearing as the case agent?

25  A   I was.

1    Q   And so, therefore, based on your knowledge, were you

2    permitted to be here in the courtroom?

3    A   Yes.

4    Q   And were you sitting in the same position that Special

5    Agent Whitson is sitting in right now?

6    A   I was.

7    Q   Defense counsel asked you about whether or not you recall

8    pressing the "stop" button on the recording device before you

9    took possession of the SD card.

10       Do you recall pressing the "stop" button?

11   A   I don't recall pressing the "stop" button.

12   Q   And at any point have you recalled being the person that

13   pressed the "stop" button?

14   A   I'm positive I did not.

15   Q   To your recollection, what did you do?

16   A   At that point Agent Whitson pushed the "stop" button as we

17   were completed with the interview and then I pulled the SD

18   card out.

19   Q   And you took custody of the SD card and then what did you

20   do with it?

21   A   I took it to ELSUR, which is our electronic surveillance,

22   which is basically in the Electronic Evidence Section.

23   Q   And when you took it to ELSUR, did you take it directly to

24   them?

25   A   Yes, I did.

1   Q   And you turned it over to them?

2   A   I did.

3   Q   Did you fill out forms handing it to them?

4   A   Yes.

5   Q   Is that called maintaining a chain of custody?

6   A   It is.

7   Q   Defense counsel asked about taking notes during the

8   interview.

9         And as a Task Force Officer with the FBI, as well as

10  29 years with the Department of Public Safety, have you been

11  trained to take notes as part of doing an interview?

12  A   Yes.

13  Q   Is that something that you were regularly called upon in

14  your job to do?

15  A   Yes.

16  Q   Is there a procedure during an interview whereby you have

17  two agents, two officers, that sit in on an interview?

18  A   Yes.

19  Q   And typically, does each individual in that interview have

20  a job?

21  A   Sometimes.  One will do the interview, one will take

22  notes.  Some will take notes.  It kind of depends sometimes.

23  But, yeah, generally, the interviewer and then the notetaker.

24  Q   And on May 5th of 2015, were you the notetaker?

25  A   I was.

1    Q    And did you write copious notes?

2    A    Yes, I did.

3    Q    And I have asked you, I just want to clarify.

4         You had an opportunity to look at the 302, the FBI

5    report that was generated from that interview on May 5th?

6    A    I have.

7    Q    And that report was generated within a day or two, you

8    said, after the interview?

9    A    The next day, yes.

10   Q    And does that 302 report fairly and accurately reflect the

11   information that the defendant conveyed to you and to Special

12   Agent Whitson?

13   A    Yes.

14   Q    Defense counsel also asked you about security cameras in

15   the FBI.  Are you familiar with there being some security

16   cameras in the FBI?

17   A    Yes.

18   Q    And defense counsel had talked about the fact that those

19   cameras just record visual or video recordings but not audio,

20   not what you can hear?

21   A    Correct.

22   Q    Is it your understanding that those security videos are

23   done just to make sure everybody in the building is safe?

24   A    Yes.

25        MR. MAYNARD:  Objection.  Leading.

1           THE COURT:  The answer will stand, but it was

2    leading.

3    BY MS. BROOK:

4    Q   To your knowledge are those videos kept and maintained as

5    part of case investigations?

6    A   To my knowledge, no.

7    Q   Going back for a minute to that May 5th interview, May 5th

8    of 2015, on that particular day was the defendant identified

9    as a subject of the investigation?

10   A   No, he was not.

11   Q   At the time you were interviewing him on that day, was he

12   interviewed just like any other witness?

13   A   Yes.

14           MS. BROOK:  I don't have any other questions.

15           THE COURT:  May Detective Nash be excused?

16           MS. BROOK:  Yes.

17           THE COURT:  Is there any objection?

18           MR. MAYNARD:  No.

19           THE COURT:  Thank you, Detective Nash.  You may step

20   down and you are excused as a witness.

21           And the government may call its next witness.

22           MS. BROOK:  The government calls Special Agent Mario

23   Calbone.

24       (Witness duly sworn)

25           THE CLERK:  Please state your name for the record and

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1     spell your last name.

2              THE WITNESS:  Mario Calbone.  C-A-L-B-O-N-E.

3              THE COURT:  You may proceed, Ms. Brook.

4              MS. BROOK:  Thank you, Your Honor.

5              Maureen, can you give him 518 and 519, please.

6         **SPECIAL AGENT MARIO CALBONE, WITNESS, SWORN**

7                   **DIRECT EXAMINATION**

8     BY MS. BROOK:

9     Q    Good afternoon.

10    A    Good afternoon.

11    Q    Would you please introduce yourself to the ladies and

12    gentlemen of the jury?

13    A    Hi.  I'm Mario Calbone.

14    Q    And where do you work?

15    A    With the FBI.

16    Q    What's your position?

17    A    A special agent in the Phoenix Division.

18    Q    How long have you been a special agent within the FBI?

19    A    It will be seven years in April.

20    Q    And where are you assigned?

21    A    I work on the International Terrorism Squad.

22    Q    And how many years have you been assigned to that

23    particular squad?

24    A    Seven years in April.

25    Q    So I want to talk about September 9th of 2015.  Were you

UNITED STATES DISTRICT COURT

1   working that day?

2   A   Yes, I was.

3   Q   And on that day were you involved in collecting evidence?

4   A   Yes, I was.

5   Q   How is it that you came to be called upon to collect a

6   piece of evidence that day?

7   A   Special Agent Stewart Whitson asked me to pick up a laptop

8   from Sergio Martinez-Chavez.  I was going to pick up the

9   laptop at his house.  He spoke with Sergio Martinez-Chavez on

10   the telephone and obtained consent -- verbal consent for the

11   FBI to search the computer.

12   Q   Okay.

13   A   The laptop was a Lenovo laptop.

14   Q   Had you met Mr. Martinez-Chavez before?

15   A   I have.

16   Q   And had you had the occasion to interview him as a witness

17   in this case before?

18   A   I have.

19   Q   Was that once or more than once?

20   A   It was three times.

21   Q   And those three interviews, did they occur back in May?

22   A   That's correct.

23   Q   So on September 9th, did you, in fact, meet up with

24   Sergio?

25   A   I did.

```
 1   Q    And don't tell us the actual address, but whereabouts was

 2   it that you met him?

 3   A    In the West Valley of Phoenix.

 4   Q    And did you obtain a piece of evidence from him?

 5   A    I did.

 6   Q    What was it?

 7   A    It was a Lenovo laptop.

 8   Q    You had mentioned before you talked to him on the phone

 9   first?

10   A    That's correct, enroute.

11   Q    And you had mentioned something about him giving you

12   consent to take it?

13   A    That's correct.  I got verbal consent while I was talking

14   on the phone.  I called him enroute, yes.

15   Q    Typically, when somebody gives you something and they give

16   it to you consensually, is there a form or a piece of

17   paperwork that you fill out?

18   A    That's correct.  I had an FD-941 which is a consent for --

19   to search the computer.

20   Q    And in this case did you have one of those forms and fill

21   it out?

22   A    That's correct.

23   Q    I'm going to place on the overhead Exhibit No. 518.  Do

24   you recognize this?

25   A    Yes, I do.
```

1    Q    And what do you recognize it as?

2    A    The FD-941.

3    Q    So that Consent to Search form?

4    A    That's correct.

5    Q    And was this the one you used, in fact, on that day on

6    September 9th?

7    A    That is.

8         MS. BROOK:  Your Honor, the government moves to admit

9    and to publish 518.

10        MR. MAYNARD:  More foundation -- objection.

11   Foundation.

12        THE COURT:  The objection is overruled.  518 is

13   admitted.

14      (Exhibit No. 518 admitted in evidence.)

15        MS. BROOK:  Thank you.

16   BY MS. BROOK:

17   Q    So you took this form out that day and you had Sergio sign

18   it?

19   A    I did.  I filled it out in front of him.  I had him read

20   it.  Asked him if he had any questions, which he did not.  He

21   signed it.  I signed it.

22   Q    And did you describe the property -- precisely the

23   property it was that he was handing over to you?

24   A    Yes, I did.

25   Q    Can you describe for us what it was that he specifically

1    gave to you?

2    A    As it says, a Lenovo laptop.  And I put the serial number

3    which was found on the back.

4    Q    Okay.

5    A    And a power cord.

6    Q    And that's the serial No. L3H --

7    A    -- HK071.

8          MS. BROOK:  Okay.  I don't know if Exhibit No. 161 is

9    still up there.  May I approach?

10          THE COURT:  You may.

11          MS. BROOK:  Thank you.

12   BY MS. BROOK:

13   Q    Do you recognize that?

14   A    Yes, I do.

15   Q    And I believe -- have we already moved to admit 161?

16          THE COURT:  I believe so.  No?  No.

17          MS. BROOK:  Government moves to admit 161.

18          THE COURT:  Is there any objection?

19          MR. MAYNARD:  No objection.

20          THE COURT:  161 is admitted.

21      (Exhibit No. 161 admitted in evidence.)

22   BY MS. BROOK:

23   Q    Is that, in fact, the laptop that you picked up that day?

24   A    That is the laptop.

25   Q    I just want to go back for one moment.

1          We discussed -- actually, before we move back, let's

2     stay here for just a second.  So I'm going to place on the

3     overhead Exhibit 519.  Do you recognize that form?

4     A    I do.

5     Q    And what's that?

6     A    It's a FD-597.  It's our Receipt of Property.

7     Q    And is that a receipt to receive property?

8     A    That's correct.

9     Q    When do you fill that out?

10    A    I filled it out after I filled out the Consent to Search

11    form.  And I filled that out in front of Sergio

12    Martinez-Chavez.

13          Again, provided that to him.  He read through it.

14    Asked him if he had any questions, which he did not.  He

15    signed it.  I signed it.  And I provided him a copy.

16          MS. BROOK:  The government moves to admit and to

17    publish 519.

18          MR. MAYNARD:  No objection.

19          THE COURT:  519 is admitted.

20       (Exhibit No. 519 admitted in evidence.)

21    BY MS. BROOK:

22    Q    After you collected and picked up this piece of evidence,

23    what did you do with the evidence?  Did you put it into

24    evidence?

25    A    Yes, I did.

1    Q    And where was that?

2    A    In the Phoenix Division Evidence Control Room.

3    Q    And now we're going to rewind for just one minute.

4         So I want to go back to the three interviews that you

5    did with Sergio.

6    A    Uh-huh.

7    Q    Those three interviews you did with him, did he

8    voluntarily sit down and interview with you?

9    A    That's correct.

10   Q    And was he made any promises or given any benefit for

11   engaging in those interviews with you in May?

12   A    No, he wasn't.

13   Q    Or at any point?

14   A    No.

15             MS. BROOK:  May I have just one moment?

16             THE COURT:  You may.

17             MS. BROOK:  Just one minute.  I'm sorry.  I want to

18   be sure there's nothing else we need to talk about so he can

19   be released.  There is one last subject to discuss.

20   BY MS. BROOK:

21   Q    On June 10th of 2015, so a month and five days after the

22   interview that we just discussed, on that day did you happen

23   to search a cab of the defendant's truck?

24   A    Did I search?

25   Q    Well, did you -- were you involved in a search and did you

```
 1    obtain consent from the defendant to search it?

 2    A    I obtained consent.  I did not search.

 3    Q    Okay.  So on that day, on June 10th --

 4    A    Uh-huh.

 5    Q    -- you obtained from the defendant consent to search that

 6    truck?

 7    A    Correct.  The cab of the truck.

 8              MS. BROOK:  I don't have any other questions.

 9              THE COURT:  Mr. Maynard?

10              MR. MAYNARD:  No questions.

11              THE COURT:  May Agent Calbone be excused?

12              MS. BROOK:  Yes, Your Honor.  Thank you.

13              THE COURT:  Any objection?

14              MR. MAYNARD:  Yes -- no.

15              THE COURT:  Thank you, sir.  You may step down and

16    you are excused as a witness.

17              The government may call its next witness.

18              Back so soon?

19              AGENT BRIAN MARLOW:  Yes, ma'am.

20              MR. KOEHLER:  Okay.  Welcome back, Agent Marlow.

21              THE WITNESS:  Thank you.

22              MR. KOEHLER:  You remain under oath.

23

24

25    ///
```

1      **SPECIAL AGENT BRIAN MARLOW, WITNESS, SWORN**

2                      **DIRECT EXAMINATION**

3      BY MR. KOEHLER:

4      Q    I'm going to place on the document camera for your review

5      and I'll walk you through this real quick and then move to

6      admit.

7           This is a photograph on the document camera.  Do you

8      recognize that?

9      A    I do.

10     Q    And what is that?

11     A    That's a photograph of -- in place of a bag and certain

12     items and also a steno book as well.

13     Q    So the steno notebook is one of those items?

14     A    Yes.

15     Q    What color is that steno book?

16     A    It's a blue cover.

17     Q    I show you the next page.  Is that a close-up of that

18     steno notebook?

19     A    It is.

20     Q    Next page, does that accurately depict it as well with a

21     ruler next to it?

22     A    Yes.

23     Q    Next page?

24     A    It's a photograph of one of the pages within the book.

25     Q    And finally, the last page?

1    A    Again, more pages in the book, yes.

2    Q    Again, this is Exhibit No. 391.  Does that exhibit fairly

3    and accurately depict the steno notebook as it was found that

4    day?

5    A    Yes.

6              MR. KOEHLER:  Move to admit 391.

7              MR. MAYNARD:  Objection.  Foundation.  I just got it.

8              THE COURT:  Well, what more do you want to know about

9    it foundation-wise?  We saw a picture of it there at the

10   scene.  We saw a picture close up of the cover.  And we saw a

11   picture of two pages.

12             If you want to ask some foundational questions

13   because you just got it, go right ahead.  But in terms of

14   foundation, I don't know what more you need.

15             MR. MAYNARD:  Can I ask a couple of questions?

16             THE COURT:  Yes.

17             MR. MAYNARD:  Okay.  Agent --

18             THE COURT:  Always at the microphone, though.  Always

19   at the microphone.

20                      **VOIR DIRE EXAMINATION**

21   BY MR. MAYNARD:

22   Q    Agent, do you recall how many pages were in this

23   particular notebook?

24             THE COURT:  Pages with writing on them?

25             MR. MAYNARD:  Pages at all.

1          THE WITNESS:  No.  I do not recall.

2          THE COURT:  How about pages with writing on them?

3          THE WITNESS:  I didn't count them.  I didn't count

4    them.

5          THE COURT:  So we saw two pages with writing.  Is it

6    your recollection there were more?

7          THE WITNESS:  There could have been.

8    BY MR. MAYNARD:

9    Q   In the exhibits we've got Exhibit 391.  It appears to be

10   two pictures of the front cover.  And then if you'll look at

11   the -- I think it's the fifth page of the exhibit, it looks to

12   me like there are more pages.  Can you look at that please?

13          Do you not have it?  Can I publish?

14          THE COURT:  Oh, yes, just to him.

15   BY MR. MAYNARD:

16   Q   What I'm looking at is here.  Do you have any recollection

17   of -- does this help refresh your recollection as to how many

18   pages were in this notebook?

19   A   There were several.  I don't -- I didn't count the pages.

20   Q   Is this your hand?  In other words, were you the one who

21   was taking the pictures of this?

22   A   No.  It was one of our photographers.

23   Q   Do you know whether or not there were other pages of

24   writing in this other than what we have here?

25   A   I don't recall.

1          THE COURT:  Well, let me see if I can ask Mr.

2   Koehler.

3          Mr. Koehler, is the notebook itself showing up at

4   some point?

5          MR. KOEHLER:  Yes, Your Honor.

6          THE COURT:  So that the answers to these questions

7   will be evident from the actual notebook?

8          MR. KOEHLER:  That is correct, Your Honor.  It's

9   enroute and should be here within the next couple of business

10   days.

11          THE COURT:  Well, so why do we need photos of the

12   pages?

13          MR. KOEHLER:  To lay foundation for the later

14   admission of the book to show that it is, in fact, a true and

15   correct copy of what was found at the scene -- or a true and

16   correct original of what was found at the scene.

17          THE COURT:  Why don't we reserve admission.  We may

18   not need both.  We have everything we can get from Agent

19   Marlow on this.

20          MR. KOEHLER:  That's correct.  And that was the

21   purpose was merely to lay that foundation so that I did not

22   need to fly him back from Dallas just for that notebook.

23          THE COURT:  That's fine.  Is that all?

24          MR. KOEHLER:  Yes, Your Honor.

25          THE COURT:  And may he now be excused and go back

1    home?

2            MR. KOEHLER:  Yes, Your Honor.  Thank you.

3            THE COURT:  Any objection?

4            MR. MAYNARD:  No, Your Honor.

5            THE COURT:  Agent Marlow, thank you very much.  You

6    may step down and you are excused as a witness.

7            THE WITNESS:  Thank you.

8            MR. KOEHLER:  The United States calls Robert

9    Meshinsky.

10      (Witness duly sworn)

11           THE CLERK:  Please state your name for the record and

12   spell your last name.

13           THE WITNESS:  Sure.  Robert.  Middle initial J.

14   Meshinsky.  M-E-S-H-I-N-S-K-Y.

15           THE COURT:  You may proceed Mr. Koehler.

16        **SPECIAL AGENT ROBERT J. MESHINSKY, WITNESS, SWORN**

17                        **DIRECT EXAMINATION**

18   BY MR. KOEHLER:

19   Q    Could you please introduce yourself to the jury.

20   A    Good afternoon.  My name is Robert Joseph Meshinsky.  I'm

21   a Special Agent with the FBI here in Phoenix.

22   Q    Do you have a particular duty set as an FBI agent here in

23   Phoenix?

24   A    Yes.  I'm the computer forensic examiner.

25   Q    And are you a member of what's called the CART team?

1    A    Yes.

2    Q    What does "CART" stand for?

3    A    Computer Analysis Response Team.

4    Q    How long have you been a Special Agent with the FBI?

5    A    Over 20 years.

6    Q    And how long have you been on the CART team?

7    A    Nineteen years.

8    Q    And that whole time have you been a computer forensic

9    specialist?

10   A    Yes and I also worked cases.

11   Q    What kind of training did you have regarding computers

12   before joining the CART team?

13   A    Before I joined the Bureau, I worked for a software

14   development company in Silicon Valley for five years.

15   Training is -- most of my training has been provided by the

16   Bureau or self-taught.

17   Q    And as part of your duties with the CART team, do you

18   participate in the execution of search warrants?

19   A    Yes.

20   Q    And do you perform a particular role in connection with

21   the execution of search warrants?

22   A    During a search warrant we will seize any of the digital

23   media that we come across.

24   Q    When you're at the scene of a search warrant, do you

25   follow a procedure for determining what electronic devices to

1    seize and how to preserve the data in those devices and

2    maintain their integrity?

3    A    We do.  If a computer is off, it will remain off and we

4    will seize it that way.

5    Q    Is there a step before that, deciding whether you actually

6    need a device?

7    A    Yes.  We will read the warrant and we will also speak with

8    the case agent as well and to see if it's something that we

9    need to take.

10   Q    Okay.  And you mentioned you checked to see if the device

11   is on.

12          If the device is on, what do you do first?

13   A    If the device is on, the first thing we check to see is if

14   encryption is running.

15          If encryption is running, we'll need to do what we

16   call a logical extraction where we'll pull the files off right

17   then and there.

18          And we will power the machine off because we may not

19   get into it once we power it off.

20          And if it's not encrypted, we will take screenshots

21   so we know what the screen looked like, the monitor looked

22   like at the time we made entry.  And we'll take pictures of

23   that so we know what it was like at that time.  And then we'll

24   power it down and we'll turn it over to the seizing agent.

25   Q    Okay.  You mentioned the words "logical extraction."

1        Can you explain to the jury what a logical extraction

2   is.

3   A    Logical extraction would be the active files that are on

4   your computer at the time your computer is on.  If you go into

5   a user directory, you'll see My Pictures, My Documents.  Those

6   are logical files that fall into that and you can see them

7   when your computer is on.

8   Q    Does the logical file include any file that has been

9   deleted?

10  A    No.

11  Q    Does it include anything that is stored in the RAM memory

12  of the computer?

13  A    No.

14  Q    Can you explain to the jury what RAM memory is?

15  A    Random Access Memory.  When you turn a computer on and the

16  application needs to fire up -- start up, excuse me -- it uses

17  the Random Access Memory.

18        It kind of goes in and stores some information there

19  and then opens up the applications.

20  Q    Do you ever take security precautions to make sure that

21  the device isn't disguising any boobie trap or some other

22  thing during the execution of the search warrant?

23  A    We look for any -- we'll do a physical inventory on the

24  items to make sure there's no wires --

25        COURT REPORTER:  Could you repeat that, please?

1    THE COURT:  He said we'll do a physical inventory on

2  the items and look for --

3    THE WITNESS:  -- any wires, things that can be

4  hanging off the computer.

5    MR. KOEHLER:  All right.  Let's slow down a little

6  bit.

7    THE WITNESS:  I'm from New York.

8  BY MR. KOEHLER:

9  Q   You talk a little faster and I have to be very mindful

10 myself.

11    All right.  So you have checked to see if the device

12 is on.  You have done a logical extraction if there's

13 encryption running, and otherwise take photographs of the

14 screen and make sure it's not boobie trapped, right?

15 A   Right.

16 Q   Once you have done that, you said you power it off?

17 A   That is correct.

18 Q   And then does part of that involve disconnecting it?

19 A   Yes.  We will disconnect the power supply.  Most of the

20 time we only need to take the box with us because we have

21 monitors, keyboards, mice.  There's no need for us to take

22 those items.

23 Q   So you're talking about the physical box of the computer?

24 A   That is correct.

25 Q   And what about other electronic devices, cellular

1   telephones and that kind of thing?  What is your process for

2   making sure that you preserve whatever data is on those

3   devices before seizing them?

4   A    If a cellular telephone is on, we will see if it's PIN

5   locked, pattern locked, see if we're able to obtain the

6   password from the individual who owns the phone.

7          If they provide it to us, we will put it in and then

8   we will undo the security.

9          We will then power the phone down once we have the

10  pass code.

11         If we are not given the pass code, we will put the

12  phone into airplane mode that it cannot dial out or receive

13  any phone calls.

14  Q    Can you explain very quickly what "airplane mode" means

15  for a phone in case folks on the jury don't know that

16  particular term.

17         THE COURT:  I thought all it meant was that's what

18  you had to do when you were on an airplane.

19         MR. KOEHLER:  Correct.

20         THE WITNESS:  That's right.  So it doesn't receive or

21  pass the signal out from the cell.

22  BY MR. KOEHLER:

23  Q    Do you turn the radios off on the phone?

24  A    You do.

25  Q    Okay.  And then what do you do after that?

1  A   We -- if we seize the phone, then we, in turn, turn it

2  over to the seizing agent.

3  Q   And does that get put into evidence at that point?

4  A   Yes.  Well, it will be transported back to the evidence

5  room and then placed into evidence.

6  Q   If a phone is locked and you don't get the password, do

7  you have remedies for that?

8  A   We do.  There's software that we can use.  If that

9  software doesn't work, then we would have to send it back to

10  the lab at Quantico and they either have a tool sweep that

11  they use that we are not able to use in the field or they can

12  open up the phone and take the memory off of the chips.

13  Q   What is the name of the lab in DC or Quantico to which you

14  send it?

15  A   We send it to the cryptology -- CEAU is the abbreviation.

16  It is in the Bureau or lab abbreviations and I can't remember

17  the whole name of it.

18  Q   Is it a Cryptographic Unit?

19  A   Yes, it is.

20  Q   Okay.  Once you've gotten to this point and you're going

21  to examine the phone or the computer, what is your next step?

22  You go get it from evidence?

23  A   That is correct.

24  Q   Okay.  And what do you do once you have retrieved it from

25  evidence in order to get the data that's on the device?

1    A    If we are using a computer as an example, we'll pull the

2    computer out of evidence.  We will then remove the hard drive

3    from the computer.  And then we will attach the hard drive to

4    a write blocker, a forensic write blocker, so that we cannot

5    write any data to the original evidence.

6         We'll attach the forensic write blocker to our exam

7    machine and then, in turn, we'll open up an application that

8    we use to image which is going to make a bit-for-bit copy of

9    the hard drive.  It will be like a photocopy of all the data

10   that's on the hard drive.

11        It's a copy that we use on -- excuse me -- a tool

12   called FTK, Forensic Tool Kit Imager.  And we make a

13   bit-for-bit copy of the hard drive.

14   Q    And when you say "bit-for-bit copy," are you talking about

15   a binary copy?

16   A    Yes.  The zeros and the ones.

17   Q    And so it records each zero and one in the exact same

18   order that it is on the drive?

19   A    On the original drive, correct.

20   Q    Is there a program or an algorithm that you can use to

21   verify that the bit-for-bit copy that you take from the hard

22   drive is identical to what is on the hard drive itself?

23   A    FTK Imager will do a verification of the drive at the

24   beginning; create what we call an MD5 hash, which is like an

25   electronic fingerprint, and then once that's done, it will

1    also perform another MD5 hash.

2           And if those match, then you know you have an exact

3    duplicate of the hard drive.

4    Q   And is it able to do the same thing to verify the

5    duplicated data after that data has been analyzed to make sure

6    that it has not been tampered with later?

7    A   Yes.

8    Q   So you have walked us through the creation of the binary

9    image of the computer.

10          Let's talk about what you do to create an image of a

11   cellular telephone or another electronic device.

12   A   A cellular telephone, we use a product called UFED -- or

13   Cellebrite, excuse me -- UFED 4, the number 4, PC.  It's an

14   application that runs on a laptop.  And then we attach the

15   phone to the laptop.  Yes.

16   Q   I want to pause you for a moment for the court reporter.

17          Could you please spell "Cellebrite"?

18   A   Cellebrite is C-E-L-L-E-B-R-I-T-E.

19   Q   And then UFED, is that an acronym?  U-F-E-D?

20   A   Correct.

21   Q   And then you said 4 PC.  Is it the number 4?

22   A   The number 4 PC.

23   Q   Okay.  Continue please.

24   A   So we'll attach it to the laptop running the software and

25   we'll then download the information off it.

1           We can do three types of extractions.  You can do a

2    logical extraction which would just be the logical files on

3    the phone.  You can do a file system extraction which would go

4    through and get all the file information that's going to be

5    off of the RAM of the memory chips that are on the phone.  Or

6    we can do a physical which would go bit-for-bit on the phone,

7    so it's getting all of the information off the phone, whether

8    it's a deleted file, an active file.  It's getting all of that

9    information.

10   Q    So to be clear, you mentioned "logical extraction" before.

11   Is this the same thing where it only recovers active files

12   that have not been deleted; is that correct?

13   A    That is correct.

14   Q    Okay.  And you used the term "specialized devices" to

15   refer to various types of cellular phones; Smartphone and so

16   forth?

17   A    Correct.

18   Q    And you use that program that you just talked about,

19   Cellebrite or other similar programs, to process all of those

20   types of items?

21   A    Yes.

22   Q    All right.  So now you have made this image from the

23   computer, right?

24   A    Correct.

25   Q    What happens next with -- let's talk specifically about

1   computers first.

2   A   Once the image is made of the computer, we will open up an

3   application we call AD Lab which is Access Data Lab.

4        We process it in AD Lab.  What AD Lab does is it goes

5   through and characterized -- it pulls out all of the

6   information that's stored on the hard drive and puts it into

7   tabs.  So if you wanted to focus on the pictures, there's a

8   graphics tab.  And you click on the graphics tab and there's

9   all the pictures that are stored on that computer; documents,

10  e-mails, spreadsheets.  E-mails are broken down into dates,

11  times, things of that nature.

12  Q   Does AD Lab do anything to change the data in any way?

13  A   It does not write to the data.

14  Q   What does it do with the data in order to generate this

15  list of categorized files that you talked about?

16  A   It interprets the zeros and ones based on the footers or

17  the extensions of the files.

18  Q   When you say "extensions," are you talking about the file

19  name extensions like ".wav" and so on?

20  A   Correct.  .pdf.  That's an extension.

21  Q   And .jpg for .jpg photos?

22  A   Correct.

23  Q   Does AD Lab also interpret the data for unused space on

24  the computer for deleted files and other types of data on the

25  computer?

1   A   If it's able to recover a deleted file, it will.

2   Sometimes it's only able to recover a fragment of the file and

3   it will attempt to recover that as well.

4   Q   Can it recover the names of files that have been deleted

5   even if it can't recover the data from the files themselves?

6   A   Yes.

7   Q   What about things like search histories, cookies, and

8   other things like that on the computer?

9   A   It will recover that if it's able to.  It's all being

10  tracked on your computer through your web browser.  So AD Lab

11  will go through and provide a nice, clean representation of

12  all your cookies, your history file.

13  Q   Does it organize that data in some way?

14  A   It does.  It puts it into a nice database.

15  Q   Does that include things like the autofill when you're

16  doing a form?  Let's say you have applied for something and

17  you're filling out a form on the computer.  If it's an

18  autofill-type form, will that information also be stored in a

19  browser?

20  A   It could be stored in the browser, yes.

21  Q   And if it is, can AD Lab recover that?

22  A   Yes.

23  Q   What about things like search strings?

24  A   If you conduct a search string, it will -- a search string

25  will be if you put in certain words that you are looking for.

1          AD Lab, once we index the hard drive -- indexing is

2     where we take and it goes through and identifies every file by

3     name that's on the computer.  So everything that starts with

4     the letter "A," everything that starts with the letter "B,"

5     and then goes from there.

6          So when you do a string search, you type in the word

7     "dog," it's going to pull up every reference to the word "dog"

8     on the computer.

9     Q    So once you have processed this data using AD Lab and

10    generated this list of files, deleted information, search

11    histories, and so on that you have described, what do you do

12    with that data?

13    A    The data is then put into what we call "CAIR," which is

14    Case Agent Investigative Review -- Case Agent Investigative

15    Review, yes, sorry.

16          And that's a virtual machine that the case agents can

17    then sit at their desk or anybody on their squad can then go

18    and start looking at the data to help forward their

19    investigation.

20    Q    You mentioned you called it a "virtual machine."  Can you

21    explain what you mean by that.

22    A    All of our data is stored on a server that resides in the

23    lab that I work in.  Where the case agents, they sit on other

24    floors, so they are able to log into our server via a virtual

25    machine.

1              A virtual machine will not allow them to write -- the

2    way we have it set up, they cannot write to any of the data.

3    They can only review the data.

4    Q    So in other words, can an agent in any way from their

5    workstation alter the data that has been derived from the

6    computer?

7    A    All the files, they only have read-access to.

8    Q    And does that mean they cannot change the data?

9    A    That is correct.

10   Q    When an agent goes through this data, if they want to flag

11   something, how do they do that?

12   A    They can label it or they can bookmark it.

13   Q    Once they have gone through and bookmarked things of

14   interest, what happens next?

15   A    Once we're told that they're done bookmarking the files of

16   interest, we will create the final report based on the

17   bookmarks.

18              It will go -- we will go through and clean up the

19   bookmarks and make sure they look presentable.

20   Q    Okay.  And do you eliminate duplicates, for instance, and

21   so on?

22   A    We eliminate duplicates.  Sometimes words are misspelled

23   in the titles.  Capitalization is -- something is lower case

24   where a capital should be, so I will change that.

25   Q    Does your cleaning up of the bookmarks in any way affect

1   what they have selected?

2   A   No.

3   Q   Does it in any way affect the data?

4   A   No.

5   Q   Once you create a final report, what happens next?

6   A   The final report is passed on -- we put it onto a piece of

7   media; CD, DVD, or blue ray disk, depending on the size.  And

8   then we archive all the remaining data which would be the

9   image sets, the AD Lab working files.

10          The actual case, we'll put onto a hard drive and then

11   that hard drive is stored in evidence.

12   Q   When you store the hard drive in evidence, does there come

13   a time when you would get rid of that or destroy it?

14   A   If the case is closed and the case agent deems that the

15   evidence is no longer necessary, then it will be destroyed.

16   Q   Is it otherwise maintained?

17   A   Yes.  It's in evidence.

18   Q   And what's the purpose for that?

19   A   In case it needs to be used again.

20   Q   Prior to the destruction of the data, do you run that hash

21   test to, again, check the integrity of the data?

22   A   Prior to closing out the lead and copying all the imaged

23   sets over to the hard drive, we will run an MD 5 hash against

24   the original image.  That's to make sure nothing has changed.

25   Q   When an agent wants -- or an intelligence analyst wants an

1   item from the data set exported in order to create an exhibit

2   or otherwise examine that item, who does the exporting,

3   generally speaking?

4   A   We will do that for them.

5   Q   All right.  Let's go now back to the specialized devices.

6         When you have run Cellebrite UFED 4 PC and gotten the

7   image of that device, what do you do with that image?

8   A   That image is then put into another product from

9   Cellebrite called Cellebrite Physical Analyzer which processes

10   the file that's created by the 4 PC device -- image, or sorry,

11   software.

12         And then that, in turn, puts it into categories as

13   well.  So all of your pictures, all of your text messages, all

14   of your video files, it will break down the text messages

15   between individuals, put it into, you know, historical

16   perspective for you.

17   Q   So when you say "break it down by individuals," are you

18   talking about organizing it by the phone number with which the

19   text communication was occurring?

20   A   That is correct.

21   Q   And does it also organize call logs?

22   A   It does.

23   Q   What about applications on the phone?

24   A   If it's able to get the applications, it will download the

25   applications as well.

1    Q    And the application data?

2    A    And the application data as well.

3    Q    Can you explain to the jury some of the types of things

4    that might be found in application data in a cell phone or

5    Smartphone?

6    A    Some of the things that could be found are, you know, text

7    documents.

8            On your Smartphone most of us have now, we have our

9    web browsers.  We do our e-mail on it.  We do our banking on

10   it.  So all of that information is being stored on your phone

11   and we are able to retrieve that information.

12   Q    If you are not able to retrieve that information but you

13   can otherwise see it in the phone by manipulating the phone,

14   do you use a program or some other device to make a record of

15   what else you find on the phones?

16   A    We use a program called ZRT.

17   Q    And do you know what that's an acronym for?

18   A    Zippy Reporting Tool.

19   Q    And can you explain to the jury what that tool is.

20   A    It takes a digital photograph of the screen and assigns an

21   MD 5 hash to that picture.  So you just scroll through, take a

22   picture, and move on, and it creates a report of all the

23   pictures you have taken and puts it into a nice report for

24   you.

25   Q    All right.  So we're going to skip past the Zippy

1   Recording Tool at this point and go back to the end product

2   from the Cellebrite Physical Analyzer.

3            How does it output that data so that one of the

4   agents or the intelligence analysts can go through the data

5   that you have recovered from the phone?

6   A   We will save it in two formats.  We'll save it as an HTML,

7   so when you open it up, it's like surfing the Internet; click

8   on the links, go to the pictures and move forward, or we'll

9   also save it as an Excel spreadsheet.

10           And we do that for several reasons.  One, if they're

11  going to take the phone numbers, they can sort on the columns;

12  or they can import the information that's in the Excel

13  spreadsheet into a different database if they had to.

14  Q   May I have just one moment, Your Honor?

15           You mentioned earlier recovering deleted files from

16  the computer.  If files have been deleted before you come

17  across the computer, are you in a position to recover files if

18  the data is still somehow present on the drive?

19  A   Sometimes we are able to recover data.  It depends on the

20  size of the hard drive and how much activity has taken place

21  on that hard drive.

22  Q   And can you explain how data from deleted files would

23  remain on a hard drive?

24  A   When a file is deleted, when you hit "delete," all you're

25  doing is telling the operating system that this space is

1    available if you need it.

2           The file actually still exists.  It's just at the

3    beginning of the name.  It just removes the first letter and

4    puts a character there and lets the system know that, okay,

5    this is a deleted file.  If I need to come back to this area

6    for some reason, I can put data at that location.

7           Smaller drives and a lot of activity, it would be

8    harder to recover versus drives now adays where we are up in

9    the terabytes in size.  Odds are, you are not going to come

10   back around to where your deleted file is and overwrite that

11   unless you're doing a lot of activity and moving files and

12   things of that nature.

13          THE COURT:  So if you have a lot of memory on your

14   computer and not a lot of data on your computer, all your

15   deleted files are all still there?

16          THE WITNESS:  That is correct.

17          MR. KOEHLER:  All right.  We are done with the

18   subject of recovering data for the moment.

19          THE COURT:  For the moment?  Not forever?

20   BY MR. KOEHLER:

21   Q   All right.  Were you part of a search warrant execution

22   team in July of 2012 on July 20th of 2012?

23   A   Yes, I was.

24   Q   Was that at the home of a person by the name of Abu Bakr

25   Ahmed?

1    A   As far as I can recall, yes.

2    Q   During the course of the execution of that search warrant,

3    did you recover electronic devices?

4    A   Yes.

5           MR. KOEHLER:  If I may approach the witness with

6    Exhibit 161?

7           THE COURT:  You may.

8    BY MR. KOEHLER:

9    Q   Agent Meshinsky, do you recognize that device?

10   A   That's a laptop that we -- that was seized at that

11   location.

12   Q   Were you the person who seized that device?

13   A   I am.

14   Q   Can you read off the serial number of that device and tell

15   us the make and model number?

16   A   Maybe.  No, on the serial number.  I can't read that

17   small.  If I can borrow your glasses?

18          What's a Lenovo is the laptop.  The model name is --

19   or it's actually a number.  0768.

20          And the serial number I cannot read.

21   Q   Okay.  We'll save that for later.  Maybe we'll put it on

22   the document camera at some point.

23          All right.  When you seized that Lenovo, do you

24   recall the act of seizing it?

25   A   I do.

```
 1   Q    Okay.  I'm going to place before you what's been marked as
 2   Exhibit No. 392 on the document camera.
 3             Do you recognize that image?
 4   A    Yes.
 5   Q    Can you tell us what that is?
 6   A    That is the computer that was on when we made entry on the
 7   day of the search warrant.
 8   Q    Does that photograph fairly and accurately depict the
 9   Lenovo at that time?
10   A    Yes.
11             MR. KOEHLER:  Move to admit Exhibit 392.
12             THE COURT:  Is there any objection?
13             MS. PLOMIN:  No objection, Your Honor.
14             THE COURT:  392 is admitted.
15        (Exhibit No. 392 admitted in evidence.)
16   BY MR. KOEHLER:
17   Q    Looking at the photograph of the computer there, do you
18   recognize devices that are inserted into the side ports on the
19   computer?
20   A    There are three devices.  There's a Magic Jack on the left
21   side of the computer.  It's used for phone calls.
22   Q    Could you put -- you've got a touch screen in front of
23   you.  Can you touch it right where the Magic Jack is?
24   A    Right there (indicating.)  Do you want me to circle it?
25   Q    Sure.
```

1    A    Magic Jack.

2            Then on this side, this white cable here leads to the

3    printer.  That was attached -- it's sitting on top of.  And

4    then a flash drive or thumb drive in the other USB port.

5    Q    That flash drive, do you recall the brand of that?

6    A    I do not.

7    Q    Did you seize that along with the computer?

8    A    Yes.

9    Q    Did you later on have the occasion to image both of these

10   devices?

11   A    Yes.

12   Q    And how did you go about that process?  The same as what

13   we described before?

14   A    Yes.

15   Q    Were you able to recognize them from evidence from having

16   seized them at the time that you took them in and extracted

17   the images from them?

18   A    Yes.

19   Q    Now, directing your attention to that flash drive, the

20   thumb drive, when you extracted the image from that, did you

21   store that image as we described earlier?

22   A    Yes, we did.

23   Q    And did agents later come back to you to review that

24   particular image of the thumb drive?

25   A    Yes.

1   Q    Were you asked to export files from that thumb drive?

2   A    Yes.

3   Q    Was one of the files that you exported from the thumb

4   drive called "S&I.pdf"?

5   A    Yes.

6   Q    I'm going to place for you on the document camera what's

7   been marked, for identification, as Exhibit 173.

8        I'm just going to show the cover page for now.  Do

9   you recognize that?

10  A    I do.

11  Q    What is that?

12  A    That's the cover page of the document that you just

13  described and was located on the thumb drive.

14  Q    So is this document -- have you reviewed this before

15  coming to court today?

16  A    I reviewed it this morning.

17  Q    And is this document a true and accurate copy of the .pdf.

18  "S&I.pdf" that you recovered from that thumb drive?

19  A    Yes.

20        MR. KOEHLER:  Move to admit 173.

21        THE COURT:  Any objection?

22        MS. PLOMIN:  No objection.

23        THE COURT:  173 is admitted.

24     (Exhibit No. 173 admitted in evidence.)

25  BY MR. KOEHLER:

```
1    Q    174 and 175 are media files.

2              Did you recover information about media files on the

3    thumb drive?

4    A    There was several video files that were on the thumb drive

5    but they had been deleted so we could not play them.

6    Q    Were you able to recover those in any way?

7    A    No.

8    Q    Do you recall the name of the first media drive that

9    begins with the word "training"?

10   A    I don't recall the names, no.

11   Q    Was one of the files you recovered named "Training That

12   Makes Killing Civilians Acceptable 1 of 2"?

13   A    I believe so.

14   Q    Was another one "Training That Makes Killing Civilians

15   Acceptable 2 of 2"?

16   A    I believe so.

17             THE COURT:  So you couldn't recover the video?

18             THE WITNESS:   Correct.

19             THE COURT:  But you recovered a title?

20             THE WITNESS:   Right.  We were able to recover the

21   title but not the video.  The actual video we couldn't

22   recover.

23   BY MR. KOEHLER:

24   Q    Now, I'm going to direct your attention to Exhibit 176.

25   Was one of the files that you recovered called "A Treatise on
```

```
 1    the Legal Status of Using Weapons of Mass Destruction Against

 2    Infidels"?

 3    A    Yes.

 4    Q    And have you reviewed that before coming to court this

 5    morning?

 6    A    This morning I saw the cover.

 7    Q    And do you recognize Exhibit 176?

 8    A    Yes.

 9    Q    Is that document a true and correct copy of the document

10    that you recovered from the flash drive bearing the same name?

11    A    Yes.

12           MR. KOEHLER:  Move to admit 176.

13           MS. PLOMIN:  No objection.

14           THE COURT:  176 is admitted.

15       (Exhibit No. 176 admitted in evidence.)

16    BY MR. KOEHLER:

17    Q    Now, directing your attention to Exhibit 177, do you

18    recognize that item?

19    A    Yes.

20    Q    Did you extract a file by the name of "To Make It Known To

21    The People and Not To Hide It" from the thumb drive?

22    A    Yes.

23    Q    Do you recognize that in comparison?

24    A    Yes.

25    Q    Is it a true and correct copy of that .pdf?
```

```
 1    A    Yes.
 2              MR. KOEHLER:  Move to admit 177.
 3              MS. PLOMIN:   no objection.
 4              THE COURT:  177 is admitted.
 5         (Exhibit No. 177 admitted in evidence.)
 6    BY MR. KOEHLER:
 7    Q    Was there another media file on the computer that went by
 8    the title "The Hatred of the Kuffar.mp4"?
 9    A    Yes.
10    Q    Were you able to recover that media file?
11    A    No, we were not.
12    Q    I'm sorry?
13    A    We were not.
14    Q    Now, going on to No. 180 -- or excuse me -- 179.
15              Was there a file .pdf called Targeting Dar al-Harb
16    Populations"?
17    A    Yes.
18    Q    And was that Inspire Magazine Issue No. 8?
19    A    Yes.
20    Q    The file that's on the document camera before you, do you
21    recognize that?
22    A    Yes.
23    Q    Is that a true and correct copy of Inspire Magazine Issue
24    No. 8 that you recovered off of the flash drive?
25    A    Yes.
```

1            MR. KOEHLER:  Move to admit 179.

2            MS. PLOMIN:  No objection.

3            THE COURT:  179 is admitted.

4        (Exhibit No. 179 admitted in evidence.)

5    BY MR. KOEHLER:

6    Q   Did you also recover a .pdf copy of Inspire Magazine Issue

7    No. 9 off of the computer?

8    A   Off the thumb drive, yes.

9    Q   Yes.  Off the thumb drive.  Thank you.

10           And directing your attention to the screen with the

11   document camera, do you recognize that?

12   A   Yes.

13   Q   Is that a true and correct copy of the Inspire Magazine

14   Issue 9 that you recovered from the thumb drive?

15   A   Yes.

16           MR. KOEHLER:  Move to admit 180.

17           MS. PLOMIN:  No objection.

18           THE COURT:  180 is admitted.

19       (Exhibit No. 180 admitted in evidence.)

20   BY MR. KOEHLER:

21   Q   Directing your attention to Exhibit 181.  Did you recover

22   a file, a .pdf file, from the thumb drive titled "The Ruling

23   on Dispossessing The Disbelievers Wealth In Dar al-Harb"?

24   A   Yes.

25   Q   And in looking at that document, is that a true and

1    correct copy of the same document that you recovered from the

2    thumb drive?

3    A    Yes.

4              MR. KOEHLER:  Move to admit 181.

5              MS. PLOMIN:  No objection.

6              THE COURT:  181 is admitted.

7         (Exhibit No. 181 admitted in evidence.)

8    BY MR. KOEHLER:

9    Q    Moving on to 182, did you recover a document, a .pdf, from

10   the thumb drive titled "The Slicing Sword"?

11   A    Yes.

12   Q    And looking at the document camera in front of you, do you

13   recognize that?

14   A    Yes.

15   Q    Is that a true and correct copy of the .pdf "Slicing

16   Sword" that you recovered from the thumb drive?

17   A    Yes.

18              MR. KOEHLER:  Move to admit 182.

19              MS. PLOMIN:  No objection.

20              THE COURT:  182 is admitted.

21        (Exhibit No. 182 admitted in evidence.)

22   BY MR. KOEHLER:

23   Q    Did you also recover a file titled "The Ruling on Leaving

24   the Battle -- Leaving for Battle and the Precondition of

25   Takfir"?

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

1   A   Yes.

2   Q   And directing your attention to Exhibit 183, do you

3   recognize that?

4   A   I do.

5   Q   Is that a true and correct copy of that file?

6   A   Yes.

7          MR. KOEHLER:  Move to admit 183.

8          MS. PLOMIN:  No objection.

9          THE COURT:  183 is admitted.

10      (Exhibit No. 183 admitted in evidence.)

11          THE COURT:  Mr. Koehler, we're going to take our

12   afternoon break at this time.

13          MR. KOEHLER:  Perfect timing.

14          THE COURT:  Ladies and gentlemen --

15          I was watching the stack, as soon as I saw you were

16   at the last one.

17          Ladies and gentlemen, we will recess for 15 minutes

18   until approximately five after 3:00.

19          You are reminded again of the admonition not to

20   discuss the case among yourselves or with anyone else.

21          Please do not form any conclusions about the case

22   until you have heard all the evidence and begun your

23   deliberations.

24          Court is in recess for 15 minutes.

25      (Recess taken at 2:46 p.m.)

1          (Open court, no jury present at 2:55 p.m.)

2               THE COURT:  Thank you.  Please sit down.  The record

3     will show the presence of counsel and the defendant.

4               Mr. Koehler?

5               MR. KOEHLER:  Thank you, Your Honor.

6               Last evening, probably about six o'clock or so, we

7     were made aware through the case agent that he had received a

8     call from a person by the name of Ruth Ortiz.

9               Ms. Ortiz is the mother of two of our juvenile

10    witnesses in the case.  She called and was extraordinarily

11    upset because ABC 15 reporters came to her house to ask her

12    how she felt about the defendant's alleged radicalization of

13    her two sons.

14              Needless to say, that was not a pleasant thing to

15    find out.  It creates the potential for witnesses to be

16    intimidated and scared from testifying having reporters show

17    up at their doorsteps, especially when we're dealing with

18    juveniles.  And we're obviously very concerned with the

19    conduct of the press in the case.

20              And I know we can't tell them what to do --

21              THE COURT:  Well, please don't say "the press."  Say

22    "ABC 15 reporters."

23              MR. KOEHLER:  Yes.  I understand.

24              THE COURT:  Were they there with a camera crew?

25              MR. KOEHLER:  I do not know that specific detail.

1        THE COURT:  Did she get the names of the reporters

2   who showed up?

3        MR. KOEHLER:  She did not, apparently, so I don't

4   know the full details, but we did learn that it was ABC 15

5   News.

6        THE COURT:  And what would you like me to do?

7        MR. KOEHLER:  I think it wouldn't hurt to remind the

8   press that this is a very sensitive case and that talking to

9   juvenile witnesses or attempting to talk to juvenile

10  witnesses, especially, is a very intimidating thing.

11       THE COURT:  Well, here's the thing.  You said "the

12  press" again and I don't know that, you know, at the moment

13  there's nobody to talk to.

14       MR. KOEHLER:  Yes.  I'm aware.

15       THE COURT:  And the individuals who have created the

16  problem for Ms. Ortiz are not here.

17       I don't know that admonishing people who haven't done

18  anything improper is appropriate.  But if there were some

19  other action that you wanted me to take that was specific to

20  Channel 15 News, I would certainly entertain that.

21       But I don't really see that it would be effective to

22  tell other people who haven't done anything inappropriate --

23       MR. KOEHLER:  Agreed.  Agreed.  It's more in the

24  notion of alerting folks that this is an issue and hoping that

25  no one else crosses that line, and certainly that ABC 15

 1    doesn't repeat that.

 2           THE COURT:  Or, I mean, you might also want to

 3    consider whether you would like to have someone from your

 4    office who deals with the press -- because I'm sure you have a

 5    public information officer -- they probably have contacts with

 6    individuals at all of the media outlets.

 7           And perhaps the appropriate thing would be for that

 8    person to raise the concern with the individuals who made the

 9    contact and emphasize that we're not talking about regular

10    ordinary witnesses.  We're talking about juveniles and, you

11    know, problems that could ensue if they were somehow

12    intimidated from testifying.

13           MR. KOEHLER:  That process is underway as well, Your

14    Honor, but I did want to advise the Court.

15           My office asked us to make sure that you were alerted

16    to this fact and aware of it.

17           THE COURT:  Okay.

18           MR. KOEHLER:  So that if it were to come up

19    somehow --

20           THE COURT:  Okay.  So at the present time you're not

21    asking that I do anything?

22           MR. KOEHLER:  Right.  We're not asking to have the

23    courtroom closed or anything along those lines, but should

24    this issue arise again, we wanted to alert the Court to it in

25    the first instance.

```
 1              THE COURT:  I appreciate it.  Thank you.  Ms. Brook?

 2              MS. BROOK:  Oh, I'm sorry.

 3              Just before you got off the bench we had one

 4    additional issue unrelated, which is that Matthew Reinsmoen is

 5    an FBI agent who is going to be testifying this afternoon, a

 6    very brief witness, for about ten minutes.

 7              It appears that his name was left off the witness

 8    list.  We had anticipated June Drake, another individual who

 9    was with him, an FBI agent, to be testifying.  She is out of

10    the country and unavailable.

11              So I know that the jury hasn't been asked:

12              Do you know Matthew Reinsmoen?

13              It's not an ideal circumstance and we apologize for

14    it, but he is a very brief witness today.

15              THE COURT:  They haven't known anybody else from the

16    FBI, so the likelihood is remote, so we can just verify that

17    when he testifies.

18              I take it, though, that he is someone who has been

19    disclosed to the defense?

20              MR. MAYNARD:  Yes.

21              MS. BROOK:  Yes.  He has.

22              THE COURT:  All right.  I think we have about five

23    more minutes before the jury comes in.

24              Okay.  I will just stay here.  Maureen will go check

25    and see if they are ready.
```

```
 1        (Open court, jury present at 3:06 p.m.)
 2             THE COURT:  Thank you, ladies and gentlemen.  Please
 3   sit down.  The record will show the presence of the jury,
 4   counsel, and the defendant.
 5             Mr. Koehler, you may continue your questions.
 6             MR. KOEHLER:  Your Honor, subject to our earlier
 7   discussion about recalling Agent Meshinsky for other purposes,
 8   I have no further questions of him regarding these devices.
 9             THE COURT:  Thank you.
10             Ms. Plomin?
11             MS. PLOMIN:  Thank you.
12                         CROSS EXAMINATION
13   BY MS. PLOMIN:
14   Q    Good afternoon, Agent.
15   A    Good afternoon.
16   Q    Now, Agent, you recovered the Lenovo laptop, Government's
17   Exhibits 61 from 2419 Vista Avenue; is that correct?
18   A    That is correct.
19   Q    And you recovered several other electronic devices from
20   that house, correct?
21   A    Correct.
22   Q    How many computers did you recover from the house?
23   A    I don't recall how many at the time.
24   Q    Would "five" sound accurate to you?
25   A    It could.
```

```
 1   Q    Did you prepare a 302 regarding the collection of these

 2   devices?

 3   A    I should have prepared a 302, yes.

 4   Q    Would it refresh your recollection to look at that 302?

 5   A    Yes.

 6        THE COURT:  You were right the first time.

 7        MS. PLOMIN:  Thank you.

 8   BY MS. PLOMIN:

 9   Q    Can you please review it to refresh your recollection.

10   A    Okay.

11   Q    And was "five" correct?

12   A    Yes.

13   Q    And you recovered two devices from room H; is that

14   correct?

15   A    That is correct.

16   Q    And room H is the room where the Lenovo was recovered,

17   correct?

18   A    Correct.

19   Q    And this second computer, what kind of computer was found

20   in room H aside from the Lenovo?

21   A    Actually, the -- it was a thumb drive, 2 gig thumb drive.

22   Q    I want to direct your attention to paragraph 5.

23   A    Okay.

24   Q    Was there a second laptop found in the -- in room H?

25   A    Yes.  There's two -- two room H -- or excuse me.  Two
```

1    laptops were found in room H, yes.

2    Q   All right.  And the second laptop, can you describe that.

3    A   Based on this, it's an HP dv5 laptop.

4    Q   And I just want to be clear.

5          When you were discussing the Government's Exhibit 174

6    through 183, you located all of those on the flash drive, not

7    on the Lenovo computer?

8    A   That is correct.

9    Q   And were you able to determine when you were reviewing the

10   flash drive the user who created the documents that were on

11   the flash drive?

12   A   No.

13   Q   Were you able to determine where those documents came from

14   in terms of what electronic device that they came from?

15   A   No.

16   Q   And if the documents on the flash drive did come from the

17   Lenovo laptop, would you expect to see those same documents

18   somewhere on the Lenovo laptop?

19   A   There would be a reference to it.  The document may reside

20   on the laptop, but there could also be a pointer or a

21   reference.

22   Q   And are you aware of any references or pointers to the

23   documents that were found on the flash drive that were found

24   on the Lenovo?

25   A   I'm not aware of any right now.

```
 1   Q   All right.  Did you have an occasion to analyze the actual
 2   Lenovo laptop?
 3   A   EMH did, put it into CAIR, and it was reviewed by somebody
 4   else, a case agent.
 5   Q   And who was it reviewed by?
 6   A   I don't recall when it was reviewed in 2012.
 7   Q   Did anybody look to see if there were any pointers or
 8   indicators of the documents that were found on the flash
 9   drive, if there were any of those found on the Lenovo laptop?
10   A   I can't answer that question.
11   Q   I would like to direct your attention to Government
12   Exhibit No. 392.  It's been admitted into evidence.
13            Do you have 392?
14            THE COURT:  Do we not have all of the exhibits, Mr.
15   Koehler?
16            MR. KOEHLER:  This was given to the defense, Your
17   Honor, yes.
18            THE COURT:  I'm not talking about the defense.
19            I'm talking about me.  Not -- and I'm not talking
20   about my copy.  I'm talking about the official exhibits.
21            From my understanding, you have been showing exhibits
22   and offering them in evidence and I have been admitting them,
23   and yet we have not been provided with the original exhibit.
24            MR. KOEHLER:  We have the original marked and
25   intended to come up during the break to put those in and give
```

1    those to the clerk and we will do that at the break.

2              THE COURT:  So before you leave today, all of the

3    exhibits have to be in the custody of the courtroom deputy.

4              MR. KOEHLER:  We will do that.

5              THE COURT:  Thank you.

6              So we would love to hand it to the witness, but we

7    don't have it, Ms. Plomin.

8              So since it's admitted, you can put it on the

9    document camera and we'll look at it from there.

10             MS. PLOMIN:  Thank you.

11             I'm not sure that you can see that.

12   BY MS. PLOMIN:

13   Q   So on Exhibit 392, is this the way the Lenovo looked to

14   you when you first recovered it?

15   A   Yes.

16   Q   And it was powered on?

17   A   Correct.

18   Q   And this was the screen that was on the Lenovo when you

19   entered the room to take the computer?

20   A   Correct.

21   Q   All right.  And it's difficult to see, but looking in the

22   top left-hand corner where there's an address and a name, can

23   you see what that name says?

24   A   I cannot make that name out.  Park?

25   Q   The second line down.

1          The target of the search warrant, are you aware, was

2    Abu Bakr Ahmed?

3    A    Yes.

4    Q    And do you see Abu Bakr Ahmed's name on the second line on

5    the top left-hand corner of the document?

6    A    Yes.

7    Q    And you didn't analyze the Lenovo laptop for additional

8    users other than Mr. Abdul Kareem, did you?

9    A    I didn't analyze the computer.  We put it into CAIR and

10   then it was analyzed by a case agent.

11   Q    All right.  And just going back to the flash drive, there

12   is absolutely no way to tell who loaded those documents onto

13   the flash drive?

14   A    That's correct.

15          MS. PLOMIN:  I don't have any further questions, Your

16   Honor.

17          THE COURT:  Thank you.

18          Any redirect at this time, Mr. Koehler?

19          MR. KOEHLER:  No redirect, Your Honor.  Thank you.

20          THE COURT:  Thank you, Agent Meshinsky.  You may step

21   down and you are subject to recall later in the trial.

22          The government may call its next witness.

23          MS. BROOK:  Thank you, Your Honor.  The government

24   calls Special Agent Jason Saitta.

25          And, Your Honor, may I approach for just a moment?

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1              THE COURT:  Sir, you can step forward?
 2         (Witness duly sworn)
 3              THE CLERK:  Please state your name for the record and
 4    spell your last name.
 5              THE WITNESS:  It's Jason Saitta.  Last name is
 6    S-A-I-T-T-A.
 7              MS. BROOK:  One moment.  I apologize.
 8              I'm sorry, Your Honor.  One second.
 9              Exhibit No. 204 is a diagram we're looking for which
10    apparently doesn't appear to be in this book.
11              THE COURT:  Did you say 204?
12              MS. BROOK:  204.  It's a scene diagram.
13              THE COURT:  Well, my 204 says "Book:  Milestones."
14              Could that be the problem?
15              MS. BROOK:  That could be.
16              I found it.  It's actually 203.
17              SPECIAL AGENT JASON SAITTA, WITNESS, SWORN
18                        DIRECT EXAMINATION
19    Q    Good afternoon.
20    A    Good afternoon.
21    Q    Would you please introduce yourself to the ladies and
22    gentlemen of the jury.
23    A    Yeah.  My name is Jason Saitta and I'm a special agent
24    with the Federal Bureau of Investigation.
25    Q    How long have you been a special agent with the FBI?
```

CR15-00707-PHX-SRB  JURY TRIAL - DAY #3  2-18-16

1  A   Approximately, 20 months.

2  Q   And were you a special agent with the FBI then back on

3  June 10th of 2015?

4  A   Yes, I was.

5  Q   And on that day in particular, were you called to be part

6  of a scene detail or scene crew at 1385 North 19th Avenue?

7  A   Yes, I was.

8  Q   What was your assignment that day?

9  A   So I was there as part of the Evidence Response Team and I

10  was assigned to be the crime scene or the scene sketcher and

11  then I was also a searcher.

12  Q   As the scene sketcher can you describe for us what you do?

13  A   It's a -- it's a not-to-scale drawing of the layout of the

14  scene.  In this case it was a one-bedroom apartment.  And it's

15  basically to compliment or supplement the photographs that are

16  taken.

17        And so it's going to show where individual items were

18  found, just kind of the layout of whatever the space is.  So

19  various rooms and, you know, other furniture if it applies.

20  Q   Did you go to Quantico before you became assigned as an

21  FBI agent?

22  A   Yes, I did.

23  Q   And at your time at Quantico, do they teach you how to

24  draw diagrams?

25  A   They do.  And then also as part of the Evidence Response

```
1    Team there's an 80-hour course that covers that as well.

2    Q   Before we turn our attention directly to the diagram

3    itself, I want to take a moment.  That day were you looking at

4    apartment No. 219?

5    A   Yes.

6    Q   And were you doing that as part of a search warrant

7    execution?

8    A   That's correct.

9    Q   Can you describe that for us.

10            THE COURT:  From the outside?

11   BY MS. BROOK:

12   Q   Well, that day, do you recall what time you got there?

13   A   I don't.  I don't recall what time of day it was.

14   Q   Okay?

15            THE COURT:  Daylight or nighttime?

16            THE WITNESS:  It was daylight.

17   BY MS. BROOK:

18   Q   So when you got there, were you with other agents from the

19   FBI?

20   A   Yes.  We -- the Evidence Response Team arrived at the

21   scene as one unit.

22   Q   And as part of looking at the unit, were you able to see

23   the building itself?  Do you know how many floors the building

24   was?

25   A   I know there were stairs.  I know there was at least a
```

1    second level.  I don't recall if there was another level of

2    stairs going up.

3    Q    Okay.  So let's focus in on Apartment No. 219.

4         Who did you understand had lived there?

5    A    Simpson and Soofi.  I don't recall the first names.

6    Q    And I misspoke a minute ago.  I think I said it was June

7    10th.

8         Was this in the early morning hours of May 5th or May

9    4th?

10   A    I believe so, yeah.

11   Q    So it was in the early morning hours of May 4th of 2015

12   and you're there.  Let's turn our attention to Exhibit No. 203

13   and I'm going to place that on the overhead.

14        Do you recognize this?

15   A    Yes, I do.

16   Q    And what do you recognize it as?

17   A    This is the sketch that I drew that day.

18   Q    And did you draw it as you're trained to draw sketches?

19   A    Yes, I did.

20        MS. BROOK:  Your Honor, the government is going to

21   move to admit Exhibit 203 and publish.

22        THE COURT:  Is there any objection?

23        MS. PLOMIN:  No objection.

24        THE COURT:  203 is admitted.

25        (Exhibit No. 203 admitted in evidence.)

1    BY MS. BROOK:

2    Q   The apartment itself, Apartment No. 219, how many bedrooms

3    did it have?

4    A   It was a one bedroom.

5    Q   So as we look at this diagram, where is the bedroom?

6    Which room is that?

7    A   The bedroom is going to be at the back.  It's identified

8    as room G.

9    Q   So why don't you go ahead and -- if you touch the screen

10   itself, it will show a line.  You can just circle that.

11          So that's the one bedroom.  Describe for us what is

12   room I?

13   A   Room I is going to be the bathroom.

14   Q   And room H?

15   A   Room H is actually the closet of room G accessible from

16   inside of room G.

17   Q   Okay.  And why is the label or terminology "room" used for

18   like a bathroom or a closet?

19   A   It's -- we just call them room labels.  So when we get to

20   a scene we put up a label A, B, C, D and it doesn't

21   necessarily mean that it's a room.  It's just that this is

22   space identified as a letter so we have a reference point.

23   Q   And do you see the kitchen?

24   A   Yes.

25   Q   Which room is that?

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
1    A    That's going to be room E.

2    Q    And can you go ahead and underline that?

3    A    (Indicating)

4    Q    And what is room B?

5    A    Room B is going to be the living room.

6    Q    And you can go ahead and maybe put a box around room B, if

7    you can.  I know it's difficult with your finger.

8              There we go.  What is room D?

9    A    Room D is kind of a little alcove or I guess -- I guess

10   somewhere you would put maybe an eating table or something,

11   but in this case it was just a little room right off the

12   kitchen, no doors or anything.

13   Q    And, in fact, was there a table in room D?

14   A    There was a table to the back of the room, yeah.

15   Q    What is room C?

16   A    Room C is kind of like a storage closet.

17   Q    And room A?

18   A    In room A would be a coat closet.

19   Q    So you had mentioned a moment ago that it was a

20   one-bedroom apartment.

21             Can you explain to us room E, D, and B, were they

22   separated by walls or something else?

23   A    E, D and B?

24             E and B were separated by walls and then D is kind of

25   a -- it's an open area, really only separated from the
```

UNITED STATES DISTRICT COURT

 1   bathroom area and the storage closet.

 2   Q   The kitchen itself, so room E, did it have doors or

 3   anything that shut it off completely as its own room?

 4   A   No.

 5   Q   And room B, the living room, did it have any doors or

 6   anything that shut it off as its own room?

 7   A   No.

 8   Q   I want to take a minute and talk about some of the things

 9   that you identified and collected into evidence that day.

10       First, I want to turn our attention to Exhibit No.

11   263.  May Special Agent Whitson approach?

12       THE COURT:  Yes.  While he is there, can he take the

13   Lenovo laptop?

14       MS. BROOK:  Yes.  That would be great.

15   BY MS. BROOK:

16   Q   So, sir, we place before you what has been marked Exhibit

17   No. 263.  Do you recognize that?

18   A   Yes, I do.

19   Q   And what do you recognize it as?

20   A   This is the desktop computer box that was located in the

21   residence.

22   Q   Okay.  And whereabouts in the residence was that

23   particular desktop computer located?

24   A   So this would have been in room B and it was underneath

25   the desk.  So if you look at the back side of room D, you'll

1    see the desk labeled and it was underneath, I believe, on the

2    right-hand side if you were looking at it.

3    Q   And what did you do on that day in relation to Exhibit No.

4    263?

5    A   We identified this and we seized it.  And then this --

6    this box was later brought back to the FBI's office and

7    entered into the Evidence Control Room.

8    Q   Okay.  So was it marked and placed into evidence at the

9    FBI?

10   A   It was.

11   Q   I want to put on the overhead the first of two exhibits

12   that are marked as 382.

13            THE COURT:  Maureen has pointed out to me that there

14   was a 382 that was offered and admitted into evidence earlier

15   today and it's not that.

16            MS. BROOK:  That's problematic then.

17            THE COURT:  I'm sure it was probably a photograph.

18            MS. BROOK:  So let's go ahead and make this one 393

19   and we will mark it as such and have it be placed in the

20   folders and such.

21   BY MS. BROOK:

22   Q   Looking at this Exhibit 393, what do you see?

23            THE COURT:  Do you need the computer there anymore?

24            MS. BROOK:  Just one more minute until I admit it and

25   then we can move it down, if that's okay.

1          THE WITNESS:  This is a picture of the living room

2     which was identified previously in the sketch.  And then this

3     was the desk that I spoke of that was to the back of the room

4     and that's this computer underneath the desk.

5          MS. BROOK:  The government is going to move to admit

6     and publish photograph No. 393.

7          THE COURT:  Is there any objection?

8          MS. PLOMIN:  No, Your Honor.

9          MS. BROOK:  And at the same time now, we're going to

10     move to publish --

11          THE COURT:  I'm sorry.  Wait.

12          Are these two pictures one exhibit?

13          MS. BROOK:  I intended to mark them as such, but now

14     that we're going to move them to the end, I will make them

15     separate.

16          THE COURT:  Okay.  So we're admitting --

17          MS. BROOK:  393.

18          THE COURT:  And the next one will be 394?

19          MS. BROOK:  That's right.

20          THE COURT:  Okay.

21     (Exhibit Nos. 393 and 394 admitted in evidence.)

22          MS. BROOK:  So the government moves to admit 263.

23          THE COURT:  Any objection to 263?  The computer.

24          MS. PLOMIN:  No, Your Honor.  Thank you.

25          THE COURT:  263 is admitted.

1           (Exhibit No. 263 admitted in evidence.)

2               MS. BROOK:  And, Special Agent Whitson, do you mind

3    moving the exhibit, the physical exhibit, back down?

4               THE COURT:  And then do you want -- are you going to

5    talk a little bit now about this picture so we can put it on

6    the jurors' screen?  393.

7               MS. BROOK:  Thank you.

8    BY MS. BROOK:

9    Q   So looking at this exhibit which is now published and the

10   jury can see it, we talked about that computer.

11              Can you circle it for us?

12   A   (Indicating)

13              MS. BROOK:  For the purpose of the record, you're

14   circling the large standing computer in the middle under the

15   desk.

16   BY MS. BROOK:

17   Q   That particular room, you have described it as a living

18   room.  What's on top of the desk?

19   A   On top of the desk is a -- it was -- I believe it was

20   being used as the computer monitor but it's like a TV monitor.

21   Q   So it's like a TV monitor screen?

22   A   Yeah.  I think -- yeah.

23   Q   You said you believed it was being used as a computer

24   monitor.  Why do you say that?

25   A   It was -- this was hooked up to the computer.

1    Q    So the TV itself was hooked up to a computer when you got

2    there?

3    A    Yes.

4    Q    And what else do we see in this particular photo.  Is

5    there a couch?

6    A    Yeah.  This is the -- like an L-shaped couch that was --

7    right when you first walk into the door, it would have been on

8    your left-hand side as you enter the apartment.

9    Q    And if you can with your finger trace the dimensions of

10   the couch so we can see where it extends.

11   A    (Indicating)

12   Q    So we're showing sort of an L-shaped sign on the inside of

13   the couch.  Having stood in that particular living room, can

14   you describe for us how big it was approximately?  What was

15   the distance approximately from that couch to the TV screen

16   that's there on top of the desk?

17   A    I would estimate maybe 15 feet; 10 to 15 feet.

18   Q    And in between what is -- what is in between the couch and

19   the desk?

20   A    Are you referring -- there's like a clear plexiglas coffee

21   table.

22        Is that where you're looking?

23   Q    Yeah.

24   A    Okay.

25   Q    And can you just mark that for us?

```
 1   A   Yeah. (Indicating)

 2   Q   The government now wants to put on the overhead Exhibit

 3   No. 394.  Do you recognize what's in this photo?

 4   A   Yeah.  This is the front view of that same desk.

 5   Q   Does it fairly and accurately represent how that desk and

 6   the room looked on that day, May 4th, in the morning when you

 7   arrived there?

 8   A   Yes, it does.

 9           MS. BROOK:  The government is going to move to admit

10   No. 394 and publish.

11           MS. PLOMIN:  No objection.

12           THE COURT:  394 is admitted.

13     (Exhibit No. 394 admitted in evidence.)

14   BY MS. BROOK:

15   Q   If you can just trace for us the area that is that flat

16   screen television so we can understand what you saw and the

17   size of it?

18   A   (Indicating)  Sorry.

19   Q   And if you can also go ahead and circle the computer

20   keyboard that's in that picture as well.

21   A   (Indicating)

22           MS. BROOK:  And for the purposes of the record, the

23   agent has put a box around the TV and circled the keyboard.

24           May I approach to get another exhibit?

25           THE COURT:  Yes.
```

```
 1            SPECIAL AGENT WHITSON:  May I approach, Your Honor?
 2            THE COURT:  You may.
 3   BY MS. BROOK:
 4   Q   Placing before you Exhibit No. 86, do you recognize that?
 5   A   Yes, I do.
 6   Q   And what do you recognize it as?
 7   A   This was a Samsung little flip phone that was -- it was
 8   located in the desk drawer that was next to the computer.
 9   Q   Did you locate it in the desk drawer next to the computer?
10   A   This -- yes, I did.
11   Q   And if you can, mark for us what desk drawer you're
12   referring to on Exhibit No. 394.
13   A   It's a little hard to see because there was a smaller one,
14   but it was there.  (Indicating)   It's going to be that deeper
15   one.
16   Q   Is that a Samsung model phone?
17   A   Yes, it is.
18            MS. BROOK:  Government moves to admit No. 86.
19            THE COURT:  Is there any objection?
20            MS. PLOMIN:  Your Honor, may we look at it, please?
21            THE COURT:  The phone?
22            MS. PLOMIN:  Yes.
23            No objection, Your Honor.
24            THE COURT:  86 is admitted.
25        (Exhibit No. 86 admitted in evidence.)
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1   BY MS. BROOK:
 2   Q   And you can put that down.  And next we need Exhibit 390,
 3   please.
 4             And while Special Agent Whitson is getting the next
 5   exhibit, Exhibit No. 86 that we just spoke about, the phone,
 6   after it was collected out of that particular desk drawer, was
 7   it placed into evidence?
 8   A   Yeah.  Well, first it was placed into a little -- it's
 9   that silver bag that's there that just keeps the signal from
10   getting to it but then that was placed into evidence after
11   that.
12   Q   And was it then at some point after the search was
13   conducted taken back to the FBI and put into evidence?
14   A   That's correct.
15   Q   Next we're going to talk about Exhibit No. 390.
16             Additionally, was there another hard drive, a 30
17   gigabyte hard drive found as well?
18   A   Yes, there was.
19             MS. BROOK:  May I have one moment?
20             THE COURT:  Yes.
21             MS. BROOK:  I don't have any other questions of this
22   witnesses.
23             THE COURT:  Thank you.  Ms. Plomin?
24             MS. PLOMIN:  Your Honor, I don't have any questions
25   for this witness.
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1              THE COURT:  May this witness be excused?
 2         MS. BROOK:  Yes, Your Honor.
 3              THE COURT:  Is there any objection?
 4         MS. PLOMIN:  No, Your Honor.
 5              THE COURT:  Thank you, sir.  You may step down and
 6    you are excused as a witness.
 7         MS. BROOK:  Thank you, Your Honor.
 8         The government calls Special Agent Charles Stanley.
 9       (Witness duly sworn)
10              THE CLERK:  Please state your name for the record and
11    spell your last name.
12              THE WITNESS:  Charles Stanley.  S-T-A-N-L-E-Y.
13         MS. BROOK:  Good afternoon.
14              THE WITNESS:  Good afternoon.
```

**CHARLES STANLEY, WITNESS, SWORN**

**DIRECT EXAMINATION**

```
17    BY MS. BROOK:
18    Q   Would you please introduce yourself to the ladies and
19    gentlemen of the jury.
20    A   Yes.  My name is Charles Stanley and I am an intelligence
21    analyst with the Federal Bureau of Investigation.
22    Q   And I misspoke a moment ago because I called you a special
23    agent.  So what is an intelligence analyst?
24    A   Intelligent analyst for the FBI, we gather information
25    about different types of threats and we inform executive
```

1    management or lawmakers about said threats.

2    Q   Are there times during your duty as an intelligence

3    analyst that you're called upon to assist in the execution of

4    search warrants?

5    A   Yes, there are.  And as a part of my job, I'm actually

6    also a part of the Evidence Response Team.

7    Q   What does it mean to be part of the Evidence Response

8    Team?

9    A   We are selected to attend a basic training for 80 hours to

10   become full-time members, basic training out of Frederiksberg,

11   Virginia, where we learn different types of evidence

12   collection techniques.  So that way when called upon to assist

13   on crime scenes, then we're able to utilize those techniques

14   and apply them as such.

15   Q   What are some of the techniques that you are trained to

16   utilize when executing search warrants at a residence?

17   A   Everything from photography to latent fingerprints to DNA

18   collection.  I mean, different types of search techniques, you

19   know, I mean we utilize static dust lifting.  I mean there are

20   a myriad of different types of evidence collection techniques.

21   Q   Are you trained in how to identify items of interest that

22   you find in search warrants?

23   A   Yes.

24   Q   And preserve them?

25   A   Absolutely.

1    Q    How do you preserve them in terms of your record keeping?

2    A    So in terms of preserving them with record keeping, as we

3    find an item, then we document what type of item it is,

4    photograph it in place, and then after photographing it, we

5    collect it in whatever type of bag it needs to be placed in;

6    cardboard, plastic, paper.

7          Label it as to what room it was in, where it was

8    located.  And then once we're done, take it back to Evidence

9    Processing Station where it will be seized by the seizing

10   agent and then transported back to the Evidence Collection

11   Room.

12   Q    So on May 4th --

13   A    -- or the control room, excuse me.

14   Q    So on May 4th, 2015, were you called upon to assist in the

15   execution of a search warrant at 13850 North 19th Avenue?

16   A    Yes.

17   Q    Was that at Apartment 219?

18   A    Yes.

19   Q    And on that day when you arrived there, were you part of a

20   large team?

21   A    Yes.

22   Q    Approximately, how many agents were there and intelligence

23   analysts, representatives from the FBI?

24   A    Between 15 to 20, I'd say.

25   Q    Placing back on the overhead already admitted Exhibit No.

1    203.  Do you recognize this?

2    A   Yes.

3    Q   And what is it?

4    A   This is the apartment that we searched.

5    Q   Turning our attention to room G, were you involved in the

6    search there in room G?

7    A   Yes.

8    Q   And generally speaking, what type of room was that?

9    A   I believe it was a bedroom.

10           MS. BROOK:  May I approach, Your Honor?

11           THE COURT:  Yes.

12           MS. BROOK:  May I approach the witness?

13           THE COURT:  Yes.

14   BY MS. BROOK:

15   Q   I placed before you Exhibit No. 84.

16           Do you recognize that?

17   A   Yes.

18   Q   And what do you recognize it as?

19   A   This was ammunition that I collected from room G.

20   Q   Let's talk specifically about where in room G you

21   collected that.

22   A   Let's see.  In room G -- let's see what number this was.

23           No. 18 on the floor.

24   Q   Hang on just one second.  I might be able to assist.

25           So I'm going to place on the overhead marked Exhibit

```
 1    No. 385.  Do you recognize that?

 2    A   Yes.

 3    Q   And what do you recognize it as?

 4    A   That was the room -- that was room G, the room that I

 5    searched.

 6    Q   And does it fairly and accurately depict how room G looked

 7    on that day, May 4th, when you were in there executing the

 8    search warrant?

 9    A   Yes.

10         MS. BROOK:  Your Honor, the government moves to admit

11    384.

12         MS. PLOMIN:  No objection.

13         MS. BROOK:  I think I misspoke.  It's 385.

14         THE COURT:  385.

15         385 is admitted.

16    (Exhibit No. 385 admitted in evidence.)

17    BY MS. BROOK:

18    Q   Looking at that picture, do you see Exhibit No. 84?

19    A   Yes.

20    Q   Can you circle it?

21    A   (Indicating)

22    Q   And for the record, the witness has circled at the bottom

23    right-hand corner of the photo.

24         So describe for us.  You mentioned it's ammunition.

25    What kind of ammunition?
```

```
 1   A    Let's see.  45 rounds PMC .38 Special.

 2              3 rounds Luger 9 millimeter.

 3              5 rounds Federal .38 Special.

 4   Q    And I want to focus in for a moment on the PMC ammo that

 5   you talked about.  Is that PMC Bronze ammunition?

 6   A    Yes.

 7   Q    And do you see a lot number on that box?

 8   A    I do.

 9   Q    Can you read for us what the lot number is?

10   A    It is lot No. 38G -- as in George -- dash 1071.

11              MS. BROOK:  And, Your Honor, if I haven't, I move to

12   admit Exhibit No. 84.

13              THE COURT:  Is there any objection to 84?

14              MS. PLOMIN:  No, Your Honor.

15              THE COURT:  84 is admitted.

16         (Exhibit No. 84 admitted in evidence.)

17              MS. BROOK:  And may I publish?

18              THE COURT:  Yes.

19              MS. BROOK:  May I ask a question standing here if I

20   do it loudly?

21              THE COURT:  Yes.

22              MS. BROOK:  Can you show us on here where that lot

23   number is?

24              THE WITNESS:  Yes. (Indicating)

25              MS. BROOK:  And, Your Honor, may I utilize the table?
```

 1          THE COURT:  Yes.

 2          MS. BROOK:  May I approach one more time?

 3          THE COURT:  Yes.

 4  BY MS. BROOK:

 5  Q   So showing the witness Exhibit No. 29 which has already

 6  been admitted and published, on that particular exhibit, just

 7  describe for us.  What is it?

 8  A   This is PMC Bronze ammunition, 50 center-fire pistol

 9  cartridges.

10  Q   And if you flip that over, do you see a lot number on that

11  box?

12  A   I do.

13  Q   And what's the lot number?

14  A   It is lot number 38G -- as in George -- dash 1071.

15          MS. BROOK:  May I approach again?

16          THE COURT:  Yes.

17          MS. BROOK:  May I have permission to put this on the

18  table?

19  BY MS. BROOK:

20  Q   So we focused in for a moment on the .38 Special

21  ammunition, the PMC Bronze ammo that we were talking about.

22          In that same exhibit, Exhibit No. 84, did that also

23  include 9 millimeter Luger rounds?

24  A   Yes.

25  Q   When you were part of the search warrant that day there on

```
 1    May 4th at Simpson and Soofi's apartment, did you also happen

 2    to search inside Simpson's Infinity?

 3    A   Yes.

 4    Q   And was that a vehicle?

 5    A   Yes.

 6    Q   Where was it located?

 7    A   In the parking lot just outside of their apartment.

 8            MS. BROOK:  May I approach one more time?

 9            THE COURT:  Yes.

10    BY MS. BROOK:

11    Q   So turning our attention first to the vehicle itself, did

12    you get a good look at it?

13    A   Yes.

14    Q   Did you look inside and inside the trunk of the vehicle?

15    A   Yes.

16            MS. BROOK:  If I may, Your Honor, place on the

17    overhead Exhibit No. 387?

18    BY MS. BROOK:

19    Q   Do you recognize what's in that photo?

20    A   Yes.

21    Q   And what do you recognize it as?

22    A   That is the vehicle that I searched.

23    Q   Is that the Infinity there, Simpson's Infinity from May

24    4th?

25    A   Yes.
```

1    Q    And one more photo which is marked as 388.

2         Do you recognize that photo?

3    A    Yes.

4    Q    And what do you recognize it as?

5    A    That is the Infinity that I searched.

6         THE COURT:  So one was a picture of the front and the

7    other is a picture of the back?

8         THE WITNESS:  Yes.

9         MS. BROOK:  The government moves to admit and publish

10   both 387 and 388.  We'll do it one at a time.

11        THE COURT:  Is there any objection?

12        MS. PLOMIN:  No, Your Honor.

13        THE COURT:  387 and 388 are admitted.

14        (Exhibit Nos. 387 and 388 admitted in evidence.)

15   BY MS. BROOK:

16   Q    Starting with 388, that's the back of the Infinity?

17   A    Yes.  That is the back.

18   Q    And looking now at 387, is that the front?

19   A    That is the front, yes.

20   Q    You have before you Exhibit No. 95.

21   A    Yes.

22   Q    And can you open it and tell us if you recognize what's

23   inside?

24        THE COURT:  Is it sealed?

25        THE WITNESS:  No.  These are -- I'm sorry.

UNITED STATES DISTRICT COURT

1    BY MS. BROOK:

2    Q    Hold it down until we admit it.

3    A    Okay.  Sorry.

4    Q    What is it?

5    A    These are CDs that were located inside of the CD case in

6    the trunk space of the Infinity.

7    Q    Were those the only CDs you found in the trunk space?

8    A    No.  I found a large CD case that had approximately 44 or

9    so CDs or DVDs.

10             MS. BROOK:  And may I approach for just one moment?

11             THE COURT:  Yes.

12             MS. BROOK:  Your Honor, the government moves to admit

13   Exhibit No. 95.

14             THE COURT:  Is there any objection?

15             MS. PLOMIN:  No, Your Honor.

16             THE COURT:  95 is admitted.

17        (Exhibit No. 95 admitted in evidence.)

18   BY MS. BROOK:

19   Q    If you can go ahead and open up the CDs, is that how they

20   were found?

21   A    No.  They were inside of a CD case.

22   Q    So as part of putting it into evidence and creating a

23   presentation so that the jury can see it, were they put into

24   those sleeves?

25   A    Yes.

1    Q    If you can go ahead and read for us what the titles of

2    those CDs are.

3    A    Let's see.  I'm not a hundred percent sure on the

4    pronunciation but Makkan Period and it is labeled CD 4, 5, 6,

5    7, 8, 9, 10, 11, 12, 13, 14, 15, and 16.

6    Q    And the CDs as they are labeled there, is that how you

7    found them in the trunk of the Infinity?

8            THE COURT:  You mean with the labels on?

9            MS. BROOK:  Yes.

10           THE WITNESS:  I'm sorry?

11   BY MS. BROOK:

12   Q    The writing that's on the CDs that you stated says "Makkan

13   Period" and it has different volumes?

14   A    Makkan Period, yes.

15   Q    Is that how you found it with the writing on that day?

16   A    Yes.

17   Q    And if you want to set that down for a moment, you

18   mentioned you found other CDs and before you are the

19   continuation of Exhibit No. 95, if you can open the next one

20   please.

21           Before we get to that, grab back the first CD case

22   that we were looking at just a moment ago.  And I just want to

23   draw your attention to the bottom-right CD.  Does that have a

24   more fuller title on it?

25   A    It does.  I apologize.  It says -- I'm sorry.  Do you want

```
 1    me to read it?

 2    Q    Please.

 3    A    The Life of Muhammad, Makkan Period, Imam Anwar al-Awlaki.

 4    Q    Anwar al-Awlaki?

 5    A    Yes.  Anwar al-Awlaki.

 6    Q    If we can move to the second set of CDs.

 7    A    Okay.

 8    Q    Do you recognize those?

 9    A    Yes.

10    Q    And what do you recognize them as?

11    A    These are also CDs that were located inside of the case

12    that I collected.

13    Q    And if you can go ahead, there's a third batch up there as

14    well, if you can open the third.  Do you recognize those?

15    A    Yes.

16    Q    And what are they?

17    A    These are also CDs that I collected from the -- they were

18    also in the case that I collected from the vehicle.

19    Q    So both the second batch and the third batch, do they

20    fairly and accurately represent how those CDs looked when you

21    collected them out of the trunk of the Infinity on May 4th?

22    A    Yes.

23         MS. BROOK:  Your Honor, the government moves to admit

24    all of Exhibit No. 95.

25         THE COURT:  So that is all of 95?
```

CR15-00707-PHX-SRB   JURY TRIAL - DAY #3   2-18-16

```
 1              MS. BROOK:  Yes.
 2              THE COURT:  Any objection to the rest of 95?
 3              MS. PLOMIN:  No, Your Honor.
 4              THE COURT:  So 95, which apparently is three separate
 5      cardboard sleeves with CDs in it, is admitted.
 6         (Exhibit No. 95 in its entirety admitted in evidence.)
 7              MS. BROOK:  Thank you, Your Honor.
 8      BY MS. BROOK:
 9      Q   If we can go back to the second batch for a moment that we
10      haven't yet talked about in detail.
11      A   Okay.
12      Q   Can you hold those up, please.
13      A   Sure.  Let me get them back.
14      Q   And can you read for us what the title of that is.
15      A   Yes.  It's Abu Bakr al Saddiq:  His Life and Times by Imam
16      Anwar al-Awlaki.  And it's labeled CD 1, 2, 3, 4, 7, 8, 9, 10,
17      11, 12, 13, 14 and 15.  And each of them have different
18      titles; for instance, CD 1 is an Introduction, CD 2 is His
19      Family Embracing Islam The Early Deeds.
20      Q   Can you go ahead and read each of the full titles?
21      A   Sure, absolutely.
22              CD 3 is Hijrah.  H-I-J-R-A-H.
23              CD 4 is Jihad With The Messenger of Allah.
24              CD 7 is Inaugural Address:  Abu Bakr And The
25      Community.
```

```
 1                  CD 8 is The Governors:  The Army of Usama.
 2                  CD 9 is The War Against The Apostates.
 3                  CD 10 is The War Against the Apostates (continued).
 4                  CD 11 is The War Against the Apostates (continued).
 5       The Compilation of the Qur'an.
 6                  CD 12.  The Conquest of Iraq.
 7                  CD 13.  The War Against the Romans.
 8                  CD 14.  The War Against the Romans (continued) and
 9       The Appointment of Umar:  His Death.
10                  CD 15.  Some of His Virtues.
11       Q   Can you go ahead and look at the third batch of CDs that
12       we haven't talked about yet?
13       A   Yes.
14       Q   And go ahead and read for us what those CDs say.
15       A   Yes.
16                  CD 1 is Ummar Ibn Alkhataab:  His Life and Times.
17                  And it's the Introduction.  His Character.  His Life
18       Before Islam.  Embracing Islam.
19                  CD 2.  It's Hijrah.  Ummar and the Qur'an.  Jihad
20       With the Messenger of Allah.
21                  CD 3.  Jihad With the Messenger of Allah (continued).
22       Incidents in Medinan.  Some of His Virtues.
23                  CD 4.  His Virtues (continued).  The Adviser of Abu
24       Bakr.
25                  CD 6.  Foundations of Government.  Life As The
```

1    Khilafah.

2              CD 7.  Ummar With His Family.  Ummar and the

3    Household of the Prophet.  Ummar and The Society.

4              CD 8.  Ummar and The Society (continued).

5              CD 9.  Enjoining Good and Forbidding Evil.  Attention

6    to Islamic Rituals.

7              CD 10.  The Mighty Patrols.

8              CD 11.  The Famine.  The Plague.

9              CD 12.  Ummar with his Governors and Army Generals.

10             CD 13.  Ummar with his Governors and Army Generals.

11             CD 14.  The Opening of the Persian Empire.

12             CD 15.  The Opening of the Persian Empire.

13             CD 16.  The Roman Front.

14             CD 17.  Comments on the Conquests.  Dreams.

15             CD 178.  His Last Days.

16   Q    Placing on the overhead not yet admitted Exhibit No. 395.

17             Do you recognize that?

18   A    Yes.

19   Q    And what do you recognize it as?

20   A    That is the trunk of the Infinity that I searched.

21   Q    And is that the place where you found the CDs that we have

22   just discussed?

23   A    It is.  It looks like item No. 7.

24             MS. BROOK:  The government moves to admit photograph

25   395 and publish.

```
 1              MS. PLOMIN:  No objection.

 2              THE COURT:  395 is admitted.

 3         (Exhibit No. 395 admitted in evidence.)

 4              MS. BROOK:  And, Your Honor, may I approach?

 5              THE COURT:  Yes.

 6              MS. BROOK:  May I put them here?

 7              THE COURT:  Yes.  You may leave them there.  Sure.

 8    BY MS. BROOK:

 9    Q   The second two batches of CDs that we just discussed a

10    moment ago, they are -- well, the face, is it handwritten or

11    is it published, you know, a professional cover?

12    A   The second batch?

13    Q   The second and the third.

14    A   The second and the third batch appear to be professionally

15    made.

16    Q   And both the second and the third, does each disk indicate

17    the author or the person that wrote them?

18    A   Yes, they do.

19    Q   And both -- well, all of the CDs on the second and the

20    third sleeve, are they all published and put together by Anwar

21    al-Awlaki?

22    A   Yes.

23              MS. BROOK:  One moment.  Your Honor, may I approach

24    with two exhibits, please?

25              THE COURT:  Yes.
```

1    BY MS. BROOK:

2    Q   I've placed in front of you two bags.  One of them has a

3    number which is 390 and the other one is going to be our 396

4    not yet marked.  The blue CD case.

5             Do you recognize that?

6    A   I do.

7    Q   And what do you recognize it as?

8    A   This is the CD case that was in the trunk of the Infinity

9    that I searched.

10   Q   And was that the place where these CDs were located?

11   A   Yes.

12            THE COURT:  So is that what we're looking at that has

13   the "7" on it in the photograph?

14            THE WITNESS:  Yes.

15            MS. BROOK:  Government moves to admit Exhibit 396.

16            THE COURT:  Is there any objection?

17            MS. PLOMIN:  No, Your Honor.

18            THE COURT:  The CD case is which number?

19            MS. BROOK:  That's going to be 396.

20            THE COURT:  396 is admitted.

21       (Exhibit No. 396 admitted in evidence.)

22   BY MS. BROOK:

23   Q   And lastly, turning our attention to Exhibit No. 390, do

24   you recognize that?

25   A   Yes.

1   Q    And what is that?

2   A    This is a CD titled Imam Anwar al-Awlaki.  The Battle of

3   Hearts and Minds.  This is a CD that was inside of the CD case

4   that I collected from the Infinity.

5            MS. BROOK:  Government moves to admit Exhibit No.

6   390.

7            MS. PLOMIN:  No objection.

8            THE COURT:  390 is admitted.

9        (Exhibit No. 390 admitted in evidence.)

10           MS. BROOK:  I have no further questions.

11           THE COURT:  Any questions for this witness,

12   Ms. Plomin?

13           MS. PLOMIN:  No, Your Honor.

14           THE COURT:  May this witness be excused?

15           MS. PLOMIN:  Yes.

16           MS. BROOK:  Yes.

17           THE COURT:  Thank you very much, Mr. Stanley.  You

18   may step down and you are excused as a witness.

19           I think we're going to quit for the day.  It's five

20   after 4:00.  Whoever is next probably has to come back

21   tomorrow anyway, so let's all start first thing -- well, first

22   thing -- 9:00 a.m.

23           Ladies and gentlemen, we will reconvene at nine

24   o'clock tomorrow morning.

25           I want to remind you, again, of the admonition not to

1   discuss the case among yourselves or with anyone else.  Please

2   remember that the only thing that you can tell people is that

3   you have been selected to sit on a jury.  The case may last up

4   to five weeks.

5         You can't tell them anything else about the case

6   until the trial is over.  Also, remember that you are not to

7   do any research about the case on your own, even looking up

8   words you've heard today, names you've heard today, looking at

9   anything that may be related at all to the case.

10        Anything you don't know that you want to know, you

11  know who to ask.  Me.

12        And then I'll ask the lawyers if I can give you the

13  answer or get the answer for you.

14        So we will see you tomorrow morning at 9:00 a.m.

15        Court is in recess.

16     (Proceedings adjourned at 4:06 p.m.)

17                            * * *

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, ELIZABETH A. LEMKE, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 1st day of August, 2016.

s/Elizabeth A. Lemke
ELIZABETH A. LEMKE, RDR, CRR, CPE