**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 19, 2016 |
| Abdul Malik Abdul Kareem, | ) 9:06 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 4
(Pages 518 through 730, Inclusive.)

APPEARANCES:
For the Government:
                U.S. ATTORNEY'S OFFICE
                By:  **Kristen Brook, Esq.**
                    **Joseph Edward Koehler, Esq.**
                40 North Central Avenue, Suite 1200
                Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
                MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
                By: **Daniel D. Maynard, Esq.**
                    **Mary Kathleen Plomin, Esq.**
                3200 North Central Avenue, Suite 1800
                Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB    JURY TRIAL-DAY #4    2-19-16

1                          **INDEX OF WITNESSES**

2   **ABDULLAH IDRIS MUBARAK:**

3   Direct examination by Ms. Brook                    Page 523
    Cross examination by Mr. Maynard                   Page 533
4   Redirect examination by Ms. Brook                  Page 546

5   **SPECIAL AGENT MATT REINSMOEN:**

6   Direct examination by Ms. Brook                    Page 553
    Cross examination by Ms. Plomin                    Page 571
7   Redirect examination by Ms. Brook                  Page 575

8   **SPECIAL AGENT CHARLES STANLEY:**

9   Direct examination by Ms. Brook                    Page 583

10  **SPECIAL AGENT STEVEN KENT:**

11  Direct examination by Ms. Brook                    Page 588

12  **SPECIAL AGENT HILDA GRAULAU:**

13  Direct examination by Ms. Brook                    Page 601
    Cross examination by Ms. Plomin                    Page 608

14

15  **SPECIAL AGENT STEVEN KENT:**

16  Direct examination by Ms. Brook                    Page 610
    Cross examination by Ms. Plomin                    Page 623

17

18  **STEFAN VERDUGO:**

19  Direct examination by Mr. Koehler                  Page 630
    Cross examination by Mr. Maynard                   Page 662
20  Redirect examination by Mr. Koehler               Page 697

21  **SPECIAL AGENT AMY VAUGHAN:**

22  Direct examination by Mr. Koehler                  Page 706

23

24

25

```
 1                    INDEX OF EXHIBITS

 2
       EXHIBIT NO.:        DESCRIPTION:              RECEIVED:
 3
       Exhibit No. 85     Motorola cell phone        Page 585
 4     Exhibit No. 92     5.56mm Winchester ammunition  Page 558
       Exhibit No. 94     CDs:  "The Hereafter Vol. 2"  Page 566
 5                        (12 CDs)
       Exhibit No. 96     CD: The Hereafter Vol. II,  Page 568
 6                        CD 2 by Anwar al-Awlaki
                          (Neyrus)
 7     Exhibit No. 97     CD: The Hereafter Volume #1,  Page 568
                          CD-1 (commercially-printed CD)
 8     Exhibit No. 98     CD: The Devil's Deception   Page 568
                          of the Saudi Salafis Part 1,
 9                        Sheikh Faisal
       Exhibit No. 99     CD: The Devil's Deception   Page 568
10                        of the Saudi Salafis Part 2/
                           Stop! Police Terror,
11                        Sheikh Faisal, Imam Anwar
                          al-Awlaki
12     Exhibit No. 100    CD: The Devil's Deception   Page 568
                          of the Shia Part 1, Sheikh
13                        Faisal
       Exhibit No. 101    CD: The Devil's Deception   Page 568
14                        of the Shia Part 2 & Reject
                          the Taghoot, Sheikh Faisal
15     Exhibit No. 102    CD: Deviation of the        Page 568
                          Ummah Past and Present, by
16                        Bilal Philips
       Exhibit No. 103    CD: Fire of the Goldsmith,  Page 568
17                        Shaikh Yasir Qadhi
       Exhibit No. 112    Acer Laptop computer        Page 603
18                        (Kareem apt)
       Exhibit No. 114    Tanfoglio 9mm Pistol        Page 612
19                        (Kareem apt)
       Exhibit No. 117    9mm Perfecta ammunition     Page 595
20                        (Kareem apt)
       Exhibit No. 118    .38 special PMC Bronze      Page 594
21                        ammunition (Kareem apt)
       Exhibit No. 119    12-gauge ammunition         Page 622
22                        (Kareem apt)
       Exhibit No. 124    Search warrant diagram      Page 590
23                        (Kareem apt)
       Exhibit No. 162    Recycle bin file            Page 712
24                        listing (Lenovo 2015
                          image) showing recycling
25                        of S&I.pdf
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #4    2-19-16

| | | |
|---|---|---|
| 1 | Exhibit No. 163   Photo:  Apocalypse Rising dated 6/5/2014 | Page 713 |
| 2 | Exhibit No. 204   Book: Milestones | Page 587 |
| 3 | Exhibit No. 205   "Purpose of Life" DVD Tzortzis | Page 561 |
| 4 | Exhibit No. 206   "Ummar Don Alkhataqb-His Life and Times" CD Anwar Al-Awlaki | Page 562 |
| 5 | Exhibit No. 207   Sheik Khalid CD | Page 564 |
| 6 | Exhibit No. 279   Constants on the Path of Jihad, book version | Page 717 |
| 7 | Exhibit No. 281   Page 13-14 of Dabiq Issue 4 | Page 717 |
| 8 | Exhibit No. 282   Dabiq Issue 5 | Page 718 |
| 9 | Exhibit No. 283   Screencap from an official ISIL video of fighters loading artillery | Page 719 |
| 10 | Exhibit No. 284   Screencap of an official ISIL video from Wilayah Halab of a public beheading | Page 720 |
| 11 | Exhibit No. 285   Advertisement for article, 'The Obligation of Appointing a Khilafah & The Forbiddance of Delaying Such', from Ansar al Khilafah, an ISIL supporter organization | Page 720 |
| 12 | | |
| 13 | | |
| 14 | Exhibit No. 286   Screencap from official ISIL Libya video showing prisoners being marched by their executioners along a beach | Page 721 |
| 15 | | |
| 16 | Exhibit No. 300   ISIL logo | Page 725 |
| 17 | Exhibit No. 307   Picture of James Foley, appearing in an ISIL video prior to his execution | Page 726 |
| 18 | | |
| 19 | Exhibit No. 311   Picture of fighters with a truckload of prisoners | Page 726 |
| 20 | Exhibit No. 312   Picture of an explosion | Page 727 |
| | Exhibit No. 313   Picture of a child posing in front of an ISIL flag | Page 727 |
| 21 | Exhibit No. 314   Picture of Steven Sotloff with Jihadi John | Page 728 |
| 22 | Exhibit No. 384   Photo of Simpson/Soofi apartment kitchen | Page 559 |
| 23 | Exhibit No. 397   Photo of Kareem's living room - 21st Place (desk) | Page 605 |
| 24 | | |
| 25 | | |

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB    JURY TRIAL-DAY #4    2-19-16

| 1 | Exhibit No. 398 | Photo of Kareem's desk in living room - 21st place (close up desk) | Page 606 |
| 2 | Exhibit No. 400 | Magazine - contains .380 rounds (Kareem's house) | Page 592 |
| 3 | Exhibit No. 401 | Box of .25 ammunition and .38 special ammunition (Kareem's house) | Page 598 |
| 4 | | | |
| 5 | Exhibit No. 403 | Photo of Kareem's bedroom - 21st place (2) | Page 592 |
| 6 | Exhibit No. 404 | Photo of Tanfoglio 9mm in Kareem's couch - 21st place | Page 615 |
| 7 | Exhibit No. 405 | Photo of Kareem's couch - 21st place | Page 614 |
| 8 | Exhibit No. 406 | Magazine - partially loaded (from gun in couch) | Page 621 |

9

10                              * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                      P R O C E E D I N G S

 2          (Called to the order of court at 9:06 a.m.)

 3              THE COURT:  Good morning, ladies and gentlemen.

 4      Please sit down.  The record will show the presence of the

 5      jury, counsel, and the defendant.

 6              And the government may call its next witness.

 7              MS. BROOK:  Thank you, Your Honor.  The government

 8      calls Abdullah Idris Mubarak.

 9              THE COURT:  Sir, please come forward and be sworn.

10      Step up to this lady right here.

11              THE CLERK:  Please raise your right hand.

12          (Witness duly sworn)

13          Please state your name for the record and spell your first

14      and last name.

15              THE WITNESS:  Abdullah Idris Mubarak.

16      A-B-D-U-L-L-A-H.  M-U-B-A-R-A-K.

17              THE COURT:  You may proceed, Ms. Brook.

18              ABDULLAH IDRIS MUBARAK, WITNESS, SWORN

19                        DIRECT EXAMINATION

20      BY MS. BROOK:

21      Q    Good morning, sir.

22      A    Good morning.

23      Q    Can you please introduce yourself to the jury.

24      A    Abdullah Idris Mubarak.

25      Q    And, Mr. Mubarak, do you live here in Phoenix?
```

1    A   Yes.

2    Q   How many years have you lived here?

3    A   I first moved here in '99.  And then I left and then I

4    came back again in 2007 with my grandson and then we left

5    again.  Then I came back again in 2010.

6    Q   So since 2010 have you been living here in Phoenix?

7    A   Yes.

8    Q   And I want to take a moment.

9         Today can you describe a little bit about your

10   clothing?  What are you wearing?

11   A   I'm wearing a thobe and a kefiyyeh and a kufi.  Yeah.

12   Q   And are those clothes that you wear on certain days or for

13   certain occasions?

14   A   Yeah.  I wear these clothes on Friday for Jumu'ah.

15   Q   What's Jumu'ah?

16   A   Jumu'ah is a holy day.  It's a holy day.  Is instead of

17   calling it Friday, we call it Jumu'ah and that's what it is,

18   you know.

19   Q   And is that a holy day for Muslims?

20   A   Yes.

21   Q   And on a day that is a Jumu'ah day, do you typically go

22   somewhere to pray?

23   A   We go to the masjid, uh-huh, in Tempe, yeah.

24   Q   Okay.  Sir, do you know or did you know a man by the name

25   of Elton Simpson?

1    A    Elton Simpson?

2    Q    Perhaps did you know him by the name of "Ibrahim"?

3    A    Ibrahim, yeah.

4    Q    And how was it that you came to meet Ibrahim?

5    A    I met him through Abdul Malik.

6    Q    Okay.  Was he someone that you met once or more than once?

7    A    More than once.

8    Q    And about how often would you see Ibrahim?

9    A    I saw him quite a few times, you know, talked to him quite

10   a few times.

11   Q    How was it that Mr. Kareem came to introduce you to

12   Ibrahim?

13   A    I think maybe when he first introduced me to him, I think

14   they came to my masjid in Tempe and they was giving me a ride

15   home.  That's when he introduced me to Ibrahim.

16   Q    And where was it that they came to in Tempe?

17   A    To the masjid -- to the mosque, yeah.

18   Q    To the mosque there in Tempe?

19   A    Yeah.

20   Q    Do you know how many years ago that was?

21   A    That might have been 2012, I think, because I was living

22   on 41st Avenue and McDowell.

23   Q    And did you know a man by the name of Nadir Soofi?

24   A    I met him.

25   Q    How was it that you met him?

1   A   I met him -- it was at a Pizza Hut -- not a Pizza Hut, but

2   a pizza place over here on 27th Avenue just a little bit south

3   of Northern.  And I think he either worked there or he ran the

4   place or something like that.

5        You know, so my phone went off in my pocket and a

6   ring tone was on my phone.

7        And he said:  Brother, you listen to music?

8        I said:  Yeah.

9        He said:  Brother, music is haram in Islam.

10       I went, like, you know, man, something wrong with

11   you, you know.  So that's how I met him.

12   Q   So your phone had a ring tone on it that was a song?

13   A   Yeah.

14   Q   And did that happen at the pizza place?

15   A   Yeah.

16   Q   Did you meet him just that one time or did you see him on

17   other times?

18   A   I seen him on a few other occasions.  But we never talked

19   because, you know, he knew that I didn't agree with, you know,

20   his way of thinking, you know, so we never talked about

21   anything.

22   Q   You mentioned Mr. Kareem.

23        So Abdul Malik Abdul Kareem?

24   A   Uh-huh.

25   Q   How is it that you met him?

 1   A   I met him -- when I met him he wasn't Abdul Malik Abdul

 2   Kareem.  He was just Abdul Malik.  And I met him up on Bell

 3   Road at a Thai shop with another one of my friends.  We called

 4   him Fat Boy.

 5   Q   When you first met him, did he just go by the name of

 6   Decarus Thomas?

 7   A   No.  He went by Abdul Malik and it was a little while

 8   after that.  But then I learned his name was Decarus Thomas.

 9   Q   And was that after you moved back here in 2010 that you

10   met him?

11   A   I met him about -- I think I met him about 2010, you know.

12   Q   Did Mr. Kareem ever talk to you about going shooting with

13   Ibrahim and Nadir Soofi?

14   A   He told me that he -- that he went shooting.  He mentioned

15   those guys.  But he said that he had been shooting one day,

16   yeah.

17   Q   And where was it that he said he had been shooting?

18   A   Up at his brother's place.

19   Q   We're going to come back to this in a minute, but I want

20   to talk to you for a second about the khalif -- the Khilafah?

21         Did Mr. Kareem talk to you about believing in the

22   Khilafah?

23   A   Well, he asked me, did I -- who was a Khilafah.  Did I

24   know of a Khalifah.

25         I'm like, you know, like Khalifahs.  You know,

```
 1   Prophet Muhammad was the last and ain't none coming after him,
 2   you know, that's it.
 3            You know, so he was kind of concerned that it was a
 4   Khalifah but, you know, he did state that if it's a Khalifah,
 5   how come none of the sheikhs are talking about it.  Because
 6   it's a Khalifah.  Simple as that.
 7   Q   Let's talk about that.
 8            So you said back to him:  There is no Khalifah?
 9   A   Right.
10   Q   The last was the Prophet Muhammad?
11   A   Right.
12   Q   And presently there is no Khilafah?
13   A   Right.
14   Q   And you mentioned him pushing back and saying:  There is a
15   Khilafah.
16   A   Well, you know, I guess he must have thought that there
17   was a Khilafah, but I clearly told him:  Ain't no Khilafahs.
18   Q   And when you had this conversation with him, Simpson and
19   Soofi were still alive?
20   A   I think they were alive, yeah.
21   Q   And at some point did you call your son to talk to
22   Mr. Kareem about there not being a Khilafah?
23   A   Right.
24   Q   And let's talk for a minute about your son.  What's his
25   name?
```

1   A    Ahmed Mubarak.

2   Q    And don't tell us exactly where, but what city does he

3   live in?

4   A    What do you mean?

5   Q    What city does he live in?  Does he live here?

6   A    No, he don't live here.  He live in Rockford, Illinois.

7   Q    Okay.  So he lives back in Illinois?

8   A    Yeah.

9   Q    And there came a day where you picked up the phone and

10  called your son?

11  A    Uh-huh.

12  Q    When you picked up the phone and called your son, was

13  Mr. Kareem there with you?

14  A    Uh-huh.

15  Q    Were you at your house or somewhere else?

16  A    In my house.

17  Q    Okay.  And why was it that you called your son?

18  A    Because I wanted my son to tell him that there is no

19  Khilafahs, you know.  So I asked my son, I said, you know, I

20  told him I said Abdul Malik is sitting here and he thinks that

21  there is a Khilafah in Islam.

22          And so I said:  Will you tell him there ain't no

23  Khilafahs.  So I had my son on the speaker phone and he told

24  him:  No, brother, there ain't no Khilafahs in Islam, you

25  know.

1    Q   Why did you think that your son in particular would be

2    good at conveying that message to Mr. Kareem?

3    A   My son is very knowledgeable in Islam.  He went to school

4    in Al-Azhar in Egypt.  He studied Islamic law.  And he has

5    been to school in Syria.  And he lived in Saudia Arabia.  He

6    lived in Egypt for two or three years.

7         So my son is very knowledgeable in Islam.  He speaks

8    Arabic better than the Arabs, you know.

9    Q   And, obviously, when you had your son there on speaker

10   phone, Mr. Kareem was sitting there?

11   A   Yeah.

12   Q   And you mentioned that your son talked and explained there

13   is no Khilafah?

14   A   Right.

15   Q   That time when you felt the need to pick up the phone and

16   call your son and have your son try to convince Mr. Kareem

17   that there was no Khilafah, before that time had there been

18   other times where Mr. Kareem talked to you about believing

19   that there was a Khilafah?

20   A   Quite a few different times, you know, but, you know, I

21   kind of let him know, you know, look, ain't no such thing.

22   There's no Khilafah.  Ain't going to be none.

23        And I said:  I don't even want to talk about.  You

24   know, kind of, sway me.  It's your beliefs, you know what I

25   mean?

 1   Q    Why did you not want to talk about it?

 2   A    Because it's senseless.  It's senseless.  I mean, why

 3   should I talk about a Khalifah when I know there ain't no

 4   Khalifah, you know.  He don't know it, but that's on him.  If

 5   he want to believe that, that's on him.

 6   Q    Who is the Khalifah a part of?

 7   A    Huh?

 8   Q    Who is the Khalifah a part of?

 9   A    Ain't no Khalifahs.

10          MS. BROOK:  May I have just one moment?

11          THE COURT:  Yes.

12   BY MS. BROOK:

13   Q    To go back to the Khilafah for just a moment, but the

14   people that do believe in a Khilafah, what group are they a

15   part of?

16          MR. MAYNARD:  Objection to the form of the

17   question -- not only the form, but the relevance.

18          THE COURT:  Sustained.

19   BY MS. BROOK:

20   Q    I asked you when we first started talking about a time

21   that Mr. Kareem had talked to you about going shooting up at

22   his brother's house?

23   A    Uh-huh.

24   Q    Do you remember talking to investigators a few months ago

25   and telling them about who Mr. Kareem told you he was with

1    when he was shooting?

2    A    I don't remember.

3    Q    I want to take one moment.  We've been talking about

4    Mr. Kareem.

5    A    Uh-huh.

6    Q    Do you see him here in the courtroom?

7    A    Sure.

8    Q    And can you go ahead and point to him and describe

9    something that he's wearing?

10   A    He's in the blue shirt.

11            MS. BROOK:  Your Honor, my the record reflect that

12   the witness has identified the defendant?

13            THE COURT:  Yes.

14   BY MS. BROOK:

15   Q    And I think we talked about this, but just the last

16   question.

17            Obviously, when the defendant, when Mr. Kareem was

18   over at your house talking to you about the Khalifah, at that

19   point in time Simpson and Soofi were still alive?

20   A    Yeah.  They was still alive.

21            MS. BROOK:  I don't have any other questions.

22            THE COURT:  Thank you.

23            Mr. Maynard.

24

25   ////

```
 1                       CROSS EXAMINATION

 2     BY MR. MAYNARD:

 3     Q    Good morning, Mr. Mubarak.

 4     A    Good morning.

 5     Q    We've never met before, have we?

 6     A    No.

 7     Q    In fact, I did send one of my associates to meet with you,

 8     Ms. Plomin.  Do you remember her?

 9     A    I don't remember.

10     Q    Okay.  Do you remember she came to your door and asked for

11     your son's phone number?

12     A    Yeah.  Yeah.  Okay.  Okay.  Yeah.

13     Q    You didn't want to talk to her at the time?

14     A    No, I didn't.

15     Q    Okay.  You don't want to be here either, do you?

16     A    No, I don't.

17     Q    Okay.  In fact, the Iman of your community has advised the

18     members of your community not to get involved in this case?

19     A    Yes, he has.

20     Q    This is one that many Muslims in this community just don't

21     want to be involved in, correct?

22     A    Correct.  Correct.

23     Q    Now, you have known Abdul Malik -- and I'm going to call

24     him "Malik" -- for oh, four, five, six years?

25     A    About five or six years, yeah.
```

1    Q    And during that time period when Mr. Malik -- or when

2    Malik was studying Islam and he had questions, would he come

3    and ask you those questions?

4    A    Sometimes.

5    Q    Did you get the sense that he sort of looked up to you

6    because you had more knowledge about Islam?

7    A    Somewhat.

8    Q    Okay.  You had studied under someone from Pakistan; is

9    that correct?

10   A    My mentor was Dr. Zees (ph) and Dr. Ahmad and they also

11   give me shahada in Illinois.

12   Q    And explain to the jury what "shahada" is.

13   A    Shahada is the first pillar of Islam declaring yourself a

14   Muslim.  You say:

15        (Witness speaking Arabic)

16            I bear witness there is no god but Allah.

17        (witness speaking Arabic)

18            THE COURT:  He's speaking in a -- I think you can

19   just have the record reflect that he said something in Arabic.

20            THE WITNESS:  Yeah.  Okay.

21            THE COURT:  But then he was going to tell us what it

22   meant.

23            And the first phrase, tell us, again, what the first

24   phrase was.

25            THE WITNESS:  First phrase is:

1              I bear witness there is no god but Allah.

2              (Witness speaking arabic)

3              And that Muhammad is the last Prophet and messenger

4    of Allah.  The last Prophet and messenger of Allah.

5    BY MR. MAYNARD:

6    Q   You also used a phrase a few minutes ago when you were

7    talking about Mr. Soofi and the music on your phone and

8    Mr. Soofi told you it was haram.

9    A   Uh-huh.

10   Q   Can you explain to the jury what "haram" is?

11   A   "Haram" means unlawful.  It's bad.  No good.

12             And "Halal" means lawful.  Good.

13   Q   And there are certain dietary restrictions for Muslims and

14   there are certain things that are, like pork, that are haram?

15   A   Right.

16   Q   Okay.  Now, you have been to Malik's house on a number of

17   occasions?

18   A   Sure.

19   Q   And you have -- did you see Simpson at his house?

20   Ibrahim?

21   A   Ibrahim, yeah.  Yeah.

22   Q   Okay.  And have you gone and eaten at Malik's home?

23   A   Yeah.

24   Q   And he would oftentimes give you rides places?

25   A   Sure.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #4    2-19-16

```
 1    Q    You guys were friends?

 2    A    Yeah.

 3    Q    Okay.  Now --

 4    A    He let me use his car.

 5    Q    I'm sorry?

 6    A    He let me use his car, yeah.

 7    Q    Now, you indicated a few moments ago, you were asked some

 8    questions about when the FBI came to your house?

 9    A    Uh-huh.

10    Q    The first time the FBI came to visit you was around May

11    20th of 2015, correct?

12    A    Okay.  Okay.

13         THE COURT:  Well, do you recall that it was a couple

14    of weeks after the death of Simpson and Soofi?

15         THE WITNESS:  Maybe.

16    BY MR. MAYNARD:

17    Q    Okay.  Let me sort of put this in context.

18         On May 1st of 2015 --

19    A    Uh-huh.

20    Q    I will tell you that was a Friday.

21         Do you remember going to the mosque on that day?

22    A    I mean, I go to the mosque every Friday.

23    Q    Okay.

24    A    And so I might not remember going to the mosque on that

25    particular day, but I'm sure that I did.
```

1   Q   Okay.  Do you recall that Mr.-- or that Malik picked you

2   up and you two drove to the mosque together on May 1st?

3           THE COURT:  What?  May 1st?

4           MR. MAYNARD:  May 1st, 2015.

5           THE WITNESS:  I'm not good with dates, you know.  My

6   brain don't work like that.  By if he picked me up on a

7   Friday, then we probably did go to the masjid, yeah.  I know

8   it was probably some Fridays that he didn't pick me up.

9   Q   And, again, for the jury, the "masjid" is the "mosque"?

10  A   The "masjid" is the same as the "mosque," yeah.

11  Q   And if I tell you that on May 3rd of 2015 is when Simpson

12  and Soofi -- or Ibrahim and Mr. Soofi were killed in Garland,

13  Texas, does that help refresh your recollection at all?

14  A   No.

15  Q   Do you recall that -- the day after -- do you recall going

16  over to Malik's house on a Saturday and eating a meal with a

17  lot of -- with a number of other individuals?

18  A   I been over there on different occasions and other

19  brothers have been there.  Yes, we had meals at his house and

20  meals at my house and meals at different restaurants and so,

21  you know, what are you saying?

22  Q   Okay.  Let me see if I can help a little bit.

23          Do you know Malik's nephew Hakeem?

24  A   I know a couple of his nephews.

25  Q   Do you know Hakeem?

1    A    I know Hakeem, yeah.

2    Q    Do you know Saleem?

3    A    Saleem, I know him too.

4    Q    Do you remember the day that Hakeem came back from

5    Philadelphia?

6    A    I kind of remember that day.

7    Q    Do you remember that on that particular day you and Malik

8    went to the mosque together and that Hakeem then got in the

9    car with you and Malik with his suitcase to come home and live

10   with Malik?

11   A    Well, I don't know about all that.  I don't think that I

12   was -- that I picked him up or I was with Malik when he picked

13   him up with the suitcase, you know what I mean.  But I

14   remember when he -- Hakeem first got here.

15   Q    Okay.

16   A    Or came back the second time.

17   Q    And in that time period when he first got here, do you

18   recall going over to Malik's house and having a meal and he

19   had cooked --

20   A    Yeah.  Yeah.

21   Q    He had cooked --

22   A    Yeah he cooked a good meal.

23   Q    Cooked a meal of Jamaica jerk goat?

24   A    Right.

25   Q    So you recall that?

1    A    Uh-huh.

2    Q    Do you recall who was there at that meal?

3    A    Hakeem and Saleem.

4    Q    Do you recall that any others came in?

5    A    No, I don't.  I don't recall any.

6    Q    Do you know an Abdul Khabir?

7    A    I know -- I know Abdul Khabir but I don't think Abdul

8    Khabir was at that house that day.

9    Q    Not while you were there?

10   A    Not while I was there because I did get up and leave and

11   caught the bus.

12   Q    And went home?

13   A    And went to my cousin's house, actually.

14   Q    Okay.  And do you recall at some point you learned that

15   Ibrahim and Soofi had been killed in Garland, Texas?

16   A    Yeah.

17   Q    And after that occurred, were there occasions when you

18   would get rides from Malik?

19   A    Probably.

20   Q    Do you recall him actually taking you to a car lot one

21   time to look at cars?

22   A    Sure.  Sure.

23   Q    Okay.  And do you recall Malik indicating to you that he

24   felt he was being followed by the FBI?

25   A    Sure.

1    Q    And did he tell you that he had been interviewed by the

2    FBI?

3    A    Well, he told me that the FBI had followed him and they

4    were following him and he pointed out where they were and what

5    cars they were in and come to find out that turned out to be

6    true.

7    Q    At some point after you had these rides with Malik and he

8    told you the FBI was following him, then the FBI came to your

9    house to interview you?

10   A    Uh-huh.   Uh-huh.

11           THE COURT:  Is that "yes"?

12           THE WITNESS:  Yes.

13           THE COURT:  Thank you.

14           MR. MAYNARD:  The court reporter has to take all of

15   this down.

16           THE WITNESS:  Yeah.  Right.  Right.  Right.

17   BY MR. MAYNARD:

18   Q    That upset you that the FBI came, didn't it?

19   A    Yeah.  It upset me that they was following him because I

20   didn't think that he had done anything wrong, you know.

21   Q    All right.

22   A    You know, he had me (Arabic word)

23           COURT REPORTER:  Could you repeat that?

24           THE WITNESS:  I guess that would be "fooled."  Yeah.

25   BY MR. MAYNARD:

1   Q    In fact, at one point prior to this a couple years

2   earlier, hadn't Malik called and asked you to come help him

3   throw Simpson out of his house?

4   A    Yeah.

5   Q    And you got a couple of your friends and you went over

6   there and helped him evict Simpson and throw him out?

7   A    Yeah.  Yeah.  Exactly.

8   Q    You thought he was hanging around with the wrong guy?

9   A    No doubt.

10  Q    Now, you were aware that Malik had a moving business?

11  A    Yes.

12  Q    And you've told us about one of your sons being in

13  Illinois and knowing a lot about Islam?

14  A    Right.

15  Q    You have another son that lives here in Phoenix or did

16  live here in Phoenix by the name of Charles Bibb?

17  A    Right.

18  Q    And he worked for Malik for some time?

19  A    Right.

20  Q    And he actually even lived with Malik for some period of

21  time?

22  A    Right.

23  Q    Okay.  And Malik would oftentimes let people live with him

24  if they didn't have a place to stay?

25  A    Yeah.

1    Q    And he would also provide free meals to people?

2    A    Right.

3    Q    That didn't have a place to eat?

4    A    Right.

5    Q    Pretty kind guy, wasn't he?

6    A    Very kind.

7            MR. MAYNARD:  Excuse me just a moment, Your Honor.

8    BY MR. MAYNARD:

9    Q    Now, when Malik came to you to talk to you about the

10   Khalifah, you told him in no uncertain terms:  There isn't

11   one.

12   A    Right.

13   Q    Okay.  And he questioned you a little bit?

14   A    Huh?

15   Q    He questioned you a little bit about that?

16   A    Yeah.

17   Q    And that's the reason you called your son.  You wanted to

18   tell him -- somebody who had a little more knowledge than you

19   do?

20   A    Correct.

21   Q    There's no Khalifah, correct?

22   A    Right.  Right.

23   Q    He didn't argue with your son, did he?

24   A    No.

25   Q    Was he respectful to him when he heard him?

1    A    Very respectful.

2    Q    Now, at some point in 2015 did Malik actually move in with

3    you for a couple of weeks?

4    A    Yeah, he did.

5    Q    And do you recall why that was?

6    A    Well, he fell on hard times and, you know, like anybody

7    else, we have to do everything we can to help our Muslim

8    brothers, you know.

9         So he needed a place to stay and I got it set up with

10   my property manager and he moved in.

11   Q    And that was for a couple of weeks?

12   A    A couple -- that's the longest -- the longest length of

13   time he could stay with me was a couple weeks.

14   Q    Okay.  But while he was staying with you, most Muslims

15   pray five times a day?

16   A    Yeah.

17   Q    Okay.  And you have a particular area in your house where

18   you do your prayers?

19   A    Right.  Right.

20   Q    But you're more knowledgeable than he is, so you're the

21   one who would lead the prayers?

22   A    Well, I led mostly all the prayers, yeah.

23   Q    Okay.  Now, prior to Soofi and Simpson get getting killed,

24   you never heard Malik speak about the Prophet drawing contest

25   that was in Dallas, did you?

1   A   No.  I never did.

2   Q   Did you -- had you ever even heard of that Prophet drawing

3   contest?

4   A   No.  I never did.

5   Q   It wasn't something that was brought out at the mosque?

6   A   Not no mosque that I went to.

7   Q   So it was never mentioned in the community about look

8   what's going on in Dallas?

9   A   No.  Never.

10   Q   First time you heard about it was after Soofi and Simpson

11   were killed?

12   A   After they got killed, yeah.

13   Q   Do you know a Sergio Martinez?

14   A   Sergio.  Sergio.  Yeah, I know him.

15   Q   And how is it that you know Mr. Martinez?

16   A   He's Abdul Malik's friend.

17   Q   And so you you've seen him over at his house?

18   A   Yeah.  I talked to his wife.  His wife is a realtor.

19   Q   Okay.  And do you know a Mr. Verdugo?

20   A   No.  I don't think I know nobody by that name.

21          MR. MAYNARD:  Just a second, Your Honor.

22   BY MR. MAYNARD:

23   Q   Do you know a fellow by the name of Stefan who lived with

24   Malik?

25   A   A white guy?

1   Q   Yes.

2   A   Yeah.

3   Q   And how did you know him?

4   A   He messed up my car.

5   Q   What did he do to your car?

6   A   He tore it apart and didn't come back to fix it.

7   Q   When was that?

8   A   It was -- I don't know.  It was when I lived over on 24th

9   and -- 24th and a couple blocks south of Glendale.  Black

10  Canyon Highway.

11  Q   On June 10th -- and, again, I know you don't remember

12  dates, but do you remember there being an evening when Agent

13  Whitson came to see you with another agent?

14  A   Uh-huh.  Uh-huh.

15  Q   You have to say "yes" or "no"?

16  A   Yes.  Yes.

17  Q   Did he come in the evening, do you recall?

18  A   I believe.

19  Q   And do you recall that he told you on that day that Malik

20  had been arrested by them?

21  A   Okay.  I recall.

22  Q   Okay.  And you invited them in?

23  A   Yes.

24  Q   Did he tell you that he was tape recording your entire

25  conversation and meeting that day?

1    A    Probably.

2    Q    Do you recall that?

3    A    Yeah.

4         MR. MAYNARD:  Okay.  All right.  Just a second.

5    BY MR. MAYNARD:

6    Q    What did you call Malik's house?

7    A    I beg your pardon?

8    Q    How did you refer to Malik's house?

9    A    I don't remember.

10   Q    Did you ever use the phrase "the refugee house" because

11   there was so many people that came in and out of there?

12   A    I don't remember.

13   Q    Okay.  Do you recall at some point Malik told you that

14   Simpson had purchased an AK47?

15   A    No.

16        MS. BROOK:  Objection.  Hearsay.

17        THE COURT:  The answer "no" has already been given.

18        MR. MAYNARD:  I don't have any further questions.

19        THE COURT:  Thank you.  Ms. Brook.

20        MS. BROOK:  Thank you, Your Honor.

21                    **REDIRECT EXAMINATION**

22   BY MS. BROOK:

23   Q    Sir, defense counsel asked you about a time when the

24   defendant came and lived with you at your apartment and your

25   house?

1    A    Yes.

2    Q    And you mentioned that he stayed with you for just a short

3    time a week or so?

4    A    Right.

5    Q    Did you kick him out?

6    A    Yes.

7    Q    Why?

8    A    Because he called a very good friend of mine a very

9    derogatory name.

10   Q    And I know it's tough in a formal setting like this, but

11   if you can tell us the words of what he said.

12   A    He said:  Is that your bitch?

13   Q    And why was it or in what context was it that he said

14   that?

15   A    Well, we had went to a place to eat and then we had got

16   into it about what to eat.  And I wanted to eat chicken and I

17   think he wanted to eat something else.

18            So we started arguing.

19            And so I said:  Look, I don't got time for this.  So,

20   you know, if you want to go some place else and eat, do it.  I

21   said I don't need you.  I don't need a ride from you.  I don't

22   need nothing from you.

23            And to show you that I don't need it, I called my

24   friend.  I said, Donna, will you come get me.

25            She said:  Where were you at?

 1              I said:  I'm on 40th Street and McDowell.

 2              And she says:  Is there a liquor store by there?

 3              I said:  Yeah.

 4              She said:  I be there in ten minutes.

 5              And she came.  I got in the car with her.  We left.

 6              So Abdul Malik followed me back home and she had

 7    already dropped me off.

 8              And he said:  Who is that?  Your bitch?

 9              I said:  Let me tell you something.  This woman is

10    responsible for me even coming out here in 1999.  I lived with

11    her.  Her and my cousin.  Don't you ever call any of my

12    friends a bitch.  You know.  And I said, man, in fact, why

13    don't you get your ass out of my house.  How about that.

14              And he went upstairs and packed his stuff and left.

15    Q   It sounds like you were very firm with him.

16    A   Yeah.

17    Q   And when he talked to you about the Khalifah and believing

18    in the Khalifah, were you firm with him about that too?

19    A   I was firm with that, yeah.

20    Q   Are you aware of what group -- that ISIS believes in the

21    Khalifah?

22    A   Sure.

23              MR. MAYNARD:  Objection.  Beyond the scope of

24    examination.

25              THE COURT:  Sustained.

```
 1   BY MS. BROOK:

 2   Q   Defense counsel asked you about whether or not the last

 3   Prophet and Messenger was Allah.

 4            Do you remember that?

 5            THE COURT:  I don't.

 6            MR. MAYNARD:  Objection.  It's beyond the scope.  I

 7   never asked that question.

 8            THE COURT:  He did not.

 9            THE WITNESS:  No.

10   BY MS. BROOK:

11   Q   You mentioned when you spoke with defense counsel that you

12   thought that the defendant was hanging out with the wrong

13   people.

14   A   Uh-huh.

15   Q   And "those people," who would that be?

16   A   Ibrahim and the other guy that got killed.

17   Q   Soofi?  Nadir Soofi?

18   A   Soofi, yeah.

19   Q   Did you know what Ibrahim and Nadir Soofi believed in?

20   A   Yeah.  I knew they were --

21            MR. MAYNARD:  Beyond -- objection.  It's beyond the

22   scope.

23            THE COURT:  Sustained.

24   BY MS. BROOK:

25   Q   Why did you think they were the wrong guys?
```

1          MR. MAYNARD:  Objection.  Beyond the scope.

2          THE COURT:  Sustained.

3          MS. BROOK:  May I have one moment?

4          THE COURT:  You may.

5          In the meantime I'm going to explain to the jury this

6   "beyond the scope" that the lawyers and I have been talking

7   about.

8          When a witness comes on the witness stand, the person

9   who calls the witness gets to ask them whatever questions they

10  believe are important or relevant to the case on what we call

11  "direct examination."

12         Then the other lawyer gets to do cross-examination

13  and ask anything that they believe is important or relevant to

14  the case.

15         And then the person who calls the witness gets to do

16  what we call "redirect," which is following up on things that

17  may have been raised for the first time on cross-examination

18  so that they can further clarify them.

19         But they aren't allowed to raise new issues or talk

20  about new things that weren't raised in the cross-examination.

21         MS. BROOK:  Thank you, Your Honor.

22  BY MS. BROOK:

23  Q   Defense counsel asked you about your discussion about the

24  Khalifah.

25         Based upon the context of your conversation with

 1   Kareem, what did you think the Khalifah was?

 2            MR. MAYNARD:  Objection.  Again, it's beyond the

 3   scope and it's also been asked and answered.

 4            THE COURT:  Well, did -- try the question a little

 5   differently.

 6            Not "what did he believe" but perhaps "what did

 7   Mr. Kareem say to him."

 8            I'm not sure his conclusion of what that was is what

 9   is admissible.

10   BY MS. BROOK:

11   Q   What did Mr. Kareem say to you about who the Khalifah was?

12   A   Well, he just -- he wanted to know if there was a

13   Khalifah.  A new Khalifah.

14            And I told him:  No.  No Khalifahs.

15   Q   So "a new Khalifah," what did he mean by that?  "A new

16   Khalifah"?

17            MR. MAYNARD:  Objection.

18            THE COURT:  No.  Did he say who he thought that new

19   Khalifah was?

20            THE WITNESS:  No.  He didn't mention any names to me.

21   But, you know, I'm thinking evidently he probably --

22            THE COURT:  No, not what you're thinking.

23            THE WITNESS:  Oh.  Okay.  Okay.

24            THE COURT:  Just what he said.

25            THE WITNESS:  Okay.  Okay.  Well, no, he didn't

```
 1    mention any names to me about a new Khalifah.
 2    BY MS. BROOK:
 3    Q   And it was at that point that you pushed back; is that
 4    correct?
 5    A   What do you mean?
 6    Q   And explained that in your mind there was not a Khalifah?
 7    A   I know there is not a Khalifah.
 8    Q   Did he mention a group?
 9    A   No.  He didn't -- he didn't mention any particular group
10    with me.
11    Q   You mentioned that this happened a few times and that
12    eventually you called your son?
13    A   Uh-huh.
14    Q   How did you feel?  Why was it you called your son?
15    A   Because I knew --
16          MR. MAYNARD:  Objection, Judge.  It's been asked and
17    answered about three times.
18          THE COURT:  Sustained.
19          MS. BROOK:  Your Honor, I don't think I've asked how
20    he felt about why he called his son.
21          THE COURT:  I sustained the objection.
22          MS. BROOK:  I have no further questions.
23          THE COURT:  May this witness be excused?
24          MS. BROOK:  Yes.
25          MR. MAYNARD:  Yes.
```

1              THE COURT:  Thank you very much, Mr. Mubarak.  You

2   may step down and you are excused as a witness.

3              THE WITNESS:  Thank you.

4              THE COURT:  And the government may call its next

5   witness.

6              MS. BROOK:  Thank you, Your Honor.  The government

7   calls Special Agent Matt Reinsmoen.

8         (Witness duly sworn.)

9              THE CLERK:  Please state your name for the record and

10  spell your last name.

11             THE WITNESS:  Matt Reinsmoen.  R-E-I-N-S-M-O-E-N.

12             MS. BROOK:  We're coordinating exhibits.

13             THE COURT:  While you're coordinating, can you

14  answer.  This is the gentleman whose name wasn't on the

15  witness list that we talked about after we broke yesterday.

16             So just, ladies and gentlemen of the jury, do any of

17  you know this gentleman?  His name is Matt -- say your last

18  name for me.

19             THE WITNESS:  Reinsmoen.

20             THE COURT:  Reinsmoen.  He's from the FBI.

21             Thank you.  Nobody knows him yet.

22        **SPECIAL AGENT MATT REINSMOEN, WITNESS, SWORN**

23                    **DIRECT EXAMINATION**

24  BY MS. BROOK:

25  Q   Good morning.  Would you please introduce yourself to the

1    ladies and gentlemen of the jury.

2    A    My name is Matt Reinsmoen.   I'm a special agent with the

3    FBI.

4    Q    And, sir, how long have you been a special agent with the

5    FBI?

6    A    Since July of 2008.

7    Q    Back in 2015, in May in particular, were you stationed and

8    assigned here in Phoenix?

9    A    Yes.

10   Q    And on May 4th of 2015, were you called upon to assist in

11   the execution of a search warrant?

12   A    I was.

13   Q    I want to talk about that for a moment.   I'm going to

14   place on the overhead what has been admitted and published as

15   Exhibit No. 203.   Do you recognize that?

16   A    I do.

17   Q    And what do you recognize it as?

18   A    A sketch from the search you were referring to.

19   Q    All right.   And was that the search at 13850 North 19th

20   Avenue, Phoenix, Arizona?

21   A    I mean, I don't know the address, but it was the one on

22   that day you're referring to.

23   Q    Okay.   An apartment?

24   A    Yes.

25   Q    On the second floor?

```
 1   A   Right.
 2   Q   And let's talk just for a second about your training and
 3   experience --
 4   A   I guess I don't remember if it was second floor.  I think
 5   it was "two zero" something, but I think it was a ground floor
 6   apartment.
 7   Q   When you conducted the search, were you there with
 8   numerous other FBI agents?
 9   A   I was.
10   Q   And were you just one member of a large team that was
11   conducting a search warrant?
12   A   Yes, part of the Evidence Response Team.
13   Q   When you went to Quantico -- or did you go to Quantico?
14   A   Yes.
15   Q   And you obviously completed your work there at Quantico?
16   A   Yes.
17   Q   And then you were sent out into the field?
18   A   Correct.
19   Q   And as part of your training at Quantico, as well as your
20   experience in the field, have you been called upon before to
21   execute search warrants?
22   A   Yes.  And, actually, I'm also a member of the Evidence
23   Response Team and I did a separate two-week course in
24   Frederiksberg, Virginia, as part of that team.
25   Q   So what does it mean to be a member of the Evidence
```

1   Response Team?

2   A   It's a group that we go out and a lot of times it would

3   be, you know, maybe crime scenes on a reservation and there

4   might be a dead body and you would process the scene and try

5   to, you know, capture and maintain the evidence, you know, in

6   an appropriate way.

7            We also do some search warrants and this was one of

8   those where our team went out.

9   Q   As part of capturing, you mean capturing the evidence,

10  maintaining the scene, do you take steps to make sure that the

11  scene is secure?

12  A   Yes.

13  Q   How do you do that?

14  A   Well, usually it's secure once we get there.  And then

15  somebody, you know, an armed officer will maintain some

16  security, you know, as far as other people coming in.

17           We also have a log.  So if you're going to enter the

18  scene, you have to sign in, you know, things like that.  It's

19  usually roped off.  Sorry.

20  Q   Oh, sorry.  I interrupted you.  Go ahead.  Roped off?

21  A   Yeah.  And it's usually, you know, roped off.  And it's

22  clear that this is a place that, you know, is not open to the

23  public at that time.

24  Q   Is that standard procedure?

25  A   Yes.

1    Q    And then you mentioned that there are procedures that

2    you're trained upon in order to collect the evidence itself?

3    A    Yes.

4    Q    And did you implement those on that day on May 4th when

5    you were executing the search warrant with other FBI members?

6    A    Yes.

7    Q    So I want to talk specifically first about an exhibit

8    that's in front of you and it's Exhibit No. 92.  And,

9    actually, it's not in front of you.

10         MS. BROOK:  Your Honor, may Special Agent Whitson

11   approach?

12         THE COURT:  Yes.

13         SPECIAL AGENT WHITSON:  The exhibit number, please?

14         MS. BROOK:  The exhibit number is No. 92.  Thank you.

15   BY MS. BROOK:

16   Q    I want to focus in first on this particular Exhibit No.

17   92.  Do you recognize it?

18   A    I do.

19   Q    And what do you recognize it as?

20   A    These were -- this was ammunition that I found at the

21   scene in this case.

22   Q    And let's walk through what it is.

23         So -- well, does it fairly and accurately represent

24   how the ammunition was when you found it at the scene in that

25   apartment on May 4th?

1   A   Yeah.  I mean, it's not in the same packaging, you know,

2   but they kept the original packaging, so I can tell, you know,

3   exactly what it is.

4   Q   To your knowledge has it been repackaged so that it can be

5   visually seen without anybody having to open it up?

6   A   Right.  Yeah.  It was in a paper bag before.

7   Q   All right.  So let's walk through what it is and --

8           Well, first, Your Honor, the government moves to

9   admit Exhibit No. 92.

10          THE COURT:  Is there any objection?

11          MS. PLOMIN:  No objection.

12          THE COURT:  92 is admitted.

13      (Exhibit No. 92 admitted in evidence.)

14  BY MS. BROOK:

15  Q   So you mentioned it's ammunition.  What types?

16  A   So it has 40 rounds of 5.56 millimeter ammunition and then

17  there's five rounds of Luger 9 millimeter and then a solo, one

18  round of a different kind of 9 millimeter ammunition.

19  Q   Okay.  I'm going to place on the overhead what has not yet

20  been admitted.  It's Government's Exhibit No. 304 -- I'm

21  sorry.  384.

22          Do you recognize what's in that photo?

23  A   Yeah.  That's the kitchen area of the apartment.

24  Q   And does it fairly and accurately represent the kitchen

25  area of the apartment, the apartment which you were searching

1   there that morning on May 4th when you seized Exhibit No. 94?

2   A   It does.

3   Q   And is this the kitchen area where you found that

4   particular exhibit?

5   A   Yes.

6   Q   That ammunition.

7           Do you see -- well, Your Honor, the government moves

8   to admit and publish 384.

9           THE COURT:  Is there any objection?

10          MS. PLOMIN:  No objection.

11          THE COURT:  384 is admitted.

12      (Exhibit No. 384 admitted in evidence.)

13  BY MS. BROOK:

14  Q   So as we all together look at this photo of the kitchen

15  area, can you, in touching this screen, make a circle where

16  you found that ammunition.

17  A   (Indicating)

18  Q   And so for the purpose of the record, the witness has

19  circled the left-hand side, upper kitchen cabinets.

20          So were they in the kitchen cabinets?

21  A   Yes.  They were up -- exactly, yeah, in that kitchen

22  cabinet.

23          MS. BROOK:  Okay.  Your Honor, may we publish the

24  Exhibit No. 92?

25          THE COURT:  It is published.

 1              Oh, 92.  I'm sorry.  I was thinking of that

 2   photograph.  Yes.

 3              MS. BROOK:  Thank you, Your Honor.

 4              THE COURT:  But please continue with your questions

 5   of the witness.

 6   BY MS. BROOK:

 7   Q   We talked about there being 40 rounds of 5.56 Winchester

 8   ammunition.  Were there also 5 rounds of 9 millimeter Luger

 9   ammo?

10   A   Yes.

11   Q   And another round of 9 millimeter, one single?

12   A   Yes.

13   Q   Special Agent Whitson, if you can pull and put in front of

14   the witness No. 205, 206, and 207, please.

15              Let's take them each one at time, so let's start with

16   Exhibit No. 205.  Do you recognize that?

17   A   Yes.

18   Q   And what do you recognize it as?

19   A   This was a CD that I found not in the apartment, but in

20   the Infinity that was at the apartment that there was also a

21   warrant for and it was in the center console of that vehicle.

22   Q   So as part of your job on May 4th, you weren't just

23   working collecting evidence inside the apartment itself, you

24   were also outside with the Infinity?

25   A   Yes.

1  Q   Okay.  And you had mentioned that those were in the center

2  console?

3  A   The 205 was.

4          MS. BROOK:  Okay.  Government moves to admit Exhibit

5  No. 205.

6          MS. PLOMIN:  No objection, Your Honor.

7          THE COURT:  205 is admitted.

8      (Exhibit No. 205 admitted in evidence.)

9          MS. BROOK:  And may we publish?

10         THE COURT:  Yes.  But please continue with your

11 questions.

12         MS. BROOK:  I have one more question about that CD in

13 particular.

14 BY MS. BROOK:

15 Q   There is black writing on the top of Exhibit No. 205.

16 Does it say "The Purpose of Life by Hamza."

17 A   Yes.

18 Q   And that writing was as it was when you found it in the

19 center console?

20 A   Correct.

21 Q   Moving next to Exhibit No. 206.  Do you see that?

22 A   I do.

23 Q   And do you recognize it?

24 A   Yes.

25 Q   What do you recognize it as?

1    A    This -- well, 206 and 207 were both part of a group of six

2    CDs that were found also in the Infinity.  These were in the

3    glove box.

4    Q    I want to take a moment and place on the overhead already

5    admitted and published Exhibit No. 387.  Do you recognize

6    that?

7    A    Yes.  That looks like the Infinity.

8    Q    Okay.  So now we're focused in on the glove box.  And you

9    mentioned that Exhibit No. 206 you found in there?

10   A    Yes.

11   Q    Does it fairly and accurately reflect how it was when you

12   collected it that day?

13   A    Yes.

14        MS. BROOK:  Government moves to admit 206.

15        MS. PLOMIN:  No objection.

16        THE COURT:  206 is admitted.

17     (Exhibit No. 206 admitted in evidence.)

18   BY MS. BROOK:

19   Q    And let's take a second and read for us what writing, if

20   any, is on top of those CDs.

21   A    Well, 206, I mean, it says, I guess, "Ummar."  U-M-M-A-R.

22   Next word is "Ibn."  I-B-N.  Next word is A-L-K-H-A-T-A-A-B.

23   and then it says "His Life and Times" and the "By" part it

24   says, "By Imam Anwar al-Awlaki."

25   Q    And how about the purple CD?

```
 1   A    The purple CD, 207, says Sheik Khalid --

 2             Do you want me to read all of it?  There's a lot.

 3   Q    Yes.

 4   A    Okay.  Something "Muslim blame yourself."

 5             "Will you die as a Muslim.  Have patience and faith

 6   in Allah."  It says "CD2" and it says, "The Legacy of Khalid

 7   Ibn Waleed.  Hypocracy of Government.  Your life in this" --

 8   it says W-O-L-D.  Maybe it's supposed to be "world."  And then

 9   it says at the bottom.  "Yassin."  Y-A-S-S-I-N.

10             MS. BROOK:  Your Honor, the government moves to

11   publish 206 and place it on the table when we're done.

12             THE COURT:  Go right ahead, but also continue with

13   your questions.

14   BY MS. BROOK:

15   Q    Moving next to 207, also in front if you, do you recognize

16   that?  So 206, if you don't mind giving that to Special Agent

17   Whitson.

18   A    They're together.

19   Q    Oh, my apologies.  Okay.  So 206 and 207 aren't bagged

20   separately.  They're bagged together, two different evidence

21   stamps.

22             THE COURT:  And I think he just read off what was on

23   207.

24   BY MS. BROOK:

25   Q    You had already mentioned that those two CDs fairly and
```

```
 1    accurately represented the CDs that you found within the glove

 2    box, is that correct, of the Infinity?

 3    A    Yes.  I mean, there were other CDs.  These were two of

 4    them.

 5              MS. BROOK:  The government moves to admit 207 as

 6    well.

 7              MS. PLOMIN:  No objection.

 8              THE COURT:  207 is also admitted.

 9         (Exhibit No. 207 admitted in evidence.)

10    BY MS. BROOK:

11    Q    I want to go back for a movement to the inside of the

12    house and place on the overhead Exhibit No. 384, already

13    admitted.

14              So this is the kitchen and we talked about that.

15    Inside the house did you also search inside of a closet?

16    A    Yes.

17    Q    Now, let's go back on the overhead and put up 203, also

18    similarly already admitted.  As we look at this exhibit, do

19    you see where the kitchen is located?

20    A    I do.

21    Q    And can you circle that for us?

22    A    (Indicating)

23              Well, there's part of a red line there.  Room E.

24    Q    Very good.  So we've got a mark over room E, which is the

25    kitchen.  Describe for us and point for us where the closet is
```

1    that you searched.

2    A    The closet is room C and there's a red circle by the

3    closet that I searched.

4    Q    Just so we can understand the layout, from room E, the

5    kitchen, to the closet there, room C, are there any walls

6    that -- other than the closet door -- are there any walls that

7    separate those rooms?

8    A    No.

9    Q    So is it more of an open floor plan, I guess you would

10   call it?

11   A    Right.

12   Q    All right.  So let's talk specifically about room C, the

13   closet.  Did you collect evidence inside the closet?

14   A    Yes.

15   Q    And did you collect CDs?

16   A    I did.

17   Q    So did you collect them and bag them and tag them and then

18   put them into evidence as you were trained to do?

19   A    Well, right.  My role was to find evidence.  And I'm not

20   trained in counterterrorism or anything like that.  So I found

21   CDs that might be within the scope of the search warrant,

22   pulled those, and then somebody will come in and say, yes,

23   these are things that we need to take, you know, or no they

24   aren't, whatever.  I did not bag and tag them.  I was the

25   finder.

```
 1    Q    Okay.  So you identified them and then another individual

 2    tagged them and then put them into evidence; is that correct?

 3    A    Correct.

 4    Q    So Special Agent Whitson, if we can put up in front of the

 5    witness Exhibit No. 94.  Do you recognize what's in there?

 6    A    I do.

 7    Q    And what do you recognize it as?

 8    A    This is part of the group.  I think there were like 57 CDs

 9    that were seized as a piece of evidence and this is part of

10    that group.

11    Q    Do they fairly and accurately represent how they appeared

12    that day when you found them in the closet?

13    A    Yeah.  I think they were actually in a case that also

14    said, you know, "The Hereafter by Anwar al-Awlaki."

15    Q    Okay.  And Special Agent Whitson has placed before you

16    another exhibit.  What number is that?  It's not yet marked.

17         Do you see there a case?

18    A    I do.

19    Q    Okay.  Let's go back then to Exhibit No. 94.  In looking

20    at those CDs, do they have labels on them?

21    A    They do.

22         MS. BROOK:  And the government moves to admit Exhibit

23    No. 94 and to publish in just a moment.

24         MS. PLOMIN:  No objection.

25         THE COURT:  94 is admitted.
```

1          (Exhibit No. 94 admitted in evidence.)

2    BY MS. BROOK:

3    Q    If you can go ahead and read for us the labels on those

4    CDs.

5    A    Sure.  So it looks like this is all part of Volume II.

6    "The Hereafter."  It's by Anwar al-Awlaki.  So it's CDs 1, 2,

7    3, 4 through 12; not missing any CDs.

8    Q    So it's 1 through 12?

9    A    Yes.

10   Q    Okay.  Of Volume II?

11   A    Of Volume II of "The Hereafter."

12   Q    And why don't we go ahead and publish those and put them

13   on the table.  Thank you.

14          And you mentioned a case.  You saw a case.  Did the

15   case bear a similar label?

16   A    Yes.

17   Q    Did the case look like a case that was put together maybe

18   with similar markings like it was put together in a set?

19   A    Yes.

20   Q    Let's move to Exhibit No. 96.

21   A    Okay.

22   Q    You have before you 96.

23   A    I do.

24   Q    And where was it that you found 96?

25   A    I believe 96, this is all within those 57 CDs that --

1            THE COURT:  I wonder if we could speed this up a
2  little bit.
3            MS. BROOK:  Sure.
4            THE COURT:  Because these appear to be all
5  individually packaged CDs one at a time, all these exhibits
6  you just put in front of him, which I'm guessing are 96
7  through maybe 103.
8            MS. BROOK:  Exactly it.
9            THE COURT:  Were they all in the closet?
10            THE WITNESS:  All within that group of 57 CDs in the
11  closet, yes.
12            THE COURT:  Okay.
13  BY MS. BROOK:
14  Q   So they fairly and accurately represent how they appeared
15  that day when you saw them and found them?
16  A   Yes.  To the best of my knowledge, yes.
17            MS. BROOK:  Then the government would move to admit
18  No. 96, 97, 98, 99, 100, 101, 102, and 103.
19            MS. PLOMIN:  No objection.
20            THE COURT:  96 through 103 are admitted.
21       (Exhibit Nos. 96, 97, 98, 99, 100, 101, 102, and 103
22  admitted in evidence.)
23  BY MS. BROOK:
24  Q   If we can go through just one by one, starting with 96,
25  and describe for us what is on the CD and what does it say.

1    A    So this is a CD with handwriting on it.

2              It says, "The Hereafter Volume II, CD2."

3              It says, "By Anwar al-Awlaki."

4              It also says "Neyrus."  N-E-Y-R-U-S.

5              And then there's a couple kind of notations, small.

6    It says I 31 and then it says 2015-01137.  And then I can't --

7    initials, maybe an "M," an "E."  I don't know.

8    Q    And as we go, what we'll do is we'll hand that exhibit to

9    Special Agent Whitson who will place it on the table and we

10   can go next to 97, please.

11   A    97 is, "The Hereafter Volume 1, CD 1," also by Anwar

12   al-Awlaki.

13   Q    98?

14   A    98 is handwriting on a CD and it says:

15             "The Devil's Deception of the" --

16             I'm not sure if it says S-A-U-D-I.  "Saudi."

17   "Salafis."  S-A-L-A-F-I-S.  Part one.  Sheikh Faisal

18   F-A-I-S-A-L.  And it also has some -- do you want the little

19   notations?

20   Q    Please, the whole thing.

21   A    It says I 27.  2015-01137.  I think maybe it's a K-E-E for

22   the initials.

23   Q    Next?

24   A    Next is 99.  It says:

25             "The Devil's Deception of the Saudi Salafis."

1    Part -- maybe 21.  "Stop Police Terror."

2            It's kind of starting to wear off but it looks like

3    it says Sheikh Faisal.  Down here there's a couple words you

4    can't read, but one is "al-Awlaki."  The small notation says:

5    I 28.  2015-01137.  Again, it looks like initials, looks to me

6    like K-E-E.

7    Q   Next?

8    A   100.  "The Devil's Deception of the Shia, Part One.

9    Sheikh Faisal."

10           The small notation says I 25.  2015-01137.  Again,

11   the same initials.  Looks like K-E-E.

12   Q   Next?

13   A   101 is also handwriting.  "The Devil's Deception of the

14   Shia, Part Two."  It says maybe "and reject the" -- "reject

15   the" -- I don't know -- taghoot.  I don't know.

16   T-A-G-H-O-O-T.  It's kind of worn off, but it looks like it

17   might say "Sheikh Faisal."

18   Q   Next?

19   A   102.  "Deviation Of The Ummah Past and Present."

20   U-M-M-A-H.  By Bilal Philips.  It says "Ibrahim" at the

21   bottom.  Small notation says: I 24.  2015-1137.  Same

22   initials.  Looks like K-E-E.

23           103 is "Fire Of The Goldsmith."  It says "Shaikh

24   Yasir Qadhi."  Small notation says:  I 29. 2015-01137.  Same

25   initials.  Looks like K-E-E.

1          MS. BROOK:  And with that one being published, I have

2     no further questions.

3          THE COURT:  Do you have any questions for this

4     witness, Ms. Plomin?

5          MS. PLOMIN:  Yes, Your Honor.

6          THE COURT:  You may proceed.

7                          **CROSS EXAMINATION**

8     BY MS. PLOMIN:

9     Q   Good morning, Agent.

10    A   Good morning.

11    Q   Agent, as part of being a part of the Evidence Response

12    Team, are you trained in collecting forensic evidence and

13    fingerprints, hair samples, those types of things?

14    A   Yes.

15    Q   Okay.  And did you do that in the apartment of Simpson and

16    Soofi on 19th Avenue?

17    A   As part of my role, I did not.

18    Q   Did anyone in your team do that?

19    A   I don't know if anybody else kept stuff in a way that they

20    were doing that.  I didn't see anybody, you know, like

21    vacuuming for fibers or anything like that, but it was -- that

22    would have been outside my role.

23    Q   And you didn't see anybody dusting for fingerprints?

24    A   I don't recall that.

25    Q   Or collecting any kind of DNA samples from the scene?

1    A    Not to my knowledge.

2    Q    Okay.  So to your knowledge, nobody was looking for any

3    evidence of Mr. Kareem being in the apartment on 19th Avenue?

4              MS. BROOK:  I object to foundation of other people's

5    knowledge.

6              THE WITNESS:  Not to my knowledge.

7              MS. PLOMIN:  I asked to his knowledge.

8              THE COURT:  Go right ahead.

9              THE WITNESS:  Okay.  To my knowledge, certainly

10   forensic.  No, I'm not aware of that.

11   BY MS. PLOMIN:

12   Q    And you were involved in the search of the apartment and

13   the Infinity, correct?

14   A    Yes.

15   Q    And did you locate any kind of mail, notes, anything

16   indicating anything relating to Mr. Kareem in the 19th Avenue

17   apartment?

18   A    I did not to my knowledge, no.

19   Q    And are you aware that correspondence between Saabir Nurse

20   and a man named Abu Jihad Hassan was found in the apartment on

21   19th Avenue?

22   A    I'm not aware of that.

23   Q    And Elton Simpson, accordingly, there was correspondence

24   found between Elton Simpson and Abu Jihad Hassan.  Are you

25   aware of that?

1    A    I'm not aware of that.

2    Q    Are you aware that there were two passports found in the

3    name of Nadir Soofi in the apartment on 19th Avenue?

4    A    I'm not aware of it.  I mean, it's my understanding that

5    he lived there and Elton Simpson, but, no, I'm not aware of

6    what else was found other than my stuff.

7    Q    What you found?

8    A    Right.

9    Q    Now, do you know whether any explosives or pipe bombs were

10   found in the apartment on 19th Avenue?

11   A    I'm not aware of any actual explosives, but I did -- up

12   in -- where was it -- in room E in the same spot where I found

13   ammunition, I found stuff that, to me, you know, as untrained

14   in bombs, looked like something we should call.

15        And I know that the bomb technicians did come in and

16   check it, but I don't think it was any, you know, pipe bombs

17   or live ammunition -- or live bombs or anything like that.

18   Q    And was that evidence seized?

19   A    No.  I think it was deemed not -- not, you know, live or

20   explosive or real kind of bomb evidence, yeah.

21   Q    All right.  And it would be important to you and the FBI

22   if there were materials to build some kind of explosive

23   devices in that apartment, correct?

24   A    Yes.

25   Q    So that to your knowledge, that would have been seized had

1   it have been material to build some kind of explosive device?

2   A   Yes.

3   Q   And it wasn't seized?

4   A   To my knowledge, that was not seized, yeah.

5   Q   Okay.  And to your knowledge, was anything found in the

6   19th Avenue apartment, any instruction manuals or anything

7   relating to building an explosive device, including a pipe

8   bomb?

9   A   To my knowledge, no.

10  Q   And just a couple more questions.

11         Now, you mentioned you found a number of CDs, both in

12  the Infinity and in the apartment, correct?

13  A   Correct.

14  Q   And you mentioned that there was some CDs that you did not

15  seize?

16  A   I -- so to clarify that, no.  How it -- there probably

17  were some CDs that were not seized.

18         How it works is we would pull out things that are

19  potentially relevant and within the scope of the search

20  warrant.  And then somebody who has knowledge of the case --

21  because I have no knowledge of the case as an Evidence

22  Response Team member -- would go through and say, oh, no, this

23  is just a singer, this is something else, you know, that kind

24  of stuff.  So, yeah, I think that there were likely CDs that

25  were not seized.

1    Q   Okay.  And in your search of the closet, I believe you

2    found a number of CDs in the closet and in the Infinity.  Do

3    you recall seeing any CDs that were just what you mentioned,

4    music, or anything that seemed to have no relevance to the

5    case?

6    A   I mean, I don't have specific recollection of that, you

7    know, right now.  I guess I would be surprised if there

8    weren't, but.

9         MS. PLOMIN:  Okay.  I don't have anything further.

10   Thank you.

11        THE COURT:  Ms. Brook, any questions on redirect?

12        MS. BROOK:  Just briefly.

13                    **REDIRECT EXAMINATION**

14   BY MS. BROOK:

15   Q   Defense counsel asked you about whether or not there were

16   any manuals or information inside the apartment related to

17   explosives or explosive capabilities or things of that nature.

18        Are you on a terrorism task force at all?

19   A   I am not.

20   Q   And did you have occasion during your search to look

21   through any of the paperwork in detail to analyze any of the

22   contents of it within the apartment?

23   A   No.  My role was only searching a couple of areas.  And

24   then the -- we went over the items that I found, yeah.

25   Q   And just in terms of general procedure and protocol during

1    a search and, in particular, during this search, agents there

2    conducting the search were wearing gloves and engaged in

3    proper procedures as you're trained to; is that correct?

4    A    Yeah.  We followed our protocol.

5            MS. BROOK:  I have no further questions.

6            THE COURT:  May this witness be excused, Ms. Brook?

7            MS. BROOK:  Yes.

8            THE COURT:  Is there any objection, Ms. Plomin?

9            MS. PLOMIN:  No.

10           THE COURT:  Thank you, Agent Reinsmoen.  You are

11   excused as a witness.  You may step down.

12           We'll take our morning break and reconvene at 10:35,

13   more or less.

14           You're reminded, again, of the admonition not to

15   discuss the case among yourselves or with anyone else.  Please

16   do not form any conclusions about the case until you've heard

17   all the evidence and begun your deliberations.

18           We will reconvene in about 15 minutes.

19           MR. MAYNARD:  Your Honor, can we have a brief

20   discussion outside the jury?

21           THE COURT:  Yes.  I will excuse the jury at this time

22   and I'll remain here and discuss a couple of matters with

23   counsel.

24       (Open court, no jury present at 10:21 a.m.)

25           THE COURT:  Before I hear what Mr. Maynard wants to

1    ask, a juror submitted a question about fingerprints.

2         I assume we're going to have a discussion about

3    fingerprints later on?

4         MS. BROOK:  That's correct.

5         THE COURT:  And I was going to propose that I tell

6    the jury when we resume that earlier this morning a juror

7    submitted a question about dusting for fingerprints and that

8    the witnesses who might know that information have not yet

9    testified.

10        MS. BROOK:  Thank you.

11        THE COURT:  Is that agreeable?

12        MS. BROOK:  Yes.

13        THE COURT:  Mr. Maynard?

14        MR. MAYNARD:  Fine.

15        THE COURT:  Mr. Maynard?

16        MR. MAYNARD:  Judge, the problem I have is we have --

17        THE COURT:  Everybody else can sit down except for

18   Mr. Maynard -- except for Mr. Maynard.

19        MR. MAYNARD:  Sorry, Your Honor.  Getting old and

20   don't hear well.

21        We had an agreement with the government before the

22   case started that we were going to tell each other who our

23   witnesses were by the end of the day.  And in fairness, I

24   meant the end of the trial day.  If we ended at 4:30, they

25   would tell me at 4:30.

1        The problem is I continue to get late disclosures

2   from the government.

3        Yesterday I got two packets of information which

4   includes -- I don't know -- ten, twelve CDs.  I haven't had a

5   chance to open them yet.  I don't know what's in them.  I'm

6   told -- I got some 302s.  I got some Bates-stamped discovery.

7        I'm continuing to get late disclosures by the

8   government.  And the main problem was when I asked the

9   government who their witnesses were going to be today, they

10  did tell me about two o'clock, 2:30 that there would be four

11  particular witnesses.  There were two witnesses, this one

12  being one, and I thought they were bringing back on another

13  witness that was on yesterday for a few minutes and I agreed,

14  that's fine, I wouldn't object.  And then they told me it was

15  going to be Mr. Abubaker and Mr. Verdugo, I was told.

16       We also discussed that we didn't think -- and I

17  certainly didn't think -- that that was going to fill the day

18  and they needed to get back to me and tell me who those

19  witnesses were.

20       At 7:30 last night I sent an e-mail out saying, look,

21  you haven't gotten back to me with anybody.  I'm assuming this

22  is all you're going to bring.

23       At eleven -- a little after 11:00 last night I got an

24  e-mail back from Mr. Koehler saying, no, that's not going to

25  fill it up.  We're going to bring in these people.

1              I didn't see it at eleven o'clock last night because
2     I was sleeping.

3              The problem I've got is these are just late
4     disclosures.  For us to try to be effective in represent -- we
5     have to get disclosures timely.  Yesterday --

6              THE COURT:  I agree.  I mean, we discussed telling
7     that -- coming to an agreement where each side would tell the
8     other side who the next lineup of witnesses were.  And you
9     may -- I didn't -- I recall saying I'm not going to order a
10    certain number of hours or days.  I'll see if you can reach an
11    agreement.  Apparently, you did.

12             I don't consider eleven o'clock at night telling --
13    within the spirit of an agreement for "we'll give you all of
14    our witnesses for the next day" the day before they testify.
15    I mean, that's just not reasonable.

16             And it isn't reasonable to expect that the defense
17    can be prepared for the cross-examination of witnesses if they
18    don't know until after eleven o'clock at night that they're
19    coming up for testimony the next day.

20             There's a lot of witnesses in this case and you can't
21    expect to have -- be prepared to testify them -- or to examine
22    them either on direct or cross without some notice that
23    they're going to be the ones to come.

24             So who is testifying today, Mr. Koehler?
25             MR. KOEHLER:  The other witness that we notified the

1    defense about for this afternoon is Amy Vaughan.

2         THE COURT:  And --

3         MR. KOEHLER:  Who testified at -- she testified at

4    the suppression hearing in the case, although her scope would

5    certainly be broader today.

6         THE COURT:  So who is testifying -- I think I asked

7    who's testifying today.

8         MR. KOEHLER:  Yes.

9         THE COURT:  Not who else.

10        MR. KOEHLER:  We have Mr. Mubarak.

11        THE COURT:  We've had two witnesses.  I don't need

12   you to tell me who they are because now I've met them.

13        MR. KOEHLER:  Agent Stanley is coming back.  Hilda

14   Graulau from -- she was one of the finders at Mr. Abdul

15   Kareem's apartment, Steven Kent, Stefan Verdugo, and Amy

16   Vaughan.

17        THE COURT:  And with the exception of -- who was in

18   the eleven o'clock e-mail?

19        MR. KOEHLER:  Amy Vaughan, I believe, is the name

20   that I provided at eleven o'clock last night after I filed the

21   Government's Response to the Defendant's Motion to Suppress

22   our expert testimony.

23        MR. MAYNARD:  He's correct.  It was Amy Vaughan.  The

24   other two names that he just mentioned I have never heard of.

25   He didn't mention those in the eleven o'clock e-mail.

 1              MS. BROOK:  Your Honor, if I may interject briefly.

 2         So I think defense counsel misspoke at first.

 3         So Abdullah Mubarak, defense counsel certainly knew

 4    was testifying this morning.

 5              The other individuals are finders.  And I believe

 6    there have been certain stipulations about foundation and

 7    finding of exhibits in terms of location and where things

 8    were.  We are using some exhibits or some individuals to

 9    testify to bring to life a little bit of that particular

10    evidence.

11              But in terms of the actual substantive individuals,

12    those people have been disclosed.

13              I just want to make one caveat, which was that we did

14    have earmarked for these two days one particular witness who

15    has now been bumped to the end of trial which we've talked

16    about Evan Kohlmann.

17              So because of the shifting with witnesses and moving

18    in the foundation of exhibits these two days, there have been

19    additional individuals who are finders that have been

20    testifying --

21              THE COURT:  All right.  Let me just stop.

22              If these people are really just finders and aren't

23    going to say anything substantive besides what they found and

24    what it might say on it, I don't think there is some prejudice

25    to the defense.

1          But I am now going to order that the government

2     disclose to the defense who their witnesses are for the next

3     day at least 24 hours before they are called to testify.

4          So if they're coming on at nine o'clock in the

5     morning, next Tuesday, defense team needs to know about it

6     before 9:00 a.m. on Monday.  And that will be the rule for the

7     rest of the case and it will go both ways.

8          MS. PLOMIN:  Your Honor, may I be heard briefly?

9          In terms of the Amy Vaughan, she's not just a mere

10    finder.

11         THE COURT:  I know she's not a mere finder and we'll

12    see how far it goes with Amy Vaughan.  And if you're not

13    prepared to cross-examine her and she's the last witness

14    today, then we will recess at the conclusion of her testimony.

15         MS. PLOMIN:  Thank you.

16         MR. KOEHLER:  I was going to make that offer and

17    inform the Court we are running ahead of schedule.

18         THE COURT:  That's always good.

19         MR. KOEHLER:  Yes.  So if we were to end early today,

20    it would not really affect the length of the trial otherwise.

21         THE COURT:  Nor would I guess any juror would

22    complain.

23         So we will reconvene in about seven minutes.

24         MR. KOEHLER:  Thank you.

25         (Recess taken at 10:29 a.m.; resumed at 10:41 a.m.)

1          (Open court, jury present.)

2              THE COURT:  Thank you, ladies and gentlemen.  Please

3      sit down.  The record will show the presence of the jury,

4      counsel, and the defendant.

5              Ladies and gentlemen, before we started this morning,

6      one of you gave me a note about -- questioning about dusting

7      for fingerprints.  And what I can tell you is any witness

8      who's going to testify about fingerprints has not yet been

9      called to testify.

10             So there will be someone later in the trial that will

11     tell you what was and what wasn't and what the results were

12     concerning fingerprints.

13             The government may call its next witness.

14             MS. BROOK:  Thank you, Your Honor.

15             Your Honor, the government briefly recalls Charles

16     Stanley who testified yesterday.  There is just two additional

17     pieces of evidence.  Defense has no objection.

18             THE COURT:  You may take the stand, sir.

19         **SPECIAL AGENT CHARLES STANLEY, WITNESS, SWORN**

20                     **DIRECT EXAMINATION**

21     BY MS. BROOK:

22     Q   Good morning, sir.

23     A   Good morning.

24     Q   Just for the purposes of the record, I know you introduced

25     yourself yesterday, but what's your name?

1  A   Charles Stanley.

2  Q   You are still under oath from yesterday.

3        I want to talk briefly.  We spoke yesterday about the

4  execution of the search warrant at Simpson and Soofi's house

5  at 13850 North 19th Avenue, Apartment 219.

6        Before you there are two additional exhibits.  And

7  let's just take them one by one.  The first is --

8        THE COURT:  Well -- they're on their way.

9        MS. BROOK:  They're not up there yet.

10       SPECIAL AGENT WHITSON:  May I approach, Your Honor?

11       THE COURT:  Yes.

12  BY MS. BROOK:

13  Q   Exhibit No. 85, do you recognize that?

14  A   Yes.

15  Q   And what do you recognize it as?

16  A   This is a cell phone that I collected from the trunk of

17  the Infinity.

18  Q   Okay.  And that was the Infinity that was located outside

19  of the apartment?

20  A   Yes, in the parking lot.

21  Q   Yesterday you spoke about CDs and things that you found in

22  the trunk.

23  A   Yes.

24  Q   And was this also open and free or what did it look like

25  inside the trunk?

 1   A   I'm sorry.  The cell phone, what did it look like in

 2   there?

 3           To the best of my recollection, I think I had to move

 4   some things that were on top of it, but it was in the trunk.

 5           MS. BROOK:  Okay.  Government moves to admit Exhibit

 6   No. 85.

 7           MS. PLOMIN:  No objection, Your Honor, but we would

 8   like to see it.

 9           THE COURT:  85 is admitted.

10      (Exhibit No. 85 admitted in evidence.)

11           MS. BROOK:  And so just one moment.

12   BY MS. BROOK:

13   Q   Why don't you read for us the type of cell phone.

14   A   Sure.  It is a Motorola cell phone.  Would you like me to

15   read the IMEI?

16           THE COURT:  No.

17           THE WITNESS:  Okay.  It's a Motorola flip phone.

18   BY MS. BROOK:

19   Q   And when it was collected, do you all take steps as do you

20   to collect the evidence, to protect it, preserve it, and put

21   it into evidence as you're trained to do?

22   A   Yes.

23   Q   And did you do that in this case?

24   A   I did.

25           MS. BROOK:  Government moves to publish.

1          Would defense like to see it before we publish?

2          MS. PLOMIN:  No.

3          THE COURT:  We'll just publish it and then Ms. Plomin

4  can take a look at it.  But please continue with your

5  questions on the next exhibit.

6  BY MS. BROOK:

7  Q  Lastly, I would like to move to Exhibit 204, also in front

8  of you.  Do you recognize that?

9  A  Yes.

10  Q  What do you recognize it as?

11  A  This is the book "Milestones" that I collected from room G

12  inside of the apartment.

13  Q  Okay.  And Exhibit No. 203 is also before you which is --

14          THE COURT:  On the screen.

15  BY MS. BROOK:

16  Q  It's already admitted.  Publish.

17          Can you circle for us, again, where room G is?

18  A  Yes. (Indicating)

19  Q  And just to put us all back where we were yesterday, is

20  that the one bedroom inside the one-bedroom apartment of

21  Simpson and Soofi?

22  A  Yes.

23  Q  And the book, where was it located, do you recall?

24  A  It was on top of the cabinet on the south wall.

25          THE COURT:  The cabinet at the top of the page?

```
 1              THE WITNESS:  Yes.
 2    BY MS. BROOK:
 3    Q   Okay.  So -- you can just go ahead and make a little X, if
 4    you would like, if it will show up.
 5              THE COURT:  He was trying and for some reason it's
 6    not showing up.
 7    BY MS. BROOK:
 8    Q   Okay.  So is that just on the top of the page as the Judge
 9    was just saying right there?
10    A   Yes.  It's where No. 21 is and where "21" is circled.
11              MS. BROOK:  Government moves to admit and publish
12    204.
13              MS. PLOMIN:  No objection.
14              THE COURT:  204 is also admitted.
15         (Exhibit No. 204 admitted in evidence.)
16              MS. BROOK:  I don't have any other questions.
17              THE COURT:  Any cross-examination of this witness,
18    Ms. Plomin?
19              MS. PLOMIN:  No, Your Honor.
20              THE COURT:  Thank you, sir.  You may step down.
21              THE WITNESS:  Thank you, ma'am.
22              THE COURT:  The government may call its next witness.
23              MS. BROOK:  Thank you, Your Honor.
24              The government calls Stephen Kent.
25         (Witness duly sworn)
```

1          THE CLERK:  Please state your name for the record,

2    spelling your first and last name.

3          THE WITNESS:  Stephen M. Kent.  S-T-E-P-H-E-N.

4    Middle initial M.  Last name K-E-N-T.

5          **SPECIAL AGENT STEPHEN M. KENT, WITNESS, SWORN**

6                    **DIRECT EXAMINATION**

7    BY MS. BROOK:

8    Q    Good morning, sir.  You can go ahead and have a seat.

9          Sir, would you please introduce yourself to the

10   ladies and gentlemen of the jury.

11   A    Special Agent Stephen M. Kent with the FBI.

12   Q    Sir, how long have you been with the FBI?

13   A    Eighteen years.

14   Q    And as part of your duties and tasks within the FBI, are

15   there times that you're called upon to be part of the

16   execution of search warrants?

17   A    Yes, I am.

18   Q    And are you trained in how to preserve scenes?

19   A    Yes.

20   Q    Are you trained in how to collect evidence?

21   A    Yes.

22   Q    Are you trained in how to mark and note where evidence is

23   located when you find it?

24   A    Yes.

25   Q    And your training, did that happen at Quantico?

```
 1    A    Yes, ma'am.

 2    Q    Throughout the last 18 years with the FBI, have you

 3    regularly maintained your training and utilized that training

 4    in the field?

 5    A    Yes.

 6    Q    I want to focus in on June 10th of 2015.  On that day were

 7    you on duty?

 8    A    Yes, ma'am.

 9    Q    And did you happen to partake in -- along with other FBI

10    agents -- the execution of a search warrant at Abdul Malik

11    Abdul Kareem's residence?

12    A    Yes.

13    Q    Was that located at 13205 North 21st Place?

14    A    To the best of my knowledge, yes.

15    Q    Let's first -- I'm going to put on the overhead what's

16    been marked as Exhibit No. 124.  Do you recognize that?

17    A    Yes, I do.

18    Q    What do you recognize it as?

19    A    That appears to be the location that was part of the

20    search.

21    Q    And that was the search you're referring to on June 10th?

22    A    Yes, ma'am.

23         MS. BROOK:  The government moves to admit and publish

24    Exhibit 124.

25         MS. PLOMIN:  No objection.
```

1     THE COURT:  124 is admitted.

2     (Exhibit No. 124 admitted in evidence.)

3   BY MS. BROOK:

4   Q   I want to focus in on the top to start the address there.

5   13205 North 21st Place, Apartment 2.

6   A   Yes.

7   Q   Is that the address of where you were?

8   A   Yes.

9   Q   And does this schematic fairly and accurately lay out the

10  residence to the best of your memory?

11  A   Yes, it appears to.

12     MS. BROOK:  I'll ask Special Agent Whitson to assist

13  and bring up a box of evidence which we collected.  We're

14  going to start first with Exhibit No. 400.

15     Your Honor, may I clear off the table?

16     THE COURT:  Yes.

17  BY MS. BROOK:

18  Q   So starting first with Exhibit No. 400, do you recognize

19  that?

20  A   Yes, I do.

21  Q   And what do you recognize it as?

22  A   It appears to be a magazine containing .380 ammo.

23  Q   Was that a piece of evidence that you located that day at

24  Kareem's house?

25  A   Yes.

1  Q   And where was it that you found that magazine that

2  contained ammunition?

3  A   It was in the back room -- let's see.  In the sketch it

4  would be room K.

5  Q   Okay.  On the sketch that we have, can you circle room K.

6  If you can circle it with your finger on the screen?

7  A   (Indicating)

8  Q   Okay.

9  A   There you go.

10  Q   Very good.  So we put a mark, somewhat of a box, around

11  room K.

12          When you went into room K, what did it look like?

13  A   It was pretty messy.  It was a lot of stuff all over the

14  place.

15  Q   Was it a bedroom or something else?

16  A   It appeared to be a bedroom.

17  Q   And I'm going to put on the overhead an exhibit not yet

18  admitted, No. 403.  Do you recognize what's in that

19  photograph?

20  A   Yes, I do.

21  Q   And what do you recognize it as?

22  A   That appears to be the location where this magazine was

23  found.

24  Q   Is that the bedroom?

25  A   Yes, ma'am.

```
 1   Q    Was it identified in the search that that, in fact, was
 2   Mr. Kareem's bedroom?
 3   A    I believe so.
 4   Q    So let's talk about Exhibit No. 400.  You said it was a
 5   magazine that was loaded?
 6   A    Yes.
 7   Q    What type of ammunition was loaded inside of it?
 8   A    380 -- or dot-380.
 9   Q    So is that .38 Special rounds?
10   A    No.  It's a smaller caliber.  It's a dot-380.
11             MS. BROOK:  Your Honor, the government moves to admit
12   Exhibit No. 400, publish, and place on the table.
13             MS. PLOMIN:  No objection.
14             THE COURT:  Exhibit 400 is admitted.
15        (Exhibit No. 400 admitted in evidence.)
16             MS. BROOK:  I want to move on to Exhibit No. --
17             Yes.  I'm sorry.
18             Your Honor, the government moves to admit Exhibit No.
19   403 and publish, which is the photograph of the bedroom.
20             MS. PLOMIN:  No objection.
21             THE COURT:  403 is admitted.
22        (Exhibit No. 403 admitted in evidence.)
23   BY MS. BROOK:
24   Q    We're going to get into the specifics about the bedroom in
25   just a second, but I want to turn our attention first to
```

1    Exhibit No. 118 that you have before you.

2            Do you have it there.  What is that?

3    A    It appears to be ammunition.

4    Q    And tell us where you found it.

5    A    In this location that's on the screen, the bedroom.

6    Q    So by "this," you mean the Exhibit No. 403 that we have on

7    the overhead, the bedroom that you have identified as

8    Mr. Kareem's?

9    A    Correct.

10   Q    Okay.  So the ammunition, whereabouts was that located?

11   A    There's a -- in the middle of the screen you can see

12   there's a pile of ammo.  It's not quite clear, but it's in

13   that general area.

14   Q    Can you describe something for us.  Is it near "36" or

15   something else?

16   A    "35."

17   Q    Okay.  And read for us the labeling of that ammunition.

18   A    It's .38 Special PMC.

19   Q    PMC?

20   A    PMC ammunition.  I believe that's the manufacturer.

21   Q    Does it say anything else related to PMC?

22   A    PMC Bronze ammunition on the sides.  .38 Special.

23   Q    And if you turn that exhibit over, do you see stamped on

24   the inside of that box a lot number?

25   A    Yes, I do.

```
 1    Q   What lot number is that?

 2            THE COURT:  Well, I think there are two boxes in

 3    there.  Do they both have the same lot number?

 4            THE WITNESS:  Yes, ma'am.

 5            THE COURT:  Okay.  Go ahead.

 6            MS. BROOK:  Thank you.

 7    BY MS. BROOK:

 8    Q   So in looking at that, can you read for us what the lot

 9    number is?

10    A   Yes.  It says:  Lot 38 G-1071 for both boxes.

11    Q   And that's on both boxes.

12    A   Yes.

13            MS. BROOK:  Your Honor, the government moves to admit

14    and publish.

15            MS. PLOMIN:  No objection.

16            THE COURT:  118 is admitted.

17       (Exhibit No. 118 admitted in evidence.)

18    BY MS. BROOK:

19    Q   Do you have 117 in front of you?

20    A   I do not.

21            MS. BROOK:  May I approach.

22            THE COURT:  You may.

23    BY MS. BROOK:

24    Q   Moving on to 117 for a moment.  We'll move back to 118 in

25    just a second.
```

1              So moving on to 117, do you recognize that?

2    A    Yes.

3    Q    What do you recognize it as?

4    A    It's a box of 9 millimeter ammunition made by Perfecta.

5    Q    And that box --

6              Well, Your Honor, the government moves to -- is that

7    ammunition that you found in this particular bedroom or

8    somewhere else?

9    A    No.  This one.

10   Q    Okay.  So you found it in this bedroom, Mr. Kareem's

11   bedroom?

12   A    Yes, in this location.

13   Q    And you said "this location."  Which location do you mean?

14   A    On the screen I believe it's room K in around No. 35 on

15   the picture.

16   Q    So was 117 located near 118, the PMC Bronze ammunition?

17   A    Yes.

18             MS. BROOK:  Government moves to admit 117.

19             MS. PLOMIN:  No objection.

20             THE COURT:  117 is admitted.

21        (Exhibit No. 117 admitted in evidence.)

22   BY MS. BROOK:

23   Q    117 and 118, did you collect it as you're trained to do?

24   A    Yeah -- well, I'm actually one of the finders and

25   searchers in that location.

1   Q    And did you watch other individuals who were there

2   collecting it?

3   A    Yes.

4   Q    And did they collect it as they're trained to do, taking

5   caution and care with all of the standard procedures that

6   you're trained to?

7   A    Yes, ma'am.

8   Q    And both 117 and 118, were they put into evidence?

9   A    Yes.

10   Q    That's with the FBI?

11   A    Yes, ma'am.

12   Q    Let's move on.  And I'm going to -- actually, before we

13   move on, I want to take a second.

14          That Perfecta ammunition, can you turn the box over

15   for me?

16   A    Yes.

17   Q    Is it one box or more than one box?

18   A    It says there's one box in here but there's a label that

19   says two box of 9 millimeter.

20   Q    Okay.  So there's a label on it that says it's two boxes,

21   but when you found it it was just one box?

22   A    Yes, ma'am.

23   Q    And read for us what the whole label says.

24   A    1995 ammunition.  Defense accessories.  Perfecta.  Two box

25   of 9 millimeter.  And there appears to be a number 664565-4.

1   Q   The 1995, is that a currency amount?

2   A   Yes.  That's a dollar amount.  $19.95.

3   Q   And the thing that you're reading, does it look like a

4   tag?

5   A   Yes, it does.  Yes, it does, on the side here.

6        MS. BROOK:  May I publish and also at the same time

7   get 407?

8        THE COURT:  Yes.

9        MS. BROOK:  I'm sorry.  401.

10  BY MS. BROOK:

11  Q   Turning our attention to 401, do you recognize that?

12  A   Yes, I do.

13  Q   And what do you recognize it as?

14  A   It contains a number of types of ammo.  It's an evidence

15  collection bag.

16  Q   So it contains a number of different types of ammunition?

17  A   Yes, ma'am.

18  Q   Do you recognize it?

19  A   Yes.

20  Q   And where do you recognize as having seen that?

21  A   This was also in room K around approximate picture No. 35.

22  Q   Okay.  So this was located near Exhibit No. 117 and 118?

23  A   Yes.

24  Q   You said it contained various different types of

25  ammunition.  Can you read for us what different types of ammo

1   it was?

2   A    Sure.   There's one box in here Lellier & Bellot .25 auto.

3            Here's another box of Hornady Critical Defense .38

4   Special plus P.

5            And then there's some additional loose ammunition.

6   Q    And are they in the same condition as they were when you

7   first saw them?

8   A    Yes.   It appears to be.

9            MS. BROOK:   Government moves to admit Exhibit 401.

10           MS. PLOMIN:   No objection.

11           THE COURT:   401 is admitted.

12       (Exhibit No. 401 admitted in evidence.)

13           MS. BROOK:   If I may have just one minute.

14           Your Honor, it appears that the Tanfoglio that we're

15   going to talk about next is still housed within the gun safe

16   within the Court.

17           So if I may just proceed and finish the testimony on

18   this and perhaps we can come back so that we don't waste any

19   time, we'll come back and talk about that piece briefly once

20   the Tanfoglio is back.

21           THE COURT:   That's fine.

22           MS. BROOK:   I want to loop back to Exhibit No. 118.

23   May I approach, Your Honor?

24           THE COURT:   Yes.

25           MS. BROOK:   If I speak loudly, can I speak from here

1    for a minute?

2             THE COURT:  Yes.

3    BY MS. BROOK:

4    Q   I have before you Exhibit No. 118 and that's the exhibit

5    that you read the lot number from?

6    A   Yes.

7    Q   If you can flip it over so you can see the lot number, I

8    want to put before you what's already been admitted and

9    published as Exhibit No. 29.

10            Is 29 also PMC Bronze ammunition?

11   A   Yes, it is.

12   Q   Same caliber?

13   A   It appears to be, yes.

14   Q   And does it also have a lot number?

15   A   Yes, it does.

16   Q   Please reference that lot number to the lot number of

17   Exhibit No. 118 that you read a moment ago.

18            Are they the same number?

19   A   Yes, they are.  Lot 38 G-1071.

20   Q   And I'm going to show you next what's already been

21   admitted and published as Exhibit No. 84.

22            Again, with Exhibit No. -- and I will go ahead and

23   get back to the podium.

24            84.  Is that the same PMC Bronze ammunition?

25   A   Yes, it is.

```
1    Q    Again, for a .38 Special?

2    A    Yes, it is.

3    Q    And the lot number, is that lot number the same?

4    A    Yes.  Lot 38 G-1071.

5    Q    So all three have the same lot number?

6    A    Yes, they do.

7              MS. BROOK:  Your Honor, at this point I would just

8    ask to be able to recall him but we can permit cross up to

9    this point.

10             THE COURT:  Do you want to cross now, Ms. Plomin, or

11   do you want to wait until whatever this other piece of

12   evidence is that he testifies about?

13             MS. PLOMIN:  Whatever works for the Court, Your

14   Honor.

15             THE COURT:  Why don't we wait.  You can do it all at

16   one time.

17             You may step down for the moment, sir.  Thank you.

18             THE WITNESS:  Thank you, Your Honor.

19             MS. BROOK:  We have one more quick witness, Hilda

20   Graulau.  I've mispronounced her name.  Graulau.

21             I may have mispronounced it again.

22             THE COURT:  Would you please come forward and be

23   sworn.  Step up to this lady here.

24        (Witness duly sworn)

25             THE CLERK:  Please state your name for the record,
```

1    spelling your first and last name.

2            THE WITNESS:  Hilda Graulau.  Hilda.  H-I-L-D-A.

3    Graulau.  G-R-A-U-L-A-U.

4            MS. BROOK:  May I approach to clean everything up?

5            THE COURT:  Yes.

6                   **HILDA GRAULAU, WITNESS, SWORN**

7                        **DIRECT EXAMINATION**

8    BY MS. BROOK:

9    Q   Good morning.

10   A   Good morning.

11   Q   Would you please introduce yourself.

12   A   I'm Hilda Graulau.  I work for the Federal Bureau of

13   Investigation.  I'm an IT Specialist, Forensic Examiner.

14   Q   And how long have you been a Forensic Examiner and an IT

15   Specialist with the FBI?

16   A   About three years.

17   Q   Are you trained at Quantico to become an IT Specialist?

18   A   Yes, and various other locations.

19   Q   As well as a Forensic Examiner?

20   A   Yes.

21   Q   What does it mean to be a Forensic Examiner?

22   A   We review for digital data, computer hard drives, CDs,

23   thumb drives, anything that's digital media, and we also

24   accompany some of the special agents on searches to identify

25   those items.

1   Q   So you said you all accompany sometimes special agents on

2   searches to seize that type of evidence?

3   A   Yes.

4   Q   Are you part of a select team that deals with computers,

5   media, and that type of devices?

6   A   Yes.  We're part of the CART team, the Computer Analysis

7   Response Team.

8   Q   On June 10th of 2015 were you on duty?

9   A   Yes.

10   Q   And were you called out to participate as part of your

11   duties on the CART team in the execution of a search warrant

12   at Mr. Abdul Malik Abdul Kareem's home?

13   A   Yes.

14   Q   Looking at what has already been marked, admitted, and

15   published, Exhibit No. 124 on the overhead, do you recognize

16   that?

17   A   Yes.

18   Q   And does that depict the home that we're talking about,

19   13205 North 21st Place, No. 2?

20   A   Yes.

21   Q   On that day did you seize some computers?

22   A   Yes.

23   Q   And in particular, did you seize an Acer computer?

24   A   Yes.

25   Q   Where was it that you found that particular computer?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #4    2-19-16

1    A    There was a desk and it was on top of the desk on the

2    left-hand side.

3            MS. BROOK:   Your Honor, may I approach?

4            THE COURT:   Yes.

5    BY MS. BROOK:

6    Q    Placed before you is Exhibit No. 112.   Do you recognize

7    that?

8    A    May I touch it?

9    Q    Please.

10   A    Yes.

11   Q    And what do you recognize it as?

12   A    Acer laptop.

13   Q    And you've had a chance to look at that?

14   A    Yes.

15   Q    And that's the Acer laptop with the same serial number

16   that you picked up that day on June 10th and put into

17   evidence?

18   A    Yes.

19           MS. BROOK:   Your Honor, the government moves to admit

20   and publish on the table Exhibit No. 112.

21           MS. PLOMIN:   No objection.

22           THE COURT:   112 is admitted.

23       (Exhibit No. 112 admitted in evidence.)

24   BY MS. BROOK:

25   Q    And while I do that, I'm going to place on the overhead

UNITED STATES DISTRICT COURT

1    Exhibit No. -- I believe it's 297 -- it is not yet admitted.

2         Just one second.  I'm sorry.  Yes.  So 397.

3         In looking at that photo, can you describe for us

4    what you see?

5    A   A desk.  There are two computers labeled 5 and 6.

6    Q   And do you recognize what's in that photo?

7    A   Yes.

8    Q   Does the photo -- well, what is it?  You've talked about

9    the desk, but where is it?

10   A   It's in room B.

11   Q   And room B where?

12   A   Which would be just behind -- there was a sofa, a brown

13   sofa.  So then there was that and then there's an opening to

14   like a backyard.

15   Q   And, again, is this the living room area, the desk area

16   inside Mr. Kareem's home?

17   A   Yes.

18        MS. BROOK:  Your Honor, the government would move to

19   admit and publish this photo.

20        MS. PLOMIN:  No objection.

21        THE COURT:  297?

22        MS. BROOK:  It's not 297.

23        THE COURT:  No, clearly, not.

24        MS. BROOK:  Mr. Koehler is going to find it while I

25   get one -- this exhibit and place it on the table.

1          THE COURT:  Well, 397, '98 and '99, one says "photo

2    of Kareem living room" -- oh it must be 398 because it says

3    "desk in living room."

4          So assuming it's 398, 398 is admitted without

5    objection.

6          MS. BROOK:  Thank you.

7          And I think there are actually two.  I think it is

8    397.  And there are two, one being a photo of the living room,

9    and then 398 being a closer-up photo that we haven't talked

10   yet specifically on the computers.

11         So, if Mr. Koehler can approach the clerk, we can

12   clarify this.

13         THE COURT:  You think this is 397?

14         MS. BROOK:  I think this is 397 and the next one is

15   398.

16         THE COURT:  Then 397 is admitted.  And I'm guessing

17   398 will follow soon.

18      (Exhibit No. 397 admitted in evidence.)

19         MS. BROOK:  Thank you.  May we publish?

20         THE COURT:  Yes.

21   BY MS. BROOK:

22   Q   You spoke a moment ago about Exhibit 112, that Acer

23   computer.  Do you see it in this photograph?

24   A   Yes.

25   Q   And can you circle it with your finger touching the

1    screen?  If you touch the screen, it will actually trace a

2    line where you touch.

3    A   (Indicating)

4    Q   And that's where it was located when you came in for the

5    search?

6    A   Yes.

7    Q   Next I want to put on the overhead a more close-up

8    version.  It's 398, not yet admitted.  Do you recognize this?

9    A   Yes.

10   Q   And what do you recognize it as?

11   A   A closer shot of the desk.

12         MS. BROOK:  And the government moves to admit and

13   publish 398 as well.

14         THE COURT:  Is there any objection?

15         MS. PLOMIN:  No, Your Honor.

16         THE COURT:  398 is admitted.

17      (Exhibit No. 398 admitted in evidence.)

18         MS. BROOK:  My apologies.

19   BY MS. BROOK:

20   Q   So as we look at this photograph, do you too see that Acer

21   that we have been talking about?

22   A   Yes.

23   Q   And can you circle that with your finger?

24   A   (Indicating)

25   Q   This computer that we've talked about, admitted into

1   evidence, did you collect it?

2   A   Yes, I did.

3   Q   And did you put it into evidence?

4   A   Put it into evidence at the office?

5   Q   Yeah.  Did you take it back to the FBI and have it be

6   analyzed?

7   A   I did not.

8   Q   Okay.  But you marked it and were part of the

9   identification team?

10   A   Yes.

11   Q   So you knew that this particular Acer was collected and

12   taken back to the office as part of the evidence that was

13   collected from this scene?

14   A   Yes.

15   Q   Okay.  Did you collect any other computers that you see in

16   this particular picture?

17   A   Yes.

18   Q   What is that?

19   A   It's an Apple iMac.

20   Q   Okay.  And do we see it here?

21   A   Yes.

22   Q   Can you maybe just put a dot where it's located?

23   A   (Indicating)

24   BY MS. BROOK:

25   Q   May the record reflect the witness has put a dot on the

1  Apple iMac and a circle around the Acer.

2          Were both computers collected and taken back to the

3  FBI?

4  A   Yes.

5          MS. BROOK:  I don't have any other questions.

6          THE COURT:  Any questions for this witness,

7  Ms. Plomin?

8          MS. PLOMIN:  Yes, Your Honor.

9                      **CROSS EXAMINATION**

10  BY MS. PLOMIN:

11  Q   Good morning.

12  A   Good morning.

13  Q   I'm going to leave the government's exhibit on the screen

14  there.

15          Going to what's been marked as No. 5 on the screen,

16  which is the Acer laptop, did you locate any power cords for

17  the Acer laptop?

18  A   I do not remember.

19  Q   If you had, would you have marked them to be taken back to

20  the FBI with the Acer laptop?

21  A   Yes.

22  Q   And do you recall what's No. 6 on the screen, the iMaC

23  computer, do you recall whether it was plugged in or not?

24  A   It was not plugged in.

25  Q   And do you recall whether you located any modems or

1   anything that could be used to access the Internet?

2   A   I do not remember.

3   Q   If you had, would that have been something that was

4   important to bring back to the FBI?

5   A   We would have photographed it and taken it.

6   Q   And as part of your duties, would it have been your duty

7   to process either the computer -- either of the computers that

8   were seized for fingerprints or DNA?

9   A   No.

10  Q   Do you know whether that was done?

11  A   I do not know.

12  Q   And to your knowledge, were any other electronic devices,

13  computers, cell phones found within the apartment?

14  A   Yes.

15  Q   And what were those?

16  A   There were some cell phones, some CDs, thumb drives.

17  Q   And did you collect any of the CDs?

18  A   I did not.

19  Q   Did you collect any of the cell phones or thumb drives?

20  A   I did not.

21          MS. PLOMIN:  Thank you very much.  I have no further

22  questions.

23          MS. BROOK:  I have no further questions.

24          THE COURT:  May this witness be excused?

25          MS. BROOK:  Yes.

1          THE COURT:  Thank you very much, Ms. Graulau.  You

2   may step down and you are excused as a witness.

3          THE WITNESS:  Thank you.

4          THE COURT:  The government may call its next witness.

5          MS. BROOK:  Your Honor, it appears that the Tanfoglio

6   is here, so can we move on and complete the testimony of

7   Special Agent Kent?

8          THE COURT:  Yes.

9          Maybe Agent Kent could just take that box with him on

10  his way up to the witness stand.

11         SPECIAL AGENT WHITSON:  May I approach, Your Honor?

12         THE COURT:  Yes.

13         MS. BROOK:  We're just looking for some exhibits.

14  No. 6 has also been placed in front of the witness.

15         **SPECIAL AGENT STEPHEN M. KENT, WITNESS, SWORN**

16                 **DIRECT EXAMINATION (cont'd)**

17  BY MS. BROOK:

18  Q   Welcome back.

19  A   Hello.  Thank you.

20  Q   So we left off talking about Exhibit No. 114.

21         Do you see 114 in front of you?  And I believe that

22  should be the box.

23  A   Oh.

24         MS. BROOK:  May I approach, Your Honor?

25         THE COURT:  Yes.

```
 1              SPECIAL AGENT WHITSON:  May I approach, Your Honor?

 2              THE WITNESS:  Oh, okay.  There's a tag on there.

 3              THE COURT:  So have we found the tag that says "114"

 4   on it?

 5              THE WITNESS:  Yes, ma'am.

 6              THE COURT:  Thank you.

 7              MS. BROOK:  Thank you.

 8              THE WITNESS:  Sorry, Your Honor.

 9   BY MS. BROOK:

10   Q   So looking at the item in there that is tagged with the

11   tag that says "114," do you recognize it?

12   A   Yes, I do.

13   Q   What do you recognize it as?

14   A   May I pick it up?

15   Q   Not quite yet.  Let me --

16   A   It appears to be a firearm that was found in the

17   residence.

18   Q   And are you familiar with whether or not that particular

19   firearm has been rendered and made safe?

20   A   It appears to be.

21   Q   Okay.  And, in fact, you know, last night did you look at

22   it again and ensure that it was rendered and made safe?

23   A   Yes.

24   Q   And is there a zip tie on it to additionally adding so

25   that nothing can move or be changed on it?
```

```
 1    A   Yes.
 2            MS. BROOK:  All right.  Your Honor, the government
 3    would move to admit so we can discuss Exhibit No. 114.
 4            MS. PLOMIN:  No objection.
 5            THE COURT:  114 is admitted.
 6        (Exhibit No. 114 admitted in evidence.)
 7    BY MS. BROOK:
 8    Q   If you can, please just pick it up and hold it up for the
 9    jury so we can see it in a way to make sure that it's not
10    pointed at anybody.  Okay.
11            Okay.  What type of weapon is that?
12    A   It appears to be a semiautomatic handgun.
13    Q   I want to talk for a moment about where it was found.  A
14    couple of minutes ago -- and you can set it back down for a
15    second.
16            A couple of moments ago we were talking about you
17    being part of the search team on June 10th of 2015 at Mr.
18    Abdul Malik Abdul Kareem's home.
19    A   Yes.
20    Q   And was that weapon, the Exhibit No. 114, found inside
21    that home?
22    A   Yes.
23    Q   Were you part of the team that found it and saw it?
24    A   Yes, I was.
25    Q   And explain for us exactly where it was located.
```

1    A    Can I refer to the chart?

2    Q    Please.

3    A    It was -- appeared that this weapon in room A and item 10

4    is like a couch-type thing, circular couch.

5    Q    Okay.  So you mentioned room A.  Can you go ahead and

6    circle room A with your finger.

7    A    (Indicating)

8    Q    And --

9         THE COURT:  His finger has a glove on it which

10   might --

11        MS. BROOK:  That's a fair point.

12        THE COURT:  It's not one of those gloves with the

13   silver thing on it that works on screens.

14   BY MS. BROOK:

15   Q    But we have a little mark on room A telling us where it

16   is.  What type of room was that?

17   A    Living room.  It appeared to be the living room.

18   Q    I'm going to place on the overhead two photos.  First of

19   all, Exhibit No. 405.  It's not yet admitted.

20        It's not clearing.  I don't have the magic touch but

21   now it's gone.  Perfect.

22        So in looking at this particular exhibit, what do you

23   see?

24   A    I see the living room and the couch.

25   Q    And where is that living room?

1   A   It's in the front area.  It would be item A -- or room A.

2           MS. BROOK:  Your Honor, the government moves to admit

3   and publish 205.

4           MS. PLOMIN:  No objection.

5           THE COURT:  205 or 405?

6           MS. BROOK:  I'm sorry.  405.

7           THE COURT:  405 is admitted.

8       (Exhibit No. 405 admitted in evidence.)

9   BY MS. BROOK:

10  Q   Do you see here, looking at this picture, the location

11  where you found the Tanfoglio weapon?

12  A   Yes.

13  Q   Where?

14  A   Do you want me to mark on the -- the approximate area?

15  Q   So may the witness -- may the record reflect the witness

16  has made a circle on the lower portion of the L-shaped couch

17  that's located there in the living room.

18           Was it sitting in a location where you could openly

19  see it?

20  A   To the best of my recollection, it was like tucked in.

21  Q   I want to place on the overhead one more photo not yet

22  admitted.  It's Exhibit No. 404.

23           Do you recognize what's in this photo?

24  A   Yes, I do.

25  Q   What do you recognize it -- what do you recognize?  What

1    do you see?

2    A    I recognize the couch.  And the couch has been tipped up

3    because we were searching under and that's when we noticed the

4    firearm where the number 10 is.

5            MS. BROOK:  Government moves to admit and publish

6    404.

7            MS. PLOMIN:  No objection.

8            THE COURT:  404 is admitted.

9        (Exhibit No. 404 admitted in evidence.)

10   BY MS. BROOK:

11   Q    You said that the couch had to be moved apart.  And as it

12   is shown in this particular picture, can you see the Tanfoglio

13   9 millimeter pistol that you have identified here and we have

14   put into evidence as 114?

15   A    Yes, I do.  It's -- you can see the back end of it in the

16   photo.

17   Q    Please circle it for us so we can clearly see it.

18   A    (Indicating)

19   Q    Thank you.

20           Explain its location in the couch to us.

21   A    It just appears to be partially concealed and accessible,

22   fairly accessible.

23   Q    Was it in that --

24           THE COURT:  Hold on.  When you say its location in

25   the couch, from this picture I can't tell if that's the back

 1    of the couch, the seating area of the couch where your feet

 2    go.  I can't tell.  I think that's what Ms. Brook was asking

 3    you.  What part of the couch is this?

 4         THE WITNESS:  This appears to be the underneath.  So

 5    the part here to the left, the big part of the couch, you can

 6    see the feet, so it was tipped up.

 7         Originally, it was down.  And so the big cushions

 8    that were seen on the left of the picture would be where your

 9    legs are, so it's tipped up.  And the next piece would be

10    where your legs are sitting.

11         MS. BROOK:  Maybe if I can Your Honor, if I can pull

12    this out a little bit, I'm going to put on the overhead both

13    405 and 404 so we can see them together.

14         Again, I do not have the magic touch.  There we go.

15    Okay.  Let me pull this out.  Let's see how we can do this.

16    Maybe like that.

17    BY MS. BROOK:

18    Q  All right.  So 405 is down below and 404 is up top.  So

19    let's turn first to 405.

20         And go ahead with your finger, once again, and if you

21    can take your hand out of the glove for a moment, it might be

22    easier.  Great.

23         Circle for us on that exhibit, the one on the bottom,

24    where the location was where this Tanfoglio 9 millimeter

25    pistol was found.

1    A    The approximate. (Indicating)

2    Q    Okay.  So are we correct in understanding that that's the

3    bottom part of the couch, the place where your legs, your

4    calves would rest against, if you were sitting in the couch?

5    A    That's correct.

6    Q    And then as we look at the photo on top, we can see -- is

7    that the part of the couch or part of the sectional that was

8    pulled up?

9    A    I'm sorry?

10   Q    Part of the sectional that was there on the far left was

11   pulled up?

12   A    Yes.  It would have been tipped up just to search

13   underneath the couch.

14   Q    Okay.  And did that expose better the groove between the

15   two different sections there?

16   A    Yes.

17   Q    Okay.  And in looking at the groove between those two

18   sections, can you clearly see where the Tanfoglio 9 millimeter

19   weapon was located when you found it?

20   A    Yes.

21   Q    And circle that again for us.

22   A    (Indicating)

23   Q    And the witness has, again, circled that center part

24   around where the -- is that the back side?

25   A    I'm sorry?  The back side of the pistol, yes.

1    Q   Okay.  And just for the purpose of the record, as we look

2    at the bottom exhibit, the full L-shaped couch as we looking

3    at it, is that an L-shaped couch?

4    A   Approximately, like an L or a C shape.

5    Q   And you say "C" because it wasn't just a direct hinge in

6    the middle?  It kind of had an arc?

7    A   Yes, a curved.  That's a curved couch.

8    Q   And the Tanfoglio weapon was found in the curved section

9    of it?

10   A   Yes.  Yes.

11   Q   All right.  So going back to the weapon itself, if you can

12   show for us -- I mean, put the gloves back on if that's okay,

13   if they're still wearable.

14        And if you can stand up, please, with Exhibit No. 114

15   and show for us what part of 114 we're looking at as we see it

16   there in Exhibit No. 404.

17   A   Certainly.  It's this portion in here.  (Indicating)

18        THE COURT:  Okay.  If you could hold it up higher so

19   the jurors can all see it.

20        THE WITNESS:  It's this back here.

21        MS. BROOK:  Your Honor, is it possible to have him

22   just come down briefly in front of the jurors so that he can

23   just show the angle at what -- unless --

24        THE COURT:  I think we can all see it fine from here.

25   BY MS. BROOK:

1    Q    So if you could just hold it up high so that we can see,

2    you had pointed to part of it.  And you're holding it up so

3    it's pointed to the back part of the courtroom with the handle

4    facing the jury and marking your finger up and down towards

5    that back part of the handle?

6    A    Correct.

7    Q    Is that the part that matches what we can see in this

8    picture how it was found?

9    A    Yes.

10   Q    And you can sit back down.  Thank you.

11        Was this weapon loaded?

12   A    Yes, it was.

13   Q    And were there any bullets in the chamber?

14   A    Yes.

15   Q    To your knowledge, what does it mean to have a bullet in

16   the chamber?

17   A    It's ready to fire.

18   Q    You should have before you Exhibit No. 408.

19   A    I have 406.

20   Q    I'm sorry.  It's 406.  Yes.

21        Do you recognize that?

22   A    Yes, I do.

23   Q    And what do you recognize it as?

24   A    This is the magazine and the round that was in the chamber

25   of the pistol.

1   Q   Okay.  So the magazine and the round that was located in

2   the chamber?

3   A   Yes.

4   Q   And just for everybody's knowledge, a magazine goes where

5   in relation to the firearm?

6   A   Do you want me to show on the firearm?

7   Q   Please.

8         THE WITNESS:  Your Honor, can I pick up the weapon

9   again?

10        THE COURT:  Yes.

11        THE WITNESS:  So the magazine is inserted here.  And

12   then when the weapon is cocked, a round is placed in the

13   chamber so it's ready to fire.

14   BY MS. BROOK:

15   Q   And as part of breaking this evidence down, putting it

16   into evidence, do you take the magazine out of it?

17   A   Yes.  The magazine is taken out.  And then the round

18   that's in the chamber is ejected so that it's made safe.

19   Q   You mentioned that inside Exhibit No. 406 was not just the

20   magazine from inside the Tanfoglio 9 millimeter pistol, but it

21   was also a bullet?

22   A   Yes, ma'am.

23   Q   And that bullet was which one?

24   A   So in the exhibit here there's a round by itself.

25   Q   And that was the round in the chamber?

```
 1    A   Yes, ma'am.

 2              MS. BROOK:  Government moves to admit 406.

 3              MS. PLOMIN:  No objection.

 4              THE COURT:  406 is admitted.

 5        (Exhibit No. 406 admitted in evidence.)

 6    BY MS. BROOK:

 7    Q   Lastly, I want to talk about Exhibit No. 119 which I

 8    believe you also have in front of you.

 9              Your Honor, may I take Exhibit No. 114 and 406 and

10    put them on the table?

11              THE COURT:  Yes.

12    BY MS. BROOK:

13    Q   No. 119.  Do you recognize it?

14    A   Yes.

15    Q   And what is it?

16    A   It's -- it contains shotgun shells.

17    Q   And where did you find those?

18    A   Those were in room K.

19    Q   Okay.  So those were back in the bedroom?

20    A   Yes, with the other ammunition.

21    Q   Okay.  I'm putting on the overhead Exhibit No. 124 which

22    has already been admitted.  There we go.

23              And we have talked about before we took the break

24    with you various other types of ammunition, 117, 118, that

25    were found within room K.
```

1              Was this exhibit, Exhibit No. 119, also found with

2    the other ammunition?

3    A    Yes.

4    Q    And that was around that little marker "35" that was in

5    the center of the room?

6    A    Approximately.

7              MS. BROOK:  Government moves to admit Exhibit No.

8    119.

9              MS. PLOMIN:  No objection.

10             THE COURT:  119 is admitted.

11        (Exhibit No. 119 admitted in evidence.)

12   BY MS. BROOK:

13   Q    Explain for us what type of ammunition 119 is.

14   A    This appears to be shotgun ammunition.

15   Q    And can you read for us the specifics of what it is?

16   A    It says on the box with the matching ammo:  12 gauge.

17   Multi-purpose load.  Field and target.  Federal ammunition.

18             THE COURT:  Is "Federal" a brand?

19             THE WITNESS:  Yes, ma'am.  Federal Ammunition.

20   BY MS. BROOK:

21   Q    I'm going to place on the overhead already admitted and

22   published photograph No. 406.

23             Explain for us, we see in the back of 406 that

24   there's something with a door that's open.  What is that?

25   A    It's a safe.

1   Q   And when you all came in, was the safe open or closed?

2   A   The safe was open when we -- when I approached inside with

3   the search team.

4   Q   Were you aware that it was closed before?

5   A   Yes.

6   Q   And that as part of the execution of the search warrant,

7   it had to be opened?

8   A   That's my understanding, yes.

9           MS. BROOK:  May I have one moment?

10  BY MS. BROOK:

11  Q   Are you aware of whether or not at some point that

12  ammunition was in the safe?

13  A   My understanding was the safe was closed.  And then while

14  they were clearing the contents, all of the ammunition was

15  moved out before I was in there.

16  Q   Okay.  So moved out of the safe and then onto the ground

17  where then you came in to review it and inventory and get

18  everything into evidence?

19  A   Yes, ma'am.

20          MS. BROOK:  I have no other questions.

21          THE COURT:  Ms. Plomin?

22          MS. PLOMIN:  Thank you.

23                       **CROSS EXAMINATION**

24  BY MS. PLOMIN:

25  Q   Good morning.

1   A   Good morning.

2   Q   I just want to clarify first, I believe this is --

3          THE COURT:  Ms. Plomin, could I ask you to move that

4   microphone that Ms. Brook lowered?  Thank you.

5          MS. PLOMIN:  I'm a little taller.

6   BY MS. PLOMIN:

7   Q   The government's Exhibit No. 403.  So just to clarify,

8   when you arrived or when the FBI arrived at the scene, all

9   those items that are outside the safe, initially, they were

10  inside the safe; is that correct?

11  A   That's my understanding, yes, ma'am.

12  Q   So there wasn't -- there wasn't ammunition strewn about

13  around the room?

14  A   No.  It was fairly centrally located.  I believe there

15  was --

16          THE COURT:  No.  I think she's asking you when --

17  before the search warrant team entered, was there ammunition

18  strewn about the room?

19          THE WITNESS:  No, Your Honor.

20          THE COURT:  Okay.

21  BY MS. PLOMIN:

22  Q   It was all inside the safe?

23  A   My understandings, yes.

24  Q   And you said that you located .380 ammunition; is that

25  correct?

```
 1    A    That's correct.

 2    Q    All right.  And as part of your training to become an FBI

 3    agent, I assume you had some firearms training?

 4    A    Yes, ma'am.

 5    Q    And to your knowledge, does .380 ammunition -- would that

 6    actually be able to be fired from a 9 millimeter weapon?

 7    A    To my knowledge you cannot cross-fire ammunition in

 8    different weapons.

 9    Q    Okay.  So it couldn't be fired from an AK-47?

10    A    I don't believe so, but that's my understanding.

11    Q    And it couldn't be fired from an AK-74?

12    A    I don't believe so.

13    Q    And it couldn't be fired from even a .38, correct?

14    A    I don't believe so as well.

15    Q    And the same is true for the .25 auto ammunition that you

16    found?

17    A    That's correct.

18    Q    And the same is true for the shotgun ammunition that you

19    found?

20    A    Yes, ma'am.

21    Q    All right.  Now, was your role -- was your role in this

22    investigation, was it initially to process the scene of the

23    entire apartment?

24    A    We are called in -- my role is to search the residence for

25    any items that might be used as evidence and then to
```

1    appropriately find it and be recognized as that.

2    Q    And did you locate -- in the entry of the apartment, did

3    you locate any kind of boobie traps or anything to prevent the

4    safe entrance into the apartment?

5    A    I am not sure, ma'am.  I wasn't involved in the actual

6    initial entry.  That was another team that did that.

7    Q    Okay.  Would that have been important for the Evidence

8    Response Team to note and to photograph and to collect

9    evidence from -- if you had found something to that extent?

10   A    I believe so.

11   Q    All right.  And you didn't note anything to that extent?

12   A    I did not.

13   Q    And the Evidence Response Team did not?

14   A    As far as I know, just the evidence that I found, there

15   was none of that, but I don't know about the whole scene

16   myself.

17   Q    All right.  And was anything found in the apartment in

18   terms of explosive-making devices, materials to make

19   explosives?

20   A    I'm not sure, ma'am.  I was -- when we go in, we're just

21   given certain areas.  So if there was any of those types of

22   items, they may have been logged, but I'm not aware of them

23   just from my role.

24   Q    And you did not locate any?

25   A    I did not.

1    Q   And you did not locate any manuals or instructions in

2    terms of making explosive devices?

3    A   I did not.  That's correct.

4    Q   And just a quick question.  Did you see any bars on the

5    windows of the apartment?

6    A   I cannot recall if there were bars.

7            MS. PLOMIN:  Thank you very much.

8            THE WITNESS:  Thank you.

9            MS. BROOK:  I have no further questions.

10           THE COURT:  May this witness be excused?

11           MS. BROOK:  Yes.

12           THE COURT:  Thank you, sir.  You may step down and

13   you are excused as a witness.

14           THE WITNESS:  Thank you, Your Honor.

15           Do you want me to leave this up here?

16           THE COURT:  Yes, please.  Agent Whitson will take

17   care of it.

18           MS. BROOK:  May I approach to help?

19           THE COURT:  Do you have another brief witness or are

20   we moving -- so the next witness is going to take a little

21   time?

22           MS. BROOK:  Correct.

23           THE COURT:  Why don't we go ahead, ladies and

24   gentlemen, and reconvene at one o'clock.

25           You're reminded of the admonition not to discuss the

 1    case among yourselves or with anyone else.

 2           Please remember not to do any independent research

 3    about the case or about anyone connected with the case.

 4           And please do not form any conclusions about the case

 5    until you have heard all of the evidence and begun your

 6    deliberations.

 7           Court is in recess until one o'clock.

 8        (Recess taken at 11:43 a.m.; resumed at 1:02 p.m.)

 9        (Open court, jury present.)

10           THE COURT:  Good afternoon, ladies and gentlemen.

11    Please sit down.  The record will show the presence of the

12    jury, counsel, and the defendant.

13           The government may call its next witness.

14           MR. KOEHLER:  Thank you, Your Honor.  The United

15    States calls Stefan Verdugo.

16           THE COURT:  This is the government's witness that is

17    in custody?

18           MR. KOEHLER:  That's correct, Your Honor.

19           THE COURT:  Okay.  Perhaps he was still on the second

20    floor.

21           This individual, I think it may have been mentioned

22    in the opening, is in custody.  And so some Deputy United

23    States Marshals went through that door to get him and they

24    will be bringing him out as soon as he's up here.

25           They were only supposed to have to go to the second

1     floor to get him.  I don't know what's taking so long.

2             Do you have any way of calling to find out what the

3     delay is?

4             U.S.MARSHAL:  Ma'am, he was in the attorney interview

5     room with his attorney.  He was up here previously.  They are

6     enroute as we speak.

7             THE COURT:  Thank you.  So you came back alone?

8             U.S.MARSHAL:  They are on their way up now.  I guess

9     he got moved from one location to another and there was some

10    miscommunication.

11            THE COURT:  Thank you.

12            U.S.MARSHAL:  Judge, I apologize for the delay.

13            THE COURT:  Thank you.

14            Mr. Verdugo, would you please step for a moment in

15    front of the lady who is standing so that she can administer

16    the oath.

17      (Witness duly sworn)

18            THE CLERK:  Please state your name for the record,

19    spelling your first and last name.

20            THE WITNESS:  Stefan.  S-T-E-F-A-N.  Last name

21    Verdugo.  V as in Victor E-R-D-U-G-O.

22            THE COURT:  Would you please come over here and take

23    a seat on the witness stand.

24            MR. KOEHLER:  Good afternoon.

25            THE WITNESS:  Good afternoon.

 1          MR. KOEHLER:  Can you adjust the microphone a little

 2   closer?

 3          THE COURT:  Maureen will do it.  I'm going to adjust

 4   the microphone and ask you to speak directly into it.  Maybe

 5   down a little bit.  Thank you, Maureen.

 6          We'll test it by telling the ladies and gentlemen of

 7   the jury your name.

 8          THE WITNESS:  My name is Stefan Verdugo.

 9                **STEFAN VERDUGO, WITNESS, SWORN**

10                     **DIRECT EXAMINATION**

11   BY MR. KOEHLER:

12   Q   How old are you, Mr. Verdugo?

13   A   Twenty-five.

14   Q   Now, you are here in court.  You're wearing clothing a

15   little different from the rest of us here in the courtroom.

16          Are you in custody somewhere else?

17   A   Yes.

18   Q   What custody are you in?

19   A   County.

20   Q   And are you facing charges over there in Maricopa County?

21   A   Yes.

22   Q   What are the charges you're facing?

23   A   Sexual assault, kidnapping, sex trafficking, pimping and

24   pandering, receiving the earnings of a prostitute, unlawful

25   imprisonment, and aggravated assault.

1   Q    Are any of those charges related in any way to the case

2   that's going on in the courtroom here?

3   A    No.

4   Q    I'll circle back to that in a little while.

5             Do you know an individual by the name of Abdul Malik

6   Abdul Kareem?

7   A    Yes.

8   Q    Is that person here in the courtroom today?

9   A    Yes.

10  Q    Can you please point him out and describe his clothing to

11  the best of your ability.

12  A    He is in a blue button-up shirt, collared.

13            MR. KOEHLER:  May the record reflect the witness has

14  identified the defendant Abdul Malik Abdul Kareem?

15            THE COURT:  And is he the gentleman that's seated

16  between the two lawyers -- the gentleman who just stood up.

17            THE WITNESS:  Yes.

18            THE COURT:  Yes, it may.

19  BY MR. KOEHLER:

20  Q    Did you know him by a different name?

21  A    Yes.

22  Q    What's the name by which you knew him?

23  A    Well, Decarus Thomas.

24  Q    And you know him by a nickname?

25  A    D.

1   Q   How long have you known him?

2   A   Since I was 14.

3   Q   And, again, how old are you now?

4   A   I'm 25.

5   Q   So approximately eleven years; is that right?

6   A   Yes.

7   Q   How did you meet him?

8   A   Through a friend, mutual friend.

9   Q   Okay.  And when you met him, did you go to work with him?

10  A   Yes.

11  Q   Where did you work?

12  A   We would move furniture together and then we worked at --

13  he would take me to work with him at Northwest Professional

14  Assemblers which is like in Fry's and we would assemble stuff.

15  Q   And did you spend a lot of time with him from that point

16  forward?

17  A   Yeah.  We spent a lot of time together.

18  Q   And did you live with him for a period of time?

19  A   Yes.

20  Q   Can you tell us what years approximately that you lived

21  with him?

22  A   From like -- off and on from like 2002 to 2004, 2005,

23  beginning of 2005.

24  Q   How old were you in 2002?

25  A   Twenty-two.

```
 1              THE COURT:  Did you mean 2012?

 2              THE WITNESS:  Oh, yes, my bad.  2012.

 3   BY MR. KOEHLER:

 4   Q   To what?  2015?

 5   A   To 2015.

 6   Q   Okay.  I was trying to figure that out.

 7              During the time that you came to know him and live

 8   with him, did you learn where he was from?

 9   A   Yes.

10   Q   Where was he from?

11   A   From Philadelphia.

12   Q   Were you living with him when he converted to Islam?

13   A   I believed he was always Islam, just he got more into his

14   religion.

15   Q   Do you remember about what time frame that happened that

16   he got more into his religion?

17   A   Probably like 2010.

18   Q   Do you remember about the last time that you lived with

19   Mr. Abdul Kareem?

20   A   The beginning of 2015.

21   Q   Can you narrow it down to a particular month?

22   A   Around March.

23   Q   Was there a reason that you moved out that particular

24   occasion?

25   A   Just fights, arguments.
```

1  Q   Did you get into an argument about money?

2  A   Yes.

3  Q   What did that center on?

4  A   Like bills, work, and --

5  Q   Were you working for him at that point in time?

6  A   Yes.

7  Q   Was he paying you consistently?

8  A   Yes.

9  Q   And did you have other sources of income?

10  A   I do -- go work with my dad.

11  Q   And did you pay him rent when you were living with him?

12  A   Not all the time.

13  Q   And so did you have disputes over rent money?

14  A   Yes.

15  Q   Did you meet a friend of Mr. Abdul Kareem's named Ibrahim?

16  A   Yes.

17  Q   Did you know that person's true name as well?

18  A   Yes.

19  Q   What was his true name?

20  A   Elton Simpson.

21  Q   I'm going to place on the document camera Exhibit 77 which

22  is already in evidence.

23        Do recognize the picture on the screen there next to

24  you?

25        THE COURT:  It's upsidedown.

```
 1              MR. KOEHLER:  Oh.  Thank you.

 2   BY MR. KOEHLER:

 3   Q   Do you recognize the picture of that individual?

 4   A   Yes.

 5   Q   Who is that?

 6   A   Elton Simpson.  Ibrahim.

 7   Q   Did he have another friend that you knew that would come

 8   over with Ibrahim?

 9   A   Yes.

10   Q   What was that person's name?

11   A   Soofi.

12   Q   And I now show you what's been marked -- or what's in

13   evidence as Exhibit No. 76.

14              Do you recognize that photo?

15   A   Yes.

16   Q   Who is that?

17   A   Soofi.

18   Q   Do you remember about when Mr. Abdul Kareem started

19   hanging around with Ibrahim, Elton Simpson?

20   A   I would say it was around like 2012.  I didn't talk to him

21   for like a year or two.  And when I came back around him, I

22   had moved -- helped him move out of an apartment that the feds

23   had actually just kicked in?

24   Q   What apartment was that?

25   A   It was off -- it was a townhouse off the I-17 and
```

1    Northern.

2    Q    Do you remember the street name by chance?

3    A    No.

4    Q    Do you know who he was living with at that apartment?

5    A    I just know he was living with Ibrahim and another guy.  I

6    don't know who else was living there with him.  I just helped

7    him move.

8    Q    Okay.  But you knew that apartment had gotten raided and

9    he moved?

10   A    Yes.

11   Q    Did he tell you who the target of the raid was?

12   A    No.

13   Q    Did he say anything about anything that was taken during

14   the course of the raid?

15   A    Like laptops.

16   Q    Do you remember what year this was?

17   A    I think it was 2002 -- I mean 2012.

18   Q    So I want to fast-forward a little bit, more toward the

19   2014 time frame.

20          Did you notice a change in --

21          Well, number one, before I get there, was this person

22   Soofi or Soofi as you pronounce his name, was he around during

23   that time frame?

24   A    I didn't start seeing him till probably like -- I would

25   say like six months before the incident.

1   Q   Okay.  And when you talk about "the incident," are you

2   talking about the Garland, Texas, attack?

3   A   Yes.

4   Q   Okay.  So if that happened in May, would you then say it

5   happened sometime in November the year before?

6   A   Yes.

7   Q   Okay.  At some point in 2014 or earlier, did you notice a

8   change in Mr. Abdul Kareem's behavior when it came to his

9   practice of Islam?

10   A   Yes.

11   Q   And can you explain that to the jury?

12   A   Just like radical behavior on how he would speak about

13   people that weren't Muslim.

14   Q   Did he have a name for people that weren't Muslim?

15   A   Yeah.  He called them kafirs.

16   Q   And did he say what should happen to those people?

17   A   Yes.

18   Q   What would he say?

19   A   He would say like -- like the crazy things that -- what

20   if -- you didn't know him, it would probably make you

21   uncomfortable, like wanting to blow kafirs up and he would

22   yell "Allahu akbar" while he did it.

23   Q   Was there a time around the end of 2014 when you

24   constructed some sort of an explosive device?

25   A   Yes.  It was New Years Day.  We were blowing up -- I was

1    taking apart fireworks and putting them in like two liter

2    water bottles and putting them in like empty milk containers

3    and I was blowing them up in the middle of the street so the

4    neighbor kids could see, like, something better than what

5    their little fireworks were doing.

6    Q   And were you still living with Mr. Abdul Kareem at this

7    time?

8    A   Yes.

9    Q   Was he there when you were doing this?

10   A   Yes.

11   Q   What about Ibrahim?

12   A   I don't -- not for all of it.

13   Q   For some of it?

14   A   Yeah.

15   Q   Did Mr. Abdul Kareem show any interest in this?

16   A   Yeah.  He thought it was pretty neat.

17   Q   And did he later ask you about other types of explosives?

18           MR. MAYNARD:  Objection, Judge.  Leading.

19           THE COURT:  Overruled.  You may answer "yes" or "no."

20           THE WITNESS:  Yes.

21   BY MR. KOEHLER:

22   Q   What did he ask you?

23   A   He asked me if I knew where to get pipe bombs or how to

24   make pipe bombs.

25   Q   Did Mr. Kareem have any guns in his apartment to your

1   knowledge?

2   A   Yes.

3   Q   What kind of guns did he have?

4        MR. MAYNARD:   Objection, Judge, to the foundation as

5   to time.

6        THE COURT:   Sustained.

7   BY MR. KOEHLER:

8   Q   During the time frame of the fall of 2014 and into the

9   spring of 2015, did you observe firearms in Mr. Kareem's

10  residence?

11  A   Yes.

12  Q   What kinds of firearms did you observe in his residence?

13  A   There was an assault rifle, handguns, and a gauge -- a

14  shotgun.

15  Q   Do you remember what size shotgun it was?

16  A   I believe it was a 12 gauge.

17  Q   And can you tell us what calibers of handguns you

18  observed?

19  A   Like 380 revolvers, a 45, nine's, 9 millimeters.

20  Q   You mentioned 380 revolvers.  Did he also have other 380

21  firearms?

22  A   He had a -- he had a 357 that was around for a while.

23  Q   And I asked you about 380s.  Did he have other 380s

24  besides the revolver that you mentioned?

25  A   Two that were around for a little -- one came around, one

1    disappeared, and another one came around.

2    Q    And can you describe what those guns looked like?

3    A    One was like jet black.  The other one was like wood-grain

4    handle and gun metal gray.

5    Q    So the metal part of it was, you said, gun metal gray?

6    A    Yeah, like silver.

7    Q    Did he keep ammunition around for these firearms during

8    this time frame?

9    A    Yes.

10   Q    Did you go ever shooting with him or see him go shooting

11   with or people?

12   A    Yes.  We've been shooting before and he would go shooting

13   with the two, Elton and Soofi, and we would sometimes shoot in

14   the backyard.

15   Q    Did you ever go anywhere with them specifically?

16   A    We went to Mesa Table Road a couple times.

17   Q    Okay.  And can you give an approximate area where that is

18   in relation to the Phoenix metro area?

19   A    It's like northeast.

20   Q    If you were to leave the Valley, what town would you be

21   going toward if you went there?

22   A    You would be going towards Show Low.

23   Q    Okay.  And when you went --

24            Do you know a friend of his by the name of Sergio

25   Martinez?

1    A    Yes.

2    Q    Was Sergio along on those trips?

3    A    No.

4    Q    How many times did you go?

5    A    Twice.

6    Q    Did he also go other times without you?

7    A    A lot, yes.

8    Q    Do you know what day of the week they would go?

9    A    Usually after what they -- Jumu'ahs, their church, after

10    their church on Fridays.

11    Q    What time would they get out of church on Fridays?

12    A    Like 2:30.

13    Q    In the afternoon?

14    A    Yes.

15    Q    Now, I'm going to move on to January of 2015.

16         Did you become aware of a terrorist attack that

17    happened in Paris, France?

18    A    Yes.

19    Q    Do you remember what the attack was about?

20    A    It was about people drawing the Prophet Muhammad.

21    Q    And what happened in Paris, do you know?

22    A    They ran into Paris and shot the people that drew the

23    pictures of the Muhammad.

24    Q    Did you see the news of that on TV?

25    A    Yes.

CR15-00707-PHX-SRB   JURY TRIAL-DAY #4   2-19-16

1   Q    Where were you when you saw that news?

2   A    We were in the house watching TV.

3   Q    Whose house?

4   A    D's.

5   Q    Okay.  Who else was there with you?

6   A    It was me -- me, D, Daniel, Elton, and Soofi.  We were

7   all -- they were like in the living room area and me and

8   Daniel were standing in the -- like the kitchen where it

9   meets.

10  Q    What was their reaction?

11  A    Pissed.

12  Q    What do you mean?

13  A    Like upset what had happened to their Muslim brothers over

14  there because you're not supposed to draw the Prophet

15  Muhammad.

16  Q    And so what was the reaction of D, Ibrahim, and Soofi to

17  the news that these people had conducted this attack in Paris

18  on that -- on the magazine?

19  A    They were -- well, they were upset and they were mad that

20  their Muslim brothers had gotten killed over trying to avenge,

21  I guess, their Prophet.  And they said that it wasn't right.

22  Q    Did they talk about what they might do about that here?

23       MR. MAYNARD:  Objection.  Leading.

24       THE COURT:  Sustained.

25  BY MR. KOEHLER:

1  Q   Did they express their feelings about what they might do

2  going forward?

3          MR. MAYNARD:  Objection.  Leading.

4          THE COURT:  Overruled.  You may answer.

5          THE WITNESS:  They said that -- that they needed to

6  get revenge for their brothers.  And then they started talking

7  about like something big happening on the West Coast.

8  BY MR. KOEHLER:

9  Q   Did there come a time when D. asked you again about

10  explosives?

11  A   Yes.

12          MR. MAYNARD:  Leading.

13          THE COURT:  Overruled.  The answer "yes" will stand.

14  BY MR. KOEHLER:

15  Q   What did he ask you?

16  A   He just asked me if I could -- if I knew anybody who made

17  them and how big of an explosive they would need to like take

18  down the Cardinal Stadium.

19  Q   Did he talk about any locations aside from the Cardinal

20  Stadium itself?

21  A   Westgate.

22  Q   And what is Westgate?

23  A   It's a place over by the Cardinals' Stadium where a lot of

24  people go to party and like hang out.  It's like, I guess, a

25  shopping center you would call it, or outlet, like a little

1    mall, outlet.

2    Q   You mentioned these trips to go shooting in the desert

3    near what you called Mesa Table Road.  Were those trips to go

4    do the shooting before or after the Paris event?

5    A   They were after.

6    Q   Did there come a time when you had a conversation with Mr.

7    Abdul Kareem about bulletproof vests?

8    A   Yes.

9    Q   Can you tell us about that conversation?

10   A   He just asked me if I knew where to get any and he had

11   already had one on hand.

12   Q   Did he have one that you had seen before?

13   A   I hadn't seen it.  He had showed it to me.  It was like a

14   camouflage one and I had an all-black one that was too small.

15   Q   So you had an all-black one that was too small and he had

16   a camouflage one?

17   A   Yes.

18   Q   Where did he store his camouflage one?

19   A   It was just sitting on top of his safe.

20   Q   Where did he keep his safe?

21   A   In his bedroom closet.

22        MR. KOEHLER:  Your Honor, may I approach the witness?

23        THE COURT:  Yes.

24   BY MR. KOEHLER:

25   Q   Do you recognize what's been placed in front of you and

1  marked as Exhibit No. 115?

2  A   Yes.

3  Q   What is it?

4  A   It's the bulletproof vest he had on top of his safe.

5  Q   Did he already have that vest at the time of this

6  conversation?

7  A   Yes.

8  Q   So let's talk about your time with Mr. Abdul Kareem.

9         On a daily basis would you spend time with him?

10        MR. MAYNARD:  Objection to the form of the question

11  as to time, Judge.

12        THE COURT:  Let's give it some time -- not "this."

13  Let's give it a time.

14  BY MR. KOEHLER:

15  Q   During the time frame we've been talking about from the

16  fall of 2014 through the spring of 2015 while you were still

17  living with him, did you spend time with him on a daily basis?

18  A   Yes.

19  Q   Did you ever observe him to listen to anything on the

20  radio in his car?

21  A   Yes.

22  Q   What would you hear him listen to on the radio in his car?

23  A   He liked listening to this Islamic speaker.

24  Q   At some point did you know the name of the Islamic

25  speaker?

```
 1    A    Kumar.

 2    Q    I'm sorry?

 3    A    Kumar.

 4    Q    Okay.  And did Mr. Abdul Kareem ever tell you what

 5    happened to that speaker?

 6    A    That he was killed.

 7    Q    Did he say who killed him?

 8    A    He didn't tell me who killed him.  He just told me he was

 9    killed because of his beliefs and that he was a really good --

10    like preacher to their people.

11    Q    Was this person on the radio or how was he hearing him?

12    A    It was like on CDs.

13    Q    How many of those CDs did you see?

14    A    He had about -- about six of them.

15    Q    In the car?

16    A    Yes.

17    Q    Did he listen to them at home as well?

18    A    Mainly just in the car.

19    Q    Did there come a time at which you got into an argument

20    with Mr. Abdul Kareem about Islam?

21    A    A few times, yes.

22    Q    Why would you get in arguments with him about Islam?

23    A    Because he tried to push his religion on everybody that

24    would come over.

25    Q    Did he try to push it on you?
```

1   A   Yes.

2   Q   Did he ever talk to you about the choice between life in

3   Islam and life not in Islam?

4   A   Pretty much that I would go to the hell fire if I wasn't

5   Muslim.

6   Q   Did there come a time after the Paris event that you heard

7   something about a contest in Texas?

8   A   Yes.

9   Q   Where did you first hear about a contest in Texas?

10   A   In the same -- the same area where we had saw the Paris

11   incident on the news and I believe it would be the living room

12   where the fireplace was.

13   Q   How did you find out about the contest?

14   A   It was through Elton Simpson.  He had came over and was

15   telling D about it.

16   Q   And were you in the room when he was telling him about it?

17   A   Yes.

18   Q   Do you recall what kind of contest it was?

19   A   It was a Muhammad's art contest.

20   Q   Did they talk about their feelings about the contest?

21   A   Yes.  They were upset about it, that it shouldn't be done

22   in that -- it was like a sin to draw Muhammad and how us as

23   kafirs don't care about their religion.

24   Q   Did someone say something about doing something about the

25   contest?

1    A    Yes.

2    Q    Who said what?

3    A    Elton had brought it up that they should go there and make

4    a stand and show them that we -- that we can't just disgrace

5    their god in any way we please and D pretty much agreed with

6    him.

7    Q    Did he say anything specific in response to what

8    Mr. Simpson said?

9    A    He said, you know -- they both just pretty much like

10   agreed upon some type of revenge and some type of stand for

11   their brothers.

12   Q    Did you ever hear the word "ISIS" used in your presence?

13   A    Yes.

14   Q    Can you tell us how it came up?

15   A    There was a thing on the news about ISIS.  And it was me,

16   Daniel, and D.  We were sitting in the living room.  And D

17   started telling us that he was a part of ISIS.  And we

18   thought -- like we thought it was kind of funny at first, you

19   know, and then D started getting really crazy about it.

20   Q    When you say "getting really crazy about it," what do you

21   mean?

22   A    Like really intense about how he would speak about it.

23   Q    Okay.  Did you see any videos or hear any audios or

24   anything like that that tied into all this?

25   A    Yes.  D and Elton would spend a few hours on -- I wouldn't

1    say every night -- but every other night he would come over

2    and he would watch like gorish videos about like terrorist

3    attacks or supposed U.S. military gunning down Muslims for no

4    reason.  And they would watch this for like a few hours a

5    night and they would go back and forth on like a next -- like

6    a next fire.

7    Q    Were they watching videos?

8    A    Yes.

9    Q    Without talking about necessarily the brand, what type of

10   device?  Is it a computer screen?  A cell phone?  A tablet?

11   What are you talking about?

12   A    A tablet.

13   Q    Can you describe some of the specific things that you saw

14   in these videos?

15        Did you see the videos yourself?

16   A    Not all of them, but I would -- they showed me a couple of

17   them, like one of a guy getting beheaded and then some of like

18   hostages being shot.

19   Q    When you saw the hostages being shot, how were they

20   dressed?

21   A    Like -- probably just like normal, like some of them like

22   we are, some of them like hostages, like they had the same

23   clothes on.

24   Q    Did you see any people dressed like you?

25        MR. MAYNARD:  Objection.  Leading.

```
 1              THE COURT:  Overruled.  You may answer "yes" or "no."
 2              THE WITNESS:  A couple times.
 3    BY MR. KOEHLER:
 4    Q   When the people were being shot, was it like one person --
 5              THE COURT:  And by "dressed like you," did you mean
 6    to describe dressed in orange?
 7              MR. KOEHLER:  Yes.  I suppose I should make that
 8    clear for the record.  The witness is dressed in an orange
 9    jumpsuit.
10    BY MR. KOEHLER:
11    Q   When watching the videos of people being shot, were the
12    people who were being shot alone or were they in groups.
13    A   Sometimes the people that were actually getting shot
14    sometimes were alone, sometimes they were in groups.  It just
15    depends on what video they had up.
16    Q   Would they talk about things while watching these videos?
17    A   They would say pretty much, you know, like that's what
18    they deserve.  That those, you know, that's what happens when
19    you mess with the Muslims.  Well, pretty much when you mess
20    with ISIS, you know, ISIS doesn't play.
21    Q   Was D part of these conversations?
22    A   Yes.
23    Q   Did he also say these things?
24    A   Yes.
25    Q   Did you ever hear a reference to the word "Khalilfah"
```

1    inside the apartment?

2    A   Yes.

3    Q   What did you think when you heard that word "Khalifah"?

4    A   That it was a rapper at first.

5    Q   Do you remember who was talking about it?

6    A   I believe it was Elton that spoke on it first.

7    Q   And did D join in the conversation?

8    A   Yes.

9    Q   Do you remember what he said by chance?

10           THE COURT:   Which one?

11   BY MR. KOEHLER:

12   Q   D.

13   A   I believe he started talking about that it was the --

14   they're like their priest that got shot, the guy that they

15   gunned down.

16   Q   Okay.

17   A   That his beliefs were like the right beliefs but people

18   had found it too -- like too chaotic to preach.

19   Q   Did Mr. Abdul Kareem show you videos like that on his cell

20   phone as well?

21   A   Yes.

22   Q   Do you recall any particular video that he showed you on

23   his cell phone?

24   A   It was like a car bomb going off.  It was a lot of

25   destruction.

1  Q   Do you remember seeing any videos involving American

2  journalists?

3  A   I don't know if they were American journalists, but they

4  looked American.

5  Q   Or reporters?

6  A   They looked like they were Americans, yes.

7  Q   Okay.  Can you describe the videos that you saw where you

8  thought the person looked American?

9  A   This guy that got his head cut off, he looked pretty

10  American to me.

11  Q   Who showed you that video?

12  A   They were both watching it.

13         MR. KOEHLER:  If I can have just a moment.  I want to

14  make sure I'm in the right place.

15         THE COURT:  You may.

16  BY MR. KOEHLER:

17  Q   I want to circle back to the announcement of the contest

18  in Texas.  You mentioned that they were upset.

19         Specifically, was D upset?

20  A   Yes.

21  Q   Was there anything visual that you could observe that told

22  you that he was upset?

23  A   Like his movements, like just the way his body language

24  was, how he got like excited in his voice about it.

25  Q   Okay.  And his facial expression?

1    A    Same.

2    Q    And you mentioned earlier that he asked you about pipe

3    bombs; is that correct?

4    A    Yes.

5    Q    Did he ask you only once about that?

6    A    No.  He asked me several times in the same instance like

7    asking me about if I knew of anyone that could get like

8    silencers as well, while asking me about pipe bombs later on.

9    Q    All right.  And then I want to circle back to going

10   shooting on Fridays.

11          Who would go shooting on Fridays after Jumu'ah?

12   A    It would just be him, Elton Simpson, and Soofi.

13   Q    Also, I asked you about ammunition for firearms.

14          Do you recall seeing shotgun shells in the apartment?

15   A    Yes.

16   Q    What kind of shotgun shells did you see?

17   A    Red 12 gauges.

18   Q    All right.  I'm going to show you what's already in

19   evidence as Exhibit 376.  Do you recognize that?

20   A    Yes.

21   Q    What is it?

22   A    It's an assault rifle.

23   Q    Have you seen it before today?

24   A    Yes.

25   Q    Where did you see it?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #4      2-19-16

1    A    At the house.

2    Q    At whose house?

3    A    D's house.

4    Q    Did it have that drum magazine on it when you saw it?

5    A    No.

6    Q    How do you recognize that gun?

7    A    By just the outlay of it, the handle on it.  It's got a,

8    pistol-grip handle and the muzzle flair on it on the tip.

9    Q    And the full stock?

10   A    Yes.

11   Q    What about this exhibit which is 377 also in evidence?

12        And just for the record, the next several I'm showing

13   will all be in evidence.

14   A    Yes.

15   Q    And from where do you recognize that?

16   A    It was in the back of Elton's -- Elton Simpson's car in

17   his trunk.

18   Q    How many times did you see that?

19   A    I saw it once in the trunk and another time they had came

20   into the house with them wrapped up in like prayer rugs.

21   Q    Now, moving to 378, I'll zoom in a little bit on that.

22        Did you ever see that firearm before?

23   A    Yes.

24   Q    When?

25   A    When it was in my possession for an little while.

```
 1    Q    Are you sure that it was that one?

 2    A    No.  Not that one, actually.

 3    Q    Okay.  Had you seen that one before?

 4    A    Yes.

 5    Q    When?

 6    A    When it had got purchased.

 7    Q    Do you know where it got purchased?

 8    A    From a mutual friend.

 9    Q    Okay.  Who is the mutual friend?

10    A    Efrain.

11    Q    Okay.  What about this firearm?

12              And for the record, this is 379.

13    A    Yes.

14    Q    Where had you seen that before?

15    A    It's the first one that D had started carrying around

16    before he had got a black one that matches that one.

17    Q    So he had this one and then he had what?

18    A    The same exact one, just jet black.

19    Q    Okay.  And is there something about this one that makes it

20    unique and recognizable to you?

21    A    The symbol on the side at the top on like the back.

22    Q    Okay.  Anything about the grip itself?

23    A    It's a wood grain.

24    Q    I want you to look a little closer at that.

25              Does that handle look like wood to you?
```

1    A    It does to me.

2    Q    Okay.  Is there anything on the grip itself that --

3    A    The golden plaque.

4         MR. MAYNARD:  Leading.

5         THE COURT:  Mr. Maynard, if you sit back in your

6    chair and you don't sit at the microphone and you don't say

7    the word "objection," I really don't have anything to respond

8    to even if I hear you and the answer has already been given.

9    BY MR. KOEHLER:

10   Q    What about that stands out to you?

11        MR. MAYNARD:  Objection.  Leading.

12        THE COURT:  Overruled.  You may answer.

13        THE WITNESS:  About the plaque?

14   BY MR. KOEHLER:

15   Q    Yes.

16   A    That it's a -- it's like pretty much the only shiny thing

17   on the side of the gun.

18   Q    And how do you recognize that?

19   A    Because I have held the gun.

20   Q    For how long?

21   A    Long enough to shoot it.

22   Q    Okay.  Where did you shoot it?

23   A    In the backyard.

24   Q    Had you seen it any other time other than the time you

25   shot it in the backyard?

1    A    Yeah.  He carried it around for a few weeks.

2    Q    And when you say "he," to whom are you referring?

3    A    D.  D had it for a few weeks.

4    Q    Where did he carry his gun?

5    A    He had that one in like a shoulder holster.

6    Q    And then you said he got a different gun after that?

7    A    Yes.

8    Q    What was the other gun?

9    A    The same exact gun, just black.

10   Q    So it didn't have this little emblem right there?

11   A    No.  It just has it on the top.

12   Q    When you say "the top," go ahead and circle it.

13        I guess he can't reach.

14        THE COURT:  He can't reach it.

15   BY MR. KOEHLER:

16   Q    Are you talking about this spot?

17        My touch screen is not working.  I'll just point.

18        Are you talking about that right there?

19   A    Yes, the Taurus symbol.

20   Q    The what symbol?

21   A    The Taurus symbol.

22   Q    Taurus.

23        Now, moving to 381 also in evidence, had you ever

24   seen that rifle before?

25   A    Yes.

1   Q   Where did you see that?

2   A   At the house.

3   Q   Whose house?

4   A   D's house.

5   Q   Do you know who that belonged to?

6   A   I believe it belonged to Soofi.

7   Q   After you had heard these conversations about the contest

8   in Texas, did you have conversations with D about that contest

9   going forward?

10   A   Yeah.  He kept saying that they were planning on going and

11   doing something.  And I kept telling him that he should not be

12   a part of it, that it wasn't worth his life.

13   Q   What was his response to that?

14   A   I don't think he listened to me a lot.

15   Q   Was there a day that you got a ride from him over to a

16   friend's house?

17   A   Yes.

18   Q   Who was the friend?

19   A   Nick.  Nicholas Loving.

20   Q   Was anyone else with you when you got that ride?

21   A   My girlfriend at the time, Amber.

22   Q   During the ride, did you talk to D about the contest?

23   A   Yes.

24   Q   What did he say?

25   A   He just said that -- that they were going to do something

1    over there and that they didn't say like -- they didn't tell

2    me that they were going to shoot it up, but they said that

3    they were going to go there and, you know, make a stand.

4            And I kept telling him that, you know, he had a lot

5    to live for and he should not do anything like that.  And, you

6    know, we had work coming.  And, you know, I cared about him.

7    He was my friend.  And he just said, you know, there's things

8    that have to be done.

9    Q    Did you have a later conversation with him in which you

10   learned he changed his mind?

11   A    Yes.

12   Q    When did that happen?

13   A    It was -- we were sitting out front of the house.  It was

14   after I got the -- I got this Suburban.  And he started

15   telling me that he didn't think he could go through with it.

16   And that's when I started telling him like, you know, it's

17   crazy.  He shouldn't do stuff like that.  And let -- you know,

18   get influenced by a religion like that.  I kept trying to tell

19   him he had stuff to live for.

20   Q    About how long before the event itself did that occur?

21   A    I would probably say like a month-and-a-half, a month.

22   Q    So early April?

23   A    Yes.

24   Q    Did he say anything about Simpson and Soofi changing their

25   mind or anything?

1    A    No.  He just kept saying they were going to go through

2    with it.

3    Q    When the event occurred, did you see news about it?

4    A    Yes.

5    Q    Where were you when you saw the news?

6    A    I was in a weekly apartment.

7    Q    Was anyone with you when you saw the news?

8    A    Yes.  My girlfriend Amber was with me.

9    Q    What was your reaction when you saw the news?

10   A    I was shocked, you know, like disbelief that it's

11   something that actually happened and I knew the two guys that

12   went and did it.

13   Q    Did you decide to do something about it?

14   A    Well, yeah.  At first I called him and asked -- I called D

15   and asked him, you know, what happened.  And he just said that

16   they martyred them in the street for no reason.  And then he

17   said it was -- first he said it was like something to do with

18   the cartels and then he just said the police had gunned them

19   down.

20   Q    And he said for no reason?

21   A    Yeah.

22   Q    Did you, after that, decide to call law enforcement?

23   A    Yes.

24   Q    And how did you make contact with law enforcement?

25   A    Through -- first through like a hotline, and then second,

 1   through the ATF that had came and talked to me anyways about

 2   some gang members that had shot at me.

 3   Q   Okay.  So ATF was coming to visit you because you had

 4   earlier made a police report?

 5   A   Because I had got shot out on 17th Avenue and Peoria and I

 6   had chased them down in my truck till the police had showed

 7   up.

 8   Q   And then the ATF came to talk to you about that?

 9   A   Yes.

10   Q   And did you tell ATF what you knew?

11   A   Yes.

12   Q   And then what happened?

13   A   Then the federal agents came and talked to me the

14   following day.

15   Q   At the time that you had these conversations with the ATF

16   and the FBI, were you facing any of the charges that you're

17   facing right now?

18   A   No.

19   Q   Did anyone offer you any money or anything for giving

20   information to the FBI at that point?

21   A   No.

22   Q   Did the FBI later pay you to make some recorded phone

23   calls to Mr. Abdul Kareem and others?

24   A   Yes.

25   Q   How much money were you paid, do you recall?

1    A    Now I can't recall.

2    Q    Was it $500?

3    A    I believe so, yes.

4    Q    Did that happen after you gave all of your statements to

5    the FBI about what you knew?

6    A    Yeah.  It was long after.

7    Q    Has anyone made you any promises in connection with the

8    charges that you are facing over in state court right now?

9    A    No.

10   Q    Has anyone told what you to say here today?

11   A    No.

12   Q    Anyone try to put words in your mouth?

13   A    No.

14   Q    Has anyone told you what any of the other witnesses in

15   this case have to say?

16   A    No.  I didn't know there was other witnesses.

17         MR. KOEHLER:  No further questions at this time.

18         THE COURT:  Mr. Maynard.

19                    **CROSS EXAMINATION**

20   BY MR. MAYNARD:

21   Q    Mr. Verdugo, we've not met, have we?

22   A    No.

23   Q    Okay.  And you've never spoken to me, correct?

24   A    No.

25   Q    But you have spoken to members of the FBI on at least a

 1   couple of occasions; is that correct?

 2   A   Yes.

 3   Q   Okay.  The first time you talked to somebody from ATF on

 4   March 5th or 6th?

 5           THE COURT:  Did you mean May?

 6   BY MR. MAYNARD:

 7   Q   May 5th or 6th?

 8   A   Yes.

 9   Q   Okay.  And then after that conversation, you spoke to

10   somebody from the FBI?

11   A   Yes.

12   Q   You told us just a moment ago you called the hotline?

13   A   Yes.

14   Q   Okay.  And did you have an understanding when you called

15   the hotline that if you gave a tip that was useful, there

16   might be some money that would be paid?

17   A   No.

18   Q   Okay.  You just did it out of the goodness of your heart?

19   A   Yes.

20   Q   Okay.  Let's talk for a minute about the time period when

21   you lived with -- you call him "D"; is that correct?

22   A   Yes.

23   Q   All right.  Now, you've told us when you first met him

24   about ten years ago.  But the first time you moved in with him

25   would have been either late 2012 or early 2013; is that right?

```
 1    A    Yes.
 2    Q    And when you moved in with him the first time, did you
 3    move in by yourself?
 4    A    Yes.  I think the first time I did move in by myself.
 5    Q    You didn't have a girlfriend that was living with you?
 6    A    Not when I first moved in.
 7    Q    And were there other people that were living there besides
 8    D?
 9    A    When I first moved in there was me, D lived there, and
10    there was another guy that lived there.  I think Muhammad
11    lived there the first time.
12    Q    Do you remember a Tobias Appleberry?
13    A    Tobias?  No.
14    Q    Do you remember a Josh Appleberry?
15    A    They moved out the day I moved in.
16    Q    Okay.  And did you have a girlfriend at the time named
17    Janine?
18    A    Yes.
19    Q    Okay.  And did she eventually move in with you?
20    A    Yes.
21    Q    And how long did she live there with you?
22    A    I think the whole time I stayed there.
23    Q    Okay.  So you and Janine actually had a bedroom to
24    yourselves, correct?
25    A    Yes.
```

```
 1   Q   All right.  And during the time period that the two of you
 2   were living there, do you remember an individual by the name
 3   of Ricky Meechum moving in?
 4   A   Yes.
 5   Q   And he was a Native American gentleman?
 6   A   Half, yes.
 7   Q   Half?  Okay.  He was not a Muslim, correct?
 8   A   No.
 9   Q   All right.  And how long do you remember that Ricky
10   Meechum lived there?
11   A   Ricky lived there for probably like six months.
12   Q   And so you were living there for a year -- approximately a
13   year with Janine.  Ricky is living there at least six months
14   during that same time period, correct?
15   A   Yes, but other people had lived there before he did, like
16   Muhammad lived there before Ricky moved in.
17   Q   Okay.  Anyone else you can remember?
18   A   Billy.
19   Q   Is that Billy Elliott?
20   A   He's a black man.  I don't know.
21   Q   Did you call him Black Billy?
22   A   Yeah.  We did call him Black Billy.
23   Q   And he was living there also?
24   A   He lived there after Ricky had moved out.
25   Q   Okay.  Do you remember anyone else?
```

```
 1   A    Lupe.  He stayed there for a while.

 2   Q    And Lupe was a friend of yours?

 3   A    Well, a mutual friend.

 4   Q    And what is his real name?  Is it Guerrero?

 5   A    Yeah.

 6   Q    Anyone else you can recall?

 7   A    Efrain stayed there for a while on the couch.  Efrain

 8   Ochoa.  And --

 9   Q    And Efrain, he was Hispanic?

10   A    Yes.

11   Q    He wasn't a Muslim?

12   A    No.

13   Q    And Ricky Meechum wasn't a Muslim, correct?

14   A    No.

15   Q    And Billy Eldridge, Black Billy, he wasn't a Muslim, was

16   he?

17   A    Yeah, he was.

18   Q    He was a Muslim?

19   A    Yes.

20   Q    Did he have an Islamic name that you recall?

21   A    No.  He just went by Black Billy.

22   Q    Okay.  And at some point after approximately a year living

23   there, did you move out for some time period?

24   A    Yes.

25   Q    And did you then move back --
```

1          Well, let's see if we can get the times right.

2          Did you move out around the end of 2013 or the first

3     part of 2014?

4     A    Yes.

5     Q    And then did you move back in May of 2014?

6     A    Yes.

7     Q    And did you move in that time with a woman by the name of

8     Mia.

9     A    That's my daughter's name.

10    Q    Okay.  Did you --

11    A    Me and my kids -- I was living there first.  And then my

12    kids' mom Lupe and my son Joey and my daughter Mia had came to

13    stay.

14    Q    So you, your two children, and your children's mother came

15    to live with you?

16    A    Yes.

17    Q    And so you were living there now from approximately May of

18    2014 through June of 2014, about a month?

19    A    No.  It had to be earlier than that because we had gotten

20    into an argument over money when I bought a truck.  And he

21    threatened to call the cops on me if I didn't move out in five

22    minutes because he thought I was holding money back from him.

23          So it was the beginning of 2014 because my kids' mom

24    and us had just got an income tax check and I just bought a

25    white Suburban and it caused a big conflict between me and

1   him.

2   Q   Okay.  Well, let's see if we can set the time frame.

3         When you were living there with Janine, you lived

4   there for almost a year.  And do you believe you moved out

5   around the first part of 2014?

6   A   We moved out, I would say, around like Christmastime.

7   Q   Okay.  And then you move in -- is it before you got your

8   income tax refund?

9   A   Yes.

10   Q   Or was it after?

11   A   It was before.

12   Q   Okay.  And do you remember when you got that?  Do you

13   think you got it in March or April or?

14   A   I don't know.  I believe we got it in March.

15   Q   Okay.  And that's when you moved in with your children's

16   mother and your two children?

17   A   Yeah.  I was already living there.  She had -- I brought

18   her down here from Anaheim, California.

19   Q   And she moves in with you and lives with you for

20   approximately a month, correct?

21   A   About.

22   Q   And is there a point in time when she is living with you

23   and you're there with your two children when the police come

24   to the residence?

25   A   Yes.

1  Q   And was it -- did you have an understanding that they came

2  because her mother had called them?

3  A   I believe so.

4  Q   Okay.  And were there allegations of domestic violence

5  involved that caused the police to come?

6  A   No.  Her mom just thinks I'm dangerous.

7  Q   And did she move out soon thereafter the police came?

8  A   No.  That's when we had bought the truck and got an

9  apartment.

10  Q   So you and your children and your children's mother,

11  though, you only stayed at D's place for a month or two in

12  2014; is that correct?

13  A   It was just not even a month because we had got the income

14  tax check and I bought the truck.  And we had gotten into an

15  argument over money.  And he thought I had spent all my money

16  on the truck and he didn't let me finish.  And he was like

17  going through some stuff and he told me to get out.  So I

18  packed my kids' stuff and my stuff and I got out.

19  Q   All right.  So you were there for a year from 2013 --

20  through most of 2013.  And now we're in the middle of 2014 and

21  you have been there for approximately a month with your

22  children and your children's mother, correct?

23  A   Yes.

24  Q   Okay.  And then you all move out.  And then you move back

25  in a third time with him, correct?

1   A   Yes.

2   Q   And the third time, do you move in with Janine again?

3   A   Yeah.  I think Janine came with me when I -- when I -- no.

4   Actually, when I came back, I actually had a girl Stephanie

5   with me.  And then I broke it off with her.  And then like a

6   few weeks later I started picking Janine up from work and

7   bringing her over.

8   Q   All right.  And so when you're living there now with

9   Stephanie and then Janine, were there others that were living

10  in the house too?

11  A   When we came back, I believe -- yeah.  When I came back

12  that time Billy was living there.

13  Q   I'm sorry?

14  A   Billy was living there at that time.

15  Q   Do you remember a person by the names of Charles Bibb?

16  A   Oh, yeah, Charles.  Charles moved in -- Charles -- yeah.

17  Charles lived there before Billy.  He lived in the room Ricky

18  had stayed in.

19  Q   Okay.  And Charles Bibb was the son of Mr. Mubarak,

20  correct?

21  A   Yes.

22  Q   Do you know Mr. Mubarak?

23  A   Yes.

24  Q   And how do you know him?

25  A   Through D.

1    Q    Excuse me?

2    A    Through D.

3    Q    Okay.  Did you ever have any business dealings with

4    Mr. Mubarak?

5    A    Yeah.  I fixed his car a couple times.

6    Q    Okay.  Was he happy with the way you fixed his car?

7    A    All except one time.

8    Q    Okay.  Now, when you moved back in this third time, would

9    it have been in the fall of 2014?

10   A    It was like right before -- right before June.

11   Q    So you're there from maybe March for a couple of weeks,

12   you move out, and then you come back in about June of 2014?

13   A    Or July.  One or the other.  I don't recall which one for

14   sure.  But it was either July -- around July 4th, because

15   that's when I was -- I had a month-to-month lease on my

16   apartment and I had some stuff that went down there and I

17   moved back in with D.

18        I was doing a job for him and we had -- I had a bunch

19   of his equipment in my truck.

20   Q    At this time did you and D, again, get in some other

21   argument or something and you moved out with either Stephanie

22   or Janine, whoever you happened to be with at that time?

23   A    Yeah.  I moved out with Janine.

24   Q    And that would have been before the end of 2014, correct?

25   A    It was -- it was only for like a month or two.

1   Q    So you came in July and then you move out in either the

2   latter part of August -- or August or September, correct?

3   A    We had like probably mid -- mid September.

4   Q    Okay.

5   A    But I had moved back in before November because I had

6   problems with Janine, so.

7   Q    Did you move back in right around Christmas of 2014?

8   A    A little before it.

9   Q    Just before Christmas but after Thanksgiving?

10   A    No.  I was there for Thanksgiving.

11   Q    I'm sorry?

12   A    I was at the house for Thanksgiving.

13   Q    And you were actually living there at that time?

14   A    Yes.

15   Q    Okay.  And then did you stay for the first couple of weeks

16   in January?

17   A    I stayed a little bit longer than that.

18   Q    Do you recall that when you left, did you have a truck at

19   the time?

20   A    Yes.

21   Q    And had -- were you concerned that that truck might be

22   repossessed?

23   A    No.

24   Q    Did you -- were you concerned that somebody was out

25   messing with your truck and that's what caused you to leave

1   that last time?

2   A   No.  I wasn't worried about anyone messing with my truck.

3   Q   What caused you to leave the last time?

4   A   Because me and D got in an argument and he pulled a gun on

5   me.

6   Q   So this would have been in January, February?  When is

7   this?  2015?

8   A   It was -- it was a little -- I think it was a little

9   either before or after my birthday.  But we had gotten into an

10   argument and --

11   Q   Well, just give me the date.

12          THE COURT:  When is your birthday?

13          THE WITNESS:  March 4th.

14          THE COURT:  March 4th.  So it was some place around

15   March 4th?

16          THE WITNESS:  Yes.

17   BY MR. MAYNARD:

18   Q   Okay.  Now, you've told us in direct examination you met

19   Mr. Soofi about six months before the Garland incident; is

20   that correct?

21   A   Yes.  Around -- it would have been around Thanksgiving

22   when I had moved back in in early November.

23   Q   Okay.  But you had known Ibrahim or Elton Simpson quite

24   some time before that?

25   A   Yes.

1   Q    Okay.  And, in fact, had you and Ibrahim ever gotten into

2   an argument or a fight?

3   A    We got into an argument a few times.

4   Q    Did you ever get into a fight?  Did you ever punch him?

5   A    No.

6   Q    Do you recall that when the government -- strike that.

7        The first time that you met with FBI agents, how many

8   agents were there?

9   A    I believe it was two.

10  Q    And did they video or audio tape you?

11  A    No, not that I recall.

12  Q    Do you recall that they prepared a report?  It's referred

13  to sometimes as a "302," but do you recall seeing a report?

14  A    No.  They just kind of --  just had asked me questions off

15  the top of their head and I gave them answers.

16  Q    To put this in context, after that meeting -- and we'll

17  get back to it in a little bit -- but to prepare for your

18  testimony today, didn't you meet with the U.S. Attorney and

19  didn't you meet with the FBI agent in the jail?

20  A    In the jail?

21  Q    Yes.

22  A    No.

23  Q    Where did you meet with them?

24  A    I had met with them here.

25  Q    They brought you here to the courthouse?

```
 1   A   Oh, yeah.  I mean, no.  I did meet with them two times
 2   while I was in lower -- LBJ.
 3   Q   Lower Buckeye?
 4   A   Lower Buckeye Jail to see if I would testify.
 5   Q   Right.  They came to meet with you, correct?
 6   A   Yes.
 7   Q   And they gave you a copy of the 302 report to review for
 8   accuracy.  Do you recall that?
 9   A   We went over it.  They didn't give me a copy.
10   Q   Okay.  But they gave it to you to read or did they read it
11   to you?
12   A   They read it to me.
13   Q   And you only had one change to make.  Do you recall that?
14   A   I don't recall what change it was, no.
15   Q   Okay.  But you were with them for several hours as they
16   read the report to you and then asked you further questions
17   about you testifying today?
18   A   Yes.
19   Q   All right.  Did they show you anything other than the
20   report?
21   A   No.
22   Q   Did they talk to you about the guns that were --
23   A   Oh, yeah.  They had showed me pictures of the guns before
24   that, yes.
25   Q   So the pictures of the guns that you saw today and you
```

1    told this jury about, this wasn't the first time you had seen

2    those pictures today, was it?

3    A    No.

4    Q    Okay.  And did they audio and videotape you when they read

5    you the 302 and showed you the pictures of the guns?

6    A    It was two separate occasions and I don't think so.

7    Q    Okay.  You're referring to two separate occasions.

8         When was the last time you met with either an FBI

9    agent or somebody from the U.S. Attorney's Office?

10   A    When I had -- was brought down here Wednesday.  They just

11   told me that I was brought by accident and I went back to

12   where I'm being held.

13   Q    When was that?

14   A    Wednesday of this week.

15   Q    Okay.  And did you meet with an FBI agent or an Assistant

16   U.S. Attorney?

17   A    I believe that the assistant attorney.

18   Q    And how long did you meet with him at that time?

19   A    We spoke for only like two minutes.  He just had to

20   apologize that they had brought me down here.

21   Q    Okay.  So it wasn't at that time that he showed you

22   something.  It was the time at Lower Buckeye Road when he read

23   you the 302 and showed you the pictures of the guns, correct?

24   A    Yes.

25   Q    Okay.  Let me see if I can help refresh your recollection.

```
 1              I want to show you a page from the 302 that the
 2    government, I believe, showed you.
 3              MR. KOEHLER:  Objection to the characterization of
 4    the witness's testimony.  The witness testified that it was
 5    read to him.
 6              MR. MAYNARD:  That the government read to him.  I
 7    apologize.
 8              THE COURT:  Can you zoom in a little bit on the part
 9    you want him to look at so it's a little bigger?
10              There's a button on the top.
11              MR. MAYNARD:  I'm not too good.  Oh.  It's on the
12    top.  Oh.  Okay.
13    BY MR. MAYNARD:
14    Q   All right.  I'm going to direct your attention -- and can
15    you read this to yourself?  I've put my finger on it and I
16    just ask you to read it to yourself to see if this helps
17    refresh your recollection.
18              Mr. Verdugo, have you had a chance to read those two
19    or three lines?
20    A   Yes.
21    Q   Okay.  Do you recall now that -- whether or not you got
22    into a fight and punched Mr. Simpson?
23    A   No.
24    Q   Do you recall that you told the FBI that you had punched
25    Mr. Simpson -- or Ibrahim?
```

1   A    No.  I just said we had a confrontation.

2   Q    You had a what?

3   A    A confrontation.

4   Q    When did you have the confrontation with Ibrahim?

5   A    One night when me and Daniel were standing out front

6   and --

7   Q    Can you give me an approximate date?  Start with the year.

8   A    It was probably around -- it was around Christmastime of

9   2014 and --

10  Q    So in Christmas of 2014, this is after you've moved in for

11  the fourth time?

12  A    It was around Christmas.

13  Q    Okay.

14          MR. KOEHLER:  Your Honor, I'm not sure what the

15  relevance of the point of whether he did or did not punch

16  Ibrahim.

17          THE COURT:  There is no question before the witness,

18  Mr. Koehler, so if that was intended to be an objection,

19  please make it if there's a question.

20  BY MR. MAYNARD:

21  Q    Now, you told this jury earlier today on direct

22  examination that you made two trips with Soofi and Ibrahim and

23  D out shooting, correct?

24  A    Yes.

25  Q    And can you tell the jury when those were, when those

1   trips took place?

2   A   They were sometime after the incident had happened in

3   January.

4   Q   The incident that happened in January?

5   A   Well, the shooting that -- the shooting incident in

6   France.

7   Q   Okay.  Sometime after the shooting in France, whenever

8   that happened, there were two separate times that you then

9   went with Soofi and Ibrahim and D out shooting in the desert?

10  A   Yes.

11  Q   Okay.  Was there anyone else that went with you?

12  A   No.

13  Q   Okay.  Do you know Sergio Martinez?

14  A   Yes.

15  Q   Did you ever go to Sergio Martinez's house to shoot?

16  A   No.

17  Q   And the date that you went shooting with Soofi, Simpson,

18  and D, was that on a Friday?

19  A   No.  It was -- I believe the first time was on a Saturday.

20  Q   And when was the second time?

21  A   It was sometime during the week.

22  Q   Okay.  And the four of you just got in the car and you

23  guys went out shooting?

24  A   Well, no.  I mean, it goes -- it's deeper than that, but.

25  Q   Are were you able to tell the FBI where this shooting took

1   place up near -- what was it?  Table Mesa Road, I think you

2   said?

3   A   Yes.

4   Q   Did you tell them where it was?

5   A   Yes.

6   Q   Did they tell you whether or not they had ever gone out

7   there to see if there was any shells or any indication that

8   you, Soofi, Simpson, and D had gone out shooting there?

9   A   I mean, it's a popular spot.  There would be shells

10  everywhere.

11  Q   That wasn't the question.

12          The question was:  Did the FBI tell you they had gone

13  out to look for the spot that you had told them that you had

14  gone shooting with these three individuals?

15          MR. KOEHLER:  Objection.  Hearsay.

16          THE COURT:  I'm sorry.  I didn't hear you, Mr.

17  Koehler.

18          MR. KOEHLER:  Objection.  Hearsay.

19          THE COURT:  Overruled.  You may answer "yes" or "no."

20          THE WITNESS:  No.

21  BY MR. MAYNARD:

22  Q   Did you ever tell the FBI that there were others that went

23  out shooting other than Simpson, Soofi, and D?

24  A   There's been others.

25  Q   Okay.  And was Abdullah Mubarak one of those others that

1    went out shooting with them?

2    A   Yes.

3    Q   And do you remember when Mr. Mubarak went out shooting

4    with them?

5    A   It wasn't with them.  It was just like D, Abdullah Mubarak

6    and Sergio going to Sergio's dad's.  That was before the

7    shooting in France.

8    Q   So you, Abdullah Mubarak --

9    A   No, not me.

10          Him, D, Abdullah Mubarak, and Sergio, those three.

11   Q   So D, Abdullah Mubarak, and Sergio went shooting sometime

12   before the shooting in France at D's?

13   A   They went to Sergio's dad's.  It's something he does quite

14   frequently.

15   Q   Okay.  And, in fact, you told the government that Sergio

16   Martinez kept many guns for D, correct?

17   A   Yes.

18   Q   The government was asking you today how many guns D had

19   and you told this jury how many.

20          You've told them in the past he had a .50-caliber?

21   A   Yes.

22   Q   And you told them -- but you didn't tell the jury today

23   about that.  How come?

24   A   I wasn't asked.

25   Q   Oh.  And you've told the government in the past that he

1   had numerous AKs, correct?

2   A   No.

3   Q   Not just the ones we have pictures of, but there were more

4   AKs than that that he had?

5   A   He has a lot of weapons.

6   Q   He have rocket launchers?

7   A   I don't know if he has rocket launchers.

8   Q   Does he have grenades?

9   A   Not that I believe.

10  Q   Now, you told the government initially that this group of

11  individuals, Soofi and Simpson and D and others had been going

12  out shooting in the desert for at least three years every

13  Friday, didn't you?

14  A   I said they had been going out and shooting.  It's

15  something D has always done for more than three years.  He's

16  always gone out shooting.

17  Q   That's not my question, sir.

18         Didn't you tell the government that Soofi, Simpson,

19  D, and other Muslims went out every Friday after Jumu'ah for

20  the past three years?

21  A   Him and Simpson did.  D and Simpson.

22         I don't know if Soofi tagged along --

23         MR. MAYNARD:  There's no question pending.

24         Just a moment, Your Honor.  I apologize.

25         THE COURT:  I think we'll take our break.

1              Ladies and gentlemen, we will take a 15-minute

2     recess.  We will reconvene at about a quarter to 3:00.

3              You are reminded again of the admonition not to

4     discuss the case among yourselves or with anyone else.

5              Please do not form any conclusions about the case

6     until you have heard all the evidence and begun your

7     deliberations.

8              Court is in recess until 2:45.

9              MR. KOEHLER:  Before we break, can I have a moment

10    with Your Honor?

11             THE COURT:  Yes.  I'll excuse the jury at this time.

12       (Open court, no jury present  at 2:31 p.m.)

13             THE COURT:  Why don't you give Mr. Verdugo a

14    15-minute break too?

15             Okay.  Mr. Verdugo, you can step down and we will

16    bring you back in in about 15 minutes.

17             Mr. Koehler?

18             MR. KOEHLER:  Yes, Your Honor.

19             I don't want to have to keep standing up to object,

20    but one of the issues that I'm seeing in the questioning is

21    that Mr. Maynard is asking Mr. Verdugo about statements he

22    made to the FBI that are not part of what we asked him on

23    direct examination.

24             THE COURT:  I am not limiting --

25             MR. KOEHLER:  Those statements --

1              THE COURT:  I'm not limiting the cross to the scope

2    of direct because I don't want any witnesses to have to come

3    back if we can take their testimony now.

4              So if that's what you're referring to, if you

5    objected that the cross exceeded the scope of direct, I would

6    not --

7              MR. KOEHLER:  That's not my objection.

8              THE COURT:  Okay.  Well, what is it then?

9              MR. KOEHLER:  My objection is that he's asking him

10   about hearsay statements that he's made to the FBI without

11   asking him about the event first.

12             THE COURT:  Well, maybe you should make an objection,

13   Mr. Koehler.

14             MR. KOEHLER:  I'm informing the Court now, because it

15   just started.  And I wanted to alert the Court to the issue

16   that I will be standing up to object.  But I don't want to

17   have to do it repeatedly in front of the jury.

18             THE COURT:  I'm sorry, but I can't --

19             Unless Mr. Maynard repeatedly asks the same kind of

20   question to which I have sustained several objections, I can't

21   in advance tell Mr. Maynard that I'm going to sustain an

22   objection to a question he has not asked.

23             So you must object in front of the jury.

24             MR. KOEHLER:  Well, I will.

25             THE COURT:  If that happens.

1          MR. KOEHLER:  I'm just alerting the Court that it's

2    coming.

3          THE COURT:  Thank you.  Court is in recess.

4      (Recess taken at 2:33 p.m.; resumed at 2:46 p.m.)

5      (Open court, jury present.)

6          THE COURT:  Thank you, ladies and gentlemen.  Please

7    sit down.  The record will show the presence of the jury,

8    counsel, and the defendant.

9          Mr. Maynard, you may continue your cross-examination.

10             **CROSS EXAMINATION  (cont'd)**

11   BY MR. MAYNARD:

12   Q   Mr. Verdugo, did Ibrahim and Soofi go shooting ever Friday

13   after dinner for three years?

14          THE COURT:  Don't look at what's on the screen.  He's

15   asking you -- just -- the question is --

16          Why don't you repeat it?

17   BY MR. MAYNARD:

18   Q   Did Soofi, Simpson, and D go shooting every Friday after

19   dinner for three years?

20   A   No.

21   Q   Did you ever tell anybody that?

22   A   They misunderstood what I said.  It was three months.

23   Q   Oh.  The government misunderstood it?  Whoever wrote the

24   302?

25   A   Whoever wrote it must have thought I said "years" but I

1    said "months."

2    Q   And you didn't correct it when they read it to you?

3    A   I didn't hear it.

4    Q   You didn't hear it?

5    A   No.

6    Q   Okay.  Now, who was in the group of Muslims that would go

7    shooting?

8            THE COURT:  You mean who else besides the three that

9    you have been asking him about?

10           MR. MAYNARD:  Yes, ma'am.

11           THE WITNESS:  Abdul Mubarak, Muhammad went with them

12   a couple times, and that's just what I know from who left from

13   the house.

14   BY MR. MAYNARD:

15   Q   Do you know an individual by the name of Abdul Khabir?

16   A   Yes.

17   Q   Was he part of this group?

18   A   Yes.

19   Q   Did D ever try to sell you an AK47?

20   A   No.

21   Q   Did you ever tell anybody that D tried to sell you an

22   AK47?

23   A   It wasn't D.  It was Ibrahim -- I mean, not Ibrahim.  It

24   was Efrain.

25           MR. MAYNARD:  Can I show this to refresh his

```
 1   recollection?
 2           THE COURT:  He hasn't expressed any inability to
 3   recall.  He says it was Ibrahim that asked if he wanted to buy
 4   one.
 5   BY MR. MAYNARD:
 6   Q   Did you ever tell anybody that it was D that tried to sell
 7   you an AK47?
 8   A   No.
 9   Q   Okay.  Let me show you page 12 of your 302 -- the 302 and
10   look at this paragraph.  Do you see where it starts "Stefan."
11           Read that to yourself.
12   A   It was supposed to be Efrain because Efrain was the one
13   who tried to sell it.
14   Q   So the government got that one wrong too; is that right?
15   A   Yes.
16   Q   Okay.  And you've told us -- you told this jury earlier on
17   direct examination that Ibrahim actually came to you and asked
18   you to either help him make a pipe bomb or make a pipe bomb
19   for him.  Do you recall that?
20   A   Or buy one.  Or if I knew anywhere to get them.
21   Q   And when did Ibrahim do that?
22   A   It was around the time that I was making the little, like,
23   plastic bombs in the front yard with the water bottles and
24   stuff.
25   Q   Well, let's talk about that for a minute.
```

1            It was -- I believe you said it was on New Years Day.

2   Was it actually New Years Eve?

3   A   Yes.  Or at midnight.

4   Q   Okay.  And fireworks in Arizona are mainly sparklers and

5   twirly things but not exploding things, correct?

6   A   Yes.

7   Q   And so you and D had gone to a place and had bought a

8   bunch of fireworks to set off for the kids in the

9   neighborhood; isn't that right?

10  A   Yes.

11  Q   And what you did was you took some of the powder out of

12  some of these sprinklers or sparkly things and you put it into

13  a two gallon -- or two liter jug; is that correct?

14  A   Yes.

15  Q   And then you put a fuse in there and you lit the fuse?

16  A   Yes.

17  Q   And that caused an explosion or a pop?

18  A   Yes.

19  Q   Correct?

20          And because you were able to do that, Ibrahim then

21  asked you, could you make him a pipe bomb because of that; is

22  that correct?

23  A   Well, Ibrahim and D both asked me if I knew how to make a

24  pipe bomb that night.

25  Q   Okay.  And what did you say?

CR15-00707-PHX-SRB   JURY TRIAL-DAY #4   2-19-16

1    A    I said yeah.

2    Q    You knew how to make a pipe bomb?

3    A    Yeah.

4    Q    How did you learn how to make a pipe bomb?

5    A    Just I come from a military family.  It's just something I

6    guess I learned.

7    Q    People in your family make pipe bombs?

8    A    No.

9    Q    Had you ever made a pipe bomb before?

10   A    Yeah.

11   Q    And -- but you told them you would not make a pipe bomb

12   for them?

13   A    Yes.

14   Q    Okay.  And I want to be clear.

15        Did they ask you to make a bomb that would blow up

16   the Cardinal Stadium?

17   A    Yes.

18   Q    And do you have that capability, do you?

19   A    No.

20   Q    No?  Okay.

21        What about Westgate Mall?

22   A    No.

23   Q    And when these fellows asked you to help them make this

24   bomb, did it ever occur to you to call the police?

25   A    Yeah.

1    Q    But you didn't?

2    A    Well, I didn't think they were serious.

3    Q    You didn't?

4    A    No.

5    Q    And you didn't call the FBI?

6    A    No.

7    Q    Didn't call any form of law enforcement on them, correct?

8    A    No.

9    Q    Okay.  And it's after they have asked you to do this that

10   you've gone -- you go shooting with them on two occasions out

11   at Table Mesa Road, correct?

12   A    Yes.

13   Q    Okay.  Now, had they created some sort of a training

14   center to train -- to learn how to shoot?

15   A    Just setting up targets.

16   Q    Okay.  I mean, they had been going out on Friday

17   afternoons for three years now, correct?

18            THE COURT:  He said "months."  He said that was a

19   mistake --

20            MR. MAYNARD:  Three months.

21            THE COURT:  -- that was written in the report.

22   BY MR. MAYNARD:

23   Q    Okay.  They have been going out.  Anybody ever talk to you

24   about a training center or anything like that?

25   A    No.

1    Q    Okay.  Were you considered to be a kafir or a kafir?

2    A    A kafir.

3    Q    And did they refer to you as a kafir?

4    A    Yeah.

5    Q    But yet they would ask you to make bombs, correct?

6         THE COURT:  Let's not be cumulative, Mr. Maynard.

7    BY MR. MAYNARD:

8    Q    All right.  Now, you lived with D on four separate

9    occasions between January of 2013 and March of 2015, correct?

10   A    Yes.

11   Q    And one of those periods was for almost a year, correct?

12   A    It was for what?

13   Q    Almost a year?

14   A    Yes.

15   Q    About a year.

16        And then the other times it was about a month each

17   time?

18   A    Well, just one time was a month.

19   Q    Okay.  Now, did -- during the time period that you lived

20   with D, did he -- was he security conscious at his house?

21   A    Yes.

22   Q    And did he put in an alarm system?

23   A    Like just ones on the door.

24   Q    So when one would open the door, the alarm would go off?

25   A    Yeah.

1   Q   And did he put bars on the windows?

2   A   Yes.

3   Q   Did he boobie trap the house?

4   A   He just had guns laying everywhere.  That's pretty boobie

5   trapped to me.  He would place things in certain manners where

6   he could see.

7         He would place the mirror in a certain way where he

8   could see the rest of the house.  He made sure that you

9   couldn't get in the house or get out of the house.

10  Q   But he didn't boobie trap the house, did he?

11  A   Boobie trap the house?

12  Q   Yes.  Did you ever use that phrase?

13        Did you tell the government that he boobie trapped

14  the house?

15  A   Well, he would set like stuff up around the house to tell

16  if you were in a certain part of the house or not.  I would

17  consider that to be boobie traps.

18  Q   Now, you told us on direct examination that the government

19  has not given you any incentives to testify today, correct?

20  A   Yes.

21  Q   Okay.  When Mr. Koehler came to see you, he told you that.

22  That was one of the first things he said to you when he came

23  out to the Buckeye jail?

24  A   Yes.

25  Q   Did he, however, go on to tell you that the FBI agents

```
 1   were willing to give statements concerning your girlfriend and

 2   her demeanor and proximity to you when you had met with them?

 3   A   No.

 4   Q   Let me see if I can refresh your recollection.  I'm going

 5   to show you a 302 from the meeting with you at West Lower

 6   Buckeye Road on or about December 17th of 2015.

 7        And I would like for you to read the section I have

 8   got down there in yellow.

 9   A   They said that was something that was required by law that

10   they had to do.

11   Q   Have you read that already?

12   A   Yeah.  I know what you're talking about.  But that's not

13   something they told me that they would do for me.  They said

14   it was something that was required by law that they had to do.

15   Q   So the fact that the agents were willing to give

16   statements and talk to the County Attorney on your behalf,

17   they told you was required by law?

18   A   Yes.

19   Q   So do you have an understanding that the FBI agents are

20   planning to talk to the County Attorney on your behalf?

21   A   No.  There's just the report of what they had eye

22   witnessed while they were around me and her.

23   Q   Okay.  And the allegations -- and I'm not going to ask you

24   about specifically -- but they deal with a time period when

25   you were actually having conversations with the FBI, correct?
```

1    A    Yes.

2    Q    Okay.  Now, after you had talked to the FBI agents in the

3    first part of May, you actually wore a wire on several

4    occasions for the FBI, didn't you?

5    A    Yes.

6    Q    And the reason was for you to go to work with D and see if

7    you could get some sort of information that would be helpful

8    in their prosecution of him?

9    A    Yes.

10   Q    Okay.  And you told us that you got paid $500.  What was

11   the $500 for?

12   A    I honestly don't know.

13   Q    Somebody just gave it to you?  Said, here, we'll give you

14   $500?

15   A    For -- they just -- they didn't tell me that they were

16   going to give me the money or nothing.  It was just pretty

17   much, I guess, for the gas money it cost me to run around and

18   do these things.

19   Q    But you didn't have to buy the wire that you were wearing.

20   You got that from the FBI, didn't you?

21   A    Yes.

22   Q    Okay.  And when you -- after you had worn the wire, at

23   some point did you leave the State of Arizona and go to

24   California?

25   A    Yes.

```
 1   Q    And were you arrested in California and extradited or

 2   brought back to Arizona?

 3   A    Yes.

 4   Q    Okay.  When you came back to Arizona, did you make any

 5   calls to D for help?

 6   A    I asked him to call my father.

 7   Q    Okay.  And after that happened, did you make any further

 8   calls to him from the jail?

 9   A    No.  He didn't -- he didn't put money on his phone.

10   Q    Do you know what his phone number is?

11   A    It's been the same phone number for years.

12   Q    Pardon me?

13   A    It's been the same phone number for years.

14   Q    And what is that number?

15   A    623-204-7295.

16   Q    Let me see if I can refresh your recollection.

17             Didn't you make 37 phone calls to him after you were

18   arrested in the month of June?

19   A    That wasn't by me.

20   Q    It was somebody else from the jail?

21   A    There was something that was going on between the pod I

22   was in and people wanting to talk to someone that knew me

23   about my charges.

24   Q    These are inmate telephone system records.

25   A    I know.
```

1   Q    That show the calls that come out of the jail.

2   A    Yeah.  They're from my booking number.  I used my name and

3   they were on the phone trying to figure out who I was.

4   Q    Prior to this arrest you have been arrested 17 times;

5   isn't that correct?

6   A    Yes.

7            MR. KOEHLER:  I'm going to object to this under

8   608(b), Your Honor.

9            THE COURT:  Mr. Koehler, I think I mentioned you have

10   to object before the answer comes in, so there's no question

11   before the witness.

12   BY MR. MAYNARD:

13   Q    When you -- between 2014 and 2015 up until the time that

14   you were arrested, did you have the same phone number?

15   A    I don't believe so.

16   Q    Did you have multiple phone numbers?

17   A    Yes.

18   Q    Can you tell me what those numbers were?

19   A    No.

20   Q    You don't remember what your phone numbers were?

21   A    No, I don't.

22   Q    Do you recognize the number 602-419-9802?

23   A    No.

24   Q    602-419-9302?

25   A    That was a phone number I had before I got arrested.

1    Q    That one was?

2    A    Yes.

3              MR. MAYNARD:  Okay.  May I have just a minute, Your

4    Honor?

5              THE COURT:  Yes.

6    BY MR. MAYNARD:

7    Q    Today on both direct and cross-examination you mentioned a

8    fellow by the name of Daniel.  Is that Daniel Vanhook?

9    A    Yes.

10             MR. MAYNARD:  I don't have any further questions,

11   Judge.

12             THE COURT:  Mr. Koehler.

13                        **REDIRECT EXAMINATION**

14   BY MR. KOEHLER:

15   Q    I'm going to start with a couple of the easier ones.

16             During the early part of cross-examination

17   Mr. Maynard asked you about an individual that he referred to

18   as Black Billy?

19   A    Yes.

20   Q    Was there more than one Billy that knew at Mr. Abdul

21   Kareem's apartment?

22   A    Yes.

23   Q    What was the other Billy's name?

24             MR. MAYNARD:  Objection.  It's beyond the scope.

25             THE COURT:  Overruled.  You may answer.

1            THE WITNESS:  We just called him Billy.  He was

2    white.

3    BY MR. KOEHLER:

4    Q   Did he get called White Billy?

5    A   No.

6    Q   And who was the person who gave this nickname Black Billy

7    to the other Billy?

8    A   D called him Black Billy, so we just all called him Black

9    Billy.  Like it didn't offend him or nothing.

10   Q   So where did you learn the nickname?

11           THE COURT:  I think he just answered that question,

12   Mr. Koehler.

13           Ask your next question.

14   BY MR. KOEHLER:

15   Q   Mr. Maynard showed you a sheet of paper a second ago and

16   you said something about inmates checking you out and making

17   phone calls.  Can you explain what it is that you're talking

18   about?

19   A   Yeah.  It's because of my charges.  And my race kept

20   wanting me to call somebody that could prove that my victim

21   wasn't under age because I was having problems.  I was getting

22   into numerous fights over it.

23           And the one guy had noticed me dial the number and he

24   kept making me call back and call back to try to get D on the

25   phone to see if he would vouch for me that my victim wasn't

```
 1    under age.
 2    Q    Let's talk about this for a moment.
 3              When these calls occurred, first off, when were you
 4    arrested and taken into custody on your charges?
 5              THE COURT:  Do you want to know about when he was
 6    arrested in California or when did he arrive in Arizona?
 7              MR. KOEHLER:  No.  When he was arrested in
 8    California.
 9              THE COURT:  Okay.
10              THE WITNESS:  I think it was the 21st.
11    BY MR. KOEHLER:
12    Q    Of what month?
13    A    May.
14    Q    And when did you get to Arizona?
15    A    June 4th.
16    Q    To your knowledge, did anybody actually talk to D about
17    what you wanted him to vouch for?
18    A    No, because I ended up getting jumped over it.
19    Q    What is "getting jumped"?
20    A    I had four guys running on me while I was in my cell.
21    Q    Beat you up?
22    A    Kind of.
23    Q    Mr. Maynard asked you about when Agent Whitson and I came
24    to visit you in Lower Buckeye Jail.  Do you recall that?
25    A    Yes.
```

1    Q    What were you told about why we were going to give the

2    reports from the FBI about their observations of you and

3    Amber?

4    A    Because it's -- you said it was legally what you had to

5    do.

6    Q    And were you told whether we would do that regardless of

7    whether you came here to testify?

8    A    Yes.  I was told that whether I would testify or not, it

9    was an obligation that the FBI had to do.  They had to turn

10   their report in or not.  It had nothing to do with me coming

11   to testify.

12   Q    Mr. Maynard asked you about your various times of living

13   in the house.  And one of the times talked about you and the

14   mother of your children and your children living in the house.

15   A    Yes.

16   Q    How long were you there?

17   A    For approximately a month.

18   Q    And why did you leave that time?

19   A    Because I had showed up at the house -- I had bought a

20   Suburban.  And D was upset about it and he thought the money

21   that I had got that I blew it all on the truck.

22        But I had didn't.  I got the truck for like nothing

23   because I know a guy that owns a dealership.  And I was -- I

24   came back to the house and my kids' mom was out eating with my

25   sister and younger brother.  And when I came back to the house

1    he was in a rage.

2    Q    He kicked you and your children out of the house?

3    A    They weren't there at the time.  He just told me to pack

4    my -- he told me to pack my shit and get out or he was going

5    to call the cops on me and have me arrested for the warrant he

6    thought I had for driving on a suspended license.

7    Q    Let's talk about people living at the house at the time

8    you were living there.

9         Was D happy about all these people that were living

10    in the house?

11    A    Well, we worked for him.  That's why they lived there.

12    Q    Okay.  And did he have other people coming to the house

13    later that didn't work for him?

14    A    Everybody that pretty much stayed at the house that wasn't

15    Muslim worked for him.  If you weren't Muslim and you lived at

16    that house, you were working for him.

17         The only Muslim that ever lived there that worked for

18    him was a guy named Muhammad.

19    Q    Did he also have a couple of young boys that came to the

20    house on occasion?

21              MR. MAYNARD:  Objection.

22              THE WITNESS:  Yes.

23              MR. MAYNARD:  Beyond the scope.

24              THE COURT:  Sustained.

25    BY MR. KOEHLER:

1  Q   Mr. Maynard asked you about Sergio Martinez.  Were you

2  close friends with Sergio Martinez?

3  A   Not really.

4  Q   Did you socialize with him independently of D?

5  A   Sometimes when he would come over when I was out front

6  smoking, we would sit there and talk while he waited for D to

7  get ready.

8  Q   But, otherwise, would you like go to his house or go do

9  things with him elsewhere?

10  A   No.

11  Q   Have you spoken to Sergio Martinez since May 3 of 2015?

12  A   No.

13  Q   Earlier Mr. Maynard asked you if you called the FBI when D

14  and Ibrahim asked you about pipe bombs and silencers and so

15  forth.

16        Why didn't you call law enforcement when they made

17  these requests of you?

18  A   Because, one, I didn't think neither of them were serious;

19  and two, D was like, you know, drinking.  So I thought it was

20  just a joke, you know, like somebody, like, oh, my girlfriend

21  cheated on me, let's go beat the dude up.

22        Just something he was kidding about.  I didn't take

23  it seriously.  It's not every day you really think somebody

24  wants you to make a bomb to hurt people.

25  Q   You mentioned he was drinking.  Did you ever see him drink

1    around Ibrahim?

2    A    No.  He wouldn't drink around the other Muslims because

3    it's not allowed.

4    Q    Mr. Maynard also brought up the fact that you saw pictures

5    of the firearms before today.

6            Prior to being shown the pictures of the firearms,

7    did you describe the firearms?

8    A    Yes.  I was asked to describe the types of firearms that I

9    had witnessed.  And two that I described you guys had showed

10   me photos of what I had described.

11   Q    Did you recognize the firearms in the photos as soon as

12   you saw them?

13   A    Yes.

14   Q    And are you certain that you recognize in particular the

15   rifles?

16   A    Yes.

17   Q    What about the Taurus revolver?

18           MR. MAYNARD:  Objection.  Asked and answered.

19           THE COURT:  Sustained.

20   BY MR. KOEHLER:

21   Q    Last thing I want to ask you about is Mr. Maynard asked

22   you about an argument that you got into with Mr. Kareem or

23   Abdul Kareem and you said that he pulled a gun on you?

24   A    Yes.

25   Q    What was that argument about?

1  A   It had something to do with -- I had -- we had, a few days

2  earlier, we had went to the bar and D had some confrontation

3  with a guy.  And I ended up fighting the guy in the parking

4  lot.

5       And then me and D were arguing and he had hit me in

6  the side of my face.  And I told him -- they had separated us.

7  And I don't know what caused him to get a gun, but he went

8  into his room and grabbed his gun and pointed it at me in the

9  living room.  And everyone started yelling D -- Daniel and

10  Lupe started yelling at him to, you know, put the gun away.

11  Q   And then last question:  Has anybody made you any promise

12  whatever in order to get you to come here today and testify?

13  A   No.

14       MR. KOEHLER:  No further questions.

15       MR. MAYNARD:  Your Honor, can I briefly ask another

16  question on cross-examination?

17       THE COURT:  On cross-examination?

18       MR. MAYNARD:  Or recross.

19       THE COURT:  Well, we don't have recross, so it

20  can't -- it would have to be something you forgot to ask him

21  on cross.

22       MR. MAYNARD:  It is.

23       THE COURT:  And it would have to be just one

24  question.  So make sure you make it just one.

25       MR. MAYNARD:  Just one?

```
 1              THE COURT:  Just one.  We'll see.
 2                   CROSS EXAMINATION (cont'd)
 3    BY MR. MAYNARD:
 4    Q   Did you ask Daniel Vanhook sometime after you moved out in
 5    March of 2015 to call D and ask if you could move back in with
 6    him because you were homeless at the time?
 7    A   No.
 8              THE COURT:  May this witness be excused, Mr. Koehler?
 9              MR. KOEHLER:  Yes, Your Honor.
10              THE COURT:  Is there any objection, Mr. Maynard?
11              MR. MAYNARD:  No.
12              THE COURT:  Thank you very much, Mr. Verdugo.  You
13    may step down and you are excused as a witness.
14              And the government may call its next witness.
15              Ms. Brook?
16              MS. BROOK:  The witness is in transit from the third
17    floor, so it might just take a minute.  She's coming upstairs.
18              THE COURT:  Is the "she" you're referring to
19    Ms. Vaughan?
20              MR. KOEHLER:  Yes.  The United States calls Amy
21    Vaughan.
22              THE COURT:  Ms. Vaughan, would you please come
23    forward and be sworn.
24         (Witness duly sworn)
25              THE CLERK:  Please state your name for the record and
```

```
 1    spell your last name.
 2            THE WITNESS:  Amy Kathleen Vaughan.  A-M-Y.
 3    V-A-U-G-H-A-N.  Kathleen.  K-A-T-H-L-E-E-N.
 4            THE COURT:  You may proceed, Mr. Koehler.
 5          AMY KATHLEEN VAUGHAN, WITNESS, SWORN
 6                  DIRECT EXAMINATION
 7    BY MR. KOEHLER:
 8    Q   Good afternoon.  Could you please introduce yourself to
 9    the jury.
10    A   Hi.  My name is Amy Vaughan and I'm an Intelligence
11    Analyst for the FBI.
12    Q   How long have you worked for the FBI?
13    A   Just over five years now.
14    Q   What are your duties as an Intelligence Analyst?
15    A   I perform a variety of research tasks, mostly providing
16    context for the investigations, exploiting data, and analyzing
17    it, and then disseminating it to the intelligence community,
18    as well as attempting to create assessments based on the data
19    we currently have to predict likely outcomes.
20    Q   Are you assigned to a particular unit in the FBI?
21    A   Yes.  I'm assigned to a squad on the Joint Terrorism Task
22    Force.
23    Q   And is that here in Phoenix?
24    A   Yes.
25    Q   How long have you been in that assignment?
```

1    A    Just over five years.

2    Q    So since day one in the FBI, you have been in an

3    Intelligence Analyst in the national security squad here in

4    Phoenix?

5    A    Yes.

6    Q    As part of your duties, do you review electronic images

7    that have been extracted from computers and cell phones and so

8    forth?

9    A    Yes, on occasion.

10    Q    Can you explain a little bit about how that material comes

11    to you, first off.

12    A    Yes.  It's acquired through some legal process or consent

13    that's given to search the device.  The CART team acquires the

14    device and processes it.  And that information is loaded as a

15    digital image to a review system that we have access to back

16    at the FBI.

17    Q    Is that the point at which you get it?

18    A    Yes.

19    Q    Why don't you tell us a little bit about how the review

20    system operates from your end?

21    A    So the first thing we do is establish what it is that we

22    are looking for.  We usually, if we're not familiar with the

23    facts of the case, which might well happen, I review them and

24    then we do two things.

25    Q    Let me pause you for a second.  You mentioned that you

1    review the facts of the case.  How do you do that?

2    A    Usually, just by speaking with the case agents and

3    reviewing the case file.

4    Q    So you want to get an understanding of what it is that

5    you're looking for?

6    A    Yes.

7    Q    In the context of your work at the FBI in your unit, is

8    there a particular area of focus of what you would always be

9    looking for?

10   A    Material relating to terrorism.

11   Q    As part of your review of a device when looking for

12   material related to terrorism, what types of data are you

13   looking through?

14   A    Documents such as .pdfs, Word documents, correspondence,

15   mainly e-mail or Instant Messages, things like that, videos,

16   audio, graphics.  That's the main base of what we look at.

17   Q    And what kinds of things are you looking for in that data?

18   A    Terrorist propaganda is a big one.  So things like

19   magazines, videos that we know have been released by terrorist

20   groups, news releases that they put out.

21        We also look for any sign of contact with known

22   terrorist groups or individuals of concern, things like

23   bomb-making instructions or instructional manuals that might

24   tell you how to commit an attack.

25        Let's see, I think that is about it.

1    Q    Do those kinds of things serve as hallmarks of items that

2    might relate to terrorism?

3    A    Yes.  Some of them can be indicators of radicalization or

4    interest in a group or even intent to commit a future attack.

5    Q    Does seeing those things alone cause you to draw a

6    conclusion or do you have to do further investigation?

7    A    Typically, we have to do further investigation.

8    Q    As you go through and you find items that perhaps have

9    some of these hallmarks, what do you do as you move through

10   the data?

11   A    First we have a labeling system in our forensic tool that

12   allows us to label whether something is pertinent or

13   nonpertinent or if it needs further processing by a CART

14   examiner or a translator or something like that.

15          Then myself or someone -- you know, someone working

16   in a similar position, would go and research the actual item

17   if such research is required.

18          So if it's a lecture or something that I haven't

19   heard of before, I will go and look that up and get a better

20   idea of what exactly it is.

21   Q    What kind of research would you do to look that up?

22   A    I might search the Internet or search FBI databases.

23   There are repositories of terrorist propaganda or lectures and

24   so forth that I can check.

25   Q    When you check, are you looking for particular information

1  about, for instance, you mentioned audio.  What would you be

2  looking to find out about the audio?

3  A   Who produced it and published it.  Who it features.

4  Q   When you say "who it features," what do you mean by that?

5  A   Who is delivering the lecture.  What it's about.

6  Q   Will you review transcripts of them as well, if they are

7  available?

8  A   If they are available, but they usually are not.

9  Q   When you're dealing with documents, e-mails, Word

10  documents, .pdfs, and so on, do you have tools available to

11  help speed your processing of those kinds of items?

12  A   Our forensic tool is set up in a way that makes an

13  immediate review of some of these items a little more easier,

14  just that it will show you all of them at once so that you can

15  scan through a little faster.

16  Q   Are you able to use things like search strings?

17  A   Yes.  We also have the ability to do targeted searches,

18  which is usually the second part of any review of media that

19  we do.

20  Q   Are you able to do those kinds of searches when you're

21  dealing with image files or video or audio files?

22  A   It depends on whether or not metadata is embedded in those

23  files with audio or video.  Things like the title and the

24  author are often embedded in the file.  And, therefore, when

25  we do a targeted search, those things will turn up, but with

1   pictures that's usually not the case.

2   Q   What do you have to do when you're looking through

3   pictures and audio and video to make certain that you don't

4   miss anything?

5   A   We need to actually look at them, listen to them, watch

6   them.

7   Q   One by one?

8   A   Yes.

9   Q   In today's world with ever-increasing hard drive sizes,

10  can you walk the jury through what it's like to be doing that?

11          THE COURT:  Well, my question would be why?  Can't we

12  get to what she was doing in this case?

13          MR. KOEHLER:  Certainly.  I just wanted to lay the

14  foundation for how we get there.

15  BY MR. KOEHLER:

16  Q   So in this case, have you -- obviously, we have met before

17  today; is that correct?

18  A   Yes.

19  Q   Have you reviewed a number of devices in connection with

20  the investigation of the attack in Garland, Texas?

21  A   Yes.

22  Q   Was one of those devices an image of a Lenovo computer

23  that was created in 2015?

24  A   Yes.

25  Q   And during the review of that computer, the image of that

1   computer, did you find items that were relevant to the

2   investigation?

3   A   Yes.

4   Q   I'm going to show you what's been marked for

5   identification as Exhibit No. 166.

6          If I can have a moment, Your Honor.

7          Showing you what's marked for identification as

8   Exhibit No. 162, Ms. Vaughan, do you recognize that?

9   A   Yes.

10  Q   Can you tell the Court and the jury what that is?

11  A   This is a screenshot of our forensic tool which shows a

12  file that has been put into the Recycle Bin and recycled which

13  was previously a .pdf file entitled S&I.pdf.

14  Q   Is that a fair and accurate depiction of the screenshot of

15  the Recycle Bin of the Lenovo from 2015?

16  A   I believe so.

17          MR. KOEHLER:  Move to admit Exhibit 162.

18          MS. PLOMIN:  No objection.

19          THE COURT:  162 is admitted.

20      (Exhibit No. 162 admitted in evidence.)

21  BY MR. KOEHLER:

22  Q   Ms. Vaughan, the file film S&I.pdf, had you seen that

23  filename elsewhere before?

24  A   Yes.

25  Q   And can you tell the jury what that filename meant to you?

1   A   Yes.   I recognized it as a .pdf of a file called the

2   Global Islamic Media Front Security and Intelligence Course.

3   Q   And now I'm now going to place Exhibit 163.   Do you

4   recognize that?

5   A   Yes.

6   Q   Where did that come from?

7   A   I believe that came from the Lenovo.

8   Q   And is that a fair and accurate depiction of the image

9   that you found on the Lenovo?

10   A   Yes.

11           MR. KOEHLER:   Move to admit 163.

12           MS. PLOMIN:   No objection.

13           THE COURT:   163 is admitted.

14       (Exhibit No. 163 admitted in evidence.)

15   BY MR. KOEHLER:

16   Q   What are the words on that image?

17   A   It says Apocalypse Rising.

18   Q   Did you recognize that image when you saw it?

19   A   No.

20   Q   There's one other question about that.

21           Do you recall the date of access for that particular

22   image?

23   A   I don't recall, no.

24   Q   All right.   Did you also review the image of the desktop

25   computer, No. 263 is the exhibit number?   Have you seen that

1    desktop before today?

2    A   Which -- can you be more specific about which desktop it

3    is?

4              THE COURT:  Would you know if Mr. Koehler told you

5    what location it was seized from, what computer he's referring

6    to?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  Why don't you tell her what

9    desktop image she reviewed.

10   BY MR. KOEHLER:

11   Q   Let me ask this.  Is there more than one desktop computer

12   that was reviewed in the case?

13   A   No, but I just wanted to make sure it was the right one.

14   Q   And having seen me lift it up, is that the right one?

15   A   Yes, sir.

16   Q   During the course of reviewing the desktop computer, did

17   you find evidence of a series of files in a lecture series

18   called Bearers of Glad Tidings?

19   A   Yes.

20   Q   And what format were those files in?

21   A   I believe they were MP3 files.

22   Q   And were those files exported from the computer on your

23   behalf?

24   A   I believe so, yes.

25   Q   Did you also review on the computer and find a file, a

```
1    sermon by a person named Anwar al-Awlaki, about the

2    persecution of Muslims?

3    A    Yes.

4    Q    And do you recall the precise name of that file?

5    A    It's Brutality Towards Muslims.

6    Q    Was there also a file on that computer, a series thereof,

7    called Constants On The Path of Jihad?

8            MS. PLOMIN:  Your Honor, objection as to which

9    computer.

10            MR. KOEHLER:  We're still talking about the desktop

11    computer.

12            THE COURT:  So this series of questions is related

13    exclusively to the desktop computer?

14            MR. KOEHLER:  That is correct.

15            THE COURT:  Please continue.

16            THE WITNESS:  Yes.

17    BY MR. KOEHLER:

18    Q    And was that a six-part audio series?

19    A    Yes.

20    Q    And was that also in MP3 format?

21    A    Yes.

22    Q    Was there also another audio called 17 Rules of Dream

23    Interpretations?

24    A    Yes.

25    Q    And another one called Dreams in Qur'an and Hadith?
```

1   A   Yes.

2   Q   Was there another audio called Dreams Of The Companions?

3   A   Something like that, yes.

4   Q   How about an audio called The Dust Will Never Settle Down?

5   A   Yes.

6   Q   And did you recognize that particular filename?

7   A   Yes.

8   Q   Do you know who the person is who delivered that lecture?

9   A   Anwar al-Awlaki.

10  Q   Was there another lecture concerning America's War on

11  Islam?

12  A   Yes.

13  Q   And a lecture about a classical book on jihad?

14  A   Yes.

15  Q   Another audio advocating Muslims to restore the honor of

16  Islam in calling for the revival of the Khalifah and jihad?

17  A   Yes.

18  Q   Were there two audios,  Allah Is Preparing Us For Victory

19  Parts 1 and 2?

20  A   Yes.

21  Q   And It's A War Against Islam?

22  A   Yes.

23  Q   Was there also a print version of Constants On The Path To

24  Jihad or On The Path Of Jihad on the computer?

25  A   Yes.

1    Q    I'm placing Exhibit 279 on the camera.

2              Ms. Vaughan, do you recognize that?

3    A    Yes.

4    Q    Is that a true and accurate copy of the document that you

5    found on the desktop computer Constants On The Path Of Jihad?

6    A    Yes.

7              MR. KOEHLER:  Move to admit 279.

8              MS. PLOMIN:  No objection.

9              THE COURT:  279 is admitted.

10        (Exhibit No. 279 admitted in evidence.)

11   BY MR. KOEHLER:

12   Q    Now, moving on to Exhibit 281.  And I believe our

13   witness -- or our exhibit list has this incorrectly described.

14             Did you find a page from Dabiq Magazine Issue No. 4?

15   A    Yes.

16   Q    Was that page 13 of the magazine?

17   A    Yes.

18   Q    I'm putting Exhibit 281 on the monitor for you.

19             Is that a fair and accurate depiction of the page

20   that you found on the desktop computer?

21   A    Yes.

22             MR. KOEHLER:  Move to admit 281.

23             MS. PLOMIN:  No objection.

24             THE COURT:  281 is admitted.

25        (Exhibit No. 281 admitted in evidence.)

```
 1    BY MR. KOEHLER:

 2    Q   Ms. Vaughan, looking at the objects depicted in the photo

 3    there, do you recognize those from your work?

 4    A   I believe they're some sort of missile.

 5    Q   Now moving on, did you also find Dabiq Issue 5 on the

 6    computer?

 7    A   Yes.

 8    Q   I'm placing what's been marked, for identification, as

 9    Exhibit 282 on the document camera.

10         Do you recognize that, Ms. Vaughan?

11    A   Yes.

12    Q   Is that a true and correct copy of the Dabiq Issue 5

13    Magazine that you found on the computer?

14    A   Yes.

15         MR. KOEHLER:  Move to admit 282.

16         MS. PLOMIN:  No objection.

17         THE COURT:  282 is admitted.

18    (Exhibit No. 282 admitted in evidence.)

19    BY MR. KOEHLER:

20    Q   Ms. Vaughan, did you also find screen captures of videos

21    on the computer in places?

22    A   Yes.

23    Q   Was one of them a screencap from an official ISIL video of

24    fighters loading artillery?

25    A   Yes.
```

 1   Q    And had you seen the actual video that this came from?

 2   A    No.

 3   Q    How could you tell it was from an official ISIL video?

 4   A    I recognized on the bottom there's an official logo.  And

 5   that logo is one of the provincial media outlets for the

 6   Islamic State.

 7   Q    Is Exhibit 283 one such screen capture?

 8   A    Yes.

 9   Q    Is that a true and accurate copy of the screencap you

10   found on the computer?

11   A    Yes.

12           MR. KOEHLER:  Move to admit 283.

13           MS. PLOMIN:  No objection.

14           THE COURT:  283 is admitted.

15       (Exhibit No. 283 admitted in evidence.)

16   BY MR. KOEHLER:

17   Q    Now, directing your attention to Exhibit 284, was there a

18   screen capture from a video of a person about to be beheaded

19   on the computer?

20   A    Yes.

21   Q    And can you tell where that screen capture came from?

22   A    It's a video from Wilayah Halab.

23   Q    And what is that?

24   A    That is one of the provincial media outlets of the Islamic

25   State.

1   Q   Is that a true and accurate copy of the screen capture?

2   A   Yes.

3           MR. KOEHLER:  Move to admit 284.

4           MS. PLOMIN:  Your Honor, we object to this in

5   relevance and overly inflammatory.

6           THE COURT:  The objection is overruled.  284 is

7   admitted.

8           But you can take it off the screen now, Mr. Koehler.

9       (Exhibit No. 284 admitted in evidence.)

10  BY MR. KOEHLER:

11  Q   Did the computer also contain an advertisement for an

12  article titled The Obligation Of Appointing a Khalifah & The

13  Forbiddance Of Delaying Such from Ansar al Khilafah, an ISIL

14  supporter organization?

15  A   Yes.

16  Q   I placed 285 on the document camera.  Is that a true and

17  accurate copy of that advertisement?

18  A   Yes.

19          MR. KOEHLER:  Move to admit 285.

20          MS. PLOMIN:  No objection.

21          THE COURT:  285 is admitted.

22      (Exhibit No. 285 admitted in evidence.)

23  BY MR. KOEHLER:

24  Q   Ms. Vaughan, there's a person's picture in the upper,

25  little bit left of center, of the picture.

1           Do you recognize that picture?

2    A    Yes.  That is Abu Bakr al-Baghdadi.

3    Q    And who is he?

4    A    He is the Khalifah of the Islamic State.

5    Q    Going now to 286, is there a screen capture from an ISIL

6    branch in Libya on the computer depicting prisoners marched

7    along a beach?

8    A    Yes.

9    Q    Now, in your work, have you learned about ISIL's expansion

10   in the Middle East?

11   A    Yes.

12   Q    Do they have a branch in Libya?

13   A    Yes, they do.

14   Q    And had you -- have you seen this particular video during

15   your work?

16   A    I have seen parts of it, yes.

17   Q    And does this photograph fairly and accurately depict the

18   screen capture you found on the computer?

19   A    Yes.

20           MR. KOEHLER:  Move to admit 286.

21           MS. PLOMIN:  No objection.

22           THE COURT:  286 is admitted.

23       (Exhibit No. 286 admitted in evidence.)

24   BY MR. KOEHLER:

25   Q    Have you seen the later part of this video when these

1    people are executed?

2    A    I have not watched that part, but I am aware of it.

3    Q    I'm going to lay foundation for some of these and then

4    move on and we'll talk about admitting them later, if that's

5    okay.

6              Is there a picture on the computer of a man being --

7    having been publicly executed?

8    A    Yes.

9    Q    Is Exhibit 287 a fair and accurate depiction of that

10   picture?

11   A    Yes.

12   Q    Exhibit No. 288.  Do you see a picture on the computer of

13   a group of people looking like they were executing a person in

14   that courtyard?

15   A    Yes.

16   Q    Does the building have a flag on it?

17   A    There's a flag on a pole on the courtyard floor.

18   Q    And what kind of flag is it?

19   A    I believe it's an Islamic State flag.

20   Q    Is this a true and accurate copy of the depiction on the

21   computer?

22   A    Yes.

23   Q    Did the computer also contain a screen capture from an

24   official video of a beheading that's about to occur?

25   A    Yes.

1   Q   Is 289 an accurate depiction of that image?

2   A   Yes.

3          THE COURT:  I'm going to interrupt you here for a

4   moment, because so far there have not been any objections to

5   the foundation for these photos.

6          And so to try to move things along a bit, does the

7   defendant have objections to whether or not these are true and

8   accurate screenshots from images from the desktop computer?

9          MS. PLOMIN:  No.  Our only objection would be

10  relevance and overly inflammatory on a number of these

11  exhibits.

12         THE COURT:  Thank you.

13  BY MR. KOEHLER:

14  Q   Looking at 290, did you find a screen capture of a --

15         THE COURT:  Well, we're not going to go through them

16  unless they're admitted.  We're not going to have a

17  description of what's in an exhibit that isn't admitted when

18  we know that you don't have to lay the foundation because we

19  have just been told that the defense has no objection to the

20  foundation for these exhibits.

21         MR. KOEHLER:  If they're not going to object to

22  foundation on the exhibits, then we can go through later

23  and --

24         The concern I have is making sure that I associate

25  the right exhibit numbers with the right computer --

```
 1              THE COURT:  Okay.

 2              MR. KOEHLER:  -- in a way that makes it clear for the

 3     record.

 4              THE COURT:  I understand that.

 5              So you're asking about exhibits through what number?

 6              MR. KOEHLER:  Right now I'm on 290.  And not all of

 7     these display the things that are of concern.  Some of them

 8     are not.

 9     BY MR. KOEHLER:

10     Q   So on page 9 of our exhibit list, Exhibits 289 through

11     299, and 301 through 306, and 308 through 310 are ones that if

12     the defendant is willing to stipulate to foundation, I will

13     skip through those and we can circle back to them later.

14              THE COURT:  Because you can avow that based on your

15     prior discussions with Ms. Vaughan that she would say these

16     were all true and accurate things that she found during her

17     review of the laptop computer?

18              MR. KOEHLER:  That is correct.  But it's the desktop

19     computer.

20              THE COURT:  I'm sorry.  I did misspeak.

21              The desktop computer, the one that you held up.

22              MR. KOEHLER:  Yes.

23              THE COURT:  And is that accurate that there is no

24     foundation objections to the exhibit numbers that Mr. Koehler

25     just read out?
```

1          MS. PLOMIN:  That is accurate, Your Honor.

2          THE COURT:  Thank you.

3          MR. KOEHLER:  So with that said, I will move to

4   Exhibit 300.  And if there are foundational objections, I will

5   ask the witness what it is.

6   BY MR. KOEHLER:

7   Q   Is that the right direction?

8   A   Yes.

9   Q   Ms. Vaughan, can you tell us what that image is?

10  A   This is one of the logos used by the official media

11  outlets of the Islamic State.

12         MR. KOEHLER:  Move to admit 300.

13         MS. PLOMIN:  No objection.

14         THE COURT:  300 is admitted.

15      (Exhibit No. 300 admitted in evidence.)

16         THE COURT:  Is it fuzzy in this picture or is it

17  always fuzzy?

18         THE WITNESS:  No.  This picture has been increased in

19  size so it's a little bit pixilated.

20  BY MR. KOEHLER:

21  Q   Now, moving on to Exhibit 307, again, assuming no

22  foundational objections, Ms. Vaughan, can you tell us what

23  this picture is?

24  A   This is a picture of James Foley as he was depicted in the

25  video that showed his execution.

```
 1   Q    And are you aware of who released that video?

 2   A    Yes.  The Islamic State.

 3           MR. KOEHLER:  Move to admit 307.

 4           MS. PLOMIN:  No objection, Your Honor.

 5           THE COURT:  307 is admitted.

 6        (Exhibit No. 307 admitted in evidence.)

 7   BY MR. KOEHLER:

 8   Q    And who was James Foley?

 9   A    I'm not totally clear on his exact profession, but he

10   worked in Syria and was kidnapped by the Islamic State.

11   Q    Now, moving to 311, what does this photograph depict?

12   A    I believe that it depicts a truckload full of prisoners.

13           MR. KOEHLER:  Move to admit 311.

14           MS. PLOMIN:  No objection.

15           THE COURT:  311 is admitted.

16        (Exhibit No. 311 admitted in evidence.)

17   BY MR. KOEHLER:

18   Q    Ms. Vaughan, do you recognize the writing in the lower

19   right-hand corner of that picture?

20   A    Yes.  I think some of it is cut off in this particular --

21   Q    Based on what you can see, can you tell what it is?

22   A    Yes.  I'm fairly sure it's a screencap from one of the

23   official Islamic State videos.

24   Q    And what does it show?

25   A    It shows an explosion in a field of some kind.
```

1          MR. KOEHLER:  That's Exhibit 312.  Move to admit it.

2          MS. PLOMIN:  No objection.

3          THE COURT:  312 is admitted.

4      (Exhibit No. 312 admitted in evidence.)

5  BY MR. KOEHLER:

6  Q   Moving now to 313, what is that?

7  A   These are children in front of an Islamic State flag

8  posing in a very common religious gesture.

9  Q   And what is that religious gesture?

10          THE COURT:  Why don't we admit it first so that the

11  jury knows what the gesture is at the same time that she's

12  telling us what it is.

13          MR. KOEHLER:  Move to admit 313.

14          MS. PLOMIN:  No objection.

15          THE COURT:  313 is admitted.

16      (Exhibit No. 313 admitted in evidence.)

17  BY MR. KOEHLER:

18  Q   And are you familiar with that gesture?

19  A   Yes.

20  Q   What is it?

21  A   It's a single finger extended upright.  And to the best of

22  my knowledge, it signifies one of the core theological

23  concepts of Islam.

24  Q   Which is?

25  A   Oneness of God, I guess.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #4    2-19-16

1    Q    Now, moving to 314, can you tell us what that is?

2    A    This is a picture of Steven Sotloff being held sort of by

3    the back of his shirt by Jihadi John in a video released by

4    the Islamic State.

5    Q    Did you know through your work who Jihadi John was?

6    A    Yes.

7    Q    Who was he?

8    A    He was a member of the Islamic State and he became famous

9    because he appeared in these videos as the executioner of

10   these captives and because he spoke English.

11              MR. KOEHLER:  Move to admit 314.

12              MS. PLOMIN:  No objection.

13              THE COURT:  314 is admitted.

14        (Exhibit No. 314 admitted in evidence.)

15              THE COURT:  Are we finished with photographs?

16              MR. KOEHLER:  For the moment.

17              THE COURT:  Would this be a good time to end for the

18   day?

19              MR. KOEHLER:  It certainly would, Your Honor.

20              THE COURT:  I assume the jury is not complaining if

21   we don't go all the way to 4:30.

22              Okay.  There being no objection from the jury to

23   ending a little early on this Friday afternoon, ladies and

24   gentlemen, we will recess until Tuesday.

25              Please remember Tuesday.

```
 1              Well, if you come on Monday, I will be here but there

 2      won't be any trial.  So please come on Tuesday at 9:00 a.m.

 3              Please remember the admonition that you are not to

 4      discuss this case among yourselves or with anyone else,

 5      including family, friends, people that you work with.  You

 6      remember what you can tell them.  You're on a jury.  The case

 7      is going to last up to five weeks and you can't tell them

 8      anything else about the case until the trial is over.

 9              Also, again, you heard about a lot of different

10      things.  Things you may not be familiar with.  Please do not

11      do any research.  Don't even look up how to spell something.

12      I just found out I have been spelling something wrong all day

13      now that I have seen it in writing.

14              Don't go back and try to figure out how to spell

15      anything.  If you are worried about your spelling, ask me.  I

16      won't know the answer but I will find out the answer for you.

17              And, finally, please do not form any conclusions

18      about the case until you have heard all the evidence and begun

19      your deliberations.

20              Court is in recess until Tuesday morning at 9:00 a.m.

21              MR. KOEHLER:  Your Honor, when can we take up the

22      issue that's raised in the trial memoranda?

23              THE COURT:  Not today.

24          (Proceedings adjourned at 4:01 p.m.)

25                            *  *  *
```

UNITED STATES DISTRICT COURT

1

2                    C E R T I F I C A T E

3

4           I, ELIZABETH A. LEMKE, do hereby certify that I am

5   duly appointed and qualified to act as Official Court Reporter

6   for the United States District Court for the District of

7   Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion

10  of the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 1st day of August,

14  2016.

15

16

17

18

19                        s/Elizabeth A. Lemke_____
                          ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25