**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 23, 2016 |
| Abdul Malik Abdul Kareem, | ) 9:03 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL - DAY 5**
**(Pages 731 through 960, Inclusive.)**

**APPEARANCES:**
**For the Government:**
        U.S. ATTORNEY'S OFFICE
        By:  **Kristen Brook, Esq.**
            **Joseph Edward Koehler, Esq.**
        40 North Central Avenue, Suite 1200
        Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
        MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
        By: **Daniel D. Maynard, Esq.**
            **Mary Kathleen Plomin, Esq.**
        3200 North Central Avenue, Suite 1800
        Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5    2-23-16

1                        **INDEX OF WITNESSES**

2     **AMBER PLUFF:**

3     Direct examination by Mr. Koehler              Page 737
      Cross examination by Mr. Maynard               Page 742
4     Redirect examination by Mr. Koehler            Page 748

5     **AMY KATHLEEN VAUGHAN:**

6     Direct examination (cont'd) by Mr. Koehler     Page 749

7     **WASEEM HYMAN:**

8     Direct examination by Ms. Brook                Page 809
      Cross examination by Mr. Maynard               Page 819
9     Redirect examination by Ms. Brook              Page 828

10    **AMY KATHLEEN VAUGHAN:**

11    Direct examination (cont'd) by Mr. Koehler     Page 830

12    **JUVENILE GIOVANNI:**

13    Direct examination by Ms. Brook                Page 883
      Cross examination by Mr. Maynard               Page 899
14
      **NICOLE MEDELLIN:**
15
      Direct examination by Ms. Brook                Page 902
16    Cross examination by Mr. Maynard               Page 912
      Redirect examination by Ms. Brook              Page 916
17
      **SERGIO MARTINEZ-CHAVEZ:**
18
      Direct examination by Mr. Koehler              Page 919
19    Cross examination by Mr. Maynard               Page 936

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5    2-23-16

1                      **INDEX OF EXHIBITS**

2
      **EXHIBIT NO.:**          **DESCRIPTION:**              **RECEIVED:**
3

4     Exhibit No. 127      Photo of Elton Simpson      Page 800
                           (Yankees hat)
5     Exhibit No. 128      Photo of Elton Simpson      Page 803
                           (Hava Java)
6     Exhibit No. 129      Photo of Elton Simpson      Page 804
                           (white Lexus)
7     Exhibit No. 130      Photo of Elton Simpson      Page 804
                           (Kareem apt)
8     Exhibit No. 133      Photo of Simpson holding    Page 805
                           phone
9     Exhibit No. 134      Photo of Simpson talking    Page 806
                           on phone
10    Exhibit No. 135      Photo of Abdul Malik        Page 807
                           Abdul Kareem
11    Exhibit No. 136      Photo of Simpson on couch   Page 807
      Exhibit No. 185      Photo of Elton Simpson      Page 832
12                         next to white Lexus
                           (QPX1.1 Acer Aspire laptop)
13    Exhibit No. 186      Photo of Abdul Malik        Page 833
                           Abdul Kareem (QPX1.1 Acer
14                         Aspire laptop)
      Exhibit No. 187      "Flames of War" video       Page 834
15                         source
      Exhibit No. 209      Picture of Anwar            Page 769
16                         al-Awlaki giving a sermon
      Exhibit No. 216      Screencap from ISIL         Page 770
17                         video showing prisoners
                           being marched to execution
18                         along a beach
      Exhibit No. 218      Picture of a man            Page 771
19                         holding an ISIL flag
      Exhibit No. 219      Picture of ISIL flag        Page 772
20    Exhibit No. 223      Picture of armed men        Page 772
                           with ISIL flag
21    Exhibit No. 225      Picture of a man            Page 773
                           carrying an ISIL flag
22    Exhibit No. 229      Picture of an ISIL          Page 773
                           flag painted on a wall
23    Exhibit No. 232      Internet Search History:    Page 774
                           "islamic state flag" and
24                         Wikimedia image

25

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB     JURY TRIAL-DAY #5     2-23-16

| | | |
|---|---|---|
| Exhibit No. 233 | Pages 8-9, 36-37, 44-45,<br>48-51, 53-61 of 40 Hadith<br>on Jihad | Page 787 |
| Exhibit No. 234 | Image of the Statue of<br>Liberty holding a shahada<br>flag.  Caption: "Islam Will<br>Dominate the World" | Page 789 |
| Exhibit No. 235 | Screencaps from "And<br>Incite The Believers" | Page 790 |
| Exhibit No. 236 | Thumbnail picture of<br>Abubakar Shekau | Page 791 |
| Exhibit No. 237 | Picture of Dzokhar<br>Tsarnaev | Page 791 |
| Exhibit No. 239 | Screencap from a video,<br>"Message to America -<br>Boston Attacks" | Page 792 |
| Exhibit No. 240 | Picture of Anjem<br>Choudary | Page 793 |
| Exhibit No. 243 | Picture 2 of Soofi's<br>son playing with a revolver | Page 768 |
| Exhibit No. 250 | Picture of Simpson,<br>Kareem, and another in a<br>room together | Page 794 |
| Exhibit No. 251 | Picture of Simpson<br>with a child sitting at<br>a computer desk | Page 794 |
| Exhibit No. 254 | Book "The Maidens of<br>Jannat (Paradise)" | Page 795 |
| Exhibit No. 260 | Picture of DVD series,<br>"The End of Time ...<br>A New Beginning" | Page 796 |
| Exhibit No. 262 | Thumbnail of University of<br>Phoenix Stadium | Page 796 |
| Exhibit No. 265 | Sermon by Awlaki about the<br>persecution of Muslims | Page 797 |
| Exhibit No. 271 | The Dust Will Never Settle<br>Down lecture | Page 798 |
| Exhibit No. 273 | Lecture concerning America's<br>'war on Islam'. | Page 798 |
| Exhibit No. 315 | Google search for<br>'authentictauhid' | Page 751 |
| Exhibit No. 319 | tru_Qur'an - Viewing<br>Profile -  Marifah Forums' | Page 752 |
| Exhibit No. 320 | The battalions of faith | Page 753 |
| Exhibit No. 321 | Nasyid senandung jihad A<br>nasru Tawala.wmv | Page 753 |
| Exhibit No. 326 | Search for 'quran fighting is<br>prescribed for you' | Page 754 |

| | | |
|---|---|---|
| 1 | Exhibit No. 327 | Click through from search to search result | Page 757 |
| 2 | Exhibit No. 328 | Site that conducts academic research of jihadist propaganda | Page 758 |
| 3 | Exhibit No. 329 | File storage of Jihadology; Issue 1-8 of Dabiq | Page 759 |
| 4 | Exhibit No. 330 | Officials hold terrorism training drill in Arizona | Page 760 |
| 5 | Exhibit No. 331 | Twitter searches for #is | Page 760 |
| | Exhibit No. 332 | Twitter searches for #isis | Page 761 |
| 6 | Exhibit No. 333 | Search for Authentic Tauheed website of Abdullah Faisal | Page 761 |
| 7 | Exhibit No. 334 | Authentic Tauheed, website of known radicalizer Abdullah Faisal | Page 762 |
| 8 | | | |
| | Exhibit No. 338 | Picture of masked, armed man. Caption: 'We have come for the sake of Allah, and we have declared jihad.' | Page 763 |
| 9 | | | |
| 10 | | | |
| | Exhibit No. 340 | Picture of jihadist fighter, captioned: 'We Are Coming' with quote from Abdullah Azzam | Page 763 |
| 11 | | | |
| 12 | Exhibit No. 341 | Phone screenshot of a DM convo between @atawaakul (Elton Simpson) and @Jihad28aa | Page 764 |
| 13 | | | |
| | Exhibit No. 342 | Picture of a baby with a grenade, gun, and an ISIL flag | Page 765 |
| 14 | | | |
| | Exhibit No. 346 | Image macro of children with rifles. "While your children are learning political correctness.  Their children are learning how to kill them." | Page 766 |
| 15 | | | |
| 16 | | | |
| 17 | Exhibit No. 347 | Thumbnail image of the Charlie Hebdo Muhammad cover | Page 766 |
| 18 | Exhibit No. 351 | List of scholars | Page 817 |
| | Exhibit No. 431 | Photograph of Elton Simpson | Page 810 |
| 19 | Exhibit No. 432 | Photograph of Nadir Soofi | Page 926 |
| | Exhibit No. 450 | Nextbook photo 1 - Git R Done | Page 838 |
| 20 | Exhibit No. 451 | Nextbook photo 2 - Navy Seal Reviews ISIS | Page 838 |
| 21 | Exhibit No. 452 | Nextbook photo 3 - Angel of Death | Page 838 |
| 22 | Exhibit No. 453 | Nextbook photo 4 - Soldier of Allah | Page 839 |
| 23 | Exhibit No. 454 | Nextbook photo 5 - Soldier of Allah | Page 839 |
| 24 | Exhibit No. 455 | Nextbook photo 6 - Soldier of Allah | Page 839 |
| 25 | | | |

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5    2-23-16

| | | |
|---|---|---|
| 1 | Exhibit No. 457 | Nextbook photo 9 - armed men in truck | Page 840 |
| 2 | Exhibit No. 458 | Nextbook photo 10 - Hakimullah Mesud | Page 840 |
| 3 | Exhibit No. 459 | Nextbook photo 11 - captive in front of mosque | Page 841 |
| 4 | Exhibit No. 467 | Nextbook ebook 1 - The British Government and Jihad | Page 841 |
| 5 | Exhibit No. 468 | Nextbook ebook 2 - Origins of the Islamic State | Page 842 |
| 6 | Exhibit No. 469 | Nextbook Photo 7 - Quetta Protest | Page 842 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2        (Called to the order of court at 9:03 a.m.)

 3             THE COURT:  Good morning, ladies and gentlemen.  The

 4   record will show the presence of the jury, counsel, and the

 5   defendant.

 6             And are we resuming with Ms. Vaughan this morning?

 7             MR. KOEHLER:  Your Honor, we have one witness we

 8   would like to call out of order from out of state.

 9             THE COURT:  That would be fine.

10             MR. KOEHLER:  The United States calls Amber Pluff.

11        (Witness duly sworn.)

12             THE CLERK:  Please state your name for the record and

13   spell your last name.

14             THE WITNESS:  Amber Pluff.  P-L-U-F-F.

15             THE COURT:  You may proceed, Mr. Koehler.

16                  AMBER PLUFF, WITNESS, SWORN

17                        DIRECT EXAMINATION

18   BY MR. KOEHLER:

19   Q   Good morning, Ms. Pluff.  Could you please introduce

20   yourself to the jury.

21   A   Amber Pluff.

22   Q   And how old are you?

23   A   Twenty.

24   Q   Did you used to date a person by the name of Stefan

25   Verdugo?
```

1    A   Yes.

2    Q   At some point --

3            When did you first start dating him, first off?

4    A   The beginning of March.

5    Q   Of what year.

6    A   Of 2015.

7    Q   So March of last year.

8            And at some point while dating him, did you come to

9    meet somebody that you knew as D?

10   A   Yes.

11   Q   And how did you meet D?

12   A   It was at the beginning of our relationship, mine and

13   Stefan's relationship.  We were on our way to a bus stop and D

14   was driving by.  And he had stopped because Stefan had called

15   for him and that's how I met him.

16   Q   Okay.  Could you please pull the microphone just a little

17   bit closer to yourself?

18   A   Sorry.

19   Q   You can actually move the microphone, I think.  Yes.  That

20   might help a little bit.

21           Okay.  And so you said Stefan called out to him.

22   What happened then?

23   A   He had pulled over into the parking lot and stopped and me

24   and Stefan got into the car.

25   Q   Okay.  And where were you and Stefan going?

1    A    We were going to our friend's house.

2    Q    What was your friend's name?

3    A    Nick Loving.

4    Q    During the ride in the vehicle, did Stefan and D talk?

5    A    Yes.

6    Q    Did you pay any attention to their conversation?

7    A    Not at all.

8    Q    Did you notice whether anything was playing on the radio

9    in the car?

10    A    No.

11    Q    Where were you seated in the car?

12    A    Behind the passenger's seat.

13    Q    And what were you doing?

14    A    Staring out the window.

15    Q    Okay.  Were you listening at all?

16    A    No.

17    Q    Did you hear any conversation between them, any specifics

18    of anything they said?

19    A    No.

20    Q    Did you hear him talk about religion or anything else in

21    the vehicle?

22    A    No.

23    Q    On times that you met D, what was his attitude like toward

24    you?

25    A    Like I didn't exist.

1    Q    Did he ever greet you?

2    A    No.

3    Q    Shake your hand?

4    A    Nope.

5    Q    Did there come a time in which you learned of a shooting

6    that happened in Garland, Texas, involving a contest?

7    A    Yes.

8    Q    Do you remember where you were when that happened?

9    A    At the Budget Suites on 27th Avenue and Yorkshire.

10   Q    Were you with Stefan Verdugo at that time?

11   A    Yes.

12   Q    And was he watching the news or how did you learn of this?

13   A    He was watching the news and he had called me over because

14   he had seen it, so.

15   Q    What was his demeanor like at that point?

16   A    Like in angry excitement, like he was upset.

17   Q    Okay.  And did he say something to you at that point?

18          MR. MAYNARD:  Objection.  Hearsay.

19          THE COURT:  Sustained.

20          MR. KOEHLER:  Your Honor, it's an excited utterance.

21          THE COURT:  Apparently, not.  She said he called her

22   over to look at something that he had already seen.

23   BY MR. KOEHLER:

24   Q    Was the thing still playing at the time?

25   A    Yes.

```
 1    Q    And was he still in a state of excitement?

 2    A    Yes.

 3    Q    Did he tell you what he was going to do at that point in

 4    time?

 5             MR. MAYNARD:  Objection.  Hearsay.

 6             THE COURT:  Sustained.

 7    BY MR. KOEHLER:

 8    Q    Did you overhear him make a phone call after that?

 9             MR. MAYNARD:  Objection.  Hearsay.

10             THE COURT:  This calls for a yes-or-no answer.  You

11    may answer, but just "yes" or "no."

12             Did you hear him make a phone call?

13             THE WITNESS:  Yes.

14    BY MR. KOEHLER:

15    Q    Prior to making the phone call, what did you do?

16    A    I'm sorry?

17    Q    Prior to the phone call taking place, what did you do?

18    A    I Googled the FBI's number for him.

19    Q    The next day, did he have a meeting with law enforcement?

20    A    Yes.

21    Q    Which agency did he meet with first?

22    A    ATF.

23    Q    Do you know why that meeting took place?

24    A    Me and him had been encountered with a driveby shooting

25    when we first started dating.
```

1   Q   And did he later on speak to the FBI after that?

2   A   Yes.

3   Q   Were you also present for that?

4   A   Yes.

5   Q   After the Garland shooting, did you happen to see D

6   driving around the neighborhood?

7   A   Yes.

8   Q   Did you see him also around the neighborhood before the

9   Garland shooting?

10  A   Yes.

11  Q   Did you see him greet D -- or excuse me -- greet Stefan

12  during that time?

13  A   Yes.

14  Q   Did he have a typical way of breaking off his

15  conversations with Stefan?

16  A   Yes.

17  Q   And were you able to observe that over the course of time?

18  A   Yes.

19  Q   And what was that way of breaking off the conversation?

20  A   He always seemed paranoid and said that he had to go

21  because the feds were listening.

22          MR. KOEHLER:  No further questions.

23          THE COURT:  Mr. Maynard.

24                      **CROSS EXAMINATION**

25  BY MR. MAYNARD:

1    Q    Good morning, Ms. Pluff.

2            You're currently living in California?

3    A    Yes.

4    Q    Okay.  I believe you just testified that when you first

5    met Stefan Verdugo was around the first of March of 2015?

6    A    Yes.

7    Q    And where was he living the 1st of March 2015?

8    A    Nick Loving's house.

9    Q    Did you have an understanding of how long he had been

10   living with Mr. Loving before you met him?

11   A    I believe so, yeah.

12   Q    And how long was that?

13   A    I think about three months.

14   Q    And so that would have been somewhere back around the

15   first of the year he had moved in with Mr. Loving?

16   A    I believe so, yes.

17   Q    Okay.  And did you move in with Mr. Verdugo at that time?

18   A    No.  It was --

19   Q    A couple weeks later?

20   A    Yeah, when we started dating, like three or four weeks

21   after that.

22   Q    Okay.  And this -- you're standing at a bus stop with

23   Mr. Verdugo and he sees -- you knew him as D; is that correct?

24   A    Yes.  Yes.

25   Q    You have to say --

1    A    Yes.

2    Q    Okay.  And D is the individual that is sitting over here

3    in the blue shirt?

4    A    Yes.

5    Q    Okay.  And Mr. Verdugo waved him down.  He stopped.  And

6    you got into the car with Mr. Verdugo?

7    A    Yes.

8    Q    Okay.  Mr. Verdugo is sitting in the passenger's seat.

9    You're sitting in the back seat right behind him?

10   A    Yes.

11   Q    Okay.  And you're going to Nick Loving's house?

12   A    Yes.

13   Q    Okay.  You said the radio wasn't playing, but there was

14   conversation going on between those two, correct?

15        Didn't you hear conversation about how's the business

16   going?  Git-r Done.  The moving company.  Things of that

17   nature?

18   A    I have heard of the business, but I haven't -- I don't

19   recall the actual conversation that they had that day.

20   Q    I understand you don't recall the conversation, but it

21   wasn't like they were speaking in hushed tones so that you

22   couldn't hear.  You just weren't paying a lot of attention to

23   it?

24   A    Yeah.

25   Q    Okay.  But you did hear some casual conversation going on

1    between the two about how are you doing, how have you been,

2    that kind of thing?

3    A    Yes.

4    Q    Okay.  And did they talk about the move -- D or

5    Mr. Malik's moving company?

6    A    I don't doubt that they did.

7    Q    Okay.  What you don't remember is them talking about any

8    religion or things of that nature, correct?

9    A    No.

10   Q    What you overheard was just basically idle chitchat

11   between two people who knew each other?

12   A    Yes.

13   Q    Okay.  So it's not that you didn't hear anything.  It's

14   just that you didn't hear anything of any substance?

15   A    Yes.

16   Q    Okay.  Now, you dated Mr. Verdugo for several months,

17   correct?

18   A    Yes.

19   Q    All right.  And at the time that Mr. Verdugo saw this news

20   story, where were you living?

21   A    The Budget Suites on 27th Avenue and Yorkshire.

22   Q    And how long had you been staying there?

23   A    I believe a little over three weeks.

24   Q    Okay.  During that time period what was Mr. Verdugo doing

25   for money?

```
 1              MR. KOEHLER:  Objection.  Relevance.

 2              THE COURT:  Overruled.  You may answer.

 3              THE WITNESS:  Odds-and-ends jobs on Craigslist.

 4    BY MR. MAYNARD:

 5    Q   Were there any other things that he was doing for money?

 6    How was he making money?

 7              MR. KOEHLER:  I continue the objection, Your Honor.

 8    Asked and answered.

 9              THE COURT:  Overruled.  You may answer.

10              THE WITNESS:  He was having me sleep with men for

11    money.

12    BY MR. MAYNARD:

13    Q   You understand that there are current charges pending

14    against Mr. Verdugo?

15    A   Yes.

16    Q   And you are the individual that was the victim in these

17    charges?

18    A   Yes.

19    Q   Okay.  Is it fair to say at that time that Mr. Verdugo was

20    having money problems?

21    A   Yes.

22    Q   And that was one of the reasons why he was having you

23    perform those acts, correct?

24    A   Yes.

25    Q   Okay.  Did you get the money or did he get the money?
```

1           THE COURT:  I think we've explored this issue enough,

2    Mr. Maynard.

3           MR. MAYNARD:  I understand.

4    BY MR. MAYNARD:

5    Q   Are you okay?  I think there's water in front of you if

6    you want some.

7           After you stopped living at the Budget Suites, do you

8    know where Mr. Verdugo went?

9    A   He fled to California.

10   Q   Does Mr. Verdugo have any tattoos on his body?

11   A   Several.

12   Q   Can you tell the jury what they are?

13          MR. KOEHLER:  Objection.  Relevance.

14          THE COURT:  Sustained.

15   BY MR. MAYNARD:

16   Q   Just a moment, Your Honor.

17          Did you at some point become aware whether

18   Mr. Verdugo had lived with D?

19   A   Yes.

20   Q   Okay.  And where do you recall that being?

21   A   Off of 17th Avenue and Peoria on Cochise.

22   Q   Did Mr. Verdugo have any friends that you visited that

23   lived in that area?

24   A   Yes.

25   Q   And where did they live?

1    A   Right across the street.

2    Q   And do you recall who they were?

3    A   I recall one of his friends.  His name was Lupe.

4         MR. MAYNARD:  I don't have any further questions,

5    Judge.  Thank you.

6         THE COURT:  Mr. Koehler, do you have any questions on

7    redirect?

8                    **REDIRECT EXAMINATION**

9    BY MR. KOEHLER:

10   Q   At the time that the phone calls happened in the meetings

11   with ATF and FBI, had Stefan yet been arrested?

12   A   No.

13   Q   When you talked to him, did you learn how long he had

14   known D?

15   A   Yes.

16   Q   How long had he known D?

17         MR. MAYNARD:  Objection.  Hearsay.

18         THE COURT:  Sustained.

19   BY MR. KOEHLER:

20   Q   When you were in the vehicle with him and D, when did you

21   overhear the idle chitchat?

22   A   When we first got in the car.

23   Q   And did you listen to the conversation any further after

24   that point?

25   A   No.

1          MR. KOEHLER:  Thank you.  No further questions.

2          THE COURT:  May this witness be excused, Mr. Koehler?

3          MR. KOEHLER:  Yes, Your Honor.

4          THE COURT:  Is there any objection.

5          MR. MAYNARD:  No, Your Honor.

6          THE COURT:  Thank you, Ms. Pluff.  You may step down

7  and you are excused as a witness.

8          The government may call its next witness.

9          MR. KOEHLER:  The United States recalls Amy Vaughan.

10         MS. BROOK:  She's in transit up the elevator.

11         THE COURT:  Maybe your witnesses should be in the

12  witness room rather than on the third floor.

13         MS. BROOK:  We thought that she was.

14         My apologies, Your Honor.  We thought she was right

15  outside.

16         THE COURT:  Ms. Vaughan, you may take the stand and

17  you may continue, Mr. Koehler.

18              **AMY KATHLEEN VAUGHAN, WITNESS, SWORN**

19                  **DIRECT EXAMINATION (cont'd)**

20  BY MR. KOEHLER:

21  Q   Good morning, Ms. Vaughan.

22  A   Good morning.

23  Q   On Friday afternoon when we left off, we were reviewing

24  files from the tower computer and I believe we were at Exhibit

25  315.

```
1              During the course of the review of the tower
2    computer, did you reveal a Google search for the website
3    called "authentictauhid"?
4    A    Yes.
5    Q    Is that a known website to FBI?
6    A    Yes.
7    Q    And what is that website?
8    A    That is the website of Jamaican Sheikh Abdullah al-Faisal.
9    Q    And I'm going to go to Exhibit 315.
10             Agent Vaughan, is Exhibit 315 a true and accurate
11   reproduction of the Google search history from the tower
12   computer?
13   A    Yes.
14   Q    And are there several exhibits that are marked the same
15   way that are all part of that same Google search history?
16   A    Yes.
17   Q    This is page 2 of 315.  Is that also part of that
18   reproduction of the Google search history?
19   A    Yes.  This is the other half of it.
20   Q    Okay.
21             THE COURT:  Oh.  So this would have been like we
22   would tape it together into one page and it would be about
23   this wide?
24             THE WITNESS:  Yes.
25             THE COURT:  Thank you.
```

1            MR. KOEHLER:  Move to admit 315.

2            MS. PLOMIN:  No objection.

3            THE COURT:  315 is admitted.

4       (Exhibit No. 315 admitted in evidence.)

5            MR. KOEHLER:  And we'll have a cleaner copy that

6   that's a little bit easier for the jury to read later on.

7   BY MR. KOEHLER:

8   Q   And I move now to Exhibit 319.  Was there a profile on the

9   computer that was viewed for a user known as "tru_Qur'an"?

10  A   Yes.

11  Q   I place Exhibit 319 on the computer.

12           Can you explain to the members of the jury how you're

13  able to locate the profile and what this profile is?

14  A   Well, on the other side of this Internet history there is

15  the title and it says in the title the name of the member.

16  His profile is being looked at.

17           And I recognized that as a username that was used

18  many times by Elton Simpson.

19  Q   So seeing that on the computer, what did that tell you in

20  terms of seeing that on the computer?

21  A   I thought it could mean that Mr. Simpson had logged in and

22  was looking at his own profile or that someone was interested

23  in what he had written.

24  Q   During your review of this computer, did you determine who

25  the principal user of the computer was?

1    A   I believe it was Nadir Soofi.

2    Q   And is this a true and correct copy of the Google history

3    showing the history of the tru_Qur'an profile?

4    A   Yes.

5            MR. KOEHLER:  Move to admit 319.

6            MS. PLOMIN:  Objection as to foundation as to which

7    device this was located on.

8            THE COURT:  Was this also from the tower computer

9    that we see on the table there?

10           THE WITNESS:  Yes.

11           THE COURT:  Is there any objection?

12           MS. PLOMIN:  No, Your Honor.

13           THE COURT:  319 is admitted.

14       (Exhibit No. 319 admitted in evidence.)

15           MR. KOEHLER:  Just for the record, we will be talking

16   about the tower computer on everything I talk about until we

17   shift to another one and I will announce that when we get

18   there.

19           THE COURT:  Thank you.

20   BY MR. KOEHLER:

21   Q   Now, directing your attention to Exhibit 320, was there a

22   viewing of a video called Battalions of Faith on YouTube in

23   the Internet history on 263?

24   A   Yes.

25   Q   And is 320 an accurate depiction of the user history

```
 1   showing that?

 2   A   Yes.

 3           MR. KOEHLER:  Move to admit 320.

 4           MS. PLOMIN:  No objection.

 5           THE COURT:  320 is admitted.

 6       (Exhibit No. 320 admitted in evidence.)

 7   BY MR. KOEHLER:

 8   Q   Now, directing you to Exhibit 321, was there a viewing of

 9   something called "Nasyid senandung jihad A nasru Tawala"?

10   A   Yes.

11   Q   Was that also on YouTube?

12   A   Yes.

13   Q   Is 321 a fair and accurate depiction of the Internet

14   history for that?

15   A   Yes.

16           MR. KOEHLER:  Move to admit 321.

17           MS. PLOMIN:  No objection.

18           THE COURT:  321 is admitted.

19       (Exhibit No. 321 admitted in evidence.)

20   BY MR. KOEHLER:

21   Q   Now, moving to 326.  Did the history of the computer show

22   the viewing of a video called "Quran Fighting Is Prescribed

23   For You"?

24   A   I believe this is just a Google search for that phrase,

25   but, yes.
```

1   Q    And is that a true and correct copy of the Google history

2   reflecting that search?

3   A    Yes.

4            MR. KOEHLER:  Move to admit 326.

5            MS. PLOMIN:  No objection.

6            THE COURT:  326 is admitted.

7        (Exhibit No. 326 admitted in evidence.)

8   BY MR. KOEHLER:

9   Q    I'm now directing you to 327.  Can you tell the Court and

10  jury what that shows.

11  A    This is the same Google search and it also shows the

12  results.

13  Q    And does it --

14  A    Oh, there we go.

15  Q    Does it show a click-through to the result of the search?

16  A    Yes.  I think the other pages show the referred link.  So

17  we can tell that that -- the other page was accessed as a

18  result of that Google search.

19  Q    Okay.  And can you explain for a minute how that works

20  with Google, how the Google search feature works, and how you

21  can see the click-through when you're reviewing the computer's

22  history?

23  A    Yes.  One way is if the referred link is recorded.  So any

24  time you are looking at a website and you click on something,

25  when you go to the next page and that's recorded in your

1    Internet history, there is a record, the refer, of how you got

2    there, what you clicked on to get to that page.  So that's one

3    way.

4            Another way is that on occasion, Google will generate

5    another refer link that includes the results and the query

6    together in one big long link.

7            So in this case, it was the first of the first sort.

8    Q   You saw the refer in the visit to the site?

9    A   Yes.  In the Internet history that was recorded.

10           THE COURT:  So I think we've all used Google.

11           So if I say -- if I Google "backpacks," then you can

12   see my Google history that I Googled that word.

13           And then is what you're saying that this shows which

14   of the search results I clicked on?

15           THE WITNESS:  Yes, ma'am.

16           THE COURT:  Thank you.

17   BY MR. KOEHLER:

18   Q   Have you encountered -- have you encountered in the course

19   of your career cases in which you have seen users clear their

20   Internet search history?

21   A   Yes.

22   Q   And are you able to see all of this when that happens?

23   A   No.

24   Q   And what about when you execute a search warrant on

25   Google -- somebody's Google account?  Can you sometimes see

1  their Google search history as part of the execution of the

2  search warrant?

3  A   Yes.  So there's the Internet history on your computer

4  which you can clear by, you know, going to your history and

5  clicking "clear."

6        But Google records separately what you are searching

7  when you are logged into your Google account.  So you have to

8  also take the additional step of clearing it from inside of

9  your Google account settings.

10 Q   Is there also a way for someone to avoid having the

11 browser itself track their searching history?

12 A   Yes.  Many browsers have such a feature.

13 Q   What is that feature called?

14 A   It's known variously as "incognito mode" or "privacy mode"

15 or "in private browsing."

16 Q   And does Internet Explorer have that feature?

17 A   Yes.

18 Q   Google Chrome?

19 A   Yes.

20 Q   Firefox?

21 A   Yes.

22 Q   The Apple browser Safari, does it also have such a

23 feature?

24 A   I can't recall.

25 Q   So is 326 a true and correct printout of that

```
1    click-through to that result?
2              THE COURT:  327?
3              MR. KOEHLER:  Yes.  327.  Thank you, Your Honor.
4              THE WITNESS:  Yes.
5              MR. KOEHLER:  Move to admit 327.
6              MS. PLOMIN:  No objection.
7              THE COURT:  327 is admitted.
8         (Exhibit No. 327 admitted in evidence.)
9    BY MR. KOEHLER:
10   Q    And is this the page that shows the click-through,
11   Ms. Vaughan?
12   A    Yes.  It's right below it there.
13   Q    And then switching to the other page of it.
14             THE COURT:  You're leaving it up there as if all of
15   us understand what all of those letters and numbers mean.
16             So I think you can take it down and move on, Mr.
17   Koehler.
18             MR. KOEHLER:  I was watching their faces to make sure
19   that everybody was done looking at it on the screen.  Thank
20   you.  I know I hate when people pull things off when I'm
21   trying to read them.
22   BY MR. KOEHLER:
23   Q    All right.  Now, moving on to 328.  Did you find evidence
24   of the user of the tower computer here searching for a website
25   that conducts academic research on jihadist propaganda?
```

1  A   Yes.

2  Q   I put 328 on the screen.  Is that an example of that?

3  A   Yes.

4  Q   And what is the name of the website they visited?

5  A   Jihadology.net.

6  Q   And is 328 a fair and accurate depiction of that history?

7  A   Yes.

8         MR. KOEHLER:  Move to admit 328.

9         MS. PLOMIN:  No objection.

10         THE COURT:  328 is admitted.

11     (Exhibit No9. 328 admitted in evidence.)

12  BY MR. KOEHLER:

13  Q   Can you tell what the user was searching for specifically

14  there?

15  A   They were viewing like a category page that was

16  specifically marked Dabiq Magazine.

17         So we would expect this page they were looking at to

18  contain all of the blogs, articles about Dabiq Magazine.

19  Q   And can you read what the next entry is on that list.

20  A   Jihadology.net/2014/07/05, al-Hayat-media-center presents

21  a new issue of the Islam State's magazine Dabiq; and the

22  number one.

23  Q   Now, moving on to 329, did the visitor -- or the user of

24  the tower computer make more visits to that jihadology

25  website?

1    A    Yes.   There is a storage section of it which is labeled

2    with the name of the author.   That's the "azalin" portion.

3    That's the name of the author.

4            So this shows visits to a number of other .pdf files

5    on the website.

6    Q    And did it show visits for issues 1 through 8 of Dabiq

7    Magazine?

8    A    This page only shows, I think, 1 through 5, yes.   Only 1

9    through 5.

10   Q    Okay.   And then moving on to page 3 of the exhibit.

11   A    Yes.   This shows 6 through 8.

12   Q    So does that mean the user had accessed 8 issues of Dabiq

13   Magazine at that point in time?

14   A    Yes.   I believe at this point in time there were only 8

15   issues available.

16   Q    Is 329 a fair and accurate depiction of that history?

17   A    Yes.

18           MR. KOEHLER:   Move to admit 329.

19           MS. PLOMIN:   No objection.

20           THE COURT:   329 is admitted.

21      (Exhibit No. 329 admitted in evidence.)

22   BY MR. KOEHLER:

23   Q    Moving on to 330, did the computer show history of the

24   user's tracking what law enforcement was doing here in Arizona

25   regarding terrorism?

1    A    I remember seeing a few articles about police activities

2    and counterterrorism training.

3    Q    And directing your attention here to Exhibit 330, is this

4    one such example?

5    A    Yes.

6    Q    Is that a fair and accurate depiction of that search or

7    that viewing of an article?

8    A    Yes.

9              MR. KOEHLER:  Move to admit 330.

10             MS. PLOMIN:  No objection.

11             THE COURT:  Exhibit 330 is admitted.

12        (Exhibit No. 330 admitted in evidence.)

13   BY MR. KOEHLER:

14   Q    And what was the name of the story.

15   A    Soldiers Hold Terrorism Training Drill In Arizona.

16   Q    Did that same Internet history also show Twitter searches

17   for Islamic State or "#IS"?

18   A    Yes.  It shows a search for "#IS."

19   Q    And is 331 a depiction of that?

20   A    Yes.

21             MR. KOEHLER:  Move to admit 331.

22             MS. PLOMIN:  No objection.

23             THE COURT:  331 is admitted.

24        (Exhibit No. 331 admitted in evidence.)

25   BY MR. KOEHLER:

```
1    Q   Did it also show searches for "ISIS"?

2    A   Yes.  It shows searches for hashtag I-S-I-S or "#ISIS."

3    Q   And is 332 a fair and accurate depiction of that in the

4    search history?

5    A   Yes.

6              MR. KOEHLER:  Move to admit 332.

7              MS. PLOMIN:  No objection.

8              THE COURT:  332 is admitted.

9        (Exhibit No. 332 admitted in evidence.)

10   BY MR. KOEHLER:

11   Q   Did it, again, show more searches for "Authentic Tauheed"?

12   A   Yes.

13   Q   And is 333 an example of that?

14   A   Yes.

15             MR. KOEHLER:  Move to admit 333.

16             MS. PLOMIN:  No objection.

17             THE COURT:  333 is admitted.

18       (Exhibit No. 333 admitted in evidence.)

19   BY MR. KOEHLER:

20   Q   Directing your attention to 334, is that a specific entry

21   from the web browser history on the tower computer?

22   A   Yes.

23   Q   And does that show a date of visiting the Authentic

24   Tauheed website?

25   A   Yes.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5    2-23-16

```
 1   Q   Is that a fair and accurate depiction of that particular
 2   line from the history?
 3   A   Yes.
 4           MR. KOEHLER:  Move to admit 334.
 5           MS. PLOMIN:  No objection.
 6           THE COURT:  334 is admitted.
 7       (Exhibit No. 334 admitted in evidence.)
 8   BY MR. KOEHLER:
 9   Q   Now, directing your attention to Exhibit 338, is that an
10   object that you found on the computer?
11   A   Yes.
12   Q   And can you tell us in brief what that is?
13   A   It's a picture of a masked man holding a rifle and it has
14   the caption:
15           "We have come for the sake of Allah and we have
16   declared jihad."
17   Q   And that's a true and accurate copy of what came off the
18   computer?
19   A   Yes.
20           MR. KOEHLER:  Move to admit 338.
21           MS. PLOMIN:  Your Honor, I would just like to clarify
22   which computer this was found on.
23           THE COURT:  It's still from the tower computer,
24   correct, Mr. Koehler?
25           MR. KOEHLER:  That is correct, Your Honor.
```

UNITED STATES DISTRICT COURT

```
1              MS. PLOMIN:  No objection.
2              THE COURT:  338 is admitted.
3         (Exhibit No. 338 admitted in evidence.)
4    BY MR. KOEHLER:
5    Q   And I want to direct your attention to 340.  Do you
6    recognize that?
7    A   Yes.
8    Q   Is that also a true and accurate copy of a picture coming
9    off of the computer?
10   A   Yes.
11             MR. KOEHLER:  Move to admit 340.
12             MS. PLOMIN:  No objection.
13             THE COURT:  340 is admitted.
14        (Exhibit No. 340 admitted in evidence.)
15   BY MR. KOEHLER:
16   Q   That's a little hard to read.  Can you tell us what the
17   text below "we are coming" says?
18   A   Yes.  It says:
19             "Now has come the time of the men.  And this is a
20   place not for words but for action.  Sheikh Abdullah Azzam."
21   Q   Thank you.
22             I'm going to direct your attention to Exhibit 341.
23   Is that also from the desktop computer?
24   A   Yes.
25   Q   And can you tell us what that is in brief?
```

```
1    A    This is a screenshot taken by an android phone and it
2    shows a direct message conversation on Twitter with a person
3    named Jazrawi, username Jihad28aa.
4    Q    And was this tied to other evidence in this case?
5    A    Yes.  This is -- the other correspondent is the account
6    "atawaakul" which belonged to Mr. Simpson.
7    Q    And did it tie to other evidence that you found regarding
8    this particular conversation in other locations?
9    A    Yes.  When we searched that particular Twitter account, we
10   found this conversation.
11   Q    Okay.  Is that a true and accurate depiction of what you
12   found on the desktop?
13   A    Yes.
14        MR. KOEHLER:  Move to admit 341.
15        MS. PLOMIN:  No objection.
16        THE COURT:  341 is admitted.
17   (Exhibit No. 341 admitted in evidence.)
18   BY MR. KOEHLER:
19   Q    Can you tell from the colors and messages on the screen
20   which person is which in the conversation?
21   A    Yes.
22   Q    Can you explain that, please.
23   A    The ones in blue are the receiver, in this case
24   Mr. Simpson; and the ones in white on the left side is the
25   person he's talking to, Jazrawi.
```

1    Q    Directing your attention to Exhibit 342, is that an image

2    that came off of the computer, the desktop computer here?

3    A    Yes.

4    Q    The bottom text on the black there, have you seen that

5    before?

6    A    Yes.  This is the text that appears on the Islamic State

7    flag.

8    Q    Is that a true and accurate copy of what came off the

9    desktop computer?

10    A    Yes.

11            MR. KOEHLER:  Move to admit 342.

12            MS. PLOMIN:  Your Honor, objection based on relevance

13    and I believe inflammatory.

14            THE COURT:  The objection overruled.  342 is

15    admitted.

16        (Exhibit No. 342 admitted in evidence.)

17    BY MR. KOEHLER:

18    Q    I'm now going to move on to Exhibit 346.

19            Ms. Vaughan, is this another image from the desktop

20    computer?

21    A    Yes.

22    Q    And is this a fair and accurate depiction of what you

23    found on the computer?

24    A    Yes.

25            MR. KOEHLER:  Move to admit 346.

```
 1              MS. PLOMIN:  No objection.

 2              THE COURT:  346 is admitted.

 3         (Exhibit No. 346 admitted in evidence.)

 4    BY MR. KOEHLER:

 5    Q   I'm now going to move on to 348 -- or excuse me -- 347.

 6              Ms. Vaughan, do you recognize that image?

 7    A   Yes.

 8    Q   It's a little pixilated; is that correct.

 9    A   Yes.

10    Q   Did that come off the computer as well?

11    A   Yes.

12    Q   Is that a thumbnail image?

13    A   Yes.

14    Q   Do you recognize where that image is from?

15    A   Yes.  This is part of the controversial Charlie Hebdo

16    cover that depicted the Prophet Muhammad.

17    Q   Is that a true and accurate copy of what came off the

18    computer?

19    A   Yes.

20              MR. KOEHLER:  Move to admit 346 -- or 347.  Excuse

21    me.

22              MS. PLOMIN:  No objection.

23              THE COURT:  347 is admitted.

24         (Exhibit No. 347 admitted in evidence.)

25              MR. KOEHLER:  If I can have just one moment, Your
```

1    Honor.  I want to make sure I'm in the right place.

2    BY MR. KOEHLER:

3    Q   Ms. Vaughan, as part of your review of devices, did you

4    also come to review a laptop that had belonged to Nadir Soofi?

5    A   Yes.

6    Q   And was that pursuant to a consent to search?

7    A   That is my understanding, yes.

8    Q   I'm moving on to that.

9            Was that a Dell Inspiron laptop?

10   A   Yes.

11   Q   Are you aware of how that came into FBI's hands?

12   A   I believe that the laptop was given by Mr. Soofi to his

13   son.  And his -- the mother of his son, her family gave it to

14   the FBI.

15   Q   During the course of reviewing that, did you find

16   materials of relevance to this case?

17   A   Yes.

18   Q   I'll start off with what's been marked for identification

19   as Exhibit 242.  Do you recognize that?

20   A   Yes.

21   Q   Does that depict an individual whose identity you know?

22   A   Yes.  This is Nathaniel Soofi.

23   Q   Is that a fair and accurate depiction of the picture you

24   found on the computer?

25   A   Yes.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5    2-23-16

```
 1                MR. KOEHLER:  Move to admit 242.
 2                MS. PLOMIN:  To clarify, the Dell Inspiron computer?
 3                MR. KOEHLER:  That's correct.
 4                MS. PLOMIN:  No objection.
 5                THE COURT:  242 is admitted.
 6           (Exhibit No. 242 admitted in evidence.)
 7      BY MR. KOEHLER:
 8      Q   Now, moving on to 243, do you recognize that?
 9      A   Yes.  This is a clearer version of the previous picture.
10                MR. KOEHLER:  Move to admit 243.
11                THE COURT:  I don't know why we need two of them.
12      She said it's the same picture and this is clearer.
13                MR. KOEHLER:  I move to substitute 243 for 242 then.
14                THE COURT:  Then 242 is withdrawn.  243 is admitted.
15           (Exhibit No. 243 admitted in evidence.)
16      BY MR. KOEHLER:
17      Q   Ms. Vaughan, did you also find a video of Nathaniel Soofi
18      on the computer?
19      A   Yes.
20      Q   And what did the video depict?
21      A   It showed him firing at a target with his father coaching
22      him on how to do so properly.
23      Q   And who is the father?
24      A   Nadir Soofi.
25      Q   Ms. Vaughan, is that another picture off the computer?
```

```
 1   A   Yes.

 2   Q   Do you recognize the individual in that photograph?

 3   A   Yes.  This is Anwar al-Awlaki.

 4   Q   Is that a true copy of what came off the computer?

 5   A   Yes.

 6           MR. KOEHLER:  This is Exhibit No. 209.  Government

 7   moves to admit 209.

 8           MS. PLOMIN:  No objection.

 9           THE COURT:  209 is admitted.

10       (Exhibit No. 209 admitted in evidence.)

11   BY MR. KOEHLER:

12   Q   During your search of the computer, did you also find a

13   series of audio recordings known as the "Hereafter"?

14   A   Yes.

15   Q   Did you find parts 1 to 22 of that series?

16   A   Yes.

17   Q   Did you also find parts 1 to 16 of what's called The

18   Seerah Mecca?

19   A   Yes.

20   Q   And 1 to 19 of the Seerah Medina?

21   A   Yes.

22   Q   And did you find parts 2, 4 to 7, 9 to 10, and 12 to 17 of

23   the Seerah Medina Part 1?

24   A   Yes.

25   Q   And parts 2 to 21 of The Lives Of The Prophets?
```

1    A    Yes.

2    Q    Are these all audio tape lectures?

3    A    Yes.

4    Q    And do you know who the speaker is in these lectures?

5    A    Anwar al-Awlaki.

6    Q    Directing your attention to 216.  Do you recognize that

7    image?

8    A    Yes.

9    Q    Was this similar to an image that we admitted earlier into

10   evidence of people being walked along the beach?

11   A    Yes.

12   Q    Is that a true and accurate copy of the picture off of the

13   Dell Inspiron laptop?

14   A    Yes.

15            MR. KOEHLER:  Move to admit 216.

16            MS. PLOMIN:  No objection.

17            THE COURT:  216 is admitted.

18        (Exhibit No. 216 admitted in evidence.)

19   BY MR. KOEHLER:

20   Q    Moving on now to 218.  Can you tell us what that is.

21   A    Yes.  This is a picture of a man wearing camouflage,

22   holding an Islamic State flag, and lifting his other hand in

23   the Tauheed finger gesture.

24   Q    Have you seen this image in another location aside from

25   the computer?

CR15-00707-PHX-SRB     JURY TRIAL-DAY #5      2-23-16

```
 1   A    Yes.  This image appears in an issue of Dabiq as well.

 2   Q    Dabiq Magazine?

 3   A    Uh-huh.

 4   Q    And is this a true and accurate copy of the picture on the

 5   computer?

 6   A    Yes.

 7              MR. KOEHLER:  Move to admit 218.

 8              MS. PLOMIN:  No objection.

 9              THE COURT:  218 is admitted.

10        (Exhibit No. 218 admitted in evidence.)

11   BY MR. KOEHLER:

12   Q    You mentioned the Tauheed finger.  Can you spell the

13   "Tauheed."  I'm not sure we've done that for the court

14   reporter.

15   A    It's spelled many ways.  The way that I usually spell it

16   is T-A-W-H-I-D.

17   Q    And have you seen it also spelled T-A-U-H-E-E-D?

18   A    Yes.

19   Q    I now have 219 on the monitor.  Do you recognize that?

20   A    Yes, but it's upsidedown.

21   Q    That's what we have you here for.

22              Can you tell us what that is?

23   A    This is a picture of the Islamic State flag.

24              MR. KOEHLER:  Move to admit 219.

25              MS. PLOMIN:  No objection.
```

1           THE COURT:  219 is admitted.

2       (Exhibit No. 219 admitted in evidence.)

3   BY MR. KOEHLER:

4   Q   Now, moving on to 223.  Can you tell us what that is?

5   A   This is a picture of armed men in front of an Islamic

6   State flag.

7   Q   That's another pixilated photo.  Did that come from a

8   thumbnail as well?

9   A   Yes.

10  Q   Is it otherwise fair and accurate?

11  A   Yes.

12          MR. KOEHLER:  Move to admit 223.

13          MS. PLOMIN:  Your Honor, I'm assuming this was also

14  found in the Dell Inspiron laptop?

15          MR. KOEHLER:  That's correct.

16          MS. PLOMIN:  No objection.

17          THE COURT:  223 is admitted.

18      (Exhibit No. 223 admitted in evidence.)

19  BY MR. KOEHLER:

20  Q   Moving on to 225.  What is that?

21  A   This is a picture of a man walking on a ridge holding an

22  Islamic State flag.

23  Q   And is that a true and accurate copy of what came off the

24  Dell Inspiron laptop?

25  A   Yes.

1          MR. KOEHLER:  Move to admit 225.

2          MS. PLOMIN:  No objection.

3          THE COURT:  225 is admitted.

4      (Exhibit No. 225 admitted in evidence.)

5   BY MR. KOEHLER:

6   Q   Now, moving forward to 229.  Do you recognize that?

7   A   Yes.

8   Q   What is it?

9   A   This is a picture of an Islamic State flag that has been

10  spray painted onto a wall.

11  Q   Is that a true and accurate copy of that?

12  A   Yes.

13         MR. KOEHLER:  Move to admit 229.

14         MS. PLOMIN:  No objection.

15         THE COURT:  229 is admitted.

16     (Exhibit No. 229 admitted in evidence.)

17  BY MR. KOEHLER:

18  Q   Now, moving on to Exhibit 232.

19         Ms. Vaughan, in the history on the computer did you

20  run into a web search for the Islamic State flag?

21  A   I believe this was recovered from an unallocated space.

22  Q   Okay.  And can you explain what an unallocated space is?

23  A   Yes.  So when something is deleted from a computer,

24  it's -- it doesn't really go away.  It's just sort of marked

25  for reuse.  So it is possible sometimes when we use our

1   forensic tools to recover those deleted items from that space.

2   Q   And is this an example of that?

3   A   Yes.

4   Q   And does this section of the unallocated space reflect

5   that the person actually clicked through to the item?

6   A   Yes.  So it shows that a Google search was performed for

7   the phrase "Islamic State flag" and this was probably in

8   Google Images.

9         The user clicked through to an image which is called

10  ShababFlag.svg that is hosted on wikimedia.org.

11  Q   Is that a true and copy of that unallocated space?

12  A   Yes.

13        MR. KOEHLER:  Move to admit 232.

14        MS. PLOMIN:  No objection.

15        THE COURT:  232 is admitted.

16     (Exhibit No. 232 admitted in evidence.)

17  BY MR. KOEHLER:

18  Q   Ms. Vaughan, did you follow that link to the ShababFlag

19  file on the Wikimedia commons site?

20  A   Yes.

21  Q   And what was that flag that you found?

22  A   It was the same flag that is used by al Shabab and the

23  Islamic State and several other terrorist groups that are

24  affiliated with al-Qa'ida.

25  Q   We admitted into evidence earlier in the trial Exhibit 65

1  which was a series of pages that had been damaged by water and
2  so forth.
3          Do you recall seeing pages with that same image on
4  it?
5  A   Yes.
6  Q   And did you examine the text along the edge of those
7  pages?
8  A   Yes, I did.
9  Q   What did you find in that text?
10  A   I found a URL for a flag called ShababFlag.svg.
11  Q   And did it match this URL here for the
12  commons.wikimedia.org?
13  A   Not quite.  But you see there above there is a version of
14  it that includes the phrase "1280px."  It included that
15  portion.
16  Q   You have a touch screen there in front of you.  Can you
17  underline that little part that you're talking about, the
18  1280px.
19  A   (Indicating)
20  Q   So a little to the left of center of your underline?
21  A   Yes, the part that says "1280px."
22  Q   Okay.  When you examined the text along the edge of the
23  thing, could you see anything that told you what date those
24  items were printed?
25  A   I believe there was, but I can't recall what the date was.

1    Q    Is it on the text of the document itself?

2    A    Of this one?

3    Q    Of the flag -- of the charred or the damaged paper?

4    A    Yes.

5            MR. KOEHLER:  Your Honor, may I approach the witness?

6            THE COURT:  Yes.

7            MR. KOEHLER:  I'm approaching with Exhibit 65 which

8    is in evidence.

9    BY MR. KOEHLER:

10   Q    Are you able to tell the date that was printed?

11   A    Yes.  There's a page here that has the date.  January 16,

12   2015.  And then it's 1:51 p.m.

13   Q    So approximately three-and-a-half months before the attack

14   in Garland, Texas?

15   A    Yes.

16   Q    Are you familiar with the date of the Charlie Hebdo attack

17   in Paris, France?

18   A    That was in January of 2015.

19           THE COURT:  Excuse me, Mr. Koehler.  We're going to

20   take our morning break.

21           Ladies and gentlemen, we're going to take a 15-minute

22   break.  We'll reconvene at approximately 10:25.  You are

23   reminded again of the admonition not to discuss the case among

24   yourselves or with anyone else.

25           Please do not form any conclusions about the case

1    until you have heard all the evidence and begun your

2    deliberations.

3           I will excuse the jury at this time and stay here and

4    discuss some matters with counsel.

5        (Open court, no jury present at 10:09 a.m.)

6           THE COURT:  You may step down, Ms. Vaughan.  Thank

7    you.  Please sit down.

8           We have a sleeping juror.  And our sleeping juror has

9    not just been sleeping today, but she appeared to also be

10   having great difficulty staying awake last week as well.

11          And one of the jurors seated next to her had alerted

12   Maureen to the fact that the juror had also been sleeping.

13   It's juror No. 3.  I was observing it last week and also this

14   morning.  Perhaps counsel have observed it as well.

15          At this point in time, do you want me to speak to

16   her?  Do you want me to do anything?  Do you want to just

17   leave it alone and hope that Mr. Koehler's presentation

18   becomes more scintillating and keeps her awake?

19          While what we have been doing this morning has been

20   somewhat tedious, I wouldn't suggest that she was only

21   sleeping through this tedious part.  She was sleeping quite a

22   bit last week too.

23          So I wanted to bring it to your attention and ask if

24   you wanted me to do anything.

25          MR. KOEHLER:  Perhaps we can have a moment to think

1    about that and confer with defense counsel.

2            THE COURT:  I take it, have you observed it as well?

3            MR. MAYNARD:  Yes, I have.

4            THE COURT:  Mr. Maynard has.  Okay.  Good.

5            MR. KOEHLER:  I don't see out of my left eye, Your

6    Honor, so I very frequently don't see the jury when I'm on

7    this side of the courtroom.

8            THE COURT:  It's not just me that's observed it.

9    Several other people have observed it as well.

10           And as I said, as well as the -- one of the jurors

11   seated next to her, so.

12           MR. MAYNARD:  My suggestion would be that you have a

13   short conversation with her and say that you noted it.  Ask

14   her if she has a problem.  I mean, there are people that have

15   sleeping issues.

16           THE COURT:  I would be happy to do that.

17           I would suggest that if that's what you want me to

18   do, that I would do it at the lunch break so that Maureen

19   could approach her discreetly and ask her if she could come

20   talk to me.  And I would want to do it in my office and not on

21   the record and see what I can find out.

22           MR. KOEHLER:  Government has no objection to that.

23           We also would suggest that if she remains on the

24   jury, perhaps she should silently be designated as an

25   alternate.

1          THE COURT:  I would suggest that it would be

2    premature to make that decision, but I will talk to her and

3    report back to you.

4          If it turns out that she does really have this as a

5    problem that she's experienced outside of the courtroom, that

6    we might want to consider something that doesn't allow her to

7    stay and sleep through the rest of the trial.

8          The problem is that when a juror brings it to my

9    attention, it also tells me that it's of concern to the jury

10   too.  And so -- but anyway, I'll speak to her at noon.  I will

11   report back to you about our conversation.

12         MS. BROOK:  Your Honor, if we may -- I'm sorry.

13   Mr. Maynard has something that could go first.  But if we may,

14   before you step off the bench, just address something briefly

15   at sidebar with Your Honor?

16         THE COURT:  Sure.

17         MR. MAYNARD:  Your Honor, I have got an issue.

18         THE COURT:  Could you explain it to me at a

19   microphone?

20         MR. MAYNARD:  Yes.

21         We subpoenaed a number of witnesses to come in for

22   when our case is going to be put on and asked them to call us

23   so that we could do scheduling and most of them have done

24   that.

25         I have a couple of witnesses who -- because I set the

1   subpoenas for today because I wasn't sure how long the

2   government's case would last and so I did it early, but I have

3   a couple of witnesses that are outside that are fairly upset

4   with having been subpoenaed and either wanted to talk to you.

5   What I want is --

6           THE COURT:  Oh.  You mean it isn't that they didn't

7   understand they didn't have to be here today?  It's that

8   they're upset that they are subject to a subpoena?

9           MR. MAYNARD:  Yes.  And that they came and they don't

10  want to ever come back again.

11          And I mean I have tried to explain to them that we

12  will accommodate their schedule and I will give them, you

13  know, 24, 48 hours' notice when we would be putting them on.

14          They just don't want to be subject to a subpoena.

15  They don't want to be here.

16          THE COURT:  What do you want me to do?

17          MR. MAYNARD:  They're subject to a subpoena.  I want

18  them to be ordered that they have to comply with it and that I

19  will give them either 48 hours or 72 hours' notice, whatever

20  the Court thinks is reasonable for them to come back.

21          THE COURT:  So you want to bring them in and have me

22  tell them that?

23          MR. MAYNARD:  Yes.

24          THE COURT:  Okay.  Let's do that right now.

25          MR. MAYNARD:  Okay.

1          THE COURT:  Could you two gentlemen come forward?  I

2    want to talk to you for a moment.  You can just stay right

3    there.

4          Sir, could I have your name -- the gentleman to my

5    left.

6          ANTHONY SAMPSON:  Anthony Sampson.

7          THE COURT:  Mr. Sampson.  And --

8          STUART SAMPSON:  Stuart Sampson.

9          THE COURT:  Two Mr. Sampsons.

10         Gentlemen, I understand that you have been served

11   with a subpoena to appear and testify in this case and that

12   you're not very happy about that.

13         ANTHONY SAMPSON:  Yeah, because I'm testifying to

14   something that I don't know about.  Just moved out here so I

15   don't know anything about this.

16         THE COURT:  I just want to explain to you that

17   because you have been served with a subpoena, you are required

18   to appear in court and testify.

19         STUART SAMPSON:  Okay --

20         THE COURT:  Hold on.  I don't know when you will be

21   required to testify.  I understand that with the subpoena came

22   a letter saying:  Please call defense counsel and he will let

23   you know when you need to be here.

24         You have to do that.  Let me explain and then I will

25   let you speak.

1          You are free to set a time to talk to Mr. Maynard or

2    to Ms. Plomin, the lawyers that subpoenaed you, to try to find

3    out what they want to talk to you about.  And I'm sure they

4    will sit down and tell you.

5          And then if there is nothing that you have to say

6    that's helpful to them, they can certainly let you know that.

7          So, Mr. Sampson, was there something you wanted to

8    say?

9          STUART SAMPSON:  I do.  Actually, since this case or

10   whatever, I have been constantly harassed by the FBI.  I have

11   been constantly harassed by the defense.  My family has been

12   harassed; my wife, my kids.  They even come into the masjid to

13   talk to us when we have nothing to do.

14          I don't know anything.  I'm missing days at work and

15   everything for something I have no clue about.  So.

16          THE COURT:  Have you actually -- this is not the FBI.

17   This is the defense lawyers.

18          STUART SAMPSON:  Defense as well.

19          THE COURT:  Have you talked to them?

20          STUART SAMPSON:  Yeah.  I told them several times I

21   don't know.  I don't want to speak to them about something I

22   don't know and then they're forcing me to come to court.

23          I'm not willing to come up here and lie about

24   anything because I don't know.

25          THE COURT:  And we would hope that you do not do

1    that.  You will -- when, if called to testify, be under oath

2    and promise to tell the truth.

3           And the other Mr. Sampson, was there something you

4    wanted to say?

5           ANTHONY SAMPSON:  My wife and daughter, we got -- I'm

6    about to get a divorce because of this.  And my daughter is

7    back home because of this now.  And I just got married --

8    because of harassment -- and I just came out here so I don't

9    know nothing.

10          THE COURT:  Now, at this point in time the defense is

11   not going to contact you again except to tell you when to come

12   back to testify.

13          And despite the fact that you don't think you have

14   anything to say that's important or relevant to this case, if

15   the defense feels otherwise, this subpoena does require you to

16   appear.

17          And because Mr. Maynard will give you a specific day

18   and time and if you -- when you show up on that day and time,

19   even if he's not ready for your testimony, I will allow that

20   you come and testify so that you are here for as short a

21   period of time as possible.

22          But because you have been served with a subpoena,

23   despite your telling me that you don't know anything, I can't

24   release you from your subpoena.  Only the person who

25   subpoenaed you can.

1          So I would suggest that you talk to Mr. Maynard and

2     Ms. Plomin.  They can tell you when to be here.  And I'm sorry

3     but you will have to be here to testify on that day.

4          STUART SAMPSON:  I can testify but I'm going to say

5     the same thing.  I don't know anything.

6          THE COURT:  That's fine.  This has nothing to do with

7     what you're going to say.  It has to do with the fact that you

8     will have to be here and answer the questions that are asked

9     of you.

10         So I apologize if this may have caused you problems

11    and with your job and with your family, but this is a very

12    important matter and so you will have to come back and testify

13    when Mr. Maynard schedules you to be here.

14         Okay.  Thank you.

15         MR. KOEHLER:  Your Honor, there was the issue defense

16    raised in their Trial Memorandum under Rule 403.

17         THE COURT:  We were going to talk at sidebar about

18    something?

19      (At sidebar on the record.)

20         MS. BROOK:  Your Honor, they wanted to flag an issue

21    for tomorrow morning.  I wanted to do it at sidebar because of

22    the nature of the issue.

23         THE COURT:  Tomorrow morning?

24         MS. BROOK:  Yes.  So we can take it up at any point

25    today at sidebar.

1           THE COURT:  We can take it up later.

2           MS. BROOK:  Okay.

3           Did you have something else you wanted to say?

4           MR. KOEHLER:  Yes, but it doesn't need to be at

5    sidebar.

6           THE COURT:  Okay.  Can we take it up later?

7           MR. KOEHLER:  It involves Ms. Vaughan's testimony and

8    foundation for exhibits the defense is objecting to under Rule

9    403.

10           THE COURT:  Okay.  That has nothing to do with the

11    foundation and we can address the admissibility at the time

12    that it is offered.

13           MR. KOEHLER:  Okay.  Well, I was ready to offer some.

14           MS. PLOMIN:  Your Honor, I also have an issue with

15    respect to Ms. Vaughan's testimony we just received.

16           THE COURT:  I don't want to talk at sidebar about

17    things that should be publically heard, but we are all going

18    to take a four-minute break now.

19       (End of discussion at sidebar.)

20           THE COURT:  Court is in recess.

21       (Recess taken at 10:21 a.m.; resumed at 10:31 a.m.)

22       (Open court, jury present.)

23           THE COURT:  Thank you, ladies and gentlemen.  Please

24    sit down.  The record will show the presence of the jury,

25    counsel, and the defendant.

1          I just passed the question that one of the jurors

2    gave me to the lawyers and so that's why they are reading a

3    single sheet of paper.

4          MR. KOEHLER:  I have read the question, Your Honor.

5          As long as there is no objection from the defense on

6    the basis of cumulativeness, because we do plan on explaining

7    this through a later witness, I would be happy to have

8    Ms. Vaughan explain those two words.

9          THE COURT:  Okay.  Why don't you go ahead and ask

10   her.

11   BY MR. KOEHLER:

12   Q   Ms. Vaughan, we have made reference to the title of the

13   magazine Dabiq?

14   A   Yes.

15   Q   Is there a place called Dabiq?

16   A   Yes.  I believe it's in Syria.

17   Q   And what is that place?

18   A   It's a small town.

19   Q   And you've also talked about the Tauheed finger.

20   A   Yes.

21   Q   What does the word "Tauheed" mean?

22   A   It's usually translated as monotheism, I believe, or

23   oneness.  It is one of the core theological concepts of Islam

24   is the singularness of Allah and of their faith.

25         MR. KOEHLER:  Thank you.

1    BY MR. KOEHLER:

2    Q    So when we left off we were on Exhibit 232, the link back

3    and you mentioned the date that those flags were printed.

4    A    Uh-huh.

5    Q    And remind us of that date and then we can move on.

6    A    That was January 16, 2015.

7    Q    Thank you.

8            Now, directing your attention to Exhibit 233.  During

9    your review of the computer, did you find sections of a book

10   called 40th Hadith On Jihad?

11   A    Yes.

12   Q    And is Exhibit 233 a true and accurate copy of the

13   different pages of 40 Hadith On Jihad that you found on the

14   Dell Inspiron laptop?

15   A    Yes.  One of two pages.

16           MR. KOEHLER:  The government moves to admit 233.

17           MS. PLOMIN:  No objection.

18           THE COURT:  233 is admitted.

19       (Exhibit No. 233 admitted in evidence.)

20   BY MR. KOEHLER:

21   Q    Ms. Vaughan, does the book state the three conditions of a

22   true Muslim?

23   A    Yes.

24   Q    Can you read the what those three conditions are?

25   A    Yes.

1          Number one:  He himself should be a mujahid.

2          Number two:  He should provide a mujahid with a means

3    of warfare and other necessities of life.

4          Three:  He should see to the well-being of a

5    mujahid's family in the latter's absence and ensure their

6    protection.

7          THE COURT:  And continuing with trying to explain

8    what a word means that we might not be familiar with, what --

9    BY MR. KOEHLER:

10   Q    What is the word "mujahid."

11   A    It is one who engages in jihad or a holy warrior is often

12   translated.

13   Q    Can you please read the text in the plain font at the

14   bottom of page 59?

15   A    "Just see how close a martyr is to paradise.  There is no

16   barrier between him and paradise apart from becoming a martyr.

17   We can also gauge from this Hadith the extent of the

18   conviction of the Sahaba on the words of Rasulullah and how

19   desirous they were in acting upon his words."

20   Q    Okay.  So we have a few more words in there.

21          First of all, what is a "Hadith"?

22   A    A Hadith is a saying of Muhammad.

23   Q    And "Sahaba."

24   A    These -- it's a name for the companions of Muhammad.  The

25   first converts to Islam, the people that he traveled with.

1   Q   And "Rasulullah."

2   A   That is a name for Muhammad.

3   Q   Now, moving on to Exhibit 234.  Do you recognize that

4   image?

5   A   Yes.  A portion of it's been cut off in this printing.

6   Q   Okay.  With the exception of a portion of it being cut

7   off, do you recognize that from the Dell Inspiron laptop?

8   A   Yes.

9           THE COURT:  Move to admit 234.

10          MS. PLOMIN:  No objection.

11          THE COURT:  234 is admitted.

12      (Exhibit No. 234 admitted in evidence.)

13  BY MR. KOEHLER:

14  Q   Now, the part of it that's cut off is the text; is that

15  right?

16  A   Yes.

17  Q   And without being cut off, do you recall what the text

18  read?

19  A   Yes.  It said:  "Islam will dominate the world."

20  Q   Now, moving on to 235.  Is this something else you

21  recognize from the Dell laptop?

22  A   Yes.

23  Q   And what is this?

24  A   This is a series of screen captures from a video.

25  Q   What's the name of the video?

1   A   And Incite The Believers.

2   Q   Is this a true and accurate copy of what was on the Dell

3   laptop?

4   A   Yes.

5           THE COURT:  Could I clarify?

6           Are we looking at something that was on the Dell

7   laptop or was there a video on the Dell laptop from which you

8   took screenshots.

9           THE WITNESS:  No, Your Honor.  This is exactly what

10  was on the laptop.

11          THE COURT:  Thank you.

12          Did you move the admission, Mr. Koehler?

13          MR. KOEHLER:  I will do so at this time if I haven't.

14          THE COURT:  Is this 235?  Is there any objection?

15          MS. PLOMIN:  No, Your Honor.

16          THE COURT:  235 is admitted.

17      (Exhibit No. 235 admitted in evidence.)

18  BY MR. KOEHLER:

19  Q   Who is the speaker in this video?

20  A   His name is Muhammad Arrashud.

21  Q   And do you know who that person is?

22  A   I don't know a whole lot about him but he was a cleric who

23  supported jihad and called for violence.

24  Q   Was this speech something that predated ISIS?

25  A   Yes.

1   Q    I guess that's where I was going.  Thank you.

2          Now, moving on to 236, do you recognize that?

3   A    Yes.

4   Q    Is this a picture that came off of the Dell Inspiron

5   laptop?

6   A    Yes.

7   Q    Do you recognize the individual in the photo?

8   A    That is Abubakar Shekau the leader of Boko Haram.

9          MR. KOEHLER:  Move to admit 236.

10         MS. PLOMIN:  No objection.

11         THE COURT:  236 is admitted.

12      (Exhibit No. 236 admitted in evidence.)

13  BY MR. KOEHLER:

14  Q    Now, going to 237.  Do you recognize that?

15  A    Yes.

16  Q    Did that also come off the Dell laptop?

17  A    Yes.

18         MR. KOEHLER:  Move to admit 237.

19         MS. PLOMIN:  No objection.

20         THE COURT:  237 is admitted.

21      (Exhibit No. 237 admitted in evidence.)

22  BY MR. KOEHLER:

23  Q    Can you tell us who is depicted in that picture?

24  A    That is Dzokhar Tsarnaev, one of the Boston Marathon

25  bombers.

1    Q    Now, going to 239.  Is that also off the Dell laptop?

2    A    Yes.

3    Q    And is that a true and accurate copy?

4    A    Yes.

5              MR. KOEHLER:  Move to admit 239.

6              MS. PLOMIN:  No objection.

7              THE COURT:  239 is admitted.

8         (Exhibit No. 239 admitted in evidence.)

9    BY MR. KOEHLER:

10   Q    Now, this one is another one of those pixilated images; is

11   that correct, Ms. Vaughan?

12   A    Yes.

13   Q    In the left can you tell us what those words say?

14   A    It said:  "Message to America.  The Boston attacks."

15   Q    And is the "Boston attacks" part that part that's in the

16   lower right-hand part of the screen that's pixilated?

17   A    I think it's on the bottom there somewhere.

18   Q    And did you look at this --

19   A    Oh, yes.  You're right.  It's the part on the right there.

20   Q    Did you look at this a little bit better resolution than

21   the pixilated version than we have printed here?

22   A    Yes.  And I also watched the video on YouTube.

23   Q    Do you recall who released the video on YouTube?

24   A    It's a group called Salafi Media.

25   Q    Is that a group known to the FBI?

1    A    Yes.

2    Q    Now, moving on to 240.  Do you recognize that picture?

3    A    Yes.

4    Q    Is that also from the Dell laptop?

5    A    Yes.

6             MR. KOEHLER:  Move to admit 240.

7             MS. PLOMIN:  No objection.

8             THE COURT:  240 is admitted.

9        (Exhibit No. 240 admitted in evidence.)

10   BY MR. KOEHLER:

11   Q    Do you recognize the person in that picture?

12   A    Yes.  This is Anjem Choudary.

13   Q    And do you know where he is based?

14   A    The UK.

15   Q    Now, Exhibit 250.  Do you recognize that?

16   A    Yes.

17   Q    What is that?

18   A    This is a picture of what I believe is Mr. Soofi's

19   apartment and there are several other individuals in the

20   picture, including Mr. Simpson and who I believe is the

21   defendant.

22   Q    And is that a fair and accurate copy of what came off of

23   the Dell laptop?

24   A    Yes.

25            MR. KOEHLER:  Move to admit 250.

```
 1              MS. PLOMIN:  No objection.

 2              THE COURT:  250 is admitted.

 3         (Exhibit No. 250 admitted in evidence.)

 4    BY MR. KOEHLER:

 5    Q    Can you use your monitor there and circle Mr. Simpson in

 6    the picture.

 7    A    (Indicating)

 8    Q    And the person you believe to be the defendant.

 9    A    (Indicating)

10    Q    Do you know who the person is on the far left in the

11    picture at all?

12    A    I'm not sure.  I can only guess.

13    Q    Okay.  We wouldn't want you to do that.

14              Exhibit 251.  Do you recognize that?

15    A    Yes.  This is a picture of the same room from a different

16    angle.

17    Q    And is that also from the Dell laptop?

18    A    Yes.

19              MR. KOEHLER:  Move to admit 251.

20              MS. PLOMIN:  No objection.

21              THE COURT:  251 is admitted.

22         (Exhibit No. 251 admitted in evidence.)

23    BY MR. KOEHLER:

24    Q    Can you tell us who is on the left in the picture?

25    A    That is Mr. Simpson.
```

1  Q   And do you recognize the child on the right in the

2  picture?

3  A   I think that's Nathaniel Soofi.

4  Q   Moving now to 254.  Did you find a publication of a book

5  on the computer called the Maidens of Jannat?

6  A   Yes.

7  Q   And is this a true and copy of the book that you found on

8  the Dell laptop?

9  A   Yes.

10          MR. KOEHLER:  Move to admit 254.

11          MS. PLOMIN:  No objection.

12          THE COURT:  254 is admitted.

13      (Exhibit No. 254 admitted in evidence.)

14  BY MR. KOEHLER:

15  Q   I think we have the translation of "Jannat" right there on

16  the paper.

17  A   Yes.

18  Q   What is that, for the record.

19  A   "Paradise."

20  Q   Thank you.

21          Now, moving on to 260.  Do you recognize that?

22  A   Yes.

23  Q   What is it?

24  A   This is a picture of a DVD set which is called The End Of

25  Time.  A New Beginning.

```
 1   Q    Was that also on the Dell laptop?
 2   A    Yes.
 3              MR. KOEHLER:  Move to admit 260.
 4              MS. PLOMIN:  No objection.
 5              THE COURT:  260 is admitted.
 6        (Exhibit No. 260 admitted in evidence.)
 7   BY MR. KOEHLER:
 8   Q    Now, showing Exhibit 262.  Ms. Vaughan, do you recognize
 9   that.
10   A    Yes.
11   Q    It's a little pixilated.  Were you able to see that in a
12   little better resolution before coming to court today?
13   A    Sort of.  Close enough.
14   Q    Is that also from the Dell laptop?
15   A    Yes.
16   Q    Can you tell us what that is?
17   A    It is a picture of Cardinal Stadium.
18   Q    Is that the University of Phoenix Stadium?
19   A    Yes.
20              MR. KOEHLER:  Move to admit 262.
21              MS. PLOMIN:  No objection.
22              THE COURT:  262 is admitted.
23        (Exhibit No. 262 admitted in evidence.)
24   BY MR. KOEHLER:
25   Q    Next I want to go through a series of audios.  We'll lay
```

1      the foundation for them to be played later.

2              On the laptop did you find -- or I guess this is

3      going -- we're going to circle back to the desktop at this

4      point.

5              On the desktop -- so this computer here from the

6      Simpson and Soofi residence -- I asked you before about the

7      lecture series Bearers of Glad Tidings.

8              Have you had an opportunity to listen to Exhibit 264

9      and compare it to the audio that was found on the computer?

10     A   I have not.

11     Q   What about the audio Brutality Toward Muslims.  Did you

12     listen to Exhibit 265?

13     A   Yes.

14     Q   And is that a true and accurate copy of the audio from

15     that same lecture that was found on the computer?

16     A   Yes.

17             MR. KOEHLER:  Move to admit 265.

18             MS. PLOMIN:  No objection.

19             THE COURT:  265 is admitted.

20         (Exhibit No. 265 admitted in evidence.)

21     BY MR. KOEHLER:

22     Q   Now, 266.  Did you also listen to the audio Exhibit 266

23     and compare it to the audio that was found on the computer

24     Constants On The Path Of Jihad?

25     A   I have not had an opportunity to listen to that one.

```
 1   Q    Okay.  271.  The Dust Will Never Settle Down.

 2            Have you compared that to the audio from the

 3   computer?

 4   A    Yes.

 5   Q    And is that a fair and accurate copy of the audio from the

 6   computer?

 7   A    Yes.

 8            MR. KOEHLER:  Move to admit 271.

 9            MS. PLOMIN:  No objection.

10            THE COURT:  271 is admitted.

11       (Exhibit No. 271 admitted in evidence.)

12   BY MR. KOEHLER:

13   Q    And 273.  Lecture concerning America's War On Islam.

14            Have you listened to that and compared it to the

15   audio from the computer?

16   A    Yes.

17   Q    And is that a true and accurate copy of the audio from the

18   computer?

19   A    Yes.

20            MR. KOEHLER:  Move to admit 273.

21            MS. PLOMIN:  No objection.

22            THE COURT:  273 is admitted.

23       (Exhibit No. 273 admitted in evidence.)

24            MR. KOEHLER:  If I can have just a moment, Your

25   Honor?
```

CR15-00707-PHX-SRB   JURY TRIAL-DAY #5   2-23-16

```
1              THE COURT:  You may.

2              MR. KOEHLER:  Thank you.

3              THE COURT:  Mr. Koehler, do you have any more

4    questions for Ms. Vaughan?

5              MR. KOEHLER:  I do.  I do.

6    BY MR. KOEHLER:

7    Q   Did you have an opportunity to review the content derived

8    from a Maxwest cellular telephone belonging to Mr. Kareem?

9    A   Yes.

10   Q   I'm going to direct your attention to Exhibit 127.

11             THE COURT:  I think it's 126, because according to my

12   list, 127 is a photograph.

13             MR. KOEHLER:  That's correct, Your Honor.

14             126 is the phone itself.  127 is the content.

15   BY MR. KOEHLER:

16   Q   So directing your attention to Exhibit 127.  Do you

17   recognize that?

18   A   Yes.

19   Q   Can you tell us what that is?

20   A   This is a picture of Mr. Simpson.

21   Q   And is that a true and accurate copy of the picture that

22   came from the Maxwest cell phone?

23   A   Yes.

24             MR. KOEHLER:  Move to admit 127.

25             MS. PLOMIN:  No objection.
```

UNITED STATES DISTRICT COURT

```
 1              THE COURT:  127 is admitted.

 2          (Exhibit No. 127 admitted in evidence.)

 3  BY MR. KOEHLER:

 4  Q   On the upper part of the image here -- and we'll get to

 5  that in a second and give the jurors a chance to look -- this

 6  part of the image, can you tell us what that is.

 7  A   Yes.  This is the EXIF data.

 8  Q   And what is EXIF data?

 9  A   It is metadata that is usually generated by the

10  picture-taking device.  And it can include such things as the

11  model of the camera that took the picture.  How big it is.

12  The date it was taken.  Technical details about the

13  composition like the aperture size and things like that.

14  Q   And does the metadata show the date that this particular

15  picture was taken, including the time?

16  A   Yes.

17  Q   And what is that date and time?

18  A   March 12, 2015 at I think it says 8:38.  It's a little

19  hard to read.  P.M.

20              THE COURT:  What's "metadata"?

21              THE WITNESS:  Metadata in this case is data attached

22  to the file that describes the file, certain aspects or

23  attributes of the file.

24              THE COURT:  And you have to look for it some place

25  else in your phone to find it?
```

1          THE WITNESS:  In this case what the picture actually

2    depicts is opening the Properties of this picture on a

3    computer and that's what is -- that's how we accessed it in

4    this particular case.

5          THE COURT:  Thank you.

6    BY MR. KOEHLER:

7    Q   If you are looking at a picture on the phone, can you also

8    pull up that picture's properties in the menu on your image

9    program on the phone?

10   A   Sometimes.  I think it often requires a special program.

11   Q   Looking at the background in this photograph, are you able

12   to tell in a general sense where this photograph was taken?

13   A   Yes.  It's at a Baskin Robbins.

14   Q   Now, moving on to 129, do you recognize that?

15   A   Yes.

16   Q   Did that also come from the Maxwest cell phone?

17   A   Yes.

18   Q   Is that a fair and accurate depiction of the image from

19   the Maxwest cell phone?

20   A   Yes.

21          MR. KOEHLER:  Move to admit 129.

22          MS. PLOMIN:  No objection.

23          THE COURT:  129 is admitted.

24     (Exhibit No. 129 admitted in evidence.)

25   BY MR. KOEHLER:

1    Q    Can you identify who is in that picture?

2    A    Yes.  This is Mr. Simpson.

3    Q    And there's a coffee cup on the table in front of him.  Do

4    you recognize that?

5    A    I didn't, but one of my colleagues did and they told me

6    it's from Hava Java.

7    Q    Well, can you read the words on the cup?

8    A    They are a little too small.

9    Q    Okay.  I'll try to zoom in for you.

10             Can you make that out now?

11   A    Not really.

12   Q    Okay.  We'll move on.

13             Is this a different means of showing the metadata

14   that is associated with a particular photograph?

15   A    Yes.

16   Q    And can you tell from the image name as well as the

17   metadata the date and time that photo was taken?

18   A    Yes.

19   Q    Can you tell us that?

20   A    It is November 22, 2014.

21   Q    And is the timestamp following that?

22   A    Yes.  It says 9:49 P.M.

23   Q    Now, moving on to 129 --

24             THE COURT:  Okay.  129 is what you just offered and I

25   admitted but I think you meant 128.

1          MR. KOEHLER:  Yes.

2          THE COURT:  Because Maureen just showed me 129 and

3    it's a different picture.

4          MR. KOEHLER:  Yes.  That is correct.  So I will move

5    to admit 128 and I will put 129 before the witness.

6          And may the record reflect the previous discussion

7    was regarding 128.

8          THE COURT:  Yes.  So 128 is admitted and now we're

9    looking at 129.

10      (Exhibit No. 128 admitted in evidence.)

11         MR. KOEHLER:  Correct.

12         THE COURT:  Well, some of us are looking at it.

13   Pretty soon all of us will be looking at it.

14   BY MR. KOEHLER:

15   Q   Ms. Vaughan, do you recognize 129?

16   A   Yes.

17   Q   And what is that?

18   A   This is a picture of Mr. Simpson.

19   Q   Did that also come from the Maxwest cell phone?

20   A   Yes.

21   Q   Is that a fair and accurate copy of the picture that came

22   off the phone?

23   A   Yes.

24         MR. KOEHLER:  Move to admit 129.

25         MS. PLOMIN:  No objection.

1      THE COURT:  129 is admitted.

2      (Exhibit No. 129 admitted in evidence.)

3   BY MR. KOEHLER:

4   Q   Is that likewise the metadata from that phone?

5   A   Yes.

6   Q   Or from that picture.  Sorry.

7   A   Yes.

8   Q   Can you tell the date and time that picture was taken?

9   A   Yes, it is May 15, 2014.  1:16 P.M.

10  Q   Now, we're on 130.  Do you recognize that?

11  A   Yes.

12  Q   Is that also from the Maxwest cell phone?

13  A   Yes.

14  Q   Is that a fair and accurate copy of that?

15  A   Yes.

16          MR. KOEHLER:  Move to admit 130.

17          MS. PLOMIN:  No objection.

18          THE COURT:  130 is admitted.

19      (Exhibit No. 130 admitted in evidence.)

20  BY MR. KOEHLER:

21  Q   There's a lot of reflection off of that.  Have you

22  reviewed that image before coming to court today?

23  A   Yes.

24  Q   And looking at the screen of that computer, could you tell

25  what brand of computer that is?

1    A    Yes.   There's an Acer logo on the program that's running

2    on the computer.

3    Q    And what is the date and time of this image?

4    A    May 22, 2014, at a minute before midnight.

5    Q    Did you also review the content of an RCA android tablet?

6    A    Yes.

7    Q    Did that device also belong to Mr. Abdul Kareem?

8    A    Yes.

9    Q    I have placed what's been marked for identification as

10   Exhibit 133 on the screen in front of you.  Do you recognize

11   that?

12   A    Yes.

13   Q    I apologize that's a little bit dark.  Can you tell us

14   what that is.

15   A    Yes.  It's a picture of Mr. Simpson using a phone.

16   Q    And what is the date and time of that image?

17   A    February 23, 2015, at 7:35 A.M.

18   Q    And was that stored on the android tablet?

19   A    Yes.

20           MR. KOEHLER:  Move to admit 133.

21           MS. PLOMIN:  No objection.

22           THE COURT:  133 is admitted.

23       (Exhibit No. 133 admitted in evidence.)

24   BY MR. KOEHLER:

25   Q    Going to Exhibit 134.  Do you recognize that?

1    A   Yes.

2    Q   And what is that?

3    A   This is another picture of Mr. Simpson.

4    Q   And is that also from that RCA android tablet?

5    A   Yes.

6           MR. KOEHLER:  Move to admit 134.

7           MS. PLOMIN:  No objection.

8           THE COURT:  134 is admitted.

9       (Exhibit No. 134 admitted in evidence.)

10   BY MR. KOEHLER:

11   Q   What is the date and time of that photo?

12   A   Could you zoom in?

13          THE COURT:  Make it a little bigger for her.

14          THE WITNESS:  Thank you.  It was February 18, 2015,

15   2:17 A.M.

16   BY MR. KOEHLER:

17   Q   Now, directing your attention to Exhibit 135.  Can you

18   tell us what that is.

19   A   Yes.  This is a picture of the defendant.

20   Q   Also from that RCA android tablet?

21   A   Yes.

22   Q   And can you tell us the date and time of that?

23   A   February 18, 2015.  2:18 A.M.

24   Q   So one minute after the last picture?

25   A   Yes.

1    Q    Does this picture appear to be what's commonly known as a

2    "selfie"?

3    A    Yes.

4              MR. KOEHLER:  Move to admit 135.

5              MS. PLOMIN:  No objection.

6              THE COURT:  135 is admitted.

7         (Exhibit No. 135 admitted in evidence.)

8    BY MR. KOEHLER:

9    Q    Now, directing your attention to 136.  Do you recognize

10   that?

11   A    Yes.

12   Q    And what is that?

13   A    This is a picture of Mr. Simpson.

14   Q    Is that likewise from the android tablet?

15   A    Yes.

16             MR. KOEHLER:  Move to admit 136.

17             MS. PLOMIN:  No objection.

18             THE COURT:  136 is admitted.

19        (Exhibit No. 136 admitted in evidence.)

20   BY MR. KOEHLER:

21   Q    And can you tell us the date and time of that photo.

22   A    February 18, 2015, 2:15 A.M.

23   Q    So about three minutes before the last picture?

24   A    Yes.

25             MR. KOEHLER:  If I can have one moment, please?

```
 1                THE COURT:  Yes.

 2                Yes, ma'am?

 3                A JUROR:  Can we take a break?

 4                THE COURT:  Yes.  We will take a brief recess.  The

 5      jurors are reminded of the usual admonition.

 6                Court is in recess for ten minutes.

 7           (Recess taken at 11:10; resumed at 11:23 a.m.)

 8                THE COURT:  Thank you, ladies and gentlemen.  Please

 9      sit down.  I understand we are going to interrupt

10      Ms. Vaughan's testimony to take the testimony of another

11      witness.

12                MS. BROOK:  Yes, Your Honor, with your permission we

13      have a brief witness by the name of Waseem Hyman and his

14      stomach is a little upset, so we were hoping to put him on now

15      and take a brief interlude.

16                (Witness affirmed)

17                THE WITNESS:  I affirm to tell the truth to the best

18      of my ability and knowledge.

19                THE CLERK:  Please state your name for the record,

20      spelling your first and last name.

21                THE WITNESS:  I am the username of Waseem Hyman.

22      Waseem is W-A-S-E-E-M.  Hyman.  H-Y-M-A-N.

23                THE COURT:  Proceed, Ms. Brook.

24                MS. BROOK:  Thank you.

25      ///
```

1        **WASEEM HYMAN, WITNESS, SWORN**

2            **DIRECT EXAMINATION**

3    BY MS. BROOK:

4    Q    And that microphone right in front of you, if you talk

5    into it, it will project your voice.

6            So, good morning.

7    A    Good morning.

8    Q    Would you please introduce yourself to the jury.

9    A    My name is Waseem Hyman.  Hello.

10   Q    And, Waseem, how old are you?

11   A    Nineteen.

12   Q    What month was your birthday in?

13   A    December.

14   Q    So back last May, you were 18?

15   A    Uh-huh.

16   Q    And do you live here in Phoenix?

17   A    Yes.

18   Q    Who do you live with?

19   A    My father.

20   Q    And your brothers and sisters?

21   A    My little sister, yeah.

22   Q    And how old is your little sister?

23   A    Sixteen.

24   Q    So she lives with you as well?

25   A    Uh-huh.

1   Q    Do you know a man by the name of -- or did you know a man

2   by the name of Elton Simpson?

3   A    Yes.

4   Q    And how is it that you knew him?

5   A    He was a friend of my father.

6   Q    And your father, what's his name?

7   A    Abdul Hyman.

8   Q    Does he go by any initials?

9   A    Not that I know of.

10  Q    So you said that Elton Simpson was a friend of your dad's.

11  What did you call him?

12  A    Ibrahim.

13  Q    All right.  And I'm going to place on the overhead, not

14  yet admitted, but marked Government's Exhibit 431.

15          Do you recognize the person in that photo?

16  A    Yes.

17  Q    And who is it?

18  A    Elton Simpson.  Ibrahim.

19          MS. BROOK:  The government moves to admit and publish

20  431.

21          MR. MAYNARD:  No objection.

22          THE COURT:  431 is admitted.

23      (Exhibit No. 431 admitted in evidence.)

24          MS. BROOK:  And, Maureen, when we have a moment, can

25  you hand to the witness Exhibit 351, please.

```
 1   BY MS. BROOK:
 2   Q   You had mentioned that you knew him.  So Ibrahim was a
 3   friend of your dad's.  And how old do you think you were when
 4   you first met him?
 5   A   I don't know.
 6   Q   A kid?  Teenager?
 7   A   A kid.
 8   Q   And would he come over to your house regularly?
 9   A   Every so often, yeah.
10   Q   When he came over to your house, would he ever talk to you
11   about Islam?
12   A   Yes.
13   Q   What sort of things would he tell you about being a
14   Muslim?
15   A   Pretty much the necessities, you know.  Guard your
16   prayers.  Respect your parents and people.  You know, pretty
17   much, that's just it.
18   Q   What was the first thing that you said?
19   A   Oh, guard your prayers.
20           Did I say that was the first one?
21           THE COURT:  He did.
22   BY THE COURT:
23   Q   Yeah, you did.
24           Explain that.  What does that mean?
25   A   To me just like Muslims are supposed to pray five times a
```

```
 1   day, you know.  He is just telling me to be consistent, to
 2   guard my prayers, to pray when I'm supposed to.
 3   Q   And Ms. Lemke who is sitting there is typing, writing out
 4   everything you say.  That's why she just wants you to go an
 5   little bit slower so she can hear what you're saying.
 6   A   Oh, okay.
 7   Q   So to pray five times a day?
 8   A   Uh-huh.
 9   Q   And you mentioned be good to your parents?
10   A   Uh-huh.  My dad, yeah.
11           He told me -- that was pretty much it.  It was always
12   that.  Because me and my dad used to argue a lot, you know,
13   and he just told me, you know, respect your father, honor
14   that, you know, but, yeah.
15   Q   You mentioned that he would come over to your house?
16   A   Uh-huh.
17   Q   And up through last May, would he also come up to your
18   house and visit at your dad's house?
19   A   Sometimes, yeah, but not a lot, no.
20   Q   Did you ever meet Abdul Kareem?
21   A   Uh-huh.
22           THE COURT:  Yes?
23           THE WITNESS:  Yes.
24           THE COURT:  Thank you.
25   BY MS. BROOK:
```

1   Q   And how is it that you came to meet Abdul Kareem?

2   A   He's friends with my father.

3   Q   And Abdul Kareem, was he also friends with Ibrahim?

4   A   Yes.

5   Q   And would he also come over to your house?

6   A   They never really came together or anything, but like he

7   would come but they would go to the masjid, you know, as a

8   ride, you know.

9   Q   So Abdul Kareem would go to the mosque too?

10  A   Yes.

11  Q   And Ibrahim would go to the mosque as well?

12  A   Yeah.

13  Q   And you, yourself, would you consider yourself a devout

14  Muslim or something else?

15  A   What do you mean by "devout"?

16  Q   Would you consider yourself to be somebody who is really

17  strict with your practice?

18  A   No.

19  Q   Okay.  But you do go to the mosque and you do practice?

20  A   Barely.

21  Q   Okay.  And are you somebody that prays five times a day?

22  A   No.

23  Q   Do you pray once a day?  Or do you just go to the mosque

24  or something different?

25  A   I don't pray consistently.  I pray sometimes.  I should be

1    praying more, though, but I don't pray consistently.  It's

2    been maybe like two or three weeks since I last prayed, so,

3    yeah.

4    Q    So it's been about two or three weeks since you last

5    prayed and is that about how you regularly pray?

6    A    Kind of, yeah.

7    Q    You had mentioned that Ibrahim talked to you about being

8    Muslim and about praying more often or more consistently?

9    A    Uh-huh.

10   Q    I want to talk about the last time you saw Ibrahim.

11          So I want to talk about Friday, May 1st.  Were you at

12   home that day?

13   A    Friday, May 1st?  Yeah.

14   Q    And did you see Ibrahim at your house?

15   A    Uh-huh.

16   Q    Were you at home by yourself or with other people?

17   A    Me and my sister were there.

18   Q    And how was it that Ibrahim came over to your house?  Did

19   you know he was coming or did he show up unannounced?

20   A    He showed unannounced.

21   Q    Do you remember about what time it was?

22   A    No.  It was probably like in the afternoon though.

23   Q    Okay.  And why do you say that?

24   A    Because it was daytime, like I just woken up.  And I sleep

25   in, so it was probably like the afternoon.

1    Q    Okay.  And you had mentioned -- was your sister home?

2    A    Yeah.

3    Q    Okay.  So did he come right in or did he ring the doorbell

4    or something else?

5    A    Oh.  He knocked and I let him in.

6    Q    So he knocked on the front door?

7    A    The screen door, yeah.

8    Q    And you let him in?

9    A    Uh-huh.

10   Q    Did you talk to him that afternoon?

11   A    Yes.

12   Q    What was his mood like?

13   A    Same as usual.  Just calm.

14   Q    So calm?

15   A    Uh-huh.

16   Q    And did he talk to you that afternoon about being a

17   Muslim?

18   A    Yes.

19   Q    What sort of things did he talk to you about that day?

20   A    Same stuff as usual, you know, respecting my parents,

21   guarding my prayers, yeah.

22   Q    And did he write down a list for you?

23   A    Yes.

24   Q    Okay.  Did he write it down in the living room or were you

25   in a different room?

1    A    He wrote it down in the living room.

2    Q    And did he write it down on a piece of paper or something

3    else?

4    A    A piece of paper.

5    Q    As he was writing the list, did he explain what he was

6    doing?

7    A    No.  He just told me that whenever I get the chance, I

8    should check it out.

9    Q    And what did you infer that to mean?  What did that mean

10    to you to check it out?

11    A    That there must be some type of information behind it that

12    he wants me to look into.

13    Q    I want you to go ahead.  Up before you is Exhibit No. 351.

14    If you can open that envelope and take a look and turn to the

15    second page.  The first is just a place holder.

16    A    Okay.

17    Q    Do you recognize that?

18    A    Yeah.

19    Q    And what do you recognize that as?

20    A    The paper you guys had taken from my house.

21    Q    Okay.  So that was a piece of paper that the FBI had taken

22    from your house?

23    A    Uh-huh.

24    Q    After the attack in Garland?

25    A    Yes.

1    Q    Okay.  And was that the same piece of paper that Ibrahim

2    wrote out that day for you and gave to you?

3    A    Yes.

4    Q    The same piece of paper that we were talking about a

5    moment ago with the list of things to check out?

6    A    Yes.

7            MS. BROOK:  All right.  Your Honor, the government

8    moves to admit and publish Exhibit No. 351.

9            MR. MAYNARD:  No objection.

10           THE COURT:  351 is admitted.

11       (Exhibit No. 351 admitted in evidence.)

12   BY MS. BROOK:

13   Q    I'm going to go ahead and place it on the overhead.

14           Let's read this together.

15           Number one, can you read that for us.

16   A    Abu Baraa.

17   Q    And what does it say next to it?

18   A    What is known by necessity in Islam.

19   Q    And let's go to No. 2.  What's No. 2?

20   A    Imam Anwar -- I can't read these other names.  I don't

21   know how to pronounce them.

22   Q    Is that al-Awlaki?

23   A    Yeah, I guess.

24   Q    Okay.  And let's just look at this list for a second.

25           So we have listed here on it there is -- or is listed

1    1 through 7.  And this list is just as it was when Ibrahim

2    handed it to you?

3    A   Well, I don't remember exactly how it looked because I

4    never really got the chance to kind of go over it, so, yeah.

5    Q   Do you remember looking up No. 1?

6    A   Yeah.

7    Q   And how is it that you looked up who No. 1 was?

8    A   YouTube.

9    Q   Okay.  And do you remember what you learned?

10   A   I believe it was something on marriage, you know, like but

11   that was all, so, yeah.  But I didn't really take much from

12   it.  I started the video and kind of quit it because it was

13   like too long and it was kind of boring, so, but, yeah.

14   Q   You mentioned Ibrahim's mood when he was with you.  You

15   said it was the same as always.

16        Describe for us as he's giving you this piece of

17   paper after he wrote out the seven people on it and handed it

18   to you, what's his mood like then?

19   A   The same.  Calm.

20   Q   And what did he tell you to do with this list of seven

21   people?

22   A   Didn't you just ask me that?

23   Q   I may have.

24   A   He told me to check them out.

25   Q   We talked a moment ago about Abdul Kareem who you said you

CR15-00707-PHX-SRB   JURY TRIAL-DAY #5    2-23-16

```
1    knew that he would come to your house.
2            Do you see him here in the courtroom with us?
3    A   I can't even see correctly, no.
4            Is that him there?  (Indicating)
5            THE COURT:  The man standing?
6            THE WITNESS:  Okay.  Yeah.  That's him.
7            THE COURT:  Okay.  Thank you.
8            MS. BROOK:  Your Honor, may the record reflect that
9    the witness has identified the defendant?
10           THE COURT:  Yes.
11           MS. BROOK:  One moment.  I don't have any other
12   questions.  Thank you.
13           THE COURT:  Mr. Maynard?
14                       CROSS EXAMINATION
15   BY MR. MAYNARD:
16   Q   Can I call you Waseem?
17   A   Yeah.
18           THE COURT:  No.
19           MR. MAYNARD:  No?
20           Okay.  Mr. Hyman.
21           THE COURT:  Yes.
22           MR. MAYNARD:  The only reason was I think his --
23           Okay.  Mr. Hyman.
24   BY MR. MAYNARD:
25   Q   You're 19?
```

UNITED STATES DISTRICT COURT

1    A    Uh-huh.

2    Q    You need to say either "yes" or "no" for the court

3    reporter.

4    A    Oh, yes, yes.  My bad.  I'm sorry.

5    Q    "Uh-huhs" and "yeahs" are hard to take down.

6          Are you in school now?

7    A    Yeah -- yes.

8    Q    Okay.  Now, you live with your dad and your sister.

9    You've known Mr. Simpson for -- since you were a young boy?

10   A    Yeah.

11   Q    Okay.  And he would come by your house on occasion and he

12   would talk to you about Islam; is that correct?

13   A    He didn't come to my house just to talk to me about Islam

14   all the time.  He's not there for me, you know.  But when he

15   was there, like when he talked to me, he just, you know, how's

16   things going, you know.

17   Q    Sure.

18   A    And he would bring up, you know, like matters with family,

19   you know, how you respect your parents.  Same thing always.

20   Q    He was a friend of your dad's?

21   A    Uh-huh.

22   Q    Is that "yes"?

23   A    Yes.

24   Q    Okay.  And did he take you and your sister sometimes maybe

25   to the mall or to do social-type things?

1   A   Yeah, but that was when we were little, so, yeah.

2   Q   Okay.  And Abdul Kareem, you've known him for sometime,

3   correct?

4   A   Yes.

5   Q   Okay.  In fact, he's a relative of your family's?

6   A   Uh-huh.

7   Q   Correct?

8   A   Yes.

9   Q   Okay.  Do you know the relationship between Abdul Kareem

10   and your dad?

11   A   Not exactly.  I think we might be related through cousins,

12   but.

13   Q   Okay.  Have you ever been to his house?

14   A   Yes.

15   Q   On a number of occasions or how often?

16   A   I think like once or twice.

17   Q   And what was the reason that you would go to Abdul

18   Kareem's house?

19   A   I think one time was because we had went to the masjid

20   before and -- or after.  I'm not sure.  It was long ago, so I

21   don't remember exactly.  And then just one time working with

22   him.

23   Q   Okay.  Did you ever go over there to eat?

24   A   Yeah.  That was like the second time maybe, yeah.

25   Q   Okay.  Now, let me take you back to May 1st.  And this is

1    the time that Ibrahim came to your house.  He came sometime

2    and it was daylight and you had recently gotten up?

3    A    Yeah.

4    Q    Typical teenager?  You get up late in the afternoon?

5    A    Yes.

6    Q    Okay.

7             THE COURT:  Well, do you get up late in the afternoon

8    or just in the afternoon?

9             THE WITNESS:  Just like in the afternoon.

10            THE COURT:  So you get up at noon or one?

11            THE WITNESS:  I don't remember.

12            THE COURT:  I mean, typically?

13            THE WITNESS:  Typically, around like noon, yeah.

14            THE COURT:  Okay.

15   BY MR. MAYNARD:

16   Q    Okay.  You did not go to the masjid that day?

17   A    No.

18   Q    And the masjid, for most of us, is a mosque, correct?

19   A    Yeah.

20   Q    Okay.  And so Friday, May 1st, was a Friday.  Do you

21   recall that?

22   A    I don't remember the date, but I just know it was a

23   Friday, yeah.

24   Q    Okay.  And tell us how long Ibrahim was there visiting

25   with you and your sister on that day?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5     2-23-16

1   A    Well, my sister was out in the living room for like maybe

2   eight minutes, you know, but they weren't talking.  She just

3   went back in her room.  And he was there for me like, I'd say,

4   like 15, 20.

5   Q    Okay.  And the list that you've shown us today that we

6   have, did he write that there or did he bring it with him?

7   A    He wrote it at the house.

8   Q    Okay.  And when you said that you looked at one of them

9   and you didn't find it very interesting, was that that day or

10  was that later on?

11  A    I think it might have been like that day, actually, or the

12  next day.  I'm not sure.

13  Q    Okay.  Was it with him there or was it after he had

14  already left?

15  A    What do you mean?  Like, what do you mean by that?

16  Q    Well, I mean, he gives you the list that we've got on the

17  screen.

18           THE COURT:  I think the question is:  Did you watch

19  it while Ibrahim was still there or did you watch it after he

20  left?

21           THE WITNESS:  Oh.  I watched it after me left.  But

22  that was just one of the people on the list.

23           MR. MAYNARD:  All right.  Thank you.

24  BY MR. MAYNARD:

25  Q    Did you stay home -- were you home into the evening,

1    seven, eight, nine o'clock that night?

2    A   Yeah, I believe so.  I don't remember.  I don't know.

3    Q   Do you remember whether or not Ibrahim came to your house

4    later that evening?

5    A   No, he didn't.  I don't remember.

6    Q   You don't remember seeing him?

7    A   No.

8    Q   Okay.

9    A   I didn't see him after that I didn't see him anymore.

10   That was the last time I seen him, actually.

11   Q   That was the last time you saw him was that --

12   A   When he gave me this list was the last time I saw him,

13   yeah.

14   Q   You've told us that there were times when Ibrahim would

15   tell you things about being a good Muslim, paying attention to

16   your dad, saying your prayers.

17        Did Abdul Kareem ever tell you what you needed to do

18   to be a good Muslim?

19   A   No.  I mean, he was as an example he prayed, I guess.  I

20   think he prays.  But we never had like one-on-one

21   conversations like that, no.

22   Q   Okay.  Was it fair to say that you were closer to Ibrahim

23   than you were to Abdul Kareem?

24   A   Yeah, in a way, yeah.

25        MR. MAYNARD:  Just a moment, Your Honor.

```
 1   BY MR. MAYNARD:
 2   Q   The seven individuals that are on the list, prior to
 3   getting this list, had you ever heard of them before?
 4   A   No.
 5   Q   Now, at some point did the FBI come to your house?
 6   A   Yes.
 7   Q   Okay.
 8   A   A couple times.
 9   Q   Do you remember when they came the first time?
10   A   Yes.
11   Q   And how was it that they came?  What do you remember?
12   A   They just came inside.  They didn't really talk to me at
13   the time, you know, but, yeah, that was -- that's how.  They
14   just came.  They spoke to my father, but, yeah.
15   Q   Okay.  Did they ever come and execute a search warrant at
16   your house?
17   A   Oh, yeah.  Malicious prosecution for that, yeah, they did.
18   It did have a part B to it also.
19   Q   I'm sorry.  I didn't hear you.
20   A   Yeah.  They executed a search warrant but it was wrong.
21   Q   How was it?  Did they come and knock on the door and you
22   came to the door?
23   A   They came -- I wasn't there at the time.  I came after.
24           They came to the door before -- my sister and my
25   father told me they came to the door with guns to my father's
```

```
 1    and sister's head and --

 2              MS. BROOK:  Objection.

 3              THE WITNESS:  -- you know, they came --

 4              THE COURT:  Hold on.  Hold on.  Don't tell us what

 5    your father or your sister told you.  Just tell us what you

 6    observed when you came home.

 7              THE WITNESS:  I wasn't there when they came at that

 8    time, no.

 9              THE COURT:  And were you home before they left?

10              THE WITNESS:  Huh?

11              THE COURT:  Were you home before the FBI left?

12              THE WITNESS:  When they did the search warrant?

13              THE COURT:  Yes.

14              THE WITNESS:  Oh, yeah.  I wasn't there when they

15    came to do the search warrant.  I came after.  Like they

16    weren't there though.

17              THE COURT:  They weren't there then?

18              THE WITNESS:  No.

19              THE COURT:  Okay.

20    BY MR. MAYNARD:

21    Q   Okay.

22    A   But also when they came without a part B too.

23              MS. BROOK:  Objection.  No question.

24    BY MR. MAYNARD:

25    Q   Did you at some point go to the FBI and get this document
```

1    back?

2    A    This document here?

3    Q    Yes.

4    A    No.  This -- this is the document here, I believe.

5    Q    Okay.

6    A    Yeah.

7    Q    Did they take any electronic things from your house such

8    as cell phones, computers, things of that nature?

9    A    Yes.

10   Q    Were any of them yours?

11   A    Yes.  I received a laptop broke.  They got it back from us

12   because they weren't supposed to take the cell phones without

13   an arrest.  And none of the electronics --

14            MS. BROOK:  Objection.  Move to strike.

15            THE COURT:  Overruled.  The answer will stand.

16            So why don't you ask your next question, Mr. Maynard?

17   BY MR. MAYNARD:

18   Q    Okay.  At some point did you get your cell phones and your

19   computers back?

20   A    Yes.  I believe a week later, but the laptop was broke.

21            MR. MAYNARD:  Okay.  Can I have just a moment, Your

22   Honor?

23            THE COURT:  Yes.

24            MR. MAYNARD:  I have no further questions, Judge.

25            THE COURT:  Ms. Brook, any additional questions for

1   Mr. Hyman?

2           MS. BROOK:  Just briefly, Your Honor.  Thank you.

3                    **REDIRECT EXAMINATION**

4   BY MS. BROOK:

5   Q   Defense counsel asked you about the document that is

6   Exhibit No. 351 we were talking about before, the one that's

7   on the overhead and they asked if you got it back.

8           I believe your response was, no, this is it.

9           So the document that you have in front of you, that's

10  the exact piece of paper that Ibrahim wrote out for you that

11  day on May 1st?

12  A   I believe so.

13  Q   And that day you mentioned that you were home, your sister

14  was home.  Your dad, he wasn't home?

15  A   No.

16  Q   Your dad, he goes by the initial AK; is that right?

17  A   I don't know.

18  Q   Have you heard his friends call him AK?

19  A   No.

20  Q   When he got home later that night, don't tell us what you

21  said, but did you tell him that Ibrahim had come to the house?

22  A   Yeah.

23  Q   And did he say something in response to you after you told

24  him that Ibrahim had come to the house?

25           MR. MAYNARD:  Objection, Your Honor.  It's beyond the

```
 1   scope.
 2             THE COURT:  Sustained.
 3             THE WITNESS:  Do I --
 4             THE COURT:  No.  Don't answer.  Thanks.
 5             THE WITNESS:  Can you reask that again actually?
 6   BY MS. BROOK:
 7   Q   So that night, that evening, you were at the house, right?
 8   A   With my father.  That part, like, to that part.
 9   Q   Okay.  You were at your house that evening when your
10   father came home?
11   A   Uh-huh.
12             THE COURT:  Yes?
13             THE WITNESS:  I don't know if he came back in the
14   evening, but like it was in nighttime when he came back home.
15             THE COURT:  Late afternoon?
16             THE WITNESS:  Late afternoon, yeah, probably.
17   BY MS. BROOK:
18   Q   At no point that night you saw Ibrahim again?
19             THE WITNESS:  No.
20             MS. BROOK:  I don't have any other questions.
21             THE COURT:  May this witness be excused and released
22   from his subpoena?
23             MS. BROOK:  Yes.
24             MR. MAYNARD:  Yes.
25             THE COURT:  Thank you very much.  You may step down,
```

```
 1   sir.  You are released from your subpoena.

 2            THE WITNESS:  Do you guys need this here?

 3            THE COURT:  Just leave it right there and we'll

 4   collect it.  Thank you very much.

 5            THE WITNESS:  God bless.

 6            THE COURT:  Please continue with your examination of

 7   Ms. Vaughan, Mr. Koehler.

 8            MR. KOEHLER:  Thank you, Your Honor.

 9            AMY KATHLEEN VAUGHAN, WITNESS, SWORN

10               DIRECT EXAMINATION (cont'd)

11   BY MR. KOEHLER:

12   Q   I believe when we left off, we had just gone through the

13   last image from the Max-- from the RCA tablet computer; is

14   that correct, Ms. Vaughan?

15            THE COURT:  Well, whether it was the last one or not

16   isn't really up to her to say.

17            MR. KOEHLER:  Exhibit 136 is where we were.

18   BY MR. KOEHLER:

19   Q   Did you also go through the Acer Aspire computer that's

20   sitting on the table here in front of the jury.

21   A   Yes.

22   Q   Through the image of that.

23            Before we get there, I want to ask you, were there

24   designators given to these different devices by the CART team

25   so that you could tell one device from another as you went
```

1    through?

2    A    Yes.

3    Q    And as you reviewed the material, did you review the

4    computer materials in what's called CAIR.

5    A    Yes.

6    Q    And can you refresh the jury's memory on what "CAIR"

7    stands for?

8    A    I don't actually know what CAIR stands for, but I can

9    describe what it is.

10    Q    Okay.  Go ahead.

11    A    It is a virtual machine.  So like a virtual environment

12    that we can log into and use our forensics tools to review the

13    data without changing anything or injuring our own computer

14    systems if there is something bad on there.

15    Q    And in the course of doing that, was the Maxwest cell

16    phone known by a particular designator?

17    A    I believe that was QPX4.

18    Q    And the Acer Aspire computer we're about to talk about,

19    what was its designator, if you recall?

20    A    QPX1, if I recall correctly.

21    Q    And the RCA tablet that we just finished talking about?

22    A    QPX3.  Yes.  QPX3.

23    Q    All right.  Now, talking about the Acer Aspire computer

24    here, were you able to assess who the user of that computer

25    was?

1    A   Yes.

2    Q   And how did you assess who the user of that computer was?

3    A   By observing logins to accounts.  Sending e-mails.  There

4    were Google voice accounts, I believe.  Pictures.  That's --

5    Q   Okay.

6    A   Various different items.

7    Q   And just for the record, we're referring to the Acer

8    Aspire that's marked and admitted as Exhibit 112.

9            And who did you assess the user of that Acer Aspire

10   to be?

11   A   The defendant.

12   Q   Abdul Malik Abdul Kareem?

13   A   Yes.

14   Q   Was one of the user accounts that you viewed on there

15   gitrdonemoving@gmail.com?

16   A   Yes.

17   Q   Placing on the document camera what's been marked for

18   identification as Exhibit No. 185.  Do you recognize that?

19   A   Yes.

20   Q   Is that a true and accurate copy of an image that came off

21   of the Acer Aspire computer?

22   A   Yes.

23           MR. KOEHLER:  Move to admit 185.

24           MS. PLOMIN:  No objection.

25           THE COURT:  185 is admitted.

```
 1          (Exhibit No. 185 admitted in evidence.)

 2     BY MR. KOEHLER:

 3     Q   Is that the same picture that we looked at before on a

 4     different device?

 5     A   Yes.

 6     Q   Now, moving on to 186.  Was that also on the Acer Aspire

 7     computer?

 8     A   Yes.

 9     Q   And what is that?

10     A   It is a picture of the defendant.

11     Q   And is that a fair and accurate picture of what came off

12     of the Acer Aspire.

13     A   Yes.

14          MR. KOEHLER:  Move to admit 186.

15          MS. PLOMIN:  No objection.

16          THE COURT:  186 is admitted.

17          (Exhibit No. 186 admitted in evidence.)

18          THE COURT:  Let's move on, Mr. Koehler.

19     BY MR. KOEHLER:

20     Q   Now, showing you what's been marked for identification as

21     Exhibit No. 187.  Ms. Vaughan, do you recognize that?

22     A   Yes.

23     Q   Can you tell us where that came from?

24     A   This was recovered from a System Restore Point.

25     Q   Okay.  What is a System Restore Point?
```

```
1    A   My understanding is that it is basically a backup of the
2    computer.
3           So that if something goes wrong, maybe you get a
4    virus or something breaks, you can just roll back to that
5    System Restore Point.  It's a feature of Windows.
6    Q   And would a System Restore Point restore portions of files
7    that had been deleted and so forth?
8    A   It could, I suppose.
9    Q   Okay.  And would it recover things that might otherwise go
10   missing during the course of a computer being operated by a
11   user?
12   A   It could, yes.
13   Q   Okay.  And what did the restore point's date reflect?
14   A   I believe it was April 21st, 2015.
15   Q   And is this a true and correct print of the recovery of
16   that particular item from the System Restore Point?
17   A   Yes.
18          MR. KOEHLER:  Move to admit 187.
19          MS. PLOMIN:  No objection.
20          THE COURT:  Exhibit 187 is admitted.
21      (Exhibit No. 187 admitted in evidence.)
22   BY MR. KOEHLER:
23   Q   Can you tell us what this particular string relates to
24   from the restore point?
25   A   Taken all together, this shows that the user attempted to
```

1    access a YouTube video.  And we can see that the URL of the

2    YouTube video and its full title are in the last string.  The

3    title of that video being ISIS video:  Flames of War.  Full

4    Film.

5            So the other strings show that in order to get to

6    that page, that user had to first click on a dialogue box that

7    appears on YouTube when an item like a video has been deemed

8    controversial or graphic.  So --

9    Q   Let's slow down.  And I want you to circle the portion of

10   the string that shows that the person had to go through that

11   dialogue box.

12   A   Yes.  (Indicating)

13   Q   And is that where it says:  Verify_controversy.

14   A   Yes.

15   Q   Okay.  And did the person have to do that more than once?

16   A   They also had to go through a dialogue that -- in which

17   they had to attest that they were of an appropriate age to

18   watch a graphic or mature video.

19   Q   Okay.  And coming from the right side of the screen, can

20   you draw an arrow to that?

21   A   (Indicating)

22   Q   And does that string reflect that the person, in fact, did

23   click through to that full video?

24   A   Yes.  So here I will underline where it says

25   "has_verified=1"

1    Q    And when you see the "one" there, is that binary code?

2    A    I believe so, yes.

3    Q    Ms. Vaughan, during your work for the FBI, have you become

4    familiar with a video known as Flames of War?

5    A    Yes.

6    Q    And have you seen that video?

7    A    I have not seen it, no.

8    Q    Okay.

9    A    But I am aware of it.

10   Q    And do you know who released the video?

11   A    The Islamic State.

12   Q    During your view of the Acer Aspire computer, did you look

13   at access logs on the computer to see when the computer was

14   last used?

15   A    I did a review of all of the files to see what the very

16   most recent access date was, yes.

17   Q    And what was the most recent access date that you observed

18   on the Acer Aspire laptop?

19   A    May 30, 2015.

20   Q    So the end of May of 2015.

21        And did you also analyze a Nextbook tablet computer?

22   A    Yes.

23   Q    And did you assess who the user was of the Nextbook tablet

24   computer?

25   A    Yes.

1    Q    And how did you assess the identity of the user of that

2    particular item?

3    A    For that item it was processed with a -- what's called a

4    Cellebrite device that creates a report.

5            And one of the categories in the report is what

6    accounts are configured -- like the device is configured to

7    use, such as e-mail accounts, Google accounts, and so forth.

8    Q    And did that advice -- device -- excuse me -- show access

9    to the gitrdonemoving@gmail.com account?

10   A    Yes, I believe so.

11           MR. KOEHLER:  Your Honor, may I approach the clerk?

12   I want to verify that I brought exhibits up there.

13           THE COURT:  Go right ahead.

14           MR. KOEHLER:  Thank you.

15           Your Honor, may I approach the clerk again, Your

16   Honor?

17           THE COURT:  Yes.

18   BY MR. KOEHLER:

19   Q    I'm going to show you what's been marked for

20   identification as Exhibit No. 450.  Do you recognize that?

21   A    Yes.

22   Q    What is that?

23   A    It is an image that says Git-r-Done.  Exclamation point.

24   Q    Did that come from the Nextbook tablet?

25   A    Yes.

```
 1                MR. KOEHLER:  Move to admit 450.

 2                MS. PLOMIN:  No objection.

 3                THE COURT:  450 is admitted.

 4          (Exhibit No. 450 admitted in evidence.)

 5                THE COURT:  We have all read it, Mr. Koehler.

 6     BY MR. KOEHLER:

 7     Q   I'm now placing Exhibit 451.  Do you recognize that?

 8     A   Yes.

 9     Q   Is that also an image that came off of the Nextbook

10     tablet?

11     A   Yes.

12                MR. KOEHLER:  Move to admit 451.

13                THE COURT:  Is there any objection?

14                MS. PLOMIN:  No, Your Honor.

15                THE COURT:  You said -- okay.  451 is admitted.

16          (Exhibit No. 451 admitted in evidence.)

17     BY MR. KOEHLER:

18     Q   Now, going to Exhibit 452.  Is that also an image from the

19     Nextbook tablet?

20     A   Yes.

21                MR. KOEHLER:  Move to admit 452.

22                MS. PLOMIN:  No objection.

23                THE COURT:  452 is admitted.

24          (Exhibit No. 452 admitted in evidence.)

25     BY MR. KOEHLER:
```

```
1    Q    Now, moving on to 453.  Ms. Vaughan, is that also from the

2    Nextbook tablet?

3    A    Yes.

4              MR. KOEHLER:  Move to admit 453.

5              MS. PLOMIN:  No objection.

6              THE COURT:  453 is admitted.

7         (Exhibit No. 453 admitted in evidence.)

8    BY MR. KOEHLER:

9    Q    Now, moving to 454.  Is that also from the Nextbook

10   tablet?

11   A    Yes.

12             MR. KOEHLER:  Move to admit 454.

13             MS. PLOMIN:  No objection.

14             THE COURT:  454 is admitted.

15        (Exhibit No. 454 admitted in evidence.)

16   BY MR. KOEHLER:

17   Q    Now, moving on to 455.  Is this likewise an image from the

18   Nextbook tablet?

19   A    Yes.

20             MR. KOEHLER:  Move to admit 455.

21             MS. PLOMIN:  No objection.

22             THE COURT:  455 is admitted.

23        (Exhibit No. 455 admitted in evidence.)

24   BY MR. KOEHLER:

25   Q    I would like to now direct your attention to Exhibit 456.
```

1    Is that likewise an image from the Nextbook tablet?

2    A   Yes.

3             MR. KOEHLER:  Move to admit 456.

4             MS. PLOMIN:  Your Honor, we object on the grounds of

5    relevance and overly inflammatory.

6             THE COURT:  I'll reserve ruling on 456.

7    BY MR. KOEHLER:

8    Q   457.  Is that also from the Nextbook tablet?

9    A   Yes.

10            MR. KOEHLER:  Move to admit 457.

11            MS. PLOMIN:  No objection.

12            THE COURT:  457 is admitted.

13        (Exhibit No. 457 admitted in evidence.)

14   BY MR. KOEHLER:

15   Q   Now, moving on to 458.  Do you recognize that?

16   A   Yes.

17   Q   Is that also from the nextbook tablet?

18   A   Yes.

19            MR. KOEHLER:  Move to admit 458.

20            MS. PLOMIN:  No objection.

21            THE COURT:  458 is admitted.

22        (Exhibit No. 458 admitted in evidence.)

23   BY MR. KOEHLER:

24   Q   Have you seen the individual depicted in that photo

25   before, Ms. Vaughan?

1    A    Yes.

2    Q    What is that person's name?

3    A    His name is Hakimullah Mesud.

4    Q    Do you know who that person was?

5    A    He was a former leader of the Pakistani Taliban.

6    Q    Now, moving on to 459.  Do you recognize that?

7    A    Yes.

8    Q    Is that also from the Nextbook tablet?

9    A    Yes.

10            MR. KOEHLER:  Move to admit 459.

11            MS. PLOMIN:  No objection.

12            THE COURT:  459 is admitted.

13        (Exhibit No. 459 admitted in evidence.)

14   BY MR. KOEHLER:

15   Q    There appears to be an object on the right side of the

16   photo, black and white.  At a higher resolution, were you able

17   to see what that object is?

18   A    There was no higher resolution available but it looks very

19   much like an Islamic State flag.

20   Q    Now, jumping up to 467.  Do you recognize that?

21   A    Yes.

22   Q    Is that also from the Nextbook tablet?

23   A    Yes.

24            MR. KOEHLER:  Move to admit 467.

25            MS. PLOMIN:  No objection.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5    2-23-16

```
 1                THE COURT:  467 is admitted.

 2         (Exhibit No. 467 admitted in evidence.)

 3    BY MR. KOEHLER:

 4    Q    And can you tell us what this comes from, Ms. Vaughan?

 5    A    This is an eBook that -- if I remember correctly, is

 6    associated with the Google account gitrdonemoving@gmail.com.

 7    Q    And so when you say "eBook," what is an eBook?

 8    A    It's a .pdf version, a digital version of a book.

 9    Q    Now, looking at 468.  Is that also from the Nextbook

10    tablet?

11    A    Yes.

12                MR. KOEHLER:  Move to admit 468.

13                MS. PLOMIN:  No objection.

14                THE COURT:  468 is admitted.

15         (Exhibit No. 468 admitted in evidence.)

16    BY MR. KOEHLER:

17    Q    Is this likewise an eBook from the Nextbook tablet?

18    A    Yes.

19    Q    What is the title of the eBook?

20    A    It's entitled the Origins Of The Islamic State.

21    Q    And now Exhibit 469, is that also an image from the

22    Nextbook tablet?

23    A    Yes.

24                MR. KOEHLER:  Move to admit 469.

25                MS. PLOMIN:  No objection.
```

1              THE COURT:  469 is admitted.

2         (Exhibit No. 469 admitted in evidence.)

3     BY MR. KOEHLER:

4     Q   In the lower right-hand corner there's the word "Quetta."

5     Do you see that, Ms. Vaughan?

6     A   Yes.

7     Q   Are you familiar with a place called Quetta?

8     A   Yes.  That's a city in Pakistan.

9              MR. KOEHLER:  Your Honor, I'm through going through

10    the exhibits that I can with the witness at this point.

11             I think there are a couple of foundational items we

12    may need to clean up.  And with the exception of those items,

13    I have no further questions for the witness at this point.

14             THE COURT:  Thank you.

15             Ladies and gentlemen, we'll take our lunch break.  We

16    will reconvene at 1:30.

17             You are reminded of the admonition not to discuss the

18    case among yourselves or with anyone else.

19             Please do not form any conclusions about the case

20    until you've heard all the evidence and begun your

21    deliberations.

22             Court is in recess until 1:30.

23         (Recess taken at 12:08 p.m.; resumed at 1:32 p.m.)

24             THE COURT:  I wanted to be sure you were all getting

25    your exercise.  That's why you had to get up twice.

1           Please sit down.  The record will show the presence

2    of the jury, counsel, and the defendant.

3           Ladies and gentlemen, over the lunch hour one of the

4    jurors indicated that she was a little bit uncomfortable

5    sitting for as long as we have to sit here.  And I suggested

6    to her and I'm going to suggest to the rest of you that if any

7    of you need to just stand up during the trial for a few

8    minutes just to stretch your back, it will not disturb anyone

9    or distract anyone.

10          So feel free to do that because I know that for some

11   people it can be uncomfortable to sit for an hour-and-a-half

12   at a time and not have the ability like you do in your

13   workplace to stand up and move around a little bit.

14          Let's continue with Ms. Vaughan's testimony.  Cross.

15          Now, let me just clarify for a moment.

16          Have you completed all of your direct examination of

17   Ms. Vaughan or are you intending to recall her later?

18          We had that discussion and I wasn't sure how it

19   resolved.

20          MR. KOEHLER:  I'm intending to recall her later, Your

21   Honor, because I found out right before she resumed the stand

22   this morning that there were some computer problems that

23   prevented her from comparing specific audio exhibits with

24   audio that came off of --

25          THE COURT:  Just the ones that you just -- the few

```
1    that you spoke about on direct?

2              MR. KOEHLER:  That's correct.

3              THE COURT:  And so it would just be for that purpose?

4              MR. KOEHLER:  That's correct.

5              THE COURT:  Okay.

6              Cross then, Ms. Plomin.

7              MS. PLOMIN:  Thank you.

8                        CROSS EXAMINATION

9    BY MS. PLOMIN:

10   Q   Good afternoon, Ms. Vaughan.

11   A   Good afternoon.

12   Q   Ms. Vaughan, I just want to make it very clear for the

13   jury which devices you analyzed and what you found on them.

14         Now, is it fair to say that you analyzed 15

15   electronic devices that were found either in Mr. Abdul

16   Kareem's truck or his house?

17   A   I don't remember the exact count, but there was certainly

18   a large number of devices, yes.

19   Q   And did you prepare a report for this case?

20   A   Yes, for most, but not all of these devices.

21   Q   And did you prepare a report including the Acer laptop?

22   A   Yes, I did.

23   Q   All right.  And that was found in Mr. Kareem's apartment,

24   correct?

25   A   Yes.
```

1   Q   All right.  And did you prepare a report analyzing the RCA

2   laptop?

3   A   A tablet.

4   Q   Yes.

5   A   Yes.

6   Q   And that was found in Mr. Kareem's truck, correct?

7   A   Yes.

8   Q   And there was also an iMac desktop that was found in

9   Mr. Kareem's apartment, correct?

10  A   Yes.

11  Q   And finally, a Nextbook tablet; is that correct?

12  A   Yes.  I did not write a report on that device.

13  Q   Did you prepare a report on January 22, 2016?

14  A   Could you be more specific?

15          THE COURT:  Why don't you show it to her on the

16  screen and maybe that will allow her to recognize it.

17  BY MS. PLOMIN:

18  Q   I'll show you the first page of it.

19          Is that your report?  Do you recognize it?

20  A   Yes.  I assisted in the preparation of this report.

21  Q   And who did you assist in the preparation of this report?

22  A   Special Agent Whitson.

23  Q   Were you the -- is it safe to say you were the computer

24  analyst that participated in creating this report and the only

25  computer analyst?

1    A   Yes.

2    Q   I would like to show you Bates 2067.  It's a Bates-stamped

3    copy.  Is that a portion of your report prepared on January

4    22, 2016?

5    A   Yes.

6    Q   And does that relate to the Nextbook tablet that was found

7    in Mr. Abdul Kareem's moving truck?

8    A   Yes.

9    Q   All right.  So, in fact, you did include in one of your

10   reports an analysis of the Nextbook tablet, correct?

11   A   Yes.  There was another analysis that was done by another

12   analyst that wasn't me, but I helped to prepare that report

13   and the other analyst did not.

14   Q   Okay.  So you didn't analyze the Nextbook tablet?

15   A   I examined it.  I just did not write the final report.

16   Q   All right.  So you examined it and you did include

17   portions of that in your report?

18   A   Yes.

19   Q   And who was that other analyst?

20   A   Her name is Jessica Maxwell.

21   Q   Maxwell?

22   A   Yes.

23   Q   And are you aware whether she prepared a report?

24   A   Yes, she did.

25   Q   Okay.  Now, you testified at some length yesterday about

1   the hard drive on what's been called the tower computer,

2   correct?

3   A   Yes.

4   Q   And that was found in Mr. Simpson and Mr. Soofi's

5   apartment, correct?

6   A   Yes.

7   Q   And when you analyzed that, you analyzed to look for any

8   other users of the device, correct?

9   A   Yes.  That would be part of my analysis.

10  Q   Look for people who logged in on their e-mail, correct?

11  A   Sure.

12  Q   And who logged into Google accounts?

13  A   Sure.

14  Q   Any other kind of indicators that you look for?

15  A   Well, there's many different types of accounts like forum

16  accounts or accounts on social media, things like that would

17  have been included in my analysis.

18  Q   All right.  Social media like Twitter?

19  A   Yes.

20  Q   And it wouldn't be social media but YouTube?

21  A   Yes.

22  Q   And when you analyzed the tower laptop -- or desktop, I'm

23  sorry -- hard drive that was found in Mr. Simpson and

24  Mr. Soofi's apartment, you found nothing relating to Mr. Abdul

25  Kareem, correct?

1   A    I don't believe so.

2          May I refer to my report?

3   Q    Please.

4          Can you tell us which report you're referring to to

5   refresh your recollection?

6   A    I'm going to look at a report I have on Internet Activity

7   Analysis and then another report that is entitled

8   Comprehensive Analysis of QPX2, 3 and 4.

9          And the question was whether or not there was

10  anything indicating that Mr. Kareem had accessed that

11  computer?

12  Q    Yes.  Whether he was a user on the computer.

13  A    No.  I don't think so.

14  Q    So there is no indication that Mr. Kareem had used that

15  computer according to your forensic analysis?

16  A    No.

17  Q    Now, you testified yesterday about the items found in the

18  tower computer and for a short time this morning.

19         And I just want to ask you:  In comparison between

20  the tower computer that was found in Mr. Simpson and Soofi's

21  apartment and the multiple devices that you analyzed relating

22  to Mr. Abdul Kareem, okay?

23         Now, you testified that you found photographs of --

24  various photographs of ISIS flags in the tower computer and

25  also Mr. Soofi's laptop, correct?

1    A    Yes.

2    Q    And you found nothing like that, you found no ISIS flags

3    in any of Mr. Kareem's four devices that you analyzed?

4    A    On the Nextbook tablet there was a picture that appeared

5    to contain an ISIS flag.

6    Q    Let me actually pull that up.

7         I'm showing you Government's Exhibit 459 and I'm

8    going to point to it.  Are you speaking about that image in

9    the background that I'm pointing to?

10   A    Yes.

11   Q    In the right-hand corner of the photograph?

12   A    Yes, I am.

13   Q    Okay.  And I want to ask you:  This image was found in the

14   Nextel computer that you wrote a short amount in your report,

15   correct?

16   A    Yes.

17   Q    And the image is extremely pixilated.

18        How did you view that image -- how did you view that

19   image when you viewed it in the image of the computer?

20   A    It was extracted in the Cellebrite report.  So we saw

21   an -- actually a smaller version of it in that report.

22   Q    And what do you mean by "a smaller version" of it?

23   A    It was -- that exhibit has been enlarged, I believe.

24   Q    So if you were to be looking into the computer, what would

25   the image actually look like?  Would it be a thumbnail image?

1    A    Something like that, yes.

2    Q    And what is a thumbnail image?

3    A    It's a smaller version of another picture, usually for

4    quick displaying, say, in a -- like file explorer-type

5    situation.

6    Q    All right.  And aside from that one image in the four

7    computers and the one cell phone that you analyzed of Mr.

8    Abdul Kareem, you found no pictures of an ISIS flag, correct?

9    A    No.

10   Q    And you found no pictures of an ISIS leader?

11   A    I would have to refer to my report for that.

12   Q    Please do.

13   A    According to my report, on the Lenovo that was acquired in

14   2015, there was a report of an ISIS leader.

15   Q    From September 11, 2014; is that right?

16        Or, I'm sorry, November of 2014, correct?

17   A    Yes.

18   Q    Okay.  And are you aware that computer was no longer in

19   Mr. Abdul's Kareem's possession at that time?

20   A    Yes.

21   Q    So in terms of any time you're aware that a device was in

22   Mr. Abdul Kareem's possession, you never found a picture of an

23   ISIS leader, correct?

24   A    No.

25   Q    And there were no photographs in any of Mr. Abdul Kareem's

1   devices depicting any beheadings or preparations for a

2   beheading, correct?

3   A    Other than the one that we just looked at, I don't believe

4   so, no.

5   Q    And there were no -- I want to point out Government's

6   Exhibit 286.  You located that image on two devices.  Which

7   devices were those?

8   A    It was the laptop recovered from Mr. Soofi's apartment

9   and -- let me make sure I have the right one.  I'm fairly

10  certain it was the tower computer from Mr. Soofi's apartment

11  as well.

12  Q    Okay.  And you did not locate that image on any of Mr.

13  Abdul Kareem's devices, correct?

14  A    No.

15  Q    You did not locate any images of people who had been

16  kidnapped by ISIS on any of Mr. Abdul Kareem's devices,

17  correct?

18  A    Correct.

19  Q    You did not locate Dabiq Magazine or any other ISIS

20  magazines on any of Mr. Abdul Kareem's -- or magazines issued

21  by ISIS on any of Mr. Abdul Kareem's devices, correct?

22  A    Correct.

23  Q    I just want to go through some of the devices you

24  analyzed.

25          You mentioned a Lenovo laptop.  The Lenovo laptop,

1  you said you examined an image from 2015; is that correct?

2  A   Yes.

3  Q   Okay.  And are you aware that that Lenovo laptop was

4  seized in a raid of an apartment or a house on Vista Street

5  where Mr. Abdul Kareem, Mr. Simpson, and Mr. Abubaker Ahmed

6  lived on July 20th of 2011?

7  A   Yes.  I'm aware of that.

8  Q   And it was seized by the FBI, correct?

9  A   Yes.

10  Q   And the FBI did not contact Mr. Abdul Kareem until January

11  of 2014 to potentially return that laptop, that Lenovo laptop

12  to him, correct?

13  A   I can't attest to that.

14  Q   And is it your understanding he then gave that laptop to a

15  man by the name of Sergio Martinez?

16  A   That's what I have been told, yes.

17  Q   And in your analysis of the Lenovo laptop, you said you

18  looked at an image from 2015.  But aside from the images you

19  found as late as November of 2014, all of your analysis of the

20  Lenovo laptop was from back in 2012 prior to the FBI seizing

21  the Lenovo laptop, correct?

22  A   I'm sorry.  That was a little bit confusing.

23  Q   Okay.  Well, in your report at pages -- Bates-stamped

24  pages 2056 through 2066 -- and this is your January 22, 2016

25  report?

```
 1    A    I'm sorry.  Can you remind me of which one that is?

 2            As you can see, I've got a pretty big stack of

 3    reports here.

 4    Q    Yes, you do.

 5            THE COURT:  It's that one from last month that you

 6    said you helped in the preparation of.

 7            THE WITNESS:  Oh, yes.  The 302, yes.

 8            THE COURT:  So what is your question?

 9    BY MS. PLOMIN:

10    Q    So in that report, the items that you noted were all from

11    January -- were all from 2012, aside from one item or two

12    items in November of 2014, correct?

13    A    In this 302 concerning specifically the Lenovo?

14    Q    Yes.

15    A    Let me make sure.

16            No.  These items were discovered in the 2015 review

17    of this Lenovo.

18    Q    My question is:  The items that you noted were either

19    accessed or viewed in 2012?

20    A    Oh.  Yes.  I believe that's correct.

21    Q    Now, concerning the Lenovo, you mentioned that you looked

22    to see other users on the computer in order to determine who's

23    using the computer, correct?

24    A    Correct.

25    Q    You found evidence logging in of an e-mail address
```

1  ibrahimibrahim602@gmail.com on that Lenovo laptop, correct?

2  A   I think I discovered that in my 2012 review of the device.

3  Q   Did you look for other users of the computer in 2015?

4  A   For the 2015 review it was done in a somewhat different

5  fashion, so that it was Agent Whitson who reviewed the

6  Internet history which would have shown that and not me.

7  Q   I'm sorry.  Agent Whitson and not you?

8  A   Yes.  So that information, if it was there, would have

9  been in the Internet history and I did not review the Internet

10  history at that time in 2015.

11  Q   Okay.  So in 2015 did you look to see who else might have

12  been using the laptop back in 2012 when you noted items that

13  you thought were of interest to you?

14  A   Yes.  But I was not as involved as extensively in this

15  one, so it was mostly reviewing files and not Internet data.

16  Q   Okay.  So did you personally look for other users on the

17  Lenovo back in 2012?

18          THE COURT:  She means:  Did you look in 2015 for

19  other users using it in 2012?

20          THE WITNESS:  Well, I wasn't -- since I wasn't

21  reviewing the Internet items where that would have been, I

22  wasn't specifically looking for it.

23          I mean, I would have been aware of that and if I had

24  found it, it would be noted.

25  BY MS. PLOMIN:

1    Q    Okay.  Now, when you testified on direct, you discussed

2    two items that were located in the Lenovo back when you

3    reviewed an image of it back in 2015 and there were two items.

4         The first one was an image and you couldn't recall

5    what that was.  It was an image where -- with the words

6    "apocalypse" on it.  Do you recall that?

7    A    Yes.  I recall that.

8    Q    Okay.  And are you aware that's a video game?

9    A    I have since looked that up and found that, yes.

10   Q    So that is no indication of extremist kind of propaganda,

11   correct?

12   A    No.  Although it is interesting, because there is no other

13   record of accessing that video game on the device.

14   Q    Okay.  And are you aware that Sergio Martinez allowed his

15   children to use his laptop -- or the Lenovo laptop once it was

16   given to him?

17   A    I was not aware of that.

18   Q    Could you tell when that video game was played on the

19   Lenovo?

20   A    I could not find any sign that the video game was played

21   on the Lenovo.

22   Q    And the only other item that you testified to that you

23   found in the image of the Lenovo was a GIMF Security Course,

24   correct?

25   A    Correct.

1   Q   And what does GIMF stand for?

2   A   Global Islam Media Front.

3   Q   And that was found in the Recycle Bin of the Lenovo?

4   A   Yes.

5   Q   Are you aware that there was also a flash drive that was

6   inserted into the Lenovo when the FBI seized it back in 2012?

7   A   Yes.  I'm aware of that.

8   Q   Can you briefly tell the jury how a flash drive works so

9   we can be clear?

10  A   I will do my best.

11          A flash drive or some other kind of mobile storage,

12  it's a small device that you plug into a computer and you can

13  put files on it and then remove it and transfer them to

14  another computer.

15  Q   So it's essentially a storage device?

16  A   Yes.  That's correct.

17  Q   And all of the files on a flash drive have to come from a

18  computer, correct?

19  A   Correct.

20  Q   All right.  And are you aware that the items were loaded

21  onto the flash drive -- I'm sorry -- the GIMF document was

22  also on the flash drive?

23  A   Yes.

24  Q   And are you aware that it was loaded onto the flash drive

25  on April 19, 2012?

1  A   I can't recall specifically, but that sounds correct.

2  Q   All right.  And then it was sent to the Recycle Bin on the

3  Lenovo laptop on April 20, 2012?

4  A   Yes.  That's correct.

5  Q   Okay.  And do you know how that document --

6        Tell me.  The GIMF Security Course, was that a

7  document?  Was that a book?  Was that an online magazine?

8  A   It's a .pdf file.  I suppose you could say it's a book.

9  Q   Okay.  Do you know how long it was?

10  A   It's -- I don't recall, no.

11  Q   Okay.  And do you know how it got onto the Lenovo laptop?

12  A   I can't say.

13  Q   All right.  So you don't know if it was sent in an e-mail

14  to somebody and then downloaded onto that computer, correct?

15  A   I couldn't tell that, no.

16  Q   And you don't know if it was loaded on from the flash

17  drive onto that computer, correct?

18  A   I couldn't tell that, no.

19  Q   And would it be a plausible scenario that it was sent to

20  somebody on an e-mail or downloaded from the Internet onto the

21  desktop of the Lenovo, put onto the flash drive, and then sent

22  into the Recycle Bin?

23  A   Certainly.

24  Q   Okay.  And did you yourself conduct a search or an

25  analysis of the flash drive that was inserted into the Lenovo?

1   Did you yourself conduct that analysis back in 2012?

2   A   I did.

3   Q   And did you note that in this same report in the January

4   22nd report of 2016?  It's a 302 report.

5           Did you discuss that in that report?

6   A   I don't believe so.  Let me check.  I may be

7   misremembering.

8           Yes.  It is there.  It's the last item.

9   Q   Now, I just want to clarify.  Are you aware that another

10  laptop computer was seized in the same room that

11  Mr. Simpson -- Mr. Abdul Kareem shared with Mr. Simpson back

12  in 2012?

13  A   Yes.  I believe there were four or five computers seized

14  from that residence.

15  Q   And there was an HP laptop that was seized from the same

16  room that Mr. Abdul Kareem shared with Mr. Simpson.  Are you

17  aware of that?

18  A   I don't remember specifically what the device models were,

19  where they were in the room when they were seized.

20  Q   Did you prepare a report on September 7, 2012, regarding

21  the various devices that were seized in the Vista residence in

22  2012?

23  A   Yes, I did.

24  Q   Do you have that report here with you today?

25  A   I believe so.  Let me pull it out.

1    Q    You noted five computers that were seized that you

2    analyzed, correct?

3    A    Correct.

4    Q    And I want to turn your attention to computer No. 3 as you

5    have listed in your report?

6    A    All right.

7    Q    And does that refer to the HP laptop that was found in the

8    Vista residence?

9    A    Yes, it does.

10   Q    And when you analyzed that computer, did you reach a

11   conclusion as to who you determined the likely user of that

12   laptop was?

13   A    Yes, I did.

14   Q    And who was that?

15   A    Elton Simpson.

16   Q    Okay.  And we'll go back to that, but that's the HP

17   laptop?

18   A    Correct.

19   Q    Okay.  Now, I want to go back to the flash drive that was

20   inserted into the Lenovo computer back in 2012.  All right?

21        Now, on that flash drive the GIMF Security Course

22   that you found in the Recycle Bin of the Lenovo was also on

23   the flash drive, correct?

24   A    Yes.

25   Q    Okay.  And that same document was also on the HP laptop?

1    A    Yes, it was.

2    Q    Okay.  And I want to talk about some other documents

3    located on the flash drive.  Okay?

4         And these are documents that you noted in your

5    report?

6    A    Yes.

7    Q    Okay.  There's a document called SlicingTheSword.pdf,

8    correct?

9    A    Yes.  That's correct.

10   Q    And that was on just the Lenovo -- I'm sorry -- on the

11   thumb drive, correct?

12   A    Yes.

13   Q    And that was also on Elton Simpson's HP computer, correct?

14   A    Yes, it was.

15   Q    And that was not on the Lenovo laptop?

16   A    No.  It was not.

17   Q    There is another .pdf you found important:  To Make it

18   Known to People and Not to Hide It.  And that was on the flash

19   drive, correct?

20   A    Yes.

21   Q    And that was also on Mr. Simpson's HP laptop, correct?

22   A    One moment.  Yes, it was.

23   Q    And that was not on the Lenovo laptop attributed to Mr.

24   Abdul Kareem, correct?

25   A    No.

1   Q    And there was another .pdf -- can you explain what a .pdf

2   is?

3   A    Yes.  It's an Adobe proprietary format for displaying

4   documents.

5   Q    So that would be a document format, correct, if ".pdf" was

6   at the end of it?

7   A    Yes.

8   Q    And there is document entitled a treatise by Sheikh Nasser

9   Al-Fayed, A Treatise on the Legal Status of Using Weapons of

10  Mass Destruction Against the Infidels, correct?

11  A    Yes.

12  Q    And that was on the thumb drive?

13  A    Yes.

14  Q    And that was also on Mr. Simpson's computer that was

15  seized in 2012, the HP computer, correct?

16  A    Yes, it was.

17  Q    And that was not anywhere on the Lenovo laptop when you

18  analyzed it, the image of it in 2015?

19  A    No.

20  Q    Now, turning to 2015 again.  I want to talk about the

21  tower computer that you attributed to Mr. Simpson and

22  Mr. Soofi that was found in Mr. Simpson's and Soofi's

23  apartment.

24          Now on that computer there was also the same GIMF

25  document found on that computer, correct?

```
 1              I'm sorry.  Let me withdraw and ask you an easier
 2      question.
 3              In terms of all the photos and screenshots that you
 4      testified to yesterday that came from the Simpson and Soofi's
 5      desktop computer, were you able to determine a date of any of
 6      those photographs.
 7      A   Some of them, yes.
 8      Q   Okay.  And if you were able to determine it, did you
 9      testify to it already?
10      A   I don't believe I did.
11      Q   Okay.  Do you recall which photographs that you were able
12      to determine a date on?
13      A   We're still speaking about the tower computer, yes?
14      Q   Yes, ma'am.
15      A   I have a very large spreadsheet here which contains a
16      number of dates for a significant number of files.
17              Is there any specific file that you would like to
18      know about?
19      Q   We can get back to that.
20              Is there a way to determine how a photograph gets
21      onto the computer?  Did they download it from the Internet?
22      Can you determine from looking at the image how it got onto
23      the computer?
24      A   From the image itself?  Not usually, no.
25      Q   What are the possible ways it could get onto a computer?
```

1    A    You could download it from the Internet.

2         You could view it on a website and have that be

3    temporarily saved in your browser cache.

4         You could receive it in an e-mail.

5         You could take it off of a flash drive.

6         You could create one.

7         I think those are the most common ways of acquiring

8    an image.

9    Q    And is there a difference between a thumb image that's

10   found and an image that isn't pixilated the way that a thumb

11   image is found?

12   A    You mean the thumbnail images?

13   Q    Yes.

14   A    Typically, thumbnail images are created automatically from

15   the larger image, so they should have the same content.

16   Q    Now, when you analyzed the tower computer found at Simpson

17   and Soofi's apartment, did you prepare a report on that?

18   A    Yes, I did.

19   Q    Okay.  And I'm referring to a report prepared on February

20   6, 2016.  Do you have that in front of you?

21   A    Is this the one entitled Comprehensive Analysis of QPX2,

22   3, and 4?

23   Q    Yes.

24   A    Yes.  I have it.

25   Q    Now, there's a section in your report where you refer to

1    weapons purchases on that tower computer, correct?

2    A    Yes, there is.

3    Q    Okay.  You document seven different items that you found

4    of interest in terms of weapons purchases on the tower

5    computer, correct?

6    A    Yes.

7    Q    And can you describe for us each of those items that you

8    found?

9    A    Certainly.  There is an e-mail dated February 8, 2015,

10   from Midway USA for -- it's like a receipt, I believe, for a

11   ProMag magazine.

12          There is an e-mail dated February 8, 2015, from

13   Atlantic Firearms which confirms their registration of a

14   profile for Nad Soofi.

15          There is an e-mail dated February 18, 2015, from eBay

16   confirming shipment of a Jiminez Arms 9 millimeter magazine.

17          There is an e-mail on February 18, 2015, from eBay

18   confirming shipment of a 10-round Mag clip.

19          There is an e-mail dated November 21, 2013, from a

20   merchant called Grab A Gun confirming a purchase of a ProMag

21   Glock magazine.

22          There is an e-mail dated February 8, 2015, from

23   Midway USA for -- containing a receipt for a ProMag Luger

24   magazine.

25          And lastly, there is an e-mail dated February 8,

1    2015, to Atlantic Firearms from Mr. Soofi asking them to add

2    his apartment number to the shipping info for -- presumably

3    for an order that he has just made.

4    Q   Okay, thank you.

5           And I just want to be clear.  Moving to the laptop,

6    the Inspiron laptop attributed to Mr. Soofi.

7           Did you look on that Inspiron laptop for any other

8    users of that laptop?

9    A   I don't recall specifically going out of my way to do so,

10   but certainly I was on the lookout for it.  And I don't recall

11   finding any such traces.

12   Q   Okay.  You didn't find any such traces of Mr. Abdul Malik

13   Abdul Kareem on that laptop at all, correct?

14   A   No.

15   Q   Now, I want to go to Mr. Abdul Kareem's devices that were

16   recovered in 2015; the Acer, the RCA, the Nextbook, the iMaC,

17   and his Maxwest phone.

18          You did not locate any of these weapons-related

19   purchases on any of those devices, correct?

20   A   Not those, no.

21   Q   Okay.  Now, let's turn specifically to the Acer Aspire

22   laptop located in Mr. Abdul Kareem's apartment.  Okay?

23          Are you aware that it was located in his apartment

24   face down on a desk with no power charger?

25   A   I was not aware of that, no.

1    Q   All right.  Are you aware that no modem was located in

2    that apartment to access the Internet?

3    A   Do you mean such as one would use to connect to the

4    Internet service provider?

5    Q   Yes.

6    A   I was not aware of that.

7    Q   All right.  Now, when you examined the Acer Aspire laptop,

8    you located several other users of that laptop; is that

9    correct?

10   A   I found traces of one other user that no longer existed.

11   Q   Okay.  Well, let's go back.

12           Did you find a login for Hyman Abdul Khabir for a

13   gmail.com?

14   A   I don't recall that.

15   Q   Did you find a user Laura?

16   A   I don't recall that.

17   Q   Can you turn to page 5 of 39 of your report on January 22,

18   2016.

19   A   Yes, I have that.

20   Q   Okay.  And the second line from the bottom.  Users.

21   Laura.  Downloads.  Does that refresh your recollection?

22   A   Oh, I'm sorry.  I totally misheard you.  I thought you

23   said "Abora" or "Agora" or something.

24   Q   Laura.

25   A   Laura.  Yes.  I did find traces of a user named Laura.

1   Q    Did you find a login for Ortiz Carlos on a gmail account?

2   A    I don't recall that.

3   Q    What about any Facebook logins?

4   A    I did see Facebook logins, but I could not identify who

5   they were for.

6   Q    You didn't find any Twitter accounts accessed, did you?

7   A    No.  However, I think the way that Twitter works now, you

8   wouldn't see it.

9   Q    But you did find evidence of Twitter activity on

10  Mr. Simpson and Mr. Soofi's computer?

11  A    Yes.

12  Q    And what was -- can you explain that?

13  A    There were visits to Twitter and there were -- there was a

14  screenshot of a phone that was accessing a Twitter account.

15  Q    And you didn't find that on the Acer laptop or any other

16  of Mr. Abdul Kareem's devices, correct?

17  A    No.

18  Q    Now, when you spoke about the video Flames of War on

19  direct, that is something that you located traces of in the

20  Acer laptop, correct?

21  A    Yes.

22  Q    Okay.  And that's the laptop we're talking about that was

23  found face down with no computer cord in Mr. Abdul Kareem's

24  apartment?

25  A    Yes.

1    Q    All right.  And you indicated that it was -- there was a

2    System Restore Point on April 21 of 2015, correct?

3    A    Yes.  That's when it was created.

4    Q    Okay.  And that could be if --

5              Does the system automatically restore?  Is that what

6    happens?

7    A    I think it automatically creates restore points, but it

8    would not automatically restore itself without some action

9    from the user.

10   Q    Okay.  And you can't with specificity say if or when that

11   video was viewed, correct?

12   A    I can only say that it was not viewed after 4/21.

13   Q    Okay.  So it could have been in 2014?

14   A    Obviously, it couldn't have been before the video was

15   published, so sometime in between those two dates.

16   Q    And the video was published when?

17   A    September 19, 2014.

18   Q    Okay.  And did you take a look at the Acer laptop to

19   determine whether Mr. Abdul Kareem had -- whether there were

20   any gaps in usage of the Acer laptop, let's say, from November

21   of 2014 through May of 2015?

22   A    Well, I wasn't specifically looking to graph his usage of

23   the machine but I did look at some evidence of usage.

24   Q    Okay.  You indicated there was a last date that the

25   computer was accessed, correct?

1    A    That would have been the absolute last time it was used or

2    turned on.

3    Q    But you did not look for a gap in usage?

4    A    No.

5    Q    Now, the RCA tablet that you looked at that was found in

6    Mr. Abdul Kareem's moving truck, you testified on direct that

7    there were essentially four pictures of note that you found in

8    that tablet, correct?

9    A    Yes.

10    Q    All right.  You didn't find any extremist material at all

11    of note to you in that RCA tablet?

12    A    I did find some YouTube searches that were of concern, but

13    they would not rise to the level of being directly connected

14    to terrorist activity.

15    Q    You didn't find any activity searching for ISIS, correct?

16    A    No.

17    Q    You didn't find any ISIS flags?

18    A    No.

19    Q    You didn't find any ISIS leaders?

20    A    No.

21    Q    You didn't find any evidence of beheadings?

22    A    No.

23    Q    You didn't find -- and this is an important question.

24         In all of Mr. Abdul Kareem's devices that you

25    analyzed, you didn't find any evidence prior to May 3rd of

1    2015 of the Draw Muhammad Contest in Garland, Texas?

2    A   No.

3    Q   And you didn't find any evidence of any interest in the

4    Charlie Hebdo attack in Paris, France, correct?

5    A   No, not that I can recall.

6    Q   And you didn't find any evidence in any of his devices of

7    searching for weapons purchases, correct?

8    A   I do recall searches about weapons but they did not seem

9    to be about purchasing weapons.

10   Q   Did you note that in your report?

11   A   I did not because it was not specific enough to really

12   merit any consideration on our part.

13   Q   Okay.  So nothing important to you?

14   A   No.  It was searches for merely like the word "gun" or

15   "firearm" which is not very specific at all.

16   Q   And in all of your analysis of Mr. Abdul Kareem's

17   computers, did you find any evidence that Mr. Abdul Kareem had

18   or accessed a Twitter account?

19   A   No.

20   Q   What about any social media that Mr. Abdul Kareem accessed

21   any social media?

22   A   I believe he had a GooglePlus account.

23   Q   And --

24           THE COURT:  What's GooglePlus?

25           THE WITNESS:  GooglePlus is a social network that was

1    launched by Google to work with Google accounts.

2            You may actually have a GooglePlus account if you

3    have Gmail already made for you.

4            It's very like Facebook where you have posts and you

5    can share things to your friends.  You have circles of friends

6    that you build and you can tailor your posts to different

7    circles.

8            THE COURT:  Thank you.

9    BY MS. PLOMIN:

10   Q   I just briefly want to ask you about the Nextbook computer

11   found in Mr. Abdul Kareem's moving truck.

12           Were you able to determine how long that computer had

13   been used or when it was initially used?

14   A   No.  I don't believe so.

15   Q   All right.  Would it be consistent with your findings that

16   that computer had only been used since the beginning of May?

17   A   I don't recall.

18   Q   Okay.  In any of the images that you testified to that

19   were found in the Nextbook computer, were you able to

20   determine a date that they were downloaded or actually somehow

21   put onto that computer?

22   A   That metadata was available, but I can't remember it off

23   the top of my head.

24   Q   Did you note it in any report?

25   A   I did not, no.

1    Q    In fact, you didn't note any of those images in your

2    January 22nd, 2016, report which is the report that you

3    prepared including the Nextbook -- or discussing the Nextbook

4    computer?

5    A    Yes.  That's correct.

6    Q    So what you're saying is that you can determine the date

7    that those were put on the Nextbook computer, those images,

8    but you don't know what they are sitting here today without

9    looking at something to refresh your recollection?

10    A    Yes.  That's true.

11    Q    All right.  Were you able to determine how any of those

12    images got onto the computer, if they were sent in an e-mail

13    or if they were viewed in a news article?  Do you have any

14    idea?

15    A    It is -- it is possible that some of that information

16    would be available on the Cellebrite report but I can't

17    specifically recall right now.

18    Q    So you didn't look for your testimony today how these

19    images that were put in by the government today found on the

20    Nextbook computer, you didn't look to see how they got onto

21    the computer?

22    A    Yes.  This is because I did not prepare the final report

23    on that.

24    Q    Who prepared the final report?

25    A    That was Jessica Maxwell as I mentioned earlier.

1    Q    But you're the one here testifying about it today,

2    correct?

3    A    Yes.  That's true.

4    Q    When did Jessica Maxwell prepare a report regarding the

5    Nextel computer?

6    A    It would have been around the same time that I prepared my

7    report about the Maxwest as we were conducting our views

8    simultaneously.

9    Q    About the Maxwest?

10   A    Yes.  I believe I wrote the report about the RCA tablet a

11   little bit later, but we were all reviewing those devices at

12   the same time, so sometime around that.

13   Q    Sometime around January 22nd of 2016?

14   A    I think so.  I'm not sure.

15   Q    Can you look at your report to determine the date of when

16   you prepared the report you're referring to?

17   A    On my reports I have had to remove the administrative

18   header because it's classified, so I don't have that

19   information on me.

20   Q    Okay.  I'm showing you the report that we have been

21   discussing, the January 22nd, 2016, report.

22        Does that refresh your recollection as to when you

23   prepared it?

24   A    No.  I'm sorry.  I was actually thinking of my other

25   report.

1    Q    What report are you referring to?

2    A    This is my personal review of the Maxwest.

3    Q    The Maxwest.  What is the Maxwest?

4    A    That is the SmartPhone that one -- one of the SmartPhones

5    that was recovered.

6         I apologize because I only know it as QPX4.

7    Q    Are you talking about the report encompassing the Maxwest

8    Gravity 5.5 SmartPhone?

9    A    Yes.  On my report it's titled Media Review of QPX4.

10   Q    Is that the report you're referring to?

11   A    Yes.

12   Q    Okay.  And so does that refresh your recollection as to

13   when that report was created?

14   A    Yes.

15   Q    January 19, 2016?

16   A    Yes.

17   Q    Okay.  And you believe that Jessica Maxwell prepared a

18   report on the Nextel computer around that time?

19   A    Nextbook tablet, yes.

20        I believe she finished her report a little before me,

21   but I don't recall specifically what date she serialized that

22   report.

23   Q    Now, in her report -- do you have her report there on the

24   stand with you?

25   A    I don't.  No.

1  Q    Okay.  Do you know if she examined or tried to ascertain

2  when these images on -- that are being attributed to Mr. Abdul

3  Kareem's Nextbook tablet -- when they were put onto the

4  computer?

5  A    She may have.  That information certainly would have been

6  available to her.

7  Q    And that may be in her report?

8  A    I know that she included screenshots of the images but I'm

9  not sure if she included the metadata.

10 Q    She included screenshots of the images in her report?

11 A    Yes.

12 Q    Of the images that were presented in court before this

13 jury today?

14 A    Yes.

15 Q    And do you know if she looked for the method by which

16 these images got onto the Nextbook tablet?

17 A    Since she reviewed the Internet history, she may well have

18 uncovered some of that information.

19 Q    And are you aware if she put that into her report?

20 A    I can't recall at this exact moment.

21 Q    So what you can say today only is that you --

22        Did you actually see these images in the image of Mr.

23 Abdul Kareem's Nextbook tablet?

24 A    Yes.  I did review the Cellebrite report.

25 Q    And the Cellebrite report.  And can you just explain how

1    you do that review and what it looks like?

2    A   So when the device is processed using the Cellebrite, it's

3    like a thing that you plug the phone into.

4            It creates a bigger part -- it's available in HTML

5    and Excel spreadsheet formats.  And there's different

6    categories that you can review that separates out specific

7    data types; so e-mails, SMS, internet history, things of that

8    nature.

9    Q   And you said you plugged the phone into -- but you're

10   talking about in this case the tablet?

11   A   Yes.  I'm sorry.  Mobile device.

12           And to clarify, I did not participate in the

13   extraction of any of these devices.  That is -- I'm not on the

14   CART team and that's a CART team function.

15   Q   Okay.  So you reviewed this report to look at the images,

16   correct?

17   A   Yes.

18   Q   And that's to the extent basically all that you did in

19   terms of the Nextbook tablet, correct?

20   A   Yes.

21           MS. PLOMIN:  Your Honor, I would like at this time to

22   reserve any future cross until we have received the Maxwell

23   report.

24           THE COURT:  Any redirect, Mr. Koehler?

25           MR. KOEHLER:  Yes, Your Honor.

1                        REDIRECT EXAMINATION

2    BY MR. KOEHLER:

3    Q   Ms. Vaughan, the reports that you refer to of your own and

4    of Ms. Maxwell, are those 302 reports?

5    A   No.  They are 1057s.

6    Q   They are what?

7    A   They are FD1057s.

8    Q   And what is that?

9    A   It's colloquially known as an "EC."

10   Q   And what does "EC" stand for?

11   A   Electronic communication.

12   Q   Okay.  And are those internal communications within the

13   FBI?

14   A   Yes.

15   Q   When you prepare your electronic communication of an

16   analysis of a device like you have done here, where does that

17   go?

18   A   It goes into our case file system which is called

19   Sentinel.

20   Q   And do the case agents use those ECs to aid them in

21   preparing the actual 302 report reporting the analysis of the

22   device?

23   A   Yes.  They do.

24   Q   Is that how your ECs were used?

25   A   Yes.

1    Q    And so would the content of your EC have been something

2    that would have been incorporated into the 302?

3    A    Yes, in whole or in part.

4    Q    And the January 22nd, 2016, report that was being used to

5    refresh your recollection, what kind of report is that?

6    A    That's a 302.

7    Q    And who prepared that?

8    A    Agent Whitson.

9    Q    You mentioned that on the RCA tablet there were some

10   YouTube searches of concern.

11           What were those searches?

12   A    They were searches for other religious figures,

13   specifically, Khalid Yasin and Zakir Naik.

14           And these are individuals who are not considered

15   connected to a terrorist group or even necessarily promoting a

16   terrorist group but have made statements in the past that are

17   of concern.

18           For example, I have a quote in my EC of Zakir Naik

19   was banned from entering the UK by the Home Secretary for

20   stating that every Muslim should be a terrorist.

21   Q    Can you spell that individual's name?

22   A    Z-A-K-I-R.  N-A-I-K.  Zakir Naik.

23   Q    And Khalid Yasin?

24   A    K-H-A-L-I-D.  Y-A-S-I-N.

25   Q    On cross-examination Ms. Plomin asked you about the dates

1   of items being loaded onto the flash drive, specifically the

2   S&I.pdf as well as having been removed from the Lenovo Recycle

3   Bin.  Do you recall that?

4   A   Yes.

5   Q   And I believe you testified that it was loaded onto the

6   flash drive on the 19th?

7   A   Yes.

8   Q   Of what month?

9   A   April.

10   Q   Of 2014?

11   A   Of 2012.

12   Q   I'm sorry.  2012.

13        And deleted from the Lenovo's Recycle Bin the

14   following day?

15   A   Yes.  That's correct.

16   Q   Did you look at the HP laptop that belonged to

17   Mr. Simpson?

18   A   Yes, I did.

19   Q   And did it show a date of that file being loaded onto that

20   laptop?

21   A   Let me consult my report.

22        Unfortunately, I have not noted any of the dates but

23   I suspect that information is still available.

24   Q   Can a computer user with their flash drive plugged into a

25   computer download an item straight from an e-mail or straight

1    off the Internet onto that flash drive?

2    A    Yes.  They have to do so intentionally, but it's certainly

3    possible.

4    Q    In other words, would that person be able to bypass the

5    computer's desktop or hard drive and so on and go straight to

6    the flash drive?

7    A    Yes.

8    Q    You mentioned that thumbnails are created for quick

9    display of an image.

10            Do computers running Windows automatically create

11    thumbnail images of larger photos that are stored on the

12    computer?

13    A    Yes.

14    Q    And does that mean the larger image would have been stored

15    on that computer at some point in the past?

16    A    That would be a reasonable assumption, yes.

17    Q    And can a thumbnail remain behind even if the larger image

18    has been deleted?

19    A    It's possible.

20    Q    If an image was downloaded off of the Internet, can that

21    sometimes be revealed through the Internet search history or

22    the Internet viewing history of that computer?

23    A    Yes.

24            MR. KOEHLER:  May I have a moment, Your Honor?

25            THE COURT:  Yes.

1          MR. KOEHLER:  Nothing further at this time, Your

2    Honor.

3          THE COURT:  We are not excusing Ms. Vaughan?

4          MR. KOEHLER:  That is correct.  Thank you.

5          THE COURT:  All right.  Ms. Vaughan, you may step

6    down.  You are not excused as a witness.  So you are not to

7    discuss your testimony with any other witness.  You are only

8    to discuss your testimony with the lawyers, but I think you

9    are safe for today.  You can probably leave and Mr. Koehler

10   will let you know when you need to come back.

11         THE WITNESS:  Thank you, Your Honor.

12         THE COURT:  You are welcome.

13         The government may call its next witness.

14         MS. BROOK:  Thank you, Your Honor.

15         THE COURT:  And while the witness is coming in, I'm

16   going to ask the jury to take my earlier advice and anybody

17   else that wants to just stand up and stretch.

18         MS. BROOK:  Your Honor, before we begin, I just want

19   to tidy up the area right here in front of the podium.

20         And additionally, note for the Court that the next

21   witness coming in is a juvenile, so I would ask the Court's

22   permission to refer to him only by his first name "Giovanni"

23   and in open record not have his last name noted.

24         THE COURT:  That would be fine.

25         MS. BROOK:  Thank you.

```
 1        (Witness duly sworn)
 2             THE CLERK:  Please state your name for the record and
 3   just your first name.
 4             THE COURT:  Just your first name.
 5             THE WITNESS:  Giovanni.  G-I-O-V-A-N-N-I.
 6             THE COURT:  You may proceed, Ms. Brook.
 7             MS. BROOK:  Thank you.
 8                  JUVENILE GIOVANNI, WITNESS, SWORN
 9                        DIRECT EXAMINATION
10   BY MS. BROOK:
11   Q   Good afternoon.
12   A   Good afternoon.
13   Q   There's some water right there and that's for you.  And if
14   you can just speak nice and clear into the microphone so we
15   can all hear you.
16   A   Okay.
17   Q   Tell us again, what's your first name?
18   A   Giovanni.
19   Q   And, Giovanni, how old are you?
20   A   Nine.
21   Q   What grade are you in?
22   A   Fourth.
23   Q   Do you have any brothers or sisters?
24   A   Yes.  I have two brothers.
25   Q   And are your brothers older or younger than you?
```

 1    A    One is younger and one is older.

 2    Q    So one is younger and then one is older?

 3    A    Yes.

 4    Q    You mentioned that you are in the fourth grade.  What's

 5    your favorite class at school?

 6    A    Math.

 7    Q    Math?  Has math always been something you've liked?

 8    A    Yes.

 9    Q    And at school, do you enjoy recess?

10    A    Yes.

11    Q    What are some of your favorite things to do during recess?

12    A    Well, I play football or infected.

13    Q    What's "infected"?

14    A    It's a game where one person is "it." And he has to tag --

15    well, if you tag someone -- the infected one has to -- if you

16    tag someone, you are infected with them and he has to get

17    everyone.  And the last one standing is whatever.

18    Q    So as soon as the infected person tags somebody else,

19    they're also infected and then they're on that team?

20    A    Yes.

21    Q    Okay.  And then they try to get everybody else to be

22    infected?

23    A    Yes.

24    Q    And you play that at school?

25    A    Yes.

1    Q    Do you play any sports?

2    A    Well, I wrestle.

3    Q    How long have you been wrestling?

4    A    About two years.

5    Q    Who got you into wrestling?

6    A    My dad.

7    Q    And do any of your brothers wrestle with you?

8    A    My little brother.

9    Q    Do you do competitions at all?

10   A    Yes.

11   Q    And how often do you do competitions?

12   A    About every other weekend.

13   Q    Do you practice a lot?

14   A    Yes.

15   Q    Is it something that you have to practice a couple times a

16   week or how often?

17   A    Two times a week.

18   Q    And does your brother go to practices with you?

19   A    Yes.

20   Q    What other kind of activities do you like to do with your

21   dad?

22   A    We play catch and we play football.  And sometimes I guess

23   we will play on the PS3.

24   Q    You play what?

25   A    On the PS3.

1    Q    On the PS3?

2    A    Yes.

3    Q    Has your dad taught you how to shoot?

4    A    At basketball?

5    Q    A gun.

6    A    Yes.

7    Q    Has he taught you to shoot basketballs too?

8    A    Yes.

9    Q    Okay.  So I want to talk about shooting for a minute.  How

10   old were you when your dad first taught you how to shoot a

11   gun?

12   A    Four.

13   Q    And what kind of gun was it that you learned how to shoot

14   when you were four?

15   A    A BB gun.

16   Q    Have you learned how to shoot other types of guns other

17   than BB guns?

18   A    Yes.

19   Q    And has your dad taught you how to do that?

20   A    Yes.

21   Q    So since you're four, so over the last five years, how

22   often would you say you go shooting with your dad?

23   A    About once a month.

24   Q    And does your dad own guns?

25   A    Yes.

```
 1   Q    Do you take dad's guns with you sometimes when you go

 2   shooting?

 3   A    Yes.

 4   Q    And what type of guns are those?

 5   A    My brother has a -- I can't remember if it's a .22 or .21.

 6   It's a rifle.

 7   Q    Okay.

 8   A    And then he has two assault rifles.  He has a revolver.  I

 9   just don't know what kind.

10   Q    Is this your older brother?

11   A    What?

12   Q    Is this your brother or your dad?

13   A    My dad.

14   Q    Okay.  And did you say a shotgun?

15   A    I don't think I did.

16   Q    Okay.  So have you ever met somebody by the name of Carus?

17   A    Yes.

18   Q    How is it that you met Carus?

19   A    Yes.

20          He's my dad's friend.

21   Q    Is he somebody you have seen more than once?

22   A    Yes.

23   Q    Have you ever been shooting with your dad and Carus and

24   some of Carus's friends?

25   A    Yes.
```

1    Q    I want us to talk about that day.

2    A    Okay.

3    Q    So on the day that you went shooting with Carus and your

4    dad and some of Carus's friends, where did you meet up with

5    everybody when you first saw them?

6    A    We were at my house in the backyard.

7    Q    And who was at your house before people showed up, who

8    were there?

9    A    Me and my mom and my dad and my brother, my younger.

10   Q    And then who came to the house?

11   A    Carus and his friends.

12   Q    How many friends?

13   A    Two.

14   Q    And those two friends, were they men or women?

15   A    Men.

16   Q    And were they adults?

17   A    Yes.

18   Q    So after Carus and his two male friends arrived at the

19   house, what did you see Carus and the two friends do?

20   A    His friends were playing on our tricycle.  One was jumping

21   on the trampoline and shooting in our basketball hoop.

22   Q    So you said the two male friends, one of them was playing

23   on one of the tricycles at the house.  Was that in the

24   driveway or somewhere else?

25   A    In the backyard.

1  Q   And you also mentioned a trampoline.  Where is your

2  trampoline?

3  A   In our backyard in the grass, like.

4  Q   And who was jumping on the trampoline that you saw?

5  A   It was -- I can't really remember the names.

6  Q   Okay.  Were they the two friends that showed up with

7  Carus?

8  A   Yes.

9  Q   Was it both of them or one of them?

10  A   One.

11  Q   Did you see Carus or his two friends do anything else at

12  the house?

13  A   Carus was sitting next to my dad talking and his friends

14  were playing.

15  Q   Okay.  And at some point did you all leave your house to

16  go shooting?

17  A   Yes.

18  Q   And when you left your house, how did you leave?  I take

19  it you were in a car?

20  A   We were both in trucks.

21  Q   Okay.  So who was in the truck that you were in?

22  A   Me, my dad, and my little brother.

23  Q   So you, your dad, and your little brother were in one

24  truck and then who was in the other truck?

25  A   Decarus and his two friends.

1    Q    When you left, were you going shooting or somewhere else?

2    A    We were going shooting.

3    Q    And were you headed -- did you go out to the desert or did

4    you go somewhere else to shoot?

5    A    To the desert.

6    Q    Once you got out to the desert -- and once you got to the

7    desert, so it's you and your dad and your little brother and

8    was Carus there?

9    A    Yes.

10   Q    And was he with the same two friends that were at the

11   house before?

12   A    Yes.

13   Q    Can you describe those two men?

14        So you talked about it being two men.  What did they

15   look like?  Do you remember?

16   A    It was a white male and a black male.  And the white male,

17   he had a beard, a shaved mustache.  I don't remember his

18   hairstyle.  I don't remember the color of the eyes or anything

19   else.

20   Q    And the other man, what color skin did he have?

21   A    He was black.  I believe he had a shaved mustache and

22   beard and then he had short hair.  I think he had earrings.  I

23   do not know.  I don't remember.

24   Q    So when you all got to the desert and it was the six of

25   you, so you and your dad and your little brother and Carus and

1  these two men, right, so everybody, was there anybody else

2  there other than that group?

3  A   No.

4  Q   Did you shoot?

5  A   Yes.

6  Q   And did your dad shoot?

7  A   Yes.

8  Q   And did Carus and his two friends shoot?

9  A   Yes.

10 Q   Did your dad bring some guns that day to shoot?

11 A   Yes.

12 Q   Were there also other guns there that day?

13 A   Yes.

14 Q   Who brought the other guns?

15 A   Decarus and his friends.

16 Q   So I want to talk about the guns that Decarus and his

17 friends brought to shoot that day.  Did you see any of them?

18 A   Shoot?

19         THE COURT:  Did you see any of the guns or did you

20 see any of the men shooting?

21         MS. BROOK:  That's a better question.

22 BY MS. BROOK:

23 Q   Did you get to shoot any of those other guns?

24 A   Yes.

25 Q   And which ones did you get to shoot?

1    A    I shot an assault rifle, a five-shot revolver, and then I

2    think that's it.

3    Q    So let's talk first about the five-shot revolver.  Who

4    gave you the five-shot revolver to shoot?

5    A    Decarus.

6    Q    And did Decarus help you shoot that five-shot revolver?

7    A    Yes.

8    Q    How did he help you?

9    A    Well, he helped me hold it so I wouldn't let go and mess

10   it up.

11   Q    So describe for me.  So if your hands are being used to

12   hold the revolver, how did Decarus with his -- how did Decarus

13   help you hold it?

14   A    I believe one hand was over mine and one was over the gun.

15   I could be wrong.

16   Q    So his hands were on or near your hands?

17   A    I believe they were on my hands.

18   Q    And you called it a five-shot revolver?

19   A    Yes.

20   Q    How did you learn it was a five-shot revolver?

21   A    I asked him what it was and that's what he said.

22   Q    And who is "him."  Who did you ask?

23   A    Decarus.

24   Q    And he said that it was a five-shot revolver?

25   A    Yes.

1    Q    Did you learn whether that gun was Carus's gun or somebody

2    else's?

3    A    I do not remember.

4    Q    You also mentioned an assault rifle and I want to talk

5    about that for a second.  Who gave you the assault rifle?

6    A    My dad.

7    Q    And did anybody help you shoot it?

8    A    Yes.

9    Q    Who helped you shoot it?

10   A    My dad.

11   Q    Did Carus help you shoot a rifle?

12   A    No.

13   Q    No?

14   A    No.

15   Q    Did you learn -- we were talking about the guns that Carus

16   and his friends brought.  So not the guns dad brought, but the

17   guns that Carus and his friends brought, did you learn who

18   bought those guns?

19   A    Yes.

20   Q    And how -- how did you learn that?

21   A    Decarus told me that he bought them.

22   Q    So Decarus told you that he bought the guns?

23   A    Yes.

24        MS. BROOK:  Giovanni, what I'm going to do in just a

25   second is have Special Agent Whitson bring a gun up for you

1    see.

2            Before we do that, I want you to know a couple of

3    things.  There are no bullets in the gun.  The magazine has

4    been taken out of the gun.  And there's a zip tie through the

5    gun which means that it's safe so it can't fire.

6            So with the Court's permission, Your Honor, I'm going

7    to ask Agent Whitson to bring up to Giovanni what has already

8    been admitted as Exhibit No. 5.

9            THE COURT:  Go right ahead.

10   BY MS. BROOK:

11   Q   And, Giovanni, you can go ahead and stand up.  And can you

12   see it okay over there or would it be better if Special Agent

13   Whitson came around?

14   A   That's okay.

15   Q   I want you to take a good look at that gun.  Giovanni, was

16   that one of the guns that you shot that day in the desert?

17   A   I do not remember -- I do not remember.

18   Q   Is there anything about that gun that looks familiar?

19   A   Yes.

20   Q   What looks familiar?

21   A   The -- I do not now how to explain but --

22           THE COURT:  Point to it.

23           THE WITNESS:  (Indicating)

24           THE COURT:  The part that's at the very back that

25   goes against your shoulder?

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  Thank you.

 3    BY MS. BROOK:

 4    Q    So that part looks familiar.  Do any other parts as you

 5    look at it look familiar?

 6    A    Yes.

 7    Q    What parts?

 8    A    It has the same metal piece and I remember a -- something

 9    like that. (Indicating)

10    Q    So you mentioned the same metal piece.  So same metal

11    piece as what?

12    A    That holds the -- it connects to the gun and the thing

13    that goes on your shoulder.  It just makes it longer.

14    Q    So you're talking about a metal piece.

15              And, Your Honor, may I come up just to see?  Because

16    I can't see through Special Agent Whitson.

17              THE COURT:  You can't?

18              MS. BROOK:  I can't.

19              May I step here if I speak really loud?

20    BY MS. BROOK:

21    Q    So, Giovanni, which parts look familiar?  You had spoken,

22    I think, about the back part; is that right?

23    A    Yes.

24    Q    And what other parts look familiar?

25    A    This down.
```

```
1    Q    Okay.

2    A    I remember something being right here like a protractor.

3    Q    Okay.  So, first of all, before we kind of talk about a

4    couple parts specifically, you said you mentioned it looks

5    familiar?

6    A    Yes.

7    Q    Does it look like the weapon that you shot that day, the

8    rifle we've been talking about?

9    A    I do not remember.

10   Q    Okay.  But you said parts of it look familiar?

11   A    Yes.

12   Q    Okay.  And do they look familiar to that weapon that you

13   were shooting?  Is that what you're talking about?

14   A    Yes.

15   Q    Okay.  Now, you had mentioned that the back of it looked

16   familiar?

17   A    Yes.

18   Q    And then you had mentioned that the top of it in here

19   looked familiar?

20   A    Yes.

21   Q    And then you said that there was something added to it; is

22   that right?

23   A    Yes.

24        THE COURT:  He said there was a metal part that

25   looked familiar.
```

1    BY MS. BROOK:

2    Q   Right.  What was the metal part also that you mentioned

3    that you said looked familiar?

4    A   Which one?  There was two.

5    Q   Okay.  Show us both.  What's the first one?

6    A   Here is this one (indicating) and then right here

7    (indicating).  They had a little something like a half-circle

8    that would go -- that would go on your knee.

9    Q   Okay.  And if we may, if Special Agent Whitson can step

10   back, just so the jury can see for a moment what we're talking

11   about.  I know we're in kind of tight quarters.

12          So, Giovanni, you had pointed to this being something

13   that looked familiar; is that correct?

14   A   Yes.

15   Q   Okay.  And so is that that metal -- I'm trying to think of

16   what we would want to call it -- knob -- that's right there on

17   the back?

18   A   Yes.

19   Q   All right.  And then you mentioned something sticking out

20   of it and you had mentioned this particular area.

21   A   Yes.

22   Q   Okay.  So the way it has been made safe, we can't stick

23   the magazine that's attached to it in.

24          THE COURT:  No.  And I wouldn't let you do it anyway.

25          MS. BROOK:  All right.  So we can sit down then.

```
 1              THE COURT:  Thank you.
 2              MS. BROOK:  And you can sit back down too.
 3              THE COURT:  How many more questions?
 4              MS. BROOK:  One more question.
 5              THE COURT:  Okay.  And then we'll take our break.
 6    BY MS. BROOK:
 7    Q   So last question.  So after you shot that day in the
 8    desert, did you and your brother play some video games in the
 9    car?
10    A   Yes.
11    Q   And at that time were you and your brother the only ones
12    in the car while everybody else was still outside in the
13    desert?
14    A   Yes.
15              MS. BROOK:  I don't have any other questions.
16              THE COURT:  We'll take our break, ladies and
17    gentlemen.  We will reconvene at about 3:15.
18              You're reminded of the admonition not to discuss the
19    case or form any conclusions about it until you have heard all
20    the evidence and begun your deliberations.
21              Court is in recess until 3:15.
22        (Recess taken at 2:56 p.m.; resumed at 3:16 p.m.)
23              THE COURT:  Thank you.  Please sit down.  The record
24    will show the presence of the jury, counsel, and the
25    defendant.
```

1          Mr. Maynard, you may cross-examine Giovanni.

2          MR. MAYNARD:  Briefly.

3                    **CROSS EXAMINATION**

4    BY MR. MAYNARD:

5    Q   Hi, Giovanni.

6    A   Hello.

7    Q   I've just got a few questions to ask you.

8          On the day that Decarus came out to your house with

9    his friends, okay?  That's the day I'm going to talk about for

10   a few minutes.  Do you remember whether or not the -- they

11   brought the guns into your house or into the yard to look at

12   to show your dad?

13   A   I do not remember.

14   Q   Did you jump on the trampoline with either one of the two

15   fellows that day?

16   A   I do not remember.

17   Q   All right.  When you went out to go shooting, you and your

18   brother and your dad got in one car, correct?

19   A   Yes.

20   Q   And Decarus and his two friends got in the other car?

21   A   Yes.

22   Q   Okay.  And your dad took a rifle, a shotgun, and a pistol

23   with him?

24   A   I do not think a rifle.

25   Q   Okay.  Just a shotgun and a pistol?

```
 1    A    And a BB gun.

 2    Q    And a BB gun?

 3    A    And I do not remember the rest.

 4    Q    Okay.

 5    A    He could have brought more.

 6    Q    And when you drove out into the desert, do you recall that

 7    the area that you went to was near a dump where there were

 8    things like broken boards and things like that around?

 9    A    Yes.

10    Q    Okay.  Did your dad like get some of the pieces of wood

11    and maybe set them up so that you could shoot at those?

12    A    Yes.

13    Q    Okay.  So it wasn't just out in the desert by itself?  It

14    was near a dump area?

15    A    Yes.

16    Q    Okay.  Do you remember, did Decarus -- let me -- Decarus,

17    stand up for a second.

18         This is Carus, right?

19    A    Yes.

20    Q    And you've known him since you were a little boy?

21    A    Yes.

22    Q    And do you remember when he lived with you at one time?

23    A    In our old house?

24    Q    Yeah.

25    A    Yes.
```

1   Q    Okay.  Now, do you remember Carus actually shooting your

2   dad's guns also?

3   A    I think so.

4   Q    And did you shoot the shotgun while you were there?

5   A    Yes.

6   Q    Do you sometimes -- your grandmother sort of lives out in

7   the desert, doesn't she?

8   A    Yes.

9   Q    And do you sometimes go to your grandmother's house or

10  when you're at your grandmother's house do people sometimes

11  shoot in her backyard?

12  A    Yes.

13  Q    Have you shot there too?

14  A    Not that day.

15  Q    Not that day.  But other times?

16  A    Yes.  Yes.

17  Q    And, in fact, is this the only time that you've ever been

18  shooting with Decarus and his two friends?

19  A    Well, with just Decarus.

20  Q    You shot with Decarus before?

21  A    Yes.

22  Q    But this was the only time that those two friends were

23  actually with you?

24  A    Yes.

25           MR. MAYNARD:  Okay.  I don't have any further

```
 1    questions, Judge.

 2            THE COURT:  Ms. Brook, do you have any additional

 3    questions?

 4            MS. BROOK:  I don't have any further questions.

 5            THE COURT:  May this witness be excused?

 6            MS. BROOK:  Yes.

 7            THE COURT:  Is there any objection?

 8            MR. MAYNARD:  No.

 9            THE COURT:  Thank you, Giovanni.  You may step down.

10            THE WITNESS:  Thank you.

11            THE COURT:  The government may call its next witness.

12            MS. BROOK:  Thank you, Your Honor.

13            The government calls Nicole Medellin.

14        (Witness duly sworn)

15            THE CLERK:  Please state your name for the record,

16    spelling your first and last name.

17            THE WITNESS:  Nicole Medellin.  N-I-C-O-L-E.

18    M-E-D-E-L-L-I-N.

19            MS. BROOK:  Good afternoon.

20            THE WITNESS:  Hello.

21               NICOLE MEDELLIN, WITNESS, SWORN

22                      DIRECT EXAMINATION

23    BY MS. BROOK:

24    Q   Would you please introduce yourself to the jury.

25    A   I'm Nicole Medellin.
```

1   Q    And the mic right in front of you, if you get close to it,

2   it will project your voice a little bit better.

3   A    There?

4   Q    There we go.

5        Do you live here in Phoenix?

6   A    Yes.

7   Q    And about how long have you lived here in Phoenix?

8   A    I was born and raised in Phoenix and I'm 26 years old.

9   Q    What do you do for a living?

10  A    I work for Maricopa County in the Clerk of Court Office

11  and I also sell real estate.

12  Q    Okay.  How long have you been selling real estate?

13  A    For about three years.

14  Q    And how long have you been working for the Clerk of the

15  Court in Maricopa?

16  A    For about three months.

17  Q    Okay.  So back last year, and in particular in January of

18  2015, at that point were you just selling real estate?

19  A    Yes.

20  Q    How are you related to Sergio Martinez-Chavez?

21  A    He's my boyfriend.

22  Q    And how long have you two been together?

23  A    For eleven years.

24  Q    Have you two lived together?

25  A    Yes.

```
 1    Q    And for about how long?

 2    A    It's probably been about nine years.

 3    Q    Do you two have children?

 4    A    Yes.

 5    Q    And how many children?

 6    A    We have two children together.

 7    Q    One of those children, is that Giovanni?

 8    A    Yes.

 9    Q    Do you know a man by the name of Decarus Thomas who also

10    goes by the name of Abdul Malik Abdul Kareem?

11    A    Yes.

12    Q    And how is it that you know him?

13    A    Through Sergio we met.

14    Q    About how long ago do you think you met him?

15    A    About eleven years ago.

16    Q    And here with us in the courtroom today, do you see Abdul

17    Kareem?

18    A    Yes.

19    Q    Can you point to him and describe something that he's

20    wearing?

21    A    I think it's a blue pull -- button-up shirt.

22              MS. BROOK:  Your Honor, may the record reflect that

23    the witness has identified the defendant?

24              THE COURT:  Yes.

25    BY MS. BROOK:
```

1   Q    You mentioned a minute ago that at one point he lived with

2   you and Sergio?

3   A    Yes.

4   Q    About how long ago was that?

5   A    It was about -- well, five or six years ago.

6   Q    And for about how long?

7   A    It was for about a year.

8   Q    And I just want to talk about this setup at that point in

9   time.  So you're with Sergio and you have children together?

10  A    Yes.

11  Q    At that point you had two?

12  A    Well, it's the two -- our two and then we also have

13  Sergio's oldest on the weekends -- so the three boys.

14  Q    Okay.  And the defendant was living with you for about a

15  year.  Was there anybody else who was also living with you

16  during that period of time?

17  A    Yes.  Sergio's oldest brother and at times his girlfriend

18  with their daughter.

19  Q    Okay.  So the defendant, did he have his own room in your

20  house at that point?

21  A    Yes.

22  Q    After he moved out, did you continue to see him?

23  A    Yes.

24  Q    And how was it you would see him?

25  A    He would come by for any of -- some events that we would

1    have, if we would have birthday parties or if we had any

2    get-togethers, barbecues, he would show up randomly to our

3    house as well.

4    Q    At some point did he ever mention anything to you about

5    the United States military?

6    A    Yeah.  When we lived together he had been drinking and we

7    had -- I think the news was on.  I don't know how it came up.

8          But he had made a comment that all of the military

9    should die because of what they were doing to the innocent

10   people and kids that were overseas.

11         And I told him -- I just said, well, you realize my

12   uncle -- sorry -- I told him:  Do you realize that my uncle is

13   a Marine?

14         And he said:  Yeah, well he should die too because of

15   what they're doing to the kids is just wrong.

16         And that was about it.

17   Q    At some point did you meet Elton Simpson?

18   A    Yes.

19   Q    And was there a name that you called him?

20   A    He went by Ibrahim.

21   Q    About how long ago do you think it was when you first met

22   Ibrahim?

23   A    I don't remember.  It would have been about at least a

24   year-and-a-half to two years ago at least.

25   Q    And how was it that you met Ibrahim?

```
 1    A    Decarus.
 2    Q    I'm going to place on the overhead what's already been
 3    admitted as government's Exhibit No. 431.  Do you recognize
 4    the individual in this photo?
 5    A    Yes.
 6    Q    And who is that?
 7    A    Ibrahim.
 8    Q    I want to talk specifically about a time in January of
 9    2015.
10    A    Uh-huh.
11    Q    Was there a day when you came home to find that Decarus,
12    Ibrahim, and another man were at your house?
13    A    Yes.
14    Q    When you came home, do you recall where you had been
15    before you got there?
16    A    I had been grocery shopping.
17    Q    And did you drive back directly from grocery shopping to
18    the house?
19    A    Yes.
20    Q    And what was your first plan when you were returning home
21    with the groceries?
22    A    I was going to go ahead and go put them inside.
23    Q    Were you able to do that when you drove home?
24    A    No.
25    Q    How come?
```

1    A    I had called Sergio to ask him to come outside and help me

2    with the groceries and he told me that Carus and his friends

3    were inside the house praying, so to just give it a minute.

4            So I went and parked and then went into the backyard.

5    Q    Okay.  So Sergio told you that Decarus and his two friends

6    were inside the house praying?

7    A    Yes.

8    Q    So at that point you weren't supposed to go inside to

9    deliver the groceries into the fridge?

10   A    Yeah.

11   Q    Did you wait?

12   A    Yeah.

13   Q    And at some point did the three of them stop praying?

14   A    Yes.

15   Q    And did you see them?

16   A    Yes.

17   Q    Did you see them first inside the house or in the backyard

18   or somewhere else?

19   A    In the backyard.  They came outside.

20   Q    You've mentioned that it was Decarus and Ibrahim was

21   there.  Was there another individual?

22   A    Yeah.  I don't remember his name but there was another

23   individual there.

24   Q    Had you met him before?

25   A    No.

1   Q   Did you go ahead and put the groceries away?

2   A   Yeah.

3   Q   And at that point what did you see Decarus and Ibrahim and

4   the other man do at the house?

5   A   They were in the backyard jumping on my kids' trampoline.

6   Q   And who did you see jumping on the trampoline in the

7   backyard?

8   A   Decarus and the two other friends that were with him,

9   Ibrahim and the other guy.

10   Q   And if you were to describe sort of how they were acting

11   or interacting with each other, how would you describe that?

12   A   Just a childlike manner.  They were jumping around having

13   fun.

14   Q   Did you see Decarus and Ibrahim and the other man do

15   anything else at the house before they left?

16   A   No.

17   Q   Eventually, did they leave?

18   A   Yes.

19   Q   And what was your understanding of the plan that was going

20   to happen that afternoon?

21   A   They were just going to go -- Sergio's mom lives out

22   towards the desert area, so they were going to go around that

23   area and shoot.

24   Q   And who is "they"?

25   A   It was Decarus and the two guys, Sergio, and he took my

```
 1    two boys with him.
 2    Q    And that included Giovanni?
 3    A    Yes.
 4    Q    After shooting, did Sergio return back home with the boys?
 5    A    Yes.
 6    Q    And was it just he and the boys that returned home or did
 7    the whole group come back?
 8    A    It was just Sergio and the boys.
 9    Q    Did you talk to Sergio when he came in?
10    A    Not initially, but afterward, once he had settled in, yes.
11    Q    And don't tell us what he said, but did Sergio tell you
12    anything about shooting that day?
13    A    Yes.
14    Q    And based upon what he said to you about shooting that
15    day, how did you feel?
16    A    I didn't -- didn't really give it much thought.  I just --
17    I mean, based on some of the comments, I was a little nervous
18    just for the safety of my kids as far as the guns and the
19    kids.
20    Q    And whether or not they -- the kids were safe when they
21    had been out there shooting?
22    A    Yeah, just because I know how my kids are active and try
23    to run around.  So as far as -- and just in any situation when
24    my kids are present around the guns, just that kind of safety
25    issue.
```

1   Q    Was there anything about what Sergio told you that made

2   you worry?

3   A    Again, just as far as --

4         Don't say the comment?  Just elaborate around it?

5   Q    Well, without repeating the words that Sergio told you,

6   based upon what he had told you, were you worried?

7   A    I was worried about -- I wasn't worried for a future

8   sense.  I was just more of concerned to make sure that he was

9   making sure the kids were watched over while they were in the

10  events.

11  Q    That Sergio had been watching over the kids when they were

12  out shooting that day based upon what Sergio told you?

13  A    Yes.

14  Q    I want to talk about the last time that you saw the

15  defendant.  Do you recall the last time you saw the defendant?

16  A    I think that was the last time I physically saw him was

17  that day.  He had come over to our house again another night,

18  but I didn't see him.

19  Q    Okay.  And so you had heard that he was at your house?

20  A    Yeah.

21  Q    Was there anything that happened in the house that you

22  could hear like a doorbell or something else that let you know

23  somebody was at the house?

24  A    No.  I had -- I had been woken up because Sergio was

25  getting back into bed and it was late.  I don't know exactly

```
 1    what time it was.  It was after midnight, I would assume.
 2            And he was getting back into bed and it was common of
 3    Carus to stop by late at night, so I just kind of said:  Is
 4    Carus here?  And he said:  Yes.
 5            So I just kind of groaned like:  Really?
 6            And he said:  I know.
 7            MR. MAYNARD:  Objection.  Hearsay.
 8            THE COURT:  Sustained.
 9    BY MS. BROOK:
10    Q    That night that we're talking about --
11    A    Uh-huh.
12    Q    -- was that after the attack in Garland had happened?
13    A    Yes.
14            MS. BROOK:  May I have one moment?
15            THE COURT:  Yes.
16            MS. BROOK:  I don't have any other questions.
17            THE COURT:  Mr. Maynard?
18                         CROSS EXAMINATION
19    BY MR. MAYNARD:
20    Q    Good afternoon, Ms. Medellin.
21    A    Hello.
22    Q    Let me just briefly talk to you about the comment that was
23    made five or six years ago.
24    A    Okay.
25    Q    At the time, as far as you understood, was Carus still
```

1    living with you?

2    A    Yes.

3    Q    He had not converted to Islam at that time, had he?

4    A    Yes, he had.

5    Q    You believe he had?

6    A    Yeah.

7    Q    Okay.  Did -- was he drinking that night?

8    A    He was always drinking, so I'm pretty sure he was.

9    Q    Pretty sure he was drunk?

10   A    Yeah.  I mean, not like passed out drunk, but he would get

11   highly intoxicated.

12   Q    Okay.  Did he apologize to you the next day for what he

13   had said?

14   A    It was the next day because I had -- I was upset about it,

15   so I told Sergio and he had talked to Carus about it.

16   Q    Okay.  Throughout this relationship, Sergio has been good

17   friends with Carus for --

18   A    Eleven years.

19   Q    -- ten or eleven years?

20   A    Yes.

21   Q    Okay.  And there have been times when Carus comes over to

22   your house and he drinks and smokes cigarettes and things of

23   that nature?

24   A    Yeah.

25   Q    In part you don't like him at times because he does come

1    over and drink and gets drunk at your house?

2    A    Yes.

3    Q    Okay.  There were times when Carus was invited to family

4    events at Sergio's family's house?

5    A    Yes.

6    Q    And he went to Sergio's mom's house?

7    A    Yes.

8    Q    On occasion?

9    A    Uh-huh.

10   Q    Okay.  And Sergio's mom lives in sort of a remote area, so

11   that there were times when there would be parties over there,

12   people would actually shoot in the back?

13   A    Yes.

14   Q    Okay.  And it's not in a backyard.  It's actually in a

15   pretty remote area, isn't it?

16   A    Yes.  Yes.

17   Q    And at these parties, people would ride ATVs or four

18   wheelers and shoot pistols and things of that nature?

19   A    Correct.

20   Q    Okay.  Was Carus good friends with your boys Giovanni and

21   the youngest one?

22   A    He used to take care of my youngest one for about a year

23   and they were -- they were good together.

24   Q    So he was -- although you believe he had a drinking

25   problem at times, he was always good to your kids?

1    A    Yes.

2    Q    Okay.  You told us initially on this particular day when

3    Sergio and the two individuals went out with Carus and your

4    two boys shooting, you had been out grocery shopping that day?

5    A    Yes.

6    Q    Okay.  But when you got back and you waited outside for a

7    while, when they came out, they were jumping on the

8    trampoline?

9    A    Uh-huh.

10    Q    Correct?

11    A    Yes.

12    Q    I mean, it looked like just they were having fun, having a

13    fun guys' evening?

14    A    Correct.

15    Q    Did they shoot some baskets?  Do you have a basket hoop?

16    A    We do have a basketball court.  I don't remember if they

17    were or not.  I just remember them jumping on the trampoline.

18    Q    All right.  And, in fact, you had a real estate license

19    and Carus at one point approached you about helping him find a

20    place to live?

21    A    Correct.

22    Q    Okay.  Would that have been after this shooting incident?

23    A    No.  It would have been before.

24    Q    Before?

25    A    Uh-huh.

1    Q   Okay.  Did you have an understanding of who it was that he

2    was looking to live with at that time?

3    A   I know that it was going to be him and there was another

4    guy.  I don't remember what the guy's name was.  I just

5    remember that he was a veteran because he had a Section 8

6    housing voucher.

7    Q   If I were to use the name "Billy," does that help refresh

8    your recollection at all?

9    A   It sounds like it could have been, but I wouldn't be a

10   hundred percent sure in remembering that.

11   Q   Did you ever speak to Billy over the phone?

12   A   Yeah.  Carus called him on the phone and he put him on

13   speaker.  He had to kind of translate because I couldn't

14   understand what the guy was saying.

15   Q   I don't want you to tell us what he said, but is it fair

16   to say it was difficult to understand him for some reason?

17   A   Yes.

18           MR. MAYNARD:  Okay.  I don't have any further

19   questions, Judge.

20           THE COURT:  Ms. Brook?

21           MS. BROOK:  Briefly, Your Honor.  Thank you.

22                          **REDIRECT EXAMINATION**

23   BY MS. BROOK:

24   Q   I just have a couple quick follow-up questions.

25           Defense counsel asked you about the time that you

UNITED STATES DISTRICT COURT

```
 1   were assisting the defendant to potentially find a house.
 2   A   Yes.
 3   Q   And he mentioned somebody who might have a Section 8
 4   license?
 5             THE COURT:  Housing voucher.
 6             MS. BROOK:  Housing voucher.  Thank you.
 7             THE WITNESS:  Yes.
 8   BY MS. BROOK:
 9   Q   So, explain to us, what is a Section 8 housing voucher?
10   A   The one that the guy was going to have was -- it's a
11   voucher.  When a person is on Section 8, they have to get
12   qualified as far as their income to make sure that they
13   qualify for the voucher.  And it either pays the whole amount
14   or a partial amount of the rent.
15             So for his it was -- because he was a veteran, to try
16   to stabilize the veteran homeless community -- so that's what
17   it was.
18   Q   So the voucher itself either pays in whole or in part for
19   whatever the rent or the amount that would monthly be paid for
20   the home?
21   A   Yes.
22   Q   Defense counsel also asked you about the time that the
23   defendant made the comment he did to you about United States
24   military members and then how they should be dead for what
25   they're doing?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #5    2-23-16

1    A    Yes.

2    Q    He asked you whether or not at that point he was Muslim.

3    A    Uh-huh.

4    Q    And you said that he was.  How did you know?

5    A    Because for the majority of the time I have known him, he

6    has been.  There was probably a brief time in the beginning,

7    but I know that at the time when we were living together he

8    was because he would come home often in his outfit -- like

9    the -- I don't know what you call it, the outfits or the items

10   that they wear.

11   Q    Were those items a special color?

12   A    It was usually white.  I think almost always white.

13   Q    And were they some white robes or something else?

14   A    It was like a white robe and he would have something on

15   his head as well.

16        MS. BROOK:  I don't have any other questions.

17        THE COURT:  May this witness be excused?

18        MS. BROOK:  Yes.

19        THE COURT:  Is there any objection?

20        MR. MAYNARD:  No.

21        THE COURT:  Thank you very much, Ms. Medellin.  You

22   may step down and you are excused as a witness.

23        Government may call its next witnesses.

24        MR. KOEHLER:  United States calls Sergio Martinez.

25        (Witness duly sworn.)

UNITED STATES DISTRICT COURT

```
 1              THE CLERK:  Please state your name for the record and
 2    spell your last name.
 3              THE WITNESS:  Sergio Martinez-Chavez.
 4    M-A-R-T-I-N-E-Z.  Chavez.  C-H-A-V-E-Z.
 5              THE COURT:  You may proceed, Mr. Koehler.
 6                 SERGIO MARTINEZ-CHAVEZ, WITNESS, SWORN
 7                        DIRECT EXAMINATION
 8    BY MR. KOEHLER:
 9    Q   Good afternoon, sir.
10              Could you please introduce yourself to the jury.
11    A   Hello.  I'm Sergio Martinez-Chavez.
12    Q   How old are you?
13    A   Thirty.
14    Q   What kind of work do you do for a living?
15    A   I'm an equipment trainer for Maricopa County.
16    Q   What does that involve?
17    A   Training --
18              THE COURT:  Can I ask, could you pull the microphone
19    a little closer?
20              THE WITNESS:  Yeah.
21              THE COURT:  Thank you.
22              Now, go ahead and describe what you do for a living.
23              THE WITNESS:  I teach initial safety to employees and
24    I instruct them out on the work in the field, show the do's
25    and don'ts.  I make sure they're safe, professional, and ready
```

1   to do the job on their own.

2   BY MR. KOEHLER:

3   Q   What kind of equipment is it that you're talking about?

4   A   Heavy equipment, earth-moving equipment.

5   Q   Do you know an individual by the name of Decarus Thomas,

6   also known as Abdul Malik Abdul Kareem?

7   A   Yes, I do.

8   Q   Is that individual in the courtroom today?

9   A   Yes.

10  Q   Could you please point him out and describe an article of

11  his clothing.

12  A   Light blue shirt, long-sleeved.

13          MR. KOEHLER:  May the record reflect the witness has

14  identified the defendant?

15          THE COURT:  Yes.

16  BY MR. KOEHLER:

17  Q   How long have you known Mr. Abdul Kareem?

18  A   I don't know, about 12 years.

19  Q   So about since you were 18 years old?

20  A   Seventeen, 18.

21  Q   And how old was he at the time that you met him?

22  A   I would say he was about 30.

23  Q   So is it fair to say he's was about 13 years older, 12

24  years older than you?

25  A   Yes.

1  Q   Did you meet a friend of his that went by the nickname

2  Ibrahim?

3  A   Yes, I did.

4  Q   I'm going to show you Exhibit 431 that's already in

5  evidence.

6          Do you recognize the person in that picture?

7  A   Yes.

8  Q   Who is that person?

9  A   That's -- I can't think of his name.  Ibrahim.

10  Q   Was there a period of time that Mr. Abdul Kareem lived

11  with you?

12  A   Yes, there was.

13  Q   Approximately, what time frame was that?

14  A   Let's see.  That was about 2008 to 2010, I would say, when

15  I was staying with my brother.

16  Q   And did he also live with you and your girlfriend Nicole

17  for a period of time?

18  A   No.

19  Q   Or stay with you for a period of time?

20  A   No.

21  Q   During the time he stayed with you and your brother, did

22  you ever see this person Ibrahim?

23  A   Yeah, one time.

24  Q   Do you remember about what year that was?

25  A   I would say about 2010.

1   Q   I want to take you forward in time to the fall of 2014.
2           Was there a time that Mr. Abdul Kareem came over to
3   your mother's house with you?
4   A   Yes.
5   Q   And did you go shooting with him at your mother's
6   property?
7   A   We were there shooting and he did come and he did end up
8   shooting as well.
9   Q   Was Ibrahim with him that time?
10  A   Yes.
11  Q   What kind of gun did they shoot?
12  A   It was a pistol.  I know it was small, dark in color.  I
13  would have to say it was about a 9 millimeter.
14  Q   Okay.  And do you remember about what time of year that
15  was?
16  A   Time of year?
17  Q   Yes.
18  A   I don't recall.  I would have to say towards the end of
19  the year.
20  Q   All right.  Now, was there another time that you went
21  shooting with them?
22  A   Yes.
23  Q   Before we get to that, did he have other friends that hung
24  out with him on occasion?
25  A   That came around?  No.

1    Q    Okay.  What about friends that you knew that he hung out

2    with or knew of?

3            MR. MAYNARD:  Objection to the form of the question.

4    I'm not sure what it's asking.

5            THE COURT:  Sustained.

6    BY MR. KOEHLER:

7    Q    Were there friends that he talked to you about that he had

8    that you didn't get to meet too much?

9    A    The only friend he ever talked about that I recall is

10   Ibrahim.  Ibrahim and I would have to say Stefan.

11   Q    Were you close to him and his other friends?

12   A    I wasn't close to any of his friends.

13   Q    Just him?

14   A    Just him.

15   Q    Did you know whether Ibrahim was also Muslim?

16   A    I did know.

17   Q    Was he?

18   A    Yes.

19   Q    And did you ever get involved in any conversations between

20   Ibrahim and Mr. Abdul Kareem?

21   A    No.

22   Q    Did they ever share anything that they talked about with

23   you?

24   A    No.

25   Q    Did there come a time when you went shooting again in the

1    desert?

2    A    Yes.

3    Q    Can you tell the jury how that particular event came

4    about?

5    A    Yeah.  He had called me one Sunday and it was out of

6    nowhere he wanted to go shooting with Ibrahim and I don't

7    remember if there was the third person in the conversation.

8    But it was late notice, so I declined.

9    Q    Okay.

10   A    And -- and throughout the week he might have asked me a

11   couple times.  At the end of the week, he called me and told

12   me that he was coming by.  And I believed him, so I just

13   waited, you know, around.  That was about a Friday.  Around

14   4:30 he showed up with Ibrahim and Soofi.

15   Q    Let's talk about that week for a bit.

16         You mentioned that he called you a few times during

17   the week --

18   A    Uh-huh.

19   Q    -- to ask about this.

20         What did you feel like his attitude was like about

21   making these requests?

22   A    He was pushy.

23   Q    And were you interested in going shooting on that day?

24   A    Not on that Sunday.  At the end of the week I didn't mind,

25   the end of the following week.

1   Q    Was there a reason why you didn't want to shoot at your

2   mom's house that day?

3   A    Yeah, because it was late.  And, you know, usually when we

4   go to her house, it's invited.  So I didn't want to be making

5   noise in her backyard.

6   Q    Where did you go to shoot that day?

7   A    We went to a remote location.  I would say off of Patton

8   Road and about to 79th Avenue.

9   Q    Before you went shooting, where were you?

10  A    At my house.

11  Q    And did you meet them out at that location that you just

12  described?

13  A    No.  They drove to my house.

14  Q    Who was driving?

15  A    Decarus.

16  Q    What vehicle was he driving?

17  A    It was a reddish, I believe, Chevy SUV.

18  Q    So reddish SUV?

19  A    Uh-huh.

20  Q    Did he have Ibrahim with him?

21  A    Yes.

22  Q    And did he have another person with him?

23  A    Yes.

24  Q    I'm going to show you what's been marked, for

25  identification, as Exhibit No. 432.

1    Do you recognize that photograph?  Who is depicted in
2  that photograph?
3  A   I do -- I don't recognize the facial hair, but it looks
4  like the individual.
5  Q   Okay.  And what name did you know that person by?
6  A   I don't remember.  I know -- I know just from watching the
7  news I remember the name "Soofi."
8  Q   Okay.  Is that the same person who came out to your home
9  that day?
10  A   I think so.
11    MR. KOEHLER:  Move to admit 432.
12    MR. MAYNARD:  No objection.
13    THE COURT:  432 is admitted.
14    (Exhibit No 432 admitted in evidence.)
15  BY MR. KOEHLER:
16  Q   Can you give us an approximate time frame?  What time of
17  year?  What month this was?  You mentioned it was a Friday.
18  A   It was the beginning of the year.  I did have a brand new
19  shotgun that I got for Christmas and it was brand new.
20    When they came over, we were doing show-and-tell, so
21  I remember having that gun, that shotgun, there that day, so
22  it had to be about the beginning of the year.
23  Q   So a Friday at the beginning of the year of 2015?
24  A   Yes.
25  Q   What gauge was the shotgun?

1   A   My shotgun?  12 gauge.

2   Q   Okay.  Did you have another shotgun in the home?

3   A   I did.

4   Q   What gauge was that shotgun?

5   A   I believe that's an 18 gauge.

6   Q   Now --

7   A   Or 20.  I can't remember.

8   Q   Okay.  You mentioned that you went shooting near Patton

9   Road; is that right?

10   A   Yes.

11   Q   Who went with you to the shooting location?

12   A   It was two of my kids, myself, Ibrahim, Soofi, and

13   Decarus.

14   Q   As was one of your two kids Giovanni?

15   A   Yes.

16   Q   Was there a reason that you did not go to a public

17   shooting range Like Ben Avery?

18   A   I have never gone to Ben Avery.  I grew up in the desert,

19   so I have always just shot out in my parents' backyard.

20   Q   Before you left the house to go to the shooting range, did

21   Mr. Abdul Kareem, Ibrahim, and the other individual do

22   anything inside your home?

23   A   Yes.  They prayed.

24   Q   Did everybody ride together to the scene in one car?

25   A   No.  They rode in the vehicle they came in and I took my

```
1    personal vehicle.

2    Q    And who drove from your house to the shooting location in

3    the other vehicle?

4    A    Ibrahim, Soofi, and Decarus.

5    Q    Who was the driver of that vehicle?

6    A    Decarus.

7    Q    When you got to the shooting location, did you use

8    targets?

9    A    We used two-by-fours from a pile of illegal dumping.

10   Q    Okay.  So was this an actual formal dump or was this just

11   an area where people dump stuff illegally in the desert

12   sometimes?

13   A    It was an area where people dump illegally.

14   Q    And did you stand up the two-by-fours or how did you set

15   up the targets?

16   A    We stood them up.

17   Q    Okay.  Do you recall which direction people were firing in

18   when they were shooting at the targets?

19            THE COURT:  Are you talking north, south, east, and

20   west?

21            MR. KOEHLER:  Correct.

22            THE WITNESS:  Yes.  They were shooting, I would have

23   to say, southeast.

24   BY MR. KOEHLER:

25   Q    Southeast?
```

1   A    And me and my boys were shooting northeast.

2   Q    So somewhat of a crossfire then?

3   A    No.  We were standing at the same location shooting in

4   almost opposite directions.

5   Q    Okay.  So shooting at targets that are away from each

6   other?

7   A    Uh-huh.

8   Q    Okay.  And when facing the targets, was the target that

9   you were shooting at to the left then to the northeast?

10   A    Yes.

11   Q    And they were shooting toward the southeast to the right?

12   A    Yes.

13   Q    But both of you were facing east?

14   A    Yes.

15   Q    Did people shoot simultaneously?  Did they shoot

16   separately?  How did that shooting itself go?

17   A    It was at the same time.

18   Q    What were you shooting?

19   A    I brought a small 410 shotgun gauge and me and my kids

20   shot that.

21   Q    Okay.  And did you see the weapons that Mr. Abdul Kareem,

22   Ibrahim, and the other individual brought to the scene?

23   A    Yes.

24        MR. KOEHLER:  If I can have a moment, Your Honor.  If

25   I could approach the witness one at a time with Exhibits 5?

 1              May the case agent approach the witness?

 2              THE COURT:  Yes.

 3              What is your question, Mr. Koehler?

 4              MR. KOEHLER:  Once it's up there, I intend to ask him

 5     if he recognizes it.

 6              THE COURT:  Why don't you ask him now.  We can all

 7     see it from afar.

 8     BY MR. KOEHLER:

 9     Q   Do you recognize what's been admitted in evidence as

10     Exhibit 5?

11     A   Yes, I do.

12     Q   And from where do you recognize that?

13     A   From that location where we went shooting.

14              MR. KOEHLER:  Very good.  If you could please return

15     Exhibit 5, Agent Whitson.

16              And let's go with Exhibit 7 first.

17              May the case agent approach again?

18              THE COURT:  Yes.

19     BY MR. KOEHLER:

20     Q   Do you likewise recognize Exhibit 7?

21     A   Yes.

22     Q   And from where do you recognize that?

23     A   The same location.

24     Q   And now looking at Exhibit 10, do you recognize that also?

25     A   Yes.

1    Q    And from where do you recognize that?

2    A    The same location.

3    Q    Starting first with the first one you looked at, Exhibit

4    5, do you recall who shot that gun?

5    A    I would have to say everybody, including myself.

6    Q    Okay.  And Exhibit 7, the second one we showed you, who

7    was shooting that one?

8    A    I would say the three individuals.

9    Q    Okay.  So when you say the three individuals, are you

10   talking about Mr. Abdul Kareem, Ibrahim, and the third person

11   that came with them?

12   A    Yes.

13   Q    And then finally, Exhibit 10, the one with the pistol

14   grip?

15   A    I would say everybody shot that one.

16   Q    Is that including yourself?

17   A    Yes, including myself.

18   Q    Okay.  Did you notice anything unusual about anybody's

19   manner of shooting when you saw them out there in the desert?

20   A    Yes.

21   Q    Whose shooting seemed unusual to you?

22   A    Ibrahim's.

23   Q    What did he do that was unusual to you while shooting?

24   A    He was running sideways, back and forth, while shooting.

25   Q    Did you also run closer to the target while shooting?

```
 1   A   Yeah.

 2   Q   You mentioned he ran sideways.

 3           Did he move both forward and backward and sideways or

 4   just sideways or how would you describe it?

 5   A   I would say he ran left to right and then back and forth.

 6   Q   Was he shooting the whole time that he was doing that?

 7   A   Yes.

 8   Q   What was everyone else doing while shooting?

 9   A   Watching.  Laughing.

10   Q   Laughing at Ibrahim while he was shooting in that manner?

11   A   Yes.

12   Q   Why were you laughing?

13   A   Well, I thought it was funny.

14   Q   Okay.  Why did you think it was funny?

15   A   I have never seen anybody shoot that way.

16   Q   Was there something about it that came into your mind

17   about what it looked like?

18           MR. MAYNARD:  Objection.  It's been asked and

19   answered.

20           THE COURT:  Sustained.

21           THE WITNESS:  Yes, I thought --

22           THE COURT:  No.  "Sustained" means you have already

23   answered that question.

24           THE WITNESS:  All right.

25   BY MR. KOEHLER:
```

```
 1    Q    At some point did you become aware of --
 2              Well, let me back up a second.
 3              When you got home after shooting, did you have a
 4    conversation with your wife?
 5    A    Yes.
 6    Q    Did you tell her about the events of the afternoon at the
 7    range or the place that you went shooting?
 8    A    Yes.
 9    Q    Did you express to her concern about what you had seen?
10    A    Yes.
11              MR. MAYNARD:  Objection.  Calls --
12              THE COURT:  The answer is "yes."
13    BY MR. KOEHLER:
14    Q    Why were you concerned about what you had seen?
15    A    I thought to myself that he looked like a terrorist.
16    Q    When you say "he," to whom are you referring?
17    A    Ibrahim.
18    Q    Did you become aware at some point that Ibrahim had been
19    involved in a shooting in Garland, Texas?
20    A    I did become aware after it happened.
21    Q    And how did you become aware of that?
22    A    Well, I was at -- while I was at the gym, I saw it on the
23    TV.
24    Q    After having seen that on the TV, was there a day or an
25    evening when Mr. Abdul Kareem came over to your house?
```

1    A    Yes.

2    Q    About how long after the incident in Garland, Texas, did

3    he come over to your house?

4    A    I would say within a week.

5    Q    And did you have a conversation with him at that time?

6    A    About what happened?

7    Q    Yes.

8    A    No.

9    Q    Did you ever talk to him about how he felt about the

10   manner in which Ibrahim and the other person had been killed?

11   A    He did tell me that he felt that it was wrong what

12   happened to Ibrahim and Soofi.

13   Q    So he felt it was wrong that the police killed them?

14   A    Yes.

15   Q    Did he talk to you at some point about having gone

16   shooting in the desert?

17   A    Yes.

18   Q    Where did that conversation take place?

19   A    In my house.

20   Q    Can you explain how it came about?

21   A    Yes.  As I was walking past him, he brushed up against my

22   shoulder and whispered, "If questioned, don't say anything

23   about going shooting."

24   Q    And what did you take that to mean?

25   A    He didn't want anyone to know.

1    Q    Now, I want to back you up a little bit.

2          Back in the past, prior to this year, did you ever

3    receive a computer from Mr. Abdul Kareem?

4    A    Yes.

5    Q    What kind of computer was it?

6    A    A laptop.

7          MR. KOEHLER:  Your Honor, may I approach the witness?

8          THE COURT:  Yes.

9    BY MR. KOEHLER:

10   Q    Mr. Martinez, I have placed in front of you Exhibit No.

11   161 in evidence.  Have you seen that computer before today?

12   A    Today?  No.  Wait.  Right now?  Yes.

13   Q    Yes.  So have you seen --

14   A    Before today?

15   Q    Yes.

16   A    Yes.  Oh, yes, I have.

17   Q    Okay.  I would like you to take a look over it real quick

18   and tell me where you have seen that computer before?

19   A    It's the computer that he gave me for my kids.

20   Q    Do you remember approximately when he brought that

21   computer to you?

22   A    It was 2014 and I would have to say right around the

23   beginning of the school year.

24   Q    So beginning of school year in August?

25   A    Yes.

```
 1    Q    September?
 2              And did you later turn that computer over to the FBI?
 3    A    Yes.
 4    Q    After the events in Garland, Texas?
 5    A    Yes.
 6              MR. KOEHLER:  May I have a moment, Your Honor?
 7              THE COURT:  Yes.
 8              MR. KOEHLER:  No further questions.
 9              THE COURT:  Mr. Maynard, you may cross.
10              MR. MAYNARD:  Thank you.
11                          CROSS EXAMINATION
12    BY MR. MAYNARD:
13    Q    Mr. Martinez-Chavez, good afternoon.
14    A    Good afternoon.
15    Q    Are you a little nervous?
16    A    Yes.
17    Q    Are you nervous in part because you're testifying against
18    a friend of yours?
19    A    That and I'm just nervous in general.
20    Q    Let me go back a little bit with you.
21              You met -- is it easier if I called him "Decarus"?
22    Is that how you know him?
23    A    That's how I know him.
24    Q    Okay.  You met Carus 12 or 13 years ago?
25    A    Yes.
```

1    Q    Okay.  How did you meet him?

2    A    I met him through his nephew.

3    Q    And what is his nephew's name?

4    A    Stuart Sampson.

5    Q    And so you became friends with him after you were

6    introduced to him?

7    A    Yes.

8    Q    Okay.  Now, you testified today at some point Carus lived

9    with you and your brother; is that correct?

10   A    Yes.

11   Q    All right.  And at some point while you were living with

12   your brother, Carus came out with Elton Simpson or Ibrahim?

13   A    Yes.

14   Q    All right.  And that was the first time that you had ever

15   met him?

16   A    Yes.

17   Q    Okay.  Now, were there times when you -- since you have

18   known Carus that you would actually go to his house?

19   A    Yes.

20   Q    And have you been out there in the last couple of years

21   prior to this incident happening in May of 2015?

22   A    Yes.

23   Q    Okay.  You would go to -- did you go to the Cochise

24   address?

25   A    I don't recall the name, but 19th and Peoria area.

1   Q   "Vista" or "Cochise" doesn't ring a bell with you?

2   A   No.

3   Q   All right.  When you would go to visit Carus, what was the

4   reasons that you would go visit him?

5   A   I don't know.  We were friends.

6   Q   You guys were buddies.  You hung out together?

7   A   Yes.

8   Q   All right.  And there were times you guys would drink some

9   beers together?

10   A   Yes.

11   Q   Is it fair to say that Carus did not drink beers in front

12   of his Muslim friends?

13   A   That's true.

14   Q   And so he would come out to your place and he would drink

15   beer out at your house?

16   A   Yes.

17   Q   And did you meet a number of different people that lived

18   with Carus over the years?

19   A   I did.

20   Q   Okay.  You met a Stefan Verdugo?

21   A   No.

22   Q   You never met him?

23   A   I might have, but I don't recognize the name.

24   Q   Okay.  Stefan?

25   A   Stefan.  Yes.

1   Q   Okay.  You met him at some point?

2   A   Yes.

3   Q   All right.  Did you meet Billy?

4   A   Yes.

5   Q   All right.  Were there usually a number of people that

6   were living with Carus through the years when you would go

7   over to his place?

8   A   Yes.

9   Q   Especially in the last couple of years, would there be

10  more than one or two people living with him?

11  A   Yes.

12  Q   Okay.  Now, there were times over the years when Carus

13  would borrow money from you?

14  A   Yes.

15  Q   And to pay you back, at times he gave you -- did he ever

16  give you guns?

17  A   Yes.

18  Q   Okay.  Did he ever give you furniture?

19  A   Yes.

20  Q   Okay.  At the time when he gave you this computer back in

21  2014, did he owe you some money at the time?

22  A   Yes.

23  Q   Okay.  Did he tell you that he was going to --

24          Well, did he -- did you have an understanding of what

25  he was going to do with that computer before he gave it to

1    you?

2              MR. KOEHLER:  Objection.  Hearsay.

3              THE COURT:  Sustained.

4    BY MR. MAYNARD:

5    Q    When you received the computer, what did you do with it?

6    A    The computer was for my kids so they could use it for

7    education, play games.

8    Q    So since you received it July, August, September of 2014,

9    did you do anything in particular with the computer?  Did you

10   upload educational games on the computer?

11   A    Yes.

12   Q    Did you upload any other types of games on the computer?

13   A    Other types of games?  Programs?

14   Q    Yeah.

15   A    I would say I might have reloaded Microsoft.

16   Q    Okay.  Now, there were times when Carus would actually go

17   to your mother's house, correct?

18   A    Correct.

19   Q    Were most of those events when Carus went to your mom's

20   house, was it because there was some sort of family

21   celebration going on?

22   A    Family gathering.

23   Q    Family gathering, sometimes it could be a birthday or

24   something of that nature?

25   A    Yes.

UNITED STATES DISTRICT COURT

1    Q    All right.  But most of the times when Carus was invited

2    to go to your mother's house, there were other people there

3    from your family?

4    A    Yes.

5    Q    And people in your family, along with Carus, would shoot

6    pistols primarily?

7    A    Smaller rifles.

8    Q    All right.  But they would do some shooting out there,

9    ride ATVs, basically just having fun afternoons?

10   A    Yes.

11   Q    Correct.

12        Was there a time when you were at Carus's house where

13   you saw a 9 millimeter gun?

14   A    Yes.

15   Q    Do you remember asking Carus about whether he would give

16   you that gun because he owed you money?

17   A    Yes.

18   Q    Do you recall that he told you that the gun wasn't his?

19   A    This, I do.  He had told me that he had given it to

20   Ibrahim.

21   Q    Okay.  Now, at a later period, did Carus bring Ibrahim to

22   one of these family outings at your parents' house?

23   A    Yes.

24   Q    Okay.  And did you shoot guns on that particular day?

25   A    Yes.

1   Q    Okay.  And do you recall whether or not the gun that

2   Ibrahim had brought jammed or not?

3   A    It did.

4   Q    Do you remember that you tried to unjam the gun?

5   A    I remember looking at it.

6   Q    Do you remember that Carus tried to unjam it?  Ibrahim

7   tried to unjam it.  You tried to unjam it.  Nobody could get

8   it unjammed.

9   A    Yeah, that's true.

10  Q    Okay.  And then later on in January of 2015, Carus called

11  you about wanting to go shooting; is that correct?

12  A    Correct.

13  Q    And initially, what he had asked you was could he bring

14  some people out and go shooting at your mother's house?

15  A    Yes.

16  Q    Okay.  And did you tell him that you didn't want them to

17  go to your mom's house in part because it would be too noisy?

18  A    I did.

19  Q    Okay.  Do you recall him telling you that --

20         MR. KOEHLER:  Objection.  Hearsay.

21         THE COURT:  Sustained.

22  BY MR. MAYNARD:

23  Q    Did you have an understanding of who would be coming with

24  him?

25  A    I knew Ibrahim was coming.

1   Q   Okay.

2   A   I had not met the other person yet.

3   Q   You had never met the other person?

4   A   Huh-uh.

5   Q   You have to -- is that a "no"?

6   A   No.  I had not.

7   Q   Okay.  And when they came out to your house, you invited

8   him into the backyard?

9   A   Yes.

10   Q   Okay.  And what was everybody doing when they got into

11   your backyard?

12   A   Playing basketball, jumping on the trampoline.

13   Q   Just horsing around and having fun?

14   A   Yes.

15   Q   You said earlier to the jury that after they got there,

16   you had a show-and-tell.  What did you mean by that?

17   A   They brought their rifles, duffle bags into my backyard,

18   and they showed me their weapons and I brought my -- a couple

19   of my guns out.

20   Q   Who did you understand owned those guns?

21   A   Soofi.

22   Q   Why did you understand it was Soofi's guns?

23   A   He carried them in and he had mentioned that he bought one

24   of the guns earlier that week.

25   Q   And did everyone sort of look at everybody's guns at that

1    time?

2    A    Yes.

3    Q    And then after the show-and-tell presentation, is that

4    when the guns were packed up, you and your two children got

5    into your car, and Carus, Simpson, and Soofi got into his and

6    left your house?

7    A    They went in the house and prayed and then we left.

8    Q    So the prayer actually happened after the show-and-tell of

9    the guns?

10   A    Yes.

11   Q    And in the meantime, Nicole came home?

12   A    Yes.

13   Q    Okay.  And then after they prayed, was there more jumping

14   on the trampoline and things after Nicole had gotten there?

15   A    I think so.

16   Q    So it wasn't like anybody was in a big hurry.  You guys

17   were -- they were over there having fun, showing you their

18   guns, and horsing around?

19   A    Yes.

20   Q    Okay.  And then you all go out to some spot in the desert.

21   Were you the one who found the place?

22   A    It was off the road where I grew up.

23   Q    Had you ever been shooting out there before?

24   A    Yes.  One time.

25   Q    Okay.  Were you aware that there might be some illegal

1    dumping so there might be some things to shoot at?

2    A   I was aware.

3    Q   Okay.  So you guys get out there.  I believe you testified

4    you shot at least two of the rifles that were brought --

5    Soofi, Simpson, and Carus brought; is that correct?

6    A   Yes.

7    Q   And did you allow one of your boys to shoot one of those

8    guns?

9    A   I think he shot one of them.

10   Q   Would you have been the one who was directing him when he

11   was shooting that gun?

12   A   I held the gun for my son as he shot it.

13   Q   Sure.  Okay.

14       Now, you also said that -- did -- while they were out

15   there shooting, you said that there was a point in time when

16   it looked like Simpson was running around shooting.  Do you

17   recall that?

18   A   Yes.

19   Q   Okay.  You said Carus was laughing?

20   A   Yes.

21   Q   Okay.  Were you laughing also?

22   A   Yes.

23   Q   It looked -- did he look funny to you as he was running

24   around out there shooting?

25   A   Yes.  It looked like he was having a good time.

1    Q    Didn't look like a military training maneuver, just looked

2    like somebody going out there shooting like they had seen

3    something in a movie?

4    A    Yes.

5            MR. MAYNARD:  Just a moment, Your Honor.

6    BY MR. MAYNARD:

7    Q    Now, after this -- did it appear to you that Decarus was

8    instructing anybody on how to shoot these weapons?

9    A    No.

10    Q    Okay.  Now, after this event occurs in May where Simpson

11    and Soofi are killed and you see it on the television, was it

12    rather upsetting to you that you knew these two guys?

13    A    I don't recall.

14    Q    Okay.  Now, the FBI came out to interview you on May 22nd

15    or thereabouts.  Do you recall that?

16    A    Yes.

17    Q    And the very first time they asked you if you had ever

18    gone shooting with Decarus and Simpson and Soofi, do you

19    recall what you told them?

20    A    Yes.

21    Q    And what did you say?

22    A    I said:  No, I haven't.

23    Q    And why?  Weren't you scared?

24    A    I was scared.

25    Q    And did the FBI then threaten you and tell you that if you

1   lied to a federal officer, that is a crime?

2   A   They did mention that it was a crime.

3   Q   And then you told them exactly what happened --

4   A   Yes.

5   Q   -- on that day.

6       And, in fact, you took them out the next day so that

7   they could see the site and you showed them exactly where you

8   guys had all been shooting?

9   A   Yes.

10  Q   And you showed them exactly, to the best of your

11  knowledge, the shells that -- the shell casings?

12  A   Yes.

13  Q   Okay.  Now, the day after you had taken the FBI out and

14  shown them around the scene where you had been shooting, did

15  you have another meeting with the FBI at the FBI headquarters?

16  A   Yes.

17  Q   Okay.  Did you -- how did you feel at that time as they

18  were interrogating you?

19      MR. KOEHLER:  Objection to the form of the question,

20  Your Honor.

21      THE COURT:  Overruled.  You may answer.

22      THE WITNESS:  I felt scared.

23  BY MR. MAYNARD:

24  Q   Okay.  Prior to Soofi and Simpson being killed in Garland,

25  Texas, had you ever heard of this Prophet drawing contest

1  before?

2  A    No.

3         MR. MAYNARD:  Just a moment, Your Honor, please.

4         No further questions.

5         THE COURT:  Thank you.

6         Ladies and gentlemen, we are going to recess until

7  nine o'clock tomorrow morning.  You are reminded, again, of

8  the admonition not to discuss the case among yourselves or

9  with anyone else.

10         You are not to form any conclusions about the case

11  until you have heard all the evidence and begun your

12  deliberations.  I will excuse the jury at this time.  We will

13  see you tomorrow morning at 9:00 a.m.

14         You may step down, Mr. Martinez.

15     (Open court, no jury present at 4:27 p.m.)

16         THE COURT:  Please sit down.

17         I wanted to report on my conversation with Juror No.

18  3.

19         As you probably gathered, she and I came up with a --

20  what we hoped was going to be a solution to her dozing off

21  which I announced at the beginning.  But she didn't take me up

22  on the suggestion other than when I had everybody stand up.

23  It appears to me that she continues to be sleeping more than

24  not.

25         It also appears to me that it's concerning one of the

1   jurors sitting next to her who appears to be trying to catch

2   my eye and catch Maureen's eye when she's asleep and sort of

3   looking like:  Why don't you do something?

4          So I ask you again:  Should we do something else?  I

5   mean, I don't know -- I mean, I don't have any other

6   suggestions for keeping her awake.

7          MR. KOEHLER:  Your Honor, in light of that and,

8   especially, in light of the fact that it appears to be a

9   distraction to her fellow juror, we would move to excuse Juror

10  No. 3.

11         MR. MAYNARD:  I'm not going to agree at this time.  I

12  certainly noticed the other day that she was sleeping.  I

13  can't say that I did today.

14         THE COURT:  That's because you were cross-examining

15  the witnesses.  But would you please -- you and/or

16  Ms. Plomin -- we'll do it again tomorrow.

17         But if there is no improvement, I don't really think

18  we have a choice.  I don't see allowing her to sit through the

19  rest of the trial, sleeping most of the time, particularly, as

20  I said, if other jurors are noticing it and that's distracting

21  to them and I'm sure concerning to them that she's not hearing

22  and seeing the evidence.

23         So we will go for tomorrow and then review where we

24  are and see if there's been any change.

25         MR. MAYNARD:  Just so the record is clear, I'm not

1    doubting what Your Honor has said.  I'm just saying I

2    certainly had seen her in the past.  I just didn't this

3    afternoon.  But I have to admit, I wasn't focused on her at

4    all.

5              I do have another issue though to raise to the Court.

6              THE COURT:  Okay.

7              MR. MAYNARD:  Judge, the report that Ms. Vaughan

8    testified about that she had looked at and that was in her

9    report that she apparently has done with Special Agent Whitson

10   that they have relied upon and put --

11             We have not received it.

12             THE COURT:  I thought -- and the government's counsel

13   can correct me if I'm wrong -- but I thought that what she

14   said was that as it references the January 22nd, 2016, 302,

15   that that incorporates this electronic transmittal from her

16   and from the other analyst.  And that that's how --

17             They don't prepare 302s themselves.  They, instead,

18   electronically transmit the information to the case agent who

19   prepares the 302.

20             I'm not -- have you received electronic versions of

21   Ms. Vaughan's reports?

22             MR. MAYNARD:  I don't believe we have.

23             THE COURT:  You know, because my understanding is

24   that that's what she said and so that that is the report.

25   That 302 is the report.

1          MR. MAYNARD:  We certainly have not gotten the

2    underlying material that they have said that somebody went

3    through and looked at this computer.

4          Quite honestly, all of these exhibits were a surprise

5    to us because we had not seen them before.

6          THE COURT:  The January 22nd, 2016, 302?

7          MR. MAYNARD:  No.  The exhibits that came in this

8    afternoon.

9          THE COURT:  Oh.  All of the ones that we hadn't seen

10   before either?

11         MR. MAYNARD:  That's right.

12         And I guess my point is is to prepare for these

13   witnesses, we have either got to have the exhibits that

14   they're going to use a day beforehand and we need to have the

15   underlying information that they're going to be relying on to

16   testify.

17         THE COURT:  Well, with respect to the exhibits, I

18   wholeheartedly agree, Mr. Koehler.

19         You seem to be coming in with stacks of folders,

20   putting them in front of the witnesses, offering them into

21   evidence as exhibits, and they are nowhere on my exhibit list.

22         My exhibit list didn't even have the numbers that you

23   were talking about today.  And it's not fair to the defense to

24   be bringing in a stack -- I mean, I don't know how many there

25   were -- at least a dozen, if not two -- of new things that had

```
 1    not previously been marked.

 2            And let's just put it this way.  We're not going to

 3    do that anymore.  We are not going to have exhibits brought in

 4    for the first time when the witness is testifying and allow

 5    them to be admitted as evidence because, number one, it's

 6    contrary to the instructions that have been provided and that

 7    Maureen has continuously advised government's counsel about.

 8            And it's not fair -- I mean, just because they know

 9    who the witness is, if they have no idea that you have all

10    these new exhibits, it's not fair to them for purposes of

11    cross-examination.

12            So if we don't have the exhibits before the

13    witness -- the day before the witness testifies, those

14    exhibits are not going to be admitted.  Clear?

15            MR. KOEHLER:  Yes, Your Honor, and I apologize for

16    that.

17            THE COURT:  Anything else, Mr. Maynard?

18            MR. MAYNARD:  Yeah.  I still want the underlying

19    information that she relied upon when she was testifying about

20    those exhibits.

21            Her testimony seemed to be that someone else, a

22    Ms. McCarthy or somebody who is not listed as a witness in

23    this case, has prepared some sort of report that she saw and

24    Agent Whitson has seen to prepare the report that did come in.

25            MR. KOEHLER:  I think there's a little confusion on
```

 1    what this information is.

 2             There's the data that comes from the computers which

 3    is produced in a report from CART that has all of the data and

 4    all of the information in the report.

 5             All of those reports have been turned over to the

 6    defense so that they can look through every image that came

 7    off the computer.

 8             THE COURT:  No.  We're not confused about that.

 9             MR. KOEHLER:  So --

10             THE COURT:  We're confused about what was in the

11    analyst's report.

12             MR. KOEHLER:  Correct.  So that's where I'm going

13    next.  And that is, the analyst will look through these data

14    and guide the case agent to the information that appears

15    relevant to the analyst and the case agent prepares a report.

16             The defense has that report.  If the witness doesn't

17    testify, it's not Jencks material.  It's certainly not Brady

18    material because they have all of the data that underlies

19    whatever the analyst has looked at and flagged.

20             Ultimately, the case agent goes through and looks at

21    what's been flagged, decides what's relevant to the case, and

22    includes it in the case agent report.

23             And that's the 302 that the defense has.

24             THE COURT:  Have you produced any of the electronic

25    transmittals from the analysts to Agent Whitson?

1          MR. KOEHLER:  The ones who have testified, so

2     Ms. Vaughan testified, and regarding the devices about which

3     she testified, we have disclosed her ECs to the defense.

4          We're going to have another intelligence analyst Greg

5     Neville testify about things that he looked at, Twitter

6     account records and so forth.

7          THE COURT:  Okay.  I'm going to order you to provide

8     to the defense an EC for -- what was her name again?  Marshal?

9          MS. PLOMIN:  Maxwell.

10         THE COURT:  The EC that Ms. Maxwell transmitted to

11    Whitson, some part of which is in the January 22nd 302.

12         MR. KOEHLER:  Okay.

13         THE COURT:  And I saw Agent Whitson making a note, so

14    I'm sure he will get it for you so that you can provide it to

15    the defense soon.

16         AGENT STEWART WHITSON:  Absolutely, Your Honor.

17         THE COURT:  Thank you.

18         AGENT STEWART WHITSON:  You're welcome, Your Honor.

19         MS. BROOK:  So we have a remaining issue to discuss

20    at sidebar from this morning which we tabled because we ran

21    out of time before we brought the jury back from the 10:15

22    break.

23         THE COURT:  Oh.  Before we change to go to that,

24    whatever happened to the witness photos?

25         MR. MAYNARD:  I'm sorry, Your Honor.  I didn't hear

```
1    you.
2           THE COURT:  We were going to give the jury photos of
3    the witnesses so that they had an additional way to remember
4    who testified, at least to the extent that they were
5    consenting to have their photos taken.
6           MS. BROOK:  To the extent that they have consented,
7    we have -- we do have the witnesses from this afternoon.  We
8    know FBI has not consented, so they are not part of that.
9           THE COURT:  What about our witnesses from Texas?
10          MR. KOEHLER:  We have their photos.  The two -- the
11   security guard and the officer and I don't know where those
12   went.  We'll find them.
13          THE COURT:  Okay.  Because I want to give them to the
14   jurors because -- sooner rather than later before they forget
15   what they looked like.
16          Because we're in week two and so they already might
17   have forgotten what -- or now be confused about which one was
18   the security guard and which one was the officer.  And the
19   photo will certainly help with their memory of that,
20   particularly since the officer was in uniform.
21          So if you could get those to us so that we can
22   provide them to the jury and I can explain to them our efforts
23   tomorrow morning.
24          MS. BROOK:  Yes.
25          THE COURT:  Okay.  Thank you.
```

1          Why do we need to discuss something at sidebar?  I'm

2     looking around the courtroom.  I don't see anybody in the

3     courtroom except representatives from the United States

4     Marshals Service, the government's lawyers, Agent Whitson,

5     defense attorneys, and the defendant.

6          MS. BROOK:  I think so long as the Court will flag me

7     if somebody in the media or somebody not a party walks in, I

8     will stop.

9          THE COURT:  They all left.

10          MS. BROOK:  I just wanted to advise the Court of a

11     situation which may present itself tomorrow and if I may just

12     provide a little bit of backdrop.

13          Tomorrow there's going to be a juvenile who testifies

14     by the name of "Carlos."  In looking at the defendant's

15     exhibits, I have seen one that references perhaps impeachment

16     that they want to do of this particular juvenile.

17          THE COURT:  How old is he?

18          MS. BROOK:  He is 12.

19          THE COURT:  Okay.

20          MS. BROOK:  So regarding a purported $300 that I

21     think defense will claim Carlos stole from the defendant.

22          To put this in context, back last March Carlos

23     disclosed that the defendant molested him.  It was disclosed

24     to a guidance counselor.  There is also another witness in

25     this case by the name of Billy Ferguson who walked in on it.

1          So the government has admonished the witness to not

2   go anywhere near that and we will not be talking about that in

3   this particular case.

4          However, the issue of $300 was brought up by another

5   attorney of the defendant's who called in to law enforcement

6   saying:  The child made it up regarding $300.

7          If asked about a specific denomination of $300, the

8   child will respond:  I told the guidance counselor I was

9   molested and he claimed that I stole $300 from him.  I never

10  did.

11         So I'm just putting on notice defense counsel about

12  where that line of questioning is going to go.  And any

13  specific allegation they make about $300, the child will put

14  into context and say he never did and that it came about after

15  he disclosed the molest.

16         THE COURT:  So Mr. Maynard now knows what your

17  concern is and I'm sure he will decide what, if anything, to

18  ask on that subject.

19         MS. BROOK:  Thank you.

20         THE COURT:  The only other thing that I'm aware of is

21  there's some issues with regard to photographs to which there

22  are objections.

23         And before we can actually talk about it, I need to

24  know what the exhibit numbers are and to actually have a copy

25  of -- I only know one number and it's one of the ones that I'm

1    not sure that we have one yet.

2           Do we have 456 yet?  It's one of the ones from today.

3           So I don't want to talk about photographs in the

4    abstract.  I want to talk about them with the exhibits that

5    are in issue, having been given to me, so that I can review

6    them and then we can talk about it.

7           So other than 456, I don't know what the numbers are.

8    And obviously, I have never seen 456 until the moment that it

9    was placed on the overhead today.

10          So I'm suggesting we defer this discussion until

11   after I know what exhibit numbers they are that wish to be

12   offered to which you know there's an objection under 403 so

13   that I can rule on them after having looked at them.

14          MR. KOEHLER:  We will endeavor to make that happen,

15   Your Honor.

16          THE COURT:  Okay.  Thank you.  I'm going to give

17   Maureen back 456.

18          MS. BROOK:  And, Your Honor, there is one last very

19   brief issue.

20          So on Friday we anticipate to have a witness by the

21   name of Richard Henderson, a very brief witness, disclosed to

22   the defense, but we noticed it inadvertently was left off our

23   witness list.

24          And so he's an individual who will be testifying.  He

25   works for PMC Bronze about what the lot number means.

```
 1              THE COURT:  He's on this witness list.  Was he not on

 2    the one that was on the juror questionnaire?  He's on my

 3    witness list here.

 4              MS. BROOK:  I don't think he was on the

 5    questionnaire.  He's from out of state.  I don't anticipate

 6    anybody will know him, but I just wanted to bring it to the

 7    Court's attention.

 8              THE COURT:  Well, remind me on Friday to ask the

 9    jurors the same thing I did with respect to that one other

10    witness whose name I now forgot that they hadn't met before or

11    hadn't seen the name before.

12              MS. BROOK:  Thank you.

13              THE COURT:  Anything else before we meet tomorrow

14    morning with the jury at 9:00 a.m.?

15              MS. BROOK:  No.

16              THE COURT:  Okay.  Court is in recess.

17         (Proceedings adjourned at 4:43 p.m.)

18                              *  *  *

19

20

21

22

23

24

25
```

1

2                C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5   duly appointed and qualified to act as Official Court Reporter

6   for the United States District Court for the District of

7   Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion

10  of the proceedings contained herein, had in the above-entitled

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 1st day of August,

14  2016.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25