UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,   )
                            )
            plaintiff.      )   **APPEAL**
                            )   **CR15-00707-PHX-SRB**
        vs.                 )   Phoenix, Arizona
                            )   February 24, 2016
**Abdul Malik Abdul Kareem**,  )   9:01 a.m.
                            )
            Defendant.      )
                            )
_____)


        BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                 JURY TRIAL - DAY 6
           (Pages 961 through 1176, Inclusive.)


APPEARANCES:
For the Government:
            U.S. ATTORNEY'S OFFICE
            By:  **Kristen Brook, Esq.**
                 **Joseph Edward Koehler, Esq**.
            40 North Central Avenue, Suite 1200
            Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
            MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
            By: **Daniel D. Maynard, Esq.**
                **Mary Kathleen Plomin, Esq.**
            3200 North Central Avenue, Suite 1800
            Phoenix, AZ  85012


Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

1          **INDEX OF WITNESSES**

2

   **SERGIO MARTINEZ-CHAVEZ:**
3
   Redirect examination by Mr. Koehler                Page 966
4
   **SPECIAL AGENT MATTHEW JENKINS:**
5
   Direct examination by Mr. Koehler                  Page 968
6  Cross examination by Mr. Maynard                   Page 984

7  **SPECIAL AGENT RODNEY DEREK JIGGETTS:**

8  Direct examination by Mr. Koehler                  Page 987

9  **SPECIAL AGENT MICHAEL LUM:**

10 Direct examination by Ms. Brook                    Page 996
   Cross examination by Ms. Plomin                    Page 1021
11 Redirect examination by Ms. Brook                  Page 1025

12 **SPECIAL AGENT CLINT HEMBERG:**

13 Direct examination by Ms. Brook                    Page 1026
   Cross examination by Ms. Plomin                    Page 1041
14 Redirect examination by Ms. Brook                  Page 1043

15 **JENNIFER FISHER:**

16 Direct examination by Ms. Brook                    Page 1045

17 **KATHY APPLETON:**

18 Direct examination by Ms. Brook                    Page 1052

19 **JUVENILE CARLOS:**

20 Direct examination by Ms. Brook                    Page 1057
   Cross examination by Mr. Maynard                   Page 1074
21 Redirect examination by Ms. Brook                  Page 1084

22

23

24

25

JUVENILE JUAN:

Direct examination by Ms. Brook                  Page 1087
Cross examination by Mr. Maynard                 Page 1111
Redirect examination by Ms. Brook               Page 1134

SPECIAL AGENT JARETT MacMASTER:

Direct examination by Ms. Brook                  Page 1140
Cross examination by Mr. Maynard                 Page 1158
Redirect examination by Ms. Brook               Page 1159

## INDEX OF EXHIBITS

| EXHIBIT NO.: | DESCRIPTION: | RECEIVED: |
|---|---|---|
| Exhibit No. 104 | Wittman item 5 shell casings | Page 979 |
| Exhibit No. 105 | Wittman item 3 shell casings | Page 979 |
| Exhibit No. 106 | Wittman item 2 shell casings | Page 979 |
| Exhibit No. 107 | Wittman item 1 shell casings | Page 979 |
| Exhibit No. 108 | Wittman item 4 shell casings | Page 981 |
| Exhibit No. 109 | Wittman item 6, diabetic test strip | Page 982 |
| Exhibit No. 110 | Scene diagram (Wittman) | Page 975 |
| Exhibit No. 113 | CD: "The Hereafter" Vol I CD #7 | Page 1037 |
| Exhibit No. 115 | Bulletproof vest | Page 1035 |
| Exhibit No. 116 | CD: The Life of Muhammad: Makkan Period | Page 1055 |
| Exhibit No. 120 | Machete & sheath | Page 1047 |
| Exhibit No. 122 | Compound bow and arrows with attachments | Page 1031 |
| Exhibit No. 125 | Taurus .38 special revolver (Kareem truck) | Page 1016 |
| Exhibit No. 126 | Maxwell cell phone QPX4) | Page 1006 |

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

| | | | |
|---|---|---|---|
| 1 | Exhibit No. 131 | Black nextbook/tablet (QPX2) | Page 1012 |
| 2 | Exhibit No. 132 | RCA Android Tablet (QPX3) | Page 1008 |
| 3 | Exhibit No. 138 | Book: Fortress of the Muslim (Kareem truck) | Page 1021 |
| 4 | | | |
| | Exhibit No. 142 | Consent to Search form (Kareem truck) | Page 1002 |
| 5 | | | |
| | Exhibit No. 200 | Hirens 15.1 CD | Page 1039 |
| 6 | Exhibit No. 366 | Ammunition from .38 Special Revolver and Speed Loaders | Page 1019 |
| 7 | | | |
| | Exhibit No. 433 | Photograph of Kareem's moving truck | Page 1000 |
| 8 | Exhibit No. 434 | Photograph of Kareem's moving truck (bench seat) | Page 1003 |
| 9 | Exhibit No. 435 | Photograph of Kareem's moving truck (bag behind seat) | Page 1003 |
| 10 | Exhibit No. 436 | Photograph of documents in bag in Kareem's moving truck | Page 1003 |
| 11 | Exhibit No. 437 | Kareem's BMO checkbook | Page 1003 |
| 12 | Exhibit No. 438 | Photograph of black Nextbook tablet - Kareem's moving truck | Page 1003 |
| 13 | Exhibit No. 439 | Photograph of .38 Special in bag - Kareem's moving truck | Page 1003 |
| 14 | Exhibit No. 440 | Photograph of .38 Special in bag (close up) | Page 1003 |
| 15 | Exhibit No. 441 | Photograph of shoulder holster .38 Special | Page 1003 |
| 16 | Exhibit No. 442 | Photograph of .38 Special with speed loaders | Page 1003 |
| 17 | Exhibit No. 443 | Photograph of Kareem's bedroom (safe closed) | Page 1029 |
| 18 | Exhibit No. 444 | Photograph of Kareem's bedroom (safe open) | Page 1034 |
| 19 | Exhibit No. 445 | Photograph of machete | Page 1048 |
| 20 | Exhibit No. 446 | Photograph of machete (close up) | Page 1050 |
| 21 | Exhibit No. 447 | Photograph of Kareem's Isuzu Ascender | Page 1054 |
| 22 | Exhibit No. 460 | Wittman photo 11 | Page 972 |
| | Exhibit No. 461 | Wittman photo 18 | Page 972 |
| 23 | Exhibit No. 462 | Wittman photo 22 | Page 972 |
| | Exhibit No. 463 | Wittman photo 41 | Page 972 |
| 24 | Exhibit No. 464 | Wittman photo 214 - diabetic test strip | Page 972 |
| 25 | | | |

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

```
 1   Exhibit No. 465    Wittman photo 232 -         Page 972
                        shell casing 5.45 x 39mm
 2   Exhibit No. 466    Wittman photo 258 -         Page 972
                        shell casing 7.62 x 39mm
 3   Exhibit No. 470    Wittman Photo 8             Page 972
     Exhibit No. 532    Diagram of 1629 W.          Page 1103
 4                      Cochise (JColvin 001)
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

P R O C E E D I N G S

1

2       (Called to the order of court at 9:01 a.m.)

3           THE COURT:  Good morning, ladies and gentlemen.

4   Please sit down.  The record will show the presence of the

5   jury, counsel, and the defendant.

6           Mr. Koehler, you may continue with your questioning

7   of Mr. Martinez.

8           MR. KOEHLER:  Thank you, Your Honor, and good

9   morning, everyone.

10          **SERGIO MARTINEZ-CHAVEZ, WITNESS, SWORN**

11              **REDIRECT EXAMINATION**

12  BY MR. KOEHLER:

13  Q   Mr. Martinez, yesterday on the witness stand you testified

14  in this case.  One of the questions I had for you in followup:

15  How long have you and Nicole lived together?

16  A   Say about ten years.

17  Q   Okay.  During cross-examination Mr. Maynard asked you

18  about seeing a gun at D's house that you described as a 9

19  millimeter.  Do you recall that?

20  A   Yes.

21  Q   And you testified that he told you he had given it to

22  Ibrahim?

23  A   Yes.

24  Q   Do you remember when that was?

25  A   No.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6  2-24-16

1  Q   Was it before or after you took them shooting in the

2  desert area?

3  A   I think it was before.

4  Q   Then he asked you about Ibrahim's gun jamming.  Is that

5  Helsinki you were out shooting in the desert?

6  A   That was when we were at my mom's house.

7  Q   So is it the pistol that jammed?

8  A   Yes.

9  Q   And when you were first interviewed with the FBI, you

10  mentioned that you originally said, no, you hadn't gone

11  shooting in the desert; is that right?

12  A   That's right.

13  Q   And did you reverse yourself quickly once the FBI started

14  pushing you on the subject a little bit?

15  A   Yes.

16  Q   Did you, in fact, take the FBI to the shooting location in

17  the desert the next day?

18  A   Yes.

19  Q   Was that the right location where you had been before?

20  A   Yes.

21       MR. KOEHLER:  I have no further questions.

22       THE COURT:  May Mr. Martinez be excused as a witness?

23       MR. KOEHLER:  Yes.

24       THE COURT:  Any objection?

25       MR. MAYNARD:  No, Your Honor.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

```
 1              THE COURT:  Thank you very much, Mr. Martinez.  You
 2    may step down and you are excused as a witness.
 3              The government may call its next witness.
 4              MR. KOEHLER:  The United States calls Matthew
 5    Jenkins.
 6         (Witness duly sworn)
 7              THE CLERK:  Please state your name for the record and
 8    spell your last name.
 9              THE WITNESS:  Matthew Jenkins.  J-E-N-K-I-N-S.
10              THE COURT:  You may proceed, Mr. Koehler.
11            SPECIAL AGENT MATTHEW JENKINS, WITNESS, SWORN
12                        DIRECT EXAMINATION
13    BY MR. KOEHLER:
14    Q   Mr. Jenkins, could you please introduce yourself to the
15    jury.
16    A   Yes.  My name is Matthew Jenkins.  I'm a special agent
17    with the Federal Bureau of Investigation.
18    Q   How long have you been with the FBI?
19    A   Approximately, four years.
20    Q   And where are you from?
21    A   Originally, South Carolina.
22    Q   What are your current duties with the FBI?
23    A   Currently, in addition to being a case agent in national
24    security matters, I previously worked gang and drug cartels
25    for three years.  And I'm also a team leader on the Evidence
```

1  Response Team for the Phoenix Division.

2  Q   And prior to the FBI, what did you do?

3  A   I was a Marine Corps Infantry officer for a little over

4  seven years.

5  Q   Did you perform Evidence Response Team duties in

6  connection to the case that's on trial in this courtroom?

7  A   Yes, I did.

8  Q   Can you tell the jury what your role was in the case?

9  A   Yes.  I was the team leader of a search out in Wittmann,

10  Arizona.

11  Q   And when you went out to Wittmann, Arizona, what were you

12  there to search for?

13  A   We were there to search for shell casings, what we call

14  "cartridge casings" in ERT, and also to determine the pattern

15  of distribution with the casings that were found.

16  Q   Do you recall the date that you went to Wittmann to search

17  the location?

18  A   Yes.  It was May 22nd of last year.

19  Q   And can you tell the members of the jury where you went?

20  A   Yes.  It was actually located in Wittmann, but it was

21  basically an area of open desert that was off of Aken Road,

22  south of Patton Road.

23  Q   About how far northwest of downtown Phoenix is that?

24  A   Probably about an hour.  It took us a while to get out

25  there.  From the office is where we left from our staging

1    location.

2    Q   Can you tell us what you did when you got to the scene?

3    A   When I originally got to the scene, I met with the case

4    agent, got a little bit of background, and then the case agent

5    and I did a walk-through of the area just to kind of see what

6    we saw, to know where to start, and how I wanted to conduct

7    the search.

8         From then my photographer took what we call "entry

9    photos" which is photos of the area as we found it before we

10   begin the search, before we conduct anything of that sort.

11        We then conducted the search, collected our evidence,

12   and then the photographer took what we call "exit photos"

13   which is the scene as we left it, showing that we picked up

14   all the evidence, that we took all of our items that belonged

15   to us before we left the scene.

16   Q   As you searched the scene, did you find shell casings at

17   the seen?

18   A   Yes, we did.

19   Q   And did you use tools to mark the location of each shell

20   casing that you found?

21   A   Yes, we did.  So we have evidence markers which have

22   numbers on them in order to annotate an item of evidence.  We

23   didn't have enough markers for every shell casing, so we

24   pulled flags from our truck and we marked shell casings with

25   flags so we knew where each one was.

1    Q    Were the flags that you used different colors?

2    A    Yes, they were.

3    Q    Did the different colors of the flags have any

4    significance in the context of this particular search?

5    A    No, they did not.  We had to use everything we had at our

6    disposal in our truck.

7    Q    I'm going to show you what's been marked for

8    identification as Exhibit No. 470.

9              Agent Jenkins, do you recognize that photograph?

10   A    Yes, I do.

11   Q    Can you tell us what that is?

12   A    That's the search scene from pretty much the northeast and

13   south.

14   Q    Okay.  And so --

15             THE COURT:  I'm going to interrupt for just a moment

16   because in the past few days there have not been any

17   objections to photos.

18             Could you tell me of the photos that are marked as

19   Wittmann photos which ones that you are planning to offer?  I

20   can find out if there are going to be any objections and we

21   might be able to speed this along a little bit.

22             MR. KOEHLER:  Certainly.  They're 470 and then 460

23   through 466.

24             THE COURT:  Have you had a chance to look at those,

25   Mr. Maynard, and do you know if you have any objections if

1    they're offered?

2          MR. MAYNARD:  I have looked at them.  We have no

3    objection.

4          MR. KOEHLER:  Very good, Your Honor.  Thank you.

5          THE COURT:  For the record, would you like to offer

6    them?

7          MR. KOEHLER:  I will move to admit all of those

8    photos.

9          THE COURT:  Exhibits 460 through 466 and 470 are

10   admitted.

11       (Exhibit Nos. 460, 461, 462, 463, 464, 465, 466, and 470

12   admitted in evidence.)

13         MR. KOEHLER:  Thank you.  Now we move to publish.  We

14   have 470 on the screen for you there and for our members of

15   the jury.

16   BY MR. KOEHLER:

17   Q   Which direction were you facing when surveying the scene

18   from the road and taking these photographs?

19   A   From this photograph, we were basically facing in a

20   southeasterly direction.

21   Q   Okay.  And as time went on, number one, did you understand

22   which direction the direction of fire was going?

23   A   From the information we had received and from the way that

24   the shell casings fell, yes, we knew the direction of fire.

25   Q   And which direction was the direction of fire?

1    A    The direction that you're looking at right now.

2    Q    Okay.  And so as the camera is facing here, which way at

3    the center of the picture is the camera facing?

4    A    It's facing basically in a south direction right now.

5    Q    Okay.  And in the right side of that picture can you tell

6    us what that is?

7    A    On the right side of the picture are some of the flags

8    that we used to mark the shell casings that we had found.

9    Q    Now, going to Exhibit 460, also in evidence, and tell the

10   members of the jury what that depicts.

11   A    Yes.  That's a photograph taken about 20 degrees to the

12   right of the first photograph that you saw and it's the rest

13   of the flags that were in the scene.

14   Q    Now, going to 461.

15   A    That's a photo taken towards the west, again, same flags

16   you saw on the previous photo, just from a different angle.

17   Q    Is that a closer-up view of some of those flags?

18   A    It is.

19   Q    I want to make sure I get -- now to 462.

20   A    462, again, same flags, same direction, just closer up.

21   You can actually see some of the shell casings in this photo.

22   Q    463?

23   A    Again, same flags from the previous photos, just from a

24   different angle again.

25   Q    Did you, in addition to shell casings, did you recover a

1    diabetic test strip at the scene?

2    A    Yes, we did.

3    Q    And that's Exhibit No. 464?

4    A    Correct.

5    Q    Did you also take photographs to document the types of

6    shell casings that you found at the scene?

7    A    Yes, we did.

8    Q    Was one of the types of shell casings that you found 5.45

9    by 39 millimeter ammunition?

10    A    Yes, it was.

11    Q    That's 467.  Is that an example photograph of that

12    ammunition shell casing?

13    A    Yes, it is.

14    Q    Did you also recover 7.62 by 39 millimeter ammunition?

15    A    Yes, we did.

16    Q    For the record, that's 466.

17         Now, Agent Jenkins, did you create a scene diagram to

18    help understand the pattern of distribution and what you

19    observed at the scene?

20    A    As the team leader, I assisted with the scene sketch.  One

21    of the members of my team actually was the one who drew it but

22    I assisted with the measuring of all distances.

23    Q    I'm going to place on the document camera what's been

24    marked for identification as Exhibit No. 110.

25         Agent Jenkins, do you recognize that?

1    A   Yes, I do.

2    Q   Is that a true and correct copy of the scene diagram that

3    you assisted in preparing?

4    A   Yes, it is.

5            MR. KOEHLER:  Move to admit 110.

6            MR. MAYNARD:  I don't have any -- no objections.

7            THE COURT:  110 is admitted.

8        (Exhibit No. 110 admitted in evidence.)

9    BY MR. KOEHLER:

10   Q   Can you show the jury where the northern indicator is on

11   the scene diagram to help them orient the diagram?

12   A   In the top right corner -- or excuse me -- top left

13   corner.

14   Q   So based on this and your earlier testimony, they were

15   shooting more or less to the south and east?

16   A   That is correct.

17           MR. KOEHLER:  Your Honor, may I approach the witness?

18           THE COURT:  Yes.  Why don't you also orient the jury

19   to the -- it's hard to see on the diagram.  What is the -- the

20   road that's going north/south.

21           THE WITNESS:  Yes, ma'am.  Again, the road going

22   north/south is Aken Road.  That's the road in which the scene

23   was off of.  So as I said earlier, it was off of Aken Road,

24   south of Patton Road.

25   BY MR. KOEHLER:

1    Q   So as you mentioned before, you've got the north indicator

2    here and Aken Road running slightly off of north but not very

3    far off of north; is that correct?

4    A   Correct.

5    Q   And, Agent Jenkins, during the course of your search of

6    the scene, what calibers of ammunition shell casings did you

7    find at the scene?

8    A   Again, cartridge casings, we found 5.54 by 39 and 7.62 by

9    39.  We also found what we call "shot shell casings" but which

10   are shotgun shells.

11   Q   Did you find any 9 millimeter ammunition shell casings?

12   A   No.  We did not.

13   Q   All right.  Now, on your map here you have different item

14   numbers.  During the course of looking at the shell casings

15   and looking at the flags that you placed and marked, did you

16   discern a pattern, a distribution pattern to the shell

17   casings?

18   A   Yes, we did.

19   Q   Okay.  You can actually touch the screen and it should put

20   an arrow on the screen.  Can you tell us where you observed

21   the patterns appeared to start and end?

22   A   Absolutely.  So where you see item 5 right here

23   (indicating), that was just three shell casings.  What it

24   appeared was a magazine was loaded into a weapon and then

25   maybe a test shot was fired since there were so few.

```
1              From there, if you move to item 3 right here
2    (indicating), that's where a majority of the shell casings
3    that we picked up were.
4              So it appeared that they -- the shooters would stand
5    in place.  They would begin shooting.  Learn how to use the
6    weapon.  Spend a lot of their time there.
7              From there they actually would shoot and move where
8    you see item 2 (indicating) which it's not -- it's not picking
9    up on the screen Item 2.
10   Q   Let me see if I can change colors and see if it works.
11   Mine is not responding either.
12   A   Okay.  Item 2.
13             MR. MAYNARD:  Objection, Your Honor.  I'm not sure
14   what the question is right now.
15             THE COURT:  Neither am I.
16             MR. KOEHLER:  I had asked about the pattern of
17   distribution of the shells and asked him to explain what it
18   was that he saw when he came through the scene and he was
19   walking from items 5 to 2 and then from there.
20             THE WITNESS:  So, again, item 3 is where a majority
21   of them were fired.
22             From item 3 to item 2, there were a few casings,
23   which means that they were firing while moving.
24             At item 2, it was, again, a position where they
25   stayed still for a while, expended several rounds.  And then
```

1  again from item 2 to item 1, they were shooting while moving

2  occurring again.  And finally, item 1 is where the evidence

3  collection ended.  That's where the final rounds were

4  collected.

5  Q   And your diagram there there's also an item 4; is that

6  correct?

7  A   There is an item 4, correct.

8  Q   And what did you find at item 4?

9  A   Item 4 was the -- a majority of the shotgun casings or

10  shotgun shells that we had found.

11  Q   And what caliber of shotgun shell casings did you find?

12  A   410.

13  Q   410 gauge?

14  A   Correct.

15  Q   All right.  So looking first at Exhibit No. 104, do you

16  recognize that?

17       THE COURT:  Once again, can we just try to put these

18  together a little more quickly foundation-wise, particularly

19  if it turns out there's not going to be any objection.

20       Are items -- are Exhibits 104, 105, 106, and 107 the

21  shell casings that you have just described in going over the

22  diagram at the various item points?

23       THE WITNESS:  Yes, ma'am.  They are.

24       MR. KOEHLER:  And are they in substantially the same

25  condition in which you found them?

```
 1              THE WITNESS:  Yes, they are.
 2              MR. KOEHLER:  Move to admit 104 through 106.
 3              MR. MAYNARD:  No objection.
 4              THE COURT:  I included 107.
 5              MR. KOEHLER:  107.
 6              THE COURT:  104 through 107 are admitted.
 7          (Exhibit Nos. 104, 105, 106 and 107 admitted in evidence.)
 8      BY MR. KOEHLER:
 9      Q   In 104 through 107, are the vast majority of those shell
10      casings the 5.45 and the 7.62 caliber ammunition?
11      A   Yes, they are.
12              THE COURT:  When you say the "vast majority," did you
13      just pick up some of them or did you pick up all of them?
14              THE WITNESS:  No, ma'am.  We picked up all of them.
15              THE COURT:  Okay.
16      BY MR. KOEHLER:
17      Q   Are there other shell casings mixed in in a couple of
18      those exhibits?
19      A   Yes.  There were two 410 gauge shotgun shells that were
20      mixed in.
21      Q   And which of the two items had the two 410 gauge shells
22      mixed in?
23      A   105 and 107.
24      Q   So 105 corresponds to item No. 5; is that correct?
25      A   Item No. 3.
```

1    Q    No. 3.  Okay.  And thank you for that.

2              So item No. 3 is this area over to the right where

3    the vast majority of the shell collection took place; is that

4    correct?

5    A    That is correct.

6    Q    And could you hold that up so the members of the jury can

7    see what you're talking about?

8    A    (Indicating)

9    Q    Were all of the shell casings clumped together in a single

10   spot or were they spread out?

11   A    No.  They were pretty spread out.  The entire search area

12   was about 30 yards by a hundred yards.  It was a pretty large

13   space.  So between items 3 and 2, and then again between items

14   2 and 1, there was approximately 30 yards between each.

15   Q    So you said that area was approximately 30 by 100 yards.

16   Is that about the size of a football field?

17   A    A little bit smaller, but, yes, approximately the same

18   size.

19   Q    All right.  Now, let's talk about the item 2 shell casings

20   which are Exhibit 106.

21   A    Okay.

22   Q    Is that the one where you had the next distribution point

23   where it looked like they stood still?

24   A    Yes, it is.

25   Q    Okay.  And can you hold that up and show that to the jury?

1    A    (Indicating)

2    Q    And then 107?

3    A    Yes.  This was from item 1, which was the last

4    distribution point.

5    Q    Now, based on where you understood the targets to be,

6    which of those items was closest to the target area?

7    A    Item 1.

8    Q    And then we talked briefly about shotgun shell casings.

9    Can you take a look at Exhibit 108.  Are those the shotgun

10   shell casings that you recovered?

11   A    Yes, they are.

12        MR. KOEHLER:  Move to admit 108.

13        THE COURT:  Is there any objection -- no wait.

14        108 was, according to my list, an ammunition box.

15        MR. KOEHLER:  Your Honor, I sent the deputy clerk an

16   e-mail last night explaining that we were renaming that set of

17   exhibits because we had packaging issues with it.

18        And so we renamed that set of exhibits and it's

19   "Wittmann item 4 shell casings."

20        THE COURT:  What happened to the old 108?  Is it

21   gone?

22        MR. KOEHLER:  Withdrawn.

23        THE COURT:  Okay.  My apologies.

24        MR. MAYNARD:  No objection.

25        THE COURT:  108 is admitted.

```
1          (Exhibit No. 108 admitted in evidence.)

2              THE COURT:  I would have put that in my group if I

3      had known it was more shells.

4      BY MR. KOEHLER:

5      Q   And now let's go to 109.  What is that?

6      A   109 is the diabetic test strip that you saw a photo of

7      earlier.

8      Q   Did you package that up as well?

9      A   Yes, I did.

10             MR. KOEHLER:  Move to admit 109.

11             MR. MAYNARD:  No objection.

12             THE COURT:  109 is admitted.

13         (Exhibit No. 109 admitted in evidence.)

14     BY MR. KOEHLER:

15     Q   So you mentioned you saw in the -- I guess our monitor --

16     the draw function is not going to work.  May I approach the

17     witness with a copy of the scene diagram?

18             THE COURT:  Why don't we just hand him the exhibit?

19             MR. KOEHLER:  Well, I don't want to mark on the

20     original.

21             THE COURT:  Oh.  You're going to ask him to draw on

22     it?

23             MR. KOEHLER:  Yes.

24             THE COURT:  Okay.  Test your screen again.  Just draw

25     something on it.
```

```
 1            MR. KOEHLER:  Oh.  Now it's working again.

 2            THE COURT:  You might want to erase what he just

 3   drew.

 4            MR. KOEHLER:  If you touch the lower left corner of

 5   the screen, it should clear the mark.  There we go.

 6   BY MR. KOEHLER:

 7   Q   Okay.  Using your screen now, can you draw the pattern

 8   that you observed of the movement based on the flags and on

 9   your collection of the shell casings?

10   A   (Indicating)

11   Q   And, again, from the curve, can you tell the jury what the

12   distance is involved between those two spaces?

13   A   Yes.  Again, between items 3 and 2, approximately 30 yards

14   and then between items 2 and 1, approximately 30 yards again.

15            MR. KOEHLER:  If I can have a moment?

16   BY MR. KOEHLER:

17   Q   Agent Jenkins, have you had occasion to drive to Dallas,

18   Texas, from Phoenix, Arizona?

19   A   Yes, I have.

20   Q   About how long did it take you to get from Phoenix to

21   Dallas?

22            MR. MAYNARD:  Objection, Your Honor.  Objection, Your

23   Honor.  It's beyond -- foundation and it's beyond the

24   disclosure.

25            THE COURT:  Overruled.  You may answer.
```

1           THE WITNESS:  I drove to an area just west of Dallas.

2    It took approximately 12 hours.

3    BY MR. KOEHLER:

4    Q   Did that include any stops?

5    A   Of course, stops for gas.  I actually blew a tire, so I

6    had to stop and change and put my spare on.

7    Q   And how long did that part take?

8    A   About 30 minutes.

9           MR. KOEHLER:  No further questions.

10          THE COURT:  Mr. Maynard?

11                       **CROSS EXAMINATION**

12   BY MR. MAYNARD:

13   Q   On the trip that you took to Dallas, how far is it from

14   Phoenix, Arizona, to Dallas, Texas?

15   A   Phoenix to Dallas, I believe, is about 14-and-a-half

16   hours.

17   Q   No.  No.  How far?

18   A   I don't know.

19   Q   How many miles?

20   A   Around 900.

21   Q   Okay.  You indicated that there was a diabetic test strip

22   that you picked up and packaged?

23   A   Yes.

24   Q   Do you know whether or not any DNA testing was done on

25   that test strip?

1   A   I believe there was, yes.

2   Q   Do you know whether or not it belonged to Abdul Malik?

3   A   I do not know.

4   Q   Okay.  Do you know whether or not there was any DNA

5   testing that was done on any of the shells?

6   A   I believe everything was sent to the lab.

7   Q   Okay.

8   A   I do not know what the results were.

9   Q   You're not the individual who will know that?

10  A   Correct.

11  Q   And you're not the individual who will know whether or not

12  there were fingerprints on the shells?

13  A   Correct.

14  Q   But I take it that when you were packaging them up and

15  picking them up, you were wearing gloves so that if there are

16  fingerprints or DNA from somebody on them, they could be

17  tested?

18  A   Absolutely.

19  Q   All right.  Did you recover any .38 caliber casings out

20  there?

21  A   No.  We did not.

22  Q   Did you conduct a study to determine whether -- where

23  those particular shells were purchased from that you found the

24  casings of out there?

25  A   I did not.

```
 1   Q    Do you know whether or not anybody at the FBI or the ATF
 2   has done that study?
 3   A    I do not know.
 4             MR. MAYNARD:  I don't have any further questions.
 5             THE COURT:  Anything on redirect, Mr. Koehler?
 6             MR. KOEHLER:  No, Your Honor.  Thank you.
 7             THE COURT:  May this witness be excused, Mr. Koehler?
 8             MR. KOEHLER:  Yes, Your Honor.
 9             THE COURT:  Any objection?
10             MR. MAYNARD:  No, Your Honor.
11             THE COURT:  Thank you, Agent Jenkins.  You may step
12   down, sir, and you are excused as a witness.
13             The government may call its next witness.
14             MR. KOEHLER:  The United States called Rodney
15   Jiggetts.
16        (Witness duly sworn)
17             THE CLERK:  Please state your name for the record and
18   spell your last name.
19             THE WITNESS:  Rodney Derek Jiggetts, spelled
20   J-I-G-G-E-T-T-S.
21             MR. KOEHLER:  Your Honor, may I approach the witness
22   stand to tidy up a little bit?  I have one that stays there
23   but the rest come off.
24             THE COURT:  Yes.
25   ////
```

1              **RODNEY DEREK JIGGETTS, WITNESS, SWORN**

2                    **DIRECT EXAMINATION**

3     BY MR. KOEHLER:

4     Q    Mr. Jiggetts, could you please introduce yourself to the

5     jury.

6     A    Again, I'm Rodney Jiggetts, spelled J-I-G-G-E-T-T-S.  I'm

7     a firearms and toolmark examiner from the Federal Bureau of

8     Investigation.

9     Q    How long have you been a firearms and toolmark examiner

10    for the FBI?

11    A    Since November of 2009.

12    Q    And can you explain what type of work you do in that role?

13    A    Okay.  My duties include receiving evidence, performing

14    the requested examinations, issuing a report, and also be

15    willing to testify, and evidence that is submitted dealing

16    with firearms, toolmarks, and gunshot residue.

17    Q    What kind of training did you receive in order to take on

18    this role?

19    A    Once I entered into the FBI, I entered into a two-year

20    training program where I was under the direct supervision of

21    other qualified examiners.  And during this time, I was issued

22    a training syllabus which included terminologies, practicals,

23    exercises that I would have to complete.

24              Also, I was able to visit the majority of the

25    firearms manufacturers to understand the manufacturing

```
1    processes and also ammunition manufacturers.

2            I also spent hundreds of hours under the comparison

3    microscope looking at thousands of samples of bullets,

4    cartridge cases, and also toolmarks.

5            And at the end of my training, I had to complete

6    several competency tests, had to complete three moot courts,

7    three oral boards.  And at that point, if I passed them

8    successfully, I was qualified by the FBI as a firearms and

9    toolmark examiner.

10   Q   Have you continued to go through training while on the job

11   since that time?

12   A   It's always continuous training with the various new

13   concepts that are out here and new manufacturing processes,

14   yes.

15   Q   And have you previously testified in court about firearms

16   identification?

17   A   Yes, I have.

18   Q   Can you tell us what firearms identification is?

19   A   Sure.  Firearms identification is a branch of forensic

20   science where it can be determined if a bullet cartridge case

21   or any part of the ammunition was or was not fired from a

22   particular firearm.

23   Q   And what is it that makes firearms identification

24   possible?

25   A   What makes firearm identification possible is the
```

1    manufacturing process.  The tool that makes these parts of the

2    firearm is under constant wear, meaning that the cutting edge

3    is constantly changing.  It's getting dull.

4            So as it touches the firearm, these microscopic marks

5    are transferred onto the firearm.  And as the bullet that

6    travels down the barrel or the cartridge case that slams

7    against the breach face, those marks are, again, transferred

8    onto those items.

9            So even if we have consecutively-made firearms, those

10   microscopic marks will be different from every firearm.

11   Q   As part of your work, did you conduct firearms

12   identification in connection with this case?

13   A   Yes, I did.

14   Q   And I want to direct your attention to Exhibit No. 106

15   that's on the witness stand in front of you.

16   A   Okay.

17   Q   Do you recognize items that are within Exhibit 106?

18   A   Yes, I do.

19   Q   Okay.  And what items do you recognize within that?

20   A   I have here items 6, 7, 8 and 7-1.  And on each item there

21   is a unique FBI laboratory number; also the item number.  And

22   scribed on each item is my symbols which says that I actually

23   examined these pieces of evidence here.

24   Q   And can you tell us what you did in the process of

25   examining those items?

1  A   The request that I received was to compare these cartridge

2  cases with firearms that were also submitted.  So the first

3  step of the examination process is to test fire the firearms.

4         By test firing the firearms, I made sure that the

5  firearm was operable, that it could operate safely, and that

6  it was -- it did function as designed by the manufacturer.  It

7  wasn't altered in any way.

8         And doing those test fires, I collected known

9  samples; the cartridge cases and the bullets.  So once those

10  were collected, I moved on to the cartridge cases.

11         I believe when I received this there were 55

12  cartridge cases in one bag.

13         The first step is to separate these cartridge cases

14  by their class characteristics, meaning their design.  And so

15  from this particular batch, there were three sets or three

16  sets of class characteristics; 7.62 by 39, a 5.45 by 39, and

17  also a .223 caliber cartridge cases.

18         And from that I was able to eliminate some cartridge

19  cases from being fired from a particular firearm because it

20  had a different class characteristics.

21         So I was able to group the 7.62 and the 5.45s

22  together.  And from there I compared them to the knowns from

23  the test fires from the firearm.

24         And from comparisons on the comparison microscope

25  which allows me to look at two samples at the same time,

1   again, the microscopic marks that we're talking about, if

2   there were sufficient agreement between the markings on the

3   known and the piece of evidence, I was able to conclude that

4   they were fired from that particular firearm.

5   Q   All right.  I would like to --

6          Your Honor, may I have the case agent approach the

7   witness with Exhibit No. 7, please?

8          THE COURT:  Yes.

9   BY MR. KOEHLER:

10  Q   Mr. Jiggetts, could you please examine Exhibit No. 7 and

11  tell us if you recognize that.

12  A   Yes.  Okay, sure.  Yes.  This was a firearm that was

13  submitted that I examined.  Again, I could tell by the FBI

14  number that I scribed on the bottom, the item number, and also

15  my symbols.

16  Q   And is that the firearm that you compared to a particular

17  type of ammunition that was submitted separately?

18  A   Yes.  This was one of the firearms that I used for my

19  identifications.

20  Q   And can you tell which ammunition to which you compared

21  that firearm?

22  A   This particular firearm is a 5.45 by 39 caliber firearm,

23  so I was able to identify the cartridge cases that were

24  submitted back to this firearm.

25  Q   Okay.  And if I could have the case agent return that and

 1    bring up Exhibit 10.

 2    A    Yes.  Again, this is another firearm that was submitted.

 3    The laboratory number is scribed on the bottom, the item

 4    number, and also, I scribed my symbols.

 5          And this particular firearm is a 7.62 by 39 caliber

 6    firearm.  And they were compared to all of the 7.62 by 39

 7    cartridge cases.  And in my conclusion that these cartridge

 8    cases were fired from this particular firearm.

 9    Q    Agent Whitson, would you return the firearm, please.

10          After you reached your conclusions that the cartridge

11    casings that you have marked in Exhibit 106 matched -- the

12    5.45 matched Exhibit 7 and the 7.62 matched Exhibit 10 -- did

13    you validate and confirm those results?

14    A    Yes.  Once I made the identification, another qualified

15    examiner is required to also examine the firearm and the

16    cartridge cases to confirm that they were fired from the same

17    particular firearm.  So it would have to be confirmed by

18    another qualified examiner.

19          MR. KOEHLER:  Thank you.  I have no further

20    questions, Your Honor.

21          THE COURT:  Mr. Maynard?

22          MR. MAYNARD:  I don't have any questions, Judge.

23          THE COURT:  May this witness be excused, Mr. Koehler?

24          MR. KOEHLER:  Yes, Your Honor.

25          MR. MAYNARD:  Your Honor, I'm going to object to

1    excusing him at this time.  Do you want an explanation?

2            THE COURT:  Yes.

3            MR. MAYNARD:  Okay.  Yesterday I received 23 CDs and

4    DVDs from the government that have 564 pages of documents

5    which includes testing.  I don't know whether or not any --

6            THE COURT:  Why don't we ask the question.

7            Did you do any other testing in relationship to this

8    case other than the comparison of these shell casings to the

9    shell casing that you fired through the two firearms that you

10   identified?

11           THE WITNESS:  The only other exams that I conducted,

12   whenever firearms are submitted to the laboratory, we must

13   test fire them and put them into NIBIN.  And those firearms

14   were tested and put into NIBIN.

15           But other than that, no other evidence was examined.

16           MR. MAYNARD:  Your Honor, I'm assuming I don't have

17   any questions.  I didn't have any questions based on the

18   report that I had received.  My only problem is I haven't had

19   the opportunity to review that 564 pages of documents.  I

20   don't know what's in there.

21           THE COURT:  Is there anything else related to

22   Mr. Jiggetts?

23           MR. KOEHLER:  None of which I'm aware, Your Honor.

24           THE COURT:  Well, then, Mr. Jiggetts, you may step

25   down but you are not excused as a witness.  You may be subject

1    to recall since the lawyers don't know at this moment if there

2    is any other reports of yours that are relevant.  Thank you.

3            THE WITNESS:  Sure.

4            THE COURT:  The government may call its next witness.

5            MS. BROOK:  Thank you, Your Honor.

6            Your Honor, the government has three witnesses which

7    are in transit right now.  They should be here in about ten

8    minutes.  If we could take our morning break just a few

9    minutes early, they will be here and we will be prepared to

10   continue.

11           THE COURT:  All right.  Ladies and gentlemen, we will

12   take a morning break.  We'll reconvene at five minutes after

13   10:00.

14           You are reminded, again, of the admonition not to

15   discuss the case among yourselves or with anyone else.  Also,

16   do not form any conclusions about the case until you have

17   heard all the evidence and begun your deliberations.

18           MR. KOEHLER:  Your Honor, may we have a moment?

19           THE COURT:  I will excuse the jury at this time and

20   we will see you at five minutes after 10:00.  Thank you.

21       (Open court, no jury present at 9:48 a.m.)

22           THE COURT:  Mr. Koehler?

23           MR. KOEHLER:  Yes.  I want to object to Mr. Maynard's

24   bringing up anything about discovery issues in the presence of

25   the jury.

1          It's inappropriate.  It's not an issue for the jury

2    to decide.  It's an issue for the Court to decide.  And

3    bringing it up in front of the jury is designed to make us

4    look bad in front of the jury.  It's completely inappropriate.

5          THE COURT:  Are you going to do -- are you going to

6    disclose any more CDs to him during the trial?

7          MR. KOEHLER:  Not that I'm aware of, Your Honor.

8          We have -- we have explained for the past four or

9    five months that there are laboratory results pending and that

10   we're trying to get everything to them as quickly as we can.

11         I know from looking through what I saw of those disks

12   that they contain underlying documentation from some of the

13   reports where there were no conclusions reached; no matching

14   prints, or there was one report that had one matching print

15   and we had disclosed that to the defense previously.  And then

16   I think the report has like the photographs of the print and

17   so on in high resolution on it.

18         So these don't contain new information.  The report

19   summarizes the information.  These contain the underlying

20   findings.  And we just received them within a day or so of

21   when they were turned over to the defense.

22         THE COURT:  And is this everything that's coming in

23   from the lab?

24         MR. KOEHLER:  I hope so.  It's my understanding that

25   it is, but I don't know.

```
 1            THE COURT:  Well, why don't you let me know too if
 2   you're going to give Mr. Maynard any new items, any more
 3   disclosure, and we can address if there are any issues with it
 4   at that time.
 5            MR. KOEHLER:  Thank you.
 6            THE COURT:  Anything else?
 7            Okay.  Court is in recess.
 8       (Recess taken at 9:50 a.m.; resumed at  10:08 a.m.)
 9            THE COURT:  Thank you, ladies and gentlemen.  Please
10   sit down.  The record will show the presence of the jury,
11   counsel, and the defendant.
12            The government may call its next writ.
13            MS. BROOK:  Thank you, Your Honor.  The government
14   called Special Agent Michael Lum.
15       (Witness duly sworn)
16            THE CLERK:  Please state your name for the record and
17   spell your last name.
18            THE WITNESS:  Michael Lum.  L-U-M.
19            THE COURT:  You may proceed, Ms. Brook.
20         SPECIAL AGENT MICHAEL LUM, WITNESS, SWORN
21                    DIRECT EXAMINATION
22   BY MS. BROOK:
23   Q    Thank you.  Good morning.
24   A    Good morning.
25   Q    Would you please introduce yourself to the jury.
```

UNITED STATES DISTRICT COURT

1  A   My name is Michael Lum.  I'm a special agent with the

2  Department of Homeland Security, Federal Protective Service.

3  And I have been assigned to the FBI's Joint Terrorism Task

4  Force since approximately 2010.

5  Q   How long -- so since 2010.

6          So you have been with the JTTF, the Joint Terrorism

7  Task Force, for five years.  And the jury has heard a lot

8  about the FBI.  You spoke about a different bureau with which

9  you're assigned within HSI.  What is that?

10  A   Actually, it's a -- the Federal Protective Service.  It's

11  a sub-component of the Department of Homeland Security.  It

12  falls directly under the headquarters branch.  It's tasked

13  with protecting federal employees, federal buildings, federal

14  property, and individuals on those properties or associated

15  with.

16  Q   How long have you been with that particular department?

17  A   I have been with the Federal Protective Service since

18  2009.

19  Q   And HSI?

20  A   I was never with HSI.  FPS left ICE in 2010.  But I have

21  been on and off with the Department of Homeland Security since

22  2002.

23  Q   Okay.  So that's what I'm getting at.  So you have been

24  with HSI, Homeland Security, since 2002.

25          And then at some point in 2010, did you receive a

1  promotion or a transfer to work with the FBI in the Joint

2  Terrorism Task Force?

3  A   I did.

4  Q   And as such, when you transferred and you started to work

5  on that particular team, did you receive additional training

6  about FBI protocols?

7  A   I did.

8  Q   And where did you get that?

9  A   There was a two-week class at the FBI headquarters here in

10  Phoenix.  And then I have also gone through evidence training,

11  hazardous evidence materials training, through FBI in

12  Virginia.

13  Q   And what sort of training have you gone through

14  specifically as it relates to evidence handling?

15  A   I'm a member of the FBI's Hazardous Evidence Material

16  Recovery Team.  So we learn how to deal with both hazardous

17  materials and the collection of evidence and hazardous

18  materials related to terrorist incidents.

19  Q   So is there a special area and procedures involved in

20  handling what has been classified or is classified as

21  "hazardous material" versus just "normal material"?

22  A   With hazardous material, such as radiological and

23  biochemical, there are other procedures, but as far as other

24  evidence, it's the exact same thing, the Evidence Response

25  Team.

1    Q    Okay.  So as a member of the Evidence Response Team and

2    being trained as such, I assume there are certain procedures

3    with which you follow when you identify and then collect

4    evidence?

5    A    There are.

6    Q    And what are those?

7    A    Well, you make sure that you're not contaminating the

8    scene, so you'll wear suits or you'll wear gloves if there's

9    issues.  Like with DNA, you wear masks; and then with

10   hazardous materials, you'll wear protective rebreathers and

11   gas masks.

12   Q    Okay.  So those procedures, wearing gloves and the -- you

13   know, procedures that you follow in your collecting evidence,

14   that's how you're trained with the FBI?

15   A    I am.

16   Q    And is that how you practice out in the field?

17   A    It is.

18   Q    So I want to speak specifically about a day which is June

19   10th of 2015.  Were you on duty that day?

20   A    I was.

21   Q    And were you called out to a scene to help assist in a

22   search?

23   A    I was.

24   Q    Where was it that you were called out to?

25   A    It was 5110 West Baseline Road at a Valero gas station

1   located on the northwest corner of that intersection of 51st

2   and Baseline.

3   Q   Did you know why you were being called out for that

4   particular search to that location?

5   A   Yes.  I was told it was for a consent search to retrieve a

6   firearm.

7   Q   And did you know what exactly it was that you would be

8   searching in an effort to retrieve a firearm?

9   A   Yes.  We were told it was the cab of a moving truck.

10   Q   Okay.  So I want to turn our attention -- I'm going to

11   place on the overhead what is not yet admitted, already marked

12   Exhibit No. 433.

13          Do you recognize what's in this photo?

14   A   I do.

15   Q   And what do you see?

16   A   It's the GMC Sidekick moving vehicle that we searched the

17   cab --

18   Q   And --

19   A   -- or Topkick, I believe.

20   Q   Is that the cab that you searched on June 10th of 2015?

21   A   It is.

22          MS. BROOK:  Your Honor, the government moves to admit

23   433 and publish.

24          MS. PLOMIN:  No objection, Your Honor.

25          THE COURT:  433 is admitted.

```
 1         (Exhibit No. 433 admitted in evidence.)
 2    BY MS. BROOK:
 3    Q   So what type of truck is it?
 4    A   It's a GMC Topkick moving truck.  It has a single cab up
 5    front and then just a cargo area in the rear there.
 6    Q   And the area specifically with which you searched, where
 7    was that?
 8    A   Just the passenger compartment of the vehicle.
 9    Q   If you can go ahead with your finger on the screen, circle
10    the area that you searched.
11    A   (Indicating)
12         MS. BROOK:  We've been having some technical
13    problems.  I don't know if it's working.
14         THE COURT:  I kind of think we all understand what
15    the passenger compartment is.
16    BY MS. BROOK:
17    Q   Very good.  So is it the part also that's orange?
18    A   It is.
19    Q   Okay.  So not the back part of the vehicle?
20    A   No.  Correct.
21    Q   All right.  So what was the vehicle license plate of this
22    particular truck?
23    A   It was CJ21056 and it was an Arizona plate.
24    Q   And you had mentioned that you knew going into the search
25    that there was a consent search, so thereby, the owner had
```

```
 1   given consent to search?

 2   A   I did.

 3   Q   I'm going to place on the overhead what's been marked as

 4   Government's Exhibit No. 142.  The form that we're looking at,

 5   is that one of the standard FBI Consent to Search forms?

 6   A   It is.

 7   Q   And does this form pertain to that search that day?

 8   A   It does.

 9   Q   And do you see the same license plate number that we spoke

10   about CJ21056?

11   A   I do.

12   Q   And then the signature authorizing the search?

13   A   I do.

14        MS. BROOK:  The government moves to admit and publish

15   142.

16        MS. PLOMIN:  No objection.

17        THE COURT:  142 is admitted.

18      (Exhibit No. 142 admitted in evidence.)

19   BY MS. BROOK:

20   Q   So let's go back to the search.  In the process of

21   searching the cab, did you identify items which you collected

22   and placed into evidence at the FBI?

23   A   I did.

24   Q   Let's start first with the bench front seat.

25        Did you search there?
```

```
1    A    I did.

2    Q    And did you find any items of interest or value?

3    A    I did.

4    Q    And I'm going to place on the overhead what has been

5    marked, not yet admitted, as Government's Exhibit No. 432.

6            Do you recognize what's in that photo?

7    A    I do.

8    Q    And what do you recognize it as?

9    A    I see a Maxwest cell phone that's connected to a charger

10   and it's placed on top of an RCA tablet that's closed.

11           MS. BROOK:  Government moves to admit and publish

12   434.

13           THE COURT:  Okay.  I'm going to try the same thing

14   that we were successful with Mr. Koehler.

15           Could you tell me of the photos that are listed as

16   being related to this search that we're talking about, what

17   numbers you're going to offer?  And then I can ask Ms. Plomin

18   if she will object to any of them and we may be able to save a

19   little time.

20           MS. BROOK:  Sure.  With 433 already being admitted,

21   it would be 434 through 442.

22           MS. PLOMIN:  No objection.

23           THE COURT:  434 to 442 are admitted.

24       (Exhibit Nos. 434, 435, 436, 437, 438, 439, 440, 441, and

25   442 admitted in evidence.)
```

1          THE COURT:  So we can just put them right on the

2   document camera for the jury to see as the witness is

3   describing what we're looking at.

4          MS. BROOK:  Excellent.  Thank you.

5   BY MS. BROOK:

6   Q   So you were talking about a phone.  And if you can, go

7   ahead and circle for us -- hopefully, it will work -- where

8   you see the phone on that bench seat.

9   A   Okay.  (indicating)

10          THE COURT:  Why don't you point with your finger and

11   have him confirm it.

12          MS. BROOK:  Sounds go.  There we go.

13          THE COURT:  Oh.  So it worked.

14   BY MS. BROOK:

15   Q   So that's where the phone is?

16   A   It is.  It's connected to the cell phone charger.

17   Q   What type of phone was it?

18   A   It was a Maxwest cell phone.

19   Q   And I want to talk for a moment about how you're trained

20   to handle digital media evidence when you collect it.

21          How are you trained?  What are you trained to do when

22   you are seizing and collecting digital media evidence?

23   A   With digital media, you leave it in the state you find it.

24   So if it's turned on, you leave it on.  If it's turned off,

25   you leave it turned off.

1           With this one, the charger was connected, so

2   everything was just taken the way it was, no buttons were

3   pushed and it was sealed into a bag.

4   Q    So that's how you engaged in the search that day.  You

5   know, you maintained the device in whatever state it was when

6   you found it?

7   A    Yes.

8   Q    All right.  I'm going to --

9           Your Honor, may I please approach and bring to the

10  witness Exhibit No. 126?

11          THE COURT:  Yes.

12          MS. BROOK:  Thank you.

13  BY MS. BROOK:

14  Q    Do you recognize that?

15  A    I do.

16  Q    And what do you recognize it as?

17  A    It's a cell phone that we -- or that I found on the bench

18  seat of the vehicle.  It's circled in the red.

19  Q    And you mentioned that you found it.  So was it placed

20  into evidence?

21  A    It was.

22  Q    Attached there, and I know we've separated it out so that

23  the jury can see both the bag as well as the phone, in the

24  two-part bags that are attached, is there a bag there that was

25  used to place the phone into evidence?

1   A    It is.  It's right here.

2   Q    And can you describe for us a little bit, as we look at

3   that bag, what are we seeing?

4   A    This is just a paper -- paper bag, similar to what they

5   have in grocery stores.  And it's used to enclose or secure

6   the evidence once you seize it.

7           MS. BROOK:  Your Honor, the government moves to admit

8   and just show Exhibit No. 126.

9           THE COURT:  Is there any objection?

10          MS. PLOMIN:  No objection.

11          THE COURT:  And what's the number again?

12          MS. BROOK:  126.

13          THE COURT:  126 is admitted.

14      (Exhibit No. 126 admitted in evidence.)

15          THE COURT:  So you just want him to hold it up?

16          MS. BROOK:  Yes.

17          THE COURT:  Just hold it up so the jury can see it.

18  BY MS. BROOK:

19  Q    So just so we all understand, so the bag that the evidence

20  is put in is right there up top?

21  A    Yes, it is.

22  Q    And what's the yellow stuff that we're looking at?

23  A    This is just evidence tape.  So once you actually place an

24  item into the bag, you seal it with the tape.  And then you

25  put the date and the time and you sign across the tape.  So if

1    it's opened, you can tell that no one has moved the tape.

2            THE COURT:  So it's a brown paper bag covered with

3    yellow tape?

4            THE WITNESS:  Yes.

5    BY MS. BROOK:

6    Q    And as we look at the bag, are there signatures on it?

7    A    There are.

8    Q    And what are those about?

9    A    Well, this was my signature when we seized it on June

10   10th.  And then someone opened it on June 11th.  And then on

11   8/20/2015 someone also opened it.  So as they are opening it,

12   they're resealing it and signing it across the crease to

13   prevent any tampering.

14   Q    Okay.  Let's move next to any other digital evidence that

15   you see there in the photo which is 434.

16           Do you see any other digital evidence?

17   A    I do.

18   Q    And what do you see?

19   A    There's an RCA tablet.  It's closed.  And the cell phone

20   is actually on top of it.

21   Q    Okay.  Can you maybe draw an arrow to it if it works?  If

22   not, I'll show it with my finger.

23   A    (Indicating)

24   Q    So the arrow there, for the record, pointing to the RCA

25   tablet, was that an android tablet?

1    A    I believe it was, yes.

2             MS. BROOK:  May I approach, Your Honor, with Exhibit

3    No. 132?

4             THE COURT:  Yes.

5             MS. BROOK:  I'm going to hand this to you and take

6    126.

7             Your Honor, may I place it on the table?

8             THE COURT:  Yes.

9    BY MS. BROOK:

10   Q    Do you recognize that?

11   A    I do.

12   Q    And what do you recognize it as?

13   A    It's the RCA tablet that we seized out of the cab of the

14   truck and it's actually underneath the cell phone and

15   delineated by the arrow.

16   Q    And how do you know?

17   A    I know it because I see the bag.  I signed it.  And I just

18   remember collecting it.

19            MS. BROOK:  Government moves to admit 132.

20            MS. PLOMIN:  No objection.

21            THE COURT:  132 is admitted.

22        (Exhibit No. 132 admitted in evidence.)

23            MS. BROOK:  May I approach one more time?

24            THE COURT:  Yes.

25   BY MS. BROOK:

1    Q    Did you also search in the back of the inside of the cab,

2    so behind the seat of the cab?

3    A    I did.

4    Q    And did you find any items back there that you collected?

5    A    I did.

6    Q    Placing on the overhead already admitted Exhibit No.

7    435 -- let me clear.  Maybe if you press the lower left-hand

8    part of your screen it might work.  There we go.

9         Describe for us so -- I'm pointing to this gray area

10   here on the bottom right-hand corner of the photo.

11         What's that?

12   A    That's the seat back of the actual bench seat.  And the

13   lever has been pushed, so the seat fell forward so you can

14   access the cargo area behind where typically the jack is found

15   and people store gear.

16   Q    And so now I'm going to also point to the second gray area

17   on the top upper part of the picture.

18         What's that?

19   A    That's the back wall.  And if you see above it, that's

20   just the glass window for the end of the passenger

21   compartment.

22   Q    I think you mentioned you found a bag.  Do you see that in

23   this photo?

24   A    I do.

25   Q    Can you point to it?

```
 1    A    (Indicating)

 2    Q    So is that a black bag?

 3    A    That is a black bag.

 4    Q    As part of collecting the bag, did you open the bag?

 5    A    We did.  I did.

 6    Q    And through the process of collecting and looking inside

 7    the bag, were you able to identify who the owner of the bag

 8    was?

 9    A    I was.

10    Q    And how was that?

11    A    There were documents inside the bag who -- that identified

12    who the owner of the bag was.

13    Q    Placing on the overhead what has already been admitted

14    Government's Exhibit No. 436.  You might have to press the

15    lower left.

16         Is this one of those documents?

17    A    It is.

18    Q    And can you read for us the name on the document?

19    A    Abdul Malik Abdul Kareem.

20    Q    And I'm showing on there --

21         MR. MAYNARD:  Your Honor.

22         THE COURT:  Yes?

23         MR. MAYNARD:  Could we have a sidebar very quickly?

24         THE COURT:  Is it concerning this exhibit?

25         MR. MAYNARD:  Yes.
```

```
 1              THE COURT:  No.  We can discuss it later.  It's
 2   already been admitted.
 3              MR. MAYNARD:  I understand, but there's a portion of
 4   it -- his social security number is showing.
 5              THE COURT:  I'm not concerned about that at this
 6   moment.
 7              MR. MAYNARD:  Okay.
 8   BY MS. BROOK:
 9   Q   Placing it back on the overhead, do you see a telephone
10   number?
11   A   I do.
12   Q   So 623-204-72 --
13              THE COURT:  Maybe 95?
14              MS. BROOK:  -- 95.  That's correct.
15              THE WITNESS:  Yes.  I see it.
16              MS. BROOK:  Your eyes are better than my.
17   BY MS. BROOK:
18   Q   -- 95 right there?
19   A   Correct.
20   Q   As well as a date of birth of July 30th, 1971?
21   A   I do see it.
22   Q   Okay.  Moving along to already-admitted Exhibit No. 438.
23              Do you recognize what's in this exhibit?
24   A   I do.  It's a tablet that we seized from that bag.
25   Q   Okay.  Let's talk specifically about that tablet.  And as
```

```
1    we do, I'm going to --
2              With Your Honor's permission, approach with Exhibit
3    No. 131.
4              THE COURT:  You may.
5    BY MS. BROOK:
6    Q    Do you recognize that?
7    A    I do.
8    Q    And what do you recognize it as?
9    A    It's the Nextbook tablet that was seized from the bag and
10   you can see the serial number on the photo.
11   Q    Okay.  And if you can on the tablet that's there, go ahead
12   and read for us what the serial number is.
13   A    Yankee Foxtrot Gulf Victor 0315004231.
14             MS. BROOK:  Your Honor, the government moves to admit
15   Exhibit No. 131.
16             MS. PLOMIN:  No objection.
17             THE COURT:  131 is admitted.
18       (Exhibit No. 131 admitted in evidence.)
19   BY MS. BROOK:
20   Q    And when you collected that Nextbook tablet, did you
21   follow the same procedures that you're trained to?
22   A    I did.
23   Q    And did you place it into the evidence bag as you're
24   trained to?
25   A    I did.
```

1    Q    Marking it in that bag itself, it has your signature?

2    A    It should in the bag.  I can't see it, but it's here.

3    Q    On the inside of the crease?

4    A    Yes, ma'am.

5         MS. BROOK:  Your Honor, may I approach one more time

6    to show the witness something related to the other two

7    exhibits?

8         THE COURT:  Yes.

9    BY MS. BROOK:

10   Q    If you can go up and hold that exhibit, do you see on the

11   back of it now a white tag on the Nextbook tablet if you turn

12   it over?

13   A    I do.

14   Q    Okay.  And that tag, does it bear a number, a "Q" number?

15   A    It does.

16   Q    And what number is that?

17   A    150713252AFC.

18   Q    And it says "Q" what?

19   A    Q2.

20   Q    Q2.  And I want to approach with already admitted Exhibit

21   No. 123 which is that RCA tablet on the front seat.

22         Does that also have a "Q" number on it?

23   A    It does.

24   Q    And what's is that?

25   A    Q3.

1    Q    And one more time with that Maxwest phone, Exhibit No.

2    126, does that have a "Q" number?

3    A    It does.

4    Q    And what is it?

5    A    Q4.

6    Q    Going back to this black bag, did you find another item

7    inside which was of evidentiary value?

8    A    I did.

9    Q    Placing on the overhead already-admitted Exhibit No. 439,

10   do you recognize what this picture shows?

11   A    I do.

12   Q    And what do you see?

13   A    There's the open pocket on the bottom part of the photo

14   and in that pocket is a Taurus revolver in a shoulder holster

15   with two-speed loaders.

16   Q    Go ahead.  And if you can, point to which pocket you're

17   talking about, or actually circle it.  That would be great.

18   A    (Indicating)

19   Q    And the record can reflect the witness has circled the

20   bottom portion of the exhibit.

21         Placing on the overhead already-admitted Exhibit No.

22   440, that's about as good as the focus is going to get.

23         What do you see there?

24   A    It's a shoulder holster holding the Taurus revolver.  The

25   holster itself and the -- where the speed loaders are being

 1   held in the holster.

 2   Q   And was this picture taken as a close-up of that weapon

 3   still inside the bag?

 4   A   It was.

 5   Q   Now, putting on the overhead already-admitted 441, what

 6   does this picture show?

 7   A   This is a closeup of the holster, the revolver, and the

 8   speed loaders which are in the pockets on the top-left corner

 9   of the photo.

10        MS. BROOK:  Your Honor, may I approach with Exhibit

11   No. 125?

12        THE COURT:  Yes.

13   BY MS. BROOK:

14   Q   You have before you Exhibit No. 125.  Can you go ahead and

15   open it for me.

16        What do you see?

17   A   It's the Taurus revolver that we seized that was in the

18   shoulder holster that was in the bag in the truck.

19   Q   And do you know what type of revolver?

20   A   It's a Taurus.

21   Q   .38 Special?

22   A   It is.

23   Q   And that was the one seized from inside the bag?

24   A   Correct.

25   Q   What color is it?

1    A   It's a blued -- it's called blued.  It's actually just a

2    black color.

3    Q   Black?

4    A   Yes.

5         MS. BROOK:  Your Honor, the government moves to admit

6    and to publish Exhibit No. 125.

7         MS. PLOMIN:  No objection.

8         THE COURT:  Well, let's ask him about its safety.

9         MS. BROOK:  Yes.  Thank you.  I'm sorry.

10   BY MS. BROOK:

11   Q   So that particular weapon, has it been made safe?

12   A   It has.  And you can see that there is a -- there is our

13   green zip tie in the cylinder.  And what that means is it's

14   been checked.  And they put the green zip tie in there so you

15   know that it's not loaded and it's in a safe condition.

16   Q   So you can tell that it's not loaded.  The barrel can't

17   move and that it's been made safe, so inoperable?

18   A   Yes.

19        MS. BROOK:  With that, Your Honor, may he stand?

20        THE COURT:  Yes.  Did I admit it yet?

21        MS. BROOK:  I don't think so.

22        THE COURT:  125 is admitted.

23      (Exhibit 125 admitted in evidence.)

24   BY MS. BROOK:

25   Q   Can you go ahead, sir, and just stand up so everybody can

1    see it a little bit more clearly.

2          THE COURT:  I know you said it's safe, but could you

3    point the barrel up?

4          Thank you.

5          Thank you.  You may sit down.

6    BY MS. BROOK:

7    Q   In looking at that weapon, the .38 Special Taurus

8    revolver, can you see the serial number?

9    A   I can.

10   Q   Can you read it for us, please.

11   A   HP97622.

12         MS. BROOK:  Your Honor, may I approach one more time

13   with three exhibits?

14         THE COURT:  Yes.

15         MS. BROOK:  Your Honor, I'm actually going to leave

16   that there for one moment.

17   BY MS. BROOK:

18   Q   An obvious point, but when you found it in that bag, it

19   was inside the shoulder holster?

20   A   Yes.

21   Q   So obviously, in that box the shoulder holster is not part

22   with it?

23   A   No.

24   Q   They have been separated?

25   A   They have been.

1   Q   Okay.  Moving along to item No. 366 which you have before

2   you -- and that would be ammunition, if that helps.

3   A   Correct.  It is.

4   Q   Okay.  Do you recognize it?

5   A   I do.

6   Q   And what is it?

7   A   It's the ammunition that was found inside the actual

8   revolver and in the speed loaders.

9   Q   What's a speed loader?

10   A   A speed loader is a device that holds the rounds for the

11   revolver.  So if you shoot the five rounds that are in the

12   revolver, you open the cylinder and dump the cartridges out

13   there.  You can grab the speed loader and it fits right into

14   the cylinder.  You turn the knob and then it loads it

15   automatically.  It was the equivalent of a magazine for a

16   revolver.

17   Q   So what's the purpose of it?

18   A   To be able to shoot fastly.

19   Q   Placing on the overhead Exhibit No. 4 -- I'm sorry -- 442.

20           In this photo do you see the speed loaders you were

21   talking about?

22   A   I do.

23   Q   And are those the same speed loaders that you found with

24   this particular Taurus .38 revolver?

25   A   They are.

1    Q    In looking at Exhibit No. 366, we spoke about it being

2    ammunition.

3    A    It is.

4    Q    And I think you already said, but is that ammunition the

5    ammunition that was collected from and with this particular

6    Taurus inside the defendant's bag on that day?

7    A    It is.

8             MS. BROOK:  Government moves to admit Exhibit 366.

9             MS. PLOMIN:  No objection.

10            THE COURT:  366 is admitted.

11        (Exhibit No. 366 admitted in evidence.)

12   BY MS. BROOK:

13   Q    Let's go back to the black bag.  In that black bag did you

14   find a checkbook?

15   A    I did.

16   Q    Before you you have Exhibit No. 437.  Do you recognize

17   that?

18   A    I do.

19   Q    And what do you recognize it as?

20   A    It's a BMO Harris checkbook with the name of Abdul Malik

21   Abdul Kareem and the check -- the account numbers.

22            MS. BROOK:  Government moves to admit Exhibit No.

23   437.

24            MS. PLOMIN:  No objection.

25            THE COURT:  437 is admitted.

```
 1              (Exhibit No. 437 admitted in evidence.)

 2                   MS. BROOK:  May I come up for just one moment?

 3                   THE COURT:  Yes.

 4                   MS. BROOK:  Your Honor, may I publish part of the

 5       checkbook?

 6                   THE COURT:  Yes.

 7       BY MS. BROOK:

 8       Q   Let's turn it so it's right-side up.

 9                   You had spoke about the name Abdul Malik Abdul

10       Kareem?

11       A   I did.

12       Q   And in looking at the overhead now, is that what we're

13       seeing?

14       A   Yes.  It is.

15       Q   If we can turn our attention next to Exhibit No. 138 that

16       you have before you, do you recognize that?

17       A   I do.

18       Q   And what do you recognize it as?

19       A   It's a Fortress Of The Muslim:  Invocation of the

20       Qur'an --

21                   THE COURT:  Is it a book?

22                   THE WITNESS:  It's a book.

23       BY MS. BROOK:

24       Q   And is that book in the same or similar condition as it

25       was when you found it?
```

1    A    It is.

2    Q    Where did you find it?

3    A    It was in one of the pockets of the actual -- the black

4    back.

5         MS. BROOK:  The government moves to admit Exhibit No.

6    138.

7         MS. PLOMIN:  No objection.

8         THE COURT:  138 is admitted.

9    (Exhibit No. 138 admitted in evidence.)

10   BY MS. BROOK:

11   Q    So just for clarification, it was in one of the pockets?

12   A    It was.

13   Q    And additionally, one of the pockets of this black bag and

14   I have on the overhead Exhibit No. 435 already admitted; is

15   that correct?

16   A    Yes.  It's from that bag.

17        MS. BROOK:  May I have one moment?

18        THE COURT:  Yes.

19        MS. BROOK:  I don't have any other questions.

20        THE COURT:  Ms. Plomin?

21                    CROSS EXAMINATION

22   Q    Good morning.

23   A    Good morning.

24   Q    Agent Lum, so Mr. Abdul Kareem, he freely consented to the

25   FBI searching through his entire truck; is that correct?

```
 1    A    That's my understanding, yes.

 2    Q    All right.  And he was cooperative with you?

 3    A    I never saw him.

 4    Q    Okay.  Now, are you aware that an individual by the name

 5    of Hakeem Sampson was also in the truck when Mr. Kareem was

 6    taken from it?

 7    A    I was not aware of that.

 8    Q    And let's talk about what you did find.

 9              You found .38 ammunition, correct?

10    A    I did.

11    Q    And a .38 revolver?

12    A    I did.

13    Q    And no other ammunition?

14    A    No.

15    Q    All right.  And as far as you know as an FBI agent, you do

16    have training in how to -- in firearms, correct?

17    A    I'm not an FBI agent, but I do have training in firearms.

18    Q    And you are aware that .38 ammunition cannot be fired from

19    any kind of assault rifle, correct?

20    A    Correct.

21    Q    Not from an AK-47, correct?

22    A    Correct.

23    Q    Not from an AK-74, correct?

24    A    Correct.

25    Q    Now, when you collected the electronic items, the cell
```

1    phone and the two tablets or laptops, I'm assuming you wore

2    gloves like you wore when you handled the firearm on the

3    stand, correct?

4    A   I did.

5    Q   And were you a part of or did you see anybody processing

6    those items for fingerprints or DNA or hair samples, anything

7    like that?

8    A   No.  I did not.

9    Q   And you didn't see anybody processing them?

10   A   No one processed the evidence for DNA, hair samples at the

11   scene.  It was collected and placed in the bags.

12   Q   And you collected them as you're trained to do in order to

13   preserve such types of evidence, correct?

14   A   Yes.

15   Q   And you took them with your gloves and placed them into

16   the bags as you were trained, correct?

17   A   I did, yes.

18   Q   And you're not aware of whether they were processed at all

19   for types of physical evidence to identify who had been

20   handling these items, correct?

21   A   Well they had "Q" numbers that indicates that they were

22   sent to the lab.

23   Q   Okay.  "Q" numbers.  Are you familiar with which lab those

24   would have been sent to?

25   A   The FBI lab.

1   Q   Okay.  For to look inside the devices, to see what was

2   inside, or to process them for physical evidence?

3   A   That I don't know.

4   Q   Okay.  Now, the black bag that you found, inside that bag

5   there were documents, legal documents, medical records,

6   financial records, receipts, all attributed to Mr. Abdul

7   Kareem, correct?

8   A   Yes.

9   Q   And his moving company, Git-r Done Moving Company,

10   correct?

11   A   Yes.

12   Q   So it was kind of like a briefcase.  Is that fair to say?

13   A   Yes.

14   Q   And in that bag you did not locate any kind of maps or

15   articles or fliers relating to Garland, Texas, or the Draw

16   Muhammad Contest there, correct?

17   A   No.

18   Q   And you did not locate any kind of ISIS flags or ISIS

19   material, correct?

20   A   No.

21   Q   No communication with anybody, and specifically, any

22   another terrorists, correct?

23   A   Correct.

24   Q   And in the entire cab of the vehicle that you did search,

25   you didn't find any such kind of material that I was just

1    asking you about, correct?

2    A    Correct.

3    Q    And you found no other firearms?  I'm sure you would have

4    mentioned that; is that correct?

5    A    Correct.

6    Q    And you found no explosive devices in that truck, correct?

7    A    Correct.

8    Q    And you're actually trained to identify such; is that

9    correct?

10   A    Yes.  It's -- as far as a device, I wouldn't know what a

11   device is.  But if something was suspicious, then I would know

12   that and I would call in the Bomb Squad.

13   Q    And no such materials in order to make an explosive

14   device, correct?

15   A    I didn't see any.

16   Q    And no sorts of manuals in order to make a pipe bomb or

17   any kind of explosive device, correct?

18   A    Correct.

19           MS. PLOMIN:  Thank you very much.

20           THE COURT:  Thank you.

21           Any additional questions, Ms. Brook?

22           MS. BROOK:  Just one moment.

23                    **REDIRECT EXAMINATION**

24   BY MS. BROOK:

25   Q    The search that you conducted of that GMC cab, it occurred

1    on June 10th of 2015?

2    A    It did.

3    Q    Approximately five weeks after May 3rd of 2015?

4    A    Yes.

5             MS. BROOK:  I don't have any other questions.

6             THE COURT:  May this witness be excused?

7             MS. BROOK:  Yes.

8             THE COURT:  Is there any objection?

9             MS. PLOMIN:  No.

10            THE COURT:  Thank you, Agent Lum.  You may step down

11   and you are excused as a witness.

12            The government may call its next witness.

13            MS. BROOK:  Thank you, Your Honor.

14            The government calls Clint Hemberg.

15       (Witness duly sworn)

16            THE CLERK:  Please state your name for the record and

17   spell your last name.

18            THE WITNESS:  Sure.  Clint Hemberg.  H-E-M-B-E-R-G.

19            THE COURT:  You may proceed, Ms. Brook.

20            MS. BROOK:  Thank you, Your Honor.

21            **SPECIAL AGENT CLINT HEMBERG, WITNESS, SWORN**

22                          **DIRECT EXAMINATION**

23   BY MS. BROOK:

24   Q    Good morning.

25   A    Good morning.

1   Q   Would you please introduce yourself to the ladies and

2   gentlemen of the jury.

3   A   Sure.  My name is Special Agent Clint Hemberg.

4   Q   And who are you a special agent with?

5   A   The Federal Bureau of Investigation.

6   Q   How long have you been with the FBI?

7   A   Just over six years.

8   Q   And when you started with the FBI, were you sent to

9   Quantico for training?

10   A   I was.

11   Q   Did you complete and move on from the Quantico training?

12   A   I did.

13   Q   And where were you first assigned after you were trained?

14   A   The Phoenix Division.

15   Q   Have you been here ever since?

16   A   I have.

17   Q   And specifically, where are you assigned?

18   A   I'm assigned to a Counterterrorism Squad here in the

19   Phoenix Field Office.

20   Q   As part of your duties in the field, and certainly your

21   training at Quantico, were you trained on how to properly

22   collect and place into evidence?

23   A   I was.

24   Q   How were you trained?

25   A   We received instruction.  We were walked through practical

1    scenarios.  We were tested.  And then we were certified that

2    we knew how to follow proper procedures.

3    Q   And so as part of your work over the last six year here in

4    the Phoenix Field Office, have you had occasion to be out in

5    the field collecting evidence?

6    A   Yes, I have.

7    Q   Is that something you routinely do?

8    A   Yes.

9    Q   And when you do so, do you follow the procedures by which

10   you're trained?

11   A   I do.

12   Q   I want to talk specifically about June 10, 2015.  On that

13   day were you called upon to be part of a search team that was

14   searching Abdul Kareem Abdul -- I'm sorry -- Abdul Malik Abdul

15   Kareem's home at 13205 North 21st Place?

16   A   Yes, I was.

17   Q   On that day as part of your duties with the search, did

18   you identify -- well, locate, identify, and place into

19   evidence certain items?

20   A   Yes, I did.

21   Q   I want to speak about just a couple.

22          Placing on the overhead screen not yet admitted

23   Government's Exhibit 443.

24          Do you recognize what's in this photo?

25   A   Yes, I do.

```
 1    Q    And I know the photo is a little dark, so what do you
 2    recognize it as?
 3    A    In the closet in the upper right sides there's a bow and
 4    arrow and this was the defendant's bedroom that we were
 5    searching on that day.
 6    Q    Okay.  In that particular residence?
 7    A    Correct.
 8              MS. BROOK:  Government moves to admit and publish
 9    443.
10              MS. PLOMIN:  No objection.
11              THE COURT:  443 is admitted.
12        (Exhibit No. 443 admitted in evidence.)
13    BY MS. BROOK:
14    Q    As we look at this photo, you had spoken a moment ago
15    about the closet and you spoke about a crossbow.  We're going
16    to get to that in a second.
17              In the photo do you see a safe?
18    A    Yes, I do.
19    Q    And as depicted in this photo, does this photo show the
20    safe before a locksmith was brought in to open it up?
21    A    That's correct.
22    Q    Okay.  Can you go ahead and just circle for us where that
23    safe is?
24    A    (Indicating)
25    Q    You may have to try a couple of times.
```

1              So you circled right here?

2     A    Correct.

3     Q    Okay.  Is there a box in that photo as well?

4              And you know what?  With the resolution and with the

5     tint it is hard to see.  Can I bring it to him for one moment

6     or can we show him Exhibit No. -- it would be better -- 443?

7              THE COURT:  Yes.

8              MS. BROOK:  Thank you.  The reflection makes it

9     difficult.

10    BY MS. BROOK:

11    Q    As Maureen is getting that, you had spoken a moment ago

12    about a crossbow.  What's that?

13    A    A crossbow is just a -- basically like a hunting bow.  And

14    then there were arrows and a kit associated with it that

15    looked like there were spare arrow tips and some other items

16    that would go along with it.

17    Q    And whereabouts did you find that?

18    A    That was up in the upper right-hand corner of the closet.

19    Q    Okay.  So in this particular area?

20    A    Correct.

21    Q    And I just want you to go ahead now that you have before

22    you Exhibit No. 143.  Open that up.  It doesn't have the glare

23    on it.  Do you see the safe?

24    A    Yes, I do.

25    Q    Okay.  And is it on the far right-hand side of the closet?

1   A   It is.

2   Q   Okay.  So moving back to the bow, may I approach, Your

3   Honor?

4           THE COURT:  Yes.

5           MS. BROOK:  Actually, may Special Agent Whitson

6   approach with Exhibit 122?

7           THE COURT:  Yes.

8   BY MS. BROOK:

9   Q   Can you go ahead and open it up and tell us if you

10   recognize what's in 122?

11   A   Sure.  It is the same bow that we found during the search

12   on that day in his residence.

13   Q   Okay.  And as part of the search, was it collected and

14   placed into evidence?

15   A   That's correct.

16           MS. BROOK:  All right.  Your Honor, the government

17   moves to admit and publish 122.

18           MS. PLOMIN:  No objection.

19           THE COURT:  122 is admitted.

20       (Exhibit No. 122 admitted in evidence.)

21   BY MS. BROOK:

22   Q   Perhaps it would be easiest if you could just stand up and

23   show us what's inside Exhibit No. 122.

24           THE COURT:  Is it still attached?

25           THE WITNESS:  It is.

```
 1                THE COURT:  Oh, okay.
 2                MS. BROOK:  And you can actually walk down because
 3     we'll put it on the table anyways, if that's okay with Your
 4     Honor.
 5                THE COURT:  Yes.
 6                MS. BROOK:  Your Honor, there's a second component to
 7     122, if Special Agent Whitson can approach?
 8                THE COURT:  He may.
 9     BY MS. BROOK:
10     Q    Do you recognize what's inside that box?
11     A    Yes, I do.
12     Q    And what is it?
13     A    It's a set of arrows and then the various attachments and
14     looks like tools to adjust the actual bow and the arrow
15     itself.
16     Q    Where have you seen those before?
17     A    It was also found in the closet in the bedroom at his
18     residence I just pointed out.
19     Q    Okay.  Was it in the same location up here in the upper
20     part of the shelf?
21     A    That is correct.
22     Q    Or the closet, rather, the shelf component of the closet?
23     A    Yes.
24                MS. BROOK:  Your Honor, the government moves to
25     publish the arrows as well.
```

```
 1              THE COURT:  What's the number.

 2              MS. BROOK:  They were marked together.

 3              THE COURT:  Oh.  So it's all 122?

 4              MS. BROOK:  Yes.

 5              THE COURT:  Okay.  I assume there's no objection to

 6     the other part of 122?

 7              MS. PLOMIN:  No, Your Honor.

 8              THE COURT:  Okay.  Yes.  Go right ahead.

 9     BY MS. BROOK:

10     Q    Placing on the overhead what has not yet been admitted,

11     Government's Exhibit No. 444, do you recognize what's in this

12     photo?

13     A    Yes, I do.

14     Q    And what do you see?

15     A    It's a safe that was -- in the previous picture that we

16     discussed -- it's opened, where the items that were inside,

17     some of them have fallen out.

18     Q    Talk to us for a moment about the opening of the safe.

19              So who was it that was called in?

20     A    A locksmith was brought in, because when we initially went

21     into the house the safe was locked and shut.

22     Q    Okay.  So a locksmith was called in to open the safe?

23     A    Correct.

24              MS. BROOK:  Government moves to admit and publish

25     Exhibit No. 444.
```

1            MS. PLOMIN:  No objection.

2            THE COURT:  444 is admitted.

3      (Exhibit No. 444 admitted in evidence.)

4  BY MS. BROOK:

5  Q   As we look at this exhibit, do you see a bulletproof vest?

6  A   Yes, I do.

7  Q   And where do you see that?

8  A   It's inside the safe.  Would you like me to circle it or?

9  Q   Yes, please.

10  A   Okay. (Indicating)

11          MS. BROOK:  And, Your Honor, may the record reflect

12  that the witness has just circled the center part of Exhibit

13  No. 444.

14          May I approach?

15          THE COURT:  Yes.

16          MS. BROOK:  I'm bringing Exhibit No. 115.

17  BY MS. BROOK:

18  Q   What is that?

19  A   This is the same vest that's depicted in the photo.

20  Q   And was that the vest that you identified there inside the

21  safe and placed into evidence on the 10th?

22  A   That's correct.

23          MS. BROOK:  Government moves to admit and to publish

24  115.

25          MS. PLOMIN:  No objection.

1        THE COURT:  115 is admitted.

2        (Exhibit No. 115 admitted in evidence.)

3   BY MS. BROOK:

4   Q   Turning our attention --

5        Well, actually, can you take 115 and stand up with it

6   for a moment?

7   A   Sure.

8        MS. BROOK:  Your Honor, may the witness walk down in

9   front of the jury?  We're going to place it on the table

10  anyway, but I just want him to be able to show some of the

11  components of the vest.

12       THE COURT:  Yes.

13       MS. BROOK:  If you can step down here and speak

14  loudly when you come down.

15  BY MS. BROOK:

16  Q   Can you explain to the jury, describe what are the

17  features of that particular vest?

18  A   If you look, it's formerly standard U.S. military issue,

19  back Cold War era.  So the features, it's fit with shoulder

20  protection.  There's also some outer pockets.

21       MS. BROOK:  Maybe if you could step back so you're

22  closer to Ms. Lemke, that would be great.

23       THE WITNESS:  Sure.  The other features is that it's

24  able to be closed and zipped securely.  As I mentioned,

25  there's also exterior pockets so you can store different

1    weapons, magazines, and different types of ammunition.

2    BY MS. BROOK:

3    Q   You said "Cold War era."  What makes you say that?

4              THE COURT:  Okay.  Let's have him get back to the

5    microphone.  Why don't you leave the vest on the table?

6              MS. BROOK:  Thank you, Your Honor.

7              THE WITNESS:  So as far as Cold War era, I was an

8    Infantry officer in the United States Army from 2002 to 2007.

9              So that same type of vest was utilized when I was a

10   cadet for some of the ranges we went to where we trained.

11   Specifically, I recall receiving grenade training where we

12   were given live hand grenades to throw --

13             THE COURT:  Okay.  The question was:  Why did you

14   refer to it as a "Cold War" issue era vest?

15             THE WITNESS:  Sure.  So the vest itself is not

16   something that's currently issued within the U.S. military.

17   It's an older model.

18             As far as the vest and the type of equipment being

19   issued today, it's -- it doesn't offer the same level of

20   protection, but it was something that was issued within the

21   U.S. Army back, you know, pre at least 1998 when I came in.

22   It was an older model.

23   BY MS. BROOK:

24   Q   And you also mentioned it has some pockets on the front of

25   it?

```
 1    A    Correct.

 2             MS. BROOK:  May I approach with two more exhibits?

 3             THE COURT:  Yes.

 4    BY MS. BROOK:

 5    Q    Approaching with 113 and 200, starting first with Exhibit

 6    No. 113, do you recognize that?

 7    A    Yes, I do.

 8    Q    And what do you recognize it as?

 9    A    It's a CD that was recovered during the search of the

10    apartment.

11    Q    Do you remember where?

12    A    Yes.  There was a desk near the kitchen of the apartment

13    where there was a shelf inside the desk and there were a

14    number of CDs and DVDs stored within it.

15    Q    Placing on the overhead what has already been admitted

16    Government's Exhibit No. 397.

17             You spoke about the desk in the living room in

18    relation to the first CD which is No. 113.

19    A    Correct.

20    Q    Is this the desk you're referring to?

21    A    That's correct.

22             MS. BROOK:  All right.  Read for -- well, the

23    government moves to admit Exhibit No. 113.

24             MS. PLOMIN:  No objection.

25             THE COURT:  113 is admitted.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

```
 1          (Exhibit No. 113 admitted in evidence.)

 2     BY MS. BROOK:

 3     Q    What color is the outside of it?

 4     A    It's purple.

 5     Q    And is there stamped labeling or handwritten labeling?

 6     A    There's handwritten labeling in addition to the standard

 7     stamped labeling you would see on a disk when it's sold.

 8     Q    Okay.  So stamped labeling, just indicating that it's a

 9     DVD or a CD or whatever it happens to be?

10     A    Correct.

11     Q    And then the handwritten labeling, can you read for us

12     what the handwritten table says?

13     A    Sure.  At the top it says:  "The Hereafter.  Volume 1.  CD

14     7."

15              MS. BROOK:  May I approach?

16              THE COURT:  Yes.

17              MS. BROOK:  May I publish on the overhead, Your

18     Honor?

19              THE COURT:  You may.

20     BY MS. BROOK:

21     Q    There we go.  Moving next to Exhibit No. 200, do you

22     recognize that?

23     A    I do.

24     Q    And what do you recognize it as?

25     A    It's a CD that was also recovered in the desk we just
```

UNITED STATES DISTRICT COURT

1    discussed.

2    Q   And was that too collected as part of your procedure that

3    day at the defendant's house on June 10th?

4    A   Yes, it was.

5    Q   Placed into evidence?

6    A   Correct.

7            MS. BROOK:  Government moves to admit Exhibit No.

8    200.

9            MS. PLOMIN:  No objection.

10           THE COURT:  200 is admitted.

11       (Exhibit No. 200 admitted in evidence.)

12   BY MS. BROOK:

13   Q   Please read for us what that CD says.

14   A   The top says Hirens -- I'll just spell it.  H-I-R-E-N-S.

15   And at the bottom it's labeled 15.1.

16           MS. BROOK:  Your Honor, may I approach one more time?

17           THE COURT:  Yes.

18           MS. BROOK:  May I publish?

19           THE COURT:  You may.

20           MS. BROOK:  May I have a moment?

21           THE COURT:  Yes.

22   BY MS. BROOK:

23   Q   And I think you already said, but just for clarification,

24   that CD was found in that desk or on the desk?

25   A   It was actually next to the desk.  There's a shelf area.

CR15-00707-PHX-SRB   JURY TRIAL-DAY #6   2-24-16

1    At the very -- in the photo at the very bottom of the desk you

2    can see there's a storage cabinet there.

3    Q    And it was found right in that storage cabinet?

4    A    Correct.

5              MS. BROOK:  I have no further questions.

6              THE COURT:  Ms. Plomin?

7                         **CROSS EXAMINATION**

8    BY MR. MAYNARD:

9    Q    Good morning, Agent.

10    A    Good morning.

11    Q    So, Agent, you participated in this search of Mr. Abdul

12    Kareem's apartment on June 10th, correct?

13    A    That is correct.

14    Q    And I just want to talk to you about the CDs that you

15    recovered.  You mentioned two CDs here today.  But, in fact,

16    your team recovered 64 CDs total from Mr. Kareem's apartment

17    and car, correct?

18    A    I wouldn't know the exact number, but there were multiple

19    CDs recovered at the residence.

20    Q    Many CDs?

21    A    Correct.  That's a correct statement.

22    Q    And including a larger kind of black CD case that you see

23    with kind of the four CDs can fit per page, correct?

24    A    Yeah.  Yes, I recall that.

25    Q    And you recovered CDs.  A vast majority of the CDs had

UNITED STATES DISTRICT COURT

1    nothing of interest to you on the CDs; is that correct?

2    A   I didn't do the subsequent exploitation of the CDs, but I

3    would say there was a broad mix of different types of CDs that

4    we recovered.

5    Q   And did you see CDs or DVDs of movies, just popular

6    movies?

7    A   Yes, I did.

8    Q   All right.  Like Gladiator, correct?

9    A   I don't recall that specifically, but, you know, that

10   would be -- right.  That would be an example of a type of

11   movie I think we saw there.

12   Q   Men In Black?

13   A   You would have to show me to remember exactly, but there

14   were movies, you know, such as that.

15   Q   Okay.  And you also recovered several music CDs, correct?

16   A   Correct.

17   Q   Michael Jackson, correct?

18   A   I don't recall that one specifically.

19   Q   Okay.  But popular music CDs that you recognized the names

20   of the artists, correct?

21   A   That's correct.

22   Q   And I just want to clarify with you.  The items that

23   you've testified to here today, those are the only items you

24   recovered that were of interest to you; is that correct?

25   A   There may have been other items I recovered, but these

1  were the ones that stand out, particularly, you know, the

2  first group we covered.

3  Q   Okay.  And when you were on the scene, did you see

4  forensic technicians or part of your team processing the scene

5  for fingerprints, DNA, hair samples of who may have handled

6  the various items that were seized?

7  A   That type of exploitation was not done immediately upon

8  seizure from what I recall.  That would have been done

9  subsequent to -- after we took possession of everything.

10  Q   What about the actual physical apartment, the desk that

11  you mentioned, the closet, the safe?  Were there people there

12  processing them to see who had access to those areas in the

13  apartment?

14  A   I don't recall that being done, no.

15  Q   And so you did not see that being done, correct?

16  A   No.  There were computer exploitation teams there.  I do

17  recall that.  But I don't recall the other stuff you

18  indicated.

19  Q   And you yourself did not locate any ISIS propaganda or

20  anything to that nature, did you?

21  A   No.  Not that I recall.

22  Q   And you yourself did not locate anything relating to

23  Garland, Texas, or an attack or a Prophet Drawing Contest, I'm

24  sorry?

25  A   Me personally, no.  I just, you know, seized the items

1    initially and it was examined afterwards for that type of

2    information.

3    Q   And you did not see any explosive manuals or how to make

4    an explosive or any kind of explosive devices, correct?

5    A   No.  I don't recall seeing that.

6            MS. PLOMIN:  Thank you very much.  I have no further

7    questions.

8            THE COURT:  Any redirect, Ms. Brook?

9            MS. BROOK:  Yes, Your Honor.  Just one moment.

10                       **REDIRECT EXAMINATION**

11   BY MS. BROOK:

12   Q   Just briefly, defense counsel asked you about items of --

13   you know, popular culture, movies, music.

14           Did you -- or can you identify any particular movie

15   or album by name?

16   A   I can't, no.

17   Q   And you executed this search on June 10th of 2015?

18   A   Correct.

19   Q   So approximately five-and-a-half weeks after May 3rd of

20   2015?

21   A   Correct.

22           MS. BROOK:  I don't have any other questions.

23           THE COURT:  May this witness be excused?

24           MS. BROOK:  Yes.

25           THE COURT:  Any objection?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

```
 1              MS. PLOMIN:  No.

 2              THE COURT:  Agent Hemberg, you may step down, sir,

 3   and you are excused as a witness.

 4              The government may call its next witness.

 5              MS. BROOK:  Thank you, Your Honor.  The government

 6   calls Jennifer Fisher.

 7              THE COURT:  I'm glad to see the jurors taking my

 8   advice on a little bit of a standing break.

 9        (Witness duly sworn.)

10              THE CLERK:  Please state your name for the record,

11   spelling your first and last name.

12              THE WITNESS:  It's Jennifer.  J-E-N-N-I-F-E-R.  Last

13   name Fisher.  F-I-S-H-E-R.

14              MS. BROOK:  Good morning.

15              THE WITNESS:  Good morning.

16              THE COURT:  And is Ms. Fisher one of the individuals

17   that wasn't on the list?

18              MS. BROOK:  I believe she may have been.

19              THE COURT:  Her name is not -- just to be sure.

20              Ladies and gentlemen, Ms. Fisher's name may not have

21   been on the list that you reviewed.

22              Do any of you know Ms. Fisher?  If so, raise your

23   hand.

24              No hands.  Please proceed, Ms. Brook.

25              MS. BROOK:  Thank you.
```

1      **JENNIFER FISHER, WITNESS, SWORN**

2      **DIRECT EXAMINATION**

3    BY MS. BROOK:

4    Q    Please introduce yourself.

5    A    I am Jennifer Fisher.

6    Q    And where are you employed?

7    A    I'm employed at the Federal Bureau of Investigations here

8    in Phoenix, Arizona.

9    Q    How long have you been with the FBI?

10   A    I have been with the FBI three years, eleven months.

11   Q    And, specifically, what is your assignment?

12   A    Specifically, my title is Administrative Specialist.

13   Q    What does that mean?

14   A    I work in Human Resources doing the hiring of all

15   applicants.

16   Q    Are you also called upon to collect and assist with search

17   warrants?

18   A    Yes.  I'm a member of the Evidence Response Team as well.

19   Q    When did you become a member of the Evidence Response

20   Team?

21   A    In October, 2014.

22   Q    And when you became a member of the Evidence Response

23   Team, did you go through training?

24   A    I did, yes.

25   Q    What was that training like?

```
 1    A    That's 80 hours of evidence response training.
 2    Q    And at the end is there just a completion of it?
 3    A    Yes, there is, but there's continuation of training any
 4    time you would like to go.
 5    Q    Okay.  So throughout your time, have you gone to --
 6    A    I've gone to additional training, yes.
 7    Q    And have you been called upon prior to June 10th of 2015
 8    to assist and partake in search warrants?
 9    A    I have, yes.
10    Q    Is that something you regularly do?
11    A    It is, yes.
12    Q    I want to speak specifically about June 10th of 2015.
13    Were you called upon to assist at a search warrant at 13205
14    North 21st Place?
15    A    I was, yes.
16    Q    And on that day did you identify items of evidentiary
17    value which you had collected and put into evidence?
18    A    Yes, I did.
19    Q    When you did that, did you collect those items and place
20    them into evidence as you're trained to?
21    A    I collect the items of evidence, yes.
22    Q    And describe how you do that.
23    A    With gloves on.  We will search the premises of what we're
24    looking for according to the search warrant.  And then we will
25    continue to search for that and those items.  And if we do
```

1    find those items, then we do collect them at the time.

2            MS. BROOK:  Your Honor, may I approach with Exhibit

3    No. 120?

4            THE COURT:  Yes.

5            MS. BROOK:  Thank you.

6    BY MS. BROOK:

7    Q    Placing on the overhead what's already been admitted and

8    published as Government's Exhibit 124.  And turning our

9    attention to 120, the exhibit in front of you first.

10   A    Yes.

11   Q    Can you open that and tell us if you recognize it?

12   A    Can I flip it over because it's top-heavy?

13   Q    Yes.  Please.

14   A    Yes.  That is the item.

15   Q    And what do you recognize it as?

16   A    Do you mind if I put gloves on?

17   Q    Please.

18   A    Okay.  Item 120 is a machete.

19   Q    Did you find that that day at 13205 North 21st Place?

20   A    I did, yes.

21           MS. BROOK:  Government moves to admit and publish

22   Exhibit No. 120.

23           MR. MAYNARD:  No objection.

24           THE COURT:  120 is admitted.

25       (Exhibit No. 120 admitted in evidence.)

```
 1   BY MS. BROOK:

 2   Q   Before we get to publishing it, let me take a second.

 3   Where was it that you found it?

 4   A   With the sketching place, it was in room E.

 5   Q   And looking at Exhibit No. 124 which is before the jury,

 6   can you circle room E for us.

 7   A   I don't know if I can do it with the gloves.  I will do it

 8   with my thumb.  Hold on.

 9          THE COURT:  It didn't work.

10   BY MS. BROOK:

11   Q   Okay.  Let's put a picture up of it.

12   A   It's not working.  Sorry.

13   Q   Placing on the overhead what has not yet been admitted as

14   445, do you recognize what's in that photo?

15   A   I do, yes.

16   Q   And what is it?

17   A   That would be the item, the machete.

18   Q   Okay.  You had spoken about room E.

19          In this picture do you see room E?

20   A   I do, yes.

21          MS. BROOK:  And the government moves to publish --

22   admit and publish 445.

23          MR. MAYNARD:  No objection.

24          THE COURT:  445 is admitted.

25       (Exhibit No. 445 admitted in evidence.)
```

1    THE COURT:  So you called it "room E," but it's

2  really a closet?

3    THE WITNESS:  Exactly.  When we do entry photos, the

4  photographer will name each room.  That way when we go to

5  collect evidence, we know exactly which room this item of

6  evidence has been in.

7  BY MS. BROOK:

8  Q    So as we turn our attention back to 124 and we see room E

9  here in the middle?

10  A    Correct.

11  Q    Just to hit on this point again, so rooms are marked

12  "rooms" regardless of whether they're a closet or a bathroom

13  or --

14  A    Exactly, yes.

15  Q    -- or in this case a laundry room area?

16  A    Yes.

17  Q    Okay.  And you had mentioned that in this picture you saw

18  the machete?

19  A    Correct.

20  Q    Where do you see it?

21  A    It is to the left of the washer leaned up against -- I

22  can't -- it looks like a mop.

23  Q    And I'm going to go ahead and point for you.

24  A    Yes.

25  Q    Is it in there?

```
1   A   Yes.  That's it right there.

2   Q   And how was it positioned?

3   A   It's standing handle-up, blade-down.

4   Q   And did it have anything that covered the blade?

5   A   Yes.  It has a sheath that is on it.

6   Q   Government is going to place on the overhead not yet

7   admitted No. 446.

8           Do you recognize what's in this photo?

9   A   I do, yes.

10  Q   And what is it?

11  A   That would be the machete.

12          MS. BROOK:  Government moves to admit and publish

13  446.

14          MR. MAYNARD:  No objection.

15          THE COURT:  446 is admitted.

16      (Exhibit No. 446 admitted in evidence.)

17  BY MS. BROOK:

18  Q   As we look at this photo here -- and I'm going to move it

19  down a little -- there we go.  Is that the position the

20  machete was in when you found it?

21  A   Yes, it is.

22  Q   Going back to exhibit already-admitted 120 in front of

23  you, if you could please go ahead and stand up and show us the

24  machete that you found in the defendant's apartment next to

25  the washing machine and dryer?
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

```
 1    A    May I take it out of the sheath?

 2              MS. BROOK:  Yes.  So go ahead and stand up first.

 3              And for the purposes of the record, the witness is

 4    showing to the jury the machete that was found in the

 5    defendant's apartment and lifting up to show the sheath.

 6              You can put it away now.

 7              I have no further questions.

 8              MR. MAYNARD:  No questions.

 9              THE COURT:  May this witness be excused?

10              MS. BROOK:  Yes.

11              THE COURT:  Is there any objection?

12              MR. MAYNARD:  No, ma'am.

13              THE WITNESS:  Thank you.

14              THE COURT:  Thank you, Ms. Fisher.  You may step down

15    and you are excused as a witness.

16              MS. BROOK:  May I approach to retrieve?

17              THE COURT:  Yes.

18              And the government may call its next witness.

19              MS. BROOK:  Thank you.  The government calls Kathy

20    Appleton.

21         (Witness duly sworn.)

22              THE CLERK:  Please state your name for the record,

23    spelling your first and last name.

24              THE WITNESS:  Kathy Appleton.  K-A-T-H-Y.

25    A-P-P-L-E-T-O-N.
```

UNITED STATES DISTRICT COURT

```
1              MS. BROOK:  The defense is curious whether or not she
2    was too read to the jury, her name.
3              THE COURT:  Do any of the jurors know Ms. Appleton?
4              I see no hands.  Thank you.
5              You may proceed, Ms. Brook.
6                   KATHY APPLETON, WITNESS, SWORN
7                        DIRECT EXAMINATION
8    BY MS. BROOK:
9    Q    Good morning.
10   A    Good morning.
11   Q    Would you please introduce yourself to the ladies and
12   gentlemen of the jury?
13   A    My name is Cathy Appleton.
14   Q    And where are you employed?
15   A    FBI.
16   Q    How long have you worked for the FBI?
17   A    A little over 14 years.
18   Q    And what is your title?
19   A    Technical Information Specialist.
20   Q    What does it mean to be a Technical Information
21   Specialist?
22   A    I work in the op center and run switchboard, reception,
23   NCIC, and radio.
24   Q    Are you also part of the Evidence Response Team?
25   A    I am.
```

1    Q    The jury has heard a fair bit about the Evidence Response

2    Team.  Did go through the 80-hour training?

3    A    I did.

4    Q    And whenabouts did you do that?

5    A    October of 2014.

6    Q    And since that point, have you been tasked with assisting

7    in the execution of search warrants and the seizing of

8    evidence?

9    A    I have.

10   Q    Is that something you regularly do?

11   A    When we're called out, yes.

12   Q    On June 11th of 2015, were you called out to search the

13   inside of a Isuzu Ascender?

14   A    I was.

15   Q    Placing on the overhead what is marked but not yet

16   admitted as Government's Exhibit 447, do you recognize that?

17   A    I do.

18   Q    And what is it?

19   A    I'm sorry?

20   Q    What is it?  What are we looking at?

21   A    It's a vehicle.

22   Q    Is that the Isuzu Ascender you searched on June 11th on

23   2015?

24   A    It is.

25           MS. BROOK:  Government moves to admit and publish

```
 1    447.

 2              MR. MAYNARD:  No objection.

 3              THE COURT:  447 is admitted.

 4         (Exhibit No. 447 admitted in evidence.)

 5    BY MS. BROOK:

 6    Q   So it was June 11th.  And before we get to the car itself,

 7    what are we looking at in the background?  Do you know where

 8    it was that this car was parked?

 9    A   Yes.  It's in the ERT bay space.

10    Q   So all of these items, including --

11              THE COURT:  So this is at the FBI's property?

12              THE WITNESS:  Yes.  It is.

13              THE COURT:  Thank you.

14    BY MS. BROOK:

15    Q   So the items back here, including all the Gatorade and

16    items and boxes, those belong to the FBI?

17    A   Yes, they do.

18    Q   And this car, was it brought into this particular bay to

19    be searched?

20    A   Yes, it was.

21    Q   Did you look inside the Ascender?

22    A   Yes, I did.

23    Q   And did you find any items that you placed into evidence?

24    A   Yes, I did.

25              MS. BROOK:  May I approach?
```

1           THE COURT:  You may.

2     BY MS. BROOK:

3     Q   I have handed you Exhibit No. 116.  Do you recognize that?

4     A   I do.

5     Q   And what do you recognize it as?

6     A   It's a CD that I found in the glove box.

7     Q   Okay.  And does it look just as it did when you found it

8     in the glove box of the Isuzu Ascender?

9     A   Yes, it does.

10          MS. BROOK:  Government moves to admit and publish

11    116.

12          MR. MAYNARD:  No objection.

13          THE COURT:  116 is admitted.

14       (Exhibit No. 116 admitted in evidence.)

15    BY MS. BROOK:

16    Q   Before we do, the markings on the CD, are they handwritten

17    or are they professionally done?

18    A   Professionally done.

19    Q   Can you read for us what the CD says?

20    A   The Life of Muhammad:  Makkan Period by Imam Anwar

21    al-Awlaki.

22    Q   Al-Awlaki?

23    A   Al-Awlaki.

24          MS. BROOK:  May I approach one more time?

25          THE COURT:  Yes.

1           MS. BROOK:  And publish?

2           THE COURT:  Go right ahead.

3           MS. BROOK:  I don't have any other questions.

4           MR. MAYNARD:  No questions.

5           THE COURT:  May this witness be excused?

6           MS. BROOK:  Yes.

7           THE COURT:  Is there any objection?

8           MR. MAYNARD:  No.

9           THE COURT:  Thank you, Ms. Appleton.  You may step

10   down and you are excused as a witness.

11           The government may call its next witness.

12           MS. BROOK:  Your Honor, we are fresh out of

13   witnesses, but we will be ready to go early after lunch if

14   it's an appropriate time to take a break.

15           THE COURT:  I have no objection to an early lunch.

16           Ladies and gentlemen, we will take our lunch break at

17   this time.  It's 11:30, so why don't we plan to reconvene at

18   12:45.  And then because it will be a long afternoon, we will

19   take two breaks during the afternoon session.

20           You are reminded, again, of the admonition not to

21   discuss the case among yourselves or with anyone else.

22           Please do not form any conclusions about the case

23   until you have heard all the evidence and begun your

24   deliberations.

25           Court is in recess for an hour and 15 minutes.

CR15-00707-PHX-SRB   JURY TRIAL-DAY #6   2-24-16

```
 1          (Recess taken at 11:31 a.m.; resumed at  12:47 p.m.)
 2              THE COURT:  Good afternoon, ladies and gentlemen.
 3     Please sit down.  The record will show the presence of the
 4     jury, counsel, and the defendant.
 5              The government may call its next witness.
 6              MS. BROOK:  Thank you, Your Honor.
 7              Our next witness is also a juvenile, so we would just
 8     ask that we use the same rule as yesterday by referring to him
 9     just by his first name "Carlos."
10              THE COURT:  That would be fine.
11              MS. BROOK:  Thank you.
12              The government calls Carlos.
13              If you would walk right up to Maureen?
14       (Witness duly sworn)
15              THE CLERK:  Please just state your first name.
16              THE WITNESS:  Carlos.
17              THE COURT:  You may proceed, Ms. Brook.
18              MS. BROOK:  Thank you.
19                  JUVENILE CARLOS, WITNESS, SWORN
20                      DIRECT EXAMINATION
21     BY MS. BROOK:
22     Q   Hi.
23     A   Hi.
24     Q   If you want to just move nice and close to the mic so that
25     we can all hear you, what's your first name?
```

CR15-00707-PHX-SRB   JURY TRIAL-DAY #6   2-24-16

```
 1    A    Carlos.

 2    Q    And, Carlos, how old are you?

 3    A    I'm 13.

 4    Q    What grade are you in?

 5    A    I'm in the eighth grade.

 6    Q    And, Carlos, do you have any brothers and sisters?

 7    A    Yes, I do.  I have ten.

 8    Q    Are there ten total of you?

 9    A    Yes -- no, there's eleven.

10    Q    Eleven.  How many brothers?  How many sisters?

11    A    Five brothers and five sisters.

12    Q    What's your favorite thing to do outside of school?

13    A    Skate.

14    Q    And what type of skating do you do?

15    A    Extreme skating.

16    Q    Street skating?

17    A    Extreme.  Skateboarding.

18    Q    Skateboarding.

19    A    Uh-huh.

20    Q    Who introduced you to skateboarding?

21    A    My brother Lupe -- or my brother Felipe.  He's sponsored.

22    Q    You have a sponsor?

23    A    I do but my brother was sponsored -- he's sponsored.

24         That's how I got into skating.

25    Q    Okay.  So your brother was sponsored as a skateboarder?
```

1    A   Yes.

2    Q   And in watching him, he sort of got you interested in

3    skateboarding?

4    A   Yeah, pretty much.

5    Q   What does your skateboard look like?

6    A   My skateboard, it's red and has a bunch of taggings on it,

7    but I'm sponsored by DGK, so it's pretty different, you know,

8    every day.

9    Q   I'm just going to have you take a deep breath.

10        Ms. Lemke, who is sitting right in front of you, has

11   to type down everything that you're saying, so we're just

12   going to go nice and slow so that she can understand

13   everything you're saying.

14   A   All right.

15   Q   But you mentioned that you are sponsored.

16   A   Uh-huh.

17   Q   So what does it mean to be sponsored as a skateboarder?

18   A   To get free stuff, I guess you could say.

19   Q   You get free things?

20   A   I get free things all the time.

21   Q   Okay.  And do you compete as a skateboarder?

22   A   Yes, in competitions.

23   Q   Okay.  And do you have to practice a lot?

24   A   Every day.

25   Q   You had mentioned that you're in eighth grade right now?

1    A    Yes.

2    Q    What's your favorite class in eighth grade?

3    A    Math.  It's the easiest thing.

4    Q    It comes easiest to you?

5    A    Uh-huh.

6    Q    Has it always come easily to you, math?

7    A    No.

8    Q    More so over the years or --

9    A    Like in the eighth grade, seventh grade, I started getting

10   a little bit better.

11   Q    Okay.  You had mentioned that you've got five brothers and

12   sisters.

13   A    Uh-huh.

14   Q    And that that's your family.

15        Was there a time that you met a man by the name of D?

16   A    Yes.

17   Q    How did you meet D?

18   A    Through my brother.  He worked in his company called

19   Git-r-Done Moving Services.

20   Q    So through your brother.  Which brother?

21   A    Lupe Guerrero.  Guerrero.

22   Q    And did Lupe work with D or something else?

23   A    He worked with D for the moving company.

24   Q    Okay.  And did D used to live near you?

25   A    He lived right across the street from me.

1   Q    We've talked about the fact you're in eighth grade right

2   now.

3   A    Uh-huh.

4   Q    And you said that D used to live across the street from

5   you.  When did D move away from where he was?  So when did he

6   leave and no longer live across the street from you?

7   A    I think like in October, November, I think.  I don't know.

8   Q    Okay.  So were you in seventh grade at the time, was it

9   last year?

10   A    It was in seventh grade at the time and I think he moved

11   like during summer, I think.  I don't know.

12   Q    Okay.  So you're in seventh grade when he moved away.  And

13   after D moved away from living across the street --

14   A    Uh-huh.

15   Q    -- did you ever talk to him again?

16   A    No.

17   Q    So from the time that D moved away from living across the

18   street -- and was that on Cochise?

19   A    Uh, yes.

20   Q    Okay.  So after he moved away and no longer lived on

21   Cochise, you didn't talk to him again?

22   A    No.

23   Q    So I want to talk about the time that you spent with D

24   when you were in seventh grade before he did move away.

25   A    Uh-huh.

```
 1   Q    Okay?  You had mentioned that Lupe, one of your brothers,
 2   had introduced you to him?
 3   A    Yes.
 4   Q    And about how long do you think it was that you spent time
 5   with D or knew D?
 6   A    A couple months, like eight.
 7   Q    So about eight months and that was during the time that
 8   you were in seventh grade?
 9   A    Uh-huh.
10          THE COURT:  Is that "yes"?
11          THE WITNESS:  Yes.
12          THE COURT:  Thank you.
13   BY MS. BROOK:
14   Q    And what the Judge is saying is that Ms. Lemke has to have
15   a "yes" or a "no" because she has to write it down.
16          So "uh-huhs" and stuff like that, there's no word for
17   that.
18   A    That's okay.  I respect that.
19   Q    So did D ever buy you presents?
20   A    Yes, he did.
21   Q    What type of presents did D buy you?
22   A    He bought me clothes and food, games.
23   Q    Clothes and food and games.  What type of games?
24   A    Video games like consoles like X-box, games, controllers,
25   you know.
```

1   Q   And did he ever buy you a watch?

2   A   Yes.  He bought me a blue Rolex watch.  Yeah.

3   Q   And did he ever buy you a phone?

4   A   Yeah.  Well, he didn't buy me a phone but he gave me a

5   phone.

6   Q   Okay.  When you were in seventh grade and living across

7   the street from D, would you go over to D's house?

8   A   Yes.  All the time.

9   Q   Is that something you would do almost every day after

10  school?

11  A   Every single day.

12  Q   You would go over there every single day.

13          Were there times that you would spend the night over

14  at D's house?

15  A   I used to live with D for like about a good month or two,

16  probably.

17  Q   And was that during seventh grade too?

18  A   Yes, it was.

19  Q   Would D also take you out to eat?

20  A   Yeah.

21  Q   And when he did, who would pay?

22  A   He would.

23  Q   After you met D, did you convert to Islam?

24  A   Yes.

25  Q   Why did you convert to Islam?

1    A    I hung out with him a lot and he asked me to.  And I felt

2    like it was necessary to because I was hanging out with him,

3    you know, maybe I should do it.

4    Q    Why did you feel like it was necessary?

5    A    Because if I was around the group of people he was around

6    with, you know, maybe I should too, you know what I mean.

7    Q    Did he tell you that it was important for your friendship?

8    A    It was.  Yeah, it was.

9    Q    And what did he say about that?

10   A    It was -- it was technically a mandatory thing.

11   Q    How do you mean?

12   A    Like if I was -- if I wasn't Muslim, I would be considered

13   a kafir, you know.  He doesn't really talk to kafirs, you know

14   what I mean, so.

15   Q    What's a kafir?

16   A    A kafir is somebody that's not Muslim, so technically,

17   everybody sitting in this room.

18   Q    Okay.  So kafir is somebody that's not Muslim.

19        Who taught you about kafirs?

20   A    Abdul Malik.  D.

21   Q    D did.  And did D tell you what he wanted to do to kafirs?

22   A    No, not really.  But he said if he had to hurt a kafir, he

23   would.

24   Q    I'm sorry.  Say that again.  He said what?

25   A    If he had to hurt a kafir, he would.

```
 1   Q    How -- was that something he said once or more than once?
 2   A    More than once.
 3   Q    How often would he say that?
 4   A    I don't know.
 5   Q    You had mentioned that you have brothers and sisters and
 6   are some of them younger than you?
 7   A    Yeah, a couple of them.
 8   Q    Do you recall asking D to buy a present for your little
 9   sister?
10   A    Yes.
11             MR. MAYNARD:  Objection.  Leading and it's hearsay.
12             THE COURT:  Overruled.  Just say "yes" or "no."
13             THE WITNESS:  Yes.
14   BY MS. BROOK:
15   Q    What did he say?
16   A    What?  What's the question?
17   Q    So I asked you if you remembered asking D to buy a present
18   for your little sister?
19   A    Yes.
20   Q    And you had said yes.
21             What did D say?
22   A    No.
23   Q    And did he say anything else?
24   A    No.
25   Q    Did D consider your little sister a kafir?
```

```
 1    A    Yes.
 2              MR. MAYNARD:  Objection.  It's been asked and
 3    answered.
 4              THE COURT:  Overruled.  You may answer.
 5              Did D consider your little sister a kafir?
 6              THE WITNESS:  I said yes.
 7              THE COURT:  Thank you.
 8    BY MS. BROOK:
 9    Q    Did D say anything about her being a kafir when he said no
10    to buying her a present?
11    A    No.
12    Q    Okay.  You had mentioned that D talked to you about being
13    Muslim?
14    A    Uh-huh.
15    Q    What did he teach you about being Muslim?
16    A    You mean like specific?
17    Q    Uh-huh.  Did he teach you how to eat or use the bathroom
18    or anything like that?
19    A    Well, we had to like do a couple of things like you had
20    certain ways to use the rest room, different ways to pray,
21    different ways to eat, some stuff we couldn't eat, some things
22    we couldn't, you know.
23    Q    Let's talk about the rest room.  So did you have to use
24    the rest room a different way?
25    A    Yes, we did.  Well, not a different way, but, you know, a
```

1   different type of way.

2   Q   Okay.  And was it important to D that you used the rest

3   room the way he taught you to use it?

4   A   Yes, it was.

5   Q   You had mentioned that there were certain things you could

6   and couldn't eat?

7   A   Yes.

8   Q   What were things you couldn't eat?

9   A   Pork.

10   Q   Was it important to D that you didn't eat pork?

11   A   Yes, it was.

12   Q   When you were in seventh grade spending time at D's house,

13   did you meet somebody by the name of Ibrahim?

14   A   Yes.

15   Q   And how did you meet him?

16   A   I met him through D.

17   Q   Did Ibrahim spend time at D's house?

18   A   Yes, he did.

19   Q   And how often would you see Ibrahim at D's house?

20   A   Like three times a week.

21   Q   Three times a week.

22        Did you ever talk to Ibrahim about being Muslim?

23   A   We used to talk about it all the time.

24   Q   And what would Ibrahim tell you about being Muslim?

25        MR. MAYNARD:  Objection.  Calls for hearsay.

1           THE COURT:  Sustained.

2    BY MS. BROOK:

3    Q    I'm going to place on the board a photograph that has

4    already been admitted.  It's Government's Exhibit 431.

5           Carlos, do you recognize who is in that picture?

6    A    Yes.

7    Q    Who is that?

8    A    Elton Simpson.

9    Q    Is that the person that you have been referring to as

10   Ibrahim?

11   A    Yes.

12   Q    Did D ever show you a video of a pilot or a person being

13   burned alive in a cage?

14   A    It wasn't shown to me.  It was like on the news.

15   Q    Okay.  Before -- right before you saw it, were you awake

16   or asleep?

17   A    I was asleep.

18   Q    What woke you up?

19   A    Him like laughing because he was like obnoxious and loud.

20   Q    So who is "he"?

21   A    Abdul Malik.  D.

22   Q    So D was laughing and you were asleep and you wake up.

23   What happens next?

24   A    He comes into my room and he's like:  Come on.  Something

25   is on TV I've got to show you.

1        I walked to the TV and there was this man like

2   being -- like not burned alive.  Like he was already dead.  He

3   looked dead because he wouldn't say anything.  But he was

4   like -- he was screaming and he was like -- he was just in a

5   cage being burned alive.  That's all it was.

6   Q   And the whole time that that video was playing, what was D

7   doing?

8   A   Just continuously laughing.

9   Q   Was that video on the TV or something else?

10  A   It was on the news.

11          MR. MAYNARD:  Objection.  Asked and answered.

12          THE COURT:  Again, Mr. Maynard, if you don't stand

13  and say the word "objection," then you're just making random

14  statements.

15          MR. MAYNARD:  I apologize.

16          THE COURT:  He answered already:  It was on the news.

17  BY MS. BROOK:

18  Q   Was the news being played on the TV or something else?

19  A   The TV.

20  Q   Do you remember what station it was?

21  A   Fox News.

22  Q   Was Fox News or news at all something that you saw at D's

23  house when you were there?

24  A   Every morning.  Every morning I saw Fox News.

25  Q   Who would show you Fox News every morning?

1    A    D.  It was on.

2    Q    Was there anything important about what was on the news

3    that he would talk to you about?

4    A    No.

5    Q    Did D talk to you about an art contest?

6    A    Yes.

7    Q    And this was during the time -- was this during the time

8    in seventh grade or some other time?

9    A    No.  It was in the seventh grade.

10   Q    What did D tell you about the art contest?

11   A    He didn't tell me anything really about it.  He just told

12   me, you know.  He went forth -- like straight forth with it.

13   You know what I mean.  Like I said -- I don't know how to

14   explain it.  Like I don't know how to explain it, technically,

15   you know what I mean, but he just told me, you know.

16   Q    Okay.  So let's start at the beginning.  And if you can

17   just move forward just to the mic so we can hear you.

18        What did D say about the contest?  Did he say

19   anything about Ibrahim?

20   A    He said something about a gun.  Like, I think it was like

21   an AK47.

22   Q    And what did he say about an AK47 and Ibrahim?

23   A    He said he would probably give it to him.  If like

24   anything went down, like, he would give it to him, you know,

25   just like for protection.

1    Q    So he was going to give Ibrahim an AK47?

2              MR. MAYNARD:  Objection to the form, Your Honor.

3              THE COURT:  Sustained.

4    BY MS. BROOK:

5    Q    So let's just make sure we all understand.

6              So D said that he was going to give Ibrahim an AK47?

7              MR. MAYNARD:  Objection to the form.

8              THE COURT:  Sustained.

9              THE WITNESS:  Yes.  He said he was -- yes.  He --

10             MR. MAYNARD:  Objection.  There's no question

11   pending.

12             THE COURT:  Okay.  Ms. Brook, ask a question.

13   BY MS. BROOK:

14   Q    What did D say he was going to do with the AK47?

15   A    He was going to give it do Ibrahim.

16   Q    And why was he going to give Ibrahim the AK47?

17             MR. MAYNARD:  Objection.

18             THE COURT:  Did he say why he was giving it to

19   Ibrahim?

20   BY MS. BROOK:

21   Q    Did he say why?

22   A    For protection.

23   Q    And was this during the conversation you had with him

24   about the art contest?

25   A    Yes.

1    Q    Where were you when you had this conversation?

2    A    At Uncle Sam's.

3              THE COURT:  What's Uncle Sam's.

4              THE WITNESS:  It's a restaurant.

5    BY MS. BROOK:

6    Q    And who was with you at Uncle Sam's?

7    A    Me, him, and his brother.

8    Q    And was that D's brother?

9    A    Yes.

10   Q    When D talked to you about the art contest and giving

11   Ibrahim the AK47, was his brother sitting at the table?

12   A    No.  He was paying for our lunches.

13   Q    Did you hear him say anything else about the art contest?

14   A    No.

15   Q    Was D -- did D ever say anything about being worried about

16   the FBI watching him?

17   A    All the time.

18   Q    Is that every day or how often would that be?

19   A    Every day it was a new thing.

20   Q    And was this throughout the time you knew him in seventh

21   grade?

22   A    Yes.

23   Q    Did D talk to you about snitching?

24   A    Yes.

25   Q    Did D tell you not to snitch?

```
 1   A    Yes.

 2            MR. MAYNARD:  Objection.  Leading.

 3            THE COURT:  Sustained.

 4   BY MS. BROOK:

 5   Q    What did D say to you about snitching?

 6   A    Just never not to snitch.

 7   Q    What did that mean to you?

 8   A    That meant never to tell him if anything bad happened.

 9   Q    To tell who?

10   A    The FBI, police, you know.

11   Q    During the time that you knew D, did D have guns?

12   A    Uh-huh.  Yes.

13   Q    Carlos, here with us in the courtroom today do you see D?

14   A    Yes.

15   Q    Can you point to him and describe something he's wearing?

16   A    Blue.

17            MS. BROOK:  Your Honor, may the record reflect that

18   the witness has identified the defendant?

19            THE COURT:  Yes.

20            MS. BROOK:  May I have one moment?

21            THE COURT:  Yes.

22   BY MS. BROOK:

23   Q    One last question.

24            I just want to go back to you talked about D talking

25   about kafirs?
```

1    A    Uh-huh.   Yes.

2    Q    Did you ever hear D mention killing kafirs?

3         MR. MAYNARD:  Objection to the form of the question.

4    It's leading.

5         THE COURT:  Overruled.  You may answer "yes" or "no."

6         THE WITNESS:  Yes.

7    BY MS. BROOK:

8    Q    What did he say?

9    A    He said if he had to shoot a kafir, he would.  He never

10   said he was going to do it for no reason.

11        MS. BROOK:  I don't have any other questions.

12        THE COURT:  Mr. Maynard, cross.

13        MR. MAYNARD:  Yes.

14                    **CROSS EXAMINATION**

15   BY MR. MAYNARD:

16   Q    Good afternoon.

17   A    Good afternoon.

18   Q    Do you recall when D moved in across the street from you?

19   A    Yes.

20   Q    It was approximately 2012?

21   A    Yeah.

22   Q    Okay.  At some point your older brother Lupe moved in with

23   D; is that correct?

24   A    Yes.  Yes, it is.

25   Q    Okay.  Prior to your brother moving in with D, did you

1    have occasions when you would go over to D's house?

2    A   I went there every day.

3    Q   And so you had been going there since he moved in?

4    A   Since I met him with my brother, like my brother

5    introduced me to him.

6    Q   Okay.  By the way, where are you in school right now?

7    What school do you go to?

8    A   I go to Royal Palm Middle School.

9            MS. BROOK:  Your Honor, I object to any line of

10   questioning that would further go to identify the victim -- or

11   I'm sorry -- the witness by last name or any other facts.

12           THE COURT:  The answer has already come in.

13           Please ask your next question, Mr. Maynard.

14   BY MR. MAYNARD:

15   Q   When -- were there times when you did work for D?

16   A   Yes.

17   Q   Did you do landscaping for him, picking up the yard?

18   A   Landscaping.  Picking up the yard.

19   Q   Is that "yes"?

20   A   Picking up the yard.  Cleaning.

21   Q   And for doing those things, did he -- you told us that he

22   bought you things.  Did he buy you those things because you

23   were doing work for him?

24   A   Yes.

25   Q   Okay.  And I think you indicated that he bought you a

1    X-box; is that correct?

2    A   Yes.

3    Q   And an X-box is a game that you can hook up to a

4    television?

5    A   Uh-huh.

6    Q   Is that a "yes"?

7    A   Yes.

8    Q   Okay.  And you took that X-box to your house to play it?

9    A   Yes.

10   Q   Okay.  Now, there were times when your brother Lupe

11   actually lived with D, correct?

12   A   Yes.

13   Q   And Lupe worked for D's moving company?

14   A   Uh-huh.  Yes.

15   Q   Okay.  And you have another brother, a little -- a brother

16   who's a little older than you, Juan?

17   A   Yes.

18   Q   And Juan would come over to D's house also?

19   A   Uh-huh.

20   Q   Is that correct?

21   A   Yes.  That is correct.

22   Q   Now -- just a second, Your Honor.  Excuse me.

23           Now you were telling us a few moments ago that you

24   were having a meal with D and his brother when he discussed

25   with you this art contest.  Do you recall that?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6  2-24-16

```
 1    A    Yes.

 2    Q    Okay.  And that discussion occurred at a restaurant called

 3    Sam's?

 4    A    Uncle Sam's.

 5    Q    Uncle Sam's.  And D's brother was there?

 6    A    Yes.

 7    Q    And what was D's brother's name?

 8    A    James.

 9    Q    Okay.  Could you describe James for the jury?  What does

10    he look like?

11    A    He was a black cowboy.  He was Christian.  That's mainly

12    it.

13    Q    Anybody else there with you?

14    A    No.

15    Q    Other than James and D and you?

16    A    No.

17    Q    Okay.  And the conversation that D had was after James had

18    left to go -- and had gone to pay the bill?

19    A    Yes.

20    Q    Okay.  Do you recall when that happened?  When that

21    conversation occurred?

22    A    Can you explain it like, you know, can you explain it like

23    in a way I can understand it, you know?

24    Q    I'll try.

25              THE COURT:  I think he wants to know:  Do you know
```

 1    what day of the week it was?  What month it was?

 2              THE WITNESS:  No.  I don't know any of that stuff.

 3    BY MR. MAYNARD:

 4    Q    Okay.  Well, let me ask you a couple of these questions.

 5              Was your brother still living there?

 6    A    No.

 7    Q    Okay.  Do you remember whether or not this conversation

 8    that you had was before Christmas last year or after

 9    Christmas?

10    A    It was before Christmas.

11    Q    It was before Christmas?

12    A    Uh-huh.

13    Q    Okay.  And do you remember if it was before Thanksgiving

14    or after Thanksgiving?

15    A    It was a little bit before Thanksgiving, I think.  Yes, a

16    little bit before.

17    Q    Okay.  So it would have been a little bit before

18    Thanksgiving while you were in the seventh grade?

19    A    Uh-huh.

20    Q    Is that a "yes"?

21    A    Yes.

22    Q    And so that would have been back in 2014?

23    A    Yes.

24    Q    Okay.  Now, when D was talking about this event at the art

25    contest, did he tell you that there was going to be an attack?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

1    A    No, he didn't.

2    Q    I'm sorry?

3    A    No, he didn't.

4    Q    Okay.  Did he tell you what was going to happen?

5    A    No, he didn't.

6    Q    Did he ask if you wanted to go with him?

7    A    No, he didn't.

8    Q    Did he tell you whether he was going or not?

9    A    No, he didn't.

10   Q    Did you ever tell the FBI that he asked you whether you

11   wanted to go with him or not?

12   A    No.

13   Q    You've met with the FBI on a couple of occasions?

14   A    Uh-huh.

15   Q    Correct?

16   A    Yes.

17   Q    One time would have been in June of 2015?

18   A    Yes.

19   Q    And then you met with them again right before Christmas

20   this past year?

21   A    Yes.

22   Q    In December of 2015, correct?

23   A    Yes.  Correct.

24   Q    And you understood that they were taking down your

25   statement?

```
 1   A    Can you rephrase that?

 2   Q    Yeah.  Did you understand that they were recording you?

 3   A    Yes.

 4   Q    Okay.  And did they at some point give you a copy of what

 5   you had said before to read?

 6   A    Not that I remember.

 7   Q    Okay.  I'm going to show you a copy of a report that was

 8   done.

 9        THE COURT:  I'm sorry.  Did you say that they had

10   something where they transcribed what he said?

11        MR. MAYNARD:  No, ma'am.

12        THE COURT:  So this is a report prepared by someone

13   else?

14        MR. MAYNARD:  Yes.

15        THE COURT:  Not based -- based on notes or something?

16        MR. MAYNARD:  I believe they were based on the

17   transcript.  It's not -- it's not a verbatim transcript of

18   that interview.

19        THE COURT:  Okay.  The problem is this is not his

20   statement.  This is somebody's -- someone's summary of his

21   statement.  And so it's not appropriate to show it to him as

22   his statement.

23        MR. MAYNARD:  I'm trying to refresh his recollection.

24        THE COURT:  It's not his statement.

25        MR. MAYNARD:  Okay.
```

```
1            THE COURT:  If you have his statement, you can show

2   it to him to try to refresh his recollection, but not what

3   someone else summarized as what they heard him say.

4            MR. MAYNARD:  Okay.

5   BY MR. MAYNARD:

6   Q   After this conversation in the restaurant, did you call

7   law enforcement to tell them about it?

8   A   No.

9   Q   Let me ask you a couple of questions about this video that

10  you told us that you saw.

11           Now, the video was of somebody being burned alive?

12  A   Yes, it was.

13  Q   Okay.  And the video was on Fox News?

14  A   Yes.

15  Q   Okay.  And you saw it on the television set at D's house?

16  A   Yes.

17  Q   Okay.  Were there any -- anything else you can recall

18  about that video?

19  A   No.

20           MR. MAYNARD:  Just a moment, Your Honor.

21  BY MR. MAYNARD:

22  Q   Do you know a person by the name of Stefan Verdugo?

23  A   Yes, I do.

24  Q   Is he good friends with your brother Lupe?

25  A   Yes, he is.
```

1  Q    And when was the last time that you saw Stefan?

2  A    Like I saw him last year around Christmas.

3  Q    Okay.  Did you see him last summer?

4  A    Yes, I did.

5  Q    Okay.  Did he come by your house after the incident

6  occurred in Garland, Texas?

7  A    No.

8  Q    You don't remember seeing him then?

9  A    No, I don't.

10  Q    Do you know whether or not your brother saw him then?

11        MS. BROOK:  Objection.  Foundation.

12        THE COURT:  Sustained.

13        That means you don't answer.

14        THE WITNESS:  I know.

15  BY MR. MAYNARD:

16  Q    Did D ever teach you how to make any bombs?

17  A    No.

18  Q    Did you ever tell anybody that D told you how to make

19  bombs?

20  A    No.

21  Q    Have you ever seen Agent Whitson before?

22  A    Who were you calling again?

23        THE COURT:  The gentleman that's --

24        MR. MAYNARD:  This gentleman.

25        THE WITNESS:  Stu.

1           THE COURT:  He's going to stand up.

2        You know him as Stu?

3           THE WITNESS:  Yeah.

4           MR. MAYNARD:  You know him as Stu?

5           THE WITNESS:  Yeah.

6    BY MR. MAYNARD:

7    Q   Is he one of the agents that interviewed you before?

8    A   Yes.

9    Q   And he interviewed you -- he was at the interview in

10   December?

11   A   No.  In the summer.

12   Q   He was at the one in the summer?

13   A   The one in the summer, what are you talking about?

14   Q   Well, there were two interviews, correct?

15   A   In the summer -- I didn't know Stu that long ago.

16   Q   Okay.  Did you meet him this last December when you came

17   down to the U.S. Attorney's Office?

18   A   Yes.

19   Q   Okay.  And so when you were being -- when people were

20   talking to you about what your testimony would be, was he in

21   that room?

22   A   What time are you talking about exactly?

23   Q   In December.

24   A   In December?  Yes.

25   Q   Who was it that was asking you questions in December?

 1    A    I don't know specifically.

 2    Q    Do you remember if Stu was asking you questions?

 3    A    Well, all three of them technically were.

 4    Q    All three of the individuals sitting at this table?

 5    A    Well, no, not really.  Kind of the same, yeah.  Yes.

 6              THE COURT:  Why don't we -- I'll ask this.

 7              Were all three of the people that are sitting at that

 8    desk, were they all in the room with you when you were

 9    talking --

10              THE WITNESS:  When I first came here?

11              THE COURT:  -- in December?

12              THE WITNESS:  In December.  Yes.  They all were.

13              THE COURT:  Okay.  And so different ones asked

14    different questions?

15              THE WITNESS:  Yes.

16              MR. MAYNARD:  Okay.  I don't have any further

17    questions.

18              THE COURT:  Ms. Brook, do you have some questions on

19    redirect?

20              MS. BROOK:  Briefly, yes.

21                        **REDIRECT EXAMINATION**

22    BY MS. BROOK:

23    Q    Carlos, just a couple more questions.

24              Defense counsel asked you about school.  And did you

25    go directly from seventh to eighth grade?

```
1    A    Yes, I did.

2    Q    Okay.  Defense counsel asked you about D paying you to do

3    some chores around the house?

4    A    Yes.

5    Q    What chores would you do?

6    A    I would just mow the lawn and rake the lawn, take out the

7    trash, mop, sweep, regular chores around the house.  I don't

8    know.

9    Q    So you would mow the lawn.  You would take out the trash.

10   You would mop and you would sweep.  And would he pay you cash

11   for doing that?

12   A    Yes.

13   Q    How much would he pay you?

14   A    Like 30 to $40.

15   Q    And just so we understand the lawn, did he have a large

16   lawn or a small lawn?

17   A    It was medium-size lawn, I guess you could say.

18   Q    Okay.  Maybe bigger or smaller than the courtroom?

19   A    Probably about from like where the corner of this is

20   (indicating) to right over there (indicating) to that wall.

21   Q    Okay.  So maybe about 20 feet?

22   A    Yeah.  Like 20 feet, I guess you could say.

23   Q    And was it like a box, like 20-feet-by-20-feet or

24   something like?

25   A    It was like a rectangle.  It was like 10-feet-by-20-feet.
```

1    Q    How often would you have to mow the lawn?

2    A    Not that much.  Like once a month.

3    Q    Once a month.

4         Defense counsel asked you about statements that

5    you've made before.  Are you sure of the memories that you

6    have talked to the jury here about today?

7    A    Some of them are a hundred percent and like probably like

8    two questions are the only ones I don't remember.

9    Q    Okay.  Do you remember what the ones were that you don't

10   remember?

11   A    The bombing.  I don't like -- I kind of do, but then I

12   don't know, because I learned how to make a firework but, you

13   know what I mean, I wouldn't consider that was a bomb, you

14   know what I mean.

15   Q    And was there another one or was that it?

16   A    No.  That's it.

17   Q    Okay.  All the other questions, are you sure about the

18   memories that you have described to the jury?

19   A    Yeah -- yes.  A hundred percent.

20        MS. BROOK:  I don't have any other questions.

21        THE COURT:  May Carlos be excused as a witness?

22        MS. BROOK:  Yes.

23        MR. MAYNARD:  Yes.

24        THE COURT:  Thank you, Carlos.  You may step down and

25   you are excused.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

```
 1              The government may call its next witness.

 2              MS. BROOK:  The government calls Juan.

 3              THE COURT:  It's not easy to sit all day, is it?  You

 4     know, just sit around all day.  It's not easy.

 5         (Witness duly sworn.)

 6              THE CLERK:  Please only state your first name for the

 7     record.

 8              THE WITNESS:  Juan.

 9              THE COURT:  Please proceed, Ms. Brook.

10              MS. BROOK:  Thank you.

11                    JUVENILE JUAN, WITNESS, SWORN

12                         DIRECT EXAMINATION

13     BY MS. BROOK:

14     Q    Good afternoon.

15     A    Hi.

16     Q    What's your first name?

17     A    Juan.

18     Q    And, Juan, how old are you?

19     A    I am 15.

20     Q    What grade are you in?

21     A    I am a freshman in high school.

22     Q    Do you have any brothers and sisters?

23     A    I have four brothers and five sisters.

24     Q    And of those brothers, is Carlos one of your brothers?

25     A    Yes, ma'am.
```

```
1    Q   Are you older or younger?

2    A   I am the middle.

3    Q   Okay.  So are you older or younger than him?

4    A   I'm older.

5    Q   And you are a freshman in high school.

6        What's your favorite class?

7    A   Math.

8    Q   And do you -- why do you like math?

9    A   It's kind of a challenge for me, so I like challenges that

10   get in my way, so.

11   Q   So it's a little bit of a challenge?

12   A   Yep.

13   Q   Have you always liked it or is that something new?

14   A   I've always liked it a little bit of challenges in my

15   life, so.

16   Q   Do you participate in any activities at school?

17   A   I participate in after school clubs.

18   Q   And which clubs?

19   A   I participate in Enemy Club and Game Room Club.

20   Q   So an Enemy Club?

21   A   Yes.

22   Q   And do you use the computers with that or how does that

23   work?

24   A   We basically go into a classroom after school and then

25   we'll talk about future clubs and future plans that we have.
```

UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

1    Q    Okay.  And you mentioned another club as well.  What was

2    that?

3    A    Game Room.

4    Q    Game Room.  And what do you do in Game Room?

5    A    We really just sit there and play games.  Otherwise, we

6    are looking for fundraisers for other clubs.

7    Q    Have you been doing those just this year, freshman year?

8    A    Yes.

9    Q    Are they sort of a specific thing you get to do in high

10   school?

11   A    Yeah.

12   Q    Do you do ROTC?

13   A    Yes.

14   Q    How long have you been doing that?

15   A    For about the entire year, first year.

16   Q    Okay.  So this whole freshman year?

17   A    Yes.

18   Q    And what sort of things do you have to do as part of ROTC?

19   A    We have to maintain self-grooming.

20   Q    Self-grooming?

21   A    Yes.

22   Q    And so you have to -- is that related to your hair or how

23   you look?

24   A    Mostly maintains to your hair.  You have to keep it at a

25   certain range.  Otherwise, you get into kind of a situation

1    with that.

2    Q   They don't like if your hair grows out too long?

3    A   Yeah.

4            THE COURT:  So I take it, Carlos couldn't be in ROTC?

5            THE WITNESS:  No.

6    BY MS. BROOK:

7    Q   And do you have to do any practices or drills with them

8    during the week?

9    A   Yes, I do.

10   Q   Are there any physical activities or things that you have

11   to do with them?

12   A   On Friday we do PT, so.

13   Q   Do you play any instruments?

14   A   The piano.

15   Q   How long have you been playing the piano?

16   A   For about three years now.

17   Q   Do you have any particular songs that you like the most?

18   A   Actually, I like Pachelbel's Canon in D Major, so.

19   Q   Do you live with your brothers and sisters and with

20   Carlos?

21   A   Yes.

22   Q   Did there come a time that you met somebody by the name of

23   D?

24   A   Yes, I did.

25   Q   And how is it that you met him?

CR15-00707-PHX-SRB   JURY TRIAL-DAY #6   2-24-16

```
 1   A    I met him through my older brother Lupe.

 2   Q    Did D for a time live near where you lived with your

 3   brothers and sisters?

 4   A    Yes.

 5   Q    And do you know what street that was on?

 6   A    That was on West Cochise Drive.

 7   Q    You are in ninth grade now?

 8   A    Yes.

 9   Q    So was there a time when D moved out and left and no

10   longer lived at Cochise?

11   A    Yes.

12   Q    When was that?

13   A    During the summer of my year as becoming a freshman.

14   Q    Okay.  And after he moved away, did you talk to him again?

15   A    No.

16   Q    So all of the time that you spent with D, it was during

17   the time that he was living in that house on Cochise?

18   A    Yes.

19   Q    And after he moved away, you didn't speak to him again?

20   A    I did not.

21   Q    Okay.  I want to talk about the time that you spent with

22   D.  You mentioned that you met him through Lupe?

23   A    Uh-huh.

24   Q    And for how long do you think?  So you talked about last

25   year you were in eighth grade; is that right?
```

UNITED STATES DISTRICT COURT

```
 1    A    Yes.

 2    Q    How much time do you think you spent with him -- was it

 3    the -- most of the time that you were in eighth grade?  Was it

 4    more than that?  What was it?

 5    A    It was about halfway where I was into eighth grade and

 6    then the summer.

 7    Q    Okay.  Did D ever buy you presents?

 8    A    Yes, he did.

 9    Q    And what sort of things did D buy you?

10    A    He bought -- I know he bought my little brother and me an

11    X-box 360.

12    Q    Anything else?

13    A    Out of everything, for me, that's all I can remember.

14    Q    Did you see him buy other gifts for your little brother

15    Carlos?

16    A    Yes, I did.

17    Q    And what sort of things did you see him buy for Carlos?

18    A    I believe it was a skateboard that he bought him.

19    Q    Ever a phone?

20    A    I'm not really sure.

21    Q    Would D ever take you out to eat?

22    A    Yes, he would.

23    Q    And when you went out to eat with D, who would pay?

24    A    D.

25    Q    How often would you go over to D's house when he was
```

1    living across the street?

2    A    In the beginning it was kind of like maybe once or twice

3    every week.

4    Q    And did that change?

5    A    Yes, it did.

6    Q    How did it change?  Was it more or less?

7    A    It changed a little bit more mostly because like I would

8    go over there every day, soon after.

9    Q    Okay.  So after school you would go over to his house

10   every day?

11   A    Yes.

12   Q    Would you ever sleep over there?

13   A    Yes.

14   Q    And when you would go over there, sometimes would Carlos

15   be there too?

16   A    Yes, he would.

17   Q    After you met D, did you convert to Islam?

18   A    Yes, I did.

19   Q    And why did you do that?

20   A    Mostly because it kind of felt like a new experience to me

21   and, you know, it was kind of going into a new experience.

22   Q    Who converted you?

23   A    D.

24   Q    Do you remember how it happened?

25   A    Yes, I did.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

1    Q    Can you describe it for us?

2    A    Basically, it goes as you kind of take a shower first

3    before everything starts.  And then once that happens, you go

4    into the living room with everybody else.  And then whoever is

5    converting you, you have to repeat everything they say after.

6    Q    Who converted you?

7    A    D.

8    Q    And did you take the shower?

9    A    Yes.

10   Q    And then did you go into the living room?

11   A    Uh-huh.

12   Q    And did you repeat after D what you were supposed to say?

13   A    I did.

14   Q    What happened then?

15   A    After that, I wasn't really -- I really have no recalling

16   memory as to that, so I'm sorry.

17   Q    When you converted, was Carlos already Muslim?

18   A    Yes.

19   Q    And before you two met D, were you Muslim?

20   A    No.

21   Q    Did you ever meet somebody by the name of Ibrahim?

22   A    Yes, I did.

23   Q    And how did you meet him?

24   A    I met him through D one night.

25   Q    Did you see him just that one night or --

UNITED STATES DISTRICT COURT

1    A    I saw him kind of like on a regular basis most of the

2    time.

3    Q    Okay.  I'm going to place on the overhead what's been

4    already marked and admitted as Government's Exhibit No. 431.

5          Do you recognize the person in that photo?

6    A    Yes.

7    Q    And who is that?

8    A    That is Ibrahim.

9    Q    You said that you saw him all the time.  Where was it you

10   saw him?

11   A    I usually saw him at D's house, but every now and then he

12   would come over to my house just to say hi.

13   Q    And when you saw him at D's house, would he ever talk to

14   you about being Muslim?

15   A    Yes.

16   Q    Did you look up to him?

17   A    I did.

18   Q    Explain that.

19   A    I looked up to him because he was kind of like wise in my

20   perspective, mostly because he taught me lessons that actually

21   worked in certain situations that I used to have in school.

22   Q    Okay.  And did he talk to you a lot about religion as

23   well?

24   A    Yes.

25   Q    I want to change subjects a little bit and talk about the

```
 1   time that you were spending time at D's house when you were in
 2   the eighth grade.
 3           Did D ever show you videos where people were killed?
 4   A   Once.
 5   Q   And can you describe the video that you saw?
 6   A   So it went along as 13 Muslims were standing in front of
 7   three cameramen along with AKs in their hands.  And they
 8   allowed one of them to speak.  And he basically just said that
 9   everything was going to be all right to his family here in
10   America, so.
11   Q   The person that was speaking saying everything was going
12   to be all right to his family back here in America, what
13   happened to him in the video?
14   A   After that it kind of went -- it kind of blacked out and
15   that's what really happened.  I'm not sure what happened to
16   him.  I guess he was beheaded or shot.
17   Q   And why do you think that?
18   A   Mostly because one Muslim was standing next to him with a
19   machete in his hand against his throat, so.
20   Q   Do you remember anything about the man that was speaking
21   saying that everything was going to be all right back to his
22   family back in America, do you remember anything he was
23   wearing?
24   A   He was wearing an orange jumpsuit.
25   Q   And the men that had the machete in their hand, do you
```

1    remember what they were wearing?

2    A    He was wearing a black robe.

3    Q    You mentioned that D showed you this video.  Was it on a

4    computer or something else?

5    A    It was on his TV.

6    Q    And did you know whether or not his TV was hooked up to a

7    computer?

8    A    No.  It was actually hooked up to an Roku system, I

9    believe it's called.

10   Q    To a what system?

11   A    A Roku.

12   Q    And did that have the ability to pull up stuff on the

13   Internet?

14   A    Yes.

15   Q    Was there a keyboard nearby?

16   A    No.  It was just a remote.

17   Q    And when D showed you this video, was anybody else there?

18   A    No.  Not that I could recall.

19   Q    Do you remember, was Ibrahim there that day?

20   A    I believe so.

21   Q    And how did D act when he was showing you this video?

22   A    It was kind of like he was a puppet, basically.  No

23   emotions.  No feelings.  Just a blank stare.

24   Q    And did he queue it up for you to see?

25   A    Yeah.

1    Q    Was he also watching the video?

2    A    Yes, he was.

3    Q    Did D ever talk to you about strapping a bomb to himself?

4    A    Yes.

5    Q    Did that happen once or more than once?

6    A    It happened more than once on occasion.

7    Q    And describe for us one time when you heard him say that.

8    What did he say?

9    A    I remember him specifically saying that he wanted to

10   literally strap himself to a bomb and go inside a mall with

11   innocent people and just blow everything up.

12   Q    You mentioned that you were inside his house at the time?

13   A    Yes.

14   Q    What was his voice like when he said that?

15   A    It kind of sounded like he was angry and upset at the

16   same -- kind of like in a state of two different opinions at

17   once.

18   Q    How do you mean?

19   A    It was kind of like he was mad, but then at the same time

20   he kind of felt guilty.

21   Q    And did he say he was guilty or did you just maybe think

22   he felt guilty?

23   A    I went into my own perspective and thought he was feeling

24   guilty.

25   Q    The way he acted and his tone, was that angry or something

1    else?

2    A   It was angry.

3    Q   And did he say why he wanted to strap a bomb to himself

4    and go into a mall to blow people up?

5    A   The exact reason I was never sure of, but all I know is

6    that that's what he said and that's all I could remember.

7    Q   You had mentioned that you heard him say that more than

8    once?

9    A   Yes.

10   Q   What happened the other time?

11   A   The next occurrence was when I was in the back room of my

12   older brother when he was currently living there.

13   Q   And what did you hear that time?

14   A   I could kind of hear a conversation between two different

15   people.  I believe that Ibrahim was there.

16   Q   Okay.  And at that point did you know Ibrahim's voice?

17   A   Yes.

18   Q   And did you -- obviously, you knew D's voice?

19   A   Yes.

20   Q   So what did you hear D say about strapping a bomb to

21   himself that time when you were in the back room?

22   A   He was kind of upset because I guess a police officer had

23   pulled him over and I guess he kind of got mad at it because

24   it was for no reason at all.  He wasn't speeding or anything,

25   so he just got pulled over for no reason.

1    Q    And what did he say about the bomb that time?

2    A    He was -- it was basically as the same first occurrence,

3    that he just wanted to strap himself to a bomb and go inside a

4    mall and kill people.

5    Q    And from what you heard, could you tell who he was talking

6    to when he said that?

7    A    Yes.

8    Q    Who?

9    A    He was talking to Ibrahim.

10   Q    During your eighth grade year when you were at D's house,

11   did you hear D talk about an attack in Texas?

12   A    He was talking about the drawing contest in Texas, I

13   believe.

14   Q    And did you hear him talk about the drawing contest in

15   Texas once or more than once?

16   A    I heard him talk about it three times, but, you know, that

17   was about it.

18   Q    Okay.  Did you hear him talk about it one time when you

19   were in a back bedroom at the house?

20   A    Yes, I did.

21            MR. MAYNARD:  Leading.

22            THE COURT:  Overruled.

23            Please ask your next question.

24   BY MS. BROOK:

25   Q    What did you hear?

1    A    I heard D talking to Ibrahim at the time.

2    Q    And what did you hear D say?

3    A    I heard D kind of like getting angry because -- I wasn't

4    really sure what at the time, so I didn't really hear Osama

5    bin Laden into the conversation at the time, so I kind of just

6    brushed it off.

7    Q    And what did you hear next?

8    A    After that I started hearing a little bit of arguing and I

9    kind of didn't listen to that part because, in reality, I

10   don't like to listen to people argue.

11   Q    Who could you hear arguing?

12   A    I could remember hearing Ibrahim and D arguing.

13   Q    Okay.  And did you stay there in the back bedroom or did

14   you go somewhere?

15   A    I actually went outside the bedroom.

16   Q    Where did you go to?

17   A    I went inside the hallway.

18   Q    And when you walked into the hallway, could you directly,

19   with your own eyes, see D and Ibrahim?

20   A    Not directly, but with the mirror that he had in the

21   living room.

22   Q    And who did you see in the living room?

23   A    I saw Ibrahim and D.

24   Q    And standing there in the hallway, what did you hear?

25   A    I could hear more about the drawing contest and just D

```
1    just getting mad at it --

2    Q   D was getting mad at who?

3    A   At whoever was doing the drawing contest or whoever was

4    hosting it.

5    Q   So D was getting mad at the people that were hosting the

6    drawing contest?

7    A   Yes.

8    Q   And what else did you hear D say?

9    A   I can hear him saying that he just wanted to go over there

10   and just shoot them.

11   Q   Did Ibrahim say anything?

12   A   No, he did not.  He was trying to talk it out of -- talk D

13   out of him.

14   Q   And did D say anything else?

15   A   No.  He did not.

16   Q   What was D's tone of voice like when he said he wanted to

17   go there and to shoot them?

18   A   He was angry and kind of like very low state though.

19   Q   And kind of what?

20   A   It was kind of in a very low state.  Not too mad.  Not

21   too --

22   Q   Okay.  Did you stay in the hall or did you go somewhere

23   else?

24   A   I stayed in the hall.

25   Q   And at some point after you heard D say that he wanted to
```

```
 1    go there to shoot them, did you continue to stay in the hall

 2    or at some point did you leave?

 3    A   At some point I did leave the hallway and go back into the

 4    room.

 5    Q   I want to put on the overhead what has not yet been

 6    admitted but has been marked as 532.  It's a sketch.  But what

 7    does it look like?

 8    A   It looks like exactly how his house was.

 9    Q   And that's the house on Cochise?

10    A   Yes.

11    Q   And it was in the house on Cochise where you heard D talk

12    about this art contest and getting upset and then saying he

13    wanted to go there and shoot somebody.

14    A   Yes.

15         MS. BROOK:  Your Honor, the government is going to

16    move to admit 532.

17         MR. MAYNARD:  No objection.

18         THE COURT:  532 is admitted.

19    (Exhibit No. 532 admitted in evidence.)

20    BY MS. BROOK:

21    Q   As we look at this, Juan, do you see the bedroom that you

22    were in?

23    A   Yes, I do.

24    Q   And you know what, if you touch the screen, you can make a

25    mark on it.
```

1          Why don't you put a mark on the bedroom you were in

2     when you first heard that conversation.

3     A    I was in the very back room here.

4     Q    Okay.  And so you have put a little mark -- you can even

5     make an "X"?

6     A    Okay.

7     Q    You mentioned that you moved out into the hallway.

8          Can you show us with your finger.  Draw a line that

9     shows where you went to and then where you stood?

10    A    (Indicating)  Right about there.

11    Q    Okay.  So you have drawn a line that is at the end of the

12    hallway.  So you walked out of the room towards the end of the

13    hallway there?

14    A    Yes.

15    Q    And that's right there near the living room?

16    A    Yes, it is.

17    Q    How did you stand in the hallway?  Did you stand in the

18    middle or against the wall or something else?

19    A    I was standing against this area of the wall (indicating.)

20          And at the corner of right about there (indicating)

21    was the mirror that I was looking at and in the prayer room I

22    could see D and Ibrahim.

23    Q    Okay.  So they were in the prayer room?

24    A    Yes.

25    Q    And can you put a circle for us where the prayer room is.

```
 1    A    (Indicating)

 2    Q    From what you heard, did you hear anything that would make

 3    you think that they knew that you were standing there in the

 4    hall?

 5    A    No.

 6    Q    And you mentioned that you then went back to the room?

 7    A    Yes, I did.

 8    Q    Was that the same room?

 9    A    Yes.

10    Q    And did -- eventually, did D come back into that room to

11    you?

12    A    Yes, he did.

13    Q    At that point was Ibrahim still in the house?

14    A    Yes, he was.

15    Q    And what did D say to you when he came back to the back

16    bedroom and you were back in the room?

17    A    He came to see if I was hungry and that if I wanted to go

18    get something to eat.

19    Q    And what else did he say?

20    A    He also wanted to see where Carlos was so he could come

21    along with us.

22    Q    Did he take you out to eat that night?

23    A    Yes, he did.

24    Q    And after you heard what you heard in the hallway and you

25    were back in the bedroom, how were you feeling?
```

1    A   I was feeling a little bit uneasy and on the skeptical

2    side about D, but it was kind of a misinterpretation as I

3    thought it would be, so I just kind of brushed it off my

4    shoulder and didn't think about it much.

5    Q   Okay.  So you thought that perhaps what?

6    A   That he's probably just making a joke about it, like, you

7    know how people make jokes, inside jokes.

8    Q   When you heard him when he was in the prayer room and you

9    were in the hall, was he laughing about what he was talking

10   about?

11   A   He chuckled a little.

12   Q   You mentioned his tone before.  Can you describe it a

13   little bit more so that we understand.

14        What was his tone like when he talked about shooting

15   people at the art contest?

16   A   It was kind of like he was almost enjoying talking about

17   it like he actually wanted to do it.

18   Q   You mentioned that there were other times that you heard D

19   talk about the Texas attack.  When else did you hear about it?

20   A   I remember him talking about it once in his car.

21   Q   And were you in the car with him?

22   A   Yes, I was.

23   Q   What did you hear D say?

24   A   D got a call from Ibrahim on his bluetooth system and I

25   was sitting in the front seat and it was me, D, and Carlos all

1  in the car.

2  Q    And so it's you, D, Ibrahim, and Carlos?

3  A    Yes.

4  Q    Okay.  And who -- Carlos is in the car.  Was he -- could

5  you see, did he have anything on him?

6  A    He had his earbuds in and was kind of falling asleep in

7  the back.

8  Q    What did you hear D say during that car ride?

9  A    I could remember him chuckling a bit and talking about the

10  Texas contest again.

11  Q    And what did you hear D say about the Texas contest?

12  A    That he kind of wanted to go over there and just continue

13  talking about shooting people and just making it seem like

14  it's no big deal and that it's his religion that he should be

15  able to defend it.

16  Q    Did he explain what it was he was defending?

17  A    He was -- he explained that Osama bin Laden is one of the

18  great Prophets that it shouldn't be made as a joke in any way,

19  shape, or form.

20  Q    And who was he talking to?

21  A    He was talking to Ibrahim.

22  Q    Was there another time that you heard D talk about the

23  Texas attack?

24  A    Yes, I did.

25  Q    And when was that?

1    A    It was in his house again.

2    Q    And what did you hear?

3    A    I could remember hearing D talk about that he just wanted

4    to go over there and kind of talk his way into them stopping

5    or just drawing something else about it.

6    Q    And "over there" was over where?  Where did he want to go?

7    A    He kind of wanted to go over to the Texas contest to see

8    who the host was and just talk to them.

9    Q    Who was D saying this to?

10   A    He was talking to Ibrahim and AK at the time.

11   Q    And where were you when this conversation was taking

12   place?

13   A    I was in the same room as the last time.

14   Q    Okay.  And what did you hear --

15        Well, where was D?

16   A    Him -- D and Ibrahim and AK were all in the prayer room.

17   Q    And, again, what was D's tone of voice like when he was

18   talking about going to Texas to the art contest to shoot

19   people?

20   A    It was -- this time it was like he had no life to it.

21   That he kind of lost his soul of it.  And then it kind of

22   redeemed it as he kept going and talking about it into further

23   detail.

24   Q    You had mentioned a video that D showed you and we talked

25   about that earlier.

 1              Did he also ever show you a video about the end of

 2   the world?

 3   A   Yes, he did.

 4   Q   And where was it that he showed you that video?

 5   A   He showed it to me on his TV that he had in the prayer

 6   room.

 7   Q   Can you describe the video that D showed you?

 8   A   The video was talking about certain Mother Nature-made

 9   disasters like tornadoes happening more often and hurricanes

10   being larger and more devastating than before.

11   Q   And did it talk about something happening to the world?

12   A   Yes, it did.

13   Q   What did it say?

14   A   It started talking about that once the trumpets of -- I

15   don't remember the name of the Prophet that they were talking

16   about -- but I know that it talked about that once the

17   trumpets started to sound in the sky, that the Apocalypse was

18   coming.

19   Q   Juan, are you still Muslim?

20   A   No.  I'm not.

21   Q   When did you stop practicing?

22   A   I stopped practicing well over -- before D moved out.

23   Q   We've talked a lot about D here today.  Do you see him

24   here with us in the courtroom?

25   A   Yes, I do.

1    Q   And can you point to him and describe something that he's

2    wearing?

3    A   He is wearing a blue shirt.

4           MS. BROOK:  Your Honor, may the record reflect that

5    the witness has identified the defendant?

6           THE COURT:  Yes.

7           MS. BROOK:  May I have just one moment?

8           THE COURT:  Yes.

9    BY MS. BROOK:

10   Q   We talked just a minute ago about that video about the end

11   of the world.

12          And did D say anything to you about that video?

13   A   He said that maybe I should take it into consideration

14   because the signs and the evidence were there that were

15   described in the Bible that the end of times is coming soon.

16   Q   We talked about that time where you heard D talk about the

17   art contest in Texas and shooting people at the art contest

18   and you going back into the back bedroom and then D coming

19   back and taking you to dinner.

20          Did D say anything to you about that conversation,

21   the conversation that had happened before that you had heard?

22   A   He did not really talk to me about it.  He didn't really

23   think I heard about it -- heard him talking about it.

24          So he just wanted -- he -- I don't know what he was

25   feeling that day, but I'm kind of guessing that he was kind

1   of -- trying to be safe --

2            MR. MAYNARD:  Objection, Your Honor, speculation.

3            THE WITNESS:  -- trying to be safe than sorry.

4            THE COURT:  Don't guess for us.  Just tell us what

5   you remember.

6   BY MS. BROOK:

7   Q   So did he say anything specifically about the conversation

8   that you had overheard when he came to the back bedroom?

9   A   No.  He hadn't.

10           MS. BROOK:  I don't have any other questions.

11           THE COURT:  Thank you.  Mr. Maynard.

12                    **CROSS EXAMINATION**

13   BY MR. MAYNARD:

14   Q   Let's talk about the time line a little bit.

15           Do you remember when D first moved into the

16   neighborhood on Cochise?

17   A   No, I do not.

18   Q   Do you remember there being a point in time when your

19   brother Lupe moved in with him?

20   A   Yes.

21   Q   And Lupe actually worked for him for a while, correct?

22   A   Yes, he did.

23   Q   Do you recall when Lupe moved out?

24   A   No, I do not.

25   Q   Do you recall that when Lupe moved out of D's house, he

```
 1   moved back into your mother's house across the street?

 2   A   Yes, he did.

 3   Q   Okay.  You just don't recall when that was?

 4   A   I do not.

 5   Q   Okay.  Do you recall whether or not it was before or after

 6   Christmas of 2014?

 7   A   No.

 8   Q   Okay.  Now, living across the street from D, is you,

 9   correct?

10   A   Yes.

11   Q   And your younger brother?  What's his name?

12   A   Carlos.

13   Q   Carlos.  Who else is living in that house?

14   A   Me, my little brother, my two younger siblings, my little

15   sisters, and my two older sisters.

16   Q   So there are six kids that are living in the house.  Your

17   mom is living there?

18   A   Uh-huh.

19   Q   Correct?

20   A   Yes.

21   Q   Okay.  What about your dad?

22   A   He's my stepdad, but, yes, he is living there.

23   Q   Okay.  So there is a male adult that is living in the

24   household too?

25   A   Yes.
```

1    Q    Okay.  And were they all living there back in 2014?

2    A    Yes, they were.

3    Q    And there were -- there was at least a time when your

4    brother Lupe was also living in that house, correct?

5    A    Yes, he was.

6    Q    Okay.  And did you have any other brothers that lived in

7    the house at the same time?

8    A    I had two stepbrothers living there.

9    Q    Okay.  So there were -- were there at least -- how many

10   people were living in the household back in 2014?

11   A    Nine.

12   Q    Nine?

13   A    About.

14   Q    Okay.  And so at some point in 2014 your brother Lupe

15   moves across the street and moves in with D, correct?

16   A    Yes, he did.

17   Q    Okay.  You've told us that you would go over there

18   sometimes several times a week and then there was at least a

19   time period when you went over there maybe more often than

20   that; is that correct?

21   A    Yes, it was.

22   Q    When you went over there several times a week, was your

23   brother Lupe living there then?

24   A    Yes, he was.

25   Q    All right.  You've told us and we were looking at this

1    drawing of the house on Cochise -- the back bedroom where you

2    placed the "X" on it, that was a room that you were back in

3    when you told us about this conversation that occurred,

4    correct?

5    A   Yes.

6    Q   Okay.  Had you been sleeping back there or what were you

7    doing back there in that bedroom?

8    A   I would go in that back bedroom just to play my older

9    brother's Game Cube that he had.

10   Q   So your brother Lupe then, was he living back there at

11   that time?

12   A   Yes.

13   Q   So if we know when your brother Lupe was living there,

14   then we'll know that time period when you heard this

15   conversation occur, correct?

16   A   Yes.

17   Q   All right.  And was Lupe back there with you?  Were you

18   playing with him?

19   A   No.  Lupe was actually out doing a job.

20   Q   Okay.  But he was still living there.  You were actually

21   in his bedroom at the time?

22   A   Yes, I was.

23   Q   All right.  And nobody else was back there with you?

24   A   Nobody.

25   Q   So Carlos wasn't there that day?

1    A    No, he was not.

2    Q    All right.  And were the only two that were in the house

3    on that with particular day Ibrahim and D?

4    A    Yes.

5    Q    All right.  Let me go back.

6         When D first moved into the neighborhood, did he help

7    your mom out?  In other words, did he help her with her car?

8    A    Not that I know of.

9    Q    Okay.  Do you know whether he gave her tools or provided

10   furniture to her?

11   A    Yes, I did.

12   Q    Okay.  I mean, was he a pretty kind, generous guy?

13   A    Yes.  He was.

14   Q    Okay.  And during the time periods when you were over in

15   this house, were there other people that were living there

16   with him?

17   A    There were three people living there.

18   Q    Okay.  Do you remember a black man by the name of Billy?

19   A    Yes.

20   Q    Okay.  And do you remember Stefan Verdugo?

21   A    Yep.

22   Q    And do you remember any others that were living there?

23   A    I remember one person also living there.  His name was

24   Efrain.

25   Q    I'm sorry?

1    A    Efrain.

2    Q    Efrain.  And then there was also your brother Lupe that

3    lived there?

4    A    Yes.

5    Q    Okay.  And did D -- did he cook for everybody?

6    A    Yes, he would.

7    Q    Okay.  And so you would eat meals over there at his house

8    also?

9    A    Yes, I would.

10   Q    All right.  Now, you've told us that at some point you

11   decided to convert to Islam; is that correct?

12   A    Yes, I did.

13   Q    Did you ever go to a mosque?

14   A    No, I did not.

15   Q    Okay.  Did you still attend church on Sundays?

16   A    Yes, I did.

17   Q    Okay.  Was your mom and all of your siblings, they're

18   Christian?

19   A    I don't know the religion of my mother, but really, we

20   just go to church just to go.

21   Q    Okay.  But did you go every Sunday?

22   A    Yes.

23   Q    Okay.  Now, did you meet -- do you know Stefan Verdugo?

24   A    Yes, I do.

25   Q    And did you meet him through your brother?

1    A    Yes, I did.

2    Q    And is he a pretty good friend of your brother Lupe's?

3    A    He was.

4    Q    Now, did you ever hear D say that he wanted to move

5    outside of the country, outside of the United States?

6    A    I have not.

7    Q    You've told us that at some point he bought you and your

8    brother an X-box; is that correct?

9    A    Yes, he did.

10   Q    And did he let you take that to your house and you play

11   that game there?

12   A    Yes.

13   Q    Okay.  Do you know whether -- where he bought it at?

14   A    I did not know.

15   Q    Okay.  Do you know whether he bought it at a pawn shop or

16   not?

17   A    No.

18   Q    Okay.  You just don't know?

19   A    Yes.

20   Q    Okay.  When you were converting to Islam, did D have you

21   reading from the Qur'an?

22   A    Yes, he did.

23   Q    And did he teach you about the history of Islam?

24   A    His friend Ibrahim taught me about that, but, yes.

25   Q    Okay.  And the time that you were in the back room on the

 1   drawing that we have on the -- do you know when that was?

 2   A   I do not.

 3   Q   Can you remember whether or not it was before or after

 4   Christmas of 2014?

 5   A   I believe it was before.

 6   Q   Okay.  And do you remember if it was before or after

 7   Thanksgiving of 2014?

 8   A   I do not.

 9   Q   Okay.  Do you remember the time of day that this took

10   place?

11   A   It was about 12.

12   Q   About noontime?

13   A   Yes.

14   Q   Okay.  So after you go out there and then you go back,

15   then you all went to eat that afternoon; is that correct?

16   A   Yes, we did.

17   Q   Okay.  And who was it that went to eat with you?

18   A   It was D, me, and my little brother.

19   Q   Okay.  Did Ibrahim go with you?

20   A   I believe once.

21   Q   No.  On this particular day, the day that you've told us

22   that is before Thanksgiving of 2014 where you've heard this

23   conversation about the drawing contest --

24           MS. BROOK:  Objection.  Misstates testimony.

25           THE COURT:  He said before Christmas, not before

1    Thanksgiving.

2            MR. MAYNARD:  Oh.  Before Christmas of 2014.

3    BY MR. MAYNARD:

4    Q    Who all went to eat?

5    A    Yes.  It was me, Carlos, Lupe, and D.

6    Q    Okay.  And Lupe went with you also?

7    A    Yes.

8    Q    Where had he been when this conversation had been taking

9    place?

10           MS. BROOK:  Objection.  Foundation.

11           THE COURT:  Overruled.  You may answer, if you know.

12           THE WITNESS:  Lupe was actually in a different car

13   but he was following D.

14   BY MR. MAYNARD:

15   Q    Okay.  Had Lupe -- let me back up a second.

16           When this conversation occurred between Ibrahim and

17   D, you were in the hallway.  And then after the conversation

18   occurs, you go back into your brother's -- Lupe's bedroom,

19   correct?

20   A    Yes, I did.

21   Q    Okay.  And then D comes in and asks you if you want to go

22   to eat.

23   A    Yes, he did.

24   Q    Was your brother Lupe there in the house at the time?

25   A    No, he was not.

1    Q   Was Carlos in the house at the time?

2    A   No, he was not.

3    Q   So somebody had to go get them or call them to go to eat

4    with you two?

5    A   Yes.

6    Q   And was Ibrahim in the house at the time?

7    A   No.  He was not.

8    Q   Where was Ibrahim?

9    A   Ibrahim was actually giving him a phone call when we were

10   on our way to the buffet.

11   Q   I'm not trying to confuse you.  I want to go back to the

12   day when you heard this conversation in the house.

13           Had Ibrahim been in the house or had he been on a

14   telephone?

15           MS. BROOK:  Your Honor, objection.  There are two

16   separate occurrences the witness has talked about where he

17   heard the conversation in the house, so the question is

18   confusing.

19           THE COURT:  Well, the witness hasn't said he's

20   confused, so.

21           But we're actually going to take our afternoon break

22   and then we will come back and start asking that question

23   again, Mr. Maynard.

24           Ladies and gentlemen, we will reconvene at 2:30.

25           You are reminded of the admonition not to discuss the

1    case or form any conclusions about it until you have heard all

2    the evidence and begun your deliberations.

3              Court is in recess until 2:30.

4         (Recess taken at 2:12 p.m.; resumed at 2:31 p.m.)

5              THE COURT:  Thank you, ladies and gentlemen.  Please

6    sit down.  The record will show the presence of the jury,

7    counsel, and the defendant.

8              You may continue with your questions of Juan,

9    Mr. Maynard.

10             MR. MAYNARD:  Thank you, Your Honor.

11   BY MR. MAYNARD:

12   Q   Juan, if I understood your testimony on direct

13   examination, I think you said that you heard D talk about the

14   drawing contest on three occasions or three different times?

15   A   Yes.

16   Q   Okay.  Did you ever tell anybody that you heard him

17   mention that drawing contest four times?

18   A   No.

19   Q   Okay.  You mentioned to us a few moments ago when you were

20   being questioned that one of the times was in the car?

21   A   Yes.

22   Q   Correct?  And your brother Carlos was in the car also,

23   correct?

24   A   Correct.

25   Q   Okay.  But you said he had headphones on or something of

1   that nature?

2   A   Yes.

3   Q   So you're the only one who happened to hear that

4   conversation?

5   A   Yes, I did.

6         MS. BROOK:   Objection.   Foundation.

7         THE COURT:   Overruled.   The answer "yes" will stand.

8   BY MR. MAYNARD:

9   Q   Did that conversation that occurred in the car where

10  Carlos was wearing headphones, did it happen before or after

11  the conversation that you've told us about where you were in

12  the back bedroom and you walked out and heard them in the

13  prayer room?

14  A   It was on a different occasion.

15  Q   I understand.   But was it earlier than the one where you

16  walked out of the bedroom and were in the hallway or was it

17  after that one?

18  A   It was after.

19  Q   Okay.   So the one in the car was after?

20  A   Yes.

21  Q   Okay.   And can you tell us how much -- how long after?   A

22  couple of days?   A week?

23  A   I don't know.

24  Q   Okay.   Do you recall whether that conversation occurred --

25  the one in the car where your brother's got the headphones

1    on -- was that before or after Christmas?

2    A   I don't know.

3    Q   Okay.  And where was it that you were going in the car

4    when that conversation occurred?

5    A   We were on our way to our -- the buffet that we usually

6    went to.

7    Q   Where was that?

8    A   It was over by Imagine School at Cortez Park.

9    Q   Okay.  And what were you going there for?

10   A   To eat.

11   Q   And what was the name of the restaurant?

12   A   Chinese Star Buffet.

13   Q   And did you meet anybody there at that restaurant on that

14   day?

15   A   No.

16   Q   So it was just you and Carlos and D?

17   A   Yes.

18   Q   And it's your understanding he was talking to who on the

19   phone?

20   A   He was talking to Ibrahim.

21   Q   Ibrahim.

22         And he had a -- I believe you said a bluetooth so

23   that you could hear it?

24   A   Yes.

25   Q   And did D say he was going to go to wherever this drawing

1   contest was?

2   A   Yes, he did.

3   Q   Okay.  And he was the one who was going to go and shoot up

4   people?

5   A   Yes.

6   Q   And did you have an understanding that drawing contest was

7   in Texas?

8   A   They talked about it regularly and they kept mentioning

9   that it was in Texas.

10   Q   Okay.  How long did that conversation last?

11   A   It lasted ten minutes exactly.

12   Q   How do you know that it lasted ten minutes exactly?

13   A   During the time that we were in the car, me and my little

14   brother both had earbuds on but I wasn't really doing anything

15   with the tablet that I had in my hands and I was paying

16   attention to the time as well as to the conversation.

17   Q   So you've got a tablet.  You're listening to music.  But

18   you're watching the time?

19   A   Yes.

20   Q   So you're able to tell the jury exactly how long that

21   conversation occurred?

22   A   It had lasted ten minutes.

23   Q   Exactly ten minutes.  Okay.

24         And the third time, where did that conversation take

25   place?

1    A    It took place at D's house.

2    Q    Okay.  And was that conversation before or after the one

3    that you've told us about that occurred in the car?

4    A    It was after.

5    Q    Okay.  And do you know how much longer after?  Was it a

6    week or a day or the same day?

7    A    It was two weeks after.

8    Q    Two weeks.  How is it that you remember that it was two

9    weeks after?

10   A    It really didn't occur to me.  But I just kind of

11   remembered it over and over, so that day when they were

12   talking about it again, it was two weeks prior.

13   Q    Okay.  So it's two weeks after.

14         Now, is that -- are we still before Christmas or are

15   we now after Christmas?

16   A    We are now after Christmas.

17   Q    Okay.  And so we're somewhere between Christmas and New

18   Years?

19   A    Yes.

20   Q    And who participates in this third conversation that

21   you've told us about?

22   A    It was AK, Ibrahim, and D.

23   Q    Okay.  So now AK is involved in this?

24   A    Yes.

25   Q    Okay.  And the conversation occurs at D's house?

```
 1    A    Yes, it did.

 2    Q    Okay.  And what time of day was it?

 3    A    I wasn't sure.

 4    Q    Well, is it in the morning or is it in the evening?

 5    A    I don't know.

 6    Q    Where were you?

 7    A    In the same room as before.

 8    Q    You're in your -- the back room that your brother is in?

 9    A    Yes.

10    Q    Is your brother still living there?

11    A    No, he was not.

12    Q    Okay.  So he's now moved out?

13    A    Yes.

14    Q    So sometime between the first conversation and this third

15    conversation, your brother has moved out of D's house?

16    A    Yes, he did.

17    Q    Okay.  So are you -- what are you doing in that -- what

18    used to be his bedroom?

19    A    I was actually watching a couple movies on the X-box that

20    we had set up in there.

21    Q    Okay.  And so now you hear this conversation between AK,

22    Ibrahim, and D?

23    A    Yes.

24    Q    Okay.  Where are they located?

25    A    They are located in the prayer room.
```

1    Q    So you're back where the "X" is on the map?

2    A    Yes.

3    Q    Is that correct?

4    A    Uh-huh.

5    Q    They're in the prayer room where you've put a circle?

6    A    Yes, they are.

7    Q    Okay.  And how is it that you came to hear them?

8    A    After the movie ended, I kind of got up and went to go see

9    if D had made anything to eat which I went into the hallway

10   and I started hearing the conversation about the Texas drawing

11   contest.

12   Q    And who was going to be drawn in this drawing contest?

13   A    Osama bin Laden.

14   Q    And who did you understand Osama bin Laden was?

15   A    He was understood to me as one of the great Prophets that

16   D had taught me about.

17   Q    So D had taught you about him?

18   A    Yes, he did.

19   Q    And did you have an understanding that it was against the

20   Muslim religion to draw Osama bin Laden?

21   A    Yes.

22   Q    Now, did you go into the prayer room while they were

23   talking?

24   A    No, I did not.

25   Q    So did you then stand in the hallway again and look at

1    this mirror so that you could see them in the prayer room?

2    A   Yes, I did.

3    Q   So this is the second time that you're seeing them in a

4    prayer room, but it's -- this time AK is in there with Ibrahim

5    and D?

6    A   Yes, he is.

7    Q   Okay.  And are they arguing or discussing?

8    A   They were discussing the Texas contest.

9    Q   Now, is this the time that you -- well -- who is going to

10   go to Texas at this point?

11   A   D was talking about going to Texas and just continuing to

12   shooting people.

13   Q   He's going to shoot people?

14   A   Yes.

15   Q   Okay.  Is Ibrahim going to go with him?

16   A   No.

17   Q   So if I heard you correctly on direct, Ibrahim is trying

18   to talk him down, saying, D, don't go to Texas and shoot

19   somebody?

20   A   Uh-huh.

21   Q   Is that correct?

22   A   Yes.

23   Q   And is AK trying to talk him down too?

24   A   Yes, he is.

25   Q   So do you ever show yourself to these three in the prayer

1    room?

2    A   I did not.

3    Q   Did they eventually come out?

4    A   They eventually stopped talking about it.  And about a

5    couple minutes afterwards, my foot slipped and I guess I'm not

6    sure if they heard me or not, so I ran back into the same

7    room.

8    Q   When you say your foot slipped, do you mean to tell this

9    jury you made some sort of noise and it made you nervous that

10   they might have heard you?

11   A   Yes.

12   Q   Okay.  Almost like in a movie, huh?

13   A   Uh-huh.

14   Q   Yeah.  And so then you take it and you run back into the

15   room hoping that they won't discover that you have overheard

16   their conversation?

17   A   Yes.

18   Q   Okay.  And did anybody come in to talk to you after this?

19   A   D came into the room to see what I was doing.

20   Q   Okay.  What did D tell you at this time?

21   A   At this time he asked me if I was doing anything and I

22   told him that I was watching a movie and that he asked if I

23   wanted to go eat.

24   Q   So did you guys go eat again?

25   A   Yes.

CR15-00707-PHX-SRB   JURY TRIAL-DAY #6   2-24-16

1    Q   And where did you go eat this time?

2    A   We went to go get some Chinese food.

3    Q   Same restaurant you went to before?

4    A   Yes.

5    Q   Who went with you to get Chinese food the second time?

6    A   It was me and D.  Nobody else.

7    Q   Okay.  What happened to Ibrahim?

8    A   Ibrahim had left as well as AK.

9    Q   Did you happen to ask D whether or not Ibrahim had talked

10   him down and told him don't go to Texas?

11   A   No.

12   Q   Did you discuss what you had heard at all with D?

13   A   I did not discuss anything that I overheard him.

14   Q   Okay.  When you overheard this conversation between

15   Ibrahim, AK, and D, was D speaking English or Arabic?

16   A   He was speaking Arabic at first and then switched to

17   English.

18   Q   How long did he speak Arabic?

19   A   A few minutes at most.

20   Q   I'm sorry?

21   A   A few minutes at most.

22   Q   A few minutes.

23       Do you understand any Arabic?

24   A   A little.

25   Q   So this conversation that you overheard, this third one

```
 1   now in the prayer room, as far as you understood from what you

 2   heard, Ibrahim was not going to go to Texas; is that correct?

 3   A   Yes.

 4   Q   And AK wasn't going to go to Texas, correct?

 5   A   Yes.

 6   Q   The only one that was going to go to Texas was D?

 7   A   Yes, it was.

 8   Q   Okay.  Now, you never heard D talk about ISIS, did you?

 9   A   No.

10   Q   You never heard D talk about a kalif?

11   A   No.

12   Q   Never heard D talk about a Khalifah?

13   A   No.

14   Q   Was D pretty protective of kids?

15   A   Yes.

16   Q   I mean, were there times when people might be saying

17   things around kids and D would tell them don't talk like that

18   around these kids?

19   A   Yes, he would.

20   Q   You testified on direct examination there were several

21   times when D talked about strapping a bomb to himself.  Do you

22   recall that?

23   A   Yes, I do.

24   Q   And when was the first time that you heard D say he wanted

25   to strap a bomb to himself?
```

1    A    It was during the first occurrence that I overheard.

2    Q    Was that -- when you're saying "the first occurrence," are

3    you talking about the time where the first time you were in

4    the back room, your brother is still living there and you walk

5    out and you hear him and Mr. Simpson talking?

6    A    Yes.

7    Q    So in that conversation, not only did D say he was going

8    to go to Texas and shoot people, he also said he was going to

9    put a bomb on himself?

10   A    Yes.

11            MS. BROOK:  Objection.  Misstates testimony.

12            THE COURT:  Overruled.  The answer will stand.

13   BY MR. MAYNARD:

14   Q    Just so that I'm clear, I mean, that occurred in the same

15   conversation, correct?

16   A    Yes, it did.

17   Q    Okay.  And what was it that D said about putting a bomb on

18   himself at that time?

19   A    He specifically said that he would strap a bomb to

20   himself, go drive to the nearest mall, go inside, and just

21   blow himself up.

22   Q    Okay.  And do you recall what Ibrahim's reaction was to

23   that?

24   A    Ibrahim was, again, as I mentioned earlier, during the

25   third time that this happened, he was trying to talk him out

```
 1    of it.

 2    Q    Did Ibrahim say something to the effect:  If you do that,

 3    you'll have to spend the rest of your life in jail?

 4    A    Yes.

 5    Q    Now, the second time that D says he's going to blow

 6    himself up or strap a bomb to himself, when does that happen?

 7    A    It was the third time.  I'm not clearly sure.

 8    Q    Okay.  So it's the time when AK is also present?

 9    A    Yes.

10    Q    Okay.  So it takes place in the prayer room.  AK is in

11    there.  Ibrahim is in there.  And D is in there, correct?

12    A    Yes.

13    Q    And he's not only talking about he's going to go to Dallas

14    to shoot these people, he's also talking about putting a bomb

15    to himself?

16    A    Yes.

17    Q    Which one was he going to do first?  Was he going to go to

18    Dallas and shoot people or was he going to put the bomb on

19    himself?

20    A    He was talking about putting -- strapping the bomb to

21    himself first.

22    Q    And then after that, then later on he would go to Dallas

23    and shoot people?

24    A    Yes.

25              MR. MAYNARD:  Okay.  Just a moment, Your Honor.
```

1          I don't have any further questions.

2          THE COURT:  Ms. Brook.

3          MS. BROOK:  Thank you.

4                    **REDIRECT EXAMINATION**

5    BY MS. BROOK:

6    Q    Juan, defense counsel has asked you a lot of questions

7    about what specific time certain things you heard the

8    defendant say happened.  He asked you specific questions about

9    what month you heard something happen.

10          Do you know for sure what month or what time,

11   specifically, you heard these things?

12   A    I was not sure.

13   Q    And when all of this was happening, were you, you know,

14   keeping a personal calendar or noting on a calendar when this

15   stuff was happening?

16   A    No, I did not.

17   Q    You've talked about two separate times that you heard the

18   defendant say that he was going to strap a bomb to himself and

19   go into a mall and blow himself and other people up.

20          When he said that, how did it make you feel?

21   A    It started to make me feel like, wow, he could eventually

22   hurt me or my little brothers or whoever is near him.

23   Q    Although you don't remember exactly when you heard him say

24   that, do you remember for sure that he did, in fact, say that

25   two separate times?

1  A   Yes.

2  Q   Defense counsel asked you a lot of questions about when,

3  specifically, you heard the defendant talk about going to

4  Texas to that Prophet drawing competition and shooting people.

5         Do you know for sure exactly when you heard him say

6  those things?

7         MR. MAYNARD:  Objection.  Asked and answered.

8         THE COURT:  Overruled.  You may answer.

9         THE WITNESS:  No.

10  BY MS. BROOK:

11  Q   And defense counsel also asked you if Lupe was living in

12  that back bedroom when at least one of the times you heard the

13  defendant say that he was going to go to Texas to that art

14  contest to shoot people.

15         When Lupe moved out of the defendant's house, that

16  back bedroom that we've looked at here, was there still a TV

17  in that back bedroom?

18  A   Yes.  There was.

19  Q   And was there still an X-box machine, a gaming machine in

20  that back bedroom?

21  A   Yes.  There was.

22  Q   And would you still spend time in that back bedroom?

23  A   I would.

24  Q   Defense counsel asked you if there were four times that

25  you overheard the defendant D talk about going to Texas and

1    shooting, attacking that art competition.  Did you hear him

2    talk about it in the car more than once?

3    A    No.

4    Q    How often would you go to the Chinese Star Buffet for

5    dinner with D?

6    A    We went almost every other weekend, so like a week apart.

7    Q    And defense counsel asked you about the time that you

8    heard D talking about going to Texas to the art contest and

9    shooting people and whether or not part of that D spoke in

10   Arabic?

11   A    Yes.

12   Q    And you said the first couple of minutes he spoke in

13   Arabic?

14   A    Yes, he did.

15   Q    When D talked about and when you heard him talk about

16   going to Texas and shooting people there, was that in English?

17   A    Yes.

18   Q    Did Ibrahim give Arabic lessons?

19   A    Yes, he did.

20          MR. MAYNARD:  Beyond the scope.

21          THE COURT:  Overruled.  The answer will stand.

22   BY MS. BROOK:

23   Q    And what did you say?

24   A    Yes.

25   Q    Did he give you Arabic lessons?

1    A    Yes, he did.

2    Q    Have you and Carlos talked together about what you heard

3    and saw?

4    A    No.  We have not.

5    Q    One last question.

6         Defense counsel asked you about the time in the car

7    where Carlos had the earbuds on and you also had earbuds on.

8    A    Uh-huh.

9    Q    And you've testified about hearing what the defendant was

10   talking about about the Texas attack.

11        Did you have anything in your ears that was making it

12   difficult for you to hear D talk?

13   A    No.

14   Q    Was the audio on?

15   A    The audio was not.

16        MS. BROOK:  I don't have any other questions.

17        THE COURT:  May this witness be excused?

18        MS. BROOK:  Yes.

19        THE COURT:  Is there any objection?

20        MR. MAYNARD:  No.

21        THE COURT:  Juan, thank you very much.  You may step

22   down and you are excused as a witness.

23        The government may call its next witness.

24        MR. KOEHLER:  Your Honor, could we have a sidebar for

25   a moment?

 1          THE COURT:  Why?

 2          MR. KOEHLER:  We have an issue that's come up that's

 3   creating an issue and we need to discuss outside the presence

 4   of the jury.

 5          THE COURT:  Does it concern the next witness?

 6          MR. KOEHLER:  It does.

 7          THE COURT:  Yes.

 8      (At sidebar on the record.)

 9          MR. KOEHLER:  We have Billy Ferguson here pursuant to

10   a writ.  He is in custody.  We visited with him during the

11   lunch hour today.

12          And although he didn't want to testify, he expressed

13   fear about testifying here.  He stated that he was going to be

14   willing to do so.

15          He is apparently now telling the deputy marshals that

16   they will have to drag him out of his cell in order to get him

17   in the courtroom.

18          I don't think we want to create a spectacle.

19          MR. MAYNARD:  I have never seen the guy.

20          THE COURT:  So what?  What do you want me to do about

21   it?  Excuse the jury?  Have them drag him out here and then

22   put him on the stand?

23          MR. KOEHLER:  No.  What I want to do is we've called

24   up Agent MacMaster who was going to come up after Mr. Ferguson

25   and we will put him on.  But I think we are going to finish

1    before four o'clock because of that.

2         THE COURT:  Well, what do you want to do about

3    Mr. Ferguson?

4         MR. KOEHLER:  Perhaps we can talk to him after

5    MacMaster testifies.  We can excuse the jury for the day and

6    talk to him.  And then go over the exhibits that the defense

7    is objecting to.  I have identified the exhibit numbers for

8    that.

9         THE COURT:  And where is MacMaster right now?

10        MR. KOEHLER:  He is coming up right now.

11        THE COURT:  Oh, he is.  All right.

12        MS. BROOK:  Would it be possible, Your Honor, just if

13   we were talking about taking two quick breaks, just to take a

14   quick one.  He's my witness.  I just wanted to get all of the

15   exhibits organized and on his desk.

16        THE COURT:  Yes.

17      (End of discussion at sidebar.)

18        THE COURT:  I said we would take two breaks.  We're

19   going to take another 15-minute break and we'll reconvene at

20   3:15.

21        You are reminded of the usual admonitions.

22      (Recess taken at 2:57 p.m.; resumed at 3:15 p.m.)

23        THE COURT:  Thank you, ladies and gentlemen.  Please

24   sit down.  The record will show the presence of the jury,

25   counsel, and the defendant.

1          Ms. Brook, you may call your next witness.

2          MS. BROOK:  Thank you, Your Honor.  The government

3    calls Special Agent Jarett MacMaster.

4       (Witness duly sworn)

5          THE CLERK:  Please state your name for the record,

6    spelling your first and last name.

7          THE WITNESS:  My name is Jarett MacMaster.  First

8    name is spelled J-A-R-E-T-T.  Last name spelled

9    M-a-c-M-A-S-T-E-R.

10          THE COURT:  You may proceed.

11          MS. BROOK:  Thank you.

12       **SPECIAL AGENT JARETT MacMASTER, WITNESS, SWORN**

13                    **DIRECT EXAMINATION**

14   BY MS. BROOK:

15   Q   Good afternoon.

16   A   Good afternoon.  How are you doing?

17   Q   Good, thanks.

18          Would you please introduce yourself to the ladies and

19   gentlemen of the jury?

20   A   Hi.  My name is Jarett MacMaster.  I'm a Special Agent

21   with the Bureau of Alcohol Tobacco Firearms & Explosives.

22   Q   How long have you been with ATF?

23   A   I have been with ATF going on seven years now.

24   Q   And what are your current duties and responsibilities with

25   ATF?

```
 1    A    My current duties include investigating firearms

 2    trafficking, investigating violent crime, you know, involving

 3    firearms, and I have a collateral duty of being a Firearms

 4    Nexus Expert.

 5    Q    What does it mean to be a Firearms Nexus Expert?

 6    A    I have access to materials, resources that basically state

 7    where a firearm is manufactured, imported.

 8    Q    And how are you trained to be that type of an expert?

 9    A    Through ATF, on top of some training in the Academy, I

10    received an additional 40 hours of training in West Virginia.

11    Q    How long ago was that?

12    A    About four years ago.

13    Q    What other duties do you have within ATF?

14    A    Such as?

15    Q    Well, I guess that would encompass it, correct?

16    A    Right.

17    Q    Have you conducted any trainings within ATF?

18    A    Could you repeat the question?  I'm sorry.

19    Q    Have you conducted any trainings for ATF or other law

20    enforcement agencies regarding firearms?

21    A    Have I conducted the training?  Or have I participated in

22    the training?

23    Q    Participated?

24    A    Yes.

25    Q    And you talked a little bit about being a nexus expert and
```

1    about doing that 40-hour course.

2           Could you just explain for us a little bit about what

3    it means to do a nexus examination of a firearm?

4    A   Yes.  To do a nexus examination of a firearm means I

5    physically look at the firearm, note any markings on it or

6    words.  Most of the time, I'm not going to lie, the gun does

7    say "Made in Brazil."  "Made in Georgia."  Somewhere else.

8           THE COURT:  So that makes it easy when it says it

9    right there on the firearm to tell us where it was

10   manufactured?

11          THE WITNESS:  Extraordinarily easy.

12          THE COURT:  Gotcha.

13          THE WITNESS:  Sometimes, though, the firearm is

14   marked with the city of the head of the corporation and not

15   exactly where the firearm is made.

16          And therein lies where I have to actually do some

17   research with materials.  I usually can talk to my peers who

18   are also firearms nexus experts and have access to

19   ATF-specific websites that list the manufacturers.

20   BY MS. BROOK:

21   Q   And is the purpose of the examination to determine,

22   obviously, where the firearm was originally made, and

23   therefore, determine whether or not it was shipped or

24   transported from where it was made to where it was found?

25   A   Yes.  And that basically means across state lines or

 1    international lines.

 2    Q    And you stated sometimes, obviously, it says so on the

 3    weapon itself and other times you cross-reference some indexes

 4    and catalogues put out by ATF that are on the Internet?

 5    A    Put out by ATF; manufacturers, catalogs, and an array of

 6    publications.

 7              MS. BROOK:  Your Honor, may I approach the witness

 8    and bring up Exhibit No. 125?

 9              THE COURT:  Yes.

10              MS. BROOK:  I'm not sure if you have gloves up there.

11              THE WITNESS:  I don't.  Thank you.

12    BY MS. BROOK:

13    Q    If you can go ahead and open already-admitted Exhibit 125

14    and tell us, is that a weapon that you have seen before?

15    A    Yes.

16    Q    Have you had an opportunity to examine that particular

17    weapon and do what is the nexus examination on it to determine

18    where exactly it was manufactured?

19    A    Yes.

20    Q    All right.  Before we get there, let's talk about the

21    weapon specifically.

22              What type of weapon is it?

23    A    It's a revolver.

24    Q    Okay.  Revolver.  And who made it?

25    A    It would be Taurus.

1           THE COURT:  Would you hold it up just so the jurors

2   remember which one it is?

3           Okay.  Thanks.

4           THE WITNESS:  You're welcome.

5   BY MS. BROOK:

6   Q   You said it was a Taurus?

7   A   Yes, I did.  A Taurus Ultralite.

8   Q   A Taurus Ultralite.  And does it have a model number?

9   A   Ultralite is the model.

10  Q   Okay.  I'm going to place on the overhead already-admitted

11  Exhibit No. 442.

12          And I believe you've had an opportunity to hold that

13  weapon up, but if we could move the box so the jury can

14  just -- put it to the side.  Perfect.

15          THE WITNESS:  Is that all right?

16          THE COURT:  That's fine.

17          THE WITNESS:  Thank you, Your Honor.

18  BY MS. BROOK:

19  Q   So what type of revolver is that?

20  A   This is a .38 -- it's a .38 Special revolver.

21  Q   Okay.  It's a .38 Special.  And does it have a serial

22  number on it?

23  A   Yes, it does.

24  Q   And what's that serial number?

25  A   HP97622.

1   Q    In doing your examination of that Taurus, so Exhibit 125,

2   who manufactured that weapon?

3   A    This would be Taurus down in Brazil.

4   Q    Okay.  And give me the name of the company again in

5   Brazil?

6   A    Taurus SA -- something Taurus SA -- SA just means

7   "corporation."

8   Q    Is it Forjas?

9   A    Forjas.  That's right.  For some reason I was thinking

10   Rojas but I knew that was wrong.

11   Q    So the Taurus SA Company, based upon your research, have

12   you been able to determine exactly where that company is

13   housed, and therefore, where it produces that weapon?

14   A    Yes.

15   Q    Where is that?

16   A    That's in Brazil.

17   Q    Is that particular company a licensed manufacturer?

18   A    Yes.

19   Q    I want to talk for a second about that particular .38

20   Special.  That .38 Special, what type of ammunition would it

21   fire?

22   A    The only type of ammunition this would fire is a .38

23   caliber ammunition.

24   Q    Okay.  Do you know where that particular weapon was

25   transshipped through; so do you know what port of entry it

 1    came in through?

 2    A    It was brought into Miami, Florida.

 3    Q    And is that location in Miami, Florida, the transshipment

 4    point as it was shipped into the United States, a point that

 5    you were able to learn about through your research and the

 6    documents as well as information available to you within ATF?

 7    A    Yes.

 8              MS. BROOK:  Let's move next to another weapon.

 9              Your Honor, may I come up and take 125 and bring to

10    him 114?

11              THE COURT:  Yes.

12    BY MS. BROOK:

13    Q    Having had an opportunity to look at Exhibit 114, do you

14    recognize that weapon?

15    A    Yes.

16    Q    And what do you recognize it as?

17    A    It's a weapon that I examined for Agent Whitson.  It's a

18    Tanfoglio Witness.

19    Q    Do you recall approximately when you examined it?

20    A    I did the physical examination about a month ago, but

21    Agent Whitson gave me the description well before that.

22    Q    So did you do both a preliminary examination of it by

23    photos and then an additional examination of it in person

24    looking at the actual weapon?

25    A    Yes.

1          MS. BROOK:  Your Honor, I'm going to put on the

2    overhead Exhibit No. 404, which was our previously-admitted

3    exhibit, a photograph of this Tanfoglio.

4    BY MS. BROOK:

5    Q    Can you read for us what the serial number is?

6    A    Give me a second.  Okay.  EA13930.

7    Q    And that type of weapon -- you mentioned it's a Tanfoglio.

8    What type is it?

9    A    This is a semiautomatic 9 millimeter pistol.

10   Q    What makes it a semiautomatic?

11   A    For every bullet that's expelled, you have to pull the

12   trigger one time, as opposed to like a machine gun where you

13   just pull the trigger and a bunch of bullets come out.

14   Q    You also mentioned that it's a pistol.  What makes it a

15   pistol?

16   A    What makes it a pistol is -- well, it's a weapon that's

17   designed -- I'm sorry -- that has a bore as an integral part

18   of the firearm and it's got a handle that's at an angle to and

19   below the line of the bore.

20   Q    And you mentioned obviously it fires bullets.  What

21   caliber bullets does it fire?

22   A    9 millimeter.

23   Q    So in looking at that particular Tangoflio, the 9

24   millimeter with that serial number, were you able to determine

25   exactly where it was manufactured?

1    A    Yes.  It was made in Italy.

2    Q    And do you know how it was imported into the United

3    States?

4    A    Yep.  It was imported through importer EAA which is

5    European Arms America -- or Armory America -- in Cocoa,

6    Florida.

7    Q    Is it stamped on it?

8    A    Yeah.  That's exactly what I'm reading off of.

9    Q    You spoke for a second about 9 millimeter bullets and I

10   just want to ask you.

11          So a 9 millimeter bullet, do you know approximately

12   how big the casing of a 9 millimeter bullet is?

13   A    Well, 9 millimeter means that that's the diameter of the

14   bullet.  It's how -- the size of the head stamp, the back part

15   of it, not the length, not the overall length, just the back

16   part.

17   Q    So, I'm sorry.  How long is the length of a 9 millimeter

18   casing?

19   A    Well, this is 9 by 19, so it would be 19 millimeters.

20          MS. BROOK:  Okay.  May I approach and take 114 and

21   bring up to the witness 15?

22          THE COURT:  Yes.

23   BY MS. BROOK:

24   Q    Have you had an opportunity to look at that weapon?

25   A    Yes.

1    Q    And could you describe for us --

2              Well, what type of weapon is it?

3    A    Well, this, again, is a semiautomatic pistol.

4    Q    And who makes it?

5    A    This would be made by Hi-Point -- well, Hi-Point is the

6    manufacturer.  Beemiller actually made it.

7    Q    And, again, what type of bullet does this particular

8    weapon fire?

9    A    This is another 9 millimeter.

10   Q    This type of weapon, is it a -- how would you characterize

11   it?  Is it a collector's item or is it something else?

12   A    No.  This is -- I believe on Hi-Point's website they say

13   this is a budget firearm for the firearm enthusiast.

14   Q    And, again, is it a semiautomatic or something else?

15   A    It's a semiautomatic.

16             MS. BROOK:  If I can walk up and take Exhibit 15 and

17   replace it with 12?

18             THE COURT:  Yes.

19   BY MS. BROOK:

20   Q    Have you seen that particular weapon before?

21   A    Yes.

22   Q    And can you describe it for us?

23   A    This is a .357 revolver -- caliber revolver.

24   Q    So you mentioned that's a .357?

25   A    Yes.

1    Q    Revolver.  And how many shots does it fire?

2    A    Well, if it's fully loaded, it fires five shots.

3    Q    I want to ask you about the .357 revolver.

4         So a .357 revolver, what type of ammunition can go

5    into that?

6    A    Well, obviously .357, but it also shoots .38.

7    Q    We had spoken a moment ago about Exhibit 125, the other

8    revolver that was a .38 Special?

9    A    Yes.

10   Q    And I had asked you what type of ammunition went in that

11   and you said that was just a straight-up .38 caliber?

12   A    Correct.

13   Q    So this type of revolver can accept both?

14   A    Correct.

15   Q    So both .38 caliber and the .357?

16   A    Yes.

17   Q    And I'm placing on the overhead already-admitted Exhibit

18   No. 379.  The photo that we're looking at, the weapon you have

19   in your hand, is that the same?

20   A    Yes.

21        MS. BROOK:  Moving next to Exhibit 10.

22        Your Honor, may I?

23        THE COURT:  You may.

24        MS. BROOK:  Do you have it?

25        THE WITNESS:  I got it.

1          THE COURT:  You can set it here if you want.

2          THE WITNESS:  Excellent.  Thank you, Your Honor.

3   BY MS. BROOK:

4   Q    Go ahead and take a look at that weapon.  You can take it

5   out and show us.  And do you recognize that weapon?

6   A    Yes, I do.

7   Q    What do you recognize it as?

8   A    Well, this also is a pistol.  It's a Romanian AK-type

9   pistol.

10  Q    You had mentioned that it's a pistol?

11  A    Yes.

12  Q    Describe for us what makes that particular weapon a

13  pistol.

14  A    Well, again, like all the other ones, it still has the

15  same features as a pistol like I described before.

16          Specifically, these firearms are also sold with

17  some -- you know, the rifle version of this is sold with a

18  stock; usually, it's collapsable.  It could be fixed.

19  Whatever.  But without the stock, it's a pistol.

20  Q    So without the stock, it's a pistol?

21  A    It's a pistol.

22  Q    Where would the stock be?  What would be stock if it was

23  on that weapon?

24  A    Well, there are like four different types of stocks.

25  There's under-folders which fold under.  There's over-folders

1    which fold over.  And there are side-folders which folds to

2    the side.  And there are fixed-stocks which don't fold

3    anywhere.  But if it was that, it would be a completely

4    different firearm.

5    Q   So what would be the benefit of it having some sort of a

6    shoulder stock if it had that?

7    A   That would make it for -- usually -- and I'm not saying

8    all shooters -- I'm just saying usually a shoulder stock would

9    make it a long gun and long guns usually have better accuracy,

10   a better shooting platform.

11   Q   In terms of the pistol family of weapons, does the length

12   of the barrel increase the accuracy as versus just a normal

13   short pistol?

14   A   It does.

15   Q   And obviously, this particular weapon has a longer barrel

16   than a typical handheld pistol?

17   A   Correct.

18   Q   Additionally, with this type of pistol is there anything

19   different about it in comparison to a normal small pistol as

20   it relates to the amount of ammunition that it can fire?

21   A   Well, this is -- this is a gun that I'm very familiar

22   with.  I'm used to seizing a lot of these guns.

23          Normally, they're sold with 30-round magazines, as

24   opposed to a revolver which is five shots, or a pistol which

25   has varying amounts of magazines.

```
 1    Q    So this type of a pistol can hold a greater capacity

 2    magazine, and therefore, fire more bullets?

 3    A    Correct.

 4    Q    I think you mentioned it, but what type of ammunition does

 5    this particular pistol hold?

 6    A    This is a -- I believe it's a 5.75.  If I'm wrong, correct

 7    me.

 8    Q    Does it take 7.62?

 9    A    That's it.  7.62.  Yes.

10    Q    And, you know, do you have your report in front of you

11    that has all of this information within it?

12    A    No.

13              MS. BROOK:  Your Honor, may I approach and have him

14    have his record up there in case he needs it?

15              THE COURT:  Yes.

16    BY MS. BROOK:

17    Q    I have also placed on the overhead already-admitted

18    picture No. 377.  That particular photograph, do you recognize

19    the picture within it?  Do you recognize the gun that's

20    depicted in the picture?

21    A    Yes.  It's similar to this gun or it is this gun.

22              MS. BROOK:  Moving along, we can put back in Exhibit

23    No. 10 and bring up Exhibit 5.

24    BY MS. BROOK:

25    Q    Have you seen that weapon before?
```

1    A    Yes.

2    Q    And what type of weapon is it?

3    A    This is a KelTec 9 millimeter rifle.

4    Q    What makes that particular weapon a rifle?

5    A    On top of everything else, the easiest way to distinguish

6    it is because it has the stock on the back which is intended

7    to be used -- fired from the shoulder.

8    Q    So the stock on the back?

9    A    Right.

10   Q    And where -- a magazine goes into it.  Can you point that

11   out to the jury.

12   A    Right on the handle. (Indicating)

13   Q    And based upon your training and experience, can that

14   particular weapon hold a myriad of different types of

15   magazines or attachments that could be inserted into the

16   bottom of it?

17   A    Yes.

18   Q    Moving along to Exhibit No. 17, do you recognize that

19   weapon?

20   A    Yes.

21   Q    And what do you recognize it as?

22   A    This is Jiminez Arms 9 millimeter pistol.

23   Q    And is it a semiautomatic?

24   A    Yes.

25   Q    You mentioned it's a 9 millimeter pistol, so does it take

1   9 millimeter bullets?

2   A   Yes, it does.

3   Q   Does it accept any other types of bullets?

4   A   No.

5   Q   And semiautomatic, so how does it fire?

6   A   Again, with each single pull of the trigger, one bullet is

7   expelled out of the barrel.

8   Q   Moving on to last Exhibit No. 7, opening that box, do you

9   recognize what's inside?

10  A   Yes.  This is the 5.45 rifle, the Elk River Tool and Die.

11  Q   Okay.  So you mentioned it's a 5.45?

12  A   Correct.

13  Q   What does that mean in relation to the type of bullets

14  that it fires?

15  A   Well, that's exactly the type of bullet it fires, a 5.45

16  millimeter round.

17  Q   Placing on the overhead already-admitted and published

18  No. 376.

19          In looking at this photograph here, do you recognize

20  the weapon you're holding in your hand?

21  A   Yes.  It's the same weapon that's in the picture, except

22  the one in the picture has a magazine attached to it.

23  Q   Can you explain for us what that drum magazine is?

24  A   Well, the drum magazine, basically, it's a dual drum

25  magazine.  It holds a lot of bullets.  I'm not sure how many,

1    but it holds a lot for continued -- and it's basically just

2    for continuous fire.

3    Q   We talked about with the KelTec rifle a minute ago about

4    the different types of magazines that could be inserted into

5    the bottom of it.

6          This weapon with this particular drum magazine, is

7    that a similar situation or a feature where that magazine

8    could be attached to that particular weapon or a different

9    magazine could be attached to that particular weapon?

10   A   Yeah -- yes.

11   Q   And let me ask a less confusing question.

12         So that particular weapon, could it take other types

13   of magazines as well?

14   A   Yes.  The double barrel or the double drum magazine is

15   usually an after-market magazine which means it's not --

16         I can't say for all of them, but in my experience,

17   the double drum magazine usually isn't sold with a rifle like

18   this.  Usually, it's just your standard 30-round magazine.

19   Q   So you mentioned it's an after-market magazine.  So what

20   does that mean -- what does that mean to you?

21   A   You can buy it from any dealer as a special magazine for

22   this gun.

23   Q   So like a special add-on or a special attachment?

24   A   Correct.

25   Q   Would it be fair to say that this particular rifle may

1    oftentimes be referred to as an AK-type?

2    A   Yes.

3    Q   And explaining the variation between what an AK-type is

4    versus an AR, what's the difference?

5    A   Well, an AK-type, this is based on the Russian AK-47,

6    AK-74, whatever.  Whereas, an AR is based off of an M16

7    American-made rifle.  Different calibers.  They're both

8    rifles, but that's pretty much where the similarities end.

9    Q   And in terms of how that particular rifle fires, can you

10   explain the mechanism; is it a single-pull or how does it

11   work?

12   A   It's still a semiautomatic rifle.  So basically, one pull

13   of the trigger means one bullet is going to come out of the

14   barrel.

15   Q   Assuming that that particular rifle was loaded with a drum

16   magazine, the drum magazine that had 90 particular -- or 90

17   bullets inside of it -- if somebody wanted to fire off all of

18   those bullets, approximately how long would that take through

19   that type of a weapon?

20   A   Depending on how experienced you are, at 90 pulls of the

21   trigger, however fast you can pull the trigger.

22   Q   Is there any reloading time with it or is it just as fast

23   as your finger can pull?

24   A   Just as fast as your finger can move.

25        MS. BROOK:  May I have one moment?

1              THE COURT:  You may.

2              MS. BROOK:  I don't have any other questions.

3              THE COURT:  Mr. Maynard?

4              THE WITNESS:  Do you want the rifle back?

5              MR. MAYNARD:  Sure.

6              SPECIAL AGENT WHITSON:  May I approach, Your Honor?

7              THE COURT:  Yes.

8                        **CROSS EXAMINATION**

9    BY MR. MAYNARD:

10   Q    I just want to make sure.  What you were doing was you

11   were looking to see where the gun was manufactured and then

12   whether or not it crossed either international or interstate

13   lines?

14   A    Correct.

15   Q    Okay.  You did not do any analysis to determine who the

16   ultimate buyer was of the weapon?

17   A    Of the -- of the Elk River I did, but not of the rest of

18   them.

19   Q    Okay.  The Elk River would have been the last one that we

20   looked at, the one that you said was sort of like an AK?

21   A    Correct.

22   Q    Okay.  Why did you pick that particular weapon and not the

23   others to determine who the buyer was?

24   A    Because that weapon was found in Texas and it was

25   manufactured in Texas.  So if it was found in Texas and

1    manufactured in Texas, it wouldn't have had any nexus.

2            However, I did back research and it was sold out of

3    Flagstaff, Arizona; so therefore, it had to cross into

4    Arizona.

5    Q   So it's manufactured in Texas, sold in Texas, but then it

6    actually ended up being sold to someone in Flagstaff, Arizona?

7    A   Correct.

8    Q   And did you then contact that person in Flagstaff to see

9    what they did with the weapon?

10   A   No.  I did not.

11   Q   Okay.  So your portion of the analysis stops there?

12   A   Correct.

13   Q   Okay.  Do you know whether or not anyone else followed up

14   on all of these weapons to determine who the ultimate

15   purchasers were or the last purchaser was?

16   A   I don't know if anybody followed up.

17           MR. MAYNARD:  Okay.  Thank you.

18           THE WITNESS:  You're welcome.

19           THE COURT:  Redirect?

20           MS. BROOK:  Yes.  Thank you.

21                    **REDIRECT EXAMINATION**

22   BY MS. BROOK:

23   Q   So defense counsel was asking you questions about research

24   done that would document who purchased a particular weapon.

25           If you -- so obviously, you work for ATF?

1   A   Correct.

2   Q   And as part of your job within ATF, are you familiar with

3   circumstances where purchases have to, by law, have a paper

4   trail to them and times that they don't?

5   A   Yes.

6   Q   If somebody goes into a store and -- like a federal

7   firearms licensee, an actual establishment that sells guns, is

8   there paperwork that has to be filled out that notes who the

9   purchaser is?

10   A   Yes.  That's an ATF Form 4473.  Here in Arizona it's an

11   ATF Form 4473.

12   Q   And those 4473 Forms, are they collected by ATF and are

13   they kept also within the -- within the store of the FFL?

14   A   Well, generally, they're kept with the FFL until such a

15   time as they go out of business and then ATF collects all

16   those 4473s.

17   Q   I want to talk about --

18           THE COURT:  Hold on a minute.  "FFL" means?

19           THE WITNESS:  Oh, I'm sorry.  Federal Firearms

20   Licensee.

21   BY MS. BROOK:

22   Q   So I want to talk in this hypothetical about this same

23   hypothetical that originally was sold within an FFL, so by a

24   Federal Firearms Licensee, by a gun store, and that 4473 Form

25   is filled out.

 1            Let's say the buyer then later takes that particular

 2    weapon and sells it to somebody on Craigslist.

 3            Is there any documentation that has to be filled out

 4    by law for that particular sale?

 5    A    No.

 6            MR. MAYNARD:  Objection, Your Honor.  It's beyond the

 7    scope.

 8            THE COURT:  Overruled.  You may answer.

 9            THE WITNESS:  Not in Arizona.

10    BY MS. BROOK:

11    Q   And similarly, we talked about Craigslist.

12            Would BackPage, if somebody is advertising a gun for

13    sale in that particular circumstance, and two people meet up

14    in a parking lot or some place else and a sale happens, is

15    there paperwork that's required to be filled out by the

16    government?

17    A    Not in Arizona.

18            MS. BROOK:  I have no other questions.  Thank you.

19            THE COURT:  May Agent MacMaster be excused,

20    Ms. Brook?

21            MS. BROOK:  Yes.  Thank you.

22            THE COURT:  Any objection?

23            MR. MAYNARD:  No.

24            THE COURT:  Thank you, sir.  You may step down and

25    you are excused as a witness.

1            And is that our last witness of the day?

2            MR. KOEHLER:  It is, Your Honor.

3            THE COURT:  Ladies and gentlemen, we will recess for

4     the day.

5            Tomorrow morning I want to start just a little bit

6     later at 9:30 rather than nine o'clock, so we will recess

7     until 9:30 tomorrow morning.

8            I want to remind you, again, of the admonition not to

9     discuss the case among yourselves or with anyone else.

10            Please remember that you are not to do any

11     independent research about the case on your own and that

12     you're not to form any conclusions about the case until you've

13     heard all the evidence and begun your deliberations.

14            I will excuse the jury at this time.  We will see you

15     tomorrow morning at 9:30.

16        (Open court, no jury present at 3:51 p.m.)

17            THE COURT:  So, Mr. Koehler --

18            Everybody else can sit down except Mr. Koehler

19     because I'm going to talk to him for a moment.

20            Mr. Koehler, what are your intentions with respect to

21     your reluctant witness?

22            MR. KOEHLER:  We would like to have him testify, Your

23     Honor.

24            THE COURT:  But what if he maintains his reluctance?

25     Are you going to have him brought out and be reluctant and let

 1   the jury see that?  Or are you going to just skip over him and

 2   move on?

 3            MR. KOEHLER:  We haven't fully decided that yet.  My

 4   inclination would probably be the latter.

 5            However, I think that he may be persuaded.  There may

 6   be -- there may be means to convince him that his family is

 7   not in jeopardy, which is apparently what he's been telling

 8   representatives of the Marshal Service, that he's concerned

 9   that his family's safety would be placed in jeopardy by virtue

10   of him coming into court and testifying.

11            THE COURT:  Okay.  Well, make sure you have witnesses

12   here tomorrow that would take up any room that he might

13   otherwise occupy in our schedule.

14            MR. KOEHLER:  Would it be possible to bring him into

15   court now and have this discussion with him now?

16            THE COURT:  No.

17            I don't have anything to say to him and I certainly

18   have no way to assure him of anything one way or the other and

19   I'm not sure that it's my role to do so.

20            MR. KOEHLER:  Okay.  Then we have the issue of the

21   exhibits.  I have provided the Court with a list of the

22   exhibit numbers to which defense may object.

23            THE COURT:  Right.  You provided the Court with a

24   list of the exhibit numbers that you want to talk about just

25   at our last break.

1          MR. KOEHLER:  Correct.

2          THE COURT:  And I haven't -- I haven't had a chance

3     to look at them.

4          MR. KOEHLER:  Understood.  I was just informing you

5     that we had flagged those for a potential discussion tomorrow

6     morning, perhaps.

7          THE COURT:  Oh, okay.  So I do want to ask you

8     questions about you wrote down all these numbers.  And after

9     three of them, 291, 293 and 310, you wrote on two of them

10    "aftermath fuzz" and after 310 the word "fuzz."

11         What is that supposed to mean?

12         MR. KOEHLER:  Those were more notes to myself to keep

13    track of which are which.

14         And those are pictures that actually depict the

15    aftermath of a beheading or an execution as opposed to what's

16    about to happen in the image.

17         And what we would propose to do with those is to

18    somehow fuzz out that portion of the image so that the jury

19    could see the rest of it and understand what it depicts

20    without having to see --

21         THE COURT:  Oh.  So when you wrote the word "fuzz,"

22    you mean you want to make part of it fuzzy?

23         MR. KOEHLER:  That is correct.

24         THE COURT:  Okay.  So when I'm looking at them, I

25    understand what your intentions are.

 1              MR. KOEHLER:  Yes.

 2              THE COURT:  Then the other thing, it says:  157

 3      portions, Twitter posts, 12, 18, 29 through 31, 34, 36, and

 4      40.  What does that mean?

 5              MR. KOEHLER:  Exhibit 157 is approximately 40 pages

 6      long.  And within those 40 pages are various Twitter posts

 7      that Mr. Simpson made leading up to the time of the attack.

 8      They range back -- I want to say into November of2014.

 9              And some of those images are fairly gory.  Others are

10      not so bad.

11              But among the ones that are pretty gory, we're going

12      to withdraw the majority of those pages.  The only ones that

13      we're looking at keeping is in 29 to 31.  And I think it's

14      either 36 or 40, the ones that show the pilot in the cage

15      being burned alive.

16              THE COURT:  So let me see if I can clarify.

17              Each page is a screenshot from Mr. Simpson's Twitter

18      postings?

19              MR. KOEHLER:  That's correct.  They're tweets that he

20      made.

21              THE COURT:  And did you want -- oh, thank you,

22      Maureen.

23              Were you offering all of it minus some of these

24      pages?

25              MR. KOEHLER:  That's correct.

```
 1              THE COURT:  So you want to offer everything and
 2    you're flagging these few pages for me to look at because you
 3    believe those are the ones that Mr. Maynard is going to be
 4    objecting to under 403(b)?
 5              MR. KOEHLER:  Correct.
 6              THE COURT:  But did you just say you're withdrawing
 7    some that you flagged for me?
 8              MR. KOEHLER:  That's correct.
 9              All but -- I believe it's 29 and I'm sorry they don't
10    have page numbers printed on them.
11              THE COURT:  So I have to go through and mentally
12    number them and get to --
13              MR. KOEHLER:  I have them flagged in my copy of the
14    exhibit if you would like to borrow that.
15              THE COURT:  I would like to borrow that.  Thanks.
16              So before you give it to me, tell me which ones
17    you're -- which ones you're going to actually pull out of the
18    exhibit before Mr. Maynard even objects.
19              MR. KOEHLER:  We're going to pull out 18.
20              THE COURT:  Okay.
21              MR. KOEHLER:  We're going to pull out 34 or fuzz it
22    out.
23              And 36, we would propose to fuzz out.
24              And 40, we would propose to fuzz out the bottom
25    image.
```

 1                  And then there's 29 -- 29, 30, and 31 are the same

 2      image series but they're tweeted at different times and with

 3      different commentary.

 4                  And so what I would do is fuzz out the additional

 5      images of that but keep the tweets so that the tweets can be

 6      seen on 30 and 31.

 7                  THE COURT:  So I need to look at 12?

 8                  MR. KOEHLER:  12, we would -- I think we would

 9      propose to fuzz that out so that you can see the executioners

10      over their victims but fuzz out the victims.

11                  THE COURT:  Okay.  So you want to -- the only one

12      you're actually withdrawing is 18?

13                  MR. KOEHLER:  I want to make sure I'm correct on

14      that.

15                  THE COURT:  You said 34 first.  First you said:

16      We'll withdraw that or maybe we'll fuzz it out.

17                  18, I think, is the only one you said you were going

18      to withdraw.

19                  MR. KOEHLER:  We'll withdraw that one.

20                  THE COURT:  Okay.  So 34 is out too?  And 18?

21                  MR. KOEHLER:  Correct.

22                  THE COURT:  Okay.  So I have to look at 12, 29

23      through 31, 36, and 40.

24                  And before I do that, are there any other objections

25      you're going to raise based on 403(b) to 157, Mr. Maynard?

 1              MR. MAYNARD:  I'm not sure, Judge.  I haven't gone

 2     all through all of those.

 3              THE COURT:  Okay.  Well, when you go through them,

 4     would you do the same thing for me that Mr. Koehler is doing,

 5     which is, since they don't have page numbers on them, hand me

 6     a copy with tags?

 7              MR. MAYNARD:  Yes.

 8              THE COURT:  So I'll take that.

 9              And then the only other thing I want to be sure is

10     that this -- the other numbers are all of the ones that the

11     government has laid foundation for which you have a 403(b)

12     objection or whether there's some of these you don't have an

13     objection to?

14              MR. MAYNARD:  I'll let you know in the morning, Your

15     Honor.

16              THE COURT:  Okay.  I'll look at these in the interim.

17     And then if some -- they're all photos, right?

18              MR. KOEHLER:  Correct.

19              THE COURT:  Okay.  What else this afternoon?

20              MR. KOEHLER:  If I can have a moment?

21              MR. MAYNARD:  I do have one issue to raise.

22              MS. BROOK:  Your Honor, I do have a quick issue.

23              You were going to -- go ahead.

24              THE COURT:  So does Mr. Koehler have anything else?

25              We'll go Koehler, Maynard, and Brook.

 1              Okay.  Mr. Maynard?

 2              MR. MAYNARD:  The government has listed for tomorrow

 3    a witness by the name of -- I believe it's Karem Fabian.  It's

 4    not on their witness list.

 5              MR. KOEHLER:  I think her last name on the witness

 6    list might have been listed as "Gonzalez" or it's her full

 7    name, but her last name that she goes by is Fabian.

 8              THE COURT:  So there's -- so is it K-A-R-E-M

 9    Gonzalez?

10              MR. KOEHLER:  That is correct.

11              THE COURT:  So that's who it is that you said now

12    goes by a different last name?

13              MR. KOEHLER:  Yes.  Her name is four names long and

14    her -- the third of the four names is her paternal last name

15    and that was an omission on our part.

16              THE COURT:  Okay.  And when she comes tomorrow,

17    what's her name going to be?

18              MR. KOEHLER:  Karem Fabian.

19              THE COURT:  Does that clarify things for you,

20    Mr. Maynard?

21              MR. MAYNARD:  It does.

22              THE COURT:  Thank you.  Ms. Brook?

23              MS. BROOK:  I just wanted to briefly address a timing

24    question as it relates to the potential Daubert hearing for

25    Evan Kohlmann and Your Honor's calendar as well as what you

1      think might work best.

2             So if we were to be conducting a Daubert hearing, is

3      Your Honor thinking that we would do that perhaps on Tuesday

4      morning out of the presence of the jury and then proceed on

5      after that?

6             THE COURT:  When did you want to have Mr. Kohlmann

7      here to testify?

8             MS. BROOK:  He can be here on Tuesday.  He flies in

9      on Monday evening.

10            THE COURT:  Well, here's -- I think we're ahead of

11     schedule, right?

12            MS. BROOK:  Yes.

13            THE COURT:  But where is the government in terms

14     of --

15            Are you anticipating him as your last witness?

16            MS. BROOK:  Yes.

17            THE COURT:  Will there be witnesses after that?

18            And I'll tell you why I'm asking that.  Because my

19     preference always is -- usually is -- that if we have a half

20     day that the jury comes in the morning rather than the

21     afternoon.

22            But, I mean, obviously, if Kohlmann was the last

23     witness, we would want to do it in the morning and have the

24     jury come in the afternoon.

25            Which reminds me, before I forget, we are going to

 1    have to take next Thursday morning off because of a prior

 2    commitment that I have until, I think, 11:30 in the morning.

 3            So we may come back early in the afternoon, maybe

 4    12:30 or something, but we will not be in session on Thursday

 5    morning, March 4th -- March 3rd.  I was looking at February.

 6    March 3rd.

 7            Okay.  So I thought maybe we could just today see

 8    where we are on --

 9            MS. BROOK:  We're moving quickly in terms of timing.

10            THE COURT:  Right.

11            MS. BROOK:  So, you know, Evan Kohlmann will be here

12    on Tuesday morning to testify.  He is available for as long as

13    we need.  He is the second to the last witness.  And then we

14    anticipate at that point we will rest.

15            THE COURT:  Okay.  So we won't -- since he's going to

16    be here all day Tuesday, we will decide when we get later in

17    the week whether the jury is coming on Tuesday morning or

18    Tuesday afternoon or all day Tuesday.

19            MS. BROOK:  Perfect.

20            And then one other just small point I wanted to put

21    on the record is I did note this morning when Mr. Koehler was

22    doing direct of a separate witness that Juror No. 3 was

23    nodding off again and was actually catching herself and

24    pulling her head back up but her eyes remained closed the

25    whole time.  So I just wanted to note it for the Court.

1          MR. MAYNARD:  Judge, I watched her and I thought she

2     stayed awake all day today.  Now, I can't say I watched her

3     all the time.

4          THE COURT:  My observation is that she stayed awake

5     more today than she did on our prior trial days.

6          But I also observed more so this morning than this

7     afternoon, but then this afternoon we had two, you know, short

8     sessions.  I did observe what I felt was "dozing off" this

9     morning.

10         But here's where I am with respect to this juror.  I

11    have brought this to your attention.  I have asked you to

12    observe.  And this is your jury.

13         And so until such time as someone actually asks me to

14    excuse Juror No. 3, I'm leaving that to counsel.  I'm not

15    going to take any more action on my own.  I don't know that

16    there is anything more that I can do.  I made the suggestions

17    that I made to her that she hasn't been following, although

18    some other jurors have taken advantage of the suggestion, but

19    I don't want to intervene any more without a request to do so.

20         But as I said, the best I can say is I thought she

21    stayed awake more than she did yesterday.

22         MS. BROOK:  Your Honor, at this stage, based upon

23    what we observed today after the admonition or the warning

24    that was given to her yesterday, the government is going to

25    move to excuse this particular witness.

```
 1            MR. KOEHLER:  Juror.

 2            MS. BROOK:  Sorry -- juror.

 3            The government is concerned about a myriad of

 4    factors.  But one, in particular, is the fact that numerous --

 5    well, at least one other juror has noted that she's dozing

 6    off.  That when she spoke to you, she admitted that she too at

 7    times had dozed off.

 8            Today after her being spoken to, we witnessed her

 9    dozing off and her head, you know, moving and catching.  And

10    it's unclear what testimony she has heard and hasn't heard.

11            And certainly the government's opinion is that the

12    defendant deserves a fair trial and jurors who hear all of the

13    evidence, not select portions.

14            THE COURT:  I think it's a very legitimate concern.

15    One of the things that I also observed that also caused me to

16    think that she was sleeping or at least nodding off was that I

17    have -- and I have been watching her very closely -- that I

18    have rarely seen her actually look at a witness, which seems

19    unusual.

20            That when the witness is testifying, I often see her

21    head in the other direction and down, even when the only thing

22    on the monitor is our seal.

23            So I'm going to give you another day of observation,

24    Mr. Maynard, and then I will act on the government's request.

25            MR. MAYNARD:  Thank you, Your Honor.
```

1          MS. BROOK:  Thank you.

2          MS. PLOMIN:  Your Honor, I do have one issue to

3    address in terms of tomorrow just very quickly.

4          The government has indicated that they will be

5    calling Gregory Neville tomorrow.  As far as I can see, there

6    are two areas of testimony that he will testify about or could

7    testify about.

8          One is items he found in Mr. Simpson's cell phone

9    that I have no issue with.

10          The other is a particular video that he might have

11    looked at on one of Mr. Kareem's laptops, his Acer laptop.

12          I'm going to object as duplicative any testimony as

13    to that video as Ms. Vaughan already testified to it and when

14    she believed it had been viewed.

15          THE COURT:  Okay.  I'll be ready.

16          MR. KOEHLER:  We weren't going to call Mr. Neville

17    for that purpose, Your Honor.

18          MS. PLOMIN:  Well, there we go.

19          THE COURT:  Is he an agent or an analyst?

20          MR. KOEHLER:  He's an intelligence analyst and we may

21    need to postpone his testimony by a day.  We're trying to work

22    our way through that.

23          THE COURT:  Okay.  I will take a look at these

24    exhibits.

25          Maureen, I'm going to give the list to you so you can

1    pull them for me.  I have 157.

2         And somebody said maybe we can take it up tomorrow

3    morning.  The reason I told the jury we weren't starting until

4    9:30 is because I'm going to be late.  I think I will be here

5    by 9:15 but I can't say for sure.  All depends on traffic.

6         So we can take these things up sometime tomorrow but

7    probably not before 9:30 because I don't -- I can't guarantee

8    I'll be here before then.  I'll be here by then.

9         Court is in recess.

10      (Proceedings adjourned at 4:11 p.m.)

11                           * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR15-00707-PHX-SRB    JURY TRIAL-DAY #6   2-24-16

1

2                    C E R T I F I C A T E

3

4           I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 1st day of August,

14   2016.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           _____
20                         ELIZABETH A. LEMKE, RDR, CRR, CPE

21

22

23

24

25