UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 25, 2016 |
| Abdul Malik Abdul Kareem, | ) 9:34 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 7
(Pages 1177 through 1318, Inclusive.)

APPEARANCES:
For the Government:
         U.S. ATTORNEY'S OFFICE
         By:  **Kristen Brook, Esq.**
              **Joseph Edward Koehler, Esq.**
         40 North Central Avenue, Suite 1200
         Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
         MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
         By: **Daniel D. Maynard, Esq.**
              **Mary Kathleen Plomin, Esq.**
         3200 North Central Avenue, Suite 1800
         Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB    JURY TRIAL-DAY #7   2-25-16

1                           **INDEX OF WITNESSES**

2       **KELLI EDMISTON:**

3       Direct examination by Mr. Koehler              Page 1180
        Cross examination by Mr. Maynard               Page 1201
4       Redirect examination by Mr. Koehler            Page 1206

5       **SEAN RAPER:**

6       Direct examination by Ms. Brook                Page 1208
        Cross examination by Mr. Maynard               Page 1218
7       Redirect examination by Ms. Brook              Page 1223

8       **KAREM FABIAN:**

9       Direct examination by Mr. Koehler              Page 1234
        Cross examination by Mr. Maynard               Page 1252
10      Redirect examination by Mr. Koehler            Page 1257

11      **JEFFREY D. EVANS:**

12      Direct examination by Mr. Koehler              Page 1258

13      **AMY KATHLEEN VAUGHAN:**

14      Direct examination (cont'd) by Mr. Koehler     Page 1282

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

CR15-00707-PHX-SRB   JURY TRIAL-DAY #7   2-25-16

1          **INDEX OF EXHIBITS**

2

3   **EXHIBIT NO.:**          **DESCRIPTION:**                    **RECEIVED:**

4


5   Exhibit No. 139     Judgment of Conviction           Page 1194
    Exhibit No. 266     'Constants on the Path           Page 1283
6                       of Jihad", Parts 1-6
    Exhibit No. 274     Lecture about a classical        Page 1284
7                       book on Jihad, Parts 1-12
    Exhibit No. 275     2009 lecture advocating Muslims  Page 1284
8                       to restore the honor of
                        Islam, calling for  revival
9                       of the Khilafah and jihad
    Exhibit No. 276     Allah Is Preparing Us for        Page 1285
10                      Victory, Part 1
    Exhibit No. 277     Allah Is Preparing Us            Page 1285
11                      for Victory, Part 2
    Exhibit No. 290     Screencap from a video           Page 1289
12                      showing a terrified prisoner
    Exhibit No. 352     Dark Blue Spiral Memo Book,      Page 1261
13                      3" x 5" (Item 16)
    Exhibit No. 356     Spiral Notebook, 8.5" x 11"      Page 1262
14                       (Item 18)
    Exhibit No. 357     Images from Forensic             Page 1194
15                      Analysis of Blue Spiral
                        Notebook (Item 18)
16  Exhibit No. 358     Google Maps Printouts            Page 1264
                        Dated April 26, 2015,
17                      Depicting Culwell
                        Center (Items 19, 20)
18  Exhibit No. 456     Nextbook photo 8 - protest       Page 1294
    Exhibit No. 472     Abdul Malik Abdul Kareem         Page 1194
19                      fingerprint card
    Exhibit No. 473     Hirens 15.1 CD Table of          Page 1269
20                      Contents
    Exhibit No. 477     Hirens Boot CD walkthrough       Page 1276
21

22

23

24

25

CR15-00707-PHX-SRB    JURY TRIAL-DAY #7   2-25-16

1               P R O C E E D I N G S

2       (Called to the order of court at 9:34 a.m.)

3           THE COURT:  Good morning, ladies and gentlemen.

4   Please sit down.  The record will show the presence of the

5   jury, counsel, and the defendant.

6           The government may call its next witness.

7           MR. KOEHLER:  Your Honor, the United States calls

8   Kelli Edmiston.

9       (Witness duly sworn)

10          THE CLERK:  Please state your name for the record and

11  spell your first and last name.

12          THE WITNESS:  My name is Kelli Edmiston.  My first

13  name is spelled K-E-L-L-I.  My last name is spelled

14  E-D-M-I-S-T-O-N.

15          THE COURT:  You may proceed, Mr. Koehler.

16              **KELLI EDMISTON, WITNESS, SWORN**

17                   **DIRECT EXAMINATION**

18  BY MR. KOEHLER:

19  Q   Ms. Edmiston, can you tell us where you work, please.

20  A   I'm employed by the Federal Bureau of Investigation.

21  Q   How long have you worked for the FBI?

22  A   For approximately six-and-a-half years.

23  Q   And what is it that you do for the FBI?

24  A   I am a physical scientist, forensic examiner, assigned to

25  the Latent Print Operations Units at the FBI laboratory.

1    Q    And where is your laboratory located?

2    A    In Quantico, Virginia.

3    Q    And the time in the FBI, has all of that been working in

4    the lab as a latent print examiner?

5    A    I have worked five years in my current position as a

6    latent print examiner at the FBI laboratory, but prior to the

7    FBI laboratory, I worked for a different division of the FBI

8    which is known as the Criminal Justice Information Services

9    Division and I worked there for approximately a

10   year-and-a-half.

11   Q    And what was that -- what was your work in that division?

12   A    I was a fingerprint examiner in which I compared known

13   prints to other known prints.

14   Q    So you were still doing fingerprint comparison at that

15   time; is that correct?

16   A    That is correct.

17   Q    And can you tell us about your training or your

18   educational background, please.

19   A    I have a Bachelors of Science and a Master of Science in

20   Forensic and Investigative Science from West Virginia

21   University.

22   Q    And can you tell us about the training that you've

23   received at the FBI laboratory?

24   A    At the FBI laboratory, I completed an approximate two-year

25   training program.  This program involved training by other

1   qualified latent print examiners.  I was taught how to

2   properly handle and process items of evidence for the presence

3   and detection of latent prints.

4        I also learned how to properly compare those latent

5   prints using our methodology.  I completed a number of

6   examinations, including written exams, oral exams,

7   presentations, and other examinations to include processing

8   and comparisons.

9        Upon completion of all of this training, I

10  successfully completed a comprehensive qualification

11  examination.

12  Q   Do you also have additional fingerprint training and

13  experience?

14  A   Prior to the FBI laboratory, I completed the training

15  program at the Criminal Justice Information Services Division.

16  Q   And what are your current duties in the laboratory?

17  A   Currently, I receive, process, inventory items of evidence

18  for the presence and detection of latent prints.

19       I then compare any latent prints that I detect to

20  other latent prints to known prints and I can search them in

21  our automated fingerprint database.

22       I write a report based on my findings and then

23  testify when requested to do so.

24  Q   Can you explain to the jury what a "known print" is?

25  A   On the palmar surfaces of your hands and on the soles of

1    your feet there's a specialized type of skin.  It is called

2    friction ridge skin.  It consists of raised portions called

3    friction ridges and valleys in between called furrows.

4         So a known print is the intentional reproduction of

5    the friction ridge skin taken in a controlled environment from

6    a known individual.

7         Typically, this is accomplished by rolling the

8    fingers from one side of the nail to the other in black

9    printer's ink and then, again, from one side to the other onto

10   a white contrasting background.  This produces a permanent

11   record for comparison purposes.

12   Q   Can you explain to the jury what a "latent print" is?

13   A   Throughout the day, certain substances can coat your

14   friction ridges such as oil from touching your hair or your

15   face or from sweat from the sweat pores along your friction

16   ridges.  So when an item is touched, there can be a transfer

17   of the friction ridge arrangement onto that item.

18        This is a latent print.  It is typically fragmentary

19   and not readily visible, so this is why I use different

20   chemicals, light sources, and fingerprint powders to help make

21   the latent print visible.

22   Q   Can someone touch an item and not leave behind a latent

23   print?

24   A   Yes.

25   Q   How can that happen?

1    A    There are different reasons as to why someone can touch an

2    item and not leave behind a latent print.  The factors are how

3    the deposition or how the person touched the item, as well as

4    what happened to the item after the latent print was

5    deposited.

6         And there are different factors such as if the

7    individual had dry or excessively chapped hands, then there's

8    nothing to deposit onto that item for the latent print to be

9    transferred.

10        Also, the opposite is true.  If the person is

11   excessively sweaty, then it would just be a smudge without any

12   friction ridge detail.

13        Other factors can have a play such as weather

14   conditions, condensation on a cup, or if the item is dirty or

15   has a textured surface to it.  So this acts negatively on the

16   detection of latent prints on those items.

17        And as far as after the latent print was deposited,

18   the latent prints can be fragile on the item such as nonporous

19   surfaces such as this plastic binder that the latent print

20   residue lies on the surface and it can be easily wiped away.

21   Q    Can things like weather also affect latent prints?

22   A    Yes.  Weather can act negatively with latent prints such

23   as the humidity or the moisture in the air.

24   Q    What about sunlight?

25   A    Yes.  This could dry the residue of the latent print.

1  Q   What are the basic factors that exist in the use of
2  fingerprints as a means of identification?
3  A   The two factors are uniqueness and persistence.  Friction
4  ridges are unique.  They develop while the fetus is in the
5  womb and they are unique from person to person, finger to
6  finger, and even among identical twins.  And this is due to
7  their hereditary and environmental factors as the fetus is
8  developing their friction ridges.
9         And the friction ridges are persistent.  They remain
10 unchanged throughout one's life until after death during
11 decomposition, with the exception of permanent scarring or
12 disease.
13        So it is with these two factors of persistence and
14 uniqueness that we can use friction ridges as a reliable means
15 of identification.
16 Q   Can you tell us what the methodology is that you use to
17 compare friction ridges?
18 A   The methodology that I use is known as ACE-V.  This is an
19 acronym and it stands for analysis, comparison, evaluation and
20 verification.
21 Q   So what is the analysis portion of that?
22 A   Analysis is the first step of ACE-V.  It is the
23 information-gathering step.  This is when I look at the
24 unknown latent print and I gather as much information as I
25 possibly can.

1    I'm looking at the quality and the quantity of

2  information.   "Quality" meaning how clear the information is

3  and "quantity" is how much unique or reliable information

4  there is.

5    And while doing this, I look at three different

6  levels of detail.  Starting with level one, this is known as

7  the overall ridge flow or pattern type.  This is things that

8  do -- the things that occur but can occur in many prints.

9  It's more of a classification and there are three main types

10  or classifications of latent prints.

11    Arches, loops, and whorls.

12    An arch is that type of pattern in which ridges enter

13  upon one side, make a rise or ridge in the middle, and then

14  flow out the opposite side upon which they entered.  An

15  arch-shaped pattern -- excuse me --

16    A loop-type pattern is a type of pattern in which

17  ridges enter upon one side, recurve, and then pass out or tend

18  to pass out upon the same side the ridges entered.

19    And a whorl-type pattern is more or less circular

20  circuit formation.

21    Now, looking closer, looking at the specific ridge

22  paths, this is known as Level Two details, looking at specific

23  characteristics.  And there are three main characteristics:

24  Ending ridges, dividing ridges, and dots.

25    An ending ridge is a ridge that flows and then stops.

1           A dividing ridge is a ridge that flows and then
2   splits or divides into two separate ridges.

3           And a dot is like a period at the end of a sentence.
4   It is as long as it is wide.

5           Of importance is not only the type of characteristic
6   but its location, if it has direction, and its spatial
7   relationship to other characteristics and within the print
8   itself.  It is all of this information that I consider during
9   Level Two.

10          Level Three is looking even closer at the specific
11  ridge paths, looking at the contours, the ridge edge shapes,
12  and also looking to see if there are pores along the friction
13  ridges.  And if present in both the latent print and the known
14  print, then this can be used to help support an identification
15  decision.

16          It is all of this information, all three levels, that
17  I use during analysis to assess the quality and quantity of
18  information.

19          And if I determine there is enough quality and
20  quantity, then this means the print is of value.  If the print
21  is of value, this means that if I was presented with the
22  correct known card, I could reach an identification decision
23  and I would not expect that same arrangement to be present in
24  another individual.

25  Q   After latent and known prints are analyzed, what is the

1   next step?

2   A    The next step is C-4 comparison.  This is when I compare

3   and lay the latent print beside the known print and I look for

4   similarities and differences.  I look for those different

5   levels of detail; the ridge flow, pattern type, and those

6   characteristics to see if they are in agreement.

7   Q    Once you've compared that information, what happens next?

8   A    The next step is E-4 evaluation.  This is when I reach one

9   of three conclusions; an identification, an exclusion, or an

10  inconclusive decision.

11       An identification decision is when there is enough

12  information in agreement to determine the two prints came from

13  the same source and I would not expect that same amount of

14  agreement to be present in another source.

15       An exclusion decision is when there's enough

16  information not in agreement to determine the two prints did

17  not come from the same source.

18       And inconclusive is when I cannot reach neither an

19  identification nor an exclusion decision.  The known print

20  does not have the comparable area.  It's either not clear

21  enough or it is just not available.

22  Q    What is the final step?

23  A    The final step is V-4 verification.  This is when another

24  independent, qualified examiner performs their own analysis,

25  their own conclusions, to reach their own decision during

1   evaluation.  This is a form of peer review and part of our

2   quality assurance system.

3   Q   And do you do that in every single case?

4   A   We follow the verification step for identification

5   decisions and single conclusions.

6   Q   Were you asked to perform fingerprint comparisons in

7   connection with this case?

8   A   Yes.

9   Q   Tell us where the evidence that came to you came from.

10  A   The evidence in this case came from different locations;

11  partially, from Texas and also from Arizona.

12  Q   Speaking to the evidence from Texas, did you develop

13  latent prints or locate latent prints on evidence from Texas?

14  A   Yes, I did.

15  Q   How many total latent prints did you develop from the

16  evidence in Texas?

17  A   I detected 20 latent fingerprints of value.

18  Q   And after you developed those prints, did you compare them

19  to known prints of individuals in this case?

20  A   Yes, I did.

21  Q   Did you develop, compare them to prints belonging to Nadir

22  Hamid Soofi?

23  A   Yes.

24  Q   Did you also compare them to prints belonging to Elton

25  Simpson?

1    A    Yes.

2    Q    Did you also compare them to prints belonging to the

3    defendant Abdul Malik Abdul Kareem?

4    A    Yes, I did.

5    Q    And was his print card known to you under the name Decarus

6    Thomas as well?

7    A    Yes.

8    Q    Among the items submitted from Texas, among the latent

9    prints from Texas, did you find any prints of the defendant

10   Abdul Malik Abdul Kareem?

11   A    No, I did not.

12   Q    Did you find any prints on those items belonging to Elton

13   Simpson?

14   A    No, I did not.

15   Q    And did you find any prints on those items belonging to

16   Nadir Soofi?

17   A    Yes.

18   Q    How many prints out of the 20?

19   A    19 latent fingerprints of value were identified to Nadir

20   Hamid Soofi.

21   Q    You mentioned that you had 20 latent prints developed.

22   How many items did you examine in order to develop those

23   latent prints?

24   A    Approximately 80.

25   Q    All right.  Let's move on to Phoenix evidence.

1  Approximately, how many items did you review from Phoenix

2  evidence?

3  A    Approximately 95.

4  Q    And among those 95, did you find prints of Nadir Soofi?

5  A    Yes, I did.

6  Q    Did you find prints of Elton Simpson?

7  A    Yes, I did.

8  Q    Do you recall how many prints for each of those two you

9  found?

10  A    If I may refer to my reports, I can provide that number.

11  Q    Yes, please.

12        MR. MAYNARD:  Your Honor, can I inquire as to the

13  date of the report because there's several.

14        THE COURT:  Yes.

15        THE WITNESS:  This report was dated January 30, 2016.

16  And for this portion of the case there were nine latent

17  fingerprints that were identified to Nadir Hamid Soofi.

18        In the same report there were 38 latent fingerprints

19  identified to Elton Simpson.

20        In the laboratory reports dated February 12th of

21  2016, in this portion of the case there were 60 latent

22  fingerprints that were identified to Nadir Hamid Soofi and

23  there were two latent fingerprints that were identified to

24  Elton Simpson.

25        MR. KOEHLER:  Now, I would like to first draw your

1    attention to Exhibits 114 and 357.

2              May I approach the witness, Your Honor?

3              THE COURT:  Yes.

4    BY MR. KOEHLER:

5    Q   Can you first open up and take a look at 114 without

6    touching it, please?  And that's an item that's in evidence.

7              Do you recognize that?

8    A   Yes, I do.

9    Q   Did you examine that item as part of your testing in this

10   case?

11   A   Yes.

12   Q   And did you develop a latent print on that particular

13   item?

14   A   I detected one latent fingerprint of value on this item.

15   Q   All right.  Now, moving on to Exhibit 357, do you

16   recognize that?

17   A   Yes, I do.

18   Q   And is that another item on which you developed a latent

19   fingerprint?

20   A   Yes.

21   Q   How many latent prints did you detect on that item?

22   A   I detected one latent fingerprint of value on this item.

23             MR. KOEHLER:  Your Honor, may I approach the clerk to

24   retrieve Exhibit 139?

25             THE COURT:  Yes.

1          MR. KOEHLER:  May I approach the witness?

2          THE COURT:  Well, if you want one of the exhibits to

3   be given to the witness, then the clerk can do that.

4          MR. KOEHLER:  Okay.

5   BY MR. KOEHLER:

6   Q   Ms. Edmiston, could you please pull that out of the sleeve

7   and examine that.  Do you recognize that?

8   A   Yes, I do.

9   Q   Did you also examine that in the laboratory?

10  A   Yes, I did.

11  Q   Does that contain an inked fingerprint?

12  A   Yes.

13  Q   And in your world is an inked fingerprint treated as a

14  known fingerprint?

15  A   Yes.  It's an intentional, recorded fingerprint.

16  Q   Now, I'm going to show you on the monitor, on the document

17  camera, what's been marked for identification as Exhibit No.

18  472.  Do you recognize that?

19  A   Yes, I do.

20  Q   And what is that?

21  A   This is a fingerprint card, a known fingerprint card with

22  the fingerprints of Decarus Thomas who is also known as Abdul

23  Malik Abdul Kareem.

24  Q   Did you compare the fingerprints that you found on

25  Exhibits 114 and 357, the inked fingerprint on Exhibit 139 to

1    the known fingerprints of Abdul Malik Abdul Kareem on Exhibit

2    472?

3    A   Yes, I did.

4    Q   What was the result of your comparison?

5    A   The prints were from the same source.  It was an

6    identification.

7            MR. KOEHLER:  I'm going to move to conditionally

8    admit 357 and 472.

9            MR. MAYNARD:  No objection.

10            MR. KOEHLER:  And 139, the fingerprint portion.

11            THE COURT:  Hold on.  Wait.

12            357 and 472 are admitted.

13            Do you want to move something else?

14            MR. KOEHLER:  Yes, Your Honor.  I further move to

15    admit conditionally Exhibit 139.

16            MR. MAYNARD:  No objection.

17            THE COURT:  139 is admitted.

18       (Exhibit Nos. 357, 472, and 139 admitted in evidence.)

19    BY MR. KOEHLER:

20    Q   Did you also create a demonstrative digital chart to help

21    explain your comparison to the jury?

22    A   Yes, I did.

23            MR. KOEHLER:  Your Honor, I would like to switch the

24    monitor to the laptop on the lectern here so we can show the

25    jury the demonstrative chart.

 1            THE COURT:  Is there any objection to the

 2   demonstrative being viewed by the jury?

 3            MR. MAYNARD:  I'm sorry.  No, Your Honor.

 4            MR. KOEHLER:  I just realized I may need to come off

 5   and come back on.  There we go.

 6   BY MR. KOEHLER:

 7   Q   Can you walk the jury through what you did in your

 8   comparison to establish that the prints belonged to the same

 9   person?

10   A   I created charted enlargements illustrating one of the

11   identifications I made in this case.

12            The latent print on your left is the latent

13   fingerprint of value I detected on Government's Exhibit 357, a

14   page from a notebook.

15            You may also notice the context clues of this latent

16   print.  In the top right-hand corner there's a hole punch and

17   also at the bottom left-hand corner there are additional

18   holes.  And this is where the page can be torn from a notebook

19   page.

20            The known print is the left thumb from a fingerprint

21   card bearing the name Abdul Malik Abdul Kareem.

22            The red letters and red lines were added by me for

23   demonstrative purposes just so you can more easily follow

24   along.

25            Also of note are the black lines.  The black lines

1   are the friction ridges and the white areas in between would

2   be the furrows.

3          So starting with analysis, beginning with the latent

4   print first, I'm looking at different levels of detail.  And

5   starting with the first level of detail, this is the overall

6   ridge flow and pattern type.

7          Starting at the top of the print, you'll notice that

8   the ridges flow from one side to the other in a curving

9   formation like a rainbow.

10         Now, move your eyes down and you will notice that the

11  ridges become busier.  There is more going on.  If you look

12  closely, you'll see two looping formations.  The top loop is

13  facing what has been designated as characteristic E.  And

14  there's a second loop underneath which is facing away from

15  what has been designated as characteristic F.

16         This is a double-loop whorl.  It is a specific type

17  of whorl formation.  Although it's not a perfect bull's eye,

18  it can still spin around and around like a pinwheel.

19         Now, let's look at the known print to see if this

20  information is in agreement.  Looking at the known print

21  starting at the top, you'll notice that the ridges flow from

22  one side over to the other in a curving, arc-like formation

23  like in a rainbow.

24         Now, draw your eyes moving down, the ridges become

25  busier and there is more going on.  And you'll notice two

1    looping formations, one on top of the other.  This is also a

2    double-loop whorl.  And this Level One pattern information is

3    in agreement.

4         And because it is in agreement, we can move on

5    looking closer at the specific ridge paths to see if the Level

6    Two information is in agreement.

7         Moving back over to the latent print, now let's look

8    for unique individual characteristics, those characteristics

9    that I spoke of before; ending ridges, dividing ridges, and

10   dots.

11        Starting with characteristic A, follow the arrow and

12   you'll notice it is pointing to an ending ridge pointing to

13   the left.

14        Now, moving from characteristic A, in the white space

15   move directly to the left.  It runs into a second ending ridge

16   pointing to the right.  I have designated this as

17   characteristic B.

18        Look closely at characteristic B.  To the right there

19   is a little dot beside it.  Now, moving from characteristic B,

20   up, across one, two continuous ridges, to a third ridge.

21   There is an ending ridge pointing down and to the left.  I

22   have designated this as characteristic C.

23        Now, let's look at the known print to see if this

24   information is in agreement.

25        Starting with characteristic A, this is an ending

1    ridge pointing to the left.  Now, moving to the left, in the

2    furrow, the white space, it meets a second ending ridge

3    pointing to the right.  This has been designated as

4    characteristic B.

5         Now, notice the little dot beside it to the right.

6    Moving from characteristic B, up across one, two continuous

7    ridges, to a third ridge.  There's an ending ridge pointing

8    down and to the left.  I have designated this as

9    characteristic C.

10        This Level Two information is in agreement.

11        Now, remember of importance is not only the type of

12   characteristic, whether it is an ending ridge, a dividing

13   ridge, or a dot, but also its location, if it has direction,

14   and its spatial relationship to other characteristics and

15   within the print itself.

16        Looking at the latent print again, let's see if there

17   is more information in agreement.

18        We left off with characteristic C.  Moving from

19   characteristic C down, across one, two continuous ridges, to a

20   third ridge, there is an ending ridge pointing to the right.

21   We have discussed this as characteristic B.

22        Moving from characteristic B, directly down, across

23   one, two, three, four, five, six continuous ridges to a

24   seventh ridge, there is a dividing ridge looping to the left

25   and down.  I have designated this as characteristic D.

1        Moving from characteristic D to the left, across one

2   continuous ridge to a second ridge, there is an ending ridge

3   pointing up.  I have designated this as characteristic E.

4        Moving from characteristic E, sliding down that same

5   ridge, it meets a second ridge which creates a dividing ridge

6   opening up and curving around towards the right.  I have

7   designated this as characteristic F.

8        Now, let's look at the known print to see if this

9   information is in agreement.

10       We left off with characteristic C.  Moving from

11  characteristic C down, across one, two continuous ridges, to a

12  third ridge, there is an ending ridge pointing to the right.

13  This has been designated and discussed as characteristic B.

14       Moving from characteristic B, directly down, across

15  one, two, three, four, five, six continuous ridges to a

16  seventh ridge, there is a dividing ridge opening to the left

17  and down.  This characteristic has been designated as

18  characteristic D.

19       Moving from characteristic D to the left, across one

20  continuous ridge to a second ridge, this is an ending ridge

21  pointing up.  I have designated this as characteristic E.

22       Moving from characteristic E, sliding down that same

23  ridge, it meets a second ridge which forms a dividing ridge

24  which opens up and curves around towards the right.  I have

25  designated this as characteristic F.  This Level Two

1    information is in agreement.

2         It is with these characteristics that I have charted

3    and explained along with additional characteristics that I

4    have not charted and not explained that I have reached the

5    decision that this latent fingerprint of value that I detected

6    on Government's Exhibit 357, a notebook page, was identified

7    to the left thumb, a known fingerprint card, bearing the name

8    Abdul Malik Abdul Kareem, which is also known as Government's

9    Exhibit No. 472.

10   Q   Did you perform the same analysis on the latent print that

11   you discovered on Exhibit 114?

12   A   Yes, I did.

13   Q   And can you describe what Exhibit 114 is, please?

14   A   Exhibit No. 114 is a pistol.

15   Q   All right.  And then Exhibit No. 139, did you do the same

16   analysis on the inked print on Exhibit 139?

17   A   Yes, I did.

18   Q   And can you tell us what Exhibit No. 139 is in general

19   terms?

20   A   139 is an intentional recording of a thumb print.

21   Q   And is it a Judgment and Commitment Order?

22   A   Yes, it is.

23        MR. KOEHLER:  I have no further questions for the

24   witness at this time.

25        THE COURT:  Mr. Maynard?

 1              MR. MAYNARD:  Yes, ma'am.

 2          Your Honor, can I have Exhibit 139 for a moment?

 3              THE COURT:  Yes.

 4              MR. MAYNARD:  Sorry, Maureen.

 5          May I have 357, Your Honor?

 6              THE COURT:  That too, yes.

 7                      **CROSS EXAMINATION**

 8   BY MR. MAYNARD:

 9   Q   Good morning.

10   A   Good morning.

11   Q   When was it that you completed your fingerprint analysis?

12   A   May I refer to my report, please?

13   Q   Sure.

14   A   The last report for this case was dated February 12, 2016.

15   Q   Okay.  Now, you've indicated that there was a latent print

16   that was found on Exhibit 114.  Do you recall that testimony?

17   A   That is correct.

18   Q   Do you know where Exhibit 114 was found here in Phoenix,

19   Arizona?

20   A   No, I do not.

21   Q   Do you know that 114 is a 9 millimeter pistol?

22   A   I know that it is a pistol as outlined in my report, but I

23   don't know anything beyond that.

24   Q   You don't know if it's the one that Abdul Kareem owned and

25   they found it in his house?

1   A    I did not study that information, no.

2   Q    Okay.  And as for Exhibit 357, what did you understand it

3   was?

4   A    It was a page from a notebook.

5   Q    Did you have an understanding of where that notebook was

6   found?

7   A    No.  I did not study this information.

8   Q    All you know is that on all of the items that were found

9   here in Phoenix, you were able to find two fingerprints that

10  you believe belong to Abdul Malik on the items that were given

11  to you?

12  A    There were two latent fingerprints of value that were

13  identified, yes.

14  Q    Okay.  And that on all of the items that you reviewed from

15  Garland, Texas, you weren't able to find any of his prints on

16  that?

17  A    That is correct.

18  Q    And the items you reviewed from Garland, Texas, did it

19  include weapons?

20  A    Yes, it did.

21  Q    And did it include shell casings?

22  A    Yes.

23  Q    And did it include notebooks?

24  A    Yes.  Papers were involved.

25  Q    In fact, there were -- were there paper flags that were

1    found?

2    A    That is correct.

3    Q    Okay.  And his fingerprint was not found on any of that

4    stuff?

5    A    Correct.

6    Q    Okay.  Now, I'm looking at your report that's dated

7    January 30th.  I take it this was a preliminary report or is

8    this a final report on these particular items?

9    A    It is an official report based on those particular items.

10   Q    So you were given items from different locations in

11   Phoenix to analyze?

12   A    Yes.

13   Q    Now, you not only analyzed the fingerprints of

14   Mr. Soofi -- Nadir Soofi and Elton Simpson, you analyzed those

15   of Decarus Thomas, correct?

16   A    That is correct.

17   Q    And you also looked for the prints of others, correct?

18   A    Yes.

19   Q    You were given the prints of a Mr. Abdul Khabir Hyman?

20   A    That is correct.

21   Q    And on the items that were -- that you looked at from

22   Garland, Texas, you didn't find Mr. Hyman's prints on any of

23   those items, did you?

24   A    No, I did not.

25   Q    And then according to your report of January 30th of 2016,

1   I believe you looked at like approximately 35 items; is that

2   true?  A lot of compact discs, notebooks, and a couple of

3   weapons?

4   A    That is correct.

5   Q    You did not find Mr. Hyman's prints on any of those items

6   either, did you?

7   A    No, I did not.

8   Q    Okay.  And then you did the report on February 12th of

9   2016, correct?

10  A    Yes.

11  Q    And, again, you looked at -- it appears that you may have

12  looked at another 60 or 70 items?

13  A    Yes.

14  Q    Okay.  And a large number of those were compact discs?

15  A    Yes.

16  Q    And you looked at envelopes, tapes, notebooks, things of

17  that nature?

18  A    That is correct.

19  Q    And you don't know where those items came from that you

20  analyzed?

21  A    No, I do not.

22  Q    But in looking at all of those items that you analyzed,

23  you didn't -- did you find any of Mr. Thomas's or Abdul

24  Kareem's fingerprints on them?

25  A    No, I did not.

1  Q    Okay.  And did you find any of Mr. Hyman's fingerprints on

2  any of those?

3  A    These examinations for this particular report were

4  discontinued based on the trial deadlines of this case, so

5  they were not fully compared to Hyman.

6  Q    Okay.  So you stopped looking at these items, so you can't

7  testify whether Mr. Hyman's prints are on them or not?

8  A    It was a partial examination, so for some of the latent

9  prints I can tell you, but for others --

10  Q    No.  Can you tell me whether Mr. Hyman's prints are on any

11  of the items that you reviewed that are in your February 12th

12  report?

13  A    Hyman at this point was not detected on any of the items,

14  no.

15  Q    Now, just for a little bit of clarification, when you were

16  looking at the fingerprints, you showed us that there were six

17  points of identification or characteristic; is that correct?

18  A    That is correct.

19  Q    When -- is there a standard by which the FBI has to find a

20  certain number of points of characteristic before they

21  determine that there is match?

22  A    No.  There is no valid or scientific standard for the

23  number of points or a standard because it is the holistic

24  approach of not only looking at the number of points but

25  also --

1   Q   I didn't ask for a lecture.  I just wanted to know.

2        Is there a number of points?  Yes or no.

3   A   No.

4   Q   Okay.  Are there other law enforcement agencies that do

5   have standards that they have to have a certain number of

6   points before they say that there is a match?

7   A   Yes, there are.

8   Q   Are there agencies that require as many as 12 to 16 points

9   of identification?

10  A   Yes.

11  Q   But the FBI doesn't do that?

12  A   That is correct.

13       MR. MAYNARD:  I have no further questions, Your

14  Honor.

15       THE COURT:  Mr. Koehler, do you have any additional

16  questions of this witness?

17       MR. MAYNARD:  May I approach the clerk, Your Honor?

18       THE COURT:  Yes.

19                    **REDIRECT EXAMINATION**

20  BY MR. KOEHLER:

21  Q   Mr. Maynard asked you about the Garland evidence and

22  whether Mr. Abdul Kareem's fingerprints were on any of that

23  evidence.

24       Were Elton Simpson's fingerprints on any of that

25  evidence?

1   A    No.

2   Q    We talked earlier about weather and moisture and so on

3   affecting fingerprints.  Would water affect fingerprints on

4   paper?

5           MR. MAYNARD:  Objection.  Beyond the scope.

6           THE COURT:  Sustained.

7   BY MR. KOEHLER:

8   Q    Were any fingerprints at all found on the printed flags

9   that you examined?

10  A    May I refer to my case notes and report, please?

11  Q    Yes.  Please.

12  A    There were two latent fingerprints of value detected on

13  the paper flags.

14  Q    Were you able to match them to anyone?

15  A    Yes.

16  Q    To whom were you able to match them?

17  A    They were both identified to Nadir Hamid Soofi.

18  Q    You, again, testified that you didn't find Mr. Abdul

19  Kareem's fingerprints on any of the firearms in Texas.

20          Those were included in the items you examined; is

21  that correct?

22  A    That is correct.

23  Q    Is there anything about a firearm that makes it more

24  difficult to retain a print?

25          MR. MAYNARD:  Objection.  Beyond the scope.

```
 1            THE COURT:  Sustained.

 2            MR. KOEHLER:  No further questions.

 3            THE COURT:  May this witness be excused?

 4            MR. KOEHLER:  Yes, Your Honor.

 5            MR. MAYNARD:  No objection.

 6            THE COURT:  Thank you very much, Ms. Edmiston.  You

 7   may step down and you are excused as a witness.

 8            The government may call its next witness.

 9            MS. BROOK:  Thank you, Your Honor.

10            The government calls Sean Raper.

11         (Witness duly sworn.)

12            THE CLERK:  Please state your name for the record,

13   spelling your first and last name.

14            THE WITNESS:  Sean Michael Raper.  S-E-A-N.

15   R-A-P-E-R.

16                 SEAN RAPER, WITNESS, SWORN

17                      DIRECT EXAMINATION

18   BY MS. BROOK:

19   Q   Good morning.

20   A   Good morning.

21   Q   And if you can speak right into the mic that's right in

22   front of you, it will help everybody be able to hear you.

23   A   Yes, ma'am.

24   Q   Would you please introduce yourself.

25   A   My name is Sean Michael Raper.
```

1    Q    And, Mr. Raper, do you live here in Phoenix?

2    A    I do.

3    Q    How long have you lived here in Phoenix?

4    A    My family and I moved here when I was about 11 years old,

5    so about 15, 16 years ago.

6    Q    What do you do for a living?

7    A    Right now I'm currently a diesel mechanic.

8    Q    What are you?  I'm sorry.

9    A    I'm a diesel mechanic.

10   Q    Okay.  And have you been doing that for a while?

11   A    About six months.  I have been in school for it for almost

12   a year.

13   Q    So prior to becoming a mechanic, you were in school?

14   A    Yes, ma'am.

15   Q    Have you ever sold a gun that you have sold online?

16   A    I've sold a few, yes, ma'am.

17   Q    Back in December of 2014, did you market for sale online a

18   .38 Special revolver?

19   A    Yes, ma'am.  It was a Smith & Wesson.

20   Q    And how is it that you did that?

21   A    I used the website known as BackPage and I went through

22   and posted online there.

23   Q    So for those of us that have not posted something on

24   BackPage before, how do you do it?  What do you put online?

25   A    Well, when you go to BackPage, it's very simple.  You just

```
 1    go to post an ad.  It will prompt you to put what you're
 2    selling, a description, and an e-mail for them to contact you
 3    at, a phone number if you choose for them to contact you at,
 4    as well as if you choose to upload a couple of photos for it.
 5    Q   And is that what you did then?
 6    A   Yes, ma'am.
 7    Q   Did you list a phone number that somebody who potentially
 8    wanted to buy the gun would be able to call you at?
 9    A   Yes, ma'am.
10    Q   And did somebody call you interested in purchasing that
11    particular .38 Special?
12    A   There was a text message, yes, ma'am.
13    Q   And did you reach out and contact the individual who
14    messaged you?
15    A   Yes, ma'am.
16    Q   And at some point did you set up a time to meet that
17    person?
18    A   Yes, ma'am.
19    Q   So did you agree upon a price?
20    A   Yes, ma'am.  $300.
21    Q   The individual that reached out to you by text message and
22    that you called back to set up the sale, did they identify
23    themselves by name?
24    A   Not during the text message, but when we met in person,
25    yes, ma'am.
```

1    Q    So at some point you met this person by -- in person?

2    A    Yes, ma'am.

3    Q    And what name did the individual provide?

4    A    The name that -- I'm bad with names sometimes, but the

5    name that -- in the report back when I was originally

6    interviewed a year ago --

7    Q    And have you had a chance to look at the report that was

8    drafted after your interview with FBI a year ago?

9    A    Yes, ma'am.

10   Q    And in looking at that report, did that report refresh

11   your memory of the name of the individual that you met?

12   A    The mark -- beginning with a D -- like DeMarco.

13   Q    So the name began with a "D"?

14   A    Yes, ma'am.

15   Q    Let's move on to the sale itself and we're going to talk

16   about more specifics in the sale.

17           So, you had mentioned that you marketed the gun for

18   sale on BackPage.  Had you done that before?

19   A    I have done that one other time, yes, ma'am.

20   Q    And you arrived upon a location that you were going to

21   meet this individual whose name started with "D"?

22   A    Yes, ma'am.

23   Q    And where was it that you decided you were going to meet

24   this person to do the sale?

25   A    The Caramba's at the cross intersections of 83rd and Union

1   Hills.

2   Q   Do you remember approximately when it was that you met

3   this person to do the sale?

4   A   It was later in the evening, sometime between 8:00 and

5   9:00 p.m., I think.

6   Q   So it was later in the evening between 8:00 and 9:00.

7   We've talked about it being in the month of December.

8           Was it early or late in the month?

9   A   I think it was closer to the early -- earlier to the mid.

10  Q   Okay.  So early to mid?

11  A   Yes, ma'am.

12  Q   And the Caramba's parking lot, why was it that you picked

13  a parking lot?

14  A   Well, in dealing with this -- when dealing with a gun sale

15  through BackPage or a private party, it's always a good

16  practice to have a well-lit area with where it's out in the

17  public.  And I chose that area because I knew that area.  It

18  was decently well lit.  And I knew that Caramba's and the

19  other stores around the area had security cameras.

20  Q   And so when you arrived at the parking lot that night

21  sometime between eight and nine o'clock, did you park in a

22  particular location in the parking lot?

23  A   Yes, ma'am.  I pulled in and I parked not right next to

24  but fairly close to an overhead light so that I would be under

25  illumination.

```
 1   Q    Okay.  So you parked underneath or close to a light.

 2              And when you showed up, were you by yourself or with

 3   somebody else?

 4   A    I was alone.

 5   Q    Eventually that night, did you meet up with the individual

 6   who had reached out to you to purchase that .38 Special?

 7   A    Yes, ma'am.

 8   Q    And how did that person arrive?

 9   A    That person arrived in a minivan with himself and two

10   other gentlemen in the vehicle.

11   Q    The person that purchased the weapon from you, was he

12   driving or a passenger?

13   A    He was driving, ma'am.

14   Q    And did the minivan that he parked, did he park close to

15   you or far away from you?

16   A    I parked on one side of a median and then there was a

17   concrete area with a little bit of dirt area in between us and

18   he parked on the opposite side of that.

19   Q    And could you see -- could you see into the minivan

20   itself?  You mentioned that there were two other people in the

21   minivan, so you could see that there were two people in the

22   minivan.

23              How well were you able to see those two people?

24   A    The individual that was in the front passenger's seat, I

25   was able to see that he was a skinnier-faced individual, a
```

1  little bit older.  He had a ball cap on.

2          The individual in the back, all I was really able to

3  see was movement.  I couldn't get a good view of the

4  individual because the light didn't penetrate that far really

5  into the minivan, but there was two individuals in there.

6  Q   Okay.  So the man whose name starts with "D" gets out of

7  the car and comes to you?

8  A   Yes, ma'am.

9  Q   At that point what happened?

10  A   At that point I introduced myself.  How you doing?  Go

11  through the normal pleasantries of feeling the person out when

12  you're selling.

13          I tell him that I have the pistol, does he have the

14  money.

15          I take the pistol out.  It's unloaded.  I show it to

16  him.  I run through what it is.  He tells me that he doesn't

17  really need to know.  He already knows how to work a revolver.

18          He pulled out the money, a wad of cash, which struck

19  me unusual, because normally, when you go to a gun deal like

20  this, you carry the very basic minimum of what you need; your

21  driver's license, only your car keys --

22          This is how I do it anyways.  Your driver's license,

23  your car key, and just enough cash to pay for what was agreed.

24          You don't bring a lot of extra money with you.

25  Q   What was the agreed-upon price for the .38 Special?

1    A    $300 U.S. dollars.

2    Q    And you mentioned that he had a wad of cash?

3    A    Yes, ma'am.

4    Q    So did he give you $300?

5    A    He gave me $300, yes, ma'am.

6    Q    After he -- did he give you the $300 from the wad of cash

7    he had?

8    A    Yes, ma'am.

9    Q    And after he gave you $300 from that wad of cash, how much

10   was left in the wad of cash?

11   A    I barely put a dent in it.  It looked like -- I mean, I'm

12   not in the habit of scoping people's money out when they're

13   handling it, but it still seemed like he had a good chunk in

14   there left.

15   Q    And you said taking off the $300 barely took a dent out

16   of --

17              MR. MAYNARD:  Objection.

18              THE WITNESS:  Yes, ma'am.

19              MR. MAYNARD:  Objection to the form of the questions.

20              THE COURT:  The form of the question sounds like it's

21   leading.

22              MS. BROOK:  Okay.  I'm just trying to clarify the

23   question.

24   BY MS. BROOK:

25   Q    So, after he peeled the $300 left out of the wad of cash,

1    maybe just show us with your hands how much cash was left.

2    A    I mean, the cash was originally approximately about that.

3    Maybe moved not even an inch. (Indicating)

4    Q    You had mentioned that you started to explain the

5    specifics of the weapon and that he expressed to you he wasn't

6    interested in the specifics.

7         Did he say anything else to you?

8    A    Well, I gave him a box of the ammo.  And before we parted,

9    he asked if I knew anybody else that was selling guns or if I

10   had any more ammo or anything along those lines because he was

11   in the market to buy right now.

12   Q    Can you describe for us what that man looked like?

13   A    The man is the gentleman sitting right over there.

14   (Indicating)

15   Q    And can you describe something that he's wearing?

16   A    It's a blue and white -- not quite plaid but

17   checkerboard-type shirt, African-American complexion, gray --

18   black hair turning gray, with a -- with facial hair.

19        MS. BROOK:  Your Honor, may the record reflect that

20   the witness has identified the defendant?

21        THE COURT:  Yes.

22        MS. BROOK:  May I have one moment?

23        THE COURT:  Yes.

24   BY MS. BROOK:

25   Q    Did the defendant tell you what he did for a living?

```
 1    A   He told me that he owned a moving company.

 2              MS. BROOK:  Your Honor, may I approach with Exhibit

 3    125?

 4              THE COURT:  Yes.

 5              MS. BROOK:  Let me get back to the mic.

 6              Use these if you want to touch it.

 7              THE COURT:  Well, hold on.

 8              THE WITNESS:  Yes.

 9              THE COURT:  I would prefer that he not touch it at

10    all.

11              THE WITNESS:  Yes, ma'am.

12              THE COURT:  Okay.  So you can look inside the box but

13    don't touch the weapon that's in there.

14              THE WITNESS:  Yes, ma'am.

15              THE COURT:  So go ahead and look in there.

16              Ms. Brook?

17    BY MS. BROOK:

18    Q   Do you recognize what's in that box?

19    A   Yes, ma'am.

20    Q   And what do you recognize it as?

21    A   It's a Taurus .38 Special revolver.

22    Q   Is that the .38 Special you sold him?

23    A   Yes, ma'am.  I misspoke earlier when I mentioned Smith &

24    Wesson.

25              MS. BROOK:  I don't have any other questions.  Thank
```

1    you.

2           THE COURT:  Mr. Maynard?

3           MR. MAYNARD:  Thank you, Your Honor.

4                        **CROSS EXAMINATION**

5    BY MR. MAYNARD:

6    Q    Good morning.

7    A    Good morning, sir.

8    Q    When you met this individual, he told you at that time

9    that he owned a moving company, correct?

10   A    Yes, sir.

11   Q    You were a little bit down on your luck at the time?

12   A    Not really, sir.  I was working at the power plant.  I was

13   considering a move of career.  I was doing all right.

14   Q    Okay.  You recall that you had been interviewed by the FBI

15   before?

16   A    Yes, sir.

17   Q    And you were interviewed back in June of 2015?

18   A    Yes, sir.

19   Q    Did you tell them that your wife had just recently left

20   you and that was why you were selling the gun because you had

21   some bills and you needed to get some extra cash?

22   A    Back in the month of December, yes, me and my former

23   ex-wife had separated.  And, yes, I did sell the gun to help

24   make bills and whatnot, yes, sir.

25   Q    And, in fact, I think you told the FBI at the time, did

1    you not, that she had left and she had taken most everything

2    and that was the reason you were selling this gun because you

3    were out of money?

4    A    Yes, sir.  My paycheck had not come in.

5    Q    And she had left in November and this transaction is

6    happening within 30 days of that?

7    A    Yes, sir.

8    Q    Okay.  And he tells you he's got a moving company.

9    Doesn't he give you a copy of his card for the moving company?

10   A    No, sir.

11   Q    You don't remember getting a copy of a card?

12   A    No, sir.  I put most cards I receive in my wallet.

13   Q    Okay.  And did you ever call him back at a later date and

14   offer to sell him a .22 rifle?

15   A    Not to my knowledge, sir.  I did mention that I had one,

16   but I wasn't interested in selling it.

17   Q    Okay.  So you don't recall calling him.

18          What number did you advertise on the BackPage?

19   A    My cell phone number, sir.

20   Q    What was that number?

21   A    623-217-9571, I believe.

22   Q    Now, when you came up to sell this gun, you said it was

23   $300; is that correct?

24   A    Yes, sir.

25   Q    Do you recall that to be the exact number or is it

1    possible that you sold it for $350?

2    A   I did not sell it for 350, sir.  It was $300.

3    Q   And did you also sell a box of ammunition with it?

4    A   Yes, sir.

5    Q   You didn't remember the make of the gun.  Are you sure you

6    remembered the amount?

7    A   Yes, sir.

8    Q   Okay.  And I believe you testified on direct that you have

9    only sold two guns?

10   A   I believe, yes, sir.

11   Q   Have you ever bought any guns off of BackPage?

12   A   No, sir.  I find their prices to be a little bit too

13   steep.  That's why I know that if I have one that's priced at

14   a good -- good price that it will usually sell.

15   Q   How much had you purchased this .38 for?

16   A   This .38 Special, I'm not too sure.  I think it was

17   probably brand new like 325, 330 before tax.

18   Q   And where did -- when did you purchase it?

19   A   Earlier in -- earlier that year.

20   Q   Like how long before you sold it?  Had it been six months?

21   Had you had this gun for six months before you sold it?

22   A   I'm not entirely sure.

23   Q   No recollection at all?

24   A   I have owned multiple different firearms, sir.  I can't

25   tell you exactly how long I have owned every single one.

1   Q   Okay.  Let me show you a Department of Justice National

2   Tracking Center Report.

3           And I'm going to direct your attention to where my

4   finger is and the purchase date of the gun.  Do you see that?

5   A   Yes, sir.

6   Q   And did you purchase this gun in Chino Valley, Arizona?

7   A   Not in Chino Valley, sir.  I brought it from Tombstone

8   Tactical.  That's over by Metro Mall.  They have more than one

9   location.  That's just their headquarters.

10  Q   And does this help refresh your recollection of when you

11  purchased the gun?

12  A   Yes, sir.

13  Q   When was it now?

14  A   Per the paperwork it says 11/12.

15  Q   This was only the second time that you had actually sold a

16  gun?

17  A   On BackPage, yes, sir.

18  Q   BackPage.  Had you sold other guns on other websites?

19  A   No, sir.

20  Q   When you were interviewed by the FBI back in June, were

21  you concerned that they were looking at you for dealing in

22  guns?

23  A   No, sir.

24  Q   Did you keep a receipt when Mr. Abdul Kareem purchased the

25  gun from you?

1   A    I did do -- I do a bill of sale with my customers that I

2   have sold a gun to or other individuals just for my record.

3   Q    And what happened to that receipt?

4   A    Well, after December me and my ex tried to reconcile, got

5   back together, moved in with each other.  She ended up leaving

6   again before the divorce and taking pretty much almost

7   everything I owned and leaving, including the box that had my

8   paperwork in it.

9   Q    She took your receipts then?

10  A    Yes, sir.

11  Q    Did you recall that you asked this individual if he had

12  any job openings so that you could work for his moving

13  company?

14  A    I remember that it was discussed that I might be looking

15  for parttime work on my days off to make a little bit of extra

16  money for the moving company, yes, sir, but nothing ever came

17  of it.

18  Q    Okay.  Did he tell you because of the time of year there

19  just wasn't a lot of moving going on?

20  A    He told me that business was a little bit down but to try

21  and contact him again later if I was still interested.

22         MR. MAYNARD:  Just a moment, Your Honor.

23         No further questions, Your Honor.

24         THE COURT:  Ms. Brook, do you have additional

25  questions?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #7   2-25-16

1          MS. BROOK:  Just briefly.

2                    **REDIRECT EXAMINATION**

3   BY MS. BROOK:

4   Q    Defense counsel asked you a bunch of questions about your

5   memory of this particular sale.  Are you sure that you saw the

6   defendant with a wad of bills in his hand after he peeled off

7   the $300 and handed it to you?

8   A    Yes, ma'am.

9   Q    And are you sure that the defendant told you after he

10  purchased this .38 Special revolver from you that he was in

11  the market for more guns and wanted to know if you had any

12  more guns for sale?

13  A    Yes, ma'am.

14         MS. BROOK:  I don't have any other questions.

15         THE COURT:  May this witness be excused?

16         MS. BROOK:  Yes.

17         THE COURT:  Any objection?

18         MR. MAYNARD:  No.

19         THE COURT:  Thank you, Mr. Raper.  You may step down,

20  sir.  You are excused as a witness.

21         THE WITNESS:  Thank you.

22         THE COURT:  You can just leave that box right there.

23         We'll take our morning break and reconvene at eleven

24  o'clock.

25         Ladies and gentlemen, you are reminded of the

1    admonition not to discuss the case among yourselves or with

2    anyone else.

3           Also, please do not form any conclusions about the

4    case until you have heard all of the evidence and begun your

5    deliberations.

6           I will excuse the jury at this time and we will

7    reconvene at eleven o'clock.

8        (Open court, no jury present 10:42 a.m.)

9           THE COURT:  Maureen tells me the government has

10   witness problems?

11          MS. BROOK:  We have two problems.

12          Can I address the first one, which is Evan Kohlmann?

13          I was notified late last night by Mr. Kohlmann that

14   he has fractured his shoulder in two separate places and was

15   in the hospital in Colorado.

16          He has been told that he cannot fly by the doctor.

17   I'm not sure if he is having surgery today or if they can mend

18   it without surgery.

19          But what I am hoping we can arrange with him is that

20   on Tuesday morning we prepare his testimony and present it via

21   VTC.  That way he doesn't have to fly here.  Apparently, he

22   needs assistance moving, dressing, changing, sleeping.

23          THE COURT:  Now, is he at home?

24          MS. BROOK:  He's in the hospital right now in

25   Colorado, I think, but my understanding is the doctors cleared

CR15-00707-PHX-SRB    JURY TRIAL-DAY #7   2-25-16

```
 1    him, eventually when he's released, surgery, or I'm not sure

 2    what's going to happen in between, to fly back to New York.

 3              THE COURT:  So he's not at home --

 4              MS. BROOK:  No.

 5              THE COURT:  -- in Colorado.  His home is in New York?

 6              MS. BROOK:  Correct.  But he's not cleared to fly

 7    otherwise.

 8              So my hope is that we can do his testimony much like

 9    we did Special Agent Chiappone for the evidentiary hearing

10    where we -- and probably through the same courthouse.  Set up

11    a VTC and have him testify that way.

12              THE COURT:  Because you anticipate he'll be in New

13    York then?

14              MS. BROOK:  Yes.  And ready to go on Tuesday is my

15    understanding.

16              THE COURT:  Well, I guess we can only hope that's

17    true.

18              MS. BROOK:  Exactly.

19              THE COURT:  I'm not going to ask Mr. Maynard to

20    respond to that yet.

21              What's the other witness problem?

22              MR. KOEHLER:  The other witness problem, Your Honor,

23    is because of the timing and things going a lot faster than

24    anticipated, and frankly, we've stipulated a few things that

25    have omitted some of the foundation issues with some of the
```

1    witnesses -- with some of the exhibits.

2            We have really kind of run low on witnesses.  And

3    this thing with Mr. Kohlmann occupied quite a bit of our night

4    last night, as you can well imagine.

5            We have Ms. Fabian available today and Ms. Vaughan to

6    finish laying foundation for audio today.

7            And then we have Jeffrey Evans, the CART examiner,

8    available to testify.  But I spoke to Ms. Plomin this morning

9    and she was unable to open the report CD that we provided her.

10           Exhibit No. 200 is the Hiren's CD.  And we asked

11   Agent Evans to examine that last week and he did and produced

12   a report.  But unfortunately, Ms. Plomin was unable to open

13   the CD on which it was contained and so she wanted more time.

14           THE COURT:  What is a Hiren's -- I know it's in

15   evidence.  What is it?

16           MR. KOEHLER:  It's a tool kit.  It has computer

17   tools.  It is a bootable CD that allows you to turn on and

18   operate a computer without starting Windows and it has various

19   tools on the CD that allow a user to both fix things on a

20   computer and stall things on a computer, remove things from a

21   computer, and so forth, without ever running Windows.

22           THE COURT:  And so that report was on a CD and the

23   defense was unable to open it?

24           MR. KOEHLER:  That's correct.

25           THE COURT:  And has that been remedied since then?

1          MR. KOEHLER:  I provided Ms. Plomin with a copy of

2    the Table of Contents of the CD.  I sent it to her via e-mail

3    last night and provided it to her in hard copy form this

4    morning.

5          And that's what I intend to present from Agent Evans

6    with respect to that CD.

7          MS. PLOMIN:  Your Honor, I just want to clarify.  The

8    report is essentially a copy of the CD that the government has

9    testified was found in Mr. Abdul Kareem's possession.

10         When you open the CD, there are several files on it

11   that I'm unable to open.  There are probably three or four

12   folders and several files that I don't know what they are.  I

13   can't open them.

14         Mr. Koehler did provide --

15         THE COURT:  But are they the things that come with

16   the CD?

17         MS. PLOMIN:  I don't know what they are.  I can't

18   open anything.

19         MR. KOEHLER:  They are.  It's called a "logical

20   extraction," Your Honor.  There's a folder on there --

21         THE COURT:  I don't really need to know.

22         MR. KOEHLER:  Okay.

23         THE COURT:  It's the things that come on the CD as

24   opposed to this CD being the repository of things that the

25   computer user put on it?

```
 1              MR. KOEHLER:  Correct.
 2              THE COURT:  For storage or safety or safe keeping or
 3    something?
 4              MR. KOEHLER:  That's correct.
 5              THE COURT:  Okay.
 6              MS. PLOMIN:  I think what the government is saying is
 7    that the CD contains tools in order to erase things off of
 8    your computer and other types of things.
 9              So I have been provided with the report which is just
10    a printout of various things that are on the CD.  There is no
11    report from Mr. Evans outlining what he found.
12              I have just been able to look at it briefly this
13    morning, but I haven't been able to go through it and I
14    haven't been able to talk to a computer expert about what all
15    these tools on the CD are or what they mean or what they can
16    do.
17              THE COURT:  Well, then while I would want him to
18    testify on direct today, we could defer his cross until
19    Ms. Plomin is ready.
20              So this Ms. Fabian --
21              MR. KOEHLER:  Yes.
22              THE COURT:  How long do you anticipate her to be
23    testifying?
24              MR. KOEHLER:  Not very long, no more than 30 minutes.
25              THE COURT:  Okay.  And then you're calling
```

```
 1    Ms. Vaughan back?

 2              MR. KOEHLER:  Correct.

 3              THE COURT:  How much more does she have to -- oh.

 4              Is this because she went now and has looked at or

 5    listened to some things that she can tell us about.

 6              MR. KOEHLER:  Yes.  And I need to verify that she's

 7    been able to do that.

 8              THE COURT:  Okay.  And then Evans?

 9              MR. KOEHLER:  Correct.

10              THE COURT:  About what -- he's going to tell us what

11    Hiren's 15.1 is?

12              MR. KOEHLER:  Correct.  In addition, he is going to

13    lay foundation for notebooks that were found in the apartment

14    on 19th Avenue.  He was one of the finders on the search

15    warrant.

16              THE COURT:  Okay.

17              What is the conclusion on Billy Ferguson?

18              MR. KOEHLER:  We are not going to call Billy

19    Ferguson.  And that, again, is part of some of the snafus that

20    we have run into.

21              THE COURT:  So other than those three and Mr.

22    Kohlmann, what other witnesses does the government still have

23    that it intends to call?

24              MR. KOEHLER:  We have Mustafa Hassan and Sayeda

25    Ahmadi.
```

1            THE COURT:  And when are they scheduled?

2            MR. KOEHLER:  They're scheduled for tomorrow.  And we

3    called and they cannot come today.  We have --

4            MS. BROOK:  We have Richard Henderson.

5            MR. KOEHLER:  -- Richard Henderson.  And he is flying

6    in from Texas.  He will be here tonight and testifying

7    tomorrow.

8            THE COURT:  Who is he?

9            MR. KOEHLER:  He is a representative of PMC, the

10   manufacturer of the .38 Special magazine -- or not magazine,

11   ammunition that is in evidence, the three boxes from different

12   locations.

13           THE COURT:  So he's going to explain the significance

14   of a lot number to us?

15           MR. KOEHLER:  Correct.

16           THE COURT:  And who else?

17           MS. BROOK:  We also have Special Agent Whitson and --

18           THE COURT:  Is he your last -- is he the one you want

19   to call last?

20           MS. BROOK:  We will call him last tomorrow.

21           Before that we'll call Greg Neville.

22           MR. KOEHLER:  Correct.

23           MS. BROOK:  And then we have two witnesses for

24   Tuesday.

25           THE COURT:  And who is Neville?  FBI?

CR15-00707-PHX-SRB   JURY TRIAL-DAY #7   2-25-16

```
 1              MR. KOEHLER:  Yes.  He is an intelligence analyst at
 2    the FBI.
 3              THE COURT:  Is Robert Meshinsky coming back?
 4              MR. KOEHLER:  I believe briefly, yes.
 5              THE COURT:  Tomorrow?
 6              MR. KOEHLER:  Yes.
 7              THE COURT:  And who is the other witness next week
 8    besides Whitson?
 9              MS. BROOK:  Ali Soofi.
10              THE COURT:  Is that the son?
11              MS. BROOK:  It's the brother.
12              THE COURT:  The brother.  And that's it?
13              MR. KOEHLER:  That's correct.
14              THE COURT:  How many days are you anticipating,
15    Mr. Maynard?
16              MR. MAYNARD:  Right now, probably a week.  I mean
17    four days.
18              THE COURT:  Okay.  I'm just trying to --
19              MR. MAYNARD:  It could be a little bit longer.
20              THE COURT:  I'm trying to get a sense of where we
21    are.
22              So the government should be able to rest, depending
23    on what happens with Mr. Kohlmann, on Tuesday or Wednesday
24    morning at the latest?
25              MS. BROOK:  Correct.
```

 1          THE COURT:  So the defense needs to be ready to go on

 2    Wednesday.

 3          MR. MAYNARD:  Okay.

 4          THE COURT:  Okay?

 5          MR. KOEHLER:  Yes.

 6          MR. MAYNARD:  So we should be prepared to start, say,

 7    Wednesday afternoon.  There will be motions and things, right?

 8          THE COURT:  Well --

 9          MR. MAYNARD:  If you want, I'll have people here in

10    the morning.

11          THE COURT:  That's what I'm saying.  You need to have

12    people here in the morning because we don't know what's going

13    to happen with Mr. Kohlmann yet.

14          For all we know -- hopefully, this isn't so -- he may

15    be having surgery on Tuesday and won't be able to testify at

16    all.  I mean, that's not an impossibility at this moment in

17    time.

18          Plus, we're going to address your motion to exclude

19    him entirely.  And if for some reason Kohlmann doesn't

20    testify, whether it's because of your motion or because he's

21    unable to, then you will be able to -- we will be able to take

22    up any motions on Tuesday afternoon.

23          MR. MAYNARD:  Okay.

24          THE COURT:  Okay.  And with respect to -- so here is

25    my last question.

1              With respect to the people that are available for the

2     rest of today, Ms. Fabian, Ms. Vaughan, and the other person

3     from the FBI, how long is that going to take?  I'm trying to

4     gauge whether we should take a lunch break or just another

5     short break or should we just play it by ear?

6              MR. MAYNARD:  Judge, can I -- you guys had told me

7     Detective Herrmann was coming in.  Is he not coming?

8              MR. KOEHLER:  No.

9              MR. MAYNARD:  Okay.  You made me prep for him.

10             THE COURT:  So we're going to -- all right.  Let's

11    just play it by ear.  We'll see where we are.  And plus, you

12    have to ask Ms. Vaughan.

13             MR. KOEHLER:  Yes.  And I wanted to inform the

14    defense, Ms. Vaughan prepared a spreadsheet that Ms. Plomin

15    asked on cross-examination about metadata on photographs that

16    were admitted into evidence the other day off of the Nextbook

17    tablet.

18             Ms. Vaughan prepared -- I want to say it was last

19    night -- a spreadsheet that shows the metadata from those

20    files and we need to get that to her for that purpose.  But we

21    also gave them the report that you asked the government to

22    provide and we gave that yesterday morning.

23             THE COURT:  From the other analyst?

24             MR. KOEHLER:  That's correct.

25             THE COURT:  Okay.  Thank you.

```
 1              Court is in recess until eleven o'clock.

 2         (Recess taken at 10:55 a.m.; resumed at  11:01 a.m.)

 3         (Open court, jury present.)

 4              THE COURT:  Thank you.  Please sit down.  The record

 5    will show the presence of the jury, counsel, and the

 6    defendant.

 7              The government may call its next witness.

 8              MR. KOEHLER:  The United States calls Karem Fabian.

 9         (Witness duly sworn)

10              THE CLERK:  Please state your name for the record,

11    spelling your first and last name.

12              THE WITNESS:  Karem Fabian.  K-A-R-E-M.  And Fabian,

13    F-A-B-I-A-N.

14              MR. KOEHLER:  Your Honor, may I approach the witness

15    stand and retrieve the exhibit?

16              THE COURT:  Yes.

17                   KAREM FABIAN, WITNESS, SWORN

18                        DIRECT EXAMINATION

19    BY MR. KOEHLER:

20    Q   I apologize.  I believe I mispronounced your last name.

21              Could you please introduce yourself to the jury.

22    A   Hi.  I'm Karem Fabian.

23              Do you want me to spell my last name?

24    Q   No.  You spelled it for the clerk.

25              And your first name is Karem; is that correct?
```

```
 1    A    Karem, yes.  Correct.

 2    Q    Where do you work?

 3    A    Currently, I'm working ABM Parking Services.  It is a

 4    garage building.

 5    Q    And what do you do for them?

 6    A    I'm a driver.

 7    Q    And what does that entail for you?

 8    A    Okay.  So what I do, I just provide transportation to

 9    patients that are disabled, so I just transport them to these

10    facilities.

11    Q    Do you own a cell phone?

12    A    Yes.

13    Q    Who is your cellular provider?

14    A    T-Mobile.

15    Q    Back in April of 2015, did you go to the T-Mobile store

16    one night?

17    A    I did.

18    Q    Do you remember the date?

19    A    It was April -- I don't quite remember the day.

20    Q    Was it around April 6th of 2015?

21    A    It was the beginning of April.  I don't exactly know the

22    date, but it was the beginning of April.

23    Q    Why did you go to the store that night?

24    A    Me and my family were trying for a plan because we were

25    just trying to switch different companies, so we were just
```

1   basically trying to get a new plan.

2   Q   Okay.  And if you could please pull the mic a little bit

3   closer and just speak nice and slow for our court reporter,

4   please.

5   A   Okay.

6   Q   About what time of the day did you arrive at the T-Mobile

7   store?

8   A   It had to be around 7:30 or so; 7:30 or 8:00.

9   Q   Did you know how late the store was going to be open?

10  A   I think they closed by 9:00 or 8:00, so it was just -- we

11  were just there for like a half an hour, 40 minutes.

12  Q   And were you there to actually get a new plan or were you

13  just shopping for one at that point?

14  A   At that point we were just trying to see what the rates

15  were, what the plans were, so it was just shopping around.

16  Q   And the T-Mobile store that you went to, where was it

17  located?

18  A   It was located on 7th Avenue and Camelback.

19  Q   And what kind of location was this?  Was it part of a big

20  shopping mall or a little strip mall?  What kind of place was

21  it?

22  A   It was like a small shop.  There was a few stores around.

23  Q   Describe the parking lot and the entryway into the store

24  for us, please.

25  A   Describe it?

1    Q   Yes.  In other words --

2            THE COURT:  Was there -- do you have to walk into a

3    building to get to the T-Mobile store?  Do you just pull up

4    and there's a sidewalk and then you walk in?

5            THE WITNESS:  Yeah.

6            THE COURT:  Just describe it in that way.

7            THE WITNESS:  Okay.  You kind of just pull and then

8    there's just the next -- in front of you, behind you, there's

9    the doors.  So it's just kind of like a drive-through and then

10   park and then the stores are right there on the side.

11   BY MR. KOEHLER:

12   Q   And so did you pull into a marked parking space in the

13   parking lot?

14   A   Uh-huh.  Yes.

15   Q   Was there a drive-through area between where you parked

16   your car and where you walked into the store?

17   A   Yeah.  There was a little drive-through, yes.

18   Q   And was there a sidewalk in front of the store?

19   A   Yeah.  There was a sidewalk all across, yeah, the stores.

20   Q   And where was your car -- if you walked out of the door of

21   the T-Mobile, was your car to the left or the right of the

22   door of the T-Mobile as you're walking out of the store?

23   A   It was actually -- I want to say across.  I mean, my car

24   was parked like this (indicating) and then the sidewalk was

25   behind me, so it was behind me.

1   Q   Okay.  And so you walked out of the store, would you go

2   straight --

3   A   Yeah.  I would go straight.

4   Q   -- across the aisle to your car?  You wouldn't have to

5   veer right or veer left to get to it?

6   A   Yeah.

7   Q   Okay.  While you were inside the store, where were you

8   positioned?

9   A   I don't know how to describe it.  I was just kind of

10   like -- I want to say the store was behind me and my car was

11   pointing that way too.

12   Q   I'm actually talking about once you went in the store.

13          When you were talking to the people in the store

14   about your plan, were you at the counter, were you at a table,

15   were you somewhere in the back of the store?

16   A   When I walked in, I was at a counter sitting down, sitting

17   down talking to the guy in there.

18   Q   Did anything unusual happen while you were at the counter

19   of the store?

20   A   Well, the only unusual thing, I'll say, was we were

21   sitting down, me and my brother, and then a guy came in.  And

22   he was just kind of like loud.  He was kind of loud and he

23   wanted to like just talk to someone.

24          So that was the only thing that caught my attention

25   because we were sitting down and there was just someone coming

1    in and they was just --

2    Q    Could you describe his tone of voice?

3    A    Upset.  I don't want to say he was mad.  He just was kind

4    of upset.

5    Q    Okay.  And did you take note of him for that reason?

6    A    No.  I just -- I just kind of like turned around and saw

7    the person because he was kind of being loud and that's it.  I

8    just went back to shop around for the phones.

9    Q    Okay.  Did you overhear any of his conversation with the

10   store employees?

11   A    The only thing I could remember was that he wanted to talk

12   to someone.  He was looking for a number to contact.  That's

13   it.  Someone he wanted to talk to.

14   Q    Did you finish your business inside the store?

15   A    No.  We just decided to leave.  We just got the

16   information and we thought we just decided to come back some

17   other day.

18   Q    You mentioned that -- I think you said something about

19   your brother.  Who was with you inside the store?

20   A    It was my dad, my mom, and brother.  It was just us four.

21   Q    Did all of you leave the store at the same time?

22   A    No -- well, yeah.  My brother and my dad left first and

23   then me and my mom left together.

24   Q    When your brother and your dad left, did they get in a

25   different car from the one you were riding in?

1    A    Yes, they did.

2    Q    And who drove the car in which you road?

3    A    I did.

4    Q    When you left to go to your car, did your mother go with

5    you?

6    A    Yes, my mom did.

7    Q    And when you walked from the door to the store, did you

8    walk straight to your car?

9    A    I did, yes.

10   Q    Did your mother get in the car at the same time as you?

11   A    Yeah.  We both did at the same time.

12   Q    Did you have the radio on in the car?

13   A    No.  I don't think I did.  No.

14   Q    Once you got in the car, what happened next?

15   A    Okay.  So I was -- when I was exiting the store, the same

16   guy that came in, you know, the man looking for a phone or

17   whatever, he was by the sidewalk on the phone.

18        And then me and my mom went to the car.  Got in.  And

19   when I was backing up, all of a sudden I heard like a -- like

20   a loud noise on my truck.  And I was like "whoa."

21        So I just kind of like stopped and looked both ways

22   and then maybe like five seconds later, probably even less, I

23   looked at my right side and there was a guy saying that I hit

24   him.

25        And I was like:  What?

1    I was like:  No.

2         And he said:  Yeah, you hit me.

3         And then he said -- he said that -- a bad word.  He

4    said:  You F-ing hit me.

5         And I was like:  No.

6         And then he asked:  Do you have insurance?

7         And I was like:  Yes, I have insurance.

8         And he asked me for my insurance.  I gave insurance

9    to him.  I don't know why I did but I gave insurance -- me and

10   my mom were both nervous, so I gave it to him.

11        And then after that, I remember he gave the

12   insurance -- there was a guy in the car on my right side.

13   Right side.  And then I remember when he told the guy:  Take a

14   picture of this.

15        And then I got out of the car and I told him:  Hey,

16   is everything okay?  Do you need help?

17        And that's when he's like:  No.  I'm okay.

18        And he gave me back my insurance card.  And then I

19   asked him because there's a Fry's and a Starbucks around

20   there, so I asked him if he needed anything from there or

21   whatever.

22        And he said:  No.  I'm fine.  I'm okay.

23        And he went back -- he went back to the sidewalk and

24   then that's pretty much it.

25   Q   So let's start back when you first walk out the door of

1    the car.  You said you saw him outside the store?

2    A   Yes.  He was on the sidewalk.

3    Q   What was he doing when he walked outside the store?

4         MR. MAYNARD:  Objection, Your Honor.  This has all

5    been asked and answered.

6         THE COURT:  Sustained.  We don't have to go back and

7    do everything twice.

8         MR. KOEHLER:  I was going --

9         THE COURT:  Well, that question was going to be the

10   second time she was going to tell us he was on the phone.

11   BY MR. KOEHLER:

12   Q   So, Ms. Fabian, I would like to have you use the chart

13   over here.

14        With the Court's permission, may I move the chart

15   over here?

16        THE COURT:  Yes.

17        He's going to ask you to draw something.  It's

18   probably going to be 7th and Camelback and where the store is

19   and the parking lot.  Can you do that?

20        THE WITNESS:  Uh-huh.

21        THE COURT:  Okay.

22        MR. KOEHLER:  May the witness approach the chart?

23        THE COURT:  Yes.

24   BY MR. KOEHLER:

25   Q   And just like the Judge said, why don't you go ahead and

```
1   just have "north" be to the top of the chart there.  And then
2   draw the intersection and show the parking lot and where you
3   parked and where the store was.
4           MR. MAYNARD:  Your Honor, may I move so I can see?
5           THE COURT:  Yes.
6           THE WITNESS:  (Witness drawing.)  This is parking and
7   this is my car and then here is T-Mobile.
8           THE COURT:  Why don't you go back to the witness
9   stand so you'll have the microphone.
10          THE WITNESS:  Okay.
11          THE COURT:  And then Mr. Koehler can just clarify or
12  ask you to explain what you drew.
13  BY MR. KOEHLER:
14  Q   So, is that chart an approximate depiction of where the
15  door to the store was, where your car is parked, and where the
16  other car was parked.
17          Is the other car the little box in the slot to the
18  right of where it says "my car" on your chart?
19  A   Yes.  It was like that.
20  Q   And then the little door drawn there, is that the door to
21  the T-Mobile store?
22  A   Yes.  That's the door.
23  Q   And then there's a little stick figure to the right of the
24  door.  What is that?
25  A   Oh.  That's kind of where the guy was standing in the
```

1   sidewalk.

2   Q   And so that's where he was when you said you walked out

3   and he was talking on the phone?

4   A   Yes.

5   Q   Now, when you got in your car, you mentioned that your mom

6   got in the car at the same time.  Did you take time to put on

7   your seatbelt?

8   A   Uh-huh, yeah.  I put my seatbelt on and everything.  And

9   then when I was backing up, that's when --

10   Q   I want to slow you down.

11   A   Sorry.

12   Q   I want to take it one step at a time here.

13          The windows to the car, do you know if they were up

14   or down?

15   A   They were down.

16   Q   Okay.  And did you hear anything behind your car before

17   you started to back up?

18   A   Huh-uh.

19          THE COURT:  No?  Is that no?

20          THE WITNESS:  No.  No.

21          THE COURT:  Thank you.

22   BY MR. KOEHLER:

23   Q   Tell us what kind of car you drive.

24   A   It's a Chevy Malibu.

25   Q   Does it make noise when you start the engine?

1   A   No.

2   Q   Well, I guess here is my question.  Is it an electric car

3   that you wouldn't hear the engine?

4   A   Oh, yeah.  It was electric car.

5   Q   Your car is an electric car?  It doesn't have a --

6   A   I'm sorry.  It's not an electric car.  No.  No.  No.  I

7   mean, it didn't make noise.  It's just normal.

8   Q   Are the brake lights on your car functional?

9   A   Yes.  They're functional.

10   Q   Are your backup lights on your car functional?

11   A   Yes.  They were fine.

12   Q   So when you put the car in reverse, the little white

13   lights come on in the back of the car to let somebody know

14   you're about to back up?

15   A   Yes.  Correct.

16   Q   Was it dark outside?

17   A   Yeah.  It was 7:00 or 8:00, so it was already dark.

18   Q   How fast were you going when you first started to back up?

19   A   I wasn't going fast.  It was just normal speed.  But you

20   put your brake and just kind of like go slow like that.  I

21   don't know exactly how fast that is.

22   Q   So were you letting off the brake to let your car back up?

23   A   Uh-huh.  Yes.

24   Q   Did you put your foot on the gas pedal and push down on

25   the gas pedal?

1    A    No.  I didn't.

2    Q    How long was it between the point at which you let off the

3    brake and the time that you heard the noise on the trunk of

4    your car?

5    A    Let's see.  It was -- the time limit?

6    Q    Yes.  How much time had passed between when you started to

7    let your foot off the brake to back up and the time that you

8    heard the noise on the trunk of your car?

9    A    I don't know.  A few seconds.  It wasn't much because it's

10   not -- the parking lot where the sidewalk is, so it's not too

11   much difference.

12   Q    Okay.  Next question.

13   A    A few seconds.

14   Q    How far out of the parking space were you when you heard

15   the noise?

16   A    I don't know exactly how to describe square feet and all

17   that.

18   Q    I'm not asking about square feet.

19         Let's look at it this way.  You mentioned that he

20   went to the person in the vehicle next to you.  Could you see

21   into the vehicle next to you?

22   A    Could you repeat that?  Sorry.

23   Q    Okay.  So after --

24         THE COURT:  Let me try this.

25         When you heard the noise at the rear of your car, was

1    part of the car still within the parking space or was it all

2    the way out where you would drive through the parking lot.

3                THE WITNESS:  When I heard the noise?

4                THE COURT:  Yes.

5                THE WITNESS:  No.  The car was still there.

6                THE COURT:  Okay.  So you still had -- you still had

7    to back up some more to get out of the parking space and start

8    driving?

9                THE WITNESS:  Yeah.

10               THE COURT:  Okay.

11               THE WITNESS:  So it was kind of like you back up like

12   that and either you go right or left, you know, to exit.

13               THE COURT:  But you still had to back up some more?

14   If the noise hadn't happened and you stopped, you still had to

15   back up some more to get completely out of the parking space?

16               THE WITNESS:  Uh-huh.  Yeah.

17               THE COURT:  Okay.  Please continue, Mr. Koehler.

18               MR. KOEHLER:  Thank you.

19               THE WITNESS:  Thank you.

20   BY MR. KOEHLER:

21   Q    What did you first do when you heard the noise?

22   A    Stop right away.

23   Q    Did you put your car back in park?

24   A    Yeah.

25   Q    Did you not -- did you pull forward back into the space or

1    did you just put your car in park right there?

2    A    I stopped.  You know what, I stopped.  I stopped and

3    then -- because he came over here, so he just started talking

4    to me, so I stopped and just put it in park.

5    Q    Okay.  When you looked over to the vehicle that was next

6    to you, you mentioned that he went around and handed the

7    person your insurance card -- or which side of the vehicle was

8    he on when he did that?

9    A    Okay.  So he was on my passenger's side and then I give

10   him my insurance from my window.  So he didn't have to go

11   around.  He just basically -- the window from the driver's

12   side was open, so he just basically passed it.

13   Q    So he reached through the driver's window?

14   A    Yeah.

15   Q    And did you see something happen inside the vehicle next

16   to you that told you what happened with the insurance card?

17   A    No.  I just know he gave the insurance to someone in the

18   car and then just told him to take a picture and I saw a

19   little flash of the phone.

20   Q    That's what I was asking.

21        So he told someone to take a picture and you saw a

22   flash?

23   A    Uh-huh.

24   Q    When you saw the flash, could you see what angle you were

25   looking through through the driver's window of the car?

1    A    Huh-uh.

2         THE COURT:  Why don't you try a different question.

3    I have no idea what you're asking.  And by virtue of the fact

4    that she didn't answer, I don't think she does either.

5    BY MR. KOEHLER:

6    Q    When you looked over in that direction to see the flash,

7    how was your car aligned with the car next to you, the one

8    that he reached into?

9    A    Well, they were just in the same direction.  Like my car

10   wasn't completely parked all the way inside, so just maybe --

11   their car was parked, you know, parked inside, and then mine

12   was just right there next to it.

13   Q    Okay.  Were your driver and passenger windows aligned with

14   the driver window of that car or were you a little bit behind

15   that car at that point?

16   A    A little bit behind.

17   Q    And about how many feet would you say you were behind the

18   windows of the driver on that car?

19   A    I don't know.  I don't know how many feet.

20   Q    Okay.  How long was it between when he came up to the

21   window and told you that you had hit him and when he asked if

22   you had insurance?

23        THE COURT:  Does it matter, Mr. Koehler?  I wish you

24   would get to the point.

25        MR. KOEHLER:  That's part of the point, Your Honor.

1            THE COURT:  Well, it's not clear.  Why don't you ask

2    her what you want to ask her rather than how many seconds it

3    took to walk to the side of the car.

4    BY MR. KOEHLER:

5    Q   Did he immediately ask you about insurance?

6    A   So after he say that I hit him and this and that, like

7    probably the next question was if I had insurance; and I say

8    yes.

9    Q   Did you hear from your insurance company after this?

10           MR. MAYNARD:  Objection -- withdrawn.

11           THE COURT:  Go ahead and answer.

12           THE WITNESS:  Two days later I received a call from

13   the insurance.

14   BY MR. KOEHLER:

15   Q   Did the parking lot have lights in it?

16   A   I believe so, yes.  I think so.

17   Q   Do you remember if the lights were on?

18   A   Yes.

19   Q   And did you look in your rearview mirror before you backed

20   up?

21   A   Yeah.  I did.

22   Q   Were you able to see the person who was with the person

23   who claimed that you hit him?

24   A   No.

25   Q   Did you believe that you hit the person who claimed that

1    you hit him?

2    A   I did not.  I didn't.

3    Q   Are you sure you didn't hit him?

4    A   I could be more than positive I didn't, because I believe

5    like it happened so quick, like I heard the noise, then five

6    seconds later he was on my right side.  That was way too fast

7    for someone to -- you know, if I would have hit the person, so

8    I know I didn't.

9    Q   Was he still on the phone when he came up to the

10   passenger's side of the car?

11   A   Yeah.  He was on the phone the whole time when he was

12   talking to me.  He didn't really talk as much.  We didn't

13   really get information.  He just pretty much I gave him my

14   insurance.  That happened.  He gave it back to me afterwards.

15   And he went back to the sidewalk and I just went home.

16   Q   Did you offer him any assistance when you were there at

17   the parking lot?

18   A   Yeah.  After when I got out of the car, I asked him, hey,

19   there's a store right there.  Do you need anything and he just

20   said:  No, I'm okay.

21   Q   Is the person that came up to the passenger's side of your

22   car and claimed that you hit him here in the courtroom today?

23   A   Yes.

24   Q   Could you please point him out and describe an article of

25   his clothing?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #7  2-25-16

```
 1   A   Yeah.  He's right there. (Indicating)
 2   Q   Okay.  Can you please --
 3            THE COURT:  Is it the gentleman who's standing to my
 4   left?
 5            THE WITNESS:  Yeah.
 6            MR. KOEHLER:  May I have a moment?
 7            THE COURT:  Yes.
 8            MR. KOEHLER:  Did you get the name of the person that
 9   was with him by chance?
10            THE WITNESS:  No.
11            MR. KOEHLER:  No further questions.
12            THE COURT:  Mr. Maynard, you may cross-examine.
13                     CROSS EXAMINATION
14   BY MR. MAYNARD:
15   Q   Good afternoon -- or good morning.
16   A   Good morning.
17   Q   Okay.  Let me just to try to briefly go through this.
18            You're going in with your family.  It's your mom,
19   your dad -- or your mom, your dad, your brother, and you going
20   into a T-Mobile store to look about getting a family plan.
21   Okay?
22            If I were to --
23            THE COURT:  Now, all we see are your fingerprints,
24   Mr. Maynard.
25   BY MR. MAYNARD:
```

1  Q    Is that the T-Mobile store that you went to?

2  A    Yep.  Yeah.

3  Q    All right.  So this sort of helps you clarify exactly

4  where everybody is.  All right.

5        So what happens is you're going in there.  And you --

6  after you're in there, you hear a man come in who seems to be

7  fairly upset with T-Mobile about something?

8  A    Uh-huh.

9  Q    You have to say either "yes" or "no."

10  A    Yes.

11  Q    Okay.  And he's asking to see a manager.  But as far as

12  you can tell, he's upset with them about something?

13  A    Yeah.

14  Q    And you don't know what it is?

15  A    No.

16  Q    No.  Okay.  And then he ends up walking outside and he's

17  standing out on the sidewalk talking on his phone?

18  A    Yes.

19  Q    And at some point you and your mom walk out because you've

20  come in one car, correct?

21  A    Yes.

22  Q    Your brother and your dad have come in another vehicle?

23  A    Yes.

24  Q    Okay.  And all four of you then go to your respective

25  vehicles?

1    A    Yeah.

2    Q    Correct.  And so as far as -- the last time you've seen

3    the guy, he's still standing on the sidewalk near the T-Mobile

4    store talking on his phone?

5    A    Yes.

6    Q    And you get into your vehicle.  You put your seatbelt on

7    and get ready to back up?

8    A    Yes.

9    Q    Right?

10   A    Uh-huh.  Yes.

11   Q    And you look back but you don't see anybody?

12   A    Yeah.

13   Q    And you start backing up and all of a sudden you hear

14   something.  Obviously, he's behind you, either you've hit him

15   or he's slapped or hit the trunk of your car, correct?

16   A    Yes.

17   Q    But you didn't see him come up behind you?

18   A    No.

19   Q    And he's still talking on his phone?

20   A    Yes.

21   Q    So as far as you know, he's walked up, talking on his

22   phone.  He's not paying attention.  You've backed up and

23   you've hit him?

24   A    Yeah.

25   Q    Okay.  And then he says, "You've hit me" in a kind of nice

```
 1   way?

 2   A    Yeah.

 3   Q    And he comes into the side passenger window which was down

 4   at that time?

 5   A    Yes.

 6   Q    Okay.  And after he said, "You've hit me," he asked you,

 7   "Do you have insurance?"

 8   A    Yes.

 9   Q    And you get out your insurance card and you give it to

10   him?

11   A    Yeah.

12   Q    Okay.  And he takes that insurance card and gives it to

13   somebody and they take a picture of it in the other vehicle?

14   A    Yes.

15   Q    You don't see who's in the other vehicle?

16   A    No.

17   Q    Okay.  You apologized to him?

18   A    Uh-huh.  Yes.

19   Q    Okay.  Because you're concerned that you've hit him?

20   A    Yeah.

21   Q    Okay.  And you then -- do you ever get out of your

22   vehicle?

23   A    Yeah.  At that point when -- when I heard the -- seen the

24   flash, I got out of the car and I asked him, "Hey, are you

25   okay?  Is there anything I can do?"
```

1   Q   Sure.  And, in fact, you asked him, "Can I take you over

2   and buy you a Starbucks?"

3   A   Uh-huh.

4   Q   Is that a "yes"?

5   A   Oh, yeah.

6   Q   And then your brother and dad are there, correct?

7   A   No, they're not.  They're gone.

8   Q   Had they already left or are they still there when this

9   happened?

10   A   No.  They left.

11   Q   So it's just you and your mom?

12   A   Yes.

13   Q   Okay.  So he's says, "No, I think I'm okay," or "I'm

14   okay," or whatever?

15   A   Yes.

16   Q   Gives you back his card -- or your insurance card?

17   A   My insurance.

18   Q   And you get in your vehicle.  You drive off?

19   A   Yes.

20   Q   All right.  You don't call the police because it's on

21   private property?

22   A   Yeah.

23   Q   Okay.  And you don't know whether or not he ended up going

24   to the hospital the next day, do you?

25   A   Yeah -- no.  I don't know.

1    Q    And you don't know whether or not in a couple weeks after

2    that he ended up going to a hospital -- or to a doctor for

3    treatment, do you?

4    A    No.

5              MR. MAYNARD:  I don't have any further questions.

6              THE COURT:  Anything else, Mr. Koehler?

7                      **REDIRECT EXAMINATION**

8    BY MR. KOEHLER:

9    Q    After you got out of the vehicle and saw him, did he show

10   any signs of having difficulty moving?

11   A    No.

12   Q    Did he show any signs of being in pain?

13   A    No.

14         He just -- huh-uh.

15   Q    Looking back on the event -- before you go there, after

16   you heard the noise, did you check your mirrors again?

17   A    No, I didn't.

18   Q    When he came around the side, had you seen him getting off

19   the ground or anything?

20   A    No.

21   Q    Looking back on the event at this point, do you think

22   there is any way that you actually hit him with your car?

23             MR. MAYNARD:  Objection, Your Honor.  It's been asked

24   and answered and it's beyond the scope.

25             THE COURT:  Overruled.  You may answer.

```
 1              THE WITNESS:  I'm sorry.  What was it again?

 2              THE COURT:  I'll read it back:  It says:

 3              Looking back at the event at this point, do you think

 4   there is any way that you actually hit him with your car?

 5              THE WITNESS:  No.

 6              MR. KOEHLER:  No further questions.

 7              THE COURT:  May this witness be excused?

 8              MR. KOEHLER:  Yes, Your Honor.

 9              THE COURT:  Is there any objection?

10              MR. MAYNARD:  No.

11              THE COURT:  Thank you, Ms. Fabian.  You may step down

12   and you are excused as a witness.

13              THE WITNESS:  Thank you.

14              THE COURT:  You're welcome.

15              The government may call its next witness.

16              MR. KOEHLER:  May I approach the clerk, Your Honor.

17              THE COURT:  Yes.

18              MR. KOEHLER:  The United States calls Jeffrey Evans.

19         (Witness duly sworn)

20              THE CLERK:  Please state your name for the record,

21   spelling your first and last name.

22              THE WITNESS:  Jeffrey D. Evans.  J-E-F-F-R-E-Y.  "D"

23   as in David.  Evans.  E-V-A-N-S.

24

25   ///
```

1    **JEFFREY D. EVANS, WITNESS, SWORN**

2    **DIRECT EXAMINATION**

3    BY MR. KOEHLER:

4    Q   Good morning.  Could you please introduce yourself to the

5    jury.

6    A   Good morning.  My name is Jeff Evans.  I'm an Information

7    Technology Specialist, Forensic Examiner with the FBI.

8    Q   How long have you been so employed?

9    A   I have been employed at the FBI a little over eleven years

10   now.

11   Q   And what do you do for the FBI?

12   A   I'm an Information Technologist Specialist, Forensic

13   Examiner.  I examine digital evidence, so computers, GPS

14   units, cell phones.

15   Q   And are you also a special agent with the FBI?

16   A   I am not.  I'm on the support side.

17   Q   Okay.  Do you also participate in the execution of search

18   warrants on occasion?

19   A   I do.  I'm also a member of the Evidence Response Team, so

20   I participate in search warrants on that behalf.  I also

21   participate in search warrants on the behalf of just my normal

22   forensic examiner side of my job.

23   Q   And were you a participant in the execution of the search

24   warrant at the apartment of Elton Simpson and Nadir Soofi on

25   May 3rd and 4th of 2015?

```
 1   A    I was.

 2   Q    And is that an apartment located on 19th Avenue in

 3   Phoenix, Arizona?

 4   A    It is.

 5          MR. KOEHLER:  Your Honor, if I may have a moment to

 6   gather some exhibits to give to the witness.

 7          May I approach the witness?

 8          THE COURT:  You may.

 9   BY MR. KOEHLER:

10   Q    During the course of the execution of the search warrant,

11   did you find some notebooks?

12   A    I did.

13   Q    And I want to direct your attention first to Exhibit No.

14   352.  Do you recognize that?

15   A    Yes.

16   Q    What is that?

17   A    It is a small notebook, blue in color, along with another

18   sheet from the notebook.

19   Q    And with the exception of having been tested, does that

20   notebook -- is that notebook in the same condition it was in

21   which you found it?

22   A    It is.

23          MR. KOEHLER:  Move to admit 352.

24          MS. PLOMIN:  Your Honor, may I please look at it?

25          THE COURT:  It's a tiny little notebook.
```

```
1              THE WITNESS:  Sorry.

2              MS. PLOMIN:  No objection.

3              THE COURT:  352 is admitted.

4         (Exhibit No. 352 admitted in evidence.)

5    BY MR. KOEHLER:

6    Q   Now directing your attention to Exhibit 354.

7    A   Yes.

8    Q   Can you tell us what that is.

9    A   It's a letter-size notebook with -- it appears to be just

10   a back cover to it.

11   Q   And did you also find that during your execution of the

12   search warrant?

13   A   I did.

14   Q   With the exception of having been tested, is that notebook

15   in the same condition in which you found it?

16   A   Yes.

17   Q   And can you tell us where in the apartment these were

18   found?

19   A   I would have to look at the sketch or the original

20   packaging for this.

21   Q   I'm going to go to the next one while we find the diagram

22   for you.  I want to direct your attention next to Exhibit 356.

23           Can you tell us what that is?

24   A   It is a similar notebook to the last exhibit.  It looks

25   like a couple pages in addition to the notebook itself.
```

```
 1   Q   Okay.  And with the exception of having pages removed for
 2   testing, is that notebook in substantially the same condition
 3   in which you found it?
 4   A   It is.
 5           MR. KOEHLER:  And move to admit 356.
 6           MS. PLOMIN:  Objection to foundation.  Just to
 7   clarify where it was found.
 8           THE COURT:  It was found during the search of the
 9   apartment on May 3 and 4 belonging to Simpson and Soofi.
10           MS. PLOMIN:  No objection.
11           THE COURT:  356 is admitted.
12       (Exhibit No. 356 admitted in evidence.)
13           MR. KOEHLER:  If I may place on the document camera
14   Exhibit No. 203, which is in evidence.
15   BY MR. KOEHLER:
16   Q   Mr. Evans, does that help you identify where these items
17   were?
18   A   Yes, it dos.
19   Q   Can you tell us where you found the items?
20   A   So Exhibit 354, item No. 17, was found in room G on the
21   floor on the west side of the room.  Let's see, room G is the
22   bedroom.
23   Q   This room here? (Indicating)
24   A   Yeah.
25   Q   And which exhibit was found in that location?
```

1    A    Exhibit 354.

2    Q    Okay.  How about 352?

3    A    352 is item No. 16 and that was found in room G on the top

4    drawer of the north cabinet.

5    Q    Can you show us where that cabinet is in the room?

6    A    (Indicating)

7    Q    Thank you.

8         And last there is one more to bring in.  Exhibit 356,

9    where was that found?

10   A    Exhibit 356 is item No. 18 and that was found in room G on

11   floor on the west side of the room.  So that would be room G,

12   west side. (Indicating) That is this item here.

13   Q    And, I'm sorry.  Did you say that was on the floor as

14   well?

15   A    Item 18 is room G, on floor, west side of room, correct.

16   Q    Now, directing your attention to Exhibit No. 358.

17   A    Exhibit 358?

18   Q    And can you look at that -- both sides of that, please.

19   A    Okay.

20   Q    And can you tell us what that is?

21   A    Exhibit 358 is two sheets of paper.  It appears to be a

22   printout.  Top left corner of the paper it says Naaman.

23   N-A-A-M-A-N.  Forest Boulevard.  Garland, Texas.  Street view.

24        At the bottom of the paper it shows a URL

25   https://www.Google.com/maps and then there's a whole nother

1   section of that.

2   Q    So looking at the Google Maps part of that www address on

3   there, does that tell you where this image came from?

4   A    Yes.  This appears to be a printout from a webpage at

5   Google, their mapping software.  And from the picture it

6   appears to be --

7           THE COURT:  Excuse me.  It's not in evidence, so

8   don't show it to the jury.

9   BY MR. KOEHLER:

10  Q    Is that a true and correct copy --

11          I'm sorry.  Is that in the same condition it was in

12  which you found it?

13  A    Yes.

14          MR. KOEHLER:  Move to admit 358.

15          MS. PLOMIN:  No objection.

16          THE COURT:  358 is admitted.

17     (Exhibit No. 358 admitted in evidence.)

18          MR. KOEHLER:  Your Honor, may I approach the witness

19  and gather those from him real quick?

20          THE COURT:  Yes.

21          THE WITNESS:  That's just the original packaging.

22  BY MR. KOEHLER:

23  Q    Mr. Evans, do you have the packaging there on the witness

24  stand?

25  A    I do.

1   Q   Looking at the packaging, does the packaging tell you what

2   room number or letter these objects came from?

3   A   Packaging shows -- it's kind of folded over in there.

4   Three notebooks and two papers.  The packaging shows room B

5   next to couch, items 16 through 20.

6   Q   And where is room B on the screen there?

7   A   Room B is this room right here (Indicating) and this would

8   be the couch in the room.  And item 11 -- sorry.  I'm circling

9   everything -- is shown right there on the sketch.

10  Q   So is that the correct location where these items were

11  found according to your notes?

12  A   Yes.  According to the package, that is the correct

13  location.  And --

14          THE COURT:  There's no question at this time, sir.

15          THE WITNESS:  Okay.  Thank you.

16  BY MR. KOEHLER:

17  Q   Do you see item numbers on there -- I'm sorry.  I don't

18  even have them.  I just realized what the source of the

19  confusion is.  May I bring the exhibits back to the witness

20  briefly?

21          THE COURT:  Yes.

22  BY MR. KOEHLER:

23  Q   Are there two sets of item numbers on those exhibits?

24  A   There are.

25  Q   And is the second set of item numbers from the FBI

1   laboratory?

2   A   It is.

3   Q   And is that what caused you to think it was the other

4   place?

5   A   It is.

6           MR. KOEHLER:  May I now approach the witness and

7   retrieve the items?

8           THE COURT:  Yes.

9   BY MR. KOEHLER:

10  Q   As part of your duties with CART in this case, did you

11  have the occasion to upload electronic evidence into the FBI

12  CARE system and other systems for others to review?

13  A   I did.

14  Q   Can you tell the jury which items that you uploaded into

15  the system?

16  A   I uploaded -- well, I examined and uploaded into the

17  system for review four different items:  A Kyocera,

18  K-Y-O-C-E-R-A, Model C, 5215 cell phone, serial number

19  268435462508389355.

20          I also uploaded -- processed and uploaded a Nextbook

21  tablet, serial No. YFGV0315004231.

22          I also processed a micro SD card within that tablet.

23          I uploaded and processed an RCA tablet serial No.

24  RS061DL8B4194 and the micro SD card within that.

25          And I've also uploaded a Maxwest Gravity 55 cell

1    phone.  This particular cell phone has two IMEI numbers, the

2    first being 359020053707854, the second IMEI number being

3    359020053707852 and the micro SD card within that.

4    Q   Were those documents -- or, excuse me, documents -- were

5    those electronic devices that had to be unlocked by your

6    Cryptographic Unit in Washington, D.C.?

7    A   That is correct.  They had to.

8    Q   Okay.  And did you get the image sets and upload those

9    into your systems?

10   A   That is correct.  I received the image sets on a DVD from

11   that unit; and using those image sets, processed them in

12   cellular software.

13   Q   And did you verify the hash values on those to make sure

14   that they were complete?

15   A   I did.

16   Q   All right.  Do you have Exhibit 200 on the witness stand

17   in front of you; is that correct?

18   A   Yes.

19   Q   Were you asked to examine that disk?

20   A   I was.

21   Q   Did you run it through your processing software at the

22   FBI?

23   A   I did.

24   Q   And did you examine the content of it?

25   A   I did.

1   Q   Can you tell the jury in general terms what that disk is?

2   A   In general terms, this disk here labeled -- hand-labeled

3   Hinres, H-I-R-E-N-S, 15.1, is a bootable CD which allows you

4   to use tools on the CD against computers such as Windows

5   computers.

6          Some of the tools on there are for recovery.  If you

7   want to try and search for lost pictures, some of those tools

8   on there are for security reasons.

9          So if you want to, for instance, go in and remove

10  unused data on the computer -- so if there's files that used

11  to be on a computer, some of those -- the tools on this CD

12  here allow you to go and pretty much write over the unused

13  portions of the computer; and other tools allow you to go and

14  delete things such as your browsing history and files such as

15  that.

16  Q   In your examination of that disk, did you find a Table of

17  Contents on it?

18  A   I did.

19  Q   You mentioned a moment ago that it's a bootable CD.

20          What does that mean?

21  A   The difference between a regular CD and a bootable CD is

22  it's running its own Operating System.

23          So when I -- if I were to put this in a computer and

24  boot to it, it's not running the Operating System on the

25  computer, the Windows 7 or the Windows 10 on the computer

 1    itself.

 2           And what that allows is that allows the utilities on

 3    the disk a greater access to the files and greater access to

 4    the raw drive in the file system.  It gives it more

 5    functionality.  It also leaves less traces of things behind.

 6    Q   And I'm going to place what's been marked for

 7    identification as Government's Exhibit 473 on the document

 8    camera.

 9           Mr. Evans, do you recognize that?

10    A   I do.

11    Q   What is that?

12    A   That is a text file on the root directory of the CD

13    itself.  The name of the text file is "HBCD.txt."

14    Q   And is this a true and correct copy of the text file

15    that's in the root directory of that CD?

16    A   It is.

17           MR. KOEHLER:  Move to admit 473.

18           MS. PLOMIN:  No objection.

19           THE COURT:  473 is admitted.

20       (Exhibit No. 473 admitted in evidence.)

21    BY MR. KOEHLER:

22    Q   Can you describe in general terms what the content of

23    Exhibit 473 is.

24    A   In general terms, this is a -- what a lot of software

25    tools will call a "read-me file."  It's directions.  It's

1   helping you understand what's on the CD itself, the different

2   utilities, short descriptions of them which you can use off of

3   this bootable CD.

4   Q   Among the files on the bootable CD, were there cleaner

5   tools?

6   A   There were.

7   Q   Can you tell the jury what a "cleaner tool" is?

8   A   A cleaner tool is a tool that allows you to go in and do

9   things such as remove your browsing history, possibly remove

10  files left behind when you go and browse the Internet.  Other

11  cleaner tools will allow you to go and clean and wipe the

12  unused space on a computer.

13          So when a computer is actually using space to store

14  data and the different picture files and whatnot as you are

15  going through your day-to-day life with your computer, what

16  ends up happening is if you delete it, the data is still there

17  and tools that we use can go and look for this.

18          And these cleaner tools will go and they will

19  identify the unused portions within a file system.

20          So if you are using maybe half of the space on your

21  computer, that other half is unused file system space and it

22  will go through and it will write random data or ones and

23  zeros or all zeros depending on the tool.

24          But it's overwriting what was there, making it so

25  that you cannot go and find possibly deleted files, things

1    along those natures.

2    Q    If a cleaner tool has been properly used and you come

3    behind to do a forensic review of a computer, are you able to

4    find the data in free space that would otherwise have been

5    left behind?

6    A    If a cleaner tool is properly written and used, you are

7    not able to find that data.  It is gone.

8    Q    I'm going to turn to -- start at page 4 of the listing

9    here.

10            Starting here where it says "Cleaners."  Can you read

11    off the names of the various cleaning tools that are on that

12    list?

13    A    Sure.

14            THE COURT:  Could you possibly zoom in a little bit

15    on that?  It's in smaller print.

16            That's good.  Thanks.

17            THE WITNESS:  So under the header "Cleaners," the

18    first tool is:

19            All Users Temp Cleaner 1.1:  To clean all users temp

20    folders, unwanted Windows files from an offline installation.

21    (Windows Freeware)

22            The second tool is:

23            ATF Cleaner 3.0.0.2:  A personal and easy-to-use temp

24    file removal software to clean all user temp folders, Java

25    cache, Opera/Mozilla browser cache, cookies, history, download

1    history, saved passwords etc.  (Windows Freeware)

2           The third tool is:

3           CCleaner 3.12.1572:  Crap cleaner is a freeware

4    system optimization and privacy tool.  (Windows Freeware)

5           Clean up! Version 4.5.2:  Removes junk files from all

6    user profiles that accumulate over time and litter your hard

7    drive.  (Windows Freeware)

8           The next one is:

9           CloneSpy 2.62:  Duplicate file cleanup tool, can

10   optionally create hardlinks to save space.

11          The next one is:

12          Data Shredder 1.0:  A tool to Erase disk and files

13   (also wipe free space ) securely.  (Windows Freeware)

14          Delete Doctor 2.2:  Delete files that are hard to

15   delete, Option to delete on reboot or via UNC Name.  (Windows

16   Freeware)

17          Duplicate File Finder 3.5:  Scans and identify

18   duplicate files.  It compares them based on byte for byte

19   comparison ensures 100% accuracy.  (Windows Freeware)

20          The last one on the page is:

21          MyUninstaller 1.74:  Alternative to the standard

22   add/remove control panel module.  (Windows Freeware)

23          The next page it continues with:

24          PC Decrapifier 2.2.8:  Removes unwanted

25   preinstalled/bundled software from Windows XP/Vista/7 that

1    usually comes with HP/Dell/Acer etc machines.  (Windows

2    Freeware)

3            Print Flush 1.3:  To clean the print spool it

4    restarts the print spooler and deletes junk print files.

5    (Windows Freeware)

6            Revo Uninstaller 1.93:  Remove unnecessary files and

7    registry entries left behind by incomplete program

8    uninstallation routines.  (Windows Freeware)

9            SpaceMonger 1.4:  Keeping track of the free space on

10   your computer.  (Windows Freeware)

11           SpaceSniffer 1.1.2.0:  Find lost space on your disks

12   the easy way.  (Windows Freeware)

13           WinDirStat 1.1.2.80:  A disk usage statistics viewer

14   and cleanup tool for Windows.  (Windows Freeware)

15           THE COURT:  Mr. Koehler, it's noon.

16           We're going to break for lunch.

17           And did you confirm that Ms. Vaughan will be here

18   this afternoon?

19           MR. KOEHLER:  Yes.  She's here.

20           THE COURT:  Okay, thank you.

21           Ladies and gentlemen, we will recess for lunch.  You

22   are reminded, again, of the admonition not to discuss the case

23   among yourselves or with anyone else.

24           Please do not form any conclusions about the case

25   until you have heard all the evidence and begun your

 1   deliberations.

 2          Court is in recess until 1:15.

 3      (Recess taken at 12:01 p.m.; resumed at 1:21 p.m.)

 4          THE COURT:  Thank you, ladies and gentlemen.  Please

 5   sit down.  The record will show the presence of the jury,

 6   counsel, and the defendant.

 7          Ladies and gentlemen, just before I came in, I know

 8   that Maureen passed out to you photographs of several

 9   witnesses.

10          We thought that that might be a memory aid for you

11   when you're deliberating, not next week, but possibly the week

12   after, so that you might -- it might help you remember who was

13   who in terms of what witness it was.

14          Those pictures are going to be collected back from

15   you.  You can't keep them, nor can you take a picture of the

16   pictures.

17          I know that you didn't get pictures of everyone.  We

18   have to ask people if they're willing to do it.  And some

19   people are and some people are not.  So to the extent we get

20   the consent from a witness, we will try to provide you with a

21   photograph with just their name on it.

22          You may continue with your questions of Mr. Evans.

23          MR. KOEHLER:  Thank you, Your Honor, and good

24   afternoon everyone.

25   ////

1          **DIRECT EXAMINATION (cont'd)**

2     BY MR. KOEHLER:

3     Q   Mr. Evans, during the lunch hour, speaking of memory aids,

4     did you have an opportunity to refresh your recollection about

5     the exhibits we talked about earlier?

6     A   I did.

7     Q   And what did you do to refresh your memory about the

8     notebooks that we talked about?

9     A   I looked at the photographs from the search scene.

10    Q   And based on looking at the photographs and the search

11    scene, are you now confident that it was the living room area

12    where you found those items?

13    A   I am.

14    Q   In what part of the living room?

15    A   It was near the couch in the living room.

16    Q   All right.  Now, earlier we were talking about that

17    Hiren's boot CD and you had just finished listing off the

18    contents of that CD; is that correct?

19    A   That is correct.

20    Q   The "Cleaner" particular documents.

21        Did you have an opportunity to create a clean copy of

22    that boot CD and run it on a computer in your lab?

23    A   I did.

24    Q   And did you capture screen prints as you went through the

25    walk-through of it?

1    A    I did.

2    Q    Now, I place on the document camera for you what's been

3    marked for identification as Government's Exhibit 477.

4              Do you recognize that?

5    A    I do.

6    Q    What is that?

7    A    That is the initial screen when you put the boot CD into a

8    computer and the initial startup.  It gives you this option

9    screen.

10   Q    And are all of the screen captures we're going to see in

11   477 true and accurate copies of the screens as you saw them as

12   you walked through going into the Shredder program on the

13   disk?

14   A    They are.

15              MR. KOEHLER:  Move to admit 477.

16              MS. PLOMIN:  No objection.

17              THE COURT:  477 is admitted.

18        (Exhibit No. 477 admitted in evidence.)

19   BY MR. KOEHLER:

20   Q    So this is the startup screen, is that what you're saying?

21   A    Yes.  This is the initial screen where you choose which

22   portion of the CD you want to use.

23   Q    And which portion of the CD did you choose?

24   A    I chose the highlighted portion, which is "Mini Windows

25   XP."

1    Q   Now, you mentioned this is Mini Windows XP.  What is the

2    difference between that and regular Windows XP, if you know?

3    A   This version of XP is designed to run off of the CD

4    itself.

5    Q   Does it leave any file storage or anything on the computer

6    when you boot this way?

7    A   It does not.  It can -- it can actually boot without the

8    hard drive in the computer if you wanted to.  So you could

9    just have this CD alone in a computer and it will boot to

10   this.

11   Q   All right.  And the next page of this, is this the screen

12   that you get?

13   A   Yes.  Could you zoom -- yes.  Thank you.

14        Yes.  That's after it's booted into the Mini XP

15   selection.

16   Q   Now, is this the Menu for the program right here?

17   A   That is correct.  That is a link to the Menu for the

18   Hiren's Boot CD Menu.

19   Q   And where did you go next from there?

20   A   I clicked that link and it opened up this next slide here.

21   Q   And did you then browse the folder as the little box says

22   on there?

23   A   I believe I clicked the Programs.  We'll have to see the

24   next page, but I believe I clicked the Programs Menu Option at

25   the top of that, yes.

1    Q    Okay.

2    A    And then once you select Programs, you can go and the

3    different categories come up.

4         And if you choose the Cleaners categories, as you can

5    see here on the screen, it lists all the different programs

6    which we read off earlier from the -- from the read-me file.

7    Q    And did you go to the program referred to as Data

8    Shredder?

9    A    I did.

10   Q    And what did you do from there?

11   A    From there, once you select Data Shredder, as you can see

12   on this next screen, it brings up the program itself.

13        And then what I did from this screen so I didn't have

14   to take a lot of screenshots, it's hard to read, I copied out

15   the text which you can see in the scroll box in the middle

16   there.

17   Q    Okay.  And then did you paste that text into a file?

18   A    I did.

19   Q    And is this next document the file to which you pasted it?

20   A    It is.

21   Q    This might be a little bit hard to read.  Okay.

22        Can you explain in laymen's terms what this is

23   telling you about what this program is capable of doing?

24   A    So the section highlighted "Cleaning Disk Free Space," in

25   laymen's terms, if you're using maybe half of your computer

1  drive space, so you have so many files, pictures, any type of

2  file that you store on the drive, any type of file that the

3  Operating System or your Browser is storing on the drive,

4  there's unused space.

5         So as you start filling it up, sometimes your

6  computer will tell you that, you know, you only have so much

7  percentage left.

8         What this program is describing here is it's going

9  through that unused space, the parts of the computer hard

10 drive where previously something could have been stored like a

11 deleted file, and it's going through and it wants to remove

12 that data.

13 Q   And what method does it use to remove that data?

14 A   It's either going to overwrite the data with random data

15 or ones and zeros.  I'm not specifically sure exactly what the

16 details on the method.

17        But it's going through.  It's identifying the unused

18 space within the File System on the computer.  And it's

19 overwriting that to get rid of any remnants of files that may

20 or may not be there.

21 Q   Can you read where it says:

22        The proper solution is to overwrite the file.

23        And then read the number 2 option under that.

24 A   Which paragraph down are we talking about?

25 Q   Right here. (Indicating)

1    A    All right.  "The proper solution is to overwrite the file

2    with meaningless data before deleting it, which is exactly

3    what shredder does.  There are several methods available,

4    varying in speed and reliability.

5            Method one:  Random overwrite.  This is the simplest

6    but least secure method.  It merely overwrites the file one or

7    more times with pseudo-random bytes.  The number of passes

8    (overwrites) can be specified."

9            Option number 2:  DOD --

10           THE COURT:  Okay.  Could you slow down because the

11   court reporter is trying to take down as you read and you're

12   reading really fast.

13           THE WITNESS:  I can.

14           Option No. 2:  DOD.  (Department of Defense) clearing

15   and sanitizing standard.  This is a more secure but slower

16   method.  The file is overwritten with zero bytes, then with

17   bytes 0xFF (255) and finally with random data.

18           Option No. 3:  Gutmann method.  This is a very slow

19   but most secure method.  The above two methods make it

20   impossible to recover shredded data with software tools, but

21   may fail when an attacker is equipped with specialized disk

22   restoration hardware, which can uncover even several layers of

23   data previously written to any disk track.  The Gutmann method

24   uses 26 overwriting passes, each of which addresses different

25   disk encoding scheme (MFM, RLL, etc.).  There are also a few

 1    random passes.  It should be impossible to recover the

 2    original data after shredding a file with this method.

 3    BY MR. KOEHLER:

 4    Q    And then what is this screen here?

 5    A    This screen is the -- two slides ago there was a "Next"

 6    button and when you hit the "Next" button, it brings up this

 7    screen here.

 8    Q    And is that where you go on to actually use the program

 9    and shred files if you were going to do that?

10    A    Yes.

11    Q    If someone were to use this disk properly, first off,

12    would there be any trace left by Hirens on the computer that

13    that disk had been used specifically on the computer?

14    A    So normally when you boot up a computer and log into an

15    Operating System, you may or may not type in a password but

16    there's going to be log files that change, there's going to be

17    user information that gets updated, even when a computer just

18    boots normally.

19         So what happens in this case is we're booting to the

20    CD and we're not necessarily reading or writing anything on

21    the drive.  So unless you go and use some of these different

22    utilities, nothing should change on the drive.

23         So there is nothing -- there's no normal indication

24    that when you boot this CD up on a computer that it was used.

25    Q    And if you use this disk to erase a particular file using

1   the Data Shredder, would that file leave traces behind that

2   would be recoverable?

3   A    That file would not leave traces behind if you used the

4   Data Shredder to delete it.

5            MR. KOEHLER:  I have no further questions.

6            THE COURT:  Ms. Plomin, did you wish to defer your

7   cross-examination until tomorrow morning?

8            MS. PLOMIN:  Yes, Your Honor.

9            THE COURT:  Thank you.

10           Mr. Evans, you may step down and you will be subject

11   to recall.  Tomorrow Mr. Koehler will let you know what time

12   you need to be here.

13           THE WITNESS:  Thank you, Your Honor.

14           THE COURT:  The government may call its next witness.

15           MR. KOEHLER:  The United States recalls Amy Vaughan.

16            **AMY KATHLEEN VAUGHAN, WITNESS, SWORN**

17               **DIRECT EXAMINATION (cont'd)**

18   BY MR. KOEHLER:

19   Q    Good afternoon, Ms. Vaughan.

20   A    Good afternoon.

21   Q    When we spoke before, there were a few exhibits that there

22   was some glitches that you had some trouble listening to

23   audio; is that correct?

24   A    Yes.

25   Q    Have you since had an opportunity to compare Government's

1    Exhibits 266, 274, 275, 276, 277, and 278 against the original

2    audio that was found on the desktop computer?

3    A   Yes, I have.

4    Q   And starting first with Exhibit 266, Constants On The Path

5    of Jihad, is the audio that's in Government's Exhibit 266 a

6    match to the audio file that was on the desktop computer?

7    A   Yes.

8            MR. KOEHLER:  Move to admit 266.

9            MS. PLOMIN:  One moment, Your Honor.  No objection.

10            THE COURT:  266 is admitted.

11        (Exhibit No. 266 admitted in evidence.)

12   BY MR. KOEHLER:

13   Q   Now, moving on to 274, have you compared the audio of the

14   lecture of the classical book on Jihad Parts 1 to 12 with the

15   exhibit audio with the audio that came off of the desktop

16   computer?

17   A   Yes.

18   Q   And is that a match?

19   A   Yes, it is.

20            MR. KOEHLER:  Move to admit 274.

21            MS. PLOMIN:  I would just like to clarify the desktop

22   computer that was found in Simpson and Soofi's apartment?

23            THE COURT:  Which computer is it that you made the

24   comparison with these exhibits?

25            THE WITNESS:  That would be the tower computer.

```
 1              THE COURT:  That was found in the Simpson/Soofi

 2    apartment?

 3              THE WITNESS:  Yes, ma'am.

 4              THE COURT:  Thank you.

 5              Is there any objection?

 6              MS. PLOMIN:  No, Your Honor.

 7              THE COURT:  274 is admitted.

 8         (Exhibit No. 274 admitted in evidence.)

 9    BY MR. KOEHLER:

10    Q   Now, moving on to 275, the 2009 lecture advocating Muslims

11    to restore the honor of Islam, did you review that particular

12    audio?

13    A   Yes.

14    Q   And did you compare it to the audio from the tower desktop

15    computer?

16    A   Yes.

17    Q   And is it a match?

18    A   Yes.

19              MR. KOEHLER:  Move to admit 275.

20              MS. PLOMIN:  No objection.

21              THE COURT:  275 is admitted.

22         (Exhibit No. 275 admitted in evidence.)

23    BY MR. KOEHLER:

24    Q   And now moving on to 276.  Allah Is Preparing Us For

25    Victory, Part 1.  Did you review the audio exhibit for that
```

```
 1   and compare it to the audio from the desktop tower computer?

 2   A   Yes.

 3   Q   And was that a match as well?

 4   A   Yes.

 5           MR. KOEHLER:  Move to admit 276.

 6           MS. PLOMIN:  No objection.

 7           THE COURT:  276 is admitted.

 8       (Exhibit No. 276 admitted in evidence.)

 9   BY MR. KOEHLER:

10   Q   Same question for Allah Is Preparing Us For Victory, Part

11   2.  Did you review that?

12   A   Yes.

13   Q   Also a match?

14   A   Yes.

15           MR. KOEHLER:  Move to admit 277.

16           MS. PLOMIN:  No objection.

17           THE COURT:  277 is admitted.

18       (Exhibit No. 277 admitted in evidence.)

19           MR. KOEHLER:  That's all I have for now, Your Honor.

20           THE COURT:  Ms. Plomin?

21           MS. PLOMIN:  No questions, Your Honor.

22           THE COURT:  May Ms. Vaughan be excused as a witness?

23           MR. KOEHLER:  Yes.  She may.

24           THE COURT:  Any objection?

25           MS. PLOMIN:  Not at this time, Your Honor.
```

1           THE COURT:  You just said "not at this time," but I'm

2   going to excuse her, which means she won't be back.

3           MS. PLOMIN:  Okay.

4           THE COURT:  Okay?

5           All right.  Thank you, Ms. Vaughan.  You may step

6   down and you are excused as a witness.

7           MR. KOEHLER:  Your Honor, as we discussed previously,

8   that is all we have for today.

9           THE COURT:  Ladies and gentlemen, the reason that

10  that's all they have for today is because we're running ahead

11  of schedule and so witnesses had been slotted in, assuming

12  they would take a little bit longer than they took.

13          So we are going to recess until tomorrow morning --

14  or at least the jury I'm going to excuse until nine o'clock

15  tomorrow morning.

16          Based on my discussions with counsel, we are

17  anticipating that the government will complete its

18  presentation of the evidence either probably Wednesday

19  morning, and then the defense will begin calling their

20  witnesses.  So we were -- as I said, we are not just on

21  schedule, but a little bit ahead of what the anticipated

22  schedule was.

23          I also wanted to let you know, just for your own

24  planning purposes, that next Thursday, so a week from today,

25  which is Thursday, March 3rd, we will only be in trial in the

1    afternoon but not in the morning.

2         So with that update, ladies and gentlemen, I will

3    excuse you until nine o'clock tomorrow morning and remind you,

4    again, of the admonition not to discuss the case or forms any

5    conclusions about it until you have heard all the evidence and

6    begun your deliberations.

7         We will see you tomorrow morning at 9:00 a.m.

8         I'm going to stay here and talk to the lawyers.

9      (Open court, no jury present at 1:39 p.m.)

10        THE COURT:  Thank you.  Please sit down.

11        Did you want to talk about the exhibits, the

12   photographs that we had talked about last night and I have

13   reviewed, the ones that the government is offering?

14        And I wasn't able to determine if the ones that are

15   tagged by Mr. Maynard are additional ones or not.  The two I

16   looked at randomly are the same, and so maybe there's some

17   additional ones.  And as we go through them, I can eliminate

18   the ones that are the same.

19        MR. KOEHLER:  That's what we had done in advance.

20   And I think Mr. Maynard flagged some of the same ones that we

21   had already elected we were going to withdraw.

22        And if I can have just a moment, I need to find my

23   list where I have my notes written on it.

24        THE COURT:  So I want to save 157 -- because it's

25   many pages -- to the end of our discussion.  Other than that,

1    I want to go in numerical order.

2            And the first one is Exhibit 289 which is a

3    photograph of a blind-folded individual with a machete at the

4    back of his neck, appearing that the photo was taken just

5    before he was beheaded.

6            MR. KOEHLER:  Correct.

7            MR. MAYNARD:  Judge, I think the first one is 287.

8            THE COURT:  I don't have 287 on my list.

9            MR. KOEHLER:  We're not offering 287.

10           MR. MAYNARD:  Okay.

11           THE COURT:  Okay.  So 287 is not being offered.

12           MR. MAYNARD:  Okay.

13           MR. KOEHLER:  Correct.

14           MS. BROOK:  Your Honor, do you mind if I stand up

15   here as well so I can look over his shoulder?

16           THE COURT:  No.

17           MR. MAYNARD:  Judge, 289 is also the same as 298.

18           MR. KOEHLER:  And we're withdrawing 298.

19           THE COURT:  That wasn't on my list either.

20           MR. KOEHLER:  Among the ones that we've laid

21   foundation for that we still want to offer, those are the ones

22   that are on the handwritten sheet.

23           Should I read that in just for the record or no?

24           THE COURT:  Well, I'm going to go through them one by

25   one.

1          MR. KOEHLER:  All right.

2          THE COURT:  So 289 that I have just described, you're

3    objecting to that on 403(b)?

4          MR. MAYNARD:  Yes.

5          THE COURT:  The next one is 290 which is a photograph

6    that depicts two images, presumably of the same person; one in

7    black and white and one in color.  And in the second image

8    that's in color, the individual appears to be kneeling with

9    his head forward and that's all I can see.

10         MR. MAYNARD:  I don't have an objection to that one,

11   Your Honor.

12         THE COURT:  Okay.  So without objection, 290 is

13   admitted.

14      (Exhibit No. 290 admitted in evidence.)

15         THE COURT:  The next one?

16         MR. MAYNARD:  I think the government has withdrawn

17   291.

18         MR. KOEHLER:  No.  We're not withdrawing 291.

19         My suggestion on 291 is that we obscure, using a tool

20   in PhotoShop, to essentially fuzz out that portion of the

21   image to render it --

22         THE COURT:  I'm not going to rule on an exhibit that

23   I haven't seen.  So 291 that's presently marked is refused.

24         And if you wish to substitute a different 291, we can

25   take it up at such time as there is a substitute.

1    But when you say you're going to fuzz it, I still

2    don't know what it's going to look like until I actually see

3    it.

4         MR. KOEHLER:  Okay.  We will do the same with 293 and

5    310.

6         THE COURT:  Okay.  So at the present -- as they are

7    presently marked, 293 and 310 are refused.

8         MR. KOEHLER:  Next is 292.

9         THE COURT:  292 also appears to be an image of an

10   individual, a different scene than 289, who may be about to be

11   beheaded.  And are you objecting to this, Mr. Maynard?

12        MR. MAYNARD:  Yes.

13        THE COURT:  Okay.  I'm not going to rule -- I'm going

14   to put those all together, because part of the 403(b) analysis

15   is looking not at them one at a time, but looking at them all

16   together.

17        The next is 297.  It's two photographs on one page,

18   both depict an individual who is blind-folded.  And the second

19   image is very similar to 289 in that this individual is in the

20   same posture with a machete over the back of his neck and

21   leaning over a stump appearing about to be beheaded.

22        I assume the government -- or the defendant objects

23   to this one also?

24        MR. MAYNARD:  I do.  And just to make sure the record

25   is clear, is it correct then that 294, 295, 296, and 297 have

```
 1    been withdrawn?

 2            THE COURT:  Were they offered?

 3            MR. MAYNARD:  I thought they were.

 4            MR. KOEHLER:  294, '95, '96 have not been offered and

 5    they are withdrawn.

 6            MR. MAYNARD:  What about 297?

 7            MR. KOEHLER:  That's the one we're presently

 8    discussing.

 9            MR. MAYNARD:  All right.  They're not being offered.

10            THE COURT:  And the government is not offering 289

11    and 299?

12            MR. KOEHLER:  We are offering 289.

13            THE COURT:  I'm sorry.  I transposed.  298 and 299.

14            MR. KOEHLER:  That's correct.

15            THE COURT:  Okay.  300 has already been admitted.

16            So the next one is 304.  So the government is not

17    offering 301 through 303, correct?

18            MR. KOEHLER:  That is correct.

19            THE COURT:  Okay.  So let's look at 304.  And this is

20    an image of a man shirtless but with a hood over his head

21    about to be beheaded, kneeling in a dirt or desert-like area.

22            The government -- or the defense objects?

23            MR. MAYNARD:  We do.

24            THE COURT:  Why is there a red circle around the

25    image of one of the people in the background?
```

1           MR. KOEHLER:  We don't know.  That's part of the

2   original image.

3           THE COURT:  That's how it came off the computer?

4           MR. KOEHLER:  Correct.

5           THE COURT:  Okay.  305 is an image of a man kneeling

6   on the ground with a raised machete over him about to be

7   beheaded.

8           MR. MAYNARD:  Defense objects to that one also.

9           THE COURT:  Okay.  I said I was going to leave 157

10  which also contains some images similar to these that I have

11  put aside to discuss the 403(b) objection.

12          The other one is 456.

13          MR. MAYNARD:  Is 306 being offered or not?

14          MR. KOEHLER:  It is not.

15          MR. MAYNARD:  Is it withdrawn?

16          THE COURT:  307 has been admitted.

17          308, 309, and 310 have not been offered.

18          MR. MAYNARD:  306 is the one I'm looking at, Judge.

19          THE COURT:  So 456 is one of those pixilated photos

20  of -- the central image is a man and you can see a few other

21  people and that's it.

22          But it's described as Nextbook Photo 8 Protest.

23          Am I missing something in this picture?

24          MR. KOEHLER:  It is not an execution photo, Your

25  Honor.

1          THE COURT:  Is there an objection to 456?

2          MR. MAYNARD:  It wasn't very clear.  I thought it was

3   an execution photo.

4          If it's not an execution photo, I can't tell.  That's

5   what it looked like to me, that there was a guy with a black

6   hood standing behind this fellow.

7          THE COURT:  I guess that's another interpretation.

8          MR. KOEHLER:  I believe those are his elbows, Your

9   Honor.  He's got his hands up behind his head with his elbows

10  raised.  He is like this. (Indicating)

11         THE COURT:  To me it just looks like a guy with his

12  mouth open yelling something.  I don't see any weapons.  I

13  mean, he's not blind-folded.  I can't tell what the black

14  image is behind him.

15         MR. MAYNARD:  I thought the guy with the black image

16  had his arm around his neck and had a knife to his throat.

17         THE COURT:  I don't see a knife.

18         MR. MAYNARD:  The thing right below his neck.

19         MR. KOEHLER:  That's a scarf.

20         MR. MAYNARD:  I can't tell.

21         THE COURT:  So what's the point of the photo?  Why do

22  we need it?  Isn't it cumulative?

23         MR. KOEHLER:  This is off of Mr. Abdul Kareem's

24  Nextbook computer.  It's not off the tower.

25         So what it does is it shows imagery that is

1   consistent with the philosophy, shall we say, of Simpson and

2   Soofi in terms of being upset about insults to the Prophet and

3   so on.

4         THE COURT:  And the index which the jury -- or the

5   Table of Contents, whatever you want to call the exhibit list

6   that the jury will have, describes it as a protest.

7         MR. MAYNARD:  Well, you can -- it looked to me like

8   it was a man standing there behind a fellow who's got his arm

9   around him.  I thought he was going to cut his throat and that

10  he's yelling or screaming.  And that there's a kid over there

11  to the left-hand side of the picture that's looking at it.

12        THE COURT:  I think that's an imaginative

13  interpretation.

14        456 is admitted.

15     (Exhibit No. 456 admitted in evidence.)

16        MR. MAYNARD:  Well, if it's not that, then it isn't

17  relevant.

18        THE COURT:  Well, it's -- I think it's relevant.  It

19  was on the defendant's computer and it appears, if the

20  government's description is correct, which is consistent with

21  my viewing of it, that it's someone, you know, protesting

22  something.

23        So, let's look at 157.

24        MR. KOEHLER:  And, Your Honor, I wanted to draw the

25  Court's attention to something as we look at 157.

1          We discussed last night one of the images in 157.

2     It's No. 34.

3          THE COURT:  Right.  You said you weren't going to

4     offer 34.

5          MR. KOEHLER:  Because of the date and time of that

6     image, we have reconsidered on that particular image.

7          And so what we're proposing to do is put a box of

8     some kind in there and have that be the same as 291, 293, and

9     310; and that is, we come back to you with that one with a

10    proposed redacted version of it.

11         THE COURT:  All right.  So at the present time, 157

12    will not be admitted so long as the pages that are in the

13    original -- current original Exhibit 12 -- 31 and 32, 34, 36,

14    and 40 are as they appear in the current version of 157.

15         I detail all of those because the government has

16    already said that it wants to alter -- they call it "fuzz" --

17    the parts of those pictures.

18         And until we see what they look like that way, I

19    can't rule on it.  So the only one that had been brought to my

20    attention yesterday that is still being offered to which an

21    objection previously was made is page 29 which, I believe, to

22    be the Jordanian pilot standing in the cage with his orange

23    shirt soaked in the accelerant that was used before he was set

24    on fire.

25         Are you objecting to that?  Just that page?

```
 1          MR. MAYNARD:  It's just that page?

 2          THE COURT:  Just that page.

 3          MR. MAYNARD:  I'm not objecting to that.

 4          THE COURT:  Okay.  So just to recap, page 12, 30, 31,

 5   34, 36, and 40 have to be substituted.  But before we take it

 6   apart and substitute, I'll have to see it.  Mr. Maynard will

 7   have to see what they look like.  And I can rule on them then.

 8          The government has previously agreed to delete page

 9   18 which is the Packman page.

10          And what you have provided to me over the lunch hour,

11   Mr. Maynard, contains those same pages plus a few more.

12          Let me just --

13          MR. MAYNARD:  Judge, I apologize.  They weren't

14   numbered.  I started numbering, but I had gone through and put

15   yellow stickies next to the ones that I objected to.  I think

16   they were fairly consistent with what the government --

17          THE COURT:  Okay.  I just want to review.  The first

18   one you show is page 12 which I have already ruled on.

19          MR. MAYNARD:  Yes.

20          THE COURT:  The second one is page 18 which the

21   government is going to delete.

22          The next ones are pages 30 and 31 which the

23   government is going to resubmit.

24          MR. MAYNARD:  Yes.

25          THE COURT:  For some reason, Mr. Maynard's copy of
```

1    this exhibit has -- well, I think it's just a duplicate.  Page

2    31 appears to be in there twice.

3              It's a February 5, 2015 at 1:50:30 --

4              MR. KOEHLER:  Your Honor, there's actually three

5    pages of that.

6              MR. MAYNARD:  The same --

7              THE COURT:  Oh, I see.  Three pages of the same

8    thing.

9              MR. KOEHLER:  He tweets it three times.

10             THE COURT:  Gotcha.  I thought it was only two.  Let

11   me just go back.

12             MR. KOEHLER:  And I believe the first page of that is

13   29 and the page that you were talking about with the pilot

14   with the accelerant on his shirt is page 28.

15             THE COURT:  Oh, okay.

16             MR. MAYNARD:  I don't have a problem with 28, but I

17   do --

18             THE COURT:  Okay.  Let me revise what I said before.

19             28 -- I had misinterpreted that it was page 29 -- so

20   it's actually 29, 30, and 31 are going to be resubmitted.

21   They are all the identical photos but they're three separate

22   tweets.

23             The next one that you identified is 34 which is the

24   government's -- the government is going to resubmit it

25   altered.

```
 1           I think the next one is 36 that Mr. Maynard

 2    identified.  The government is going to modify it.

 3           And then there's 40 which the government is going to

 4    resubmit.

 5           And now there's one additional page that Mr. Maynard

 6    has marked from Exhibit 157 to which he has an objection.  And

 7    I don't know what page it is except to say that it's some

 8    number of pages after 40 and it is a tweet from April 8, 2015,

 9    at 8:32:09 a.m.  And it is four photographs showing the

10    execution of a man dressed in what appears to be a blue

11    jumpsuit.

12           And I assume that your primary concern is with the

13    fourth picture?

14           MR. MAYNARD:  Fourth picture.

15           MR. KOEHLER:  We will obscure the fourth picture and

16    resubmit.

17           THE COURT:  Okay.

18           MR. KOEHLER:  That appears to be page 52 of the

19    exhibit.

20           THE COURT:  So you think that's 52?

21           MR. KOEHLER:  Yes.

22           THE COURT:  Okay.  Let me -- Maureen -- I don't want

23    to take Mr. Maynard's off, so I need to find it in 157 and I'm

24    going to mark it as page 52.

25           Okay.  So I think the 403(b) question is how many
```

1    pictures of just before an execution do we need to have before

2    it becomes more prejudicial than probative?

3           And so we have some of those in 157.  And then the

4    exhibits that I have reserved for the 403(b) discussion are

5    also of that same category.  It's 289, 292, 297, 304, and 305.

6           MR. KOEHLER:  Your Honor, there's a couple of things

7    in play here.

8           One is these are not merely offered to show the

9    states of mind of the individuals who were present in the room

10   watching these, but they're also present to corroborate

11   witnesses, one of whom hasn't testified yet, but will testify

12   that these kinds of things were playing nearly constantly in

13   the apartment.

14          And having different images of the same types of

15   scenes, although certainly they're not pretty, they are, in

16   fact, what was being played in the defendant's presence.  And

17   that is what will be testified to by our witnesses.

18          In addition, obviously, we have the children would

19   have already testified to seeing these types of things played

20   in the defendant's apartment.

21          Limiting them to just a couple of those images takes

22   away from --

23          THE COURT:  Hold on a minute.  You said "being

24   played."  Because these are -- I have been describing them as

25   "photographs."  And that's what I believe -- aren't they all

1   photographs that were found on a computer that belonged to

2   Simpson or Soofi?

3         MR. KOEHLER:  They are still images.  Some of them

4   are screen captures.  Some of them are, in fact, photographs.

5         THE COURT:  I'm sorry.  I see.  Sometimes they're

6   described as a screencap from a video.

7         MR. KOEHLER:  And don't hold me to precision on this,

8   but you will hear testimony from Ali Soofi that Simpson was

9   tweeting while Ali Soofi was in the apartment and Mr. Abdul

10  Kareem and Mr. Soofi were in the apartment.

11        And the tweet -- the Twitter feed was on the flat

12  screen TV inside the apartment and he was seeing these kinds

13  of things displayed on the screen when Mr. Simpson was

14  operational on Twitter.  He also saw him doing the same thing

15  from his cell phone in Mr. Abdul Kareem's presence and talking

16  about it and the two of them laughing about it.

17        And so having these things in evidence will serve to

18  corroborate his testimony.

19        THE COURT:  Well, maybe I need to hear his testimony,

20  because right now all I know is that they're screenshots from

21  videos or they're photographs or they're tweets from

22  Mr. Simpson which, if the idea of these is to show that

23  Simpson and/or Soofi were -- I'll just use the term

24  "radicalized" -- then we don't need this many pictures.  If it

25  has to do with -- if it's tied directly to the defendant,

```
 1        that's a slightly different analysis.

 2               Because I think to this time, the evidence of what

 3        Mr. Kareem actually may have been watching on a screen has

 4        been -- has come in through the testimony of witnesses, the

 5        young witnesses, and perhaps also the 19-year-old witness.

 6        And I remember specifically it was a news -- the news report

 7        on Fox which was the Jordanian pilot.

 8               But I'm not sure that we've heard any specific

 9        evidence of any images like this that were tied directly to

10        Mr. Kareem.

11               MR. KOEHLER:  There were statements about beheading

12        videos, and specifically, Stefan Verdugo testified about

13        seeing beheading videos --

14               THE COURT:  Okay.  You're right.

15               MR. KOEHLER:  -- that he was shown.

16               And I also believe that Sergio Martinez mentioned --

17           (Discussion had off the record.)

18               THE COURT:  I don't -- my recollection of

19        Mr. Martinez, I don't recall him talking about videos.

20               MR. KOEHLER:  I think it was Juan talking about the

21        13 people being executed.

22               THE COURT:  Is that the people that are being marched

23        down the beach?

24               MR. KOEHLER:  Three journalists being executed by 13

25        men.  That's what it was.
```

 1          THE COURT:  I'm sorry.  The what?

 2          MR. KOEHLER:  Three journalists being executed by 13

 3   men.  Juan testified about that -- the juvenile.

 4          THE COURT:  Well, if he did, I don't remember.  If he

 5   did, I don't think it was that specific.

 6          MS. BROOK:  If I may, he did -- I'm sorry, Your

 7   Honor.

 8          He did testify additionally about the orange that the

 9   journalists were wearing, the black outfits.

10          THE COURT:  Right.  I remember him talking about some

11   people that were wearing the orange outfits.  I don't recall

12   him saying there were three journalists executed by 13 men.

13          MR. KOEHLER:  I think he said there were three men

14   executed by 13 is what he said.

15          THE COURT:  Okay.

16          MR. KOEHLER:  In addition, Your Honor --

17          THE COURT:  But we don't have those images?

18          MR. KOEHLER:  Correct.

19          In addition, we have testimony that will come in

20   tomorrow through Agent Whitson about the defendant's admission

21   to having seen the Jordanian pilot video and claiming that the

22   others showed it to him.

23          THE COURT:  Well, I'm not ruling on the Jordanian

24   pilot photos until such time as I see what you've made them

25   look like.

1          MR. KOEHLER:  Okay.

2          THE COURT:  We have the Jordanian pilot's photos of

3  him standing in the cage soaked in whatever the accelerant

4  was.

5          MR. KOEHLER:  Okay.

6          THE COURT:  And then you're going to do something

7  with the remaining three; the two images repeated three times.

8          MR. KOEHLER:  Correct.

9          THE COURT:  I'm going to wait to hear what I hear

10  from other evidence -- or from other witnesses and then I will

11  rule on these.  And then I have deferred ruling on --

12          Well, I have actually refused Exhibits 310, 291, and

13  290 to see what you come up with as their alternatives.

14          MR. KOEHLER:  You mean 293?  290 was admitted without

15  objection.

16          THE COURT:  Oh, did I mix -- I'm sorry.

17          Yes.  I'm sorry.  They were -- the two folders were

18  stuck together.  It's 293 and 291 and 310.

19          Okay.  Maureen, before I get them mixed up again,

20  here are the two that are admitted.

21          Can we talk for a minute about Mr. Kohlmann?

22          MR. KOEHLER:  Yes.  And I shall defer to my

23  colleague.

24          THE COURT:  I just want to share some thoughts about

25  my review of his report.  And let's clarify.

1          The report that is his final report is the one that's

2   attached to the Government's Response to the Motion to

3   Preclude.

4          MS. BROOK:  That's correct.  It's a 31-page report.

5          THE COURT:  And the one that Mr. Maynard attached is

6   almost the same as I saw it.  The one attached to your

7   Response had -- I will say -- a few additional paragraphs.  It

8   may have been two.  It may have been three.  But other than

9   that, it was the same.

10          There were no deletions from the report that

11   Mr. Maynard had attached, just those few additional

12   paragraphs.

13          MS. BROOK:  Correct.

14          THE COURT:  Okay.  My thoughts about Mr. Kohlmann

15   before I hear any argument are these:

16          He is a qualified expert with respect to terrorism,

17   the leaders of various terrorist groups, the history of how

18   these groups came to be, some of the predecessor individuals

19   who inspired these groups and what I will call the -- the

20   "philosophy" doesn't sound like the right word, but it's the

21   best word I can come up with right now -- the philosophy of

22   these various terrorist groups.

23          I don't -- I know that Mr. Maynard's motion focused

24   on his lack of a scientific method, but he is not a scientist

25   in the hard sciences.

1          His expertise is derived from his study over many

2    years of these subjects.  And he is an expert the same way

3    that a historian can be an expert.  They don't necessarily --

4    there's no scientific study done to become an expert, say, in

5    the history of the Civil War.  It's because one has studied it

6    from all different aspects.  And Mr. Kohlmann clearly, to me,

7    seems to qualify as an expert.

8          I think that the issue in this case is what the scope

9    of his testimony should be.  And when you read his report, it

10   is very clear to me that his report gives an incredible amount

11   of information about these subjects that he knows so well.

12         That is not relevant here.  My view, after reviewing

13   his report, is that the scope of any expert testimony that he

14   would give would have to be tied to things that were

15   discovered that relate to books, CDs, things on computers that

16   have been found in this case.

17         Mr. Kohlmann shouldn't be able to come and give the

18   jury some lecture that starts with the beginning of the

19   radical Islamic movement -- I think he started in Pakistan --

20   and talk to the jury about all of those things.

21         But it seems to me that it would be helpful to the

22   jury, for example, in Simpson and Soofi's vehicle -- or

23   Simpson's vehicle -- all of these CDs were found that, you

24   know, part 1 through 24, and what are they and who is the

25   person that is delivering these lectures and why is that

```
 1   significant?

 2          But if you were to examine him and he were to testify

 3   based on all of this background information in his report, in

 4   my opinion, it's highly prejudicial and to use a word

 5   inappropriately, more or less "terrorize" the jury into

 6   thinking that anyone who ever had any exposure whatsoever to

 7   any of these people has to be a terrorist.

 8          So those are my thoughts.  I don't know that the

 9   significance of some of the evidence that was found can be

10   appreciated by the jury without further explanation,

11   explanation that he's clearly qualified to give.

12          So that's my thoughts on Mr. Kohlmann.

13          I don't see that we need a Daubert hearing to

14   determine his qualifications as an expert.  I don't know how

15   they can be doubted.

16          But what's -- and we wouldn't have an evidentiary

17   hearing on limiting his testimony, because that's not what a

18   Daubert hearing is about.  That would be whether or not he was

19   qualified and whether his opinions were based on the types of

20   reliability standards that are required under Daubert and the

21   cases cited since then.

22          So do you think we need an evidentiary hearing for

23   Mr. Kohlmann, Mr. Maynard?

24          MR. MAYNARD:  Judge, I wasn't prepared to discuss the

25   subject because I didn't think we were going to discuss it
```

1    today.  But I mean --

2          THE COURT:  Well, we don't have to discuss it today

3    if you don't want to.  I'm happy to leave you with my

4    thoughts.

5          MR. MAYNARD:  And I appreciate that.

6          Now, when I read Mr. Kohlmann's reports, I mean, it

7    seems to me that here is a man who has gone onto the Internet

8    and the problem is you can't verify the sources of some of

9    this stuff that he relies upon.

10          I don't disagree with you that he seems to have

11    knowledge about the history of these radical groups, al-Qa'ida

12    and various leaders.

13          Same kind of information I can find off of Wikipedia,

14    quite honestly, although --

15          THE COURT:  Well, he seems to have more reliable

16    sources than that.

17          MR. MAYNARD:  Well, I'm not so sure because I think a

18    lot of the information he says is that "I Twitter with

19    somebody."  Well, you never know who is on the other side when

20    you're doing these things.

21          Contrary to your analogy to a historian, a historian,

22    if they're going to write a book about Gettysburg, they go to

23    Gettysburg.  They get reliable diaries.  They go to the scene.

24    And they study what actually happened at that particular

25    place.

1          What Mr. Kohlmann seems to do is he goes onto the

2    Internet and he gathers information that comes down either

3    from e-mails, tweets, websites -- and as some of the books

4    that I have read over the past couple of months talk about

5    these websites from radical groups, it's like Whack a Mole.  I

6    mean, they go up and then all of a sudden --

7          THE COURT:  But we're only going to be talking about

8    one.

9          Now, I say that before the government says no, no, we

10   have to mention -- I mean, there might be some appropriate

11   background into who is ISIL, but we're not going to go back

12   and talk about al-Qa'ida in Arabia and the Taliban and all

13   those people that --

14         His report, to me, reads like -- to me it reads like

15   a report that he has produced numerous times and then he goes

16   onto his computer and adds paragraphs that are appropriate to

17   the case for which he has been retained.

18         MR. MAYNARD:  I think that's absolutely the case.

19         And the defense is not arguing for a minute that

20   ISIS, ISIL, Islamic State, whatever, isn't a designated

21   terrorist organization.  They are.  I mean, there's no -- I'll

22   stipulate to that.  That's not a problem.

23         THE COURT:  But the problem is, Mr. Maynard, we have

24   Count 5 here where the government has to prove that there was

25   a conspiracy to provide material support to a foreign

 1     terrorist organization.

 2              And while there isn't going to be any dispute that

 3     the Islamic State is a foreign terrorist organization, what it

 4     means to provide material support to them depends in part on

 5     what ISIL or ISIS is requesting that its followers provide.

 6              And as I read his report, his opinion is that the

 7     Islamic State, through some rather well-known spokespeople,

 8     some of whom are dead, but apparently are still listened to,

 9     are exhorting people to do the very type of thing that Simpson

10     and Soofi did and that that's what the Islamic State considers

11     providing material support to their cause.

12              And I think the government -- they have to prove

13     that.  And I think they prove it through, in part, what this

14     expert can tell us about the Islamic State, the people who

15     have prepared and delivered their message, particularly, the

16     ones that delivered it in English, and to put that together

17     with the things that were discovered with Simpson and Soofi,

18     either in the car or in their apartment, that are those very

19     people that are encouraging the type of activity that they

20     engaged in.

21              MR. MAYNARD:  The problem I have is that I think Mr.

22     Kohlmann, who testifies for the FBI all the time, over 30

23     times now, I'm concerned he's going to get up on this stand

24     and say, look, here's the history of these terrorist groups.

25              He can look to what Soofi and Simpson may have done.

1    Their tweets.  Who they were listening to.  And he's going to

2    try to draw the conclusion that they were radicalized.  I

3    think anybody can draw the conclusion they were radicalized by

4    the actions that they took in Garland, Texas.

5         The question is whether or not he's going to somehow

6    or another through that taint the jury towards my client.

7         I agree, the government has got a hoop they've got to

8    jump through and they're trying to do it through Mr. Kohlmann.

9         I'm just not sure that Mr. Kohlmann is the

10   appropriate person.  I mean, when you look at his background,

11   he really hasn't talked about ISIS or ISIL.  He's focused on

12   al-Qa'ida in the past, is one.

13        And two, his report leads me to believe --

14        THE COURT:  Well, ISIS is new in comparison.

15        MR. MAYNARD:  Well, it is, but it's been around for a

16   while.  I mean, it's been around for four or five years.

17        THE COURT:  Well, going back to my question.

18        What evidentiary hearing would we have regarding his

19   qualifications that aren't set out in his report and in his

20   curriculum vitae?

21        MR. MAYNARD:  I will look at it and I will tell you

22   there is something else that I believe we should do.

23        THE COURT:  But I am not going to permit Mr. Kohlmann

24   to basically testify the way he wrote his report.  I don't

25   think that we start with whoever it was that -- where, you

Case 2:15-cr-00707-SRB   Document 392   Filed 08/04/16   Page 135 of 142   1311

CR15-00707-PHX-SRB   JURY TRIAL-DAY #7   2-25-16


```
 1   know, he starts -- I don't have it right here either, but, you

 2   know, he starts in Pakistan and then tries to say here is --

 3   and here is how everybody evolved and here's how they

 4   eventually become the Islamic State and they were kind of

 5   dormant for a few years and now they started to become strong

 6   when, I think, in 20 -- I don't know -- 2012 or something.

 7            MR. MAYNARD:  Thereabouts.

 8            THE COURT:  I think we start with what is the

 9   significance of this disk?  Who is Anwar al-Awlaki.  You know,

10   that kind of -- that's where we are.

11            Most of the stuff that's in his report, he's not

12   going to be able to testify about, because that's the part

13   that I think would be incredibly prejudicial where the jury

14   would lose sight of what is it that they're trying to

15   determine.

16            What they're trying to determine is whether there was

17   a conspiracy, at least involving Simpson and Soofi, to provide

18   material support to terrorists.

19            I don't think there's too much doubt that Simpson and

20   Soofi were involved in a conspiracy to commit the crimes they

21   committed in Texas.

22            But it's Count 5 that can't be proved just by virtue

23   of the fact that they went to Texas and did what they did and

24   just by virtue of the fact that they had material that we

25   don't really know the significance of because we don't have
```

UNITED STATES DISTRICT COURT

1    that expertise.  Kohlmann does.

2          MS. BROOK:  Your Honor, if I can just interject

3    briefly, and I think we are basically on the same page in

4    terms of what we anticipate Kohlmann's testimony to be.

5          Obviously, ISIS came from somewhere and they came

6    from AQI.

7          And so understanding a little bit of that evolution,

8    in part -- and obviously, it's a very, very small couple of

9    sentences of testimony -- puts into perspective where ISIS

10   came from.  That's one component.

11         The second part would be obviously understanding the

12   historical significance and political significance of Anwar

13   al-Awlaki.  And so that would involve a small portion of

14   history.  But, again, this is not extensive testimony.

15         The government anticipates the bulk of the testimony

16   in this case to be, obviously, about the individual items of

17   evidence that were found and what those items of evidence

18   mean.

19         And I do concur.  The report goes way back and talks

20   about all sorts of individuals and their chronological

21   evolution to the violent jihadi move and we're not here to

22   give, you know, a lecture to the jury about violent jihad.

23         THE COURT:  Well, you may not be, but it sure appears

24   that that's what Mr. Kohlmann wants to do.  If he wrote this

25   report for this case, that's clearly the way his report is,

1    like a graduate-level seminar in how radical Islam came to be.

2         MS. BROOK:  And perhaps in part that's done as an

3    education factor for the individuals that read the report, not

4    necessarily based upon all of those parts of the report coming

5    into testimony.

6         So with that in mind, we've talked about Anwar

7    al-Awlaki.  Azzam is also another individual.  Pictures we've

8    seen admitted into evidence here about him and his role and

9    the importance.

10        So the pieces of history that we talk about, the

11   historical component will be slight, but it's all going to be

12   relevant to items of evidence that we found.

13        THE COURT:  Well, the way I am envisioning it,

14   Ms. Brook, is that we actually start with the items of

15   evidence and then he explains the significance, if any, to how

16   this would be consistent with providing --

17        I mean, is he really here to testify about anything

18   other than Count 5?  I mean, would we even need him if you

19   didn't have Count 5?

20        MS. BROOK:  He certainly puts into perspective

21   certain items of evidence found in the conspiracy and the

22   collaboration, the theme that bound together these men.  But

23   obviously, his probative value is Count 5, so that's why he's

24   here.

25        And as noticed in the government's expert notice,

1    there's also components of his testimony that are going to be

2    based upon just what Your Honor was speaking about; Junaid

3    Hussain and Miski, the individuals that are the Western

4    proponents or the Western propagandists that were in

5    communication and contact with the defendant's

6    co-conspirators.

7            So there are components of how ISIS works that will

8    be part of the testimony as well.  But the government intends

9    for every single piece of the testimony to be relevant and

10   material to items in evidence and understanding this case.

11           THE COURT:  Right.  And so that's why I say the way I

12   see his testimony coming in is that, first, it's based on an

13   item of evidence that we need to understand who it is or what

14   their message is, as opposed to starting out by telling us who

15   all these people are, what their message is, what they want

16   people to do, and then following it up with, "Oh, and by the

17   way, I saw his picture on a computer" or "It's been reported

18   to me that the FBI saw his picture on a computer."

19           MS. BROOK:  That's fine.

20           THE COURT:  So if you want to talk more about this

21   tomorrow, Mr. Maynard, we can, but those --

22           MR. MAYNARD:  I'll think about it overnight, Your

23   Honor.

24           Do you want to talk about the physical aspect of it?

25   I mean --

1          THE COURT:  Well, that's another issue.

2          If you think there is to be an evidentiary hearing on

3     his expert qualifications, we need to know that very soon.

4          MR. MAYNARD:  I've heard you.  I understand where

5     you're going, but I'll let you know tomorrow.

6          THE COURT:  But I think -- do you have an objection

7     to him appearing by VTC?

8          MR. MAYNARD:  Here's the problem I have and I just --

9     I just learned of it today.

10          THE COURT:  Well, obviously --

11          MR. MAYNARD:  I didn't have any problem with the

12     other witness and in the abstract I don't.

13          Obviously, they probably prefer to have him here, as

14     would I, but the problem is impeachment.  If I have material

15     for impeachment, I don't want to send it to him ahead of time

16     so he can see it.

17          THE COURT:  I think we have -- actually, if he is on

18     the VTC at the courthouse in New York, I think there's a way

19     to put things on the document camera to link in.  I know

20     there's -- no?

21          THE CLERK:  I don't think so.

22          THE COURT:  I'm trying to remember some way that I've

23     seen where our screen goes from being a person to a document.

24          MR. MAYNARD:  I mean, that's really the only issue I

25     have.  I don't have a problem with him testifying on a camera.

1           I just --

2           MS. BROOK:  What we can also do, Mr. Koehler just

3    suggested, was to have Mr. Maynard ship the impeachment

4    documents that he has to the Clerk of the Court there in New

5    York and she can hand it to him after he testifies on direct.

6    And we can overnight it.  We'll overnight it to them.

7           MR. MAYNARD:  That might work.

8           THE COURT:  It might work.  Well, think about it.

9           MR. MAYNARD:  I hadn't thought about it.  I mean,

10   this was after the lunch hour and that's what I was trying to

11   think of.

12          THE COURT:  Ordinarily, I wouldn't have a witness

13   like this by VTC, but these are rather extraordinary

14   circumstances and we can't delay the trial until he's fit to

15   travel.

16          MR. MAYNARD:  No.  It sounds to me like he probably

17   broke his shoulder skiing.  I don't know.  I don't know.

18          THE COURT:  Okay.  Is there anything else?

19          MR. MAYNARD:  Yes.

20          THE COURT:  Any other open issues?

21          MR. MAYNARD:  I have one more issue.

22          My understanding is that Special Agent Whitson is

23   going to testify tomorrow.

24          I understand your rule, I believe, is is that only

25   one lawyer can cross-examine somebody.  The issue that I would

1  ask the Court to consider is the way we have divided the cases

2  is the electronic information Ms. Plomin has mainly dealt with

3  and the other stuff that's simple I have to deal with.

4           I understand --

5           THE COURT:  It seems like a wise division of labor.

6           MR. MAYNARD:  Mr. Whitson may be testifying in both

7  areas.  And I'm wondering, can we have permission to have two

8  people cross but on completely different areas.

9           THE COURT:  I might make an exception to that rule,

10  but I won't allow two different people to object to his

11  testimony.

12           MR. MAYNARD:  Okay.

13           THE COURT:  And I won't allow you to -- if one of you

14  thinks the other didn't ask a question to, you know, overlap

15  each other.

16           MR. MAYNARD:  I understand.

17           THE COURT:  Okay.  All right.

18           Court is in recess until nine o'clock tomorrow

19  morning.

20      (Proceedings adjourned at 2:35 p.m.)

21                              * * *

22

23

24

25

```
1
2                    C E R T I F I C A T E
3
4          I, ELIZABETH A. LEMKE, do hereby certify that I am
5  duly appointed and qualified to act as Official Court Reporter
6  for the United States District Court for the District of
7  Arizona.
8          I FURTHER CERTIFY that the foregoing pages constitute
9  a full, true, and accurate transcript of all of that portion
10 of the proceedings contained herein, had in the above-entitled
11 cause on the date specified therein, and that said transcript
12 was prepared under my direction and control.
13         DATED at Phoenix, Arizona, this 1st day of August,
14 2016.
15
16
17
18
19
20              s/Elizabeth A. Lemke
                ELIZABETH A. LEMKE, RDR, CRR, CPE
21
22
23
24
25
```