## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) February 26, 2016 |
| Abdul Malik Abdul Kareem, | ) 9:06 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 8
(Pages 1319 through 1505, Inclusive.)

APPEARANCES:
For the Government:
          U.S. ATTORNEY'S OFFICE
          By:  **Kristen Brook, Esq.**
               **Joseph Edward Koehler, Esq.**
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
          MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
          By: **Daniel D. Maynard, Esq.**
               **Mary Kathleen Plomin, Esq.**
          3200 North Central Avenue, Suite 1800
          Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1                    **INDEX OF WITNESSES**

2

    **RICHARD HENDERSON:**
3
    Direct examination by Ms. Brook              Page 1323
4
    **JEFFREY D. EVANS:**
5
    Cross examination by Ms. Plomin              Page 1331
6   Redirect examination by Mr. Koehler          Page 1339

7   **MUSTAFA HUSSAN:**

8   Direct examination by Ms. Brook              Page 1340
    Cross examination by Mr. Maynard             Page 1349
9
    **GREGORY NEVILLE:**
10
    Direct examination by Mr. Koehler            Page 1351
11  Cross examination by Ms. Plomin              Page 1408
    Redirect examination by Mr. Koehler          Page 1428
12
    **SPECIAL AGENT ROBERT MESHINSKY:**
13
    Direct examination (cont'd) by Mr. Koehler   Page 1432
14
    **SPECIAL AGENT STEWART WHITSON:**
15
    Direct examination by Ms. Brook              Page 1443
16

17

18

19

20

21

22

23

24

25

1        **INDEX OF EXHIBITS**

2

| **EXHIBIT NO.:** | **DESCRIPTION:** | **RECEIVED:** |
|---|---|---|
| Exhibit No. 140 | Certified birth certificate Decarus Thomas | Page 1495 |
| Exhibit No. 141 | Certified name change records Decarus Thomas | Page 1495 |
| Exhibit No. 153 | Twitter screenshot: Sharia is Light re AFDI Draw Muhammad Contest | Page 1377 |
| Exhibit No. 154 | Twitter screenshot: Sharia is Light re #texasattack | Page 1378 |
| Exhibit No. 155 | Twitter screenshots: AbuHussainAlBritani | Page 1381 |
| Exhibit No. 156 | Pages from Dabiq Magazine regarding Garland attack | Page 1385 |
| Exhibit No. 190 | Email from Ibrahim to Gitrdonemoving@gmail.com (Item 7082) | Page 1480 |
| Exhibit No. 348 | Draft message mentioning Daren (LG GPLG440GB -- 480-849-8186; Item #134-135) | Page 1434 |
| Exhibit No. 349 | Draft message mentioning "another postponement" (LG GPLG440GB -- 480-849-8186; Item 136-139) | Page 1435 |
| Exhibit No. 350 | Photo of the screen of another digital device (LG GPLG440GB -- 480-849-8186; Item #38-41) | Page 1437 |
| Exhibit No. 354 | Blue Spiral Notebook, 8.5" x 11" (Item 17) | Page 1339 |
| Exhibit No. 407 | Abdul Malik Abdul Kareem Clip_01 | Page 1465 |
| Exhibit No. 408 | Abdul Malik Abdul Kareem Clip_02 | Page 1465 |
| Exhibit No. 409 | Abdul Malik Abdul Kareem Clip_03 | Page 1465 |
| Exhibit No. 410 | Abdul Malik Abdul Kareem Clip_04 | Page 1465 |
| Exhibit No. 411 | Abdul Malik Abdul Kareem Clip_05 | Page 1465 |
| Exhibit No. 412 | Abdul Malik Abdul Kareem Clip_06 | Page 1465 |
| Exhibit No. 413 | Abdul Malik Abdul Kareem Clip_07 | Page 1465 |
| Exhibit No. 414 | Abdul Malik Abdul Kareem Clip_08 | Page 1465 |

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1

2   Exhibit No. 415      Abdul Malik Abdul Kareem        Page 1465
                         Clip_09
3   Exhibit No. 416      Abdul Malik Abdul Kareem        Page 1465
                         Clip_10
4   Exhibit No. 417      Abdul Malik Abdul Kareem        Page 1465
                         Clip_11
5   Exhibit No. 418      Abdul Malik Abdul Kareem        Page 1465
                         Clip_12
6   Exhibit No. 419      Abdul Malik Abdul Kareem        Page 1465
                         Clip_13
7   Exhibit No. 420      Abdul Malik Abdul Kareem        Page 1465
                         Clip_14
8   Exhibit No. 421      Abdul Malik Abdul Kareem        Page 1465
                         Clip_15
9   Exhibit No. 422      Abdul Malik Abdul Kareem        Page 1465
                         Clip_16
10  Exhibit No. 424      Abdul Malik Abdul Kareem        Page 1465
                         Clip_18
11  Exhibit No. 425      Abdul Malik Abdul Kareem        Page 1465
                         Clip_19
12  Exhibit No. 426      Abdul Malik Abdul Kareem        Page 1465
                         Clip_20
13  Exhibit No. 427      Abdul Malik Abdul Kareem        Page 1465
                         Clip_21
14  Exhibit No. 428      Abdul Malik Abdul Kareem        Page 1465
                         Clip_22
15  Exhibit No. 430      Abdul Malik Abdul Kareem        Page 1465
                         Clip_24
16  Exhibit No. 471      Flames of War video (media)     Page 1485
    Exhibit No. 475      Khyber Halal Photo 2            Page 1344
17  Exhibit No. 478      Kareem-Simpson-Soofi           Page 1358
                         Telephonic Communication
18                       Excerpts
    Exhibit No. 479      Kareem Post Garland            Page 1366
19                       Communication
    Exhibit No. 480      Simpson Twitter DM Excerpts    Page 1387
20  Exhibit No. 481      Acer Network Access Log        Page 1440
    Exhibit No. 486      Photograph of Elton Simpson    Page 1483
21                       DSC_0063
    Exhibit No. 487      Photograph of Elton           Page 1483
22                       Simpson DSC_0082

23

24

25

UNITED STATES DISTRICT COURT

1        **P R O C E E D I N G S**

2        (Called to the order of court at 9:06 a.m.)

3        THE COURT:  Good morning, ladies and gentlemen.

4    Please sit down.  The record will show the presence of the

5    jury, counsel, and the defendant.

6        The government may call its next witness.

7        MS. BROOK:  Thank you, Your Honor.

8        The government calls Richard Henderson.

9        If you would step right up to Maureen, she will swear

10   you in.

11       THE CLERK:  Please state your name for the record and

12   spell your last name.

13       THE WITNESS:  James Richard Henderson.

14   H-E-N-D-E-R-S-O-N.

15       THE COURT:  You may proceed, Ms. Brook.

16       MS. BROOK:  Thank you.

17           **JAMES RICHARD HENDERSON, WITNESS, SWORN**

18                    **DIRECT EXAMINATION**

19   BY MS. BROOK:

20   Q   Good morning.

21   A   Good morning.

22   Q   Would you please introduce yourself to the jury.

23   A   I'm sorry?

24   Q   What's your name?

25   A   James Richard Henderson.

1   Q   And, Mr. Henderson, where do you work?

2   A   I work for the PMC Ammunition.

3   Q   And where do you live?

4   A   In Houston, Texas.

5   Q   Your job with PMC Ammunition, is it based there out of

6   Houston, Texas?

7   A   Well, I travel the whole United States, but, yes, I'm

8   based out of Houston.

9   Q   What is your exact title with PMC Ammunition?

10   A   I am Director of Sales and Marketing.

11   Q   And how many years have you been the Director of Sales and

12   Marketing?

13   A   Three years.

14   Q   Before that, were you also employed by PMC Ammunition?

15   A   Yes, I was.

16   Q   And what did you do then?

17   A   I was -- did sales and did any work where anybody had a

18   question about the ammunition.  I was the person to go to to

19   find what the answers were.

20   Q   For how many years did you do that?

21   A   I did that for four years prior.

22   Q   And prior to that, what did you do?

23   A   I was a salesman for another ammunition company in the

24   United States.

25   Q   How many years did you work for them?

1  A    Fifteen years for them.

2  Q    All right.  I want to speak, specifically, about PMC

3  ammunition and we're going to focus in on 38 Special PMC

4  Bronze ammunition.  Where is it manufactured?

5  A    It's manufactured in South Korea.

6  Q    And does that include the 38 Special Bronze?

7  A    Yes.

8  Q    When they're manufactured, are they stamped with a number?

9  A    Yes.  Every lot of ammunition manufactured is given a lot

10  number so we can track it in case there's a problem or

11  somebody has a question about it.

12  Q    Okay.  And so when it's stamped with that lot number,

13  whereabouts is the ammunition stamped with that number?

14  A    The box that the ammunition is placed in is stamped with

15  that number.

16  Q    And is it stamped in Korea or is it stamped here in the

17  United States?

18  A    It's stamped in Korea.

19  Q    When the lot that has the same number, the exact same lot

20  number is produced in Korea and stamped, is that whole lot

21  shipped together?

22  A    Yes, it is.

23  Q    I want to speak specifically about lot No. --

24       One second.

25       -- 38G1071.

1          Do you know when that specific lot number of 38

2   Special PMC Bronze ammunition was shipped and arrived here in

3   the United States?

4   A    It was April 11th.  It arrived around April 11th of 2014.

5   It did not clear Customs till April 14th.

6   Q    And whereabouts was that batch shipped to in the United

7   States?

8   A    It was shipped to Long Beach, California.

9   Q    So from Korea to Long Beach.  And then once the batch

10  arrived in Long Beach, was any of that ammunition shipped

11  directly to the State of Arizona?

12  A    No, ma'am.

13  Q    Do you know which states it was shipped to?

14  A    Yes.

15  Q    Can you tell us?

16  A    Oh, let's see.  It was shipped to Tennessee, Illinois,

17  Utah, Kansas, Nevada, Montana, and Nebraska.

18  Q    Can you describe for us what a "battle pack" is?

19  A    A battle pack is a plastic vinyl sleeve that we -- or PMC

20  came up with the name.  And we use it to put ammunition in so

21  it's very highly water resistant and keeps the ammunition from

22  being damaged or anything.  It's just one of our packaging

23  options.

24  Q    And what color are the battle packs that the 38 Special

25  PMC come in?

 1   A    Sand or light tan.

 2   Q    And approximately -- or how many boxes of PMC ammunition

 3   go into one battle pack?

 4   A    In 38 Special we put six in a battle pack.

 5          MS. BROOK:  Your Honor, may I please approach the

 6   witness with already-admitted Exhibit No. 23 and 29 from the

 7   Garland crime scene?

 8          THE COURT:  Yes.

 9   BY MS. BROOK:

10   Q    In looking at Exhibit No. 23, which is the one you have

11   your right hand on, do you see one of those battle packs that

12   you were just speaking about?

13   A    Yes, I do.

14   Q    And now turning your attention to 29 which is the other

15   exhibit, that one there, can you look at that and read for us

16   what the lot number is from that particular box?

17   A    38G1071.

18   Q    And is that the same lot number that we have been speaking

19   about shipped from Korea to Long Beach and then distributed to

20   seven states but not Arizona?

21   A    Yes.  That is correct.

22          MS. BROOK:  May I approach with two more exhibits?

23          THE COURT:  Yes.

24          MS. BROOK:  It's going to be 84 -- so 84 --

25   already-admitted Government's 84 from Simpson and Soofi's

1   apartment and already-admitted 118 from the defendant's house.

2   BY MS. BROOK:

3   Q   You spoke a minute ago about boxes and you said,

4   specifically, six boxes of ammunition go into each battle

5   pack.

6           Can you hold up for us and just display maybe through

7   Exhibit No. -- well 84 or whichever -- exactly what is a box?

8   A   Okay.  A box of ammunition is like so.  There's 50 rounds

9   in a box.  They're put in a cardboard box sleeve.

10  Q   And so six of those would go into a battle pack?

11  A   Yes.

12  Q   We've talked about Exhibit No. 29.  You read for us the

13  lot number.

14          Can you just reference for us Exhibit No. 84 and 118

15  and tell us if those lots numbers are the same as the one that

16  you read previously?

17  A   Yes.  They are both the same.

18  Q   You spoke a moment ago about one shipment all having a

19  unique lot number.

20          Other shipments of 38 Special Bronze PMC ammunition

21  produced in Korea by your company and shipped to the United

22  States, do they all have a separate and unique lot number?

23  A   Yes.  They do.

24  Q   And in any given year, approximately how many rounds or

25  bullets of 38 Special PMC Bronze ammunition does your company

1    produce in Korea and bring to the United States?

2    A    Yeah.   We produce two to three million rounds and ship to

3    the United States.

4              THE COURT:   Just of 38 Special rounds?

5              THE WITNESS:   Just the 38 Special.   Yes.

6              MS. BROOK:   May I have a moment?

7              THE COURT:   Yes.

8    BY MS. BROOK:

9    Q    Now, I want to go back to the battle pack quickly.

10             So that battle pack that we looked at, the battle

11   packs that were shipped with this particular lot number, was

12   this lot number only exclusively produced in the battle packs?

13   A    Yes.

14   Q    So they weren't shipped and sold individually by boxes?

15   A    No.   They were all shipped by battle pack.

16   Q    How many battle packs of this specific lot number were

17   produced and shipped in total?

18   A    Ten thousand -- let's see.   10,530 boxes.   It would be

19   1,735 battle packs.

20   Q    Okay.   So 1,755 or 35?

21   A    Fifty-five.

22   Q    Fifty-five battle packs.

23   A    Yes.

24             MS. BROOK:   In total of this specific lot number.

25             I don't have any other questions.   Thank you.

```
1            THE COURT:  Mr. Maynard?

2            MR. MAYNARD:  No questions.

3            THE COURT:  May Mr. Henderson be excused?

4            MS. BROOK:  Yes.  Thank you, Your Honor.

5            MR. MAYNARD:  No objection.

6            THE COURT:  Mr. Henderson, thank you very much, sir.

7    You may step down and you are excused as a witness.

8            The government may call its next witness.

9            MR. KOEHLER:  Your Honor, at this point we are

10   anticipating the recross of -- or not the recross, the cross

11   of Mr. Evans.

12           MS. PLOMIN:  We're prepared.

13           THE COURT:  Okay.  You may recall, ladies and

14   gentlemen, yesterday Jeffrey Evans, one of the FBI forensic

15   examiners testified.  And Ms. Plomin deferred her cross.  It

16   had to do with a problem opening a CD and not being able to

17   see something.

18           And so that's why he's coming back and the

19   cross-examination is this morning.

20           MR. KOEHLER:  While we're waiting for Mr. Evans, may

21   I approach the clerk?

22           THE COURT:  Yes.

23           And also, did somebody want to -- I don't think

24   Mr. Evans is going to be testifying about any of this

25   ammunition.
```

1          MS. BROOK:  He doesn't need the ammunition.

2          Sir, you may take the stand.  You've already been

3     sworn in this matter.

4          THE WITNESS:  Thank you, Your Honor.

5                  **JEFFREY EVANS, WITNESS, SWORN**

6                      **CROSS EXAMINATION**

7     BY MS. PLOMIN:

8     Q   Good morning.

9     A   Good morning.

10    Q   Is it Agent Evans?

11    A   No.

12    Q   Mr. Evans?

13    A   Yes.

14    Q   Okay.  Madame Clerk, could I please have Exhibit 473?

15          May I approach the clerk, Your Honor?

16          THE COURT:  Yes.

17          MS. PLOMIN:  Thank you.

18    BY MS. PLOMIN:

19    Q   Mr. Evans, I want to start talking to you about Exhibit

20    200, which was the CD that you talked about which was found in

21    Mr. Abdul Kareem's apartment.

22    A   Okay.

23    Q   And I would like to show you and the jury Exhibit 200

24    that's been admitted into evidence.

25          Now, Mr. Evans, the date that you received this item,

```
 1    it was August 3, 2015; is that correct?
 2    A    Yes.
 3    Q    And you prepared a Report of Examination in this matter,
 4    correct?
 5    A    Yes.
 6    Q    And that was dated February 24th of 2016; is that correct?
 7    A    Yes.
 8    Q    So the first time you actually went in and analyzed this
 9    CD was February 24th of 2016, correct?
10    A    It was actually a few days before that.
11    Q    Okay.  But it was just recently in the past week or so?
12    A    Yes.
13    Q    So up until that time, the CD had no interest to you or no
14    value to you in terms of evidentiary value, correct?
15    A    I only examine what I'm asked to.
16    Q    All right.  But you are a forensic computer expert; is
17    that your expertise?
18    A    Yes.
19    Q    And this CD didn't jump out at you as anything suspicious?
20    A    I only examine the evidence items that I'm asked to.  I
21    wasn't asked to examine this evidence item until just
22    recently.
23    Q    But you did receive it, yes?
24    A    The FBI was in possession of it.
25    Q    All right.  Well, I want to show you just a report, your
```

 1    February 24th report, just so that I want to be really clear.

 2            Do you recognize that as your report that you wrote?

 3    A   Yes.

 4    Q   And the date the items on the report were received was

 5    August 3rd, 2015?

 6    A   That's the first date that all the items -- any item that

 7    I examined for this case.

 8    Q   Okay.  And this DVD is labeled QPX_107 and that is among

 9    the list of items you received on August 3rd, 2015?

10    A   That's correct.  It's labeled QPX_107.

11    Q   And when you saw this, it didn't jump out to you as

12    something that was important to examine; is that true?

13    A   I didn't see it until I was asked to examine it.

14    Q   Okay.  Now, I'm going to put Exhibit 200 back on the

15    screen here.

16            Now, this type of CD, just for clarification, it's

17    obviously handwritten.  The title "Hirens 15.1" is obviously

18    handwritten, true?

19    A   True.

20    Q   So it's not a produced CD that you buy at the store,

21    right?

22    A   That is correct.

23    Q   All right.  So would a person download this from the

24    Internet and it's free software, correct?

25    A   That is correct.  You go to a website and download what's

1  called an ISO file.  And then you'd use a computer to burn it

2  out to the CD.

3  Q   And, in fact, these types of CDs contain -- or this CD, in

4  particular, contains all kinds of tools that you can use -- a

5  person can use on their computer aside from just deleting

6  files or cleaning a computer, correct?

7  A   That is correct.

8  Q   All right.  And, in fact, these types of CDs are used

9  routinely by computer shops and repair places in order to

10  maybe clean a used computer for a new user, correct?

11  A   Yes.

12  Q   To copy files, correct?

13  A   Yes.  They could be.

14  Q   It has antivirus software on it, right?

15  A   I believe it does, yes.

16        MS. PLOMIN:  All right.  Your Honor, may I approach

17  the witness with Exhibit 473 just to refresh his recollection

18  if he needs to?

19        THE COURT:  Is that the original 473?

20        MS. PLOMIN:  Yes.

21        THE COURT:  If you hand it to Maureen, she'll hand it

22  to the witness.

23        THE WITNESS:  Thank you.

24  BY MS. PLOMIN:

25  Q   Okay.  Mr. Evans, so we're both looking at Exhibit 473 and

```
 1    I have a copy here for the screen.
 2           So let's just start where it says "Antivirus Tools"
 3    at the top left-hand corner of the document -- well, let me
 4    back up.
 5           This document is essentially a summary of everything
 6    that was on the Hiren CD; is that right?
 7    A    That's correct.  It's actually a file from the CD itself.
 8    Q    So it's essentially an index?
 9    A    You can think of it like an index, yes.
10    Q    And where it says "Antivirus Tools" bracketed by the two
11    lines, two horizontal lines, that is essentially the kind of
12    title for all of the tools below it that would fall into
13    antivirus tools, correct?
14    A    That's correct.
15    Q    And the Antivirus Tools is like a category; is that fair
16    to say?
17    A    Yes.
18    Q    And there on this CD on this index there are actually 15
19    categories of tools that a user can use for various reasons on
20    a computer, true?
21    A    It looks like there could be even more than 15, just doing
22    a quick count of the sections.
23    Q    Okay.  So at least 15?
24    A    Were you asking just the sections or just the tools for
25    antivirus?
```

1    Q    The sections.

2    A    The sections.  Yeah, at least 15.

3    Q    And the "Cleaning" section, that's one of those 15 or more

4    sections on this index; is that true?

5    A    That is correct.

6    Q    So let's start.

7         Can you read to the jury each of the categories that

8    are listed on this index?

9    A    Sure.  The first is "Antivirus Tools."

10        The next one would be "Backup Tools" towards the

11   bottom of that page.

12        The next page does not have a section on it.

13        Page 3, the first one on page 3 is "BIOS/CMOS.

14   C-M-O-S Tools."

15        After that is "Browsers/File Managers."

16        On page 4 section "Cleaners."

17        On page 5 we have "Device Driver Tools."

18        "Editors/Viewers."

19        On page 6 we have "FileSystems Tools" and "Hard Disk

20   Tools."

21        There's not another section on page 7.

22        On page 8 we have "MBR (Master Boot Record) Tools."

23        On page 9 we have "MS DOS, D-O-S, Tools."

24        On page 10 there are "Network Tools."

25        And then the next section is "Optimizers."

```
 1            On page 11 we have a category "Other Tools."

 2            Then another category at the bottom "Partition

 3   Tools."

 4            On page 12 we have "Password Tools."

 5            On page 13 there is "Process Tools."

 6            On page 14 is "Recovery Tools."

 7            On page 15 we have "Registry Tools.

 8            "Remote Control Tools."

 9            "Security/Encryption Tools."

10            On page 16 there are "Startup Tools" and "System

11   Information Tools."

12            On page 17 there is "Testing Tools" and "Tweakers."

13   T-W-E-A-K-E-R-S.

14            And that appears to be all the sections.  Page 18

15   does not have a new section.

16   Q   This document will be in evidence for the jury to read

17   more thoroughly, but under each of the categories there's

18   essentially a title of a tool and then a description of what

19   it is.  Is that fair to say?

20   A   That is correct.

21   Q   And this CD, with all of these tools, it could be used for

22   organizing files.  There are tools to organize files, correct?

23   A   There are.

24   Q   All right.  And to backup your files and things like that,

25   keep your computer safe, correct?
```

1  A   That is correct.

2  Q   All right.  And if a computer isn't working properly, if

3  it's overloaded or there are issues with the computer, there

4  are tools on here that would be used in order to repair it,

5  correct?

6  A   That is correct.

7  Q   And I would just like to give you a scenario and ask you

8  if it's a logical scenario.

9         If a computer shop were to have this CD, Exhibit No.

10  200, if a computer shop were to have that CD, and a person

11  were to bring in a laptop that wasn't working correctly and

12  then trade in that laptop for a new laptop -- that was

13  actually used but a new laptop to that person -- would it be

14  logical that the computer shop would use the tools on this CD

15  to either try and fix the initial laptop or to clean the used

16  laptop to give to the new user?

17         Was that a logical scenario?

18  A   Yes.

19  Q   And just one last question.  Would it also be logical to

20  use the tools on that CD on Exhibit 200 to transfer files from

21  one computer to another?

22  A   You could do that.

23         MS. PLOMIN:  No further questions.

24         THE COURT:  Mr. Koehler, any questions on redirect?

25         MR. KOEHLER:  Your Honor, may I approach the exhibit

1    box?

2              THE COURT:  Yes.

3                   **REDIRECT EXAMINATION**

4    BY MR. KOEHLER:

5    Q   Mr. Evans, when we spoke yesterday, I had you talk about

6    this notebook; is that correct?

7    A   That is.

8    Q   And is this the same notebook that we talked about

9    yesterday and that you found in the living room of the

10   apartment?

11   A   It is.

12             MS. PLOMIN:  Objection.  Outside the scope.

13             THE COURT:  It may very well be, but I want to hear

14   the next question.

15             MR. KOEHLER:  Moving to admit 354.

16             THE COURT:  He forgot to move to admit it yesterday.

17             MS. PLOMIN:  No objection.

18             THE COURT:  354 is admitted.

19        (Exhibit No. 354 admitted in evidence.)

20             MR. KOEHLER:  May I approach the clerk?

21             THE COURT:  Yes.

22   BY MR. KOEHLER:

23   Q   Mr. Evans, when was the first time you saw this CD?

24   A   It was, I believe, Tuesday.

25             MR. KOEHLER:  No further questions.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

```
 1              THE COURT:  May this witness be excused, Mr. Koehler?

 2              MR. KOEHLER:  Yes, Your Honor.

 3              THE COURT:  Is there any objection?

 4              MS. PLOMIN:  No, Your Honor.

 5              THE COURT:  Thank you, Mr. Evans.  You may step down

 6   and you are excused as a witness.

 7              THE WITNESS:  Thank you.

 8              THE COURT:  The government may call its next witness.

 9              MS. BROOK:  Thank you, Your Honor.

10              The government calls Mustafa Hussan.

11              If you walk straight up to Maureen, she will swear

12   you in.

13        (Witness duly sworn)

14              THE CLERK:  Please state your name for the record,

15   spelling your first and last name.

16              THE WITNESS:  Mustafa Hussan.  M-U-S-T-A-F-A.  And

17   then last name H-A-S-S-A-N.

18                    MUSTAFA HUSSAN, WITNESS, SWORN

19                         DIRECT EXAMINATION

20   BY MS. BROOK:

21   Q    Good morning.

22   A    Good morning.

23   Q    What's your name?

24   A    Mustafa Hussan.

25   Q    And how old are you?
```

1    A    Twenty.

2              THE COURT:  Can I ask you to pull the microphone down

3    just a little bit.  I think that would be fine.

4              THE WITNESS:  Better?

5              THE COURT:  Yes.

6              MS. BROOK:  And if you'll just speak directly into

7    that mic, everybody can hear you.

8              THE WITNESS:  Okay.

9    BY MS. BROOK:

10   Q    Do you live here in Phoenix.

11   A    Yes, I do.

12   Q    And how long have you lived here?

13   A    Twenty years.  I was born so --

14   Q    You lived here all your life?

15   A    Yeah, all my life.

16   Q    Back on April 30th of 2015, back last year April?

17   A    Yes.

18   Q    Were you working at a restaurant by the name of Khyber

19   Halal?

20   A    Yes, I was.

21   Q    And what did you do at the restaurant?  What was your job?

22   A    Mainly cashier, but I was doing other jobs as well, like

23   cleaning up and just like a manager job.

24   Q    And do you do anything else?  Do you go to school or do

25   you have any other jobs?

1   A   I don't have any other jobs, but I attend college, ASU.

2   Q   So let's go back to April 30th and I want to talk a little

3   bit about the restaurant for a moment.

4           You mentioned the name is Khyber Halal?

5   A   Yes.

6   Q   What type of food does it serve?

7   A   Mainly like Afghani food, Pakistani, Indian food, things

8   like that.

9   Q   Is the restaurant a halal restaurant?

10  A   Yes, it is.

11  Q   I know that that's part of the name of the restaurant, but

12  what does that mean if it's "halal"?

13  A   It's similar to kosher.

14  Q   So is the food blessed or prepared in an particular way?

15  A   The food isn't -- I mean, we go through us to make the

16  food.  And the meat -- whoever gives us the meat or the place

17  where we buy it from, they -- I'm guessing that they sort of

18  halal it or --

19  Q   So the ingredients that go into the food themselves are

20  prepared -- you believe, at least, in a way that's halal or

21  has some sort of a special preparation?

22  A   Well, the food we just prepare like normal food, but I

23  mean, yeah, pretty much.

24  Q   Okay.  I want to talk about the restaurant and how it's

25  set up.  Can you tell us generally where it's located, like

1    its cross streets?

2    A   It's on 4030 North 24th Street and Indian School.

3    Q   Describe for us what the inside of the restaurant looks

4    like.  Is it a large restaurant or a smaller restaurant?

5    A   I would say it's sort of like a small restaurant.  It fits

6    about 50 people.  There's about eleven tables in the

7    restaurant and yeah.

8    Q   You mentioned that you work at the cash register?

9    A   Yes.

10   Q   So when people come in to get food, do they go in and sit

11   down and take a menu and have somebody come to them?  Or do

12   they order at the register?

13   A   Some people, if they're going to do -- if they do

14   take-out, they order at the register.  But if they were to

15   dine in, we would hand them the menus, they would sit down,

16   and someone would meet them and take their order.

17   Q   So it sort of provides both services, depending upon if

18   it's take-out or if it's dine-in.

19   A   Yeah.  Uh-huh.

20   Q   And you spoke about the register itself.

21       When you work at the restaurant, are you at the

22   register and then in the front part of the restaurant or are

23   you back in the kitchen area?

24   A   I'm always going to be at the front by the cash register

25   or in that area.

1    Q    You said that it's a smaller restaurant.  It seats maybe

2    about 50 people at most.  I'm going to place -- there's a TV

3    screen right there next to you.  I'm going to put up on that

4    screen Exhibit No. 475 which has not yet been admitted.

5              Do you recognize what's in that picture?

6    A    Yep.

7    Q    And what do you see?

8    A    Tables.  Pictures.  Rugs.

9    Q    Is that the inside of the Khyber Halal?

10   A    Yes, it is.

11             MS. BROOK:  Your Honor, the government moves to admit

12   and publish 475.

13             MR. MAYNARD:  No objection.

14             THE COURT:  475 is admitted.

15        (Exhibit No. 475 admitted in evidence.)

16   BY MS. BROOK:

17   Q    This area that we're looking at here, is that the seating

18   area or the dining area of the restaurant?

19   A    Yes, it is.

20   Q    And not pictured in this photograph but off to the side --

21             Well, where would the register be?

22   A    Well, to the right.

23   Q    Okay.  So would it be kind of over this way a little bit?

24    (Indicating)

25   A    A little further to the right.

1    Q    Okay.  So if we are imagining a big room, it's more over

2    towards the side?

3    A    Yes.

4    Q    Okay.  You spoke about the type of food that the

5    restaurant serves.  Does it also serve a type of cheeseburger?

6    A    Yes, just a regular cheeseburger.

7    Q    A regular cheeseburger?

8    A    Yeah.

9    Q    So along with the Afghani and Indian food, it also serves

10   some American-type food?

11   A    Yes, it does.

12   Q    On Thursday, April 30th, we've talked about you working

13   that particular day.  Did three men come into the restaurant

14   that you had seen before?

15   A    Yes, they did.

16   Q    And one of them in particular, was he a regular?

17   A    I wouldn't really say a regular, but, yeah, I had seen him

18   on some occasions when they would come.

19   Q    I'm going to place on the overhead what's already been

20   admitted as Government's Exhibit No. 129.

21         Do you recognize that person?

22   A    Yes.

23   Q    And who do you see in that photo?

24   A    I don't know him by name, but --

25   Q    Is that one of the three men that came in that day?

1    A    Yes.

2    Q    Did that particular individual have an order that he

3    ordered more frequently?

4    A    Yeah.  He -- I mean, he usually ordered the cheeseburger.

5    Q    Okay.  You mentioned that he came in with two other

6    people.

7    A    Yes.

8    Q    And can you describe those other two people?

9    A    One of them was shorter.  He was kind of chubbier.  And

10   then the third one was kind of muscular and, yeah, like big.

11   Q    And here with us in the courtroom today do you see him?

12   A    Yes.  He's over there. (Indicating)

13   Q    Can you point to him and describe something that he's

14   wearing?

15   A    Right there.  Blue shirt. (Indicating)

16        MS. BROOK:  Your Honor, may the record reflect that

17   the witness has identified the defendant?

18        THE COURT:  Yes.

19   BY MS. BROOK:

20   Q    On that day when this man and the defendant came into the

21   restaurant, you mentioned that they were with a third man as

22   well.  Do you remember about what time it was they got there?

23   A    It was kind of dark, so I would say maybe 5:00 to 7:00.

24   Q    And when they came in, did they come in and sit and order

25   and stay or something else?

1    A    They got take-out.

2    Q    Describe for us what you saw.

3          So they came in and where did they go?

4    A    They just -- they ordered their food and then they just

5    went outside.

6    Q    Okay.  And so when the defendant and this man here came in

7    with the third man, they came to order food.  So did they come

8    to you or somewhere else?

9    A    They came to the cash register where I was standing and

10   then they ordered their food.

11   Q    Okay.  And after they ordered their food, where did they

12   go?

13   A    They just went outside.

14   Q    I want to talk about how they were interacting with each

15   other when they ordered their food.  How were they

16   interacting?  You had mentioned you had seen them before on

17   other occasions.  How were they interacting?

18   A    Just like normal people with just conversation when -- or

19   I didn't really see them have like conversation when they were

20   inside.  They just ordered their food and then they just went

21   outside, so.

22   Q    Okay.  And from what you saw of them, was anybody angry or

23   upset?

24   A    No.

25   Q    You mentioned that they went outside.  About how long does

```
1   it take approximately once you put a take-out order in for

2   that take-out order to be cooked and then produced?

3   A   About 15 to 20 minutes at the most.

4   Q   And you mentioned that they didn't stay inside the

5   restaurant.  They went outside the restaurant?

6   A   Yes.  They went outside.

7   Q   Could you see them when they were outside?

8   A   No.

9   Q   And then at the end when the order was up, what happened?

10  A   I just left the food on the counter.  And then whenever

11  they felt that their food might be ready, they would come in

12  and take their food.

13  Q   And I just want to rewind for a minute back to the point

14  where the order was placed.

15         So you saw this man and the defendant and did all

16  three of the men come and approach the counter together?

17  A   No.  They didn't.

18  Q   Did one order for all of them?

19  A   Yes.

20  Q   And do you remember which one?

21  A   Yes.

22  Q   Who?

23  A   The gentleman sitting over there.

24  Q   Eight days after this particular day, so eight days after

25  this Thursday, the following Friday, did the FBI come out to
```

```
 1   your restaurant and talk to you?

 2   A   Yes, they did.

 3   Q   And did they take a statement from you?

 4   A   Yes, they did.

 5   Q   When you were working at the counter, were you working

 6   also with another employee?

 7   A   Yes, I was.

 8   Q   And what was her name?

 9   A   Sayeda Ahmadi.

10        MS. BROOK:  I don't have any other questions.

11        THE WITNESS:  Okay.  Thank you.

12        THE COURT:  Mr. Maynard?

13                    CROSS EXAMINATION

14   BY MR. MAYNARD:

15   Q   Had you seen Abdul Malik before?

16   A   At the restaurant, yes.

17   Q   Yeah.  He's somebody that came into the restaurant

18   periodically?

19   A   Not on like a daily basis.  Once in a while he would come

20   and eat some food.

21   Q   But he wasn't a stranger to you?  He had been in there

22   over the past year or so?

23   A   I would say so, yes.

24   Q   And Mr. Simpson, the man whose picture is on, he came in

25   there more often?
```

1    A    I would say yes.

2    Q    And he normally ordered cheeseburgers?

3    A    Yeah.

4    Q    And that's the reason you remember him?

5    A    Yeah.

6    Q    Okay.  The other fellow that came in, you just don't

7    recall -- do you recall whether he came in periodically or

8    not?

9    A    I wouldn't say periodically, but he would come like maybe

10   once or twice.  I have seen him before.

11   Q    You just don't know what his name was?

12   A    I don't.

13        MR. MAYNARD:  Okay.  I don't have any further

14   questions.

15        THE COURT:  Any other questions?

16        MS. BROOK:  No, Your Honor.  Thank you.

17        THE COURT:  May Mr. Hussan be excused as a witness?

18        MS. BROOK:  Yes.

19        THE COURT:  Any objection?

20        MR. MAYNARD:  No.

21        THE COURT:  Thank you very much.  You may step down

22   and you are excused as a witness.

23        THE WITNESS:  Thank you.

24        MR. KOEHLER:  The United States called Gregory

25   Neville.

```
1        (Witness duly sworn)
2             THE CLERK:  Please state your name for the record and
3    spell your last name.
4             THE WITNESS:  Greg Neville.  N-E-V-I-L-L-E.
5             THE COURT:  You may proceed, Mr. Koehler.
6                   GREGORY NEVILLE, WITNESS, SWORN
7                        DIRECT EXAMINATION
8    BY MR. KOEHLER:
9    Q   Good morning, Mr. Neville.  Could you please introduce
10   yourself to the jury.
11   A   My name is Greg Neville.  I'm an Intelligence Analyst with
12   the FBI.
13   Q   How long have you worked for the FBI?
14   A   Ten months.
15   Q   And what did you do before working for the FBI?
16   A   I worked for a contract security company managing the
17   contract between that company and a private company.
18   Q   And how long were you in that position?
19   A   Seven years.
20   Q   Let's talk about your work for the FBI.
21            What kind of training have you received as an
22   Intelligence Analyst for the FBI?
23   A   I received ten months of training at Quantico for new
24   Intelligence Analysts.  I have also received five days of
25   additional training in open source research and exploitation.
```

1   Q   Do you do open source research -- open source research and

2   exploitation on a daily basis in your job?

3   A   Yes, I do.

4   Q   Can you tell the jury in general terms what open source

5   research and exploitation means.

6   A   Generally speaking, that's anything that is publicly

7   available.  Most of it consists of social media, so it is the

8   collection and exploitation of social media intelligence.

9   Q   And what kind of social media sites do you go to to

10  exploit for open source information?

11  A   Things like Twitter, Facebook, Google+, anything along

12  those lines.

13  Q   When you are looking at those kind of sites, what kind of

14  material on those sites would you describe as being open

15  source?

16  A   Anything that's publicly available for view, so anything

17  that the public could go to and see.

18         THE COURT:  So when I think of something like

19  Facebook or Twitter, I think about having an account and then

20  having certain people that I communicate with but they are the

21  only ones that see what I have communicated.

22         THE WITNESS:  Yes, Your Honor.  There are two

23  different ways you can do it.  You can have your account set

24  to be "private" so that only certain people can see it or you

25  can have a "public" account where anyone can see anything

1    posted to your wall.  That's true for both Facebook and

2    Twitter.

3    BY MR. KOEHLER:

4    Q    In your day-to-day work at the FBI, have you also received

5    on-the-job training in this realm?

6    A    Yes, I have.

7    Q    Do you also conduct work and exploitation of items gained

8    through search warrants of social media accounts?

9    A    Yes, I do.

10   Q    And the same thing for cell phone records?

11   A    Yes.  We receive training for communication analysis.

12   Q    Can you explain the kinds of things you do to exploit

13   social media account information that comes from a search

14   warrant?

15   A    Can you clarify the question for me?

16   Q    Okay.  When you get something via a search warrant through

17   social media, what kinds of things do you get?

18   A    The accounts come back -- let's talk about Twitter

19   specifically -- in zipped files that contain the account

20   images.  Those are images that would be associated with

21   tweets.  All the tweets themselves, direct messages, the

22   account info, as far as when it was set up, when it was

23   suspended or ended.  I believe that's all I can recall.

24   Q    Where does that information get stored when it comes via

25   search warrant?

1    A    That information is stored into our file management

2    system.

3    Q    And what's that system called?

4    A    Sentinel.

5    Q    And when you receive call detail records, are those,

6    likewise, stored in Sentinel?

7    A    Yes, they are.

8    Q    And from where do you get call detail records?

9    A    Those can come back from like T-Mobile subpoenas, things

10   like that.

11   Q    Okay.  So in other words, directly from the cellular

12   service provider?

13   A    Yes, sir.

14   Q    Do you also occasionally review information that comes

15   from search warrants that have been executed or consent

16   searches of electronic devices including cellular telephones?

17   A    Yes, sir, I do.

18   Q    What system do you use to gain access to that information?

19   A    That information -- or that system is called CAIR.

20   Q    Do the CAIR or Sentinel systems allow you in any way to

21   alter the data that has been obtained either via subpoena,

22   search warrant, or otherwise?

23   A    No, sir.

24   Q    In this case did you obtain text records from cellular

25   telephones belonging to Abdul Malik Abdul Kareem with a cell

```
 1    phone number 623-204-7295?

 2    A   Yes, sir.

 3    Q   Did you also get access to records from the search warrant

 4    of the cell phone of Elton Simpson with a phone number

 5    623-313-6382?

 6    A   Yes, sir.

 7    Q   Did you also get access to call detail records from

 8    T-Mobile for both of those phone numbers?

 9    A   Yes, sir, I did.

10    Q   And did T-Mobile certify the authenticity of the records

11    that they provided to the FBI?

12    A   Yes, sir.

13    Q   Did you also get call detail records for a phone belonging

14    to Nadir Soofi with the phone number 602-518-5840?

15    A   Yes, sir.

16    Q   Same certification?

17    A   Yes, sir.

18    Q   In the course of your work, did you also obtain access to

19    Twitter records that had been obtained via search warrant?

20    A   Yes, sir.

21    Q   Was one of those records for account number 2827006337?

22    A   Yes, sir.

23    Q   And another one 3062911044?

24    A   Yes, sir.

25    Q   And 3070170972?
```

```
1    A    Yes, sir.

2    Q    Another one 3092582583?

3    A    Yes, sir.

4    Q    And 3121473777?

5    A    Yes, sir.

6    Q    3154850044?

7    A    Yes.

8    Q    And finally, 3161708545?

9    A    Yes, sir.

10   Q    Did all those accounts relate to a particular individual?

11   A    Yes, sir.  Those were all belonging to Elton Francis

12   Simpson.

13   Q    And did Twitter, likewise, provide a certification of

14   authenticity of all of those account records?

15   A    Yes, they did.

16   Q    I want to now direct your attention to what's been marked

17   for identification as Government's Exhibit 478.

18             Did you analyze the cellular telephone call detail

19   records that you received from T-Mobile?

20   A    Yes, sir, I did.

21   Q    And during the course of that analysis, did you summarize

22   the number of calls and the dates of call volume and length of

23   calls and that kind of information?

24   A    Yes, sir, I did.

25   Q    Is Exhibit 478 a true and accurate summary of that?
```

1   A   Yes, it is, sir.

2   Q   Does it also contain information about text messages that

3   you gleaned from the execution of the search warrants on Elton

4   Simpson's telephone and Abdul Malik Abdul Kareem's phone that

5   I described earlier?

6   A   Yes, sir.

7   Q   Does it fairly and accurately depict the call detail

8   records and the text records that came from the search

9   warrants?

10  A   Yes, sir.

11          MR. KOEHLER:  Move to admit 478.

12          MS. PLOMIN:  Your Honor, objection.  Request a

13  sidebar.

14          THE COURT:  The only objection would be if this were

15  not an accurate summary of voluminous records.

16          MS. PLOMIN:  I don't know that.

17          THE COURT:  Have you received the voluminous records?

18          MS. PLOMIN:  Yes.

19          THE COURT:  Is this suggestion that you just haven't

20  had a chance to verify the accuracy?

21          MS. PLOMIN:  Yes.

22          THE COURT:  I'm going to conditionally admit 478 so

23  that we can move on.

24          And if you later convince me that this is not an

25  accurate summary of the voluminous records, then we will

1  revisit the admission of 478, but at this time 478 is

2  admitted.

3       (Exhibit No. 478 admitted in evidence.)

4  BY MR. KOEHLER:

5  Q   So, Mr. Neville, let's talk first about the number of

6  telephonic communications exchanged between Abdul Malik Abdul

7  Kareem and Elton Simpson and Nadir Soofi.

8  A   So there were a total of 659 telephonic communications

9  between Abdul Malik Abdul Kareem, Elton Simpson, and Nadir

10  Soofi.

11  Q   How many of those were actual telephone calls?

12  A   262 of those were phone calls.

13  Q   Among those 262 calls, were there calls that didn't

14  correlate between the two sets of phone records?

15  A   Yes, sir.  We found eight calls that were on Abdul Malik

16  Abdul Kareem's records that were not on Elton Simpson's and an

17  additional 14 calls that were on both records but had a

18  zero-second time duration.

19  Q   So ruling out those 22 as likely not connected calls, how

20  many total phone calls?

21  A   That would be 240, sir.

22  Q   And how many of those calls went to Nadir Soofi?

23  A   Of those calls, five were with Nadir Soofi.

24  Q   And so the remainder with Elton Simpson?

25  A   235, sir.

1   Q   How many text messages exchanged?

2   A   There were 397 total messages exchanged.

3   Q   And just to make it clear, what is the time period we're

4   discussing here?

5   A   This is from January 1st to May 4th, 2015.

6   Q   So from the beginning of the year to the day after the

7   event in Garland, Texas; is that correct?

8   A   Yes, sir.

9   Q   Did you also look for calls of lengthier duration?

10   A   Yes, sir, I did.

11   Q   And how many calls were 15 minutes or more in duration?

12   A   I identified 13 calls that were 15 minutes or more in

13   duration.

14   Q   I'm sorry.  Can you look at the record again.

15   A   I'm sorry.  13 calls -- oh, 15 minutes or more?  Nine

16   calls, I'm sorry, that were 15 minutes or more duration.

17   Q   You have above that 13 that were ten minutes or more.  Did

18   that include the nine calls that were more than 15?

19   A   Yes, sir.

20   Q   So there are nine that are 15 or more and four that are

21   between 10 and 15?

22   A   Yes, sir.

23   Q   Can you identify for the members of the jury the days with

24   the most telephonic communication?

25   A   Yes, sir.  On February 9th, 2015, there were 30 calls and

1    texts exchanged between them.

2           On March 17th there were 22 calls and texts

3    exchanged.

4           March 23rd, 20 calls and texts.

5           March 30th, 24 calls and texts.

6           April 6th, 24 calls and texts.

7           And April 16th, 28 calls and texts.

8    Q   Okay.  Rather than have you list off all the days with no

9    communication, can you tell the jury how many days in January

10   they went without any telephonic communication?

11   A   There were four days in January.

12   Q   And in February?

13   A   There were three days in February.

14   Q   And how many in March?

15   A   There were nine days in March.

16   Q   And how many in April?

17   A   There were 11 days in April.

18   Q   Let's talk about the text messages.

19          Did you focus on particular things in this excerpt of

20   the text messages between Mr. Simpson and Abdul Malik Abdul

21   Kareem?

22   A   Yes, sir.  I was looking for communication that indicated

23   they had been together or were going to be together.

24   Q   Let's look at March 12th as an example of what in the text

25   message series told you that they would be together.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1           And if you could please read the sender and the time
2      and what they said.
3      A   At 8:12 Elton Simpson said:  "Won't be able to be here too
4      much longer."
5           At 8:12 p.m. Kareem replied:  "I'll be right there
6      leaving now."
7           At 8:14 Simpson said: " Okay but I still won't be
8      here to long when you come...have another errand to run insha
9      Allah."
10          At 8:14 Simpson said:  "I've Ben here since 7:45."
11          Then 8:14 he cleaned up the "Been."
12          8:15 Kareem said:  "How to be patient I'm coming
13     right now pick the phone up and call me."
14     Q   All right.  And did you see similar communications showing
15     that there was a likelihood of them meeting on the other days
16     that you have listed in the text messages that are in this
17     record?
18     A   Yes, sir.
19     Q   I want to skip forward now to April 6th of 2015.
20          Did you see indications that they were getting
21     together that day as well?
22     A   Yes, I did, sir.
23     Q   And can you tell us about starting at 4:08 p.m.?
24     A   Can I get it pulled up on the screen, please?
25     Q   Yes.

1  A   At 4:08 p.m. Simpson sends a message asking:  "You close?"

2        4:15 p.m. Kareem replies:  "Leaving house be there in

3  ten minutes."

4        4:20 Simpson replies:  "Okay."

5        4:29 Simpson says:  "Let me know when you are close."

6        4:29 he says:  "I will come out."

7        4:29 Simpson says:  "Insha Allah."

8  Q   Now, did something different happen in their text messages

9  on this day than you had seen in other days?

10  A   Yes, sir.  There were two picture messages sent.

11  Q   Are the two pictures depicted on the next page?

12  A   Yes, sir, they are.

13  Q   In general terms, can you describe what those two pictures

14  are?

15  A   Those are two pictures of insurance cards.

16  Q   And can you look at the right-hand side card and read off

17  the names of the named insured and the authorized driver?

18  A   It is Maria E. Gonzalez and the listed driver is Marcos

19  Fabian.

20  Q   Which direction were these pictures sent?

21  A   The first one, I believe, was the left; the second one on

22  the right.

23  Q   And who sent them to whom?

24  A   Simpson sent them to Abdul Kareem.

25  Q   And this is the night of April 6, 2015?

1   A    That is correct.

2   Q    I now want to skip forward to April 30, 2015.

3          Can you see communications between Elton Simpson and

4   Abdul Malik Abdul Kareem on April 30, May 1st, May 3rd, and

5   May 4th?

6   A    Yes, sir.

7   Q    And can you go through and read off what those

8   communications were.

9   A    Yes.  On April 30th at 3:42 p.m. Kareem calls Simpson.

10  That call was one minute or less in duration.

11         At 3:44 Kareem sends a message to Simpson saying:

12  "Salaam walaikum brother give me a call when you get this

13  message."

14  Q    Okay.  And at 6:15 p.m.

15  A    Kareem calls Simpson.  That conversation is two minutes.

16         7:02 Simpson calls Kareem, one minute.

17         7:03 p.m. Kareem calls Simpson, two minutes.

18         7:12 Simpson calls Kareem, seven minutes.

19         And at 9:12 Simpson calls Kareem, seven minutes.

20  Q    Now, on May 1st.

21  A    On May 1st at 8:40 p.m. Kareem calls Simpson.  It's a

22  one-minute or less duration call.

23         At 9:12 p.m. Simpson sends a message saying:  "Wa

24  alaykim salam wrwb...sorry about yesterday for the punches and

25  for today akhi.  I won't be able to make it...I know you

1    hooked it up though lol."

2    Q    Before you read the next message, he used the word "akhi."

3    Is that a term with which you have become familiar during the

4    past ten months working at the FBI?

5    A    Yes, sir.

6    Q    Is it something you see regularly?

7    A    Yes, sir.

8    Q    To what does that term refer to?

9    A    It usually refers to "brother."

10   Q    Okay.  Go ahead.

11   A    At 9:28 Kareem sends:  "No problem brother but I didn't

12   cook it."

13          9:28 Kareem sends:  "Bye am going to cook it tomorrow

14   insha Allah."

15          9:28 Kareem sends:  "And I want the brothers to

16   come."

17          9:29 p.m. Kareem says:  "Notice I said brothers."

18          9:29 p.m. Kareem says:  "Would that be okay with

19   y'all."

20   Q    Did Simpson ever respond to any of those messages?

21   A    No, sir.

22   Q    Did he call back or anything?

23   A    No, sir.

24   Q    Okay.  Let's go to May 3, 2015.

25   A    At 11:58 on May 3rd, 2015, Kareem calls Nadir Soofi.

1    Q    And are you familiar with the time difference between

2    Arizona and Texas?

3    A    I am not, sir.

4    Q    Okay.  I want you to move forward to May 4th.

5    A    May 4th at 1:26 a.m. Kareem calls Elton Simpson.

6         8:29 a.m. Kareem calls Nadir Soofi again.

7    Q    What was the duration on those last three calls?

8    A    All three were one minute.

9    Q    Or less?

10   A    Or less.  One minute as billed by T-Mobile.

11   Q    I want to now turn your attention to what's been marked

12   for identification as Exhibit No. 479.

13        Did you also isolate texts of Mr. Abdul Malik Abdul

14   Kareem on May 3rd and 4th of 2015?

15   A    Yes, I did.

16   Q    And are these all of his texts from that day?

17   A    No.  They are not.

18   Q    Okay.  Are they an excerpt thereof and what have you

19   removed?

20   A    They are an excerpt.  I removed some of the texts that

21   included personal identifiable information.

22   Q    So with the exception of people sending personal

23   identifiable information, this is otherwise a true and

24   accurate copy of the record of his texts that day?

25   A    Yes, sir.

1   Q   And when you mentioned personal identifiable information,

2   what types of texts was he getting that contained or sending

3   that contained personal identifiable information?

4   A   From the content I concluded that they were texts for

5   moving, part of his business, and they were including things

6   like the name, address, phone number for a client.

7   Q   All right.  Is this otherwise an accurate representation

8   of the texts that came from the search warrant on his phone

9   for that day or those two days?

10   A   Yes, sir.

11           MR. KOEHLER:  Move to admit 479.

12           MS. PLOMIN:  No objection.

13           THE COURT:  479 is admitted.

14       (Exhibit No. 479 admitted in evidence.)

15   BY MR. KOEHLER:

16   Q   So if you would start at the top and make your way through

17   and read these texts for the jury.

18   A   Okay.  So this is from number 16236802020.  Time is

19   6:56:07 a.m. on May 3rd, 2015.  Message reads:  "Just wanted

20   to check with you if it would be possible if you could push it

21   back to 11 a.m."

22           This is to that number 16236802020 --

23   Q   And from this point forward can you just refer to that as

24   the "2020" number?

25   A   Yes, sir.

1          From the 2020 -- or to the 2020 number at 9:44 a.m.

2     Sent:  "Okay."

3          At 9:45 a.m. sent to the 2020 number:  "I'll be there

4     at 11."

5          From the 2020 number at 9:53 a.m.:  "Thank you so

6     much."

7     Q   From that series of conversations, what did that look

8     like?

9     A   I suspect that to be a client.

10    Q   Okay.  And now from the next phone call -- you can just

11    use the name if there's a context.

12    A   So to Lafayette sent at 10:00 a.m.:  "Pick up the phone."

13         To Lafayette at 10:09 a.m.:  "Hi Abdul, this is

14    Jessica.  May 3rd move date at 27524 North 17th Lane Phoenix

15    85085."

16    Q   So looking at that and the previous message, what did it

17    look like was happening there?

18    A   It looks like he was forwarding an address for a potential

19    client.

20    Q   Okay.  Now moving on to the next message.

21    A   From Lafayette:  "Got it."

22         To Lafayette:  "6236802020 that's her phone number."

23    Q   Okay.  And then the next message.

24    A   From Lafayette:  "Just called her."

25         From Lafayette at 10:14:38 a.m.:  "What's the

1    hourly."

2          From Lafayette at 10:25 a.m.:  "How much do you got

3    her at."

4    Q   Okay.  Can you move on to the next conversation?

5    A   To 4808860131 at 12:35 p.m.:  Hey Mike how you doing this

6    is Abdullah I'm running a couple minutes late I had to go pick

7    up the -- pick the trailer up and I'm on my way I just tried

8    to give you a call but didn't get any answer.

9          From that 60131 number at 1:26 p.m.:  "Had to stop by

10   the bank just arrived here."

11   Q   Next conversation.

12   A   From Chris:  "Yo carus I need you to PayPal me that $100

13   today please."

14   Q   Next?

15   A   From 14808860131 at 2:10 p.m.:  "2501 east Avalon Drive.

16   85016."

17   Q   So from those messages did you gather that was another

18   move being arranged?

19   A   Yes, sir.

20   Q   Okay.  Go on.

21   A   To Chris at 2:11 p.m.:  "Chris give me a minute I'll give

22   you a call right back."

23          From 6236802020 at 2:31 p.m.:

24   "Jesmarie76@gmail.com."

25   Q   So the "2020" number sent him an e-mail address?

1   A    Yes, sir.

2   Q    Okay.  Moving forward.

3   A    From 4804488365 at 5:59 p.m.:  "Hello brother."

4          From the same number ending in "8365" at 6:01 p.m.:

5   "Brother."

6          From the same number ending in the "8365."  "Are you

7   there?"  That's at 6:01 p.m.

8          At 8:25 p.m.  "Hello brother."  Same number.

9          At 8:21 p.m. again.  "Are you there?"  Same number.

10   Q    All right.  And did he finally respond to that?

11   A    Yes, sir.

12   Q    What did he say?

13   A    He responded at 8:46.  "Brother call me."

14   Q    Are you aware of the time of the attack as it occurred in

15   Garland, Texas?

16   A    I am not, sir.

17   Q    Okay.  Now, go on to the next message.

18   A    That is to 4804488365 at 9:17 p.m.  He sends:

19   "519143806."

20   Q    Okay.  I want you to skip back up one because I think you

21   skipped one.

22   A    I'm sorry.  To Asma Bangladesh at 8:49 p.m.  "Salaam

23   walaikum brother call me."

24   Q    Okay.  And then go on from there with the "8365" number.

25   A    8365 at 9:25 p.m.  "Brother why don't you call me back."

1   Q   Next.

2   A   To Abdul Kahbir at 9:45 p.m.  "Salaam walaikum unblock my

3   number".

4   Q   Next.

5   A   To Abdul Kahbir at 9:45 p.m.  "Very important I want to

6   talk to you about something."

7   Q   Next.

8   A   From Abdullah Mubarak at 5:31 a.m. on 5/4 -- I'm sorry --

9   May 4, 2015.  "FBI:  Suspects killed outside Muhammad cartoon

10   Texas event lived in Phoenix (Sent from 3 TV Phoenix News)

11   http. --

12       THE COURT:  Okay.  Hold on.  Let's not read that.

13   BY MR. KOEHLER:

14   Q   Is that a web link that appears to relate to the attack?

15   A   Yes, it is.

16   Q   And that was from Abdullah Mubarak?

17   A   Yes, sir.

18   Q   Okay.  Next.

19   A   In Lafayette 5:40 a.m.  "You know something about that

20   move."

21       From Abdul Kahbir at 7:23 a.m.  "Well salam alaikim,

22   so far he has not the t back."

23       From Abdul Kahbir at 8:10 a.m.  "Abdul Malik

24   extremely important that you call me, brother based on what I

25   read this morning I believe Ibraheem is dead."

1    Q    Next.

2    A    From 4804488365 at 8:35 a.m.  "Hello brother."

3         From the same number at 8:36 a.m. "Now I will post

4    your ads start."

5         To Abdul Kahbir at 8:39 a.m.  "My phone is going to

6    your voice mail call me back."

7         To 4804488365 at 8:39 a.m.  "Okay brother please

8    post."

9         And the same message sent at 8:40.  "Okay brother

10   please post."

11   Q    Okay.  And go to the next one.  After that --

12        Well, the pound sign is in this one here.  Was that

13   anything of significance to you in going through the records?

14   A    In the records it was a list of addresses for Craigslist.

15   Q    Okay.  And then let's go to the next one.

16   A    From 480448365 at 9:00 a.m.  "Now live ads please check it

17   brother."

18   Q    Now, during the course of your analysis of these records

19   did you become familiar with this 4804488365 number?

20   A    Yes, sir.

21   Q    And can you explain, based on what you read in the

22   records, what you learned about what the relationship was

23   between Mr. Abdul Kareem and that person?

24   A    Yes, sir.  Based on the content of the messages, that

25   number was posting Craigslist ads for Abdul Malik Abdul

```
 1   Kareem.
 2           THE COURT:  Before we go on, we're going to take our
 3   morning break, Mr. Koehler.
 4           Ladies and gentlemen, we will reconvene in about 15
 5   minutes.  You're reminded of the admonition not to discuss the
 6   case or form any conclusions about it until you have heard all
 7   the evidence and begun your deliberations.
 8           Court is in recess until 10:35.
 9       (Recess taken at 10:16 a.m.; resumed at 10:37 a.m.)
10           THE COURT:  Thank you, ladies and gentlemen.
11           Apparently, my badge is not working well to unlock
12   the door.
13           Please sit down.  The record will show the presence
14   of the jury, counsel, and the defendant.
15           Mr. Koehler, you may continue.
16   BY MR. KOEHLER:
17   Q   So, Mr. Neville, when we left off, we had just gone to the
18   morning of May 4th, 2015, with the messages back and forth
19   with the 8365 number and his last two messages to that person
20   were:  "Okay brother please post."
21           Is that correct?
22   A   Yes, sir.
23   Q   And based on your analysis, what did that appear to mean?
24   A   Posting of the Craigslist ads.
25   Q   Okay.  And now I want to go to the next page and start at
```

1    the top with 10:28:28 a.m.

2    A    That's from Abdul Kahbir.   "Abdul Malik" -- I'm sorry.

3    This is at 10:28 a.m.

4            "Abdul Malik if you type in the name Elton Simpson on

5    the Internet Ibraheem picture pops up with them talking about

6    the attack in Texas and his father now knows that Ibraheem is

7    dead because he made a comment to ABC news."

8    Q    All right.   Next message.

9    A    From 5042330268 at 11:14 a.m. with the number:

10   "16233301127.  Hey its Chris the guy you met yesterday would

11   you be interested in buying food stamps."

12           From the same number ending in "0268" at 2:28 a.m. --

13   or p.m.   "Did you find anyone that wants to buy food stamps."

14           From number 6024815119 at 2:29 p.m.   "The people from

15   Luis Aplains say that they called you on Saturday and leave

16   you a message and you don't answer the phone, they going to

17   come on Wednesday."

18           From 6024815119 at 2:29 p.m.   "I'm going to pick up

19   my daughter from school I'll be back in like 30 minutes."

20   Q    Okay.   And just continue to refer to that as the "5119"

21   number.

22   A    5119 at 3:02 p.m. "I'm here now if you wanted to bring

23   the."

24           From Abdul Kahbir at 3:05 p.m.   "Would just send me a

25   he hang number already."

1          To Lafayette at 3:06 p.m.   "Bro pick up your phone."

2          To Lafayette at 3:07 p.m.   "Yo why you keep going to

3    voicemail what's up."

4          To Abdul Kahbir at 3:31 p.m.   "Ali" and the number

5    "6024469730."

6          From Abdul Kahbir.   "Right on" at 3:31 p.m.

7          To Chris at 3:50 p.m.   "Chris I didn't forget about

8    you they didn't get off the job yet alright."

9          From Josh Josh at 3:58 p.m.   Dot, dot, dot, and then

10   the emoji for smiley.

11         To 4804488365 at 4:57 p.m.   "Salaam walaikum brother

12   what's wrong with you brother I run a business brother I need

13   you to post ads."

14         From Abdul Kahbir at 5:19 p.m.   "Okay just letting

15   you know I'm on my way home and I'm riding my bike, see you

16   soon."

17         To Abdul Kahbir at 5:40 p.m.   "Okay."

18         From 4804488365 at 6:42 p.m.   "Hello brother."

19   Q    And is that the last one from May 4, 2015?

20   A    Yes, sir.

21   Q    So am I correct in looking at this that the first time

22   that he responds to Abdul Khabir in a text message back to

23   Abdul Khabir is at 8:39 a.m. where he says, "My phone is going

24   to your voice mail call me back."

25   A    Yes, sir, based on the content that was on that phone.

CR15-00707-PHX-SRB   JURY TRIAL-DAY #8 2-26-16

1    Q   And did you ever see a response to Abdul Mubarak based on

2    the content of the phone?

3    A   No, I did not.

4    Q   Now, you mentioned "based on the content of the phone."

5        Is there a way that those messages might not still be

6    there?

7    A   They could have been deleted, sir.

8    Q   And so what you have is from the phone itself, not from

9    the provider; is that correct?

10   A   Yes, for that day.

11   Q   Now, I want to talk to you about a Twitter --

12       THE COURT:  I just want to clarify for the jury

13   because we've looked at two summary exhibits.

14       478 was a summary of phone calls and the source

15   documentation was -- were documents provided by the phone

16   company; is that right?

17       THE WITNESS:  Yes, ma'am.

18       THE COURT:  The 479, the summary of text messages

19   wasn't a subpoena to the phone company but was actually

20   extracted from a phone?

21       THE WITNESS:  That is correct, Your Honor.

22       THE COURT:  Thank you.

23   BY MR. KOEHLER:

24   Q   And one thing I want to make clear:

25       When you requested call detail records from the phone

1    companies, did they provide you any text content?

2    A    No.  They did not.

3    Q    Based on your work and your knowledge of your job, do cell

4    phone companies retain text content that is available to you?

5    A    Not to my knowledge.

6    Q    All right.  Let's talk about the Twitter content.

7            I want to first direct your attention to Exhibit 153

8    that's on your monitor in front of you.  Do you recognize

9    that?

10   A    Yes, I do.

11   Q    And can you describe just in general terms what that is.

12   A    That is a screenshot taken of Elton Simpson's account

13   "Shariah Is Light" is the --

14           THE COURT:  Hold on.  He didn't ask you to read it.

15   He asked you to describe what it is.

16           THE WITNESS:  Sorry.

17           THE COURT:  And so the answer is:  "It's a screenshot

18   from Elton Simpson's phone."

19           THE WITNESS:  From his Twitter account.

20           THE COURT:  Okay.

21   BY MR. KOEHLER:

22   Q    Okay.  And as part of your open source research and

23   exploitation in this case, did you review screenshots from

24   Elton Simpson's Twitter account?

25   A    Yes, I did.

1    Q    And is this a fair and accurate depiction of the

2    screenshot of his Twitter account from April 23 of 2015?

3    A    Yes, it is.

4           MR. KOEHLER:  Move to admit 153 and publish.

5           MS. PLOMIN:  No objection.

6           THE COURT:  153 is admitted.

7       (Exhibit No. 153 admitted in evidence.)

8    BY MR. KOEHLER:

9    Q    While this is on here, can you explain a little bit about

10   how Twitter works when somebody tweets out about a news

11   article?

12   A    Yes.  So when Twitter -- or when a person posts on Twitter

13   a link like this, you can click on it and it will go to it

14   directly from the site.  In the returns, the way it comes

15   through is through a T-dot co-link that's a Twitter link

16   itself.  So Twitter creates a separate link in their server

17   that kind of directs to that link.

18   Q    Okay.  And here he twittered an article from a Breitbart

19   News; is that correct?

20   A    Yes.

21   Q    And what does the article concern?

22   A    It's the AFDI Draw Muhammad Contest in Garland, Texas.

23   Q    And what did Mr. Simpson say about this?

24   A    He said:  "When will they learn.  They are planning on

25   selecting the best picture drawn of Rasulullah (saws) in

1    Texas."

2    Q    And are you familiar with the term "Rasulullah" through

3    your work?

4    A    I am not.

5    Q    And what is the time on that post?

6    A    That is 12:42 a.m. on April 23rd.

7    Q    And is this Arizona time?

8    A    Yes, it is.

9    Q    Now, I want to direct your attention to Exhibit 154 marked

10   for identification.  Can you tell us what that is in general

11   terms again?

12   A    That is a screenshot of Elton Simpson's Twitter account.

13   Q    And is this a tweet that he posted?

14   A    Yes, it is.

15   Q    And is that a fair and accurate depiction of the

16   screenshot from his Twitter account?

17   A    Yes, it is.

18   Q    What is the date of this post?

19   A    This one is May 3rd, 2015.

20            MR. KOEHLER:  Move to admit 154.

21            MS. PLOMIN:  No objection.

22            THE COURT:  154 is admitted.

23        (Exhibit No. 154 admitted in evidence.)

24   BY MR. KOEHLER:

25   Q    Have you see the term "bay'ah" before?

CR15-00707-PHX-SRB     JURY TRIAL-DAY #8 2-26-16

1    A    Yes.

2    Q    And are you familiar with what that means?

3    A    I believe so, yes.

4    Q    Okay.  Can you explain it in general terms?

5    A    It's like a proclamation of allegiance.

6    Q    And are you familiar with the words "Amirul Mu'mineen"?

7    A    Yes, I am.

8    Q    And what is "Amirul Mu'mineen"?

9    A    That is a reference to the Khalif of the Islamic State Abu

10   Baker al-Baghdadi.

11   Q    And the term "mujahideen"?

12   A    It's an Islamic warrior.

13   Q    And are you familiar with the term "make dua"?

14   A    It's like "make prayer."

15   Q    There's a hash tag at the bottom of that; is that correct?

16   A    Yes, there is.

17   Q    What is that hash tag?

18   A    #texasattack.

19   Q    In your open source exploitation did you run across other

20   Twitter customers who were using that hash tag in the wake of

21   the Garland attack?

22   A    Yes, we did.

23   Q    Was one of those a poster using the handle

24   "AbuHussainAlBritani"?

25   A    Yes, sir.

1   Q   I'm going to show you now what's been marked for

2   identification as Exhibit 155.

3          Through your work at the FBI, are you familiar with

4   the person who is using the Twitter handle

5   "AbuHussainAlBritani"?

6   A   Yes.

7   Q   Who is that person?

8   A   That is Junaid Hussain.

9   Q   And is that person somebody that was the subject of

10  interest to the FBI?

11  A   Yes.

12  Q   And why so?

13  A   He is a member of the Islamic State of Iraq and the

14  Levant.

15  Q   And did he post tweets about the Texas attack using the

16  hash tag "#texasAttack" in the wake of the attack?

17  A   Yes, he did.

18  Q   And did you review those in open source research and

19  exploitation?

20  A   Yes, I did.

21  Q   Taking a look now at 155, is that a representation of his

22  posts after the attack in Garland, Texas?

23  A   Yes, they are.

24  Q   And is that a true and accurate copy of his posts?

25  A   Yes, they are.

1          MR. KOEHLER:  Move to admit 155.

2          MS. PLOMIN:  No objection.

3          THE COURT:  155 is admitted.

4      (Exhibit No. 155 admitted in evidence.)

5  BY MR. KOEHLER:

6  Q   You can please walk us through the time line of these

7  posts after the attack?

8  A   There are not times to these.

9  Q   Okay.  Can you just read through the different posts and

10 note the approximate time of day that's on the top of it?

11 A   So this screenshot was taken at 9:21 p.m.

12          It's AbuHussainAlBritani --

13          THE COURT:  Hold on a second.

14          When you say this screenshot was taken at 9:21 p.m.,

15 does that mean that that's when you were looking at it or does

16 that have something to do with when it was posted?

17          THE WITNESS:  That's when it was captured.  That is

18 not when it was posted.

19          THE COURT:  Captured by who?

20          THE WITNESS:  This particular screenshot was captured

21 by our Washington Field Office.

22          THE COURT:  Okay.  So 9:21 has no significance to

23 when the person that made the posts made the posts?

24          THE WITNESS:  No.

25          THE COURT:  Okay.  This is something that shows when

 1    somebody from your agency happened to look at this?

 2            THE WITNESS:  Yes, ma'am.

 3            THE COURT:  Okay.

 4    BY MR. KOEHLER:

 5    Q   And just to be clear, did you also view these posts during

 6    the open source research yourself?

 7    A   Yes, I did.  Yes.

 8    Q   Based on your open source research, do you know the

 9    approximate date and time of these?

10    A   These occurred after the attack on May 3rd, 2015.

11    Q   And were they within a short period of time after the

12    attack or a day after?

13    A   They were relatively close to the attack.

14    Q   Okay.  And so go ahead and start in the upper left and

15    read through the posts.

16    A   "AbuHussainAlBritani:  And do not say about those who are

17    killed in the way of Allah.  'They are dead.'  Rather, they

18    are alive, but you perceive it not."

19            Next post:

20            "AbuHussainAlBritani:  The two brothers attained

21    shahdah in Texas.  O Kuffar know that death is better than

22    living humiliated.  Allahu Akbar.  #garlandshooting."

23            Next one:  "If there is no check on the freedom of

24    your speech, then let your hearts be open to the freedom of

25    our actions #GarlandShooting #TexasAttack."

1          Move to the next one.

2          "Kill those that insult the Prophet.

3   #GarlandShooting."

4          Next one.  "Allahu Akbar.  Two of our brothers just

5   opened fire at the Prophet Muhammad (s.a.w.) art exhibition in

6   Texas #TexasAttack."

7          The next one: "@atawaakul May Allah swt reward you

8   and give you Jannah #TexasAttack."

9   Q   In your work have you become familiar with what the term

10   "Jannah" is?

11   A   Yes.

12   Q   And what is that?

13   A   That is "paradise."

14   Q   Okay.  Below that did he retweet a post of Elton

15   Simpson's?

16   A   Yes, he did.

17   Q   And was that retweet post this one here, Exhibit 154, that

18   was just admitted?

19   A   Yes, sir.

20   Q   The next part of 155, this is actually page 3 of 155.  Can

21   you tell us what that is?

22   A   That is the profile of AbuHussainAlBritani.

23          If would you like me to describe it further:

24          The "AbuHussainAlBritani" is his display name.

25          The "@AbuHu55ainbrxt" is his handle.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1            And then he has a Kik address below that.

2    Q    And does he have a note next to the Kik address?

3    A    Yes.  It says:  "Brothers only."

4    Q    And to what does that mean or what does that refer?

5    A    That only other brothers in the fight can message him on

6    Kik.

7    Q    And what does he say about himself in his profile.

8    A    He says he's "Random British Mujahid Somewhere In The

9    Islamic State."

10   Q    After the attack did the Islamic State issue a release of

11   their magazine Dabiq?

12   A    Yes, they did.

13   Q    And did the Dabiq magazine include an article about the

14   Texas attack?

15   A    Yes, it did.

16   Q    I'm going to show you what's been marked for

17   identification as Exhibit 156.  Do you recognize that?

18   A    Yes, I do.

19   Q    What is that?

20   A    That's an excerpt from Dabiq Issue 9.

21   Q    Is it the article that they published?

22   A    Yes, it is.

23   Q    Is it a true and correct copy of that news article?

24   A    Yes.

25            MR. KOEHLER:  Move to admit 156.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1      MS. PLOMIN:  No objection.

2      THE COURT:  156 is admitted.

3      (Exhibit No. 156 admitted in evidence.)

4  BY MR. KOEHLER:

5  Q   Can you just read that first paragraph for the jury?

6  A   Sure.

7      "As the crusaders continue to reveal their intense

8  hatred and animosity towards Islam through their relentless

9  bombing and drone campaigns on the Islamic State, a new breed

10  of crusader continues shedding light on the extent of their

11  hatred towards the religion of truth.  This breed of crusader

12  aims to do nothing more than to anger the Muslims by mocking

13  and ridiculing the best of creation, the Prophet Muhammad Ibn

14  Abdillah (sallallahu alayhi wa sallam) under the pretext of

15  defending the idol of 'freedom of speech.'"

16  Q   Do you recognize the two individuals pictured in the

17  article?

18  A   Yes, I do.

19  Q   And who are the individuals starting with the upper

20  individual?

21  A   The top picture is Elton Simpson and the bottom picture is

22  Nadir Soofi.

23  Q   And inset in the picture of Nadir Soofi, is that the same

24  tweet that Elton Simpson posted shortly before the attack?

25  A   Yes, it is.

1    Q   And can you tell us what time that tweet was posted?  I

2    don't think I asked you that before.

3    A   I would have to look at my records real quick.

4    Q   If you could, please.

5            I can put it on the screen.  This is 154 already in

6    evidence.  Does that tell you what time?

7    A   It says 4:35 p.m. Arizona time.

8    Q   And how far ahead of Arizona was Dallas, Texas, on May 3

9    of 2015, accounting for Daylight Savings Time?

10   A   Two hours.  So it would have been at 6:35 p.m. Dallas

11   time.

12   Q   And during the break did you refresh your recollection on

13   what time the attack itself occurred?

14   A   Yes, I did.

15   Q   And what time did the attack itself occur?

16   A   6:51 p.m. Dallas time; so 4:51 p.m. Arizona time.

17   Q   I would like to now draw your attention to Exhibit No.

18   157.  And we're not going to seek admission of this at this

19   time.  I just want to lay the foundation with you.

20           Have you reviewed all of 157 before court today?

21   A   Yes, I have.

22   Q   Can you describe in general terms what is contained in

23   Exhibit 157?

24   A   These are tweets and screenshots of tweets from Elton

25   Simpson's seven Twitter accounts.

```
 1   Q    And are the tweets and screenshots each true and accurate
 2   depictions of the tweets that he made and the screenshots of
 3   his account at the time it existed?
 4   A    Yes, they are.
 5   Q    Did you also through the search warrant review direct
 6   messages that Elton Simpson exchanged with other individuals?
 7   A    Yes, I did.
 8   Q    And did you assist in the preparation of a PowerPoint that
 9   depicts relevant conversations between Mr. Simpson and those
10   other individuals?
11   A    Yes, I did.
12   Q    Does the PowerPoint that you've prepared -- or assisted in
13   preparing -- fairly and accurately depict each of the
14   conversations series as they occurred?
15   A    Yes.
16   Q    And was that PowerPoint depicted in -- I'm going to put
17   this on your screen here -- Exhibit 480, the printout?
18   A    Yes, sir.
19            MR. KOEHLER:  Move to admit 480.
20            MS. PLOMIN:  No objection.
21            THE COURT:  480 is admitted.
22       (Exhibit No. 480 admitted in evidence.)
23            THE COURT:  And can you clarify it because I see it
24   has that little bird that's the Twitter symbol.
25            THE WITNESS:  Uh-huh.
```

1    THE COURT:  What's the difference between a Twitter

2  post and a direct message?

3    THE WITNESS:  A direct message is a direct

4  communication between two people like a private chat, sort of

5  like a sheen gene instant messages.  So it is not public

6  information.

7  BY MR. KOEHLER:

8  Q   So that is not something that you could obtain through

9  your normal day-to-day open source research; is that correct?

10  A   That is correct.

11  Q   And did everything in Exhibit 480 come from your review of

12  the Twitter records that were returned via the search warrant?

13  A   Yes, they did.

14  Q   Okay.  I'd like to switch to the computer please at the

15  lectern.

16    Okay.  Let's start with the first post.  Did he know

17  a person or communicate with a person with the known name of

18  "Miski"?

19  A   Yes, he did.

20  Q   What is the first communication that we have as part of

21  Exhibit 480?

22  A   It is from 6:17 a.m. on December 7th, 2014.

23    Would you like me to read it?

24  Q   Yes, please.

25  A   "Did the brother interpret the dream for you?"  Smiley

1    face.

2    Q    Okay.  Keep going.

3    A    "Or not yet."  6:17.

4    Q    And Miski's response?

5    A    Miski's response.  "Akhil Kareem I've met with the sheikh

6    and He said the Hoor Al Ayn is waiting for you eagerly.  That's

7    the interpretation of the dream."

8    Q    During the course of your work for the FBI, have you run

9    across dream interpretation before?

10   A    Yes, I have.

11   Q    Can you just describe in general terms what dream

12   interpretation is as far as you have seen it?

13   A    As I have seen it, it's a lot of people have it

14   interpreted to figure out what meaning it has for their life

15   or what's going to happen in their life as kind of directed by

16   Allah.

17   Q    And have you heard the term "Hoor Al Ayn" and become

18   familiar with it in your work?

19   A    Yes, I have.

20   Q    What is "Hoor Al Ayn"?

21   A    Generally speaking, it refers to the kind of pure souls

22   that reside in Jannah.

23   Q    And, again, you refer to "Jannah" as "paradise"?

24   A    Paradise, yes.

25   Q    On December 30 did he engage in another conversation with

1  Miski about dream interpretation?

2  A   Yes.

3  Q   Okay.  What did Miski say?

4  A   He said:  "Hold on let me write what the sheikh said about

5  your dream."

6          "Okay insha Allah."

7          "Akhi the sheikh said that this dream is a glad

8  tidings from Allah.  You will loose an opportunity to doing

9  something good like Hijra."

10  Q   Are you familiar with that term "hijra"?

11  A   Yes, I am.

12  Q   What is "hijra"?

13  A   It refers to the travel for Islamic purposes.  Generally,

14  it's an emigration to Islamic lands.

15  Q   Okay.  And in the context of the Islamic State, does it

16  have unique meaning?

17  A   Yes.  Usually it's used to refer to traveling to the

18  Islamic State or area controlled by the Islamic State.

19  Q   What does he say next?

20  A   "Two:  You will then be saddened over the lost of the

21  great opportunity."

22          "You will miss out in allot of Ajar because of that."

23  Q   Have you also become familiar with the term "Ajar" during

24  your work?

25  A   Yes, I have.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

```
1   Q    What does "Ajar" refer to?

2   A    "Reward".

3            "Four:  Allah will hold you back from doing so, so

4   that you can get another opportunity for a better place with

5   greater Ajar."

6            "Five:  The time between the two H's is a bit long.

7   It's not gonna be as soon as you loose the first opportunity.

8   It's gonna be a bit later."

9   Q    Did this conversation continue?

10  A    Yes.

11           "Wa Billaahi Tawfeeq."

12  Q    Is this a term of which you are familiar?

13  A    It is not.

14           "Akhi."

15           "Five:  The time between the two H's is a bit long.

16  It's not gonna be as soon as you loose the first opportunity.

17  It's gonna be a bit later."

18           "Two H's?  You didn't mean to type H's sah?"

19  Q    Miski's response?

20  A    "So what about it akhi."

21           "I did."

22           "Hijra."

23  Q    So when he's talking about the two H's does that mean he's

24  talking about hijra there?

25  A    Yes.
```

1        From Simpson:  "He's saying hijra will happen again?
2  Or just another way of getting Ajar from Allah?"
3        "As of number 4."
4  Q   And Miski's response?
5  A   "He said it will happen again insha Allah but to a better
6  place."
7        Simpson:  "Can I ask you this.  When Sheikh Adnani
8  gives a public address, can we assume this is what Al Khalifah
9  wants as well?  Seeing that Adnani is the spokesman?"
10 Q   Are you familiar with a Sheikh Adnani who is a spokesman
11 for someone?
12 A   Yes.  He is the spokesman for the Islamic State of Iraq
13 and the Levant.
14 Q   And what is Sheikh Adnani's name, if you know it?
15 A   I don't know the first name.
16 Q   So you just know the last name Adnani?
17 A   Adnani.
18        "And seeing Al Khalifah hasn't come out to correct
19 what Adnani says."
20        "Yes akhil Kareem, Adnani never speaks unless he's
21 been ordered by the Khalif of the Muslims.  He can never speak
22 without the order of the Khalif."
23        Continuing on.  "Maybe then, it is possible that the
24 Ajar is in what he has said earlier."
25 Q   Mr. Neville, are you familiar with a pronouncement that

1   Sheikh Adnani made on behalf of the Islamic State in the

2   months prior to this conversation?

3   A   Yes, I am.

4   Q   And did he make a specific proclamation directed toward

5   people who could not make hijra to the Islamic State?

6   A   Yes, he did.

7   Q   And in general terms, what did he call for?

8   A   He called for attacks in the West.

9          "And Afwan the Sheikh said Allah will hold you back

10   from something far better in Ajar then last time.  It could be

11   H or something else."

12          The next he clarifies:  "It is."

13   Q   The asterisk there next to the "it is," does that have

14   significance in online instant messaging and text messaging?

15   A   Yes.  Usually it denotes a correction to something that

16   was earlier.

17   Q   So when he says "it is" here, can you tell based on the

18   previous post that he had there what he was correcting?

19   A   Yes.  The first message says:  "Maybe then it's is."

20          So he's got sort of "it is is."

21   Q   So he is correcting his typo?

22   A   Yes.

23          "Akhi yes, matter fact that is far better in Ajar

24   than H right now."

25   Q   So what is Miski saying right there in terms of

```
 1    translating that more to English?
 2    A    That an attack against the West is far better in reward
 3    than going to the Islamic State.
 4    Q    Now, moving forward to January 3, 2015.
 5    A    From Simpson:  "I wonder what it means when one sees imam
 6    Anwar in a dream."
 7    Q    Are you familiar with the name "Anwar" in your work?
 8    A    Yes, I am.
 9    Q    Who is that reference to?
10    A    That's Anwar al-Awlaki.
11              "You don't have to ask the sheikh akhi lol."
12    Q    Are you familiar with what L-O-L means in short term
13    messaging?
14    A    Yes.  It's "laughing out loud."
15    Q    So in other words, is Simpson joking when he said you
16    don't have to ask the sheikh?
17    A    Yes.
18    Q    So what does that imply about the previous sentence?
19    A    Just that he doesn't need to ask the sheikh to have that
20    interpreted.
21              From Miski:  "Maybe he's telling you what he told
22    nidal."
23    Q    Are you familiar with someone named "nidal" who in the
24    past had communication with Anwar al-Awlaki?
25    A    Yes.  Nidal Hasan who perpetrated the Ft. Hood shooting
```

1    had communication with Anwar al-Awlaki before he committed the

2    attack.

3    Q    Moving forward now to January 9, 2015.

4    A    "Subhan Allah things seem to be moving along so fast."

5         "Masha Allah akhi, What happened in France made the

6    Muslims everywhere happy akhi."

7    Q    Did something happen in France shortly before this

8    communication?

9    A    Yes.  On January 7th an attack was committed at the

10   Charlie Hebdo.

11   Q    Is that the Charlie Hebdo Magazine that had the drawing of

12   the Prophet Muhammad?

13   A    Yes.  Yes, it is.

14        From Simpson:  "I got confused though.  They

15   mentioned two brothers at first and then they mentioned a

16   brother and a sister."

17        From Miski:  "With what akhi?"

18        Simpson:  "There were two separate events?"

19        Question mark.

20        "Na3m akhi they were separate."

21   Q    Go ahead.

22   A    They went -- well --

23        "I heard about the two who got shahadah insha Allah

24   at the grocery store.  What about the two brothers?"

25        "Akhi they all got shahadah."

1       Simpson:  "I only heard about the bro and the sister.

2       JZK.  Where did the other two get it?

3       House?  Warehouse?"

4       And from Miski:  "They went inside a place and took

5  hostage, they killed the hostages and they got martyred.  They

6  were told to surrender and they said no, we came for shahada."

7  Q   Does he go on to talk to another individual who went by

8  the Twitter handle QaQa_ibnAmr?

9  A   Yes.

10  Q   Can you go ahead and tell us about this conversation?

11  A   Yes.  So on this conversation we assessed it -- I'm going

12  to refer to him as "QaQa" was a user in the United Kingdom.

13  It starts out with:

14       "Stay safe bro I seen all these Kufar trying to get

15  active over there."

16  Q   And "over there" would refer to?

17  A   The West.  Over in the United States.

18       Simpson:  "Yep."

19       QaQa:  "Alhamdulillah I'm okay I guess."

20       Simpson:  "Story after story is poppin up.

21       A family in Michigan was just attacked."

22       QaQa:  "I think that I get paranoid a lot now at home

23  lol."

24       Simpson:  "It's natural.  Whoever had previous

25  experiences would."

1   Q    When he says that, does that give an indication of

2   something with relation to this person QaQa?

3   A    Yes.  It indicates that he's had previous experiences with

4   law enforcement.

5   Q    Go ahead.

6   A    From QaQa:  "Especially at night I lay down thinking when

7   Eva I hear noises I'm like...yep that's my door coming

8   through.  Bro did you get to see that video before they took

9   it down...it was a security guide for ikhwa from AQ."

10  Q    Does "AQ" have significant meaning in the terminology of

11  your world?

12  A    Yes.  That's al-Qa'ida.

13        Simpson:  "No I will ask for it though.

14        Insha Allah."

15        From QaQa:  "Yeah try get it insha Allah it's a must

16  watch very beneficial especially for us still about."

17  Q    The term "us still about," could you understand what that

18  meant?

19  A    I assessed it to mean that those that were still in the

20  West and not in the Islamic State.

21  Q    Going on to April 1, 2015.

22  A    This is a conversation with Miski again.  It says:  "I

23  think he's claiming he belongs to IS bro."

24  Q    Now, is the word "IS" there the world "is"?

25  A    No.  I assessed it to be "I-S" as in "Islamic State."

```
 1   Q   And what does Miski say?
 2   A   "Na3m akhi, I've heard of it."
 3            Simpson:  "Okay, anyone you can ask about him?"
 4   Q   Based on those messages, could you assess what it was they
 5   were talking about there?
 6   A   I assessed that Simpson was trying to vet somebody who was
 7   claiming to be an Islamic State member through Miski.
 8   Q   And did Simpson later send a Twitter handle to Miski?
 9   A   Yes.  He sent him the handle "@Muslim_Sniper_1."
10   Q   And did Simpson later have a conversation with a person
11   using a handle very similar to that?
12   A   Yes, he does.
13            So on April 20th:  "Wa alaykim salam.  Is your ss the
14   same?"
15   Q   Does "SS" have unique meaning within your world in
16   investigating counterterrorism cases?
17   A   Yes.  It's Surespot.
18   Q   What is Surespot?
19   A   Surespot is an encrypted messaging app.
20   Q   Is that something that you can exploit through open source
21   research?
22   A   No.  It is not.
23   Q   Is it something that law enforcement can intercept?
24   A   No.
25   Q   And why is that?
```

```
 1   A   It uses end-to-end encryption and the messages are not

 2   stored through Surespot.  So the only people who have access

 3   to that information are the sender and the receiver.

 4   Q   So does that provide a more secure form of communication

 5   for people who are engaged in this kind of activity?

 6   A   Yes, sir.

 7              @Muslimsniper:  "Yes I've seen your Surespot.  Yes it

 8   is the same.  And yes his Surespot."

 9              Simpson:  "You should contact me there not here

10   akhi."

11              @Muslimsniper:  "Is the correct.  Okay.  Sorry."

12              Continuing on from Simpson:

13              I expect a higher level of security from you my

14   brother."  Smiley face.

15              "Khair in Sha Allah."

16              "Sorry bro."

17              From Simpson:  "My situation here is not easy."

18              Another smiley face.

19              @Muslimsniper:  "Come on Surespot."

20              From Simpson.  "I sent you a message there."

21   Q   I notice, by the way, that the Twitter icon had changed

22   for Elton Simpson.  Is that the icon that he was using on this

23   particular account?

24   A   Yes.  This was his profile picture for the @tawaakul

25   account.
```

1    Q    And do you recognize the person depicted in that picture?

2    A    Yes.

3    Q    Who is that person?

4    A    That is Anwar al-Awlaki.

5    Q    Reading this communication between Simpson and this

6    @Muslimsniper person, could you tell from the tone of the

7    conversation what was going on between the two of them?

8    A    Simpson seemed to be jokingly scolding @Muslimsniper for

9    not having enough security for messaging him through Twitter

10   and not through Surespot.

11        So this is another conversation with Miski.  This is

12   on April 23rd.  "Checks my '@' to you."

13        From Miski:  "I just read it akhi.  Subhanallah."

14        "The kibr."

15        "Kibr to the fullest akhi.  May Allah swt bring a

16   soldier from him who'd avenge his beloved Prophet."

17   Q    You mention this is April 23rd what is the time?

18   A    The time is 1:02 a.m.

19        The first, the "check my @ to you" came at 12:51 a.m.

20   Q    May I have a moment?

21        Did that correspond to the tweet on April 23 which is

22   in Exhibit 153?

23   A    Yes.  It does.

24   Q    The timing of this?

25   A    Yes.  On April 23rd I believe at 12:42 a.m. is when

1    Simpson posted the tweet about the contest saying "when will

2    they learn."

3    Q   And the word "kibr" or "kibr," however that is pronounced,

4    have you become familiar with that term?

5    A   Yes.

6    Q   And to what does that refer?

7    A   It's "arrogant" or "arrogance."

8    Q   Now, moving to May 2nd, 2015.

9    A   So this one is again with Miski:  "Is your SS working?"

10         Surespot.

11         "Yes akhil habeeb."

12         From Simpson:  "And juba89."

13   Q   Through your work did you become familiar with that handle

14   "juba89"?

15   A   Yes.  That was one of Elton Simpson's Surespot I.D.s.

16         "I sent you a request akhi."

17   Q   Now, moving forward to April 15th.

18   A   "As salamu alaykum akhil kareem.  Afwan for the

19   disturbance."

20   Q   Are you familiar with that term "Afwan"?

21   A   I am not.

22   Q   Okay.

23   A   "Isn't Surespot more secure than kik?"

24   Q   What is "kik"?

25   A   Kik is another messenger app.

UNITED STATES DISTRICT COURT

1   Q   Is it another app that offers a level of security to

2   users?

3   A   It does.

4   Q   Can you explain that a little bit?

5   A   I do not know as much about kik.

6   Q   Okay.  Is it known to be more or less secure than

7   Surespot?

8   A   Less secure.

9           "Yes akhi it is.  I have Surespot too."

10          This is from Junaid Hussain.

11          He then provides his surespot I.D.

12          "Abuhussain3.  Walaykumsallam."

13          From Simpson:  "Do you mind if I add you to Surespot?

14  I'm juba8021."

15  Q   Is that another one of Simpson's Surespot handles?

16  A   Yes.  Simpson had several Surespot handles that he

17  communicated out through Twitter direct messages.

18  Q   The next message.

19  A   "I'll add you insha Allh."

20          "Allah."

21  Q   Is this another example of him correcting himself with an

22  asterisk?

23  A   Yes, it is.

24          "No problem akhi, add me inshaAllah."

25          From Simpson:  Okay just sent you an invite."

1   Q   Okay.  Now we're skipping back to February 17, 2015.

2           Did Simpson have another conversation with a person

3   on Twitter, a person that was overseas?

4   A   Yes, he did.

5   Q   Okay.  Let's go on through this.

6   A   "More and more raids happening in UK."

7           "Subhan Allah."

8           This is with that --

9   Q   Is that that "QaQa" person again?

10  A   It is the "QaQa" person again.

11  Q   Okay.  Go ahead.

12  A   "Yeah.  One hundred percent."

13          "Bro this is just the start of the CTS bill."

14          "Watch next month."

15          "They just gathering info right now."

16          "By March so much more raids."

17          "They just stacking up them two raids."

18          "They nothing bro,"

19          "They go inn when they ready."

20          "May Allah protect us all Ameen."

21          "Masha Allah.  May Allah increase you in insight."

22  Q   Still the same day, correct?

23  A   Yes.

24          From QaQa:  "It's different out here that's why we

25  just on point super alert."

1          From Simpson:  "Bro you are about to make me choke on

2     my Fritos."

3          QaQa:  "Cant slip."

4          LOL with a few extra O's.

5          "What's Fritos?"

6          "Lool."

7          "Chips basically."

8          From QaQa:  "Nah I'm being for real."

9          From Simpson.  "Potatoes chips."

10          From QaQa:  "It's crazy over here."

11          "YH we call those crisps."

12          From Simpson:  "You call fries chips Sah?"

13          QaQa:  "YH we call fries chips."

14          Simpson:  "And diapers nappies."

15          QaQa:  "Loool yhh."

16          From Simpson:  "Bro I was just telling a bro from

17     Philly what you said."

18          QaQa:  "And pants trousers."

19          "We in here rollin bro."

20     Q   When he says "we in here rollin," what does that refer to?

21     A   Laughing.

22          QaQa:  "lol.  Yh.  Wats he saying."

23          "Tell him give a.r. ab dawah."

24     Q   Do you know what those terms refer to?

25     A   I do not.

1  Q    Continuing?

2  A    From Simpson:

3         "Felons can't have guns here."

4         From QaQa:  "Who police nah they come to my house

5  with them big things yo it's crazy.  They have them at ma

6  windows.  It be like summer in the middle of the night the way

7  they light up ma house at night last time all ma neighbors

8  there windows was wild man."

9  Q    Go ahead.

10  A    This is a little bit later in their conversation.

11         "Man out here I could get the best of guns here

12  without that amount LOL."

13  Q    Earlier in the conversation they had been talking about

14  gun prices?

15  A    Yes, they had.

16  Q    And money?

17  A    "You."

18         Clarifying again.

19         QaQa:  "With a connect though like 1700 and then you

20  the man double up on sales an you winning.  LOL I know."

21         Simpson:  "Yeah."

22         From QaQa:  "I heard you get ASK for like 500 400 man

23  that's cheap."

24         Simpson:  "Yep, seen that before."

25         QaQa:  "That's cheaper than sham."

1   Q   Do you know what "sham" is?

2   A   Yes.  "Sham" refers to Syria.

3           Simpson:  "For reals."

4           QaQa clarifies.  "AKS."

5   Q   Okay.  And this is "AKS," correct?

6   A   Yes.

7   Q   Looking at the conversation, going back to the previous

8   part of it, to what does that refer?

9   A   Earlier he says "ASK."

10  Q   So does that mean he meant to say "AKS" right there?

11  A   Yes, it does.

12  Q   And in your world what is an "AK"?

13  A   It's an assault rifle.

14  Q   Go on.

15  A   "Yeah trust bro out there life different."

16  Q   When he says that, is he referring to sham?

17  A   Yes.

18          "Alhamdulillah tho.  Whats the bro from Philly saying

19  though man whats poppin in his side they need a set up them

20  dawah tables."

21          Simpson:  "He stay out here.  LOL."

22  Q   So when he says "he stay out here," what does that mean?

23          MS. PLOMIN:  Objection.  Calls for speculation.

24          THE COURT:  Sustained.

25          MR. KOEHLER:  That's all I have at this time.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

```
 1              I want to just make sure if I might have just one
 2   moment, Your Honor.
 3              THE COURT:  Yes.
 4   BY MR. KOEHLER:
 5   Q   I'm going to place on the document camera what is already
 6   in evidence as Exhibit 134.  Can you read the date and time on
 7   that particular -- the EXIF data for that particular
 8   photograph?
 9   A   Yes.  Date taken 2/18/2015 at 2:17 a.m.
10   Q   And do you recognize the person in that photo?
11   A   Yes.  That's Elton Simpson.
12   Q   And this is 135 also in evidence?
13   A   And that's 2/18/2015 at 2:18 a.m.
14   Q   And who is depicted in that photo?
15   A   Abdul Malik Abdul Kareem.
16   Q   And so these photos were taken early in the morning hours
17   following this conversation that we just covered the Twitter
18   conversation?
19   A   Yes.
20              MR. KOEHLER:  I have no further questions at this
21   time.
22              THE COURT:  Ms. Plomin.
23              MS. PLOMIN:  Thank you.
24   ///
25                         CROSS EXAMINATION
```

1    BY MS. PLOMIN:

2    Q    Good morning.

3    A    Good morning.

4    Q    Is it Agent Neville?

5    A    I'm an Intelligence Analyst, ma'am.

6    Q    Okay.  Mr. Neville.

7    A    Sounds good.

8    Q    All right.  So, Mr. Neville, just to start with the

9    Twitter accounts that you were discussing, did you search for

10   a Twitter account for our client Mr. Abdul Kareem?

11   A    Yes.

12   Q    And you didn't find one, did you?

13   A    No, I did not.

14   Q    You found no activity of Mr. Abdul Kareem on Twitter,

15   correct?

16   A    No.  I did not find any.

17   Q    All right.  So everything that you've testified to today

18   pertained to Mr. Simpson communicating with others or posting

19   tweets on Twitter publicly?

20   A    That is correct.

21   Q    All right.  And as part of your duties as an Intelligence

22   Analyst, you are to monitor open source data including Twitter

23   accounts, correct?

24   A    Yes, ma'am.

25   Q    And that includes people of interest to the FBI who might

1    be planning some sort of an attack or be participating in

2    terrorist activity; is that true?

3    A    Yes.

4    Q    And you're aware that Elton Simpson back in 2010 was

5    prosecuted for and later convicted of lying to the FBI after

6    he had been originally charged with a terrorism-related

7    offense?

8    A    I'm aware of it, but I was not part of that investigation.

9    Q    And the FBI can certainly monitor public Twitter or tweets

10   of anyone, correct?

11   A    As long as they are public.

12   Q    And Mr. Simpson's tweets in this case that you testified

13   to, the public tweets, for instance, when he posted in

14   February about the Garland, Texas attack, anybody could view

15   that, correct?

16   A    Yes, ma'am.

17   Q    Including the FBI, correct?

18   A    Yes, ma'am.

19   Q    And anybody could view when he posted, "When will they

20   ever learn" and posted a hash tag -- I'm sorry -- a link to

21   the Texas drawing contest, correct?

22   A    Yes, ma'am.

23   Q    Including the FBI?  The FBI could see that on April 23rd

24   he posted that tweet, correct?

25   A    That was a public tweet, ma'am.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

```
 1   Q   Now, you also discussed some private messages that were

 2   sent between Mr. Simpson and some other individuals.  Those

 3   were not --

 4           You also mentioned Surespot and another maybe -- I'm

 5   not sure if you called it an application -- but a means of

 6   hiding your communications.

 7           These private messages, those were not done through a

 8   filter where these communications were hidden like Surespot,

 9   correct?

10   A   That is correct.

11   Q   So if the FBI wanted to -- and this was a person of

12   interest -- they could get a warrant and look at these private

13   messages, correct?

14   A   If they had a warrant.

15   Q   Right.

16           Now, you're not an expert in counterterrorism, are

17   you?

18   A   No, ma'am.

19   Q   And you're not an expert in Islamic studies, correct?

20   A   No, ma'am.

21   Q   And you are not an expert in Arabic translation, correct?

22   A   No, ma'am.

23   Q   So what you testified that you believed -- some of these

24   words and terms within these tweets -- what you believed them

25   to mean, you were basing them on what you've seen on the
```

1    Internet, correct?

2    A   Yes, ma'am.

3    Q   Okay.  No formal education in those areas, correct?

4    A   No, ma'am.

5    Q   Now, while we're on the topic, I want to draw your

6    attention to the April 1st tweet between Elton Simpson and

7    Miski or the conversations -- I'm sorry, the private

8    conversations.

9           And just to clarify, these private conversations,

10   others cannot view them if they go onto Twitter?  It's not

11   public?

12   A   No, ma'am.

13   Q   And you mentioned or you read a conversation where

14   Mr. Simpson says "I think he's claiming he belongs to IS bro."

15          And Miski responds something to the effect of -- I'll

16   put it up on the screen, actually.

17          And this is from Exhibit 480 that has been admitted

18   into evidence?

19          Something to the effect of:  I've heard of it.

20          And then Simpson responds:

21          Okay.  Anyone you can ask about him?

22          Correct?

23   A   Yes.

24   Q   And you interpreted that to mean that he was -- Simpson

25   was asking about somebody he knew who was wanting to join

1    ISIS.  Is that what you testified to?

2    A    No.  I think he was vetting somebody who was claiming that

3    they belonged to ISIS and asking Miski if there was anybody

4    Miski could verify that he did or did not work for ISIS.

5    Q    And you don't know if he was talking about somebody online

6    who he was talking to, correct?

7    A    Not specifically, no.

8    Q    You don't know if this is somebody who he had read about

9    in a magazine or in some kind of publication, correct?

10   A    No.  I do not.

11   Q    You don't know if he had any idea who this person was,

12   even if your interpretation that he was talking about or

13   vetting somebody is correct; is that true?

14   A    Yes.

15   Q    All right.  So you have no idea who he was talking about

16   or exactly what he was saying; is that true?

17   A    We assessed it to be @Muslimsniper because he sends that

18   handle to him.

19   Q    You believed he was talking about @Muslimsniper?

20   A    Yes.

21   Q    And did you have an occasion to determine who that account

22   was linked to?    @Muslimsniper?

23   A    Do you mean the owner of that account?

24   Q    Yes.

25   A    No.  All I have is the handle.

1    Q    Okay.  But you do know that Mr. Abdul Kareem did not have

2    any Twitter accounts, correct?

3    A    I do know that, yes.

4    Q    So you know that Mr. Abdul Kareem is not @Muslimsniper?

5    A    Yes, ma'am.

6    Q    Now, turning to the conversation on February 17th and this

7    continues to be from Exhibit 480 that's been admitted.

8           Okay.  Let's start with that.  Now, in this

9    conversation they're talking -- would it be safe to say that

10   Miski and Elton Simpson are joking around about potato chips

11   and what the difference is between what the British say and

12   what they call them in America?

13   A    This is not with Miski, ma'am.  This is with a different

14   user.

15   Q    Okay.  Who -- do you know who the other user is?

16   A    I do not.

17   Q    Would it be safe to say that whoever Simpson is talking

18   to, they're joking around about differences in the British

19   vernacular and the American vernacular?

20   A    At this point in the conversation, yes.

21   Q    Okay.  And then they're talking about fries and chips and

22   diapers and nappies, correct?

23   A    Yes, ma'am.

24   Q    Okay.  And then right after Simpson says -- makes the

25   comment, the joke about diapers and nappies, the other

1    individual responds:  "LOLOL."

2          And then the next sentence is:

3          Bro I was just telling a bro from Philadelphia about

4    what you said, correct?

5    A   Yes.

6    Q   After they're talking about the differences between

7    British and American vernacular and joking about it, correct?

8    A   Yes.

9    Q   And you don't know who that bro from Philadelphia is,

10   correct?

11   A   I do not.

12   Q   Now, on direct you testified that the word "hijra," you

13   interpreted that to mean -- initially you said you interpreted

14   it to mean that it's to travel for the purpose of Islam,

15   right?

16   A   Yes, ma'am.

17   Q   And then you went on to say that you thought that this

18   particular circumstance it's talking about traveling for the

19   Islamic State?

20   A   Not in this particular circumstance, ma'am.

21   Q   Okay.

22   A   In general we're seeing now when "hijra" is used in

23   conversations, it's often used to refer to travel to the

24   Islamic State, specifically.

25   Q   And, again, you have no formal training in

1    counterterrorism or Islamic studies, correct?

2    A    No.   That's just through my experiences as an FBI analyst.

3    Q    All right.   And "hijra" also has been used for a very,

4    very long time to refer to travel to -- for the Islamic

5    religion in order to go to sites that are important in Islam,

6    correct?

7    A    Yes, ma'am.

8    Q    And these Surespot or Kik -- you testified on direct --

9    what would you call them?  Applications?  Or what would the

10   terminology be?

11   A    Messaging applications.

12   Q    Messaging application.   Do they have to be filtered

13   through a Twitter account or something to that extent?

14   A    No.   They do not.

15   Q    And to your knowledge has there been anything like that,

16   any trace of that found in any of the devices that Mr. Abdul

17   Kareem had?

18   A    I'm not aware.   I did not do the analysis on all of the

19   devices.

20   Q    All right.   Now, I want to loop back to your testimony

21   about the conversation -- or I'm sorry -- the communications

22   between Mr. Abdul Kareem and Elton Simpson and Nadir Soofi.

23   A    Yes, ma'am.

24   Q    Or at least their phone numbers.

25   A    Yes, ma'am.

1  Q    Okay.  Now, you testified that Elton Simpson and Mr. Abdul

2  Kareem they communicated a lot, correct?

3  A    Yes, ma'am.

4  Q    And you're aware that they were friends?

5  A    Yes.

6  Q    And the beginning of your testimony, you testified of

7  communications in March of 2015.  And would it be safe to say

8  they're just saying "Hey, where are you."

9          "I'll come and get you."

10         Nothing of any importance, correct?

11 A    No.  That was just an indication of them meeting up.

12 Q    Okay.  And they're -- strike that.

13         Now, April 6, 2015, text conversation that you talked

14 about, I'm placing a page from Exhibit 478 onto the screen

15 that's been admitted.

16         At 1:07 p.m. can you read from 1:07 to 2:29 p.m., the

17 conversation?

18 A    Yes, ma'am.

19         1:07 p.m. Simpson.  "Hey, me you and AK should go get

20 chai."

21         1:07 p.m. Simpson:  "And a snack."

22         1:10 p.m.  Kareem:  "Okay."

23         2:28 p.m. Simpson:  "Are you out yet?"

24         2:28 p.m. Kareem:  "I have to go and pick up the

25 prescription and then go get dressed I just got out."

```
 1            2:29 p.m.  Simpson:  "How long you think?"
 2   Q   And just go on for the next two lines, please.
 3   A   2:31 p.m.  Kareem:  "Hey you guys I still gotta get my
 4   washer and dryer and refrigerator on in the house hit me up
 5   when you guys finish."
 6            2:33 p.m.  Simpson:  "LOL."
 7   Q   Okay.  So it sounds like they're just having casual
 8   conversation about going out to eat and get some tea, correct?
 9   A   Yes, ma'am.
10   Q   And that's what's happening on April 6th about one o'clock
11   in the afternoon, correct?
12   A   Up until 2:33 p.m., ma'am.
13   Q   And would it be fair to say that the communication that
14   you viewed between the text messages that you viewed between
15   Mr. Abdul Kareem and Mr. Simpson, they are talking about
16   normal, everyday activities such as going on errands, joking
17   around, and just hanging out, making plans to see each other;
18   is that fair?
19   A   Yes, ma'am.
20            MS. PLOMIN:  Does the court have Government's Exhibit
21   478?
22            Your Honor, may I approach the clerk?
23            THE COURT:  Yes.
24            MS. PLOMIN:  Thank you.
25   BY MS. PLOMIN:
```

1  Q    You probably guessed I'm going to draw your attention to

2  May 1, 2015?

3  A    Yes, ma'am.

4  Q    Okay.  Now, you testified to the conversation between

5  Simpson and Mr. Abdul Kareem on May 1st, 2015.

6          And Mr. Simpson's text at 9:12 p.m., does that

7  indicate to you that Mr. Simpson is apologizing to Mr. Abdul

8  Kareem for having a fight the day before?

9  A    Based on that, yes.

10  Q    And you don't know what it was about, correct?

11  A    I do not, ma'am.

12  Q    All right.  And then 9:28 -- I'm sorry -- let's go back to

13  9:12.  Mr. Simpson says:

14          "I know you hooked it up though.  LOL."  Correct?

15  A    Yes, ma'am.

16  Q    He says I'm sorry I can't make it, correct?

17  A    Yes, ma'am.

18  Q    And Kareem merely responds that he didn't cook it,

19  correct?

20  A    Yes, ma'am.

21  Q    Are you aware that Mr. Kareem invited several --

22          Well, you did.  You looked at Mr. Kareem's text

23  messages, correct?

24  A    I did, yes, ma'am.

25  Q    And in those text messages he was inviting several people

1  over because he had made a feast, essentially, and you saw

2  that in the text messages, correct.

3  A   I don't recall the content from those messages, no.

4  Q   So you don't recall Mr. Abdul Kareem asking several

5  people, saying, hey, why don't you come over for dinner,

6  correct?

7  A   I recall hearing it but I don't recall the exact content

8  and who it was with.  Let me clarify.

9  Q   But you do recall him inviting people over to eat?

10  A   Yes.

11  Q   And "LOL," can you just repeat what that means for the

12  jury?

13  A   "Laughing out loud."

14  Q   Okay.  So Simpson's attitude is pretty light-hearted in

15  this message, correct?

16  A   Based on that, maybe.

17  Q   So based on the records that you reviewed, Mr. Abdul

18  Kareem called Soofi's phone number, the phone number you

19  associate with Soofi, about midnight on May 3, 2015, correct?

20  A   Yes, ma'am.

21  Q   And that's after the attack occurred in Texas, correct?

22  A   Yes, ma'am.

23  Q   And it says one minute there.

24       You're aware that Mr. Soofi was already dead at that

25  point, correct?

1    A    Yes, ma'am.

2    Q    So one minute.  He clearly did not speak to Mr. Soofi?

3    A    No, ma'am.  That's as billed by T-Mobile in their returns.

4    Q    What does that mean?

5    A    That means that they charge anything that's a minute or

6    less to a minute.

7    Q    So if --

8         THE COURT:  But the question is:  Do they charge if

9    nobody answers?

10        THE WITNESS:  I do not know that.  I just know that

11   the returns show a one-minute call.

12        THE COURT:  Because we know that Mr. Soofi didn't

13   answer.

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  So somehow a call was made.  Not

16   answered.  But there's still a one-minute charge for it?

17        THE WITNESS:  To clarify.  It's on the returns.  It's

18   on the record showing a one-minute thing.

19        THE COURT:  But you don't know --

20        So if we see a whole bunch of other one-minute ones,

21   we have no idea whether that was a completed call or not a

22   completed call?

23        THE WITNESS:  No.  The record does not differentiate

24   between answered or not answered.  It's just whether or not it

25   completes to the other phone.

```
 1    BY MS. PLOMIN:

 2    Q   So, for instance, if Mr. Abdul Kareem's phone called a

 3    phone number associated with Mr. Nadir Soofi and it connected

 4    to voice mail, would that show one-minute call?

 5    A   Based on my review, yes.

 6    Q   All right.  And that just reminds me.

 7            In your analysis that there are 659 total telephonic

 8    communications exchanged between Mr. Abdul Kareem and

 9    Mr. Simpson and Mr. Soofi, does that include the one-minute

10    duration phone calls that could be just connecting the voice

11    mail?

12    A   Yes, it does.

13    Q   Okay.  And then similarly, Mr. Kareem calls Mr. Simpson

14    1:26 a.m. and there's a one-minute on May 4th, I'm sorry, and

15    there's that one-minute notation.

16            Does that mean the same to you?  Connected voice

17    mail?

18    A   Yes, ma'am.

19    Q   And, again, Mr. Soofi at  8:29 a.m. on May 4th?

20    A   Yes, ma'am.

21    Q   Same thing?

22    A   Yes.

23    Q   Are you aware that Ali Soofi and Nadir Soofi had switched

24    the SIM cards out of their phones so they essentially

25    exchanged cell phone numbers so Nadir's number became Ali's
```

1    number?

2    A    I was not, ma'am.

3    Q    And you obviously don't know when that happened, correct?

4    A    I don't not, ma'am.

5    Q    But if Mr. Abdul Kareem had a phone number for Nadir Soofi

6    and the numbers had been switched --

7              Well, let me -- I'll withdraw that.  Strike that.

8              Moving to Exhibit 479, the summary of the text

9    messages of Mr. Abdul Kareem on May 3rd and May 4th.  Are

10   these all of the text messages that you recovered on May 3rd

11   and May 4th on Mr. Kareem's phone?

12   A    No.  They are not.

13   Q    All right.  So you just picked out the ones that were

14   important to you?

15   A    No, ma'am.  I removed a couple that had identifiable

16   information.  I was unaware whether or not that could or could

17   not be shown.

18   Q    I see.  But aside from that is this complete to you?

19   A    Yes.

20             THE COURT:  Were the ones that you did not include on

21   this report messages that you interpreted as related to his

22   moving business?

23             THE WITNESS:  Yes, ma'am.

24             THE COURT:  With personal identifying information?

25             THE WITNESS:  Yes, ma'am.

1    BY MS. PLOMIN:

2    Q   So there are actually more texts on April 3rd and April

3    4th about his moving business and him communicating about his

4    business, correct?

5         MR. KOEHLER:  Just to clarify the record, May 3rd and

6    4th.

7         THE COURT:  I think you said "April."

8         MS. PLOMIN:  Oh.  May 3rd and 4th?

9         THE WITNESS:  Yes, ma'am.

10   BY MS. PLOMIN:

11   Q   So when you become aware of a phone number, you can either

12   issue a warrant or a subpoena to the provider in order to find

13   out who the subscriber to that phone number is; is that right?

14   A   That's generally done by agents, ma'am.

15   Q   Okay.  But law enforcement can do that, correct?

16   A   Yes.

17   Q   All right.  And did anybody ascertain who this phone

18   number belonged to ending in "8365"?

19   A   I am unaware of anybody.

20        MS. PLOMIN:  Madame Clerk, may I have Exhibit 479.

21        May I approach, Your Honor.

22        THE COURT:  Yes.

23        MS. PLOMIN:  Thank you.

24   BY MS. PLOMIN:

25   Q   So I'm placing Exhibit 479 on the screen for the jury to

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1    see and for you to see.

2            This phone number "4804488365," we don't know whose

3    phone number that is, correct?

4    A    I do not know whose phone number that is, ma'am.

5    Q    But it's your understanding this is a person who Mr. Abdul

6    Kareem communicated with relating to posting ads for his

7    moving business, correct?

8    A    Yes, ma'am.

9    Q    So on May 3rd at six o'clock p.m. -- and I'm sorry.

10           What time was the attack in Texas?

11   A    It was at 6:51 p.m. Arizona time.

12   Q    At six o'clock.  6:01 --

13           THE COURT:  Wait.  Wait.  Wait.

14           I thought you said it was at 6:51 Texas time.

15           THE WITNESS:  That is correct, ma'am.  I'm sorry.

16   6:51 Texas.  4:51 Arizona.

17   BY MS. PLOMIN:

18   Q    Okay.  So it's 6:01:25.  6:01 p.m.  Mr. Abdul Kareem is

19   receiving text messages from this phone number just asking him

20   where he is, correct?

21   A    Yes, ma'am.

22   Q    And then Mr. Abdul Kareem texts him back, this guy who is

23   posting ads for him for his business, correct?

24   A    Yes, ma'am.

25   Q    And that's at 8:21:29 p.m.  Correct?

1    A   He texted him back, it looks like, at 8:46 p.m.

2    Q   All right.  And then do you know who Asma -- spelled

3    A-S-M-A -- do you know who that is?

4    A   I do not, ma'am.

5    Q   Are you aware that this is a person that Mr. Abdul Kareem

6    also communicated with about posting ads for his business?

7    A   I am not, ma'am.

8    Q   Did you look to see within the records whether or not

9    there was other communications with this person about ads for

10   Craiglists --

11   A   I did not.

12   Q   -- for his business?

13   A   No, ma'am.  I did not.

14   Q   And at 8:49:05 p.m. he says:

15           "Salaam walaikum brother call me."

16           Correct?

17   A   Yes, ma'am.

18   Q   And that's Mr. Abdul Kareem sending that out, right?

19   A   Yes, ma'am.

20   Q   And what does "salaam walaikum" mean, do you know?

21   A   I do not know.

22   Q   Have you ever heard it before?

23   A   Yes.

24   Q   And it's a common greeting for Muslim people to greet each

25   other with; is that right?

1    A    I believe so.

2    Q    And then so up until 9:45:11 p.m. on the night of May 3rd,

3    Mr. Abdul Kareem is communicating with people who are posting

4    ads for his moving business, correct?

5    A    Yes, ma'am.

6    Q    And then at that time at 9:25:23 p.m. -- I'm sorry.

7    9:45:11 p.m. he sends a text to Mr. Abdul Khabir and says:

8             There's something really important.  I want to talk

9    to you.

10            Is that right?

11   A    Yes.  First he says:  Unblock my number.

12   Q    I'm glad you reminded me.

13            "Unblock my number."

14            Does that indicate to you that maybe they had been --

15   Mr. Abdul Khabir and Mr. Abdul Kareem may have been having an

16   argument before?

17            MR. KOEHLER:  Objection.  Calls for speculation.

18            THE COURT:  Sustained.

19   BY MS. PLOMIN:

20   Q    Does it indicate to you that the number was blocked?

21   A    Yes, ma'am.

22   Q    And so the next day Mr. Abdul Kareem starts receiving

23   texts notifying him of the contest and perhaps that Ibrahim is

24   dead, is that correct, on May 4th?

25   A    Yes, ma'am.

1    Q    He receives a text from Abdul Mubarak sending him a link

2    to a news article, a public news article; is that right?

3    A    Yes, ma'am.

4    Q    And that is at 5:30 in the morning, correct?

5    A    Yes, ma'am.

6    Q    And then Abdul Kahbir at 10:28:28 a.m., he's texting Mr.

7    Abdul Kahbir -- I'm sorry -- Mr. Abdul Kareem saying:

8         If you type the name Elton Simpson on the Internet,

9    Ibrahim picture pops up with them talking about attack in

10   Texas.

11        And so he's notifying him as well; is that correct?

12   A    Yes, ma'am.

13   Q    And meanwhile, on the day of May 4th, Mr. Abdul Kareem is

14   communicating with people about his moving business, correct?

15   A    Yes, ma'am.

16   Q    And I want to go back to the morning of May 3rd.  The

17   review of the text messages, your review of the text messages

18   of Mr. Abdul Kareem's phone, he was communicating to somebody

19   about a moving job that day, correct?

20   A    Yes, ma'am.

21        THE COURT:  Excuse me, Ms. Plomin.  We're going to

22   break for lunch.

23        Ladies and gentlemen, we will reconvene at 1:15.

24        I want to remind you again of the admonition not to

25   discuss the case among yourselves or with anyone else.

CR15-00707-PHX-SRB     JURY TRIAL-DAY #8 2-26-16

1    Please do not form any conclusions about the case

2    until you have heard all the evidence and begun your

3    deliberations.

4    Court is in recess until 1:15.

5    (Recess taken at 11:59 a.m.; resumed at 1:18 p.m.)

6    THE COURT:  Thank you, ladies and gentlemen.  Good

7    afternoon.  Please sit down.  The record will show the

8    presence of the jury, counsel, and the defendant.

9    Ms. Plomin, you may continue with your questions for

10   Mr. Neville.

11   MS. PLOMIN:  Your Honor, I don't have any further

12   questions.

13   THE COURT:  Thank you.  Mr. Koehler, redirect?

14                    **REDIRECT EXAMINATION**

15   BY MR. KOEHLER:

16   Q   Thank you, Your Honor, and good afternoon everyone.

17   Mr. Neville, first off, you were asked about

18   Mr. Simpson's public activity on Twitter.

19   Did any of the messages that you saw on his public

20   Twitter profile rise to the level of being unlawful in any

21   way?

22   A   No, sir.

23   Q   The next thing is about your training.

24   Have you -- has your training focused on the areas in

25   which you described in your testimony today?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1   A   Yes, sir.

2   Q   The terms that you observed that you talked about knowing

3   the meaning of, how often do you see those terms?

4   A   On a daily basis, sir.

5   Q   Now, I want to talk to you about Surespot.

6         Ms. Plomin asked you a question about getting a

7   search warrant for Surespot.  Does Surespot store data in a

8   way that the FBI could execute a search warrant at Surespot

9   and get any of that data?

10  A   They do not store any kind of content.  There's no way of

11  getting any of the content of messages.

12  Q   And if the user has deleted the content from their device,

13  can it be gotten from the device?

14  A   No.  It cannot.

15        THE COURT:  So when you said they don't retain any

16  content, you sort of implied that there is something you could

17  get from Surespot.  What is it?

18        THE WITNESS:  I'm not fully aware of what it is but I

19  have heard that you can get some of the to/from kind of data.

20        THE COURT:  So the fact that a communication was made

21  but not what the content was?

22        THE WITNESS:  As long as it hasn't been deleted.

23  Once it's deleted from a device, it deletes from their servers

24  as well.

25        THE COURT:  Thank you.

UNITED STATES DISTRICT COURT

1    BY MR. KOEHLER:

2    Q   One of the terms that we discussed earlier was the word

3    "hijra."

4            In the Islamic State magazine Dabiq is "hijra" a term

5    used in that magazine?

6    A   Yes, it is.

7    Q   Is it, in fact, the title of one of their magazines?   In

8    other words, one of their issues of the magazine?

9    A   Yes, it is.

10   Q   What is the full title of that issue?

11   A   I do not know the full title offhand.

12   Q   Okay.  With respect to the issue of noncompleted calls,

13   was the fact that a call could go to voice mail one of the

14   reasons that you looked at the records for both calls to

15   correlate them?

16   A   Yes, sir.

17   Q   For both phones.

18           And did that help you rule out possible calls that

19   looked like noncomplete calls?

20   A   Yes, sir.

21   Q   And, again, what was the count of the calls that you ruled

22   out?

23   A   There were eight that were on one record and not the

24   other.  And 14 that were on both records but with a

25   zero-second duration on Simpson's.

1    Q    So a total of 22 calls that you ruled out for that reason?

2    A    Yes.

3    Q    Between April 23, 2015 and April 29 of 2015 were there any

4    communications at all, whether they were text messages,

5    outgoing phone calls that might have gone to voice mail, or

6    calls with zero-seconds duration of any sort between Elton

7    Simpson and Abdul Malik Abdul Kareem's phones?

8    A    Not in the records I reviewed.

9    Q    And the last thing, I believe it was Exhibit 479, that you

10   had the May 3rd and 4th, 2015 text messages.

11   A    Yes, sir.

12   Q    You mentioned that you omitted text messages that had

13   personally identifying information in them.

14        Did you review over the lunch hour to see how many

15   text messages you omitted?

16   A    Yes, I did.

17   Q    How many messages were they?

18   A    There were two messages.

19   Q    And, in general, can you describe what those two messages

20   were?

21   A    Yes.  They were messages -- first one from a potential

22   client that had her full name, address, phone number, and her

23   husband's phone number.

24        The second message was that being forwarded to

25   Lafayette.

1          MR. KOEHLER:  No further questions.

2          THE COURT:  May Mr. Neville be excused?

3          MR. KOEHLER:  Yes.

4          THE COURT:  Any objection?

5          MS. PLOMIN:  No, Your Honor.

6          THE COURT:  Thank you very much, Mr. Neville.  You

7     may step down and you are excused as a witness.

8          The government may call its next witness.

9          MR. KOEHLER:  The government recalls Robert

10    Meshinsky.

11         THE COURT:  Sir, you may take the stand.

12         You may proceed, Mr. Koehler.

13         MR. KOEHLER:  Agent Meshinsky, you remain under oath.

14         **SPECIAL AGENT ROBERT MESHINSKY, WITNESS, SWORN**

15              **DIRECT EXAMINATION (cont'd)**

16    BY MR. KOEHLER:

17    Q   I want to talk to you about some of the other devices in

18    the case that you processed.  We talked last week about the

19    thumb drive.  Do you recall that?

20    A   Correct.

21    Q   Can you tell members of the jury the other devices that

22    you uploaded in this case.

23    A   There were several computers.  There were thumb drives.

24    There was SD cards from cell phones.  There were cell phones

25    as well.

1    Q    All right.  And are you able to describe them more

2    specifically in terms of a device number and the type of

3    device it was?

4    A    I could -- we -- the convention that we use is we assign

5    "Q" numbers to it.  "Q" is questionable item.  "PX" meaning

6    Phoenix.  And then we assign a number to it.

7             In the case we started with QPX_100 because we were

8    taking items from the house as well as from the truck.  And

9    the QPX_100 was a laptop and QPX 100_1 was the hard drive that

10   was within the laptop.  There were several other items.  I

11   can't recall them all.

12   Q    Was one of them known as QPX_9?

13   A    Yes.

14   Q    And what item was that specifically?

15   A    I believe QPX_9 was a phone.

16   Q    Was it a LG 440 phone?

17   A    Yes.

18   Q    And did you export items from that particular device?

19   A    Yes.

20   Q    I want to direct your attention first to Exhibit No. 348

21   on the document camera.  Do you recognize that?

22   A    Yes.  That would be a picture we took.

23   Q    Okay.  And did you take this picture with the ZRT tool?

24   A    I did.

25   Q    Can you remind us again what that was?

1    A    Zippy recording tool.

2    Q    And how do you use that tool, again?

3    A    We have the phone in airplane mode as you can see so it

4    cannot receive or transmit data.

5            We scroll through to, in this case, text messages and

6    we take it with a digital camera, take a picture.

7    Q    And is Exhibit 348 a true and accurate copy of one such

8    set of text messages from the LG 440 phone?

9    A    It is.

10           MR. KOEHLER:  Move to admit 348.

11           MS. PLOMIN:  No objection.

12           THE COURT:  348 is admitted.

13    (Exhibit No. 348 admitted in evidence.)

14    BY MR. KOEHLER:

15    Q    Can you please read the text message there.

16    A    I hope I don't -- Yes.

17           "Insha Allah we will get daren and use the money to

18    fund operts here...no sham...they check passport, et cetera.

19    We went to Deer Valley and found out yest they dnt check."

20           Don't.

21    Q    And continue from where that ends.

22    A    "And found out" -- abbreviation for yesterday -- "they

23    don't check passports for national travel.  I feel at ease

24    about this decision.  We will look into getting silencers

25    today for daren."

1    Q   And now on to 349.

2           Is this also an export of text messages from that

3    same LG 440 phone?

4    A   Yes, it is.

5           MR. KOEHLER:  Move to admit 349.

6           MS. PLOMIN:  No objection.

7           THE COURT:  349 is admitted.

8       (Exhibit No. 349 admitted in evidence.)

9    BY MR. KOEHLER:

10   Q   Can you start with page one and read the texts from that.

11   A   "I'm serious...we will need another postponement...I will

12   explain...this situation will affect people, a bro in

13   particular as if he is in -- he is not telling me not to go

14   shopping."

15   Q   Go on.

16   A   "But he just needs a door to open up first...if not,

17   things can become super difficult on him.  He doesn't mind the

18   backlash that will come but he wants to put some."

19   Q   Go on to page 3 and go to the line below.

20           "Wants to put some."

21   A   "Wants to put some eggs in his basket.  He asked me to

22   postpone.  He is trustworthy too.  Just spoke with

23   him...second reason is security...two people were told but

24   they won't be..."

25   Q   Just the last line.

```
1    A    -- "but they won't be in."

2    Q    And now moving on to 350, is this another export of text

3    from the ZRT phone?

4    A    From the LG phone, correct.

5    Q    I'm sorry.  From the ZRT of the LG phone?

6    A    Correct.

7    Q    Now, this looks different.  Can you explain what this is

8    just in general terms?

9    A    This is a picture of a picture that was on the phone.

10   Q    So in other words, you had the phone open with a ZRT and

11   took a photograph of it.  And what you're showing on the

12   screen of the phone that you're taking a photograph is a

13   photograph of another phone?

14   A    Correct.

15   Q    Okay.  And are you able to read the text on that if I zoom

16   in a little bit?

17   A    If you zoom in.

18           THE COURT:  But only if you offer it first.

19   BY MR. KOEHLER:

20   Q    Is that a true and correct copy of what came out of the LG

21   440 phone?

22   A    Yes.

23           MR. KOEHLER:  Move to admit 350.

24           MS. PLOMIN:  No objection.

25           THE COURT:  350 is admitted.
```

 1          (Exhibit No. 350 admitted in evidence.)

 2              THE COURT:  So do I understand correctly that what

 3     you -- this is somebody took a photograph of a text message on

 4     somebody else's phone?

 5              THE WITNESS:  Correct.  This picture was on the phone

 6     that I took a picture of.

 7              I can try to read this.  Where do you want me to

 8     start?

 9     BY MR. KOEHLER:

10     Q   Go ahead and read the line about "but when you get a

11     flight."

12     A   "But when you get a flight from Bulgaria you get a flight

13     to" --

14              I can't read that part.  And then it looks like

15     G-O-H-G-E-N Airport.  Not the -- and I can't read the next

16     letter -- name -- or word, excuse me.

17     Q   Okay.  Let's go to the next one.  Go ahead.

18     A   "You're not one way.  You have a trip both ways to IST and

19     back to Bulgaria."

20     Q   Go ahead.

21     A   "Okay.  Find out in which city or" -- I can't read that --

22     "he is in and I will call him to ask about me."

23     Q   Does it say:  "Will I tell him who to ask about me"?

24     A   Yes.  That is a "who."

25     Q   And last page.

1   A   "Find someone you know in D."

2          Can't read what's after that.  I can't read the next

3   word.

4          "...them to me and I will tell them who to ask."

5          Can't read the next.

6   Q   Is that a little smiley face?

7   A   There's a little smiley face at the end, yes.

8   Q   Exhibit 486 and 487.

9          I'm now going to show you what's been marked for

10  identification as Exhibit 486.  Do you recognize that, Agent

11  Meshinsky?

12  A   It's a picture taken from one of the computers.

13  Q   And is that a true and accurate copy of the picture that

14  was taken?

15  A   Yes.

16  Q   And do you recall which computer this came off of?

17  A   I do not recall the computer.

18  Q   But are you certain it came off of one of the computers?

19  A   Yes.

20         MR. KOEHLER:  Move to admit 486.

21         MS. PLOMIN:  Objection as to foundation as to which

22  computer.

23         THE COURT:  Sustained.

24  BY MR. KOEHLER:

25  Q   Can I show the Agent page 2 of the exhibit?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1          What are you looking at there, Agent Meshinsky?

2    A    That's the metadata from the picture.

3    Q    Does the metadata help refresh your recollection where

4    that came from?

5    A    Well, it was taken with a Sony camera.  I would have to

6    believe it was one of the laptops that were in the location we

7    described as QPX 100_1.

8    Q    I'm going to withdraw those two at this time.

9          Now, the last thing, did you also export data from

10   the Acer Aspire that was taken from Mr. Abdul Malik Abdul

11   Kareem's house?

12   A    Yes.

13   Q    And as part of that, did you analyze the data and export

14   items from that.

15   A    Exported items, correct.

16   Q    Is one of the items you exported a system log?

17   A    Yes.

18   Q    I would like to draw your attention now to Exhibit 481.

19   Do you recognize that?

20   A    Yes.

21   Q    What is that?

22   A    Those are items that were in the activity log which is

23   stored on your computer.  Every time you plug something into

24   it, an event is registered in your computer.  So this would be

25   the event log and this here are --

UNITED STATES DISTRICT COURT

1  Q   I don't want you to go further yet.

2  A   Okay.

3  Q   Is this a true and accurate copy of the event log from the

4  Acer Aspire computer taken from Mr. Abdul Kareem's home?

5  A   Yes.

6          MR. KOEHLER:  Move to admit 481.

7          MS. PLOMIN:  No objection.

8          THE COURT:  481 is admitted.

9      (Exhibit No. 481 admitted in evidence.)

10 BY MR. KOEHLER:

11 Q   Can you describe the types of events that are being logged

12 in this particular event log?

13 A   This particular event log shows tethering between the

14 computer and the phone.  The phone is the Gravity 5.5

15 accessing the Internet.

16 Q   Was there a Gravity 5.5 phone that was seized in this

17 case?

18 A   There was.

19 Q   And do you recall whose phone that was?

20 A   I don't recall the user's name, no.

21 Q   Okay.  And can you tell us what lines in this correlate to

22 a log-on and a log-off from the Gravity phone?

23 A   If you look on TimeCreated(System Time) 2015 is the year.

24 01.  January.  22.  And you have your time of 1622, so it

25 would be 4:22.  Then your log-off time, it doesn't show there.

```
 1   Q    Okay.  So what is it -- what's the code that says that
 2   there's a connection or a log-on time?  Where is that shown on
 3   this particular record here, can you tell?
 4   A    "TimeCreated."  That's when the event took place.
 5   Q    Okay.  And then is there something specific that means
 6   that it's coming on versus turning off?
 7   A    No.
 8   Q    Okay.  Let's go to the next?
 9   A    So that would be a different day.  That is January 23rd,
10   2015.
11   Q    Then going to the next page, do you see more log-ins?
12   A    Yes.  I'm sorry.  February 8, 2015.
13   Q    Are these all to that Gravity 5.5 phone?
14   A    That is correct.
15   Q    And do the records throughout this document reflect
16   log-ins and log-outs from the Gravity 5.5?
17   A    Correct.
18   Q    Can you explain to members of the jury what tethering is.
19   A    Tethering allows you to use your cell phone as a hot spot.
20   And you can connect your laptop or even your desktop.  You can
21   do it remotely over the WiFi.  You can connect using your USB
22   or your phone cable.  And so you use that as a hot spot.
23   Q    So if somebody uses a cell phone as a hot spot, do they
24   need a cable modem or a router in their home?
25   A    They do not.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

```
 1              MR. KOEHLER:  No further questions.

 2              THE COURT:  Ms. Plomin, do you have any questions for

 3    Agent Meshinsky?

 4              MS. PLOMIN:  Your Honor, I would ask to approach.

 5              THE COURT:  Just tell me.

 6              MS. PLOMIN:  Your Honor, we received some exhibits

 7    last night, late last night --

 8              THE COURT:  The exhibits that he just testified

 9    about?

10              MS. PLOMIN:  Yes.

11              THE COURT:  And so you haven't had a chance to review

12    them for purposes of cross-examination?

13              MS. PLOMIN:  Yes.

14              THE COURT:  And so you wish to defer it till another

15    day which is probably next Tuesday?

16              MS. PLOMIN:  Yes.

17              THE COURT:  All right.  We will do that.

18              Agent Meshinsky, thank you, sir.  You may step down

19    and we'll see you next week.

20              MS. BROOK:  Government calls Special Agent Stewart

21    Whitson.

22              THE CLERK:  Please state your name for the record

23    spelling your first and last name.

24              THE WITNESS:  Stewart Whitson.  S-T-E-W-A-R-T.

25    W-H-I-T-S-O-N.
```

1    MS. BROOK:  Just one moment.

2    **SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN**

3    **DIRECT EXAMINATION**

4  BY MS. BROOK:

5  Q   Good afternoon.

6  A   Good afternoon.

7  Q   Would you please introduce yourself one more time to

8  ladies and gentlemen of the jury.

9  A   Hi.  I'm Special Agent Stewart Whitson with the Federal

10  Bureau of Investigation.

11  Q   And, sir, what is your current assignment?

12  A   I'm a Special Agent assigned to a National Security Squad

13  and I investigate counterterrorism matters.

14  Q   How long have you been with the FBI?

15  A   Just under five years.

16  Q   And what is your educational background before you joined

17  the FBI?

18  A   I obtained a Bachelor of Arts in Political Science with a

19  minor in History, along with a Juris Doctorate from the

20  University of Minnesota.  And I'm currently pursuing a

21  master's degree from George Washington University in Safety

22  and Security Leadership with an emphasis on strategic security

23  studies.

24  Q   Prior to joining the FBI, where were you employed?

25  A   I was a U.S. Army Infantry Platoon Leader and then later a

1    Company Commander.

2    Q    And the later what?

3    A    A Company Commander in the infantry.

4    Q    At some point did you become an officer within the

5    military?

6    A    Yes, I was an officer.

7    Q    In that capacity, were you ever deployed?

8    A    Yes.

9    Q    Where were you deployed to?

10   A    I was deployed to Iraq for 16 months in 2005 to 2007.

11   Q    And as an officer deployed in Iraq, just briefly, what

12   were some of your duties there?

13   A    Well, essentially, I had an area of -- well, I spent some

14   time between Ramadi and Fallujah, but most of my time near

15   Baghdad.  And I had an area of the city that I was there to

16   help take care of, to provide safety and security, built an

17   elementary school, pharmacy, that kind of thing.  So just kind

18   of met with Imams and sheikhs and things like that in the

19   area.

20   Q    So fast-forwarding, then at some point, obviously, five

21   years ago you became a Special Agent within the FBI.

22         At some point did you become the lead case agent in

23   the investigation against Abdul Malik Abdul Kareem?

24   A    Yes.

25   Q    And as it relates to him, prior to May 5th of 2015, did

1    you know him?

2    A    No.

3    Q    Historically, are you aware of an investigation the FBI

4    had into Elton Simpson?

5    A    Yes.

6    Q    And were you ever involved in that particular case?

7    A    No.

8    Q    I want to start off and talk about an interview that you

9    conducted on May 5th of 2015.  On that day did you happen to

10   interview Abdul Malik Abdul Kareem?

11   A    Yes.

12   Q    And here --

13        THE COURT:  How about, Agent Whitson, could you speak

14   more closely to the microphone?

15        THE WITNESS:  Yes, Your Honor.

16        THE COURT:  Thank you.

17   BY MS. BROOK:

18   Q    Here with us in the courtroom today, do you see him?

19   A    Yes.

20   Q    Can you point to him and identify something that he's

21   wearing.

22   A    He's the gentleman in the long-sleeved collared shirt,

23   blue.

24        MS. BROOK:  Your Honor, may the record reflect the

25   witness has identified the defendant?

```
 1              THE COURT:  Yes.
 2    BY MS. BROOK:
 3    Q   So how was it on that day on May 5th that you became
 4    involved in conducting that particular interview?
 5    A   On May 5th, the morning of May 5th, I was asked by my
 6    supervisor to assist in the interview of Mr. Kareem.
 7    Q   And on that day on May 5th, was the defendant a suspect in
 8    the investigation?
 9    A   No.
10    Q   We've heard, and obviously, you have been here as the lead
11    case agent, so you have heard Detective Nash testify about him
12    being there during that interview and taking notes.
13              Other than you and Detective Nash, were there any
14    other agents that were involved in that interview that day?
15    A   No.
16    Q   So let's talk about the setup of that interview.
17              How was it that the defendant came to the FBI to
18    partake in that particular interview?
19    A   Sometime prior -- early in the morning, I guess, that day
20    Detective Nash had reached out to Mr. Kareem via telephone and
21    asked him whether he would be willing to voluntarily come into
22    the office to speak with investigators.
23    Q   Did you do anything to set up an interview room?
24    A   Yes.
25    Q   What did you do?
```

1    A   So while he coordinated with Mr. Kareem to see if

2    Mr. Kareem would be willing to come in, I set up the interview

3    room we would use and then I sought to acquire a recording

4    device to use during that interview.

5    Q   So you sought out a recording device to use in that

6    particular interview.  Is it a priority of yours to record

7    interviews that you conduct as part of an ongoing

8    investigation?

9    A   It depends on the situation.

10   Q   And explain that a little bit.

11   A   Well, so a lot of the interviews we do may be in an

12   environment that isn't necessarily safe or conducive for

13   conducting recordings.  So if we're going into a place of

14   known crime or we're interviewing someone that we know to be

15   dangerous, I may not want to worry about messing with the

16   recording device while I'm conducting the interview.

17        But, typically, when it's going to be something in

18   the office or something such as this interview was, I would

19   try to record it.  That would be my practice.

20   Q   And what was your first step that day in an attempt to

21   record the interview?  Did you select a particular room?

22   A   Yes.  So my first effort was to obtain a room that we

23   already had wired for video and audio but that room was taken.

24   Because of the investigation, lots of people were being

25   interviewed.  So then I needed to find an alternate location.

1   Q    Okay.  And just to be clear, on that day was the defendant

2   under arrest?

3   A    No.

4   Q    And was he in any way ordered to come down to the FBI to

5   partake in an interview?

6   A    No.

7   Q    Did you reach out to Special Agent Brian Taylor within the

8   FBI?

9   A    Yes.

10  Q    And who is Brian Taylor?  What's his position within the

11  FBI?

12  A    He's a Special Agent that deals with technical matters,

13  recording devices, and things like that.

14  Q    And so did -- is he a technically-train Special Agent that

15  assists with setting up recording devices?

16  A    Yes.

17  Q    Did you enlist his help to set up the recording device in

18  the particular room that you had the defendant in for an

19  interview?

20  A    Well, initially, I just requested a device to use.  But

21  Special Agent Taylor let me know that he already had a room

22  wired for audio and video and asked if I wanted to use that,

23  which, of course, I said, yes, if you already have that wired

24  for audio and video, that would work out perfectly.

25  Q    So how was it the defendant appeared at the FBI that day?

1   Did he -- how did he get there, do you know?

2   A   I believe he drove himself.  He -- we didn't go get him.

3   He somehow showed up at our office at the time when he was

4   supposed to and then Detective Nash went out to greet him.

5   Q   At some point did you greet him within the FBI?

6   A   Yes.

7   Q   And where was it that you greeted him?

8   A   I greeted him -- so we have a door that leads into a lobby

9   area at our office.  And then there's another door that leads

10   into the area with the interview rooms.  And so I greeted him

11   at that other door that leads into where the interview rooms

12   are.

13   Q   And did he come with you into the interview room?

14   A   Yes.

15   Q   And the interview room, just explain the setup of it.  How

16   many total -- once you got in there with him, how many people

17   were inside the interview room?

18   A   There were three of us.

19   Q   Okay.  So it was you, Detective Nash, and the defendant?

20   A   Yes.

21   Q   And the room that you're in, is the door locked?

22   A   No.

23   Q   And do you express to an individual when you're

24   interviewing them in these circumstances that they are free to

25   leave and it's a voluntary interview?

```
1   A   Yes.

2   Q   What do you say?

3   A   So my --

4           THE COURT:   Could I ask that instead of asking it

5   theoretically, if you could ask about what he did that day?

6   BY MS. BROOK:

7   Q   So let's focus in right on this particular interview.

8   What did you say to the defendant in terms of it being a

9   voluntary interview?

10  A   Well, as soon as he came into the room with us, I thanked

11  him, told him how much we appreciated that he had voluntarily

12  come into the office, that obviously, he understood with what

13  had happened in Texas that we were interviewing lots of people

14  and so that it made our job a lot easier for people to be

15  willing to come in and do it like that and sincerely thanked

16  him for doing that.

17  Q   Okay.   Approximately, how long was the interview?

18  A   Just under two hours.

19  Q   And at any point during the interview, did you leave the

20  room?

21  A   No.

22  Q   At any point during the interview did Detective Nash leave

23  the room?

24  A   No.

25  Q   And at any point did the defendant leave the room?
```

1  A   No.

2  Q   At any point did he express that he wanted to leave the

3  room?

4  A   No.

5  Q   At any point did he express that he didn't want to talk to

6  you?

7  A   No.

8  Q   How did he appear during the interview?  Did he look sick

9  at all?

10  A   No.

11  Q   Did he appear to be sweating at all?

12  A   No.

13  Q   Did he appear to be struggling to communicate with you at

14  all?

15  A   No.  Not at all.

16  Q   Did he seem uncomfortable at all?

17  A   No.  I think, you know, once we got into the conversations

18  about Simpson, I think you could see him kind of well up with

19  tears as we were talking about that.  But other than that, he

20  seemed perfectly comfortable.

21  Q   Did you ask him if he knew Elton Simpson and Nadir Soofi?

22  A   Yes.

23  Q   And what did he say?

24  A   He said he did know them.

25  Q   Did he know that they were both killed on May 3rd of 2015,

1    so two days before?

2    A   Yes.

3    Q   And, initially, did he tell you that to his knowledge,

4    Simpson didn't have an AK?

5    A   Yes, initially.

6    Q   And by "AK," what does that mean?

7    A   He said an AK-47, which I understood, based on the context

8    of the conversation, to be an AK-47 assault rifle.

9    Q   Then what happened next?

10   A   Then -- so after he said that, we asked him further

11   questions.  And then he corrected himself and said that he had

12   seen an AK-47.

13   Q   Did you ask him if he had ever gone shooting with Simpson

14   or Soofi?

15           MR. MAYNARD:  Objection, Your Honor.  It's leading.

16           THE COURT:  I don't think that was.  Overruled.

17           THE WITNESS:  So, yes.  I did ask him if he had gone

18   shooting with Simpson and Soofi.

19   BY MS. BROOK:

20   Q   And what did he say?

21   A   He said no.

22   Q   Did he say anything about Simpson ever asking him to go

23   shoot with him?

24   A   Yes.

25   Q   What did he say?

1   A   He said that they had asked him to go shooting and had

2   specified that they didn't want to do it at a range.  They

3   wanted to do it somewhere out in the desert in order to avoid

4   law enforcement detection.  And he said that his response was

5   he declined to do that.

6   Q   Did he make any statements about whether or not Simpson

7   and Soofi had gone shooting with the weapons that they used in

8   connection with the attack?

9   A   He stated that to the best of his knowledge, they had not

10  ever fired the weapons that they ultimately used in Garland.

11  Q   Did he make any statements about whether he had seen

12  Simpson or Soofi with body armor, military gear, or vests?

13  A   Yes.

14  Q   What did he say?

15  A   He specifically said that he had not seen body armor,

16  other kind of tactical gear, backpacks, things of that nature.

17  Q   At some point during the conversation did the defendant

18  say who he thought Simpson and Soofi may be influenced by?

19  A   Yes.

20  Q   And who was that?

21  A   He described him as a radical salafi Jamaica-based

22  scholar named Faisal.

23  Q   And based upon your training and experience, your work

24  within the JTTF, the Joint Terrorism Task Force, do you know

25  what Sheikh Faisal is?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1   A   Yes.

2   Q   Who is he?

3   A   Sheikh Faisal is a Jamaica-based radical cleric.  He was

4   someone that supported the al-Qa'ida and the Arabian Peninsula

5   and al-Qa'ida in general before the emergence of the Islamic

6   State.

7           And then when the Islamic State announced its

8   khalifate on June 29th of 2014, he was one of the first

9   English-speaking clerics to come out in support of them.  And

10  so he delivered lectures and things like that in support of

11  the Islamic State.

12  Q   Did the defendant say whether or not he too followed or

13  watched Sheikh Faisal?

14  A   The defendant said he did not.

15  Q   And let me take a step back.

16          So in this case during the course of its

17  investigation, did you find evidence of Sheikh Faisal lectures

18  on the defendant's Acer computer?

19  A   Yes.

20  Q   Where else did you find evidence of Sheikh Faisal

21  lectures?

22  A   We also found two to three -- I believe it was three

23  separate Sheikh Faisal CDs in Simpson and Soofi's apartment

24  located on 19th Avenue.

25  Q   In the beginning of the interview -- I want to go back to

1    is the interview itself -- did you warn the defendant that

2    lying to the FBI is a crime?

3    A    Yes.

4    Q    Did you ask him if he had heard or whether or not he knew

5    of the Draw The Prophet Muhammad Contest in Garland, Texas,

6    before the attack happened?

7    A    Yes.

8    Q    And what did he say?

9    A    He said he had not heard of the attack -- or heard of the

10   event at all until after the attack took place.

11   Q    Did you ask him whether or not he knew in advance that

12   Simpson or Soofi planned to conduct an attack on the contest?

13   A    I did.

14   Q    And what did he say?

15   A    He said he did not know that they planned to do that.

16   Q    At some point during the course of your conversation with

17   the defendant, did he tell you that he only talked to Simpson

18   on one particular phone, that he only had one phone?

19   A    Yes.

20           MR. MAYNARD:  Objection.  Leading.

21           THE COURT:  That one was.  Sustained.

22   BY MS. BROOK:

23   Q    What did he say about the way in which he contacted

24   Simpson by using a phone?

25   A    During the interview he mentioned that Simpson had two

1    phones but that there was only one phone that he communicated

2    with and that the other phone Simpson had, Simpson didn't

3    share that number with anyone else and that Simpson

4    communicated with a woman based in Canada using that phone.

5    But that Mr. Kareem only called him on the other phone.

6    Q    In the week before the attack, what did the defendant

7    describe as his contact with Simpson?

8    A    During this interview the defendant said he had -- that

9    they had essentially cut off communications with him the week

10   prior to the attack, that Simpson was not returning his phone

11   calls.

12   Q    Did he state anything about a Friday night dinner that

13   Simpson didn't show up to?

14   A    Yes.

15   Q    What did he say?

16   A    May I check my notes?

17   Q    Please.

18        MR. MAYNARD:  Your Honor, can I inquire as to what

19   the agent is looking at?

20        THE COURT:  Yes.

21        THE WITNESS:  I'm looking at my report dated May 5th,

22   2015.  It's an FD-302 that I drafted following that interview.

23   BY MS. BROOK:

24   Q    And what did he say?

25   A    He said that he had seen Simpson on May 1st at the mosque.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

```
1   That he had confronted him about canceling the reservations

2   and that he had invited him and others to have a dinner at his

3   house.

4   Q   Did he also say that before that point that week he hadn't

5   seen him?

6   A   May I review my notes?

7   Q   Please.

8   A   Yes.  He said one week prior that he had -- Simpson had

9   cut off communications with him and then he had suddenly

10  received a text message from Simpson on April 30th.

11  Q   I want to go back for a second.

12          Defense counsel mentioned the report that you have.

13  So after you completed this interview, did you draft a report?

14  A   Yes.

15          MR. MAYNARD:  Objection, Your Honor, to the form of

16  the question.  I never mentioned a report.

17          THE COURT:  He just asked what report it was after

18  Whitson asked, but nevertheless, the answer will stand.

19  BY MS. BROOK:

20  Q   So after the interview that you conducted with the

21  defendant, did you create a report?

22  A   Yes.

23  Q   And how many pages is it?

24  A   It's four pages.

25  Q   How soon after the interview itself was completed did you
```

CR15-00707-PHX-SRB     JURY TRIAL-DAY #8 2-26-16

```
 1    sit down and write out the report?
 2    A   Within 24 hours.
 3    Q   And what did you use to assist you in creating that
 4    report?
 5    A   I used interview notes created primarily by my partner
 6    Detective Nash.  I also had some interview notes myself.  And
 7    I also relied upon my memory and the memory of Detective Nash.
 8    Q   Is it important as you're trained to generate your reports
 9    close in time to the interview itself?
10    A   Yes.
11    Q   And why is that?
12    A   The memory is fresh in your mind so it will tend to be
13    more accurate the sooner you can do it.
14    Q   I want to ask about one more question related to the
15    interview.
16             Did you ask the defendant if Simpson or Soofi had
17    asked him to participate in the attack?
18    A   Yes.
19    Q   And what did he say about that?
20    A   He said that they had not asked him to participate in the
21    attack.
22    Q   Did he say "that attack" or "any attack"?
23    A   He said -- they had not asked him to participate in that
24    attack or any attack.
25    Q   After the interview was over, did the defendant leave the
```

1   interview room?

2   A   Yes.

3   Q   And how did that happen?

4   A   Once the interview came to a conclusion, we told -- we

5   again thanked him for coming in voluntarily and for his time

6   and we escorted him out.

7          And so we kind of got to that same door where I had

8   met him before.  The interview equipment was in an adjacent

9   room that's located right next to that opening, so I stopped

10  in that doorway where that opening is and said my good-byes

11  there and then Detective Nash continued into the lobby with

12  Mr. Kareem.

13  Q   Did you at some point go in to stop the recording

14  equipment?

15  A   Yes.

16  Q   Who as it that initially started the recording equipment

17  before the interview began?

18  A   Special Agent Taylor.

19  Q   And had you worked out --

20          Well, how do you know that he was going to start the

21  equipment?

22  A   So prior to conducting the interview, I had come down and

23  Special Agent Taylor had kind of given me a quick orientation

24  to the equipment, how it would work, that kind of thing.  And

25  we developed a plan of how it would work.  And essentially he

1    would --

2         Well, first we did tests to make sure the camera

3    where it was positioned would be able to see Mr. Kareem and

4    see us, that our heads wouldn't block it, that kind of thing,

5    because it was located behind us.

6         So after we had done those tests, then we developed a

7    plan whereby I would give him a thumbs up when I was ready for

8    him to start the recording.  He would give me a thumbs up to

9    let me know the recording was actually going.  And then I

10   would open those two doors that led to the lobby and allow

11   Mr. Kareem to come in.

12        That way the recording would be rolling before he

13   came into the room and not start, you know, after he was in

14   there, that kind of thing.

15   Q   And before the interview started, did you give Special

16   Agent Taylor the thumbs up as you had planned on doing?

17   A   Yes.

18   Q   And at the end of the interview, what was the plan for how

19   the recording equipment would be stopped?

20   A   And so the plan was he would start the equipment.  And

21   then once it was over, all I had to do was come in and there

22   was a single button to push on this equipment.  And so he had

23   explained that to me.  And he said:  When you push that, that

24   will stop it and it will also eject an SD card which was the

25   digital media that the recording would go onto.

1    We would then, obviously, take that card and we would

2    bring it to our electronic surveillance folks who then, you

3    know, keep that as evidence and make copies of it, that sort

4    of thing.

5    Q   So did you and Detective Nash, after the conclusion of the

6    interview, go back into the interview recording equipment room

7    and press Stop like you were told to do by Special Agent

8    Taylor?

9    A   Yes.

10   Q   And did the SD card eject out of the system?

11   A   Yes.

12   Q   And was the SD card placed into property and evidence?

13   A   Yes.

14   Q   At some point after the interview did you become aware

15   that the interview itself did not download and record onto the

16   SD card?

17   A   Yes.

18   Q   Are you aware of whether or not the SD card had been taken

19   to be further analyzed to see if they can extract the

20   interview off of it?

21   A   Yes.

22   Q   Was there any success?

23   A   No.

24       And so they were able to see the practice videos I

25   described.  Those were able to be found on there where he had

1    had me come in and he had tested to see if it would work.  But

2    the actual interview was not on the disk.

3    Q   On June 10th of 2015, so approximately 35 days later, was

4    the defendant arrested after he was indicted in connection

5    with this case?

6    A   Yes.

7    Q   And Mr. Koehler is going to start the equipment.

8              On that particular day was the defendant interviewed

9    again?

10   A   Yes.

11   Q   Before you interviewed him -- and let's back up a little

12   bit.

13             So he was arrested.  Where was he arrested?

14   A   He was arrested at a gas station located in the southwest

15   area of Phoenix.  I can't recall the exact city.  It's a

16   Valero gas station.  But he was driving his moving truck and

17   he was pulled over and arrested.

18   Q   And where did you conduct the interview?

19   A   The interview was conducted at FBI headquarters which is

20   located in Phoenix.

21   Q   And who was it that was part of this particular interview?

22   A   Again, it was myself and Detective Nash conducted the

23   interview.

24   Q   Do you recall approximately what time of day it was?

25   A   I don't recall off the top of my head because it was

1    indoors.  And so I was managing the operation from indoors, so

2    I didn't --

3    Q    Before you started the interview, obviously, at this point

4    the defendant is under arrest?

5    A    Uh-huh.

6    Q    Did you advise him of his rights?

7    A    Yes.

8    Q    And, Your Honor --

9    A    Sorry.  I do.  It was in the morning, obviously, because

10   that's when -- the earlier morning hours to early afternoon

11   was when he was finally arrested I recall.

12   Q    So the interview was in the morning or in the afternoon?

13   A    The interview didn't take place until afternoon but he was

14   arrested sometime in late morning to early afternoon, so it

15   would have been just after that.

16   Q    And have you had a chance to review clips 407 through 430.

17   Do they fairly and accurately represent the interview?

18   A    Yes.

19   Q    I spoke a moment ago.  I asked you about the advisal of

20   rights.  You said that you had given it to him.

21        Your Honor, at this point the government is going to

22   move to admit and publish Exhibit No. 407.

23        MR. MAYNARD:  Your Honor, due to completeness, I ask

24   that the entire interview be shown to the jury.

25        THE COURT:  Well, you can certainly do that if you

```
 1   wish.  But I don't -- I don't know how long it is.  I don't

 2   know how many pauses there are in it.  But I'm sure you have

 3   the whole thing.

 4          MR. MAYNARD:  I have the disk and I don't know

 5   exactly what clips the government is planning to show, for

 6   certain reasons, and so --

 7          THE COURT:  I'm going to allow the government to

 8   proceed.  And if at a later point in time you want to show the

 9   rest or the entire interview, you may do so.  So you may

10   proceed.  It's --

11          MS. BROOK:  407.

12          THE COURT:  Well, are you going to offer all of them?

13          MS. BROOK:  I am.

14          THE COURT:  Isn't it 407 then through 430?

15          MS. BROOK:  The government is going to be offering

16   407 through 422 and then 424 through 428 and 430.

17          MR. MAYNARD:  Your Honor, again, having not seen the

18   clips, under 106 I would ask that they show it all.  I just

19   haven't seen them.

20          THE COURT:  Well, what you have seen is the entire

21   interview.

22          MR. MAYNARD:  Yes.  Numerous times.

23          THE COURT:  And I take it you do not doubt when

24   Ms. Book says that these are all excerpted from the

25   interview -- that same interview.
```

```
 1              MR. MAYNARD:  I don't have any reason to doubt
 2   Ms. Brook.
 3              THE COURT:  Well, the objection is overruled.
 4              407 through 422, 424 through 428 and 430 are
 5   admitted.
 6         (Exhibit Nos. 407, 408, 409, 410, 411, 412, 413, 414, 415,
 7   416, 417, 418, 419, 420, 421, 422, 424, 425, 426, 427, 428,
 8   and 430 admitted in evidence.)
 9              MS. BROOK:  Thank you, Your Honor.
10              And we're going to go ahead and play now the clip.
11         (Displaying video clip to the jury.)
12   BY MS. BROOK:
13   Q   Did you ask him during the interview if he knew Elton
14   Simpson and Nadir Soofi?
15   A   Yes.
16              MS. BROOK:  Government is going to play Exhibit 408.
17         (Displaying video clip to the jury.)
18   BY MS. BROOK:
19   Q   Did you ask him if he had heard of the Charlie Hebdo
20   attack?
21   A   Yes.
22         (Displaying video clip to the jury.)
23   BY MS. BROOK:
24   Q   Did you ask him about Cochise?
25   A   Yes.
```

1    Q    And let's just take a step for a second.  During the

2    course of this investigation, did you determine the date and

3    time when the defendant moved out of the house on Cochise?

4    A    Yes.

5    Q    When was that?

6    A    It was sometime towards the middle of March 2015, possibly

7    toward the end.

8    Q    And we've seen evidence in this case of the search warrant

9    that was conducted at the defendant's house on 21st Place.

10           About when after he moved out of the house on Cochise

11   did he move into that particular house?

12   A    His lease began on April 1st of 2015 in the new house --

13   or in the new apartment, I should say, the one located on 21st

14   Place.

15   Q    And then the search warrant was conducted on June 10th of

16   2015?

17   A    Yes.

18   Q    Did you ask him if he had heard Simpson and Soofi talk

19   about the Garland attack?

20   A    Yes.

21        (Displaying video clip to the jury.)

22   BY MS. BROOK:

23   Q    What's the Dola?

24   A    Well, I think al Dola is what he meant is the first "D" in

25   the acronym "DASH" which is the Arabic acronym for ISIS.

1    Islamic State.  That it basically means the word "state" in

2    that acronym.

3    Q    Did you ask him during the interview if looking back, he

4    thought that there were clues that they would attack?

5    A    Yes.

6    Q    And did he respond?

7    A    Yes.  He responded.

8         (Displaying video clip to the jury.)

9    BY MS. BROOK:

10   Q    Did you ask him about the guns that Simpson and Soofi had

11   with them?

12   A    Yes.

13   Q    The guns during the attack?

14   A    Yes.

15        (Displaying video clip to the jury.)

16   BY MS. BROOK:

17   Q    So he stated initially that he went shooting with Simpson

18   and Soofi this one time about a year-and-a-half ago and then

19   towards the end of the interview said about a year ago?

20   A    Yes.

21   Q    Did you follow up on that particular shooting event and

22   ask him about the guns that Simpson and Soofi brought that one

23   day he said where they all went shooting together?

24   A    Yes.

25        (Displaying video clip to the jury.)

1    BY MS. BROOK:

2    Q    Did you ask further questions to pinpoint exactly who

3    Sergio was that the defendant was talking about?

4    A    Yes.  Yes, I did.

5         (Displaying video clip to the jury.)

6    BY MS. BROOK:

7    Q    Did you ask him if on that one day when they -- he is

8    saying that Simpson and Soofi and he went shooting, if Simpson

9    shot or fired a weapon when he was out there?

10   A    Yes.

11        (Displaying video clip to the jury.)

12   BY MS. BROOK:

13   Q    Did you ask him when this one time shooting event

14   occurred?

15   A    Yes.

16        (Displaying video clip to the jury.)

17   BY MS. BROOK:

18   Q    Did you also ask him where he had gotten the ammunition

19   that he shot that day?

20   A    Yes.

21        (Displaying video clip to the jury.)

22             THE COURT:  Excuse me, Ms. Brook.

23             We're going to take our afternoon break.

24             Ladies and gentlemen, we will reconvene at a quarter

25   to 3:00.  You are reminded of the admonition not to discuss

1   the case or form any conclusions about it until you have heard

2   all the evidence and begun your deliberations.

3           Court is in recess until quarter to 3:00.  I'll

4   excuse the jury at this time.

5        (Open court, no jury present at 2:27 p.m.)

6           THE COURT:  You may step down, Agent Whitson.

7           THE WITNESS:  Thank you, Your Honor.

8           THE COURT:  Mr. Koehler?

9           MR. KOEHLER:  Your Honor, Mr. Maynard addressed the

10  issue of the rule of completeness.

11          The government will object to the defendant offering

12  up self-serving hearsay from the other portions of the

13  interview unless he can show that they are somehow directly

14  tied to something being taken out of context.

15          THE COURT:  I note that you have a transcript that

16  you have running with these various film clips.

17          Do you have a transcript of the entire interview?

18          MR. KOEHLER:  Yes.  And it was disclosed to the

19  defense.

20          THE COURT:  That's fine.  But I was going to ask that

21  you give it to me so that I am prepared when Mr. Maynard asks

22  to play other parts of the interview.

23          MR. KOEHLER:  We will get that for you, Your Honor.

24          One thing I wanted to bring up specifically about

25  that, during the course of the interview, the subject of the

1    molestation accusations comes up.

2            And the defendant goes into some fairly lengthy

3    detail explaining why, you know, this accusation was false and

4    so on.

5            I'm assuming he doesn't want to play that part of the

6    interview, but perhaps I'm wrong.

7            THE COURT:  Well, why don't you provide me with the

8    transcript.

9            MR. MAYNARD:  Well, Judge, I believe -- I don't think

10   we have a transcript that's like this that's a video --

11           THE COURT:  No.  I'm asking for a transcript -- I

12   don't want to watch the interview because I can read it

13   faster.  I'm asking just for the transcript.

14           MR. KOEHLER:  We will get that to you, Your Honor.

15           MS. BROOK:  Your Honor, just one other unrelated

16   issue, but since we have everyone gathered without the jury, I

17   noted again this morning, and additionally, yesterday

18   afternoon again, that Juror No. 3 is sleeping.

19           She was not catching her head this morning, but she

20   was absolutely, in my opinion, her eyes were closed for

21   prolonged periods, not making any eye contact or having any

22   direct contact with the witness and was staring down at the

23   screen during periods in which there was nothing on the

24   screen.

25           I just wanted to make that observation.

```
 1            THE COURT:  That is consistent with my observations
 2   as well.
 3            MS. BROOK:  I wanted to reurge what we brought up two
 4   days ago regarding removing that particular juror.
 5            MR. MAYNARD:  I reluctantly agree.
 6            THE COURT:  Well, what I would propose --
 7            So let me be clear.
 8            MR. MAYNARD:  Because we have noticed she is sleeping
 9   the last two days.
10            THE COURT:  So both the government and defense
11   counsel agree that I should excuse Juror No. 3; is that
12   correct, Ms. Brook?
13            MS. BROOK:  Yes.
14            THE COURT:  Mr. Maynard?
15            MR. MAYNARD:  Yes.
16            THE COURT:  What I will do to avoid any embarrassment
17   to Juror No. 3 is that I'm going to ask Maureen to discreetly
18   ask her to stay behind when we recess at the end of the day.
19            And I will have her in my -- ask her into my office
20   and just she and I -- and I will excuse her not on the record
21   and not with all of the rest of you present.
22            MS. BROOK:  Thank you, Your Honor.
23            MR. MAYNARD:  That's fine.
24            MR. KOEHLER:  Your Honor, there was one very minor
25   detail.  I neglected to walk through a few exhibits with
```

1    Mr. Meshinsky before we finished.

2         THE COURT:  He will be back.

3         MR. KOEHLER:  Correct.  And I spoke to Ms. Plomin.

4    She has graciously agreed that 9I may go back into that with

5    him before she begins her cross on Tuesday.

6         THE COURT:  Okay.  And then are we still -- I had on

7    the list for today Ms. Ahmadi.

8         Is she going to be testifying?

9         MR. KOEHLER:  We needed to line up a Dari interpreter

10   for her.  And because of that, we decided to push her to

11   Tuesday.  And I apologize for not notifying the Court first

12   thing about that.

13        We may decide not to call her at all, but we're going

14   to dwell on that.  But if we do, it will be Tuesday.

15        THE COURT:  I heard her name finally and she's just

16   someone else that worked in this same restaurant?

17        MR. KOEHLER:  That is correct.

18        THE COURT:  Okay.  All right.  Anything else?

19        MR. KOEHLER:  No, Your Honor.

20        THE COURT:  Okay.  We will reconvene at a quarter to

21   3:00.

22      (Recess taken at 2:32 p.m.; resumed at 2:48 p.m.)

23      (Open court, jury present.)

24        THE COURT:  Thank you, ladies and gentlemen.  Please

25   sit down.  The record will show the presence of the jury,

1    counsel, and the defendant.

2              Ms. Brook, you may continue.

3              MS. BROOK:  Thank you, Your Honor.

4    BY MS. BROOK:

5    Q   So we left off -- and, I think, the last thing I asked you

6    before we were about to play a clip -- was did you ask the

7    defendant if he ever went shooting with Simpson and Soofi

8    together on any other occasion other than this one time that

9    he had talked to you about?

10   A   Yes.

11             (Displaying video clip to the jury.)

12   BY MS. BROOK:

13   Q   Also -- and I skipped over it by accident right before we

14   got to this clip -- did you ask him how well Simpson and Soofi

15   shot that day when he was talking about them shooting with

16   Sergio?

17   A   Yes.

18             (Displaying video clip to the jury.)

19   BY MS. BROOK:

20   Q   During the interview did the defendant talk more about

21   Sergio?

22   A   Yes.

23             (Displaying video clip to the jury.)

24   BY MS. BROOK:

25   Q   Did you ask the defendant if he knew of or believed in the

1    Khalifah or the khalif?

2    A   Yes.

3    Q   And just to refresh our memory a little bit, who exactly

4    is the Khalifah or the khalif?

5    A   Well, the idea of the khalif is to be the leader of the

6    Ummah or the community of Muslims throughout the world.

7           And currently, Abu Bakr al Bagdadi has claimed

8    himself to be the Khalifah of the Ummah and he is the current

9    leader of the Islamic State.

10   Q   And, again, who are the only people that believe that the

11   khalif or the Khalifah presently exist?

12           MR. MAYNARD:  Objection.  Foundation.

13           THE COURT:  Sustained.

14           MS. BROOK:  We can handle that through another

15   witness but we're going to move on and play 422.

16       (Displaying video clip to the jury.)

17   BY MS. BROOK:

18   Q   Did you ask the defendant more about moving out of

19   Cochise?

20   A   Yes.

21   Q   And also about how often or how much he would see Simpson?

22   A   Yes.

23       (Displaying video clip to the jury.)

24   BY MS. BROOK:

25   Q   Did you ask the defendant if he knew about the Draw the

1    Prophet Muhammad contest in Garland, Texas, before the attack?

2    A    Yes.

3         (Displaying video clip to the jury.)

4    BY MS. BROOK:

5    Q    Did you show him a picture of Stephan Verdugo and ask him

6    if he knew him?

7    A    Yes.

8         (Displaying video clip to the jury.)

9    BY MS. BROOK:

10   Q    Did the defendant admit to you that he possessed and he

11   owned guns?

12   A    Yes.

13        (Displaying video clip to the jury.)

14   BY MS. BROOK:

15   Q    Did you ask him about his relationship with Simpson in the

16   days before the attack?

17   A    Yes.

18        (Displaying video clip to the jury.)

19   BY MS. BROOK:

20   Q    Did you ask the defendant if he had ever bought ammunition

21   with Simpson before?

22   A    Yes.

23        (Displaying video clip to the jury.)

24   BY MS. BROOK:

25   Q    Did you ask the defendant if he previously had been

```
 1   convicted of a felony?
 2   A    Yes.
 3        (Displaying video clip to the jury.)
 4   BY MS. BROOK:
 5   Q    And if we can switch it back to the Elmo.  Thank you so
 6   much.
 7             In the course of the investigation in this case, did
 8   you execute search warrants on Google search history of the
 9   defendant?
10   A    Yes.  I served two search warrants on his Gmail account
11   gitrdonemoving@gmail.com?
12   Q    And did that also produce Google search history as well?
13   A    Yes.
14   Q    In your analysis of the search warrant returns and the
15   defendant's computer as well, did you find evidence of erased
16   computer history?
17   A    Yes.  I found evidence that -- that someone had gone into
18   that "gitrdonemoving" Gmail account and erased the search
19   history inside that account.
20   Q    And explain that.  How did you find that?
21   A    Well, so to back up, I had served two separate search
22   warrants.
23             The first one arrived back in early June of 2015.
24   And when I reviewed that search warrant return, I saw there
25   was only a list of one group of searches done on a single day
```

1    and I believe it was May 21st of 2015.

2            When I served a second search warrant upon that same

3    company and I looked at the search history inside the Google

4    account, I noticed that that day 5/21 was no longer visible.

5    And instead, there was only days through, I believe, June 6th

6    through on or about June 9th of 2015.

7            And so by -- and one other thing to state.

8            In both of those search warrants returns, there's a

9    line in there where it says about the search history.  And

10   then it will say "true" or "false."  If it says "true" on that

11   line, that mean that it's saving your history in Google.  If

12   it says "false," which you can go into your Google account and

13   turn that off, then it will not save that history.

14           And so because I saw that listed as "true," I knew

15   that the user of that e-mail account did not turn that

16   function off.

17           So in other words, the Google account would be saving

18   their search history.  And so by looking at all that data

19   together, I was able to conclude that he had gone in and

20   erased his Google search history sometime after that 5/21 date

21   because it was no longer there when I saw it the next time.

22   Q   So let me just be clear.  So there were two separate

23   captures of the Google search history?

24   A   Uh-huh.

25   Q   And what we're referring to specifically, is it the

1    Internet browsing history?

2    A    No.  And so basically when you go into Google when you're

3    signed in, whether you know it or not, if you're still logged

4    onto your Google account -- say you have checked your Gmail

5    and you haven't logged out -- Google continues to track your

6    search history.

7           And so what also happens on your computer is your

8    Internet browser tracks your search history.  And so most

9    people know in that Internet browser, that's that box when

10   you're looking at the Internet and you see the line across.

11          And sometimes if you'll hit that arrow, drop an

12   arrow, you'll see places you visited.  Or you can delete --

13   there will be a button there to delete your browsing history.

14          Well, a lot of people know to delete that.  But what

15   they might not know is in order to delete the records on their

16   Google account, they actually have to go into Google and do a

17   extra step, and that's actually log into their Google Gmail

18   account and erase it there as well.

19          So analysis of these search warrants showed me that

20   that person had taken that extra step.  So not only had they

21   erased the browsing history, but they had actually known or at

22   least cared enough to go into their Google account and

23   actually do it, and again, on more than one occasion based on

24   my analysis.

25   Q    And you could tell that because the second capture of

1    Google Internet history did not provide search history that

2    the first capture did?

3    A   Yes.

4    Q   I want to talk to you about the gitrdonemoving@gmail.com

5    e-mail address.  Did you too execute a search warrant on that

6    particular e-mail address?

7    A   Yes.  Those were the two search warrants that I described

8    moments ago.

9    Q   And I want to speak specifically about a particular

10   e-mail.

11          Did you find an e-mail that was sent to

12   gitrdonemoving@gmail.com on November 9th of 2014?

13   A   Yes.

14   Q   And in the course of your investigation, was that e-mail

15   relevant?

16   A   Yes.

17   Q   Can you explain that?

18   A   Yes.  It was an e-mail that was forwarded from Elton

19   Simpson.

20          It was a letter from Elton Simpson's probation

21   officer detailing travel restrictions related to Elton

22   Simpson.

23          And so what the records show is that Elton Simpson,

24   without putting the message, had just forwarded that e-mail he

25   had received from his probation officer, directly to the

1    e-mail address gitrdonemoving@gmail.com.

2    Q   So let's take a step back and rewind for a minute.

3          So back in November of 2014, have you become aware

4    through the course of this investigation, that Elton Simpson

5    was on federal probation and had a probation officer?

6    A   Yes.

7    Q   And was that officer an individual by the name of Angela?

8    A   I don't recall her name.

9    Q   Okay.  I'm going to place on the overhead what has not yet

10   been admitted but is marked as Government's Exhibit No. 190.

11         And in looking at this particular exhibit, what do

12   you see?

13   A   This is the letter I just spoke about and it's --

14   Q   I'm going to go ahead and scroll to the top so you can see

15   that as well.

16         Does it fairly and accurately represent the e-mail

17   that you saw subject to the execution of this search warrant?

18   A   It does.

19         MS. BROOK:  The government moves to admit and publish

20   190.

21         MR. MAYNARD:  No objection.

22         THE COURT:  190 is admitted.

23      (Exhibit No. 190 admitted in evidence.)

24   BY MS. BROOK:

25   Q   Starting from the top, let's go ahead and scroll.  I know

```
 1   the type is really small.  Who was this e-mail from?

 2   A   The sender is Ibrahim at e-mail address

 3   ibrahimibrahim602@gmail.com.

 4   Q   And who is it sent to?

 5   A   It was sent to gitrdonemoving@gmail.com.

 6   Q   And just so we're all on the same page, who have you

 7   determined through the execution of these search warrants is

 8   the owner of that e-mail account?

 9   A   I have been able to determine the user of both accounts

10   through search warrants.  But the gitrdonemoving@gmail.com is

11   owned by Mr. Kareem.  It's his account.

12   Q   And the owner of the first e-mail account Ibrahim?

13   A   Was Elton Simpson's e-mail account.

14   Q   You spoke about the date already.  Do you see the date

15   there listed at the top?

16   A   Yes.

17   Q   What is that?

18   A   It's 9 November, 2014.

19   Q   And as we look at the text, so pulling it down, do you see

20   attached to it an e-mail sent to Ibrahim forwarded to the

21   defendant from his probation officer Angela?

22   A   Yes.

23   Q   Can you read it to us, please?

24   A   Yes.  It says:

25           I just reviewed your judgment and there is nothing as
```

1    far as travel restriction.  I am not sure why you were stopped

2    from getting on the plane.  Did they give you a reason at the

3    time?  What they did say was -- what did they say was the

4    reason you were stopped?  As far as I am concerned, as long as

5    you comply with the ten business days' notice and you get

6    approval from me for domestic travel, I do not see why you

7    cannot go.  Out of the country is a different procedure and

8    takes longer.  Hope that helps.  Thanks.

9    Q   So bottom line, communication through this e-mail, does it

10   express that Ibrahim needs to have approval from his probation

11   officer in order to travel domestic or foreign?

12   A   Yes.  It's approval to travel foreign and has to provide

13   at least ten-day notice to travel domestically.

14   Q   I want to turn back to the Maxwest cell phone of the

15   defendant that was seized inside the cab of his truck on June

16   10th.  That particular cell phone, what was it identified by

17   in the lab?  What QPX number did they give it?

18   A   It was known as QPX4.

19   Q   I'm going to place on the overhead what has not yet been

20   admitted yet, Government's Exhibit 486.

21       Do you recognize what's in this photo?

22   A   I do.

23   Q   And what is it?

24   A   It's a picture of Elton Simpson with his cell phone in his

25   hand taken in an unknown restaurant.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1    Q    Where was this photo extracted from?  What device?

2    A    This photo was extracted from QPX4, the Maxwest cell

3    phone.

4         MS. BROOK:  Your Honor, the government moves to admit

5    and publish 486.

6         MR. MAYNARD:  No objection.

7         THE COURT:  486 is admitted.

8    (Exhibit No. 486 admitted in evidence.)

9    BY MS. BROOK:

10   Q    Moving on to 487, not yet admitted government's 487.

11        Do you recognize that?

12   A    Yes.

13   Q    And what do you recognize it as?

14   A    This is another picture of Elton Simpson with his cell

15   phone and, again, in a restaurant that I do not know which

16   restaurant that is.  It was taken on the QPX4 Maxwest cell

17   phone.

18        MS. BROOK:  Government moves to admit and publish

19   486 -- I'm sorry -- 487.

20        MR. MAYNARD:  No objection.

21        THE COURT:  487 is admitted.

22   (Exhibit No. 487 admitted in evidence.)

23   BY MS. BROOK:

24   Q    We've spoken in this case extensively about the Acer

25   computer laptop that was found in the defendant's house on

```
 1    June 10th.  We've heard testimony about the Flames of War

 2    video that was captured and accessed on the Acer computer as

 3    well as downloaded onto the Acer computer.

 4            MR. MAYNARD:  Objection to the form of the question,

 5    Your Honor.

 6            THE COURT:  Sustained.

 7    BY MS. BROOK:

 8    Q   Have you had a chance to review Government's Exhibit No.

 9    471?

10    A   Yes.

11    Q   And does 471 fairly and accurately reflect the video

12    Flames of War?

13    A   Yes.

14    Q   Obviously, as part of that, have you had an opportunity to

15    review the full video in its entirety?

16    A   Yes.

17    Q   Can you provide us just a general description of that

18    video?

19    A   Yes, I can.

20            Flames of War is a propaganda video that was

21    published by the Islamic State in September of 2014.  It's a

22    55-minute long film.  It's almost two films put together.  The

23    first part of it is what I would describe as the Islamic

24    State's version of history starting with the US-led invasion

25    of Iraq, the way they see how that history has played out to
```

 1    their current position.

 2            And then the end of the video includes a scene from

 3    an Islamic State member performing -- he actually delivers a

 4    speech too the West and then executes a number of Syrian

 5    soldiers after they had dug their own grave and then executes

 6    them upon the completion of his speech.

 7            MS. BROOK:  We'll save for a later time discussion of

 8    the significance and role of that particular video, but at

 9    this point the government moves to conditionally admit 471

10    subject to discussions later about 403.

11            MR. MAYNARD:  No objection.

12            THE COURT:  471 is admitted.

13      (Exhibit No. 471 admitted in evidence.)

14    BY MS. BROOK:

15    Q   In reviewing the defendant's Acer computer, did you also

16    find evidence of Anwar al-Awlaki lectures that were downloaded

17    onto that computer?

18    A   Yes.

19    Q   How many?

20    A   At least five al-Awlaki lectures were downloaded on the

21    Acer Aspire laptop.

22    Q   And can you talk to us about the time frame.

23            What are the earliest downloads of the al-Awlaki

24    lecture onto the Aspire laptop of the defendant's?

25    A   Well, of the five, the data that still remains on the Acer

1    only provides dates for two of the five and both of those were

2    in August of 2015.

3    Q   Is it August of 2013?

4    A   Yes.  It was actually August of 2013.  Sorry.  I misspoke.

5    Q   And you stated that the computer only retains the download

6    dates for those two?

7    A   Yes.  That's all that remains on the computer at the time

8    when we searched it.

9    Q   So can you explain what that means?

10   A   Yes.  So any time someone obviously -- it's kind of been

11   explained a couple times.  But anytime someone downloads

12   something on their computer, an image of that is saved on the

13   computer.

14        And then once they delete that image, it goes into

15   another area of the computer.  It doesn't leave the computer,

16   but it just goes to that area.  And the computer can then

17   write over that when it needs to save other files.

18        And the computer, when it decides to write over that

19   other area, it doesn't do it in an organized fashion.  It

20   doesn't just write over this document first and then move on

21   to the next one.  It just kind of randomly picks space and we

22   call it that "unallocated space."

23        And so that's why when things have been deleted,

24   you'll find fragments of it.  So fragments of the metadata

25   that might not include the address when it was created or

1   other things like that.

2         And so that was the case with these.  There were only

3   two where we could see that date and we can confidently say

4   those were downloaded on or about August of 2013.

5         The remaining three we simply do not know the date

6   that those were viewed or downloaded.

7   Q   Have you had an opportunity to review Exhibit No. 184?

8   A   Yes.

9   Q   Now, we're going to come back to that.

10         So moving along, I want to talk about the defendant's

11   Nextbook tablet that was found inside of his truck on June

12   10th of 2015.

13         Placing on the overhead Exhibit No. 459 already

14   admitted, looking at the thumbnail that was the remaining

15   remnant of the image on this particular tablet, based upon

16   your training and experience, do you recognize this image?

17   A   Yes.

18   Q   And what do you recognize it as?

19   A   This is a screencap of an ISIS propaganda video that was

20   released on or about 28 August of 2014 entitled A Message In

21   Blood To The Leaders Of The Kurdish American Alliance.

22         Would you like me to continue?

23   Q   Please.

24   A   You can see in the background there's a mosque in the

25   background.  That's actually the Great Mosque in Mosul in

1   Iraq.  And you can see there's an Islamic State flag to the

2   right of the third -- I guess you would call them Islamic

3   State mujahideen fighter in the back that you can kind of see

4   it.

5           What you can't see on this imagine, if it was the

6   actual video were you to watch it, there's another black

7   Islamic State flag that's digitally enhanced that's put on the

8   screen in the top-left corner but you can't see that on this

9   version.  You would see that if you were actually watching

10  this video.

11  Q   So the image itself is a still frame from the video

12  itself?

13  A   Yes.

14  Q   You also mentioned the release date of the video.  What

15  was that?

16  A   It was on or about August 28th of 2014.

17  Q   We have talked about another tablet, the RCA tablet.

18  A   Yes.

19  Q   On that particular tablet was Origins of the Islamic State

20  found?

21  A   Yes.

22  Q   And can you explain for us what Origins of the Islamic

23  State is?

24  A   I guess you could describe it as a treatise on the

25  conquests of the Prophet Muhammad be upon him and it's an

```
 1   older work that was published in or about 1916 is when it was

 2   actually translated it from Arabic to English.  That's about

 3   it.

 4   Q   So it's a treatise?

 5   A   Yes.

 6   Q   And was it found in its entirety?

 7   A   Yes.

 8   Q   Can we please hand the witness Exhibit No. 196.

 9          In the execution -- well, in the course of the

10   investigation of this particular case, did FBI execute a

11   search warrant on BMO Harris Bank, and specifically, the

12   defendant's account held with them?

13   A   Yes.

14   Q   I have handed you Exhibit No. 196.  Do you recognize that?

15   A   Yes.

16   Q   And what do you recognize it as?

17   A   This is a grand jury subpoena that was issued to BMO

18   Harris Bank and it's listed Abdul Malik Abdul Kareem, so any

19   accounts belonging to or utilized by Abdul Malik Abdul Kareem.

20   Q   And when the bank executes a search warrant and then

21   returns the compliance to you, does that compliance include

22   the data transactions creation of the account itself?

23   A   Yes.

24   Q   And did you find any transaction or event relevant to the

25   investigation as it relates to those documents?
```

1    A    Yes.  There was two pieces of information that I think are

2    relevant.

3    Q    What was the first?

4    A    The first one was on or about November 10th of 2014, Abdul

5    Malik Abdul Kareem opened this account depositing $10,000

6    cash.

7    Q    And what was the second?

8    A    The second was on or about November 13th of 2014, so just

9    three days later, Mr. Kareem withdrew $5,000 cash.

10   Q    You made mention when you started speaking about the first

11   relevant fact that the opening of this account in and of

12   itself was relevant.  Explain that.

13   A    Mr. Kareem already possessed more than one bank account.

14   Some had been -- kind of languished.  But there was another

15   account he was using.  So that we found that interesting,

16   whereas, you know, most people would just deposit money into

17   their existing account.

18          The fact that he created a new account at a new bank

19   he had not banked with prior to this date and that he then

20   withdrew $5,000 of the cash right away following that deposit.

21   Q    If we could please hand to the witness Exhibit No. -- and

22   there's four of them but we can do them one at a time.

23          The first is 472.  May I approach the clerk?

24          THE COURT:  Yes.

25   BY MS. BROOK:

1   Q   So you have been handed Exhibit No. 472 which has already

2   been admitted and we have spoken about it.  What is 472?

3   A   472 is two copies of fingerprints taken for Mr. Kareem.

4   And looks like one copy with the dates printed were October 20

5   of 2015 and the other copy, the date printed -- well, this is

6   the date printed here, so it was June 15, 2015.

7          One second if I can further analyze.  I want to

8   confirm that this may be the same.  Yes.  This is a copy of

9   the one below it, it looks like.

10  Q   And I'm going to place on the overhead what has not yet

11  been admitted as -- I'm sorry.  It has been admitted.  472.

12         So as we look at this particular exhibit, were you

13  present when the defendant Abdul Malik Abdul Kareem's prints

14  were rolled and placed onto this particular card?

15  A   Yes.

16  Q   And do you recall when that happened?

17  A   I don't recall the exact date, but I can see that there

18  may be a date on it.  But I don't recall off the top of my

19  head the date when we took this.

20  Q   Okay.  And was there one time, one occurrence, where you

21  were present with the defendant when his prints were rolled?

22  A   Yes.

23  Q   Just for completeness, I'm going to put it back on the

24  overhead for a moment.  And as we scroll in -- and, Your

25  Honor, this particular exhibit was conditionally admitted, so

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

```
 1    we would just move to fully admit it at this point.
 2              MR. MAYNARD:  No objection.
 3              THE COURT:  To the extent that it was conditionally,
 4    it is now admitted.
 5         (Exhibit No. 472 admitted in evidence.)
 6    BY MS. BROOK:
 7    Q   And looking at this particular exhibit we see notes
 8    related to an FBI Laboratory Print Identification Comparison,
 9    correct?
10    A   Yes.
11    Q   And that's the verified 10/21/15?
12    A   Yes.
13    Q   Turning next to Exhibit No. 139 which you have before you.
14              Do you recognize 139?
15    A   Yes.  This is the certified copy of the Judgment and
16    Conviction for Mr. Kareem's 2004 DUI arrest.  It's a Class 4
17    felony.
18              MS. BROOK:  And, again, so government moves --
19              I believe this too was conditionally admitted.  139.
20              THE COURT:  Correct.
21              MS. BROOK:  So the government would move to
22    unconditionally admit it.
23              MR. MAYNARD:  No objection.
24              THE COURT:  So ordered.
25         (Exhibit No. 139 admitted in evidence.)
```

1    BY MS. BROOK:

2    Q    The copy that you have there before you, is that a

3    certified copy with a raised seal on the back page as well as

4    it being stapled together?

5    A    Yes.

6            MS. BROOK:  Your Honor, may I publish?

7            THE COURT:  Yes.

8    BY MS. BROOK:

9    Q    So in looking at the first page, can you see that it is

10   the Judgment of the Court?

11           Defendant is guilty of the following:

12           Offense Count 1.  Aggravated Driving or Actual

13   Physical Control While Under the Influence of Intoxicating

14   Liquor or Drugs, a class 4 felony?

15   A    Yes.

16   Q    And are you aware that a Class 4 felony in the State of

17   Arizona is punishable by more than one year in prison?

18   A    Yes.

19   Q    Additionally, I'm going to turn to the last page.

20           Looking at the last page of that document, can you

21   see that there's a fingerprint?

22   A    Yes.

23   Q    And that fingerprint too has an identified stamp,

24   laboratory signature by the FBI, stating that it has been

25   compared.

1  A   Yes.

2  Q   And are you aware in this case, as there's already been

3  testimony, that that fingerprint on that last page was

4  compared and identified to the defendant Abdul Malik Abdul

5  Kareem?

6           MR. MAYNARD:  Objection, Your Honor.  It's leading.

7           THE COURT:  Sustained.

8  BY MS. BROOK:

9  Q   Are you aware of who that fingerprint on the last page of

10  the Judgment and Commitment Order was identified to belong to?

11          THE WITNESS:  Yes.

12          MR. MAYNARD:  Objection.  Lack of foundation.

13          THE COURT:  Sustained.

14  BY MS. BROOK:

15  Q   It's already been testified to, so we will move on.

16          I would just like for you for a moment to read to us

17  the social security number in evidence there.

18  A   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.

19  Q   Moving along to Exhibit 140 which you have before you, do

20  you recognize that?  I'll give you a chance to look at it.

21  A   Yes.

22  Q   And what do you recognize it as?

23  A   This is a certification -- certified copy of Mr. Kareem's

24  birth certificate and it actually has two copies.

25          It has one under the name of Decarus Lowell Thomas

1    and it has another certification for birth of Abdul Malik

2    Abdul Kareem signifying that they are one in the same person.

3              MS. BROOK:  The government moves to admit and publish

4    140.

5              MR. MAYNARD:  No objection.

6              THE COURT:  140 is admitted.

7         (Exhibit No. 140 admitted in evidence.)

8    BY MS. BROOK:

9    Q    Where does it state where he was born?

10   A    It says Philadelphia.

11   Q    Moving along to Exhibit 141, do you recognize that once

12   you get a chance to look at that?

13   A    Yes.

14   Q    And what is it?

15   A    This is a certified copy of an Order changing the name of

16   an adult.  The applicant's name is Decarus Lowell Thomas and

17   the name being changed to is Abdul Malik Abdul Kareem.

18   Q    And certified is a raised seal and is it stapled?

19   A    There's a raised seal, and, yes, it's stapled.

20             MS. BROOK:  Government moves to admit 141.

21             MR. MAYNARD:  No objection.

22             THE COURT:  141 is admitted.

23        (Exhibit No. 141 admitted in evidence.)

24   BY MS. BROOK:

25   Q    I want to change subjects a little bit and discuss part of

```
 1    your investigation.
 2            So in this case we've heard testimony and talked
 3    about going out to the Wittmann area to look at the desert and
 4    take pictures and examine the scene.
 5            Were you able to go out to the Table Mesa desert area
 6    also testified to to go out and examine that particular desert
 7    area?
 8    A   I did not personally do that, but members of our team
 9    attempted to locate that area but were unable to locate an
10    area that we could say they actually shot at.
11    Q   And based upon your training and experience, are you
12    familiar with the topography and the range area that's out
13    there in Table Mesa?
14            MR. MAYNARD:  Objection, Your Honor.  He just said he
15    didn't go out there.
16            THE COURT:  She's asking if he is familiar with that
17    area of Arizona.
18            MR. MAYNARD:  Okay.
19            THE WITNESS:  I am familiar with that area.
20    BY MS. BROOK:
21    Q   Can you explain what that range area looks like?
22    A   Yes.  It's just arid desert, mountains, and there's a
23    winding road that goes through that area and there's a number
24    of spots off the side of the road where anyone can go off to
25    the side of the road and shoot.
```

1    And so, again, there was a number of locations where

2    that could have taken place, but not that we could

3    definitively say the group had been into.

4    Q   And based upon your training and experience, is that a

5    very --

6    Well, is it a place that has a more populated shell

7    area?

8    MR. MAYNARD:  Objection.  Lack of foundation.

9    THE COURT:  Sustained.

10   BY MS. BROOK:

11   Q   I want to talk for a minute about your training and

12   experience as it relates to firearms and operating firearms

13   within the capacity of the FBI as well as within the United

14   States military.

15   Is that something that you were trained to do back

16   when you were working for the military as well as when you

17   worked for the FBI?

18   A   Yes.

19   Q   And is it something that --

20   Well, explain to us a little bit about that.

21   A   Well, from my military experience, I started as a basic

22   enlisted person, a private.  So that's our entire life centers

23   around weapons and things like that.

24   And then later when I became an officer, I was taught

25   more about weapons, about properly maintaining them,

1    disassembling, reassembling them, that kind of things.  But

2    then also being able to teach that to my soldiers and/or have

3    my -- we call them NCOs, but they would teach the classes too

4    and I would help oversee that.

5         On the FBI side of things, I was a member of the SWAT

6    Team for three years.  And so, obviously, I trained quite

7    extensively with weapons and things like that, again, knowing

8    how to properly disassemble them, to clean them and maintain

9    them properly so they will work, to then properly lubricate

10   them so that they will continue to function, and then to

11   properly reassemble them so that they can function when

12   needed.

13   Q   Explain to us the purpose of properly lubricating a

14   weapon.

15   A   Well, depending -- well, all weapons which have moving

16   parts, they're metal parts that rub against one another.  And

17   so lubrication is often needed, obviously, to help limit the

18   friction that happens between those moving parts.  So that's

19   generally the reason why you lubricate.

20        The other reason, obviously, is rust.  So because the

21   weapon is made primarily of metal, if moisture gets inside the

22   components, especially the internal components that you can't

23   see, then that can create rust which could obviously cause the

24   weapon to either malfunction or not operate properly later on.

25   Q   So what happens to a weapons's firing capability if it's

1   not properly lubricated and maintained?

2   A    It diminishes.   Its capability diminishes if it's not

3   properly maintained.

4           Specific things that could happen, it could lock up.

5   The weapon could actually go as far as to break, obviously, if

6   some part became corroded or broke because it wasn't

7   maintained.

8           But the other kind of more common thing is the weapon

9   could just jam.   And that's when as a -- you know, as a weapon

10  is firing, when one round is fired, you know, especially with

11  semiautomatic rifles and things like that -- when one round is

12  fired, that causes the next round to then come up into the

13  chamber and so those parts are moving.   And if the components

14  of the weapon aren't properly lubricated and aren't moving

15  properly, then that can mess up that function as far as the

16  round being able to come up.

17          And what will happen is it will just jam.   You'll

18  fire one shot and then you'll kind of get a lock.   You'll have

19  to clear that weapon.   Actually, take the magazine out, clear

20  it, and then reload it and start over.

21  Q   When you were in the military conducting trainings on

22  properly maintaining and working with weapons, did you teach

23  other people how to lubricate weapons?

24  A    Yes, I did.

25  Q   Did you teach other people how to break weapons down?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #8 2-26-16

1    A    Yes, I did.

2    Q    Did you teach other people how to reassemble weapons?

3    A    Yes, I did.

4    Q    Is it a skill?

5    A    Yes.  It is a skill.

6            MS. BROOK:  May I have one moment?

7            THE COURT:  Yes.

8            MS. BROOK:  We have one last thing but it might take

9    just a moment for me to find.  Exhibit No. 98.

10           Your Honor, may I ask the agent to come down?  He is

11   much more familiar --

12           THE COURT:  Did you say 98?

13           MS. BROOK:  Yes.  98, 100, and 101.

14           THE COURT:  Yes.  Go ahead.  They are CDs if you need

15   a hint.

16           MS. BROOK:  Thank you.

17           Sorry about the delay.  May I approach?

18           THE COURT:  Yes.

19   BY MS. BROOK:

20   Q    Showing -- I'm showing the witness what's been previously

21   marked and admitted as Exhibit No. 98, 100, and 101.

22           Do you recognize those?

23   A    I do.

24   Q    And what do you recognize them as?

25   A    These are three separate CDs with lectures of Sheikh

1    Faisal who we had spoken about earlier, the Jamaican-based

2    salafi scholar whom the defendant had said Elton Simpson may

3    have been inspired by during the first interview.

4            And so there's three separate disks that were

5    discovered inside the Simpson/Soofi apartment on 19th Avenue.

6            MS. BROOK:  Your Honor, we have one last exhibit for

7    the defendant -- or I'm sorry -- for the witness to look at

8    and it's a spreadsheet related to the data on the Acer and

9    we're just trying to identify it.

10   BY MS. BROOK:

11   Q    And, Special Agent Whitson, as part of your notes up

12   there, do you have the spreadsheet on the Acer?

13   A    Are you looking for the Internet search history for the

14   Acer?

15   Q    Correct.

16   A    Yes.  I do have a copy here of that.

17   Q    Okay.  And what I just wanted to marry up and discuss for

18   a moment was to come back to those Sheikh Faisal lectures.

19           We've now looked at the three exhibits, the Sheikh

20   Faisal lectures identified in Simpson and Soofi's house.  And

21   I wanted to discuss for a moment the download of those

22   lectures or the data that was left behind on the Acer computer

23   related to Sheikh Faisal.

24   A    Okay.

25   Q    Do you have information about that download or the

1    information that was left behind about Sheikh Faisal on the

2    Acer?

3            MR. MAYNARD:  Judge, I'm going to object at this

4    time.  He's going to be relying upon a document we really have

5    never had.

6            THE COURT:  Has this spreadsheet been given to

7    Mr. Maynard?

8            MS. BROOK:  Yes.  And he has before him his reports

9    which have all been disclosed.

10           THE COURT:  So your question, again, Ms. Brook?

11   BY MS. BROOK:

12   Q    The data that was found or identified on the Acer computer

13   as it relates to Sheikh Faisal, can you explain what the data

14   was?

15           MR. MAYNARD:  Judge, again, objection.

16           Whatever we have been given, we just got and we sent

17   it to our expert to look at.  I can't read it.

18           MS. BROOK:  And, Your Honor, this is all discussed in

19   Evan Kohlmann's report extensively.

20           THE COURT:  Okay.  Since Agent Whitson isn't going

21   anywhere, he's going to be with us through the rest of the

22   trial, we're going to defer until Mr. Maynard has had a chance

23   to have somebody interpret this for him.

24           MS. BROOK:  Sounds good.

25           Your Honor, I'm just confirming.

1          I don't have any other questions.

2          THE COURT:  Mr. Maynard.

3          MR. MAYNARD:  Judge, is it possible -- I mean, I have

4    to get reorganized to start cross-examining.  There's been a

5    lot of information.

6          THE COURT:  Is what possible?

7          MR. MAYNARD:  Take an early break today?

8          THE COURT:  You mean recess until Tuesday at 9:00?

9          MR. MAYNARD:  Yes.

10          THE COURT:  Are there any objections?

11          I see no objections from the jury.

12          So, ladies and gentlemen, we will recess until nine

13    o'clock on Tuesday morning.

14          You are reminded again of the admonition not to

15    discuss the case among yourselves or with anyone else.

16          Please remember that you are not to communicate any

17    information about this case to anyone.  The only thing you can

18    say is that you're selected to sit on a jury, the case could

19    last up to three more weeks, and you can't tell them anything

20    else about the case until the trial is over.

21          Once, again, no research, no investigation about the

22    case on your own, and finally, please do not form any

23    conclusions about the case until you have heard all the

24    evidence and begun your deliberations.

25          Court is in recess until nine o'clock Tuesday

1   morning, March 1st.

2        (Proceedings adjourned at 3:47 p.m.)

3                          * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4        I, ELIZABETH A. LEMKE, do hereby certify that I am

5   duly appointed and qualified to act as Official Court Reporter

6   for the United States District Court for the District of

7   Arizona.

8        I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13        DATED at Phoenix, Arizona, this 1st day of August,

14   2016.

15

16

17

18

19                          s/Elizabeth A. Lemke
                            ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25