## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

United States of America,       )
                                )
            plaintiff.          )   **APPEAL**
                                )   **CR15-00707-PHX-SRB**
        vs.                     )   Phoenix, Arizona
                                )   March 2, 2016
**Abdul Malik Abdul Kareem,**       )   9:02 a.m.
                                )
            Defendant.          )
                                )
_____)

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
        REPORTER'S TRANSCRIPT OF PROCEEDINGS
            JURY TRIAL - DAY 10
        (Pages 1718 through 1923, Inclusive.)

APPEARANCES:
For the Government:
            U.S. ATTORNEY'S OFFICE
            By:  **Kristen Brook, Esq.**
                **Joseph Edward Koehler, Esq.**
            40 North Central Avenue, Suite 1200
            Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
            MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
            By: **Daniel D. Maynard, Esq.**
                **Mary Kathleen Plomin, Esq.**
            3200 North Central Avenue, Suite 1800
            Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR15-00707-PHX-SRB    JURY TRIAL-DAY #10   3-2-16

1                        **INDEX OF WITNESSES**

2

        **EVAN F. KOHLMANN:**
3
        Cross examination (cont'd) by Mr. Maynard        Page 1720
4       Redirect examination by Ms. Brook               Page 1734

5       **ALI HAMID SOOFI:**

6       Direct examination by Ms. Brook                 Page 1744
        Cross examination by Maynard                    Page 1780
7       Redirect examination by Ms. Brook               Page 1854

8       **SPECIAL AGENT STEWART WHITSON:**

9       Cross examination by Mr. Maynard                Page 1869

10

11

12                       **INDEX OF EXHIBITS**

13      **EXHIBIT NO.:**        **DESCRIPTION:**                **RECEIVED:**

14      Exhibit No. 383    Diagram of Jihad Leaders        Page 1742
                           (demonstrative)
15      Exhibit No. 497    Photograph of Miski             Page 1742
        Exhibit No. 547    E-mail dated 5/2/15 between     Page 1885
16                         Whitson & Taylor
        Exhibit No. 548    Photograph of Kareem's living   Page 1902
17                         room 21st Place
        Exhibit No. 549    Photograph of Kareem's living   Page 1902
18                         room 21st Place
        Exhibit No. 553    Photograph of electrostatic     Page 1915
19                         page of Simpson's notebook
        Exhibit No. 554    302 Report dated 10/21/15       Page 1915
20      Exhibit No. 555    Photograph of envelope to       Page 1918
                           Elton Simpson from Jihaad
21      Exhibit No. 556    Photograph of envelope to       Page 1919
                           Saabir Nurse
22      Exhibit No. 557    Photograph of envelope from     Page 1920
                           Jihaad to Sabir Nurse
23

24

25

```
 1                    P R O C E E D I N G S

 2        (Called to the order of court at 9:02 a.m.)

 3             THE COURT:  Good morning, ladies and gentlemen.

 4    Please sit down.  The record will show the presence of the

 5    jury, counsel, and the defendant.

 6             Mr. Maynard, you may continue your cross-examination

 7    of Mr. Kohlmann.

 8             MR. MAYNARD:  Thank you, Your Honor.

 9               EVAN F. KOHLMANN, WITNESS, SWORN

10                 CROSS EXAMINATION (cont'd)

11    BY MR. MAYNARD:

12    Q   Mr. Kohlmann, did you speak with anybody from the FBI or

13    the U.S. Attorney's Office after your testimony yesterday?

14    A   I did.

15    Q   Who did you speak with?

16    A   I spoke with Kristin Brook.

17    Q   And what was the discussion about?

18    A   The nature was the arrangements regarding my testimony

19    today and the VTC.

20    Q   Anything else?

21    A   I believe Ms. Brooks also asked me if I had returned a

22    disc to the U.S. Attorney's Office.

23    Q   Okay.  Now, yesterday at lunch after you were mistaken on

24    when the Prophet Drawing Contest in Garland was first

25    announced, you told us that through the lunch hour you had
```

1  determined it was a -- you determined the correct date.  Do

2  you recall that?

3  A   That's correct, yes.

4  Q   Okay.  Did you speak with anybody from the U.S. Attorney's

5  Office or the FBI during the lunch hour yesterday?

6  A   I didn't -- well, I did, actually.  I spoke with Kristen

7  Brook briefly and I reviewed evidence that they had sent to

8  me.

9  Q   And did she ask you to go back and review the evidence so

10  that you could get the correct date on the Muhammad Drawing

11  Contest?

12  A   That's correct, yes.

13  Q   Now, I believe when we ended yesterday we were talking --

14  I was asking you a few questions about how you ended up

15  preparing for your testimony.

16       You actually did prepare a report in this case,

17  correct?

18  A   That's correct, I did.

19  Q   Okay.  And you prepared a draft, correct?

20  A   Yes, that's correct.  Yeah.  An initial draft, that's

21  correct, yeah.

22  Q   And then how long after that draft did you finalize your

23  report?

24  A   I don't know.  It would have been maybe a week or two

25  weeks afterwards.  I was receiving evidence in pieces, so I

1   was -- basically, as I was going along, I was creating a new

2   draft to incorporate new evidence that I had received.

3   Q    Okay.  You did not -- and I believe you testified to this

4   yesterday.  You did not actually download digital information

5   from either cell phones or from other electronic -- other

6   electronic media that had been gathered by the FBI; is that

7   correct?

8   A    Correct.  That's correct, yes.

9   Q    And therefore, you did not forensically review any of that

10  electronic -- those electronic devices?

11  A    That's correct, yes.

12  Q    Okay.  So your testimony is not based upon a forensic

13  analysis.  It's really based upon getting information from the

14  FBI and then telling the jury some historical background on

15  the individuals that you were asked about and certain writings

16  or videotapes?

17  A    Yeah.  I would say that's more or less correct, yes.

18  Q    Okay.  Now, yesterday --

19         Your Honor, I would like to put 497 on the overhead.

20         THE COURT:  Right.  And this is not admitted, but

21  used -- that's fine because it's just a larger version of a

22  picture of Miski that has already been admitted in evidence

23  and we're just using it because it's bigger.

24  BY MR. MAYNARD:

25  Q    Do you recall yesterday there was -- you testified that --

1   to the best of your knowledge that the photograph that is on

2   the screen is the photograph of Miski?

3   A   I believe I said it's the photograph associated with

4   Miski.  I have never met Miski, so I don't know if this is his

5   real photograph.  But this is certainly the photograph

6   associated with his avatar.

7   Q   Right.  And that's part of the problem in doing Internet

8   research, correct?

9   A   It depends.  It can be, depending on the type of

10  information and the type of analysis.

11  Q   You don't know whether Miski is actually a man or a woman,

12  correct?

13  A   No.  I know he's a man.

14  Q   But you've not met him?

15  A   That's correct.

16  Q   And the only picture you've seen is the one that's on his

17  avatar?

18  A   I believe so.  I did work on an investigation involving

19  Mr. Miski back in 2008, but I don't recall ever seeing any

20  other images of him other than the one that's on his Twitter

21  avatar or Twitter account.

22  Q   And a lot of what you do is you read what is put out by

23  people who profess to be terrorists on the Internet, correct?

24  A   That's a piece of it, yeah, a large piece of it.  Correct,

25  yes.

1    Q    Now a couple of things real briefly.

2         You've talked about yesterday you had published a

3    book in 2004, correct?

4    A    That's correct, yes.

5    Q    And that is the only book that you have published?

6    A    That's correct, yes.

7    Q    That book was published the same year that you graduated

8    from law school?

9    A    That's correct, yes.

10   Q    And is the book basically an extension of your senior

11   thesis at Georgetown?

12   A    I wouldn't call it exactly an "extension," but it's

13   certainly built upon the foundations that were established in

14   my honors thesis, yes.

15   Q    And it was first published by a press company in England

16   called Berg Press, correct?

17   A    It's Oxford International Press, but it's Berg as an

18   imprint of Oxford International Press.

19   Q    And Oxford International Press has nothing to do with

20   Oxford University?

21   A    That's exactly correct, yes.

22   Q    So when you tell us Oxford International Press, it is not

23   Oxford University Press, correct?

24   A    No, not at all.  They're two separate entities.  They have

25   nothing to do with each other.

1    Q    And you submitted your book to a number of university

2    presses hoping to have them publish the book, correct?

3    A    I think it's fair to say I submitted my book to a wide

4    range of presses in the U.S. and the UK.

5    Q    Including presses associated with major American

6    universities?

7    A    I think I only submitted it to one American university

8    which was the University of Pennsylvania.

9    Q    And that was the university that you were graduating from

10   at that time?

11   A    That's correct, yes.

12   Q    They turned your book down?

13   A    They didn't publish it but they never exactly responded,

14   so I don't know.

15   Q    Now, you went through yesterday and talked about the

16   various individuals, the seven individuals that were on this

17   list which was Exhibit 351.

18        May I put it on the screen, Your Honor?

19        THE COURT:  You may.

20   BY MR. MAYNARD:

21   Q    And is it your understanding that this list of individuals

22   is somehow related to my client?

23   A    It's my understanding it's related to this case, so I

24   suppose that's related to your client, but that's the extent.

25   Q    Well, in your report you mentioned at least three separate

```
 1    times that:
 2            I have been provided with a handwritten list of seven
 3    individuals that I understand were relevant to the defendant.
 4            Do you recall that?
 5    A   Yeah.  That's correct.
 6    Q   Okay.  Do you know who prepared this list?
 7    A   No, I do not.
 8    Q   Do you know if my -- if that's my client's handwriting or
 9    not?
10    A   No, I do not.
11    Q   Do you even know if my client knows who these seven people
12    are?
13    A   No, I do not.
14    Q   Now, yesterday you told us that you were called by the
15    U.S. Attorney's Office, contacted by them, and you started
16    work on this, I believe, in either late October or early
17    November; is that correct?
18    A   Approximately then, yes.
19    Q   And is that when they started sending you information so
20    that you could start working on this report?
21    A   I believe so, yes.
22    Q   Okay.  And then you completed your first draft sometime in
23    January or was it December?
24    A   I don't recall to be honest.  I think it was January, if I
25    remember correctly.
```

1   Q    Do you have a copy of your report with you?

2   A    Unfortunately, no.  I do not have it in front of me.

3   Q    Okay.  On the third page of your report --

4          May I read from his report or can I --

5          He can't see what I put on the monitor, can he?

6          THE COURT:  No.  He can't.

7   BY MR. MAYNARD:

8   Q    Okay.  On the third page of your report you indicate that

9   in January of 2016, the U.S. Attorney's Office for the

10  District of Arizona requested that I review various

11  evidentiary materials, including, but not limited to, FBI 302

12  documents and an FBI report outlining the contents of digital

13  media seized from the defendant.

14          Does that help to refresh your recollection when you

15  were actually contacted by the U.S. Attorney's Office here?

16  A    No.  That was a typo.  I was contacted earlier than that.

17  Q    Okay.  So --

18  A    I was asked to produce an expert report, I believe, in

19  January but I was contacted and provided evidence, I believe,

20  as early as December.

21  Q    You go on to say:

22          I was further asked to opine on topics and issues

23  found in these evidentiary materials that would be relevant to

24  my particular area of expertise.

25          You just did a typo when you typed this up; is that

1    correct?

2    A    Well, no.  It may just be a matter of interpretation.  I

3    mean, I was asked to write the report in January but I was --

4    I was in communication with the U.S. Attorney's Office earlier

5    than that and I began receiving evidence, I believe, earlier

6    than that.

7    Q    I thought you just told me that you had a draft done in

8    early January.

9    A    No.  I believe my draft was done in mid-January.

10   Q    Okay.  Now, you've talked about a number of individuals

11   from this list of seven that we've looked at.  And I believe

12   you talked about Azzam being sort of the father of jihad; is

13   that correct?

14   A    Shaykh Abdullah Azzam, correct, yes.

15   Q    And he wrote a book called The Defense of Muslim Lands?

16   A    That is one of his books, yes.

17   Q    And, in fact, we sort of looked at it.  I think you looked

18   at the cover and you talked about it being written in the

19   1980s, correct?

20   A    That's correct, yes.

21   Q    And when he wrote that, didn't he write it when the United

22   States was on the same side that he was against the Russians

23   in Afghanistan?

24   A    Saying that he was on the same side of the United States

25   is not accurate.  Abdullah Azzam rejected the United States

 1   and insisted that he was not on the same side of the United

 2   States.  Although it's true that they were both fighting

 3   against the Soviets and against the Communist government in

 4   Afghanistan.

 5   Q   Now, you went over numerous sermons and speeches with us

 6   yesterday and I'm not going to go back over them all, I

 7   promise.

 8           Can you -- were you provided with information as to

 9   where those sermons and speeches came from?

10   A   I was provided with some information, although that's not

11   the focus of what I was looking at and I don't know how

12   detailed that information was.

13           There were names of computers and there were

14   evidentiary numbers and I'm aware in some cases where those

15   computers or where that evidence was taken or seized.  But in

16   other cases, I'm not sure I'm entirely familiar with the

17   source or what the significance is to the case.

18   Q   So you don't know whether my client actually viewed those

19   things or not?

20           MS. BROOK:  Objection.  Speculation.

21           THE COURT:  Overruled.  You may answer.

22           THE WITNESS:  I don't know.  No.

23   BY MR. MAYNARD:

24   Q   And we spent time yesterday talking about Inspire Magazine

25   and is it -- I'm probably pronouncing this wrong.  Is it

1    Dabiq?

2    A    Dabiq.   Dabiq.

3    Q    Both of those are jihadist magazines, correct?

4    A    Correct, yes.

5    Q    Inspire was actually put out by al-Qa'ida, yes?

6    A    Correct.

7    Q    And Dabiq was put out by ISIS, right?

8    A    Accurate, yes, correct.

9    Q    And there are many people who would read these magazines

10   that are not terrorists, including you.

11   A    Well, I don't want to say the word "many," but there are

12   definitely people that read this that are not terrorists,

13   that's correct, yes.

14   Q    You have no idea -- do you have any idea how many copies

15   of Inspire or Dabiq are read online?

16   A    I don't think there's a way of getting an absolutely

17   accurate --

18   Q    The answer is no, you don't have any idea?

19   A    I have an idea, but I don't have -- I wouldn't say it's

20   fully accurate.  It's more of a straw pole kind of idea.

21   Q    Communists could be reading these magazines?

22   A    Well, they do.

23   Q    And academics could read these magazines?

24   A    They certainly do.

25   Q    People like you who look into the Deep Dark Web could read

1    the magazines?

2    A    That's also true.

3    Q    Or people who were just sort of interested in what is

4    going on with al-Qa'ida could read Inspire?

5    A    They could, but I don't know how wise that would be but

6    they could, that's true.

7    Q    It may not be wise because people like you might think

8    that they're terrorists if they're reading those things,

9    correct?

10   A    I don't think they have to worry about me.  I think I'm

11   not the source of the problem.

12   Q    Now, you told us at length yesterday about the cases that

13   you've testified in for the United States Government.

14          Do you recall that testimony?  Is that a "yes"?

15   A    Yes.

16   Q    And --

17   A    Yes.

18   Q    And we went through not only how much you've made from

19   testifying, but in addition to that $1.3 million that you've

20   received, you've also received approximately $140,000 from the

21   Department of Defense?

22   A    I believe so, yes.

23   Q    And you have received an additional $154,000 paid for

24   different things that you have done for the FBI?

25   A    That's correct, yes.

1  Q   So prior to testifying today, you've made actually more

2  like $1.5 million from the Government?

3  A   Actually, you know, I'm not sure.  I think the 1.3

4  includes the FBI fees, although I'm not a hundred percent

5  certain about that.  It's possible.

6  Q   I have a letter from the U.S. Attorney that indicates that

7  it does not.  So --

8  A   I would defer to the letter.

9  Q   Okay.  Now, were you retained as an expert in a case

10  called the *United States v. Babar Ahmad* filed in Federal

11  District Court in Connecticut?

12  A   Yes, I was.

13  Q   And you don't have that listed on your resume anywhere,

14  correct?

15  A   Actually, I do.  I have it listed under *Hassan Abu Jihaad*,

16  et al. as the two of them were co-conspirators in the same

17  investigation.

18  Q   And how do you have it listed?

19  A   Under *Hassan Abu Jihaad*, et al.

20        Mr. Abu Jihaad was the co-conspirator in that case

21  and was tried separately but it was the same investigation.

22  Q   And this case was filed in the Federal District Court in

23  Connecticut in 2013 or 2014?

24  A   The initial case I don't remember.

25        Mr. Ahmad's case I was also supposed to testify in,

1   but I don't recall when it was filed.  I don't believe --

2   yeah.  I don't recall.

3   Q   I'm looking at your resume.

4        Do you have your resume with you?

5   A   Unfortunately, I do not have it in front of me right now.

6   Q   Okay.  I don't see it on there, but you think it is

7   somewhere?

8   A   I testified in the *Abu Jihaad* case.

9   Q   I see no cases filed --

10  A   I believe it's in 2008 -- I would look in 2008 or '9 which

11  is when I believe Mr. Abu Jihaad's case went to trial.

12  Q   Did you prepare a report in 2014 in the *Ahmad* case?

13  A   Yes, I did.  Yes, I did.  Excuse me.

14  Q   And was that report withdrawn?

15  A   I have no idea.

16  Q   Do you know an individual by the name of Dr. Marc Sageman?

17  Sageman?

18  A   I do, yes.

19  Q   And did Dr. Sageman write a report in opposition to the

20  report that you had written?

21        MS. BROOK:  Objection.  Hearsay.

22        THE COURT:  The answer "yes" or "no" may be allowed.

23        THE WITNESS:  I have no idea, Your Honor.

24  BY MR. MAYNARD:

25  Q   So you have no idea whether he wrote such a report?

1    A    No.   I have no idea.   I don't believe I ever saw any

2    report issued by Dr. Sageman in that case.

3    Q    And as we sit here, you don't know whether or not your

4    report was actually withdrawn or not?

5    A    No, I do not.

6              MR. MAYNARD:   I don't have any further questions.

7              THE COURT:   Thank you.   Ms. Brook?

8              MS. BROOK:   Thank you, Your Honor.

9              MR. MAYNARD:   May I approach the clerk?

10             THE COURT:   Yes.

11                    **REDIRECT EXAMINATION**

12   BY MS. BROOK:

13   Q    Good morning.

14   A    Good morning.

15   Q    Defense counsel yesterday asked you about Anwar al-Awlaki

16   and how he is viewed by people in the United States after his

17   death.

18             Can you explain that a little.

19   A    Yes.   Anwar al-Awlaki's death in a drone strike was

20   obviously a major international news event and it was covered

21   very, very heavily in American media, as was the debate about

22   drone strikes killing American nationals.

23             As a result Anwar al-Awlaki became an extremely

24   controversial figure within the Muslim Community.   He was

25   directly associated not just with al-Qa'ida and Yemen, but the

1    last sermons that he had issued before his death in which he

2    had very aggressively in English called upon American Muslims

3    to go out and kill other people.

4           As a result there was a strong push from within the

5    Muslim Community to try to put aside Anwar al-Awlaki and to

6    avoid Anwar al-Awlaki because of the connotation of what his

7    name meant.

8           His name became synonymous with that of al-Qa'ida and

9    certainly most Muslims in the United States wanted to have

10   nothing to do with Anwar al-Awlaki or his ideas and certainly

11   did not want anyone to associate those ideas with them.

12   Q   Defense counsel yesterday asked you about the expert

13   examination that you provided in this particular case.

14          In some cases that you have been involved in have you

15   examined forensically digital evidence?

16          MR. MAYNARD:  Objection.  It's beyond the scope.

17          THE COURT:  Overruled.  You may answer.

18          THE WITNESS:  Yes, I have.

19   BY MS. BROOK:

20   Q   And in some cases do you make examinations based upon FBI

21   reports of their forensic examinations?

22   A   Yes.  That's also correct.

23   Q   In this case what did you do?

24   A   In this case I did the latter.

25   Q   At some point did you receive a piece of evidence from the

1    U.S. Attorney's Office here in Phoenix?

2    A   Several pieces, yes.

3    Q   I'm talking about digital, digital evidence.

4    A   Yes, I did.

5    Q   What form was that in?

6    A   I believe it was on a DVD or Blu-ray disc.

7    Q   And was that a single disc?

8    A   Yes.  It was a single disc.

9    Q   Did you conduct any examinations based on that disc?

10   A   I was preparing to and I had copied the material onto a

11   local cache but then I was advised by the U.S. Attorney's

12   Office to cease my analysis and to return the disc to the U.S.

13   Attorney's Office.

14   Q   So did you do forensic analysis that you rendered any

15   opinions on in this particular case?

16   A   No, I did not.  I followed the instructions given to me.

17   Q   And what did you do with the disc?

18   A   I returned the disc to the U.S. Attorney's Office via Fed

19   Ex.

20   Q   Yesterday you mentioned destroying something.  What was it

21   that was destroyed?

22   A   It was -- initially, when I copied the material on to

23   begin the analysis, I copied it into a cache, a local cache.

24   I then removed that material from the cache so I no longer

25   have any copy of it.

1  Q   It wasn't anything that you actually received in hard copy

2  that was all sent back?

3  A   No.  Everything -- everything that I received on that disc

4  was sent back and any copies that were made to do the analysis

5  were destroyed.  And like I said, I never actually got to

6  start doing the analysis.

7  Q   And along those lines, in cases where you do receive

8  forensic evidence, to your knowledge, are those pieces of

9  evidence all copies, not originals?

10  A   I don't think they are ever originals.

11  Q   You mentioned talking about an avatar in discussions with

12  defense counsel in regards to Miski.

13  A   Yes.

14  Q   What's an avatar?

15  A   An avatar online is when you create an identity for

16  yourself on a forum, on Twitter, on any other social

17  networking platform.  As part of that avatar, you have to

18  create a name for yourself and often you have to provide an

19  image.  And the idea is is that's your online identity.  That

20  name and that image forms your online identity.

21         Those avatars become very important because it's like

22  your calling sign.  It's like your name or your signature.

23  It's how people know who you are.

24  Q   How do you verify the authenticity of people's claims to

25  be terrorists on the Internet?

1   A   Well, in some cases there's ways of providing objective

2   evidence.   Some people simply are able to provide

3   authenticating information.   They're able to provide video of

4   themselves holding weapons in a conflict zone with other known

5   wanted individuals.

6        Other individuals receive authentication or

7   accreditation from sources that are unimpeachable, i.e., ISIS

8   saying, yes, this is officially this person or officially that

9   person.

10       Or conversely, people that are al-Qa'ida or ISIS

11  members online who, again, have been authenticated, who

12  themselves can authenticate others.

13       But there are innumerable ways to figure out whether

14  or not someone is really what they say or coming close to it

15  anyway.   Some pieces of that information can be difficult to

16  discern, particularly when it comes to photographs or avatar

17  information.

18  Q   In regards to Miski in particular, that avatar, is that an

19  individual you have been able to verify the authenticity of?

20  A   I believe it is, indeed, him.

21  Q   And with the other individuals that we've spoken about in

22  this case, have you too been able to verify the authenticity

23  of them?

24  A   Yes.   There's almost zero doubt whatsoever that Junaid

25  Hussain is Abu Hussain al-Britani and that those were his

1    Twitter accounts.  This information has been verified by

2    International governments as well as the United States

3    Government.

4           Mujahid Miski, a/k/a Mohamed Abdullahi Hassan, his

5    account and his presence, again, has been verified by the U.S.

6    Government.  In fact, he has surrendered in Somalia as of

7    recently, so we know he exists and we know that he was doing

8    this stuff.

9           So, again, there are ways of piecing together whether

10   or not someone is real and whether or not they're really

11   connected to an organization.

12          It can be challenging and it can take time, but with

13   the people that are involved in this particular case, I don't

14   think there's much of a question.

15   Q   In the realm of keeping current and maintaining knowledge

16   of terrorist organizations, what is the best means or forum

17   with which to understand research and keep current with those

18   organizations and individuals?

19          MR. MAYNARD:  Objection.  Beyond the scope.

20          THE COURT:  Overruled.

21          THE WITNESS:  You have to go -- excuse me.

22          THE COURT:  Hold on.

23          Overruled.  You may answer.

24          THE WITNESS:  Sorry, Your Honor.

25          The importance is is this.  Is that if you want to

1    understand what these folks are talking about, if you want to

2    understand their literature, if you want to understand their

3    videos, if you want to understand their ideology or their

4    theology, you have to go where those materials are present.

5          And these days the only place to find those materials

6    in the case of ISIS outside of a place like Syria or Iraq is

7    on the Internet.  If you are not studying the activities of

8    these organizations and their communications on the Internet,

9    you really have no picture of what these organizations or

10   individuals are doing.

11         The best forum of determining what they're up to is,

12   of course, going physically to Syria and Iraq and interviewing

13   Abu Bakr al-Baghdadi, the leader of ISIS, or interviewing Abu

14   Mohammed al-Ashami, the official spokesman of ISIS.  But

15   that's not an option.  That's not an option for anyone.

16         Short of that, the best next option is to go to their

17   objective statements that are in the form of video, audio

18   testimonials, their magazines, and their official communiques.

19         This is what these people believe.  There is

20   absolutely no doubt these things are authentic and legitimate.

21   Everyone acknowledges as much.  And it's a widely, widely

22   known and established science within the study of these

23   organizations.

24         I'm hardly the only person that relies on this.  In

25   fact, if you don't rely on this information, at least in part,

1   to understand what these groups are up to, you really don't

2   have any eye into what they're doing.

3   Q   Defense counsel asked you about Inspire Magazine, those

4   publications that we talked about yesterday, Issue 8, Issue 9.

5          To be clear, which branch of al-Qa'ida published

6   Inspire?

7   A   It's known as al-Qa'ida in the Arabian Peninsula, AQAP,

8   otherwise known as al-Qa'ida in Yemen.  It's al-Qa'ida's

9   faction in Yemen, which is the country south of Saudi Arabia

10   in the Arabian Peninsula.

11          MS. BROOK:  May I have a moment?

12          THE COURT:  Yes.

13   BY MS. BROOK:

14   Q   The CD that you returned to the U.S. Attorney's Office in

15   Phoenix, how soon after you received it did you return it?

16   A   I believe it was within days.

17   Q   Do you remember which month that happened in?

18   A   I believe it was late January, early February, but I'm not

19   exactly sure.  I'd have to check my records.

20          MS. BROOK:  I don't have any other questions.

21          THE COURT:  Thank you.

22          And at this time may Mr. Kohlmann be excused as a

23   witness?

24          MS. BROOK:  Yes.

25          MR. MAYNARD:  No objection.

CR15-00707-PHX-SRB   **JURY TRIAL-DAY #10   3-2-16**

```
 1              THE COURT:  Thank you very much, Mr. Kohlmann.  We
 2   are finished with you.  I hope you feel better soon.
 3              THE WITNESS:  Thank you, Your Honor.  I really
 4   appreciate your patience.
 5              THE COURT:  The government may call its next witness.
 6              MS. BROOK:  Thank you.  Your Honor, and before we do,
 7   I would move to admit -- I believe that's 383 as well as the
 8   demonstrative.
 9              THE COURT:  Hold on.  Let's find out about 383 first.
10              Is there any objection?
11              MR. MAYNARD:  I don't remember what it was.
12              THE COURT:  It's this poster.
13              MR. MAYNARD:  No objection.
14              THE COURT:  383 is admitted.
15         (Exhibit No. 383 admitted in evidence.)
16              MS. BROOK:  And additionally, we would move to admit
17   497 which was the larger picture of Miski.
18              THE COURT:  Is there any objection?
19              MR. MAYNARD:  I don't have any objection to that.
20              THE COURT:  497 is also admitted.
21         (Exhibit No. 497 admitted in evidence.)
22              MS. BROOK:  May I take one moment and just clean up
23   this area?
24              THE COURT:  Who is our next witness?
25              MS. BROOK:  Ali Soofi.
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #10   3-2-16

```
 1              THE COURT:  Why don't you bring in Mr. Soofi, Agent
 2    Whitson.
 3              MR. MAYNARD:  Your Honor, I thought I would be
 4    cross-examining Agent Whitson first.
 5              THE COURT:  I don't think he has completed his direct
 6    testimony.
 7              MR. MAYNARD:  I believe he has.
 8              THE COURT:  Have you finished your direct?
 9              MS. BROOK:  I believe we have, yes.
10              THE COURT:  Okay.  Is there some reason why we need
11    to take --
12              MS. BROOK:  He is set to fly out later today.
13              THE COURT:  Yeah.  I think our discussion last
14    evening was that Mr. Soofi would be the next witness after Mr.
15    Kohlmann and then we would finish up with Agent Whitson.
16              MR. MAYNARD:  I didn't understand it that way.  I
17    understood he would be testifying today, but I understood that
18    Mr. Whitson would be first.
19              THE COURT:  We're going to take Mr. Soofi's testimony
20    now.
21              Sir, would you please come forward and be sworn.
22         (Witness duly sworn)
23              THE CLERK:  Please state your name for the record,
24    spelling your first and last name.
25              THE WITNESS:  My name is Ali Hamid Soofi.  First name
```

CR15-00707-PHX-SRB    JURY TRIAL-DAY #10   3-2-16

```
 1    A-L-I.  Last name S-O-O-F-I.  Hamid.  H-A-M-I-D.

 2             THE COURT:  You may proceed, Ms. Brook.

 3             MS. BROOK:  Thank you.

 4                 ALI HAMID SOOFI, WITNESS, SWORN

 5                      DIRECT EXAMINATION

 6    BY MS. BROOK:

 7    Q    Good morning.

 8    A    Good morning.

 9    Q    And there's some water there in front of you.

10             If you want to take the mic and move that up close to

11    you so that it's almost right in front of your mouth, that way

12    everybody will be able to hear you.

13             What's your name?

14    A    My name is Ali Soofi.

15    Q    And, Mr. Soofi, how old are you?

16    A    I'm 33.

17    Q    What state do you live in?

18    A    I live in Texas right now.

19    Q    And who is it that you live with?

20    A    My mom.

21    Q    Don't tell us the name of the place that you work for, but

22    generally, what do you do for a living?

23    A    I work on a tree farm.

24    Q    And what do you do at the tree farm?

25    A    I'm a chem tech and a plant health supervisor.
```

1    Q    Was there a time that you lived here in Phoenix?

2    A    Yes.  I previously lived in Phoenix in 2005, 2010, and

3    2014.

4    Q    And in 2014, who did you live here in Phoenix with?

5    A    With my brother Nadir Soofi.

6    Q    So Nadir Soofi, is he your -- was he your older brother or

7    younger brother?

8    A    He was older.

9    Q    How much older?

10   A    Sorry.

11            About a year-and-a-half.

12            I'm sorry.

13   Q    And there's water right there if you want to take a sip.

14            I want to go back to 2014, the time that you moved

15   back to Phoenix the last time, you mentioned that you moved in

16   with your brother.

17            And where was it that you lived with him?

18   A    We lived in a one-bedroom apartment off of Thunderbird.

19   Q    Do you remember when it was that you moved in with him?

20   A    It was the beginning of February 2014.

21   Q    And when you moved in with your brother in February of

22   2014, was it just the two of you or did somebody else live

23   there too?

24   A    He had had Elton Simpson living with him at the time when

25   I moved in.

1   Q   Elton Simpson, what did you refer to him as?

2   A   Ibrahim.

3   Q   So you, your brother, and Ibrahim were living together in

4   this one-bedroom apartment.

5        I want to take a second and have you describe for us

6   what the apartment looked like.  You mentioned it was one

7   bedroom.  Who lived in the one bedroom?

8   A   My brother Nadir, Ibrahim, and I.

9   Q   Okay.  So who got the -- was it -- that was a bad question

10  on my part.

11       Who got the one individual bedroom itself?  Who slept

12  in there?

13  A   My brother occupied that bedroom the majority of the time.

14  Q   And where did you sleep?

15  A   I slept on the couch.

16  Q   Ibrahim, where did he sleep?

17  A   He slept on the couch as well.  It was an L-shaped

18  sectional, so we would share.

19  Q   So where on the L-shaped sectional would you sleep?

20  A   The one closest -- the side that was closest to the door.

21  Q   And where would Ibrahim sleep?

22  A   He would sleep on the other side that was closest to the

23  sliding door to go outside.

24  Q   I'm going to place on the overhead what has already been

25  admitted as Government's Exhibit 393 and move to publish.

1          There's a screen in front of you.  Do you recognize

2   that room?

3   A   Yes.

4   Q   And what is that?

5   A   That's the living room of our apartment.

6   Q   Do you see that L-shaped couch that you were talking

7   about?

8   A   Yes.

9   Q   And can you -- if you just touch the screen, point to the

10  area where you would sleep.

11  A   Right here.  (Indicating)

12          He would occupy this area right here.

13  Q   You or Ibrahim?

14  A   Ibrahim would sleep right there.  I would sleep right

15  here.  (Indicating)

16  Q   Okay.

17  A   So our feet would kind of meet in the middle almost.

18  Q   So you would sleep on the side of the couch that was

19  closest in this picture to the fan?

20  A   Yes.

21  Q   That room itself, do you see a TV in there?

22  A   Yes.

23  Q   And is that the TV that was in the apartment when you were

24  living there?

25  A   Yes.

1  Q   The way that the apartment looks and how it's decorated,

2  was that how it looked when you lived there?

3  A   Yes.

4  Q   You mentioned that you moved in with your brother and

5  Ibrahim in February of 2014.  When did you move out?

6  A   It was April of 2015, about a month before what had

7  happened with my brother.

8  Q   So the early part of April?

9  A   Yes.

10  Q   I want to talk about Ibrahim.

11       How is it that you first met him?

12  A   Back in 2010 we owned a pizza establishment on Northern

13  and he would frequently come and visit because my brother was

14  attending the mosque down the road from there.

15       And once he had started going to the mosque, Ibrahim

16  would start showing up and praying with my brother at the

17  pizza shop.  And, I mean, that's the general -- generally, how

18  I met him was, you know, through the mosque and through the

19  pizza place.

20  Q   So you mentioned that you owned a pizza place back in

21  2010.  Who did you own it with?

22  A   My brother and I owned the shop.

23  Q   And after you first met him, did you continue to see

24  Ibrahim over time?

25  A   Yes.

1    Q    At some point did you meet Abdul Malik Abdul Kareem?

2    A    Yes.  That was in -- when I moved back in 2014, it was

3    probably, I want to say, halfway through the time that I had

4    been in Phoenix I had met him.

5    Q    Okay.  And how did you meet him?

6    A    Through mutual friends of my brother in the mosque.  We

7    all were running a carpet cleaning business.  And I had -- I

8    first met him at the mosque.

9    Q    So you first met Malik at the mosque.

10        You had mentioned that you at some point owned a

11   carpet cleaning business.  What happened to the pizza

12   business?

13   A    It had gone under because my brother was aimed more

14   towards serving the Muslim community rather than the community

15   that was surrounding our business, so the business -- the

16   whole idea didn't work, so it went under.

17   Q    At some point you opened a carpet cleaning business

18   instead?

19   A    Yes.

20   Q    And was that with your brother too?

21   A    Yes.

22   Q    I want to talk about February of 2014 through April of

23   2015 and the time that you lived there in the 19th Avenue

24   apartment with Ibrahim and your brother.

25        How often did you see Malik at the apartment?

1   A   At first it was on occasion, but as time progressed he was

2   there more often.

3   Q   Describe what you mean as "there more often."  How

4   frequently?

5   A   I would say it went from maybe once or twice a week to

6   three to four times a week.

7   Q   And when Malik was at the apartment, were there ever times

8   that he would sleep over?

9   A   Yes.

10  Q   How often would that happen?

11  A   Just like at the start it was, you know, here and there.

12  It was every once in a while.  But, I mean, towards the end it

13  was more often.  I would say maybe three times a week or more.

14  Q   Okay.  Who was Malik closest to in the house?

15  A   Ibrahim.

16  Q   And were there any other people other than Malik who came

17  to the house as much as he did?

18  A   There was another man named AK.  He would occasionally

19  come to the house but not as much.  He was more -- he had a

20  larger family, so he would spend more time, you know, with the

21  family but he would on occasion come over.

22  Q   So was there any other visitor who was there as much as

23  Malik?

24  A   No.

25  Q   When Malik was in the house, you had mentioned three to

1    four times a week towards the end, were you at times also

2    there in the house with them?

3    A    Yes.

4    Q    And who was he in the house with when he would be there?

5    A    It would be myself, my brother Nadir, and Ibrahim.

6    Q    During those 13 months that you were there in the

7    apartment, did Malik express any support for any terrorist

8    organization?

9    A    Yes.

10   Q    What did he say?

11   A    The general topic between my brother Nadir, Ibrahim, and

12   Malik is from the videos that I observed, the daily

13   activities, I wasn't, you know, educated to what was exactly

14   going on but over time I came to understand that it was

15   ISIS-based.

16   Q    Okay.

17   A    That was the basic -- the basic idea of everything that

18   was being watched and all the literature that was being read

19   and listened to was -- it was more the militant, more

20   ISIS-side of, you know, Islam.

21   Q    Did you hear Malik talk about ISIS?

22   A    On occasion with Ibrahim, the conversations they had with

23   the Twitter account that he had that he would tweet after

24   watching videos of, you know, ISIS members driving around with

25   their flags and guns, usually Ibrahim would tweet something.

1           And then they would both be sitting on the couch and

2      they would discuss, you know, the general idea of, you know,

3      what was going on in the video and the text that was being

4      sent.

5      Q   Did your brother Nadir also support ISIS?

6      A   Yes.  Towards -- not in the beginning.  My brother was a

7      very -- I mean, you could say he was, you know, a really kind

8      person like I am.  But I mean he was very gullable.  He was

9      very easily influenced by people.

10          My family and I are not very religious with the whole

11     Islam and with everything, so my brother always, you know, was

12     trying to find somebody that, you know, would cater that for

13     him, would, you know, take him in.

14     Q   Over time, over those 13 months, did you see Malik and

15     Ibrahim and your brother become more intense in their support

16     for ISIS?

17               MR. MAYNARD:  Objection, Your Honor.  Leading.

18               THE COURT:  Sustained.

19     BY MS. BROOK:

20     Q   Did your brother, Ibrahim, and Malik express the same

21     amount of support during the whole time that you were living

22     there or did it change?

23     A   It increasingly -- at the start I hadn't noticed anything.

24     But increasingly during the time that I was there, it had got

25     worse to the point where I would have to leave at times

1    because I felt unsafe at the apartment.

2    Q    And those times when you felt you would need to leave, who

3    was in the house?

4    A    It was Ibrahim, my brother Nadir, and Malik was in the

5    house.

6    Q    Do you remember a time period in particular when the

7    intensity changed?

8    A    It was close to around May or June time.  I mean, closer

9    to halfway through, you know, the halfway point when I was

10   there, it had got to the point where, you know, I had actually

11   thought even -- like I couldn't stay there because it was just

12   constantly -- that was the constant talk, you know, that was

13   in the apartment.

14   Q    And that constant talk, who were the people that were

15   constantly talking about ISIS?

16   A    The majority of the time it was Ibrahim and my brother

17   and -- but then when Malik would join them as well, the times

18   that he would stay over, that's when they all three of them

19   would get together and speak on the subject.

20   Q    I want to talk specifically about the videos that you

21   mentioned.

22          What videos did you see?

23   A    I mean, from what I understand, ISIS recruitment videos to

24   glorify, you know, what they're doing, what they're trying to

25   accomplish.  Basically, guys driving around in trucks with

1  black flags with white writing and two swords crossing,

2  shooting guns, basically, down-talking, you know, America.

3          And also the execution videos that they had shown for

4  people, nonbelievers that didn't believe the same militant

5  side of Islam that they did.

6  Q   How did you come to understand that those videos were

7  about the glorification of ISIS?

8  A   Through my brother.

9  Q   And I want to talk about where it was you saw those

10  videos.  Let's talk first about the videos that you mentioned

11  with the men driving around in trucks.

12          You mentioned them.  What color were they wearing?

13  The men in the trucks?

14  A   They were covered in black.  Black clothing.

15  Q   And did you see any flags?

16  A   There was a black flag with white Arabic writing with two

17  swords crossing.

18  Q   Where was it that you -- and in that particular video, did

19  you see that or something like it once or more than once?

20  A   It was almost on a daily basis after the end of May/June

21  time, it was constantly playing.

22  Q   And that's end of May/June time of 2014?

23  A   '14.  Yes.

24  Q   Where was it that those videos were playing?

25  A   On the main TV screen.  We only had one TV in the

CR15-00707-PHX-SRB   JURY TRIAL-DAY #10   3-2-16

1  apartment.  Nobody really watched television, so I mean that

2  was the only source of, you know, entertainment that we had.

3  Q   And the screen, do you see it here in this picture?

4  A   Yes.

5  Q   Can you circle it?

6  A   Right there.  (Indicating)

7  Q   When those videos would play, was there a volume on them?

8  A   Yes.  We had a surround-sound set up to the TV, so it was

9  actually pretty loud.  There were times our upstairs neighbors

10 would complain.  We actually had a couple complaints about

11 noise levels from our apartment.

12 Q   When those videos were playing, was Malik there?

13 A   Yes.

14 Q   And where would he be when those videos were playing?

15 A   There was a variety of places.  If we were not cooking,

16 everybody would be sitting on this couch.  And Ibrahim would

17 always sit, you know, right here with his belongings.

18 (Indicating)  He always had his belongings right next to him

19 on that couch.

20       Then Malik would usually sit like towards the middle

21 area.  And I would always be in the corner here in this area.

22 (Indicating)  And my brother was always -- Nadir was always in

23 the main computer chair, like controlling what was being

24 watched.

25 Q   And during the times that Malik was sitting where you

1  circled there in the middle where the L comes together, was he

2  watching the videos or something else?

3  A   Everybody in that room was watching videos that was

4  present, yes.

5  Q   And did he ever say anything when those videos were

6  playing?

7  A   I mean, a lot of what I can remember is a lot of what was

8  said was that, you know, that people need to learn their

9  lesson.  That nonbelievers, you know, will basically learn

10  their place in this world in the end.

11  Q   You also spoke about seeing an execution video.

12        Where was it that you saw that video play?

13  A   In this -- off the same TV in the living room.

14  Q   Describe for us what you saw when you watched that

15  execution video.

16  A   Basically, the video was set up to -- there was a line of

17  guys in black clothing with a row of guys in orange clothing

18  kneeling head-down in front.  And, basically, they -- the main

19  guy would have a knife out and he would speak something in

20  Arabic and then he would start to cut and saw at the back of

21  the guy's neck until his head was completely cut off.

22  Q   When that video was playing, was Malik there?

23  A   Yes.

24  Q   And where was he when that video was playing?

25  A   The same area that I had circled previously.

1   Q   So there on the couch?

2   A   Yes.

3   Q   Was he watching the video or something else?

4   A   Everybody in that room was watching the video.

5   Q   And, again, when that video was playing, did he say

6   anything?

7   A   I mean not really.  Just from what I could observe from

8   everybody's faces, it was more of a look of like, like almost

9   like pleased or excited, almost like an excited look,

10  especially from Ibrahim.  He just always had that look of like

11  being pleased with, you know, these videos of violence.

12  Q   How did Malik look?

13  A   I would say exactly the same as my brother and Ibrahim

14  looked.  I mean, the look of being pleased, you know, that

15  they're accomplishing what they're trying to accomplish.  I

16  mean it's --

17  Q   Did anybody ever try to talk you into supporting ISIS?

18  A   At first it started out as trying to get me to convert

19  back to Islam, to pray five times a day, to, you know, to pull

20  me back into Islam.

21          But, I mean, I think towards the middle I think my

22  brother -- it changed up from, you know, more of the calm

23  approach, the kind approach, to, you know, either you follow

24  this way or, you know, people like you are killed.  People

25  that are born Muslim and that do everything that you are doing

 1   against the religion, I mean, usually people like that are

 2   killed.

 3   Q    Did Malik ever talk about people like you being killed?

 4   A    Yes.  He had mentioned to me a couple times about the

 5   kafirs, nonbelievers, people that -- you know, that don't

 6   believe in the same, you know, area that they believe in in

 7   Islam.

 8            So I mean there's different -- you know, I guess the

 9   normal -- a normal Muslim person, their definition of a kafir

10   is just somebody that's a nonbeliever.  But to somebody with

11   more of a militant side of Islam is going to be, you know,

12   these people should be killed.

13   Q    Do you recall where you were when Malik said those things

14   to you?

15   A    I was in the living room and Ibrahim and Malik were

16   present.  My brother had actually come out to me before that

17   and spoke with me about having relations with girls outside of

18   wedlock and other things that I was doing that were looked

19   down upon.

20            So in general I was an outcast in that group of -- at

21   the apartment.  So every time I would go back to the

22   apartment, I would feel like someone had been working on my

23   brother, someone had been pushing him in a direction where

24   they turned him against me.

25            I didn't feel safe at that apartment myself.  I mean,

```
 1    just in general, because I think just the general vibe I got

 2    off of everybody in the apartment.

 3    Q   I want to talk about the tweets that you mentioned.

 4            Who in the apartment used Twitter?

 5    A   Ibrahim was the only one that had a Twitter account in

 6    there.

 7    Q   Did your brother have a Twitter account?

 8    A   No.  He had a Facebook account.

 9    Q   How -- well, did you ever see Ibrahim use his Twitter

10    account?

11    A   Yes.  There was -- on occasion I would come back from my

12    hikes and he was on the main TV screen tweeting at the time.

13    And within that -- you would have the profile picture of the

14    guy that you were tweeting with.

15    Q   So how is it that you could see the tweets on the computer

16    screen?  How was this set up so that you could see that?

17    A   I mean, as soon as you walk in the apartment, the door is

18    like, you know, right here in this area.  (Indicating)

19            So as soon as you walk in, you have a dead, you know,

20    shot of the screen.  And then usually when I would come in, I

21    would sit down.  And, you know, I would go on like a 20,

22    30-mile marathon runs, so by the time I would come back, I

23    wanted to relax and I would, you know, unwind right here.

24            (Brief interruption)

25            MS. BROOK:  I think it's the video screen.
```

1   BY MS. BROOK:

2   Q   So you said you would come into the living room?

3   A   Yes.

4   Q   Let's talk for a second about the living room.  As we look

5   at this picture here, is there a table there?

6   A   Yes.  There's a -- we had actually built that.  It was a

7   plexiglas piece of equipment we had built for a cleaning

8   service, but it was built wrong, so we used it as a table.

9   Q   Can you explain for us, roughly, how big is this room that

10  we're looking at?

11          So if you're sitting on the couch, what's the

12  distance to that TV screen?

13  A   From the couch to the TV is probably like nine feet from

14  where I would sit to the TV screen.

15  Q   And you mentioned seeing Ibrahim on Twitter on the

16  computer screen.

17          Who was it, if you know, that he was tweeting with

18  and you could see on the computer screen?

19  A   It was an African-American man.  He had a beard.  And from

20  what I know, he was from Minnesota.  And that's the gist of it

21  that I would know.

22  Q   And were there times that he was tweeting with that man

23  when Malik was also in the house?

24  A   Yes.  Ibrahim was constantly tweeting with this -- with

25  this -- I'm not sure what his name is, but with the guy, the

1  African-American man on the Twitter account.

2  Q   And were there times when Malik was in the house?

3  A   Yes.

4  Q   Where would Malik usually sit or be when Ibrahim was

5  tweeting with that person?

6  A   I mean, they're usually sitting right next to each other

7  in the same spots as always, the same spots in the middle, and

8  Ibrahim was always on that corner.

9  Q   And when Ibrahim was tweeting with that man, was Malik

10  watching and engaged or doing something else?

11  A   He was engaged at times because I -- when he would tweet,

12  Ibrahim would always lean over and show what he was tweeting.

13  And there would almost be a discussion about what he was

14  tweeting.

15         He would also do the same thing with my brother as

16  well.  You know, watch a specific video and then tweet

17  something about it and go back and, you know, he would show,

18  you know, each one of them.

19  Q   Were there times that he was tweeting just on his phone

20  and then other times tweeting where you could see it on the

21  computer or the TV screen there?

22  A   Yes.

23  Q   I want to place on the overhead government's admitted

24  Exhibit No. 497.

25         Do you recognize that man?

1    A    That's the picture from the profile pic of the Twitter

2    account that he was tweeting with.

3    Q    And was that the man that you were talking about before

4    from Minnesota who Ibrahim was tweeting with when Malik was

5    there?

6    A    Yes.

7    Q    Did you ever hear the name Abu Bakr al-Baghdadi in the

8    house?

9    A    Yes.  On occasion I did, yes.

10   Q    And did you ever hear Malik talk about Abu Bakr

11   al-Baghdadi?

12   A    A couple of times, but not as much as my brother and

13   Ibrahim.  They were constantly, you know, playing his lectures

14   and reading his literature, basically.

15   Q    What was the nature of how your brother and Ibrahim and

16   Malik would act when talking about Abu Bakr?

17   A    From my knowledge, they looked to him as a -- you know,

18   someone for knowledge, someone as almost like a -- you know,

19   someone you look up to for, you know, the next -- your next,

20   you know, move in life or, you know, what direction you're

21   going to go.

22   Q    And Malik too, did he express the same feelings?

23   A    I can't really remember exactly what he had said about

24   that man.

25   Q    Did you hear the word "khalif" mentioned?

1    A    Yes.

2    Q    And who would talk about the khalif?

3    A    It was a general discussion between the three of them

4    through my brother, Ibrahim, and Malik.

5    Q    Did you ever here anyone talk about selling their things

6    and moving away?

7    A    Yes.  There was one day after the mosque my brother and I

8    were going back to the car and we had ran into Malik and he

9    was talking about selling everything to move overseas to start

10   a consulting company.

11   Q    I want to talk about the Charlie Hebdo attack.

12        Did you ever see anything about the attack on the

13   Charlie Hebdo magazine when you were in the house?

14   A    Yes.  They had a -- pulled up the news feed online, the

15   different feeds that they had about the attack, those were

16   pulled up at the house.

17   Q    Who is "they"?

18   A    Between my brother, Ibrahim, and Malik.

19   Q    Describe how your brother and Ibrahim and Malik acted when

20   they watched the news feed about the Charlie Hebdo attack?

21   A    It was almost a look of like being pleased, excited, that

22   they had got their message across, they had accomplished, you

23   know, something, you know, got some sort of message across.

24   Q    Did all three of them look pleased?

25   A    Yes.

1   Q   Would anybody in the house talk about the end of times?

2   A   I mean, that was a constant discussion.

3           I mean, towards the end, I mean -- I mean, towards

4   the end when my brother started acting more radical, it was a

5   constant discussion of the different prophesies that have

6   occurred already.  The constant worry of, you know, just in

7   general, the different prophesies that have been foretold are

8   happening.  So they said it's a matter of time, you know.

9   Q   Who said that?

10  A   My brother.

11  Q   Who all would talk about the end of times?

12  A   It was a general discussion in my house between my

13  brother, Abdul Malik, and Ibrahim.

14          I mean, I think that was more the general subject

15  that was talked about a lot because they -- it's almost like

16  after that started, they started secluding themselves to that

17  apartment.

18          And my brother was almost, you know -- and Ibrahim

19  were afraid to leave the apartment almost towards the end.

20  They felt like, you know, they were going to be killed or

21  something and that they needed to arm themselves and, you

22  know, protect themselves from anybody that were killing

23  Muslims.

24  Q   I want to talk about what you were doing for work in 2014

25  and 2015.  We've talked about the pizza shop.  You mentioned

 1    at some point you opened a carpet cleaning business.

 2            When you first moved in with your brother, what were

 3    you doing for work?

 4    A   My brother was working for Kiwi Cleaning Services.  I had

 5    joined him just to make, you know, something so I could send

 6    money back to my kids in Salt Lake City.  But we were doing

 7    contract work for a cleaning company, so we would go out and

 8    they would send us so many contracts and we would get paid a

 9    percentage of each job.

10    Q   So you and your brother when you first moved in were

11    working for Kiwi Carpet Cleaning?

12    A   My brother was existing -- already had been working for

13    them.  I had just joined him.  I wasn't employed by the

14    company but I was just helping my brother to make some sort of

15    money.

16    Q   Was there a point when you started to do something else?

17    A   Yes.  Once -- so when we branched off from Kiwi and

18    started our own carpet cleaning business, and within that time

19    my brother just -- he completely changed who he was.  I mean,

20    he wasn't the same person.  He didn't care about money

21    anymore.  He just --

22    Q   I want to talk about the transition.

23            So you were working for Kiwi and then you started

24    your own carpet cleaning business.  You said "we."  Who was it

25    that was doing the carpet cleaning business?

1    A    My brother Nadir and I.

2    Q    And do you remember what time of year it was when you

3    started your own carpet cleaning business?

4    A    We branched off in January of 2015.

5    Q    And before that point you had been with Kiwi?

6    A    Yes.

7    Q    When you started your own business there in January of

8    2015, was it successful?  Were you making money?

9    A    Not really.  We had jumped out and started a brand new

10   business, brand new name.

11          My brother was in charge of advertising on the

12   business side and I was more of the hands-on.  I would do all

13   the labor side of work.

14          At first he was, you know, committed to the job.  But

15   I think slowly over the influence of people that he just

16   dropped off completely and let the business go under.

17   Q    After you paid your bills, did you have extra money?

18   A    No.  We barely had enough money to eat.

19   Q    And was that throughout, so January --

20   A    It was --

21   Q    -- did that continue after January?

22   A    It was the whole time that I was there.  I mean the only

23   reason we survived was because my dad helped us.  Without my

24   dad, I mean, we would have been homeless pretty much.

25   Q    To help you pay for food?

1    A    For food and rent and for, you know, business supplies and

2    stuff like that.

3    Q    At some point -- well, let me take a second.

4            During that time what was Ibrahim doing for work?

5    A    He was working parttime for a man named Saabir at a dental

6    practice.  He would work there parttime.

7    Q    And throughout the time that you were living there, so

8    over those 13, 14 months, was he working parttime consistently

9    throughout that period.

10   A    I mean at first it was consistent.  But after a couple of

11   months, he was only working a couple of days here and there.

12   But mostly the majority of the time he was at the apartment

13   with my brother.

14   Q    At some point did you learn that Ibrahim had a new weapon?

15   A    Yes.  He was actually very excited about it.  The day that

16   he had got it, he had brought it back and shown all of us, my

17   brother and I at the apartment.

18   Q    Can you describe what it looked like?

19   A    It was a more compact stock snubnose AK.

20   Q    And you said he showed all of us what it looked like.

21           Who was there?

22   A    My brother and I were at the apartment.  That's when

23   Ibrahim and Malik came to the apartment.

24   Q    Did you come to learn who had purchased it?

25   A    Yes.  Through the conversation, yes, I learned.

1    Q    What did you learn?

2    A    That Malik had supplied the money for his weapon because

3    their -- with finance-wise, between the three of us living,

4    between Ibrahim, myself, and my brother, I mean, there was no

5    money there.

6    Q    When was it that Ibrahim came home with this snubnose

7    rifle?

8    A    It was about four months -- around four months after I had

9    moved in.

10          MS. BROOK:  I want to take a second.  May I have a

11   moment?

12          THE COURT:  Yes.

13          MS. BROOK:  May we approach -- actually, Special

14   Agent Whitson is going to approach to show the witness the

15   weapon.

16          THE COURT:  Yes.

17          MS. BROOK:  And, again, this is a weapon that's been

18   made safe.

19   BY MS. BROOK:

20   Q    And for the record, this is Exhibit No. 10.  I want you to

21   take a look at that.  Do you recognize that weapon?

22   A    Yes.  That is Ibrahim's -- the snubnose that I was talking

23   about.

24   Q    The same one that you learned Malik had paid for?

25   A    Yes.

```
 1              THE COURT:  Ms. Brook, we're going to take our
 2    morning break.
 3              Ladies and gentlemen, we'll take our 15-minute break.
 4    We'll reconvene at 20 minutes to 11:00.
 5              You are reminded of the admonition not to discuss the
 6    case or form any conclusions about it until you have heard all
 7    the evidence and begun your deliberations.
 8              Court is in recess.
 9         (Recess taken at 10:22 a.m.; resumed at  10:41 a.m.)
10              THE COURT:  Thank you.  Please sit down.  The record
11    will show the presence of the jury, counsel, and the
12    defendant.
13              Ms. Brook, you may continue.
14              MS. BROOK:  Thank you, Your Honor.
15              And if you want to get situated again with that mic
16    right there just so we can all hear you.
17    BY MS. BROOK:
18    Q   The day after your brother was killed, did you interview
19    with the FBI?
20    A   Yes.
21    Q   And how did you feel?
22    A   I was completely torn apart.  And, also, I mean, you know,
23    in the same sense I kind of had the -- that fear and also for
24    that kind of scare in the same sense because of, you know,
25    what had happened to my brother and the people that were
```

 1    involved with my brother, you know, were still, you know, out

 2    and about.

 3            So I mean -- in general I was just completely

 4    destroyed and scared.

 5    Q   Did those feelings affect your interview with the FBI?

 6            MR. MAYNARD:  Objection.  Leading.

 7            THE COURT:  Overruled.  You may answer "yes" or "no."

 8            THE WITNESS:  Yes.

 9    BY MS. BROOK:

10    Q   Did you tell the FBI everything you knew when you

11    interviewed with them?

12    A   It was bits and pieces.  I was broken up.  I mean, the day

13    that I -- it was the day after my brother died.  I mean --

14    Q   Initially, did you tell the FBI about Malik?

15    A   No.  No, I didn't.  No.

16    Q   Did you deliberately not tell them about Malik?

17    A   Yes.

18    Q   Why?

19    A   I mean, just from my -- you know, generally meeting

20    somebody, you know, the vibe you get off people and the

21    general actions of somebody, you can tell, you know, how

22    violent a person is over what they're capable of.

23            I mean just from stories that I have heard, instances

24    that he was involved in, just the general, you know, the

25    feeling of the person.  You know that you just feel that -- I

```
 1    mean, you know, they're capable of more, you know, I mean, if

 2    provoked.

 3    Q    Eventually, did you tell the FBI what you knew about

 4    Malik?

 5    A    Yes.  It was after I had gone for my brother's funeral and

 6    I was interviewed again in Kansas.

 7    Q    I want to talk about other weapons.  At some point did

 8    your brother come home with an AK-style weapon?

 9    A    Yes.  He had come home with a full body AK.

10    Q    Do you remember when that was?

11    A    It was about four months before the incident.

12    Q    So roughly around January?

13    A    Around January time, yes.

14    Q    And when he brought it home, did you learn who had bought

15    it?

16    A    Yes.

17    Q    What did you learn?

18    A    My brother had told me he had borrowed the money from

19    Malik to buy the rifle because, I mean, there was no other

20    source of income.

21    Q    Did you learn how much it cost?

22    A    Yes.

23    Q    And when your brother told you that he had got the money

24    from Malik, where was Malik?

25    A    He was at the apartment with us.
```

1   Q    During that conversation?

2   A    Yes.

3   Q    I'm going to have Agent Whitson approach and show you

4   Exhibit No. 7.  Again, this weapon has been made safe.

5          Did you get a chance to look?

6          Okay.

7          Do you recognize that weapon?

8   A    Yes.  That was my brother's.

9   Q    Is that the same weapon that we were talking about a

10  moment ago that your brother told you while Malik was standing

11  there that he had purchased -- "he" being Malik -- had

12  purchased for your brother?

13         MR. MAYNARD:  Objection to the form of the question.

14         THE COURT:  Sustained.

15  BY MS. BROOK:

16  Q    Is that the same weapon we were talking about a moment

17  ago?

18  A    Yes.

19  Q    And is that the same weapon that you had learned somebody

20  other than your brother purchased?

21         MR. MAYNARD:  Objection to the form of the question

22  and asked and answered.

23         THE COURT:  Sustained.

24  BY MS. BROOK:

25  Q    Who purchased that weapon?

1    A    Abdul Malik and my brother had purchased it.

2    Q    You had mentioned money.

3         How much did you come to learn that that weapon cost?

4    A    I'm sorry?

5    Q    How much was that weapon, do you know?

6    A    It was $700.

7    Q    And how did you learn that?

8    A    My brother had told me the day he got it how much it had

9    cost because, I mean, we didn't -- you know, we didn't have

10   money let alone to survive, so I was like, you know, how did

11   you come to acquire this weapon.

12        And, you know, that's when he had come out and said,

13   well, you know, I had borrowed the money from Malik to get it

14   and I'm going to pay him back.

15   Q    And was this that conversation where Malik was standing

16   there?

17   A    Yes.  He was in the same room, yes.

18   Q    Did you ever see Malik with the two weapons that we've

19   shown you here again in the apartment?

20   A    Yes.

21   Q    And what did you see him do with those weapons in the

22   apartment?

23   A    At first it was, you know, the general excitement that

24   they had got new weapons and they were passing them around

25   looking at them.  There was a time also where they had sat

1    down and cleaned the weapons after they had gone shooting in

2    the desert.

3    Q   Who is "they"?

4    A   Well, there was two occasions they had gone shooting.   One

5    was -- the first time was Ibrahim, my brother, Malik, and they

6    said they were going to pick up AK along the way.

7    Q   And where were they going, the three of them, when they

8    left the house?

9    A   They were going out to the -- towards Sedona to the

10   desert.

11   Q   Was this with the weapon that we just looked at a moment

12   ago, the one that you recognized of your brother's?

13   A   Yes.  It was with both.  Both weapons.

14   Q   Were there any other times that you heard your brother,

15   Ibrahim, and Malik plan to go shooting?

16   A   Not other than the two times that I just mentioned.

17   Q   Did you see Malik touch or do anything with those weapons

18   inside the apartment?

19   A   Yes.  He had handled both weapons, the initial, when they

20   were initially bought and when they were cleaning them as

21   well.

22   Q   Who was cleaning the weapons?

23   A   All three of them were sitting -- between Ibrahim, Abdul

24   Malik, and my brother, they were all sitting in this general

25   area.  (Indicating)

1          And this table would be straight, so everybody would

2     be sitting.  And there's a cloth over the table and all the

3     weapons would be disassembled on the table after that first

4     time that they had gone shooting.

5     Q   And what did you see them do with the weapons?

6     A   It was the disassembly, cleaning, and the reassembly of

7     the weapon.

8     Q   What did you see Malik do?

9     A   Basically, like what was like overseeing, almost, like

10    almost, you know, like a mentor do.  Like somebody that, you

11    know, knows -- because my brother or Ibrahim, could I tell

12    that they had no -- no previous training that way.  And there

13    was no training involved in, you know, disassembly,

14    reassembly.  I mean, the most my brother knew was how to

15    shoot.

16    Q   What did you hear Malik talk about during this time where

17    he was there with your brother and Ibrahim disassembling the

18    weapons?

19    A   Proper cleaning procedures.  Not leaving grease on guns.

20    Not completely removing grease from, you know, sliding parts.

21    Just the general cleaning a barrel the way it's bored

22    properly.  You stick a -- you know, the brush, if it goes down

23    the wrong way, it can, you know, destroy the inside of the

24    barrel, so proper cleaning procedures.

25    Q   And out of the three of them, who showed the most skill at

1    being able to disassemble and clean the weapons?

2    A    From what I can remember Malik was -- I mean, between

3    my -- Malik was probably the most experienced and then my

4    brother; other than my brother.

5    Q    Was he teaching anything about the process?

6            MR. MAYNARD:  Objection.  Leading.

7            THE COURT:  Overruled.  You may answer.

8            THE WITNESS:  Proper -- just proper procedures of

9    maintaining a weapon.

10   BY MS. BROOK:

11   Q    And how about anything about reassembling the weapon?

12   A    That's with barrel types, how they're spiraled to, you

13   know, the proper insertion of like bristle brushes and not

14   taking grease off completely of components, you know, to

15   complete the chrome finish so they stay lubricated.

16   Q    Did he explain that process?

17   A    Yes.

18   Q    And when he explained it, were your brother and Ibrahim

19   watching?

20   A    Yes.  They were sitting both there -- they were all

21   sitting within the line that I have right there.

22   Q    You had mentioned weapons that were being used to be

23   disassembled and cleaned.  Which weapons were those?

24   A    The stock, the snubnose, the full body AK, and my brother

25   had a little 9 millimeter pistol that he would pulled apart.

1          But other than that, I mean, there was a revolver and

2    a fold-out 9 millimeter that didn't really require any

3    cleaning really.

4    Q    Did it include both of the weapons that we've showed you

5    today?

6    A    Yes.

7    Q    At some point did you move out of the house?

8    A    I moved out -- I moved out a month prior to the incident

9    with my brother.

10   Q    And who did you move in with when you moved out of the

11   19th Avenue apartment?

12   A    I had moved in with my girlfriend at the time.

13   Q    Before you moved in -- or permanently with your

14   girlfriend, during the time before, the months before, were

15   you at times spending time at your girlfriend's house?

16   A    Yes.  I would spend the weekdays at the apartment with my

17   brother, but during the weekends I would usually stay at my

18   girlfriend's place.

19   Q    And how soon before you moved out did you start to spend

20   weekends at your girlfriend's place?

21   A    It was right there within that month before it happened.

22   I mean, I was going over there occasionally, but it became,

23   you know, more often, and then she just told me to move in.

24   Q    On Friday, May 1st, did you see your brother?

25   A    Yeah.  That was the last time I saw him.

1   Q   And where was it that you saw him?

2   A   Right here in this apartment.

3   Q   Why did you go over to the apartment?

4   A   I had left my workout equipment there.  I had originally

5   got all my clothes and moved out, but I needed to rent a truck

6   to get all my workout equipment, so I had gone back there to

7   collect that.

8   Q   When you showed up to collect the workout equipment, who

9   was at the apartment?

10   A   Ibrahim and my brother.

11   Q   And how were Ibrahim and your brother acting?

12   A   It was just like every day.  I mean, it was just like a

13   normal day.  I mean, they were happy.  My brother liked to

14   cook his soup.  He was cooking his soup.  Ibrahim was playing

15   Call Of Duty.  I mean, it was just a general like happy

16   feeling.

17   Q   Did you see at the house that day any of the weapons that

18   you've seen here today?

19   A   Yes.

20   Q   What did you see?

21   A   When I had gone in to check for the remainder of my

22   clothing, I had gone in the closet and moved a couple items

23   back.  And my brother had still had his AK and the bulletproof

24   vest hidden in the closet.

25   Q   I'm going to place on the overhead what's already been

```
 1    admitted as Exhibit No. 130.

 2             In looking at this picture, the background of it, is

 3    that your house, the house that you lived in at 19th Avenue?

 4    A    No.  It isn't.

 5    Q    How can you tell?

 6    A    By the color of the walls.  I don't recognize that shelf

 7    at all.

 8    Q    Do you know or have you spent time talking to a man by the

 9    name of Stefan Verdugo?

10    A    No.

11    Q    Do you know or have you spent time talking to a

12    13-year-old boy by the name of Carlos?

13    A    No.

14    Q    Do you know or have you spent time talking to a

15    15-year-old boy by the name of Juan?

16    A    No.

17    Q    Do you know or have you spent time talking to an adult man

18    by the name of Sergio Martinez-Chavez?

19    A    No.

20    Q    At some point after your brother was killed, did Malik

21    talk to you about talking to the police?

22    A    Yes.  I had a phone conversation with him about not

23    talking to the FBI.  I got a couple of calls from people.

24    Also AK -- I mean both are generally saying that, you know,

25    what is done is done.  You need to leave it, you know, for
```

1    what has happened.  And basically, you know, inviting me to

2    come and hang out with them.

3    Q   Malik who we have been talking about here today, the man

4    that was at the apartment with your brother and Ibrahim, do

5    you see him here in the courtroom?

6    A   I'm sorry.  My mind is somewhere else.  I'm sorry.

7    Q   Do you see Malik here in the courtroom?

8    A   Yes, I do.

9    Q   And can you point to him and describe something that he's

10   wearing.

11   A   He's right there wearing the plaid shirt.

12         MS. BROOK:  Your Honor, may the record reflect that

13   the witness has identified the defendant?

14         THE COURT:  Yes.

15         MS. BROOK:  I don't have any other questions.

16         THE COURT:  Mr. Maynard.

17                      **CROSS EXAMINATION**

18   BY MR. MAYNARD:

19   Q   All right.  I want to go back and get a time line so that

20   we're all clear when everything happened in this case.

21         If I understand correctly, you moved to Arizona for

22   the last time in February of 2014; is that correct?

23   A   Yes.

24   Q   And at that point you moved in with your brother?

25   A   Yes.

1  Q   And it was in the apartment that he was living in when he

2  died on May 3rd?

3  A   Yes.

4  Q   Okay.  And when he -- when you moved into that apartment,

5  he was already living with Elton Simpson?

6  A   Yes.

7  Q   And you started working with him at a job that he had with

8  Kiwi Carpet Cleaning business, correct?

9  A   Yes.

10  Q   Now, when you first moved into that apartment, was your

11  brother watching these ISIS videos that you've told us about

12  today?

13  A   No.  Not that I had seen initially.

14  Q   Well, you don't move out of that apartment until the 1st

15  of April, end of March of 2015, correct?

16  A   Yes.

17  Q   So you're in that apartment with them for 14 months or

18  thereabouts?

19  A   Around that, yes.

20  Q   Okay.  Now, you've told us that at some point you meet a

21  girl and you move in with her -- or a woman.

22          And you moved in with her, I believe, the end of

23  March or first part of April?

24  A   Yea.  It was around the first part of April of 2015.

25  Q   And when did you actually meet her?

1   A   I think it was May of 2014.

2   Q   May of 2014.  Okay.

3        Did you meet her on some sort of social media site?

4   A   Yes.  It was an online site.  I didn't have time to get

5   out and about.  We were constantly working so it was off a

6   site called Tinder.

7   Q   And you said you were constantly working.  You were

8   working for Kiwi at that time, correct?

9   A   Yes.

10  Q   And then you and your brother left Kiwi and started a

11  business, I thought you said, in January of 2015?

12  A   Yes.

13  Q   Did I get that date right?

14  A   Yes.

15  Q   Was it around the first of January?  The end of January?

16  When?

17  A   I'm not completely sure on a date on that.

18  Q   What's your best recollection?

19        MS. BROOK:  Asked and answered.

20        THE COURT:  Overruled.  You may answer if you have an

21  estimate of beginning, end, middle.

22        THE WITNESS:  I would say within the first week --

23  first week of January.

24  BY MR. MAYNARD:

25  Q   And I want to pinpoint, if we can, when did Mr. Simpson

1   buy his AK?

2   A   It was four months after I had moved in, so around May.

3   Q   I'm sorry?

4   A   It was around May time.

5   Q   May or June?

6   A   May or June time, around there.

7   Q   And when did your brother buy his?

8   A   His was bought -- that was closer to the, you know, the

9   beginning of the year.  I mean, because he had had it for two

10  months, so it was about February/March time that he had had

11  his weapon.

12  Q   February or March?

13  A   Yea -- yes.

14  Q   Now, when Mr. Simpson bought his AK, did you see it right

15  away?  Did he bring it in and show it to everybody?

16  A   I was there when he had presented it, yes, to everybody.

17  Q   Okay.  Now -- and I don't want to misstate anything, but

18  if I understood your direct testimony, you said at the

19  beginning Abdul Malik was at the apartment that you stayed in

20  one or two times a week?

21  A   Yea, initially, when I first met him, he would come over

22  occasionally.

23  Q   When did you first meet him?

24  A   It was at the mosque.

25  Q   When in relationship to the girlfriend that you had?  Was

1    it before or after?

2    A    It was before.

3    Q    So it was sometime before May of 2014?

4    A    Yes.  It would have to be.

5    Q    Can you give us any better recollection of it?

6    A    I have -- I have no idea.  I can't remember exactly what

7    month that was.

8    Q    You met him at the mosque for the first time?

9    A    Yes.

10   Q    And so you had been living in this apartment from February

11   until April and that's the first time you meet Abdul Malik,

12   correct?

13   A    It was halfway through the time that I moved in, yeah.

14   Q    Pardon me?

15   A    Halfway through the time so that I moved in.

16   Q    Well, halfway through the time would be somewhere around

17   November or December?

18   A    Not exactly.  I don't mean half.  I mean, you know, after

19   a little bit of time of living there.  I'm not sure on the

20   whole, you know, timings of that but --

21   Q    Well, you have a very good recollection on things.  I want

22   to try to get it as pinpoint accurate as we can.

23   A    Okay.

24   Q    Do you recall any better as we sit here when you met Abdul

25   Malik the first time?

1           I believe you said a minute ago you met him at the

2   mosque?

3   A   I just remember it was really hot that day.  It was very

4   hot.

5   Q   So does that mean it would have been maybe in June, July,

6   or August?

7           MS. BROOK:  Objection.  Speculation.

8           THE COURT:  I think he's already given you his

9   best -- the best information he can.  Before he met his

10  girlfriend and after he moved here in February.

11  BY MR. MAYNARD:

12  Q   And was it after you met him that time that he started

13  staying or coming over to the apartment one or two times a

14  week?

15  A   Yes.

16  Q   Okay.  But prior to that you had not seen him?  He had not

17  come to the apartment?

18  A   No.

19  Q   Okay.  And then I believe you testified to the jury that

20  at some point it then increases to three to four times a week.

21          When did that happen?

22  A   I think that was closer -- I know it was -- because I know

23  after I had first met him, he started coming over, it was

24  probably like a couple months after I had first met him.  I'm

25  not sure on that quite exact timing of that.

1   Q   Is it before the new year?

2   A   Yes.  It was before.  Before the new year.

3   Q   Could you recall based on any holidays?  Was it before

4   Thanksgiving or after Thanksgiving?

5   A   I'm sorry.  I can't.

6   Q   So the best you can do is it's several months after the

7   first time you met him, so October/November, thereabouts?

8           MS. BROOK:  Objection, Your Honor.  Speculation and

9   asked and answered.

10          THE COURT:  Sustained.

11          MS. BROOK:  Misstates testimony.

12  BY MR. MAYNARD:

13  Q   And you said he started coming three to four times a week

14  and that he slept over three nights a week.  When did he start

15  sleeping over three nights a week?

16  A   I mean it was -- I mean close around -- I'd say like

17  December time.  I remember it was closer towards the end of

18  the year it was more frequent.

19  Q   And so from the December or January time period until the

20  time you moved out, Malik was sleeping at your apartment three

21  times a week?

22  A   I mean, from what I can understand, he -- I don't know

23  what was going on in his life, but, I mean, he was over there.

24  Q   Was he sleeping at your apartment three times a week in

25  the last three or four months that you were living there?

1   A   Yes.

2   Q   Now, you've also told us that -- or let me see if I've got

3   this.

4         When your brother brought in his AK-47, Malik was

5   there; is that correct?

6   A   He had come back with him, yes.

7   Q   And it was when he came in you learned that your brother

8   had -- that Malik had either loaned him the money or had

9   bought the AK for him; is that correct?

10   A   Yes.   I had learned that he had loaned the money to him.

11   Q   But that would have been in February or March of 2015?

12   A   Yes.

13   Q   Correct?   Okay.

14         Now, you told us about an incident where -- or a time

15   when you saw them cleaning the guns and it was all three of

16   them together, correct?

17   A   Yes.

18   Q   Can you give us -- so it has to be sometime after your

19   brother bought his because that gun was being cleaned, right?

20   A   Yes.

21   Q   And you move out around the first week of April.

22         So can you tell me to the best of your recollection

23   when it was that you saw this being done, the cleaning?

24   A   Because I know that they went shooting like pretty much a

25   couple days after he had bought his weapon, so it was within

CR15-00707-PHX-SRB    JURY TRIAL-DAY #10   3-2-16

1   that week.

2   Q   A couple of days after your brother got his weapon?

3   A   Yes.

4   Q   So when did they go?  Did they go on a --

5   A   It was a weekend because we only had specific days off.

6   Q   Okay.

7   A   I'm not quite -- I can't remember if it was -- what day

8   exactly.

9   Q   But you weren't working that day?

10  A   No.  I was on a -- I would leave early in the mornings to

11  go for my hikes.

12  Q   Okay.  And then you came home and you saw them after they

13  had been shooting that day cleaning the weapons?

14  A   Yes.

15  Q   And is it your best recollection that they went shooting

16  in the morning?

17  A   Yes.

18  Q   And then you saw them either in the afternoon or was it

19  the evening?

20  A   It was later that evening.

21  Q   And so that would have been on either a Saturday or a

22  Sunday?

23  A   Yes.

24  Q   And either in March -- February or March?

25  A   Yes.

1   Q    And you seem to be pretty knowledgeable about cleaning

2   guns.  Did you stand there and watch that happen?

3   A    I watched for a little while.  I watched a little bit of

4   them disassembling it and then I went into the kitchen to

5   cook.  And when I came back out and was sitting down eating,

6   they were reassembling the gun at that point.

7   Q    Did you participate in cleaning of the guns at all?

8   A    No.

9   Q    Do you have any knowledge about cleaning guns?

10   A    Not really.  I have never -- never owned a gun in my whole

11   life.  I have never really thought I needed to have one.

12   Q    Have you ever cleaned one?

13   A    No.

14   Q    Did you ever go shooting with your brother?

15   A    Not in Arizona.  But when we lived in Salt Lake City, my

16   dad owned weapons and we would go shooting out there.

17   Q    So what kind of guns did you shoot when you were with your

18   dad in Salt Lake City?

19   A    He had a 30 aught 6.  223.  It was a magnum, a .40 caliber

20   magnum, a 9 millimeter, and I think there was like a -- I

21   think it was an SKS.  My dad and his friends would also bring

22   their weapons as well.

23   Q    Your father had several rifles?

24   A    Yeah.  He had owned a couple weapons and his friends would

25   bring theirs as well.

1    Q    When was the last time you went shooting?

2    A    Actually, in Kansas with my brother and my dad.

3    Q    Was that in January of 2015?

4    A    No.  This was -- this was in 2014.  I think it was in -- I

5    remember it was wintertime.  But my brother had his 9

6    millimeter and his fold-out 9 millimeter stock with him and we

7    had used those to shoot at the range.

8    Q    Now, your brother had a 9 millimeter pistol, correct?

9    A    Yes.

10   Q    When did your brother get the 9 millimeter pistol?

11   A    That was way before I moved out.  I have no idea when he

12   had bought that.

13   Q    Okay.  And you mentioned to us just a second ago that your

14   brother had a 9 millimeter gun with a collapsable stock?

15   A    Yes.

16   Q    When did he buy that?

17   A    That was probably a couple months before I had moved

18   there, from a garage sale.

19   Q    So you believe he bought it in either January of 2014 or

20   December of 2013?

21   A    I can't really say exactly when.  I'm not completely --

22   Q    Well, when you moved in February of 2014, did he have the

23   gun with the collapsable stock?

24   A    Yes.  He had it at that time, yes.

25   Q    Let me back up just a little bit here.

1            You were born in the United States?

2     A    Yes.

3     Q    Okay.  At some point your father moved you and your

4     brother and your mother to Pakistan; is that correct?

5     A    Yes.

6     Q    And you lived in Pakistan for six or seven years?

7     A    Yes.

8     Q    And your father and mother separated at that time?

9     A    Yes.  When I was -- I think I was nine years old when they

10    divorced.

11    Q    And your mother came back to the states and you stayed in

12    Pakistan?

13    A    Yes.

14    Q    And you went to school in Pakistan?

15    A    Yes.

16    Q    And then you moved back to the states and you moved to

17    Salt Lake City?

18    A    Yes.

19    Q    And at some point you got a girl pregnant in high school

20    in Salt Lake City?

21    A    Yes.

22    Q    Okay.  At that point did you sort of become the black

23    sheep in the family for a while?

24    A    I was disowned from the family strictly because the girl I

25    had got pregnant and wanted to stay with was Mormon.  I was

1    basically going against my father's wishes.

2    Q    And did you become baptized Mormon at some point?

3    A    Yes.

4    Q    And you got married to the woman in Salt Lake City?

5    A    Yes.

6    Q    And you have two children there?

7    A    Yes.

8    Q    Okay.  And then at some point you got divorced and you

9    moved to Arizona; is that correct?

10   A    Actually, we had been separated in 2010.  That's when we

11   had the pizza place.  And then after a year in 2011 I had

12   moved back to reconcile things.  But that's when we had

13   actually signed the divorce papers but stayed together for

14   three years.

15   Q    Okay.  Did your wife actually move here to Arizona with

16   you when they had the pizza place?

17   A    No.  She was present here in 2005 when we owned the dry

18   cleaners.

19   Q    And did she ever move to Arizona?

20   A    Yes.  She moved out here from '05 to '06 with me.

21   Q    Okay.  And in '05 to '06 you worked at a dry cleaner?

22   A    Yeah.  We owned a dry cleaners, yes.

23   Q    Something your father had helped you purchase?

24   A    My dad had actually purchased it originally for his family

25   to run.  But then he had brought my brother in to take over

1    and then my brother had brought me in to help.

2    Q    Then you went back to Salt Lake City for a time period?

3    A    Yes.  After that '05/'06 I went back and came back in

4    2010.

5    Q    And then you came back in about 2010.  Was that when the

6    pizza place was?

7    A    Yes.

8    Q    And then you left to go back to Salt Lake City after how

9    long?  How long were you here?

10    A    I was here for a year and then I went back.

11    Q    And you stayed in Salt Lake for a couple of years before

12    you came back in February of 2014?

13    A    Yes.

14    Q    Okay.  Now, your brother -- you told us about these ISIS

15    videos that were playing all the time.

16         When did that start?

17    A    I was -- I can't remember an exact -- like an exact time,

18    but I know it was at least like a couple of months after I was

19    there.  You know, they call them nasheeds.  They're like some

20    sort of a -- I don't know a complete description behind it,

21    but they're like religious songs that would be played

22    constantly.

23         Ibrahim was really big on playing those.  Nothing

24    else was allowed to be played in that apartment.  It started

25    with that.  But then, you know, then the videos also included

1    the nasheeds plus the people driving around.

2    Q   Can you give me some idea when that started, whether it

3    was in the summer, whether it was before you met your

4    girlfriend or after?

5              MS. BROOK:   I object.   Asked and answered.

6              THE COURT:   The music or the videos?

7              It's not clear whether your question was about the

8    music or the videos.

9    BY MR. MAYNARD:

10   Q   The music, was that music videos?

11   A   No.   They were just -- they were just -- it has the black

12   flag with the Arabic writing and the swords on it.   That's all

13   it shows.   But then it just has music playing in the

14   background.

15   Q   Okay.   So there was the black flag with music -- or black

16   flag with white writing with music playing in the background?

17   A   Yes.

18   Q   And that was the first thing you recall being played on a

19   daily basis at the apartment?

20   A   Yes, because I was -- nothing else -- anything else I

21   would put on would be shut off immediately.

22   Q   And was that by your brother or was it by --

23   A   By both, both of them, Ibrahim and my brother.

24   Q   And when did those music videos or those music with the

25   flags start being played?   Was it soon after you got there

```
 1   or --
 2   A    No.  It was -- they were already -- my brother would
 3   actually listen to it in his car as well.  He had CDs.  Abu
 4   Bakr CDs that he would listen to every day.
 5   Q    Your brother would listen to Abu Bakr CDs?
 6   A    Yes.
 7   Q    In the car?
 8   A    That's all he would listen to were lectures.  He didn't
 9   listen to music or watch TV, like, you know, normal cable.
10   Anything that was on TV would be, you know, involved with you
11   know --
12   Q    Did you have cable TV there when you first moved in?
13   A    No.  We had a PC that was connected to the main TV.  And
14   pretty much from that you can access everything, so.
15   Q    So at some point this music then progressed to ISIS
16   videos?
17   A    Well, I mean ISIS would -- from what I observed was that
18   they -- you know, they would post their videos, occasionally
19   post videos.
20          And, I mean, somehow Ibrahim would, you know, he
21   would always know, you know, these newer videos that would
22   come out.  And that's when a lot of these -- you know, the
23   whole tweeting thing started that I observed a lot of.
24   Q    Can you give the jury some idea of when you started seeing
25   these ISIS videos?
```

1   A   I think it was summertime.  Yes.

2   Q   Okay.

3   A   I just remember it was hot again.  It was hot that time

4   of --

5   Q   And you have indicated that they were playing pretty much

6   all day.  Now, if I understood your testimony, Ibrahim is

7   working as a dental hygienist or a dental assistant or

8   something of that nature, correct?

9   A   Yes.

10   Q   Is that a "yes"?

11   A   Yes.

12   Q   Okay.  And he's working with an individual by the name of

13   Saabir Nurse?

14   A   Yes.

15   Q   And did you know Saabir Nurse?

16   A   I had known him from that pizza shop, yes.

17   Q   And did he come over to the apartment that you were in?

18   A   He stopped by maybe once or twice but that was all that I

19   noticed.

20   Q   Now, on a normal day, what time would you and your brother

21   get up to go to work?

22   A   Well, we only had one bathroom, so I would get up at 5:00

23   to get ready first.  And then my brother was pretty slow

24   getting ready, so he was always the one after me.

25   Q   And then would Ibrahim get up last?

1    A    It was pretty much whoever got to the restroom first

2    waking up in the morning.

3    Q    Okay.  What time did you and your brother routinely go to

4    work every day?

5    A    We would leave the house by 6:30.  We had to reach the

6    warehouse at 7:00 for supplies and just depending on the

7    workload and how many contracts we were able to get and how

8    long each job would take.

9    Q    And did you normally -- or what were the days of the week

10   that you guys would work?

11   A    It all depended on contracts.  Sometimes there was no

12   work.  Other times we would have contracts to work all day

13   long.

14   Q    From February until the end of the year when you started

15   your own business, were you normally working a full week or

16   not?

17   A    No.

18   Q    Can you give me some idea of how many hours a week you

19   were working?

20   A    I mean, there was days we worked 22 hours straight because

21   there was the two of us and we took on jobs that were way

22   above us.  So it just all depended on the workload.

23   Q    Did your brother work on Fridays?

24   A    Yes, but he would -- he would shut down everything for

25   prayer time.  Even if we were in the middle of a job, he would

1    shut down everything.

2    Q    Okay.  And did he do that every Friday?

3    A    Yes.

4    Q    Your brother was a very religious man, correct?

5    A    I mean, throughout the time that I have known my brother,

6    he was religious and then he would fall off and he got

7    religious and fell off.

8         But then this time around he got religious and, you

9    know, went to the extreme side of it for some reason.

10   Q    And you saw that progression happen while you were living

11   with him, correct?

12   A    Yes.  Through his actions, yes.

13   Q    And your brother had actually had problems with the FBI in

14   the past while living in Salt Lake City, hadn't he?

15   A    Yes.  He was questioned by them.

16   Q    I'm sorry?

17   A    He was questioned by the FBI for stuff he was posting

18   online, yes.

19   Q    And he was posting things online about President Bush?

20   A    Yes.

21   Q    Okay.  And so you're living there with him and you're

22   watching this progression.  Do you confront your brother about

23   it?

24   A    Many times.

25        I would get threatened to be kicked out.  My brother

1    had come to the point where blood didn't matter anymore.  It

2    was his Muslim brothers that came ahead of anybody.

3           I mean, he didn't really care what happened.  You

4    know, my brother and I were very close our whole life but he

5    got to the point where he didn't even care what happened to me

6    as well.  He was ready to kick me out for no reason.  I mean,

7    the reason behind his reason was that, you know, the beliefs

8    that he had started believing, the more militant side of

9    Islam.  Before he was, you know, very kind, a very soft

10   person.

11   Q   And did he actually kick you out or did you leave on your

12   own?

13   A   The last confrontation I had with my brother when he had

14   confronted me about, you know, being a kafir, doing what I'm

15   doing, you know, Muslims like me are killed.  That was the --

16   I mean pretty much the last time.

17   Q   Well, when you moved out in the first week of April, had

18   he kicked you out or had you done that on your own?

19   A   I had left on my own because I felt unsafe at that

20   apartment.

21          Just from the general talk, I mean, the general

22   actions of the people in that apartment, I mean, it was a

23   matter of time.  In my head I thought it was like -- I kept

24   thinking in my head, well, it's a matter of time before these

25   guys are picked up.  Someone is going to pick them up and I

1  don't want to be associated with that because I have nothing

2  to do with that.

3  Q   You were getting nervous when you were there?

4  A   Yes.  I mean, I expressed it to my family as well.

5  Q   You called your father?

6  A   I'm sorry?

7  Q   You called your father and told him?

8  A   I called my mother and my father but they -- I didn't

9  really have a good standing.  Through my 20's I did a lot

10  of -- you know, I got in trouble a lot.  I wasn't really the

11  best of, you know, everybody's list.  So nobody really

12  believed or cared what I had to say basically.

13  Q   And is it fair to say that you were closer to your mother

14  than you are to your father?

15  A   Definitely, yes.

16  Q   And you would call your father to talk about your

17  brother's progression in the religion?

18        MS. BROOK:  Objection.  Hearsay.

19        THE COURT:  Overruled.  You can answer "yes" or "no."

20        THE WITNESS:  Yes.

21  BY MR. MAYNARD:

22  Q   Now, at the end of 2014 did you and your brother make a

23  trip to Kansas?

24  A   Yes.

25  Q   And when did you leave Arizona to go to Kansas?

1   A    I'm not completely sure what day that was, but I remember

2   it was in the evening because my -- we had just rebuilt my

3   brother's engine on his car.  He was putting the last

4   finishing touches on it and it kind of pushed it further into

5   the evening, you know, but I remember we -- it was around the

6   evening time that we had left.

7   Q    Do you remember if it was before or after Christmas?

8   A    I'm not quite sure.  But we don't celebrate Christmas, so

9   I'm not even sure what day Christmas is.

10  Q    Even though you were baptized Mormon, you don't celebrate

11  Christmas any longer?

12  A    The whole thing with getting baptized was to please my

13  in-laws.  I was living at their house.  My family was -- my

14  dad didn't want me to come live with him because of my

15  step-mom and my mom was in no position to take me in.

16         So, I mean, it was more to, you know, put myself in a

17  better standing with my wife's parents.

18  Q    And did you drive to Kansas with your brother?

19  A    Yes.

20  Q    And did you go by Salt Lake City and pick up your kids?

21  A    Yes.

22  Q    And then from Salt Lake City, you and your brother drove

23  on to Kansas and stayed with your dad for some period of time?

24  A    Yes.

25  Q    How long did you stay with your dad?

```
 1    A    For about a week.

 2    Q    And how long -- and then you drove back to Salt Lake City

 3    and dropped your kids off?

 4    A    And then drove back to Phoenix.

 5    Q    Is it fair to say you were gone about two weeks?

 6    A    No.  It was -- the drive -- because my brother and I were

 7    driving, so we drove within -- I mean straight through.  We

 8    didn't stop.  So it was about -- the whole trip was maybe

 9    eight days, nine days.

10    Q    Do you have a driver's license?

11    A    No.  I didn't have a driver's license at the time.  I do

12    now but not at that time.

13    Q    Now, did you go shooting with your brother while you were

14    in Kansas?

15    A    Yes.

16    Q    Okay.  You did go shooting with your brother?

17    A    In Kansas, yes.

18    Q    And this would have been in late 2014 or early 2015,

19    correct?

20    A    Yeah.  It was late 2014.

21    Q    Okay.  And you went to -- did you go to a shooting range?

22    A    Yes.  We went to an actual proper building and, you know,

23    they have the enclosed shooting ranges.

24    Q    What guns did your brother carry with him when you went to

25    Kansas?
```

1    A    The 9 millimeter handgun.  He always had that with him.

2    And he brought the fold-out stock just for an extra gun to

3    shoot.

4    Q    He did not have his AK-47 at that time?

5    A    No.  He hadn't purchased it.

6    Q    When you came back, is that when you started the new

7    business?

8    A    Yeah.  A little after we had come back from visiting my

9    dad we had started it up.

10   Q    Now, before the trip to Kansas, you were working pretty

11   much full time for another cleaning service, correct?

12   A    You could say -- I would be more parttime than anything.

13   Q    And Simpson is working full time at that point as a dental

14   hygienist or dental assistant, something --

15            MS. BROOK:  Objection.  Misstates testimony.

16            THE COURT:  Sustained.  He never said Simpson worked

17   full time.

18   BY MR. MAYNARD:

19   Q    No.  Simpson is working some point prior to January 1st as

20   a dental assistant -- something in a dentist's office?

21   A    I mean on occasion he would get called to work there

22   because he wasn't able to get a normal job because of the

23   previous run-in he had with the FBI.  He had a record that,

24   you know, he couldn't do anything in the states.

25   Q    Simpson actually had a felony conviction, didn't he?

1    A    Yes.

2    Q    And you were aware of that?

3    A    Yes.   That was from -- I had learned that when I had

4    worked at the pizza place that he had.

5    Q    And while you were living with your brother and Simpson in

6    2014, did probation officers ever come to your apartment?

7    A    No.

8    Q    Never once?

9    A    Never once.

10   Q    Now, can you tell us how much Simpson was working prior to

11   January of 2015?

12   A    When I first moved out, he moved out to Phoenix in

13   February, 2014.   He was actually working consistently at the

14   start.   He would actually go every day.

15          But then progressively it started to two days here,

16   maybe a day here, but it was more of he was -- my brother and

17   Ibrahim were content with, you know, making enough to just pay

18   bills and have enough to eat.

19          I mean, they weren't worried about making anything

20   more than that.   So that's why our business went down as well

21   because my brother had the same mentality that, you know, more

22   money, more problems.   But in that same sense, you have to

23   survive somehow.

24   Q    Well, when you two started your own business, you thought

25   you were going to be able to do pretty well, didn't you?

1   A   I thought we were going to do great.

2   Q   And it was because you had now learned how to clean

3   carpets and clean stone floors?

4   A   Yea.  We did specialized stone floors.  We did flood

5   remediation.  Carpet repairs.  Carpet installations.  I mean

6   we took on jobs that we had no knowledge about but, you know,

7   YouTube is a good place to find out.

8   Q   So I mean as of the first part of January, you guys are

9   doing pretty well?

10          MS. BROOK:  Objection.  Misstates testimony.

11          THE COURT:  Overruled.  You may answer.

12          THE WITNESS:  I wouldn't say that well.  I mean, we

13   were doing better than we had had previously.  I actually had

14   money to send to my kids and my brother was able to give me

15   like -- I was getting like $150 a week.

16   BY MR. MAYNARD:

17   Q   Over and above rent and food and those kinds of things?

18   A   So, yeah.  He would add in like rent and say, okay, well,

19   I justify paying you this much because I pay rent and I pay

20   for food and everything else, so.

21   Q   Now, your brother has a son?

22   A   Yes.

23   Q   And tell the jury what his name is.

24   A   Nathaniel Soofi.

25   Q   And he's eight years old or thereabouts?

1    A    Yeah.  I think eight or nine now.

2    Q    Your brother got him every other weekend or did he get

3    him --

4    A    Every weekend.

5    Q    Every weekend.  So Nathaniel Soofi would actually come to

6    your apartment every weekend?

7    A    Uh-huh.

8    Q    Correct?

9    A    Yes.

10   Q    And Nathaniel Soofi, would he listen to these ISIS videos

11   that were being played?

12            MS. BROOK:  Objection.  Speculation.

13            THE COURT:  Rephrase the question.

14   BY MR. MAYNARD:

15   Q    Would the ISIS videos be played while Nathaniel Soofi was

16   there?

17   A    Yes.  I mean, other than the times that he was allowed to

18   watch his approved cartoons or videos or he had his time to

19   play his games, his video games.  But other than that, I mean

20   there was nothing else played on that TV.

21   Q    So ever since February of 2014 through the time that you

22   leave in April, Nathaniel Soofi was coming over every weekend?

23            MS. BROOK:  Objection.  Foundation.

24            THE COURT:  Overruled.  You may answer.

25            THE WITNESS:  It wasn't every -- every weekend.  I

1  mean, there were times where my brother and I would plan

2  things or on hikes or certain things he wasn't, you know,

3  capable of doing or there was just some times my brother just

4  didn't want to have him for the weekend.

5  BY MR. MAYNARD:

6  Q   But generally speaking, your brother had him every

7  weekend?

8  A   Yes.

9  Q   And your brother and Nathaniel were very close, weren't

10  they?

11  A   Very close, yes.

12  Q   Did your brother teach Nathaniel how to shoot a gun?

13  A   Yes.

14  Q   And where did he teach him how to shoot a gun?

15  A   He had come to the shooting range with us in Kansas and

16  shot the pistol and the foldout.

17        Also, just in general gun play with like Nerf guns at

18  the house, we would always, you know, have fun and that's the

19  extent of his shooting-wise.

20  Q   Now, going back to the woman that you met in April or May,

21  did there come a point in time when you started spending

22  evenings with her or spent the night with her?

23  A   I mean I --

24  Q   I'm talking overnight.  You stayed overnight at her

25  apartment.

1    A    I mean, if it would get too late, yes, I would spend the

2    night but --

3    Q    When did that start?

4    A    Probably a couple months after I met her.  I'm not

5    completely sure.  When we first met, we were -- it's called

6    being put in the friend zone.  I got put in the zone and it

7    took a while before we actually got together.

8         Like I was just friends with her hanging out and then

9    I eventually built a relationship with her.

10   Q    Right.  I mean, at some point you moved in with her,

11   you've told us.

12   A    Yes.

13   Q    But prior to that were there times when you would spend

14   evenings or stay overnight?

15   A    Yes.  We would occasionally go to the movies and out to

16   dinner.

17   Q    Okay.

18   A    But on occasion, yes, she would let me stay the night.

19   Q    And did you stay there often on the weekends?

20   A    Yeah.  Most of the time -- it was most of the time I

21   didn't have work the next day because there was no way I could

22   have --

23   Q    When did you start spending your weekends at her

24   apartment?

25   A    I mean, that was towards the end when she had actually,

1   you know, let me build a relationship with her.  I had only

2   been -- we had only been in a relationship for about a

3   month-and-a-half before, you know, I got moved off to Kansas.

4   Q   Well, starting in January after you got back from your

5   trip to Kansas with your kids and with your brother, were you

6   spending your weekends with your brother or were you spending

7   your weekends with your girlfriend?

8   A   It was mixed.  Mixed between the two of them.

9   Q   And so you would see your nephew --

10        Did you call him your nephew or what did you call

11   Nathaniel?

12   A   I would call him Nate.

13   Q   Nate.  Okay.

14        You would see Nate on the weekends.  Did you see him

15   every weekend that he was there?

16   A   No.  There were times that I wasn't present at the

17   apartment to see him.

18   Q   Did you go to the mosque with your brother?

19   A   Yes, some.  That was more of a -- a thing to please my

20   brother.  I mean, he was really adamant about, you know, being

21   Muslim and praying five times a day and, you know, trying to

22   pull me away from, you know, I guess what I was doing on a

23   daily basis.

24   Q   Your brother didn't like the fact that you had a

25   girlfriend that you spent the night with; is that correct?

1   A    No.  He -- he actually started to hate me for it.

2   Q    Okay.  And when you told us -- I believe you told us

3   earlier at some point did your brother tell you that people

4   who did what you were doing should die?

5   A    Yes.  They are basically called kafirs.  People that are

6   born Muslim but, you know, go against the religion, you're

7   completely looked down upon.

8   Q    Do you recall when your brother told you that?

9   A    I mean, that was the whole -- I mean, I was -- I don't

10   like saying this, but I was seeing, you know -- at first I was

11   seeing, you know, multiple girls.  And so, you know, he saw

12   that but, you know, that's when he started to, you know, say

13   these things to me.

14   Q    So you were having relationships with more than just one

15   woman while you were living with your brother?

16   A    I mean not relations.  But I mean I enjoy hanging out more

17   with females than guys, I guess you could say.

18   Q    And your brother did not approve of your lifestyle?

19   A    No, because you're not supposed to hang out with females

20   unless your intent is to marry them.  So you're not supposed

21   to.  It's just a big no-no in Islam.

22   Q    And when you had gone to Kansas with your brother, had

23   your brother lectured you about your lifestyle?

24   A    Actually, when we had gone on the drive -- see, when I

25   pull my brother away from everybody, he would come back to the

```
 1   person I knew.  I would bring him back to the brother I know.
 2            But when I would leave him with, you know, the people
 3   at the apartment, it was -- I would come back and he would be
 4   a whole other person.
 5   Q   Now, did you become aware at some point that your brother
 6   started looking on the Internet to buy an AK-47 in January?
 7   A   I had no idea till it was brought to the house.
 8   Q   So the first time you knew anything about it was when you
 9   saw it?
10   A   Yes.
11   Q   And did you have any understanding of where he bought the
12   AK-47?
13   A   Yes.  He expressed to me how it was bought and how he
14   received the money.
15   Q   No.  Where?
16   A   From Craigslist.
17   Q   Okay.  And when he bought it from Craigslist, did he tell
18   you who it was that he had bought it from?
19   A   All I know is that a gentleman that -- he would basically
20   upgrade these rifles and sell them online.
21   Q   I'm sorry.  I didn't hear.
22   A   He was a gentleman that sold upgraded weapons.  I mean
23   that's all I know of because he had come back with armor
24   piercing rounds and like specialty items on the rifle that you
25   don't usually just get.
```

1    Q    So when your brother came back with this, it was a

2    customized AK-47?

3    A    Yes.

4    Q    Okay.  Now, you've also told us that -- I heard you

5    mention a couple of times that at some point during the days

6    you did either long hikes or you did long runs.

7              How often was that?

8    A    Oh, about three times a week.

9    Q    And when you say "long runs," are you talking -- are you

10   an ultramarathon runner?

11   A    I would say a marathon runner.  I do 30-miles-plus.

12   Q    And you would go out and run 20 or 30 miles three times a

13   week?

14   A    About two or three, like two or three times a week,

15   depending on my knees if they would allow it.

16   Q    Was that normally during the week or was it on the

17   weekend?

18   A    I mean, if we didn't have work, it was during the week.

19   On the weekends I would, you know, rather do something else.

20   Q    But you would work in the morning with your brother if

21   there was work and then you would go out in the afternoons and

22   you would run 20 or 30 miles?

23   A    That was only on the days we didn't work.  There was no

24   way after work that I would be able to do that.

25   Q    Okay.  So when there wasn't work, you would run these long

1    runs?

2    A    Yes.

3    Q    And then on the weekends you were spending time with

4    different women, including the woman that you eventually had a

5    relationship with?

6    A    Yeah.  It was mixed between, you know, the females I was

7    seeing and my brother.

8    Q    Okay.

9    A    Because my brother and I also tried to make plans with

10   each other, you know, so we, you know.

11   Q    Now, let me ask you a few questions.  I want to switch

12   here for a second.

13          Your brother, the last time you saw him was on May

14   1st of 2015, correct?

15   A    Yes.

16   Q    You had not seen him for approximately a couple of weeks

17   before that?

18   A    Like a week.  A week before.

19   Q    Your brother had contacted you and was sort of emphatic

20   that you bring him a pair of shoes of his that you owned?

21   A    Yeah.  I had borrowed his dress shoes for my court date

22   and I had kept them in my girlfriend's place.  And that last

23   week I hadn't gone over there, he was adamant every day, you

24   know, you need to bring me my shoes.  But I would leave them

25   outside the house and he was more than welcome to pick them up

1    himself, but he --

2    Q   He didn't pick them up?

3    A   No.

4    Q   And on that day it seemed he was adamant on the March or

5    on May 1st that you come to the house to see him or ostensibly

6    to bring the shoes back?

7    A   Yes.  And to give him the apartment key, because he said

8    there was no point of having the key if I'm not living there.

9    Q   And so it was at that point that you then cleaned out all

10   of your stuff, correct?

11   A   Well, prior to that I had taken my clothes out but --

12   Q   But you had athletic equipment, weight equipment, things

13   of that nature that had not been taken out?

14   A   No.  The heavy, big stuff I needed a truck to get that

15   out.

16   Q   And that's the day you got it.  Was it in the evening of

17   May 1st?

18   A   It was 7:30.  I remember the exact time.  I was there

19   from -- because I remember I had got into an argument with my

20   girlfriend because she didn't want me to leave and go to the

21   apartment.  But I left anyway and I was there from 7:30 to

22   8:30.

23   Q   Your girlfriend wasn't welcome in the apartment, was she?

24   A   No, not at all.

25   Q   You go over to see your brother.  Simpson is there,

1    correct?

2    A    Yes.

3    Q    They seem to be in a jolly mood?

4    A    Yes.

5    Q    And your brother tells you you can actually take some of

6    his athletic equipment, his weights?

7    A    They were all mine.  I had made a collection over time.

8    In his room I had, you know, like a punching bag and weight

9    bench and all that stuff and all my weights.

10         But at that time too it kind of struck me funny

11   because he was, you know, asking me if I wanted to take

12   anything else.

13   Q    Okay.  You mentioned you had a punching bag and other

14   things.  Do you have any -- you've studied martial arts?

15   A    Yes.  I study mixed martial arts.

16   Q    Do you study jujitsu?

17   A    It's a -- I do a mix between muay Thai and jujitsu.

18   Q    Muay Thai is a Thai form of boxing?

19   A    It's more of like a kickboxing form.

20   Q    Okay.  And so you saw your brother that night.  You saw

21   Simpson that night.  You told them good-bye, correct?

22   A    Yes.

23   Q    And your brother advised you to remember what he had told

24   you about Islam?

25   A    He told me to remember the teaching of Islam.  If I have

1  any questions, everything is online and that he was just

2  generally happy that he was able to help me move forward in

3  life, to get a second chance, you know, at actually making

4  something of myself.

5  Q    You knew that your brother was leaving town, correct?

6  A    He said he was doing business out of town.

7  Q    Did you know your brother was leaving town?

8  A    Yes.

9  Q    And was it your understanding he was going out of state on

10  business?

11  A    Yes.

12  Q    Okay.  You did not know, though, that he was going to go

13  to Texas for this Muhammad drawing contest?

14  A    No.

15  Q    Okay.  And did you attempt to text or call your brother

16  that weekend?

17  A    No.  I mean, the next time I had heard anything was when I

18  saw the news that Monday morning.  I saw his car on the news.

19  Q    You got up Monday morning at your girlfriend's house?

20  A    Yes.

21  Q    And you saw the news.

22        Did you recognize your brother's car?

23  A    At first they had said -- I had heard Elton Simpson's

24  name.  And initially, my first reaction was that, you know, my

25  brother was still here and it was Malik and Ibrahim that had

```
 1    gone out.
 2    Q    You thought it was Malik and Ibrahim.
 3              Didn't you see an overhead shot of the car?
 4    A    Not till -- when they had first started showing the
 5    initial pictures, they had showed Elton Simpson's face.  And
 6    they said that two men from Phoenix had gone out to Dallas and
 7    done a shooting in Garland.
 8    Q    You're telling us now that you think it was your -- your
 9    initial reaction was it was Simpson and Malik?
10    A    But then when I saw the car --
11    Q    Did you call your brother?
12    A    Yes.  And I just got the answering machine multiple times.
13    But then that's when the news feed showed my brother's car, I
14    knew from there that it was my brother.
15    Q    Okay.  And your brother had a fairly unique looking car?
16    A    Yes.
17    Q    Okay.  Even though it had been destroyed in Garland,
18    Texas, you still recognized it?
19    A    Yes.
20    Q    And you understood that Simpson could not have driven that
21    car out there?
22    A    He cannot drive a stick shift.
23    Q    Right.  Now, at some point that morning you get called by
24    the FBI; is that right?
25    A    No.
```

1    Q    Did you call them?

2    A    My girlfriend had a friend in the FBI and she had told

3    them that I was the -- you know, that I'm the brother of, you

4    know, the person that went up there and did that.  And I need

5    to, you know, to basically to come out and, you know, tell my

6    side of the story, you know, so they don't have to come

7    searching for me so it would look better.

8    Q    Did you then meet with the FBI on the morning of May 4th

9    of 2015?

10   A    Yes.

11   Q    And where did you meet with them?

12   A    It was at a coffee shop.

13   Q    And how many agents were there?

14   A    There were -- there were two that talked to me but there

15   was one that stayed kind of behind.

16   Q    Were you worried at that time that you might be implicated

17   because you had been living with the two guys who had just

18   gone and committed a terrorist act in Garland?

19   A    No.  I wasn't afraid of any association with what had

20   happened.  I was just in general -- generally, I mean, when

21   you find out that somebody so close to you, especially your

22   brother, has been killed, I mean, I had completely fallen

23   apart.

24        But at the same sense, I was, you know -- I had that

25   fear and I was scared because I'm like, okay, well, you know,

1    if they're going to be looking towards me for either

2    retaliation for what has happened or if they are going to be

3    looking towards me to come after me to join them or you know.

4    Q    Had your brother attempted to get you to join him and

5    Simpson?

6    A    Towards the end, I mean, they pushed a lot, a lot more.

7    Q    Now, this first meeting with the FBI that occurs at a

8    coffee shop, how long do you recall that meeting lasting?

9    A    It was about an hour.

10   Q    Okay.  And when was the next time you met with the FBI?

11   A    It was in Kansas.

12   Q    Didn't you meet with the FBI again in Phoenix, Arizona, on

13   May 5th?

14   A    No.  They had only talked to me the one time at that

15   coffee shop and then the next time was at the airport before I

16   was leaving.

17   Q    Well, that airport was in Phoenix, Arizona, wasn't it?

18   A    Yeah.  It was just a quick -- a quick run-in just to show

19   me some pictures and verify people.

20   Q    And then you flew home to Kansas for your brother's

21   funeral?

22   A    Yes.

23   Q    And how many times did you meet with the FBI in Kansas?

24   A    About three times.  Three times.

25   Q    When you met with the FBI on May 4th, were you aware that

```
 1    you were being recorded?

 2    A    No.

 3    Q    Did the FBI eventually tell you that they had recorded

 4    you?

 5    A    No one has ever said anything about being recorded that

 6    first time.  I knew that other times I had been recorded but

 7    not the initial.

 8    Q    Not the first one?

 9    A    Huh-uh.

10    Q    So you have not listened to a transcript or you have not

11    listened to a recording of that first interview; is that

12    correct?

13    A    No.

14    Q    Okay.  And when you were in Kansas, you said you met with

15    them on at least three occasions?

16    A    Yes.

17    Q    Did they tell you they were recording you when you met

18    with them in Kansas?

19    A    Yes.  They would put the recorder in plain sight and said

20    they were recording.

21    Q    Did they meet with you first and talk to you and ask you

22    questions and then after they had asked you questions did they

23    then record you?

24    A    No.  It was -- I mean right off the bat they had the

25    recording going.
```

```
1    Q   You're sure?

2    A   Yes.

3              THE COURT:  Mr. Maynard, we're going to break for

4    lunch.

5              MR. MAYNARD:  Okay.

6              THE COURT:  Ladies and gentlemen, we will reconvene

7    at 1:15.  You are reminded of the admonition not to discuss

8    the case among yourselves other with anyone else.

9              Please do not form any conclusions about the case

10   until you have heard all the evidence and begun your

11   deliberations.

12             Court is in recess until 1:15.

13        (Recess taken at 11:59 a.m.; resumed at 1:19 p.m.)

14             THE COURT:  Good afternoon, ladies and gentlemen.

15   Please sit down.  The record will show the presence of the

16   jury, counsel, and the defendant.

17             Mr. Maynard, you may continue your cross-examination

18   of Mr. Soofi.

19                  CROSS EXAMINATION (cont'd)

20   BY MR. MAYNARD:

21   Q   At some point in 2014 or 2015, did your father come to

22   visit you in Phoenix?

23   A   In 2014.

24   Q   When?

25   A   It was within the summertime.
```

```
 1    Q    Okay.  And do you recall how long he stayed?

 2    A    It was a brief visit.  It was like four days.

 3    Q    Now, the day after your brother is killed, you meet with

 4    the FBI at a coffee shop at approximately eleven o'clock in

 5    the morning, correct?

 6    A    Yes.

 7    Q    And there are two agents that are interviewing you and

 8    then there's another agent that's somewhere nearby?

 9    A    Yes.

10    Q    And they start asking you questions about what has gone on

11    in that apartment that you have been living in for the last 14

12    months, correct?

13    A    Yes.

14    Q    And they ask you:

15            Were there any other people that came into the

16    apartment besides you and your brother and Mr. Simpson.

17            Do you recall that?

18    A    I don't recall that question.

19    Q    I believe you told me earlier you were not aware that you

20    were being taped at the time?

21    A    Yes.  I was not aware of it, no.

22    Q    Do you recall that they asked you:

23            Did anybody come in that seemed to have your

24    brother's and Simpson's beliefs?

25    A    No.  I was never asked.
```

1    Q    Okay.  Do you recall that the detective on May 4th --

2              THE COURT:  Excuse me.  You've placed something on

3    the screen and you haven't told Mr. Soofi what it is.

4    BY MR. MAYNARD:

5    Q    Mr. Soofi, I have placed on the screen a portion of a

6    certified transcript of the conversation that you had with

7    detectives on May 4th, 2015.  Have you seen this document

8    before?

9    A    No.

10   Q    You do recall that there was a conversation that you had

11   with detectives at this time?

12   A    Yes.

13   Q    Okay.  I'm going to ask you to look on page 15, starting

14   at line 12.  Do you see the question from the detective?

15   A    Yes.

16   Q    Would you read that to yourself for a second.

17   A    Okay.

18   Q    Do you recall now that you told them that the only guy

19   that you recall coming to the house at the time was a fellow

20   by the name of AK?

21   A    I mean, I can't completely recall my conversation at that

22   time.  But, I mean, when I initially had come to the FBI, I

23   mean, my mind was in complete --

24   Q    I'm sure you were upset.  Your brother had just been

25   killed.

1          THE COURT:  Could you speak closer to the microphone,

2    Mr. Maynard.  You're drifting away.

3          MR. MAYNARD:  I'm sorry.

4    BY MR. MAYNARD:

5    Q   You had learned about it five or six hours earlier,

6    correct?

7    A   Yes.

8    Q   And the FBI are coming in there to investigate because

9    they're wanting to know, as they told you, if there was

10   anybody else that may be out there that would be involved in

11   something like this, correct?

12   A   Yes.

13   Q   And you're wanting to help the FBI and give them as much

14   information as you can at that time?

15   A   I did my best at the time with the state I was in.

16   Q   And you've just told us that for the prior three or four

17   months that Abdul Malik was sleeping at your brother's house

18   two or three nights a week and staying there three or four

19   days a week, correct?

20   A   Yes.

21   Q   But when they asked you if there's anybody else that could

22   be involved, you don't mention Abdul Malik at all, do you?

23   A   It was based off of --

24   Q   Excuse me.  You did not mention Abdul Malik the first time

25   you were interviewed by the FBI?

1    A    No, I didn't.

2    Q    Okay.  In fact, you told the FBI that day that:

3          My brother and roommate would never bring anyone back

4    to the house.

5          Do you recall telling them that?

6    A    I wouldn't personally bring people to the house, but, you

7    know, people would show up on their own.  They wouldn't

8    physically, you know, grab the person and bring them to the

9    house.  It was more of friends visiting.

10   Q    So when you told the FBI that my brother and roommate

11   would never bring anyone back to the house, what you meant was

12   they didn't physically bring them back, but people would just

13   drop by?

14   A    Yes.

15   Q    And the FBI then went on and asked you to describe AK.

16          Do you recall that?

17   A    Yes.

18   Q    And do you now recall that you described him as a Muslim

19   man with a family with a graying beard?

20   A    That's a general description, yes.

21   Q    And then you went on to tell them:

22          That's the only person that came to the house.

23   A    I mean, like I said at the time, at that point in time I

24   couldn't -- anybody -- I mean, I don't care who you are, if

25   you're --

1   Q    Excuse me.

2   A    If you're --

3   Q    Excuse me.  Excuse me, Mr. Soofi.  Sorry for your loss.

4        But let me direct you to page 16 of the transcript of

5   your testimony with the FBI or your statement to the FBI that

6   day.  Take a look at page 16.  Start on line 2 and read down

7   and see if this helps to refresh your recollection.

8        Do you see beginning on line 10 where you said:

9        I mean, that's the only person other than that they

10  would leave.  They would always leave and do stuff and they

11  wouldn't tell me.

12       Do you see that?

13  A    Yes.

14  Q    Do you remember telling the FBI that on that morning?

15  A    No, I don't.  I really can't remember a lot of what I said

16  that morning.

17  Q    Do you remember the FBI questioning you about your role

18  and that you were living there and you were watching these

19  ISIS videos on a daily basis, weren't you?

20  A    No.

21  Q    You didn't watch them?

22  A    I had watched on occasion, but not on a daily basis, no.

23  Q    Didn't you tell the FBI that you had told your brother and

24  Simpson that they had to stop.  Otherwise, they were going to

25  get you in trouble?

1    A    Yes.

2    Q    Okay.  Now, at eleven o'clock when this interview took

3    place, the FBI asked you about when you learned or how you

4    learned that it was your brother that was involved.

5           Do you remember that line of questioning?

6    A    Yes.

7    Q    And do you remember that you told them that you saw the

8    two AK-47s and you saw your brother's car?

9    A    I saw the car on the news, but I didn't see the weapons.

10   The weapons weren't presented to me in a picture until --

11   Q    There's not a question pending.

12          I'm going to show you -- I put on part of page 25 of

13   the transcript and begin reading it approximately line 22.

14   You can start at 18 for the question.

15          THE COURT:  Okay.  I'm going to just interrupt this

16   right now.

17          You asked him if he said he saw two AKs and this

18   transcript says nothing about seeing it.

19   BY MR. MAYNARD:

20   Q    Oh.  Had you heard that there were two AKs there in the

21   news reports?

22   A    Nothing of the weapons.

23   Q    Look at page 25, going on to page 26.

24          Did you say to the FBI that morning:

25          I mean if it was Simpson and that's my brother's car

1    and Elton didn't know how to drive a stick for crap he would

2    have -- he would have killed the car and that's my brother's,

3    his little souped up little Cobalt.  He wouldn't let anybody

4    drive it.  I was the only one that really drove it.  When I

5    saw that car I was, like, yeah.  And then I heard two AKs and

6    they both owned AKs.

7            Do you remember making those statements to the FBI on

8    May 4th?

9    A    No.  I don't remember that.

10   Q    You don't deny that you made it, do you?

11   A    I mean, some of it sounds like from what I said, but, I

12   mean, the last part I can't really see it.

13   Q    And do you recall as the FBI continued to ask you

14   questions, you told them that your brother went shooting up

15   north on occasion?

16   A    Yes.

17   Q    And do you recall that you told them that you went with

18   your brother and his son shooting out in the desert?

19   A    That was before -- that was way before he got the AKs.

20   Either of them.  That was when we had gone for a hike, my

21   brother always had his 9 millimeter on him, so we just decided

22   to take it out and shoot at a couple things.

23   Q    But when the FBI asked you about whether you had ever gone

24   out shooting with your brother, you said you had gone out

25   shooting with your brother and your nephew Nathaniel out in

1    the desert?

2    A    Yes.

3    Q    Just the three of you?

4    A    Yes.

5    Q    And, again, when the FBI asked you about how you learned

6    it was your brother and you told them that you had seen the

7    car and you heard about two AKs, you didn't say anything to

8    them that, oh, I thought it must have been Simpson and Malik,

9    did you?

10   A    The only thing I recollect saying was that I know that's

11   my brother and they had already mentioned Elton Simpson's

12   name.

13   Q    Now, you told us a few moments ago that your brother

14   bought his AK in either February or March.

15         Do you recall that?

16   A    Yes.

17   Q    And you've told us at length about how your brother came

18   in, Malik was with him, and that Malik said he had either

19   bought the gun or had loaned him $700 for the gun.

20         Do you remember that?  That's what you've told us

21   today.

22   A    I had stated that my brother had come in and -- you know,

23   he had told me that Malik had loaned him the money for the gun

24   and he was going to pay him back.

25   Q    Now, when the FBI asked you on May 4th when your brother

```
 1    bought the gun, you told them it was five months ago, correct?

 2    A   In which --

 3    Q   Let me direct your attention to page 27.  I'm going to

 4    direct your attention, starting at the top.  Special Agent is

 5    asking you about the guns that your brother has.  And you tell

 6    him that he had a Glock and he bought this -- you told him it

 7    wasn't a Glock and that he had bought a 9 millimeter at a yard

 8    sale.

 9            Do you recall that?

10    A   Yes.

11    Q   And then you go on.  He asked you:

12            Are there any other weapons?

13            And you say:  No, just the handgun.  And he had

14    recently got the AK, probably five -- like five months ago.

15    It was like five months ago.

16            Do you know how he acquired it?

17            Mr. Soofi:  Through Craigslist.  He bought it on

18    Craigslist.  Bought it through a private owner.  It was

19    upgraded, you know.  Those guys that have their upgraded

20    collection of weapons and they personally do stuff to them.

21            Do you know about how much he paid?

22            It's like I think 700 bucks.

23            You didn't mention anything about Abdul Malik when

24    the agents are asking you when your brother purchased the AK,

25    did you?
```

1    A    Initially, in that first interview, no.

2    Q    And you didn't tell them that he had gotten the money from

3    Abdul Malik either, did you?

4    A    No.  With the questions that were asked, I -- and at the

5    time, like I said, it was -- I mean --

6    Q    I know you were upset.  I understand.

7         Now, going on, they ask you about when Simpson had

8    gotten his.  Do you see that?

9         And you told them that Simpson had gotten his before

10   your brother had.

11   A    Yes.

12   Q    Do you recall?

13        You told them:

14        He got his probably a couple of months before my

15   brother got his.  It was more, you know, the compact AK, you

16   know, the smaller compact one.  It was just the hand grip.

17        MS. BROOK:  Your Honor, I'm going to object to the

18   form of the question.  There's no impeachment question before

19   the witness.

20        THE COURT:  Sustained.

21   BY MR. MAYNARD:

22   Q    Do you recall that the officers --

23        THE COURT:  You can take that off the screen,

24   Mr. Maynard.  You are going to get his recollection.

25        MR. MAYNARD:  Yes, ma'am.

```
 1    BY MR. MAYNARD:

 2    Q    Do you recall that the FBI agents were asking you when

 3    Mr. Simpson had gotten his weapon, his AK?

 4    A    Yes.

 5    Q    And do you recall that you told them it was a couple of

 6    months before your brother had gotten his?

 7    A    I'm not sure on the time period, but --

 8    Q    Let me show you your transcript again.

 9              Do you see where you said:

10              He got his probably a couple of months before my

11    brother got his.  It was more, you know, the compact AK, the

12    smaller compact one.

13              Do you see that?

14              Does that refresh your recollection that you told the

15    agents then Mr. Simpson had gotten his a couple of months

16    before your brother had gotten his?

17    A    I mean, I can't really remember that day completely.  I

18    mean, anything that would have came up that day was

19    completely --

20    Q    There's no question pending.

21              Do you recall telling the agents that there was a lot

22    of ammunition kept at the apartment?

23    A    Yes.

24    Q    Do you recall the agents asking you whether or not you

25    knew about the Muhammad drawing contest before your brother
```

1    going there?

2    A    Yes.

3    Q    And do you recall you told them you didn't know anything

4    about it?

5    A    I'm sorry?

6    Q    You told them you didn't know anything about it?

7    A    Yes.

8    Q    Okay.  Had you heard your brother say before that people

9    who drew pictures of the Prophets should be killed?

10   A    Any depiction of a Prophet is not allowed, especially a

11   Prophet Muhammad.

12   Q    Now, do you recall that when the agents asked you what you

13   knew about your brother's plans, you told them that your

14   brother was rather secretive?

15          MS. BROOK:  Your Honor, objection.  Form of the

16   question.

17          THE COURT:  Sustained.

18   BY MR. MAYNARD:

19   Q    Okay.  Was your brother rather secretive?

20   A    Yes.

21   Q    Okay.  Was Ibrahim also rather secretive?

22   A    Yes.

23   Q    In the weeks leading up to this Garland attack, did they

24   sort of keep to themselves?

25   A    They stayed in the apartment the majority of the time.

1    Q    And you weren't in there the last two or three weeks, were

2    you?

3    A    The last week I wasn't there completely, but I was there

4    off and on.  I would stop by occasionally.

5    Q    And the last couple of months before this attack were they

6    careful around you?

7    A    Yes.  With any conversations, they would leave the house

8    to go out to eat somewhere.  Or they would go out to an

9    undisclosed location, somebody's house.  They never told me

10   the name of the person, but they were always going to a

11   person's house.  They didn't want me to go with them.

12   Q    Did the FBI ask you if you thought there was somebody that

13   was providing money to your brother and Simpson?

14           MS. BROOK:  Objection.  Form of the question.

15           THE COURT:  Overruled.  You may answer.

16           THE WITNESS:  Yes.  There was a mention of an outside

17   source.  That's kind of why my brother quit advertising for

18   the business.  Ibrahim stopped working because --

19   BY MR. MAYNARD:

20   Q    Excuse me.  I'll ask the questions.

21           Did you tell the FBI who you thought it was that was

22   providing money to Ibrahim and your brother?

23   A    No.  That --

24   Q    Did you tell the FBI on that day that there were

25   individuals that would provide money to people who would

1  spread Islam?

2  A   Yes.

3  Q   And did you tell the FBI that you had suspicions about who

4  was providing money?

5  A   Yes.

6  Q   And when you told the FBI that, you never mentioned my

7  client Abdul Malik, did you?

8  A   No.

9  Q   In fact, who you mentioned was an Imam in the Phoenix

10  area, correct.

11  A   Yes.

12  Q   Now, when the FBI asked you about your having not lived

13  there for the last several weeks, did you tell the FBI that

14  you had been kicked out?

15  A   No.  I remember telling them that I had --

16  Q   Excuse me.  There's no question.  Thank you.

17       I'm going to show you what's been marked from that

18  same transcript of May 4 of 2015.  I direct your attention to

19  page 48, line 2.

20       The detective says:

21       So I had mentioned, did you have any ideas or

22  suspicions about anybody that may have -- may have been

23  supporting them?

24       MS. BROOK:  Objection.  Form of the question.

25       THE COURT:  Overruled.  You may continue.

```
 1   BY MR. MAYNARD:

 2   Q   Answer:  I mean --

 3           Mr. Soofi:  Answer:  I mean, when my brother kicked

 4   me out, he said that he did not have anybody that would fund

 5   him.  And then you go on to some more explanation.

 6           Do you recall giving that answer to that question at

 7   that time?

 8   A   No.

 9   Q   Okay.

10           MS. BROOK:  And, Your Honor, defense counsel just

11   misread the transcript on that last question.

12           MR. MAYNARD:  If I did, I apologize.

13           MS. BROOK:  He said he did have somebody that funded

14   them.

15           MR. MAYNARD:  Where would you like me to read?

16           THE COURT:  You said he said that he did not have

17   somebody that would fund him.  And it says that he said that

18   he did have somebody that would fund him.

19           MR. MAYNARD:  Oh.  I'm sorry.

20   BY MR. MAYNARD:

21   Q   Your brother indicated he had somebody who would fund him?

22   A   Yes.

23   Q   You have to say "yes" or "no."

24   A   Yes.

25   Q   And the FBI asked you who you thought that was, correct?
```

1    A    Yes.

2    Q    And you never mentioned Abdul Malik at that time, did you?

3    A    No.

4    Q    In fact, who you mentioned was a local Imam?

5    A    Yes.

6    Q    Okay.  And, in fact, your brother wouldn't let you into

7    his apartment because you had a girlfriend; isn't that right?

8    A    No.  I was -- I was allowed in the apartment.  My

9    girlfriend was not allowed.

10   Q    Did you tell the FBI you weren't allowed in the apartment

11   because you had a girlfriend?

12   A    No.

13   Q    Let me show you that same transcript, page 66.

14             The FBI agent said:

15             Your brother said that?

16             Mr. Soofi:  Yeah.

17             So it was just -- there were people, yeah, there were

18   other people like behind a lot of -- behind the scene stuff

19   that was going around.  They kept me in the dark on it.  But

20   my brother would come out and say once in a while because he

21   would get frustrated with me because of things I -- I wasn't

22   allowed in his apartment because I had a girlfriend.  And I

23   would have to -- you know, tell her that I can't be with you

24   and pray five times a day.

25             Do you recall making that statement to the agent that

1    day?

2    A    Yes.  I remember that one.

3    Q    Mr. Soofi, weren't you trying to distance yourself from

4    your brother's and Mr. Simpson's actions on that day?

5    A    Which day are you talking about?

6    Q    On May 4th when the FBI is interviewing you.

7    A    I'm sorry.  I'm not completely sure what you're -- I'm

8    trying to just --

9    Q    Certainly you're upset that your brother has died that

10   day.

11   A    Yes.

12   Q    Okay.  But aren't you worried that the FBI is going to

13   look at you because you've been living there with them now for

14   14 months?

15   A    I mean, yes, in the back of my head.  I mean, there's

16   always, you know, guilty by association most of the time.

17   Q    That's right.

18   A    So.

19   Q    And isn't it true that not one time in that interview did

20   you ever mention Mr. Abdul Malik as either coming to the

21   house, staying there, or anything else?

22   A    Not that I can remember from that interview, no.

23   Q    Okay.  Now, you then left the next day and went to Kansas

24   for your brother's funeral, correct?

25   A    Yes.

1   Q   And to be with your family; is that right?

2   A   Yes.

3   Q   And then the FBI met you at the airport and talked to you

4   then?

5   A   Yes.

6   Q   And then after you got to Kansas, I believe you told me

7   this morning that they met with you on at least three

8   occasions?

9   A   Yes.

10   Q   Correct?

11        Do you happen to remember the first time they met

12   with you, either what time or what day it was?

13   A   It was a weekday around like 2:30 or so.

14   Q   Do you remember if it was in the morning or the afternoon?

15        THE COURT:  He said around 2:30 or so.

16        MR. MAYNARD:  I'm sorry.  I didn't hear him, Your

17   Honor.  Thank you.

18   BY MR. MAYNARD:

19   Q   The first time you met with the FBI in Kansas, did you

20   meet -- did they tell you they were going to tape that

21   conversation?

22   A   Yes.  They had put a tape recorder in front of me.

23   Q   All right.  And there was a tape-recorded conversation

24   from May 22nd of 2015 in Kansas, but it was at 10:00 in the

25   morning.  Does that --

```
 1    A    They -- they had me calling -- I was calling -- they had

 2    me calling AK.  They were recording conversations from phone

 3    calls that was made.  They were having me call various people.

 4    Q    I was going to get to that.

 5         Did they have you start making these telephone

 6    conversations that they were taping before or after this

 7    meeting on May 22nd?

 8    A    After.

 9    Q    Okay.  And then they asked you to call several people and

10    tape those conversations, correct?

11    A    Yes.

12    Q    One of them Abdul Malik, correct?

13    A    Yes.

14    Q    One of them was his nephew Saleem Sampson?

15    A    Yes.

16    Q    And then you made numerous phone calls over the course of

17    the next two months to AK Hyman?

18    A    Yes.

19    Q    Did you only make one phone call to Mr. Abdul Kareem?

20    A    Yeah.  Only one phone call was made.

21    Q    Okay.  And do you recall that in that phone call, Mr.

22    Abdul Kareem asked you how you were?

23    A    Yes.  It was a normal conversation.

24    Q    Normal conversation.  He asked you when you would be

25    coming back?
```

1    A    Yeah.   Pretty much when I was going to come back, you

2    know.

3    Q    He offered you a job?

4    A    I had talked with him previously about working for his

5    company, that I could help him out.

6    Q    In that telephone conversation he said if you come back I

7    can give you a job.

8    A    Give me a job.

9    Q    I'm about to go on Google.

10   A    Yes.

11   Q    I'm going to have a lot of work, correct?

12        Could use your help?

13   A    Yes, because I'm a seasoned mover, so.

14   Q    And he even offered -- he told you he had a three-bedroom

15   apartment?

16        MS. BROOK:   Your Honor, I object to hearsay with any

17   further line of questioning on this.

18   BY MR. MAYNARD:

19   Q    Did he offer you -- I'm sorry.

20        THE COURT:   You apparently are going to ask a

21   different question.

22        MR. MAYNARD:   I was.

23   BY MR. MAYNARD:

24   Q    Did he offer you a place to stay?

25        MS. BROOK:   Objection.   Hearsay.

 1            THE COURT:  Overruled.  You may answer.

 2            THE WITNESS:  Yes.

 3    BY MR. MAYNARD:

 4    Q    And he had a three-bedroom apartment, correct?

 5    A    I'm not sure.  I had never been to his residence.

 6    Q    Okay.  You've never been to any of his residences at any

 7    time?

 8    A    No.

 9    Q    And, in fact, where you lived was a one-bedroom apartment,

10    correct?

11    A    Yes.

12    Q    And you slept on one end of the couch, correct?

13    A    Yes.

14    Q    Mr. Simpson slept on the other end of the couch.  It was

15    L-shaped?

16    A    Yes.

17    Q    And your brother slept on the bed?

18    A    Yes.

19    Q    Yeah.  And his son Nathaniel, when he came over, he slept

20    with your brother?

21    A    Yes.

22    Q    You described Abdul Malik as the big guy who had been shot

23    in the back.

24            Do you recall that?

25    A    Yeah.

 1              MS. BROOK:  Objection to the form of the question.

 2              THE COURT:  Overruled.  You may answer.

 3              THE WITNESS:  Yes.

 4     BY MR. MAYNARD:

 5     Q   Okay.  In fact, didn't you say at some point that you

 6     would like to fight with him?

 7     A   I mean, I enjoy, you know, competition.  I mean, it's not

 8     something that I like, you know, I look to go look for people.

 9              But it's -- you know, it's just been basic

10     competition.  With what I train, it teaches you to use bigger

11     guys' strength against them, you know.  So it's something to

12     further my training, so.

13     Q   Sure.  He's a fairly large man but you weren't afraid of

14     him because of your martial arts training, correct?

15     A   In that aspect, yes.

16     Q   In fact, you told the FBI that you would sort of like to

17     go at it with him?

18     A   With any big guy, it's always fun, you know.

19     Q   Do you recall in the May 22nd conversation the FBI asked

20     you whether or not anyone ever stayed over at your apartment?

21     A   I'm not completely sure.  I mean, I was asked --

22     Q   Do you recall that you told them "only on occasion"?

23     A   I mean, there's -- I mean, a couple different times I

24     was --

25     Q   Do you recall that you told them "only on occasion"?

1    A    No.  I don't recall that.

2    Q    I'm going to start you on page -- this is a certified

3    transcript of the tape recording from -- that you had with the

4    interview with the FBI on May 22nd, 2015, in Kansas that

5    started at 10:00 a.m.  I'm going to start you up a little bit

6    higher.  It says:

7              So they didn't always agree with each other on

8    everything like that, so how long would AK stay in the

9    apartment?  Did he ever spend -- like spend the night or

10   anything?

11             Answer:  Well he stayed late.  I mean, we would have

12   people sleep over.

13             Question:  Okay.

14             Answer:  But --

15             Question:  It wasn't a regular thing?

16             Answer:  No.  It wasn't regular.  There wasn't much

17   room.  It was a one-bedroom apartment.

18             And I'm going to skip down to the question on line

19   22.

20             Did he ever spend the night?  So if you said, hey, if

21   he ever spent the night, there was probably one occasion or

22   either way, either -- you were saying that there is a

23   possibility --

24             And going to page 15.

25             -- that he spent the night?

```
 1              Your answer was:
 2              I mean I know that Malik, he spent the night
 3    occasionally.
 4              Question:  Okay.
 5              The answer was:  But AK, I know he would be there
 6    until late, but I never.
 7              Question:  Okay.
 8              Answer:  On weekends I would -- I would leave.
 9              Do you recall giving that answer to that question?
10    A   I guess, but it sounds different.
11    Q   I'm sure it does.  But you did not tell the FBI on May
12    22nd that Mr. Abdul Malik was spending the night at your
13    apartment for two or three nights a week for the last three
14    months that you were there?
15    A   I mean, I had mentioned that --
16              MS. BROOK:  Your Honor, misstates his testimony.  He
17    said "occasionally."
18              THE COURT:  He said that he came over that many times
19    a week.  He didn't -- I don't think that he said that he spent
20    the night all of those times.
21              MR. MAYNARD:  I think he did.
22              THE COURT:  So rephrase the question.
23    BY MR. MAYNARD:
24    Q   I'll ask another question.
25              The FBI is asking you a lot of questions about AK,
```

1    correct?

2    A    Yes.

3    Q    And he's the one that you really called the most and you

4    were -- they were taping your conversations every time you

5    called him, correct?

6    A    Yes.

7    Q    Is that "yes"?

8    A    Yes.

9    Q    And when did you first meet AK?

10   A    Probably around the same time I met Abdul Malik.

11   Q    And did you meet him at the mosque or somewhere else?

12   A    At the apartment.

13   Q    Okay.

14   A    Among others.

15   Q    Do you recall telling the FBI in May 22nd that you didn't

16   meet him until after you had been living in the apartment for

17   seven months?

18           MS. BROOK:   Objection to the form of the question.

19           THE COURT:   Sustained.

20   BY MR. MAYNARD:

21   Q    Did you tell the FBI you hadn't met him until you had been

22   living in the apartment for seven months?

23           MS. BROOK:   Same objection.

24           THE COURT:   Sustained.

25   BY MR. MAYNARD:

```
 1    Q    Did you meet him --

 2              Help me out here.

 3              THE COURT:  You never asked him when he met him.

 4              MR. MAYNARD:  I know.

 5              THE COURT:  So whether he told the FBI something

 6    different is not appropriate until such time as he says

 7    something different than what he told the FBI.

 8              MR. MAYNARD:  Thanks.

 9              THE COURT:  So, do you know approximately when you

10    first met AK at the apartment?

11              THE WITNESS:  Not exactly a time frame.

12    BY MR. MAYNARD:

13    Q    Do you think it was about seven months after you had moved

14    in?

15    A    That might be a little long.  It was probably -- I started

16    working -- the mosque -- I mean, it was probably a shorter

17    period than that.  I think that's a little bit longer.

18    Q    Did you tell the FBI it had been seven months after you

19    moved in?

20    A    I don't really remember a time frame of what I said that

21    day.

22    Q    Did you ever go to AK's house?

23    A    I had been there once to drop off groceries because we had

24    met him at the Walmart and he didn't have a vehicle to get

25    back and he had two big baskets full of groceries, so we gave
```

1  him a ride home.

2  Q    Do you recall that at this interview on May 22nd in Kansas

3  that the FBI showed you pictures of different individuals for

4  you to identify?

5  A    Yes.

6  Q    And one of the people that they showed you a picture of

7  was Abdul Malik?

8  A    Yes.  He was one of the pictures.

9  Q    And AK was in one of the pictures?

10  A    Yes.

11  Q    Okay.  Now, after this interview took place on May 2nd of

12  2015, the FBI then asked you to make telephone calls to

13  several individuals, correct?

14  A    Yes.

15  Q    And they taped all of those calls?

16  A    Yes.

17         MS. BROOK:  Objection.  Cumulative.

18         THE COURT:  If you're transitioning back, but let's

19  not go back to what's already been asked.

20         MR. MAYNARD:  I'm hoping not to.

21  BY MR. MAYNARD:

22  Q    And was your task to try to get them to say something that

23  would make them guilty of a crime?

24         MS. BROOK:  Objection to the form of the question.

25         THE COURT:  Sustained.

1          Rephrase the question, Mr. Maynard.

2     BY MR. MAYNARD:

3     Q    What did you understand -- why was the FBI taping them?

4     What did you understand --

5          THE COURT:  Did the FBI tell you what they wanted you

6     to say or accomplish in the taped phone calls?

7          MR. MAYNARD:  Better question than any of mine.

8          THE WITNESS:  No.

9     BY MR. MAYNARD:

10    Q    Did you tape some of the telephone calls while you were in

11    Texas?

12    A    Yes.  There was, I think, one phone call that was taped

13    while I was visiting my mom.

14    Q    In the telephone calls that you had with Mr. Abdul Malik,

15    did you tell him that you told the FBI that he had been there

16    a handful of times?

17         MS. BROOK:  Objection.  Misstates testimony.

18         THE COURT:  So you're asking him about whether he

19    told Mr. Kareem something about what he told the FBI?

20         MR. MAYNARD:  No, ma'am.  I'll rephrase.

21         THE COURT:  That's what the question says.

22         MR. MAYNARD:  Must have been a bad question.

23    BY MR. MAYNARD:

24    Q    You had a telephone call -- you had a number of telephone

25    calls with AK, correct?

1   A   Yes.

2   Q   And one of those calls do you recall telling him that you

3   had told the FBI that AK and Malik had been at your apartment

4   a handful of times?

5           MS. BROOK:  Objection.  Hearsay.

6           THE COURT:  Overruled.  You may answer if you recall

7   whether you said that or not.

8           THE WITNESS:  I don't remember that, no.

9   BY MR. MAYNARD:

10  Q   I'm going to show you a certified transcript of a

11  telephone conversation between Ali Soofi and Abdul Khabir

12  Hyman from July 8, 2015.  On page 23 you see where you stated,

13  beginning on line 19:

14          Well, I had -- you know, I had -- I had -- I had --

15  you know, I had to say that, you know, you guys were there a

16  handful of times, but, you know -- but the videos were always

17  playing, so I mean that's --

18          Do you recall that you made that comment to him then?

19  A   It doesn't look familiar.

20  Q   You don't deny that it was stated though, do you?

21  A   I mean, it's hard to remember everything from way back

22  till now with those small little details, especially with all

23  the questioning, I guess.

24  Q   Did the FBI grill you about watching the ISIS videos?

25  A   No.

1  Q    Do you remember telling Abdul Khabir Hyman that they

2  grilled you about watching the ISIS videos?

3            MS. BROOK:  Objection.  Hearsay.

4            THE COURT:  Overruled.  You may answer.

5            THE WITNESS:  No.  I don't remember that.

6            MR. MAYNARD:  Let me show you the transcript from

7  July 8, 2015, page 19.

8            You said:

9            Well, I mean -- I mean, the biggest thing, I mean,

10  that they really grilled me about, you know, the ISIS videos.

11  They -- they said that -- you know, the computer evidence, you

12  know, that they had, and all the terrorist videos, videos that

13  were being -- that were being played, you know, on the

14  computer at that time and they basically, you know, asked if I

15  had watched any of the videos or, you know, they wanted to

16  know if anybody that I had showed up as a visitor had seen

17  them when I was visiting, but I don't know, you know, why they

18  were making such a big deal about all of us watching the

19  videos.

20            Do you remember stating that to Mr. Abdul Hyman?

21  A    No.  I don't remember that, especially about the videos.

22  Q    Now, at some point you learned -- strike that.

23            At some point did you learn that Abdul Kareem had

24  been arrested?

25  A    I was informed by the FBI, yes.

1    Q    And how many times did you meet with the FBI all together?

2              You've told me, I believe, three times in Kansas,

3    twice in Phoenix, once on the 4th of May, once on the 5th at

4    the airport.

5    A    Yes.

6    Q    Any other times that you recall meeting with the FBI?

7    A    No.  Those are the only times; the twice here and then the

8    times they came to my parents' house in Kansas.

9    Q    And we've seen a transcript from May 22nd.

10             Do you recall the other times that they met with you

11   in Kansas?

12             THE COURT:  Are you asking him about the dates?

13             MR. MAYNARD:  Yes, ma'am.

14             THE WITNESS:  We met at my lawyer's office and at my

15   parents' house.  I mean, that's --

16   BY MR. MAYNARD:

17   Q    Okay.  When was it that you met at your lawyer's office

18   with the FBI?

19   A    That's when I had done the phone conversation, the longer

20   phone conversation with AK.  That was --

21   Q    So while that was being taped, you were sitting in your

22   lawyer's office having that conversation?

23   A    Yes.

24   Q    Okay.  And when was the other time that you met with the

25   FBI in Kansas?

1  A   It was at my dad's house.

2  Q   What was the time, if you recall, the month?

3  A   This wasn't too long after I was there.  It was July or

4  August time, I believe.  I'm not quite sure on the dates of

5  every time we met.

6  Q   Do you recall meeting on June 4th of 2015?

7  A   The 4th of July?

8          No.  I can't honestly remember specifics on the

9  dates.

10  Q   Did agents show you photographs of the weapons at one

11  meeting?

12  A   Yes.

13  Q   Was that in Kansas?

14  A   Yes.

15  Q   Did you ever come back to Phoenix after you left for your

16  brother's funeral other than this trip?

17  A   No.

18  Q   Okay.  Do you recall being interviewed by agents of the

19  FBI telephonically on September 25th of 2015?

20  A   No.  I don't remember.

21  Q   Do you remember that it was Agent Whitson and AUSA Kristen

22  Brook that interviewed you?

23  A   On a phone conversation?  Or there was a two-way, the

24  video conversation.

25  Q   Video conference?

```
 1   A    Yes.  Video conference.

 2   Q    Okay.  You recall that then?

 3   A    Yes.

 4   Q    Okay.  Do you recall whether or not that was taped?

 5   A    Yes, it was.

 6   Q    Were you shown photographs at that telephone conference?

 7   A    No.  I don't think on that occasion.

 8            I'm sorry.  I can't really remember if --

 9   Q    Do you remember another time that you were interviewed by

10   the agents -- AUSA Brook and Agent Whitson on January 29th of

11   2016 at your mother's house in Texas?

12   A    Yes.

13   Q    Was that interview taped?

14   A    Yes.  I'm pretty sure it was.

15            I'm sorry.  My memory with that is --

16            MR. MAYNARD:  Just a moment, Your Honor.

17            I don't have any further questions.

18            THE COURT:  Thank you.

19            Ms. Brook.

20            MS. BROOK:  Thank you, Your Honor.

21                        REDIRECT EXAMINATION

22   BY MS. BROOK:

23   Q    Defense counsel asked you a handful of questions about

24   some recorded conversations that you did with AK over the

25   summer, last summer?
```

 1    A    Yes.

 2    Q    And, first of all, for any of the recorded calls or any of

 3    the communications that you had with the FBI, did anybody pay

 4    you or compensate you?

 5    A    No.

 6    Q    Did anybody promise you or give you any benefit for doing

 7    those recorded calls or anything that you have said?

 8    A    No.

 9    Q    And in those recorded calls with AK, were those done at

10    the direction of an FBI agent?

11    A    I'm sorry.  Do you mean were they giving me the --

12    coaching me or --

13              THE COURT:  No.  Did they ask you to make the call?

14              THE WITNESS:  Yes.

15    BY MS. BROOK:

16    Q    And defense counsel showed you some of the things that you

17    said to AK on those calls.  In particular, he asked you about

18    one statement that you made to AK where you said:

19              I had to tell them that you were at the house a few

20    times watching the ISIS videos.

21    A    Yeah.  Yes.

22    Q    Were those statements that you made to him for a reason?

23    A    Yes.

24    Q    And what reason was that?

25              MR. MAYNARD:  Objection to the form of the question.

1    Lack of foundation.

2              THE COURT:  Overruled.  You may answer.

3              I assume he's going to tell us the reason he had.

4              THE WITNESS:  It was basically to bring out -- try to

5    bring out any additional information that was being withheld.

6    BY MS. BROOK:

7    Q    So to try to encourage him to talk on the phone?

8    A    Try to get him into that comfort zone where he would be

9    able to, you know, come out with anything that hasn't been

10   said already between us.

11   Q    As you've testified here today, was AK at that apartment

12   more than just a couple of times?

13   A    Yes.

14   Q    And Malik, as you have testified here today, was he at the

15   apartment as frequently as you have testified he was?

16   A    Yes.

17   Q    Defense counsel asked you about how often it was that

18   Malik would sleep over at that apartment on 19th Avenue.

19              Every week was it the same amount of nights that he

20   would sleep over?

21   A    It would vary.  I mean, there were times it would be -- he

22   would sleep over.  And then it would be, you know, a couple

23   days would go buy and then he would come by again and stay the

24   night.  So it was off and on throughout the week.

25   Q    So although the number or the times every week would vary,

1    was he consistently over at the house with Ibrahim and your

2    brother throughout the time that you lived with them for those

3    14 months?

4    A   I mean, yes.  All three of them were together, but the

5    majority of the time Ibrahim and Abdul Malik would be

6    together.

7    Q   And that's at the apartment?

8    A   At the apartment or, you know, when they would leave they

9    would mainly be together.

10   Q   After you moved out, so that first week of April, you have

11   testified that you came back to the apartment a few times and

12   that you were back there with your brother.

13          During those times was Malik there?

14   A   Yes.

15   Q   Defense counsel asked you about the specific month when

16   you first saw Nadir, your brother, come home with Malik with

17   that new AK that you identified here?

18   A   Yes.

19   Q   Are you certain of exactly what month it was?

20   A   I only know it's a time frame of about four months before

21   the incident happened.

22   Q   So four months before May 3rd?

23   A   Yes.

24   Q   When you watched Malik and Ibrahim and your brother

25   disassemble, clean, and reassemble those weapons that we've

 1    talked about here today, did you learn about the process by

 2    watching?

 3    A   I mean, the in and out, the little bit that I would watch

 4    because I was cooking my food, you know, I picked up bits and

 5    pieces.

 6          No.  I have never, you know, really dealt with

 7    weapons.  So for me to know, you know, that leaving grease on

 8    components -- I mean, because usually if I clean something,

 9    I'm going to clean it down to the chrome to get it shining.

10    But, I mean, that's certain things you would have to know, you

11    know, if you've dealt with weapons.

12    Q   From what you watched, did Simpson and your brother know

13    how to do that?  Know how to disassemble, clean, and

14    reassemble those weapons?

15          MR. MAYNARD:  Objection.  Beyond the scope.

16          THE COURT:  Sustained.

17    BY MS. BROOK:

18    Q   You mentioned that you learned as you were watching.

19          Who did you learn from?

20          MR. MAYNARD:  Objection.  It's beyond the scope.

21          THE COURT:  Overruled.

22          THE WITNESS:  I'm sorry.  Could you repeat it one

23    more time?

24    BY MS. BROOK:

25    Q   You mentioned that you learned how to disassemble and how

1    to leave the grease and how to reassemble the weapons by

2    watching.

3            Who did you learn from as you watched.

4    A    I mean, I was watching everybody in general, but I mean, I

5    think the main person they looked up to, I mean, was Abdul

6    Malik.

7    Q    What do you mean by that in the context of this particular

8    process of disassembling, cleaning, and reassembling the

9    weapons.

10   A    Knowledge.  I mean, knowledge-wise.

11   Q    Who had the knowledge?

12   A    Malik would have to.  I mean, there was -- I mean, nobody

13   there knew anything about weapons, I mean, other than shooting

14   them.

15   Q    So by that, who do you mean didn't know about weapons that

16   was in that room that day?

17           MR. MAYNARD:  Objection.  Asked and answered.

18           THE COURT:  Overruled.  You may answer.

19           THE WITNESS:  My brother Nadir and Ibrahim.

20   BY MS. BROOK:

21   Q    How did you learn to leave the grease?  Not clean it

22   totally clean but to leave the grease?

23           MR. MAYNARD:  Objection.  It's beyond the scope.

24           THE COURT:  Sustained.

25   BY MR. MAYNARD:

1   Q   Defense counsel asked you about those months before you

2   moved in with your girlfriend about the nights during which

3   you would spend the night over at your girlfriend's house.

4           Generally speaking, weekday nights would you stay at

5   the apartment with your brother and Ibrahim at that apartment?

6   A   Yes.

7   Q   And how do you recall that?

8   A   Do you mean recall the general -- like the feeling of that

9   or --

10  Q   Was there a reason -- is there a reason why you know that

11  on those weekday nights you would stay at the apartment and

12  not be at your girlfriends house?

13  A   I'm sorry.

14  Q   It's a bad question.  That's okay.

15          So you had said that on weekend nights you would stay

16  over at your girlfriend's house?

17  A   Yes.

18  Q   Was there a reason why on weekend nights you would stay at

19  her house?

20  A   Mostly, just because of the general feeling of that

21  apartment on the weekends because they would stay home all

22  day.  And, I mean, it was constant talk about and I'd be

23  constantly pushed into the whole religion thing.

24          I would start talking about something else and they

25  would push right back into religion.  It was constant

 1    religion.

 2    Q    And who is "they"?

 3    A    My brother and Ibrahim.

 4    Q    Was Malik there?

 5    A    You mean in different instances or that specific time?

 6    Q    Sometimes?

 7    A    Yea.  Some of the times he was there.

 8    Q    And that was during the time that they were trying to

 9    convert you to make you believe what they believed?

10    A    I mean, it was a daily thing, you know.

11    Q    When you moved out of the house in the beginning of April,

12    was your brother the only person in the house who was mad at

13    you for moving in with your girlfriend?

14          MR. MAYNARD:  Objection.  It's beyond the scope.

15          THE COURT:  Overruled.  You may answer.

16          THE WITNESS:  I know that Ibrahim -- like this was

17    the biggest one who had the problem because he was the

18    majority of the time with my brother.  He had a very strong

19    hold on him.

20          So every time I would leave, especially leave my

21    brother with Ibrahim, I would come back and, you know, that's

22    when I would really get it.

23          I mean, he would stop me at the door pretty much and

24    say, well, you know, what have you been doing?  You know, if

25    you have been doing this, this, this, this, I don't want you

1    in the apartment because this is my sanctuary.  By you coming

2    into my sanctuary you're tainting it with your, you know, what

3    you have been doing.

4    Q   Did Malik get mad at you for moving in with your

5    girlfriend?

6    A   I wouldn't say "mad," but all three of them in general

7    were almost like in disgust about what I was doing.  I mean,

8    in general, I got a general feeling from everybody and from

9    what they said that, you know, you're supposed to be Muslim.

10   You're supposed to be praying five times a day, not going

11   around, messing around with females and doing things against

12   the religion.

13           And that, you know, you're basically considered a

14   kafir.  You're a nonbeliever.  I mean, even my own brother

15   said that, you know, people like me should being killed.

16   Q   You testified about how Nadir told you that Malik had

17   loaned him the money to buy that AK that we have been talking

18   about here today?

19           MR. MAYNARD:  Objection to the form of the question.

20           THE COURT:  I haven't heard the question yet.  I

21   think it's a transitional statement.

22           MR. MAYNARD:  Objection to that.

23           THE COURT:  Go ahead, Ms. Brook.

24   BY MS. BROOK:

25   Q   Did your brother and Ibrahim borrow money from Malik on

```
 1    other occasions?

 2             MR. MAYNARD:  Beyond the scope.

 3             THE COURT:  Sustained.

 4             MS. BROOK:  He questioned him specifically about

 5    money, borrowing money.

 6             THE COURT:  I'm trying to recall.

 7             Other than in relation to the purchase of the weapon?

 8             MS. BROOK:  About when he was -- yes.

 9             MR. MAYNARD:  No, I didn't.

10             THE COURT:  Okay.  I only recall it in connection

11    with the purchase of the weapon.

12             Sustained.

13    BY MS. BROOK:

14    Q    Defense counsel asked you a lot of questions about the

15    information that you initially provided the FBI in May when

16    you talked to them after you found out that your brother was

17    killed.

18             You have testified that you were afraid.  What were

19    you afraid of?

20    A    Basically, my thoughts were, you know, the people involved

21    are coming for me next.  As far as my brother was involved,

22    they would expect, I guess, the same from me.

23             And then also in the same sense, I mean, I have

24    little kids and a family -- or I did have a wife -- but, I

25    mean, you know, everybody's safety in general.  I mean, it
```

1    just came to my head, okay, well now, what my brother has done

2    is going to do a lot to our family.  So in general I was, you

3    know, scared for just the general safety of myself and

4    everybody else.

5    Q   Were you afraid of Malik?

6    A   Not afraid of him as a person, but in the -- you know,

7    what could have been done or could have happened, I mean,

8    if --

9    Q   Did that play into why initially you didn't tell the FBI

10   about Malik?

11              MR. MAYNARD:  Objection to the form of the question.

12              THE COURT:  Sustained.

13   BY MS. BROOK:

14   Q   Did that affect what you told the FBI?

15              MR. MAYNARD:  Objection.

16              THE COURT:  Sustained.

17   BY MS. BROOK:

18   Q   Did you hold back information because of your fear of

19   people that Malik was associated with?

20              MR. MAYNARD:  Objection.  It's leading.

21              THE COURT:  Overruled.  You may answer "yes" or "no."

22              THE WITNESS:  Yes.

23              MS. BROOK:  May I have a moment?

24              THE COURT:  Yes.

25   BY MS. BROOK:

```
 1   Q   You have testified about your martial arts training.  And

 2   even with the training that you have, would that training in

 3   every situation, protect you from an armed attack?

 4   A   With my -- the extent of my training comes to close

 5   combat.  I would have to be close quarters.  Anybody with --

 6   it's not going to come in handy if somebody is too far away

 7   from you.  It's not going to come into play at all.

 8           MS. BROOK:  I don't have any other questions.

 9           THE COURT:  May Mr. Soofi be excused?

10           MS. BROOK:  Yes.

11           THE COURT:  Is there any objection?

12           MR. MAYNARD:  No.

13           THE COURT:  Mr. Soofi, thank you.  You may step down

14   and you are excused as a witness.

15           THE WITNESS:  All right.

16           THE COURT:  Why don't we go ahead and take our break

17   since we're transitioning to another witness.

18           We will reconvene, ladies and gentlemen, at ten

19   minutes to 3:00.

20           You're reminded of the usual admonitions.

21           Court is in recess.

22       (Recess taken at 2:33 p.m.; resumed at 2:46 p.m.)

23       (Open court, no jury present.)

24           THE COURT:  Thank you.  Please sit down.  The record

25   will show the presence of counsel and the defendant.
```

 1          The jury is not present.

 2          Ms. Brook?

 3          MS. BROOK:  Thank you, Your Honor.  I think Mr.

 4  Koehler is going to address this, but what we wanted to

 5  address before you brought back the jury was the rule of

 6  completeness that the defense suggested during the playing of

 7  the excerpts of the transcript.

 8          I will turn it over to Mr. Koehler.

 9          MR. KOEHLER:  That's correct, Your Honor, and we

10  outlined this in our Trial Memorandum, starting on page 18 of

11  the trial memorandum, and running through page 20 of the Trial

12  Memorandum.

13          The rule of completeness that's set forth in Rule 106

14  is fairly clear, and that is, that only statements that are

15  necessary to prevent the admission of a portion being unfair

16  need be admitted.

17          THE COURT:  I don't disagree with you.

18          MR. KOEHLER:  And so it's our position that in

19  selecting the clips that we did within that transcript, that

20  we did so by subject matter.

21          THE COURT:  Well, whether or not there are questions

22  and answers before the clips or after the clips that would put

23  them into better context, that is where the rule of

24  completeness would allow more of the recording to be played.

25          I don't think there is any dispute about that.

1    MS. BROOK:  And if I may, briefly, here is my only

2    concern.  The transcript is a hundred pages and there were

3    certainly other parts of the transcript that didn't come in,

4    including the last 20 pages which Your Honor has seen.

5          And with that, I'm just concerned about, you know,

6    defendant spending a considerable amount of time parsing

7    particular language of it where I just continually have to

8    object to every question he is asking.

9          THE COURT:  If that happens, you'll have to object.

10         MS. BROOK:  Okay.

11         THE COURT:  I mean, I'm not going to go through a

12   hundred pages and ask Mr. Maynard to tell me specifically

13   where so that you can object before he asks about it.

14         MS. BROOK:  Okay.  And then additionally, we have

15   spoken with defense counsel.  I believe it's their intent,

16   still, if Your Honor permits them, to split up questioning

17   based upon computer knowledge and not.

18         Our thought, and defense has said they're okay with

19   it, we too have sort of split the case where Mr. Koehler is

20   handling a lot of the computer-oriented questions.  So on

21   redirect, if he could potentially handle the computer-related

22   questions as well.

23         THE COURT:  I'm sorry.  We didn't have that split on

24   direct, so we're not having it on redirect.

25         MS. BROOK:  Okay.

1          THE COURT:  Had you asked about direct and put it

2    into two segments, that would have been fine, but this is a

3    one-time exception that I made at Mr. Maynard's request.

4          MS. BROOK:  And the only reason why I bring it up is

5    I expect they will probably do extensive questioning on that

6    particular subject, where with our direct, it really wasn't.

7          And so I know that you permit -- because you don't

8    want him to be recalled, you permit them to go into areas well

9    beyond the scope of what direct contained.

10          THE COURT:  Well, we'll see what happens.

11          MS. PLOMIN:  Your Honor, I just want to be clear.

12    It's the computer and cell phone evidence that I will be

13    addressing.

14          THE COURT:  Fine.  Let's bring in the jury.

15          MS. BROOK:  Thank you, Your Honor.

16       (Open court, jury present at 2:49 p.m.)

17          THE COURT:  Agent Whitson, come take the witness

18    stand.

19          And please go ahead and sit down as you come in.

20          The record will reflect the jury has now joined us.

21    Everyone else may also be seated.

22          Mr. Maynard, you may cross-examine Agent Whitson.

23          MR. MAYNARD:  Thank you, Your Honor.

24

25    ////

1    **SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN**

2    **CROSS EXAMINATION**

3    BY MR. MAYNARD:

4    Q    Good afternoon, Agent Whitson.

5    A    Good afternoon, sir.

6    Q    I want to ask you a couple of questions about just

7    investigation in general.

8         You are the case agent on this case, correct?

9    A    Yes.

10   Q    And as the case agent, you are basically in charge of the

11   entire investigation for the FBI?

12   A    Yes.

13   Q    Okay.  So you are the one who decides what people need to

14   be interviewed; is that correct?

15   A    To a certain extent.

16   Q    Okay.  And you will decide to some degree what needs to be

17   fingerprinted, what doesn't need to be fingerprinted?

18   A    To a certain extent.

19   Q    All right.  I mean, there's certain standards that the FBI

20   follows on a case.  I mean, for instance, because this event

21   actually starts in Garland, Texas, the agents there actually

22   started to process that scene before you ever got involved in

23   this case?

24   A    Yes.

25   Q    Okay.  And we've heard a number of the people that were

```
 1    testifying.  I think we would ask them at times, Are you an
 2    agent?
 3            And there are people working in the FBI who are not
 4    agents, they are just employees of the FBI; is that correct?
 5    A    Yes.
 6    Q    And the FBI has the capacity to do fingerprint analysis,
 7    correct?
 8    A    Yes.
 9    Q    DNA analysis?
10    A    Yes.
11    Q    Hair analysis?
12    A    Yes.
13    Q    Fibers?
14    A    Yes.
15    Q    And there are certain protocols that are followed by the
16    FBI when it is processing a scene, correct?
17    A    Yes.
18    Q    And there are also certain protocols that are followed
19    when the FBI is interviewing witnesses?
20    A    Yes.
21    Q    Let's briefly talk about that for a minute.
22            In this case, for instance, the last witness that was
23    on the stand, when he was interviewed six hours after he had
24    learned of his brother's death, the FBI recorded that
25    interview.
```

1      Are you aware of that?

2   A   Yes.

3   Q   And it was surreptitiously done.  In other words, the FBI

4   agents did not tell him we are recording this interview, at

5   least according to him?

6   A   Yes.

7   Q   Why is that?

8           MS. BROOK:  Objection.  Speculation.

9           THE COURT:  I think he's asking it generally why it's

10  done, not why it was done in connection with that specific

11  interview.

12          Would that be correct, Mr. Maynard?

13          MR. MAYNARD:  Yes.

14          THE COURT:  Why does the FBI interview people on tape

15  and not tell them about it?

16          THE WITNESS:  Well, so there's an option to do both.

17  Obviously, you can record and tell the person that they are

18  being recorded.  And then it is also permissible to not tell

19  the person they're being recorded.

20          And, generally, that decision is based on a judgment

21  call of the person conducting the recording in consultation

22  with their supervisor and with other people involved in the

23  case.

24          Sometimes if you tell someone they're being recorded,

25  that can make the statement -- they could be less forthcoming.

1    So people will tend to -- especially that we are describing

2    that scenario where the recording device was on the table, in

3    my experience people will be staring at that recording device

4    and it will make them nervous and not necessarily that they

5    are going to lie, but it just makes them uncomfortable.

6              And so that's one reason that we might not say that a

7    recording is going to take place.  But there are certainly

8    others as well.

9    Q    Are there -- is there a protocol in the FBI that if

10   somebody is a prospective target that you will surreptitiously

11   tape them?

12   A    No.

13   Q    Is that a call that is left up to the agent who is doing

14   the interview to decide?

15   A    So, generally, it would be up to that agent in

16   consultation with their supervisor and the rest of the team

17   would make a decision on that, what made the most sense.

18   Q    Well, and using the last witness Ali Soofi that we just

19   had, his first interview was taped.

20             Do you know whether or not the interview that was

21   done of him at the airport was taped?

22   A    I don't know.

23   Q    You would be the person, though, who all --

24             What is a 302?

25   A    A FD-302 is a report we generate whenever something occurs

1      that is potentially testimonial.

2              So if we talk to someone that could be potentially

3      testimonial, then we would write down that interview into our

4      form which we call an FD-302.

5      Q   And I'm just going to knock the "FD" off and call it a

6      "302" from now on in your cross.

7              Were you responsible for reviewing all of the 302s

8      that were generated in this investigation?

9      A   For the investigation of Mr. Kareem, yes.

10     Q   All right.  We'll get to that in a second.

11             But if an agent did something that generated a 302,

12     was that 302 then sent to you?

13     A   Not always.

14     Q   Okay.  Would it eventually come to you?

15     A   It depends.  So may I explain?

16     Q   Yes.  Give me a --

17     A   So, obviously, the initial investigation was the Simpson

18     and Soofi investigation.  Those two investigations each had

19     their own case agent that would be running that case.

20             Any reports that had to do with Simpson and Soofi

21     would have gone to those case files for those agents to

22     review.

23             I became involved with Mr. Kareem a few days later, I

24     think as I'd explained before, but it was around May 8th.  And

25     so until May 8th there wasn't -- I wasn't part of the

UNITED STATES DISTRICT COURT

1    investigation.

2    Q   Well, in fact, prior to May 8th, the investigation wasn't

3    really the investigation of Mr. Abdul Kareem.  It was the

4    investigation of Mr. Simpson?

5    A   Exactly.  And Mr. Soofi.

6    Q   Well, didn't the investigation number actually go back to

7    about 2006 when we look at those very first 302s?

8    A   I'm not sure that they go back --

9         That would sound right but -- for Mr. Simpson.

10   Q   I mean, you are aware that Mr. Simpson had been

11   investigated by the FBI?

12   A   Yes.

13   Q   You are aware that Mr. Simpson had been prosecuted by the

14   FBI?

15   A   Yes.

16   Q   You are aware that he was convicted of a crime?

17   A   Yes.

18   Q   Lying to the FBI?

19   A   Yes.

20   Q   And he was a convicted felon?

21   A   Yes.

22   Q   Okay.  And you understood that Mr. Simpson, after his

23   conviction, was on probation?

24   A   Yes.

25   Q   Okay.  As part of your investigation, have you determined

1   whether any probation officers went and interviewed

2   Mr. Simpson at his home?

3   A    No.

4   Q    You have not done that?

5   A    No.

6   Q    Okay.  Now, in -- to stay with the taping for a few

7   minutes, Mr. Soofi just testified and you heard his testimony

8   that he was aware that he was being taped in some interviews

9   that he had with the FBI in Kansas.

10           Do you recall that testimony?

11  A    Yes.

12  Q    Okay.  Do you know whether or not he was taped when he did

13  his September interview?

14  A    Is that the video teleconference interview?

15  Q    Yes.

16  A    He was not taped.

17  Q    Why, if you have him on a video teleconference in Kansas

18  and you're here in Phoenix, are you not taping that?

19  A    Well, that particular interview was with Mr. Soofi and his

20  defense attorney.  And it was -- and the end that we were on

21  was in a U.S. Attorney's Office with the two prosecutors.

22           And so I assumed the call was -- and this is my

23  assumption -- but the call was probably something that was

24  made by his defense attorney that he didn't want that

25  recorded.

1          But I don't know.  It wasn't the FBI or anything.

2    Q   Mr. Soofi seemed to think it was recorded, but it was not,

3    correct?

4    A   That's what he -- he seemed to think that, yes.

5    Q   But it clearly was not recorded?

6    A   It was not recorded.

7    Q   And then there was an interview where you and Ms. Brook

8    flew to Texas to meet with him at his mother's house, correct?

9    A   Yes.

10   Q   And that was to get him ready to come here and testify?

11   A   Yes.  To talk with him, yes.

12   Q   And, again, you didn't record that conversation either,

13   did you?

14   A   No.

15   Q   Does the FBI have a protocol that when they're getting a

16   witness ready to testify that you don't record it so that it

17   doesn't have to be turned over to defense counsel?

18   A   No.

19   Q   You just -- was that your decision to make not to

20   interview him -- or not to tape that last interview as you

21   prepared him to come testify?

22   A   No.  My understanding is --

23   Q   Wait.  Was that --

24   A   I'm sorry?

25   Q   Was that your decision to make that particular call not to

1   tape him?

2   A   No.

3   Q   Who made that decision?

4   A   That would be the decision of the prosecutors.

5   Q   Now, as this investigation began after the Garland event,

6   were you involved in it on May 4th?

7   A   Yes.  I was involved, I guess you could say.

8   Q   Is it fair to say that here in Phoenix, the FBI began to

9   go out and take statements from people they thought might have

10   knowledge about what had happened in Garland, Texas?

11   A   Yes.

12   Q   Okay.  And the FBI also, I think, even on the evening of

13   May 3rd started the process of going in to gather witnesses --

14   gather evidence from Soofi and Simpson's apartment here in

15   Phoenix?

16   A   Yes.

17   Q   Okay.  And that evidence, as we've heard and seen, would

18   be bagged, sealed, and then there would be a chain of custody

19   so that you could process that for possible evidence that

20   could be used in a trial?

21   A   Yes.

22   Q   Okay.  And the FBI then also started calling particular

23   people and asking them to come in for interviews, correct?

24   A   Yes.

25   Q   One of the people that you called to interview was my

1    client Mr. Abdul Kareem?

2    A    Yes.  Detective Nash called him, yes.

3    Q    Detective Nash is not an FBI agent, but he was working on

4    the Joint Task Force with the FBI at the time?

5    A    Yes.

6    Q    Okay.  And so Mr. Abdul Kareem came in to the FBI's office

7    without having a subpoena, correct?

8    A    Yes.

9    Q    And he came in and he gave a statement to you and Mr. Nash

10   without a lawyer present?

11   A    Yes.

12   Q    And during that same time period, you were also

13   interviewing -- or the FBI or people of the Joint Task Force

14   were interviewing people like Saleem Sampson?

15   A    I'm not sure exactly when he was interviewed, but, yes, I

16   know he was interviewed.

17   Q    Okay.

18   A    Whether it was at the same time or not.

19   Q    Ali Soofi was interviewed rather early?

20   A    Yes.

21   Q    Okay.  Did you interview Duncan Simpson, Mr. Simpson's

22   father?

23   A    Yes.  He was interviewed.

24   Q    And did you interview Duncan Simpson, Jr., Mr. Simpson's

25   brother?

1    A    Yes.  I believe so.

2    Q    And there was an interview done of Nathaniel Soofi?

3    A    Yes.

4    Q    The son?

5    A    Yes.

6    Q    And his mother?

7    A    Yes.

8    Q    And Abdul Mubarak who came in here and testified earlier?

9    A    Yes.

10   Q    And Mr. Abdul Hyman, he was interviewed?

11   A    Yes.

12   Q    Now, all of these people are being interviewed and the FBI

13   is beginning to gather evidence, correct?

14   A    Yes.

15   Q    You're getting evidence from Garland, Texas, and you're

16   also gathering evidence from Soofi and Simpson's apartment?

17   A    Yes.

18   Q    And when the FBI is going to seek to look for fingerprints

19   or DNA, do you send that material to Quantico or do you

20   process it here in Phoenix?

21   A    That's all sent to Quantico; so DNA, fingerprints.

22   Q    Now, let's talk just for a second about the interview with

23   Abdul Malik that occurred on May 5th of 2015.

24        You intended to record that interview, correct?

25   A    Yes.

1   Q   And that interview was taken at the FBI office here in

2   Phoenix?

3   A   Yes.  Yes.

4   Q   And I believe your testimony on direct examination was

5   Agent Brian Taylor had a room already equipped to do an

6   interview in?

7   A   Yes.

8   Q   And you were going to video and audiotape that interview?

9   A   Yes.

10  Q   And you had a signal with Mr. Taylor where you would give

11  him the thumbs up and he was to make sure that the camera was

12  turned on?

13  A   Yes.

14  Q   And then for some reason or other, either the camera

15  didn't turn on, or something happened to the machine?

16  A   Yes.

17  Q   Or something happened to the chip that was in the machine?

18  A   Yes.

19  Q   Okay.  And it would be your understanding when

20  Mr. Kareem -- Abdul Kareem came in, you led him into that

21  conference room and you turned around and gave the thumbs up?

22  A   No.

23  Q   No?  When did you give the thumbs up?

24  A   So, Detective Nash left the area where the interview rooms

25  are and he went out into the lobby area which is -- to get

1    Mr. Kareem.

2            And so I stayed behind.  And once he left, I looked

3    into the room where Special Agent Taylor was and I gave him

4    the thumbs up signal.  And they then kind of manipulated the

5    machine or whatever and then looked back up to me and gave me

6    a thumbs-up symbol.

7            Once he give me that thumbs-up symbol, that was a cue

8    to me to know that the recording had started.  So we were

9    using thumb up because we didn't want to be talking, hey, is

10   the recording going, because it would be capturing our voice

11   saying that.  So that's why we were using the thumb ups.

12           So when he gives me that thumbs-up and says the

13   recording is going, then I turn and open the door that leads

14   to the lobby area.  And right as I open that door, that's when

15   Detective Nash comes in with Mr. Kareem.

16           And so I escort him right in.

17           And to kind of back up a second, if I may, the room

18   where Special Agent Taylor had this recording equipment set up

19   is a room that's right nextdoor to the room where we were

20   conducting the interview.

21           And so the doors are literally right next to each

22   other, so, you know, once we did the thumbs-up signal, I was

23   to shut that door.  That's why he was starting it.  And then

24   we walked past that closed door into the room to do the

25   interview.

1    Q   So you would have expected that this audio/video machine

2    was going to be working because Agent Taylor is an expert?

3    A   Yes.

4    Q   And it wasn't you or Nash that had to push the button to

5    start it?

6    A   Yes.

7    Q   Agent Taylor should have been sitting there looking at it,

8    seeing whether or not it was looking into the room and working

9    properly, correct?

10   A   Yes.

11   Q   And you expected that that happened because he gave you

12   the thumbs up?

13   A   Yes.

14   Q   And then you went in and you took an interview, believing

15   that this audio and video recording was working?

16   A   Yes.

17   Q   And then afterwards you walked out and one of you went to

18   turn it off, correct?

19   A   Yes.

20   Q   Either you or Mr. Nash?

21   A   Yes.

22   Q   Okay.  And then one of you collected the card, the SIM

23   card or whatever was used?

24   A   Yes.  Detective Nash collected the card.

25   Q   Did you turn it off or did Detective Nash turn it off?

1  A    Yes.   I think I was the one that turned it off.

2  Q    So you turn it off, but then he ejects the card?

3  A    Yeah.  Because it wasn't an instantaneous -- so I pushed

4  the button and I think it just kind of had a -- where it shuts

5  down or whatever and then it ejects and then he took the card.

6  Q    Okay.  And then he supposedly took the card down and put

7  it into Security so that it can -- you have a chain of custody

8  on the card, correct?

9  A    Yes.  It's Electronic Surveillance is that group that he

10 brought it to.

11 Q    That CART group we've talked about?

12 A    It's not the same as CART, but it's in a -- they're a

13 completely separate group, but essentially just any electronic

14 surveillance, they keep track of that evidence as opposed to

15 the other evidence room that has the other type of evidence.

16 Q    And then at some point you learned that there was nothing

17 on the card?

18 A    Yes.

19 Q    And did you take any steps at that point to determine if

20 the card had malfunctioned?

21 A    Yes.  So -- well, so I learned the day before --

22 Q    Did you take steps --

23 A    I mean, I personally did not.

24 Q    Okay.  Did you -- who took those steps to determine if the

25 card had malfunctioned?

1    A    So Special Agent Taylor went directly to Electronic

2    Surveillance the next morning and he personally inspected the

3    card to make sure it wasn't a mistake on their part, that the

4    data wasn't buried on there somewhere.

5            And what he was able to find was the recordings of

6    the test runs we had done before we started the recording, but

7    that was all that was on there.  There wasn't anything else.

8    Q    Did anybody then go and check the equipment to see if it

9    had malfunctioned?

10   A    I don't know that -- I mean, I don't know if the equipment

11   was still set up.  It was something that was temporarily set

12   up in the room.

13   Q    To this day do you know what caused this malfunction that

14   you have?

15   A    I do not know.

16   Q    And also in the interview room there is a camera, a

17   security camera in the corner, that is looking down on the

18   room, correct?

19   A    Yes.

20   Q    And it is -- although it's not taking audio, it's taking

21   video?

22   A    Yes.

23   Q    And were you advised that you should keep a copy of that

24   video of the interview since you now had lost the audio and

25   the video?

1    A    No.

2    Q    Nobody told you that?

3    A    I was not advised that I should do that.

4    Q    Anybody suggest to you that that would be the right thing

5    to do?

6    A    No.   Special Agent Taylor sent me --

7    Q    You answered the question.   Thank you.

8              Can I approach the clerk, Your Honor?

9              THE COURT:   Yes.

10             MR. MAYNARD:   Can the witness be shown Exhibit 547,

11   please.   Oh, I'm sorry.

12   BY MR. MAYNARD:

13   Q    Do you recognize Exhibit 547?

14   A    Yes.

15   Q    Is this an e-mail starting at the bottom from Brian Taylor

16   to you on May 6th of 2015?

17   A    Yes.

18   Q    And then on the top are you responding to Mr. Taylor's

19   e-mail to you on May 6th of 2015?

20   A    Yes.

21             MR. MAYNARD:   Okay.   Move for the admission of

22   Exhibit 547.

23             MS. BROOK:   Your Honor, this e-mail contains hearsay,

24   so we would object.

25             THE COURT:   The objection is overruled.

 1          547 is admitted.

 2      (Exhibit No. 547 admitted in evidence.)

 3  BY MR. MAYNARD:

 4  Q   Would you look at the first e-mail which is on the bottom

 5  of the page.  It says:

 6          "No luck on recovering the audio or video of the

 7  interview.  I was able to recover the 'test' videos prior to

 8  the actual interview" --

 9          And I'm going to skip down to the next paragraph.

10          "I spoke with Jeff Mendez this morning and told him

11  that you would require video exported from the security system

12  DVR."

13          Do you see that?

14  A   Yes.

15  Q   "He said no problem but requested that you send an e-mail

16  to Shari McAllister" -- and on.

17          And you responded:

18          "Thanks for running this all down.  I'll touch base

19  with the case agents first, and if they want me to proceed,

20  I'll send the e-mail and get with Rich."

21          Do you recall sending this e-mail?

22  A   Yes.

23  Q   And I take then you did not follow through and save the

24  security system DVR; is that correct?

25  A   What do you mean by that?

1    Q    It says you would require video exported from security

2    system DVR.

3            So doesn't that refer to the security camera that's

4    in the corner?

5    A    So, yeah.  I did not send a request to Rich Stoddard and

6    Shari McAllister as he said.

7    Q    You did not.  Even though Mr. Taylor had suggested that

8    you would need this, you didn't follow through and get that?

9    A    No.

10    Q    Now, the interview that you did on May 5th of 2015 of Mr.

11    Abdul Kareem, you've testified you prepared a 302 the next

12    day; is that correct?

13    A    Yes.

14    Q    And you testified you used Agent Nash's notes and some

15    notes that you had?

16    A    Yes.

17    Q    How long were your notes?

18    A    My notes were maybe less than half of a page.

19    Q    Okay.  And this was an hour, hour-and-a-half interview?

20    A    Yes.  About that, yes.

21    Q    Did you show Mr. Abdul Kareem any pictures during that

22    interview?

23    A    I don't believe so.

24    Q    Now, after that interview he was free to leave, correct?

25    A    Yes.

1   Q    And do you recall whether or not his nephew who was with

2   him was also interviewed on May 5th?

3   A    Yes.  I believe he was.

4   Q    Okay.  And there's a 302 of that interview also?

5   A    Yes.  It would -- yes.

6   Q    Now, at some point the FBI got a call concerning an

7   individual by the name of Stefan Verdugo, correct?

8   A    Yes.

9   Q    And Stefan Verdugo then met with FBI agents and he was

10  interviewed at length?

11  A    Yes.

12  Q    Is it fair to say that after Stefan Verdugo came in and

13  met with the FBI on or about May 7th, that the investigation

14  in this case changed?

15  A    Yes.  That's fair.

16  Q    At that point did Mr. Abdul Kareem, based on Mr. Verdugo's

17  statements to the FBI, did he become the target of the

18  investigation?

19  A    He became a subject.  He became an investigative subject.

20  Q    What is the difference between a "subject" and a "target"?

21  A    Well, there can be a couple different types of

22  investigations.

23        One type of investigation can be of an incident.  So,

24  for instance, the investigation that was going on in Dallas

25  was an investigation of the Garland attack.

1          My investigation that I was involved in was an

2     investigation of a subject and in this case it was Mr. Kareem.

3     Q    What's the difference between a "subject" and a "target"?

4     A    Well, I guess that would be semantics.

5     Q    Okay.

6     A    I wouldn't really call him a "target."  I would call him a

7     "subject."

8     Q    Beginning on May 8th, did the FBI begin to do surveillance

9     on Mr. Kareem?

10    A    I don't recall the exact day, but it would have been very

11    close to May 8th which was the day we opened the full

12    investigation.

13          MR. MAYNARD:  Your Honor, can I put a 302 showing the

14    beginning of the -- to refresh his recollection?

15          THE COURT:  Yes.

16    BY MR. MAYNARD:

17    Q    Agent Whitson, I'm going to put on a 302.  Could you take

18    a look at that for a moment?

19    A    Yes.

20    Q    Does that help refresh your recollection?

21    A    That does.  Thank you.

22    Q    Do you recall that the physical surveillance of Mr. Abdul

23    Kareem began the day after the FBI met with Mr. Verdugo?

24    A    Well, so all I can tell from that is it looked like

25    surveillance was going on on the 8th.  I can't tell

1    necessarily when it started.

2            But it was certainly going -- that would make sense

3    that it would have started on the 8th after we had opened the

4    full investigation.

5    Q   All right.  Were you -- is that the date that you became

6    the case agent?

7    A   Yes.

8    Q   Okay.  And starting on May 8th, the FBI began to do

9    physical surveillance on Mr. Abdul Kareem on a daily basis?

10   A   Yes.

11   Q   And what I mean by "physical" -- or "physical

12   surveillance" is you had agents that were literally watching

13   him from 7:30 or 8:00 in the morning until sometime into the

14   evening?

15   A   Twenty-four hours a day.

16   Q   You had him 24 hours a day?

17   A   Twenty-four hours a day.

18   Q   And there were times when he would be driving his moving

19   truck and there would be helicopters that would be following

20   him?

21   A   There's an aircraft, so an airplane.  I don't know of any

22   helicopters, but there was an aircraft.

23   Q   Okay.  And, additionally, you engaged Mr. Verdugo to

24   assist in this investigation at that point?

25   A   Well, he had already come forward on his own before that,

1   but.

2   Q   He had come forward and you asked Mr. Verdugo to make some

3   telephone calls to Mr. Abdul Kareem?

4   A   Yes.

5   Q   And those telephone calls were then monitored and taped?

6   A   Yes.

7   Q   And you then asked Mr. Verdugo to try to go back to work

8   with Mr. Abdul Kareem?

9   A   Yes.

10  Q   And you asked Mr. Verdugo to carry a body wire so that his

11  conversations with Mr. Abdul Kareem and others would be taped?

12  A   Yes.

13  Q   And this went on for several weeks?

14  A   Yes.

15  Q   And you gathered all of that information as part of this

16  investigation?

17  A   Yes.

18  Q   Okay.  And I believe we've heard Mr. Verdugo was paid

19  $500?

20  A   Yes.

21  Q   Was he ever paid any more than that?

22  A   No.

23  Q   In fact, at some point while he was assisting the FBI in

24  this, did he get charged with a crime?

25  A   Yes.

1   Q   And then he fled the state and went to California?

2   A   Yes.

3   Q   Okay.  Now, the FBI then decided to arrest Abdul Kareem on

4   June 10th of 2015?

5   A   Yes.

6   Q   Correct?

7   A   Yes, sir.

8   Q   And you arrested him at a gas station.  He was in his

9   moving truck?

10   A   Yes.

11   Q   Okay.  And he didn't resist?

12   A   No.

13   Q   He didn't run away?

14   A   No.

15   Q   And during the entire time that the FBI was following him

16   24 hours a day from May 8th, was that until June 10th?

17   A   Yes.

18   Q   Okay.  You never saw him try to leave the state?

19   A   No.

20   Q   Never saw him try to leave the country?

21   A   No.

22   Q   Okay.  And he is arrested and he is taken into custody and

23   he is then taken to the FBI headquarters to be interviewed

24   again?

25   A   Yes.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #10   3-2-16

1   Q   And this time we do have a tape of that interview?

2   A   Yes.

3   Q   And you read him his rights because he is now under arrest

4   and he's in custody?

5   A   Yes.

6   Q   And he decided not to have a lawyer?

7   A   Yes.

8   Q   When the FBI is talking to witnesses or potential

9   witnesses, is it okay for the FBI to lie to them?

10  A   Yes.

11  Q   Isn't that something you routinely do is you'll lie to

12  somebody and say, "Geez, Mr. A has told us this terrible thing

13  about you"?

14  A   Not routinely.

15  Q   You do it on occasion?

16  A   On occasion.

17  Q   It's a technique that's used by the FBI?

18  A   Yes.

19  Q   I mean, you told -- you told Mr. Abdul Kareem that --

20          Strike that.

21          You told Mr. Hyman that Mr. Abdul Kareem had said

22  that he had been out in the desert shooting with him when you

23  interviewed Mr. Hyman?

24          MS. BROOK:  Objection.  Hearsay.

25          THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

```
 1    BY MR. MAYNARD:
 2    Q    Okay.  Once Mr. Abdul Kareem was arrested, you took his
 3    pickup truck or his moving truck and you started processing
 4    it, correct?
 5    A    Yes.
 6    Q    And in that truck you found a lot of documents that dealt
 7    with the running of his business?
 8    A    Yes.
 9    Q    I mean, he clearly was running a business, was he not?
10    A    Yes.
11    Q    And you found a gun?
12    A    Yes.
13    Q    And when you interviewed him that day, did you ask him if
14    he had any weapons?
15    A    Yes.
16    Q    And he told you that there would be a gun in the truck?
17    A    Yes.
18    Q    And he told you there would be a gun in his house?
19    A    Yes.
20    Q    And at that point, you had not told him that there was a
21    search warrant and that there was a search going on in his
22    home, had you?
23    A    I think I had, because I think my question to him was:
24            Are we going to find any guns?
25            So it's kind of in a sense that we're doing a search
```

 1    there.  Can you just tell us where they're at so we can move

 2    along.

 3    Q   And he told you there was one there?

 4    A   He said there was.

 5    Q   And he told you it was a 9 millimeter?

 6    A   Yes.

 7    Q   And you asked him did he have any other weapons and he

 8    said no?

 9    A   Yes.

10    Q   Okay.  And during that time period where you're

11    interviewing him, FBI agents are processing his house and also

12    processing his truck?

13    A   Yes.

14    Q   And later that evening you go out and you meet with

15    Mr. Abu -- Mr. Mubarak?

16    A   Yes.

17    Q   And you tell him that Mr. Abdul Kareem has been arrested?

18          MS. BROOK:  Objection.  Hearsay.

19          THE COURT:  Overruled.  You may answer if you told

20    him that when you interviewed him that night.

21          THE WITNESS:  Yes.

22    BY MR. MAYNARD:

23    Q   Okay.  Did you tell him that he was going to spend the

24    rest of his life in jail?

25          MS. BROOK:  Objection.  Hearsay.

1          THE COURT:  Sustained.

2    BY MR. MAYNARD:

3    Q   Agent Whitson, also during this same time period prior to

4    the arrest of Mr. Abdul Kareem had a grand jury been empaneled

5    or was there a grand jury empaneled that was actually looking

6    at him?

7    A   At Mr. Kareem?

8    Q   Yes.

9    A   Yes.

10   Q   Okay.  And were you the one that was asking for certain --

11   to get this grand jury to give certain subpoenas to get

12   certain information?

13   A   Yes.  I had submitted grand jury subpoenas.

14   Q   Right.  I mean, you asked for all of his banking records?

15   A   Yes.

16   Q   Is that correct?

17          You asked for all of his records dealing with

18   telephone companies that he had had any relationship with?

19   A   Yes.

20   Q   I mean, in fact, I think you -- I think I saw them for

21   four different telephone companies, correct?

22   A   Yes.

23   Q   And all of these companies complied and you got all of

24   that information?

25   A   Yes.

1   Q   And you got Google searches that he had done, correct?

2   A   Yes.  Those are search warrant returns not --

3   Q   I'm sorry?

4   A   I had search warrant returns from Google, not from the

5   grand jury, but.

6   Q   And during your surveillance, you had followed him to a

7   storage facility and you got a warrant to go look at that

8   storage facility?

9   A   Yes.

10   Q   And you didn't find any -- anything that was incriminating

11   at that storage facility, correct?

12   A   Yes.

13   Q   Yes, that's correct?

14   A   Well, we never searched the storage facility, but we did

15   obtain that, I believe, and reviewed the records and never

16   conducted a search.

17   Q   Do you recall that there were four phone companies that

18   subpoenas were issued to?

19           THE COURT:  I think he already said that.

20           MR. MAYNARD:  Okay.

21   BY MR. MAYNARD:

22   Q   And do you recall that there were three banks that

23   subpoenas were issued to?

24   A   That sounds right.

25   Q   You mentioned the other day on your direct examination, I

1    believe, that you had looked at his banking records and there

2    was one particular transaction out of all these banking

3    records that you thought was a little peculiar or suspicious?

4    A    There was actually a couple, but I was asked about one.

5    Q    Okay.  Did you actually have a forensic accountant go

6    through and look at his banking records?

7    A    Yes.

8    Q    And did the forensic accountant prepare a report on the

9    banking records?

10   A    Yes.

11   Q    Okay.  And the one particular matter that you talked about

12   that you said looked a little suspicious was a $10,000 deposit

13   and the next day was a $5,000 withdrawal?

14   A    Well, it was three days later there was a $5,000 --

15   Q    Yeah.

16   A    And it was -- yeah.  $10,000 cash, yes.

17   Q    Did you, in the process of your investigation, go through

18   and determine if he had made any major purchases within a day

19   or two of that withdrawal?

20   A    We analyzed bank records to see if there was evidence of

21   that, including, obviously, credit cards and things like that.

22   Q    Did you look to see whether or not he had bought one of

23   his two moving trucks within a week of when he made that

24   withdrawal?

25   A    Yea.  We did not see evidence of that.

1    Q    And did you look to see -- even in the documents that you

2    found in his truck you didn't see any evidence that?

3    A    Not -- yeah -- no evidence that I can recall.

4    Q    You don't know whether he did or he didn't?

5    A    Yeah, I don't.  No.  There was not.

6    Q    You also sent subpoenas to Microsoft, correct?

7    A    Yes.

8    Q    And sent subpoenas to at least three credit agencies?

9    A    Yes.

10   Q    And subpoenas to yelp.com?

11   A    Yes.

12   Q    You were pretty invested in this investigation, were you

13   not?

14   A    Yes.

15   Q    Spending a lot of time on it?

16   A    Yes.

17   Q    Okay.  And we had a woman who came in here earlier

18   testifying about an incident that occurred in a parking lot at

19   a -- I believe it was a T-Mobile or Verizon store.

20        Do you recall that testify?

21   A    Yes.

22   Q    Okay.  And did you ever subpoena Mr. Abdul Kareem's

23   medical records to see whether or not he went to the hospital

24   the day after he was hit in that parking lot?

25   A    No.

1   Q    So you don't know as we sit here whether or not he went to

2   the hospital at John C. Lincoln the next day?

3   A    No.

4   Q    You don't know whether he went to visit a doctor?

5   A    No.

6   Q    A week later?

7   A    No.  I don't know that.

8   Q    Okay.  You could have done that had you chosen to?

9   A    Yes.  I suppose, yes.

10  Q    Now, let me back up just a little bit.

11          On the Garland, Texas, matter, you, as part -- as

12  being the case agent in this case would have looked at that

13  incident pretty thoroughly, would you not?

14  A    Yes.

15  Q    You were aware that the FBI had paid a confidential

16  informant in Mr. Simpson's case over $130,000 in the course of

17  five years?

18  A    No.  I'm not aware of that.

19  Q    You've never heard that before?

20          MS. BROOK:  Objection, Your Honor.  Relevance.

21          THE COURT:  Sustained.

22  BY MR. MAYNARD:

23  Q    Okay.  Was the FBI -- did the FBI alert the Police

24  Department in Garland, Texas, that Mr. Simpson may be a

25  problem?

```
 1    A   Yes.  My understanding is yes.
 2    Q   Okay.  And did they send a copy of his picture to the
 3    Garland Police Department or to the FBI office in Texas?
 4    A   That's my understanding is yes.
 5    Q   Okay.  And how long before the incident occurred did the
 6    FBI do that?
 7    A   I don't know.
 8            MR. MAYNARD:  May I approach the witness -- the
 9    clerk?
10            THE COURT:  Yes.
11            MR. MAYNARD:  Your Honor, may I approach the clerk
12    with Exhibit 548?
13            THE COURT:  Yes.
14            MR. MAYNARD:  549 and 550.
15    BY MR. MAYNARD:
16    Q   Agent, looking at Exhibit 548, do you recognize that
17    photograph?
18    A   I recognize the photograph, yes.
19    Q   Okay.  And what is that a picture of?
20    A   That's a picture of Mr. Kareem's living room.
21    Q   And looking at 549, do you recognize that photograph?
22    A   I actually don't recognize this one, but I can tell from
23    the content of the picture that it's clearly Mr. Kareem's --
24    Q   Are these paragraphs taken by the FBI when it did its
25    search?
```

1    A    These look like the ones -- yes.  These look like the ones

2    taken by the FBI.

3    Q    And Exhibit 550, do you recognize it?

4    A    I don't recognize this particular picture, but I -- so I

5    don't.

6    Q    Okay.  And do you recognize this as the room -- photograph

7    of the room in Mr. Abdul Kareem's apartment?

8    A    I don't.

9              MR. MAYNARD:  Move for the admission of 549 and 548.

10             MS. BROOK:  No objection.

11             THE COURT:  548 and 549 are admitted.

12        (Exhibit Nos. 548 and 549 admitted in evidence.)

13             MR. MAYNARD:  May I publish, Your Honor?

14             THE COURT:  Yes.

15   BY MR. MAYNARD:

16   Q    Now, when the FBI goes into an apartment or to a house, do

17   they normally take pictures as they first go in and then do

18   they take pictures after they leave?

19   A    Well, so I guess not technically as they first -- so first

20   entry is gained.  And so depending on the circumstances, if

21   that's done by a SWAT team or something like that, that entry

22   would take place first, so you wouldn't get photos before they

23   had entered.

24             If it's a compliant one, then the Evidence Response

25   Team will begin their search by doing entry photos before

1    conducting the search.

2    Q    In this particular case was there a SWAT team involved?

3    A    Yes, there was.

4    Q    Was there a concern that the condo or the apartment might

5    be boobie trapped?

6    A    Yes, there was.

7    Q    And was that because Mr. Verdugo had advised the FBI that

8    Mr. Abdul Kareem boobie trapped his apartment?

9    A    Yes.  That was a concern, yes.

10   Q    And did you find any -- or did the FBI find any boobie

11   traps in the apartment?

12   A    No.  No.

13   Q    Did you find any surveillance equipment in the apartment?

14   A    I believe not.

15   Q    Were there any alarm systems in the apartment?

16   A    I don't believe so.

17   Q    Had Mr. Verdugo told the FBI that there might be alarm

18   systems in the apartment?

19   A    Not in this apartment, but in the previous apartment that

20   he lived in, he said that one was boobie trapped or had

21   alarms -- I don't know if he said "alarms" but.

22   Q    Because of that, there was some concerns.  So when you

23   west into this one, you were careful?

24   A    Yes.  I made the assumption that if he had it in the other

25   apartment, he might have it in this one as well.

1   Q   And is this the way you understand the apartment looked?

2   A   This is -- I have never actually seen the apartment.   I

3   have only seen the photos.   But there is -- this is what I

4   understand to be his apartment.

5   Q   Exhibit 549.   Again, that's the way the apartment looked

6   when the FBI got there?

7   A   That I can't say.

8        MS. BROOK:   I object to foundation based upon what he

9   testified to.

10       THE COURT:   He said:   "That I can't say."

11  BY MR. MAYNARD:

12  Q   You did not then participate in going into the apartment;

13  is that correct?

14  A   No.

15  Q   Now, did the FBI, simultaneously to going into Mr. Abdul

16  Kareem's apartment, did they also conduct a search on

17  Mr. Hyman's apartment?

18  A   Yes.   The FBI did.

19  Q   Did you participate in that particular search?

20  A   No.

21  Q   And was it in that search where the lists that we have

22  seen with the seven individuals on it that the expert

23  testified about were found?

24  A   Yes.

25  Q   Now, the FBI, as we have seen, collected these guns from

1   Garland, Texas, correct?

2   A   Yes.

3   Q   And they have done a fingerprint analysis on them?

4   A   Yes.

5   Q   And they have determined that my client's fingerprints are

6   not on those guns?

7   A   Yes.

8   Q   Correct.

9        They've also done a DNA analysis?

10   A   In one -- are you referring to the guns on the table or

11   the just the ones from Garland, right.

12   Q   The guns from Garland.

13   A   That's what I wanted to be sure.

14        Sorry, could you say the last question, sir?

15   Q   Yeah.  Did the FBI do a DNA analysis to determine whether

16   or not my clients' DNA was found on these guns from Garland,

17   Texas?

18   A   Yes.

19   Q   And they did not find my client's DNA, did they?

20   A   No.

21   Q   Did the FBI take apart the guns to determine how well they

22   had been maintained?

23   A   Not that I know of.

24   Q   We have heard testimony today that these guns were

25   maintained in a certain manner with grease on them and some

1    left on.

2            Has anybody checked to see how they were maintained?

3    A    No.

4    Q    So as we sit here, you don't know whether they were

5    properly maintained or not properly maintained?

6    A    Yeah.  I cannot say whether they were properly maintained.

7    Q    Did the FBI do a -- work with the ATF --

8            What is the ATF?

9    A    Alcohol Tobacco & Firearms is an agency of the federal

10   government that deals primarily in those type of violations.

11   Q    Does the FBI work in conjunction with the ATF to determine

12   where guns are purchased?

13   A    Yes.

14   Q    And did the FBI work with the ATF in this case to

15   determine where the guns that were found in Garland, Texas,

16   had been purchased?

17   A    Yes.

18   Q    And was there anything in that investigation of the guns

19   found in Garland, Texas, that indicated that my client had

20   purchased those guns?

21           MS. BROOK:  Objection, Your Honor.  Speculation.

22           THE COURT:  Overruled.  You may answer if you know.

23           THE WITNESS:  Nothing in the ATF reports that would

24   indicate that Mr. Kareem purchased those guns.

25   BY MR. MAYNARD:

1   Q    Okay.  Are you familiar with an individual by the name of

2   Ali Biaz?

3   A    Yes.

4   Q    Okay.  Was he actually investigated in this case?

5   A    Yes.

6   Q    And had Mr. Biaz had an AK-47 for sale on Craigslist in

7   January of 2015?

8   A    I think that is correct, yes.

9   Q    And did he indicate that he had posted on Backpage on

10  January 6th of 2015, an AK-47 for sale on that particular day?

11  A    I don't recall the exact dates off the top of my head of

12  when he posted it, but.

13  Q    But there would be a 302 that would indicate that,

14  correct?

15  A    Yes.  I think there would be a 302 that would indicate

16  that.

17  Q    Let me see if I can show you the 302 dated May 22nd of

18  2015 and see if that helps to refresh your recollection.

19         Do you see that last paragraph?

20  A    Yes.

21  Q    Does that help refresh your recollection?

22  A    Well, I didn't draft this report, but I can --

23  Q    I understand.  But this report would have been sent to you

24  for review, correct?

25  A    Yes.  I would have reviewed this.

```
 1   Q   This would have been done by an agent who was reporting to

 2   you as the case agent on the case?

 3   A   Well, so this technically would have gone to the

 4   Simpson/Soofi because it was tracking those weapons.

 5           But, yes, this did not come to me but I definitely

 6   reviewed this at one point.

 7           Sir, could it be put back on, please?  I want to read

 8   the last part.

 9           Okay.  Thank you.

10   Q   Mr. Biaz had an AK-47 for sale on January 6th of 2015 here

11   in Phoenix, Arizona for $700, correct?

12   A   Yes.  According -- yes.

13   Q   Did the FBI investigate Mr. Biaz to get his text messages

14   to see if he had texted anybody about this?

15   A   Yeah.  We already had copies of the text messages from one

16   of the phones seized in Dallas.

17   Q   And that's how you came to go to him, correct?

18   A   Yes.

19   Q   Okay.  Were there other individuals that sold AK47s that

20   you also investigated?

21   A   There were other individuals that were selling AK47s.

22           I think even Mr. Biaz couldn't say with certainty

23   that he did actually sell it other than what his statement

24   was.

25           But one that comes to mind is -- I think his last
```

1    name was Leon.  L-E-O-N.  I don't know if I'm pronouncing that

2    correctly.  But he was another individual that was also

3    selling AK47s around that same time.

4    Q    Now, in the searches of Soofi and Simpson's apartment, you

5    also found a number of notebooks, correct?

6    A    Yes.

7    Q    And some of those notebooks actually had writing in it and

8    you would analyze that writing?

9    A    Yes.

10   Q    Okay.  Now, by analyzing it, you may have looked at it to

11   determine who wrote it, correct?

12   A    Yes.

13   Q    And there were also times when the FBI looked at that

14   notebook and found that there had been writing on a sheet of

15   paper.  That paper had been ripped out.  But you could tell

16   from the indentation underneath that there had been writing on

17   the sheet that was on top?

18   A    Yes.

19   Q    Does that make sense?

20   A    Yes.  Indented writing?

21   Q    Right.

22   A    Yes.

23   Q    And the FBI has a technique to uncover what is in that

24   indented writing; isn't that right?

25   A    Yes.

1    Q    And in this particular case, you sent some of those

2    notebooks off to Quantico to have them be tested

3    electrostatically; is that right?

4    A    Yes.

5    Q    In fact, there's a -- it's an electrostatic detection

6    apparatus that is used by the FBI, correct?

7    A    Yes.

8             MR. MAYNARD:  And the -- may I approach?

9             THE COURT:  Yes.

10            MR. MAYNARD:  Can the witness be shown Exhibit 553.

11   BY MR. MAYNARD:

12   Q    Do you recall seeing this document before?

13   A    Yes.

14   Q    And was this document tested by the FBI's lab in Quantico,

15   Virginia?

16   A    Yes.

17   Q    And did you prepare a 302 on this document?

18   A    I believe I did.

19   Q    Do you recall that you prepared a 302 where you wrote out

20   in more legible English what you understood was on this

21   document?

22   A    Yes.  I do recall that.

23   Q    And this would have been done in the normal investigative

24   process of the FBI, correct?

25   A    Drafting the 302?

1   Q   Yeah.   Drafting the 302.

2   A   Yes.

3   Q   Looking at the document that was attached and then

4   drafting a 302 as to what it says?

5   A   Yes.

6           MR. MAYNARD:   Okay.   I move for the admission of 553.

7           MS. BROOK:   Your Honor, I object to foundation based

8   upon the document itself and the writing.

9           THE COURT:   I think --

10          MS. BROOK:   And hearsay.

11          THE COURT:   All we know about this is that he's seen

12  it before.   I don't think you -- I mean, we can infer that you

13  tied it back in to this is some indented writing that was

14  electrostatically tested but he didn't say that.

15          MR. MAYNARD:   Okay.   Let me --

16  BY MR. MAYNARD:

17  Q   Was this -- or the original --

18          This is a photocopy.   Was the original -- is this a

19  photocopy of a page from a notebook that was uncovered at

20  Simpson and Soofi's apartment?

21  A   It looks like it is, yes.

22  Q   And did you take it and send it to Quantico, Virginia?

23  A   Yes.   I sent it, yes.

24  Q   And did it get an electrostatic detection.

25  A   I don't know the exact -- someone at the Quantico lab

1    performed a test on it to be able to look at the indented

2    writing.

3    Q    And who was the individual that did that?

4    A    His name was Antoine Frazier and he's a -- I can't recall

5    his title, but he's a lab -- an employee at the FBI lab at

6    Quantico.

7    Q    And did Antoine Frazier prepare a report to be sent back

8    to you?

9    A    Yes.

10   Q    And did you then take that report and prepare a 302?

11   A    Yes.  Yes.  It was based on his report, so, yeah.

12   Q    Did you base it on the document or did you base it on the

13   report?

14   A    I based it just solely on the document, I believe.  So

15   using his indented version, I then drafted a 302.

16            MR. MAYNARD:  Your Honor, I move for the admission of

17   553?

18            MS. BROOK:  Same objection as it relates to hearsay.

19            THE COURT:  Well, considering the fact that I can't

20   read one single thing on here except a stray letter, I can't

21   figure out what the value of this is other than to show this

22   is what it looks like when it comes back from being tested.

23            I mean, nobody can read this.  I don't know how Agent

24   Whitson did an interpretation of it but maybe he can explain

25   it.

CR15-00707-PHX-SRB    JURY TRIAL-DAY #10   3-2-16

```
 1   BY MR. MAYNARD:
 2   Q    I don't have the original, but Agent Whitson, using the
 3   report -- and I have Mr. French (sic) subpoenaed so I hate to
 4   have him come back but I can but he prepared a 302?
 5            THE COURT:  I can't assess whether it's admissible
 6   because I can't read a single thing on here.
 7            But obviously, the next thing you want to do is have
 8   Agent Whitson's interpretation of this.
 9            MR. MAYNARD:  I do.
10            THE COURT:  Because nobody can read it.  So I need to
11   see that.
12            MR. MAYNARD:  All right.  May I approach?
13            THE COURT:  Yes.
14            So how did you read it?  Does the original -- is it
15   more legible or did you use a magnifying glass or?
16            THE WITNESS:  Your Honor, it comes back in kind of
17   two versions.  So it has that one version where the writing is
18   in white and the background is in black.
19            And then another version, the opposite.  And so using
20   both of those versions to look back and forth, the parts that
21   you can see in black you can write; and then you've got to go
22   to the other version to see the rest of the document, back and
23   forth.
24            And, again, it is my interpretation of what this
25   says.
```

UNITED STATES DISTRICT COURT

```
 1    BY MR. MAYNARD:

 2    Q   All right.  Agent Whitson, Exhibit 554, this is a 302 that

 3    you prepared, correct?

 4    A   Yes.

 5    Q   You prepared it on or about October 21st of 2015?

 6    A   Yes.

 7    Q   And you did this after having sent a small blue notebook,

 8    along with other documents, back to Quantico to be analyzed,

 9    correct?

10    A   Yes.

11    Q   And this particular notebook had been found in Soofi and

12    Simpson's apartment; is that right?

13    A   Yes.

14    Q   And you received a report back from Quantico that you

15    utilized to prepare this document?

16    A   Yes.

17    Q   And this is the type of document that you would have

18    prepared in the normal course of your investigation?

19    A   Yes.

20    Q   And based upon the testing that was done back in Quantico,

21    it appears that somebody had written a note and then ripped

22    that note out of the notebook, correct?

23    A   Yes.

24    Q   And what we then have is your interpretation, based upon

25    the testing that has been done by the FBI, as to what that
```

1    original note said?

2    A    Yes.  So based on the indent that was left on the page

3    beneath the page that was ripped out.

4    Q    Because it was important for you to try to determine all

5    the relevant evidence that you could find in this case?

6    A    Yes.

7         MR. MAYNARD:  Your Honor, I move for the admission of

8    553 and 554.

9         MS. BROOK:  Same objection, Your Honor.

10        THE COURT:  The objection is overruled.

11        553 -- and let me just say with respect to 554, I

12   don't know if there is any additional objection.  I have only

13   been focusing on Agent Whitson's quoting of what he believes

14   was written in the indented writing.  So there may be other

15   portions, but I haven't read them.

16        MS. BROOK:  And so, Your Honor, the same objection

17   would be hearsay as it relates to the underlying information

18   upon which the text was derived.

19        THE COURT:  The objection is overruled and I'm going

20   to admit 553 and at least that portion of 554 that contains

21   the interpretation of 553.

22        (Exhibit Nos. 553 and 554 admitted in evidence.)

23   BY MR. MAYNARD:

24   Q    All right.  Agent Whitson, would you, beginning on the

25   bottom, would you read to the jury what that says.

```
 1   A   Yes.  It says:

 2           "Bismillah.

 3           Dear akhi Fil Lah Subhan Allah.  There was a change

 4   in plans.  Indeed something dreadful came up.  The money that

 5   I had from you was being used for what was needed for the

 6   initial plan but that changed.  This money is what was left

 7   over..." --

 8           And I think it's the word "but" --

 9           "...I will leave you with the title of my car to do

10   as you please with it.  I believe Abdul Malik knows how to get

11   it notarized.  I was also going to give you my tax return but

12   it won't be here in time.  Please forgive me if you do not get

13   all the money back.

14           Always fear Allah and keep me in your dua inshaAllah.

15   You have benefitted me greatly.  Allah grant you Jannah.

16   Forgive me for my short..." --

17           I can't tell the word --

18           "...and may Allah unite us in Jannah."

19           Signed.  "Ibrahim."

20   Q   And this was found in Ibrahim's apartment?

21   A   Yes.

22   Q   And do you know as part of your investigation who Ibrahim

23   gave the title to his car to?

24   A   I can -- no.  I don't know with certainty.

25   Q   Okay.  Do you understand that the title was given to some
```

1    individual?

2    A    Yes.

3    Q    But you as the case agent don't know who that is?

4    A    I don't know with certainty, but I have an idea.

5    Q    Okay.  It wasn't given to my client, was it?

6    A    No.

7              THE COURT:  I take it since we're reading this

8    indented writing that you never found the original note?

9              THE WITNESS:  That's correct, Your Honor.

10             MR. MAYNARD:  Sorry, Judge.  I've got a mess.

11             May I approach?

12             THE COURT:  Yes.

13   BY MR. MAYNARD:

14   Q    Agent Whitson, before we get to 555 and 556 and 557, after

15   obtaining that notebook we just looked at, what steps did you

16   do to further investigate who had received the car from

17   Mr. Simpson?

18   A    I -- it was -- as soon as I saw that information I called

19   a meeting with various other agents in the office who were

20   handling different aspects of the branching investigations

21   that came off of this main one and then asked if this meant

22   anything to them and then collected information in that sense.

23   Q    Okay.  And did you go out and interview anybody?

24   A    I did not go out and interview.

25   Q    And although you said you've speculated who got it, you

1   don't know?

2   A   I don't know.

3   Q   All right.  Could you please look at 556 please -- or 555.

4        Have you seen this envelope before as part of the

5   investigation?

6   A   Yes.

7   Q   Was this an envelope that was found in Elton Simpson's

8   apartment?

9   A   Yes.

10  Q   And was this preserved by the FBI in the normal course of

11  its investigation?

12  A   Yes.

13           MR. MAYNARD:  Move for the admission of 555.

14           MS. BROOK:  No objection.

15           THE COURT:  555 is admitted.

16      (Exhibit No. 555 admitted in evidence.)

17  BY MR. MAYNARD:

18  Q   Who appears to be the sender of this letter?

19  A   Abu Jihaad.

20  Q   And do you know who Abu Jihaad is?

21  A   Yes.

22  Q   Who is he?

23  A   He was an individual arrested a while back for

24  terrorism-related charges.  He was convicted of providing

25  information to a terrorist group while employed as a member of

```
 1   the Navy.

 2   Q   And would you take a look at 556, please.

 3           Have you seen this document before?

 4   A   Yes.

 5   Q   And was this found in Mr. Simpson's apartment also?

 6   A   Yes.

 7   Q   And was it preserved by the FBI in the normal course of

 8   its investigation?

 9   A   Yes.

10           MR. MAYNARD:  I'd move for the admission of 556.

11           MS. BROOK:  No objection.

12           THE COURT:  556 is admitted.

13       (Exhibit No. 556 admitted in evidence.)

14   BY MR. MAYNARD:

15   Q   The letter was written to an individual by the name of

16   Saabir Nurse.  Do you see that?

17   A   Yes.

18   Q   Who is Mr. Nurse?

19   A   Saabir Nurse is an associate of Ibrahim's.

20   Q   Okay.  Is this the individual that he worked with?

21   A   At the dentist office, yes.

22   Q   Okay.  And it appears to have come from the same

23   individual that's in prison for terrorism?

24   A   Yes.

25   Q   And, could you take a look at --
```

```
 1            And, again, that was found at Soofi and Simpson's

 2    apartment, correct?

 3    A    Yes.

 4    Q    Could you take a look at Exhibit 557, please.

 5            Have you seen this document before?

 6    A    Yes.

 7    Q    And was this found at Soofi and Simpson's apartment?

 8    A    Yes.

 9    Q    And was it found in the normal course of your

10    investigation?

11    A    Yes.

12    Q    And was it preserved by the FBI?

13    A    Yes.

14            MR. MAYNARD:  I move for the admission of 557.

15            MS. BROOK:  No objection.

16            THE COURT:  557 is admitted.

17      (Exhibit No. 557 admitted in evidence.)

18    BY MR. MAYNARD:

19    Q    This appears to be another letter from the same Saabir

20    Nurse?

21    A    Yes.

22    Q    From Mr. Jihaad?

23    A    Yes.

24    Q    Did you ever interview Mr. Jihaad in connection with this

25    investigation?
```

```
 1   A    No.

 2   Q    Did you interview Saabir Nurse in connection with this

 3   investigation?

 4   A    The FBI did conduct interviews with Mr. Nurse.

 5   Q    And there was a 302 done?

 6   A    Yes.  That's my understanding.

 7   Q    Did anyone ever interview Mr. Nurse after you prepared the

 8   handwritings or the 302 on that electrostatic page?

 9   A    I don't know if it was after I had prepared the 302, but

10   it was after we had had that talk.  So I had that talk before

11   the 302 was even done.

12   Q    Do you know whether or not the FBI asked Mr. Nurse if he

13   had received that document from Mr. Simpson?

14   A    I believe, yes.  I believe they did.

15   Q    And did the FBI ask him for a copy of it?

16   A    I don't.  I don't know.

17   Q    In other words, you didn't get a copy of the document?

18   A    Yeah.  I never received it -- a copy of that document.

19          MR. MAYNARD:  Okay.  Judge, is there any way we can

20   quit early today and I can get organized and be done in about

21   ten minutes in the morning?

22          THE COURT:  Well, the morning?

23          MR. MAYNARD:  Oh, the afternoon.

24          THE COURT:  Not the morning.

25          But, yes, we can, only if you promise that tomorrow
```

1   morning when the rest of us aren't here that you make an

2   appointment to have Maureen mark any additional exhibits that

3   you intend to use in the cross-examination of Agent Whitson.

4           MR. MAYNARD:  I promise.

5           THE COURT:  Okay.

6           Ladies and gentlemen, we will recess until one

7   o'clock tomorrow afternoon.

8           You are reminded, again, of the admonition not to

9   discuss the case among yourselves or with anyone else.

10          Please do not form any conclusions about the case

11  until you have heard all the evidence and begun your

12  deliberations.

13          Court is in recess until one o'clock tomorrow

14  afternoon.

15      (Proceedings adjourned at 4:13 p.m.)

16                          * * *

17

18

19

20

21

22

23

24

25

```
1

2                    C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 1st day of August,

14   2016.

15

16

17

18

19                          s/Elizabeth A. Lemke
                            ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25
```