## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

United States of America,       )
                                )
             plaintiff.         )   **APPEAL**
                                )   **CR15-00707-PHX-SRB**
        vs.                     )   Phoenix, Arizona
                                )   March 9, 2016
**Abdul Malik Abdul Kareem**,       )   9:05 a.m.
                                )
             Defendant.         )
                                )
_____ )

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY  14
(Pages 2441 through 2643, Inclusive.)

**APPEARANCES:**
**For the Government:**
            U.S. ATTORNEY'S OFFICE
            By:  **Kristen Brook, Esq.**
                 **Joseph Edward Koehler, Esq**.
            40 North Central Avenue, Suite 1200
            Phoenix, AZ  85004

**For the Defendant Abdul Malik Abdul Kareem:**
            MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
            By: **Daniel D. Maynard, Esq.**
                **Mary Kathleen Plomin, Esq.**
            3200 North Central Avenue, Suite 1800
            Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1 **INDEX**

2 **SUMMARY OF COURT PROCEEDINGS**                                **PAGE:**

3 **DEFENDANT RESTS**                                           Page 2564
**GOVERNMENT REBUTTAL RESTS**                                 Page 2640

4                           **INDEX OF WITNESSES**

5 **ABDUL MALIK ABDUL KAREEM:**

6 Cross examination by (cont'd) by Mr. Koehler          Page 2444
7 Redirect examination by Mr. Maynard                  Page 2475

8 **MARC SAGEMAN:**

9 Direct examination by Mr. Maynard                    Page 2488
  Cross examination by Mr. Koehler                     Page 2517
10 Redirect examination by Mr. Maynard                 Page 2557

11 **LORENZO VIDINO:**

12 Direct examination by Ms. Brook                      Page 2570
   Cross examination by Mr. Maynard                     Page 2595
13 Redirect examination by Ms. Brook                    Page 2604

14 **DETECTIVE JEFFREY DAVIS NASH:**

15 Direct examination by Ms. Brook                      Page 2605
   Cross examination by Mr. Maynard                     Page 2612
16 Redirect examination by Ms. Brook                    Page 2618

17 **GREGORY NEVILLE:**

18 Direct examination by Mr. Koehler                    Page 2621

19 **AMY KATHLEEN VAUGHAN:**

20 Direct examination by Mr. Koehler                    Page 2627
   Cross examination by Ms. Plomin                      Page 2632
21 Redirect examination by Mr. Koehler                  Page 2633

22 **SPECIAL AGENT STEWART WHITSON:**

23 Direct examination by Mr. Koehler                    Page 2635
   Voir dire examination by Mr. Maynard                 Page 2637
24 Direct examination (cont'd) by Mr. Koehler           Page 2639

25

CR15-00707-PHX-SRB   JURY TRIAL-DAY #14   3-9-16

1                    **INDEX OF EXHIBITS**

2    **EXHIBIT NO.**:         **DESCRIPTION:**           **RECEIVED:**

3    Exhibit No. 197    Four Moneygram receipts         Page 2638
     Exhibit No. 538    CV - Marc Sageman               Page 2490
4    Exhibit No. 601    Kareem insurance recording      Page 2462
     Exhibit No. 602    Photograph of Roku 2XS          Page 2446
5                       remote
     Exhibit No. 604    James Sampson interview         Page 2607
6                       6-11-15 Clip 1
     Exhibit No. 606    James Sampson interview         Page 2608
7                       6-25-15 Clip 3
     Exhibit No. 607    Sageman e-mail 1-21-09          Page 2523
8    Exhibit No. 608    Sageman e-mail 2-19-09          Page 2526
     Exhibit No. 609    Sageman e-mail 3-12-09          Page 2528
9    Exhibit No. 610    Sageman e-mail 3-24-09          Page 2531
     Exhibit No. 611    Sageman e-mail 6-17-09          Page 2533
10   Exhibit No. 612    Gitrdonemoving e-mail           Page 2629
                        9-21-14
11   Exhibit No. 614    Kareem's text communications    Page 2622
     Exhibit No. 616    Lorenzo Vidinos                 Page 2573
12                      Curriculum Vitae

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1                      P R O C E E D I N G S

 2        (Called to the order of court at 9:05 a.m.)

 3             THE COURT:  Good morning, ladies and gentlemen.

 4   Please sit down.  The record will show the presence of the

 5   jury, counsel, and the defendant.

 6             You may proceed with your cross-examination, Mr.

 7   Koehler.

 8             MR. KOEHLER:  Thank you, Your Honor.

 9             I want to just let the Court know there's an exhibit

10   that I want to play that apparently is going to take a few

11   minutes to play because there is an IT-enforced reboot of the

12   litigation laptop happening at this moment.

13           ABDUL MALIK ABDUL KAREEM, WITNESS, SWORN

14                   CROSS EXAMINATION (cont'd)

15   BY MR. KOEHLER:

16   Q   All right.  Mr. Abdul Kareem, when we left off yesterday,

17   I was talking to you about your records from your visit to

18   John C. Lincoln Hospital.

19             Do you recall that?

20   A   Yes.

21   Q   And so in the course of your examination there at the

22   hospital you asked for x-rays to be performed; is that right?

23   A   Yes.

24   Q   Okay.  Let's look here at the x-ray report.  Right here it

25   says:
```

1              "Findings.  There is no evidence of acute fracture or

2    dislocation of the hip.  Femoral head, neck intertrochanteric

3    regions and proximal femoral shaft appear intact.  The

4    visualized portions of the superior and inferior pubic rami

5    and iliac wing appear supp intact."

6              Down at the bottom.

7              "No acute process identified."

8              Is that correct?

9    A    Right.

10   Q    In other words, somebody at the hospital didn't find any

11   evidence of an injury at that point, correct?

12             MR. MAYNARD:  Objection.  Objection to the form of

13   the question.

14             THE COURT:  Sustained.

15             A JUROR:  Our screen isn't working.

16             THE COURT:  Oh.  Maureen will fix it.

17             A JUROR:  Okay.  She turned it on.  Thank you.

18             Maureen is becoming superfluous.  She usually jiggles

19   the wires and it's fixed.

20             MR. KOEHLER:  High tech at its finest.

21   BY MR. KOEHLER:

22   Q    We also talked about your Roku device at your house,

23   correct?

24   A    Yes.

25   Q    I want to show you on your monitor what's been marked for

```
 1    identification as Exhibit 602.  Do you recognize that?

 2    A   Yes.

 3    Q   What is that?

 4    A   Looks like a remote.

 5    Q   That's the same model remote as the one for your Roku,

 6    correct?

 7    A   Yes.

 8            MR. KOEHLER:  Move to admit 602.

 9            MR. MAYNARD:  No objection.

10            THE COURT:  602 is admitted.

11        (Exhibit No. 602 admitted in evidence.)

12            THE WITNESS:  But the Roku that I have didn't come

13    with that.

14            MR. KOEHLER:  There's not a question in front of you,

15    sir.

16    BY MR. KOEHLER:

17    Q   Do you remember your interview on May 5th of 2015?

18    A   Somewhat.

19    Q   Some of it?

20    A   Yes.

21    Q   Do you recall Agent Whitson advised you during the course

22    of your interview that lying to the FBI is a crime, correct?

23    A   Yes.

24    Q   And during that interview you told agents that you did not

25    go shooting in the desert with Elton Simpson and Nadir Soofi
```

```
 1   prior to May 3rd of 2015, didn't you?
 2   A   No, I didn't.
 3   Q   So it's your testimony here today that you did not make
 4   that statement?
 5   A   I didn't make that statement.
 6   Q   Okay.  Before May 3rd, 2015 --
 7           Or excuse me --
 8           You told the agents that before May 3, 2015, neither
 9   Simpson nor Soofi fired the weapons they used in connection
10   with the Garland attack that occurred on May 3, 2015?
11   A   I don't remember saying that.
12   Q   So you don't remember saying that to the agents?
13   A   No.
14   Q   You also told the agents you did not know in advance that
15   Simpson and Soofi planned to conduct an attack in Garland,
16   Texas, correct?
17   A   Yes.
18   Q   And you also told them that you did not know about the
19   Muhammad Art Exhibit and Contest that was to take place on
20   May 3, 2015, until after that attack occurred, correct?
21   A   Yes.
22   Q   And you told us earlier -- actually, I want to come back
23   to that.
24           Let's talk about your BMO Harris deposit.  You said
25   that deposit came from an insurance settlement, right?
```

```
 1    A    Yes.

 2    Q    And what was the name of the insurance company?

 3    A    I don't remember the name of the insurance company.

 4    Q    What type of vehicle were you in when you were in the

 5    collision that led to the settlement?

 6    A    I was in a -- a rental car.

 7    Q    And you deposited that check into a new account with BMO

 8    Harris because you had trouble with your business account,

 9    right?

10    A    Right.  It wasn't a check that I deposited.  It was cash.

11    Q    You testified yesterday it was a check, didn't you?

12    A    No.  I cashed the check.

13    Q    Where did you cash it?

14    A    I cashed it on 19th Avenue and Bell at a check cashing

15    store.  I deposited the cash into the BMO Harris.

16    Q    So you took a $10,000 check to a check cashing store?

17    A    Yes.

18    Q    And you cashed it?

19    A    Yes.

20    Q    And then you went to BMO Harris and deposited the $10,000

21    in cash?

22    A    Yes.

23    Q    So the check cashing store didn't take any fee for cashing

24    the check?

25    A    Yeah.  The check was actually for $13,800.
```

```
1    Q    It was for $13,800?

2    A    Yes.

3    Q    And you only had 10,000 left?

4    A    And I had 10,000.  I paid off all my bills.  My landlord,

5    all my bills and everything, and got caught up on all my

6    bills.  Then I deposited the rest of the money inside of the

7    BMO Harris account and went and bought the truck in San Diego

8    and then came back up --

9    Q    Okay.

10   A    -- and then purchased --

11   Q    Let's stop for a minute.

12        How much did you pay for that truck?

13   A    I paid $4,000 for it.

14   Q    And you said you spent the rest of the money, the rest of

15   the 5,000?

16   A    In order to get the truck overhauled, tires and everything

17   else on it, that came to over 1500.

18   Q    You testified yesterday that you had let Elton Simpson use

19   your computer to set appointments for your business, right?

20   A    Yes.

21   Q    That's not what you told Detective Nash back in January

22   2014 though, was it?

23   A    I don't remember.

24   Q    Isn't it true you told Detective Nash that you had told

25   Simpson and Abu Bakr Ahmed not to use your Lenovo laptop?
```

1    A    Yes.  I did tell them that.

2    Q    You also admitted to Agent Nash that you looked at Inspire

3    Magazine on your own, correct?

4    A    Yes.

5    Q    And you wanted to see what it was all about?

6    A    Uh-huh.

7    Q    You knew that Anwar al-Awlaki was a major contributor to

8    Inspire, didn't you?

9    A    No.

10   Q    You told Agent Nash you didn't care about that Inspire

11   stuff, right?

12   A    Yes, I did.

13   Q    You said:  You're asking for trouble.  I don't follow that

14   kind of thing.

15   A    Yes, I did.

16   Q    Did you know that Anwar al-Awlaki had been killed in a

17   U.S. drone strike?

18   A    Not at that -- at that time, no, I didn't.

19   Q    You testified on direct that you moved out of the Vista

20   house and got away from Abu Bakr Ahmed because he was into

21   fraud stuff, right?

22   A    Yes.

23   Q    Yet you continued to have Mr. Simpson live with you?

24   A    Simpson -- I didn't know that he was into anything.

25   Q    But you knew that he had been convicted of lying to the

1   FBI, didn't you?

2   A   No, I didn't.

3   Q   You tried to wipe that Lenovo laptop before giving it to

4   Sergio Martinez; isn't that right?

5   A   Yeah.  We both did.  Me and Sergio.

6   Q   Okay.  And that was because there was bad stuff on it you

7   didn't want kids to see?

8   A   Well, I didn't know exactly what was on it, so.

9   Q   You testified yesterday that there was bad stuff on it.

10  A   Bad stuff on it, but I didn't know exactly what was on it,

11  so I tried to wipe it because Detective Nash had spoke to me

12  about the Inspire Magazine and I didn't know what exactly what

13  was all on that computer.

14  Q   So you didn't know that the bad stuff on there also

15  included Anwar al-Awlaki lectures about Violence Against

16  Western Targets?

17  A   I didn't know about that Anwar al-Awlaki lectures was

18  violent.

19  Q   While we're talking about electronic devices, you used

20  your Maxwest Gravity 5.5 cell phone as a WiFi hotspot for your

21  Acer computer, didn't you?

22  A   I had hooked it up once for it but never used it.  It

23  wouldn't work for me.

24  Q   But you were, in fact, accessing the Internet using the

25  Acer Aspire, correct?

CR15-00707-PHX-SRB   JURY TRIAL-DAY #14   3-9-16

```
 1   A    The Acer was hooked up to the Internet which was Cox at

 2   the --

 3   Q    Okay.

 4   A    -- and that was at the Cochise house.

 5   Q    What about at your apartment that you moved into?

 6   A    I didn't have Internet there.

 7   Q    So how were you using the Nextbook to access the Internet?

 8   A    It was hooked up to my -- to my phone.

 9   Q    Okay.

10   A    It always stayed hooked up to the phone.

11   Q    Okay.  So you set up a WiFi hotspot on your phone,

12   correct?

13   A    Right.

14   Q    And you used that to tether your computer and your tablet?

15   A    Right.  That's only the tablet.  I didn't use the

16   computer.

17   Q    So you stopped using the computer --

18   A    Yes.

19   Q    -- in May of 2015?

20   A    No.  I stopped using the computer back in around November.

21   I didn't really use the computer.

22   Q    So the Acer --

23   A    There was something wrong with it.  We tried to get it to

24   get the computer fixed but it wouldn't work.  It wasn't

25   working right for me.
```

UNITED STATES DISTRICT COURT

```
 1    Q    So the Acer computer that you had in your apartment on

 2    June 10 of 2015 --

 3    A    Uh-huh.

 4    Q    -- you did not use that computer?

 5    A    I tried to use it but it wouldn't work.  It wouldn't work

 6    for me.

 7    Q    Okay.  While we're getting those two laptops out, did you

 8    use the Cox service to provide Internet access to the Roku

 9    device.

10    A    Yes.

11    Q    And the Roku device is a media streaming player, right?

12            MR. MAYNARD:  Excuse me.  I can't hear while he's

13    doing this.

14            MR. KOEHLER:  Okay.  I'll pause for a minute.

15            THE WITNESS:  A media streaming device?

16            MR. MAYNARD:  Sorry.

17            THE COURT:  Okay.  The question was:

18            And the Roku device is a media streaming player,

19    right?

20            THE WITNESS:  I wouldn't say "media." I know it

21    played movies.

22    BY MR. KOEHLER:

23    Q    So you could use it to access Netflix, right?

24    A    Yeah.  Movies.

25    Q    You could use it to access Hulu?
```

1    A    Yes.

2    Q    You could use it to access YouTube?

3    A    Not that one I had.

4    Q    Okay.  It got its movies and stuff off the Internet; is

5    that right?

6    A    Yes.

7    Q    Okay.  Have you had a chance to look at these computers

8    before taking the stand?

9    A    Say that again?

10   Q    Have you had a chance to look at these laptop computers

11   before taking the stand?

12   A    No.

13           MR. KOEHLER:  May I approach the witness?

14           THE COURT:  You may.

15           THE WITNESS:  Okay.  It's been a long time since I

16   seen this computer, so, okay.

17           MR. MAYNARD:  Can you tell us the numbers on those?

18           MR. KOEHLER:  112 is the Acer and 161 is the Lenovo.

19   BY MR. KOEHLER:

20   Q    Those were your computers, right?

21   A    Well, the Acer was.  The Lenovo was mines back in 2012 and

22   then I gave it to Sergio, so it belonged to Sergio.

23   Q    So it's your testimony that you had no Internet access

24   other than through your Gravity 5.5 Maxwest phone?

25   A    Yes.

1    Q    At the apartment?

2    A    Yes.

3    Q    At Cochise you had Cox Internet?

4    A    I had Cox up until I would say -- I don't remember.

5    November.

6    Q    You had CenturyLink at one point as well, didn't you?

7    A    Right.

8    Q    You testified on direct that Mr. Simpson was pushy with

9    you about wanting to go shooting, right?

10   A    Yes.

11   Q    In fact, you testified he was upset because Sergio

12   Martinez pushed back the shooting to the following weekend,

13   right?

14   A    Yes.

15   Q    Again, in May of 2015, May 5th, you told the FBI you did

16   not go shooting in the desert with Simpson and Soofi, isn't

17   that right?

18            MR. MAYNARD:  Objection.  It's been asked and

19   answered.

20            THE COURT:  Overruled.  You may answer.

21            THE WITNESS:  No.  I didn't say that.

22   BY MR. KOEHLER:

23   Q    You also testified that you kicked Elton Simpson out of

24   your home in the summer of 2013, right?

25   A    Yes.

```
 1   Q    And your reasons were because he was watching military
 2   videos and because you thought he had placed a tracking device
 3   in your car?
 4   A    Yes.
 5   Q    Let's talk about the videos.
 6        Were they videos of soldiers involved in battles in
 7   the Middle East?
 8   A    Yes.
 9   Q    Did they have voiceovers?
10   A    No.  I just remember it was music playing.
11   Q    Were they nasheeds?
12   A    I don't know what -- well, it sounded like music.
13   Q    Okay.  Was it someone singing or was it actual, like,
14   music playing?
15   A    Yeah.  Somebody singing.
16   Q    Was Elton Simpson watching beheading videos back in 2013?
17   A    No.  I never seen any.
18   Q    And you never told the FBI any of this when you talked to
19   Detective Nash in 2014, correct?
20        MR. MAYNARD:  Objection to the form of the question.
21        THE COURT:  Sustained.
22   BY MR. KOEHLER:
23   Q    You never told Agent Nash about Elton Simpson watching
24   military-type videos when you talked to him in January of
25   2014, did you?
```

```
 1    A    When are you talking about?  When I went to pick the
 2    computer up?
 3    Q    You talked to him twice.
 4              The day before you picked up the computer?
 5    A    On the phone?
 6    Q    Yes.
 7    A    That question was never asked.
 8    Q    And then you talked to him about -- you talked to him the
 9    following day when you picked up the computer as well?
10    A    I only talked to him twice but the question was never
11    asked.
12    Q    Your May 5th, 2015, interview, you did not tell the agents
13    about Simpson watching those military-style videos, did you?
14    A    I can't recall if I did or not.
15    Q    And you didn't tell them about those videos in your
16    June 10, 2015, interview either?
17    A    I can't remember if I did or not.
18    Q    When you spoke to Detective Nash on January 24 of 2014,
19    that's when you got the Lenovo computer back, right?
20    A    I don't remember the date that I got it back.
21              THE COURT:  Well, does that sound about the time that
22    you got it back?
23              THE WITNESS:  Yeah.  It was like late January.
24              THE COURT:  2014?
25              THE WITNESS:  Yes.
```

```
 1   BY MR. KOEHLER:

 2   Q   First off, you did not tell him that Elton Simpson had

 3   authority to use your Lenovo laptop computer on behalf of your

 4   business, did you?

 5   A   It was in 2014.

 6           MR. MAYNARD:  Objection, Your Honor.

 7           THE COURT:  Excuse me.  Your lawyer wants to say

 8   something first.

 9           MR. MAYNARD:  Objection to the form of the question

10   and it's been asked and answered; and three, we don't know

11   whether the question was ever asked.

12           THE COURT:  Well, that may be a possible answer, but

13   it doesn't make the question objectionable.

14           Overruled.  Please ask the question again, Mr.

15   Koehler.

16   BY MR. KOEHLER:

17   Q   When you spoke to Detective Nash on January 24, 2014, you

18   got your Lenovo computer back from him, you did not tell

19   Detective Nash that you had authorized Elton Simpson to use

20   your Lenovo laptop computer on behalf of your business,

21   correct?

22   A   It was in 2014 when he called me to come and get my

23   computer.

24   Q   And then --

25   A   The question was never asked did I let Elton see it --
```

 1    Elton come use my computer.

 2    Q    Well, the next day when you talked to him when you got the

 3    computer, you told him about the fact that you made Simpson

 4    leave your house, right?

 5    A    Right.

 6    Q    And you told him the reason you made Simpson leave the

 7    house was because Simpson had been using your Lexus and --

 8    A    Right.

 9    Q    -- and not paying you for the use of the Lexus?

10    A    Right.  He was supposed to buy it.

11    Q    And then you claim that he put a tracking device on your

12    car or you found something that you thought was a tracking

13    device?

14    A    I found it, yes.

15    Q    Right?

16    A    Yes.

17    Q    And then you took the car away from him, right?

18    A    Right.

19    Q    You told Agent Nash that the next day Simpson went and

20    bought himself a used car?

21    A    Yes.

22    Q    And that upset you?

23    A    Right.  And I put him out because of it.

24    Q    And then you kicked him out because of that?

25    A    No.  I put him out that same day I found it.  I didn't put

CR15-00707-PHX-SRB   JURY TRIAL-DAY #14   3-9-16

```
 1    him out the next day.  I put him out the same day.

 2    Q   That you found the device?

 3    A   Yes.

 4    Q   But you didn't mention anything about those military

 5    videos being a basis for putting him out?

 6    A   They wasn't asked.  He didn't ask me those questions.  I

 7    volunteered that information.

 8    Q   Okay.  But you didn't volunteer all the information, did

 9    you?

10    A   No, because he wouldn't ask that.

11          He asked me a question how is your friends and how

12    are they doing and I just volunteered that information.

13          MR. KOEHLER:  I finally have things up and running.

14    I want to play a portion of a phone call between you and the

15    Gainsco Insurance Company.

16    BY MR. KOEHLER:

17    Q   Do you remember getting a call from the insurance person

18    to ask you about your claim?

19    A   Yes.

20    Q   I want to play the beginning of this call and you tell me

21    if you recognize it.

22          THE COURT:  First, you're going to tell us if it's

23    your voice that you hear in the conversation so we know

24    whether or not it's a conversation between you and someone

25    else.
```

```
 1            THE WITNESS:  All right.

 2            MR. KOEHLER:  If I can switch to the laptop on the

 3   lecturn, please.

 4            It should be playing.  Should I not see it on the

 5   screens here?

 6            (Playing Exhibit 601 audio to the jury.)

 7            MALE SPEAKER #1:  "This is (inaudible) calling from

 8   the Gainsco Insurance. I'm calling about No. AZ415257.

 9   April 8, 2015, approximately 4:09 p.m. Central Time. I do want

10   you to know this call will be recorded for training and

11   investigative purposes.

12            Do I have your permission to proceed?

13            MALE SPEAKER #2:  Yes, you do.  And I just have to

14   ask you about that last part (inaudible).

15            MALE SPEAKER #1:  And can you confirm your first and

16   last name, please.

17            MALE SPEAKER #2:  First name is Abdul Malik Abdul

18   Kareem.

19            MALE SPEAKER #1:  Is "Abdul Malik" one word.

20            MALE SPEAKER #2:  No.

21            MALE SPEAKER #1:  And is "Abdul Kareem" also two

22   words as well?

23            MALE SPEAKER #2:  Yes.

24            MALE SPEAKER #1:  And, sir, what is your date of

25   birth."
```

```
 1   BY MR. KOEHLER:

 2   Q   Do you recognize your voice on that call?

 3   A   Yes.

 4   Q   And that's the call that you had with the insurance

 5   company on April 8, 2015, correct?

 6   A   I don't remember the date.

 7           THE COURT:  But it was just a little bit after the

 8   accident at the T-Mobile parking lot?

 9           THE WITNESS:  Yes.

10           MR. KOEHLER:  Move to admit 601.

11           MR. MAYNARD:  Assuming that the rest of the tape,

12   that's all it is, that's fine.  I mean, I haven't heard the

13   tape.

14           THE COURT:  Then 601 is admitted.

15       (Exhibit No. 601 admitted in evidence.)

16           THE COURT:  Excuse me.  Could you stop it for just a

17   moment?  Since it's now admitted, the court reporter does not

18   have to attempt to take down the audio.  You may continue.

19       (Playing Exhibit 601 audio to the jury.)

20   BY MR. KOEHLER:

21   Q   That was a true recording of that entire conversation,

22   correct?

23   A   I believe so.

24   Q   All right.  Now that my computer is done with the reboot

25   and playing that, let's circle back.
```

1              You said on direct examination that Simpson would

2     never let anybody see him tweet on a cell phone; is that

3     right?

4     A    Yeah -- or text.

5     Q    I've placed on your screen -- can you see that there,

6     Exhibit 133, which is in evidence?

7     A    Yeah.

8     Q    Do you recognize that?

9     A    That's him on the phone.

10    Q    And you took that picture of him, right?

11    A    Yeah.  I was sitting down.

12    Q    And so he's sitting there.  You can see his phone.  And

13    you take a picture of him of it?

14    A    Taken when -- that's an L-shaped couch.  I'm sitting --

15    the couch go like this (indicating).  He's sitting on this end

16    and I'm sitting directly over here.

17    Q    Well, let's go to 134, also in evidence.

18             You took that photo of him as well?

19    A    Yeah.  I don't see him tweeting or texting.

20    Q    No.  I didn't ask that question.

21    A    You asked me that question -- you said --

22    Q    I did not ask you that question just then.

23             No, I just asked you --

24    A    I asked me the question that --

25    Q    Sir, there's no question before you.

```
 1              Do you see him in the photo there, right?

 2   A   Yes.

 3   Q   You took that photo also, correct?

 4              The date on that one February 18, 2015, correct?

 5   A   I can't see it.

 6   Q   Does that help you?

 7   A   Yes.

 8   Q   Now, let's go back to that 133 real quick.  I'll go to the

 9   second page of that.  What's the date of that?

10   A   The 23rd.

11   Q   February 23rd, right?

12   A   Yes.

13   Q   You took both of those photos, correct?

14   A   I believe so.

15   Q   In your interview you mentioned having seen a video

16   depicting a person being burned alive in a cage, right?

17              MR. MAYNARD:  Objection to the form of the question.

18   I don't know what interview he's talking about.

19              THE COURT:  Yeah.  Let's be more specific.

20   BY MR. KOEHLER:

21   Q   In your June 10, 2015, interview you told the agents that

22   Elton Simpson showed you a video of somebody being burned

23   alive in a cage; is that right?

24   A   I believe so.

25   Q   I'm going to show you page 27 of Exhibit 157 which is in
```

```
 1    evidence on the document camera.

 2            Those are screenshots from that video; is that right?

 3    A    I believe so.  That's all I seen of the video.  I didn't

 4    see him get burned alive.

 5    Q    During your June 10 interview --

 6    A    I only seen the beginning of the video.  I didn't see the

 7    whole video.  Nothing getting burned alive.  As soon as

 8    Simpson was about -- when he was showing it to me, after he

 9    was showing this to me, I told him --

10    Q    Sir, there's no question before you.

11    A    Okay.

12    Q    Thank you.  It's your testimony you never went to the

13    apartment of Elton Simpson and Nadir Soofi prior to --

14    Nadir Soofi prior to February 2015, correct?

15    A    Right.

16    Q    And you only slept in that apartment one time, right?

17    A    Right.

18    Q    That was in February 2015 when your water went out?

19    A    Yes.

20    Q    And then I want to make sure I understand you correctly.

21            You testified on direct examination that you only

22    went into that apartment four or five times total?

23    A    Yes.

24    Q    And Ali Soofi was present each time you went there?

25    A    Yes.
```

1   Q   And, again, you only spent the night once?

2   A   Yes.

3   Q   You testified on direct examination that someone called

4   you in October or November and told you that Elton Simpson and

5   Nadir Soofi bought AK rifles, correct?

6   A   Yes.

7           MR. MAYNARD:  Objection to the --

8           THE COURT:  Yeah, let's -- we have been talking about

9   various years.  And you said October or November but you

10  didn't say whether --

11          MR. KOEHLER:  I'm sorry.  2014.

12          THE COURT:  Okay.  Was that the objection?

13          MR. MAYNARD:  Well, that was part of the objection.

14  The other one, I don't believe he testified as to the years

15  when that -- or the time period when the phone call was made.

16  He said he got called at some point.

17          THE COURT:  Okay.  Well, why don't you ask your

18  question again.   I can't remember that.

19  BY MR. KOEHLER:

20  Q   You testified on direct examination that you got a call

21  from someone in October or November, 2014, and that person

22  told you that Elton Simpson and Nadir Soofi had purchased

23  AK -- or AK-style rifles; is that right?

24          MR. MAYNARD:  Objection to the form of the question.

25          THE COURT:  Overruled.  You may answer.

```
 1              THE WITNESS:  Yes.
 2    BY MR. KOEHLER:
 3    Q    Who was it who called you and told you that?
 4    A    I don't remember.
 5    Q    When you talked to the FBI in May 2015, you didn't tell
 6    them that information about that phone call, did you?
 7              MR. MAYNARD:  Objection to the form of the question.
 8              THE COURT:  Overruled.  You may answer.
 9              THE WITNESS:  I don't remember.
10    BY MR. KOEHLER:
11    Q    And during your interview on June 10, 2015, you didn't
12    tell the FBI about that phone call, did you?
13    A    I don't remember.
14    Q    When you testified on direct, you testified about the
15    shooting being close to the evening time; is that right?
16              MR. MAYNARD:  Objection to the form of the question.
17    I'm not sure what he means by "the shooting."
18              THE COURT:  Are you talking about the time when
19    everyone went with Sergio and Sergio's kids and he and Simpson
20    and Soofi?
21    BY MR. KOEHLER:
22    Q    Correct.  So when you went shooting with Sergio Martinez
23    and his boys and Elton Simpson and Nadir Soofi in the desert
24    near Wittmann, do you recall that?
25    A    Yes.
```

1   Q   And you testified that that event wrapped up close to

2   evening time, right?

3   A   Yeah.  It was getting dark.

4   Q   Because you could see the muzzle flashes?

5   A   Yes.

6   Q   Okay.  And during your testimony you mentioned that you

7   saw that Simpson had been moving -- maybe he wasn't still

8   running but he was moving while shooting, correct?

9   A   Well, yeah, he was still moving while shooting.

10  Q   And you testified that you tried to take a photo of

11  Simpson and he got mad and made you delete the photo, right?

12  A   Right.

13  Q   And yet, again, during your May 5, 2015, interview, you

14  did not tell the FBI that, did you?

15  A   I don't believe the question was asked and I don't

16  remember.

17  Q   Well, in fact, you denied going shooting in the desert at

18  all on May 5, 2015, correct?

19  A   Like I told you, I don't believe the question was asked.

20  I don't remember the question.

21  Q   Okay.  And in your June 10, 2015, interview, you told the

22  FBI that he was not moving while shooting, correct?

23  A   I don't remember.

24  Q   And you did not tell the FBI about taking a photo and

25  Simpson getting upset, did you?

```
 1    A    Well, no, I don't remember in that interview.  I was
 2    scared to death on June 10th.
 3    Q    That's not the question I have for you, sir.
 4              I asked you a very simple question.
 5    A    I don't remember.
 6    Q    Did you tell the FBI?  Yes or no?
 7    A    I don't remember.
 8    Q    When you interviewed with the FBI on June 10, 2015, you
 9    talked about going and purchasing the 38 Special ammunition,
10    correct?
11    A    Yes.
12    Q    You told them you bought a pack of it?
13    A    Yes.
14    Q    In fact, the tan bag that we showed here in court earlier,
15    that's the bag that that ammunition came in, isn't it?
16    A    Not that I -- I don't remember.
17              MR. KOEHLER:  May I approach the witness?
18              THE COURT:  You may.
19              THE WITNESS:  I wouldn't say that bag.
20              MR. MAYNARD:  Oh, whoa. Whoa.
21              THE COURT:  Wait.  Wait.  Wait until Mr. Koehler --
22    just look at it and then he is going to ask you a question for
23    you to answer.  Don't start talking until he asks a question.
24              MR. KOEHLER:  May I speak from here?
25              THE COURT:  Yes.
```

1  BY MR. KOEHLER:

2  Q   I want you to read what that says right there on the bag.

3  A   Okay.  I see it.

4          MR. MAYNARD:  Do you want to show it to me?

5  BY MR. KOEHLER:

6  Q   It says it's 38 Special ammunition, PMC, correct?

7  A   Yes.

8  Q   During that June 10th interview, you did not tell the FBI

9  that Elton Simpson was with you when you went and bought that

10  ammunition, did you?

11  A   I don't remember.

12  Q   Specifically, you told the FBI that that ammunition was

13  all for yourself, correct?

14  A   I don't remember.

15          MR. KOEHLER:  May I replay this section of your

16  interview?  This is 428 which is in evidence.

17      (Playing Exhibit 428 for the jury.)

18  BY MR. KOEHLER:

19  Q   This bag I showed you in Exhibit No. 23, that's plastic,

20  right?

21  A   Yes.

22  Q   And it has two little holes at the top of the bag, little

23  handle holes?

24  A   Yes.

25  Q   In your June 10th interview with the FBI, you told Agent

1    Whitson and Detective Nash you only saw Elton Simpson probably

2    once or twice a month in the months preceding the attack in

3    Garland, correct?

4    A   Right.

5    Q   That wasn't -- that wasn't true though, was it?

6    A   I probably seen Elton probably about -- I would say about

7    around two -- about two times.

8    Q   Okay.  And during your June 10 interview, you told the

9    agents that you went to that apartment twice, probably three

10   times, correct?

11   A   I'm not sure if I said that or not but I know I been there

12   probably about a handful.

13   Q   And the last time you were at that apartment was about a

14   month-and-a-half before the Garland attack?

15   A   Yes, when I went and picked them up.

16   Q   Now, you saw Elton Simpson and Nadir Soofi get on the

17   Internet at times, didn't you?

18   A   Where?

19   Q   And you knew that --

20   A   No.  I said "where."

21        THE COURT:  He said "where" not "yeah."

22   BY MR. KOEHLER:

23   Q   I'm just talking in general.

24        You saw them get on the Internet and watch videos in

25   the past.

1    A    Not Nadir.

2    Q    Just Elton Simpson?

3    A    Just Elton Simpson when he was living at my house.

4    Q    And you knew that these were things that had gotten him in

5    trouble before, correct?

6    A    After I found out, yeah, he got in trouble for those.

7    Q    Let's talk about that for a minute.

8         You knew he was on probation, right?

9    A    I found out he was on probation.

10        MR. MAYNARD:  Objection to the form of the question.

11        THE COURT:  Overruled.  He said yes he knew he was on

12   probation.

13   BY MR. KOEHLER:

14   Q    And --

15   A    I found out he was on probation in 2014.

16   Q    Well, when he was living with you, he had a probation

17   officer coming to do home visits, didn't he?

18   A    No.  He was on summary probation.  Once I found out.  He

19   reported to them.  They didn't come to the house.

20   Q    And, in fact, you had some of his probation-related

21   documents in your apartment on June 10, 2015, when the FBI

22   searched your apartment, didn't you?

23   A    No.

24   Q    You had a whole boxful of his stuff in your apartment?

25   A    No.  It probably wasn't in my apartment.  I believe it was

1    in my storage area but I didn't know it was his.  And the

2    storage area was in the backyard.  It probably was out in the

3    backyard, not in my apartment.

4    Q   He also sent you an e-mail in November of 2014 that

5    included a forwarded communication from his probation officer,

6    correct?

7    A   He was at my house and he couldn't read the document that

8    was on his phone and he asked me can he forward it to my

9    e-mail address so he can print it out.

10   Q   That wasn't my question.

11        I'm just asking you a yes-or-no question.

12   A   Yes.

13   Q   You previously had a 380 caliber pistol in your home at

14   some point, didn't you?

15   A   No.

16   Q   Which device did Elton Simpson use to show you the video

17   of the Jordanian pilot?

18   A   He used his phone.

19   Q   Now, I think you've already acknowledged that ISIS is the

20   group that claims to have a Khilafah; is that right?

21   A   Yes.

22   Q   And you went and saw Abdullah Mubarak yourself to talk to

23   him about the existence of a Khalifah, correct?

24   A   We was in the car.

25   Q   You were what?

1    A    We were in the car.

2    Q    You were in the car?

3    A    Yes.  In my car.  I wasn't at his house.

4    Q    Did you previously have a shotgun in your home?

5    A    No.  I didn't have a shotgun in my home.  Those shotgun

6    shells I have a long time.

7    Q    I'm sorry?

8    A    I said those shotgun shells I had for a long time.

9    Q    And you just had them for the heck of it?

10   A    No.  They was supposed to go to Sergio.

11   Q    All right.  And you testified that you listened to Anwar

12   al-Awlaki CDs from 2010 to 2015, correct?

13   A    Yes.

14   Q    How many of his CDs did you own?

15   A    I think 16.  Only it was a case that came with The Lives

16   of the Prophet and I think 16 CDs come in that case.

17   Q    Did you have any other series of his?

18   A    No.

19   Q    So you listened to that one series over and over again for

20   five years?

21   A    Yes.

22   Q    Where did you get that?

23   A    I believe I bought it at a book store.  I'm trying to -- I

24   think it was off of like 52nd Street and McDowell.

25   Q    You had other CDs of his that had handwritten labels on

```
 1    them, didn't you?

 2    A    They weren't mines probably.  I don't -- I only had Lives

 3    of the Prophet.

 4    Q    But you listened --

 5    A    I don't know if those CDs that you had belonged to my

 6    nephew.

 7    Q    But you were listening to them, right?

 8    A    No.

 9    Q    So you didn't have them in your car?

10    A    I had them in my car but my CD player didn't work.

11              MR. KOEHLER:  If I can have a moment?

12              That's all I have, Your Honor.

13              THE COURT:  Ladies and gentlemen, we will take our

14    morning break and we will reconvene at 10:30.

15              You are reminded of the use admonitions.

16              Court is in recess until 10:30.

17         (Recess taken at 10:15 a.m.;resumed at 10:32 a.m.)

18              THE COURT:  Thank you, ladies and gentlemen.  Please

19    sit down.  The record will show the presence of the jury,

20    counsel, and the defendant.

21              Mr. Maynard, questions on redirect.

22              MR. MAYNARD:  Thank you, Your Honor, please.

23                      REDIRECT EXAMINATION

24    BY MR. MAYNARD:

25    Q    I'm going to put on the overhead the Exhibit 602 that was
```

1    admitted.

2          That is a remote for a Roku; is that correct?

3    A   Yes.

4    Q   Okay.  Was that device programmed to your television in

5    your living room at your house on Cochise?

6    A   Yes.

7    Q   Could you watch YouTubes on the television in your house

8    on Cochise using this Roku device?

9    A   Not this one.

10   Q   Okay.  Were there other Roku devices in your house?

11   A   Yes.

12   Q   Who owned those Roku devices?

13   A   Stefan had one and Billy Eldridge had the other one.

14   Q   On the TV that was in your living room could you watch any

15   YouTubes?

16   A   No.

17   Q   Okay.  Would it have been possible to have programmed this

18   device on one of the other Rokus so that one could watch

19   YouTubes?

20   A   Yes.  The device that I had, this one, was a Roku 1, like

21   the very first Roku and I programmed that remote to that Roku.

22   Q   The one that was in the living room?

23   A   Right.

24   Q   Okay.  You were asked some questions about Elton Simpson

25   and knowing when -- learning when he first had a felony

```
 1    conviction.

 2            Tell the jury, when did you first learn that Elton

 3    Simpson had a felony conviction?

 4    A   In 2014.

 5    Q   And how is it that you learned that he had a felony

 6    conviction?

 7    A   He had got -- he had sent -- he asked me could I -- can he

 8    send me an e-mail from his probation officer so he -- because

 9    he couldn't see it on his phone.

10            And I had a printer and he wanted to print that

11    document out.  So I let him send it to my e-mail and then I

12    printed the document out and then I seen that he was on

13    probation.

14    Q   At the time that he lived with you at Vista, did a

15    probation officer ever come to the Vista house while you were

16    there?

17    A   No.

18    Q   At the time that he lived with you on Cochise, did a

19    probation officer ever come to the house while you were there?

20    A   No.

21    Q   Okay.  You indicated a few minutes ago that it was your

22    understanding that he was on a different type of probation

23    where he actually went to see the probation officer; is that

24    correct?

25    A   Right.
```

1    Q    When did you learn that?

2    A    Well, I don't think he went to go see them.  He didn't

3    have to go see them.

4    Q    You think he was on probation and they just didn't check

5    on him?

6    A    Yeah.  He told me it was summary probation and summary is

7    like you don't go.

8    Q    Okay.  Now, you were asked some questions you got a

9    $13,200 settlement on a case and you cashed it at a check

10   cashing place rather than putting it in the bank.

11   A    Yes.

12   Q    Okay.  Explain to the jury why you did that that way?

13   A    All right.  I got the check for the $13,800 and I -- I got

14   the check.  I cashed it at the check cashing place because if

15   I was to deposit it into the checking account, they will hold

16   it for at least seven days.

17        I had already talked to the guy in San Diego on me

18   purchasing the truck and he had another buyer to buy the

19   truck.  So I cashed the check and then took the $10,000 and

20   deposited it into the BMO Harris account and withdrawed $5,000

21   out a couple days later.

22   Q    Now, you were asked some questions about whether -- while

23   we have been here in court you have had a chance to look at

24   these laptops, the Acer and the Lenovo.

25        Do you recall that question?

1    A   Yes.

2    Q   Okay.  That is your Acer -- or it was your Acer and it was

3    your Lenovo at one time?

4    A   Yes.

5    Q   You've not had a chance to look at any of this stuff after

6    court any day, have you?

7    A   No.

8    Q   Why not?

9    A   Because I'm incarcerated and been incarcerated for over

10   ten months.  And nobody has brought any of these devices up to

11   the jail for me to look at.

12   Q   In fact, are you in solitary confinement?

13   A   Yes.

14   Q   Okay.  Do you have a television?

15   A   No.

16   Q   Do you have access to radio?

17   A   No.

18          MR. KOEHLER:  Objection.  Beyond the scope.

19          THE COURT:  Sustained.

20   BY MR. MAYNARD:

21   Q   You were asked about a number of different -- I guess it

22   was said -- interviews that you gave.

23          In 2014 you went and met with Agent Nash and got back

24   your computer; is that correct?

25   A   Yes.

1   Q    Okay.  You talked to him over the phone before you went

2   and got the computer?

3   A    Yes.

4   Q    Okay.  Did you think that that was an interview that you

5   were doing with him?

6   A    No.

7   Q    Okay.  Did he ask you some questions?

8   A    Yes.

9   Q    Okay.  Did you answer those questions when he asked you?

10  A    Yes.

11  Q    Okay.  When you went and you picked up the computer, did

12  you sit down and have a formal interview with him?

13  A    No.

14  Q    Did he ask you some questions?

15  A    Yes.

16  Q    Did you answer those questions at that time?

17  A    Yes.

18  Q    At any time in 2014 when you met with Detective Nash to

19  get back your computer, did you think you were actually being

20  interviewed by the FBI?

21  A    No.

22  Q    What did you think was going on at that time?

23  A    I was just coming there to pick the device up.

24  Q    So when you said you didn't volunteer any information, if

25  he asked you questions, you answered it?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #14   3-9-16

```
1    A    Right.

2    Q    Okay.  Now, in May of 2015, that was a formal interview at

3    the FBI office, correct?

4    A    Yes.

5    Q    Okay.  Did you answer the questions there to the best of

6    your knowledge?

7    A    Yes.

8    Q    Okay.  Did you answer the questions that they asked you?

9    A    Yes.

10   Q    Okay.  Were you -- were you nervous at the time?

11   A    Yes.  I was.

12   Q    Were you having some trouble with your diabetes?

13   A    Yes.

14   Q    Okay.  Did you do the best you could to answer the

15   questions that were asked at the time?

16   A    Yes.

17   Q    Did they also caution you that if you lied to them, that

18   could be a federal offense?

19   A    Yes.

20   Q    Okay.  Now, you then had a -- you then actually went back

21   voluntarily to the FBI office several weeks later, correct?

22   A    Yes.

23   Q    Okay.  Were you willing to answer questions at that time?

24   A    Yes.

25   Q    And what was the purpose of going back several weeks
```

UNITED STATES DISTRICT COURT

1    later?

2    A   Well, I was being followed and it was really -- I was

3    really, really -- it was over --

4            MR. KOEHLER:  This is beyond the scope of cross, Your

5    Honor.

6            THE COURT:  Overruled.

7            THE WITNESS:  I was being followed and I didn't know

8    exactly why I was being followed.

9            And it was -- they almost caused me to get into an

10   accident a couple times.  And I went back so I could speak to

11   somebody and talk to somebody because I didn't know exactly

12   what was -- why I was being followed at the time.

13   BY MR. MAYNARD:

14   Q   All right.  Now, you were arrested on June 10th of 2015?

15   A   Yes.

16   Q   You're taken into custody and you're taken into the FBI

17   office again?

18   A   Yes.

19   Q   Are you nervous?

20   A   Very nervous.

21   Q   Are you scared?

22   A   Yes.

23   Q   Are you asked a number of questions again by Agent Whitson

24   and Detective Nash?

25   A   Yes.

1   Q   Did you do the best you could to answer those questions at

2   that time?

3   A   Yes.

4   Q   Did Agent Whitson ask you whether or not you had been

5   shooting with Soofi and Simpson at some point?

6   A   Yes.

7   Q   Did you tell -- what did you tell him?

8   A   I told him that I was -- I was -- I was shooting with

9   them.

10  Q   Did he ever say to you, "You didn't say that to me in the

11  last interview"?

12  A   I don't believe so, no.

13  Q   You were asked questions about the May 5th interview.

14          Did they ever show you any pictures of the weapons

15  that we've seen here for the last four weeks?

16  A   No.

17  Q   Okay.  Do you have any idea what weapons Simpson and Soofi

18  would have been using in Garland, Texas?

19  A   No.  The only weapons -- I don't know what weapons they

20  would have been using.  Only weapons I know is that these

21  weapons that they brought in here.

22  Q   You had seen the weapons that they had when you had been

23  out in the desert shooting in January?

24  A   Yes.

25  Q   Did you know whether or not they still had those weapons

1    or not?

2    A    No.

3    Q    Do you know whether they had acquired any new weapons or

4    not?

5    A    No.

6    Q    You were asked a question on cross-examination about

7    receiving a phone call from somebody telling you that some

8    individuals had purchased a -- or had gotten an AK.

9            Do you recall that question on cross-examination?

10   A    Yes.

11   Q    Okay.  I believe on cross-examination you said that the

12   caller told you that it was Simpson and Soofi who had bought

13   AKs in October or November?

14   A    No.  It was Simpson.  Somebody calling me and said Simpson

15   had purchased AKs.

16   Q    Did somebody ever call you and tell you that Soofi had

17   purchased an AK?

18   A    Later.  Later somebody had called and said Soofi had

19   purchased.

20   Q    You were asked whether or not you had ever had a 380

21   pistol in your home.

22           Did you ever have a 380?

23   A    No.

24   Q    Did you ever have any 380 ammunition in your house?

25   A    I believe it was only one bullet that was there.

1    Q    Do you have any understanding of how that one bullet got

2    there?

3    A    I was sweeping the truck.  And when I was cleaning the

4    truck out, the back end of the truck and I found the clip and

5    the one bullet in the back.  And I didn't want to dispose of

6    it, so I just put it in a drawer.

7    Q    We listened to the tape recording of your talking to an

8    insurance agent or somebody, an insurance adjuster --

9    A    Yes.

10   Q    -- for the woman that ran into you.

11          Had you ever heard this tape before?

12   A    No.

13   Q    Do you recall that the conversation did occur sometime

14   within a week after that accident?

15   A    Yes.

16   Q    Okay.  Did you have an attorney at the time?

17   A    No.

18   Q    Had you ever had an attorney prior to that?

19   A    No.

20   Q    Had you had one for your lawsuit?

21   A    Yes.

22   Q    Did you call that attorney?

23   A    No.

24   Q    When was it that you first went to an attorney for the

25   lawsuit involving getting hit in the packing lot?

1   A   I believe it was like a week -- a week later.  I don't
2   really remember the dates.
3   Q   Was it after you had gone to the chiropractor?
4   A   Yes.
5   Q   You were shown some pictures of Simpson holding his cell
6   phone that apparently you took at different times in February?
7   A   Right.
8   Q   Did Simpson -- was Simpson on his cell phone often?
9   A   All the time.
10  Q   Did he show you what he was doing when he was on his cell
11  phone?
12  A   No.
13  Q   Did you know whether he was tweeting versus texting versus
14  e-mailing?
15  A   No.
16  Q   Did he ever show you any of those?
17  A   No.
18  Q   There was questions asked of you and we heard a videotape
19  of your interview.
20          In the videotape you said that you bought those 38s
21  just for you.  You heard that?
22  A   Yes.
23  Q   Okay.  Did you buy those 38s just for you?
24  A   No.  Me and Simpson, we split them.  We -- he gave me $75
25  and I put my $75 up and we bought them.

```
 1    Q    Okay.  You were asked about why you hadn't volunteered

 2    certain information to Detective Nash in November such as you

 3    didn't volunteer to him that you had seen any military videos.

 4              Do you recall that?

 5    A    Yes.

 6    Q    You did volunteer at some point in that conversation --

 7    you must have told them that you had thrown Simpson out at one

 8    point?

 9    A    Yes.

10    Q    Did you volunteer to him that you got help from

11    Mr. Mubarak and two other individuals to throw Simpson out?

12    A    No.

13    Q    Why not?

14    A    I didn't think it was relevant.

15              MR. MAYNARD:  I don't have any further questions,

16    Your Honor.

17              THE COURT:  Thank you, Mr. Kareem.  You may step

18    down.

19              MR. MAYNARD:  Can he be released?

20              THE COURT:  No.

21              You may call your next witness.

22              MR. MAYNARD:  Defense calls Dr. Marc Sageman.

23         (Witness duly sworn)

24              THE CLERK:  Please state your name for the record,

25    spelling your first and last name.
```

1          THE WITNESS:  Marc Sageman.  Marc is with a "C," so

2     it's M-A-R-C.  Sageman.  S-A-G-E-M-A-N.

3          THE COURT:  Some of the jurors may have observed that

4     Dr. Sageman has been sitting in the courtroom yesterday and

5     today listening to the testimony and wondered about that rule

6     that I talked about.

7          Last Friday the parties agreed, the government and

8     the defense agreed that Mr. Sageman, because of the nature of

9     his testimony, could remain in the courtroom and listen to any

10    testimony that was given prior to the time he testified.

11         So that was an agreement between the parties that he

12    could do that.  You may proceed.

13         MR. MAYNARD:  Thank you, Your Honor.

14                 **MARC SAGEMAN, WITNESS, SWORN**

15                      **DIRECT EXAMINATION**

16    BY MR. MAYNARD:

17    Q   Would you introduce yourself to the jury.

18    A   My name is Marc Sageman.  I just spelled my name.

19    Q   Okay.  You are a doctor?

20    A   That's correct, yes.

21    Q   And what -- tell the jury what degrees you hold and from

22    what universities.

23    A   I have a B.A. from Harvard University.  I have a Master's

24    Degree and a Ph.D. and a Medical Doctorate, so I have two

25    doctorates, all from New York University.

1  Q   And what area of medicine have you specialized in?

2  A   Three.  I specialize first in pathology, surgical

3  pathology.  I became a flight surgeon.  And then I became a

4  psychiatrist and subspecialized in forensic psychiatry.

5  Q   Could the witness be shown Exhibit 538, please.

6      Dr. Sageman, I'm going to ask you to look at Exhibit

7  538.  Can you identify that for me?

8  A   Yes.  It's my Curriculum Vitae.  It's my resume.

9  Q   Okay.  Did you prepare this in the normal -- have you had

10 this prepared for some time?

11 A   Yes.

12 Q   And do you update it periodically?

13 A   I do.  And I realize this is not the last updated version.

14 Q   Okay.  Does this CV or resume accurately depict --

15     THE COURT:  Well, let's just stop right there.

16     Either the government is going to not object and it

17 will be admitted, or the government will object and I will

18 sustain the objection on the basis of hearsay.

19     You can't establish a hearsay exception, but I think

20 somebody didn't object to the last resume that was offered, so

21 why don't we just test that before we go through a lot of

22 process that won't be successful in the absence of an

23 agreement to its admission.

24     MR. MAYNARD:  I move for the admission of Exhibit

25 538.

1          MR. KOEHLER:  Your Honor, we did not offer Mr.

2    Kohlmann's curriculum vitae into evidence.

3          THE COURT:  No.  I know you didn't, but somebody

4    else's was and it was admitted, so I didn't know if you were

5    going to object or not.

6          MR. KOEHLER:  We will let it come in.  No objection.

7          THE COURT:  538 is admitted.  Thank you.

8      (Exhibit No. 538 admitted in evidence.)

9    BY MR. MAYNARD:

10   Q   Okay.  538.  We have your professional qualifications and

11   associations.  You're a diplomate of a number of different

12   psychiatry boards; American Board of Psychiatry, American

13   Board of Psychiatry and Neurology, correct?

14   A   That's correct, yes.

15   Q   Let's talk for a moment about after you got out of school.

16   What did you do as your profession?

17   A   Which school?

18   Q   Medical school.

19   A   I first -- I wanted to get into academics, so I became a

20   pathologist.  Pathologists know everything.  They just don't

21   do anything.

22          But I was interested in pathology, and especially in

23   international health.  And from my residency in pathology, I

24   joined the Navy because they have the three best hospitals on

25   tropical diseases in the world in Cairo, Manila, and the

1    Philippines and -- and Panama.  I'm sorry.

2          And I was posted to Japan when I was in the Navy.

3    And at that time the boat people came out from Cambodia after

4    the genocide in Cambodia.  And I'm a child -- a Holocaust

5    survivor.  I grew up in France.  I have an accent, as you can

6    tell, and, you know, genocides are very -- you know, I'm

7    obsessed by them.

8          My undergraduate thesis is how people survived

9    concentration camps when I was at Harvard.  I've kind of

10    looked at political violence all the time.  And the military

11    was not doing anything, so I decided to join a U.S. government

12    agency that actually was doing something about genocides in

13    the early 80s to do something about it.

14    Q   And after you got out of the Navy, what agency did you

15    join?

16    A   Well, supposedly my relationship with that agency is still

17    classified, so let's call it a secret government agency.  I

18    worked there for seven years.  I was assigned both in

19    Washington, Islamabad, and New Delhi, India, and there I dealt

20    with the Afghan refugees.

21    Q   At some point did you begin to develop an interest in

22    studying terrorism?

23    A   Well, I did during the 80s while I was dealing with the

24    Afghans.  The mujahideen, the Freedom Fighters, were fighting

25    against the Soviets at the time.  And I was there from 1987 to

1    1989, so the last two years of the war.

2            And then when I returned to medicine, I was

3    interested -- I decided to actually continue, but in civilian

4    violence, so psychiatry and forensic psychiatry, looking

5    really at criminal behavior, serial criminal behavior.

6            I was at that time teaching courses on

7    ethno-political conflict.  I'm sorry.  I have a tendency to

8    speak fast, so please stop me.

9            And I taught courses on such conflict and on

10   terrorism even prior to 9/11.  And, of course, 9/11 put

11   everything in terms of my background in focus and I started

12   looking at the people who did 9/11 and, you know, in the last

13   15 years I have been studying terrorism.

14   Q    Have you taught at any universities?

15   A    Yes.  Several.

16   Q    And tell the jury where you have taught and the areas that

17   you've taught in.

18   A    As an undergraduate I taught physics at Harvard.  I was a

19   physics major.  At the University of Pennsylvania I taught law

20   and psychiatry for seven years, forensic psychiatry.

21           And I taught trauma, the psychology of trauma the

22   Moral Psychology of Holocaust Perpetrators.  All those were

23   seminars, semester-long seminars.  Then the Psychology of

24   Terrorism, all those at the University of Pennsylvania.

25           And then later on I taught a seminar, a very good

1    seminar on terrorism at Columbia University.  And at the same

2    time, I think, I have lectured at at least 40, 50 major

3    universities worldwide.

4    Q    And I'm going to put on the screen page 3 of your resume.

5          The seminar-long courses you have taught, is this --

6    are these the universities that you have given lectures at on

7    terrorism?

8    A    Yes.  There are a few more because, as I said, this is not

9    the most recent.

10   Q    At some point I contacted you or my office contacted you

11   about retaining you in this case; is that correct?

12   A    Yes.

13   Q    How much are you being paid an hour to testify in this

14   case?

15   A    I'm paid $300 an hour.  I'm paid for my time, not for my

16   testimony.

17   Q    Did you -- what did you look at in this case to prepare

18   for your testimony?

19   A    I -- you know, I always ask for the whole discovery

20   material and, you know, I pick and choose what's relevant from

21   the discovery material.  And I guess I have probably received

22   it, like you did, in drips and drabs, including yesterday, the

23   last, so I have looked at the discovery material mostly.

24   Q    Okay.  Were you familiar with Evan Kohlmann who's

25   testified in this case?

1    A    Oh, yes, very much so.

2    Q    When did you first become familiar with Evan Kohlmann?

3    A    When I was teaching at the University of Pennsylvania.

4    The University of Pennsylvania Press forwarded me a manuscript

5    on the War in Bosnia to review and Evan Kohlmann was the

6    author of that manuscript.

7    Q    At that particular time were you teaching at the

8    University of Pennsylvania?

9    A    Yes, I was.

10   Q    And was he a student there?

11   A    Not my student.  He was a law student.  I taught at the

12   School of Arts and Sciences and the Medical School.  I didn't

13   teach at the law school.

14   Q    Okay.  Did -- did you determine to accept that manuscript

15   from Mr. Kohlmann for publication?

16   A    No.  I didn't think it was an academic manuscript.  He

17   basically was taking mujahideen propaganda which, of course,

18   exaggerate their deeds.  He had no methodology.  I didn't

19   think it was worthy of publication, so I rejected it.

20   Q    So you actually have read his book, but you read it before

21   it was published?

22   A    Well, that was the earlier version of the book.  Then I

23   read his book afterwards, and he did modify a few things.

24   Q    No, just a second, Your Honor.  I lost her.

25        And doing the work that you do on terrorism, have you

 1    written any books?

 2    A    Yes.  I have written both unclassified stuff and

 3    classified stuff.  And so two books are unclassified and two

 4    other books are going to be published this year.

 5    Q    Let's talk about the -- what's the first book that you

 6    wrote?

 7    A    The first book on the subject was Understanding Terror

 8    Networks.  It was published by the University of Pennsylvania

 9    Press in 2004.

10    Q    And what was the thesis of that book?

11    A    Asking an author to condense, you know, a life's worth in

12    two sentences?

13           Basically, I looked at the history of the jihad.  You

14    know, I called it at that time *The Global Salafi Jihad,* its

15    origin, how it spread, its ideology, how people get recruited

16    in it, how people join the movement, how people carry out

17    operations.

18           I looked at the psychology of the terrorists and I

19    did a social network analysis of the people that -- the 117

20    individuals which were the database for my book.

21    Q    And how did you go about doing the research for that book?

22    A    At that time I did not have my clearances back, so I had

23    to use open source;  Newspaper accounts, sometimes trial

24    transcripts that I could -- that -- because the movement

25    started in the 1980s, so there was some trials in the 1990s

 1   and one in 2001, the trial about the East African Embassy.  So

 2   that was available.  Trial transcripts are chockful of

 3   information and that was the basis of my database.

 4   Q   And when did you publish that first book?

 5   A   In 2004.

 6   Q   And what is your second book?  When did you publish it?

 7   A   The second book was called *Leaderless Jihad* and that was

 8   published in 2008.

 9   Q   And what is sort of the thesis of that book in a few

10   sentences?

11   A   The thesis of that book was that in the four years

12   between 2004 and the second book 2008, the threat against the

13   West was changing.

14        You know, at first it was very much al-Qa'ida sending

15   almost teams like 9/11 threatening the West.  But I saw a

16   change, kind of homegrown terrorism.  That's why it was called

17   *Leaderless Jihad*.  And it was shifting to young people trying

18   to carry out operation on behalf of the terrorist

19   organization, foreign terrorist organization, but not being

20   directed or orchestrated by the foreign terrorist

21   organization.

22        So this was very much young people volunteering.

23   And, indeed, the case here at present of Simpson and Soofi is

24   the poster children of my thesis.  That's exactly what I was

25   talking about in 2008, predicting almost what would happen

1    now.

2    Q   You have indicated that you have a couple of other books

3    that are in the works.

4    A   Yes.

5    Q   Can you describe to the jury what those books are?

6    A   The first one, which is a shorter book, is called

7    *Misunderstanding Terrorism*.  And I'm kind of showing how the

8    sound bites about terrorism, the lack of appreciation of the

9    numbers, the real threat, that leads people to really kind of

10   misunderstand and, indeed, exaggerate the threat.

11          People think that ISIS is here.  There is no evidence

12   of any ISIS person so far being arrested into the United

13   States.

14          It is a threat to Europe because they can drive from

15   Syria through Turkey through the Balkans to France and

16   Belgium.  But they can't swim across the Atlantic, so it's not

17   very much of a threat here.  The threat here is very much as

18   you have here, people who volunteer to do things on behalf of

19   ISIS, for instance.

20          The second book is much larger.  The second book is

21   about 800 pages and it's really looking at political violence,

22   what people call "terrorism," from the French Revolution to

23   the first Wall Street bombing in September, 1920, looking at

24   four continents, basically looking at 34 campaigns of violence

25   and each campaigns are several groups really over the past 225

1    years, over four continents.

2    Q   Okay.  In looking at all the work that you do in the area

3    that you practice in, prior to this shooting incident that

4    occurred in Garland, Texas, on May 3rd, had you ever heard of

5    the Muhammad Drawing Contest that was taking place there?

6    A   No.  No.  I mean, there were some Muhammad cartoons, you

7    know, of course, in 2006, and then people repeating them in

8    Europe.  But no, I had not heard of that contest until May 3rd

9    when I heard the shooting.

10          MR. MAYNARD:  Okay.  Can the witness be shown Exhibit

11   351?  Your Honor, can I get 351 so we can put it on the

12   overhead?

13          THE COURT:  Yes.

14   BY MR. MAYNARD:

15   Q   All right.  Dr. Sageman, have you seen this list of

16   writers or scholars or individuals before?

17   A   I have seen the list, yes.

18   Q   Okay.  Are you familiar with most of the people that are

19   on this list?

20   A   Yes.

21   Q   Let me direct your attention first, let's talk about

22   Shaykh Azzam which is No. 3 on this list.

23          Mr. Kohlmann told us here that Azzam was the

24   godfather of jihad.  Do you agree with that?

25   A   That's ridiculous.

1   Q   Why is that?

2   A   Abdullah Azzam was a cleric.  He's kind of the Thomas

3   Paine of Afghanistan, let's say.  He is Jordanian but, you

4   know, I think, born in the 40s.  Was an actually Islamic

5   scholar.  He studied both in Jordan and Al-Azhar University in

6   Egypt, was close to the Muslim Brotherhood, went to Saudia

7   Arabia.

8           And when the Soviets invaded Afghanistan between

9   Christmas and New Years, 1979, he left jihadist way, was

10  teaching, and went to Islamabad and Peshawar to see what he

11  could do to help the Freedom Fighters fight against the Soviet

12  Union.

13          And he wrote, first of all, an essay in defense of

14  Muslim land where he's really arguing that it's the individual

15  duty of Muslims to come to the help of their co-religionists

16  in a country, in a Muslim country that was invaded by

17  infidels.

18          Now, this was actually a very innovative argument,

19  because when you declare war, only countries really declare

20  war raise ishada and it doesn't make sense, me as an

21  individual, to declare war on Iraq.  I mean, people we would

22  laugh at the idea.

23          But he's actually so declaring war, going to war,

24  jihad, is a collective duty in mainstream Islam, in mainstream

25  Muslim jurisprudence.  He was arguing that actually it could

1   be viewed as an individual duty because of your individual

2   responsibility to go out there and volunteer to help the

3   Afghan Freedom Fighters that were called to mujahideen by us

4   and try to throw the Soviets out of Afghanistan.

5            We were on the same side of Sheikh Abdullah Azzam

6   and, actually, I met him.

7   Q    Tell the jury, when did you meet Azzam?

8   A    I met Azzam late 1988, early 1989.  You know, I basically

9   greeted him.  It was a very short conversation.  It was at a

10  conference with the seven political leaders who were the head

11  of the Afghan Freedom Fighters fighting against the Soviets

12  were meeting to decide what would happen after the withdrawal

13  of the Soviet which happened on February 15, 1989.

14           So there was this huge conference.  A lot of

15  diplomats were there.  A lot of, you know, Pakistani

16  government official, a lot of the Freedom Fighters and their

17  representative were at that meeting.  And it was in Islam, but

18  it wasn't Peshawar.

19           I must say that, you know, Abdullah Azzam was

20  traveling all around the world trying and convince young

21  Muslim to come and help the Freedom Fighters in Afghanistan.

22  He came to the United States half a dozen time and opened up a

23  recruiting center,  Al Kifah on Fourth Street in Tucson,

24  Arizona.

25           There is a mosque over there and within that mosque

1  they had that center.  And it was -- it was, I guess,

2  functional between 1985 and at least 1993.  So this was not

3  any secret.  He was not against us.  We were on the same side.

4  As a matter of fact, I think we founded and armed the Afghan

5  Freedom Fighters.

6  Q   So did the United States embrace Azzam?

7  A   We are on the same side.  I mean, yes.  He came here.

8  There was no problem.  So Azzam was against terrorists.  Azzam

9  was for the Freedom Fighters, very much like we were

10  overthrowing the British forces that were occupying the United

11  States at the time where we declared our independence.

12      And his argument was very much Thomas Paine's

13  argument, if you think about it, during the independence war

14  in 1776.  Common sense would look at this very similar.

15      And then Azzam wrote several book, joined the

16  caravan, the caravan would be the caravan of fighters fighting

17  the lofty mountain where he described the fighting.  I mean

18  all of those were classics.

19      And as I said, he was against people fighting against

20  the wrong government such as, you know, going after the

21  government of Egypt.

22      And so as a result of his rejection of terrorism, he

23  was killed by a car bomb on November 24, 1989, in Peshawar.

24  He was going to the mosque with his two son.  There was a car

25  bomb next to his car.  It exploded and he was killed.

1   Q   Who is it that is believed to have killed Azzam?

2   A   You know, it's about 50/50.  It's either the Egyptian

3   Islamic jihad or al-Qa'ida.  It's in between those two.

4        At that time he was really very much pro Mashud.  And

5   so it could also be another political leader of the Freedom

6   Fighters who was against Amisha Mashud.

7        I'm sorry.  Do you have trouble with the names?

8   You're fine?  Okay.

9        And so it could be Gulbuddin Hekmatyar.

10       THE COURT:  You might want to spell that.

11       THE WITNESS:  Okay.  Gulbuddin Hekmatyar.

12   G-U-L-B-U-D-D-I-E-N.  Hekmatyar is H-E-K-M-A-T-Y-A-R.

13       So it was either Gulbuddin Hekmatyar, the Egyptian

14   Islamic jihad of the group around Dr. Zawahiri who is now the

15   head of al-Qa'ida which -- or al-Qa'ida itself.

16       Azzam was never al-Qa'ida.  Al-Qa'ida was formed

17   against Azzam.

18   BY MR. MAYNARD:

19   Q   So you would never refer to Azzam as the godfather of

20   jihad?

21   A   No.  I would refer him as a godfather of the foreign

22   fighters going to Afghanistan fighting the Soviet Union, but

23   not of jihad.  He was very much against what evolved after the

24   Afghan War.

25   Q   Another individual who is listed on this that the jury has

1    heard a lot about is Iman Anwar al-Awlaki.

2         Can you tell us about Anwar al-Awlaki?

3    A   Anwar al-Awlaki is a son of the former Minister of

4    Agriculture in Yemen.  And when his father was in the United

5    States for his graduate studies, Anwar was born here in the

6    United States.  So he's really technically a U.S. citizen.

7         He grew up here his early childhood.  And when his

8    father went back to Yemen to become Minister of Agriculture,

9    he went back.  So I guess his teenage years were in Yemen.

10   So, you know, he speaks both English and Arabic.

11        He came back here for his undergraduate education at

12   university here.  I think it was in engineering.  I'm not

13   really quite sure.  But he decided to become an Imam and he

14   was preaching at various -- at three different location.  I

15   think Denver, Colorado, was one, southern California was the

16   other, and then Falls Church, Northern Virginia was the third.

17        During the time that he was here and then in 2002 he

18   went on to England for a year.  He recorded a series of

19   lectures on the history of Islam, really the lives of the

20   Prophet and then the life of the four righteous khalifs as

21   they called the first four khalifs after the death of the

22   Prophet.

23        And those became extremely popular because most of

24   the literature on Islam and most of the lecture on Islam is in

25   Arabic.  And so he's one of the first and one of the few

1    preachers who actually spoke.  And he is very engaging.  You

2    know, I studied Islam in the early 80s in preparation for my

3    assignment to the Middle East, so I -- you know, studied Islam

4    from academic books.

5           But when I went back to Islam after 9/11, I saw that

6    his lectures were available.  And I cannot -- my refresher

7    course was really al-Awlaki.  Those historical lectures, as I

8    said, about the life of the Prophet and the four khalifas

9    really uncontroversial.

10          It's a conservative interpretation of Islam.  So his

11   popularity in the Muslim world is -- you know, it depends who

12   you talk to.  I talk to a lot of Muslim because that's kind of

13   my work.  And so as most -- you know, Muslims with -- or Jews

14   or Christian, you know, half of them really don't go to church

15   or half of them don't care about religion.

16          Al-Awlaki is, of course, not popular in that element,

17   those guys who don't really pray or are not religious.  And of

18   the religious Muslims, Islam is kind of divided into a

19   spiritualist wing, the Sufis, where they think that you have

20   saints between, you know, God and yourself, and so they kind

21   of very much worship saints as well as God.

22          And then you have the very conservative, you know,

23   where there's just God and yourself.  Even the Prophet is

24   not -- you know, a saint or, you know, they don't worship the

25   tomb of the Prophet.  The salafis are very, very strict.

1          He is a conservative.  And among conservative, he is

2     extremely popular, even to this day in terms of the religious

3     lectures.

4          So he goes back to Yemen around 2004, I believe.  And

5     in 2006 he's put in prison.  No real charges.  And he's in

6     prison in Yemen for about a year-and-a-half and he's released

7     in December of 2007.  After his release from prison, he

8     becomes much more political.  His lectures reflect this

9     political aspect.

10         So when you talk about al-Awlaki, you have to say

11    "al-Awlaki when"?  Because otherwise, you know, just by saying

12    the name of al-Awlaki, you can't really tell whether he's, you

13    know, a jihadist, which he became later on in life, or whether

14    it's the earlier al-Awlaki where you have, you know, a

15    conservative interpretation of the life of the Prophet and not

16    just about the Qur'an but about the hadiths which were the

17    behavior and the saying of the Prophet as people remember that

18    were written down in collected works about the Prophets.

19         And then so some of the lectures that we heard

20    throughout this trial, the historical lectures of al-Awlaki,

21    are pretty noncontroversial, you know, just as the lady civil

22    right advocate who was here was telling you.  She gives that

23    as gift and they do, they popular.

24         But as I said, after he -- around 2008, 2009 he

25    became a little bit more political.  The lectures were a

 1    little bit more political and some of the lectures were still

 2    nonviolent.

 3            And so I think the two lectures that you heard, I

 4    think at this trial, one was Brutality Against Muslims and

 5    that is about Palestinian being brutalized in Gaza.  And even

 6    there he does not advocate violence.  He advocates, and you

 7    know, not only the lecture but the transcript is available on

 8    the website that you heard of that people download the

 9    lectures.

10            And here he says you have to do jihad by word.  So

11    you have to protest what's happening.  And jihad by wealth,

12    meaning you have to give to legitimate organizations such as

13    Red Cross and then so in order to help the refugees.

14            You heard another lecture Hearts and Minds --

15    Q   Talk for a second about the different types of jihad there

16    are.  We have heard "jihad" mentioned over and over again.

17    A   Yea.  Jihad got a bad name.  Jihad just in Arabic means

18    "effort."  That's all.  An effort.

19            And people ask the Prophet:  What is the greatest

20    jihad?

21            And the Prophet said:  The greatest jihad --

22            By the way, I'm not Muslim.  I'm Jewish.  So, you

23    know, take my interpretation of Islam with a grain of salt

24    here.

25            So the Prophet said:  The greatest jihad is a

1    constant struggle within yourself to be a good man, a good

2    Muslim.  That is, you know, every day struggle.  It's never

3    ending.

4            There are other efforts, but what people are mostly

5    concerned about in violence is, of course, the violent jihad.

6    And even there there are several types of jihad.  And the one

7    that's really accepted in mainstream Islamic jurisprudence,

8    mainstream Islamic jurisprudence, is the defensive jihad.

9            When your country is invaded by foreign invaders who

10   are not Muslim, then it is the collective duty of the country

11   to defend yourself and the rest of the Muslim Community should

12   come and repel those invaders.  Exactly what happened in

13   Afghanistan in the 1980s.  And this is very much accepted.

14           And, of course, the mufti -- so a mufti is the head

15   cleric in the country or an organization.

16           So Shaykh bin Baz who was the Mufti of Saudi Arabia

17   declared Afghanistan a jihad in the early 1980s.  And so this

18   kind of allowed Muslims to kind of come to the help of the

19   Afghan Freedom Fighters to repel the Soviet forces.

20           There is an extremist interpretation of jihad which

21   is what we have here at this trial which is -- this is

22   offensive jihad.  This is terrorism.  And Muslims reject that.

23   This is very small sect almost, very extremist.  You know,

24   there's 1.5 billion Muslims, so you're talking about a few

25   thousand, tens of thousands, if you actually look at armies

1   who believe that you can carry out terrorism on behalf of

2   Islam.

3           But as I said, that's a very, very small minority and

4   this is the offensive jihad, what I call global neo-jihadi,

5   you know, terrorism now.  I used to call it global salafi

6   jihad in my previous book, but now, you know, my thinking has

7   evolved.

8   Q   You mentioned jihad of wealth.  What did you mean by that?

9   A   This is to give money, basically.  Jihad of wealth.  Jihad

10  of word is you protest.

11  Q   So when you were referring to the lecture on Brutality

12  Against Muslims, what did that deal with?

13  A   He says "jihad of wealth."  If you look at -- al-Awlaki

14  always finishes his lectures by giving five points:  Point

15  number one, we should do this.  Point number two, we should do

16  that.

17          And I think if you look at point two or three, I

18  don't think point number one in that lecture he says we have

19  to do a jihad of wealth, you know, meaning we have to support

20  the Palestinian refugees who are brutalized in Gaza.

21  Q   We have also heard some discussion here about a lecture on

22  Changing Hearts and Minds.

23          Are you familiar with that lecture by al-Awlaki?

24  A   Yes, I do.  And actually, I heard it this weekend to

25  remind me.  And here, again, this was in contrast to a study

1    by the Rand Corporation that was authored by a woman named

2    Cheryl Bernard who is Jewish, like me, who wrote about what

3    kind of propaganda we should have in the United States in

4    order to counter this, quote, extremist messaging from those

5    extremist jihadists.

6            And so she says, well, you know, you have to say that

7    Islam is moderate.  You have to --

8            And so al-Awlaki really takes exception and say who

9    are you to -- a Jew -- to tell us Muslim what to believe in?

10           And so here, again, I think that's point number three

11   of the lecture.  What should we do about?  And I think point

12   number three, he advocates jihad of word, meaning protest and

13   jihad of wealth, you know, you have to support the people who

14   are being persecuted in the world, Muslims that are being

15   persecuted in the world.

16           There is nothing about jihad of the sword, which is

17   their version of the violent jihad.  So jihad of sword.  And

18   if you look at that lecture, there's nothing there.

19           Of course, you heard about two other lectures since

20   we are all here.  One is Constants on the Path of Jihad.  And

21   that's a definitely violent jihadi, you know, advocating

22   killing Westerners.  And this is al-Awlaki commentary on the

23   book of the same title by a Saudi who is not a cleric but he

24   was kind of -- he died in 2004.  His name was Yussuf Ayiri.

25   And that's spelled A-Y-I-R-I.  Yussuf is with a "Y,"  So

 1    Y-U-S-S-U-F.  And that's definitely a violent jihad.

 2              And then you heard also another one.  The Dust Will

 3    Never Settle.  And this is probably more relevant to this

 4    trial, because here he was commenting not on this cartoon

 5    contest, because, of course, al-Awlaki was killed in the

 6    summer of 2011, so he couldn't have known about that.

 7              But he was protesting about the cartoon of the Danish

 8    newspaper that published a cartoon in 2006 and then was kind

 9    of repeated -- you know, republished in many other newspapers

10    to promote freedom of speech.  And he said that is -- you

11    know, that is an insult to Islam, so he's advocating killing

12    the people who drew the cartoons in that one.  So this is very

13    much terrorist.

14              So when you say al-Awlaki, some of it is beyond the

15    pale.  It's definitely terrorism.  Some of it is political.

16    But, you know, a little bit extreme, but still not advocating

17    violence.

18              And the historical lectures which are halala, some

19    would say, in Islam which is "legal."  "Legitimate."  And many

20    people would agree with it.  It's fairly noncontroversial.

21              So after al-Awlaki, you know, had those lectures, he

22    became involved in terrorism himself and became designated by

23    the U.S. State Department as a terrorist.  And, I believe, it

24    was in July 2010 and he was killed by a drone a year later in

25    Yemen.

1  Q   We've also heard about a writing called -- I believe it's

2  the British Government in Jihad.  Are you familiar with that?

3  A   Yes, I am.

4  Q   Is that a terrorist writing?

5  A   This book was written by Mirza Ghulam Ahmad.  And he

6  became a sect of believers called the Ahmadiyya.  This is a

7  nonviolent sect.  It was "turn the other cheek."

8       Whoever was advocating violent jihad in the

9  North-West Frontier Province at the time because he is

10  Pakistani -- well, this was India.  Pakistan was not created

11  until 1948.  So he wrote this book at the end of the 19th

12  Century and he is advocating peaceful resolution.  So you can

13  protest against --

14       Well, I can give you a little bit background.  At

15  that time it was a very contested area.  There were no

16  frontiers.  Every 20 years you had some kind of itinerant

17  mullah in urdu or pashto, which is a language of Afghanistan,

18  they call mulai.

19       So there were mulais preaching jihad on the border

20  between India and Afghanistan.  And he in that book says,

21  look, you can't do that.  You have to really discredit those

22  people who really are kind of self-promoters on the frontier

23  and preach jihad.  He said that's not the way.  We have to

24  resolve things peacefully.  This is not Islam.  Islam is a

25  peaceful religion.

1          I must say that because his followers think he's kind

2    of a Prophet.  Mainstream Muslims in Pakistan are slaughtering

3    the Ahmadiyya sect.  They being killed right now in Pakistan.

4    And, you know, in many -- many Muslims don't consider them

5    Muslim anymore because they just, you know, this peaceful sect

6    that -- who think that Ahmad was the Prophet.

7    Q   Now, we also heard from Mr. Kohlmann about terrorist

8    cells.  His opinion was that there were certain divisions of

9    labor that people would be responsible to perform.

10         Have you studied terrorist cells here in the United

11   States?

12   A   Yes.  I mean, basically that big book that's coming out

13   this year is based on a four-year study that I did for the

14   U.S. Air Force.  It's still classified, but I mean --

15         MR. KOEHLER:  Your Honor, I'm going to object to the

16   witness testifying about any form of classified information in

17   this setting.

18         THE COURT:  Well, I don't think he's going to testify

19   about classified information.  I think he's going to testify

20   about a book --

21         THE WITNESS:  That's correct.

22         THE COURT:  -- that he wrote that is going to be

23   published and is not classified; is that right?

24         THE WITNESS:  That's correct.

25         MR. KOEHLER:  It's not appropriate to sell expertise

1   in an open setting based on classified information that no one

2   else has access to and no one has the ability to ask what it

3   is or question the foundation for it.

4          THE COURT:  Your objection is overruled.  You may

5   continue.

6          THE WITNESS:  The information that I --

7          THE COURT:  Wait.  No.  I want a question to refocus

8   where we're going.

9   BY MR. MAYNARD:

10  Q   Yes.  Are you familiar with terrorist cells in the United

11  States and whether or not there is a division of labor between

12  those members of the cells?

13  A   One, definitely; the others, no.  I mean, I'm talking

14  about dozens of cells, quote/unquote.

15  Q   How many terrorist cells have you actually studied in the

16  United States?

17  A   Oh, in the United States?  Of the Islamist -- this last

18  what's called jihadi extremists?

19  Q   Yes.

20  A   About a dozen here.  But, I mean, I go back to 1886 in

21  Chicago, you know, the anarchists.  That's in my book.  So

22  terrorism has been around for a long time.  This form of

23  terrorism is actually very recent, you know, of the last 225

24  years which is the span of my study.

25          You really don't see it until really the

1    assassination of Saadat, 1981.  So this is, you know, the last

2    40 years.

3    Q   Is there a division, say, within terrorist cells of four

4    and five individuals?

5    A   I'm sorry?

6    Q   Are there divisions of labor in smaller terrorist cells?

7    A   Well, in terms of division of labor, really, this depends

8    on the size of the group.  If you have a solo, you know,

9    attack like Major Hasan, Nidal Malik Hassan, is a

10   one-guy-show.  Of course, there is no division of labor.

11        And on the other side you have very, very complicated

12   plots involving dozens of individuals like the 9/11 attack

13   against the United States where you have a very clear division

14   of labor.

15        So most of it is in between.

16        But when you have very small numbers like two or

17   three individuals, usually what you have is that you have one

18   guy who is the informal leader.  And this informal leader is

19   the guy who initiated the plot and drives it.  And that guy

20   also is very much in communication with other people like him

21   in these community of extremists.

22        You know, and, you know, looking at the evidence in

23   this case, it's -- it seems to be Simpson who is really kind

24   of texting and tweeting to other extremists.

25        So this usually is the leader and the other guys are

```
 1   very much do everything.  But they usually do everything.

 2   They don't -- you know, they buy weapons together.  They train

 3   together.

 4           As a matter of fact, coming close to the execution of

 5   the attack, they all hang out together all the time.  Why is

 6   that?  Because, you know, they feel uncomfortable with their

 7   former friends.  You know, they have a secret.  The other guys

 8   are not in on it.  So, you know, you want to relax a little

 9   bit before the day of the execution, you know, of the plot.

10           And so you feel really uncomfortable.  That's why

11   they all seem to hang out together towards the last two or

12   three weeks.  And this happens very much in Britain and to

13   United States.  And when we have surveillance on the people,

14   the surveillance shows very clearly --

15           MR. KOEHLER:  I'm going to object.  We've moved

16   beyond the question of division of labor.

17           THE COURT:  Sustained.

18   BY MR. MAYNARD:

19   Q   Is there a particular phrase that suicide bombers use to

20   refer to their executing the suicide bombing attack?

21   A   Yes.  There is.

22   Q   What is that phrase?

23   A   "Wedding."

24   Q   Why is the phrase "wedding" used?

25   A   Because you're going to die and you're going to wed the 72
```

1   virgins waiting for you in heaven.  So it's a cause for

2   celebration.  You know, people are very joyful.  They have a

3   party.  It's a wedding.

4        And that's very much how they refer to it in code

5   words.  They usually use the word "wedding" instead of an

6   "attack" or an "operation" or a "bomb."  It's "wedding."

7   Q   When there are cells of terrorists that are going to

8   commit a terrorist act, is it sad to those who stay behind

9   that some of them have died?

10   A   They celebrate.  As I say, you know, I'm a psychiatrist,

11   so I have kind of scratched under the surface and so on.  I

12   think that they have to be --

13        MR. KOEHLER:  Objection, Your Honor.  This goes

14   beyond the notice of disclosure of expert testimony.  There is

15   nothing in the notice about psychological testimony.

16        THE COURT:  The objection is overruled as to this

17   question.  It's generalities.  It's not about anyone in

18   particular.

19        Go ahead and complete your answer.

20        THE WITNESS:  So, basically, I think that, you know,

21   they probably are a little bit more realistic, but overtly

22   they celebrate.  You know, they do have a party.  You know,

23   the Palestinians, for instance, who blow themselves up in

24   Israel, you know, they have what's called a wedding ceremony

25   and so they have a celebration.  And that's why it looks to

```
 1    us -- I mean, we're horrified by it because we see that they

 2    celebrate for killing people.  I mean, how obscene can you

 3    get?

 4              MR. MAYNARD:  Just a moment, Your Honor.

 5              I have no further questions.

 6              THE COURT:  Mr. Koehler?

 7              MR. MAYNARD:  Can I approach.

 8              THE COURT:  Yes.

 9                        CROSS EXAMINATION

10    BY MR. KOEHLER:

11    Q    Good morning, Dr. Sageman.

12    A    Good morning.

13    Q    You started off fairly early on in your testimony talking

14    about Evan Kohlmann; is that right?

15    A    Yes.

16    Q    And you were critical of his work?

17    A    Yes.

18    Q    And specifically, it was about an article on the Afghan

19    Bosnia Network that you were critical of?

20    A    It was his book which is about the Afghan Bosnian Network,

21    yes.

22    Q    Okay.  I'm pointing to your book, *Leaderless Jihad*, page

23    188, correct?

24    A    Yes.  It seems so, yes.

25    Q    Right here -- I'll zoom in a little for you.
```

1    A    Yes.

2    Q    Would you read that citation for me?

3    A    Yes.  I mean you have to cite the book you're criticizing,

4    so it's Evan Kohlmann, *Al-Qa'ida's Jihad in Europe*.  That's

5    the one I rejected, yes.

6    Q    But you cited Dr. Kohlmann in your work -- or Mr.

7    Kohlmann.  I'm sorry.

8    A    You have to cite people that you criticize.  You can't say

9    I'm criticize somebody that I'm not citing.

10   Q    And where exactly was it that you were critical of him in

11   your book?

12   A    The book was just, you know, some people talked about

13   Bosnia, but I was never a fan of Evan.

14            Now, Evan knows a lot of good things, but his stuff

15   on Bosnia is terrible.

16   Q    His stuff on Bosnia is terrible?

17   A    Yes.

18   Q    But we're here talking about ISIS, not Bosnia, correct?

19   A    The book is about Bosnia, not ISIS.  You were in 2004 --

20   Q    I'm sorry.  You're not answering my question, sir.

21            In this trial we're talking about ISIS; is that

22   right?

23   A    That's right, yes.

24   Q    Okay.  And specifically, Mr. Kohlmann testified about

25   ISIS's online recruiting efforts, correct?

1           MR. MAYNARD:  Objection, Your Honor.  I'm not sure

2     that the witness has -- he hasn't seen Mr. Kohlmann's

3     testimony.

4           THE COURT:  He can answer for himself, Mr. Maynard.

5           MR. MAYNARD:  Well --

6           THE COURT:  If you know.

7           The question was:

8           Specifically, Mr. Kohlmann testified about ISIS's

9     online recruiting efforts, correct?

10          THE WITNESS:  I have no idea.  I didn't see the

11    transcript.  I'm still waiting for it.

12    BY MR. KOEHLER:

13    Q   You read his report in preparation for today though,

14    didn't you?

15    A   Yes.  I did read his report.

16    Q   And his report contained information in it about ISIS's

17    online recruiting efforts.

18    A   It has several scholars and -- but he doesn't really talk

19    about recruitment.  I don't think that Evan is an expert on

20    recruitment.

21          He is an expert on propaganda, so he can talk about

22    the propaganda that people put out, but he never interviews

23    the recipient.  So to see if people were swayed by the message

24    or not, I have no idea if he --

25    Q   Okay.  You're going well beyond the question that I asked

1   you, sir.

2   A   Well, no.  You asked me whether --

3         MR. KOEHLER:  Objection.  Move to strike.

4         THE COURT:  The motion to strike is denied.

5   BY MR. KOEHLER:

6   Q   Okay.  I asked you a simple question.  Now I will move on.

7         Have you done any research into Twitter used by ISIS

8   for propaganda and recruitment?

9   A   I have looked at some, really in connection to various

10  trials that I'm involved in where that was an issue.

11  Q   And have you published any works on that subject?

12  A   No.  I have testified to some, I think.

13  Q   Now, back in 2009 you were collaborating with Mr. Kohlmann

14  on a book; is that right?

15  A   No.  We collaborate on a lecture that we gave at the UN.

16  I was NYPD scholar in residence.  He lived three blocks away.

17  We met for drinks.

18         As I said, he knows a lot about the propaganda and so

19  we decided to give a lecture together and --

20  Q   I put on the document camera for your review a document

21  here.  Do you recognize that?

22  A   No, I don't.  Where is it from?

23  Q   Does this have your name at the top:  Marc Sageman and

24  Evan Kohlmann?

25  A   You know, a lot of people can use my name.  I have not

1   written -- I don't recall.

2   Q   Let's put this on there for you.

3   A   Yes.  As I said, we met over drinks, decided to actually,

4   you know, have a lecture together at the time.  I mean, we're

5   kind of friends.

6          And then after the lecture I realized that all the

7   arguments were mine and I didn't really want to work with him

8   anymore.

9   Q   Dr. Sageman, you testified in the *Mehanna* case in New

10  York; is that right?

11  A   No.  It's in Boston.

12  Q   It's in Boston?

13  A   That's correct.

14  Q   You testified in that case and you were asked questions

15  about this precise document, weren't you?

16          THE COURT:  You just said "this precise document" and

17  the document before him is an e-mail.

18  BY MR. KOEHLER:

19  Q   Correct.  This e-mail and the document that was attached

20  to the e-mail; is that right?

21  A   I'm not sure that I -- if -- that I read the other one, so

22  I guess Evan must have written the other stuff.  But I do

23  remember exchanging e-mails with Evan Kohlmann a number of

24  years ago.

25  Q   And you and Mr. Kohlmann discussed the notion of

 1   collaborating on a book that was going to be titled *Hacking*

 2   *Al-Qa'ida:  The Intersection of Social Network and Technology*

 3   *in Terrorism*; isn't that right?

 4   A   That's not correct.  As I said, he probably wrote that

 5   with my name on it, but we only collaborated for a lecture.

 6   And I decided, because I don't think he has much integrity,

 7   that I did not want to collaborate with him anymore.  This was

 8   the end of it.

 9   Q   You sent him an e-mail after you reviewed this first part

10   of this draft and in the e-mail you said to him:

11          I suspect that as we write, this will change.  It's a

12   good start and we should meet again for drinks and discussion.

13          Correct?

14   A   As I said, we met for drinks.  We cannot decide.  That

15   probably is a piece that he wrote.  I don't know if he

16   attached it or not, but I don't remember writing that.

17          I remember writing the e-mail.  I don't remember, you

18   know, writing the attachment.  I think you're jumping to

19   conclusions.

20   Q   All right.  I would like to place Exhibit No. 607 on the

21   document camera for the witness.

22          Do you recognize this e-mail exchange with Mr.

23   Kohlmann?

24   A   No, but let me read it.  I mean, seven years ago, I'm

25   sorry.  Yes.  Seven years ago.  Yeah.  There's nothing about

 1   collaboration in the book.  He just discovered, you know, a

 2   backdoor into a wealth of material and I said:

 3            That's great.  Congratulations.  Sounds good.  We'll

 4   discuss it tomorrow.  You know, we should meet over drinks.

 5            That's what we --

 6   Q   That's a true and accurate copy of your e-mail exchange

 7   with Mr. Kohlmann, is it not, on that date?

 8   A   I don't recall.  I mean, it looks -- it looks like my

 9   e-mail address.  It looks like his e-mail address.  It

10   probably is, but I have no recollection of it seven years ago.

11            MR. KOEHLER:  Move to admit 607.

12            MR. MAYNARD:  No objection.

13            THE COURT:  607 is admitted.

14        (Exhibit No. 607 admitted in evidence.)

15            THE COURT:  Do you have any more questions about this

16   exhibit?

17            MR. KOEHLER:  Just a couple.

18   BY MR. KOEHLER:

19   Q   So in this e-mail exchange, Mr. Kohlmann was telling you

20   about something that he discovered in that the propaganda

21   groups in their discussion forums were becoming aware of the

22   need for more English-language material, correct?

23   A   That's what it says.

24   Q   Is that a good summary of what he said to you?

25   A   Ah, yeah.

1   Q   And then you congratulated him on finding a way to get

2   into that forum and invited him to discuss the best way to

3   exploit that; is that right?

4   A   Yes, because, again, we were going to have that lecture

5   that we were going to have before the UN.  And I think the

6   lecture was two months later, so that was really material for

7   the lecture.

8         MR. KOEHLER:  All right.  And that's it for that

9   exhibit.

10         I assume you're asking me that because you want to

11   call the lunch break?

12         THE COURT:  Yes.

13         Ladies and gentlemen, we'll take our lunch break.

14   We'll reconvene at 1:15.

15         You are reminded of the admonition not to discuss the

16   case or form any conclusions about it until you have heard all

17   the evidence and begun your deliberations.

18         Court is in recess until 1:15.

19     (Recess taken at 11:54 a.m.; resumed at 1:18 p.m.)

20         THE COURT:  Thank you, ladies and gentlemen.  Please

21   sit down.  The record will show the presence of the jury,

22   counsel, and the defendant.

23         Mr. Koehler, you may continue your cross-examination.

24         MR. KOEHLER:  Thank you, Your Honor.

25   ////

```
 1              CROSS EXAMINATION (cont'd)
 2    BY MR. KOEHLER:
 3    Q   When we left off you were discussing your e-mail
 4    communications with Evan Kohlmann; is that correct?
 5    A   Probably, yes.
 6    Q   So I want to direct your attention now to Exhibit No. 608.
 7              Do you recall engaging in an e-mail conversation with
 8    Mr. Kohlmann and an individual by the name of Naureen?
 9              THE COURT:  We can't see the whole page here.
10    Perhaps the witness could be given a copy of the exhibit.  I
11    have just been handed a copy and it's three pages long.
12              THE WITNESS:  Oh.  Thank you.
13              THE COURT:  And it's also six years old or seven
14    years old, so he might need a moment to look at it.
15              MR. KOEHLER:  Yes.  If you could please read through
16    that, please.
17              THE WITNESS:  I'm sorry.  Does it go reverse order?
18              MR. KOEHLER:  Yes.  It's in reverse chronological
19    order, so you may want to start at the bottom and work your
20    way back.
21              THE WITNESS:  All right.  Sorry.
22              Yes, I have finished.
23    BY MR. KOEHLER:
24    Q   That's an e-mail conversation that you had with a woman
25    named Naureen Chowdhruy which is spelled --
```

1            I want to get this right for the record.

2    A   Yeah, I remember Naureen.

3    Q   Yes.  I'm spelling it for the court reporter.

4            N-A-U-R-E-E-N.  Chowdhury,  C-H-O-W-D-H-U-R-Y.  And

5    then Fink.  And she was a Senior Program Officer with the

6    International Peace Institute, correct?

7    A   Yes.  It's a subdivision of the UN.

8    Q   And this is the UN presentation that you were talking

9    about that you were going to do with Mr. Kohlmann, correct?

10   A   That's correct, yes.

11   Q   Is this a fair and accurate representation of that e-mail

12   conversation?

13   A   Well, I don't remember.  The e-mail conversation took

14   place seven years ago, but I mean it looks probably right,

15   yes.

16            MR. KOEHLER:  Move to admit 608.

17            MR. MAYNARD:  No objection.

18            THE COURT:  608 is admitted.

19       (Exhibit No. 608 admitted in evidence.)

20   BY MR. KOEHLER:

21   Q   And in this conversation you told Ms. Chowdhruy Fink:

22            Dear Naureen:

23            I'm not sure we can help you with a provisional title

24   and date of release.  *Internet Jihad* might be a catchy title.

25   The truth is that Evan and I outlined what we thought was a

1    great argument over a few bottles of wine.  For me to

2    remember, I would need to get back in that mood again.  Not a

3    great sacrifice, especially if Evan would accompany me in this

4    mission.  Best, Marc.

5            Is that correct?

6    A    It does sound like my sense of humor, yes.

7    Q    So in other words, you and Mr. Kohlmann got together and

8    you came up with an idea for your presentation.  And the title

9    of that presentation that you had under consideration was

10   *Internet Jihad*, correct?

11   A    Yeah.  I think that was my idea, yes.

12   Q    And this was a topic that you were starting to see emerge

13   and you identified it in your book *Leaderless Jihad* and you

14   also talked about it at least briefly in understanding

15   terrorist networks; is that correct?

16   A    Yeah.  I think I developed it much more in my second book

17   in that chapter you're referring to.

18   Q    Now, I would like to direct your examination to Exhibit

19   609, if I can have the clerk place 609, 610, and 611 before

20   the witness, please.

21           If you could take a minute to study 609 for me,

22   please.

23   A    Again, reverse order?

24   Q    Yes, please.

25           I believe the first message is at the bottom of the

```
 1   first page and then an article linked below it.
 2   A   Do you want me to read the whole article or just the
 3   exchange of conversation?
 4   Q   The exchange of conversation.
 5            I have a feeling you're familiar with the article now
 6   that you have looked at it, correct?
 7   A   No, actually.  You know, I get about 20 of those a day.  I
 8   don't really read them unless somebody says this is really
 9   good.
10   Q   Okay.  Then go ahead and read the conversation above.
11   A   No.  I read the conversation.  Do you want me to read the
12   article as well?
13   Q   My question is going to be:  Is that e-mail exchange a
14   fair and accurate depiction of an e-mail exchange that you and
15   Evan Kohlmann had about a particular article, correct?
16   A   You know, it sounds like me.  It sounds like him.
17            Do I remember what I wrote seven years ago, no.  But
18   it sounds like us.
19   Q   And this is the kind of thing you would talk to him about,
20   right?
21   A   For those three months we were in contact with each other,
22   yes.
23            MR. KOEHLER:  Move to admit 609.
24            MR. MAYNARD:  No objection.
25            THE COURT:  609 is admitted.
```

```
 1        (Exhibit No. 609 admitted in evidence.)
 2   BY MR. KOEHLER:
 3   Q   Now, in this forwarded e-mail exchange Mr. Kohlmann sends
 4   you an article in which someone asserted that the threat of
 5   jihadi terrorism over the Internet was over-blown essentially,
 6   correct?
 7   A   That's what it sounds like, yes.
 8   Q   And in it he said to you:
 9        I can't believe they are really arguing that
10   self-recruitment has never happened on Internet forums.
11   That's like arguing the Earth is flat.  We have empirical
12   evidence to the contrary.  This sounds like a very politically
13   motivated study.
14        And you wrote in response:
15        Yes.  I disagree with them as well.
16        Correct?
17   A   Yes.
18   Q   So you were agreeing with Mr. Kohlmann about this
19   particular issue?
20   A   That self-recruitment has never happened on Internet
21   forums?
22   Q   Correct.
23   A   It has happened sometimes, so that's why I disagree.  I
24   don't think that it's all Internet-related but, yes, it has
25   happened before.  I disagreed with them and I agreed with
```

1    Evan, but not to the extent that Evan is saying that it sounds

2    like it's always -- that that's basically what he's arguing in

3    court.

4    Q    But at this point you're talking about the use of jihadi

5    Internet forums to spread global terror, correct?

6    A    No.  I'm arguing about self-recruitment.

7    Q    And is self-recruitment not part of the spread of global

8    terror?  Is that what you're saying?

9    A    No.  I'm just saying that some people self-recruit.  And

10   when -- and sometimes the Internet is a factor into

11   self-recruitment.

12           I mean the big dispute about my book *Leaderless Jihad*

13   is that people say that doesn't happen and I had already

14   written my book.

15   Q    And you and Mr. Kohlmann are in agreement that that

16   happens, correct?

17   A    Oh, yes.

18   Q    And now I would like to direct your attention to Exhibit

19   610.

20   A    Yes.

21   Q    Do you recognize this as a conversation between yourself

22   and Mr. Kohlmann?

23   A    As I keep telling you, I don't remember.  It's seven years

24   ago, but it does sound like it's how we spoke to each other,

25   so it may be, yes.

1          MR. KOEHLER:  Move to admit 610.

2          MR. MAYNARD:  No objection.

3          THE COURT:  610 is admitted.

4      (Exhibit No. 610 admitted in evidence.)

5  BY MR. KOEHLER:

6  Q    In this conversation Mr. Kohlmann is talking about the

7  emergence of the Al-Fajr Media Center and pegging its

8  emergence to February 22, 2006, correct?

9  A    Yes.  That's what he says, yes.

10 Q    And he makes reference to tag lines on communications from

11 AQI.  What is AQI?

12 A    Al-Qa'ida in Iraq.

13 Q    And that is the Al-Qa'ida branch that was led by Abu Musab

14 al-Zarqawi as it evolved into that group, correct?

15 A    Yes.

16 Q    And so they changed from the Al-Hesbah Network to the

17 Al-Fajr Media Center?

18 A    Not quite.  Not quite.

19 Q    Okay.  Explain.

20 A    There were about seven -- I guess what's called "jihadi

21 forums" at the time.  Al-Hesbah was one of the major ones.

22          And when correspondence or when they cannot put

23 something on the website, they sometimes say it comes from

24 either Al-Hesbah or it comes from something else.

25          Here this was the first time he noticed that it was

1   posted with Al-Fajr Media Center, so he thought that perhaps

2   this being the first instance he's seen it, he spends all his

3   time on the Internet, Evan.  So that was the first time he saw

4   it and I assume that maybe when it was the birth of the

5   Al-Fajr.

6            So now you have an eighth forum while the government

7   was closing down three other -- three or four.  It's a much

8   more complicated situation than what you just described and

9   I'm trying to give you that.

10  Q   But he was monitoring these different things and there was

11  somebody who took note from this Al-Hesbah that Al-Fajr had

12  suddenly taken the lead in distribution of things from AQI,

13  Al-Qa'ida in Iraq, correct?

14  A   I don't know they took the lead, but it was the first time

15  he saw it.

16  Q   And you noted your agreement, correct?  You said that

17  makes sense?

18  A   Well, I trust him on that one because he spends all his

19  time on the Internet.  I interview people and try to figure

20  out what's going on.  He spends all his time on the Internet.

21  Q   This is another e-mail, Exhibit 611.

22  A   Yes.

23  Q   This is from June 17, 2009, correct?

24  A   That's what it says, yes.

25  Q   And in that e-mail you invite Evan to dinner?

1    A   Yes.

2    Q   Is that a true and accurate copy of that e-mail?

3    A   I have no idea, but I remember having dinner with him that

4    day.

5            MR. KOEHLER:  Move to admit 611.

6            MR. MAYNARD:  No objection.

7            THE COURT:  611 is admitted.

8        (Exhibit No. 611 admitted in evidence.)

9            THE WITNESS:  Actually, I had lunch with him.  I

10   didn't have dinner.

11   BY MR. KOEHLER:

12   Q   Now, I move on to Exhibit 615.  Can I ask that Exhibit 615

13   be placed before the witness?

14           Do you recognize Exhibit 615?

15   A   No.

16   Q   This is one of your own articles, isn't it?

17   A   I think that I may have written something for Senate

18   testimony or something like that.  Let me read it.

19           I usually publish, you know, in journals.  So

20   whenever is -- when I give a testimony, you know, this may be

21   my testimony.

22           No.  This actually was not testimony.  This was an

23   article that I did submit, you're right, for the Annals Of The

24   American Academy of Political and Social Sciences.

25   Q   That's an academic journal of some sort?

CR15-00707-PHX-SRB    JURY TRIAL-DAY #14   3-9-16

1   A    Yes.  I'm hesitant because it's kind of both popular and

2   academic, but, yes, it would -- it would fit, you know.  Let's

3   say it's an academic journal, yes.

4   Q    Would you agree that the name The American Academy of

5   Political and Social Science connotes academia?

6   A    Yes.  But as I say, it's -- it's not as well peer-reviewed

7   as other academic journals.  People kind of ask you to submit

8   articles by invitation often for political reason.

9        And this was for political reason because it was

10  during the presidential campaign in 2008, so it wasn't really

11  peer-reviewed.

12  Q    Okay.  But you do recognize the article as being yours,

13  correct?

14  A    I wrote an article on that subject at the time.  I don't

15  know if this is my article, but I think that probably is.

16          MR. KOEHLER:  Move to admit 615.

17          MR. MAYNARD:  No objection.

18          THE COURT:  Well, this is a rather unusual -- I

19  realize there's no objection, but articles are not usually

20  admitted.

21          And so I have a concern of having someone's article,

22  an expert's article admitted when the jury may not be in a

23  position to be able to understand it.

24          MR. KOEHLER:  I'm only offering it for one purpose,

25  Your Honor, and I will show that in a second.

UNITED STATES DISTRICT COURT

1          THE COURT:  Then should the article be admitted?

2          You're allowed to quote from articles that experts

3    have written and then ask them questions about it without

4    actually admitting into evidence the article.

5          So despite the lack of objection, I'm not admitting

6    it at this time.

7    BY MR. KOEHLER:

8    Q   Okay.  I would like to direct your attention to the last

9    page of the article where you cite your references in that

10   article?

11   A   Yes.

12   Q   And specifically, your third reference down, out of a

13   total of eight references, one of which is yourself, the third

14   one down is Evan Kohlmann's publication in 2008 *Homegrown*

15   *Terrorists:  Theory and Cases in the War on Terrorists' Newest*

16   *Front*, correct?

17   A   Yes.  I think it was in the same issue.

18          Now, I was very puzzled by this, because I usually

19   don't write with somebody else.  And it says Richard Clark.

20   And now I remember that Richard Clark was the Editor of that

21   particular issue of that journal.  Richard Clark is not an

22   academic.  He used to be at the National Security Council, so

23   he invited people to submit articles for that particular issue

24   that were not peer-reviewed.

25   Q   My question to you is very simple.

```
 1    A    Evan Kohlmann was also --
 2              I'm giving you a full answer.  If you want me to say
 3    "yes" or "no" --
 4    Q    Yes or no.  Did you cite Evan Kohlmann in an article that
 5    you co-authored?
 6    A    Sure.
 7    Q    Thank you.
 8    A    I didn't co-author.  I was the only author of that
 9    article.  That's why it's not accurate.
10              Richard Clark was the Editor of that issue but I
11    never wrote an article with Richard Clark.
12    Q    Okay.  So you are the author of the article?
13    A    Correct.
14    Q    Richard Clark is not the co-author?
15    A    That's correct.
16    Q    You are the sole author?
17    A    That's correct.
18    Q    And you cited Evan Kohlmann in your article?
19    A    Yes.
20    Q    Thank you.  Now, you have been testifying in
21    terror-related cases since the *Mehanna* trial in Boston,
22    correct?
23    A    Yes.  That was my first one.
24    Q    How many United States terrorism-related cases involving
25    Islamic terrorism have you testified in?
```

1    A    About half a dozen.

2    Q    How many of those half-dozen have involved Evan Kohlmann

3    appearing as a witness?

4    A    I think all but one or two.

5    Q    All but one or two?

6    A    Yeah.

7    Q    And is that inclusive of this one or is this number 7?

8    A    This may be number 7.

9    Q    Okay.  And in each of those cases you have come in to

10   disparage Mr. Kohlmann's work; is that correct?

11   A    No.  As I said, one or three wasn't, around.  And I'm an

12   expert witness.  I don't come here to disparage anybody.

13   Q    But each time you have come in and you have criticized Mr.

14   Kohlmann's work, correct?

15   A    Yes.  In the five cases that I remember, yes.

16   Q    And you make $300 an hour to do that?

17   A    Yes.

18   Q    How much money have you made testifying for defense in

19   these cases?

20   A    I don't get paid for my testimony.  I get paid for my

21   time.  So it really depends on my time.

22        I think for those six cases, maybe -- I don't know --

23   $150,000.  $30,000 per case.  That's about a hundred hours.

24   Q    So about $30,000 per case?

25   A    About -- it depends.  Some cases were $9,000 because they

 1   were local.  Others I had to travel and to -- I usually

 2   interview people, so it depends.  I average about 100 hours

 3   per case.

 4   Q   And in any of those cases have you been a witness for the

 5   United States Government?

 6   A   Not in these particular cases.

 7   Q   If I can switch to the computer please, I'm placing on the

 8   screen Exhibit 458 which is in evidence.

 9        Dr. Sageman, do you recognize that person.

10   A   Yes, I do.

11   Q   Who is that?

12   A   Hakimullah Mehsud.

13   Q   He was killed in November 2013, correct?

14   A   That's what the press reported or about that time.

15   Q   I'm now going to move to 459 also in evidence.

16        Now we're on 459.  Do you recognize that?

17   A   This looks like one of those -- it's probably ISIS.  I

18   mean, dressed in black, some guy in front of them, I mean, you

19   know, there's so many of those pictures.

20   Q   Are you familiar with the video *A Message in Blood to the*

21   *Kurdish Alliance*?

22   A   You know, I have came through hundreds of videos that I've

23   looked at for the past 15 years.  This look like pretty

24   typical of one of those videos, yes.

25   Q   Do you recognize the mosque in the background?

1    A    No, I don't.  I have never been there.

2    Q    So you don't recognize the Grand Mosque in Mosul?

3    A    No.  I have been to Baghdad.  I have not been to Mosul.

4    Q    So you are not aware that this particular video was

5    published in August of 2014, were you?

6    A    I'm sorry?

7    Q    You're not aware of this particular video published in

8    August 2014?

9    A    No.  I don't have a frame-by-frame memory of all the

10   hundreds of videos that I have seen.  This looks, as I said,

11   like an ISIS with, you know, a prisoner in orange suit in

12   front of it.  It's pretty typical.  And it looks like the ISIS

13   flag to the side.

14           Do I remember it?  No.  I'm just now commenting on

15   what I see.

16   Q    If I can switch to the document camera, please, I'm on

17   Exhibit 157 which is in evidence.

18           Showing you page 2 of Exhibit 157, who is the

19   individual who is both in the icon picture here and this

20   person here on the background?

21   A    Anwar al-Awlaki.

22   Q    Were you familiar with ISIS's release of its video *Flames*

23   *of War*?

24   A    Not at the time, but for this case, yes.  I have looked at

25   it.

1   Q   So at the time that it came out, you weren't monitoring

2   ISIS communications and things like that?

3   A   No.  I deal with people.  I don't really deal with

4   propaganda, only when the propaganda is relevant to the people

5   I'm investigating or looking at or in my research to try to

6   find out why they join.

7         If it's about the video account, then look at the

8   video.  But I'm not a propaganda guy.  I do not monitor the

9   propaganda from ISIS day to day.

10  Q   Do you agree that terrorist organizations like ISIS use

11  propaganda as a recruiting tool?

12  A   I think they think that those are effective as a

13  recruiting tool, but I don't know.  That's why I interview

14  people who join to say:  What are the factors that led you to

15  joining them?

16        And most of the time it wasn't a video.  It was

17  something else.  But the video sometimes was effective, yes.

18  Q   And I'm not just talking about the video.  I said

19  propaganda as a general matter.

20  A   It's not so much propaganda.  People really join those

21  organizations because they see usually on Fox News or CNN

22  Muslims being bombed by barrel bombs and they are absolutely

23  outraged.  And so they kind of want to go and defend their own

24  compatriots abroad, you know, just like we did when 9/11

25  happened.

1          You saw those two towers.  You see 3,000 people

2     dying.  Well, that energized the country to really fight

3     Al-Qa'ida and go out there and kill them.  It's kind of

4     sensitive for them.

5     Q   So just to be clear then, what you're saying is that these

6     organizations like ISIS will use videos depicting bombings in

7     the Middle East as propaganda to recruit, correct?

8     A   Usually, that's not what they show.  I mean, the videos

9     are really -- many of them about those execution, that really

10    turn people off.  If they didn't use those videos, I'm pretty

11    sure that they would have far more recruits coming in because

12    that turns people off.

13    Q   That wasn't my question.

14         My question was:  Do they use videos showing U.S.

15    bombings in the Middle East as a recruiting tool?

16    A   Most of the videos that I have seen do not have U.S.

17    bombing, so I don't really know.  No.  No.  Actually, in

18    *Flames of War* I don't think those were U.S. bombings.

19    Q   I wasn't asking you about *Flames of War*.

20    A   You are asking me in general question.  I'm answering in

21    general way.

22    Q   This is page 15 of Exhibit 157 in evidence.

23    A   Uh-huh.

24    Q   This is a tweet from Elton Simpson.  Who is he tweeting

25    about here?

1    A    This is Abdullah Azzam.

2    Q    This is page 16 of 157.   That's Anwar al-Awlaki, correct?

3    A    Yes.

4    Q    And he's talking about choosing the path of war?

5    A    To defend ourselves, just like from oppression, just like

6    I just told you.  People feel, you know, they bomb the

7    victims, and therefore, they decide to volunteer to defend

8    their community.  You know, I'm not condoning or condemning

9    them.  I'm trying to understand why they join.

10           So you only read part of it.  You have to read the

11   whole of it, yes.

12   Q    But this is the part that Elton Simpson chose to tweet,

13   correct?

14   A    You're telling me that.

15   Q    Now, in your book *Understanding Terrorist Networks*, part

16   of the time you spent was debunking the notion that people who

17   would join a terrorist network were either mentally ill or

18   financially despondent and so forth, correct?

19   A    That was Chapter 3.

20   Q    And one of the things that you found to be a common factor

21   among groups that did, in fact, join terrorist networks was a

22   person who served as a link to that network, correct?

23   A    Yeah.  I said "friendship" or "kinship," those links.

24   Q    Right.  So there was -- you've got somebody in the group

25   that has joined by friendship or kinship.  And then somebody

1    in that group had a link to the jihad, correct?

2    A    At that time, yes.

3    Q    Okay.  This is Exhibit 480, page 1, in evidence.

4         Do you recognize the individual on the left with the

5    handle Muhajir_Miski1_Miski?

6    A    Yeah.  I think he's an American who was in Somalia at the

7    time.

8    Q    And are you familiar with the concept of dream

9    interpretation?

10   A    I'm sorry?

11   Q    Are you familiar with the concept of dream interpretation?

12   A    The contact?

13   Q    The concept?

14   A    Oh, the concept.  I'm a psychiatrist.

15        THE COURT:  I think that's a yes.

16   BY MR. KOEHLER:

17   Q    Okay.  And are you familiar with it in a --

18        THE COURT:  What's happening is you're looking down

19   and you're not being picked up by the microphone, Mr. Koehler.

20   BY MR. KOEHLER:

21   Q    Are you familiar with it in the context of jihadi

22   radicalization and recruitment?

23   A    No.  That does not really kind of ring a bell.  Jihadis

24   really -- or those extreme Muslims put a lot of weight on

25   dreams and Saudi interpretation, but I'm not really sure that

1   it has anything to do with recruitment.

2   Q   So you're not familiar with that?

3   A   I'm familiar with dream interpretation in Muslim

4   extremists, yes, I am.

5   Q   Okay.

6   A   But not in recruitment.

7   Q   Okay.  Well, why don't you tell us about the part of it

8   that you are familiar with.

9   A   Well, they take -- they put a lot of weight on their

10  dreams.  They think that the dreams often have a meaning and

11  they trying to understand the meaning of those dreams.

12  Q   And do those dreams often get interpreted in terms of

13  achieving paradise?

14  A   No.  They can interpret it whichever way.

15  Q   If someone makes reference to the "maidens" or the

16  "virgins" in the dream?

17  A   Usually, they mean the hurs.

18  Q   And what are the hurs?

19  A   Those are, you know, those mythical -- 72 mythical -- well

20  they are the black-eyed beauties of paradise is how they call

21  them.

22  Q   And how does one achieve that 72 according to the way they

23  live?

24  A   Well, if you are a literalist of the Qur'an, you think

25  that if you are shaheed -- that means if you died a hero for

1   Islam -- you will be rewarded in heaven with 72 black-eyed

2   virgins.

3   Q   In other words, if you're a martyr, you get the virgins,

4   right?

5   A   If you're a hero and you die during the course of fighting

6   for Islam.  It's been translated as "martyr," but some of them

7   are not martyrs.

8   Q   Are you aware of ISIS's release of a list of 100 U.S.

9   military personnel that occurred this year -- or last year?

10  A   I have read that in the newspaper.

11  Q   So you haven't seen the list?

12  A   No.  I have not.

13  Q   Were you aware that Elton Simpson had downloaded that

14  list?

15  A   I didn't pay attention to it, no.

16  Q   Were you aware that Elton Simpson and Nadir Soofi had a

17  name of a U.S. service member from that list written down in a

18  notebook in their apartment?

19  A   I think I was aware of that.

20  Q   Did you know that that same notebook had the name and

21  address of the Curtis Culwell Center and the date of May 3rd,

22  2015?

23  A   Is that the notebook that was found there in Garland?  I

24  mean, I'm trying to refresh my memory.

25  Q   The one from the Simpson/Soofi apartment.

1    A    I thought that they had something in Garland, so I'm a

2    little bit confused perhaps.

3    Q    Are you familiar with a publication that's called *Hijra to*

4    *the Islamic State*?

5    A    No.

6    Q    Are you familiar with the magazine that ISIS produces or

7    ISIL produces called Dabiq?

8    A    Yes.

9    Q    Have you read that magazine?

10   A    A few issues, yes.

11   Q    Are you aware of Shaykh Adnani's call to Muslims to travel

12   to the Islamic State?

13   A    Yes.

14   Q    And his alternative call to conduct attacks in their

15   homelands if they are unable to make hijra?

16   A    Yes.

17   Q    I'm going to show you 495 which is in evidence.

18           So you're aware of this release but you have never

19   seen it before; is that correct?

20   A    Yeah.  I've never looked at it, that's correct.

21   Q    Let's talk for a minute about Anwar al-Awlaki.

22           You talked about his earlier recordings and being

23   less radical, correct?

24   A    The earlier historical recording were historical, yes.

25   They were not as radical as the later recording, that's

1   correct.

2   Q   Would you agree that his recordings, whether they're early

3   recordings or later recordings, are very frequently found

4   among the possessions of people who have committed attacks in

5   the West?

6   A   Yes.  And among millions of others as well.

7   Q   In fact, Farouk Abdul Mutallab -- which is F-A-R-O-U-K

8   A-B-D-U-L  M-U-T-A-L-L-A-B -- who is that individual?

9   A   He's the underwear bomber.

10  Q   And he is somebody who followed Anwar al-Awlaki closely?

11  A   He even went to visit him.

12  Q   And Nidal Hasan?

13  A   I'm familiar with Nidal Hasan.

14  Q   Who is he?

15  A   He's the nature of psychiatrist as well in the Army who

16  did the Ft. Hood shooting, killing 13 people.

17  Q   And he was in frequent contact with Anwar al-Awlaki as

18  well, wasn't he?

19  A   He only exchanged 18 e-mails; depends what you mean by

20  "frequent."

21  Q   And you know that Anwar al-Awlaki claims to have

22  instructed him and radicalized him, correct?

23  A   Yes.  And that's not correct.

24  Q   Let's go on next.  The Tsarnaev brothers?

25  A   Yes.

1   Q   They also had Anwar al-Awlaki materials?

2   A   I wasn't involved in the case but that seems to be what

3   the newspaper reported.

4   Q   A person named --

5          THE COURT:  Would you remind the jury who the

6   brothers are.

7          THE WITNESS:  Oh.  Those were the Boston bombing on

8   April 15th, the Boston Marathon bombing in 2013.

9   BY MR. KOEHLER:

10  Q   A person named Abdulazeez in Chattanooga, Tennessee?

11  A   I'm not familiar with him.

12  Q   That's somebody who -- I'll move own.

13         Carlos Bledsoe?

14  A   Yes.  Mohammad.

15  Q   I'm sorry?

16  A   Muhammad.

17  Q   Yes.  He attacked a military recruiting station, correct?

18  A   That's correct, in Little Rock, Arkansas.

19  Q   In Little Rock, right.  And he was another person who

20  followed Anwar al-Awlaki closely?

21  A   I think he also went to Yemen, yes.  I don't think he met

22  with al-Awlaki but he went to Yemen.

23  Q   Are you aware that Nadir Soofi told his son about doing

24  the same thing?

25  A   Going to Yemen?

 1           MR. MAYNARD:  Objection to the form of the question.

 2           THE COURT:  Sustained.

 3   BY MR. KOEHLER:

 4   Q   Let's go on.  The two attackers in San Bernadino; Syed

 5   Farouk and Tashfeen Malik?

 6   A   What about them?

 7           MR. MAYNARD:  Objection to the form.

 8   BY MR. KOEHLER:

 9   Q   Have you been retained by the defense in that case?

10   A   Yes.

11   Q   And those two, likewise, were found to be followers of

12   Anwar al-Awlaki, correct?

13   A   In "that case," you mean Marquez.  I was not retained in

14   the two people who died.

15   Q   Right.

16   A   But their friend did, Marquez, so the case is Marquez.

17           And I think they gathering the discovery material.  I

18   have got nothing, so I don't really know anything about the

19   case.

20   Q   Can you identify a single Islamic terror attack in the

21   West since 9/11 involving English speakers that did not

22   involve them being avid consumers of Anwar al-Awlaki's

23   lectures?

24   A   People were about to conduct attacks who were stopped

25   before or people who have conducted attacks?

1  Q   People who have either done it or been stopped immediately

2  beforehand.

3  A   Yes, I do.

4  Q   And who is that?

5  A   Well, you have Kubanov in Idaho.  You Hamidullin in

6  Richmond.  You have Najibullah in Denver.

7         You have -- I mean --

8  Q   And those people are known not to be followers of

9  al-Awlaki?

10  A   I have looked at all the discovery material, all the

11  electronic stuff since I have been -- in those cases and they

12  had no al-Awlaki.

13  Q   Were you aware in this case that the Lenovo laptop that

14  belonged to the defendant had Internet search history for

15  various lectures of Anwar al-Awlaki on it?

16  A   Yes.

17  Q   And among those practice lectures were *The Battle of*

18  *Hearts and Minds*?

19  A   Yeah.  And that's nonviolent.

20  Q   You testified about *Brutality Toward the Muslims*?

21  A   Again, that's nonviolent.  It's political but not violent.

22  Q   Were you aware it also had *And Incite The Believers* by

23  Arrashud on it?

24  A   Yes.

25  Q   Tell us about Arrashud.

1   A   He is kind of almost an unknown Imam who rants and raves

2   in Arabic very fast.  His video is in Arabic.  And they flash

3   subtitles so fast that you really have to be a very fast

4   reader to understand it.  That's why I was surprised to see it

5   on the Lenovo.  You saw the defendant.  He doesn't read that

6   fast.

7   Q   Okay.  I'm not asking how fast he reads.  Okay?

8        I'm asking you about Arrashud in terms of his

9   philosophy.

10  A   Arrashud is just one of those very extremist guy who

11  basically is trying to convince people to go out and kill

12  Westerners.

13  Q   Now, you're aware that ISIS sells itself as fulfilling the

14  Qur'anic prophesies of the Apocalypse, right?

15  A   I think that's one of the attempted selling points, yes.

16  Q   And included in that is the fact that they name their

17  magazine Dabiq?

18  A   Yes, because that's a site where that last battle is

19  supposed to take place.

20  Q   And they have headquartered themselves in Raqqa?

21  A   I'm sorry?

22  Q   They've headquartered themselves in Raqqa, Syria?

23  A   Yes.  I think their headquarter is in Raqqa.

24  Q   And that's part of the prophesy as well, right?

25  A   Well, it's kind of a Book of Revelation.

1      It's a vague prophesy.  But supposedly, there's going

2  to be some apocalyptic end to it and it's going to be over

3  there in Iraq-Syria because at that time in the Seventh

4  Century it was no Iraq or Syria.  It was just desert.

5  Q   Would you agree with me that the websites Hoor-al-ayn.com

6  and Kalamullah.com are websites that are designed for an

7  audience with an interest in violent jihad?

8  A   No.  I think that's a conservative Islam.  I mean they

9  have all kinds of videos.  Some of them are -- preach

10 violence, but the vast majority do not.

11 Q   In *Leaderless Jihad* you talk at one point about the

12 concept of violent attack, even if it fails, serving as

13 propaganda on behalf of the organization.

14 A   It sounds right to me.  I have written the book nine years

15 ago.

16 Q   Does that remain a valid point that even a failed attack

17 can serve as propaganda for an organization like ISIS?

18 A   It could.  I mean, it depends on the context.  I mean, you

19 ask the question in a vacuum.

20 Q   Well, for instance --

21 A   Meaning a failed attack is not good propaganda?

22 Q   -- when somebody praises somebody, you talked about

23 celebration after somebody dies a martyr, correct?

24 A   Some people do that, yes.

25 Q   And so if someone is praising somebody as having achieved

```
 1   shahada, does that not serve as propaganda for the

 2   organization?

 3   A    That's not really the point.  I'm not really sure what is

 4   propaganda or what's not.

 5           I mean, the families, some of them, celebrate.

 6   Others, they're deeply despondent that they've lost a close

 7   one.  So it's very hard to tell.

 8   Q    So even somebody who is like-minded might be despondent

 9   over the loss of someone important to them; is that what

10   you're saying?

11   A    I'm sorry.  Can you speak slowly?

12   Q    Even someone who is like-minded may be despondent over the

13   loss of someone close to them, correct?

14   A    I mean, you know, it's a concept that's very hard for a

15   psychiatrist to understand.

16   Q    There's no question for you.

17   A    Okay.  Fine.

18           The answer is "yes and no" then.

19           MR. KOEHLER:  If I could have a moment?

20   BY MR. KOEHLER:

21   Q    Isn't it true that someone who is a slow reader could

22   pause a video in order to read the subtitles?

23   A    Of course.

24   Q    Have you listened to the CD of *The Hereafter* that was

25   discovered in the defendant's apartment?
```

1    A    I have gone through it very fast.

2    Q    I'm sorry?

3    A    You know, I can't listen.  Sporadically, you know, when I

4    see something about an hour, you know, I listen five minutes.

5    I kind of sample, unless, you know, it's something that I'm

6    interested in personally.  Most of those -- I mean, there's so

7    many of them that I just sample.  That's how I conduct my

8    research.

9    Q    *The Hereafter* is a lecture about the Signs of the

10   Apocalypse, right?

11   A    Yes.

12   Q    Sign 44, are you familiar with that one?

13   A    No, not Sign 44.

14   Q    So you are not familiar with that being the final battle?

15   A    I'm not familiar with that video.

16   Q    Are you familiar with who al-Awlaki identified the Romans

17   as?

18   A    Well, you know, at the time it's not al-Awlaki.  At the

19   time you have to put yourself back to the Seventh Century.

20   And non-Muslims, people around the Mediterranean were called

21   Romans by people who were not -- who were from the desert

22   because they all looked like Romans to them.

23         And al-Awlaki is just using the term that was used

24   around that time.

25   Q    Right.  But he refers to the Romans and he talks about

1   that being "the West," correct?

2   A   That would be -- I think if you can move forward in

3   history, 14th Century, that would become the West later on.

4   Q   So in other words, al-Awlaki in interpreting this prophesy

5   says that the Romans are now the West, correct?

6   A   I think that's correct, yes.

7   Q   Have you done any studies of ISIS members and what they

8   view as justification for what they're doing?

9   A   I have heard a few, yes.

10   Q   Are you aware of ISIS supporters using this particular

11   sign from al-Awlaki's lectures as justification?

12          MR. MAYNARD:  Objection to the form.

13          THE COURT:  Yes.  Rephrase the question more

14   specifically, please.

15   BY MR. KOEHLER:

16   Q   Are you aware of ISIS supporters looking to al-Awlaki's

17   Sign 44 as justification for what ISIS is doing in terms of

18   pursuing this final apocalyptic battle?

19   A   I think that some probably do.  But remember, al-Awlaki

20   died two years prior to the creation of ISIS, so this is not

21   what al-Awlaki meant.

22          But some of the followers of ISIS now kind of, you

23   know, go retrospectively and kind of say, yeah, this is kind

24   of a justification.  It's a war.  It's a clash of civilization

25   between Islam and the West.

1   Q    Based on what you have seen, what I have shown you from

2   Exhibit 157 with Mr. Simpson's Twitter posts and his handles

3   and his profile pictures, would you agree that Anwar al-Awlaki

4   was someone extremely important in Simpson's eyes?

5   A    It seems that he listens to him and so on, so, yeah, I

6   would guess that he would be, yes.

7   Q    And would you agree, based on the fact that Soofi didn't

8   have a Twitter account and that Simpson did, that Simpson was

9   the person who served as the link to the jihad in this case?

10  A    The link between what and what?

11  Q    Between his group, whether it's just him and Soofi, or him

12  and Soofi and others, that Simpson served as the link to the

13  jihad?

14  A    Well, I think that he was trying to link up to dislodge a

15  community, some of whom were in Britain, others were in

16  Somalia.

17       I think one guy may have been in Iraq itself.  He was

18  tweeting.  I'm not really sure -- I didn't see anything that

19  he was presenting them as -- that he was the head of the

20  group.

21  Q    Were you aware of his communications with Junaid Hussan?

22  A    Yes.  I think that's the one that was in Iraq.

23  Q    Were you aware that they were communicating with each

24  other over Surespot?

25  A    Yes.  That's what my understanding.  I mean, they mention

1    it on their tweets.

2    Q   You recognize Junaid Hussan's name?

3    A   Yes.

4    Q   He was part of ISIS, right?

5    A   Yeah.  He went to Iraq to join ISIS, yes.

6    Q   And he was from Britain?

7    A   Yes.

8    Q   He was involved with the Islamic State Hacking Division?

9    A   What division?

10   Q   The Islamic State Hacking Division.  He was involved with

11   them?

12   A   It seems so.  I mean, their electronic brigade or whatever

13   they call it, if they call it "hacking division," that's fine.

14   I'll accept that.

15   Q   He was a computer hacker before he left England, correct?

16   A   I think he was, yes.

17   Q   And he was killed by the United States?

18   A   Yes.  He was killed after -- I think after this Garland

19   shooting.

20          MR. KOEHLER:  Nothing further.

21          THE COURT:  Thank you, Mr. Koehler.

22          Mr. Maynard?

23                    **REDIRECT EXAMINATION**

24   BY MR. MAYNARD:

25   Q   Dr. Sageman, just a few questions.

1          You did a presentation with Evan Kohlmann for either

2    the UN or an agency associated with the UN back in 2009 or

3    thereabouts?

4    A    In March 2009, yes.

5    Q    Okay.  You're aware that Evan Kohlmann does a lot of work

6    on the Internet; is that correct?

7    A    Yes.

8    Q    How would you describe what Evan Kohlmann does versus what

9    you do?

10   A    Evan just kind of looks at the Internet.  He looks at what

11   the propaganda is.  He spends all his time on the Internet.

12          I try to look at the people who carry out the attack.

13   I'm trying to understand how they became radicalized, how they

14   turned violent, what influences went into that mixture that

15   kind of led them to shoot.

16          I'm a people person.  I'm a psychiatrist.  So I go

17   around the world, interview people to really try to understand

18   how this is possible so that we can stop it.  And sometime the

19   Internet or the messages on the Internet may or may not be

20   important in that process.

21   Q    At one point you were a scholar in residence for the New

22   York Police Department?

23   A    That was the time that --

24          MR. KOEHLER:  Beyond the scope.

25          THE COURT:  Overruled.  I can't tell whether it is or

1   not.  It's just one question.

2   BY MR. MAYNARD:

3   Q    When was that?

4   A    That was when I met Evan Kohlmann because he lived two

5   blocks, three blocks away from where the Intelligence Unit of

6   the NYPD was housed.  I was a scholar in residence helping the

7   New York Police Department trying to protect the city.

8        And we found out that we were on the same

9   presidential election team.  And I'm thinking, well, you know,

10  maybe I can give Evan Kohlmann enough of a chance.  I kind of

11  reached out to him.  We met over drinks.  You saw the bottle

12  of wine mentioned.

13       And since he has a tremendous knowledge of the

14  Internet, I said, well, maybe we can merge our expertise.  And

15  then, you know, when I started looking at other stuff he was

16  doing, I did not like it at all, so my relationship with his

17  was four months.

18       MR. KOEHLER:  I object to the narrative at this

19  point.

20       THE COURT:  I'm sorry.  I think he's finished his

21  answer.  He said my relationship with him was four months.

22       Your next question then, Mr. Maynard.

23  BY RIGHT1:

24  Q    Is it fair to say that you recognized that Evan Kohlmann

25  does have expertise in certain areas involving the Internet?

1   A   Absolutely.

2   Q   And do you have an understanding that he has a fairly

3   large, significant collection of Islamic propaganda that can

4   be found on the Internet?

5   A   Yes.  That's his area of expertise.

6   Q   You two just seem to differ on certain other aspects of

7   terrorism?

8   A   That's correct.  Yes.

9   Q   You were asked a couple of questions about --

10         One question you were asked was about the

11  relationship of the individual who did the attack at Ft. Hood

12  with al-Awlaki.  And what was that relationship, if any?

13  A   Al-Awlaki sent -- I mean Major Hasan sent 16 e-mails over

14  the space of a few months to al-Awlaki, to the al-Awlaki

15  website.  Al-Awlaki was not responding about e-mail number 8

16  or 9.

17         When Major Hasan invited al-Awlaki to come to the

18  United States so he could give him a reward, a kind of medal,

19  and al-Awlaki finally responded and said, you know, it's too

20  much, you know, honor.  I don't think I deserve such honor.

21         And so Major Hasan answered back to him and said:  I

22  understand.  And by the way, I'm not married.  Could you look

23  for a sister for me.

24         You know, meaning to set him up for real marriage,

25  not one of the 72 virgins.

1           And al-Awlaki answered:  Yes.  I'll look out for a
2   sister for you.
3           And that's it.  And that's the only two e-mail that
4   al-Awlaki answered back to Nidal Hasan.
5           And then after the Ft. Hood shooting, you know,
6   again, propaganda people brag and exaggerate, so I think
7   al-Awlaki said:  Oh, yeah, I directed this attack.
8           Which, of course, was not the case.
9   Q   Are you familiar with a writing called The Origins of the
10  Islamic State?
11  A   Yes, vaguely.  Yes.
12          MR. KOEHLER:  Objection.  Beyond the scope.
13          THE COURT:  Once, again, I can't tell yet.
14          MR. KOEHLER:  We never talked about that publication
15  on cross.
16          THE COURT:  There may be, but there's not a next
17  question yet for me to be able to determine.
18  BY MR. MAYNARD:
19  Q   You were asked some questions about dream interpretation.
20  A   Yes.
21  Q   Okay.  You are familiar with dream interpretation as your
22  work as a psychiatrist, correct?
23  A   Yes.  I was very skeptical about it, but, yes, I'm very
24  familiar with it.
25  Q   Okay.  And are you aware in this case as to whether or not

 1    anybody was having dreams and asked them to be interpreted by

 2    someone?

 3    A    Yes.

 4    Q    And who was the individual that was asking that their

 5    dreams be interpreted?

 6    A    I think Simpson was the individual who said:

 7            I dream of al-Awlaki last night.

 8    Q    Is it fair to say that al-Awlaki clearly became a radical

 9    near the end of his life?

10    A    He was a terrorist at the end of his life.

11    Q    And that his writings at the end of his life promoted

12    terrorism?

13    A    Yes.

14    Q    But your belief is that the writings at the beginning of

15    his life really have nothing to do with terrorism?

16    A    That's right.

17    Q    Based on the -- you were asked some questions about why

18    people join terrorist cells or organizations.

19            What is your understanding as to why people join

20    these terrorist cells and organizations?

21            MR. KOEHLER:  Objection.  That question was not

22    asked.

23            THE COURT:  Overruled.  You may answer.

24            THE WITNESS:  Well, I'm going to give you a quick

25    overview of the argument in my two books.

1          Basically, it's an identification.  We identify with

2     the victims.  You see people persecuted, killed by barrel

3     bombs in Syria.  That's really when I talk to people who want

4     to go to Iraq or Syria, that's usually what they tell me and

5     they say, you know, I can't just stand by and let them be

6     murdered.

7          So they want to go there to protect their community.

8     So they identify.  They become -- they develop a social

9     identity of a soldier.  I am a soldier for Allah.  You know,

10    I'm mushaad.  And it's very similar, you know, volunteering

11    for the Army in the U.S.

12         And what those cultures do?  They kill.

13         And that's basically, in a nutshell, part of the

14    process.  Maybe I can give you all the conditions and so on,

15    but we'll be here for next week.  So that's in a nutshell.

16    It's an identification as a soldier to protect your community

17    which is under -- under attack.

18    Q    You were asked questions about whether or not you have

19    testified for the United States in terrorist cases?

20    A    That's correct.

21    Q    Have you ever been retained by the United States to

22    testify?

23    A    Yes, I have.

24    Q    Okay.  And why is it that you ended up not testifying in

25    those cases?

 1    A    The defendant pled guilty so my testimony was not needed.

 2            MR. MAYNARD:  I don't have any further questions,

 3    Your Honor.

 4            THE COURT:  May Dr. Sageman be excused?

 5            MR. MAYNARD:  Yes.

 6            THE COURT:  Is there any objection, Mr. Koehler?

 7            MR. KOEHLER:  No, Your Honor.

 8            THE COURT:  Thank you, Dr. Sageman.  You may step

 9    down, sir, and you are excused as a witness.

10            THE WITNESS:  Thank you very much.

11            MR. MAYNARD:  The defense rests.

12    **DEFENSE RESTS**

13            THE COURT:  And is the government ready with a

14    rebuttal case?

15            MS. BROOK:  Yes, Your Honor.

16            THE COURT:  We will take our afternoon break.  We

17    will reconvene at a quarter to 3:00.

18            Ladies and gentlemen, you are reminded of the usual

19    admonitions.

20            Court is in recess until quarter to 3:00.

21        (Recess taken at 2:26 p.m.; resumed at 2:40 p.m.)

22        (Open court, no jury present.)

23            THE COURT:  Thank you.  Please sit down.  The record

24    will show the presence of counsel and the defendant.  The jury

25    is not present.

1           Before the jury comes back, I wanted to talk to you

2    about the schedule.

3           MS. BROOK:  Yes.

4           THE COURT:  Ms. Brook, what is the rebuttal case?

5    How long?  How many people?  How long?

6           MS. BROOK:  We are hopeful we will get it done today,

7    so we have four people.

8           THE COURT:  Okay.  So that's all I need to know.

9           MS. BROOK:  Okay.

10          THE COURT:  No matter what happens, we're not going

11   to have a lot of time --

12          Well, let's put it this way.  It's not going to be

13   possible to be instructing the jury at nine o'clock tomorrow

14   morning.  And so I would like your thoughts on what we should

15   do.

16          We are going to have to -- I don't know if you are

17   going all the way up to 4:30, but in terms of preparing the

18   instructions, they are completely unprepared -- well, they're

19   not completely unprepared -- but they're certainly not

20   anywhere close to being ready to hand out to the jury.

21          MS. BROOK:  So is it possible, so let's say

22   hypothetically, we end today at 4:30, can we spend time at

23   that point agreeing upon the instructions and getting them

24   prepared at that juncture?  Or will the Court may not be

25   available?

1           THE COURT:  Well, the problem is is that there is not

2    going to be anybody available to put them together until

3    tomorrow if we don't start until late today.

4           MS. BROOK:  Right.

5           THE COURT:  And so my thoughts are that at a minimum,

6    we don't have the jury to come in until tomorrow afternoon.

7           However, you may have -- and I'm looking more at

8    Mr. Maynard -- you may have thoughts about having the

9    arguments take place over more than one day.

10          MR. MAYNARD:  Yes.  I don't want the arguments to

11   take place over more than one day.

12          My thought was if we could do the jury

13   instructions -- if we could get them done in the morning and

14   the government tells us that they are going -- they indicated

15   to me they were going to take an hour to an hour-and-a-half, I

16   thought, on their closing.  I'm thinking an hour,

17   hour-and-a-half.

18          But if it looks like we're going to go two days, I

19   would ask the Court to send the jury home until Friday.

20          THE COURT:  I'm amenable to that.  And then we

21   aren't -- we aren't rushing and making a mistake on the

22   instructions.

23          It's very clear we cannot -- I could not start

24   reading the instructions at one o'clock tomorrow and expect

25   that the closings could be complete.

1           MR. MAYNARD:  Right.  So I would prefer that we put

2     the closings off until Friday and that we spend tomorrow,

3     whatever time is necessary, to get the jury instructions done.

4           MS. BROOK:  I'm trying to think of another option for

5     that.  It's certainly --

6           MR. MAYNARD:  Monday?

7           MS. BROOK:  No, not Monday.

8           Perhaps we could also -- we need to get Dr. Vidino on

9     the stand.  He has a flight out tonight.

10          We could, in the alternative, get Dr. Vidino on the

11    stand and then turn our attention to the instructions, compile

12    those and get those finished, finish our testimony in the

13    morning, and then move on from there.

14          THE COURT:  Well, the process -- first of all, we

15    can't finally settle the instructions today --

16          Well, I could, but you probably want to actually see

17    them as a set of instructions to make sure that they are a

18    full and complete set of the instructions.  Because as we go

19    through them today, we're just going one-by-one and you're

20    never going to see the full set of instructions.

21          And at least based on what's been submitted, it's

22    going to be a fairly thick set of instructions.

23          And so if we came back tomorrow morning for, you

24    know, 30 minutes, we would still have a significant gap

25    because you would want to have time --

```
 1            First, we would have to get the instructions put
 2   together in a set.  You would have to review them.  Make any
 3   objections.  We would have to make any corrections.  And then
 4   we would have to make 15, 16, 17, 18 -- 20 sets of
 5   instructions.
 6            So the jury would be sitting in the jury room for
 7   quite a long time.  I don't anticipate if we came back in the
 8   morning for half an hour that -- I can't even be confident we
 9   would be ready to go at 11:00.
10            MS. BROOK:  Okay.
11            THE COURT:  So I think we're talking Friday morning
12   at 9:00.  And then we can make sure that we have got a good
13   set of instructions.
14            MS. BROOK:  Right.
15            THE COURT:  So that's the plan.
16            MR. MAYNARD:  That would be fine.
17            THE COURT:  Okay.  Oh, last thing, thank you,
18   Maureen.
19            Remember the juror question you wanted to think
20   about, the "perjury" question?
21            MR. MAYNARD:  Oh, yeah.  I think the government's
22   position was not to deal with it?
23            THE COURT:  Was to just -- yeah.
24            MS. BROOK:  That's correct.
25            MR. MAYNARD:  I would go along with that.
```

1           THE COURT:  Okay.  I think I want to acknowledge

2   there was a question and that -- that the information that was

3   requested was not relevant in this case.

4           How is that?

5           MS. BROOK:  Yes.

6           MR. MAYNARD:  That would be fine.

7           THE COURT:  Oh, somebody wants to know what a

8   rebuttal case is.  I will try and give a brief explanation.

9           Okay.  Let's bring the jury in.

10      (Open court, jury present at 2:47 p.m.)

11          THE COURT:  Please sit down.

12          As you come in, ladies and gentlemen, the record will

13  reflect that the jury has joined us.

14          I wanted to address two juror questions.  One was

15  submitted at the time of recess last Friday and the juror --

16  the question that was asked is an issue that is not relevant

17  in this case.

18          And if that juror, after the case is all over, still

19  wants to have an explanation about the issue or the question

20  that was raised, I will be happy to see if I can answer it

21  outside of the context of this case.

22          And the second question is:  What is a rebuttal case?

23  Good question.  You may have noticed we have this pattern that

24  when somebody calls a witness, there's direct examination,

25  then cross, then redirect.  And the purpose of redirect is to

1    be able for the person who called the witness to ask questions

2    about things that were raised on cross.

3           In the trial as a whole, we have the government's

4    case-in-chief, the defense case, and then the government's

5    rebuttal case that is analogous to what I just explained about

6    direct, cross, and redirect.

7           This is an opportunity for the defense in a

8    relatively short case -- we're hoping that it will be over in

9    an hour-and-a-half -- to call witnesses to address things that

10   may have been raised in the defense case that were not

11   addressed in the government's case-in-chief.

12          MS. BROOK:  Thank you, Your Honor.

13          The Government calls Dr. Lorenzo Vidino.

14          THE CLERK:  Please state your name for the record,

15   spelling your first and last name.

16          THE WITNESS:  Sure.  Lorenzo.  That's L-O-R-E-N-Z-O

17   V-I-D-I-N-O.

18          THE COURT:  You may proceed, Ms. Brook.

19          MS. BROOK:  Thank you, Your Honor.

20          And, Maureen, when you have a moment, can you hand

21   him Exhibit 616, please.

22               **LORENZO VIDINO, WITNESS, SWORN**

23                     **DIRECT EXAMINATION**

24   BY MS. BROOK:

25   Q    Good afternoon.

1   A    Good afternoon.

2   Q    Would you please introduce yourself to the jury.

3   A    Sure.  My name is Lorenzo Vidino.

4   Q    And, Dr. Vidino, what do you do for a living?

5   A    I work at George Washington University.  I run a research

6   center at GW.

7   Q    The research center that you run, what's the name of it?

8   A    It's called the Program On Extremism.

9   Q    So it's the Program On Extremism?

10   A    Yes, correct.

11   Q    And what is your specific field of expertise?

12   A    Basically, for the last 15 years, I have studied what's

13   called jihadist homegrown networks in the West, Europe, and

14   North America.

15   Q    Let's take a moment and talk about your educational

16   background.  Where did you go to college?

17   A    Well, I got my undergraduate degree in law in Italy.  Then

18   I moved to the states in 2002 and I went to -- I got my

19   masters and Ph.D. from Tufts University.

20   Q    And your masters and your Ph.D., one by one, what was your

21   focus in those studies?

22   A    Sure.  The masters was in international relations with a

23   focus on security; and the Ph.D. was also on international

24   relations with a focus on Middle East and security.

25   Q    And you mentioned that you also studied law.  Did you get

1    a law degree when you were in Italy?

2    A    Yes.

3    Q    The focus of your studies related to your Ph.D.,

4    specifically, what was it?

5    A    I looked at homegrown networks, jihadist networks in the

6    West, the processes of radicalization and recruitment for --

7    at the time it was al-Qa'ida -- there was no ISIS -- al

8    Qa'ida-related networks in Europe and North America.

9    Q    And when was it that you got your Ph.D.?

10   A    What year?

11   Q    Yes.

12   A    2010.

13   Q    Have you published books on the subject of terrorism?

14   A    Yes.  I published -- I authored three books and I have

15   edited three books.

16   Q    Specifically, let's go through them one by one.

17        What was the first book you published?

18   A    The first one was call *Al-Qa'ida in Europe*, but it was

19   back in 2005 and I think it was the first book on the subject,

20   on Al-Qa'ida in Europe back then.

21        Then I published a book in 2010, *The New Muslim*

22   *Brotherhood In The West*.  That was for Columbia University

23   Press.

24        And then I published another book on jihadist

25   networks in Italy back in 2013.

```
 1   Q    Do any of the books that you've published or work focus on

 2   al-Qa'ida in Iraq or the Islamic State?

 3   A    Yeah.  I have a chapter in the Al-Qa'ida in Europe book on

 4   Europeans and North Americans going to Iraq to fight.  It was

 5   obviously the very beginning.  It was 2005.

 6          So the phenomenon of foreign fighter had just

 7   started.  And then I added to the book which came out two

 8   years ago, 2014, if I'm not mistaken on -- it's called ISIS

 9   Incubators and it's about recruiting networks for ISIS, again

10   in Europe and North America.

11   Q    And the books that you've published, your educational

12   background, as well as the articles that you have written, are

13   they all contained within your CV?

14   A    Yes.

15   Q    And before you is Exhibit No. 616.  I'm going to place it

16   on the overhead so you can see it before you.

17          Is that your CV?

18   A    Yes.  Correct.

19          MS. BROOK:  So the Government would move to admit

20   616.

21          MR. MAYNARD:  No objection.

22          THE COURT:  I was hoping not, Mr. Maynard, after I

23   twisted Mr. Koehler's arm on the last one.

24          616 is admitted.

25        (Exhibit No. 616 admitted in evidence.)
```

1    BY MS. BROOK:

2    Q    You spoke a moment ago about working at George Washington

3    and being the founder and director of the program on

4    extremism.

5              In relation to your work there, have you recently

6    published a report?

7    A    Yes.  On December 1st, 2015, we published a report which

8    is called *ISIS in America:  From Retweets to Raqqa.*

9              And it's basically the first to report or published

10   on ISIS in America, on recruitment networks in America for

11   ISIS.

12   Q    And that report itself, so it talks about recruitment

13   networks.  Generally speaking, what does the report detail?

14   A    Well, basically what we did, we did two things.  We have a

15   research team at the center.  We looked at all the cases of

16   individuals who are being charged with ISIS-related activities

17   in the U.S. since the first case which was March 2014.  So we

18   looked at the 71 individuals who have been charged in the U.S.

19             We looked at all the legal documents.  We looked

20   at -- we interviewed people, supplemented with thousands and

21   thousands of pages of records, with interviews, media

22   reporting.

23             And then what we also did is we looked at the online

24   scene.  We looked at Twitter, Instagram, Facebook, a variety

25   of social media platforms where American-based ISIS

1    sympathizers interact.

2    Q   And the report itself, once it was released back in -- you

3    said December?

4    A   December 1st, yes.

5    Q   Has it been relied upon or spoken about in mainstream

6    media?

7            MR. MAYNARD:  Objection, Your Honor.  This is not

8    rebuttal at this point.

9            THE COURT:  We're still getting his qualifications, I

10   think.

11           MR. MAYNARD:  Okay.

12           THE COURT:  Overruled.  You may answer.

13           THE WITNESS:  Yeah.  I think it was well received, I

14   would say, both within government and, generally speaking,

15   policy-making circles.  It was mentioned in three

16   Congressional hearings.  I was asked to testify before the

17   Senate last January.

18           And it also received a lot of media coverage.  It

19   was, incidentally, released the day before the San Bernadino

20   attacks.  It was purely coincidence, obviously, and it

21   received a lot of media attention, so it was featured in New

22   York Times, Washington Post, Wall Street Journal, CNN.  You

23   name it, all the mainstream media outlets covered it.

24   Q   Does the report itself focus on homegrown violent

25   extremism?

1    A    Yes.  We looked at cases of Americans who join ISIS, all

2    the cases are Americans, people arrested in the U.S. and the

3    vast, vast majority of them are U.S. citizens.

4    Q    What's the main take-away point from the report?

5    A    I would say the main one is that there's no such thing as

6    a common profile of ISIS support or ISIS sympathizers in the

7    U.S.

8         It really runs the gamut.  You have teenage girls and

9    40-year-old men.  You have all kinds of socioeconomic

10   backgrounds, all kinds of educational backgrounds, different

11   patterns into radicalization, different recruiting patterns,

12   so absolute diversity in profiles.

13   Q    And just a little bit more about your background before we

14   jump into the meat of the testimony here.

15        Have you written apeds?

16   A    Yes.  I write fairly often in both American and

17   international media.

18   Q    Who for?

19   A    Recently published in the Washington Post a couple of

20   times, Boston Globe, Wall Street Journal, and also a lot of

21   media in Europe, Middle East.

22   Q    Have you appeared on television as an expert in the area

23   related to terrorism?

24   A    Yes, but fairly often also I would say in the U.S. with

25   the big networks like CNN, MSNBC, Fox, CBS, NBC, ABC.

1  Q   Are you quoted in newspapers as it relates to homegrown

2  extremism?

3  A   Yes, again, fairly often.  Particularly, of course, when

4  something related to terrorism comes up in the news, I am

5  called upon relatively often by, you know, again, sort of

6  mainstream media, the New York Times, Wall Street Journal.

7  Q   And in connection with your work in this case, have you

8  been compensated or do you expect to be compensated?

9  A   Yes.

10  Q   And roughly what do you expect to be compensated in

11  connection with your work in this particular field?

12  A   Sure.  I'm being paid $250 an hour.

13  Q   And in total, how much do you think your bill will be for

14  for the amount of work you have done for this case?

15  A   I would estimate about $10,000.

16  Q   Do you provide trainings and seminars on the Islamic

17  State?

18  A   Yes, on the Islamic State and on radicalization in

19  general. We -- the center in general and myself personally --

20  we provide a lot of training, again, both in the United States

21  and abroad to law enforcement, intelligence agencies, as well

22  as, of course, you know, think-tanks, academia or

23  policymakers.  We brief a lot.  We provide a lot of -- we do a

24  lot of public speaking and seminars.

25            MS. BROOK:  Your Honor, may I approach and turn this

```
 1    board so it's facing forward?
 2              THE COURT:  Yes.
 3              MS. BROOK:  Thank you.
 4    BY MS. BROOK:
 5    Q   And I'm turning around for the jury Exhibit No. 283 -- I'm
 6    sorry -- 383 which has already been admitted and published.
 7    It's our exhibit of photographs and names related in this
 8    case.
 9              Dr. Sageman was here today and were you in the
10    courtroom for that?
11    A   Yes, I was.
12    Q   Okay.  He testified that there is no evidence that there
13    is a threat here in the United States from ISIS homegrown
14    extremists.  Do you agree with that?
15    A   No.  I would strongly disagree with that.
16    Q   Can you explain that?
17    A   We have seen some 18 individuals arrested in the United
18    States for ISIS-related activities.
19              We have seen a few attacks that have been inspired by
20    ISIS.
21              The FBI speaks of around a thousand cases open
22    nationwide related to ISIS.  And we have seen at least a dozen
23    Americans who have died in Iraq and Syria fighting with ISIS,
24    some of them are suicide bombers.
25              So I think we have a whole spectrum, whether it's
```

 1    individuals who are just inspired by ISIS ideology or

 2    individuals who have actually, physically joined ISIS and

 3    pledge allegiance to ISIS.  I think we have them in the United

 4    States.

 5            I would agree with what Dr. Sageman said that it's

 6    less than in Europe, but I think every single official has

 7    gone on the records in the U.S. saying that we have seen

 8    ISIS-related radicalization in the U.S. and it's unprecedented

 9    compared to what we used to see related to al-Qa'ida a few

10    years back.

11    Q   And the radicalization itself, does that pertain to people

12    so "homegrown" -- how would you define that or how do you

13    classify that?

14    A   The vast majority of individuals who are attracted to ISIS

15    ideology are individuals who are homegrown, U.S. born, whether

16    they are second or third generation immigrants or converts to

17    the faith.

18            The vast majority are people who are born and raised

19    in the U.S. or at least have gone -- and have undergone the

20    radicalization process in the United States; so homegrown,

21    yes.

22    Q   I want to focus in for a moment on Shaykh Abdullah Azzam

23    who we have talked about in this case.

24            Dr. Sageman testified that categorizing him as the

25    Godfather of Jihad is ridiculous, that he is a Jordanian

 1    scholar.

 2            What is your opinion of Azzam as it relates to being

 3    somebody that has an effect on violent jihadists?

 4            MR. MAYNARD:  Objection to the form of the question.

 5            THE COURT:  Sustained.  You can rephrase your

 6    question.

 7    BY MS. BROOK:

 8    Q   Has Shaykh Azzam had a significant influence on violent

 9    homegrown extremist jihadists?

10    A   He's still referred to as one of the key idealogues of --

11    let's call it the "Jihadist Movement" even though he died a

12    long time ago.

13            His ideas are still very much referenced by a lot of

14    homegrown radicals in the U.S.

15            The idea that jihad is an Vidino obligation, that's

16    really the main contribution of Abdullah Azzam to the jihadist

17    movement is that it's mandatory upon every Muslim to go and

18    use violence to defend fellow Muslims who are under attack.

19            That's where you get the Azzam contribution and

20    that's very much used by groups like al-Qa'ida, like ISIS, and

21    by individuals who seek to join groups like ISIS or al-Qa'ida.

22            So even though he was killed a long time ago, his

23    ideas are very, very much relevant today.

24    Q   So starting in the 1980s, how did Azzam start to identify

25    himself?

1   A   Azzam basically was the first charismatic Vidino that

2   understood that Afghanistan, when Afghanistan had been invaded

3   by the Soviets, was a cause not just for the Afghans but for

4   the whole Muslim Community, that all Muslims should have gone

5   to Afghanistan and defeated the Soviets.

6        Basically, he started to make it a religious

7   obligation.  He crafted the idea.  He was somebody with a

8   religious background.  He was a cleric, indeed.  And he made

9   the religious argument that it was religiously mandatory for

10  all able-bodied Muslims to go to Afghanistan and fight.

11       His ideas have been used by people after him to make

12  every other conflict that involves Muslims is a mandatory

13  jihad.

14  Q   So in present day do ISIL members see Azzam as somebody

15  that is inspirational in terms of violent jihad?

16  A   Yes, absolutely.  And it's clear from the fact that you

17  see it online, on social media where, in conversations among

18  ISIS sympathizers, a lot of them use the icon of Abdullah

19  Azzam as their icon on Twitter or on Facebook.

20       They share books.  They share links.  They share

21  lectures.  Abdullah Azzam is one of the, I would say, top five

22  idealogues of the global movement.

23  Q   And, historically, who was Azzam a mentor for?

24  A   Osama bin Laden.

25  Q   Was he a mentor in person with him or was it just his

1  writings?

2  A   No.  No.  Absolutely, they knew each other very well.  And

3  the very beginning of the experience of Arab volunteers going

4  to Afghanistan to fight the Soviets was the office that

5  Abdullah Azzam and Osama bin Laden created in Peshawar

6  together in the mid '80s.  Abdullah Azzam and Osama bin Laden

7  started what's called a services office in Peshawar, Pakistan,

8  in the mid '80s.

9       That was the first place created to have Arab

10  volunteers go and fight in Afghanistan against the Soviets.

11       Azzam was older, more charismatic, and more

12  knowledgeable than bin Laden.  Bin Laden looked up to Azzam.

13  To simplify things a bit, bin Laden had the money, Azzam had

14  the brains.

15  Q   Let's shift gears for a moment and talk about Anwar

16  al-Awlaki.

17       So Dr. Sageman testified that Anwar al-Awlaki's

18  historical lectures are pretty uncontroversial presently.

19       Do you agree with that?

20  A   It depends what you mean by "controversial."

21       I would say they're not directly advocating violence.

22  It's clear that there is a trajectory in al-Awlaki's work

23  where he calls for direct attacks and for violence and does,

24  indeed, come to light only late by let's say 2005, 2006,

25  definitely after his incarceration in Yemen.

1          But his early works are really set -- sort of create

2     a narrative of confrontation with the West, a narrative of

3     victimization that is conducive to violence.

4          It's not purely religious work.  It's not just purely

5     explaining the life of the Prophet.

6          One of the main reasons why al-Awlaki was -- and

7     still is -- so popular is because he contextualizes arguments

8     that come from Islamic history and Islamic writings from 14

9     centuries ago within a modern setting.  So he talks about

10    Islamic civilization being under attack by the West.

11         There's parts of certain -- some of his writings

12    where he talks about McDonald's Civilization and part of that

13    imposition of the McDonald's Civilization on the Islamic word

14    is the fact that if you don't accept McDonald's, you're also

15    going to have bombs and the West is going to attack you.

16    Q   So let me just take a second and rewind for a moment.

17         So in talking about, you know, the Hereafter or Life

18    and Times Of The Prophet, those particular types of lectures,

19    are they ones that present day homegrown extremists still find

20    inspirational and important to them?

21    A   Yes, absolutely.

22    Q   And in a nutshell, can you explain why?

23    A   First of all, they are very sophisticated explanations of

24    parts of the faith which, you know, jihadists will look at the

25    violent part, but also they will look at the foundations of

1    Islam.

2          So al-Awlaki plays a role in explaining those parts

3    which are less controversial.  But it's also the beginning,

4    the foundation, of a certain narrative whose logical

5    consequence is violence.

6    Q   So I want to talk about mainstream society and the take or

7    the view of al-Awlaki over the last ten years.  So we've

8    talked about in this case that Anwar al-Awlaki was killed by a

9    drone strike in 2000 -- or I'm sorry, in 2011.

10         MR. MAYNARD:  Objection to the form of the question.

11         THE COURT:  It's not clear where you're going.  You

12   said ten years.  I was just going to ask you to clarify.

13         Are you talking about in his last ten years or in the

14   period 2006 to 2016?

15         MS. BROOK:  That's right.  I'll ask a better

16   question.

17         THE COURT:  We all know he died in 2011.

18   BY MS. BROOK:

19   Q   So before 2011, was it reported in mainstream media that

20   Anwar al-Awlaki had violent jihadi views.

21   A   I would say that by -- right after 9/11 and definitely

22   once the 9/11 Commission Report came out, you had reporting in

23   the media that he was linked -- some of the 9/11 highjackers,

24   and that he had questionable connections.

25         By 2007/2008, it was public knowledge that he had

 1    become violent and associated with al-Qa'ida.

 2              You have coverage in the Washington Post and Time

 3    Magazine, on CNN, talking about this American cleric being one

 4    of the main sources of inspiration of a lot of plots, a lot of

 5    individuals that carried out attacks in the West.  So but by

 6    2008, I would say, it was very much public knowledge.

 7    Q    Have you read and are you familiar with the 9/11

 8    Commission Report?

 9    A    Yes, I am.

10    Q    And briefly, what is it?

11    A    It's the official government analysis, basically, of what

12    happened on 9/11, what lead to the attacks, and basically,

13    then it also issued recommendations for how to prevent future

14    atrocities.

15    Q    Approximately what year was it released in?

16    A    2004, I believe.

17    Q    And does it talk about Anwar al-Awlaki?

18    A    Yes.

19    Q    Generally, what does it report?

20    A    It basically questions the fact that -- talks about the

21    fact that al-Awlaki had been a mentor to some of the -- to two

22    of the core 9/11 highjackers.

23              And in particular, the fact that he was a mentor to

24    them in San Diego when they arrived in the United States for

25    the first time in 1999 in preparation for the attacks; and

1   then the fact that one year later, he's also mentoring them

2   when they moved to Virginia.

3           So that this long, protracted interaction with two of

4   the core 9/11 highjackers and a lot of other unanswered

5   questions about it, I think, at the time -- and that's the

6   time also when al-Awlaki came under investigation from the

7   FBI.

8           There were a lot of questions that were not really

9   answered.  And it then lead to al-Awlaki himself realizing he

10  was monitored, leave the country.

11  Q   By 2007, did Anwar al-Awlaki advocate for American Muslims

12  to integrate into American society or was he encouraging

13  something else?

14  A   I think that's debatable whether he was encouraging them

15  to integrate.  He was very critical of American society, of

16  Western society in general.  He always advocated for an

17  Islamic society ruled by Sharia law.

18          He did not advocate violent confrontation with the

19  West, necessarily, but he argued that good Muslims lived only

20  under an Islamic order, so not a democratic order.

21  Q   I want to take a moment.

22          Yesterday we heard testimony from Ms. Deedra Abbud

23  who is the former Executive Director of the Arizona Board for

24  CAIR -- or CAIR.  And what does "CAIR" stand for?

25  A   It's the Council on American Islamic Relations.

1    Q    Can you give us a quick background sketch on what CAIR is?

2    A    CAIR is a -- I would say a slightly controversial

3    organization because it is an advocacy group and does some

4    good work on civil liberties.  But at the same time, it has

5    been under investigation from authorities for a long time.

6         It was in 2007/2008 an unindicted co-conspirator in

7    the largest terrorism financing case in U.S. history.

8    Q    Let's talk for a second.  Does CAIR have a Texas branch?

9    A    Yes, we do.

10   Q    And before May 3rd of 2015, did CAIR, the Texas branch,

11   speak about the Draw the Prophet Muhammad Art Exhibit that was

12   going to be held in Garland, Texas?

13   A    Yes.  They sent out a few bulletins, a few communiques

14   denouncing the event.

15   Q    And when were those?  Do you remember when they were

16   released?

17   A    In the weeks leading to the event.  I would say April --

18   in March/April.

19   Q    Dr. Sageman testified about The Battle of Hearts and

20   Minds.

21        Placing on the overhead first what's already been

22   admitted as the string site from the Lenovo computer.

23        Based upon your research, your studies, your work, do

24   violent jihadis rely upon the Battle of Hearts and Minds as an

25   important work?

1   A    It's a work that appears often in the library of

2   individuals who are engaged in violent activities.

3   Q    And can you explain how parts of its message appeal to

4   those individuals?

5   A    Well, not directly advocating violence.  It still lays out

6   that the initial narrative of confrontation between the West

7   and Islam, that sort of incompatibility between the West and

8   Islam, but he argues exists.

9        And at the same time argues that basically those --

10  that those Muslims who do not live or aspire to live under

11  Sharia law are basically not good Muslims, which is quite a

12  confrontational message but could lead to violence.  It

13  doesn't necessarily.  It's not always leading to violence, but

14  it's sort of the beginning of the trajectory that leads to

15  violence.

16  Q    I want to take a second and switch gears and speak for a

17  moment about terrorism cells.

18       So Dr. Sageman testified that terrorism cells, as it

19  relates to division of labor, that he has only seen one case

20  where there was a terrorism cell that had a division of labor

21  of the people within the cell.

22       Is that consistent with what you have seen?

23  A    I would say no.  There's obviously enormous diversity in

24  how terrorist cells work and networks work.  I mean, you can

25  have a generalized answer.

1          I would say that in particular in structured groups,

2     it's normal to have a division of labor.  But even in more

3     improvised, certainly the homegrown clusters, homegrown

4     networks, you do see that people that have certain skills will

5     do certain things.

6          So if one -- somebody is better with computers, that

7     person will be more in charge of all the IT aspects of the

8     cells or the network's activities.

9          Somebody will be more prone to finding weapons or

10    finding explosives.  Somebody else will be more the money

11    person.

12         So generally, there is that normal division.  I think

13    it's almost normal.  You have it in any kind of aggregation of

14    individuals.  You can have five friends, so somebody is better

15    at organizing things, somebody is better at getting money.

16         It's a normal division of labor.  I think that it

17    happens fairly normally.

18    Q   Dr. Sageman also testified that members of terrorism

19    cells, homegrown extremist terrorism cells, will feel

20    uncomfortable with their former friends, especially in the

21    weeks prior to an attack and they self-isolate.

22         Is that something that you have seen?

23    A   I would say that it does happen in some cases, but in the

24    majority of cases that I can think of, it's actually the

25    opposite.  But you would have people who don't really have a

1    major change or behavior in the weeks or days leading up to an

2    attack.

3           I think it's normal, actually, to see whenever we see

4    interviews with people who live around people who carry out

5    attacks to see how shocked and surprised they were because

6    that person didn't really have a change in behavior and they

7    looked like a very normal person.

8           First example that comes to mind is the Boston

9    Marathon bombers.  You know, the younger brother, in

10   particular, the younger of the two Tsarnaev brothers who did

11   his homework, went to a party a couple days before the attack,

12   lived with his roommate, a normal life.

13          So, again, some cases you might have that change in

14   behavior, but in most cases I would say no.

15   Q    So is that Johar Tsarnaev?

16   A    Johar Tsarnaev, yes.

17   Q    And you said he lived with his roommate.  Was his roommate

18   Muslim?

19   A    No.

20   Q    And in the days before he was going to movies and doing

21   normal things?

22   A    Yeah.  He was going to class, going out with friends,

23   having dinner, you know.

24   Q    Based upon your experience, are violent jihadis always

25   devout in there practice?

1    A    They would like to be, but I think that in many cases we

2    see that a lot of them are not.  Again, there's always

3    exceptions.  You can't generalize, but it's fairly normal to

4    have individuals involved in jihadist activities who engage in

5    behaviors that are very un-Islamic.  Let's put it like that.

6    Q    Can you give us an example?

7    A    Well, since --

8              MR. MAYNARD:  Objection, Your Honor.  It's beyond the

9    scope.

10             THE COURT:  Overruled.  You may answer.

11             THE WITNESS:  First example that comes to mind

12   because we talked about the Tsarnaev brothers, they both --

13   both the younger, but particularly the younger, but also the

14   older, the elder used drugs.  They dated.

15             So all behaviors, but not behaviors that somebody

16   that claims to be strictly Muslim should engage in.  But I

17   think it's fairly normal.  I can think of -- well, the 9/11

18   highjackers that used to go to strip clubs in Vegas.  It's

19   fairly normal.

20   Q    Would going to a strip club be consistent with a devout

21   Muslim practice?

22   A    No.  Absolutely not.

23   Q    And why so?

24   A    Because, obviously, the engagement with the other sexes

25   under very strict rules.  So probably it's a little of the

1    opposite of what the kind of behavior that a devout Muslim

2    should engage in.

3    Q   Dr. Sageman testified that perpetrators of an attack would

4    be happy and celebrate upon hearing that the other

5    perpetrators had achieved martyrdom.

6    A   True.

7    Q   Based upon your experience and everything that you have

8    seen and researched, are perpetrators of an attack only happy

9    and celebrate that those have died in an attack have died?

10   A   Well, they obviously are happy among themselves.  They

11   celebrate the fact that somebody has achieved martyrdom, as

12   you know, achieved jihada, achieved martyrdom, and achieved

13   Paradise.

14        Obviously extraordinary, that behavior might be

15   different.  Those that do not die and participate in the

16   attack in one way or the other, obviously are not going to

17   make that joy and participation for the event known to the

18   outside world, obviously, because they might be afraid that

19   there will be consequences for bad behavior.

20   Q   Dr. Sageman testified about his opinions on Evan Kohlmann.

21   And as it relates to ISIS, do you have an opinion about Evan

22   Kohlmann's knowledge base as it relates to the Islamic State?

23   A   He has been studying the subject for a long time.  I think

24   Kohlmann was working on al-Qa'ida in Iraq already, which is

25   the group that preceded ISIS, Arabian 2006/2007 when really

 1    the group started.

 2            Plus, he -- as I think Dr. Sageman admitted, he's

 3    very knowledgeable on everything that goes on online.  And

 4    it's well known that ISIS is very good at using the Internet

 5    and social media so that that allows Kohlmann to be quite

 6    knowledgeable on ISIS propaganda and ISIS activities.

 7    Q   Let's talk about that for a second.

 8            Based upon your research, your studies, your

 9    experience, is media propaganda for the Islamic State an

10    effective recruitment tool?

11    A   Absolutely.

12    Q   And Dr. Sageman talked about how people would see the

13    brutal murders and the videos that they put out of slaying

14    people.

15            Based upon your experience, those particular videos

16    that the Islamic State propaganda machine releases, do they

17    have an effect in the recruitment of violent homegrown

18    extremists?

19    A   Yeah.  Generally speaking, yes.

20            Obviously, as I said, we have very different profiles

21    of individuals who are attracted to ISIS.  Some of them would

22    be attracted to certain aspects of the propaganda; some others

23    to others.

24            But it's very clear that some individuals are

25    attracted specifically to the violent videos.  They tend to be

1    very widely shared on social media.

2           You do see -- well, when we are at the Center at

3    George Washington University that I run is that we monitor

4    that scene online on social media.  So we do see what they

5    talk about, what ISIS sympathizers talk about on social media.

6           And we see the enthusiasm that exists when some of

7    the most gruesome of videos come out.  Those are the ones that

8    get a lot of people going; not everybody, but quite a few

9    people.

10   Q   Are you familiar with the websites Hoor-al-ayn and

11   Kalamullah?

12   A   Yes.

13   Q   And those two websites, are those just for followers of

14   conservative Islam?

15   A   I think that's an understatement.  I think it's extremely

16   conservative Islam, to say the least, but I would say quite on

17   the militant side.

18          Not everybody that is on it is jihadists, but I think

19   it's sometimes a fine line.  Of course, it's difficult to

20   really -- you know, it's not black and white, but I would say

21   it's more than just conservative.

22   Q   Do violent homegrown extremists watch and look at material

23   on those websites?

24   A   Yes.  It's a link.  The tradition is being shared quite

25   often.

1          MS. BROOK:  May I have a moment?

2          THE COURT:  Yes.

3          MS. BROOK:  I don't have any other questions.

4          THE COURT:  Thank you.

5          Mr. Maynard?

6                    **CROSS EXAMINATION**

7    BY MR. MAYNARD:

8    Q   Dr. Vidino, did Dr. Sageman get anything right?

9    A   Yeah.  Quite a few things.

10   Q   Is Dr. Sageman a well-known scholar in the area?

11   A   Sure.  Absolutely.

12   Q   Is he well respected?

13   A   By some.

14   Q   Are his works considered to be groundbreaking?

15   A   Oh, absolutely.  I would say particularly the 2003/2004,

16   the first book, Understanding Terrorist Network.

17          Absolutely, the whole idea of the bunch of guys was

18   absolutely groundbreaking at the time.  I relied upon it

19   myself a lot.

20   Q   I'm sorry?

21   A   I use it myself quite a bit.

22   Q   Okay.  Are there times when Dr. Sageman is controversial

23   with other people?

24   A   Absolutely.

25   Q   Okay.  You told us that you're the -- you're teaching at

1    George Washington University?

2    A    No.  I'm direct -- I'm teaching as an adjunct, but my main

3    job there is I run a center, a research center.

4    Q    Okay.  This research center that you run, this is an

5    administrative position that you have?

6    A    I'm the Director.  I'm the Head of Research.  It's not an

7    administrative.  I mean, I run the research.  I direct it.

8    Q    And how many employees are there that are working there?

9    A    Paid employees, we have six people; and then we have

10   some -- basically a dozen research assistants, graduate and

11   undergraduate students.

12   Q    Students?

13   A    Yeah.

14   Q    But they're not paid?

15   A    No.

16   Q    And you just got your Ph.D. in March of 2010?

17   A    Uh-huh.

18   Q    Is that correct?

19   A    That's correct.

20   Q    From Tufts?

21   A    From Tufts.

22   Q    Okay.  And this research center that you're the Director

23   of, you're the one who proposed this?  You're the founder?

24   A    Well, I'm not the one who proposed it, but I was called to

25   do it, but it was offered it to me, so.

```
1    Q    That only started in April of 2015?

2    A    Correct.

3    Q    It's a brand new center?

4    A    Correct.

5    Q    Okay.  And prior to that, you spent approximately a year

6    in Milan as a visiting fellow?

7    A    Correct.

8    Q    And just so that we're clear, when you said you have a law

9    degree from the University of Milano or University of Milan, a

10   law degree in Italy, that's an undergraduate degree?  One goes

11   and they get that.

12   A    Yeah.  Straight from high school and they get that.

13   Q    Straight from high school and then you can get a law

14   degree?

15   A    It's a five-year degree, but it's undergrad.

16   Q    But you do have a master's degree and you do have a Ph.D.

17   from Tufts?

18   A    Correct.

19   Q    Is the area that you are -- would you agree that your area

20   of expertise is primarily in the area of the New Muslim

21   Brotherhood?

22   A    No.  I would say it's 67 percent on the jihadi network

23   and -- I mean it's difficult to really put a number, but 30,

24   40 percent on the Brotherhood; and the two things are not

25   completely -- I mean, there's a lot of overlap between the
```

1    two.

2    Q    Sure.  When it comes to al-Awlaki, now, there's no

3    question he was an Imam in San Diego for a while, correct?

4    A    Correct.

5    Q    He was an Imam in Falls Church, Virginia, at the time of

6    9/11?

7    A    Yep.

8    Q    And after 9/11 happened, like you, he was somebody that

9    people would contact to ask questions in the media?

10   A    Absolutely.

11   Q    He was in the New York Times?

12   A    Absolutely.

13   Q    He was in the -- all the national media that pretty much

14   you have mentioned you --

15   A    Yeah.

16   Q    Okay.  Actually, PBS did a documentary called Legacy Of

17   The Prophet where al-Awlaki made an appearance in that in

18   2002?

19   A    Uh-huh.

20   Q    Is that correct?

21   A    I believe so.

22   Q    Okay.  And then al-Awlaki ends up leaving the United

23   States around 2004 and goes --

24   A    And he goes back and forth for a bit but, yeah, he spends

25   some time in the UK.  Then comes back and realizes things are

```
 1    --
 2    Q    Things are sort of strange --
 3    A    -- things are difficult for him, right, and he leaves the
 4    country for good.
 5    Q    All right.  So he spends a couple of years in the UK or
 6    coming back and forth?
 7    A    Yeah, more or less.
 8    Q    And eventually goes to Yemen in 2007?
 9    A    I think 2006.
10    Q    Okay.  And then he is --
11    A    He gets arrested.
12    Q    I don't even need to ask questions.
13    A    I'm sorry.  Sorry.  I didn't mean to interrupt you.
14    Q    That's okay.  He's arrested and he's jailed for a couple
15    of years, a year-and-a-half?
16    A    Yeah.  Yeah.
17    Q    And clearly when he gets out, he is at least more publicly
18    radical --
19    A    Correct.
20    Q    -- than he was before?
21    A    Absolutely.
22    Q    And he certainly becomes a terrorist near the end of his
23    lifetime?
24    A    Correct, yes.
25    Q    But he is killed prior to ISIS even forming?
```

1   A    Yeah.  He had nothing to do -- it's al-Qa'ida.  Nothing to

2   do with ISIS.

3   Q    Okay.  You were telling us a little bit about the

4   individuals who commit acts of terror and they achieve a

5   martyrdom.

6        One of the reasons, in part, is because they'll get

7   those 72 black-eyed virgins; is that correct?

8   A    Obviously, everybody has got different motivations, but if

9   you look at what individuals who would carry out attacks and

10  die talk about, yes, they often mention the 72 virgins and the

11  green birds of Paradise, all the gifts and blessings that will

12  come once you achieve martyrdom, yes.

13  Q    And so these individuals that have committed sins under

14  the Islamic faith, if they commit a martyrdom, they then --

15  those sins are forgiven because they go to heaven and they get

16  the green birds, they got the black-eyed virgins, correct?

17  A    Correct.  Correct.

18  Q    So if you are a sinner, this is a good thing for you,

19  right?

20  A    That's how some of them believe it to be, yes.

21  Q    Just briefly on the issue of Azzam, wasn't the United

22  States on the side of Azzam when he was alive?  Azzam.

23  A    I think that's a slight simplification.  I would say that

24  the United States was supporting the Afghans against the

25  Soviets, that's for sure, so they were on the same side.

1                I think there was -- you know, I've never seen any

2      evidence.  I don't think anybody has ever really shown

3      evidence of direct support of Azzam, bin Laden, and the Arab

4      Mujahideen by the United States.

5                The United States used proxies to support everybody

6      that fought the Soviets.  In most cases that proxy was the

7      Pakistani government and Pakistani intelligence agencies.  So

8      they are on the same side, but I don't -- I'm not aware of any

9      evidence of direct support.

10     Q    There was a book of several years ago written on The

11     Falling Towers?

12     A    The Looming Tower.

13     Q    The Looming Towers?

14     A    Yeah.  Lawrence White.

15     Q    Won a Pulitzer Prize?

16     A    Right.

17     Q    History of al-Qa'ida and Osama bin Laden?

18     A    Best book on the subject.

19     Q    Best book.

20                And it does indicate that the United States actually

21     supported the side that Osama bin Laden was on at that time?

22     A    It supported the side.  I'm not sure it was direct

23     support, as I said.  I mean, to some degree you can argue --

24     Q    Well, The Looming Tower seemed to --  whoever the author

25     was of the Looming Tower --

1    A    Lawrence White.

2    Q    Right.  Seemed to imply that in a --

3    A    No.  I don't think it was -- I'm quoted in the book.  I

4    know the book very well.  I helped in the research.

5           No, I don't think that's what he said.  He said, of

6    course, we're on the same side.  There was some indirect

7    flirtation, you can argue.  I think that's the extent that he

8    would argue there was -- to some degree you can argue like the

9    U.S. has some groups in Syria now that are fighting Assad and

10   are Islamists, like Sabbatai Muslims, so -- and it doesn't

11   mean that just because they're both against Assad that they

12   are fighting together.

13   Q    The United States was going to at that particular time

14   would support pretty much anybody --

15   A    Yeah.

16   Q    -- who was going against the Soviet Union.

17   A    Absolutely.

18   Q    Okay.  You didn't mean to imply that CAIR, the Counsel on

19   American Islamic Relations, is a terrorist organization, did

20   you?

21   A    No.  No.  No.  I stated a fact that in 2007 it was

22   mentioned as an unindicted co-conspirator in the largest

23   terrorism financing case in U.S. history which is the Holy

24   Land Foundation case in Dallas, Texas.  That's all.

25   Q    But there's no findings against CAIR?

1    A    Because it was unindicted.

2    Q    Right.

3    A    Everything else in the --

4    Q    Yeah.

5    A    Absolutely.

6    Q    I mean you're a lawyer.  You know that if there had been

7    strong evidence, they would have been indicted.

8    A    Absolutely.

9    Q    Okay.  So you didn't mean to imply that there was

10   something wrong?

11   A    No.  But at the same time, I think it says something about

12   the organization.

13   Q    Okay.  In fact, CAIR is sometimes analogized to the ACLU?

14   A    By some, I guess.

15   Q    By some?

16   A    Depends by who.

17   Q    Did you read Peter Bergen's book on the United States of

18   Jihad?

19   A    It just came out.  I started reading it.  It literally

20   came out a few weeks ago.

21   Q    Did you notice that Dr. Sageman was mentioned numerous

22   times in there?

23   A    Yeah.  I did notice that.

24   Q    Actually, it even had his picture in there.

25   A    Yeah.

```
 1    Q    I didn't see you mentioned in there.

 2    A    No.  I don't think I am, yeah.

 3    Q    Evan Kohlmann is not mentioned in there either, is he?

 4         You don't know?

 5    A    I didn't look for his name to be honest.

 6    Q    Are you and Evan Kohlmann very close?

 7    A    We're friends, yeah, absolutely.

 8    Q    Been friends a long time?

 9    A    Yes.

10    Q    And, in fact, you're familiar with the book that he wrote?

11    A    Oh, yeah.

12    Q    Okay.  Is it -- did you assist him in any of the research

13    he did in that book?

14    A    Yes.  I provided him some documents.

15    Q    Is that why he put you in the Acknowledgments of his book

16    back in 2004?

17    A    Exactly.  Exactly.

18         MR. MAYNARD:  I don't have any further questions.

19         THE COURT:  Any questions on redirect, Ms. Brook?

20         MS. BROOK:  Just very briefly.

21                    REDIRECT EXAMINATION

22    Q    Defense counsel asked you if you're friends with Evan

23    Kohlmann.  Are you also friends with Dr. Sageman?

24    A    Yes.  I would say so.

25         MS. BROOK:  I don't have any other questions.
```

1          THE COURT:  May Dr. Vidino be excused as a witness?

2          MS. BROOK:  Yes.

3          THE COURT:  Any objection?

4          MR. MAYNARD:  Yes -- no.

5          THE COURT:  Thank you very much, Dr. Vidino.

6          You may step down and you are excused as a witness.

7          The government may call its next witness.

8          MS. BROOK:  Thank you, Your Honor.  The government

9    calls Detective Jeff Nash.

10         THE COURT:  Remember a couple weeks ago when we

11   administered the oath, Detective Nash?

12         THE WITNESS:  Yes.

13         THE COURT:  You are still under oath.  Come and have

14   a seat on the witness stand.

15     (Witness duly sworn)

16         THE COURT:  You may proceed.

17         **DETECTIVE JEFFREY DAVIS NASH, WITNESS, SWORN**

18                    **DIRECT EXAMINATION**

19   BY MS. BROOK:

20   Q   Would you introduce yourself one more time to the ladies

21   and gentlemen of the jury.

22   A   I'm Detective Jeff Nash with the Arizona Department of

23   Public Safety and I'm assigned to the Joint Terrorism Task

24   Force.

25   Q   I want to start off and talk about two interviews that you

1    conducted back in June of 2015.  And on June 11th of 2015, did

2    you have occasion to interview James Sampson?

3    A    I did.

4    Q    Was it in connection with this case?

5    A    It was.

6    Q    Where did you interview him?

7    A    At his home.

8    Q    And were you alone or with another agent?

9    A    I was with another agent.  Nathan Gina.

10   Q    When you interviewed Mr. Sampson that day, was the

11   interview recorded?

12   A    It was.

13   Q    And during that interview, did you ask Mr. Sampson about

14   Stefan Verdugo?

15   A    I did.

16   Q    Did you ask him what his impression of Stefan Verdugo was?

17   A    I did.

18   Q    Have you had the opportunity to listen to Government's

19   Exhibit 604?

20   A    Yes.

21   Q    And does it fairly and accurately reflect Mr. Sampson's

22   response to your question?

23   A    Yes, it does.

24            MS. BROOK:  Government moves to admit and play.

25            THE COURT:  Is there any objection?

1           MR. MAYNARD:  No.

2           THE COURT:  Whatever number it is is admitted.  604.

3           (Exhibit No. 604 admitted in evidence.)

4           MS. BROOK:  The audio is not working.  One minute.

5           MR. MAYNARD:  Your Honor, I don't have an objection

6    to the tape being played but I haven't seen a transcript of it

7    before, so I'm not sure --

8           THE COURT:  Well, this is a listening aid.

9           MR. MAYNARD:  Okay.

10          THE COURT:  And if anyone has any quarrel about

11   whether or not it's an accurate representation, I will tell

12   the jury that this transcript is only to aid you in listening.

13          As you may have noticed sometimes, when you hear a

14   tape you can't always understand the words.  But for purposes

15   of any further review by you of the evidence, it's what you

16   hear that is the evidence and not necessarily what is typed on

17   the screen.

18          MS. BROOK:  Thank you, Your Honor.

19          (Exhibit No. 604 being played for the jury.)

20   BY MS. BROOK:

21   Q   On June 25th did you have occasion -- so June 25th of

22   2015, did you have occasion to interview Mr. Sampson again?

23   A   I did.

24   Q   And on that day where did you interview him?

25   A   It was at the FBI Headquarters building.

1    Q    And did he come down voluntarily for an interview?

2    A    Yes, he did.

3    Q    Did you interview him by yourself or with somebody else?

4    A    No.  I was with Detective Dan Harmon.

5    Q    And that particular interview, was it recorded?

6    A    It was.

7    Q    In that interview did Mr. Sampson discuss whether he knew

8    Malik was a felon?

9    A    Yes, he did.

10   Q    Have you had an opportunity to listen to Exhibit No. 606?

11   A    Yes.

12   Q    And does it fairly and accurately represent his response

13   in talking about that?

14   A    Yes, it does.

15            MS. BROOK:  Government moves to admit and play 606.

16            MR. MAYNARD:  No objection.

17            THE COURT:  606 is admitted.

18            (Exhibit No. 606 admitted in evidence.)

19            (Exhibit No. 606 being played for the jury.)

20   BY MS. BROOK:

21   Q    I want to move on and I want to talk briefly about your

22   interview with the defendant on May 5th of 2015.

23            During that interview -- and we've talked about it a

24   little bit before when you were here in the case-in-chief

25   about three weeks ago.  We talked about that interview as it

1   relates to the room, correct?

2          So just to ground us a little bit, who were the

3   agents that were in the room that day for that interview?

4   A   It was myself and Agent Whitson.

5   Q   And during that interview, was the defendant -- during

6   that interview what did he say about whether he had gone

7   shooting in the desert with Simpson and Soofi?

8   A   He said, no, he hadn't -- he did say that Simpson asked

9   him to go shooting but he refused.

10   Q   And during that interview, what did the defendant say

11   about Simpson having an AK?

12   A   At first he denied Simpson having an AK or any knowledge

13   of it and then he changed his answer and said that he did know

14   he had an AK and that Simpson had showed it to him.

15   Q   And did he say when he had shown it to him?

16   A   It was about six months prior from the date of the

17   interview.

18   Q   And during that interview, what did the defendant say

19   about Soofi having an AK?

20   A   Mr. Kareem said that he knew that Nadir Soofi had a gun,

21   had an AK and a couple of other weapons.

22   Q   At any point during that interview did the defendant

23   mention that the reason why he knew that Simpson and Soofi had

24   an AK was because he had received a call from somebody who

25   told him that?

1    A    No.

2    Q    At any point during that interview did he say that the

3    reason why he knew that Simpson and Soofi had an AK was

4    because he had received two calls from people who told him

5    that?

6    A    No.

7    Q    The questions that were asked to the defendant during this

8    interview and the questions we've just talked about, were they

9    important in this investigation?

10   A    Yes, they were.  It was very early on in the

11   investigation.  At that point we were interviewing everybody

12   that was either associated or related to the Elton Simpson and

13   Nadir Soofi.  That was to help further along the investigation

14   and make sure we didn't have other people involved.

15   Q    And, again, during this particular interview you took

16   notes?

17   A    I did.

18   Q    And those notes were all preserved?

19   A    Yes.

20   Q    And afterwards there was a four-page report that was

21   drafted?

22   A    Yes.

23   Q    And did you sign that report?

24   A    I did.

25   Q    During that interview with the defendant on May 5th at any

1   point did he say that he wasn't feeling good?

2   A   No.

3   Q   Did he say a couple of times that he wasn't feeling good?

4   A   No, he didn't.

5   Q   Did he look sick?

6   A   No, he didn't.

7   Q   Did he seem to be loopy or confused?

8   A   No, he was not.

9   Q   Did he seem to be lethargic?

10  A   No.

11  Q   Did he tell you he had a headache?

12  A   No.

13  Q   Did he say he was hungry?

14  A   No.

15  Q   On January 23rd of 2014 did you speak to the defendant in

16  connection to returning back to him his Lenovo laptop and that

17  thumb drive?

18  A   Yes, I did.

19  Q   After you spoke to him on the 23rd, and then, again, on

20  the 24th, did you generate a report?

21  A   I did.

22  Q   Did you generate one report for the contact you had with

23  him on the 23rd?

24  A   Yes.

25  Q   Did you generate another report for the contact you had

```
 1   with him on the 24th?

 2   A   I did.

 3   Q   At any point did he tell you that back in 2012 Ibrahim was

 4   working for him?

 5   A   No.

 6   Q   At any point did he tell you that back in 2012 Ibrahim was

 7   allowed to use his Lenovo laptop computer?

 8   A   No.

 9   Q   At any point did he tell you that back in 2012 Ibrahim was

10   allowed to use his e-mail account?

11   A   No.

12   Q   Specifically, what did he say to you about other people

13   using his Lenovo computer back in 2012?

14   A   Mr. Kareem told me that he had told them, meaning Elton

15   Simpson and Abu Bakr Ahmed, to not use his computer.

16           He had had a computer that had crashed before and

17   when he got his new computer, the Lenovo, he told them not to

18   use it.

19           MS. BROOK:  May I have one moment?

20           THE COURT:  Yes.

21           MS. BROOK:  That's all.

22           THE COURT:  Mr. Maynard?

23           MR. MAYNARD:  Just a moment, Your Honor.  I

24   apologize.

25                    CROSS EXAMINATION
```

1  BY MR. MAYNARD:

2  Q   Detective Nash, you were the one who called -- or were you

3  the one who called Mr. Abdul Kareem and told him he needed to

4  come and get his Lenovo computer back in January of 2014?

5  A   That he needed to come in?  No.

6  Q   Were you the one who contacted him about coming in?

7  A   Yes.

8  Q   And did you tell him that he did not have to come in?  You

9  could just get rid of the computer?

10 A   That's correct.

11 Q   Did you tell him that he should come in and get the

12 computer because he could sell it and make money?

13 A   I did tell him that.

14 Q   So you encouraged him to come in to get the computer?

15 A   If he wanted to.

16 Q   Yeah.  Initially, he said he didn't want it, didn't he?

17 A   Correct.

18 Q   And he said:  Just get rid of it.

19 A   Yes.

20 Q   And you told him he needed to come in and get it?

21 A   I didn't tell him he needed to come in and get it.

22         I asked him if he wanted to come in and get it and

23 made him an offer --

24 Q   And he told you no, but then you followed up, correct?

25 A   I told him, I said, he could take it and sell it if he

 1    wanted to.

 2    Q    Now, how long did that telephone conversation last?

 3    A    A few minutes.

 4    Q    Two minutes?  Three minutes?

 5    A    A few minutes.  I don't remember exactly.

 6    Q    Did you keep notes?

 7    A    Not for that, no.

 8    Q    How many times did you see him in January of 2014?

 9    A    Twice.

10    Q    Okay.  So you had that telephone conversation and then he

11    came in?

12    A    Actually, I take that back.  I only saw him once.

13    Q    Okay.  Are you sure?

14    A    Yes.

15    Q    Okay.  So the two meetings that you were just being asked

16    about, one of them was this two, three, four, eight-minute

17    telephone conversation?

18    A    Correct.

19    Q    So it wasn't really a meeting, was it?

20    A    No, it was not.

21    Q    And you really weren't interrogating him or asking him

22    questions.  You were telling him:  Here's the computer and

23    it's ready to come in -- it's ready for him to take.

24              THE COURT:  Which one of those questions would you

25    like Detective Nash to answer?

```
 1              MR. MAYNARD:  I'll slow down.
 2   BY MR. MAYNARD:
 3   Q   In the telephone conversation, the purpose of it was to
 4   tell him that it was ready for him to come and pick up?
 5   A   Correct.
 6   Q   And it's a very short conversation?
 7   A   It was a few minutes, yeah.
 8   Q   Yeah.  Now, he comes in and he picks up the computer on
 9   January 23rd; is that correct?
10   A   I believe it was the 24th.
11   Q   So it was the day after the telephone conversation?
12   A   That's correct.
13   Q   How long is he there when he's picking up this computer?
14   A   He actually stayed about a half an hour.
15   Q   On your 302 do you list the time he arrives and the time
16   that he leaves?
17   A   I don't recall if I did or not.
18   Q   At the time that he was there picking up the computer,
19   you're asking him questions, correct?
20   A   Not really, no.
21   Q   He just came in and he's picking up a computer that he's
22   indicated he didn't want and he stays for 30 minutes to talk
23   you, a member of the Joint Terrorism Task Force?
24   A   I'm confused.  I think you have two of the -- the two --
25   the telephone call and the actual face-to-face meeting
```

 1    combined.

 2    Q   No.  I don't think so.

 3             There's a telephone call that you make to him that

 4    lasts a few minutes about coming in and getting the computer,

 5    correct?

 6    A   Correct.

 7    Q   He comes in the next day to get his computer, correct?

 8    A   Correct.

 9    Q   And that's the only reason he's there is to get his

10    computer and take it and leave, correct?

11    A   Correct.

12    Q   You've not asked him to come in and be interviewed, have

13    you?

14    A   No.  I have not.

15    Q   Okay.  So he comes in to get his computer.  And you --

16    does this take place --

17             Well, strike that.

18             Where does it take place?

19    A   In the parking lot.

20    Q   And do you start asking him questions?

21    A   No.  He started a conversation with me.

22    Q   Okay.  Did you ask him any questions?

23    A   No.  He started a conversation.

24    Q   So there really wasn't anything for him to answer then if

25    you didn't ask him any questions, was there?

```
 1  A    No.  He carried -- he started the conversation and carried
 2  the conversation.
 3  Q    Okay.  Now, on January 5th -- strike that.  Sorry.
 4            On May 5th, that's the interview where you and
 5  Detective Whitson have asked him to come in, correct?
 6  A    Yes.
 7  Q    And that's the interview where -- we've gone over more
 8  times than I care to think about anymore -- about the taping
 9  of the interview?
10  A    Yes.  Correct.
11  Q    And so when you're sitting in there during the interview,
12  you're taking some notes, correct?
13  A    Correct.
14  Q    However, you believe that it's being audiotaped, correct?
15  A    Correct.
16  Q    You believe it's being videotaped, correct?
17  A    Yes.
18  Q    Okay.  And routinely, if you have audio and videotaped an
19  interview, you're going to develop your 302 after you look at
20  that; isn't that correct?
21  A    Correct.
22  Q    Okay.  Now, you just told us a minute ago -- strike that.
23            Did you show him any pictures of these weapons that
24  were in Garland, Texas?
25  A    Not on 5/5.
```

1    Q    Did you have any pictures of the weapons at that point?

2    A    We did not.

3    Q    Okay.  Did you know what weapons had been used in Garland,

4    Texas, as of the time of this interview?

5    A    Specifically, no.

6            MR. MAYNARD:  I don't have any further questions.

7            THE COURT:  Ms. Brook?

8            MS. BROOK:  Just briefly.

9                         **REDIRECT EXAMINATION**

10   BY MS. BROOK:

11   Q    Just a couple quick questions.

12           So on May 5th, 2015, when you were interviewing the

13   defendant, did you know that some of the weapons used in

14   connection with the Garland attack were assault rifles?

15   A    Yes.

16   Q    And how soon after your interview with the defendant did

17   you learn that the recording equipment didn't work?

18   A    It was either later that day or the next day.

19   Q    And to your knowledge, was the report generated

20   immediately?

21   A    Yes.

22   Q    I want to talk about the January 23rd, 2014, interview --

23   or conversation you had with the defendant on the phone about

24   the Lenovo laptop and the two gigabyte thumb drive.

25           And I'm placing on the overhead, is that your report?

1   A   Yes, it is.

2   Q   And it's two pages?

3   A   I'm sorry?

4   Q   Is it two pages?

5   A   Yes.

6   Q   How soon after your phone conversation with him on

7   January 23rd of 2014 did you generate this two-page report?

8   A   It was the next day.

9   Q   And can you tell that by the date?

10   A   It was investigated on the 23rd.  If you could go back up

11   to the top.  Okay.  So it was the same day.

12   Q   So you generated the report the same day?

13   A   Yes.

14   Q   And you can tell that because it says "Date of Entry" of

15   the report on the top?

16   A   Yes.

17   Q   Turning your attention next to your report from January --

18   report regarding your meeting with the defendant on

19   January 24th of 2014.

20   A   Okay.  It was --

21   Q   Is it a two-page report?

22   A   It is.

23   Q   And how soon after your meeting did you generate that

24   report?

25   A   Looks like four days.

```
1   Q    Okay.  When the defendant met you in the parking lot to

2   pick up the computer, the Lenovo computer, was that the only

3   thing that he picked up?

4   A    No.

5   Q    What else did he pick up?

6              MR. MAYNARD:  Objection.  Beyond the scope.

7              THE WITNESS:  A 2 gigabyte hard drive.

8              MR. MAYNARD:  Objection.  It's beyond the scope.

9              THE COURT:  Sustained.

10  BY MS. BROOK:

11  Q    Defense counsel suggested --

12             THE COURT:  Sustained.

13             MS. BROOK:  I don't have any other questions.

14             THE COURT:  Thank you, Detective Nash.  You may step

15  down.

16             The government may call what I believe is your last

17  witness.

18             MS. BROOK:  Two.

19             THE COURT:  Two?  Oh.

20             MR. KOEHLER:  Possibly, a third one.

21             Your Honor, there is a third witness.  I'm not sure

22  we're able to get that third witness here by 4:30.  It's a

23  five-minute witness.

24             The United States recalls Greg Neville.

25             THE COURT:  You may take the stand, sir.  You are
```

```
 1    still under oath.

 2            You may proceed, Mr. Koehler.

 3        (Witness duly sworn.)

 4              GREGORY NEVILLE, WITNESS, SWORN

 5                  DIRECT EXAMINATION

 6    BY MR. KOEHLER:

 7    Q   Good afternoon, Mr. Neville.

 8    A   Good afternoon.

 9    Q   Would you please reintroduce yourself briefly to the jury.

10    A   My name is Greg Neville.  I'm an Intelligence Analyst with

11    the FBI.

12    Q   And you previously testified about text messaging between

13    Elton Simpson and the defendant, among other things; is that

14    correct?

15    A   Yes, it is.

16    Q   And yesterday did you export a series of text messages and

17    call detail records from the defendant's Maxwest Gravity 5.5

18    cell phone?

19    A   Yes, I did.

20    Q   And did that come from the extraction of his phone through

21    Cellebrite?

22    A   Yes, it did.

23    Q   I have on the witness stand in front of you what's been

24    marked for identification as Exhibit 614.  It's on the monitor

25    there.
```

1              Do you recognize that?

2    A   Yes, I do.

3    Q   Is that a true and accurate copy -- and I'm going to flip

4    through the pages real quick -- the export that you did

5    showing phone calls and text messages between Abdul Malik

6    Abdul Kareem and Elton Simpson on April 16, 2015, April 17,

7    2015, and April 22nd of 2015?

8    A   Yes, it is.

9              MR. KOEHLER:  Move to admit 614.

10             MR. MAYNARD:  No objection.

11             THE COURT:  614 is admitted.

12        (Exhibit No. 614 admitted in evidence.)

13             THE COURT:  I notice it's color-coded.  Do you want

14   to tell us what the code is?

15             THE WITNESS:  The messages that are in red are sent

16   by Elton Simpson and the messages in black are sent by Abdul

17   Kareem.

18             THE COURT:  Thank you.

19   BY MR. KOEHLER:

20   Q   And have the times in this all been converted to Arizona

21   time?

22   A   Yes.  They have.

23   Q   All right.  Starting with the first call -- or the first

24   text at 5:27 p.m.

25             Could you walk us through for April 16, 2015.

```
 1   A    Yes.  So 5:27 Simpson sends:

 2            "Brother call AK he's wondering about you."

 3            At 5:36 p.m. Kareem sends:

 4            "Where are you?"

 5            At 5:36 p.m. Kareem sends:

 6            "I text him so he should read the text and see."

 7            5:37 p.m. Simpson sends:

 8            "Should probably call."

 9            5:37 Simpson sends:

10            "Might be a text or."

11            5:39 p.m. Simpson says:

12            "I'm at the crib but a little busy at the moment what

13   are you doing?"

14            5:49 p.m. Kareem sends:

15            "I'm at the doctors office."

16            5:55 p.m. Simpson says:

17            "Okay."

18            5:58 p.m. Kareem says:

19            "Leaving doctors office now."

20            6:19 p.m. Simpson says:

21            "All right."

22            6:20 Kareem:

23            "I'm home right now."

24            6:20 Simpson:

25            "Okay."
```

CR15-00707-PHX-SRB   JURY TRIAL-DAY #14   3-9-16

```
1              6:21 Kareem sends:
2              "Want to run the downtown bis want to go?"
3              6:22 p.m. Simpson says:
4              "Not now I can't."
5              6:23 p.m. Kareem says:
6              "You still busy?"
7              6:24 Simpson says:
8              "Yep."
9              6:25 p.m. Kareem says:
10             "Okay."
11             7:40 p.m. Simpson calls Kareem.
12             7:56 p.m. Simpson says --
13   Q   How long was that call?
14   A   15 minutes, 26 seconds.
15   Q   Okay.  Go ahead.
16   A   7:56 p.m. Simpson sends:
17             "Castor soft."
18             7:57 p.m. Simpson sends:
19             Screen shot.
20             8:38 p.m. Kareem calls Simpson.  31 seconds.
21             8:50 p.m. Kareem calls -- or texts Simpson:
22             "Salaam walaikum brother why didn't you respond to
23   that text."
24             8:58 p.m. Kareem:
25             "Brother do you see my text?"
```

```
 1                8:56 p.m. Simpson:

 2                "Walaikum salaam wrwbed."

 3                8:58 Kareem says:

 4                "But I ask you did you see my text?"

 5                8:59 p.m. Simpson sends:

 6                "The salaam one?"

 7                10:09 p.m. Simpson calls Kareem.  16 minutes, 41

 8     seconds.

 9     Q   Now, moving on to April 17 of 2015.

10     A   At 5:40 p.m. Kareem calls Simpson.  One minute, 45

11     seconds.

12                At 8:17 p.m. Kareem calls Simpson.  Five seconds.

13                At 8:18 p.m. Kareem sends:

14                "Salaam walaikum hey I didn't see you calling me I

15     have my GPS on."

16                9:02 p.m. Kareem:

17                "Salaam walaikum."

18                918 p.m. Simpson sends:

19                "Walaikum Salaam wrwbb."

20                9:18 p.m. Simpson:

21                "Its all good."

22                9:18 Simpson:

23                "Just at the crib playing Battlefield."

24                9:30 p.m. Kareem:

25                "I'm just finishing up this job."
```

```
 1              9:34 p.m. Kareem:

 2              "Are you getting killed?"

 3              9:41 p.m. Simpson:

 4              "Yep."

 5   Q   And April 22nd?

 6   A   At 10:09 a.m. Kareem calls Simpson.  Two seconds.

 7              At 12:10 p.m. Kareem calls Simpson.  Three minutes,

 8   24 seconds.

 9              At 2:57 p.m. Kareem calls Simpson.  Fourteen seconds.

10              3:01 p.m. Kareem:

11              "Salaam walaikum my blood sugar was over a thousand

12   so I have to get admitted into the hospital that I was going

13   to let me leave said I'm about to go into a diabetic coma."

14              3:13 p.m. Simpson:

15              "Wa alaikum salaam wrwb subin allah.  May Allah make

16   it easy."

17              8:19 p.m. Kareem calls Simpson.  Five seconds.

18              10:34 p.m. Simpson calls Kareem:  Seven minutes, 24

19   seconds.

20              MR. KOEHLER:  No further questions.

21              THE COURT:  Any questions, Mr. Maynard?

22              MR. MAYNARD:  No questions.

23              THE COURT:  Thank you, Mr. Neville.  You may step

24   down.

25              MR. KOEHLER:  The United States calls Amy Vaughan.
```

CR15-00707-PHX-SRB   JURY TRIAL-DAY #14   3-9-16

```
1              THE COURT:  Ms. Vaughan, you may take the stand.  You
2    are still under oath.
3         (Witness duly sworn)
4              THE COURT:  You may proceed, Mr. Koehler.
5              MR. KOEHLER:  Can I ask that Exhibit 499 be placed
6    before the witness.
7              AMY KATHLEEN VAUGHAN, WITNESS, SWORN
8                     DIRECT EXAMINATION
9    BY MR. KOEHLER:
10   Q   Ms. Vaughan, when we spoke before in this case --
11             First off, can you please briefly reintroduce
12   yourself to the jury.
13   A   Yes.  My name is Amy Vaughan.  I'm an Intelligence Analyst
14   for the FBI Phoenix Division.
15   Q   And when we previously spoke, you spoke about reviewing
16   the data that had been extracted from the Acer Aspire laptop
17   computer that was recovered from Mr. Kareem's apartment; is
18   that correct?
19   A   Yes.  That's correct.
20   Q   During the course of reviewing that, did you discover data
21   that appeared to have been deleted from the computer?
22   A   Yes.
23   Q   How was it that you were able to tell that something was
24   deleted as opposed to being an active file in reviewing an
25   image of the computer?
```

1   A   There's a couple of different ways that that information

2   is presented to us in our forensics program.

3           There is a special icon, for example, or there might

4   be file metadata that exists so you can see there was a file

5   but you can't open it because there's nothing there and it

6   might be grayed-out, for example, which is one way they show

7   it to us.  And there is another type of recovered file which

8   is known as "carved files."

9           So that -- and in that case, the program is usually

10  able to reconstruct most, if not all, of the file but that

11  designation means it was recovered from previously-deleted

12  material.

13  Q   I'm showing you what's in evidence as Exhibit No. 499 and

14  you have it there in front of you on the stand.

15          It makes reference to Opera Carved Web History as

16  well as Chrome and 360 Safe Browser.

17          In the lexicon of forensic software, what does the

18  term "carved" mean?

19  A   It's a term that describes a technique, basically, of

20  rebuilding files.  So the files are fragmented and they are

21  scattered across the computer's hard drive.  And what the

22  forensics program is sometimes able to do is find all those

23  pieces and then string them back together.  So in this case,

24  this is one such reconstruction.

25  Q   So by definition, does the fact that something shows as

1  being "carved" mean that at some point it had been deleted?

2  A   Yes.

3  Q   Did you find other evidence of deletions from the Acer

4  Aspire computer?

5  A   Yes.  There were numerous files, including several that we

6  previously discussed, that were fragmentary.  So at some point

7  it had to exist in its totality, but by the time we got to it

8  it was in pieces.

9  Q   I would like now to direct your attention to Exhibit No.

10  612 and I'll put that on the overhead camera for you, the

11  document camera.  Do you recognize 612?

12  A   Yes.

13  Q   And what is that?

14  A   This is a screenshot from our forensics program of a file

15  that I located on the Acer Aspire.  It's an HTML file that was

16  downloaded on or before 9/21/2014.

17          And it says basically what would -- you would get if

18  you opened your Gmail, looked at an e-mail, and then tried to

19  save that page as HTML.

20  Q   Is this a true and correct copy of the file that you found

21  on the Acer Aspire?

22  A   Yes.

23          MR. KOEHLER:  Move to admit 612.

24          MS. PLOMIN:  No objection.

25          THE COURT:  612 is admitted.

1         (Exhibit No. 612 admitted in evidence.)

2    BY MR. KOEHLER:

3    Q    What is the e-mail account that was being accessed?

4    A    It was gitrdonemoving@gmail.com.

5    Q    And is that this address down here at the bottom?

6    A    Yes.  So that filename would have reflected the title of

7    the page at the time it was viewed.

8    Q    In the course of reviewing the Acer Aspire, did you also

9    find video files on the Acer Aspire?

10   A    Yes.

11   Q    Among the video files that you found on the Acer Aspire,

12   did you find videos that appeared to have been shot by the

13   defendant Abdul Malik Abdul Kareem?

14   A    Yes.

15   Q    And was one of the videos that you found on the computer

16   related to a water leak at his home?

17   A    Yes.

18   Q    Did you have that video exported?

19   A    Yes, I did.

20   Q    Did you review the exported video and compare it to the

21   original that you had seen on the Aspire?

22   A    Yes, I did.

23   Q    And is it a true and correct copy?

24   A    Yes.

25   Q    And has that been marked as Exhibit 617 for court here

 1   today?

 2   A   Yes.

 3   Q   What is the date of that video?

 4           MS. PLOMIN:  Your Honor, I'm going to object.  This

 5   is not rebuttal and late disclosure.

 6           THE COURT:  Well, as far as I can tell, the only

 7   thing that's relevant is the date for purposes of any rebuttal

 8   testimony.

 9           MR. KOEHLER:  It has to do with the defendant's

10   testimony about a water leak in his home that he had to have

11   the water shut off and the date that he said that he had to

12   have the water shut off.

13           THE COURT:  Right.  But I don't see why we need

14   anything beyond the date.

15           MR. KOEHLER:  I would like to corroborate the

16   witness's testimony that it is actually a video of the water

17   leak and not just her assertion that it is.

18           THE COURT:  Well, is there some dispute about whether

19   there was a water leak on a certain time?

20           MR. KOEHLER:  The defendant testified that his water

21   was shut off in February and he went and stayed at the Simpson

22   and Soofi apartment in February.

23           This video shows a water leak that was in August.

24           THE COURT:  Again, it's a date issue.  Nothing else.

25   I don't think we need the video.  She can tell us what the

```
 1    date of the video is.

 2    BY MR. KOEHLER:

 3    Q    Okay.  What was the date of the video?

 4    A    August 2014.

 5    Q    Okay.  Did you find any videos or other files in the

 6    computer relating to a water leak at Mr. Abdul Kareem's

 7    residence in 2015?

 8    A    No.

 9    Q    Did you find any such -- any files or e-mails or other

10    documents that related to a water leak or water shutoff in

11    2015?

12    A    Not that I can recall.

13              MR. KOEHLER:  I will stand by my motion to admit 617,

14    but otherwise, no further questions.

15              THE COURT:  The objection is sustained.

16              Ms. Plomin?

17                       CROSS EXAMINATION

18    BY MS. PLOMIN:

19    Q    Good afternoon, Ms. Vaughan.

20    A    Good afternoon.

21    Q    Ms. Vaughan, you testified that you viewed some deleted

22    files on the Acer computer, correct?

23    A    Yes.

24    Q    And you also viewed a large amount of content on that

25    computer that was not deleted, correct?
```

1    A    Yes.

2    Q    And including photographs of Simpson, correct?

3    A    Yes.

4    Q    Upwards of 14 photographs of Simpson, correct?

5    A    That sounds about right.

6    Q    And you also found visits to a website Hoor-al-ayn; is

7    that true?

8    A    There was trace evidence of that website.  It's

9    Hoor-al-ayn.com, yes.

10    Q    And also Kalamullah.com?

11    A    Yes.

12    Q    Now, with respect to this video that you watched of a

13    water leak, did you watch that video?

14    A    Yes, I did.

15    Q    Could you tell whether the water leak was inside or

16    outside the house?

17    A    Yes.  It was inside the house.

18        MS. PLOMIN:  No other questions.  Thank you.

19        THE COURT:  Any redirect, Mr. Koehler?

20                    **REDIRECT EXAMINATION**

21    BY MR. KOEHLER:

22    Q    You were asked about visits to Hoor-al-ayn and

23    Kalamullah.com and you mentioned that you found trace evidence

24    of those.

25        Explain what "trace evidence" is and what it is that

```
 1   you found.
 2   A    What I found was what appeared to be remnants of cached
 3   files.  So every time a computer visits a website, pieces of
 4   that website are cached on that computer.  So that -- parts of
 5   that, fragmentary parts of that were what were found.
 6            So there is no other way for that to get on that
 7   computer without visiting that website.
 8   Q    Does it also mean that whoever looked at those things
 9   deleted them from the computer after having done so?
10   A    Yes.  That's one explanation, yes.
11            MR. KOEHLER:  No further questions.
12            THE COURT:  Thank you, Ms. Vaughan.  You may step
13   down.
14            MR. KOEHLER:  Your Honor, as I mentioned, there's one
15   other witness to lay foundation for something very briefly.
16   It has to do with Western Union receipts.
17            THE COURT:  But?
18            MR. KOEHLER:  But the witness is not available this
19   afternoon.
20            THE COURT:  And yesterday I advised the government
21   that all of their rebuttal witnesses had to be here ready to
22   go this afternoon.
23            You did not advise me that there would be any
24   difficulty with doing that.  We are -- and so, I mean, it's
25   not 4:30.  Your witness isn't here.  I don't know why your
```

 1    witness isn't here and why he couldn't or she couldn't be

 2    present.

 3              So if you don't have any more witnesses, you'll have

 4    to rest your rebuttal case.

 5              MR. KOEHLER:  Can we have a moment to see where we

 6    are with that?

 7              THE COURT:  Yes.

 8              MR. KOEHLER:  Thank you.

 9              The government recalls Stewart Whitson.

10              THE COURT:  Agent Whitson, you may take the stand.

11          **SPECIAL AGENT STEWART WHITSON, WITNESS, SWORN**

12                       **DIRECT EXAMINATION**

13    BY MR. KOEHLER:

14    Q   Agent Whitson, as part of the booking process, were you

15    present when the defendant was booked into custody following

16    this interview?

17    A   For part of that process I was present, yes.

18    Q   And was his property, including his wallet, seized from

19    him at the time of his arrest?

20    A   Yes, it was.

21    Q   Was that evidence laid out in a room in your presence?

22    A   Yes, it was.

23    Q   And did you participate in going through his wallet and

24    the belongings that came out of his wallet?

25    A   Yes.  All of the evidence was laid out that was in his

1    wallet.  And then I visually went through and viewed all of

2    the items that were in his wallet before they were then

3    packaged.

4           MR. KOEHLER:  Can I verify something with the clerk

5    briefly, Your Honor?

6           THE COURT:  Yes.

7           MR. KOEHLER:  I'm actually going to need to borrow

8    you in a minute to find Exhibit 194.

9           May I borrow the witness for a moment, Your Honor?

10          THE COURT:  Yes.

11   BY MR. KOEHLER:

12   Q   So after the arrest, you mentioned that his wallet was

13   removed.  Did you witness the actual inventorying of

14   everything from the wallet?

15   A   Yes.  So they had laid out the wallet and all of its

16   contents and all of the contents from his pocket across the

17   table.

18          And then I came through and visually looked at those

19   to see if there was any evidence that I needed to action right

20   away, that kind of thing.  So I reviewed everything that was

21   in the wallet and then left to do other things.

22   Q   Was one of the things that you reviewed from the wallet a

23   set of receipts?

24   A   Yes.

25   Q   I would like to direct your attention to Exhibit 197.

1    A    Yes.

2    Q    Can you tell the Court and the jury what those are?

3    A    Yes.  Exhibit 197 is four MoneyGram receipts that were

4    found inside Mr. Kareem's wallet on June 10th of 2015.

5    Q    And are those the original receipts?

6    A    Yes.  They are a portion of the receipt that's torn off.

7              MR. KOEHLER:  Move to admit 197.

8              MR. MAYNARD:  May I voir dire, Your Honor?

9              THE COURT:  You may.

10             MR. MAYNARD:  Detective Whitson --

11             THE COURT:  Okay, but you have to talk at a

12   microphone.

### VOIR DIRE EXAMINATION

14   BY MR. MAYNARD:

15   Q    Special Agent Whitson, was the wallet taken from my client

16   at the truck when he was arrested?

17   A    I don't know if it was on his person or at the truck, but

18   it was brought to the office with him as part of his personal

19   belongings.

20   Q    Were you there when the wallet was taken when he was

21   arrested?

22   A    Not when he was arrested.  I was not there.

23   Q    He's brought back and he's interviewed by you and

24   Detective Nash, correct?

25   A    Yes.

1   Q   And somebody then has taken his wallet at some point and

2   laid out the materials on it, you believe?

3   A   Yes.

4   Q   Correct?  You didn't do it?

5   A   I did not do that.

6   Q   You didn't carry the wallet back either from where they

7   got it in his pocket or whether they got it in his truck,

8   correct?

9   A   I did not carry it -- I did not.

10   Q   Did you look at those materials that day right after you

11   had done -- or did you do it later on?

12   A   I believe it was literally a minute after the interview

13   was over.  The room that they had it set up in was actually

14   right down the hall from the spot where I interviewed

15   Mr. Kareem.  And so as I --

16   Q   I'm asking the questions.

17   A   Sorry.

18   Q   Did you have anything to do with laying it out?

19   A   I did not lay out the contents.

20   Q   Somebody else laid it out and told you that that was the

21   contents of the wallet?

22   A   Yes.

23        MR. MAYNARD:  Objection.  Foundation, Your Honor.

24        THE COURT:  The objection is overruled.

25        197 is admitted.

1    (Exhibit No. 197 admitted in evidence.)

2         MR. KOEHLER:  May I approach the witness to retrieve

3    the exhibit?

4         THE COURT:  Yes.

5              **DIRECT EXAMINATION (cont'd)**

6    BY MR. KOEHLER:

7    Q   I'm going to do these one at a time.  This first one, can

8    you tell us the date and the amount?

9    A   Yes.  The first one is dated May 4th of 2015 and the

10   amount is $500.

11   Q   The next one?

12   A   The next one is dated March 30th of 2015 and the amount is

13   $399.

14   Q   Next?

15   A   The next one is dated May 4th, 2015, and it is $225.

16   Q   And finally?

17   A   And the fourth one is March -- there's a bit of a glare,

18   so I can't tell if that's the 25th or -- it looks like the --

19   there it is -- March 25th, 2015, and the amount is $300.

20   Q   And can you tell which direction the money is going on

21   these?

22   A   Yes.  These are -- so this is money that is being sent by

23   the -- and this is a receipt to the person who sent that

24   money.

25         MR. KOEHLER:  No further questions.

```
1              THE COURT:  Mr. Maynard, any questions?

2              MR. MAYNARD:  No questions.

3              THE COURT:  Thank you, Agent Whitson.  You may step

4    down.

5              MR. KOEHLER:  May I approach the clerk?

6              THE COURT:  Yes.

7              MR. KOEHLER:  Same as last time.  Subject to review

8    of exhibits, the government rests.

9    GOVERNMENT REBUTTAL RESTS

10             THE COURT:  Thank you, Mr. Koehler.

11             Ladies and gentlemen, all of the evidence in this

12   case has now been received but, of course, you still can't

13   discuss the case.

14             What remains of the trial is my giving you your

15   instructions on the law and the closing arguments.

16             We are going to have closing arguments not tomorrow

17   but Friday morning at 9:00 a.m. and there's a good reason for

18   this.

19             These instructions that I will give you, hopefully,

20   when you get them, you'll think, oh, gosh, they're so clear

21   and concise and brief.  But that's not what they look like

22   right now.  And the lawyers and I need to spend some time --

23   what we call "settling the instructions" -- and then we need

24   to have them prepared and duplicated and all of that.

25             Also, hopefully, this will give the lawyers a little
```

1   time to make sure their closing arguments are also well

2   organized, clear, and concise.

3          So we talked just before you came in and decided that

4   the best course of action was for us to work tomorrow, for you

5   to have the day off tomorrow, and first thing Friday morning

6   at 9:00 a.m. you will receive your instructions on the law,

7   then you will hear the closing arguments, and some time on

8   Friday you will begin your deliberations.

9          Even though all the evidence has now been received,

10  you still are not to discuss the case among yourselves or with

11  anyone else.  You are not to discuss the case or form any

12  conclusions about it until you have received your instructions

13  on the law and heard the closing arguments of counsel.

14         Please also remember that you're not to advise anyone

15  concerning the status of this case, only that it's still on

16  schedule and will be over no later than a week from Friday,

17  although it's certainly looking like it will be sooner than

18  that at this point in time.

19         I think we'll get together at nine o'clock tomorrow

20  morning unless there is anything pressing we need to talk

21  about right now.  Is that agreeable?

22         MR. MAYNARD:  That's agreeable for the defense.

23         MR. KOEHLER:  That's fine.

24         A JUROR:  So is tomorrow a day off, but when we get

25  our sheet, is it the week or --

1           THE COURT:  I don't know that.  You would have to

2     check with the Jury Administrator about that.

3           Court is in recess until nine o'clock on Friday

4     morning except for the lawyers.

5           I'll see you tomorrow morning at 9:00 a.m.

6        (Proceedings adjourned at 4:30 p.m.)

7                           *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                      C E R T I F I C A T E

3

4           I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 1st day of August,

14   2016.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25