CR15-00707-PHX-SRB    JURY TRIAL-DAY #16    3-11-16

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) **APPEAL** |
| | ) **CR15-00707-PHX-SRB** |
| vs. | ) Phoenix, Arizona |
| | ) March 11, 2016 |
| Abdul Malik Abdul Kareem, | ) 9:02 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 16
(Pages 2717 through 2899, Inclusive.)

APPEARANCES:
For the Government:
        U.S. ATTORNEY'S OFFICE
        By:  **Kristen Brook, Esq.**
             **Joseph Edward Koehler, Esq**.
        40 North Central Avenue, Suite 1200
        Phoenix, AZ  85004

For the Defendant Abdul Malik Abdul Kareem:
        MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
        By: **Daniel D. Maynard, Esq.**
            **Mary Kathleen Plomin, Esq.**
        3200 North Central Avenue, Suite 1800
        Phoenix, AZ  85012

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                          **INDEX**

2

   **SUMMARY OF COURT PROCEEDINGS**                    **PAGE:**

3

4    FINAL INSTRUCTIONS TO THE JURY                Page 2720

5    CLOSING ARGUMENT:  GOVERNMENT                 Page 2736
     CLOSING ARGUMENT:  DEFENSE                    Page 2800
6    REBUTTAL CLOSING ARGUMENT:  GOVERNMENT        Page 2862
     FINAL INSTRUCTIONS TO THE JURY               Page 2887

7

8    JURY RETIRES                                  Page 2895

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR15-00707-PHX-SRB    JURY TRIAL - DAY #16    3-11-16

```
1              P R O C E E D I N G S

2       (Called to the order of court at 9:02 a.m.)

3            THE COURT:  Good morning, ladies and gentlemen.

4   Please sit down.  The record will show the presence of the

5   jury, counsel, and the defendant.

6            Ladies and gentlemen, let me give you a brief rundown

7   of what we have on our schedule today.  You have in front of

8   you the final jury instructions.  I'm going to read them.  You

9   can follow along as I read them or just listen.  You will have

10  these to take back with you for later reference during your

11  deliberations, if necessary.

12           After I read the instructions, the government will

13  make its closing argument.  Following that, Mr. Maynard will

14  make his closing argument for the defendant.  After that there

15  will be a final argument or a rebuttal argument by the

16  government.

17           I will then read to you the last couple of

18  instructions, go over the verdict forms with you, and when

19  we're concluded with that, you will go back to the jury room

20  and begin your deliberations.

21           I expect that the government's closing argument will

22  take most of the morning.  We'll take our usual break

23  sometime -- I asked Mr. Koehler to kind of pick a moment when

24  we could take our break at the right time.

25           Mr. Maynard will either begin his just before lunch
```

UNITED STATES DISTRICT COURT

1   or just after lunch.  I thought we might take a shorter lunch

2   break today.

3          But then sometime, hopefully, by mid to late

4   afternoon, you will be able to begin your deliberations.

5   **FINAL INSTRUCTIONS TO THE JURY**

6          Members of the jury, now that you have heard all the

7   evidence, it is my duty to instruct you on the law that

8   applies to this case.

9          It is your duty to weigh and to evaluate all the

10  evidence received in the case and, in that process, to decide

11  the facts.  It is also your duty to apply the law as I give it

12  to you to the facts as you find them, whether you agree with

13  the law or not.  You must decide the case solely on the

14  evidence and the law and must not be influenced by any

15  personal likes or dislikes, opinions, prejudices, or sympathy.

16  You will recall that you took an oath promising to do so at

17  the beginning of the case.

18         You must follow all these instructions and not single

19  out some and ignore others; they are all important.  Please do

20  not read into these instructions or into anything I may have

21  said or done any suggestion as to what verdict you should

22  return.  That is a matter entirely up to you.

23         The indictment is not evidence.  The defendant has

24  pled not guilty to the charges.  The defendant is presumed to

25  be innocent unless and until the government proves the

 1   defendant guilty beyond a reasonable doubt.  In addition, the

 2   defendant does not have to testify or present any evidence to

 3   prove innocence.  The government has the burden of proving

 4   every element of each charge beyond a reasonable doubt.

 5         Proof beyond a reasonable doubt is proof that leaves

 6   you firmly convinced the defendant is guilty.  It is not

 7   required that the government prove guilty beyond all possible

 8   doubt.

 9         A reasonable doubt is a doubt based upon reason and

10   common sense and is not based purely on speculation.  It may

11   arise from a careful and impartial consideration of all the

12   evidence, or from lack of evidence.

13         If after a careful and impartial consideration of all

14   the evidence, you are not convinced beyond a reasonable doubt

15   that the defendant is guilty, it is your duty to find the

16   defendant not guilty.  On the other hand, if after a careful

17   and impartial consideration of all the evidence, you are

18   convinced beyond a reasonable doubt that the defendant is

19   guilty, it is your duty to find the defendant guilty.

20         The evidence you are to consider in deciding what

21   facts are consists of:

22         One, the sworn testimony of any witness; and

23         Two, the exhibits received in evidence; and

24         Three, any facts to which the parties have agreed.

25         The following things are not evidence and you may not

1    consider them in deciding what the facts are:

2         One, questions, statements, objections, and arguments

3    by the lawyers are not evidence.  The lawyers are not

4    witnesses.  Although you must consider a lawyer's questions to

5    understand the answers of a witness, the lawyer's questions

6    are not evidence.  Similarly, what the lawyers have said in

7    there opening statements, will say in their closing arguments

8    and at other times is intended to help you interpret the

9    evidence, but it is not evidence.  If the facts as you

10   remember them differ from the way the lawyers state them, your

11   memory of them controls.

12        Two, any testimony that I have excluded, stricken, or

13   instructed you to disregard is not evidence.

14        Three, anything you may have seen or heard when the

15   court was not in session is not evidence.  You are to decide

16   the case solely on the evidence received at the trial.

17        Evidence may be direct or circumstantial.  Direct

18   evidence is direct proof of a fact, such as testimony by a

19   witness about what that witness personally saw or heard or

20   did.  Circumstantial evidence is indirect evidence, that is,

21   it is proof of one or more facts from which you can find

22   another fact.

23        You are to consider both direct and circumstantial

24   evidence.  Either can be used to prove any fact.  The law

25   makes no distinction between the weight to be given to either

1    direct or circumstantial evidence.  It is for you to decide

2    how much weight to give to any evidence.

3           In deciding the facts in this case, you may have to

4    decide which testimony to believe and which testimony not to

5    believe.  You may believe everything a witness says, or part

6    of it, or none of it.

7           In considering the testimony of any witness, you may

8    take into account:

9           One, the witness's opportunity and ability to see or

10   hear or know the things testified to;

11          Two, the witness's memory;

12          Three, the witness's manner while testifying;

13          Four, the witness's interest in the outcome of the

14   case, if any;

15          Five, the witness's bias or prejudice, if any;

16          Six, whether other evidence contradicted the

17   witness's testimony;

18          Seven, the reasonableness of the witness's testimony

19   in light of all the evidence; and

20          Eight, any other factors that bear on believability.

21          The weight of the evidence as to a fact does not

22   necessarily depend on the number of witnesses who testify.

23   What is important is how believable the witnesses were, and

24   how much weight you think their testimony deserves.

25          You have heard testimony from persons who, because of

1  education or experience, were permitted to state opinions and

2  the reasons for their opinions.

3       Such opinion testimony should be judged like any

4  other testimony.  You may accept it or reject it, and give it

5  as much weight as you think it deserves, considering the

6  witness's education and experience, the reasons given for the

7  opinion, and all the other evidence in the case.

8       You are here only to determine whether the defendant

9  is guilty or not guilty of the charges in the indictment.  The

10  defendant is not on trial for any conduct or offense not

11  charged in the indictment.

12       You have heard testimony that the defendant made a

13  statement.  It is for you to decide, one, whether the

14  defendant made the statement, and, two, if so, how much weight

15  to give to it.  In making those decisions, you should consider

16  all the evidence about the statement, including the

17  circumstances under which the defendant may have made it.

18       A separate crime is charged against the defendant in

19  each count.  You must decide each count separately.  Your

20  verdict on one count should not control your verdict on any

21  other count.

22       The defendant is charged in Count 1 with Conspiracy

23  to Transport Firearms and Ammunition in Interstate Commerce

24  with the Intent to Commit the felonies of Murder and/or

25  Aggravated Assault.  In order for the defendant to being found

1    guilty of this charge, the government must prove each of the

2    following elements beyond a reasonable doubt:

3         First, beginning on or before January 7, 2015, and

4    continuing through May 3, 2015, there was an agreement between

5    two or more persons to transport firearms and ammunition from

6    one state to another with the intent to commit the felonies of

7    Murder and/or Aggravated Assault in Texas or with knowledge or

8    reasonable cause to believe that Murder and/or Aggravated

9    Assault would be committed with the firearms and ammunition;

10         Second, the defendant became a member of the

11    conspiracy knowing of at least one of its objects and

12    intending to help accomplish it; and

13         Third, one of the members of the conspiracy performed

14    at least one overt act for the purpose of carrying out the

15    conspiracy, with all of you agreeing on a particular overt act

16    that you find was committed.

17         The overt acts alleged in the Indictment are:

18         One, on dates beginning before January 7, 2015, and

19    ending on or before May 3, 2015, Kareem, Simpson, Soofi, and

20    other persons known and unknown traveled to remote desert

21    areas near Phoenix, Arizona, to practice shooting firearms.

22         Two, on dates between January 7, 2015, and May 3,

23    2015, Kareem provided firearms to Simpson and Soofi.

24         Three, on dates between February 11, 2015, and May 3,

25    2015, Kareem hosted Simpson, Soofi, and other persons known

1    and unknown inside his home in Phoenix, Arizona, to discuss

2    attacking the Muhammad Art Exhibit and Contest in Garland,

3    Texas.

4            Four, on dates between May 1, 2015, and May 3, 2015,

5    Simpson and Soofi traveled from Phoenix, Arizona, to Garland,

6    Texas, armed with firearms.

7            An overt act is an act that is a substantial step

8    toward the completion of the conspiracy.  An overt act does

9    not itself have to be unlawful.  A lawful act may be an

10   element of a conspiracy if it was done for the purpose of

11   carrying out the conspiracy.  The government is not required

12   to prove that the defendant personally did one of the overt

13   acts.

14           The defendant is charged in Count 5 with Conspiracy

15   to Provide Material Support to the Islamic State of Iraq and

16   the Levant (ISIL), a designated foreign terrorist

17   organization.  In order for the defendant to be found guilty

18   of this charge, the government must prove each of the

19   following elements beyond a reasonable doubt:

20           First, beginning at an unknown time but no later than

21   in or about June 2014, and continuing through May 3, 2015,

22   there was an agreement between two or more persons to provide

23   material support or resources to ISIL, a designated foreign

24   terrorist organization;

25           Second, the defendant became a member of the

1   conspiracy knowing of its unlawful object and intending to

2   help accomplish it;

3          Third, ISIL was designated a foreign terrorist

4   organization at the time of the conspiracy;

5          Fourth, the defendant knew that at least one of the

6   following conditions existed:

7          A.  That ISIL was a designated foreign terrorist

8   organization; or

9          B.  That ISIL has engaged, or was engaging, in

10  terrorist activity; or

11         C.  That ISIL has engaged, or was engaging, in

12  terrorism; and

13         Fifth, the offense occurred in whole, or in part,

14  within the United States.

15         The term "material support or resources" means any

16  property, tangible or intangible, or any service including

17  currency or monetary instruments, training, facilities,

18  weapons, personnel (one or more individuals who may be or

19  include oneself), and transportation.

20         The term "training" means instruction or teach

21  designed to impart a specific skill, as opposed to general

22  knowledge.

23         The term "personnel" means one or more persons, which

24  can include the defendant's own person.  No person may be

25  convicted, however, in connection with providing personnel,

1    unless that person has knowingly conspired to provide to a

2    foreign terrorist organization with one or more individuals,

3    (who may include the defendant), to work under that terrorist

4    organization's direction or control or to organize, manage,

5    supervise, or otherwise direct the operation of the

6    organization.  Individuals who act entirely independently of

7    the foreign terrorist organization to advance its goals or

8    objectives are not considered to be working under the foreign

9    terrorist organization's direction and control.

10          You all must agree as to the type of material support

11   or resources the defendant conspired to provide.  In other

12   words, the government must prove beyond a reasonable doubt

13   that the defendant conspired to provide one or more of these

14   forms of material support or resources; there is no

15   requirement that the defendant provided all of these forms of

16   material support or resources.

17          The term "terrorist activity" means any activity

18   which is unlawful under the laws of the place where it is

19   committed (or which, if it had been committed in the United

20   States, would be unlawful under the laws of the United States

21   or any State) and which involves the commission of any of the

22   following, or a threat, attempt, or conspiracy to do any of

23   the following:

24          A.  The seizing or detaining, and threatening to

25   kill, injure, or continue to detain, another individual in

1    order to compel a third person (including a governmental

2    organization) to do or abstain from doing any act as an

3    explicit or implicit condition for the release of the

4    individual seized or detained;

5              B.  An assassination; and

6              C.  The use of any explosive, firearm, or other

7    weapon or dangerous device (other than for mere personal

8    monetary gain), with intent to endanger, directly or

9    indirectly, the safety of one or more individuals or to cause

10   substantial damage to property.

11         The term "terrorism" means premeditated, politically

12   motivated violence perpetrated against noncombatant targets by

13   subnational groups or clandestine agents.

14         A conspiracy is a kind of criminal partnership - an

15   agreement of two or more persons to commit one or more crimes.

16   The crime of conspiracy is the agreement to do something

17   unlawful; it does not matter whether the crime agreed upon was

18   committed.

19         For a conspiracy to have existed, it is not necessary

20   that the conspirators made a formal agreement or that they

21   agreed on every detail of the conspiracy.  It is not

22   however -- It is not enough, however, that they simply met,

23   discussed matters of common interest, acted in similar ways,

24   or perhaps helped one another.  In order to find the defendant

25   guilty of conspiracy, you must find that there was a plan to

1    commit the crime that was the object of the conspiracy.

2           One becomes a member of a conspiracy by willfully

3    participating in the unlawful plan with the intent to advance

4    or further some object or purpose of the conspiracy, even

5    though the person does not have full knowledge of all the

6    details of the conspiracy.  Furthermore, one who willfully

7    joins an existing conspiracy is as responsible for it as the

8    originators.  On the other hand, one who has no knowledge of a

9    conspiracy, but happens to act in a way which furthers some

10   object or purpose of the conspiracy, does not there by become

11   a conspirator.  Similarly, a person does not become a

12   conspirator merely by associating with one or more persons who

13   are conspirators, nor merely by knowing that a conspiracy

14   exists.

15          A defendant may be found guilty of conspiracy even if

16   the defendant personally did not commit the act or acts

17   constituting the crime, but aided and abetted in its

18   commission.  To prove a defendant guilty of conspiracy by

19   aiding and abetting, the government must prove each of the

20   following elements beyond a reasonable doubt:

21          First, the crime of conspiracy was committed by

22   someone;

23          Second, the defendant aided, counseled, commanded,

24   induced or procured that person in committing the crime of

25   conspiracy;

1          Third, the defendant acted with the intent to

2     facilitate the conspiracy; and

3          Fourth, the defendant acted before the crime was

4     completed.

5          It is not enough that the defendant merely associated

6     with the person committing the crime, or unknowingly or

7     unintentionally did things that were helpful to that person,

8     or was present at the scene of the crime.  The evidence must

9     show beyond a reasonable doubt that the defendant acted with

10    the knowledge and intention of helping that person commit the

11    crime of conspiracy.  A defendant acts with intent to

12    facilitate the crime when the defendant actively participates

13    in a criminal venture with advance knowledge of the crime and

14    having acquired that knowledge when the defendant still had a

15    realistic opportunity to withdraw from the crime.

16         The defendant is charged in Count 2 with Aiding and

17    Abetting the Interstate Transportation of Firearms and

18    Ammunition with the Intent to commit Murder and/or Aggravated

19    Assault in Texas.  To prove a defendant guilty of Aiding and

20    Abetting the Interstate Transportation of Firearms and

21    Ammunition with the intent to commit Murder and/or Aggravated

22    Assault the government must prove each of the following

23    elements beyond a reasonable doubt:

24         First, a person transported firearms and ammunition

25    from one state to another with the intent to commit murder

1    and/or aggravated assault in Texas, or with knowledge or

2    reasonable cause to believe that murder and/or aggravated

3    assault would be committed with the firearms and ammunition;

4         Second, the defendant aided, counseled, commanded,

5    induced or procured that person to transport firearms and

6    ammunition in interstate commerce with the intent to commit

7    murder and/or aggravated assault;

8         Third, the defendant acted with the intent to

9    facilitate, transporting firearms and ammunition in interstate

10   commerce with the intent to commit murder and/or aggravated

11   assault; and

12        Fourth, the defendant acted before the crime was

13   completed.

14        It is not enough that the defendant merely associated

15   with the person committing the crime, or unknowingly or

16   unintentionally did things that were helpful to that person,

17   or was present at the scene of the crime.  The evidence must

18   show beyond a reasonable doubt that the defendant acted with

19   the knowledge and intention of helping that person commit

20   transporting firearms and ammunition in interstate commerce

21   with the intent to commit the felonies of murder or aggravated

22   assault.

23        A defendant acts with intent to facilitate the crime

24   when the defendant actively participates in a criminal venture

25   with advance knowledge of the crime and having acquired that

1    knowledge when the defendant still had a realistic opportunity

2    to withdraw from the crime.

3              Each member of a conspiracy is responsible for the

4    actions of the other conspirators performed during the course

5    of and in furtherance of the conspiracy.  If one member of a

6    conspiracy commits a crime in furtherance of a conspiracy, the

7    other members have also, under the law, committed that crime.

8              Therefore, you may find the defendant guilty of

9    Interstate Transportation of Firearms and Ammunition with the

10   intent to commit Murder and/or Aggravated Assault as charged

11   in Count 2 if the government has proved each of the following

12   elements beyond a reasonable doubt:

13             First, the person involved in the conspiracy charged

14   in Count 1 and/or Count 5 knowingly and intentionally

15   transported firearms and ammunition from one state to another;

16             Second, that person intended to commit Murder and/or

17   Aggravated Assault, or had knowledge or reasonable cause to

18   believe that Murder and/or Aggravated Assault would be

19   committed with the firearms and ammunition;

20             Third, that person was a member of the conspiracy

21   charged in Count 1 and/or Count 5;

22             Fourth, that person transported firearms and

23   ammunition from one state to another with the intent to commit

24   Murder and/or Aggravated Assault in furtherance of the

25   conspiracy;

1          Fifth, the defendant was a member of the same

2   conspiracy at the time that the offense charged in Count 2 was

3   committed; and

4          Sixth, the offense fell within the scope of the

5   unlawful agreement and could reasonably have been foreseen to

6   be a necessary or natural consequence of the unlawful

7   agreement.

8          The defendant is charged in Count 3 with False

9   Statements to the FBI.  In order for the defendant to be found

10  guilty of this charge, the government must prove each of the

11  following elements beyond a reasonable doubt:

12         First, on or about May 5, 2015, the defendant made a

13  false statement to the FBI, with all of you agreeing on the

14  false statement he made;

15         Second, the defendant acted willfully; that is, the

16  defendant acted deliberately and with knowledge both that the

17  statement was untrue and that his conduct was unlawful; and

18         Third, the statement was material to the activities

19  or decisions of the FBI; that is, it had a natural tendency to

20  influence, or was capable of influencing, the agency's

21  decisions or activities.

22         The alleged false statements are:

23         One, that defendant did not go shooting in the desert

24  with Simpson and Soofi before May 3, 2015;

25         Two, that before May 3, 2015, neither Simpson nor

1   Soofi fired the weapons they used in connection with the

2   attack in Garland, Texas;

3          Three, that defendant did not know in advance that

4   Simpson and Soofi planned to conduct an attack in Garland,

5   Texas; and

6          Four, that defendant did not know about the Muhammad

7   Art Exhibit and Contest that was to take place in Garland,

8   Texas, on May 3, 2015, until after Simpson and Soofi were

9   killed while attempting to conduct an attack on the contest.

10          The defendant is charged in Count 4 with Felon in

11   Possession of Firearms.  In order for the defendant to be

12   found guilty of this charge, the government must prove each of

13   the following elements beyond a reasonable doubt:

14          First, on or about June 10, 2015, the defendant

15   knowingly possessed a Taurus model 85 Ultralite .38 caliber

16   revolver and/or a Tanfoglio model Witness 9 millimeter pistol,

17   with all of you agreeing on the particular firearm he

18   possessed;

19          Second, the Taurus model 85 Ultralite .38 caliber

20   revolver and the Tanfoglio model Witness 9 millimeter pistol

21   had been shipped or transported from one state to another

22   state; and

23          Third, at the time the defendant possessed the Taurus

24   model 85 Ultralite .38 caliber revolver and/or the Tanfoglio

25   model Witness 9 millimeter pistol, the defendant had been

1   convicted of Aggravated Driving While Under the Influence in

2   the State of Arizona, a felony.

3       A person has possession of something if the person

4   knows of its presence and has the physical control of it, or

5   knows of its presence and has the power and intention to

6   control it.

7       An act is done knowingly if the defendant is aware of

8   the act and does not act through ignorance, mistake, or

9   accident.  The government is not required to prove that the

10  defendant knew that his acts or omissions were unlawful except

11  with respect to the crime of False Statements to the FBI as

12  charged in Count 3.  You may consider evidence of the

13  defendant's words, acts, or omissions, along with all the

14  other evidence, in deciding whether the defendant acted

15  knowingly.

16      Mr. Koehler, you may make your closing argument.

17  **CLOSING ARGUMENT:  GOVERNMENT**

18      MR. KOEHLER:  Thank you, Your Honor, and good morning

19  everyone.

20      I would like to begin by taking a minute to thank you

21  all for your attentiveness throughout this trial.

22      Jury service is always a challenge and is especially

23  a challenge in a case that lasts as long as this one has and

24  as complex as this one has been.  So thank you on behalf of

25  the trial team in this case.

1           We are here to talk about this case that involved

2    this attack in Garland, Texas, on May 3 of 2015.

3           I'm not going to spend a lot of time talking about

4    the events as they happened specifically in Garland, simply

5    because that evidence is clear and undisputed in this case.

6           Elton Simpson and Nadir Soofi drove to Garland,

7    Texas, with the intent to commit mass murder against the

8    people who were attending the Draw Muhammad Contest at the

9    Curtis Coldwell Center there in Garland, Texas.

10          They showed up, pulled out their guns, and

11   thankfully, Officer Gregory Stevens was alert and was well

12   trained and he stopped that attack right there before it got

13   into the Culwell Center.

14          The ultimate questions that are before you in this

15   case are really just two:  Did the defendant Abdul Malik Abdul

16   Kareem know that Elton Simpson, who everybody knew as

17   "Ibrahim," and Nadir Soofi were planning to conduct those

18   attacks in support of ISIS, not just the Garland attack, but

19   the other things that they planned to do -- and we'll talk

20   about that in a minute.

21          The second thing is:  Did he encourage or help them

22   or join them in those plans?

23          I'm going to get into detail in a moment, but first

24   off, the government has proven in this case beyond a

25   reasonable doubt that the defendant knew that Elton Simpson

1   and Nadir Soofi were ISIS supporters.

2          He knew himself.  You heard it in his interview

3   statements and his post-arrest statements that were recorded.

4   You heard it from Juan.  You heard it from Carlos.   From

5   Stefan Verdugo.  From AK Wahid.  You also heard it from

6   Abdullah Mubarak when he talked about their arguments about

7   the existence of a Khalifah.  And you also heard it from Ali

8   Soofi.

9          He also knew that they had planned to conduct

10  attacks.  Sergio Martinez told you about how he was pushy

11  about going shooting.  Abdul Khabir Wahid told you about how

12  he talked to the defendant -- and he's a defense witness, by

13  the way -- talked to the defendant about the fact that Simpson

14  and Soofi had planned to go attack a Marine base.

15         Nathaniel Soofi told you about how his father Nadir

16  told him about different attacks that he planned to conduct,

17  not just the Garland contest, but running over soldiers at

18  Luke Air Force Base and going and attacking a base, a

19  recruiting station.

20         Stefan Verdugo.  He told you how the defendant wanted

21  to be a part of the Garland attack.  He tried to talk the

22  defendant out of that.

23         Juan.  He told you about how the defendant wanted to

24  strap a bomb to himself and go blow himself up in a mall and

25  also about the Garland contest as well.

1          And you have Carlos telling you from the witness

2    stand that the defendant was considering providing an AK47 to

3    Elton Simpson for protection.

4          Also, his actions following the attack.  His efforts

5    to cover up his involvement and his closeness to Elton Simpson

6    and Nadir Soofi are evidence of his knowledge of what they

7    were doing.

8          He also helped.  He helped them acquire firearms.  He

9    loaned money for the AK47 and the AK47.  And Stefan Verdugo

10   also told you that the defendant gave Elton Simpson the .357

11   that Elton Simpson had in the pocket of his pants when the

12   Garland attack occurred.  And we'll get into that in more

13   detail.

14         He took them shooting to a secluded location.  He

15   went shooting with them in the desert; not just the times that

16   Sergio told you about, but also the times that Ali Soofi told

17   you about and Stefan Verdugo.

18         He helped them maintain their firearms.  Taught them

19   how to take them apart, clean them, lubricate them, put them

20   back together.  He also provided ammunition that was taken

21   with them to the attack.  And, again, we'll get into more

22   detail on this, but he admitted buying that ammunition for

23   himself during his post-arrest interview.  And the lot numbers

24   on the ammunition found in Garland, found in the Simpson and

25   Soofi apartment, and found in Mr. Kareem -- Abdul Kareem's

1    apartment all matched.  That's that .38 Special ammunition.

2         What was the defendant's role?  He was a motivator.

3    He was a bank roller.  He was a trainer and an intended

4    participant.  Let's walk through the charges that you have

5    here and then we'll go into the detail on a couple of them

6    first and then in more detail later on the others.

7         The first charge is conspiracy to transport firearms

8    in interstate commerce with intent to commit a felony.

9         The second is aiding and abetting the actual

10   transportation of the firearms in interstate commerce with the

11   intent to commit a felony.

12        The third charge is false statements to the FBI.

13        The fourth charge is felon in possession of a

14   firearm.

15        And finally, the conspiracy to provide material

16   support to a foreign terrorist organization.

17        Before we go further, I want to knock out the easiest

18   charge in this case, the "felon in possession" charge.  That

19   charge has three elements.

20        First, that the defendant knowingly possessed the

21   Taurus model 85 Ultralite .38 caliber revolver and/or the

22   Tanfoglio model Witness 9 millimeter pistol with all of you

23   agreeing on which firearm he possessed.

24        Well, in this case you have the evidence that the

25   Tanfoglio was found in the couch of his apartment.  It had his

1    fingerprint on it.  And later the defendant admitted from the

2    witness stand that that was his gun.

3           The .38 Special was in the defendant's bag in the

4    back of the U-Haul truck that he was driving, his moving

5    truck.  And he admitted from the stand that that was his gun.

6    You also heard from Sean Raper that he had purchased that gun

7    from Mr. Raper directly.

8           Those firearms were transported and shipped in

9    interstate commerce and they were also imported into the

10   United States from a foreign country, both guns.  One came

11   from Brazil, the Taurus.  The Tanfoglio, the 9 millimeter,

12   came from Italy.  Both imported to Florida and both had to

13   have come from Florida to the State of Arizona, and therefore,

14   crossed state lines.

15          Finally, the defendant's felony conviction.  You have

16   Exhibit 139, his felony conviction for Aggravated DUI.  You

17   also have his admission from the witness stand that he has not

18   one, but two felonies.

19          So there you have all of the elements of Felon in

20   Possession of a Firearm.

21          The Conspiracy to Provide Material Support is really

22   the heart of the case in this case.  All of the evidence that

23   supports the "material support" charged in this case drives

24   the existence of proof on the other counts and establishes the

25   other counts beyond a reasonable doubt, just like it does the

1    material support conspiracy.

2              That conspiracy began sometime between June of 2014

3    and ran through May 3 of 2015 with the failed attack in

4    Garland, Texas.

5              It was an agreement between two or more people to

6    provide material support or resources to ISIL, also known as

7    ISIS.

8              The defendant became a member of that conspiracy

9    knowing of its unlawful object and intending to accomplish it.

10             These are the rest of the elements:

11             The government has to prove that ISIL was a

12   designated foreign terrorist organization.

13             In this case you have a stipulation that that's a

14   fact, that ISIL was, in fact, a designated foreign terrorist

15   organization.

16             You have evidence -- and we will get into this --

17   that the defendant knew that ISIL engaged in terrorist

18   activity or terrorism.

19             And, of course, the offense occurred in the United

20   States.

21             All of the proof that you have seen here in this

22   courtroom is about conduct and activity that occurred in the

23   State of Arizona and the State of Texas.

24             Here is the definition of "material support or

25   resources."  It includes any service, including currency or

1    monetary instruments, training, facilities, weapons,

2    personnel, which can be one or more individuals who may or may

3    not include oneself, and transportation.

4        "Any service" includes service in the form of a

5    violent attack within the United States, whether it be

6    strapping a bomb to oneself and detonating inside of a mall,

7    attacking a sporting event, attacking a U.S. military base or

8    U.S. military personnel, or attacking the Draw Muhammad

9    Contest.

10        Training.  "Training" is instruction or teaching

11    designed to impart a specific skill as opposed to general

12    knowledge.  That would include shooting practice, firearms

13    maintenance, disassembling, cleaning, lubricating, and

14    reassembling a firearm.  All critical to how you make a

15    firearm continue to operate and not jam.

16        "Personnel."  You have to have an agreement to

17    provide one or more individuals who may include any of the

18    co-conspirators to work under the terrorist organization's

19    direction or control.  Importantly, individuals who act

20    entirely independently of the terrorist organization are not

21    considered to be working under its direction or control.

22        But if they are doing anything that submits

23    themselves to the terrorist organizations directions or

24    control, they are, in fact, conspiring to provide personnel.

25        Let's talk about "aiding and abetting" for a minute.

 1    The defendant is guilty of conspiracy, even if he didn't

 2    directly become a member of the conspiracy.  In other words,

 3    let's say, for instance, that Simpson and Soofi had a

 4    conspiracy and they didn't really consider the defendant to be

 5    part of their plans but he knew of their plan.  He knew what

 6    their conspiracy was and he intended to help them in

 7    committing that conspiracy.  He's guilty as though he did it.

 8        If one person knows that another person is committing

 9    a crime and chooses to help that person and has the intent to

10    help them succeed in committing the crime, the person who

11    helps is as guilty as though they did the crime themselves.

12        We have to prove the conspiracy existed, that he

13    aided, counseled, commanded, induced, or procured, in other

14    words, helped or encouraged them, and that he acted with

15    intent to facilitate that conspiracy.

16        And finally, he has to have acted before the

17    conspiracy ended, which is May 3 of 2015.

18        All right.  Let's talk about what that conspiracy

19    was.  It was a violent jihad.  It's not just one thing.  It's

20    a series of things.  Travel to the Middle East.  Hijra.

21        You'll hear more about that in a moment.

22        Attacking the Super Bowl or West Gate or another

23    shopping mall.  Attacking U.S. military personnel such as

24    Major Fedoruk whose name was in that notepad, recruiting

25    station or soldiers near a base.  Again, making an attack

1   within the United States against these types of things is

2   violent jihad on behalf of ISIL.

3          Finally, attacking the Garland contest.  Those are

4   all violent jihad plans.

5          You have to have two or more people to have a

6   conspiracy.  Well, first off, you have two right away; Simpson

7   and Soofi who are both dead in the street in Garland.  But you

8   also have the defendant.  You also have other people with whom

9   they were communicating; specifically, Junaid Hussan, Miski,

10  and you saw Simpson's direct messages with both of them in his

11  Twitter feed, and others known and unknown as alleged in the

12  Indictment that you heard in the beginning of the case.

13         What is the evidence of the agreement?  First off,

14  you have them watching these ISIL videos both in their

15  apartment and in the defendant's house.  And you have Sheikh

16  Adnanis call.  Remember, he's the official spokesman for ISIS

17  and we'll get to that in more detail later.

18         And he made a call to either travel to the United --

19  or to the Islamic State to commit hijra and join the Islamic

20  Army; or if you can't get here, he said, conduct attacks in

21  your homeland, kill people by any means necessary, whether

22  you're stabbing them, shooting them, hitting them on the head

23  with a rock, or running them over with a car.

24         You have Elton Simpson researching travel to the

25  Islamic State, the hijra.  And you have that Exhibit 47.  It

 1    will be in the JERS system.  You're going to have a TV screen

 2    with a computer attached to it that will let you look at all

 3    of these exhibits.

 4          One of the things that he had in that white Samsung

 5    Galaxy phone is Exhibit 47, a publication called Hijra To The

 6    Islamic State.  It explains who to contact, where you need to

 7    go, and how to get there.

 8          You also have him downloading information about U.S.

 9    military members from the Islamic State Hacking Division and

10    then writing down Major Fedoruk's information in the notebook,

11    again, showing that this is what their agreement is.

12          And finally, you have the ISIS flags at the Garland

13    scene which are on the table here in front of you.  That's

14    what they took with them when they went to go conduct that

15    attack because they wanted to announce to the world:  We're

16    here on behalf of ISIS.

17          Let's talk about that hijra for a moment.  First, you

18    have items that tie Mr. Kareem to knowing about that plan; and

19    that is, Mr. Simpsons e-mail to Mr. Kareem about travel

20    restrictions.  You heard Mr. Kareem announce from the stand

21    that, oh, he just forwarded that e-mail to me to print.

22          I'm going to show you something in a minute that

23    shows the lie in that statement.

24          I got way ahead of myself.

25          Okay.  Sorry about that.  I hit the wrong button.

1            The LG 440 phone from the Simpson and Soofi

2   apartment, again, has information about hijra to the Islamic

3   State.  And specifically, there's photos about -- there's

4   photos of another telephone in which texts were being

5   exchanged about traveling to Bulgaria and then going to Sabiha

6   Gokcen Airport in Turkey which is very near the Syrian border

7   in order to get into Syria and join the Islamic State.

8            You have the reference to the same notebook.  It's

9   written on the top of one of the pages in that notebook from

10  Garland and you have a photocopy of that page that is in

11  evidence.  And then you have Nathaniel Soofi, a defense

12  witness, telling you how his dad Nadir Soofi was intending to

13  travel to the Middle East to join the Islamic Army.

14           All right.  Let's look at that e-mail here.

15           On the right you have an e-mail from Andrea Olguin

16  who is a probation officer to Elton Simpson.  July 24, 2014.

17  And you'll have this in the JERS system, so you'll be able to

18  look at the whole thread.

19           But Elton Simpson had sent her an e-mail asking about

20  travel restrictions because he couldn't board a plane two

21  years earlier to go see his grandmothers when they passed

22  away, in wanting to know:  Is there something going on that's

23  stopping me from traveling?

24           This is in July 2014, right after the announcement of

25  a Khalifate in the Islamic State.

1           She responds back to him letting him know, no,

2     there's not any restrictions on your travel.  You just need to

3     give me ten days' notice before you travel and get permission.

4     And she says that international travel is different and you'll

5     have to communicate with me about that.

6           That's back in July of 2014.  When does he send this

7     to the defendant?  Well, first, he sends it from his Yahoo

8     account verily there signs it Yahoo.com.  He forwards that to

9     his personal Gmail account, the "ibrahimibrahim602" account,

10    walling it off, and then forwards it on to Abdul Malik Abdul

11    Kareem at his "gitrdonemoving" e-mail on November 9th.

12          You mean he could not have printed that e-mail if he

13    really needed to print it for some reason between July 24 and

14    November 9?  What's the significance of that?

15          This puts him in the time frame where he is studying

16    hijra to the Islamic State.  It's also after the announcement

17    by Sheikh Adnani of the call for people to travel to the

18    Islamic State and fight on behalf of the Islamic State.  He's

19    letting Abdul Malik Abdul Kareem know that he has problems

20    with international travel.

21          You also have the research into going there and this

22    is the communication:

23          But when you get a flight from Bulgaria you get a

24    flight to Sabiha Gokcen Airport not the Ataturk, in other

25    words, a different airport in Turkey.

1          Bless you.

2          The next text message is just as important:

3          You're not one way.  You're have a trip both ways to

4    IST and back from Bulgaria.

5          Why?  Because these folks know that law enforcement

6    and intelligence agencies are looking for people engaged in

7    one-way travel to areas that are near Syria.  They are on the

8    lookout and they're being advised here how to get in without

9    being detected.

10          Let's talk next about his conversations with Mujahid

11    Miski.  He's still thinking about how he might get there

12    despite the travel restrictions.

13          Mujahid Miski tells him:

14          You will lose an opportunity to do something good

15    like Hijra.  Then you'll be saddened over the loss of that

16    great opportunity and you'll miss out of a lot of Ajar -- in

17    other words "reward" -- because of that.  Allah will hold you

18    back from doing so, so that you can get another opportunity

19    for a better place with greater Ajar.  The time between the

20    two H's is a bit long -- again referring to "hijra."  It's not

21    going to be as soon as you lose the first opportunity.  It's

22    going to be a bit later.

23          He said it will happen again.  Insha Allah, meaning

24    "God willing," but to a better place.

25          And then Elton Simpson -- and this is a really

1    important thing, because it shows his intention to place

2    himself under the guidance and control of the Khalifah, and

3    specifically, to do things on behalf of the Islamic State.

4           When Sheikh Adnani gives a public address, can we

5    assume this is what Al Khalifah wants as well?  Seeing that

6    Adnani is the spokesman and seeing that Al Khalifah hasn't

7    come out to correct what Sheikh Adnani is saying.

8           Miski responds:

9           Yes akhil Kareem, Adnani never speaks unless he's

10   been ordered by the khalif of the Muslims.  He can never speak

11   without the order of the Khalif.

12          They go on from here:

13          Maybe then it's possible that the ajar is in what he

14   has said earlier.

15          Again, referring back to that call for attacks in the

16   United States if you can't make hijra to the Islamic State.

17          And Afwan the Sheikh said Allah will hold you back

18   for something far better in Ajar than the last time.  It could

19   be H or something else.

20          Akhi yes, matter of fact, that is far better in Ajar

21   than hijra is right now.  In other words, the Sheikh is

22   telling you, attacking in your homeland and placing fear in

23   the hearts of your people in your homeland is far greater in

24   Ajar than traveling to the Middle East and committing hijra

25   there.

1          Now, let's talk about Kareem's knowledge that ISIL is

2    a terrorist organization, in other words, engaged in terrorist

3    activity.

4          Simpson and Soofi played those ISIL videos regularly;

5    the beheadings, the mass executions, the people riding around

6    in trucks armed, the motivational videos showing people being

7    killed allegedly by U.S. troops, innocent people being killed

8    in the Middle East in order to get people fired up.

9          Mr. Abdul Kareem is interviewed, admitted having seen

10   on Mr. Simpsons phone that ISIL video of the Jordanian pilot

11   being burned alive.  That's in Exhibit 422 and I'll play that

12   in a second.

13         In addition, he played those same types of videos

14   himself.  You heard it from the boys Juan and Carlos.  You

15   heard it from Stefan Verdugo.  And you heard from Ali about

16   him watching those same videos in the Simpson and Soofi

17   apartment.

18         So this is what he had to say about that Jordanian

19   pilot video.

20       (Playing an excerpt of Exhibit No 442 to the jury.)

21         MR. KOEHLER:  All right.  Let's go on from there.

22         So he admits right there that he saw that Jordanian

23   pilot being burned alive in the cage on Elton Simpsons phone.

24   He also admitted knowing that Simpson and Soofi had been

25   looking at terrorist materials.

 1          This is in Exhibit 412, again, part of his

 2   post-arrest interview.  He said:

 3          I be looking at them, like, you know what, leave,

 4   like, you know, like getting on the Internets and stuff like

 5   that.  I'd be like you guys are stupid.  Get off that stuff.

 6   You know what I mean.  You already got in trouble before for

 7   that, you know what I mean.

 8          And then here is the context for that.  Remember back

 9   in 2012, the raid at the Vista house where they took his

10   Lenovo laptop?

11          Ibrahim would come about once or twice a week.  This

12   was over off of Vista.  This was on Vista and we wind up

13   staying over there.  And then after they move to Cochise he

14   started getting on the computer, looking at different videos,

15   and I wasn't with all that stuff with them watching those

16   videos and everything, so I told them they had to leave.

17          That's what he said again in his June 10, 2015

18   post-arrest interview about having seen Elton Simpson and

19   others looking at these terrorist materials.  So he knew

20   exactly what was going on with these folks.

21          More knowledge of the conspiracy.

22          He admitted that he knew Simpson and Soofi wanted to

23   travel to the Middle East to support ISIS.

24          Here is what he said in his June 10, 2015 recorded

25   interview, and that is Exhibit 411.

1              I heard them say stuff but I never -- I don't know

2      what they -- they basically was talking about leaving.  Do you

3      know what I mean?

4              Here is the important part.

5              They basically were going to get out of here and go

6      to the Dola.

7              Now, Agent Whitson explained to you that the Dola is

8      a reference to al dala, the word dala being the "D" in diash,

9      the Arabic acronym for the Islamic State.

10             But I don't know where that's at, you know what I

11     mean?

12             So he knew they wanted to travel and to fight on

13     behalf of a terrorist organization.

14             You also have Abdullah Mubarak talking about his

15     conversations here on the witness stand with Mr. Abdul Kareem.

16             So you said back to him:  There's no Khalifah.

17             Right.

18             The last was the Prophet Muhammad.

19             Right.

20             And presently there is no Khalifah.

21             Right.

22             And then you mentioned him pushing back and saying:

23     There is a Khalifah.

24             Well, you know, I guess he must have thought that

25     there was a Khalifah, but I clearly told him:  Ain't no

 1     Khalifahs.

 2             And then later he answers a question -- answers a

 3     question about whether the defendant brought that up at other

 4     times.

 5             Quite a few different times, you know, but, you know,

 6     I kind of let him, you know, look, ain't no such thing.

 7     There's no Khalifah.  Ain't going to be none.

 8             And I said:  I didn't even want to talk about, you

 9     know, kind of sway me.  It's your beliefs, you know what I

10     mean?

11             He had to call his son to get his son to tell Abdul

12     Malik Abdul Kareem that there's no Khalifah.

13             Now, who has a Khalifah?  Only one group in the

14     terror world right now in the Islamic world is claiming to of

15     a Khalifah in modern times and that's ISIL.  You heard that

16     from Evan Kohlmann.  You heard that from others in this case.

17             Okay.  Let's talk about some of the witnesses who

18     knew Mr. Abdul Kareem.  You have Carlos.  You have Juan.

19     Stefan Verdugo.  Sergio Martinez.  Nicole Medellin.  Giovanni.

20     Abdullah Mubarak.  Ali Soofi.  Nathaniel Soofi.  And AK Wahid.

21             Let's talk about Carlos first.

22             He was an eighth grade student.  He knew the

23     defendant through his older brother for about a year.  His

24     interactions with the defendant happened back in seventh

25     grade, so a year ago and before, and that's how he remembered

1    some of the timing of things.

2            He did odd jobs for the defendant.  He received gifts

3    and money from the defendant.  He went to the defendant's

4    house all the time and he spent the night there.  He converted

5    to Islam.  Why?  Because the defendant told him that if he

6    wanted to be the defendant's friend, he had to convert to

7    Islam.  A little bit of coercion there?

8            The last time he saw the defendant was shortly before

9    the defendant moved away from the Cochise house.  So he's had

10   no contact with him in the past year because we're now in

11   March of 2016.  So it's been about a year since he had contact

12   with him.

13           Carlos told you about seeing that video of the

14   Jordanian pilot the next morning, how the defendant showed him

15   the Fox News video of it.  The defendant was laughing so loud

16   that it woke up Carlos.  And then the defendant got him and

17   brought him into the living room to show him the video of this

18   guy being burned alive inside a cage.  Who shows that kind of

19   thing to a child?

20           Let's talk about the Garland contest.  The defendant

21   told him about the Garland contest before the contest took

22   place.  He talked about giving an AK47 to Ibrahim because he

23   knew Ibrahim was going to go there and he was going to need

24   protection for himself when he went to attack it.  And then he

25   talked about killing kafirs.  He said:  If I had to shoot a

1  kafir, I would.

2         Let's talk about Juan.  Juan is Carlos's older

3  brother who is in the ninth grade now.  He was in the eighth

4  grade when all this was going on.  He also went to the house

5  on Cochise after school most days and sometimes slept at the

6  defendant's house.

7         He saw Ibrahim when he was there.  He also converted

8  to Islam and was learning Arabic.  One of the things he saw

9  there with Ibrahim and the defendant was an execution video.

10 And he described it for you involving 13 Muslims standing with

11 these three cameramen.  And one of the Muslims had a sword to

12 the cameramans throat as the cameraman was telling his family

13 that they were going to be okay.

14        The defendant showed these things on the TV in his

15 house using a Roku system.  That's part of why you don't

16 necessarily see as much on the electronic devices from the

17 defendant's house is because he was streaming it off of a

18 Roku.

19        He also told you that the defendant literally wanted

20 to strap himself to a bomb and go inside a mall with innocent

21 people and just blow them up.

22        Another time after the defendant had been pulled over

23 by a police officer for what he thought was no reason, he said

24 he wanted to strap himself to a bomb and go inside and kill

25 people.  Not a reaction to the officer, but a reaction toward

1    innocent people.  Why?

2          Juan heard Mr. Abdul Kareem talking to Ibrahim about

3    that contest three different times before the attack.

4          First time he was in the back bedroom and heard them

5    getting angry about what he called an Osama bin Laden Contest.

6          The second time he went to a hallway to listen and

7    used -- I'm sorry -- he went to the hallway to listen and

8    watched the defendant and Ibrahim in the prayer room using the

9    mirror in the house.

10         He said the defendant was angry at the people hosting

11   the contest and that he just wanted to go there and shoot them

12   or wanted to go there and just shoot them.

13         The second time he was in the defendant's vehicle and

14   he overheard the defendant talking to Ibrahim on the phone.

15   The defendant had a bluetooth audio system and he could hear

16   him over that.  And he heard him chuckling about the Texas

17   attack.

18         The third time back at the house he heard the

19   defendant talking to Ibrahim and AK Wahid about that contest.

20         Juan also told you about Kareem's fascination with

21   the end of times and he showed him a video about it.  And his

22   testimony here was once the trumpets started to sound in the

23   sky, the Apocalypse was coming.

24         Interestingly, Kareem had those Soldier of Allah 2

25   images on his Nextbook tablet that evoked the End of Times

1   imagery and those are Exhibits 453, 454, and 455.

2          And Soofi's Dell laptop had that picture of the End

3   Of Time...A New Beginning on his laptop, and that's Exhibit

4   260 and those are right here.  In the upper right you see the

5   Soldier of Allah 2 and there's quotes.

6          And I won't go into the specifics of the quotes.  You

7   can look at them on JERS later.  But you can see the End of

8   Time imagery there.  It corroborates what Juan was telling you

9   about Mr. Abdul Kareem's fascination with that.

10          Not so coincidentally, that's also how ISIS sells

11   itself.  They're headquartered in Rocca.  They talk about the

12   Final Battle in Dabiq.  They name their magazine Dabiq.  And

13   you have Dabiq Issues 5 and 8 from Mr. Simpson's cellphone in

14   evidence here.  They are Exhibits 45 and 46.

15          You also have Exhibit 40 from Elton Simpsons phone.

16          Which nation does rum in the hadith of the last days

17   refer to?

18          Well, Anwar al-Awlaki answered that question in the

19   Hereafter CD that was found in Mr. Kareem's possessions.

20     (Playing an excerpt of Exhibit 113 to the jury.)

21     MR. KOEHLER:  So he's talking about the Caucasians,

22   the people from the West, and I didn't play the whole

23   recording, but it's the people from the West.  That's who he's

24   talking about who are going to be in that Battle at Dabiq at

25   the End of Time.  We played more of that for you during the

1    trial, but I just wanted that little snip for you here.

2    I want to move on next to Sergio Martinez.  He's

3    known the defendant since he was about 18 years old, so about

4    12 years.  He had the defendant over to his mothers house with

5    Simpson to go shooting.

6    One of the more interesting things that happened

7    while they were shooting, Simpson's gun jammed.  So right

8    there, Mr. Abdul Kareem knows that Simpson is not doing a good

9    job of taking care of his guns.  That came out on

10   cross-examination.  That wasn't on direct.

11   Mr. Maynard asked that question of Sergio Martinez

12   and he told you that that gun jammed.  And so at that point

13   when they couldn't unjam that gun, he knew that Simpson needed

14   to know how to properly clean, disassemble, clean,  lubricate,

15   and reassemble a firearm.

16   The defendant asked him to take Simpson and Soofi

17   shooting in the desert and he was pushy about going shooting.

18   Why?  Well, this is in January.  What's coming up at the first

19   part of February?  The Super Bowl that he had told Stefan

20   Verdugo that they wanted to attack with pipe bombs.

21   Let's talk about the shooting trip out to Wittmann.

22   That group came to Martinezs house before going shooting and

23   prayed inside before they left.  Ibrahim and Simpson both shot

24   firearms that had been found in Garland.

25   You heard Sergio Martinez talk about the fact that

1    the guns used in Garland were the same guns that were brought

2    to the Wittmann scene when they went shooting there.  He also

3    told you that Ibrahim ran backward and forward and side to

4    side while shooting.

5           You heard Agent Jenkins from the FBI who is the ERT

6    team leader and went out and collected the shells.  All those

7    little flags they put in the ground showed that pattern of

8    movement forward and backward and side to side while firing.

9    And even the defendant himself made a partial admission to

10   that -- oh, yeah, I kind of saw him moving -- when he was

11   testifying here just the other day.

12          And you had Rodney Jiggetts from the FBI confirm for

13   you that the shell casings from that scene matched those

14   firearms that were found in Garland, Texas.

15          Mr. Martinez expressed concern to his wife Nicole

16   Medellin when he got home from shooting.  Why?  Well, he told

17   you they looked like terrorists while they were shooting,

18   specifically talking about Ibrahim.

19          About a week or so after the house -- after the

20   attack, the defendant went to Sergio Martinezs house.  And you

21   know that not only because of Sergio Martinez.  You know that

22   because Agent Whitson told you that they were tracking the

23   defendant and he had been followed to Mr. Martinezs house.

24          In fact, the defendant, in taking the witness stand

25   here in the case, didn't even deny that.  He didn't deny going

1    to the house.  And he didn't deny that he told Sergio Martinez

2    that he felt it was wrong what happened to Ibrahim and Soofi.

3    In other words, he thought that the police did wrong in

4    killing those two when they pulled out their weapons and

5    started shooting.

6         He also told you that the defendant brushed up

7    against his shoulder and whispered:  If questioned, don't say

8    anything about going shooting.

9         He didn't want anyone to know.  That's another thing

10   the defendant did not deny from the witness stand; going to

11   Sergio Martinez and telling him to keep his mouth shut about

12   going shooting in the desert.

13        Why would he need to cover that up if it was

14   innocent?

15        Nicole Medellin came in and talked to you and she

16   told you about how she spoke to the defendant back in around

17   2010.  And he told her that U.S. soldiers all deserved to die

18   because they were killing Muslim children overseas.  That's

19   that same selling point that ISIS and these other groups are

20   using to recruit people to join them and go fight on behalf of

21   the Islamic State.

22        The West is killing people and harming people and

23   somebody needs to do something about it.  You've heard that

24   theme over and over again from different witnesses in this

25   case.  And here is Nicole Medellin talking about this being

1    that mans state of mind all the way back in 2010, years before

2    the time period we're talking about.  This is not a new

3    phenomenon with this man.

4         Sergio told you about going shooting with -- he had

5    told her about going shooting with Simpson and Ibrahim and

6    Soofi in the desert.  And his conversation with her made her

7    fear for her childrens safety as a result of that event.

8         Kareem came back over to her house and Sergio's house

9    after the attack and it was late at night.  Again,

10   corroborating what Sergio told you that the defendant came

11   over later and said:  Don't say anything about going shooting.

12        Let's move on.  Stefan Verdugo.  Here's another

13   person who's known the defendant for a long time since he was

14   much younger, since age 14.

15        You may remember Stefan.  He's the guy that came in

16   in the orange jumpsuit.  Not your typical witness in a federal

17   trial, but he came in and he talked about his time with the

18   defendant.

19        He showed Kareem and Simpson how to make a small

20   explosive device.  And Kareem asked about making that bigger,

21   making pipe bombs.  He also asked about silencers.  Kareem

22   asked him about explosives to attack the Super Bowl or West

23   Gate Mall, again, showing this intent to conduct an attack on

24   behalf of ISIS.  Not just Simpson and Soofi, but Abdul Malik

25   Abdul Kareem.

 1          He saw Simpson and Soofi watch those violent ISIS

 2     videos.  And what did he tell you he learned from those?  ISIS

 3     don't play.  In other words, they're not kidding around when

 4     they say:  We're coming for you.  They're not kidding around

 5     when they say:  If you mess with us, we'll kill you.  They're

 6     for real.

 7          He also told you that the defendant called

 8     non-Muslims "kafirs."  Same thing that you heard from others

 9     in this case.  And he talked about wanting to blow kafirs up

10     and yelling "Allahu akbar" while doing it.  He also recognized

11     those guns from the Garland attack and one of the guns he

12     recognized specifically was that .357 magnum with the little

13     gold emblem in the handle.

14          And he told you that the defendant had given that gun

15     to Ibrahim and he replaced it with a black Taurus .38 Special

16     and you'll see that in a minute.

17          He told you about the videos.  He said D -- that's

18     how he knew the defendant Decarus Thomas before he changed his

19     name to Abbuhl Kareem -- and Elton would spend a few hours.

20     Not every night, but every other night, he would come over and

21     he would watch gorish videos about terrorist attacks or

22     supposed U.S. military gunning down Muslims for no reason.

23          And they would watch this for like a few hours a

24     night and they would go back and forth on what was later

25     clarified to be a tablet computer.  Again, this ties to Nicole

1    Medellin.  These aren't two people that hang out together.

2    And yet they're both describing that same attitude toward the

3    U.S. military.

4         Here is what he says about the Garland contest.

5    Simpson told Kareem about that contest in front of Verdugo.

6    And then later Mr. Abdul Kareem told Verdugo about plans to

7    attack that contest and that he was going to be part of that

8    attack.

9         He said:  There's things that have to be done.

10   Again, somebody has to do something because of what the U.S.

11   is doing overseas.  Right?

12        Verdugo told Kareem it wasn't worth his life.  And

13   some point later on, Kareem changed his mind and decided he

14   wasn't going to be part of it, actually go there and do it.

15   But that doesn't mean that he wasn't still part of the plan.

16   It just meant that he wasn't going to go.

17        Kareem talked to Verdugo a few days after the attack

18   when Verdugo called him and he said the police martyred them

19   in the street for no reason.  No reason?  Two people pull out

20   guns in the street and open fire and killing them -- shooting

21   back and killing them is no reason?

22        Let's talk a little bit about corroboration with

23   Stefan Verdugo.  He was the guy in the orange jumpsuit and he

24   told you there were other people being executed in orange

25   jumpsuits.  And that matches the same descriptions you heard

1    from Juan and Carlos and also from Nathaniel Soofi when he

2    described that Message in Blood with the men in orange

3    jumpsuits being marched along the beach.

4         You also saw the Charlie Hebdo attack with Kareem,

5    Simpson, and Soofi.  This is after the attack.  This is after

6    the police have hunted these people down.  And they were upset

7    because their Muslim brothers were being killed after having

8    slaughtered people at the Charlie Hebdo Magazine.

9         Ali Soofi, Nadir Soofi's brother, described the same

10   thing, only he saw it earlier.  And he saw them watching the

11   attack and celebrating their Muslim brothers accomplishment.

12   They had killed the people in the Charlie Hebdo Magazine and

13   they were on the run.  And so that was a time for celebrating

14   because they were successful.

15        One of the things that Stefan Verdugo did was

16   describe things from inside Mr. Abdul Kareem's residence in

17   fairly minute detail.  He described that camouflage

18   bulletproof vest.  He described ammunition, including the

19   12-gauge ammunition being there.  He described different kinds

20   of guns that Mr. Abdul Kareem had in his possession.

21        One of those guns he described was a gun-metal gray

22   like silver, .380 pistol with a wood-grain handle.  That gun

23   wasn't found by the FBI when they searched Mr. Abdul Kareem's

24   residence, but they did find a magazine that matches the

25   description of that gun.  That's this one here.  It's Exhibit

1    No. 400 and that's a photograph of that.

2         And that's not one round inside like Mr. Abdul Kareem

3    described.  It's five rounds inside that magazine.  It's not

4    something he found sweeping out a truck.  It's something that

5    he had inside his apartment in his bedroom.

6         Mr. Verdugo had nothing to gain here.  He got $500

7    from the FBI.  Why?  So that he could legally drive around

8    while trying to make recordings and making recorded phone

9    calls.  It would make sense that the FBI would not want

10   somebody who is helping them to get pulled over for driving on

11   a suspended license and end up getting taken into custody or

12   get their car taken away while they're trying to help the FBI.

13        Nine months later when he comes in here and testifies

14   in front of you, he doesn't owe the FBI a darn thing.  He's

15   already gotten whatever benefit he was going to get.  And the

16   same thing is true with regard to his state case.  He told you

17   there's been nothing given to him in the state case in

18   exchange for coming over here and testifying in this case.

19        The only thing that he got was agents writing reports

20   and disclosing those reports on things that they had seen that

21   might be material to his defense.  Why?  Because that's a

22   constitutional obligation that the government has to turn over

23   that kind of material and so that happened.

24        What's important is it happened back in December.  He

25   came here and testified for you in the end of February.

 1    Again, whatever benefit he was going to get, he already had.

 2    He didn't have to come here and talk to you.

 3            Let's go on to Ali Soofi and then, hopefully, take a

 4    break from there.

 5            Ali Soofi lived in Simpson's and Soofi's apartment

 6    from February, 2014, to March, 2015, and moved out in April,

 7    about a month before the attack.  He said the defendant

 8    frequently came over to that apartment and spent the night

 9    there on occasions sleeping on that L-shaped couch.

10            And he talked to you about how their feet kind of

11    practically touched each other because they were on opposite

12    ends of that L.  He also told you the defendant came to the

13    apartment two or three times per week in the months leading up

14    to May 3 of 2015.

15            He describes the ISIS videos that they watched.  He

16    said Simpson and Soofi and the defendant were watching these

17    ISIS videos showing people riding around in trucks shooting

18    guns.  He told you about how Ibrahim would talk about those

19    videos to both Nadir Soofi and the defendant and would Tweet

20    about them and talk about that.

21            He said he began to feel unsafe in that apartment as

22    the talk about ISIS got more intense and he started spending

23    more time with his girlfriend, but still was there during the

24    week.

25            He also told you about those videos having been

UNITED STATES DISTRICT COURT

1    played on that tower computer.  And remember, that's hooked up

2    to a flat screen TV in the apartment.  Everybody in that

3    apartment could see.  It's not like it's this great big place.

4    It's a one-bedroom apartment with one living room and

5    everybody inside the apartment could see that flat screen.

6          Nadir, his brother, was always at the main computer

7    chair controlling what was being watched.  When the videos

8    were playing, the defendant was saying:  People need to learn

9    their lessons.  Nonbelievers, you know, will basically learn

10   their place in this world in the end.

11         He also told you about seeing beheading videos being

12   played and Ibrahim being pleased about that and the defendant

13   and his brother Nadir likewise being pleased by what they saw.

14   Their expressions were just like Ibrahims.

15         He talked to you about kafirs.  That the defendant

16   mentioned to him a couple of times about the kafirs, the

17   nonbelievers, and told you "these people should be killed" is

18   what the defendant said.

19         Again, this is somebody completely unrelated to Juan

20   and Carlos, unrelated to Stefan Verdugo describing the same

21   thing.

22         He also talked to you about Elton Simpson's Twitter

23   usage.  Only Ibrahim had a Twitter account.  Nadir Soofi

24   didn't have one.  Neither did the defendant.  Ibrahim used the

25   Twitter account from that tower computer, again, connected to

1    the flat screen so everyone could see it.

2           He described a man, African-American who was from

3    Minnesota that Ibrahim would Tweet with all the time,

4    constantly.  And then we showed him a picture.  That's Mujahid

5    Miski.  That's the same person that you saw in those Twitter

6    direct messages in Exhibit 480 that was talking back and forth

7    to Elton Simpson and that I showed you earlier when I was

8    talking about his commitment to the Islamic State and hijra.

9           He told you that Ibrahim and Mr. Abdul Kareem would

10   sit next to each other on the couch and talk about what

11   Ibrahim was doing on Twitter.  He said Ibrahim would always

12   lean over and show what he was Tweeting -- and this is on his

13   phone at this point -- and there would almost be a discussion

14   about what he was Tweeting.

15          He would do the same thing with my brother as well,

16   you know, watch a specific video and then Tweet something

17   about it and then show him.

18          Here is a slide from Exhibit 480.  Elton Simpson on

19   Twitter talking to that guy QaQa that he had been talking to

20   at another point in the conversation about the price of

21   firearms in sham, which is Syria, compared to the United

22   States.

23          In this part he's talking about other things, but he

24   says:

25          Bro I was just telling a bro from Philly what you

1    said.

2          That's consistent with what Ali told you about him

3    talking about what he's Tweeting about.

4          And then you have in evidence -- I think it's Exhibit

5    134, but forgive me if I'm wrong -- photographs of Elton

6    Simpson taken by the defendant on his camera -- on his cell

7    phone and recovered by the CART examiners the early morning

8    hours of February 18.  That's your "bro from Philly."

9          Oh.  The khalif discussion.  Again, you have another

10   discussion with the defendant, Elton Simpson, and Nadir Soofi

11   about a Khalif.  Who's got a Khalif?  ISIL.

12         He also told you that the defendant talked about

13   selling all of his possessions and moving to the Middle East.

14   Hijra.

15         He told you about the Charlie Hebdo attack.  And I

16   already went through this.  They looked pleased because,

17   again, these people had accomplished what they were setting

18   out to do, which was get that message across on behalf of

19   ISIL.  Don't insult the Prophet.  We'll kill you.

20         He also told you, again, this End of Times

21   fascination and there was a constant discussion toward the end

22   when his brother became more radical.  A constant discussion

23   of different prophesies that had already occurred, the

24   constant worry of the different prophesies that had been

25   foretold are happening.

1          Again, this is how ISIS sells itself.  They are

2     fulfilling those prophesies.  They are reading them and

3     they're selling themselves and it's fulfilling the prophesies

4     that are going to trigger that final battle, Armageddon, and

5     these folks wanted to be a part of it.

6          He also told you about money.  His brother Nadir ran

7     two businesses into the ground, the pizza business as well as

8     the cleaning business, because he was too focused on the

9     Islamic radical side of things and not on running his

10    business.  And the only way they got by was with financial

11    help from their father.

12         He told you the same thing about Ibrahim.  Ibrahim

13    had been working parttime consistently, but after a while it

14    became nothing, almost a couple of days here and there.

15    Neither of these guys had the kind of money that it took to

16    buy a gun for $700.

17         Even the defendant admitted that Ibrahim had stopped

18    working.  He told you about Ibrahims AK, that he got it

19    sometime four months or so after Ali moved in the apartment.

20    That he didn't have the money to buy that gun.  And he told

21    you that the defendant provided the money to buy that gun.

22         Nadirs AK.  He told you the same thing about that.

23    Nadir came home with a full body AK about four months before

24    the Garland attack.  That's corroborated by those texts that

25    you saw during the trial when the LG 440 phone, the one found

1    in Garland, was being used to ask questions of prospective

2    sellers about whether they had their AKs for sale and

3    discussing price.  Those were in January of 2015.  That ties

4    directly to what Ali told you.

5          Nadir told Ali that he borrowed $700 from the

6    defendant to buy the gun and the defendant was present in the

7    room when that happened.

8          He told you about them going shooting in the desert;

9    twice with Simpson and Soofi, one time was north towards

10   Sedona, and they took those AK rifles.  The defendant handled

11   both of those firearms.  He told you about them cleaning the

12   firearms.  After that first time they went shooting, the

13   defendant was showing Simpson and Soofi how to take them

14   apart, how to clean them, how to lubricate them, and how to

15   put them back together.  Why?  Because he knew that they

16   needed to know how to do that in order to have their guns be

17   functional.  He was overseeing.

18         And Ali told you Ibrahim and his brother Nadir had no

19   training at all with guns.  Again, describing that proper

20   cleaning procedure.  Not leaving grease on the guns, not

21   completely removing the grease from the sliding parts, and

22   cleaning the barrel properly using the brush to clean the

23   barrel so that you don't damage it.

24         Lets take a pause here.

25         THE COURT:  Thank you, Mr. Koehler.

1          Ladies and gentlemen, we'll take our morning break at

2     this time.  We will reconvene at about ten minutes to 11:00.

3          You are, again, reminded of the admonition you are

4     not to discuss the case among yourselves or form any

5     conclusions about it until you have heard the rest of the

6     closing arguments of counsel and begun your deliberations.

7          I want to also make a special request of all of our

8     spectators here today.  All of my jurors are wearing juror

9     badges.  You may encounter some of them.  You may be talking

10    about the case because you're not prohibited from doing so.

11         But please, if you see any of these people with their

12    juror badges on, or even if they don't have their juror badges

13    on, please stop discussing the case so that there is no

14    possibility that they overhear any of your discussion about

15    the case.

16         I don't think that I have to warn you about not

17    contacting or trying to speak to any of my jurors.  I'm sure

18    you know very well that that is also prohibited.

19         We will reconvene, ladies and gentlemen, in 15

20    minutes.

21         Court is in recess.

22      (Recess taken at 10:34 a.m.; resumed at  10:51 a.m.)

23         THE COURT:  Thank you, ladies and gentlemen.  Please

24    sit down.  The record will show the presence of the jury,

25    counsel, and the defendant.

1          Mr. Koehler, you may continue your closing argument.

2          MR. KOEHLER:  Thank you, Your Honor.

3          We left off at the point in which I was about to

4    explain to you how the defense witnesses also support the

5    governments case in this case.

6          Let's talk first about AK Wahid, a friend of the

7    defendant's and a friend of Ibrahims.

8          Mr. Wahid came in here and under oath told you from

9    the witness stand that Abdul Malik Abdul Kareem told him about

10   Simpson and Soofi planning to light up a Marine base.  He told

11   you he had heard the same thing directly from them, but that

12   the defendant came to him and told him that Simpson and Soofi

13   had talked to him about doing that.

14         Now, of course, the defendant said that it was AK

15   that told him about this attack and that he didn't really --

16   it was vague and he didn't really understand it and we'll come

17   back to that in a little bit.

18         He was also present with the defendant and Ibrahim

19   when the defendant bought that Taurus .38 Special.  This is

20   the gun that came from Sean Raper.  Sean Raper was the guy

21   that came in here and told you how he had the gun listed on

22   Craigslist and the defendant contacted him and they met in a

23   parking lot.

24         And when the defendant bought the gun from him,

25   whether it was $300 or $350 is really irrelevant.  The thing

1    that was relevant to Raper at the time was that the defendant
2    had this great big old wad of cash in his hands.  And how
3    nobody in their right mind goes to a transaction like that
4    involving a firearm exchange with a whole bunch of money on
5    them.  That's a very easy way for someone to get robbed.  So
6    it makes sense that that would stand out to him.
7         In addition, he told you that the defendant said he
8    was in the market for more guns.  Who was with him?  AK and
9    Ibrahim.
10        Also, this gun matches Stefan Verdugo's description
11   of the defendant getting a new gun after he gave Ibrahim the
12   .357 with the little gold emblem in the handle.
13        And it also dovetails with the notion that Nadir
14   Soofi was seeking to buy an AK rifle in January, which is
15   after this, of course, but it shows, hey, Abdul Malik Abdul
16   Kareem in the market for more guns shopping with Ibrahim.  And
17   lo and behold, who is looking for a gun as well?  Nadir Soofi.
18        There's that .357 from Garland.  If you look in this
19   lower-left corner right here, you see that little gold emblem
20   just like Stefan Verdugo described.  Over here, that's the .38
21   Special that Mr. Abdul Kareem had in his truck; all black, a
22   Taurus, just like Stefan Verdugo described.
23        Let's talk about Nathaniel Soofi who came in as a
24   defense witness.  He stayed at that apartment on most weekends
25   and stayed over on Saturdays.  That's the same night the

1    defendant's brother James Sampson came in here and told you

2    that the defendant usually spent at his place.  So it would

3    make sense that Nathaniel Soofi would never see the defendant

4    spend the night at the Simpson and Soofi apartment.  Why?

5    Because he wasn't there on the nights that the defendant would

6    be there.

7         He told you about seeing ISIS execution videos on

8    Nadirs computer and he saw them when he was alone with Nadir.

9    He didn't see those videos with Ibrahim and he didn't see

10   those with the defendant because Nadir was showing those to

11   him just the two of them.

12        He also knew about the Garland contest.  And he knew

13   that the planning for that started all the way back in

14   February.  He described how it was cold outside and it was

15   still February at that point in time.

16        Nadir told his son about the plan to attack the

17   contest and he overheard Nadir and Ibrahim talking about it.

18   He didn't overhear Nadir and Ibrahim and Malik talking about

19   it.  There's no doubt about that.  But that doesn't mean that

20   Malik wasn't part of the plan, because Malik usually wasn't

21   there when Nathaniel was.

22        Let's talk about corroboration for a minute.

23        Ali Soofi didn't know Stefan Verdugo.  Didn't know

24   Juan.  Didn't know Carlos.  In fact, he didn't know Sergio

25   Martinez either.

1          But Juan and Carlos and Stefan Verdugo all describe

2     the same types of videos and the same types of behavior among

3     Abdul Malik Abdul Kareem, Elton Simpson, and Nadir Soofi that

4     Ali described.  And he doesn't even know them.

5          Ali described Nadir as making soup on the night of

6     May 1st, the night before they left.  And lo and behold, AK

7     Wahid comes in and testifies to you that on the night of May

8     1st, Nadir brought him soup.  What a coincidence.

9          Let's talk about other corroboration in this case.

10    Abdullah Mubarak.

11         Verdugo had talked about hearing the word "Khalifah."

12    Only Verdugo is not a Muslim.  He's more of a street kind of

13    guy.  And who does he think Khalifah is?  A musician.  A

14    rapper.

15         Abdullah Mubarak explained his arguments with the

16    defendant about the existence of a Khalifah in todays world.

17    And he had to call his son to explain "there is no Khalifah"

18    to the defendant.  So, again, the Khalifah discussion was

19    something that's going on and it makes every bit of sense that

20    it would happen in the Cochise residence when Stefan Verdugo

21    was there and corroborated by Abdullah Mubarak.  Only ISIL

22    claims to have a Khalifah.

23         The defendant also admitted in Exhibit 422 -- that's

24    one of his post-arrest interview videos -- that he knew that

25    ISIL is the group that claims to have a Khalifah.

1    Again, Carlos and Juan, not in contact with Verdugo

2  after the contest.  Remember?  Verdugo is not living there

3  anymore.  And not only that, but Verdugo got arrested by the

4  FBI -- the agency that he's supposedly favoring somehow over

5  the defendant -- in California just a few weeks after the

6  attack took place.

7    So these kids had no contact with him and yet they

8  described the same things.

9    Again, Ali didn't know these kids.

10    Now, I want to break and switch to the document

11  camera for you in a minute and you'll have these on the JERS

12  video.  Let me switch to the document camera, please.

13    This is Exhibit 291.  And you'll have a much better

14  view of this when you're in the room.  The thing I want you to

15  focus on is what's in the background here.

16    This is an execution being carried out in front of

17  children.  The same thing occurs in Exhibit 293, an execution

18  in front of children.

19    Why are they doing this?  Why is Nadir Soofi showing

20  his son these videos?  Why is this man showing Juan and Carlos

21  those videos?

22    It's so that they can indoctrinate these children and

23  turn them into the future soldiers of ISIL.  That's why.

24    Let's talk about joining and aiding the conspiracies.

25  Again, he was pushy with Sergio to take Elton Simpson and

1    Nadir Soofi out to the desert to shoot.  He told you from the

2    witness stand that Elton was pushy with him.  And it makes

3    every bit of sense that he would have, again, been pushy with

4    Sergio.

5            He taught them how to disassemble, clean, lubricate,

6    and reassemble those firearms.  He may not have been up to

7    James' standards, but he certainly learned from James that he

8    didn't want to leave too much oil on the outside of the gun;

9    that it needed to be lubricated, but perhaps not as much as

10   the defendant wanted those guns to be lubricated.

11           The next thing is, remember, Sergio, again, on cross

12   explaining that a gun had jammed when Elton Simpson and the

13   defendant went to his mothers house to shoot?  Again, the

14   defendant knew that Elton Simpson needed to learn how to do

15   this the right way or his gun was going to jam and it wasn't

16   going to function when he conducted an attack.

17           Let's talk about physical evidence in this case.

18           Remember the ammunition that we talked about earlier?

19   That .38 Special ammunition that fits both in a .357 magnum as

20   well as in a .38 Special pistol?  You have Richard Henderson

21   from PMC Ammunition testify about how that particular

22   ammunition came in these battle packs.

23           That's that bag right there on the table in front of

24   you.  And in evidence is a photo of that bag sitting on the

25   ground in Garland filled with that .545 ammunition that was

1   for the AK-74.

2          So they took the boxes out of that bag of the .38

3   Special ammo and they put that ammunition in that bag and took

4   it with them to Texas.

5          Kareem -- Mr. Abdul Kareem had two boxes of that in

6   his apartment.  Remember, it came in a six-pack.  Simpson and

7   Soofi had one box in their apartment.  And then they had a box

8   with them in Garland, Texas.  Five rounds of that ammunition.

9   And that's this exhibit right here with the individual rounds,

10  Exhibit No. 13.  Those are the rounds that came out of the

11  .357 that Elton Simpson had in his pocket that was cut away.

12         There's the bag.  There's the lot number on the

13  ammunition from the Simpson and Soofi apartment.  The

14  ammunition from the Garland scene is in the lower left.  And

15  then the ones on the lower right are from Mr. Abdul Kareem's

16  apartment.  Lot number matches on every single one of those.

17         Here is what Mr. Kareem had to say about that

18  ammunition.

19      (Playing an excerpt of Exhibit 428 to the jury.)

20         MR. KOEHLER:  It wasn't for him.  It was for me.

21  Adamant about that.  Yet when he took the stand and testified

22  in front of you the day before yesterday and the day before

23  that, he told you that was a split purchase.  That they both

24  paid half for that purchase.

25         But that's not what he said in his post-arrest

1    interview.  "It was for me," he said.

2            There's other ammunition that matches in this case

3    that hasn't really been talked about very much, and that is,

4    the Perfecta 9 millimeter ammunition that was found at the

5    Garland scene, as well as a box of it in Abdul Kareem's

6    apartment locked away.

7            On the table there you see the whole box from the

8    apartment.  And then also on the table you see the remnants of

9    that box.  The one from the apartment is Exhibit 117.  The one

10   from the scene is Exhibit 59.

11           Now, if you look closely, right here you can see it

12   says two box -- or 250 X -- meaning 50 shells -- of 9

13   millimeter ammunition for 1995.  Two boxes.  Here's one box in

14   the apartment.  Here's another box from the scene.

15           The box from the scene is destroyed, so you don't

16   have the lot number from that box, but you do have the bar

17   code and it's exactly the same between the two bar codes.

18           Is that just a coincidence?

19           Let's talk for a minute about Mr. Abdul Kareem's

20   paranoia.  He thought there was a tracking device in his car

21   and he thought that Simpson was an FBI informant.  And then he

22   told you that Simpson thought that he was an FBI informant.

23           You heard from Amber Pluff, Stefan Verdugo's

24   ex-girlfriend, that Mr. Abdul Kareem always seemed paranoid

25   and he had to go because the Feds were listening.

1          Carlos also told you the defendant was worried all

2     the time about the FBI watching and you heard that elsewhere

3     as well.

4          He had five weeks after this attack to clean up.  And

5     who knows how long before the attack, once he decided that he

6     wasn't actually going to go.

7          Five weeks to purge overtly jihadist materials,

8     whether they're books or other literature, the The Defense of

9     the Muslim Lands book that was found in Garland.  Five weeks

10    to get rid of overtly jihadist CDs like The Battle of Hearts

11    and Minds and five weeks to clean up his computer devices.

12         He tried to wipe that Lenovo laptop in 2014 before

13    giving it to Sergio Martinez.  And he told you that he burned

14    that 2 gigabyte thumb drive; burned it up in a barbecue.

15         He also cleaned his Google Search History in 2015

16    multiple times.

17         Agent Whitson testified about things that were in the

18    history when he executed the first search warrant on Mr. Abdul

19    Kareems Gmail account that weren't there the second time that

20    he executed the search.

21         And there were things in the Acer Aspire in its

22    Search History that had been accessed from the Google account

23    that, likewise, were not there when they did the first search

24    warrant on the Gmail account.

25         So, again, Mr. Abdul Kareem is, in fact, cleaning his

1    computers, cleaning his Gmail account.

2          And in case you hear an argument that this isn't a

3    guy who is sophisticated enough to do this, remember, this is

4    not only a guy who's cleaned his Gmail account and has the

5    tools to clean his computer, but he also knows how to tether

6    that computer to a cell phone.  He's not somebody who is

7    completely unsophisticated when it comes to computers.

8          Again, one of the things that he deleted from that

9    computer was that Flames of War video.  The only trace of that

10   video was in the unallocated space and in the Windows System

11   Recovery Restore Point, a place that was too deep for him to

12   figure out how to get to.  But it was deleted and it had been

13   there before.

14         And you have that whole video in evidence.  He had

15   the tool with which to perform this cleanup.  That's Exhibit

16   200, that Hirens boot CD, the one that says Hirens 15.1 on it.

17   And you heard from Mr. Evans, the CART examiner from the FBI,

18   about some of the tools and that CD.

19         One of them is the program called Shredder.  And

20   here's what it says:  Shredder allows you to erase files in

21   such a way that it is impossible to recover them by software

22   or hardware means.

23         So he had exactly the right tool that he needed to

24   take those things off of his computer and he had five weeks

25   within which to do it.

1            Let's talk for a minute about credibility.

2     Mr. Sampson, when asked if it would surprise him about his

3     brother wiring money to people when borrowing money from him,

4     says:

5            Surprise is such a vague word to me.

6            Is "surprise" really that vague?

7            He also said:

8            I wouldn't say that I -- that he didn't know the

9     defendant had been convicted of a felony.

10           In other words, he claimed that he told the FBI that

11    he did know that the defendant had a felony.

12       (Playing an excerpt of Exhibit 606 to the jury.)

13           MR. KOEHLER:  There you have it.  That's exactly what

14    he told the FBI.

15           If I knew he had that felony, he wouldn't have had a

16    gun.  But he told you on the witness stand that he told the

17    FBI that he did know he had a felony.

18           One thing he did tell you was that the defendant

19    always used too much oil when cleaning guns.

20           And then, of course, the wiring of money.  And you

21    saw the money wiring receipts where the defendant was sending

22    money to other people in significant dollar amounts; $500

23    here, $700 there.  The defendant deposited $10,000 in cash

24    into his BMO Harris bank account.  He wasn't hurting for

25    money.

1          Let's talk for a minute about the experts in this

2     case.

3          Dr. Sageman came in here and talked to you about his

4     point of view on things.  But one thing became clear very

5     early on, and that is, he didn't know a heck of a lot about

6     ISIS.  He didn't follow their propaganda or their recruitment

7     efforts.  He didn't recognize their materials and the

8     relevance that those materials have to their recruitment

9     strategies.

10         His expertise was in al-Qa'ida and what attracted

11    people to al-Qa'ida, not ISIS; not ISISs online propaganda or

12    its recruiting strategies.

13         Not only that, but he didn't bother listening to the

14    totality of the al-Awlaki recordings that were discussed in

15    this trial.

16         Look at the other side of things.  Mr. Kohlmann

17    devotes most of his time to terrorist propaganda and

18    recruiting efforts online.  That's what he does.  He spends

19    his whole time in his life online following what they're doing

20    and figuring out where that's going next.

21         The same thing is true of Dr. Vidino.  He dedicates

22    the majority of his time to the study of ISIS and has

23    published a seminal paper on ISISs recruiting strategy and

24    their use of Twitter to further their efforts.

25         Speaking of Dr. Sageman, he claimed that the

1    Hearts -- that The Hearts and Minds recording is not a violent

2    recording.  This, again, is something that was in the Search

3    History from the Lenovo laptop and is Exhibit 164.

4        (Playing an excerpt of Exhibit 164 to the jury.)

5        MR. KOEHLER:  Facing death with a smile, just like

6    Elton Simpson did when he got out of the car on May 3rd of

7    2015.

8        You heard from Bruce Joiner describing how he thought

9    at first this must be a prank because this guy was grinning at

10   him.  And then he saw the gun come up and realized that it

11   wasn't.

12       We'll stop here for a minute.  This is a case that

13   involved a lot of digital evidence, as well as the physical

14   evidence and the witnesses who came in here and testified.

15   And the reality of this case is that the digital evidence is

16   completely unnecessary for you to reach a conclusion of guilt

17   in this case.

18       You have the testimony of all the different witnesses

19   in this case about what was going on inside the Simpson and

20   Soofi apartment with the defendant present.  You have the

21   witness testimony about what was happening inside the

22   defendant's residence and the things that he was doing and

23   saying to people and that were said to him in other peoples

24   presence.

25       To know exactly what was going on, you have the ISIS

1    flags, all of the weapons, the books and literature that the

2    two shooters in Garland, Simpson and Soofi, had with them.

3           That, alone, is enough to support a guilty verdict in

4    this case.  But like they say in the infomercials:

5           Wait.  There's more.

6           This digital evidence in this case isn't just

7    something to deepen and broaden your understanding of the

8    scope of the conspiracy, the fact that they wanted to travel

9    to the Islamic State and fight.  It's not just evidence of

10   their desire to attack other targets like the ISHD, the

11   Islamic State Hacking Division target list of a hundred

12   service members.

13          It goes beyond that.  It corroborates what you have

14   heard from these children.  These children describe watching

15   beheading videos and other things that they've seen.  And lo

16   and behold, this is exactly what you find on the computers,

17   those things, the al-Awlaki lectures that you heard that they

18   were listening to and so forth.

19          So you've got these devices that Simpson and Soofi

20   had:  The Samsung Galaxy Smartphone, that was Simpson's phone,

21   the tower desktop computer that was Soofi's, the Dell Inspiron

22   laptop computer that was Soofi's, the Samsung Galaxy

23   Smartphone that was Soofi's, and then the two LG 440 --

24   they're kind of drop phones -- those little flip phones, one

25   in the car in Garland and one in the apartment.

1            Without a doubt, these things were replete with

2    jihadist material and evidence of Simpson's and Soofi's

3    intentions.  But they also contained things that corroborate

4    what you have heard from the witnesses in the courtroom here,

5    and that is, by and large the purpose of bringing the evidence

6    from those items your way.

7            Mr. Abdul Kareem's devices.  He had the Lenovo laptop

8    that had the thumb drive attached to it.  He had the Acer

9    Aspire computer, his Maxwest Gravity 5.5 Smartphone, and his

10   Nextbook tablet.

11           The Lenovo laptop had that Security Intelligence

12   Course from the Global Islamic Media Front in the Recycle

13   Bin.  In other words, somebody had deleted it but not finished

14   doing so.

15           That's a How-To Guide on operational security for

16   people in organizations on how to avoid detection by Western

17   intelligence in law enforcement.

18           You also had on the Lenovo laptop Internet searches

19   for jihadist audio and video files such as the Battle of

20   Hearts and Minds, Anwar al-Awlaki;

21           His lecture on Brutality Toward the Muslims;

22           The Arrashud lecture And Incite The Believers;

23           The Mujahideen Bagram Escape video showing people

24   escaping from the Bagram Prison;

25           And then the Kalamullah.com link for other al-Awlaki

```
 1    lectures.
 2            And, again, Kalamullah.com is a jihadi website for
 3    promoting the global salafi jihad as  Dr. Sageman described
 4    it.
 5            You also have the thumb drive.
 6            S&I.pdf, again, that Security And Intelligence
 7    Course;
 8            Training That Makes Civilians Acceptable;
 9            A Treatise on the Legal Status of Using Weapons of
10    Mass Destruction Against the Infidels;
11            To Make It Known To People...and Not to Hide It, by
12    Anwar al-Awlaki;
13            The Hatred of the Juffar;
14            Inspire Magazine, Issues 8 and 9.
15            This is something that Mr. Abdul Kareem admitted to
16    Detective Nash that he had watched or looked at.  Inspire
17    Magazine.  He said Elton Simpson didn't show that to me.  I
18    looked at it on my own.
19            The next thing is:
20            The Ruling on the Dispossessing the Disbelievers
21    Wealth in Dar al-Harb.
22            And that ties to the Karem Fabian insurance claim.
23    And you have that document in evidence.  It's Exhibit 181.  I
24    encourage you to take a look at that and tell me if the notion
25    of committing fraud inside the United States against
```

1   Westerners to support jihad is not consistent with exactly

2   what the defendant did when he slapped the trunk of

3   Ms. Fabian's car and then claim that she hit him.

4          He didn't fall down.  The records from John C.

5   Lincoln the very next day, the day that he claimed that he

6   couldn't get up, he couldn't move his hip, he couldn't move

7   his leg; the records from the hospital, that day's visit, no

8   objective symptoms, normal range of motion; the x-rays, no

9   evidence of injury.

10          The only place that supports his claim of injury is

11   the chiropractic clinic.  Does the chiropractor go and talk to

12   the person that was on the other side of that?  No.  You have

13   to take his word for it.

14          Even if they found an injury, it doesn't mean that it

15   came from that.

16          The Acer Aspire had that ISIS Flames of War video on

17   it.  Again, just like Ms. Vaughan testified, the person who

18   pulled that video up clicked through five screens in order to

19   get to see that.  They had to do age verification,

20   controversial video, verification.  Say --

21          Yes.  Yes.  Yes.  I want to see this video.

22          -- before they got to it.  That's the exact same

23   thing the defense expert testified about when he got up on the

24   witness stand.  It had the five Anwar al-Awlaki lectures, and,

25   again, another lecture from the Jamaican Sheikh, Sheikh Faisal

1    who is another extremist radical cleric.

2            The Nextbook tablet.  Not only did it have those End

3    Of Times imagery items that we talked about before.  But it

4    also had a thumbnail photo of Hakimullah Mehsud who is the

5    former leader of the Taliban in Pakistan and was killed in

6    November of 2013, and it also had a screen capture from that

7    ISIS Message in Blood to the Kurdish Alliance.  And that was

8    an execution video in front of the Great Mosque in Mosul.

9            Now, you heard from Agent Whitson that video was

10   released August 28, 2014, and the other photo was of a person

11   that was killed in November, 2013.

12           Does it seem logical to you that these items would be

13   on a tablet computer that wasn't even started up until May 28,

14   2015 -- or May 22nd of 2015, being originated from a news site

15   like CNN?

16           Why would a story of Hakimullah Mehsud being killed

17   in November, 2013, be newsworthy in mid 2015?  Why would this

18   Message in Blood video released by ISIS months and months

19   earlier be a newsworthy item at that point in time in the

20   West?

21           It doesn't make sense.  The only thing that would

22   make sense is if the defendant went somewhere and saw those

23   things on a site that would promote those kind of things.

24           Not a news site.  A Jihadi site.

25           He also has the eBooks, the British Government in

1    Jihad and the Origins of The Islamic State.

2         This is a fascination.  It's something that he

3    couldn't stay away from for whatever reason.  He's fascinated

4    with the End of Time scenario that ISIS is selling.  He's

5    fascinated with people like Hakimullah Mehsud and the

6    execution videos and he's fascinated with the Origins Of The

7    Islamic State.

8         Let's circle back here for a minute.

9         We have two conspiracies here.  One is the "material

10   support" conspiracy; and the second is the "interstate

11   transportation of firearms."

12        The "interstate transportation of firearms"

13   conspiracy is one that had to have begun later, no sooner than

14   when the Garland, Texas, contest was announced.  So it had to

15   have begun sometime in February or later.

16        The "firearms transportation" conspiracy requires an

17   agreement between two or more people to commit transportation

18   of firearms in interstate commerce with intent to commit a

19   felony; in other words, traveling across state lines with guns

20   intending to commit murder and/or aggravated assault in Texas.

21        It can be proven by direct or circumstantial

22   evidence.  I would submit to you that we have proven this

23   beyond a reasonable doubt by direct evidence, just by virtue

24   of the fact that Elton Simpson and Nadir Soofi went to Garland

25   from Phoenix armed and opened fire when they got there.

1          Abdul Malik Abdul Kareem joined the conspiracy.  We

2     have shown you all of the evidence of the different witnesses

3     that put him knowing about this contest, knowing what the

4     defendants wanted to do, and wanting to be a part of it.

5          The agreement itself is the crime.  Again, the object

6     crime need not actually be committed.  And I submit to you,

7     they tried.  They just didn't succeed.

8          The evidence of the transportation.  Part of the

9     agreement is very simple.  They traveled to Garland while

10    armed.  They fired shots.

11         Now, this conspiracy -- and, again, you had Stefan

12    Verdugo's testimony that the defendant was actually intending

13    to be a part of that at one point in time -- this conspiracy

14    differs from the "material support" conspiracy in that it

15    requires the commission of an overt act.

16         That's not in the elements of the "material support"

17    conspiracy.  I would submit to you, again, in this case you

18    have Elton Simpson and Nadir Soofi practicing shooting with

19    the defendant, traveling to Texas with their firearms, they

20    discussed this attack and the defendant hosted them to do so

21    in his home, and they opened fire in Garland, Texas.

22         Overt acts all over the place.

23         The next charge is that Aiding and Abetting the

24    Transportation of Firearms Interstate With Intent to Commit a

25    Felony.

1        Again, the defendant knew what they wanted to do.  He
2  knew what their plan was.  And he encouraged them and he
3  helped them and he had the intent of helping them to succeed.
4  One of the things that he did to help ensure that they would
5  succeed was to teach them how to clean the firearms.
6        The next charge is the false statements to the FBI.
7  The defendant made false statements to the FBI.  He acted
8  deliberately with knowledge that the statement was untrue and
9  his conduct was unlawful.
10        Here's in that little warning from Agent Simpson to
11  the defendant:  You know it's a crime to lie to the FBI.
12        Because that's where this is relevant.  The defendant
13  admitted from the stand even that Agent Whitson warned him in
14  his May 5 interview that it was illegal to lie to the FBI.  So
15  he knew that lying to the FBI was unlawful.
16        And finally, the statement had to be material.
17        Again, May 5, 2015, two days after the attack.  All
18  statements about where Simpson and Soofi were, how they got
19  those guns, and so forth, are material to that investigation.
20        Agent Whitson and Detective Nash interviewed the
21  defendant together on May 5th, 2015.  Important to remember.
22  The defendant wasn't even a target of the investigation at
23  that time.  Everybody was being asked questions about these
24  people.
25        Why?  Because the agents wanted to figure out what

CR15-00707-PHX-SRB    JURY TRIAL - DAY #16    3-11-16

1    happened and how.

2         The recording failed.  But they wrote a report almost

3    immediately thereafter while it was still fresh in their minds

4    and using notes that they had created during the interview.

5         The defendant in that interview denied shooting in

6    the desert with Simpson and Soofi.

7         He denied that Simpson and Soofi had fired those

8    assault rifles before.

9         He denied knowing of the attack in advance.

10        And he denied even knowing of the contest until after

11   the attack.

12        I have already described what all the witnesses said

13   about the defendant's knowledge of that contest and how he

14   planned at some point to be a part of attacking it.

15        He repeated those lies again on June 10 in his

16   interview.  He told the agents:  Until this happened, I didn't

17   hear, I didn't know anything with that contest.

18        So that corroborates the fact that he said that

19   before and showed that the agents were, in fact, telling the

20   truth about what he said in that May 5 interview.

21        He testified here in court as well.  He didn't know

22   of the attack plan and he didn't know about the contest until

23   after the attack.

24        But he also lied to you while he was on the witness

25   stand.  He claimed that he split that .38 Special ammunition

1    purchase with Elton Simpson.   Again, Exhibit 428.

2          We bought some ammunition and that was for me.   It

3    wasn't for him.   It was for me.

4          Adamant.

5          He also claimed that he thought his felonies were old

6    and they didn't count anymore, which is not an excuse, by the

7    way.   But in his interview he tells the agents:

8          I'm not a felon.   That was under Decarus Thomas.   My

9    name is not Decarus Thomas.   My name is not Decarus Thomas.

10          This is not an honest man.

11          Another lie from the witness stand.   He claimed the

12    first time he went to the Simpson and Soofi apartment was in

13    February, 2015, because his water had to be turned off due to

14    a leak in his home.

15          You heard from Ms. Vaughan when she testified from

16    the witness stand.   She found videos related to a water leak

17    in the defendant's Acer Aspire laptop computer.   And lo and

18    behold, the video that she found was shot in August of 2014,

19    six months before February, 2015.

20          That's when he had the leak.   That's when he had to

21    have his water turned off.   There were no other videos in 2015

22    of such a recording.   There were no messages or anything else

23    related to a water leak in 2015.

24          The defendant also told you from the witness stand

25    that somebody called him and told him that Simpson and Soofi

1    bought AK rifles.  And then later he said, no, no.  It was two

2    different calls; one for Simpson, one for Soofi.

3            He either heard from Simpson and Soofi about plans to

4    shoot up a Marine base, as was testified to by Abdul Khabir

5    Hyman, or he heard from AK Hyman -- or AK Wahid, excuse me --

6    that Simpson and Soofi had told Wahid about that.

7            So one way or another, he knew that Simpson and Soofi

8    had either discussed with him or discussed with AK intention

9    to attack a Marine base.

10           This was vague and it wasn't important or relevant.

11   What person in their right mind hears somebody who is their

12   close friend talking about attacking a Marine base or hears of

13   them planning to do it and then hears in a phone call that

14   they have acquired an AK rifle and doesn't have alarm bells go

15   off?  That's relevant.  That's important.

16           One more lie.  When he was on the witness stand the

17   other day, the defendant told you that he didn't use that Acer

18   laptop between somewhere in October or November of 2014

19   through the end of May until his arrest in June of 2015.

20           He told you that something was wrong with it.  It

21   wasn't working and so he wasn't using it.

22           Members of the jury --

23           Can I switch to the document camera, please?

24           This is Exhibit 481.  This is something that Agent

25   Meshinsky talked to you about how he exported this item from

1    the Acer Aspire laptop.  This is the System Access Log.  It's

2    wireless access from the Acer Aspire laptop.  And the first

3    entry date on here is 2015 0122 at 62231.

4         In other words, January 22 of 2015, the Acer Aspire

5    laptop was turned on.  The name of the computer is Git PC and

6    it accessed the Gravity 5.5 Smartphone.

7         So that computer was on and Abdul Kareem had his

8    wireless phone in range of that computer tethered to it so

9    that it could access the Internet.  That's January 22nd.

10        This is about eight or nine pages here, somewhere in

11   that neighborhood, but let's just fast forward to the end of

12   May.

13        You have May 27th.  The same thing.  Connecting to

14   the Gravity, the Git PC.  And, again, on May 30, 2015.

15        When Ms. Vaughan was testifying on the stand, she

16   told you how she reviewed the Internet Search History from

17   that computer and that computer was active all the way through

18   the end of May, 2015, and this document establishes that.

19        So if we can switch back, please.

20        When the defendant told you from the witness stand

21   under oath that he wasn't using that computer during that time

22   frame, he was lying to you.

23        Why would he lie to you about that?  Because he knows

24   what was found.  Only someone who is guilty lies during an

25   interview.  Only someone who's guilty gives false testimony

 1    under oath.  He lied in his interviews and he lied on the

 2    witness stand, and he is, in fact, guilty here.

 3            Something to keep in mind.  No one from the

 4    government, not Ms. Brook in opening, not me during my

 5    closing, and not one single witness from the government has

 6    testified and called that man "the master mind."

 7            Nobody has called him that.  The only person that

 8    used that word was Mr. Maynard during his opening statement.

 9            Okay.  He's not a master mind, but he is a motivator,

10    a trainer, and a bank roller.  And you should find him guilty.

11            Thank you.

12            THE COURT:  Thank you, Mr. Koehler.

13            Mr. Maynard, you may --

14            MR. MAYNARD:  Can we take an early lunch?

15            THE COURT:  Yes.  I gave -- when trying to set up the

16    schedule yesterday, I gave Mr. Maynard the option.  And I said

17    if it's any time after 11:30, we could take an early lunch

18    break and then come back so that his closing would not have to

19    be interrupted by a long period of time.

20            So let's take a one-hour -- well, let's take a

21    57-minute lunch break.  Let's reconvene at 12:30, ladies and

22    gentlemen.

23            Again, I want to remind you of the admonition that

24    you still cannot discuss the case among yourselves.  Of

25    course, can you not discuss the case with anyone else.

CR15-00707-PHX-SRB    JURY TRIAL - DAY #16    3-11-16

1          Your deliberations will begin sometime later today.

2    And until then, please do not form any conclusions about the

3    case or discuss the case with each other.

4          Court is in recess until 12:30.

5        (Recess taken at 11:33 a.m.; resumed at 12:30 p.m.)

6          THE COURT:  Good afternoon, ladies and gentlemen.

7    Please sit down.  The record will show the presence of the

8    jury, counsel, and the defendant.

9          Mr. Maynard, you may make your closing argument.

10   **CLOSING ARGUMENT:  DEFENSE**

11         MR. MAYNARD:  Thank you, Your Honor.

12         And thank you, ladies and gentlemen of the jury.

13         I agree with the government in one thing, and that is

14   that this has been a long trial.  Mary, Abdul Malik, and I

15   want to thank you for your patience and for your attention

16   that you paid in this case because there's an awful lot of

17   evidence.

18         All this evidence wasn't really necessary.  What the

19   government has done in this case is tried to deal with your

20   fears, the fears that we have about the unknown, about

21   al-Qa'ida, about ISIS, about homegrown terrorists.

22         And they've paraded in front of you all of these

23   guns, all of these weapons, all of this material, pictures,

24   and videos and stories of people being burned alive, having

25   their heads cut off.  And, yeah, it's all happening and it's

UNITED STATES DISTRICT COURT

1    horrifying and terrifying.  But this case is about is about

2    whether my client, Abdul Malik, conspired with Soofi and

3    Simpson to do what they did.

4         There's no question there was a conspiracy in this

5    case.  Simpson and Soofi were in a conspiracy.  They decided

6    that they were going to travel across state lines and attempt

7    to commit murder and assault people in Texas.

8         There's no question that Officer Stevens was the kind

9    of police officer we would all like to have in our community.

10   He did exactly what we want a police officer to do.  In fact,

11   he went well beyond the call of duty.

12        The idea that he is standing there, a motorcycle

13   police officer, and two guys drive up in a car, stop, and get

14   out with automatic weapons, and he has the wherewithal and

15   state of mind to pull his gun and shoot those two before they

16   do any damage or harm to anybody, they should be making a

17   statue to him.  I mean, that's the kind of police officer we

18   all want in our community.

19        But this case is about the government deciding they

20   need to find somebody else because the government messed up in

21   this case.  And Agent Whitson told you at the very beginning:

22   Simpson was a convicted felon.  He had lied to the FBI.

23   People believed that he was a terrorist.  He should have been

24   watched closer.  Nobody but nobody seems to have gone to his

25   apartment after he had been convicted back in 2011.

1          But the FBI seems to have known sometime on May 2nd

2    or May 3rd, at least, at least as of May 3rd, that he was

3    traveling to Dallas, Texas, or Garland, Texas, to commit an

4    act of terror.

5          They sent his picture.  They sent information

6    concerning what the car looked like.  And it did no good.

7    They were embarrassed by this.  So they went out and they

8    started looking.  And they did the right thing.  Was there

9    anybody else involved?  Was this just two people?  Or were

10   there more?

11         But what happened is is after they interview Stefan

12   Verdugo, my client becomes the target and all the resources,

13   everything else, is geared towards looking at and convicting

14   him.  Not getting to the truth, not getting to what really

15   happened, but let's get a conviction.

16         That's not what our justice system is about here in

17   this country.  Our justice system is supposed to be based upon

18   going out, gathering the evidence, determining if a crime has

19   been committed, determining who committed the crime, and then

20   prosecuting them.

21         It's not a matter, as you were being told, "our

22   witness" or "their witness."  These are witnesses to the

23   event, whether they're put on by the government or they're put

24   on by the defense.  Those weren't my witnesses.  Those were

25   the witnesses that were out there that should have been put on

1   by the government to tell you what this case was about.

2          And the government failed to put on an awful lot of

3   witnesses in this case because they're not -- the government

4   isn't concerned with finding the truth.  The government is

5   concerned with getting a conviction.

6          And you know what?  This isn't a game.  It's not who

7   wins and who loses.  That's not what this is supposed to be

8   about.  There's a mans life that's at stake.

9          It's not:  Let me marshal the evidence to support my

10  case.

11         It's:  Let me give the evidence to the jury, to the

12  citizens of this country, and let them decide who's guilty.

13         That didn't happen here.  That's why we had to bring

14  in 13 witnesses in this case.

15         I'm going to spend a moment with you just looking at

16  the jury instructions.  The Court has gone through them, but I

17  want to focus on a couple.

18         One is on page 12.  Look, this is concerning

19  Conspiracy in Count 1.  Was there a conspiracy?  Absolutely,

20  there was a conspiracy.  Simpson and Soofi were in a

21  conspiracy.

22         The real question is Two:  The defendant became a

23  member of the conspiracy knowing of at least one of the

24  objects and intending to help accomplish it.

25         That's the issue you have to decide.  The rest of

1    this stuff you really don't.  That's the ultimate issue here.

2    Did he become a member of that conspiracy?

3           Looking at page 14 on Count 5.  Again, number Two:

4    The defendant became a member of the conspiracy knowing of its

5    unlawful object and intending to help accomplish it.

6           That's the issue you have to decide.  This other

7    stuff, they're the elements of the crime, but there's no

8    question Soofi and Simpson did them.  There really isn't.

9    That's the issue.

10          Look at the conspiracy statute on page 17.  This is

11   awful important because the Judge has instructed you that the

12   conspiracy is a form of a partnership.  But just -- it's not

13   enough, however, that they simply met, discussed matters of

14   common interest, acted in similar ways or perhaps helped one

15   another.  I mean, the government wants to say that because my

16   client went out shooting in the desert sometime in January,

17   that promoted the conspiracy.

18          The Garland contest hadn't even been announced by

19   then.  It didn't get announced until February 11th.  This

20   conspiracy is concerning going to Garland, Texas.  Read the

21   instructions carefully.  It's about going to Texas to commit

22   an act of murder or attempted murder.

23          Also, the government has instructed you that, "One

24   becomes a member of the conspiracy by willfully participating

25   in the unlawful plan..."  It goes on, "On the other hand, one

1    who has no knowledge of a conspiracy, but happens to act in a

2    way that furthers some object or purpose of the conspiracy,

3    does not thereby become a conspirator.  Similarly, a person

4    does not become a conspirator merely by associating with one

5    or more persons who are conspirators, nor merely by knowing

6    that a conspiracy exists."

7            There were lots of people that testified here that

8    knew that Simpson and Soofi were becoming different.  They

9    were becoming more radical.  Their form of Islam was different

10   than other people's.  We had Mr. Mubarak come in.  My client

11   testified.  We had a number of folks that came in and

12   testified about that.

13           The same thing with aiding and abetting.  The

14   question becomes, "The defendant aided, counseled, commanded,

15   induced or procured that person in committing the crime of

16   conspiracy."

17           "The defendant acted with the intent to facilitate

18   the conspiracy."

19           He has to know what they're going to do.  There's no

20   evidence that he knew what they were going to do.  There's no

21   evidence that anybody knew exactly what they were going to do

22   except for one person, Nathan Soofi, the little boy who came

23   in here.  And we'll talk about him later because he becomes

24   very important.

25           It helps to counter his uncles testimony, but he also

1   tells you that he told the government this and he told Agent

2   Whitson and these prosecutors that he knew that his dad was

3   going to Texas.

4          And when I asked Agent Whitson on cross-examination:

5          Did anybody other than Carlos and Juan and Verdugo

6   ever tell you that they knew that there was going to be this

7   Muhammad Drawing Contest in Garland, Texas, before the event?

8          He said:  No.

9          Yet three weeks earlier in their offices Nathaniel

10  Soofi had told them that he knew about it.  But they didn't

11  put him on the stand.  And you've got to sit there and wonder

12  why.  Was this a search for the truth?  If it was a search for

13  the truth, why didn't the government put him on?

14         Count 2 is on aiding and abetting.  The question is:

15  Did my client know?  And the question is he did not -- or the

16  answer is he did not.

17         Now, let me get to the easy one, Count 4, Felon in

18  Possession.  My client had two guns.  My client had two felony

19  convictions.  He didn't have a right to have the guns.  He

20  might have been a knucklehead because he thought that if he

21  changed his name, he wasn't the same person.  And he might

22  have thought that after four years these are felony

23  convictions but they're DUIs, that somehow or another they

24  went away.

25         I don't know that most people would know that a

1   felony DUI is something that would prohibit you from getting a

2   gun.  One can certainly go and petition to try to get the

3   right to bear an arm and to vote and do the many other things

4   that one -- but he didn't do that.  I think the evidence is

5   pretty clear on that one, so I'm not going to spend a lot of

6   time on Count 4.

7          I'm going to focus on the other counts.  We need to

8   go through and look at some of this evidence together.  And

9   I'm going to start with the -- one of the very first witnesses

10  that the government put on.

11         And I will tell you, I'm not good with computers.

12  You saw during the course of this trial whenever it came to

13  electronics, Mary handled all those things, so I don't have a

14  PowerPoint.  I just -- I'm not very good.  So I'll put a

15  couple of pictures up for you and things, but that's it.

16         Mr. Mubarak came in here.  And although you probably

17  don't have his picture in your book, I don't think anybody is

18  going to forget what he looked like when he walked in here.

19  It's the fellow dressed in white.

20         Why did the government bring him in here?  I'm not

21  sure, except I think they were hoping that he was going to say

22  that my client was telling everybody that there was a Khalifah

23  and that he believed in the Khalifah.

24         What did Mubarak say?  He said my client came to him

25  and asked him about whether there was a Khalifah or not, the

 1    head of the new Caliphate, the head of ISIS.

 2           And he told him no, hell no.  There isn't any more

 3    Khalifahs.  There's no more Khalifahs since the Prophet.

 4           And he questioned him some more because this was a

 5    man that he went to because Mr. Mubarak had been a Muslim for

 6    a much longer time.  And he eventually called his son and had

 7    his son speaking to my client.  And he said he was respectful.

 8    He didn't argue with him.  But his son confirmed there was no

 9    Khalifah and that was sort of the end of it.

10           Now, Mr. Mubarak also went on to tell us that in the

11    summer of 2014, that my client became disenchanted with

12    Mr. Simpson because of things he was doing and also because he

13    thought that he had planted some sort of tracking device or

14    something in his car and was trying to get him to leave and

15    actually got Mubarak to come over with a couple of his friends

16    and they threw him out.

17           Lastly, what Mr. Mubarak told us, which becomes

18    rather important, is that my client lived with him for a week

19    to two weeks, sometime in either February or March.  He

20    thought it was probably March.  He wasn't sure.  I'm going to

21    let you rely upon your own recollections, because he was

22    having some problems.

23           Well, why does that become important?  Because we're

24    going to have to deal with Ali Soofi.  Because, you know, if

25    you believe Ali Soofi and you think he's telling the truth,

 1    he's guilty as hell.

 2         Ali Soofi is a liar.  And this isn't Perry Mason.  I

 3    can't get Ali Soofi to say, "Oh, my goodness, I told a lie,"

 4    and, you know, the station is over for the day.

 5         When you're cross-examining somebody and you think or

 6    you believe that they're lying on the stand, you have to do it

 7    in a way by looking at what other people say, letting you rely

 8    upon your logic, seeing if there are inconsistent statements

 9    that they have made prior, or does it just make any sense at

10    all what he's talking about.

11         And one of the reasons I was -- I asked Mubarak about

12    my client living with him in the spring for several weeks is

13    if my client is staying over at Simpson and Soofi's two and

14    three nights a week, why does he need to stay at Mubaraks?

15    Why can't he just stay with him them?  That makes no sense.

16    Somebody's -- something is wrong here.

17         There are four witnesses that the government has

18    relied upon in this case:  Stefan Verdugo, the man in orange,

19    the two young men, young boys that lived across the street,

20    Carlos and Juan, and Ali Soofi.

21         Those are the four that I really have to deal with

22    the most.

23         Now, Stefan Verdugo.  He lived with my client off and

24    on for a number -- for about a year-and-a-half.  He was there

25    back in 2014.  He becomes very important in this case because

1    the government relies upon him.

2         What the government told you he said he said.  The

3    question is:  Is it truthful or is it a lie?  And I contend

4    that the vast majority of what came out of his mouth was a

5    lie.

6         Now, Stefan said that he had gone shooting with

7    Simpson and Soofi and Abdul Malik on at least two occasions

8    and he said he told the FBI where that was.  It was somewhere

9    off of -- I think it was Table Mesa Road up in the northern

10   part of the county.

11        When the FBI learned where -- about where my client

12   had been shooting with Sergio, they sent a team out there.

13   They took pictures.  They videotaped it.  They audiotaped it.

14   They had pictures and flags and everything else.  They picked

15   up shells and brought them in here to show you.

16        Why couldn't they do the same where Stefan Verdugo

17   told them?  Because it didn't happen.  They weren't able to

18   find any place where Stefan Verdugo could -- had told them

19   that there had been shooting because it didn't happen.

20        My client went shooting with Simpson and Soofi one

21   time and that was with Sergio Martinez.  That was it.  Stefan

22   Verdugo lied.

23        Stefan Verdugo made a number of comments about what

24   he heard and he tried to say on direct examination, and even

25   on cross-examination, if we could verify that by talking to

1    Daniel.  He mentioned "Daniel" a number of times.  And if you

2    recall, I asked him at the end of the cross -- was that --

3    what Daniel was that?  Was that Daniel VanHook?  And he said

4    yes.

5            Now, I'm going to show you part of Stefan Verdugo's

6    testimony.  And I just made a copy of it.  I didn't make a

7    nice PowerPoint for you.

8            And he said something happened in France.

9            And he said:  Yes.

10           And do you remember what the attack was about?

11           It was about people drawing the Prophet Muhammad.

12           And what happened in Paris, do you know?

13           They ran into Paris and shot people that drew the

14   pictures of Muhammad.

15           And then I went on and asked him a number of

16   questions.

17           So what was the reaction of D, Ibrahim and Soofi?

18           And he tells us that the news that these people had

19   conducted this attack in Paris on the magazine.

20           They were -- they were upset.  They were mad that

21   their Muslim brothers had gotten killed over trying to avenge,

22   I guess, their Prophet.

23           Now, what became important in that questioning was

24   what he says here.

25           Okay.  Who else was there with you?

```
 1              It was me -- me, D, Daniel, Elton, and Soofi.  We
 2    were all -- they were like in the living room area and me and
 3    Daniel were standing in the -- like the kitchen.
 4              We put Daniel VanHook on the stand.  What did Daniel
 5    VanHook say?
 6              Did you ever hear anything about -- within those
 7    conversations about a contest in Texas of drawing the Prophet
 8    Muhammad?
 9              No.
10              And did you ever hear anything about any mention of
11    the attack in Paris, a Charlie Hebdo attack, between Ibrahim
12    and Decarus Thomas?
13              The answer was:  No.
14              Additionally, Stefan Verdugo told us:
15              And did you hear ISIS used in your presence?
16              Yes.
17              Can you tell us how it came up?
18              There was a thing on the news about ISIS.  And it was
19    me, Daniel, and D.  We were sitting in the living room.  And D
20    started telling us that he was part of ISIS.  And we
21    thought -- like we thought it was kind of funny at first, you
22    know, and then D started getting really crazy about it.
23              We asked Daniel VanHook:
24              And during that time -- and I want to focus on from
25    November 2014 to when Decarus moved out of the Cochise house.
```

 1          That's the time period that Verdugo was living with

 2   him.

 3          During that time were you ever with Stefan when

 4   Decarus told you he was part of ISIS?

 5          No.

 6          Did Decarus ever tell you he was part of ISIS?

 7          No.

 8          Additionally, you might recall that Stefan said that

 9   he had moved out in March of 2015.  And I asked him a number

10   of times about was he sure it wasn't January.

11          No, it was March.

12          We asked Mr. VanHook did he ever make a call to

13   Decarus or rather -- I keep thinking Decarus from the thing --

14   to Abdul Malik about letting Stefan move back in.

15          And he said:  Yes.

16          Stefan in the spring of 2015 was having a financial

17   hard time.  He had lived with a guy by the name of Nick Love.

18   He had also moved into some Budget Hotel.  Didn't seem to have

19   a job and wanted to move back in with Abdul Malik and had

20   asked VanHook to make the call for him.

21          VanHook made the call for him.

22          And Decarus said no.  He didn't want to have anything

23   to do with Stefan Verdugo anymore.

24          Stefan lied when he said that he didn't have VanHook

25   make that call.

1          Stefan Verdugo would have you believe that my client

2      is going to commit an act of terror in Texas that isn't --

3      that the event is not announced until February 11th.  I think

4      the evidence shows that Verdugo moved out in January.

5          And I go to Amber Pluff, the woman that the

6      government brought in.  And I'm not sure why, but I think they

7      were hoping that she was going to confirm that there was a

8      ride in a car that she participated in, but she hadn't really

9      heard any conversation.

10          But what she did tell us was that she started dating

11      Stefan Verdugo the first of March.  And that it was her

12      understanding that he had been living the prior several months

13      with Nick Lowe, which now puts us back into January.

14          And you know, I felt sorry for the poor woman.  I

15      mean, what comes out of her examination is that Stefan Verdugo

16      is about as low a life as one is going to be.  He meets this

17      girl in March and by the summer he is kidnapping her, selling

18      her to men, and when that gets found out, he takes off and

19      goes to California.

20          All during this time he's helping the FBI.  He's the

21      confidential informant that they have had.  He's the one

22      they're relying on.  He's the one that's met with them on May

23      8th and they have now relied on him, Stefan Verdugo, the man

24      in orange, to start trailing my client 24 hours a day.

25          Now, you've got to ask yourself.  Stefan Verdugo also

 1    said I made telephone calls for the FBI to Abdul Malik.  Why

 2    would he do that?  Well, they're trying to get evidence to

 3    show that, you know -- and rightfully so.  That's exactly what

 4    they're supposed to do.

 5              You didn't hear one telephone call played by the FBI.

 6    Why?  Because there's nothing there.  I mean, if Stefan

 7    Verdugo had heard my client say:  I was going to go to Dallas

 8    or Garland, Texas, and I decided not to, don't you think he

 9    would have gotten on the phone and said to him:  Boy, Malik,

10    am I really glad you didn't go to Garland.  I'm glad I helped

11    talk you out of it or I'm glad you decided to change your mind

12    or isn't that terrible what happened to those guys or, boy,

13    I'm glad you're still alive.  Something.  There would have

14    been something.  There's nothing.

15              What else did we learn from Stefan Verdugo?  That the

16    FBI -- they wired him up.  And they had him ask to go back and

17    work for Abdul Malik.  And Abdul Malik wasn't going to live

18    with Stefan but he did let him work for him for a while.

19              You would have thought there would have been

20    something in those conversations that you would have heard

21    that would have supported the governments case, but there

22    isn't.  There wasn't.  Because Stefan Verdugo was lying.  It

23    didn't happen.

24              The government relies on two young boys that lived

25    across the street --

1          Oh.  And Stefan Verdugo, when I asked him on

2    cross-examination did you get paid $500?

3          Yes.

4          Why?

5          I don't know.  Gas money.

6          Well, the FBI later on tells us through Agent Whitson

7    that, well, it wasn't just gas money.  He had outstanding

8    tickets.  And we wanted to make sure that they were paid.

9          They didn't pay them.  They gave him $500.

10          And they didn't give him any incentives to testify,

11    for goodness sakes.  No.  They went and met with him in the

12    jail down at South Buckeye where he had been sitting since

13    June and they knew he was down there because the FBI assisted

14    in bringing him back from San Diego.  But the FBI had a

15    constitutional mandate or obligation to provide a statement to

16    Mr. Verdugo that might help him in his case that's in Maricopa

17    County.

18          But you know what?  That constitutional obligation

19    somehow or another didn't rise like cream coming to the top

20    until the day after they met with him.

21          So they go and meet with him in December, right

22    before this trial is going to start, talk to him about what

23    he's going to testify to, and tell him that we're not giving

24    you this as an incentive but we're going to -- we're

25    constitutionally required to tell the County Attorney what you

 1    did and what we saw.

 2         I don't know why that constitutional mandate didn't

 3    seem to come to their attention in July or August or

 4    September, October, November, but it came to their attention

 5    right before he's going to testify.  And he came in here on

 6    their own, as you were just told.  Had nothing.  His civic

 7    duty to come in here.

 8         Carlos and Juan.  Carlos is the younger boy with the

 9    long hair and he said he really never heard my client talk

10    about going to do anything just horrible.  There was no

11    mention of the attack.

12         He said that he had heard that my client was going to

13    give Ibrahim an AK47.  He said that there may be something

14    about this Muhammad Drawing Contest that was going on in

15    Garland.  He had heard about that but he didn't know that my

16    client was going to go attack them or not.

17         But he heard about the contest.  And one of the

18    things one does on cross-examination is you ask them questions

19    and try to figure out when they heard it and who is there.

20    And he said he heard it somewhere between --

21         First, he thought it was before Christmas of 2014 and

22    then he said he thought it might even be before Thanksgiving

23    of 2014.

24         Well, it's not announced until February 11th of 2014.

25         Well, you might think, well, he just doesn't remember

```
 1    the date --
 2              THE COURT:  Excuse me.  Did you mean '15?
 3              MR. MAYNARD:   '15.  Thank you.
 4              He might just not remember the dates.  Most kids
 5    remember when Christmas happens and they know when the big
 6    events happen versus the bad events.
 7              Now, what was more interesting was Juan.  Juan was
 8    the older brother who was 15 years old who got on the stand.
 9    That is -- and some sort of ROTC or something.
10              And Juan told us that he heard about the Muhammad
11    Drawing Contest on three separate occasions.  The first one,
12    his brother Lupe was living there in the house because my
13    client constantly let people live there with him.  They came
14    and they went.
15              We heard -- nobody contradicted that he had all kinds
16    of people coming in.  He had homeless people staying there.
17    He had homeless people that had children staying there.  Must
18    be a pretty good cook, because everybody talked about eating
19    his food and coming over to -- he would cook for almost
20    everybody in the neighborhood.
21              But Juan's conversation was interesting because he
22    has three separate occasions when he hears about this.  The
23    first one is when his brother Lupe is there.
24              And I asked him:  If we know when Lupe lived there,
25    then we'll know when that happened.
```

1              And he said:  Yes.

2              Well, the only testimony concerning Lupe was from my

3    client.  The government didn't bring Lupe in to ask him.  My

4    client said he lived there for the month of October of 2014.

5              That's it.  It's uncontradicted.

6              They could have brought in Lupe.  Could have brought

7    in his mother from across the street.  Could have brought in

8    any of these people.  Didn't do it.  But he says he's in there

9    watching -- he's playing a video game.  He sneaks down the

10   hallway.  He hears Simpson and Abdul Malik talking about this

11   Garland, Texas event.

12             Well, couldn't happen when he said it did, but let's

13   assume it happened anyway.

14             What's the conversation?  The conversation is that

15   the known terrorist Simpson is trying to talk him down.  You

16   know, Abdul Malik, don't go.  Don't go to Dallas.  You know,

17   you might get killed.  I mean, that's terrible.  Don't do it.

18             And so he goes back to the room.  The next time he

19   hears about this is -- he's in the car and he's in the car

20   with his brother.  And he and his brother both have ear buds

21   in.

22             The brother seems to be listening to music.  He does

23   not seem to be listening to music because he's looking down

24   and he knows that exactly this conversation that Abdul Malik

25   was on with Simpson on a bluetooth took exactly ten minutes.

1          And he doesn't have any music in so he can hear the

2   whole conversation.  And then again, it's about this attack in

3   Garland that Malik is going to go and he's going to shoot

4   people in Dallas.  Garland, Texas.  He's also thinking about

5   blowing himself up.  He's going to strap dynamite to himself

6   and go into a mall because he's so angry with what's going on.

7   That's the second conversation.

8          The third one is we're back to the house again and

9   it's sometime around Christmas but we're not sure.  It could

10  be after Christmas.  And he sneaks down the hall.  But this

11  time there are three people.  It's Simpson, AK Waseem, and

12  Abdul Malik.

13         And he hears the three of them and he's seeing them

14  through this mirror that seems to be only -- he sees them but

15  they don't seem to see him.  But he hears them talking again.

16         And again, they're talking -- they're trying to talk

17  him down because he is so angry about what's going on in

18  Garland, Texas, that he's going to go there to shoot people.

19  But he's also thinking that he may put dynamite on his chest

20  and go to a mall.

21         And I asked him the question, you know, was he going

22  to go to the mall first or was he going to go to Garland?

23         Oh, he was going to go to the mall.

24         So he was going to go to the mall and blow himself

25  up?

 1            But Simpson told him, gee, if you do that, you can

 2     spend your life in prison.  But after he blew himself up, that

 3     was when he was going to go to Garland, Texas, and commit

 4     these heinous acts that he is now sitting here in front of

 5     you.

 6            That was his testimony.  That's what they want you to

 7     believe because they don't care what the truth is.  They're

 8     looking for a conviction.  That's pitiful.  Relying on that

 9     testimony is just pitiful.

10            Sergio.  Sergio came in here and I think Sergio told

11     the truth.  There was -- I mean, scared to death, as anybody

12     would be under these circumstances.

13            He thinks he's now taken out to shoot in the desert

14     two guys who have now committed an act of terror in another

15     state.  And when he was first asked by the FBI, Did you do

16     this?  And he said, No.  And then they cautioned him that

17     lying to the FBI could be a crime, he said, Yeah, I did.  You

18     know, he was scared to death.

19            But he said exactly what happened.  That sometime in

20     January my client drove out there with Simpson and Soofi.  He

21     had called him for several weeks saying, you know, can I come

22     out there and shoot guns?  In fact, the government would have

23     you believe that he wanted to go out there and find the place

24     that was in the desert that was remote and quiet.

25            That's not what Sergio said.  Sergio said he called

 1    and asked can we go to your mothers house and shoot?  And

 2    Sergio said, no, I don't want to shoot rifles here because

 3    it's too noisy.

 4            So they went to Sergios.  Played basketball.  Jumped

 5    on the trampoline.  And eventually, Sergio was -- and what

 6    happens?  Soofi takes the guns out of the car and brings them

 7    in.  And they have a show-and-tell with Sergio.  And Sergio

 8    thinks -- he thinks all the guns belong to Soofi.

 9            And he is showing them the new gun that he's gotten

10    for Christmas.  They're showing him what they have.  And then

11    they go off and they drive five or ten minutes down the road

12    to an area that -- that Sergio knows and that's where they

13    shoot.  And they shoot for some period of time.  And it's in

14    the evening and it's dark and you can see the flash from the

15    guns at the end of it and the kids are wearing headlamps.

16            Now, Sergio then takes the government out there and

17    shows them exactly where he took them to shoot.  They find all

18    kinds of ammunition and he cooperates as fully as he possibly

19    can.

20            The government spent a lot of time going through all

21    of this stuff and going through all of these computers and all

22    of this electronic material.  And there's absolutely no

23    question that when you look at the electronic equipment that

24    was at Soofis and Simpson's, it is loaded with what one would

25    believe are radical materials.

1          They kept -- they keep wanting to go back to saying

2     that my client had radical stuff on his stuff.  Clearly, the

3     Lenovo that was taken in 2012 has that type of material on it.

4     But back then, he said from the very beginning, and Agent Nash

5     even confirmed it, he always said that thumb drive, I don't

6     know what's on it and it's not mine.  I didn't have anything

7     to do with it.

8          And in 2014 when they call him and tell him you need

9     to come pick this up, he initially says I don't want the

10    Lenovo back.  You guys have probably put something in it and I

11    don't want it.

12         And they're -- you know, you've got to come get it

13    back.  You can sell it.  You can do what you want with I.  And

14    Agent Nash told us just two days ago that that conversation

15    only took about five or eight minutes.

16         Now, the government, you know, wants you to think

17    what was my client supposed to be telling them at that time.

18    He comes and he picks up the computer.  Agent Nash says I

19    didn't interrogate him.  I didn't ask him questions.  I

20    just -- I'm in the parking lot and he's telling me things.

21         Well, what's he telling you?  Jeez.  At this point

22    I'm not having much to do with Simpson because I threw him out

23    of the house after the summer of 2013.  That's -- you know,

24    the thumb drive, he takes it and he signs the receipt.  But

25    what does he do with it?  He destroys it because he doesn't

 1    want it anymore.

 2            What does he do with the Lenovo?  He really doesn't

 3    want it anymore but he owes money to Sergio.  So he tells

 4    Sergio, look -- you know, Sergio says, well, you can pay me

 5    back in part by giving me the Lenovo.  So they try to clean

 6    the Lenovo.  If there's anything on it and they don't know

 7    what's on it, they don't want these children to see anything.

 8            And he gives it to him.  And the understanding is

 9    both my client and both Sergio tried to clean the Lenovo

10    computer.  Apparently, didn't do a good job.  There's a lot of

11    stuff that's still on it, but he certainly didn't give it to

12    Sergio to use with his children thinking that it was loaded

13    with stuff that they shouldn't see.

14            The government brought in the individual who sold my

15    client the .38 and my client doesn't deny he went out there

16    and he bought that .38 at night.  He had gotten it off

17    Backpage.  Called him up and paid $350.

18            Why is it important there's $350?  It really goes to

19    the credibility of the individual who was selling the gun.  I

20    mean, what he told you was that, "This was only the second gun

21    I had ever sold."

22            He had just -- and I pointed out, he had just bought

23    that gun about 30 days prior to this sale going on.  Well,

24    this is a guy who's bought a gun.  He's selling it for more

25    than he paid for it and he's selling it out of the trunk of

1    his car at night.

2           And this is his second time?  No.  I mean, he sat

3    there and -- look, when I do these deals, you know, nobody

4    brings big wads of cash because they're going to get robbed.

5    I always park under a light so that everybody can see me.  If

6    this is his second time, how does he already have a process

7    that he goes through?

8           He doesn't want to have the government coming after

9    him, so he's sort of backing up and trying to walk away from

10   this thing.

11          And my client says, yeah, that's the guy.  I gave him

12   a card.  He told me that he was looking for a job because he

13   was sort of down on his luck.  I told him that my jobs are

14   seasonal.  Give me a call.  And maybe I will have something

15   for you later on.

16          Now, he says that my client said he was in the market

17   for a bunch of guns.  My client says no.  He offered to sell

18   me a .22 and I didn't want a .22.

19          My client certainly didn't go out and buy any more

20   guns after that.  There's no evidence that he bought any more

21   guns.  In fact, you now have to ask yourself -- the government

22   keeps saying that my client provided either the money, the

23   guns, or the ammunition.

24          Who brought in Robert Abke?  Robert Abke was a fellow

25   that we brought in who sold 800 rounds of ammunition to

1    Simpson and Soofi in the course of a week in January of 2015

2    for those assault rifles and they knew it.  He had been

3    interviewed by them.

4            They knew who sold that ammunition and they chose not

5    to bring him in here.  Why?  I mean when Abke testified, Do

6    you know him?  Have you ever seen my client?  What was the

7    answer?  No.

8            Put a picture of Simpson.

9            Yeah, that looks like him.

10           Soofi.

11           I'm not sure, but that looks like him.

12           They had the text messages from Bunker Bob but chose

13   not to tell you about them because they don't want to know the

14   truth.  They want a conviction.

15           When we started putting on evidence in this case, I

16   started off in what I hoped would be a chain of events that

17   had occurred on May 3rd.  I brought in Dunston Simpson, Jr.

18   who was his brother that was killed.  Why?  Because he's the

19   one that starts the dominoes falling that tells how my client

20   learned of Elton Simpsons demise.

21           Dunston got a call from a reporter.  Dunston

22   doesn't -- tries to get in touch with his brother.  Isn't able

23   to get in touch with him.  The reporter apparently has told

24   him that it looks like your brother may have been involved in

25   an event in Garland, Texas.

1          Dunston doesn't even know where his brother lives.

2    Now, he told us that his brother had gotten closer to the

3    family in the last three or four months, but he doesn't know

4    where he lives so he doesn't know where to go.

5          So he starts calling people that he thinks know his

6    brother and he gets Stuart Sampson who we brought in.  And

7    Stuart Sampson says I told Dunston while I'm on the phone with

8    him I'll ride down to your brothers place and see if he's

9    there.

10         And so he drove over to the apartment which was not

11   too far from the mosque.  He goes up.  Nobody comes to the

12   door.  But he looks -- looks like there are people or vehicles

13   outside.  He gets back in his vehicle.  Drives back to the

14   mosque.  And by the time he gets there, he's grabbed,

15   handcuffed, and put on the ground and it's the FBI doing an

16   investigation on this.

17         Once they finally let him go, he calls his brother

18   and he calls my client.  Where are they?  I mean, my client is

19   sitting there -- a co-conspirator, knowing that these guys

20   have gone to Garland, Texas, to commit this heinous act, you

21   would expect he would be sitting there on pins and needles

22   waiting to see if they succeeded or not succeeded.

23         He's chowing down at Red Lobster with his nephew who

24   has just come into town on May 1st.  And I put his nephew

25   Anthony Sampson on the stand to tell you what his reaction

 1    was.  The reaction was it was shock and amazement.  He

 2    couldn't finish his meal.  They had to put it in a to-go box

 3    and he leaves.

 4           And he goes by to see what's going on over at Soofi's

 5    and Simpsons and it's covered with police officers.

 6           So now he goes to AKs.  And AK is mad at him and is

 7    not answering his phone calls, so we have seen all these text

 8    messages where he's saying, "Pick up the phone.  I've got to

 9    talk to you."

10           So he goes there and he sees him.  And they go back

11    and go to Soofis and Simpsons place and they can't get in

12    there because there's so many police officers.

13           So what do they do?  They go to Dunston Simpson, Sr.s

14    house.  If he's committed this conspiracy and knows that these

15    people have died, is he going to go see the fellow that's

16    died's father?

17           And when they go in and they see his dad, they look

18    at the news and they're trying to determine what's actually

19    happened and they can't figure it out.  Although he seems to

20    recognize the car and says that, geez, it looks like Nadir

21    Soofis car but they're still not sure.

22           What also was important when I put Dunston Simpson,

23    Sr. on the stand was I asked him whether he had received his

24    sons car registration.  All right.  And we'll get to that in a

25    minute, but you'll recall that I asked the government -- now,

1    I put in -- we put into evidence, not the government -- the

2    document that the FBI had found in Soofi and Simpsons

3    apartment.  They had sent it back to Quantico, Virginia.  They

4    had it electrostatically tested.

5          Agent Whitson then prepares a 302 report concerning

6    the document.  And what does the document show?  Well, the

7    original document which is Exhibit 553 doesn't show us too

8    much.  But what they were able to find, which is Exhibit 554,

9    is this.  And again, I don't speak Arabic but then:

10          Dear brother in Allah.  Glory be to God.  There was a

11    change in plans indeed.  Something dreadful came up.  The

12    money that I had from you was being used for what was needed

13    for the initial plan but that changed.  This money is what

14    your left over --

15          I don't know what the next word is.

16          I will leave you with the title of my car to do as

17    you please with it.  I believe Abdul Malik knows how to get it

18    notarized.  I was also going to give you my tax return but it

19    won't be here in time.  Please forgive me if you do not get

20    all the money back.

21          Always fear Allah and keep me -- on and on.

22          Why is that important?  Does it give you some idea of

23    who gave him the money?  Whoever he is giving the title to his

24    car is the person who he's either sounds like he's returning

25    the money -- some money.  He's giving him the title to his

1    car.  Would have liked to have given him the tax return.

2            What did the FBI do to investigate this?  I asked

3    Agent Whitson on the stand:  Do you know who got the title to

4    his car?  Do you know who -- who was the recipient of this

5    note?

6            I'm not sure.  Maybe, but I'm not sure.

7            Well, the chain went like this.  When I put AK on the

8    stand, I asked him when is the last time you've seen Soofi and

9    Simpson?

10           And again, the government didn't put AK on the stand.

11   We did.  It's not my witness.  He's the witness that you need

12   to try to get to the truth of what happened.

13           He gets on the stand and says that at 8:30 or 9:00

14   o'clock on May 1st, Simpson and Soofi stop by my house.  They

15   bring me a bowl of soup.

16           Well, that confirms what Ali said, yeah, they were

17   cooking soup that night.  But what else does he get?  He gets

18   the key from Simpson and he gets an envelope from Simpson that

19   he doesn't know what's in it.  And he doesn't really even

20   realize at the time that the car key is to the car.

21           And Simpson says to him:  Give this envelope to

22   Saabir Nurse.  Who is Saabir Nurse?  He's a man that Simpson

23   has worked with.

24           Implication would be Saabir Nurse is the one who gave

25   him the money.

1          Then what happens?

2          AK says:  I give the envelope to Saabir Nurse.  I

3     give him the key to the car.

4          Then what happens?

5          Dunston Simpson says after my son died, Saabir Nurse

6     gave me the title to my sons car and the key.

7          Did the government put in any of that evidence?  No.

8     Because they don't want to know what the truth is.  They want

9     a conviction.

10         The government put on Ali Soofi because they wanted

11    you to believe him.  And if you do, my client is going to

12    prison for a long, long time.

13         Ali Soofi lied.  Ali Soofi, I contend -- and I can't

14    get into his head.  I'm not exactly sure why he did what he

15    did.

16         There's a number of things that could have motivated

17    him to do what he did.  I think what it was was he was scared

18    to death that he had lived in that apartment with those guys

19    for 13 or 14 months.  He knew everything that had gone on in

20    there.  And he was afraid the FBI was going to be looking at

21    him and he has to make it go away.  Make it put on the back of

22    somebody else.

23         It's almost like, you know, it can't be Mr. Ewell.

24    It's got to be Tom Robinson who did it.  It's not him.  It's

25    not the left-handed guy.  It's Tom Robinson.  He's the bad

1    guy.

2         Again, when you're cross-examining and trying to show

3    somebody is lying, it's not Perry Mason.  They're not going to

4    fall apart on the stand.  That just doesn't happen.  But what

5    is important is for you to watch how they look, what their

6    demeanor is, how they act, where they're looking.  I mean,

7    those are things that are all important and the Court has

8    advised you of that in a jury instruction.

9         I spent a fair amount of time at the very beginning

10   of the cross-examination going through a time line because

11   those are important.  Trying to get the time down.  Have him

12   tell me what the time was.  I asked him about when his brother

13   had bought the gun.  And this is the transcript of this trial.

14   This is page 41 and I said:

15        And when did your brother buy his?

16        His was bought -- that was closer to the, you know,

17   the beginning of the year.  I mean, because he had had it for

18   two months, so it was about February/March time that he had

19   had this weapon.

20        February or March?

21        Yes.

22        Now, we know that that's not right.  We know that he

23   probably bought it in January because he's out there with

24   Sergio shooting in January, so he has to have it by then.

25        All right.  Then I ask him a number of questions

UNITED STATES DISTRICT COURT

1    which, you know when he hit the stand and he testified and he

2    sat there and cried for five or ten minutes at the very

3    beginning.

4              I mean, everybody felt sorry for him.  You couldn't

5    help but feel sorry for him.  He lost his brother.  And I got

6    the sense from this jury that, boy, they're looking at me,

7    they're looking at my client, and they're thinking, wow, this

8    is terrible.

9              But he lied.  He goes on and says:

10             And you said he started coming and he --

11             The "he" is my client.

12             -- three to four nights a week and that he slept over

13   there three nights a week.

14             When did he start sleeping over there three nights a

15   week?

16             I mean it was -- I mean close around -- I'd say like

17   December time.  I remember it was closer towards the end of

18   the year it was more frequent.

19             You never heard anybody who lived in that Cochise

20   house say that he was over sleeping at somebody else's house

21   three nights a week.  Why?  Because it didn't happen.  I mean,

22   Carlos and Juan and Verdugo, everybody.  Nobody says he's

23   gone.  He's there.

24             Why in the world would a man who has a three-bedroom

25   house or a four-bedroom house go to an apartment -- a

1   one-bedroom apartment where there are three men and a boy

2   living on the weekends?

3          I mean, the testimony was is that Simpson is sleeping

4   on one end of a couch, Soofi is sleeping -- Ali Soofi is

5   sleeping on the other end of the couch, and Nadir is sleeping

6   in the bedroom.  So he would give it up and go stay with them

7   and either sleep on the floor or one of them would sleep on

8   the floor.

9          You have to use your common sense.  It doesn't make

10  any sense.

11         Also, if he's having the flood at the house and he's

12  taking a shower, why doesn't he just go stay over there?  Why

13  would he go take a shower?  Why would he go to anybody's

14  house?  He could just stay with them all the time because

15  that's where -- at least according to Ali Soofi that's where

16  he is staying.  Why would he ever go stay with Mubarak for a

17  week or two?  Why not just with them?

18         And there are small things that you ask somebody that

19  you hope to be able to use later in a closing.  For instance,

20  in this case it says:

21         And is it your best recollection that they went

22  shooting in the morning?

23         Yes.

24         And then you saw them either in the afternoon or was

25  it in the evening?

1              It was later that evening.

2              Nobody ever testified they went shooting in the

3      morning except him on this one occasion.  And why does this

4      become important?  Because this is the time he says he sees

5      them cleaning the gun is that they've gone shooting in the

6      morning.  They've come back at night.  And my client is

7      teaching them how to clean these guns for some reason.

8              Now, the government would have you believe that,

9      geez, when he saw that Simpsons gun jammed back two years

10     earlier at Sergios house, this made him know that he had an

11     epiphany.  Sergio -- or Simpson doesn't know how to take care

12     of guns.  I need to teach him how to do it.

13             Now, what the point was nobody could unjam the gun.

14     I mean, they didn't know how to do it.  Simpson didn't know

15     how to do it.  He didn't know how to do it.  Sergio didn't

16     know how to do it.  They didn't know anything about guns.

17             He goes on and says he only went shooting -- I said:

18             Did you ever go shooting with your brother?

19             Not in Arizona.

20             Well, I'm going to tell you, he contradicts himself

21     later on and says, well, I went one time up near Sedona but it

22     was -- we were only with pistols.

23             Oh, but then, oh, yeah, then I went in Salt Lake City

24     which he says here.  But then he says:

25             Oh, later on, yeah I did go with my dad and my

1     brother in Kansas.

2           The story keeps changing.

3           He was also one who seemed to be very fit.  And I

4     asked him questions about running because he wanted you to

5     believe that he would go out running two, three days a week,

6     20 to 30 miles at time.

7           You might do that if you're an ultramarathon runner.

8     And I asked him that and he said, no, I'm a marathoner.  I run

9     marathons.  Marathoners don't run 30 miles a week or 30 miles

10    at a time two or three times a week.  It doesn't happen.

11          What ultimately happens in this matter is I then

12    start asking him about his first meeting with the FBI.  Now,

13    he told us on direct examination that when he first heard

14    about the event in Garland, Texas, and he saw this, at first

15    he thought it wasn't his brother.  He thought it was Simpson

16    and Abdul Malik.

17          That's what he told us.  He saw it at about five or

18    six o'clock in the morning on May 4th.  He meets with the FBI

19    at eleven o'clock.  I played over and over -- or read over and

20    over again portions of the transcript.  They asked him:

21          Is there anybody else that you were aware of that was

22    in that apartment that you think might have been involved in

23    something like this?

24          The guy who just told us that that morning he thought

25    it wasn't his brother, he thought it was Abdul Malik, what

```
1    does he say to the FBI?

2             No.  Well, maybe AK.

3             Anybody else?

4             No.

5             And this is at a time when he's telling us that for

6    the prior four, five, six months he has been spending three or

7    four days a week over there at that place and he's sleeping

8    over there two or three nights a week.

9             He's lying.

10            At page 84 of the transcript he says:

11            Let me direct your attention to page 16 of the

12   transcript of your testimony with the FBI or your statement to

13   the FBI that day.  Take a look at page 16.  Start on line 2

14   and read down.  Do you see beginning on line 10 where you

15   said:

16            I mean, that's the only person other than that they

17   would leave.  They would always leave and do stuff and they

18   wouldn't tell me.

19            Do you see that?

20            Yes.

21            Do you remember telling the FBI that on that morning?

22            No, I don't.  I really can't remember a lot of what I

23   said.

24            And earlier:

25            Mr. Soofi, I have placed on the screen a portion of a
```

1   certified transcript of the conversation that you had with the

2   detectives on May 4th.  Have you seen this document?

3           No.

4           Going down:

5           Okay.  I'm going to ask you to look at page 15,

6   starting on line 12.  Do you see the question from the

7   detective?

8           Yes.

9           Would you read that to yourself?

10          Do you recall now that you told them that the only

11  guy that you recall coming to the house at the time was a

12  fellow by the name of AK.

13          I mean, I can't completely recall --

14          His answer was:

15          I can't completely recall my conversation at that

16  time.  But, I mean, when I initially had come to the FBI, I

17  mean, my mind was incomplete --

18          And I said:

19          I'm sure you were upset.  Your brother had just been

20  killed.

21          But I go on to ask him:

22          And the FBI are coming in there to investigate

23  because they're wanting to know, as they told you, if there

24  was anybody else that may be out there that would be involved

25  in something like this, correct?

1          Yes.

2          And you've just told us that for the prior three or

3    four weeks -- or three or four months -- that Abdul Malik was

4    sleeping at your brothers house two or three nights a week and

5    staying there three or four?

6          Yes.

7          But when they asked you if there was anybody else

8    that could be involved, you don't mention Abdul Malik at all,

9    do you?

10          It was based off of --

11          Excuse me.  You did not mention Abdul Malik the first

12    time you were interviewed by the FBI?

13          No, I didn't.

14          He's just told us on direct that he thinks it's Malik

15    that's there with Simpson.  He's lying.

16          What happens over the course of this is that the lies

17    get bigger and bigger and bigger.

18          He goes home to Kansas.  Never comes back to Phoenix.

19    They wire him up.  He makes telephone calls.  He makes a phone

20    call to my client, clearly trying to get evidence that they're

21    going to use to try to convict him.

22          You didn't hear the phone call.  Why?  Because

23    there's nothing bad on it.  He didn't do anything.  He then --

24    Ali then makes a number of phone calls to AK asking him a

25    number of things.  And, yeah, AK tells him don't talk to the

1    FBI.  I don't blame him.  I wouldn't either.  I won't.

2            And what happens?  They're taping all of these

3    conversations.  Except when they go to interview him in

4    January 29th, they fly out to Texas to go to his mothers

5    house, not to prepare him to come in here to testify, but

6    rather, just to see what he's going to say.

7            Now, he told us that he met with the FBI here the day

8    after his brother is killed.  Meets with them on the 5th at

9    the airport.  He had, he said, at least three conversations

10   and one was video-linked while he was in Kansas.  He's made

11   all these phone calls for them.

12           But then they fly out there and do they tape the

13   interview with him?  No.  Why not?

14           Because if you tape the interview, they have to turn

15   it over to the defense so the defense can see what he's going

16   to say.

17           By not taping it, they don't have to tell us.  We get

18   their 302.  We get their version of what he's going to say.

19   And for the very first time after having met with the FBI over

20   six times, he now decides on January 29th, oh, yeah, by the

21   way, I saw them -- I saw Abdul Malik teaching them how to

22   clean the guns.

23           That's the first time.  And how do we know that's the

24   first time?  Whitson tells us.

25           I asked him on cross-examination.  I went through the

1    different meetings that happened in Kansas and I asked him:

2              Wasn't it -- was that the first time?

3              And he says yes.

4              Looking at Agent Whitsons testimony in this case,

5    page 124 from March 3rd.  I asked him:

6              Okay.  He --

7              And I'm referring to Ali Soofi.

8              He never mentioned in that interview that he had seen

9    Abdul Kareem assisting or directing his brother and

10   Mr. Simpson in cleaning the weapons, did he?

11             I would have to review my report to --

12             You had a notebook.  Do you want to look at

13   September 29th?

14             I have just reviewed my report from September 25th

15   and I don't see that he was asked that question or that he

16   provided any information related to cleaning or disassembling

17   or reassembling a weapon.

18             I then went on and I asked Agent Whitson:

19             And you did not audio or videotape that interview?

20             And we're talking about him now being in Texas in

21   January.

22             No, I did not.

23             That was the first time that he ever mentioned that

24   he had seen my client directing Mr. Soofi, his brother, and

25   Mr. Simpson in how to clean and disassemble any of these

1   weapons, correct?

2          I think that's correct.

3          Okay.  And that interview took place on January 29th

4   of 2015.

5          And his response was:

6          I'm not sure if I have a copy of the report.

7          That's when that interview took place.  That's the

8   first time that he ever mentioned it.

9          He comes up with more and more statements trying to

10  put the blame on my client as time goes by.  Every time the

11  FBI meets with him, he thinks of something new.  I don't know

12  why, but it seems strange to me.

13         He told us on direct examination that my client was

14  the one who purchased the guns that he told the story that his

15  brother had gone out and bought the gun.  He came in.  My

16  client was with him.  He was complaining how much money had

17  been spent.  And my client said he had bought the guns.

18         When I asked him on cross-examination about his

19  conversations with the FBI he said:

20         And then you go on -- I'm reading from the transcript

21  of that May 4th meeting that he had with the FBI.

22         They asked him:

23         Are there any other weapons?

24         And you say:  No, just the handgun.  And he had

25  recently got the AK, probably five -- like five months ago.

1     It was like five months ago.

2              They asked him the question:

3              Do you know how he acquired it?

4              Mr. Soofi:  Through Craigslist.  He bought it on

5     Craigslist.  Bought it through a private owner.  It was

6     upgraded, you know.  Those guys that have their upgraded

7     collection of weapons and they personally do stuff to them.

8              Do you know about how much he paid?

9              It's like I think 700 bucks.

10             And I asked the question:

11             You didn't mention anything about Abdul Malik when

12    the agents are asking you when your brother purchased the AK,

13    did you?

14             Initially, in that first interview, no.

15             And you didn't tell them that he had gotten the money

16    from Abdul Malik either, did you?

17             No.  With the questions that were asked, I -- and at

18    the time, like I said, it was -- I mean --

19             What he goes on to say -- and I could go through this

20    over again and I'm going to stop at this point -- but what he

21    goes on to say is they ask him:

22             Was there somebody that you think provided him the

23    money?

24             And he says:  Yeah, it's an Imam.

25             Who do I think provided him the money?  Somebody by

1    the name of Saabir Nurse.  It seems pretty clear to me.

2            But we're not getting to that answer because the FBI

3    didn't follow up on it because they're not sure.

4            Who got that registration to the car?

5            I asked a lot of questions of Agent Whitson in this

6    case because of my concern about the rush to judgment by the

7    government.

8            I asked them:

9            We've got a guy who says that my client is spending

10   three to four days a week over there, spending two to three

11   nights.

12           Did you canvass or anybody at the FBI go over there

13   and canvass the apartment complex to see if they -- anybody

14   saw him?

15           And his answer was:  We did.  Nobody recognized a

16   photograph of him.

17           You would think that if he was over there as Ali

18   Soofi said, somebody would have seen him that lived there, one

19   of the neighbors would have.

20           THE COURT:  Are you at a --

21           MR. MAYNARD:  I'm at a place to break.

22           THE COURT:  -- at a convenient breaking point?

23           MR. MAYNARD:  I am.

24           THE COURT:  Thank you, Mr. Maynard.

25           Ladies and gentlemen, we'll go ahead and take our

1    afternoon break.  We will reconvene in 15 minutes.

2          You are reminded not to discuss the case among

3    yourselves or with anyone else.

4          Please do not form any conclusions about the case

5    until you have heard the balance of the closing arguments and

6    begun your deliberations.

7          Court is in recess for 15 minutes.

8        (Recess taken at 1:46 p.m.; resumed at 2:00 p.m.)

9          THE COURT:  Thank you, ladies and gentlemen.  Please

10   sit down.  The record will show the presence of the jury,

11   counsel, and the defendant.

12         Mr. Maynard, you may continue.

13         MR. MAYNARD:  Thank you, Your Honor.

14         I'm getting close to being done.  There's a couple of

15   more areas I just need to touch on briefly.

16         I want to show you Exhibits 55, 56, and 57.  These

17   were letters that were found in Soofi's and Simpson's

18   apartment.  Again, these were put in by the defense.  They

19   weren't put in by the government, although the government is

20   the one that found them.

21         These were letters written from an individual by the

22   name of Abu Jihad who is a convicted terrorist who is in

23   prison down in Florida and he clearly wrote this to Simpson.

24         And for some reason, Simpson happened to have copies

25   of letters from Abu Jihad to Saabir Nurse.  He has two of

 1    them.  The same Saabir Nurse.  And we have his address that

 2    apparently got the registration to the car.  That, apparently,

 3    is the one who loaned the money to Simpson or gave him the

 4    money for whatever he was going to do.  And we've heard some

 5    testimony about were they going to go to a Marine base?

 6          I don't know where a Marine base is.  I don't know if

 7    Saabir Nurse gave them money to buy the weapons or to go

 8    somewhere else, but it would appear that they decided to use

 9    that money to go to Texas and carry out this attack.

10          There were times in this case when I thought I was in

11    a fraud case.  That somehow or another, this was a -- the

12    government was bringing an action against my client accusing

13    him of some sort of insurance fraud.

14          I guess the theory of the government was that somehow

15    or another he faked getting hit by a car on April 6th and that

16    he was then going to file this fraudulent insurance claim to

17    get money to promote the terrorism.

18          Well, the terrorist attack is on May 3rd.  I mean, I

19    don't think anybody thinks you can get money from an insurance

20    company in three weeks -- or at least I haven't had that kind

21    of experience -- but we spent more time on these medical

22    records and bringing in the woman who ran into my client.  She

23    stopped the car.  She gave him her card.  She contends now

24    that she didn't think she hit him.

25          We were -- I asked Agent Whitson had they gotten the

 1    medical records from John C. Lincoln who he told them they had

 2    gone to and he said no.

 3            So we put in the medical records which were Exhibit

 4    523.  And, yes, he went to John C. Lincoln the day after the

 5    incident occurred.  It says clearly that the patient denies

 6    falling to the ground.  He states that he didn't feel any pain

 7    yesterday but felt it when he woke up this morning.  The

 8    patient has not tried anything to relieve the pain.  He states

 9    that he went to sleep and noticed I wasn't walking the same as

10    I was yesterday when he woke up.

11            He's feeling pain.  Pain is subjective.  He goes in.

12    He asks for an x-ray.  He hasn't broken anything.  They keep

13    him in the hospital.  And John C. Lincoln, on page 60 under

14    the Clinical Impression is he's got a strained left hip, a

15    lumbar strain and a low-back strain.  That's what the hospital

16    said.

17            Now, he goes to a chiropractor.  But additionally,

18    Exhibit 524, he also goes to another doctor later on.  And

19    there's the assessment.  I mean, maybe these doctors are in

20    cahoots with him.  I don't know.  Maybe this is Saabir Nurse.

21    But these are the medical records.  He got injured.  He had

22    pain.  This isn't a case about insurance fraud, although the

23    government seems to want to focus on that.  The medical

24    records are there.

25            He then went on to see a chiropractor.  He spent I

1    don't know how many visits, but it's like 10 or 12 visits to

2    the chiropractor.  And when they release him, he says:  I

3    state with confidence that Abdul Malik Abdul Kareem was truly

4    hurt as he claims he was and I did not find anything that

5    would lead me to believe otherwise.  I found this patient's

6    accounting of his injury and clinical presentation to be

7    plausible and believable.

8            Additionally, you heard Malik testify that on the

9    first of May, after he had gone to Jumu'ah and after he had

10   seen Simpson and Soofi, that he went to a doctor's

11   appointment.  This is the doctors appointment he went to.  He

12   went to the chiropractor that day.  I mean, the documents

13   support what his story has been.

14           Agent Whitson on cross-examination -- or on direct

15   examination said that he had found they had done forensic

16   accounting on the bank records of my client.

17           We didn't hear from a forensic accountant because

18   there really wasn't anything to talk about.  My client

19   deposited $10,000 on a particular day in November.  He took

20   out 5,000 a couple days later.  And Agent Whitson, for some

21   reason, found that activity to be suspicious.  But when I

22   asked him whether or not he had checked to see if my client

23   had purchased a vehicle in that time period, he had not.

24           And I then asked him:

25           Did you look to see whether or not he had bought one

1      of his two moving trucks within a week of when he made that

2      withdrawal?

3              Yea.  We did not find -- see evidence of that.

4              And did you look to see -- even in the documents that

5      you found in his truck, you didn't see any evidence of that?

6              Not -- yeah -- no evidence that I can recall.

7              Well, what we got through discovery from the FBI

8      was -- and that "22" marker is an FBI marker -- is a receipt

9      for the purchase of a truck on November 13, 2014, consistent

10     with the date that he took the money out of the bank as he

11     testified to.

12             Again, the government isn't interested in the truth.

13     They're interested in a conviction.  This is their document.

14     I mean, I don't know how he can't find it.

15             I spent a fair amount of time going through the

16     taping in this case because, look, it's -- it is incredible to

17     me that they have all of these interviews and then just before

18     somebody is going to take the stand and they're going to

19     testify, they don't tape those so that we know exactly what

20     they're going to say.

21             And as we talked about a few minutes ago in the case

22     of Ali Soofi, I asked him whether they taped Ali Soofis when

23     they flew out to Dallas to meet with his mother and meet with

24     him before he came here and he told me no.

25             And I said was that your decision to make the

1    particular call not to tape him?

2         No.

3         Who made the decision?

4         That would be the decision of the prosecutor.

5         Why?  Because they don't want to turn over what he

6    said.  They want a conviction.  They don't want the truth.

7         A count in this case centers around whether or not my

8    client lied to the FBI on May 5th.  And there's no question he

9    has always -- if you find evidence that he knew that there was

10   a Muhammad Drawing Contest prior to May 3rd, then he lied,

11   because he has always said I never heard of it before.

12        In fact, everybody except for four witnesses and I

13   believe Mr. Kohlmann might make five, said they never heard of

14   it before.  I don't remember what Mr. Vidino said yesterday.

15   I think he said there was some advertisement that came out on

16   it but he didn't testify that he had seen that before then.

17   It could have been research that he did later.

18        My client said he didn't know they were going to

19   Texas.  Nobody except Nathaniel Soofi has ever said that they

20   knew they were going to Texas.

21        One of the counts that the government has -- or the

22   statements is that the guns that -- let me not misstate it.

23   Let me see if I can --

24        No. 4 was knowing about the contest.

25        No. 3 is did not know in advance that Simpson and

1    Soofi planned to conduct an attack in Garland.

2           No. 2 was that before May 3rd, neither Soofi or

3    Simpson fired the weapons they used in connection with the

4    attack in Garland, Texas.

5           How would he know whether they had fired?  He knew

6    they had fired weapons, but the question is, did he know those

7    were the weapons that were used in the attack?

8           I specifically asked the agents:  Had you sent the

9    weapons back?  Did you have pictures of the weapons?

10          And Nash said no.

11          I mean, even if he knew that they had weapons, what

12   they used in that attack, I don't know how he could ever know.

13          So the question really boils down to the defendant

14   did not go shooting in the desert with Simpson and Soofi

15   before May 3rd of 2015.

16          He certainly did.  There's no question about it.

17          And in the June 10th he says I went shooting with

18   them.

19          If we had a video or audio tape, we would know the

20   question that was asked.  This question has always seemed

21   strange to me, because why is it that they went shooting in

22   the desert?  Why wasn't it:  Did you ever go shooting?  Did

23   you ever see them shoot guns?  Did you ever do any of those

24   things?

25          He contends he doesn't remember that question being

1   asked.  He contends that he told the truth.  And he certainly

2   told the truth on June 10th.  And when you listen to it and

3   you listen to that audio, you don't hear Whitson or Nash

4   saying to him, geez, that's not what you told us before.

5   Nobody seemed surprised by the comment when he says, yes, I

6   went shooting in the desert.

7          Now, you know, clearly, as time goes on, we've had

8   some more testimony about were they running, were they not.

9   That's not the statement that he's being accused of lying to

10  the FBI about.  It's not whether they were running or not

11  running.  It was whether or not they asked him the question:

12         Did you go shooting in the desert with Simpson and

13  Soofi?  And did he say no?

14         And he says:  I don't recall.

15         We don't have that videotape.  We don't have that

16  audio tape.  We don't even have the security tape that it

17  looked like this individual, Mr. Taylor, was telling Agent

18  Whitson he needed to get.  Because he says that after they

19  determined they don't have the audio tape or the videotape,

20  there is still a security tape and we can look at that.

21         Yes, we can't hear, but you can look to see the

22  manner that he is answering.  You can see his gestures.

23         I spoke with Jeff -- or Mendez this morning and told

24  him that you would require video export from the security

25  system DVR.  He said no problem but requested that you send an

1    e-mail to Sherry McAllister.  And Whitson says he's going to

2    do it.

3          I'll touch base with the case agents first.  And if

4    they want me to proceed, I'm send an e-mail and get with Rich.

5          Why wouldn't you get it?  He's just told you you're

6    going to need to get it.  Why wouldn't you get it?

7          Additionally, another area that the FBI failed to

8    adequately investigate is the AK47s.  I asked him questions

9    about whether or not they had done searches with ATF and what

10   they had done in that regards.

11         What we knew from the limited discovery that we had

12   gotten was that there were several individuals in the Phoenix

13   area that in the January time frame were selling AK47s on

14   Craigslist for $700.  Well, do you think for a second that

15   those people are going to say, oh, yeah, that's the one I sold

16   to the terrorist who shot up people in Texas?

17         What they did was, I asked the question:

18         Did the FBI investigate Mr. Biaz to get the text

19   messages to see if he had texted anybody about this?

20         Yeah.  We already had copies of the text messages

21   from one of the phones seized in Dallas.

22         They knew that Simpson and Soofi had been texting

23   with this fellow.  And Biaz had an AK47 for sale on January

24   6th of 2015 here in Phoenix for $700.  But their contention is

25   it's my client who bought the gun.

1          I then went on to ask:

2          And that's how you came to go to him, correct?

3          Yes.

4          This was a case where the government had the bad guy

5     and then they went out to try to find the facts and make him

6     into a really bad guy.  I mean, they thought from the time

7     that Stefan Verdugo came and talked to them that he was a bad

8     guy.  He was one of these co-conspirators.

9          And so the rest of their time, all they did was spend

10    it trying to sculpt the evidence to convict him, not to find

11    out what really had happened, not to figure out was it Biaz or

12    was it someone else that had sold the gun.  Not to figure out

13    who had actually sold the ammunition.  Not to figure out who

14    had provided the money.

15         I asked Agent Whitson at one point was he excited,

16    happy when they had gotten authorization from the Department

17    of Justice to file new charges in the Second Superseding

18    Indictment against my client for terrorism, which is the Count

19    5 count, providing material support to a foreign terrorist

20    organization.

21         And his response was no.

22         Well, so I said:

23         Were you happy when it was -- when it was the

24    government brought that second superseding indictment?

25         No.

1          Didn't you think this was a fantastic thing for the

2    government to do?

3          To do what?

4          Charge him with Conspiracy to Provide Material

5    Support to a Foreign Terrorist Organization?

6          No.  I didn't think that was a happy thing to do.

7          However, on December 14th the government had gotten

8    an e-mail -- Agent Whitson had gotten an e-mail from the U.S.

9    Department of Justice saying you have approval for Conspiracy

10   to Provide Material Support as outlined in your e-mail.

11         What's Whitsons response?

12         Fantastic news.  Thank you, all three, for all the

13   hard work.  I know that there is going to be a lot of people

14   in our organization -- the FBI -- who will be very pleased.

15         Now, look, somebody asked the question:  Why did I

16   put that on there?  Why did I ask that question?

17         The reason is is that the government became invested

18   in getting a conviction early on once they arrested him.  They

19   didn't go out and gather the evidence and present it to you so

20   that you could determine what the truth was in this case.

21         This, to me, demonstrated that the government was

22   trying to get the most stringent, toughest charges they could

23   get.  And to call somebody a terrorist, to call somebody now

24   in this environment, in this climate, whose name happens to be

25   Abdul Malik Abdul Kareem, that he is providing material

1    support to a foreign terrorist organization is awful.

2         If he did it, okay.  But fantastic?

3         Now, did Agent Whitson lie?  I don't know.  I don't

4    know what he remembers.  I don't know that he remembered

5    seeing it.  But he certainly should have remembered that he

6    was excited about it.  Why?  Because these are career-making

7    cases.  He can tell you he's got 12 other cases that he's

8    handling.  He doesn't have one like this.

9         Okay.  When you went downstairs and you were picked

10   for this jury and you went through that jury questionnaire,

11   there were 150 of you.  And I'm sure many of you read that

12   questionnaire and thought to yourself, gee, this is about

13   Islam, this is about terrorism.  Wow, this might be sort of an

14   interesting case, although I don't know that I want to go four

15   or five weeks.

16        You walk upstairs and you saw all the press.  Well,

17   this could be an interesting case.  Then you walked inside and

18   you saw all the marshals.  Wow.  I don't know that I want to

19   be here with all those marshals around.  In fact, we've had

20   people ask are we going to be sequestered about this.

21        I mean, terrorist cases are serious, serious cases.

22   To be charged with that, to be a Muslim-American and be

23   charged with terrorism, stuck for the rest of his life,

24   whether you find him innocent or not, if you find him not

25   guilty, he's still going to be tarred with that.

1          Probably the witness that we put on, to me that was

2     the most difficult one, was Nathan Soofi.  No kid should go

3     through that.  I mean, the thought that his father showed him

4     beheading videos, people being burned alive is just beyond

5     tragic to me.

6          And what I found really upsetting was that the

7     government knew this.  And they had interviewed him.  And I

8     had asked Agent Whitson when he was on the stand in this case:

9          You've heard from three witnesses so far that said

10    that they should -- that they knew about the Muhammad Drawing

11    Contest before it occurred.  Would you agree with that?

12         Could you say that again?

13         Yeah.  We heard Mr. Verdugo said that he had heard

14    about the Muhammad Drawing Contest before it occurred.

15         Yes.

16         And the two juveniles Carlos and Juan both said that

17    they had heard about the drawing contest before it occurred.

18         Yes.

19         Okay.  Did anyone else in your investigation, anyone

20    tell you that they had heard of this contest before it

21    occurred other than those two individuals -- those three

22    individuals?

23         No.  Not that I recall.

24         And when Nathan Soofi got on the stand, he testified,

25    you know, okay, did you ever -- did your dad ever tell you

1    that -- about a contest where they were going to draw pictures

2    of the Prophet Muhammad?

3             He said:  Yes.

4             Well, I remember he said like it was in Texas.

5             Did he tell you if he thought that that was a bad

6    thing or a good thing?

7             Yeah.  He said it was a bad thing.  He said he was

8    going to go there.  He was going to go to Texas and go there

9    and then he was going to go to the building and start

10   shooting.

11            But the part that was the most difficult is when I

12   went on to ask him:

13            Okay.  Do you see the people that are sitting at this

14   table and I pointed to the prosecution and to Agent Whitson.

15            Yes.

16            Have you ever seen them before?

17            Yeah.

18            Did you go to their office two or three weeks ago and

19   talk to them?

20            Yeah.

21            Did you tell them the same thing that you've told us

22   today?

23            Yes.

24            Why didn't the government put Nathan Soofi on the

25   stand?  Are they going to tell you that it was because they

1    didn't want to put him through this?  They had interviewed him

2    earlier back in May.  And they now interview him two or three

3    weeks before they bring him here.

4         He says my client, he never saw him spend the night

5    over there -- and granted, Nathan Soofi was only there on the

6    weekends -- he said he saw him a couple of times on occasion.

7    Couldn't remember his name, the guy who's supposedly over

8    there three or four days a week, two or three nights.

9         Nathan Soofi helps in putting the lie to his uncles

10   testimony.  Nathan Soofi demonstrates that the government was

11   into this case for a conviction, not to try to find the truth.

12   I mean, otherwise, Agent Whitson would have told me, oh, yeah,

13   it was Nathan Soofi who told me two weeks ago or three weeks

14   ago when I interviewed him with the prosecutors that he knew

15   about this contest.  But he had just told me no, he didn't.

16        One thing that's interesting -- and I'm going to put

17   this on and it's not a very clear picture -- but I want you to

18   look at it when you get into -- I can tell you that in the

19   documents that you are going to get -- and you have a very

20   large screen -- you can blow this up and it's very -- it's

21   much clearer than it is on this camera.

22        But if you'll recall, the government told us when

23   they showed us this picture that this man right here was my

24   client.

25        My client is not bald.  I mean, he doesn't have a lot

1      of hair.  It might be me, but it's not him.

2              This is Simpson.  This is Ali Soofi.  This is Nathan

3      Soofi.  And this is someone else and I don't know who it is.

4      But they told you that that picture 250 was my client.  It's

5      not.

6              This has been an interesting case and it's coming to

7      an end and we're probably all glad about that.

8              But you folks really are -- I mean, the jury is the

9      buffer between the government and the rest of us.  And the

10     government has tried to instill you with fear.  And that's

11     what most of this has all been about.  Not whether or not he's

12     a member of the conspiracy, but you should be afraid, and

13     therefore, you should convict somebody.  He's got a bad name.

14     He hung around with people that did a bad thing.

15             They -- many of us in this room -- I'm sure on the

16     jury and all throughout this audience, we learn our sense of

17     justice, in part at least, from reading Harper Lee's immortal

18     To Kill a Mockingbird.  And it was sort of -- I don't know if

19     it's poetic, but she died the first week of this trial which

20     was sort of interesting.

21             But it's in that book that we learn that there's

22     community pressures at times that are on people to do things

23     that aren't right.  When Tom Robinson is convicted, everybody

24     who reads the book, everybody who sees the movie, they know

25     he's not guilty.

CR15-00707-PHX-SRB      JURY TRIAL - DAY #16    3-11-16

```
1            My client is a Muslim-American in a very bad
2    environment and climate right now.  He is not guilty of these
3    charges.
4            Felon in Possession of a Weapon, it's not going to be
5    too hard for you.
6            The other four, he is not a co-conspirator.  The
7    evidence does not support the governments contention.  The
8    government has withheld -- they did withhold evidence from you
9    that we brought to your attention.
10           When you look at the evidence without passion or
11   prejudice, you can only come to one conclusion.  The
12   government has not proved that he is guilty beyond a
13   reasonable doubt.
14           And I believe that you will take that instruction
15   that you've gotten from the government, you'll look at all the
16   evidence in this case, and you'll go in there and you'll find
17   that he is not guilty beyond a reasonable doubt of those
18   charges that involve him traveling across state lines to
19   commit murder, conspiracy, aiding and abetting, aiding and
20   abetting or conspiracy with a terrorist organization or of
21   lying to the FBI.
22           Thank you.
23           THE COURT:  Thank you, Mr. Maynard.
24           Ms. Brook?
25           MS. BROOK:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT

1   **REBUTTAL CLOSING ARGUMENT:   GOVERNMENT**

2          MS. BROOK:  Good afternoon, ladies and gentlemen.

3          For the last hour-and-a-half the defense counsel has

4   stood before you and time and time again alleged that the

5   government is not here to find the truth and alleged that the

6   government is withholding evidence.

7          And as he said it over and over again -- bless you --

8   he made mention to a couple of things.

9          One, witnesses that you heard from and who called

10  them;

11         Two, agents' testimony and calling into question

12  their credibility or their motives;

13         Three, whether or not pretrial interviews were

14  recorded.

15         Ladies and gentlemen, in this case which lasted four

16  weeks, the government called witnesses and those witnesses

17  were subpoenaed and came here and testified.  In the criminal

18  justice system it is the governments burden exclusively to

19  prove to you all beyond a reasonable doubt that the defendant

20  is guilty of a crime.

21         It is our burden and our burden exclusively.

22         The defendant doesn't have to say a thing.  Doesn't

23  have to do a thing during the course of that trial.  But,

24  ladies and gentlemen, make no mistake about it, the defendant

25  has subpoena power too.

1          So when defense counsel stands before you and says

2     that the government was withholding evidence or the government

3     didn't call absolutely every witness, the defense can call

4     those witnesses too.

5          They made reference to Lupe.  If the government -- if

6     the defendant wanted you to hear from Lupe, they have subpoena

7     power too.

8          Defense counsel talked about pretrial interviews and

9     whether or not pretrial interviews in this case were recorded

10    and insinuated that things must have been covered up or the

11    truth did not come out from those interviews.

12         Ladies and gentlemen, Special Agent Whitson testified

13    and was asked specifically about that.  The first question he

14    was asked:

15         And in this case have you -- oh --

16         And in any case have you ever recorded pretrial

17    interviews?

18         Never.

19         In your experience what's the general purpose of a

20    pretrial witness interview?

21         So a pretrial interview is an opportunity for the

22    prosecutors to speak with a person who is a potential witness

23    to kind of explain what the process is going to be, what they

24    can expect, and the kind of thing, just to give them a general

25    overview of the process.

1              And then also to go through the things, the

2    information that they have provided, and make sure the

3    prosecutors have a complete understanding of all of that

4    information.

5              Further, Special Agent Whitson was asked:

6              In every interview conducted in this case, was there

7    an admonition given?

8              In pretrial witness interviews, is there an

9    admonition that was given to every witness?

10             Yes.

11             What is it?

12             It's just to tell the truth.  So over any time you go

13   to a pretrial witness interview, that's going to be something

14   that's repeated over and over again to kind of help set them

15   at ease.

16             It's just that at the end of the day when you're on

17   the stand, just tell the truth and then you don't have to

18   think.  You just tell the truth.

19             Ladies and gentlemen, defense counsel also talked

20   about the interview on May 5th that wasn't recorded and

21   insinuated that because the security camera footage was not

22   retrieved, that somehow evidence was covered up.

23             Special Agent Whitson testified that never in any

24   case has he ever heard of any agents subpoenaing security

25   camera footage or obtaining it.

1           And why?  Because there's no audio.

2           And also, when you look at the defendant's interview

3     on June 10th of 2015, the video, you can see up high in the

4     corner the security camera footage.  And you can see what that

5     angle would reflect; a wide span of the entire room without

6     any facial features or ability to see or decode peoples

7     expresses.

8           But at the end of the day, ladies and gentlemen, all

9     of these questions that defense counsel has stood before you

10    and raised are distractions.  Distractions to keep you from

11    looking at the evidence that has come from this witness stand.

12          So let's start at the top.

13          Defense counsel started off by having you guys look

14    at the conspiracy instructions and talking about the defendant

15    just being merely present, and therefore, not being culpable.

16    Defense counsel talked about friends, the defendants' friends,

17    that he was around these people but he didn't do anything.

18          Ladies and gentlemen, first, the defendant chose

19    Elton Simpson as his friend.  And time and time again, he

20    chose him.  For a period of time he wasn't friends with him

21    because he thought that Ibrahim had put some sort of a tracker

22    or a device on his car and he was reporting on him to the FBI.

23          Just think about that for a second.  The defendant

24    was afraid that Ibrahim was reporting on him to the FBI.

25          What was the defendant afraid of?

1          So let's pause for a second and think about the

2     snapshot that that provides into the defendant's mindset.

3          If the defendant knows that Simpson is interested in

4     violent Jihadi material, if the defendant knows that Simpson

5     spends time watching execution videos conducted by ISIS, if

6     the defendant knows that Simpson has been convicted before,

7     but yet over the months before Garland, the defendant is

8     texting Simpson hundreds of times.  They're in frequent

9     contact.  Even with all of that stuff, they remain close

10    friends.

11         What does that tell you?

12         Well, let's put aside -- let's put into a box the

13    question of what their friendship indicates.  Because at the

14    end of the day, the question is:  What did the defendant

15    himself do?  This case isn't about who he was friends with.

16    It's about what he did.

17         He provided guns to Ibrahim and to Nadir Soofi.  He

18    provided ammunition to them.  He took them out shooting and he

19    also trained them on how to use their weapons.

20         Ladies and gentlemen, engaging in illegal Backpage

21    purchases of weapons or of ammunition with somebody who had a

22    minimum you know supports ISIS, that in and of it itself tells

23    you about the defendant's choices.

24         The evidence in this case shows that the defendant

25    not only helped and aided his friends who he knew supported

1    the Islamic State and were intending to act out to attack in

2    the name of the Islamic State, but it also shows that he

3    wanted to attack too.

4        You've heard about the testimony.  Him wanting to go

5    into a mall with a bomb and blow himself up.  You've also

6    heard the testimony from the days and weeks after the contest

7    was announced and the defendant was talking about wanting to

8    go and shoot up the contest too.

9        Ladies and gentlemen, "mere presence" isn't you

10   buying the bullets that end up on the ground in the scene at

11   Garland, Texas.

12       Aiding and abetting.  Let's talk about that as a

13   concept.  The defendant is charged with two conspiracies.  In

14   Count 1 and Count 5 he's charged with conspiracies.

15       Aiding and abetting applies to Count 1, Count 2, and

16   Count 3.  So in Count 1 and 2, the interstate transportation

17   of firearms with the intent to commit a felony, Count 1 is the

18   conspiracy; Count 2 is the actual crime.

19       Obviously, the defendant himself did not drive and

20   transport those weapons to Texas, but he helped.  And it is

21   the aid that he provided that makes him guilty of those

22   crimes.

23       But aid how?  Defense counsel suggests that when the

24   defendant purchased those weapons for Simpson and Soofi, at

25   that point the contest had not yet been announced.  What did

1   the defendant do after the contest was announced?

2          Well, he went out into the desert and he shot with

3   Simpson and Soofi.  He hosted them in his house to talk about

4   the plan to attack the contest.  He sat in Soofi and Simpson's

5   living room and he taught them how to disassemble, lubricate,

6   and reassemble those weapons, just as Ali Soofi testified to

7   when he came in here.

8          And defense counsel asked, they said, well, you must

9   be very -- you know, adept with weapons because you certainly

10  described that well.  And he responded:  I don't own a weapon.

11  I've shot before but I learned from watching.

12         Count 5, additionally, aiding and abetting applies to

13  that count too.  You don't have to find that the defendant was

14  part of the conspiracy, that he was part of the plan itself

15  between Simpson and Soofi, although the evidence that has come

16  from this witness stand does show that.

17         All you have to find is that he helped the plan.  If

18  he helped the plan while knowing of the plan, what it was, and

19  that was an evolving plan, as we know, it was an evolving plan

20  over 2015 and in the late months of 2014, a plan that first

21  came about talking about wanting to commit hijra, going to the

22  Islamic State, evolved into attacks, attacks that included the

23  United States military bases, recruitment centers, going in to

24  bomb a mall, and in the end it crystallized into Garland.

25         And how did he help?  The ways that we've talked

```
 1         about already.

 2                   So defense counsel talked about other people, other

 3         individuals who may also be responsible or involved.  At the

 4         beginning of this case, the judge read to you the Indictment.

 5         And when she did, it was clear that the "conspiracy" referred

 6         to the "defendant and others," others not named, but others.

 7                   Defense counsel asks you to consider other people;

 8         AK, Nurse, and distract you from the evidence that implicates

 9         the defendant.  He brought before you all the indented letter

10         and he said that the indented letter somehow implicates

11         somebody else.

12                   Well, let's talk about that letter for a moment.  The

13         indented letter itself was never found.  What was found was a

14         piece of paper that was etched over, sent to the lab, and they

15         raised a letter.  Let's assume -- or they raised the words

16         from the page.

17                   So let's assume, hypothetically, that that letter was

18         found.  And let's assume, hypothetically, that Simpson on the

19         eve of the attack gave that letter to somebody else.

20                   You have heard hours of testimony in this case from

21         experts; experts who have talked to you about how ISIS is a

22         well-oiled machine and they are trying to mobilize masses of

23         people to attack the United States to support the Islamic

24         State.

25                   Implicated in that is the obvious point that a lot of
```

1    people are involved.  Just because an additional person may

2    also be involved, does not mean that the defendant isn't too

3    involved.  There are a lot of people.  And the question for

4    you to decide in this case is:  Is the defendant guilty?

5         A defense to a bank robbery case isn't:  I'm not

6    guilty because when I robbed the bank, I did it with a friend

7    and he's guilty, not me.

8         Just because more people may be responsible or

9    involved or assisting doesn't take away from the defendant's

10   involvement and his capability -- or his culpability for the

11   manner in which he assisted, aided, helped to plan, and put

12   together this attack.

13        Defense counsel also talked, similarly, about the

14   letters from Hassan Jihaad.  And we looked at just the letter

15   backings, the outside.  There was a letter in 2010, there was

16   a letter in 2012, and a letter in 2014.

17        Two were addressed to Saabir Nurse, the 2010 and the

18   2012 one.  The 2014 one was addressed to Elton Simpson.  And

19   remember, we opened that letter up.  It was written with a

20   typewriter.  And what did it say?  It was Hassan Jihaad trying

21   to convince Ibrahim to not believe in the Khalifah, to believe

22   in his mindset to support his terrorist group which is

23   al-Qa'ida.

24        Defense is trying to insinuate that there is a

25   conspiracy between somebody who is not ISIS and Elton Simpson.

1   You can see the letter.  The letter is in evidence.  Again,

2   these are distraction techniques.

3          Defense counsel talked about Nathaniel and focused on

4   just one part of what Nathaniel said, while excluding and

5   ignoring all of the other pieces of Nathaniels testimony.

6          What Nathaniel testified to is that this plan came

7   together in February.  This plan came together months before

8   the attack.

9          Now, when asked on the stand if he knew Malik, he

10  said he had seen him.  Nathaniel had testified that when he

11  was at his dads house, it was weekends and he spent a lot of

12  time with his dad.  Make no mistake, it came out clearly from

13  Nathaniel when he testified that him and his father keep some

14  really big secrets.

15         His dad had told him as a secret that he was going to

16  go attack Garland.  He talked to him about the bullets and not

17  leaving fingerprints.  He showed him the gun.  And he imparted

18  upon him the information that he might not come back and he

19  was going to kill Americans.

20         That was a secret between him and his dad.  A secret

21  he was not even allowed to tell his mom.

22         Defense counsel insinuates that if Nathaniel knew

23  this information, that obviously, he would have to equally

24  know information about the defendant.  Let's just think about

25  that for a moment in terms of common sense.

1            First, Nadir Soofi is obviously a very complicated

2       individual, an individual who was mentally okay with

3       committing jihad, martyring himself in order to kill masses of

4       Americans.  So getting in his head to understand exactly why

5       he did what he did is a challenge.

6            But let's think about common sense.  What Nadir does

7       know is that Nathaniel is not going with him.  Nathaniel is

8       staying here.  Which means, when and if Nadir does die while

9       committing this jihad, the FBI and the police are going to

10      come and find Nathaniel and talk to him.

11           Does it make sense that he would impart upon this

12      8-year-old information about co-conspirators and their

13      identity, individuals who were not going with him to commit

14      the attack?

15           Similarly to Ali, Nathaniel and Soofi in that house,

16      along with the defendant, only extended certain information to

17      certain people.  Ali knew that the defendant, Simpson, and

18      Soofi all supported ISIS.  He knew that they watched those

19      videos.  He knew that the defendant wanted to kill kafirs.

20           But what didn't he know?  He didn't know about any

21      attack plans.  And strategically, he didn't know that.  Nadir

22      was not going to impart that information on him, nor the

23      defendant, nor Simpson, because all he has to do as an adult

24      is just pick up the phone and call 911.  And additionally, if

25      he didn't do that, he would call his parents.

1        Common sense tells us that Nathaniel only knew what
2   his dad wanted him to know.
3        Defense counsel talked to you about Sergio and
4   questioned Sergios role in this.  Why was Sergio necessary to
5   go out to the desert to shoot?  And it brings up a corollary
6   point.
7        Defense counsel at the end thought it was odd, the
8   question that was asked to the defendant about shooting in the
9   desert by the agents on May 5th.  Obviously, the defendant is
10  a convicted felon.  Simpson is a convicted felon.  So they're
11  not going to head off to the local range in order to shoot.
12       The desert is the obvious place where they would
13  shoot if they're going to shoot.
14       But "Where in the desert?" is the question.  Sergio
15  testified that the summer before -- so the summer of 2014,
16  that he was at a birthday party at his mothers house and that
17  the defendant and Ibrahim were there too.  And it became clear
18  at that birthday party that behind moms house you couldn't
19  fire rifles, that they were too loud.  The defendant knew
20  that.  And in January, the defendant sought out Sergio to help
21  him find a remote spot in the desert to shoot.  And he did.
22       You can see from the evidence from the Wittmann scene
23  that he shot and he shot there with the weapons that were used
24  to conduct the attack.
25       But, ladies and gentlemen, obviously, at that point

1    Sergio wasn't needed again.  Sergio had taken the defendant

2    and Simpson and Soofi -- and by "taken," I mean shown, because

3    the defendant himself drove Simpson and Soofi in his car to

4    the shooting area.

5            It was a remote location.  It was in Wittmann, an

6    area where there are lots of remote locations as the witnesses

7    testified to about the desert area out there.

8            So at that point he had given the defendant all he

9    needed, those remote locations in the desert.  We have heard

10   that the defendant, Simpson, and Soofi proceeded over the

11   following months to continue to go shooting out in the desert

12   together.  We have heard that from Ali.  We have heard that

13   from Mubarak.  We have heard that from AK.  And Verdugo talked

14   about all the times that they went shooting together.

15           Obviously, ladies and gentlemen, not all criminals

16   are masterminds.  And in this case, Simpson, Soofi, and the

17   defendant have left behind a lot of clues.  And in this case

18   they utilized Sergio for what they needed, which was to find

19   that desert location.  And he gave it to them and then the

20   defendant could continue to go shooting with Simpson and Soofi

21   and practice their shot in anticipation of the attacks that

22   they were planning to make over those months in 2015.

23           Defense counsel suggests that you can't trust

24   Verdugo.  You know, ladies and gentlemen, it would be great as

25   a prosecutor to come in here and to put on witnesses in any

1     case who were maybe two nuns and a school teacher.  The

2     defendant was friends with Verdugo.  It was the defendant's

3     friendship with Verdugo that made Verdugo a witness in this

4     case.

5           Defense counsel has insinuated benefits and we've

6     talked about those.  And at the end of the day, it is up to

7     you all to determine the credibility of any witness based upon

8     a lot of factors.

9           And one of them is corroboration; to look for

10    corroboration of witnesses' testimony to determine whether or

11    not what they are saying bears truthfulness.

12          With Ali, the corroboration -- I'm sorry -- with

13    Verdugo, the corroboration is Ali.  Two men.  They don't know

14    each other.  They have never met.  They live in different

15    places, but yet they report the exact same thing about the

16    defendant.

17          They report that the defendant was watching the ISIS

18    execution videos.  They report that the defendant kept saying

19    he wanted to kill kafirs.  They both report that during 2015,

20    the defendant and Simpson and Soofi went shooting together in

21    the desert and they both talk about the defendant's reaction

22    to the Charlie Hebdo attack.

23          Defense counsel suggests that you can't trust Verdugo

24    because of the absence of a recorded call which somehow talked

25    about the attack or had the defendant make an admission about

1      the attack.

2              Ladies and gentlemen, from the evidence that's come

3      from this witness stand, it's clear that the defendant is

4      paranoid of law enforcement.

5              What did he say to James Sampson in his first or so

6      call after he found out from Stuart that Ibrahim was likely

7      dead in the attack that he knew was going to take place -- and

8      we're going to get to that in a second.  He said:  I can't

9      talk to you about this on the phone.

10             Is it logical then to infer that he's going to make

11     admissions on the phone with anybody or Verdugo?

12     Corroboration with Verdugo.

13             You also look to Juan.  And a small detail, but an

14     important one, Verdugo testified about the mirrors inside the

15     Cochise house of the defendant's, that house that he lived in

16     up until the middle of March of 2015, the one where Juan and

17     Carlos lived across the street.

18             He talked about how the defendant had hung mirrors so

19     that he could see from one room into the other rooms.

20             When the defendant testified, he testified that the

21     room in the Cochise house that he spent the most time in was

22     the prayer room.

23             And then Juan.  Juan testified that it was through

24     those angled mirrors that he stood in the hallway on that very

25     first time that he heard the defendant talk about the Garland

1    contest and his desire to shoot it up.  He stood there in the

2    hall and he saw the words come out of the defendant's mouth by

3    looking in that angled mirror where he could see him into the

4    prayer room.

5           One last point about Verdugo.  James Sampson, the

6    defendant's own brother.  What did he say about Verdugo back

7    in June?  We heard the recording two days ago.  And he said:

8    He's a good kid.  He tries to help to fix things that he

9    doesn't know how to, like refrigerators, but he's a good kid.

10          Defense counsel talked at length and called Ali a

11    liar.  And, again, ladies and gentlemen, you are the judges of

12    credibility in this case and you exclusively.  Defense counsel

13    talked about how Ali disclosed information about the

14    defendant.  And he said that the manner in which he disclosed

15    the information means that you can't trust the information and

16    he is not telling the truth.

17          Well, what did Ali say?

18          Initially, did you tell the FBI about Malik?

19          No.  No, I didn't.  No.

20          Did you deliberately not tell them about Malik?

21          Yes.

22          Why?

23          I mean just from my --  you know, generally meeting

24    somebody, you know, the vibe you get off of people and the

25    general actions of somebody, you can tell, you know, how

UNITED STATES DISTRICT COURT

1      violent a person is over what they're capable of.

2              I mean just from stories that I have heard, instances

3      that he was involved in, just the general, you know, the

4      feeling of the person.  You know, that you just feel what

5      they're capable of.

6              Eventually, did you tell them?

7              Yes, after I had gone to my brothers funeral and I

8      was interviewed in Kansas.

9              Additionally, he was asked:

10             Did you hold back information because of your fear of

11     people that Malik was associated with?

12             His response:  Yes.

13             So let's talk about that.  Ali testified about his

14     fear of the defendant and other people, about his fear that

15     they would come after him for retaliation or come after him --

16     them -- him to make them join him.

17             He talked about that fear.

18             And what brought home that fear for Ali?  What we

19     learned during AKs testimony.

20             We learned during AKs testimony that in the hours

21     after the attack in Garland, AK called Ali.

22             And he told Ali:  Do not talk to the police.

23             He made that call because Malik told him to make that

24     call.

25             Not only was he afraid of Malik because of him being

 1    physically afraid of him or afraid he might get hurt, but

 2    Malik had made sure that Ali wouldn't talk by reaching out to

 3    him in the hours after his brother was killed to send the

 4    message.

 5            And, ladies and gentlemen, if the defendant wasn't a

 6    co-conspirator with Simpson and Soofi, if the defendant wasn't

 7    in the house with Simpson and Soofi and Ali, how would he ever

 8    know Ali?  How would he ever know Alis phone number?  And most

 9    importantly, why in the world would he care what Ali told to

10    the police unless he knew that he had to cover his tracks,

11    because he knew what Ali had seen of him.

12            Ali had known about his support for the Islamic

13    State, about how he had talked about wanting to kill kafirs.

14    Ali knew the defendant and the defendant reached out through

15    AK to make sure he didn't talk.

16            Defense counsel -- we're going to get into this

17    briefly -- defense counsel talked a lot about the timing of

18    individuals, how the individuals who testified talked about

19    time and equated how they were able to report a time that an

20    event happened, or whether or not that individual was telling

21    the truth.

22            And he put on the overhead a page from Alis

23    transcript.  And he said see, Ali here in this transcript says

24    that it was between March -- or February and March that Nadir

25    Soofi came back with that weapon and talked about the

UNITED STATES DISTRICT COURT

 1   defendant giving him the money to buy it.

 2           Page 29 on direct examination, what did Ali say?

 3           The defendant said, oh, well, you know --

 4           Or defense counsel said Ali was wrong about the

 5   timing.  It was, you know, February or March.  That's the

 6   reason why it's inconsistent and you can't understand or test

 7   his credibility.

 8           In the beginning he said this:

 9           I want to talk about other weapons.  At some point

10   did your brother come home with an AK style weapon?

11           His response:  Yes.  He had come home with a full

12   body AK.

13           Do you remember when that was?

14           It was roughly four months before the incident.

15           So roughly around January?

16           Around January time.

17           It was on cross-examination when asked was it

18   February or March, he said:  I think so.

19           Let's talk about timing.  Defense counsel has argued

20   to you that you can't trust Juans testimony.  You can't trust

21   Carlos's testimony or any other adult who may not have the

22   timing of an event correct.  You can't trust them about the

23   substance of what they heard.

24           Ladies and gentlemen, common sense tells us that with

25   children and with some adults, they're not great with dates

1    and they're not great with times.  And that inability to

2    pinpoint actual dates or times doesn't have any bearing upon

3    their clear memories of significant events that have happened

4    in their lives.

5            So, children may not remember exactly when they went

6    to Disneyland or when they went to Legoland or when they went

7    to their friend's birthday party, but they do remember being

8    at their friend's birthday party.  They remember the

9    significant events like the first time they road on the

10   Matterhorn or taking that picture with Mickey Mouse.

11           Kids are kids.  And they may not remember exactly

12   when something happened.  For instance, a child may clearly

13   remember a clown that was at her best friends birthday party

14   when she was a kid.  She remembers the red pants that they

15   were wearing, that crazy yellow hat, the big scary eyes, and

16   at 19 can still talk about that clown.

17           But if you ask her:  Was that in the fall or in the

18   spring or did that birthday party happen in the morning or the

19   afternoon?  And all bets are off.

20           Mr. Maynard is a very skilled cross-examiner and he

21   did a very good job confusing children and even some of the

22   adults on time.

23           At the end of the day the question is:  Did the

24   substance of the events that they reported, the significant

25   events that they heard in their life, did the substance of

1    those events stay the same and stay consistent?

2           And, again, ladies and gentlemen, you look to the

3    corroboration.  I'm not going to belabor the point at this

4    stage, but there are a couple of key details.

5           One is this:

6           Juan and Carlos.  Brothers.  Did they testify to the

7    exact same memories?  Or did each of them testify to

8    individual and distinct memories that they had?  Did each of

9    them testify that they hadn't spoken to the other about the

10   memories that they had?

11          The corroboration is in those details, the way in

12   which they can report what happened based on what else was

13   going on and the memories they have, the totality of the

14   events.

15          And one quick one with Carlos was Fox News.  When he

16   talked about the Jordanian pilot being burned alive, when he

17   talked about waking up because of the obnoxious laughter of

18   the defendant who then came in and got him and brought him

19   into the other room to watch that man burn alive.  He said he

20   saw it on Fox News.

21          And what did Evan Kohlmann testify to?  That the only

22   network that actually released that footage was Fox News.  It

23   was scandalous.  And it was, you know, something maybe there

24   was some backlash for Fox for doing, but nonetheless, those

25   are the details, the corroborating details to look for.

1          I have a couple more quick points and I know it's

2     been a long day, so we'll move quickly through it.

3          Defense has made a big deal out of the defendant's

4     reaction, his reaction to learning that Ibrahim had been

5     killed, that reaction at Red Lobster and in the hours

6     afterwards.

7          On one hand he said he was too upset.  Right?  The

8     defendant was too upset to have been part of the plan because

9     he wouldn't have been a jihadist if he was upset.  Or he

10    wasn't happy enough, something similar, along those lines.

11    Made a big deal out of his reaction.  Highlighting, as the

12    defense is arguing, that he was unaware.

13         Well, let's take a closer look at what happened in

14    those hours after the defendant learned that after the plan he

15    had put into play, Ibrahim had predictably died.

16         What happened?  He's sitting at Red Lobster.  He gets

17    the call.  The call comes from Stuart.  Stuart lets them know

18    that the news is calling because Ibrahim has been involved in

19    a shoot-out and it's everywhere.  It's all over the news.

20         Was the defendant's reaction the same as the

21    emotional display you all saw a few days ago?  Was he welled

22    up?  Was he sad?  No.  He called the waiter over.  He told you

23    from his own testimony:  I called the waiter over and asked

24    him to box up my food to go.

25         Additionally, look at the text messages.  How did the

1   defendant respond in those hours after?

2          You will see when you look at these records that the

3   defendant was in these hours -- so 8:30, 8:21 on May 3rd,

4   receiving texts from an individual who was doing some postings

5   for him as you can read from the text messages that continue:

6          Are you there?

7          And then he texted him back at 8:46.

8          Brother, call me.

9          Again, sending to the same number, a phone number,

10   and then:

11          Brother, why don't you call me back?

12          Again, continuing this discussion with him in the

13   early morning hours:

14          Hello brother.

15          He gets a message.

16          Now I'll post your ads.

17          He responds, doing these business-as-usual text

18   messages:

19          Okay brother.  Please post.  Okay brother.  Please

20   post.

21          And you can see that ads were posted.

22          And then as those hours continued, him negotiating

23   other pick-ups, business pick-ups, with somebody who he was

24   doing a job with.

25          The other reason that you know through these text

1    messages is his effort to silence Ali.  And you see that

2    through the exchange that he has here with AK:

3         Text me the dang number already.

4         And he does.

5         And we know what AK then did on his behalf.

6         Dr. Vidino testified about how individuals

7    predictably respond to circumstances and act in these

8    situations in order to act in accordance with how people would

9    anticipate them to act.

10          As we wrap up, look to the defendant's statements

11   that he made on the stand.  Did the defendant lie?

12        Mr. Koehler talked at length about it before and I'm

13   just going to highlight a couple quick points.

14        Defense counsel stood before you and said:  Look at

15   the chiropractic documents.  They support the defendant.  And

16   as you look at those documents, the question is:  Who wrote

17   them and for what purpose?

18        But at the end of the day, let's look at some other

19   lies that the defendant made on the stand and why.

20        One of them he testified that in the month of April,

21   he only saw Ibrahim twice.  He said once was on the 6th and

22   once was on the 22nd and those were the only two times.

23        So are there pieces of evidence that you have that,

24   even from just these evidence, you can see that that is a lie?

25        Text messages between the defendant and Ibrahim on

```
1    April 12:
2           Question -- or message sent:
3           I want to know if you want me to pick you up on the
4    way.  Dinner is ready.
5           To which he responds -- Simpson responds:
6           Okay.  You can.  Insha Allah.  Okay.
7           Did the defendant talk about them seeing each other
8    that day?  Or the next day?
9           I'll come and get you.
10          Okay.
11          Text from Kareem.
12          Simpson:  Insha Allah.
13          Kareem:  Okay.  I'll be right there.
14          Brother I'm outside.
15          Okay.
16          Ladies and gentlemen, you also heard from Mustafa
17   Hassan who said on April 30th he saw the defendant with
18   Ibrahim at that restaurant.
19          And these are just the pieces of evidence left behind
20   about their connection which the defendant lied about when he
21   sat there.
22          At the end of the day, the question is this:
23          Why would a man engage in illicit Backpage ammunition
24   purchases with Ibrahim?  Why would he provide Simpson and
25   Soofi guns?  Why would he take them shooting over and over
```

1    again?  Why would he teach them how to maintain and to keep

2    their weapons?

3            Why?  Because he knew that Simpson and Soofi were

4    ISIS supporters.  He too supported the Islamic State.  And he

5    wanted to help them act and attack and kill kafirs in the name

6    of ISIS to support the Islamic State.

7            The evidence in this case has come from the witness

8    stand and it has come from numerous different places, numerous

9    different witnesses, people who have been eyewitnesses and

10   have seen and heard and testified.

11           And the instructions tell you that at the end of the

12   day, there's not any one number of witnesses that you need to

13   look for.

14           You have heard from multiple witnesses who explain

15   and recount the defendant's attachments, his affiliation, and

16   his ideology.  And the fact that he wanted to attack America

17   in order to support the Islamic State.

18           Ladies and gentlemen, we ask you to hold the

19   defendant accountable and to find him guilty of all five

20   counts.

21           Thank you.

22   **FINAL INSTRUCTIONS TO THE JURY**

23           THE COURT:  Thank you, Ms. Brook.

24           Ladies and gentlemen when you begin your

25   deliberations, elect one member of the jury as your presiding

1    juror who will preside over the deliberations and speak for

2    you here in court.

3        You will then discuss the case with your fellow

4    jurors to reach agreement if you can do so.  Your verdict,

5    whether guilty or not guilty, must be unanimous.

6        Each of you must decide the case for yourself, but

7    you should do so only after you have considered all the

8    evidence, discussed it fully with the other jurors, and

9    listened to the views of your fellow jurors.

10       Do not be afraid to change your opinion if the

11   discussion persuades you that you should.  But do not come to

12   a decision simply because other jurors think it is right.

13       It is important that you attempt to reach a unanimous

14   verdict but, of course, only if each of you can do so after

15   having made your own conscientious decision.  Do not change an

16   honest belief about the weight and effect of the evidence

17   simply to reach a verdict.

18       Because you must base your verdict only on the

19   evidence received in the case and on these instructions, I

20   remind you that you must not be exposed to any other

21   information about the case or to the issues it involves.

22   Except for discussing the case with your fellow jurors during

23   your deliberations:

24       Do not communicate with anyone in any way and do not

25   let anyone else communicate with you in any way about the

1    merits of the case or anything to do with it.  This includes

2    discussing the case in person, in writing, by phone or

3    electronic means, via e-mail, text messaging, or any

4    interstate -- Internet chat room, blog, website or other

5    feature.  This applies to communicating with your family

6    members, your employer, the media or press, and the people

7    involved in the trial.  If you are asked or approached in any

8    way about your jury service or anything about this case, you

9    must respond that you have been ordered not to discuss the

10   matter and to report the contact to the court.

11          Do not read, watch, or listen to any news or media

12   accounts or commentary about the case or anything to do with

13   it; do not do any research, such as consulting dictionaries,

14   searching the Internet or using other reference materials; and

15   do not make any investigation or in any other way try to learn

16   about the case on your own.

17          The law requires those restrictions to ensure the

18   parties have a fair trial based on the same evidence that each

19   party has had an opportunity to address.  A juror who violates

20   these restrictions jeopardizes the fairness of these

21   proceedings.  If any juror is exposed to any outside

22   information, please notify the court immediately.

23          The punishment provided by law for this crime is for

24   the court to decide.  You may not consider punishment in

25   deciding whether the government has proved its case against

1    the defendant beyond a reasonable doubt.

2            Verdict forms have been prepared for you.  After you

3    have reached unanimous agreement on the verdicts, your

4    presiding juror should complete the verdict forms according to

5    your deliberations, sign and date them, and advise the law

6    clerk that you are ready to return to the courtroom.

7            If it becomes necessary during your deliberations to

8    communicate with me, you may send me a note through the law

9    clerk, signed by any one or more of you.  No member of the

10   jury should ever attempt to communicate with me except by a

11   signed writing, and I will respond to the jury concerning the

12   case only in writing or here in open court.  If you send out a

13   question, I will consult with the lawyers before answering it,

14   which may take some time.  You may continue your deliberations

15   while waiting for the answer to any question.  Remember that

16   you are not to tell anyone, including me, how the jury stands,

17   numerically or otherwise, on any question submitted to you,

18   including the question of the guilt of the defendant, until

19   after you have reached a unanimous verdict or have been

20   discharged.

21           Ladies and gentlemen, you will receive five forms of

22   verdict; one for each count.  I will not read them to you.  I

23   will just describe that for each count, except Count 3, your

24   verdict will simply ask you to state whether or not you find

25   the defendant guilty or not guilty of the crime charged in

1    that count.

2           With respect to Count 3, which is the charge Making

3    False Statements to the Federal Bureau of Investigations, if

4    you find the defendant guilty of that crime, you will be asked

5    to indicate on the jury form which of the alleged four false

6    statements you have unanimously found that the defendant made.

7           Do counsel have any additions or corrections to the

8    instructions as read?

9           MR. KOEHLER:  No, Your Honor.

10          MR. MAYNARD:  No, Your Honor.

11          THE COURT:  Ladies and gentlemen, at this time I'm

12   going to ask Maureen to select three of you as alternate

13   jurors.  She will make this selection by lot, having put your

14   juror numbers in a little box, and she will pick three of

15   them.

16          THE CLERK:  Juror No. 2, Juror No. 12, and Juror No.

17   16.

18          THE COURT:  The three of you have been chosen as the

19   alternates in this case.  That means that you will not

20   participate in the deliberations.  However, it does not mean

21   that you are now free to discuss the case with anyone you

22   wish.

23          In the unlikely circumstance that during

24   deliberations a juror had to be excused because of an illness

25   or a personal emergency, so long as you had not discussed the

1   case with anyone, we would be able to call one or more of the

2   alternates to come in and deliberate with the jury.

3         So I'm going to ask the three of you to leave your

4   notebooks here.  We will keep your notes until the verdicts

5   have been returned, at which time we will make sure your notes

6   are shredded.

7         And also, if you would provide contact information to

8   Maureen, we will call you when the verdicts have been

9   returned, let you know what they are, and when we do that, at

10  that time the admonition will be lifted and you will be free

11  to discuss the case with anyone you wish.

12        I want to thank the three of you very much for

13  participating as jurors in this trial.

14        You may be disappointed that you have been selected

15  as alternates, but I want you to know that your presence here

16  has been extremely important.

17        We lost one of our four alternates during the course

18  of the trial and it's possible that we could have lost more.

19  Your presence has assured that we did not have to start over

20  and retry the case because we had lost a juror during the

21  trial.

22        You are free to leave the courthouse when your fellow

23  jurors retire to begin deliberations.  And, again, I want to

24  thank you very much for your participation in this trial.

25        Before I have Sanessa sworn, I want to mention a

```
 1    couple of other things.
 2            First, it's 3:25.  Obviously, you will be able to go
 3    back and get organized and begin your deliberations.  But
 4    what's important now is that the schedule, within reasonable
 5    limits, is up to you.  You can deliberate for as long as you
 6    wish this afternoon or you can get organized and decide to
 7    come back after the weekend.
 8            When you decide to adjourn today, please call
 9    Sanessa -- she will give you her number -- and let her know.
10    And then also let her know what time you will be returning
11    next week.
12            I did want to mention that if all 12 of you wished to
13    come back on Monday to deliberate, you would be free to do
14    that.  But I'm sure that you have -- because of the schedule,
15    that may not be possible and it would have to be that all 12
16    of you felt that it was convenient to do so.
17            Otherwise, you can come back on Tuesday.  And, again,
18    let Sanessa know what time you wish to return to begin
19    deliberations.
20            And, again, I just read to you a lengthy admonition
21    that applies during any recess, including the weekend recess.
22    And please be sure not to let anyone know what the status of
23    your deliberations is.
24            At this time I will ask if Sanessa could please come
25    forward and be sworn as the bailiff.
```

1          (Bailiff duly sworn.)

2          THE COURT:  I forgot to mention how we're going to

3    handle the exhibits.

4          The paper exhibits, the photographic exhibits, you

5    will be able to view on a large screen that will be in the

6    jury room.  Sanessa will show you how to work it.  It's really

7    easy.  There's also an index of the exhibits on there, so all

8    of the numbers of the exhibits that have been admitted are in

9    the index along with a brief description of what the exhibit

10   is.

11         However, there's also all of these physical exhibits,

12   exhibits that can't be shown on the television screen.

13         The physical exhibits that are not firearms or

14   ammunition we'll send in.  If you don't want it today, we

15   don't have to give it to you today.  But we will send it in so

16   you have it available to look through if you need to or wish

17   to.

18         With respect to the firearms and ammunition, if you

19   wish to inspect the firearms or ammunition in the jury room,

20   you may do that.  But you'll have to send a note out and ask

21   me, at which time I will have them sent in.

22         You can look at them for as long as you like and then

23   we'll take them out again.

24         I want to remind you that every time somebody

25   testified about them, we had them tell you that they were safe

1    and in a position with zip ties where they couldn't be fired.

2    If, in fact, you do handle any of the firearms in this case,

3    please be careful with them.

4           If you want to see the ammunition, we will also send

5    that in and let you look at the ammunition for as long as you

6    like and then remove it when you're finished.  However, do not

7    ask for the guns and the ammunition at the same time because

8    we will only provide one or the other, but not both.

9           So let Sanessa know if you wish to have the physical

10   evidence brought in this afternoon and we'll send it in.

11   Otherwise, we will have it waiting for you when you return

12   after the weekend.

13          The jury may now go to the jury room to begin

14   deliberations.

15          **(Jury retires at 3:29 p.m.)**

16          (Open court, no jury present at 3:30 p.m.)

17          THE COURT:  Please sit down.

18          Mr. Koehler, is there anything else we need to

19   discuss?

20          MR. KOEHLER:  Not from the government, Your Honor.

21          THE COURT:  Mr. Maynard?

22          MR. MAYNARD:  No, ma'am.

23          THE COURT:  A couple of things.  Are you going to

24   just hang around until you find out when the jury is going

25   home today?

```
 1              MR. KOEHLER:  Yes.

 2              THE COURT:  You too, Mr. Maynard?

 3              MR. MAYNARD:  Yes.

 4              THE COURT:  Good.  Then we will handle any questions

 5     we receive by telephone unless you happen to be here.

 6              So make sure that you provide Maureen with telephone

 7     numbers where we can reach you and which will be answered and

 8     not go to some voicemail.

 9              We will also, if we can, if you're at a location

10     where we can fax you the question, we will do so so that you

11     have a chance to look at it.

12              The only time that I will require the presence of

13     counsel and the defendant if the jury sends out a note is if

14     they send out a note that indicates a desire to have testimony

15     read back or send out a note that would reflect an inability

16     to reach a unanimous verdict when I would have to address them

17     in court.  Other than that, we should be able to handle any

18     questions in writing.

19              So I have already admonished the jury with respect to

20     the evening recess, so I will not bring them back in the

21     courtroom again today to further admonish them.

22              If, when they come back next week, whether it's

23     Monday or Tuesday, but I'm going to guess it's going to be

24     Tuesday, if they were to continue on deliberations until the

25     next day, I would bring them back into the courtroom at the
```

1    evening recess to admonish them, but I do not require that

2    counsel be present for that admonition.

3           I simply place it on the record, find out when

4    they're coming back the next day, and then will advise you

5    both that they have gone for the day and what time they're

6    returning for the next day.

7           Okay.  If there is nothing else, court is at recess.

8       (Recess taken at 3:32 p.m.; resumed at 3:59 p.m.)

9       (Open court, no jury present.)

10          THE COURT:  Let the record show the presence of

11   counsel.  The jury is not present.  The defendant is not

12   present.

13          I want to report that the jury has gone home.

14   They're coming back Tuesday morning at 9:00 a.m. and they

15   specifically asked before they left if they could wait and

16   have this answer on Tuesday morning.

17          So, when you started showing pages of transcript, I

18   knew this was coming and I have prepared the following answer

19   for your consideration.

20          "No."

21          It goes on.  No, it goes on, because "no" is just too

22   abrupt.

23          "You must rely on your own memories and notes of what

24   witnesses said.  The lawyers had the court reporter prepare

25   some portions of the testimony of some witnesses.  There is

```
 1   not a full trial transcript available."

 2           Agreeable?

 3           MR. KOEHLER:  Yes.

 4           MR. MAYNARD:  That's agreeable.

 5           THE COURT:  Okay.  Then they will have this on

 6   Tuesday morning.

 7           I did not choose to add more information about if

 8   they have any specific question about what any specific

 9   witness said.  We can read to them, but if they do, we'll deal

10   with it then.

11           MR. KOEHLER:  Okay.  Thank you.

12           MS. BROOK:  Thank you.

13           THE COURT:  So Tuesday morning, just make sure

14   starting at nine o'clock that Mr. Koehler and/or Ms. Brook,

15   Mr. Maynard and/or Ms. Plomin are available if we call.

16           MR. KOEHLER:  We shall.

17           MR. MAYNARD:  We shall.

18           THE COURT:  Have a nice weekend.

19       (Proceedings adjourned at 4:01 p.m.)

20                          * * *

21

22

23

24

25
```

1

2                    C E R T I F I C A T E

3

4         I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8         I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13        DATED at Phoenix, Arizona, this 1st day of August,

14   2016.

15

16

17

18

19                    s/Elizabeth A. Lemke
                      ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25