JOHN S. LEONARDO
United States Attorney
District of Arizona

KRISTEN BROOK
Arizona State Bar No. 023121
JOSEPH E. KOEHLER
Arizona State Bar No. 013288
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: kristen.brook@usdoj.gov
Email: joe.koehler@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>   Plaintiff,<br><br>v.<br><br>Abdul Malik Abdul Kareem,<br><br>   Defendant. | No. CR-15-00707-01-PHX-SRB<br><br>**RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR NEW TRIAL** |

   The United States, through undersigned counsel, respectfully urges the Court to deny Kareem's Motion for New Trial, and respectfully submits the new information and argument in the Supplemental Brief do not provide any additional support for the motion. The newly-disclosed materials were not remotely exculpatory and do not detract in any way from the evidence that demonstrated Kareem's participation in the conspiracies charged in the second superseding indictment. Indeed, all of the communications set forth in the newly-disclosed materials occurred after Kareem's direct participation in the planning and preparation phases of the conspiracies.

## I. Facts

The facts of the case are lengthy and set forth in detail in the government's response to the Motions for New Trial and Judgment of Acquittal. The following facts are relevant to Kareem's Supplemental Brief.

The conspiratorial acts of Kareem, Elton Simpson, and Nadir Soofi began, and many were completed, well before the FBI Undercover Employee (UCE) first made online contact with Simpson on April 23, 2015. The material support conspiracy charged in Count Five began in or around June 2014, when the Islamic State officially proclaimed the formation of a Caliphate in Iraq and Syria. Similarly, the conspiracy to transport firearms in interstate commerce charged in Count One began in or around January 2015. The testimony of juvenile witnesses Carlos and Juan, and of Sergio Martinez, Ali Soofi, and Stephan Verdugo, as well as that of various other witnesses, all established conspiratorial acts of Kareem, Simpson and Soofi that occurred well before the UCE made contact with Simpson online.

To start, Ali Soofi testified that Kareem, Simpson, and Nadir Soofi watched violent jihadist videos in the Simpson/Soofi apartment in mid-2014, and that they all celebrated ISIL's announcement of a caliphate in Iraq and Syria in June 2014. (Ali Soofi RT 3/2/16 11.) In addition, on November 9, 2014, Simpson forwarded an email to Kareem about his travel restrictions; this coincided with Simpson's investigation of potential Hijrah travel to Syria via Turkey on behalf of ISIL. (Exh. 3 (Tr. Exh. 190).) Prior to the Super Bowl game played on February 1, 2015, Kareem and Simpson discussed a plan to attack the Super Bowl along with the Westgate shopping mall – a mall adjacent to the Super Bowl. (Juan RT 2/24/16 13,15) (Verdugo RT 2/19/16 16, 61-62.) Kareem aided Simpson and Soofi to acquire firearms first in the summer of 2014, then again between December 2014 and January 2015. (Ali Soofi RT 3/2/16 25-27, 29.) Kareem took Simpson and Soofi shooting in the desert in January 2015 with the weapons he helped them purchase – the same weapons used in the Garland attack. (Ali Soofi RT 3/2/16 32-33; Martinez RT 2/24/16 12-14; Verdugo RT 2/19/16 12, 16.) Multiple witnesses testified Kareem made statements

about his plan to attack the Garland contest before April 2015.[1]  (Juan RT 2/24/16 13; Verdugo RT 2/19/16 30; Carlos RT 2/24/16 14-15.)  Simpson accessed an ISIL-published list of U.S. military personnel on March 20, 2015.  (*See* Kohlmann RT 3/1/16 73-77; Exh. 4, 5 (Tr. Exh. 495, 496).)  The name and address of one military member from the list was written in a notebook belonging to Simpson and/or Soofi.   (Exh. 5 (Tr. Exh. 496).)  Only on April 23, 2015 and April 24, 2015 did the UCE exchange written messages with Simpson.[2]  This happened well after many of the conspiratorial acts proven at trial, and after all of the conspiratorial acts in which Kareem directly participated, took place.

The UCE first made contact with Hendricks on March 24, 2015, well after the material support and interstate transportation of firearms conspiracies were well under way. From March 23, 2015, through April 22, 2015, the UCE and Hendricks discussed various topics centering on Islamic doctrine, the Islamic State, taking action within the United States on behalf of the Islamic State, and recruiting like-minded individuals to join Hendricks's group.  The UCE developed an online relationship with Hendricks and sought to build trust in order to gain information on Hendricks's relationship with ISIL and plans to act within the United States on behalf of ISIL.  The UCE's discussions with Hendricks about the Garland contest began at the end of April 2015, well after the UCE and Simpson ceased communication.

The UCE and Elton Simpson communicated over two days, April 23 to April 24, 2015 – they did not communicate before or after those days.  Hendricks referred the UCE

---

[1] The Muhammad Art Exhibit and Contest was held at the Curtis Culwell Center in Garland, Texas on May 3, 2015, and was announced on the internet in February 2015.

[2] The Government has disclosed to the defense all communications between the Federal Bureau of Investigation Undercover Employee (UCE) and Erick Jamal Hendricks, and between the UCE and Elton Simpson.  All of the communications were in the form of written messages sent via online social media applications.  Although the messages occupy 850 pages of screen shots, each page contains approximately 15 lines of text, with each line containing up to approximately eight words.  The government has had transcripts prepared of the entirety of both conversations.  The transcripts are attached as Exhibits 1 (Hendricks) and 2 (Simpson) to this response.  In addition, the government has prepared a glossary of terms commonly used in the messages; the glossary is attached as Exhibit 10.

- 3 -

to Simpson's juba1911 handle on April 23, 2015, and the UCE contacted Simpson via that handle the same day.³ (Exh. 1 at 151-152; Exh. 2 at 1.) In fact, after the UCE reported on his conversation with Simpson, Hendricks directed the UCE to delete his account through which the UCE communicated with Simpson. (Exh. 1 at 172.) Further, when the UCE told Hendricks that Simpson had deleted his account, Hendricks responded that he had done the same. (Exh. 1 at 188-189.) None of the evidence suggests Hendricks was simultaneously communicating with Simpson when the UCE was communicating with Hendricks about the contest – no evidence shows Hendricks was engaged in any form of communication with Elton Simpson on May 3, 2015. The phones recovered at the Garland attack scene did not contain any communications between Simpson and Hendricks, and agents involved in the Hendricks investigation recovered no evidence from Hendricks showing communications with Simpson. Hendricks declared he was not in contact with Simpson at the time, and the messages show Simpson had dropped his account through which the UCE communicated with him. (Exh. 1 at 188, 220.)

The UCE's conversations with Simpson and Hendricks do not reveal any collaboration between Simpson and Hendricks to attack the Garland contest. In fact, the communications reveal Simpson barely knew Hendricks and did not trust him. Multiple exchanges reflect Simpson's caution in dealing with Hendricks.

First, the UCE and Simpson had a lengthy exchange during which Simpson expressed his unwillingness to meet new people over the phone. Simpson described having been arrested as a result of meeting a "spy" (informant) face to face and having dealt with the person for four years. During the exchange, Simpson told the UCE "I always assume they r watching."⁴ (Exh. 2 at 9.) Simpson stated, "New faces are an issue," and "New

---

³ Hendricks provided only Simpson's screen name; he did not provide a name or any other identifying information. (Exh. 1 at 152.)

⁴ The message exchanges reflected in the screen shots are much like cellular telephone text messages in that the participants often use slang and shortened versions of words, misspell words, and use little punctuation. The quotations in this response do not

Muslims too." (Exh. 2 at 11.)  Simpson also cautioned the UCE that plenty of spies are knowledgeable about Islam, so testing candidates on Islamic knowledge is not a sufficient means of vetting them.  (Exh. 2 at 12.)  After discussing various security measures employed by the UCE and Hendricks in forming their "group," Simpson warned the UCE: "Don't be afraid to think for urself too akhi [brother]" "Keep that in mind"  (Exh. 2 at 14.) Simpson told the UCE "I'm always on guard" "And that's my advice to u." (Exh. 2 14.) The UCE asked whether spies "approach u" "Or try to get u sucked up into something," and Simpson responded, "Both bro."  (Exh. 2 at 15.)  Taking the hint that Simpson was distrustful, the UCE later stated to Simpson, "I guess you're gonna chill with the other brother [Hendricks] for now," and Simpson responded, "what u mean?"  (Exh. 2 at 15.) The UCE clarified, stating "I'm supposed to report back to him how the conversation went," and "I don't know if you want to keep in touch with him," and added "I assumed you guys were talking for a while. But maybe that's not the case.  No worries." (Exh. 2 at 16.)  After a couple more messages from the UCE, Simpson replied "Sorry bro." (Exh. 2 at 16.)

       Second, after a little more conversation about how Hendricks recommended them to each other, Simpson confirmed he was not part of Hendricks's group:

       UCE: He told me u were a good brother and clean and on board

       Simpson: Ok

       Simpson: Yeah, not so much

(Exh. 2 at 16.)

       Third, Simpson reaffirmed that he had just met Hendricks online as the UCE probed the length of time Simpson and Hendricks had been in contact. The UCE stated "I thought u guys was talking for a while."  (Exh. 2 at 17.)  Simpson replied "No," "2 days bro," and

---

make any corrections to the messages and instead set them forth as they were originally typed.

"I told you we haven't talked much at all."[5]  (Exh. 2 at 17.)  Simpson then inquired how long the UCE had been in contact with Hendricks, how Hendricks approached the UCE, and asked for additional information about their introduction through another person, and about that person having been arrested.  (Exh. 2 at 17-19.)  When the UCE mentioned the other person's arrest, Simpson bluntly stated, "I am not comfortable with. It."  (Exh. 2 at 19.)

Fourth, when referring to his own contact with Hendricks, Simpson stated, "I find it odd that the drawing of Rasulullah ( saws ) is in texas, and he just happens to live there bro."  (Exh. 2 at 19.)  Simpson discussed having posted a link to the Garland contest on Twitter and the reactions to the post, and notes "And then all of a sudden a guy pops up talking about meeting . . . And he lives in texas LOL."  (Exh. 2 at 20.)  The conversation continued about the reaction to the Twitter post (more about this below), and Simpson steered the conversation back to Hendricks: "Allahu Alim if he's legit . . . I find that really odd though . . . The timing."  (Exh. 2 at 20.)  Simpson then told the UCE "It's safer to keep things to urself bro . . . [Because] this can easily turn into a sting operation :) . . . This can easily be used as a ploy for that . . . But, Allah knows best bro."  (Exh. 2 at 21.)  The UCE acknowledged the warning: "I hear ya. But its hard. How else am I gonna link up . . . Without going on the long trip (referring to Hijrah to the Islamic State)."  (Exh. 2 at 21.)  Simpson again warned the UCE: "If u go, just be careful how u answer things."  (Exh. 2 at 21.)  Simpson then questioned why Hendricks needed a group rather than simply acting

---

[5] Other evidence corroborates this assertion.  Simpson photographically preserved a screen shot of communications between himself and Hendricks, who was using the handle "Ummahone."  Agents extracted the photograph from one of Simpson's phones recovered from the Simpson/Soofi apartment after the attack, an LG440 phone designated as QPX9.  The communications in the screenshot all bear the date April 23, 2015.  Simpson asked Hendricks: "Are you working in law enforcement or any branch of the government?"  Hendricks responded: "No I'm in no way shape form or fashion working with any government or . . . Law enforcement and I'm not on any mission to entrap you . . . Or arrest . . . Or detain . . . Etc."  (Exh. 6.)  This conversation reveals Simpson was vetting Hendricks on April 23, 2015, and had not previously formed any level of trust toward Hendricks.

alone, and asked more questions about how much information the UCE knew about Hendricks. (Exh. 2 at 21-24.)

Fifth, Simpson closed the conversation with a warning that confirmed he thought Hendricks was a spy or an informant: "I will say one thing on that (the UCE meeting Hendricks) . . . if u have ur own thing……keep it on u at all times . . . [Because] u know it's real and functional . . . Make sense?" (Exh. 2 at 24.)  The UCE answered affirmatively, and Simpson followed up: "If u read about sting ops . . . From the news . . . They never give authentic . . . Things." (Exh. 2 at 24.)  This is a veiled reference to bringing one's own firearm to a meeting with a new person, because in a sting operation an agent or informant would not provide the target with an operable firearm.  Throughout the entire conversation, Simpson made it clear he does not trust Hendricks.

In the UCE's follow-up conversation with Hendricks on the evening of April 24, 2015, the UCE informed Hendricks that Simpson thought Hendricks was a spy.  "I talked to the new brother last night and all night to night… Looooog talk.  Not good.  Basically he thinks you're a spy." (Exh. 1 at 164.) Hendricks responded, "Me out of all people… Can he say what was his proof." (Exh. 1 at 165.)  The UCE summarized Simpson's suspicions to Hendricks, and Hendricks responded "I am so angry with this brother.  Can he I'd [ID] you in anyway? I mean online? …The brother is shell shocked…. This is what happens to brothers who have been previously locked up before." (Exh. 1 at 166.)

Finally, the UCE's conversations with Simpson do not reflect any form of encouragement to Simpson to attack the Garland contest or knowledge that Simpson would conduct such an attack.  The lone statement upon which Kareem relies to claim inducement to attack the contest, "Tear up texas," has been taken out of context.  The statement "Tear up texas" was merely the UCE's response to Simpson's statement directing the UCE to guess what an Islamic fighter (a Mujahed) said upon learning of the Garland contest. Below is the full conversation beginning after Simpson noted it was odd that the contest was to be held in Texas and Hendricks just happened to live in Texas.

Simpson: Did u see that link I posted?

- 7 -

| | |
|---|---|
| 1 | Simpson: About texas? |
| 2 | Simpson: Prob not |
| 3 | UCE: I don't have ur twitter |
| 4 | Simpson: It's ok |
| 5 | Simpson: I posted it |
| 6 | Simpson: Man ppl responded |
| 7 | Simpson: Including a muj |
| 8 | UCE: This is all I got, just ur [redacted, referring to social media app] |
| 9 | Simpson: Many* [correcting "Man" above] |
| 10 | UCE: Oh |
| 11 | Simpson: And u can assume what the muj said about such event |
| 12 | UCE: Mujahed? [singular form of Mujahedeen, meaning an Islamic warrior] |
| 13 | Simpson: And then all of a sudden a guy pops up talking about meeting |
| 14 | Simpson: Yep [referring back to UCE's "Mujahed?"] |
| 15 | Simpson: And he lives in texas lol |
| 16 | UCE: Tear up texas |
| 17 | Simpson: Bro u don't have to say that |
| 18 | Simpson: U know what happened in Paris |
| 19 | Simpson: I think |
| 20 | Simpson: Yes or no |
| 21 | Simpson: ? |
| 22 | UCE: Right |
| 23 | Simpson: So that goes without saying |
| 24 | Simpson: No need to be direct |
| 25 | UCE: What happened in Paris… Of course |
| 26 | Simpson: That'll get u caught up one day |
| 27 | UCE: Ok |
| 28 | (Exh. 2 at 19-20.) |

The context of the above conversation not only makes it clear that the UCE was not urging Simpson to "Tear up texas;" it also makes clear that Simpson was warning the UCE that making comments such as that would get him "caught up one day." Nowhere does Simpson state or even imply he is planning to attack the contest; the most he does is indicate that because of the attacks in Paris, any mention of violence toward the contest likely would draw the attention of law enforcement, and that feelings of anger toward the contest go "without saying." Just as Simpson warned others in Twitter direct messages about exercising operational security (Exh. 7 (Tr. Exh. 480) at 14), his statements to the UCE were warnings to be careful even when communicating over encrypted social media applications.

Simply put, Kareem's claim that Simpson was conspiring with Hendricks does not make sense in light of Simpson's distrust of Hendricks, an online persona he had just met on April 23, 2015. The UCE's communications with Simpson similarly do not show any trusted relationship, cooperation, or plan to attack the Garland Contest. The UCE did not have any further contact with Simpson after April 24, 2015. Additionally, on May 2, 2015, the UCE asked Hendricks if he was still in contact with Juba (Simpson). (Exh. 1 at 220.) Hendricks answered the UCE, "No, I'm not in contact [with Simpson]," then Hendricks gave the UCE an incorrect Twitter handle for Simpson, "tawwakil."[6] (Exh. 1 at 220.)

## II. Argument
### A. The Communications Between UCE and Simpson, and UCE and Hendricks Were Not *Brady* Material.

The communications between the UCE and Simpson and the UCE and Hendricks were not *Brady* material because they were not favorable to Kareem, either as exculpatory material or impeachment evidence. Therefore, the non-disclosure of the materials did not violate *Brady v. Maryland*, 373 U.S. 83 (1963). "The three elements of a *Brady* violation

---

[6] Kareem erroneously asserts Hendricks provided the UCE with Simpson's correct Twitter handle, "tawaakul." (CR 432 at 6.) Simpson used this handle to post about the contest and to announce his pledge of loyalty to ISIL leader Abu Bakr al-Baghdadi shortly before commencing the attack on the Garland contest. (Exh. 8, 9 (Tr. Exh. 153, 154).)

- 9 -

are: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the [government], either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Kohring*, 637 F.3d 895, 902-903 (9th Cir. 2011) (citation and internal quotation marks and alterations omitted).

The written communications have no significance to the prosecution of Kareem or Kareem's involvement in the conspiracies for which he was charged, and likewise are not favorable to Kareem or impeachment evidence. Materiality is determined by weighing several factors, including (1) the importance of the witness, (2) the significance of the evidence, and (3) the strength of the prosecution's case. *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995). The communications speak for themselves and tell the whole story of the relationship, or lack thereof, between the parties.

1. The Communications Were Not Material Evidence

The communications show that Simpson did not trust the UCE or Hendricks, and further demonstrate no collaboration – or even mere discussion – occurred between UCE and Simpson to attack the Garland contest. On April 23, 2015, Hendricks directed the UCE to message Juba1911 (Simpson) for the first time. Hendricks instructed that the purpose of the contact was for the UCE to "Just validate who I am and what we have been connecting brothers … don't ask him about details though … Just give him an idea of who I am and etc. Make general conversation." (Exh. 1 at 152.) The UCE did message Simpson and the two communicated by written messages for two days, starting on April 23, 2015 and ending on April 24, 2015. (Exh. 2 at 6.)

Simpson never discussed any idea or plan to attack the Garland contest with the UCE because Simpson did not trust the UCE or Hendricks. Simpson made his distrust clear throughout his communications with the UCE. Specifically, Simpson said to the UCE, "I'm not really a phone person . . . U feel me? . . . I've been in some tight situations b4." (Exh. 2 at 7.) The UCE responded, "Its tuff be I'm not a phone guy either but got to be careful. (Exh. 2 at 7.) Simpson responded, "And as rasulullah (saws) said, the believer

is not stung from the same hole twicw . . . Twice*." (Exh. 2 at 7.) Simpson went on to describe his caution with meeting strangers and connecting by means other than in person. Simpson directed his caution to the UCE personally and said: "New faces are always an issue . . . New Muslims too . . . Sorry but that's a fact." (Exh. 2 at11.)

The communications show Simpson also encouraged the UCE to be leery of new people, including Hendricks. (Exh. 2 at 12, 18-24.). Simpson encouraged the UCE to be careful and not team up with Hendricks, telling the UCE he should be concerned when someone requests him to do something he could do himself: "Also, if a bro wanted to do something, he doesn't need help with that . . . But a team . . . Is not needed always." (Exh. 2 at 21-22.)

The communications show that Simpson barely knew the UCE and Hendricks. On April 23, 2015, the UCE asked Simpson "Have u been talking to our group long?" Simpson responded, "I'm fresh like squeezed lemonade akh. 1 day." (Exh. 2 at 6.) Later that night, the UCE asked again, "I thought u guys was talking for a while." (Exh. 2 at 17.) Simpson responded: "No . . . 2 days bro . . . I told u we haven't talked much at all . . . How long have u spoke with him?" (Exh. 2 at 17.)

Simpson brought up the Garland contest first with the UCE to express his suspicion of Hendricks. (Exh. 2 at 19-20.) Simpson messaged the UCE "I find it odd that the drawing of Rasulullah (saws) is in texas, and he just happens to live there bro . . . Did u see that link I posted?" (Exh. 2 at 19.) Simpson explains that after he posted the link, "man (many) ppl responded … Including a muj (mujahedeen)." (Exh. 2 at 19.) Then Simpson said about Hendricks, "And then all of a sudden a guy pops up talking about meeting . . . I find that really odd though . . . The timing." (Exh. 2 at 20.) Following up on Simpson's expressed distrust, in a separate written message the UCE told Hendricks of Simpson's distrust and caution. (Exh. 2 at 20.). Critically, the communications show Simpson and the UCE did not engage in any discussion of an attack on the Garland contest, and the communications are devoid of any evidence of collaboration between the UCE and Simpson to attack the contest.

The communications are not material because the outcome of the case would not have been different if the defense had the information before trial. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kohring*, 637 F.3d. at 903. "There is a 'reasonable probability' of prejudice when suppression of the evidence 'undermines confidence in the outcome of the trial.'" (*Id.* A "reasonable probability" may be found even if the remainder of the evidence would have been sufficient to convict the defendant. *Id*. The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish "materiality" in the constitutional sense. *United States v. Agurs*, 427 U.S. 97, 109-110 (1976).

The UCE and Simpson did not communicate after April 24, 2015. Days later, on April 30, 2015, the UCE again mentioned Simpson to Hendricks. (Exh. 1 at 210). Hendricks' response was, "Who is Juba." (Exh. 1 at 210.) Only after the UCE provided a lengthy response reminding Hendricks of who Juba was did Hendricks ask, "The AZ brother? . . . The one who call me a spy?" to which UCE responded, "Yup. May All Ah forgive him." (Exh. 1 at 211.) The UCE then stated, "Too bad it didn't work with him cuz I coulda linked up wit him." (Exh. 1 at 212.) This statement referred back to the UCE's earlier conversation with Hendricks about Simpson, in which he expressed regret that he would not be learning more about Islam from Simpson, who could have been a mentor to the UCE. (Exh. 1 at 188.)[7] Hendricks responded, "You can link up with him brother. That's your call." (Exh. 1 at 212). Hendricks's response amounted to a statement that he would not be offended if the UCE resumed communication with Simpson; however, it was not a directive to do so.

Because these undisclosed communications were in no way related to the conspiracy involving Kareem, Simpson, and Soofi, they were not material. Thus, Kareem was not

---

[7] The comments are in the midst of a separate discussion about evaluating another person for recruitment. (Exh. 1 at 187-188.)

- 12 -

prejudiced by their non-disclosure. "The terms 'material' and 'prejudicial' are used interchangeably in *Brady* cases." *Benn v. Lambert*, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002) (Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material.' Thus, for *Brady* purposes, the two terms have come to have the same meaning."). Evidence is material when there is a "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

          2.        The Government's Case Against Kareem was Strong

The strength of the government's case is probably the most important factor in weighing the materiality of undisclosed evidence. When the government's proof is strong, undisclosed evidence has less capacity to affect the verdict. *United States v. Olsen*, 704 F.3d 1172, 1185-87 (9th Cir. 2013) (government presented evidence of defendant's year-long research into use of ricin as a poison as evidence of intent to possess or use ricin as a weapon; this evidence was overwhelming and made evidence that would have impeached a government witness immaterial).

The evidence at trial was strong and it showed that Kareem's role in the conspiracy included assisting Simpson and Soofi with firearms training, providing money to purchase weapons and ammunition which were used in the attack, instruction on how to care for and maintain their weapons, taking Simpson and Soofi shooting in the desert, hosting Simpson and Soofi in his home, and providing a meeting location to plan the attack. (Ali Soofi RT 3/2/16 25-27, 29, 32-33; Martinez RT 2/24/16 12-14; Verdugo RT 2/19/16 12, 16, 30; Juan RT 2/24/16 13; Carlos RT 2/24/16 14-15.) The evidence also showed that Kareem supported ISIL and knew Simpson and Soofi supported ISIL. (Ali Soofi RT 3/2/16 9-15, 39; Verdugo RT 2/19/16 20-21.) Among other things, he admittedly watched ISIL beheading videos and the video of a Jordanian pilot being burned alive, while in Simpson's company, and also talked to Simpson about ISIL. (Carlos RT 2/24/16 12-13.) Multiple witnesses also testified they witnessed Kareem, Simpson and Soofi celebrate and cheer the

attackers who murdered 11 people on January 11, 2015, inside the offices of the French satirical magazine Charlie Hebdo, after the magazine published cartoons of the Prophet Muhammad. (Ali Soofi RT 3/2/16 21-22; Verdugo RT 2/19/16 13-15.) Multiple witnesses also testified they witnessed Kareem discuss his desire to attack the Garland contest. (Juan RT 2/24/16 13; Verdugo RT 2/19/16 30; Carlos RT 2/24/16 14-15.)

The evidence against Kareem is completely independent from the recently-disclosed communications. The communications contained no references to any plan to attack the Garland contest, nor did they contain references to any particular individuals with whom Simpson was associated. The defendant bears the burden of showing a reasonable probability of a different outcome. As the Supreme Court explained in *Kyles v. Whitley*, "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. 419, 434 (1995).

### B. The Evidence Was Not Required to be Disclosed Under Rule 16

The non-disclosure of the evidence did not violate Rule 16(a)(1)(E). Rule 16(a)(1)(E) requires the government to provide access, upon the request of a defendant, to documents, photographs, etc. if the items are material to preparing the defense. Fed. R. Crim. P. 16. A violation of Rule 16, "does not itself require reversal, or even exclusion of the affected testimony." *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1247 (9th Cir. 1997).

The burden is on the defendant to show prejudice when the government acts in good faith. *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1032 (9th Cir. 2009). "The prejudice that must be shown to justify reversal for a discovery violation is a likelihood that the verdict would have been different had the government complied with the discovery rules…" *Id.* at 1398, n.8. Kareem argues that he was prejudiced because if he had known the information he would have asserted an entrapment defense or used the information to support his defense that he was not involved and was unaware of Simpson's and Soofi's

plan to attack the Garland contest.[8] As explained below, the non-disclosed information would not have provided a legally sufficient basis to support admission of evidence for an entrapment defense; nor would it otherwise have been helpful to the defense.

1. Any Claim of Entrapment of Simpson Would Not Transfer to Kareem

Because the UCE communicated only with Simpson and Hendricks, and not Kareem, an entrapment claim by Kareem would have been legally barred at trial. "Only a government official can entrap a defendant." *United States v. Thickstun*, 110 F.3d 1394, 1998 (9th Cir. 1997) (citing *United States v. Emmert*, 829 F.2d 805, 808 (9th Cir. 1987). "[A]" principal wrongdoer, not knowingly working for the government, cannot entrap his co-conspirator." *Id.*; *United States v. Lomas*, 706 F.2d 886, 891 (9th Cir.1983), *overruled on other grounds*, *Segura v. United States*, 468 U.S. 796, 814-15 (1984); *United States v. Shapiro*, 669 F.l2d 593, 597-98 (9th Cir. 1982). "There is no reason to distinguish between a defendant induced to commit crime by a self-motivated private person and one induced by an entrapped private person. In neither case does the inducer realize that he is working on behalf of the government, and neither case implicates the policies behind the entrapment defense." *Thickstun*, 110 F.3d at 1399. Thus, even assuming the "[t]ear up texas" remark somehow entrapped Simpson, Kareem would not have been eligible to assert Simpson's entrapment as a defense in his own case because the Ninth Circuit has rejected derivative entrapment as a defense. *E.g.*, *Shapiro*, 669 F.2d at 598 ("this court does not recognize a concept of derivative entrapment").

---

[8] In his supplemental brief, Kareem again asserts "[t]he Government contended at trial that Mr. Abdul Kareem was the mastermind of this attack . . . ." (CR 432 at 10.) As government counsel explained in closing argument, the government has never referred to Kareem as the mastermind of the attack on the Garland contest. Indeed, the government introduced evidence throughout the course of the trial showing Simpson acted as the conduit between the conspirators and other ISIL supporters, and posted public messages on Twitter about the contest. Nothing in the newly-disclosed communications conflicts with the government's theory of the case presented at trial.

## 2. The UCE did not Induce Simpson to Attack and Simpson was Predisposed to Attack the Contest

Even if derivative entrapment were a viable legal theory, none of the evidence in the case even hints that the government induced Simpson to commit the attack. Further, the evidence introduced throughout the trial demonstrated beyond any reasonable doubt that Simpson was predisposed to attack the contest well before exchanging messages with the UCE on April 23-24, 2015. *Mathews v. United States*, 485 U.S. 58, 63 (1988). Entrapment exists as a defense only if: (1) the defense presents evidence to show the government induced the crime, and; (2) the government fails to prove beyond a reasonable doubt the defendant's predisposition to engage in the criminal conduct. *Id.*

The message "Tear up texas" was not an inducement to commit any crime – including the attack on the Garland contest. The UCE messaged Simpson "Tear up texas" in response to what was essentially a question – guess what the Muj said? (Exh. 2 at 20 ("And u can assume what the muj said about such event").) The message was not a statement about Simpson attacking the contest. (Exh. 2 at 20.)

Assuming for the sake of argument the UCE had messaged Simpson more explicitly, "you should attack the contest," such a statement would not qualify as inducement to commit the crime because it is not an act of persuasion, coercion, a plea upon friendship or a promise of a reward. The degree of inducement required to establish an entrapment defense consists of opportunity plus something else, typically, excessive pressure by the government upon a defendant or the government's taking advantage of an alternative, non-criminal type of motive. *United States v. Poehlman*, 217 F.3d 692, 701 (9th Cir.2000); *United States v. Spentz*, 653 F.3d 815, 819 (9th Cir. 2011) (inducement does not include the typical benefit from engaging in the proposed criminal act). In *Spentz*, the government indisputably proposed the idea of committing a robbery to the defendants and their accomplices, but "the fact that government agents merely afford opportunities or facilities for the commission of the offense does not constitute entrapment.") *Id.* (quoting *Sherman v. United States*, 356 U.S. 369, 372 (1958)). Similarly, "Tear up Texas" did not amount to

solicitation to commit a crime, and even if it did, mere solicitation to commit a crime does not rise to the level of inducement. *Sorrells v. United States*, 287 U.S. 435, 451 (1932).

Even if inducement were present, the trial evidence of Simpson's predisposition was overwhelming. In evaluating predisposition, the Ninth Circuit considers five factors: (1) the character and reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. *United States v. Tucker*, 133 F.3d 1208, 1217 (9th Cir.1998) (citations omitted). *United States v. Jones*, 231 F.3d 508, 518 (9th Cir. 2000). The Supreme Court has held that "where the defendant is simply provided with the opportunity to commit a crime, the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Jacobson v. United States*, 503 U.S. 540, 549-550 (1992); *see also United States v. Jones*, 231 F.3d 508, 518 (9th Cir. 2000). The government is required to prove only predisposition, not lack of inducement. *United States v. McClelland*, 72 F.3d 717, 722 (9th Cir.1995) ("If the defendant is found to be predisposed to commit a crime, an entrapment defense is unavailable regardless of the inducement."); *United States v. Simas*, 937 F.2d 459, 462 (9th Cir.1991) (in absence of inducement, evidence of lack of predisposition is irrelevant and the failure to give a requested entrapment instruction is not error). *See also* Model Crim. Jury Instr. 9th Cir. 6.2 (2010).

The trial evidence overwhelmingly demonstrated Simpson's predisposition to attack the contest long before he exchanged messages with the UCE. Indeed, Simpson had previously been convicted of federal criminal charges arising from a plot to travel overseas to engage in religious-inspired warfare, and the trial evidence included numerous Twitter messages from Simpson sharing and praising images depicting brutal tactics employed by ISIS. It is difficult to imagine stronger evidence of predisposition to engage in the conspiracies charged in this case.

Even if derivative entrapment were a viable theory, the absence of any evidence of inducement, coupled with the overwhelming evidence of predisposition, leads to a single conclusion: any entrapment claim raised in the trial in this case would have failed. Therefore, the evidence of the UCE's communications with Simpson and Hendricks was not material to the preparation of the defense, and the government's failure to disclose it before trial did not violate *Brady* or Rule 16.

C. The Non-Disclosed Evidence Was Classified and Subject to Withholding Under CIPA

Further, even if the non-disclosed evidence were somehow within the scope of the government's Rule 16 discovery obligations, the evidence was classified at the time of trial and would have been subject to a government CIPA motion to limit disclosure. At the time of the trial, the government's investigation of Hendricks was ongoing, and the non-disclosed evidence was classified.

The Ninth Circuit's case law on CIPA discovery procedures is consistent with the guidance of the D.C., First, and Fourth Circuits, which have held that the District Court should engage in a three-step analysis in determining whether to grant the government's request to protect documents from disclosure to the defendants, their counsel, and the public. Directly on point, the Ninth Circuit held in *United States v. Sarkissian*, 841 F.2d at 965, that "[o]n issues of discovery, the court can engage in balancing" national security concerns against a defendant's need for the documents.

Thus with regard to the documents at issue, first the Court would have been obliged to consider the validity of the Government's claim of the classified information privilege. *Klimavicius-Viloria*, 144 F.3d at 1261; *see also Mejia*, 448 F.3d at 455-56; *Yunis*, 867 F.2d at 623. Then, the Court would have determined whether the classified information at issue was "relevant and helpful" to the defense. *Klimavicius-Viloria*, 144 F.3d at 1261 (quoting *Yunis*, 867 F.2d at 623). Third, for classified information deemed relevant and helpful, the Court would have engaged in the balancing of interests described in *Roviaro* to determine whether the information would be disclosed to the defendant. *See, e.g.*, *Sarkisian*, 841

F.2d at 965. Specifically, under *Sarkissian*, this Court would have balanced the Government's interest in protecting the national security against the Defendant's purported need for classified information. *Sarkissian*, 841 F.2d at 965; see also *Yunis*, 867 F.2d at 625; *Smith*, 780 F.2d at 1105.

Here, each factor would have weighed against disclosure of the documents at issue. The government's claim of classified information privilege was valid at the time of trial, the information was not helpful to the defense, and the defense's interest was in any event outweighed by the government's interests in protecting classified information and maintaining the secrecy of the Hendricks investigation. Therefore, the government respectfully submits the non-disclosure of the communications was proper in light of the then-ongoing investigation of Hendricks and their status as classified material.

### III. Conclusion

Because the non-disclosed communications were not exculpatory and were not required to be disclosed under Rule 16, the Court should deny Kareem's Motion for New Trial and his Motion for Judgment of Acquittal.

Respectfully submitted this 30th day of November, 2016.

JOHN S. LEONARDO
United States Attorney
District of Arizona

*s/ Kristen Brook*
*s/ Joseph E. Koehler*
KRISTEN BROOK
JOSEPH E. KOEHLER
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of November, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Maynard, Attorney for Defendant

By: */s Joseph E. Koehler*