Daniel D. Maynard, No. 009211
dmaynard@mmcec.com
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500

Attorneys for Defendant

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| United States of America, | No. CR 15-00707-PHX-SRB |
|---|---|
| Plaintiff, | **REPLY SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR NEW TRIAL BASED ON PROSECUTORIAL MISCONDUCT** |
| v. | |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

The Defendant, Abdul Malik Abdul Kareem ("Mr. Abdul Kareem"), by and through his undersigned counsel, files this Reply to his Supplemental Brief in Support of Motion for New Trial Based on Prosecutorial Misconduct.

Mr. Abdul Kareem has always maintained that he was innocent of the charges against him except for the charge that he was a felon in possession of a weapon. A significant portion of Mr. Abdul Kareem's defense was to demonstrate to the jury that the Federal Bureau of Investigation ("FBI") had prematurely arrested him after the attack in Garland, Texas and had not conducted a fair and unbiased investigation but rather had only looked to convict him rather than to determine what really happened. Until recently, long after the trial was completed, did the Government disclose that an Undercover agent of the FBI ("Undercover Agent") had twitted with Simpson about a possible terrorist attack in Garland, Texas and that the Undercover Agent was at the attack and observed and heard it but took no steps to stop it.

On November 9, 2016, Mr. Abdul Kareem filed his Supplemental Brief in Support of the Motion for New Trial Based on Prosecutorial Misconduct. (Doc. No. 432) The understanding was that the Government had provided all the relevant documents and the relevant FD302 reports concerning the Undercover Agent who had texted Elton Simpson ("Simpson") about the Draw Muhammad contest held in Garland, Texas in May 2015. But no. On November 17, 2016, the Government sent Mr. Abdul Kareem's counsel a new letter with new supplemental disclosures that were clearly available in May 2015. *See* Exhibit 1 (filed under seal). Exhibit 1 is a FD302 that was not prepared until September 15, 2016 concerning the Undercover Agent's activities in Garland, Texas on May 3, 2015. It discloses that on May 3, 2015, the Undercover Agent, while operating in an undercover capacity, took photographs while driving on Naaman Forest Blvd. in front of the Curtis Culwell Convention Center ("Convention Center") in Garland, Texas. There are two photos allegedly taken from a phone camera by the Undercover Agent shortly before Simpson and Nadir Soofi ("Soofi") attacked security officials at the Convention Center. Both pictures include the western access point of the southern parking lot of the Convention Center, which is the location of the attack. According to the Undercover Agent, while driving westbound on Naaman Forest Blvd., he took the first picture at 6:49 p.m. and then while driving eastbound on Naaman Forest Blvd., he took the second picture at 6:50 pm. The Undercover Agent estimates that the second picture is taken less than 30 seconds before the shooting. (Ex. 1)

There is nothing in Exhibit 1 that states why this FD302 was not prepared and drafted until September 14, 2016 even though the activity took place on May 3, 2015. Agent Whitson testified on March 2, 2016 at page 70 that an FD302 is a report that is generated by the FBI "whenever something occurs that is potentially testimonial." JTR - Day 10 (Ex. 2) Also, he testified that FBI agents are trained to generate the reports close in time to the incident or interview. (Tr. T. 2/26/16, p. 17) One photo shows what appears to be a police officer speaking to a security guard, apparently the security guard that was shot, Bruce Joiner, and the

police officer that shot Simpson and Soofi. In the FD302 drafted on May 8, 2015, by the Undercover Agent, he states:

> At approximately 6:50 p.m. Central Standard Time, [I] was driving eastbound on Naaman Forest Boulevard, coming from the vicinity of the intersection of North Garland Avenue and Naaman Forest Boulevard. As [I] approached the western edge of the parking lot for the Curtis Culwell Convention Center, [I] was driving behind a dark colored sedan. When that vehicle drove to the western access point to the southern parking lot of the Convention Center, [I] observed this vehicle stop on Naaman Forest Boulevard and two occupants exited the vehicle. As [I] was passing the stopped vehicle in the right lane, with the vehicle to the immediate right of [me], [I] observed the driver holding an assault rifle and raising it up. The driver was a male wearing dark colored clothing and what appeared to be additional equipment on his chest, like a tactical vest. At this point, [I] heard many shots fired. As [I] drove forward, with the vehicle to the rear right of [me], [I] looked over [my] right shoulder and observed a police officer shooting in the direction of the stopped vehicle. As [I] quickly drove away eastbound, [I] continued to hear shots fired until [I] was stopped by police officers on Naaman Forest Boulevard.

There is no explanation why Simpson and Soofi's vehicle does appear in his second photo when he claims to have been driving behind Simpson and Soofi's vehicle at the time of the attack. This is only one of many questions that the defense would have asked had it been aware of the Undercover Agent.

Additionally, there is no discussion in this FD302 nor any others produced as to whether or not the Undercover Agent had any contact with Simpson or Soofi and how it was that he came to be at the site of the attack when it occurred. In his Declaration, the Undercover Agent claims not to have had communications with Simpson after April 24, 2015. We know from the other information that has been disclosed, including the Undercover Agent's Declaration, that he was in Garland, Texas to observe the Convention Center and that while in Garland, Texas he was communicating with Hendricks who had put him in touch with Simpson approximately ten days earlier. It is hard to believe or understand that the Undercover Agent did not prepare any additional reports concerning his activities on that day including when he arrived in Garland, what he did all day, who he contacted, who he communicated with, what he saw, what

happened to him after the attack and why he did not do anything to try and stop the attack or assist law enforcement once he saw it happening.

The Government's contention is that these documents were classified until recently and are not exculpatory. It is hard to understand how a document that discloses that an FBI agent was at the scene of a terrorist attack and who had been in contact with the terrorists ten (10) days before the attack about the activities that caused the attack cannot have any bearing on this case. Was this all a coincidence? It certainly raises numerous questions that had it been disclosed earlier, would have been explored by the defense in this case. The defense certainly would have examined Agent Whitson on these issues and would have subpoenaed the Undercover Agent for trial.

The Government goes to great lengths in its Response to attempt to minimize the relationship between the Undercover Agent and Hendricks, Hendricks and Simpson and Simpson and the Undercover Agent; however, there is no explanation or discussion by the Government about the Undercover Agent being in Garland, Texas at the same time that Simpson is there and driving by the exact spot where the terrorist attack occurs, at the exact time that it occurs. Also, there is no discussion or disclosure by the Government of the Undercover Agent's activities on the day of the terrorist attack or after the terrorist attack. It is impossible to believe that the Undercover Agent did not prepare reports disclosing his activities on that day or that he was not interrogated and investigated by police officers. The defense was provided with copies of all of the interviews of the people who were in the Convention Center at the time of the attack but who did not see the attack; however, we were never provided with any of the information concerning this Undercover Agent.

**GOVERNMENT BIAS AND FAILURE TO DISCLOSE**

It was part of Mr. Abdul Kareem's strategy to demonstrate to the jury that the FBI did not do an unbiased investigation after it prematurely arrest Mr. Abdul Kareem but rather that it was biased for a number of reasons. First, the FBI had spent over $130,000 with a

- 4 -

confidential informant to try to obtain evidence against Mr. Simpson some years earlier but had been unsuccessful and arguably embarrassed by the results. Second, Agent Whitson who was placed in charge of this investigation, was personally invested in the investigation as was the FBI in general and were not doing an unbiased investigation but rather were focused on going after Mr. Abdul Kareem. The FBI had followed Mr. Abdul Kareem 24 hours a day for almost a month but had not obtained any evidence of his alleged involvement with Simpson and Soofi's attack on Garland, Texas and the FBI had taped many of Mr. Abdul Kareem's conversations and phone calls and had obtained no incriminating information against him. Although Agent Whitson denied being personally happy when Mr. Abdul Kareem was indicted for conspiracy to provide material support to a terrorist organization, upon hearing the news he sent out an e-mail stating, "[f]antastic news. Thank you or three -- thank you all three of you for all the hard work. I know there is going to be a lot of people in our organization [the FBI] who will be very pleased." (Tr. Trans. 3/3/16, p. 138]. Third, the FBI focused a great deal of its attention on alleged terrorism in the United States and was embarrassed that Simpson, who should have been on its radar was able to travel from Phoenix, Arizona to Garland, Texas to perpetrate an attack on civilians even though an undercover FBI agent had communicated with two alleged terrorists; *i.e.*, Simpson and Hendricks and did little or nothing to stop the attack and the FBI did not want to disclose that it was aware that this attack may be coming and allowed it to go forward.

      All evidence that Mr. Abdul Kareem's counsel could garner to show that the FBI was biased and was coming after Mr. Abdul Kareem and trying to divert attention from the FBI's ineptness and missteps was important to Mr. Abdul Kareem's case. Agent Whitson testified on March 2, 2016 that he was not aware that the FBI had paid a confidential informant in Simpson's prior case over $130,000 in the course of five years. Agent Whitson admitted that the FBI had alerted the police department in Garland, Texas that Simpson may be a problem and that it was his understanding that Simpson's picture had been sent to the Garland, Texas

police department or the FBI office in Texas prior to the attack. He stated that did not know how long before the incident occurred that the FBI had notified that Garland police department. (Doc. No. 264, 3/2/16, p. 98). However, Agent Whitson was not questioned about the FBI's involvement in communicating with Simpson through an Undercover Agent only ten (10) days before the attack nor was there discussion that when the Undercover Agent was discussing, over twitter, the Muhammad Drawing Contest he had told Simpson to "Tear up Texas." Had Mr. Abdul Kareem been aware that the Undercover Agent had been communicating with Simpson about the possibility of the Garland attack and that the Undercover Agent was actually in Garland and saw the attack and had taken photographs, there would have been additional questions asked of Agent Whitson and the Undercover Agent would have been subpoenaed to testify at trial about his communication with Simpson, his presence in Garland at the time of the attack and what he did after.

The Government argued in its closing argument that

> [f]or the last hour-and-a-half the defense counsel has stood before you and time and time again alleged that the government is not here to find the truth and alleged that the government is withholding evidence.
>
> And, as he said it over and over again . . . he made mention to a couple of things. One, witnesses that you heard from and who called them; two, agents' testimony and calling into question their credibility or their motives; three, whether or not pretrial interviews were recorded.

Yes, these things were done by the defense and Mr. Abdul Kareem's defense team has always maintained his innocence and that the case against him was the result of bias and a cover up by the FBI. The Government stated in its opening statement that Mr. Abdul Kareem's role "in this three-man team was that he was the bank roller. He was the trainer. He was the motivator." (Tr. Tran. 2/17/16, p. 2) However, the evidence against Mr. Abdul Kareem was primarily circumstantial and the Government withheld material, relevant, vital evidence from the defense.

**BRADY VIOLATION**

As argued in the prior brief, the Fifth and Fourteenth Amendment require the Government to disclose specific types of evidence to defendants. In *Brady v. Maryland*, 373 U.S. 83 (19863) the Supreme Court held that the due process clause requires the prosecution to disclose, upon request, evidence favorable to an accused person and such evidence is material to guilt or punishment. 373 U.S. 83, 87 (1963). A *Brady* violation occurs when: (1) evidence is favorable to the accused because it is exculpatory or <u>impeaching</u>; (2) evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued. *Strickler v. Green*, 527 U.S. 263, 281-82 (1999). It is important to note that although much of this newly released evidence from the government may not be exculpatory it is certainly *impeaching* and supports Mr. Abdul Kareem's view and position that this was not an unbiased investigation by the FBI to determine the truth but a rush to judgment to get a conviction and to cover up the FBI's own ineptness and misdeeds.

Favorable evidence is material if there is a reasonable probability that disclosure of the evidence would have changed the outcome of the proceeding. *United States v. Bagley*, 473 U.S. 667 at 682 (1985). A reasonable probability under *Bagley* is a probability sufficient to undermine confidence in the outcome. 473 U.S. at 678, 682 (plurality opinion). When assessing evidences materiality, the court must take into account the cumulative affect of the suppressed evidence in light of other evidence, not merely the probative value of the suppressed evidence standing alone. *See Kyles*, 514 U.S. at 436 (materiality under *Bagley* is evaluated and distinct, cumulative analysis in which "suppressed evidence is considered collectively not item by item." *U.S. v. Sedaghaty*, 728 F.3d 885, 900-01 (9th Cir. 2013)(*Brady* violation because cumulative affect of interview notes and government payments to witness weakened and potentially impeached the witness' testimony.) This was a close case. The Government did not have a smoking gun. Mr. Abdul Kareem testified for two days and has always maintained his innocence. The majority of adverse evidence was from innuendo; two impeached young boys,

a person charged with numerous crimes involving kidnaping and selling his girlfriend for sex, and Ali Soofi, the brother of one of the terrorists, who lived with them and had to know a lot about their plans and who never even mentioned Mr. Abdul Kareem the first time he was interviewed by the FBI for an hour and a half the day after his brother was killed in the terrorist attack. The jury was out over three days before it reached a verdict and the press reported that when the jury first went out, the initial vote was six for conviction and six for acquittal. This was a close case and every piece of evidence was important. The prosecution's intent behind the suppression of evidence does not determine whether evidence is material or whether the proceedings outcome would have changed. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Also, the Government is obligated to disclose information that could be used to impeach Government witnesses, especially where the witness' testimony is an important part of the Government's case. *Giglio v. U.S.*, 405 U.S. 150, 155 (1972). *See Gonzalez v. Wong*, 667 F.3d 1965, 1982-84 (9th Cir. 2012)(undisclosed psychological reports on prison informant could have provided new grounds on which to impeach informant). The prosecutor has an affirmative duty to learn of and disclose any exculpatory or impeachment evidence known to other government agents, including any agents or officers involved in the investigation. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The government's constitutional duty is to disclose continuously throughout the proceeding. *See Pennsylvania v. Richie*, 480 U.S. 39, 60 (1987). These recent Government disclosures were made well after the trial.

## **ENTRAPMENT WAS A POTENTIAL INCONSISTENT DEFENSE**

The entrapment defense is a judicially-created limitation on government activity. *United States v. Russell*, 411 U.S. 423, 430-35 (1972). It was first recognized by the United States Supreme Court in *Sorrells v. United States*, 287 U.S. 435 (1932). The defense is premised on the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense but was induced to commit them by the government. To raise an entrapment defense, the defendant must present evidence that he was:

- 8 -

(1) induced to commit the crime by a government agent; and (2) not otherwise predisposed to commit the crime. *Mathews v. United States*, 485 U.S. 58, 62-63 (1988). The most basic definition of inducement is "solicitation plus some overreaching or improper conduct on the part of the government." *United States v. Hsu*, 364 F.3d 192, 200 (4th Cir. 2004).

The Government's position is that (1) there was no entrapment because there was no inducement of Mr. Abdul Kareem by a government agent (the Undercover Agent), and (2) even if there was inducement by a government agent to Simpson, the Undercover Agent had no contact with Mr. Abdul Kareem and therefore could not have inducement him. The defense in this case has always been that Mr. Abdul Kareem was not involved in this terrorist attack and did not even know anything about the Draw Muhammad Contest prior to learning that Simpson and Soofi had been shot at the contest in Garland, Texas on May 3, 2015. However, defenses can always be pled in the alternative and had defense counsel been aware of the communications between Simpson and the undercover agent including the Undercover Agent's statement "Tear up Texas" inducement might have been alternative theory to promote.

The Government argues in this case that the Ninth Circuit does not accept or recognize derivative entrapment. The Circuits are split on whether the entrapment defense is available in cases where a defendant was induced to commit a crime by a private party without government involvement. However, a number of a circuits have recognized derivative entrapment defense under some circumstances when government agents act through private citizens. *United States v. Valencia*, 645 F.2d 1158, 1168-69 (2nd Cir. 1980) (as amended). *United States v. Washington*, 106 F.3d 983, 993-94 (D.C. Cir. 1997). To determine whether one is predisposed to commit a crime, the Ninth Circuit has adopted a five factor predisposition test which directs the factfinder to consider: (1) the character or reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged the in activity for profit; (4) whether the defendant showed by any reluctance; and (5) the nature of the government's inducement. *United States v. Gurolla*, 333

F.3d 944, 955 (9th Cir. 2003). Entrapment is generally a jury question. A jury instruction must be given if sufficient evidence of entrapment is presented, even if entrapment is inconsistent with other defenses being offered by the defendant and irrespective of whether the defense concedes the elements of the crime. *Mathews v. United States*, 485 U.S. 58, 62 (1988).

Thus entrapment could have been alleged by Mr. Abdul Kareem had he known of the Undercover Agent's communications with Simpson.

**CONCLUSION**

Mr. Abdul Kareem has alleged numerous instances of misconduct by the prosecution in his original motion for a new trial. Prior to oral argument on the motion, the Government revealed that it had not produced certain other evidence because it was allegedly classified. After oral argument on the motion for new trial, the Government disclosed the text communications between the Undercover Agent and Simpson concerning the Draw Muhammad Contest in Garland, Texas that Simpson eventually attacked. Also, we have learned that the Undercover Agent was in Garland, Texas at the time and place of the attack and witnessed it and heard it but did nothing to stop it. The cumulative effect of all of the late disclosed evidence and the evidence that was disclosed after trial lead to the inescapable conclusion that there is not confidence in the jury's verdict and that Mr. Abdul Kareem did not get a fair trial nor due process. Although no single piece of evidence entirely exculpates Mr. Abdul Kareem; the lateness of the disclosures deprived him of a fair trial and due process and hindered his ability to put on a defense.

RESPECTFULLY SUBMITTED this 16th day of December, 2016.

**MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.**

By /s/Daniel D. Maynard
Daniel D. Maynard
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
Attorney for Defendant

1 | **ORIGINAL** of the foregoing e-filed this 16th day of December, 2016 via ECF with:

2 | Clerk of the Court
United States District Court
3 | 401 W. Washington
Phoenix, AZ 85003

**COPY** of the foregoing mailed this 16th day of December, 2016 to:

Kristen Brook
Joseph E. Koehler
US Attorneys Office
2 Renaissance Square
40 N. Central Ave., Ste. 1200
Phoenix, AZ 85004-4408
Attorneys for Plaintiff

By   /s/Stacey Tanner