DANIEL R DRAKE
DRAKE LAW, PLC
4340 East Indian School Road
Suite 21-113
Phoenix, Arizona 85018
drakelawplc@gmail.com
Arizona State Bar No. 003781
Telephone (602) 881-5341
Attorney for Defendant

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 15-0707-PHX-SRB |
| Plaintiff-Respondent, | **Supplemental Motion for New Trial – Newly Discovered Evidence – Governmental Misconduct** |
| v. | |
| Abdul Malik Abdul Kareem, | |
| Defendant-Movant. | |

Defendant Abdul Malik Abdul Kareem ("Kareem") moves this Court, pursuant to Rule 33, Fed. R. Crim. P., to grant him a new trial based upon newly discovered evidence, evidence indicating governmental misconduct. Alternatively, Defendant submits this as a supplement to his previous motion for a new trial based upon the recently discovered evidence.

This Court has jurisdiction to entertain and hear this motion notwithstanding the pendency of Defendant's appeal. In *United States v. Frame*, 454 F.2d 1136 (9th Cir. 1972) the court held that Rule 33 permits a district court to entertain a motion for a new trial based upon newly discovered evidence without the necessity of a remand. "Only after the district court has heard the motion and decided to grant the motion is it necessary to request a remand from the appellate court." *Frame*, 454 F.2d at 1138. Should the Court be inclined to grant the motion, it so notifies the parties. Kareem would then move the appellate court to remand the case for formal disposition of the motion.

This motion is based upon statements of government counsel and testimony of

1

FBI undercover agent Steven Jane ("UCA" or "Jane") during the March 2018 trial of Erick Jamal Hendricks ("Hendricks"), in the Northern District of Ohio, Case No. 1:16CR265 ("Hendricks case").  Their statements demonstrate that the FBI knew much more about the Garland attack than it previously acknowledged or disclosed in Kareem's case.  They show that a substantial number of documents likely exist regarding these communications and the FBI's knowledge of the events that the government has not shared with Kareem or this Court.

All this is explained in the memorandum and supported by copies of the transcripts from portions of the Hendricks' trial.  The government's opening statement on March 8, 2018, is Attachment 1.  The direct examination of UCA Jane on March 9, 2018, is Attachment 2. The cross and redirect examination of UCA Jane on March 12, 2018, is Attachment 3.  References to the transcripts will be by date and page, e.g. 3/8/18 RT 622.  The remaining transcript citations are to trial transcripts in Kareem's cases, all of which predate the March 8, 2018 opening statement in Hendricks' case.  Also attached is a page extracted from the government's disclosure during post trial proceedings in Kareem's case showing the date of creation in April 10, 2015 and its declassification on August 12, 2016.  That is Attachment 4.

Excludable delay will not occur as a result of this motion or an order based thereon under 18 U.S.C. § 3161.

# M E M O R A N D U M

## Overview

In Kareem's trial, the government argued that Kareem was a key conspirator, "motivator," "trainer," "bank roller," and intended participant with Simpson and Soofi in the conspiracy to attack the Draw Mohammad contest in Garland, Texas.  Government Closing Argument, 3/11/16 RT 2740.  All this, notwithstanding evidence that Kareem was surprised to learn of the attack.  (3/11/16 RT 2048-49.)

In post-trial proceedings the government asserted there was no substantive connection between Hendricks and Elton Simpson, and Hendricks and the Draw Mohammad contest in Garland, Texas.  Further, it asserted that it was mere chance that an undercover agent using the pseudonym Steven Jane was driving in a car behind the car containing Simpson and Soofi in the moments preceding the Garland attack.  It argued the communications between Simpson and the UCA were limited to a short span that did not include the days immediately preceding the attack and did not include communications with Kareem.  As a result, it continued, there was no harm in its failure to disclose those communications and facts as they were neither helpful to the defendant nor harmful to the government.

Kareem's defense was that he did not know about the Mohammad Drawing contest before the attack nor did he know Simpson and Soofi planned to go to Garland, Texas and commit the attack.  The defense argued that the FBI withheld evidence and rushed to find a scapegoat because it failed to stop the attack.

Government Statements During the Trial of Erick Jamal Hendricks Assert the Two Cases Were Linked

Now, in a judicial admission by a party opponent, the government has taken a different tack and has linked the two cases.  During Hendricks' trial the government told the jury in opening statements that Hendricks was "unequivocally tied to this attack," referring to the attack in Garland, Texas.  3/8/18 RT 622.  This is not what this Court heard previously from the government in Kareem's case.

Department of Justice attorney Rebecca Magnone told the jury that Hendricks "was in contact with one of the Garland attackers, Simpson."  3/08/18 RT 624.  Hendricks, she continued, claimed to be in contact with "senior leaders from ISIS."  3/8/18 RT 624.  Hendricks told the UCA that he "wish[ed] someone could go to Texas and harass them during the night.  A good solid protest" following up with advice to "See

3

1   what you and bro Juda [Simpson] can do.  At least be heard." 3/8/18 RT 626.[1]

2          Eventually, according to Ms. Magnone, "[Hendricks] asks him [the UCA] about

3   weapons, and if he had a weapon that he could use." 3/8/16 RT 627.[2] Ms. Magnone told

4   the jury that, once Hendricks understood the UCA was in Garland, he told him that if he

5   saw Pam Geller, promoter of the drawing contest, to "make your voice heard against her."

6   3/8/18 RT 627.[3]

7          When the attack was foiled, Hendricks, according to Ms. Magnone, "took credit

8   for the attack in Garland...[and] threatened future attacks in the United States." 3/8/18

9   RT 630.  He told a person that he was "friends with the shooters, that one of the shooters

10  was a close brother who left a letter that he wanted published after the attack.  And that

11  this document was allegedly that letter." 3/8/18 RT 630.  Hendricks asked that person to

12  post the flyer claiming credit for the attack at Hendricks direction. 3/8/18 RT 630.  The

13  defense has not yet seen a copy of the flyer post from Hendricks case, but it may be the

14  very post the government in Kareem's case relied upon for its "material support" charges.

15         Taking the government's current position that Hendricks was "unequivocally tied

16  to the attack," information concerning Hendricks should have been shared with the

17  defense in Kareem's case.   Hendricks was involved in a conspiracy to commit the very

18  attack the government has charged against Kareem.

19         <u>The Testimony of the Undercover Agent Supports Kareem's Defense and
    Undermines Confidence in the Verdicts</u>

20

21         The testimony of the UCA in Hendricks' trial demonstrates that Hendricks played

22  a significant role in the foiled attack.  Hendricks' role supports Kareem's defense that he

23  was not the planner or key conspirator the government argued he was.  When coupled

24  with the evolving statements of Ali Soofi and others, it suggests their testimony aligned

25  _____

    [1] The UCA later testified he understood these comments as coded advice to attack the
    contest violently, rather than exercise a right of peaceful "protest." 3/9/18 RT 995-98.

26  [2] The UCA later testified that, playing the role, he told Hendricks he had "Tools of the
    trade" and another coded reference indicating a rifle. 3/9/18 RT 1008-09.

27  [3] This was not a literal instruction to speak out or raise his voice, but a direction to attack
    her, the UCA later testified.  3/9/18 RT 1005

28

                                        4

1  more closely with the government's theory the closer the trial came.  Hendricks' actions

2  certainly show that testimony in a new and unfavorable light.  In short, they reduce

3  confidence in the rightness of the verdicts.

4       The UCA's testimony also suggests the FBI has a robust and sophisticated

5  investigative capacity, capable of establishing involvement if one were indeed involved

6  or evidencing lack of involvement.  It can connect real people with made-up user names

7  on social media accounts.  When Hendricks introduced the UCA to a third party by giving

8  the UCA the individual's user name, the UCA testified he was able to determine on two

9  separate occasions with two different individuals that the individuals were an FBI

10  informant.  3/9/18 RT 906, 983.  That was a two-step process (first identifying the

11  individual by name and, second, confirming that the named individual was an FBI

12  informant), and it speaks to the FBI's capacity.

13       In another example, when introduced to an individual communicating under the

14  user name "juba1911," the UCA reached out to other agents and discovered that

15  "juba1911" was Elton Simpson.  3/9/18 RT 978-79.  It is not clear how the FBI knew this

16  in April 2015, whether it was tracking Simpson's communications, or if it was aware of

17  other user names used by Simpson that it has not shared with the defense.

18       It also speaks to the FBI's large network of informants.  So plentiful were

19  government informants that while working the case involving Hendricks the UCA

20  encountered two previously unknown informants who were also gathering information

21  on Hendricks. That suggests that other informants might have been gathering information

22  on Simpson, information that could show Simpson was taking directions or receiving

23  money or firearms from someone other than Kareem.

24       The failure to disclose information revealed in the UCA's testimony about the

25  communications between Hendricks and the UCA, Hendricks and Simpson, and the UCA

26  and others is not, however, the most troubling aspect revealed during Hendricks trial.

27  Surprising and almost shocking is the UCA's claim during his testimony that he was

28

1   unaware whether Simpson and Soofi were even in Texas.   3/12/18 RT 1072-73.

2   Hendricks already told him to link up with bro juba, (3/8/18 RT 626, 3/9/18 RT 998-99,

3   3/9/18 RT 987-88), and that Simpson has another brother with him.   3/9/18 RT 999.

4          The UCA's claim is surprising, since the evidence in Kareem's trial indicated the

5   FBI sent a "be on the lookout" warning to federal and local authorities in Texas prior to

6   the attack.   3/2/16 RT 1900-01.   The warning had information concerning the suspects'

7   vehicles and included a picture of Simpson.   3/11/16 RT 2801-02.   If the UCA was

8   unaware of the plans, as he claimed during Hendricks trial, he could have played no role

9   in sending the warning.   Someone else within the FBI, then, knew enough about the

10  planned attack and Simpson and Soofi's role in it to send the warning.   That has never

11  been disclosed.

12         It also seems from the testimony of the UCA explaining the meaning of the coded

13  conversations with Hendricks, that Hendricks knew more about the attack than Kareem.

14  He knew that Simpson was going to Garland, Texas, with another "brother."   3/9/19 RT

15  998-99.   Kareem denied such knowledge and appeared surprised when he learned that

16  Simpson and Soofi may have attacked the Contest.   3/11/16 RT 2048-49.   When

17  Hendricks heard the news about the attack, he thought the UCA had been one of the

18  attackers.   3/9/18 RT 1025-26.

19         The UCA testified that the FBI was in charge of the security for the event. 3/9/18

20  RT 1002-03.   Presumably, it had made plans for the disposition of its and local resources,

21  apparently including rooftop snipers, based upon some perceived threat assessment.

22  Presumably, the briefing materials would show what threats, including Simpson or

23  others, were anticipated.   None of that information was shared in this case where evidence

24  concerning the actual attack was presented to the jury.

25         The UCA testified that his actions were being directed by higher-ups.   He said he

26  works on multiple cases at any given time.   3/9/18 RT 833.   The "chief investigator" gave

27  him authorization to pursue the original target.   3/12/18 RT 1054.   He received

28

"background information…[provided] by the investigating agents who were follow[ing] that individual."  3/12/18 RT 1058.

The UCA testified that when he wanted to travel to Texas he was given authorization to do so by the ranking FBI agent in his office and the Dallas Field Office. 3/9/18 RT 1001.  Presumably this was in writing and would show justification.  When he got to Garland, another officer working full time with the FBI put him in a position in the parking lots and directed him to remain there.  3/9/18 RT 1004.  Before he could leave that location, the UCA contacted the officer working with the FBI and requested permission to leave the parking lot and drive by the Center.  3/9/18 RT 1014.

Hendricks wanted the UCA to connect with Simpson the day before the event but the UCA did not have authorization to do so, so he did not.  3/9/18 RT 999.

The UCA made it clear in his testimony that he exercised discretion in interpreting conversations that frequently included accurate and purposefully misleading information. 3/12/18 RT 1066. Sometimes he did not keep all communications which presumably included text messages captured on screenshots.  An individual would have to rise to a certain level of interest before the UCA was very purposeful about capturing screenshots immediately.  3/12/18 RT 1063-64.  He did explain that he wrote reports regarding his communications, Forms FD-302.  3/12/18 RT 837-39, 840-42.   The forms produced, however, are simple documents that refer to attached copies of screenshots.  Clearly, there are additional FD-302s concerning his being directed to make contact with Simpson before the attack and his travel and experience while in Garland, Texas that have not been produced.

The Problem Is That the Government Controls All the Facts and Shares Them Only as It Suits Its Purposes

What the government withholds simply does not exist.  How then, absent court authorized discovery, is the defense to make a credible case?  As in *Brady*, the defense had no knowledge of the July 9, 1958, confession of Brady's co-defendant until after

1   Brady was tried, convicted, sentenced, and after his conviction had been affirmed on

2   appeal. *Brady v. Maryland*, 373 U.S. 83, 84 (1963.)

3         It is clear from the UCA's testimony in the Hendricks case that all the information

4   the government possessed concerning the Garland attack has not been produced.  An FD-

5   302 is a report the FBI generates whenever something occurs that is potentially

6   testimonial according to trial testimony of FBI Agent Whitson who was in charge of the

7   Kareem investigation.  (3/2/16 RT 1872)  Agent Whitson testified that he reviewed all

8   the FD-302s for the Kareem investigation (3/2/16 RT 1873) and that the FBI gathered

9   evidence from the Garland attack.  3/2/16 RT 1879.  It is hard to believe that the UCA

10  did not prepare extensive FD-302s concerning his trip to Garland, how he spent his day,

11  what he saw when the attack occurred, and what he did after he sped away from the

12  attack.

13        In his closing, Kareem argued that;

14          "the FBI seems to have known something on May 2nd or May 3rd, at

15          least, at least as of May 3rd, that he [Simpson] was traveling to Dallas,

16          Texas, or Garland, Texas, to commit an act of terror.

17          They [FBI] sent his [Simpson's] picture.  They sent information

18          concerning what the car looked like.  And it did no good.  They [FBI] were

19          embarrassed by this."

20  (3/11/16 RT 2801-02)

21        Kareem's defense, in part, was based upon the FBI looking for a conviction rather

22  than the truth.  The defense supported this argument by focusing on the witnesses with

23  relevant information that the government declined to call because they did not support

24  the government's case for a conviction.  (3/11/16 pp. 2802-03)  The extent of the UCA

25  testimony and the government's failure to disclose him is consistent with the defense

26  theory of the case.

27        The screenshots of the texts between Hendricks and the UCA and UCA and

28

Simpson were apparently classified and thus unknown to anyone but the government and its agents.  The government knew that Kareem was proceeding to trial in February 2016 but did not declassify the April and May 2015 information until August 2016, when Kareem's trial was over.  See Attachment 4.  At that point the declassified information was of no use to the defense.

One can only wonder what other information is out there, known only to the government.  The belated disclosure is what makes it so difficult now to be assured there is no other information favorable to the defense in the government's possession.

**The Test for a New Trial on Newly Discovered Evidence that had been in the Government's Possession**

To establish a Brady violation, a defendant must show that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government; and (3) the evidence is material to the guilt or innocence of the Defendant or punishment.  *United States v. Sedaghaty*, 728 F.3d 885, 889 (9th Cir. 2013); *United States v. Houston*, 648 F.3d 806, 813 (9th Cir. 2011).

If information would be "advantageous" to the Defendant or would tend to call the government's case into doubt, it is favorable.  *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015).  The suppression of favorable evidence is prejudicial if that evidence was "material" for *Brady* purposes.  *Strickler*, 527 U.S. at 282.  Evidence is material if it *could* reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.  *Strickler*, 527 U.S. at 290.

1.  <u>There was Evidence that was Exculpatory or Impeaching</u>

Kareem's defense at trial was that he was not involved in planning or preparing for the attack on the Draw Mohammad contest in Garland, Texas, on May 3, 2015 and that the FBI was embarrassed by this attack and its failure to stop it.  It rushed to judgment rather than doing a thorough investigation.  He did not dispute his association with

9

Simpson or Soofi. He contended he did not know about the Mohammad Drawing Contest before the attack, and that he did not assist in planning their travel to Garland since he did not know they were traveling there. He disputed that he had purchased firearms for Simpson and Soofi. While he admitted that he took Simpson and Soofi shooting with Sergio Martinez one time, it was not to practice evasive tactics or marksmanship. Also, he was not active on social media used by reported jihadis

The evidence disclosed at Hendricks' trial tended to show that Kareem's defense was well founded. It pointed toward a third party who was liable, thus tending to exculpate Kareem. Other actors were the moving force behind the attack, not he. It also strengthens the impeachment or discrediting of the civilian witnesses, whose stories got better as trial approached.

The UCA testimony also demonstrated the FBI could gather and quickly assess social media communications between would-be jihadis. It demonstrated an expansive array of informants actively seeking out those who would do harm. The testimony revealed common practices, such as encrypted conversations, shifting user names, and other tactics common to jihadis. This information, and the absence of any similar information as to Kareem, tends to impeach or degrade the government's theory of the case.

The government's admission that Hendricks was "unequivocally tied to this attack" would have had a devastating impact on the government's trial theory in Kareem's case. It weakens the government case and strengthens the defense.   And, as an admission of a party opponent, it can be offered to exculpate Kareem.

2.   <u>The Evidence Should Have Been but Was Not Produced</u>

Much of Kareem's previous motion for new trial focused on evidence consisting of screenshots of communications between an FBI undercover agent (UCA) and Simpson and Hendricks disclosed by the prosecution months after the trial of the May 3, 2015, foiled attack. During the motion proceeding Kareem argued that he was hamstrung

1   without the opportunity to question the UCA, relying solely upon the disclosed
2   screenshots.

3       In March 2018 Hendricks went on trial in Akron, Ohio.  The prosecution took
4   positions and asserted a factual theory in its opening statement.  And, the UCA hung lots
5   of flesh on the bones of the screenshots.  His testimony suggests there is additional
6   information available that would exculpate Kareem or impeach government witnesses
7   and the government's theory of this case.

8       The UCA testified during the Hendricks trial explaining his communications with
9   Hendricks and Simpson and disclosing his location during the day of the attack.  None of
10  the explanation given by the UCA was made available to Defendant prior to the
11  Hendricks trial, so that information is necessarily newly discovered.

12      3.  The Evidence is Material to Guilt or Punishment

13      As noted above, the UCA testimony at Hendricks' trial establishes the liability of
14  a third party.  It would have altered the mix presented to the jury.  The new information
15  supports the reasonable probability of a different result at a new trial.  Some of Kareem's
16  actions may have involved going shooting in the desert, but those actions on his part were
17  not directed to preparing for the attack.  There was no testimony that Kareem ever
18  commented that if the guns were going to be used in an attack, they had to be properly
19  maintained so that they would not jam.  Nor was there testimony that Kareem directed
20  Simpson and Soofi to run around while they were shooting so they could practice the
21  evasive actions they would need in the planned attack.  In fact, both Sergio and Kareem
22  thought the actions were so silly that they were laughing while the two were running
23  around.

24      Possessing or viewing Jihadi propaganda or Muslim lectures or speaking out about
25  the treatment of Muslims' or their religion does not demonstrate that the possessor is a
26  terrorist or has participated in planning terrorist attack.  Freedom of speech and thought
27  are still protected provided they do not veer into action and planning criminal acts.

28

1    The evidence at Hendricks' trial, as summarized in the government's opening

2  statement, suggests a third party was involved in the actual plan to attack the Mohammad

3  Drawing Contest, not Kareem.  It tends to show, consistent with Kareem's defense, that

4  he had no intent to training or prepare the attackers in marksmanship or evasive tactics.

5          *Kareem did not act in the fashion the UCA described as typical for a jihadi*

6    In its order denying the motion for new trial, the district court cited as evidence of

7  Kareem's involvement the fact he "watch[ed] videos with Soofi and Simpson." 1 ER 21.

8  Yet this was simply an exercise of Kareem's First Amendment freedoms of association

9  and, to some extent, speech.  The statute at issue does not prevent free speech or

10 association.

11    It also pointed out that Kareem purchased firearms for Simpson and Soofi prior to

12 the attack, according to the testimony of Ali Soofi.  However, Ali told the FBI in his first

13 two statements something completely different.  When compared with the language of

14 Hendricks and the UCA is his jihadi "persona," the testimony of Ali and Sergio almost

15 innocuous.  The government may argue it is only a matter of degree.  Yet that difference,

16 even in degree, is something the jury should have been able to consider in judging

17 Kareem's case.

18    Hendricks told the UCA to "See what you and bro juda [sic] can do.  At least be

19 heard." 3/9/18 RT 998-99.  Later, Hendricks asked "What you got with you?" which the

20 UCA understood to be a query about the kind of weapon the UCA had with him.  3/9/18

21 RT 1008.  Hendricks gave instructions that the UCA understood as a direction to target

22 the people doing the drawing and hosting the event.  3/9/18 RT 1009.  "Voice your

23 concerns to the hosts after their [security] detail is gone."  3/9/18 RT 1009.  The UCA

24 understood that to suggest waiting until the event was over and the hosts were outside in

25 the parking lot getting ready to leave. 3/9/18 RT 1009-10.  These were specific and direct

26 statements, albeit in code.

27    No such pointed testimony exists at Kareem's trial.  Statements attributed to

28

Kareem do not rise above idle talk.  Especially when compared to the coded directions from Hendricks.

>    *The FBI had ample resources to quickly identify those suspected of jihadi sentiments but had no such information as to Kareem*

The UCA said that when he received a communication from "Juba" he reached out to other agents to find out the identity of that person.  3/9/18 RT 978.  He learned it was Elton Simpson.  3/9/18 RT 979.  There was no discovery produced by the government in Kareem's case that the government knew Simpson was communicating as "Juba."

When the UCA indicated he could not contact Simpson on one application, Hendricks gave the UCA a Twitter user name "Tawwakil."  3/9/18 RT 1000.  Other investigators told the UCA this was consistent with a Twitter account used by Simpson. 3/9/18 RT 1000.  Again, no discovery was produced by the government in Kareem's case that the government was monitoring Simpson's Twitter accounts or how it knew he had a user name of "Tawwakil."  To know this, the government must have monitored Simpson's accounts or had information from an informant.

The fact Kareem did not have a Twitter account, and there was no evidence that he used Twitter or any of the encrypted Internet applications to communicate with jihadis supports his claim that he was not a party to planning a jihadi attack.  He could have compared the behavior of Simpson, the UCA, the FBI informant, and Hendricks to his own.  Each of those spoke in guarded code, were careful to shift identities, and to use encrypted communications.  None of that evidence exists as to Kareem.  Its absence speaks volumes.

The capacity to identify and connect the dots, and the lack of any such connections on the part of Kareem, is material to establishing through independent evidence that, whatever statements Kareem may have made in conversation with others, he took no overt acts in furtherance of those statements, as did known jihadis.  He was not trolling

13

the Internet looking for jihadis to recruit for the conspiracy.  In fact, there was no evidence that Kareem had any personal social media accounts, at least nothing unrelated to his moving business.  He could have used the information revealed in the testimony of the UCA to support his claims that he was not trying to recruit or support others in efforts perpetrate terrorist attacks.

> *FBI internal documents evidencing requests and authorizations granted might reveal an absence of information about Kareem, suggesting a lack of involvement on his part*

Before he began his investigation of the initial target, the UCA testified, the "chief investigator" gave him information and authorization to do so.  It seems logical that, as he progressed on to Hendricks and those in Hendricks' orbit, that he would have received additional authorizations.  Some of those may be in writing and contain no mention of Kareem.

The operational plan for the Garland event may reveal the information then possessed about who and how the attack might take place, or at least it might have identified certain threats.

The UCA obtained authorization not only from his own office but also the Dallas field office to travel to Garland for the Mohammad Drawing Contest.  3/9/18 RT 1001.  He said the authorization was approved through the highest-ranking agent in both offices.  3/9/18 RT 1001.  For an FBI field office that is usually the Special Agent in Charge.  Presumably, this authorization – and any request for authorization – was written and should reveal the information that justifies the request.

The UCA was concerned about Simpson's communications, he testified, but he did not have authorization on May 2, 2015 (3/9/18 RT 998), to reengage in communication with Simpson, even though Simpson and another person were apparently heading for the contest in Garland.  3/9/18 RT 999.

It is logical that some of those authorizations would be in writing and include a summary of the investigation and justification for the requested authorization, perhaps

1  even focusing upon Hendricks but not Simpson and certainly not Kareem.  None of that

2  has been shared.

3       **Conclusion**

4       The government's assertions at the Hendricks' trial show involvement of third

5  parties, but not Kareem.  To that end, they tend to impeach or undercut the government's

6  theory of the case in Kareem's trial.  They support his defense that he was not a planner

7  or participant in the foiled attack.

8       The testimony of the undercover agent demonstrates that Kareem's actions did not

9  fit in the typical jihadi pattern, which would have supported Kareem's defense at trial.

10      For the foregoing reasons, this Court should grant this motion and order a new

11 trial.

12      Respectfully submitted this 11th day of June 2018.

13

14 MAYNARD CRONIN ERICKSON                 DRAKE LAW, PLC
   CURAN & REITER, P.L.C.

15 *s/Daniel D. Maynard*                   *s/Daniel R. Drake*

16 DANIEL D. MAYNARD                       DANIEL R. DRAKE

17

18                      Certificate of Service

19

20      I hereby certify that on June 11, 2018, I electronically transmitted the attached document
   to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic
21 Filing to Assistant U.S. Joseph E. Kohler and Kristen Brook, CM/ECF registrants:

22 s/Daniel R. Drake

23

24

25

26

27

28
                                          15