United States

v.                                    Case No. 2:15-cr-00707-SRB

Abdul Malik Abdul Kareem

# ATTACHMENT 3

## Cross and Redirect Examination of FBI Agent Steven Jane in United States v. Erick Jamal Hendricks
pp. 1048-1087

```
1                    UNITED STATES DISTRICT COURT
2                    NORTHERN DISTRICT OF OHIO
                           EASTERN DIVISION
3

4       UNITED STATES OF AMERICA,

5                Plaintiff,              Case No. 1:16CR265
                                         Akron, Ohio
6            vs.                         Monday, March 12, 2018

7       ERICK JAMAL HENDRICKS,

8                Defendant.

9

10                       TRANSCRIPT OF TRIAL
                VOLUME 7, PAGES 1048 THROUGH 1278
11              BEFORE THE HONORABLE JOHN R. ADAMS
                   UNITED STATES DISTRICT JUDGE
12

13      APPEARANCES:

14      For the Government:  Matthew W. Shepherd
                             Office of the U.S. Attorney - Cleveland
15                           Carl B. Stokes U.S. Courthouse
                             801 Superior Avenue, West, Suite 400
16                           Cleveland, Ohio 44113
                             (216) 622-3600
17
                             Mark S. Bennett
18                           Office of the U.S. Attorney - Akron
                             2 South Main Street, Room 208
19                           Akron, Ohio 44308
                             (330) 375-5716
20
                             Rebecca A. Magnone
21                           U.S. Department of Justice
                             960 Pennsylvania Avenue, NW
22                           Washington, DC 20530
                             (202) 353-9472
23
        For the Defendant:   David L. Doughten
24                           Attorney at Law
                             4403 St. Clair Avenue
25                           Cleveland, Ohio 44103
                             (216) 361-1112
```

1　　　　　　　　　　　Stephen D. Hartman
　　　　　　　　　　　　Attorney at Law
2　　　　　　　　　　　1st Floor
　　　　　　　　　　　　320 North Michigan Street
3　　　　　　　　　　　Toledo, Ohio 43604
　　　　　　　　　　　　(419) 690-4604
4

5　Court Reporter:　　　Caroline Mahnke, RMR, CRR, CRC
　　　　　　　　　　　　Lori A. Callahan, RMR, CRR
6　　　　　　　　　　　Federal Building & U.S. Courthouse
　　　　　　　　　　　　2 South Main Street, Suite 568
7　　　　　　　　　　　Akron, Ohio 44308
　　　　　　　　　　　　(330) 252-6021
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25　Proceedings recorded by mechanical stenography; transcript
　　produced by computer-aided transcription.

1     (March 12, 2018, outside the presence of the jury:)

2          THE COURT:  Counsel, are we ready to proceed?

3          MR. SHEPHERD:  The government is, Your Honor.

4          MR. DOUGHTEN:  The defense is.

00:22:00  5     THE COURT:  All right.  We'll have the jurors

6     brought forward.

7          (Jury in 9:10.)

8          THE COURT:  Sir, you're still under oath.

9     Counsel, you may cross-examine at this time.

00:23:56  10     MR. DOUGHTEN:  Thank you, Your Honor.

11          CROSS-EXAMINATION OF STEVEN JANE

12     BY MR. DOUGHTEN:

13     Q.   Good morning, Agent Jane.

14     A.   Good morning.

00:24:02  15     Q.   On Friday you gave a lot of opinions and conclusory

16     beliefs.  I'm going to go over those a little bit today.

17          But before I do that, I'm going to go into kind a

18     little bit about your background knowledge so we know what

19     this was based on, if you will.

00:24:20  20     As some preliminary matters, how fluent are you in

21     Arabic?

22     A.   I'm not fluent.

23     Q.   Okay.  And so the -- the reason I'm asking, my

24     understanding is, and correct me if you have a different

00:24:37  25     understanding, is that a lot of the language of Arabic

1    depends upon intonations, I understood, for example, that

2    the same word with a different intonation may have a

3    different completely meaning.  Is that your understanding?

4    A.    I don't think I would make that characterization of

00:24:52  5    Arabic.

6          Intonation, like meaning tone?

7    Q.    Yeah, by tone or the way you finished a sentence, or,

8    you know, how you pronounced word, the two words that

9    basically are spelled the same way that in a different usage

00:25:06 10    may have a completely different meaning?

11    A.    Connotation, you know, context.

12    Q.    Yes.

13    A.    Can matter, certainly.  Certainly.

14          THE COURT:  One at a time, please.

00:25:15 15          THE WITNESS:  Yeah, I'm sorry.

16    BY MR. DOUGHTEN:

17    Q.    But what you're telling us this morning is that the

18    intonation doesn't mean anything in your opinion?

19    A.    Intonation.  Are we talking about pronunciation?

00:25:26 20    Q.    Yes.  And also the tone and how long you might

21    pronounce a vowel or if you finished with your voice going

22    up at the end of a phrase?

23    A.    Maybe intonation could imply a question versus a

24    statement.

00:25:40 25    Q.    But that's your basic understanding?

1052

1     A.    I think that there's a -- I can think of other

2     languages where intonation has a greater impact.

3     Q.    I'm only asking about Arabic.

4     A.    Right.  And I'm saying relative to Arabic.  I don't

00:25:54  5   really, in my formal Arabic training, intonation has not

6     been stressed.  Pronunciation, of course, matters and

7     context of course, matters.

8     Q.    Would you agree that when you're reading Arabic words

9     on a screen shot, you can't get that intonation or context

00:26:14 10   because we're talking about, in many cases, abbreviations?

11    A.    It is correct that on a screen, it's not the same as

12    spoken Arabic.

13    Q.    Okay.  And just to get this out of the way, there were

14    references to wives of Mr. Hendricks having multiple wives.

00:26:37 15         And if you don't have the background for this, that's

16    fine, just let me know.

17         But you would agree that Islam, like lot of the major

18    religions, have many different sects and many different

19    believes of the same -- of the Koran, correct?

00:26:52 20   A.    Correct.

21    Q.    And, in fact, in the Koran, there's a sura which

22    allows up to four wives.  Are you aware of that?

23    A.    Correct.

24    Q.    But there are very strict situations for that,

00:27:04 25   correct?

1   A.   Correct.

2   Q.   It's not in the main, presently, correct?  Most of

3   Islam don't practice multiple wives; is that correct?  Or do

4   they?

00:27:12  5   A.   The Islamic word consists of about 1.6 billion people

6   around the world.  So it's difficult to kind of summarize

7   1.6 billion people.

8   Q.   So it's not that unusual for someone who was a

9   believer in the black letter of the Koran to have multiple

00:27:33 10   wives; is that correct?

11   A.   That is, yes.  Yes, sir.

12   Q.   And it was mentioned by -- something about divorce.

13   Do you know the divorce proceedings once you're married in

14   Islam.  Are you aware of that?

00:27:46 15   A.   I'm somewhat familiar, yes.

16   Q.   It's a 90-day process; is that correct?

17   A.   It depends on certain understandings of about, but

18   that sounds familiar to me.

19   Q.   Okay.  So the fact that Mr. Hendricks has multiple

00:28:00 20   wives in and of itself doesn't suggest any type of

21   radicalism?

22   A.   No, I would not say that.  Certainly I'm not saying

23   that.

24   Q.   Okay.  I want to get to your work in general as an

00:28:15 25   undercover.  And you've had nine years of counterterrorism

1    training, correct?

2    A.    Yes, sir.

3    Q.    And if I understand your work -- and correct

4    me -- that a lot of what you do is you're on a computer and

00:28:32  5    you're trolling and you're looking for key words; is that

6    right?

7    A.    That is not correct, sir.

8    Q.    Give us an idea of how you're able to find a person in

9    a chat room or what is it that triggers, you know, that

00:28:48 10    something may be going on here?

11    A.    Sure.  So often is the case, as it was in this

12    investigation, that I was tasked with investigating the

13    original subject, the original target.

14          There was independent reasons to give -- for the chief

00:29:06 15    investigator to give me the authorization to pursue that

16    original target.

17    Q.    So if I understand right then, you were assigned a

18    certain person.  And in following this person, you noticed

19    him talking to somebody else that --

00:29:20 20    A.    Right.

21    Q.    Okay.

22          Now, again, just a little bit of background.

23          The two main religions in Islam or sects are Sunni and

24    Shia, correct?

00:29:33 25    A.    Those are the two largest sects within Islam.  There's

1    additional sects within Islam, but those with are the two

2    largest.

3    Q.   If you can, can you tell us the difference between the

4    two sects?  And I know it's complicated, but just generally.

00:29:48  5    If you can't, if you can't that's fine.

6    A.   No, no.  I can.  It depends on how much time you want

7    me to spend on it.

8    Q.   Let me give you a parameter so maybe you can answer my

9    question better.

00:30:02  10        Let's talk in general.  Is there such a thing as a

11   typical terror suspect, or are they all different?

12   A.   Being every two humans are different.

13   Q.   Correct.

14   A.   There's a lot of trends in belief systems and there's

00:30:18  15   a very codified belief system with ISIS terrorists and

16   similar terrorists to ISIS.

17        I mean, it's very --

18   Q.   Let me stop you there.  Let me stop you there because

19   you're getting to the point I want you to make.

00:30:29  20        ISIS in general is Sunni; correct?

21   A.   They come from the Sunni background, that is correct.

22   Q.   And is there a reason for this?

23   A.   A reason why ISIS comes from the Sunni background?

24   Q.   Correct.

00:30:44  25   A.   Yes.

1    Q.    And could you explain to the jury what that reason is?

2    A.    So this is -- there's a lot that can go into this

3    question.

4    Q.    Okay.  Let me do this.  Let me ask you my

00:30:54   5    understanding and tell me if you agree with it or not.

6    A.    Okay.

7    Q.    Is it true that ISIS believes that there's a caliphate

8    or state, that there's a true state that doesn't recognize

9    national borders?

00:31:12  10    A.    Yes, very much true.

11    Q.    And is it true that part of ISIS, which grew out of, I

12    guess, the 2004 war; is that accurate?

13          Did ISIS, did they exist before the 2004 invasion of

14    Iraq?

00:31:29  15    A.    This is kind of a historical and academic argument.

16    You could make that academic argument.  ISIS has morphed

17    into its current state and does have historical connections

18    and tentacles back to 2004 with Abu Masab al-Zarqawi who is

19    al-Qa'ida in Iraq at that time.  And the leadership of

00:31:51  20    al-Qa'ida in Iraq in 2004 later morphed into what we

21    currently know to be ISIS today.

22    Q.    But a like --

23    A.    A lot of this is kind of his historical.

24    Q.    It is.  Because there's a lot of confusion and I think

00:32:04  25    the background will assist us.

1     Is there a different between ISIS and al-Qaeda?

2  A.   Yes.

3  Q.   And is ISIS also a Sunni-based organization?

4  A.   So al-Qaeda also comes from a Sunni background.  Now,

00:32:20  5  their ideological linnage begins in Sunni Islam.

6     I think it's worth noting that if you were to take a

7  group like ISIS and a group like al-Qaeda, there are other

8  concentric circles, or sects -- basically ISIS is a sub-sect

9  within a sub-sect within a sub-sect.

00:32:39  10     And you can build that out to get to a very large here

11  is Islam, here is Sunni Islam.  And then you can kind of

12  bracket into smaller circles until you gets to the target

13  group.

14  Q.   S I'm sorry.  So I think the point you're making is

00:32:51  15  within these concentric groups, there's disagreements on how

16  to interpret the religion, correct?

17  A.   Yes.  And there are significant disagreements between

18  ISIS and al-Qaeda.

19  Q.   Okay.  Now -- for the -- in your work for the -- in

00:33:13  20  trying to ferret out, if will you, violent radicals, if you

21  will, do they associate themselves or practice Sunni versus

22  Shia religion in the United States?

23  A.   ISIS and al-Qaeda are certainly exclusively Sunni and

24  are not Shia in the U.S. and around the world.

00:33:35  25  Q.   And in your experience, do the people that you

1  investigate, do they associate themselves particularly with

2  one or the other main religious groups of Islam?

3  A.    There are extremists and violent extremists and

4  terrorists that come from a Shia backgrounds.  I do not

5  investigate them.

6       My focus is on violent extremists and terrorists that

7  have a Sunni background.

8  Q.    So in this case, for instance, with the original

9  person you were assigned to, do you have any idea what that

10 person's Islam backgrounds is, if they are a follower of one

11 group or the other?

12 A.    Yes, I did.

13 Q.    How is that determined?

14 A.    Part of it is the background information that was

15 given to me in advance by the investigating agents who were

16 follow with that individual.

17      And then also in the process of just talking to him, I

18 was able -- you know, he explained his identify logical

19 background.  So a combination of both.

20 Q.    And from that -- well, you don't ever ask somebody, do

21 you follow Sunni or do you follow Shia?  Is that a question

22 you ask?  Or do you just determine it from your

23 conversations?

24 A.    Often it's both.

25 Q.    Okay.  Now, when you're trying to ferret a suspect

1  out, one of the tasks you have is to make them believe that

2  you are of a like mind; is that correct?

3  A.    A goal is to present a persona that would appear that

4  is amenable to the thoughts of the subject.

00:35:14  5  Q.    That's kind of convoluted.  I'm trying to pin you

6  down.

7  A.    Sure.  I can state it again or a different way, if you

8  would like.

9  Q.    Okay.

00:35:24  10  A.    So yes.  My goal is to present a persona that is also

11  prone or like-minded, at matching the subject.

12  Q.    Because the more you put out there that you may be

13  radical and receptive to their ideas, the more they're going

14  to open up to you, correct?

00:35:45  15  A.    Actually I would say vice versa, you know, whereas if

16  I see a behavior that they exhibit and then I match them, I

17  reflect those, then they're more likely to talk more to me.

18  Q.    Okay.  And so your goal is to make that suspect, or

19  whoever it may be, believe that you're receptive to their

00:36:07  20  radicalism.  Correct?

21  A.    Yes, and in that process is also to reflect that

22  they're committing, what they are putting out so they will

23  then trust me and share more of what they're really thinking

24  and what their goals are.

00:36:23  25  Q.    Now, in your training, yourself and other officers,

1  are you permitted to basically say something like, you know,

2  we have to do violent jihad in order to get like

3  basic -- can you come out there and saying, "I'm looking for

4  brothers that are willing to do violent jihad," hoping you

5  can then attract people who --

6  A.    No.  I'm strictly forbidden from entrapping an

7  individual.  We have plenty of legal training in advance to

8  make sure we do not entrap someone.

9  Q.    Okay.  So this leads me to a question.  I want to talk

10  a little bit about Garland, Texas.

11       You did a lot to explain that if you put out, if I got

12  this correctly, a response to accepted, that was the person

13  that you were following, tear up Texas, correct?

14  A.    That was when I was talking to Elton Simpson, I used

15  the phrase.

16  Q.    Elton Simpson?

17  A.    I was talking to Elton Simpson, the Phoenix-based

18  deceased shooter from Garland, Texas.

19  Q.    Now, in that -- there was no question mark on that

20  particular comment, correct?

21  A.    No, because --

22  Q.    Tear up Texas, but there's no question mark there?

23  A.    That is because I was answering his question, or as a

24  follow up to his statement when he said, "I wonder what

25  someone else would say, a third party."

1    Q.   Okay.  But I understand, but you didn't put a question

2    mark at the end of that statement, correct?

3    A.   No, I did not.

4    Q.   Now, if you had suggested that, that would have been

00:37:56 5    improper under your guidelines, correct?

6    A.   If I had suggested that --

7    Q.   Yeah, if you said -- if he, for instance -- this is

8    hypothetical, I understand.

9         But if he would have said, you know, "We and the

00:38:09 10    brothers want to take action against Pamela Geller," and you

11    would have said, "Tear up Texas," meaning suggesting that

12    they do something violent, that would have been improper,

13    correct?

14    A.   If the subject suggests the violent act first, then it

00:38:26 15    is not improper for me to reflect like mindedness.

16    Q.   Okay.  But it's up to you to determine whether the

17    subject has suggested violence.  That's what you can do

18    independently, correct?  You have the training, and then you

19    read the text message, and then you determine whether that

00:38:46 20    message reflects violence, correct?

21    A.   Yes.

22    Q.   And if you believe it does, then you're allowed to

23    rely up to that level.  Would that be a fair assessment?

24    A.   Yes.

00:38:56 25    Q.   So there is a certain amount of independent judgment

1062

1   on your part?

2   A.   Yes.

3   Q.   And it's dangerous that you don't misinterpret, isn't

4   it?

00:39:03  5   A.   Yes.

6   Q.   Okay.  And so you're aware in your context that -- let

7   me start over again.

8        In your experience on the web, isn't it fair to say

9   that you have to be on the lookout for misinformation by

00:39:27  10   your contacts?

11   A.   Yes.

12   Q.   And it's pretty common that there's misinformation,

13   correct?

14   A.   The way that the -- the person he was talking to was

00:39:35  15   using some very crafty misinformation which was not the norm

16   in my experience.

17   Q.   Just asking you in general.  In your background, in

18   general, what you're first talking to somebody, they're

19   trying to avoid detection, correct?

00:39:48  20   A.   Correct.

21   Q.   And the way they do that is they won't give any

22   biographical information, correct?

23   A.   Yes.

24   Q.   And if they do, oftentimes it's incorrect?

00:39:59  25   A.   Yes, that's common practice.

1     Q.    So that when you're talking to a subject that you're

2     vetting, you have to be careful as an agent on identifying

3     what misinformation is, correct?

4     A.    Correct.

00:40:20 5     Q.    And that's difficult to do when all you have is screen

6     shots?

7     A.    Correct.

8     Q.    Now, you were talking a lot about your general

9     theories about how suspects react. But I think you also

00:40:43 10     said that they're constantly changing their tactics,

11     correct?

12     A.    Depends on the individual, but that's a trend.

13     Q.    Well, originally when you first started contacting the

14     person -- and I think it was sham_reason, and you can

00:41:02 15     correct me, but you didn't catch the screen shots because

16     you were supervised that they deleted their account faster

17     than you thought.

18     You were caught off guard by that?

19     A.    I was.

00:41:14 20     Q.    So, in fact, this was a tactic that the person used

21     that you hadn't seen before?

22     A.    That's probably a fair statement.

23     Q.    And that's why we only got one side of that

24     conversation?

00:41:26 25     A.    Right. At the time when those conversations were

1064

1    happening, I thought it was just an ancillary -- I wasn't

2    sure what to make of this associate.  This associate hadn't

3    risen to the level of interest to where I would be, you

4    know, very purposeful about capturing those screen shots

00:41:43  5    immediately.  It was just in the beginning of a

6    relationship.

7    Q.    I understand.  But the point is, it would have been

8    nice if you would have been able to get both sides of the

9    conversation, correct?

00:41:52  10   A.    It would have been preferred, yes.

11   Q.    Even an experienced Agent, such as yourself, were

12   caught off guard when the other side of the conversation was

13   deleted quickly?

14   A.    That is correct.

00:42:03  15   Q.    So in fact, tactics do change, and part of you, you

16   have to be aware that things could be changing in how they

17   go about recruiting, changes over time, correct?

18   A.    Yes.

19   Q.    There was a lot of words that, you know, that were out

00:42:29  20   there that were -- yesterday, and you would say, "Well, in

21   this field, in this limited field, this word means this,"

22   correct?  A number of times yesterday?

23         Let me give you an example.

24         There were some screen shots where the person you were

00:42:53  25   talking to talked about having brothers in Texas, correct?

1   A.    He alluded to having brothers in the southwest, or

2   confirmed that he wanted to meet three brothers in the

3   southwest.

4   Q.    And there was also references to deserts, correct?

00:43:16  5   A.    Correct.

6   Q.    And, in fact, there was an identifying screen shot of

7   maybe the stereotypical Arab man with the Arab headdress in

8   the bright sunshine in white robes, and you didn't believe

9   that was who this person was, correct?

00:43:37 10   A.    I was suspicious as to whether that was really him or

11  not.

12  Q.    Well, it was a young, good looking, healthy Arab man,

13  correct?

14  A.    It looked like a model in the picture.  It doesn't

00:43:47 15  look like an authentic regular picture.  I mean it looked

16  like a staged photo.

17  Q.    That was an example of misinformation because the

18  person didn't want to you know who he or she was, correct?

19  A.    That was -- that, and the nature of the picture, the

00:44:02 20  picture just looked phony, for lack of a better term.

21  Q.    And the references to the desert, I mean there's

22  nothing more stereotypic than associating Arabs with the

23  desert?

24        Wouldn't you agree that?

00:44:22 25  A.    I would have to recognize there was a stereotype, a

1     generic stereotype of an Arab in the desert, yes.

2     Q.    Now, you never met sham_reason; is that correct?

3     A.    In person, I did not.

4     Q.    Okay.  And going all the way down through accepted and

00:44:36  5     itsnotme, you never actually met that person, correct?

6     A.    Correct.  I only had online communication with that

7     person.

8     Q.    And I think it was your opinion that some of what that

9     person was saying was obviously wrong, but some of it you

00:44:53 10     believed was accurate?

11     A.    Correct.

12     Q.    And so basically you were picking out the parts of the

13     conversation that fit your theory?

14     A.    Well, I was using my discretion and judgment.

00:45:04 15     Q.    That's right.

16     A.    And to compare consistent narratives to where the

17     outliers were, and I suspected the outliers was the

18     deliberate misinformation.

19     Q.    And that's your job?

00:45:16 20     A.    Correct.

21     Q.    You're trained to do that to try to separate the

22     misinformation from what might be accurate?

23     A.    Correct.

24     Q.    And you're doing this based solely upon your

00:45:27 25     experience and training and the screen shots, what you're

Case 2:15-cr-00707-SRB Document 503-1 Filed 06/11/18 Page 21 of 258

1  seeing on the screen shots?

2  A.  Right, as a professional in this trade, that's what I

3  get paid to do.

4  Q.  And you have nothing else to go on but what the screen

00:45:40  5  shots are?

6  A.  That and my judgment, education, profession, and

7  training.

8  Q.  So your conclusions that you reached were based upon

9  your judgment, education and training, correct?

00:45:48  10  A.  Correct.

11  Q.  But if things changed and words changed, and usages

12  changed, that's dangerous for an agent because you might

13  possibly get something wrong, correct?

14  A.  That danger could exist.

00:46:06  15  Q.  Now -- and this is a general question.  But in your

16  experience, are all -- and I'm going to say radical, and in

17  the context I'm saying I mean violently radical.  I'm not

18  talking about a subset.

19      But do all radicals come out of the same handbook?  I

00:46:24  20  mean, don't different people that you investigate use

21  different tactics?

22  A.  Yes, they do.  They share a lot of commonalities, but

23  every two humans are different.

24  Q.  Let's talk about one of the commonalities.  You talked

00:46:38  25  about Anwar Al-Awlaki?

1    A.    Um.

2    Q.    And I think you indicated he was the number one

3    English speaking influence on a lots of ISIS recruiting.

4    Would that be fair to say?

00:46:51  5    A.    Absolutely.

6    Q.    And so his lectures, he has a number of lectures on

7    the Internet that a lot of people that were being I guess

8    for lack of better term groomed are sent to that particular

9    site?

00:47:06  10    A.    Yes, that's a common trend.

11    Q.    Okay.  And so his lectures, are there -- does he talk

12    in his lectures about, you know, the battle of the trenches,

13    for instance?

14    A.    Yes.

00:47:21  15    Q.    And does he talk about crossbows, for instance?

16    A.    I think so.

17    Q.    And does he talk about the body, the limbs being

18    across other countries and the head being ISIS, or the brain

19    being -- come out of Syria?

00:47:40  20    A.    So you said Anwar Al-Awlaki was killed before ISIS

21    existed.  So --

22    Q.    When was he killed?

23    A.    I think it was 2014.  Or I'm sorry, I think it

24    was -- I don't recall exactly what year it was that he was

00:47:58  25    killed.

1     Q.    I thought you said ISIS kind of grew out of 2004,

2   2006?

3     A.    I mean, ISIS did emerge and declare the caliphate in

4   Mosul in July 2014, but Anwar Al-Awlaki was killed well

00:48:11 5   before that. So Anwar Al-Awlaki was never alive to comment

6   on ISIS.

7     Q.    Not the word ISIS, but in his teaching, doesn't he

8   refer to the fact that in his radicalism, that, in fact, the

9   caliphate is like the head of the organization?

00:48:28 10     A.    Yes.

11     Q.    And doesn't he also in his lectures talk about that

12   the body are frankly the recruits, the brothers, the true

13   believers, whoever you want to be, which would be all over

14   the world?

00:48:38 15     A.    I can't quote him, but he speaks to that kind of

16   concept in general.

17     Q.    Okay. So when this person that you're referring to,

18   and sham_reason, the progeny, because this is all the same

19   person, correct?

00:48:55 20     A.    Correct.

21     Q.    So this person referring to a head and limbs, that's

22   really consistent with Al-Awlaki's teachings, isn't it?

23     A.    Essentially, yes.

24     Q.    Now, did Al-Awlaki also, in his lectures, talk about

00:49:22 25   this concept of being off the grid, getting out of the Ian

1    then coming back into the grid?

2    A.    So my understanding, familiarity with Anwar Al-Awlaki

3    is he spoke much more to the religious justification for use

4    of violence against the United States and nonMuslims.

00:49:42 5    Q.    So he was very attracted to young Muslims who were

6    frustrated and may want to branch into violence, correct?

7    A.    Yes, he was very charismatic and also very influential

8    in providing a religious justification for killing

9    nonMuslims.

00:49:59 10   Q.    I don't think.

11   A.    I can't really think of him talking specifically about

12   tactics, about how to execute those violent actions.  He is

13   more of an ideologue.

14   Q.    But his lectures are easily acceptable -- sorry.

00:50:16 15  Wrong word -- accessible on the Internet and have been for

16   quite some time?

17   A.    Correct.

18   Q.    I want to ask you a little bit now on Garland, Texas

19   to make sure we have that correctly.

00:50:39 20        Now, you got permission from your supervisors to go to

21   Garland, correct?

22   A.    Yes.

23   Q.    And at that time were you aware of Mr. Soofi and Mr.

24   Simpson?

00:50:50 25   A.    Was I aware of them in general?

1    Q.    Yes.

2    A.    I was aware of Mr. Simpson.

3    Q.    But you didn't know anything about Mr. Soofi at that

4    time?

00:51:00  5    A.    I don't think I did, and if I did, it was not very

6    much.  Of course, I never talked to him either.  And so, no,

7    I didn't have -- I didn't really have any background

8    knowledge on Mr. Soofi at that time.

9    Q.    I want to make sure I understood your testimony Friday

00:51:17 10    correctly.

11          When you went to Garland, this was for the draw a

12    picture of Muhammad contest, correct?

13    A.    Yes.

14    Q.    And that was set up by Pamela Geller in response to

00:51:33 15    the Charlie Hedbo incident in Paris, France, about four

16    months earlier?

17    A.    I don't know her specific motives and reasons nor

18    organizing the event.  That sounds likely.

19    Q.    Well, in Paris, wasn't that attack taken out because

00:51:50 20    their editors of the newspaper had put in a caricature of

21    Muhammad?

22    A.    From what I recall, yes.

23    Q.    So in Texas, a similar contest was set up basically

24    just to say, "You're not going to tell us what we can and

00:52:06 25    cannot do," correct?

1  A.    Correct.  That's what I understood the objective of

2  that event to be.

3  Q.    So I got to believe the FBI would think that that

4  Garland, Texas would be a major target for possible

00:52:22  5  reprisal?

6  A.    That was a certain.  And for that reason, the FBI, in

7  advance, set up a command post on-site and there was robust

8  security.

9  Q.    And you knew that when you were driving -- did you

00:52:35  10  drive to Texas?

11  A.    No, I flew there.

12  Q.    And so you, I think we heard your conversations, but

13  you were aware that there were many other FBI agents in the

14  area, correct?

00:52:44  15  A.    Yes.  I didn't know the details of what the FBI was

16  doing --

17  Q.    Sure.

18  A.    -- there?  I had a pretty narrow task to sit in a car

19  in a parking lot and I -- you know, I had some knowledge,

00:52:58  20  but I didn't have intimate knowledge of the FBI's presence

21  physically there.

22  Q.    Is it fair to say that you felt a little more secure

23  in your capacity because you were aware that security

24  measures had been taken?

00:53:11  25  A.    Yes.

1    Q.    Now, did you have any idea, when you were sitting in

2    the parking lot taking pictures, that Simpson and Soofi were

3    even in Texas?

4    A.    I did not definitively know.  I was concerned.  I was

00:53:28   5    concerned for the obvious, that you also stated, and that

6    is, this is a very lucrative a target because it was

7    designed to be very provocative --

8    Q.    I'm sorry.  My question was Soofi and Simpson, did you

9    have independent knowledge that Soofi and Simpson were going

00:53:47  10    to be at the convention center at the same time you were?

11    A.    I definitively did not have that knowledge.

12    Q.    So basically in all your conversations with

13    accepted -- and that was the user name at the time, correct?

14    A.    Correct.

00:54:03  15    Q.    At no time did accepted say, "Watch out for other

16    brothers who may be there."  That's correct, isn't it?

17    A.    That is correct.

18    Q.    In fact, when you indicated, "Look, I can't get

19    close -- the security" -- I'm paraphrasing -- "the security

00:54:18  20    is too close," accepted indicated to you, wait until I get

21    there; isn't that correct?

22    A.    One is I did not say that I could not get too close.

23    I did not say that in my communication with the user of

24    accepted.

00:54:32  25    Q.    Okay.  Go ahead and say what you said.

1   A.   I'll paraphrase.

2   Q.   Paraphrase is fine.

3   A.   So I briefed him on -- I briefed him on the security

4   posture.  I wanted him to think I was giving him an accurate

00:54:48  5   briefing on the security posture.

6   Q.   You indicated to him that you couldn't get close

7   enough for your voice to be heard, correct?

8   A.   I told him that I was going to go in and get closer.

9   I did not tell him that I could not.

00:55:01  10  Q.   And then he said, "If you can't get there, wait for

11  me," correct?

12  A.   I recall him saying that "Maybe I can get there or

13  maybe you can wait for me" -- maybe -- I would have to look

14  at the raw verbatim screen shots to see exactly what he

00:55:18  15  said.  But he did bring up waiting for his arrival.

16  Q.   Which --

17  A.   And then I think he also --

18  Q.   Let me stop you there.  Just answer what I ask so we

19  can kind of keep this tighter.

00:55:28  20  A.   Okay.  Sure.

21  Q.   But he did say to you in a text -- I say, text, he did

22  communicate to you, "Wait until I get there.  If you

23  can't -- if you can't -- if you have a problem letting your

24  voice be heard, wait until I get there," correct?

00:55:43  25  A.   I think I recall him saying that he could not get

1    there in time.

2    Q.    Okay.  But you don't remember the word wait?

3    A.    No, I do.  I do.  And I remember him after that also

4    saying --

00:55:53  5    Q.    Which would be an indication that obviously he wasn't

6    there, correct?

7    A.    He was not physically in Texas.

8    Q.    And at no point in time did he indicate to you, in

9    your testimony, that, "Hey, there may be other brothers in

00:56:08 10    the area"?

11    A.    He told me to try to contact Mr. Simpson who was in

12    Arizona -- or he understood Arizona.

13    Q.    My question was a yes or no question?

14    A.    Okay.

00:56:21 15    Q.    But he didn't say to you "Be careful because there are

16    other brothers in the area."  That was never communicated to

17    you.  "There's other brothers at the convention center"?

18    A.    That statement was not communicated to me.

19    Q.    And so I think your testimony was, when you drove down

00:56:38 20    the road and you turned around to come past security and

21    there was a car in front of you that was going slow.  Was

22    that car weaving back and forth, or just going slow?

23    A.    It wasn't weaving.  It wasn't driving like a regular

24    traffic behavior.  It was -- there was something odd with

00:56:56 25    the way the car was driving.  It was a little bit kind of

1   closer to the shoulder of the road and driving a little bit

2   slower.  So is it wasn't like normal traffic.

3   Q.    Well, what was the miles per hour?  25, 35 in that

4   area if you can remember?

00:57:10  5   A.    It was probably 25 or 30.

6   Q.    And so did you have a weapon on you at that time?

7   A.    No.

8   Q.    And so if I understand it correctly, everything

9   happened, what, within 25 seconds?

00:57:20 10   A.    Approximately.

11   Q.    And so one of the reasons that you tried to drive

12   around is you had nothing that you could protect yourself

13   with, or stop the attack?

14   A.    At the time of the shooting?

00:57:30 15   Q.    Yes.

16   A.    At the time of the shooting, my -- the forward

17   momentum of my vehicle was already moving past them.  I was

18   driving and passing them while the shooting was happening.

19          And I had no weapon, so I quickly got out of the area

00:57:48 20   because I was literally in the crossfire.  So I gunned it

21   with my car to get out of there as fast as possible so I

22   didn't get shot.

23   Q.    I'm going to back up.

24   A.    Sure.

00:57:57 25   Q.    You were in the cross -- some of the agents were on

1   the other side of the road?

2   A.    So like to my right were the security officers,

3   including one police officer.

4          After -- in front of them were the two shooters, Mr.

00:58:09 5   Simpson and Mr. Soofi.

6          And then I was right behind them as I was passing

7   them.

8          So as I look over my shoulder, my right shoulder, I

9   saw the line of fire in both directions.

00:58:19 10   Q.    Was your car struck?

11   A.    It was not.  I mean, I would estimate that I was like

12   a half second of getting out of the line of fire.  I mean, I

13   saw the shooting.  And I heard it all kind of behind my

14   right shoulder as I looked back over my right shoulder.

00:58:35 15   Q.    All right.  So afterwards, I think your -- sorry.  Let

16   me start again.

17          That was May 2 of 2015?

18   A.    The shooting was on May 3.

19   Q.    May 3.  I'm sorry, you're right.

00:58:50 20          Did you have any direct communication with accepted

21   the day before?

22   A.    Yes.

23   Q.    Did you have any direct communication with -- or were

24   you aware of any direct communication with Mr. Simpson or

00:59:04 25   Mr. Soofi the day before?

1    A.    No, I did not.

2    Q.    So you talk to accepted on May 3, and it was the next

3    day that you heard from accepted again, correct, May 4?

4    A.    It was -- so I sent a message just after midnight

5    which was early morning of May 4.  And then I think it was

6    May 5 that accepted -- or the user of accepted contacted me

7    from a new account.

8    Q.    Okay.  And so basically Garland was national news,

9    correct?

10   A.    Yes.

11   Q.    And so everybody knew quickly that there were two

12   people that were killed, correct?

13   A.    Yes.

14   Q.    And so when accepted said to you, "Look, I figured out

15   that it couldn't be you," it would be pretty obvious to do

16   that when they knew two people were dead and you

17   communicated with him after the shootings, correct?

18   A.    Yes.  I was still alive.

19   Q.    So -- leave it at that.

20         Now, you also talked a little bit about some of the

21   other Surespot -- Surespot.

22         I think you indicated yesterday that it's your belief

23   that Surespot wasn't capable of multiple apps?  Did you

24   testify to that?

25   A.    I think what I said was that at that time Surespot,

1  one Surespot account could be used on one phone.

2  Q.   Are you aware that if -- or is it your belief that if

3  Surespot could be on -- as long as it's the same user name

4  could be on two different applications?  Two different

5  phones?

01:00:48

6  A.   So in 2015, my understanding of the technological

7  capabilities of Surespot was that it was limited such that

8  only one account could be used on one phone.

9       So one user of one account could only be used on one

10 phone.

01:01:02

11      You could not have two users using the same account on

12 two different phones.  Surespot was designed with the

13 encryption to where that is physically impossible.

14 Q.   Do you know if that changed?

15 A.   Since 2015?

01:01:14

16 Q.   Is it your belief that Surespot still operates in that

17 case -- that means.

18 A.   I don't know of any jihadis that use Surespot in 2018.

19 And so I don't know the capabilities of Surespot in 2018.

20 Q.   All right.  And speaking of which, there was testimony

01:01:33

21 about telegraph.  Do you know what telegraph is?

22 A.   Telegram?

23 Q.   Telegram.  Thank you.

24 A.   I'm familiar with telegram, yes.

25 Q.   And what is telegram?

01:01:47

1   A.   Telegram is another encrypted mobile messages app with

2   additional features and functions, but it allows for

3   peer-to-peer encrypted messaging.

4   Q.   Are you aware from your experience whether telegraph

01:02:01   5   is now a favored --

6   A.   Telegram is currently very popular amongst terrorists,

7   jihadis, and ISIS supporters.

8   Q.   I just have a few more things.  I just want to kind of

9   clean up some areas.

01:02:23   10   Did you testify Friday that one of the tactics that

11   somebody may use is keeping off the grid?  Did you testify

12   about that?

13   A.   I testified that the user of all these accounts

14   promoted this idea of living off of the grid as his

01:02:43   15   preferred tactic for avoiding detection.

16   Q.   All right.  And when you're talking off the grid, that

17   would mean -- correct me if I'm wrong -- you know, not

18   having accounts in your name, paying things in cash, not

19   having receipts, that sort of thing?

01:02:59   20   Is that what we're talking about?

21   A.   Well this concept of living off the grid was defined

22   by the user of these accounts.  And so I could tell you what

23   he told me how to live off the grid or how he described

24   that.

01:03:09   25   Q.   Okay.  But getting a hotel and using your driver's

1    license and providing them your actual name and actual Email

2    and being accurate, that's really not consistent with living

3    off the grid, is it?

4    A.    If you're defining living off the grid in the pure

01:03:30 5    sense of living a lifestyle that can't be detected, then

6    yes, that would be against -- I think there is different

7    grades of living off of the grid.  It depends on how any one

8    person wants to define that.

9         I mean, you could say living off the grid means you

01:03:46 10    only ride a bicycle.

11    Q.    I think you testified, you know, yesterday that

12    staying off the grid was referred to as disconnecting from

13    society?

14    A.    To some degree, yes.

01:03:57 15    Q.    But it's all degrees?

16    A.    Yes.

17         MR. DOUGHTEN:  Could I have one second, Your

18    Honor?

19         THE COURT:  Yes, you may.

01:05:13 20    BY MR. DOUGHTEN:

21    Q.    I just have a couple more questions.

22    A.    Sure.

23    Q.    In your capacity as working undercover, did you at any

24    time in 2015 -- well, between January and May of 2015, did

01:05:29 25    you update or change your profile?

1    In other words, do you have a profile so that the

2 other person can vet you out?  Accepted, did accepted have a

3 way of vetting you out?

4 A.    So accepted was aware of the Twitter account I was

01:05:45  5 using at the time, was aware of the Surespot account, and

6 then the Wickr accounts.

7 Q.    And during that period of time, did you update your

8 profile or make a new profile of any sort?

9 A.    I did not change my Twitter account.  That remained

01:05:59 10 constant during the entire information.

11    And then I only changed my Surespot accounts and Wickr

12 accounts in concert with the person I was talking with.

13 Q.    Okay.

14 A.    And often at their direction.

01:06:13 15       MR. DOUGHTEN:  One second.  I'm sorry, Your

16 Honor.

17       THE COURT:  That's all right.

18 BY MR. DOUGHTEN:

19 Q.    And in context with that, in your undercover, you

01:06:44 20 would never put your working user name on your public

21 domain, would you?  You would keep those separate?

22 A.    Like my -- like a personal account?

23 Q.    Yes.

24 A.    I would not -- I'm sorry.  Can you -- I would not mix

01:06:58 25 my personal account with an account I was using for work.

1  Q.  That's obvious.

2  A.  I don't think I understood the question.

3  Q.  You know what.  I'll drop that question.  I'm sorry.

4  It's kind of convoluted.

01:07:09 5      The last question I was, just to clarify Garland,

6  accepted never told you what to do, correct, except for

7  he --

8  A.  He said to go make my unique one-man protest and make

9  my voice heard against Pamela Geller in the context of

01:07:27 10  using, you know, the tools that I had available to me.

11  Q.  And you interpreted that he didn't specifically say,

12  "This is what you need to do?"  He left that up to you?

13  A.  He did not -- give me have explicit orders to commit

14  an act of violence against Pamela Geller.  I mean, it

01:07:45 15  was --

16  Q.  Thank you.

17          MR. DOUGHTEN:  No further questions, Your Honor.

18          THE COURT:  Thank you.

19      Any redirect of this witness?

01:07:50 20          MR. SHEPHERD:  Yes, Your Honor.

21          REDIRECT EXAMINATION OF STEVEN JANE

22  BY MR. SHEPHERD:

23  Q.  Good morning, Agent Jane.

24  A.  Good morning, sir.

01:08:06 25  Q.  I first want to get -- ask you a little bit about some

1     of the locations that you were asked about.

2         So as I understood it, you testified just a minute ago

3     that you flew to Garland, Texas?

4     A.     Correct. Flew to Dallas, Texas and then drove to a

01:08:22 5     suburb of Dallas, which is Garland, Texas.

6     Q.     Where did you fly from?

7     A.     I flew from at that time I was in Cleveland, Ohio. I

8     flew out of Cleveland.

9     Q.     And during the course of these communications, where

01:08:35 10     were you physically located?

11     A.     I was in a variety of states, to include California

12     and Ohio.

13     Q.     Would that have been in the Cleveland area?

14     A.     Yes.

01:08:47 15     Q.     The day before you flew to Garland, Texas, did you

16     receive any communications from accepted on where accepted

17     was located?

18     A.     Yes, I did.

19     Q.     Where was that?

01:08:58 20     A.     He said he was in Maryland, Baltimore, Maryland.

21     Q.     Did he indicate what he was doing on that day in

22     Baltimore, Maryland?

23     A.     At the time there were riots, significant riots going

24     on in Baltimore, Maryland. On May 2, the riots were dying

01:09:15 25     down. And he also told me that he was going to meet with

1  another brother, which would be called the Pennsylvania

2  brother.

3      And that was -- the Pennsylvania brother is someone

4  that the user of accepted put me in contact --

01:09:31  5           MR. DOUGHTEN:  Objection.

6           THE COURT:  Sustained.

7  BY MR. SHEPHERD:

8  Q.    And you earlier were asked about living off the grid.

9  And you said what you learned from living off the grid was

01:09:43 10  what you were told.  What were you told living off the grid

11  meant by accepted?

12  A.    So it was consistent with the concept of kind of

13  detaching from society.  As an example, you know, paying

14  with cash so you didn't leave a trail of receipts.  Like

01:10:03 15  changing your residence, moving around, being nomadic.

16  Q.    If we could pull of Government Exhibit I believe 5

17  page 43.

18      Taking a look at the bottom of the screen, without

19  reading it, what was this person here after at this time,

01:10:34 20  advising you to do?

21  A.    To live off the grid.

22  Q.    And if we move forward to page 44, what was the

23  further advice beyond living off the grid?

24  A.    That I needed to get trained.

01:10:49 25  Q.    And then what was the following advice in the middle

1086

1    of the page?

2    A.    And then after getting trained, then I would go back

3    to society to live on the grid.  Just go back and live in

4    overt living like a normal person.

01:11:05  5    Q.    Okay.

6    A.    So the end goal was to live and appear as if you're a

7    normal person in society.

8    Q.    If we can hold on for just a minute.

9         You were asked a lot about the reliance on your own

01:11:27 10    training and judgment in this job.

11         What is your sort of judgment based on when you're in

12    a case like this?

13    A.    It's a combination of experience, training, education,

14    etcetera.  But, of course, I'm looking for indications that

01:11:47 15    this person is inclined to commit a crime, in this case in

16    the terrorism context, to commit an act of violence, or

17    support an act of violence or support a terrorist

18    organization.

19         So I'm looking for physical indications that the

01:12:05 20    person is committed to that and is willing to take action?

21              MR. SHEPHERD:  May I have a moment, Your Honor?

22              THE COURT:  You may.

23              MR. SHEPHERD:  Your Honor, no further questions.

24              THE COURT:  Thank you.

01:12:55 25         Anything further of this witness?

1   MR. DOUGHTEN:  No.  Thank you very much.

2   THE COURT:  All right.  Ladies and gentlemen,

3   we're going to take a very, very quick break.  I need to

4   confer with the attorneys briefly.  Just give us about five

01:13:10   5   minutes.  We'll be back with you.

6   Leave your notepads on your chairs.  Remember all the

7   discussions we've had about not discussing the case among

8   yourselves or with anyone else.  They all apply.

9   We'll see you in about five or ten minutes, please.

01:13:23   10   Thank you very much.

11   All rise.

12   (Jury out, 10:00 a.m.)

13   THE COURT:  Just be seated very briefly.

14   I want to let the witness be removed from the

01:14:17   15   courtroom.

16   Procedurally, just give me a preview of your day,

17   counsel for the government, just while we have a few minutes

18   here.

19   MR. SHEPHERD:  Yes, Your Honor.

01:14:27   20   Our next witness is an expert witness who has

21   been -- we provided notice to the defend counsel and they've

22   had an opportunity to discuss with him prior -- his

23   testimony prior to coming in.

24   We then have a couple of witnesses who should be

01:14:43   25   pretty short.

```
1                      C E R T I F I C A T E

2

3          I certify that the forgoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter.

6

7          S/Caroline Mahnke            3/12/18

8          Caroline Mahnke, RMR, CRR        Date

9

10         S/Lori A. Callahan           3/12/18

11         Lori A. Callahan, RMR, CRR       Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```