ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

KRISTEN BROOK
Arizona State Bar No. 023121
JOSEPH E. KOEHLER
Arizona State Bar No. 013288
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: kristen.brook@usdoj.gov
Email: joe.koehler@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-15-00707-01-PHX-SRB |
|---|---|
| Plaintiff, | |
| v. | **RESPONSE TO DEFENDANT'S AMENDED MOTION TO COMPEL DISCLOSURE** |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

Defendant was convicted by the jury because, among other crimes, he conspired to provide material support to ISIS and he conspired with confederates to transport firearms across state lines in order to murder civilians at a gathering in Garland, Texas. Defendant has now filed an Amended Motion to Compel Disclosure, which notes that he sent government counsel a six-page letter that "identified 15 different points on which disclosure was sought." (CR 525 at 4.) Defendant's motion offers no analysis of any of these points. Rather, it simply attaches the letter, asserts without explanation that everything it refers to is Rule 16 or *Brady* material, and then moves the Court "to compel production by the government of items requested by the defense by letter." (*Id.* at 1.)

None of the items requested by the defense falls within the scope of the government's discovery obligations under Rule 16, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), or any other doctrine.  Defendant's letter claims these items would be material or exculpatory to support the baseless and entirely speculative defense theory that he "was targeted as a defendant because the FBI was embarrassed by its failure to detect and disrupt the plan to attack the contest in Garland, Texas." (CR 525-1.)  He further argues "the US failed to appreciate the risk posed by" his confederate and "the FBI could have foiled the attack given the information it possessed." (*Id.*)

Even if a defense could be fashioned around the FBI's supposed embarrassment resulting from failing to prevent a crime (and it cannot because jury nullification is a prohibited defense), undersigned counsel have seen no information even hinting at the notion that Defendant was "targeted" for reasons other than the evidence that pointed to him—namely, the statements of witnesses to his conduct and the physical and electronic evidence that implicated him in the charged conspiracy.  Because Defendant fails to make any showing, the United States respectfully submits the Court should deny his motion.

### Brief Procedural Background[1]

The instant Motion to Compel arises in the context of a pending Supplemental Motion for New Trial (CR 505) that defendant Abdul Malik Abdul Kareem filed while his appeal is pending and in which opening briefs for the defense and the government have been filed.

The principal event that triggered the investigation leading to the charges in this case was Elton Simpson's and Nadir Soofi's attempted attack on the Muhammad Art Exhibit and Contest in Garland, Texas, on May 3, 2015.  Following the attack, the FBI launched an investigation and interviewed hundreds of people, conducted searches and

---

[1] The facts and history of this case are set out in greater detail in the government's trial memorandum (CR 200), its response to Kareem's motion for new trial (CR 319) and its response to Kareem's supplemental brief to the motion (CR 441).

gathered evidence at multiple locations, and analyzed a large number of electronic devices and physical items.

On June 10, 2015, a grand jury returned an indictment against Defendant Kareem, charging him with various counts. The grand jury returned superseding indictments on September 1, 2015 (CR 57), and December 22, 2015 (CR 158). The second superseding indictment included the following charges: Count 1, Conspiracy to Transport Firearms in Interstate Commerce with Intent to Commit Felonies; Count 2, Aiding and Abetting Transportation of Firearms in Interstate Commerce with Intent to Commit Felonies; Count 3, Making False Statements to the FBI; Count 4, Felon in Possession of Firearms; and Count 5, Conspiracy to Provide Material Support to a Foreign Terrorist Organization. The case proceeded to trial on February 16, 2016 (CR 209), and the jury returned guilty verdicts on all counts on March 17, 2016 (CR 285).

Following the trial, Kareem filed a motion for new trial (CR 303) and a separate motion for judgment of acquittal (CR 302) on March 31, 2016, and a supplement to the motion for new trial (CR 432) on November 9, 2016. The government responded to the initial motion and the supplement, and after a hearing, the Court denied the motion for new trial on January 23, 2017 (CR 469). The Court sentenced Kareem to a total term of 30 years of imprisonment on February 8, 2017 (CR 489). Kareem filed a timely notice of appeal (CR 484). That appeal remains pending with the deadline for reply briefing stayed pending this Court's adjudication of Kareem's Supplemental Motion for New Trial (CR 505).

**Discussion**

**A.     Defendant may not obtain discovery based on a legally invalid defense**

In Defendant's letter, he claims the right to discovery of a number of items based on the premise that "the FBI was embarrassed by its failure to detect and disrupt the plan to attack" the Muhammad Art Exhibit and Contest in Garland, Texas. Kareem asserts the FBI "wanted to bring a prosecution of someone," and therefore targeted Kareem as a scapegoat (CR 525-1 at 2). The government has since responded to the letter in writing.

Simply put, the FBI's "failure to detect and disrupt the plan" is not a defense to the charges in the case. This "defense" is totally untethered to the evidence showing Defendant's involvement in these crimes. Turning Defendant's trial into an attack on the FBI for failing to stop the attack would be nothing more than an argument for jury nullification, asking the jury to ignore the independent proof in the government's case because agents did not stop a crime. Jury nullification as a defense is not a basis for finding materiality[2] because the defendant does not have a right to pursue jury nullification. *See, e.g., Strickland v. Washington*, 466 U.S. 668, 695 (1984) ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.").

For example, in *Wilkins v. United States*, 754 F.3d 24 (1st Cir. 2014), the court affirmed the district court's denial of motion to set aside a conviction flowing from a guilty plea based on failure to disclose evidence that a drug chemist who tested the substance at issue had been falsifying drug tests in other cases. *Id. at* 30. The court noted defense counsel's intent to "make his client's trial a referendum on [the chemist] rather than a proceeding aimed at determining his client's guilt or innocence." *Id.* The court explained: "Refined to bare essence, this importuning asks us to find materiality based on the possibility of jury nullification. But courts are duty-bound to presume that jurors will follow their instructions, and there is no principled way in which we can rely on a petitioner's hope of jury nullification to find prejudice." *Id.* (internal citations omitted).[3]

---

[2] The Court's order denying the original motion for new trial accurately sets forth the legal standards for evaluating materiality under *Brady* and determining discoverability under Rule 16. In the interest of brevity, the government will not reiterate those standards here.

[3] *See also United States v. Felix*, No. 213CR00042APGPAL, 2016 WL 4720918, at *4 (D. Nev. Sept. 9, 2016), aff'd, 727 F. App'x 921 (9th Cir. 2018) (affirming denial of motion for new trial based on argument that failure to disclose meeting between witness and AUSA, after which witness refused to testify, was a *Brady* violation; "To the extent one could speculate that the jury may have been provoked into jury nullification if it heard about the meeting between Healy and the Assistant United States Attorney, a defendant cannot argue jury nullification. Consequently, a new trial is not warranted on the basis that perhaps the jury would nullify based on the Government allegedly strong-arming a witness. I therefore

Kareem's disclosure motion in this case is similar to one that was denied in *United States v. Burton*, 81 F. Supp. 3d 1229, 1236, 1253 (D.N.M. 2015).  In *Burton*, the court denied a motion to compel production of records relating to FBI and state police investigations of a shooting that occurred after a transaction of phony drugs between an undercover police officer and two coconspirators.  The defendant argued, "because of the . . . incident, the FBI had to find someone to hold responsible and chose him as their scapegoat." *Id.* at 1236.  The court found no indication that the records the defendant sought contained any information that was discoverable, a *Giglio* review took place and revealed nothing, and there was no evidence that the agent witness involved in the charged phony drug transactions was criticized or disciplined for conduct relating to the transactions or the shooting incident that occurred after the transactions.  *Id*. at 1253-54.

In analyzing the applicability of Rule 16 to the requested information, the court noted Rule 16 does not authorize a "broad or blind fishing expedition among documents possessed by the Government." *Id.* (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957)).  *See generally Moore v. Illinois*, 408 U.S. 786, 795 (1972) (the government need not provide a complete and detailed accounting to the defense of all investigation conducted in a given case).

To pick one example, this is especially true of Kareem's desire to obtain discovery of the identities of persons to whom the S/A Jane's messages were sent and the actions they took (discussed further below).  None of the recipients of S/A Jane's messages about Hendricks or Simpson testified at the trial in this case.  Thus, their identities and statements could not be construed as Jencks Act statements or impeachment material under *Giglio*. Because, as this Court previously held, the Hendricks-related "disclosure does not call into question Defendant's involvement: watching videos with Soofi and Simpson, taking Simpson and Soofi shooting, or supplying Simpson and Soofi with firearms" (CR 469 at 9), communications among FBI personnel about the operational details of the Hendricks

---

deny the motion for a new trial based on a Brady/Giglio violation.") (internal quotation omitted).

investigation or S/A Jane's concerns about Simpson likewise would not constitute *Brady* material.

Because Defendant's theory continues to fail in calling into question the evidence showing his involvement in the crime, it is not a basis to claim unrelated evidence is discoverable.

**B.     Response to Defendant's 15-Item List**

The defendant's motion incorporates by reference the discovery request letter dated September 6, 2018. The numbered paragraphs below correspond to the numbered requests in Kareem's letter.[4]

1.     The evidence of Simpson's communications as requested in paragraph 1 of the letter has been disclosed. Simpson's Twitter communications that were recovered by the FBI, including those from his @tawaakul and The Sword and the Tongue accounts, were all disclosed on Bates # 436, the 1TB hard drive, on October 13, 2015. Discovery page 635, disclosed November 6, 2015, contains the names of the various Twitter accounts for which the FBI obtained search warrants. Moreover, discovery pages 1677 through 1682, disclosed January 29, 2015, consisted of a report by Investigative Analyst Gregory Neville (one of the government's trial witnesses) titled "Simpson's Use of Twitter as a Means of Expressing Radical Beliefs." This report described Simpson's various Twitter handles and the communications in which he engaged that demonstrated his radical beliefs.

Simpson's encrypted media communications via Surespot handle juba1911 were disclosed in the post-trial disclosure that was the subject of Kareem's supplement to his original motion for new trial. No additional message content is available because the Surespot communications were encrypted and were not recoverable via search warrant from Surespot. Further, Simpson had deleted his other Surespot accounts, including known accounts juba2 and juba 8021. The only available Surespot data other than the UCE's

---

[4] To be clear, undersigned counsel have sought and are continuing to seek authorization to disclose certain additional information to the defense; however, that information does not fall within the aforementioned discovery obligations. The additional information would support the government's position with respect to Kareem's supplement to his original motion for new trial as well as his supplemental motion for new trial.

screenshot preservation of messages was the message count between Simpson and other users. A report previously disclosed at Bates-stamped discovery pages 1887-1894 on January 29, 2016, noted that Simpson engaged in at least 209 Surespot communications with Mohamed Abdallahi Hassan, aka "Miski," leading up to the attack, with at least 103 messages being exchanged on the day of the attack, May 3, 2015.  Although the government could not recover the content of these encrypted messages, it did offer trial exhibits featuring Twitter direct messages between Simpson and Miski that showed Miski confirming for Simpson that ISIS was encouraging attacks within the United States.  (Tr. Exh. 480 (conversation about whether ISIS spokesman Adnani spoke for ISIS leader Abu Bakr al-Baghdadi)).  Simpson's association with Miski was public knowledge shortly after the attacks. *See* https://www.counterextremism.com/extremists/elton-simpson.

2. As the Court found in its order denying the motion for new trial, the specific actions the FBI took in pursuing leads regarding Simpson prior to May 3, 2015, is not relevant to the elements of the offenses with which Kareem was charged, nor does it serve to impeach any government trial witness.  All Jencks Act material concerning the government's trial witnesses, including SA Stewart Whitson, has been disclosed. Impeachment of S/A Whitson about the actions (or lack thereof) of other agents during the trial and about which he lacked personal knowledge would have been improper hearsay. Merely stating (as defense counsel did during trial) that as the case agent S/A Whitson would know of and be able to comment on the actions of others involved in the investigation does not overcome the strictures of the hearsay rule.

3. Ms. Theobald's research to identify Simpson as the user of "The Sword and the Tongue" and Surespot IDs juba2 and juba 8021 would not have been relevant evidence at Kareem's trial.  The government laid other foundation to associate Simpson to those accounts and disclosed the underlying information about those accounts on October 13, 2015, as described above.  Ms. Theobald's research was not Jencks or *Giglio* material because she did not testify.  The research, which undersigned counsel have not seen, would not have been *Brady* material merely by virtue of not showing online activity associated

with Kareem.  The government never contended, nor did the evidence at trial in any way suggest, that Kareem was a participant in any social media or other electronic communication concerning the Garland attack or that he engaged in any form of electronic communication concerning ISIS, etc.  The government's proof concerning Kareem's activities consisted of evidence of in-person communications and conduct.  The government established at trial that Simpson was the person with the online presence and who was communicating with ISIS-affiliated persons such as Miski and Junaid Hussain.

4. The government has disclosed reports and evidence[5] supporting S/A Jane's statement about thinking "juba1911 should be of concern."  Specifically, the government disclosed a message S/A Jane sent earlier the same day, which was in the same batch of supplemental discovery (Bates pp. 867-898). S/A Jane did not communicate with Kareem; therefore, the lack of any statements of S/A Jane with respect to Kareem is not exculpatory or impeachment material for the same reasons set forth above.

5. S/A Jane's communications within the chain of command concerning his planned trip to Garland, Texas is not relevant under Rule 16 or *Brady*, nor does it constitute *Giglio*/Jencks material.  The transcripts from the trial of Erick Jamal Hendricks support S/A Jane's belief that he was going to Texas in order to bolster his credibility with Hendricks and that he did not anticipate encountering a "PX subject" in Texas.  As S/A Jane testified in that trial, he was not armed when he was in Garland, Texas.  His movements were controlled, including his obtaining permission from the on-scene agent to move closer to the event to take photos to prove to Hendricks he had been at the event.  As previously mentioned, undersigned counsel continue to work with FBI to release additional information about S/A Jane's presence in Garland, Texas. The government anticipates the additional information would further corroborate S/A Jane's assertion that he did not anticipate encountering Simpson.

---

[5] No Jencks Act evidence exists regarding S/A Jane with respect to Kareem's trial because S/A Jane did testify at that trial.  Although the Jencks Act does not apply to S/A Jane's declaration or reports, the government has endeavored to provide his reports and statements to Kareem in this case in the interest of full disclosure.

6. As stated above, the identity of the persons to whom S/A Jane communicated about his perception that Hendricks wanted him to meet Simpson, and what they did with that information, is not relevant to the defense under Rule 16 or *Brady*, nor is it impeachment material.  Again, a "defense" based on this information would not be a legal or factual defense to the charge, but rather an attempt to seek jury nullification, which is not a defense and not a matter on which the defense would be entitled to a jury instruction. All Jencks material concerning the government's trial witnesses, including S/A Stewart Whitson, has been disclosed. The existence of other conspirators is not exculpatory – indeed, the government introduced evidence concerning other possible conspirators, including Miski and Hussain, during the trial in this case. *See* Trial Exhibit 480 (Simpson Twitter direct message excerpts). The evidence demonstrating Kareem's involvement consisted of witnesses who described his criminal conduct that occurred well before Simpson's April 23, 2015, tweet about the Garland contest.

7. The identity of persons to whom S/A Jane communicated about the potential to contact Simpson to inquire whether he was at the event is not relevant to the defense under Rule 16 or *Brady*, nor is it impeachment material.  S/A Jane testified during the Hendricks trial that he did not receive authorization to approach Simpson, and nothing suggests S/A Jane would have been able to reach Simpson without risking revelation of his use of law enforcement resources and thereby risking exposure of his status as an undercover agent.  S/A Jane had no means to contact Simpson because Simpson already had dropped his Surespot account, juba1911, through which S/A Jane had communicated with him.  Had S/A Jane successfully used Simpson's @tawaakul account on Twitter, that would have immediately drawn suspicion from Simpson because (1) Simpson never provided that username to S/A Jane, (2) the two never previously communicated via that account, and (3) Hendricks provided a misspelled version of that account name to S/A Jane, which could have been an attempt to test Jane by discovering whether Jane knew the true Twitter account name.

The defense also requests additional information regarding the reference in the FBI Inspections Division's Garland Shooting Incident Review to Simpson's "go it alone" comment. This comment occurred during the only communications Simpson and the UCE had: the April 23-24, 2015, conversation they had over Surespot, which was documented via screen shots and disclosed September 15, 2016.

9. The government already has disclosed the email communications crediting IA Andrea Theobald's analysis with identifying juba1911 as Elton Simpson.

10. The existing disclosure contains the information that led the FBI, and specifically S/A Jane, to conclude it was possible Simpson might travel to Garland, Texas. As the disclosure shows, S/A Jane drew the conclusion that it was possible based on his communications with Hendricks and the earlier conversation with Simpson, as well as the general knowledge that the contest would be an attractive target for an attack. This information would not have been admissible to impeach S/A Whitson or any other government witness, for the same reasons previously stated.

11. The existence of an FBI alert to authorities in the Dallas area to be on the lookout for Simpson was public knowledge in the immediate aftermath of the attack. It was repeatedly reported in the media and was referenced during the trial. *E.g.*, https://www.nbcnews.com/news/us-news/fbi-says-it-alerted-garland-police-about-elton-simpson-n355526; https://www.nytimes.com/2015/05/08/us/fbi-says-it-warned-of-gunman-in-garland-texas-attack.html. Additional evidence concerning the alert would not be exculpatory; nor would it serve to impeach any of the government's witnesses, for the reasons previously stated. Nevertheless, undersigned counsel have requested a copy of the alert but have not seen it in any form. The law enforcement alerts undersigned counsel have reviewed are general in nature and do not mention Simpson, Hendricks, or anyone connected to either of them. Nevertheless, undersigned counsel are working with the current case agent to locate the alert and will disclose it if and when it is obtained.

12. The names and locator information of agents who received emails from S/A Jane is not relevant under Rule 16 or *Brady*, nor would it qualify as impeachment material

for S/A Whitson or any of the other government witnesses who testified in the case. Again, the FBI's concern about Simpson was well-known and documented, and was addressed in cross-examination of various government witnesses at trial. The FBI's concern about Simpson and the fact that it did not prevent Simpson's and Soofi's attempt to attack the contest is not *Brady* or *Giglio* material; nor does it fall within Rule 16.

13. As discussed above, documentation of S/A Jane's authorization to travel to Garland, Texas, is not discoverable – it does not fall within the scope of Rule 16, *Brady*, or *Giglio*. The evidence already disclosed, along with the Hendricks trial transcript of S/A Jane's testimony, fully describes S/A Jane's purpose and justification for the travel.

14. FBI authorizations, generally and in this context, do not fall within the scope of Rule 16, *Brady*, or *Giglio*. Such evidence does not constitute impeachment for any government witness, nor is it relevant or exculpatory. It bears no relation to the government's case against Kareem for the reasons set forth above.

15. Briefing notes and materials on the law enforcement presence in Garland do not fall within the scope of Rule 16, *Brady*, or *Giglio*. They are not relevant to any of the issues at trial or any of the elements of the charges in the case.

The lack of a mention of Kareem in the context of the Hendricks investigation or research into Simpson's online identities does not constitute exculpatory evidence. As noted above, the government never asserted at trial that Kareem was a participant in online communication about ISIS or the Garland attack. *See United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989) ("[The defendant] seems to argue that any information gleaned from any witness by a federal prosecutor that does not incriminate the defendant necessarily exculpates him. This proposition is supported by neither law nor logic."); *United States v. Rhodes*, 569 F.2d 384, 388 (2d Cir. 1978) (no *Brady* violation when the prosecution did not disclose that certain eyewitnesses to a robbery were unable to identify the defendant because "[t]he eyewitnesses did not state that the defendant was not one of the robbers. . . . [r]ather, they testified that they could not state whether the defendant was or was not one of the perpetrators" and such evidence was not exculpatory).

For example, in *United States v. Zuno-Arce*, 44 F. 3d 1420, 1422 (9th Cir. 1995), a defendant was convicted of conspiring to kidnap, torture, interrogate, and murder DEA Agent Enrique Camarena-Salazar in Guadalajara, Mexico in 1985.  Post-conviction, the defendant claimed that the government had hid exculpatory DEA and FBI interviews with a Mexican federal agent until after the close of evidence in the defendant's case.  *Id.* at 1425.  During multiple interviews of the Mexican federal agent, the agent advised FBI and DEA that he had spoken with multiple people who were present during the torture of DEA Agent Camarena and those people had mentioned individuals who were also present. *Id.* at 1425–26.  The defendant argued that the interviews were exculpatory because none of the witnesses to the torture apparently mentioned the defendant's name as being present.  *Id.* at 1426.

In holding that the interviews were not exculpatory evidence, the Ninth Circuit held the "inference is too weak . . . to amount to exculpatory evidence" and that "not every witness statement which fails to inculpate a defendant should be treated as exculpatory." *Id.*  The court explained, "the torture took place over two days, [and] the statement does not show when the people who told the agents who were present were there themselves and when they were absent," the interviews do not "establish that [the defendant] was not there during the torture," and "the language of the witness statement [does not] suggest that the agent purported to list all persons who were present at any time during the torture." *Id.*

Similarly, the research into Simpson's online identities was focused on his identities in the context of the Hendricks investigation, not his in-person associations with individuals who were not communicating over online messaging applications.  Again, even if the agents' motive for pursuing prosecution were somehow a defense to the charge, undersigned counsel have not seen any evidence to suggest the agents in this case acted based on anything other than the evidence implicating Kareem that arose during the course of the investigation.

**Conclusion**

Based on the foregoing, the United States respectfully requests the Court deny the defendant's Amended Motion to Compel Disclosure.

Respectfully submitted this 7th day of February, 2019.

>ELIZABETH A. STRANGE
>First Assistant United States Attorney
>District of Arizona
>
>s/ Kristen Brook
>s/ Joseph E. Koehler
>KRISTEN BROOK
>JOSEPH E. KOEHLER
>Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of February, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Drake & Daniel Maynard, Attorneys for Defendant

By: /s Joseph E. Koehler