# EXHIBIT A

1  Daniel D. Maynard, No. 009211
2  **MAYNARD CRONIN ERICKSON**
   **CURRAN & REITER, P.L.C.**
3  3200 North Central Avenue, Suite 1800
   Phoenix, Arizona 85012
4  (602) 279-8500
5  dmaynard@mmcec.com

6  Daniel R. Drake, No. 003781
7  **DRAKE LAW, PLC**
   4340 East Indian School Road, Suite 21-113
8  Phoenix, Arizona 85018
   (602) 881-5341
9  drakelawplc@gmail.com
10
   Attorneys for Defendant
11
                    **UNITED STATES DISTRICT COURT**
12
                         **DISTRICT OF ARIZONA**
13
14  United States of America,
                                        2:15-cr-00707-SRB
15              Plaintiff,
                                        **DECLARATION OF DANIEL**
16        v.                            **D. MAYNARD**
17  Abdul Malik Abdul Kareem,
18              Defendant.

19        Daniel D. Maynard, pursuant to 28 U.S.C. §1746, hereby affirms under penalty
20
   of perjury:
21
22        1.    I was the trial attorney for the Defendant Abdul Malik Abdul Kareem
23  ("Kareem") in the above-captioned case and am co-counsel on his appeals to the United
24  States Court of Appeals for the Ninth Circuit, C.A. No. 17-10067 and C.A. No. 17-
25  10118.  I make this Declaration in support of Abdul Malik Abdul Kareem's Addendum
26
27  to Supplemental Motion for a New Trial – Newly Discovered Evidence – Government
28

                                        1

1    Misconduct.

2         2.      On March 15, 2019, three years after the completion of Kareem's trial, the

3    Government disclosed for the first time that it had placed a pole camera outside the

4
5    entrance of Elton Simpson's ("Simpson") and Nadir Soofi's ("Soofi") apartment on or

6    about May 1, 2015 and that it had copies Saabir Nurse's iPhone and passport on

7    September 26, 2015.  (Exhibit 1)

8         3.      The video from the pole camera discloses the comings and goings of
9
10   Simpson, Soofi, and Ali Soofi ("Ali") on May 1, 2015.  (The video was provided in an

11   external hard drive which is not being filed with this motion but can be provided to the

12   court).

13        4.      Attached as Exhibit 2 is a synopsis prepared by Declarant and his staff of
14
15   what is seen on the video provided by the Government on March 15, 2019 along with

16   certain stills that Declarant has extracted from the video.  The camera starts out looking

17   at upstairs apartment #34 and then moves to the parking lot and rooftops and at 2:02
18
19   p.m., it moves to the sidewalk entry to the apartment.

20        5.      Exhibit 2A is believed to be a photo of Soofi as he returns from Friday

21   services on May 1, 2015 at 2:08 p.m.

22        6.      Exhibit 2B is believed to be a photo of Simpson as he returns from Friday
23
24   services at 2:08 p.m. on May 1, 2015.

25        7.      Exhibit 2C is believed to be Soofi returning to his apartment on May 1,

26   2015 at 5:57 p.m.

27

28

8.      Exhibits 2D, E and F are believed to be photos of Ali Soofi carrying items out of Simpson and Soofi's apartment on May 1, 2015 between 6:41 p.m. and 6:52 p.m.

9.      At trial, Ali Soofi, the Government's key witness, testified that he was certain he was at Simpson and Nadir Soofi's apartment from 7:30 p.m. until 8:30 p.m. and that he carried out a weight bench and a punching bag.  (Exhibit 3, Ali's Trial Testimony from pp. 1814, 1815)  The video shows Ali arriving before 6:00 p.m. and departing around 7:00 p.m.  I would have used the video to impeach his testimony about his timing at the apartment and the relationship of Kareem to Simpson and Soofi and concerning the Government's arguments that Kareem was the bank roller, trainer and motivator.  Also, it verifies Kareem's testimony that he did not see Simpson and Soofi after Friday services.

10.     This video shows Simpson and Soofi but it does not show Kareem being present.

11.     The video would have been shown to the jury by the defense to show that Kareem was not present when Simpson and Soofi left for their trip to Garland and we would have argued that if Kareem was the bank roller, trainer and motivator, he surely would have been present when they prepared to leave since Ali Soofi testified that in April 2015, Kareem was at the apartment three or four times a week and would spend the night.  (Exhibit 3, Ali's Tr. T. p. 1750)

12.     The late disclosure of the pole camera and video causes the defense to wonder if there were FD 302s or other memos prepared by the FBI prior to the pole camera being installed concerning (a) why it was installed, (b) who authorized its

installation, (c) how often it was viewed by those who installed it, (d) whether the camera feed live video to another location where one could watch it live and was that being done?  It appears the pole camera could be accessed remotely as the point of aim or area of view changes at least three times during the materials provided.  As noted in the July 26, 2018, disclosures, UCA Jane was advising other agents days before the Garland attack that Simpson was of concern when Simpson went dark and broke off communications with Jane.  That should have heightened concerns.  And, when neither Simpson nor Soofi could be seen at their apartment, that should have increased the level of concern.  Perhaps that is what prompted the warning to Texas authorities before the contest; the warning whose existence has been admitted but the warning document never produced.  There is no explanation why the pole camera and its contents were not disclosed to the defense.  Certainly, Agent Whitson had to know of its existence and if Kareem had been there on May 1, 2015, I am sure it would have been disclosed and played to the jury.

13.     On March 15, 2019, the Government disclosed for the first time that on May 28, 2015, Nurse was referred to an outbound inspection by Customs and Border Protection ("CBP") at George Bush International Airport ("IAH") in Houston, Texas.  (Exhibit 4)  The FBI had this information along with Nurse's SIM card call logs and SIM card contacts as of June 1, 2015.

14.     Exhibit 4 shows that the Customs and Border Patrol ("CBP") downloaded Nurses, iPhone on September 26, 2015 at the George Bush International Airport ("IAH") when he passed through customs returning from a trip to visit his father in

Trinidad and Tobago.  (Exhibit 5, pp. 1, 2)  The download captured Nurse's iPhone reports, call logs, contact information and this is disclosed on a FBI electronic communication report dated September 29, 2015.

15.    Nurse's passport, Exhibit 6, discloses that Nurse made several trips to Saudi Arabia for the Haj including the latest on September 9, 2014.  Along with numerous other trips abroad thus showing the strength of his religious beliefs and his access to funds that permitted him to travel abroad.

16.    The download of Nurse's iPhone discloses a connection between Nurse, Simpson, Yayah, and Bell.  There were numerous communications between Simpson and Nurse in May 2015 before the Garland attack and between Bell and Nurse after the Garland incident.  Nurse only called Kareem after Simpson was killed and only on May 7 and 9.

17.    Kareem's defense team contacted Nurse before the trial but he refused to meet or discuss the case thus causing the defense to be concerned about calling him as a witness even though he had been listed on the Government's witness list then removed.

18.    During the defense's investigation, we determined that Simpson had given Nurse the title to his car and a note from Simpson to Nurse was found in Simpson's apartment and was electrostatically enhanced by the FBI.  The note indicated that Nurse had provided money to Simpson for some type of illicit activity and Simpson was paying him back by giving Nurse his car.

19.    During the trial, Ali Soofi testified that his brother, Soofi, had someone who was funding him.  (Exhibit 3, Trial T. p. 1836)  Ali Soofi also testified that his

brother told him he was going out of town on business trip, but that makes no sense as Soofi's employment was in carpet cleaning and Simpson and Soofi were moving lots of materials to their car.  The Government argued that Kareem was the funding source and the defense argued that it was Nurse.

20.      On cross-examination at trial, Agent Whitson was asked what steps he took to further investigate who received the title to Simpson's car.  Agent Whitson testified that he called a meeting with various other agents who were handling other aspects of the investigation and asked if the note from Simpson meant anything to them and collected information in that sense.  (Exhibit 3, Tr. T. 1917)

21.      It was later established that Nurse was given the registration to Simpson's car and that Nurse gave the car registration to Simpson's father.

22.      The defense did not subpoena Nurse to testify because it was not sure what he was going to say and we did not have the information that we now have.

23.      Had the defense had this information prior to trial, it would have called Nurse as a witness. First, Nurse's phone records show that Nurse had a close connection to Simpson, that upon learning of Simpson's death, he did not contact Kareem but rather was contacting Yayah and Bell.  Also, with this new information, I would have investigated Bell more and it would have given the defense contact information on Yayah.  Kareem did not know Yayah's real name and had no contact information for him.  Kareem believed that Yayah was someone that Simpson visited in Scottsdale, Arizona to Skype the Jamaican Salafi Cleric, Sheikh Faisal.  Clearly, if had we had this information prior to the trial, I would have changed my trial strategy concerning certain

witnesses to be called. I would have called Nurse and Sabari and investigated Bell further. I believe I could have established that Nurse was the bank roller and that Simpson Skyped with the radical cleric Sheikh Faisal through Sabari. We were never able to contact Sabari but once we knew his name, we would have called him as a witness concerning he and Simpson Skyping and Kareem not participating.

24.     Also, based on all of the recently disclosed information, the defense would have called Steven Jane ("UCA"), the undercover FBI agent who witnessed the attack in Garland, Texas and communicated with Simpson before the attack.

25.     It is believed that the UCA's communications with Simpson may have caused the FBI to place the pole camera outside Simpson and Soofi's apartment but we have not been given that information.

26.     Had all of this information been disclosed, it would have impacted the defense's trial preparation and strategy and we would have called the UCA, Nurse and Sabari and probably Bell.

27.     This recently disclosed information was material to Kareem's defense.

28.     Also, this information would have strengthen the defense's argument that Nurse was the funding source that Soofi told Ali Soofi about and was consistent with Simpson giving Nurse the title to his car.

DATED this 26th day of April, 2019.

Daniel D. Maynard

# EXHIBIT 1



**U.S. Department of Justice**

United States Attorney
District of Arizona

| | | |
|---|---|---|
| Two Renaissance Square | Main: | (602) 514-7500 |
| 40 N. Central Ave., Suite 1800 | Main Office Fax: | (602) 514-7693 |
| Phoenix, AZ 85004-4408 | | |

March 15, 2019

Daniel Maynard
3200 N. Central Ave., Suite 1800
Phoenix, AZ 85012

Daniel Drake
4340 E. Indian School Rd., Ste. 21-113
Phoenix, AZ 85018

Re:   *United States v. Abdul Malik Abdul Kareem*, CR15-00707-PHX-SRB

Dear Mr. Maynard and Mr. Drake:

Please find enclosed one (1) compact disc, Bates-stamped # 000914, containing the results and reports of an extraction by U.S. Customs and Border Protection of a mobile phone belonging to Saabir Nurse on September 26, 2015. In addition, enclosed is one (1) computer hard drive, Bates-stamped # 000915, containing pole camera video (no audio) footage recorded at the Simpson/Soofi apartment from May 1-3, 2015. Finally, with this letter, we are re-disclosing Exhibits 52 and 53 from the trial of Erick Jamal Hendricks Bates-stamped as #000899-000913. Those exhibits previously were disclosed via email.

As with the other post-trial disclosures we have made in the case, we do not believe these items to be relevant and material to the prosecution of Mr. Kareem, but are disclosing them in an abundance of caution.

Sincerely,

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/ Joseph Koehler*

JOSEPH KOEHLER
Assistant United States Attorney

JK/nh

# EXHIBIT 2

Camera 2 (5/1/15) 1:26:40

Camera starts out looking at upstairs apt. (#34) and then moves to parking lot and roof tops. At 2:02 pm, it moves to the sidewalk entry to the apt.

| | |
|---|---|
| 2:08:21 | Two men arrive (Soofi & Simpson?) |
| 2:26:23 | Two men leave |
| 3:02:19 | Person on phone passes by |
| 4:02:22 | Man with sunglasses passes by |
| 4:27:24 | Man returns (Simpson?) |
| 4:40:39 | Man passes (only shows part of him) |
| 4:46:24 | Woman arrives with what looks like take out food |
| 4:52:27 | Man passes |
| 5:01:55 | Woman leaves with bag |
| 5:02:52 | Woman comes with bag |
| 5:57:45 | Man comes (Soofi?) |
| 6:00:59 | Man leaves |
| 6:01:34 | Man returns with bag |
| 6:30:17 | Man comes (Soofi?) |
| 6:41:16 | Man leaves with suitcase and garbage bag |
| 6:42:06 | Man returns |
| 6:43:38 | Man leaves with items (too blurry to tell what they are) |
| 6:44:32 | Man returns |
| 6:52:11 | Man comes |
| 6:56:07 | Man leaves with clothes |
| 6:56:15 | Man comes |
| 6:56:24 | Security patrol man |
| 7:04:42 | Man leaves carrying boots |
| 7:08:38 | Lady, man & dog appear |
| 7:10:36 | " |
| 7:14:33 | " (another lady has joined them to smoke and talk) |
| 8:38:28 | Man and woman pass with garbage or laundry bag |
| 9:43:00 | Man leaves |
| 9:45:53 | Man comes |
| 9:47:20 | Man returns |
| 9:49:43 | Man leaves with bag |
| 9:50:19 | Man comes |
| 9:52:09 | Man comes |
| 9:54:54 | Two men leave with bags |
| 9:56:17 | Man comes |
| 9:58:05 | Man leaves |

# EXHIBIT 2A

# XProtect Smart Client Surveillance Report

**Surveillance Report**



| Camera name: | Camera 2 |
|---|---|
| Image capture time: | Friday, May 01, 2015 2:08:18 PM |
| Report print time: | Wednesday, April 10, 2019 4:45:33 PM |
| User: | |
| User's note: | |

# EXHIBIT 2B

# XProtect Smart Client Surveillance Report



| Camera name: | Camera 2 |
|---|---|
| Image capture time: | Friday, May 01, 2015 2:08:30 PM |
| Report print time: | Wednesday, April 10, 2019 4:47:07 PM |
| User: | |
| User's note: | |

# EXHIBIT 2C

# XProtect Smart Client Surveillance Report



| Surveillance Report | |
| --- | --- |
| Camera name: | Camera 2 |
| Image capture time: | Friday, May 01, 2015 5:57:47 PM |
| Report print time: | Wednesday, April 10, 2019 5:04:15 PM |
| User: | |
| User's note: | |

# EXHIBIT 2D

# XProtect Smart Client Surveillance Report

**Surveillance Report**



| Camera name: | Camera 2 |
|---|---|
| Image capture time: | Friday, May 01, 2015 6:41:16 PM |
| Report print time: | Wednesday, April 10, 2019 5:07:41 PM |
| User: | |
| User's note: | |

# EXHIBIT 2E

# XProtect Smart Client Surveillance Report

**Surveillance Report**



| | |
|---|---|
| **Camera name:** | Camera 2 |
| **Image capture time:** | Friday, May 01, 2015 6:43:38 PM |
| **Report print time:** | Wednesday, April 10, 2019 5:09:22 PM |
| **User:** | |
| **User's note:** | |

# EXHIBIT 2F

# XProtect Smart Client Surveillance Report

**Surveillance Report**



| Camera name: | Camera 2 |
|---|---|
| Image capture time: | Friday, May 01, 2015 6:52:11 PM |
| Report print time: | Wednesday, April 10, 2019 5:11:18 PM |
| User: | |
| User's note: | |

# EXHIBIT 3

1  A    At first it was on occasion, but as time progressed he was

2  there more often.

3  Q    Describe what you mean as "there more often."  How

4  frequently?

5  A    I would say it went from maybe once or twice a week to

6  three to four times a week.

7  Q    And when Malik was at the apartment, were there ever times

8  that he would sleep over?

9  A    Yes.

10  Q    How often would that happen?

11  A    Just like at the start it was, you know, here and there.

12  It was every once in a while.  But, I mean, towards the end it

13  was more often.  I would say maybe three times a week or more.

14  Q    Okay.  Who was Malik closest to in the house?

15  A    Ibrahim.

16  Q    And were there any other people other than Malik who came

17  to the house as much as he did?

18  A    There was another man named AK.  He would occasionally

19  come to the house but not as much.  He was more -- he had a

20  larger family, so he would spend more time, you know, with the

21  family but he would on occasion come over.

22  Q    So was there any other visitor who was there as much as

23  Malik?

24  A    No.

25  Q    When Malik was in the house, you had mentioned three to

1  himself, but he --

2  Q   He didn't pick them up?

3  A   No.

4  Q   And on that day it seemed he was adamant on the March or

5  on May 1st that you come to the house to see him or ostensibly

6  to bring the shoes back?

7  A   Yes.  And to give him the apartment key, because he said

8  there was no point of having the key if I'm not living there.

9  Q   And so it was at that point that you then cleaned out all

10  of your stuff, correct?

11  A   Well, prior to that I had taken my clothes out but --

12  Q   But you had athletic equipment, weight equipment, things

13  of that nature that had not been taken out?

14  A   No.  The heavy, big stuff I needed a truck to get that

15  out.

16  Q   And that's the day you got it.  Was it in the evening of

17  May 1st?

18  A   It was 7:30.  I remember the exact time.  I was there

19  from -- because I remember I had got into an argument with my

20  girlfriend because she didn't want me to leave and go to the

21  apartment.  But I left anyway and I was there from 7:30 to

22  8:30.

23  Q   Your girlfriend wasn't welcome in the apartment, was she?

24  A   No, not at all.

25  Q   You go over to see your brother.  Simpson is there,

1    correct?

2    A    Yes.

3    Q    They seem to be in a jolly mood?

4    A    Yes.

5    Q    And your brother tells you you can actually take some of

6    his athletic equipment, his weights?

7    A    They were all mine.  I had made a collection over time.

8    In his room I had, you know, like a punching bag and weight

9    bench and all that stuff and all my weights.

10           But at that time too it kind of struck me funny

11   because he was, you know, asking me if I wanted to take

12   anything else.

13   Q    Okay.  You mentioned you had a punching bag and other

14   things.  Do you have any -- you've studied martial arts?

15   A    Yes.  I study mixed martial arts.

16   Q    Do you study jujitsu?

17   A    It's a -- I do a mix between muay Thai and jujitsu.

18   Q    Muay Thai is a Thai form of boxing?

19   A    It's more of like a kickboxing form.

20   Q    Okay.  And so you saw your brother that night.  You saw

21   Simpson that night.  You told them good-bye, correct?

22   A    Yes.

23   Q    And your brother advised you to remember what he had told

24   you about Islam?

25   A    He told me to remember the teaching of Islam.  If I have

CR15-00707-PHX-SRB    JURY TRIAL-DAY #10   3-2-16

1    BY MR. MAYNARD:

2    Q   Answer:  I mean --

3          Mr. Soofi:  Answer:  I mean, when my brother kicked

4    me out, he said that he did not have anybody that would fund

5    him.  And then you go on to some more explanation.

6          Do you recall giving that answer to that question at

7    that time?

8    A   No.

9    Q   Okay.

10          MS. BROOK:  And, Your Honor, defense counsel just

11    misread the transcript on that last question.

12          MR. MAYNARD:  If I did, I apologize.

13          MS. BROOK:  He said he did have somebody that funded

14    them.

15          MR. MAYNARD:  Where would you like me to read?

16          THE COURT:  You said he said that he did not have

17    somebody that would fund him.  And it says that he said that

18    he did have somebody that would fund him.

19          MR. MAYNARD:  Oh.  I'm sorry.

20    BY MR. MAYNARD:

21    Q   Your brother indicated he had somebody who would fund him?

22    A   Yes.

23    Q   You have to say "yes" or "no."

24    A   Yes.

25    Q   And the FBI asked you who you thought that was, correct?

UNITED STATES DISTRICT COURT

1   individual?

2   A    Yes.

3   Q    But you as the case agent don't know who that is?

4   A    I don't know with certainty, but I have an idea.

5   Q    Okay.  It wasn't given to my client, was it?

6   A    No.

7            THE COURT:  I take it since we're reading this

8   indented writing that you never found the original note?

9            THE WITNESS:  That's correct, Your Honor.

10           MR. MAYNARD:  Sorry, Judge.  I've got a mess.

11           May I approach?

12           THE COURT:  Yes.

13   BY MR. MAYNARD:

14   Q    Agent Whitson, before we get to 555 and 556 and 557, after

15   obtaining that notebook we just looked at, what steps did you

16   do to further investigate who had received the car from

17   Mr. Simpson?

18   A    I -- it was -- as soon as I saw that information I called

19   a meeting with various other agents in the office who were

20   handling different aspects of the branching investigations

21   that came off of this main one and then asked if this meant

22   anything to them and then collected information in that sense.

23   Q    Okay.  And did you go out and interview anybody?

24   A    I did not go out and interview.

25   Q    And although you said you've speculated who got it, you

# EXHIBIT 4

FD-1057 (Rev. 5-8-10)





# FEDERAL BUREAU OF INVESTIGATION
## Electronic Communication

**Title:** ▮▮ Saabir NURSE's customs outbound inspection.          **Date:** 06/01/2015

**CC:** ▮▮▮▮▮▮▮▮

**From:** HOUSTON
          Contact: ▮▮▮▮▮▮▮▮ong

**Approved By:** ▮▮▮▮▮▮▮▮

**Drafted By:** ▮▮▮▮▮▮▮ong

**Case ID #:** ▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮

**Synopsis:** ▮▮ To document information received from Customs and Border Protection (CBP) regarding outbound inspection of Saabir NURSE at George Bush Intercontinental Airport (IAH), Houston, TX.



**Full Investigation Initiated:** ▮▮▮▮▮

**Administrative Notes:** ▮▮ Be advised that information received from CBP is for intelligence purposes only and not to be disseminated without prior approval from CBP.

**Enclosure(s):** Enclosed are the following items:
1. ▮ NURSE's IOIL
2. ▮ NURSE's SIM card report
3. ▮ NURSE's SIM card call logs
4. ▮ NURSE's SIM card contacts
5. ▮ NURSE's SIM card SMS



KAREEM SUPPLEMENTAL DISCLOSURE 000912

Title: ███ Saabir NURSE's customs outbound inspection.
Re: ████████████, 06/01/2015

Details:

███ On May 28, 2015, Saabir NURSE, DOB ████/1983, was referred for a Customs outbound inspection. During the inspection, NURSE stated that he was traveling to Trinidad for two weeks. NURSE was traveling with his wife, ████████ (DOB ████/1987, US PP#████████96). NURSE was in possession of one thousand ($1000) in cash.

◆ ◆

2

# EXHIBIT 5

FD-1057 (Rev. 5-8-10)                                       

# FEDERAL BUREAU OF INVESTIGATION
### Electronic Communication

**Title:** ███████ Saabir NURSE's customs      **Date:** 09/29/2015
inspection at George Bush Intercontinental
Airport (IAH).

**CC:** ████████████

**From:** HOUSTON
        ████████
        **Contact:** ████████████ong

**Approved By:** ████████████

**Drafted By:** ████████████ong

**Case ID #:** ████████        ████████████

**Synopsis:** ████████ To document information received from Customs and
Border Prot█████ BP) regarding Saabir NURSE's inspection at IAH,
Houston TX.

████████████
████████████
████████████

**Full Investigation Initiated:** ████████

**Administrative Notes:** ████ Be advised that information received from
CBP is for intelligence █████rposes only and not to be disseminated
without prior approval from CBP.

**Enclosure(s):** Enclosed are the following items:
1. ████ NURSE's iPhone report
2. ████ NURSE's iPhone call logs
3. ████ NURSE's iPhone contacts
4. ████ NURSE's iPhone images



Title: ██████ Saabir NURSE's customs inspection at George Bush
Intercontinental Airport (IAH).
Re: ██████████, 09/29/2015

5. ██ NURSE's iPhone MSM section
6. ██ NURSE's SIM card report
7. ██ NURSE's SIM call logs
8. ██ NURSE's SIM card contacts
9. ██ NURSE's SIM card SMS
10. ██ NURSE's pocket litter
11. ██ NURSE's IOIL

**Details:**

██ On September 26, 2015, Saabir Aaquil NURSE, a US citizen, DOB:
██/1983, US PP# ██████86, Arizona DL ██████42, arrived at IAH
on board United Airlines flight #1459 from Port of Spain,
Trinidad and Tobago. NURSE was referred for a customs secondary
inspection.

██ NURSE was returning from a 2 and a half week (September 9 to
26) trip to Trinidad and Tobago where visited his father in Red
Hill, Dabadie. NURSE visited his father to celebrate the Eid
marking the end of the Hajj. In the past, NURSE visited his
father about once a year and has done so since he became a US
citizen in about 2006. Due to his father's health he will visit
twice a year. NURSE stayed at his father's home and only left
when he went to the airport this morning.

██ NURSE lives and works in Glendale, AZ as a dental assistant
for the past 10 years. NURSE has lived in the greater Phoenix
area since he moved to the US with his mother when he was a small
child. NURSE attended Apollo College located at 27th and Dunlap in
Phoenix, AZ. NURSE has two addresses: ██████████
Glendale, AZ ████, which appears on his AZ Driver's License and
an address which he wrote on his CBP Form 6059b (Customs
Declarations form) ██████████ Phoenix, AZ ████. NURSE

2



Title: ███████ Saabir NURSE's customs inspection at George Bush Intercontinental Airport (IAH).
Re: ██████████, 09/29/2015

stated that he is planning to move out of the Phoenix House and move back home with his mother in Glendale due to scorpion infestation in his home.

██ When asked about his travels, NURSE stated that he currently has no planned to travel anytime in the future. In 2014, NURSE did traveled to attend Hajj. NURSE stated that it was his second time to go on Hajj. When asked if he attended any celebrations for Hajj while in Trinidad Tobago, NURSE stated they had a celebration and prayer but none of the rituals associated with Hajj.

██ An examination of NURSE's belongings was conducted in secondary with negative results.

██ Additionally, CBP advised that a drone was found in NURSE's checked bag during NURSE's outbound inspection on September 9, 2015.

◆ ◆



3

# EXHIBIT 6

KAREEM SUPPLEMENTAL DISCLOSURE 000902





KAREEM SUPPLEMENTAL DISCLOSURE 000903



KAREEM SUPPLEMENTAL DISCLOSURE 000904



KAREEM SUPPLEMENTAL DISCLOSURE 000905



KAREEM SUPPLEMENTAL DISCLOSURE  000906





KAREEM SUPPLEMENTAL DISCLOSURE 000907