MICHAEL BAILEY
United States Attorney
District of Arizona

KRISTEN BROOK
Arizona State Bar No. 023121
JOSEPH E. KOEHLER
Arizona State Bar No. 013288
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone:  602-514-7500
Email: kristen.brook@usdoj.gov
Email: joe.koehler@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          v.<br><br>Abdul Malik Abdul Kareem,<br><br>                    Defendant. | No. CR-15-00707-01-PHX-SRB<br><br>**RESPONSE TO DEFENDANT'S SUPPLEMENTAL MOTION FOR NEW TRIAL** |

The Court should deny Kareem's Supplemental Motion for New Trial (CR 505, 541) and allow the pending appeal to proceed.  Kareem's motion refers to three categories of what he claims is new evidence:  (A) transcripts from the 2018 trial of Eric Hendricks, including the prosecutor's opening statement and testimony of an FBI undercover employee (UCE); (B) pole camera footage capturing a common area of the apartment complex at which Elton Simpson and Nadir Soofi lived; and (C) information obtained during Customs inspections of Saabir Nurse.  None of this is a basis for a new trial here.

The Hendricks trial, which occurred two years after the 2016 trial in this case, is not *Brady* material.  The prosecutor's opening statement is not evidence, and transcripts of the UCE's testimony add nothing new and do not conflict with the case presented at Kareem's

trial. The same is true of the pole camera footage and the information resulting from Saabir Nurse's out-bound and in-bound Customs inspections in 2015. The information is neither exculpatory nor material to the charges in this case, and it does not conflict with the strong evidence that demonstrated Kareem's participation in the conspiracies. In short, it does not meet the high bar to undermine confidence in the verdict. Thus, Defendant's motion should be denied.

## I. Brief Background

The facts of the case are lengthy and set forth in detail in the government's Response to Kareem's Motion for New Trial and Motion for Judgment of Acquittal (CR 324), its Response to Kareem's Supplemental Brief in Support of Motion for New Trial (CR 441), and the Court's Order denying the motions (CR 469). Thus, we will only briefly restate here a few pertinent background facts.

The material support conspiracy charged in Count Five began in or around June 2014. Similarly, the conspiracy to transport firearms in interstate commerce charged in Count One began in or around January 2015. During Kareem's trial, the testimony of Sergio Martinez, Ali Soofi, Stephan Verdugo, and juvenile witnesses Carlos and Juan, as well as that of various other witnesses, all established conspiratorial acts of Kareem, Simpson and Soofi that occurred well before the UCE made contact with Simpson online. Specifically, all of Kareem's conspiratorial acts with Elton Simpson and Nadir Soofi began, and were complete, well before the FBI Undercover Employee (UCE) first made online contact with Simpson on April 23, 2015.

No evidence shows Hendricks was engaged in any form of communication with Elton Simpson on May 3, 2015. The phones recovered at the Garland attack scene, the content of which was disclosed before trial, did not contain any communications between Simpson and Hendricks, and agents involved in the Hendricks investigation recovered no evidence from Hendricks showing communications with Simpson. Hendricks declared he was not in contact with Simpson at the time, and the messages show Simpson had dropped

his account through which the UCE communicated with him and Hendricks had dropped his account as well.[1]  (CR 441-1 at 190-91, 222.)

Meanwhile, the government introduced evidence at trial showing Simpson conspired with others in addition to Soofi and Kareem, including Mujahid Miski and Junaid Hussain, to commit attacks in the United States for ISIS.  (*See* Tr. Exh. 157, 480.)  In addition, the government disclosed results from grand jury subpoenas served on Surespot on October 13, 2015 (Bates # 436).   On January 29, 2016, the government disclosed a report (Bates # 1887-1894) analyzing those returns, in which the author noted Simpson engaged in at least 209 Surespot communications with Miski leading up to the attack, with at least 103 messages being exchanged on the day of the attack, May 3, 2015.   The government could not recover the content of these encrypted messages.   Simpson's association with Miski was public knowledge shortly after the attacks.  *See* https://www.counterextremism.com/extremists/elton-simpson.

Nothing about the UCE's presence in Garland or his communications with Simpson and Hendricks has anything to do with Kareem's, Simpson's, and Nadir Soofi's activities months earlier.  In the Hendricks trial, the UCE testified that his purpose in traveling to Garland on May 3, 2015, was "to be able to demonstrate to [Hendricks] that I was following his guidance."  He said his "goal was to go there, observe the event, take pictures, and so when I later met him face-to-face, I could pull up my phone and say, 'Look it. I was there.'" He did so in order to be able to "tell him that I went to execute this solid one-man protest" and he "had planned to use a security reason to say that it was not suitable for me to execute the task."  (Exh. 2 at 6-7, Hendricks RT 3/9/18 at 1001-02).

## II.    Applicable Law

Pursuant to the Supreme Court's holding in *Brady v. Maryland,* 373 U.S. 83, 87 (1963), prosecutors are constitutionally obligated to disclose evidence favorable to an

---

[1] Hendricks also advised the UCE to delete his account through which he had communicated with Simpson.  (CR 441-1 at 174.)

accused that is material either to guilt or to punishment. *Kyles v. Whitley,* 514 U.S. 419,432 (1995); *Jones v. Ryan,* 733 F.3d 825, 837 (9th Cir. 2013).

To establish a *Brady* violation, a Defendant must show three elements: (1) the information at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the information must have been suppressed by the [government], either willfully or inadvertently; and (3) the information was material, meaning there is a reasonable probability that the result of the proceedings would have been different. *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013). *United States v. Kohring*, 637 F.3d 895, 902-903 (9th Cir. 2011) (citation and internal quotation marks and alterations omitted).

Evidence is "favorable to the accused" for *Brady* purposes if it is either exculpatory or impeaching. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). "If information would be 'advantageous' to the defendant or 'would tend to call the government's case into doubt,' it is favorable." *Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) (quoting *Banks v. Dretke*, 540 U.S. 668, 691 (2004) and *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013)) (internal citations omitted). Materiality is determined by weighing several factors, including the importance of the witness, the significance of the evidence, and the strength of the prosecution's case. *Kyles*, 514 U.S. at 436-37.

To establish materiality, a defendant needs to establish "a 'reasonable probability' of a different result." *Id.* at 434; *United States v. Agurs*, 427 U.S. 97, 109-110 (1976) (quoting *United States v. Bagley*, 473 U.S. 667, 678)); *see also Sedaghaty,* 728 F.3d at 900 ("In evaluating materiality, we focus on whether the withholding of the evidence undermines our trust in the fairness of the trial and the resulting verdict."). The mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial does not establish "materiality" in the constitutional sense. *Agurs*, 427 U.S. at 109-110. *See also Cone v. Bell*, 556 U.S. 449, 469-70 (2009) (evidence is material when there is "a reasonable probability that, had the evidence been

1  disclosed, the result of the proceeding would have been different") (citing *Bagley*, 473 at

2  682).

3          Finally, the rule of *Brady* applies only to information "unknown to the defense."

4  *Agurs*, 427 U.S. at 103.

5  **III.    No *Brady* Violation Occurred**

6          In his motion, Kareem argues about three main subjects.  The first involves the

7  March 2018 trial of Erick Jamal Hendricks in Cleveland, Ohio.  Defendant claims the

8  prosecutor's opening statement concerning the connection between Hendricks and the

9  attack on the Muhammad Art Exhibit and Contest in Garland, Texas, is newly-discovered

10  evidence.  He makes similar arguments about testimony of the FBI UCE, which Kareem

11  claims showed a connection between Hendricks and the attack, described the FBI's

12  investigative capacity, and implicated Hendricks' level of knowledge.  The second subject

13  is pole camera video footage from the exterior of the Simpson/Soofi apartment on May 1,

14  2015, which Kareem claims would have served to impeach a government witness.  The

15  third is information gleaned from Customs inspections of Saabir Nurse in 2015, which

16  Kareem claims would have helped show Nurse was the person providing funding to

17  Simpson and Soofi for the Garland attack.

18          For the reasons explained below, none of these arguments justifies a new trial.

19          **A.    The Hendricks Trial**

20          With respect to information related to the trial of Erick Jamal Hendricks in the

21  Northern District of Ohio, the government respectfully submits this Supplemental Motion

22  for New Trial is the equivalent of a motion to reconsider, because it does not set forth new

23  evidence that was unavailable at the time Kareem filed his supplemental brief in support

24  of his original motion for new trial.

25

26

27

28

### 1. A Statement Made by an Attorney in Opening Statements is not Evidence, Nor is Any of What Was Said Exculpatory or Newly-Discovered.

First, Kareem claims one of the attorneys representing the United States in a separate prosecution in the Northern District of Ohio made an opening statement on March 8, 2018, that is newly-discovered evidence. Kareem isolates the attorney's statement about Hendricks being "unequivocally tied"[2] to the Garland attack perpetrated by Simpson and Soofi and claims, "[t]his is not what this Court heard previously from the government in Kareem's case." (CR 505 at 3.) However, the prosecutor in the Hendricks trial did not state Hendricks did anything to aid Simpson and Soofi in conducting the attack. Nor did the prosecutor state Hendricks encouraged Simpson and Soofi to conduct the attack.

In fact, the prosecutor expressly disclaimed that Hendricks was involved in planning the attack or participated in the attack: "Now, **this defendant did not plan or participate in this attack**, nor is he on trial for this attack. But the evidence will show that he was unequivocally tied to this attack." (Exh. 1 at 3-4, Hendricks RT 3/8/18 622-23 (emphasis added).) The prosecutor did not state what she meant by "unequivocally tied," but clearly she disclaimed the notion that it meant Hendricks was involved in planning or participating in the attack. The prosecutor's opening statement does not support Kareem's allegation.

Just as importantly, it is settled law that an attorney's opening statement is not evidence. *See* NINTH CIR. MODEL CRIM. JURY INSTR. 1.4 (2010 ed.); *United States v. Ramirez*, 367 F.2d 813 (7th Cir. 1966). No evidence exists to support Kareem's allegation that Hendricks engaged in any form of planning the Garland attack, nor does any evidence exist to show Hendricks aided or assisted Simpson and Soofi in conducting the Garland attack. The only evidence of Hendricks's ties to the attack were his messages to the UCE in which he implied the UCE should attack the contest and should contact "Juda" (a misspelled version of Simpson's "Juba" messaging handle) to see what they could do. None of the evidence in the Hendricks trial showed Hendricks was in contact with Simpson

---

[2] The prosecutor did not use the words "inextricably intertwined," as stated in Kareem's amended Addendum Memorandum (CR 543).

at or near the time of the Garland attack.  The UCE confirmed under oath during the Hendricks trial that he was not in contact with Simpson after April 25, 2015,[3] as previously stated in the UCE's declaration. (Exh. 2 at 3, Hendricks RT 3/9/18 980.)

Kareem also refers to other statements by a prosecutor during opening statement in the Hendricks trial.  Again, opening statements are not evidence.  Even if it were evidence, it would not be newly discovered because the information in each of those statements was part of the original complaint and in the printed screen shots from the UCE's conversations with Simpson and Hendricks.  Specifically, Kareem refers to the prosecutor's statements that (1) Hendricks "was in contact with one of the Garland attackers, Simpson," (2) Hendricks claimed to be in contact with "senior leaders from ISIS," (3) Hendricks told the UCA he "wish[ed] someone could go to Texas and harass them during the night. A good solid protest," and followed up with advice to "See what you and bro Juda [Simpson] can do. At least be heard," (4) Hendricks asked the UCE about weapons, and if he had a weapon that he could use, (5) once Hendricks understood the UCE was in Garland, Hendricks told the UCE that if he saw contest organizer Pam Geller, to "make your voice heard against her," (6) after the attack was foiled, Hendricks, "took credit for the attack in Garland...[and] threatened future attacks in the United States, and (7) Hendricks told a person that he was "friends with the shooters, that one of the shooters was a close brother who left a letter that he wanted published after the attack, and asked that person to post a flyer claiming credit for the attack.  The prosecutor referred to a trial exhibit that "was allegedly that letter."[4] (CR 505 at 4.)

---

[3] The screenshots of the communications reveal the last communications between the UCE and Simpson took place late at night on April 24, 2015, Arizona time. The UCE was in a different time zone and the date in that time zone at that point in time was April 25, 2015.

[4] In his Supplemental Motion, Kareem noted the defense had "not yet seen a copy of the flyer post from Hendricks case, but it may be the very post the government in Kareem's case relied upon for its "material support" charges." (CR 505 at 4.)  The government obtained the exhibits to which Kareem refers in his motion and disclosed them via email on January 25, 2019.  The information about this particular document was set forth in the Hendricks complaint. (CR 448 at 32-33).  Kareem did not make any additional assertions regarding those exhibits in his Addendum to the Supplemental Motion.

All of the information in these statements was contained in the criminal complaint in the Hendricks case, and the majority of it came from the screen shots of communications between the UCE and Simpson and communications between the UCE and Hendricks. (CR 448.)  The government disclosed that complaint on August 4, 2016, and disclosed the screen shots on September 15, 2016.  Kareem made extensive use of those materials in his original Supplement to his Motion for New Trial. This information is not new, and is not a proper basis for the instant Supplemental Motion for New Trial.

## 2. The Testimony by the FBI Undercover Employee (UCE) Does not Contain Relevant or Material Newly-Discovered Evidence.

Kareem also asserts the UCE's testimony in the 2018 Hendricks trial "demonstrates that Hendricks played a significant role" in the Garland attack. (CR 505 at 4.)  Of course, trial testimony in 2018 did not exist at the time of the 2016 trial, and thus it is not something the government could have suppressed in the discovery and trial phases in this case. Further, the substance of the UCE's testimony in the Hendricks trial did not reveal the existence of any new exculpatory materials, nor did it reveal any basis to impeach any witness's testimony or the UCE's declaration in this case.

The UCE's discussions with Hendricks about the Garland contest began at the end of April 2015, well after the UCE and Simpson ceased communication.  Kareem has not pointed to any evidence, in the UCE-Simpson or UCE-Hendricks communications or in the Hendricks trial itself, that would show Hendricks was communicating with Simpson in the same time frame in which Hendricks was communicating with the UCE about the contest.  Indeed, Kareem's claim that Simpson was conspiring with Hendricks does not make any sense in light of Simpson's distrust of Hendricks, an online persona he had just met on approximately April 23, 2015.  The UCE's communications with Simpson similarly do not show any trusted relationship, cooperation, or plan to attack the Garland Contest. Nothing in the UCE's 2018 testimony rises to the level of material exculpatory information.

Kareem's claim also makes no sense in light of the UCE's testimony that he was unarmed and unaware of Simpson's presence at the contest.  The UCE testified, "I had

nothing that would identify me with the FBI, so I had no badge or credentials or weapon or anything that a regular agent would have. I did not." (Exh. 2 at 7, Hendricks RT 3/9/18 at 1002). Kareem also expresses surprise at the UCE's testimony that he did not know whether Simpson and Soofi were in Texas at the time of the attack. (CR 505 at 5-6.) Kareem states the UCE's testimony is surprising because the FBI sent a lookout "warning to federal and local authorities in Texas prior to the attack," arguing the UCE or someone else in the FBI had to have known enough to send the lookout, yet the government has not disclosed exactly what the FBI knew. (CR 505 at 6.)[5] The UCE testified that he did not make contact with Simpson and did not know where Simpson was, and Hendricks did not warn him that Simpson would be present. (Exh. 2 at 7-8, Hendricks RT 3/9/18 at 1002-03; Exh. 3 at 4, Hendricks RT 3/12/18 at 1075).

The news media widely reported the existence of an FBI lookout concerning Simpson, but the lookout about which they reported was not published. *See, e.g.*, Andrew Grossman, *FBI Sent Warning to Police About Elton Simpson Before Cartoon Attack*, Wall St. J., May 7, 2015, *available at* https://www.wsj.com/articles/fbi-sent-warning-to-police-about-elton-simpson-before-cartoon-attack-1431028256 (last visited May 14, 2019). Undersigned counsel have engaged in numerous inquiries with the FBI about the aforementioned lookout/alert since the filing of the instant motion. On May 1, 2019, undersigned counsel received the information that had been sent to the FBI Dallas Field Office on May 3, 2015. The information was a Tactical Intel Report that had been created in March 2015, and simply contained Simpson's photo, his biographical information, and other pertinent information including family members and vehicles associated with Simpson. (Exh. 4, Email and Tactical Intel Report.) It was not a lookout or alert – it was sent in response to a request from the Dallas Field Office, which was tracking numerous

---

[5] Kareem cites to his own counsel's closing argument in support of his claim that the "warning had information concerning the suspects' vehicles and included a picture of Simpson." (CR 505 at 6 (citing RT 3/11/16 at 2801-02).) In response to leading questions on cross-examination, Agent Whitson declared it was his "understanding" that a lookout/alert was sent and it included a picture of Simpson. (RT 3/2/16 1900-01.) Whitson did not testify about the specifics of any alert or even confirm direct knowledge of such an alert, and did not testify about an alert that included information about vehicles. (*Id.*)

other threats to the contest, and was not broadly disseminated. (Exh. 5, Hegwood Declaration.) No other lookout or alert appears to have been sent with respect to Simpson and/or Nadir Soofi.

Kareem's counsel raised the issue of the lookout during closing argument at trial. (RT 3/11/2016 2801-02.) Additionally, Kareem raised the issue of the UCE's denial of specific knowledge of Simpson's and Soofi's presence in Garland, juxtaposed against the alleged existence of the FBI lookout, in his Supplemental Brief in Support of Motion for New Trial (CR 432 at 2, 3, 9). Therefore, this is of no substance and is not newly-discovered information.

Further related to the UCE's testimony, Kareem notes the UCE testified about obtaining supervisory authorization to engage in various steps during his investigation of Hendricks. (CR 505 at 6-7.) The UCE testified about checking in with local agents at the scene and sitting in his car. (Exh. 2 at 9, Hendricks RT 3/9/18 at 1004.). "I had a pretty narrow task to sit in a car in a parking lot and I -- you know, I had some knowledge, but I didn't have intimate knowledge of the FBI's presence physically there. (Exh. 3 at 3, Hendricks RT 3/12/18 at 1072). Kareem claims additional undisclosed reports must exist concerning directions the UCE received directing him to "make contact with Simpson before the attack and his travel and experience while in Garland, Texas . . . ." (CR 505 at 8.) Again, the UCE testified about his reaction to being near the attack, being caught by utter surprise and feeling helpless. (Exh. 2 at 15, Hendricks RT 3/9/18 at 1019.) The notion that an undercover FBI employee would seek and obtain supervisory approval to engage in various investigative steps is neither novel nor surprising and is not new evidence.

Next, Kareem questions the validity of UCE's statement that he did not know Simpson and Soofi would be in Texas. He points to the existence of an FBI lookout for Simpson as evidence to undermine the UCE's statement that he was unaware Simpson and Soofi would be in Garland. The fact that the UCE expressed concern about Simpson based on his prior communications and Hendricks's statements is irrelevant to Kareem's case. Noting the possibility that Simpson might show up in Garland is not remotely equivalent

to actual knowledge of his presence and/or planning to meet with him. The UCE testified that he was not aware Simpson and Soofi were in Garland, and multiple other statements in his testimony and the photos he took support that statement. First, the UCE testified that he was unarmed and powerless to intervene as the attack unfolded. (Hendricks RT 3/9/2018 1002, 1019, *supra*.) "I had no means to physically interdict the shooting. I had no weapon with me. My vehicle was at a point where it was passed [sic] the area of the attack so it wasn't like I could use my forward momentum of the vehicle to, you know, interdict the attackers." (Hendricks RT 3/9/2018 1019). Further, the photographs he took were of the Culwell Center, just as he testified, and not of Simpson and Soofi or their vehicle. (Hendricks RT 3/9/2018 1017; 3/12/2018 1190). The photos themselves depict the Culwell Center entrance from opposite directions, corroborating the UCE's testimony that he drove one direction down Naaman Forest Boulevard and took a picture, then turned around and took a photo while traveling the opposite direction shortly before the attack began. (Exh. 2 at 11-13, Hendricks RT 3/9/2018 1015-17; CR 456 at 3-4.) The notion that an undercover agent would knowingly be in proximity to an impending attack involving high-powered rifles while unarmed simply defies common sense.

Kareem also claims without any supporting evidence that the FBI targeted him because it was embarrassed by its failure to prevent the attack in light of the information it possessed. The notion that the FBI targeted Kareem alone for prosecution after the attack is factually inaccurate as well as legally irrelevant.

The FBI conducted a very broad investigation in the wake of the attack. The government disclosed search warrants and results for other individuals who were under investigation in the wake of the attack on a 1TB hard drive, Bates # 436 (10/13/15). Moreover, the FBI continued to investigate the possibility of involvement of other persons even after charges were filed in this case. For instance, in the October 16, 2015, interview of Robert Abke, disclosed at Bates # 1697-1699 (January 29, 2016), agents showed Abke photos of Simpson, Nadir Soofi, Kareem and six other people, including Nurse and Sabari.

The attack made it obvious that the FBI missed signs of Simpson becoming "operational" as opposed to someone merely exercising his right to free speech. Pointing blame in hindsight, however, does nothing to undermine the testimony of witnesses with personal knowledge of Kareem's words and deeds. It does nothing to undermine corroborating evidence, including the fact that Kareem possessed ammunition matching that found at the Garland crime scene, the existence of computer records corroborating A.S.'s testimony, and computer records demonstrating that Kareem lied during his testimony. The argument fails legally because the proof at trial established Kareem's guilt beyond a reasonable doubt, and mere allegations concerning the adequacy of the investigation or the agents' motives for investigating are irrelevant to analyzing the strength of the evidence itself. *See U.S. v. Patrick*, 248 F.3d 11, 21 (1st Cir. 2001) ("speculative evidence of the inadequacy of the police investigation would have shifted the jury's focus from the accusations against [defendant] to accusations against the police, thus creating a real danger of unfair prejudice and jury confusion that "substantially outweighed" the evidence's probative value"). *See also Wren v. United States*, 517 U.S. 806, 813 (1996) (police officers' "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

### 3. The FBI's Investigative Capacity is Neither Material nor Newly-Discovered Evidence.

Kareem also claims the UCE's testimony "suggests the FBI has a robust and sophisticated investigative capacity, capable of establishing involvement if one were indeed involved or evidencing lack of involvement." (CR 505 at 5.) Kareem argues that the evidence in the Hendricks trial "revealed common practices, such as encrypted conversations, shifting user names, and other tactics common to jihadis" and notes the evidence did not show Kareem engaged in any such activities.[6] (CR 505 at 10.)

This information is not new – it was apparent throughout the UCE's communications with Hendricks (during which Hendricks changed user names multiple times), which were the subject of Kareem's supplement to his motion for new trial. (CR

---

[6] In his argument on this point, Kareem claims "[t]here was no discovery produced by the government in Kareem's case that the government knew Simpson was communicating as "Juba." CR 505 at 13. This claim is untrue – the government disclosed grand jury subpoena returns for Simpson's Surespot accounts, including his Juba2, Juba1911 and Juba8021 handles, and search warrant results for his Juba1911 handle (No. 15-8231MB). Likewise, the government disclosed all of Simpson's Twitter records, including those under his @tawaakul handle. All of these materials were in the hard drive marked Bates number 436, disclosed on October 13, 2015.

432, 441-1.)  Additionally, the communications with the UCE would not have operated to exculpate Kareem given the timing and nature of his role in the conspiracy.  The government never asserted that Kareem had an online presence, for recruitment or otherwise, in furtherance of the conspiracy. Rather, the government introduced evidence showing Simpson acted as the conduit between the conspirators and other ISIS supporters and posted public messages on Twitter about the contest.  Thus, the absence of any reference to Kareem in the UCE's communications about the investigation is unsurprising given the fact that the UCE engaged only in written online communications during the investigation.  None of this is a basis for a new trial.

### 4. The UCE's Testimony did not Suggest Hendricks Knew More About the Attack than Kareem, and is not Newly-Discovered Evidence on this Point.

Kareem claims the UCE's conversations with Hendricks suggest "Hendricks knew more about the attack than Kareem" because Hendricks knew "Simpson was going to Garland, Texas, with another 'brother'" and "thought the [UCE] had been one of the attackers."  (CR 505 at 6.)

This contention is not new and was the subject of Kareem's Supplemental Brief in support of his original Motion for New Trial.  There is no basis for relitigating the same arguments.  Again, this contention is wrong and not supported by the evidence.  The communications between the UCE and Simpson and the UCE and Hendricks were not *Brady* material because they were not favorable to Kareem, either as exculpatory material or impeachment evidence.  Hendricks told the UCE to act alone in the form of a "one-man protest."  (Exh. 2 at 4-5, Hendricks RT 3/9/18 996-97; Exh. 3 at 5, Hendricks RT 3/12/18 at 1083.)  Hendricks also was so unaware of Simpson's and Soofi's attack plans that Hendricks mistakenly thought the UCE attacked the contest and died.  (Exh. 2 at 16-17, Hendricks RT 3/9/18 at 1025-26.)  The written communications have no significance to the prosecution of Kareem or Kareem's involvement in the conspiracies for which he was charged, and likewise are not favorable to Kareem or impeachment evidence.  The

communications speak for themselves and tell the whole story of the relationship, or lack thereof, between the parties.

As this Court found, "[t]he Government's disclosure does not create any nexus between the undercover agent's investigation and Defendant. The disclosure does not call into question Defendant's involvement in watching videos with Soofi and Simpson, taking Simpson and Soofi shooting, or supplying Simpson and Soofi with firearms. Therefore, the disclosure is not exculpatory or material to his defense." (CR. 469 at 9, Amended Order.) For that same reason, his argument is unavailing here.

**B.    The Pole Camera Footage Adds Nothing to the Case**

In his addendum to his supplemental motion for new trial (CR 543), Kareem asserts additional arguments related to disclosure the government provided on March 15, 2019, which included video footage from a pole camera that was visually recording activities in a common area of the Simpson/Soofi apartment on and after May 1, 2015.[7] Undersigned counsel became aware of the video in 2019, well after the trial, and disclosed it simply because it captured images of Simpson and Nadir Soofi on May 1, 2015. The video is not relevant to any defense or probative of any fact at issue in this case.

The video from the pole camera is unremarkable and does not include audio. It does not show the actual door to the apartment, but rather a common portal shared with other apartments. As a result, numerous other individuals unrelated to the case appear in the video. There is nothing in that footage that is material to the case or that could have had any effect on the outcome of trial.

Kareem contends the pole camera video would have enabled him to impeach trial witness A.S. He claims the video contradicts A.S.'s testimony on two points: First, that

---

[7]    In his declaration in support of the Addendum to the Supplemental Motion for New Trial, defense counsel states, "It is believed that the UCA's communications with Simpson may have caused the FBI to place the pole camera outside Simpson's and Soofi's apartment but we have not been given that information." (CR 543-1 ¶ 25.) The pole camera was requested and authorized on April 9, 2015, before the date of the UCE's first communications with Simpson. (Exh. 6, Report of FBI S/A Ryan Mullen.) Therefore, the UCE-Simpson communications could not have been the basis for the pole camera authorization.

- 14 -

A.S. visited the apartment approximately one hour earlier than he stated in his testimony. Second, that A.S. did not carry out a punching bag and weight bench as he stated during his testimony.

On the first point, A.S. testified to his recollection of having visited the apartment from 7:30 to 8:30 p.m. on May 1, 2015. The video timestamp shows he arrived at approximately 6:30 p.m. and departed at approximately 7:05 p.m. That is not a material difference, in part because neither Simpson nor Soofi appeared in the video during that time window.

On the second point, Kareem is incorrect in multiple ways in his assertion that "[A.S.] testified he moved out a punching bag, weight bench and all of his weights." (CR 543 at 5.) A.S. did not testify specifically about the items he moved out of the apartment; he only testified about the items he had in the apartment. (CR 543-1 27-28; RT 3/2/16 1814-15.) Additionally, the video shows A.S. carrying a weight bench out of the apartment at 6:55:07 p.m. on May 1, 2015. (Exh. 7, Video Screenshot 20150501185507). A.S. did not describe the punching bag or state whether he removed it from the apartment on May 1, 2015. Although the video does not clearly show A.S. carrying out a punching bag, it shows him carrying various items that could either be a punching bag or contain one, depending on the type, size, and composition of the punching bag.

Kareem asserts he could have argued that A.S. "was helping his brother load his car or because he knew his brother was not coming back he is taking all of his personal items." (CR 543 at 5.) The first part of this assertion is wholly inconsistent with the video footage. The footage featuring A.S. shows him doing exactly as he described during the trial – carrying out items that appear to be exercise equipment, weights, and a weight bench. Nadir Soofi does not appear in the video during the time A.S. was in the video, which does not advance an argument or theory that A.S. was helping Nadir Soofi load his car. The second part of the assertion is something the defense could have raised at trial without the video – A.S. testified that he removed his remaining belongings from the apartment at Nadir Soofi's request and returned his key. The video footage adds nothing to the possible

argument that A.S. knew Nadir Soofi would not be returning, and Kareem fails to point out how that possible argument would have amounted to a worthwhile basis for impeachment of A.S.

Thus, the matters about which Kareem asserts he would have impeached A.S. are insignificant. A less than one-hour difference between A.S.'s recollection of his time of arrival and departure, and whether he retrieved a punching bag from the apartment, would not have affected his credibility, especially in view of other evidence that corroborated his testimony about things that happened in the apartment while Kareem was present. For example, Trial Exhibit 480, in which Simpson sent a direct message over Twitter to another person that "I was just telling a bro from Philly what u said," served to corroborate A.S.'s testimony that Kareem (who was from Philadelphia) was present in the Simpson/Soofi apartment as Simpson posted messages on Twitter and played ISIS videos. Further, the video itself shows A.S. bringing shoes with him as he arrives to the apartment, and carrying out weights and exercise equipment, just as he testified.

Kareem also claims the pole camera footage was exculpatory because it did not show Kareem at the Simpson/Soofi apartment on May 1, 2015. At no time during the entire trial did the government assert that Kareem was present at the Simpson/Soofi apartment on that date. The government introduced testimony through Stefan Verdugo and the juvenile witnesses that Kareem decided not to participate in the attack itself well before May 1, 2015. His absence from the video, if anything, corroborates that trial testimony and provides inculpatory evidence.

Nothing in the video is material, exculpatory, of value for impeachment, or sufficient to undermine confidence in the verdict.

## C. Customs Inspections of Saabir Nurse Add Nothing to the Case

Also subsequently discovered by undersigned, and disclosed in an abundance of caution on March 15, 2019, are reports and documents relating to Customs inspections of Saabir Nurse in connection with his May 28, 2015, departure from the United States and his September 26, 2015, return to the United States, both via the George Bush

Intercontinental Airport (IAH) in Houston, Texas. The Customs reports included records of an extraction of Nurse's cellular telephone upon his return to the United States.[8] This information also is not material and would not have had any significant effect on the trial.

The image of Nurse's cellular telephone was collected in September 2015, and its content does not contain any information relevant to the trial. It revealed that although Simpson was in touch with Nurse during the weeks prior to the attack, the communications were about innocuous subjects such as soccer games. It contains no evidence suggesting that Nurse knew about the drawing contest or funded the Garland attack. Indeed, the indented letter admitted by defendant at trial shows the opposite – Simpson referenced a different plan in the letter – the money from Nurse was not used for that original plan, which to this date remains unknown. The letter reflects Nurse did not have foreknowledge of the attack and that the plans for which the funds were intended did not come to fruition.[9]

Kareem claims the information from Nurse's phone shows "Nurse had numerous contacts with Bell and Yayah following Simpson's death but not with Kareem." (CR 543 at 8-9.) Kareem never called any of these individuals to testify even though he had the reports of Nurse's and James Bell's interviews prior to trial. The information extracted from Nurse's phone adds nothing to this – the communications in his phone were not incriminating, and his association with John Sabari ("Yahya") and Bell was reflected in the reports in the case. The government provided Nurse's full biographical information, including his street address, in discovery at Bates # 1414 (disclosed October 13, 2015, and again November 18, 2015).

---

[8] Undersigned counsel disclosed the report containing the cell phone data in order to correct any misimpression unintentionally given when counsel told the Court and defense counsel that no search warrant had been executed on Nurse's cell phone. Although that representation was technically true, it may have suggested that the phone had not been searched at all, but undersigned counsel have since discovered that it was.

[9] Kareem also points out that FBI Agent Whitson testified that he was not aware of any further investigations done of Nurse. Agent Whitson became case agent on the Nurse investigation on April 27, 2016 (after the end of the trial in this case), and ceased case agent responsibilities for the investigation on November 7, 2017. The questions defense counsel directed to him about the Nurse investigation during the Kareem trial did not elicit personal knowledge about that investigation.

Importantly, Kareem was the person who originally informed investigating agents that "Yahya" (also occasionally spelled "Yaya" in reports) facilitated Skype calls between Simpson and Sheikh Faisal. Undersigned counsel have reviewed the defense discovery requests in this case and have not located an instance in which the defense sought additional information about "Yahya" or any indication that the defense was unable to discover "Yahya's" true identity. This may because Kareem actually did know John Sabari was "Yahya." A cursory search through the report of extraction of Kareem's Acer Aspire computer revealed an employment verification letter for Sabari from Nordstrom Rack stored on the computer with the filename "scan0001 (2).docx." (Exh. 8, Employment Letter for John Sabari.) Kareem's possession of the letter on his computer indicates he would have known Sabari by his true name, and his interview report shows he knew "Yahya."

Even assuming Kareem did not know "Yahya's" true identity, the government provided discovery in the case that would have given the same information that Kareem claims would have come from Nurse's cellular telephone – "Yahya's" phone number. The government disclosed at Bates # 1982 (disclosed January 29, 2016) the fact that a search of Simpson's and Soofi's apartment yielded a piece of notebook paper "with various names and phone numbers, to include Yahya and others." (Exh. 9 at 2, 4, Evidence report & notebook paper page.) Undersigned counsel on several occasions offered to make all physical evidence in the case available for inspection, and on one occasion defense counsel traveled to the FBI Phoenix office to view the physical evidence in the case. Additionally, the cell phone extraction report for Simpson's White Galaxy S5 cellular telephone[10] (disclosed as part of the hard drive marked Bates # 310 on September 2, 2015) contained Simpson's contact list. That contact list included two contacts with phone numbers under

---

[10] This phone was recovered at the scene in Garland, Texas. It was marked as Exhibit 39 at trial and numerous admitted trial exhibits, including Exhibits 40-47 and 495, came from it. The extraction of Simpson's cell phone also revealed text messages between Simpson and Nurse that correspond to the text messages between Simpson and Nurse that were contained in the extraction of Nurse's phone in September 2015.

the name "Yahya," and additional email and telephone contact information for John Sabari.[11] (Exh. 10 at 4, 6, Simpson cell phone contacts page.)

The defense likewise did not request more information about John Sabari in his true name, even though trial witness Stefan Verdugo described him as a "bad guy like Abdul" in one of his interviews with the FBI, disclosed at Bates # 1058-1060 (October 13, 2015, and November 18, 2015). Had the defense made such a request for specific information or reports regarding "Yahya" or Sabari, the government would have provided that information. With that said, the defense has had the reports of John Sabari's interviews for approximately three years, and has yet to point to specific exculpatory information the defense would have elicited from Sabari. This may be because none of the records from Simpson's phone or his cell phone provider records show any communications between Simpson and Sabari.

The notion that the defense would have called Sabari and/or Saabir Nurse to demonstrate Nurse was the source of Simpson's and Soofi's funding for the Garland attack makes no sense. First, as noted above, the letter apparently written to Nurse describes the money Nurse provided as having been intended for an unknown "original plan" that was different from what Simpson and Soofi ultimately did. Simpson declared "something dreadful" had occurred that caused plans to change. The notion that the defense would have had a "Perry Mason" moment and extracted a confession from Nurse is implausible – the defense has had possession of Nurse's interview reports and has known both his identity and his association to Simpson since the early stages of this case. Further, the government disclosed at Bates # 1660 the fact that Nurse delivered the title to Elton Simpson's car to Simpson's father, Dunston Simpson, Sr., after Elton Simpson's death. In

---

[11] As an aside, Kareem appears mistaken that the contact in Nurse's phone would have led him to Sabari. The contact "Yayah" in Nurse's phone appears not to be John Sabari. The "Yahya" contact on the notebook paper from the Simpson/Soofi apartment matches the phone number for Sabari that was in Simpson's Galaxy S5 cell phone, but the number in Nurse's cell phone contacts does not. (Exh. 11 at 9, Nurse phone contacts page.) A search of Nurse's cell phone contacts for Sabari's known phone numbers yielded a negative result. Therefore, Nurse's phone would not have led Kareem to Sabari. Nurse's phone also contained a contact for Kareem under the name Abdulmalik (Exh. 11 at 7.)

that report, Dunston Simpson, Sr., referred to Nurse as Elton Simpson's former boss.[12] The government disclosed a report analyzing Elton Simpson's email communications that included a description of a message Simpson sent to Nurse on September 28, 2014, referring to a sum of money, "$3293.58," at Bates # 1676. The government disclosed the report of Nurse's interview at Bates # 2008-2011. In the report, Nurse disclosed he had known Elton Simpson since his freshman year of high school. He also stated Simpson occasionally worked for him as a dental assistant. The government disclosed all of the foregoing reports on January 29, 2016. Despite having had this information for years, Kareem has not produced any concrete information to support his assertion that he would have shown Nurse was the person who was responsible for financing and/or motivating Simpson's and Soofi's violent plans.

Kareem also contends that information from Nurse's passport shows his religious commitment and resources to travel internationally – making it more likely that Nurse would be willing to engage in religious violence and that he had the resources to support Simpson. This argument, though legally improper, logically flawed, and speculative,[13] was easily inferred at the time of trial based on the information above. *See United States v. Jordan*, 485 F.3d 1214, 1219 (10th Cir. 2007) ("It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime. Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice.").

Kareem contends Nurse's contacts with "Khalid Bell" (James Bradley Bell) and "Yayah" (John Sabari, aka "Yahya") show the greater importance of those three

---

[12]  Kareem likewise knew Simpson worked for Nurse. He provided the same information to agents during his June 10, 2015, interview.

[13]  Ironically, Kareem claims his actions, which he argues consisted only of possessing and viewing propaganda and speaking out about the treatment of Muslims, do not demonstrate that he participated in planning a terrorist attack. (CR 505 at 11 ("Possessing or viewing Jihadi propaganda or Muslim lectures or speaking out about the treatment of Muslims' or their religion does not demonstrate that the possessor is a terrorist or has participated in planning terrorist attack. Freedom of speech and thought are still protected provided they do not veer into action and planning criminal acts.").)

individuals' testimony. The government previously noted in its response to Kareem's original motion for new trial that Kareem was well aware of John Sabari, aka "Yahya." It noted that Kareem's counsel apparently had researched the 2010 case against Simpson, which provided ample notice of Sabari's connections to Simpson. Further, the government noted Kareem himself told investigators about Sabari during his May 5, 2015, interview. In that interview, Kareem told agents that Simpson and others would go to Sabari's residence to speak to Jamaican cleric Sheikh Faisal. Kareem clearly knew about Sabari's ties to Simpson and Soofi, and this Court previously included a finding on this subject in its order denying Kareem's motion for new trial. (CR 469 at 8.) Again, Kareem points to nothing that would suggest he would have been successful in eliciting exculpatory testimony from Sabari, and even if he could make such a showing, he knew enough about Sabari in advance of trial to have done so at the time of trial.

Much the same is true with respect to James Bell. Kareem was aware of Bell's relationship with Simpson, and Bell's interview transcripts contained no evidence that would have been relevant or helpful to the defense in this case. Again, the fact that Bell was aware of the Garland contest is of no moment. His awareness of the contest in no way suggests he had foreknowledge of the attack.

Here, as above, the defense is seeking to relitigate the previously-adjudicated motion for new trial. As noted previously, Kareem was well aware of Sabari, Bell, and Nurse, and their connections to Simpson. He included all three individuals on his witness list, and although he called numerous witnesses in his defense case, he did not call Nurse, Bell, or Sabari.[14] Kareem has yet to point to a single shred of evidence indicating anyone

---

[14] Kareem also claims, "Nurse was on the Government's initial witness list but was removed before trial as were Bell and Sabari. Clearly, the Government believed Nurse, Bell and Sabari were helpful to its case against Kareem but removed them when it decided they were not. It is a reasonable inference or probability that Nurse, Bell and Sabari were removed when it was determined that they would provide evidence favorable to the defense which appears to be after they downloaded Nurse's phone and copied his passport." (CR 543 at 13.) This claim fails factually as well as logically. First, the government's initial and final trial witness lists did not include Nurse or Sabari. (CR 198, 294.) Meanwhile, Bell was on both lists. (*Id.*) Second, the government places people on drafts of witness lists to provide notice that they are potential witnesses. Numerous reasons exist for not

witnessed Nurse, Bell, or Sabari participating in discussions with anyone concerning the Garland contest or conducting an attack on behalf of ISIS. Pointing to the mere existence of communications among the three after the Garland attack does not demonstrate the existence of information that would have been relevant and helpful to the defense.

Finally, even assuming some small quantum of evidence existed to show Nurse, Bell, or Sabari had something to do with the conspiracy to attack the Garland contest or more generally to provide material support to ISIS, as this Court previously found with respect to Hendricks, such evidence would not foreclose or even necessarily serve to undermine Kareem's proven participation in the conspiracy. (CR 469 at 9.)

## IV. The Government's Case Against Kareem was Strong

The strength of the government's case is probably the most important factor in weighing the materiality of undisclosed evidence. When the government's proof is strong, undisclosed evidence has less capacity to affect the verdict. *United States v. Olsen*, 704 F.3d 1172, 1185-87 (9th Cir. 2013) (government presented evidence of defendant's year-long research into use of ricin as a poison as evidence of intent to possess or use ricin as a weapon; this evidence was overwhelming and made evidence that would have impeached a government witness immaterial).

The evidence at trial was strong and it showed that Kareem's role in the conspiracy included assisting Simpson and Soofi with firearms training, providing money to purchase weapons and ammunition which were used in the attack, instruction on how to care for and maintain their weapons, taking Simpson and Soofi shooting in the desert, hosting Simpson and Soofi in his home, and providing a meeting location to plan the attack. (Ali Soofi RT 3/2/16 25-27, 29, 32-33; Martinez RT 2/24/16 12-14; Verdugo RT 2/19/16 12, 16, 30; Juan

---

calling a witness are unrelated to whether a witness might be helpful to the defense. For instance, credibility, lack of personal knowledge, and avoiding jury confusion are legitimate reasons not to call a witness that are unrelated to which party the witness's information would help. Failing to call a witness is not a concession that a witness has any material information, let alone material exculpatory information. Kareem's circular reasoning on this point has no merit. If his reasoning had merit, it would mean that in any case in which the government fails to call a witness on its witness list, that failure would itself constitute notice to the defense that the witness would be helpful to the defense.

RT 2/24/16 13; Carlos RT 2/24/16 14-15.) The evidence also showed that Kareem supported ISIS and knew Simpson and Soofi supported ISIS. (Ali Soofi RT 3/2/16 9-15, 39; Verdugo RT 2/19/16 20-21.) Among other things, he admittedly watched ISIS beheading videos and the video of a Jordanian pilot being burned alive, while in Simpson's company, and talked to Simpson about ISIS. (Carlos RT 2/24/16 12-13.) Multiple witnesses also testified they witnessed Kareem, Simpson and Soofi celebrate and cheer the attackers who murdered 11 people on January 11, 2015, inside the offices of the French satirical magazine Charlie Hebdo, after the magazine published cartoons of the Prophet Muhammad. (Ali Soofi RT 3/2/16 21-22; Verdugo RT 2/19/16 13-15.) Multiple witnesses also testified they witnessed Kareem discuss his desire to attack the Garland contest. (Juan RT 2/24/16 13; Verdugo RT 2/19/16 30; Carlos RT 2/24/16 14-15.)

The defendant bears the burden of showing a reasonable probability of a different outcome. As the Supreme Court explained in *Kyles v. Whitley*, "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." 514 U.S. 419, 434 (1995). Defendant received a fair trial, the evidence against him was strong, and nothing undermines confidence in the verdict.

**V.    Conclusion**

For the foregoing reasons, this Court should deny Kareem's Supplemental Motion for New Trial.

Respectfully submitted this 15th day of May, 2019.

MICHAEL BAILEY
United States Attorney
District of Arizona

*s/ Kristen Brook*
*s/ Joseph E. Koehler*
KRISTEN BROOK
JOSEPH E. KOEHLER
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Drake & Daniel Maynard, Attorneys for Defendant

By:  */s Joseph E. Koehler*