Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No.003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　　Plaintiff/Respondent,<br><br>　　v.<br><br>Abdul Malik Abdul Kareem,<br><br>　　　　　　　Defendant/Movant. | 2:15-cr-00707-SRB<br><br>**ABDUL MALIK ABDUL KAREEM'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S SUPPLEMENTAL MOTION FOR A NEW TRIAL**<br><br>**(Oral Argument Requested)** |

　　　　This Court should grant Defendant's Motion for a New Trial and Defendant's Motion for an Evidentiary Hearing to determine why the Government is only now disclosing material evidence that it had in its possession months prior to Abdul Malik Abdul Kareem's ("Kareem") trial, much of it before Kareem was even charged, and why the Assistant United States Attorney handling the case was not even aware of this evidence until recently.  The prosecution's reliance on the FBI to provide the required

1

information amounted to an abdication of its responsibility.  When the Court looks at the FBI's blatant and intentional misconduct in failing to turn over evidence in its possession to the prosecutors and ultimately to the defense that was relevant and material to the defense, it will be compelled to conclude that Kareem was denied a fair trial and there can be no confidence in the verdict.[1]

## I.   **Background of What Has Been Disclosed Since the Verdict Was Rendered**

Kareem filed a Motion for New Trial Based on Prosecutorial Misconduct on March 31, 2016.  (Doc. 303)  The thrust of the Defendant's complaint was the late and piecemeal disclosures made by the government on the eve of trial and during trial, in violation of the Court ordered disclosure dated.  (Doc. 303, p. 2).  After the motion was filed, the Government produced records of three interviews of John Sabari that had never been produced.  (Dec., ¶ 452)  It is not clear whether these were even known to the prosecution before the trial but now it is clear that the prosecution asserts that at the time of trial in February 2016, it was unaware of:

(a) The existence of a pole camera placed to video the comings and goings at Simpson and Soofi's apartment in May 2015 (Dec., ¶ 3(a));

(b) The fact that Nurse's cell phone was imaged in September 2015 and in the FBI's possession (Dec., ¶ 3(b));

(c) The contents of Nurse's passport, capture in September 2015 and in the FBI's

---

[1]   Here is a readers guide to the acronyms used by the FBI: "PX" stands for the Phoenix Field Office; "DL" stands for the Dallas Field Office; "CTD" stands for Counter Terrorism Division based in Washington, D.C.  "TFO" stands for a task force officer, some non-FBI law enforcement officer such as a police officer, sheriff, or an agent with another federal agency assigned to an FBI task force; "FOUO" means for official use only.

possession (Dec., ¶ 3(c));

(d) The existence of the Tactical Intel Report of Simpson created in March 2015 (Dec., ¶ 3(d));

(e) The fact the Tactical Intel Report was sent to FBI Dallas on May 3, 2015 (Dec., ¶ 3(e));

(f) The fact an undercover agent of the FBI ("UCA") was in electronic communication with Simpson before the Garland attack about the Mohammad Drawing Contest (Dec., ¶ (f));

(g) The fact the UCA responded to one of Simpson's communications with "tear up Texas" in reference to the Mohammad Drawing Contest (Dec., ¶ 3(g));

(h) The fact the UCA was driving around the Culwell Center in Garland and was behind Simpson and Soofi when they began their attack and he took pictures (Dec., ¶ 3(h));

(i) The fact that the Dallas FBI asked the Phoenix FBI for its thoughts on who a "brother from Arizona" who might participate in the Garland attack might be (Dec., ¶ 3(i)); and

(j) The fact that the Phoenix FBI responded with only one name, Simpson, but it did not think it was him since his car was still parked at his apartment complex (Dec., ¶ 3(j)).

Each of these circumstances could have been used at trial to undercut the Government's evidence and to support independently the defense raised at trial; that the

FBI was not interested in a search for the truth but rather sought a conviction and attempted to misdirect from its failures.  There can be no confidence in the verdict.

**A. <u>Pole Camera</u>**

On March 15, 2019, the Government disclosed that the FBI had placed a pole camera outside of Simpson and Soofi's apartment that showed the coming and going of people to the apartment beginning about 2:00 p.m. on May 1, 2015 thru May 4, 2015. (Dec., ¶ 4)  Ali Soofi, Soofi and Simpson can be seen on the video footage.  May 1, 2015 is the date the Government argued Simpson and Soofi left to go to Garland.  The Government argues that there "is nothing in that footage that is material to the case or that could have had any effect on the outcome of trial."  (Doc. 550, p. 14)  What is clear is that Kareem is not on the footage, he did not go to Simpson and Soofi's apartment on the day they packed and left to go to Garland.

The Government argued in its opening statement at trial that Kareem's "role in this three-man team was that "he was the bank roller.  He was the trainer.  He was the motivator."  (Tr. Tran. 2-17-16, p. 226)  The Government called Mustafa Hussam a 20 year old who testified he saw Kareem, Simpson and a third person the evening of April 30, 2015 getting food to-go from a restaurant where he worked.  (Tr. Tran. 2-26-16, p. 1340)  The implication being that they were together planning the attack.  But the video from the apartment conclusively shows that Kareem was not with Simpson and Soofi as they packed to travel to Garland to carry out the attack.  This video is exculpatory because a reasonable juror would expect someone who allegedly motivated, trained and bankrolled the attackers would be with them as they prepared to leave to handle any last

minute questions or details.  Kareem's absence in the video would have raised doubts in the minds of the jury as to the claims against him.

Can there be any doubt that if Kareem had been in the video it would have been disclosed and used by the Government because it would be material and relevant.  Thus, his absence from the video is just as material and relevant.

After receiving the video footage from the pole camera on March 15, 2019, the defense was left to speculate about how the pole camera was put there or why. However, in the Government's Response, we learned for the first time that FBI SA Amy L. Fryberger submitted the request for electronic monitoring for approval on April 9, 2015.  (Dec., ¶ 7(c))  The defense has yet to see the request nor do we know why SA Fryberger submitted the request.  (Dec., ¶ 8)  This is additional information that is material since if Simpson or his apartment were under surveillance, it would show that Kareem was not there three or four times a week as testified to by Ali Soofi at trial. The request specified the video surveillance include the parking lot, the walkways to the residence and the residence itself.  (Dec., ¶ 7(c))  The request was approved by FBI Phoenix Field Office Supervisory Special Agent Glenn S. Mullen on April 4, 2015 and approved by FBI Phoenix Field Office Assistant Chief Division Counsel Matthew J. Greenberg on April 9, 2015.  (Dec., ¶ 7(c))  The defense has not been provided any of these original documents but rather a report created by SA Mullen on May 15, 2019. ((Dec., ¶ 7(c); Doc. 550, Ex. 6)

It remains unanswered why the original requests and the pole camera video was not turned over to the defense and why the Assistant U.S. Attorney was not made aware

of the pole camera video until 2019.  (Doc. 550, p. 14)  Why did the FBI not turn over the pole camera video to the U.S. Attorneys' Office in May 2015?  The FBI installed it, then shut it down, and certainly someone from the FBI reviewed it.

With the knowledge of the pole camera, the defense would have called SA Fryberger to ask about what prompted her request.  (Dec., ¶ 47(b)  The Government states in a footnote in its Response that the request was not prompted by the UCE's communications with Simpson because the pole camera was requested on April 9, 2019 before the date of the UCE's first communications with Simpson.  (Doc. 550, p. 14, note 7)  However, we do not know what prompted the request and what type of surveillance was being done on Simpson or the apartment prior to deciding to install a pole camera and why it took three weeks after it was approved to install it.

**B. Saabir Nurse Investigation**

**The Cell Phone**

On March 15, 2019, the Government disclosed for the first time reports and documents relating to the U.S. Custom and Border Protection's ("CBP") inspection of Nurse done in connection with his May 28, 2015 departure from the United States and his September 26, 2015 return to the United States through the airport in Houston, Texas.  (Dec., ¶¶ 6, 9)  CBP downloaded the contents of Nurse's cell phone and gave it to the FBI to retain as evidence.  (Dec., ¶¶ 6, 9)  The Government argues that its content does not contain any information, relevant to Kareem's' trial.  (Doc. 550, p. 17); however, in the case of *United States of America v. Abdul Kabir Wahid*, CR-17-00360-PHX-JJT-1 ("*U.S. v. Wahid*") on February 27, 2019, the Government called Russell

Carmen, a supervisory officer with the CPB to testify about his work with the Joint Terrorist Task Force ("JTTF"); how he conducted a logical extraction of Nurse's cell phone; and, turned it over to the FBI to be loaded into its evidence collection system. (Dec. ¶ 48)  The Government then called Greg Neville, an intelligence analyst with the FBI, who testified about the communications between Wahid and Nurse from May 3, 2015 through May 6, 2015 extracted by CBP from Nurse's cell phone.  (Dec., ¶¶ 47, 48)  This showed that Nurse visited Wahid's apartment on May 6, 2015 at 2:27 a.m. These were significant phone calls back and forth but it confirms that Kareem did not communicate much with Nurse and it further shows the relationship between Nurse and Wahid.  The Government argued that Kareem bankrolled the Garland attack; however, this evidence supports Kareem's contention that Nurse was the source of funds to Simpson and there was no significant relationship between Nurse and Kareem.  If Kareem were part of the Garland, Texas attack, one would expect more communications between Nurse and Kareem.

**The Passport**

Also, on March 15, 2019, the Government disclosed a copy of Nurse's passport that was made by CBP that showed significant foreign travel by Nurse, thus supporting Kareem's contention that Nurse had sums of money to give to Simpson and Nurse's strong faith in Islam since he traveled to Saudi Arabia twice for the Haj.  (Dec., ¶ 6) Additionally, Nurse's traveling out of the country from May 28, 2015 until September 26, 2016 for four months was material to bolster the argument that he had sufficient access to money, that he did not need a job and one could infer that he left the country

due to his concern about the Garland attack until he learned that Kareem had been arrested.  (Dec., ¶ 6)

### The Note and Car Title

All of this information was material and relevant to Kareem.  The defense had earlier complained about the lack of disclosure concerning Nurse, an individual who was listed on January 8, 2016 on the Government's Preliminary Witness List without the Government having disclosed a single statement, document or interview with him. (Doc. 303, p. 8)  On November 11, 2015, the Government disclosed a 302 report documenting a letter to an unknown individual that had been written in and torn out of a notebook discovered in Simpson's apartment.  The FBI was able to determine the contents of the letter based on indentations made on the page below it after it was sent to the FBI Lab in Quantico, Virginia for electrostatic testing.  The letter was signed "Ibrahim" and stated, "the money that I had from you was being used for what was needed for the initial plan but that changed. . ," "I will leave you with the title of my car to do as you please with it."  (*See* Trial Exs. 553 and 554)  The Government provided no information as to whom the letter was written or any investigation it conducted in order to determine the recipient of the letter or its meaning.

The Government waited until January 29, 2016 to disclose a 302 report documenting an interview with Dunston Simpson Sr., Simpson's father, on November 3, 2015 that disclosed that Nurse provided the title of Simpson's car to Dunston Simpson Sr. after the attack.  (Exs. 27 and 28)  This was well past the *Brady* deadline to disclose this vital piece of information.  Even if not construed as a *Brady* violation, this

information clearly was favorable to the defense since it supported Kareem's argument that he was not the financer or money man for the attack; this evidence showed Nurse to have been that person.  The Government could not have overlooked that possibility.  It was material to preparing the defense.  The Government also waited until January 29, 2016, to disclose, for the first time, any documentation of FBI interviews of Nurse.  (Exs. 27 and 29)  This included 302s documenting interviews conducted on May 4, 2015 and May 26, 2015.  Aside from this disclosure, which occurred three months after the Government's *Brady* deadline and on the eve of trial, the Government did not disclose any other materials regarding the investigation it did of Nurse, nor any additional interviews with Nurse.

FBI Agent Whitson revealed further investigation on cross-examination at trial for the first time.  (Ex. 30)(Tr. T., 3/2/16, pp. 114-119)  In response to questions on cross examination, Agent Whitson testified that after receiving the information about the letter, he prepared a 302 report on October 21, 2015.  He stated that he called a meeting with various other agents "handling different aspects of the branching investigations . . . and asked if it meant anything to them and then collected information in that sense."  He was not sure if he called the meeting before or after he prepared the 302.  Agent Whitson testified that after this meeting FBI agents again interviewed Nurse.  (Tr. T., 3/2/16 pp. 114-119)  No documentation of these interviews has ever been produced.

SA Jensen testified in *Wahid* about the importance of the FBI of learning that Wahid had given Nurse the title to Simpson's car, the car keys and a note that appears

to describe Nurse as having given Simpson money that the FBI would employ "a vast amount of resources to follow up on [this] type of evidence." (Dec., ¶¶ 13, 14) Based on SA Jensen's testimony, it is only logical that the FBI conducted further investigation into Nurse before Kareem's trial or it should have to explain why not. Kareem has never received any of the fruits of these labors; it appears the FBI purposely may have waited until after Kareem's trial to conduct its investigation on Nurse.

### C. Phoenix FBI Alerts Dallas FBI and Garland Police to be on the Look Out for Simpson

### The Tactical Intel Report

The Government's Response provides the Kareem defense with additional information that is material and has never been provided before in explaining how the Phoenix FBI alerted the Dallas FBI that Simpson may be coming to Garland. The Kareem defense team received for the first time a copy of an e-mail from A/SIA Melody Bruns of the Dallas FBI office to other Dallas Agents at 2:12 p.m. on May 3, 2015 "Please let us know if you see the individual (see attached) at today's event. PX advised it is very unlikely that he will be there, but we wanted to send this out just in case. Please direct any questions my way." (Dec., ¶ 7(a)) The attached was a "Facesheet" on Simpson or a "Tactical Intel Report" (4 pages). (Dec., ¶ 7(a)) The AUSA states in the Response that he received these documents on May 1, 2019 and that the Tactical Intel Report was created in March 2015. (Doc. 550, p. 9, Ex. 4) There is no explanation as to why the Report was created in March 2015 and how it played into the April 9, 2015 request to put pole cameras outside of Simpson's apartment. (Dec., ¶ 8) Again, this chain of evidence seems to be missing many logical links. If there was

surveillance of Simpson by the FBI starting in March 2015, it is material to Kareem because we believe it will show little or no connection between Simpson and Kareem and put the lie to much of Ali Soofi's testimony.

### **The Brother from Arizona Mention**

Next, the Kareem defense obtained information for the first time in a Declaration of Intelligence Analyst Weldon Harrison Hegwood for the FBI that he received information from a FBI Dallas Agent in contact with the UCA travelling to the event in support of the FBI investigation of Erick Jamal Hendricks ("Hendricks") and that Hendricks informed the UCE he may encounter a "brother from Arizona" at the event. (Dec., ¶ 7(b))  Agent Hegwood asked an FBI Dallas Intelligence Analyst to contact the FBI Phoenix Division in an attempt to ascertain the likely identity of the "brother from Arizona."   (Dec., ¶ 7(b))   The FBI Phoenix Division believed the "brother from Arizona" may be Simpson but that Simpson's vehicle remained parked at his apartment complex and they did not think Simpson would travel to the event.  (Dec., ¶ 7(b)) Agent Hegwood requested a picture of Simpson and his Arizona license plate number which he transmitted to a detective at the Garland Police Department and advised him to remain vigilant for vehicles bearing Arizona license plates.  (Dec., ¶ 7(b)); Response, Ex. 5)

Thus, it might be argued that the FBI was embarrassed by the fact that it had some information that Simpson might be participating in an attack in Garland and it even had a pole camera to monitor Simpson's comings and goings from his apartment but it did not do a proper investigation.  Agent Hegwood was advised that Simpson's

car was in the parking garage of his apartment complex but the question remains was there a camera on his car or did FBI agents do a drive by his apartment complex?  How many pole cameras were there at the apartment complex?  Was any investigation being done on Simpson's long-time roommate; *i.e.*, Soofi?  Had any agents ever seen Kareem with Simpson in 2015?  Why was Simpson the only one that the Phoenix FBI thought could be the "brother from Arizona?"  (Dec., ¶ 8)  These are all areas that would have been explored in Kareem's' trial if the information had been timely disclosed.

**D.  Undercover FBI Special Agent ("UCA")**

The failure to disclose the communications between Simpson and the UCA, the communications between the UCA and Hendricks, and the UCA's presence and taking photos of the attack has been dealt with in prior motions.   (Doc. 432 and 452) However, the evidence concerning the UCA must be taken into account when the Court looks at the Government's failure to turn over material information to Kareem due to the cumulative effect of the non-disclosures.

First, the text messages between the UCA, Simpson and Hendrick would have been helpful in showing the jury that Simpson never mentioned Kareem, the alleged bankroller, trainer and motivator of this operation according to the Government and would have demonstrated that Simpson was the motivator to the Garland attack.  (Dec., ¶ 32(a)-(f)

The defense would have called the UCA to testify about his texting with Simpson, his role in encouraging the attack, *i.e.*, his use of the phrase "Tear up Texas" as well as his appearance in Garland, the timing, what he was texting Hendricks and

why he alerted the FBI in Dallas about a "brother from Arizona."  (Dec., ¶ 49(a)  The

defense should have been given the chance to cross-examine the UCA and not have to

reply upon the Government's spin, especially since the FBI has withheld so much

material and relevant information from the defense and apparently from the Assistant

U.S. Attorneys handling this case.

When one couples the apparent FBI request on April 9, 2015 for pole cameras to

be placed outside of Simpson's apartment with the contact Simpson made with the

UCA allegedly on April 24, 2015, it calls into question what the FBI knew about

Simpson and when the FBI knew it.  Cross-examination is the great engine used in trials

to try and drill down to the truth and Kareem was denied that opportunity due to the

FBI's failure to disclose material, relevant information.

**Ali Soofi's Testimony in *Wahid* Case**

The testimony of Ali Soofi in *Wahid* is inconsistent with his testimony in

Kareem's case because his testimony in *Wahid* on the first day barely mentions Kareem

and when he talks about the Group in the apartment, he only refers to Simpson, Soofi

and Wahid.  (Dec., ¶¶ 16-17)  However, overnight, it appears that the Government

refreshes his recollection and he starts out testifying about Kareem's presence in the

apartment but this time he expands it and says Kareem was there "pretty much

throughout the whole week" and that that conduct was consistent the entire time Ali

lived in the apartment.  (Dec., ¶ 18)  This was inconsistent with his testimony in

1  Kareem's trial where he said he did not meet Kareem the first three or four months he

2  lived in the apartment and that Kareem's time in the apartment got to be more and more

3

4  as time went on.  (Dec., ¶¶ 19-20)  Any evidence that goes to contradict Ali Soofi's

5  testimony is helpful to Kareem's defense.

6  **II.**   **Legal Analysis**[2]

7      The proper legal analysis has been put before this Court in the defense's prior

8
   motions.  However, to restate the obvious, there can be no faith in the jury's verdict
9
10  when so much material and relevant evidence was intentionally withheld from the

11  defense by the Government.

12      The defense relies upon the Government to do a proper investigation and then

13
   turn over the fruits of that investigation to the defense.  The defense then decides
14
15  whether to contest the Government's case or to negotiate a plea arrangement.  However,

16  when the Government withholds information or violates its duty the system fails.

17      In *Strickler v. Greene*, 527 U.S. 263 (1999), the Supreme Court set forth the

18
19  three essential components of a *Brady v. Maryland*, 373 U.S. 83 (1963) prosecutorial

20

21  _____

   [2]   **Error! Main Document Only.**The Government misperceives the authority for the defense
22  argument about the government's opening statement in the Hendrick's case that Hendricks is
   "inextricably tied" to the Garland attack and the impact the government's assertion to that effect as
23  newly discovered evidence.  The authority is Fed. R. Evid. 801.  That provision permits one party to
   admit into evidence an opposing party's statement that was made by the party in a representative
24  capacity (801(d)(2)(A)), or was made by a person whom the party authorized to make the statement
   (801(d)(2)(B)), or was made by the party's agent or employee on a matter within the scope of that
25  relationship and while it lasted. (801(d)(2)(D).  The Advisory Committee Notes outline the strong
   logical basis for allowing into evidence admissions or statements made by one party at the request of
26  the opposing party.  Indeed, logic suggests that having made a statement to one effect on a given issue
   should estop that party from later asserting a contrary position.  Logic would also suggest that the
27  opponent could offer that statement against the party making it as a logical outgrowth of the adversary
   system.  *See United States v. Kattar*, 840 F.2d 118, 130-31 (9th Cir. 1988.)The government mistakenly
28  bases its argument on the classic rule that what lawyers say in opening statement is not evidence in the
   case at hand.  We do not dispute that rule.  We disagree that it is applicable here.

14

misconduct claim: "The evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id*. at 281-82. For prejudice to exist, the suppressed, favorable evidence must be "material." *Brady*, 373 U.S. at 87. Under the materiality standard set forth in *Brady*, the accused is entitled to a new trial "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)

In *Kyles*, the Supreme Court emphasized four aspects of the materiality test. *Id*. at 434. First, the Court explained that "a reasonable probability of a different result" does not require a defendant to prove "that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Id*. at 434. The burden on the defendant is less onerous: to obtain relief, he must show that because of the absence of the favorable evidence, the verdict at trial is not "worthy of confidence." *Id*.

Second, the defendant is not required to show that, "in light of the undisclosed evidence, there would not have been enough left to convict." *Id*. at 434-35. The Court explained that: "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435.

Third, a defendant who proves a *Brady* violation need not show prejudice because *Brady's* materiality test folds in a prejudice analysis. *Id*. at 435-46

("Assuming, *arguendo*, that a harmless-error enquiry were to apply, a *Bagley* error could not be treated as harmless, since a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding might have been different, necessarily entails the conclusions that the suppression must have had [a] substantial and injurious effect or influence in determining the jury's verdict.")  In short, if the favorable evidence suppressed by the government was "material," then it is by definition prejudicial.

And most importantly, fourth, the prejudicial effect of the suppressed evidence is "considered collectively, not item by item." *Id*. at 436.  The Court indicated that this "collective" standard should encourage prosecutors to resolve close questions about the materiality of evidence in its possession in favor of disclosure. *Id*. at 439.  A government policy favoring disclosure underscores the prosecutor's role as a seeker of truth and justice rather than a competitor intent on winning at all costs. *Id.* at 439-40.

In this case, it is clear that the prosecution was not aware of certain evidence before the trial that has been disclosed since the trial. (Dec., ¶ 3)  As the *Kyles* court emphasized, since the prosecution has the means to discharge the Government's disclosure obligations any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police, or in this case the FBI, for the prosecutor, and even for the court's themselves, as the final arbiters of the Government's obligation to ensure a fair trial. *Kyles*, 514 at 438.

The disclosure of the suppressed evidence would have made a different result reasonably probable.  The disclosure of the pole camera would have weakened the

Government's case and strengthened the defense.  A jury would reasonably have been troubled by the fact that the alleged bankroller, motivator and trainer was not with Simpson and Soofi as they prepared for their attack.  This would have undermined Ali Soofi's testimony concerning all the times he alleged Kareem was with Soofi and Simpson.

The disclosure of Nurse's passport would have shown his two trips to the Haj, his extensive intentional travel, his leaving the country for four months soon after the Garland attack and his financial ability to give money to Simpson.  The disclosure of Nurse's cell phone contents would have shown that Kareem and Nurse were not close and only communicated briefly about Simpson's funeral.  Also, the Defendant would have called Nurse to testify about his relationship with Simpson, the communications he and Simpson had with a known terrorist based on the letters found in Simpson's apartment and his loan to Simpson.  The defense was concerned about calling Nurse since he refused to speak with the defense but with the additional information, the defense would have had a better chance at getting to the truth and would have called him to testify.

The defense would have called SA Jensen about the further investigation the FBI did of Nurse and the importance of following the money.

The defense would have called John Sabari (Yahya) to inform the jury that Simpson and Soofi met with Sabari and communicated through Skype with Sheikh Faisal, the radical Islamic Jamaican Cleric and that Kareem never once attended these Skype sessions.  This would have allowed the jury to understand that Simpson and were

the radicalized individuals and motivation of this attack and not Kareem.   This testimony would have served to undercut the Government's contention that Kareem was a radical Muslim extremist and that he was a follower of Sheikh Faisal.   Also, Sabari followed Simpson's tweets and is one of the few who was aware of the Mohammad Drawing Contest.

These disclosures would have provided the defense with additional information to cross-examine Agent Whitson and to attack the thoroughness and the good faith of the FBI's investigation and to discredit some of the methods the FBI employed, its conclusions and its overall attempt to get to the truth.

The defense would have called other FBI agents concerning their investigation of Simpson starting in March 2015 and developed what investigation of Simpson was being done, and who and how they knew his car was in the apartment parking lot and why only Simpson was disclosed as the possible "brother from Arizona."

The defense would have called UCA Jane to discuss his texts with Simpson, his knowledge of the "brother from Arizona, his comment about "tear up Texas," and his being at the scene of the attack in Garland.

All of this information would have helped to damage the Government's case and raised opportunities to attack the thoroughness and the good faith of the FBI investigation.   With all of this additional information, and the belief that there is even more that the FBI has failed to disclose, the defense could have laid a greater foundation than it did for a vigorous argument that the FBI had been guilty of negligence.

There must be some reason why the FBI did not disclose all of the information in its possession to the prosecution. Who is tasked with making disclosures to the defense? The FBI took it upon itself to determine what was relevant and material and that is not how our system of justice works.

In *United States v. Olsen*, 704 F.3d 1172 (9th Cir. 2013), the Ninth Circuit held that trial prosecutors must disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. In this case, the prosecution apparently did not make the decision to withhold certain evidence but rather that decision was made for it by the Justice Department's investigative arm, the FBI. The FBI did not tell Kareem's prosecutors about the pole camera, the downloading of Nurse's phone, having a copy of Nurse's passport, the March investigation into Simpson, the Hendricks' investigation including the UCA and 850 pages of tweets, the communications between the Dallas and Phoenix FBI offices and there is no explanation why this material information was not disclosed.

Now, the Assistant U.S. Attorneys are tasked to argue that the withheld evidence was not material; however, once they became aware of it, they turned it over. I believe the prosecution would have turned over all of this evidence if it had been aware of it and I doubt whether the prosecution would testify under oath that this evidence is not material, especially the video from the pole camera. A video of a scene is far better evidence than the mere testimony of one's memory or speculation.

This was a close case. Even in the current climate where the threat of terrorism causes people to have a great deal of fear. Jurors have been quoted as saying they were

evenly split at the start of deliberations.  Clearly, the failure to make the necessary and required disclosures causes there to be concern that Kareem did not get a fair trial and there must be a lack of confidence in the verdict.

**II.   Conclusion**

The Government did not fulfill its disclosure obligations in this case and it resulted in a trial that violates due process and a verdict that there can be no confidence in.  First, the Government made many late disclosures that violated this Court's Scheduling Order and it disclosed interviews with potential witnesses after the trial as set forth in Kareem's first Motion for a New Trial.  (Docs. 303 and 345)  The Government then disclosed information about the actions of an UCA that even the prosecutor was not aware of.  (Docs. 432 and 452)  Now in 2019, three year after the trial is completed, we learn from the first time of an FBI investigation of Simpson started in March 2015 that caused a pole camera to be placed outside of his apartment and video of Simpson and Soofi entering and leaving their apartment on the day they left to go to Garland that even the prosecutors were not aware of.  Contrary to a representation made by the prosecutor in 2016 that there were no additional interviews of Nurse and that the FBI had not downloaded the contents of Nurse's cell phone, we learn now for the first time that in September 2015 the FBI had a download of Nurse's cell phone and a copy of his passport and that the FBI opened up a full investigation of Nurse after Kareem's trial.  It remains hard to believe that the FBI did not do some further investigation of Nurse prior to Kareem's trial based upon the testimony of SA Jensen in the Wahid trial and if it did not then it should explain why.

All the potential evidence in this case has not been disclosed.  There needs to be full disclosure which can only be insured through an evidentiary hearing.  Kareem requests that this Court grant, as well, his motion for an Evidentiary Hearing on the lack of Government disclosures and a new trial.

RESPECTFULLY SUBMITTED this 4th day of June, 2019.

**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**

By   /s/Daniel D. Maynard
        Daniel D. Maynard
        3200 North Central Avenue, Ste. 1800
        Phoenix, Arizona 85012
        Attorneys for Defendant/Appellant

**DRAKE LAW, PLC**

By   /s/Daniel R. Drake
        Daniel R. Drake
        4340 East Indian School Road
        Suite 21-113
        Phoenix, Arizona 85018
        Attorney for Defendant/Appellant

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 4, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants:

AUSA Joseph E. Koehler and AUSA Kristen Brook

Additionally, a copy was served upon Mr. Abdul Kareem by first class letter, postage prepaid, at:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Abdul Malik Abdul Kareem #44126-408
FCI Florence
Federal Correctional Institution
PO Box 6000
Florence, CO  81226

 /s/Stacey McClellan
Stacey McClellan