Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No. 003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | 2:15-cr-00707-SRB |
|        Plaintiff, | **DECLARATION OF DANIEL** |
| v. | **D. MAYNARD** |
| Abdul Malik Abdul Kareem, | |
|        Defendant. | |

Daniel D. Maynard, pursuant to 28 U.S.C. §1746, hereby affirms under penalty of

perjury:

    1.    I was the trial attorney for the Defendant Abdul Malik Abdul Kareem

("Kareem") in the above-captioned case and am co-counsel on his appeals to the United

States Court of Appeals for the Ninth Circuit, C.A. No. 17-10067 and C.A. No. 17-10118.

I make this Declaration in support of Abdul Malik Abdul Kareem's Reply To The

Government's Response To Defendant's Supplemental Motion for New Trial ("Reply").

1

2.     The Government abdicated its responsibility to make proper disclosures since the prosecution argues that the newly and untimely disclosed material was not disclosed to it before or even during Kareem's trial.

3.     The prosecution asserts that at the time of trial in February 2016, it was unaware of:

(a)     the existence of the May 2015 pole camera placed by the FBI to videotape the coming and going at Simpson's and Soofi's apartment (Doc. 550, p. 14);

(b)     the fact that Saabir Nurse's ("Nurse") cell phone was imaged in the September 2015 (Doc. 550, p. 16);

(c)     the content of Nurse's passport, captured in September 2015 (Doc. 550, p. 16);

(d)     the existence of the Tactical Intel Report created in March 2015 of Elton Simpson ("Simpson")(Doc. 550, p. 9);

(e)     the fact the Tactical Intel Report was sent to Dallas FBI on May 3, 2015 (Doc. 550, p. 9);

(f)     the fact an undercover FBI agent was in electronic communications with Simpson before the Garland attack;

(g)     the fact the UCA responded to one of Simpson's communications with "tear up Texas" in reference to the Mohammad Drawing Contest;

(h)     the fact the UCA viewed the Garland attack and was behind Simpson and Soofi when they attacked and took pictures;

2

(i)     the fact that the Dallas FBI asked Phoenix FBI for its thoughts on who a "brother from Arizona" who might participate in the Garland attack might be; and

(j)     the fact that the Phoenix FBI responded with only one name, Simpson, but it did not think it was him since his car was still parked at his apartment complex.

4.     On March 15, 2019, the Government disclosed for the first time that the FBI had video surveillance of Simpson and Soofi's apartment on the day they left to go to Garland, Texas from a pole camera the FBI had mounted outside their apartment complex.  The video provided starts at approximately 1:30 p.m. on May 1, 2015 through 10:19 a.m. on May 4, 2015.

5.     AUSA Koehler stated that he did not become aware of the pole camera video until 2019, well after the trial.  (Doc. 550, p. 14)

6.     On March 15, 2019, the Government disclosed for the first time the FBI had downloaded the contents of Sabari Nurse's cell phone, the individual the defense believed was the funding source for the Garland attack, and had copied his passport that showed extensive international travel in particular, twice to Saudi Arabia and soon after the Garland attack.  These March 15, 2019 disclosures were discussed in Kareem's Addendum filed on April 26, 2019.  (Doc. 541)

7.     On May 15, 2019, over three years after the completion of Kareem's trial, the Government filed its Response to Defendant's Supplemental Motion for New Trial (Doc. 550) and it contains additional new material that is being disclosed for the first time information but was available since well before Kareem's trial; *i.e.*:

3

(a) Ex. 4 to the Response is an email dated May 3, 2015 at 2:12 p.m. Dallas time from FBI Agent Melody A Bruns, a Dallas field office intelligence analyst sending a four (4) page Tactical Intel Report on Simpson to numerous FBI agents in the Dallas area, that these agents should look for Simpson at the Garland event although Phoenix's FBI advise that it is unlikely that he will be there.  In the response, the prosecutor explained this report was created in March 2015 and sent to the Dallas field office May 3, 2015, in response to a request from that office. Apparently, that or a similar request prompted Phoenix agents, not to review the pole camera footage, but drive to the apartment to learn whether Simpson's car was in the parking lot.  They found it was.  They never considered that he might have traveled with an accomplice, even though the Dallas office was trying to track Simpson, among others, according to the Government's response. Doc. 550, pp. 9-10.

(b) Ex. 5 to the Response is a declaration from an FBI Intelligence Analyst who claims that on May 3, 2015 he learned from another FBI agent that an undercover FBI Special Agent (UCA) was traveling to the event as part of an investigation of Hendricks and that Hendricks had informed the UCE that he may encounter a "brother from Arizona" at the event.  Another FBI agent contacted the FBI Phoenix office in an effort to identify the "brother from Arizona." The only person referenced by the Phoenix FBI office was Simpson but the Phoenix FBI office advised that Simpson's car was parked at his apartment complex and they sent what is part of Ex 4 which the FBI provided to the Garland Police Department. The FBI advised the Garland Police Department to look for vehicles bearing Arizona License plates.  The Declaration was signed May 15, 2019, recounting events occurring in 2015.

(c) Ex. 6 to the Response is an FD 302 dated May 15, 2019 describing a request for electronic monitoring submitted by FBI Special Agent Amy L. Fryberger on April 9, 2015 requesting video surveillance of the parking lot, the walkway to Simpson's residence and the residence itself.  The request was approved by FBI Supervising Special Agent Glenn Milnor on 4-9-2015 and approved by FBI Assistant Chief Division Counsel Matthew J. Greenberg on 4/9/2015.  There is reference made to documentation (that was not provided) that indicated the video camera was started on May 1, 2015 at 13:26:40 and stopped on May 4, 2015 at 10:19:41.  Again, this is a non-contemporaneous document seeking to recount events from 2015.  The original contemporaneous documents were not supplied although they clearly exist.

(d) Ex. 7 to the Response is a still shot from the video of Ali Soofi on May 1, 2015 at 14:00:32.

4

(e) Ex. 8 to the Response professes to be a notice of employment verification for John Sabari dated 1/17/13, which is not date stamped and appears to be placed in Kareem's computer at a time when it was not in his possession. There is no indication that Kareem knew of its substance. Trial evidence showed others had access to Kareem's computer.

8.      There are several items that are conspicuously missing that have not been disclosed but appear to exist. There is no explanation why prior to April 9, 2015 SA Fryberger wanted video monitoring of Simpson's apartment, walkway to the apartment and parking lot. We do not know why, if it was approved on April 9, 2015, it took until May 1, 2015 to be operational. We do not know if there was one camera or three, as that seems to be what was approved. We do not know how the Phoenix FBI office knew on May 3, 2015 that Simpson's car was still in the parking lot – was there a camera surveilling it or did an agent drive by and see the car? Are there other cameras and other tapes that have not been provided? Why was the video or pole camera not disclosed to the Assistant U.S. Attorney handling Kareem's case until 2019? (Doc. 550, p. 14)

9.      AUSA Koehler states in the Response that he subsequently discovered reports and documents in the FBI's possession relating to the extraction of Nurse's cellular telephone and a copy of Nurse's passport. (Doc. 550, p. 16-17) Thus, the prosecution learned of this cell phone extraction in 2019 when it was necessary to lay the foundation for communications between Nurse and Abdul Khabir Wahid ("Wahid") who the Government prosecuted in *United States of America v. Abdul Khabir Wahid*, CR-17-00360-PHX-JJT-1 ("*Wahid*").

10.     The prosecution stated in May 5, 2016 that after Nurse was interviewed on May 26, 2015 by the FBI, no additional interviews of Nurse took place, and no additional report was drafted.  (Doc. 324, pp. 19-20)  In his trial testimony, SA Stewart Whitson speculated that another interview may have been conducted after November 2015, but no such interview occurred according to the prosecution.  (RT 3/3/15 118)  The prosecution went on to say that the interview reports reveal Nurse permitted agents to look through his phone.  Nothing further came of that review, and the Government did not obtain a search warrant for the phone.  Similarly, the government did not obtain historical cell phone records for Mr. Nurse's phone pursuant to 18 U.S.C. § 2703.  (Doc. 324, p. 19)  In its recent Response, the prosecutor attempts to correct his misstatements to the Court (Doc. 550, p. 17, n. 8) but it is clear the prosecutor was not told by the FBI that it had the contents of Nurse's cell phone by mid-September 2015.

11.     I obtained a copy of a portion of the trial transcript in *United States v. Abdul Khaibr Wahid*, CR-17-00360-PHX-JJT-1, February 26, 2019 and February 27, 2019, pages 1 thru 317 ("*Wahid*")(Ex. 1).

12.     *Wahid* is a companion trial to Kareem's and Wahid is accused of lying to FBI agents when he was interviewed.

13.     One witness in the Wahid trial was SA Kim Edward Jensen, a thirty year agent with the FBI, and in May 2015, a member of the Phoenix division and the Joint Terrorism Task Force ("JTTF")(Ex. 1, pp. 40-42)

6

14.    When SA Jensen was questioned about the importance to the FBI of learning that Wahid had given Nurse the title to Simpson's car, his car keys and a note that appears to describe Nurse as having given Simpson money, Jensen testified that in terrorism investigations, when they find evidence of a financial transaction or some sort of money distribution, the FBI employs a "vast amount of resources to follow up on those types of evidence." (Ex. 1, p. 44)

15.    This testimony is at odds with SA Whitson's testimony and we have seen no evidence of the follow up that was apparently done by SA Jensen or should have been done by SA Whitson or SA Jensen.

16.    Ali Soofi testified in Wahid's trial and his testimony was inconsistent with his testimony in Kareem's trial.  In both cases, Ali said he moved in with his brother in February 2014 and lived with him until April 2015 for 14 months.  At first, in Kareem's trial, Ali testified that he met Kareem about half way through his stay which would have made it August or September 2014 (Ex. 2, p. 1749); he later modified it to April or May 2014.  He went on to testify that at first, after he met Kareem, Kareem came over two or three times a week and near the end three or four times a week and spent the night three times or more a week.  (Ex. 2 TT pp. 1749-50, 1784-1786)

17.    In Wahid's trial, Ali barely mentioned Kareem being present in the apartment during the first day of testimony. When asked about Salim Sampson (Kareem's nephew) Ali answered:

A.    He was a mutual friend of the group I guess.

7

Q.    Which group?

A.    With Elton, AK [Wahid], my brother."

No mention of Kareem.  There was little testimony of Kareem being in the apartment during Ali Soofi's first day of testimony in *Wahid*.

18.    On Ali's second day of testimony, after the overnight break, Kareem becomes the most frequent visitor at the apartment.  (Ex. 1, 141)   When asked how often Kareem was at the apartment Ali testified:

A.    It was pretty much throughout the whole week.  He would be there off and on.  He would sometimes spend the night.  Other times he would be there to eat.

Q.    So Abdul Malik [Kareem] was he there the most of any other visitor who didn't live at the house or something else?

A.    He was the most frequent person that would visit.

Q.    And that was pretty consistent throughout the time that you were in the house?

A.    Yes.

19.    Clearly, Ali was prompted to give Kareem a bigger presence at the apartment but Ali forgot he testified that he did not meet Kareem when he moved to the apartment in February 2014 and that Kareem did not visit at first.

20.    This inconsistent testimony is relevant and material since Kareem testified that he was only at Simpson's apartment on a few occasions and Kareem's testimony was collaborated by Nathanial Soofi, who was there every weekend and testified he had not

seen Kareem and by the evidence that the FBI canvased the apartment complex and no one recognized Kareem's photo. The video camera footage supports Kareem's testimony and if there was other surveillance done of the apartment by the FBI, it should be disclosed.

21.     After Kareem's first Motion for New Trial was fully briefed by May 24, 2016, the Government sent me a copy of an Affidavit in Support of an Application for a Criminal Complaint and Arrest Warrant by a Special Agent with the FBI involving the arrest of Erick Jamal Hendricks ("Hendricks"). It is my understanding that the Assistant U.S. Attorneys handling Kareem's case had just learned of the Hendricks' investigation. This disclosure was followed by 850 pages of screenshots of Twitter communications between the Undercover FBI Agent ("UCA") and Hendricks and the UCA and Simpson. Although the FBI had these documents in April 2015, it is my understanding that AUSAs handling Kareem's case were aware of them until after Kareem's trial based upon my conversation with AUSA Koehler.

22.     The primary purpose of this Declaration is to explain the defense strategy at trial and to explain how the newly disclosed items are material to that defense.

23.     It has been my practice in defending people accused of crimes to review all the information provided by the Government to determine the strength of the Government's case before deciding on a defense strategy.

24.     It is my belief, based on my forty plus years of experience, that 75 to 90 percent of the information concerning an alleged crime will be provided by the

9

Government's investigation.  At times, a defendant may have an alibi defense or self-defense that needs to be explained but generally most of the information concerning an alleged crime comes from the Government's investigation.  The defense is often hampered in its investigation when witnesses will not talk to the defense; as was the case with Nurse here.  Often, the defense does not know the names or contact information of possible witnesses, as was the case with John Sabari, aka "Yahya."

25.    Thus, the defense relies to a great degree upon the Government making timely and complete disclosures as is required by various rules of criminal procedure, case law and the United States Constitution.

26.    The Government's failure to make timely and complete disclosures adversely affects a criminal defendant's ability to put on a proper defense.

27.    Kareem's defense was that although he was friends with Simpson, had been roommates years earlier, and had gone shooting with Simpson and Nadir Soofi ("Soofi") with his friend Sergio Martinez and his young boys in the desert, he was not aware of the Mohammad Drawing Content before he learned that Simpson and Soofi had attacked it in Garland, Texas ("Garland"), he had not provided them with funds for their endeavor, he had not encouraged them nor had he known they were going to Garland, Texas.

28.    In preparing a defense it is always important to review all of the evidence and assess how it fits into the Government's case against your client and the client's defense. The analogy of a complex jigsaw puzzle with many small pieces as the evidence is often appropriately used.  Seemingly insignificant pieces of evidence may become

10

significant to both the defense and the prosecution as the case progresses but the defense is often saddled with creating its defense only after it understands the entirety of the Government's case.

29.     The Government suggests the defense wants to relitigate earlier motions for new trial. This claim is inappropriate. The prejudicial effect of suppressed evidence is "considered collectively, not item by item." *Kyles v. Whitely*, 514 U.S. 419, 436 (1995); see Doc. 303, pp. 13-14. Thus, the fact that the Government continues to disclose material information three years after Kareem's trial makes it relevant to look at *all* the late disclosures in assessing whether the motion for new trial should be granted.

30.     Generally speaking, when the Government indicts someone and makes the required disclosures, a picture of the Government's case becomes apparent since the Government is required to make disclosures, including of items material to preparing the defense and items the Government intends to use in its case-in-chief. See Fed. R. Crim. P. 16(a)(1)(E)(i) and (ii).

31.     In this case many of the disclosures made by the Government were made after the court set deadlines through its Scheduling Order and many were made after the trial was completed.

32.     As already discussed in prior briefs, the Government failed to disclose that:

(a)     That it had interviewed John Sabari, a person on the Government's preliminary witness list, three times prior to trial and did not disclose any of the three reports until after the trial and as set forth in the earlier pleading would have been a key

11

witness for Kareem to show that he was not a follower of Sheikh Faisal nor did he Skype with Simpson, Soofi or Sabari  (Doc. 345, p. 1);

(b)     The Government was investigating Erick Jamal Hendricks ("Hendricks") who the Government alleged to have conspired to provide material support to a foreign terrorist organization ("ISIS") and involved communications between Hendricks and an undercover FBI agent ("UCE") about the Draw Mohammad Contest in Garland, Texas (Doc. 432 and 452);

(c)     The UCE communicated with Hendricks who put the UCE in contact with Simpson with whom he tweeted about the about the Mohammad Drawing contest prior to the attack (Doc. 432 and 452);

(d)     The UCE traveled to Garland and was told by Hendricks that he might see a "brother from Arizona" in Garland (Doc. 432 and 452);

(e)     The UCE saw the attack, took a couple of pictures, and drove away while the attack was taking place (Doc. 432 and 452);

(f)     On September 15, 2016, the Government produced approximately 850 pages of documents comprised of screen shots of Twitter communications between the UCE and Hendricks and the UCE and Simpsons (Docs. 432 and 452).  These texts would have been used to show that Kareem was never mentioned and that Simpson was the motivator of the attack.

33.     The Government has argued in opposition to our motion that by attacking the inadequacies of the FBI, I was seeking jury nullification.  (Doc. 527)

34.     Such a statement is unwarranted. Jury nullification is where the jury believes the law is unjust and decides not to apply the law despite the judge's instruction to do so.  There was never a hint by me that I thought the law was unjust; only that it did no apply in this case.  Additionally, lawyers are not permitted to argue jury nullification to the jury.   The Government, raised no "jury nullification" objection at trial.  It is unseemly that it raises it post-trial.

35.     The purpose for attacking the adequacy of the FBI's investigation was to show the jury how biased the FBI agents were in their investigation, testimony, and their findings.  The argument was that this was not a search for the truth.  It was an attempt to find a live person to charge.  Once the selection was made, all efforts were made to demonstrate it had made the right choice.   The defense is entitled to attack the thoroughness and even the good faith of an investigation.

36.     It is my belief after over forty (40) years in practice that a typical juror will be more likely to believe the testimony of law enforcement officials and in particular FBI agents over the testimony of lay people.

37.     It was my intent to try and show that the FBI agents were biased in an effort to diminish their credibility in front of the jury, not to seek jury nullification.

38.     Thus, all of the evidence that we could gather to try and discredit the testimony of the FBI agents was important and useful.  I hoped to show the jury that the FBI was not an unbiased agency but rather since September 11, 2001 has focused much of its resources on Islamic terrorist cases because it was embarrassed by the lack of

13

intelligence that it had gathered prior to the 9/11 attack on America.

39.     After Kareem was arrested and we obtained the first government disclosures it appeared that the Government's case was primarily based on the testimony of two juvenile neighbors of Kareem's and the testimony of Stephen Verdugo ("Verdugo"), so it was going to be important to discredit their testimony.

40.     Verdugo was a disgruntled ex-friend of Kareem's who had lived with Kareem, but Kareem had recently denied him housing and a job.  Verdugo was a despicable individual who we believed we could discredit since his testimony could not be collaborated nor did it seem plausible.  The idea that this uneducated kid with no money would be asked to make a bomb sufficient to blow up the Super Bowl was as preposterous as was his story that Kareem would confide in him after he would not let him live in his house nor give him a job.  Also, Verdugo was without money and he was prostituting his girlfriend for money.

41.     Kareem did hire Verdugo for several weeks, after the attack, unsuspecting his perfidy.  Verdugo was wired and made numerous calls to Kareem trying to get Kareem to implicate himself in the Garland attack and Kareem never did.  Nor was there any statements by Kareem that supported any of Verdugo's outrageous statements.  Lastly, after Verdugo approached the FBI on May 7, 2015 the FBI placed surveillance on Kareem 24 hours a day until he was arrested on June 10, 2015 and gained no information based on Kareem's conduct that helped its case.

14

42.     As for the two boys who were neighbors of Kareem it appeared that they were just trying to get some notarity for themselves.  Their statements about when and where Kareem made comments to them were implausible and their testimony, I believed, was easily impeached.

43.     Thus, from the beginning the Government's primary evidence against Kareem appeared to be that of FBI agents concerning Kareem's friendship and association with Simpson and the finding of certain materials on his computer which Kareem claimed from the beginning to the end he was not aware of or it had been placed on the computer by Simpson.

44.     The thrust of the defense was to convince the jury that Kareem had severed much of his contact with Simpson; he did not tweet nor was he in contact with Muslim terrorists nor any Muslin terrorist sympathizers; that he had never heard of the cartoon drawing content in Garland, nor had other Muslims, and that he had not provided funds to Soofi and Simpson for their purchase of weapons nor for their trip to Garland, Texas. Kareem's lack of contact with Muslim terrorist sympathizers was why the interviews with Saabir were so important since Saabir and Simpson Skyped with a radical Jamaican Muslim Cleric and Kareem never did.

45.     At the beginning it did not appear that Ali Soofi had any testimony that implicated Kareem.  He did not even mention Kareem in his initial interview.  Then he became a Government agent, trying to bring down Kareem and others, including Abdul Khabir Wahid.  But each time he spoke to FBI agents his testimony involved Kareem

more and more.  During his first interview with FBI agents, the day after his brother's death in Garland Texas, which interview was surreptitiously taped he was asked who came over to the apartment that he shared with his brother and Simpson and he only mentioned Abdul Khabin Wahid.  He never said that Kareem came by the apartment.  His testimony evolved over time.  The more times he was interviewed by the FBI the more he placed Kareem in the frame and in his last interview that was a prep session right before trial he has Kareem spending multiple nights a week at the apartment, teaching Simpson and Soofi how to clean and oil automatic weapons even though Kareem did not and had not ever owned one.  Ali Soofi, thus, became the primary witness against Kareem after multiple meetings with the FBI, most of which were not taped after the first one. Thus, we had to rely on the FD 302s prepared by the FBI agents, and in particular Special Agent and Case Agent Whitson, to determine what Ali Soofi would say.

46.     As the case neared trial Ali Soofi's testimony became more damning for Kareem and there appeared to be a correlation between his refreshed memory and his meetings with the FBI just as seems to happen in the Wahid case.  Thus, the credibility of the FBI agents and the agency as a whole became more important to the defense.

47.     It appears likely that sometime after the attack and prior to trial, Nurse was placed on the FBI "watch list" operated by the FBI's Terrorist Screening Center. *See* https://www.fbi.gov/about/leadership-and-stucture/national-security-breanch/tsc  last visited May 31, 2019.  None of this was revealed by the Government, who listed and then withdrew Nurse as a potential witness to be called by the prosecution.  Based on SA

Jensen's testimony in the Wahid case, it would appear after learning that Nurse was given

Simpson's car to pay him back for providing him with money, the FBI would employ "a

vast amount of resources to follow up."

We now know that the Government opened an investigation of Nurse on April 27,

2016. (Doc. 550, p. 17, 9)  This is similar to another situation the case against Hendricks

in Northern Ohio.  Although the investigation of Hendricks was virtually complete in

May 2015, Hendricks was not charged until after the conclusion of Kareem's trial, so too

with the investigation of Nurse.  The timing is beyond coincidental and harmful to

Kareem, since the Government failed to make timely, proper disclosures and appears to

have hid certain evidence even from the prosecution that it was obtaining in these related

and intertwined investigations.

48.     In *Wahid* the Government called Russell Carman, a supervisor officer with

US Customs and Border Protection ("CBP") who testified about performing a logical

extraction on the phone of Saabir Nurse on September 26, 2015 at George Bush

International Airport in Houston and turning it over to the FBI to be stored under its

evidence retention authority (Ex. 1 p. 185)  This extraction was dealt with in my earlier

Declaration. (Doc. 541, p. 1)

49.     Based on all of the recently disclosed information, the defense would have

done the following at trial if this information would have been disclosed:

(a)     called Steven Jane to testify ("UCA"), the undercover FBI agent who

witnessed the attack in Garland, Texas and communicated with Simpson before the attack

17

to discuss his communications and the coincidence of his being at the site of the attack when it occurred, his statement "Tear up Texas," his communication; concerning a "brother from Arizona," and how he came to communicate with Simpson and were there more texts that he was not able to copy.

(b)     called SA Amy Fryberger to testify as to what prompted her to seek a pole camera outside Simpson's apartment, how many were there, when did they become operational, how often were they monitored, was she aware of an investigation of Simpson as early as March 2015 and what prompted it;

(c)     called an FBI agent who checked on Simpson's car being in the apartment parking lot on May 3, 2015, did they drive by, was there more than one camera, did anyone review the pole camera video to determine when Simpson last left the apartment and had not returned;

(d)     called Nurse concerning giving money to Simpson, his foreign travel, the Haj, his lack of a relationship with Kareem, his relationship with Sabari and Bell, his letters to and from a jailed terrorist found in Simpson's apartment, whether he was interviewed after May 2015;

(e)     called SA Jensen about whether the FBI invested vast resources in investigating Nurse and if so, when and what was the outcome of the investigation;

(f)     called John Sabari to testify about Simpson and Soofi coming to his house in Scottsdale to Skype with Sheikh Faisal ("Faisal"), the Radical Muslim Cleric in Jamaica and that Kareem never attended these sessions. The Government went to great

lengths to argue that Kareem was a follower of Faisal yet he never attended any of the sessions when Sabari, Simpson and Soofi Skyped with Faisal. This would have gone a long way in supporting Kareem's testimony that he was not a follower of Faisal and show that he was not involved with Simpson and Soofi in communicating with known terrorists or terrorist sympathizers.

(g)    possibly called James Bell to testify about his relationship with Simpson and his knowledge of the Mohammad Drawing contest and his lack of a relationship with Kareem.

(h)    Additional questions for SA Whitson who side-stepped several areas of inquiry about Nurse, the pole camera, the UCA, and the investigation by the FBI into Simpson starting March 2015;; and

(i)    Russell Carmen who downloaded Nurse's phone.

50.    Had all of this information been disclosed before trial, it would have impacted the defense's trial preparation and strategy and the witnesses we would have called and our attack on the thoroughness and the good faith of the FBI's investigation.

51.    This recently disclosed information was material to Kareem's defense.

DATED this 4th day of June, 2019.


Daniel D. Maynard

19

# EXHIBIT 1

CR-17-00360-PHX-JJT-1, February 26, 2019

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF ARIZONA

3        _____

4
United States of America,          )
5                                   )
                     Plaintiff,     )
6    vs.                            )
                                    )   CR-17-00360-PHX-JJT-1
7    Abdul Khabir Wahid,            )
                                    )
8                      Defendant.   )
                                    )   February 26, 2019
9    _____)

10

11

12        BEFORE:  THE HONORABLE JOHN J. TUCHI, JUDGE

13        REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS

14        BENCH TRIAL - DAY 1 (Witness testimony only)

15              (Pages 1 through 130)

16

17

18

19

20

21   Official Court Reporter:
     Elaine Cropper, RDR, CRR, CCP
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35
23   Phoenix, Arizona  85003-2151
     (602) 322-7245/(fax) 602.322.7253
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

            United States District Court

131

CR-17-00360-PHX-JJT-1, February 27, 2019

1                UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ARIZONA

3                  _____

4     United States of America,        )
                                        )
5                       Plaintiff,      )
                                        )
6     vs.                               )   CR-17-00360-PHX-JJT-1
                                        )
7     Abdul Khabir Wahid,               )
                                        )
8                       Defendant.      )
                                        )   February 27, 2019
9                                       )   9:20 a.m.
     _____)

10

11

12      BEFORE:   THE HONORABLE JOHN J. TUCHI, JUDGE

13          REPORTER'S TRANSCRIPT OF PROCEEDINGS

14           BENCH TRIAL - DAY 2 (Entire day)

15             (Pages 131 through 317)

16

17

18

19

20   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
21   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, SPC 35
22   Phoenix, Arizona  85003-2151
     (602) 322-7245/(fax) 602.322.7253
23
     Proceedings Reported by Stenographic Court Reporter
24   Transcript Prepared by Computer-Aided Transcription

25

                United States District Court

```
 1              (KIM EDWARD JENSEN, a witness herein, was duly sworn      12:17:47

 2   or affirmed.)

 3                        DIRECT EXAMINATION

 4   BY MS. BROOK:

 5   Q.    Good afternoon.                                                12:18:01

 6   A.    Good afternoon.

 7   Q.    Would you please introduce yourself to the Court?

 8   A.    My name is Kim Jensen.

 9   Q.    And, sir, for the better part of your professional career,

10   what did you do for a living?                                       12:18:12

11   A.    I was an FBI agent for approximately 30 years.  Prior to

12   that I was in the military.

13   Q.    When did you first become an FBI agent?

14   A.    I first became an FBI agent in 1987.

15   Q.    And then when did you retire from the FBI?                    12:18:27

16   A.    Three years ago, in 2016.

17   Q.    You had mentioned that at some point prior to 1987 that

18   you were in the military?

19   A.    Yes, I was.

20   Q.    So during your time in the military, your 30-some odd         12:18:40

21   years working with the FBI, were you trained in interview

22   skills?

23   A.    Yes, I was.  I was what's called the 96 Charlie in the

24   military.  I was an interrogator.

25   Q.    And then again when you joined the FBI in '87 throughout      12:18:54
```

United States District Court

KIM EDWARD JENSEN - Direct

1   your 30 years with them as a Special Agent, did you have                     12:18:57

2   training to do interviews?

3   A.   I did throughout my career, yes.

4   Q.   And in fact, when you were working in the military, were

5   you certified as an interviewer?                                            12:19:09

6   A.   I was.  I was certified as an interviewer and interrogator

7   as a 96 Charlie.

8   Q.   So let's focus in on May of 2015.  Which branch of the FBI

9   were you working for?

10  A.   I was working in the Phoenix Division within the JTTF,              12:19:23

11  which is the Joint Terrorism Task Force.

12  Q.   So as a special agent within the JTTF, in the immediate

13  aftermath of the Garland, Texas, attack, what were your

14  specific roles?

15  A.   My specific roles in the -- after the attack was to            12:19:40

16  interview -- was to conduct as many interviews as I could and

17  to follow leads and then report those interviews and leads back

18  to my supervisor.

19  Q.   And did you interview just one person or multiple people

20  during the time you were assigned to work?                              12:19:58

21  A.   As a result of those attacks we -- I myself interviewed

22  multiple people.

23  Q.   As you were working in the field as part of the follow-up

24  investigation to the Garland, Texas, attack, did you get an

25  idea roughly of the amount of assets or resources that the            12:20:18

KIM EDWARD JENSEN - Direct

1   Phoenix FBI was contributing to this particular investigation?          12:20:21
2   A.   I did.   As a member of the JTTF, I saw that our entire
3   JTTF, which is approximately five or six squads, was completely
4   mobilized to deal with all of the leads that came about as the
5   Garland attack.   So there was probably, I would estimate,            12:20:35
6   around 100 people at least in the Phoenix Division that was
7   involved in investigating those attacks.
8   Q.   At what point during the course of this investigation did
9   it become a terrorism investigation?
10  A.   Immediately.   In my opinion, immediately because there was       12:20:55
11  a significant amount of press coverage regarding that Garland
12  attack and myself and as well as other people that I work with
13  knew that there was the Draw the Prophet Muhammed contest being
14  in Texas which had been targeted before by people that belonged
15  to al-Qaeda and ISIS.   So when that happened everyone, that I        12:21:20
16  worked with knew it was probably or most likely a result of a
17  terrorist incident.
18  Q.   And you had mentioned the news as well.   Was that you
19  reporting that this was a suspected terrorism attack?
20  A.   Yes.   It was reported extensively.                              12:21:39
21  Q.   Were you aware that ISIS had claimed responsibility for
22  the attack?
23  A.   No, I was not aware immediately that ISIS had -- I
24  postulated that but I was not aware immediately until about a
25  day afterwards.                                                       12:21:51

United States District Court

KIM EDWARD JENSEN - Direct

1   Q.   So roughly around May 4 or so?                                    12:21:55

2   A.   May 4, yeah.

3   Q.   Let's take a step back.  So you had mentioned that you

4   were staffed on the JTTF.  At is pertains to engaging in

5   terrorism investigations, were you specifically trained on    12:22:08

6   leads to follow and important pieces of evidence to collect?

7   A.   Yes, I was.  I had been trained regarding terrorism

8   investigations extensively.

9   Q.   And that training obviously was before the May of 2015?

10  A.   Pardon?                                                   12:22:27

11  Q.   Was before the May of 2015, that training?

12  A.   Yes.  Yes.  It was, it was for several decades.

13  Q.   And additionally out in the field, is this something that

14  you would put into practice if need be during other types of

15  terrorism investigations?                                     12:22:38

16  A.   Yes, it would be.

17  Q.   So let's break it down for a moment.  During a terrorism

18  investigation, what sorts of pieces of evidence are important

19  to collect?

20  A.   During a terrorism investigation, it is almost like       12:22:50

21  putting together a jigsaw puzzle with an innumerate amount of

22  small, tiny pieces of puzzle which then, during the course of

23  the investigation, that you try to amass and to try to collect

24  or gather a picture of what's happening.

25            Even though those pieces may be disparate or          12:23:07

United States District Court

KIM EDWARD JENSEN - Direct

1    seemingly insignificant; but when you look a at them in the          12:23:11
2    totality of everything else, they paint a pretty good picture.
3    So the type of evidences that we are looking for when we do a
4    terrorism investigation are things like individuals involved,
5    monetary, any kind of monetary instruments that was used, just     12:23:26
6    a myriad of evidentiary things which you're looking for,
7    people, places, who, what, where, when, and how.
8    Q.    So let's unpack that just a little bit.  You had mentioned
9    that some of the evidence that you're looking for may appear
10   insignificant.  What does that mean?                               12:23:47
11   A.    Well, some of the -- for example, money.  Money in and of
12   itself is just a monetary instrument.  But in a lot of times in
13   my experience, money is used to repay people for services they
14   committed or especially to repay people, survivors of terrorist
15   attacks.  So something that doesn't seem that much or to have      12:24:06
16   that much weight, for example, money, maybe could be overlooked
17   but, in fact, that is a clear indication as to intention and
18   it's evidence.
19   Q.    And additionally, if you are in the field and you find
20   evidence of a financial transaction or some sort of money          12:24:24
21   distribution in a case like this, do you follow up on it?
22   A.    We certainly do.  We employ a vast amount of resources to
23   follow up on those types of evidence.
24   Q.    What are some of the other things that you are looking for
25   in the immediate aftermath of a terrorism attack investigation     12:24:49

KIM EDWARD JENSEN - Direct

| | | |
|---|---|---|
| 1 | like this?  What are some of the concerns that you have | 12:24:52 |

1  like this?  What are some of the concerns that you have
2  investigatively?
3  A.    The primary concern that we have is preventing a secondary
4  incident from taking place.
5        Oftentimes in terrorism investigations, there's --
6  there are more than one incidences or planned events which may
7  take place.  So our primary goal, the reason why we go out as
8  fast as we do and as hard as we do is to prevent a secondary
9  attack from happening.
10  Q.   And in order to do so, are there types of evidence that
11  you look for or things that you are on the watch for during
12  that investigation?
13  A.    Yes.  We are.  We are primarily looking for things
14  obviously like bombs, like weapons, caches of money that could
15  be used to purchase things, individual involved, communications
16  equipment, transportation equipment.  A myriad of things that
17  one could use to perpetrate another attack.
18  Q.   Are you also looking to identify who the attackers, the
19  original attackers, were in connection with or contact with
20  before the attack?
21  A.    Absolutely.  We're trying to identify those individuals
22  that did the attack, if that can be done, and then to
23  immediately identify their circle of associates so that we can
24  investigate whether those individuals were involved or will be
25  involved in a subsequent attack.

12:24:52
12:25:04
12:25:28
12:25:47
12:26:05
12:26:21

United States District Court

KIM EDWARD JENSEN - Direct

1  Q.   So to go out, speak with or communicate, interview, follow          12:26:26

2  up on those circle of associates?

3  A.   Absolutely.

4  Q.   Let's turn our attention to May 6 of 2015.   On that

5  particular day, did you interview an individual by the name of          12:26:41

6  Abdul Khabir Wahid?

7  A.   Yes, I did.

8  Q.   And here with us in the courtroom today, do you recognize

9  him?

10 A.   Yes, I do.                                                          12:26:49

11 Q.   Can you point to him and identify him by something that

12 he's wearing?

13 A.   He's sitting there, wearing a maroon shirt.

14         MS. BROOK:   Your Honor, may the record reflect that

15 the witness has identified the defendant?                               12:26:58

16         THE COURT:   It does.

17 BY MS. BROOK:

18 Q.   On May 6 of 2015, did you interview Mr. Wahid?

19 A.   Yes, I did.

20 Q.   And where was it that you interviewed him?                         12:27:10

21 A.   At his house on Port au Prince Lane in Glendale.

22 Q.   Do you remember or recall roughly what time it was?

23 A.   It was in the afternoon, probably around 2:30.

24 Q.   And when you arrived to do the interview, did you call in

25 advance?                                                                12:27:31

KIM EDWARD JENSEN - Direct

1    A.   No, we did not.  We didn't actually know where he lived

2    and so prior to showing up at his house, we had gone to two

3    other residences to try to track down where Mr. Wahid lived.

4    Q.   So when you arrived at that address on Port au Prince and

5    I think you mentioned it was in the 3,000 block of Port au

6    Prince?

7    A.   Yes.  Somewhere in the 3000 block.

8    Q.   When you arrived at that house, were you by yourself?

9    A.   I was not.  I was with another special agent by the name

10   of Robert Byrne.

11   Q.   And how were you two dressed?

12   A.   We were dressed fairly casually which is what we typically

13   do when we do investigations.

14   Q.   How was it that you first made contact with Mr. Wahid

15   there at the house on Port au Prince?

16   A.   We drove our vehicle up to his house and parked in the

17   street and then we entered through a gate which he has on his

18   property which is about 15 feet away from his front door.

19   After entering the gate, which is a courtyard, we knocked on

20   his house.

21   Q.   Were you using recording equipment?

22   A.   Yes.  Special Agent Byrne was wearing recording equipment.

23   Q.   And was that recording equipment recording from the point

24   that you came up and knocked at the door?

25   A.   Yes, it was.

United States District Court

12:27:32

12:27:45

12:28:01

12:28:14

12:28:30

12:28:43

KIM EDWARD JENSEN - Direct

1    Q.    And that equipment, is it on your exterior or is it on the          12:28:44

2    interior of clothing?

3    A.    Interior, principally in a pocket.

4    Q.    Do you announce and did you announce during this interview

5    that you were recording the interview?          12:28:54

6    A.    No, we did not.

7    Q.    So what was the purpose of going to Mr. Wahid's house to

8    interview him on that day?

9    A.    Well, the day before, on May 5, I had on opportunity to

10   speak with Ali Soofi regarding the incident regarding his          12:29:09

11   brother Nadir who was one of the attackers in Garland, Texas.

12   And in the course of that short interview that I conducted at

13   the airport while he was preparing to fly out to Missouri, I

14   asked him some details regarding his brother.  Regarding the

15   apartment and where he lived with his brother and I also asked          12:29:34

16   him about some associates that he saw over at his residence.

17   And as a result of that interview, we decided to go speak with

18   Mr. Wahid.

19          MS. BROOK:  At this is point, Your Honor, we're

20   briefly going to start the recordings.  Do you think this is a          12:29:56

21   good time?

22          THE COURT:  If you think this is a good breaking

23   point, this is when I intended to let you all go for lunch.

24   Why don't we go ahead and do that then?

25          All right.  Ladies and gentlemen, it's 12:30.  The          12:30:08

United States District Court

KIM EDWARD JENSEN - Direct

1  parties need time to prepare so we're going to start again at                12:30:11

2  1:45.  If everybody can be ready to go then.  Until then, we

3  will be in adjournment.

4          Mr. Jensen, to save us just a minute, when we come

5  back, if you want to just resume your place on the stand, it              12:30:24

6  will save us an interruption calling you up.

7          THE WITNESS:  Okay.

8          THE COURT:  All right.  Thank you.

9          MS. BROOK:  Thank.  You, Your Honor.

10          (Recess at 12:30; resumed at 1:46.)                               12:30:34

11          THE COURT:  All right.  Looks like we're ready to

12  proceed.  Thank you, everyone, for resuming your positions as

13  well.

14          Ms. Brook, you can proceeds whenever you're ready.

15          MS. BROOK:  Thank you, Your Honor.                                01:46:21

16  BY MS. BROOK:

17  Q.  Sir, we left off, we were talking about interviews that

18  you conducted on May 6 of 2015?

19  A.  Yes.

20  Q.  And that was at a residence on Port au Prince Lane?                   01:46:29

21  A.  Yes.

22          MS. BROOK:  Can we place on the overhead Exhibit

23  Number 159, please.

24  Q.  I just wanted to clarify.  So what has been put up on the

25  overhead as Exhibit 159, do you see, recognize what's in this            01:47:13

United States District Court

50

KIM EDWARD JENSEN - Direct

1  photo?                                                                    01:47:16

2  A.    I do.

3  Q.    And what is it?

4  A.    It's the residence of Mr. Wahid's residence.

5  Q.    So when you went to the residence on Port au Prince on May    01:47:20

6  6 of 2015, is this the residence you're referring to?

7  A.    Yes, it is.

8         MS. BROOK:  Your Honor, may the Government move to

9  admit Exhibit 159?

10        THE COURT:  There being no objection --                       01:47:31

11        MR. WAHID:  No.

12        THE COURT:  -- then, yes, 159 is admitted.

13        (Exhibit Number 159 was admitted into evidence.)

14  BY MS. BROOK:

15  Q.    So as you look at this residence, is that a green gate?   01:47:39

16  A.    Yes, it is.

17  Q.    If you're going to go in and knock on the front door of

18  this residence, how do you approach it?

19  A.    You have to open the green gate and walk about 15 feet

20  away to the front door which is right behind it.                    01:47:51

21  Q.    Can you go ahead and I think just by touching it, you

22  could put an X on what is actually the front door of this

23  residence.

24  A.    (Witness complies).

25  Q.    Just a dot.  Do you mind putting an X?                        01:48:07

United States District Court

KIM EDWARD JENSEN - Direct

1   A.   (Witness complies).                                           01:48:10

2   Q.   So where the X and the arrow is the front door and then

3   draw a line through the green gate so we all know what we're

4   referring to.

5          So as you and Special Agent Byrne approached that         01:48:23

6   afternoon and came to the front door, is that where you went?

7   A.   Yes, it is.

8   Q.   And at some point you mentioned you came into contact with

9   Mr. Wahid?

10  A.   Yes.                                                          01:48:32

11  Q.   What happened at that point?  Where did the interview

12  actually take place?

13  A.   Initially we knocked on the green gate to look for dogs,

14  which is a safe thing to do.  And once we determined there were

15  no dogs in there, we let ourselves in the green gate but we did  01:48:44

16  knock on at first just to see if there was any dogs.  Once we

17  passed the green gate, we approached the front door and we

18  knocked on the front door.

19  Q.   And what happened then?

20  A.   Mr. Wahid's daughter answered the door and we identified     01:48:58

21  ourselves to his daughter and we asked that we be able to speak

22  with her father.

23  Q.   And at that point, did you see Mr. Wahid?

24  A.   We did not because it was a closed screen door so we asked

25  him to open the screen door.                                      01:49:20

United States District Court

KIM EDWARD JENSEN - Direct

1  Q.   And then was the screen door opened?                    01:49:22

2  A.   Yes.  Mr. Wahid opened the screen door and we asked if we

3  could come in to speak with him.

4  Q.   And what did he say?

5  A.   He said we could so we entered his house and spoke with    01:49:29

6  him.

7  Q.   And when was it after you entered his house that you spoke

8  with him?

9  A.   In the living room in close proximity to the front door.

10 Q.   Describe for us what the setup was during the interview.   01:49:38

11 Were you standing or sitting or something else?

12 A.   We were all seated on chairs and couches in his front

13 living room.

14 Q.   And by "all," who are we talking about?

15 A.   Myself, Special Agent Robert Byrne, and Mr. Wahid.         01:49:50

16 Q.   And was that for the duration of the interview?

17 A.   That was for the duration of the interview, yes.

18 Q.   It seems like an obvious question but at any point were

19 your guns drawn?

20 A.   No.                                                        01:50:02

21 Q.   And the tone and demeanor, was it pretty much consistent

22 throughout the interview?

23 A.   It was.  Everything was very amicable and very

24 cooperative.

25 Q.   Did you explain to Mr. Wahid why you were there?           01:50:26

United States District Court

KIM EDWARD JENSEN - Direct

1    A.   We did.  We explained that we were there because of the          01:50:28

2    attack in Garland, Texas.

3    Q.   And at what point during the interview was that?

4    A.   Within a few minutes of speaking with him.

5    Q.   And did Mr. Wahid seem to understand what that meant?          01:50:41

6    A.   Yes.  He did seem to understand what that meant.

7    Q.   Did you also explain to him that it's a crime to lie to

8    the FBI?

9    A.   We did.  We explained that it was a crime to lie to the

10   FBI and withhold anything that was of material.                     01:50:53

11   Q.   Have you had the opportunity to listen to and review the

12   full audio recording of that May 6 interview?

13   A.   I have.

14   Q.   And additionally, have you had the opportunity to sit and

15   listen to review audio clips 85 through 99?                         01:51:09

16   A.   Yes, I have.

17   Q.   Do each of those clips fairly and accurately represent a

18   portion of the interview that you had that day with the

19   defendant on May 6?

20   A.   Yes, they do.                                                   01:51:22

21   Q.   You mentioned a moment ago that there was a portion of the

22   interview where you explained that it was a crime to lie to the

23   FBI.

24   A.   Yes.

25   Q.   Does Exhibit Number 85 fairly and accurately represent         01:51:34

KIM EDWARD JENSEN - Direct

1   that component of the conversation?                         01:51:37

2   A.   Yes, it does.

3               MS. BROOK:  Your Honor, we're going to move to play

4   Exhibit Number 85.

5               THE COURT:  Any objection, Mr. Wahid?            01:51:44

6               MR. WAHID:  No.

7               THE COURT:  All right.  You may.

8               (Exhibit 85 was played.)

9   BY MS. BROOK:

10  Q.   Shortly after that portion of the conversation, did Wahid   01:53:33

11  talk about watching Simpson in the months nearing the attack

12  become more radicalized?

13  A.   Yes, he did.

14  Q.   And what was said?

15  A.   He basically said that he watched the process in which   01:53:46

16  Simpson was becoming more and more upset.

17  Q.   And what did you say, more and more upset?

18  A.   More and more upset, radicalized.

19  Q.   Did Mr. Wahid describe the last time that he saw Simpson

20  and Soofi before the attack?                                 01:54:11

21  A.   Yes.  He spoke to us about the occasion that he had to

22  meet with Simpson and Nadir Soofi on Friday before the attack.

23  Q.   And does Exhibit Number 86 reflect that part of the

24  conversation?

25  A.   Yes, it does.                                           01:54:28

United States District Court

KIM EDWARD JENSEN - Direct

1          MS. BROOK:  Your Honor, the Government is going to          01:54:29
2     move to admit and play 86.
3          THE COURT:  All right.  Hearing no objection, 86 is
4     admitted.  You may play.
5          (Exhibit Number 86 was admitted into evidence.)          01:54:37
6          (Exhibit Number 86 was played.)
7     BY MS. BROOK:
8     Q.   As part of this terrorism investigation into the Garland
9     attack, was this component of the interview you had with Wahid
10    important?                                                      01:55:22
11    A.   Yes, it was important, very important.
12    Q.   Why so?
13    A.   Because at this point in the interview, we realized that
14    Mr. Wahid may have been the very last person to see Simpson and
15    Soofi prior to their travel to Garland, Texas, to carry out the  01:55:34
16    attack.
17    Q.   So, therefore, why would the details of that interaction
18    be important in this terrorism investigation?
19    A.   Historically, the last person to spend time with subjects
20    who are going to go perpetrate or go do something nefarious,    01:55:50
21    that last person has some cogent details and facts that will
22    aid in the investigation of the case and help us recover
23    evidence as quickly as we can.
24    Q.   And is the timing of the recovery of that evidence
25    important?                                                      01:56:07

United States District Court

KIM EDWARD JENSEN - Direct

1    A.   It's very important because almost all evidence is          01:56:08

2    perishable.   It disappears, it goes away, it walks away and so

3    the speed at which we can get to that evidence is extremely

4    important.   And specifically in this case, it's very important

5    because there was a terrorist attack and we were concerned      01:56:25

6    there was going to be another one.

7    Q.   Based upon your training and experience, your work in the

8    JTTF as well as your work in the military dealing with these

9    type of situations, are you familiar with something called a

10   farewell message?                                               01:56:40

11   A.   Yes, I am.

12   Q.   And what is that in relationship to terrorism attacks?

13   A.   Oftentimes when individuals go to commit an act of

14   terrorism they leave behind either a written message or

15   recorded message or video message explaining their motives and  01:56:54

16   giving some clues as to what they were going to do and why they

17   were going to do it so it's a common practice for people to

18   leave a message of some sort.

19   Q.   Additionally we spoke briefly before the break about the

20   follow-on attack.   Based upon your training and experience,    01:57:18

21   both in the JTTF as well as in relation to other terrorist

22   attacks that have happened in other locations, is the concern

23   of a follow-on attack an important one?

24   A.   The concern of a follow-on attack is probably one of the

25   most important things we look at in the course of an            01:57:34

United States District Court

KIM EDWARD JENSEN - Direct

| | |
|---|---|
| 1 | investigation.  Typically, a lot of attacks happen in | 01:57:36 |
| 2 | coordination and are linked to other attacks that follow those |
| 3 | attacks.  So we were focused like a laser beam on anything that |
| 4 | could happen as a result of that attack to see if there was a |
| 5 | pending attack or if there was a planned attack or if there was | 01:57:54 |
| 6 | anything set in motion which may precipitate a secondary |
| 7 | attack. |

1    investigation.  Typically, a lot of attacks happen in    01:57:36

2    coordination and are linked to other attacks that follow those

3    attacks.  So we were focused like a laser beam on anything that

4    could happen as a result of that attack to see if there was a

5    pending attack or if there was a planned attack or if there was    01:57:54

6    anything set in motion which may precipitate a secondary

7    attack.

8    Q.    You mentioned the word "coordination," how could that or

9    has it, based on your training and experience, come into play

10    in terms of the aftermath of a first attack leading to a second    01:58:08

11    attack?

12    A.    Many, also times, many occasions, specifically in

13    terrorist attacks, many bombings or it could be any type of

14    attack really are daisy or chain-linked to other events.

15         So, for example, a bomb could go off and that bomb    01:58:29

16    would cause people to scurry in one direction and many times

17    there is a secondary device at that location and many times

18    there's a third or a fifth device which I've seen in my career

19    on numerous occasions.

20    Q.    Is it possible for the attackers to coordinate via    01:58:48

21    messages?

22    A.    And the attackers do communicate with each other via

23    messages or telephone calls or video messages or couriers or

24    any manner or means they communicate with each other, either to

25    aid or assist or to redirect.    01:59:05

58

KIM EDWARD JENSEN - Direct

1  Q.  Did you follow up specifically on different components          01:59:11

2  after the defendant said about the interaction he had with

3  Simpson and Soofi on Friday?

4  A.  We followed up on everything that he told us.

5  Q.  Let me ask a better question.  Did you follow up with him       01:59:26

6  in the interview when you were talking to him?

7  A.  We followed up on questions that -- that we asked him and

8  we followed up on the answers that he gave us.

9  Q.  Did you inquire about what the attackers were wearing when

10 they were at his house?                                             01:59:40

11 A.  I did.

12 Q.  Whether or not they were carrying or bringing anything?

13 A.  Yes, I did.

14 Q.  Does Exhibit Number 87 reflect that part of the

15 conversation?                                                       01:59:49

16 A.  Yes, it does.

17         MS. BROOK:  The Government is going to move to admit

18 and play 87.

19         THE COURT:  There being no objection, 87 is admitted.

20         (Exhibit Number 87 was admitted into evidence.)            02:00:02

21         (Exhibit Number 87 was played.)

22 BY MS. BROOK:

23 Q.  Did you then ask Wahid where the attackers, the two men,

24 Simpson and Soofi, were standing when they came to the house?

25 A.  Yes, I did.                                                     02:00:31

KIM EDWARD JENSEN - Direct

1   Q.   Does clip number 88 represent that part of the                    02:00:34
2   conversation?
3   A.   Yes, it.
4        MS. BROOK:   Your Honor, the Government is going to
5   move to admit and play Exhibit 88.                                     02:00:40
6        THE COURT:   There being no objection, 88 is being
7   admitted; and if I didn't say it before, 85 is admitted.
8        (Exhibit Number 85 was admitted into evidence.)
9        (Exhibit Number 88 was admitted into evidence.)
10       (Exhibit Number 88 was played.)                                   02:00:50
11  BY MS. BROOK:
12  Q.   Let me just follow up on that for a moment.  Did you
13  understand or did he point to or explain exactly where the part
14  of the house was that Simpson, he, and Soofi stood that Friday
15  night?                                                                 02:01:19
16  A.   Yes. Mr. Wahid was adamant about where they were standing
17  when they had the conversation.
18  Q.   And where was that?
19  A.   In front of his front door outside of his house on his
20  property.                                                              02:01:31
21  Q.   Outside of that white door that we were just looking at a
22  minute ago on exhibit admitted number 159?
23  A.   Yes.
24  Q.   Did you then ask him to describe again what happened when
25  Simpson and Soofi visited his home on May 1 that evening?             02:01:44

United States District Court

KIM EDWARD JENSEN - Direct

1   A.   I did.                                                          02:01:48

2   Q.   And does Exhibit Number 89 represent that part of the

3   conversation?

4   A.   Yes, it does.

5          MS. BROOK:  The Government moves to admit and play           02:01:55

6   Exhibit 89.

7          THE COURT:  All right.  There being no objection, 89

8   is admitted.

9          (Exhibit Number 89 was admitted into evidence.)

10         (Exhibit Number 89 was played.)                              02:02:02

11  BY MS. BROOK:

12  Q.   Did you follow up on this and ask exactly what Simpson and

13  Soofi said to him that night?

14  A.   I did.  I asked him repeatedly.

15  Q.   And does clip number 90 represent one of the times where       02:03:59

16  you asked?

17  A.   Yes, it does.

18         MS. BROOK:  Government moves to admit and play

19  Exhibit Number 90.

20         THE COURT:  All right.  There being no objection, 90         02:04:08

21  is admitted.

22         (Exhibit Number 90 was admitted into evidence.)

23         (Exhibit Number 90 was played.)

24  BY MS. BROOK:

25  Q.   At this point in the interview, based upon your training       02:05:34

United States District Court

KIM EDWARD JENSEN - Direct

1   experience, did it seem odd to you that Simpson and Soofi came                                      02:05:39

2   over to the house that night, gave a bowel of soup to Wahid,

3   talked about the kids needing good Muslim role models and his

4   son needing -- being a good Muslim and that was it?

5   A.   Yes, it did.  And I --                                                                           02:05:56

6               MR. WAHID:  Objection.  Speculation.

7               THE COURT:  The objection is overruled.  The witness

8   can answer the reasons he has and the Court will test those.

9               Go ahead.

10              THE WITNESS:  Yes.  It felt very strange and very odd   02:06:08

11  to me and that's why I kept pressing him and asking the same

12  questions over and over.

13  BY MS. BROOK:

14  Q.   Based upon your training and experience, why did it seem

15  odd?                                                                                                  02:06:19

16  A.   It seemed odd that someone would come over before they

17  were going to commit a horrendous act to give someone a bowl of

18  soup.

19  Q.   At this point, did you continue to push, to ask what all

20  happened?                                                                                             02:06:37

21  A.   Yeah, because of the -- because of the oddity of that, we

22  continued to push I think for another hour asking the same

23  questions over and over.

24  Q.   Does Exhibit 91 represent the next part of the

25  conversation on that point?                                                                           02:06:52

United States District Court

KIM EDWARD JENSEN - Direct

1    A.    Yes.                                                          02:06:54

2            MS. BROOK:   Government moves to admit and play

3    Exhibit Number 91.

4            THE COURT:   There being no objection, 91 is admitted.

5            (Exhibit Number 91 was admitted into evidence.)        02:07:02

6            (Exhibit Number 91 is played.)

7    BY MS. BROOK:

8    Q.    Did Wahid's statement to you that Simpson had asked him to

9    join in conducting another attack on a military base before the

10   attack on the Draw the Prophet Muhammed contest in Garland, did   02:12:24

11   that affect your interview with the defendant?

12   A.    It certainly did.

13   Q.    How so?

14   A.    Well, now we know that Simpson had approached Mr. Wahid

15   approximately two months before the day we were interviewing      02:12:42

16   him and asked him to go on an attack mission with him to a

17   marine base.  And it's conversation, according to what he told

18   me, was that it took place right outside his house, the same

19   place that the conversation was taking place where the soup was

20   exchanged at this point, our feelers and suspicions were          02:13:05

21   realized based on our experience that terrorist attacks usually

22   are accompanied by numerous other similar events.  And so this

23   put the interview in a different light.

24   Q.    Did you ask Wahid again at that point what else he

25   remembered about what transpired with he, Simpson, and Soofi on   02:13:31

United States District Court

KIM EDWARD JENSEN - Direct

1    that Friday night?                                        02:13:34

2    A.   Yes, I did.   Because he let us know that he was invited to

3    participate in one attack previously two months ago and I

4    suspected at that point that they came to his house Friday

5    night possibly asking him to join them in another attack in    02:13:51

6    Garland, Texas.

7    Q.   Does Exhibit Number 92 represent that part of the

8    conversation?

9    A.   Yes, it does.

10            MS. BROOK:   Your Honor, the Government is going to    02:14:04

11   move to admit and play Government Exhibit Number 92.

12            THE COURT:   All right.   There being no objection, 92

13   is admitted.

14            (Exhibit Number 92 was admitted into evidence.)

15            (Exhibit 92 is played.)                         02:14:21

16   BY MS. BROOK:

17   Q.   What was the top of the black car that was referred to in

18   the questions asked to Wahid?

19   A.   It was the car that was sitting outside of the fence just

20   on the other side of his property.                       02:15:42

21   Q.   Was that Nadir's car that was driven over that night?

22   A.   That was I believe Nadir's car.

23   Q.   Did you go on to ask Wahid why he thought that Simpson and

24   Soofi came to his house that night of all places?

25   A.   I did.                                              02:16:00

KIM EDWARD JENSEN - Direct

1  Q.   And does Exhibit Number 93 represent fairly that part of                02:16:00

2  the conversation?

3  A.   Yes, it does.

4         MS. BROOK:   Government moves to admit and play

5  Exhibit Number 93.                                                           02:16:09

6         THE COURT:   All right.   Without objection, 93 is

7  admitted.

8         (Exhibit Number 93 was admitted into evidence.)

9         (Exhibit 93 was played.)

10  BY MS. BROOK:                                                               02:18:23

11  Q.   Did you ask Wahid which one of the two, Simpson or Soofi,

12  had told him that his daughter needed a good role model?

13  A.   Yes, I did.

14  Q.   Does 94 represent that part of the conversation?

15  A.   Yes, it does.                                                          02:18:36

16         MS. BROOK:   Government moves to admit and play 94.

17         COURTROOM DEPUTY:   There being no objection, 94 is

18  admitted.

19         (Exhibit Number 94 was admitted into evidence.)

20         (Exhibit 94 was played.)                                            02:18:47

21  BY MS. BROOK:

22  Q.   Did you ask Wahid when he thought that Simpson and Soofi

23  left Phoenix and drove to Texas?

24  A.   Yes, I did.

25  Q.   And does Exhibit Number 94 fairly and accurately represent           02:19:33

KIM EDWARD JENSEN - Direct

| | | |
|---|---|---|
| 1 | that part of the conversation? | 02:19:37 |
| 2 | A.    Yes, it does. | |
| 3 | MS. BROOK:   Government moves to admit and play 95. | |
| 4 | THE COURT:   With no objection, 95 is admitted. | |
| 5 | (Exhibit Number 95 was admitted into evidence.) | 02:19:46 |
| 6 | (Exhibit 95 is played.) | |
| 7 | BY MS. BROOK: | |
| 8 | Q.    Did you ask Wahid exactly how Nadir handed the soup to | |
| 9 | him? | |
| 10 | A.    Yes, I did. | 02:21:23 |
| 11 | Q.    Does Exhibit Number 96 fairly and accurately represent | |
| 12 | that part of the conversation? | |
| 13 | A.    Yes, it does. | |
| 14 | MS. BROOK:   The Government moves to admit and play | |
| 15 | Exhibit Number 96. | 02:21:33 |
| 16 | THE COURT:   All right.   If there's no objection, 96 | |
| 17 | is admitted. | |
| 18 | (Exhibit Number 96 was admitted into evidence.) | |
| 19 | (Exhibit 96 is played.) | |
| 20 | BY MS. BROOK: | 02:22:15 |
| 21 | Q.    A few minutes ago we listened to a clip where Wahid talked | |
| 22 | about receiving phone calls that day or text messages from | |
| 23 | Simpson. | |
| 24 | A.    Yes. | |
| 25 | Q.    During this interview, did you follow up with Wahid on | 02:22:28 |

KIM EDWARD JENSEN - Direct

1   that point and ask him to show you his call history from his          02:22:32

2   phone from Friday through the weekend?

3   A.   Yes, I did.

4   Q.   And does Exhibit Number 97 fairly and accurately represent

5   that part of the conversation?                                        02:22:42

6   A.   Yes, it does.

7        MS. BROOK:   The Government moves to admit and play

8   Exhibit Number 97.

9        THE COURT:   Hang on for a second.

10       There being no objection, 97 is admitted.                        02:22:56

11       Now you may publish.

12       (Exhibit Number 97 was admitted into evidence.)

13       (Exhibit 97 was played.)

14  BY MS. BROOK:

15  Q.   Again, it was Wednesday, May 6, that you were at the            02:23:49

16  house?

17  A.   Yes.

18  Q.   Does you ask Wahid for Abdul Malik's phone number?

19  A.   Yes, I did.

20  Q.   And does Exhibit Number 98 fairly and accurately represent      02:24:04

21  that part of the phone call?

22  A.   Yes, it does.

23  Q.   Abdul Malik Abdul Kareem, was that the individual that

24  Wahid was referring to a few clips ago?

25  A.   Yes, it is.                                                      02:24:18

United States District Court

KIM EDWARD JENSEN - Direct

1        MS. BROOK:   The Government moves to admit and play    02:24:18

2  Exhibit Number 98.

3        THE COURT:   All right, sir.   With no objection, 98 is

4  admitted.

5        (Exhibit Number 98 was admitted into evidence.)    02:24:35

6        (Exhibit 98 is played.)

7  BY MS. BROOK:

8  Q.   Did you ask Wahid for his phone number?

9  A.   Yes, I did.

10  Q.   And does Exhibit Number 99 fairly and accurately represent    02:25:10

11  that part?

12  A.   Yes, it does.

13        MS. BROOK:   The Government moves to admit and play

14  Exhibit Number 99.

15        THE COURT:   There being no objection, 99 is admitted.    02:25:20

16        (Exhibit Number 99 was admitted into evidence.)

17        (Exhibit 99 is played.)

18  BY MS. BROOK:

19  Q.   When -- well, a few moments ago before we started playing

20  these clips, I asked you if Government Exhibit Numbers 95    02:25:47

21  through 99 fairly and accurately represented each of the clips

22  that you listened to and that we played here in court.   I just

23  want to ask that one more time because we didn't do that for

24  each one, just for the sake of expediency throughout, but I

25  wanted to make sure that the record is correct.    02:26:09

KIM EDWARD JENSEN - Direct

1  A.   Yes.  All of those clips accurately represent what       02:26:11
2  happened.
3  Q.   How long was this interview that you had with the
4  defendant on May 6 at his house?
5  A.   A little more than two hours.                             02:26:23
6  Q.   And at any point during this two-hour plus interview did
7  the defendant tell you that Simpson and Soofi also provided him
8  an envelope?
9  A.   No, he did not.
10  Q.   At any point during this interview, did the defendant also  02:26:41
11  tell you that Simpson and Soofi, when they were there, also
12  provided him a set of car keys?
13  A.   No, he did not.
14  Q.   At any point did he mention an envelope or car keys?
15  A.   No, he did not.                                          02:26:54
16  Q.   At any point during this interview, did he mention whether
17  or not he was given instructions by Simpson or by Soofi to do
18  something after they left that night?
19  A.   No, he did not.
20  Q.   Would that have been important in your investigation?    02:27:06
21  A.   That would have been very important.
22  Q.   How?
23  A.   Well, you have to realize this was Wednesday.  The attack
24  happened on Sunday.  We had two dead bodies.  We were rushing
25  to find everything that we could as quickly as we could to    02:27:19

United States District Court

KIM EDWARD JENSEN - Direct

1   prevent anything else from happening.  So any material fact on    02:27:22
2   this case would have helped us out significantly.  It would
3   have given us leads.  It would have given us the opportunity to
4   examine the perishable evidence before it disappeared before we
5   had a chance to examine it and look at it to see where those      02:27:38
6   leads took us, to see if there was another pending attack, to
7   see if there were other individuals involved, to see the
8   totality of all of these circumstances.  We were not able to do
9   that.
10  Q.   During this interview, at any point, was Saabir Nurse        02:27:52
11  brought up?
12  A.   No, I do not believe he was brought up in this interview.
13  Q.   And if you had known that the defendant had been given an
14  envelope and a set of car keys and asked to provide them to
15  another person, what would you have done with that information?   02:28:09
16  A.   We would have immediately set out possibly to retrieve
17  the -- those pieces of evidence to see what they were to see if
18  they were coded messages, to see if it was a last will, to see
19  if it provided instructions to anyone else.  We would have run
20  that to ground as quickly as we possibly could have.             02:28:30
21  Q.   At any point during this interview were you told that he
22  provided those keys and envelope to Saabir Nurse in the early
23  hours of that particular day, Wednesday, May 6?
24  A.   No.
25  Q.   And if you had been told that, what specifically would you   02:28:48

KIM EDWARD JENSEN - Direct

| | |
|---|---|
| 1 | have done with regard to the investigation of Saabir Nurse? | 02:28:53 |
| 2 | A.   We probably would have requested Mr. Wahid help us out and |
| 3 | trying to track down that evidence to see who he gave it to, |
| 4 | when he gave it to him, where he was when he gave it to him, |
| 5 | where were they possibly located.  And we may have asked for | 02:29:07 |
| 6 | his assistance and if he had declined assisting us, then we |
| 7 | would have had to figure out other means to get ahold of that |
| 8 | material that was given to Saabir Nurse. |
| 9 | Q.   What are other investigative means that you have at your |
| 10 | disposal that you may have used if you knew about this | 02:29:25 |
| 11 | information? |
| 12 | A.   Well, we could have employed undercover agents.  We could |
| 13 | have employed sources.  We could have everything at our |
| 14 | disposal to find out where that evidence was. |
| 15 | Q.   Would a search warrant have been possible? | 02:29:37 |
| 16 | A.   A search warrant definitely would have been possible, |
| 17 | either orders for text messages, 2703(d) orders, electronic |
| 18 | order, physical search orders. |
| 19 | Q.   And, again, did any of that happen? |
| 20 | A.   None of that happened. | 02:29:55 |
| 21 | Q.   On June 10 of 2015, did you interview the defendant again? |
| 22 | A.   Yes, I did. |
| 23 | Q.   And where was that? |
| 24 | A.   That was at the same residence on Port au Prince Lane. |
| 25 | Q.   Let's talk a little bit about the setup to that interview. | 02:30:14 |

KIM EDWARD JENSEN - Direct

1  Where did it occur, the interview itself?                    02:30:17

2  A.   It occurred in the yard, on the side of his house.

3  Q.   And during the interview, was the defendant restrained at

4  all?

5  A.   Initially he was.  It was an interview that was concurrent   02:30:27

6  with a search warrant and so, typically, what we do when we

7  serve a search warrant, we secure the scene to make sure

8  there's nothing dangerous that's going to happen.  And then

9  after we secure the scene, we let everybody go.  And is exactly

10 what happened with Mr. Wahid.  We --                           02:30:44

11 Q.   I'm sorry.  Go ahead.

12 A.   We initially handcuffed him, as what we always do when we

13 serve a search warrant, and we read him his rights.  We tell

14 them after we have secured the scene, he is free to go and we

15 informed him that he was not under arrest.                     02:30:58

16 Q.   Okay.  And the restraint that's used, is that used for

17 officer safety or something else?

18 A.   That is for everyone's safety, to include his safety, as

19 well as anyone in the vicinity.

20 Q.   So during the duration of the interview, was he           02:31:10

21 handcuffed?

22 A.   No, he was not handcuffed.

23 Q.   And were your weapons drawn?

24 A.   During the knock of serving the search warrant there were

25 weapons drawn, yes.                                            02:31:22

KIM EDWARD JENSEN - Direct

1   Q.   But during the duration of the interview, during that time          02:31:24
2   period, were weapons drawn?
3   A.   After the scene was secure, after his house was secure and
4   the proximity of his house was secure -- when I say "secure,"
5   someone went and looked to make sure there was no one there --          02:31:36
6   then all of our weapons were put back in holsters.
7   Q.   This interview, like the first interview we talked about,
8   the May 6 one, was it recorded?
9   A.   Yes, it was.
10  Q.   And did the recording mechanism work as it should?               02:31:50
11  A.   Yes, it did.
12  Q.   Have you had an opportunity to review the recording in its
13  entirety?
14  A.   Yes, I have.
15  Q.   Have you also separately had an opportunity to review            02:31:59
16  Government's Exhibits 100 through 106?
17  A.   Yes, I have.
18  Q.   And do each of those exhibits fairly and accurately
19  represent component parts of the interview that you did with
20  the defendant on June 10 of 2015?                                     02:32:12
21  A.   Yes, they do.
22  Q.   Was he provided his rights?
23  A.   Pardon?
24  Q.   Was he read his rights?
25  A.   Yes, he was.                                                     02:32:26

United States District Court

KIM EDWARD JENSEN - Direct

1   Q.   And does Exhibit Number 100 represent that part of the                   02:32:27

2   conversation?

3   A.   Yes, it does.

4           MS. BROOK:   Government moves to admit and play

5   Exhibit Number 100.                                                           02:32:35

6           THE COURT:   With there being no objection, 100 is

7   admitted.

8           (Exhibit Number 100 was admitted into evidence.)

9           (Exhibit 100 was played.)

10  BY MS. BROOK:                                                                 02:33:39

11  Q.   Couple of quick points.   We heard somebody's voice on that

12  recording.   Who was reading the defendant his rights?

13  A.   Special Agent Robert Byrne.

14  Q.   And, again, like the first interview you did, was it you

15  and Special Agent Byrne together that conducted that interview?               02:33:55

16  A.   Yes, we were together.

17  Q.   Were there additional agents there or primarily you two?

18  A.   There were several agents there that were effecting a

19  search warrant, but myself and Special Agent Byrne were the

20  ones that accompanied Mr. Wahid throughout the duration.                      02:34:08

21  Q.   And, again, just to ground ourselves a little bit here,

22  Special Agent Byrne made mention of Malik.   Who was that?

23  A.   Abdul Malik, we -- at this point, we ascertained that he

24  may be a co-conspirator in this case regarding the Garland,

25  Texas attack, an associate of Mr. Wahid.                                      02:34:30

United States District Court

KIM EDWARD JENSEN - Direct

1  Q.   And that's Abdul Malik Abdul Kareem?                    02:34:35

2  A.   Abdul Malik Abdul Kareem, yes.

3  Q.   Did Mr. Wahid at that point agree to talk and to continue

4  talking with you?

5  A.   Yes, he did.                                            02:34:50

6  Q.   What was the purpose of this interview?

7  A.   The purpose of this interview, honestly, we didn't think

8  that he would speak with us while we were effecting the search

9  warrant at his house.  And we just asked to ask him some

10 follow-up questions, to which he agreed.  So we wanted to ask   02:35:09

11 him some follow-up questions regarding the first interview

12 which took place on the sixth of May.

13 Q.   So, again, these questions, follow-up questions, following

14 up on the May 6 interview, the essence of the questions, what

15 were they about?                                              02:35:24

16 A.   Well, like I said previously, the onset of my testimony,

17 these cases are like a giant puzzle piece so in the course of

18 all of these interviews that we were conducting, we would

19 ascertain a small piece or a small puzzle piece, small puzzle

20 piece.  And at this time we were starting to put those small    02:35:43

21 puzzle pieces together to form a picture.

22        And from that picture, we had ascertained that Mr.

23 Wahid may be in receipt of something from Simpson and Soofi.

24 Q.   When you say "these cases," what type of cases in

25 particular are we referring to?                              02:36:01

United States District Court

KIM EDWARD JENSEN - Direct

1    A.    We're talking about terrorism cases.                                    02:36:03

2    Q.    So, again, was this more information, gathering more

3    information about the Garland attack and the people that may be

4    involved?

5    A.    Yes.                                                                    02:36:14

6    Q.    Did you ask Wahid if he texted Simpson and Soofi to thank

7    them for the soup after that Friday night encounter before the

8    attack?

9    A.    Yes, we did.

10   Q.    And does clip 101 represent that part of the conversation?  02:36:27

11   A.    Yes, it does.

12              MS. BROOK:   The Government moves to admit and play

13   Exhibit 101.

14              THE COURT:   If there's no objection, 101 is admitted.

15              (Exhibit Number 101 was admitted into evidence.)        02:36:46

16              (Exhibit 101 was played.)

17   BY MS. BROOK:

18   Q.    Was this the first time during any of your interviews with

19   Wahid where he told you that Simpson and Soofi gave him a key

20   and an envelope?                                                              02:38:44

21   A.    Yes, it was the first time he mentioned that.

22   Q.    Did you ask him why he didn't tell you about the envelope

23   and the key the first time you all talked to him?

24   A.    Yes, I did.

25   Q.    Does Exhibit Number 102 reflect part of that?                02:39:09

KIM EDWARD JENSEN - Direct

1   A.   Yes, it does.                                                    02:39:12

2          MS. BROOK:   The Government moves to admit and play

3   Exhibit Number 102.

4          THE COURT:   All right.   With no objection, 102 is

5   admitted.                                                            02:39:22

6          (Exhibit Number 102 was admitted into evidence.)

7          (Exhibit 102 is played.)

8   BY MS. BROOK:

9   Q.   Did Wahid talk to you during this interview about him

10  knowing about Simpson's loyalties with ISIS or violent jihadi       02:41:21

11  tendencies?

12  A.   During this particular interview?

13  Q.   Yes.

14  A.   I believe he did.

15  Q.   Did you ask him in these conversations about Simpson's         02:41:41

16  loyalties, did Wahid talk about any ISIS videos that he had

17  seen through Simpson?

18  A.   Yes, he did.

19  Q.   And does clip 103 represent that part of the interview?

20  A.   Yes, it does.                                                   02:41:58

21          MS. BROOK:   Government moves to admit and play

22  Exhibit Number 103.

23          THE COURT:   If there's no objection, 103 is admitted.

24          (Exhibit Number 103 was admitted into evidence.)

25          (Exhibit 103 played.)                                        02:42:17

United States District Court

KIM EDWARD JENSEN - Direct

1    BY MS. BROOK:                                                       02:42:39

2    Q.    Did you ask Wahid how he knew that the key he was provided

3    was a car key?

4    A.    Pardon?

5    Q.    Did you ask Wahid how he knew the car or the key he was      02:42:45

6    provided was a car key?

7    A.    Yes, I did.

8    Q.    And does Exhibit 104 represent that?

9    A.    Yes, it does.

10              MS. BROOK:   The Government moves to admit and play       02:42:56

11   Exhibit Number 104.

12              THE COURT:   If there's no objection, 104 is admitted.

13              (Exhibit Number 104 was admitted into evidence.)

14              (Exhibit Number 104 is played.)

15   BY MS. BROOK:                                                       02:43:56

16   Q.    And I apologize, Exhibit 104 certainly talks about the key

17   and the envelope but the distinction between the two, is that

18   also in Exhibit 105?

19   A.    Yes.

20              MS. BROOK:   The Government moves to admit and play       02:44:07

21   Exhibit Number 105.

22              THE COURT:   With no objection, 105 is admitted.

23              (Exhibit Number 105 was admitted into evidence.)

24              (Exhibit 105 is played.)

25   \\\


United States District Court

KIM EDWARD JENSEN - Direct

| | |
|---|---|
| 1   BY MS. BROOK: | 02:44:28 |
| 2   Q.   Did you again in this interview ask him more about the | |
| 3   envelope and the key? | |
| 4   A.   Yes, I did. | |
| 5   Q.   And is that represented in Exhibit Number 106? | 02:44:34 |
| 6   A.   Yes. | |
| 7        MS. BROOK:   Government moves to admit and play | |
| 8   Exhibit Number 106. | |
| 9        THE COURT:   With no objection, 106 is admitted. | |
| 10       (Exhibit Number 106 was admitted into evidence.) | 02:44:50 |
| 11       (Exhibit 106 is played.) | |
| 12   BY MS. BROOK: | |
| 13   Q.   So this interview on June 10 of 2015 was approximately one | |
| 14   month and seven days after the attack on the Curtis Culwell | |
| 15   Center? | 02:45:32 |
| 16   A.   Yes. | |
| 17   Q.   How, if at all, does the discovery of the transfer of this | |
| 18   envelope and key at that point, one month and one week after | |
| 19   the event, affect the investigation? | |
| 20   A.   Well, I initially thought when he told me about the key | 02:45:49 |
| 21   that the key could just as well have been to a locker.  And | |
| 22   numerous cases that I've worked, terrorism investigations, | |
| 23   there have been things that have been locked up and in | |
| 24   containers, there have been things have been locked up in cars | |
| 25   and trunks in which they are materially relevant to a case, for | 02:46:07 |

United States District Court

KIM EDWARD JENSEN - Direct

1  example, explosives and other such evidence.                    02:46:10

2          So without having -- with passing over a month, that

3  evidence was not available to us and we could have dispatched a

4  number of individuals on the fifth probably at 5 o'clock that

5  afternoon the first time we interviewed him to ascertain        02:46:28

6  whether there was anything locked in any compartment, any

7  storage facility, anything which would require a key to open it

8  wherein explosive material or other perishable evidence could

9  be.  And that happens quite a bit during terrorism

10 investigations.                                                  02:46:48

11 Q.   And so you said the fifth.  Were referring to the

12 interview on May 6?

13 A.   Right.  The first interview in May.

14 Q.   So the passage of time, does that affect the potential to

15 recover something like the envelope?                             02:47:00

16 A.   It does because all evidence, as I said, is perishable.

17 After one month and five days, a lot of things can happen to

18 evidence after that amount of time.  That's why when we conduct

19 these investigations, that is why we try to cover every single

20 lead as expeditiously and as quickly as we possibly can, to     02:47:21

21 avoid that loss of evidence.

22 Q.   To your knowledge, was the envelope ever recovered in this

23 investigation?

24 A.   I do not know.

25 Q.   On December 11 of this same year, 2015, did you, again,    02:47:34

United States District Court

KIM EDWARD JENSEN - Direct

1   interview the defendant?                                              02:47:37

2   A.   Yes, I did.

3   Q.   And where did that interview occur?

4   A.   It occurred in the lobby of the FBI office on 7th Street.

5   Q.   How was it that Mr. Wahid came to appear, come to the FBI         02:47:46

6   office?

7   A.   It had to do with something with his son's computer.

8   Q.   Did he come voluntarily?

9   A.   Yes, he did.

10  Q.   And were you by yourself when you interviewed him or with         02:47:58

11  somebody else?

12  A.   I was not.  I was with Robert Byrne and Rob -- I can't

13  remember Rob's last name but I was with two other individuals.

14  Q.   Rob, is he also an employee of the FBI?

15  A.   Yes.  He's a DHS agent.                                           02:48:14

16  Q.   Okay.  Where did the interview happen?

17  A.   In the lobby of the FBI building.

18  Q.   And, again, was this interview recorded?

19  A.   It was recorded.

20  Q.   Have you had the opportunity to review in totality the           02:48:27

21  interview of December 11, 2015, of the defendants?

22  A.   Yes, I have.

23  Q.   And did you also have an opportunity to review and listen

24  to Exhibit Number 107 and Government's Exhibit 108?

25  A.   Yes, I have.                                                       02:48:43

United States District Court

KIM EDWARD JENSEN - Direct

1   Q.   Do those two clips fairly and accurately represent                   02:48:44

2   component pieces of the interview that you conducted that day

3   of the defendant at the FBI?

4   A.   Yes, they do.

5   Q.   During this interview, did Wahid tell you -- did he            02:49:06

6   explain to you, in his words, why he lied to you all on May 6

7   of 2015?

8   A.   Yes, he did.

9   Q.   Does clip number 107 fairly and accurately represent that

10  part of the conversation?                                           02:49:20

11  A.   Yes, it does.

12  Q.   And, again, this lie was about the key, the envelope, and

13  the instructions?

14  A.   Yes.

15          MS. BROOK:   Government moves to admit and play             02:49:28

16  Government's Exhibit 107.

17          THE COURT:   All right.   There being no objection --

18          MR. WAHID:   I object to the characterization of

19  lying.

20          THE COURT:   I'm going to sustain that objection as          02:49:40

21  well as leading on that.

22          Please be careful with the kind of questions that you

23  ask the witness, Ms. Brook.

24          But the exhibit is admitted.   There being no

25  objection to that, you may publish.                                 02:49:50

United States District Court

KIM EDWARD JENSEN - Direct

1          (Exhibit Number 107 was admitted into evidence.)          02:49:54

2          (Exhibit 107 was played.)

3    BY MS. BROOK:

4    Q.    Did you explain to Wahid why you continued to ask him

5    questions that Friday night?          02:50:47

6    A.    Yes, I did.

7    Q.    And does Exhibit Number 108 reflect that part of the

8    interview?

9    A.    Yes, it does.

10          MS. BROOK:    Government moves to admit and play          02:50:55

11   Exhibit Number 108.

12          THE COURT:    There being no objection, 108 is

13   admitted.

14          You may publish.

15          (Exhibit Number 108 was admitted into evidence.)          02:51:05

16          (Exhibit 108 is played.)

17   BY MS. BROOK:

18   Q.    At this point, did you have any concerns about the type of

19   answers he was providing during his interview?

20   A.    Yes, I did.          02:51:39

21   Q.    And what were those concerns?

22   A.    Those concerns were based on what he told me, that

23   information that we were asking wasn't our business and he

24   emphatically demonstrably told me that it was none of my damn

25   business regarding the information that he had received from          02:51:54

United States District Court

KIM EDWARD JENSEN - Direct

1   Ibrahim.                                                                02:52:04

2   Q.   When we started talking a while ago, you mentioned that

3   you also were part of other pieces of the investigation related

4   to the Garland attack?

5   A.   Yes.                                                               02:52:14

6            MS. BROOK:  And Your Honor, I saw you looking at the

7   clock.  Are we okay to keep going?

8            THE COURT:  You're fine.

9   BY MS. BROOK:

10  Q.   Did you happen in this investigation to also interview an         02:52:21

11  individual by the name of Ali Soofi?

12  A.   I did.

13  Q.   And who is Ali Soofi?

14  A.   Ali Soofi is Nadir Simpson's brother.

15  Q.   On May 5, 2015, did you interview Ali?                             02:52:34

16  A.   I did.

17  Q.   And where was it that you interviewed Ali on May 5?

18  A.   The interview took place at the Phoenix Airport, I believe

19  in Terminal 2.

20  Q.   Do you recall how that interview was set up?                      02:52:51

21  A.   I do.  I was asked to accompany a couple of FBI agents to

22  go and speak with Ali at any time prior to his departure.

23  Q.   And did you do that?

24  A.   I did.

25  Q.   Did you have an opportunity to talk to Ali during that           02:53:02

KIM EDWARD JENSEN - Direct

1   interview?                                                      02:53:05

2   A.   I did.

3   Q.   Describe for us what Ali's demeanor was like during that

4   interview.

5   A.   This was the day before that we interviewed Mr. Wahid so   02:53:12

6   just a short period of time after his brother was killed in

7   Garland, Texas.  So, understandably, he was very distraught.  I

8   felt bad about asking him questions because I could see how he

9   was suffering mentally and emotionally.  He was very upset that

10  his brother had been killed.  I believe he told me he was going  02:53:35

11  to go get ready for his brother's funeral around the Kansas

12  City area.

13  Q.   Without getting into the details of exactly what he said,

14  was he able to sit with you all and provide you some

15  information about things he had witnessed?                      02:53:49

16  A.   He was.

17  Q.   And did he provide you and the FBI information that was of

18  investigative value to the FBI?

19  A.   It was.  The types of questions that I asked him was

20  specifically who was at his apartment when he was residing with  02:54:04

21  his brother -- his brother Nadir and also Ibrahim Simpson, and

22  I also asked him the duration of the time that -- what kind of

23  time frame we were looking at, the individuals that came over

24  to his house to visit his brother, if there were any weapons at

25  his brother's house.                                            02:54:29

United States District Court

KIM EDWARD JENSEN - Direct

1  Q.   And without telling us what he said, did he answer those            02:54:34

2  questions?

3  A.   Yes, he did.

4  Q.   On May 2012, so roughly seven days after meeting Ali at

5  the airport, did you meet up with Ali again?                             02:54:45

6  A.   I believe we did.

7  Q.   And without telling us what city, what state was it where

8  he was interviewed?

9  A.   Missouri.

10  Q.   Could it have been Kansas?                                          02:55:07

11  A.   It was right on the border so I'm unsure exactly what

12  state because that city is split right down the middle.

13  Q.   Additionally, on June 4 of 2015, were you present in

14  another meeting with FBI agents with Ali Soofi?

15  A.   Yes, I was.                                                         02:55:24

16  Q.   And without telling us what he said, what was the purpose

17  of that interview?

18  A.   The purpose of the interview was to talk to Ali about some

19  of the previous questions that we had asked him, specifically

20  about the individuals that were visiting his brother, if there          02:55:39

21  were any weapons at all.  We wanted him to give us more precise

22  details about the weapons that his brother had in his

23  possession and also Mr. Simpson may have had in his possession.

24  Q.   Are you aware of whether or not during that particular

25  interview Ali was instructed in how to use recording devices to         02:55:56

KIM EDWARD JENSEN - Direct

1   make phone calls?                                                    02:56:01

2   A.    Yes, he was.

3   Q.    Were you there for that?

4   A.    I was.  However, I was speaking with his parents most of

5   the time so I wasn't privy to the exact nature of those             02:56:09

6   conversations regarding the technical aspects of the phone.

7   Q.    Do you know whether or not Ali had agreed at that point to

8   make consensual calls on behalf of the FBI?

9   A.    Yes, he had.

10  Q.    Throughout the time that you met with Ali during the month    02:56:28

11  of May and that time in June, June 4 of 2015, did Ali continue

12  to provide information to the FBI that was of investigative

13  value?

14  A.    He did.

15        MS. BROOK:  May I have a moment?                              02:56:47

16        THE COURT:  You may.

17        MS. BROOK:  I have no more questions of this witness.

18        THE COURT:  All right.  Ms. Brook, thank you.

19        Mr. Wahid, do you have any questions for this

20  witness?                                                            02:57:05

21        MR. WAHID:  Yes.

22        THE COURT:  All right.  If you're going to ask him

23  questions, I would like you to do it from the lectern so that

24  the witness has a clear line of sight to you, please.

25

United States District Court

KIM EDWARD JENSEN - Cross

### CROSS - EXAMINATION

BY MR. WAHID:

Q.    In your first visit to Mr. Wahid's home, did you have a
subpoena?

A.    Pardon?

Q.    Did you have a subpoena?

A.    I received a subpoena, yes.

Q.    No.  No.  I said in your visit to Mr. Wahid's home, did
you have a subpoena?

A.    I'm sorry.  I can't understand the question.

THE COURT:  Mr. Wahid, you're asking him did he have
a subpoena for you when he came to see you the first time?

MR. WAHID:  Right.  Yes.

BY MR. WAHID:

Q.    "Yes" or "no"?

A.    I did not have a subpoena the first time I came to see
you.  You're talking about the fifth?

Q.    The very first time.  That's what I mean by the first
time.

A.    On the sixth, now, we did not have a subpoena.

Q.    Both times when you were at Mr. Wahid's home, was he
obligated to speak with you?

A.    No, he was not.

Q.    Would you say that both times you were at Mr. Wahid's
home, it was voluntary on his part that he spoke with you?

United States District Court

KIM EDWARD JENSEN - Cross

1  A.   Yes.                                                    02:58:22

2  Q.   Was Mr. Wahid obligated to tell you about the envelope and

3  the key?

4  A.   He was obligated -- he was admonished to tell the truth,

5  yes.                                                         02:58:35

6  Q.   In your first visit to Mr. Wahid's home, did you ask him

7  if Elton Simpson gave him anything?

8  A.   Yes.

9  Q.   Your first visit?

10 A.   I asked him what else did he tell you, what else happened?  02:58:56

11 I asked I think what else three or four different times.  If I

12 said, "What else did Simpson give you," no, I did not ask,

13 "What else did Simpson give you," because Mr. Wahid told me

14 that Nadir gave him the soup.

15 Q.   When you returned on your second visit with the search     02:59:19

16 warrants, did you ask Mr. Wahid if Elton Simpson had given him

17 anything?

18 A.   Can you say that one more time?

19 Q.   When you returned on your second visit with the search

20 warrant, did you ask Mr. Wahid if Elton Simpson had given him   02:59:31

21 anything?

22 A.   Yes.

23 Q.   In your first visit to Mr. Wahid's home, what was it that

24 Mr. Wahid had told you that this gentleman Nadir Soofi had

25 given him?                                                   02:59:51

United States District Court

KIM EDWARD JENSEN - Cross

1    A.   I think Mr. Wahid told me that Nadir Soofi gave him a bowl    02:59:54

2    of soup.

3    Q.   In your first visit to Mr. Wahid's home, what was the

4    statement that Mr. Wahid omitted and not tell you that Elton

5    Simpson had given him?                                          03:00:11

6               THE WITNESS:   Can you read that one?

7    A.   I can't hear your words very well.

8    Q.   Okay.  In your first visit to Mr. Wahid's home, what was

9    the statement that Mr. Wahid omitted and not tell you that

10   Elton Simpson had given him?                                    03:00:26

11   A.   What he admitted was the instructions that he had received

12   from Simpson, the key that he received from Simpson --

13              MS. BROOK:   Your Honor, I'm going to object.   I

14   believe the question was not heard by the witness.

15              THE COURT:   I believe the question was "omitted," not  03:00:45

16   "admitted."

17              But the other reason that this is confusing for

18   everyone is, because Mr. Wahid, you're referring to yourself in

19   the third person.

20              And, Mr. Jensen, you're answering in the third         03:00:53

21   person.   I think it would simplify, and we would all be on the

22   same page, if we used "I" and "me" rather than "Mr. Wahid."

23   Let's try it that way.

24              If you could ask the question again, Mr. Wahid, using

25   "I" and "me."                                                   03:01:10

United States District Court

KIM EDWARD JENSEN - Cross

1    BY MR. WAHID:                                                    03:01:12

2    Q.    In your first visit to my home, what was the statement

3    that I omitted and not tell you that Elton Simpson had given

4    him?

5    A.    That Elton Simpson had given you?  That what you omitted    03:01:22

6    were the statements from Elton Simpson that he gave you some

7    instructions, that he gave you an envelope, and that he gave

8    you a key.  Those were the three things that you omitted.

9    Q.    When did you find out that I had omitted a statement about

10   the envelope and the key?                                        03:01:53

11   A.    Probably four or five days after I spoke to you the first

12   time.

13   Q.    Okay.  This is a "yes" or "no" question.  Did Mr. Wahid

14   correct his omitted statement by admitting that Elton Simpson

15   had given him a key and envelope?                                03:02:15

16          MS. BROOK:  Your Honor, I didn't hear the question.

17          THE COURT:  Please repeat it and please try and use

18   "I" and "me."

19          MR. WAHID:  Okay.  Yeah.  I keep forgetting about

20   that.                                                            03:02:24

21   BY MR. WAHID:

22   Q.    Did I correct the omitted statement by admitting that

23   Elton Simpson had given me a key and envelope?

24   A.    You corrected -- you corrected your own statement when

25   you -- the second time that we interviewed you when Mr. Byrne    03:02:36

KIM EDWARD JENSEN - Cross

1  asked if you Elton Simpson gave you something.  You said, "No."   03:02:40

2  And then you corrected yourself after you said, "No."

3  Q.   I asked you "yes" or "no".  I didn't ask for all of that.

4  A.   Yes.

5  Q.   Okay.  What did Mr. Wahid say he did with the key and   03:02:52

6  envelope?

7        MS. BROOK:  Your Honor, objection to the form of the

8  question.

9        THE WITNESS:  Can you say that one more time?

10 BY MR. WAHID:   03:03:05

11 Q.   I keep forgetting.  I'm sorry.

12        What did I say that I did with the key and envelope?

13 A.   I still can't hear you very well.  You say what did I

14 say --

15 Q.   -- that I did with the key and the envelope?   03:03:13

16        MS. BROOK:  And, Your Honor, just speculation in

17 terms of what time.  So what date is he referring to?  May 6?

18 June 10.

19        THE COURT:  Right.  So this is a foundational issue.

20 There have been multiple meetings between the two of you.  If   03:03:28

21 you could tell us May 6, the June meeting or the December

22 meeting, which one are you referring to, Mr. Wahid?

23        MR. WAHID:  I guess June 10.

24        THE COURT:  And do you need the question repeated

25 again?   03:03:45

KIM EDWARD JENSEN - Redirect

1        THE WITNESS:  Yes, please.                         03:03:46

2        THE COURT:  I'm going to ask the court reporter to

3    read it back.

4        (Requested portion of record read:  What did I say

5    that I did with the key and envelope?)                 03:04:03

6        THE WITNESS:  The second time we interviewed you, you

7    said you gave the key and the envelope to Saabir Nurse.

8    BY MR. WAHID:

9    Q.   Were there any more attacks because Mr. Wahid - because I

10   failed to give you that information about the key and envelope? 03:04:21

11   A.   Not to my knowledge.

12   Q.   Were there any more new developments in the investigation

13   such as naming more terrorists?

14   A.   Yes.

15   Q.   Was anyone injured or killed because I failed to give you  03:04:47

16   the information about the key and envelope?

17   A.   Not to my knowledge.

18        MR. WAHID:  I have nothing else, Your Honor.

19        THE COURT:  All right.  Thank you, Mr. Wahid.

20        Is there any redirect, Ms. Brook?                  03:05:13

21        MS. BROOK:  Briefly.

22                **REDIRECT EXAMINATION**

23   BY MS. BROOK:

24   Q.   For clarification sake, at any point during your two plus

25   hour interview of the defendant on May 6 of 2015, did he tell  03:05:26

1  you that Simpson and Ibrahim had provided him on the Friday                                03:05:30

2  before the attack an envelope and a key?

3  A.   No, he did not.

4  Q.   At any point did he say either of them gave him an

5  envelope or a key?                                                                          03:05:45

6  A.   No, he did not.

7  Q.   At any point did he make any reference or indication to

8  there being an envelope and a key?

9  A.   No, he did not.

10  Q.   At any point did he discuss any instructions that either                              03:05:53

11  Simpson or Soofi gave him on May 1?

12  A.   No, he did not.

13  Q.   As we listened to in the audio clip on June 10, 2015, when

14  first asked if there was anything else given or anything else

15  that happened during that May 1 of 2015 encounter, at first did                            03:06:32

16  he say, "No."

17  A.   He said, "No."

18            MS. BROOK:   I have no further questions.

19            THE COURT:   All right.   Thank you, Ms. Brook.

20            And then the witness may be excused.                                             03:07:08

21            Mr. Jensen, you may step down.   Thank you, sir.

22            (Witness excused.)

23            THE COURT:   Counsel, for the parties, let's go ahead

24  and take the afternoon break now.

25            Mr. Wahid, I saw you trying to get my attention.                                 03:07:18

United States District Court

|   |   |
|---|---|
| 1 | MR. WAHID:  I was just going to ask you could I use | 03:07:20 |
| 2 | the bathroom. | |
| 3 | THE COURT:  Yes.  We're going to go ahead and take a | |
| 4 | 15-minute break.  Everybody can be ready to go just a little | |
| 5 | bit after 3:20 and we'll go through to the end of the day at | 03:07:27 |
| 6 | 4:30. | |
| 7 | We're on recess.  Thank you. | |
| 8 | MR. MCBEE:  Your Honor, may I ask what time the Court | |
| 9 | intends to start court tomorrow? | |
| 10 | THE COURT:  I was intending to start at 9 o'clock. | 03:07:47 |
| 11 | Does that work for you? | |
| 12 | MR. MCBEE:  Yes.  That's fine. | |
| 13 | (Recess at 3:07; resumed at 3:24.) | |
| 14 | THE COURT:  All right.  Thank you, everyone.  The | |
| 15 | Government can call its next witness. | 03:24:21 |
| 16 | MS. BROOK:  Thank you, Your Honor.  The Government | |
| 17 | calls Ali Soofi. | |
| 18 | THE COURT:  All right.  Mr. Soofi, if you would step | |
| 19 | up past the bar to my courtroom deputy, she'll swear you in. | |
| 20 | COURTROOM DEPUTY:  If I can have you state your name, | 03:25:00 |
| 21 | spell your first and last name for the record, please. | |
| 22 | THE WITNESS:  First name is Ali, A-L-I.  Last name is | |
| 23 | Soofi, S-O-O-F-I. | |
| 24 | COURTROOM DEPUTY:  Thank you.  Please raise your | |
| 25 | right hand. | 03:25:11 |

1         (ALI SOOFI, a witness herein, was duly sworn or    03:25:12

2  affirmed.)

3                      **DIRECT EXAMINATION**

4  BY MS. BROOK:

5  Q.   Good afternoon.  And Mr. Soofi, can you please introduce    03:25:37

6  yourself to the Court?

7  A.   My name is Ali Hamid Soofi.

8  Q.   And just as you get up there and get comfortable, there's

9  water right there if you need it and want to pour yourself a

10  cup.    03:25:56

11  A.   I'm good.  Thank you.

12  Q.   How old are you?

13  A.   36.

14  Q.   And do you live here in Phoenix, Arizona?

15  A.   No.  I live outside the state.    03:26:04

16  Q.   When was it that you moved away from Phoenix?

17  A.   It was in, like, 2015.

18  Q.   Was it during summertime?

19  A.   It was during May, May 4 or 5 I left to go to Kansas.

20  Q.   And so that's when you left and you didn't come back here    03:26:31

21  to Phoenix to live?

22  A.   Yes.

23  Q.   Let's talk for a moment, is Nadir Soofi, was he your

24  brother?

25  A.   Yes.    03:26:43

ALI SOOFI - Direct

1   Q.   Was he older or younger than you?                          03:26:43

2   A.   Younger.

3   Q.   And back in 2014, did you live here in Phoenix?

4   A.   I'm sorry?

5   Q.   Back in 2014, did you live here in Phoenix?                03:26:56

6   A.   Yes.

7   Q.   And when you were living here in Phoenix in 2014, who did

8   you move in with?

9   A.   My brother.

10  Q.   And that's Nadir?                                          03:27:07

11  A.   Yes.

12  Q.   Did you live with just him or somebody else, too?

13  A.   He had a friend Ibrahim, or Elton Simpson, that he was

14  living with.

15  Q.   So did the three of you move in together?                 03:27:18

16  A.   They were already living together.  I had moved in with

17  them because I had nowhere to go so I pretty much had got

18  divorced and moved out so I moved in with them.

19  Q.   So you got divorced you moved here to Phoenix, you moved

20  in with your brother Nadir and he was living with Elton        03:27:38

21  Simpson?

22  A.   Yes.

23  Q.   Do you remember generally where that apartment complex was

24  that you lived?

25  A.   I think it was off of 16th Avenue and Thunderbird area.    03:27:50

United States District Court

ALI SOOFI - Direct

1  Q.   Was it near 19th Avenue?                                          03:27:54

2  A.   19th.   I'm sorry, I can't remember the exact address.   I

3  know it was on Thunderbird around -- that area.

4  Q.   And you mentioned that the three of you lived together.

5  Do you remember when in 2014 that started?   Do you remember    03:28:05

6  about what time of year in 2014 you moved in with the two of

7  them?

8  A.   It would be -- it was February.

9  Q.   February of 2014?

10  A.   Yes.                                                            03:28:23

11  Q.   And how long was it that you stayed living there in that

12  apartment with your brother and with Elton Simpson?

13  A.   A little bit less than a year and a half, about two months

14  less.   About a year and four months.

15  Q.   So approximately when in 2015 did you move out?   You had    03:28:36

16  mentioned that you moved back to Kansas on May 4.   At that

17  point, had you been no longer living with your brother and

18  Elton Simpson?

19  A.   Yes.   I was -- I had moved in with a girlfriend in the

20  beginning of April.                                                 03:28:55

21  Q.   So April of 2015.

22         So I want to rewind a little bit and ask you about

23  how it was you first met Elton Simpson.

24  A.   My wife had kicked me out previously in 2010.   I had moved

25  to Phoenix.   My brother owned a pizza place so I came out to    03:29:17

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | live with him and he was still in the same apartment that he | 03:29:23 |
| 2 | was in after.  Elton was someone that would come to the | |
| 3 | restaurant, the pizza place we owned, on almost like a daily | |
| 4 | basis because my brother would pray with him, go to the mosque | |
| 5 | nearby. | 03:29:46 |
| 6 | Q.   So was this 2010, 2011? | |
| 7 | A.   Yes. | |
| 8 | Q.   So you were working at the pizza shop with your brother? | |
| 9 | A.   Yes.  When I arrived there, my brother had given me a cook | |
| 10 | position. | 03:29:59 |
| 11 | Q.   And -- I'm sorry.  Go ahead. | |
| 12 | A.   I was going to say I would work every day, pretty much | |
| 13 | all -- six to seven days a week sometimes. | |
| 14 | Q.   So it was during that period of time that you first met | |
| 15 | Elton Simpson at the pizza shop? | 03:30:13 |
| 16 | A.   Yes. | |
| 17 | Q.   Did you spend time with him back then outside of the pizza | |
| 18 | shop? | |
| 19 | A.   Not really because I wasn't really religious so the only | |
| 20 | time would be when we went out to eat or when my brother would, | 03:30:29 |
| 21 | you know, take us to eat.  Other than that, it was nothing | |
| 22 | really. | |
| 23 | Q.   At some point did you leave Phoenix during that time | |
| 24 | period, the 2011 time period? | |
| 25 | A.   It was probably around the same time, around February, | 03:30:48 |

United States District Court

ALI SOOFI - Direct

1   March that I had gone back to get back with my wife or ex-wife.                    03:30:51

2   Q.   And at that point in time, who was your brother living

3   with?

4   A.   Nobody.

5   Q.   And then you returned back to Phoenix in February of 2014?    03:31:07

6   A.   Well, so in 2011 when I left, Elton took my position like

7   pretty much.  I left and he moved in.  So when I left, he

8   wasn't in there living with him but he moved in after the fact

9   I had left.

10  Q.   So for a period of time in 2011 he lived there but you had    03:31:28

11  left or were about to leave?

12  A.   Yes.

13  Q.   So I want to talk about the apartment complex that you

14  were living in for that roughly 14-month period, February of

15  2014 through April of 2015.  You had mentioned who you lived     03:31:44

16  with.  You lived with your brother and Simpson.  Can you

17  describe the apartment for us?

18  A.   It was a small, one-bedroom apartment.  The main living

19  area was not that big.  I mean, it had the living room and the

20  kitchen and then it would go straight to the bathroom and       03:32:07

21  bedroom.

22  Q.   So there was one bedroom.  Who had the one bedroom?

23  A.   My brother occupied that.

24  Q.   And then where did you sleep?

25  A.   I slept on the couch.  We had a big L-shaped couch in the    03:32:19

United States District Court

100

ALI SOOFI - Direct

1  living room.  We kind of divided that so we could sleep, like          03:32:24

2  our feet would kind of meet at one point.

3  Q.    Who is "our."  Who is the other person?

4  A.    Elton.  He was the other one that lived -- basically, we

5  would share the living room.                                           03:32:38

6  Q.    And other than the living room, the one bedroom, I presume

7  a kitchen, bathroom, is that the extent of the apartment?

8  A.    Yes.  We had a small balcony with a storage room, a little

9  storage room.

10 Q.    Can you explain to us roughly how big that living room       03:32:56

11 was?

12 A.    It was probably, like, 20 by 15 and it was pretty small.

13 Q.    I'm going to place on the overhead what's already been

14 marked as Government's Exhibit number 27.

15         COURTROOM DEPUTY:  Is it on the computer or the Elmo?      03:33:21

16         MS. BROOK:  It's on the computer.

17 BY MS. BROOK:

18 Q.    Looking at Government's Exhibit Number 27, do you

19 recognize that?

20 A.    Yes.                                                         03:33:34

21 Q.    And what do you recognize it as?

22 A.    It's the living room of the apartment.

23 Q.    The apartment that we've been talking about?

24         MS. BROOK:  Your Honor, the Government moves to admit

25 Government's Exhibit Number 27.                                    03:33:56

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | THE COURT:  Any objection, Mr. Wahid? | 03:34:00 |
| 2 | MR. WAHID:  No. |
| 3 | THE COURT:  All right.   27 is admitted. |
| 4 | (Exhibit Number 27 was admitted into evidence.) |
| 5 | BY MS. BROOK: | 03:34:09 |
| 6 | Q.   And Mr. Soofi, on the back wall depicted in this |
| 7 | photograph, what are the black boxes? |
| 8 | A.   Those are surround speakers.  We hooked up a stereo |
| 9 | system. |
| 10 | Q.   Sorry? | 03:34:29 |
| 11 | A.   They were just surround speakers. |
| 12 | Q.   Did that stereo system connect at all to the TV or what |
| 13 | was playing on the TV? |
| 14 | A.   Yes. |
| 15 | Q.   And do we see the TV in this picture? | 03:34:39 |
| 16 | A.   No. |
| 17 | Q.   Was the TV in this room? |
| 18 | A.   Yes, where the black chair is, it would have been on the |
| 19 | table. |
| 20 | Q.   Okay.  So looking here on the right side where that black | 03:34:56 |
| 21 | chair is? |
| 22 | We're going to put another picture up there, |
| 23 | Government's Exhibit Number 28.  Just one moment.  What's this |
| 24 | a picture of? |
| 25 | A.   That's a plexiglass -- we had turned it into a table but | 03:35:25 |

ALI SOOFI - Direct

1  it was a plexiglass -- it was an idea that my brother and I had          03:35:32

2  to use to clean the air vents because we had an air vent

3  cleaning business as well.  So it was made too heavy so we

4  converted it into a table.

5  Q.   And was that in the living room?                                    03:35:49

6  A.   Yes.  That was the middle, the main table.

7           MS. BROOK:  The Government moves to admit Exhibit

8  Number 28 and to place back on the overhead Exhibit Number 27.

9           THE COURT:  Any objection to 28, Mr. Wahid?

10          MR. WAHID:  No.                                                 03:36:05

11          THE COURT:  28 is admitted.

12          (Exhibit Number 28 was admitted into evidence.)

13          THE COURT:  Ms. Brook, I could use a little context

14  as to the dating of the two photographs because we have had

15  testimony that Mr. Soofi lived in this apartments two different          03:36:13

16  times and I don't know when this came from.

17          MS. BROOK:  Sure.

18  BY MS. BROOK:

19  Q.   Was it in this apartment that you lived two different

20  times?                                                                  03:36:21

21  A.   Yes.

22  Q.   So in looking at this picture that we see, Government's

23  Exhibit Number 27, does this fairly and accurately represent

24  how the apartment looked during the time period that you lived

25  there the last time period, so the 2014-2015 time period?              03:36:36

ALI SOOFI - Direct

1   A.   Yes.   It's exactly the same minus -- I mean, the table was        03:36:41

2   2014 when we made that but from 2010 it's pretty much the same.

3   Q.   You had mentioned that you moved out of the apartment

4   early April of 2015.   Did you have occasion to go back into the

5   apartment before the attack happened on May 3, in that              03:37:01

6   in-between period of time?

7   A.   I would visit at times.

8   Q.   And so the room as it's depicted here, is that how it

9   continued to look when you were back in the apartment?

10  A.   Yes.                                                           03:37:22

11  Q.   We had talked a moment ago about a TV.   Roughly how large

12  was the TV that was in this room?

13  A.   It was about 52 inch.

14  Q.   When you were in this particular room, the living room,

15  could you clearly see that TV?                                      03:37:43

16  A.   Yes.   Sitting in that room, anybody that was sitting in

17  there, it was positioned in front of them.

18  Q.   Was there anything that obstructed your view of that TV?

19  A.   No, not at all.

20  Q.   At some point did you meet an individual by the name of        03:38:06

21  Abdul Khabir Wahid?

22  A.   Yes.

23  Q.   How did you meet him first?

24  A.   It was through my brother.   I had heard about him

25  previously in 2010, you know, when we were at the pizza place       03:38:27

United States District Court

ALI SOOFI - Direct

1   but I had never met him until 2014.                               03:38:30

2   Q.   Do you see him here in the courtroom with us?

3   A.   Yes.

4   Q.   Can you point to him and identify something that he's

5   wearing?                                                          03:38:42

6   A.   The plaid red shirt.

7           MS. BROOK:  Your Honor, may the record reflect that

8   the witness identified the defendant?

9           THE COURT:  It does.

10  BY MS. BROOK:                                                     03:38:51

11  Q.   What did you call him?  Did you call him Mr. Wahid or what

12  name was he referred to as?

13  A.   I knew him by AK.

14  Q.   And is that how others referred to him, that you heard?

15  A.   Yes.                                                         03:39:05

16  Q.   You had mentioned that in 2010, 2011 you had heard of him.

17  When was the first time that you met him?

18  A.   It was at the apartment with my brother and Elton.

19  Q.   Which apartment?

20  A.   The one on the screen.                                       03:39:25

21  Q.   And roughly during which time period was that when you met

22  him in this apartment that we're looking at here, Exhibit

23  Number 27?

24  A.   I think it was -- I think it was shortly after I had

25  reached -- I was living there.                                    03:39:42

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | Q.   So shortly after you moved in in February of 2014? | 03:39:45 |
| 2 | A.   Yes. |
| 3 | Q.   Did you see him at that apartment, your apartment, the |
| 4 | apartment you shared with Nadir and with Simpson, just once or |
| 5 | more than once? | 03:40:08 |
| 6 | A.   I had seen him there more than once.  A lot of the times |
| 7 | as well I would go on runs.  I would, you know, just some |
| 8 | conversation after I would hear from my brother or Elton that |
| 9 | they were hanging out. |
| 10 | Q.   Hanging out at the house, the apartment, or somewhere | 03:40:32 |
| 11 | else? |
| 12 | A.   Both. |
| 13 | Q.   And approximately how many times do you think that you saw |
| 14 | him in this apartment with your brother and or Simpson? |
| 15 | A.   It was on occasion.  Me personally, it was maybe once or | 03:40:50 |
| 16 | twice here and there.  Just from their conversation, I would |
| 17 | hear other times. |
| 18 | Q.   So did you see him more than two times in this apartment? |
| 19 | A.   Yes. |
| 20 | Q.   And you say here that, to your knowledge, was he there | 03:41:09 |
| 21 | once a week, once a month, how often? |
| 22 | A.   I would say once or twice a week maybe. |
| 23 | Q.   I want to talk about what was occurring in this living |
| 24 | room that we're looking at.  During the time that you lived in |
| 25 | 2014 and 2015 with your brother and with Elton Simpson, were | 03:41:31 |

United States District Court

ALI SOOFI - Direct

1  there videos that were watched, displayed on the TV in the          03:41:37

2  living room of this house?

3  A.    Yes.  At first I didn't know what they were.  It was a lot

4  of guys with their head wraps driving around in trucks shooting

5  guns with black flags with -- you know, there was Arabic          03:42:00

6  writing with the swords crossing.  I mean, we would get a lot

7  of, you know, complaints because they would have it up so loud.

8  Q.    Who is "they"?

9  A.    Just general neighbors.  We had people that lived around

10 us.                                                              03:42:20

11 Q.    So there were, obviously, people in the living room that

12 were watching those videos.  Who was it that you recall

13 watching those videos?

14 A.    I mean, Elton would always or my brother would always be

15 at the computer.  It would be Abdul Kareem, the other guy, and          03:42:38

16 then I remember on occasions there would be AK as well.

17 Q.    And when AK was there, were there ever any of these videos

18 playing?

19 A.    They had them constantly playing unless I got on the

20 computer and like put on something I personally watched.  They          03:43:06

21 were always --

22 Q.    Go ahead.

23 A.    They would always have something of that sort playing.

24 Q.    You said of that sort, so you talked about videos with

25 people head wraps, with guns in the back of trucks with the          03:43:20

United States District Court

ALI SOOFI - Direct

1    black flags, with the swords.  Did you see any other types of          03:43:25

2    videos?

3    A.    On occasion they would put on the execution videos of

4    people that went against the beliefs of, you know -- of the

5    people that were in the videos.                                        03:43:45

6    Q.    In the execution videos that you saw shown on the TV in

7    this living room, how were people executed?

8    A.    By beheading.

9    Q.    You had mentioned that Simpson and your brother watched

10   those videos all the time.  Is that something that happened           03:44:10

11   daily?  Weekly?  How often is all the time?

12   A.    It was a daily thing.

13   Q.    During the time that you were in the apartment, did you

14   hear Simpson express support for ISIS?

15   A.    Not directly but a lot of hate towards people that didn't       03:44:34

16   believe in the same beliefs that he had, basically saying that,

17   you know, if you didn't believe what he did, you were a kaffir

18   and that basically you should be killed because you're going

19   against, you know, the beliefs.

20   Q.    Did he the word "kaffir"?                                        03:44:53

21   A.    Yes.  I was called a kaffir plenty of times.

22   Q.    And by whom?

23   A.    My brother and Elton.

24   Q.    Anybody else?

25   A.    I mean, Abdul Kareem would joke around with me but he           03:45:08

United States District Court

ALI SOOFI - Direct

1   directly wouldn't come at me with that, kind of like accusing       03:45:12
2   me of, you know, doing wrong.
3   Q.    And what were the wrong things that you did that got
4   judgment by your brother and others in this home?
5   A.    Dating outside of marriage.  I guess having relations with   03:45:30
6   females in general outside of marriage.
7   Q.    Did Simpson and your brother ever talk about violence
8   towards you for things that you did?
9   A.    I mean, my brother had at times told me that people like
10  me that usually do that, you know, they usually, you know,          03:45:54
11  should be killed because, you know, you're -- I mean I was
12  raised Muslim but I was never really practicing.  I mean I did
13  it more for, you know, to please my dad at times and my
14  brother.  If I went against it, I wouldn't have had a place to
15  live.  So, I mean, I kind of just, you know, did it to please,      03:46:16
16  you know.
17  Q.    At any point when you were living in this house, did you
18  hear anybody talk about an attack on the Draw the Prophet
19  Muhammed contest?
20  A.    No.                                                           03:46:37
21  Q.    Did Simpson and your brother know that you did not share
22  their views on violence towards people who didn't believe what
23  they believe?
24  A.    I mean, yes, they clearly understood that I wasn't
25  anywhere near, you know, on their level of things thinking          03:46:58

United States District Court

ALI SOOFI - Direct

1   towards especially harming people.                                    03:47:04

2   Q.   Did they try to convince you to believe what they

3   believed?

4   A.   When I first moved there, yes.  I mean, I had to pray five

5   times a day.  I had to go to the mosque.  You know, I had to    03:47:15

6   listen to my brother's lectures.  It's almost like when I would

7   leave and come back, my brother would have a whole knew agenda,

8   he would have this whole new -- almost like the vibe of my

9   brother was different.  He was -- he would try to push things

10  onto me, you know, and threaten me with, you know, "I'm going   03:47:39

11  to kick you out," or -- you know, "You're not my brother unless

12  you believe the same things I do."

13  Q.   Did the lectures that your brother gave you talk about

14  violence towards people who didn't believe what he did?

15  A.   Yes.                                                        03:47:57

16  Q.   Did Simpson also regularly talk to you about violence

17  against people who didn't believe what he believed?

18  A.   He wouldn't directly talk to me but my brother and Elton

19  would talk in front of me.

20  Q.   Did you see weapons in this apartment during the months    03:48:14

21  that you lived there in 2014 and 2015?

22  A.   Yes.

23  Q.   Were the weapons regularly kept in the apartment?

24  A.   The original handguns that they had in there were

25  concealed to where they would stay.  My brother would have his  03:48:37

United States District Court

ALI SOOFI - Direct

1  in his room and Elton would have his tucked away on the side of          03:48:40

2  the couch.  But later on they had acquired the two AK47s and

3  those were in plain sight.

4  Q.  Did you ever see Wahid near the weapons that were inside

5  this apartment?                                                          03:48:58

6  A.  I can remember the first day my brother had got his

7  weapon, we were all over there and we were passing it around

8  checking it out.

9  Q.  So Nadir got a weapon and you're in this apartment that we

10 are looking at here in 19th Avenue.  What type of weapon was             03:49:16

11 it, just generally?

12 A.  I think it was AK74.

13 Q.  And was Wahid there at any point?  Did he -- did you see

14 him near the weapon?

15 A.  I mean, Elton, my brother, and I and AK were there that              03:49:36

16 day when he had brought it back.

17 Q.  Abdul Malik Abdul Kareem was also there?

18 A.  Yes.

19 Q.  What happened when the weapon was brought back, when the

20 weapon was in the house and Wahid was there?                             03:49:52

21 A.  I mean it was passed around.  Naturally when people get

22 new things, they pass them around.  Everybody was checking it

23 out, basically just seeing how the weapon was.

24 Q.  Why was it that you moved out?

25 A.  Just the increasing -- you know, my brother had changed              03:50:24

United States District Court

ALI SOOFI - Direct

1  completely.  My brother was getting more violent towards me.  I                03:50:27

2  was -- you know, I slept there and Elton would sleep next to me

3  so, you know, I felt that, you know, sooner or later something

4  was going to happen to me.  So I felt like the need to get out

5  and get away just for my own safety.                                            03:50:46

6  Q.   How do you mean your brother was becoming more violent?

7  A.   He wasn't my brother any more.  He was always -- he didn't

8  want to leave the apartment.  He was talking about, you know,

9  people outside you are, you know, are kaffirs, people that

10  should be killed that don't believe in what I believe in.  And,     03:51:08

11  you know, that you're -- basically, it's hard when you know

12  your own family member switches up on you and is willing to

13  kill you over something that someone else has put that idea

14  into his head.

15  Q.   Over the time that you were living in the house in 2014,        03:51:32

16  2015, did Simpson change as well?

17  A.   Oh, yeah.  He would stay in the apartment as well.  They

18  would rarely leave towards the end.  They would both stay

19  secluded with each other basically just playing their videos

20  and reading their books nonstop.                                     03:51:54

21  Q.   You mentioned that Simpson would rarely leave.  To your

22  knowledge, was he working?

23  A.   He wasn't able to get employment because he had told me he

24  was on the FBI watch list previously so he was working for a

25  friend just to make enough money to pay rent.                        03:52:13

United States District Court

ALI SOOFI - Direct

1    Q.    Were you or your brother working in 2014, 2015?          03:52:19

2    A.    Yes.  We were contracted through a carpet cleaning

3    company, but then we opened up our own cleaning company after

4    that.  So we would work during those times.  But towards the

5    end, my brother didn't get any contracts.  He kind of shut     03:52:38

6    down, you know, and said that God would provide for us.  So it

7    kind of fell apart.

8    Q.    How were you paying rent?

9    A.    My dad.  He would send money for rent.

10   Q.    How was it that you heard that your brother was dead?     03:53:03

11   A.    It was the morning I woke up.  My girlfriend had turned on

12   the news and I basically saw his car on the news and saw

13   Elton's face.  So I pretty much put two and two together and I

14   kind of figured, you know, they had -- they had gotten so close

15   and so intense with each other, it was a pretty much a dead     03:53:55

16   give-away that he would have gone with him.

17   Q.    From what you heard on the news, did you know right away

18   that there was a terrorism investigation?

19   A.    From what I saw on the news, the headlines, yes, that he

20   had gone to shoot up a cartoon drawing contest.                 03:54:20

21   Q.    Did you reach out to the FBI?

22   A.    Yes.  The morning that I found out, my girlfriend had a

23   friend in the FBI that she had contacted and I had met up with

24   two agents that morning to answer any questions they had.

25   Q.    So that was on the first morning after May 4, the Monday?  03:54:48

United States District Court

ALI SOOFI - Direct

1   A.   Yes.                                                    03:54:52

2   Q.   On that day, May 4, did you get a phone call from AK?

3   A.   Yes.

4   Q.   And did you talk to him?

5   A.   Yes.                                                    03:55:07

6   Q.   What did he say to you?

7   A.   Just basically that he was checking, basically letting me

8   know like more of what had happened and basically advising me

9   not to speak with the FBI about anything.

10  Q.   You said "more of what had happened."  More of what had   03:55:38

11  happened in relation to what?

12  A.   To the incident with my brother because I guess they had

13  gone to the apartment to go check and that's when they had

14  everything boarded up and the FBI or the cops were there.

15  Q.   So that AK Wahid had gone to Nadir and Simpson's apartment  03:56:03

16  and seen stuff boarded up?

17  A.   Yes.

18  Q.   And you also said that he told you not to talk to the FBI.

19  Was that in that call there on the fourth?

20  A.   Yes.                                                    03:56:24

21  Q.   Do you recall had you had a conversation on the phone with

22  AK before that day?  Had he ever called you before?

23  A.   Not really.  I mean, it was more of just, you know, the

24  occasional run-in when I was with my brother.

25  Q.   Do you have any memory of ever talking to him on the phone  03:56:49

United States District Court

ALI SOOFI - Direct

1  before that day?

2  A.   No.

3  Q.   And May 5, the next day, Tuesday, did you meet again with

4  the FBI?                                                              03:57:07

5  A.   Yes.

6  Q.   Both days, on May 4 and May 5 when you met with the FBI,

7  did you talk to them?

8  A.   Yes.

9  Q.   And generally speaking, what were some of the topics that

10 you talked to them about?                                            03:57:24

11 A.   It basically was everything that had happened.  It was --

12 just because of what had happened, it all came out jumbled but

13 pretty much they had asked, you know, the involvement, who was

14 all involved, the names of the people, if I recognized, you

15 know, pictures of other people, just the generally of what had    03:57:50

16 happened.

17 Q.   Without telling us what you said, did you tell them about

18 what you had seen inside the apartment?

19 A.   Yes.

20 Q.   And start to talk to them about things that you heard         03:58:10

21 inside the apartment?

22 A.   Yes.

23 Q.   People that you saw that came to the apartment and visited

24 your brother and Simpson?

25 A.   Yes.                                                           03:58:22

03:56:53

ALI SOOFI - Direct

1   Q.   Weapons that you saw in the apartment?                    03:58:23

2   A.   Yes.

3   Q.   Did you talk to them voluntarily?  Did you choose to talk

4   to them?

5   A.   Yes.                                                      03:58:36

6   Q.   On that day, on May 5, did you leave Phoenix and fly

7   somewhere else?

8   A.   Yes.

9   Q.   What state did you go to?  Where did you head to?

10  A.   To Kansas.                                                03:58:51

11  Q.   On May 7 did you receive a phone call from Salim Sampson?

12  A.   Yes.

13  Q.   And where were you when you got that call?

14  A.   I was at my parents' house.

15  Q.   When you were on the phone with Salim, did anybody else   03:59:16

16  get on the phone?

17  A.   AK was with him the original time that I was called.

18  Q.   And did you talk to AK?

19  A.   Yes.

20  Q.   Do you recall what AK said to you on the phone that day on 03:59:36

21  May 7?

22  A.   The first time I talked to him he was basically just

23  saying, you know, how I was and what was going on, you know,

24  where I was, when was I coming back.  Basically just giving me

25  advice on what to say and who not to talk to.                  04:00:04

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | Q.   What do you mean "who not to talk to"? | 04:00:10 |

1   Q.   What do you mean "who not to talk to"?

2   A.   To not say anything, you know, that doesn't need to be

3   said to the FBI.

4   Q.   Did he specifically talk about the FBI to you during that

5   conversation on May 7?

6   A.   Yes.

7   Q.   Do you recall the FBI coming to your father's home there

8   in Kansas on May 12?

9   A.   Yes.

10   Q.   And did you show them your phone during the time that they

11   were at the house?

12   A.   Yes.   They had taken my phone and examined it.

13   Q.   Did they take some screen shots of your phone?

14   A.   Yes.

15   Q.   I'm going to place on the overhead what's been marked as

16   Government's Exhibit 160.

17           MS. BROOK:   And, Your Honor, this I believe is three

18   pages so we're just going to look at each page for foundation

19   purposes.

20           Your Honor, may I approach?   We can do it off the

21   Elmo.

22           THE COURT:   You can use the Elmo if you like, yeah.

23   BY MS. BROOK:

24   Q.   We're going to look at three separate pages all marked as

25   Government's Exhibit 160.   Here's the first page, second page,

04:00:22
04:00:38
04:01:15
04:01:37
04:02:16

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | and third page.  Do you recognize what's depicted in these | 04:02:33 |
| 2 | photos? |
| 3 | A.    It's from my old cell phone. |
| 4 | Q.    And can you tell by -- how can you tell? |
| 5 | A.    On the previous page it had contacts for my ex-girlfriend, | 04:02:49 |
| 6 | my mom, friends, and Salim. |
| 7 | Q.    You had mentioned a call that you received from Salim on |
| 8 | May 7.  Who is Salim Sampson? |
| 9 | A.    He was a mutual friend of the group I guess. |
| 10 | Q.    Which group? | 04:03:18 |
| 11 | A.    With Elton, AK, my brother. |
| 12 | Q.    And looking at page three of Exhibit Number -- |
| 13 |          MS. BROOK:   Before I do that Your Honor, the |
| 14 | Government moves to admit Exhibit Number 160. |
| 15 |          THE COURT:   If there is no objection, 160 is | 04:03:34 |
| 16 | admitted. |
| 17 |          (Exhibit Number 160 was admitted into evidence.) |
| 18 | BY MS. BROOK: |
| 19 | Q.    Do you recognize this call detail? |
| 20 | A.    Yes. | 04:03:44 |
| 21 | Q.    And what is it? |
| 22 | A.    It was a call that I received from Salim. |
| 23 | Q.    And here where it says eight minutes and 19 seconds, based |
| 24 | on using your phone and looking at this, what does that mean? |
| 25 | A.    That means that -- the duration of the call. | 04:04:00 |

118

ALI SOOFI - Direct

1   Q.   You had spoken a moment ago about a call where AK got on            04:04:03

2   the phone when you were talking to Salim Sampson.  Was it this

3   call?

4   A.   Yes.

5   Q.   Did you continue to talk to the FBI during the month of            04:04:26

6   May?

7   A.   Yes.  I was in contact with them.

8   Q.   And did you continue to provide them information of things

9   that you had seen when you lived in the apartment on 19th

10  Avenue?                                                                 04:04:39

11  A.   Yes.

12  Q.   Details of things that were said, what you saw, what you

13  knew?

14  A.   Yes.

15  Q.   On June 4 of 2015, did you meet with some agents who               04:04:51

16  provided you recording devices?

17  A.   Yes.

18  Q.   Explain to us what happened that day.  What did you agree

19  to do?

20  A.   Well, basically, they had given me a 1-800 number and a            04:05:09

21  password.  When I was receiving a phone call, I would basically

22  agree to put that in and so they would record the call.

23  Q.   Did you need to dial the 1-800 number before you connected

24  to the person that you were speaking with to make the

25  recording?                                                             04:05:36

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | A.    Yes.   I would have to let the call go through and then | 04:05:37 |
| 2 | dial the number, the 1-800 number, their phone number and the | |
| 3 | password for it to record the call. | |
| 4 | Q.    Did you agree to make recorded conversations or recordings | |
| 5 | based upon conversations with AK? | 04:05:56 |
| 6 | A.    Yes. | |
| 7 | Q.    And did you, over the month of June and July do that? | |
| 8 | A.    Yes. | |
| 9 | Q.    You had mentioned that you would need to call him to set | |
| 10 | up the recording device.   How was it that that would happen? | 04:06:16 |
| 11 | Would he call and it would be a missed call or what would spur | |
| 12 | the time that you would call him to talk? | |
| 13 | A.    I would receive a call and I would let it go through and | |
| 14 | then after that, I would put in the 1-800 number and then call | |
| 15 | back. | 04:06:38 |
| 16 | Q.    So you would receive a call from AK, Mr. Wahid, let it go | |
| 17 | to voicemail and then call him back using the 1-800 number? | |
| 18 | A.    Yes. | |
| 19 | Q.    On June 6 of 2015, did you record a conversation with | |
| 20 | Wahid? | 04:07:03 |
| 21 | A.    Yes. | |
| 22 | Q.    And have you had the opportunity to listen to the entire | |
| 23 | recorded -- recording of the recording that you made of that | |
| 24 | conversation? | |
| 25 | A.    Yes. | 04:07:13 |

United States District Court

ALI SOOFI - Direct

1   Q.   That recording, does it fairly and accurately reflect the          04:07:14

2   conversation you recorded with the defendant on June 6 of 2015?

3   A.   Yes.

4   Q.   Did you also listen to Government Exhibits 118, 119, 120

5   and '21?                                                                04:07:32

6   A.   Yes.

7   Q.   And did those fairly and accurately represent snippets of

8   the conversation that you had that day and recorded with the

9   defendant?

10  A.   Yes.                                                               04:07:44

11  Q.   During that call on June 6, did the defendant tell you not

12  to call the FBI?

13  A.   Yes.

14  Q.   Does Government's Exhibit 118 reflect that part of the

15  call?                                                                   04:08:06

16  A.   Yes.

17          MS. BROOK:   Government moves to admit and play

18  Government's Exhibit 118.

19          THE COURT:   Any objection, Mr. Wahid?

20          No objection.   It's admitted.                                  04:08:17

21          (Exhibit Number 118 was admitted into evidence.)

22          (Exhibit 118 was played.)

23  BY MS. BROOK:

24  Q.   Did the defendant tell you to tell the FBI that you didn't

25  know anything?                                                          04:10:03

ALI SOOFI - Direct

1    A.    Yes.                                                                04:10:07

2    Q.    Does Government's Exhibit 119 reflect that part of the

3    conversation?

4    A.    Yes.

5              MS. BROOK:   Government moves to admit and play               04:10:15

6    Exhibit Number 119.

7              THE COURT:   There being no objection, 119 is

8    admitted.

9              (Exhibit Number 119 was admitted into evidence.)

10             (Exhibit 119 is played.)                                      04:10:26

11   BY MS. BROOK:

12   Q.    Throughout this call, did the defendant tell you multiple

13   times to not call and not talk to the FBI?

14   A.    Yes.

15   Q.    Does Exhibit 120 reflect that?                                    04:11:20

16             MS. BROOK:   Government moves to admit and play

17   Exhibit Number 120.

18             THE COURT:   Without objection, 120 is admitted.

19             Can you start it again, Mr. Koehler?   I didn't hear

20   the first part.                                                         04:11:42

21             (Exhibit Number 120 was admitted into evidence.)

22             (Exhibit 120 is played.)

23   BY MS. BROOK:

24   Q.    Did the defendant tell you during this conversation what

25   happens if the FBI catches you in a lie?                               04:12:07

United States District Court

ALI SOOFI - Direct

1    A.    Yes.                                                              04:12:09

2    Q.    Does Exhibit Number 121 reflect that part of the

3    conversation?

4    A.    Yes.

5              MS. BROOK:   Government moves to admit and play              04:12:17

6    Exhibit Number 121.

7              THE COURT:   There's no objection so 121 is admitted.

8              (Exhibit Number 121 was admitted into evidence.)

9              (Exhibit 121 is played.)

10   BY MS. BROOK:                                                          04:12:50

11   Q.    In Exhibit Number 199, which we heard a moment ago, the

12   defendant told you to tell the FBI that you didn't know

13   anything.   From your perspective, did you know information that

14   you wanted to convey to the FBI?

15   A.    Yes.                                                             04:13:06

16   Q.    And was that information that you were telling the FBI?

17   A.    Yes.

18   Q.    Did that information relate in part to things you had

19   observed with AK, Mr. Wahid?

20   A.    Yes.                                                             04:13:28

21   Q.    On June 7, so the next day, did you miss another call from

22   the defendant?

23   A.    Yes.

24   Q.    And did you call him back?

25   A.    Yes.   He was in -- using the number they had provided me.      04:13:41

ALI SOOFI - Direct

1    Q.    Using the recording system?                              04:13:48

2    A.    Yes.

3    Q.    Have you had an opportunity to review that recording in

4    its entirety?

5    A.    Yes.                                                      04:13:53

6    Q.    And did that recording fairly and accurately represent the

7    conversation that you had with the defendant on June 7 of 2015?

8    A.    Yes.

9    Q.    Have you also had the opportunity to review clips,

10   Government's Exhibit 122, 123, 124, 125, 126, 127 and 128?      04:14:07

11   A.    Yes.

12   Q.    Do those clips fairly and accurately reflect component

13   parts or snippet pieces of the recorded conversation you

14   recorded of the defendant from that day?

15   A.    Yes.                                                      04:14:27

16   Q.    During that call, did the defendant say to you that the

17   FBI doesn't know what you know?

18   A.    Yes.

19   Q.    And, again, tell you to tell the FBI that you don't know

20   anything?                                                       04:14:48

21   A.    Yes.

22   Q.    Does Exhibit Number 122 reflect that part of the

23   conversation?

24   A.    Yes.

25         MS. BROOK:  Government moves to admit and play 122.       04:14:57

124

ALI SOOFI - Direct

1    THE COURT:  Without objection, 122 will be admitted.    04:15:00

2    (Exhibit Number 122 was admitted into evidence.)

3    (Exhibit 122 is played.)

4  BY MS. BROOK:

5  Q.   When the videos were being played, the ISIS propaganda    04:16:40

6  videos --

7  A.   Yes.

8  Q.   -- did you see them?

9  A.   Yes.

10 Q.   During this call, did the defendant tell you to call the    04:16:55

11 FBI, don't go in and talk to them in person?

12 A.   Yes.

13 Q.   Does Exhibit Number 123 reflect that part of the

14 recording?

15 A.   Yes.    04:17:09

16    MS. BROOK:  Government moves to admit and play

17 Exhibit 123.

18    THE COURT:  No objection.  123 is admitted.

19    (Exhibit Number 123 was admitted into evidence.)

20    (Exhibit 123 is played.)    04:17:27

21 BY MS. BROOK:

22 Q.   Did the defendant tell you to make your answers to the FBI

23 short and quick?

24 A.   Yes.

25 Q.   And, additionally, for you to tell them that you weren't    04:18:03

125

ALI SOOFI - Direct

1    there, you don't know anything?                                    04:18:06

2    A.    Yes.

3    Q.    Does Exhibit Number 124 reflect that?

4    A.    Yes.

5          MS. BROOK:  Government moves to admit and play 124.           04:18:15

6          THE COURT:  There's no objection so 124 is admitted.

7          (Exhibit Number 124 was admitted into evidence.)

8          (Exhibit 124 is played.)

9    BY MS. BROOK:

10   Q.    Is it true that you were never at the apartment?             04:19:31

11   A.    No.

12   Q.    And is it true that you only saw Wahid, the defendant, at

13   the apartment one or two times?

14   A.    No.

15   Q.    Why did you say that?                                        04:19:43

16   A.    I'm sorry.  I kind of lost my train of thought.

17   Q.    That's okay.

18         So the defendant said to you in this recording:  I've

19   never seen you except one time.

20         And you said:  Yeah, I would always take off on my           04:20:09

21   runs.  Is it true that you only saw him there one or two times?

22   A.    No.

23   Q.    So in the midst of this conversation with him, do you have

24   a purpose?  What are you trying to do as you talk to him?

25   A.    Just to, you know, let him know that they have, you know,    04:20:36

United States District Court

ALI SOOFI - Direct

1   all the -- you know, all the evidence all in front of them.     04:20:40

2   So, I mean, like me saying, like, I can't lie to them.

3   Basically I came forward and told them what it was, you know,

4   how everything played out.

5   Q.   Throughout the course of this conversation, did the       04:21:04

6   defendant tell you what to say to the FBI?

7   A.   Yes.

8   Q.   Did he also tell you that if you talked to the FBI, you

9   would be charged?

10  A.   Yes.                                                       04:21:19

11  Q.   Does clip number 125 represent that part of the

12  conversation?

13  A.   Yes.

14  Q.   Government moves to admit and play 125.

15          THE COURT:  If there's no objection, 125 is admitted.   04:21:30

16          (Exhibit Number 125 was admitted into evidence.)

17          (Exhibit 125 is played.)

18  BY MS. BROOK:

19  Q.   Did Simpson and your brother keep the weapons secret from

20  you?                                                            04:22:18

21  A.   No.

22  Q.   Were they readily apparent when you were in the apartment?

23  A.   Yes.

24  Q.   And at times was Wahid present when those guns were

25  readily apparent or obvious in plain sight in the apartment?    04:22:35

United States District Court

ALI SOOFI - Direct

1  A.   Yes.                                                    04:22:40

2  Q.   During this call, did the defendant repeatedly tell you

3  that you don't know anything?

4  A.   Yes.

5  Q.   Does Exhibit Number 127 reflect that?                   04:22:52

6  A.   Yes.

7            MS. BROOK:   The Government moves to admit and play

8  127.

9            THE COURT:   There being no objection, 127 is

10 admitted.                                                    04:23:03

11           (Exhibit Number 127 was admitted into evidence.)

12           (Exhibit 127 is played.)

13 BY MS. BROOK:

14 Q.   Did the defendant also tell you to tell the FBI that you

15 never saw any guns?                                          04:24:08

16 A.   Yes.

17 Q.   Does 126 reflect that?

18           THE COURT:   Oh, I see.

19           MS. BROOK:   I inadvertently skipped one, Your Honor.

20 The Government moves to admit and play 126.                  04:24:24

21           THE COURT:   If there's no objection, 126 is admitted.

22           (Exhibit Number 126 was admitted into evidence.)

23           (Exhibit 126 is played.)

24 BY MS. BROOK:

25 Q.   Did the defendant also tell you again don't go into the 04:25:00

United States District Court

ALI SOOFI - Direct

1  office; call them?                                                    04:25:03

2  A.    Yes.

3  Q.    Does Exhibit Number 128 reflect that part of the call?

4  A.    Yes.

5          MS. BROOK:   Government moves to admit 128.                   04:25:13

6          THE COURT:   With no objection, 128 is admitted.

7          (Exhibit Number 128 was admitted into evidence.)

8          (Exhibit 128 is played.)

9  BY MS. BROOK:

10 Q.    On June 18 of 2015, did you also record a conversation          04:26:17

11 with the defendant?

12 A.    Yes.

13 Q.    And did it occur the same way that we've talked about

14 previously where you missed a call and then you called him back

15 with the recording phone number or did it come about a            04:26:30

16 different way?

17 A.    It was the same process with the recording.

18 Q.    So you missed a call from him and then you called him

19 back?

20 A.    Yes.                                                            04:26:42

21         THE COURT:   Ms. Brook, I'm thinking if we were going

22 to end for the day in about two and a half or three minutes

23 anyway, this is a new call, maybe this is a good place to break

24 for the day.

25         MS. BROOK:   Okay.                                            04:26:52

United States District Court

ALI SOOFI - Direct

1      THE COURT:  Does that work?                                    04:26:53

2      MS. BROOK:  Yeah.

3      THE COURT:  All right.

4           So, ladies and gentlemen, we're going to go ahead and

5  recess for the day.  It's just two minutes shy of 4:30.  If the    04:26:58

6  parties can be ready to go again tomorrow morning at 9 o'clock,

7  we will resume.

8      MS. BROOK:  Thank you.

9      THE COURT:  All right.  Thank you, all.  We are

10 adjourned.                                                         04:27:10

11      The courtroom should open up at about 8:45.

12      Is that right, Julie?

13      COURTROOM DEPUTY:  Correct.

14      THE COURT:  Okay.

15      (Whereupon, these proceedings recessed at 4:27 p.m.)

16                       *  *  *  *  *

17

18

19

20

21

22

23

24

25

ALI SOOFI - Direct

C E R T I F I C A T E

I, ELAINE M. CROPPER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 8th day of February, 2019.


s/Elaine M. Cropper
_____
Elaine M. Cropper, RDR, CRR, CCP


United States District Court

ALI SOOFI - Direct

# P R O C E E D I N G S

    (Court was called to order by the courtroom deputy.)

    (Defendant is present and out of custody.)

    (Proceedings begin at 9:20.)

    THE COURT:  All right.  Thank you, everyone.  Please be seated.      `09:20:06`

    Thank you, Mr. Soofi, for returning to the stand.  It saves us a few minutes.

    One housekeeping matter before we begin, Mr. Wahid.  We started about a half-hour late on Friday because of your     `09:20:18`  delays in getting a ride here.  We're 20 minutes late today.  This is not ordinarily an issue in criminal trials because the defendant is usually in custody.

    I have two choices.  If this happens again, I am either going to reconsider your ability to remain out of     `09:20:39`  custody for the remainder of the trial or I'm going to move the trial forward whether are you present or not given that warning.  Please don't let it happen again, sir.

    We may proceed.

    MS. BROOK:  Thank you, Your Honor.      `09:20:56`

    (ALI SOOFI, a witness herein, was previously duly sworn or affirmed.)

            **DIRECT EXAMINATION** (Continued)

BY MS. BROOK:

Q.   Good morning.      `09:21:03`

United States District Court

ALI SOOFI - Direct

1   A.   Good morning.                                                    09:21:03

2   Q.   We left off yesterday and I'm going to place on the

3   overhead what has been admitted as Exhibit Number 27.

4        Yesterday we talked about the inside of this

5   apartment and this was the apartment where you were living in    09:21:22

6   2014 through 2015 with your brother and Simpson; is that

7   correct?

8   A.   Yes.

9   Q.   You had spoken yesterday about a 52-inch TV that was on

10  the wall right next to where that black chair on the right is;   09:21:34

11  is that correct?

12  A.   Yes.

13  Q.   And you had described videos that you saw, violent videos

14  that you saw that were being played on that TV.

15       Can you explain for us how the TV was set up so that        09:21:49

16  those videos could play?

17  A.   It was a connected through the PC, connected through the

18  PC.

19  Q.   What was connected through the PC?

20  A.   The computer.  So anything that was streamed through the    09:22:07

21  computer would show up on the TV screen.

22  Q.   So it was through that streaming through the computer that

23  the image would be projected up onto that 52-inch TV?

24  A.   Yes.

25  Q.   And you spoke yesterday about the violent videos you had    09:22:23

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | said that were constantly playing on that 52-inch TV. | 09:22:25 |
| 2 | Who was present -- and I want to talk globally.  Who |
| 3 | all did you see present when those videos were playing? |
| 4 | A.   It was the main people in general:  Abdul Malik, my |
| 5 | brother, Elton, and AK. | 09:22:47 |
| 6 | Q.   And you mentioned Abdul Malik.  In terms of visitors |
| 7 | during the time period that you were living at the house, how |
| 8 | frequently or how much would Abdul Malik be over at your home? |
| 9 | A.   It was pretty much throughout the whole week.  He would be |
| 10 | there off and on.  He would sometimes spend the night.  Other | 09:23:09 |
| 11 | times he would be there to eat. |
| 12 | Q.   So Abdul Malik, was he there the most of any other visitor |
| 13 | who didn't live at the house or something else? |
| 14 | A.   He was the most frequent person that would visit. |
| 15 | Q.   And that was pretty consistent throughout the time that | 09:23:33 |
| 16 | you were in the house? |
| 17 | A.   Yes. |
| 18 | Q.   Who was the second most frequent visitor? |
| 19 | A.   Other than that, it was just AK. |
| 20 | Q.   You had mentioned that Malik would sleep over at the | 09:23:49 |
| 21 | apartment? |
| 22 | A.   Yes. |
| 23 | Q.   Where is it that Malik would sleep? |
| 24 | A.   He would -- Elton would give up his side of the couch and |
| 25 | he would sleep on the floor because he had an air mattress that | 09:24:07 |

United States District Court

ALI SOOFI - Direct

1  he could pull out so he would take his place on the couch.   I     09:24:11
2  remember he was a much larger person so he would kind of, you
3  know, spill into my side.
4  Q.   You testified yesterday that Mr. Wahid, who you know as
5  AK, would be at the house one to three times a week and I mean  09:24:29
6  the apartment; is that correct?
7  A.   Yes.
8  Q.   Was there a time of day that you would see him there?
9  A.   It would be early morning or evening when we would come
10 back.  We were mostly gone during the day for jobs but during   09:24:54
11 the evening we would be home.
12 Q.   So let's talk about early morning.  When you would see Mr.
13 Wahid in your apartment in the early morning, what would you
14 have -- how was it that you would see him?
15 A.   In -- the majority of the time he was with Elton, they     09:25:18
16 would hang out a lot so I was right there sleeping in the
17 entrance.  So anybody who would come through door, I would see
18 them right off.
19 Q.   Is there something that you would do in the mornings?
20 A.   I would usually wake up to go for my runs or go on a        09:25:34
21 carpet cleaning job if one was present to do.
22 Q.   Generally speaking, when you would wake up, was he there
23 or did he come at some point later in the morning?
24 A.   It would be after Elton would be up because he was the
25 only one that had the car.                                      09:25:58

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | Q.   So after your runs? | 09:26:01 |
| 2 | A.   The majority of the time, yes, or I would hear that they |
| 3 | were hanging out or over at the house. |
| 4 | Q.   Were there other times of day that you frequently saw him |
| 5 | at the apartment, "he" being Mr. Wahid? | 09:26:16 |
| 6 | A.   Other than that, if we were eating or, you know, Abdul |
| 7 | Malik would come over and cook so it would be later that night |
| 8 | if anything. |
| 9 | Q.   So Malik would come over and cook and then it would be |
| 10 | later in the evening.  What, if anything, would you see Mr. | 09:26:32 |
| 11 | Wahid do in the apartments -- in the apartment later in the |
| 12 | evening? |
| 13 | A.   The majority of the time we would all be sitting on the |
| 14 | couch or the kitchen and there wasn't too much space in between |
| 15 | so you could only be either sitting on the couch or the person | 09:26:51 |
| 16 | that was cooking. |
| 17 | Q.   Did you ever hear the name Abu Bakr al-Baghdadi mentioned |
| 18 | in the apartment? |
| 19 | A.   Yes, plenty of times. |
| 20 | Q.   And who would talk about Abu Bakr al-Baghdadi? | 09:27:15 |
| 21 | A.   Elton was the biggest one.  Malik when they would get |
| 22 | together, the ones that would talk the most, basically would |
| 23 | work up, you know, anybody that was in there.  Like my brother |
| 24 | would get easily influenced through their words. |
| 25 | Q.   Did you say they would work up? | 09:27:39 |

ALI SOOFI - Direct

1   A.   I'm saying the way they would, like, glorify, like, any of      09:27:41

2   the videos that were being watched, you know, pretty much,

3   glorifying a movie or pumping people up on what they were doing

4   throughout the videos.

5   Q.   And "they" being you said --      09:28:02

6   A.   More of the Malik and Elton.

7   Q.   Was it also your brother from time to time?

8   A.   Eventually, yes.

9   Q.   And eventually you saw your brother worked up about those

10  ISIS videos that were being played?      09:28:18

11  A.   Yes.

12  Q.   Was there a point in time where you came to understand

13  that the violent videos were ISIS?

14  A.   Yes.  Eventually, after a couple of months, I learned

15  through, you know, my brother and Elton that the videos they      09:28:34

16  were playing were more of the militant side of Islam.

17  Q.   We left off yesterday about to start a call, a recorded

18  call, that you did with the defendant on June 18 of 2015.  Do

19  you recall making that recording on June 18 of 2015?

20  A.   Yes.      09:29:09

21  Q.   And have you had an opportunity to listen to that

22  recording in its entirety?

23  A.   Yes, I have.

24  Q.   And have you also had an opportunity to review

25  Government's Exhibits 129 through 134?      09:29:21

United States District Court

ALI SOOFI - Direct

1   A.   Yes.                                                         09:29:26

2   Q.   And do those reflect snippets of that call?

3   A.   Yes.

4   Q.   And do 129 through 134 fairly and accurately represent the

5   call as you made and as you heard that was done on June 18 of    09:29:36

6   2015?

7   A.   Yes.

8   Q.   When you started to talk to Mr. Wahid on June 18 of 2015,

9   did he ask you if you had followed his advice?

10  A.   Yes.                                                         09:30:01

11  Q.   And does call number 129 reflect that part of the

12  conversation?

13  A.   Yes.

14          MS. BROOK:   Government moves to admit and play 129.

15          THE COURT:   If there's no objection, 129 is admitted.   09:30:13

16          (Exhibit Number 129 was admitted into evidence.)

17          (Exhibit 129 was played.)

18  BY MS. BROOK:

19  Q.   During this call, did Mr. Wahid tell you about an envelope

20  and a set of keys, a key that Simpson had given him before the   09:31:05

21  attack?

22  A.   Yes.

23  Q.   Does call 130, or Exhibit Number 130 rather, reflect that

24  part of the conversation?

25  A.   Yes.                                                         09:31:18

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | MS. BROOK:  Government moves to admit and play 130. | 09:31:20 |
| 2 | THE COURT:  If there's no objection, 130 is admitted. | |
| 3 | (Exhibit Number 130 was admitted into evidence.) | |
| 4 | (Exhibits 130 was played.) | |

5   BY MS. BROOK:                                                    09:35:07

6   Q.   When Wahid said, "Don't lie on me," what did you interpret

7   that to mean?

8   A.   Basically, not to give any information out regarding AK.

9   Q.   Information to whom?

10  A.   The FBI.                                                    09:35:23

11              MR. WAHID:  Objection.  That's speculation.

12              THE COURT:  The objection is overruled.  The question

13  was asking what the statement meant to the witness.  The

14  witness answered accordingly.  That is appropriate.

15              You can move forward.                                09:35:39

16  BY MS. BROOK:

17  Q.   How did you feel when he said that?

18  A.   You know, basically --

19              MR. WAHID:  Objection.  Relevance.

20              THE COURT:  Hold on before you answer that.          09:35:52

21              No, I'll allow it.  The objection is overruled.

22              You can answer it.

23              THE WITNESS:  Basically, feeling that he's, you know,

24  telling me I can -- if you speak on me, you know, basically he

25  stated in there that people get put in the grave for talking so  09:36:09

United States District Court

ALI SOOFI - Direct

1  I take that as a threat.  You know, basically saying to me if          09:36:14

2  you say any information regarding my name that, you know,

3  there's consequences to it.

4  BY MS. BROOK:

5  Q.   During this conversation, did Wahid suggest to you that          09:36:32

6  the FBI was going to get you?

7  A.   Yes.

8  Q.   Does Exhibit Number 131 depict that part of the call?

9  A.   Yes.

10          MS. BROOK:  Government moves to admit and play 131.          09:36:44

11          THE COURT:  If there's no objection, 131 is admitted.

12          (Exhibit Number 131 was admitted into evidence.)

13          (Exhibit 131 is played.)

14  BY MS. BROOK:

15  Q.   During this call, did Wahid tell you that he understood          09:37:30

16  the seriousness of the investigation?

17  A.   Yes.

18  Q.   And the interviews that were being conducted?

19  A.   Yes.

20          MS. BROOK:  Government moves to admit and play          09:37:48

21  Exhibit Number 132.  Actual, I'm sorry, if I may.

22  BY MS. BROOK:

23  Q.   Does Government's Exhibit 132 depict that part of the

24  call?

25  A.   Yes.          09:38:03

United States District Court

ALI SOOFI - Direct

| | |
|---|---|
| 1 | MS. BROOK:  Government moves admit and play 132. | 09:38:04 |
| 2 | THE COURT:  All right.  If there's no objection, 132 |
| 3 | is admitted. |
| 4 | (Exhibit Number 132 was admitted into evidence.) |
| 5 | (Exhibit 132 is played.) | 09:38:11 |

BY MS. BROOK:

Q.   During this call with Wahid, did he talk to you more about being in trouble with the FBI if you talked to the FBI?

A.   Yes.

Q.   Does clip number 133 reflect that part of the call?    09:39:26

A.   Yes.

MS. BROOK:  Government moves to admit and play clip 133.

THE COURT:  With no objection, 133 is admitted.

(Exhibit Number 133 was admitted into evidence.)    09:39:40

(Exhibit 133 was played.)

BY MS. BROOK:

Q.   Who did you interpret "they" to be?

A.   The FBI.

Q.   During this call, did Wahid talk to you about missing    09:40:24

Ibrahim Simpson?

A.   Yes.

Q.   Did he also talk to you about how frequently he would see or spend time with Simpson?

A.   Yes.    09:40:35

149

ALI SOOFI - Direct

1   Q.   Does call number 1, though, reflect that part of the          09:40:36

2   conversation?

3   A.   Yes.

4            MS. BROOK:   Government moves to admit and play 134.

5            THE COURT:   If there's no objection, 134 admitted.      09:40:49

6            (Exhibit Number 134 was admitted into evidence.)

7            (Exhibit 134 was played.)

8   BY MS. BROOK:

9   Q.   Did you record another conversation with Mr. Wahid on July

10  8 of 2015?                                                        09:41:43

11  A.   Yes.

12  Q.   And how was it that this call came to pass?  Was it like

13  you had talked about before where you missed a call and then

14  called back or something else?

15  A.   Yes.  It would always be the same.  I would have to miss     09:41:59

16  the call and then redirect it with the 1-800 number.

17  Q.   And you did that this time on July 8?

18  A.   Yes.

19  Q.   Have you had an opportunity to listen to and review in its

20  entirety the phone call that you recorded with the defendant on   09:42:15

21  July 8 of 2015?

22  A.   Yes.

23  Q.   And does that recording fairly and accurately represent

24  the conversation that you had with him on that day?

25  A.   Yes.                                                         09:42:30

ALI SOOFI - Direct

1  Q.   And likewise, have you had the opportunity to listen to          09:42:35

2  Government's Exhibit 135 through 153 as well as 162?

3  A.   Yes.

4  Q.   And does 135 through 153 as well as 162, do those

5  exhibits -- I apologize.   162 was actually from June 18.          09:42:58

6          So let's just right now talk about 135 through 153.

7  Did you have the opportunity to listen to those clips in their

8  entirety?

9  A.   Yes.

10 Q.   And do those clips fairly and accurately represent parts       09:43:27

11 of the recorded call that you had with the defendant on July 8?

12 A.   Yes.

13 Q.   A moment ago I asked you if you missed a call from Wahid

14 and then called him back.   Does Government's Exhibit Number 135

15 reflect that part of the call?                                     09:43:51

16          MS. BROOK:   Government moves to admit and play 135.

17          THE COURT:   There being no objection, 135 is

18 admitted.

19          (Exhibit Number 135 was admitted into evidence.)

20          (Exhibit 135 was played.)                                 09:44:11

21 BY MS. BROOK:

22 Q.   Did Wahid next in this conversation tell you or did you,

23 rather, tell him that the FBI came to talk to you?

24 A.   I told him that they had come to speak with me.

25 Q.   Does 136 represent that part of the call?                     09:44:44

United States District Court

151

ALI SOOFI - Direct

1   A.   Yes.                                                           09:44:47

2           MS. BROOK:  Government moves to admit and play 136.

3           THE COURT:  There's no objection.  136 is admitted.

4           (Exhibit Number 136 was admitted into evidence.)

5           (Exhibit 136 was played.)            09:44:58

6   BY MS. BROOK:

7   Q.   Did Wahid talk to you during this call about what to say

8   to the FBI regarding weapons in the house?

9   A.   Yes.

10  Q.   And also weapons in relation to him and him being in the   09:47:41

11  house?

12  A.   Yes.

13  Q.   Does Exhibit Number 137 reflect that part of the call?

14  A.   Yes.

15          MS. BROOK:  The Government moves to admit and play   09:47:55

16  137?

17          THE COURT:  There being no objection, 137 is

18  admitted.

19          (Exhibit Number 137 was admitted into evidence.)

20          (Exhibit 137 was played.)           09:48:09

21  BY MS. BROOK:

22  Q.   Did in this call Wahid continue to talk to you about the

23  weapons and himself in the apartment?

24  A.   Yes.

25  Q.   Does Exhibit Number 138 reflect the continuation of this   09:49:47

United States District Court

ALI SOOFI - Direct

1  discussion?                                                          09:49:50

2  A.   Yes.

3        MS. BROOK:   Government moves to admit and play 138.

4        THE COURT:   138 is admitted, there being no

5  objection.                                                           09:50:01

6        (Exhibit Number 138 was admitted into evidence.)

7        (Exhibit 138 was played.)

8  BY MS. BROOK:

9  Q.   How did you feel when Wahid told you during this call to

10 tell the FBI that you didn't remember pieces of information?         09:52:19

11 A.   Basically, to me, that's telling me to lie, basically

12 going against what I saw in person.

13 Q.   And did you, in fact, remember Wahid being presented

14 weapons in the apartment there on 19th Avenue where you lived

15 with Simpson and your brother?                                       09:52:51

16 A.   Yes.  I mean, from everybody that was there with Elton,

17 myself, Abdul Malik, Elton, everybody was -- my own brother

18 brought the gun in, everybody had checked it out.

19 Q.   What do you mean by "checked it out"?

20 A.   You know, in general, when somebody pulls a weapon, they       09:53:14

21 are just checking out the sights, the general, I guess,

22 condition of the gun.

23 Q.   Do you remember at some point AK checking out that gun in

24 the apartment there on 19th Avenue?

25 A.   Yes.  It was the first day that my brother had bought it.      09:53:36

United States District Court

ALI SOOFI - Direct

1   Q.   During this call did Wahid also talk to you about the ISIS   09:53:44

2   videos that were played in the living room of your and your

3   brother and Simpson's apartment on 19th Avenue?

4   A.   Yes.

5   Q.   Does Exhibit Number 139 represent that part of the call?   09:53:56

6   A.   Yes.

7         MS. BROOK:  Government moves to admit and play

8   Exhibit Number 139.

9         THE COURT:  No objection appearing, it will be

10   admitted.   09:54:15

11         (Exhibit Number 139 was admitted into evidence.)

12         (Exhibit 139 was played.)

13   BY MS. BROOK:

14   Q.   In this conversation with the defendant, did he caution

15   you further about talking to the FBI about these ISIS videos?   09:55:49

16   A.   Yes.

17   Q.   Did he caution you about getting himself, Wahid, in

18   trouble if you talked to the FBI about these videos?

19   A.   Yes.

20   Q.   Have you listened to and reviewed Exhibit Number 140?   09:56:08

21   A.   Yes.

22   Q.   Does that reflect this part of the conversation?

23   A.   Yes.

24         MS. BROOK:  Government moves to admit and play 140.

25         THE COURT:  There being no objection, 140 is   09:56:18

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | admitted. | 09:56:20 |
| 2 | (Exhibit Number 140 was admitted into evidence.) | |
| 3 | (Exhibit 140 was played.) | |
| 4 | BY MS. BROOK: | |
| 5 | Q.   Was Wahid only at the apartment one time? | 09:57:44 |
| 6 | A.   No. | |
| 7 | Q.   How did you feel when he said that to you, that I was only | |
| 8 | there one time? | |
| 9 | A.   Saying the same things, basically telling me to lie, going | |
| 10 | against, you know, everything that I witnessed. | 09:58:08 |
| 11 | Q.   When Wahid said to you in that call, "I don't know who you | |
| 12 | thought you saw but I've only ever been there one time," what | |
| 13 | did you interpret to mean? | |
| 14 | A.   I took that as basically saying, you know, basically, I | |
| 15 | don't know what I'm talking about and I don't know what I | 09:58:38 |
| 16 | witnessed or saw.  Basically, I'm just, you know, talking just | |
| 17 | to talk. | |
| 18 | Q.   During this call did Wahid tell you that the statements | |
| 19 | you make to the FBI could harm him? | |
| 20 | A.   Yes. | 09:59:05 |
| 21 | Q.   And does Exhibit Number 141 reflect that part of the call? | |
| 22 | A.   Yes. | |
| 23 | MS. BROOK:   Government moves to admit and play 141. | |
| 24 | THE COURT:   There being no objection, 141 is | |
| 25 | admitted. | 09:59:18 |

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | (Exhibit Number 141 was admitted into evidence.) | 09:59:19 |
| 2 | (Exhibit 141 was played.) | |
| 3 | BY MS. BROOK: | |
| 4 | Q.    Who did you interpret "they're," so they're building a | |
| 5 | case against me?  Who was that? | 09:59:44 |
| 6 | A.    The FBI. | |
| 7 | Q.    Did Wahid go on in this call and tell you to stop talking | |
| 8 | to the FBI in order to protect Wahid, in order to protect | |
| 9 | himself? | |
| 10 | A.    Yes. | 10:00:03 |
| 11 | Q.    Does Exhibit Number 142 reflect that part of the phone | |
| 12 | call? | |
| 13 | A.    Yes. | |
| 14 | MS. BROOK:  Government moves to admit and play 142. | |
| 15 | THE COURT:  There being no objection, 142 is | 10:00:14 |
| 16 | admitted. | |
| 17 | (Exhibit Number 142 was admitted into evidence.) | |
| 18 | (Exhibit 142 was played.) | |
| 19 | BY MS. BROOK: | |
| 20 | Q.    Were you sure that you had seen Wahid there many more than | 10:01:07 |
| 21 | one time? | |
| 22 | A.    Yes. | |
| 23 | Q.    Throughout this call, did Wahid continue to push and say | |
| 24 | he was only in apartment one time?  I'm sorry. | |
| 25 | Throughout this call, did Wahid continue to push and | 10:01:32 |

United States District Court

ALI SOOFI - Direct

1   talk about the idea that he was only in the apartment one time?   10:01:35

2   A.   Yes.

3   Q.   Does Exhibit Number 143 reflect that part of the call?

4   A.   Yes.

5         MS. BROOK:   Government moves to admit and play 143.   10:01:45

6         THE COURT:   There being no objection, 133 is

7   admitted.

8         (Exhibit Number 143 was admitted into evidence.)

9         (Exhibit 143 is played.)

10   BY MS. BROOK:   10:02:52

11   Q.   During the time that you lived in the 19th Avenue

12   apartment, how many times did you see the defendant there to

13   eat?

14   A.   It was numerous times.

15   Q.   Did Wahid say to you to not get him in trouble when you go   10:03:17

16   to court?

17   A.   Yes.

18         MR. WAHID:   Objection.

19         THE COURT:   Hold just a minute.

20         MR. WAHID:   Leading.   10:03:36

21         THE COURT:   No.   I'm going to overrule the objection.

22   This Court interprets a leading question as one that suggests

23   the answer.   When the witness is free to accept or refute the

24   premise of the question, as was the case here, it's not a

25   leading question so the question and answer will stand.   10:04:03

United States District Court

ALI SOOFI - Direct

1        You can continue.                                    10:04:06

2   BY MS. BROOK:

3   Q.   Does Exhibit Number 145 represent that part of the

4   conversation?

5   A.   Yes.                                                 10:04:10

6            MS. BROOK:   Government moves to admit and play 145.

7            THE COURT:   Did you say 145 or 144?

8            MS. BROOK:   145.

9            THE COURT:   There being no objection, 145 is

10  admitted.                                                 10:04:21

11           (Exhibit Number 145 was admitted into evidence.)

12           (Exhibit 145 was played.)

13  BY MS. BROOK:

14  Q.   Back on July 8 of 2015, had you received a subpoena to go

15  to court?                                                 10:05:40

16  A.   Yes.

17  Q.   So back in 2015, that summer, had the FBI given you a

18  subpoena or were you using the concept of a subpoena in your

19  conversation with him?

20  A.   Initially I was told to use -- that I had been subpoenaed  10:05:58

21  and then after I was -- actually received one to appear in

22  court.

23  Q.   Okay.  So at some point in 2015 or so you did receive a

24  subpoena to appear in court.  Was that for trial testimony?

25  A.   Yes.  That was for the grand jury.                   10:06:24

United States District Court

158

ALI SOOFI - Direct

1  Q.   When we were in this conversation, were you talking about          10:06:30

2  the subpoena to -- because you had received it or had you yet

3  received the subpoena at this point?

4  A.   I'm sorry?

5  Q.   No.   That's okay.   It was very confusing question.              10:06:48

6            So what I'm saying is, on July 8 of 2015, did you

7  have in your hand the subpoena yet if you recall?

8  A.   Yes.   I was in Kansas at the time and that's when I was --

9  they had brought one out to me.

10 Q.   Okay.   During this call, did Wahid tell you about               10:07:11

11 withholding information, he himself personally withholding

12 information from the FBI?

13 A.   Yes.

14 Q.   Does Exhibit Number 146 represent that part of the call?

15 A.   Yes.                                                             10:07:33

16 Q.   Government moves to admit and play 146.

17          THE COURT:   There being no objection, 146 is

18 admitted.   Hold for just a second before you play that, please.

19 I need to go off the record.

20          (Discussion off the record.)                                10:08:24

21          THE COURT:   Thank you for your patience.   We're ready

22 to proceed.

23          (Exhibit Number 146 was admitted into evidence.)

24          (Exhibit 146 was played.)

25 \\\

United States District Court

ALI SOOFI - Direct

| | | |
|---|---|---|
| 1 | BY MS. BROOK: | 10:09:13 |
| 2 | Q.   So when Wahid said to you, "Even if I knew that I knew | |
| 3 | he -- that he was holding a gun, I would not have never said | |
| 4 | something like that," when he said that to you, what did | |
| 5 | that -- what did you interpret that as?  What did that mean? | 10:09:32 |
| 6 | A.   I, basically, had knowledge of the weapons, basically not | |
| 7 | to say anything, that he wouldn't say something like that | |
| 8 | because, I mean, if you know that kind of information, then, | |
| 9 | and you withhold it. | |
| 10 | Q.   He went on to say, "Because I already know what time it | 10:09:56 |
| 11 | is.  I know what kind of heat you can bring on a person or down | |
| 12 | on a person by saying stuff like that," what did you interpret | |
| 13 | that to mean? | |
| 14 | A.   Basically, he had understood the seriousness of what was | |
| 15 | going on and saying anything of that sort is just going to get | 10:10:15 |
| 16 | you further in trouble. | |
| 17 | Q.   Did Wahid also talk about what might happen to a person if | |
| 18 | you talked to the FBI? | |
| 19 | A.   Yes. | |
| 20 | Q.   Does Exhibit Number 147 represent that part of the | 10:10:34 |
| 21 | conversation? | |
| 22 | A.   Yes. | |
| 23 | MS. BROOK:  Government moves to admit and play 147. | |
| 24 | THE COURT:  Being no objection, 147 is admitted. | |
| 25 | (Exhibit Number 147 was admitted into evidence.) | 10:10:51 |

United States District Court

160

ALI SOOFI - Direct

1          (Exhibit 147 was played.)                    10:10:52

2    BY MS. BROOK:

3    Q.    Who did you interpret "they" to be?

4    A.    The FBI.

5    Q.    When Wahid said to you, "Allah, he will get you for, that,    10:11:58

6    trust me," what did that mean to you?

7    A.    Basically saying, like, in the end, God will get me for my

8    wrongdoing but, you know, you could take it into another aspect

9    with a lot of, you know, Muslims who are fanatics, that's

10   basically saying like in the end, you're going to get yours.    10:12:27

11   Q.    And Allah will get you for what specifically?  What did

12   you interpret Wahid saying to you when he said, "Allah will get

13   you" -- rather, directly, "Allah, he will get you for that,

14   trust me"?

15   A.    For basically talking, for talking to the FBI and giving    10:12:48

16   them the information.

17   Q.    In this call did Wahid also talk to you about why he did

18   not want to be connected to the ISIS videos?

19   A.    Yes.

20   Q.    Does clip number 148 represent that part of the call?    10:13:20

21   A.    Yes.

22          MS. BROOK:  Government moves to admit and play 148.

23          THE COURT:  No objection, 148 is admitted.

24          (Exhibit Number 148 was admitted into evidence.)

25          (Exhibit 148 was played.)    10:13:32

United States District Court

ALI SOOFI - Direct

1    BY MS. BROOK:                                                   10:14:44

2    Q.    In your apartment on 19th Avenue when you were living

3    there, 2014, 2015, did you see the defendant watching those

4    ISIS videos?

5    A.    Yes.                                                      10:14:57

6    Q.    How did you feel when he said to you here, "You have to be

7    careful how you say that"?   What did you feel, if anything,

8    that he was trying to say to you?

9    A.    That I need to watch what I say.

10   Q.    In what way?                                              10:15:31

11   A.    Basically saying, you know, anything that I say --

12   basically, like -- it's almost like coaching, you know,

13   somebody coaching you to say consistently throughout the calls

14   that, you know, they keep repeating the same thing, to not talk

15   to the FBI, that I don't know anything, you know, I was         10:15:57

16   completely left in the dark the whole time.

17   Q.    And you say "coaching," is that because what he was saying

18   to you was different than what you remembered?

19   A.    Yes.

20   Q.    Did Wahid tell you during this call that if you choose to  10:16:20

21   talk to the FBI, lie to them?

22   A.    I'm sorry?

23   Q.    That's okay.   Did Wahid say to you during this call, "If

24   you choose to talk to the FBI, lie to them"?

25   A.    Yes.                                                      10:16:40

United States District Court

ALI SOOFI - Direct

| 1 | Q.    And is that represented in clip number 149? | 10:16:41 |

1    Q.    And is that represented in clip number 149?

2    A.    Yes.

3            MS. BROOK:  Government moves to admit and play 149.

4            THE COURT:  Hold that.

5            MR. KOEHLER:  Sorry.                                    10:17:00

6            THE COURT:  Please keep a handle on that.

7            149, without objection, is admitted.

8            (Exhibit Number 149 was admitted into evidence.)

9            THE COURT:  You may play it now from the beginning,

10   please.                                                        10:17:12

11           (Exhibit 149 was played.)

12   BY MS. BROOK:

13   Q.    Did Wahid also say to you in this call, "Whoever you talk

14   to the FBI about, you can get them in trouble"?

15   A.    Yes.                                                     10:18:28

16   Q.    Does Exhibit Number 150 reflect that part of the call?

17   A.    Yes.

18           MS. BROOK:  Government moves to admit and play 150.

19           THE COURT:  There being no objection, 150 is

20   admitted.                                                      10:18:40

21           (Exhibit Number 150 was admitted into evidence.)

22           (Exhibit 150 was played.)

23   BY MS. BROOK:

24   Q.    In that call, Wahid mentioned Hakim.  Who is Hakim?

25   A.    He's the nephew of I think Salim's.  Salim's nephew or   10:20:57

United States District Court