ALI SOOFI - Direct

1  Abdul Kareem, he was related to those.                          10:21:07

2  Q.   So he's somehow a relative of Salim and Abdul Wahid -- I'm

3  sorry.   You said Abdul Malik?

4  A.   I'm not -- I know they were related.   He was a cousin or

5  nephew.                                                          10:21:28

6  Q.   And additionally in that call, the defendant mentioned

7  Salim.   Was that the individual you were just talking about?

8  A.   Yes.

9  Q.   Okay.

10        During this call, did Wahid say to you that the FBI       10:22:02

11  are bad people?

12  A.   Yes.

13  Q.   Does Exhibit Number 152 represent that part of the call?

14  A.   Yes.

15        MS. BROOK:   Government moves to admit and play 152.      10:22:15

16        THE COURT:   Without objection, 152 is admitted.

17        (Exhibit Number 152 was admitted into evidence.)

18        (Exhibit 152 was played.)

19  BY MS. BROOK:

20  Q.   Did in this call Wahid again warn you about what could     10:23:29

21  happen to him if you talked to the FBI?

22  A.   Yes.

23  Q.   Does clip number 153 represent that part of the call?

24  A.   Yes.

25        MS. BROOK:   Government moves to admit and play 153.      10:23:46

United States District Court

ALI SOOFI - Direct

1    THE COURT:  Without objection, 153 is admitted.    10:23:50

2         (Exhibit Number 153 was admitted into evidence.)

3         (Exhibit 153 was played.)

4  BY MS. BROOK:

5  Q.   When Wahid says here, "All because you wanted to be honest    10:24:31

6  with them," who did you interpret "them" to be?

7  A.   The FBI.

8  Q.   I want to go back for a moment to June 18 of 2015.  During

9  the call on June 18 of 2015, the call that you recorded with

10 the defendant, did the defendant also mention not wanting to    10:25:08

11 get Saabir Nurse in trouble?

12 A.   Yes.

13 Q.   And have you had the opportunity to review Government's

14 Exhibit 162?

15 A.   Yes.    10:25:26

16 Q.   Does 162 fairly and accurately represent that part of the

17 conversation you had with the defendant on June 18?

18 A.   Yes.

19      MS. BROOK:  Government moves to admit and play 162.

20      THE COURT:  There being no objection, 162 is    10:25:39

21 admitted.

22      (Exhibit Number 162 was admitted into evidence.)

23      (Exhibit 162 was played.)

24      MS. BROOK:  May I have one moment?

25      I don't have any other questions.    10:27:53

United States District Court

1    THE COURT:  All right.  Thank you, Ms. Brook.    10:27:54

2    Mr. Wahid, do you have cross-examination for this

3  witness?

4    MR. WAHID:  Sure.

5    THE COURT:  We'll go ahead and start it and then    10:28:02

6  we'll probably take our break in about ten minutes or so, ten

7  or 15 minutes.

8                    **CROSS - EXAMINATION**

9  BY MR. WAHID:

10  Q.    First of all, I was going to say I want to tell you I am    10:28:35

11  sorry for your brother, you know, passing away.  I am sorry

12  about that.  I'm not going to sit up here and try to go back

13  and forth --

14    MS. BROOK:  Your Honor, I would object to form.

15    THE COURT:  Understood.  I'm going to give Mr. Wahid    10:28:54

16  a little bit of leeway since he's not a practiced lawyer.

17    But, Mr. Wahid, I'm not going to allow you to make

18  statements.  You need to ask questions.  So would you do that,

19  sir?

20    MR. WAHID:  Okay.    10:29:08

21  BY MR. WAHID:

22  Q.    Did I admit to you that I committed a crime, "yes" or

23  "no"?

24  A.    I don't understand.

25  Q.    Did I admit to you that I committed a crime?  I said "yes"    10:30:17

United States District Court

ALI SOOFI- Cross

1  or "no" to the question, please.                                   10:30:20

2  A.   I don't know how that would be relevant.

3  Q.   I didn't ask you that.  I just asked you "yes" or "no" to

4  the question.  Did I admit to you that I committed a crime?

5  A.   No.                                                            10:30:39

6  Q.   Did I admit to you a crime that I wanted to conceal?

7  "Yes" or "no" to the question, please.

8  A.   Not that I know of, no.

9  Q.   Did I mention to you about a crime that I committed which

10  I didn't want you to report to law enforcement?  "Yes" or "no"     10:31:05

11  to the question, please.

12  A.   Yes.

13  Q.   Okay.  Did you say "yes"?

14  A.   Yes.

15  Q.   Okay.  What would that crime be?                              10:31:23

16  A.   Basically, you were telling me to lie about everything I

17  knew about.  You were telling me to lie to the FBI.  You were

18  telling me to say I didn't know anything about what my brother

19  was doing, about what was going on in that apartment.  So . . .

20  Q.   Did I share any information with you concerning the           10:32:00

21  carrying out of a federal offense?  "Yes" or "no" to the

22  question, please.

23           MS. BROOK:  Is he asking him to ascertain whether or

24  not something is a federal offense?  I would object to

25  speculation if that was the question.  I had a hard time           10:32:15

United States District Court

1  hearing it.                                                10:32:17

2              THE COURT:  Let's go ahead --

3              Mr. Wahid, ask the question again so I can evaluate

4  it.

5  BY MR. WAHID:                                              10:32:22

6  Q.    Did I share any information with you concerning the

7  carrying out of a federal offense?

8              MS. BROOK:  Same objection.

9              THE COURT:  I'm going to sustain the objection

10 because it calls for a legal conclusion.  The witness is not in  10:32:30

11 a position to tell or classify something as a federal offense

12 one way or the other.

13             I will sustain the objection.

14 BY MR. WAHID:

15 Q.    Since I mentioned to you that I wanted to commit or    10:32:54

16 intended to commit a crime, tell me, what crime was that?

17 A.    I just explained that to you.  You were telling me to lie

18 about everything I knew about.  And lying to the FBI, you know,

19 is just as bad.  You know, withholding information about

20 something you know that important is, you know --             10:33:15

21 Q.    Withhold what information?

22             MS. BROOK:  Your Honor, as to this question drawing

23 for a legal conclusion, I would have the same objection.

24             THE COURT:  I'm going to overrule the objection here

25 because it goes to a question you didn't object to and the    10:33:32

1  witness answered.  And I think for completeness, I need to hear  10:33:35

2  it.

3          So the question is appropriately asked in this case.

4          Ms. Cropper, will you read back the question because

5  now that we've had this interruption, it's probably confusing  10:33:48

6  to the witness.

7          (Requested portion of record read:  Withhold what

8  information?)

9          THE WITNESS:  Information about my brother, about you

10  being at the apartment, the guns and everything in general, how  10:33:59

11  many times you visited, not to say anything to the FBI, I

12  didn't know anything when I was there seeing all of you guys

13  progressively get worse.

14  BY MR. WAHID:

15  Q.   It has been over four years and you had an opportunity to  10:34:30

16  tell law enforcement about this crime since you worked so

17  closely with them.  Why all of a sudden now you decide to say

18  something?

19          MS. BROOK:  Objection.  Foundation.

20          THE COURT:  You're going to have to expand on that  10:34:49

21  Ms. Brook.  What's the foundation lacking in that question?

22          MS. BROOK:  It assumes he didn't say something sooner

23  which goes beyond the scope of the testimony that was presented

24  in direct.

25          THE COURT:  All right.  Understood.  No, I'll allow  10:35:11

1    the witness to answer that question and if he remembers things       10:35:15

2    differently than the question has been posed, he can answer

3    that way.

4            You can answer, Mr. Soofi.  Do you need it read back?

5            THE WITNESS:  Yes, please.                                    10:35:31

6            (Requested portion of record read:  It has been over

7    four years and you had an opportunity to tell law enforcement

8    about this crime since you worked so closely with them.  Why

9    all of a sudden now you decide to say something?)

10           THE WITNESS:  Originally I thought with the case I            10:35:56

11   was called with beforehand, everything was put out forth, you

12   know.  From my recollection, I thought everything was done and

13   over with at that point, especially regarding my brother.  I'm

14   sorry.  I don't really know anything else to answer that.

15   BY MR. WAHID:                                                         10:36:30

16   Q.   You stated that I mentioned to you about me committing a

17   crime or attempt to commit a crime yet none of the exhibit

18   recording clips that have been played to you hear me saying

19   such.  Can you please show me which recording clips by number

20   where I confess to committing a crime or possible attempt to         10:36:45

21   commit a crime?

22           MS. BROOK:  Objection, Your Honor.  One, asked and

23   answered as to this question.  Two, it misstates the prior

24   testimony.

25           THE COURT:  I'm going to sustain the objection in            10:36:57

1    part.  First, there is a statement in that question or a          10:36:59

2    statement in what you've laid out, Mr. Wahid.  You can only ask

3    questions here.  I'll allow you to attempt to rephrase the

4    question but there are no affirmative statements.

5              Go ahead, please.                                       10:37:17

6    BY MR. WAHID:

7    Q.   Can you please show me which recording clips by number

8    where I confess to committing a crime or possible attempt to

9    commit a crime?

10              MS. BROOK:  Your Honor, I would object again to form    10:38:35

11   of the question.  If he wants to ask a question that elicits an

12   answer, that's one thing.  But asking the witness to recall an

13   exhibit number of items that are already in evidence is

14   practically impossible.

15              THE COURT:  I'm going to sustain the objection and      10:38:53

16   for the reason that, again, that it calls for a legal

17   conclusion which this witness is not qualified to make and it

18   is not his role in the trial.  That is a question for the Court

19   only.

20              When questions ask a witness to conclude whether a      10:39:12

21   crime has been committed or attempted to be committed, that's a

22   question for the Court and that's my problem with the question.

23   So the objection is sustained here.

24              Please move on.

25              MR. WAHID:  I can't think of anything right now, Your   10:40:38

1  Honor.                                                    10:40:40

2          THE COURT:  Mr. Wahid, do you want to consult with

3  your advisory counsel?

4          MR. WAHID:  Sure.

5          MR. MCBEE:  Judge, would it be possible to take the    10:40:47

6  midmorning break?

7          THE COURT:  It is time for the break.  We're going to

8  go ahead and take 15 minutes and we will come back and we will

9  complete the cross-examination of Mr. Soofi and any redirect.

10         So if everybody can be ready to go at five minutes    10:40:59

11 'til 11 I, would appreciate it.

12         And Mr. Soofi, if you can return to the stand at that

13 point.

14         All right.  We're on recess.

15         (Recess at 10:41; resumed at 10:58.)                  10:41:09

16         THE COURT:  Thank you, everyone.  Please be seated.

17         Mr. Wahid, if you have any other questions for the

18 witness, you may proceed.

19 BY MR. WAHID:

20 Q.    Yesterday when the prosecutor played the exhibit recording  10:58:52

21 clip from -- when I was on the phone with you, I stated I was

22 over the apartment one time and you agreed by saying, "Yeah."

23 Now you're saying today in court that I was over at the

24 apartment three times a week.  And you also stated I was over

25 at the apartment a handful of times.                          10:59:15

1    Yesterday you stated I was -- yesterday you stated in | 10:59:18

2    court I was over twice a week.  So why does your story keep

3    shifting?

4    A.    I don't think that it is shifting.  I told in that phone

5    call, it clearly says that I said there were multiple times | 10:59:40

6    that you were over there and I never agreed to once, never

7    agreed to saying that you came there once.

8    Q.    Yes, you did.  You did agree.

9              MS. BROOK:  Object.

10             THE COURT:  Sustained. | 10:59:57

11             MR. MCBEE:  Judge, may I be with my client at the

12   lectern?

13             THE COURT:  Excuse me?

14             MR. MCBEE:  May I be with my client at the lectern?

15             THE COURT:  If that's what you would like, Mr. Wahid, | 11:00:07

16   you may.

17   BY MR. WAHID:

18   Q.    Do you remember yesterday on recordings which I said to

19   you I was over there only one time and you said, "Yeah, I was

20   doing my runs"? | 11:00:37

21   A.    I never agreed to you being there one time.  I remember

22   saying I went on my runs but I never agreed.

23             (Defendant confers with counsel.)

24   BY MR. WAHID:

25   Q.    Well, yesterday when she played the recording, I stated in | 11:01:10

1  the clip that I had only been over to your house one time and          11:01:18

2  you said, "Yeah."

3           If that was the case, why did you not correct me in

4  the recording?

5           THE COURT:  I'm going to sustain the objection.               11:01:29

6           And here's the issue, Mr. Wahid.  The recordings are

7  in evidence.  This is now argument essentially.  I will

8  certainly allow you to argue along these lines in the closing

9  argument and even if you want to play clips or direct my

10  attention to the transcript that the Government has prepared,         11:01:49

11  that's all fine.  But there's no profit now in asking the

12  witness questions that rely on a statement of what the evidence

13  said because the evidence is already in, so I can rely on that.

14           So I would like you to move on if you have another

15  topic that doesn't involve going over what's already in          11:02:09

16  evidence and that's my ruling.  Sustained.

17           (Defendant confers with counsel.)

18  BY MR. WAHID:

19  Q.   Did you see me holding any guns?

20  A.   Yes.  But the day my brother bought that AK and brought it       11:02:40

21  to the house you were there and you held it just like I had

22  held it.

23  Q.   Do you have pictures?

24  A.   Pictures?  Nobody takes pictures on those kind of

25  occasions.  That's not something special.  I mean, why would         11:02:56

1    there be pictures?                                                  11:03:00

2            MR. WAHID:  Hold on Your Honor.

3            (Defendant confers with counsel.)

4    BY MR. WAHID:

5    Q.   You stated on the tape that I was only there a handful of      11:04:01

6    times but then today in court you are saying that I was there

7    at least three times a week.  Why is there a discrepancy?

8            MS. BROOK:  Objection, Your Honor.

9            THE COURT:  Sustained and for the same reason.  It's

10   in evidence now.  The answer to that question, the Court is         11:04:16

11   already able to consider what is in evidence and it will decide

12   the credibility based on that so please move on.

13           (Defendant confers with counsel.)

14   BY MR. WAHID:

15   Q.   Why is your testimony on the tape different from what it       11:05:53

16   is in the court?

17           MS. BROOK:  Your Honor, I didn't hear the question.

18           MR. WAHID:  Why is his testimony on the tapes

19   different than what they are today in court?

20           MS. BROOK:  Same objection.                                 11:06:07

21           THE COURT:  Same ruling.  The objection is sustained.

22   The Court will make a determination as to consistency between

23   what was testified to in court and what was recorded in

24   exhibits that have been admitted.

25           Do you have anything else, Mr. Wahid, for this              11:06:23

United States District Court

| | |
|---|---|
| 1 | witness. | 11:06:25 |

MR. WAHID:  No.  No.

THE COURT:  All right.  Thank you.

Ms. Brook, does the Government have any redirect?

MS. BROOK:  Just briefly.                11:06:31

## REDIRECT EXAMINATION

BY MS. BROOK:

Q.   On the morning of May 4, 2015, when you heard about and

learned about the attack on the Curtis Culwell Center, did you

call law enforcement?                      11:06:47

A.   Yes.

Q.   And approximately when in relation to when you learned

about the attack did you call law enforcement?

A.   Right after.

Q.   Prior to the attack, at any point when you were inside the   11:07:06

apartment or at any other time, did you hear about or learn

about a plan to attack the drawing contest?

A.   No, I didn't learn about it until I saw the news that

morning after.

MS. BROOK:  May I have one more moment, Your Honor.    11:07:33

I don't have any other questions Your Honor.

THE COURT:  All right.  Thank you.  Then the witness

may be excused.

Mr. Soofi, you may step down and you are free to go.

(Witness excused.)                        11:07:59

United States District Court

RUSSEL A. CARMAN - Direct

1   down and you are excused.   Thank you.                        11:17:50

2               THE WITNESS:   Thank you.

3               (Witness excused.)

4               THE COURT:   The Government can call its next witness.

5               MR. KOEHLER:   The United States calls Russell Carman.   11:18:10

6   C-A-R-M-A-N.

7               THE COURT:   Mr. Carman, if you would step up past the

8   bar to my courtroom deputy, she'll swear you in up front.

9               COURTROOM DEPUTY:   Right up here.   If you can please

10  state your name and spell your last name for the record.      11:18:47

11              THE WITNESS:   Russell Alan Carman, C-A-R-M-A-N.

12              (RUSSEL A. CARMAN, a witness herein, was duly sworn

13  or affirmed.)

14                      **DIRECT EXAMINATION**

15  BY MR. KOEHLER:                                                11:19:14

16  Q.   Good morning, Mr. Carman.   Would you please introduce

17  yourself to the Court and Mr. Wahid?

18  A.   My name is Russell Carman.   I'm a supervisor officer with

19  the U.S. Customs and Border Protection.

20  Q.   How long have you been employed by CBP?                   11:19:26

21  A.   15 years, sir.

22  Q.   And are you with the CBP field office operations?

23  A.   Yes, I am.

24  Q.   Where are you stationed?

25  A.   George Bush Intercontinental Airport in Houston.          11:19:35

RUSSEL A. CARMAN - Direct

1  Q.  How long have you been stationed at the airport in          11:19:40

2  Houston, Texas.

3  A.  15 years, my entire career.

4  Q.  Do you joint with the Joint Terrorism Task Force as part

5  of your duties there?                                            11:19:47

6  A.  I have in the past.  My current assignment, I'm a

7  supervisor; but prior to my promotion about 18 months ago, I

8  worked counter-terrorism with the Joint Terrorism Task Force.

9  Q.  So back in September of 2015, were you essentially a line

10 officer working with the JTTF?                                   11:20:03

11 A.  Yes, sir.  At that time I was working with the Tactical

12 Terrorism Response Team within CBP and I liased with the FBI

13 through the Joint Terrorism Task Force.

14 Q.  Were you on duty on September 26 of 2015?

15 A.  I was, sir.                                                  11:20:22

16 Q.  And on that date did you have an encounter with a person

17 by the name of Saabir, S-A-A-B-I-R; middle name Aquil,

18 A-Q-U-I-L; last name Nurse, N-U-R-S-E?

19 A.  Yes, sir, I did.

20 Q.  And was Mr. Nurse in transit?                                11:20:36

21 A.  Yes, sir.  He was arriving from Trinidad and Tobago.

22 Q.  So he was arriving into the United States on an airplane

23 flight; is that correct?

24 A.  Yes, sir.  He arrived on a United flight from Port au

25 Spain.                                                           11:20:47

United States District Court

RUSSEL A. CARMAN - Direct

1   Q.   As part of his arrival, did you conduct a search of his

2   cellular telephone?

3   A.   Yes, sir.

4   Q.   Did you use a particular device to conduct that search?

5   A.   We used our issued Cellebrite device.

6   Q.   So it was a Cellebrite?

7   A.   Yes, sir.

8   Q.   And did you conduct a physical or a logical extraction of

9   that phone?

10  A.   What I did was I did the logical extraction.

11  Q.   Very good.  And did you create a UFED report?

12  A.   Yes, sir.

13  Q.   And did you also create a hash file to validate the UFED

14  report?

15  A.   That's not a term that I'm used to.  But I'm sure that

16  when we create it and put it through and send it over,

17  something along those lines was created.

18  Q.   Okay.  Does UFED, when it creates the report, is it

19  something that can be altered by somebody else after it's

20  created?

21  A.   No, sir.

22  Q.   All right.  And did you record that to read-only media?

23  A.   Yes, sir.

24  Q.   And after you did that, did you turn that report over to

25  the FBI to be loaded into its evidence collection system?

United States District Court

11:20:49

11:20:58

11:21:11

11:21:26

11:21:41

11:21:50

|   |   |   |
|---|---|---|
| 1 | A.    Yes, sir. | 11:21:54 |
| 2 | Q.    And when you extracted the data, did you do it using CBP's | |
| 3 | border search authorities? | |
| 4 | A.    Yes, sir. | |
| 5 | Q.    And did you turn it over to the FBI to be stored under | 11:22:02 |
| 6 | their evidence retention authorities? | |
| 7 | A.    Yes, sir. | |
| 8 | MS. BROOK:  I have no further questions for the | |
| 9 | witness. | |
| 10 | THE COURT:  Mr. Wahid, do you have any questions for | 11:22:14 |
| 11 | Agent Carman? | |
| 12 | MR. WAHID:  No. | |
| 13 | THE COURT:  All right. | |
| 14 | Sir, that means that you may step down and I can | |
| 15 | excuse you.  Thank you. | 11:22:21 |
| 16 | THE WITNESS:  Thank you, sir. | |
| 17 | (Witness excused.) | |
| 18 | THE COURT:  All right.  Will the Government call its | |
| 19 | next witness, please. | |
| 20 | MR. KOEHLER:  The United States calls Jason Saitta. | 11:23:01 |
| 21 | And if I can have one moment while he's coming in to hook up | |
| 22 | the computer at the lectern. | |
| 23 | THE COURT:  Mr. Saitta, if you would step up to the | |
| 24 | courtroom deputy, she'll swear you in. | |
| 25 | COURTROOM DEPUTY:  If you can please state your name | 11:23:27 |

11:23:28
1  and spell your last name for the record.

2          THE WITNESS:  Jason Saitta.  Last name is

3  S-A-I-T-T-A.

4          COURTROOM DEPUTY:  Thank you.

5          (JASON SAITTA, a witness herein, was duly sworn or    11:23:35

6  affirmed.)

7          MR. KOEHLER:  For the record, I have on the monitor

8  Exhibit Number 27 that is already in evidence.

9                      **DIRECT EXAMINATION**

10 BY MR. KOEHLER:    11:24:01

11 Q.   Mr. Saitta, could you please introduce yourself to the

12 Court and Mr. Wahid?

13 A.   Sure.  My name is Jason Saitta.  I'm a Special Agent with

14 Federal Bureau of Investigation.

15 Q.   How long have you been so employed?    11:24:11

16 A.   Since June of 2014.

17 Q.   And were you on duty on May 3 and 4 of 2015?

18 A.   I was.

19 Q.   Did you execute a search warrant at an apartment complex,

20 13850 North 19th Avenue, Apartment 219, on or about May 4, the    11:24:36

21 morning thereof, in 2015?

22 A.   Yes, I did.

23 Q.   Do you recall whose residence that was?

24 A.   That was Simpson and Soofi.

25 Q.   Elton Simpson and Nadir Soofi?    11:24:53

1   THE COURT:  All right.                                    11:32:12

2       Mr. Frazier, if you will pass the bar and come up to

3   the courtroom deputy here, she will swear you in.

4       COURTROOM DEPUTY:  If you can please state your name

5   and spell your last name for the record.                  11:32:21

6       THE WITNESS:  Antoine Frazier.  Last name is spelled

7   F-R-A-Z-I-E-R.

8       COURTROOM DEPUTY:  Thank you.  Please raise your

9   right hand.

10      (ANTOINE FRAZIER, a witness herein, was duly sworn or  11:32:31

11  affirmed.)

12                      **DIRECT EXAMINATION**

13  BY MR. KOEHLER:

14  Q.  Good morning, Mr. Frazier.

15  A.  Good morning.                                          11:32:54

16  Q.  Would you please introduce yourself to the Court and Mr.

17  Wahid?

18  A.  Yes.  My name is Antoine Frazier.

19  Q.  And where do you work, Mr. Frazier?

20  A.  I'm employed by the Federal Bureau of Investigation.  I'm  11:33:04

21  assigned to the Laboratory Division that is located at

22  Quantico, Virginia.

23  Q.  And what do you do in the Laboratory Division there?

24  A.  I'm a forensic document examiner and I examine documentary

25  evidence.  It can include handwriting, hand printing, indented  11:33:18

1    writing examinations, torn edge exams, and other examinations.    11:33:21

2    Q.    How long have you been employed in that position?

3    A.    I have been employed by the FBI for over 31 years.  I have

4    been employed as a document examiner since 1998 so about 21

5    years.    11:33:41

6    Q.    Very good.  And tell us about your educational background.

7    A.    In 1984 I did receive a bachelor of science degree from

8    Middle Tennessee State University with a major in biology.  In

9    1996 I did take continuing education courses at George

10   Washington University that also included a course in document    11:33:57

11   examination.  And also in 2011 I received my master of science

12   degree in forensic studies from Stevenson University.

13   Q.    And can you tell us about the training that you received

14   to prepare you to become a document examiner?

15   A.    Yes.  In 1998 I did complete a two-year training program    11:34:14

16   in the field of questioned documents, document examination.

17   That training included classroom instruction, testing, working

18   practical problems and also working the direct supervision of

19   other qualified forensic document examiners.

20   Q.    Do you also receive continuing training in that field?    11:34:43

21   A.    Yes.  I attend meetings, professional meetings, for

22   continuing education training as well in that field.

23   Q.    And do you devote the majority of your time to the

24   examination of questioned documents?

25   A.    Yes, I do.    11:35:02

ANTOINE FRAZIER - Direct

1    Q.   Very good.                                                11:35:04

2              I'm going to place on you -- in front of you on the

3    monitor a few different items here.  I'm going to start with

4    Exhibit Number 45.

5    A.   Is 45 to the left?                                        11:35:28

6    Q.   I'm waiting for it to come up on your screen.  Oh, I know

7    why.  Do you recognize that?

8    A.   I do recognize my initials in the bottom right corners of

9    those pages.

10   Q.   And are those copies of pages that you made in the course  11:35:51

11   of examining documents in this case?

12   A.   Yes.

13   Q.   And are these true and correct copies of the document that

14   you examined?

15   A.   Yes, they are.                                            11:36:04

16   Q.   All right.  I'm going to direct your attention now to

17   Exhibit Number 47.  Do you recognize that?

18   A.   Yes, I do.  Exhibit Number 47 is the front cover of a

19   notebook using side lighting for identifying examinations.

20   Side lighting would be just placing a light on each side of the 11:36:27

21   page to look for indented writing.

22   Q.   And did you assign an item number to this item, a

23   laboratory item number?

24   A.   Yes.  That was my item number 17.

25   Q.   Very good.  Is that a true and correct copy of the image   11:36:44

United States District Court

1  that you created using side lighting of the front of that          11:36:50

2  notebook?

3  A.    Yes, it is.

4           MR. KOEHLER:  Move to admit 47.

5           THE COURT:  Any objection?                                  11:36:57

6           MR. WAHID:  No.

7           THE COURT:  All right.  Thank you, Mr. Wahid.

8           47 is admitted.

9           (Exhibit Number 47 was admitted into evidence.)

10 BY MR. KOEHLER:                                                      11:37:07

11 Q.    I'm now going to direct your attention to Exhibit

12 Number 48.  Can you tell the Court what that is?

13 A.    Yes.  Exhibit 48 is an image of electrostatic processing

14 of indented writing.  Electrostatic processing is another way

15 to conduct indented writing examinations.  It involves -- if I    11:37:21

16 may just go into a little bit on how that works.  It's used

17 with the ESDA machine, the ElectroStatic Detection Apparatus

18 machine, and basically page 49 of my item 47 was placed on this

19 machine.

20           I actually put a piece of imaging film over that page    11:37:39

21 and just to give you a visual, imaging film, it was almost like

22 Saran wrap but a mylar filming imaging.  And then the next step

23 would be to give that electrical charge to the document using a

24 Corona bar and then finally just placing black toner beads on

25 that imaging film will bring up the indentations if they are      11:38:02

ANTOINE FRAZIER - Direct

1  present on the page.                                    11:38:05

2         And then the final step would be to complete an

3  adhesive sheet over that to have a permanent image of the

4  indented writing.

5  Q.  So the ElectroStatic Detection Apparatus is designed for   11:38:15

6  the recovery of indented writing from a piece of paper?

7  A.  Yes, it is.  And if I could just explain what indented

8  writing would be.

9  Q.  That's what I was going to ask you next.

10  A.  Indented writing is when two or more pages are stacked,   11:38:29

11  one on top of the other, and the indentations or the writing

12  from the top page may become indented or impressed on the pages

13  below that top page.  That's what indented writing is.

14  Q.  So it comes from the pressing of the point of the pen when

15  somebody is writing on one page and it transfers to the page   11:38:44

16  below?

17  A.  That's correct.  The writing could be pen or pencil.

18  Q.  All right.  And is this a true and correct copy of the

19  indented writing on that item?

20  A.  Yes, it is.                                        11:38:57

21  Q.  And what page of this notebook was that and is this the

22  same item, 17?

23  A.  Yes, same item 17.  It was on page 49 of Government

24  Exhibit Number 46, 47.

25  Q.  All right.                                         11:39:13

United States District Court

ANTOINE FRAZIER - Direct

1    MR. KOEHLER:  Move to admit Exhibit Number 48.

2    THE COURT:  There being no objection, 48 is admitted.

3    MR. WAHID:  No, Your Honor.

4    (Exhibit Number 48 was admitted into evidence.)

5    BY MR. KOEHLER:

6    Q.   All right.  I'm directing your attention to Exhibit

7    Number 49 now.  Can you tell the Court what that is?

8    A.   Yes.  Exhibit Number 49 is a Photoshop imaging of --

9    software imaging enhancement of the indented writing,

10   electrostatic processing lift that was conducted at the

11   laboratory.  This is actually the back page reversed and it's

12   enhanced to show the actual writing.

13   Q.   So just so we're clear, this is still page 49 but it's the

14   backside of it and you reverse it like a mirror; is that

15   correct?

16   A.   Correct.  It was reversed for right reading.

17   Q.   So, in other words, if you took a page and flipped it

18   over, you would be reading it like you're looking in a mirror

19   and what you did is mirror that to make it flip so that you can

20   read it clearly?

21   A.   That's correct.

22   Q.   And then you used Photoshop to enhance to get a better

23   view of the writing?

24   A.   That's correct.

25   Q.   In your enhancement did you do anything to alter any of

1    the wording or any of the writing that appears on that page?    11:41:00

2    A.    Not at all.

3              MR. KOEHLER:  Move to admit 49.

4              THE COURT:  Any objection, Mr. Wahid?

5              MR. WAHID:  No.    11:41:08

6              THE COURT:  All right.  Thank you.

7              49 is admitted.

8              (Exhibit Number 49 was admitted into evidence.)

9    BY MR. KOEHLER:

10   Q.    And just for the Court's edification, did you prepare some    11:41:12

11   PowerPoint slides that kind of visually depict what did you?

12   A.    Yes, I did.

13   Q.    I'm going to direct your attention to 161.

14             MR. KOEHLER:  It is not pulling up on my screen for

15   whatever reason.  I'm going to go ahead and skip that because I    11:41:57

16   think you've already described it well.  Unless the Court has

17   any questions about how that process was done, then I have no

18   further questions for the witness.

19             THE COURT:  All right.

20             Thank you, Mr. Koehler.    11:42:10

21             Mr. Wahid, do you have any questions for Mr. Frazier?

22             MR. WAHID:  No.

23             THE COURT:  All right.

24             Thank you.  Then, Mr. Frazier, that means that I can

25   excuse you and you are free to go.  You may step down, sir.    11:42:19

1    THE WITNESS:  Thank you, Your Honor.                    11:42:22

2    (Witness excused.)

3    THE COURT:  All right.  Mr. Koehler, would the

4  Government call its next witness, please.

5    MR. KOEHLER:  The United States calls Robert          11:42:50

6  Meshinsky.

7    THE COURT:  All right.

8    Mr. Meshinsky, if you would step up to my courtroom

9  deputy, she will swear you in.

10    COURTROOM DEPUTY:  If you could please state your    11:43:31

11  name and spell your last name for the record.

12    THE WITNESS:  Robert Meshinsky.  M-E-S-H-I-N-S-K-Y.

13    (ROBERT MESHINSKY, a witness herein, was duly sworn

14  or affirmed.)

15    MR. KOEHLER:  Your Honor, may I retrieve Exhibits 16, 11:43:51

16  29, and 41 so that I can place them before the witness?

17    THE COURT:  You may.

18                    **DIRECT EXAMINATION**

19  BY MR. KOEHLER:

20  Q.   Good morning.                                     11:45:04

21  A.   Good morning.

22  Q.   Would you please introduce yourself to the Court and Mr.

23  Wahid?

24  A.   Good morning.  My name is Robert Meshinsky and I am a

25  retired Special Agent.                                 11:45:12

1    THE COURT:  All right.  Very good.  Then if that's       01:25:51
2  the case, then we'll just proceed with the remainder of the
3  Government's case or at least as far as we get today.
4    Mr. Koehler, do you want to go ahead and call your
5  next witness then?                                          01:26:01
6    MR. KOEHLER:  Yes, Your Honor.  The United States
7  calls Gregory Neville.
8    THE COURT:  Mr. Neville, if you would step up to the
9  courtroom deputy, she will swear you in.
10    COURTROOM DEPUTY:  If you could please state your       01:26:16
11  name and spell your last name for the record.
12    THE WITNESS:  Gregory Neville.  N-E-V-I-L-L-E.
13    (GREGORY NEVILLE, a witness herein, was duly sworn or
14  affirmed.)
15              **DIRECT EXAMINATION**                         01:26:26
16  BY MR. KOEHLER:
17  Q.   Good afternoon, Mr. Neville.  Could you please introduce
18  yourself to the Court and to Mr. Wahid?
19  A.   My name is Greg Neville.  I'm an intelligence analyst with
20  the FBI.                                                    01:26:52
21  Q.   How long have you worked for the FBI?
22  A.   Just under four years.
23  Q.   Prior to coming to work for the FBI, what did you do?
24  A.   I worked in contract security.  I managed a contract
25  between a company and a private company.                    01:27:06

GREGORY NEVILLE - Direct

1   Q.   And can you tell the Court your educational background?

2   A.   I have a master's degree in applied criminology and a

3   bachelor's degree in criminology and criminal justice.

4   Q.   And can you tell us what your job title is with the FBI?

5   A.   Intelligence analyst.                                      01:27:23

6   Q.   And has that been your job the whole approximately four

7   years that you've been with the FBI?

8   A.   Yes.

9   Q.   Can you describe for the Court what your day-to-day duties

10  involve as an intelligence analyst?                           01:27:34

11  A.   We look at various information and compile it and put it

12  together and make assessments about that information.

13  Q.   Do you personally focus on analyzing communication?

14  A.   Yes.

15  Q.   And does that include cellular telephone records?        01:27:53

16  A.   Yes, it does.

17  Q.   Does it include text message communications?

18  A.   Yes.

19  Q.   Does it include social media exploitation and

20  communications?                                               01:28:04

21  A.   Yes, it does.

22  Q.   Let's talk for a minute about social media.  Can you give

23  the Court just a brief overview of the types of social media

24  that you work to exploit and analyze?

25  A.   We review things like Facebook, Twitter, Google plus,    01:28:18

United States District Court

1  Instagram, anything that is what we call Open Source.        01:28:22

2  Q.    And so you do open source exploitation.  Do you also --

3  and before I go past that point, can you explain to the Court

4  what Open Source means?

5  A.    Open Source is things that are publicly available on the   01:28:37

6  Internet.  So it's the social media sites, web sites, things

7  like that.

8  Q.    Do you also review collection that comes from search

9  warrants, wiretaps, 2703(d) orders and the like?

10 A.    Yes, we do.                                               01:28:54

11 Q.    And can you explain to the Court how those are acquired

12 and stored and how you access them?

13 A.    They are usually housed into two different systems that we

14 use.  One is called Sentinel.  The other one is CAIR, Case

15 Agent Investigative Review.  Depending on what we get back from  01:29:09

16 the provider, it will be uploaded in there and then we can go

17 and access that.

18 Q.    When that data is uploaded into Sentinel and/or CAIR, is

19 it something that you can alter in any way?

20 A.    No.                                                       01:29:27

21 Q.    What do you do when you find something of interest in

22 Sentinel or CAIR?

23 A.    We will open up a local copy and then, depending on what

24 it is, extract the information that we're interested in.

25 Q.    And when you do that, do you sometimes do that directly   01:29:43

1    yourself and other times ask the CART team to do that?    01:29:45

2    A.    Yes.

3    Q.    And by CART is that the Computer Analysis Response Team?

4    A.    Yes.

5    Q.    In this case, did you participate in analyzing    01:29:58

6    communication records relating to Elton Francis Simpson?

7    A.    Yes, I did.

8    Q.    Did you also look for communications records relating to

9    Nadir Soofi?

10    A.    Yes, I did.    01:30:11

11    Q.    Abdul Malik Abdul Kareem?

12    A.    Yes.

13    Q.    Abdul Khabir Wahid?

14    A.    Yes.

15    Q.    Did you also look at communications, devices and results    01:30:19

16    relating to Saabir Nurse?

17    A.    Yes, I did.

18    Q.    And Ali Soofi?

19    A.    Yes, I did.

20    Q.    Let's start with Elton Simpson first.  Did FBI execute    01:30:32

21    search warrants on Twitter accounts belonging to Mr. Simpson?

22    A.    Yes.

23    Q.    Was one of those accounts number 2827006337?

24    A.    Yes, I believe so.

25    Q.    And was another 3062911044?    01:30:49

| | | |
|---|---|---|
| 1 | A. Yes. | 01:30:57 |
| 2 | Q. Was another one 3070170972? | |
| 3 | A. Yes. | |
| 4 | Q. And 3092582583? | |
| 5 | A. Yes. | 01:31:13 |
| 6 | Q. And 3121473777? | |
| 7 | A. Yes. | |
| 8 | Q. And 3154850044? | |
| 9 | A. Yes. | |
| 10 | Q. And, finally, 3161708545? | 01:31:28 |
| 11 | A. Yes. | |

12  Q.   And when Twitter responded to the search warrants that

13  were issued for those various Twitter accounts, did they

14  accompany that with a certification of authenticity of those

15  records?                                                          01:31:52

16  A.   Yes, they did.

17  Q.   I'm going to direct your attention to what's on the

18  screen.  It's Exhibit Number 61.  Do you recognize that?

19  A.   Yes, I do.

20  Q.   Is that the custodian declaration of records?               01:31:59

21  A.   Yes.

22  Q.   And do the numbers on that correspond to the numbers I

23  just read?

24  A.   Yes, they do.

25  Q.   Now, Agent Neville, and that was signed under penalty of    01:32:17

United States District Court

GREGORY NEVILLE - Direct

1   perjury declaring that those records were authentic on behalf          01:32:21

2   of somebody at Twitter?

3   A.    Yes.

4   Q.    Did you take from the records that you obtained in

5   those -- and so did you go through and analyze the different           01:32:29

6   account numbers that I just read off?

7   A.    Yes, I did.

8   Q.    And did all of the results of those search warrants, the

9   content that came from Twitter, was it all related to Elton

10  Simpson?                                                               01:32:44

11  A.    Yes.

12  Q.    And did you go through and pull out relevant information

13  from each of those Twitter accounts that got compiled into some

14  of the other Government exhibits in this case?

15  A.    Yes, I did.                                                      01:32:55

16  Q.    All right.  Let's go to Exhibit Number 69 now.  Do you

17  recognize that?

18  A.    Yes, I do.

19  Q.    And can you tell the Court what that is?

20  A.    That was a tweet that was put out by Elton Simpson on his        01:33:09

21  tawaakul account on April 23 referring to the Draw the Prophet

22  contest in Garland, Texas.

23  Q.    And is @tawaakul, and that's the at symbol followed by

24  T-A-W-A-A-K-U-L, is that one of the @ handles that Mr. Simpson

25  frequently used on Twitter?                                           01:33:33

United States District Court

GREGORY NEVILLE - Direct

1   A.   Yes.                                                      01:33:35

2   Q.   Was another one @brdofgreen?

3   A.   Yes.

4   Q.   Short for Bird of Green?

5   A.   Yes.                                                      01:33:43

6   Q.   And is this a true and correct copy of the tweet that he

7   posted on April 23?

8   A.   Yes, it is.

9           MR. KOEHLER:  Move to admit Exhibit Number 69.

10          THE COURT:  Is there any objection, Mr. Wahid?         01:33:57

11          MR. WAHID:  No.

12          THE COURT:  No objection.  69 is admitted.

13          (Exhibit Number 69 was admitted into evidence.)

14  BY MR. KOEHLER:

15  Q.   And what was this tweet about?                            01:34:09

16  A.   It's a news article related to the Draw the Prophet

17  contest in Garland, Texas, and Elton Simpson has tweeted out:

18  When will they ever learn?  They are planning on selecting the

19  best drawn of Rasulullah (saws) in Texas.

20  Q.   All right.  I'm going to skip forward to Exhibit          01:34:31

21  Number 73.  And I'm going to, for ease, use the document camera

22  with this one.

23          You've reviewed Exhibit Number 73 before coming to

24  court today; is that correct?

25  A.   Yes, it is.                                               01:35:07

United States District Court

GREGORY NEVILLE - Direct

1 Q. And are all of the contents of Exhibit Number 73 derived   01:35:08

2 from the Twitter records that were listed in Exhibits 62

3 through 78 with the account numbers that I read?

4 A. Yes, sir.

5 Q. All right. And have you reviewed every page of this?   01:35:19

6 A. Yes, I have.

7 Q. Is all of it true and accurate copies of what you pulled

8 out of those records?

9 A. Yes, they are.

10         MR. KOEHLER: I'm going to move to admit Exhibit   01:35:32

11 Number 73.

12         THE COURT: Any objection?

13         MR. WAHID: No.

14         THE COURT: 73 is admitted.

15        (Exhibit Number 73 was admitted into evidence.)   01:35:38

16 BY MR. KOEHLER:

17 Q. Directing your attention to the first page of 73, what is

18 the date of this tweet?

19 A. It's February 13, 2015.

20 Q. And is this tweet also related to that same contest?   01:35:49

21 A. Yes. Yes, it is.

22 Q. And Elton Simpson is tweeting about the contest on

23 February 13; is that right?

24 A. Yes. He did a retweet, so it's a tweet that somebody else

25 had posted that, he then posted the same tweet.   01:36:04

GREGORY NEVILLE - Direct

1  Q.   And do you know approximately when the contest itself had

2  been announced?

3  A.   I do not know.

4  Q.   Okay.  Looking now at the second page of this, and I'm

5  going to zoom in a little bit to make it a little bit easier.

6  Another tweet from Mr. Simpson; correct?

7  A.   This is a screen shot of his the Twitter home page?

8  Q.   And does that show his handle?

9  A.   Yes, it does.

10 Q.   And what is his handle that he's using at that point?

11 A.   It's @tawaakul.

12 Q.   And what is the nickname that he's posting under that day?

13 A.   Shariah is Light.

14 Q.   And do you know what the word "Shariah" means?

15 A.   It's Islamic law.

16 Q.   And do you know whose picture is there right above Shariah

17 is Light as well as on the main banner?

18 A.   Yes.  It's Anwar al-Awlaki.

19 Q.   Now, on the third page of this, another tweet from Elton

20 Simpson?

21 A.   This is another screen shots of his profile?

22 Q.   All right.  And is he using the @tawaakul handle again --

23 A.   Yes, he is.

24 Q.   -- with a different nickname?  What is the nickname there?

25 A.   Fan of Hoorul Ayn.

01:36:07

01:36:21

01:36:40

01:36:53

01:37:14

01:37:26

United States District Court

GREGORY NEVILLE - Direct

1    Q.   And do you know what the term "Hoorul Ayn" stands for?    01:37:29

2    A.   It refers to the pure souls in Jannah, commonly referred

3    to as the virgins.

4    Q.   And is Jannah heaven in Islamic terms?

5    A.   Yes.    01:37:44

6    Q.   All right.  Now, under the fourth page here again using

7    the Anwar al-Awlaki image; is that correct?

8    A.   Yes.

9    Q.   Does he have a different nickname on this fifth page here?

10    A.   Yes.  It's the sword.    01:38:00

11    Q.   And what -- does he have a tweet here that he's retweeting

12    down at the bottom of the page?

13    A.   Yes, he does.

14    Q.   And what is the subject matter of that tweet?

15    A.   "The dead Assad regime pilot whose fighter jet was shot    01:38:16

16    down by #ISIS forces today in Bir Qasb #Damascus."

17    Q.   And are you familiar with a pilot having been shot down in

18    Syria?

19    A.   Yes, it was a Jordanian pilot.

20    Q.   All right, sir.  Next, is this another tweet from Elton    01:38:37

21    Simpson?

22    A.   Yes, it is.

23    Q.   And what is the date of that?

24    A.   October 31, 2014.

25    Q.   And just the -- do you know what this picture is of?    01:38:47

United States District Court

GREGORY NEVILLE - Direct

1    A.    I do not.                                                      01:38:56

2    Q.    Is it a page from a book?

3    A.    Yes.

4    Q.    And what is the title of this segment of that book?

5    A.    "Those Who Beheaded For the Prophet."                         01:39:03

6    Q.    Next we have page seven, did he retweet something there?

7    A.    Yes.  He retweeted a link to the Flames of War video.

8    Q.    Have you seen the Flames of War video?

9    A.    I have.

10   Q.    Can you briefly describe what it is for the Court?          01:39:20

11   A.    It's an English language propaganda video that was created

12   and disseminated by ISIS.

13   Q.    Could you describe the production quality of that video?

14   A.    It's very professional, high-quality video.

15   Q.    Did it depict people being killed --                        01:39:38

16   A.    Yes, it does.

17   Q.    -- and executed?

18   A.    Yes.

19   Q.    What is this tweet from November 25, 2014?

20   A.    That's a tweet that features Abu Bakr al-Baghdadi, who is    01:39:54

21   the leader of ISIS.

22   Q.    And December 24, what is this tweet about?

23   A.    It's a cover of a book, Defence of the Muslim Lands.

24   Q.    Tweet from December 26, 2014.  Do you recognize the person

25   depicted in the photograph on this?                               01:40:26

United States District Court

1   A.   Yes.  That is Anwar al-Awlaki.      01:40:28

2   Q.   And can you read the quote at the bottom of this?

3   A.   "The caravan is moving.  The more you delay joining it,

4   the further it will get away and the harder it will be to catch

5   up with it!"      01:40:39

6   Q.   On page 11 we have a tweet from December 26, 2014.  Can

7   you tell the Court what is depicted there?

8   A.   It's a group of ISIS fighters beheading people.

9   Q.   A tweet on December 30, 2014, it begins, "Make lots of

10   du'a for Amirul-Mu'minin."  Do you know who Amirul Mu'mineen      01:41:06

11   is?

12   A.   Yes.  That's referring to the leader of ISIS, Abu Bakr

13   al-Baghdadi.

14   Q.   January 1, 2015, what does this image depict?

15   A.   It's a painting of the Islam State banner.      01:41:22

16   Q.   Here we have a tweet from January 6 of 2015.  Can you tell

17   us who the person who is depicted in the photograph on that?

18   A.   Sheikh Abdullah Azzam.

19   Q.   Is he the author of that book Defence of the Muslim Lands

20   that we saw a few pages earlier?      01:41:47

21   A.   Yes, I believe so.

22   Q.   And who is in this photo here on page 15?

23   A.   It's Anwar al-Awlaki.

24   Q.   And is this a quote of his?

25   A.   Yes, it is.      01:42:02

1    Q.    What does the quote read?                                    01:42:03

2    A.    I'm sorry.  Can you repeat?

3    Q.    What does the quote read?

4    A.    "We have chosen the path of WAR in order to defend

5    ourselves from your oppression.  God Willing, we will continue    01:42:12

6    with this war and you will find us persistent."

7    Q.    And this tweet was January 7, 2015; is that correct?

8    A.    That's correct.

9    Q.    All right.  This one here, with whom is Mr. Simpson

10   communicating on these tweets here?                               01:42:32

11   A.    An individual who goes by the name Mujahid Miski.

12   Q.    And do you know what Mujahid Miski's or Mujahid Miski's

13   true name was?

14   A.    Mohamed Abdullahi Hassan.

15   Q.    Is that M-O-H-A-M-E-D, middle name A-B-D-U-L-L-A-H-I, last   01:42:53

16   name H-A-S-S-A-N?

17   A.    Yes.

18   Q.    And the date of these tweets January 9 of 2015; is that

19   correct?

20   A.    Yes.                                                         01:43:13

21   Q.    All right.  January 13, 2015.  Do you recognize this?

22   A.    Yes, I do.

23   Q.    What is he tweeting about here?

24   A.    These are the attackers from the Charlie Hebdo attack that

25   was perpetrated on January 7, 2015.                               01:43:26

GREGORY NEVILLE - Direct

1  Q.   And the weapons depicted here, do you know that if these      01:43:30

2  are consistent with the weapons that were recovered in that

3  attack?

4  A.   Yes.

5  Q.   January 13, 2015.                                             01:43:43

6  A.   It's another depiction of the ISIS banner.

7  Q.   January 14, of 2015?

8  A.   This is another tweet with Charlie Hebdo.

9  Q.   Looking at the person in all black in the lower right

10 corner of the picture, can you tell what that person is doing     01:44:02

11 with his left hand?

12 A.   Yes.  He's holding up his index finger.

13 Q.   Does that have significance in the world of

14 counter-terrorism?

15 A.   Yes, it does.                                                 01:44:13

16 Q.   Can you describe what that significance is?

17 A.   It's a symbol of tawhid which is the oneness of Allah.

18 And it's used by extremists to exemplify their devotion to

19 Allah.

20 Q.   January 27, 2015?                                             01:44:30

21 A.   This is another tweet about an Abu Bakr al-Baghdadi?

22 Q.   January 28, 2015?

23 A.   This is a propaganda photo of the Islamic State describing

24 the various things that they have to offer.

25 Q.   So extolling of the virtues of the caliphate of the          01:44:53

United States District Court

1    Islamic State?                                                          01:44:57

2    A.    Yes.

3    Q.    Page 22, do you recognize that image?

4    A.    These are photos of the Jordanian pilot who was shot down

5    and later burned alive by ISIS.                                         01:45:07

6    Q.    And Mr. Simpson was tweeting about that?

7    A.    Yes, he was.

8    Q.    Next page, 23, what are these images?

9    A.    These are the depictions of that pilot being burned alive.

10   Q.    Page 24.                                                          01:45:23

11   A.    This is a photo of an individual being executed by an ISIS

12   member with an ISIS flag in the background.

13   Q.    What are the words that he tweeted at the top of that?

14   A.    "When will they ever learn?"

15   Q.    Do those words match the tweet that he made on April 23,         01:45:37

16   2015, about the Mohammed Drawing Contest?

17   A.    Yes.

18   Q.    February 10, 2015.

19   A.    This is another photo of an execution being perpetrated by

20   on ISIS member.                                                        01:45:54

21   Q.    Page 26.  I'm going to zoom out a little bit.  What is

22   Mr. Simpson doing there?

23   A.    He's comparing a photo of individuals being kept in a cage

24   by U.S. Army with the burning alive of the Jordanian pilot.

25   Q.    Page 27.                                                         01:46:28

GREGORY NEVILLE - Direct

1    A.    It's another propaganda photo exemplifying why they          01:46:29

2    believe that they are the ultimate group.

3    Q.    And by "they" you are talking about ISIS?

4    A.    ISIS, yes.

5    Q.    Can you tell what this tweet is about?                        01:46:43

6          MR. KOEHLER:    Whoa.    The monitor just went off.    I

7    can see it on the camera down here.    Did I do something wrong?

8    I can see it on the camera down here but I'm not seeing it on

9    the monitors.

10          COURTROOM DEPUTY:    It's just not there.    It's still      01:47:00

11   searching like it did the other day.

12          MR. KOEHLER:    There we go.    Thank you.

13   BY MR. KOEHLER:

14   Q.    What is this tweet about?

15   A.    This is was a propaganda video put out by ISIS of the        01:47:26

16   execution of a group of Christians.    It was titled "A Message

17   Signed with Blood to the Nation of the Cross."

18   Q.    And was that put out by ISIS in Libya?

19   A.    Yes.

20   Q.    So ISIS was not just confined to Syria and Iraq?             01:47:38

21   A.    No.

22   Q.    Can you tell us what this one was?

23   A.    This is a young photo of Abu Bakr al-Baghdadi.

24   Q.    And this tweet from March 1?

25   A.    "Khilafah has returned," another ISIS propaganda image.      01:48:04

United States District Court

1    Q.    Page 31?                                                 01:48:15

2    A.    This was another propaganda video "Strike Their Necks."

3    It's a beheading video.

4    Q.    And this one here?

5    A.    These are links to the English language magazine *Dabiq*    01:48:26

6    magazine which was one of their English language propaganda

7    magazines that they released.

8    Q.    And this one here?

9    A.    It's an image of people swearing allegiance to ISIS.

10   Q.    That's from April 7, 2015?                               01:48:45

11   A.    Yes, it is.

12   Q.    April 8, 2015?

13   A.    It's another execution image.

14   Q.    Page 35, April 10, 2015.

15   A.    This is another depiction of an ISIS propaganda video that  01:49:02

16   was put out.

17   Q.    And this one?

18   A.    This is also a propaganda video that was put out by ISIS.

19   Q.    Now, here you have some communications; is that correct?

20   A.    Yes.                                                      01:49:22

21   Q.    And can you tell us, A, what is the nickname that

22   Mr. Simpson is using on April 23, 2015 on this one?

23   A.    I'm your bro fillalh.

24   Q.    And is he still using that @tawaakul handle?

25   A.    Yes.                                                      01:49:38

1    Q.    And in that communication stream, does he have                    01:49:39

2    communications with Miski?

3    A.    Yes, he does.

4    Q.    And are those communications about the Charlie Hebdo

5    attack?                                                                 01:49:50

6    A.    Yes.

7    Q.    And are they comparing them to the Draw Muhammad Contest

8    in Garland, Texas?

9    A.    Yes, they are.

10   Q.    And is that what that Breitbart link is that I'm pointing         01:49:57

11   out right here (Indicating)?

12   A.    Yes, that's it.

13   Q.    And can you read what Miski's tweet was about that contest

14   at the top of this page?

15   A.    "If only we had men like these brothers in the #states,          01:50:15

16   our beloved Muhammad would not have been drawn."

17   Q.    And then the tweet right below that?

18   A.    "The brothers from Charlie Hebdo attack did their part.

19   It's time for the brothers in the #US to do their part."

20   Q.    Are these more communications that Simpson had via               01:50:41

21   Twitter?

22   A.    Yes.

23   Q.    And is he the one in the middle, the sword @tawaakul?

24   A.    Yes, he is.

25   Q.    And talking about your home getting raided and have a gift       01:50:50

United States District Court

1    with you even if you take a shower, keep your shower time                    01:50:53

2    short?

3    A.   Yes.

4    Q.   Did you assess the meaning of having a gift with you in

5    the shower?                                                                  01:51:03

6    A.   Having a weapon ready.

7    Q.   And here on April 30, 2015, still talking about Amirul

8    Mu'mineen?

9    A.   Yes.

10   Q.   And that's referring to Abu Bakr al-Baghdadi?                           01:51:20

11   A.   Yes, it is.

12   Q.   So based on these samplings from Mr. Simpson's Twitter

13   accounts, is it fair to say that he was rather focused on

14   loyalty to the Islamic State and their point of view?

15   A.   Yes.                                                                    01:51:40

16   Q.   Now I'm going to switch back to the computer, please.

17            I'm going to directing your attention to Exhibit

18   Number 70 on the screen there.  Do you recognize that?

19   A.   Yes.

20   Q.   And did that -- was that something that you found on                    01:52:26

21   Twitter Open Source?

22   A.   Yes.

23   Q.   And tell us what that is.

24   A.   This is the last tweet that was put out by Elton Simpson

25   before he committed the attack in Garland, Texas.                           01:52:35

| | | |
|---|---|---|
| 1 | Q. Is that a true and correct copy of that tweet? | 01:52:38 |
| 2 | A. Yes, it is. | |
| 3 | MR. KOEHLER: Move to admit 70. | |
| 4 | THE COURT: Mr. Wahid, any objection? | |
| 5 | MR. WAHID: No. | 01:52:47 |
| 6 | THE COURT: All right. 70 is admitted. | |
| 7 | (Exhibit Number 70 was admitted into evidence.) | |
| 8 | BY MR. KOEHLER: | |
| 9 | Q. And did he, again, mention Amirul Mu'mineen in that tweet? | |
| 10 | A. Yes. | 01:52:56 |
| 11 | Q. And what does it mean where he says "the bro with me and | |
| 12 | myself have given bay'ah"? | |
| 13 | A. It's an oath of allegiance. | |
| 14 | Q. And "may Allah accept us as mujahideen"? | |
| 15 | A. He's referring to being accepted as soldiers of Islam. | 01:53:09 |
| 16 | Q. And do you know what "make du'a" means? | |
| 17 | A. Make prayer. | |
| 18 | Q. All right. Now, directing your attention to 71. Do you | |
| 19 | recognize this, Mr. Neville? | |
| 20 | A. Yes, I do. | 01:53:59 |
| 21 | Q. And was this also obtained through Open Source Twitter? | |
| 22 | A. Yes. | |
| 23 | Q. And can you tell us what this is? | |
| 24 | A. These are screen shots of Junaid Hussain tweeting about | |
| 25 | the attack in Garland, Texas, after it occurred. | 01:54:12 |

GREGORY NEVILLE - Direct

1  Q.    First off, who is Junaid Hussain?                          01:54:16

2  A.    He was an ISIS member.   He was involved in online

3  radicalization for other people.   He was an English speaker

4  from Britain.   He also head up the Islamic State Hacking Group.

5  Q.    And was -- did he use the Twitter handle @AbuHu55ain would   01:54:35

6  look like spelling out Abu Hussain?

7  A.    Yes.

8  Q.    And Abu Hussain al-Britani was the nickname that he used?

9  A.    Yes.

10 Q.    And did he tweet specifically in relation to the Garland,    01:54:51

11 terror attack?

12 A.    Yes, he did.

13 Q.    And what did he say?

14 A.    "And do not say about those who are killed in the way of

15 Allah, 'They are dead.'  Rather, they are alive, but you          01:55:02

16 perceive it not."

17        "The 2 brothers attained shahdah in Texas.   O Kuffar

18 know that death is better than living humiliated.   Allahu Akbar

19 #garland shooting."

20 Q.    Okay.  Can you tell us what the word "shahdah" means?        01:55:19

21 A.    Shahdah is a plural of shahid which is to be a martyr.

22 Q.    And what is kuffar?

23 A.    It's the infidels, the unbelievers.

24 Q.    Okay.  So here's he's telling the unbelievers that death

25 is better than living humiliated?                                 01:55:36

United States District Court

1    A.    Yes.                                                      01:55:39

2    Q.    All right.   Next one.

3    A.    "If there is no check on the freedom of your speech, then

4    let your hearts be open to the freedom of our actions

5    #GarlandShooting #TexasAttack."                                01:55:46

6    Q.    On the right-hand side.

7    A.    "Kill those that insult The Prophet #GarlandShooting."

8    Q.    Next?

9    A.    "Allahu Akbar!!!!!   2 of our brothers just opened fire at

10   the Prophet Muhammad (s.a.w.) art exhibition in Texas!          01:56:02

11   #TexasAttack."

12   Q.    And is that s.a.w. an abbreviation for something?

13   A.    Yes.   It's sallallahu alayhi wa Salam.

14   Q.    And what does that mean?

15   A.    It's a term of reference to the Prophet.   So anytime the   01:56:17

16   Prophet is mentioned, you say it.   And it's prayer -- may

17   Allah -- I can't remember.

18   Q.    Is an easy English translation for it, peace be upon him?

19   A.    Yes, essentially.

20   Q.    All right.   And then next did he tweet @atawaakul himself?  01:56:37

21   A.    Yes.   "@atawaakul May Allah swt reward you and give you

22   Jannah! #TexasAttack.

23   Q.    Can you read rest of his communications about this on the

24   screen?

25   A.    "If there is no check on the freedom of your speech, then   01:57:13

United States District Court

1  let your hearts be open to the freedom of our actions          01:57:16

2  #GarlandShooting #TexasAttack."

3          "They Thought They Was Safe in Texas From The

4  Soldiers of the Islamic State #garlandshooting #TexasAttack."

5          "Kill Those That Insult The Prophet                     01:57:28

6  #GarlandShooting."

7          "Allahu Akbar!!!!!  2 of our brothers just opened

8  fire at the Prophet Muhammad (s.a.w.) art exhibition in texas!

9  #TexasAttack."

10          "@atawaakul May Allah swt reward you and you and."     01:57:43

11  Q.    And so that's a repeat of the message from the previous

12  page; is that right?

13  A.    Yes.

14  Q.    So in light of what was found, did you also go looking

15  through Mr. Simpson's direct messages for communications with   01:58:03

16  others that might relate to his ideology as well as to this

17  event?

18  A.    Yes.

19          MR. KOEHLER:  If I can switch back to the document

20  camera, please.                                                 01:58:35

21  BY MR. KOEHLER:

22  Q.    I've placed on the document camera what's been marked for

23  identification as Exhibit Number 74.  Do you recognize that?

24  A.    Yes, I do.

25  Q.    And can you describe in general terms what that is?       01:58:47

1   A.   Those are Twitter direct messages between Elton Simpson   01:58:51

2   and Miski.

3   Q.   And did he have a couple of Twitter direct messages with

4   somebody else later on in the exhibit?

5   A.   Yes.   01:59:00

6   Q.   All right.  And are those true and correct copies of

7   Twitter direct messages that you had extracted from the Twitter

8   data that you received?

9   A.   Yes.

10          MR. KOEHLER:  Move to admit Exhibit Number 74.   01:59:10

11          THE COURT:  Any objection, Mr. Wahid?

12          MR. WAHID:  No.

13          THE COURT:  74 is admitted.

14          (Exhibit Number 74 was admitted into evidence.)

15   BY MR. KOEHLER:   01:59:17

16   Q.   So on this first page, what are Simpson and Miski talking

17   about here?

18   A.   Simpson is asking Miski if the brother interpreted the

19   dream of his.

20   Q.   Is dream interpretation something that you frequently see   01:59:29

21   in connection with Islamic counter-terrorism investigations?

22   A.   Yes.

23   Q.   And can you describe generally to the Court what that is

24   about?

25   A.   We see it frequently just in terms of people looking for   01:59:44

1   meaning in their dreams and justification for future actions.   01:59:46

2   Q.   All right.  Now directing your attention to the next page

3   of that, did Mr. Miski actually provide an interpretation?

4   A.   Yes, he did.

5   Q.   And let's start with the first one.   02:00:02

6   A.   "Akhi the sheikh said that this dream is a glad tidings

7   from Allah swt.

8         "You will loose an Opportunity to doing something

9   good like Hijra.  Then you'll be saddened over the lost of the

10   great opertunity.  You will miss out in allot of Ajar because   02:00:18

11   of that."

12   Q.   Can we stop for a moment?

13   A.   Yes.

14   Q.   First, hijra, what is that?

15   A.   It's immigration to Islamic lands.  In terms of ISIS, it   02:00:28

16   refers to going over and joining the caliphate in Syria or

17   Iraq.

18   Q.   And what does the word "ajar" mean?

19   A.   Reward.

20   Q.   Now keep going.   02:00:39

21   A.   "Allah swt will hold you back from doing so, so that you

22   can get another opportunity for a better place with greater

23   Ajar.

24         "The time between the two H's is a bit long.  It's

25   not gonna be as soon as you loose the first opportunity.  It's   02:00:53

1   gonna be a bit later."                                    02:00:56

2   Q.   All right.  As you continue with the -- does Mr. Simpson

3   ask him about that fifth item?

4   A.   Yes.  Simpson asks, "The time between the two H's is a bit

5   long.  It's not gonna be as soon as you loose the first     02:01:11

6   opportunity.  It's gonna be a bit later.

7            "Two H's.  You didn't mean to type H's sah?"

8            Miski replies, "What about it akhi?  I did.  Hijrah."

9            And Simpson replies, "He's saying hijra will happen

10   again?  Or just another way of getting ajr from Allah?  As of  02:01:30

11   number 4."

12            Miski replies, "He said it will happen again insha

13   Allah but to a better place."

14   Q.   Stop for a moment.  Insha Allah, what does that mean?

15   A.   God willing.                                        02:01:52

16   Q.   Okay.  Keep going.

17   A.   Simpson's replies, "Can I ask you this.  When sheikh

18   adnani gives a public address, can we assume that this is what

19   Al Khalifah wants as well?  Seeing that adnani is the

20   spokesman?  And seeing Al Khalifah hasn't come out to correct  02:02:02

21   what sh adnani says?"

22   Q.   How does Miski respond to that?

23   A.   "Yes akhil kareem.  Adnani never speaks unless he's been

24   ordered by the Khalif of the Muslims.  He can never speak

25   without the order of the Khalif."                          02:02:16

1  Q.  Go ahead.                                           02:02:23

2  A.  Simpson states, "Maybe then, it's is possible that the ajr

3  is in what he said earlier."

4          Miski replies, " And Afwan the Sheikh said Allah will

5  hold you back for something far better in Ajar than the last    02:02:33

6  time.  It could be H or something else."

7          Simpson corrects an earlier thing and says, "It is."

8  Q.  And then -- go ahead.

9  A.  Miski replies, "Akhi yes, Matter of fact that is far

10  better in Ajar than H right now."                        02:02:49

11  Q.  And so when he's talking about something being far better

12  than ajar, is he referring back to this comment about Shaykh

13  Adnani's public address?

14  A.  Yes.

15  Q.  All right.  Next one, January 3, 2015.                02:03:00

16  A.  Simpson asks, "I wonder what it means when one sees imam

17  Anwar in a dream.  You don't have to ask the sheikh akhi.

18  Lol."

19  Q.  When he says, "You don't have to ask the sheikh akhi,"

20  what did you assess he's meaning there?                   02:03:24

21  A.  He doesn't need to have that dream interpreted by the

22  sheikh.

23  Q.  And then what is Miski's response to that?

24  A.  "Maybe he's telling you what he told nidal."

25          MR. KOEHLER:  May I have a moment, Your Honor?    02:03:35

BY MR. KOEHLER:                                                    02:03:50

Q.   Okay.  January 9, 2015.

A.   "Subhan Allah things seem to be moving along so fast."

        Miski replies, "Masha Allah akhi, What happened in

France made the Muslims happy everywhere happy akhi."          02:04:00

Q.   Stop right there for a moment.  What happened in France?

Do you know the approximate date of the Charlie Hebdo attack?

A.   It was January 7, 2015.

Q.   So just two days before this message?

A.   Yes.                                                         02:04:14

Q.   Okay.  Keep going.

A.   Simpson replies, "I got confused though.  They mentioned

two brothers at first and then they mentioned a brother and a

sister."

        Miski replies, "With what akhi?"                        02:04:23

        Simpson replies, "There were 2 separate events?"

        Miski replies, "Na3m akhi they were separate."

Q.   So were there two separate events involved in Paris,

France, when the Charlie Hebdo attack occurred?

A.   Yes.                                                         02:04:42

Q.   All right.  Keep going.

A.   Simpson's replies, "I heard about the two who got shahadah

insha Allah at the grocery store.  What about the two

brothers?"

        Miski replies, "Akhi they all got Shahadah."           02:04:54

United States District Court

1    Simpson replies, "I only heard about the bro and the    02:04:57

2    sister Jzk.  Where did the other two get it?  House?

3    Warehouse?"

4    Miski replies, "They went inside a place and took

5    hostage. they killed the hostages and then they got martyred.    02:05:08

6    They were told to surrender and they said no, We came for

7    shahadah."

8    Q.   And, again, shahadah means martyrdom?

9    A.   Yes.

10   Q.   All right.  Is he talking to Miski about somebody else    02:05:25

11   here?

12   A.   Yes.

13   Q.   What is this about?

14   A.   Vetting out somebody who he believes to be an ISIS member.

15   Q.   And April 23, 2015.    02:05:39

16   A.   He's asking Miski to check a tweet that was posted to

17   Miski specifically.

18   Q.   Okay.

19   A.   And it's in reference to the Draw the Prophet contest in

20   Garland, Texas.    02:05:56

21   Q.   Is that the same day that he tweeted at Miski about that

22   same contest publicly?

23   A.   Yes.

24   Q.   So they both had a public exchange on it as well as this

25   private direct message exchange?    02:06:05

1  A.   Yes.                                                    02:06:07

2  Q.   All right.  May 2, 2015.

3  A.   Simpson asks Miski if his ss is working.  He replies, "Yes

4  akhil habeeb."

5          Simpson replies, "And juba89."                       02:06:21

6          Miski replies, "I sent you a request akhi."

7  Q.   Now, this is -- correct me if I'm wrong -- the day before

8  the attack in Garland, Texas?

9  A.   Yes, it is.

10 Q.   And is ss an abbreviation for something that you're       02:06:34

11 familiar with in your work?

12 A.   Yes.  It's Surespot.

13 Q.   S-U-R-E-S-P-O-T, one word?

14 A.   Yes.

15 Q.   And what is Surespot?                                     02:06:50

16 A.   It's a multimedia communication application.  It's an

17 encrypted application so that the communications are secure.

18 Q.   And are they encrypted end to end?

19 A.   Yes, they are.

20 Q.   Was the FBI able to recover any content data from Surespot 02:07:01

21 between Simpson and Miski or anyone else?

22 A.   No.

23 Q.   Did the FBI recover from Surespot information showing

24 communications between Simpson and Miski?

25 A.   Yes.                                                      02:07:18

GREGORY NEVILLE - Direct

1  Q.  Did you get a count on those communications?            02:07:18

2  A.  I do not have it.  I know it was in the hundreds.

3  Q.  And were those communications in the vicinity of the

4  attack itself?

5  A.  Yes.                                                     02:07:31

6  Q.  And juba89, was that a handle that was associated with

7  Elton Simpson on Surespot?

8  A.  Yes, it is.

9  Q.  And on April 15, 2015, different communication with

10  someone else.  Who is he communicating with there?          02:07:47

11  A.  This is a direct message exchange between Elton Simpson

12  and Junaid Hussain.

13  Q.  And can you tell us what this is about?

14  A.  Simpson is asking Junaid Hussain about Surespot, asking

15  him if he has a Surespot.  Junaid Hughes replies that he does  02:08:02

16  and that it is more secure than Whatsapp -- I'm sorry, than

17  Kick and provides him with his Surespot ID.

18  Q.  All right.  Go ahead.

19  A.  Simpson asks if he minds if he adds him to Surespot and

20  gives him his Surespot name and then tells him that he's added  02:08:17

21  him.

22  Q.  And that's a different handle, juba8021, than the previous

23  handle, juba89; correct?

24  A.  Yes.

25  Q.  Earlier we talked about using data recovered from cellular  02:09:06

United States District Court

1    telephones as well as cell phone records obtained in connection    02:09:11

2    with this case; is that correct?

3    A.    Yes.

4    Q.    Did you analyze records that were obtained from the cell

5    phone of Ali Soofi?    02:09:22

6    A.    Yes, I did.

7    Q.    And did you also use telephone call detail records that

8    came from Abdul Khabir Wahid's cellular telephone records?

9    A.    Yes.

10    Q.    All right.  I'm going to place on the camera here for you    02:09:40

11    what's been marked for identification for you as Exhibit 76.

12    Do you recognize this?

13    A.    Yes.

14    Q.    And can you tell the Court what this is?

15    A.    This is the call between Ali Soofi and Abdul Khabir Wahid,    02:09:52

16    Salim Sampson, and Abdul Malik Abdul Kareem from May 3, 2015,

17    through May 7,2015, extracted from the call log of the SCH-i535

18    Galaxy III.  MEID:  256691432504785177 utilized by Ali Soofi.

19    Q.    And did this come from a UFED report that was obtained by

20    Russell Carman with Customs and Border Protection, this cell    02:10:25

21    phone extraction of Ali Soofi?

22    A.    No.  I think this one came from the Kansas City office.

23    Q.    Oh, I'm sorry.  I'm thinking of Saabir Nurse's phone.

24          Did this come from Andrew Knutson's extractions of

25    Ali Soofi's cell phone?    02:10:44

GREGORY NEVILLE - Direct

1  A.   Yes.                                                    02:10:46

2  Q.   And did you access that through the FBI either CAIR or

3  Sentinel evidence systems?

4  A.   Yes, I did.

5  Q.   And when you received that data from there, was it     02:10:51

6  something that could be altered in any way on your end?

7  A.   No.

8  Q.   So you started with May 3, 2015, and went to May 7 of

9  2015, to get that narrow window; is that correct?

10 A.   Yes.                                                    02:11:06

11 Q.   And are these all of the communications between Ali Soofi

12 and those other individuals that are listed on this exhibit

13 during that time frame?

14 A.   Yes.

15 Q.   And so did Ali Soofi have two missed phone calls on May 3 02:11:20

16 of 2015 at 9:44 p.m. and 11:58 p.m. Arizona time?

17 A.   Yes.

18 Q.   When you went through the records that came out of that

19 phone as well as the cell phone records that came from AT&T for

20 Mr. Wahid's phone, did you convert all the times in those      02:11:40

21 records to Arizona time for ease of understanding?

22 A.   Yes, I did.

23 Q.   All right.  And did he have phone calls on May 4 with

24 Abdul Kareem that looked like calls that did not go through as

25 well as Salim Sampson that did, Abdul Kareem that went through, 02:11:59

United States District Court

GREGORY NEVILLE - Direct

1  another call with Salim Sampson that went through, and then a          02:12:05

2  missed call from Abdul Kareem?

3  A.   Yes.

4  Q.   And then did he have a call from Abdul Wahid on May 4 that

5  had a seven-second duration on it from -- coming from Mr.           02:12:17

6  Wahid's number?

7  A.   Yes.

8  Q.   With a seven-second duration, did you make an assessment

9  about that?

10  A.   The phone likely went to voicemail.          02:12:29

11  Q.   All right.  And, by the way, are all of these true and

12  correct reflections of what you found in the data?

13  A.   Yes.

14         MR. KOEHLER:  I'm going to move to admit Exhibit

15  Number 76.          02:12:39

16         THE COURT:  Mr. Wahid, any objection to 76?

17         MR. WAHID:  No.

18         THE COURT:  76 is admitted.

19         (Exhibit Number 76 was admitted into evidence.)

20  BY MR. KOEHLER:          02:12:45

21  Q.   All right.  Now looking at May 4 at 3:36 p.m., did Ali

22  Soofi place a call to Abdul Khabir Wahid?

23  A.   Yes.

24  Q.   And what was the duration of that?

25  A.   17 seconds.          02:12:55

United States District Court

GREGORY NEVILLE - Direct

1  Q.  And then did he place another one to Wahid about half-hour    02:12:56

2  later at 3:58 p.m., also 17 seconds?

3  A.  Yes.

4  Q.  Did you make an assessment, based on the lengths of those

5  two, what must have occurred?                                     02:13:08

6  A.  Those also likely went to voicemail.

7  Q.  All right.  Did they finally have a call that took place

8  on Monday, May 4, that lasted for nine minutes and 14 seconds

9  at approximately 4:54 p.m. Arizona time?

10 A.  Yes.                                                          02:13:23

11 Q.  And nine minutes and 54 seconds -- or nine minutes and 14

12 seconds?

13 A.  Yes.  Nine minutes, 14 seconds.

14 Q.  And then did he have a call a few days later with Salim

15 Samson on May 7 at 5:57 p.m. that lasted eight minutes and 19     02:13:32

16 seconds?

17 A.  Yes.

18 Q.  All right.  Now going to Exhibit Number 77, do you

19 recognize this?

20 A.  Yes, I do.                                                    02:13:48

21 Q.  What is depicted in this exhibit?

22 A.  This is the SMS content between Abdul Malik Abdul Kareem

23 and Abdul Khabir Wahid from May 3, 2015, through May 6, 2015,

24 taken from the call log of the MaxWest Gravity55 smart phone.

25 IMEI-1: 359020053707845.                                          02:14:07

United States District Court

GREGORY NEVILLE - Direct

```
 1   Q.  And were there also phone calls reflected in these        02:14:17
 2   records?
 3   A.  Yes.  The T-Mobile records for phone number 623-204-7295.
 4   Q.  And is this true and correct copy of the data that you
 5   recovered both from the MaxWest phone as well as from the      02:14:33
 6   T-Mobile call detail records?
 7   A.  Yes.
 8            MR. KOEHLER:  Move to admit Exhibit 77.
 9            THE COURT:  Any objection, Mr. Wahid?
10            MR. WAHID:  No.                                       02:14:46
11            THE COURT:  77 admitted.
12            (Exhibit Number 77 was admitted into evidence.)
13            THE COURT:  Mr. Koehler, are you moving on to another
14   record now?
15            MR. KOEHLER:  No.  I'm still on this is one but I'm   02:14:56
16   happy to take a break if you would like.
17            THE COURT:  I think, yeah, let's go ahead and take
18   our -- the first break of the afternoon.  I'm going to give us
19   two breaks this afternoon, both a little shorter.  Let's take
20   ten minutes now.  All right.                                  02:15:09
21            MS. BROOK:  Your Honor, just quickly for planning
22   purposes, we're ending today at 4:30 as well or are we going to
23   go after?
24            THE COURT:  I won't keep you all beyond 4:30.
25            MS. BROOK:  Okay.  I just wanted to make sure for     02:15:22
```

1  witness readiness.  Thanks.                                    02:15:24

2              (Recess at 2:15; resumed at  2:26.)

3              THE COURT:  Thank you, all.  Please be seated.

4              All right.  Mr. Koehler, you can resume.

5              MR. KOEHLER:  Thank you.  I just want to confirm if I   02:27:01

6  moved to admit 77 already.

7              THE COURT:  It's admitted.

8              MR. KOEHLER:  Very good.

9  BY MR. KOEHLER:

10 Q.   So Mr. Neville, I want to draw your attention --           02:27:09

11             COURTROOM DEPUTY:  Are you on the document camera or

12 your computer?

13             MR. KOEHLER:  Document camera still.  Thank you.

14             THE COURT:  So I know for planning purposes,

15 Mr. Koehler, about how much longer with this witness on direct?  02:27:24

16             MR. KOEHLER:  15 minutes.

17             THE COURT:  Thank you.

18 BY MR. KOEHLER:

19 Q.   So directing your attention to May 4, 2015, at 8:10 a.m.

20 did Mr. Wahid text Mr. Kareem?                                  02:27:36

21 A.   Yes.

22 Q.   What did he have to say there?

23 A.   "Abdul Malik extremely important that you call me, brother

24 based on what I read this morning I believe Ibrahim is dead."

25 Q.   Did he have more conversations with Mr. Kareem that         02:27:50

1  morning?                                                      02:27:52

2  A.    Yes.

3  Q.    So the times on this are in seconds instead of minutes; is

4  that right?

5  A.    Yes.                                                    02:28:04

6  Q.    Did he text Mr. Kareem again later that same morning, just

7  a couple hours later?

8  A.    Yes.

9  Q.    And what did he say there?

10 A.    "Abdul Malik if you type the name Elton Simpson on the    02:28:15

11 internet Ibraheem picture pops up with them talking about the

12 attack in Texas and his father now knows what that Ibraheem is

13 dead because he made a comment to ABC news."

14 Q.    And then did they have three somewhat lengthier phone

15 calls in between that time and their next text message?        02:28:36

16 A.    Yes.

17 Q.    All right.  And then at 3:05 p.m., did Wahid text Kareem?

18 A.    Yes.

19 Q.    And what does it say?

20 A.    "Would just send me he dang number already."             02:28:51

21 Q.    And then did they have another call not long after that

22 text?

23 A.    Yes.

24 Q.    And is that 55 seconds so just under minute?

25 A.    Yes.                                                     02:29:04

GREGORY NEVILLE - Direct

1   Q.   And then did Kareem text him back at 3:30 p.m.?                     02:29:04

2   A.   Yes.

3   Q.   And what did he text him back?

4   A.   "Ali" and then the number 602-446-9730.

5   Q.   And do you know if that was the number that Ali Soofi was          02:29:16

6   using at that point in time?

7   A.   Yes.

8   Q.   And how did Mr. Wahid respond to that?

9   A.   "Right on" with a smiley face emoji.

10  Q.   And then on May 4 at 7:02 p.m. did they have another call           02:29:30

11  that lasted approximately nine minutes?

12  A.   Yes.

13  Q.   And then on May 6 of 2015 at 12:02 p.m., did he send a

14  text to Kareem?

15  A.   Yes.                                                                02:29:52

16  Q.   And what does that text say?

17  A.   "Dunstons contact number is 602 920 3040."

18  Q.   Did Elton Simpson have a brother by the name of Dunston?

19  A.   Yes.

20  Q.   And does that phone number correspond to that brother              02:30:05

21  Dunston's number?

22  A.   Yes.

23  Q.   That's it for 77.

24       Now I'm going to direct your attention to Exhibit 78.

25  Can you tell the Court what this is?                                     02:30:25

United States District Court

1  A.   This is communication between Abdul Wahid and Saabir Nurse   02:30:28

2  from May 3, 2015, through May 6, 2015, extracted by CBP from

3  the cell phone of a Saabir Nurse on September 26, 2015.

4  Q.   So did this come from the UFED report from Russell Carman?

5  A.   Yes, it did.   02:30:45

6  Q.   Thank you.  I apologize for that confusion earlier.

7         All right.  And so Mr. Nurse and Mr. Wahid, did you

8  isolate communication that the two of them had when you were

9  going through the UFED report in Mr. Nurse's phone?

10 A.   Yes, I did.   02:31:01

11 Q.   And on Monday, May 4 at 7:21 a.m., did Mr. Wahid text

12 Mr. Nurse?

13 A.   Yes, he did.

14 Q.   And what did he say?

15 A.   "Salam alaikum I need to see u Wed if that's all right   02:31:13

16 with you."

17 Q.   Okay.  And did Nurse respond to that?

18 A.   Yes.

19 Q.   What did he say?

20 A.   "Walaikum salaam if I have the time inshallah I'll you   02:31:21

21 know."

22 Q.   And how did Wahid respond to that?

23 A.   "Don't.  Funky its really important."  Followed by, "Don't

24 be funky it's really important."

25 Q.   And then next?   02:31:37

GREGORY NEVILLE - Direct

1    A.    "So I hope to see you inshallah."                        02:31:38

2    Q.    All right.  And then two messages down from that did he

3    say something about Ibrahim?

4    A.    Yes.

5    Q.    And can you read that?  Obviously, he corrected aloha to    02:31:51

6    Allah so just read it as he intended.

7    A.    (Reading) Salam alaikum.  From Allah we are and to Allah

8    we must return.  Ibrahim is dead.  He was shot and killed

9    Saturday at the Prophet Muhammad Cartoon contest in Texas.

10   Q.    Now, let's skip forward to Wednesday, May 6.  Did Saabir    02:32:16

11   Nurse have what appeared to be attempted phone calls to Abdul

12   Khabir Wahid?

13   A.    Yes.

14   Q.    And were those at 2:26 and 2:27 a.m.?

15   A.    Yes.                                                      02:32:32

16   Q.    And what was the duration?

17   A.    Two seconds and one second.

18   Q.    And did you assess that to be an incomplete phone call?

19   A.    Yes.

20   Q.    All right.  And then what happened next?                  02:32:41

21   A.    Saabir Nurse sent a text message to Abdul Wahid saying, "I

22   don't have time today I'm busy, but I'm outside your door now."

23   Q.    And then did he try to call him again at 2:28 a.m.?

24   A.    Yes.

25   Q.    And then did they have another conversation at 6:52 p.m.   02:32:54

United States District Court

1  that evening that was a minute and two seconds?          02:32:58

2  A.    Yes.

3  Q.    And another one at 8:30 p.m. that was a minute and 54

4  seconds?

5  A.    Yes.                                                02:33:05

6  Q.    And then two more phone calls, two missed, and then two

7  more phone calls at 8:50 and 8:59 p.m. between the two of them?

8  A.    Yes.

9  Q.    And that was all Wednesday, May 6 of 2015?

10 A.    Yes.                                                02:33:19

11        MR. KOEHLER:  And I can't remember if I did.  Did I

12 move to admit 78?

13        COURTROOM DEPUTY:  No.

14        THE COURT:  It's not admitted.

15        MR. KOEHLER:  The Government moves to admit 78.     02:33:36

16        THE COURT:  Any objection, Mr. Wahid?

17        MR. WAHID:  No.

18        THE COURT:  78 is admitted.

19        (Exhibit Number 78 was admitted into evidence.)

20 BY MR. KOEHLER:                                           02:33:44

21 Q.    All right.  The last one is 79.  Do you recognize this?

22 A.    Yes, I do.

23 Q.    And from what is this derived?

24 A.    This is from the Huawei phone belonging to Abdul Wahid.

25 Q.    And was a search warrant executed on that phone?     02:33:58

1  A.  Yes.                                                    02:34:00

2  Q.  And did this come from the UFED report that was derived

3  from that search warrant's execution?

4  A.  Yes.

5  Q.  Is the data here true and correct copy of data that came  02:34:06

6  that's relevant to his communications with Abdul Khabir Wahid,

7  Dunston Simpson, Saabir Nurse, and Abdul Malik Abdul Kareem

8  from May 6, 2015, through June 10, 2015?

9  A.  Yes, it is.

10       MR. KOEHLER:  All right.  Move to admit Exhibit 79.    02:34:23

11       THE COURT:  Any objection, Mr. Wahid?

12       MR. WAHID:  No.

13       THE COURT:  All right.  79 is admitted.

14       (Exhibit Number 79 was admitted into evidence.)

15  BY MR. KOEHLER:                                             02:34:38

16  Q.  And in this did you see a fairly significant series of

17  phone calls back and forth between Abdul Malik, Abdul Kareem

18  and Abdul Khabir Wahid?

19  A.  Yes.

20  Q.  And did it also correspond to some of his communications  02:34:50

21  with other individuals we've named?

22  A.  Yes.

23  Q.  And then is there a phone call to a number or a text to a

24  number corresponding to Dunston Simpson, Elton Simpson's

25  brother?                                                    02:35:05

1   A.   Yes.            02:35:05

2   Q.   And what nickname does he have in his call log for that

3   person?

4   A.   Brother Ibrahim's.

5   Q.   And did Elton Simpson have a nickname?    02:35:13

6   A.   He was Ibrahim.

7   Q.   And can you read what he texted to Elton Simpson's brother

8   Dunston?

9   A.   "Hey Dunston it's Abdul Khabir.  Hey if it's all right

10  with u, I wanted ur mom and dads number just to check on them.   02:35:24

11  I used to have their number years ago when they use to live in

12  Avondale.  Anyhow if u could I would appreciate it if you could

13  give me their number.  I dreamt about Ibraheem.  It was a good

14  dream."

15  Q.   And did Dunston Simpson respond to that?    02:35:39

16  A.   Yes.  He responded, "Glad to hear you had a positive dream

17  please share with them."

18  Q.   All right.  And next.

19  A.   "I will, Sababir had a dream as well.  In Saabir's dream

20  Ibraheem came to his house.  Saabir let him in, in the dream   02:35:56

21  Saabir knew Ibraheem was dead already Saabir asked Ibraheem

22  what's your situation now and Ibraheem told Saabir that Allah

23  had put him in the highest heaven and that it was sweet, now

24  that's what he dream of all dreams.  I know u may or may not

25  understand and why ur brother did what he did, but I do ur   02:36:14

1   brother was STRONG in the religion and very sincere and          02:36:17
2   passionate about his sincerity and dedication to Allah enough
3   where some of us could take a lesson from him he believed and
4   feared not because he knew God was on his side and thats what
5   makes me believe he was successful and he got what we all are    02:36:30
6   struggling for which is heaven."
7   Q.   And what was the date and time of that message?
8   A.   It's May 20, 2015.
9   Q.   And 4:14 p.m.?
10  A.   Yes.                                                        02:36:45
11          MR. KOEHLER:  If I can have a moment, Your Honor.
12          I have no further questions for the witness, Your
13  Honor.
14          THE COURT:  All right, sir.  Thank you, Mr. Koehler.
15          Mr. Wahid, do you have any questions for this            02:37:44
16  witness?
17          MR. WAHID:  No.
18          THE COURT:  All right.  Thank you.
19          Then, Mr. Neville, you may step down and you are
20  excused.                                                         02:37:52
21          (Witness excused.)
22          MR. KOEHLER:  The United States calls Amy Vaughan.
23          THE COURT:  Ms. Vaughan, if you would step up to the
24  courtroom deputy, she'll swear you in.
25          COURTROOM DEPUTY:  Can you state your full name and      02:38:25

| | |
|---|---|
| 1 | spell your last name for the record? | 02:38:25 |

THE WITNESS:  Amy Vaughan.  V-A-U-G-H-A-N.

(AMY VAUGHAN, a witness herein, was duly sworn or affirmed.)

**DIRECT EXAMINATION**  02:38:37

BY MR. KOEHLER:

Q.  Ms. Vaughan, could you please introduce yourself to the Court?

A.  Yes.  Hello.  I'm Amy Vaughan.  I'm an intelligence analyst for the Counter-Terrorism Division of the FBI.  02:39:15

Q.  Are you presently stationed in Washington DC?

A.  Yes.

Q.  How long have you been with the FBI?

A.  Just about nine years now.

Q.  And that whole time have you served as an intelligence  02:39:27 analyst?

A.  Yes.

Q.  What has been your principal area of focus during your career as an intelligence analyst?

A.  I have primarily worked counter-terrorism cases dealing  02:39:38 with al-Qaeda and ISIS.

Q.  And has your focus been on Islamic extremism and terrorism as it relates to that?

A.  Absolutely, yes.

Q.  During 2015, were you stationed in Phoenix, Arizona?  02:39:52

1    A.    Yes.                                                              02:39:55

2    Q.    Did you participate in the investigation into the

·3   aftermath of the terrorist attack or the attack that Elton

4    Simpson and Nadir Soofi committed in Garland, Texas?

5    A.    Yes.                                                              02:40:08

6    Q.    As part of that, did you analyze computer devices?

7    A.    Yes, I did.

8    Q.    And can you tell the Court what your role is a in terms of

9    analyzing electronic evidence with counter-terrorism in mind?

10   A.    As an intelligence analyst that specializes in Islamic        02:40:25

11   extremism, my job was to find any evidence within the digital

12   media that would indicate a nexus to terrorism.  For example,

13   terrorist propaganda.

14   Q.    And would you access the devices themselves or would you

15   access the media in some other form?                                  02:40:48

16   A.    No.  Another team within the FBI would process what's

17   called an image of the device and then I would use special

18   software to interact with the image in order to prevent any

19   alteration or like malware type incidents.

20   Q.    Okay.  And would you flag items for members of the CART        02:41:10

21   team to export on your behalf?

22   A.    Yes.

23   Q.    In this case did you work directly with Agent Robert

24   Meshinsky to have data exported from electronic devices that

25   were seized in connection with this case?                            02:41:25

AMY VAUGHAN - Direct

1  A.   Yes, I did.                                                    02:41:28

2  Q.   And specifically, was one of those devices that you worked

3  with him on the image of a Samsung Galaxy S5 cell phone that

4  was seized in Garland, Texas?

5  A.   Yes.                                                           02:41:40

6  Q.   I'm doing to direct your attention to Exhibit Number 20

7  which is in evidence and on your screen.  Do you recognize

8  that?

9  A.   Yes.

10 Q.   I'm going to zoom in on a portion of that page.  Do you       02:41:52

11 recognize that portion of the page?

12 A.   Yes, I do.

13 Q.   And can you tell the Court what that is?

14 A.   This is an item from the Internet history on that device

15 and what it indicates is that the user visited a page which is   02:42:03

16 justpaste.it slash ISIHD_leak.  And, actually, the item

17 directly below that indicates that that they first clicked on a

18 link on Twitter which took them to justpaste.it.  The title of

19 the just paste it is on the left and -- would you like me to

20 talk about the content of that particular page?                   02:42:29

21 Q.   We're going to get there in a moment.  So first off, can

22 you tell the Court in general terms what is just paste it?

23 A.   Justpaste.it is a website that provides a service.  It's

24 very, very simple.  It essentially allows people to copy and

25 paste text and then have that text be hosted for other people     02:42:47

United States District Court

AMY VAUGHAN - Direct

1   to look at.  So they can share, you know, reports or stories or   02:42:51

2   links to whatever they desire.

3   Q.   So seeing these two links in here, is it fair to say that

4   somebody using this phone went to justpaste.it and accessed the

5   document ISHD_leak?   02:43:10

6   A.   Yes.

7   Q.   All right.  And did you go to justpaste.it to see what

8   that document was?

9   A.   So at the time that I reviewed this, that particular link

10  had been removed but there is what's called a mirror of that   02:43:25

11  content which is actually listed in the title of the item.  The

12  belinszky.eu.  So I visited the mirror and retrieved the PDF

13  that would have been on the justpaste.it page.

14  Q.   I'm going to direct your attention to Exhibit Number 21.

15  Do you recognize this?   02:43:55

16  A.   Yes.  That is the PDF.

17  Q.   And is that a true and correct copy of the relevant pages

18  of the PDF that you found on the justpaste.it side that had the

19  title ISHD_leak?

20  A.   Yes.   02:44:07

21  Q.   All right.  I'm going to -- let's back up one second.

22  That's a true and correct copy.

23          MR. KOEHLER:  The Government moves to admit

24  Exhibit 21.

25          THE COURT:  Mr. Wahid, any objection?   02:44:18

United States District Court

1        All right.  I need to be clear.  The last question         02:44:20

2   you asked the witness:  Is this a true and correct copy of the

3   relate paged of the PDF you found on the justpaste.it site?

4        MR. KOEHLER:  The mirror site.

5        THE COURT:  The mirror hosted in Europe?         02:44:32

6        MR. KOEHLER:  Correct.

7        THE COURT:  All right.  With that, the exhibit is

8   admitted and that's 21.

9   BY MR. KOEHLER:

10  Q.   And just to be clear, that mirror corresponded to the same    02:44:40

11  link that you found in the Samsung Galaxy S5?

12  A.   Yes.  In fact, the justpaste.it was made at the same time

13  as all of the mirrors and they all had exactly the same

14  content.

15       (Exhibit Number 21 was admitted into evidence.)         02:44:53

16  BY MR. KOEHLER:

17  Q.   All right.  And is this one of the pages of that document?

18  A.   Yes.

19  Q.   In general terms, can you tell the Court what the document

20  as a whole was?         02:45:12

21  A.   Yes.  It was a compilation of names and addresses and

22  assignments of military personnel that was stolen or otherwise

23  acquired by members of what was called the IS Hacking Division

24  which they distributed to encourage people to attack or harm

25  the people on the list.         02:45:39

AMY VAUGHAN - Direct

1  Q.  Was the IS Hacking Division the Islamic State Hacking      02:45:41
2  Division?

3  A.  Yes.

4  Q.  And was the head of that Junaid Hussain?

5  A.  Yes.      02:45:48

6  Q.  And is this image on the screen, Major Gena Fedoruk, was
7  that image obscured on the original version online?

8  A.  I believe it may have been, yes.

9  Q.  And Major Gena, G-E-N-A, last name F-E-D-O-R-U-K, was that
10  person one of a number of U.S. service members whose address      02:46:08
11  was released as part of the ISHD_leak release?

12  A.  Yes.

13  Q.  Did you also go through an image of a desktop computer
14  that was found in the Simpson and Soofi residence?

15  A.  Yes, I did.      02:46:41

16  Q.  And did you assess the content of that computer and ask
17  Special Agent Meshinsky to export certain items from that
18  computer yes?

19  A.  Yes.

20  Q.  Was one of those items page 13 of *Dabiq*, issue two?      02:46:53

21  A.  Yes.

22  Q.  Another one *Dabiq*, issue five?

23  A.  Yes.

24  Q.  Was another one a screen cap from an official ISIS video
25  of fighters loading artillery?      02:47:05

AMY VAUGHAN - Direct

1    A.    Yes.                                                                          02:47:08

2    Q.    And have you looked at all of these exhibits before coming

3    to court today?

4    A.    Yes.

5    Q.    So rather than place them on the monitor before you, I'm    02:47:12

6    just going to talk generally about them while you're on the

7    stand if that's okay.

8    A.    Sure.

9    Q.    Another one of a public beheading from Wahliah Halab?

10   A.    Yes.                                                                          02:47:24

11   Q.    And an advertisement of an obligation of appointing a

12   Khilafah and the forbiddance of delaying such?

13   A.    Yes.

14   Q.    And a screen cap from an official ISIS Lybia video showing

15   prisoners marched along a beach?                                     02:47:38

16   A.    Yes.

17   Q.    And another one, a video from Wahliah Halab showing the

18   aftermath of a public beheading?

19   A.    Yes.

20   Q.    And then pictures of ISIS fighters with a truckload of    02:47:46

21   prisoners?

22   A.    Yes.

23   Q.    And Twitter searches for both IS as well as ISIS?

24   A.    Yes.

25   Q.    In going through that computer, what would you say the    02:47:56

United States District Court

AMY VAUGHAN - Direct

1  quantity of this kind of information was?                    02:48:03

2  A.   It was extensive and given that what I found was most

3  likely from a very short period of time, like under a week, it

4  was voluminous.   Someone had to have been sitting there pretty

5  much continuously paging through page after page of             02:48:18

6  ISIS-related content.

7  Q.   The list of things the I just read off to you, could you

8  give the Court an approximate percentage that that represents

9  of what you actually found on the computer?

10  A.   Oh, it's almost certainly less than 10 percent, maybe two   02:48:36

11  or three percent of the total.

12  Q.   Did you find anything on the computer that indicated that

13  the people who were using the computer had any real significant

14  interest in anything outside of this?

15  A.   It's difficult to say.   I've only recorded the pertinent   02:49:00

16  items.   We don't typically spend much time on what we deem not

17  relevant to the case so I don't have a strong recollection of

18  what other kinds of activity were going on in the computer.

19  Q.   That makes sense.

20       All right.   I'm going to move on from there but was   02:49:20

21  it fair to say that the people who were using the computer

22  appeared to be fairly focused on the Islamic State in

23  particular?

24  A.   Yes.

25  Q.   All right.   Now, did you also, when you were looking   02:49:34

United States District Court

AMY VAUGHAN - Direct

1    through the computer, look for items that related to Anwar          02:49:37

2    al-Awlaki?

3    A.    Yes.

4    Q.    And why would you look for things that are related to

5    Anwar al-Awlaki?                                                     02:49:48

6    A.    Anwar al-Awlaki is one of the most prolific and important

7    radicalizers of the modern era.  He's a figure who is reveered

8    by jihadists, by ISIS, and al-Qaeda alike.  And he -- his

9    sermons and writings are very frequently, if not usually,

10   encountered among the effects of individuals who become             02:50:15

11   radicalized.

12   Q.    And the certain speeches of his, are they reflective of

13   the mind set of groups like al-Qaeda and ISIS?

14   A.    Absolutely.

15   Q.    Did you find one of his lectures on there that is known as     02:50:31

16   "The Dust Will Never Settle Down"?

17   A.    Yes.

18   Q.    And did you listen to the entirety of that lecture as it

19   appeared on the desktop computer?

20   A.    It's quite long so I listened to some excerpts.                02:50:49

21   Q.    Okay.  And I'm going to play for you exhibits.  Have you

22   reviewed Exhibits 154 through 158 before coming to court today?

23   A.    Yes.

24   Q.    And are those all clipped excerpts from "The Dust Will

25   Never Settle Down"?                                                  02:51:05

United States District Court

AMY VAUGHAN - Direct

1    A.   Yes, they are.                                              02:51:06

2            MR. KOEHLER:  I'm going to move to admit those but

3    not place those at this time.

4            THE COURT:  You're moving to admit 154 through 158 en

5    masse?                                                          02:51:21

6            MR. KOEHLER:  That's correct.

7            THE COURT:  Any objection?

8            MR. WAHID:  No.

9            THE COURT:  They are admitted.

10           (Exhibit Numbers 154 through 158 were admitted into    02:51:27

11   evidence.)

12           MR. KOEHLER:  Can I have a moment, Your Honor?

13           MR. MCBEE:  I apologize, Your Honor.  May we pause

14   for just a moment?  Client is in some discomfort.  I just want

15   to talk to him for a second.                                   02:52:15

16           (Defendant confers with counsel.)

17           MR. MCBEE:  Judge, Mr. Wahid would like to address

18   the Court about how he's feeling at the moment in terms of

19   being able to proceed.

20           MR. WAHID:  My head is pounding.  It has been          02:52:39

21   pounding for like over an hour.  It seems like it's getting

22   worse.

23           THE COURT:  All right, Mr. Wahid.  So a headache of

24   some type?

25           MR. WAHID:  Yes.                                       02:52:52

United States District Court

AMY VAUGHAN - Direct

1    THE COURT: All right. Let's -- let me see where we
2  are in the process.

3         Mr. Koehler, how much more do you have with
4  Ms. Vaughan?

5         MR. KOEHLER: I have two exhibits. It should take    02:53:01
6  about two or three minutes.

7         THE COURT: Are you going to ask questions about the
8  exhibits afterwards or are you just laying the foundation?

9         MR. KOEHLER: Laying the foundation for admission.

10        THE COURT: All right. I'm going to go ahead and do    02:53:13
11 that and then take a break. I'll give you some substantial
12 amount of time to see if you -- some aspirin or otherwise will
13 make you feel better and if not, I'll take that up if I have
14 to.

15        Let's go ahead and do that.    02:53:25

16 BY MR. KOEHLER:

17 Q.   So Ms. Vaughan, in front of you on the monitor is Exhibit
18 Number 82. Do you recognize that?

19 A.   Yes, I do.

20 Q.   And --    02:53:33

21        MR. KOEHLER: It just disappeared.

22        COURTROOM DEPUTY: We can't control it. It's a
23 short. They are working on it.

24        MR. KOEHLER: It's back.

25 \\\

United States District Court

AMY VAUGHAN - Direct

BY MR. KOEHLER:                                                    02:53:47

Q.   Can you tell us where this photo came from?

A.   Yes.  This was a photo taken by Abdul Malik Abdul Kareem's

MaxWest phone.

Q.   Was it stored on his phone?                                  02:54:00

A.   Yes.

Q.   And did you recover that during your review of the search

warrant execution on Mr. Abdul Malik Abdul Kareem?

A.   Yes, I did.

Q.   Is that a true and correct copy of the photo that came off  02:54:13

the phone?

A.   Yes.

        MR. KOEHLER:  Move to admit 82.

        THE COURT:  Is there any objection?

        MR. WAHID:  No.  No.                                      02:54:20

        THE COURT:  82 is admitted.

        (Exhibit Number 82 was admitted into evidence.)

BY MR. KOEHLER:

Q.   Now, Exhibit Number 83.  Was this also a photograph

present on the MaxWest phone?                                      02:54:33

A.   Yes, it was.

Q.   And is it a true and correct copy of the photo that you

had pulled off of that phone?

A.   Yes.

        MR. KOEHLER:  Move to admit 83.                           02:54:43

1    THE COURT:  All right.                              02:54:45

2    Mr. Wahid, any objection?

3    MR. WAHID:  No.

4    THE COURT:  All right.  83 is admitted.

5    (Exhibit Number 83 was admitted into evidence.)     02:54:48

6    MR. KOEHLER:  I have nothing further for this

7    witness, Your Honor.

8    THE COURT:  All right.  Mr. Wahid, are you going to

9    have questions for this witness when we resume?

10   MR. WAHID:  No.                                      02:54:59

11   THE COURT:  All right.  If that is the case, then I

12   can excuse the witness now.

13   Ms. Vaughan, you may step down and you are excused.

14   Thanks you.

15   (Witness excused.)                                   02:55:05

16   THE COURT:  We're going to go ahead and take a

17   half-hour break and see if that improves Mr. Wahid's

18   circumstances.

19   Mr. Koehler, Ms. Brook, if you can tell me, as I read

20   it, the Government only has three witnesses noticed.  I don't   02:55:22

21   know whether you're calling all of them.  Two of them are

22   special agents and one of them an expert witness.  What is your

23   current plan?

24   MR. KOEHLER:  We're going to call Matthew Levitt next

25   and then Stewart Whitson.  I believe the third witness is        02:55:33

United States District Court

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| United States of America, | ) |
| | ) |
| plaintiff. | ) APPEAL |
| | ) CR15-00707-PHX-SRB |
| vs. | ) Phoenix, Arizona |
| | ) March 2, 2016 |
| Abdul Malik Abdul Kareem, | ) 9:02 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY 10
(Pages 1718 through 1923, Inclusive.)

APPEARANCES:
For the Government:
        U.S. ATTORNEY'S OFFICE
        By:  **Kristen Brook, Esq.**
             **Joseph Edward Koehler, Esq.**
        40 North Central Avenue, Suite 1200
        Phoenix, AZ  85004


For the Defendant Abdul Malik Abdul Kareem:
        MAYNARD CRONIN ERICKSON CURRAN & REITER PLC
        By: **Daniel D. Maynard, Esq.**
            **Mary Kathleen Plomin, Esq.**
        3200 North Central Avenue, Suite 1800
        Phoenix, AZ  85012


Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1    Q   At some point did you meet Abdul Malik Abdul Kareem?

2    A   Yes.   That was in -- when I moved back in 2014, it was

3    probably, I want to say, halfway through the time that I had

4    been in Phoenix I had met him.

5    Q   Okay.  And how did you meet him?

6    A   Through mutual friends of my brother in the mosque.  We

7    all were running a carpet cleaning business.  And I had -- I

8    first met him at the mosque.

9    Q   So you first met Malik at the mosque.

10          You had mentioned that you at some point owned a

11   carpet cleaning business.  What happened to the pizza

12   business?

13   A   It had gone under because my brother was aimed more

14   towards serving the Muslim community rather than the community

15   that was surrounding our business, so the business -- the

16   whole idea didn't work, so it went under.

17   Q   At some point you opened a carpet cleaning business

18   instead?

19   A   Yes.

20   Q   And was that with your brother too?

21   A   Yes.

22   Q   I want to talk about February of 2014 through April of

23   2015 and the time that you lived there in the 19th Avenue

24   apartment with Ibrahim and your brother.

25          How often did you see Malik at the apartment?

1    A   At first it was on occasion, but as time progressed he was

2    there more often.

3    Q   Describe what you mean as "there more often."  How

4    frequently?

5    A   I would say it went from maybe once or twice a week to

6    three to four times a week.

7    Q   And when Malik was at the apartment, were there ever times

8    that he would sleep over?

9    A   Yes.

10   Q   How often would that happen?

11   A   Just like at the start it was, you know, here and there.

12   It was every once in a while.  But, I mean, towards the end it

13   was more often.  I would say maybe three times a week or more.

14   Q   Okay.  Who was Malik closest to in the house?

15   A   Ibrahim.

16   Q   And were there any other people other than Malik who came

17   to the house as much as he did?

18   A   There was another man named AK.  He would occasionally

19   come to the house but not as much.  He was more -- he had a

20   larger family, so he would spend more time, you know, with the

21   family but he would on occasion come over.

22   Q   So was there any other visitor who was there as much as

23   Malik?

24   A   No.

25   Q   When Malik was in the house, you had mentioned three to

1    it before or after?

2    A    It was before.

3    Q    So it was sometime before May of 2014?

4    A    Yes.  It would have to be.

5    Q    Can you give us any better recollection of it?

6    A    I have -- I have no idea.  I can't remember exactly what

7    month that was.

8    Q    You met him at the mosque for the first time?

9    A    Yes.

10    Q    And so you had been living in this apartment from February

11    until April and that's the first time you meet Abdul Malik,

12    correct?

13    A    It was halfway through the time that I moved in, yeah.

14    Q    Pardon me?

15    A    Halfway through the time so that I moved in.

16    Q    Well, halfway through the time would be somewhere around

17    November or December?

18    A    Not exactly.  I don't mean half.  I mean, you know, after

19    a little bit of time of living there.  I'm not sure on the

20    whole, you know, timings of that but --

21    Q    Well, you have a very good recollection on things.  I want

22    to try to get it as pinpoint accurate as we can.

23    A    Okay.

24    Q    Do you recall any better as we sit here when you met Abdul

25    Malik the first time?

1          I believe you said a minute ago you met him at the

2     mosque?

3     A   I just remember it was really hot that day.  It was very

4     hot.

5     Q   So does that mean it would have been maybe in June, July,

6     or August?

7          MS. BROOK:  Objection.  Speculation.

8          THE COURT:  I think he's already given you his

9     best -- the best information he can.  Before he met his

10    girlfriend and after he moved here in February.

11    BY MR. MAYNARD:

12    Q   And was it after you met him that time that he started

13    staying or coming over to the apartment one or two times a

14    week?

15    A   Yes.

16    Q   Okay.  But prior to that you had not seen him?  He had not

17    come to the apartment?

18    A   No.

19    Q   Okay.  And then I believe you testified to the jury that

20    at some point it then increases to three to four times a week.

21          When did that happen?

22    A   I think that was closer -- I know it was -- because I know

23    after I had first met him, he started coming over, it was

24    probably like a couple months after I had first met him.  I'm

25    not sure on that quite exact timing of that.

1    Q    Is it before the new year?

2    A    Yes.  It was before.  Before the new year.

3    Q    Could you recall based on any holidays?  Was it before

4    Thanksgiving or after Thanksgiving?

5    A    I'm sorry.  I can't.

6    Q    So the best you can do is it's several months after the

7    first time you met him, so October/November, thereabouts?

8         MS. BROOK:  Objection, Your Honor.  Speculation and

9    asked and answered.

10         THE COURT:  Sustained.

11         MS. BROOK:  Misstates testimony.

12   BY MR. MAYNARD:

13   Q    And you said he started coming three to four times a week

14   and that he slept over three nights a week.  When did he start

15   sleeping over three nights a week?

16   A    I mean it was -- I mean close around -- I'd say like

17   December time.  I remember it was closer towards the end of

18   the year it was more frequent.

19   Q    And so from the December or January time period until the

20   time you moved out, Malik was sleeping at your apartment three

21   times a week?

22   A    I mean, from what I can understand, he -- I don't know

23   what was going on in his life, but, I mean, he was over there.

24   Q    Was he sleeping at your apartment three times a week in

25   the last three or four months that you were living there?