Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No.003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| United States of America, | 2:15-cr-00707-SRB |
|---|---|
| Plaintiff/Respondent, | **ABDUL MALIK ABDUL** |
| v. | **KAREEM'S MOTION TO DISMISS** |
| Abdul Malik Abdul Kareem, | **(Oral Argument Requested)** |
| Defendant/Movant. | |

Defendant Abdul Malik Abdul Kareem ("Mr. Abdul Kareem") moves this Court to dismiss the indictment against him with prejudice. The Government's conduct in denying him access to favorable information interfered with his Fifth Amendment due process right to a fair trial, as well as his Sixth Amendment rights to present a complete defense to the charges against him and the effective assistance of counsel. The

1

disclosures since trial and the purposeful manner in which prosecutions and disclosures were timed demonstrates the government proceeded with utter disregard for Mr. Abdul Kareem's rights.   Moreover, it appears the material evidence suppressed by the investigators was withheld information from the prosecutors.   These tactics warrant dismissal of the indictment with prejudice.

The prosecutors disclosed information in 2019 pertaining to a pole camera, Nurse's cell phone, communications between FBI personnel in Dallas and Phoenix, and other materials.   Those recent disclosures should be considered along with materials disclosed previously since the analysis is a cumulative one, not simply piece by piece.   It appears investigators withheld 913 separately numbered pages together with a hard drive (pole camera videos) and a DVD (Nurse's cell phone contents) containing records too voluminous to number individually, and likely much more.   The prosecuting attorney has explained that he only became aware of these materials shortly before disclosing them. (Doc. 548, p. 14 and 16, as to the pole camera and Nurse's passport and phone contents.). This demonstrates the prosecutors have been prevented from making the required determinations of what should be disclosed under Fed. R. Crim. P. 16, *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and *Kyles v. Whitley*, 514 U.S.419, 432-440 (1995) Such conduct should not be tolerated.   It warrants exercise of this Court's power to remedy these outrageous due process violations, Constitutional and procedural violations, preserve judicial integrity, and deter future conduct of this sort.

This motion is supported and explained by the attached memorandum.

Excludable delay under 18 U.S.C. § 3161 will not occur as a result of this motion or a ruling thereon.

RESPECTFULLY SUBMITTED this 8th day of August 2019.

**MAYNARD CRONIN ERICKSON**    **DRAKE LAW, PLC**
**CURRAN & REITER, P.L.C.**

/s/Daniel D. Maynard       /s/Daniel R. Drake
DANIEL D. MAYNARD      DANIEL R. DRAKE

## <u>MEMORANDUM</u>

## I. INTRODUCTION

The court should consider this motion and, if inclined to grant it or believes it raises substantial, issue an indicative ruling advising the court of appeals that it intends to grant the motion or that the motion raises a substantial issue that merits further exploration at the trial level.  Mr. Abdul Kareem will then move the court of appeals to remand the case to the district court for disposition as contemplated by Fed. R. App. P. 12.1.[1]

---

[1] FRAP 12.1. REMAND AFTER AN INDICATIVE RULING BY THE DISTRICT COURT ON A MOTION FOR RELIEF THAT IS BARRED BY A PENDING APPEAL
  (a) Notice to the Court of Appeals.
  If a timely motion is made in the district court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending, the movant must promptly notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue.
  (b) Remand After an Indicative Ruling.
  If the district court states that it would grant the motion or that the motion raises

Here is the problem that warrants dismissal of the charges: someone other than the prosecutors in Mr. Abdul Kareem's case decided what documents and results of investigation would be disclosed to Mr. Abdul Kareem prior to his trial's conclusion. Information the government possessed in 2015 was kept from Mr. Abdul Kareem and surfaced only when the government wanted to use it for its own purposes in August 2016, March 2018, and February 2019.

Mr. Abdul Kareem could have used those suppressed materials to respond to the government allegations and prepare and present a complete defense. Who in the government made those decisions to withhold information is unknown: it was not government counsel in this case, we are told.

Defense pleadings seeking a new trial detail the information suppressed by the government until after defendant's trial, and what use the defense would have made of that information had it been available. (Doc. 303, Doc. 345, Doc. 432, Doc. 452, Doc. 505, Doc. 559.) Those pleadings are incorporated here. Granting a new trial is but one remedy for withholding favorable information from the defense.

This motion seeks dismissal of the indictment with prejudice. The nature of the items and the manner in which they were suppressed calls for relief different from the

a substantial issue, the court of appeals may remand for further proceedings but retains jurisdiction unless it expressly dismisses the appeal. If the court of appeals remands but retains jurisdiction, the parties must promptly notify the circuit clerk when the district court has decided the motion on remand.

4

grant of a new trial.  The government's conduct should not be countenanced but punished by granting this motion to dismiss.

Where the conduct is outrageous and amounts to a due process violation, the court may dismiss an indictment.  *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008).  If the conduct does not rise to a due process violation, the court may nonetheless dismiss under its supervisory powers.  *Id*., *citing United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)).

The defendant has moved separately for an evidentiary hearing for this Court to determine the nature of the misconduct and the appropriate remedy.

## II.	FACTUAL BACKGROUND AND RELATED MATTERS

### A.	The government controlled the timing of the cases and disclosures

Four matters revolve around the attack on the Draw the Prophet Contest in Garland, Texas on May 3, 2015.  This is the order in which they were charged.

1.	This case, where charges were brought on June 10, 2015.  Trial commenced February 16, 2016, and concluded March 17, 2016;

2.	*U.S. v. Hendricks*, CR 16-265-JRA in the Northern District of Ohio, during which the government alleged that Hendricks actions to recruit, radicalize, and encourage acts of violence "culminated on May 3, 2015 in Garland, Texas, where a thwarted terrorist attack took place."  (Prosecution Opening Statement, 3/8/18 RT 622.) The government explained Hendricks was "inextricably tied to the Garland

5

attack." (*Id*., at 622-23.)  During trial the government presented evidence about the Garland attack and called a number of witnesses who testified at Mr. Abdul Kareem's trial.  (Copies of the witness list and clerks docket report are attached as Exhibit A.)   Charges were brought August 3, 2016.  Trial concluded on March 20, 2018;

3.  *U.S. v. Wahid*, CR 17-00360, tried to Judge Tuchi of this court.  That case alleged false statements by Wahid's about his interactions with Simpson and Soofi on May 1, 2015.  During trial the government presented evidence about the Garland attack and called a number of witnesses who had testified at Mr. Abdul Kareem's trial. (Copies of the witness list, exhibit list and clerks docket report are attached as Exhibit B.)  Charges were brought March 14, 2017.  Trial concluded February 28, 2019.

4.  The investigation of Saabir Nurse ("Nurse").  The FBI apparently had him on a watchlist in 2015.  It imaged his phone and copied his passport in September 2015. (March 15, 2019 disclosure; Doc. 548. p. 17 n. 8)  It opened an investigation of Nurse in April 2016, the month after Mr. Abdul Kareem's trial was completed in this case and concluded that investigation several months later Doc. 548 p. 17 n. 8);

The order in which these matters were investigated and tried impacted what was shared with Mr. Abdul Kareem's prosecutors and in turn determined what information

6

was available for sharing with attorneys representing him.  The government may be free to choose whom it will charge and when, but that prerogative does not include the right to ignore the constitutional rights of one defendant because it does not yet want to charge a second defendant.

**B. The nature of the investigations and how the government manipulated proceedings and disclosures to keep information from Mr. Abdul Kareem yet have it available when it wanted to use it**

**1. The Hendricks Case**

Unlike the case against Mr. Abdul Kareem, the case against Hendricks was largely complete on May 3, 2015.  As pointed out in the new trial pleadings, the government had been investigating Hendricks prior to the attack.  It had videotaped him as he met with an undercover informant in an attempt to vet and recruit the informant to join the terrorist cell he claimed to be creating. CITE It had recordings of his communications with an undercover agent and with Simpson leading up to the attack.  It had a manifesto that Hendricks freely shared about Muslims living in the United States and preparing for jihad.  CITE

Hendricks shut down after the attack, other than claiming credit for it in the name of ISIS.  The superseding indictment against Hendricks shows that only the last overt act, posting online a document purporting to claim that the attack was committed by the "Islamic State in America," occurred after the attack.  (Doc. 25, page 4, included in Exhibit A)  It appears little additional information was gathered against Hendricks between the May 3, 2015 attack and his charging on August 3, 2016.

With all that in hand in early May 2015, the government waited until six months after the trial of this case to initiate proceedings against Hendricks, rather than proceeding first against Hendricks while it built its case against Mr. Abdul Kareem.  The defense suggests this is because the FBI felt a need to demonstrate its prowess, to live up to its vision: "Ahead of the threat through leadership, agility, and integration," (FBI website, https://www.fbi.gov/about/mission last visited August 5, 2019), a vision statement that "captures the essence of what defines success for the FBI."   (FBI website, https://www.fbi.gov/about/mission/fbi-strategy  last visited on August 5, 2019.)

When one reads the e-mail traffic included in Doc. 550-5, one is left with a firm conviction that Phoenix FBI thought Simpson was no risk to show up in Garland.  This would have been valuable support for the defense effort to show the bias of FBI witnesses and a motive to find a live suspect to charge and convict.  Also, this information could have been used to impeach the credibility of FBI agents, in particular case agent Whitson.

The government suppressed the following evidence during Mr. Abdul Kareem's trial that was used in the Hendricks trial:

- Communications between an undercover agent (UCA) and Elton Simpson,

- The communication between the UCA and Simpson in which the UCA responded to a comment by Simpson with the famous "Tear up Texas" line;

- The May 2, 2015 communication from Hendricks to the UCA encouraging him to connect with Bro Juda and "see what you and Bro Juda can do";

8

- Communications between the undercover agent (UCA) and other FBI personnel regarding the UCA's assessment that Simpson was "of concern" regarding the Garland; and,

- Communications indicating that the UCA thought about reaching out to Simpson to see where he was after their communications stopped, but he did not have authorization to do so.

### 2. Mr. Abdul Kareem's Case

In contrast to the case against Hendricks, the government did not consider Mr. Abdul Kareem of interest prior to the attack.[2]  It did not commence surveillance or open an investigation of him prior to May 6, 2015.  Its round-the-clock surveillance of Mr. Abdul Kareem and repeated efforts by Ali Soofi and Stephon Verdugo to capture Mr. Abdul Kareem incriminating himself failed to reveal anything incriminating. Notwithstanding the status of its investigation, the government chose to proceed first against Mr. Abdul Kareem, indicting him on June 10, 2015.

### 3. The Nurse Investigation

The government may have been monitoring or tracking Saabir Nurse as early as May 28, 2015.  Apparently, by September 26, 2015, Nurse was on the FBI watch list, a list created by the FBI National Security Branch, Terrorist Screening Center. (*See* https://www.fbi.gov/about/leadership-and-structure/national-security-branch/tsc   Last visited May 22, 2019.)  It tracked him leaving the country on May 28, 2015 and returning

---

[2] It had seized his computer during a search warrant executed against Simpson but there is no indication it had opened an investigation of him or was surveilling his activities.

9

on September 26, 2015.  He was interviewed about his travel and his faith.  His cell phone was imaged, capturing all his contacts, incoming and outgoing phone numbers, and verbatim text messages.  Agents also copied his passport and routed the information to the FBI.

The government initially listed Nurse, John Sabari, and James Bell as witnesses that might be called by the government in its case in chief.  It later dropped them from its final witness list.[3]  Its reasoning is unknown, but it never disclosed the contents of Nurse's phone or his passport prior to trial.

At trial the defense argued that Mr. Abdul Kareem was not the mastermind, trainer, and bankroller of the Garland attack, another, possibly Nurse was.  The defense pointed to a note from Elton Simpson, one to the attackers, given to Wahid and intended for delivery to Nurse.  The note explained that Simpson was giving Nurse the title to his car to repay Nurse for funds advanced for one purpose that had been used for another.  The defense argued these funds had been used for the attack; not funds from Mr. Abdul Malik.  The suppressed information would have supported the defense argument that Nurse had greater access to money than Mr. Abdul Kareem, and might have shown he was more radicalized toward Islam.

---

[3] In *United States v. Cadet*, 727 F. 2d 1453, 1469 (9th Cir. 1984), the court upheld a district court order requiring the government to disclose the names and addresses of  witnesses to the offense charged whom the government did not intend to call as witnesses.  The court of appeal reasoned that, if the government did not intend to call such witnesses, there was a reasonable possibility that they would be able to provide evidence favorable to the defense.

10

Almost immediately following Mr. Abdul Kareem's trial, according to government disclosures in March 2019, it began an investigation of Nurse that lasted for several months.  (Doc. 548 p. 17 n. 8.)  The matter under investigation or the results were never revealed.

Not until 2019, when it suited the government's purposes in the Wahid prosecution, did the government disclose that it had downloaded Nurse's cell phones in September 2015.  (Exhibit B, Exhibit List, Exhibit 78; Doc. 548 p. 17 n.8.)  In fact, the government previously denied that it had any information from Nurse's phone.  (*Id*.)  Then, in 2019, when it wanted to use the record of calls and texts to show that Nurse visited Wahid's apartment on 2:27 am on May 6, 2015, the image of Nurse's phone captured in 2015 was produced.  (Exhibit B, Exhibit List, Exhibit 78.)

During Mr. Abdul Kareem's trial the government suppressed evidence:

- That it had a copy of the incoming and outgoing phone numbers on Nurse's cell phone that would show contacts between Nurse and others, such as A.K. Wahid;

- That it had verbatim text messages showing Nurse's communications with others about Simpson and not Mr. Abdul Kareem;

- That it had a copy of Nurse's passport showing substantial foreign travel, including two trips to Saudi Arabia for the Haj;

- That Nurse had remained out of the country from May 28 until September

11

26, 2019;

- That Nurse's loan to Simpson was significant and warranted further investigation. It did so through the testimony of FBI case agent Stewart Whitson to the effect that the note and loan were of no particular importance; and,

- That it intended to open an investigation of Nurse as soon as Mr. Abdul Kareem's trial was over.

**4. The Wahid Case**

Finally, on March 14, 2017, the government indicted Wahid for making false statements during the investigation of the Garland attack. Wahid proceeded to trial in February 2019. The same two prosecutors were government counsel in the trial against Mr. Abdul Kareem and Wahid. In that case they were attempting to connect Wahid with Nurse and used evidence it had had since September 2015, the contents of Nurse's cell phone captured when he returned to the United States after an extended stay out of the country.

**5. The post-trial disclosures of suppressed information contain relevant and material information**

Following trial, the government made further disclosures which Mr. Abdul Kareem could have used in preparing his defense and impeaching government witnesses. Those materials are listed on Exhibit C. Should the Court hold an evidentiary hearing , those materials, some covered under the protective order in this case, will be offered in toto.

The government controlled the sequence of these related trials and disclosures choosing which case would go first, declining to produce information favorable to Mr. Abdul Kareem in his case, and then after his trial disclosing information possessed since 2015 it wanted to use in other prosecutions. Those governmental – or perhaps only FBI decisions – adversely affected Mr. Abdul Kareem's ability to receive effective assistance of counsel and violated the government's discharge of its obligations under Rule 16 and *Brady*.

### III.   LEGAL ANALYSIS

Dismissal of an indictment with prejudice is appropriate under two theories: (1) outrageous government conduct that violates a defendant's due process rights, *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008), or (2) a court may dismiss under its supervisory power "to implement a remedy for a violation of recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *Id.* (quoting *United States v. Simpson*, 927 F.3d 1088, 1090 (9th Cir. 1991)).

### A.  Fifth Amendment Due Process claim under *Brady* and Rule 16(a)(1)(E)

One aspect of Mr. Abdul Kareem's arguments for dismissal is anchored in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and its progeny dealing with suppression of material evidence favorable to the defense that resulted in prejudice to the defendant. A *Brady* claim of misconduct requires a petitioner to show that the evidence suppressed by the

prosecutor satisfies three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [government], either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

Prosecutors are constitutionally obligated to disclose "evidence favorable to an accused ...[that] is material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Favorable evidence is not limited to evidence that is exculpatory; it includes that which impeaches a prosecution witness. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

In terms of what qualifies as "material" evidence, the Supreme Court provided guidance in *Kyles v. Whitley,* 514 U.S. 419, 437-40(1995). There, as here, some of the favorable evidence to the defense was not revealed to the Louisiana prosecutor until after the trial. The State argued that the prosecutor should not be held accountable for evidence not shared with the prosecution but known to the police. The Court rejected that argument as it would leave the police, not prosecutors or judges, as the "final arbiters of the government's obligation to ensure fair trials." *Id*. at 438.

The State also argued that it was difficult to know from the "perspective [of a trial prosecutor at] trial … exactly what might become important later on." *Id*. at 438 (citing transcript of the oral argument). The Court acknowledged that the character of a piece of

14

evidence as favorable will often turn on the context of the existing or the potential evidentiary record.

Rejecting the State's argument, the Court reasoned that because of the prosecutorial obligation to seek the truth, the State could not escape its obligation on the ground it was too taxing or difficult to discharge. Quoting *Agurs*, it observed "[T]he prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id*. at 439. It stated such a rule would justify trust in the prosecutor as "the representative…of a sovereignty…whose interest…in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Id*. (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The Ninth Circuit explained the differing perspective of a prosecutor and a reviewing court when looking at particular evidence in *United States v. Olsen*, 704 F.3d 1172, 1183 n. 3 (9th Cir. 2013.) It is particularly difficult to predict the impact of a particular piece of evidence; thus, prosecutors should disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. *Id*. The retrospective view of materiality is appropriate only in the context of appellate review .

This approach is consistent with a prosecutor's duties (and a reviewing court's analysis) as set forth in *Kyles v. Whitley*, 514 U.S. 419, 437-40 (1995). Because the impact of suppressed evidence is determined cumulatively rather than piece-by-piece, a prosecutor must have some discretion about what is disclosed. At the same time, the

1  prosecutor has a corresponding burden to affirmatively seek out favorable evidence

2  known to others acting on the government's behalf in a case. *Id*. at 437-38.

3      The Ninth Circuit dealt with the government's failure to disclose evidence in its

4
5  possession until after the parties had rested in *United States v. Hernandez-Meza*, 720 F.3d

6  760 (2013). It noted that Fed. R. Crim. P. 16 requires the prosecution to disclose evidence

7  it intends to use in its case in chief (Rule 16(a)(1)(E)(ii)) and evidence material to

8
   preparing a defense (Rule 16(a)(1)(E)(i). *Id*., at 767-69.

9

10      There, the prosecution withheld evidence that defendant's mother applied to

11  become a naturalized citizen in a trial where the issue was whether the defendant was an

12  alien. If born to a naturalized citizen the defendant would have been a U.S. citizen. The

13
14  suppressed application showed, however, that Hernandez-Meza's mother filed her

15  application 18 years after he was born – he had no claim to derivative citizenship.

16      Hernandez-Meza asserted a derivative citizenship defense at trial, only to have the

17  government move to reopen and offer his mother's application in evidence. The court of

18
19  appeals found this unfair to Hernandez-Meza. "[He] was entitled to build his defense

20  strategy on the assumption that he had seen all the items the government would present

21  as part of its case." *Id*., at 768. So, too, was Mr. Abdul Kareem, but that proved to be

22  not so.

23

24      The court found the failure to disclose the application violated the prosecution's

25  duty to disclose information material to preparing a defense under Rule 16(a)(1)(E)(i).

26

27                                        16

28

*Id.*, at 768-69.  The court began by noting that "materiality is a low threshold;" it is satisfied so long as the information would have helped Hernandez-Meza prepare a defense.  *Id.*, at 768 (citing *United States v. Doe*, 705 F.3d 1134, 1151 (9th Cr. 2013)). Even if it simply caused a defendant to completely abandon a planned defense and take a different path, information is "material."  *Id.*  Lack of knowledge that certain information exists, or even a showing of due diligence to ferret it out, will not excuse non-compliance with Rule 16(a)(1)(E), unlike subsections 16(a)(1)(D) and (F).  *Id.*, at 768.

This makes clear the prosecutor's duty to seek out and disclose favorable evidence. Yet here, it seems, the trial prosecutors find themselves in the same position as the Louisiana prosecutors in *Kyles*.  Evidence from 2015 has been popping up that they claim to have known nothing about until just before they disclosed it to the defense.  There is no escape from the government's responsibility regardless of the prosecutor's good faith, good intentions, or lack of knowledge.

### B. Sixth Amendment violation of right to present a complete defense and interference with the right to effective assistance of counsel

The Supreme Court held in *Holmes v. South Carolina*, 547 U.S. 319 (2006) that a defendant has a Sixth Amendment right to present a complete defense, and a state procedural rule precluding a defendant from doing so could not stand.  Holmes challenged the state's evidence, the handling of forensic evidence, and alleged a plot to frame him.  In addition, he sought to introduce evidence that a third party was the

17

murderer.  The state court precluded the third party liability evidence based on a state evidentiary rule precluding introduction of such evidence when the state's evidence, particularly forensic evidence, was strong.  The Court held that evaluation only of the prosecution's evidence as a basis to exclude defense evidence was arbitrary and violative of Holmes right to a "meaningful opportunity to present a complete defense."  547 U.S. at 331.

Here, Mr. Abdul Kareem challenged the testimony of government witnesses and sought to demonstrate that he was not the planner, trainer, and "bankroller" as the government painted him.  He attempted to show that others were likely more influential on Simpson and Soofi than he because they were closer to radical Muslims and that others gave Simpson money that was used for the attack.  These were a part of his defense, but the government action in suppressing evidence, or delaying its disclosure past the point of utility, deprived him of the right to present this evidence to the jury.

This suppression of information interfered with Mr. Abdul Kareem's Sixth Amendment right to the assistance of counsel.  As noted in *Strickland v. Washington,* 466 U.S. 668, 690-91(1984), a lawyer's professional judgment about what approach to take rests on the bedrock of a thorough investigation of the case.  A failure to make a full investigation before selecting and preparing the defense may rise to ineffective assistance of counsel.  Uniformed-counsel's conduct may undermine the proper functioning of the adversary process such that the trial cannot be relied on to have produced a just result.

*See United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989) (reversing conviction for failure to investigate a mental defense); *Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) (holding a failure to investigate "cannot be construed as a trial tactic" where counsel did not even bother to view relevant documents that were available).

Here, defense counsel thought they knew their case. Yet any investigation done to arrive at a defense strategy by the start of trial on February 16, 2016 no longer mattered when the government started producing items not previously listed as exhibits. One-hundred-fifty new trial exhibits for the prosecution put the defense in an untenable position. Defense counsel was committed to his approach to the case when the opening statements were made. He had to rely upon the facts as he knew them at the start of trial. Even if his overall strategy might remain the same with the benefit of the suppressed evidence, the withheld evidence denied him the factual support needed for that strategy to be credible.

### C. An evidentiary hearing will confirm that dismissal of the indictment is the appropriate remedy here.

The foregoing shows that evidence in the government's possession, was suppressed, and was material. Defendant's constitutional rights to a fair trial, the presentation of a complete defense, and right to the effective assistance of counsel were denied. The result was prejudicial, and a verdict not worthy of confidence.

The defense has requested an evidentiary hearing to present the district court with a clear understanding of how the information disclosed post-trial came to the prosecutor's

attention, when it did, and why not sooner. This is the proper procedure. Those facts

developed at such a hearing will confirm the outrageous, willful, and flagrant government

conduct, and support this Court's decision that dismissal is the appropriate remedy.[4]

Other cases have involved hearings of this sort. In *Hernandez-Meza* the court

vacated the conviction and remanded the case for an evidentiary hearing into whether the

failure to disclose the application was willful, with the district court to impose appropriate

sanctions if willful. *Id.*, 720 F.3d at 769. Two other cases discussed in *Chapman*

involved remands to the district court to determine the nature of the alleged violations

and the remedies warranted. *Chapman*, 542 F.3d at 1086. The first, *United States v.*

*Kojayan*, 8 F.3d 1315 (9th Cir. 1993) involved a government failure to disclose an

agreement with a testifying co-conspirator. Based on misleading statements from the

prosecutor and the government's failure to accept responsibility, the conviction was

reversed, and the case remanded to determine whether to retry the defendants or dismiss

the indictment. *Chapman*, 524 F.3d at 1086, *citing Kojayan*, 8 F.3d at 1325. The second

was *United States v. Blanco*, 392 F.3d 382 (9th Cir. 2004). There the government failed

to disclose "highly relevant impeachment material" about a confidential informant.

*Chapman*, 524 F.3d at 1086, *citing Blanco*, 392 F.3d at 392. The court of appeals

remanded for further factfinding to determine the full extent of the violations, with a

---

[4] Although the appropriate remedy for disclosure violations is usually a new trial, where the government actions rise to a level of flagrant misconduct, dismissal is appropriate. *Chapman*, 524 F.3d at 1086.

20

range of options available to the court including dismissal of the indictment.  *Chapman*, 524 F.3d at 1086, *citing Blanco*, 392 F.3d at 395.

The prudent course is to conduct an evidentiary hearing notwithstanding the readily apparent nature of the misconduct.

**IV.    CONCLUSION**

It is one Department of Justice that prosecuted Mr. Abdul Kareem, and the Hendricks and Wahid cases, and investigated Nurse.   All these investigations and prosecutions were under its control.   It should be held accountable for its interference with Mr. Abdul Kareem's constitutional and procedural rights; the Court should act to protect the integrity of the judicial process, and to deter future misconduct.   It is impossible to confidence that the government has met its disclosure obligations, even at this point, due to its prior misconduct.   The Court should hold an evidentiary hearing and then dismiss the indictment with prejudice.

RESPECTFULLY SUBMITTED,

**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
By   /s/Daniel D. Maynard
       Daniel D. Maynard
       3200 North Central Avenue, Ste. 1800
       Phoenix, Arizona 85012
       Attorneys for Defendant/Appellant

**DRAKE LAW, PLC**
By   /s/Daniel R. Drake
       Daniel R. Drake
       4340 East Indian School Road

Suite 21-113
Phoenix, Arizona 85018
Attorney for Defendant/Appellant

### **CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants:  AUSA Joseph E. Koehler and AUSA Kristen Brook.  Additionally, a copy was served upon Mr. Abdul Kareem by first class letter, postage prepaid, at:

Abdul Malik Abdul Kareem #44126-408
FCI Florence
Federal Correctional Institution
PO Box 6000
Florence, CO  81226

/s/Daniel R. Drake
Daniel R. Drake

22