MICHAEL BAILEY
United States Attorney
District of Arizona

KRISTEN BROOK
Arizona State Bar No. 023121
JOSEPH E. KOEHLER
Arizona State Bar No. 013288
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone:  602-514-7500
Email: kristen.brook@usdoj.gov
Email: joe.koehler@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-15-00707-01-PHX-SRB |
|---|---|
| Plaintiff, | |
| v. | **GOVERNMENT'S SUR-REPLY IN OPPOSITION TO SUPPLEMENTAL MOTION FOR NEW TRIAL** |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

Kareem's reply claims suppression of things like pole camera footage that he does not appear in, records related to Saabir Nurse that do not involve him or the Garland attack, and FBI activities that (he alleges) would have embarrassed the FBI about the quality of its investigation.  These are not *Brady* or *Giglio* materials.  They are neither exculpatory nor material, and in light of the strong evidence of Kareem's guilt, none undermines confidence in the jury's verdict, either individually or collectively.

**Background**

"Reversal of a conviction or sentence is required only upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a

different light as to undermine confidence in the verdict." *United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013) (quotation omitted). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

Kareem's reply claims "[t]his was a close case." (CR 559 at 19.) To the contrary, the government's case against Kareem was very strong – it consisted of eyewitness testimony concerning Kareem's actions and statements, and physical and electronic evidence that corroborated the witnesses' testimony.

A.S. testified that Kareem, Simpson, and Nadir Soofi watched violent jihadist videos in the Simpson/Soofi apartment in mid-2014, and that they all celebrated ISIS's announcement of a caliphate in Iraq and Syria in June 2014. (RT 3/2/16 1752-1757.) In addition, on November 9, 2014, Simpson forwarded an email to Kareem about his travel restrictions; this coincided with Simpson's investigation of potential Hijrah travel to Syria via Turkey on behalf of ISIS. (Tr. Exh. 190[1]). Prior to the Super Bowl game played on February 1, 2015, Kareem and Simpson discussed a plan to attack the Super Bowl along with the Westgate shopping mall – a mall adjacent to the Super Bowl. (RT 2/19/16 643-44.)

Kareem aided Simpson and Soofi to acquire firearms first in the summer of 2014, then again between December 2014 and January 2015. (RT 3/2/16 1767-68, 1771-73.) Kareem took Simpson and Soofi shooting in the desert in January 2015 with the weapons he helped them purchase – the same weapons used in the Garland attack. (RT 2/19/16 639-40, 644, 679, 681-82; RT 2/23/16 887-97, 923-33; RT

---

[1] The trial exhibits cited in this factual summary were attached as exhibits to the government's response to Kareem's Supplemental Brief in support of his Motion for New Trial (CR 441.)

2/24/16 966-67; RT 3/2/16 1773-74.) Kareem also showed Simpson and Nadir Soofi how to maintain their weapons. (RT 3/2/16 25-27, 29, 32-33.)

Multiple witnesses testified about statements Kareem made before April 2015 in which he expressed his desire to attack the Garland contest. (RT 2/24/16 1100-03, 1106-08; 1124-31; RT 2/19/16 647-48, 652.) Kareem made statements to another witness about providing an AK-47 to Simpson in relation to the contest. (RT 2/24/16 at 1070-72.) One witness also testified about statements Kareem made to Simpson about strapping a bomb to himself and blowing himself up in a public place such as a shopping mall. (RT 2/24/16 1098-1100, 1131-33.) After the foregoing events, sometime in late March or early April 2015, Kareem decided not to accompany Simpson and Soofi to conduct the attack. (RT 2/19/16 658-60.)

Throughout the trial, the government presented physical and electronic evidence to corroborate the witnesses' testimony. The evidence included ammunition from Kareem's home that matched ammunition found at the attack scene and in the Simpson/Soofi apartment (Tr. Exh. 13, 29, 84, 118), firearm items and a bullet-proof vest matching descriptions given by Stephan Verdugo (RT 2/19/16 639-40, 644; Tr. Exh. 114, 115, 119, 400), and Twitter records in which Simpson referenced a "bro from Philly" (Kareem's hometown) who was laughing at the conversation he was having with a fellow ISIS supporter (Tr. Exh. 480). The evidence also demonstrated Kareem lied during his testimony when he claimed he had not used his Acer computer since it stopped working in November 2014, when records showed he was using it and even tethering it to his Maxwest cell phone in May 2015. (RT 3/9/16 2452-55; Tr. Exh. 481.) This evidence, combined with the testimony of all the witnesses and remaining exhibits, established Kareem's guilt beyond a reasonable doubt.

## Argument

In sum, and as explained in more detail below, no suppression of exculpatory or impeaching evidence occurred, and the jury's verdict is worthy of confidence.

1. **<u>The absence of Kareem in the pole camera footage does not exonerate him.</u>**

Kareem's reply claims that pole camera footage from outside of Simpson and Soofi's apartment from May 1-4, 2015, was exculpatory because it did not show him. Specifically, Kareem claims that this would have undermined his notion that if Kareem were involved in the Garland attack, Kareem would have been with Simpson and Nadir Soofi on May 1, 2015, as they prepared to leave to conduct the attack. (CR 559 at 4.)

This claim, however, ignores the evidence and argument at trial. The government never argued Kareem was at the Simpson/Soofi apartment on May 1, 2015. In fact, the government presented evidence showing Kareem backed away from participating in the attack, although he did not withdraw from the conspiracy. Just as Kareem's active participation in the conspiracy took place before Elton Simpson's communications with the FBI UCE on April 23-24, 2015, it likewise took place well before the pole camera was activated on May 1, 2015. Moreover, Kareem's presence or absence in one place on one date does not make it more or less likely he was in that place or another place on separate dates – including the dates A.S. testified he had been present in the Simpson/Soofi apartment watching ISIS videos. The mere absence of incriminating evidence within a given video or audio recording, interview, or report, does not render that evidence "favorable" under *Brady*. Such information is essentially silent. The fact that it does not implicate a defendant certainly does not mean that it can be construed as favorable to that defendant.

In *United States v. Borda*, the court explained, "the fact that Government statements or exhibits are silent and do not implicate a defendant certainly cannot be construed as 'favorable' to that defendant." 41 F. Supp. 2d 16, 24 (D.D.C. 2013). This is because "the absence of incriminating information in a report cannot be turned into an affirmative conclusion that it is 'favorable' to the Defendants and,

therefore, cannot constitute *Brady* material." *Id.*  *See also id.* at 25 ("Once again, Defendants are asking that the mere absence of incriminating evidence is 'favorable' under *Brady*. That is just not correct . . .").

In the same way, and as this Court previously observed in this case (CR 469 at 9), the fact that other criminals are involved in other aspects of a crime does not make it less likely that the charged defendant could also be involved.  Here, the government never argued that Simpson and Kareem were planning together on May 1, 2015.  Indeed, the proof at trial focused on Kareem's acts to support and facilitate the attack that occurred well before that date.

Kareem points to the testimony of Mustafa Hassan as evidence the government was attempting to show Kareem was engaged in planning with Simpson and Soofi shortly before the attack, and would have appeared in the pole camera video if that were the case.  This argument misapprehends the purpose of Hassan's testimony.  The government presented Hassan's testimony about Kareem's presence at a restaurant with Simpson the evening of April 30, 2015, to rebut Kareem's claim that he had severed contact with Simpson weeks before the attack.[2]  Simply put, the government presented Hassan's testimony to challenge the credibility of Kareem's statements in the wake of the Garland attack.  Why would Kareem have told the FBI he had not contacted Simpson in weeks, when they were in fact out to dinner together on April 30, 2015?  Kareem's false statement on this subject was an early sign that he was hiding something, but in no way did the government imply that Kareem was engaged in preparation or planning with Simpson and Nadir Soofi on April 30 or May 1, 2015.  The pole camera footage does not advance Kareem's defense that the investigation was unreliable or that the FBI targeted Kareem based on something

---

[2] The government made this precise point in its opening statement during Kareem's trial.  (RT 2/17/16 at 237.)

other than the overwhelming evidence of his guilt. Nor does the footage cast doubt on the adequacy of the investigation.

To demonstrate materiality, a defendant must show the evidence would "enable the accused to substantially alter the quantum of proof in his [or her] favor." *United States v. Marshall,* 532 F.2d 1279, 1285 (9th Cir.1976). On cross-examination of government witnesses, in opening statement, and in closing argument, Kareem extensively explored the quality of the investigation and his claims of bias. The pole camera captured video images, without audio, from a vantage point that showed only the sidewalk area and portal leading to the Simpson/Soofi apartment – it did not show the apartment door or the area immediately adjacent to the door. The footage was marginally probative at best.

To the extent it may have been probative, the pole camera footage was consistent with A.S.'s trial testimony. The footage showed Simpson and Soofi coming and going from the area of the apartment, and witness A.S. carrying away his weights and workout equipment, just as he testified during the trial. This undisclosed video footage would not have contradicted the government's witnesses or shown them to be lying. Nor would it have provided a basis to attack the investigation, advance allegations of investigators' bias or sloppiness, or support a third-party perpetrator claim. Whatever value it might have had was outweighed by its potential for confusing the jury and wasting the court's time. *See* Fed. R. Evid. 403.

The fact that the pole camera footage does not show Kareem on May 1 does not contradict any government evidence or argument, and it does not make it more or less likely that the evidence about what Kareem did was true. *See United States v. Joiner,* 727 F. App'x 821, 827-28 (6th Cir. 2018) (rejecting claim that the government "suppressed exculpatory evidence by failing to preserve security camera footage . . . in violation of *Brady"* because defendant failed to show prejudice). The withheld evidence cannot "reasonably be taken to put the whole case in such a

different light as to undermine confidence in the verdict." *Turner v. United States*, 116 A.3d 894 (D.C. 2015), *aff'd*, *Turner v. United States*, --- U.S. ---, 137 S. Ct. 1885 (2017). This is especially true in light of Kareem's exhaustive attack against the investigation at trial. Evidence "questioning the adequacy of various aspects of the government's investigation itself – as opposed to the adequacy of the evidence gathered as a result of that investigation – is either irrelevant or of very little probative value, as it improperly shifts the jury's focus from the accusations against the defendant to accusations against the police." *United States v. Carmichael*, 373 F. Supp. 2d 1293, 1297 (M.D. Ala. 2005).

In short, nothing in the pole camera footage falls within the scope of the government's discovery obligations under Brady, Giglio, or Rule 16. The government certainly would have disclosed the video footage had undersigned counsel known about it during the time of the trial in this case, but would have done so in the interest of transparency, not out of obligation.

**2. The information about Saabir Nurse was irrelevant, tangential, and would have been confusing to the jury.**

Kareem claims he would have changed his strategy and called Nurse and others to testify had the government disclosed Nurse's phone records, travel records, and information about further investigation of Nurse prior to trial. These arguments are addressed in more detail below, but in summary, they raise tangential points that are of no consequence to any of the issues or testimony in Kareem's trial, and they would have been excluded as such. *See United States v. Olsen*, 704 F.3d 1172, 1183 (9th Cir. 2013) (suppressed evidence must cast case in different light sufficient to undermine confidence in the verdict); *United States v. Robbins*, 197 F.3d 829, 845 (7th Cir.1999); *United States v. Patrick*, 248 F.3d 11, 23 (1st Cir.2001). *See also United States v. Estell*, 641 F.App'x 552, 56 (7th Cir. 2016) (rejecting defendant's claim that district court erred by preventing him from arguing government's investigation of robbery was deficient). The inclusion of such evidence would have

had no bearing on Kareem's trial and the information provides no basis to undermine confidence in the verdict.

     a. <u>The Government's use of Saabir Nurse's phone records in the *Wahid* trial would not have been relevant to Kareem's defense in his trial.</u>

Kareem contends the government's use of Saabir Nurse's phone records in the Wahid trial would have been relevant to Kareem's defense in his own trial. (CR 559 at 7.) This argument ignores the fact that Wahid's charges were different from those Kareem faced. Specifically, the indictment against Wahid charged him with one count of making material false statements to the FBI that involved terrorism, and one count of attempted witness tampering. The content of Nurse's phone was relevant to Wahid's case because it provided detail to the timeline of Wahid's communications with Nurse in relation to the timing of his false statements to FBI agents. The timing demonstrated that Wahid knowingly and intentionally provided false information to the agents on May 6, 2015, when the investigation was in its early stages.

The information from Nurse's phone and his travel details did not fall within the scope of Rule 16, the Jencks Act, *Brady*, or *Giglio*. The government disclosed to Kareem the additional information, including the content of Nurse's phone, because Kareem had requested the information in his Motion for New Trial and subsequent filings. The government disclosed the information in order to complete the record and provide transparency. As the government noted in its response to Kareem's original Motion for New Trial, any record of Nurse's involvement or contact with Simpson, Nadir Soofi, and Kareem would have been encapsulated in the phone records of the known co-conspirators in this case. (CR 319 at 19-20.) Kareem has pointed to nothing in the content of Nurse's phone that was exculpatory, had impeachment value, or was otherwise material to the defense. Even assuming the information about which Kareem complains was material in some way, it was available through other sources.

Kareem notes that the content from Nurse's phone showed that Nurse visited Wahid's apartment on May 6, 2015 at 2:27 a.m. Kareem contends that this content "confirms that Kareem did not communicate much with Nurse and it further shows the relationship between Nurse and Wahid." (CR 559 at 7.) This information is not new. First, during Kareem's trial, Wahid testified that he followed instructions Simpson had given to him by delivering to Nurse an envelope and a key from Simpson (RT 3/8/16 at 2223, 2225, 2231-32.). Wahid testified that he later learned the envelope contained the title to Simpson's car. (RT 3/3/16 at 2225.) Dunston Simpson, Sr., Simpson's father, testified that Nurse subsequently gave him the title and key to Simpson's car. (RT 3/8/16 at 2029.) Second, the government never alleged that Kareem and Nurse were close, and Kareem's own phone records (disclosed in October 2015) reflected that Kareem and Nurse had little contact. Information about the closeness of Nurse's relationships with other associates of Simpson (who were not implicated in the investigation) is irrelevant to Kareem's participation in the conspiracy. Kareem has not shown such information would have been favorable or material to any defense, and has not shown it would have served to impeach any witness who gave testimony in the case.

      b. <u>Nurse's travel out of the country is not relevant, favorable, or material to Kareem's case.</u>

Next, Kareem claims Nurse's travel out of the country "was material to bolster the argument . . . that he did not need a job and one could infer that he left the country due to his concern about the Garland attack until he learned that Kareem had been arrested." (CR 559 at 7-8) Nurse's passport and the travel stamps therein were not remotely relevant to any of the issues in play during Kareem's trial. Even if Nurse's ability to travel and his actual travels were somehow relevant, Kareem has not shown that the relevance of the passport and travel stamps would have been apparent to investigators. *Cf. California v. Trombetta,* 467 U.S. 479, 489 (1984) (destruction of

evidence violates *Brady* only if potential exculpatory value was apparent prior to destruction).

The only evidence concerning Nurse that was even remotely relevant to the issues in this case was the indented letter ostensibly from Simpson to Nurse. That letter referenced money from Nurse being used for an "initial plan . . . that changed" and Simpson providing the title to his car as repayment. Kareem introduced that letter into evidence during his trial.

The notion that Nurse's ability to travel meant Nurse provided financial assistance to Simpson to conduct the Garland attack is nothing more than speculation about matters cumulative to Kareem's existing knowledge. The fact that Nurse provided a job and cars to Simpson was known prior to trial and was discussed during Kareem's closing argument. (RT 3/11/16 32-33, 45-49.) In fact, Kareem told the FBI during his interview that he knew Nurse helped Simpson financially. Because he already knew this information, Kareem could have called Nurse or others to provide it, yet he made the strategic decision not to pursue that course.

Moreover, this information was inconsequential. The fact that Nurse had the means to travel does not imply that he (a) knew of Simpson's plan to attack the contest or (b) was willing and did in fact provide financial backing for it. Hajj (making a pilgrimage to Mecca) is a common devout Islamic practice – it does not mean that an individual is preparing to commit violent jihad or supports violent jihad. Kareem offers no support for the speculative proposition that Islamic radicals are more likely to attend Hajj. Indeed, none of the evidence in this case suggests Simpson or Nadir Soofi attended Hajj.

Similarly, the fact of Nurse's travel out of the United States is irrelevant to any of the issues in the case. Kareem's argument that Nurse may have been staying outside the United States to evade potential arrest is nothing more than pure speculation. Nurse returned to the United States under his true name, which indicates he did not fear arrest. Kareem's sheer speculation about what he might

have done with the additional information does not state a claim under *Brady*. *See Runningeagle v. Ryan*, 686 F.3d 758, 769-70 (9th Cir. 2012) (rejecting *Brady* claim in capital case based on speculation about undisclosed statements jailhouse informant made to prosecutors that potentially implicated third party in murders); *United States v. Sessa*, 711 F.3d 316, 322 (2d Cir. 2013) (speculation about possible other perpetrator of murder insufficient to support claim of *Brady* violation; "The fact that an unidentified person, at some point in the past, had been in [victim's] car does not plausibly suggest that that person killed [victim]. Nor does the fact that the authorities diligently pursued other leads but found no evidence implicating any other person tend to exculpate Sessa.").

Kareem strategically did not call Nurse to testify at trial. Rather, Kareem attempted to implicate Nurse through innuendo and repeatedly claimed the FBI failed to investigate Nurse. (RT 3/11/16, 32-33, 45, 47 and 49). Kareem now claims he would have called Nurse to testify, but does not set forth any statement of actual proof he would have elicited from Nurse.

Nurse denied knowledge of the attack. His denial is consistent with the language in the indented letter ostensibly from Simpson to Nurse. Kareem claims he would have impeached Nurse by showing Nurse had sufficient income to travel and had attended Hajj. This scenario would have been irrelevant under Rule 401, and tangential at best to counter the evidence the government presented about Kareem's involvement. At worst, it would have come across as an attempt to embarrass Nurse or trigger an invocation of his right against self-incrimination – both of which would have been an appropriate basis for objection under Rule 403. *See United States v. Klinger*, 128 F.3d 705, 709 (9th Cir. 1997) ("It is well established that a criminal defendant may not call a witness if that witness—whether or not a codefendant—'will merely be invoking his Fifth Amendment right not to testify.'") (citation omitted); Fed. R. Evid. 611.

  c. <u>The testimony of Special Agents Whitson and Jensen does not support Kareem's argument.</u>

Kareem complains that the government did not provide documentation of subsequent FBI interviews with Nurse. (CR 559 at 9; 559-1 at 6.) He claims additional interviews must exist but offers nothing but speculation to support the notion that such reports exist and would be favorable to his case.

The only support Kareem offers is the testimony of Special Agent Whitson. However, because SA Whitson was not the case agent for Nurse during or prior to his testimony, he lacked personal knowledge of the details of the Nurse investigation. Kareem's reply argument on this point is nothing more than speculation about the existence of additional reports of interviews of Nurse that may be relevant to this case.

Similarly, Kareem argues, "[b]ased on SA Jensen's testimony, it is only logical that the FBI conducted further investigation into Nurse before Kareem's trial or it should have to explain why not. . . . [I]t appears the FBI purposely may have waited until after Kareem's trial to conduct its investigation of Nurse." (CR 559 at 9-10.) Special Agent Kim Jensen testified during the Wahid trial about the importance of the FBI's having learned that Wahid gave Nurse a key and an envelope believed to contain the title to Simpson's car and a letter from Simpson to Nurse. He further testified about the fact that further investigation would have been conducted had Wahid told the truth about passing the envelope from Simpson to Nurse, and how such further investigation might have revealed additional information in the case. He did not state further investigation necessarily would have implicated Nurse.

Nor did Special Agent Jensen testify that he had any personal knowledge of the details of the Nurse investigation. He testified that he was one of the case agents investigating Wahid, not one of the agents investigating Nurse. Kareem's argument, again, is nothing more than speculation. Speculation is not a basis for finding a *Brady*

violation. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) ("[W]here, as in this case, a federal appellate court . . . grants habeas relief on the basis of little more than speculation with slight support, the proper delicate balance between the federal courts and the States is upset to a degree that requires correction."). The government already disclosed the reports of interviews of Nurse that related to Simpson and the Garland attack. None of the interviews of Nurse contains any information that would fall within the scope of *Brady*, *Giglio*, or Rule 16 in this case.

**3.    The tactical intel report and statements in other trials do not undermine the verdict in this case.**

   a.    The tactical intel report has no relevance to Kareem's trial

Regarding the Tactical Intel Report, Kareem complains about the lack of an explanation of why the report was created in March 2015 and how it played into the April 9, 2015 request to place a pole camera outside of Simpson's apartment. Kareem contends, "[i]f there was surveillance of Simpson by the FBI starting in March 2015, it is material to Kareem because *we believe* it will show little or no connection between Simpson and Kareem and put the lie to much of Ali Soofi's testimony." (emphasis added) (CR 559 at 10-11.)

This argument, again, is pure speculation. Kareem essentially is seeking a log of every aspect of the government's investigation of Simpson, before and after the Garland attack, in order to uncover wrongdoing he speculates must have been done by investigators. First, such speculation is unfounded. Kareem points to no evidence to support the notion that he was targeted for prosecution for any reason other than the evidence that led investigators to him. Second, nothing in the law requires such sweeping disclosure, especially in the absence of particular information showing that disclosure would actually be relevant and helpful to the defense. "[C]ourts must also take care that [in this case, alleged] wrongdoing by investigators that has no bearing on the matter before the court not be used as a diversion from fairly assessing the prosecution's case. Like any other potential evidence, information about police

corruption must be evaluated by reference to the ordinary rules of criminal procedure and evidence. . . ." *United States v. Ulbricht*, 858 F.3d 71, 105 (2d Cir. 2017). The argument that the believed surveillance of Simpson would have been material because Kareem believes the alleged surveillance would have shown little or no connection between Simpson and Kareem, in turn impeaching Ali Soofi, is pure speculation that would have confused the jury and wasted the court's time and resources.

        b.     <u>Statements from other trials related to the Garland attack are entirely consistent with the Governments' position in this case</u>.

The defense stated that: (a) the testimony of A.S. in the Wahid trial was inconsistent with the testimony given at Kareem's trial; and (b) the prosecutor's opening statement in the Hendricks trial was a party admission, and "logic suggests that having made a statement to one effect on a given issue should estop that party from later asserting a contrary position." (CR 559 at 14 n.2.). The statements from other trials related to the Garland attack are consistent with the Government's position in Kareem's case and do not warrant a new trial on these grounds.

        1.     <u>The testimony of A.S. in the *Wahid* trial was aimed at establishing Kareem as the most frequent visitor to the Simpson/Soofi apartment, not to describe the precise frequency of Kareem's presence.</u>

The testimony of A.S. in the Wahid trial was consistent in all material respects with his trial testimony in the instant case and is not new evidence that would, standing alone or in combination with Kareem's other allegations, justify a new trial. First, the focus of A.S.'s testimony in the Wahid trial, three years after the trial in this case, was different. The focus in the Wahid trial was on Wahid's false statements to the FBI and his conduct in attempting to convince A.S. not to talk to the FBI and to provide misleading information to the FBI.

A.S.'s testimony about Kareem in the Wahid trial provided background and context for his testimony about Wahid and Wahid's motives for attempting to sway

A.S. The testimony merely established that Kareem was the most frequent visitor to the Soofi/Simpson apartment; it did not enumerate the frequency of his visits.

Contrary to Kareem's assertion, A.S. did not testify that Kareem was consistently at the apartment throughout the week during A.S.'s time at the apartment. Rather, in response to a somewhat leading question designed to guide him to the subject of the coming questions, he stated Kareem's status as the most frequent visitor to the apartment was consistent throughout the time A.S. resided at the apartment:

> Q. So Abdul Malik, was he there the most of any other visitor who didn't live at the house or something else?
> A. He was the most frequent person that would visit.
> Q. And was that pretty consistent throughout the time that you were in the house?
> A. Yes.
> Q. Who was the second most frequent visitor?
> A. Other than that, it was just AK

(RT 2/27/19 141.)

In the Wahid trial the government also introduced a timeline of text messages and call detail records Kareem and Wahid exchanged after the Garland attack. The timeline contained the same information that was admitted in Kareem's trial but in a different format. The timeline demonstrated Kareem's involvement in the initial contact between Wahid and A.S. This in turn demonstrated Wahid was seeking to avoid scrutiny of both Kareem and himself when he attempted to tamper with A.S. To the extent they even exist, inconsistencies in A.S.'s testimony about the timing of Kareem's presence in the apartment were insignificant and do not cast doubt on the verdict in this case. Delving into the minutiae of the timing of Kareem's presence

in the apartment would have consumed more time than the subject warranted given the purpose of that portion of A.S.'s testimony.

### 2. The prosecutor's opening statement in the *Hendricks* trial was not a party admission.

The prosecutor's statement in the Hendricks trial was not an admission of any sort – it was at most a qualified statement about Hendricks's attempts to get the undercover FBI employee to attack the contest. To the extent Kareem suggests estoppel should come into play, the government has maintained throughout this case, and well before the Hendricks trial took place, that Simpson did not trust Hendricks, and Hendricks did not play any role in the attack itself. (CR 441 at 4-7.) This Court agreed in its order denying the original Motion for New Trial. (CR 469 at 9.) The prosecutor's statement in the Hendricks trial, "Now, this defendant did not plan or participate in this attack, nor is he on trial for this attack," was entirely consistent with the position the government previously declared in the instant case. (Hendricks RT 3/13/18 622-23.)

**4.     Taken cumulatively, Kareem's claims do not warrant a new trial.**

In all, none of Kareem's arguments, standing alone or cumulatively, establishes the existence of a *Brady*, *Giglio*, or Rule 16 violation. Courts evaluate the cumulative effect of *Brady*/*Giglio* claims collectively after evaluating each claim individually. *United States v. Kohring*, 637 F.3d 895, 903 (9th Cir. 2011).

> Cumulative error applies only when multiple errors exist such that our review of them would be better served by examining the prejudice collectively, rather than through "a balkanized, issue-by-issue harmless error review." *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988). There were not multiple errors here and therefore there cannot be cumulative error. *See United States v. Jeremiah*, 493 F.3d 1042, 1047 (9th Cir. 2007) ("[B]ecause we hold that there was no error committed by the district court, Jeremiah's theory of cumulative error necessarily fails").

*United States v. Lindsay*, 931 F.3d 852, 869 (9th Cir. 2019).

An item-by-item analysis of Kareem's claims in his Motion for New Trial reveals no *Brady* violation occurred because Defense counsel either had access to

the information or the evidence was not exculpatory or material to the defense. (CR 459 at 7–10.) Likewise, Kareem's new arguments are inconsequential and do not create a reasonable probability that, in light of the entire trial record in this case, had the evidence been disclosed, the result of the proceeding would have been different. *See Turner v. United States*, 137 S. Ct. 1885, 1893-94 (2017); *Kohring*, 637 F.3d at 903. The totality of Kareem's claims – many arising out of his expedited trial strategy – do not in any way cast doubt on the trial evidence that demonstrated his participation in the conspiracies charged in the indictment, his false statements to the FBI, and his possession of a firearm after having been convicted of a felony.

**5.     The Government's broad disclosure of information does not expand its discovery obligations.**

The Government made a commitment to disclose a wide array of information in this case post trial and respond to Kareem's allegations with transparency. That said, "[T]he prosecut[ion] is not required [under *Brady*] to deliver [its] entire file to defense counsel. . . ." *United States v. Bagley*, 473 U .S. 667, 675 (1985). *Brady* does not require the government to disclose every scrap of evidence that could conceivably benefit a defendant. *See, e.g.*, *Moore v. Illinois*, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work"). "Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation." *United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998).

### Conclusion

Based on the foregoing and the previous briefing on this subject (CR 319, 324, 441, 548, & 550), the United States respectfully requests the Court deny Kareem's Supplemental Motion for New Trial and declare that it does not raise a substantial

1  issue to warrant a remand of jurisdiction from the Court of Appeals for the Ninth
2  Circuit.
3        Respectfully submitted this 21st day of August, 2019.

                      MICHAEL BAILEY
                      United States Attorney
                      District of Arizona

                      *s/ Kristen Brook*
                      *s/ Joseph E. Koehler*
                      KRISTEN BROOK
                      JOSEPH E. KOEHLER
                      Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

      I hereby certify that on the 21st day of August, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Drake & Daniel Maynard, Attorneys for Defendant

By: */s Joseph E. Koehler*