Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No.003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　　　Plaintiff/Respondent,<br><br>　　v.<br><br>Abdul Malik Abdul Kareem,<br><br>　　　　　　　Defendant/Movant. | 2:15-cr-00707-SRB<br><br>**ABDUL MALIK ABDUL KAREEM'S RESPONSE TO MOTION FOR CLARIFICATION OF COURT'S ORDER SETTING EVIDENTIARY HEARING**<br><br>**AND**<br><br>**MOTION TO COMPEL PRODUCTION OF DOCUMENTS FROM GOVERNMENT AND EXPAND EVIDENTIARY HEARING**<br><br>**(Oral Argument Requested)** |

**Newly discovered evidence that another person claimed responsibility for the attack**.

Today, the defense learned for the first time that an individual named Joshua Ryne Goldberg posted a map of the Cull well Center in Garland, Texas, and urged anyone in

1

the area to attack.  Goldberg was prosecuted in the Middle District of Florida, Case 3:17-cr-00249-BJD-MCR.  He was charged with attempted malicious damage by an explosive of a building, in violation of 18 U.S.C. § 844(i).  The investigation leading to his arrest and conviction was handled by the FBI.

According to the factual basis in his plea agreement, prior to the drawing contest Joshua Ryne Goldberg posted maps and encouragement to attack the drawing contest "with your weapons, bombs, or knives."  Case 3:17-cr-00249-BJD-MCR, Doc. 75, p. 20.  Simpson copied his post, according to the factual basis.  On August 26, 2015, the FBI found a posting where Goldberg took responsibility for inspiring the Garland attack.  *Id.*  A copy of the plea agreement is attached as Exhibit 1.

Counsel has not had time to explore this information, but called it to the attention of Assistant U.S. Attorney Joseph Koehler, who was unaware of it.  Whatever the government response, this was evidence that should have been presented to the jury in Abdul Kareem's case.  The jury should have been free to evaluate Goldberg's August 2015 statement claiming responsibility.  It should not have been up to the FBI to decide that Goldberg information was not believable, and therefor did not have to be disclosed.

**Background**

The Court held a telephone conference on August 9, 2019 and set an evidentiary hearing for October 15, 2019.  Counsel had not been advised of the purpose of the telephone conference before it took place.  The Court made it clear that the Court was

interested in knowing about the pole camera that had recently been disclosed by the Government, it contents and why it had not been disclosed earlier. The defense suggested a broader scope might be appropriate based on its recently filed motion to dismiss. That motion was based on a pattern of continuing violations of the government's discovery obligations. The defense suggested counsel meet to discuss what evidence they believed they would put on and whether they would raise additional issues with the Court.

**Efforts to resolve issues regarding the evidentiary hearing**

Prior to meeting with Government counsel, defense counsel sent a letter to the Government on August 14, 2019, listing what witnesses and documents they would like to have at the evidentiary hearing. Contrary to the Government's statement on pages 2-3 of the motion for clarification, the defense did not demand production of documents.[1]

Counsel for the defense and the Government then met August 15, 2019 to discuss the evidentiary hearing. The Government took the position that it was not required to turn over any documents, and therefor would not produce any. It also thought it only necessary that the defense have three witnesses. The defense lawyers explained why they wanted the listed witnesses and why they thought they were entitled to documents. They readily acknowledged that the Court had not indicated that the evidentiary hearing would discuss disclosures related to Saabir Nurse, but reiterated their position that they had filed a motion to dismiss, in part based upon a pattern of belated disclosures: the pole camera

---

[1] Perhaps the Government was put off because the defense listed AUSA Koehler as one of those witnesses as he apparently was the one who first learned of the pole camera's existence. He could testify to those circumstances as well as his efforts to ensure he was given full access to the FBI's information.

video; Nurse's cell phone and passport contents; a tactical information sheet sent from FBI-Phoenix to FBI-Dallas; and the activities of an undercover agent who was present at the time of the attack in Texas.

During this meeting, the Government disclosed for the first time the practice for staffing terrorism cases; it was different than the typical arrangement counsel had come to know. Instead of having a "case agent" assigned to a particular investigation, like a drug conspiracy, which could include multiple subjects, in terrorism cases an individual "case agent" was assigned to the investigation of one individual who was deemed to be a terrorist or potential terrorist. Thus, there would be separate investigations regarding Simpson, Nurse, Wahid, and Abdul Kareem, each with a separate "case agent" assigned to each individual. The upshot seemed to be that because Agent Whitson was the case agent assigned to Abdul Kareem and not Elton Simpson or Saabir Nurse, he would have seen the materials as to Abdul Kareem but not necessarily have seen anything developed as to Simpson or Nurse. This was news to the defense. Upon returning to their offices they wrote a letter to the Government confirming the conversations and reiterating the defense need for production of certain witnesses and documents.

**The government's practices compartmentalize information in a possible attempt to reduce or evade its disclosure obligations**

The practice of assigning agents to individuals rather than investigations appears to allow government agents to disclaim knowledge of what occurred in the investigation of a related individual. That is similar to the problem in *Giglio v. United States*, 405 U.S. 150 (1972), where one prosecutor promised immunity to a government witness. A second

prosecutor tried the case and assured the jury no promises had been made to the witness. As the Seventh Circuit noted in *Carey v Duckworth*, 738 F.2d 875, 878 (1984), a prosecutor's office cannot get around *Brady* by keeping itself in the dark, or compartmentalizing information about different aspects of the case.

Here, compartmentalization it evident.  The government has repeatedly argued that an agent had no personal knowledge of the investigation of one individual because he was the case agent regarding another individual.  Thus, the agent on the Adbul Kareem cases does not know about the Nurse investigation, nor does the agent on the Wahid investigation.

In civil lawsuits, lawyers are allowed to file interrogatories, document requests, request to admit and take depositions of individuals in order to gather information.  In a criminal case, these discovery devices are not provided.  There are, however, Constitutional, statutory, and procedural rules intended to ensure a fair trial and a defendant's right to present a complete defense.  In this context, "complete" refers to all the matters that would assist the defense, not that the defense would result in a "complete" victory or acquittal.

Discovery is generally done by the Government and, in this case, the Government admitted that it had over 200 FBI agents that worked on the case plus numerous U.S. Attorneys.  The Government becomes the custodian of the results of that investigation. It chooses what it will disclose, and what it will not.

Like a dystopian game of Battleship, the defense can only guess what information

5

the Government has until the Government discloses it, sometimes in a related trial like the Hendricks case in Ohio or the Wahid case in Arizona. The defense can request information, say information about Saabir Nurse, the "warning" sent from FBI-Phoenix to FBI-Dallas, or the preparations made by FBI-Dallas providing security for the drawing contest, See Motion to Compel, Doc. 525-1, p. 6, No. 11. The government, however, can refuse to produce that information claiming it not relevant or involves an unrelated investigation, or refuse to produce it until it wants to use it, Response to Motion for New Trial, Doc. 550-5, Exhibit 5. This is precisely the situation the Court was concerned with in *Dennis v. United States*:

> A conspiracy case carries with it the inevitable risk of wrongful attribution of responsibility to one or more of the multiple defendants. * *. * Under these circumstances, it is especially important that the defense, the judge and the jury should have the assurance that the doors that may lead to truth have been unlocked. In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact. Exceptions to this are justifiable only by the clearest and most compelling considerations.

384 U.S. 855, 873-74 (1966).[2]

The defense may not be entitled to a complete inventory of the government's investigation, but the prosecutors certainly were. By now it is patently clear they did not have that opportunity. The Court is entitled to know how this could happen and what else might have been withheld to the detriment of the defense.

It is clear that the Government lawyers who were prosecuting the case are charged

---

[2] *Dennis* involved an alleged conspiracy to defraud the United States by filing false affidavits. At issue was a defense request to review grand jury transcripts of four government witnesses.

with knowing all of the information that the various agents knew.  If they were misled by the agents, that is something that this Court needs to know.  The Government is in the best position to ensure that trial attorneys have access to all relevant information to ensure that a defendant is afforded a fair trial and due process. *Kyles v. Whitely*, 514 U.S. 419, 438-39 (1995).  A trial is not a fair trial if due process is denied.  When the prosecutors are not making the decision what evidence to turn over, but rather that decision making authority has been appropriated by non-lawyer investigators charged with gathering the evidence and giving it to the prosecutor, there is no assurance of a fair trial.  The investigators make the final decisions what evidence sees the light of day, displacing prosecutors and judges.    Kyles, 514 U.S. at 438.  Whether we like it or not, there are rules that are established to make sure that due process and a fair trial is given to every criminal defendant.  When those rules are broken, there is no confidence in the system.

**The pole camera**

Defense counsel believes it is necessary to learn the history of this pole camera and to determine whether the Government willfully failed to disclose it.  In order to reach a decision on that issue, it seems appropriate to determine when the FBI decided to put a pole camera outside of Simpson's apartment, why it wanted to put the pole camera outside of Simpson's apartment, when the pole camera was installed, when it became operational, how often it was monitored, whether it was monitored on May 3 when the FBI in Texas contacted the FBI in Phoenix inquiring about Simpson, when the pole camera was taken down and its footage stored, who stored it, where it was stored, and who it was disclosed to.  It seems incredible that an FBI agent doing the investigation of

the Garland attack would not be aware that there had been a pole camera placed outside the apartment of the two individuals who participated in the attack and that FBI agents had not reviewed that footage to determine who had come in and out of the apartment on the day that terrorists loaded their car with weapons and other materials and/or left Phoenix to drive to Garland, Texas.

The prosecutors have indicated that they were not aware of the pole camera. Once they became aware of it, they turned it over. Why? Because they knew it was the kind of information that should have been turned over from the very beginning.

The only testimony that placed Abdul Kareem at the apartment complex was that of Ali Soofi, whose testimony continued to change with each interview with the FBI agents. In his first interview with the FBI on the day after his brother's death he was not aware that he was being taped. When asked who came to visit his brother and Simpson at their apartment, the only person he mentioned was Abdul Kabir Wahid. There was no mention of Abdul Kareem. However, as the interviews continued, Ali Soofi began to recall that Abdul Kareem was at the apartment three times a week.[3]

The pole camera, and any earlier surveillance of Simpson, would have supported Abdul Kareem's position that he did not go there and was not involved in planning the attack by Simpson and Soofi. Evidence that Nurse had advanced funds to Simpson,

---

[3] In Doc. 577 the Government asserts that the testimony of Soofi in the Wahid trial, which likewise became more accusatory toward Abdul Kareem, "was aimed at establishing Kareem as the most frequent visitor to the Simpson/Soofi apartment." p. 14, ll. 17-19. How was this relevant in Wahid's trial where the issues revolved around allegations that Wahid lied to the FBI about his receipt of the note and car keys, and tried to dissuade Ali Soofi from cooperating with the Government?

bolstered by an FBI investigation of Nurse along the lines suggested by FBI SA Jensen's testimony at Wahid's trial, would show Abdul Kareem was not the bank roller of this operation.  Information showing investigation of Sabari, as previously argued, could show that Simpson was regularly visiting Sabari and becoming more radicalized the more he visited and Skyped with a radical cleric from Sabari's house.

**Expansion of the evidentiary hearing is appropriate**

The Government attorneys were denied knowledge of this information for over three years and we do not know how the prosecutor came to gain the knowledge of it. That is why it is important to know who at the FBI had knowledge of the pole camera and the video tapes.  The more people that knew about it, the more likely it is that it was an intentional act by the FBI to keep this information from the U.S. Attorneys' Office. That is why it is important to know why it was put up, all the individuals that were in the process, who put it up, when it was put up, when it was activated, who viewed it, who took it down, where it was stored, and who had knowledge of it.  That process, we believe, suggest there were probably 7-8 individual FBI agents or employees involved.  We then need to know what happened to the information and how it is that the agent in charge of the case against Mr. Abdul Kareem either was not aware of it or determined on his own not to turn it over, or why the agents that he was working with did not inform him of it.

The same is true of the existence of the undercover agent communicating with Simpson, the contents of Nurse's phone and passport, and the tactical information sheet.

**The conduct at issue violated the Sixth Amendment**

Justice Holmes's dissent in *Olmstead v. United States*, 277 U.S. 438 (1928),

frames the classic expression of his view that the law is always a balance between competing and incompatible forces:

> [W]e must consider the two objects of desire, both of which we cannot have, and make up our minds which to choose.  It is desirable that criminals should be detected, and, to that end, that all available evidence should be used.  It is also desirable that the government should not itself foster and pay for other crime, when they are the means by which the evidence is to be obtained . . . .  We have to choose, and, from my part, I think it is less evil that some criminals should escape than that the government should play in ignoble part.

*Olmstead*, 277 U.S. at 469.

The lesson from this discussion, one we are clearly addressing in this case, is the desire for the Government to play by the rules and to not take it upon itself to withhold evidence.  If the FBI is going to decide who should be prosecuted and what evidence should be turned over to the prosecutors, we are all in trouble.

The Sixth Amendment provides

> [I]n all criminal prosecutions, the accused shall enjoy the right of a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, in which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

The need for this fundamental right is obvious.  An accusation typically focuses on allegations about the defendant's past conduct, what he did, when, where, why, how, with, whom, to whom, and so on.  For an innocent person, and all defendants are presumed innocent, this information is highly relevant because he must know it to defend

himself.   The accusation itself generally would only tell the guilty defendant what he already knows.

The portion of the Sixth Amendment that provides the accused shall enjoy the right . . . to be confronted with the witnesses against him is a fundamental right and those witnesses should not only be those who are going to testify but those who have provided the evidence for those who are going to testify.  The Sixth Amendment also provides that the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor.  However, if the Government does not turn over the information that it has gathered during the investigation and trial, and disclose what it has concerning the various witnesses, then the defendant is not able to exercise the Sixth Amendment right to compel witnesses who may testify in his favor because he is not aware of them.  We need to determine how the evidence was obtained, whether it was obtained lawfully and why it was obtained.

In this case, it is highly relevant to determine the procedures and processes that the FBI went through in obtaining a pole camera and videotaping Elton Simpson.  At this point, we do not know whether there was more than one camera,  If the Government had been following Simpson from December 2014 when it remarked that he was a member of a terrorist organization, the defense needs to know that because it then supports his defense that he was not meeting with Simpson as was alleged by Ali Soofi.  At this point, because of the Government's failure to timely turn over information and its failure to turn over certain information until more than three years after the trial, there can be little or

no confidence in the Government's ability or willingness to provide information that might attack the verdict that resulted.

This fundamental issue goes to the heart of the evidence concerning Saabir Nurse. Although there was some information concerning Nurse, the Government failed to turn over a significant amount of the information that it had obtained. Had the full amount of the information that the Government obtained had been turned over to the Defendant, then the Defendant could have exercised his right under the Sixth Amendment to have compelled Nurse to testify. It has always seemed incredible that we have received little or no information concerning John Sabari who, has now become known, was the individual that Simpson and Soofi would travel to meet in Scottsdale and to communicate with an Islamic terrorist cleric from Jamaica. There may be an ongoing investigation but clearly Kareem would have liked to have known who Simpson and Soofi were meeting with in Scottsdale to communicate with an Islamic cleric and would have been able to exercise his Sixth Amendment right to subpoena a witness who we believe would have testified that Kareem never participated in any of those meetings, as he testified during his trial, this would have been corroborative testimony.

The Sixth Amendment guarantee of the assistance of counsel is of no benefit if counsel is not provided with all of the relevant evidence that has been gathered. Our Sixth Amendment was written to promote truth and openness in a fair trial.

The defense believes that it is entitled to the documents that it has requested from the Government and although it does not know the names of the witnesses, it has provided

the Government with an outline of the information that it seeks to obtain and why. There is transparency in the defense and there is opaqueness in the Government's position. What is it trying to hide? Obviously, it is trying to hide why it did not produce evidence in this case in a timely manner when the evidence is clearly material and relevant. Can anyone question whether or not a Government agent who witnessed a crime was material and relevant to the trial? Can anyone question whether or not the communications between a Government agent and one who commits a crime are relevant? Can anyone question whether or not videotapes of one who commits a crime just days before the crime is committed is relevant?

The Government's position is: Well maybe some of this was relevant, maybe it was material, but its harmless error now after the trial because he was convicted, and we did not use the material. We had sufficient evidence to convict and none of this "new" information disproves that evidence. But there can be no confidence that the Government's knowledge of this information was not used to help direct the prosecution explicitly or implicitly. What we do know is that material and relevant information was not provided in a timely manner to this Defendant. He was denied his Constitutional rights to a fair trial including his rights under various portions of the Sixth Amendment.

For these reasons, we ask that the Court expand the evidentiary hearing and order that the Government provide us with the documents that we seek and provide us with its employees to provide the information that we seek so that we can determine why the information was not turned over in a timely manner and whether or not this was done

willfully by the Government.

RESPECTFULLY SUBMITTED this 16th day of September 2019.

**MAYNARD CRONIN ERICKSON
CURRAN & REITER, P.L.C.**

By  /s/Daniel D. Maynard
      Daniel D. Maynard
      3200 North Central Avenue, Ste. 1800
      Phoenix, Arizona 85012
      Attorneys for Defendant/Appellant

14

**DRAKE LAW, PLC**

By  /s/Daniel R. Drake
        Daniel R. Drake
        4340 East Indian School Road
        Suite 21-113
        Phoenix, Arizona 85018
        Attorney for Defendant/Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants:

AUSA Joseph E. Koehler and AUSA Kristen Brook

Additionally, a copy was served upon Mr. Abdul Kareem by first class letter, postage prepaid, at:

Abdul Malik Abdul Kareem #44126-408
FCI Florence
Federal Correctional Institution
PO Box 6000
Florence, CO  81226

/s/Daniel R. Drake
Daniel R. Drake

15