Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON**
**CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No.003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | 2:15-cr-00707-SRB |
|        Plaintiff/Respondent, | **DEFENDANT'S POST-HEARING SUPPLEMENT TO MOTION TO DISMISS AND FOR A NEW TRIAL** |
|   v. | |
| Abdul Malik Abdul Kareem, | **ORAL ARGUMENT REQUESTED** |
|        Defendant/Movant. | |

Pending before the Court are Defendant Abdul Malik Abdul Kareem's ("Kareem") supplemental motion for new trial, Doc. 505, and motion to dismiss, Doc 570.

**<u>Background</u>**

The Court ordered a limited evidentiary hearing on the facts surrounding the approval, installation, reviewing and storage of a pole camera video tape showing the breezeway leading to Elton Simpson ("Simpson") and Nadir Soofi's ("Soofi") apartment

1

that had been installed by the FBI on May 1, 2015 but was not disclosed to Kareem until March 15, 2019, over three years after the conclusion of Kareem's trial.   After a telephonic conference between the attorneys and the Court setting the hearing parameters, the Government disclosed for the first time that the FBI had Simpson under surveillance in March and April 2015[1], and at the hearing disclosed additional communications concerning Simpson between the Phoenix office of the FBI with FBI officials in Dallas and Los Angeles prior to the Garland attack.  The Court permitted limited inquiry into the FBI surveillance of Simpson beginning in March 2015.

The Court did not permit inquiry regarding other recently disclosed and discovered information, such as the travel documents and phone records of Saabir Nurse ("Nurse") acquired by the Government in September 2015 and disclosed in March 2019; the investigation of Erick Jamal Hendricks ("Hendricks") in 2015 and his trial in March 2018; inquiry regarding the arrest of Joshua Ryne Goldberg ("Goldberg") in August 2015 and his guilty plea in December 2017; and, the defense request to call SA Andrew Smith ("SA Smith"), one of the case agents of the FBI investigation of  Simpson in the months leading up to the May 3, 2015, attack in Garland, Texas concerning his contacts with the Undercover Agent ("UCA") and his communications with the FBI's Dallas office concerning Simpson before the Garland attack.

Although the focus was on the pole camera video, the Court's ultimate analysis should not be so limited.  The Supreme Court has explained that materiality is to be determined "in terms of suppressed evidence considered collectively, not item by item."

*Kyles v. Whitley*, 514 U.S. 419, 436 (1995).  The Ninth Circuit  explained in *United States v. Kohring*, 637 F.3d. 895, 903 (9th Cir 2011) that, "[t]here is a 'reasonable probability' of prejudice when suppression of the evidence 'undermines confidence in the outcome of the trial.'" (*citing Kyles*, 514 U.S. at 434).  A "reasonable probability" may be found even if the remainder of the evidence would have been sufficient to convict the defendant.  *Id*., (*citing Jackson v Brown*, 513 F.3d 1057, 1071 (9th Cir. 2008) (citing *Strickler v. Greene*, 527 U.S. 263, 290 (1999)).

**Overview**

What has become clear in the three and a half years since verdicts were rendered is that the prosecutors were not the ones making decisions about what information to disclose in Kareem's trial.  The hearing made clear that the prosecutors abdicated their responsibility to make the decisions regarding what to disclose and left those decisions to SA Whitson who, on his own, allegedly reviewed 35 sub-files or folders and tens of thousands of documents, according to the Government's hearing memorandum.[2]  Clearly, SA Whitson missed material documents in the file that others found with little effort.[3] SA Whitson failed to disclose information that every FBI agent testifying at the evidentiary hearing said they would have disclosed, and the prosecutors were upset at the discovery and did disclose items once they learned of them.[4], although often months after they learned of it.  Now, with thousands of  pages of post-verdict disclosures and video tapes, it is beyond dispute that the FBI either intentionally or negligently suppressed information during the prosecution of Kareem.  Much of that information would have

been helpful to the defense. (*See* Declaration 2 of Daniel D. Maynard, attached as Exhibit A). Kareem was prejudiced by the Government's conduct and, if dismissal of the indictment is not warranted, a new trial certainly is. This Court can have no confidence in the verdicts rendered in this case and must question why material information was not timely provided to Kareem and whether all material information has been provided.

This investigation and trial was not a search for the truth. Evidence was compartmentalized and placed beyond the reach of the defense and the prosecutors by the FBI because it was housed in files of investigations conducted by other FBI agents, not the Kareem case agent. SA Whitson testified that he reviewed all the 302s in the Kareem investigation[5] which was an investigation of one subject, Kareem.[6] Yet he disclaimed knowledge of the content of investigations of other individuals, even alleged co-conspirators, because he was not the case agent in those matters.[7]

When the Government wanted to use evidence from other cases/investigations against Kareem, it did. Much of the trial evidence against Kareem consisted of information related to Simpson's or Soofi's actions, items found in their apartment, cars, or at the crime scene in Garland, Texas. Yet the defense was not given access to all the investigation regarding Simpson, including the 2015 surveillance and that he was considered a threat to the Pat Tillman Run.

The Government's approach appears to be driven by the disclosure requirements for evidence the Government wants to use[8] and the Jencks Act.[9] By a careful choice of witnesses the Government attempted to limit its disclosure obligations, asserting

4

repeatedly that because so-and-so was not called as a witness, it did not have to produce information regarding that witness.  For example, it was not until it was clear SA Fryberger was going to testify at the evidentiary hearing did the Government release 302s authored by Fryberger and others on her squad regarding physical surveillance of Simpson in March, April, and May 2015.[10]  Since SA Smith did not testify at the evidentiary hearing, the Government did not produce reports or 302s authored by him except those pertaining to the physical surveillance even though SA Smith initiated the Simpson investigation in early 2015.  The defense learned in the hearing for the first time that SA Smith responded to an email from the UCA in the Hendricks case about the UCA's concerns regarding Simpson and the Garland contest and that SA Smith communicated with Dallas FBI's offices inquiry about Simpson's whereabouts on May 3, 2015.  The defense was given no further information such as a responsive email or electronic communication from SA Smith to the UCA; no notes of a conversation; no 302 nor any of SA Smith's communications with the FBI's Dallas office.  This is the manner in which this material information was kept from the defense.

Lost in the focus of the evidentiary hearing is the record that has been building since the defense filed its motion for new trial on March 31, 2016, Doc. 303, of the Government's failure to make timely disclosure.  This memorandum seeks to outline the evidence produced and the key points from pleadings over the past three and one half years, information that was material and available and should have been disclosed before trial.  It covers the original motion for new trial, Doc. 303, up through the Government's

hearing memorandum, Doc. 607 and the evidentiary hearing.

### 1. What the Government disclosed after Kareem's trial ended;

In the three years and seven months between the March 17, 2016, verdicts and the October 18, 2019, conclusion of the evidentiary hearing the Government produced thousands of pages of material documents that were in existence before Kareem's trial. The listing of materials is, in part, set forth in Doc. 570-3, filed in support of the defense motion to dismiss, Doc. 570. It covers post-trial disclosures from August 2016 through May 19, 2019, when the Government filed Doc. 550, its response to the supplemental motion for new trial. That filing by the Government added 11 separate attachments of new material which were not Bates numbered. On October 7, 2019, the Government produced 140 pages of supplemental disclosures. On October 18, 2019, the Government produced five additional pages of supplemental disclosures, with an ending Bates number of 01062.

### a) John Sabari

After the trial, the Government produced for the first time three 302s of John Sabari ("Sabari") from interviews of Sabari conducted by the FBI before Kareem's trial disclosing that Simpson and Soofi, Kareem's alleged co-conspirators, had video discussions with a radical Jamaican Islamic Cleric at Sabari's home in the months leading up to the Garland attack, and Sabari never mentioned Kareem as attending these meetings. This was material to show that Kareem was not involved in planning the Garland attack, nor was Kareem a radical Muslim like Simpson and Soofi.

### b) <u>Undercover Agent for FBI</u>

On September 16, 2016, the Government disclosed approximately 850 pages of encrypted messages captured by the UCA.[11]   Those messages revealed his communications with Simpson just weeks before the Garland attack, and with another terrorist suspect, Hendricks, about the attack on Garland.[12]  After disclosing the messages, the Government disclosed photos the UCA took of the site of the attack right before the attack.[13] however, at the time Kareem's defense was not provided with an explanation of why the UCA was there, any 302s of what he saw, or what his instructions were.

Later, after the UCA testified in the Hendricks' trial, Kareem's defense obtained transcripts of the UCA's testimony and learned more about the UCA's activities and communications with Simpson.[14]  Further disclosures included the UCA's emails to other FBI personnel about Simpson.  Those communications with Simpson covered only a few days prior to the Garland contest but left the UCA concerned about the threat posed by Simpson.[15]  The UCA who had been communicating with Simpson was so concerned about Simpson appearing at the Garland, Texas, event, that he sent an email April 30, 2015, to three agents, including SA Smith, in the Phoenix FBI offering to share his concerns.[16] We learned of those communications for the first time in July 2018.  We learned in 2019 how concerned Dallas FBI was that it reached out to Phoenix FBI for information on Simpson.[17]  However, we still have not received any documents about SA Smith's communications with the UCA in response to the April 30, 2015 email from the UCA, nor what Smith did in response.

c) **Simpson Investigation in 2015**

Kareem requested information from the Government on September 6, 2018, seeking information concerning "an FBI alert to authorities" including information about which FBI office and which FBI employees authored or sent a warning about Simpson and the Garland contest.[18]  Kareem requested names and locator information regarding which individuals in the Phoenix FBI were copied on communications from the UCA as that might help the defense locate witnesses and documents.[19]  The Government opposed the request[20] and the Court denied a motion to compel based upon the request.

Then, the Government filed Doc. 550, its response to the supplemental motion for new trial, and attached as Exhibit 4 heavily redacted emails and a copy of the Tactical Intel Report Phoenix FBI sent to Dallas FBI on May 3, 2015.[21]  Also attached was a declaration by an FBI Intelligence Analyst, Weldon Hegwood ("IA Hegwood"), who was present in the Dallas FBI Command Center monitoring possible threats to the Garland contest.[22]  When he learned that the UCA had concerns that a "brother from Arizona" might travel to the event, he caused other FBI employees to query Phoenix FBI who the "brother from Arizona" might be.[23]  Phoenix FBI, according to the declaration, advised that it might be a reference to Simpson, but Phoenix FBI did not think Simpson would travel to the event.[24]

IA Hegwood advised that he still wanted a photograph of Simpson and his Arizona license plate number and reached back to Phoenix FBI for that information.  Some time prior to 2:12 pm Dallas time he received the forwarded Tactical Intel Report included in

Doc. 550-5, Exhibit 5, along with the advice that Simpson's vehicle remained in the parking lot at his apartment complex in Phoenix.[25]   Nevertheless, IA Hegwood sent a copy of the Intel Report/face sheet to the Garland Police Department.[26]

In March 2019, the Government disclosed for the first time that the FBI had placed a pole camera outside of Simpson's apartment on May 1, 2015.  This disclosure led to the Court setting the 2019 evidentiary hearing, and ultimately to the disclosures of the surveillance that the Phoenix FBI conducted on Simpson beginning in March 2015.  The surveillance reports were not disclosed until October 7, 2019, when the Government was certain that SA Fryberger was going to be called at the evidentiary hearing.[27]  Had the evidentiary hearing not been set by the Court, the Kareem defense doubts that the Government would have made these material disclosures.

Days before the evidentiary hearing, Kareem learned for the first time that the Government was concerned that Simpson would attack the Pat Tillman Run in 2015, attended by thousands of Arizonans, and had done significantly more investigation of Simpson that was not disclosed at Kareem's trial.[28]  At the hearing we learned the round the clock surveillance prior to the Pat Tillman Run was because the FBI considered Simpson a threat, and the only threat, to the event and did not want to lose contact with him.  The FBI had a pole camera and video set-up installed that streamed live images to the desk of one of the co-case agents on the Simpson investigation.  That video showed Soofi and Simpson on May 1, 2015, carrying items to the parking lot the night they left Phoenix for Garland, Texas and Soofi was wearing a sidearm.[29]

The defense learned at the hearing that FBI agents in Phoenix, prompted by FBI agents elsewhere, went to Simpson's apartment on May 2 and 3, 2015, to see if his car was there.[30] If there are documents showing these communications, they have not been produced. Agents in Dallas, Texas were so concerned about the threat posed by Simpson that they reached out to agents in Phoenix to obtain Simpson's photo and license plate information, which they shared with local law enforcement in Garland once received.

The Government opposed the appearance of SSA Glenn Milnor and SA Andrew Smith at the evidentiary hearing in October 2019.[31] After testifying at the hearing SSA Milnor disclosed that he was called by an FBI agent in Los Angeles to check on the whereabouts of Simpson late in the evening of May 2, 2015. The Government produced two 302s prepared by SSA Milnor in 2015 and agreed that he could be recalled prior to the oral argument. SSA Milnor recounted that, rather than checking the live stream from the pole camera, he traveled to Simpson's apartment complex at about midnight and found Simpson's car parked there but noticed that Soofi's car was gone. The Government has not produced any documents concerning the communications between SSA Milnor and the Los Angeles FBI agent.

At the evidentiary hearing, the defense learned that SA Smith had communicated with the UCA on April 30, 2015, but because the Government opposed SA Smith's appearance, we never found out what the UCA shared with him regarding the UCA's concerns about Simpson appearing at the Garland contest nor what SA Smith shared with the UCA or Dallas FBI.

All of this information was allegedly unknown by the prosecutors prior to Kareem's trial, according to their statements. Their reactions upon learning of the UCA and his communications with Simpson, the existence of the pole camera and its video, and the discovery mid-evidentiary hearing that there was still information they were unaware of, demonstrate the prosecutors failed to learn of evidence favorable to the defense in the hands of the FBI, and that they abdicated their duty to review evidence and produce it, relying upon the FBI, more specifically SA Whitson.

**d) <u>Saabir Nurse</u>**

Saabir Nurse ("Nurse") had been the focus of defense questioning once it learned he had given money to Simpson for some undisclosed plan, and that one of Simpson's last acts before leaving for Garland was to write a note to Nurse explaining that the funds Nurse had advanced had been used for a different purpose.[32]  Simpson gave Nurse the keys and title to his car to repay for the advance.  When questioned about FBI investigation of Nurse, SA Whitson said he called some other agents together to discuss the note, but he did not do any follow-up interviews.[33].  When pressed by defense counsel about the contents of Nurse's cell phone shortly after the verdicts, the prosecutors claimed there was no record of what was on Nurse's phone.[34]  Following trial Kareem learned that in mid-September 2015 the FBI had a downloaded image of Nurse's cell phone and a copy of his passport showing travel to the Middle East and other locales out of country.[35]  None of that was shared with Kareem prior to the verdicts even though Nurse had been listed as a witness by the Government.  Because the Government later withdrew

Nurse as a witness, it presumably felt no obligation to disclose the September 2015 information regarding him.  It is hard to believe SA Whitson was unaware of the September 2015 information and its value to the defense.

A month after the verdicts in Kareem's case SA Whitson became the case agent on an investigation of Nurse.[36]  The defense was not permitted to question SA Whitson at the evidentiary hearing about Nurse and his knowledge of this information back in 2015.

Another agent, SA Kim Jensen, testifying in the Wahid case explained that considerable resources would be devoted to exploring the financial transaction disclosed in the Simpson note to Nurse.[37]  The defense was given records regarding credit reports, loans, bank accounts, and insurance for Simpson, Soofi, Wahid, and Kareem, but none for Nurse.  It stands to reason the Government had such information on Nurse.  And, it also stands to reason that the defense could have used this information to support its claim that Nurse, not Kareem, was the bankroller of the attack and would undercut the prosecution's claim to the contrary.  With the information it now has, Kareem would have called Nurse as a witness at his trial.[38]

### e)  Joshua Goldberg

Joshua Goldberg ("Goldberg") was arrested on September 10, 2015, by FBI agents in the Middle District of Florida.[39]  Part of the factual basis for the complaint authorizing his  arrest was that prior to the Garland attack Goldberg posted tweets calling for the attack, including posting a map of the Curtis Culwell Center.[40]  On the morning of the

attack, Goldberg sent a tweet which Simpson re-tweeted: "I'm back kuffar!  Die in your rage!"[41]  Goldberg also created a document available online in which he said, "You might know me for inspiring the attacks in Garland, Texas…."[42]

The prosecutors in Kareem's case never disclosed this information and may have been unaware of it even though the case was investigated by the FBI.[43]  It should have been disclosed since it involves a potential co-conspirator.  The Government may argue the claim of responsibility was empty bragging, but that was for the jury to decide not the Government.

**2. The Government's Shifting Position to Justify Not Disclosing Material Evidence.**

In a conventional case where the Government alleges a conspiracy and seeks to attribute the actions of others to a given defendant, that defendant is entitled to discovery of information in the Government's possession regarding all the alleged co-conspirators.  Had Simpson and Soofi been stopped before the attack, or not killed in the attack, is there any doubt that the three alleged co-conspirators would have been given access to the investigation as to each other.  Simpson and Soofi would have been given the surveillance reports and the pole camera video since it involved them.  Because they were killed, however, Kareem was not given that information, even though he was tarred with other aspects of the investigations of Simpson and Soofi, such as materials on their phones and computers, and items found in their apartment, cars, and the Garland crime scene.

This new material showed the shifting positions taken by the Government about what was related to the prosecution of Kareem and what it claimed was unrelated.  The

13

Government used information regarding Kareem's alleged co-conspirators to prosecute him, but kept from him information about its investigation of those same alleged co-conspirators under various theories, such as: the information related to a separate investigation;[44] the witness lacked personal knowledge regarding the separate investigation[45]; or, the witnesses who generated documents were not called as witnesses so there was no obligation to produce their statements in the form of 302 reports or emails. Much of the same evidence of Simpson's activities used against Kareem was used in the trials of Hendricks, A. K. Wahid, and in the case against Goldberg, yet the Government claimed the cases were unrelated, such that materials from other cases did not have to be produced in the Kareem's case.

Here are some examples.

The Government opposed disclosure of items when the defense requested them in its September 6, 2018, letter[46], but when the Government wanted to use the information it did so.[47]

The Government argued to the Court in Kareem's case that the communications among Simpson, Hendricks, and the UCA were unrelated to the conspiracy involving Kareem, Simpson, and Soofi, and thus were not material.[48]  Yet the Government told the jury in Hendrick's trial that Hendricks was "inextricably tied" to the Garland attack,[49] and offered evidence of Hendrick's encouragement of Simpson and the UCA "to make their voices heard" at the contest.  And it referred to and offered much of the same evidence at Hendricks' trial that it had used at Kareem's trial.[50]

At Kareem's trial, the Government claimed Hussain was a co-conspirator. It "introduced evidence at trial showing Simpson conspired with others in addition to Soofi and Kareem, including Mujahid Miski and Junaid Hussain, to commit attacks in the United States for ISIS."[51]  In its hearing memorandum, the Government revealed the investigation of Simpson was reopened after the FBI learned he was communicating with an individual[52], likely Hussain.  At the evidentiary hearing, however, the Government objected to questions regarding Hussain and his connection to Simpson, even though the communications with Hussain were likely the predicate for reopening the Simpson investigation.[53]

**The FBI's Attempts to Hide its Failures from Kareem and Public.**

In the Kareem trial the defense argued that the FBI was embarrassed by its failure to thwart the Garland attack despite its efforts to keep an eye on Simpson.  That embarrassment, the defense argued, led the Government to rush its case in an attempt to demonstrate that it was only moments away from thwarting the attack and that it could swiftly bring to justice those who supported the attack.  It was willing to accept unreliable witnesses in the face of weak evidence linking Kareem to the attack.  That embarrassment led the FBI to be biased against Kareem.  That bias showed in the FBI witness testimony and in the manner it handled the interviews of the witnesses against Kareem, particularly Stephen Verdugo, two juvenile witnesses, and Ali Soofi.  Every time Ali Soofi met with SA Whitson his memory of Kareem grew.  When first interviewed and asked who visited Simpson and Soofi he never mentioned Kareem.  This interview was surreptitiously

recorded shortly after the attack.  Following his fourth interview, which was not recorded, he remembered Kareem was in Simpson and Soofi's apartment three or four times a week.  He had Kareem sleeping in the one bedroom apartment three to four nights a week in the months leading up to the attack.  This, even though Kareem had his own apartment. And by the time of his testimony in Wahid's trial he barely mentioned Kareem in his first day of testimony but in the second day of his testimony, he claimed that Kareem was the most frequent visitor in Simpson and Soofi's apartment.[54]

The post-verdict disclosures supported Kareem's defense.  Now we know that the Phoenix office of the FBI was embarrassed by the man-hours it spent surveilling Simpson because it feared he would attack the Pat Tillman Run, and it missed his departure for Texas because it simply failed to monitor or view the pole camera video, even when other FBI offices were asking about Simpson's whereabouts before the Garland attack.

At the evidentiary hearing we learned that the FBI had reopened its investigation of Simpson in March 2015.  It had him under physical surveillance by a team of 16 investigators watching him around the clock in the run-up to the Pat Tillman Run in late April 2015.[55]  Simpson was the only person in Arizona, according to testimony at the hearing, who merited such treatment, even though there is no evidence he took any notice of the Tillman event and Kareem's defense team has not been provided with any documents explaining why the FBI believed Simpson would attack the Pat Tillman Run. This is material since it would, by inference, show there was no information that made Kareem a suspect of attacking the Pat Tillman Run and the surveillance members never

saw Kareem at Simpson's apartment or with Simpson.

Yet, when it came to the Garland contest about which Simpson had been tweeting[56], the Phoenix FBI seemed unconcerned.  It was up to the UCA in the Hendricks case to voice concerns about Simpson and the Garland contest.[57]  He offered to share those concerns with Phoenix FBI,[58] but we do not know what was shared, nor what action, if any, the Phoenix FBI agents took.  It appears, frankly, that they disregarded the threat and took no action.

The UCA did share his concerns with FBI in Dallas, and that prompted the Dallas FBI[59] inquire into Simpson's whereabouts and the Phoenix FBI responded that Simpson's car was still at his apartment in Phoenix[60] and ignored that Simpson was seen traveling in Soofi's car,[61] and that Soofi's car was gone from the parking lot around midnight of May 2, 2015.[62]

We learned at the hearing that a member of the Los Angeles FBI was concerned enough that he called, rather than emailed, SSA Milnor on May 2, 2015, attempting to determine the whereabouts of Simpson.  This prompted SSA Milnor to travel to Simpson's apartment in an attempt to verify Simpson's location.  SSA Milnor's 302 documented that Simpson's car was still there but Soofi's was not.  We have no documents reflecting what SSA Milnor reported to the Los Angeles FBI.  Nowhere, other that the Phoenix FBI files, does any information about Soofi's car appear, so it seems the fact Soofi's car was not in the parking lot late on May 2, 2015, was never communicated to Dallas FBI or the Garland Police Department.  Doc. 550-5, Exhibit 5, p. 3, ¶ 4.

When Dallas FBI persisted in its attempts to gather information about Simpson, beyond the fact that Phoenix FBI thought he would not travel to the event on May 3, 2015, and requested a photo and a license plate number for Simpson, Phoenix FBI responded with an outdated[63]   Tactical Intel Report that contained the requested photo and plate number, but made no mention of Soofi as an associate of Simpson, even though it was clear they were roommates, attended the same mosque, and Simpson was seen riding in Soofi's car.

Ultimately, the Government was forced to acknowledge that "[t]he attack made it obvious that the FBI missed signs of Simpson becoming "operational" as opposed to someone merely exercising his right to free speech."[64]   As the defense has been urging since the first disclosures regarding the activities of the UCA, had it known of his existence it would have called the UCA as a witnesses to help support Kareem's defense.[65]   He could have explained precisely what concerned him, what he communicated to the FBI personnel with whom he was working, and to SA Smith in Phoenix.  There were concerns about Simpson but not about Kareem because he was not involved.

### 3.  The Assistant U.S. Attorneys Abdicated Their Disclosure Responsibilities.

The ultimate responsibility to determine and carry out  the Government's disclosure obligations in a criminal trial rests on the prosecuting attorneys.[66]  They have a duty to take affirmative steps to learn of information within the investigating agencies and ensure that it is produced.[67]   Here, the prosecutors delegated that authority to SA

Whitson who, as explained above, either intentionally did not disclose material information or was grossly negligent in his failure to do so.

Upon learning of the existence of the pole camera video in November 2018, the prosecutors disclosed it on March 15, 2019.   On another occasion, following his testimony at the evidentiary hearing, SSA Milnor indicated to SA Mullen in the presence of the prosecutors that he believed he had written two 302's regarding his participation in physical surveillance.  This was in addition to occasions where his participation in surveillance was documented by others.   At this disclosure each of the prosecutors "verbally expressed their surprise…."[68]

One might ask how this could happen.  Were the prosecutors not talking to the FBI agents about what actions they took and what records existed before the witnesses took the stand?  Without such exploration, how could the prosecutors be sure they were aware of all the witnesses written statements so they might be disclosed pursuant to *Brady*, the Jencks Act, or other disclosure requirements?  The short answer is that they could not.  They could not be certain they had discharged their affirmative duties to learn of information in the hands of governmental agencies participating in the prosecution and disclose any exculpatory or impeaching evidence, or evidence material to preparing the defense, as required under *Kyles v. Whitley*, 514 U.S. 419, 437 (1985).

**Conclusion**

First, Kareem did not get a fair trial because the Government did not timely disclose information material to Kareem's defense.   Even now, Kareem questions

whether the Government still has an undisclosed store of information that could exculpate him, impeach government witnesses, or otherwise help him present a complete defense. This includes: 302s prepared by SA Smith; records of communications between Phoenix FBI and the UCA, Los Angeles FBI, and Dallas FBI; information concerning Nurse, such as credit reports, bank statement, and money transfer records; documents or 302s concerning Sabari, who has been a known associate of Simpson since 2010; information on the other alleged co-conspirators known to the Government, such as Miski, Junaid Hussain, or Abu Hassan; 302s prepared by the UCA; and, records reflecting why the Phoenix FBI perceived Simpson as a threat to the Pat Tillman Run in 2015.  After all of the late disclosures there can be no confidence that the Government has turned over all material information.  Thus, there can be no confidence that Kareem was given a fair trial nor in the resulting verdicts.

Second, it is clear that the prosecutors abdicated their responsibility to SA Whitson and that SA Whitson failed to make proper disclosures.  It is hard to believe that many of these multiple failures to disclose were not made in an effort to hide the FBI's failures concerning its handling of the threat posed by Simpson.  For all of these reasons, this court should either dismiss this case or grant a new trial.

RESPECTFULLY SUBMITTED this 3d day of December 2019.

**MAYNARD CRONIN ERICKSON**   **DRAKE LAW, PLC**
**CURRAN & REITER, P.L.C.**

/s/Daniel D. Maynard      /s/Daniel R. Drake
DANIEL D. MAYNARD     DANIEL R. DRAKE

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 3, 2019, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants:

<u>/s/Daniel R. Drake</u>
Daniel R. Drake

END NOTES

[1]  Doc. 607, U.S. Hearing Memo ("US Memo"), pp. 2-3

[2]  Doc. 607, US Memo, p. 8.

[3]  Doc. 607, US Memo, pp. 6-7.

[4]  Doc. 607, US Memo, p. 1.

[5]  3/2/16 RT 1873.

[6]  3/2/16 RT 1889.

[7]  2/26/16 RT 1444-45 SA Whitson said he was aware of the Simpson investigation but not involved in that; 3/2/16 RT 1873-74 SA Whitson describes the differing cases and case agents.

[8]  Fed. R. Crim. P. 16, in pertinent part, require disclosure of items within the Government's possession, custody and control and:

                         * * *

        (ii)  The Government intendeds to use the item in its case-in-chief at trial. . . ."

[9]  October 7, 2019 Disclosure Letter.  Copies of the disclosure communications following the filing of the Supplemental Motion for New Trial, Doc. 505, on June 11, 2018 are attached as Exhibit B.

[10]  Exhibit B, October 7, 2019 Disclosure Letter

[11]  Doc. 432, Defense Motion for New Trial Supplement ("Defense MNTS"), p.2.

[12]  Doc. 432, Defense MNTS, p. 2.

[13]  Bates 864-66.

[14]  Doc. 505, Defense Supplemental Motion for New Trial ("Defense SMNT"), 505-1, 505-2, and 505-3.

[15]  Bates 888, 891.

[16]  Evidentiary Hearing Exhibit 135, Bates 890-92.

[17]  Doc. 550, U.S. Response to Supplemental Motion for New Trial ("US RspSMNT"), 550-5, pp. 2-3.

[18]  Doc. 525, Defense Amended Motion to Compel Disclosure, Doc. 525-1, Exhibit 1, p. 6, No. 11.

[19]  Doc. 525, Defense Amended Motion to Compel Disclosure, Doc. 525-1, Exhibit 1, p. 6, No. 11.

[20]  Doc. 527, U.S. Response to Motion to Compel.

[21]  Doc. 550, US RspSMNT, 550-4.

[22]  Doc. 550, US RspSMNT, 550-5, Exhibit 5.

[23]  Doc. 550, US RspSMNT 550-5, Exhibit 5, p. 3, No. 5.

[24]  Doc. 550, US RspSMNT, 550-5, Exhibit 5, p. 3, No. 6.

[25]  Doc. 550, US RspSMNT, 550-5, Exhibit 5, p. 3, No. 6.

[26]  Doc. 550, US RspSMNT, 550-5, p. 3, No. 7.

[27]  Exhibit B, Government Disclosure Letter re Bates 914-1054, October 7, 2019.

[28] Doc. 607, US Memo, pp. 2-3.

[29] Evidentiary Hearing Exhibit 19.

[30] Evidentiary Hearing Exhibit 187, Bates 1061.

[31] Doc. 579, U.S. Motion for Clarification pp. 3-4.

[32] Trial Exhibit 553.

[33] 3/2/16 RT 1917.

[34] Doc. 324, U.S. Response to Motion for New Trial ("US RspMNT"), pp. 19-20.

[35] Doc. 550, US RspSMNT, 550, p. 16-17.

[36] Doc. 550, US RspSMNT, 550, p. 17, n. 9.

[37] Doc. 589, Defense Response to Motion for Clarification ("Defense RspMFClarification"), Doc. 559-1, Exhibit 1, p. 44; Doc. 559-1 pp. 6-7.

[38] Doc. 559, Defense Reply re Supplemental Motion for New Trial ("Defense RplSMNT"), Doc. 559-1, p. 18.

[39] Doc. 589, Defense RspMFClarification, pp. 1-2.

[40] Goldberg Complaint, Doc. 1, Case 3:17-cr-0249-BJD-JRK, p. 7, ¶ 11, attached as Exhibit C.

[41] Exhibit C, Goldberg Complaint, p. 7, ¶ 12.

[42] Exhibit C, Goldberg Complaint, p. 7, ¶ 13; see also Doc. 589-1, Exhibit 1, Goldberg Plea Agreement, Doc. 75, Case 3:17-cr-0249-BJD-JRK, p. 20, Factual Basis.

[43] Doc. 589, Defense RspMFClarification, p. 2.

[44] Doc. 441, U.S. Response to Motion for New Trial Supplement ("US RspMNTS")pp. 12, 14.

[45] Doc. 577, U.S. Sur-reply re Defense SMNT, p. 12; Doc. 582 p.14.

[46] Doc. 527, U.S. Response to Amended Motion to Compel Disclosure.

[47] At the evidentiary hearing we learned that the UCA sent an email to Andrew Smith, Deetta Nolen, and Amy Fryberger (the three co-case agents on the Simpson investigation) on April 30, 2015, offering to share his thoughts on why Simpson ought to be of concern regarding the Garland contest, and that SA Smith responded the UCA's email. Evidentiary Hearing Exhibit 135. We also learned from the testimony of SA Fryberger that SA Smith responded to the UCA, but SA Smith was not permitted to testify and SA Fryberger did not know the substance of the response nor what SA Smith learned. We also learned that SSA Glenn Milnor, in response to a contact from a person in Los Angeles FBI, traveled to the apartment complex after 11:00 pm on May 2, 2015, and found that Simpson's vehicle was still parked, but that the car belonging to Simpson's roommate was not in the parking lot. See Evidentiary Hearing Exhibit 187, Supplemental Discovery 001061.

The information disclosed in Doc. 550 and at the evidentiary hearing would have been offered at trial to establish a factual predicate for the bias of FBI agents because they were embarrassed that they had failed to thwart the attack. This bias manifested itself in the manner in which the agents handled witnesses such as Ali Soofi, who, on his

first interview made no mention of Kareem, but by his fourth interview had his memory restored and recalled that Kareem was present at Simpson and Soofi's apartment three or four nights a week.

[48] "Because these undisclosed communications were in no way related to the conspiracy involving Kareem, Simpson, and Soofi, they were not material."  Doc. 441, US RspMNTS, p.12.  "The evidence against Kareem is completely independent from the recently disclosed communications." Doc. 441, US RspMNTS, p.14.

[49]      "All of these interactions, communications, occurred in the spring of 2015.  And they culminated on May 3, 2015 in Garland, Texas, where a thwarted terrorist attack took place.

Now, this defendant did not plan or participate in this attack, nor is he on trial for this attack. But the evidence will show that he was unequivocally tied to this attack." Doc. 505, Defense SMNT, Doc. 505-1, Attachment 1, pp. 3-4, quoting Government Opening Statement.

[50]      "So let me tell you what happened on May 3, 2015.

Elkton [sic] Simpson and Nadir Soofi drove from Phoenix, Arizona to Garland, Texas, to the Curtis Cullwell Center.  They were dressed in black and shielded in body armor.

*          *          *

As the event was coming to a close, Simpson and Soofi drove up to the facility. They stopped their car approximately where that circle is on the slide, and they got out.

Now, the evidence will show that between the two of them they had six weapons, assault -- semi-assault weapons. They had rifles. They had pistols, and they had over 15 [sic] rounds of ammunition and they began to fire." Doc. 505, Defense SMNT, Doc. 505-1, Attachment 1, pp. 3-4, quoting Government Opening Statement.

"Not only did the defendant [Hendricks] put the undercover agent in contact with Simpson, but he actually told him to go to Garland, Texas. So this first text message says -- not text message but message over this communication platform.

"I wish someone could go to TX," Texas, and "harass them during the night. A good solid protest. A unique one-man protest."

He went on. And you can see the screen shot a little clearer. "See what you and bro Juda can do. At least be heard."

The evidence will show that bro Juda is a reference to Elkton [sic] Simpson, Juda or Juba was an online moniker that he would [be] using. Doc. 505, Defense SMNT, Doc. 505-1, Attachment 1, p. 6, quoting Government Opening Statement.

The exhibit list in the Hendricks prosecution is not available on PACER.  The witness lists at Mr. Abdul Kareem's trial and Hendrick's trial show that SA Brian Marlow, Senior Team Leader of the Evidence Response Team in Dallas FBI who oversaw gathering of evidence in Garland, Texas (2/17/16 RT 300-04); SA Jason Saitta, Phoenix FBI, who participated in the search of Simpson and Soofi's apartment (2/18/16

RT 484-87); and Intelligence Analyst Amy Vaughan of the Phoenix FBI Joint Terrorism Task Force, who searched and analyzed evidence, including computer evidence, such as the computers and phones related to Simpson and Soofi (2/19/16 RT 706-10) testified at Kareem's trial, Doc. 294, Witness List, and also Hendricks trial. Doc. 550, US RspSMNT, Doc. 550-1, p. 2.

[51] Doc. 550, US RspSMNT, p. 3 ("Simpson engaged in at least 209 Surespot communications with Miski leading up to the attack, with at least 103 messages being exchanged on the day of the attack, May 3, 2015.")

[52] Doc. 607, US Memo, p. 2.

[53] Doc. 607, US Memo, p. 2. Hussain was not identified by name, but the context describes him: "a subject located outside the United States who was fighting for a designated terrorist organization overseas."

[54] Doc. 577, U.S. Sur-reply re Defense SMNT.

[55] The surveillance reports produced by the Government in the days preceding the hearing showed 16 FBI agents and Joint Terrorism Task Force offices watched Simpson from 12:41 pm on April 24, 2015, to 11:32 am on April 25, 2015. Exhibit 12, pp. 14-17.

[56] Retweeting on February 13, 2015, a tweet about "Texas holds contest to mock the Prophet (SAW), and tweeting on April 23, 2015, "When will they ever learn? They are planning on selecting the best picture drawn of Rasulullah (saws) in texas. [sic]" Doc. 441, US RspMNTS, Doc. 441-8.

[57] "This morning [4/29/15], I gave my thoughts about juba1911 to Justin and why I think that juba1911 should be of concern." Supplemental Disclosure 000888-89. Because we do not know who "Justin" is, nor where he is located, we are at a loss to contact him and find out what the UCA told him. Nor have we any reports or other information documenting the nature of the UCA's concerns.

[58] On April 30, 2015, at 11:01 am, the UCA sent an email to the three co-case agents on the Simpson investigation: Deetta Nolan, Andrew Smith, and Amy Fryberger. Hearing Exhibit 135. In the message, the UCA reports that he "may have had a lengthy conversation with [Redaction marks "XXX"] Elton Simpson XXX. I'm working two XXX cases XXX and one of the subjects referred Surespot user "juba1911" to me. In the near future you can expect to hear from XXX about the possible connection. I'm informally getting ahead of XXX. I'll let them break the news to you, Andrew and Amy. If you care to hear my assessment of Surespot user "juba1911", just let me know."

[59] On May 17, 2019, the Government produced a declaration dated May 15, 2019, by Intelligence Analyst Weldon Hegwood. Hegwood declared that when he learned that the UCA was informed by Hendricks that he might encounter a "brother from Arizona" at the Garland event. Doc. 550, US RspSMNT, 550-5, p. 2. Per Dallas FBI, Phoenix FBI thought the reference was to Simpson, but Phoenix FBI did not think Simpson would travel to the event as his car was parked at the apartment complex.

[60] Doc. 550, US RspSMNT, 550-5, p. 3, ¶ 6.

[61] Hearing Exhibit 12, p.3, Supplemental Disclosure # 00916.

[62] Hearing Exhibit 187, p. 5, Supplemental Disclosure # 01061.

[63] It listed as associates Simpson's family members and a woman who was listed as a joint owner of one of Simpson's vehicles, yet that vehicle was never seen in the physical surveillance.  Physical surveillance prior to May 3, 2015, did reveal that Simpson and Soofi's were roommates, attended the same mosque, and that Simpson rode as a passenger in Soofi's car on one occasion.  Hearing Exhibit 12, pp. 1, 3, 14, Supplemental Disclosure 00914, 00916, 00928.

[64] Doc. 550, US RspSMNT, p. 12.

[65] Doc. 432, Defense MNTS, p. 8, ll. 3-5; Doc. 541-1, p. 8

[66] Those obligations arise under Fed. R. Crim. P. 16(a)(1), including the obligation to produce items material to preparing the defense, under 16(a)(1)(E)(i); productions of witness statements under Fed. R. Crim. P. 26.2 and the Jencks Act, 18 U.S.C. § 3500; production of impeaching information under *Giglio v. United States*, 405 U.S. 150 (1972) and *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991); and, evidence favorable to an accused, *Brady v. Maryland*, 373 U.S. 83 (1963).  A defendant's failure to request favorable evidence does not relieve the Government of its obligations to produce such evidence.  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (*citing United States v. Agurs*, 427 U.S. 97 (1976).

[67] *Kyles*, 514 U.S. at 437-38.

[68] Evidentiary Hearing Exhibit 187, p. 2, Supplemental Disclosure 01058.