**NOT FOR PUBLICATION**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America, | No. CR-15-00707-001-PHX-SRB |
| Plaintiff, | **ORDER** |
| v. | |
| Abdul Malik Abdul Kareem, | |
| Defendant. | |

Pending before the Court is Defendant Abdul Malik Abdul Kareem ("Defendant")'s Supplemental Motion for New Trial – Newly Discovered Evidence – Governmental Misconduct ("Supp. MNT") (Doc. 505) and Motion to Dismiss ("MTD") (Doc. 570). Because Defendant's motions contain overlapping arguments, the Court considers them together.

# I.    BACKGROUND

## A.    Factual Background

On or about May 1, 2015, Elton Francis Simpson ("Simpson") and Nadir Hamid Soofi ("Soofi") left Phoenix, Arizona to travel to a Prophet Muhammad drawing contest in Garland, Texas.  (Doc. 469, Order dated 1/23/17 ("1/23/17 Order") at 2 n.1.)  On May 3, they arrived at the contest and opened fire.  (*Id.*)  Moments later, they were shot and killed. (*Id.*)

On December 22, 2015, a grand jury returned a Second Superseding Indictment ("SSI") charging Abdul Malik Abdul Kareem ("Defendant") on five counts related to his alleged aid to Simpson and Soofi in planning this attack: knowingly and intentionally

conspiring to transport firearms and ammunition in interstate commerce with the intent to commit crimes punishable by imprisonment exceeding one year in violation of 18 U.S.C. § 924(b) with overt acts in furtherance thereof, in violation of 18 U.S.C. § 371 (Count One); knowingly and intentionally transporting firearms and ammunition in interstate commerce with the intent to commit crimes punishable by imprisonment exceeding one year, in violation of 18 U.S.C. § 924(b) and 18 U.S.C. § 2 (Count Two); knowingly and willfully making false, fraudulent, and fictitious material statements and representations to the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001(a)(2) (Count Three); having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessing, in and affecting interstate commerce, firearms, in violation of 18 U.S.C. § 922(g)(1) (Count Four); and knowingly and intentionally conspiring to provide "material support or resources" to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1) (Count Five).  (Doc. 158, Second Superseding Indictment ("SSI") at 1.)

Trial spanned nineteen days and the jury deliberated for three.  (*See* Doc. 285, Verdict ("Verd.").)  During deliberations, the jury submitted several questions to the Court.  (*See* Doc. 290, J. Qs. During Delibs./Ct's. Ans.) ("Jury Qs."); *see also* Doc. 289, Jury Q. During Delibs./Ct's. Ans. (additional question).)  Just before breaking on the second day of deliberations, the jury asked the Court:

> "If we cannot come to a unanimous decision on a count, how should we proceed/document it on the verdict sheet?"

(Jury Qs. at 11–12; Doc. 274, Min. Ent. dated 3/16/16 ("3/16/16 Min. Ent.") at 2.)  At the same time it submitted this question, the jury submitted a question about Count Two:

> "Is discussing a criminal act that subsequently comes to pass considered active participation?"

(Jury Qs. at 13.)  The jury received the Court's responses when it reconvened the following

day.  (*See id.* at 12; 3/16/16 Min. Ent. at 2.)

After a third day of deliberating, the jury returned verdict sheets, signed and dated, finding Defendant guilty on all counts.  (*See* Verd.)  The Court sentenced Defendant to 30 years in prison: 5 years for Count One; 10 years for Count Two; 5 years for Count Three; 10 years for Count Four; and 20 years for Count Five.  (Doc. 489, Amend. Judg. at 1.) Counts One, Three, and Four run concurrently with Count Five; Count Two runs consecutively to Count Five.  (*Id.* at 1.)

Since trial, the Government has disclosed additional evidence.  Between trial and the Court's 1/23/17 Order, the Government disclosed reports detailing communications between Ali Baiz, Christian Leon, and Nadir Soofi, regarding the sale of firearms; a 302 detailing the FBI's 05/04/15 interview with James Bell; and information about an undercover FBI employee ("UCE")'s investigation of Simpson.  (*See* 1/23/17 Order at 7.) During that time, Defendant believed the Government had additional, never-disclosed information relating to Saabir Nurse and John Sabari.  (*Id.* at 8–10; Doc. 303, MNT dated 3/31/16 ("3/31/16 MNT") at 2 (detailing UCE investigation evidence), 8–9 (detailing Nurse evidence).)  In its 1/23/17 Order, the Court ruled that the Government's failure to disclose this evidence did not violate *Brady v. Maryland*.[1]  (*See* 1/23/17 Order at 7–10.)

Between the Court's 1/23/17 Order and this Order, the Government disclosed the following evidence: (1) surveillance footage from a pole camera installed in Simpson's apartment complex on May 1, 2015; (2) the contents of a cell phone and passport belonging to Saabir Nurse, an individual who had contact with Simpson and to whom Simpson left title to his car; (3) a tactical information sheet attached to an email circulated among Dallas FBI agents, alerting that Simpson could come to Garland (the "Tactical Intel Report"); (4) testimony regarding the UCE's investigation of Erick Jamal Hendricks, an individual later charged with two counts of conspiring to provide material support to ISIL and attempting to provide material support to ISIL; (5) two online posts made by Joshua Ryne Goldberg,[2]

---

[1] 373 U.S. 83, 87 (1963).
[2] The Government did not disclose this evidence; Defendant independently located it.  (*See* Doc. 589, Mot. to Compel Prod. of Docs. ("Mot. to Compel") at 1.)

one featuring a map of the center hosting the drawing contest and a call to attack it, the other claiming responsibility for inspiring the Garland attack; and (6) two 302s[3] detailing spot surveillances of Simpson's apartment conducted on May 2 and 3 of 2015. ("Mot. to Comp." at 2–4; MTD Ex. A (Hendricks Indictment); Doc. 617, Min. Ent. dated 10/18/19 ("10/18/19 Min. Ent.").)

### 1. Pole Camera Footage

In March of 2019, the Government disclosed surveillance footage from a camera installed on a pole facing the entryway to Simpson's apartment. (Doc. 541, Def. Add. to Supp. MNT – Newly Disc. Evid. – Gov. Misconduct ("Add. to Supp. MNT"), Ex. 1 (modified by Doc. 543); *see also* Evid. Hr'g. Ex. 19.)  The pole camera's recording began on May 1, 2015, at 1:26 p.m., and ended on May 3, 2015, at 10:19 a.m.  (*See* Evid. Hr'g. Ex. 19.)  The footage shows Simpson and Soofi transporting several long bags and duffel bags from Simpson's apartment to the lot where Soofi's car was parked on the day the two left Phoenix to attack the Garland contest.  (*See id.*)  Exhibit 19 contains screenshots and an evidence log of the recorded activity prepared by the FBI.  (*See id.*)  The evidence log is replicated below in relevant part:

| Date, Time | Event |
|---|---|
| May 1, 13:26 | Camera recording begins |
| May 1, 14:08 | Simpson and Soofi enter apartment wearing religious clothing |
| May 1, 14:26 | Simpson and Soofi leave apartment in white t-shirts |
| May 1, 16:27 | Simpson returns to apartment |
| May 1, 18:01 | Soofi returns to apartment carrying black trash/shopping bag |
| May 1, 18:30 | Ali Soofi[4] enters apartment |

---

[3] A 302 is a report generated by the FBI documenting events that are "potentially testimonial."  (Doc. 264, Tr. Test. of SA Whitson pt. 2 ("Whitson Test. 2") at 70.)
[4] Ali Soofi is Nadir Soofi's younger brother.  (Doc. 260, Tr. Test. of Ali Soofi (A. Soofi Test.") at 3.)

| | |
|---|---|
| May 1, 18:41 - 19:04 | Ali Soofi removes several objects from the apartment in five trips, including a large shopping bag, a gym bag, a weight-lifting bar, a piece of exercise equipment, and a pair of boots |
| May 1, 19:04 | Ali Soofi leaves apartment and does not return |
| May 1, 21:43 - 21:45 | Soofi retrieves a long object from his vehicle |
| May 1, 21:47 - 21:58 | Soofi and Simpson remove several objects from the apartment in three trips, including several long bags and duffel bags |
| May 1, 21:58 | Soofi and Simpson leave the apartment and do not return |
| May 3, 10:19 | Camera recording disconnected |

(*Id.* at 1.)

### 2.     Saabir Nurse's Cell Phone and Passport Contents

In March of 2019, the Government disclosed a U.S. Customs and Border Protection Agency report containing information collected from Saabir Nurse on May 28, 2015.  (*See* Add. to Supp. MNT at 7–8; *id.* Ex. A(1)–(6).)  This information includes an extraction of Saabir Nurse's phone—including his contacts, call logs, and phone images—and photocopies of Nurse's passport.  (*Id.*)  The call log shows that Nurse called Simpson several times in April of 2015.  (*Id.*)  Nurse's passport shows that prior to the Garland attack, Nurse made several trips out of the country, including two trips to Saudi Arabia for the Hajj.  (*See id.* at 7.)

### 3.     Tactical Intel Report

In May of 2019, the Government disclosed a four-page "facesheet" on Simpson that was attached to a copy of an email circulated among Dallas FBI agents mere hours before the Garland attack.  (*See* Doc. 550, Resp. to Def. Supp. MNT ("Resp. Supp. MNT") at 9;

*id.* Ex. 4 at 1, 7–10.)  The report summarizes Simpson's biographical, historical, and car-related information as well as information about Simpson's known associates.  (*See id.* Ex. 4 at 7–10.)  The body of the email stated: "Please let us know if you see the individual (see attached) at today's event [the Garland contest].  PX [Phoenix FBI] advised it is very unlikely that he will be there, but we wanted to send this out just in case.  Please direct any questions my way."  (*Id.* Ex. 4 at 1.)

### 4.     UCE Activities

As recounted by the Court in its 1/23/17 Order, the UCE communicated with Simpson and several other suspected terrorists online.  (*See* 1/23/17 Order at 9.)  He also happened to be driving behind Soofi's car in Garland moments before Simpson and Soofi opened fire.  (*Id.*)  In the March 2018 trial of Eric Jamal Hendricks, the UCE testified regarding (1) his communications with Simpson and Hendricks; (2) email correspondence with other government employees, in which he expressed concerns about Simpson and the Garland contest; and (3) communications indicating that he had considered contacting Simpson but lacked the necessary authorization.  (MTD at 8–9 (summarizing testimony); *see also United States v. Hendricks*, No. 1:16-cr-00265 (N.D. Ohio 2018).)

### 5.     Goldberg Posts

On or around September 16, 2019, defense counsel learned of a plea agreement entered into by Joshua Ryne Goldberg.  (Mot. to Compel at 1.)  The factual basis of the plea agreement, which contains information from the criminal complaint filed in Goldberg's case, reflects that Goldberg was arrested in Florida in September of 2015 and charged with one count of distributing information relating to explosives, destructive devices, and weapons of mass destruction.  (Complaint at 1, *United States v. Goldberg*, 3:17-cr-0249-BJD-JRK (M.D. Fla. 2017) ("Goldberg Compl.").)  It also reflects that before the Garland attack, Goldberg posted a map of the center hosting the contest and a message "urg[ing] anyone in the area to attack 'with your weapons, bombs, or knives.'"  (*Id.* at 6 (quoting tweet).)  Goldberg had also tweeted "I'M BACK KUFFAR!  DIE IN YOUR RAGE!" which Simpson retweeted on the morning of the attack.  (*Id.* at 6.)  Goldberg later

1    claimed credit for inspiring the attack.  (*Id.* at 7.)

2                    **6.      SA Milnor's 5/02/15 and 5/03/15 302s**

3          On October 18, 2019 the Government disclosed two 302s prepared on May 8, 2015

4    by special agent ("SA") Glenn Milnor.  (Evid. Hr'g. Ex. 187.)  One 302 detailed physical

5    surveillance (a "spot check") of the parking lot of the Simpson apartment complex,

6    conducted by SA Milnor on May 2, 2015 from 11:16 p.m to 11:20 p.m. ("5/02/15 302").

7    (*Id.*)  In it, SA Milnor noted his observation of Simpson's but not Soofi's car in the complex

8    parking lot.  (*Id.*)  The second 302 suggests similar surveillance was conducted on May 3,

9    2015 ("5/03/15 302").  (*Id.*)  SA Milnor testified that he generated the 05/03/15 302 by

10   mistake and conducted no physical surveillance on May 3, 2015.  (Doc. 639, Tr. of

11   10/18/19 Evid. Hr'g. ("10/18/19 Evid. Hr'g. Tr.") at 301.)

12           **B.      Procedural Background**

13          The Court denied Defendant's first motion for a new trial in its 1/23/17 Order,

14   rejecting Defendant's argument that the Government violated *Brady v. Maryland* by failing

15   to disclose evidence until immediately before, during, or after trial.  (*See* 1/23/17 Order at

16   3, 11 (denying 3/31/16 MNT).)  The Court ruled that the disclosures made before and

17   during trial were not prejudicial because Defendant was able to make effective use of the

18   evidence disclosed, and the disclosures made after trial were not exculpatory,[5] or not

19   material,[6] or both.[7]  (*See id.* at 4–6, 7–10.)

20          Defendant now argues that the Government's most recent disclosures were

21   suppressed in violation of *Brady v. Maryland* and seeks dismissal of his indictment or a

22   new trial.  (*See* Supp. MNT at 1; MTD at 1.)  The Court held a three-day evidentiary hearing

23   to determine the issues surrounding the authorization of the pole camera and its failure to

24   be disclosed until 2019. (*See* Docs. 612, 616, 617, Evid. Hr'g. Min. Ents.)  Appellate

25   proceedings have been stayed pending resolution of these motions.  (*See* Doc. 586, Order

26   dated 09/13/19 (staying Case Nos. 17-10067 (appeal) and 17-10118 (cross appeal)).)

27   _____
     [5] Texts from Ali Baiz and Christian Leon; statements made by John Sabari and James
28   Bradley Bell.  (1/23/17 Order at 7–8.)
     [6] Saabir Nurse's text messages and related 302s.  (1/23/17 Order at 8–9.)
     [7] The UCE's investigation of Simpson.  (1/23/17 Order at 9.)

## II.      LEGAL STANDARD AND ANALYSIS

Defendant argues that the evidence disclosed after the Court's 1/23/17 Order was suppressed in violation of *Brady*, Federal Rule of Criminal Procedure 16(a)(1)(E)(ii), and the Sixth Amendment.  (MNT at 1, MTD at 1, 17–18.)  Below, the Court establishes jurisdiction before considering each argument in turn.

### A.      Jurisdiction

After a timely notice of appeal has been filed, district courts generally lack the authority to address post-judgment motions.  *See Davis v. Yageo Corp.*, 481 F.3d 661, 685 (9th Cir. 2007); *see also* Docs. 484, 491, 492, Nots. of App. (timely notices of appeal); Doc. 495, Not. of App. (timely cross appeal).  However, Federal Rule of Civil Procedure 62.1(a) provides that

> [i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

Fed. R. Civ. P. 62.1(a).  A party need not file a formal Rule 62.1(a) motion for the Court to make a Rule 62.1(a) indicative ruling.  *Mendia v. Garcia*, 874 F.3d 1118, 1122 (9th Cir. 2017).  Thus, Rule 62.1(a) gives the Court jurisdiction to consider Defendant's motions. This Order is the Court's indicative ruling.

### B.      *Brady* Claim

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Clark v. Chappell*, 936 F.3d 944, 980 (9th Cir. 2019) (quoting *Brady*, 373 U.S. 87 (quotations omitted)); *see also Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (explaining that post-*Brady* case law has made "clear that a defendant's failure to request favorable evidence [does] not leave the Government free of all obligation").  A *Brady* violation has three elements: "'(1) the evidence at issue

1    must be favorable to the accused, either because it is exculpatory, or because it is

2    impeaching; (2) that evidence must have been suppressed by the State, either willfully or

3    inadvertently; and (3) prejudice must have ensued.'" *Clark*, 936 F.3d at 980 (quoting *Reis-*

4    *Campos v. Biter*, 832 F.3d 968, 975 (9th Cir. 2016) (internal quotations omitted)). *Brady*

5    violations are assessed on a count-by-count basis. *United States v. Bagcho*, 227 F. Supp.

6    3d 28, 31 (D.D.C. 2017).

7         "Any evidence that would tend to call the government's case into doubt is favorable

8    for *Brady* purposes." *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013) (citing *Strickler*

9    *v. Greene*, 527 U.S. 263, 290 (1999)). Evidence is favorable if "it is either exculpatory or

10   impeaching," "even if its value is only minimal." *Comstock v. Humphries*, 786 F.3d 701,

11   708 (9th Cir. 2015) (citing *Strickler*, 527 U.S. at 281–82 and *Milke*, 711 F.3d at 1012).

12   "[W]hether evidence is favorable is a question of substance, not degree, and evidence that

13   has any affirmative, evidentiary support for the defendant's case or any impeachment value

14   is, by definition, favorable." *Comstock*, 786 F.3d at 708 (citing *Strickler*, 527 U.S. at 281–

15   82).

16        Evidence is "suppressed" where it is known to the government and not disclosed to

17   the defendant. *Comstock*, 786 F.3d at 709 (citing *Strickler*, 527 U.S. at 282). To comply

18   with *Brady*, the government must disclose evidence known to the prosecutor as well as

19   evidence "known only to police investigators and not to the prosecutor." *Comstock*, 786

20   F.3d at 709 (citing *Strickler*, 527 U.S. at 280–81) (internal quotations omitted)).

21        "'With respect to the prejudice element, evidence is material only if there is a

22   reasonable probability that, had the evidence been disclosed to the defense, the result of

23   the proceeding would have been different.'" *Clark*, 936 F.3d at 980 (quoting *Reis-Campos*,

24   832 F.3d at 975 (internal quotations omitted)). A "reasonable probability" is "a probability

25   sufficient to undermine confidence in the outcome." *Id.* at 980 (quoting *Reis-Campos*, 832

26   F.3d 975) (internal quotations omitted)). Courts consider materiality "both individually

27   as well as cumulatively in light of the evidence as a whole." *United States v. Sedaghaty*,

28   728 F.3d 885, 892 (9th Cir. 2013).

Defendant argues that the Government's suppression of the following evidence violates *Brady*: (1) the pole camera footage; (2) Saabir Nurse's cell phone and passport contents; (3) the Tactical Information Report; (4) the UCE's activities; (5) the Goldberg posts; and (6) the 05/02/15 and 05/03/15 302s.[8]  (*See* Supp. MNT; Add. to Supp. MNT; MTD; Mot. to Compel at 1–2.)  The Court considers each nondisclosure separately and then cumulatively.

### 1.      Pole Camera Footage

At the outset, the Court notes that the pole camera footage could not have affected the verdicts on Count Three (false statements)[9] and Count Four (felon in possession).  The crimes charged in these counts occurred after the pole camera was dismantled.  (*See* SSI at 5.)  The footage tells jurors nothing about whether Defendant lied to the FBI, knew about the Garland contest, or knew that Simpson and Soofi were preparing to attack it.  (*See* Verd. at 3.)  Similarly, the footage has no bearing on whether Defendant unlawfully possessed a firearm on June 10, 2015.  (*See* SSI at 5.)

The other counts present a closer question.  Unlike the crimes charged in Counts Three and Four, the crimes charged in Counts One, Two, and Five occurred during the time the pole camera was live.  Count Five charges Defendant with being in a conspiracy with Simpson and Soofi from June 2014 to May 3, 2015; Count One, from January 2015 to May 3, 2015.  (*Id* at 3–5.)  Count Two's crime began on May 1, 2015 and ended on May 3, 2015.  (*Id.* at 4.)  These crimes are predicated on the actions of Simpson and Soofi, whose activities were captured by the pole camera.  Below, the Court examines whether the

---

[8] As the 5/02/15 and 5/03/15 302s were not disclosed until October 18, 2019, Defendant's briefing, completed before that time, did not address them.  The Court proceeds assuming that Defendant would have included the 302s in his *Brady* challenge had they been disclosed earlier.

[9] The alleged false statements are: "(1) that [Defendant] did not go shooting in the desert with Simpson and Soofi before May 3, 2015; (2) that before May 3, 2015, neither Simpson nor Soofi fired the weapons they used in connection with the attack in Garland, Texas; (3) that Simpson and Soofi did not ask him to participate in an attack of any kind on or before May 3, 2015; (4) that he did not know in advance that Simpson and Soofi planned to conduct an attack in Garland, Texas; and (5) that he did not know about an event, that is, the Muhammad Art Exhibit Contest that was to take place in Garland, Texas, on or about May 3, 2015, until after Simpson and Soofi were killed while attempting to conduct an attack on the contest. (SSI at 5.)  The jury unanimously found that Defendant falsely made the statements in (4) and (5) only.  (Verd. at 3.)

footage is favorable, was suppressed, and is material to Counts One, Two, and Five.

### a.  Favorability

Defendant argues the footage is favorable because he is not in it, and "a reasonable juror would expect [that] someone who allegedly motivated, trained and bankrolled the attackers"—Defendant's alleged role in the conspiracy—"would be with them as they prepared to leave to handle any last minute questions or details."  (Doc. 559, Def. Reply to Resp. Supp. MNT ("Reply Resp. Supp. MNT") at 4–5; *see also* Add. to Supp. MNT. at 5.) The Government responds that the footage is not favorable evidence, but is "essentially silent" evidence, reasoning that "[t]he mere absence of incriminating evidence within a given video or audio recording, interview, or report, does not render that evidence 'favorable' under *Brady*."  (Doc. 577, Gov. Sur-Reply in Opp'n to Supp. MNT ("Sur-Reply") at 4.)

In support, the Government cites *United States v. Borda*.  (*Id.* (citing *Borda*, 941 F. Supp. 2d 16, 24 (D.D.C. 2013).)  In *Borda*, the government charged two defendants with conspiring to distribute cocaine with the intent or knowledge that the cocaine would be unlawfully imported into the United States.  941 F. Supp. 2d at 19.  The defendants conceded distribution but argued that they lacked the requisite intent or knowledge.  *Id.* at 20.  To prove intent, the government introduced evidence, mostly witness testimony, that defendants knew their cocaine was shipped to a city located near the U.S.–Mexico border; that the city itself had insufficient demand for a delivery as large as defendants'; that one defendant stated that the city is "not a market for personal use"; that defendants discussed "conditions at the border"; that all of the cocaine from one of the drug deals ended up in the United States; that defendants were paid in U.S. currency; and one defendant's statement that in previous, similar transactions, those who received the drugs went on to sell them in the United States.  *Id.* at 20–21.  The government did not disclose numerous DEA reports which "said nothing at all" about whether the cocaine had reached the United States or whether defendants knew where it was headed.  *Id.* at 24.  Nevertheless, the defendants argued the DEA reports were favorable and suppressed in violation of *Brady*.

*Id.*  The D.C. Circuit rejected this argument, reasoning that "the absence of incriminating information in a report cannot be turned into an affirmative conclusion that it is 'favorable' to the defendants."  *Id.*

*Borda* is inapplicable.  In *Borda*, the absence of information in the DEA reports was not relevant to defendants' intent—the reports could not have helped defendants prove that they did not know their drugs were destined for the United States.  Here, in contrast, Defendant's absence from the footage is relevant to the charges of Counts One, Two, and Five.  Counts One and Five charge Defendant with being a member of two (distinct but overlapping) conspiracies.  At trial, Defendant conceded the existence of the conspiracies but argued he was not a member.  (*See* Doc. 349, Tr. Def. Cl. Arg. at 2 ("There's no question there was a conspiracy in this case.  Simpson and Soofi were in a conspiracy.").)  The footage shows that Defendant was not helping Simpson and Soofi carry duffel bags containing firearms and ammunition out of Simpson's apartment on the day Simpson and Soofi left for Garland.  (*See* Evid. Hr'g. Ex. 19.)  Evidence of Defendant's alleged co-conspirators acting without him during the timeframe of the conspiracies is not "essentially silent" information—it is information that has some bearing on whether Defendant was a member of the conspiracies.  Because the footage adds at least minimal exculpatory value to Defendant's case, it is favorable as to Counts One and Five.

The footage is even more favorable as to Count Two.  The crime charged in Count Two began on May 1, when Simpson and Soofi loaded firearms and ammunition into Soofi's car to drive across state lines.  (*See* SSI at 4.)  On May 1, the pole camera captured Simpson and Soofi—but not Defendant—carrying firearms and ammunition from Simpson's apartment to the lot where Soofi's car was parked.  (*See* Evid. Hr'g. Ex. 19.)  The footage adds at least minimal exculpatory value to the argument that Defendant did not help Simpson and Soofi transport these firearms and ammunition across state lines.  Therefore, it is favorable.

### b.     Suppression

Whether the footage was suppressed is not disputed: the footage existed and was in

1    the FBI's possession at the time of Defendant's trial.  (*See generally* Doc. 263, Tr. Test. of

2    SA Whitson ("Whitson Test. pt. 1").)   The FBI did not share the footage with the

3    prosecutors until nearly three years after trial, after which point the prosecutors turned it

4    over to the defense.   (*See generally id.*; Add. to Supp. MNT at 2.)   Because the

5    Government's duty to disclose extends not only to evidence the prosecutors knew about,

6    but also to evidence that investigating officers possessed at the time of trial, irrespective of

7    the prosecutors' knowledge, the Court concludes the footage was suppressed.  *See*

8    *Comstock*, 786 F.3d at 709.

9                          **c.    Materiality**

10          Unlike the favorability requirement, which only requires the Court to determine

11   whether the footage adds some value to Defendant's case, the materiality requirement

12   requires the Court to determine whether the footage adds value sufficient to undermine

13   confidence in the jury's verdict.  *See id.* at 708.  The Court therefore evaluates the weight

14   of the evidence against the backdrop of the entire record.  *See id.* at 708 (citing *Strickler*,

15   527 U.S. at 281–82 and *Milke*, 711 F.3d at 1012); *see also Turner v. United States*, 137 S.

16   Ct. 1885, 1893 (2017).

17          The Government argues suppression of the footage does not undermine confidence

18   in the outcome of the trial because Defendant's whereabouts on May 1, 2015[10] were

19   undisputed.  (Resp. Supp. MNT at 16.)  But while Defendant's whereabouts on May 1 were

20   never in dispute,[11] Defendant's involvement in the conspiracies was always in dispute.

21   (*See* Tr. Def. Cl. Arg. at 5 ("That's the ultimate issue here.  Did he become a member of

22   that conspiracy?").)  The value of the footage extends beyond corroborating Defendant's

---

23   [10] At trial, Defendant testified that on May 1, he went to Jumu'ah at 12:45 p.m., had lunch
24   at his own house, went to a chiropractic appointment at 4 p.m., visited a market to buy goat
     meat, and cooked the meat that night.  (Doc. 299, Tr. Test. of Kareem ("Kareem Test. pt.
     1") at 74, 78–81.)
25   [11] While the government generally called Defendant a liar, *see* Doc. 354, Gov. Rebut. Cl.
26   Arg. at 25 ("[L]ook to the defendant's statements that he made on the stand.  Did the
     defendant lie?"), and specifically questioned the legitimacy of his chiropractic
27   appointments, *see id.* ("Defense counsel stood before you and said:  Look at the
     chiropractic documents.  They support the defendant.  And as you look at those documents,
28   the question is:  Who wrote them and for what purpose?"), the Government correctly notes
     that it presented no evidence countering Defendant's testimony about his whereabouts on
     May 1.  (*See* Resp. Supp. MNT at 16.)

accounting of his activities on May 1: it bolsters the argument that Defendant was not a member of the Simpson/Soofi conspiracies, at least not on May 1.

The Government argues that because the evidence establishing Defendant's membership in the conspiracies is strong and remains unaffected by the footage, the footage cannot be material to any count.  (10/18/19 Evid. Hr'g. Tr. at 336.)  Specifically, the Government argues that "[t]he jury's verdict in this case was based on testimony from juveniles, from Stefan Verdugo who used to live with [Defendant], from Sergio Martinez" and "Mr. Kareem visiting Mr. Martinez within a couple of days of the attack and whispering in his ear not to say anything to the FBI about going shooting with Simpson and Soofi."  (*Id.* at 335–36.)  Additionally, the Government points to Ali Soofi's testimony "about being in that apartment with [Defendant], Simpson, and Soofi watching those videos—the person being burned alive, the beheading videos, and all the other things he saw in that apartment" and Simpson's tweet that "the 'bro from philly' is in here rolling." (*Id.* at 336.)

The Government highlights the lack of evidence it presented establishing Defendant's membership in the conspiracies near the time of the pole camera's operation. (*Id.* at 336 ("Nothing in this video, nothing in the surveillance changes one bit about the evidence that we introduced, which basically came to an end in early April of 2015 when it comes to [Defendant]'s conduct.").)  The Government further emphasizes that it introduced only two pieces of evidence post-dating April 2015.  One "had to do with [Defendant's] access to his own computer"; the other was "the server at the restaurant [Mustafa Hassan] who testified that Kareem and Simpson and another individual went to his restaurant on April 30, 2015."[12]  (*Id.* at 337.)  Because the bulk of the Government's evidence predates the footage, and the jury found this evidence sufficient to convict, the Government maintains that suppression of the footage cannot undermine confidence in the verdict.  (*Id.*)  As to Counts Five and One, the Government is correct.  As to Count Two,

---

[12] Defendant's testimony contradicts this witness.  (*See* Kareem Test. pt. 1 at 74–75 ("Q: And had you seen Simpson the day before on April 30th? / A:  No. . . . Q:  You're sure? / A: Yes. . . Q:  You didn't have dinner with him at the Afghani restaurant? / A:  No.  I cooked myself.  I cooked some lamb shanks.")

the Court disagrees.

### i.    Count Five

The Court instructed the jury to find Defendant guilty on Count Five if the Government proved: (1) an agreement between two or more persons to provide material support to ISIL; (2) that Defendant "became a member of the conspiracy knowing of its unlawful object and intending to help accomplish it"; (3) that ISIL was a terrorist organization at the time of the conspiracy; (4) that Defendant knew that ISIL was a terrorist organization; and (5) that the offense occurred within the United States.  (*See* Doc. 287, Final Jury Inst. ("Jury Inst.") at 14.)  At trial, parties did not dispute the existence of a conspiracy or that Defendant knew ISIL was a terrorist organization.  (Tr. Def. Cl. Arg. at 2; Doc. 353, Tr. Gov. Cl. Arg. at 58.)  Rather, parties focused on whether Defendant joined Simpson and Soofi's conspiracy "knowing of its unlawful object and intending to help accomplish it."  (*See* Tr. Def. Cl. Arg. at 5; Tr. Gov. Cl. Arg. at 2–3.)

As the Government recognizes, the bulk of the evidence supporting Count Five dates from June of 2014 to early April of 2015.  (*See* Resp. Supp. MNT at 2; 10/18/19 Evid. Hr'g. Tr. at 336.)  The footage leaves this evidence undisturbed.  It does not contradict evidence of Defendant taking Simpson and Soofi shooting in the desert, evidence of Defendant watching ISIL videos, or evidence of Defendant hosting Simpson and Soofi at his house.  (*See* 1/23/17 Order at 9.)  Neither does it contradict Ali Soofi's testimony that Defendant visited Simpson's apartment two to three times per week before Ali moved out in early April.  Further, Count Five did not require the Government to prove that the conspirators specifically intended to attack the drawing contest in Garland.[13] Because Defendant's absence from the apartment on May 1 does not call into question his presence at other events that transpired at different times, the Court concludes there is no reasonable probability that the jury's Count Five verdict would have changed with the footage.  The footage is therefore not material to Count Five.

---

[13] *See* Jury Inst. at 15; *see also* Gov's Cl. Arg. at 3, 10 (discussing other planned attacks—attacking the Super Bowl, West Gate shopping mall, U.S. military personnel—and arguing that any attack made within the United States "is a violent jihad on behalf of ISIL" sufficient to meet Count Five's requirements).

### ii.     Count One

For similar reasons, the footage is not material to Count One.  Count One charges Defendant with conspiring to transport firearms and ammunition across state lines with the intent to commit a felony, a conspiracy spanning January 7, 2015 to May 3, 2015.  (SSI at 3.)  To convict Defendant on Count One, the Government had to prove that: (1) "there was an agreement between two or more persons to transport firearms and ammunition from one state to another with the intent to commit . . . felonies in Texas"; (2) Defendant "became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it"; and (3) "one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy."  (Jury Inst. at 12.)  Relative to the Count Five conspiracy, this conspiracy spanned a shorter time and was supported by less evidence.  Nevertheless, this conspiracy is supported by enough evidence[14] that the footage, which offers only a glimpse into a nearly five-month long conspiracy, is unlikely to affect the jury's verdict.  The footage is therefore not material to Count One.

### iii.     Count Two

The crime charged by Count Two spans a much shorter time frame than those charged by Counts One and Five, so footage of what transpired on May 1 takes on much greater significance.  Count Two charged Defendant with the substantive crime of transporting firearms and ammunition across state lines with the intent to commit a felony, which occurred between May 1 and May 3 of 2015.  At the Government's insistence, the Court presented the jury with two alternate theories of liability: the aiding-and-abetting

_____

[14]  The following evidence supported Defendant's involvement in the Count One conspiracy: Sergio Martinez's testimony that he took Defendant, Soofi, and Simpson shooting in the desert, that Defendant purchased an AK 47 for Simpson off of Craigslist, and that ISIL released a video, later watched by Defendant, of ISIL members setting fire to a Jordanian pilot; Ali Soofi's testimony that Defendant taught Simpson and Soofi how to disassemble and clean their weapons; the two juveniles' testimony that they heard Defendant discussing the Garland contest; and the Afghan restaurant server's testimony that Defendant dined with Simpson on the evening of April 30, 2015.  The Government stated that the server's testimony was offered only to rebut Defendant's testimony that he had severed contact with Simpson weeks before the attack, not to establish the conspiracy. (*See* Sur-Reply at 5.)  Nevertheless, it bears on Defendant's contact with Simpson during the timeframe of the conspiracy.

theory and the *Pinkerton* theory.  The theories differ in the proof required to establish criminal intent.  *Compare United States v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir. 1997) (citing *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988)) *with Pinkerton*, 328 U.S. at 647.  The aiding-and-abetting theory requires that Defendant have the specific intent to facilitate the commission of a crime by another as well as the intent of the underlying substantive offense; the *Pinkerton* theory permits the Government to establish intent by the fact of the formation of the conspiracy, so long as the substantive crime was done in furtherance of the conspiracy.[15]  *Pinkerton* liability, in other words, offers the Government a "shortcut" to proving the criminal intent of one who aided and abetted a crime, where there was a conspiracy to commit that crime.  *See Nye & Nissen*, 336 U.S. at 622 (Frankfurter, J., dissenting) ("[T]he *Pinkerton* decision . . . offer[s] a tempting short-cut by which to sustain the verdict.").

The Court has no way of knowing whether the jury relied on the aiding-and-abetting theory or the *Pinkerton* theory to convict Defendant on Count Two.  Therefore, if the pole camera footage is material to Count Two under either instruction, the Court's confidence in the Count Two verdict is undermined and a new trial on that count is warranted.

The *Pinkerton* instruction required that the jury find Defendant was a member of one of the conspiracies "at the time" Simpson and Soofi transported firearms and ammunition across state lines.  (*See* Jury Inst. at 21.)  The relevant "time" is May 1 to May 3, 2015.  (*Id.*; *see also* SSI at 4.)  The Government, of course, bore the burden of proving every element beyond a reasonable doubt, including—under the *Pinkerton* theory of liability—that Defendant was a member of Simpson and Soofi's conspiracy "at the time" they drove across state lines with the intent to commit a felony.

The Government acknowledges that events establishing Defendant's participation in the conspiracies "took place well before the pole camera was activated on May 1, 2015."

---

[15] *Pinkerton*, 328 U.S. at 647–48; *see also Nye & Nissen v. United States*, 336 U.S. 613, 620 (1949) ("The rule of [*Pinkerton*] does service where the conspiracy was one to commit offenses of the character described in the substantive counts."); *United States v. Almeida*, 379 F. App'x 919, 924 (11th Cir. 2010) ("In the context of *Pinkerton* liability, '[c]riminal intent to commit the substantive offenses may be established by the formation of the conspiracy.'" ) (quoting *United States v. Woodard*, 459 F.3d 1078, 1085 (11th Cir. 2006)).

(Sur-Reply at 4.)   As a result, relatively little of the Government's evidence bears on whether Defendant was a member of the conspiracy on the date that Simpson and Soofi left Arizona to attack the Garland contest.   (*Compare* Gov. Cl. Arg. at 10–57 (discussing evidence supporting Count Five in argument spanning 40 pages) *with* Gov. Cl. Arg. at 59 (discussing evidence specific to Count Two); Doc. 354, Gov. Cl. Arg. Rebuttal at 7–8 (discussing evidence specific to Count Two).)   Defendant, in contrast, presented some evidence that he was not a member of the conspiracy at the time Simpson and Soofi left for Texas: he testified that he had little contact with Simpson in the weeks leading up to May 1.   (Kareem Test. pt. 1 at 75–76.)   The Government rebutted Defendant's statement with testimony from Mustafa Hassan that Defendant and Simpson dined at his restaurant on the evening of April 30, 2015—which Defendant, in turn, denied.   (*See* Sur-Reply at 5; Kareem Test. pt. 1 at 74–75.)   The footage would have supported Defendant's testimony that he had little contact with Simpson in the weeks leading up to the attack.   Its corroborative value is particularly important because the Government introduced very little evidence establishing Defendant's involvement in the conspiracies around the time of the Count Two crime—and what little evidence the Government did procure was contradicted by Defendant.

The Government suggests that the footage is consistent with evidence the Government presented "showing Kareem backed away from participating in the attack, although he did not withdraw from the conspiracy."   (Sur-Reply at 4.)   For support, the Government cites the testimony of Stefan Verdugo and the two juveniles.   (*Id.*; *See* Resp. Supp. MNT at 16.)   Verdugo testified:

> MR. KOEHLER: After you had heard these conversations about the contest in Texas, did you have conversations with D about that contest going forward?
>
> VERDUGO: Yeah. He kept saying that they were planning on going and doing something. And I kept telling him that he should not be a part of it, that it wasn't worth his life.
>
> MR. KOEHLER: What was his response to that?

VERDUGO: I don't think he listened to me a lot.

. . .

MR. KOEHLER: Did you have a later conversation with him in which you learned he changed his mind?

VERDUGO: Yes.

MR. KOEHLER: When did that happen?

VERDUGO: It was—we were sitting out front of the house. It was after I got the—I got this Suburban.  And he started telling me that he didn't think he could go through with it.  And that's when I started telling him like, you know, it's crazy. He shouldn't do stuff like that. And let—you know, get influenced by a religion like that. I kept trying to tell him he had stuff to live for.

MR. KOEHLER: About how long before the event itself did that occur?

VERDUGO: I would probably say like a month-and-a-half, a month.

MR. KOEHLER: So early April?

VERDUGO: Yes.

MR. KOEHLER: Did he say anything about Simpson and Soofi changing their mind or anything?

VERDUGO: No. He just kept saying they were going to go through with it.

(Doc. 251, Tr. Test. of Verdugo ("Verdugo Test.") at 30–32.)  Verdugo's testimony that Defendant "started telling me that he didn't think he could go through with it" provides only weak evidence that Defendant backed away from participating in the attack yet remained a part of the conspiracy.  Verdugo's testimony does not reflect what the Government claims—that Defendant did not himself wish to participate in the attack, yet wanted to help others carry it out.  Verdugo's testimony suggests only that Defendant, at one point, expressed doubts about attacking the contest.  The testimonies of Juan and Carlos are even less compelling: neither juvenile's testimony suggests that Defendant considered backing away from participating in the attack, much less wanted others to carry it out in his stead.[16]  (*See* Doc. 249, Tr. Test. of Juv. Juan ("Juan Test."); Doc. 248, Tr.

---

[16] To the contrary, Juan stated that he heard Defendant "talking about going to Texas and just continuing to shoot[] people."  (Juan Test. at 43.)

Test. of Juv. Carlos ("Carlos Test.").)

The footage shows Simpson and Soofi leaving Simpson's apartment for the last time on May 1, 2015 at 9:58 p.m. It shows Simpson and Soofi taking three trips to and from the apartment, presumably to Soofi's car, transporting several long bags and duffel bags. Defendant—charged with aiding the transport of the very firearms and ammunition inside these duffels—is not helping them. (*See* Evid. Hr'g. Ex. 19.) Viewing this footage, the jury could have reasonably doubted whether Defendant was a member of the conspiracies at this point in time.[17]

At the very least, the footage is of minor importance to Count Two. The Supreme Court instructs that "[a]dditional evidence of relatively minor importance might be sufficient to create a reasonable doubt" if the verdict is "already of questionable validity." *United States v. Agurs*, 427 U.S. 97, 113 (1976). The Court has cause to question the validity of the jury's verdict on Count Two. At one point during deliberations, the jury appears to have been hung. The dates on the verdict sheets indicate that Counts Three, Four, and Five had already been decided when the jury asked the Court:

> "If we cannot come to a unanimous decision on a count, how should we proceed/document it on the verdict sheet?"

(*See* Verd. at 1, 2, 3 (Count Three signed on 3/15/16; Count Four signed on 3/15/16; Count Five signed on 3/16/16); Jury Qs. at 11–12.) At the time the jury submitted this question,

---

[17] Arguably, too, the footage is just as material to Count Two under the aiding-and-abetting theory of liability, which required the Government to prove that Defendant "actively participate[d]" in the criminal venture. (*See* Final Jury Inst. at 20.) First, the footage's depiction of Simpson and Soofi but not Defendant preparing for the crime suggests that Defendant did not actively participate in the crime—rather, it suggests that Defendant's participation in the crime was, at most, passive. (*Id.*) Second, since the instructions provide two different ways of proving the same criminal intent, it follows that the "active participation" requirement, like the *Pinkerton* "at the time" requirement, would fold in the inquiry of what Defendant's intent was at the time of the crime. *See Cosgrove v. United States*, 224 F.2d 146, 152 (9th Cir. 1954) ("'Generally speaking, to find one guilty as a principal on the ground that he was an aider and abetter it must be proven that he shared in the criminal intent of the principal and there must be a community of unlawful purpose at the time the act is committed.'") (quoting *Johnson v. United States*, 195 F.2d 673, 675 (8th Cir. 1952)). While the Court need only find the footage "material" under one set of instructions, the Court notes that the footage's relevance to Count Two likely does not hinge on which theory of liability the jury relied upon.

then, Counts One and Two were the only undecided counts.  (*See* Verd. at 4, 5 (Counts One and Two dated 3/17/16); *cf. United States v. Pelullo*, 105 F.3d 117, 123 (3d Cir. 1997) (considering actions of jury when evaluating whether a guilty verdict is "worthy of confidence").)   Concurrent with this question, the jury asked the Court a question pertaining to Count Two.[18]  (*See* Jury Qs. at 13–14.)  It is possible the jury was hung on both Counts One and Two, and probable the jury was hung on *at least* Count Two, because the jury submitted a Count Two question along with the hung-jury question and because Count Two required the Government to prove—at least under the *Pinkerton* instructions— something not required by the other counts: that at the time Simpson and Soofi drove to Garland, Defendant was a member of the conspiracy.[19]

A jury's ambivalence affects the Court's *Brady* analysis because the closer the verdict, the more likely it is that one additional piece of evidence—even one of relatively minor significance—would have introduced reasonable doubt into the mind of a juror.  *See Agurs*, 427 U.S. at 113; *cf. Browning v. Baker*, 875 F.3d 444, 466 (9th Cir. 2017) ("Given th[e] mountain of evidence providing potential reasons to doubt [a witness's] credibility, getting just one juror to change his or her mind about the truth of [the witness's] testimony likely would not have required much.").

Evidence establishing that Defendant was a member of either conspiracy at the time of the Count Two crime was relatively weak.  Ali Soofi testified that Defendant, Simpson, and Soofi went shooting in "February or March," and Stefan Verdugo testified that Simpson, Soofi, and Defendant went shooting "a lot."  (Doc. 260, Tr. Test. of A. Soofi ("A. Soofi Test.") at 47; Verdugo Test. at 13.).  Their testimony, vague as it was, hardly bears on Defendant's participation in the conspiracy on May 1.  Likewise, Ali Soofi's testimony that Defendant taught Simpson and Soofi how to clean their firearms after they returned from shooting one day has little bearing on Defendant's membership in the conspiracies

---

[18] "Is discussing a criminal act that subsequently comes to pass considered active participation?"  (Doc. 290, Jury Qs, at 12.)

[19] Even if the jury were hung on Count One, too, the pole camera footage is still not material to that verdict because there is no reasonable probability that footage of Simpson and Soofi for a few hours at the end of the conspiracy could have convinced the jury that Defendant had not been a member of the conspiracy during the preceding months.

on May 1.  (*See* A. Soofi Test. at 32.)  The juveniles' testimony that Defendant, Simpson, and Soofi discussed the Garland attack, and that Defendant hosted one such discussion in his home, was untethered to any timeline.  (*See* Carlos Test. at 14 (stating Defendant discussed Garland contest once); Juan Test. at 15 (stating Defendant discussed Garland contest three times).)  Stefan Verdugo's testimony about Defendant's plans for attacking the Garland contest was contradicted by his later testimony that Defendant had second thoughts about the attack.  (Verdugo Test. at 30–32.)  The Government's evidence that the ammunition found in Defendant's apartment matches that brought by Simpson and Soofi to Garland is hardly probative of Defendant's membership in the conspiracies on May 1.  (*See* Doc. 259, Tr. Test. of Henderson ("Henderson Test.") at 2–9 (matching ammo); *see also* Gov. Cl. Arg. at 58–59; *id.* at 25, 45 (recapping testimony); *see also Comstock*, 786 F.3d at 711 (look to prosecutor's closing arguments to determine the "likely damage" done by the suppression of *Brady* evidence) (quoting *Kyles*, 514 U.S. at 444).)

The evidence listed above post-dates the contest's announcement on February 11, 2015.  (*See* Tr. Def. Cl. Arg. at 6.)  Evidence predating the contest's announcement[20] is even less probative of whether Defendant was a member of either conspiracy on May 1. Evidence pre-dating the contest's announcement has little bearing on a crime requiring the jury to find that Simpson or Soofi intended to commit a felony *in Texas*, because there is no evidence that Texas was on Simpson and Soofi's radar before the Garland contest was announced.  (*See* Jury Inst. at 19 (requiring jury to find "a person transported firearms . . . with the intent to commit murder and/or aggravated assault in Texas . . . ."); *see also* Tr.

---

[20] This evidence consists of: Sergio Martinez's testimony that he went shooting with Defendant, Simpson, and Soofi in January 2015; Sergio's testimony that during this shooting, Defendant trained Simpson and Soofi how to shoot while doing drills; Defendant's financing of the snubnose AK-style weapon used by Simpson and the Elk River gun used by Soofi; and evidence establishing the existence of a conspiracy early on, including testimony about Defendant, Simpson, and Soofi watching ISIL videos, discussions about other attacks, and the computer-related evidence.  (*See* Doc. 246, Tr. Test. of Sergio Martinez-Chavez ("Test. Martinez Day 1") at 9 (Martinez stating he took Defendant, Simpson, and Soofi shooting in the desert "a Friday at the beginning of the year in 2015"); *see id.* at 14–15 ("[Ibrahim] was running sideways, back and forth, while shooting."); A. Soofi Test. at 25–26 (snubnose AK financed by Defendant in 2014); Doc. 265, Tr. Test. of SA Whitson pt. 3 ("Whitson Test. pt. 3") at 154 (Elk River gun sold in January of 2015).)

Def. Cl. Arg. at 57–58 ("The 'interstate transportation of firearms' conspiracy is one that had to have begun later, no sooner than when the Garland, Texas contest was announced.").)  Evidence that Defendant conspired to attack the Super Bowl, the West Gate Shopping Center, and U.S. military personnel stationed in Phoenix arguably do not support the Count One conspiracy, because those attacks involved no crossing of state lines.

Count Two required the jury to find that Defendant was a member of one of the Simpson/Soofi conspiracies at the time Simpson and Soofi illegally transported firearms and ammunition across state lines.  The footage shows Simpson and Soofi carrying firearms and ammunition out of Simpson's apartment, to the lot where Soofi's car was parked, on the very day the two left for Garland.  Defendant's absence is conspicuous.  Had the jury seen Simpson and Soofi preparing to commit the crime charged in Count Two without Defendant's help, it might have acquitted him.  The jury's ambivalence on Count Two only strengthens the probability of acquittal.  The Court concludes that this amounts to a "reasonable probability" that the footage would have changed the jury's verdict on Count Two.  Its suppression therefore violated *Brady* as to Count Two.  The appropriate remedy is discussed *infra* in Section (II)(D) of this Order.

### 2.    Saabir Nurse's Cell Phone and Passport Contents

Defendant argues that Saabir Nurse's cell phone contents are material because they indicate relationships between Nurse and Simpson and between Nurse and Wahid,[21] and highlight the lack of a relationship between Nurse and Defendant.  (Reply Resp. Supp. MNT at 7.)  Defendant reasons that he could have used the cell phone contents to argue that Nurse, not Defendant, bankrolled the attack.  (*Id.*)  The lack of a relationship between Nurse and Defendant, Defendant maintains, suggests that Defendant was not involved in the Garland attack.  (*Id.* ("If Kareem were part of the Garland, Texas attack, one would expect more communications between Nurse and Kareem.").)  Defendant argues that Nurse's passport—which shows that before the Garland attack, Nurse had traveled to

---

[21] Wahid, at Simpson's direction, gave Nurse an envelope containing the keys and title to Simpson's car.  (*See* Doc. 352, Tr. Test. of Abdul Khabir Wahid ("Wahid Test.") at 26.)

several countries, including Saudi Arabia—demonstrates that Nurse was more radicalized than Defendant and that Nurse "had access to money that permitted him to travel internationally as compared to [Defendant] who was barely getting by." (Add. to Supp. MNT at 7.) Nurse's access to money, Defendant argues, makes it more likely that Nurse, and not Defendant, bankrolled the Garland attack. (*Id.*) The Government responds that the information about Nurse is "irrelevant, tangential, and would have been confusing to the jury." (Sur-Reply at 7.)

The Court agrees with the Government. Defendant's own phone records, disclosed before trial, already reflect that Defendant and Nurse had very little phone contact. Nurse's phone records would have added little, if anything, to the information the jury already had. *See United States v. Kohring*, 637 F.3d 895, 902 (9th Cir. 2011) ("[I]f suppressed evidence is 'merely cumulative,' then the failure to disclose is not a violation.") (citing *Morris v. Ylst*, 447 F.3d 735, 741 (9th Cir. 2006)). Nurse's relationships with Simpson or Wahid do not affect the evidence establishing Defendant's involvement in the crimes charged in any count. Defendant is simply incorrect that evidence that Nurse had the means to travel suggests that he, and not Defendant, bankrolled the attack.

### 3. Tactical Intel Report

Defendant argues that the Tactical Intel Report is material because is suggests the FBI conducted further surveillance on Simpson. (Reply Resp. Supp. MNT at 10–11.) Defendant reasons that any further surveillance "is material to [Defendant] because we believe it will show little or no connection between Simpson and Kareem and put the lie to much of Ali Soofi's testimony." (*Id.*)

This argument rests on unfounded speculation. *See United States v. Rogers*, 960 F.2d 1501, 1511 (10th Cir. 1992) (considering argument "entirely speculative" when Defendant "did not set forth any specific documents that the government possessed which the prosecution failed to produce under *Brady*"). The prosecutors have disclosed information above and beyond that required by *Brady*, as they have received it from the FBI, and they have worked with the FBI to gather information from other investigations.

The Court will not entertain Defendant's baseless speculation.

Any argument that the Tactical Intel Report shows little connection between Simpson and Defendant is incorrect.  The report is essentially silent on that point: it shows only that the FBI was investigating Simpson, and saw him as a potential threat to the Garland contest.  Because it is not even minimally exculpatory, the Court concludes the Tactical Intel Report is not favorable.

### 4.    UCE Activities

In its 1/23/17 Order, the Court held that the Government's disclosure of the UCE's investigation was neither favorable nor material to Defendant's defense.  (1/23/17 Order at 9.)  Defendant now argues that additional disclosures relating to the UCE—namely, the UCE's testimony during the Hendricks trial and statements made by the Hendricks prosecutors—were suppressed in violation of *Brady*.  (Supp. MNT at 1–2.)

As an initial matter, testimony from a trial in 2018 cannot have been suppressed because it did not exist during Defendant's trial.   "If the record is conclusive that all relevant agents of the government did not know about the *Brady* material, then, of course, no *Brady* violation has occurred as the 'government has no obligation to produce information which it does not possess or of which it is unaware.'"  *United States v. Price*, 566 F.3d 900, 910 n.11 (9th Cir. 2009)  (quoting *Sanchez v. United States*, 50 F.3d 1448, 1453 (9th Cir. 1995)); *see United States v. Riley*, No. 14-20686, 2016 WL 4269497, at *2 (E.D. Mich. Aug. 15, 2016) (recognizing that the government did not suppress an interview because the interview occurred after trial).   Similarly, the Hendricks prosecutors' statements were made after Defendant's trial, so they—to the extent they can even be considered evidence—cannot have been suppressed.

To the extent Defendant argues it is the substance of the UCE's investigation that should have been disclosed, the Court has previously rejected this argument and rejects it again.  (*See* 1/23/17 Order at 9; *see also* Reply Resp. Supp. MNT at 12 (acknowledging this issue was already before the Court).)

Defendant advances two new arguments related to the UCE's investigation.  First,

Defendant argues that he "would have called the UC[E] to discuss his contacts with Simpson, his travel to Garland, Texas, his witnessing the Garland attack, and what reports he prepared prior to and after the Garland attack."  (Add. to Supp. MNT at 10.)  But this argument is misdirected: "[m]ateriality focuses not on trial preparation, but instead on whether earlier disclosure would have created a reasonable doubt of guilt."  *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003) (citing *Agurs*, 427 U.S. at 112 n.20); *see also Rogers*, 960 F.2d at 1511 (materiality does not focus on trial strategy).  Defendant's assertion that disclosure of the UCE investigation would have caused him to call the UCE to the stand is insufficient to prove materiality.

Second, Defendant argues the UCE's testimony suggests that "the FBI has a robust and sophisticated investigative capacity . . . [and a] large network of informants."  and that "[c]learly, there are additional FD-302s concerning [the UCE] being directed to make contact with Simpson before the attack and his travel and experience while in Garland, Texas that have not been produced."  (Supp. MNT at 5, 7.)  But as explained above, evidence that merely serves as a springboard for further speculation, without more, is not material under *Brady* because there is no reasonable probability that its disclosure would have changed the verdict.  (*See supra* Section (II)(B)(3).)

The UCE's testimony was not suppressed because it did not exist until after Defendant's trial.  The Court has previously rejected the argument that the substance of the UCE's testimony is favorable or material.  The additional arguments now advanced by Defendant are likewise rejected.

### 5.   Goldberg Posts

The Goldberg posts do not affect evidence establishing Defendant's involvement in the conspiracies.  That Simpson retweeted one of Goldberg's posts has no bearing whatsoever on Defendant's involvement.  The posts leave all of the evidence presented at trial undisturbed—they have no impeachment value, contradict no witnesses, and add little, if anything, to Defendant's case.  At most, they suggest that others, too, sought to carry out terrorist activities.  The posts have no reasonable probability of affecting the outcome on

any count.  Therefore—even assuming favorability and suppression—this evidence is not material.

### 6.       SA Milnor's 05/02/15 and 05/03/15 302s

Defendant argues that the Government's belated disclosure of SA Milnor's 302s is the latest demonstration that the prosecutors abdicated their duty to review and disclose evidence favorable to the defense.[22]  Specifically, Defendant argues that the prosecutors had a duty to take affirmative steps to learn of information possessed by the FBI and ensure that information was produced, citing *Kyles v. Whitley* for support.  (Post-Hr'g. Supp. at 18 n.67 (citing *Kyles*, 514 U.S. at 437–38).)  While Defendant is correct that prosecutors have a duty to learn of information favorable to defendants, this duty forms the basis of the suppression prong of the *Brady* analysis.  *Kyles*, 514 U.S. at 437 (duty to disclose); *Price*, 566 F.3d at 911 (duty forms basis of suppression prong).  An abdication of this duty, then, informs only whether information was suppressed; it does not form an independent basis for relief.  As *Kyles* itself recognizes, *Brady* and progeny "do[] not tax the prosecutor with error for any failure to disclose, absent a further showing of materiality."  *Kyles*, 514 U.S. at 439.

SA Milnor's 302s are essentially silent.  They indicate the presence of Simpson but not Soofi's car at the apartment complex.  This information is not even minimally exculpatory: it has no bearing on Defendant's involvement in the conspiracy.  SA Milnor did not, for example, check for Defendant's car.  Further—even assuming favorability and suppression—the 302s are not material to any count.  Rather, they are cumulative to what is already known: that Simpson and Soofi, riding in Soofi's car, were already on their way to Texas at this time.  *See Kohring*, 637 F.3d at 902 ("[I]f suppressed evidence is 'merely cumulative,' then the failure to disclose is not a violation.") (citing *Morris*, 447 F.3d at 741).  SA Milnor's 302s are neither favorable nor material.

---

[22] Defendant makes this argument in a motion struck by the Court as unauthorized.  (*See* Doc. 629, Def. Post-Hearing Supp. to Supp. MNT & MTD ("Post-Hrg. Supp.") at 10–11, 18–19.)  The motion is considered only to the extent it advances this argument, which Defendant could not have made in any prior filing due to the Government's belated disclosure of SA Milnor's 302s.

1

### 7.    Cumulative Effect

In addition to considering the materiality of the evidence in isolation, the Court evaluates the materiality of all suppressed evidence cumulatively.  *See Wearry v. Cain*, 136 S. Ct. 1002, 1007 (2016); *see also Barker v. Fleming*, 423 F.3d 1085, 1094, 1099 (9th Cir. 2005).  This requires the Court "to step back and consider the strength of the prosecution's case . . . ."  *Barker*, 423 F.3d at 1099.  In so doing, the Court may look to closing arguments. *See Comstock*, 786 F.3d at 711.  As Defendant makes no argument that the evidence was material to Counts Three and Four, the Court evaluates the evidence suppressed by the Government collectively to determine its materiality to Counts One and Five only.   In addition to the evidence detailed above, *see supra* Section (II)(B)(1)–(6), the Court considers the evidence at issue in its 1/23/17 Order denying Defendant's first motion for a new trial.  (*See* 1/23/17 Order at 7–10; *supra* at (I)(A) (recounting evidence).)

The bulk of the Government's evidence was probative of whether Defendant was a "motivator," "bank roller," and "trainer and intended participant" of the Garland attack.[23]

---

[23] This evidence included testimony from Juvenile Juan, Juvenile Carlos, Stefan Verdugo, Abdul Khabir Wahid, and Abdullah Idris Mubarak that Defendant knew Simpson and Soofi were ISIL supporters; testimony from Juan, Carlos, Verdugo, Mubarak, and Ali Soofi that Defendant knew Simpson and Soofi were planning attacks; testimony from Sergio Martinez that Defendant was pushy about asking him to take Defendant, Simpson, and Soofi shooting in the desert; testimony from Ali Soofi and Verdugo that Defendant went shooting multiple times; testimony from Wahid about a discussion with Defendant concerning Simpson and Soofi planning to attack a Marine base; testimony from Nathanial Soofi (Soofi's son) that Soofi told him about the Garland attack and a proposed attack on Luke Air Force base; testimony from Verdugo that Defendant wanted to be a part of the Garland attack; testimony from Juan that Defendant wanted to strap a bomb to himself and blow himself up in a mall, that Defendant was fascinated with the "end of times" propaganda, that Defendant showed Juan an "end of times" video, and that Defendant discussed the Garland contest around him; and testimony from Carlos that Defendant considered providing an AK 47 to Simpson. (Gov. Cl. Arg. at 3, 4, 23.)  The Government also argued that Defendant's activities following the attack demonstrate his involvement in the conspiracy:  Defendant's efforts to cover up his involvement by whispering, "If questioned, don't say anything about going shooting" into Sergio Martinez's ear, Defendant's attempt to wipe his computer clean and clear his browser history, and Defendant's closeness to Simpson and Soofi as evidence of his knowledge of what they were doing. (*Id.* at 4, 26, 48.)  The Government introduced evidence that Defendant helped Simpson and Soofi acquire firearms by loaning them money, through Verdugo's testimony that Defendant gave Simpson the gun Simpson brought to Garland; Ali Soofi's testimony that Defendant taught Simpson and Soofi how to clean and maintain their firearms; and expert testimony that Defendant possessed ammunition matching that brought to Garland by Simpson and Soofi.  (*Id.* at 4, 5.)  The Government also presented evidence extracted from Defendant's computers, which included "end of times" imagery and other ISIL-related pictures; and testimony that Defendant watched ISIL videos and laughed at one.

(Gov. Cl. Arg. at 5.)  Defendant's primary defense was that the FBI wanted a conviction for the attack, and used Defendant as a scapegoat to obscure the FBI's failure to anticipate Simpson's attack.  (Def. Cl. arg. at 3 ("[T]his case is about the government deciding they need to find somebody else because the government messed up in this case."); *id.* at 4 ("[T]he government isn't concerned with finding the truth.  The government is concerned with getting a conviction."); *id.* at 28 (same); *id.* at 51 (same); *id.* at 54–58 (elaborating).) Defendant argues that the suppressed evidence would have permitted him to "la[y] a greater foundation than [he] did for a vigorous argument that the FBI had been guilty of negligence" as well as prove there were other key conspirators—namely, Nurse, Hendricks, and Goldberg.  (Reply Resp. Supp. MNT at 18; Supp. MNT at 4, 11; Add. to Supp. MNT at 9.)

But the suppressed evidence—even considered cumulatively—does not advance Defendant's argument that the investigation was unreliable or that the FBI targeted Defendant based on something other than the evidence of his guilt.  The evidence of Defendant's guilt stands on its own: its probative value is unaffected by the investigatory methods used.  Nor does the suppressed evidence cast doubt on the adequacy of the investigation: disclosures happen after the investigation is conducted, and are not themselves a part of the investigation.

Similarly, none of the evidence suggesting others' participation in the Simpson/Soofi conspiracies—the Goldberg posts, the UCE's communication with Hendricks, Nurse, or Simpson, Nurse's phone and passport contents—affects the affirmative evidence introduced by the Government establishing Defendant's participation in the conspiracy.  At most, the cumulative effect of the suppressed evidence suggests that other individuals, too, were plotting terrorist activities—not that other people *in lieu of Defendant* were plotting terrorist activities.  (*See* Def. Cl. Arg. at 45.)

In any event, Defendant's strongest third-party defense is that Nurse financed Simpson and Soofi.  But during trial, Defendant had access to—and used—the only

_____

(*Id.* at 21, 23.)

- 29 -

1   evidence supporting this argument: the indentation of the note that Simpson wrote to Nurse,

2   indicating that the car title was given to him as repayment for money lent to finance a plan

3   that changed, and Simpson's father's testimony that Nurse delivered the title to him after

4   the attack. (*See id*. at 30–32.)   Defendant also presented evidence of letters found in

5   Simpson's apartment, written from a Florida inmate named Abu Jihad, addressed to Nurse.

6   (*Id.* at 47.)   Based on this evidence, then, a relationship between Simpson and Nurse was

7   already established.  The suppressed evidence would have added very little to Defendant's

8   case.

9         To the extent Defendant argues that much of the suppressed evidence is valuable

10   for its potential to lead to other evidence, the Court rejects this argument.  This argument

11   is too speculative to amount to a reasonable probability that the verdicts would have been

12   affected.  (*See* 10/18/19 Evid. Hr'g. Tr. at 339 ("There just can't be confidence that the

13   Government has turned over everything.").)

14         Defendant devoted a significant portion of closing arguments to attacking Ali

15   Soofi's credibility.  (Def. Cl. Arg. at 10 ("Ali Soofi is a liar."); *id.* at 33–45 (attacking Ali

16   Soofi's credibility).)  But the only evidence bearing on Ali's credibility is the pole camera

17   footage, and the Court has already determined that evidence was material and suppressed

18   in violation of *Brady*.  (*See supra* Section (I)(B)(1).)  None of the remaining suppressed

19   evidence bears on Ali Soofi's credibility.

20         The evidence establishing Defendant's participation in the Simpson/Soofi

21   conspiracies remains undisturbed by the suppressed evidence, even when considered

22   cumulatively.  There is no reasonable probability that the suppressed evidence, if disclosed,

23   would have changed the jury's verdicts on Counts One, Three, Four, and Five.  Therefore,

24   Court concludes that the Government did not violate *Brady* as to Counts One, Three, Four,

25   and Five by failing to disclose the aforementioned evidence.

26         **C.     Other Claims**

27         Defendant argues that Federal Rule of Criminal Procedure 16(a)(1)(E)(ii) imposes

28   upon prosecutors the duty to seek out and disclose favorable evidence, and the prosecutors

failed to fulfill this duty.  (MTD at 17.)   Rule 16 requires prosecutors to disclose all evidence it intends to use in its case in chief.  Fed. R. Crim. P. 16(a)(1)(E)(ii).  As the prosecutors used none of the recently disclosed evidence in its case-in-chief, the Government did not violate Rule 16.

Defendant advances two arguments that the Government's suppressions violate the Sixth Amendment.  First, Defendant argues that the Government violated Defendant's right to present a complete defense.  (MTD at 18.)  Defendant reasons that the Government's suppression of evidence related to others' influence on Simpson and Soofi prohibited counsel from fully developing his arguments that others were more influential than he, both because others were more radicalized and because others gave Simpson money.  (*Id.*)  Second, Defendant argues that the Government's suppression interfered with Defendant's right to assistance of counsel.  (*Id.*)  He reasons that "a lawyer's professional judgment about what approach to take rests on the bedrock of a thorough investigation of the case," and "[a] failure to make a full investigation before selecting and preparing the defense may rise to ineffective assistance of counsel."  (*Id.*)

As *Brady* and its progeny define the parameters of the relief accorded on the basis of suppressed evidence, Defendant's claims merely reiterate the claims the Court has already discussed as potential *Brady* violations.  *See United States v. Owen*, No. C-96-524 DLJ, 1996 WL 479017, at *7 (N.D. Cal. Aug. 1, 1996).  Because no *Brady* violations occurred as to Counts One, Three, Four, and Five, the Court concludes that Defendant was also not deprived of his Sixth Amendment right to present a defense or right to counsel.  As to Count Two, the Court will grant Defendant the relief appropriate under *Brady* and its progeny.

### D.    Remedy

Having determined that the Government violated *Brady* as to Count Two by failing to disclose the pole camera footage, the Court now turns to the appropriate remedy.  "Although the appropriate remedy [for a *Brady* violation] will usually be a new trial, a district court may dismiss the indictment when the prosecution's actions rise . . . to the

1  level of flagrant prosecutorial misconduct." *United States v. Chapman*, 524 F.3d 1073,

2  1086 (9th Cir. 2008) (citing *Giglio*, 405 U.S. at 153–54)). "Because it is a drastic step,

3  dismissing an indictment is a disfavored remedy." *United States v. Struckman*, 611 F.3d

4  560, 577 (9th Cir. 2010) (citing *Rogers*, 751 F.2d at 1076–77).

5      The Court lacks sufficient evidence to conclude the Government "acted flagrantly,

6  willfully, and in bad faith." *See Kohring*, 637 F.3d at 912–13 (citing *Chapman*, 524 F.3d

7  at 1085). Over the course of a three-day evidentiary hearing, the Court heard testimony

8  from the three case agents who oversaw Defendant's investigation, the case agent who

9  oversaw the Simpson investigation, the SA who requested installation of the pole camera,

10 and SA Milnor, who, in addition to generating the 05/02/18 and 05/03/18 302s, approved

11 the pole camera application and supervised the squad that conducted the Simpson

12 investigation. (Doc. 638, Tr. of 10/16/19 Evid. Hr'g. at 244.) The Court concludes that

13 the FBI's failure to turn over the pole camera footage before trial was an oversight; it was

14 not the result of flagrant or willful conduct or bad faith. Neither is there evidence of bad

15 faith by the prosecutors. The Court therefore will not dismiss Count Two of the SSI.

16 Rather, the Court will grant a new trial on Count Two.

17 **III.    CONCLUSION**

18      Surveillance footage of members of the conspiracy that Defendant is alleged to be

19 a part of, on the day that two of these members left Arizona with firearms and ammunition

20 to cross state lines to commit a felony, is favorable to Defendant, was suppressed, and is

21 material to Count Two, but Count Two only. The Government's suppression of the footage

22 therefore constitutes a *Brady* violation for Count Two. The other suppressed evidence,

23 whether considered separately or cumulatively, is not material to any count, so does not

24 constitute a *Brady* violation.

25      Because the Government's suppression of the pole camera footage was not flagrant,

26 willful, or done in bad faith, dismissal is not an appropriate remedy. Rather, the appropriate

27 remedy is a new trial on Count Two.

28      **IT IS ORDERED** that the Court would deny Defendant's Motion to Dismiss (Doc.

570) if the United States Court of Appeals for the Ninth Circuit remands its currently pending appeal back to this Court.

**IT IS FURTHER ORDERED** that the Court would deny Defendant's Supplemental Motion for New Trial – Newly Discovered Evidence – Governmental Misconduct (Doc. 505) to the extent stated herein.

**IT IS FURTHER ORDERED** that the Court would reverse Defendant's conviction on Count Two and remand for a new trial on Count Two.

**IT IS FURTHER ORDERED** that pursuant to Federal Rule of Civil Procedure 62.1(b), the parties shall promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 of the Court's decision.

**IT IS SO ORDERED.**

Dated this 23rd day of December, 2019.

Susan R. Bolton
United States District Judge