Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No.003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br>Plaintiff/Respondent,<br>v.<br>Abdul Malik Abdul Kareem,<br>Defendant/Movant. | 2:15-cr-00707-SRB<br>**DEFENDANT'S THIRD SUPPLEMENT TO MOTION FOR NEW TRIAL** |

Defendant Abdul Malik Abdul Kareem ("Kareem") submits this supplement to his previous motions for a new trial based upon newly discovered and disclosed evidence. In the alternative, this is a separate motion pursuant to Rule 33, Fed. R. Crim. P., to grant him a new trial based on newly disclosed evidence. This motion is supported by the attached memorandum of points and authorities, and the declaration of counsel.

Defendant filed his initial motion for new trial on March 31, 2016, Doc. 303, addressing discovery issues at trial. Following new disclosures by the Government, he

filed a supplement to his motion on November 9, 2016, Doc. 432. Based on testimony and statements in the trial of Erick Jamal Hendricks, Defendant filed a supplemental motion on June 11, 2018, Doc. 505. After the pleadings were completed regarding Doc. 505, and the Court had set an evidentiary hearing for limited purposes, the Government disclosed for the first time additional information it had had since 2015. This supplement/motion is based on those most recent disclosures and the prejudice their suppression caused the defense.

**MEMORANDUM OF POINTS AND AUTHORITIES**

By October 1, 2019, the pleadings on an earlier supplemental motion for new trial (Doc. 505) were complete and the Court had set an evidentiary hearing for the limited purpose of exploring when and why a pole camera was installed to surveil the entrance to Elton Simpson's apartment, why its existence was not disclosed to Kareem, and the circumstances leading to the failure to disclose.

On October 7, 2019, eight days before the evidentiary hearing, the Government provided new material information, including surveillance reports on Simpson between March 10, 2015 and April 27, 2015. The defense had no prior knowledge that the FBI had been surveilling Simpson during this time period nor that the FBI considered Simpson a threat to the 2015 Pat Tillman Run held in Tempe, Arizona. The circumstances surrounding this surveillance and the reason for conducting it has not been explored, developed, or addressed by the Court. The newly disclosed FBI 302s describe surveillance of Simpson beginning on March 10, 2015 through April 30, 2015 that at

times included detailed reports of where and with whom Simpson met, as well as photos of people that Simpson met with. There can be no doubt that if Kareem had been captured in one of the photos or described in one of the 302s as being with Simpson, the Government would have presented it to the jury to bolster its case that Kareem was a co-conspirator with Simpson. By the same token, his failure to be seen is material to Kareem's defense because it supports Kareem's testimony that he rarely saw Simpson in 2015 and contradicts Ali Soofi's testimony that in 2015, Kareem was often at Simpson's apartment and spent the night there three and four times a week.

At the outset of the evidentiary hearing the Court reaffirmed its limitation: "This is the time set for evidentiary hearing concerning the pole camera and its footage."[1] (10/15/19 RT 4.). The defense sought to call additional witnesses at the hearing, but the Court refused because it deemed the testimony beyond the scope of the hearing. (10/16/19 RT 274-76; 282-89). The Court repeatedly sustained objections to defense questions at the hearing on the grounds the questions were beyond the scope of the

---

1 During the August 9, 2019, conference call with the Court, the defense noted that its recent motion to dismiss requested an evidentiary hearing and that "might expand the issues, at least in our thoughts, beyond just the pole camera." (8/9/19 RT 9). That motion (Doc. 565), pointed out the need for an evidentiary hearing regarding the failure to disclose a number of items, not just the pole camera video. (Doc. 565 pp. 7-13, 19-21; See Doc. 565-4, Text of Proposed Order, ordering an evidentiary hearing on the motion to dismiss). In its response to the Government's motion for clarification and to expand the evidentiary hearing (Doc. 589), the defense argued for expansion of the hearing beyond just the pole camera. (Doc. 589 pp. 9-13). Also, the defense filed a motion to compel production of records and documents pertinent to the pole camera, beyond the limited nature of materials the Government agreed to provide. (Doc. 596).

hearing. (10/1519 RT 27, 33, 61, 77-78, 79, 113, 115-16, 137, 138, 175-76; 10/16/19 RT 246, 247, 256, 257, 258; 10/18/19 RT 307). The Government also objected to certain inquiries on the basis the information sought was classified. The Court accommodated those objections, carefully controlling the questioning. (10/15/19 RT 12, 184; 10/16/19 RT 214, 220). The prosecution did not invoke the procedures of the Classified Information Procedures Act (the "Act"), nor did it provide the defense with any summary of the sought information or stipulate to the relevant facts the classified information would tend to prove, as provided in Section 4 of the Act. In sum, the Court gave some latitude, but largely confined the testimony to just the pole camera video, its discovery and production.

The Court's order, Doc. 640, is largely confined to what was developed concerning the pole camera and the disclosures between the filing of the supplemental motion for new trial (Doc. 505) and its August 9, 2019 pronouncement regarding the scope of the hearing. The Order fails to mention or consider the surveillance done of Simpson from March 2015 through April 30, 2015. Due to the extent of this surveillance, the number of people involved in the surveillance, and the purpose of the surveillance it is equally if not more material to Kareem's defense than the existence of the pole camera and its failure to be timely disclosed. It is material to show the video and surveillance by the FBI and that should have been considered by the jury. The failure to have such evidence prejudiced the defense.

After the briefing on the prior motions to dismiss and for new trial were completed. The Government disclosed 302s that revealed the FBI had Simpson under surveillance from March 10, 2015 thru April 29, 2015 (Exhibit 12), and it was far more extensive than "spot" surveillance.

1. March 10 and 11, 2015, spot surveillance checks were made by SA Hebert on both days at both Simpson's apartment and his known work address.
2. April 1, 2015, SA Smith conducts surveillance at Simpson's suspected address from 6:50 a.m. until 8:15 a.m. or 1 hour and 25 minutes.
3. April 3, 2015, Task Force Officer ("TFO") Del Rio conducted surveillance at Simpson's apartment. There is no mention when it started, but at 1:00 p.m., TFO Del Rio saw Simpson exit his apartment alone and get into a car with license plate number AGV6488 with another male, Nadir Soofi. At 3:20, TFO Del Rio saw the vehicle return and photographed the vehicle and parking space. No mention is made of when TFO Del Rio terminated surveillance.
4. April 11, 2015, TFOs Altounian, Knuckols, Wilson, Denny and Del Rio conduct surveillance at Simpson's apartment. No mention is made of when surveillance began, but at 11:56 a.m., they saw Simpson leave the apartment and drive to a park in Peoria, Arizona. Simpson met with two males, one was identified as Lamont Jones and the other was unidentified; however, photos were taken of the three. Kareem was not there. Surveillance terminated at 1:30 p.m.

5. April 24, 2015, continuous surveillance of Simpson was commenced at an unspecified time by TFOs Altounian and Emfinger. At 12:41, they saw Nadir Soofi leave the apartment and drive to a Mosque at 9th Street. At 1:06 p.m., Simpson arrived at the Mosque. At 1:58 p.m., Simpson left the Mosque and returned to his apartment. At 3:20 p.m., Simpson left his apartment and went to Ali Baba restaurant. A second shift of surveillance took over at 4:02 p.m. This new team consisting of TFO Altounian, TFO Dow, SA Brown, SA Tobias, SA Jacobs conducted surveillance from 4:00 p.m. until midnight. At 5:20 p.m., Simpson returned to his apartment. Another surveillance team consisting of SA Nolen, SA Fryberger, and SSA Milnor surveilled Simpson's apartment from 12:00 a.m. on April 25, 2015 until 6:00 a.m.

6. Surveillance continued on April 25, 2015 by SA Hebert, SA Smith, SA Byrne, TFO Emfinger, TFO Denney and TFO Del Rio. Simpson left his apartment at 11:00 a.m. and drove to Paseo Park in Peoria, Arizona where he met with several individuals. None of these people have been identified as Kareem and there was no mention of photographs. Surveillance was terminated at 11:32 a.m.

7. SSA Milnor testified that the reason for the extensive surveillance on April 24 thru April 25, 2015 was a concern by the FBI that Simpson may have been planning an attack on the Pat Tillman Run that took place in Phoenix, Arizona on the morning of April 25, 2015. There has been no disclosure as to why the

FBI had this concern.

8. On April 26, 2015, SA Brown observed both Simpson's car and Soofi's car at the apartment between 7:24 a.m. and 7:35 a.m.

9. On April 27, 2015, SA Brown instituted surveillance at Simpson's apartment at 7:24 a.m. and observed Simpson and Soofi's vehicles in the parking lot and terminated surveillance at 8:20 a.m. after approximately one hour. SA Brown returned at 8:25 a.m. and noted that Soofi's vehicle was gone but Simpson's vehicle was present. SA Brown continued surveillance for another hour and a half with no meaningful observations and terminated surveillance at 9:59 a.m.

10. On April 30, 2015, the undercover agent ("UCA") investigating Jamal Erick Hendrick's and communicating with Simpson prior to the Garland attack, sent an email to the three FBI co-case agents in Phoenix assigned to the Simpson investigation, suggesting that Simpson was of concern and offering to share his observations;

11. On or about April 30, 2015, SA Smith responded to the UCA in some fashion, either by phone or email (10/15/19 RT 49-51), but the Court did not permit SA Smith to testify (10/16/19 RT 282-89) and the substance of that communication has not been provided;

12. On the evening of May 2, 2019, a supervisor in the Los Angeles FBI office called Supervisory Special Agent Glenn Milnor of Phoenix FBI, the supervisor of the squad handling the Simpson investigation, passing along information

that indicated Simpson was discussing his thoughts, but the LA supervisor was unsure if Simpson was going to participate in something, according to SSA Milnor's testimony (10/18/19 RT 304). Based on the call from Los Angeles, SSA Milnor talked with SA Smith and, at about 11:15 pm on May 2, 2019, traveled from his home to the apartment complex where Simpson and Soofi lived in an attempt to locate Simpson's vehicle (10/18/19 RT 299, 304). SSA Milnor noticed that Simpson's car was still at the apartment complex but Soofi's car was gone. He did not relay that information to the LA supervisor (10/18/19 RT 305).

13. On the evening of May 3, 2015, SSA Milnor talked with SAs Fryberger and Smith regarding reviewing the pole camera video to confirm whether Simpson and Soofi had left their apartment and what information could be obtained from the video captured (10/16/19 RT 260).

The above information was solely in the possession of the Government and beyond the reach of the defense. The Government withheld this information until more than three years after the verdicts and after the briefing on the motion for a new trial. The limitations on motions for new trial should not apply because the Government withheld the information and the defense could not have brought it to the Court's attention earlier. We incorporate the arguments and citations of Defendant's Memorandun re Government's Timeliness Arguments, Doc. 595. As an example, the Government produced an April 30, 2019, email from the UCA to SAs Nolen, Fryberger, and Smith,

but it refused to provide any information indicating the position and office assignment of those agents. (See Defense Motion to Compel Discovery, Doc. 525-1, pp.2-3 (Discovery request letter); and the Government response, Doc. 527, p.7.) Not until the Government produced surveillance reports on October 7, 2019, did the Government first reveal that SAs Nolen, Fryberger, and Smith were based in Phoenix, and not until the testimony of SA Fryberger was it clear these three were assigned the investigation of Simpson in the months leading up to the May 3, 2015, attack in Garland, Texas. Nor did the Government reveal that SA Smith responded to the UCA's email until SA Fryberger testified at the evidentiary hearing. (10/15/19 RT 49-50, 51). Not until SSA Milnor testified at the evidentiary hearing did the defense know that only Simpson in Arizona was considered a threat to the crowd assembled at the Pat Tillman Run. (10/16/19 RT 268). Had it known of this information, the defense would have brought it to the Court's attention at an earlier date.

The information cited above was material and would have been helpful to the defense at Defendant's trial. See Exhibit 1, Maynard's Declaration. It would have supported elements of the defense contention that the Phoenix FBI had failed to act ahead of the threat and had let yet another terrorist attack occur on U.S. soil because it was not watchful enough, even though it had clear warning in Simpson's social media and his contacts with the UCA. Phoenix FBI was embarrassed because of this shortcoming, and this is a rational explanation for its failure to disclose this information to the defense. Given the fact the prosecutors were the ones who discovered the existence of the pole

camera and its video, it establishes that the prosecutors had been relying upon the FBI to generate listings of materials the government would want to use in its case-in-chief (Fed. R. Crim. P. 16(a)(1)(E)(ii), and information material to preparing the defense (Fed. R. Crim. P. 16(a)(1)(E)(i).

Additionally, SA Whitson testified at the evidentiary hearing that on or about May 8, 2015, he became aware that the FBI in Phoenix had been surveilling Simpson prior to May 3, 2015 when he heard SA Smith mention that the FBI had done surveillance on Simpson's apartment. He said he spoke to SA Smith about the surveillance and that SA Smith said he conducted drive-by surveillance of Simpson and Soofi's apartment. However, SA Whitson testified that SA Smith never mentioned the pole camera at Simpson and Soofi's apartment. (10/15/19 RT 133-134) This needs to be explained because it is odd that when SA Smith learned that SA Whitson was heading up the Kareem investigation, he would not have told SA Whitson all of the facts surrounding the surveillance which would include the perceived threat by Simpson to the Pat Tillman Run, the 24 hours of surveillance that surrounded it, and the full extent of the surveillance of Simpson in the two months before May 3, 2015, and that SA Whitson would not have asked SA Smith about Kareem's presence in the Simpson investigation. Certainly if Kareem or his vehicle had been seen in any of this surveillance, it would have been material to SA Whitson's investigation of Kareem.

**A. Fifth Amendment Due Process claim under *Brady* and Rule 16(a)(1)(E)(i)**

The legal bases for a new trial has been briefed and will not be repeated other than

to state that arguments for dismissal are anchored in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and its progeny dealing with suppression of material evidence favorable to the defense that resulted in prejudice to the defendant and *Kyles v. Whitley,* 514 U.S. 419, 437-40(1995).

The Ninth Circuit explained the differing perspective of a prosecutor and a reviewing court when looking at particular evidence in *United States v. Olsen*, 704 F.3d 1172, 1183 n. 3 (9th Cir. 2013.) It is particularly difficult to predict the impact of a particular piece of evidence; thus, prosecutors should disclose favorable information without attempting to predict whether its disclosure might affect the outcome of the trial. *Id*. The retrospective view of materiality is appropriate only in the context of appellate review .

The Ninth Circuit dealt with the government's failure to disclose evidence in its possession until after the parties had rested in *United States v. Hernandez-Meza*, 720 F.3d 760 (2013). It noted that Fed. R. Crim. P. 16 requires the prosecution to disclose evidence it intends to use in its case in chief (Rule 16(a)(1)(E)(ii)) and evidence material to preparing a defense (Rule 16(a)(1)(E)(i). *Id*., at 767-69. There, the prosecution withheld evidence that defendant's mother applied to become a naturalized citizen in a trial where the issue was whether the defendant was an alien. If born to a naturalized citizen the defendant would have been a U.S. citizen. The suppressed application showed, however, that Hernandez-Meza's mother filed her application 18 years after he was born – he had no claim to derivative citizenship.

Hernandez-Meza asserted a derivative citizenship defense at trial, only to have the government move to reopen and offer his mother's application in evidence. The court of appeals found this unfair to Hernandez-Meza. "[He] was entitled to build his defense strategy on the assumption that he had seen all the items the government would present as part of its case." *Id*., at 768. So, too, was Kareem, but that proved to be not so.

The court found the failure to disclose the application violated the prosecution's duty to disclose information material to preparing a defense under Rule 16(a)(1)(E)(i). *Id*., at 768-69. The court began by noting that "materiality is a low threshold;" it is satisfied so long as the information would have helped Hernandez-Meza prepare a defense. *Id*., at 768 (citing *United States v. Doe*, 705 F.3d 1134, 1151 (9th Cir. 2013)). Even if it simply caused a defendant to completely abandon a planned defense and take a different path, information is "material." *Id.* Lack of knowledge that certain information exists, or even a showing of due diligence to ferret it out, will not excuse non-compliance with Rule 16(a)(1)(E), unlike subsections 16(a)(1)(D) and (F). *Id*., at 768.

The prosecutor has duty to seek out and disclose favorable evidence to the defense. Yet here, it seems the trial prosecutors find themselves in the same position as the Louisiana prosecutors in *Kyles*. Evidence from 2015 keeps popping up that the prosecutor's claim to have known nothing about until just before they disclosed it to the defense.

Also, it may seem strange to some and may seem intentional to others that SA Whitson, after learning on or about May 8, 2015 that FBI agents and Joint Task Officers in his own office had been surveilling Simpson, in March and April 2015, did not explore this further to see if Kareem, the suspect he is working to build a case against, was ever seen during the prior surveillance with Simpson or Nadir Soofi, his alleged two co-conspirators. At the recent evidentiary hearing, SA Whitson testified that he and SA Smith talked about the surveillance of Simpson and Smith "kind of almost bemoaned the fact that he [Simpson] had just gone." (10/15/19 RT 176) Also, SA Whitson testified that he put together a memo that brought together all the facts that took place between the time the Simpson investigation was reopened in 2015 and the Garland attack. (10/15/19 RT 141) SA Whitson said he tried to create his own timeline of when Simpson and Nadir Soofi left Phoenix. (10/15/19 RT 127-128) Since SA Whitson was aware about May 8, 2015 that the FBI had surveilled Simpson in 2015 prior to the attack and that SA Smith was involved (10/15/19 RT 133) it was odd or worse that SA Whitson did not disclose the fact of this surveillance to the prosecutors and did not take further steps to investigate it. SA Whitson testified that he never asked Simpson's case agents (SAs Smith, Fryberger, and Nolen) if they could tell him whether Kareem had contact with Simpson and Nadir Soofi during the investigation and surveillance of Simpson, even though SA Whitson was investigating Kareem. (10/15/19 RT 131) The Government surely would have claimed it probative and offered the evidence if Kareem had been seen with Simpson as part of its conspiracy case.

Also, SA Whitson was a central witness against Kareem since he conducted an interview of Kareem in which the recorder failed to work and every time he met with Ali Soofi, Ali's testimony against Kareem got worse and worse. Certainly Agent Whitson's credibility and bias should have been for the jury to decide taking his above actions into account. See United States v. Abel, 469 U.S. 45, 468-70 (1984).

**B. <u>Sixth Amendment Violation of Right to Present a Complete Defense and Interference with the Right to Effective Assistance of Counsel</u>**

The Supreme Court held in *Holmes v. South Carolina*, 547 U.S. 319 (2006) that a defendant has a Sixth Amendment right to present a complete defense, and a state procedural rule precluding a defendant from doing so could not stand. Holmes challenged the state's evidence, the handling of forensic evidence, and alleged a plot to frame him. In addition, he sought to introduce evidence that a third party was the murderer. The state court precluded the third party liability evidence based on a state evidentiary rule precluding introduction of such evidence when the state's evidence, particularly forensic evidence, was strong. The Court held that evaluation only of the prosecution's evidence as a basis to exclude defense evidence was arbitrary and violative of Holmes right to a "meaningful opportunity to present a complete defense." 547 U.S. at 331.

Here, Kareem challenged the testimony of Government witnesses and sought to demonstrate that he was not the planner, trainer, and "bankroller" as the Government painted him. He attempted to show that others influenced Simpson and Soofi, not he, because they were closer to radical Muslims and that others gave Simpson money that

was used for the attack. These were a part of his defense, but the Government action in suppressing evidence, or delaying its disclosure past the point of utility, deprived him of the right to present this evidence to the jury.

This suppression of information also interfered with Kareem's Sixth Amendment right to the assistance of counsel. As noted in *Strickland v. Washington,* 466 U.S. 668, 690-91 (1984), a lawyer's professional judgment about what approach to take rests on the bedrock of a thorough investigation of the case. A failure to make a full investigation before selecting and preparing the defense may rise to ineffective assistance of counsel. Uniformed-counsel's conduct may undermine the proper functioning of the adversary process such that the trial cannot be relied on to have produced a just result. *See United States v. Burrows*, 872 F.2d 915, 918 (9th Cir. 1989)(reversing conviction for failure to investigate a mental defense); *Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988) (holding a failure to investigate "cannot be construed as a trial tactic" where counsel did not even bother to view relevant documents that were available).

**Conclusion**

Here, defense counsel thought they knew their case but they were wrong. The fact of the surveillance and what it revealed or failed to reveal as to Kareem associating with Simpson is certainly material. Kareem was alleged to have conspired with Simpson and Nadir Soofi to attack the Mohammad Drawing Contest in Garland, Texas. Kareem testified he had very little contact with Simpson and Nadir Soofi in 2015 and any evidence that supported that is material. Additionally, the fact that the Government did not disclose

this evidence is material as to the credulity, bias and truthfulness of the Government's witnesses. Kareem requests an evidentiary hearing on why the FBI's surveillance of Simpson in 2015 was not disclosed to Kareem before trial and to explore the full extent of the surveillance and investigation of Simpson by the FBI in 2015.

RESPECTFULLY SUBMITTED this 23rd day of January, 2020.

**MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.**

/s/Daniel D. Maynard
DANIEL D. MAYNARD

**DRAKE LAW, PLC**

/s/Daniel R. Drake
DANIEL R. DRAKE

**CERTIFICATE OF SERVICE**

I hereby certify that on January 23, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrants:

/s/Stacey McClellan
Stacey McClellan