Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON CURRAN & REITER, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No. 003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Abdul Malik Abdul Kareem,<br><br>　　　　　Defendant. | 2:15-cr-00707-SRB<br><br>**DECLARATION OF DANIEL D. MAYNARD** |

Daniel D. Maynard, pursuant to 28 U.S.C. §1746, hereby affirms under penalty of perjury:

1.  I was the trial attorney for the Defendant Abdul Malik Abdul Kareem ("Kareem") in the above-captioned case and am co-counsel on his appeals to the United States Court of Appeals for the Ninth Circuit, C.A. No. 17-10067 and C.A. No. 17-10118. I make this Declaration in support of Abdul Malik Abdul Kareem's Supplemental Motion for New Trial and Motion to Dismiss ("Supplemental").

2. This Declaration is in addition to my Declaration signed on June 4, 2019 and attached to Kareem's Reply to the Government's Response to Defendant's Supplemental Motion for New Trial ("Declaration 1").

3. After my Declaration 1, the Government disclosed additional information for the first time before and during the evidentiary hearing that began on October 15, 2019.

4. Other than the evidence discussed in Declaration 1, the prosecution asserts that at the time of trial in February 2016, it was unaware of the following facts that were disclosed since Declaration 1:

(a) The fact the FBI had opened a new investigation on Simpson in March 2015;

(b) The fact that the Phoenix Office of the FBI began surveillance on Simpson in March 2015 and, on April 24 to 25, 2015, the FBI surveilled Simpson all day and that during this surveillance the FBI never saw Kareem at Simpson's apartment nor with Simpson;

(c) The fact the FBI was concerned that Simpson was going to initiate a terrorist attack on the Pat Tillman Run on April 25, 2015 but apparently had no concern about Kareem;

(d) The fact that the Undercover FBI Agent ("UCA") sent an e-mail to three Phoenix FBI agents on April 30, 2015 offering to explain why he believed Simpson had been communicating with him about the Mohammad Drawing Contest and that Simpson

should be of concern;

(e) The fact that an FBI agent in Los Angeles, California contacted SSA Milnor late in the evening of May 2, 2015 requesting information on Simpson and that, rather than check the video stream from the pole camera, SSA Milner drove to Simpson's apartment and noted Simpson's car was there but Soofi's was gone – we do not know who contacted SSA Milnor nor do we have any communication to the Los Angeles agent.

(f) The fact the Dallas FBI office contacted SA Smith in Phoenix about Simpson's whereabouts on the afternoon of May 3, 2015 and, instead of going to FBI office to view the live video feed that started on May 1, 2015, SA Smith drove to Simpson's apartment and reported that Simpsons' car was in lot so did not think he was to his way to Garland.

5. There are several items that are conspicuously missing that have not been disclosed but appear to exist:

(a) Documents explaining why the FBI believed Simpson was going to commit a terrorist attack at the Pat Tillman Run;

(b) Documents between SA Smith and UCA concerning why the UCA thinks he has been in communication with Simpson and any concerns either has about Simpson;

(c) Documents showing communications between SSA Milnor and Los Angeles FBI about Simpson and why Los Angeles FBI was concerned about Simpson on May 2, 2015;

3

(d) Documents or communications between Dallas FBI and SA Smith on May 3, 2015 concerning Simpson and why SA Smith did not view live feed, did not tell Dallas FBI Soofi's car was missing and did not disclose to Dallas FBI the inquiry from Los Angeles FBI on May 2, 2015.

6. The information about the FBI surveilling Simpson and their never seeing Kareem at the apartment nor Simpson going to Kareem's apartment nor their meeting each other supports Kareem's story and contradicts Ali Soofi's testimony. When coupled with Ali Soofi's testimony at Wahid's case, which I set forth in Declaration 1, this adds even more credence to Kareem and is impeachment of Ali Soofi.

7. The defense would have used this newly disclosed information to support Kareem's position that he did not see Simpson often in March and April 2015; support his position that Ali Soofi lied about his being at Simpson's three or four times a week; and, show that Kareem did not bankroll, train, nor assist Simpson and Nadir Soofi ("Soofi").

8. The Government's failure to make timely and complete disclosures adversely affected Kareem's ability to put on a proper defense.

9. Kareem's defense was that in large measure although he was friends with Simpson, they had been roommates years earlier, and had gone shooting with Simpson and Soofi with his friend Sergio Martinez and his young boys in the desert, he was not aware of the Mohammad Drawing Content before he learned that Simpson and Soofi had attacked it in Garland, Texas ("Garland"). He had not provided them with funds for

4

their endeavor, he did not spend a lot of time with Simpson and Soofi, he did not show them how to clean a gun, he had not encouraged them to attack anyone, nor had he known they were going to Garland, Texas.

10. In preparing a defense it is always important to review all of the evidence and assess how it fits into the Government's case against your client and the client's defense. The analogy of a complex jigsaw puzzle with many small pieces as the evidence is often appropriately used, including by SA Jensen. Seemingly insignificant pieces of evidence may become significant to both the defense and the prosecution as the case progresses but the defense is often saddled with creating its defense only after it understands the entirety of the Government's case.

11. The Government has suggested that the defense wants to relitigate earlier motions for new trial. This claim is untrue. The prejudicial effect of suppressed evidence is "considered collectively, not item by item." *Kyles v. Whitely*, 514 U.S. 419, 436 (1995); see Doc. 303, pp. 13-14. The fact that the Government continues to disclose material information over three years after Kareem's trial makes it relevant to look at ***all*** the late disclosures in assessing whether the motion for new trial or motion to dismiss should be granted.

12. As already discussed in prior briefs, the Government failed to disclose that:

(a) It had interviewed John Sabari ("Sabari") three times prior to trial and did not disclose any of the three reports until after the trial. As set forth in the earlier pleading Sabari would have been a key witness for Kareem to show that Kareem was not a follower

of Sheikh Faisal nor did he Skype with Simpson, Soofi or Sabari (Doc. 345, p. 1);

(b) The Government was investigating Erick Jamal Hendricks ("Hendricks") who the Government alleged to have conspired to provide material support to a foreign terrorist organization ("ISIS") and involved communications between Hendricks and an undercover FBI agent ("UCA") about the Draw Mohammad Contest in Garland, Texas (Doc. 432 and 452);

(c) The UCA communicated with Hendricks who put the UCA in contact with Simpson with whom he tweeted about the about the Mohammad Drawing Contest prior to the attack (Doc. 432 and 452);

(d) The UCA traveled to Garland and was told by Hendricks that he might see a "brother from Arizona" in Garland (Doc. 432 and 452);

(e) The UCA saw the attack, took photos just before the attack, and drove away while the attack was taking place (Doc. 432 and 452);

(f) On September 15, 2016, the Government produced approximately 850 pages of documents comprised of screen shots of Twitter communications between the UCA and Hendricks and the UCA and Simpsons (Docs. 432 and 452). These texts would have been used to show that Kareem was never mentioned and that Simpson was the motivator of the attack;

(g) Phoenix FBI opened a new investigation of Simpson in March 2015 and conducted surveillance on Simpson in March and April 2015 and never saw any contact between Simpson and Kareem.

(h)   The UCA was communicating with the SA Smith, SA Fryberger, and SA Nolen about Simpson on April 30, 2015;

(i)   An FBI agent in Los Angeles contacted SSA Milnor about Simpson on May 2, 2015;

(j)   The Phoenix FBI installed a pole camera to surveil Simpson, and Kareem is never seen on the video;

(k)   Why the FBI believed Simpson might conduct a terrorist attack on the Pat Tillman Run in April 2015, and was there any intelligence mentioning Kareem;

(l)   Why was the prosecution in Florida related to Garland attack not disclosed even though many of the same FBI employees were used in both cases.

13.   The Government has argued in opposition to our motion that by attacking the inadequacies of the FBI, Kareem was seeking jury nullification. (Doc. 527)

14.   The purpose for attacking the adequacy of the FBI's investigation was to show the jury how biased the FBI agents were in their investigation, testimony, and their findings. The argument was that this was not a search for the truth. It was an attempt to find a live person to charge. Once the selection was made, all efforts were made to demonstrate it had made the right choice. The defense is entitled to attack the thoroughness and even the good faith of an investigation.

15.   It was my intent to try and show that the FBI agents were biased in an effort to diminish their credibility in front of the jury, not to seek jury nullification. The fact that SA Whitson knew of the FBI's surveillance of Simpson in 2015 by at least May 8,

2015 and he failed to disclose it to the prosecutors and failed to investigate the facts of the surveillance of an alleged co-conspirator of Kareem's is relevant and material to SA Whitson's credibility and bias as a witness.

16. Thus, all of the evidence that we could gather to try and discredit the testimony of the FBI agents was important and useful. I hoped to show the jury that the FBI was not an unbiased agency but rather since September 11, 2001 has focused much of its resources on Islamic terrorist cases because it was embarrassed by the lack of intelligence that it had gathered prior to the 9/11 attack on America.

17. Thus, from the beginning the Government's primary evidence against Kareem appeared to be concerning Kareem's friendship and association with Simpson and the finding of certain materials on his computer which Kareem claimed he was not aware of or they had been placed on the computer by Simpson.

18. The thrust of the defense was to convince the jury that Kareem had severed much of his contact with Simpson; he did not tweet nor was he in contact with Muslim terrorists or extremists nor any Muslin terrorist or extremist sympathizers; that he had never heard of the Mohammad Drawing Contest in Garland before the attack, nor had other Muslims; and that he had not provided funds to Soofi and Simpson for their purchase of weapons nor for their trip to Garland, Texas. Kareem's lack of contact with Muslim terrorist sympathizers was why the interviews with Sabir were so important since Sabir and Simpson Skyped with a radical Jamaican Muslim Cleric and Kareem never did.

19. As discussed in my earlier Declaration 1, as the case neared trial Ali Soofi's testimony became more damning for Kareem and there appeared to be a correlation between his refreshed memory and his meetings with the FBI and in particular, SA Whitson, just as seems to have happened in the Wahid case. Thus, the credibility of Ali Soofi, the FBI agents, SA Whitson, and the FBI agency as a whole was important to the defense.

20. Based on all of the recently disclosed information, the defense would have done the following at trial if this information would have been disclosed in addition to what I stated in my first Declaration:

(a) Called SA Smith, SA Fryberger, SA Nolen and other FBI agents who conducted surveillance of Simpson in March and April 2015 to testify that they never saw Kareem at Simpson's nor Simpson with Kareem thus supporting Kareem's version of the facts and contradicting Ali Soofi.

(b) Called Steven Jane, UCA, to testify about his concerns regarding Simpson and his communications with FBI agents in Dallas and in Phoenix, in particular, his communication to SA Smith and SA Fryberger and SA Smith's response including his April 30, 2015 e-mail to SA Smith;

(c) Called SSA Milnor to discuss why he believed Simpson might attack the Pat Tillman Run and whether there was any information about Kareem attacking the Pat Tillman Run or any other event including the Mohammad Drawing Contest;

(d) Called SA Smith who checked on Simpson's car being in the apartment parking lot on May 3, 2015, to discuss why he did not view video stream from the pole camera, his communication with UCA, what he discussed with SA Whitson regarding the investigation of Simpson;

(e) Asked additional questions of SA Whitson, who side-stepped several areas of inquiry about Nurse, the pole camera, the UCA, and the investigation by the FBI into Simpson starting in March 2015 where he was the case agent;

(f) Called Nurse to testify about the money he gave to Simpson and show Kareem did not fund Simpson;

(g) Called Sabari to testify that he, Simpson and Soofi Skyped with a Jamaican radical Islamic cleric and that Kareem never did, thus supporting Kareem's testimony that he was not radicalized like Simpson; and,

21. Had all of this information been disclosed before trial, it would have impacted the defense's trial preparation and strategy and the witnesses we would have called and our attack on the thoroughness and the good faith of the FBI's investigation.

22. The recently disclosed information was material to Kareem's defense.

DATED this 23rd day of January, 2020.

_Daniel D. Maynard_
Daniel D. Maynard

10