GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

KRISTEN BROOK
Arizona State Bar No. 023121
JOSEPH E. KOEHLER
Arizona State Bar No. 013288
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: kristen.brook@usdoj.gov
Email: joe.koehler@usdoj.gov
Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Abdul Malik Abdul Kareem,<br><br>Defendant. | No. CR-15-00707-01-PHX-SRB<br><br>**OBJECTIONS TO PRESENTENCE REPORT; ALTERNATIVE MOTION FOR UPWARD DEPARTURE** |

The United States of America respectfully submits its objections to the Presentence Report. The Presentence Report should include an upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1, and a sentencing enhancement pursuant to U.S.S.G. § 3A1.4, raising the Total Offense Level should be 43 pursuant to U.S.S.G. Ch. 5, Pt. A cmt. n.2. If the Court declines to impose the upward adjustment pursuant to § 3A1.4, the government respectfully moves for an upward departure pursuant to Application Note 4 to § 3A1.4.

Because the scheduled re-sentencing is on an open record, the Court is free to consider all information in the case in determining the appropriate guideline range. *See United States v. Ruiz-Alvarez*, 211 F.3d 1181, 1184 (9th Cir. 2000) (defendant sentenced on multiple counts; after count vacated on appeal sentencing package became unbundled

and court had authority "to put together a new package reflecting its considered judgment" regarding appropriate punishment on remaining counts). The application of the obstruction of justice adjustment (U.S.S.G. § 3C1.1) and terrorism enhancement (U.S.S.G. § 3A1.4) are both relevant to determining the overall sentence, for which the Court must calculate a single Sentencing Guideline range as required by U.S.S.G. §§ 3D1.4; 5G1.2; *see also United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010) (where the guidelines recommendation was life in prison but none of the crimes of conviction allowed for a life sentence, the district court correctly imposed consecutive maximum sentences on all counts). In this case, the correct Guidelines range is the combined statutory maximum for the five counts of conviction, 35 years in prison.

The court is more than familiar with the factual and procedural background of the case, so this memorandum will focus on the facts and law pertinent to application of §§ 3C1.1 and 3A1.4. The government will file a separate Sentencing Memorandum to discuss the application of § 3553(a) factors at sentencing.

## I.   APPLICATION OF § 3C1.1

Section 3C1.1 of the Sentencing Guidelines provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. The upward adjustment for obstruction of justice applies to "threatening, intimidating, or otherwise unlawfully influencing a . . . witness, . . . directly or indirectly, or attempting to do so." U.S.S.G. § 3A1.4 cmt. n. 4(A). It also applies to "committing . . . perjury." *Id*. cmt. n. 4(B).

Kareem willfully attempted to obstruct or impede the administration of justice with respect to the investigation and trial in this case. First, Kareem attempted to convince witness Sergio Martinez-Chavez not to tell the FBI about a critical fact – that he had arranged with Martinez-Chavez to take Simpson and Soofi to practice shooting in the

desert.  Second, Kareem deleted evidence from his Acer Aspire computer and Nextbook tablet, and from his Google search history.  Third, Kareem willfully testified falsely under oath during his trial.

A.  Attempt to Prevent FBI from Finding Proof About Shooting in the Desert

Within approximately one week after the attack occurred, Kareem visited Martinez-Chavez at his house.  (RT 2/23/16 911-912, 934.)  Kareem instructed Martinez-Chavez not to say anything about going shooting in the desert with Simpson and Soofi if he was questioned:  "As I was walking past him, he (Kareem) brushed up against my shoulder and whispered, 'If questioned, don't say anything about going shooting.'"  (RT 2/23/16 934.)  When asked what that meant to him, Martinez-Chavez stated,  "He didn't want anyone to know."  (*Id.*)

Martinez-Chavez initially honored Kareem's request.  When the FBI first approached him, Martinez-Chavez denied having gone shooting with Kareem, Simpson, and Soofi.  (RT 2/23/16 946.)  Agents warned Martinez-Chavez that it was a crime to lie to them.  He then told them about going shooting in the desert and led agents to the location where the event took place.  (RT 2/23/16 947; RT 2/24/16 967.)  Agents recovered shell casings and other evidence from the desert scene.   (RT 2/24/16 969-983.)

The evidence established that Kareem knew about the planned attack on the contest in advance.  It further established Kareem knew on May 3, 2015, that Simpson and Soofi had been killed in the attack.  Kareem was interviewed two days later, on May 5, 2015, and asked about whether he went shooting in the desert with Simpson and Soofi.  Thus, Kareem knew about the attack and that the FBI was investigating his involvement in the conspiracy before he spoke to Martinez-Chavez.  Kareem's statement made clear that he acted to conceal information from the FBI, whom he did not want to discover he took Simpson and Soofi shooting in the desert.  His act of going to Martinez-Chavez's house and warning him not to tell the FBI about going shooting was deliberate and showed Kareem intended to obstruct the investigation.

With respect to an attempt to influence a witness, § 3C1.1 does not require the government to prove more than an attempt to unlawfully influence the witness. *United States v. Phillips*, 367 F.3d 846, 859 (9th Cir. 2004) ("§ 3C1.1's enhancement is triggered when a defendant attempts to influence a witness," and "the guidelines do not require materiality when a defendant attempts to influence a witness."). Thus, Kareem's willful act of attempting to have Martinez-Chavez conceal information from the FBI when questioned is in itself sufficient to trigger the upward adjustment for obstruction of justice.

B. Deletion of Evidence from Computer and Google Search History

When agents and analysts reviewed the content of Kareem's devices and his Google search history, it became apparent he had deleted relevant evidence from both. For instance, his viewing of the Flames of War video had been deleted from the computer. (RT RT 2/23/16 834-835, 868.) He deleted other relevant files, including searches for al-Awlaki lectures and extremist websites and accessing those items, from the computer as well. (RT 2/26/16 1485-1487; RT 3/1/16 1514-1521, 1540-1541; RT 3/9/16 2627-2630, 2632-2634; Tr. Exh. 488-492.) Similarly, Kareem's Nextbook tablet contained fragments of evidence of at least one ISIS video that had been deleted. (RT 2/26/16 1487-1488.) Similarly, between May 21, 2015, and June 9, 2015, Kareem deleted his Google search history at least once. (RT 2/26/16 1476-1479.) The deletions of files from the Acer computer and Nextbook tablet as well as Kareem's Google search history after the Garland attack reflects willful conduct to destroy relevant evidence in the case.

The evidence from Kareem's computers and Google search history was material to the FBI's investigation. Although agents recovered portions of the evidence from those items, they may have recovered more information, including dates and times of accessing files, had they not been deleted. (RT 2/26/16 1485-1487; RT 3/1/16 1514-1521, 1540-1541; RT 3/9/16 2627-2630, 2632-2634.) These acts similarly were sufficient to trigger the obstruction adjustment. U.S.S.G. 3C1.1 cmt. n.4(D) ("destroying . . . evidence that is material to an official investigation").

C. <u>False Testimony at Trial</u>

    1. Kareem's False Testimony

Kareem willfully provided false testimony at trial. Kareem testified that he had never heard of the Garland contest until after Simpson and Soofi attacked the contest. (RT 3/8/16 2383.) He denied any involvement in acquiring weapons or ammunition for Simpson and Soofi. (RT 3/8/16 2348-2349.) He denied any involvement in their plans to commit attacks in the name of ISIS, and denied any involvement in the plan to attack the contest. (RT 3/8/16 2383.) The jury necessarily found all these statements to be false in returning their guilty verdicts.

Kareem also testified that he split the purchase of the .38 special ammunition with Simpson. (RT 3/9/2016 2486.) However, he told agents during his interview that "we bought some ammunition and that was for me. . . . it wasn't for him, it was for me." (Tr. Exh. 428.)

Kareem testified that someone called and told him Simpson and Soofi bought AK rifles but he did not remember who that person was. (RT 3/8/16 2348; RT 3/9/16 at 2467) Later he testified that it was two calls. (RT 3/9/16 2484.) He also testified that he either heard from Simpson and Soofi about plans to shoot up a Marine or other military base, or heard about the plans from Abdul Khabir Wahid.[1] (RT 3/8/16 2396.) Kareem stated he "didn't think anything of it." (RT 3/9/16 2423.) He also testified that he didn't tell the FBI about the plan to attack the marine base because, "I didn't think it was anything." (RT 3/8/16 2424.) In short, Kareem testified that any discussion about attacking a military base was not important enough to resonate with him. (RT 3/9/16 2423.) Then he changed his story and said that AK and he never talked about the plan to attack the marine base, "AK never mentioned that conversation to me and I never mentioned that to AK." (Id.). This testimony was patently incredible – no reasonable person would hear of plans to shoot up

---

[1] Wahid recounted a similar conversation. (RT 3/8/16 2219-2220.)

a military base and think it unimportant, testify to having had a conversation about it, and then change the story and deny having had the conversation in the first place.

Further, in the most demonstrably false aspect of his testimony, Kareem claimed his Acer Aspire computer, which was the source of a number of trial exhibits, had quit working around November 2014 and he had not used it since. (RT 3/9/16 2452-2453.) Kareem's testimony on this point was intended to convey the impression that he was not the person who accessed the ISIS Flames of War video on the Acer Aspire computer. (RT 3/23/16 833-836; Tr. Exh. 187; RT 3/8/16 2322-2323.) However, the access logs for the Acer Aspire revealed that Kareem had been using it after May 3, 2015 – the access logs showed the computer was in use and tethered to Kareem's Maxwest cellular phone on May 30, 2015.[2] (RT 2/23/16 836; RT 2/26/16 1439-1441; Tr. Exh. 481.)

2. Kareem's False Testimony was Willful and Material

Kareem's false testimony was willful if he consciously "act[ed] with the purpose of obstructing justice," as opposed to testifying falsely as a result of "confusion, mistake, or faulty memory." *United States v. Taylor*, 749 F.3d 842, 848 (9th Cir. 2014) (internal citations omitted). It is sufficient to find that a defendant consciously lied with the intent to influence the outcome of the proceeding. *Id*. There can be no question of Defendant's intent when he testified falsely at trial in this case. He testified at length and responded to specific aspects of the case against him in ways designed to undermine the value of the testimony and exhibits that had been admitted.

There is also no question that Kareem's lies were material. Material statements relate to "information that, if believed, would tend to influence or affect the issue under determination." *Id*. at 847. If the jury had believed Kareem's testimony, that testimony would have directly negated the elements of the crimes charged. Kareem's statements were therefore material, and the Court should make an explicit finding of such to support the obstruction of justice enhancement.

---

[2] Kareem also denied having tethered the Acer computer to the Maxwest phone. (RT 3/8/16 2452.)

Because Kareem willfully attempted to influence Sergio Martinez-Chavez to conceal information from the FBI with the intent to impede the investigation, willfully deleted electronic evidence, and willfully provided material false testimony during his trial, the Court should impose the two-level upward adjustment provided in § 3C1.1.

## II.    APPLICATION OF § 3A1.4

The Court previously declined to apply the terrorism enhancement because it found that there was "not clear and convincing evidence[3] the conspiracy was calculated to influence or affect government conduct."  (CR 492 at 1.)   The government respectfully requests the Court reconsider this decision on the open record before it in light of the evidence and argument set forth below.

### A. *Evidence Proved the Conspirators Possessed the Mens Rea* for § 3A1.4

Section 3A1.4 of the Sentencing Guidelines applies to a "felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4.  The terrorism enhancement applies when a terrorism crime (including a violation of 18 U.S.C. § 2339B) was committed in a manner "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5)(A) (incorporated by U.S.S.G. § 3A1.4 cmt. n.1).

Although the material support statute, § 2339B, "requires only that the defendant have 'knowledge of the foreign group's designation as a terrorist organization or the group's commission of terrorist acts,'" the terrorism enhancement in § 3A1.4 "requires the defendant's specific intent that the offense 'influence or affect the conduct of government by intimidation or coercion.'"  *United States v. Alhaggagi*, 978 F.3d 693, 701 (9th Cir. 2020).  The enhancement in § 3A1.4 also includes an offense calculated to "retaliate against government conduct."  18 U.S.C. § 2332b(g)(5); U.S.S.G. § 3A1.4 comment (n.1).  "Congress created this distinction in order to punish certain dangerous terrorists more severely than persons who committed non-violent crimes." *Alhaggagi*, 978 F.3d at 699.

---

[3] As explained in more detail *infra*, the government respectfully submits the preponderance standard applies to the terrorism enhancement in this case.

B. The Standard of Proof in this Case Should be Preponderance of the Evidence

Ordinarily, the preponderance standard of proof applies to disputed sentencing factors. *United States v. Pike*, 473 F.3d 1053, 1057 (9th Cir. 2007) (citing *United States v. Riley*, 335 F.3d 919, 925 (9th Cir. 2003)). In cases in which a guideline enhancement creates an "extremely disproportionate" impact on sentencing, the Ninth Circuit has required a heightened standard of proof, requiring clear and convincing evidence in support of the enhancement. *See Id.; United States v. Jordan*, 256 F.3d 922, 927 (9th Cir. 2001).

In *Jordan*, the court confirmed the six factors for determining whether to apply the clear and convincing standard that it had originally announced in *United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000):

> (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether the increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Jordan*, 256 F.3d at 928 (quotation marks omitted).

The Presentence Report, filed September 14, 2021, provides a Base Offense Level of 38, with an upward adjustment of 2 levels for the use of body armor in the offense pursuant to U.S.S.G. § 3B1.5(1), and arrives at an Adjusted Offense Level of 40. PSR ¶ 45. The multiple count adjustments do not result in any change and no adjustment for acceptance of responsibility applies, so the Total Offense Level remains at 40. PSR ¶ 58. The resulting guideline range is 324-405 months. PSR ¶ 92.

The PSR incorrectly states the range of 325-405 months exceeds the combined statutory maximum prison terms. PSR ¶ 92. The combined maximum terms are 5 years each for Counts 1 and 3, 10 years for Count 4, and 15 years for Count 5, for a total of 35 years. PSR ¶ 91. Thus, the combined statutory maximum is 420 months, which is greater than 405 months.

If the Court sustains the government's objection regarding § 3C1.1 above, the Total Offense Level would be 42, and the resulting range would be 360-life, but in this case, 360-420 months. Depending on the Court's ruling on the applicability of the obstruction enhancement, application of the terrorism enhancement pursuant to § 3A1.4 will result in an increase of either one or three levels. As a result, the terrorism enhancement would have a minor impact on the guideline range, because the resulting increase is between zero and 15 months.

In this case, the *Valensia* factors weigh heavily in favor of applying the preponderance standard, not a standard of clear and convincing evidence. First, the upward adjustment in § 3A1.4 would, if the guidelines went above Level 43, result in a range above the statutory maximum penalties for Kareem's offenses of conviction. The statutory maximum, therefore, becomes the applicable range. U.S.S.G. §§ 5G1.1(a), 5G1.2(d). That said, the existing guideline range without the obstruction enhancement is only 15 months below the combined statutory maximum terms of imprisonment. With the obstruction enhancement, the range at Level 42 provides a maximum term of life imprisonment, which also would exceed the combined statutory maximum penalties. Of course, the guidelines restrict the maximum sentence to the statutory maximum. U.S.S.G. §§ 5G1.1, 5G1.2. Thus, the impact of applying the terrorism enhancement would be minor.

Second, the enhanced sentence would not negate or nullify the government's burden of proof. The terrorism enhancement relates directly to the charged conspiracy to provide material support to ISIS. Therefore, Kareem's convictions support the enhanced sentence.

Third, the facts supporting the terrorism enhancement do not create new offenses; they represent the conduct that formed the gravamen of Counts 1 and 5. Nor do the facts supporting the terrorism enhancement create new offenses requiring separate punishments.

Fourth, the increase in the sentence is not based so much on the extent of the conspiracy as it was the purpose of the conspiracy, which was charged and proven at trial.

Fifth, the increase in offense level is either three or one depending on the Court's ruling regarding the obstruction adjustment, but in any event is less than four.

Sixth, the length of the enhanced sentence does not more than double the length of the initial range as presently stated in the PSR, and this is not a case in which Kareem otherwise would receive a relatively short sentence. The increase at the low end of the range is from 324 to 420 months (96 months), and at the high end is from 405 to 420 months (15 months).

The *Valensia* factors, in the totality of the circumstances, weigh overwhelmingly against applying the clear-and-convincing standard of proof. Therefore, the Court should apply the preponderance standard. *See Pike*, 473 F.3d at 1058-59 (courts apply totality of circumstances evaluation of *Valensia* factors; finding preponderance standard applied when only one factor supported use of clear-and-convincing standard).

C. Evidence Supporting Application of § 3A1.4

The evidence at trial showed that Kareem conspired with Elton Simpson (Simpson) and Nadir Soofi (Soofi) to provide material support to ISIS by conducting attacks in the United States. The Garland attack was the culmination of the conspiracy, although Kareem, Simpson, and Soofi considered other targets along the way – including U.S. military service members, U.S. military bases, U.S. military recruitment centers, and a public mall. Importantly, the jury necessarily found Kareem knew the object of the conspiracy (to provide material support to ISIS) and intended to help accomplish that object. (CR 287 at 13, 15.)

The evidence also showed Kareem, Simpson, and Soofi sought to further ISIS's objectives of retaliating against opposing governments by murdering civilians and torturing soldiers. They further supported ISIS's ultimate goal of drawing Western governments into an apocalyptic battle that would bring about a global Caliphate, whether through the taking of territory in the Middle East or through killing innocent civilians around the world.

Among other things, Kareem admittedly watched ISIS beheading videos and the video of a Jordanian pilot being burned alive, while in Simpson's company, and also talked to Simpson about ISIS. Multiple witnesses testified they witnessed Kareem, Simpson and Soofi celebrate and cheer the attackers who murdered 11 people on January 11, 2015,

inside the offices of the French satirical magazine Charlie Hebdo, after the magazine published cartoons of the Prophet Muhammad.[4]

Witness testimony provided insight into the minds of Kareem, Simpson, and Soofi, helping to demonstrate their conspiracy was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

### 1. Evan Kohlmann

Expert witness Evan Kohlmann provided a substantial amount of background information about ISIS, its motivations, its recruiting strategies, and its directives to people seeking to join it and/or further its objectives. "The Islamic State recruits people both directly and indirectly and has aggressively encouraged people to carry out acts of violence on its behalf." (RT 3/1/16 1582.) One of the reasons for ISIS's public media campaign showing violent acts is to terrify or intimidate its enemies. (RT 3/1/16 1586.) "[T]hey hope to intimidate the United States. They hope to intimidate Arab governments. They hope to intimidate the governments of Syria and Iraq and others, including France, the United Kingdom, European states, almost everyone." (*Id.*)

ISIS's execution videos are intentionally-designed, with the victims commonly dressed in orange jumpsuits. (RT 3/1/16 1588.) "The orange jumpsuit is meant to signify the same jumpsuits being worn by detainees in Guantanamo Bay, Cuba." One such video, a screenshot from which was Exhibit 459 (which came from Kareem's Nextbook tablet computer), was titled "A Message to the Kurds, Barzani, and the Americans. (RT 3/1/16 1587-1588, 1590; Tr. Exh. 459.)

Kohlmann testified ISIS made clear to its adherents they had an obligation to make Hijrah, i.e., travel to the Islamic State and "become part of the state and help build the state." (RT 3/1/16 1606.) For a person lacking the means to join ISIS in the Middle East,

---

[4] Expert testimony at trial from Evan Kohlmann established that "ISIS ha(d) offered monetary rewards and had repeatedly encouraged individuals living in Western countries to assassinate and to murder anyone involved in blaspheming the Prophet Muhammad, including the individuals involved with Charlie Hebdo." (RT 3/1/16 1600-1601). The attacks were in direct response to the exercise of free speech. (RT 3/1/16 1600.)

it was that person's "obligation to support the Islamic State in your own backyard. And by that they mean carrying out acts of violence directly inside of Western countries." (*Id.*)

### 2. Lorenzo Vidino

Expert witness Lorenzo Vidino noted the trajectory of al-Awlaki's teachings grew more violent in the 2005-2006 timeframe, while noting that even his earlier teachings created "a narrative of confrontation with the West, a narrative of victimization that is conducive to violence." (RT 3/9/16 2582-2583.) These factors made al-Awlaki's early writings and sermons inspirational and important to homegrown violent extremists long after his death. They form part of a "narrative whose logical consequence is violence." (RT 3/9/16 2583-2584.) The "Battle of the Hearts and Minds" lecture, a search for which appeared on Kareem's Lenovo laptop, is part of this narrative – al-Awlaki notes in it that the West and Islam are incompatible, among other things." (RT 3/9/16 2587-2588.)

### 3. Stefan Verdugo

Stefan Verdugo, a long-time friend, former employee, and former roommate of Kareem's, testified that Kareem called people who weren't Muslims "Kaffirs," and talked about "wanting to blow Kaffirs up and he would yell 'Allahu Akbar' while he did it.' " (RT 2/19/16 637-638). Verdugo testified that Kareem, Simpson, and Soofi were upset that the people who committed the murders at the Charlie Hebdo magazine and elsewhere in Paris, France, had themselves been killed following the attacks. (RT 2/19/16 at 642.) "They said that -- that they needed to get revenge for their brothers. And then they started talking about like something big happening on the West Coast." (RT 2/19/16 at 643.)

Kareem told Verdugo "that he was a part of ISIS." (RT 2/19/16 648). Verdugo testified that Kareem was "like really intense about how he would speak about it (ISIS)." (*Id.*). Verdugo also witnessed Kareem and Simpson watch "gorish (*sic*) videos about like terrorist attacks or supposed U.S. military gunning down Muslims for no reason. And they would watch this for like a few hours a night . . . ." (RT 2/19/16 at 648-649.) While watching videos of ISIS members killing people, Kareem, Simpson, and Soofi would discuss them: "They would say pretty much, you know, like that's what they deserve. That

those, you know, that's what happens when you mess with the Muslims. Well, pretty much when you mess with ISIS, you know, ISIS doesn't play." (RT 2/19/16 650.)

After the New Year in 2015, Kareem also asked Verdugo "several times" if Verdugo knew "where to get pipe bombs or how to make pipe bombs." (RT 2/19/16 638, 653.) Kareem and Simpson together specifically asked Verdugo how to make a pipe bomb that could blow up University of Phoenix Stadium (home of the Arizona Cardinals NFL team and the site of the Super Bowl in February 2015). (RT 2/19/16 643, 689.)

    4.    Juan (Juvenile)

Juan, a former neighborhood friend of Kareem's who sometimes slept at Kareem's house, testified that he overheard Kareem discuss the Garland drawing contest, prior to the event, at Kareem's home on Cochise. (RT 2/24/16 1093, 1100-1103.) Juan was in the hallway and heard and saw Kareem and Simpson discuss the contest. (RT 2/24/16 1101-1102.) Juan testified that he heard Kareem getting mad at "whoever was doing the drawing contest or whoever was hosting it. . . . I can hear him saying that he just wanted to go over there and just shoot them." (RT 2/24/16 1102.) Juan testified that he heard Kareem discuss attacking the contest on two other occasions: Kareem "kind of wanted to go over there and just continue talking about shooting people and just making it seem like it's no big deal and that it's his religion that he should be able to defend it." (RT 2/24/16 1107.)

Juan also testified that he heard Kareem say, on more than one occasion – prior to the Garland attack, that "he wanted to literally strap himself to a bomb and go inside a mall with innocent people and just blow everything up." (RT 2/24/16 1098.) Juan testified that Kareem said on another occasion, "he just wanted to strap himself to a bomb and go inside a mall and kill people." (RT 2/24/16 1100.)

Kareem also showed Juan a video about the end of the world. Juan recalled that "once the trumpets of – I don't remember the name of the Prophet that they were talking about – but I know that it talked about that once the trumpets started to sound in the sky, that the Apocalypse was coming." (RT 2/26/16 1109.) Kareem told Juan, "maybe I should

take it into consideration because the signs and the evidence were there that were described in the Bible that the end of times is coming soon."  (RT 2/26/16 1110.)

Kareem's statements about the "end times" were consistent with ISIS ideology and its self-declared purpose of pursuing an apocalyptic battle with the West.  The government introduced records of "end of times" videos being watched from Kareem's computer that corroborated Juan's account.  (RT 2/23/16 796, 839; Tr. Exh. 260, 453, 454, 455.)

5.      Carlos (Juvenile)

Carlos, a former neighborhood friend of Kareem's who often slept at Kareem's house, testified that Kareem spoke to him about the Garland contest before it occurred.  (RT 2/24/16 1070.)  Carlos testified that he converted to Islam at Kareem's insistence because "it was technically a mandatory thing . . . if I wasn't Muslim, I would be considered a Kaffir, you know." (RT 2/24/16 1063-1064.)  Kareem told Carlos that he would "shoot a Kaffir" if he had to.  (RT 2/24/16 1074.)

On one occasion, at Kareem's house, Kareem woke Carlos up and had him watch the video of a Jordanian pilot burned alive by ISIL.  (RT 2/24/16 1068-1069, 1081.)  Carlos and Kareem watched the pilot as he "was screaming and he was like – he was just in a cage being burned alive." (RT 2/24/16 1069.)  The whole time Kareem was "laughing because he was like obnoxious and loud … continuously laughing."  (RT 2/24/16 1068-1069.)

6.      Ali Soofi

Ali Soofi testified Kareem would discuss his support of ISIL with Simpson and Soofi, and "everything that was being watched and all the literature that was being read and listened to was -- it was more the militant, more ISIS-side of, you know, Islam." (RT 3/2/16 1751.)  Ali began to feel unsafe at the apartment as the talk about ISIS got more intense.  (RT 3/2/16  1752-1753.)  Ali testified that as a non-believer, he was an outcast in the house, a Kafir.  (RT 3/2/16 1758.)  On a couple of occasions, Kareem told Ali "these people (Kaffirs) should be killed." (*Id*.)  Ali testified that Kareem looked pleased as he watched an ISIL execution video.  (RT 3/2/16 1756-1757.)  Ali also testified that Kareem, alongside Simpson and Soofi, watched the news reports of the Charlie Hebdo attacks in

January 2015 at the apartment. (RT 3/2/16 1763.) Kareem looked "excited" and "pleased" about the attack, that the attackers had "got their message across." (*Id.*)

When ISIS glorification videos were playing, Kareem said: "[P]eople need to learn their lesson. That nonbelievers, you know, will basically learn their place in this world in the end." (RT 3/2/16 1756.) Ali testified that Kareem, Simpson, and Soofi would discuss the end times. "[T]hat was a constant discussion. I mean, towards the end, I mean – I mean, towards the end when my brother started acting more radical, it was a constant discussion of the different prophesies that have occurred already. The constant worry of, you know, just in general, the different prophesies that have been foretold are happening. So they said it's a matter of time, you know." (RT 3/2/16 1764.) Ibrahim, Nadir Soofi and the defendant were all part of the discussions. (*Id.*)

7. Abdul Khabir "AK" Wahid

Abdul Khabir "AK" Wahid testified, as a defense witness, that he learned from Kareem before the attack in Garland that Simpson and Soofi planned to attack a military base. (RT 3/8/16 2264-2265, 2267.) He also heard the same information from Simpson. (RT 3/8/16 2219-2220.)

8. Nicole Medellin

Nicole Medellin testified at trial that she knew Kareem through her boyfriend Sergio Martinez, and that Kareem had lived with her and Chavez for about a year. (RT 2/23/16 904-905.) Medellin testified that she first met Kareem roughly eleven years before, in 2004. (*Id.*) Medellin testified about a time when Kareem was living at her home and discussed the United States military. (*Id.*) Kareem said "all of the military should die because of what they were doing to the innocent people and kids that were overseas." (RT 2/23/16 906.) Medellin told Kareem that her uncle was a marine, to which Kareem responded, "[y]eah, well he should die too because of what they're doing to the kids is just wrong." (RT 2/23/16 906.)

9.     Trial Exhibits

The trial exhibits in the case likewise helped to demonstrate the conspiracy in this case was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

A thumb drive that was attached to Kareem's Lenovo laptop seized in 2012 contained a so-called legal treatise justifying the use of weapons of mass destruction (nuclear, chemical, and biological weapons) against the United States.  (Tr. Exh. 176.)  It also contained an issue of Inspire Magazine[5] that featured an article written by Anwar al-Awlaki entitled, "Targeting the Populations of the Countries that are at War with the Muslims." (Tr. Exh. 179 at 21.)  In the article, al-Awlaki notes scholars agree various non-combatants in countries "at  war with the Muslims" are "legitimate targets" if they "participate in the war effort against Muslims either by actual participation in fighting, financial contribution or opinion." (*Id*.)  In other words, having an opinion supporting the actions of the United States or paying taxes to the United States makes a person a legitimate target in retaliation for the actions of the United States government and military.  Such retaliation can include the use of explosives, poisons, or chemical/biological weapons in populated areas, or firing randomly at crowds.  (*Id*. at 24.)

Another document on the device was a re-publication of al-Awlaki's article "to make it known to people…and not to hide," in which al-Awlaki lamented America's influence with middle eastern governments and declared, "Second: Don't consult with anyone in killing Americans. Fighting Satan does not need any religious verdict, consultation, or prayer for guidance in decision making. They are the 'Party of Satan.'" (Tr. Exh. 177.)  Kareem had numerous recordings of al-Awlaki speeches, and admitted having viewed Inspire magazine.  (RT 3/8/16 2390, 2393; RT 3/9/16 2450, 2474.)  All of these materials were consistent with Kareem's expressions of hatred toward the United

---

[5] "Inspire Magazine . . .  is a completely self-contained training manual, both ideological and practical, everything from learning the ideas of violent jihad and Anwar al-Awlaki to how to build remote detonators, how to build explosive devices."  (RT 3/1/16 1657-1658)

States and desire to do something in retaliation for the actions of the American military in the Middle East.

Simpson's Twitter posts reflected a similar desire, not simply to retaliate against individuals for engaging in speech, but to influence and retaliate against United States government actions. Among other things, Simpson posted on Twitter a picture of caged ISIS prisoners and in turn compared the photo to the United States government's treatment of prisoners at the detention facility in Guantanamo Bay, Cuba. (Tr. Exh. 157 at 35.) Simpson tweeted an image of the Flames of War video, an ISIS propaganda video challenging Western governments including the United States. The collage image included an image of then-President Barack Obama making clear the intent to threaten the United States government. (Tr. Exh. 157 at 7.) Kareem accessed the same video on his computer. (RT 2/23/16 834-835; Tr. Exh. 187.)

The trial evidence showed Simpson accessed a list of United States military personnel from his phone. (RT 3/1/16 1529-1530; Tr. Exh. 494.) The list was published by a group calling itself the Islamic State Hacking Division. (RT 3/1/16 1613-1614.) The name and address of a military member residing in the Phoenix metro area was written in a notepad found in the Simpson/Soofi apartment. (RT 3/1/16 1615-1617; Tr. Exh. 495, 496.)

Simpson and Soofi carried ISIS flags with them to Garland, manifesting their intent to spread the ISIS message and demonstrate its reach. (RT 2/18/16 371; Tr. Exh. 65.) Further, they pledged allegiance to Abu Bakr al-Baghdadi, the self-proclaimed ISIS Caliph ("Khalifa") minutes before the attack, and added a Twitter "hashtag," "#texasattack," in an apparent attempt to draw more attention to his tweet announcing the attack. (RT 2/26/16 1378-1379; Tr. Exh. 154.)

Simpson also posted a quote from Anwar al-Awlaki, "We have chosen the path of WAR in order to defend ourselves from your oppression. God Willing, we will continue with this war and you will find us persistent." (Tr. Exh. 157 at 16.) The war al-Awlaki

referenced was the war between Islam and the West, including the United States government. (RT 3/1/16 1637, 1639-1640, 1642-1643; Tr. Exh. 177, 182.)

Another of Simpson's tweets showed a fist punching through a United States flag. (Tr. Exh. 157 at 24.) Another was a re-tweet of "A Message Signed with Blood to the Nation of the Cross," a clear reference to the United States, depicting the execution of Libyan soldiers who had been taken captive. (Tr. Exh. 157 at 39.)

Kareem admitted he knew Simpson and Soofi wanted to travel to the Middle East to join ISIS. "I heard them say stuff, but I never, I don't know what they, they basically was talking about leaving, do you know what I mean? But I, they basically were going to get out of here and go to the Dola [al Dawla – 'The State'], but I don't know where that's at, you know what I mean?" (Tr. Exh. 411.) Other exhibits, however, revealed Kareem was seeking to assist Simpson in his quest to be able to travel overseas. (RT 2/26/16 1436-1438, 1480-1482; Tr. Exhs. 190, 350.)

D.    The Conspirators' Conduct and Statements Show the Conspiracy was Calculated to Influence or Retaliate Against Government Conduct

"The terrorism enhancement applies so long as [the conspirators'] conduct was 'calculated . . . to retaliate against government conduct,' even if it was also calculated to accomplish other goals simultaneously." *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (quoting 18 U.S.C. § 2332b(g)(5)(A)); see also *United States v. Stein*, 985 F.3d 1254, 1267 (10th Cir. 2021) (applying enhancement in case involving attack against Muslims living in apartment complex based on acts and statements indicating conspirators' desire to influence government conduct); *United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010). "[T]the terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation." *United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004). "[I]t is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered." *Id*.

"Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, i.e., planned – for whatever reason or motive – to achieve the stated object." *Awan*, 607 F.3d at 317 (2d Cir. 2010). In this case, Kareem was convicted of a conspiracy to provide material support to ISIS through a violent terrorist attack in ISIS's name. As § 3A1.4 dictates, the question is whether the conspiracy was calculated to influence or affect the conduct of government, or to retaliate against government conduct.

"In cases involving violent acts of terrorism, specific intent is relatively easy to identify, either from the statements or admissions of the defendant or the nature of the offense." *Alhaggagi*, 978 F.3d at 701. In *Alhaggagi*, the court overruled the imposition of the terrorism enhancement in a case involving creation of social media accounts on behalf of ISIS. *Id*. at 702-04. In reaching its conclusion, the court noted the significant difference in inferring intent in cases involving non-violent conduct. "In other words, one can open a social media account for a terrorist organization without knowing how that account will be used; whereas it is difficult to imagine someone bombing a government building without knowing that bombing would influence or affect government conduct." *Id*. at 702. Similarly, it is difficult to imagine someone attempting to kill a large number of people in a public place without knowing such conduct will influence or affect government conduct.

Similarly, the court in *Alhaggagi* noted the absence of findings that the defendant opened the social media accounts for the purpose of retaliating against government conduct or posted messages in the accounts demonstrating retaliatory intent, or knew how ISIS sympathizers would use them. *Id*. at 704. The court found ISIS's conduct in using the accounts was insufficient evidence of the defendant's intent in opening them. *Id.*

In this case, the attack targeted civilians attending a contest that was offensive to Muslims. That said, the attack was not merely retaliation against the people at the contest. It was a violent attack in the name of ISIS against the freedom of speech guaranteed by the First Amendment – in essence, retaliation against one of the foundational principles of freedom in the United States Constitution. Our courts enforce the constitutional guarantee

of freedom of speech, and ISIS and similarly-minded individuals seek to attack the United States in order to convince our government not to enforce that guarantee. (*See* Tr. Exh. 155) ("If there is no check on the freedom of your speech, then let your hearts be open to the freedom of our actions #GarlandShooting #TexasAttack"); Tr. Exh. 157 at 51, 52 (Miski tweet referring to Charlie Hebdo attack and noting, "If only we had men like these brothers in the #States, our beloved Muhammad would not have been drawn."); RT 3/9/16 2510 (testimony of defense expert Marc Sageman noting Awlaki speech, The Dust Will Never Settle Down (Tr. Exh. 271), calls for terrorist violence to protest free speech)).

Further, the attack served as a call-to-arms to like-minded people to conduct terrorist attacks in the United States in the name of ISIS. (RT 2/26/16 1378-1383; Tr. Exh. 154, 155.) *Cf. Stein*, 985 F.3d at 1267 (defendants were motivated by anti-Muslim sentiment, but also sought to influence or retaliate against government conduct as evidenced by manifesto).

Moreover, the Garland attack was but one of the objects of the conspiracy – the conspirators also sought to attack a United States military base. That alone demonstrates an intent to influence or affect the conduct of government or to retaliate against government conduct.

The object of the conspiracy in this case was to provide material support to ISIS, a terrorist group that aimed to draw Western governments into a final, apocalyptic battle. The evidence described above showed Kareem espoused the same beliefs. Further, Kareem's expressions of hatred toward the United States and his desire for revenge against United States military members further demonstrated that Kareem, like Simpson and Soofi, sought to influence the actions of and retaliate against the United States government for its military actions in the Middle East. Even the defense expert declared people are drawn to join ISIS and other terrorist organizations "because they see usually on Fox News or CNN Muslims being bombed by barrel bombs and they are absolutely outraged. And so they kind of want to go and defend their own compatriots abroad . . . ." (RT 3/9/16 2540; *see also* RT 3/9/16 2542, 2563.)

All of the foregoing evidence demonstrates by a preponderance of the evidence (and indeed, by any standard) that the conspirators in this case conspired to provide material support to ISIS and that their conduct was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Therefore, the terrorism enhancement in § 3A1.4 applies.

### III. ALTERNATIVE MOTION FOR UPWARD DEPARTURE

In the event the Court finds § 3A1.4 inapplicable because the evidence does not establish to a sufficient degree the conspirators' intent to influence or retaliate against government conduct, the government respectfully submits an upward departure is appropriate under the facts of this case. Section 3A1.4 provides an invited upward departure for cases in which the facts do not demonstrate intent to influence or retaliate against government conduct, but nevertheless involve intent to coerce a civilian population.

> [T]here may be cases in which . . . the offense involved, or was intended to promote, one of the offenses specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B), but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. In such cases an upward departure would be warranted, except that the sentence resulting from such a departure may not exceed the top of the guideline range that would have resulted if the adjustment under this guideline had been applied.

U.S.S.G. § 3A1.4 cmt. n.4.

The evidence introduced at trial in this case demonstrates under any standard of proof that the conspirators (in addition to their intent to influence or retaliate against government conduct) sought to intimidate and/or coerce a civilian population – the people who attended the Garland contest, and anyone else considering whether to draw the Prophet Muhammad. Therefore, an upward departure under the express terms of Application Note 4 is appropriate in the event the Court determines § 3A1.4's terrorism enhancement does not apply. The government respectfully requests the Court upward depart one or three levels (depending on the application of § 3C1.1) to Level 43 on this basis.

# IV.    CONCLUSION

Based on the foregoing, the United States respectfully requests the Court impose the two-level upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1, and impose the terrorism enhancement in § 3A1.4, resulting in a Total Offense Level of 43 with a Criminal History Category of VI, with resulting guideline range that is the combined statutory range of imprisonment, 420 months.  Alternatively, the government requests the Court upward depart to Level 43.

Further, the United States respectfully recommends the Court impose the statutory maximum sentences of five years of imprisonment on Count 1, five years of imprisonment on Count 3, ten years of imprisonment on Count 4, and 15 years of imprisonment on Count 5, all run consecutively for a combined sentence of 35 years (420 months).

Respectfully submitted this 1st day of October, 2021.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

*s/Kristen Brook*
*s/Joseph E. Koehler*
KRISTEN BROOK
JOSEPH E. KOEHLER
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of October, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and that true and accurate copies have been transmitted electronically to counsel for the defendant via the ECF system.

Daniel Maynard and Daniel Drake, Attorneys for Defendant

By:  /s Joseph E. Koehler