Daniel D. Maynard, No. 009211
**MAYNARD CRONIN ERICKSON & CURRAN, P.L.C.**
3200 North Central Avenue, Suite 1800
Phoenix, Arizona 85012
(602) 279-8500
dmaynard@mmcec.com

Daniel R. Drake, No.003781
**DRAKE LAW, PLC**
4340 East Indian School Road, Suite 21-113
Phoenix, Arizona 85018
(602) 881-5341
drakelawplc@gmail.com

Attorneys for Defendant

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>        Plaintiff/Respondent,<br><br>v.<br><br>Abdul Malik Abdul Kareem,<br><br>        Defendant/Movant. | 2:15-cr-00707-SRB<br><br>**SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE AND/OR DEPARTURE PURSUANT TO 18 U.S.C. § 3553(a) AND 5K2.0 OF THE SENTENCING GUIDELINES** |

Defendant, Abdul Malik Abdul Kareem ("Abdul Kareem"), through his undersigning counsel, files the following Sentencing Memoranda and Motion for Downward Variance and/or Departure pursuant to Title 18 U.S.C. § 3553(a) and 5K2.0

1

of the United States Sentencing Guidelines ("Guidelines"), and clarified by the United States Supreme Court's decisions and due to the disparity in the sentence compared to others that have been convicted and sentenced in related cases or in cases involving similar facts. He respectfully requests that this Court impose a sentence of no more than ninety (90) months. In support of this motion, Abdul Kareem submits the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND

Abdul Kareem was found guilty of Conspiracy to Transport Firearms and Ammunition in Interstate Commerce with the Intent to Commit a Felony, Aiding and Abetting the Transportation of Firearms and Ammunition in Interstate Commerce with the Intent to Commit a Felony, Making False Statements to the Federal Bureau of Investigations, Felon in Possession of a Firearm, and Conspiracy to Provide Material Support or Resources of a Designated Foreign Terrorist Organization, after a five week trial. Since the time of his prior sentencing, Abdul Kareem learned that the FBI had Simpson under surveillance for weeks prior to the Garland attack including surveillance 24 hours a day in the week prior and the FBI installed a pole camera outside his residence to view him 24 hours a day every day. At no time was Abdul Kareem seen with Simpson

2

during this surveillance. Abdul Kareem filed a motion for a new trial and the court granted the motion as to Count 2 which the government then dismissed.

Prior to this incident, Abdul Kareem had little criminal history. He has never been convicted of a violent crime, rather his only convictions are for disorderly conduct and driving under the influence. Further, Abdul Kareem's last conviction was in 2004. Since that time, Abdul Kareem had been a productive member of society. He had been steadily employed since he was 16 years old. He had started and operated three small businesses and provided employment to many people in need. Not only had he provided employment, but he had also provided housing and food to numerous people as testified to by his brother and others at his trial.

Prior to this conviction, Abdul Kareem maintained a very close relationship with his large extended family of siblings and half-siblings and prior to his incarceration, spoke with his mother and his brother, James Sampson, nearly every day. In fact, prior to Abdul Kareem's arrest in the instant case, his mother was planning on moving from Philadelphia to Phoenix to live with Abdul Kareem. Abdul Kareem had taken in two of his nephews and allowed them to live with him when they needed a place to live and provided them with jobs. At the time of his arrest, one of his nephews was working for him and living with him.

3

While he was raised in a Baptist household, Abdul Kareem converted to Islam in 2011. He was drawn to Islam because he believes it to be a peaceful religion and he was drawn to the sense of community that it provides. Prior to the time of the instant charges, Abdul Kareem had never been accused of radical or violent thinking by anyone much less acts of violence. Those who are close to Abdul Kareem report that his view of Islam was that it is a peaceful, inclusive, and loving religion.

Because of the nature of the charges and the evidence before the Court are different from when he was originally sentenced in 2017, it bears touching upon the record as it now stands. Because the government dismissed Count 2 of the indictment, there is no allegation or evidence directing linking Abdul Kareem to the actual execution of a scheme to attack the Draw the Prophet Mohammad Contest (the Contest). The evidence, taken in the light most favorable to the government, is that Abdul Kareem knew of the contest and discussed it with others, which he denies. That Mr. Kareem provided the firearms involved months prior to the attack on the Contest and before it had even been announced, which he denies. Further, the evidence, especially since we have learned that the FBI had Simpson under surveillance, shows that Abdul Kareem did not help Simpson and Soofi organize for the attack on the Contest and load their vehicle before they left for Texas. Nor was he involved in conveying Simpson's farewell note, title and

keys to his vehicle which was done to pay back money given to him to use for the another purpose. To do that, Simpson relied on Abdul Khabir Wahid not Abdul Kareem.

In essence, the evidence shows Abdul Kareem was not a part of the final plans and preparation for the attack on the Contest. Perhaps, not sufficient to establish a legal defense of withdrawal from the wide-ranging conspiracy framed by the government, the evidence as it now stands shows Abdul Kareem was not an active participant in carrying out the attack on the Contest.

## II. MOTION FOR DOWNWARD DEPARTURE AND OR VARIANCE AND ARGUMENT FOR BEING SENTENCED AT LOW END OF THE GUIDELINE RANGE

### A. The Guideline Sentence Conflicts with 18 U.S.C. § 3553(a)'s Directive to Impose a Sentence "Sufficient but no Greater Than Necessary"

In *Kimbrough v. United States*, 552 U.S. 85 (2007), the Supreme Court reasserted its holding set forth in *United States v. Booker*, 543 U.S. 220 (2005) and *Rita v. United States*, 551 U.S. 338 (2007), that the United States Sentencing Guidelines are only one of several 18 U.S.C. § 3553(a) factors to be considered by the sentencing court in its effort to impose a "just and reasonable" sentence. The district courts must treat the Guidelines as the "starting point and the initial benchmark" when sentencing a defendant. 552 U.S. at 108. In fact, the Guidelines are not only no longer mandatory, they are also not presumed reasonable. *Nelson v. United States*, 555 U.S. 350, 352 (2009). The Supreme Court found that a sentencing court has the discretion, after considering relevant

sentencing factors, to disagree with the Guidelines' "rough approximation" and impose a sentence that is "sufficient but not greater than necessary, to comply with the purposes" of sentencing. *Rita*, 551 U.S. at 351. *See also United States v. Davenport*, 445 F.3d 366,370 (4th Cir. 2006)(quoting *United States v. Foreman*, 436 F.3d 638, 644 n.l (6th Cir. 2006). The Supreme Court recognizes that the sentencing judge has greater familiarity with the individual case and the individual defendant before him and is in a superior position to find facts and judge their import under 18 U.S.C. § 3553(a) in each particular case. *Kimbrough*, 552 U.S. at 109. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 98 (1996).

When *Booker* made the Guidelines only one of a number of factors to be considered at sentencing by the district court, the door was opened to consider mitigating factors previously discouraged or prohibited from consideration by the Guidelines. *See*, e.g., *Rita*, 551 U.S. at 351; *United States v. Chase*, 560 F.3d 828 (8th Cir. 2009)(holding that "departure precedent does not bind the district courts with respect to variance decisions..."). 18 U.S.C. § 3553(a) directs that the sentencing court consider the "nature and circumstances of the offense and the history and characteristics of the defendant in

6

order to impose the appropriate sentence. 18 U.S.C. § 3553(a). The sentence should be "sufficient, but not greater than necessary to comply with the purposes set forth... [therein]." *Id*.

Abdul Kareem offers the following in the way of 18 U.S.C. § 3553(a) factors that support his request for a downward variance from the applicable Guidelines range as determined by this court to arrive at his requested sentence of no more than 90 months.

**B. The History and Circumstances of the Defendant Warrant a Downward Departure or Variance.**

**1. Family Support**

Congress found that prisoners cite family support as the most important factor in helping them stay out of prison. (42 U.S.C. § 17501(b)(7)). Abdul Kareem has a loving family that support him. He is extremely close to his mother and before he was arrested, he was in contact with her numerous times a week and she continues to support him and love him. She lives in Philadelphia but visited Phoenix to see him while he awaited sentencing and has called his attorney and him numerous times to check on him and his condition. Abdul Kareem's mother wrote a letter in support stating in simple prose the unconditional love and support she has for her son. Several of his siblings wrote letters of support that express their love for Abdul Kareem. The letters of support from his

friends and family members speak of a kind, good hearted human who helped those in need and fed people when they were hungry and provided them with jobs.

After he was committed to the BOP Abdul Kareem has continued to often speak with his mother. The FBI reviewed Abdul Kareem's phone calls after he was alleged to have sought to kill the prosecutors and his attorney, allegations that have no merit, his phone logs show that he often speaks to his mother and a review of the calls reveal nothing nefarious.

His family continues to support him and believe in him based upon their history with him. Certainly, the differences in the conditions of his upbringing and where he was raised and his continued family support should be taken into consideration in sentencing pursuant 18 U.S.C. § 3553 and to 5K2.0(a)(2)(A) and (B).

## 2. **Low Risk of Recidivism**

In sentencing the Court is required to impose a sufficient sentence but no greater than necessary to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Abdul Kareem's low risk for recidivism weighs in favor of the Court exercising its discretion in applying a downward variance or departure. The U.S. Supreme Court described "the likelihood that [the defendant] will engage in future criminal conduct" as "a central factor that sentencing courts must consider." *Pepper v. U.S.*, 562 U.S. 476, 478 (2011).

Empirical data has established age at sentencing and criminal history category are significant factors in predicting whether an individual will reoffend.  *See* United States Sentencing Commission, *Measuring Recidivism:  Criminal History Computation of the Federal Sentencing Guidelines* (2004), available at https://www.ussc.gov/research/research-publications/measuring-recidivism-criminal-history-computation-federal-sentencing-guidelinesm, last visited October 8, 2021.   The data has demonstrated that the older an offender is at sentencing and the lower their criminal history category, the likelihood that they reoffend dramatically decreases.  *Id.* Given that Abdul Kareem is 50 years old and his Criminal History level is two, he is amongst the least likely to reoffend.

It is unsurprising that Abdul Kareem falls into a category of offenders least likely to reoffend given how aberrant the behavior for which he was convicted is compared to the rest of his life.   Prior to these allegations, Abdul Kareem lived for 50 years with no history of exhibiting radical or terrorist ideology nor was he ever convicted for a violent crime.  The crimes for which he was convicted are in stark contrast to the life he has led, therefore it is highly unlikely to occur again.

Further, while Abdul Kareem disputes the evidence, the crime for which Abdul Kareem was convicted occurred within a set of circumstances that have ceased to exist. Abdul Kareem lived his entire life without an accusation of radicalism against him until

he associated with Simpson. It is clear from the evidence that Simpson was the instigator of this crime with a long history of radical thinking and attempts to do violence on behalf of that radical thinking. Simpson and Soofi were clearly the primary actors in this crime where the evidence presented, at best, established Abdul Kareem as an minimal participant. Given that Simpson and Soofi are deceased, any influence they allegedly had no longer exists and it is highly likely Abdul Kareem will continue to live a law abiding life.

### 3. Solitary Confinement

18 U.S.C. § 3553 requires that the "court shall impose a sentence sufficient, but not greater than necessary" to achieve its purposes. Amongst these purposes is to provide just punishment for the offense, afford adequate deterrence, protect the public, and provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* The conditions under which Abdul Kareem has been and will be incarcerated warrant a downward variance to avoid a sentence that is greater than necessary to achieve the objectives of 18 U.S.C § 3553.

Abdul Kareem was arrested on June 10, 2015. From that day on he spent nine months awaiting trial in solitary confinement in unimaginable conditions. He was confined to a small windowless cell for 23 hours a day. The cell was equipped with only a twin size bed with a thin threadbare mattress, a shower, toilet and sink. His only means

of determining if it was day or night was by the timing of the meals he was given.  He was never permitted to go outside, and was allowed only one hour a day to go into a second windowless room.  His only human contact was with guards giving him meals and his attorneys.  He was allowed no visits and was only permitted to make phone calls during his allotted one hour a day.  The inability to see outside his cell enhanced his sense of isolation and he had no access to television, radio, newspapers, or magazines.  When he asked for a Quran, he was initially given a Bible by the guards.

While in prison inmates have alleged that he sought to kill his attorneys and the prosecutors but after a thorough investigation no charges were brought nor any punishment imposed by the BOP.  Due to his notoriety he is the victim of schemes by inmates looking to obtain favorable treatment.

While awaiting resentencing he was placed in a special housing unit because he told the guards his cellmate was bringing in drugs.  He has been publicly humiliated, disgraced, has lost his business and his ability to make a living wage.  Further, the F.B.I. alleged that Abdul Kareem had ties to the Black Panther Party despite the fact that not a shred of evidence to this effect was produced in discovery or introduced at trial and yet he was designated as a member of the Black Panther Party while at CCA Florence which limited his movements and activities.  This designation was eventually removed.

Because of the conditions of his incarceration, Abdul Kareem's punishment is more severe than the average offender. A lengthy period of incarceration under these severe conditions is greater than necessary to achieve the objectives of 18 U.S.C. 3553.

## C. The Nature and Circumstances of the Offense Warrant a Downward Departure or Variance.

While Simpson and Soofi committed a serious crime, this Court should consider the minimal role Abdul Kareem played in the conspiracy. While Abdul Kareem continues to deny any involvement in the conspiracy, at best the evidence at trial supported that Abdul Kareem was minimally involved and withdrew from the conspiracy.

Under 18 U.S.C. § 3553(a), the Court may consider factors not ordinarily deemed relevant by the Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38. In *Gall*, the Court upheld a downward variance based in large part on withdrawal from the conspiracy even though withdrawal from conspiracy is not a factor ordinarily considered under the Guidelines. *Id*.

The single most important and uncontroverted fact established at trial was that Abdul Kareem did not travel to Garland, Texas nor did he participate in the attack. While the attack was occurring, Abdul Kareem was 1,000 miles away working for his moving business. While witnesses testified that Abdul Kareem had possible knowledge of Simpson and Soofi's desire to do harm at the Draw Muhammad Contest, there was no

12

evidence that Abdul Kareem knew any details of the plan or took any steps to go to Texas to participate in the attack. The testimony at trial supports the conclusion that he was shocked and surprised by the attack. There were no texts or communications from Simpson or Soofi in the days before the attack to Abdul Kareem. Abdul Kareem requests this Court consider this along with his minimal participation in the conspiracy as outlined below, in support of a downward variance in his sentence.

**D.** **The Nature of the Offense Falls Outside the Heartland of Cases to Which the Federal Guideline Range Describes Therefore a Downward Departure is Warranted.**

Abdul Kareem moves for a downward departure pursuant to 5K2.0(a)(2)A) and (B), which provide that the Court can depart downward if there is a factor not adequately taken into consideration by the Sentencing Commission or in exceptional cases in which there is present a circumstance that the Sentencing Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence. Alternatively, he argues for being sentenced to the low end of the guideline range.

Chapter 1, Part A(b) of the Federal Sentencing Guidelines Manual states that sentencing courts are to treat each guideline as carving out a "heartland" which is a set of typical cases embodying the conduct that the guideline describes. "When a court finds an atypical case, one to which a particular guideline linguistically applies but where

conduct significantly differs from the norm, the court may consider whether a departure is warranted." Section 5K2.0(a)(4) states "a departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of an offense."

The sentencing court may consider disregarding the Guidelines sentence where the case falls outside the "heartland" to which the Commission intends individual Guidelines to apply. *Rita v United States*, 551 U.S. 338, 351 (2007).

Here, the offense for which Abdul Kareem was convicted falls outside the "heartland" of cases applicable to the guideline range. The instant case is extremely unusual, in that Abdul Kareem has no ties to ISIS or any other terrorist organization. There was no evidence submitted or admitted at trial of Abdul Kareem meeting with, texting or communicating with ISIS recruiters or members. In contrast to Simpson, there is no evidence that he communicated with anyone from ISIS nor did he pledge allegiance to ISIS. Unlike Simpson, Abdul Kareem did not attempt to travel to a foreign country to fight on behalf of a terrorist organization. Most importantly, Abdul Kareem did not participate in the attack in Garland, Texas. Given the minimal and attenuated role Abdul

Kareem was convicted of playing in the offense, this case falls outside the heartland to which Guidelines apply.

### III.   MOTION FOR DOWNWARD DEPARTURE BASED ON MINIMAL ROLE IN THE OFFENSE.

§ 3B1.2 of the Sentencing Guidelines provides adjustments downward to the offense level based upon Abdul Kareem's role in the offense.  §3B1.2(a) provides for a downward decrease in the offense level by 4 levels if the Defendant was a minimal participant in the offense and §3B1.2(b) provides for a decrease of 2 if the role is minor.  Clearly both are subjective standards.  §3B1.2(a) is intended to "cover defendants who are plainly among the least culpable of those involved in the conduct of the group."  *U.S. Sentencing Guidelines Manual § 3B1.2(a), cmt. n. 4 (2013)*.  The relevant comparison is between the defendant's conduct and that of his co-participants, not between the defendant's conduct and that of the hypothetical "average participant" in the type of crime charged.  *United States v. Petti*, 973 F.2d 1441 (9th Cir. 1992), *cert. denied*, 123 L. Ed. 2d 480 (1993).

The evidence presented at trial established that Abdul Kareem was a minor or minimal participant in the criminal activity and thus his offense level should be decreased as was argued in Abdul Kareem's objections to the PSR.

15

The facts presented at trial demonstrated a stark contrast between the role of Simpson and Soofi and the role that Abdul Kareem played in the Garland event. Abdul Kareem was certainly the least culpable of the group. The evidence presented shows that Simpson and Soofi, not Abdul Kareem, planned, promoted, and executed the attack. They communicated with known terrorists to deepen their resolve. They then armed themselves with three assault rifles, three handguns, two bullet proof vests, and hundreds of rounds of ammunition and drove over 1,000 miles to Garland, Texas. They pledged allegiance to the leader of the Islamic State publicly on Simpson's twitter account.

By contrast, while Simpson and Soofi were attempting the attack, Abdul Kareem was over 1,000 miles away working for his company doing a moving job. By every account, he did not arm himself, travel to Texas, pledge allegiance to the Islamic State, or fire a single shot. There is no evidence that Abdul Kareem planned any part of the attack nor that he led Simpson and Soofi into this kind of extremist thinking.

It seems clear from the evidence at trial that Simpson was the instigator and ideological leader behind the crime. Simpson had been espousing extremist ideology and expressing his desire to commit violence at least six years prior to the Garland event. He was prosecuted for terrorism related charges in 2010 during which the investigation revealed recorded statements that he made discussing his desire to go fight on behalf of his terrorist views. He had eight Twitter accounts through which he constantly

16

communicated with known terrorists and publicly announced his intentions regarding the Draw Muhammad Contest in Garland Texas. By contrast, the investigation into Abdul Kareem revealed nothing of that nature.

The only evidence presented at trial that Abdul Kareem conspired with Simpson and Soofi were the allegations that Abdul Kareem provided money to buy one of the six firearms and/or one box of the hundreds of rounds of ammunition that Simpson and Soofi brought with them to Garland, Texas. This is the greatest extent of Abdul Kareem's involvement that is supported by any evidence. It is important to note, aside from the one firearm and one box of ammunition attributed to Abdul Kareem, Simpson and Soofi took five other firearms and thousands of other rounds of ammunition to perpetrate the Texas attack. Thus, even if Abdul Kareem played no role at all and provided nothing to Simpson and Soofi, the attack would have occurred in virtually the same manner. Abdul Kareem's purported role was inconsequential. Based on the evidence presented at trial, Abdul Kareem's role can be seen as a minor or minimal participant in the conspiracy. Simpson and Soofi were the perpetrators of the crime and the evidence presented at trial showed that Abdul Kareem's role was substantially less. The evidence presented at trial warrants Abdul Kareem receiving a downward reduction for a minor or minimal role in the crime.

**IV.** **THE COURT SHOULD NOT APPLY THE ENHANCEMENT ACCORDING TO U.S.S.G. § 3A1.4.**

For purposes of the Guideline § 3A1.4, the "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5) and has two components. The first (A) "is calculated to influence or affect the conduct of government by intimidation or coercion, or retaliate against government conduct;" and (B) is a violation of various enumerated statutes. The first element is not present in this case. The attack upon the Contest was an attack on private individuals who were putting on or attending the Contest. Any argument that it was calculated to influence or affect the conduct of government is a tortured description of what happened. This was an attack against individuals and not the government.

This issue was recently dealt with in *United States v. Alhaggagi*, 978 F.3d 693 (9th Cir. 2020). The parties agreed and the court held that it was the government's burden to prove the first element or prong of the statute by clear and convincing enhancement due to the severity of the enhancement. *Alhaggagi*, 978 F.3d at 700-701. The 9th Circuit found that the defendant must have the intent required to trigger the terrorism enhancement pursuant to U.S.S.G. § 3A1.4, that the offense "influence or affect the conduct of government by intimidation or coercion." *Alhaggagi*, 978 F.3d at 701. The 9th Circuit's reasoning is similar to that used by the 2nd Circuit in *United States v. Stewart*,

18

590 F.3d 93 (2nd Cir. 2009).   The mens rea element of the enhancement has not been met here.

Additionally, this court may deviate from the Guidelines if the court expresses a reasonable policy disagreement with the particular provisions.  *United States v. Mitchell*, 624 F.3d 1023, 1030, (9th Cir. 2010).   This court should not apply the sentencing enhancement according to U.S.S.G. § 3A1.4 because it is draconian and inconsistent with the directives according to 18 U.S.C. § 3553 as applied to this case.

18 U.S.C. § 3553(a)(1) requires that the sentence reflects the nature and seriousness of the offense.  The sentencing guideline for the crime of which Abdul Kareem was convicted, Providing Material Support to a Foreign Terrorist Organization, already takes into account the fact that this crime is a federal crime of terrorism.  It is unfair to increase his offense level 12 levels and increase his Criminal History Category to VI based on an enhancement for conduct for which he is already being punished.

In order to find Abdul Kareem guilty of Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization, the jury was instructed that the government must prove 1) there was an agreement between two or more persons to provide material support to a ISIL 2) Abdul Kareem became a member of the conspiracy knowing of its unlawful object and intending to help accomplish it 3) that ISIL was a designated foreign terrorist organization at the time of the conspiracy and 4) Abdul

19

Kareem knew that either ISIL was a designated foreign terrorist organization or that ISIL has engaged or was engaging in terrorist activity. (See Doc. 287, Final Jury Instruction, p. 14). It is, therefore, inherent in the charge that the crime involved or was intended to promote terrorism. The guideline range for that crime reflects the entirety of the conduct and Abdul Kareem should not be punished twice for the same conduct. To do so would not fairly reflect the nature and circumstances of the offense.

18 U.S.C. § 3553(a)(1) also requires that court to consider "the history and characteristics of the defendant" in its sentencing determination. Abdul Kareem's history dictates that he should be in Criminal History Category II. If U.S.S.G. § 3A1.4 were applied, Abdul Kareem's Criminal History Category would increase to VI, therefore treating him as though he were a career offender. This completely disregards the history and characteristics of the defendant and applies a 4 level increase in his Criminal History Category based on no evidence whatsoever. Because the application of § 3A1.4 of the Federal Sentencing Guidelines would be inconsistent with the objectives of 18 U.S.C. § 3553 and fundamental fairness, this Court should not apply the enhancement.

V.     **DISPARITY.**

Also available to the Court now are the sentencings in related cases involving Abdul Khabir Wahid and Erick Jamal Hendricks and the sentencing of Enrique Marquez Jr., in a case with similar facts, who was charged in connection with a December 2015

attack on the Inland Regional Center in San Bernardino, California, by a husband and wife team who were killed shortly following the attack. Counsel does not have access to the presentence reports in those cases, but we do have access to the public record. The public record shows that Abdul Kareem received a sentence more harsh and out of line with the sentences imposed on others in two related cases, and out of line with an unrelated case that is almost on all fours with this case. Wahid received 67 months, Hendricks 180 months, and Marquez Jr 240 months.

### 1. U.S. v. Abdul Khabir Wahid, 17-cr-00360, District of Arizona

There are two cases related to the attack carried out by Simpson and Soofi. The first is an Arizona case involving Abdul Khabir Wahid ("Wahid"), CR 17-0360-JJT.

Wahid was charged with making a false statement, 18 U.S.C. §1001(a)(2), and Witness Tampering, 18 U.S.C. §1512(b)(3). The first charge related to Wahid's concealment of the fact that Simpson gave him an envelope and a key during a May 1, 2015, visit by Simpson to Wahid's home, and that Simpson gave him instructions to deliver the envelope and key to another individual three days after the scheduled date of the Contest. CR 17-cr-00360 Doc. 3, Count 1. The second charge was based upon Wahid advising Ali Soofi, a primary witness against Abdul Kareem, not to cooperate with the FBI regarding the investigation of the attack on the Contest. Wahid chose to represent himself at trial.

21

Much of the evidence in Wahid's case was the same as in Abdul Kareem's. The government used many of the same witnesses and exhibits.

Other witnesses were called in Mr. Kareem's trial, but here is the overlap in the witnesses called at Wahid's trial:

| Witnesses | Testified in Abdul Kareem's case, Doc. 294 | Testified in Abdul Wahid's case, Doc. 164 |
|---|---|---|
| Brian Marlow | XX | XX |
| Robert Meshinsky | XX | XX |
| Greg Neville | XX | XX |
| Jason Saitta | XX | XX |
| Ali Soofi | XX | XX |
| Amy Vaughan | XX | XX |
| Stewart Whitson | XX | XX |
| Greg Stevens | XX | XX |

Attached as Exhibit 1 are the first three pages of the exhibit list for Wahid's trial, Doc. 165, showing nearly 50 exhibits the Court will recognize from Mr. Kareem's trial. (Exhibit 1, Doc 165, Witness List, pp. 1-3)

The government argued that Wahid should receive a 262-months sentence, which would have been the low end of the Guidelines if a statutory maximum were imposed on each count and the sentences ordered to run consecutively. Judge Tuchi reasoned the terrorism enhancement applied to false the statement count because it had been pled, but not to the witness tampering count because it was not alleged. (Exhibit 2, Doc. 318,

Sentencing Transcript, pp. 29-31.)  He was also concerned that the application of the adjustment was "the tail wagging the dog."  (Exhibit 2, p. 29.)

Rather than follow the Guidelines and the government's suggestion of maximum sentences running consecutively, Judge Tuchi imposed a sentence of 67 months on each count and ordered them to run concurrently. (Exhibit 2, p. 66.)  He felt that the sentence was sufficient but not greater than necessary, to carry out the sentencing purposes of § 3553(a).

**2.  U.S. v. Hendricks, 1:16-cr-00265, Northern District of Ohio**

The second case involves Erick Jamal Hendricks ("Hendricks") who was arrested on a complaint filed in August 2016.  (Exhibit 3, Doc. 1 and Affidavit Doc 1-1.) According to its terms, the Affidavit was intended to provide probable cause to believe that during a three-month period ending on May 31, 2015, Hendricks conspired to provide material support to a foreign terrorist organization, ISIL, in violation of 18 U.S.C. § 2339(a)(1), and conspired to provide material support and performed overt acts in the Northern District of Ohio.  (Doc. 1-1 p.2).

The affiant describes Hendrick's efforts to recruit members for Jihadi activity on behalf of ISIL.  (Doc. 1-1, p 13).  Hendricks communicated with an undercover agent and at least three confidential sources about recruiting members for a cell to support ISIL in the United States.  (Doc. 1-1, p. 12).  The Affidavit continues to describe Hendricks's

connections to a perpetrator of the attack on the Contest. (Doc. 1-1 p. 24). It points to a posting by Simpson of a reference to the Contest on April 23, 2015, about 10 days prior to the attack. (Doc. 1-1 p.24). Hendricks encouraged an undercover agent to travel to Garland, Texas, connect with Simpson if he could, and "make his voice be heard," a reference the undercover agent told the jury that he understood to mean "make an attack" on the contest. (Exhibit 4, Doc. 92, Trial Transcript 3/9/18, p. 1005). According to the Affidavit, the undercover agent traveled to Garland and watched Simpson and Soofi get out of their car and begin shooting at the Contest.

Although the government had the bulk of this information prior to the May 3, 2015 attack, it did not file charges against Hendricks until August 2016, more than one year later and after the trial in Abdul Kareem's case concluded. Nor did it share any of this information with the defense in Abdul Kareem's case before or during his trial.

Prior to trial the defense in the Hendricks case sought to preclude the introduction of evidence concerning the Garland attack. (Exhibit 5, Doc. 65, Defendant's Motion in Limine). It reasoned that the evidence was unrelated to charges that Hendricks sought to establish a cell to support ISIL. (Exhibit 5, p. 1). The government argued that the two cases were related, and the evidence of the attack by Simpson and Soofi was part and parcel of a common plan. (Exhibit 6, Doc. 78, Government's Response to Defendant's

Motion in Limine, pp. 3-13).  The district court accepted the government's position and denied the motion in limine.

At the opening of the trial the government prosecutor, an attorney from the U.S. Department of Justice National Security Division, told the jury that Hendricks "was inextricably entwined" in the Garland attack.  (Exhibit 7, Trial Tanscript 3/8/18, pp. 622-23). The government called several of the same witnesses that had testified for the government at Abdul Kareem's trial (Brian Marlow, Jason Saitta, and Amy Vaughan), and offered much of the evidence from Abdul Kareem's trial.  (See Exhibit 6, p. 17).

Notwithstanding Hendrick's connection to the Garland attack and his considerable efforts to recruit members for a terrorist cell, the court sentenced him to half the sentence of Abdul Kareem – 180 months.  (Exhibit 8, Doc. 152, Judgment, p. 2).

### 3. U.S. v Enrique Marquez Jr, Case 5:15-cr-00093, Central District of California

The case involving Enrique Marquez Jr. ("Marquez Jr") resulted in the death of 14 yet resulted in a much shorter sentence for Marquez Jr who was in a similar situation to Abdul Kareem.  The case involved a shooting and placement of a bomb at the Inland Regional Center ("IRC") in San Bernardino, California in December 2015.  The shooters in that case, a husband and wife Sayed Rizwan Farook and Tafsheen Malik, respectively, attacked a gathering and killed 14 individuals, fled the scene, and were then killed in a

shoot-out with police. (Exhibit 9, Doc. 1, Complaint p. 4.) Authorities discovered that the firearms used in the attack had been purchased by Marquez Jr. (Exhibit 9, p. 5.) Also they found smokeless powder similar to that used in the attack had been purchased by Marquez Jr while planning earlier contemplated attacks. In 2012 Marquez had planned with one of the shooters to make earlier attacks, but those plans had not been carried out, other than to purchase firearms, ammunition, and other tactical gear, as well as going to local firing ranges. (Exhibit 9, pp. 3, 8-14, 15-20).

Marquez Jr was charged with conspiring to provide material support to a terrorist in violation of 18 U.S.C. § 2339A(a), and four other counts including two counts of false statements in the purchase of firearms, as he represented that he purchased the firearms for himself when he knew that was false. (Exhibit 10, Doc. 12, Indictment).

Marquez Jr entered into a plea agreement to two counts and Count 1 and Count 2 was sentenced to 240 months, 120 months on each, with the sentences to run consecutively. According to the government's objections to the presentence report, the report calculated an advisory Guidelines range of 300 months imprisonment. (Exhibit 11, Doc. 75, Government Objection to Presentence Report, p. 3). That range was arrived at by using a total offense level of 42 and a Criminal History of VI. (Exhibit 11, p. 3.) The offense level was based on the conviction for the conspiracy to provide material support charged in Count 1 resulting in a base offense level of 33, an adjustment of plus

12 levels as the offense was intended to promote a federal crime of terrorism under U.S.S.G. § 3A1.4, and a reduction of three levels for acceptance of responsibility as Marquez Jr entered a plea of guilty to Counts 1 and 2. These values resulted in an advisory Guideline range of 360 to life imprisonment, but that exceeded the statutory maximum of the offenses of conviction, thus the range of 300 months. (Exhibit 11, p. 3). Doc. 75. The government calculated that the proper advisory guideline range is life imprisonment. (Exhibit 11, p. 4).

The defense argued that the application of the adjustment was inappropriate because it was contrary to § 3553 individualized assessment, contrary to the proportionality review, and constituted an extreme overstatement of Marquez's criminal history. (Exhibit 12, Doc. 310, Sentencing Transcript 10/23/20, pp. 8-9).

The district court touched on the § 3553(a) factor, and imposed a sentence of 20 years, or 240 months. (Exhibit 12, pp. 68-72).

VI.     **SENTENCE REDUCTION DUE TO FBI MISCONDUCT.**

After the trial was completed it was twice discovered that the government had failed to turn over all relevant evidence. The first involved the government's failure to disclose the communications between an undercover FBI agent and Simpson about the Contest and the undercover agent being at the scene and observing the attack. Much of this information was used in the prosecution of Hendricks.

After Abdul Kareem was sentenced we learned that the FBI office in Phoenix had Simpson under surveillance for weeks prior to the Garland attack and at one point had him under surveillance 24 hours a day by multiple agents because the FBI believed he would commit an act of terrorism.  The FBI even put up a pole camera to monitor the entrance into Simpson's apartment.  This was not disclosed in a timely fashion.  This failure resulted in the court granting a new trial on Count 2 which the government then dismissed rather than go back to trial.

However, the court should consider a sentence reduction as remedial deterrence for this misconduct.  The government continues to seek a harsh sentence for Abdul Kareem. Foreign Terrorism cases appear to make carriers in the FBI and it was excited and happy after the second supersceding indictment charged Terrorism.  There must be a method to deter bad conduct that is short of dismissing the case.  Abdul Kareem and his counsel believe he is entitled to a new trial but in the alternative the court should consider giving a sentence reduction as a sanction against the government.  See *US v. Dicus*, 579 F.Supp. 2d 1142 (N.D. Iowa 2008); *Starr, Sonja "Sentence Reduction as a Remedy for Prosecutorial Misconduct*," Geo.L.J. 97 no. 6 (2009) 1509-66.

**VII.   <u>CONCLUSION</u>**

Recognizing that the Court cannot consider Abdul Kareem protestations of his innocence, it still should consider the facts presented at trial, the government's failure to

timely turn over evidence and the disparity in sentencing. He did not get found guilty of a crime of violence. Also, the facts produced at trial support that he was a minor or minimal participant. He did not go to Garland, Texas. He did not pledge allegiance to ISIS as was done by Soofi and Simpson. There was no evidence that he even had any communications with ISIS. Thus his sentence should be no more than 90 months.

RESPECTFULLY SUBMITTED this 8th day of October, 2021.

**MAYNARD CRONIN ERICKSON & CURRAN, P.L.C.**

By /s/Daniel D. Maynard
      Daniel D. Maynard
      3200 North Central Avenue, Ste. 1800
      Phoenix, Arizona 85012
      Attorneys for Defendant/Appellant

**DRAKE LAW, PLC**

By /s/Daniel R. Drake
      Daniel R. Drake
      4340 East Indian School Road
      Suite 21-113
      Phoenix, Arizona 85018
      Attorney for Defendant/Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 8, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing. I electronically

transmitted a copy to:  AUSA Joseph E. Koehler and AUSA Kristen Brook.  Additionally,

a copy was served upon Mr. Abdul Kareem by first class letter, postage prepaid, at:

Abdul Malik Abdul Kareem #44126-408

      /s/Rosalie Mobley
      Rosalie Mobley

30